## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR
## ENTRY OF INTERIM AND FINAL
## ORDERS (I) AUTHORIZING THE DEBTORS TO
## MAINTAIN AND ADMINISTER THEIR EXISTING
## CUSTOMER PROGRAMS AND HONOR CERTAIN PREPETITION
## OBLIGATIONS RELATED THERETO, (II) AUTHORIZING THE BANKS
## TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER
## REQUESTS RELATED THERETO, AND (III) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors") hereby file this motion (the "Motion") for the entry of interim and final orders,

substantially in the forms attached hereto as Exhibit A (the "Interim Order") and Exhibit B

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

(the "Final Order," and, together with the Interim Order, the "Proposed Orders"), (i) authorizing the Debtors to maintain, administer, and/or modify their customer-related programs as described in this Motion and honor certain prepetition obligations related thereto, (ii) authorizing the Debtors' banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing, and (iii) granting related relief. The facts and circumstances supporting this Motion are set forth in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] filed concurrently herewith. In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.        The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.        Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]    Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the First Day Declaration.

2

3.      The statutory and legal predicates for the relief sought herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1.

## BACKGROUND

4.      On November 3, 2024 (the "Petition Date"), each of the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Debtors are authorized to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

6.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

## RELIEF REQUESTED

7.      By this Motion, the Debtors seek entry of the Proposed Orders:  (i) authorizing the Debtors to maintain and administer their customer-related programs as described in this Motion and honor certain prepetition obligations, with cash payments related thereto up to $14.86 million on an interim basis and up to $16.26 million in the aggregate on a final basis, and (ii) granting related relief.

## CUSTOMER PROGRAMS

8.      As set forth in the First Day Declaration, the Debtors are a privately held operator and acquirer of franchised and franchisable businesses.  The Debtors' business segments include

a diverse collection of highly recognized, market-leading, and emerging retail brands, including: (i) The Vitamin Shoppe ("Vitamin Shoppe"), an omnichannel specialty retailer and wellness lifestyle company offering large varieties of vitamins, minerals, herbs, homeopathic remedies, and supplements, among others; (ii) Buddy's Home Furnishings ("Buddy's"), retail furniture chains that offer in-store and online sales of furniture, mattresses, new and out-of-box home appliances, and home accessories at discount prices; (iii) Pet Supplies Plus ("Pet Supplies"), an omnichannel pet supplies and services retail chains offering premium brands and proprietary label and specialty pet products, grooming, and pet washing services; and (iv) American Freight, retail furniture chains that sell quality furniture, mattresses, and home appliances at discounted prices. The Debtors operate both franchise and corporate-owned programs with respect to each of their business segments. Across all brands, the Debtors have over 2,200 total retail store locations, approximately 11,900 total employees, and operations spanning across the United States. Additionally, the Debtors buy directly from manufacturers and sell directly to customers through multiple online platforms.

9. Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors sought to maximize the value of their customer relationships and to develop and sustain a positive reputation in the marketplace through the implementation of certain accommodations to their customers (the "Customer Programs").[3] On account of the Customer Programs, the Debtors may owe certain obligations to their customers arising both before and after the Petition Date (collectively, the "Customer Obligations").

---

[3] Although this Motion is intended to be comprehensive, the Debtors may have inadvertently omitted individual promotion, incentive, discount, or accommodation offered to customers through the Debtors' Customer Programs. The Debtors request relief with respect to all Customer Programs, regardless of whether such Customer Program is specifically identified herein.

10.     The Customer Programs promote customer satisfaction, create goodwill for the Debtors' business, and enhance the value of their brands.  In the absence of certain Customer Programs, such as warranties, credits, promotions, and financing options, among others, the customers could turn to competitors for their various retail shopping needs.  The Debtors' failure to either honor their prepetition Customer Obligations or to continue the Customer Programs in the ordinary course during these Chapter 11 Cases will likely put the Debtors at a significant competitive disadvantage.  Retaining customers is critical to the Debtors' ongoing operations in these Chapter 11 Cases and is necessary to maximize the value of the Debtors' business for the benefit of all stakeholders.

11.     As discussed in the First Day Declaration, the Debtors anticipate closing each of their store locations under the American Freight banner (the "Store Closing Procedures") and liquidating and winding down the American Freight brand through these Chapter 11 Cases. Notwithstanding the store closings, the Debtors, through this Motion, seek to continue the Customer Programs relating to the Debtors' remaining brands, and seek to continue certain of the American Freight Customer Programs for a limited duration as described in further detail below.

