**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF
CERTAIN CRITICAL VENDORS, FOREIGN VENDORS, SHIPPERS & LOGISTICS
PROVIDERS, AND 503(b)(9) CLAIMANTS; AND (II) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby file this motion (the "Motion") for entry of interim and final orders, substantially in the forms attached hereto as Exhibit A (the "Interim Order") and Exhibit B (the "Final Order," and, together with the Interim Order, the "Proposed Orders"), (i) authorizing, but not directing, the Debtors to pay certain prepetition Critical Vendors Claims, Foreign Vendors

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising , LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

Claims, Shippers & Logistics Providers Claims, and 503(b)(9) Claims (each as defined below) in an amount not to exceed $77,650,000 pursuant to the Interim Order (the "Interim Order Cap") and, in the aggregate, inclusive of amounts paid pursuant to the Interim Order, an amount not to exceed $99,700,000 pursuant to the Final Order (the "Final Order Cap"), and (ii) granting related relief. In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] filed contemporaneously herewith.  In further support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.  The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), 503(b), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

---

[2]    Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the First Day Declaration.

(the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1(m).

## BACKGROUND

4.        On November 3, 2024 (the "Petition Date"), each of the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Debtors are authorized to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.        No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

6.        Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

## RELIEF REQUESTED

7.        By this Motion, the Debtors seek entry of the Proposed Orders: (i) authorizing, but not directing, the Debtors to pay certain prepetition Critical Vendor Claims, Foreign Vendors Claims, Shippers & Logistics Providers Claims, and 503(b)(9) Claims, collectively subject to the Interim Order Cap and the Final Order Cap, and (ii) granting related relief.  As described in further detail below, the obligations that the Debtors seek authority to pay are summarized in the following table:

| Critical Goods and Services Providers | Requested Interim Amount | Requested Final Amount |
|---|---|---|
| **Shippers & Logistics Providers, Foreign Vendors, and Critical Vendors** | $23,650,000 | $41,500,000 |
| **503(b)(9) Providers** | $54,000,000 | $58,200,000 |
| Total: | $77,650,000 | $99,700,000 |

## PRELIMINARY STATEMENT

8.     The Debtors are a privately held operator and acquirer of franchised and franchisable businesses.  The Debtors' business segments include a diverse collection of highly recognized, market-leading, and emerging retail brands, including: (i) The Vitamin Shoppe ("Vitamin Shoppe"), an omnichannel specialty retailer and wellness lifestyle company offering large varieties of vitamins, minerals, herbs, homeopathic remedies, and supplements, among others; (ii) Buddy's Home Furnishings ("Buddy's"), retail furniture chains that offer in-store and online sales of furniture, mattresses, new and out-of-box home appliances, and home accessories at discount prices; and (iii) Pet Supplies Plus ("PSP"), an omnichannel pet supplies and services retail chains offering premium brands and proprietary label and specialty pet products, grooming, and pet washing services.  The Debtors operate both franchise and corporate-owned programs with respect to each of their business segments.  Across all brands, the Debtors have over 2,200 total retail store locations, approximately 11,900 total employees, and operations spanning across the United States.  Across all businesses, the Debtors focus on identifying key products and merchandise required to drive operational and strategic improvements across their franchise platforms and, in connection therewith, the leading vendors, product developers, and suppliers throughout the industry.  The Debtors operate across intensely competitive industries, where they compete with various established companies.

9.     The Debtors' success throughout the United States is partially fueled by their partnerships with certain critical vendors and goods and services providers that ensure that the Debtors are able to deliver and sell the highest quality products for use by their franchisees and for their customers.  As further described below, the Debtors' businesses depend on the uninterrupted flow of inventory and other goods through their distribution networks and to their franchisees and

stores, including the purchase, importation, storage, and shipment of the Debtors' inventory and merchandise. The Debtors rely on a number of third-party warehousemen and distributors, various freight vendors, other shipping services providers, and merchandise suppliers for the receipt, distribution, and delivery of the products and merchandise that the Debtors sell in their stores and on their e-commerce sales platforms. The Debtors' critical goods and services providers support nearly every aspect of the Debtors' business, including by: storing the Debtors' products, shipping the Debtors' products to their franchisees and customers, and supplying their products and merchandise.

10. Moreover, with respect to each of the Debtors' businesses, the Debtors obtain core products and merchandise from a limited number of highly specialized vendors that are irreplaceable, due to, among other things, demand created by branding and marketing. If the Debtors fail to stock the products that their customers have grown accustomed to seeing in their stores and across their e-commerce websites, the effects would extend far beyond simply not offering those particular products. If consumers become aware that the Debtors do not stock a particular item, they will simply not come to the Debtors' stores or visit their websites, where they may have purchased additional items beyond the one product that they initially came to purchase. Consequently, although the Debtors have evaluated several supplier options for the sourcing of their merchandise and products over the past several years, their unique merchandise and products cannot be sourced across multiple, redundant suppliers without difficulty and heightened costs. If the Debtors' critical goods and services providers refuse to continue doing business with the Debtors on account of outstanding prepetition amounts, replacing them would cause significant delays in each Debtor's ability to deliver the necessary products to its stores, franchisees, and customers during the rapidly approaching holiday season, which would not only jeopardize, but

also cause irreparable, and potentially irreversible, damage to the Debtors' business and their estates.

11.     Further, even if the Debtors were able to switch shippers and logistics providers and other critical and foreign vendors to alternative suppliers on such short notice (which, with respect to the Critical Vendors, Foreign Vendors, and Shippers & Logistics Providers discussed herein, they cannot), there would be significant disruptions in the Debtors' operations to the detriment of the Debtors' business and, ultimately, their stakeholders.  Given that the Debtors' businesses revolve around the timely production and distribution of merchandise and products, even a slight delay in the delivery of such products to market could negatively affect the Debtors' market share, causing irreparable harm to their business.

12.     Accordingly, prior to the Petition Date, the Debtors worked with their advisors to evaluate their vast vendor base of more than 6,000 vendors and suppliers to determine which business relationships and goods and services providers within the categories described below are critical to the Debtors' ongoing successful business operations during these Chapter 11 Cases— the loss of which would immediately and irreparably harm their business.  The Debtors submit that the relief requested through this Motion will allow the Debtors to preserve and maximize value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.

