## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) PAY CERTAIN PREPETITION EMPLOYMENT OBLIGATIONS AND COMPENSATION OBLIGATIONS AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND COMPENSATION OBLIGATIONS AND (II) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby file this motion (the "Motion") for the entry of interim and final orders, substantially in the forms attached hereto as Exhibit A (the "Interim Order") and Exhibit B (the "Final Order," and, together with the Interim Order, the "Proposed Orders"), (i) authorizing the Debtors, in their discretion, to (a) pay the Prepetition Workforce Obligations and Compensation

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

Obligations and (b) maintain the Compensation Program and Employee Benefit Obligations (each as defined below), and (ii) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of* David Orlofsky *in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] filed concurrently herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 507(a), and 541 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1.

---

[2]     Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the First Day Declaration.

**BACKGROUND**

4.      On November 3, 2024 (the "Petition Date"), each of the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Debtors are authorized to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

6.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

**RELIEF REQUESTED**

7.      The Debtors request entry of the Proposed Orders authorizing, but not directing, the Debtors, in their discretion, to: (i) pay all prepetition wages, salaries, and compensation to the Workforce (as defined below and, collectively, the "Wages"), pay prepetition obligations under the Commission Program, Severance Practices, and Attendance Award Program (each as defined below) and maintain the historical AIP, Commission Program, Attendance Award Program, and Severance Practices, and all related administrative and incidental costs (each as defined below and, collectively, the "Compensation Obligations"), and maintain prepetition employee benefits (each as described below and, collectively, the "Employee Benefit Obligations"); (ii) pay all employment, unemployment, Social Security, Medicare, and federal, state, and local taxes relating to the Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, the "Payroll Taxes"), and make other payroll deductions, including, but not limited to, union payments, retirement, and other employee benefit plan contributions, garnishments, and voluntary deductions

(all as described below and, collectively with the Payroll Taxes, the "Payroll Deduction

Obligations," and, collectively with the Wages and Employee Benefit Obligations, the "Prepetition

Workforce Obligations"); and (iii) honor and continue the Debtors' prepetition programs, policies,

and practices as described in this Motion in the ordinary course of business.

8.      To fulfill these commitments, the Debtors request entry of the Interim Order,

authorizing, but not directing, the Debtors to pay Prepetition Workforce Obligations and, subject

to entry of the Final Order, prepetition amounts under the Commission Program, Severance

Practices, and Attendance Award Program, in an amount not to exceed $26,305,300 on an interim

basis and $28,063,800 on a final basis, subject to the $15,150 statutory cap per current or former

Employee or Temporary Employee (each as defined below) established by sections 507(a)(4) and

(a)(5) of the Bankruptcy Code.  Further, the Debtors request that the Court authorize the Debtors'

banks and other financial institutions to receive, process, honor, and pay all checks, drafts,

electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts

before the Petition Date for Prepetition Workforce Obligations (or to reissue checks, drafts,

electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank

accounts, as may be necessary), and authorize, but not direct, the banks and financial institutions

to rely on the Debtors' representations as to which checks, drafts, electronic fund transfers, or other

forms of payment drawn or issued on the Debtors' bank accounts are subject to this Motion;

provided that sufficient funds are on deposit in the applicable bank accounts to cover such

payments.[3]

---

[3]     Contemporaneously with the filing of this Motion, the Debtors filed the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors To (A) Continue To Maintain Their Cash Management System, Including Bank Accounts and Business Forms, and (B) Honor Certain Prepetition Obligations Related Thereto; (II) Waiving Certain Operating Guidelines; (III) Extending Time to Comply with Section 345(B); and (IV) Granting Related Relief* (the "Cash Management Motion"), which seeks, among other things, authority to

## THE DEBTORS' WORKFORCE

9.      As of the Petition Date, the Debtors employ approximately 7,000 full-time employees and 4,900 part-time employee (collectively, the "Employees").  The workforce is divided among the Debtors' headquarters located in Delaware, Ohio (the "Headquarters"), as well as remote and home-based employees across the United States, Canada, and Portugal.  There are approximately 2,500 salaried and 9,400 hourly Employees.  In the ordinary course of their business, the Debtors have historically hired short-term or temporary Employees (the "Temporary Employees") for specific short-term projects, or on short-term freelance, per diem, or temporary basis.  Temporary Employees are hired through various temporary employment agencies (the "Staffing Agencies").  As of the Petition Date, the Debtors retain approximately 225 Temporary Employees across the United States through the Staffing Agencies.

10.      Approximately 17 of the Debtors' Employees are union members (collectively, the "Union Employees" and, together with Employees and Temporary Employees, the "Workforce"). The Union Employees are represented by the Teamsters Local Union No. 243, an affiliate of the International Brotherhood of Teamsters (the "Union").  All Union Employees are located in Livonia, Michigan.  The Union is party to a collective bargaining agreement (a "CBA") with the Debtors.  The CBA expires on October 18, 2026.

11.      The Debtors' Workforce performs a variety of critical functions throughout the Debtors' business, including, among other things, operating and managing the Debtors' facilities; establishing sales relationships with customers; rectifying supply chain issues, if any; ensuring fulfillment goals are met; and developing and maintaining quality control and compliance goals.

---

continue using the Debtors' cash management system, including their Bank Accounts (as defined in the Cash Management Motion).

Additionally, the Workforce provides administrative, marketing, managerial, and customer service, as well as accounting services, from the Debtors' Headquarters and elsewhere.

12.    The Debtors' ability to run their business safely and productively depends entirely on the expertise and continued support and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the continuity and competence of their Workforce will be jeopardized if the relief requested herein is not granted. Moreover, if the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course of business, members of their Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such an outcome would have a highly negative impact on Workforce morale and productivity and would risk immediate and irreparable harm to the Debtors' continuing operations and their estates.  Accordingly, the Debtors have determined that meeting their Prepetition Workforce Obligations and continuing all of the compensation and benefits programs described in this Motion are vital to preventing the loss of key members of the Debtors' Workforce during the pendency of these Chapter 11 Cases and to maintaining the continuity and stability of the Debtors' operations.

## I.    Overview

13.    As described in further detail below, the obligations that the Debtors seek authority to pay are summarized in the following table:

| Compensation | Interim Period | Final Period |
|---|---|---|
| Gross Wages | $13,610,000 | $13,610,000 |
| Temporary Employees / Independent Contractors | $140,000 | $140,000 |
| Payroll Processing Services | $216,000 | $216,000 |
| Commissions | $1,945,800 | $2,162,000 |
| Non-Insider Severance | $0 | $115,000 |
| Union Employee Attendance Awards | $150 | $150 |
| Withholding Obligations | $4,320,000 | 4,320,000 |
| Expense Reimbursement | $113,600 | $113,600 |
| Concur / ExpenseWire Administrative Fees | $0 | $24,200 |
| FRG Card Program | $329,000 | $329,000 |
| PSP Card Program | $1,966,000 | $1,966,000 |
| **Employee Benefits Programs** | | |
| Benefits Administrators | $35,000 | $35,000 |
| Medical Plans | $1,892,500 | $2,465,000 |
| Prescription Plan | $350,000 | $350,000 |
| Dental Plan | $75,100 | $141,000 |
| Stop-Loss Policy | $230,000 | $230,000 |
| Flex Spending Account - Employee Deductions | $13,200 | $13,200 |
| Health Savings Account - Employee Deductions | $24,100 | $24,100 |
| Health Savings Account - Employer Contributions | $0 | $19,700 |
| Basic Life / AD&D | $94,000 | $94,000 |
| Short-Term - Disability | $135,000 | $135,000 |
| CorVel Claims Administrator | $70,850 | $70,850 |
| Workers' Compensation Program | $745,000 | $1,490,000 |
| **Total:** | **$26,305,300** | **$28,063,800** |

## II.    Compensation Obligations

### A.    Workforce Wages and Compensation

14.    Generally, Employees are paid their Wages on a bi-weekly basis. If a payday falls on a holiday, the Wages are paid on the business date prior to the holiday or weekend. Over the past twelve (12) months, the average monthly payroll for Employees aggregated approximately $36,500,000. The Debtors estimate that, as of the Petition Date, the total amount of outstanding prepetition Wages is approximately $13,610,000 all of which will become due and owing within the first twenty-one (21) days of these Chapter 11 Cases. To the best of the Debtors' knowledge,

as of the Petition Date, no Employee is owed Wages in an amount exceeding the $15,150 statutory cap imposed by section 507(a)(4) of the Bankruptcy Code.

15.     In the ordinary course of business, the Staffing Agencies submit invoices to the Debtors on behalf of the Temporary Employees, which are subsequently paid in accordance with the Debtors' standard accounting practices and according to the terms of each Temporary Employee's contract.  The Debtors do not pay wages to, withhold taxes for, or provide benefits or paid time off to the Temporary Workers.

