## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND
### FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO ASSUME
### THE CONSULTING AGREEMENT, (II) APPROVING PROCEDURES
### FOR STORE CLOSING SALES, AND (III) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") hereby file this motion (the "Motion") for the entry of an interim order, substantially

in the form attached hereto as **Exhibit A** (the "Proposed Interim Order"), and a final order[2]

(the "Proposed Final Order," and, together with the Proposed Interim Order, the "Proposed

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] The Debtors will file the form of Proposed Final Order prior to the final hearing on the Motion.

Orders"),[3] (i) authorizing the Debtors to assume that certain Letter Agreement Governing Inventory Disposition, by and between Hilco Merchant Resources, LLC (the "Consultant") and American Freight FFO, LLC, Franchise Group Newco Intermediate AF, LLC, and each of Franchise Group Newco Intermediate AF, LLC's subsidiaries (collectively, "American Freight"), dated as of November 3, 2024 (as amended, revised, or supplemented from time to time, the "Consulting Agreement"), annexed as Schedule 1 to the Proposed Orders, (ii) authorizing and approving sales of the Merchandise (as defined below) owned by American Freight by means of "store closings," "sale on everything," "everything must go," or similar themed sales (the "Sales") in the American Freight retail stores identified in the Consulting Agreement (the "Stores"), with such Sales to be free and clear of all liens, claims, and encumbrances, (iii) authorizing the Sale of the furniture, fixtures, and equipment located in the Stores or otherwise under American Freight's control (the "FF&E" and, together with the Merchandise, the "Store Closure Assets," and, the Sale of the Store Closure Assets, the "Store Closing Sales"), (iv) approving the guidelines for conducting the Store Closing Sales (the "Store Closing Procedures"), substantially in the form annexed as Schedule 2 to the Proposed Orders, and (v) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"),[4] which was filed concurrently herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

---

[3]     Capitalized terms, including those in the Summary of Material Terms chart below, used but not otherwise defined herein shall have the meanings given to them in the Proposed Orders.  To the extent there are any discrepancies between the Proposed Interim Order and Proposed Final Order, the Proposed Final Order, as approved by the Court, will control.

[4]     Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the First Day Declaration.

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 365, and 554 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9013-1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1.

## BACKGROUND

4.     On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions in the Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are authorized to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

6.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

## THE STORE CLOSING SALES

### I.     Overview

7.     As set forth in the Debtors' Restructuring Support Agreement, and in furtherance of their restructuring efforts, the Debtors currently anticipate closing each of their owned retail store locations for their American Freight business segment and liquidating and winding down American Freight through these Chapter 11 Cases.  Accordingly, through this Motion, the Debtors seek authority to assume and perform under the Consulting Agreement and continue to and/or initiate Store Closing Sales pursuant to the Store Closing Procedures.

8.     American Freight is one of the nation's leading retailers of furniture, mattresses, appliance and appliance-related products, offering its customers in-store and online access to furniture, mattresses, new and out-of-box home appliances, and home accessories at discount prices.  American Freight provides its customers with multiple payment options, including third-party financing, which provides customers with access to high-quality products and brand name appliances that may otherwise remain aspirational.  As of the Petition Date, American Freight operates approximately 341 retail store locations across 41 states, consisting of approximately 329 company-owned locations.

9.     In recent years, macroeconomic headwinds in the retail industry have negatively impacted American Freight's financial performance.  Higher interest rates and inflation have had an adverse effect on business performance and franchise sales, as consumer discretionary spending has decreased, especially with respect to lower-income consumers, who comprise American Freight's core customer base.  Moreover, although the COVID-19 pandemic saw a dramatic spike

4

and "pull-forward" in consumer expenditures with respect to home remodeling and furnishing, a steady increase of inflationary pressures and interest rates following the pandemic has resulted in consumers moving away from financing for discretionary home appliances and accessories.

10.     In light of these challenges, prior to the Petition Date, the Debtors, their advisors, and key economic stakeholders carefully considered numerous strategic options and potential transactions to be implemented with respect to American Freight, as part of the Debtors' broader restructuring efforts.  These considerations included the rightsizing of American Freight's business around a nucleus of profitable store locations, the sale of substantially all of American Freight's assets at a going concern value, and an orderly, expedited liquidation of American Freight's assets and the wind-down of its business.

11.     In connection with these efforts, in the weeks leading up to the Petition Date, the Debtors, with the assistance of Ducera and their other advisors, conducted a robust marketing process to sell American Freight's assets at a going concern.  The Debtors' initial market outreach formally began in September 2024.  As part of this process, the Debtors and Ducera reached out to over 80 potential bidders, of which 29 signed confidentiality agreements and received financial and operational diligence materials through the Debtors' virtual data room.

12.     While the Debtors' market outreach yielded several promising initial indications of interest, no proposals materialized for the purchase of American Freight's assets at a going concern that would result in greater projected proceeds than the projected proceeds that would be realized by conducting the Store Closing Sales and liquidating the Store Closure Assets.[5]  Moreover, the Debtors concluded that American Freight's limited amount of profitable store locations could not

---

[5]     During the Chapter 11 Cases, the Debtors and their advisors will evaluate the sale of American Freight's intangible assets (including intellectual property), which will not be liquidated through the Store Closing Sales.

support the rightsizing of its business through a plan of reorganization. Simultaneously with the marketing and sale process, the Debtors and their advisors also focused their efforts on identifying third-party consultants to evaluate and conduct the Store Closing Sales and to prepare each Store for turnover to the applicable landlords—all on terms that would maximize recoveries for the Debtors' stakeholders.

## II.      Selection of the Consultant & Consulting Agreement

13.     The Debtors solicited bids from various third-party consultants through a referral-for-proposal process. The Debtors received and, with the assistance of their advisors and their Board of Directors, carefully considered three formal proposals, each of which contemplated both a fee-based and equity-based structure. The Debtors provided each potential consultant with access to an extensive virtual data repository, responded to numerous requests for additional information and documents, conducted extensive due diligence sessions with each potential consultant, and held final presentation meetings. The Debtors carefully evaluated each proposal based on the potential consultant's proposed strategy to conduct the Store Closing Sales, the risks associated with each proposal, including with respect to not achieving forecasted recovery targets, the qualifications operational capabilities of each potential consultant, and the general economic terms of each proposal. To ensure that the Debtors achieved the most value maximizing proposal available under the circumstances, the Debtors negotiated with each bidder and obtained favorable changes to proposed economics and compensation structures.

14.     These negotiations resulted in the Debtors' decision to move forward with the proposal submitted by the Consultant, which the Debtors determined represented the most value maximizing transaction available. A number of considerations led to this conclusion, including, among others: (i) as compared to the other proposals, the Consultant's proposal would result in the highest net cash flow to the Debtors and their estates in the chapter 11 process; (ii) the Consultant's

proposal presents minimal execution risk, considering the Consultant's previous experience and familiarity with liquidating retail store locations similar in size and nature to American Freight's stores; and (iii) of the proposals, the Consultant's proposal is expected to result in the greatest paydown of the obligations owed under the Debtors' ABL Facility.

15.    Following the selection of the Consultant's proposal, the Debtors and the Consultant continued to conduct arm's-length negotiations with respect to the terms of the Consultant's retention and, on November 3, 2024, the parties entered into the Consulting Agreement.  Pursuant to the Consulting Agreement, the Consultant will serve as the exclusive consultant to the Debtors in connection with the Store Closing Sales.  A summary of the material terms of the Consulting Agreement is set forth below.[6]

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Services Provided by Consultant**<br><br>*Consulting Agreement § C(i)* | The services to be provided by the Consultant generally include the following:<br><br>• Provide qualified Supervisors engaged by Consultant to help oversee the management of the Stores and Distribution Centers;<br><br>• Recommend appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant;<br><br>• Recommend appropriate discounts of Merchandise, staffing levels for the Stores, and appropriate bonus and incentive programs, if any, for the Stores' employees, all of which shall be approved in advance by Merchant;<br><br>• Help oversee display of Merchandise for the Stores and Distribution Centers; |

---

[6]    The following summary chart is for the convenience of the Court and parties in interest and should not be construed to be a comprehensive restatement of the terms of the Consulting Agreement.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.  Capitalized terms used but not defined in this summary chart shall have the meaning ascribed to them in the Consulting Agreement.

| TERM | CONSULTING AGREEMENT |
|---|---|
| | • To the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; <br><br> • Maintain the confidentiality of all proprietary or non-public information regarding Merchant, including in accordance with the provisions of any confidentiality agreement signed by the Parties; <br><br> • Assist Merchant in connection with managing and controlling loss prevention and employee relations matters; <br><br> • Assist Merchant with determining the necessity for obtaining any applicable permits and governmental approvals to conduct the Sale, including working with Merchant to obtain each in a timely and orderly fashion and preparing or causing to be prepared all forms necessary to assist in Merchant's securing any applicable permits and governmental approvals necessary to conduct the Sale, the costs and expenses of which shall be paid by Merchant and shall be in addition to the costs and expenses set forth on the Expense Budget; <br><br> • At Merchant's sole discretion, implement Consultant's affiliate CareerFlex program for Merchant's Store level and other employees; <br><br> • Meet with Merchant, on a weekly or as needed basis, to review sales, sales reporting, and expenses in an effort to minimize expenses and maximize overall net recovery of the Sale; and <br><br> • Provide such other related services deemed necessary or appropriate by Merchant and Consultant. |
| **Sale Term** <br><br> *Consulting Agreement § B* | For each Store, the Sale Commencement Date shall be November 4, 2024 and terminate no later than December 29, 2024; provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any one or more Stores on a Store-by-Store basis prior to the Sale Termination Date. |
| **Expenses** <br><br> *Consulting Agreement § E* | Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store-level operating expenses, all costs and expenses related to Merchant's other retail store operations, Merchant's costs for operating the Distribution Centers, and Consultant's other reasonable and documented out of pocket expenses.  To control expenses of the Sale, Merchant and Consultant have established an appropriate Expense Budget of certain delineated |

| TERM | CONSULTING AGREEMENT |
|---|---|
| | expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs (including signage and the shipping, freight, and sales tax related thereto where applicable).  The Expense Budget may only be modified by mutual agreement of Consultant and Merchant. |
| **Compensation of Consultant**<br><br>*Consulting Agreement § E* | In consideration of its services under the Agreement, Consultant shall earn a base fee equal to two percent (2.0%) of the Gross Proceeds of Merchandise sold at the Stores and the Distribution Centers.  For purposes of the Agreement, "Gross Proceeds" means gross receipts calculated using the "gross rings" method, net of applicable sales taxes; provided, however, that it is expressly understood and agreed that Gross Proceeds shall not include proceeds of sales made prior to the Sale Commencement Date or after the Sale Termination Date.<br><br>In addition to the base fee, and not in lieu of the base fee, the Consultant shall be entitled to, from Gross Proceeds, Additional Incentive Compensation based upon the Gross Recovery Percentages achieved as set forth in the following table.  The Additional Incentive Compensation shall be equal to the aggregate sum of the percentages set forth in the "Additional Incentive Compensation" column of the table (e.g., calculated back to first dollar) for the corresponding Gross Recovery Percentage achieved.  No Additional Incentive Compensation shall be earned or payable where the Gross Recovery Percentage is less than 114.0%: |

| Gross Recovery Percentage | Additional Incentive Compensation |
|---|---|
| Between 114.0% and 115.50% | An additional 0.25% of Gross Proceeds (total fee equal to 2.25% of Gross Proceeds) |
| Above 115.50% | An additional 0.25% of Gross Proceeds (total fee equal to 2.50% of Gross Proceeds) |

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Terms of Additional Consultant Goods**<br><br>*Consulting Agreement § S* | Exercisable in its reasonable discretion, Consultant shall have the right to supplement the Merchandise in the Sale with Additional Consultant Goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise in the Sale.  The purchase of any Additional Consultant Goods shall be made by Consultant at Consultant's sole expense. Sales of Additional Consultant Goods shall otherwise be made in conjunction with the Sale, and Additional Consultant Goods shall be run through Merchant's cash register systems, so long as Consultant has marked the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant |

| Term | Consulting Agreement |
|---|---|
| | Goods from the sale of Merchandise.  Consultant and Merchant shall also cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Merchandise.  Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Consultant shall pay to the Merchant an amount equal to five percent (5%) of the gross proceeds (excluding sales taxes) from the sale of Additional Consultant Goods completed during the Sale Term and Consultant shall retain all remaining amounts from the sale of the Additional Consultant Goods. Consultant and the Merchant intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to the Merchant in all respects and not a consignment for security purposes. Subject solely to Consultant's obligations to pay to the Merchant the Additional Consultant Goods fee described in the Agreement, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity shall have any claim against any of the Additional Consultant Goods or their proceeds.<br><br>At Consultant's sole cost and expense, the Merchant shall insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with the Merchant's insurers. Consultant shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Consultant Goods.   The Additional Consultant Goods shall be consigned to the Merchant as a true consignment under Article 9 of the Code. |
| **Conduct of the Store Closing Sales**<br><br>*Consulting Agreement § D* | All sales of Merchandise shall be made on behalf of Merchant. Consultant does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant or, as applicable, as ordered by the Bankruptcy Court. |
| **Expense Advance**<br><br>*Consulting Agreement § E* | Upon execution of the Agreement, the Merchant shall pay by wire transfer to the Consultant an advance payment of costs and expenses delineated in the Expense Budget of $3,300,000.   The Expense Advance shall be held by Consultant and applied towards Expense Budget items as incurred. Any portion of the Expense Advance not so used shall be returned to Merchant within three days following the final reconciliation. |

| TERM | CONSULTING AGREEMENT |
|---|---|
| **FF&E Disposition**<br><br>*Consulting Agreement § I* | Consultant shall sell the FF&E in the Stores from the Stores themselves. Merchant shall be responsible for all reasonable and documented costs and expenses incurred by Consultant in connection with the sale of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties. Consultant shall have the right to abandon at the Stores any unsold FF&E. Consultant shall also sell the FF&E located in the Merchant's Distribution Centers.<br><br>Consultant shall be entitled to a commission from the sale of the FF&E equal to fifteen percent (15.0%) of the Gross Proceeds of the sale of the FF&E.<br><br>Consultant shall remit to Merchant all Gross Proceeds from the sale of FF&E. During each weekly reconciliation, Consultant's FF&E fee shall be calculated, and Consultant's calculated FF&E fee, along with any reasonable FF&E costs and expenses then incurred, shall be paid within seven (7) days after each such weekly reconciliation, upon Merchant's receipt and review of a reasonably detailed invoice by the Merchant in accordance with the terms of the Agreement. |
| **Insurance**<br><br>*Consulting Agreement § G* | Merchant shall maintain throughout the Sale Term, on such terms and conditions as are consistent with Merchant's ordinary course operations, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Consultant to be named an additional insured with respect to all such policies. At Consultant's request, Merchant shall provide Consultant with a certificate or certificates evidencing the insurance coverage required hereunder and that Consultant is an additional insured thereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.<br><br>Consultant shall maintain, throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least two million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Consultant's provision of services at the Stores. Consultant shall name Merchant as an additional insured and loss payee under such policy, and upon |

| Term | Consulting Agreement |
|---|---|
| | execution of the Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Consultant shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements. Further, should Consultant employ or engage third parties to perform any of Consultant's undertakings with regard to the Agreement, Consultant will ensure that such third parties are covered by Consultant's insurance or maintain all of the same insurance as Consultant is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance. |
| **Indemnification by Consultant** <br><br> *Consulting Agreement § F(ii)* | Consultant shall indemnify, defend and hold Merchant and Merchant Indemnified Parties harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Consultant or the Consultant Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, the Agreement by Consultant; (c) any liability or other claims made by Consultant's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Consultant's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Consultant or any of the Consultant Indemnified Parties; and (e) any claims made by any party engaged by Consultant as an employee, agent, representative or independent contractor arising out of such engagement. |
| **Indemnification by Merchant** <br><br> *Consulting Agreement § F(i)* | Merchant shall indemnify, defend, and hold Consultant and Consultant Indemnified Parties harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of the Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Consultant Indemnified Parties) against Consultant or a Consultant Indemnified Party, except claims arising from Consultant's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of |

| TERM | CONSULTING AGREEMENT |
|------|----------------------|
|      | Consultant's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law. |

16.     Through this Motion, the Debtors seek to assume the Consulting Agreement and allow the Consultant to conduct its work uninterrupted.  The Debtors have determined that: (a) the services of the Consultant are necessary for a seamless and efficient large-scale store closing process, as is contemplated by this Motion, and to maximize the value of the assets being sold; and (b) the Consultant is capable of performing the required tasks on favorable financial terms.

17.     Further, the Debtors have determined, in an exercise of their business judgment, that assumption of the Consulting Agreement will allow the Debtors to use the experience and resources of the Consultant in performing large-scale liquidations at the Stores in a format that allows the Debtors to retain control over the liquidation process and maximize benefit to their estates.  Prior to the Petition Date, the ability of the Debtors and the Consultant to advertise and conduct the Sales at the Stores as "store closing" or "going out of business" sales was limited in some jurisdictions based on permitting requirements or by the terms of American Freight's leases. The ability to use the "store closing" and "going out of business" messages in advertising is critical to drive sales and, thus, maximize recovery for the Debtors and their estates.

## III.     The Store Closing Procedures

18.     The Debtors seek approval of the Store Closing Procedures to sell the Store Closure Assets, in each case free and clear of liens, claims, or encumbrances.  The Debtors believe that the Store Closing Procedures are consistent with store closing procedures approved by other courts in similar contexts.  The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures set forth herein provide the best

and most efficient means of selling the Store Closure Assets to maximize the value to their estates. The Debtors estimate that execution of the Store Closing Sales will take until approximately December 29, 2024 (which date may be extended for any Stores by mutual agreement of the Debtors and Consultant).

19.    The Debtors also seek approval of the Store Closing Procedures to provide newspapers and other advertising media in which the Store Closing Sales may be advertised with comfort that the Debtors are conducting the Store Closing Sales in compliance with applicable law and with the Court's approval. The Debtors seek interim approval of the Store Closing Procedures in light of the significant operating losses generated by the Stores, the Debtors' liquidity constraints, the need to conduct the Store Closing Sales, and the budget set forth in the Debtors' proposed debtor-in-possession financing order. Finally, although the Debtors seek approval of the Store Closing Procedures as default procedures, they seek to preserve flexibility for the Debtors, the Consultant, and the landlords of specific Store locations. Accordingly, the Debtors seek approval for the Debtors and the Consultant and the applicable landlords to be authorized to enter into agreements modifying the Store Closing Procedures with respect to specific Stores (collectively, the "Side Letters"), without further order of the Court.