## I.     Warranty Program

12.     To support their customers, certain of the Debtors offer their customers the option of purchasing protection plans for replacements or repairs of certain damaged or defective products after the expiration of the manufacturer's warranty period (the "Warranty Program").  The Warranty Program is underwritten and provided by a third-party insurance company (the "Warranty Insurer").  Under the Warranty Program, the Warranty Insurer is responsible for reviewing a customer's claim and determining whether the allegedly defective product can be repaired or if it meets certain requirements necessary for replacement.  Repair services are

5

administered by the Warranty Insurer, while product replacements are provided directly by certain of the Debtors.  In addition, certain of the Debtors are reimbursed by the Warranty Insurer for costs associated with providing replacement products under the Warranty Program.  The Debtors' obligations to their customers under the Warranty Program are typically satisfied through the provision of replacement products and services, not in cash.

13.     Maintaining the Warranty Program is critical to retaining customers, who may be less willing to purchase the Debtors' products or may completely stop doing business with the Debtors if defective products are not remedied.  Such an outcome would inevitably lead to a decline in revenues to the detriment of the Debtors' stakeholders.  Accordingly, the Debtors seek authorization to honor all outstanding prepetition obligations on account of the Warranty Program and continue honoring Customer Obligations in connection with the Warranty Program on a postpetition basis in a manner consistent with their past practices.  Based on the Debtors' historical records, the Debtors have accrued approximately $2.4 million in obligations in connection with the Warranty Program.

## II.     Layaway Program

14.     Prior to the Petition Date, the Debtors offered a layaway program under the American Freight banner allowing customers to pay for merchandise over a period of time (the "Layaway Program").  Under the Layaway Program, customers provided the Debtors with a down payment toward the purchase of merchandise and then incrementally paid the remaining balance.

15.     In anticipation of the Store Closing Procedures, the Debtors do not intend to continue the Layaway Program in the ordinary course of business during these Chapter 11 Cases and will continue the Layaway Program for a limited period of fifteen (15) days following the

Petition Date (the "Layaway Period").  During the Layaway Period, layaway customers are provided the opportunity to complete payment and retrieve their layaway items or, alternatively, request a refund.  Any layaway merchandise not collected by the customers by the end of the Layaway Period will be returned to the American Freight inventory and sold pursuant to the Store Closing Procedures.  For the avoidance of doubt, the Layaway Program will otherwise be terminated, and customers will not be able to initiate a layaway purchase on or after the Petition Date.

16.    Although the Debtors do not seek to continue the Layaway Program beyond the Layaway Period, the Debtors may be required to provide refunds on account of the Layaway Program due to cancellations of customer orders and refund requests.  Therefore, the Debtors seek authority, not direction, to make payments on account of obligations owed under the Layaway Program in an amount not to exceed $5.7 million.

### III.    Return Program

17.    In addition to the Layaway Program, and in consideration of the store closings, the Debtors will allow American Freight customers to return merchandise (the "Return Program") for a limited duration and under limited circumstances.  Under the Return Program, customers may return items purchased prior to the Petition Date for a period of fifteen (15) days following the Petition Date.  The Debtors will not accept the return of any purchases of American Freight merchandise made on or after the Petition Date and during the Store Closing Procedures.

### IV.    Rent-to-Own Program

18.    The Debtors offer a rent-to-own program (the "Rent-to-Own Program") under the Buddy's banner, providing an alternative option for customers that may not qualify under a traditional retail purchase program.  The Rent-to-Own Program allows Buddy's brand customers

the opportunity to acquire brand name furniture, appliances, and electronics through a rent-to-own structure. Under the Rent-to-Own Program, Buddy's and the customer enter into a rental-purchase agreement, lease, or a lease-purchase agreement, dependent on the state where the customer completes the transaction. Payments under the Rent-to-Own Program are made on a periodic basis. Generally, the customer may terminate the agreement early with no penalty other than certain minimum fees.

19.    Under the Rent-to-Own Program, customers may elect to purchase a third-party extended warranty on the rent-to-own merchandise (the "RTO Warranty"). Under the RTO Warranty, the Debtors will repair products during the term of a rental-purchase agreement, lease, or lease-purchase agreement, as applicable, and for up to sixty (60) days following receipt of final payment. Under the RTO Warranty, the customer is also entitled to receive a similar item to use while their rent-to-own merchandise is under repair.