## THE SHIPPERS & LOGISTICS PROVIDERS

13.     The Debtors conduct their business through a complex logistics network that is dependent on services provided by certain common carriers, warehousemen, freight forwarders, and third-party logistics providers (collectively, the "Shippers & Logistics Providers").  The Shippers & Logistics Providers are responsible for transporting the Debtors' products from foreign

countries to the United States, and once in the United States, transporting the manufactured products to either warehouses, the Debtors' distribution centers, the Debtors' stores, or directly to customers.   As a result, the Shippers & Logistics Providers regularly possess certain of the Debtors' products and merchandise in the ordinary course of the Debtors' operations.   The Shippers & Logistics Providers are paid by the Debtors for services that have been concluded on behalf of the Debtors.   If any fees and expenses owed to the Shippers & Logistics Providers are not satisfied, these parties may refuse to deliver or release the Debtors' products, thereby preventing the Debtors from delivering their merchandise and products to their stores, franchisees, and customers.

14.     Moreover, many of the parties in the Debtors' logistics chain likely have incidental possessory liens on the Debtors' goods and products.   Under the laws of most states, carriers and warehousemen will, in certain circumstances, have a lien on the goods in their possession that secures the charges or expenses incurred in connection with the transportation or storage of goods. Furthermore, in certain circumstances, these parties may be entitled to sell the goods in their possession to third parties to enforce the possessory liens and secure payment of the charges or expenses incurred in connection with any lien charges, including shipping and storage charges. Even a minor interruption to the Debtors' supply chain could undermine the Debtors' ability to fulfill their stores', franchisees', and customers' needs and adversely impact relationships with such parties.

15.     Such Shippers & Logistics Providers' possession (and retention) of the Debtors' products would severely disrupt the Debtors' operations and affect the Debtors' ability to fulfill orders and, in turn, efficiently administer these Chapter 11 Cases.   Likewise, the value of the Debtors' product in the Shippers & Logistics Providers' possession is likely to exceed the amounts

owed to such Shippers & Logistics Providers.  As a result, the cost of such disruption to the Debtors' estates would likely be greater than any applicable lien charges or payments owed to the Shippers & Logistics Providers.  Accordingly, the Debtors seek authority to satisfy certain prepetition Shippers & Logistics Providers Claims subject to the Interim Order Cap and the Final Order Cap.

## THE FOREIGN VENDORS

16.     The continual operation of the Debtors' businesses entails transacting with various foreign vendors, including foreign manufacturers and suppliers (collectively, the "Foreign Vendors").  Given the global nature of their distribution network, in the ordinary course of their businesses, the Debtors regularly transact with Foreign Vendors that are critical to the Debtors' supply chain.

17.     Based on the reactions of foreign suppliers in other chapter 11 cases, the Debtors believe that there is a significant and material risk that a Foreign Vendor may stop providing services to the Debtors on a timely basis and/or completely sever its business relationship with the Debtors.  While the automatic stay is not, by its terms, limited in its geographical scope, as a practical matter, the ability to enforce its provisions may be limited to creditors that are subject to the jurisdiction of the United States bankruptcy courts.  Certain Foreign Vendors may lack minimum contacts with the United States and, thus, may not be subject to the jurisdiction of the Court.  Many of the Foreign Vendors have significant, long-standing relationships with the Debtors and either cannot be replaced given their specialized role in the Debtors' supply chain or cannot be replaced without significant delay and cost.

18.     Based on the substantial experience of the Debtors' management in the industry and their knowledge of the Foreign Vendors, the Debtors believe that there is a significant risk that

the Foreign Vendors may consider themselves beyond the jurisdiction of the Court, disregard the automatic stay, and engage in conduct that would disrupt the Debtors' operations.  Indeed, among other things, Foreign Vendors may exercise self-help (if permitted under local law), which could include reclaiming vital goods and equipment already in the Debtors' possession and shutting down the Debtors' access to essential goods needed to maximize profit.

19.     Even if Foreign Vendors stop short of foreclosing or attaching liens on the Debtors' assets, and even if they do not commence litigation or insolvency proceedings, the Foreign Vendors could cut off trade credit, demand cash-on-delivery or implement other advance payment terms, or simply refuse to continue conducting business with the Debtors.  Because the Foreign Vendors may not have any (or only a *de minimis* amount of) assets or operations in the United States that may subject them to the jurisdiction of the Court, the Debtors have no workable enforcement mechanism against these parties.  The cumulative impact of the Foreign Vendors' actions could have a devastating effect on the going-concern value of Debtors' business and ability to operate in chapter 11.  For the foregoing reasons, the Debtors seek authority to satisfy certain prepetition Foreign Vendors Claims subject to the Interim Order Cap and the Final Order Cap.

## THE CRITICAL VENDORS

20.     In addition to the Shippers & Logistics Providers and the Foreign Vendors, the Debtors rely on critical vendors to operate their business in the ordinary course, including, but not limited to, Merchandise and Inventory Suppliers and Other Critical Vendors (each as defined below and, collectively, the "Critical Vendors").

### B.     Merchandise and Inventory Suppliers

21.     To conduct their businesses, the Debtors rely on Merchandise and Inventory Suppliers to supply the inventory and merchandise that the Debtors and their franchisees sell in their stores and through their websites.  The Merchandise and Inventory Suppliers provide the

Debtors with goods on terms that create considerable liquidity for the Debtors' businesses, and maintaining these trade terms is critical to the Debtors' continued success. Given the unique nature of the merchandise sold in the Debtors' stores, with certain products across the businesses having strong, entrenched brand identities that render them irreplaceable, the merchandise and inventory purchased from the Merchandise and Inventory Suppliers cannot be easily replaced or substituted by alternative vendors. Furthermore, the Debtors' business is wholly reliant on the sale of their merchandise and inventory. Failing to stock the Debtors' most in-demand items received from the Merchandise and Inventory Suppliers—especially in light of the upcoming holiday season—would significantly harm the Debtors' businesses.

22.     Likewise, several of the Debtors' materials have a limited shelf life, which prevents the Debtors from stockpiling key materials, without risking significant loss. As a result, the Debtors often do not maintain large inventories of such materials and, as with many other comparably sized retailers and manufacturers, often do not enter into long term supply arrangements. Instead, the Debtors order such products in smaller batches through purchase orders, which makes them extremely vulnerable to Merchandise and Inventory Suppliers ceasing to do business with the Debtors on account of unpaid prepetition amounts. Thus, the trade terms on which the Merchandise and Inventory Suppliers supply goods are critical to the Debtors' success and ability to build their holiday inventory and, without their continued relationship with the Merchandise and Inventory Suppliers, the Debtors cannot operate profitable businesses.