16.     Due to the individualized and *ad hoc* nature of many of the Temporary Workers' working relationship with the Debtors, it is difficult for the Debtors to determine the total accrued and unpaid prepetition obligations due to the Temporary Workers as of the Petition Date with specificity.  However, the Debtors believe that, based on historical monthly spend, the Debtors likely owe approximately $140,000 in outstanding obligations due to Temporary Workers as of the Petition Date, all of which will become due and owing within the first twenty-one (21) days of these Chapter 11 Cases.  The Debtors believe that most of the Temporary Workers are likely not subject to the statutory cap under section 507(a)(4); nevertheless, the Debtors do not intend to pay any Temporary Worker amounts in excess of the statutory cap under section 507(a)(4) of the Bankruptcy Code.

### B.     Payroll Processing Services

17.     The Debtors use Paycom Software, Inc. ("Paycom") for Employees hired through Debtor Buddy's Newco, LLC, Automatic Data Processing, Inc. ("ADP") for Employees hired through Debtor Vitamin Shoppe Industries LLC, UKG Inc. ("UKG") for all other United States-based Employees, and Globalization Partners for Employees located abroad (collectively with Paycom, ADP, and UKG, the "Payroll Processors") to provide services and administer payroll, which includes calculating and processing gross-to-net payroll, issuing payroll payments

to the appropriate funds transfer networks, assisting with time-keeping services, generating pay statements, and coordinating the payment of any Deductions or other applicable withholdings.  The Payroll Processors debit the Debtors' respective bank accounts on a bi-weekly basis to satisfy all specific payroll and associated Withholding Obligations and Union Deductions (each as defined herein).  The ongoing services of the Payroll Processors are imperative to the smooth functioning of the Debtors' operations and payroll processing.  The Debtors pay UKG approximately $220,000 per month, Paycom approximately $12,000 per month, ADP approximately $42,000 per month, and Globalization Partners approximately $700 each month for their services (the "Payroll Processing Fees").  The Debtors remit all fees owed to UKG, Paycom, ADP, and Globalization Partners on a bi-weekly or monthly basis and in advance.  The Debtors estimate that, as of the Petition Date, the amount of accrued but unpaid obligations owed on account of the Payroll Processing Fees is approximately $216,000, all of which will become due and owing within the first twenty-one (21) days of these Chapter 11 Cases.

### C.   Employee Commission Program, Incentive Plan, and Severance Program

#### 1.   Commission Program

18.     The Debtors offer various commission programs for certain eligible Employees in sales and sales support roles (the "Sales Commission Program") and for other Employees based on franchise sales in accordance with the terms of their employment contracts (the "Franchise Commission Program" and, together, the "Commission Programs").  The Commission Programs are designed to incentivize and reward high achievement of the Debtors' product and services sales relative to an assigned quota as well as the Debtors' franchise sales.  Eligible Employees working in a sales and sales support position are eligible to earn commission on bi-weekly or a monthly basis by meeting certain revenue forecasts established by the Debtors.  Approximately 3,825 Employees participate in the Sales Commission Program.  Commissions are based on the

applicable sales Employee's performance, with various incentive components designed to align such individual's interests with the Debtors' operational goals and objectives. Employees participating in the Franchise Commission Program are eligible to earn commission on a monthly basis equal to ten percent (10%) of all amounts paid to the Debtors in connection with the sale of any franchise. As of the Petition Date, four (4) Employees are eligible to receive commission in connection with franchise sales. All payments under the Commission Programs are paid in arrears.

19. As of the Petition Date, the Debtors estimate that they owe approximately $2,162,000 on account of accrued amounts due under the Commission Program, $1,945,800 of which will become due within the first twenty-one (21) days of these Chapter 11 Cases. Subject to entry of the Final Order, the Debtors are seeking authority, but not direction, to pay all prepetition amounts due and owing under the Commission Program and to maintain the Commission Program in the ordinary course of business and consistent with past practices.

**2.      Annual Incentive Plans**

20. In the ordinary course of business, the Debtors have historically maintained annual incentive plans for eligible Employees (the "AIPs"). Generally, the AIPs are designed to incent high achievement of the Debtors' financial performance and reward those Employees who contribute to the annual growth and business strategy of the Debtors. Approximately 1,500 Employees participate in the AIPs. Compensation under the AIPs is discretionary, based upon the Debtors' operational and financial performance and such Employee's performance and performance review. Based on the specific AIP's incentive award payout system, Employees may be eligible to earn commission on a monthly or an annual basis. Approved monthly incentive awards payouts are made during the following fiscal month, when feasible, while approved annual incentive award payouts are generally made in conjunction with the payout of annual bonuses in March of the following fiscal year. For annual awards, compensation earned under the AIPs is

analyzed by the Debtors in January of the following fiscal year and subject to approval by the Debtors' board of directors as well as the terms and conditions of the AIP plan, as applicable.  All payments made under the AIP are paid in arrears.

21.      The Debtors believe the AIPs are necessary to properly motivate Employees to perform and drive value for all stakeholders.  Accordingly, the authority to continue to maintain the AIPs and pay all obligations thereunder is critical to maintaining morale for Employees and avoiding disruption to their workforce.

22.      The Debtors are current on all payments under the AIPs and do not expect to make any payments under the AIPs until 2025.  However, the Debtors include this description out of an abundance of caution and, subject to entry of the Final Order, seek authority, but not direction, to continue the AIPs in the ordinary course of business and consistent with past practices.  For the avoidance of doubt, the Debtors are not seeking authority to pay any payments in connection with the AIP at this time and do not seek authority to remit payments on account of the AIP to "insiders" under the Bankruptcy Code.

**3.      Non-Insider Severance Practices**

23.      In the ordinary course of business, while the Debtors do not have a formal severance policy, the Debtors have an informal discretionary practice of paying severance to eligible Employees involuntarily terminated without cause (the "Employee Severance Practices").  Union Employees are eligible to receive severance in accordance with the terms of the CBA (the "Union Employee Severance Practices" and, together with the Employee Severance Practices, the "Severance Practices").

- **Employee Severance Practices**:  The Debtors do not guarantee severance to any Employee.  However, the Debtors may allocate severance, in their Debtors' sole discretion and in exchange for a release of claims, to eligible Employees based on such Employee's

position and length of employment with the Debtors.  Generally, the Debtors provide an Employee with one (1) or two (2) weeks of severance pay for every one (1) year of employment to eligible non-insider Employees upon their termination from the Debtors, with a maximum severance benefit equal to twelve (12) weeks based on the Employee's position.  In the past, the Debtors have offered Employees a continuation of benefits pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). Eligible Employees are typically paid severance in accordance with the Debtors' existing payroll cycle or in accordance with state law requirements, as applicable.  In order to receive severance, all eligible Employees must sign a severance release agreement. Severance payments are remitted following execution of such agreement in line with the term set forth in the agreement.

- **Union Employee Severance Practices**:  Full-time Union Employees whose roles are eliminated are eligible to receive severance pursuant to the terms of the CBA.  Generally, the Debtors provide Union Employees with one (1) week of severance pay for every one (1) year of completed, continuous employment with the Debtors, with a maximum severance benefit equal to four (4) weeks.  Severance payments are remitted as a lump sum payment.

24.     Prior to the Petition Date, the Debtors completed a reduction in force, pursuant to which they paid severance obligations to terminated Employees.  The Debtors believe that it is critical that, subject to entry of the Final Order, they receive authorization to honor their current severance obligations and continue the Severance Practices in the ordinary course of business. Employees must be assured during the marketing and sale process that the employment protections they are accustomed to will carry on.  If the Severance Practices are discontinued, Employees will

become concerned about the employment practices of the Debtors' and their purchaser(s) and may seek out new employment, which would greatly impact the Debtors' ability to achieve their chapter 11 objectives.  Although payments under the Severance Practices are not due and payable until an Employee is terminated and at the sole discretion of the Debtors, having the Severance Practices in place will assuage Employees and motivate them to continue working for the Debtors.  The Debtors want to assure their Employees that they will be compensated fairly and appropriately in the event that the ultimate purchaser of the Debtors' assets reorganizes the company's internal operations upon emergence from chapter 11.  As of the Petition Date, the Debtors owe approximately $115,000 in prepetition severance in connection with the Debtors' Employee Severance Practice.

25.    As detailed above, through this Motion, the Debtors do not seek authority to provide severance payments to "insiders" under the Bankruptcy Code.  The Debtors only seek authority to provide severance payments, at the Debtors' sole discretion, to eligible Employees who do not exercise strategic control or authority over the Debtors' business or company decisions made in these Chapter 11 Cases, do not make decisions with respect to the Debtors' revenue spend, do not participate in the overall management of the Debtors, are not members of the Board, were not appointed by, nor report to, the Board, and do not attend Board meetings.  To the extent any Employee with a title of "Director" or "Manager" of a particular division may receive a payment under the Severance Practices, these Employees are neither responsible for creating company policy with respect to the oversight of the Debtors' strategic plan, determining the disposition of funds on strategic financing activities, nor granted any decision-making authority akin to an executive.

26.     Accordingly, the Debtors are seeking the authority, but not direction, to continue the existing Severance Practices with respect to non-insiders in the ordinary course of business, subject to entry of the Final Order.