## IV.    Liquidation Sale Laws and Dispute Resolution Procedures

20.    Certain states in which American Freight operates stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, but not limited to, state and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws"). Liquidation Sale Laws may establish licensing requirements, permitting requirements, bonding requirements, waiting periods, time limits, bulk sale restrictions, and augmentation limitations that would otherwise apply to the Store Closing Sales. As set forth above, prior to the Petition Date, the ability of the Debtors and the

Consultant to advertise the sale at the Stores as "store closing" or "going out of business" sales was limited in some jurisdictions based on permitting requirements or by the terms of American Freight's leases. Such requirements hamper the Debtors' ability to maximize value in selling American Freight's inventory. Subject to the Court's approval, the Debtors intend to conduct the Store Closing Sales in accordance with the Store Closing Procedures without complying with the Liquidation Sale Laws, and, to the extent such procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures shall control.

21. To facilitate the orderly resolution of any disputes between the Debtors and any Governmental Units (as defined in Bankruptcy Code section 101(27)) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), as set forth in the Proposed Orders:

(i) Provided that the Store Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors and the Consultant will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Store Closing Sales in accordance with the terms of the Interim Order, or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any Liquidation Sale Laws.

(ii) Within three (3) business days after entry of the Interim Order, the Debtors will serve by first-class mail copies of the Interim Order, the Consulting Agreement, and the Store Closing Procedures on the following: (A) the Attorney General's office for each state where the Store Closing Sales are being held, (B) the county consumer protection agency or similar agency for each county where the Store Closing Sales are being held, (C) the division of consumer protection for each state where the Store Closing Sales are being held, (D) the chief legal counsel for the local jurisdiction, and (E) the landlords for the Stores (collectively, the "Dispute Notice Parties").

(iii) To the extent that there is a dispute arising from or relating to the Store Closing Sales, the Interim Order or the Final Order, as applicable, the Consulting Agreement, or the Store Closing Procedures, which dispute relates to any

Liquidation Sale Laws (a "<u>Reserved Dispute</u>"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten (10) days following entry of the Interim Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute (the "<u>Dispute Notice</u>"), explaining the nature of the dispute to: (A) proposed counsel to the Debtors, (i) Willkie Farr & Gallagher, LLP, 787 7th Avenue, New York, NY 10019, Attn: Debra M. Sinclair, Esq. (dsinclair@willkie.com), Betsy L. Feldman (bfeldman@willkie.com), and Joseph R. Brandt, Esq. (jbrandt@willkie.com), and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon L. Morton, Esq. (emorton@ycst.com), Matthew B. Lunn, Esq. (mlunn@ycst.com), and Allison S. Mielke, Esq. (amielke@ycst.com); (B) the Consultant, (i) c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847-849-0859, Attn: T. Kellan Grant; and (ii) (1) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn: Steven E. Fox (sfox@riemerlaw.com), and (2) Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attn: Mark L. Desgrosseilliers (desgross@chipmanbrown.com); (C) the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox, Esq. (timothy.fox@usdoj.gov); and (D) counsel to any official committee appointed in these Chapter 11 Cases. If the Debtors, the Consultant and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "<u>Dispute Resolution Motion</u>").

(iv)    In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of any Interim Order or Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Store Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors and the Consultant to conduct the Store Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Consulting Agreement, and/or the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(v)     If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (ii) and (iii) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs.   Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

## V.      Fast Pay Laws

22.     Many states in which American Freight operates have laws and regulations that require American Freight to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Restrictive Laws").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

23.     The nature of the store closings contemplated by this Motion will result in a substantial number of employees being terminated during the Store Closing Sales.  To be clear, the Debtors intend to pay terminated employees as expeditiously as possible and under normal payment procedures.  However, American Freight's payroll system will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws.  Under ordinary circumstances, American Freight's payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by state law.  This process requires American Freight's payroll department to calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing.  Given the number of employees who will likely be terminated during the Store Closing Sales, this process could easily take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.

24.     Accordingly, the Debtors request that the Proposed Orders provide, with respect to any Fast Pay Laws that would apply to the sale of the Store Closure Assets, that the Debtors and Consultant be presumed to be in compliance with the Fast Pay Laws.

## VI.    Lease Restrictions

25.     The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the store closings and Store Closing Sales.  In certain cases, the contemplated store closings and Store Closing Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which American Freight operates, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.  Such restrictions would also hamper American Freight's ability to maximize value in selling its inventory.

26.     The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with, or otherwise impede the conduct of, the store closings or the Store Closing Sales, or institute any action against the Debtors in any court (other than in the Court) or before any administrative body that, in any way, directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings, the Store Closing Sales, or the advertising and promotion (including through the posting of signs) of the Store Closing Sales.

## VII.    Customer Programs[7]

27.    The successful implementation of the Store Closing Sales requires modifications to certain of American Freight's customer programs.  Accordingly, the Debtors intend to implement the following changes to American Freight's customer programs, which will be communicated to customers immediately upon the commencement of these Chapter 11 Cases and the Store Closing Sales.

    a.    **Returns**. For the first 15 days after the Petition Date, American Freight will accept returns of merchandise sold by American Freight in the ordinary course of business prior to the Petition Date, so long as the return is otherwise in compliance with American Freight's return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price being offered in connection with the Store Closing Sales.  Items sold during the Store Closing Sales will be sold on a "as final" basis and returns will not be accepted for such items.

    b.    **Layaway Program**.  American Freight will provide each existing Layaway Program (as defined in the Customer Programs Motion) customer with the opportunity to, within the first 15 days after the Petition Date, pay the remaining balance owed under its layaway plan and retrieve the purchased merchandise or, alternatively, cancel its layaway plan in exchange for a full refund.  American Freight's Layaway Program will otherwise terminate on the Petition Date and any merchandise not timely purchased and retrieved will be returned to American Freight's inventory and sold during the Store Closing Sales.

## VIII.   The Store Bonus Program

28.    The Debtors seek authorization to implement a bonus program (the "Store Bonus Program") and make payments thereunder to Store Bonus Program participants, all of whom are non-insiders, to ensure successful consummation of the Store Closing Sales. Specifically, the Debtors request authority, at their discretion, to provide additional compensation in the form of

---

[7]    The relief requested by the Debtors with respect to their customer programs is set forth in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief*, which was filed concurrently with this Motion (the "Customer Programs Motion").

bonuses (the "Store Bonuses") in an aggregate amount of up to approximately $2.9 million. The Store Bonuses will be distributed among approximately 780 Store employees, including Store directors, managers, and associates, to incentivize these Store employees to complete the Store Closing Sales in a manner that maximizes value for the Debtors and their stakeholders. The maximum Store Bonus that will be provided to any individual employee under the Store Bonus Program is approximately $2,500, which amount will be provided to eligible Store directors. Additionally, the Store Bonus Program contemplates an increase of 0.5% in sales commission for Store sales associates, as well as an hourly wage increase in the amount of $3 for warehouse associates. The Store Bonuses are conditioned on eligible employees remining employed for the duration of the Store Closing Sales. For the avoidance of doubt, none of the employees eligible for the Store Bonuses are "insiders" of the Debtors.

29.     The success of the Store Closing Sales depends on Store-level employees continuing their ordinary course duties under the supervision of the Consultant and Debtors. Store employees are necessary to, among other things, service customers, administer in-store sales, facilitate the movement of American Freight's inventory from its warehouses to the Stores, and manage cash receipts and bank deposits. Replacing such employees would be unfeasible under the contemplated timeframe for the Store Closing Sales. Through the employees' ongoing commitment and performance, they can ensure that the Debtors maximize stakeholder value through the Store Closing Sales at a time when those employees' positions will soon be terminated. The Store Bonus Program is a necessary component of the Closing Sales, has the support of the Debtors' DIP Lenders and the Ad Hoc Group of First Lien Secured Lenders, and is contemplated by the approved budget attached to the proposed debtor-in-possession financing order.

## BASIS FOR RELIEF

### I.      The Court Should Authorize the Assumption of the Consulting Agreement

30.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See, e.g., In re Tayfur, 505 B.R. 673, 677 (Bankr. W.D. Pa. 2014) ("The Bankruptcy Code does not set forth a standard for making a determination as to whether assumption or rejection should be authorized; however, courts have adopted the standard of the business judgment test.").  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to impartially control a case.  See Richmond Leasing Co. v. Capital Bank, 762 F.2d 1303, 1311 (5th Cir. 1985).

31.      The assumption of the Consulting Agreement represents a reasonable exercise of the Debtors' business judgment.  In consultation with their advisors, the Debtors determined that the Stores are a burden to their estates, and that the Store Closure Assets should be liquidated for the benefit of the Debtors' estates and their creditors.  Further, after arm's length negotiations with several potential consulting firms, the Debtors believe that the Consulting Agreement contains the most favorable terms available under the circumstances.

32.     Furthermore, store closings or liquidation sales are routine occurrences in chapter 11 cases, especially involving retail debtors.  See, e.g., In re Big Lots, Inc., No. 24-11967 (JKS) (Bankr. D. Del. October 21, 2024) [D.I. 576]; In re New rue21 Holdco, Inc., No. 24-10939 (BLS) (Bankr. D. Del. May 23, 2024) [D.I. 193]; In re Express, Inc., No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) [D.I. 234]; In re Number Holdings, Inc., No. 24-10719 (JKS) (Bankr. D. Del. May 9, 2024) [D.I. 462]; In re Indep. Pet Partners Holdings, LLC, No. 23-10153 (LSS) (Bankr. D. Del. Mar. 1, 2023) [D.I. 229]; In re Z Gallerie, LLC, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) [D.I. 192]; In re Things Remembered, Inc., No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) [D.I. 217]; In re Charming Charlie Holdings Inc., No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) [D.I. 280]; In re RadioShack Corp., No. 17-10506 (BLS) (Bankr. D. Del. Mar. 29, 2017) [D.I. 322]; In re Sports Auth. Holdings, Inc., No. 16-10527 (MFW), (Bankr. D. Del. Apr. 14, 2016); In re Quiksilver, Inc., No. 15-11880 (BLS) (Bankr. D. Del. Oct. 7, 2015) [D.I. 253]; In re RadioShack Corp., No. 15-10197 (BLS) (Bankr. D. Del. Feb. 20, 2015) [D.I. 455]; In re Coldwater Creek, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) [D.I. 355]; In re Anchor Blue Holding Corp., Case No. 11-10110 (PJW) (Bankr. D. Del. Jan. 13. 2011) [D.I. 52].

33.     The Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Store Closing Sales in an efficient and cost-effective manner.  Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to efficiently conduct the Store Closing Sales for the benefit of all stakeholders.  If the Consulting Agreement is not assumed on an interim basis, there could be substantial harm to all stakeholders.  For example, the estate would lose the benefit of the momentum and preparation that has already been started by the Consultant in preparing for the Store Closing Sales prepetition.  Moreover, the proposed timeline for the Store Closing Sales

is predicated on the Store Closing Sales starting immediately.  Finally, given the number of stores and the particular issues in administering the Store Closing Sales, it is not certain that the Debtors could retain a liquidator able to conduct the process as efficiently and effectively as the Consultant.

34.      For the reasons set forth herein, the Debtors submit that they have exercised their reasonable business judgment in seeking to assume the Consulting Agreement, thereby engaging and enabling the Consultant to proceed with the Store Closing Sales, and respectfully request that the Interim Order approving the assumption of the Consulting Agreement be granted.

## II.      The Court Should Approve the Store Closing Procedures

35.      The Court may authorize the Debtors to consummate the store closings and Store Closing Sales pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).  Further, section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

36.      Pursuant to section 363(b) of the Bankruptcy Code, for the purpose of conducting the Store Closing Sales, the Debtors need only show a legitimate business justification for the proposed action.  See, e.g., In re Filene's Basement, LLC, Case No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (holding that transactions under section 363 of the Bankruptcy Code must be based upon a debtor's sound business justification, and that where a debtor articulates a reasonable basis for its business decisions, courts will generally not entertain objections to the debtor's conduct); see also In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor

articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

37.    When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption "that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." In re Tower Air, Inc., 416 F.3d 229, 234 (3d Cir. 2005).  Accordingly, parties challenging a debtor's decision must make a showing of bad faith, self-interest, or gross negligence.  See Tower Air, 416 F.3d at 238 (stating that overcoming the presumptions of the business judgment rule is a "near-Herculean task" and that in order to do so, the decision must "go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith"); In re Shubh Hotels Pittsburgh, LLC, 439 B.R. 637, 640 (Bankr. W.D. Pa. 2010) (J. Deller) ("[C]ourts have also held that a court should accept a debtor's business judgment unless there is evidence of bad faith."); In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987) (J. Bentz) ("[T]he court should not interfere with or second guess the debtor's sound business judgment unless and until evidence is presented that establishes that the debtor's decision was one taken in bad faith or in gross abuse of its retained business discretion.").

38.    In addition, the Court may authorize the store closings and Store Closing Sales based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may authorize actions that are essential to the continued operation of a debtor's business.  See In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1999) (noting that in the Third Circuit, debtors may pay pre-

petition claims that are essential to continued operations); see also In re Fin. News Network Inc., 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization).

39. The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtors and their advisors believe that the Store Closing Procedures represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of landlords and other parties in interest.

40. Furthermore, ample business justification exists to conduct the Store Closing Sales. As described above, prior to the Petition Date, the Debtors, their advisors, and key economic stakeholders carefully considered numerous strategic options and potential transactions to be implemented with respect to American Freight. Indeed, the Debtors, with the assistance of Ducera and their other advisors, conducted an expedited and robust prepetition marketing process to sell American Freight's assets at a going concern value. This process provided a market check on the value of American Freight's assets, and confirmed that the projected proceeds from any going-concern sale of the assets would not exceed the proceeds realized by conducting a full-scale liquidation and wind-down of the business.

41. Once it became apparent that conducting the Store Closing Sales and liquidating the Store Closure Assets would result in a value maximizing transaction for the Debtors and their stakeholders, the Debtors carefully considered numerous formal proposals from potential consultants to conduct the liquidation, and spent weeks negotiating the economics of each proposal

in order to achieve the most favorable terms possible. Through hard fought and arm's-length negotiations, the Debtors were able to achieve significant economic concessions from each of the potential consultants. And ultimately, the Debtors determined, in their business judgment, that the final proposal submitted by the Consultant represented the most favorable terms available under the circumstances.

42. Importantly, any delay in consummating the store closings and Store Closing Sales would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons. Many of the Stores fail to generate positive cash flow and therefore are a drain on liquidity. Thus, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Closing Stores. Further, the swift and orderly commencement of Store Closing Sales will allow the Debtors to timely reject the applicable Store leases, and therefore avoid the accrual of unnecessary administrative expenses for rent payment. Delaying the store closings and Store Closing Sales may cause the Debtors to pay additional postpetition rent at many of these stores, which would be a significant cost to the estates.

## III.   The Court Should Approve of the Sale of the Store Closure Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests under Bankruptcy Code Section 363(f)

43. The Debtors request approval to sell the Store Closure Assets on a final "as is" basis, free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code. A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate

value of all liens on such property; (d) such interest is in *bona fide* dispute; or (e) such entity could

be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); In re Trans World Airlines, Inc., 322 F.3d 283, 290 (3d Cir. 2003) (holding

that under section 363(f), a sale free and clear of interests can occur if any one of five conditions

has been satisfied); In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f)

is written in the disjunctive, the court may approve a sale free and clear if any one subsection is

met).

44.     The Debtors anticipate that, to the extent there are liens on the Store Closure Assets,

all holders of such liens will consent to the sales because the Store Closing Sales provide the most

effective, efficient, and time-sensitive approach to realizing proceeds for, among other things, the

repayment of amounts due to such parties, thereby satisfying section 363(f)(2) of the Bankruptcy

Code.  Moreover, any and all liens on the Store Closure Assets sold during the Store Closing Sales

would attach to the proceeds of such sales with the same force, effect, and priority as such liens

currently have on these assets, subject to the rights and defenses, if any, of the Debtors and of any

party-in-interest with respect thereto.

45.     Moreover, all identified lienholders will receive notice and will be given sufficient

opportunity to object to the relief requested on a final basis.  Any such entity that does not object

to the sale should be deemed to have consented.  See Futuresource LLC v. Reuters Ltd., 312 F.3d

281, 285-86 (7th Cir. 2002) ("[i]t is true that the Bankruptcy Code limits the conditions under

which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the

consent of the interest holder, and lack of objection (provided of course there is notice) counts as

consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might

have an interest in the bankrupt's assets had to execute a formal consent before they could be

sold.") (internal citations omitted); In re Tabone, Inc., 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding failure to object to sale free and clear of liens, claims, and encumbrances satisfies section 363(f)(2)); In re Elliot, 94 B.R. at 345 (same).

46.     Accordingly, the Debtors submit that the sale of the Store Closure Assets satisfies the statutory requirements of section 363(f) of the Bankruptcy Code and should be free and clear of any liens, claims, encumbrances, and other interests.

## IV.     The Court Should Waive Compliance with the Restrictive Laws and Approve the Dispute Resolution Procedures

47.     The Debtors ability to conduct the Store Closing Sales in accordance with the Store Closing Procedures and without complying with Restrictive Laws is critical to the Store Closing Sales' success.  Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Store Closing Sales, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.  Additionally, compliance with Fast Pay Laws would require American Freight to pay terminated employees within a time frame that would be detrimental to the conduct of these Chapter 11 Cases, if not impossible.

48.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Restrictive Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Restrictive Laws that may apply to the Store Closing Sales.  As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closing Sales and, therefore, the below

requested relief seeking the waiver of certain state and local laws and lease provisions is appropriate.

49.     The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws.  *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court authorized, a company need not comply with the Liquidation Sale Laws.  See, e.g., Ark. Code Ann. § 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Fla. Stat. Ann. 559.25(2) (same); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order).  *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Bankruptcy Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Restrictive Laws as it is essential to the continued operation of the Debtors' business. *Third*, the Bankruptcy Court will be able to supervise the Store Closing Sales because American Freight and its assets are subject to the Bankruptcy Court's exclusive jurisdiction.  See 28 U.S.C. § 1334.  As such, creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Bankruptcy Court because the Debtors are only seeking interim relief at the outset of these cases, and parties in interest will be able to raise any further issues at the final hearing.

50.     Further, bankruptcy courts have consistently recognized, with limited exceptions, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  See In re Shenango Group. Inc., 186 B.R. 623, 628 (Bankr. W.D. Pa.

1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . [A] state statute . . . cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997). Specifically, courts have found that preemption is appropriate, where the only state laws involved concern economic regulation rather than the protection of public health and safety. See In re Baker & Drake. Inc., 35 F.3d 1348, 1353 (9th Cir. 1994) (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

51.     Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors. Accordingly, authorizing the Store Closing Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate. The Debtors do not seek a general waiver of all state and local law requirements, but only those that apply specifically to retail liquidation sales. Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closing Sales. Moreover, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising. Finally, the Dispute Resolution Procedures provide an orderly means for resolving any disputes arising between the Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale Laws, and should therefore be approved.