20.    Customers may also elect to purchase a third-party extended warranty on the rent-to-own merchandise (the "Third-Party RTO Warranty"). The Third-Party RTO Warranty is provided through Benefit Marketing Solutions ("BMS"). Customers must purchase a club membership through BMS to participate in the Third-Party RTO Warranty and must continue to pay for such membership for twelve (12) months after remitting final payment for the merchandise acquired under the Rent-to-Own Program. Customers pay their BMS club membership payments directly to Buddy's, which subsequently remits a percentage of the amount collected, generally 16.15% or 19.20%, to BMS. The majority of the club benefits provided by BMS are available to the customer directly and require no assistance from the Buddy's stores. Any product benefit reimbursement from BMS under the Third-Party RTO Warranty is credited directly to the

applicable Buddy's store for replacement products; Buddy's then provides the customer with the replacement merchandise.

21.     By this Motion, the Debtors seek the authority, but not direction, to continue the Rent-to-Own Program in the ordinary course of business and to honor, perform, and otherwise satisfy any obligations in connection with the Rent-to-Own Program.

**V.     Replacements**

22.     Consistent with industry practice and to accommodate customers' needs, certain of the Debtors maintain replacement policies for inadequate, damaged, or defective equipment (the "Replacement Policies").   The Replacement Policies promote sales of merchandise by generating goodwill and confidence in customer purchases.   By this Motion, the Debtors seek authorization, but not direction, to honor the Replacement Policies, on a postpetition basis and in a manner consistent with past practices.

**VI.     Gift Card Programs**

23.     The Debtors currently maintain two (2) gift card programs under the Pet Supplies and Vitamin Shoppe banners pursuant to which their customers can purchase pre-paid gift cards (the "Gift Cards") in various denominations (the "Gift Card Programs").   Gift Cards can be purchased online through the Debtors' respective e-commerce websites, and in-store in amounts generally varying between $20.00 and $200.00.   Gift Cards can then be redeemed either in-store or online and used towards the purchase of merchandise and services.   The Debtors estimate that, as of the Petition Date, approximately $2,907,658.00 in issued Gift Cards is outstanding.

24.     On average, the Debtors that participate in the Gift Card Programs pay Fiserv, Inc., Stored Value Solutions, and InComm Payments (collectively, the "Gift Card Administrators") approximately $40,000 per month to process and administer the Gift Card Programs.   As of the

Petition Date, the Debtors estimate they owe approximately $60,000 to the Gift Card Administrators on account of administrative fees associated with the Gift Card Programs (the "Gift Card Program Fees"), all of which will come due during the interim period.

25. The Debtors believe that continuing to honor the Gift Card Programs, including all Gift Cards purchased or issued prepetition, is essential for maintaining customer goodwill throughout these Chapter 11 Cases. The negative impact of refusing to honor the Gift Card Programs would jeopardize the Debtors' relationships with their customers. By this Motion, the Debtors seek authorization, but not direction, to, in a manner consistent with past practices: (i) pay the Gift Card Program Fees in the ordinary course, without regard to whether the obligations arose before, on, or after the Petition Date; and (ii) honor all Gift Cards purchased by or issued to customers prior to the Petition Date and maintain the Gift Card Programs in the ordinary course of business.

## VII. Rewards Programs

26. The Debtors currently operate two customer loyalty rewards programs under the Pet Supplies[4] and Vitamin Shoppe banners that enable customers to earn points that can be exchanged for certain products or services offered in the Debtors' stores or ecommerce websites (the "Rewards Programs"). In addition, certain of the Debtors' Rewards Programs provide eligible customers with free products in exchange for redemption of points that are earned through recurrent purchases of products as well as offer rewards for services through punch card programs.

27. Customers sixteen (16) years of age and older are eligible to participate in the Rewards Programs. Under the Rewards Programs, customers earn points based on the amount of

---

[4]   Rewards programs described in this section under the Pet Supplies banner also include the Debtors' Wag N' Wash brand.