### C.     Other Critical Vendors

23.     The Debtors also rely on other critical vendors (the "Other Critical Vendors") to operate their business in the ordinary course, including, but not limited to, vendors that provide open-box merchandise and services critical to the maintenance of the Debtors' stores and distribution centers and vendors that provide marketing-related services, such as advertising on

key customer-facing platforms, to identify and generate new customers.  Essential goods and services provided by such vendors include online operations, website development and maintenance, and management, general supplies and packaging materials, employee onboarding and management programs, regulated direct mail and digital marketing campaigns, customer relationship management capabilities, brand creative services, and the Debtors' omnichannel initiatives, among other critical services that support the Debtors' operational needs across all platforms.  In many instances, the Other Critical Vendors are the only vendors able to produce or deliver the volume or quality of certain services or products sufficient to meet the Debtors' operational needs.  If the Other Critical Vendors ceased doing business with the Debtors on account of unpaid prepetition amounts, the process of finding suitable replacement vendors would be time consuming and could significantly delay the delivery of the Debtors' product to their stores, franchisees, and customers.  Without these Other Critical Vendors, the Debtors cannot sustain the highest quality retail and website operations that they have worked for years to achieve, would be unable to continue serving their franchisees and customers, and would likely lose significant revenue.  Given the proximity to the upcoming holiday season, such consequences would be especially detrimental to the Debtors' businesses.  Accordingly, the Debtors seek authority to satisfy certain Other Critical Vendor Claims subject to the Interim Order Cap and the Final Order Cap.

## CUSTOMARY TRADE TERMS

24.     In return for paying Critical Vendors and Foreign Vendors, the Debtors seek authorization to condition payment of the Critical Vendor Claims and Foreign Vendor Claims (each, a "Trade Claim" and, collectively, the "Trade Claims"), either in full or in part, on each vendor's agreement to continue to provide favorable trade terms in line with historical practices

and other terms covered by existing agreements and other programs for the postpetition delivery of goods and services as well as continue supplying the Debtors with essential goods and services for the duration of these Chapter 11 Cases (collectively, the "Customary Trade Terms").

25.    To ensure that the Critical Vendors and Foreign Vendors continue to deal with the Debtors on the Customary Trade Terms, the Debtors propose that a letter agreement (a "Trade Agreement"),[3] substantially in the form attached hereto as Exhibit C, be sent to the Critical Vendors and Foreign Vendors for execution, together with a copy of the Interim Order (or the Final Order, if such order has been entered) granting this Motion.  For the avoidance of doubt, the Proposed Orders do not approve the terms of the Trade Agreement.

26.    The Debtors propose that each Trade Agreement include, without limitation:

(a)    the amount of the relevant Critical Vendor's or Foreign Vendor's estimated Trade Claim, accounting for any setoffs, other credits, and discounts thereto; provided, however, such amount shall be used only for the purposes of determining such Critical Vendor's or Foreign Vendor's claim under the Interim Order or Final Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of this Court;

(b)    the Customary Trade Terms applicable to such Critical Vendor or Foreign Vendor, or such other terms as the Critical Vendor or Foreign Vendor and the Debtors may agree on that are at least as favorable as those that were in effect twelve (12) months prior to the Petition Date, and the Critical Vendor's or Foreign Vendor's agreement to provide goods and/or services to the Debtors pursuant to such terms during the pendency of the Debtors' bankruptcy cases, unless the Debtors fail to make timely payments under the agreed-upon terms; and

(c)    the Critical Vendor's or Foreign Vendor's agreement not to file or otherwise assert against any or all of the Debtors, their estates, or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien") or claim for

---

[3]    The Debtors' entry into a Trade Agreement shall not change the nature, validity, amount, or priority of the underlying Trade Claims and shall not constitute an assumption or rejection of any executory contract or unexpired lease between a Debtor and Critical Vendor or Foreign Vendor (if any).

reclamation (a "Reclamation Claim"), regardless of the statute or other legal authority upon which such Lien or Reclamation Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor or Foreign Vendor by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent the Critical Vendor or Foreign Vendor has already obtained or otherwise asserted such a Lien or Reclamation Claim, the Critical Vendor or Foreign Vendor shall take whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim.

27.     The Debtors seek only the authority to enter into Trade Agreements when the Debtors determine that payment of such Trade Claims in the ordinary course is necessary and that such agreements are advisable. The Debtors also hereby seek authority to make payments in the ordinary course on account of the Trade Claims, even in the absence of a Trade Agreement, if the Debtors determine, in their business judgment, that failure to pay such Trade Claims in the ordinary course is likely to result in irreparable harm to the Debtors' business operations and that they are not reasonably likely to be able to achieve a Trade Agreement with the relevant Critical Vendor or Foreign Vendor.[4]

28.     In the event that a Critical Vendor or Foreign Vendor refuses to supply goods and services to the Debtors on Customary Trade Terms (or such other terms as are agreed to by the parties) following receipt of payment on its Trade Claim, or fails to comply with any Trade Agreement entered into between such Critical Vendor or Foreign Vendor and the Debtors, then the Debtors hereby seek authority, in their discretion and without further order of the Court, to: (i) declare that any Trade Agreement between the Debtors and such Critical Vendor or Foreign Vendor, as applicable, is terminated; (ii) declare that payments made to such Critical Vendor or Foreign Vendor, as applicable, on account of its Trade Claim be deemed to have been in payment

---

[4]     Nothing in this Motion should be construed as a waiver by any of the Debtors of their rights to contest any claim of a Critical Vendor or a Foreign Vendor under applicable law.

of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor or Foreign Vendor without further order of this Court or action by any person or entity; and (iii) recover any payment made to such Critical Vendor or Foreign Vendor, as applicable, on account of its Trade Claim to the extent that such payments exceeded the postpetition claims of such Critical Vendor or Foreign Vendor, as applicable, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.

29.     In sum, if a Trade Agreement is terminated or a Critical Vendor or Foreign Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms (or such other terms as have been agreed to by the parties) following receipt of payment on its Trade Claim, the Debtors seek authority to return the parties to the positions they held immediately prior to the entry of the Interim Order approving this Motion with respect to all prepetition claims of such Critical Vendor or Foreign Vendor.  In addition, the Debtors reserve the right to seek damages or other appropriate remedies against any breaching Critical Vendor or Foreign Vendor.

30.     The Debtors further propose that any Trade Agreement terminated as a result of a Critical Vendor's or Foreign Vendor's refusal to comply with the terms thereof may be reinstated in the Debtors' discretion if:

    (a)    the underlying default under the Trade Agreement is fully cured by the Critical Vendor or Foreign Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor or Foreign Vendor of such a default; or

    (b)    the Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor or Foreign Vendor.

31.     Some of the Critical Vendors and Foreign Vendors also may have obtained Liens on the Debtors' (or other parties') assets, based upon Trade Claims held by such vendors.  As a further condition to receiving payment on a Trade Claim, a Critical Vendor or Foreign Vendor must agree to take whatever action is necessary to remove any such Lien.