### 4.     Union Employee Attendance Awards

27.     The Debtors offer the Union Employees quarterly rewards for perfect attendance (the "Attendance Award Program").  In order to be eligible to receive a perfect attendance bonus, Union Employees must not incur a chargeable absence / tardy violation (as described in further detail in the CBA).  The Attendance Award Program refreshes each quarter and is only offered to Union Employees.  As of the Petition Date, the Debtors estimate that they owe approximately $150 on account of accrued amounts due under the Attendance Award Program, all of which will become due in the first twenty-one (21) days of these Chapter 11 Cases.  Subject to entry of the Final Order, the Debtors are seeking authority, but not direction, to pay all prepetition amounts due and owing under the Attendance Award Program, if any, and to maintain the Attendance Award Program in the ordinary course of business and consistent with past practices.

### III.    Withholding and Payroll Taxes Deduction Obligations

28.     In the ordinary course of business and during each applicable payroll period, the Debtors routinely deduct amounts from Employees' paychecks for retirement programs, benefit plans, flexible spending accounts, insurance programs,  garnishments, and other similar programs (the "Deductions") and forward such amounts to various third-party recipients.

29.     In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authority.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of

gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (the "Payroll Taxes," and, collectively with Employee Payroll Taxes, the "Withholdings Obligations").  The Debtors' Withholding Obligations are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.  The Debtors remit such Withholding Obligations to the relevant authorities through the Payroll Processors.

30.     Over the past twelve (12) months, the Debtors' average monthly Withholding Obligations equaled approximately $10,390,000.  As of the Petition Date, the Debtors estimate that they have accrued Withholding Obligations equal to approximately $4,320,000, all of which are expected to come due within the first twenty-one (21) days of these Chapter 11 Cases.  By this Motion, the Debtors seek authority, but not direction, to pay any unpaid Withholding Obligations in a manner consistent with historical practices and to continue to honor the Withholding Obligations in the ordinary course of business during these Chapter 11 Cases.

**IV.     Union Deductions**

31.     In the ordinary course of business, the Debtors withhold from the Union Employees' first paycheck of the month amounts for the payment of dues and, as applicable, initiation fees to the Union (together, the "Union Dues").  These withheld amounts are remitted to the Union by the twentieth (20th) of each month.  The Union Dues are paid as part of the Debtors' payroll and amount to approximately $570 per month.

32.     Union Employees may elect to contribute to the Union's Democrat, Republican, Independent Voter Education committee ("DRIVE").  On a weekly basis, DRIVE notifies the Debtors of the amounts designated by each contributing Union Employee to be deducted from the contributing Union Employee's paycheck (the "Unpaid DRIVE Contributions" and, together with unpaid Union Dues, the "Union Deductions").  As of the Petition Date, the Debtors believe they

are current on account of all Union Deductions, but include this description out of an abundance of caution and seek authority to pay such prepetition amounts if any become due.

## V.    Employee Benefits Programs

### A.    Paid and Unpaid Leave

33.    The Debtors maintain several paid leave benefit programs for their Employees, providing paid leave for paid time off ("PTO"), holidays, and other personal leaves of absence (collectively, the "Paid Leave").   As of the Petition Date, the Debtors believe there is approximately $1,870,000 of accrued Paid Leave for Employees.

34.    These forms of compensation are, in certain cases, required by statute, and, in all cases, customary and necessary.  These policies enable the Debtors to retain qualified Employees to operate their business.  Failure to provide these benefits could contravene applicable law, harm Employee morale, and encourage the premature departure of Employees.  The Debtors, therefore, request authority to continue these benefits programs in the ordinary course of business during these Chapter 11 Cases.

35.    Paid Time Off.  While the PTO policies for each Debtor vary slightly, each eligible Employee is granted a specified number of PTO days based on such Employee's length of service with the Debtors and the number of hours such Employee is normally scheduled to work per month.  Temporary Employees do not accrue PTO, unless required by local law or regulation.  The PTO policies are generally described below:

- **Franchise Group**:  Eligible Employees accrue PTO on an hourly basis each month, beginning on each Employee's date of hire.  Accrual rates increase on the anniversary of the Employee's date of hire.  Generally, Employees accrue a maximum of sixteen (16) PTO days per year.

- **American Freight**:  Salaried, full-time, and part-time Employees are eligible for PTO. Hourly Employees are eligible for PTO after six (6) months of service and earn all PTO on the first day of eligibility.  Salaried Employees earn a pro-rata amount of PTO on their first day of work and, thereafter, fully earn all PTO at the start of each new fiscal year.  Store-

level hourly Employees may accrue a maximum of fifteen (15) PTO days per year, based on each Employee's length of service and position. Store managers and corporate-based salaried and hourly Employees may accrue a maximum of twenty-five (25) PTO days per year, based on each Employee's length of service and position.

- **Vitamin Shoppe**: Full-time salaried and hourly Employees are eligible for PTO. Generally, eligible Employees accrue PTO every work week based on hours worked, unless otherwise required by State law. Eligible salaried Employees begin accruing PTO on each Employee's date of hire, but are not eligible to use PTO until competing three (3) to six (6) months of continuous full-time employment (based on the Employee's position). Part-time Employees do not accrue PTO, but are eligible to receive unpaid time off. Generally, hourly Employees may accrue a maximum of 182 hours of PTO per year, based on each Employee's length of service and position. Corporate-based salaried and hourly Employees may accrue a maximum of thirty-five (35) PTO days per year, based on each Employee's length of service and position.

- **Buddy's**: Full-time Employees are eligible for PTO. Generally, eligible Employees accrue PTO each pay period based on hours worked. Eligible salaried Employees begin accruing PTO on each Employee's date of hire, but are not eligible to use PTO until competing three (3) months of continuous full-time employment. Generally, Employees may accrue a maximum of twenty (20) PTO days per year, based on each Employee's length of service and position.

- **Pet Supplies**: Full-time salaried and hourly Employees are eligible for PTO. Generally, eligible Employees accrue PTO each month based on hours worked and begin accruing PTO on each Employee's date of hire. Eligible Employees may accrue a maximum of twenty-five (25) PTO days per year, based on each Employee's length of service and position. Part-time Employees do not accrue PTO.

- **Union Employees**: Full-time and part-time Union Employees begin accruing PTO after six (6) months of service. For example, Union Employees employed by the Debtors for at least six (6) months, but for less than two (2) years, receive a minimum of five (5) days of PTO per year. Union Employees employed by the Debtors for at least two (2) years, but for less than seven (7) years, receive a minimum of ten (10) days of PTO per year. Union Employees employed by the Debtors for seven (7) or more years receive a minimum of fifteen (15) days of PTO per year. Union Employees must request their PTO days in accordance with the terms of the CBA.

36. Eligible Employees are permitted to apply their PTO to take vacation, sick days, and personal days. Eligible Employees are permitted to carry over unused portions of PTO each year up to a permitted cap based upon an Employee's length of service and position with the Debtors. Generally, Employees may not receive cash payouts for unused PTO, unless required by State law.

37.   <u>Holidays</u>.  In addition, in 2024, the Debtors generally offered Employees up to seven (7) paid holidays and Union Employees six (6) paid holidays throughout the year (collectively, the "<u>Holidays</u>").   Generally, eligible Employees and Union Employees are not required to work on a designated Holidays.  Employees that are scheduled to work on a Holiday are compensated in accordance with state and local regulations and are eligible to receive compensation at their applicable pay rate, plus their holiday pay.  Full-time Union Employees scheduled to work on a Holiday qualify for eight (8) hours of holiday pay at their regular rate of pay and Part-time and Union Employees qualify for five (5) hours of holiday pay at their regular rate of pay.

38.   <u>Other Leaves of Absence</u>. The Debtors also permit eligible Employees to take certain other paid and unpaid leaves of absence for personal reasons.  Based on Employee location, the Debtors offer certain paid and unpaid leaves, including: (i) certain paid parental leave following the birth, adoption, or foster care placement of a child, including paid break times for nursing mothers; (ii) time to be used by Employees for personal absences; (iii) certain military leaves of absence; (iv) emergency bereavement and compassionate leave; and (v) leave for jury duty and witness duty, among other leaves of absence.  Union Employees receive other forms of paid and unpaid leaves of absence in accordance with the terms of the CBA.  The Debtors rely on Reliance Matrix for reviewing, approving, processing, and tracking leave requests related to the U.S. Family and Medical Leave Act.  Over the past twelve (12) months, the Debtors paid Reliance Matrix approximately $3,200,000 for its services.   As of the Petition Date, the Debtors believe they are current on account of all payments due to Reliance Matrix, but include this description out of an abundance of caution and seek authority, but not direction, to pay such prepetition amounts if any become due.