**V.      The Court Should Waive Compliance with Any Restrictions in the Leases**

52.      Certain of American Freight's leases governing the premises of the Stores that are subject to Store Closing Sales may contain provisions purporting to restrict or prohibit American Freight from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  See In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring [a] debtor to maximize estate assets . . ."); In re R. H. Macy and Co., Inc., 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); In re Tobago Bay Trading Co., 112 B.R. 463, 467–68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

53.      Store closing sales are a routine part of chapter 11 cases involving retail debtors.  Such sales are consistently approved by courts, despite provisions in recorded documents or agreements purporting to forbid such sales.  Indeed, courts have repeatedly deemed such restrictive contractual provisions unenforceable as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code.  See, e.g., In re HDC Holdings II, LLC, Case No. 24-12307 (TMH), Docket No. 39 (Bankr. D. Del. Oct. 11, 2024) (approving, on

an interim basis, sale of store closing sales notwithstanding any restrictive provision of any lease, sublease, license, reciprocal easement agreement, restrictive covenant, or other agreement); In re New RSC Holdco, Inc. (f/k/a New rue21 Holdco, Inc.), Case No. 24-10939 (BLS), Docket No. 193 (Bank. D. Del. May 23, 2024) (approving waiver of any contractual restrictions that could inhibit inventory liquidation sales); In re Lucky Brand Dungarees, LLC, Case No. 20-11768 (CSS), 2020 WL 4698654 (Bankr. D. Del. Aug. 12, 2020) (same); In re Earth Fare, Inc., Case No. 20-10256 (KBO), Docket Nos. 16 and 221 (Bankr. D. Del. Feb. 26, 2020) (same); In re Vitamin World, Inc., Case No. 17-11933 (KJC), Docket No. 493 (Bankr. D. Del. Nov. 21, 2017) (same); In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets"); In re Sports Authority Holdings, Inc., No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016) (authorizing store closing sales without requiring compliance with lease provisions affecting store closing or liquidation sales).

54.      Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closing Sales, the Debtors request that the Court authorize the Debtors and or the Consultant to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

## VI.      The Court Should Approve the Abandonment of Certain Property In Connection with Any Liquidation Sales

55.      After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. §554(a); see also Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

56.     The Debtors are seeking to sell certain owned FF&E remaining in the Stores.  The Debtors may determine, however, that the costs associated with holding or selling certain property or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and may be burdensome to retain.

57.     To maximize the value of American Freight's assets and to minimize the costs to the Debtors' estates, the Debtors respectfully request authority to abandon any of American Freight's remaining FF&E or other property located at any of the Stores without incurring liability to any person or entity.  The Debtors further request that the landlord of each Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties.

58.     Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of American Freight's hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

**VII.    Appointment of a Consumer Privacy Ombudsman is Unnecessary**

59.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  The Debtors will not be selling or releasing personally identifiable

information in the course of the Store Closing Sales.  Therefore, appointment of a consumer privacy ombudsman is unnecessary.

60.    To the extent there is any personally-identifiable information in any FF&E that the Debtors seek to sell or abandon, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any such confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number).

## VIII.   The Debtors Have a Valid Business Justification for the Store Bonus Program

61.    Under the circumstances of these Chapter 11 Cases, the implementation of the Store Bonus Program is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' and all their estates' stakeholders.  The Debtors believe the Store Bonuses are necessary to sustain employee morale and facilitate the Store Closing Sales during these Chapter 11 Cases.  Absent the Store Bonuses, the Debtors are likely to lose key store personnel that are critical to administering final sales of Store Closure Assets. The Store Bonuses are purposed to mitigate flight risk by incentivizing and rewarding store employees for staying with the Debtors through the Store Closing Sales process.

62.    If the Debtors are not able to keep their Store employees and motivate them through the Closing Sales, the Debtors will realize less value to the detriment of the Debtors' creditors. The potential loss to the estates if employees are not retained through the Sales process far outweighs the cost of the Store Bonus Program, which is reasonable in light of competitive market practices. The maximum aggregate cost of the Store Bonus Program for the Stores is approximately $2.9 million, which the Debtors, their advisors, and the Consultant have carefully

determined is the maximum aggregate cost required to incentivize employees to continue optimal performance despite the added stress inherent in the chapter 11 process.

63.     The Store Bonus Program is also comparable to employee incentive plans regularly paid as "expenses of sale" by liquidating agents in other "store closing" and similar-themed sales. As such, courts have approved incentive payments similar to those contemplated in the Store Bonus Program. See, e.g., In re Z Gallerie, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (authorizing customary store closing retention bonus program to non-insider employees who remain employed for the store closing process); In re Things Remembered, Inc., No. 19- 10234 (KG) (Bankr. D. Del. Feb.28,2019) (same); In re Bon-Ton Stores, Inc., No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018) (same).

64.     Importantly. the Store Bonus Program has the support of the Debtors' DIP Lenders and the Ad Hoc Group of First Lien Secured Lenders, and is contemplated by the approved budget attached to the proposed debtor-in-possession financing order.  Accordingly, the Debtors submit that the relief requested with respect to the Store Bonus Program is a valid exercise of the Debtors' business judgment and the approval of the Store Bonus Program is appropriate under section 363 of the Bankruptcy Code and is in the best interests of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

## RESERVATION OF RIGHTS

65.     Nothing in the Proposed Orders or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code, other than assumption of the Consulting Agreement, or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the

rights of the Debtors and their estates with respect to any and all claims or causes of action; or (iv) shall be construed as a promise to pay a claim.

66.     Nothing in the Proposed Orders or this Motion shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of any Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

67.     Nothing in the Proposed Orders or this Motion shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

## SATISFACTION OF BANKRUPTCY RULE 6003

68.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief within twenty-one (21) days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief is necessary to avoid immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

69.     As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without authorization of the relief requested herein.  Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

70.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

71.     To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

### REQUEST FOR RELIEF FROM BANKRUPTCY RULE 2002

72.     Generally, pursuant to Bankruptcy Rule 2002, debtors are required to give parties in interest 21 days' notice of "a proposed use, sale, or lease of property of the estate other than in the ordinary course of business." However, Bankruptcy Rule 2002(a)(2) provides that the court may shorten this time for cause.  As discussed more fully above and in the First Day Declaration, the Debtors and their estates will suffer irreparable harm if the relief requested is not heard on an expedited basis and the proposed Interim Order is not entered as soon as possible.

73.     For the foregoing reasons, the Debtors respectfully submit that cause exists to waive the twenty-one (21) day notice requirement under Bankruptcy Rule 2002, to the extent applicable.

### NOTICE

74.     Notice of this Motion has been or will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney's Office for the District of Delaware; (iii) those creditors holding the fifty (50) largest unsecured claims against the Debtors' estates; (iv) counsel to the ABL Lenders; (v) counsel to the Ad Hoc Group of First Lien Lenders; (vi) counsel to the Second Lien Term Loan Lenders; (vii) counsel to the HoldCo Lenders; (viii) counsel to the DIP Agent; (ix) counsel to the DIP Lenders; (x) the Internal Revenue Service; (xi) the Attorney General's office for each state where the Store Closing Sales are being held;

(xii) the division of consumer protection for each state where the Store Closing Sales are being held; (xiii) the chief legal counsel for the local jurisdiction; and (xiv) the landlords for the Stores. The Debtors will serve copies of this Motion and an order entered in respect of this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors request entry of the Proposed Orders, granting the relief requested herein and such other and further relief as is just and proper.

Dated: November 3, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (*pro hac vice* pending)
Matthew A. Feldman (*pro hac vice* pending)
Betsy L. Feldman (Del. No. 6410)
Joseph R. Brandt (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com
jbrandt@willkie.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## EXHIBIT A

**Proposed Interim Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No.** |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO ASSUME THE CONSULTING AGREEMENT, (II) APPROVING PROCEDURES FOR STORE CLOSING SALES, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") for entry of an interim order (this "Interim Order"): (i) authorizing the Debtors to assume that certain *Letter Agreement Governing Inventory Disposition*, by and between Hilco Merchant Resources, LLC (the "Consultant") and American

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Consulting Agreement, as applicable.

Freight LLC, dated as of November 3, 2024 (as amended, revised, or supplemented from time to time, the "Consulting Agreement"), (ii) authorizing and approving the Store Closing Sales of American Freight's Merchandise by means of "store closings," "sale on everything," "everything must go," or similar themed Sales in American Freight's retail Stores identified in the Consulting Agreement, with such Sales to be free and clear of all liens, claims, and encumbrances, (iii) authorizing the Sale of the furniture, fixtures, and equipment located in the Stores or otherwise under American Freight's control, (iv) approving the Store Closing Procedures for conducting the Store Closing Sales, and (v) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core matter pursuant to 28 U.S.C. § 157(b); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, CONCLUDED, AND DETERMINED THAT:[3]**

A.      The Debtors' decision to enter into, on an interim basis, and subject to entry of final order granting the requested relief, perform under, and make payments required by the Consulting Agreement, a copy of which is attached hereto as <u>Schedule 1</u>, is a reasonable exercise of the Debtors' sound business judgment, consistent with their fiduciary duties, and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.

B.      The Consulting Agreement, and the consideration to be paid thereunder, was negotiated, proposed, and entered into by the Consultant and the Debtors without collusion, in good faith, and from arm's-length bargaining positions.  The terms and conditions set forth in the Consulting Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtors or their creditors under any applicable laws.

C.      The Store Closing Procedures, a copy of which is attached hereto as <u>Schedule 2</u>, are reasonable and appropriate, will provide an efficient means for the Debtors to dispose of the Store Closure Assets, and are in the best interest of the Debtors' estates.

D.      The Store Closing Sales, in accordance with the Store Closing Procedures and with the assistance of the Consultant, will provide an efficient means for the Debtors to liquidate and dispose of the Merchandise as quickly and effectively as possible, and are in the best interest of the Debtors' estates.

E.      The Debtors and the Consultant may sell the Store Closure Assets free and clear of all liens, claims, and encumbrances as provided for herein because, in each case, one or more of

---

[3]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of any such encumbrances who did not object, or who withdrew their objections, to the entry of this Interim Order are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of any such encumbrances who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having such encumbrances attach to the Debtors' share of proceeds from the sale of the applicable Store Closure Assets with the same validity and priority and to the same extent and amount that any such Encumbrances had with respect to such Store Closure Assets.

F.      The Dispute Resolution Procedures are fair and reasonable and comply with applicable law.

G.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

H.      The Consultant is not an "insider" of the Debtors as such term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling shareholders exists between the Consultant and the Debtors.

I.      The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and all other parties in interest herein.

J.      Time is of the essence in effectuating the Consulting Agreement and the Store Closing Sales contemplated therein without interruption. The conduct of the Store Closing Sales will provide an efficient means for the Debtors to dispose of the Store Closure Assets. The Store Closing Sales under the Consulting Agreement must be permitted to maximize the value that the

Consultant may realize from the Store Closing Sales and the value that the Debtors may realize from assuming the Consulting Agreement.

**IT IS HEREBY ORDERED THAT:**

1.       The Motion is GRANTED on an interim basis as provided herein.

2.       A final hearing on the relief sought in the Motion shall be conducted on [_____**], 2024 at [_____ ](ET)** (the "Final Hearing").   Any party-in-interest objecting to the relief sought at the Final Hearing or the Final Order shall file and serve a written objection, which objection shall be served upon (i) proposed co-counsel for the Debtors, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Debra M. Sinclair, Esq. (dsinclair@willkie.com) and Betsy L. Feldman, Esq. (bfeldman@willkie.com), and (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn:  Edmon L. Morton, Esq. (emorton@ycst.com) and Matthew B. Lunn, Esq. (mlunn@ycst.com); (ii) counsel to any official committee appointed in these Chapter 11 Cases; (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox, Esq. (timothy.fox@usdoj.gov); (iv) counsel to the DIP Agent, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004, Attn: Gregg Bateman, Esq. (bateman@sewkis.com), Sagar Patel, Esq. (patel@sewkis.com), and Michael Danenberg, Esq.(danenberg@sewkis.com); (v) counsel to the DIP Lenders and Ad Hoc Group of First Lien Secured Lenders, (a) Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn: Jayme Goldstein, Esq. (jaymegoldstein@paulhastings.com), Jeremy Evans, Esq. (jeremyevans@paulhastings.com), and Isaac Sasson (isaacsasson@paulhastings.com), and (b) Landis Rath & Cobb LLP, 919 N. Market Street Suite 1800, Wilmington, DE 19317, Attn: Adam   G.   Landis,   Esq.   (landis@lrclaw.com)   and   Matthew   McGuire,   Esq.

(mcguire@lrclaw.com); (vi) counsel to the Second Lien Secured Parties, White & Case LLP, 200 S Biscayne Blvd, Miami, FL 33131, Attn: Thomas Lauria, Esq. (tlauria@whitecase.com), and 111 S. Wacker Dr., Suite 5100, Chicago, IL 60606, Attn: Bojan Guzina, Esq. (bojan.guzina@whitecase.com); (vii) counsel to the HoldCo Lenders at the address set forth in (vii) above; and (viii) the Consultant, (a) c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847-849-0859, Attn: T. Kellan Grant; and (b) (1) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn: Steven E. Fox (sfox@riemerlaw.com), and (2) Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attn: Mark L. Desgrosseilliers (desgross@chipmanbrown.com), in each case no later than _____, 2024 at 4:00 p.m. (ET). If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

3.    The Debtors and the Consultant are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Interim Order.

4.    To the extent of any conflict between this Interim Order, the Store Closing Procedures, and the Consulting Agreement, the terms of this Interim Order shall control over all other documents and the Store Closing Procedures shall control over the Consulting Agreement.

5.    Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take effect immediately upon its entry.

## II.    Authority to Assume the Consulting Agreement

6.    The assumption of the Consulting Agreement, pursuant to this Interim Order, by the Debtors pursuant to section 365 of the Bankruptcy Code is approved on an interim basis. The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement pursuant to sections 363 and 365 of the Bankruptcy Code, including making payments

required by the Consulting Agreement, including without limitation the payment of fees (including, without limitation, any applicable base fees, Additional Incentive Compensation, and proceeds of sales of Additional Consultant Goods, if any) and reimbursement of expenses, to the Consultant without the need for any application of the Consultant or a further order of this Court, and such amounts shall be paid free and clear of any and all liens, claims and encumbrances. Consultant's fees and expenses shall be paid from the gross proceeds of the Store Closing Sales (including proceeds of sales of Additional Consultant Goods, if any), without adherence to any weekly, monthly or aggregate limitation in a cash collateral budget entered in connection with the Chapter 11 Cases, but shall be subject to the terms of the Consulting Agreement itself, including as to any expense budget attached thereto.

7.      Subject to the restrictions set forth in this Interim Order and the Store Closing Procedures, the Debtors and the Consultant hereby are authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement and the Store Closing Sales. Each of the transactions contemplated by the Consulting Agreement and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and/or the Store Closing Sales from the Petition Date are hereby are approved and ratified.

8.      The Debtors are authorized to amend the Consulting Agreement from time to time in accordance with its terms, including by extending the Sale Term, without further order of this Court.

9.      Subject to entry of a final order granting such relief, notwithstanding anything to the contrary in the Consulting Agreement, including in Section 9.B thereof, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of the Consultant's fraud, willful misconduct, or gross negligence.

### III.    Authority to Engage in Store Closing Sales

10.    The Debtors and the Consultant are authorized, on an interim basis pending the Final Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately conduct the Store Closing Sales in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

11.    The Store Closing Procedures are approved in their entirety.

12.    The Debtors are authorized to discontinue operations at the Stores, at the conclusion of the applicable Store Closing Sales, in accordance with this Interim Order and the Store Closing Procedures.

13.    All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Consulting Agreement or this Interim Order hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Consultant.

14.    Neither the Debtors nor the Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Store Closing Sales and to take the related actions authorized herein.

### IV.    Conduct of the Store Closing Sales

15.    All newspapers and other advertising media in which the Store Closing Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Store Closing Sales and the sale of Merchandise, FF&E and Additional Consultant Goods pursuant to the Consulting Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise, FF&E and

Additional Consultant Goods in the manner contemplated by and in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

16.     The Debtors and Consultant are hereby authorized to take such actions as may be necessary and appropriate to implement the Consulting Agreement and to conduct the Store Closing Sales without necessity of further order of this Court as provided in the Consulting Agreement or the Store Closing Procedures, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," "going out of business" or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), and use of sign-walkers and street signage.

17.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, FF&E and Additional Consultant Goods, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors and the Consultant are unable to resolve the matter consensually, any party may request a telephonic hearing with this Court pursuant to this Interim Order.  Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (i) the Final Hearing or (ii) within three (3) business days of such request.  This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

18.     Except as expressly provided in the Consulting Agreement, any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the store closings or the Store Closing Sales

(including the sale of the Merchandise, FF&E and Additional Consultant Goods), the rejection of leases, abandonment of assets, or "going dark" provisions shall not be enforceable in conjunction with the Store Closing Sales or the store closings.  Breach of any such provisions in these Chapter 11 Cases in conjunction with the store closings or the Store Closing Sales shall not constitute a default under a lease or provide a basis to terminate the lease; provided that the store closings and the Store Closing Sales are conducted in accordance with the terms of this Interim Order and the Store Closing Procedures.  The Debtors and landlords of the closing locations are authorized to enter into agreements ("Side Letters") between themselves modifying the Store Closing Procedures without further order of this Court, and such Side Letters shall be binding as among the Debtors and any such landlords.  In the event of any conflict between the Store Closing Procedures, this Interim Order, and any Side Letter, the terms of such Side Letter shall control.

19.     Except as expressly provided for herein or in the Store Closing Procedures, and except with respect to any Governmental Unit (as to which paragraphs 32 and 33 herein shall apply), no person or entity, including, but not limited to, any landlord, shopping center manager, licensor, service provider, utility, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the store closings, the Store Closing Sales, or the sale of Merchandise, FF&E, or Additional Consultant Goods, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such Store Closing Sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, or creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding, the conduct of the store closings or the Store Closing Sales and/or (b) instituting any action or proceeding in any court (other than in the Court), or

administrative body seeking an order or judgment against, among others, the Debtors, the Consultant, or the landlords, at the Stores that might in any way directly or indirectly obstruct, otherwise interfere with, or adversely affect the conduct of the store closings, the Store Closing Sales or other liquidation sales at the Stores, and/or seek to recover damages for breaches of covenants or other provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.    In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment, and other assets of American Freight for the purpose of conducting the Store Closing Sales, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Interim Order.