10

money spent on eligible products.  Customers may also earn points by participating in certain activities, including polls and surveys.  Customers may then redeem their earned points online or in the store on eligible products.  In addition, customers may also receive cash back or free merchandise when a specified amount of points are accrued.  A significant portion of sales at the Vitamin Shoppe brand are generated through the Vitamin Shoppe Rewards Program.  As of the Petition Date, the Debtors estimate that approximately 4.7 million customers are enrolled in the Vitamin Shoppe Rewards Program and approximately 3.5 million customers are enrolled in the Pet Supplies Rewards Program

28.     The Pet Supplies brand also offers rewards on services through three (3) punch card programs:  (i) grooming rewards; (ii) nail service rewards; and (iii) pet wash rewards.  After accumulating a certain amount of qualifying purchases, customers can receive a 50%-100% discount on the future purchase of a similar service.  For the avoidance of doubt, the Debtors do not make cash payments on account of such reward programs.

29.     By this Motion, the Debtors seek authorization, but not direction, to, in a manner consistent with past practices:  (i) continue the Rewards Programs in the ordinary course, and (ii) honor all rewards accrued under the Rewards Programs without regard to whether the obligations arose before, on, or after the Petition Date.

## VIII.   Other Promotions and Discounts

30.     Certain of the Debtors offer additional sales promotions and discounts (the "Promotional Programs"), including promotional markdowns, rebates, coupons, seasonal deals, and other offers.  The Promotional Programs are an important part of the Debtors' businesses and engender goodwill for the Debtors' brands, target captive customers or customers that would otherwise be unlikely to purchase their merchandise, and generate revenue by encouraging sales

11

at store locations.  For example, the Pet Supplies Wag n' Wash brand offers customers the ability to prepay for self-serve dog washes at a discounted price (the "Dirty Dog Discount Program"). Under the Dirty Dog Discount Program, customers can purchase five (5) self-service dog washes for $40.00, all of which must be used within twelve (12) months from the date of purchase.  For the avoidance of doubt, the Debtors do not make cash payments on account of the Dirty Dog Discount Program.  The Debtors believe that continuing to honor the Promotional Programs in the ordinary course of business, including promotional markdowns, coupons, deals, and other offers issued prepetition, is essential for maintaining customer goodwill throughout these Chapter 11 Cases.

## IX.    Franchisee Programs

31.    In the ordinary course of business, the Debtors engage in certain programs and transactions with their franchisees, which include, among other things, reimbursement for the satisfaction of gifts cards, discounts, promotions to the Debtors' customers at franchised locations, sales incentives related to online merchandise sales, consigned inventory, and various franchisee fees and obligations (the "Franchisee Programs").  Through these programs, the Debtors and their franchisees offer a seamless customer experience—notwithstanding whether a customer purchases merchandise or services at a corporate location or a franchised location—which promotes goodwill and results in increased sales revenue.  Notably, certain of the Debtors act as a middleman between the Debtors' merchants and their franchisee counterparts.   Given the Debtors' established relationships with their merchants and the costs associated with maintaining such relationships, several of the Debtors' franchisees are wholly reliant upon the Debtors to place and fulfill their merchandise orders, instead of ordering directly from the applicable merchandise vendor.  Under this arrangement, the Debtors front the costs associated with the franchisees' orders.  Such invoices

are subsequently reimbursed by the applicable franchisee to the Debtors.  Given this relationship, the Debtors may receive promotional or discounted reimbursable amounts from their vendors on account of sales made at franchised locations.  When this occurs, the Debtors promptly remit amounts owed to the relevant franchisee.

32.    For example, the Pet Supplies Debtors and their franchisees may honor manufacturers' discounts or coupons for customers to use in purchasing products at the Debtors' corporate locations and at franchised locations.   Once the Pet Supplies Debtors receive the discounted, reimbursed amount from the merchants, the Pet Supplies Debtors subsequently remit to the relevant franchisee the amounts received on account of merchandise sold by the franchisee at its store to make the franchisee whole (such program, the "Scanback Program").  The Debtors keep any discounted amounts for products sold directly from the Debtors.  The Scanback Program promotes the Pet Supplies brand and helps generate additional revenue for the corporate and franchise locations.  The Debtors may also reimburse franchisees for other costs, discounts, and promotions, such as the costs associated with honoring gift cards, coupons, loyalty points, and other promotional programs.

33.    In addition, the Debtors may incur certain fees and obligations pursuant to their agreements with the franchisees.  For example, certain of the Debtors make quarterly payments to certain of their franchisees based on sale revenues.  Prior to receiving the first quarterly payment, the franchisee must pay a royalty fee to the applicable Debtor to operate under their brand.  Certain of the Debtors also receive rebates when a customer finances a purchase through certain third parties at either a corporate or franchise location.  Where the purchase was made at one of the Debtors' franchise locations, the rebate is then passed through to the franchisee that completed the transaction.