## THE CRITICAL VENDOR PROCESS

32.     With the assistance of their advisors, the Debtors' senior management team has spent considerable time reviewing and analyzing the Debtors' books and records, consulting with employees responsible for operations and purchasing, and analyzing applicable laws, regulations, and historical practice to identify those vendors that are actually essential to the continued and uninterrupted operation of the Debtors' business—the loss of which would materially impair the going-concern viability of the Debtors' business, and, ultimately, their ability to continue operating in the ordinary course of business, to the detriment of the Debtors, their vendors, and all of their stakeholders.  Specifically, as part of this process, the Debtors considered a variety of factors in examining each of their vendor relationships, including:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, to refuse to ship inventory or to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

31.     In addition to these factors, the Debtors and their advisors examined the status of each vendor relationship, the vendor's familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be otherwise satisfied as part of the chapter 11 process.

32.     Based on the foregoing considerations, the Debtors identified the Critical Vendors whose cessation of services or provision of goods could cripple, in short order, the Debtors' business and, therefore, result in irreparable harm.  The Debtors believe that the Critical Vendors will refuse to supply goods or services to the Debtors postpetition, unless some or all of their prepetition claims are paid, and that immediate replacement of the Critical Vendors would be impracticable or, in some cases, impossible.  Without authority to pay the Critical Vendors, the Debtors could be forced to suspend certain operations immediately.

## THE 503(b)(9) CLAIMANTS

33.     The Debtors may have received certain goods or materials from various vendors within the twenty (20) days before the Petition Date (the "503(b)(9) Claimants").  Under section 503(b)(9) of the Bankruptcy Code, the value of such goods or materials would be accorded administrative priority (the "503(b)(9) Claims").  A significant number of the 503(b)(9) Claimants are also Critical Vendors.  The Debtors' relationships with these vendors are not governed by long-term contracts.  Rather, the Debtors obtain goods from such claimants on an order-by-order basis. Additionally, the Debtors have tight timelines with their vendors, with some invoices being due and payable as early as 15 days within receipt.  As a result, a 503(b)(9) Claimant may refuse to supply new orders if the Debtors do not pay the 503(b)(9) Claims.  Such refusal would negatively affect the Debtors' estates because the Debtors' business is dependent on the steady flow of goods and products through their logistics network. Further, certain of the Debtors place bulk inventory

orders with their vendors in November and December to ensure the proper variety and quantity of their merchandise is available for sale in January following the holiday season. The substantial amount of interim and final relief requested in this Motion is, in part, the result of such orders.

34.     Accordingly, the Debtors request the authority, but not the direction, to pay undisputed 503(b)(9) Claims as and when they come due subject to the Interim Order Cap and the Final Order Cap. Importantly, the Debtors do not seek to accelerate or modify existing payment terms with respect to the 503(b)(9) Claims. Rather, the Debtors will pay the 503(b)(9) Claims as they come due in the ordinary course of business. As of the Petition Date, the Debtors estimate that the 503(b)(9) Claims total approximately $58,200,000 in the aggregate, approximately $54,000,000 of which will come due within twenty-one (21) days following the Petition Date.

## BASIS FOR RELIEF REQUESTED

**A.     The Court Should Grant the Requested Relief Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.**

35.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate. See, e.g., In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a bankruptcy court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.), 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

36.     Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so.  See Ionosphere Clubs, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

37.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Under section 105(a), courts may authorize payments of prepetition obligations when essential to the continued operation of a debtor's businesses.  See Just for Feet, 242 B.R. at 825.  Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  Ionosphere Clubs, 98 B.R. at 176.

38.     Indeed, the United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New Eng. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. Id. (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits

"immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); Just for Feet, 242 B.R. at 824–25 (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

39.     Allowing the Debtors to pay Shippers & Logistics Providers Claims, Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims pursuant to sections 363(b) and 105(a) of the Bankruptcy Code is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code: preserving going-concern value and maximizing the value of property available to satisfy creditors. See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship, 526 U.S. 434, 453 (1999).

**B.      Payment of Certain Shippers & Logistics Providers Claims Now Will Not Adversely Affect Creditor Recoveries in These Chapter 11 Cases.**

40.     Certain Shippers & Logistics Providers may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[5]  11 U.S.C. § 362(b)(3).  As a result, the Debtors anticipate that certain Shippers & Logistics Providers may assert or perfect liens, refuse to turn over goods in their possession, or stop performing their ongoing obligations.

---

[5]     See 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection.").

Even absent a valid lien, to the extent that certain Shippers & Logistics Providers have possession of the Debtors' inventory, mere possession or retention would disrupt the Debtors' operations.

41.     Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Shippers & Logistics Providers may be entitled to adequate protection of a valid possessory lien to the extent that the Debtors use or sell the estate property against which a Shippers & Logistics Providers Claim is asserted.  Given that the value of such property will generally far exceed the value of the related Shippers & Logistics Providers Claim, creditors will not be harmed—and, in fact, will be benefited—by the satisfaction of certain amounts owed to the Shippers & Logistics Providers.  In some instances—for example, if a Shipper & Logistics Provider is permitted a lien—where the amounts owed to a Shipper & Logistics Provider is less than the value of the goods that could be held as collateral to secure the Shipper & Logistics Provider Claim, such parties may be fully secured creditors of the Debtors' estates.  In such instances, payment now only provides such parties with what they might be entitled to receive, only without any interest costs that might otherwise accrue during these Chapter 11 Cases.  See In re Kidde-Fenwal, Inc., Case No. 23-10638 (LSS) (Bankr. D. Del. May 16, 2023) (authorizing payment of certain lien claimants' prepetition claims when lien claimants are able to assert possessory liens on the debtors' goods in the event of non-payment).  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy and the ultimate delivery and sale of inventory to customers.

**C.     Ample Authority Exists to Support the Payment of Critical Vendor Claims and Foreign Vendor Claims.**

42.     The Debtors depend on the supply of good and merchandise and the provision of services by the Critical Vendors and Foreign Vendors to sustain their operations.  Ensuring that these Critical Vendors continue to supply and service such goods to the Debtors is, therefore, vital to the success of these Chapter 11 Cases and the ability of the Debtors to continue operating in the

ordinary course of business during these Chapter 11 Cases.  A slight disruption to the products, instruments, and services provided by the Critical Vendors could leave the Debtors unable to meet their obligations and disrupt their important relationship with their customers.  The resulting harm to the Debtors' estates, in turn, far outweighs the costs associated with paying a portion of the Debtors' prepetition obligations to the Critical Vendors.  The Debtors believe that the relief sought in this Motion will not burden the Debtors and, instead, will help to maximize the value of their estates.