B.     **Expense Reimbursement**

39.     The Debtors, in the ordinary course of business, reimburse Employees for a variety of ordinary, necessary, and reasonable business-related expenses that the Employees incur on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses").   Such Reimbursable Expenses generally must be submitted within thirty (30) days of incurrence in order to be eligible for reimbursement.   In order to constitute a Reimbursable Expense, the expense must be directly attributable to conducting company business, necessary to the performance of the Employee's job, and reflect a prudent decision to incur the expense, among other requirements. Generally, Employees initially incur and pay for such Reimbursable Expenses by using personal funds or credit cards, but are subsequently reimbursed by the Debtors after submission and approval of expense reimbursement reports.   The Debtors generally reimburse Employees through Concur Technologies, Inc. ("Concur").   However, Debtor Vitamin Shoppe Industries LLC relies on ExpenseWire LLC ("ExpenseWire") to reimburse its Employees.   Reimbursable Expenses generally include airfare, hotel stays, meals, and transportation, among other expenses. Additionally, the Debtors provide certain Employees in company roles that require extensive travel with company vehicles.   The Debtors reimburse Employees for vehicle maintenance and fuel costs on a monthly basis.   Likewise, the Debtors may reimburse monthly cellphone payments up to a prescribed amount for Employees in certain support roles.   Employees are expected to use sound judgment and good business sense when incurring all Reimbursable Expenses, and the Debtors reserve executive approval to accept or deny repayment of all requested Reimbursable Expenses. The Debtors pay, on average, approximately $450,000 per month on account of requested and approved Reimbursable Expenses.   As of the Petition Date, the Debtors believe they owe approximately $113,600 on account of accrued but unpaid Reimbursable Expenses, all of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases.

Additionally, the Debtors pay approximately $21,000 to Concur and $3,200 to ExpenseWire per month for use of its services.  As of the Petition Date, the Debtors estimate that they owe Concur and ExpenseWire approximately $24,200 on account of its services.

  **C.**  **Credit Card Program**

  40.  In the ordinary course of business, the Debtors maintain two credit card programs in accordance with the terms of an agreement with JPMorgan Chase & Co ("JPMorgan").  Through JPMorgan, the Debtors provide certain Employees with access to credit cards on an as-needed basis.  Debtor Franchise Group, Inc.'s credit cards have an aggregate limit of approximately $1 million and are used primarily for administrative charges, select vendor services, and company travel expenses (the "FRG Card Program").  Debtor Franchise Group Inc. is invoiced approximately every seven (7) days.  As of the Petition Date, the Debtors have approximately 542 active credit cards.  As of the Petition Date, the Debtors believe they owe approximately $329,000 to JPMorgan under the FRG Card Program, all of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases.

  41.  Similarly, Debtor Pet Supplies "Plus", LLC maintains a credit card program with JPMorgan (the "PSP Card Program" and, together with the FRG Card Program, the "Credit Card Programs").  The PSP Card Program also primarily covers administrative charges, select vendor services, and company travel expenses and has an aggregate limit of approximately $3 million. Debtor Pet Supplies "Plus", LLC is invoiced and pays such obligations under the PSP Card Program to JPMorgan on a monthly basis and, as of the Petition Date, believe they owe approximately $1,966,000 to JPMorgan under the PSP Card Program,  all of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases.

  42.  On average, charges under the Credit Card Programs equal approximately $1,312,000 in the aggregate per month (the "Credit Card Obligations").  Although the Debtors do

not believe that Employees may be held personally liable for any unpaid Credit Card Obligations, out of an abundance of caution, the Debtors seek authority to pay any outstanding Credit Card Obligations owed as of the Petition Date and to continue the Credit Card Programs on a postpetition basis in the ordinary course of business consistent with past practices.  As of the Petition Date, the Debtors believe they owe approximately $2,295,000 on account of accrued but unpaid expenses under the Credit Card Program, all of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases.

### D.   Health and Welfare Benefits

43.   The Debtors offer their eligible Employees a large portfolio of benefits, including, but not limited to, medical care, dental coverage, vision coverage, health savings accounts, coverage under COBRA, flexible spending accounts, life and disability insurance, and other benefit programs provided to Employees in the ordinary course of business (collectively, and as listed in detail in paragraphs 45–57 below, the "Health and Welfare Benefits").  Unless otherwise stated, following a thirty (30) day waiting period, full time Union Employees are eligible to participate in the Debtors' Health and Welfare Benefits.  As of the Petition Date, the total accrued but unpaid obligations owed by the Debtors relating to the Health and Welfare Benefits are approximately $5,067,850.

44.   In the ordinary course of business, the Debtors engage AleraGroup, Inc. ("AleraGroup") to assist with structuring and managing their Health and Welfare Benefits.  In exchange for their services, AleraGroup receives a commission from the Health and Welfare Benefits plans equal to approximately $35,000 per month.  The Debtors believe that failing to maintain its relationship with AleraGroup would have an adverse effect on the Employees and the Debtors' ability to maintain and manage each Health and Welfare Benefits set forth herein.  As of the Petition Date, the Debtors estimate that they owe AleraGroup approximately $35,000 on

account of its services, all of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases.

### 1.   Medical, Prescription, Dental, and Vision Benefits

45.     The Debtors offer all eligible Employees and their dependents the option to select between four (4) medical plans (collectively, the "Medical Plans") administered through United Medical Resources ("UMR"), Surest, and Kaiser Permanente ("Kaiser").  Three of the Medical Plans (one UMR Premium PPO plan, one Surest Select PPO plan, one UMR HSA plan) are self-insured by the Debtors.  The Kaiser HMO plan is available to Vitamin Shoppe store-level employees located in Hawaii and is fully insured.  The Debtors subsidize Employees' premiums in connection with the Medical Plans, and all eligible Employees contribute through payroll Deductions.  The Debtors pay, on average, approximately $1,320,000 per month towards the Medical Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $2,465,000 on account of the Medical Plan, $1,892,500 of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases.  Relatedly, the Debtors also offer a prescription drug plan (the "Prescription Plan") through OptumRx and Kaiser.  The Prescription Plan is also self-insured.  The Debtors pay, on average, approximately $700,000 per month for prescription claims.  As of the Petition Date, the Debtors estimate that they owe approximately $350,000 on account of the Prescription Plan, all of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases.

46.     Additionally, the Debtors offer all eligible Employees the option of participating in two (2) dental plans (the "Dental Plans") administered by Delta Dental of Ohio. The Dental Plans are self-insured by the Debtors.  The Debtors subsidize Employees' premiums in connection with Dental Plans, and all eligible Employees contribute through payroll Deductions.  On average, Employees contribute approximately $107,000 per month to the Dental Plans, while the Debtors

contribute approximately $92,000 per month to the Dental Plans. As of the Petition Date, the Debtors estimate that they owe approximately $141,000 on account of the Dental Plans, $75,100 of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases.

47.     The Debtors also offer all eligible Employees the option of participating in two (2) vision plans administered through VSP Vision Care (the "Vision Plans"). The Vision Plans are funded fully through Employee Deductions. As a result, the Debtors do not owe any amounts on account of the Vision Plans and include this description herein for descriptive purposes and out of an abundance of caution.

## 2.     Stop Loss Policy

48.     Because the Medical Plans are self-insured, the Debtors assume the sole responsibility for funding them. To limit the variability in, and control costs in respect of, the Medical Plans, the Debtors have stop-loss insurance coverage under a policy (the "Stop Loss Policy") administered by Symetra Financial. The Debtors pay a premium per enrolled Employee per month. The self-insured retention limit for such coverage is $325,000. On average, the Debtors pay approximately $230,000 per month under the Stop Loss Policy. As of the Petition Date, the Debtors estimate that approximately $230,000 will become due in connection with the Stop Loss Policy within the first twenty-one (21) days of these Chapter 11 Cases.

## 3.     Flexible Spending Accounts

49.     All eligible Employees may elect to participate in the Debtors' tax-advantaged flexible spending account plans administered by WEX Health, Inc. ("Wex"), under which the Debtors offer their Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care expenses. The Debtors offer two (2) separate FSA Plans: (1) the Health Care FSA; and (2) the

Limited Use FSA (together, the "FSA Plans"). Employees who waive participation in the Debtors'

Medical Plans, enroll in either the UMR Premium PPO or the Surest Select PPO Medical Plans,

or enroll in the UMR HSA Medical Plan, but are ineligible to open an HSA, are entitled to enroll

in the Health Care FSA. Employees that are enrolled in the UMR HSA Medical Plan may opt to

enroll in the Limited Use FSA Plan, and such funds may be used exclusively for eligible dental

and vision expenses.

50.      Under the FSA Plans, eligible Employees may designate a certain amount of pre-

tax dollars per pay period to be withheld from their payroll as a Deduction and to pay for eligible

health care expenses and dependent care expenses (the "Employee FSA Contributions").

Following each pay period, such Employee FSA Contributions are remitted to, and held by, Wex

on behalf of each participating Employee. When an Employee seeks to use any elected FSA

amounts, Wex reviews the request to ensure that it meets the FSA requirements before funding the

claim. Eligible Employees may contribute up to $3,050 in Employee FSA Contributions per year

under the FSA Plans. As of the Petition Date, the Debtors estimate the current FSA Plans balance

as $71,000. Further, as of the Petition Date, the Debtors believe they owe approximately $13,200

in unremitted Employee FSA Contributions, all of which will become due and owing during the

first twenty-one (21) days of these Chapter 11 Cases.