21.    All Sales of Store Closure Assets and Additional Consultant Goods shall be "as is" and final.  However, as to the Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.    The Consultant shall not be liable for sales taxes except with respect to the Additional Consultant Goods and except as otherwise expressly provided in the Consulting Agreement and the payment of any and all sales taxes (except with respect to the Additional Consultant Goods or as expressly provided in the Consulting Agreement) is the responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Store Closing Sales to the applicable Governmental Units as and when due; provided that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance

of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  The Consultant shall collect, remit to the Debtors, and account for sales taxes as, and to the extent provided in, the Consulting Agreement.  This Interim Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell the Store Closure Assets, and all Sales of Store Closure Assets, whether by the Consultant or the Debtors, shall be free and clear of any and all liens, claims, encumbrances, and other interests; provided, however, that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the Sale of the Store Closure Assets with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Store Closure Assets, subject to any claims and defenses that the Debtors may possess with respect thereto and the Consultant's fees and expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtors propose to sell or abandon FF&E which may contain personal and/or confidential information about American Freight's employees and/or customers (the "Confidential Information"), American Freight shall remove the Confidential Information from such items of FF&E before such sale or abandonment.

25.     The Debtors and/or the Consultant (as the case may be) are authorized and empowered to transfer Store Closure Assets and Additional Consultant Goods among the Stores. The Consultant is hereby authorized to sell the Debtors' FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Consulting Agreement; provided that

the Consultant and the Debtors are not authorized to abandon, and are directed to remove, any hazardous materials defined under applicable law from any leased premises as and to the extent they are required to do so by applicable law.

26.     Notwithstanding anything to the contrary in this Interim Order or the Consulting Agreement, the Debtors shall not sell or abandon any property that the Debtors know is not owned by a Debtor without the owner's consent; provided that the Debtors will work in good faith with the owner of any such property to arrange for the return of the property to the owner; provided further, that the Debtors may abandon property owned by any landlord at the applicable Store in accordance with the terms of this Interim Order; provided further, that the Debtors shall not abandon any property against which the Debtors know a third party has asserted a lien without providing notice to such party.

27.     No later than seven (7) days prior to objection deadline to entry of a final order on the Motion, the Consultant shall file a declaration disclosing connections to the Debtors, their creditors, and other parties in interest in these Chapter 11 Cases, and the Debtors shall serve the same on the U.S. Trustee, any official committee of unsecured creditors appointed in these cases, and all parties who have filed requests for service under Bankruptcy Rule 2002, by email, or if the email address is not available to the Debtors, then by first class mail.

28.     Notwithstanding this or any other provision of this Interim Order, nothing shall prevent or be construed to prevent the Consultant (individually, as part of a joint venture, or otherwise) or any of its affiliates from providing additional services to and/or bidding on the Debtors' assets not subject to the Consulting Agreement pursuant to an agency agreement or otherwise ("Additional Assets").  Nothing contained in this Order shall be deemed to prohibit the Consultant (individually, as part of a joint venture, or otherwise) or any of its affiliates to bid on,

guarantee, or otherwise acquire such Additional Assets, or offer to provide additional services, notwithstanding anything to the contrary in the Bankruptcy Code or other applicable law.

## V.    Dispute Resolution Procedures with Governmental Units

29.    Nothing in this Interim Order, the Consulting Agreement, or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order, the Consulting Agreement, or the Store Closing Procedures shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code.  The store closings and the Store Closing Sales shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Interim Order, the Consulting Agreement, or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Interim Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise, pursuant to paragraph 33 herein.  Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct

was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.  Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

30.     Provided that the Store Closing Sales are conducted in accordance with the terms of this Interim Order, the Consulting Agreement, and the Sale Closing Procedures, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, to the extent that the sale of Store Closure Assets is subject to any Liquidation Sale Laws, including any federal, state, or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or fast pay laws, bulk sale laws, including laws restricting safe, professional, and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Store Closing Sales and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Store Closure Assets, the Debtors and the Consultant will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Store Closing Sales in accordance with the terms of this Interim Order and the Store Closing Procedures without the necessity of further showing compliance with any Liquidation Sale Laws.

31.     To the extent that between the Petition Date and the Date of the Final Hearing there is a dispute arising from or related to the Sale Closing Sales, the proposed Final Order, the Consulting Agreement, or the Sale Closing Procedures, which disputes relate to any Liquidation Sales Laws, the following Dispute Resolution Procedures shall apply:

(i)     Within three (3) business days after entry of this Interim Order, the Debtors will serve by first-class mail copies of this Interim Order, the Consulting Agreement, and the Store Closing Procedures on the following: (A) the Attorney General's office for each state where the Store Closing Sales are being held, (B) the county

consumer protection agency or similar agency for each county where the Store Closing Sales are being held, (C) the division of consumer protection for each state where the Store Closing Sales are being held, (D) the chief legal counsel for the local jurisdiction, and (E) the landlords for the Stores (collectively, the "Dispute Notice Parties").

(ii)    To the extent that there is a dispute arising from or relating to the Store Closing Sales, the Interim Order, or the proposed Final Order, as applicable, the Consulting Agreement, or the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain jurisdiction to resolve the Reserved Dispute. Any time within ten (10) days following entry of the Interim Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute (the "Dispute Notice"), explaining the nature of the dispute to: (A) proposed counsel to the Debtors, (i) Willkie Farr & Gallagher, LLP, 787 7th Avenue, New York, NY 10019, Attn: Debra M. Sinclair, Esq. (dsinclair@willkie.com), Betsy L. Feldman (bfeldman@willkie.com), and Joseph R. Brandt, Esq. (jbrandt@willkie.com), and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon L. Morton, Esq. (emorton@ycst.com), Matthew B. Lunn, Esq. (mlunn@ycst.com), and Allison S. Mielke, Esq. (amielke@ycst.com); (B) the Consultant, Attn: (i) c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847-849-0859, Attn: T. Kellan Grant; and (ii) (1) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn: Steven E. Fox (sfox@riemerlaw.com), and (2) Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attn: Mark L. Desgrosseilliers (desgross@chipmanbrown.com); ; (C) the United States Trustee for the District of Delaware (the "U.S. Trustee"), J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox, Esq. (timothy.fox@usdoj.gov); and (D) counsel to any official committee appointed in these Chapter 11 Cases. If the Debtors, the Consultant and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

(iii)    In the event that a Dispute Resolution Motion is filed, nothing in this Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of this Interim Order or the Final Order nor the conduct of the Debtors pursuant to this Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of any Interim Order or Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Store Closing Sales pursuant to this Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court

16

grants authority for the Debtors and the Consultant to conduct the Store Closing Sales pursuant to the terms of this Interim Order or the Final Order, as applicable, the Consulting Agreement, and/or the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in this Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(iv)     If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in this Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (ii) and (iii) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

32.     Subject to paragraphs 30 and 31 above, each and every federal, state, or local agency, departmental or Governmental Unit with regulatory authority over the Store Closing Sales and all newspapers and other advertising media in which the Store Closing Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors or the Consultant be required to post any bond, to conduct the Store Closing Sales.

33.     Provided that the Store Closing Sales are conducted in accordance with the terms of this Interim Order, the Consulting Agreement, and the Store Closing Procedures, and in light of the provisions in the laws that exempt court-ordered sales from their provisions, the Debtors and the Consultant shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Store Closing Sales in accordance with the terms of this Interim Order and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws; <u>provided</u> that the Consultant and the Debtors are not authorized to

abandon, and are directed to remove, any hazardous materials defined under applicable law from any leased premises as and to the extent they are required to do so by applicable law.

34.     Within three (3) business days of entry of this Interim Order, the Debtors shall serve copies of this Interim Order, the Consulting Agreement, and the Store Closing Procedures via E-mail, facsimile or regular mail, on: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney's Office for the District of Delaware; (iii) those creditors holding (a) the fifty (50) largest unsecured claims against the Debtors' estates, and (b) to the extent not already served pursuant to the foregoing, those creditors holding the twenty (20) largest unsecured claims against the estate of American Freight; (iv) counsel to the ABL Lenders; (v) counsel to the Ad Hoc Group of First Lien Secured Lenders; (vi) counsel to the Second Lien Term Loan Lenders and HoldCo Term Loan Lenders; (vii) counsel to the DIP Agent; (viii) counsel to the DIP Lenders; (ix) the Internal Revenue Service; (x) the Attorney General's office for each state where the Store Closing Sales are being held; (xi) the division of consumer protection for each state where the Store Closing Sales are being held; (xii) the chief legal counsel for the local jurisdiction; and (xiii) the landlords for the Stores.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**VI.     Other Provisions**

35.     The Debtors are authorized, but not directed, to implement and make payments under the Store Bonus Program.  For the avoidance of doubt, no Store Closing Bonuses shall be paid to any executives, directors, or "insiders," as that term is defined in the Bankruptcy Code, absent further Court order.

36.     The Consultant is authorized to supplement the Merchandise in the Stores with Additional Consultant Goods; provided that any such Additional Consultant Goods must be of like kind and no lesser quality than the Merchandise. The Additional Consultant Goods shall be

purchased by the Consultant and delivered to the Stores at the Consultant's sole expense (including as to labor, freight, and insurance relative to shipping such Additional Consultant Goods to the Stores). Sales of Additional Consultant Goods shall otherwise be made in conjunction with the Store Closing Sales and be run through the Debtors' cash register systems; provided, however, that the Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number or in such other manner that shall distinguish the Additional Consultant Goods from the Merchandise. The Consultant and the Debtors shall cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could distinguish the Additional Consultant Goods from the Merchandise.

37. All transactions relating to the Additional Consultant Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from the Consultant to the Debtors under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes. For the avoidance of doubt, any disbursements by the Debtors to the Consultant of proceeds of the Additional Consultant Goods shall not be considered disbursements for purposes of calculating quarterly fees payable by the Debtors pursuant to 28 U.S.C. § 1930(a)(6).

38. The Consultant shall pay to the Debtors an amount equal to five percent (5%) of the gross proceeds (excluding sales taxes) from the sale of Additional Consultant Goods in the Stores completed during the Sale Term. All remaining amounts from the sale of the Additional Consultant Goods shall be the exclusive property of the Consultant, and no other person or entity shall have any claim against any of the Additional Consultant Goods or their proceeds. At the Consultant's sole cost and expense, the Debtors shall insure the Additional Consultant Goods at the Consultant's request and, if required, promptly file any proofs of loss with regard to the same with the Debtors'

insurers. The Consultant shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

39.     The Consultant is hereby granted a first-priority security interest in and lien on (a) the Additional Consultant Goods and (b) the Additional Consultant Goods proceeds, which security interest shall be deemed perfected, on an interim basis, pursuant to this Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties; provided that the Consultant is authorized to deliver any notices and file any financing statements under the applicable UCC and amendments thereof with respect to the Consultant's interest in the Additional Consultant Goods and any proceeds from the sale thereof.

40.     In the event of any conflict between the Store Closing Procedures, the Consultant Agreement, and any Side Letter with any landlord, the terms of such Side Letter shall control.  To the extent there is a conflict between either the Store Closing Procedures, the Consultant Agreement, or the Side Letter on the one hand, and this Interim Order, this Interim Order shall control.

41.     With respect to each Closing Store, at the conclusion of the Sale at the Store, the Consultant shall vacate the Closing Store; provided that Consultant may abandon any FF&E not sold in the Sale at the closing store at the conclusion of the Sale at such Closing Store (the "Termination Date"), without cost or liability of any kind to the Consultant.  The Debtors will have the option to remove the FF&E prior to the Termination Date.  For the avoidance of doubt, as of the Termination Date with respect to each closing store, the Consultant may abandon, in place and without further responsibility or liability of any kind, any FF&E.

42.     The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against the Consultant, in each case, other than as expressly provided for in the Consulting Agreement, as modified by this Interim Order.

43.     To the extent the Debtors are subject to any state "fast pay" laws in connection with the Store Closing Sales, the Debtors shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of: (a) American Freight's next regularly scheduled payroll; and (b) seven (7) calendar days following the termination date of the relevant employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

44.     Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, other than assumption of the Consulting Agreement; (f) a waiver or limitation of the Debtors' rights or the rights of any other person under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

45. Except as otherwise provided herein with respect to the Consultant's base fees, any Additional Incentive Compensation (if applicable), and Consultant's entitlement to receive the gross proceeds of sales of Additional Consultant Goods (net of any applicable Additional Consultant Goods Fee, if any), nothing herein shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

46. Except as otherwise provided herein with respect to the Consultant's base fees, any Additional Incentive Compensation (if applicable), and Consultant's entitlement to receive the gross proceeds of sales of Additional Consultant Goods (net of any applicable Additional Consultant Goods Fee, if any), nothing herein, nor as a result of any payment made pursuant to this Interim Order, shall be deemed or construed as a waiver of the right of Debtors, or shall impair the ability of Debtors, to contest the validity and amount of any payment made pursuant to this Interim Order.

47. Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

48. Subject to Paragraph 6 hereof, notwithstanding anything to the contrary set forth herein, any payment made, or authorization contained, hereunder shall be subject in all respects to the Approved Budget (as such term is defined in the order approving the Debtors' postpetition financing agreements).

49. Notice of the Motion as provided therein is deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the local rules of this Court are satisfied by such notice.

50.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

51.     Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.

52.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

53.     This Court shall retain jurisdiction with regard to all issues or disputes relating to this Interim Order or the Consulting Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords and/or the Consultant for protection from interference with the store closings or Store Closing Sales, (c) any other disputes related to the store closings or Store Closing Sales, and (d) protect the Debtors and/or the Consultant against any assertions of any liens, claims, encumbrances, and other interests.  No such parties or person shall take any action against the Debtors, the Consultant, the landlords, the store closings, or the Store Closing Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

# SCHEDULE 1

**Consulting Agreement**



*Execution Version*

November 3, 2024

_**VIA EMAIL**_
American Freight, LLC
109 Innovation Court, Suite J
Delaware, OH 43015
Attn: Andrew Kaminsky

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Mr. Kaminsky:

By executing below, subject to section R hereof, this letter shall serve as an agreement (this "<u>Agreement</u>") between Hilco Merchant Resources, LLC, on the one hand ( "<u>Consultant</u>" or a "<u>Party</u>"), and American Freight FFO, LLC, Franchise Group Newco Intermediate AF, LLC, and each of Franchise Group Newco Intermediate AF, LLC's subsidiaries on the other hand (collectively, "<u>Merchant</u>" or a "<u>Party</u>" and together with the Consultant, the "<u>Parties</u>"), under which Consultant shall act as the exclusive consultant for the purpose of conducting a sale of certain Merchandise (as defined below) at (i) the Merchant's stores and distribution centers as set forth on <u>Exhibits A and C</u> hereto, respectively, and (ii) any other stores or facilities designated for disposition by Merchant from the date of this Agreement (each a "<u>Store</u>" and collectively, the "<u>Stores</u>") through a "Store Closing", "Going Out of Business", "Everything Must Go", "Everything on Sale" or similar themed sale (the "<u>Sale</u>").

**A.    <u>Merchandise</u>**

For purposes hereof, "<u>Merchandise</u>" shall mean all goods, saleable in the ordinary course, located in the Stores or in the Distribution Centers (as defined below) on the Sale Commencement Date (as defined below) or received in the Stores during the Sale Term.  "Merchandise" does not mean and shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Merchant; (2) owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Stores (collectively, "<u>FF&E</u>"); (3) damaged or defective merchandise that cannot be sold; or (4) revenue generated from the sale of services such as, but not limited to, warranty protection, home delivery and financing rebates, and profit share fees.  For the avoidance of doubt, "Merchandise" includes scratch and dent appliances and floor model furniture.

**B.    <u>Sale Term</u>**

For each Store, the Sale shall commence on November 4, 2024 (the "<u>Sale Commencement Date</u>") and conclude no later than December 29, 2024 (the "<u>Sale Termination Date</u>"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any one or more Stores on a Store-by-Store basis prior to the Sale Termination Date.  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "<u>Sale Term</u>."  At the conclusion of the Sale, Consultant shall surrender the premises for each Store to Merchant in broom clean condition and in accordance with the lease requirements for such premises; provided, however, that Merchant shall bear all costs and expenses associated with surrendering the premises

in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Consultant and Merchant. At the conclusion of the Sale at each Store, Consultant shall photographically document the condition of each such Store and provide such photographs to Merchant within three (3) business days thereof. Photographs shall reference with specificity each Store by number, name, and location.

**C.    Project Management**

     (i)    Consultant's Undertakings

     During the Sale Term, Consultant shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Consultant to help oversee the management of the Stores and Distribution Centers; (b) recommend appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; (c) recommend appropriate discounts of Merchandise, staffing levels for the Stores, and appropriate bonus and incentive programs, if any, for the Stores' employees, all of which shall be approved in advance by Merchant; (d) help oversee display of Merchandise for the Stores and Distribution Centers; (e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant, including in accordance with the provisions of any confidentiality agreement signed by the Parties; (g) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (h) assist Merchant with determining the necessity for obtaining any applicable permits and governmental approvals to conduct the Sale, including working with Merchant to obtain each in a timely and orderly fashion and preparing or causing to be prepared all forms necessary to assist in Merchant's securing any applicable permits and governmental approvals necessary to conduct the Sale, the costs and expenses of which shall be paid by Merchant and shall be in addition to the costs and expenses set forth on the Expense Budget; (i) at Merchant's sole discretion, implement Consultant's affiliate CareerFlex program for Merchant's Store level and other employees; (j) meet with Merchant, on a weekly or as needed basis, to review sales, sales reporting, and expenses in an effort to minimize expenses and maximize overall net recovery of the Sale; and (k) provide such other related services deemed necessary or appropriate by Merchant and Consultant.

     The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Consultant's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

     (ii)    Merchant's Undertakings

     During the Sale Term, Merchant shall (a) be the employer of the Stores' employees, other than the Supervisors; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Consultant and the Supervisors; (f) execute all agreements determined by the Merchant and Consultant to be necessary or desirable for the operation of the Stores during the Sale; (g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores and any computer servers necessary to operate the Sale; (h) apply for and obtain, with Consultant's

assistance and support, all applicable permits and authorizations (subject to any Approval Order (as defined below), including landlord approvals and consents) for the Sale; (i) at Merchant's sole discretion, assist Consultant with implementing the CareerFlex program for Merchant's Store level and other employees; (j) use commercially reasonable efforts to transfer all Merchandise from the Distribution Centers to the Stores during the Sale Term; and (k) ensure that Consultant has quiet use and enjoyment of the Stores during the Sale Term in order to perform its obligations under this Agreement.

Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Consultant.

The Parties expressly acknowledge and agree that Consultant shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Consultant.

Merchant or its auditors shall have the right, upon reasonable written notice to Consultant (with email being sufficient), to inspect, at reasonable times and locations, such documentation, records, and equipment that reasonably relate to the services provided for under this Agreement for purposes of ensuring performance of Consultant's obligations under this Agreement.

**D.**    **The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Consultant does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant or, as applicable, as ordered by the Bankruptcy Court (as defined below).