13

34. The inability to continue honoring the Franchisee Programs would likely result in a disruption to the Debtors' business operations due to customer dissatisfaction and decreased sales across the Debtors' businesses. As of the Petition Date, the Debtors estimate they have accrued approximately $9.1 million in connection with the Franchisee Programs. By this Motion, the Debtors request authority, but not direction, to continue to honor the Franchisee Programs and to honor obligations related thereto in the ordinary course of business, whether such obligations arose before or after the Petition Date; provided, however, that such cash payments on account of the Franchisee Programs shall not exceed $7.7 million on an interim basis, and $9.1 million on an aggregate, final basis, unless otherwise ordered by the Court.

## X.  Customer Credit Program, Chargebacks, and Payment Processors

35. Consistent with industry practice and to accommodate customers' needs, the Debtors may provide customers with credits for future purchases (the "Customer Credit Program") with respect to general customer services, exchanges, and certain related circumstances. Accordingly, the Debtors may have accrued on their books prepetition amounts relating to the Customer Credit Program. Given the nature of the Customer Credit Program, it is difficult for the Debtors to ascertain with certainty the average monthly cash obligations under such program. The Debtors estimate they have accrued approximately $1.5 million in connection with the Customer Credit Program. For the avoidance of doubt, the Debtors do not make cash payments on account of the Customer Credit Program. By this Motion, the Debtors request authority, but not direction, to continue to honor the Customer Credit Program and to honor obligations related thereto in the ordinary course of business, whether such obligations arose before or after the Petition Date.

36. In addition to cash, the Debtors accept several other methods of payment including, but not limited to, personal checks, credit cards, and debit cards. Certain of the Debtors' customers

14

may dispute certain charges with their credit card issuer, and the Debtors may be obligated to refund the applicable amount subject to certain adjustments (the "<u>Chargebacks</u>").  Generally, Chargebacks are satisfied by netting the amount charged against pending payments owed by a Payment Processor (as defined below) to the Debtors.  Due to the automated nature of the Chargebacks, it is difficult for the Debtors to ascertain the approximate amount of outstanding Chargebacks owed at one time and, relatedly, it is possible that certain fees incurred by the Debtors immediately prior to the Petition Date may not have been fully set off against the payments received by the Debtors prior to the Petition Date.

37.     For certain methods of payment, the Debtors receive sale proceeds less any Chargebacks and processing fees charged by credit card companies or other third-party payment processors directly into certain revenue collection accounts.  Certain of the Debtors utilize J.P. Morgan Chase Bank, N.A., PayPal, Inc., CardConnect LLC, Chase Paymentech, and/or Adyen N.V. as their payment processors (each a "<u>Payment Processor</u>" and, collectively, the "<u>Payment Processors</u>") pursuant to various merchant services agreements (collectively, the "<u>Merchant Services Agreements</u>").  As of the Petition Date, the Debtors estimate that the Payment Processors are holding reserves in the amount of $2.7 million, which amount is determined by each respective Payment Processor based on processing history and risk of loss, as collateral in support of the Chargebacks.

38.     The ability to continue to accept payment from customers and others is essential for the continued operation of the Debtors and to maximize the value of the Debtors' estates.  As such, by this Motion, the Debtors seek authority, but not direction, to:  (i) continue honoring their obligations to the Payment Processors, including Chargebacks, in the ordinary course of their business, without regard to whether the obligations arose before, on, or after the Petition Date, and

(ii) continue to honor the terms and obligations contained in the Merchant Services Agreements (the "Merchant Services Obligations") in the ordinary course of business consistent with past practice to ensure no disruption to the Debtors' business.

### BASIS FOR RELIEF REQUESTED

I.     **Continuing to Honor the Customer Programs in the Ordinary Course Is Warranted Under Sections 363(b) and 105(a) of the Bankruptcy Code and Is in the Best Interests of the Debtors' Business and Their Estates.**

39.     The Court has authority to authorize the Debtors to continue the Customer Programs, modify such programs in the ordinary course of business, and pay prepetition claims arising thereunder, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.  Courts generally acknowledge that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers); see also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (granting authority to pay prepetition claims of certain vendors and finding that such payment was "essential to the survival of the debtor during the chapter 11 reorganization").  In so doing, these courts acknowledge that several legal theories rooted in sections 363(b) and 105(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