43.     Further, with respect to the Foreign Vendor Claims, suppliers and vendors located in foreign countries may be less familiar with the chapter 11 process and react skeptically to various debtor protections, despite the worldwide nature of the automatic stay.  The merchandise and services provided to the Debtors by the Foreign Vendors is a key source of the Debtors' revenue and a major factor in the overall reputation of the Debtors and the loyalty of their customers.  The Debtors believe that the ability to utilize Foreign Vendors is essential to maintaining a competitive cost structure.

44.     As set forth above, despite the commencement of these Chapter 11 Cases and the imposition of the automatic stay, the Foreign Vendors likely would be able to immediately pursue remedies against the Debtors and seek to collect prepetition amounts owed to them.  Non-payment of Foreign Vendor Claims may also cause Foreign Vendors to take other harmful actions, including delaying shipments of materials or component parts.  As a result, there is a significant risk that the Foreign Vendors could seek to reclaim vital goods and equipment already in the Debtors' possession or shut down the Debtors' access to essential goods needed to maximize profit, which would significantly disrupt the Debtors' operations.  Timely shipment of inventory is critical to the Debtors' business and cash flows, and the Debtors can ill afford any delays or interruptions of

this nature.  If the Foreign Vendors were to fail to ship goods or to refuse to do business with the

Debtors because of a failure to pay their prepetition claims, the Debtors would not be able to

provide their customers with products and merchandise.  Thus, in light of the potential irreparable

harm that could result if the Foreign Vendors refused to continue making timely deliveries to the

Debtors—coupled with the lack of any workable enforcement mechanism against such parties—

the Debtors believe that payment of the Foreign Vendor Claims is essential to avoid costly

disruptions to the Debtors' operations and ability to continue operating as a going concern in these

Chapter 11 Cases.

**D.**     **The Court Should Authorize the Payment of Claims Entitled to Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code.**

45.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the

"value of any goods received by the debtor within 20 days before the date of commencement of a

case under this title in which goods have been sold to the debtor in the ordinary course of such

debtor's business."  Consequently, payment of such claims now only provides such parties with

what they will be entitled to ultimately receive in these cases.  The timing of such payments lies

squarely within the Court's discretion.  <u>See</u> <u>In re Glob. Home Prods., LLC</u>, No. 06-10340 (KG),

2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("The timing of the payment of that

administrative expense claim is left to the discretion of the Court."); <u>In re Alamo Drafthouse</u>

<u>Cinemas Holdings, LLC</u>, No. 21-10474 (MFW) (Bankr. D. Del. Mar. 29, 2021) (authorizing

debtors to pay claims arising under section 503(b)(9) of the Bankruptcy Code).  The payment of

certain 503(b)(9) Claims, in the Debtors' discretion, may allow the Debtors to maximize the value

of their estates by allowing the Debtors to satisfy such claims, where doing so would have a net

benefit to their estates in terms of increased inventory, favorable credit terms, or other benefits to

the estates.

46.     Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims sooner rather than later in a chapter 11 case.  The Debtors believe they may pay such 503(b)(9) Claims as administrative claims incurred in the ordinary course of business in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code.  See, e.g., In re Dura Auto. Sys. Inc., No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21–23 ("I think arguably the debtor could pay its 503(b)(9) claimants without court approval.").  Again, the timing of such payments lies squarely within the Court's discretion.  See Glob. Home, 2006 WL 3791955, at *3.

## SATISFACTION OF BANKRUPTCY RULE 6003(b)

47.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one (21) days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  The failure of any Vendor to deliver necessary goods and services to the Debtors would have immediate and detrimental consequences to the Debtors' business and would jeopardize the Debtors' efforts to preserve and maximize the value of their estates, to the detriment and prejudice of all of the Debtors' stakeholders.  Moreover, it is the Debtors' business judgment that continuation of their positive relationship with the Critical Vendors is critical to avoid any unexpected or inopportune interruption to their operations and increases the likelihood of successfully prosecuting these Chapter 11 Cases.  Thus, if the relief requested herein is not granted, the Debtors' failure to satisfy Critical Vendor Claims would cause the Debtors' estates immediate and irreparable harm by detracting from, and potentially derailing, the Debtors' chapter 11 efforts.

48.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

49.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, any delay in paying Shippers & Logistics Providers Claims, Critical Vendor Claims, and 503(b)(9) Claims would be detrimental to the Debtors, their creditors, and estates, as the Debtors' ability to manage and run their business operations without any unexpected or inopportune interruption requires, in part, that they continue to receive the goods and services provided by the Shippers & Logistics Providers and Critical Vendors.  For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders.

50.     To implement the foregoing immediately, the Debtors also respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent they are applicable to the Proposed Orders.

## RESERVATION OF RIGHTS

51.     Nothing in the Proposed Orders or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair,

prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action; or (iv) shall be construed as a promise to pay a claim.

52.     Nothing in the Proposed Orders or this Motion shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of any Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

53.     Nothing in the Proposed Orders or this Motion shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

## <u>NOTICE</u>

54.     Notice of this Motion has been or will be provided to:  (i) the U.S. Trustee; (ii) the United States Attorney's Office for the District of Delaware; (iii) those creditors holding the fifty (50) largest unsecured claims against the Debtors' estates; (iv) counsel to the ABL Lenders; (v) counsel to the Ad Hoc Group of First Lien Lenders; (vi) counsel to the Second Lien Term Loan Lenders; (vii) counsel to the HoldCo Lenders; (viii) counsel to the DIP Agent; (ix) counsel to the DIP Lenders; (x) the Internal Revenue Service; and (xi) the Banks.  The Debtors will serve copies of this Motion and an order entered in respect of this Motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.  No previous motion for the relief sought herein has been made to this Court or any other court.


*[Remainder of Page Left Intentionally Blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Proposed Orders, granting the

relief requested herein and such other and further relief as is just and proper.

Dated: November 3, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (*pro hac vice* pending)
Matthew A. Feldman (*pro hac vice* pending)
Betsy L. Feldman (Del. No. 6410)
Joseph R. Brandt (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com
jbrandt@willkie.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**EXHIBIT A**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS**
**TO PAY CERTAIN PREPETITION CLAIMS OF CERTAIN**
**CRITICAL VENDORS, FOREIGN VENDORS, SHIPPERS & LOGISTICS**
**PROVIDERS AND 503(b)(9) CLAIMANTS; AND (II) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the debtors and debtors in possession

in the above-captioned cases (collectively, the "Debtors") for the entry of interim and final orders,

(i) authorizing, but not directing, the Debtors to pay certain prepetition Shippers & Logistics

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the First Day Declaration.