### 4.      Health Savings Account

51.      Eligible Employees enrolled in the UMR HSA Medical Plan (the "HSA Plan

Employees") may elect to participate in the Debtors' tax-advantaged health savings account plan

(the "HSA Plan") managed by Wex, under which the Debtors offer the HSA Plan Employees the

ability to contribute a portion of their pre-tax compensation to a health savings account to pay for

qualified out-of-pocket health care expenses for the HSA Plan Employees and qualified

dependents. The HSA Plan Employees who elect to participate in the HSA Plan designate a certain

amount per month to be withheld from their payroll as a Deduction.  Employer contributions are generally funded on a monthly basis based on the following scale: (i) the Debtors contribute $300 per year to all HSA Plan Employees enrolled in the Employee-only medical plan; and (ii) the Debtors contribute $500 per year to all HSA Plan Employees enrolled under the Employee plus spouse, children, or family medical plans.  Generally, the Debtors' and each HSA Plan Employee's contributions may not exceed $4,150 for the Employee-only medical plan and $8,300 for the Employee plus spouse, children, or family medical plans.

52.     The HSA Plan Employees contribute, on average, approximately $32,900 on a bi-weekly basis to the HSA Plan (the "Employee HSA Contributions"), while the Debtors contribute, on average, approximately $59,000 to the HSA Plan on a quarterly basis (the "Company HSA Contributions").  The Employee HSA Contributions are remitted to Employees' HSA accounts every pay cycle on a bi-weekly basis, while the Company HSA Contributions are remitted to Employees' HSA accounts on either a bi-weekly or quarterly basis.  The Debtors also pay a *de minimis* monthly administrative fee to Wex for each covered HSA Plan Employee.  As of the Petition Date, the Debtors believe they owe approximately $24,100 in unremitted Employee HSA Contributions, all of which will become due within twenty-one (21) days of the Petition Date. As of the Petition Date, the Debtors believe they owe approximately $19,700 in Company HSA Contributions.

### 5.     Basic Life and Disability Insurance

53.     The Debtors provide all eligible Employees with group life and accidental death and dismemberment (AD&D) insurance through Securian Financial ("Securian") in the event of serious illness, injury, or death, or in the event that an Employee becomes unable to work due an illness or injury (the "Basic Life/AD&D Insurance").  The Basic Life/AD&D Insurance is offered to all eligible Employees at no cost.  The Debtors pay approximately $106,000 per month toward

the Basic Life/AD&D Insurance.  Further, through Securian, eligible Employees may opt into an additional voluntary life and accidental death and dismemberment insurance coverage program ("Voluntary Life/AD&D Insurance," and, together with the Basic Life/AD&D Insurance, the "Life/AD&D Insurance Policies").  Employees pay for the Voluntary Life/AD&D Insurance through post-tax payroll Deductions.  The Debtors do not contribute to the Voluntary Life/AD&D Insurance policy.

54.     The Debtors also offer group short-term disability coverage (the "Short-Term Disability Coverage") and voluntary long-term disability coverage (the "Long-Term Disability Coverage" and, together with the Short-Term Disability Coverage, the "Disability Coverage Policies") through Reliance Matrix for eligible Employees.  The Short-Term Disability Coverage is fully funded by the Debtors and cost the Debtors approximately $270,000 per month for Employees.  Employees pay for the Long-Term Disability Coverage through after-tax payroll Deductions.

55.     As of the Petition Date, to the best of the Debtors' knowledge, the Debtors estimate that approximately $94,000 in connection with the Basic Life/AD&D Insurance and $135,000 in connection with the Short-Term Disability Coverage remains outstanding, all of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases.

### 6.     Unemployment Insurance

56.     Employees may be eligible to receive unemployment insurance benefits under certain circumstances of separation from employment (the "Unemployment Insurance").  The Unemployment Insurance is administered on a state-by-state basis and, as a result, eligibility for benefits is determined by the state unemployment agency of the state in which the eligible Employee works.  As a result, the Debtors do not accrue payments in connection with any Unemployment Insurance programs.

### 7. Other Welfare Programs

57.     In addition to the foregoing, the Debtors offer an Employee Assistance Program (the "EAP") through ACI Specialty Benefits as well as various employee wellness programs that provide medical and welfare benefits to eligible Employees, such as travel assistance, legal, financial, and grief resources, and pet insurance, among other benefits (collectively, the "Other Welfare Programs").   The Debtors believe that the Other Welfare Programs are important to maintain Employee morale and assist in the retention of the Debtors' workforce.   The monthly cost of such programs for the Debtors is *de minimis* in the context of the Debtors' aggregate compensation and benefit obligations.   The Debtors believe that failing to honor expected benefits under such Other Welfare Programs, as well as the Debtors' main Health and Welfare Benefits, would have an adverse effect on the Employees.

### E. Workers' Compensation

58.     The Debtors maintain workers' compensation insurance that provides coverage for their Employees for employee-related injuries, disability, or death, as prescribed by state and federal workers' compensation laws and other statutes, at no cost to Employees (the "Workers' Compensation Program").   In connection with these requirements, the Debtors maintain workers' compensation insurance policies through The Chubb Corporation ("Chubb" and, such policy, the "Workers' Compensation Policy").   Under the Workers' Compensation Policy, the Debtors are responsible for workers' compensation claims up to $250,000.   If a workers' compensation claim exceeds, $250,00, Chubb provides all excess insurance coverage.   The annual premium for the Workers' Compensation Policy equals approximately $1,050,000 for 2023-2024 policy period, which the Debtors have paid in full.   Under the Workers' Compensation Policy, the Debtors historically pay monthly premiums based on an annual estimated projected payroll, which is audited and reconciled annually.   Employees manage their workers' compensation claims through

CorVel Corporation ("CorVel").   As of the Petition Date, the Debtors believe they owe approximately $70,850 in administrative fees to CorVel on account on their services, all of which will become due and owing within the first twenty-one (21) days of these Chapter 11 Cases.

59.     To ensure that the Debtors comply with state law requirements, it is necessary to obtain authority to continue to maintain the Workers' Compensation Program in the ordinary course of business and authority, but not direction, to pay any prepetition amounts related thereto, including, without limitation, any payments for future workers' compensation claims, premiums, deductibles, and fees owed for administrative costs, and other amounts required in connection with the Workers' Compensation Program as such amounts become due in the ordinary course of business. As of the Petition Date, the Debtors estimate that they owe approximately $1,490,000 on account of the Workers' Compensation Program, $745,000 of which will become due and owing during the first twenty-one (21) days of these Chapter 11 Cases

### F.     Employee Retirement Benefits: 401(k) Plan

60.     The Debtors maintain and administer a 401(k) savings plan, a qualified defined contribution plan pursuant to section 401(k) of the Internal Revenue Code, for all eligible Employees and Union Employees (the "401(k) Plan").   Approximately 12,900 Employees actively participate in the 401(k) Plan.   Fidelity acts as the record keeper to the 401(k) Plan.   Over the past twelve (12) months, Employees' 401(k) monthly contributions to the 401(k) Plan totaled approximately $9,190,000 in withholdings from participating Employees' paychecks.   The Debtors do not contribute to Employees' 401(k) Plans, but include this description out of an abundance of caution.

**BASIS FOR RELIEF REQUESTED**

I.    **Payment of the Prepetition Workforce Obligations and Compensation Obligations Is a Sound Exercise of the Debtors' Business Judgment and Is Appropriate Under Sections 363 and 105(a) of the Bankruptcy Code.**

61.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions." Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); see also In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); see also, e.g., In re Adelphia Commc'ns Corp., No. 02-41729 (REG), 2003 WL 22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); In re Global Home Prods., LLC, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007); In re Dana Corp., 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006).

62.    In addition to being justified under section 363(b)(1) of the Bankruptcy Code, payment of the Prepetition Workforce Obligations and Compensation Obligations is warranted under the doctrine of necessity.  Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a) and the "doctrine of necessity," the Court may exercise

its broad grant of equitable powers to permit the payment of prepetition workforce obligations when such payment is essential to the continued operation of the debtor's business.  See, e.g., In re Just for Feet, Inc., 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to the confirmation of a reorganization plan).

63.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  Id. (stating that a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also Official Comm. of Unsecured Creditors of Motor Coach Indus. Int'l, Inc. v. Motor Coach Indus. Int'l, Inc. (In re Motor Coach Indus. Int'l, Inc.), No. 08-12136-BLS, 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying stay pending appeal on grounds that doctrine of necessity had not been brought into serious question by courts in Third Circuit).

64.     The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy of Chapter 11."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also In re Chateaugay Corp., 80 B.R. 279, 287

(S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); In re Just for Feet, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("A general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition workforce obligations may be permissible within the first twenty-one (21) days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.