**E.**    **Consultant Fee and Expenses in Connection with the Sale**

In consideration of its services under this Agreement, Consultant shall earn a base fee equal to two percent (2.0%) of the Gross Proceeds of Merchandise sold at the Stores and the Distribution Centers.  For purposes of this Agreement, "Gross Proceeds" means gross receipts calculated using the "gross rings" method, net of applicable sales taxes; provided, however, that it is expressly understood and agreed that Gross Proceeds shall not include proceeds of sales made prior to the Sale Commencement Date or after the Sale Termination Date.

In addition to the base fee, and not in lieu of the base fee, the Consultant shall be entitled to, from Gross Proceeds, an additional fee based upon the Gross Recovery Percentages achieved as set forth in the following table (the "Additional Incentive Compensation").  The Additional Incentive Compensation shall be equal to the aggregate sum of the percentages set forth in the "Additional Incentive Compensation" column of the table (e.g., calculated back to first dollar) for the corresponding Gross Recovery Percentage achieved.  It is understood and agreed that no Additional Incentive Compensation shall be earned or payable where the Gross Recovery Percentage is less than 114.0%:

3

| Gross Recovery Percentage | Additional Incentive Compensation |
|---|---|
| Between 114.0% and 115.50% | An additional 0.25% of Gross Proceeds (total fee equal to 2.25% of Gross Proceeds) |
| Above 115.50% | An additional 0.25% of Gross Proceeds (total fee equal to 2.50% of Gross Proceeds) |

For purposes of the Additional Incentive Compensation:

"**Cost Value**" with respect to each item of Merchandise sold shall mean the lower of (i) the lowest per unit vendor cost in the File or the Merchant's books and records, maintained in the ordinary course consistent with historic practices; or (ii) the Retail Price.

"**File**" shall mean those spreadsheets provided by Merchant and labeled "10.05.24 Inventory by SKU & Location & Bucket.xlsx."

"**Gross Recovery Percentage**" shall mean the Gross Proceeds divided by the sum of the aggregate Cost Value of all of the Merchandise.

"**Retail Price**" shall mean with respect to each item of Merchandise sold, the retail price reflected at the register for such item, excluding the discount granted in connection with such sale.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store-level operating expenses, all costs and expenses related to Merchant's other retail store operations, Merchant's costs for operating the Distribution Centers, and Consultant's other reasonable and documented out of pocket expenses. To control expenses of the Sale, Merchant and Consultant have established an appropriate budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs (including signage and the shipping, freight, and sales tax related thereto where applicable). The Expense Budget for the Sale is attached hereto as Exhibit B. The Expense Budget may only be modified by mutual agreement of Consultant and Merchant. The costs of supervision set forth on Exhibit B include, among other things, industry-standard deferred compensation.

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Consultant) shall be reconciled on every Wednesday for the prior week. All fees, reasonable expenses, or other reasonable amounts reimbursable or payable to Consultant shall be paid, in accordance with the approved Expense Budget, within seven (7) days after each such weekly reconciliation, upon Merchant's receipt and review of a reasonably detailed invoice. The Parties shall complete a final reconciliation and settlement of all amounts payable to Consultant and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty five (45) days following the Sale Termination Date for the last Store.

Upon execution of this Agreement, the Merchant shall pay by wire transfer to the Consultant an advance payment of costs and expenses delineated in the Expense Budget of $3,300,000 (the "Expense Advance"). The Expense Advance shall be held by Consultant and applied towards

Expense Budget items as incurred.  Any portion of the Expense Advance not so used shall be returned to Merchant within three days following the final reconciliation.

**F.    Indemnification**

(i)    Merchant's Indemnification

Merchant shall indemnify, defend, and hold Consultant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, principals, affiliates, and Supervisors (collectively, "Consultant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Consultant Indemnified Parties) against Consultant or a Consultant Indemnified Party, except claims arising from Consultant's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Consultant's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)    Consultant's Indemnification

Consultant shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, principals, and affiliates (other than the Consultant or the Consultant Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Consultant or the Consultant Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Consultant; (c) any liability or other claims made by Consultant's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Consultant's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Consultant or any of the Consultant Indemnified Parties and (e) any claims made by any party engaged by Consultant as an employee, agent, representative or independent contractor arising out of such engagement.

**G.    Insurance**

(i)    Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, on such terms and conditions as are consistent with Merchant's ordinary course operations, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability

insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Consultant to be named an additional insured with respect to all such policies. At Consultant's request, Merchant shall provide Consultant with a certificate or certificates evidencing the insurance coverage required hereunder and that Consultant is an additional insured thereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

  (ii)  <u>Consultant's Insurance Obligations</u>

  Consultant shall maintain, throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Consultant's provision of services at the Stores. Consultant shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Consultant shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements. Further, should Consultant employ or engage third parties to perform any of Consultant's undertakings with regard to this Agreement, Consultant will ensure that such third parties are covered by Consultant's insurance or maintain all of the same insurance as Consultant is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

**H.**  **<u>Representations, Warranties, Covenants and Agreements</u>**

  (i)  Merchant warrants, represents, covenants and agrees that (a) Merchant is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein, (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; (d) all normal course hard markdowns on the Merchandise have been, and will be, taken consistent with customary Merchant's practices, and (e) the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Consultant.

  (ii)  Consultant warrants, represents, covenants and agrees that (a) Consultant is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform the Consultant's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Consultant and this Agreement constitutes a valid and binding obligation of Consultant enforceable against Consultant in accordance with its terms and conditions, and the

consent of no other entity or person is required for Consultant to fully perform all of its obligations herein, (c) Consultant shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent, and (e) Consultant will not take any disciplinary action against any employee of Merchant.

## I.    Furniture, Fixtures and Equipment

Consultant shall sell the FF&E in the Stores from the Stores themselves.  Merchant shall be responsible for all reasonable and documented costs and expenses incurred by Consultant in connection with the sale of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.  Consultant shall have the right to abandon at the Stores any unsold FF&E. Consultant shall also sell the FF&E located in the Merchant's distribution centers identified on Exhibit C hereto (the "Distribution Centers").

In consideration for providing the services set forth in this section I, Consultant shall be entitled to a commission from the sale of the FF&E equal to fifteen percent (15.0%) of the Gross Proceeds of the sale of the FF&E.

Consultant shall remit to Merchant all Gross Proceeds from the sale of FF&E.  During each weekly reconciliation described in section E above, Consultant's FF&E fee shall be calculated, and Consultant's calculated FF&E fee, along with any reasonable FF&E costs and expenses then incurred, shall be paid within seven (7) days after each such weekly reconciliation, upon Merchant's receipt and review of a reasonably detailed invoice by the Merchant in accordance with the terms of this Agreement.

## J.    Termination

The following shall constitute "Termination Events" hereunder:

(a)    Merchant's or Consultant's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured ten (10) days after receipt of written notice thereof to the defaulting Party; provided, that if either Party's performance of any such obligations is prevented by reason of any cause(s) beyond such Party's reasonable control, such shall not constitute a Termination Event, unless such failure to perform cannot be remedied within the Sale Term;

(b)    Any representation or warranty made by Merchant or Consultant is untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

(c)    the Sale is terminated or materially interrupted or impaired for any reason other than (i) an event of default by Consultant or Merchant, or (ii) any cause(s) beyond the Parties' reasonable control.

If a Termination Event occurs, the non-defaulting Party (in the case of an event of default) or either Party (if the Sale is otherwise terminated or materially interrupted or impaired) may, in its discretion, elect to terminate this Agreement by providing fourteen (14) business days' written notice

thereof to the other Party and, in the case of an event of default, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default. If this Agreement is terminated, Merchant shall be obligated to pay Consultant all amounts due under this Agreement through and including the termination date.

**K.**     **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows: (a) To Merchant: at the address listed above; with copy to Willkie Farr & Gallagher LLP, 787 Seventh Avenue New York, New York 10019, Attn: Debra M. Sinclair, Esq., at dsinclair@willkie.com, Betsy L. Feldman, Esq., at bfeldman@willkie.com, and Joseph R. Brandt, Esq., at jbrandt@willkie.com; (b) To Consultant: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847- 849-0859, Attn: T. Kellan Grant; or (c) such other address as may be designated in writing by Merchant or Consultant.

**L.**     **Independent Consultant**

Consultant's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Consultant or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Consultant is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.**     **Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided, however, that Consultant may syndicate this transaction to one or more of the national liquidation firms upon prior written notice thereof to Merchant. In the event of such syndication, Consultant shall remain responsible for all obligations under this Agreement and the fees, expenses, or other amounts owed to Consultant under this Agreement shall not increase on account of the syndication. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.**     **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.      Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of Delaware (without reference to the conflicts of laws provisions therein) and, as applicable, the Bankruptcy Code (as defined below).  Merchant and Consultant waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Consultant against Merchant or Merchant against Consultant on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Consultant, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.

In the event of Merchant's filing under chapter 11 of the Bankruptcy Code, any legal action, suit, or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant (the "Bankruptcy Court"), and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or *forum non conveniens*.

**P.      Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.  All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.      Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument.  This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

**R.      Bankruptcy**

In the event of Merchant's filing under chapter 11 of the Bankruptcy Code, the effectiveness of this Agreement is subject to and contingent upon the entry of an order of the Bankruptcy Court, in form and substance reasonably acceptable to Consultant, authorizing the Merchant's entry into and approval of this Agreement (the "Approval Order").  As soon as reasonably practicable after the filing, Merchant shall prepare and file a motion seeking entry of the Approval Order (the "Motion").  Prior to filing the Motion, the Merchant shall share the Motion, proposed Approval Order and all related documents with Consultant.  The Merchant shall use the Merchant's best efforts to ensure that the Approval Order shall specifically provide, among other things: (i) the approval of the payment of all

9

fees and reimbursement of expenses hereunder to Consultant without further order of the Bankruptcy Court and free and clear of all liens, claims and encumbrances; (ii) that all such payments of fees and reimbursement of expenses be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iii) that the payment of all fees and reimbursement of expenses to Consultant related to such Approval Order shall be included in any approved debtor-in-possession, cash collateral, or other post-petition financing budget as a condition to the assumption of this Agreement, but shall be payable pursuant to the Approval Order on a timely basis as an administrative expense regardless of their inclusion in such budgets; (iv) authorization to conduct the Sale without the necessity of complying with applicable state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise restrict the implementation of the Sale; (v) authorization to conduct the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; (vi) authorization to conduct the sale of Additional Consultant Goods in accordance with the terms and conditions of this Agreement; and (vii) authorization to take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.

**S**.    **Additional Consultant Goods**

(i)    Exercisable in its reasonable discretion, Consultant shall have the right to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Consultant Goods"). The purchase of any Additional Consultant Goods shall be made by Consultant at Consultant's sole expense. Sales of Additional Consultant Goods shall otherwise be made in conjunction with the Sale, and Additional Consultant Goods shall be run through Merchant's cash register systems, so long as Consultant has marked the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. Consultant and Merchant shall also cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Merchandise. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale.

(ii)    Consultant shall pay to the Merchant an amount equal to five percent (5%) of the gross proceeds (excluding sales taxes) from the sale of Additional Consultant Goods completed during the Sale Term and Consultant shall retain all remaining amounts from the sale of the Additional Consultant Goods. Consultant and the Merchant intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to the Merchant in all respects and not a consignment for security purposes. Subject solely to Consultant's obligations to pay to the Merchant the Additional Consultant Goods fee described in this Agreement, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity shall have any claim against any of the Additional Consultant Goods or their proceeds. At Consultant's sole cost and expense, the Merchant shall insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with the Merchant's insurers. Consultant shall be responsible for payment of any

deductible under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

(iii)    The Merchant acknowledges that the Additional Consultant Goods shall be consigned to the Merchant as a true consignment under Article 9 of the Code.  The Approval Order shall contain provisions reasonable acceptable to Consultant governing the treatment and sale of Additional Consultant Goods.

\*                \*                \*

11

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity—we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

*Kellan Grant*
_____
By:  T. Kellan Grant
Its:   EVP Commercial Counsel


**AGREED AND ACCEPTED as of the 3rd day
of November, 2024**

AMERICAN FREIGHT FFO, LLC, FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC, AND EACH OF FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC'S SUBSIDIARIES


_____
By: Andrew Kaminsky
Its: Authorized Signatory

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity—we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

_____

By:  T. Kellan Grant
Its:   EVP Commercial Counsel

**AGREED AND ACCEPTED as of the 3rd day
of November, 2024**

AMERICAN FREIGHT FFO, LLC, FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC, AND EACH OF FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC'S SUBSIDIARIES

By: Andrew Kaminsky
Its: Authorized Signatory

12

Docusign Envelope ID: 90F1CA5E-C7A3-486E-8353-4920591B7158

## EXHIBIT A

**Stores**

**American Freight**
Exhibit A

**Store List**

| Count | Loc # | Concept/Banner | Name | Address | Address2 | | City | State | Zip | Territory | District | Gross Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | AFF | Lima OH | 3650 Fort Shawnee Industrial Dr. | | - | Lima | OH | 45805 | Northeast | Delaware | 29,653 |
| 2 | 2 | AFF | Evansville IN | 2800 Lynch Ave | | - | Evansville | IN | 47711 | Central | Louisville | 32,000 |
| 3 | 3 | AFF | Lexington OH | 2770 Lexington Ave. | | - | Lexington | OH | 44904 | Northeast | Parma | 22,800 |
| 4 | 4 | AFF | Mishawaka IN | 1217 E. McKinley Ave. | | - | Mishawaka | IN | 46545 | Central | Indianapolis | 31,000 |
| 5 | 5 | AFF | Terre Haute IN | 1800 Fort Harrison Rd Ste 4 | | - | Terre Haute | IN | 47804 | Central | Peoria | 20,858 |
| 6 | 6 | AFF | Ocala FL | Store Location1010 S.W. 17th Street | | - | Ocala | FL | 34471 | Southeast | Orlando | 40,000 |
| 7 | 7 | AFF | Louisville KY | 1920 Watterson Trail | | - | Louisville | KY | 40299 | Central | Florence | 38,480 |
| 8 | 8 | AFF | Massillon OH | 4345 Lincoln Way East | | - | Massillon | OH | 44646 | Northeast | Parma | 40,000 |
| 9 | 9 | AFF | Cincinnati - Muhlhauser Rd OH | 4782 Muhlhauser Rd | | - | West Chester | OH | 45011 | Northeast | Cincinnati | 56,250 |
| 10 | 10 | AFF | East Columbus OH | 5055 E. Main Street | | - | Columbus | OH | 43213 | Northeast | Delaware | 39,100 |
| 11 | 11 | AFF | Buffalo NY | 778 Niagara Falls Blvd. | | - | North Tonawanda | NY | 14120 | Northeast | Buffalo | 30,000 |
| 12 | 12 | AFF | Lexington KY | 272 W. New Circle Rd | | - | Lexington | KY | 40606 | Central | Florence | 31,000 |
| 13 | 13 | AFF | Tallahassee FL | 3170 W. Tharpe St. | | - | Tallahassee | FL | 32303 | Southeast | Orlando | 32,000 |
| 14 | 15 | AFF | North Columbus OH | 900 Morse Rd. | | - | Columbus | OH | 43229 | Northeast | Delaware | 35,460 |
| 15 | 16 | AFF | Akron OH | 2655 S. Arlington Rd. | | - | Akron | OH | 44319 | Northeast | Parma | 31,193 |
| 16 | 18 | AFF | South Orlando FL | 2193 Viscount Row | | - | Orlando | FL | 32809 | Southeast | Orlando | 27,110 |
| 17 | 19 | AFF | Fort Lauderdale FL | 6001 Powerline Rd. | | - | Fort Lauderdale | FL | 33309 | Southeast | Miami | 25,825 |
| 18 | 20 | AFF | Florence KY | 7102 Turfway Rd. | | - | Florence | KY | 41042 | Central | Florence | 21,630 |
| 19 | 21 | AFF | Miami FL | 5240 NW 167th St. | | - | Miami | FL | 33014 | Southeast | Miami | 23,507 |
| 20 | 22 | AFF | North Orlando FL | 4116 N. Orange Blossom Trail | | - | Orlando | FL | 32804 | Southeast | Orlando | 22,614 |
| 21 | 23 | AFF | Pittsburgh PA | 503 Rodi Rd. | | - | Pittsburgh | PA | 15235 | Northeast | Pittsburgh | 36,000 |
| 22 | 24 | AFF | Tampa FL | 4535 S. Dale Mabry Hwy | | - | Tampa | FL | 33611 | Southeast | Tampa | 17,760 |
| 23 | 25 | AFF | Fort Wayne IN | 4515 Merchant Rd. | | - | Fort Wayne | IN | 46818 | Central | Indianapolis | 35,000 |
| 24 | 26 | AFF | Grand Rapids | 3125 Lake Eastbrook Blvd. S.E. | | - | Grand Rapids | MI | 49512 | Northeast | Livonia | 28,000 |
| 25 | 27 | AFF | Port Orange FL | 3350 S Ridgewood Ave. | | - | Port Orange | FL | 32129 | Southeast | Orlando | 27,400 |
| 26 | 28 | AFF | Chattanooga TN | 6242 Perimeter Dr. | | - | Chattanooga | TN | 37421 | Southeast | Nashville | 42,000 |
| 27 | 29 | AFF | Morrow GA | 1230 Mt. Zion Rd. | | - | Morrow | GA | 30260 | Southeast | Morrow | 37,090 |
| 28 | 31 | AFF | Livonia MI | 28300 Schoolcraft Rd. | | - | Livonia | MI | 48150 | Northeast | Livonia | 24,000 |
| 29 | 33 | AFF | Syracuse NY | 2410 Erie Blvd. East | | - | Syracuse | NY | 13224 | Northeast | Buffalo | 12,000 |
| 30 | 34 | AFF | Ann Arbor MI | 4801 Washtenaw Ave. | | - | Ann Arbor | MI | 48108 | Northeast | Livonia | 19,550 |
| 31 | 36 | AFF | St Petersburg FL | 4400 34th Street North | | - | St Petersburg | FL | 33714 | Southeast | Tampa | 19,400 |
| 32 | 37 | AFF | Norcross GA | 6796-A Jimmy Carter Blvd. | | - | Norcross | GA | 30071 | Southeast | Morrow | 23,707 |
| 33 | 39 | AFF | Winter Park FL | 1544 FL 436 | | - | Winter Park | FL | 32792 | Southeast | Orlando | 24,424 |
| 34 | 40 | AFF | West Jacksonville FL | 6024 103rd Street | | - | West Jacksonville | FL | 32210 | Southeast | Jacksonville | 32,000 |
| 35 | 41 | AFF | South Indianapolis IN | 5750 Kopetsky Dr. | | - | Indianapolis | IN | 46217 | Central | Indianapolis | 23,700 |
| 36 | 42 | AFF | Marietta GA | 1075 Cobb Parkway SE | | - | Marietta | GA | 30060 | Southeast | Morrow | 20,509 |
| 37 | 43 | AFF | Northfield OH | 10333 Northfield Rd. Unit 110 | | - | Northfield | OH | 44067 | Northeast | Parma | 23,028 |
| 38 | 44 | AFF | North Indianapolis IN | 8920 Corporation Dr | | - | Indianapolis | IN | 46256 | Central | Indianapolis | 27,200 |
| 39 | 46 | AFF | Warren MI | 32880 Dequindre Rd. | | - | Warren | MI | 48092 | Northeast | Livonia | 33,634 |
| 40 | 47 | AFF | Gainesville FL | 4222 NW 13th St | | - | Gainesville | FL | 32609 | Southeast | Orlando | 20,785 |
| 41 | 48 | AFF | West Palm Beach/Riviera Beac | 6688 N. Military Trail | | - | Rivierabeach | FL | 33407 | Southeast | Miami | 20,000 |
| 42 | 49 | AFF | Erie PA | 2411 W. 12th St | | - | Erie | PA | 16505 | Northeast | Buffalo | 19,840 |
| 43 | 50 | AFF | Parma OH | 6767 Brookpark Rd. | | - | Parma | OH | 44129 | Northeast | Parma | 22,753 |
| 44 | 51 | AFF | Nashville TN | 3041 Owen Dr. | | - | Antioch | TN | 37013 | Southeast | Nashville | 29,952 |
| 45 | 52 | AFF | Knoxville TN | 737 Lovell Rd. | | - | Knoxville | TN | 37932 | Southeast | Nashville | 22,000 |
| 46 | 53 | AFF | Panama City FL | 2116 South Highway 77 | | - | Lynn Haven | FL | 32444 | Southeast | Montgomery | 14,940 |
| 47 | 54 | AFF | Dayton OH | 2800 Springboro Pike | | - | Dayton | OH | 45439 | Northeast | Cincinnati | 39,000 |
| 48 | 56 | AFF | Pensacola FL | 4500 Mobile Highway | | - | Pensacola | FL | 32506 | Southeast | Montgomery | 19,754 |
| 49 | 57 | AFF | Fort Myers FL | 13080 Metro Parkway | | - | Fort Myers | FL | 33966 | Southeast | Tampa | 24,000 |
| 50 | 58 | AFF | Lakeland FL | 2210 Commerce Point Dr. | | - | Lakeland | FL | 33801 | Southeast | Tampa | 35,750 |
| 51 | 59 | AFF | Melbourne FL | 7619 Ellis Rd. | | - | Melbourne | FL | 32904 | Southeast | Miami | 22,500 |
| 52 | 60 | AFF | Madison WI | 3674 Kinsman Blvd. | | - | Madison | WI | 53704 | Central | Milwaukee | 23,554 |
| 53 | 61 | AFF | Lafayette IN | 3233 Teal Rd. | | - | Lafayette | IN | 47905 | Central | Peoria | 21,340 |
| 54 | 62 | AFF | Mobile AL | 3404 Moffett Rd. Unit-B | | - | Mobile | AL | 36607 | Southeast | Montgomery | 25,000 |
| 55 | 63 | AFF | South Milwaukee WI | 3804 South 27th St. | | - | Milwaukee | WI | 53221 | Central | Milwaukee | 30,446 |
| 56 | 65 | AFF | Lansing MI | 1475 Lake Lansing Rd. | | - | Lansing | MI | 48912 | Northeast | Livonia | 30,000 |
| 57 | 66 | AFF | St Paul MN | 717 Prior Ave N | | - | St Paul | MN | 55104 | Central | Milwaukee | 25,272 |
| 58 | 67 | AFF | Charleston | 6330 Maccorkle Ave. | | - | St. Albans | WV | 25177 | Northeast | Cincinnati | 48,000 |
| 59 | 68 | AFF | Clarksville | 2231 B Madison St. | | - | Clarksville | TN | 37043 | Southeast | Nashville | 20,568 |
| 60 | 70 | AFF | Harrisburg | 6305 Allentown Blvd. | | - | Harrisburg | PA | 17112 | Northeast | Pittsburgh | 33,600 |
| 61 | 71 | AFF | Savannah | 15000 Abercorn St. | | - | Savannah | GA | 31419 | Southeast | Jacksonville | 27,413 |
| 62 | 72 | AFF | Montgomery | 231 N. Eastern Blvd./Bypass Whs #3 | | - | Montgomery | AL | 36117 | Southeast | Montgomery | 30,000 |
| 63 | 74 | AFF | Douglasville | 5834 Fairburn Rd. | | - | Douglasville | GA | 30134 | Southeast | Morrow | 35,000 |
| 64 | 76 | AFF | Boardman | 6224 South Ave. | | - | Boardman | OH | 44512 | Northeast | Pittsburgh | 19,306 |
| 65 | 77 | AFF | Portage | 501 Mall Dr. | | - | Portage | MI | 49024 | Central | Indianapolis | 23,000 |
| 66 | 80 | AFF | Memphis | 7859 Highway 64 | | - | Memphis | TN | 38133 | Central | Little Rock | 48,403 |