40.     Pursuant to section 363(b) of the Bankruptcy Code, courts may authorize payment of prepetition obligations where a sound business purpose exists for doing so.  See In re Ionosphere

16

<u>Clubs</u>, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); <u>see also</u> <u>James A. Phillips, Inc.</u>, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).  Indeed, courts have noted that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." <u>In re CoServ, L.L.C.</u>, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

41.     In addition, courts may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  This "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.  See <u>In re United Am., Inc.</u>, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (acknowledging that the doctrine of necessity "is a necessary deviation because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its pre-petition claim."); <u>NVR L.P.</u>, 147 B.R. at 127 ("Under [section 105(a)] the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); <u>see also</u> <u>In re Lehigh & New Eng. Ry.</u>, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); <u>Just for Feet</u>, 242 B.R. at 824–25 (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of prepetition claims" under the doctrine of necessity).

17

42.     Accordingly, the Court has authority to authorize the Debtors to continue the Customer Programs, modify such programs in the ordinary course of business, and pay prepetition claims arising thereunder, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code. Continuing to administer the Customer Programs without interruption during the pendency of these Chapter 11 Cases is critical to preserving the value of the Debtors' assets by, most importantly, preserving customer goodwill and market share.  These Customer Programs promote customer satisfaction, encourage new purchases, and ensure that the Debtors remain competitive. By encouraging purchases and creating revenue, the continuation of the Customer Programs will inure to the benefit of the Debtors' estates and their creditors.  Accordingly, the Debtors submit that they have shown cause sufficient to warrant honoring the Customer Programs and any obligations relating thereto, and respectfully request that the relief sought herein be approved on the terms set forth in the Interim Order and the Final Order, as applicable.

## II.     Processing of Electronic Fund Transfers Should Be Authorized

43.     The Debtors also request that the Court authorize the Banks, when requested by the Debtors, in their discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition amounts described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date.  The Debtors have sufficient funds to pay any amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations.  The Debtors further request that the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

## <u>SATISFACTION OF BANKRUPTCY RULE 6003</u>

44.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief within twenty-one (21) days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief is necessary to avoid immediate and irreparable harm.  <u>See</u> Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  <u>See</u> <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

45.    As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without authorization for the relief requested herein.  Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

## <u>WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)</u>

46.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

47.    To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## **RESERVATION OF RIGHTS**

48.     Nothing in the Proposed Orders or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action; or (iv) shall be construed as a promise to pay a claim.

49.     Nothing in the Proposed Orders or this Motion shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of any Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

50.     Nothing in the Proposed Orders or this Motion shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

## **NOTICE**

51.     Notice of this Motion has been or will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney's Office for the District of Delaware; (iii) those creditors holding the fifty (50) largest unsecured claims against the Debtors' estates; (iv) counsel to the ABL Lenders; (v) counsel to the Ad Hoc Group of First Lien Lenders; (vi) counsel to the Second Lien Term Loan Lenders; (vii) counsel to the HoldCo Lenders; (viii) counsel to the DIP Agent; (ix) counsel to the DIP Lenders; (x) the Internal Revenue Service; (xi) the Payment Processors; and (xii) the Banks.  The Debtors will serve copies of this Motion and an order entered in respect of this Motion as required by Local Rule 9013-1(m).  In light of

20

the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders,

granting the relief requested herein and such other and further relief as is just and proper.

Dated: November 3, 2024
        Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
*/s/ Shella Borovinskaya*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (*pro hac vice* pending)
Matthew A. Feldman (*pro hac vice* pending)
Betsy L. Feldman (Del. No. 6410)
Joseph R. Brandt (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com
jbrandt@willkie.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

## EXHIBIT A

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ___** |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO MAINTAIN AND ADMINISTER THEIR EXISTING CUSTOMER PROGRAMS AND HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (II) AUTHORIZING THE BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO, AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion")[2] of the debtors and debtors in possession

in the above-captioned cases (collectively, the "Debtors") for entry of an interim order and a final

order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, (i) authorizing the Debtors

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2]   Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

to maintain and administer the Customer Programs and honor certain prepetition obligations related thereto, (ii) authorizing the Banks to honor and process check and electronic transfer requests related thereto, and (iii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief granted herein is in the best interests of the Debtors' estates and their creditors; and due and proper notice of the Motion having been given and the requirements of Bankruptcy Rule 6004(a) and the Local Rules having been satisfied by such notice; and no other or further notice of the Motion being required; and an interim hearing having been held to consider the interim relief requested in the Motion (the "Hearing"); and upon the record of the Hearing; and upon all of the proceedings had before this Court; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is granted on an interim basis as set forth herein.