Providers Claims, Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims in an amount not to exceed the Interim Order Cap and, in the aggregate, inclusive of amounts paid pursuant to the Interim Order, an amount not to exceed the Final Order Cap, and (ii) granting related relief; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and this Court having found that venue of these Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and this Court having determined that it may enter an order consistent with Article III of the United States Constitution; and upon consideration of the First Day Declaration; and upon the record in these Chapter 11 Cases and all of the proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, and their creditors; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is GRANTED on an interim basis as set forth herein.

2.    A final hearing on the relief sought in the Motion shall be conducted on _____, 2024 at _____ **(ET)** (the "Final Hearing"). Any party-in-interest objecting to the relief sought at the Final Hearing or entry of the Final Order shall file and serve a written objection, which objection shall be served upon (i) proposed co-counsel for the Debtors,

(a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Debra M. Sinclair, Esq. (dsinclair@willkie.com) and Betsy L. Feldman, Esq. (bfeldman@willkie.com), and (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn:  Edmon L. Morton, Esq. (emorton@ycst.com) and Matthew B. Lunn, Esq. (mlunn@ycst.com); (ii) counsel to any official committee appointed in these Chapter 11 Cases; (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox, Esq. (timothy.fox@usdoj.gov); (iv) counsel to the DIP Agent, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004, Attn: Gregg Bateman, Esq. (bateman@sewkis.com), Sagar Patel, Esq. (patel@sewkis.com), and Michael Danenberg, Esq.(danenberg@sewkis.com); (v) counsel to the DIP Lenders and Ad Hoc Group of First Lien Lenders, (a) Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn: Jayme Goldstein, Esq. (jaymegoldstein@paulhastings.com), Jeremy Evans, Esq. (jeremyevans@paulhastings.com), and Isaac Sasson, Esq. (isaacsasson@paulhastings.com), and (b) Landis Rath & Cobb LLP, 919 N. Market Street Suite 1800, Wilmington, DE 19317, Attn: Adam G. Landis, Esq. (landis@lrclaw.com) and Matthew McGuire, Esq. (mcguire@lrclaw.com); (vi) counsel to the ABL Lenders, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, Attn: Jennifer Ezring, Esq. (Jennifer.Ezring@lw.com), James Ktsanes, Esq. (James.Ktsanes@lw.com) and Andrew Sorkin, Esq. (andrew.sorkin@lw.com); (vii) counsel to the Second Lien Term Loan Lenders, White & Case LLP, 200 S Biscayne Blvd, Miami, FL 33131, Attn:  Thomas Lauria, Esq. (tlauria@whitecase.com), and 111 S. Wacker Dr., Suite 5100, Chicago, IL 60606, Attn:  Bojan Guzina, Esq. (bojan.guzina@whitecase.com); and (viii) counsel to the HoldCo Lenders at the address set forth in (vii) above, in each case no later than

3

_____, 2024 at 4:00 p.m. (ET).  If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

3.      The Debtors are authorized in their discretion, to pay, honor, or otherwise satisfy prepetition Shippers & Logistics Providers Claims, Foreign Vendor Claims, Critical Vendor Claims, and 503(b)(9) Claims in the ordinary course of their business up to an aggregate amount of $77,650,000 on an interim basis, subject to the terms and conditions set forth in this Interim Order.

4.      Nothing in this Interim Order shall prejudice the Debtors' right to request authority to pay additional amounts on account of the Shippers & Logistics Providers Claims, Foreign Vendor Claims, Critical Vendor Claims, and 503(b)(9) Claims and the Debtors' right to seek such relief is expressly reserved.

5.      The Debtors are authorized to undertake appropriate efforts to cause Critical Vendors and/or Foreign Vendors to enter into Trade Agreements with the Debtors substantially similar to that annexed as <u>Exhibit C</u> to the Motion, as a condition of payment of each such Critical Vendor's or Foreign Vendor's Trade Claim.  The Debtors are authorized, in their discretion, to make payments on account of a Trade Claim, subject to the other limits set forth herein, even in the absence of a Trade Agreement, if the Debtors determine, in their business judgment that failure to pay such Trade Claim is likely to harm the Debtors' business operations.  For the avoidance of doubt, this Interim Order does not approve the terms of the Trade Agreement.

6.      If a Critical Vendor or Foreign Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed to by the parties) following receipt of payment on its Critical Vendor Claim or Foreign Vendor Claim, as applicable, (regardless of whether such Critical Vendor or Foreign Vendor has entered into a Trade

Agreement), or fails to comply with any Trade Agreement entered into between such Critical Vendor or Foreign Vendor and the Debtors, then the Debtors may, without further order of the Court: (i) declare that any Trade Agreement between the Debtors and such Critical Vendor or Foreign Vendor, as applicable, is terminated; (ii) declare that payments made to such Critical Vendor or Foreign Vendor, as applicable, on account of its Trade Claims shall be deemed to have been in payment of then-outstanding or subsequently accruing postpetition claims of such Critical Vendor or Foreign Vendor; and (iii) take any and all appropriate steps to recover any payment made to such Critical Vendor or Foreign Vendor, as applicable, on account of its Trade Claim(s) to the extent that such payments exceeded the postpetition claims of such Critical Vendor or Foreign Vendor, as applicable, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense; provided, however, that, if requested, such Critical Vendor or Foreign Vendor shall be entitled to notice and an opportunity to be heard as to any disputes with respect to the Debtors' exercise of the rights enumerated in this Paragraph 6.  Nothing herein shall constitute a waiver of the Debtors' rights to seek damages or other appropriate remedies against any breaching Critical Vendor or Foreign Vendor.

7.      Notwithstanding the foregoing, the Debtors may, in their discretion, reinstate a Trade Agreement if:

a.      the underlying default under the Trade Agreement is fully cured by the Critical Vendor or Foreign Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor or Foreign Vendor of such default; or

b.      the Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor or Foreign Vendor.

8.      The authorization granted hereby to pay Trade Claims shall not create any obligation on the part of the Debtors or their officers, directors, attorneys, or agents to pay the Trade Claims, none of the foregoing persons shall have any liability on account of any decision by

the Debtors not to pay a Trade Claim and nothing contained in this Interim Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect the Trade Claims to the extent they are not paid.

9.      The amount of any Trade Claim set forth in a Trade Agreement shall be used only for purposes of determining a Critical Vendor's or Foreign Vendor's claim under this Interim Order, shall not be deemed a claim allowed by the Court, and may be subject to further order of the Court.  Notwithstanding payment of such Trade Claim in accordance with this Interim Order, the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court.  Further, signing a Trade Agreement containing a claim amount for purposes of this Interim Order shall not excuse such Critical Vendor or Foreign Vendor from filing a proof of claim in these cases on account of prepetition amounts that may remain unpaid.