65.     It is a sound exercise of the Debtors' business judgment to pay the Prepetition Workforce Obligations and, to the extent requested herein, the Compensation Obligations because doing so will help the Debtors avoid the potential for value-destructive interruption to their business operations during these Chapter 11 Cases.  For the reasons discussed herein, payment of the Prepetition Workforce Obligations and Compensation Obligations enhances value for the benefit of all interested parties.  The Debtors' ability to continue operations and maximize value depends, in large part, on the retention, motivation, and productivity of their Workforce, whose efforts will be critical to the success of these Chapter 11 Cases.  Most of the Debtors' Workforce rely exclusively on the Prepetition Workforce Obligations and Compensation Obligations to

satisfy their daily living expenses.  If amounts owed are not received or benefits are delayed, the Workforce may be exposed to significant financial hardship; in some cases, individuals will be unable to meet their basic needs, which may make continuing to work for the Debtors impossible. If the Debtors are unable to satisfy their various compensation and benefits obligations, the Workforce will suffer at a time when their support is critical to the Debtors.  Therefore, to provide certainty to the Debtors' Workforce, maintain morale and productivity, limit turnover, and minimize any adverse effect of the commencement of these Chapter 11 Cases, it is necessary to continue providing ordinary course compensation and benefits to such individuals.  Moreover, for the avoidance of doubt, no member of the Workforce will receive payment under this Motion in excess of the statutory cap of $15,150 on account of any existing Prepetition Workforce Obligations and Compensation Obligations outstanding as of the Petition Date.  Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to pay and continue the Prepetition Workforce Obligations and, as applicable, the Compensation Obligations in the ordinary course of business and consistent with past practice.

II.    **Payment of Certain of the Prepetition Workforce Obligations and Compensation Obligations Are Required as Priority Claims.**

66.    The Debtors believe that the majority of the Prepetition Workforce Obligations and Compensation Obligations constitute priority claims under sections 507(a)(4), (a)(5), and (a)(8) of the Bankruptcy Code, which must be satisfied before any general unsecured claims against the Debtors' estates.  <u>See</u> 11 U.S.C. §§ 507(a)(4), 507(a)(5), 507(a)(8), 726.  Specifically, under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status up to $15,150 per individual.  <u>See</u> 11 U.S.C. § 507(a)(4)(A).

- 32 -

67.     Similarly, under section 507(a)(5) of the Bankruptcy Code, employees' claims for contributions to certain employee benefit plans are also afforded priority unsecured status up to $15,150 per employee covered by such plan, less any amount paid under section 507(a)(4).  See 11 U.S.C. § 507(a)(5)(A).  The same holds true for the payment of payroll taxes, as the relevant taxing authorities generally would hold priority claims under section 507(a)(8) of the Bankruptcy Code for such obligations and their payment will not prejudice other creditors of the Debtors.  See 11 U.S.C. § 507(a)(8).

68.     The Debtors believe that no member of the Workforce is owed accrued and unpaid Wages in excess of the cap, and no amounts are accrued and owing under any benefits plan in excess of the cap.  Thus, the Prepetition Workforce Obligations and, as applicable, Compensation Obligations are priority claims that, in any event, must be paid in full under the Bankruptcy Code. As a result, payment of such Prepetition Workforce Obligations and Compensation Obligations merely expedites the treatment afforded to such claims and is consistent with the priority scheme set forth in the Bankruptcy Code.  Accordingly, the Debtors request entry of the Interim Order authorizing the Debtors to pay the Prepetition Workforce Obligations in an aggregate amount not to exceed the Interim Amount subject to the $15,150 per individual cap, followed by the final hearing on this Motion authorizing the Debtors to pay Compensation Obligations and continue paying Workforce obligations in the ordinary course throughout these Chapter 11 Cases.

**III.     Funds Related to the Payroll Taxes and Payroll Deduction Obligations May Be Held in Trust and Are Not Property of the Estates.**

69.     Payroll Taxes withheld from an Employee's wages and any other Payroll Deduction Obligations are collected or withheld by the Debtors and may be held in trust for the benefit of the applicable taxing authority.  As a result, Payroll Taxes and other Payroll Deduction Obligations are not property of the Debtors' estates under section 541 of the Bankruptcy Code and those funds,

therefore, are not available for the satisfaction of creditors' claims.  See, e.g., Begier v. IRS, 496 U.S. 53 (1990) (withheld taxes are property held by the debtor in trust for another and, as such, not property of the debtor's estate); City of Farrell v. Sharon Steel Corp., 41 F.3d 92, 95 (3d Cir. 1994) (withheld taxes were subject to a trust); see generally In re Columbia Gas Sys. Inc., 997 F.2d 1039, 1060 (3d Cir. 1993) (indicating that even if a statute does not establish an express trust, a constructive trust may be found).  Instead, the Debtors may be obligated to remit these funds to the applicable taxing authority.

70.     Many federal, state, and local statutes also impose personal liability on officers and directors of companies for the failure to remit certain Payroll Taxes and other Payroll Deduction Obligations.  To the extent that the relevant Payroll Taxes and other Payroll Deduction Obligations remain unpaid by the Debtors, the Debtors' directors, officers, and executives may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases.  Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Debtors and their directors, officers, and executives from devoting their full attention to the Debtors' businesses and the orderly administration of these Chapter 11 Cases.  The Debtors believe that these distractions would materially undermine their ability to operate in the ordinary course of business and to administer these Chapter 11 Cases, with resulting detriment to any parties-in-interest.

71.     For these reasons, the Debtors submit that the relief requested in this Motion is essential, appropriate, and in the best interests of their estates, creditors, and any parties-in-interest, and, therefore, should be granted.

## IV.    The Debtors Do Not Seek to Make Payments in Connection with Compensation Obligations Outside the Scope of Section 502(b)(7) or that are Subject to Section 503(c).

72.     By this Motion, the Debtors seek authority to continue the Commission Program, AIP, Attendance Award Program, and Severance Practices in the ordinary course and honor, in the

Debtors' sole discretion, Compensation Obligations that arise after the Petition Date exclusively for non-insider Employees.  For the avoidance of doubt, the Debtors do not seek authority to pay Compensation Obligations to "insiders" during these Chapter 11 Cases.

73.     Given the uncertainty attendant to companies operating in chapter 11 and out of an abundance of caution, the Debtors request authority, in their sole discretion, to continue the Severance Practices with respect to non-insider Employees terminated postpetition in the ordinary course of business, if any, in an effort to provide additional comfort to such Employees.  For the avoidance of doubt, the Debtors are not requesting authority to, and will not make, any payments to insiders that are subject to section 503(c) of the Bankruptcy Code.

74.     The Compensation Obligations do not implicate section 503(c)(3) of the Bankruptcy Code because they do not include insiders and payments made pursuant to the Compensation Obligations are within the ordinary course of the Debtors' business.  See 11 U.S.C. § 503(c)(3) (prohibiting certain payments "outside the ordinary course of business").  The Court may grant the relief requested if it finds that a non-insider severance program satisfies the requirements of section 363(b) of the Bankruptcy Code.  See In re Mesa Air Grp., Inc., No. 10-10018 (MG), 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (noting that compensation plans within the ordinary course of business are governed by section 363 of the Bankruptcy Code, not section 503(c)).  None of the Employees that would be paid on account of the AIP, Commission Program, Attendance Award Program, or Severance Practices are "insiders" of the Debtors for purposes of section 503(c) of the Bankruptcy Code because none of the Employees: (a) participate in the management of the Debtors; (b) have decision-making authority with respect to the policies of the Debtors; (c) report directly to the Debtors' board of directors; (d) were appointed by the Debtors' board of directors; (e) qualify as an "insider" under Rule 16a-

1(f) of the Securities Exchange Act; (f) undertake budget control over the Debtors' business operations; (g) are compensated in the form of equity of the Debtors; and (h) are relatives of any insider of the Debtors.  Accordingly, the Debtors submit that the Compensation Obligations do not implicate section 503(c) of the Bankruptcy Code.

75.    For the reasons stated herein, discretion to continue the Compensation Obligations—similar to all of the relief sought through this Motion—is critical and necessary to assuage Employee concerns and motivate them to achieve the Debtors' chapter 11 objectives. Accordingly, the requested relief should be approved.

**V.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.**

76.    Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).  Section 362 of the Bankruptcy Code, however, permits a debtor or other parties-in-interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

77.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims under the Workers' Compensation Policy in the appropriate judicial or administrative forum during these Chapter 11 Cases.  The Debtors believe that cause exists to modify the automatic stay because staying an Employee's workers' compensation claim could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees.  As discussed above, such departures would cause a severe disruption in the Debtors' business to the detriment of all stakeholders.

Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the workers' compensation claims, if any, to proceed.