**American Freight**
Exhibit A

Store List

| Count | Loc # | Concept/Banner | Name | Address | Address2 | | City | State | Zip | Territory | District | Gross Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 67 | 81 | AFF | Newport News | 451A Oriana Rd | | - | Newport News | VA | 23608 | Northeast | Richmond | 33,472 |
| 68 | 82 | AFF | Decatur | 1291 E. Pershing Road | | - | Decatur | IL | 62526 | Central | Peoria | 20,204 |
| 69 | 83 | AFF | Birmingham AL | 3260 Morrow Rd. | | - | Trussville | AL | 35235 | Central | Birmingham | 28,000 |
| 70 | 85 | AFF | Goodlettsville | 309 N. Main St. | | - | Goodlettsville | TN | 37072 | Southeast | Nashville | 20,800 |
| 71 | 87 | AFF | Champaign | 2002 Glenn Park Drive Suite B | | - | Champaign | IL | 61821 | Central | Peoria | 32,000 |
| 72 | 89 | AFF | Augusta | 1708 Wylds Rd. | | - | Augusta | GA | 30909 | Southeast | N Charleston | 40,550 |
| 73 | 90 | AFF | North Charleston SC | 4750 Goer Dr. Suite C | | - | North Charleston | SC | 29406 | Southeast | N Charleston | 22,159 |
| 74 | 91 | AFF | Huntsville | 2518 Memorial Parkway NW | | - | Huntsville | AL | 35810 | Central | Birmingham | 20,000 |
| 75 | 93 | AFF | Palmetto FL | 1201 10th Street East | | - | Palmetto | FL | 34221 | Southeast | Tampa | 25,198 |
| 76 | 94 | AFF | Burnsville | 3200 Highway 13 West | | - | Burnsville | MN | 55337 | Central | Milwaukee | 21,326 |
| 77 | 97 | AFF | St Louis MO | 9801 Page Ave. | | - | St Louis | MO | 63132 | Central | Kansas City | 33,552 |
| 78 | 98 | AFF | Baton Rouge LA | 8560 Florida Blvd. | | - | Baton Rouge | LA | 70815 | Southeast | Montgomery | 25,490 |
| 79 | 99 | AFF | Altoona | 516 West Plank Rd. Suite #22 | | - | Altoona | PA | 16602 | Northeast | Pittsburgh | 33,280 |
| 80 | 100 | AFF | Norfolk | 6359 East Virginia Beach Blvd. | | - | Norfolk | VA | 23502 | Northeast | Richmond | 35,000 |
| 81 | 101 | AFF | Columbia | 1424 Atlas Road | | - | Columbia | SC | 29209 | Southeast | N Charleston | 30,800 |
| 82 | 103 | AFF | Monroe | 630 N. Telegraph Rd. | | - | Monroe | MI | 48162 | Northeast | Livonia | 27,000 |
| 83 | 104 | AFF | Rome GA | 2502 Shorter Ave. NW | | - | Rome | GA | 30165 | Central | Birmingham | 30,000 |
| 84 | 105 | AFF | Muncie IN | 4201 N. Oxat State Rd. 3 | | - | Muncie | IN | 47303 | Central | Indianapolis | 22,000 |
| 85 | 106 | AFF | Shreveport LA | 336 Montgomery St. | | - | Shreveport | LA | 71107 | West | Tulsa | 34,000 |
| 86 | 107 | AFF | Albany NY | 76 Fuller Rd | | - | Albany | NY | 12205 | Northeast | Buffalo | 23,480 |
| 87 | 109 | AFF | Metairie LA | 3409 N I-10 Service Rd W. | | - | Metairie | LA | 70002 | Southeast | Montgomery | 23,400 |
| 88 | 111 | AFF | San Antonio TX | 639 Lanark Dr. | | - | San Antonio | TX | 78218 | West | Houston | 43,529 |
| 89 | 112 | AFF | Hagerstown MD | 17627 Virginia Ave. | | - | Hagerstown | MD | 21740 | Northeast | Richmond | 28,000 |
| 90 | 114 | AFF | Helena MT | 4600 Highway 52 | | - | Helena | AL | 35080 | Central | Birmingham | 43,000 |
| 91 | 115 | AFF | West Richmond VA | 9131 Midlothian Turnpike | | - | Richmond | VA | 23236 | Northeast | Richmond | 28,926 |
| 92 | 116 | AFF | Loves Park IL | 1502 E. Riverside Blvd. | | - | Loves Park | IL | 61111 | Central | Chicago | 26,500 |
| 93 | 117 | AFF | Myrtle Beach SC | 1049B Glenforest Rd | | - | Myrtle Beach | SC | 29579 | Southeast | N Charleston | 22,037 |
| 94 | 118 | AFF | Green Bay WI | 2490 Main St. | | - | Green Bay | WI | 54311 | Central | Milwaukee | 24,000 |
| 95 | 119 | AFF | Indianapolis West IN | 5615 38th St. Unit A | | - | Indianapolis | IN | 46254 | Central | Indianapolis | 22,247 |
| 96 | 120 | AFF | Huntington | 3116 US Route 60 | | - | Huntington | WV | 25705 | Northeast | Cincinnati | 19,340 |
| 97 | 121 | AFF | Waco TX | 1002 TX-340 Loop | | - | Bellmead | TX | 76705 | West | West Dallas | 30,000 |
| 98 | 123 | AFF | Roanoke VA | 4496 Electric Rd. | | - | Roanoke | VA | 24018 | Southeast | Raleigh | 35,364 |
| 99 | 124 | AFF | Columbus | 1627 South Lumpkin Rd. | | - | Columbus | GA | 31903 | Southeast | Jacksonville | 44,000 |
| 100 | 125 | AFF | Grand Prairie TX | 1825 Westpark Dr. | | - | Grand Prairie | TX | 75050 | West | West Dallas | 43,754 |
| 101 | 126 | AFF | Macon GA | 2525 Pio Nono Ave Suite 1100 | | - | Macon | GA | 31206 | Southeast | Jacksonville | 23,662 |
| 102 | 127 | AFF | Dallas TX | 2964 W. Wheatland Rd. | | - | Dallas | TX | 75237 | West | West Dallas | 26,040 |
| 103 | 129 | AFF | Stone Mountain GA | 5370 U.S. Highway 78 Suite 400 | | - | Stone Mountain | GA | 30087 | Southeast | Morrow | 32,000 |
| 104 | 130 | AFF | Saginaw MI | 4345 Bay Road | | - | Saginaw | MI | 48603 | Northeast | Livonia | 31,274 |
| 105 | 131 | AFF | Corpus Christi TX | 5568 Ayers St. | | - | Corpus Christi | TX | 78415 | West | Houston | 20,640 |
| 106 | 132 | AFF | Oklahoma City OK | 2825 W I-240 Service Rd. | | - | Oklahoma City | OK | 73159 | West | Oklahoma City | 32,044 |
| 107 | 134 | AFF | Greenville | 2600 Anderson Rd. | | - | Greenville | SC | 29611 | Southeast | N Charleston | 26,010 |
| 108 | 136 | AFF | McAllen TX | 1001 E. Highway 83 | | - | McAllen | TX | 78501 | West | Houston | 33,898 |
| 109 | 138 | AFF | Spartanburg | 473 East Blackstock Road | Unit 1 | - | Spartanburg | SC | 29301 | Southeast | N Charleston | 29,800 |
| 110 | 139 | AFF | Cranston | 1808 Plainfield Pike | | - | Cranston | RI | 02921 | Northeast | Newington | 20,045 |
| 111 | 141 | AFF | North Charlotte NC | 7201 Smith Corners Blvd. | | - | Charlotte | NC | 28269 | Southeast | Jacksonville | 21,700 |
| 112 | 142 | AFF | El Paso TX | 11330 James Watt Dr. | | - | El Paso | TX | 79936 | West | Houston | 20,500 |
| 113 | 143 | AFF | Lubbock TX | 4426 34th St. Suite B | | - | Lubbock | TX | 79410 | West | Oklahoma City | 33,382 |
| 114 | 147 | AFF | West Charlotte NC | 1526-A Alleghany St | | - | Charlotte | NC | 28208 | Southeast | Jacksonville | 23,383 |
| 115 | 149 | AFF | Port St Lucie FL | 7121 US-1 | | - | Port St Lucie | FL | 34952 | Southeast | Miami | 21,126 |
| 116 | 150 | AFF | Albuquerque NM | 1700 Eubank Blvd. NE | | - | Albuquerque | NM | 87112 | West | Phoenix | 20,000 |
| 117 | 151 | AFF | Glendale AZ | 4961 W. Bell Rd. Suite B-3 | | - | Glendale | AZ | 85308 | West | Phoenix | 25,700 |
| 118 | 154 | AFF | Mesa AZ | 4422 E. University Dr. Suite 101 | | - | Mesa | AZ | 85205 | West | Phoenix | 23,660 |
| 119 | 155 | AFF | Eastlake OH | 34700 Vine Street Suite 200 | | - | Eastlake | OH | 44095 | Northeast | Parma | 43,714 |
| 120 | 156 | AFF | East Jacksonville FL | 8661 Old Kings Rd. South Unit 2 | | - | East Jacksonville | FL | 32217 | Southeast | Jacksonville | 24,450 |
| 121 | 157 | AFF | East Phoenix AZ | 3144 E. Thomas Rd. | | - | East Phoenix | AZ | 85016 | West | Phoenix | 25,000 |
| 122 | 158 | AFF | Sanford FL | 3818 S. Orlando Dr. | | - | Sanford | FL | 32773 | Southeast | Orlando | 21,755 |
| 123 | 159 | AFF | Topeka KS | 3333 S. Kansas Ave | | - | Topeka | KS | 66611 | Central | Kansas City | 28,450 |
| 124 | 160 | AFF | Delaware | 1141 S. Columbus Pike | | - | Delaware | OH | 43015 | Northeast | Delaware | 19,054 |
| 125 | 161 | AFF | Broken Arrow OK | 3301 S. Elm Place | | - | Broken Arrow | OK | 74012 | West | Tulsa | 18,487 |
| 126 | 163 | AFF | Bryan TX | 3125 S. Texas Ave #1500 | | - | Bryan | TX | 77802 | West | Houston | 26,770 |
| 127 | 164 | AFF | Bowling Green KY | 101 Clay St | | - | Bowling Green | KY | 42101 | Central | Louisville | 37,000 |
| 128 | 165 | AFF | Columbia MO | 2900 Paris Rd. Suite 200 | | - | Columbia | MO | 65202 | Central | Kansas City | 35,200 |
| 129 | 167 | AFF | Independence MO | 2210 S. St. Rt. 291 Hwy. Suite B | | - | Independence | MO | 64057 | Central | Kansas City | 25,392 |
| 130 | 172 | AFF | Davenport IA | 1010 E. Kimberly Rd. Suite #1 | | - | Davenport | IA | 52807 | Central | Peoria | 35,488 |
| 131 | 174 | AFF | Dothan GA | 2131 Ross Clark Circle | | - | Dothan | AL | 36301 | Southeast | Montgomery | 45,736 |
| 132 | 175 | AFF | Decatur GA | 1960 B Candler Rd | | - | Decatur | GA | 30032 | Southeast | Morrow | 25,052 |