2.      A final hearing on the relief sought in the Motion shall be conducted on _____, 2024 at _____ **(ET)** (the "Final Hearing").  Any party-in-interest objecting to the relief sought at the Final Hearing or entry of the Final Order shall file and serve a written objection, which objection shall be served upon (i) proposed co-counsel for the Debtors, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Debra M.

Sinclair, Esq. (dsinclair@willkie.com) and Betsy L. Feldman, Esq. (bfeldman@willkie.com), and (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn:  Edmon L. Morton, Esq. (emorton@ycst.com) and Matthew B. Lunn, Esq. (mlunn@ycst.com); (ii) counsel to any official committee appointed in these Chapter 11 Cases; (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox, Esq. (timothy.fox@usdoj.gov); (iv) counsel to the DIP Agent, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004, Attn: Gregg Bateman, Esq. (bateman@sewkis.com), Sagar Patel, Esq. (patel@sewkis.com), and Michael Danenberg, Esq.(danenberg@sewkis.com); (v) counsel to the DIP Lenders and Ad Hoc Group of First Lien Lenders, (a) Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn: Jayme Goldstein, Esq. (jaymegoldstein@paulhastings.com), Daniel Fliman, Esq. (danfliman@paulhastings.com), and Nicholas Bassett, Esq. (nicholasbassett@paulhastings.com), and (b) Landis Rath & Cobb LLP, 919 N. Market Street Suite 1800, Wilmington, DE 19317, Attn: Adam G. Landis, Esq. (landis@lrclaw.com) and Matthew McGuire, Esq. (mcguire@lrclaw.com); (vi) counsel to the ABL Lenders, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, Attn: Jennifer Ezring, Esq. (Jennifer.Ezring@lw.com), James Ktsanes, Esq. (James.Ktsanes@lw.com) and Andrew Sorkin, Esq. (andrew.sorkin@lw.com); (vii) counsel to the Second Lien Term Loan Lenders, White & Case LLP, 200 S Biscayne Blvd, Miami, FL 33131, Attn:  Thomas Lauria, Esq. (tlauria@whitecase.com), and 111 S. Wacker Dr., Suite 5100, Chicago, IL 60606, Attn:  Bojan Guzina, Esq. (bojan.guzina@whitecase.com); and (viii) counsel to the Holdco Lenders at the address set forth in (vii) above, in each case no later than _____,

3

2024 at 4:00 p.m. (ET).  If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

3.     The Debtors are authorized, but not directed, to continue to administer Customer Programs currently in effect, modify such programs as in the ordinary course of business, and honor any prepetition Customer Obligations related to the Customer Programs, on an interim basis, without regard to whether the Debtors' obligations arose before, on, or after the Petition Date; provided, however, that any cash payments on account of prepetition Customer Obligations related to the Customer Programs shall not exceed $14.86 million on an interim basis, unless otherwise ordered by this Court.

| Program | Anticipated Cash Spend |
|---------|------------------------|
| Warranty | $1.4 million |
| Layaway | $5.7 million |
| Gift Cards | $60,000 |
| Franchisees | $7.7 million |
| Chargebacks | De minimis |

4.     The Debtors are authorized to continue, replace, implement, modify, and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further Court Order and with five (5) business days' notice to any official committee appointed in these Chapter 11 Cases in advance of such changes; provided, however, in the event the Debtors determine it appropriate to discontinue the practice of accepting Gift Cards, the Debtors shall provide notice of such termination no later than seven (7) business days' prior thereto through prominent displays on the Debtors' respective e-commerce websites and store locations, including Point of Sale terminals.

5.      The Banks on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and the Banks are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order without any duty of further inquiry and without liability for following the Debtors' instructions.

6.      The Debtors are authorized, but not directed, to continue to operate under the Merchant Services Agreements.  The Debtors are authorized to pay or reimburse the Payment Processors for the Merchant Services Obligations, whether such obligations incurred pre- or post-petition, and the Payment Processors are authorized to receive or obtain payment for such Merchant Services Obligations, as provided for herein, and in accordance with the terms of the Merchant Services Agreements, including, without limitation, by way of recoupment or setoff without further order of this Court.  Any claim a Payment Processor may have under the Merchant Services Agreements shall be entitled to, in addition to any other lien, collateral, or payment priority rights in support thereof, administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code.