10.      A Critical Vendor or Foreign Vendor who receives payment on account of a Trade Claim (whether or not such Critical Vendor or Foreign Vendor signs a Trade Agreement) shall not: (i) file or perfect a Lien on account of such Trade Claim, and any such Critical Vendor or Foreign Vendor shall take all necessary action to remove any existing Lien relating to such Trade Claim, even if the Lien is against property of a non-Debtor; or (ii) seek to reclaim goods previously shipped to the Debtors.

11.      Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

12.      The execution of a Trade Agreement by the Debtors shall not be declared a waiver of any other cause of action, including avoidance actions, which may be held by the Debtors.

13.     The Debtors' banks and other financial institutions (collectively, the "<u>Banks</u>") are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order, and any such Banks shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Interim Order.

14.     Nothing in this Interim Order (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors, (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates, or (iii) shall be construed as a promise to pay a claim.

15.     Notwithstanding anything to the contrary in this Interim Order, the Motion, or its attachments, the validity, amount, or priority status of a creditor's claim, including that of claims arising under § 503(b)(9) of the Bankruptcy Code, shall not be affected by whether such creditor executes a Vendor Agreement or provides services or goods to the Debtors under Customary Trade Terms, or otherwise.

16.     Nothing in this Interim Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or

(b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

17.     Nothing in this Interim Order, nor as a result of any payment made pursuant to this Interim Order, shall be deemed or construed as a waiver of the right of Debtors, or shall impair the ability of Debtors, to contest the validity and amount of any payment made pursuant to this Interim Order.

18.     Nothing in this Interim Order shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

19.     Notwithstanding anything to the contrary set forth herein, any payment made, or authorization contained, hereunder shall be subject in all respects to the Approved Budget (as such term is defined in the order approving the Debtors' postpetition financing agreements).

20.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

21.     The requirements of Bankruptcy Rule 6003(b) have been satisfied because the relief set forth in this Interim Order is necessary to avoid immediate and irreparable harm.

22.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be effective and enforceable immediately upon its entry.

23.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

24.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

## EXHIBIT B

**Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (JTD)<br><br>(Jointly Administered)<br><br>Ref. Docket No. ___ |

**FINAL ORDER (I) AUTHORIZING THE
DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF CERTAIN
CRITICAL VENDORS, FOREIGN VENDORS, SHIPPERS & LOGISTICS
PROVIDERS, AND 503(b)(9) CLAIMANTS; AND (II) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the debtors and debtors in possession

in the above-captioned cases (collectively, the "Debtors") for the entry of interim and final orders,

(i) authorizing, but not directing, the Debtors to pay certain prepetition Shippers & Logistics

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the First Day Declaration.

Providers Claims, Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims in an amount not to exceed the Interim Order Cap and, in the aggregate, inclusive of amounts paid pursuant to the Interim Order, an amount not to exceed the Final Order Cap, and (ii) granting related relief; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and this Court having found that venue of these Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and this Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and upon consideration of the First Day Declaration; and upon the record in these Chapter 11 Cases and all of the proceedings had before this Court; and the Court having approved the Motion on an interim basis; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, and their creditors; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, in their discretion, to pay, honor, or otherwise satisfy prepetition Shippers & Logistics Providers Claims, Foreign Vendor Claims, Critical Vendor Claims, and 503(b)(9) Claims in the ordinary course of their business up to an

aggregate amount of $99,700,000, inclusive of amounts paid pursuant to the Interim Order, on a final basis, subject to the terms and conditions set forth in this Final Order.

3.        Nothing in this Final Order shall prejudice the Debtors' right to request authority to pay additional amounts on account of the Shippers & Logistics Providers Claims, Foreign Vendor Claims, Critical Vendor Claims, and 503(b)(9) Claims and the Debtors' right to seek such relief is expressly reserved.

4.        The Debtors are authorized to undertake appropriate efforts to cause Critical Vendors and/or Foreign Vendors to enter into Trade Agreements with the Debtors substantially similar to that annexed as <u>Exhibit C</u> to the Motion, as a condition of payment of each such Critical Vendor's or Foreign Vendor's Trade Claim.  The Debtors are authorized, in their discretion, to make payments on account of a Trade Claim, subject to the other limits set forth herein, even in the absence of a Trade Agreement, if the Debtors determine, in their business judgment, that failure to pay such Trade Claim is likely to harm the Debtors' business operations. For the avoidance of doubt, this Final Order does not approve the terms of the Trade Agreement.

5.        If a Critical Vendor or Foreign Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed to by the parties) following receipt of payment on its Critical Vendor Claim or Foreign Vendor Claim, as applicable, (regardless of whether such Critical Vendor or Foreign Vendor has entered into a Trade Agreement), or fails to comply with any Trade Agreement entered into between such Critical Vendor or Foreign Vendor and the Debtors, then the Debtors may, in their discretion and without further order of the Court: (i) declare that any Trade Agreement between the Debtors and such Critical Vendor or Foreign Vendor, as applicable, is terminated; (ii) declare that payments made to such Critical Vendor or Foreign Vendor, as applicable, on account of its Trade Claims shall be

deemed to have been in payment of then-outstanding or subsequently accruing postpetition claims of such Critical Vendor or Foreign Vendor; and (iii) take any and all appropriate steps to recover any payment made to such Critical Vendor or Foreign Vendor, as applicable, on account of its Trade Claim(s) to the extent that such payments exceeded the postpetition claims of such Critical Vendor or Foreign Vendor, as applicable, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense; provided, however, that, if requested, such Critical Vendor or Foreign Vendor shall be entitled to notice and an opportunity to be heard as to any disputes with respect to the Debtors' exercise of the rights enumerated in this Paragraph 5. Nothing herein shall constitute a waiver of the Debtors' rights to seek damages or other appropriate remedies against any breaching Critical Vendor or Foreign Vendor.

6.      Notwithstanding the foregoing, the Debtors may, in their discretion, reinstate a Trade Agreement if:

    a.   the underlying default under the Trade Agreement is fully cured by the Critical Vendor or Foreign Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor or Foreign Vendor of such default; or

    b.   the Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor or Foreign Vendor.

7.      The authorization granted hereby to pay Trade Claims shall not create any obligation on the part of the Debtors or their officers, directors, attorneys, or agents to pay the Trade Claims, none of the foregoing persons shall have any liability on account of any decision by the Debtors not to pay a Trade Claim and nothing contained in this Final Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect the Trade Claims to the extent they are not paid.

8.      The amount of any Trade Claim set forth in a Trade Agreement shall be used only for purposes of determining a Critical Vendor's or Foreign Vendor's claim under this Interim Order, shall not be deemed a claim allowed by the Court, and may be subject to further order of the Court.  Notwithstanding payment of such Trade Claim in accordance with this Interim Order, the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court.  Further, signing a Trade Agreement containing a claim amount for purposes of this Final Order shall not excuse such Critical Vendor or Foreign Vendor from filing a proof of claim in these cases on account of prepetition amounts that may remain unpaid.