## VI.    Processing of Checks and Electronic Fund Transfers Should Be Authorized.

78.    The Debtors further request that the Court authorize and direct their bank and all other financial institutions to receive, process, honor, and pay any and all checks drawn or electronic funds relating to the Prepetition Workforce Obligations and Compensation Obligations, whether such checks were presented before or after the Petition Date; provided that sufficient funds are on deposit in the applicable bank accounts to cover such payments.  The Debtors have sufficient funds to pay any amounts described in this Motion in the ordinary course of business by virtue of consensual use of cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment to be made hereunder.  For that reason, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.  The Debtors also seek authority to issue new postpetition checks or effect new electronic fund transfers on account of the Prepetition Workforce Obligations and Compensation Obligations to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Debtors' Chapter 11 Cases.

## SATISFACTION OF BANKRUPTCY RULE 6003

79.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief within twenty-one (21) days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief is necessary to avoid immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n2 (Bankr.

S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

80.     As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without authorization of the relief requested herein.  Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

81.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

82.     To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## RESERVATION OF RIGHTS

83.     Nothing in the Proposed Orders or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action; or (iv) shall be construed as a promise to pay a claim.

84.     Nothing in the Proposed Orders or this Motion shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of any Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date,

85.     Nothing in the Proposed Orders or this Motion shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

## NOTICE

86.     Notice of this Motion has been or will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney's Office for the District of Delaware; (iii) those creditors holding the fifty (50) largest unsecured claims against the Debtors' estates; (iv) counsel to the ABL Lenders; (v) counsel to the Ad Hoc Group of First Lien Lenders; (vi) counsel to the Second Lien Term Loan Lenders; (vii) counsel to the HoldCo Lenders; (viii) counsel to the DIP Agent; (ix) counsel to the DIP Lenders; (x) the Union; (xi) the Internal Revenue Service; and (xii) the Banks.  The Debtors will serve copies of this Motion and an order entered in respect of this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.  No previous motion for the relief sought herein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors request that the Court enter the Proposed Orders, granting the

relief requested herein and such other and further relief as is just and proper.

Dated: November 3, 2024
      Wilmington, Delaware

<div style="margin-left:40%">

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (*pro hac vice* pending)
Matthew A. Feldman (*pro hac vice* pending)
Betsy L. Feldman (Del. No. 6410)
Joseph Brandt (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com
jbrandt@willkie.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

</div>

**<u>Exhibit A</u>**

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ___** |

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) PAY CERTAIN PREPETITION EMPLOYMENT OBLIGATIONS AND COMPENSATION OBLIGATIONS (B) MAINTAIN THE COMPENSATION OBLIGATIONS THE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion")[2] of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") for the entry of interim and final orders, pursuant to sections 105(a), 363(b), 507(a), and 541 of the Bankruptcy Code, Bankruptcy Rules

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] Capitalized terms used but not otherwise defined in this Interim Order shall have the meanings ascribed to them in the Motion.

6003 and 6004, and Local Rule 9013-1, (i) authorizing the Debtors, in their discretion, to (a) pay all Prepetition Workforce Obligations and Compensation Obligations and (b) maintain the Compensation Obligations and Employee Benefits Programs, and honor and continue the Debtors' prepetition programs, policies, and practices as described in the Motion in the ordinary course of business; and (ii) granting certain related relief, all as more fully set forth in the Motion; and upon consideration of the Motion and all pleadings related thereto, including the First Day Declaration; and due and proper notice of the Motion having been given; and having determined that no other or further notice of the Motion is required; and having determined that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and having determined that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and having determined that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      A final hearing on the relief sought in the Motion shall be conducted on **_____, 2024 at _____ (ET)** (the "Final Hearing").  Any party-in-interest objecting to the relief sought at the Final Hearing or entry of the Final Order shall file and serve a written objection, which objection shall be served upon (i) proposed co-counsel for the Debtors, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Debra M. Sinclair, Esq. (dsinclair@willkie.com) and Betsy L. Feldman, Esq. (bfeldman@willkie.com), and (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street,

Wilmington, DE 19801, Attn:  Edmon L. Morton, Esq. (emorton@ycst.com) and Matthew B. Lunn, Esq. (mlunn@ycst.com); (ii) counsel to any official committee appointed in these Chapter 11 Cases; (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox, Esq. (timothy.fox@usdoj.gov); (iv) counsel to the DIP Agent, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004, Attn: Gregg Bateman, Esq. (bateman@sewkis.com), Sagar Patel, Esq. (patel@sewkis.com), and Michael Danenberg, Esq.(danenberg@sewkis.com); (v) counsel to the DIP Lenders and Ad Hoc Group of First Lien Lenders, (a) Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn: Jayme Goldstein, Esq. (jaymegoldstein@paulhastings.com), Jeremy Evans, Esq. (jeremyevans@paulhastings.com), and Isaac Sasson, Esq. (isaacsasson@paulhastings.com), and (b) Landis Rath & Cobb LLP, 919 N. Market Street Suite 1800, Wilmington, DE 19317, Attn: Adam G. Landis, Esq. (landis@lrclaw.com) and Matthew McGuire, Esq. (mcguire@lrclaw.com); (vi) counsel to the ABL Lenders, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, Attn:  Jennifer  Ezring,  Esq.  (Jennifer.Ezring@lw.com),  James  Ktsanes,  Esq. (James.Ktsanes@lw.com) and Andrew Sorkin, Esq. (andrew.sorkin@lw.com); (vii) counsel to the Second Lien Term Loan Lenders, White & Case LLP, 200 S Biscayne Blvd, Miami, FL 33131, Attn:  Thomas Lauria, Esq. (tlauria@whitecase.com), and 111 S. Wacker Dr., Suite 5100, Chicago, IL 60606, Attn:  Bojan Guzina, Esq. (bojan.guzina@whitecase.com); and (viii) counsel to the HoldCo Lenders at the address set forth in (vii) above, in each case no later than _____, 2024 at 4:00 p.m. (ET).  If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

3.      The Debtors are authorized, but not directed, in their discretion and business judgment, to (i) pay or otherwise honor all Prepetition Workforce Obligations, in an amount not to exceed $26,305,300 on an interim basis; (ii) pay postpetition Wages and Employee Benefit Obligations; (iii) maintain the Compensation Obligations and Employee Benefits Programs; (iv) honor and continue their programs, policies, and practices described in the Motion that were in effect as of the Petition Date, in the ordinary course of business, and in the same manner and on the same basis as the Debtors honored and continued such programs, policies, and practices before the Petition Date; and (v) withhold and remit all federal, state, and local taxes relating to the Wages and Employee Benefit Obligations as required by applicable law; provided that in no event shall the Debtors pay any Prepetition Workforce Obligations and Compensation Obligations before such amounts are due and payable, and this Interim Order shall not be deemed to allow the Debtors to accelerate any payment of any amounts of Prepetition Workforce Obligations that may be due and owing by the Debtors; provided, further, that the Debtor shall seek Court approval, upon a motion, of any modification that would implicate any portion of section 503(c) of the Bankruptcy Code.

4.      The Debtors are authorized, but not directed, in their sole discretion, to pay prepetition Compensation Obligations and continue their Compensation Obligations in the ordinary course of business.  Nothing herein shall be deemed to (i) authorize the payment of any amounts in satisfaction of the Compensation Obligations that are subject to section 503(c) of the Bankruptcy Code; provided, however, that the Debtors shall seek Court approval, upon a notice, of any modification that would implicate any portion of section 503(c) of the Bankruptcy Code. Notwithstanding anything to the contrary herein, any authority to continue the Severance Practices as to current Employees who may be terminated postpetition shall be addressed at the Final Hearing.

4

5.      Notwithstanding any other provision of this Interim Order and absent further order of the Court (i) payments or transfers to, or on behalf of, members of the Workforce on account of Prepetition Workforce Obligations or other obligations in the interim period shall be limited by sections 507(a)(4) and (a)(5) of the Bankruptcy Code and capped at the amount afforded priority by those statutory subsections and (ii) the Debtors are authorized, but not directed, to pay amounts owed for Paid Leave upon termination/resignation of an Employee in excess of the caps provided by sections 507(a)(4) or (a)(5) of the Bankruptcy Code where applicable state law requires such payment.

6.      Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum, and the Debtors are authorized to continue the Workers' Compensation Program and pay any payments under the Workers' Compensation Policy.  This modification of the automatic stay pertains solely to pursuing workers' compensation claims.

7.      The Debtors are authorized, but not directed, to reissue payment for the Prepetition Workforce Obligations and, subject to a Final Order, Compensation Obligations and to replace any inadvertently dishonored or rejected payments.  Further, the Debtors are authorized, but not directed, to reimburse any expenses that Employees may incur as a result of any bank's failure to honor a prepetition check.

8.      The Debtors are authorized (i) to honor all Reimbursable Expenses and continue the Credit Card Programs in the ordinary course, including making ordinary course modifications thereto, (ii) to perform their obligations under the Credit Card Programs, (iii) to request further permission to pay outstanding prepetition expenses arising thereunder, to the extent applicable, and (iv) to pay any postpetition expenses in the ordinary course.

5

9.      The Debtors are authorized, but not directed, to continue to operate under the Credit Card Programs and to pay or reimburse any and all Credit Card Obligations thereunder, whether incurred prepetition or postpetition (including, but not limited, any processing fees incurred in connection with the Credit Card Programs).

10.      Nothing in this Interim Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

11.      Nothing in this Interim Order, nor as a result of any payment made pursuant to this Interim Order, shall be deemed or construed as a waiver of the right of Debtors, or shall impair the ability of Debtors, to contest the validity and amount of any payment made pursuant to this Interim Order.

12.      Nothing in this Interim Order shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

13.      Notwithstanding anything to the contrary set forth herein, any payment made, or authorization contained, hereunder shall be subject in all respects to the Approved Budget (as such term is defined in the order approving the Debtors' postpetition financing agreements).

14.      The Debtors' banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay Prepetition Workforce Obligations and Compensation Obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date; provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Debtors' banks may rely on the representations of the Debtors with respect

to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order, and any such bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Interim Order.

15. Nothing in this Interim Order (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action; or (iv) shall be construed as a promise to pay a claim.

16. The Debtors are authorized, but not directed, to take any and all actions necessary to effectuate the relief granted herein.

17. The requirements of Bankruptcy Rule 6003(b) have been satisfied because the relief set forth in this Interim Order is necessary to avoid immediate and irreparable harm.

18. Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be effective and enforceable immediately upon its entry.

19. Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

20. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

## Exhibit 1

| Compensation | Interim Period |
|---|---|
| Gross Wages | $13,610,000 |
| Temporary Employees / Independent Contractors | $140,000 |
| Payroll Processing Services | $216,000 |
| Commissions | $1,945,800 |
| Non-Insider Severance | $0 |
| Union Employee Attendance Awards | $150 |
| Withholding Obligations | $4,320,000 |
| Expense Reimbursement | $113,600 |
| Concur / ExpenseWire Administrative Fees | $0 |
| FRG Card Program | $329,000 |
| PSP Card Program | $1,966,000 |
| **Employee Benefits Programs** | |
| Benefits Administrators | $35,000 |
| Medical Plans | $1,892,500 |
| Prescription Plan | $350,000 |
| Dental Plan | $75,100 |
| Stop-Loss Policy | $230,000 |
| Flex Spending Account - Employee Deductions | $13,200 |
| Health Savings Account - Employee Deductions | $24,100 |
| Health Savings Account - Employer Contributions | $0 |
| Basic Life / AD&D | $94,000 |
| Short-Term - Disability | $135,000 |
| CorVel Claims Administrator | $70,850 |
| Workers' Compensation Program | $745,000 |
| **Total:** | **$26,305,300** |

**Exhibit B**

**Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. ___ & ___** |

## FINAL ORDER (I) AUTHORIZING DEBTORS TO (A) PAY CERTAIN PREPETITION EMPLOYMENT OBLIGATIONS AND COMPENSATION OBLIGATIONS AND (B) MAINTAIN THE COMPENSATION OBLIGATIONS AND EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

Upon consideration of the motion (the "<u>Motion</u>")[2] of the debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>") for the entry of interim and final orders, pursuant to sections 105(a), 363(b), 507(a), and 541 of the Bankruptcy Code, Bankruptcy Rules

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2]   Capitalized terms used but not otherwise defined in this Final Order shall have the meanings ascribed to them in the Motion.

6003 and 6004, and Local Rule 9013-1, (i) authorizing the Debtors, in their discretion, to (a) pay all Prepetition Workforce Obligations and Compensation Obligations and (b) maintain the Compensation Obligations and Employee Benefits Programs, and honor and continue the Debtors' prepetition programs, policies, and practices as described in the Motion in the ordinary course of business; and (ii) granting certain related relief, all as more fully set forth in the Motion; and upon consideration of the Motion and all pleadings related thereto, including the First Day Declaration; and due and proper notice of the Motion having been given; and having determined that no other or further notice of the Motion is required; and having determined that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and having determined that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and having determined that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, in their discretion and business judgment, to (i) pay or otherwise honor all Prepetition Workforce Obligations and Compensation Obligations in an amount not to exceed $28,063,800 on a final basis; (ii) pay postpetition Employee Benefit Obligations; (iii) maintain the Compensation Obligations; (iv) honor and continue their programs, policies, and practices described in the Motion that were in effect as of the Petition Date, in the ordinary course of business, and in the same manner and on the same basis as the Debtors honored and continued such programs, policies, and practices before the Petition

Date; and (v) withhold and remit all federal, state, and local taxes relating to the Wages and Employee Benefit Obligations as required by applicable law; provided that in no event shall the Debtors pay any Prepetition Workforce Obligations and Compensation Obligations before such amounts are due and payable, and this Final Order shall not be deemed to allow the Debtors to accelerate any payment of any amounts of Prepetition Workforce Obligations that may be due and owing by the Debtors; provided, further, that the Debtor shall seek Court approval, upon a motion, of any modification that would implicate any portion of section 503(c) of the Bankruptcy Code.

3.      The Debtors are authorized, but not directed, in their sole discretion, to pay or otherwise honor the prepetition Compensation Obligations and continue their Compensation Obligations in the ordinary course of business and to pay any accrued, but unpaid amounts due thereunder, notwithstanding that such obligations may have arisen prior to the Petition Date.

4.      Notwithstanding any other provision of this Final Order and absent further order of the Court, (i) payments or transfers to, or on behalf of, members of the Workforce on account of Prepetition Workforce Obligations, Compensation Obligations, or other obligations shall be limited by sections 507(a)(4) and (a)(5) of the Bankruptcy Code and capped at the amount afforded priority by those statutory subsections; and (ii) the Debtors are authorized, but not directed, to pay unpaid Paid Leave upon termination/resignation of an Employee in excess of the caps provided by section 507(a)(4) or (a)(5) of the Bankruptcy Code where applicable state law requires such payment.

5.      Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum, and the Debtors are authorized to continue the Workers' Compensation Program and pay

any payments under the Workers' Compensation Policy.  This modification of the automatic stay pertains solely to pursuing workers' compensation claims.

6.      The Debtors are authorized, but not directed, to reissue payment for the Prepetition Workforce Obligations and Compensation Obligations to replace any inadvertently dishonored or rejected payments.  Further, the Debtors are authorized, but not directed, to reimburse any expenses that Employees may incur as a result of any bank's failure to honor a prepetition check.

7.      The Debtors are authorized (i) to honor Reimbursable Expenses and continue the Credit Card Programs in the ordinary course, including making ordinary course modifications thereto, (ii) to perform their obligations under the Credit Card Programs, (iii) to request further permission to pay outstanding prepetition expenses arising thereunder, to the extent applicable, and (iv) to pay any postpetition expenses in the ordinary course.

8.      The Debtors are authorized, but not directed, to continue to operate under the Credit Card Programs and to pay or reimburse any and all Credit Card Obligations thereunder, whether incurred prepetition or postpetition (including, but not limited, any processing fees incurred in connection with the Credit Card Programs).

9.      The Debtors' banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay Prepetition Workforce Obligations and Compensation Obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date; provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Debtors' banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date

4

should be honored pursuant to this Final Order, and any such bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Final Order.

10.     Nothing in this Final Order (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action; or (iv) shall be construed as a promise to pay a claim.

11.     Nothing in this Final Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

12.     Nothing in this Final Order, nor as a result of any payment made pursuant to this Final Order, shall be deemed or construed as a waiver of the right of Debtors, or shall impair the ability of Debtors, to contest the validity and amount of any payment made pursuant to this Final Order.

13.     Nothing in this Final Order shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

14.     Notwithstanding anything to the contrary set forth herein, any payment made, or authorization contained, hereunder shall be subject in all respects to the Approved Budget (as such term is defined in the order approving the Debtors' postpetition financing agreements).

15.     The Debtors are authorized, but not directed, to take any and all actions necessary to effectuate the relief granted herein.

16.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be effective and enforceable immediately upon its entry.

17.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

18.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

**Exhibit 1**

| Compensation | Final Period |
|---|---|
| Gross Wages | $13,610,000 |
| Temporary Employees / Independent Contractors | $140,000 |
| Payroll Processing Services | $216,000 |
| Commissions | $2,162,000 |
| Non-Insider Severance | $115,000 |
| Union Employee Attendance Awards | $150 |
| Withholding Obligations | 4,320,000 |
| Expense Reimbursement | $113,600 |
| Concur / ExpenseWire Administrative Fees | $24,200 |
| FRG Card Program | $329,000 |
| PSP Card Program | $1,966,000 |
| **Employee Benefits Programs** | |
| Benefits Administrators | $35,000 |
| Medical Plans | $2,465,000 |
| Prescription Plan | $350,000 |
| Dental Plan | $141,000 |
| Stop-Loss Policy | $230,000 |
| Flex Spending Account - Employee Deductions | $13,200 |
| Health Savings Account - Employee Deductions | $24,100 |
| Health Savings Account - Employer Contributions | $19,700 |
| Basic Life / AD&D | $94,000 |
| Short-Term - Disability | $135,000 |
| CorVel Claims Administrator | $70,850 |
| Workers' Compensation Program | $1,490,000 |
| **Total:** | **$28,063,800** |