**American Freight**
Exhibit A

Store List

| Count | Loc # | Concept/Banner | Name | Address | Address2 | | City | State | Zip | Territory | District | Gross Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 133 | 176 | AFF | Jackson TN | 2151 N. Highland Ave. | - | | Jackson | TN | 38305 | Southeast | Nashville | 29,702 |
| 134 | 180 | AFF | Wilmington NC | 5128 Oleander Dr | - | | Wilmington | NC | 28403 | Southeast | Raleigh | 18,882 |
| 135 | 182 | AFF | Athens GA | 3190 Atlanta Hwy | - | | Athens | GA | 30606 | Southeast | N Charleston | 22,000 |
| 136 | 183 | AFF | Pearland TX | 3267 East Broadway St #16 | - | | Pearland | TX | 77581 | West | Houston | 20,776 |
| 137 | 184 | AFF | East Houston TX | 11051 East Freeway | - | | East Houston | TX | 77029 | West | Houston | 23,616 |
| 138 | 187 | AFF | Texarkana, TX | 1801 N Robison Rd #1E | - | | Texarkana | TX | 75501 | West | Tulsa | 21,499 |
| 139 | 189 | AFF | Cincinnati - Ridge Ave OH | 5375 Ridge Ave | - | | Cincinnati | OH | 45213 | Northeast | Cincinnati | 25,489 |
| 140 | 190 | AFF | Rochester, NY | 3333 W. Henrietta Rd Ste 27 | - | | Rochester | NY | 14623 | Northeast | Buffalo | 23,440 |
| 141 | 192 | AFF | Dublin, GA | 116B Hillcrest Parkway | - | | Dublin | GA | 31021 | Southeast | Jacksonville | 46,479 |
| 142 | 193 | AFF | Bloomington, IN | 3100 W. Susan Dr. | - | | Bloomington | IN | 47404 | Central | Indianapolis | 31,465 |
| 143 | 195 | AFF | Gastonia, NC | 1467B E. Franklin Blvd. | - | | Gastonia | NC | 28054 | Southeast | Charlotte | 27,210 |
| 144 | 196 | AFF | Anderson, SC | 122 E. Shockley Ferry Rd. | - | | Anderson | SC | 29624 | Southeast | N Charleston | 19,028 |
| 145 | 198 | AFF | Tuscaloosa, AL | 2300 McFarland Blvd Suite 4 | - | | Northport | AL | 35476 | Central | Birmingham | 23,428 |
| 146 | 199 | AFF | Chillicothe, OH | 110 Consumer Center Dr | - | | Chillicothe | OH | 45601 | Northeast | Delaware | 22,000 |
| 147 | 200 | AFF | Wilkes-Barre, PA | 370 East End Centre | - | | Wilkes-Barre | PA | 18702 | Northeast | Buffalo | 24,624 |
| 148 | 204 | AFF | Fairhaven, MA | 2 Fairhaven Commons Way | - | | Fairhaven | MA | 02719 | Northeast | Newington | 21,422 |
| 149 | 205 | AFF | Lawton, OK | 30 NW Sheridan Rd | - | | Lawton | OK | 73505 | West | Oklahoma City | 17,121 |
| 150 | 206 | AFF | Hickory, NC | 2108 US Highway 70 SE | - | | Hickory | NC | 28602 | Southeast | Charlotte | 17,000 |
| 151 | 207 | AFF | Clarksville, IN | 511 Little League Blvd Ste B | - | | Clarksville | IN | 47129 | Central | Florence | 22,736 |
| 152 | 209 | AFF | Lancaster, PA | 1276 Lititz Pike | - | | Lancaster | PA | 17601 | Northeast | Pittsburgh | 18,665 |
| 153 | 210 | AFF | Fredericksburg, VA | 9745 Patriot Hwy | - | | Fredericksburg | VA | 22407 | Northeast | Richmond | 30,188 |
| 154 | 211 | AFF | Danville, VA | 3316 Riverside Dr | - | | Danville | VA | 24541 | Southeast | Raleigh | 24,500 |
| 155 | 212 | AFF | Elyria, OH | 445 Midway Blvd. | - | | Elyria | OH | 44035 | Northeast | Parma | 28,000 |
| 156 | 213 | AFF | Flint, MI | 5038 Miller Rd Ste 2B | - | | Flint | MI | 48507 | Northeast | Livonia | 18,930 |
| 157 | 214 | AFF | Birmingham AL | 2012 Verterans Memorial Dr | - | | Birmingham | AL | 35214 | Central | Birmingham | 17,500 |
| 158 | 215 | AFF | Conyers GA | 425 Sigman Rd NW Ste 105-106 | - | | Conyers | GA | 30012 | Southeast | Morrow | 32,196 |
| 159 | 216 | AFF | Aiken SC | 1680 Richland Ave W | - | | Aiken | SC | 29801 | Southeast | N Charleston | 26,238 |
| 160 | 217 | AFF | Clay NY | 4124 NYS 31 | - | | Clay | NY | 13041 | Northeast | Buffalo | 21,775 |
| 161 | 218 | AFF | Morganton NC | 118 Fiddler's Run Blvd | - | | Morganton | NC | 28655 | Southeast | Charlotte | 24,500 |
| 162 | 219 | AFF | Salem VA | 1357 W. Main St. | - | | Salem | VA | 24153 | Southeast | Raleigh | 25,804 |
| 163 | 220 | FFO | Fort Smith AR 1 - Rogers Ave | 8819 Rogers Avenue S-A | - | | Fort Smith | AR | 72903 | Central | Northern Arkansas | 26,620 |
| 164 | 221 | FFO | Joplin MO | 2640 E. 32nd Street | - | | Joplin | MO | 64804 | Central | Northern Arkansas | 34,000 |
| 165 | 222 | FFO | Jefferson City MO | 2010 Missouri Blvd. | - | | Jefferson City | MO | 65109 | Central | Kansas City | 22,129 |
| 166 | 223 | FFO | Sedalia MO | 3200 West Broadway | - | | Sedalia | MO | 65301 | Central | Kansas City | 25,435 |
| 167 | 224 | FFO | West Plains MO | 1364 Southern Hills CTR | - | | West Plains | MO | 65775 | Central | Northern Arkansas | 15,450 |
| 168 | 225 | FFO | Sherwood AR | 6527 Warden Road | - | | Sherwood (N Little Rock) | AR | 72120 | Central | Little Rock | 16,500 |
| 169 | 226 | FFO | Bryant AR | 22401 HWY I-30 | - | | Bryant | AR | 72022 | Central | Little Rock | 25,000 |
| 170 | 228 | FFO | Little Rock AR 3 - Shackleford | 280 S Shackleford Rd | - | | Little Rock | AR | 72211 | Central | Little Rock | 30,000 |
| 171 | 230 | FFO | Jonesboro AR | 2839 Race Street | - | | Jonesboro | AR | 72401 | Central | Northern Arkansas | 26,750 |
| 172 | 231 | FFO | Conway AR | 580 Amity Rd | - | | Conway | AR | 72032 | Central | Little Rock | 30,300 |
| 173 | 232 | FFO | Batesville AR | 1 Furniture Lane Batesville | - | | Batesville | AR | 72501 | Central | Northern Arkansas | 31,320 |
| 174 | 233 | FFO | Siloam Springs AR | 3758 Hwy 412 E | - | | Siloam Springs | AR | 72761 | West | Tulsa | 23,500 |
| 175 | 234 | FFO | Shawnee OK | 4939 N. Union Ave. | - | | Shawnee | OK | 74804 | West | Oklahoma City | 23,500 |
| 176 | 235 | FFO | Fort Smith AR 2 - Hwy 71 | 8300 Hwy 71 South | - | | South Fort Smith | AR | 72908 | Central | Northern Arkansas | 23,500 |
| 177 | 239 | FFO | Warrensburg MO | 133 Parsons Avenue | - | | Warrensburg | MO | 64093 | Central | Kansas City | 20,560 |
| 178 | 240 | FFO | Lawton OK 2 - Sun Blvd | 7420 NW Sun Blvd. | - | | Lawton | OK | 73505 | West | Oklahoma City | 23,555 |
| 179 | 241 | FFO | Paducah KY | 3521 James Sanders Blvd | - | | Paducah | KY | 42001 | Central | Louisville | 23,505 |
| 180 | 242 | FFO | St. Joseph MO | 3715 N Belt Highway | - | | Saint Joseph | MO | 64506 | Central | Kansas City | 35,000 |
| 181 | 243 | FFO | Norman OK | 831 Sonoma Park Drive | - | | Norman | OK | 73071 | West | Oklahoma City | 23,700 |
| 182 | 244 | FFO | Owensboro KY | 2512 Calumet Trace | - | | Owensboro | KY | 42303 | Central | Louisville | 23,500 |
| 183 | 245 | FFO | New Albany IN | 2300 State Street | - | | New Albany | IN | 47150 | Central | Florence | 23,634 |
| 184 | 246 | FFO | Madison IN | 440 E. City Drive | - | | Madison | IN | 47250 | Central | Florence | 24,920 |
| 185 | 247 | FFO | Elizabethtown KY | 1705 N. Dixie Highway | - | | Elizabethtown | KY | 42701 | Central | Louisville | 26,097 |
| 186 | 249 | FFO | Louisville KY 4 - Preston Highw | 5749 Preston Highway | - | | Louisville (south) | KY | 40219 | Central | Louisville | 25,000 |
| 187 | 250 | FFO | Bardstown KY | 223 KY Home Square Shopping Ct | - | | Bardstown | KY | 40004 | Central | Louisville | 22,972 |
| 188 | 251 | FFO | Springfield MO | 1434 E Independence St | - | | Springfield | MO | 65804 | Central | Northern Arkansas | 31,936 |
| 189 | 252 | FFO | Frankfort KY | 104 Brighton Park Blvd. | - | | Frankfort | KY | 40601 | Central | Louisville | 20,000 |
| 190 | 253 | FFO | Osage Beach MO | 202 Gs Hwy 54 | - | | Osage Beach | MO | 65065 | Central | Northern Arkansas | 26,250 |
| 191 | 254 | FFO | Horn Lake MS | 7258 Interstate Boulevard | - | | Horn Lake | MS | 38637 | Central | Little Rock | 23,500 |
| 192 | 257 | FFO | Wichita Falls TX | 3127 Lawrence Rd. | - | | Wichita Falls | TX | 76308 | West | Oklahoma City | 20,560 |
| 193 | 258 | AFF | Albany GA | 2304 N. Slappey Blvd. | - | | Albany | GA | 31701 | Southeast | Jacksonville | 34,233 |
| 194 | 260 | AFF | Rocky Mount NC | 1980 Stone Rose Dr | - | | Rocky Mount | NC | 27804 | Southeast | Raleigh | 24,000 |
| 195 | 261 | AFF | Venice FL | 515 Tamiami Trail S | - | | Venice | FL | 34285 | Southeast | Tampa | 23,722 |

**American Freight**
Exhibit A

Store List

| Count | Loc # | Concept/Banner | Name | Address | Address2 | | City | State | Zip | Territory | District | Gross Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 196 | 262 | AFF | Piqua OH | 987 E Ash St Ste 125 | | - | Piqua | OH | 45356 | Northeast | Delaware | 50,000 |
| 197 | 264 | AFF | Winchester TN | 2607 Decherd Blvd | | - | Winchester | TN | 37398 | Southeast | Nashville | 20,563 |
| 198 | 265 | AFF | Brooksville FL | 657 S Broad St | | - | Brooksville | FL | 34601 | Southeast | Tampa | 25,000 |
| 199 | 266 | AFF | Rock Hill SC | 809 Albright Road | | - | Rock Hill | SC | 29730 | Southeast | Charlotte | 31,500 |
| 200 | 267 | AFF | San Angelo, TX | 3315 Sherwood Way Ste 149 | | - | San Angelo | TX | 76904 | West | West Dallas | 19,177 |
| 201 | 268 | AFF | Ardmore OK | 340 N Commerce St | | - | Ardmore | OK | 73401 | West | Oklahoma City | 25,000 |
| 202 | 269 | AFF | Peoria IL | 5212 N Big Hollow Road | | - | Peoria | IL | 61615 | Central | Peoria | 24,124 |
| 203 | 271 | AFF | Denham Springs LA | 10076 Crossing Way Ste 530 | | - | Denham Springs | LA | 70726 | Southeast | Montgomery | 55,939 |
| 204 | 272 | AFF | China Grove NC | 106 S US 29 Hwy | | - | China Grove | NC | 28023 | Southeast | Charlotte | 30,280 |
| 205 | 273 | AFF | Muskegon MI | 1750 E Sherman Blvd | | - | Muskegon | MI | 49444 | Northeast | Livonia | 34,000 |
| 206 | 274 | AFF | Johnstown PA | 820 Scalp Ave | | - | Johnstown | PA | 15904 | Northeast | Pittsburgh | 22,700 |
| 207 | 275 | AFF | Memphis TN | 7060 Winchester Rd | | - | Memphis | TN | 38125 | Central | Little Rock | 30,000 |
| 208 | 277 | AFF | Battle Creek MI | 30 Columbia Ave E  Ste H | | - | Battle Creek | MI | 49015 | Northeast | Livonia | 26,992 |
| 209 | 279 | AFF | Lynchburg VA | 3700 Candlers Mountain Rd  Ste 67 | | - | Lynchburg | VA | 24502 | Northeast | Richmond | 25,467 |
| 210 | 280 | AFF | Prattville AL | 1890 E Main St | | - | Prattville | AL | 36066 | Southeast | Montgomery | 24,178 |
| 211 | 281 | AFF | Agawam MA | 890 Suffield St | | - | Agawam | MA | 01001 | Northeast | Newington | 34,500 |
| 212 | 285 | AFF | Butler PA | 100 Pullman Sq | | - | Butler | PA | 16001 | Northeast | Pittsburgh | 41,765 |
| 213 | 287 | AFF | Horseheads NY | 1020 Center Street Ste 1A | | - | Horseheads | NY | 14845 | Northeast | Buffalo | 24,000 |
| 214 | 288 | AFF | Hooksett NH | 1328 Hooksett Rd Ste 13B | | - | Hooksett | NH | 03106 | Northeast | Newington | 22,230 |
| 215 | 289 | AFF | Wadsworth OH | 180 Great Oaks Trail Ste B | | - | Wadsworth | OH | 44281 | Northeast | Parma | 20,276 |
| 216 | 290 | AFF | Niles OH | 5185 Youngstown Warren Rd  Unit 5 | | - | Niles | OH | 44446 | Northeast | Pittsburgh | 25,326 |
| 217 | 291 | AFF | Kingsport TN | 1189 N Eastman Rd | | - | Kingsport | TN | 37664 | Southeast | Charlotte | 22,741 |
| 218 | 293 | AFF | Waterloo IA | 2060 Sovia Dr  Ste #112 | | - | Waterloo | IA | 50702 | Central | Peoria | 18,120 |
| 219 | 294 | AFF | Centennial CO | 9667 E County Line Rd | | - | Centennial | CO | 80112 | West | Colorado | 25,003 |
| 220 | 295 | AFF | Colorado Springs CO | 1680 Briargate Blvd  Ste 100 | | - | Colorado Springs | CO | 80920 | West | Colorado | 44,763 |
| 221 | 296 | AFF | Westminster CO | 9180 Wadsworth Pkwy | | - | Westminster | CO | 80021 | West | Colorado | 35,000 |
| 222 | 297 | AFF | Parkersburg WV | 270 Park Center Dr | | - | Parkersburg | WV | 26101 | Northeast | Delaware | 28,000 |
| 223 | 298 | AFF | Port Arthur | 3100 Highway 365  Ste #114 | | - | Port Arthur | TX | 77642 | West | Houston | 23,000 |
| 224 | 299 | AFF | Medford OR | 1600 N Riverside Ave  Unit 1094 | | - | Medford | OR | 97501 | West | Seattle | 29,853 |
| 225 | 300 | AFF | Layton UT | 2159 Harris Blvd Ste 1 | | - | Layton | UT | 84041 | West | Colorado | 25,000 |
| 226 | 301 | AFF | Ogden UT | 4113 Riverdale Rd | | - | Ogden | UT | 84405 | West | Colorado | 23,046 |
| 227 | 302 | AFF | Pueblo CO | 5737 N Elizabeth St | | - | Pueblo | CO | 81008 | West | Colorado | 23,230 |
| 228 | 303 | AFF | Sherman TX | 2222 Texoma Pkwy Ste 200 | | - | Sherman | TX | 75090 | West | Tulsa | 25,200 |
| 229 | 310 | AFF | | - | - | - | | | 84057 | 0 | 0 | - |
| 230 | 1916 | AFO | McAllen, TX | 700 E Expy 83 Suite 200 | | - | McAllen | TX | 78503 | West | Houston | 30,969 |
| 231 | 4001 | AFO | Kansas City, MO | 3632 Front St | | - | Kansas City | MO | 64120 | Central | Kansas City | 22,520 |
| 232 | 4015 | AFO | Daytona Beach, FL | 1415 S. Nova Rd | | - | Daytona Beach | FL | 32114 | Southeast | Orlando | 30,721 |
| 233 | 4025 | AFO | Amarillo, TX | 7302 SW 34th Ave | | - | Amarillo | TX | 79121 | West | Oklahoma City | 38,925 |
| 234 | 4032 | AFO | Portage, MI | 669 Mall Dr | | - | Portage | MI | 49024 | Central | Indianapolis | 36,459 |
| 235 | 4038 | AFO | Palmdale, CA | 320 West Rancho Vista Blvd | | - | Palmdale | CA | 93551 | West | San Diego | 45,800 |
| 236 | 4058 | AFO | Pensacola, FL | 6235 N Davis Hwy | Ste 101 | - | Pensacola | FL | 32504 | Southeast | Montgomery | 23,700 |
| 237 | 4068 | AFO | Webster, TX | 20750 Gulf Freeway | | - | Webster | TX | 77598 | West | Houston | 32,499 |
| 238 | 4073 | AFO | Lansing, MI | 810 S. Waverly Rd | | - | Lansing | MI | 48917 | Northeast | Livonia | 32,811 |
| 239 | 4076 | AFO | Holland, OH | 6645 Airport Hwy | | - | Holland | OH | 43528 | Northeast | Livonia | 27,878 |
| 240 | 4119 | AFO | Tacoma, WA | 6th Avenue Plaza | 5401 6th Ave. Suite 515 | - | Tacoma | WA | 98406 | West | Seattle | 29,080 |
| 241 | 4185 | AFO | Clearwater, FL | 5251 110th Ave. N. | #120 | - | Clearwater | FL | 33760 | Southeast | Tampa | 43,200 |
| 242 | 4192 | AFO | Sarasota, FL | 8333 Lockwood Ridge Rd. | | - | Sarasota | FL | 34243 | Southeast | Tampa | 14,782 |
| 243 | 4221 | AFO | Tulsa, OK | 6120 E. 71st St. | | - | Tulsa | OK | 74136 | West | Tulsa | 15,000 |
| 244 | 4268 | AFO | Fayetteville, NC | 1240 Ireland Dr | | - | Fayetteville | NC | 28304 | Southeast | Raleigh | 35,310 |
| 245 | 4307 | AFO | Oklahoma City, OK | 2805 SW 29th St | | - | Oklahoma City | OK | 73119 | West | Oklahoma City | 29,900 |
| 246 | 4324 | AFO | Newington, CT | 65 Holmes Rd. | | - | Newington | CT | 06111 | Northeast | Newington | 46,114 |
| 247 | 4333 | AFO | Bridgeville, PA | 1051 Washington Pike | | - | Bridgeville | PA | 15017 | Northeast | Pittsburgh | 36,500 |
| 248 | 4345 | AFO | Orlando FL | 4308 E Colonial Dr | | - | Orlando | FL | 32803 | Southeast | Orlando | 27,118 |
| 249 | 4526 | AFO | West Palm Beach, FL | 2031 Okeechobee Blvd. | | - | West Palm Beach | FL | 33409 | Southeast | Miami | 26,016 |
| 250 | 4583 | AFO | Wauwatosa, WI | 3203 N Mayfair RD | | - | Wauwatosa | WI | 53222 | Central | Milwaukee | 21,285 |
| 251 | 4598 | AFO | Tempe, AZ | 5000 Arizona Mills Circle | Suite 625 | - | Tempe | AZ | 85282 | West | Phoenix | 29,390 |
| 252 | 4599 | AFO | Prince William, VA | 2700 Potomac Mills Circle | Suite #707 | - | Prince William | VA | 22192 | Northeast | Richmond | 33,008 |
| 253 | 4601 | AFO | Voorhees, NJ | 322 S. Burnt Mill Rd. | | - | Voorhees | NJ | 08043 | Northeast | Richmond | 19,600 |
| 254 | 4606 | AFO | Darien, IL | 7415 South Cass Avenue | | - | Darien | IL | 60561 | Central | Chicago | 21,830 |
| 255 | 4611 | AFO | Coon Rapids, MN | 141 85th Avenue NW | | - | Coon Rapids | MN | 55433 | Central | Milwaukee | 38,567 |
| 256 | 4617 | AFO | Carrollton, TX | 1215 Marsh Lane | Suite #180 | - | Carrollton | TX | 75006 | West | West Dallas | 31,161 |
| 257 | 4618 | AFO | Rancho Cordova, CA | 10379 Folsom Blvd. | | - | Rancho Cordova | CA | 95670 | West | Seattle | 25,818 |

**American Freight**
Exhibit A

Store List

| Count | Loc # | Concept/Banner | Name | Address | Address2 | City | State | Zip | Territory | District | Gross Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 258 | 4619 | AFO | Fenton, MO | 639 Gravois Bluff Blvd. | Suite A | Fenton | MO | 63026 | Central | Kansas City | 34,500 |
| 259 | 4621 | AFO | Philadelphia, PA | 1357 Franklin Mills Circle | - | Philadelphia | PA | 19154 | Northeast | Richmond | 20,327 |
| 260 | 4650 | AFO | Mesquite, TX | 1418 N. Town East Blvd | Ste 100 | Mesquite | TX | 75150 | West | West Dallas | 27,080 |
| 261 | 4657 | AFO | Lafayette, LA | 2001 NW Evangeline Thruway | - | Lafayette | LA | 70501 | Southeast | Montgomery | 25,000 |
| 262 | 4666 | AFO | Phoenix, AZ | 16809 N. 9th St. | - | Phoenix | AZ | 85022 | West | Phoenix | 23,500 |
| 263 | 4684 | AFO | Modesto, CA | 1800 Prescott Rd | Suite J | Modesto | CA | 95350 | West | Seattle | 21,250 |
| 264 | 4695 | AFO | Knoxville, TN | 9305 Kingston Pike Ste 110 | - | Knoxville | TN | 37922 | Southeast | Nashville | 30,971 |
| 265 | 4790 | AFO | Portage, IN | 6169 US Route 6 | - | Portage | IN | 46368 | Central | Chicago | 19,162 |
| 266 | 4794 | AFO | Parma, OH | 7490 Broadview Rd. | - | Parma | OH | 44134 | Northeast | Parma | 24,724 |
| 267 | 4820 | AFO | La Mesa, CA | 8805 Murray Drive | - | La Mesa | CA | 91941 | West | San Diego | 19,837 |
| 268 | 4823 | AFO | Fall River, MA | 133 Mariano S. Bishop Blvd. | - | Fall River | MA | 02721 | Northeast | Newington | 38,190 |
| 269 | 4824 | AFO | Boise, ID | 8033 W. Franklin Road | - | Boise | ID | 83709 | West | Colorado | 26,500 |
| 270 | 4952 | AFO | Newark, DE | 49 University Plaza | - | Newark | DE | 19702 | Northeast | Richmond | 31,886 |
| 271 | 4958 | AFO | Ontario, CA | 2401 S. Vineyard Ave. | - | Ontario | CA | 91761 | West | San Diego | 26,000 |
| 272 | 4962 | AFO | Glendale, AZ | 5734 W Peoria Ave | - | Glendale | AZ | 85302 | West | Phoenix | 20,990 |
| 273 | 4989 | AFO | Las Vegas, NV | 4854 W Lone Mountain Rd | - | Las Vegas | NV | 89130 | West | Phoenix | 57,000 |
| 274 | 4994 | AFO | Richmond, VA | 4100 Tomlynn St. - Suite "A" | - | Richmond | VA | 23230 | Northeast | Richmond | 41,953 |
| 275 | 5060 | AFO | Reynoldsburg, OH | 2885 Gender Rd | - | Reynoldsburg | OH | 43068 | Northeast | Delaware | 33,016 |
| 276 | 5207 | AFO | Mchenry, IL | 1750 Richmond Rd | - | McHenry | IL | 60050 | Central | Chicago | 21,283 |
| 277 | 5230 | AFO | Livonia, MI | 12001 Sears Ave. | - | Livonia | MI | 48150 | Northeast | Livonia | 33,384 |
| 278 | 5233 | AFO | Kettering, OH | 2000 E Dorothy Ln | - | Kettering | OH | 45420 | Northeast | Cincinnati | 23,000 |
| 279 | 5264 | AFO | Hixson, TN | 5450 Highway 153 Ste 100 | - | Hixson | TN | 37343 | Southeast | Nashville | 25,787 |
| 280 | 5282 | AFO | West Covina, CA | 728 South Orange | - | West Covina | CA | 91790 | West | San Diego | 17,310 |
| 281 | 5292 | AFO | Streamwood (Hanover Park), I | 1040 S Barrington Rd | - | Streamwood | IL | 60107 | Central | Chicago | 21,656 |
| 282 | 5438 | AFO | Broadview, IL | 1000 Broadview Village Square | - | Broadview | IL | 60153 | Central | Chicago | 23,282 |
| 283 | 5446 | AFO | Homewood, AL | 372 Palisades Blvd. | - | Birmingham | AL | 35209 | Central | Birmingham | 20,674 |
| 284 | 5630 | AFO | San Diego, CA | 1210 W. Morena BLVD | - | San Diego | CA | 92110 | West | San Diego | 28,022 |
| 285 | 5631 | AFO | Santa Ana, CA | 1430 S. Village Way | Suite K | Santa Ana | CA | 92705 | West | San Diego | 22,560 |
| 286 | 5632 | AFO | Cerritos, CA | 18714 Gridley Road | - | Cerritos | CA | 90703 | West | San Diego | 22,122 |
| 287 | 6052 | AFO | Tampa, FL | 8245B North Florida Road | - | Tampa | FL | 33604 | Southeast | Tampa | 22,008 |
| 288 | 7322 | AFO | Fairview Heights, IL | 55 Ludwig Drive (Space 55) | - | Fairview Heights | IL | 62208 | Central | Kansas City | 31,310 |
| 289 | 7349 | AFO | Gilbert, AZ | 857 North Val Vista Drive | - | Gilbert | AZ | 85234 | West | Phoenix | 19,329 |
| 290 | 7359 | AFO | Oceanside, CA | 2505-B Vista Way 1 | - | Oceanside | CA | 92054 | West | San Diego | 38,902 |
| 291 | 7450 | AFO | North Olmsted, OH | 26662 Brookpark Extension | - | North Olmsted | OH | 44070 | Northeast | Parma | 27,030 |
| 292 | 7454 | AFO | Pittsburgh, PA | 2003 Cheryl Drive | - | Pittsburgh | PA | 15237 | Northeast | Pittsburgh | 53,389 |
| 293 | 7487 | AFO | San Antonio, TX | 6157 NW Loop 410 | - | San Antonio | TX | 78238 | West | San Antonio | 38,000 |
| 294 | 7533 | AFO | Greenville, SC | 1117 Woodruff Rd | Suite K. | Greenville | SC | 29607 | Southeast | N Charleston | 28,860 |
| 295 | 7561 | AFO | Taylor, MI | 9860 Telegraph Road | - | Taylor | MI | 48180 | Northeast | Livonia | 24,424 |
| 296 | 7564 | AFO | Charlotte, NC | 9575 South Blvd | - | Charlotte | NC | 28273 | Southeast | Charlotte | 35,000 |
| 297 | 7593 | AFO | Chesapeake, VA | 2005 South Military Hwy | - | Chesapeake | VA | 23320 | Northeast | Richmond | 32,256 |
| 298 | 7601 | AFO | Cincinnati | 10200 Colerain Ave Ste 11 | - | Cincinnati | OH | 45251 | Northeast | Cincinnati | 25,000 |
| 299 | 7604 | AFO | North Charleston, SC | 5101 Ashley Phosphate | Suite 136 | N. Charleston | SC | 29418 | Southeast | N Charleston | 40,704 |
| 300 | 7611 | AFO | Florence, KY | 51 Spiral dr | - | Florence | KY | 41042 | Central | Florence | 20,257 |
| 301 | 7631 | AFO | Arlington, TX | 401 SOUTHWEST PLZ STE 105 | - | Arlington | TX | 76016 | West | West Dallas | 25,200 |
| 302 | 7633 | AFO | Derby CT | 656 New Haven Ave Ste 1 | - | Derby | CT | 06418 | Northeast | Newington | 25,000 |
| 303 | 7659 | AFO | Torrance, CA | 3610 Torrance Blvd | - | Torrance | CA | 90503 | West | San Diego | 47,328 |
| 304 | 7818 | AFO | Spring, TX | 19750 North Freeway (HI-45N) | - | Spring | TX | 77373 | West | Houston | 25,494 |
| 305 | 7920 | AFO | Fort Worth, TX | 1265 Town Square Drive. | - | Fort Worth | TX | 76116 | West | West Dallas | 30,577 |
| 306 | 8234 | AFO | Houston, TX | 5901 Griggs Rd. | - | Houston | TX | 77023 | West | Houston | 25,328 |
| 307 | 8279 | AFO | Speedway, IN | Spdwy Spr Ctr. | 6022 W. Crawfordsville Rd. | Speedway | IN | 46224 | Central | Indianapolis | 30,825 |
| 308 | 8286 | AFO | Shrewsbury, MA | Shrewsbury Vlg Shpng Ctr.  1000 Boston Trnpk | | Shrewsbury | MA | 01545 | Northeast | Newington | 34,980 |
| 309 | 8346 | AFO | San Leandro, CA | 1936 W. 140th Ave. | - | San Leandro | CA | 94577 | West | Seattle | 34,458 |
| 310 | 8412 | AFO | Jacksonville, FL | 11111 San Jose Blvd  Ste 1 | - | Jacksonville | FL | 32223 | Southeast | Seattle | 28,020 |
| 311 | 8487 | AFO | Nashville, TN | 642 Thompson Ln. | - | Nashville | TN | 37204 | Southeast | Nashville | 60,395 |
| 312 | 8495 | AFO | Medley, FL | 8090 NW 77th Court | - | Medley | FL | 33166 | Southeast | Miami | 37,000 |
| 313 | 9059 | AFO | Fresno, CA | 4150 Shaw Ave | - | Fresno | CA | 93722 | West | Seattle | 29,000 |
| 314 | 9112 | AFO | Shawnee, KS | 6995 Quivira Rd | - | Shawnee | KS | 66216 | Central | Kansas City | 25,957 |
| 315 | 9150 | AFO | Corona, CA | 1208 Magnolia Ave | - | Corona | CA | 92881 | West | San Diego | 25,047 |
| 316 | 9229 | AFO | Sacramento, CA | 1200 Blumenfeld Dr | Suite C | Sacramento | CA | 95815 | West | Seattle | 43,043 |
| 317 | 9284 | AFO | Austin, TX | 13435 N HIGHWAY 183 STE 101 | - | Austin | TX | 78750 | West | Houston | 38,217 |
| 318 | 9411 | AFO | Houston, TX | 11687 Westheimer Rd | - | Houston | TX | 77077 | West | Houston | 26,024 |
| 319 | 9486 | AFO | Sparks, NV | 350 Glendale Ave. | - | Sparks | NV | 89431 | West | Seattle | 20,089 |

**American Freight**
**Exhibit A**

Store List

| Count | Loc # | Concept/Banner | Name | Address | Address2 | City | State | Zip | Territory | District | Gross Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 320 | 9603 | AFO | Huber Heights, OH | 8284 Troy Pike | - | Huber Heights | OH | 45424 | Northeast | Cincinnati | 28,018 |
| 321 | 9670 | AFO | Naperville, IL | 540 S. Hwy 59 | - | Naperville | IL | 60540 | Central | Chicago | 33,260 |
| 322 | 9756 | AFO | Tinley Park, IL | 16040 S. Harlem Ave | - | Tinley Park | IL | 60477 | Central | Chicago | 24,480 |
| 323 | 9796 | AFO | Allen, TX | 109 N Greenville Ave | - | Allen | TX | 75002 | West | West Dallas | 35,398 |
| 324 | 9849 | AFO | Henderson, NV | 1437 W. Sunset Rd. | - | Henderson | NV | 89014 | West | Phoenix | 17,500 |
| 325 | 9876 | AFO | Raleigh, NC | 3529 Maitland Dr | - | Raleigh | NC | 27610 | Southeast | Raleigh | 39,903 |
| 326 | 9881 | AFO | Wichita, KS | 3535 N Rock Road Ste 100 | - | Wichita | KS | 67226 | West | Tulsa | 39,902 |
| 327 | 9888 | AFO | Clackamas, OR | 10176 SE 82nd AVE | - | Clackamas | OR | 97086 | West | Seattle | 34,103 |
| 328 | 9897 | AFO | San Antonio, TX | 820 Rector Drive East | Suite 120 | San Antonio | TX | 78209 | West | Houston | 26,298 |
| 329 | 9974 | AFO | Concord, NC | 545 Concord Pkwy | - | Concord | NC | 28027 | Southeast | Charlotte | 35,742 |
| **329** | | | | | | | | | | *Average Sq. Ft.* | *28,150* |

Docusign Envelope ID: 90F1CA5E-C7A3-486F-8353-4320591B7159

# <u>EXHIBIT B</u>

## Expense Budget

**American Freight**
**Exhibit B**

| Expense Budget | | |
|---|---|---|

| | 1st Week | Each Subsequent Week |
|---|---|---|
| **Advertising** | | |
| Digital & Media | 108,070 | 108,070 |
| Signs (2) | 1,344,685 | - |
| Sign Walkers | 155,658 | 155,658 |
| Subtotal Advertising | 1,608,413 | 263,728 |
| | | |
| **Supervision** | | |
| Fees / Wages / Expenses (3) | 615,516 | 370,899 |
| Subtotal Supervision | 615,516 | 370,899 |
| | | |
| **Miscellaneous** | | |
| Miscellaneous /Legal (4) | 50,000 | - |
| Subtotal Miscellaneous | 50,000 | - |
| | | |
| Total Expenses | 2,273,929 | 634,627 |

Notes:

1. This Expense Budget contemplates a sale term of November, 5, 2024 through December 31, 2024. The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.
2. Includes Sales Tax.
3. Includes Deferred Compensation and Insurance.
4. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, shall be in addition to and not part of the budgeted legal expenses.

Docusign Envelope ID: 90F1CA5E-C7A3-490E-8353-4320591B7159

# EXHIBIT C

## Distribution Centers

**American Freight**
**Exhibit C**

## Distribution Centers

| Count | Loc # | Concept/ Banner | Name | Address |
|---|---|---|---|---|
| 1 | 4052 | ORDC | New Castle, DE | 700 CENTERPOINT BLVD, New Castle, DE |
| 2 | 4612 | ORDC | Livonia, MI | 12001 SEARS AVE, Livonia, MI |
| 3 | 5236 | ORDC | Reno, NV | 400-450 W PARR BLVD, Reno, NV |
| 4 | 7820 | ORDC | Kansas City, MO | 3630 E FRONT ST, Kansas City, MO |
| 5 | 9240 | ORDC | Tucker, GA | 2301-A MT INDUSTRIAL BLVD, Tucker, GA |
| 6 | 9449 | ORDC | Carrollton, TX | 1215 MARSH LN STE #180, Carrollton, TX |
| 7 | 9889 | ORDC | Houston, TX | 5901 GRIGGS RD STE A, Houston, TX |

# <u>SCHEDULE 2</u>

**Store Closing Procedures**

## Store Closing Procedures[1]

1.      The Store Closing Sales will be conducted during normal business hours or such hours as otherwise permitted by the applicable unexpired lease.

2.      The Store Closing Sales will be conducted in accordance with applicable state and local "Blue Laws," and thus, where such a law is applicable, no Store Closing Sales will be conducted on Sunday unless American Freight has been operating such stores on Sundays.

3.      On "shopping center" property, neither the Debtors nor the Consultant shall distribute handbills, leaflets, or other written materials to customers outside of any Stores' premises, unless permitted by the applicable lease or if distribution is customary in the "shopping center" in which such Store is located; provided that the Debtors and the Consultant may solicit customers in the Stores themselves.  On "shopping center" property, neither the Debtors nor the Consultant shall use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed in writing by the landlord.

4.      The Debtors and the Consultant shall have the right to use and sell the FF&E.  The Debtors and the Consultant may advertise the sale of the FF&E in a manner consistent with these Store Closing Procedures.  The purchasers of any FF&E sold during the Store Closing Sales shall be permitted to remove the FF&E either through the back or alternative shipping areas at any time, or through other areas after Store business hours; provided, however, that the foregoing shall not apply to *de minimis* FF&E sales made whereby the item can be carried out of the Store in a shopping bag.

5.      The Debtors and the Consultant may, but are not required to, advertise all of the Store Closing Sales as "store closing," "sale on everything," "everything must go," "going out of business" or similarly themed sales.  The Debtors and the Consultant may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Store Closing Procedures.

6.      The Debtors and the Consultant shall be permitted to utilize sign walkers, displays, hanging signs, and interior banners in connection with the Store Closing Sales; provided that such sign walkers, displays, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  Neither the Debtors nor the Consultant shall use neon or day-glo on its sign walkers, displays, hanging signs, or interior banners if prohibited by the applicable lease or applicable law.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (a) non-enclosed mall Stores and (b) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such

---

[1]      Capitalized terms used but not defined in these Store Closing Procedures shall have the meanings ascribed to them in the Interim Order to which these Store Closing Procedures are attached as **Schedule 2** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

banners shall be located or hung so as to make clear that the Store Closing Sale is being conducted only at the affected Store, and shall not be wider than the storefront of the Store. In addition, the Debtors shall be permitted to utilize sign walkers in a safe and professional manner. Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.    Neither the Debtors nor the Consultant shall make any alterations to the storefront, roof, or exterior walls of any Stores or shopping centers, or to interior or exterior store lighting, except as authorized by the applicable lease. The hanging of in-Store signage shall not constitute an alteration to a Store.

8.    Affected landlords will have the ability to negotiate with the Debtors, or at the Debtors' direction, the Consultant, any particular modifications to the Store Closing Procedures. The Debtors and the landlord of any Store are authorized to enter into Side Letters without further order of the Court, provided that such agreements do not have a material adverse effect on the Debtors or their estates.

9.    Conspicuous signs will be posted in each of the affected stores to the effect that all sales are "final."

10.   The Debtors will keep store premises and surrounding areas clear and orderly, consistent with past practices.

11.   An unexpired nonresidential real property lease will not be deemed rejected by reason of a Store Closing Sale, Store Closing or the adoption of these Store Closing Procedures.

12.   The rights of landlords against the Debtors for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

13.   If and to the extent that the landlord of any Store contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall provide at least five (5) days' written notice, served by E-mail or overnight delivery, on:

If to the Debtors:

Franchise Group, Inc.
109 Innovation Court, Suite J,
Delaware, Ohio 43015
Attention: Andrew Kaminsky
with copies (which shall not constitute notice) to:

Young Conaway Stargatt & Taylor LLP
Rodney Square
1000 N. King St.
Wilmington, DE 19801
Attention:    Edmon L. Morton, Esq. (emorton@ycst.com)

Matthew B. Lunn, Esq. (mlunn@ycst.com)
Allison S. Mielke, Esq. (amielke@ycst.com)

and

Willkie Farr & Gallagher LLP
787 Seventh Ave.
New York, New York 10019
Attention:      Debra M. Sinclair (dsinclair@willkie.com)
                Betsy L. Feldman (bfeldman@willkie.com)
                Joseph R. Brandt (jbrandt@willkie.com)

If to the Consultant:

c/o Hilco Merchant Resources, LLC
One Northbrook Place, 5 Revere Drive, Suite 206
Northbrook, IL 60062
Fax:  847-849-0859

Attention: T. Kellan Grant (KGrant@hilcoglobal.com)

With a copy to (which shall not constitute notice):

Riemer & Braunstein LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Email: sfox@riemerlaw.com

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by E-mail, or overnight delivery.