7.      Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

8.      The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these Chapter 11 Cases with respect to prepetition amounts owed in connection with the relief granted herein.

9.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

10.     The requirements of Bankruptcy Rule 6003(b) have been satisfied because the relief set forth in this Interim Order is necessary to avoid immediate and irreparable harm.

11.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be effective and enforceable immediately upon its entry.

12.     Nothing in this Interim Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

13.     Nothing in this Interim Order, nor as a result of any payment made pursuant to this Interim Order, shall be deemed or construed as a waiver of the right of Debtors, or shall impair the ability of Debtors, to contest the validity and amount of any payment made pursuant to this Interim Order.

14.     Nothing in this Interim Order shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

15.     Notwithstanding anything to the contrary set forth herein, any payment made, or authorization contained, hereunder shall be subject in all respects to the Approved Budget (as such term is defined in the order approving the Debtors' postpetition financing agreements).

16.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

17.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

**<u>EXHIBIT B</u>**

**Final Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. ___ & ___** |

### FINAL ORDER (I) AUTHORIZING THE DEBTORS TO MAINTAIN AND ADMINISTER THEIR EXISTING CUSTOMER PROGRAMS AND HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (II) AUTHORIZING THE BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO, AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion")[2] of the debtors and debtors in possession

in the above-captioned cases (collectively, the "Debtors") for entry of an interim order and a final

order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, (i) authorizing the Debtors

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

to maintain and administer the Customer Programs and honor certain prepetition obligations related thereto, (ii) authorizing the Banks to honor and process check and electronic transfer requests related thereto, and (iii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief granted herein is in the best interests of the Debtors' estates and their creditors; and due and proper notice of the Motion having been given and the requirements of Bankruptcy Rule 6004(a) and the Local Rules having been satisfied by such notice; and no other or further notice of the Motion being required; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, to continue to administer Customer Programs currently in effect, modify such programs as in the ordinary course of business, and honor any prepetition Customer Obligations related to the Customer Programs, on a final basis, without regard to whether the Debtors' obligations arose before, on, or after the Petition Date; provided, however, that any cash payments on account of prepetition Customer Obligations related to the Customer Programs shall not exceed $16.26 million on a final basis, unless otherwise ordered by this Court.

| Program | Anticipated Cash Spend |
|---------|------------------------|
| Warranty | $1.4 million |
| Layaway | $5.7 million |
| Gift Cards | $60,000 |
| Franchisees | $9.1 million |
| Chargebacks | De minimis |

3.      The Debtors are authorized to continue, replace, implement, modify, and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further Court Order and with five (5) business days' notice to any official committee appointed in these Chapter 11 Cases in advance of such changes; provided, however, in the event the Debtors determine it appropriate to discontinue the practice of accepting Gift Cards, the Debtors shall provide notice of such termination no later than seven (7) business days' prior thereto through prominent displays on the Debtors' respective e-commerce websites and store locations, including Point of Sale terminals.

4.      The Banks on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and the Banks are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

5.      Any payment made pursuant to this Final Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

6.      The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these Chapter 11 Cases with respect to prepetition amounts owed in connection with the relief granted herein.

7.      The Debtors are authorized, but not directed, to continue to operate under the Merchant Services Agreements.  The Debtors are authorized to pay or reimburse the Payment Processors for the Merchant Services Obligations, whether such obligations incurred pre- or post-petition, and the Payment Processors are authorized to receive or obtain payment for such Merchant Services Obligations, as provided for herein, and in accordance with the terms of the Merchant Services Agreements, including, without limitation, by way of recoupment or setoff without further order of this Court.  Any claim a Payment Processor may have under the Merchant Services Agreements shall be entitled to, in addition to any other lien, collateral, or payment priority rights in support thereof, administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code.

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order.

9.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be effective and enforceable immediately upon its entry.

10.      Nothing in this Final Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

11.     Nothing in this Final Order, nor as a result of any payment made pursuant to this Final Order, shall be deemed or construed as a waiver of the right of Debtors, or shall impair the ability of Debtors, to contest the validity and amount of any payment made pursuant to this Final Order.

12.     Nothing in this Final Order shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

13.     Notwithstanding anything to the contrary set forth herein, any payment made, or authorization contained, hereunder shall be subject in all respects to the Approved Budget (as such term is defined in the order approving the Debtors' postpetition financing agreements).

14.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

15.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.