9.      A Critical Vendor or Foreign Vendor who receives payment on account of a Trade Claim (whether or not such Critical Vendor or Foreign Vendor signs a Trade Agreement) shall not (i) file or perfect a Lien on account of such Trade Claim, and any such Critical Vendor or Foreign Vendor shall take all necessary action to remove any existing Lien relating to such Trade Claim, even if the Lien is against property of a non-Debtor; or (ii) seek to reclaim goods previously shipped to the Debtors.

10.      Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

11.      The execution of a Trade Agreement by the Debtors shall not be declared a waiver of any other cause of action, including avoidance actions, which may be held by the Debtors.

12.      The Debtors' banks and other financial institutions (collectively, the "Banks") are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or

after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments. The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Final Order, and any such Banks shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Final Order.

13.     Nothing in this Final Order (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors, (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates, or (iii) shall be construed as a promise to pay a claim.

14.     Notwithstanding anything to the contrary in this Final Order, the Motion, or its attachments, the priority status of a creditor's claim, including that of claims arising under § 503(b)(9) of the Bankruptcy Code, shall not be affected by whether such creditor executes a Vendor Agreement or provides services or goods to the Debtors under Customary Trade Terms, or otherwise.

15.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order.

16.     Nothing in this Final Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

17.     Nothing in this Final Order, nor as a result of any payment made pursuant to this Final Order, shall be deemed or construed as a waiver of the right of Debtors, or shall impair the ability of Debtors, to contest the validity and amount of any payment made pursuant to this Final Order.

18.     Nothing in this Final Order shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

19.     Notwithstanding anything to the contrary set forth herein, any payment made, or authorization contained, hereunder shall be subject in all respects to the Approved Budget (as such term is defined in the order approving the Debtors' postpetition financing agreements).

20.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be effective and enforceable immediately upon its entry.

21.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

22.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

## **EXHIBIT C**

**Trade Agreement**

[Date]

TO:    [Critical Vendor]
       [Name]
       [Address]

Dear Valued Supplier:

As you may be aware, on November 3, 2024 (the "Petition Date"), Franchise Group, Inc. and its subsidiaries (collectively, the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Cases" and the "Bankruptcy Court," respectively).  On the Petition Date, we requested the Bankruptcy Court's authority to pay certain critical service providers and suppliers (the "Critical Vendors") in recognition of the importance of our relationship with them and our desire that the Bankruptcy Cases have as little effect on them as possible.  On [●], 2024, the Bankruptcy Court entered the interim order (the "Interim Order").  On [●], 2024, the Bankruptcy Court entered the final order (the "Final Order" and together with the Interim Order, the "Orders")) authorizing us, under certain conditions, to pay pre-bankruptcy claims of Critical Vendors that agree to the terms set forth below and to be bound by the terms of the Orders.  Copies of the Orders are enclosed.

To receive payment on pre-bankruptcy claims, we require each Critical Vendor to agree to continue supplying goods to the Debtors based on "Customary Trade Terms."  In the Orders, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowance, rebates and availability and other applicable terms and programs) in effect between such Critical Vendor and the Debtors 12 months prior to the Petition Date (the "Prepetition Trade Terms") or such other trade terms, practices and programs agreed upon by the parties that are at least as favorable to the Debtors as the Prepetition Trade Terms.

For purposes of administration of this trade program as authorized by the Bankruptcy Court, the Debtors and you agree as follows:

1.    The total prepetition amount due to the vendor (net of any setoffs, credits or discounts) is $_____ (the "Total Prepetition Claim").

2.    The amount that you are agreeing to be paid under this vendor motion is $_____ (the "Critical Vendor Claim").  **Your Critical Vendor Claim does not constitute a claim allowed by the Bankruptcy Court in the Bankruptcy Cases.  By signing this Trade Agreement you [ are / are not ] agreeing to waive all remaining claims on account of prepetition amounts that may remain unpaid (the difference between the Total Prepetition Claim and the Critical Vendor Claim).**

1

2.        The open trade balance or credit line that you will extend to the Debtors for shipment of postpetition goods is $_____ (which shall not be less than the most favorable trade terms offered to the Debtors prior to the Petition Date).

3.        In consideration for the payment described herein, you agree not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "<u>Lien</u>") or claim for reclamation ("<u>Reclamation Claim</u>"), regardless of the statute or other legal authority upon which such Lien or Reclamation Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent you have already obtained or otherwise asserted such a Lien or Reclamation Claim, you shall (at your own expense) take whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim.

4.        You will hereafter extend to the Debtors all Customary Trade Terms, which are:


[ADD INDIVIDUALIZED SET OF CUSTOMARY TRADE TERMS]


Payment of your Critical Vendor Claim in the manner set forth in the Order may occur upon execution of this letter by a duly authorized representative of your company and the return of this letter to the Debtors.  Your execution of this letter agreement and the return of the same to the Debtors constitutes an agreement between you and the Debtors:

(a)        to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Critical Vendor Claim set forth above;

(b)        that, during the pendency of the Bankruptcy Cases, you will continue to supply the Debtors with goods and/or services, pursuant to the terms hereof and that the Debtors will pay for such goods in accordance with the terms hereof;

(c)        that you have reviewed the terms and provisions of the Order and acknowledge that you are bound by such terms;

(d)        that you will not separately seek the reclamation of goods shipped to the Debtors;

(e)        that if either the trade payment program authorized by the Order (the "<u>Trade Payment Program</u>") or your participation therein terminates as provided in the Order, any payments received by you on account of your Critical Vendor Claim will be deemed to have been in

2

payment of postpetition obligations owed to you and you will immediately repay to the Debtors any payments made to you on account of your Critical Vendor Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense; and

(f)    that, subject to the terms and conditions set forth herein, your Critical Vendor Claim will be paid in accordance with the following schedule:

| Date | Amount of Payment |
|------|-------------------|
|      |                   |

The Debtors and you also hereby agree that any dispute with respect to this agreement, the Order and/or your participation in the Trade Payment Program shall be determined by the Bankruptcy Court notwithstanding any provision of any other contract between you and the Debtors to the contrary (whether such contract exists now or is entered into in the future).

If you have any questions about this Agreement or our financial restructuring, please do not hesitate to call [Name] at (___)_____ or [Name] at (___)_____.

Sincerely,
[Debtor]
By:
Its:

Agreed and Accepted by:
[Name of Critical Vendor]

By:

Its:

Dated: