## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") hereby file this motion (this "Motion")[2] for entry of an interim order, substantially in

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2]   Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Interim Order or the applicable DIP Loan Document (as defined below), as applicable. In the event there is any

the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"), pursuant to sections 105(a), 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").  In support of this Motion, the Debtors submit the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed at Docket No. 15; and the *Declaration of Christopher Grubb in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Obtain Senior Secured Priming Superpriority Postpetition Financing and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "Grubb Declaration"), filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      As described in the First Day Declaration, the Debtors have faced significant operational and financial challenges in the months leading to the Petition Date.  To continue operating in the ordinary course throughout this chapter 11 process, the Debtors require immediate access to additional financing.  Accordingly, the Debtors now seek authorization to enter into the

---

inconsistency between the meaning of a capitalized term in this Motion, on the one hand, and in the Interim Order or a DIP Loan Document, on the other, the meaning in the Interim Order or DIP Loan Document shall govern.

DIP Facility and continue using Cash Collateral, subject to the terms and conditions of the DIP Orders and the DIP Loan Documents.

2.      Prior to the Petition Date, the Debtors engaged in good faith, arm's-length negotiations with an Ad Hoc Lender Group of holders of certain Prepetition First Lien Lenders (the "Ad Hoc Lender Group") regarding the terms of the DIP Facility, which consists of (i) an aggregate principal amount of up to $250 million of new money first-out delayed-draw term loans, *plus* applicable fees and premiums ("New Money DIP Loans"); and (ii) a second-out roll-up of up to $500 million (the "Roll Up DIP Loans") of the Prepetition First Lien Secured Obligations held by the DIP Lenders (or their respective designated Approved Funds (as defined in the DIP Credit Agreement)).

3.      The DIP Facility and the Debtors' ongoing use of Cash Collateral are critical to provide the liquidity to preserve their businesses, maintain relationships with vendors, suppliers, and franchisees, continue honoring payroll obligations for their nearly 12,000 employees, and satisfy their ongoing working capital and operational needs.  Access to the DIP Facility and Cash Collateral will also facilitate the Debtors' dual-track marketing and chapter 11 plan processes, which, together, will ensure that the Debtors identify a value-maximizing transaction on the most efficient timeline possible under the circumstances.

4.      Importantly, the DIP Facility represents the best postpetition financing option available to the Debtors.  With the assistance of their investment banker, Ducera Partners LLC ("Ducera"), the Debtors actively canvassed the market for alternative financing sources.  Although the Debtors received two proposals, including one from a third-party financing source, neither was as economically attractive as the DIP Facility—and the third-party proposal, in particular, would have required the Debtors to commence these Chapter 11 Cases with a litigation over priming liens

and disputed Cash Collateral usage.  As a result, the Debtors focused their efforts on engaging with the Ad Hoc Lender Group on the DIP Facility, in which all lenders under the Prepetition First Lien Facility are permitted to participate by signing the Restructuring Support Agreement and completing the DIP syndication materials and complying with the related Syndication Procedures (as defined below).

5.      The combination of the DIP Facility and the Debtors' authorized use of Cash Collateral represents the only viable postpetition financing path for the Debtors.  The relief requested by this motion is necessary to preserve the Debtors' operations and maximize the value of the Debtors' estates for the benefit of all creditors.  For the reasons set forth in this Motion, the First Day Declaration, and the Grubb Declaration, entry into the DIP Facility and continued use of Cash Collateral, on the terms set forth in the Interim Order, are necessary to avoid immediate and irreparable harm and are in the best interests of the Debtors, their estates, and all stakeholders.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Local Bankruptcy Rules 4001-2 and 9013-1.

## **BACKGROUND**

9.      On November 3, 2024 (the "Petition Date"), each of the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Debtors are authorized to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

11.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

## **Interim Relief is Necessary**

12.     The Debtors will not be able to meet ordinary course obligations without access to the DIP Facility and Cash Collateral during the interim period following the Petition Date.  Such access is needed to pay, among other things, wages and benefits, taxes and fees, rent, invoices for goods and services, and other obligations that will come due during the interim period. Without access to the DIP Facility and Cash Collateral, the Debtors would face immediate, material disruption to their operations and their most critical business relationships, including with their employees and vendors, to the detriment of all of their stakeholders.  Authority to enter into the DIP Facility and use Cash Collateral during the interim period is necessary to ensure that the Debtors' businesses do not face immediate and irreparable harm at the outset of these cases.

32344769.2

**RELIEF REQUESTED**

13.     By this Motion, the Debtors respectfully request entry of the DIP Orders, granting,

among other things, the following relief, as applicable:

(a)     Authorizing the Debtors to obtain postpetition financing on a superpriority priming senior secured basis in the aggregate principal amount of up to $750,000,000, *plus* applicable fees and premiums (the "DIP Facility"), on the terms and conditions set forth in the Interim Order and that certain *Senior Secured Super-Priority Priming Term Loan Debtor-In-Possession Credit Agreement*, substantially in the form attached to the Interim Order as **Exhibit 1** (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement", and, together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, filed and/or delivered in connection therewith, including the Loan Documents (as defined in the DIP Credit Agreement), the Master Consent (as defined in the DIP Credit Agreement), the Fronting Fee Letter (as defined in the DIP Credit Agreement), and the Syndication Procedures (as defined below) (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, together with the DIP Credit Agreement, collectively, the "DIP Loan Documents")), by and among the Lead Borrower, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, (collectively, the "Borrowers"), each of the direct and indirect subsidiaries of the Borrowers, and each of Freedom VCM Holdings, LLC, Freedom Receivables II, LLC, Freedom VCM Interco Holdings, Inc., and Freedom VCM Receivables, Inc., as secured guarantors solely with respect to the outstanding DIP Obligations in respect of the New Money DIP Loans (each as defined below) (collectively, the "Secured Guarantors", and together with the Borrowers, the "Secured DIP Loan Parties"), and each of Freedom VCM Interco, Inc., and Freedom VCM, Inc., as unsecured guarantors (collectively, together with Secured Guarantors, the "Guarantors", and together with the Borrower, the "DIP Loan Parties"), Wilmington Trust, National Association, as administrative agent and as collateral agent (in such capacities, the "DIP Agent"), and the lenders from time to time party thereto (collectively, the "DIP Lenders", and together with the DIP Agent, the "DIP Secured Parties"), comprised of the following:

(i)     a "new money" first-out delayed draw term loan facility in an aggregate principal amount of up to $250,000,000, *plus* applicable fees and premiums (the "New Money DIP Facility"; the commitments thereunder, the "New Money DIP Commitments", and the term loans extended thereunder, the

"New Money DIP Loans"), pursuant to which (A) $125 million shall be borrowed in a single borrowing on the Effective Date (as defined in the DIP Credit Agreement) (the "Interim New Money DIP Loans"), (B) an aggregate principal amount not to exceed $50 million shall be borrowed in a single borrowing on or after the entry of the Final Order, and (C) an aggregate principal amount not to exceed $75 million may be borrowed in a single borrowing on or after the entry of the Confirmation Order (as defined in the DIP Credit Agreement), and (D) other amounts not to exceed the New Money DIP Commitments, after accounting for the draws under the foregoing subclauses (A)–(C), may be drawn to the extent set forth in the Approved Budget and approved by the Required DIP Lenders in their sole discretion (collectively, together with the Interim New Money DIP Loans, the "DIP Borrowings", and, each, a "DIP Borrowing"), which New Money DIP Loans that are borrowed on the Effective Date shall initially be provided and funded through the Fronting Lender (as defined in the DIP Credit Agreement) in accordance with the terms of the DIP Loan Documents, on such date set forth in the foregoing clause (A) and, thereafter, such New Money DIP Loans and New Money DIP Loan Commitments shall be assigned by the Fronting Lender in accordance with the Syndication Procedures, in the case of each of the foregoing, subject to the terms and conditions set forth in the Interim Order and in the DIP Loan Documents (including, without limitation, the Approved Budget (as defined below) and any conditions precedent to each of the DIP Borrowings set forth therein)); and

(ii)     conversion of up to $500,000,000 of the Prepetition First Lien Secured Obligations (as defined below) (together with accrued and unpaid interest thereon) into a second-out tranche of DIP Loans (such conversion, the "Roll Up", and such converted amounts, the "Roll Up DIP Loans"), pursuant to which, effective immediately upon the completion of the Syndication (as defined in the Syndication Procedures (and after giving effect to all assignments in connection with the Syndication)) of the DIP Facility pursuant to the Syndication Procedures substantially in the form attached to the Interim Order as **Exhibit 2** (the "Syndication Procedures"), on the Syndication Date (as defined in the Syndication Procedures), up to $500,000,000 of the Prepetition First Lien Secured Obligations (together with accrued and unpaid interest thereon) held by the DIP Lenders (or any of their respective designated Approved Funds (as defined in the DIP Credit Agreement)) as of the Syndication Date will be, on the Syndication Date, automatically deemed "rolled up" and converted into the DIP Facility, on a cashless two dollars of Roll Up DIP Loans for every dollar of principal amount of New Money DIP Loans (i.e., $250,000,000),

based upon such Person's (or any of its designated Approved Funds) pro rata share of principal amount of New Money DIP Loans, and shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Roll Up DIP Loans for all purposes hereunder as if originally funded on the Effective Date;

(b)     authorization and approval for the Borrowers to incur, and the Guarantors to jointly and severally, irrevocably and unconditionally, guarantee, on a superpriority basis, the payment in full in cash of all DIP Obligations (as defined below) in accordance with the DIP Orders and the DIP Loan Documents;

(c)     authorization and approval for the Debtors to: (i) execute, deliver, and perform under the DIP Credit Agreement and each of the other DIP Loan Documents, including the Master Consent, the Fronting Fee Letter, the Syndication Procedures and any and all other documents related to the fronting or seasoning of the DIP Term Loans, and to perform all such other and further acts as may be required in connection therewith; (ii) incur all loans, advances, extensions of credit and financial accommodations, and pay all principal, interest, premiums or similar amounts, including, without limitation, the DIP Backstop Premium (as defined in the DIP Credit Agreement), the Commitment Premium (as defined in the DIP Credit Agreement), and the Exit Premium (as defined in the DIP Credit Agreement), fees, including the Fronting Fee (as defined in the DIP Credit Agreement), costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts, including without limitation, all "Secured Obligations" as defined in the DIP Credit Agreement, whether or not such obligations arose before or after the Petition Date (as defined below), whenever the same shall become due, whether at stated maturity, by mandatory prepayment, declaration, acceleration or otherwise, in each case, in accordance with the applicable DIP Loan Documents and the DIP Orders (collectively, the "DIP Obligations"); and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of the DIP Orders, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(d)     authorization and approval for the Debtors to grant to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in the DIP Orders, subject to the Carve Out, and subject to the relative priorities set forth in the DIP Orders;

(e)     authorization and approval for the Debtors to grant to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, allowed superpriority administrative expense claims against each of the Debtors, on a joint and

several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in the DIP Orders;

(f)     authorization and approval for the Debtors to use the proceeds of the DIP Facility, the DIP Collateral and the Prepetition Collateral, including Cash Collateral, in accordance with the terms and conditions set forth in the Interim Order and the DIP Loan Documents, including the Approved Budget, subject to any variances expressly permitted under the DIP Credit Agreement (the "<u>Permitted Variances</u>");

(g)     authorization and approval of the form of adequate protection, as and to the extent set forth in the Interim Order, to the Prepetition Secured Parties to protect against any Diminution in Value of their respective Prepetition Liens in the Prepetition Collateral (including Cash Collateral);

(h)     modification or vacatur of the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Interim Order and the DIP Loan Documents, as set forth in the DIP Orders, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, and providing for the immediate effectiveness of the Interim Order;

(i)     approval of certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, (i) the DIP Secured Parties, the DIP Loan Documents, the DIP Liens, and the DIP Obligations, (ii) subject to the terms of the DIP Orders, the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Liens and the Prepetition Secured Obligations;

(j)     approval of the Debtors' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties, and the Prepetition Collateral as to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth in the DIP Orders;

(k)     approval of (i) the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Secured Parties, and (ii) the Debtors' waiver of the equitable doctrine of "marshaling" and the Debtors' waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, with respect to the Prepetition Collateral as to the Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties, in each case, upon the terms set forth in the DIP Orders;

(l)     scheduling a final hearing (the "<u>Final Hearing</u>") on the Motion to consider entry of the Final Order and approving the form of notice with respect to such Final Hearing, which order shall be in form and substance and on terms

and conditions acceptable in all respects to the Required DIP Lenders and the DIP Agent; and

(m)   granting related relief.

## SUMMARY OF DIP CREDIT AGREEMENT AND USE OF CASH COLLATERAL

14.   In accordance with Bankruptcy Rules 4001(b)(1) and 4001(c)(1), and Local Bankruptcy Rule 4001-2(a)(i) and (ii), a summary of certain key terms of the proposed DIP Facility and the proposed DIP Orders is set forth below (the "Rule 4001 Summary"). The Rule 4001 Summary is qualified in its entirety by reference to the applicable provisions of the proposed DIP Orders and the DIP Credit Agreement, and the proposed DIP Orders and the DIP Credit Agreement will control in the event of any inconsistency between this Motion, the Rule 4001 Summary and the proposed DIP Orders and the DIP Credit Agreement, as applicable. Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the DIP Credit Agreement.

| Summary of Material Terms | |
|---|---|
| **Borrower(s)**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Franchise Group, Inc., a Delaware corporation (the "Lead Borrower"), Franchise Group Newco PSP, LLC, a Delaware limited liability company ("FG Newco PSP"), Valor Acquisition, LLC, a Delaware limited liability company ("Valor"), Franchise Group Newco Intermediate AF, LLC, a Delaware limited liability company ("FG Newco Intermediate AF", and together with the Lead Borrower, FG Newco PSP and Valor, individually, a "Borrower" and, collectively, the "Borrowers"), each in their respective capacities as debtors and debtors-in-possession.<br><br>See Preamble of the DIP Credit Agreement. |
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each direct or indirect subsidiary of any of the Borrowers, as secured obligors, and each of Freedom VCM Holdings, LLC,  Freedom Receivables II, LLC, Freedom VCM Interco Holdings, Inc., and Freedom VCM Receivables, Inc., as secured obligors solely with respect to the outstanding DIP Obligations of the Tranche A DIP Loans (each as defined below) (collectively, together with the Borrowers, the "Secured Loan Parties"), and each of Freedom VCM, Inc., and Freedom VCM Interco, Inc., *as unsecured obligors* unless, with respect to Freedom VCM, Inc., and Freedom VCM Interco, Inc., the requisite holders of Holdco Claims consent to such parties being secured obligors (collectively, together with the Secured Loan Parties, the "Loan Parties"), each in their respective capacities as debtors and debtors-in-possession.<br><br>See Section 1.01 of the DIP Credit Agreement. |

| Summary of Material Terms | |
|---|---|
| **Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Jefferies Capital Services, LLC, as Fronting Lender, the Persons listed on Schedule 2.01 of the DIP Credit Agreement and any other person that becomes a lender to the DIP Credit Agreement pursuant to an assignment and assumption agreement.<br><br>See Preamble and Schedule 2.01 of the DIP Credit Agreement. |
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Trust, National Association, as administrative agent and as collateral agent<br><br>See Preamble of the DIP Credit Agreement. |
| **DIP Facility and Borrowing Limits**<br><br>Bankruptcy Rule 4001(c)(1)(B) | (a) $250,000,000 of "new money" first-out delayed draw term loans, *plus* applicable fees and premiums, and (b) a $500,000,000 second-out roll-up facility pursuant to which a portion of Prepetition First Lien Secured Obligations (as defined below) will be deemed "rolled up" as term loans and shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, second-out roll-up term loans.<br><br>See Preamble of DIP Credit Agreement. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The closing under the DIP Facility shall be subject to customary conditions to closing for facilities of this type.<br><br>See § 4.01 of the DIP Credit Agreement. |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Adjusted Term SOFR (subject to a floor of 1.0%) + 10.00% or the Alternative Base Rate + 9.00% with respect to the New Money Term Loans<br><br>Adjusted Term SOFR (subject to a floor of 1.0%) + 4.75% or the Alternative Base Rate + 3.75% with respect to the Roll Up DIP Loans<br><br>See § 1.01 of the DIP Credit Agreement, definition of "Applicable Rate." and § 2.13 of the DIP Credit Agreement. |
| **Maturity Date; Duration for Use of DIP Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B) | The DIP Facility shall mature on the earliest to occur of: (i) one hundred and eighty (180) days after the Closing Date (as may be extended for up to three (3) consecutive 30-day periods with the consent of the Required Supermajority Lenders); (ii) 11:59 p.m. New York City Time on the date that is five (5) days after the Petition Date (or if such fifth day is not a Business Day, the first succeeding Business Day thereafter) if the Interim DIP Order, in form and substance reasonably acceptable in all respects to the Required DIP Lenders, has not been entered by the Bankruptcy Court prior to such date and time; (iii) 11:59 p.m. New York City Time on the date that is forty-five (45) days after the Petition Date (or if such forty-fifth day is not a Business Day, the first succeeding Business Day thereafter) if the Final DIP Order, in form and substance reasonably acceptable in all respects to the Required DIP Lenders, has not been entered by the Bankruptcy Court prior to such date and time; (iv) the effective date of a chapter 11 plan of any Loan Party; (v) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code; (vi) consummation of a Sale Transaction (other than a Sale Transaction pursuant to a Sufficient Bid or is otherwise consented to by the Required Supermajority Lenders in their sole discretion), (vii) termination of the Restructuring Support Agreement and (viii) the acceleration of the DIP Loans and the termination |

| Summary of Material Terms | |
|---|---|
| | of the commitments under the DIP Facility in accordance with the terms of the DIP Loan Documents. <br><br> See § 1.01 of the DIP Credit Agreement, definition of "Maturity Date." |
| **Parties with an Interest in Cash Collateral** <br><br> Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties. |
| **Purposes for Use of DIP Proceeds and Cash Collateral** <br><br> Bankruptcy Rule 4001(b)(1)(B)(ii) | Solely in accordance with and subject to the DIP Credit Agreement the proceeds of the DIP Facility may be used only for the following purposes: (i) to make adequate protection payments as required in the DIP Loan Documents and the DIP Orders, (ii) to pay the administrative costs of the Chapter 11 Cases (including professional fees and expenses), (iii) to fund the Carve Out and to make payments under the Carve Out in accordance with the terms of the DIP Orders) and (iv) for general corporate purposes, in each case, in accordance with and subject to the DIP Loan Documents and the DIP Orders (including the Approved Budget, subject to Permitted Variances). <br><br> See Interim Order ¶ H(d) and Section 3.16 of the DIP Credit Agreement. |
| **Budget** <br><br> Bankruptcy Rule 4001(b)(1)(B)(ii) | Use of Cash Collateral and proceeds of the DIP Facility are subject to consolidated 13- week cash flow forecast statements of the Debtors set forth on **Exhibit 3** attached to the Interim Order (the "Initial Budget", that shall be updated by the Debtors and approved by Required DIP Lenders from time to time in accordance with the terms of the Interim Order and the DIP Loan Documents, the "Approved Budget"). <br><br> See Interim Order ¶ H(j) and Section 5.16 of the DIP Credit Agreement. |
| **Fees** <br><br> Bankruptcy Rule 4001(c)(1)(B) | 2.5% Commitment Premium on the New Money Commitments (due and payable in kind on the Effective Date and included in the principal amounts of New Money Term Loans on such date). <br><br> 2.5% Exit Premium on all Loans under the DIP Credit Agreement (due and payable in kind in the form of New Money Term Loans upon repayment in full or immediately prior to the Maturity Date). <br><br> 0.2% Fronting Fee on the New Money Term Loans funded by the Fronting Lender on the Effective Date, to be paid to the Fronting Lender in accordance with the terms of the Fronting Fee Letter. <br><br> DIP Backstop Premium equal to 10% of the New Money Commitments  due and payable in kind on the Effective Date and included in the principal amounts of the New Money Term Loans on such date. <br><br> See § 2.12 of the DIP Credit Agreement. |
| **Adequate Protection** <br><br> Bankruptcy Rule 4001(b)(1)(B)(ii) | *Prepetition ABL Secured Parties:* <br><br> The Prepetition ABL Secured Parties, as applicable, shall be granted the following adequate protection, subject in all cases to the Carve Out: |

| Summary of Material Terms |
|---|

Retained Priority on ABL Priority Collateral: the DIP Liens will be junior to the Prepetition ABL Liens in ABL Priority Collateral.

Adequate Protection Claims: The Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, shall be granted, to the extent and in the amount of any Diminution in Value of the Prepetition ABL Liens in the Prepetition ABL Collateral (including Cash Collateral), superpriority administrative expense claims subject to the relative priorities set forth in **Exhibit 4** attached to the Interim Order, and senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

Adequate Protection Liens: The Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, shall be granted, to the extent and in the amount of any Diminution in Value of the Prepetition ABL Liens in the Prepetition ABL Collateral, valid, binding, enforceable and perfected post-petition liens and security interests in all DIP Collateral subject to the relative priorities set forth in **Exhibit 4** attached to the Interim Order.

Postpetition Interest: The Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive all interest due (at the non-default rate) under the Prepetition ABL Credit Agreement that accrued but was unpaid as of the Petition Date, payable in cash, and thereafter, all interest due (at the non-default rate) under the Prepetition ABL Credit Agreement, as and when due thereunder, payable in cash.

Fees and Expenses: The Debtors shall pay the out-of-pocket costs and expenses of the Prepetition ABL Agent, whether arising prior to or after the Petition Date, including, without limitation, the reasonable and documented fees and expenses of (A) Latham & Watkins LLP, as counsel to the Prepetition ABL Agent, (B) M-III Partners, LP, as financial advisor to the Prepetition ABL Agent, (C) one local counsel to the Prepetition ABL Agent, and (D) Choate Hall & Stewart LLP as counsel for certain ABL Lenders.

Information Rights:  The Prepetition ABL Agent (and the ABL Advisors) shall receive all reports, documents and other information required to be delivered to the DIP Secured Parties under the DIP Loan Documents and the Interim Order substantially contemporaneously with the delivery of such information to the DIP Secured Parties.

Adequate Protection Account: If the Borrower delivers a weekly Borrowing Base Certificate to the Prepetition ABL Agent that provides a Borrowing Base that is less than the sum of (a) the Prepetition ABL Obligations plus (b) $32,000,000 (an "Availability Event," and the amount of such shortfall, the "Borrowing Base Shortfall"), the Borrower shall, by the end of the second Business Day thereafter, deposit cash in an amount equal to the Borrowing Base Shortfall into a controlled segregated reserve account maintained by the Prepetition ABL Agent (the "Adequate Protection Account"), with all funds held in the Adequate Protection Account deemed ABL Priority Collateral and deemed not DIP Collateral, provided that the Borrowing Base shall be adjusted on a dollar-for-dollar basis by the amount of cash then held in the Adequate Protection Account and shall be reflected in Borrowing Base Certificates, provided further that, for the avoidance of doubt, the DIP Liens shall extend to the Debtors' reversionary interest in the Adequate Protection Account. The Borrower may withdraw cash from the Adequate Protection Account at any time

| Summary of Material Terms |
| --- |

so long as such withdrawal, delivery of the most recent Borrowing Base Certificate would not have resulted in an Availability Event.

***Prepetition First Lien Secured Parties:***

Adequate Protection Claims:  The Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, shall be granted, to the extent and in the amount of any Diminution in Value of the Prepetition First Lien Liens in the Prepetition First Lien Collateral (including Cash Collateral), superpriority administrative expense claims subject to the relative priorities set forth in **Exhibit 4** attached to the Interim Order.

Adequate Protection Liens: The Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, shall be granted, to the extent and in the amount of any Diminution in Value of the Prepetition First Lien Liens in the Prepetition First Lien Collateral, valid, binding, enforceable and perfected post-petition liens and security interests in all DIP subject to the relative priorities set forth in **Exhibit 4** attached to the Interim Order.

Postpetition Interest: The Prepetition First Lien Agent, on behalf of the Prepetition First Lien Lenders, shall receive (x) promptly upon the entry of the Interim Order, all interest due (at the non-default rate) under the Prepetition First Lien Credit Agreement that accrued but was unpaid as of the Petition Date, if any, payable in cash, and (y) thereafter, all interest due (at the non-default rate) under the Prepetition First Lien Credit Agreement, as and when due thereunder, payable in cash.

Fees and Expenses: The Debtors shall pay (A) the out-of-pocket costs and expenses of the Prepetition First Lien Agent, including, without limitation, the reasonable and documented fees and expenses of (x) Seward & Kissel LLP, as counsel to the Prepetition First Lien Agent, and (y) a single firm as local counsel to the Prepetition First Lien Agent (collectively, the "First Lien Agent Fees and Expenses"), and (B) the out-of-pocket fees and expenses of the members of the Ad Hoc Lender Group, including, without limitation, the reasonable and documented fees and expenses of the Lender Advisors (collectively, the "Ad Hoc Lender Group Fees and Expenses", and together with the First Lien Agent Fees and Expenses, the "First Lien Fees and Expenses").

Information Rights:  The Debtors shall provide the Prepetition First Lien Agent and the Ad Hoc Lender Group (and their respective advisors) with all reports, documents and other information required to be delivered to the DIP Secured Parties under the DIP Loan Documents and the Interim Order substantially contemporaneously with the delivery of such information to the DIP Secured Parties.

***Prepetition Second Lien Secured Parties:***

Adequate Protection Claims: The Prepetition Second Lien Agent, for the benefit of itself and the Prepetition Second Lien Lenders, shall be granted, to the extent and in the amount of any Diminution in Value of the Prepetition Second Lien Liens in the Prepetition Second Lien Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors in each of the Chapter 11 Cases and any Successor

| Summary of Material Terms | |
|---|---|
| | Cases (the "Second Lien Adequate Protection Claims"), subject to the relative priorities set forth in **Exhibit 4** attached to the Interim Order.<br><br>Adequate Protection Liens:  The Prepetition Second Lien Agent, for the benefit of itself and the Prepetition Second Lien Lenders, shall be granted, to the extent and in the amount of any Diminution in Value of the Prepetition Second Lien Liens in the Prepetition Second Lien Collateral, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "Second Lien Adequate Protection Liens"), which Second Lien Adequate Protection Liens shall be subject to the relative priorities set forth in **Exhibit 4** attached to the Interim Order.<br><br>***Prepetition Second Lien Sidecar Secured Parties:***<br><br>Adequate Protection Claims: The Prepetition Second Lien Sidecar Agent, for the benefit of itself and the Prepetition Second Lien Sidecar Lenders, shall be granted, to the extent and in the amount of any Diminution in Value of the Prepetition Second Lien Sidecar Liens in the Prepetition Second Lien Sidecar Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases subject to the relative priorities set forth in **Exhibit 4** attached to the Interim Order.<br><br>Adequate Protection Liens:  The Prepetition Second Lien Sidecar Agent, for the benefit of itself and the Prepetition Second Lien Sidecar Lenders, shall be granted, to the extent and in the amount of any Diminution in Value of the Prepetition Second Lien Sidecar Liens in the Prepetition Second Lien Sidecar Collateral, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "Second Lien Sidecar Adequate Protection Liens", and together with the ABL Adequate Protection Liens, the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens, the "Adequate Protection Liens"), subject to the relative priorities set forth in **Exhibit 4** attached to the Interim Order.<br><br>See Interim Order ¶ 10. |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall achieve the following transaction milestones (the "Milestones"), each of which shall be extended automatically to the extent the corresponding milestones set forth in the RSA are extended in accordance with the terms thereof and otherwise at any time with the written approval of the Required DIP Lenders:<br><br>a)  no later than November 4, 2024, the Loan Parties shall have delivered substantially complete drafts of the First Day Pleadings, the DIP Loan Documents (including this Motion and the Interim Order), the Bidding Procedures Motion, the proposed Bidding Procedures Order, the Plan, the Disclosure Statement, and the Solicitation Materials to the Ad Hoc Lender Group Advisors;<br><br>b)  no later than November 4, 2024, the Loan Parties shall have delivered a confidential information memorandum in connection with the Sale Process to the Ad Hoc Lender Group Advisors; |

| Summary of Material Terms |
|---|

c)   no later than November 4, 2024, the Loan Parties shall have engaged the Liquidator pursuant to that certain Letter Agreement Governing Inventory Disposition;

d)   no later than November 4, 2024, the Petition Date shall have occurred;

e)   no later than one (1) day after the Petition Date, the Debtors shall have filed with the Court the First Day Pleadings, this Motion (including the Interim Order), and the Bidding Procedures Motion (including the proposed Bidding Procedures Order);

f)   no later than three (3) days after the Petition Date, the Debtors shall have filed with the Court the Plan, the Disclosure Statement, and the Solicitation Materials;

g)   no later than five (5) days after the Petition Date, the Court shall have entered the Interim Order;

h)   no later than five (5) days after the Petition Date, the Court shall have entered an interim order approving procedures for the Store-Closing and Liquidation Sales at American Freight;

i)   no later than twenty-eight (28) days after the Petition Date, the Court shall have entered the Bidding Procedures Order, which shall require, among other things, the submission of any (i) non-binding indications of interest on or before forty (40) days after the Petition Date and (ii) Qualified Bids (as defined in the Bidding Procedures) by no later than eighty (80) days after the Petition Date (the "Bid Deadline"); provided that the Sale Process shall not be terminated prior to the expiration of the Bid Deadline;

j)   no later than forty-five (45) days after the Petition Date, the Court shall have entered the Final Order;

k)   no later than forty-five (45) days after the Petition Date, the Court shall have approved the Disclosure Statement and the Solicitation Materials;

l)   to the extent more than one Sufficient Bid is received by the Bid Deadline, by no later than eighty-five (85) days after the Petition Date, the Debtors shall commence an auction for the Debtors' assets in accordance with the terms of the Bidding Procedures Order; provided that if there is only one Sufficient Bid received by the Bid Deadline, then the Sale Toggle Event shall occur;

m)   to the extent more than one Sufficient Bid is received by the Bid Deadline, no later than ninety (90) days after the Petition Date, the Court shall have entered the Sale Order; provided that if there is not more than one Sufficient Bid received by the Bid Deadline, then the Court shall have entered the Sale Order no later than eighty-seven (87) days after the Petition Date;

n)   no later than ninety (90) days after the Petition Date, the Court shall have entered the Confirmation Order; and

o)   no later than the earlier of (i) ten (10) days after entry of the Confirmation Order and/or the Sale Order, if applicable (ii) one hundred twenty (120) days after the Petition Date, the Plan Effective Date shall have occurred and all the

| Summary of Material Terms | |
|---|---|
| | Restructuring Transactions (irrespective of whether the Restructuring Transactions occur pursuant to the Plan Transaction or the Sale Transaction) shall have been implemented and consummated. <br><br> See DIP Credit Agreement § 6.17 and Schedule 6.17. |
| **Liens and Priorities** <br><br> Bankruptcy Rule 4001(c)(l)(B)(i) | First Priority Liens on Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to Permitted Prior Liens, including, for the avoidance of doubt, subject to entry of the Final Order, Avoidance Action Proceeds (collectively, the "Unencumbered Property"). <br><br> Priming DIP Liens and Junior DIP Liens. Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral, which DIP Liens (A) shall be subject and subordinate to (1) Permitted Prior Liens, and (2) solely with respect to ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) and DIP Collateral of a type that would otherwise constitute ABL Priority Collateral, the ABL Adequate Protection Liens (as defined below) and the Prepetition ABL Liens, (B) shall be subject to the priorities set forth in **Exhibit 4** attached to the Interim Order, and (C) shall be senior to any and all other liens and security interests in the DIP Collateral, including, without limitation, all liens and security interests in the Term Loan Priority Collateral or any DIP Collateral that would otherwise constitute Term Loan Priority Collateral (including, without limitation, any ABL Adequate Protection Liens, Prepetition ABL Liens, First Lien Adequate Protection Liens, Prepetition First Lien Liens, Second Lien Adequate Protection Liens, Second Lien Sidecar Adequate Protection Liens, Prepetition Second Liens or Prepetition Second Lien Sidecar Liens in Term Loan Priority Collateral), provided, however, for the avoidance of doubt, the foregoing priming shall not apply to Freedom VCM, Inc., and Freedom VCM Interco, Inc., as unsecured obligors under the DIP Facility. <br><br> DIP Liens Senior to Other Liens. Except to the extent expressly permitted under the DIP Orders, the DIP Liens and the DIP Superpriority Claims shall not be made subject or subordinate to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien, security interest or claim granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided and preserved for the benefit of the Secured DIP Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Secured DIP Loan Parties or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof; provided, however, for the avoidance of doubt, the foregoing provisions shall not apply to Freedom VCM, Inc., and Freedom VCM Interco, Inc., as unsecured obligors under the DIP Facility. <br><br> See Interim Order ¶ 6(c). |
| **Carve Out** | An amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the |

| Summary of Material Terms | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below), (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below), (iii) to the extent allowed by this Court at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all accrued and unpaid fees and expenses (in each case, including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors to the DIP Loan Parties when and if earned pursuant to the terms and conditions of an engagement letter approved by this Court in these Chapter 11 Cases) (collectively, the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and the Official Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>", and together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first day following the date of delivery by the DIP Agent, at the direction of the Required DIP Lenders, of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (and in the case of the Committee Professionals, not to exceed the aggregate amounts set forth for the Committee Professionals in the Approved Budget), and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $4,000,000 incurred after the first day following the date of delivery by the DIP Agent, at the direction of applicable the Required DIP Lenders, of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>"). <br><br> <u>See</u> Interim Order ¶ 23(a). |
| **Events of Default** <br><br> Bankruptcy Rule 4001(c)(I)(B) | The DIP Credit Agreement and Interim Order contain "Events of Default" that are usual and customary including, without limitation, failure to pay any principal or interest when due, the Loan Parties' failure to satisfy any of the Milestones, subject to any grace period applicable thereto (unless waived by the DIP Agent (at the direction of the Required DIP Lenders) and the Required DIP Lenders in accordance with the terms of the DIP Credit Agreement). <br><br> <u>See</u> DIP Credit Agreement Section 7.01. |
| **Waiver/Modification of the Automatic Stay** <br><br> Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Loan Documents. <br><br> <u>See</u> Interim Order ¶ 15. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** <br><br> Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests in and liens on collateral securing the obligations under the DIP Facility shall be valid and perfected upon entry of the Interim Order. <br><br> <u>See</u> Interim Order ¶ 6(a). |

| Summary of Material Terms | |
|---|---|
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the DIP Secured Parties (together with their related parties and representatives, in each case subject to the conditions and limitations set forth in the DIP Credit Agreement).<br><br>See Section 9.03(b) of the DIP Credit Agreement |
| **Cross-Collateralization**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(A) | See Liens and Priorities above. |
| **Debtors' Stipulations**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(B) | Pursuant to the Interim Order, the Debtors for themselves, their estates and all representatives of such estates, make the stipulations set forth in Paragraphs E and F of the Interim Order.<br><br>See Interim Order ¶¶ E, F. |
| **506(c) Waiver**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(C) | Subject to entry of the Final Order, the Debtors have agreed to waive the right to surcharge the DIP Collateral pursuant to section 506(c) with respect to the DIP Secured Parties, Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties.<br><br>See Interim Order ¶¶ H(g), 26. |
| **Liens on Chapter 5 Causes of Action**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(D) | Subject to entry of the Final Order, the DIP Secured Parties and Prepetition Secured Parties shall be granted valid, perfected, enforceable and non-avoidable liens on, and security interests in Avoidance Action Proceeds, subject to the relative priorities set forth in **Exhibit 4** attached to the Interim Order.<br><br>See Interim Order ¶ 6(b). |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(E) | Up to $500,000,000 of the Prepetition First Lien Secured Obligations (together with accrued and unpaid interest thereon) shall be converted to Roll Up DIP Loans.<br><br>See Interim Order ¶ 2(c). |
| **Disparate Treatment of Professionals Under Carve Out**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(F) | Allowed Professional Fees of Professional Persons shall share in in an aggregate amount not to exceed $4,000,000 incurred after the first day following the date of delivery by the DIP Agent, at the direction of applicable the Required DIP Lenders, of the Carve Out Trigger Notice, to the extent allowed at any time.<br><br>See Interim Order ¶ 23(a). |
| **Non-Consensual Priming Liens**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(G) | As of the filing of this Motion, the Prepetition Second Lien Secured Parties and the Prepetition Second Lien Sidecar Secured Parties have not consented to their applicable Prepetition Liens being primed. |

| Summary of Material Terms | |
|---|---|
| **Section 552(b)(1) Waiver**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(H) | Subject to entry of the Final Order, the Debtors have agreed that the "equities of the case" exception in section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Secured Parties of Prepetition ABL Secured Parties.<br><br>See Interim Order ¶ 27. |
| **Prepayment Penalties**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(I) | The DIP Credit Agreement does not require the payment of prepayment penalties (except with respect to the Exit Premium described in Section 2.12(c) of the DIP Credit Agreement).<br><br>See DIP Credit Agreement Sections 2.11(a), 2.12(e). |
| **Payment of Lender Expenses**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(K) | The Interim Order requires the reasonable and documented fees and expenses of the law firms, financial advisors and other professionals of the DIP Secured Parties, Prepetition First Lien Secured Parties and Prepetition ABL Secured Parties as described in the Interim Order.<br><br>See Interim Order ¶¶ 2(e), 10. |
| **Limitations on Investigations of Liens**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(L) | The Interim Order prohibits the use of the financing to investigate the liens of the Prepetition Secured Parties, except for up to $50,000 of the DIP Collateral set aside for an Official Committee to investigate liens prior to the Challenge Deadline.<br><br>See Interim Order ¶ 25. |
| **Authorization of DIP Facility and DIP Loan Documents**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(R) | The Interim Order immediately approves the terms and conditions of the DIP Facility.<br><br>See Interim Order ¶ 2(a). |
| **Notice of an Event of Default**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(S) | The Interim Order provides for five (5) days' written notice of an Event of Default.<br><br>See Interim Order ¶ 21(b). |
| **Limitations on Arguments in the Event of a Default**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(T) | N/A. |
| **Marshalling Waiver**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(X) | The Interim Order provides that, subject to the entry of the Final Order, neither the DIP Secured Parties, the Prepetition First Lien Secured Parties nor the Prepetition ABL Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine (other than with respect to Freedom VCM Holdings, LLC).<br><br>See Interim Order ¶ 27. |

| Summary of Material Terms | |
|---|---|
| | The Interim Order provides that, with respect to Debtor Freedom VCM Holdings, LLC, the DIP Obligations shall be repaid, _first,_ from DIP Collateral comprised of Unencumbered Property of all Secured DIP Loan Parties (other than Debtor Freedom VCM Holdings, LLC), <u>second</u>, from all other DIP Collateral of all Secured DIP Loan Parties (other than Debtor Freedom VCM Holdings, LLC), and <u>third</u>, from assets at Debtor Freedom VCM Holdings, LLC.  Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Debtor Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions (as defined in the Restructuring Supporting Agreement)) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Debtor Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (as defined in the Restructuring Supporting Agreement) (the "<u>Freedom Allocated Fees and Expenses</u>").  Debtor Freedom VCM Holdings, LLC shall be required to use any cash (including Cash Collateral) it has on hand to pay its ratable share of such Freedom Allocated Fees and Expenses, if any; <u>provided</u>, that, for the avoidance of doubt, Debtor Freedom VCM Holdings, LLC, shall not otherwise use any of its cash (including Cash Collateral) until an agreement is reached on the Freedom Allocated Fees and Expenses; <u>provided</u>, <u>further</u>, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Obligations.<br><br><u>See</u> Interim Order ¶ 33. |
| **DIP Liens on Unencumbered Assets**<br><br>Local Bankruptcy Rule 4001- 1(a)(1)(G) | DIP Liens shall be valid, binding, continuing, enforceable, non- avoidable, fully and automatically perfected _pari passu_ first priority liens and security interests in all Unencumbered Property.<br><br><u>See</u> Interim Order ¶ 6(c)(i). |

15.     The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating the restructuring transactions contemplated by the Restructuring Support Agreement. In light of the foregoing, the terms of the DIP Facility are appropriate under the facts and circumstances of these Chapter 11 Cases and should be approved.

## **DEBTORS' PREPETITION CAPITAL STRUCTURE**

16.     As of the Petition Date, the Debtors have funded debt consisting of the following:

| Borrower Debtor Entity | Loan Facility Description | Approximate Principal Amount Outstanding as of the Petition Date |
|---|---|---|
| Franchise Group, Inc. | Prepetition ABL Facility | $248.7 million |

| | First Lien Term Loan Facility | $1.097 billion |
| | Second Lien Term Loan Facility | $125 million |
| | Pari Passu Second Lien Sidecar Term Loan Facility | $0 |
| Freedom VCM, Inc. | Secured HoldCo Term Loan Facility | $514.7 million |

The Debtors have no unsecured funded debt.  Each outstanding debt issuance is described below.

17.    ***Prepetition ABL Facility***. Certain of the Debtors are parties to that certain *Third Amended and Restated Loan and Security Agreement*, dated as of March 10, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition ABL Credit Agreement," and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents[3] and the Prepetition Intercreditor Agreements (as defined below), collectively, the "Prepetition ABL Loan Documents"), by and among Franchise Group, Inc., Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the Borrowers, the guarantors party thereto (the "Prepetition ABL Guarantors," and together with the Borrower, the "Prepetition ABL Loan Parties"), JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "Prepetition ABL Agent"), and the lenders party thereto from time to time (collectively, the "Prepetition ABL Lenders," and together with the Prepetition ABL Agent, the "Prepetition ABL Secured Parties").  Pursuant to the Prepetition ABL Credit Agreement, the Prepetition ABL Lenders provided a revolving credit facility (the "Prepetition ABL Facility") to the

---

[3]    "Loan Documents" means the Prepetition ABL Agreement, the revolving letters of credit, the Prepetition Intercreditor Agreements, the security documents, the Prepetition ABL Agreement Guaranty and any supplements thereto, the Prepetition ABL Pledge Agreement and any supplements thereto, and any promissory note issued.

Prepetition ABL Loan Parties. Pursuant to the Prepetition ABL Loan Documents, each of the Prepetition ABL Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all principal amounts outstanding under the Prepetition ABL Facility, *plus* accrued but unpaid interest (including default interest) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations," and all other amounts that may be due or owing under the Prepetition ABL Loan Documents (collectively, the "Prepetition ABL Secured Obligations").

18.   Pursuant to the Prepetition ABL Loan Documents, each of the Prepetition ABL Loan Parties granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, valid and properly perfected continuing liens and security interests in (the "Prepetition ABL Liens") substantially all of the assets of the Prepetition ABL Loan Parties, including, without limitation, all "Collateral" (collectively, the "Prepetition ABL Collateral").

19.   ***Prepetition First Lien Term Loan***. Certain of the Debtors are parties to that certain *First Lien Credit Agreement*, dated as of March 10, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, "Prepetition First Lien Credit Agreement," and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition First Lien Credit Agreement) and the Prepetition Intercreditor Agreements (as defined below), collectively, the "Prepetition First Lien Loan Documents"), among Franchise Group, Inc., Franchise Group Newco PSP, LLC, Valor

23

Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the Borrowers, the guarantors party thereto (the "Prepetition First Lien Guarantors", and together with the Borrowers, the "Prepetition First Lien Loan Parties"), and Wilmington Trust, National Association, as collateral agent and administrative agent (in such capacities, the "Prepetition First Lien Agent"), and the lenders party thereto from time to time (collectively, the "Prepetition First Lien Lenders," and together with the Prepetition First Lien Agent, the "Prepetition First Lien Secured Parties"). Pursuant to the Prepetition First Lien Credit Agreement, the Prepetition First Lien Lenders provided a term credit facility (the "Prepetition First Lien Facility") to the Prepetition First Lien Loan Parties.  Pursuant to the Prepetition First Lien Loan Documents, each of the Prepetition First Lien Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all principal amounts outstanding under the Prepetition First Lien Facility, *plus* accrued but unpaid interest (including default interest) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Loan Document Obligations," "Secured Obligations," and all other amounts that may be due or owing under the Prepetition First Lien Loan Documents (collectively, the "Prepetition First Lien Secured Obligations").

20.     Pursuant to the Prepetition First Lien Loan Documents, each of the Prepetition First Lien Loan Parties granted to the Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, valid and properly perfected continuing liens and security interests in (the "Prepetition First Lien Liens") substantially all of the assets of the Prepetition First Lien Loan Parties, including, without limitation, all "Collateral" (collectively, the "Prepetition First Lien Collateral").

21.     ***Prepetition Second Lien Term Loan***. Certain of the Debtors are parties to that certain *Second Lien Credit Agreement*, dated as of March 10, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, "Prepetition Second Lien Credit Agreement," and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition Second Lien Credit Agreement) and the Prepetition Intercreditor Agreement (as defined below), collectively, the "Prepetition Second Lien Loan Documents"), among Franchise Group, Inc., Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the Borrowers, the guarantors party thereto (the "Prepetition Second Lien Loan Guarantors," and together with the Borrowers, the "Prepetition Second Lien Loan Parties"), and Alter Domus (US) LLC, as administrative agent (in such capacity, the "Prepetition Second Lien Agent"), and the lenders party thereto from time to time (collectively, the "Prepetition Second Lien Lenders," and together with the Prepetition Second Lien Agent, the "Prepetition Second Lien Secured Parties").  Pursuant to the Prepetition Second Lien Credit Agreement,  the Prepetition Second Lien Lenders provided a term credit facility (the "Prepetition Second Lien Facility") to the Prepetition Second Lien Loan Parties.  Pursuant to the Prepetition Second Lien Loan Documents, each of the Prepetition Second Lien Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all principal amounts outstanding under the Prepetition Second Lien Facility, *plus* accrued but unpaid interest (including default interest) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or

otherwise), including all "Loan Document Obligations," and all other amounts that may be due or owing under the Prepetition Second Lien Loan Documents (collectively, the "Prepetition Second Lien Secured Obligations").

22.    Pursuant to the Prepetition Second Lien Loan Documents, each of the Prepetition Second Lien Loan Parties granted to the Prepetition Second Lien Agent, for the benefit of itself and the Prepetition Second Lien Lenders, valid and properly perfected continuing liens and security interests in (the "Prepetition Second Lien Liens") substantially all of the assets of the Prepetition Second Lien Loan Parties, including, without limitation, all "Collateral" (collectively, the "Prepetition Second Lien Collateral").

23.    ***Prepetition Second Lien Sidecar Term Loan***. Certain of the Debtors are parties to that certain *Sidecar Pari Passu Second Lien Credit Agreement*, dated as of August 21, 2023 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, "Prepetition Second Lien Sidecar Credit Agreement," and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition Second Lien Sidecar Credit Agreement) and the Prepetition Intercreditor Agreement (as defined below), collectively, the "Prepetition Second Lien Sidecar Loan Documents"), among Franchise Group, Inc., Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the Borrowers, the guarantors party thereto (the "Prepetition Second Lien Sidecar Loan Guarantors," and together with the Borrowers, the "Prepetition Second Lien Sidecar Loan Parties"), and Alter Domus (US) LLC, as administrative agent (in such capacity, the "Prepetition Second Lien Sidecar Agent"), and the lenders party thereto

from time to time (collectively, the "Prepetition Second Lien Sidecar Lenders," and together with the Prepetition Second Lien Sidecar Agent, the "Prepetition Second Lien Sidecar Secured Parties").  Under the Prepetition Second Lien Sidecar Credit Agreement, the Prepetition Second Lien Sidecar Lenders provided a term credit facility (the "Prepetition Second Lien Sidecar Facility") to the Prepetition Second Lien Sidecar Loan Parties.  Pursuant to the Prepetition Second Lien Sidecar Loan Documents, each of the Prepetition Second Lien Sidecar Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all of the principal amounts outstanding under the Prepetition Second Lien Sidecar Facility, *plus* accrued but unpaid interest (including default interest) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Loan Document Obligations," and all other amounts that may be due or owing under the Prepetition Second Lien Sidecar Loan Documents (collectively, the "Prepetition Second Lien Sidecar Secured Obligations").

24.    Pursuant to the Prepetition Second Lien Sidecar Loan Documents, each of the Prepetition Second Lien Sidecar Loan Parties granted to the Prepetition Second Lien Sidecar Agent, for the benefit of itself and the Prepetition Second Lien Sidecar Lenders, valid and properly perfected continuing liens and security interests in (the "Prepetition Second Lien Sidecar Liens") substantially all of the assets of the Prepetition Second Lien Loan Parties, including, without limitation, all "Collateral" (collectively, the "Prepetition Second Lien Sidecar Collateral").

25.    ***Prepetition HoldCo Term Loan***. Certain of the Debtors are parties to that certain *Credit Agreement*, dated as of August 21, 2023 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, "Prepetition HoldCo Credit

Agreement," and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition HoldCo Credit Agreement) and the Prepetition Intercreditor Agreements (as defined below), collectively, the "Prepetition HoldCo Loan Documents"), among Freedom VCM, Inc., as the Borrower, Freedom VCM Interco, Inc., as Holdings ("Holdings"), the guarantors party thereto (the "Prepetition HoldCo Loan Guarantors," and together with the Borrower and Holdings, the "Prepetition HoldCo Loan Parties"), and Alter Domus (US) LLC, as administrative agent (in such capacity, the "Prepetition HoldCo Agent"), and the lenders party thereto from time to time (collectively, the "Prepetition HoldCo Lenders," and together with the Prepetition HoldCo Agent, the "Prepetition HoldCo Secured Parties"). Under the Prepetition HoldCo Credit Agreement, the Prepetition HoldCo Lenders provided a term credit facility (the "Prepetition HoldCo Facility") to Freedom VCM, Inc. and Holdings. Pursuant to the Prepetition HoldCo Loan Documents, Holdings, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all principal amounts outstanding *plus* accrued but unpaid interest (including default interest) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Loan Document Obligations," "Secured Obligations," and all other amounts that may be due or owing under the Prepetition HoldCo Loan Documents (collectively, the "Prepetition HoldCo Secured Obligations"). Pursuant to that certain Supplement No. 1 to the Guarantee Agreement, dated as of August 19, 2024, certain of the Debtors unconditionally and irrevocably guaranteed the Secured Holdco Guarantee Obligations (as defined in the Prepetition

Second Lien Credit Agreement) arising under the Prepetition HoldCo Facility and pursuant to that certain Fifth Amendment to Second Lien Credit Agreement, dated as of August 19, 2024, certain of the Debtors agreed to treat the Secured Holdco Guarantee Obligations as "Secured Obligations" (as defined in the Prepetition Second Lien Credit Agreement).

26.     Pursuant to the Prepetition HoldCo Loan Documents, Freedom VCM, Inc. and Holdings granted to the Prepetition HoldCo Agent, for the benefit of itself and the Prepetition HoldCo Lenders, valid and properly perfected continuing liens and security interests in (the "<u>Prepetition HoldCo Liens</u>") substantially all of the assets of the Prepetition HoldCo Loan Parties, including, without limitation, all "Collateral"[4] (collectively, the "<u>Prepetition HoldCo Collateral</u>").

27.     ***Intercreditor Agreements***. The Prepetition ABL Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, the Prepetition Second Lien Sidecar Secured Parties and the Prepetition HoldCo Secured Parties in their respective capacities as such (collectively, the "<u>Prepetition Secured Parties</u>") with respect to collateral and proceeds thereof are governed by three intercreditor agreements:

(a)     The Prepetition ABL Agent, the Prepetition First Lien Agent, the Prepetition Second Lien Agent, and the Prepetition Second Lien Sidecar Agent are party to that certain Amended and Restated Intercreditor Agreement dated as of November 22, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "<u>Prepetition ABL/Term Intercreditor Agreement</u>"), which sets forth the relative payment and lien priorities and other rights and remedies of the Prepetition ABL Secured Parties, on the one hand, and the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties, on the other hand, with respect to "Common Collateral."[5]

(b)     The Prepetition First Lien Agent, the Prepetition Second Lien Agent, and the Prepetition Second Lien Sidecar Agent are party to that certain

---

[4]     "Collateral" is defined in the Prepetition HoldCo Credit Agreement to mean any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the security documents as security or the Secured Obligations.

[5]     "Common Collateral" is defined in the Prepetition ABL/Term Intercreditor Agreement to mean collateral that is Prepetition ABL Collateral, Prepetition First Lien Collateral and Prepetition Second Lien Collateral.

Amended and Restated Intercreditor Agreement dated as of November 22, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition First Lien/Second Lien Intercreditor Agreement"), which sets forth the relative payment and lien priorities and other rights and remedies of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties with respect to "Collateral."[6]

(c)     The Prepetition Second Lien Agent and the Prepetition Second Lien Sidecar Agent are party to that certain Intercreditor Agreement dated as of August 21, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Sidecar Intercreditor Agreement," and together with the Prepetition ABL/Term Intercreditor Agreement and the Prepetition First Lien/Second Lien Intercreditor Agreement, the "Prepetition Intercreditor Agreements"), which sets forth the relative payment and lien priorities and other rights and remedies of the Prepetition Second Lien Secured Parties and the Prepetition Second Lien Sidecar Secured Parties with respect to "Collateral."[7]

28.     The Intercreditor Agreements govern, among other things, the priority of distribution of collateral and proceeds thereof among the Prepetition Secured Parties.

29.     Under the Interim Order, the Debtors are proposing that the Prepetition Second Lien Secured Parties and Prepetition Second Lien Sidecar Secured Parties receive adequate protection liens on Unencumbered Property, replacement liens on Prepetition Collateral, and superpriority adequate protection claims, each subordinate to the liens and claims of the DIP Secured Parties, Prepetition ABL Secured Parties, and the Prepetition First Lien Secured Parties.

30.     Such protections are more than sufficient to compensate the Prepetition Second Lien Secured Parties and Prepetition Second Lien Sidecar Secured Parties for the priming of their applicable Prepetition Liens by the DIP Liens.  Notably, the DIP Liens securing the Roll Up DIP Loans already prime the Prepetition Second Lien Liens and the Second Lien Sidecar Liens and,

---

[6]     "Collateral" is defined in the Prepetition First Lien/Second Lien Intercreditor Agreement to mean collateral that is both Prepetition First Lien Collateral and Prepetition Second Lien Collateral.

[7]     "Collateral" is defined in the Prepetition Second Lien Sidecar Intercreditor Agreement to mean collateral that is both Prepetition Second Lien Collateral and Prepetition Second Lien Sidecar Collateral.

therefore, the Roll Up DIP Loans do not entitle the Prepetition Second Lien Secured Parties to adequate protection.  As to the New Money DIP Loans, such loan proceeds will be used to by the Debtors to fund the Approved Budget, which will ensure the continued operations of the Debtors and will allow for an orderly sale process meant to maximize the value obtained by all stakeholders, including by unlocking any existing value that may exist for the benefit of the Prepetition Second Lien Secured Parties and the Prepetition Second Lien Sidecar Secured Parties.

31.    The only additional adequate protection they may even *seek* is payment of postpetition interest, which the Debtors believe is inappropriate at this stage in the case as it is likely that the Prepetition Second Lien Secured Parties and Prepetition Second Lien Sidecar Secured Parties are undersecured and therefore any postpetition interest would be disallowed pursuant to the terms of section 502(b)(2) of the Bankruptcy Code.

## DEBTORS' NEED FOR CASH COLLATERAL AND DIP FINANCING

32.    As detailed in the First Day Declaration, to continue operating in the ordinary course, and to effectuate an efficient restructuring, the Debtors need immediate access to liquidity.  See First Day Declaration at ¶¶ 83–84.  Not only is continued use of Cash Collateral important for the Debtors' business, but so, too, is immediate access to the funds available from the DIP Facility.  Id. at ¶¶ 84–85.  The Debtors' businesses are cash intensive, with significant daily costs required to satisfy obligations to vendors and employees.  Id.  Given the business's substantial cash needs, the Debtors' management team operates the Debtors with a minimum liquidity threshold of $25 million.  Id. at ¶ 88.  That figure, established months prior to the commencement of these cases, already reflects a reduction from the Debtors' historical minimum liquidity threshold of between $50 and $100 million, as part of an effort to extend the Debtors' prepetition runway to negotiate a transaction with their economic stakeholders.  Id.  As the Initial Budget shows, the Debtors now expect to fall below their $25 million minimum liquidity threshold in the first week

of these Chapter 11 Cases absent the DIP Facility, even if they obtain access to Cash Collateral. Id. Accordingly, the proceeds of the DIP Facility and the use of Cash Collateral are essential to the Debtors' reorganization efforts, and are in the best interest of the Debtors, their estates, their creditors, and all parties in interest.

33.     As part of the Debtors' financial review and analysis, the Debtors, with the assistance of their financial advisor, AlixPartners, developed the Initial Budget, which is attached as **__Exhibit 3__** to the Interim Order. The Initial Budget incorporates a number of factors and reasonable assumptions, including the Company's substantial working capital requirements, the effect of filing for chapter 11 on the Debtors' operations, material cash disbursements, vendor relationships and required payments, cash flows from the Debtors' ongoing operations, and the cost of necessary goods and materials. Furthermore, the Initial Budget includes all of the expenditures that the Debtors seek authority to pay under various "first day" pleadings, if approved by the Court.

34.     The Debtors require immediate access to the funding provided by the DIP Facility on an interim basis. See First Day Declaration at ¶¶ 83–84.  The events leading up to the commencement of these Chapter 11 Cases have underscored the Debtors' need to access the proceeds of the DIP Facility and Cash Collateral on an interim basis.  Id. at ¶¶ 84–85.  Absent immediate access to the funds available from the DIP Facility and the Debtors' continued use of Cash Collateral, as well as the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their businesses and, simultaneously, eliminate their best chance for consummating a comprehensive and orderly restructuring, to the detriment of all stakeholders.  Id. at ¶ 85.  Moreover, unless the Debtors can demonstrate that they have the means available to operate in the ordinary course and pay for goods and services that are

vital to ongoing business operations, vendors and suppliers may refuse to do business with the Debtors.  Immediate access to the DIP Facility will enable the Debtors to stabilize their businesses, maintain ordinary course operations, meet their financial commitments throughout the course of the Chapter 11 Cases, and avoid irreparable harm pending the Final Hearing.  <u>Id.</u> at ¶ 89.

### <u>PREPETITION EFFORTS TO SECURE DIP FINANCING</u>

1.   Prior to the Petition Date, as further detailed in the Grubb Declaration, Ducera launched a solicitation process to obtain postpetition financing and commenced negotiations with potential lenders. Ducera contacted 19 traditional banks and alternative lenders as prospective financing sources for both priming and non-priming ABL and term loan postpetition financing, in addition to the Debtors' existing Prepetition ABL Secured Parties, Prepetition First Lien Secured Parties, and Prepetition Second Lien Secured Parties.  <u>See</u> Grubb Declaration at ¶ 15.  To date, the Debtors received only one DIP financing proposal from a third-party lender, which was determined to be insufficient for the Debtors' needs to operate these Chapter 11 Cases and reorganize successfully given the Debtors' prepetition capital structure.  <u>See</u> Grubb Declaration at ¶ 17. The Debtors also received two proposals from certain of their Prepetition ABL Lenders, but such proposals were also not viable to fulfill the Debtors' liquidity needs.  <u>Id.</u>

35.   Due to the overall lack of interest from third-party lenders and the insufficient bids from the Prepetition ABL Lenders, the Debtors determined that the most feasible source of postpetition financing would be from the Ad Hoc Lender Group, comprised of certain of the Prepetition First Lien Secured Parties.  Over the course of multiple weeks, the Debtors' advisors actively negotiated the terms and provisions of the DIP Facility. <u>See id.</u> at ¶ 19.  These good faith, arm's-length negotiations involved exchanging multiple drafts of term sheets, the Interim Order, the DIP Credit Agreement, and other DIP Loan Documents, as well as numerous telephone conferences between the Debtors, the DIP Lenders, and their respective advisors.  <u>See id.</u>  These

negotiations culminated in the DIP Facility, which provides both a needed infusion of liquidity and a consensual path forward in these Chapter 11 Cases. See id.

36.     Given that, among other things, (a) no party was willing to provide DIP financing on a junior or unsecured basis and (b) the Prepetition First Lien Lenders and Prepetition ABL Lenders were unwilling to consent to a priming DIP facility, any DIP financing other than the DIP Facility provided by the Ad Hoc Lender Group would result in a protracted and costly litigation, including a potential priming fight or valuation dispute at the outset of these Chapter 11 Cases. Regardless of the prospect of success, the expense and disruption associated with any such litigation would seriously strain the Debtors' liquidity and jeopardize the Debtors' successful administration of these Chapter 11 Cases at the exact time. See Grubb Declaration at ¶ 21.

37.     Based on extensive negotiations between the parties and the marketing efforts undertaken by the Debtors and Ducera, the DIP Facility represents the Debtors' best available financing option.  See id. at ¶ 30.  The terms of the DIP Facility are reasonable under the circumstances and are generally consistent with market terms for debtor-in-possession financing, particularly in light of the circumstances of these Chapter 11 Cases and the robust marketing process undertaken, and represent the most favorable terms available to the Debtors.  Id. at ¶ 19.

## BASIS FOR RELIEF

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing.**

**A.      Entering into the DIP Loan Documents and Payment of Fees Thereunder is an Exercise of the Debtors' Sound Business Judgment.**

38.     The Court should authorize the Debtors, in exercising their sound business judgment, to enter into the DIP Loan Documents, obtain postpetition DIP financing under the DIP Facility, and continue using Cash Collateral. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit so long as the agreement to obtain such

credit does not run afoul of the provisions and underlying policy considerations of the Bankruptcy Code. See, e.g., In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

39.    To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re Curlew Valley Assocs., 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

40.    Courts generally will not second-guess a debtor's business decisions when those decisions involve a minimum level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. See In re Los Angeles Dodgers LLC, 457 B.R. at 313. To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" In re Dura Auto. Sys., Inc., No. 06-11202 (KJC), 2007

35

WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

41.     The Debtors' entry into the DIP Facility represents a sound exercise of their business judgment. See First Day Declaration, at ¶ 88–89. The Debtors require access to the DIP Facility because (i) they require immediate access to funds, as, among other reasons, they will otherwise fall below their minimum liquidity threshold immediately in the days following the Petition Date, and (ii) it is critical for the Debtors to reassure their suppliers, customers, vendors, employees, and other stakeholders that the Debtors have adequate liquidity to fund these Chapter 11 Cases and complete their restructuring efforts with the support of their largest creditor constituency, the Ad Hoc Lender Group. See First Day Declaration at ¶¶ 85–86.  The terms of the DIP Facility were negotiated in good faith and at arm's length, resulting in proposed financing terms that are more favorable overall to the Debtors than the terms contained in the proposals received from the other prospective financing sources. See Grubb Declaration at ¶¶ 17, 19, 20. Accordingly, the Court should authorize the Debtors' entry into the DIP Facility as a reasonable exercise of the Debtors' business judgment.

**B.     The Roll Up of a Portion of the Prepetition First Lien Secured Obligations Is Appropriate.**

42.     The proposed Roll Up of a portion of the Prepetition First Lien Secured Obligations into the DIP Facility is also an exercise of the Debtors' sound business judgment.  See Grubb

Declaration at ¶¶ 23–26.  Upon entry of the Interim Order, the Debtors seek to have up to $500 million of the Prepetition First Lien Secured Obligations (together with accrued and unpaid interest thereon) held by the DIP Lenders (or any of their respective designated Approved Funds) rolled up and converted into a new tranche of the DIP Facility, on a cashless two dollars of Roll Up DIP Loans for every dollar of principal amount of New Money DIP Loans, for all purposes of the DIP Loan Documents as if originally funded on the Effective Date (as defined in the DIP Credit Agreement).  Grubb Declaration at ¶ 23.  Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. Courts in this jurisdiction have approved similar DIP features, including on the first day of the case.  See, e.g., In re American Tire Distributors, Inc., No. 24-12391 (CTG) (Bankr. D. Del. Oct. 25, 2024) (authorizing a DIP facility with a roll-up on a three-to-one basis upon entry of the interim order), In re Airspan Networks Holdings Inc., No. 24-10621 (TMH) (Bankr. D. Del. Apr. 4, 2024) (authorizing a $53.8 million DIP facility, including a $37.3 million roll-up); In re Sientra, Inc., No. 24-10245 (JTD) (Bankr. D. Del. Mar. 3, 2024) (authorizing a $90 million DIP facility, including a $67.5 million roll-up); In re NanoString Technologies, Inc., No. 24-10160 (CTG) (Bankr. D. Del. Feb. 6, 2024) (authorizing $142.5 million DIP facility, including a $95 million roll-up); In re Restoration Forest Products Group, LLC, No. 24-10120 (KBO) (Bankr. D. Del. Feb. 1, 2024) (authorizing approx. $93.3 million DIP facility, including approx. $64.3 million roll-up); In re Virgin Orbit Holdings, Inc., No. 23-10405 (KBO) (Bankr. D. Del. Apr. 5, 2023) (approving $42.5 million in roll-up of the debtors' prepetition debt, which represents approximately 57% of the of DIP); In re Shiloh Industries Inc., No. 20-12024 (LSS) (Bankr. D. Del. Sep. 1, 2020) (authorizing roll-up of $100 million of the debtors' prepetition debt into the DIP facility totaling $122 million); In re GNC Holdings, Inc., No. 20-11662 (KBO) (Bankr. D. Del. June 26, 2020) (court approved

full roll-up of the prepetition $275 million ABL facility upon entry of the interim order); In re

Remington Outdoor Co., Inc., No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing

approximately a $338 million DIP facility and a roll-up of approximately $150 million pursuant

to interim order); In re The Bon-Ton Stores, Inc., No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6,

2018) (court approved the full roll-up of approximately $493 million of outstanding prepetition

debt in interim order).

43.     The Roll Up is an indispensable part of the DIP Facility.  See Grubb Declaration at

¶ 24.  Throughout the course of the extensive negotiations over the terms of the DIP Facility, the

DIP Lenders consistently indicated that they would only agree to provide credit to the Debtors on

the basis that they receive postpetition priority with respect to their Prepetition First Lien Secured

Obligations at a 2:1 ratio.  The DIP Lenders were unwilling to accept any other economic or

temporal formulation of the Roll Up, and the parties' negotiations resulted in the roll up mechanic

described herein.  See id.

44.     The DIP Facility would not be available absent the specific roll up mechanic

embodied in the DIP Credit Agreement.  See id. at 25.  Without the Roll Up, the DIP Lenders have

indicated that they are unwilling to provide access to the proposed new money financing pursuant

to the DIP Facility, which is critical to the Debtors' ongoing ordinary course operations.

45.     Moreover, the Roll Up does not prejudice any of the other Prepetition Secured

Parties.  The Prepetition Second Lien Secured Obligations and, if any, the Prepetition Second Lien

Sidecar Secured Obligations are already subordinated to the Prepetition First Lien Secured

Obligations, so the Roll Up does not impact the Prepetition Second Lien Secured Parties or the

Prepetition Second Lien Sidecar Secured Parties' priority status.

46.     Given the circumstances, the Debtors' agreement to the Roll Up under the DIP

Facility represents an exercise of the Debtors' sound business judgment and should be approved.

Grubb Declaration at ¶ 26.

**C.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

47.     The Debtors propose to obtain financing under the DIP Facility, in part, by

providing superpriority claims and liens pursuant to section 364(c) and (d) of the Bankruptcy Code,

significantly as set forth in paragraph 2 hereof.

48.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit

allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section

364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1)
> with priority over any or all administrative expenses of the kind
> specified in section 503(b) or 507(b) of the Bankruptcy Code; (2)
> secured by a lien on property of the estate that is not otherwise
> subject to a lien; or (3) secured by a junior lien on property of the
> estate that is subject to a lien.

11 U.S.C. § 364(c); see also In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing,

upon showing that unsecured credit cannot be obtained).

49.     Courts have articulated a three-part test to determine whether a debtor is entitled to

financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

    a.     the debtor is unable to obtain unsecured credit under section 364(b) of the
           Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

    b.     the credit transaction is necessary to preserve the assets of the estate; and

    c.     the terms of the transaction are fair, reasonable, and adequate, given the
           circumstances of the debtor-borrower and proposed lenders.

See In re Ames Dep't Stores, 115 B.R. at 37–40; see also In re St. Mary Hosp., 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); Crouse Group, 71 B.R. at 549.

50.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts will consider whether (a) the debtor made reasonable efforts, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender. See In re Republic Airways Holdings Inc., 2016 WL 2616717, at *11; In re Los Angeles Dodgers LLC, 457 B.R. at 312–13; In re Ames Dep't Stores, Inc., 115 B.R. at 40. However, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).

51.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

52.     As such, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected. Here, no party that the Debtors' advisors contacted as part of the above-described process was interested in providing, or willing to provide, postpetition financing to the Debtors on a junior basis. See Grubb Declaration, at ¶ 12. Accordingly, the DIP Facility' structures are

appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives. <u>See</u> <u>Anchor Savs. Bank FSB v. Sky Valley, Inc.</u>, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."); <u>see also</u> <u>In re El Paso Refinery, L P</u>, 171 F.3d 249, 252 (5th Cir. 1999) (stating that priming lien given to a postpetition lender by "agreement was given a priority over the preexisting first lien of a group of Term Lenders"); <u>In re Outboard Marine Corp.</u>, 2002 WL 571661, at *1 (Bankr. N.D. Ill. 2002) ("[T]he DIP Lenders committed to provide certain financing to the Debtors . . . pursuant to which the Prepetition Lenders consented to the imposition of priming liens upon the Prepetition Collateral and in favor of the DIP Lenders[.]"), <u>aff'd</u>, <u>Bank of Am., N.A. v. Moglia</u>, 330 F.3d 942 (7th Cir. 2003).

53.     The Prepetition First Lien Secured Parties have consented to the priming liens securing the DIP Facility. <u>See</u> Grubb Declaration, at ¶ 32.   The Debtors and the Prepetition ABL Secured Parties have been in discussions to obtain the Prepetition ABL Secured Parties' consent, and such discussions are ongoing.

54.     Moreover, pursuant to the DIP Orders, the Prepetition Secured Parties will receive adequate protection in the form of (i) replacement liens on any security interests in all DIP Collateral, (ii) superpriority administrative expense claims as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (iii) with respect to the Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties, accrued but unpaid interest at the non-default rate as of the Petition Date and thereafter all interest due under the applicable Prepetition Loan Documents, (iv) the payment of all reasonable and documented fees and out-of-pocket expenses of the Prepetition ABL Agent, the Ad Hoc Lender Group and the Prepetition First Lien

Agent, (v) financial reporting, and (vi) and, with respect to the Prepetition ABL Secured Parties, an adequate protection account in which the Debtors will fund an amount representing the diminution in the value of their prepetition collateral, in each case, in accordance with the terms and conditions set forth in the Interim Order and DIP Loan Documents. See Interim Order at ¶ 10. Additionally, the DIP Liens securing the DIP Facility will be junior to those securing the Prepetition ABL Facility, with respect to ABL Priority Collateral, and the proceeds of the DIP Facility will be utilized to fund the Debtors' continuing operations and these chapter 11 cases, including the sales process, all of which will maximize recoveries to the Debtors' stakeholders, including, in particular, the Prepetition Second Lien Secured Parties and the Prepetition Second Lien Sidecar Secured Parties.

55.     As stated above, section 364(d)(1) permits the debtor to obtain postpetition financing with priming liens in the event prepetition lienholders subject to the priming are adequately protected.  Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

> **D.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

56.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. In re Snowshoe Co., Inc., 789 F.2d at 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); see also In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re Stanley Hotel,

<u>Inc.</u>, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); <u>In re Ames Dep't Stores</u>, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

57.     Here, the Debtors have made a good faith effort to seek out optimal postpetition financing arrangements to meet their short-term liquidity needs as well as their longer-term restructuring objectives.  <u>See</u> Grubb Declaration, at ¶ 14–16.  The DIP Facility constitutes the best available solution to the Debtors' financing needs because it provides an actionable path forward in (and out of) these Chapter 11 Cases that maximizes value and provides much-needed improvements to their balance sheet upon emergence.  <u>Id.</u> at ¶ 33.  Accordingly, the DIP Facility represents the best option available to address the Debtors' immediate liquidity needs, and the Debtors respectfully submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances.

### II.     The Use of Cash Collateral Is Warranted and Should Be Approved.

58.     For the reasons set forth herein, the Debtors require use of Cash Collateral as well as the DIP Facility for the continued operation of the Debtors' businesses and smooth entry into these Chapter 11 Cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)     each entity that has an interest in such cash collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

59.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e) and should be authorized to use Cash Collateral. As noted above, the Debtors intend to provide the appropriate parties with adequate protection for the use of Cash Collateral. Further, the Prepetition Secured Parties will inherently benefit from the Debtors' continued use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall value. See, e.g., 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); In re Sky Valley, Inc., 100 B.R. at 114 ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117 (N.D. Ga. 1989). Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

### III.     The Debtors Should Be Authorized to Pay the Premiums and Fees Required by the DIP Loan Documents.

60.     Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain premiums, fees, expenses, and other payments to the DIP Agent and the DIP Lenders.  The Debtors have also agreed to pay the fees and expenses of counsel and other professionals retained by the DIP Agent and the DIP Lenders as provided for in the DIP Loan Documents.  The fees payable under the DIP Loan Documents include a 2.5% Commitment Premium on the New Money Commitments, due and payable in kind on the date of entry of the Interim Order and added to the principal amount of the New Money DIP Loans, 2.5% Exit

Premium on the DIP Obligations, due and payable in the form of New Money DIP Loans upon repayment in full or immediately prior to maturity, a 0.2% Fronting Fee on the New Money Commitments to be paid in accordance with the terms of the Fronting Fee Letter, and a 10% DIP Backstop Premium on the New Money Commitments, due and payable in kind on the date of entry of the Interim Order and to be added to the principal amount of the New Money DIP Loans. The DIP Loans shall bear interest at a rate per annum equal to the adjusted SOFR rate (subject to a floor of 1.00% plus (a) with respect to the New Money DIP Loans, 10.00%, and (b) with respect to the Roll Up DIP Loans, 4.75%. Grubb Declaration at ¶ 27.

61.     The Debtors believe that the interest, premiums, and fees to be paid under the DIP Facility are consistent with the market and are reasonable and appropriate, particularly in light of the circumstances of these Chapter 11 Cases and the robust marketing process undertaken, and represent the most favorable terms available to the Debtors. See Grubb Declaration at ¶ 28. The Debtors considered the fees when determining in their sound business judgment that the DIP Facility constituted the best, and the only, actionable terms on which the Debtors could obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates. Id. at ¶ 29. Among other things, the premiums and fees payable under the DIP Loan Documents are particularly reasonable given the DIP Lenders' consent to the conversion of the DIP Loans into a combination of take-back debt and reorganized equity as set forth in the Restructuring Term Sheet (as defined in the Restructuring Support Agreement), subject to the terms and conditions of the DIP Loan Documents and the Plan (as defined in the Restructuring Support Agreement). Accordingly, the Court should authorize the Debtors to pay the interest, premiums, payments, fees, costs and expenses provided under the DIP Loan Documents in connection with the DIP Facility.

IV.     **The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protections under Section 364(e).**

62.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

63.     The DIP Facility (a) is the product of arm's-length, good-faith negotiation processes; (b) is the best available postpetition financing option for the Debtors in light of the facts and circumstances of the Debtors and these Chapter 11 Cases; and (c) contains reasonable and appropriate financial terms and conditions under the circumstances.  See Grubb Declaration at ¶ 30. The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, id., and the proceeds of the DIP Facility and Cash Collateral will be used only for purposes that are permissible under the Bankruptcy Code.  Further, the Debtors ran a competitive process before selecting the DIP Lenders' proposal.  See id. at ¶ 14–16.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders and the Prepetition Secured Parties in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Agent and the DIP Lenders and the Prepetition Secured Parties are entitled to all of the protections afforded thereby.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

64.      The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the DIP Agent, DIP Lenders, and the Prepetition Secured Parties to exercise rights and remedies under certain circumstances. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. See, e.g., In re Yellow Corp., No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (modifying automatic stay as necessary to effectuate the terms of the order); In re Lannett Co., Inc., No. 23-10559 (JKS) (Bankr. D. Del. June 7, 2023) (same); In re Carestream Health, Inc., No. 22-10778 (JKS) (Bankr. D. Del. Sep. 27, 2022) (same); In re OSG Group Holdings, Inc., No. 22-10718 (JTD) (Bankr. D. Del. Aug. 9, 2022) (same); In re Armstrong Flooring, Inc., No. 22-10426 (MFW) (Bankr. D. Del. Jun. 7, 2022) (same); In re MD Helicopters, Inc., No. 22-10263 (KBO) (Bankr. D. Del. Apr. 26, 2022) (same); In re BHCosmetics Holdings, LLC, No. 22-10050 (CSS) (Bankr. D. Del. Mar. 9, 2022) (same); In re Alto Maipo Del. LLC, No. 21-11507 (KBO) (Bankr. D. Del. Dec. 17, 2021) (same). The Debtors therefore submit that the modification of the automatic stay as set forth in the DIP Orders should be approved.

**VI.     Failure to Obtain Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

65.      Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use

cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. See Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

66.     The Debtors cannot continue to operate their businesses without the use of Cash Collateral. See First Day Declaration at ¶ 83. Additionally, immediate access to the funds available from the DIP Facility is critical to the Debtors' businesses operations at the outset of these Chapter 11 Cases. Id. As such, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their businesses, preserve value, and avoid irreparable harm pending the Final Hearing.

67.     The Debtors, with the assistance of their advisors, developed the Initial Budget. First Day Declaration at ¶ 87. The Initial Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the Budget is prepared. Id. The Initial Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their businesses for the period set forth in the Initial Budget and establishes that the Debtors will have adequate liquidity during this interim period if allowed to utilize the Cash Collateral and access the DIP Facility. Id. at ¶ 88.

68.     The Debtors are seeking limited relief to, among other things, satisfy payroll and contractual obligations, pay suppliers, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' businesses. See First Day Declaration at ¶ 85. The ability to satisfy these expenses when due is essential to the

Debtors' continued operation of their businesses during the pendency of these Chapter 11 Cases. Id. at ¶¶ 85–86.

69.     Failure to obtain access to the DIP Facility and Cash Collateral will result in immediate and irreparable harm to the Debtors and their stakeholders and will diminish the value of the Debtors' estates to the detriment of their creditors.  Id. at ¶ 86.  Without the approval of the DIP Facility and use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course and preserve and maximize the value of their assets for the benefit of all parties in interest.  Id. at ¶¶ 84–86.

70.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors respectfully request that the Court conduct an expedited hearing on this Motion and enter the proposed Interim Order authorizing the Debtors to enter into the DIP Facility and use Cash Collateral.

## REQUEST FOR FINAL HEARING

71.     Pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## WAIVER OF BANKRUPTCY RULES 4001 AND 6004

72.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rules 4001(a)(3) and 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), to the extent such stay applies.

## **RESERVATION OF RIGHTS**

73.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## **NOTICE**

74.     Notice of this Motion has been or will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney's Office for the District of Delaware; (iii) those creditors holding the fifty (50) largest unsecured claims against the Debtors' estates; (iv) counsel to the Prepetition ABL Secured Parties; (v) counsel to the Ad Hoc Lender Group; (vi) counsel to the Prepetition Second Lien Secured Parties; (vii) counsel to the Prepetition Second Lien Sidecar Secured Parties; (viii) counsel to Prepetition HoldCo Secured Parties; (ix) counsel to the DIP Agent; (x) counsel to the DIP Lenders; (xi) counsel to the Fronting Lender; and (xii) the Internal Revenue Service. The Debtors will serve copies of this Motion and an order entered in respect of this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **NO PRIOR REQUEST**

75.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request entry of the proposed DIP Orders granting the relief requested herein and such other and further relief as the Court may deem just and equitable.

Dated: November 4, 2024
       Wilmington, Delaware

<div style="margin-left:40%;">

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Edmon L. Morton*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac*)
Debra M. Sinclair (admitted *pro hac vice*)
Betsy L. Feldman (Del. No. 6410)
Yara Kass-Gergi (admitted *pro hac vice* )
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
mfeldman@willkie.com
dsinclair@willkie.com
bfeldman@willkie.com
ykass-gergi@willkie.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

</div>

## EXHIBIT A

**Interim DIP Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION
FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS
AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO
THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE
AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***")[2] of Franchise Group, Inc. (the "***Lead Borrower***") and its

affiliated debtors and debtors in possession (collectively, the "***Debtors***") in the above-captioned

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the DIP Credit Agreement (as defined below).

chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Procedure (the "**Local Bankruptcy Rules**") promulgated by the United States Bankruptcy Court for the District of Delaware (the "**Court**"), seeking entry of an interim order (this "**Interim Order**") and a Final Order (as defined below), among other things:

(a) authorizing the Debtors to obtain postpetition financing on a superpriority priming senior secured basis in the aggregate principal amount of up to $750,000,000, *plus* applicable fees and premiums (the "**DIP Facility**"), on the terms and conditions set forth in this Interim Order and that certain *Senior Secured Super-Priority Priming Term Loan Debtor-In-Possession Credit Agreement*, substantially in the form attached to this Interim Order as **Exhibit 1** (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**", and, together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, filed and/or delivered in connection therewith, including the Loan Documents (as defined in the DIP Credit Agreement), the Master Consent (as defined in the DIP Credit Agreement), the Fronting Fee Letter (as defined in the DIP Credit Agreement), and the Syndication Procedures (as defined below) (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**")), by and among the Lead Borrower, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, (collectively, the "**Borrowers**"), each of the direct and indirect subsidiaries of the Borrowers, and each of Freedom VCM Holdings, LLC, Freedom Receivables II, LLC, Freedom VCM Interco Holdings, Inc., and Freedom VCM Receivables, Inc., as secured guarantors solely with respect to the outstanding DIP Obligations in respect of the New Money DIP Loans (each as defined below) (collectively, the "**Secured Guarantors**", and together with the Borrowers, the "**Secured DIP Loan Parties**"), and each of Freedom VCM Interco, Inc., and Freedom VCM, Inc., as unsecured guarantors (collectively, together with Secured Guarantors, the "**Guarantors**", and together with the Borrower, the "**DIP Loan Parties**"), Wilmington Trust, National Association, as administrative agent and as collateral agent (in such capacities, the "**DIP Agent**"), and the lenders from time to time party thereto (collectively, the "**DIP Lenders**", and together with the DIP Agent, the "**DIP Secured Parties**"), comprised of the following:

(i)      a "new money" first-out delayed draw term loan facility in an aggregate principal amount of up to $250,000,000, *plus* applicable fees and premiums (the "***New Money DIP Facility***"; the commitments thereunder, the "***New Money DIP Commitments***", and the term loans extended thereunder, the "***New Money DIP Loans***"), pursuant to which (A) $125 million shall be borrowed in a single borrowing on the Effective Date (as defined in the DIP Credit Agreement) (the "***Interim New Money DIP Loans***"), (B) an aggregate principal amount not to exceed $50 million shall be borrowed in a single borrowing on or after the entry of the Final Order, and (C) an aggregate principal amount not to exceed $75 million may be borrowed in a single borrowing on or after the entry of the Confirmation Order (as defined in the DIP Credit Agreement), and (D) other amounts not to exceed the New Money DIP Commitments, after accounting for the draws under the foregoing subclauses (A)–(C), may be drawn to the extent set forth in the Approved Budget and approved by the Required DIP Lenders in their sole discretion (collectively, together with the Interim New Money DIP Loans, the "***DIP Borrowings***", and, each, a "***DIP Borrowing***"), which New Money DIP Loans that are borrowed on the Effective Date shall initially be provided and funded through the Fronting Lender (as defined in the DIP Credit Agreement) in accordance with the terms of the DIP Loan Documents, on such date set forth in the foregoing clause (A) and, thereafter, such New Money DIP Loans and New Money DIP Commitments shall be assigned by the Fronting Lender in accordance with the Syndication Procedures, in the case of each of the foregoing, subject to the terms and conditions set forth in this Interim Order and in the DIP Loan Documents (including, without limitation, the Approved Budget (as defined below) and any conditions precedent to each of the DIP Borrowings set forth therein)); and

(ii)     the conversion of up to $500,000,000 of the Prepetition First Lien Secured Obligations (as defined below) (together with accrued and unpaid interest thereon) into a second-out tranche of DIP Loans (such conversion, the "***Roll Up***", and such converted amounts, the "***Roll Up DIP Loans***"), pursuant to which, effective immediately upon the completion of the Syndication (as defined in the Syndication Procedures (and after giving effect to all assignments in connection with the Syndication)) of the DIP Facility pursuant to the Syndication Procedures substantially in the form attached to this Interim Order as **Exhibit 2** (the "<u>Syndication Procedures</u>"), on the Syndication Date (as defined in the Syndication Procedures), up to $500,000,000 of the Prepetition First Lien Secured Obligations (together with accrued and unpaid interest thereon) held by the DIP Lenders (or any of their respective designated Approved Funds (as defined in the DIP Credit Agreement)) as of the Syndication Date will be, on the Syndication Date, automatically deemed "rolled up" and converted into the DIP Facility, on a cashless two dollars of Roll Up DIP Loans for every dollar of principal amount of New Money DIP Loans (i.e., $250,000,000), based upon such Person's (or any of its designated

> Approved Funds) pro rata share of principal amount of New Money DIP Loans, and shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Roll Up DIP Loans for all purposes hereunder as if originally funded on the Effective Date;

(b)     authorizing the Borrowers to incur, and the Guarantors to jointly and severally, irrevocably and unconditionally, guarantee, on a super-priority basis, the payment in full in cash of all DIP Obligations (as defined below) in accordance with this Interim Order and the DIP Loan Documents;

(c)     authorizing the Debtors to: (i) execute, deliver, and perform under the DIP Credit Agreement and each of the other DIP Loan Documents, including the Master Consent, the Fronting Fee Letter, the Syndication Procedures and any and all other documents related to the fronting or seasoning of the DIP Term Loans, and to perform all such other and further acts as may be required in connection therewith; (ii) incur all loans, advances, extensions of credit and financial accommodations, and pay all principal, interest, premiums or similar amounts, including, without limitation, the Backstop Premium (as defined in the DIP Credit Agreement), the Commitment Premium (as defined in the DIP Credit Agreement), and the Exit Premium (as defined in the DIP Credit Agreement), fees, including the Fronting Fee (as defined in the DIP Credit Agreement), costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts, including without limitation, all "Secured Obligations" as defined in the DIP Credit Agreement, whether or not such obligations arose before or after the Petition Date (as defined below), whenever the same shall become due, whether at stated maturity, by mandatory prepayment, declaration, acceleration or otherwise, in each case, in accordance with the applicable DIP Loan Documents and this Interim Order (collectively, the "***DIP Obligations***"); and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(d)     authorizing the Secured DIP Loan Parties to grant to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in this Interim Order, subject to the Carve Out, and subject to the relative priorities set forth in this Interim Order;

(e)     authorizing the Debtors to grant to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in this Interim Order;

(f)     authorizing the Debtors to use the proceeds of the DIP Facility, the DIP Collateral and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), in accordance with the terms and conditions set forth in this

-4-

Interim Order and the DIP Loan Documents, including the Approved Budget, subject to any variances expressly permitted under the DIP Credit Agreement (the "***Permitted Variances***");

(g)     granting adequate protection, as and to the extent set forth herein, to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined below) of their respective Prepetition Liens (as defined below) in the Prepetition Collateral (including Cash Collateral);

(h)     modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(i)     approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, (i) the DIP Secured Parties, the DIP Loan Documents, the DIP Liens, and the DIP Obligations, (ii) subject to paragraph 24  hereof, the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Liens and the Prepetition Secured Obligations (each as defined below);

(j)     subject to entry of the Final Order granting such relief, approving the Debtors' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties, and the Prepetition Collateral as to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth herein;

(k)     subject to entry of the Final Order granting such relief, approving (i) the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Secured Parties and, (ii) the Debtors' waiver of the equitable doctrine of "marshaling" and the Debtors' waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, with respect to the Prepetition Collateral as to the Prepetition Secured Parties, in each case, upon the terms set forth in this Interim Order; and

(l)     scheduling a final hearing (the "***Final Hearing***") on the Motion to consider entry of a final order (the "***Final Order***") authorizing the relief requested in the Motion on a final basis and approving the form of notice with respect to such Final Hearing, which order shall be in form and substance and on terms and conditions acceptable in all respects to the Required DIP Lenders and the DIP Agent.[3]

---

[3]    As used herein, the term "***Required DIP Lenders***" means the "Required Lenders" under (and as defined in) the DIP Credit Agreement.

The Court, having considered the Motion, the DIP Loan Documents, the exhibits attached thereto, the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 15] (the "**First Day Declaration**"), and the *Declaration of Christopher Grubb in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Obtain Senior Secured Priming Superpriority Postpetition Financing and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "**Grubb Declaration**", and together with the First Day Declaration, the "**DIP Declarations**"), the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on November [●], 2024 (the "**Interim Hearing**"), and upon the record of the Chapter 11 Cases; and due and proper notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b)-(d) and 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors, represents a sound exercise of the Debtors' business judgment, and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A.     *Petition Date*. On November 3, 2024 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these Chapter 11 Cases.

B.     *Debtors in Possession*. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.     *Committee Formation*. As of the date hereof, the Office of the United States Trustee (the "***U.S. Trustee***") has not appointed an official statutory committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "***Official Committee***").

D.     *Jurisdiction and Venue*. This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court may enter a final order consistent with Article III of the United States Constitution. Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013 and 9014, and Local Bankruptcy Rules 2002-1, 4001-2 and 9013-1.

---

[4]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.       *Debtors' Stipulations, Releases and Acknowledgements Regarding DIP Secured Parties.* In requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Lenders to provide the DIP Facility, the Debtors, for themselves, their estates and all representatives of such estates, admit, stipulate, acknowledge and agree as follows:

(a)       *No Control.* None of the DIP Secured Parties control the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder.

(b)       *No Claims, Defenses, or Causes of Action.* As of the date hereof, there exist no claims, defenses or any other Cause of Action[5] of any nature or description whatsoever that may be asserted by the Debtors, their respective estates, predecessors, successors and assigns, against any of the DIP Secured Parties or any of their respective current, former and future affiliates, subsidiaries, funds or managed accounts, officers, directors, managers, members, equity holders, partners, principals, employees, representatives, agents, attorneys, advisors, consultants and other professionals, and the predecessors in interest, successors and assigns of each of the foregoing (collectively, the "***Representatives***"), in their capacities as such, in each case, arising from, in connection with, or related to this Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder.

(c)       *Releases.* Effective as of the date of entry of this Interim Order, the Debtors, on behalf of themselves and their respective estates, to the maximum extent permitted by applicable law, hereby absolutely, unconditionally and irrevocably release and forever discharge and acquit the DIP Secured Parties and each of their respective Representatives (in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors and assigns at any time had, now have or that their successors and assigns may have against any of the DIP Secured Parties and their

---

[5]   The term "***Cause of Action***" means any action, cause of action, claim, counter-claim, cross-claim, defense, account, objection, challenge, offset, setoff, demand, liability, responsibility, dispute, remedy, indebtedness, obligation, guaranty, right, interest, indemnity, assertion, allegation, suit, controversy, proceeding, loss, damage, injury, reimbursement obligation, attorneys' fees, costs, expenses or judgments of every type, whether known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, whether assertable directly or derivatively, including, without limitation, all legal and equitable theories of recovery, arising under the Bankruptcy Code or applicable non-bankruptcy law, whether local, state of federal U.S. or foreign common law, statute, law, rule, regulation, or by contract, of every nature or description whatsoever.

respective Representatives for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in each case, arising under, in connection with or related to this Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder, including, without limitation, (i) any claim or Cause of Action seeking avoidance, whether under chapter 5 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute, common law or otherwise ("***Avoidance Actions***"), (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or Causes of Action arising under the Bankruptcy Code, (iv) any claims or Causes of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder, or (v) any claim or Cause of Action with respect to the validity, enforceability, extent, amount, perfection or priority of the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder; provided, however, that nothing contained in this subparagraph (c) shall relieve the DIP Secured Parties from fulfilling any of their commitments under, and in accordance with, the DIP Loan Documents.

F.      *Debtors' Stipulations, Releases and Acknowledgements Regarding Prepetition Secured Parties.* In requesting the DIP Facility and the use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lenders to provide the DIP Facility, and in exchange for and in recognition of the priming of the Prepetition Liens and the consent (and/or deemed consent) of the Prepetition Secured Parties to the use of their Cash Collateral, the Debtors, for themselves, their estates and all representatives of such estates, admit, stipulate, acknowledge and agree as follows (subject to paragraph 24 of this Interim Order) (collectively, the admissions, stipulations, and acknowledgments and agreements set forth in this paragraph F, the "***Stipulations***"):

(a)     *Prepetition ABL Facility*

(i)      *Prepetition ABL Credit Agreement.* Pursuant to that certain *Third Amended and Restated Loan and Security Agreement*, dated as of March 10, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "***Prepetition ABL Credit Agreement***", and together with all other agreements, guarantees, pledge, collateral

and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Financing Agreements (as defined in the Prepetition ABL Credit Agreement) and the Prepetition ABL Intercreditor Agreement (as defined below), collectively, the "***Prepetition ABL Loan Documents***"), by and among the Borrowers, as borrowers (collectively, the "***Prepetition ABL Borrowers***"), certain subsidiaries of the Borrowers, as guarantors (the "***Prepetition ABL Guarantors***", and together with the Prepetition ABL Borrowers, the "***Prepetition ABL Loan Parties***"), JPMorgan Chase Bank, N.A., as agent (in such capacity, the "***Prepetition ABL Agent***"), and the lenders party thereto from time to time (collectively, the "***Prepetition ABL Lenders***", and together with the Prepetition ABL Agent, the "***Prepetition ABL Secured Parties***"), the Prepetition ABL Lenders provided a revolving credit facility (the "***Prepetition ABL Facility***") to the Prepetition ABL Loan Parties. Pursuant to the Prepetition ABL Loan Documents, each of the Prepetition ABL Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all of the Prepetition ABL Secured Obligations (as defined below).

(ii)    *Prepetition ABL Secured Obligations.* As of the Petition Date, the Prepetition ABL Loan Parties were justly and lawfully indebted to the Prepetition ABL Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of not less than $261.3 million on account of principal amounts outstanding under the Prepetition ABL Facility (including issued letters of credit), *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations" (as defined in the Prepetition ABL Credit Agreement), and all other amounts that may be due or owing under the Prepetition ABL Loan Documents (collectively, the "***Prepetition ABL Secured Obligations***").

(iii)    *Prepetition ABL Liens.* Pursuant to the Prepetition ABL Loan Documents, each of the Prepetition ABL Loan Parties granted to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, valid and properly perfected continuing liens and security interests in (the "***Prepetition ABL Liens***") substantially all of the assets of the Prepetition ABL Loan Parties, including, without limitation, all "Collateral" (as defined in the Prepetition ABL Credit Agreement) (collectively, the "***Prepetition ABL Collateral***") and the "ABL Priority Collateral" (as defined in the Prepetition ABL Intercreditor Agreement).

(b)    *Prepetition First Lien Facility.*

(i)    *Prepetition First Lien Credit Agreement.* Pursuant to that certain *First Lien Credit Agreement*, dated as of March 10, 2021 (as amended by that certain *First Amendment to First Lien Credit Agreement*, dated as of November 22, 2021, as further amended by that certain *Second Amendment to First Lien Credit Agreement*, dated as of August 1, 2022, as further amended by that certain *Third Amendment to First Lien Credit Agreement*, dated as of February 2, 2023, as further modified by that certain

*Limited Waiver to First Lien Credit Agreement*, dated as of August 6, 2024, as further amended by that certain *Fourth Amendment to First Lien Credit Agreement*, dated as of August 19, 2024, as further modified by that certain *Agency Assignment & Amendment Agreement*, dated as of October 1, 2024, as further amended by that certain *Fifth Amendment to First Lien Credit Agreement*, dated as of October 15, 2024, and as may be further amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date in accordance with the terms thereof, the "***Prepetition First Lien Credit Agreement***", and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition First Lien Credit Agreement) and the Prepetition Intercreditor Agreements (as defined below), collectively, the "***Prepetition First Lien Loan Documents***"), by and among the Borrowers, as borrowers (collectively, the "***Prepetition First Lien Borrowers***"), certain subsidiaries of the Prepetition First Lien Borrowers, as guarantors (collectively, the "***Prepetition First Lien Guarantors***", and together with the Prepetition First Lien Borrowers, collectively, the "***Prepetition First Lien Loan Parties***"), Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, the "***Prepetition First Lien Agent***"), and the lenders party thereto from time to time (collectively, the "***Prepetition First Lien Lenders***", and together with the Prepetition First Lien Agent, the "***Prepetition First Lien Secured Parties***"), the Prepetition First Lien Lenders provided a term loan credit facility (the "***Prepetition First Lien Facility***") to the Prepetition First Lien Loan Parties. Pursuant to the Prepetition First Lien Loan Documents, each of the Prepetition First Lien Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all of the Prepetition First Lien Secured Obligations (as defined below).

        (ii)     *Prepetition First Lien Secured Obligations*. As of the Petition Date, the Prepetition First Lien Loan Parties were justly and lawfully indebted to the Prepetition First Lien Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of not less than $1,131.8 million on account of principal amounts (including capitalized interest added thereto) outstanding under the Prepetition First Lien Facility, *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Secured Obligations" (as defined in the Prepetition First Lien Credit Agreement) and all other amounts that may be due or owing under the Prepetition First Lien Loan Documents (collectively, the "***Prepetition First Lien Secured Obligations***").

        (iii)     *Prepetition First Lien Liens.* Pursuant to the Prepetition First Lien Loan Documents, the Prepetition First Lien Loan Parties granted to the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, properly perfected continuing liens and security interests in (collectively, the "***Prepetition First Lien Liens***") substantially all of the assets of the Prepetition First Lien Loan Parties, including, without limitation, all "Collateral" (as defined in the Prepetition First Lien

Credit Agreement) (the "***Prepetition First Lien Collateral***") and the "Term Loan Priority Collateral" (as defined in the Prepetition ABL Intercreditor Agreement).

        (c)     *Prepetition Second Lien Facility.*

        (i)     *Prepetition Second Lien Credit Agreement.* Pursuant to that certain *Second Lien Credit Agreement*, dated as of March 10, 2021 (as amended by that certain *First Amendment to Second Lien Credit Agreement*, dated as of November 22, 2021, as further amended by that certain *Second Amendment to Second Lien Credit Agreement*, dated as of August 1, 2022, as further amended by that certain *Third Amendment to Second Lien Credit Agreement*, dated as of August 21, 2023, as further amended by that certain *Fourth Amendment to Second Lien Credit Agreement*, dated as of December 18, 2023, as further modified by that certain *Limited Waiver to Second Lien Credit Agreement*, dated as of August 6, 2024, as further amended by that certain *Fifth Amendment to Second Lien Credit Agreement*, dated as of August 19, 2024, and as may be further amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date in accordance with the terms thereof, the " ***Prepetition Second Lien Credit Agreement***", and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition Second Lien Credit Agreement) and the Prepetition Intercreditor Agreements (as defined below), collectively, the "***Prepetition Second Lien Loan Documents***"), by and among the Borrowers, as borrowers (collectively, the "***Prepetition Second Lien Borrowers***"), certain subsidiaries of the Prepetition Second Lien Borrowers, as guarantors (collectively, the "***Prepetition Second Lien Guarantors***", and together with the Prepetition Second Lien Borrowers, collectively, the "***Prepetition Second Lien Loan Parties***"), Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, the "***Prepetition Second Lien Agent***"), and the lenders party thereto from time to time (collectively, the "***Prepetition Second Lien Lenders***", and together with the Prepetition Second Lien Agent, the "***Prepetition Second Lien Secured Parties***"), the Prepetition Second Lien Lenders provided a term loan credit facility (the "***Prepetition Second Lien Facility***") to the Prepetition Second Lien Loan Parties. Pursuant to the Prepetition Second Lien Loan Documents, each of the Prepetition Second Lien Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all of the Prepetition Second Lien Secured Obligations (as defined below).

        (ii)     *Prepetition Second Lien Secured Obligations*. As of the Petition Date, the Prepetition Second Lien Loan Parties were justly and lawfully indebted to the Prepetition Second Lien Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of not less than $125.0 million on account of principal amounts outstanding under the Prepetition Second Lien Facility, *plus* $19.5 million outstanding on account of the Prepetition Second Lien Loan Parties' guaranty of the Secured Holdco Guarantee Obligations (as defined in the Prepetition Second Lien Credit Agreement) pursuant to that certain *Supplement No. 1 to the Guarantee Agreement*, dated as of August 19, 2024, and that certain *Fifth Amendment to Second Lien Credit Agreement*, dated as of August 19, 2024, *plus* all fees,

costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), *plus* accrued but unpaid interest (including default interest, if applicable) thereon; including all "Secured Obligations" (as defined in the Prepetition Second Lien Credit Agreement) and all other amounts that may be due or owing under the Prepetition Second Lien Loan Documents (the "***Prepetition Second Lien Secured Obligations***").

(iii)     *Prepetition Second Lien Liens.* Pursuant to the Prepetition Second Lien Loan Documents, the Prepetition Second Lien Loan Parties granted to the Prepetition Second Lien Agent, for the benefit of itself and the Prepetition Second Lien Secured Parties, properly perfected continuing liens and security interests in (collectively, the "***Prepetition Second Lien Liens***") substantially all of the assets of the Prepetition Second Lien Loan Parties, including, without limitation, all "Collateral" (as defined in the Prepetition Second Lien Credit Agreement) (the "***Prepetition Second Lien Collateral***") and the "Term Loan Priority Collateral" (as defined in the Prepetition ABL Intercreditor Agreement).

(d)     *Prepetition Second Lien Sidecar Facility.*

(i)     *Prepetition Second Lien Sidecar Credit Agreement.* Pursuant to that certain *Sidecar Pari Passu Second Lien Credit Agreement*, dated as of August 21, 2023 (as amended by the *First Amendment to Sidecar Pari Passu Second Lien Credit Agreement*, dated as of December 18, 2023, as further amended by the *Second Amendment to Sidecar Pari Passu Second Lien Credit Agreement*, dated as of August 19, 2024, as further amended by the *Third Amendment to Sidecar Pari Passu Second Lien Credit Agreement*, dated as of October 15, 2024, and as may be further amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date in accordance with the terms thereof, the "***Prepetition Second Lien Sidecar Credit Agreement***", and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, and the Loan Documents (as defined in the Prepetition Second Lien Sidecar Credit Agreement), collectively, the "***Prepetition Second Lien Sidecar Loan Documents***"), by and among the Borrowers, as borrowers (collectively, the "***Prepetition Second Lien Sidecar Borrowers***"), certain subsidiaries of the Prepetition Second Lien Sidecar Borrowers, as guarantors (collectively, the "***Prepetition Second Lien Sidecar Guarantors***", and together with the Prepetition Second Lien Sidecar Borrowers, collectively, the "***Prepetition Second Lien Sidecar Loan Parties***"), Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, the "***Prepetition Second Lien Sidecar Agent***"), and the lenders party thereto from time to time (collectively, the "***Prepetition Second Lien Sidecar Lenders***", and together with the Prepetition Second Lien Sidecar Agent, the "***Prepetition Second Lien Sidecar Secured Parties***"), the Prepetition Second Lien Sidecar Lenders provided a term loan credit facility (the "***Prepetition Second Lien Sidecar Facility***") to the Prepetition Second Lien Sidecar Loan Parties. Pursuant to the Prepetition Second Lien Sidecar Loan Documents, each of the Prepetition Second Lien Sidecar Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the

payment in full in cash of all of the Prepetition Second Lien Sidecar Secured Obligations (as defined below).

(ii)     *Prepetition Second Lien Sidecar Secured Obligations*. As of the Petition Date, the Prepetition Second Lien Sidecar Loan Parties were justly and lawfully indebted to the Prepetition Second Lien Sidecar Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of $0 on account of all amounts outstanding under the Prepetition Second Lien Sidecar Facility inclusive of all "Secured Obligations" (as defined in the Prepetition Second Lien Sidecar Credit Agreement) and all other amounts that may be due or owing under the Prepetition Second Lien Sidecar Loan Documents (collectively, the "***Prepetition Second Lien Sidecar Secured Obligations***").

(iii)     *Prepetition Second Lien Sidecar Liens.* Pursuant to the Prepetition Second Lien Sidecar Loan Documents, the Prepetition Second Lien Sidecar Loan Parties granted to the Prepetition Second Lien Sidecar Agent, for the benefit of itself and the other Prepetition Second Lien Sidecar Secured Parties, properly perfected continuing liens and security interests in (collectively, the "***Prepetition Second Lien Sidecar Liens***") substantially all of the assets of the Prepetition Second Lien Sidecar Loan Parties, including, without limitation, all "Collateral" (as defined in the Prepetition Second Lien Sidecar Credit Agreement) (the "***Prepetition Second Lien Sidecar Collateral***") and the "Term Loan Priority Collateral" (as defined in the Prepetition ABL Intercreditor Agreement).

(e)     *Certain Definitions.*

(i)     "***Prepetition Agents***" means the Prepetition ABL Agent, the Prepetition First Lien Agent, the Prepetition Second Lien Agent and the Prepetition Second Lien Sidecar Agent, in their respective capacities as such.

(ii)     "***Prepetition Collateral***" means the Prepetition ABL Collateral, the Prepetition First Lien Collateral, the Prepetition Second Lien Collateral, and the Prepetition Second Lien Sidecar Collateral, respectively.

(iii)     "***Prepetition Liens***" means the Prepetition ABL Liens, the Prepetition First Lien Liens, the Prepetition Second Lien Liens, and the Prepetition Second Lien Sidecar Liens, respectively.

(iv)     "***Prepetition Loan Documents***" means the Prepetition ABL Loan Documents, the Prepetition First Lien Loan Documents, the Prepetition Second Lien Loan Documents, and the Prepetition Second Lien Sidecar Loan Documents, respectively.

(v)     "***Prepetition Loan Parties***" means the Prepetition ABL Loan Parties, the Prepetition First Lien Loan Parties, the Prepetition Second Lien Loan Parties, and the Prepetition Second Lien Sidecar Loan Parties, respectively.

(vi)     "***Prepetition Secured Obligations***" means the Prepetition ABL Secured Obligations, the Prepetition First Lien Secured Obligations, the Prepetition Second

Lien Secured Obligations, and the Prepetition Second Lien Sidecar Secured Obligations, respectively.

(vii) "***Prepetition Secured Parties***" means the Prepetition ABL Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, and the Prepetition Second Lien Sidecar Secured Parties, in their respective capacities as such.

(f) *Validity and Enforceability of Prepetition Secured Obligations and Prepetition Liens.* As of the Petition Date, (i) the Prepetition Liens in the Prepetition Collateral (A) have been properly recorded and were valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Prepetition Collateral, (B) were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or the financial commitments and other financial accommodations or consideration secured or obtained thereby, and (C) are senior with priority over any and all other liens on or security interests in the Prepetition Collateral, subject only to (1) liens and security interests that were expressly permitted to be incurred under the Prepetition Loan Documents (solely to the extent such permitted liens and security interests were (x) in existence on the Petition Date, (y) valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), and (z) senior in priority to the Prepetition Liens (such liens described in this paragraph F(f)(i)(C)(1), the "***Permitted Prior Liens***")),[6] and (2) the relative rights and priorities set forth in the Prepetition Intercreditor Agreements; (ii) the Prepetition Secured Obligations constitute legal, valid, non-avoidable and binding obligations of each of the Prepetition Loan Parties, enforceable in accordance with the terms of the Prepetition Loan Documents (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); (iii) no portion of the Prepetition Liens or the Prepetition Secured Obligations, and no payments made at any time to any of the Prepetition Secured Parties, is subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including, without limitation, any Avoidance Action or any claim or Cause of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery, or any other claim or Cause of Action of any nature or description, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, in each case, that may be asserted by

---

[6] Nothing contained herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing contained herein shall prejudice the rights of any party in interest, including, but not limited to the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, or any Official Committee, in each case, to the extent such party has standing to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Prior Lien (subject to the terms of this Interim Order). For the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) is not a Permitted Prior Lien.

the Debtors, their respective estates or any other person or entity; and (iv) the Prepetition Secured Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code against each of the Prepetition Loan Parties and their respective estates.

(g)     *Enforceability of the Prepetition Intercreditor Agreements.*

(i)     The Prepetition ABL Agent, the Prepetition First Lien Agent, the Prepetition Second Lien Agent and the Prepetition Second Lien Sidecar Agent are party to that certain *Amended and Restated Intercreditor Agreement*, dated as of November 22, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "***Prepetition ABL Intercreditor Agreement***"), which sets forth the relative payment and lien priorities and other rights and remedies of the Prepetition ABL Secured Parties, on the one hand, and the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties and the Prepetition Second Lien Sidecar Secured Parties, on the other hand, with respect to "Common Collateral" (as defined in the Prepetition ABL Intercreditor Agreement). Pursuant to the Prepetition ABL Intercreditor Agreement, the parties thereto agreed, among other things: (a) that the Prepetition ABL Liens on the ABL Priority Collateral are senior to the Prepetition First Lien Liens, Prepetition Second Lien Liens, and Prepetition Second Lien Sidecar Liens on such collateral, and (b) that the Prepetition First Lien Liens, Prepetition Second Lien Liens, and Prepetition Second Lien Sidecar Liens on the Term Loan Priority Collateral are senior to the Prepetition ABL Liens on such collateral.

(ii)     The Prepetition First Lien Agent, the Prepetition Second Lien Agent and the Prepetition Second Lien Sidecar Agent are party to that certain *Amended and Restated First Lien/Second Lien Intercreditor Agreement*, dated as of November 22, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "***Prepetition 1L/2L Intercreditor Agreement***", and together with the Prepetition ABL Intercreditor Agreement, collectively, the "***Prepetition Intercreditor Agreements***"), which sets forth the relative payment and lien priorities and other rights and remedies of the Prepetition First Lien Secured Parties, on the one hand, and the Prepetition Second Lien Secured Parties and the Prepetition Second Lien Sidecar Secured Parties, on the other hand, with respect to "Common Collateral" (as defined in the Prepetition 1L/2L Intercreditor Agreement).

(iii)     Pursuant to section 510(a) of the Bankruptcy Code, the Prepetition Intercreditor Agreements, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents, (A) shall remain in full force and effect, (B) continue to govern the relative obligations, priorities, rights, and remedies of the Prepetition Secured Parties with respect to any shared or common Prepetition Collateral, and (C) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order except to the extent expressly set forth herein.

(h)      *No Claims, Defenses, or Causes of Action.* As of the date hereof, there exist no claims, defenses or any other Cause of Action of any nature or description whatsoever that may be asserted by the Debtors, their respective estates, predecessors, successors and assigns, against any of the Prepetition Secured Parties or any of their respective Representatives, in each case, arising from, in connection with, or related to this Interim Order, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents or the Prepetition Collateral.

(i)      *Releases.* Effective as of the date of entry of this Interim Order, the Debtors, on behalf of themselves and their respective estates, to the maximum extent permitted by applicable law, hereby absolutely, unconditionally and irrevocably release and forever discharge and acquit the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition ABL Secured Parties, and each of their respective Representatives (in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors and assigns at any time had, now have or that their successors and assigns may have against any of the Prepetition Secured Parties and their respective Representatives for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in each case, arising under, in connection with or related to this Interim Order, the DIP Facility, the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations or the Prepetition Loan Documents, the Adequate Protection Liens (as defined below), the Adequate Protection Claims (as defined below), the Adequate Protection Obligations (as defined below), the Prepetition Loan Documents, or the transactions contemplated thereunder or hereunder, including, without limitation, (i) any Avoidance Actions, (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or Causes of Action arising under the Bankruptcy Code, (iv) any claims or Causes of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations or the Prepetition Loan Documents, or (v) any claim or Cause of Action with respect to the validity, enforceability, extent, amount, perfection or priority of the DIP Facility, the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Collateral or the Prepetition Loan Documents.

(j)      *Cash Collateral.* Any and all of the Secured DIP Loan Parties' cash, whether existing on the Petition Date or thereafter, wherever located (including, without limitation, all cash, cash equivalents and other amounts on deposit or maintained by the Debtors in any accounts with any depositary institution), whether as original Prepetition Collateral, arising from the sale or other disposition of Prepetition Collateral, or proceeds of other Prepetition Collateral, or cash, rents, income, offspring, products, proceeds or profits generated from the Prepetition Collateral, constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "***Cash Collateral***").

G.      **Findings Regarding Corporate Authority.**

(a)      Each of the Debtors has all requisite power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

H.      **Findings Regarding DIP Facility and Use of Cash Collateral.**

(a)      *Good Cause*. Good and sufficient cause has been shown for the entry of this Interim Order.

(b)      *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors have an immediate and critical need to use Cash Collateral and to obtain postpetition financing pursuant to the DIP Facility, in each case, on an interim basis, in order to, among other things, permit the orderly continuation and operation of their businesses, maintain business relationships with customers, vendors and suppliers, make payroll, pay the costs of administering the Chapter 11 Cases and satisfy other working capital and operational needs of the Debtors, in the case of each of the foregoing, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget (subject to Permitted Variances). The Debtors' access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the DIP Facility and the use of Cash Collateral is necessary and vital to, among other things, preserve and maintain the going concern values of the Debtors. The Debtors and their estates will be immediately and irreparably harmed if the financing under the DIP Facility is not obtained pursuant to the terms of this Interim Order and, as applicable, the DIP Loan Documents, or if the Debtors are unable to use Cash Collateral. Entry of this Interim Order is necessary and appropriate to avoid such harm to the Debtors, their estates, and other parties in interest.

(c)    *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing or other financial accommodations from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility, the DIP Loan Documents and this Interim Order. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate secured credit for money borrowed under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting (a) the DIP Liens on all DIP Collateral, (b) the DIP Superpriority Claims, (c) the rights, benefits and protections to the DIP Secured Parties, and (d) the Adequate Protection Liens, Adequate Protection Claims and other Adequate Protection Obligations to the Prepetition Secured Parties, in the case of each of the foregoing, upon the terms and conditions set forth in this Interim Order and in the DIP Loan Documents. After considering all available alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best source of debtor-in-possession financing available to them at this time and is in the best interests of all of their stakeholders.

(d)    *Use of Proceeds of DIP Facility and Cash Collateral.* As a condition to providing the DIP Facility and their consent to the use of Cash Collateral, each of the DIP Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition First Lien Secured Parties (as applicable) requires, and the Debtors have agreed, that all proceeds of the DIP Loans and all Cash Collateral shall be used and/or applied solely for the purposes expressly permitted in the Approved Budget (subject to Permitted Variances), including, without limitation, (i) to pay the costs of administration of the Chapter 11 Cases, (ii) for general corporate and working capital purposes, (iii) to pay adequate protection payments to the extent set forth herein, and (iv) to pay professional

fees and expenses in accordance with this Interim Order, in the case of each of the foregoing, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget (subject to Permitted Variances).

(e)     *Adequate Protection*. Pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, the Prepetition Secured Parties are entitled to adequate protection against any post-petition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, (i) the use, sale or lease by the Debtors of such collateral, (ii) the market value decline of such collateral, (iii) the use of Cash Collateral by each of the Debtors, (iv) the imposition of the automatic stay, (v) the subordination of the Prepetition Liens and Prepetition Secured Obligations to the Carve Out, the DIP Liens and the DIP Obligations, in each case, as set forth in this Interim Order, and (vi) any other act or omission which causes diminution in the value of their respective liens or interests in the Prepetition Collateral (collectively, the "***Diminution in Value***"), as set forth in this Interim Order and the DIP Loan Documents; provided, however, that nothing in this Interim Order shall (x) be construed as the affirmative consent by any of the Prepetition ABL Secured Parties or the Prepetition First Lien Secured Parties for the use of Cash Collateral or other Prepetition Collateral other than on the terms expressly set forth in this Interim Order (including the Approved Budget), (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the DIP Collateral or the Prepetition Collateral (whether senior, *pari passu* or junior) other than on the terms expressly set forth in this Interim Order, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties (subject to the Prepetition Intercreditor Agreements) to seek new, different or additional adequate protection after the date hereof or assert the interests of any of the Prepetition Secured Parties. Based on the Motion, the

DIP Declarations and the other evidence filed in support of the Motion, and the record presented to the Court in connection with the Interim Hearing, the terms of the adequate protection arrangements and the use of Prepetition Collateral (including Cash Collateral) set forth herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral).

(f)     *Consent*. Certain of the Prepetition Secured Parties have consented to the Debtors' use of Prepetition Collateral (including Cash Collateral) solely to the extent expressly permitted under the Approved Budget (subject to Permitted Variances), the Debtors' entry into the DIP Facility, the incurrence of the DIP Liens, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, in each case, in accordance with and subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(g)     *Limitation on Charging Expenses against Collateral; Section 552(b) Waiver*. As a material inducement to the DIP Lenders' agreement to provide the DIP Facility, and in exchange for (i) the DIP Secured Parties' agreement to subordinate their DIP Liens to the Carve Out and Permitted Prior Liens, (ii) the Prepetition Secured Parties' agreement to subordinate their Prepetition Liens and Adequate Protection Liens to the DIP Liens and the Carve Out to the extent set forth herein, and (iii) certain of the Prepetition Secured Parties' consent to the use of Prepetition Collateral (including Cash Collateral), (a) subject to entry of the Final Order granting such relief, the Debtors have waived their right to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Secured Parties, the Prepetition First Lien Secured Parties or the Prepetition ABL Secured Parties upon, the DIP

Collateral, the Prepetition ABL Collateral or the Prepetition First Lien Collateral (as applicable), whether pursuant to section 506(c) of the Bankruptcy Code or otherwise, (b) subject to entry of the Final Order granting such relief, the DIP Secured Parties, Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the Prepetition ABL Collateral or the Prepetition First Lien Collateral (as applicable) (other than with respect to Debtor Freedom VCM Holdings, LLC as specifically set forth in paragraph 33 below), and (c) subject to entry of the Final Order granting such relief, each of the Prepetition First Lien Secured Parties and Prepetition ABL Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition First Lien Secured Parties, the Prepetition ABL Secured Parties or the Prepetition First Lien Collateral or the Prepetition ABL Collateral, in the case of each of the foregoing, to the extent set forth herein.

(h)     *Proper Exercise of Business Judgment*. Based on the Motion, the DIP Declarations, and the record presented to the Court at the Interim Hearing, (a) the terms of the DIP Facility, (b) the terms of adequate protection granted to the Prepetition Secured Parties hereunder, and (c) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order, (i) were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties and the Prepetition Secured Parties, (ii) are fair, reasonable, and the best available to the Debtors under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration. Absent access to the DIP Facility and the ability to continue to use Cash Collateral upon the terms set forth in this

Interim Order, the DIP Loan Documents, including the Approved Budget (subject to Permitted Variances), the Debtors, their estates, their creditors and other parties-in-interest will be seriously, immediately and irreparably harmed.

(i) *Good Faith*. The DIP Facility and the terms of the DIP Loan Documents, the terms on which the Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties have consented to the Debtors' use of Cash Collateral, and this Interim Order have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, the Prepetition Secured Parties and each of their respective Representatives, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility, the DIP Loan Documents and this Interim Order, including, without limitation, all loans, advances, extensions of credit and other financial accommodations made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents, shall each be deemed to have been extended by the DIP Secured Parties, the Prepetition Secured Parties (as applicable) and each of their respective affiliates, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by sections 364(e) of the Bankruptcy Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the DIP Secured Parties and the Prepetition Secured Parties (and each of their successors and assigns thereof) pursuant to this Interim Order and the DIP Loan Documents (including, without limitation, all DIP Obligations, DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Claims, Adequate Protection Obligations, and adequate protection payments provided under this Interim Order), shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(j)    *Initial Budget*. The Debtors have prepared and delivered to the DIP Secured Parties the initial itemized cash flow forecast set forth on **Exhibit 3** attached hereto (the "***Initial Budget***"), reflecting, on a line item, cumulative and aggregate basis, (i) the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors, in each case, for each calendar week during the period from the calendar week ending on the Saturday of the calendar week in which the Petition Date occurs through and including the end of the thirteenth (13th) calendar week thereafter, (ii) the sum of weekly unused availability under the DIP Facility, plus unrestricted cash on hand, (iii) the weekly outstanding principal balance of amounts outstanding under the DIP Facility, and (iv) a professional fee accrual budget with respect to the anticipated professional fees and expenses to be incurred by each applicable professional advisor during such period. The Initial Budget is an integral part of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties (as applicable) are relying, in part, upon the Debtors' agreement to comply (subject to Permitted Variances) with the Approved Budget, in determining to enter into the DIP Facility and to allow the Debtors' use of proceeds of the DIP facility and Cash Collateral in accordance with the terms of this Interim Order and the DIP Loan Documents.

(k)    *Notice*. Notice of the Motion and the Interim Hearing constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Local Bankruptcy Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

(l)    *Immediate Entry*. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and 6003 and the Local

Bankruptcy Rules. Unless the relief set forth in this Interim Order is granted, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and the use of Prepetition Collateral (including Cash Collateral) upon the terms set forth in this Interim Order and the DIP Loan Documents are in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) and the Local Bankruptcy Rules. The Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-1(b).

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the Motion, the DIP Declarations, the evidence adduced at the Interim Hearing and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.     *Motion Granted.* The Motion is hereby granted, on an interim basis, upon the terms and conditions set forth in this Interim Order and the DIP Loan Documents. Any objections or other statements with respect to any of the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights inconsistent with this Interim Order, are hereby denied and overruled. This Interim Order shall become effective and enforceable immediately upon its entry.

2.     *Authorization of DIP Facility and DIP Loan Documents.*

(a)     *Authorization of DIP Loan Documents.* The DIP Facility is hereby approved. The Debtors are hereby authorized to (i) execute, deliver and perform all of their obligations under the DIP Loan Documents and this Interim Order; and (ii) execute, deliver and perform under any and all other instruments, certificates, agreements and other documents

(including, without limitation, the execution and/or recordation of collateral, pledge and security documents, mortgages and deeds of trust (if applicable) and financing statements), and perform all such other and further acts that, may be necessary, required or desirable for the Debtors to perform their obligations under the DIP Facility, the DIP Loan Documents and this Interim Order and to implement the transactions contemplated thereunder and hereunder.

(b)     *Authorization to Borrow; Use of Cash Collateral.* The Borrowers are hereby authorized to borrow, and the Guarantors are hereby authorized to guarantee, on a joint and several basis, up to the principal amount of $125 million (*plus* applicable interest, premiums (including, without limitation, the Backstop Premium and the Commitment Premium), fees (including professional fees and expenses), costs, expenses, charges and other amounts payable hereunder and under the DIP Loan Documents), subject to the terms and conditions (including any conditions precedent to such DIP Borrowing) set forth in the DIP Loan Documents and this Interim Order. The Debtors are hereby authorized to use the proceeds of all DIP Borrowings under the DIP Facility and all Cash Collateral solely in the manner and for the purposes expressly permitted in the Approved Budget (subject to Permitted Variances), the DIP Loan Documents and this Interim Order.

(c)     *Roll Up DIP Loans.* The Roll Up is hereby approved to the extent set forth herein. Effective immediately upon entry of this Interim Order and the completion of the Syndication on the Syndication Date pursuant to the Syndication Procedures, up to $500,000,000 of the Prepetition First Lien Secured Obligations (together with accrued and unpaid interest thereon) held by the DIP Lenders (or any of their respective designated Approved Funds) as of the Syndication Date will be, on the Syndication Date, automatically deemed "rolled up" and converted into the DIP Facility, on a cashless two dollars of Roll Up DIP Loans for every dollar

of principal amount of New Money DIP Loans (i.e., $250,000,000), based upon such Person's (or any of its designated Approved Funds) *pro rata* share of principal amount of New Money DIP Loans, and shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Roll Up DIP Loans for all purposes hereunder, and shall not be subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action of any nature or description whatsoever, and which Roll Up DIP Loans shall be due and payable in accordance with the terms and conditions set forth in the DIP Credit Agreement as if originally funded thereunder on the Effective Date. From and after the Effective Date, the outstanding aggregate amount of Prepetition First Lien Secured Obligations held by each such DIP Lender (or any of its designated Approved Funds) shall be automatically and irrevocably deemed reduced by the amount of the Roll Up DIP Loans held by such DIP Lender (or any of its designated Approved Funds).

(d)    *Syndication; Roll Up Process*. The Debtors, the Debtors' claims agent, the DIP Secured Parties and the Prepetition First Lien Agent are authorized and directed to take any and all actions as may be necessary or appropriate to effectuate (i) the Syndication of the DIP Facility pursuant to the Syndication Procedures, and (ii) the Roll Up of a portion of the Prepetition First Lien Secured Obligations held by the DIP Lenders (or any of their respective designated Approved Funds) as of the Syndication Date into the DIP Facility, including, without limitation, the assignment, transfer or designation of such Prepetition First Lien Secured Obligations pursuant to any procedure that facilitates the cancellation of such Prepetition First Lien Secured Obligations in connection with the Roll Up. The Debtors, the Debtors' claims agent, the DIP Secured Parties and the Prepetition First Lien Agent are authorized and directed to take such further actions as are necessary or appropriate to implement the Roll Up. In furtherance of the foregoing, the Prepetition First Lien Agent is authorized and directed in connection with the

Roll Up to cancel a corresponding amount of the Prepetition First Lien Secured Obligations in the Register (as defined in the Prepetition First Lien Credit Agreement) maintained by it as directed by Lender Advisors.

(e)     *DIP Fees and Expenses; Indemnification.* The Debtors are hereby authorized and directed to pay, as and when due, any and all (i) fees, premiums or other payments payable under the DIP Loan Documents (including, without limitation, fees payable under the Syndication Procedures, the Fronting Fee, the Backstop Premium (which shall be paid in kind and added the principal amount of the New Money DIP Loans), the Commitment Premium (which shall be paid in kind and added the principal amount of the New Money DIP Loans), and the Exit Premium), and in any separate letter agreements between any of the Debtors, on the one hand, and the DIP Agent and/or the DIP Lenders, on the other hand, including, without limitation, put option premiums, "seasoning" fees, commitment payments, unused facility payments, early termination, prepayment or exit payments, unused facility payments, administrative agent's, collateral agent's or trustee's fees, or other amounts referred to therein, (ii) amounts due (or that may become due) to the "Indemnitees" (as defined in the DIP Credit Agreement) in respect of the indemnification obligations under the DIP Loan Documents, which are hereby approved, and (iii) costs, expenses and disbursements of the DIP Secured Parties payable under the DIP Loan Documents and this Interim Order, including, without limitation, the reasonable and documented fees and expenses of (A) Seward & Kissel LLP, as counsel to the DIP Agent, (B) one local counsel to the DIP Agent, (C) Paul Hastings LLP, as counsel to the ad hoc group of certain Prepetition First Lien Lenders (the "***Ad Hoc Lender Group***"), (D) Landis Rath & Cobb LLP, as local counsel to the Ad Hoc Lender Group, (F) Lazard Frères & Co., as financial advisor to the Ad Hoc Lender Group, and (G) any other accountants, consultants, attorneys, advisors, appraisers, or other professionals that

may be retained by the Ad Hoc Lender Group with the consent of the Borrower, such consent not to be unreasonably withheld or delayed (the foregoing subclauses (C)-(G), the "***Lender Advisors***"), in the case of each of the foregoing clauses (i)-(iii), whether or not such payments, premiums, fees, costs, expenses or other amounts arose before or after the Petition Date and whether or not the transactions contemplated herein or in the DIP Loan Documents are consummated, without the need to file fee or retention applications with the Court, without the need to comply with the U.S. Trustee's fee guidelines, and all such payments, premiums, fees, costs, expenses and other amounts are hereby approved (and, to the extent paid prior to the entry of this Interim Order, ratified in full), shall be non-refundable and irrevocable, and shall not be subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including any Avoidance Action, or any other claim or Cause of Action seeking the reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, surcharge, recovery, or any other claim or Cause of Action of any nature and description whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise. In the case of the foregoing clause (iii), any invoices submitted for payment may be in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall be promptly paid by the Debtors, on a monthly basis as appropriate, upon receipt of any such invoices, subject to paragraph 11 with respect to fees and expenses incurred after the Effective Date.

3.      *DIP Obligations.*

(a)      Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the Debtors, and shall be fully enforceable against each of the Debtors, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "***Successor Cases***"), in each case, in accordance with the terms of the DIP Loan Documents and this Interim Order.

(b)      Upon execution and delivery of the DIP Loan Documents, the DIP Loan Parties shall be jointly and severally liable for all DIP Obligations, including, without limitation, all loans, advances, extensions of credit, financial accommodations, principal, interest, premiums or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts (including without limitation, all "Secured Obligations" as defined in the DIP Credit Agreement), whether or not such obligations arose before or after the Petition Date, whenever the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, in each case, which may now or from time to time be owing by any of the Debtors to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, or any of the DIP Lenders under the DIP Loan Documents or this Interim Order. The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease, on the DIP Termination Date (as defined below) (subject to paragraph 21(b) hereof), and without limiting

the foregoing, the use of Cash Collateral shall also automatically cease upon the occurrence of the Cash Collateral Termination Date (subject to paragraph 21(f) hereof).

(c)     All obligations incurred, payments made, and transfers or grants of security and liens set forth in this Interim Order and the DIP Loan Documents by the Debtors are granted to or for the benefit of the Debtors for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby. No obligation, payment, transfer, or grant of liens and security interests under this Interim Order or the DIP Loan Documents to the DIP Secured Parties or the Prepetition Secured Parties (including, without limitation, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Adequate Protection Obligations, or any adequate protection payments provided hereunder) shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including any Avoidance Action or any other claim or Cause of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery, or any other claim or Cause of Action of any nature and description whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (in each case in accordance with and subject to the fee review procedures set forth in paragraph 11 hereof).

4.     *No Obligation to Extend Credit.* The DIP Lenders shall have no obligation to make any loan or advance under the applicable DIP Loan Documents unless all of the conditions precedent to the making of such loan or advance by the applicable DIP Lenders under the

applicable DIP Loan Documents and this Interim Order have been satisfied in full (or waived) in accordance with the terms of the DIP Loan Documents and this Interim Order, as applicable. Notwithstanding anything contained in this Interim Order or the DIP Loan Documents to the contrary, in no event shall (i) the aggregate principal amount of the DIP Loans available or outstanding under the DIP Credit Agreement at any time (after giving effect to all DIP Borrowings previously made or requested) exceed the total Term Commitments (as defined in the DIP Credit Agreement), or (ii) the aggregate principal amount of the DIP Loans from any DIP Lender exceed such DIP Lender's Term Commitment (as defined in the DIP Credit Agreement).

5.      *No Duty to Monitor Compliance*. None of the DIP Secured Parties or the Prepetition Secured Parties shall have any obligation or responsibility to monitor the Debtors' use of DIP Collateral, Prepetition Collateral or Cash Collateral, and each of the DIP Secured Parties and Prepetition Secured Parties may rely upon the Debtors' representations that the use of DIP Collateral, Prepetition Collateral and Cash Collateral complies with and is in accordance with the requirements of this Interim Order and the DIP Loan Documents.

6.      *DIP Liens.*

(a)      *DIP Liens.* Effective upon entry of this Interim Order, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreements or other action to take possession or control of any DIP Collateral), as security for the prompt and complete payment and performance of all DIP Obligations when due (whether at stated maturity, by acceleration or

otherwise), the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "***DIP Liens***") in all DIP Collateral, subject and subordinate to the Carve Out and Permitted Prior Liens (as defined below), and subject to the relative priorities set forth in paragraph 6(c) and **Exhibit 4** of this Interim Order.

(b)    The term "***DIP Collateral***" means all assets and properties of each of the Secured DIP Loan Parties and their estates, of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, any of the Secured DIP Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, and wherever located, including, without limitation, (i) all of the Secured DIP Loan Parties' rights, title and interests in all "Collateral" (as defined in the DIP Credit Agreement), Prepetition Collateral (including Cash Collateral), ABL Priority Collateral and Term Loan Priority Collateral (each as defined in the Prepetition ABL Intercreditor Agreement), (ii) all money, cash and cash equivalents, all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with any and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time), all accounts receivable and other receivables (including those generated by intercompany transactions), all rights to payment, contracts and contract rights, all instruments, documents and chattel paper, all securities (whether or not marketable), all goods, furniture, machinery, plants, equipment, vehicles, inventory and fixtures, all real property interests, all interests in leaseholds, all franchise rights, all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property, all general intangibles, tax or other refunds, or insurance proceeds, all equity interests, capital stock, limited

liability company interests, partnership interests and financial assets, all investment property, all supporting obligations, all letters of credit and letter of credit rights, all commercial tort claims (including, for the avoidance of doubt, any Cause of Action related thereto), all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records), and all rents, products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to any Secured DIP Loan Party from time to time with respect to any of the foregoing, and (iii) subject to entry of the Final Order, all proceeds of and property that is recovered from or becomes unencumbered as a result of, whether by judgment, settlement or otherwise, Avoidance Actions ("***Avoidance Action Proceeds***").

(c)    *Priority of DIP Liens.* The DIP Liens shall have the following ranking and priorities (subject in all cases to the Carve Out):

(i)    *First Priority Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to Permitted Prior Liens, including, for the avoidance of doubt, subject to entry of the Final Order, Avoidance Action Proceeds (collectively, the "***Unencumbered Property***").

(ii)    *Priming DIP Liens and Junior DIP Liens.* Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than as described in subparagraph (c)(i) of this paragraph 6), which DIP Liens (A) shall be subject and subordinate to (1) Permitted Prior Liens, and (2) solely with respect to ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) and DIP Collateral of a type that would otherwise constitute ABL Priority Collateral, the ABL Adequate Protection Liens (as defined below) and the Prepetition ABL Liens, (B) shall be subject to the priorities set forth in **Exhibit 4** attached hereto, and (C) shall be senior to any and all other liens and security interests in the DIP Collateral, including, without limitation, all liens and security interests in the Term Loan Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) or any DIP Collateral that would otherwise constitute Term Loan Priority Collateral (including, without limitation, any ABL Adequate Protection Liens, Prepetition

ABL Liens, First Lien Adequate Protection Liens (as defined below), Prepetition First Lien Liens, Second Lien Adequate Protection Liens (as defined below), Second Lien Sidecar Adequate Protection Liens (as defined below), Prepetition Second Liens or Prepetition Second Lien Sidecar Liens in Term Loan Priority Collateral).

(iii) *DIP Liens Senior to Other Liens.* Except to the extent expressly permitted hereunder, the DIP Liens and the DIP Superpriority Claims (as defined below) shall not be made subject or subordinate to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, including any lien, security interest or claim granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided and preserved for the benefit of the Secured DIP Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Secured DIP Loan Parties or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.

(d) To the fullest extent permitted by the Bankruptcy Code, any provision of any lease, license, contract or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest, or proceeds thereof or other collateral related thereto, shall have no force or effect with respect to the transactions granting the DIP Liens or the Adequate Protection Liens in any such fee, leasehold, interest, or other collateral, or in the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Secured Parties or the Prepetition Secured Parties in accordance with the DIP Loan Documents and this Interim Order.

(e) Subject to entry of this Interim Order and solely with respect to Freedom VCM Holdings, LLC subject to paragraph 33 below, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, may be repaid (i) *first*, from the DIP Collateral comprising Unencumbered Property, and (b) *second*, from all other DIP Collateral, subject to the relative priorities set forth on **Exhibit 4** hereto.

7.     *DIP Superpriority Claims.* Pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code, the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors in each of their respective Chapter 11 Cases and any Successor Cases on account of the DIP Obligations, with priority over any and all other administrative expense claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, the Adequate Protection Claims and all administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***DIP Superpriority Claims***"). The DIP Superpriority Claims shall (x) for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and (y) be subject to the priorities set forth in **Exhibit 4** attached hereto. The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral, subject only to the Carve Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.     *Use of DIP Collateral, Prepetition Collateral and Cash Collateral.*

(a)     The Debtors are hereby authorized to use the proceeds of DIP Loans and all Cash Collateral solely to the extent permitted under the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions set forth in the DIP Loan Documents and this

Interim Order. Except on the terms and conditions of this Interim Order and the DIP Documents, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court.

(b)     Without the prior written consent of the Required DIP Lenders, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as permitted by the DIP Loan Documents. All collection and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents (subject to paragraph 37 hereof and the priorities set forth on **Exhibit 4** hereto). Except as may be provided in the DIP Loan Documents, and subject to the priorities set forth on **Exhibit 4** hereto, the Debtors are authorized and directed, upon the closing of a sale of any of the DIP Collateral, to immediately pay all proceeds of any such sale to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, to satisfy the DIP Obligations in accordance with this Interim Order and the DIP Loan Documents until the DIP Obligations are Paid in Full,[7] and any order approving the sale of such DIP Collateral shall provide that the sale is conditioned upon such payment of DIP Obligations (except to the extent otherwise agreed in writing by the Required DIP Lenders).

9.     *Budget and Variance Reporting.*

(a)     The Initial Budget sets forth, on a line item, cumulative and aggregate basis, (i) the Debtors' projected cash receipts expected to be collected, and necessary disbursements and

---

[7]   The term "***Paid in Full***" or "***Payment in Full***" means the indefeasible payment in full in cash of all DIP Obligations or Prepetition Secured Obligations, as the case may be, other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder have been terminated or expired.

expenditures (including debt service costs) expected to be incurred or made, by the Debtors, in each case, for each calendar week during the period from the calendar week ending on the Friday of the calendar week in which the Petition Date occurs through and including the end of the thirteenth (13th) calendar week thereafter, (ii) the sum of weekly unused availability under the DIP Facility, plus unrestricted cash on hand, (iii) the weekly outstanding principal balance of amounts outstanding under the DIP Facility, and (iv) a professional fee accrual budget with respect to the anticipated professional fees and expenses to be incurred by each applicable professional advisor during such period.

(b)  *Updated Budgets*.  No later than 5:00 p.m. (New York City time) on every fourth Thursday following the Petition Date (each such Thursday, the "***Updated Budget Deadline***"), the DIP Loan Parties shall deliver to the DIP Agent, the Lender Advisors and the DIP Lenders a supplement to the Initial Budget (each, an "***Updated Budget***"), covering the then-upcoming 13-week period that commences with Saturday of the calendar week immediately preceding such Updated Budget Deadline, in each case consistent with the form and detail set forth in the Initial Budget and including a forecasted unrestricted cash balance as well as a line-item report setting forth the estimated fees and expenses to be incurred by each professional advisor on a weekly basis; provided, however, that (x) (i) the Updated Budget will be deemed, in each case, conditionally approved unless the Required DIP Lenders provide written notice of their objection to such Updated Budget (which notice may be provided by one of the Lender Advisors on their behalf via email) within four(4) Business Days of the delivery of such Updated Budget, and during such period, the Initial Budget or most recent Approved Budget, as applicable, shall remain in effect (the "***Interim Approval Period***"), (ii) following the Interim Approval Period, if no objection is received from the Required DIP Lenders pursuant to clause (i), the Updated Budget shall be

deemed the Approved Budget, shall be in full force and effect and shall constitute the "Approved Budget" (which Approved Budget shall be the Initial Budget until superseded by an approved Updated Budget), provided, that the Required DIP Lenders may, at any time after such Interim Approval Period and until the date that is seven (7) Business Days after delivery of the Updated Budget (each such date, an "*Objection Deadline*"), object to such Updated Budget, and upon receipt of such objection, the Initial Budget or the most recent Approved Budget shall be deemed the Approved Budget and (y) if the Required DIP Lenders do not provide written notice of their objection to such Updated Budget (which notice of objection may be provided by one the Lender Advisors on their behalf via email) by the applicable Objection Deadline, the Updated Budget shall be in full force and effect and shall constitute the Approved Budget for all purposes hereunder; (iii) the Required DIP Lenders shall not have any obligation to approve any Updated Budget, and (iv) no modification to the Initial Budget or any Updated Budget, any reforecasting of any information relating to any period covered thereby or the inclusion of new line items in any Updated Budget, as the case may be, shall in any event be effective without the affirmative written consent of the Required DIP Lenders (which may be provided by one of the Lender Advisors on their behalf via email).

(c)    No later than 5:00 p.m. (New York City time) every Thursday, commencing with the first Thursday immediately following the first full week after the calendar week in which the Petition Date occurs (each such Thursday, the "*Variance Report Deadline*"), the DIP Loan Parties shall deliver to the DIP Agent and the Lender Advisors a variance report, each in form, detail and substance satisfactory to the Required DIP Lenders in their sole discretion (each, a "*Variance Report*"), setting forth the difference between, on a line-by-line and aggregate basis, (i) actual operating receipts and budgeted operating receipts as set forth in the Approved Budget,

as the case may be (the "***Receipts Variance***"), and (ii) actual operating disbursements and budgeted operating disbursements as set forth in the Approved Budget, as the case may be (the "***Disbursements Variance***"), in each case, for the applicable period, together with a reasonably detailed explanation of such Receipts Variance and Disbursements Variance for such applicable period.

10.    *Adequate Protection*. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e) and 507 of the Bankruptcy Code, to adequate protection of their respective Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in this paragraph 10, are collectively referred to herein as the "***Adequate Protection Obligations***"):

(a)    *Adequate Protection for Prepetition ABL Secured Parties.* The Prepetition ABL Secured Parties are hereby granted the following adequate protection of their Prepetition ABL Liens in the Prepetition ABL Collateral (including Cash Collateral):

(i)    *ABL Adequate Protection Claims.* The Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, is hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition ABL Liens in the Prepetition ABL Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases (the "***ABL Adequate Protection Claims***"), which shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral. The ABL Adequate Protection Claims shall be (a) subject and subordinate to the Carve Out and the DIP Superpriority Claims and *pari passu* with the First Lien Adequate Protection Claims (as defined below), (b) subject to the relative priorities set forth in **Exhibit 4** attached hereto, and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(ii)    *ABL Adequate Protection Liens.* The Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, is hereby granted, effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take

-40-

possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition ABL Liens in the Prepetition ABL Collateral, valid, binding, enforceable and perfected post-petition liens and security interests in all DIP Collateral (the "***ABL Adequate Protection Liens***"). The ABL Adequate Protection Liens (a) shall be subject to the Carve Out and Permitted Prior Liens, (b) shall be subject to the relative priorities set forth in **Exhibit 4** attached hereto, and (c) shall be senior to any and all other liens and security interests in the DIP Collateral.

(b)      *Additional Adequate Protection for Prepetition ABL Secured Parties.* As additional adequate protection of the Prepetition ABL Liens in the Prepetition ABL Collateral (including Cash Collateral), the Debtors are hereby authorized to provide, and the Prepetition ABL Secured Parties are hereby granted, additional adequate protection in the form of the following:

(i)      *Interest Due Under Prepetition ABL Credit Agreement.* The Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive (x) promptly upon the entry of this Interim Order, all interest due (at the non-default rate) under the Prepetition ABL Credit Agreement that accrued but was unpaid as of the Petition Date, payable in cash, and (y) thereafter, all interest due (at the non-default rate) under the Prepetition ABL Credit Agreement, as and when due thereunder, payable in cash.

(ii)      *Fees and Expenses.* The Debtors are authorized and directed to pay, without the necessity of filing formal fee applications or compliance with the U.S. Trustee's fee guidelines, the out-of-pocket costs and expenses of the Prepetition ABL Agent, whether arising prior to or after the Petition Date, including, without limitation, the reasonable and documented fees and expenses of (A) Latham & Watkins LLP, as counsel to the Prepetition ABL Agent, (B) M-III Partners, LP, as financial advisor to the Prepetition ABL Agent, (C) one local counsel to the Prepetition ABL Agent, and (D) Choate Hall & Stewart LLP as counsel to certain Prepetition ABL Lenders (collectively, the "***ABL Advisors***"), in each case, as follows: (1) promptly following the entry of this Interim Order, the Debtors shall pay in full in cash all costs and expenses of the Prepetition ABL Agent, including the reasonable and documented fees and expenses of the ABL Advisors (collectively, the "***ABL Fees and Expenses***") arising on or prior to the Petition Date, (2) upon the Effective Date, the Debtors shall pay in full in cash all ABL Fees and Expenses arising through the Effective Date, and (3) thereafter, subject in the case of professional fees to the procedures set forth in paragraph 11 of this Interim Order, the Debtors shall pay in full in cash all ABL Fees and Expenses that arise following the Effective Date.

(iii)      *Reporting.* The Debtors shall provide the Prepetition ABL Agent (and the ABL Advisors) with all reports, documents and other information required to be delivered to the DIP Secured Parties under the DIP Loan Documents and this Interim Order contemporaneously with the delivery of such information to the DIP Secured Parties. The Debtors shall provide the Prepetition ABL Agent with all other reporting required under the Prepetition ABL Credit Agreement when due in accordance with its terms except as otherwise set forth in this Interim Order.

(iv)     *Cash Management Covenant.* The Debtors shall maintain their cash management arrangements in a manner consistent with those described in the applicable "first day" order, which shall be in form and substance reasonably acceptable to the Prepetition ABL Agent.

(v)     *[Reserved.]*

(vi)     *ABL Cash Collateral Borrowing Base.*     The definition of "Borrowing Base" used in the determination of any Availability Event or Borrowing Base Shortfall (each as defined below) shall be the "Borrowing Base" as defined in, and determined in accordance with, the Prepetition ABL Credit Agreement and set forth in the most recent Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement) delivered prior to the Petition Date but modified as provided below herein (the "***Cash Collateral Borrowing Base***"), which, for the avoidance of doubt, shall give effect to the applicable Net Recovery Percentages (as defined in the Prepetition ABL Credit Agreement) set forth in the (i) Addendum, dated September 25, 2024, to the Gordon Brothers appraisal report for Pet Supply Plus, LLC, dated May 13, 2024; (ii) Addendum, dated July 9, 2024, to the Gordon Brothers appraisal report for Franchise Group, Inc. (American Freight Group, Inc.), dated May 15, 2024; and (iii) Addendum, dated July 9, 2024, to the Gordon Brothers appraisal report for Franchise Group, Inc. (Vitamin Shoppe), dated April 30, 2024, and in each case, as adjusted pursuant to a Permitted Re-Appraisal (defined below); provided, further, that notwithstanding anything to the contrary in the Prepetition ABL Credit Agreement, (x) the Cash Collateral Borrowing Base shall not otherwise reflect any new reserves or any modifications of eligibility criteria  (except those eligibility criteria that automatically change pursuant to the application of any formula or numerical calculation as in effect on the Petition Date), (y) the Cash Collateral Borrowing Base will be calculated using any updated Borrowing Base Certificates (as defined in the ABL Credit Agreement) as and when required to be delivered pursuant to paragraph 10(a)(vii) below, and (z) the Cash Collateral Borrowing Base shall be increased (on a dollar-for-dollar basis) by the amount of cash then held in the Adequate Protection Account (as defined herein).  For the avoidance of doubt, the Cash Collateral Borrowing Base shall not include any amounts deposited in the Professional Fees Account pursuant to paragraph 23(b) hereof.

(vii)     *Borrowing Base Reporting*. The Debtors shall deliver to the Prepetition ABL Agent, with copies to the DIP Agent, a Borrowing Base Certificate, with all the information required to be provided in connection therewith, in each case in the format customarily delivered with each Borrowing Base Certificate delivered prior to the Petition Date, setting forth the Cash Collateral Borrowing Base (i) calculated as of the last day of the immediately preceding calendar week (with weeks, for purpose of the Borrowing Base Certificate, beginning on Sunday and ending on Saturday) on Thursday of each week commencing on November 14, 2024 for the week ending November 9, 2024, and each Thursday thereafter; and (ii) calculated as of the last Business Day of the immediately preceding fiscal month, promptly, but in no event later than December 20, 2024 with respect to the fiscal month ended November 30, 2024, and twenty calendar days (or, if such day is not a Business Day, the next Business Day) following the end of each subsequent fiscal month, which monthly Borrowing Base Certificates shall reconcile all weekly

inventory roll forwards. The Borrowing Base Certificates will include weekly back up information consistent with the Prepetition ABL Credit Agreement, including, but not limited to, an inventory summary report by category as determined by Borrowers in accordance with their current and prior inventory management policies and a letter of credit inventory summary, and identifying where such inventory is located.

(viii) *Appraisals*. Notwithstanding anything to the contrary in the Prepetition ABL Credit Agreement, the Prepetition ABL Agent will not be entitled to request access for and/or request any new inspections, appraisals and field examinations (including, without limitation, with respect to ABL Priority Collateral). Notwithstanding the foregoing, the Prepetition ABL Agent shall be permitted to request access for and/or request any new inspections, appraisals, and field examinations from time to time, at the Prepetition ABL Agent's own expense, for valuation purposes only, which (i) do not impact the calculation of the Cash Collateral Borrowing Base and (ii) do not unreasonably interfere with the ordinary course activities and operations of the Debtors as in effect at such time, *provided* that, on or after the "Outside Date" under and as defined in the DIP Credit Agreement, if the Prepetition ABL Loan Parties have not emerged from chapter 11, the Prepetition ABL Agent may conduct one appraisal, inspection, and field examination consistent with past practice, and may adjust the valuations used to calculate the Borrowing Base in accordance with the terms of the Prepetition ABL Credit Agreement based on such appraisal, inspection, or field examination (a "***Permitted Re-Appraisal***").

(ix) *Adequate Protection Account*. If the Borrower delivers a weekly Borrowing Base Certificate to the Prepetition ABL Agent that provides a Borrowing Base that is less than the sum of (a) the Prepetition ABL Obligations plus (b) $32,000,000 (an "***Availability Event***," and the amount of such shortfall, the "***Borrowing Base Shortfall***"), the Borrower shall, by the end of the second Business Day thereafter, deposit cash in an amount equal to the Borrowing Base Shortfall into a controlled segregated reserve account maintained by the Prepetition ABL Agent (the "***Adequate Protection Account***"), with all funds held in the Adequate Protection Account deemed ABL Priority Collateral and deemed not DIP Collateral, *provided* that the Borrowing Base shall be adjusted on a dollar-for-dollar basis by the amount of cash then held in the Adequate Protection Account and shall be reflected in Borrowing Base Certificates, *provided further* that, for the avoidance of doubt, the DIP Liens shall extend to the Debtors' reversionary interest in the Adequate Protection Account. The Borrower may withdraw cash from the Adequate Protection Account at any time so long as such withdrawal, delivery of the most recent Borrowing Base Certificate would not have resulted in an Availability Event.

(c) *Adequate Protection for Prepetition First Lien Secured Parties.* The Prepetition First Lien Secured Parties are hereby granted the following adequate protection of their Prepetition First Lien Liens in the Prepetition First Lien Collateral (including Cash Collateral):

(i) *First Lien Adequate Protection Claims.* The Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, is hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition First Lien Liens

in the Prepetition First Lien Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors in each of their respective Chapter 11 Cases and any Successor Cases (the "***First Lien Adequate Protection Claims***"), which shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral. The First Lien Adequate Protection Claims shall be (a) subject and subordinate to the Carve Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in **Exhibit 4** attached hereto, and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature.

        (ii)    *First Lien Adequate Protection Liens.* The Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, is hereby granted, effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition First Lien Liens in the Prepetition First Lien Collateral, valid, binding, enforceable and perfected post-petition liens and security interests in all DIP Collateral (the "***First Lien Adequate Protection Liens***"). The First Lien Adequate Protection Liens shall be (a) subject to the Carve Out, the DIP Liens, and Permitted Prior Liens, and with respect to ABL Priority Collateral, the ABL Adequate Protection Liens and the Prepetition ABL Liens, (b) subject to the relative priorities set forth in **Exhibit 4** attached hereto, and (c) senior to any and all other liens and security interests in the DIP Collateral.

        (d)    *Additional Adequate Protection for Prepetition First Lien Secured Parties.*

As additional adequate protection of the Prepetition First Lien Liens in the Prepetition First Lien Collateral (including Cash Collateral), the Debtors are hereby authorized to provide, and the Prepetition First Lien Secured Parties are hereby granted, additional adequate protection in the form of the following:

        (i)    *Interest Due Under Prepetition First Lien Credit Agreement.* The Prepetition First Lien Agent, on behalf of the Prepetition First Lien Lenders, shall receive (x) promptly upon the entry of this Interim Order, all interest due (at the non-default rate) under the Prepetition First Lien Credit Agreement that accrued but was unpaid as of the Petition Date, if any, payable in cash, and (y) thereafter, all interest due (at the non-default rate) under the Prepetition First Lien Credit Agreement, as and when due thereunder, payable in cash.

(ii)    *Fees and Expenses.* The Debtors are authorized and directed to pay, without the necessity of filing formal fee applications or compliance with the U.S. Trustee's fee guidelines, whether arising prior to or after the Petition Date, (A) the out-of-pocket fees, costs and expenses of the Prepetition First Lien Agent, including, without limitation, the reasonable and documented fees and expenses of (x) Seward & Kissel LLP, as counsel to the Prepetition First Lien Agent, and (y) a single firm as local counsel to the Prepetition First Lien Agent (collectively, the "***First Lien Agent Fees and Expenses***"), and (B) the out-of-pocket fees and expenses of the members of the Ad Hoc Lender Group, including, without limitation, the reasonable and documented fees and expenses of the Lender Advisors (collectively, the "***Ad Hoc Lender Group Fees and Expenses***", and together with the First Lien Agent Fees and Expenses, the "***First Lien Fees and Expenses***"), in each case, as follows: (1) promptly following the entry of this Interim Order, the Debtors shall pay in full in cash all First Lien Fees and Expenses arising on or prior to the Petition Date, (2) upon the Effective Date, the Debtors shall pay in full in cash all First Lien Fees and Expenses arising through the Effective Date, and (3) thereafter, subject in the case of professional fees to the procedures set forth in paragraph 11 of this Interim Order, the Debtors shall pay in full in cash all First Lien Fees and Expenses that arise following the Effective Date.

(iii)    *Reporting.* The Debtors shall provide the Prepetition First Lien Agent and the Lender Advisors with all reports, documents and other information required to be delivered to the DIP Secured Parties and the Prepetition ABL Secured Parties under the DIP Loan Documents and the Prepetition ABL Loan Documents, respectively, and this Interim Order contemporaneously with the delivery of such information to the DIP Secured Parties to the Prepetition ABL Secured Parties, as applicable.

(iv)    *Cash Management Covenant.* The Debtors shall maintain their cash management arrangements in a manner consistent with those described in the applicable "first day" order, which shall be in form and substance reasonably acceptable to the Ad Hoc Lender Group.

(e)    *Adequate Protection for Prepetition Second Lien Secured Parties.* The Prepetition Second Lien Secured Parties are hereby granted the following adequate protection of their Prepetition Second Lien Liens in the Prepetition Second Lien Collateral (including Cash Collateral):

(i)    *Second Lien Adequate Protection Claims.* The Prepetition Second Lien Agent, for the benefit of itself and the Prepetition Second Lien Lenders, is hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition Second Lien Liens in the Prepetition Second Lien Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases (the "***Second Lien Adequate Protection Claims***"), which shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all

-45-

DIP Collateral. The Second Lien Adequate Protection Claims shall be (a) subject and subordinate to the Carve Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in **Exhibit 4** attached hereto, and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(ii)     *Second Lien Adequate Protection Liens.* The Prepetition Second Lien Agent, for the benefit of itself and the Prepetition Second Lien Lenders, is hereby granted, effective and perfected as of the Petition Date, without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other act to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition Second Lien Liens in the Prepetition Second Lien Collateral, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "***Second Lien Adequate Protection Liens***"), which Second Lien Adequate Protection Liens shall be (a) subject to the Carve Out, the DIP Liens and the Permitted Prior Liens and with respect to ABL Priority Collateral, the ABL Adequate Protection Liens and the Prepetition ABL Liens, (b) subject to the relative priorities set forth in **Exhibit 4** attached hereto, and (c) shall be senior to any and all other liens and security interests in the DIP Collateral.

(f)     *Adequate Protection for Prepetition Second Lien Sidecar Secured Parties.*

The Prepetition Second Lien Sidecar Secured Parties are hereby granted the following adequate protection of their Prepetition Second Lien Sidecar Liens in the Prepetition Second Lien Sidecar Collateral (including Cash Collateral):

(i)     *Second Lien Sidecar Adequate Protection Claims.* The Prepetition Second Lien Sidecar Agent, for the benefit of itself and the Prepetition Second Lien Sidecar Lenders, is hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition Second Lien Sidecar Liens in the Prepetition Second Lien Sidecar Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases (the "***Second Lien Sidecar Adequate Protection Claims***", and together with the ABL Adequate Protection Claims, the First Lien Adequate Protection Claims and the Second Lien Adequate Protection Claims, the "***Adequate Protection Claims***"), which shall be payable by each of the DIP Loan Parties, on a joint and several basis, and shall have recourse to all DIP Collateral. The Second Lien Sidecar Adequate Protection Claims shall be (a) subject and subordinate to the Carve Out and the DIP Superpriority Claims, (b) subject to the relative priorities set forth in **Exhibit 4** attached hereto, and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(ii)    *Second Lien Sidecar Adequate Protection Liens.* The Prepetition Second Lien Sidecar Agent, for the benefit of itself and the Prepetition Second Lien Sidecar Lenders, is hereby granted, effective and perfected as of the Petition Date, without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other act to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition Second Lien Sidecar Liens in the Prepetition Second Lien Sidecar Collateral, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "***Second Lien Sidecar Adequate Protection Liens***", and together with the ABL Adequate Protection Liens, the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens, the "***Adequate Protection Liens***"), which Second Lien Sidecar Adequate Protection Liens shall be (a) subject to the Carve Out, the DIP Liens and the Permitted Prior Liens and with respect to ABL Priority Collateral, the ABL Adequate Protection Liens and the Prepetition ABL Liens, (b) subject to the relative priorities set forth in **Exhibit 4** attached hereto, and (c) shall be senior to any and all other liens and security interests in the DIP Collateral.

11.    *Adequate Protection Fees and Expenses.* The invoices with respect to the professional fees and expenses payable under paragraphs 2, 10(b)(ii)(3) and 10(d)(ii)(3) of this Interim Order shall not be required to comply with the U.S. Trustee guidelines, nor shall the applicable professionals be required to file fee applications with the Court with respect to any fees or expenses payable hereunder, and all invoices therefor may be in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall, by email, be provided to counsel to the Debtors, counsel to any Official Committee and the U.S. Trustee (the "***Fee Notice Parties***"); provided, however, if no formal objection to payment of the requested fees and expenses is made in writing by any of the Fee Notice Parties within ten (10) calendar days after delivery of such invoices (the "***Fee Objection Period***"), then, upon the expiration of the Fee Objection Period, without further

order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors and, in any event, no later than three (3) Business Days after expiration of the Fee Objection Period; provided, further, however, if a formal objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, the undisputed portion shall promptly be paid by the Debtors, and in any event, no later than three (3) Business Days after expiration of the Fee Objection Period, and the disputed portion shall only be paid upon resolution of such objection by the applicable parties or by order of the Court. Any hearing on an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice shall be limited to reasonableness of the fees, costs and expenses that are the subject of such objection. Subject to this paragraph 11, none of the adequate protection payments required to be made pursuant to this Interim Order shall be subject to claim, counterclaim, challenge, setoff, subordination, recharacterization, defense, avoidance or disgorgement in the Chapter 11 Cases or any Successor Cases.

12.    *Adequate Protection Reservation of Rights of Prepetition Secured Parties.* Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties pursuant to this Interim Order shall not be deemed an admission that the interests of such Prepetition Secured Parties are indeed adequately protected, and is without prejudice to the right of the Prepetition Secured Parties (subject to the Prepetition Intercreditor Agreements) to seek additional relief with respect to the use of Prepetition Collateral (including Cash Collateral), or to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification. Nothing herein shall be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Secured Parties under the

Prepetition Loan Documents, the Prepetition Intercreditor Agreements, or under applicable law, and the Prepetition Secured Parties expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under the Prepetition Loan Documents and applicable law. Without limiting the foregoing, nothing contained in this Interim Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate the Prepetition Secured Parties for any Diminution in Value during the Chapter 11 Cases.

13.     *Reservation of Rights.* Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Secured Parties or the Prepetition Secured Parties (subject to the Prepetition Intercreditor Agreements and this Interim Order) to seek any other or supplemental relief in respect of the Debtors; (b) subject to the Prepetition Intercreditor Agreements, the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents or the Prepetition Loan Documents (including the Prepetition Intercreditor Agreements), the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code; (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers; or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties (in each case, subject to the Prepetition Intercreditor Agreements). Notwithstanding anything contained herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly

or implicitly, the Debtors' or any party in interest's right to oppose (on an emergency basis if need be) any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order and subject to the Prepetition Intercreditor Agreements.

14.    *Amendments.* Without the need for further notice or approval of this Court, the Debtors are authorized to execute, deliver and perform under, one or more amendments, waivers, consents, or other modifications (including, for the avoidance of doubt, the payment of any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection therewith) to and under the DIP Loan Documents, in each case, in accordance with the provisions of the DIP Credit Agreement governing amendments thereto (and otherwise in form and substance acceptable to the Required DIP Lenders); provided, however, that any amendment that (a) shortens the maturity of the extensions of credit thereunder; (b) increases the aggregate commitments thereunder; or (c) increases the rate of interest or any fee (other than any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection with such amendment) payable thereunder (each, a "***Material DIP Amendment***") shall be provided (which may be by electronic mail) to counsel for any Official Committee, counsel to the Prepetition ABL Agent and the U.S. Trustee and filed with the Court no later than three (3) Business Days prior to the anticipated date of effectiveness of any such Material DIP Amendment, and if no formal objection to the Material DIP Amendment is made by the U.S. Trustee, Prepetition ABL Agent or any Official Committee within such three (3) Business Day period, then, without further notice or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; provided, however, if a formal objection is made by the U.S. Trustee, Prepetition ABL Agent or any Official Committee within such three (3) Business Day period, then such Material DIP Amendment shall be subject to approval of the Court.

15.     *Modification of Automatic Stay.* The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without further notice to or order of this Court, to permit (in each case, subject to the Prepetition Intercreditor Agreements): (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may request to assure the perfection and priority of the DIP Liens; (b) the DIP Loan Parties to incur all liabilities and obligations, including all of the DIP Obligations, to the DIP Secured Parties as contemplated under this Interim Order and the DIP Loan Documents; (c) the DIP Loan Parties to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such acts as the Prepetition Agents may request to assure the perfection and priority of the Adequate Protection Liens; (d) the DIP Loan Parties to incur all liabilities and obligations, including all Adequate Protection Obligations, to the Prepetition Secured Parties as contemplated under this Interim Order and the Prepetition Loan Documents; (e) the DIP Loan Parties to pay all amounts required hereunder and under the DIP Loan Documents; (f) the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of this Interim Order, the Prepetition Intercreditor Agreements, the Prepetition ABL Loan Documents, and the DIP Loan Documents; (g) subject to paragraph 21(b) and/or 21(f) of this Interim Order (as applicable), the DIP Secured Parties and the Prepetition Secured Parties to exercise, upon the occurrence and during the continuance of any DIP Termination Event (as defined below), all rights and remedies provided for in this Interim Order, the DIP Loan Documents or applicable law; (h) to perform under this Interim Order and the DIP Loan Documents, and to take any and all other actions that may be required, necessary, or desirable for the performance by the Debtors under this Interim Order and the DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder; and (i) the

implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents.

16. *Perfection of DIP Liens and Adequate Protection Liens*.

(a)    This Interim Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted hereunder and under the DIP Loan Documents, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein (each, a "**Perfection Act**") (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

(b)    Without in any way limiting the automatically effective perfection of the liens granted hereunder and the DIP Loan Documents (including, without limitation, the DIP Liens and the Adequate Protection Liens), the DIP Agent, at the direction of the Required DIP Lenders, and the Prepetition Agents (acting at the direction of the requisite Prepetition Secured Parties under the applicable Prepetition Loan Documents, as applicable), respectively, are hereby authorized, but not required, in the case of the DIP Agent, at the direction of the applicable Required DIP Lenders, and in the case of the Prepetition Agents, (acting at the direction of the requisite Prepetition Secured Parties under the applicable Prepetition Loan Documents, as applicable) as

they may determine for any reason, to execute, file and record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of submission, to the maximum extent permitted under applicable law) or otherwise effectuate any Perfection Act or to take any other action in order to attach, validate, perfect, preserve and enforce the liens and security interests granted to them hereunder or under the DIP Loan Documents to otherwise evidence such liens and security interests in all DIP Collateral; provided, however, that, whether or not the DIP Agent, at the direction of the Required DIP Lenders, or the Prepetition Agents determine (acting at the direction of the requisite Prepetition Secured Parties under the applicable Prepetition Loan Documents, as applicable), to execute, file, record or otherwise effectuate any Perfection Act with respect to any liens or security interests granted hereunder, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to objection, challenge, dispute, avoidance, recharacterization or subordination as of the entry of this Interim Order. Upon the request of the DIP Agent, at the direction of the Required DIP Lenders, without any further consent of any party, the DIP Agent and the Debtors are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent, for the benefit of itself and the DIP Lenders, to further validate, perfect, preserve and enforce the DIP Liens. All such documents will be deemed to have been recorded and filed as of the entry of this Interim Order.

(c)     A certified copy of this Interim Order may, as to the DIP Agent, at the direction of the Required DIP Lenders, or as to the Prepetition Agents (acting at the direction of the requisite Prepetition Secured Parties under the applicable Prepetition Loan Documents, as applicable), be (but need not be) filed with or recorded in filing or recording offices in addition to or in lieu of any security documents, and all filing offices are hereby authorized and directed to

accept such certified copy of this Interim Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent, at the direction of the Required DIP Lenders, or the Prepetition Agents to take all actions, as applicable, referenced in this paragraph.

17.      *Protection of DIP Lenders' Rights.*

(a)      Until the DIP Obligations are Paid in Full, the Prepetition Secured Parties, and subject to the terms of the Prepetition ABL Intercreditor Agreement and the terms hereof with respect to the Prepetition ABL Secured Parties, shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens or security interests granted to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents or this Interim Order or otherwise seek to exercise or enforce any rights or remedies against any DIP Collateral, Prepetition Collateral or Prepetition Loan Party (as applicable), including, without limitation, any exercise of setoff or recoupment; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens or claims on, such DIP Collateral or and the proceeds thereof, to the extent such transfer, disposition, sale, or release is authorized hereunder, under the applicable DIP Loan Documents; or (iii) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), any of the applicable DIP Secured Parties have filed financing statements or other documents in respect of the liens granted pursuant to this Interim Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or securities interests as of the Petition Date; or (iv) deliver or cause to be delivered, at the Debtors' cost and expense (for which the Prepetition Agents shall be reimbursed upon submission to the Debtors of invoices or billing statements), any

termination statements, releases and/or assignments in favor of the DIP Agent and the DIP Secured Parties or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of DIP Collateral subject to any sale or disposition authorized hereunder or under the DIP Loan Documents. No Prepetition Secured Party may, directly or indirectly, (A) contest, or support any other Person in contesting, in any proceeding, the extent, validity, attachment, priority, or enforceability of any DIP Lien held by or on behalf of any of the DIP Secured Parties in the DIP Collateral (or the extent, validity, allowability, or enforceability of any DIP Obligations secured thereby or purported to be secured thereby) or the provisions of the DIP Loan Documents or this Interim Order, (B) take any action that would restrain, hinder, limit, delay or otherwise interfere with the exercise of any rights or remedies by any of the DIP Secured Parties, or (C) contest, object to or support any other Person in contesting or objecting to the manner in which any DIP Secured Party seeks to enforce or collect the DIP Obligations, the DIP Superpriority Claims or the DIP Liens or any amendment, waiver or modification of any DIP Loan Document (including **Exhibit 4** attached hereto).

(b)      Except with respect to Prepetition ABL Secured Parties and the Prepetition ABL Intercreditor Agreement solely as provided herein, to the extent any Prepetition Secured Party has been noted as a secured party on any security document or otherwise has possession of or control with respect to any Prepetition Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent, for the benefit of itself and the other DIP Secured Parties, and the DIP Lenders, and such Prepetition Secured Party shall comply with the instructions of the DIP Agent, at the direction of the Required DIP Lenders, with

respect to the exercise of such possession or control, subject to the priorities set forth on **Exhibit 4**.

(c)      Notwithstanding anything to the contrary herein, (i) so long as there are any Prepetition ABL Secured Obligations (including the ABL Adequate Protection Claims) outstanding and prior to the Payment in Full of the Prepetition ABL Secured Obligations (including the ABL Adequate Protection Claims), in each case solely with respect to the ABL Priority Collateral, the enforcement rights of the DIP Secured Parties or Prepetition Secured Parties (other than the Prepetition ABL Secured Parties) with respect to ABL Priority Collateral shall be subject to the terms of the Prepetition ABL Intercreditor Agreement as if the DIP Agent was party thereto as a First Lien Term Loan Representative (as defined in the Prepetition ABL Intercreditor Agreement), and (ii) so long as there are any DIP Obligations or Prepetition First Lien Secured Obligations (including the First Lien Adequate Protection Claims) outstanding and prior to the Payment in Full of the DIP Obligations and Prepetition First Lien Secured Obligations (including the First Lien Adequate Protection Claims), in each case solely with respect to the Term Loan Priority Collateral, the enforcement rights of the Prepetition Secured Parties (other than the Prepetition First Lien Secured Parties) with respect to Term Loan Priority Collateral shall be subject to the terms of the Prepetition Intercreditor Agreements, as applicable, as if the DIP Agent was party thereto as a First Lien Term Loan Representative.

(d)      Except with respect to Prepetition ABL Secured Parties and Prepetition ABL Intercreditor Agreement solely as provided herein, in the event that any person or entity that holds a lien on or security interest in DIP Collateral that is junior or otherwise subordinate to the DIP Liens receives any DIP Collateral or proceeds of DIP Collateral, or receives any payment on account of such lien or security interest in the DIP Collateral, (whether in connection with the

exercise of any right or remedy (including setoff), payment or distribution from the Debtors, mistake, or otherwise), prior to the Payment in Full of all DIP Obligations, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Secured Parties, and shall immediately turn over all such proceeds to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in the same form as received, with any necessary endorsements, for application in accordance with the DIP Loan Documents and this Interim Order. The DIP Agent, at the direction of the Required DIP Lenders, is hereby authorized to make any such endorsement as agent for each of the Prepetition Agents or any Prepetition Secured Party. This authorization is coupled with an interest and is irrevocable.

(e)     Except as expressly provided herein or in the DIP Loan Documents, no claim or lien having a priority senior to or *pari passu* with those granted to any of the DIP Secured Parties or Prepetition Secured Parties by this Interim Order shall be granted or permitted while any of the DIP Obligations, Adequate Protection Obligations or the Prepetition Secured Obligations, respectively, remain outstanding. Except as expressly provided in this Interim Order or the DIP Loan Documents, each of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Claims: (A) shall not be made junior or subordinated to or *pari passu* with (i) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, whether under section 364(d) of the Bankruptcy Code or otherwise, (ii) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (iii) any lien arising after the Petition Date including, without limitation, any lien or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (iv) any intercompany or

affiliate lien or claim; and (B) shall not be subject to sections 506(c) (subject to entry of the Final Order granting such relief), 510, 549, 550 or 551 of the Bankruptcy Code.

18.    *Maintenance of DIP Collateral.* Until such time as all DIP Obligations are Paid in Full (or as otherwise agreed in writing by the Required DIP Lenders) and all Prepetition ABL Obligations are Paid in Full (or as otherwise agreed in writing by the Prepetition ABL Agent), the Debtors shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Loan Documents, the Prepetition First Lien Loan Documents and Prepetition ABL Loan Documents. Upon the entry of this Interim Order, the DIP Agent, for the benefit of itself and the other DIP Secured Parties, shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (including all property damage and business interruption insurance policies of the Debtors, whether expired, currently in place, or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, at the direction of the Required DIP Lenders, *first*, to the Payment in Full of all DIP Obligations, and *second*, to the payment of the Prepetition Secured Obligations (subject to the terms and conditions of the Prepetition Intercreditor Agreements), subject, in the case of each of the immediately preceding two clauses, to paragraph 37 hereof. Notwithstanding the foregoing, the Debtors and/or the Prepetition Agents shall take any actions reasonably requested by the DIP Agent, at the direction of the Required DIP Lenders, to have the DIP Agent, on behalf of itself and the other DIP Secured Parties, added as an additional insured and lenders loss payee on each such insurance policy.

19.    *Cash Management.* Until such time as all DIP Obligations and Prepetition Secured Obligations are Paid in Full, the Debtors shall maintain the cash management system in effect as

of the Petition Date, as modified by this Interim Order and any order of the Court authorizing the continued use of the cash management system that is acceptable to the Required DIP Lenders and the DIP Agent. The Debtors shall not open any new deposit or securities account that is not subject to the liens and security interests of each of the DIP Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition First Lien Secured Parties (in which case they shall be subject to the lien priorities and other provisions set forth in this Interim Order).

20.      *Reporting; Access to Records.* The Debtors shall provide the DIP Lenders and Lender Advisors with all reporting, management calls, access to books and records and other information required to be provided to any of the DIP Secured Parties under the DIP Loan Documents. Without limiting the requirements contained herein or in the DIP Loan Documents, the Debtors shall (a) provide the DIP Agent (and its advisors), the Required DIP Lenders, the Ad Hoc Lender Group and any Official Committee (and each of their respective advisors) with (i) all reports, documents, and information required to be delivered under the DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder), and (ii) reasonable access, upon reasonable notice and during regular business hours, to the Debtors' books and records, assets and properties, for purposes of monitoring the Debtors' businesses and operations and the value of the DIP Collateral, and (b) reasonably cooperate and consult with, and provide information reasonably requested by the DIP Agent, at the direction of the Required DIP Lenders, the Required DIP Lenders, the Ad Hoc Lender Group or any Official Committee (and their respective advisors) concerning the Debtors' businesses, financial condition, properties, business operations and assets.

21.    *DIP Termination Events; Exercise of Remedies.*

(a)    *DIP Termination Events.* The occurrence of any of the following shall constitute a "DIP Termination Event" under this Interim Order (each a "***DIP Termination Event***", and the date upon which such DIP Termination Event occurs, the "***DIP Termination Date***"), unless waived in writing by the Required DIP Lenders: (i) the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement; (ii) the occurrence of the "Maturity Date" under and as defined in the DIP Credit Agreement; (iii) any of the Debtors seeks authorization from the Court for (or the Court enters an order authorizing or approving) any amendment, modification, or extension of this Interim Order or the DIP Loan Documents without the prior written consent of the Required DIP Lenders (and no such consent shall be implied by any other action or inaction of any of the DIP Secured Parties); (iv) the failure of the Debtors to make any payment required under this Interim Order or the DIP Loan Documents to any of the DIP Secured Parties or the Prepetition First Lien Secured Parties as and when due and payable hereunder or thereunder; (v) the failure by any of the Debtors to timely perform or comply in any material respect, with any of the other terms, provisions, conditions or other obligations under this Interim Order; or (vi) the occurrence of any Cash Collateral Termination Event.

(b)    *Remedies Upon DIP Termination Event.* Upon the occurrence and during the continuation of a DIP Termination Event, without further notice to, hearing, or order from the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent, acting at the direction of the Required DIP Lenders, to, subject to the terms of the Prepetition Intercreditor Agreements (if applicable): (i) deliver to the Lead Borrower a notice declaring the occurrence of a DIP Termination Event; (ii) declare the termination, reduction or restriction of the commitments under

the DIP Facility (to the extent any such commitment remains); (iii) declare the DIP Obligations then outstanding to be due and payable; (iv) declare the termination of the DIP Facility and the DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens or the DIP Obligations; (v) declare the reduction or restriction on the DIP Facility or the DIP Loan Documents; (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral; (vii) charge interest at the default rate under the DIP Facility; (viii) freeze all monies or balances in any deposit accounts of the Debtors; (ix) immediately exercise any and all rights of set-off; (x) exercise any right or remedy against the DIP Collateral, including, without limitation, the disposition of DIP Collateral for application towards the DIP Obligations; or (xi) take any other action or exercise any other right or remedy permitted under the DIP Loan Documents, this Interim Order or applicable law; provided that, in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (vi), (vii), (viii), (ix), (x) and (xi) of this paragraph 21(b), the DIP Agent, acting at the direction of the Required DIP Lenders, shall provide counsel to the Debtors, the Prepetition ABL Agent and ABL Advisors, counsel to any Official Committee and the U.S. Trustee five (5) days' prior written notice (the "***Remedies Notice***")[8] (which may be provided by email or other electronic means), and during such five (5) day notice period (the "***Remedies Notice Period***"), the Debtors and/or any Official Committee shall be permitted to request an emergency hearing before the Court (which request must be made prior to the conclusion of the Remedies Notice Period, and shall seek consideration of such request on an expedited basis) to determine whether a DIP Termination Event has occurred; provided, however, that, during the Remedies Notice Period, the Debtors are

---

[8]    For the avoidance of doubt, the Remedies Notice, or any other notice contemplated under this paragraph 21 may be included in the Carve Out Trigger Notice.

permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required DIP Lenders, and the Carve Out Reserves.

(c)     Unless the Court finds that a DIP Termination Event has not occurred, following the expiration of the Remedies Notice Period, without further notice to, hearing or order from the Court, the automatic stay of section 362 of the Bankruptcy Code shall automatically be vacated and modified for the purposes of permitting the DIP Secured Parties to exercise any and all rights and remedies available to them under this Interim Order, the DIP Loan Documents, and applicable law (including, without limitation, the enforcement of rights against DIP Collateral pursuant to clauses (vi), (vii), (viii), (ix), (x) and (xi) of paragraph 21(b), subject to the Prepetition Intercreditor Agreements, as applicable).

(d)     Following the expiration of the Remedies Notice Period, and following the Payment in Full of all DIP Obligations (unless the Required DIP Lenders otherwise agree in writing), unless otherwise ordered by the Court during the Remedies Notice Period, the automatic stay of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Prepetition Agents (acting at the direction of the requisite Prepetition Secured Parties under the applicable Prepetition Loan Documents) (subject to the Prepetition Intercreditor Agreements), to exercise all rights and remedies available under the Prepetition Loan Documents or applicable law with respect to Prepetition Collateral consistent with this Interim Order.

(e)     The Debtors shall cooperate with the DIP Secured Parties and/or the Prepetition Secured Parties in their efforts to enforce their liens and security interests in the DIP Collateral or the Prepetition Collateral, as applicable, and (other than the right to contest

whether a DIP Termination Event has occurred and is continuing) the Debtors shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral or the Prepetition Collateral, as applicable.

(f)    Upon the occurrence of any of the below events (a "***Cash Collateral Termination Event***"), the Prepetition ABL Secured Parties, on not less than five (5) days' notice to the Debtors, the Official Committee (if any), and the DIP Lenders (such five (5) day period, the "***ABL Remedies Notice Period***"), during which ABL Remedies Notice Period the Debtors, the DIP Lenders, and/or any Official Committee shall be permitted to request an emergency hearing before the Court (which request must be made prior to the conclusion of the ABL Remedies Notice Period, and shall seek consideration of such request on an expedited basis) to determine whether a Cash Collateral Termination Event has occurred, may terminate their consent to the Debtors' use of Cash Collateral constituting ABL Priority Collateral (unless otherwise ordered by the Court); provided, however, that during the ABL Remedies Notice Period, the Debtors are permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the requisite Prepetition ABL Secured Parties, and the Carve Out Reserves (the date on which the Prepetition ABL Secured Parties' consent to the Debtors' use of Cash Collateral is terminated in accordance with this paragraph 21(f), the "***Cash Collateral Termination Date***"):

(i)    the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) that has not been waived by the Required DIP Lenders pursuant to the DIP Loan Documents or cured for a period of five (5) Business Days;

(ii)    the termination of all commitments under the DIP Facility, other than in accordance with the DIP Documents;

(iii)    the failure of the DIP Lenders to fund a material portion of any properly requested draw under the DIP Facility in violation of the terms of the DIP Loan Documents, which failure has not been remedied within five (5) days after such request;

(iv)    the exercise of remedies by the DIP Agent including, but not limited to, the termination of the consensual use of Cash Collateral or the delivery of a Carve Out Trigger Notice;

(v)    the failure to make any payment of interest owed pursuant to paragraph 10(b)(i) within five (5) Business Days after such payment becomes due;

(vi)    the failure to fund the Adequate Protection Account (as defined herein) in accordance with the terms of this Interim Order within five (5) Business Days of an Availability Event (as defined herein);

(vii)    the filing of any motion or pleading by the Debtors to stay, vacate, reverse, amend or modify this Interim Order or the Final Order in a manner materially adverse to the Prepetition ABL Secured Parties without their consent;

(viii)    the entry of an order appointing a trustee, receiver or examiner with expanded powers with respect to any of the Debtors;

(ix)    the Debtors shall attempt to invalidate or reduce the Prepetition ABL Obligations;

(x)    the dismissal of any of the Chapter 11 Cases;

(xi)    the effective date of any chapter 11 plan;

(xii)    the conversion of any of the Chapter 11 Cases to a case under chapter 7;

(xiii)    the failure to deliver any Borrowing Base Certificate (as defined herein) within five (5) Business Days after the date which such Borrowing Base Certificate is required to be delivered under this Interim Order; and

(xiv)    the stay, reversal, vacatur, rescission or other modification of this Interim Order or the Final Order in a manner materially adverse to the Prepetition ABL Secured Parties without the consent of the Prepetition ABL Secured Parties.

22.    *No Waiver by Failure to Seek Relief.* The rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties specified herein, are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties or the Prepetition Secured Parties may have under the DIP Loan Documents, the Prepetition Loan Documents, applicable law or otherwise.

The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise. No delay on the part of any party in the exercise of any right or remedy under this Interim Order, the DIP Loan Documents or the Prepetition Loan Documents shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. Except as otherwise set forth in the Prepetition Intercreditor Agreements, none of the rights or remedies of any party under this Interim Order, the DIP Loan Documents and the Prepetition Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the DIP Loan Documents and the requisite parties under the Prepetition Loan Documents, as applicable. No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties (as applicable).

23. *Carve Out.*

(a) *Carve Out.* As used in this Interim Order, the term "**Carve Out**" means an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below), (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below), (iii) to the extent allowed by this Court at any time, whether by interim order, procedural order, or

otherwise (which order has not been vacated or stayed), all accrued and unpaid fees and expenses (in each case, including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors to the DIP Loan Parties when and if earned pursuant to the terms and conditions of an engagement letter approved by this Court in these Chapter 11 Cases) (collectively, the "*Allowed Professional Fees*") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "*Debtor Professionals*") and the Official Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "*Committee Professionals*", and together with the Debtor Professionals, the "*Professional Persons*") at any time before or on the first day following the date of delivery by the DIP Agent, at the direction of the Required DIP Lenders, of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (and in the case of the Committee Professionals, not to exceed the aggregate amounts set forth for the Committee Professionals in the Approved Budget), and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $4,000,000 incurred after the first day following the date of delivery by the DIP Agent, at the direction of applicable the Required DIP Lenders, of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "*Post-Carve Out Trigger Notice Cap*"); provided, however, that nothing herein shall be construed to impair the ability of any party in interest to object to the fees, expenses, reimbursement, or compensation described in clauses (i) through (iv) of this paragraph 23(a) on any grounds. The "*Carve Out Trigger Notice*" shall mean a written notice delivered by email (or other electronic means) by (x) the DIP Agent (at the direction of the Required DIP Lenders) and/or (y) the Prepetition ABL Agent, in each case, to counsel to the Debtors, the U.S. Trustee and counsel to

the Official Committee (if any), which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event (in the case of a Carve-Out Trigger Notice delivered by the DIP Agent) and/or a Cash Collateral Termination Event (in the case of a Carve-Out Trigger Notice delivered by the Prepetition ABL Agent), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     *Carve Out Reserves.*  The Debtors shall, on a weekly basis, transfer cash proceeds of the DIP Facility or cash on hand into a segregated account (the "***Professional Fees Account***") in an amount equal to the reasonable good faith estimates of Professional Persons of the amount of unpaid fees and expenses incurred during the preceding week by such Professional Persons. The Professional Fees Account, if applicable, shall be held in trust and used solely to satisfy Allowed Professional Fees. On the day on which a Carve Out Trigger Notice is delivered in accordance with this paragraph 23(b) of this Interim Order, (the "***Termination Declaration Date***"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash (including Cash Collateral) on hand as of such date, including funds in the Professional Fees Account, if applicable, (net of any amounts held on retainer by any Professional Persons) and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees accrued on and prior to the Termination Declaration Date (the "***Pre-Carve Out Trigger Notice Reserve***"). Upon the occurrence of a Termination Declaration Date, Professional Persons shall have two (2) Business Days thereafter to deliver fee statements to the Debtors and the DIP Agent that cover such Professional Persons' reasonable good faith estimate of the Allowed Professional Fees incurred by such Professional Persons through and including the Termination Declaration Date. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors as of such date to utilize

all cash (including Cash Collateral) on hand as of such date (net of any amounts held on retainer by any Professional Persons) and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "***Post-Carve Out Trigger Notice Reserve***" and, together with the Pre-Carve Out Trigger Notice Reserve, the "***Carve Out Reserves***"). The Carve Out Reserves shall be deposited in segregated non-interest bearing trust accounts at the DIP Agent, to be held in trust, and used solely to satisfy Allowed Professional Fees benefitting from the Carve Out in accordance with the terms hereof until such Allowed Professional Fees are paid in full. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of paragraph 23(a) (the "***Pre-Carve Out Amounts***"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent, for the benefit of itself and the other DIP Secured Parties, for application to the DIP Obligations in accordance with the DIP Credit Agreement, unless and until the DIP Obligations are Paid in Full, in which case, any remaining excess shall be paid to the Prepetition Secured Parties (subject to the terms of the Prepetition Intercreditor Agreements) in accordance with their rights and priorities set forth in the Prepetition Intercreditor Agreements, as of the Petition Date (unless the DIP Agent, at the direction of the Required DIP Lenders, and the requisite Prepetition Secured Parties, respectively, have otherwise agreed in writing in respect of the applicable obligations owed to each of them). All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of paragraph 23(a) (the "***Post-Carve Out Amounts***"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent, for itself and for the benefit of the

other DIP Secured Parties, for application to the DIP Obligations in accordance with the DIP Credit Agreement, unless and until the DIP Obligations are Paid in Full (unless the Required DIP Lenders have otherwise agreed in writing), in which case, any remaining excess shall be paid to the Prepetition Agents for the benefit of the Prepetition Secured Parties (subject to the terms of the Prepetition Intercreditor Agreements) in accordance with their rights and priorities set forth in the Prepetition Intercreditor Agreements (unless the Required DIP Lenders and the requisite Prepetition Secured Parties, respectively, have otherwise agreed in writing in respect of the applicable obligations owed to each of them). Notwithstanding anything to the contrary in the DIP Loan Documents, the Prepetition Loan Documents or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 23, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 23, prior to making any payments to the DIP Agent, for itself and for the benefit of the other DIP Secured Parties, the Prepetition Agents or any of the Debtors' creditors, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents, the Prepetition Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, at the direction of the Required DIP Lenders, and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the DIP Liens and the Adequate Protection Liens shall automatically attach to any residual interest in the Carve Out Reserves (which liens shall be deemed automatically perfected senior liens), with any excess paid to the DIP Agent, for itself and for the benefit of the other DIP Secured Parties, unless and until the DIP Obligations are Paid in Full, in which case, any remaining

excess shall be paid to the Prepetition Agents for the benefit of the Prepetition Secured Parties (subject to the terms of the Prepetition Intercreditor Agreements) in accordance with their rights and priorities set forth in the Prepetition Intercreditor Agreements (unless the Required DIP Lenders and the requisite Prepetition Secured Parties, respectively, have otherwise agreed in respect of the applicable obligations owed to each of them). Notwithstanding anything to the contrary in this Interim Order, (x) disbursements by the Debtors from the Carve Out Reserves shall not constitute loans or indebtedness under the DIP Loan Documents or the Prepetition Loan Documents or otherwise increase or reduce the DIP Obligations or the Prepetition Secured Obligations, (y) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (z) nothing contained herein shall constitute a cap or limitation on the ability of the Professional Persons to assert a claim on account of Allowed Professional Fees that are due and payable by the Debtors.

(c)     *Payment of Allowed Professional Fees Prior to Termination Declaration Date.* Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall reduce the Carve Out on a dollar-for-dollar basis.

(d)     *Payment of Carve Out on or After the Termination Declaration Date*. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis; provided, however, prior to repayment from the Carve Out Reserves, any retainers held by Professional Persons shall be applied to repay the obligations set forth in clauses (iii) and (iv) of paragraph 23(a) prior to repayment of such obligations from the Carve Out

Reserves, and, concurrent with such repayment of such obligations using such retainers, the Carve Out shall permanently be reduced on a dollar for dollar basis.

(e)     *No Direct Obligation to Pay Allowed Professional Fees.* None of the DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     *Priority of Carve Out.* For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order, the Carve Out shall be senior to all liens, security interests, and superpriority claims granted hereunder, under the DIP Loan Documents or the Prepetition Loan Documents.

24.     *Effect of the Debtors' Stipulations on Third Parties.*

(a)     The Debtors' Stipulations contained in paragraph F of this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes immediately upon entry of this Interim Order. The Debtors' Stipulations shall be binding upon any Official Committee, all other creditors, and all parties-in-interest and each of their respective successors and assigns, in all circumstances and for all purposes, unless (i) the Official Committee or such party-in-interest (subject in all respects to any agreement or applicable law which may

limit or affect such entity's right or ability to do so) obtains requisite standing pursuant to an order of the Court entered prior to the Challenge Deadline (as defined below) and has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "**Challenge Proceeding**") by no later than the Challenge Deadline, (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, or otherwise objecting to or challenging any of the admissions, stipulations, findings or releases included in the Debtors' Stipulations, (B) asserting or prosecuting any so-called "lender liability" claims, Avoidance Actions or any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action seeking reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery with respect to the Prepetition Liens, the Prepetition Secured Obligations or the Prepetition Loan Documents, and (C) asserting or prosecuting any other claim or Cause of Action of any nature or description whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Prepetition Secured Parties or their Representatives (clauses (A)-(C), collectively, the "**Challenges**", and each, a "**Challenge**"), and (ii) there is entered a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such timely Challenge in any duly-filed Challenge Proceeding; <u>provided</u>, <u>however</u>, that as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date; <u>provided</u>, <u>further</u>, <u>however</u>, that any pleadings filed in connection with any Challenge Proceeding, including any motion filed with the Court seeking requisite standing and authority to pursue a Challenge, shall include a draft complaint attached thereto and shall set otherwise forth with specificity the

basis for each such Challenge, and any Challenge not so specified in a Challenge Proceeding timely and properly filed prior to the Challenge Deadline shall be deemed forever, waived, released and barred.

(b)     If no such Challenge Proceeding is timely and properly filed by the Challenge Deadline, or if the Court does not rule in favor of the plaintiff in any such Challenge Proceeding, then, without further notice or order of the Court, (i) each of the admissions, stipulations, findings and releases contained in the Debtors' Stipulations shall be binding on all parties-in-interest, including, without limitation, any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), (ii) the Prepetition Secured Obligations shall constitute allowed claims against each of the Debtors in the Chapter 11 Cases and any Successor Cases, and the Prepetition Liens shall be deemed to be legal, valid, non-avoidable, binding, continuing, perfected and enforceable, as of the Petition Date, against each of the Debtors in the Chapter 11 Cases and any Successor Cases, (iii) the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Loan Documents shall not be subject to any other or further Challenge, contest, attack, objection, challenge, defense, claim, counterclaim, reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors

in the Chapter 11 Cases or any Successor Cases), and (iv) all Challenges against any of the Prepetition Secured Parties or any of their Representatives (in their capacities as such) shall be deemed forever waived, released and barred.

(c)    If any such Challenge Proceeding is timely filed by the Challenge Deadline, the Debtors' Stipulations shall nonetheless remain binding and preclusive on any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), except to the extent that any of the admissions, stipulations, findings or releases contained in the Stipulations were expressly challenged in such Challenge Proceeding (and solely as to the plaintiff party that timely filed such Challenge Proceeding and _not_, for the avoidance of doubt, any other party-interest).

(d)    The "***Challenge Deadline***" means the date that is (i) seventy-five (75) calendar days after the entry of this Interim Order, (ii) as to each of the Prepetition Loan Documents, such later date as has been agreed to, in writing, by the requisite Prepetition Secured Parties, as applicable, under the applicable Prepetition Loan Documents solely respect to the Challenges pertaining to such Prepetition Loan Document, and (iii) any such later date as has been ordered by the Court, for cause shown, upon a motion filed and served within the time period set forth in clause (i) of this paragraph 24(d).

(e)    For the avoidance of doubt, the Debtors' stipulations, waivers, agreements and releases contained in paragraph E of this Interim Order shall _not_ be subject to Challenge, and shall be binding upon the Debtors and their estates, and any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or selected in any of

the Chapter 11 Cases or any Successor Cases), any Official Committee, all other creditors and all parties-in-interest and each of their respective successors and assigns, in all circumstances and for all purposes, immediately upon entry of this Interim Order.

(f)       Nothing in this Interim Order vests or confers on any person or entity, including any Official Committee, standing or authority to pursue any Challenge belonging to the Debtors or their estates, and all rights to object to any request for such standing are expressly reserved.

25.       *Limitations on Use of DIP Collateral, Cash Collateral, Carve Out or Other Funds:* Notwithstanding anything contained in this Interim Order or any other order of the Court to the contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out or any other funds may be used (nor shall any professional fees, costs, or expenses be paid or applied in connection therewith) by any of the Debtors, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-interest (including without limitation any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly:

(a)       to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, initiate, assert, commence, support or prosecute (or finance the initiation or prosecution of) any claim, counterclaim, cross-claim, Cause of Action, suit, arbitration, proceeding, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any nature or description (whether for monetary, injunctive, affirmative relief or otherwise) against any of the DIP Secured Parties or the Prepetition Secured Parties or their respective Representatives, including, without limitation, (i) any objection or challenge to the amount, validity, enforceability, extent, perfection or priority the DIP Loan Documents, the DIP Obligations (including, for the avoidance of doubt, the Backstop Premium, the Commitment Premium, the Exit Premium and the Fronting Fee), the DIP Liens, the DIP Collateral, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, (ii) any Avoidance

Actions, (iii) any so-called "lender liability" claims, (iv) any claim or Cause of Action seeking the invalidation, reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery with respect to the DIP Liens, the DIP Obligations (including, for the avoidance of doubt, the Backstop Premium, the Commitment Premium, the Exit Premium and the Fronting Fee), the DIP Loan Documents, the DIP Collateral, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents or the Prepetition Collateral, (vi) any other claim or Cause of Action of any nature and description whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, against any of the DIP Secured Parties or the Prepetition Secured Parties or their respective Representatives;

(b)      objecting to, appealing or otherwise challenging this Interim Order, the DIP Facility, the DIP Obligations (including, for the avoidance of doubt, the Backstop Premium, the Commitment Premium, the Exit Premium and the Fronting Fee), the DIP Liens, the DIP Loan Documents or the transactions contemplated hereunder or thereunder;

(c)      objecting to or seeking to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the DIP Secured Parties or the Prepetition Secured Parties under this Interim Order or the DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred and is continuing);

(d)      objecting to or seeking to prevent, hinder, interfere with or otherwise delay any of the DIP Secured Parties', Prepetition First Lien Secured Parties' or the Prepetition ABL Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral or Prepetition Collateral (as applicable) in accordance with this Interim Order, the DIP Loan Documents or the Prepetition Loan Documents (as applicable) (other than to contest whether a DIP Termination Event has occurred and is continuing);

(e)      seeking or requesting authorization to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code, or otherwise, unless such financing is sufficient to cause the Payment in Full of all DIP Obligations and Prepetition Secured Obligations contemporaneously with the closing of such financing (or as otherwise agreed in writing by the Required DIP Lenders and the requisite Prepetition Secured Parties, as applicable);

(f)      seeking or requesting authorization to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under the DIP Loan Documents) in any portion of the DIP Collateral that are senior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens or the Prepetition Secured Obligations unless all DIP Obligations and Prepetition Secured Obligations have been Paid in Full (or as otherwise agreed in writing by the Required DIP Lenders or the requisite Prepetition Secured Parties, as applicable); or

(g)    seeking or requesting to use Cash Collateral or sell or otherwise dispose of DIP Collateral (without the prior written consent of the Required DIP Lenders) other than as provided herein and in the DIP Loan Documents;

(h)    seeking to pay any amount on account of any claims arising prior to the commencement of these Chapter 11 Cases, unless such payments are agreed to in writing by the Required DIP Lenders (or are otherwise included in the Approved Budget);

*provided, however*, that no more than $50,000 of the DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out or any other funds may be used for allowed fees and expenses incurred by any Official Committee prior to the Challenge Deadline to investigate (but not to litigate, contest, initiate, assert, join, commence, support or prosecute any claim, Cause of Action or Challenge, including by way of discovery, with respect to), the validity, enforceability, extent, perfection or priority of the Prepetition Liens, the Prepetition Secured Obligations and the Prepetition Loan Documents.

26.    *Limitation on Charging Expenses.* Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition ABL Secured Parties, respectively, upon the DIP Collateral, the Prepetition First Lien Collateral, or the Prepetition ABL Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to DIP Secured Parties, the Prepetition First Lien Collateral as to the Prepetition First Lien Secured Parties, or the Prepetition ABL Collateral as to the Prepetition ABL Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code, any other legal or equitable doctrine (including unjust enrichment) or otherwise, without the prior written consent of the Required DIP Lenders with respect to the DIP Collateral, the requisite Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents with respect to the Prepetition First Lien Collateral, or the requisite Prepetition ABL Secured Parties

under the Prepetition ABL Loan Documents with respect to the Prepetition ABL Collateral, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in this Interim Order (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the DIP Secured Parties, any of the Prepetition First Lien Secured Parties, or any of the Prepetition ABL Secured Parties; provided, however, that the foregoing shall be subject to the terms of the Final Order granting such relief.

27.     *No Marshalling; Section 552(b) Waiver.* In no event shall the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition ABL Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition First Lien Collateral, the Prepetition First Lien Secured Obligations, the Prepetition ABL Collateral, or the Prepetition ABL Secured Obligations (as applicable) (other than with respect to Debtor Freedom VCM Holdings, LLC as specifically set forth in paragraph 33 below), and all proceeds of the DIP Collateral, the Prepetition First Lien Collateral, and the Prepetition ABL Collateral shall be received and applied in accordance with this Interim Order, the DIP Loan Documents, the Prepetition Intercreditor Agreements, the Prepetition First Lien Loan Documents, and the Prepetition ABL Loan Documents, as applicable; provided, however, that the foregoing shall be subject to the terms of the Final Order granting such relief. Each of the Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition First Lien Secured Parties, the

Prepetition First Lien Collateral, the Prepetition ABL Secured Parties, or the Prepetition ABL Collateral.

28.    *Right to Credit Bid.* (a) The DIP Agent or its designee (which may be an acquisition vehicle formed by the Required DIP Lenders) (in each case, acting at the direction of the Required DIP Lenders), shall have the unqualified right to credit bid up to the full amount of the applicable DIP Obligations, including, for the avoidance of doubt, the Roll Up DIP Loans, in any sale of all or any portion of DIP Collateral (including, for the avoidance of doubt, any asset for which the DIP Collateral is limited to the proceeds thereof as a result of applicable law prohibiting encumbrances from being attached to such asset) subject to and in accordance with the DIP Loan Documents, and (b) subject to section 363(k) of the Bankruptcy Code, each of the Prepetition Agents or its/their designee(s) (which may be an acquisition vehicle) (in each case, acting at the direction of the requisite Prepetition Secured Parties under the applicable Prepetition Loan Documents) shall have the unqualified right to credit bid up to the full amount of the applicable Prepetition Secured Obligations in any sale all or any portion of the Prepetition Collateral (including, for the avoidance of doubt, any asset for which the Prepetition Collateral is limited to the proceeds thereof as a result of applicable law prohibiting encumbrances from being attached to such asset) in accordance with the applicable Prepetition Loan Documents (subject to the Prepetition Intercreditor Agreements), in the case of each of foregoing clauses (a) and (b), without the need for further order of the Court authorizing same, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise. The DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition Agents (acting at the direction of

the requisite Prepetition Secured Parties under the applicable Prepetition Loan Documents), shall each have the absolute right to assign, transfer, sell, or otherwise dispose of their respective rights to credit bid (subject to the Prepetition Intercreditor Agreements and this Interim Order) to any acquisition vehicle formed in connection with such bid or other designee.

29.     *Binding Effect; Successors and Assigns.* Immediately upon entry of this Interim Order, subject to paragraph 24 of this Interim Order, the provisions of the DIP Loan Documents and this Interim Order, including all findings and conclusions of law herein, shall be binding upon all parties in interest in the Chapter 11 Cases and any Successor Cases, including without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Official Committee or any other committee appointed or formed in the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors, the DIP Secured Parties and the Prepetition Secured Parties and their respective successors and assigns; provided, however, that, for the avoidance of doubt, the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to make any loan, permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

30.     *No Modification of Interim Order.* Until and unless the DIP Obligations and the Prepetition Secured Obligations have been Paid in Full, the Debtors irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly: (a) without the prior written consent

of the Required DIP Lenders, (i) any modification, stay, vacatur or amendment to this Interim
Order, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any
Successor Cases equal or superior to the DIP Superpriority Claims (other than the Carve Out),
(iii) the grant of any lien or security interest on any DIP Collateral with priority equal to or superior
to the DIP Liens, except as expressly permitted hereunder or under the DIP Loan Documents,
(iv) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is
inconsistent with this Interim Order, or (b) without the prior written consent of the Prepetition
Agents, acting at the direction of the requisite Prepetition Secured Parties, (i) any modification,
stay, vacatur or amendment to this Interim Order that adversely affects the rights, remedies,
benefits or protections of the applicable Prepetition Secured Parties, (ii) the allowance of any claim
against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the
Adequate Protection Claims (other than the Carve Out and the DIP Superpriority Claims), or
(iii) the grant of any lien or security interest on any DIP Collateral or Prepetition Collateral with
priority equal to or superior to the Adequate Protection Liens, except as expressly permitted
hereunder or under the DIP Loan Documents.

31.     *Proceeds of Subsequent Financings.* Without limiting the provisions of the
immediately preceding paragraph, if at any time prior to the Payment in Full of all of the
DIP Obligations, the Adequate Protection Obligations and the Prepetition Secured Obligations,
either the Debtors, the Debtors' estates, any chapter 11 trustee, chapter 7 trustee or examiner with
enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases
or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of
the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents, then, unless
otherwise agreed in writing by the Required DIP Lenders, all of the cash proceeds derived from

such credit or debt intended to refinance the DIP Obligations shall immediately be turned over to the DIP Agent for further distribution to the DIP Secured Parties on account of their DIP Obligations pursuant to the applicable DIP Loan Documents.

32.     *Preservation of Rights Granted Under Interim Order.*

(a)     *Good Faith Under Section 364(e) of the Bankruptcy Code.* The DIP Secured Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order, the DIP Facility and the DIP Loan Documents, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and upon the record made at the Interim Hearing and during these Chapter 11 Cases, the DIP Secured Parties and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order or the DIP Loan Documents are hereafter reversed, modified, vacated or stayed by a subsequent judgment or order of this Court or any other court, any such reversal, stay, modification or vacatur shall not affect (i) the validity or enforceability of advances previously made hereunder or under the DIP Loan Documents by the DIP Secured Parties to the Debtors, (ii) the validity or enforceability of any obligation, indebtedness or liability incurred under this Interim Order or the DIP Loan Documents by the Debtors to the DIP Secured Parties, (ii) the validity, enforceability, or perfection of any of the claims, liens, security interests, rights, privileges or benefits granted hereunder or under the DIP Loan Documents, or (iii) the payment of any fees, costs, expenses or other amounts, in the case of each of the foregoing, prior to the actual receipt of written notice by the DIP Agent, to be sent at the direction of the Required DIP Lenders, and/or the Prepetition Agents (as applicable) of the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification or vacatur, any such claim, lien, or security interest, right, privilege, remedy or

benefit shall be governed in all respects by the original provisions of this Interim Order, the Prepetition Intercreditor Agreements and the DIP Loan Documents.

(b)      *Survival.* Notwithstanding anything contained herein or in the DIP Loan Documents to the contrary, the terms and provisions of this Interim Order and the DIP Loan Documents (including, without limitation, all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the DIP Secured Parties and the Prepetition Secured Parties under this Interim Order and the DIP Loan Documents), and any actions taken pursuant hereto or thereto, shall survive, shall continue in full force and effect, shall remain binding on all parties-in-interest, and shall be governed by the original provisions of this Interim Order and maintain their priorities as set forth in this Interim Order, and shall not be modified, impaired, or discharged by, entry of any order that may be entered (i) confirming any chapter 11 plan in any of the Chapter 11 Cases, (ii) converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, (iii) dismissing any or all of the Chapter 11 Cases, (iv) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases, or (v) approving the sale or disposition of any DIP Collateral (except as expressly permitted in the DIP Loan Documents), in each case, until all of the DIP Obligations, the Adequate Protection Obligations and the Prepetition Secured Obligations have been Paid in Full (unless the Required DIP Lenders and/or the requisite Prepetition Secured Parties have otherwise agreed in writing in respect of the applicable obligations owed to each of them).

(c)      *Dismissal/Conversion.* If any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that (i) all of the claims, liens

and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Secured Parties and the Prepetition Secured Parties hereunder and under the DIP Loan Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order and the Prepetition Intercreditor Agreements until all DIP Obligations, Adequate Protection Obligations and Prepetition Secured Obligations have been Paid in Full (and that all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections, notwithstanding such dismissal or conversion, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes of enforcing this Interim Order, the DIP Loan Documents, the Prepetition Intercreditor Agreements and all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Secured Parties and the Prepetition Secured Parties hereunder or thereunder.

33.     *Debtor Freedom VCM Holdings, LLC*. Notwithstanding anything to the contrary herein, with respect to Debtor Freedom VCM Holdings, LLC, the DIP Obligations shall be repaid, *first,* from DIP Collateral comprised of Unencumbered Property of all Secured DIP Loan Parties (other than Debtor Freedom VCM Holdings, LLC), *second*, from all other DIP Collateral of all Secured DIP Loan Parties (other than Debtor Freedom VCM Holdings, LLC), and *third*, from assets at Debtor Freedom VCM Holdings, LLC.  Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Debtor Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions (as defined in the Restructuring Supporting Agreement)) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Debtor Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First

Lien Lenders (as defined in the Restructuring Supporting Agreement) (the "Freedom Allocated Fees and Expenses").  Debtor Freedom VCM Holdings, LLC shall be required to use any cash (including Cash Collateral) it has on hand to pay its ratable share of such Freedom Allocated Fees and Expenses, if any; provided, that, for the avoidance of doubt, Debtor Freedom VCM Holdings, LLC, shall not otherwise use any of its cash (including Cash Collateral) until an agreement is reached on the Freedom Allocated Fees and Expenses; provided, further, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Obligations.

34.    *Loss or Damage to Collateral.* So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Loan Documents, (a) the DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the Debtors.

35.    *Proofs of Claim.* The DIP Secured Parties and the Prepetition Secured Parties shall not be required to file proofs of claim or request for payment of administrative expenses in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment in respect of the DIP Obligations, the Adequate Protection Obligations or the Prepetition Secured Obligations. The Debtors' Stipulations, acknowledgments and provisions of this Interim Order are deemed sufficient to and do constitute timely filed proofs of claim or request for payment of administrative expenses in respect of such claims arising under the DIP Obligations, the Adequate

Protection Obligations and the Prepetition Secured Obligations against each of the applicable Debtors. Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Chapter 11 Cases shall not apply to the DIP Secured Parties, the Prepetition Secured Parties, the DIP Obligations or the Prepetition Secured Obligations; provided, however, that, notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Agent (on behalf of itself or any of the other DIP Secured Parties), or any of the Prepetition Agents (on behalf of themselves and the applicable Prepetition Secured Parties (as applicable)), in their discretion, may (but are not required to) file (and amend and/or supplement) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any Successor Cases, and any such proof of claim may (but is not required to be) filed as one consolidated master proof of claim in the Debtors' lead Chapter 11 Case against all of the Debtors, which shall be deemed to have been filed against each and every Debtor. Such consolidated or master proofs of claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable party, which instruments, agreements or other documents will be provided upon reasonable written request to the DIP Agent or the applicable Prepetition Agents, as the case may be. Any proof of claim filed by or on behalf of any of the DIP Secured Parties or the Prepetition Secured Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

36.    *Limitation of Liability.* Nothing in this Interim Order, the DIP Loan Documents or any documents related thereto shall in any way be construed or interpreted to impose or allow the

imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the Debtors and their respective affiliates in the operation of their businesses, their restructuring efforts or in connection with the administration of these Chapter 11 Cases. In determining to make any loan or extension of credit, or permit the use of Cash Collateral, or in exercising any rights or remedies hereunder, under the DIP Loan Documents or the Prepetition Loan Documents, neither the DIP Secured Parties nor the Prepetition Secured Parties shall (a) be deemed to be in control of the operations of the Debtors, (b) owe any fiduciary duty to the Debtors or their creditors, shareholders or estates, or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S. §§ 9601 et seq., as amended, or any similar federal or state statute).

37.    *Intercreditor Agreements.* Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreements, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including, for the avoidance of doubt, with respect to the Adequate Protection Liens) and DIP Secured Parties (as if the DIP Agent was party thereto as a First Lien Term Loan Representative, in the case of the Prepetition ABL Intercreditor Agreement), and (iii) shall not be deemed amended, altered or modified by the terms of this Interim Order, except to the extent expressly set forth herein.

38.     *Payments Free and Clear.* Subject to the Carve Out, any and all payments or proceeds remitted to the DIP Secured Parties or the Prepetition Secured Parties pursuant to the DIP Loan Documents, the Prepetition Intercreditor Agreements, this Interim Order, the Final Order (if and when entered) or any subsequent order of this Court shall be irrevocable (subject, solely in the case of certain professional fees, the fee review procedures set forth in paragraph 11 of this Interim Order), received free and clear of any claim, charge, assessment or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the Debtors) (subject to paragraph 26 hereof), section 552(b) of the Bankruptcy Code (subject to paragraph 27 hereof) or otherwise.

39.     *Joint and Several Liability.* Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for all obligations (including all DIP Obligations and all Adequate Protection Obligations) under this Interim Order and the DIP Loan Documents.

40.     *Third Party Beneficiary.* Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

41.     *Interim Order Controls.* In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order and any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the DIP Credit Agreement or DIP Loan Documents, the terms and provisions of this Interim Order shall govern and control. Notwithstanding anything contained in any other order entered by this

Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Loan Documents, including, without limitation, the Approved Budget (subject to Permitted Variances).

42.    *Effectiveness.* This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

43.    *Bankruptcy Rules.* The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

44.    *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order. When used in this Interim Order, the word "including" shall not imply limitation.

45.    *Necessary Action.* The Debtors are authorized to take any and all such actions as are necessary, required or appropriate to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder.

46.    *Retention of Jurisdiction.* The Court retains jurisdiction to hear, determine and, if applicable, enforce the terms of any and all matters arising from or related to the DIP Facility, the DIP Loan Documents, the Prepetition Intercreditor Agreements and this Interim Order, and the Court's jurisdiction shall survive confirmation and consummation of any chapter 11 plan for any

of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

47.    *Final Hearing.* The Final Hearing shall be held on [●], 2024 at [●] (prevailing Eastern Time), and any objections to the final relief sought in the Motion shall be filed with the Court no later than [●], 2024 at 4:00 p.m. (prevailing Eastern Time) and served upon the following: (a) [_____]; (b) [_____]; (c) [_____]; and (d) [_____].

48.    *Notice of Entry of Interim Order.* The Debtors shall promptly serve copies of this Interim Order to the parties that have been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Official Committee (if appointed).

## Exhibit 1

**Draft DIP Credit Agreement**

*Execution Version*

SENIOR SECURED SUPER-PRIORITY PRIMING TERM LOAN DEBTOR-IN-POSSESSION
CREDIT AGREEMENT

dated as of

November [•], 2024

among

FRANCHISE GROUP, INC.,
as a Borrower, as Lead Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the
Bankruptcy Code,

FRANCHISE GROUP NEWCO PSP, LLC,
as a Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

VALOR ACQUISITION, LLC,
as a Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC,
as a Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

the Guarantors from time to time party hereto,

the Lenders from time to time party hereto,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent and as Collateral Agent,

# TABLE OF CONTENTS
### (continued)

**Page**

ARTICLE I DEFINITIONS ........................................................................................ 1

    SECTION 1.01   Defined Terms. ........................................................... 1
    SECTION 1.02   Classification of Loans and Borrowings........................... 40
    SECTION 1.03   Terms Generally...................................................... 40
    SECTION 1.04   Accounting Terms; GAAP........................................... 41
    SECTION 1.05   Effectuation of Transactions. ..................................... 41
    SECTION 1.06   [Reserved]............................................................ 41
    SECTION 1.07   Certain Determinations. ............................................ 41
    SECTION 1.08   Divisions. ............................................................. 42
    SECTION 1.09   Interest Rates. ........................................................ 42

ARTICLE II THE CREDITS....................................................................................... 42

    SECTION 2.01   Commitments. ........................................................ 42
    SECTION 2.02   Loans and Borrowings. ............................................. 43
    SECTION 2.03   Requests for Borrowings. .......................................... 44
    SECTION 2.04   Syndication. .......................................................... 45
    SECTION 2.05   [Reserved]............................................................ 45
    SECTION 2.06   Funding of Borrowings. ............................................ 45
    SECTION 2.07   Interest Elections.................................................... 46
    SECTION 2.08   Termination and Reduction of Commitments.................. 47
    SECTION 2.09   Repayment of Loans; Evidence of Debt. ....................... 47
    SECTION 2.10   [Reserved]............................................................ 48
    SECTION 2.11   Prepayment of Loans. .............................................. 48
    SECTION 2.12   Fees. .................................................................. 49
    SECTION 2.13   Interest. ............................................................... 50
    SECTION 2.14   Benchmark Unavailability; Benchmark Replacement Setting........................ 51
    SECTION 2.15   Increased Costs. ..................................................... 53
    SECTION 2.16   [Reserved]............................................................ 54
    SECTION 2.17   Taxes. ................................................................. 54
    SECTION 2.18   Payments Generally; Pro Rata Treatment; Sharing of Setoffs........................ 57
    SECTION 2.19   Mitigation Obligations; Replacement of Lenders.............. 59
    SECTION 2.20   [Reserved]............................................................ 59
    SECTION 2.21   [Reserved]............................................................ 59
    SECTION 2.22   Defaulting Lenders.................................................. 59
    SECTION 2.23   Illegality. ............................................................. 60

ARTICLE III REPRESENTATIONS AND WARRANTIES ...................................... 61

    SECTION 3.01   Organization; Powers. .............................................. 61
    SECTION 3.02   Authorization; Enforceability. .................................... 61
    SECTION 3.03   Governmental Approvals; No Conflicts. ........................ 62
    SECTION 3.04   Financial Condition; No Material Adverse Effect. ............ 62
    SECTION 3.05   Properties. ............................................................ 62
    SECTION 3.06   Litigation and Environmental Matters. ......................... 62
    SECTION 3.07   Compliance with Laws. ............................................ 63
    SECTION 3.08   Investment Company Status. ...................................... 63
    SECTION 3.09   Taxes. ................................................................. 63
    SECTION 3.10   ERISA; Labor Matters. ............................................ 63
    SECTION 3.11   Disclosure. ........................................................... 64

**TABLE OF CONTENTS**

(continued)

Page

SECTION 3.12    Subsidiaries. ............................................................................................. 64
SECTION 3.13    Intellectual Property; Licenses, Etc. .................................................... 64
SECTION 3.14    [Reserved]. ................................................................................................ 65
SECTION 3.15    Federal Reserve Regulations. ................................................................ 65
SECTION 3.16    Use of Proceeds. ...................................................................................... 65
SECTION 3.17    Anti-Corruption Laws and Sanctions. ................................................ 65
SECTION 3.18    Security Documents. ............................................................................... 66
SECTION 3.19    Insurance. .................................................................................................. 66
SECTION 3.20    Franchise Agreements. ........................................................................... 66
SECTION 3.21    Budget; Variance Report. ...................................................................... 67
SECTION 3.22    Orders. ........................................................................................................ 67
SECTION 3.23    Bankruptcy Matters. ............................................................................... 67

ARTICLE IV CONDITIONS .................................................................................................... 68

SECTION 4.01    Effective Date. .......................................................................................... 68
SECTION 4.02    Each Credit Event after the Effective Date. ...................................... 70

ARTICLE V AFFIRMATIVE COVENANTS ......................................................................... 70

SECTION 5.01    Financial Statements and Other Information. .................................... 71
SECTION 5.02    Notices of Material Events. ................................................................... 73
SECTION 5.03    Information Regarding Collateral. ....................................................... 73
SECTION 5.04    Existence; Conduct of Business. ........................................................... 73
SECTION 5.05    Payment of Taxes, etc. ............................................................................ 74
SECTION 5.06    Maintenance of Properties. .................................................................... 74
SECTION 5.07    Insurance. .................................................................................................. 74
SECTION 5.08    Books and Records; Inspection and Audit Rights. .......................... 74
SECTION 5.09    Compliance with Laws. .......................................................................... 75
SECTION 5.10    Use of Proceeds. ...................................................................................... 75
SECTION 5.11    Additional Subsidiaries. ........................................................................ 75
SECTION 5.12    Further Assurances. ................................................................................. 76
SECTION 5.13    Franchise Agreements. ........................................................................... 76
SECTION 5.14    [Reserved]. ................................................................................................ 76
SECTION 5.15    Maintenance of Ratings. ........................................................................ 76
SECTION 5.16    Additional Chapter 11 Reporting. ....................................................... 76

ARTICLE VI NEGATIVE COVENANTS ............................................................................... 78

SECTION 6.01    Indebtedness; Certain Equity Securities. ........................................... 78
SECTION 6.02    Liens. ........................................................................................................... 81
SECTION 6.03    Fundamental Changes; Lead Borrower Covenant. .......................... 83
SECTION 6.04    Investments, Loans, Advances, Guarantees and Acquisitions. ......... 84
SECTION 6.05    Asset Sales. ................................................................................................ 86
SECTION 6.06    [Reserved]. ................................................................................................ 88
SECTION 6.07    Restricted Payments; Certain Payments of Indebtedness. .............. 88
SECTION 6.08    Transactions with Affiliates. ................................................................. 90
SECTION 6.09    Restrictive Agreements. ......................................................................... 90
SECTION 6.10    [Reserved]. ................................................................................................ 92
SECTION 6.11    Changes in Fiscal Periods. ..................................................................... 92
SECTION 6.12    Amendment of Financing Documents. ............................................... 92
SECTION 6.13    Franchise Agreements. ........................................................................... 92

**TABLE OF CONTENTS**

(continued)

Page

SECTION 6.14   [Reserved]...................................................................................92
SECTION 6.15   Minimum Liquidity........................................................................92
SECTION 6.16   [Reserved]...................................................................................92
SECTION 6.17   Milestones....................................................................................92
SECTION 6.18   Permitted Variance.......................................................................92
SECTION 6.19   Chapter 11 Cases .........................................................................92

ARTICLE VII EVENTS OF DEFAULT...........................................................................93

SECTION 7.01   Events of Default. .........................................................................94
SECTION 7.02   [Reserved]...................................................................................99
SECTION 7.03   Application of Proceeds. ..............................................................99
SECTION 7.04   Bankruptcy Code and Other Remedies. .....................................100

ARTICLE VIII ADMINISTRATIVE AGENT .................................................................102

SECTION 8.01   Appointment and Authority. ......................................................102
SECTION 8.02   Rights as a Lender.....................................................................103
SECTION 8.03   Exculpatory Provisions. .............................................................103
SECTION 8.04   Reliance by Agents. ...................................................................105
SECTION 8.05   Delegation of Duties. .................................................................107
SECTION 8.06   Resignation of Administrative Agent; Mergers. .........................107
SECTION 8.07   Non-Reliance on Agents and Lenders. .......................................108
SECTION 8.08   Existing Intercreditor Agreements. ...........................................109
SECTION 8.09   Administrative Agent May File Proofs of Claim. ........................109
SECTION 8.10   No Waiver; Cumulative Remedies; Enforcement.........................109
SECTION 8.11   Withholding Taxes. ....................................................................110
SECTION 8.12   Credit Bidding. ..........................................................................110
SECTION 8.13   Erroneous Payments...................................................................111

ARTICLE IX MISCELLANEOUS ................................................................................113

SECTION 9.01   Notices. ......................................................................................113
SECTION 9.02   Waivers; Amendments................................................................115
SECTION 9.03   Expenses; Indemnity; Damage Waiver........................................118
SECTION 9.04   Successors and Assigns...............................................................120
SECTION 9.05   Survival. .....................................................................................124
SECTION 9.06   Counterparts; Integration; Effectiveness.....................................125
SECTION 9.07   Severability. ...............................................................................126
SECTION 9.08   Right of Setoff. ...........................................................................126
SECTION 9.09   Governing Law; Jurisdiction; Consent to Service of Process. .......126
SECTION 9.10   WAIVER OF JURY TRIAL...........................................................127
SECTION 9.11   Headings. ...................................................................................127
SECTION 9.12   Confidentiality. ..........................................................................127
SECTION 9.13   USA PATRIOT Act. .....................................................................129
SECTION 9.14   Release of Liens and Guarantees. ..............................................129
SECTION 9.15   No Advisory or Fiduciary Responsibility. ...................................130
SECTION 9.16   Interest Rate Limitation. ............................................................131
SECTION 9.17   [Reserved] ..................................................................................131
SECTION 9.18   Judgment Currency ....................................................................131
SECTION 9.19   Acknowledgement and Consent to Bail-In of Affected Financial
                Institutions ................................................................................131

**TABLE OF CONTENTS**

(continued)

SECTION 9.20    Acknowledgement Regarding Any Supported QFCs ...................................... 132
SECTION 9.21    Orders Control ........................................................................................ 132
ARTICLE X GUARANTEE ............................................................................................... 132
SECTION 10.01    Guarantee ............................................................................................ 132
SECTION 10.02    Guarantee of Payment; Continuing Guarantee ..................................... 133
SECTION 10.03    No Limitations. ..................................................................................... 133
SECTION 10.04    Reinstatement ...................................................................................... 135
SECTION 10.05    Agreement to Pay; Subrogation ........................................................... 135
SECTION 10.06    Information ........................................................................................... 135
SECTION 10.07    [Reserved] ............................................................................................ 135
SECTION 10.08    Indemnity and Subrogation .................................................................. 135
SECTION 10.09    Contribution and Subrogation .............................................................. 136
SECTION 10.10    Subordination. ...................................................................................... 136

SCHEDULES:

Schedule 2.01       —       Commitments and Loans
Schedule 2.04       —       Syndication
Schedule 3.03       —       Government Approvals; No Conflicts
Schedule 3.06       —       Litigation and Environmental Matters
Schedule 3.12       —       Subsidiaries
Schedule 3.20       —       Franchise Agreements

Schedule 6.01       —       Existing Indebtedness
Schedule 6.02       —       Existing Liens
Schedule 6.04(e)    —       Existing Investments
Schedule 6.08       —       Existing Affiliate Transactions
Schedule 6.09       —       Existing Restrictions
Schedule 6.17       —       Milestones
Schedule 9.01       —       Notices


EXHIBITS:

Exhibit A       —       Form of Assignment and Assumption
Exhibit B       —       Form of Closing Certificate
Exhibit C-1     —       Form of United States Tax Compliance Certificate 1
Exhibit C-2     —       Form of United States Tax Compliance Certificate 2
Exhibit C-3     —       Form of United States Tax Compliance Certificate 3
Exhibit C-4     —       Form of United States Tax Compliance Certificate 4
Exhibit D       —       Form of Note
Exhibit E       —       Form of Notice of Borrowing
Exhibit F       —       Form of Syndication Procedures


Annex A         —       Initial Budget

SENIOR SECURED SUPER-PRIORITY PRIMING TERM LOAN DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of November [•], 2024 (this "<u>Agreement</u>"), among FRANCHISE GROUP, INC., a Delaware corporation ("<u>Lead Borrower</u>"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), FRANCHISE GROUP NEWCO PSP, LLC, a Delaware limited liability company ("<u>FG Newco PSP</u>"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), VALOR ACQUISITION, LLC, a Delaware limited liability company ("<u>Valor</u>"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC, a Delaware limited liability company ("<u>FG Newco Intermediate AF</u>", and together with Lead Borrower, FG Newco PSP and Valor, individually and collectively, the "<u>Borrower</u>"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), the Guarantors from time to time party hereto, the Lenders from time to time party hereto and Wilmington Trust, National Association, as Administrative Agent and as Collateral Agent.

WHEREAS, on November 3, 2024 (the "<u>Petition Date</u>"), the Borrower and certain affiliates and direct and indirect Subsidiaries of the Borrower (each, a "<u>Chapter 11 Debtor</u>" and collectively, the "<u>Chapter 11 Debtors</u>") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") initiating their respective jointly administered case under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") (Case No. 24-12480-JTD (Bankr. D. Del.)) (collectively, the "<u>Chapter 11 Cases</u>"), and each Chapter 11 Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has asked the Lenders to provide the Borrower with a senior secured super-priority priming term loan debtor-in-possession credit facility (the "<u>DIP Facility</u>") consisting of (a) $250,000,000 of "new money" first-out delayed draw term loans that will be made available to the Borrower pursuant to the terms, and subject to the conditions set forth, in this Agreement and the Orders; and (b) a second-out roll up facility pursuant to which a portion of the Prepetition Senior Priority Obligations arising under the Prepetition Senior Priority Credit Agreement will be deemed "rolled up" as term loans and shall automatically be deemed to be substituted and exchanged, and paid-off and discharged, for second-out Roll-Up Term Loans (as defined herein) pursuant to the terms, and subject to the conditions set forth, in this Agreement and the Orders;

WHEREAS, the Lenders are willing to make term loans to the Borrower, subject to the terms and conditions set forth in this Agreement and the Orders; and

WHEREAS, the Secured Obligations of the Borrower are guaranteed by the Guarantors and subject to the Carve-Out, secured by Liens on the Collateral, in each case, as set forth in, and subject to, the Loan Documents and the Orders.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

<div align="center">ARTICLE I</div>

<div align="center">DEFINITIONS</div>

SECTION 1.01     <u>Defined Terms</u>.

As used in this Agreement, the following terms have the meanings specified below:

<div align="center">1</div>

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Ad Hoc Lender Group" means that certain group of Lenders constituting the Required Lenders and represented by the Lender Professionals, as may be reconstituted from time to time.

"Adequate Protection Claims" shall have the meaning assigned to such term in the Orders.

"Adequate Protection Liens" shall have the meaning assigned to such term in the Orders.

"Adjusted Term SOFR" means, subject to Section 2.14(b), with respect to any SOFR Borrowing, for any Interest Period, a rate per annum equal to the sum of (i) Term SOFR as in effect at such time for such Interest Period and (ii) the Term SOFR Adjustment for such Interest Period; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" means Wilmington Trust, National Association, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain fee letter dated as of the date hereof, by and among the Borrower and the Agents.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means the Administrative Agent and the Collateral Agent, and any successors and assigns in such capacity, and "Agents" means two or more of them.

"Agent Parties" has the meaning given to such term in Section 9.01(c).

"Agreement" has the meaning given to such term in the preliminary statements hereto.

"Agreement Currency" has the meaning given to such term in Section 9.18.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1.00%, (c) Adjusted Term SOFR for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1%, and (d) 2.00%; provided that for the purpose of this definition, Adjusted Term SOFR for any day shall be based on the Term SOFR Reference Rate at approximately 6:00 a.m. (New York City time) on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate

or Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or Adjusted Term SOFR, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.14 hereof, then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.

"Ancillary Document" has the meaning assigned to such term in Section 9.06.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, and all other applicable laws, rules, and regulations concerning or relating to bribery or corruption.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Period" means (w) with respect to the first Variance Report against the Initial Budget, the first full one-week period ending on Friday of the week immediately preceding the first Variance Report Deadline, (x) with respect to the second Variance Report against the Initial Budget, the first full 2-week period ending on Friday of the week immediately preceding the second Variance Report Deadline, (y) with respect to the third Variance Report against the Initial Budget, the first full 3-week period ending on Friday of the week immediately preceding the third Variance Report Deadline for such Variance Report, and (z) with respect to the fourth Variance Report, and each Variance Report thereafter, the 4-week period ending on the Friday of the week immediately preceding the applicable Variance Report Deadline.

"Applicable Rate" means, (a) with respect to any New Money Term Loans maintained as ABR Loans, 9.00% per annum, and with respect to any New Money Term Loans maintained as SOFR Loans, 10.00% per annum, and (b) with respect to any Roll-Up Term Loans maintained as ABR Loans, 3.75% per annum, and with respect to any Roll-Up Term Loans maintained as SOFR Loans, 4.75% per annum.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Budget" has the meaning assigned to such term in Section 5.16(a).

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A or any other form reasonably approved by the Administrative Agent.

"Audited Financial Statements" means (a) the audited consolidated balance sheet of the Lead Borrower and its Subsidiaries, and the related audited statements of income, cash flows and stockholders' equity, for the fiscal year of the Lead Borrower ended on or about December 31, 2023 and (b) the audited consolidated balance sheet of PSP and its Subsidiaries, and the related audited statements of income, cash flows and stockholders' equity, for the fiscal year of PSP, ended on or about December 31, 2023.

"<u>Available Tenor</u>" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to <u>Section 2.14(e)</u>.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bankruptcy Code</u>" has the meaning specified in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" has the meaning specified in the recitals to this Agreement.

"<u>Bankruptcy Event</u>" means, with respect to any Person, such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof; <u>provided</u> that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"<u>Basel III</u>" means: (i) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision on 16 December 2010, each as amended, supplemented or restated; (ii) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and (iii) any further guidance or standards published by the Basel Committee on Banking Supervision relating to Basel III.

"<u>Benchmark</u>" means, initially, the Term SOFR Reference Rate; <u>provided</u> that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable

Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.14(b).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that is administratively feasible for the Administrative Agent and selected by the Required Lenders:

(a)      the sum of: (1) Daily Simple SOFR and (2) the related Benchmark Replacement Adjustment;

(b)      the sum of: (1) the alternate benchmark rate that has been selected by the Required Lenders and the Lead Borrower as the replacement for the then-current Benchmark giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for dollar-denominated syndicated credit facilities at such time and (2) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Lead Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time; provided that such Benchmark Replacement Adjustment is administratively feasible for the Administrative Agent.

"Benchmark Replacement Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, the applicability of Section 2.14 and other technical, administrative or operational matters) that the Required Lenders decides may be appropriate to reflect the adoption and implementation of any such rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents); provided that such Benchmark Replacement Conforming Changes implement changes that are administratively feasible for the Administrative Agent.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)        in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)        in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an 'affiliate' (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing or any committee thereof duly authorized to act on behalf of such board, manager or managing member, (c) in the case of any partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preliminary statements hereto.

"Borrower Materials" has the meaning assigned to such term in Section 5.01.

"Borrowing" means Loans of the same Class and Type, made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Minimum" means $1,000,000.

"Borrowing Multiple" means $500,000.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Requirements of Law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any Capitalized Leases; provided, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness, unless the corresponding leases would have been treated as Capitalized Leases

under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases). For purposes of <u>Section 6.02</u>, a Capital Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"<u>Capitalized Lease</u>" means, as applied to any Person, any lease of any property (whether real, personal, or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee which is a transaction of a type commonly known as a "synthetic lease" (<u>i.e.</u>, a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income Tax purposes); <u>provided</u>, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness, unless the corresponding leases would have been treated as Capitalized Leases under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases).

"<u>Carve-Out</u>" shall have the meaning assigned to such term in the Orders.

"<u>Cash Management Obligations</u>" means (a) obligations of the Borrower or any Subsidiary in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit or purchase card programs and similar arrangements.

"<u>Casualty Event</u>" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards, in each case, in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"<u>Challenge Deadline</u>" shall have the meaning assigned to such term in the Orders.

"<u>Change in Law</u>" means: (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law," to the extent enacted, adopted, promulgated or issued after the date of this Agreement, but only to the extent such rules, regulations, or published interpretations or directives are applied to the Borrower and its Subsidiaries by the Administrative Agent or any Lender in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities, including for purposes of <u>Section 2.15</u>.

"<u>Chapter 11 Cases</u>" shall have the meaning specified in the recitals to this Agreement.

"<u>Chapter 11 Debtors</u>" shall have the meaning specified in the recitals to this Agreement.

"<u>Claiming Party</u>" has the meaning assigned to such term in <u>Section 10.09</u>.

"<u>Class</u>" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are New Money Term Loans or Roll-Up Term Loans and (b) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents or any Order as security for the Secured Obligations (including, for the avoidance of doubt, the "DIP Collateral" as defined under and in accordance with the Orders).

"<u>Collateral Agent</u>" means Wilmington Trust, National Association, in its capacity as collateral agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in <u>Article VIII</u>.

"<u>Collateral and Guarantee Requirement</u>" means, at any time, the requirement that:

(a)    all outstanding Equity Interests owned by or on behalf of any Loan Party (other than Equity Interests owned by or on behalf of Holdco Borrower or Holdco Intermediate Parent), shall have been pledged, and, the Collateral Agent shall have pursuant to the Orders, a valid and perfected superpriority lien on such Equity Interests; and

(b)    all Secured Obligations shall have been unconditionally guaranteed by each Borrower (other than with respect to such Borrower's direct Secured Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each other Loan Party; and

(c)    the Orders shall have created valid and perfected liens securing the Secured Obligations consistent with the priorities set forth in the Orders.

For the avoidance of doubt, Holdco Borrower and Holdco Intermediate Parent shall only be a Guarantor under this Agreement and are not granting Collateral or Liens to secure the Secured Obligations under this Agreement or the Orders. Notwithstanding anything herein to the contrary in any Loan Document or in the Orders, the Holdco Loan Parties (other than Holdco Borrower and Holdco Intermediate Parent) shall only provide Liens and Guarantees on its assets to secure the Secured Obligations in an amount not to exceed the outstanding principal balance (together with any interest, fees, reimbursement, indemnity and other amounts owed in respect thereof) of the New Money Term Loans at any time outstanding. Upon the reasonable request of the Required Lenders, the Loan Parties shall make filings or take any other actions with respect to the perfection of liens unless expressly otherwise set forth in the Orders.

"<u>Commitment</u>" means with respect to any Lender, the New Money Term Loan Commitment of any Class, the Roll-Up Term Loan Commitment or any combination thereof (as the context requires).

"<u>Commitment Premium</u>" has the meaning assigned to such term in <u>Section 2.12(b)</u>.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 <u>et</u> <u>seq</u>.), as amended from time to time, and any successor statute.

"Company Advisors" has the meaning assigned to such term in Section 5.16(c)."Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Confirmation Date Borrowing Cap" means $75,000,000.

"Confirmation Order" means the final order entered by the Bankruptcy Court in the Chapter 11 Cases confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code, in form and substance acceptable to the Required Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Required Lenders (which may be provided via email by counsel to the Required Lenders).

"Contributing Party" has the meaning assigned to such term in Section 10.09.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b), (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b) or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning specified in Section 9.20.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent (acting at the direction of the Required Lenders) may establish another convention, provided that such convention is administratively feasible for the Administrative Agent. .

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, or (ii) pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Lead Borrower or the Administrative Agent, or any other Lender, as applicable, in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under

this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent or any other Lender, as applicable, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Loans and under this Agreement; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's or any other Lender's, as applicable, receipt of such certification in form and substance satisfactory to it and the Administrative Agent or such Lender or (d) has become the subject of (i) a Bankruptcy Event or (ii) a Bail-In Action.

"Deposit Accounts" shall have the meaning set forth in Article 9 of the UCC.

"DIP Backstop Parties" has the meaning assigned to such term in the Restructuring Term Sheet.

"DIP Backstop Premium" has the meaning assigned to such term in Section 2.12(e).

"DIP Facility" shall have the meaning assigned to such term in the recitals hereto.

"DIP Superpriority Claims" shall have the meaning assigned to such term in the Orders.

"Disbursements Variance" has the meaning assigned to such term in Section 5.16(b).

"Dispose" and "Disposition" each has the meaning assigned to such term in Section 6.05.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)     matures or is mandatorily redeemable or contains any mandatory put, redemption or repayment provision (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)     is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests);

(c)     is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof; or

(d)     in the case of any preferred Equity Interest, provides for scheduled payments of dividends and/or distributions in cash;

in each case, on or prior to the date ninety-one (91) days after the Maturity Date; provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms

thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after, or payment thereunder is subject to the prior, repayment in full of all the Loans and all other Secured Obligations that are accrued and payable and the termination of the Commitments, (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of employees of the Borrower (or any direct or indirect parent thereof) or any of its subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Borrower or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) any Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for a requirement of payment of dividends or distributions in violation of <u>clauses (a)</u> or <u>(b)</u> above shall not constitute a Disqualified Equity Interest if the terms of such Equity Interest (x) give the applicable issuer the option to elect to pay such dividends or distributions on a non-cash basis and (y) do not require the cash payment of dividends or distributions at any time that such cash payment is not permitted under <u>Section 6.07</u> of this Agreement or would result in an Event of Default hereunder.

"<u>Disqualified Lenders</u>" means (i) those Persons identified by the Lead Borrower to the Administrative Agent in writing prior to the Effective Date as being "Disqualified Lenders", (ii) those Persons who are competitors of the Lead Borrower and/or any of their Subsidiaries or Persons Controlling or Controlled by any of the foregoing, in each case, identified by the Lead Borrower to the Administrative Agent from time to time in writing (including by email) which designation shall become effective three (3) Business Days after the delivery of each such written designation to the Administrative Agent, but which shall not apply retroactively to disqualify any persons that have previously acquired, or entered into a trade to acquire, an assignment or participation interest in the Loan and (iii) in the case of each Person identified pursuant to clauses (i) and (ii) above, any of their Affiliates (other than any such Affiliate that is primarily engaged in, or that advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which the primary Disqualified Lender does not possess the power to direct or cause the direction of the investment policies of such entity referenced in clause (ii) above, unless separately identified by the Lead Borrower pursuant to clause (i) above) that are either (x) identified in writing by the Lead Borrower to the Administrative Agent from time to time or (y) clearly identifiable as Affiliates on the basis of such Affiliate's name. Such list of Disqualified Lenders shall be available for inspection upon request by any Lender.

"<u>dollars</u>" or "<u>$</u>" refers to lawful money of the United States of America.

"<u>Earn-Outs</u>" means, with respect to any Person, obligations of such Person arising from Permitted Acquisitions or other Investments permitted hereunder which are payable to the sellers thereunder in their capacity as such based on the achievement of specified financial results or other criteria or milestones over time.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Date</u>" means the date on which the conditions precedent set forth in <u>Sections 4.01</u> and <u>4.02</u> have been satisfied.

"<u>Electronic Signature</u>" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"<u>Eligible Assignee</u>" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than the Borrower or any of its Affiliates), other than, in each case, (i) a natural person (or a holding company, investments vehicle, investment vehicle or trust for, or owned and operated by or for the primary benefit of a natural person), (ii) a Defaulting Lender or (iii) a Disqualified Lender; <u>provided</u> that a Disqualified Lender will constitute an Eligible Assignee solely to the extent that such assignment is consented to in writing by the Lead Borrower.  Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall have no liability with respect to any assignment made to a Disqualified Lender unless (i) the Administrative Agent has acted with gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment) and (ii) the Lead Borrower has not consented to such assignment or is not deemed to have consented to such assignment to the extent required by <u>Section 9.04(b)</u>.

"<u>Environmental Laws</u>" means all applicable treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, to preservation or reclamation of natural resources, to Release or threatened Release of any Hazardous Material or to the extent relating to exposure to Hazardous Materials, to health or safety matters.

"<u>Environmental Liability</u>" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities) directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Equity Interests</u>" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Title IV and Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 4001(b) of ERISA or Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, in each case whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any Plan; (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by a Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA) with respect to the termination of any Plan or by application of Section 4069 of ERISA with respect to any terminated plan; (f) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or to an intention to terminate or to appoint a trustee to administer any plan or plans in respect of which such Loan Party or ERISA Affiliate would be deemed to be an employer under Section 4069 of ERISA; (g) the incurrence by a Loan Party or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Multiemployer Plan; (h) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability, or the failure of a Loan Party or any ERISA Affiliate to pay when due, after the expiration of any applicable grace period, any installment payment with respect to any Withdrawal Liability; or (i) the withdrawal of a Loan Party or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Party" has the meaning assigned to such term in Section 9.03(b).

"Excluded Taxes" means, with respect to any Recipient, (a) Taxes imposed on (or measured by) net income (however denominated) and franchise Taxes by a jurisdiction (i) as a result of such recipient being organized or having its principal office or, in the case of any Lender, its applicable lending office located in such jurisdiction (or any political subdivision thereof), or (ii) that are Other Connection Taxes, (b) any branch profits tax imposed under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a) above, (c) any withholding Tax imposed pursuant to FATCA, (d) any Tax that is attributable to a Lender's failure to comply with Section 2.17(e) and (e) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Lead Borrower under Section 2.19(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17(a), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office.

"Existing ABL Intercreditor Agreement" means that certain Amended and Restated Intercreditor Agreement, dated as of November 22, 2021, by and among the Prepetition Senior Priority

Agent, the Prepetition Junior Priority Agent and the Prepetition ABL Agent (and any other Persons party thereto), and acknowledged by certain of the Loan Parties, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof.

"<u>Existing First Lien/Second Lien Intercreditor Agreement</u>" means that certain Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, by and among, among others, the Prepetition Senior Priority Agent, the Prepetition Junior Priority Agent and the Prepetition ABL Agent, and acknowledged by certain of the Loan Parties, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof.

"<u>Existing Intercreditor Agreements</u>" means the Existing ABL Intercreditor Agreement and the Existing First Lien/Second Lien Intercreditor Agreement, as the context may require.

"<u>Exit Premium</u>" has the meaning assigned to such term in <u>Section 2.12(c)</u>.

"<u>Extraordinary Net Cash Receipts</u>" means any cash (determined on a net basis) received by or paid to or for the account of the Borrower or any Subsidiary not in the ordinary course of business consisting of (a) proceeds of directors and officers insurance (other than proceeds not payable to the Loan Parties or the estates pursuant to the terms of any such insurance policy), (b) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than with respect to reimbursement of third party claims) relating to the Collateral and (c) foreign, United States, state or local tax refunds; in each case, net of reasonable and documented costs and expenses associated therewith, including reasonable and documented legal fees and expenses; provided, however, that Extraordinary Net Cash Receipts shall not include cash receipts to the extent that such funds are received by the Borrower or any Subsidiary in respect of any third party claim against such Person and applied to pay (or reimburse such Person for its prior payment of) such claim plus related costs and expenses.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable thereto and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>Federal Funds Effective Rate</u>" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; <u>provided</u> that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"<u>Federal Reserve Bank of New York's Website</u>" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"<u>Final Borrowing Cap</u>" means the remaining New Money Term Loan Commitments after giving effect to the incurrence of New Money Term Loans pursuant to <u>Sections 2.01(a)(i)</u> through <u>2.01(a)(iii)</u>.

"<u>Final DIP Order</u>" means the final order entered by the Bankruptcy Court in the Chapter

11 Cases approving (i) the Loan Parties' entry into the Loan Documents, (ii) the making of the Loans, (iii) the granting of the DIP Superpriority Claims and Liens against the Loan Parties and their assets in accordance with the Loan Documents with respect to the Collateral, (iv) the payment of the applicable premiums and fees under the Loan Documents (including the Commitment Premium, the Exit Premium, and the DIP Backstop Premium), (v) the items set forth in "Debtors' Stipulations, Releases and Acknowledgements Regarding DIP Secured Parties" and "Debtors' Stipulations, Releases and Acknowledgements Regarding Prepetition Secured Parties" in the Final DIP Order, (vi) the use of cash collateral, and (vii) the granting of adequate protection to the Prepetition Secured Parties, in each case, on a final basis, in form and substance acceptable to the Agents and the Required Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Required Lenders and, solely to the extent any such reversal, vacation, stay, amendment, supplement or other modification affects the rights or obligation of any Agent, such Agent.

"Financial Advisor" means AlixPartners, LLP, as financial officer to the Loan Parties.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or corporate controller of the Lead Borrower, another officer of the Lead Borrower with similar responsibilities, or the chief executive officer or chief operating officer of the Lead Borrower.

"Financing Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party and (b) the borrowing of Loans hereunder and the use of the proceeds thereof.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Day Orders" means all material orders entered by the Bankruptcy Court pursuant to motions filed on or about the Petition Date by the Chapter 11 Debtors.  The First Day Orders must be reasonably acceptable to the Required Lenders; *provided*, that the Orders and the interim and final order (I) Authorizing Debtors (as defined therein) to (A) Continue their Existing Cash Management System, (B) Maintain Existing Business Forms, (C) Continue Intercompany Arrangements, (D) Continue Using P-Cards, and (E) Pay Bank Fees; (II) Granting an Extension of Time to Comply With 11 U.S.C. § 345(B); and (III) Granting Related Relief must be acceptable to the Required Lenders.

"Floor" means a rate of interest equal to 1.00% per annum.

"Foreign Lender" has the meaning assigned to such term in Section 2.17(e)(ii).

"Foreign Subsidiary" means each Subsidiary that is organized under or incorporated in the laws of a jurisdiction other than the United States, any state thereof or the District of Columbia.

"Franchise Agreement" means a franchising agreement between any Loan Party or any Subsidiary thereof, as franchisor, and any other Person, as franchisee, pertaining to the establishment and operation of a business with operations comparable to the operations of the Lead Borrower and its Subsidiaries.

"Franchise Disclosure Documents" means any uniform franchise offering circulars and franchise disclosure documents used by (and, to the extent required, filed by) any Loan Party or Subsidiary of a Loan Party to comply with any applicable law, rule, regulation or order of any Governmental Authority.

"<u>Franchise Laws</u>" means all applicable laws, rules, regulations, orders, binding guidance or other requirements of the United States Federal Trade Commission or any other Governmental Authority relating to the relationship between franchisor and franchisees or to the offer, sale, termination, non-renewal or transfer of a franchise.

"<u>Fronting Fee</u>" has the meaning assigned to such term in <u>Section 9.12(d)</u>.

"<u>Fronting Fee Letter</u>" means that certain Jefferies Fronting Fee Letter, dated as of the Effective Date, by and among, *inter alia*, the Lead Borrower and the Fronting Lender (as such Fronting Fee Letter may be amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"<u>Fronting Lender</u>" means Jefferies Capital Services, LLC and/or its Affiliates.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, as in effect from time to time; <u>provided</u>, <u>however</u>, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capital Lease Obligations or Capitalized Leases shall be determined in accordance with the definitions of such terms.

"<u>Governmental Approvals</u>" means all authorizations, consents, approvals, permits, licenses and exemptions of, registrations and filings with, and reports to, Governmental Authorities.

"<u>Governmental Authority</u>" means any (i) federal, state, local, municipal, or other government, (ii) governmental or quasi-Governmental Authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"<u>Guarantee</u>" of or by any Person (the "<u>guarantor</u>") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; <u>provided</u> that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and

reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means the Lead Borrower, each Subsidiary of the Lead Borrower (other than the other Borrowers), Topco and each Subsidiary of Topco (other than the Lead Borrower) (in each case, on a secured or unsecured basis, as applicable, pursuant to the terms and conditions hereof and in the Orders).

"Guaranty" means, collectively, the guaranty of the Secured Obligations by the Guarantors pursuant to this Agreement.

"Hazardous Materials" means all explosive, radioactive, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants of any nature and in any form regulated pursuant to any Environmental Law.

"Holdco Borrower" means Freedom VCM, Inc., a Delaware corporation.

"Holdco Credit Agreement" means that certain Credit Agreement dated as of August 21, 2023 and as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time, among Holdco Intermediate Parent, as holdings, Holdco Borrower, as borrower, certain lenders party thereto and Alter Domus (US) LLC, as administrative agent and collateral agent.

"Holdco Deferred Interest Amount" means an amount equal to $19,505,047.98 which is comprised of the amount of the interest payment due under the Holdco Credit Agreement on or around August 21, 2024.

"Holdco Intermediate Parent" means Freedom VCM Interco, Inc., a Delaware corporation.

"Holdco Loan Document" means the "Loan Documents" (or any similar term) under the Holdco Credit Agreement.

"Holdco Loan Parties" means Topco, Freedom VCM Interco Holdings, Inc., a Delaware corporation; Holdco Intermediate Parent; Holdco Borrower and the Receivables Entities.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (w) trade accounts payable in the ordinary course of business, (x) any Earn-Out obligation, purchase price adjustment or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid within thirty (30) days after being due and payable, (y) liabilities associated with customer prepayments and deposits and (z) expenses accrued in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to

be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (j) Disqualified Equity Interests and other preferred equity issuances (and similar instruments); provided that the term "Indebtedness" shall not include (i) deferred or prepaid revenue, (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty, indemnity or other unperformed obligations of the seller, (iii) contingent indemnity and similar obligations incurred in the ordinary course of business (iv) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (v) Indebtedness of any Person that is a direct or indirect parent of the Borrower appearing on the balance sheet of the Borrower, or solely by reason of push down accounting under GAAP, (vi) any non-compete or consulting obligations incurred in connection with a Permitted Acquisition, (vii) any reimbursement obligations under pre-paid contracts entered into with clients in the ordinary course of business, (viii) for the avoidance of doubt, any Qualified Equity Interests issued by the Borrower. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of the Borrower and its Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms).

"Indemnified Taxes" means Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document, other than Excluded Taxes and Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information" has the meaning assigned to such term in Section 9.12(a).

"Initial Borrowing Cap" means $125,000,000.

"Initial Budget" means a 13-week cash flow projection in the form of Annex A, reflecting (i) the Loan Parties' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth calendar week thereafter, and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by the Company Advisors, the professionals of the Official Committee (if any), and other professionals during the thirteen week period.

"Intellectual Property" means all intellectual property rights of every kind and nature, including rights in inventions, patents, copyrights, licenses, trademarks, rights in trade secrets, and rights in software, all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, and proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

19

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.07.

"Interest Payment Date" means the last Business Day of each March, June, September and December, upon any prepayment due to acceleration and on the Maturity Date.

"Interest Period" means, with respect to any SOFR Borrowing, the period commencing on the date such Borrowing is disbursed or converted to or continued as a SOFR Borrowing and ending on the date that is one month thereafter as selected by the Borrower in its Borrowing Request; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period and (c) no Interest Period shall extend beyond the Maturity Date. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Borrowing Cap" means $50,000,000.

"Interim DIP Order" means an interim order entered by the Bankruptcy Court in the Chapter 11 Cases approving (i) the Loan Parties' entry into the Loan Documents, (ii) the making of the Loans, (iii) the granting of the DIP Superpriority Claims and Liens against the Loan Parties and their assets in accordance with the Loan Documents with respect to the Collateral, (iv) the payment of the applicable premiums and fees under the Loan Documents (including the Commitment Premium, the Exit Premium, and the DIP Backstop Premium, (v) the items set forth in "Debtors' Stipulations, Releases and Acknowledgements Regarding DIP Secured Parties" and "Debtors' Stipulations, Releases and Acknowledgements Regarding Prepetition Secured Parties" in the Interim Order", (vi) the use of cash collateral, and (vii) the granting of adequate protection to the Prepetition Secured Parties on an interim basis, which order shall be in form and substance acceptable to the Agents and the Required Lenders and shall be in full force and effect, and shall not, subject to entry of the Final DIP Order, be reversed, stayed, amended, supplemented or otherwise modified without the prior written consent of the Required Lenders and, solely to the extent any such reversal, vacation, stay, amendment, supplement or other modification affects the rights or obligations of any Agent, such Agent.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and the Subsidiaries (i) intercompany advances arising from their cash management, tax, and accounting operations and (ii) intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms)) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (a) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof)

with respect to such loan or advance after the date thereof, (b) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (c) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the fair market value (as determined in good faith by a Financial Officer) of such Equity Interests or other property as of the time of the transfer, <u>minus</u> any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (d) any Investment (other than any Investment referred to in clause <u>(a)</u>, <u>(b)</u> or <u>(c)</u> above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), <u>plus</u> (i) the cost of all additions thereto and <u>minus</u> (ii) the amount of any portion of such Investment that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (to the extent the amounts referred to in clause <u>(ii)</u> do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of <u>Section 6.04</u>, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; <u>provided</u> that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"<u>Investors</u>" means the one or more co-investors and other investors who are holders of Equity Interests in the Borrower (or any direct or indirect parent thereof) on the Effective Date after giving effect to the Transactions, together with their Affiliates.

"<u>ISDA Definitions</u>" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"<u>Judgment Currency</u>" has the meaning assigned to such term in <u>Section 9.18</u>.

"<u>Lead Borrower</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>Lender Professionals</u>" means, collectively, Paul Hastings LLP, as counsel, and Lazard Frères & Co. LLC, as financial advisor, to certain Lenders constituting the Required Lenders (and/or such other professionals as determined by the Required Lenders from time to time).

"<u>Lenders</u>" means the Fronting Lender, the Persons listed on <u>Schedule 2.01</u> and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, in each case, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, ground lease, capital lease or title retention

agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Liquidity" means, as of any date of determination, (a) the sum of the daily unrestricted (except for any restrictions pursuant to the collateral and security documents (including any account control agreements), in each case, for the benefit of the respective lenders, agents and/or other secured parties under this Agreement, the Prepetition Junior Priority Credit Agreements and the Prepetition ABL Credit Agreement) cash and cash equivalents of the Loan Parties (other than the Holdco Loan Parties) for such period *minus* (b) any cash in the Deposit Accounts maintained by Lead Borrower at Canadian Imperial Bank of Commerce with the account number ending in x9922 and x0508 needed to cover expenses incurred in connection with the self-insurance policies maintained by the Lead Borrower in accordance with the terms hereof.

"Liquidity Report Deadline" has the meaning assigned to such term in Section 5.16(d).

"Loan Documents" means this Agreement, the Security Documents (including the Orders), the Administrative Agent Fee Letter and, except for purposes of Section 9.02, any Note delivered pursuant to Section 2.09(e).

"Loan Parties" means any Borrower, any Subsidiary Loan Parties and any Holdco Loan Parties.

"Loans" means, individually or collectively as the context requires, the New Money Term Loans and the Roll-Up Term Loans.

"Majority in Interest", when used in reference to Lenders of any Class, means, at any time, Lenders holding outstanding Loans of such Class representing more than 50% of all Loans of such Class outstanding at such time; provided that whenever there are one or more Defaulting Lenders, the total outstanding Loans each Defaulting Lender shall be excluded for purposes of making a determination of the Majority in Interest.

"Manual Sweeping Accounts" shall have the meaning ascribed to the term "Manual Sweeping Accounts" in the Prepetition ABL Credit Agreement as in effect on the date hereof.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement".

"Material Adverse Effect" means a circumstance or condition that would materially and adversely affect (i) the business, results of operations or financial condition of the Lead Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Loan Parties, taken as a whole, to perform their payment obligations under the applicable Loan Documents or (iii) the rights and remedies, taken as a whole, of the Agents and the Lenders under the Loan Documents, or on the ability of the Loan Parties, taken as a whole, to perform their payment obligations to the Lenders, in each case, under the Loan Documents, in each case, other than the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases, the events that lead to the commencement of the Chapter 11 Cases, events that customarily and reasonably result from the commencement of the Chapter 11 Cases (in each case, other than matters affecting the Loan Parties that are not subject to the automatic stay) and the consummation of the transactions contemplated by the First Day Orders or the Plan of Reorganization.

"Material Indebtedness" means Indebtedness for borrowed money (other than the Secured Obligations), Capital Lease Obligations, unreimbursed obligations for letter of credit drawings and financial

guarantees (other than ordinary course of business contingent reimbursement obligations) or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $10,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Intellectual Property" means any intellectual property owned by the Borrower or any of its Subsidiaries, the loss of which would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

"Material Non-Public Information" means material non-public information with respect to the Lead Borrower or its Affiliates, or the respective securities of any of the foregoing for purposes of United States Federal and state securities laws.

"Material Real Property" means real property (including fixtures) (i) located in the United States, (ii) first acquired by any Loan Party after the Effective Date and (iii) owned (but not leased or ground-leased) by any Loan Party with a book value, as reasonably determined by the Lead Borrower in good faith on the date of acquisition thereof, greater than or equal to $2,000,000.

"Maturity Date" means the earliest to occur of: (a) one hundred and eighty (180) days after the Effective Date (the "Outside Date"); provided, that, the Outside Date may be extended by the Required Supermajority Lenders for up to three (3) consecutive 30-day periods, (b) 11:59 p.m. New York City Time on the date that is five (5) days after the Petition Date (or if such fifth day is not a Business Day, the first succeeding Business Day thereafter) if the Interim DIP Order, which shall be in form and substance consistent with the consent rights set forth in Section 3.02 of the Restructuring Support Agreement, has not been entered by the Bankruptcy Court prior to such date and time, (c) 11:59 p.m. New York City Time on the date that is forty-five (45) days after the Petition Date (or if such forty-fifth day is not a Business Day, the first succeeding Business Day thereafter), if the Final DIP Order, which shall be in form and substance consistent with the consent rights set forth in Section 3.02 of the Restructuring Support Agreement, has not been entered by the Bankruptcy Court prior to such date and time, (d) the effective date of a chapter 11 plan of any Loan Party, which has been confirmed by an order entered by the Bankruptcy Court in any of the Chapter 11 Cases, (e) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code, (f) consummation of a Sale Transaction (other than a Sale Transaction pursuant to a Sufficient Bid or that is otherwise consented to by the Required Supermajority Lenders in their sole discretion), (g) termination of the Restructuring Support Agreement, and (h) the acceleration of the Loans and the termination of the Commitments pursuant to Article VII.

"Maximum Rate" has the meaning assigned to such term in Section 9.16.

"Milestones" has the meaning assigned to such term in Section 6.17.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or

purchase price adjustment or Earn-Out, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, minus (b) the sum of (i) all fees and out-of-pocket expenses paid by the Borrower and its Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by the Borrower and its Subsidiaries as a result of such event to repay Indebtedness (other than (A) the Loans and (B) in respect of the Collateral, Indebtedness secured by a lien on such Collateral that is *pari passu* or junior to the lien on such Collateral securing the Secured Obligations) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the *pro rata* portion of net cash proceeds thereof (calculated without regard to this clause (y)) attributable to minority interests and not available for distribution to or for the account of the Borrower or its Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by the Borrower or any Subsidiary and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established by the Borrower and its Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, provided that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of Net Proceeds in the amount of such reduction.

"New Money Term Loan Commitments" means, with respect to each Lender, the commitment to make New Money Term Loans hereunder in accordance with Section 2.01(a), expressed as an amount representing the maximum principal amount of the New Money Term Loans to be made by such Lender hereunder, as such commitment may be reduced from time to time (a) pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption, including in connection with the Syndication Procedures or (b) pursuant to a reduction of the Commitments by the Borrower. As of the date hereof, the aggregate amount of New Money Term Loan Commitments is $250,000,000. The amount of each Lender's New Money Term Loan Commitment is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Term Loan Commitment.

"New Money Term Loans" has the meaning assigned to such term in Section 2.01(a).

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Note" means a promissory note of the Borrower, in substantially the form of Exhibit D, payable to a Lender in a principal amount equal to the principal amount of the Loans of such Lender.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate (which rate shall be administratively feasible for the Administrative Agent) for a federal funds transaction quoted at 11:00 a.m. on such day received by a financial institution selected by the Required Lenders from a federal funds broker of recognized standing selected by such financial institution; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"<u>Official Committee</u>" means any official committee of unsecured creditors appointed in any of the Chapter 11 Cases.

"<u>Orders</u>" means the Interim DIP Order and/or the Final DIP Order, as the context requires.

"<u>Organizational Documents</u>" means, with respect to any Person, the charter, articles of association or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of any present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient (x) having executed, delivered, become a party to, performed its obligations or received payments under, received or perfected a security interest under or enforced any Loan Documents or engaged in any other transaction pursuant to this Agreement or (y) having sold or assigned an interest in any Loan Documents).

"<u>Other Taxes</u>" means any and all present or future recording, stamp, documentary or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.19(b)).</u>

"<u>Outside Date</u>" has the meaning specified in the definition of "Maturity Date".

"<u>Overnight Bank Funding Rate</u>" means, for any day, the rate comprised of both overnight federal funds and overnight SOFR Borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"<u>Participant</u>" has the meaning assigned to such term in <u>Section 9.04(c)(i)</u>.

"<u>Participant Register</u>" has the meaning assigned to such term in <u>Section 9.04(c)(ii)</u>.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"<u>Periodic Term SOFR Determination Day</u>" has the meaning specified in the definition of "Term SOFR Reference Rate".

"<u>Permitted Acquisition</u>" means the purchase or other acquisition, by merger, consolidation or otherwise, by the Borrower or any Subsidiary of any Equity Interests in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person; <u>provided</u> that (a) in the case of any purchase or other acquisition of Equity Interests in a Person, (i) such Person, upon the consummation of such purchase or acquisition, will be a Subsidiary (including as a result of a merger or consolidation between any Subsidiary and such Person), or (ii) such Person is merged into or consolidated with a Subsidiary and such Subsidiary is the surviving entity of such merger or consolidation, (b) the business of such Person, or such assets, as the case may be, constitute a Similar Business (or assets with respect thereto), (c) with respect to each such purchase or other acquisition, all actions required to be taken with respect to such newly created or acquired Subsidiary (including each subsidiary thereof) or assets in order to satisfy the requirements set forth in the definition

of the term "Collateral and Guarantee Requirement" to the extent applicable shall have been taken to the extent required by Sections 5.11 or 5.12 (or shall be taken within the time periods set forth in this Agreement or such later date as agreed to by the Required Lenders), (d) subject to Section 1.06, after giving effect to any such purchase or other acquisition no Event of Default shall have occurred and be continuing, and (e) all such purchases and acquisitions of the Equity Interests in any Person will result in such Person becoming a Loan Party (within the time periods set forth in this Agreement), or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of) such Person will become owned by a Loan Party (or a Person that will become a Loan Party within the time periods set forth in this Agreement).

"Permitted Encumbrances" means:

(a)    Liens for Taxes, assessments or governmental charges that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b)    Liens with respect to outstanding motor vehicle fines and Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

(c)    Liens incurred, pledges or deposits made in the ordinary course of business (i) in connection with payroll taxes, workers' compensation, unemployment insurance and other social security legislation, public liability laws or similar legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause (i);

(d)    Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts, customer claims, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(e)    easements, licenses, servitudes, restrictive covenants, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole;

(f)    leases or subleases of real or personal property granted to other Persons (as lessee thereof) that do not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole;

(g)        rights of future tenants pursuant to written leases entered into in accordance with the terms hereof;

(h)        Liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 7.01(j) and any pledge and/or deposit securing any settlement of threatened litigation;

(i)        Liens on (i) goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of its Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such Lien secures only the obligations of the Borrower or such Subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 6.01 and (ii) specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(j)        Liens arising from precautionary Uniform Commercial Code financing statements or similar filings made in respect of operating leases entered into by the Borrower or any of its Subsidiaries;

(k)        rights of recapture of unused real property in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any Governmental Authority;

(l)        Liens in favor of deposit banks or securities intermediaries securing customary fees, expenses or charges in connection with the establishment, operation or maintenance of deposit accounts or securities accounts;

(m)        liens in favor of obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(n)        Liens arising from grants of non-exclusive licenses or sublicenses of Intellectual Property, or covenants not to sue with respect to Intellectual Property, made in the ordinary course of business;

(o)        rights of setoff, banker's lien, netting agreements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(p)        Liens arising from the right of distress enjoyed by landlords or Liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent or performance of other obligations in respect of leased properties, so long as such Liens are not exercised or except where the exercise of such Liens would not reasonably be expected to have a Material Adverse Effect;

(q)        Liens or security given to public utilities or to any municipality or Governmental Authority when required by the utility, municipality or Governmental Authority in connection with the supply of services or utilities to the Borrower or any of its Subsidiaries;

(r)        servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other agreements pertaining to the

27

use or development of any of the assets of the Person, provided the same do not result in (i) a substantial and prolonged interruption or disruption of the business activities of the Borrower and its Subsidiaries, taken as a whole, or (ii) a Material Adverse Effect; and

(s)    any valid Liens that constitute Permitted Prior Liens as defined under, and in accordance with, the Orders; provided that such Liens shall have the priorities set forth in the Orders; and

(t)    Liens securing (i) the Secured Obligations under this Agreement and the other Loan Documents and (ii) the Prepetition Senior Priority Obligations; provided that such Liens shall have the priorities set forth in the Orders;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money other than Liens referred to in clauses (d) and (k) above securing obligations under letters of credit or bank guarantees or similar instruments related thereto and in clause (g) above, in each case to the extent any such Lien would constitute a Lien securing Indebtedness for borrowed money.

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Subsidiary:

(a)    dollars, euros, Swiss francs, Sterling, Canadian dollars, or such other currencies held by it from time to time in the ordinary course of business;

(b)    readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States, (ii) the United Kingdom, (iii) Canada, (iv) Switzerland or (v) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of such country or such member nation of the European Union is pledged in support thereof;

(c)    time deposits with, or certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $250,000,000 in the case of U.S. banks and $100,000,000 (or the dollar equivalent as of the date of determination) in the case of foreign banks (any such bank in the foregoing clauses (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)    commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)    repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer covering securities described in clauses (b) and (c) above;

(f)    marketable short-term money market and similar highly liquid funds substantially all of the assets of which are comprised of securities of the types described in clauses (b) through (e) above;

(g)    securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, the United Kingdom, Canada, Switzerland, a member of the European Union or by any political subdivision or taxing authority

of any such state, member, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)    investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(i)    instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized or incorporated in such jurisdiction;

(j)    investments, classified in accordance with GAAP as current assets of the Borrower or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000 or its equivalent, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k)    demand deposit accounts holding cash;

(l)    interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G7 government or other G7 governmental agency or a G7 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof;

(m)    other short-term investments of a type analogous to the foregoing utilized by Foreign Subsidiaries;

(n)    investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (m) above; and

(o)    any guarantee or indemnity for the obligations of a Subsidiary in connection with a Subsidiary claiming exemption from audit, the preparation and filing of its accounts or other similar exemptions (including under section 394C, 448C or 479C of the Companies Act 2006 or other similar or equivalent provisions).

"Permitted Variance" means, (i) with respect to the first Variance Report, no limitations on Disbursements Variance and Receipts Variance, (ii) with respect to the second Variance Report, Disbursements Variance less than 25% and Receipts Variance less than 25%, (iii) with respect to the third Variance Report, Disbursements Variance less than 20% and Receipts Variance less than 20% and (iv) with respect to the fourth Variance Report and every Variance Report thereafter, Disbursements Variance less than 15% and Receipts Variance less than 15%, in each case under the foregoing clauses (i) through (iv), on an aggregate basis (and not on a line item basis) and excluding, in any event, any professional fees.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity, whether existing as of the Effective Date or subsequently created or coming to exist.

"Petition Date" has the meaning assigned to such term in the recitals hereto.

"Plan" means any employee pension benefit plan as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization" means a plan of reorganization under the Chapter 11 Cases (including all related schedules, supplements, exhibits and orders, as applicable), which shall be consistent with the Restructuring Support Agreement and otherwise shall be in form and substance satisfactory to the Required Lenders.

"Platform" has the meaning assigned to such term in Section 5.01.

"Prepayment Event" means:

(a)      any non-ordinary course sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries pursuant to Section 6.05(k) or the occurrence of any other Casualty Event;

(b)      the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness, other than Indebtedness permitted under Section 6.01 or permitted by the Required Lenders pursuant to Section 9.02; or

(c)      the issuance of any equity in the Borrower or any Subsidiary thereof; and

(d)      the receipt of Extraordinary Net Cash Receipts by the Borrower or any of its Subsidiaries.

"Prepayment Percentage" means 100%.

"Prepetition ABL Agent" means JPMorgan Chase Bank, N.A., as "Agent" under, and as such term is defined in, the Prepetition ABL Credit Agreement (and shall also include any successor agent in such capacity).

"Prepetition ABL Collateral" means the "Collateral" as defined in the Prepetition ABL Credit Agreement and any other liens or security interests securing any Prepetition ABL Obligations.

"Prepetition ABL Credit Agreement" means that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among the Borrower, each of the other loan parties party thereto from time to time, the Prepetition ABL Agent and the lenders party thereto from time to time (collectively, the "Prepetition ABL Lenders"), as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition ABL Liens" means the liens and security interests granted by the Loan Parties to secure the Prepetition ABL Obligations.

"Prepetition ABL Loan Documents" means the "Financing Agreements" (or any similar term) under the Prepetition ABL Credit Agreement.

"Prepetition ABL Loans" means the "Loans" under the Prepetition ABL Credit Agreement.

"Prepetition ABL Obligations" means all "Obligations" as such term is defined in the

Prepetition ABL Credit Agreement.

"Prepetition ABL Secured Parties" means, collectively, the Prepetition ABL Lenders, the Prepetition ABL Agent and the other secured parties under the Prepetition ABL Credit Agreement and the other Prepetition ABL Loan Documents.

"Prepetition Debt" means, collectively, Prepetition Senior Priority Obligations, the Prepetition ABL Obligations and the Prepetition Junior Priority Obligations.

"Prepetition Junior Priority Agent" means Alter Domus (US) LC, as administrative agent and collateral agent under each of the Prepetition Junior Priority Credit Agreements, together with its successors and assigns.

"Prepetition Junior Priority Collateral" means the "Collateral" as defined in each of the Prepetition Junior Priority Credit Agreements and any other liens or security interests securing any Prepetition Junior Priority Obligations.

"Prepetition Junior Priority Credit Agreements" means, collectively, (i) that certain Second Lien Credit Agreement, dated as of March 10, 2021, among the Borrower, the Prepetition Junior Priority Agent and the lenders party thereto from time to time (collectively, the "Prepetition Junior Priority Lenders"), as amended, restated, supplemented or otherwise modified from time to time and (ii) that certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, among the Borrower, the Prepetition Junior Priority Agent and the Prepetition Junior Priority Lenders.

"Prepetition Junior Priority Liens" means the liens and security interests granted by the Loan Parties to secure the Prepetition Junior Priority Obligations.

"Prepetition Junior Priority Loan Documents" means the "Loan Documents" as defined in each of the Prepetition Junior Priority Credit Agreements.

"Prepetition Junior Priority Loans" means the "Loans" under the Prepetition Junior Priority Credit Agreements.

"Prepetition Junior Priority Obligations" means all "Secured Obligations" as such term is defined in each of the Prepetition Junior Priority Credit Agreements.

"Prepetition Junior Priority Secured Parties" means, collectively, the Prepetition Junior Priority Lenders, the Prepetition Junior Priority Agent and the other secured parties under each of the Prepetition Junior Priority Credit Agreements and the other Prepetition Junior Priority Loan Documents.

"Prepetition Loan Documents" means, collectively, the Prepetition ABL Loan Documents, the Prepetition Junior Priority Loan Documents and the Prepetition Senior Priority Loan Documents.

"Prepetition Secured Obligations" means, collectively, the Prepetition ABL Obligations, the Prepetition Junior Priority Obligations and the Prepetition Senior Priority Obligations.

"Prepetition Secured Parties" means, collectively, the Prepetition ABL Secured Parties, the Prepetition Junior Priority Secured Parties and the Prepetition Senior Priority Secured Parties.

"Prepetition Senior Priority Agent" means Wilmington Trust, National Association, as administrative agent and collateral agent under the Prepetition Senior Priority Credit Agreement, together

with its successors and assigns.

"Prepetition Senior Priority Collateral" means the "Collateral" as defined in the Prepetition Senior Priority Credit Agreement and any other liens or security interests securing any Prepetition Senior Priority Obligations.

"Prepetition Senior Priority Credit Agreement" means that certain First Lien Credit Agreement, dated as of March 10, 2021, among the Borrower, the Prepetition Senior Priority Agent and the lenders party thereto from time to time (collectively, the "Prepetition Senior Priority Lenders"), as the same has been amended, amended and restated, supplemented or otherwise modified from time to time.

"Prepetition Senior Priority Liens" means the liens and security interests granted by the Loan Parties to secure the Prepetition Senior Priority Obligations.

"Prepetition Senior Priority Loan Documents" means the "Loan Documents" as defined in the Prepetition Senior Priority Credit Agreement.

"Prepetition Senior Priority Loans" means the "Loans" under the Prepetition Senior Priority Credit Agreement.

"Prepetition Senior Priority Obligations" means all "Secured Obligations" as such term is defined in the Prepetition Senior Priority Credit Agreement.

"Prepetition Senior Priority Secured Parties" means, collectively, the Prepetition Senior Priority Lenders, the Prepetition Senior Priority Agent and the other secured parties under the Prepetition Senior Priority Credit Agreement and the other Prepetition Senior Priority Loan Documents.

"Prime Rate" means the per annum rate publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases quoting a prime rate of the type described, either (a) the per annum rate quoted as the base rate on such corporate loans in a different national publication as reasonably selected by Administrative Agent or (b) the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the Bank prime loan rate or its equivalent).

"Public Company Costs" means, as to any Person, costs associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and charges relating to compliance with the provisions of the Securities Act and the Exchange Act, as applicable to companies with equity or debt securities held by the public, the rules of national securities exchange companies with listed equity or debt securities, directors' or managers' compensation, fees and expense reimbursement, charges relating to investor relations, shareholder meetings and reports to shareholders or debtholders, directors' and officers' insurance and other executive costs, legal and other professional fees and listing fees.

"Public Lender" has the meaning assigned to such term in Section 5.01.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning specified in Section 9.20.

"Qualified Equity Interests" means Equity Interests of the Borrower other than Disqualified Equity Interests.

"Receipts Variance" has the meaning assigned to such term in Section 5.16(b).

"Receivables Entities" means, collectively, Freedom Receivables II, LLC, a Delaware limited liability company, and Freedom VCM Receivables, Inc., a Delaware corporation.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Reference Time" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is Term SOFR, 6:00 a.m. (New York City time) on the day that is two U.S. Government Securities Business Days preceding the date of such setting or (3) if such Benchmark is not Term SOFR, the time determined by the Administrative Agent in its reasonable discretion.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, trustees, agents, controlling persons, advisors and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns of each of the foregoing.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, emptying, escaping, pumping, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Relevant Governmental Body" means the Board of Governors or the NYFRB, or a committee officially endorsed or convened by the Board of Governors or the NYFRB, or any successor thereto.

"Remedies Notice Period" has the meaning assigned to such term in Section 7.01.

"Removal Effective Date" has the meaning assigned to such term in Section 8.06.

"Reorganized Common Equity" has the meaning assigned to such term in the Restructuring Support Agreement.

"Representative" means, with respect to any series of Indebtedness permitted by this Agreement to be secured by the Collateral on a *pari passu* or junior or "silent" subordinated basis, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"Required Lenders" means, at any time, Lenders (other than the Fronting Lender, except with respect to waivers, amendments, or consents that directly and materially adversely affect the Fronting Lender; provided that to the extent the Syndication Date shall not have occurred within 15 Business Days of the Effective Date, after the fifteenth (15th) Business Day, the Fronting Lender's Loans shall be included for purposes of determining the "Required Lenders" until the Syndication Date has occurred) having Loans

and unused Commitments representing more than 50.1% of the aggregate Loans and unused Commitments at such time; provided that to the extent set forth in Section 9.02 or Section 9.04 whenever there are one or more Defaulting Lenders, the total outstanding Loans and the unused Commitments of each Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Required Supermajority Lenders" means, at any time, Lenders (other than the Fronting Lender, except with respect to waivers, amendments, or consents that directly and materially adversely affect the Fronting Lender; provided that to the extent the Syndication Date shall not have occurred within 15 Business Days of the Effective Date, after the fifteenth (15th) Business Day, the Fronting Lender's Loans shall be included for purposes of determining the "Required Lenders" until the Syndication Date has occurred) having Loans and unused Commitments representing more than 66 2/3% of the aggregate Loans and unused Commitments (other than Commitments of the Fronting Lender) at such time; provided that to the extent set forth in Section 9.02 or Section 9.04 whenever there are one or more Defaulting Lenders, the total outstanding Loans and the unused Commitments of each Defaulting Lender shall be excluded for purposes of making a determination of Required Supermajority Lenders.

"Requirements of Law" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date" has the meaning assigned to such term in Section 8.06.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, company secretary or other similar officer, manager or a member of the Board of Directors of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on the Effective Date or thereafter pursuant to the definition of the term "Collateral and Guarantee Requirement," any secretary, assistant secretary, company secretary or director of a Loan Party, and as to the Lead Borrower, any Financial Officer. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Subsidiary.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement (including all exhibits, schedules and attachments thereto), dated as of November 1, 2024 (as may be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof), by and among the Chapter 11 Debtors and the Consenting First Lien Lenders (as defined therein).

"Restructuring Term Sheet" has the meaning assigned to such term as in the Restructuring

Support Agreement.

"Roll-Up" means the "roll up" of Prepetition Senior Priority Obligations into Roll-Up Term Loans pursuant to the terms of this Agreement and the Orders.

"Roll-Up Term Loan Commitments" means, with respect to each Lender, the commitment to make Roll-Up Term Loans hereunder in accordance with Section 2.01(b), expressed as an amount representing the maximum principal amount of the Roll-Up Term Loans to be made by such Lender hereunder, as such commitment may be reduced from time to time (a) pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption or (b) pursuant to a reduction of the Commitments by the Borrowers. As of the Effective Date, the aggregate amount of Roll-Up Term Loan Commitments is $0, and upon the completion of Syndication on the Syndication Date and after giving effect to all related Assignments and Assumptions, the aggregate amount of Roll-Up Term Loan Commitments shall be deemed to be $500,000,000, without any further action of any party to this Agreement or the Loan Documents, the Bankruptcy Court or any other Person. The amount of each Lender's Roll-Up Term Loan Commitment is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Roll-Up Term Loan Commitment.

"Roll-Up Term Loans" shall have the meaning assigned to such term in Section 2.01.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"Sale Transaction" means the closing of a sale of all or substantially all assets or equity of the Loan Parties (other than to another Loan Party).

"Sale Transaction Qualified Extension" means an extension of the Maturity Date that would otherwise result from the consummation of a Sale Transaction (pursuant to clause (f) of the definition of "Maturity Date"), which extension shall be subject to (a) the consent of the Required Supermajority Lenders and (b) the Restructuring Support Agreement being in effect as of the date of such extension; provided, that no such extension shall extend the Maturity Date later than the Outside Date.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the Crimea, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic regions of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union, any EU member state or His Majesty's Treasury of the United Kingdom, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned 50% or more by any such Person in the foregoing clauses (a) and (b), or (d) any Person otherwise the subject of Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, or Her Majesty's Treasury of the United Kingdom.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Holdco Obligations Guarantee" means the supplement to the Guarantee Agreement, dated as of August 19, 2024, by and among the Loan Parties and Alter Domus (US) LLC, as administrative agent and collateral agent, pursuant to which all of the Loan Parties become "New Guarantors" under the "Guarantee Agreement" (as defined in the Holdco Credit Agreement) and which shall terminate upon payment in full of the Holdco Deferred Interest Amount to the respective parties.

"Secured Obligations" means (a) the due and punctual payment in cash by the Borrower of (i) the principal of the Loans and all accrued and unpaid interest thereon at the Applicable Rate or rates provided in this Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents to which it is a party, including obligations to pay fees, expenses, reimbursement obligations and indemnification obligations and obligations to provide cash collateral, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment in cash and performance of all other monetary obligations of the Borrower under or pursuant to each of the Loan Documents to which it is a party and (c) the due and punctual payment and performance of all the monetary obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents to which it is a party (including interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Secured Loan Parties" means each Borrower and each Guarantor, other than the Holdco Borrower and Holdco Intermediate Parent.

"Secured Parties" means (a) each Lender, (b) the Administrative Agent, (c) the Collateral Agent, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (e) the permitted successors and assigns of each of the foregoing.

"Security Documents" means a collective reference to the Orders and each other security agreement or pledge agreement executed and delivered pursuant to the "Collateral and Guarantee Requirement" and/or Section 5.11, Section 5.12(a), Section 5.12(b) or Section 5.14 to secure any of the Secured Obligations.

"Similar Business" means (1) any business conducted by the Borrower or any Subsidiary on the Effective Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Subsidiaries conduct or propose to conduct on the Effective Date.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Alternate Base Rate".

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held (unless parent does not Control such entity), or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent; in each case, whether existing as of the Effective Date or subsequently created or coming to exist.

"Subsidiary" means any subsidiary of the Lead Borrower (unless otherwise specified or the context otherwise requires).

"Subsidiary Loan Party" means each Subsidiary of the Lead Borrower.

"Sufficient Bid" has the meaning assigned to such term as in the Restructuring Support Agreement.

"Supported QFC" has the meaning specified in Section 9.20.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Syndication" has the meaning assigned to such term in Section 2.04.

"Syndication Date" has the meaning assigned to such term in Section 2.04.

"Syndication Procedures" has the meaning assigned to such term in Section 2.04.

"Tax Restructuring" means any reorganizations and other activities related to tax planning and tax reorganization (as determined by Lead Borrower in good faith) entered into after the Effective Date so long as such Tax Restructuring does not materially impair the Guarantee or the security interests of the

Agents and the Lenders under the Security Documents in the Collateral, taken as a whole, and Borrower and its Subsidiaries otherwise comply with Sections 5.11 and 5.12.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Commitment" means, with respect to each Lender, the Commitment of such Lender to make Loans hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the Loans to be made by such Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.08 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The amount of each Lender's Term Commitment is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Term Commitment.

"Term Lender" means a Lender with a Term Commitment or an outstanding Loan.

"Term Loans" means, individually or collectively as the context requires, New Money Term Loans and the Roll-Up Term Loans.

"Term SOFR" means, for any SOFR Loan, the Term SOFR Reference Rate and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 6:00 a.m. (New York City time), two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the Term SOFR Administrator.

"Term SOFR Adjustment" means (a) with respect to a SOFR Loan with an Interest Period of one month, 0.11448% per annum, (b) with respect to a SOFR Loan with an Interest Period of three months, 0.26161% per annum and (c) with respect to a SOFR Loan with an Interest Period of six months, 0.42826% per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means, for any day and time (such day, the "Periodic Term SOFR Determination Day"), with respect to any SOFR Loan and for any tenor comparable to the applicable Interest Period, the rate per annum published by the Term SOFR Administrator and identified by the Administrative Agent as the forward-looking term rate based on SOFR. If by 5:00 pm (New York City time) on such Periodic Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to Term SOFR has not occurred, then, so long as such day is otherwise a U.S. Government Securities Business Day, the Term SOFR Reference Rate for such Periodic Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the Term SOFR Administrator, so long as such first preceding U.S. Government Securities Business Day is not more than five (5) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"Topco" means Freedom VCM Holdings, LLC, a Delaware limited liability company.

"Transaction Costs" means all fees, premiums, costs and expenses incurred or payable by the Borrower or any other Subsidiary in connection with the Transactions.

"Transactions" means (a) the execution and delivery of the Loan Documents, the creation of the Liens pursuant to the Security Documents and the incurrence of the DIP Facility and the funding of the New Money Term Loans on the Effective Date, (c) the consummation of the other transactions contemplated by this Agreement on the Effective Date, (d) the consummation of any other transactions in connection with the foregoing, and (e) the payment of the Transaction Costs related thereto.

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Alternate Base Rate.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Special Resolution Regimes" has the meaning specified in Section 9.20.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a U.S. jurisdiction other than the State of New York, the terms "UCC" and "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unaudited Financial Statements" means the unaudited consolidated balance sheet of the Lead Borrower and its Subsidiaries, and the related unaudited statements of income, cash flows and stockholders' equity, for the fiscal quarter of the Lead Borrower ended on or about June 30, 2024.

"United States Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(e)(ii)(C).

"Updated Budget" has the meaning assigned to such term in Section 5.16(a).

"Updated Budget Deadline" has the meaning assigned to such term in Section 5.16(a).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Variance Report" has the meaning assigned to such term in Section 5.16(b).

"Variance Report Deadline" has the meaning assigned to such term in Section 5.16(b).

"Wholly Owned Subsidiary" means any Subsidiary that is a wholly owned subsidiary.

"wholly owned subsidiary" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"Zero Balance Accounts" means Deposit Accounts in which a balance of zero is maintained by the depository institution at all times by automatically transferring funds from a master Deposit Account to such Zero Balance Account in an amount only large enough to cover checks presented and other debits to such account, such that any such Zero Balance Account maintains an overnight balance of zero dollars at all times.

SECTION 1.02    Classification of Loans and Borrowings.

For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Class (e.g., an "New Money Term Loan" or "Roll-Up Term Loan") or by Type (e.g., a "SOFR Loan" or "ABR Loan") or by Class and Type (e.g., a "SOFR New Money Term Loan"). Borrowings also may be classified and referred to by Class (e.g., an "New Money Term Loan Borrowing") or by Type (e.g., a "SOFR Borrowing") or by Class and Type (e.g., a "SOFR New Money Term Loan Borrowing").

SECTION 1.03    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed

by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document, including all schedules, exhibits and other attachments thereto and as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or other modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04     Accounting Terms; GAAP.

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

SECTION 1.05     Effectuation of Transactions.

All references herein to the Borrower and its Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of the Borrower and the other Loan Parties contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Transactions that occurred on the Effective Date, unless the context otherwise requires.

SECTION 1.06     [Reserved].

SECTION 1.07     Certain Determinations.

(a)     [Reserved].

(b)     [Reserved].

(c)     Notwithstanding the foregoing, for purposes of any determination under Article V, Article VI or Article VII or any determination under any other provision of this Agreement subject to any Dollar limitation, threshold or basket, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than Dollars shall be translated into Dollars based on the relevant currency exchange rate in effect on the applicable date of determination (rounded to the nearest currency unit, with 0.5 or more of a currency unit being rounded upward); provided, however, that for purposes of determining compliance with Article VI with respect to any amount in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness, Lien or Investment is incurred or Disposition, Restricted Payment or such transaction with an Affiliate is entered into; provided, further, that, for the avoidance of doubt, the foregoing provisions of this Section 1.07(c) shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness, Lien or Investment may be incurred or Disposition, Restricted

Payment or prepayment, redemption, purchase, defeasance or such transaction with an Affiliate may be entered into at any time under such Sections. Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent (acting at the direction of the Required Lenders) may from time to time specify with the Borrower's consent (such consent not to be unreasonably withheld) to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

SECTION 1.08    Divisions.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.09    Interest Rates.

The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform. Upon the occurrence of a Benchmark Transition Event, Section 2.14(b) provides a mechanism for determining an alternative rate of interest. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability. The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to any Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

ARTICLE II

THE CREDITS

SECTION 2.01    Commitments.

(a)    New Money Term Loans. Subject to the terms and conditions hereof and the Orders, the Lenders with New Money Term Loan Commitments (which, as of the Effective Date, will be the Fronting Lender) hereby severally, but not jointly, agree to make term loans in Dollars (the "New Money Term Loans") to the Borrower: (i) on the Effective Date, in a single borrowing in an aggregate principal amount not to exceed the Initial Borrowing Cap, (ii) on or after the entry of the Final DIP Order, in a single

42

borrowing in an aggregate principal amount not to exceed the Interim Borrowing Cap, (iii) on or after the entry of the Confirmation Order, in a single borrowing in an aggregate principal amount not to exceed the Confirmation Date Borrowing Cap and (iv) after the entry of the Final DIP Order, if the entire amount of the New Money Term Loan Commitments have not been fully drawn pursuant to the foregoing clauses (i) through (iii) and, subject to the approval of the Required Lenders in their sole discretion and to the extent set forth in the Approved Budget in a single borrowing in an aggregate principal amount not to exceed the Final Borrowing Cap; it being understood and agreed that the Fronting Lender shall initially provide the New Money Term Loans on the date set forth in the foregoing clause (i) and, thereafter, such New Money Term Loans and related New Money Term Loan Commitments shall be assigned by the Fronting Lender in accordance with Section 2.04 and Section 9.04. In no event shall any Lender be required to make New Money Term Loans in excess of its New Money Term Loan Commitments. Amounts borrowed under this Section 2.01(a) and subsequently repaid or prepaid may not be reborrowed.

(b)     Roll-Up Term Loans. Subject to the terms and conditions of the Interim DIP Order and this Agreement, effective immediately upon the completion of Syndication on the Syndication Date and after giving effect to all related Assignments and Assumptions, and without any further action by any party to this Agreement or the Loan Documents, the Bankruptcy Court or any other Person (i) up to $500,000,000 of Prepetition Senior Priority Loans (together with accrued and unpaid interest thereon) held by the Lenders party hereto (or any of their respective designated Approved Funds) as of the Syndication Date that are Prepetition Senior Priority Secured Parties shall be, on the Syndication Date, automatically deemed (on a cashless two dollars of Roll-Up Term Loans for every dollar of the sum of (x) the principal amount of New Money Term Loans outstanding as of the Syndication Date plus (y) the amount of New Money Term Loan Commitments of such Lender as of the Syndication Date (i.e., $250,000,000) basis) to constitute U.S. Dollar-denominated term loans under this Agreement ("Roll-Up Term Loans") based upon each such Person's (or any of their respective designated Approved Funds) pro rata share of principal amount of New Money Term Loans, which Roll-Up Term Loans shall be due and payable in accordance with the terms and conditions set forth in this Agreement as if originally funded hereunder on the Effective Date and (ii) from and after the Effective Date, the outstanding aggregate amount of the Prepetition Senior Priority Loans held by each such Lender (or any of its designated Approved Funds that is an Eligible Assignee) shall be automatically and irrevocably deemed reduced by such amount of Roll-Up Term Loans allocated to each such Lender (or any of its designated Approved Funds that is an Eligible Assignee).

(c)     Subject to the terms and conditions of this Agreement (including the priorities set forth herein), the Term Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed. The Term Loans may from time to time be SOFR Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent as set forth herein.

SECTION 2.02     Loans and Borrowings.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, provided that the Commitments of the Lenders are several and other than as expressly provided herein with respect to a Defaulting Lender, no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

(b)     Subject to Section 2.14, each Term Loan Borrowing shall be comprised entirely of ABR Loans or SOFR Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement;

43

(c)     At the commencement of each Interest Period for any SOFR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that a SOFR Borrowing that results from a continuation of an outstanding SOFR Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of fifteen (15) SOFR Borrowings outstanding.

SECTION 2.03       Requests for Borrowings.

To request a Term Loan Borrowing, the Lead Borrower shall notify the Administrative Agent, and in the case of Borrowings on the Effective Date, the Fronting Lender, of such request in writing by telecopy, electronic mail, facsimile or overnight courier (a) in the case of a SOFR Borrowing, not later than 12:00 p.m., New York City time, three (3) U.S. Government Securities Business Days before the date of the proposed Borrowing, (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, on the date of the proposed Borrowing; provided that any notice given in connection with Borrowings on the Effective Date (including SOFR Borrowings) may be given not later than 2:00 p.m., New York City time, one (1) Business Day before the Effective Date; provided further that, in each case, the Administrative Agent may in its discretion accept any later request. Each such written Borrowing Request shall be signed by the Lead Borrower substantially in the form of Exhibit E and shall be irrevocable. Each such written Borrowing Request shall specify the following information:

(i)     whether the requested Borrowing is to be a Borrowing of New Money Term Loans and/or a Borrowing of any other Class (specifying the Class thereof);

(ii)     the aggregate amount of such Borrowing;

(iii)     the date of such Borrowing, which shall be a Business Day;

(iv)     whether such Borrowing is to be an ABR Borrowing or a SOFR Borrowing;

(v)     in the case of a SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(vi)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.06; and

(vii)     that the Borrowing amounts are being used solely in accordance with the Approved Budget and that, as of the date of such Borrowing, the conditions set forth in Sections 4.02(e) and 4.02(f) are satisfied.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested SOFR Borrowing, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04 <u>Syndication</u>.

Following the Effective Date, the Lead Borrower shall use commercially reasonable efforts to assist the Fronting Lender in connection with a syndication process (the "<u>Syndication</u>") for the assignment of a proportionate share of New Money Term Loans and New Money Term Loan Commitments in each case in accordance with syndication procedures set forth in <u>Exhibit F</u> (the "<u>Syndication Procedures</u>"), which shall be acceptable to each of the Administrative Agent (acting in consultation with the Required Lenders), the Fronting Lender and the Lead Borrower (each in their reasonable discretion). The Syndication shall terminate on the date the Fronting Lender shall have notified Lead Borrower and the Administrative Agent that the syndication of the New Money Term Loans and New Money Term Loan Commitments (including any fees that have been capitalized and paid in the form of New Money Term Loans pursuant to <u>Section 2.12</u>) has been completed (such date, the "<u>Syndication Date</u>").  Upon completion of the Syndication, a <u>Schedule 2.04</u>, which shall be prepared by the Lender Professionals and reasonably satisfactory to the Required Lenders, shall be delivered to the Administrative Agent and the Borrower, which shall set forth the aggregate New Money Term Loans and New Money Term Loan Commitment held by each Lender upon closing of the Syndication (broken out by New Money Term Loans, New Money Term Loan Commitments, Roll-Up Term Loans and Roll-Up Term Loan Commitments). The Administrative Agent (i) shall be entitled to conclusively rely on the <u>Schedule 2.04</u> prepared by the Lender Professionals without investigation, (ii) shall incur no liability for acting in reliance upon such <u>Schedule 2.04</u> delivered to it by the Lender Professionals, and (iii) is hereby directed by the Borrower and the Lenders to update the Register pursuant to <u>Section 9.04(b)(iv) to</u> reflect the Lender allocations set forth in such <u>Schedule 2.04</u>.

SECTION 2.05        [<u>Reserved</u>].

SECTION 2.06        <u>Funding of Borrowings</u>.

(a)        Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, New York City time, to the Applicable Account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Lead Borrower in the applicable Borrowing Request.

(b)        Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph <u>(a)</u> of this <u>Section 2.06</u> and may, in reliance on such assumption and in its sole discretion, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent. If such Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower agrees to pay such corresponding amount to the Administrative Agent forthwith on demand. The Administrative Agent shall also be entitled to recover from such Lender or Borrower interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrower, the interest rate applicable to such Borrowing in accordance with <u>Section 2.13</u>. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c)      The obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 9.03(c).

SECTION 2.07      Interest Elections.

(a)      Each Term Loan Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03. Thereafter, the Lead Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.07. The Lead Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)      To make an election pursuant to this Section 2.07, the Lead Borrower shall notify the Administrative Agent of such election in writing by telecopy, electronic mail, facsimile or overnight courier by the time that a Borrowing Request would be required under Section 2.03 if the Lead Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such written Interest Election Request shall be irrevocable and shall be signed by the Lead Borrower.

(c)      Each written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)      the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)      the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)      whether the resulting Borrowing is to be an ABR Borrowing or a SOFR Borrowing; and

(iv)      if the resulting Borrowing is to be a SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a SOFR Borrowing but does not specify an Interest Period, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)      Promptly following receipt of an Interest Election Request in accordance with this Section 2.07, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Lead Borrower fails to deliver a timely Interest Election Request with respect to a SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Lead Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Borrowing and (ii) unless repaid, each SOFR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08     Termination and Reduction of Commitments.

(a)     Each Lender's New Money Term Loan Commitments shall each be (A) permanently reduced on a dollar-for-dollar basis by the aggregate principal amount of any New Money Term Loans made by such Lender in accordance with Section 2.01(a) in respect of such applicable New Money Term Loan Commitments, (B) terminated in full on the Maturity Date, and (C) terminated in full to the extent done so pursuant to Article VII.  The Roll-Up Term Loan Commitments shall be reduced on a dollar-for-dollar basis by the aggregate principal amount of Roll-Up Term Loans deemed made by such Lender in accordance with Section 2.01(b), in respect of such Roll-Up Term Loan Commitments, and shall be reduced to zero upon the entry of the Final DIP Order after giving effect to the Roll-Up Term Loans deemed made on such date in accordance with Section 2.01(b).

(b)     The Lead Borrower may at any time terminate, or from time to time reduce, the Commitments of any Class, provided that each reduction of the Commitments of any Class shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 unless such amount represents all of the remaining Commitments of such Class.

(c)     The Lead Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section 2.08 at least one (1) Business Day prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section 2.08 shall be irrevocable. Any termination or reduction of the Commitments of any Class shall be permanent. Each reduction of the Commitments of any Class shall be made ratably among the Lenders in accordance with their respective Commitments of such Class.

SECTION 2.09     Repayment of Loans; Evidence of Debt.

(a)     The Borrower hereby unconditionally promises to repay to the Administrative Agent for the account of each Lender in cash the entire outstanding principal amount of, and all accrued but unpaid interest on, the Loans and all other Secured Obligations then due and payable (if any) on the Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower

to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)      The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section 2.09, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section 2.09 shall control.

(e)      Any Lender may request that Loans of any Class made by it be evidenced by a Note. In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns).

Notwithstanding anything to the contrary in the foregoing, each Lender agrees that, on the Plan Effective Date (as defined in the Restructuring Support Agreement) and so long as the Restructuring Support Agreement remains in effect (and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders (as defined in the Restructuring Support Agreement) to terminate the Restructuring Support Agreement, unless such act or occurrence was waived, cured or extended in accordance with the terms of the Restructuring Support Agreement), the New Money Term Loans, Roll-Up Term Loans held by each Lender (or any of its designated Approved Funds), the Commitment Premium, the Exit Premium and the DIP Backstop Premium, in each case to the extent outstanding at such time, shall convert either into "Loans" under the Take-Back Debt Facility (as such term is defined in the Restructuring Support Agreement) or Reorganized Common Equity, in each case in accordance with the terms set forth in the Restructuring Support Agreement and Restructuring Term Sheet.  For the avoidance of doubt, in no event will any Agent be required to track, calculate or confirm the amount of the Commitment Premium, the Exit Premium or the DIP Backstop Premium, in each case except to the extent such Commitment Premium, DIP Backstop Premium, or Exit Premium has been capitalized and "paid in kind" by being added to the outstanding principal amount of New Money Term Loans.

SECTION 2.10      [Reserved].

SECTION 2.11      Prepayment of Loans.

(a)      The Lead Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without penalty or premium, except with respect to the Exit Premium described in Section 2.12(c), in each case subject to the requirements of this Section 2.11 and Section 2.16. All voluntary prepayments shall be applied first toward repayment of the New Money Term Loans and then, following payment in full of the New Money Term Loans, to the repayment of the Roll-Up Term Loans, in each case, on a *pro rata* basis.

(b)      In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any of its Subsidiaries in respect of any Prepayment Event, the Borrower shall, within three (3) Business Days after such Net Proceeds are received by or on behalf of the Borrower (or, in the case of a Prepayment Event described in clauses (b) and (c) of the definition of "Prepayment Event", on the date of such Prepayment Event), prepay Term Loan Borrowings (with respect to a Prepayment Event described in clause (b) of the definition of "Prepayment Event", in each case, *pro rata* based on the aggregate principal amount of outstanding Borrowings of each such Class, among (x) first New Money Term Loans until paid in full and (y) second to Roll-Up Term Loans until paid in full) in an aggregate

amount equal to the Prepayment Percentage of the amount of such Net Proceeds. All mandatory prepayments subject to this Section 2.11(b) shall be applied first toward repayment of the New Money Term Loans and then, following payment in full of the New Money Term Loans, to the repayment of the Roll-Up Term Loans until paid in full, in each case, *pro rata* based on the aggregate principal amount of outstanding Borrowings of each such Class.

(c)     [Reserved]

(d)     All optional prepayment of Borrowings pursuant to Section 2.11(a), shall be applied (x) first toward repayment of the New Money Term Loans and (y) then to the repayment of the Roll-Up Term Loans, in each case, *pro rata* based on the aggregate principal amount of outstanding Borrowings of each such Class. Optional prepayments of Term Loan Borrowings shall be allocated in direct order of maturity, and subject to the foregoing, the Administrative Agent shall apply such prepayments in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16; provided that, in connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to Section 2.11(c) or (d), such prepayments shall be applied on a *pro rata* basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are ABR Loans or SOFR Loans.

(e)     The Borrower shall notify the Administrative Agent of any optional prepayment pursuant to Section 2.11(a)(i) in writing by telecopy, electronic mail, facsimile or overnight courier of any prepayment hereunder (i) in the case of prepayment of a SOFR Borrowing, not later than 11:00 a.m., New York City time, three (3) U.S. Government Securities Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one (1) Business Day before the date of prepayment (or, in each case, such later date or date which the Administrative Agent may agree to in its sole discretion). Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13, and subject to Section 2.11(b), shall be without premium or penalty. At the Borrower's election in connection with any prepayment pursuant to this Section 2.11, such prepayment shall not be applied to any Term Loan of a Defaulting Lender (under any of subclauses (a), (b) or (c) of the definition of "Defaulting Lender") and shall be allocated ratably among the relevant non-Defaulting Lenders.

SECTION 2.12     Fees.

(a)     The Borrower agrees to pay to the Agents for their own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Agents pursuant to the Administrative Agent Fee Letter.

(b)     The Borrower agrees to pay, on the Effective Date, for the ratable account of each of the Lenders providing New Money Term Loan Commitments on the Effective Date, as compensation

for the funding of such Lender's New Money Term Loans, a commitment premium (the "<u>Commitment Premium</u>") in an amount equal to 2.50% of such Lender's New Money Term Loan Commitments on the Effective Date.  The Commitment Premium shall be payable in kind on the Effective Date by adding the aggregate amount thereof to the outstanding principal balance of the New Money Term Loans on such date, on a ratable basis with respect to the New Money Term Loans of each Lender as of the Effective Date and shall be subject to the Syndication.  The Commitment Premium will be in all respects fully earned, due and payable on the Effective Date and non-refundable and non-creditable thereafter.  For the avoidance of doubt, the Lenders agree to the treatment of the Commitment Premium as set forth in the final paragraph of <u>Section 2.09</u>.

(c)    The Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders on the Maturity Date or on any other date that the Loans are repaid in full (whether through a mandatory prepayment, voluntary prepayment, acceleration or otherwise) a non-refundable fee (the "<u>Exit Premium</u>") equal to 2.50% of the aggregate principal amount of the Loans repaid on such applicable date, which fee shall be in all respects fully earned, due and payable on such date and non-refundable and non-creditable thereafter.  For the avoidance of doubt, the Lenders agree to the treatment of the Exit Premium as set forth in the final paragraph of <u>Section 2.</u>09.

(d)    The Borrower agrees to pay to the Fronting Lender for the sole account of the Fronting Lender, the fronting fee set forth in the Fronting Fee Letter (the "<u>Fronting Fee</u>"). The Fronting Fee will be in all respects fully earned, due and payable pursuant to the terms and conditions of the Fronting Fee Letter.

(e)    The Borrower agrees to pay to the Fronting Lender, for the ratable account of the DIP Backstop Parties, a non-refundable put option premium as set forth in the Restructuring Support Agreement (the "<u>DIP Backstop Premium</u>"). The DIP Backstop Premium will be in all respects fully due, earned and payable in accordance with the terms of the Restructuring Term Sheet.  For the avoidance of doubt, the Lenders agree to the treatment of the DIP Backstop Premium as set forth in the final paragraph of <u>Section 2.09</u>.

(f)    Notwithstanding the foregoing, and subject to <u>Section 2.22</u>, the Borrower shall not be obligated to pay any amounts to any Defaulting Lender pursuant to this <u>Section 2.12</u>.

SECTION 2.13    <u>Interest</u>.

(a)    The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)    The Loans comprising each SOFR Borrowing shall bear interest at Adjusted Term SOFR for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)    Notwithstanding the foregoing, if upon the occurrence and during the continuance of any Event of Default under paragraph <u>(a)</u>, <u>(b)</u>, <u>(h)</u> or <u>(i)</u> of <u>Section 7.01</u> any principal of or interest on any Loan or any fee or other amount payable by any Loan Party under a Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, all overdue principal amounts of the Loans shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of the principal of any Loan, 2.00% per annum plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this <u>Section 2.13</u> or (ii) in the case of any other amount, 2.00% per annum plus the rate applicable to ABR Loans as provided in paragraph <u>(a)</u> of this <u>Section 2.13</u>; <u>provided</u> that no amount shall be payable pursuant to this <u>Section 2.13(c)</u> to a Defaulting Lender so long as such Lender shall be a Defaulting Lender; <u>provided</u>, <u>further</u> that no amounts shall accrue pursuant to this <u>Section 2.13(c)</u> on any

overdue amount or other amount payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(d)        Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan, provided that (i) interest accrued pursuant to paragraph (c) of this Section 2.13 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)        All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Adjusted Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.14        Benchmark Unavailability; Benchmark Replacement Setting.

(a)        If prior to the commencement of any Interest Period for a SOFR Borrowing:

(1)        the Administrative Agent or the Required Lenders determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining Adjusted Term SOFR or Term SOFR, as applicable, for such Interest Period; provided that no Benchmark Transition Event with respect to such benchmark shall have occurred at such time; or

(2)        the Administrative Agent is advised by the Required Lenders that Adjusted Term SOFR or Term SOFR, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then in each such case, the Administrative Agent shall give notice thereof to the Lead Borrower and the Lenders in writing by telecopy, electronic mail, facsimile or overnight courier as promptly as practicable thereafter and, until the Administrative Agent (acting at the direction of the Required Lenders) notifies the Lead Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a SOFR Borrowing shall be ineffective and (ii) if any Borrowing Request requests a SOFR Borrowing, then such Borrowing shall be made as an ABR Borrowing; provided, however, that, in each case, the Lead Borrower may revoke any Borrowing Request that is pending when such notice is received.

(b)        *Benchmark Replacement*. Notwithstanding anything to the contrary herein or in any other Loan Document (and any Swap Agreement shall be deemed not to be a "Loan Document" for purposes of this Section 2.14), if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement"

for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders (or, if such Benchmark Replacement affects fewer than all Classes, the Majority in Interest Lenders of each affected Class).  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(c)       *Benchmark Replacement Conforming Changes*. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent (acting at the direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d)       *Notices; Standards for Decisions and Determinations*. The Administrative Agent will promptly notify the Lead Borrower and the Lenders of (i) the occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to <u>Section 2.14(e)</u> and (v) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this <u>Section 2.14</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 2.14</u>.

(e)       *Unavailability of Tenor of Benchmark*. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will no longer be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)       *Benchmark Unavailability Period*. Upon the Lead Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have

converted any such request into a request for a Borrowing of or conversion to ABR Loans. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

SECTION 2.15    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender;

(ii)    subject the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document to any Taxes (other than Indemnified Taxes, Other Taxes or Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or SOFR Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any SOFR Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or otherwise), then, from time to time upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such increased costs actually incurred or reduction actually suffered; provided that the Borrower shall not be liable for such compensation if, in the case of requests for reimbursement under clause (ii) above resulting from a market disruption, (A) the relevant circumstances are not generally affecting the banking market or (B) the applicable request has not been made by the Majority in Interest of Term Lenders with respect to Term Loans; provided, further, that to the extent any such costs or reductions are incurred by any Lender as a result of any requests, rules, guidelines or directives enacted or promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and Basel III, then such Lender shall be compensated pursuant to this Section 2.15(a) only to the extent such Lender is imposing such charges on similarly situated borrowers where the terms of other syndicated credit facilities permit it to impose such charges.

(b)    If any Lender determines that any Change in Law regarding capital requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then, from time to time upon request of such Lender, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section 2.15 delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 2.15</u> shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to this <u>Section 2.15</u> for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; <u>provided further</u> that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.16      [Reserved].

SECTION 2.17      <u>Taxes</u>.

(a)      Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable Requirements of Law. If the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct any Taxes from such payments, then the applicable withholding agent shall make such deductions and shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law, and if such Taxes are Indemnified Taxes, then the amount payable by the applicable Loan Party shall be increased as necessary so that after all such required deductions have been made (including such deductions applicable to additional amounts payable under this <u>Section 2.17</u>), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions been made.

(b)      The Borrower shall timely pay to the relevant Governmental Authority in accordance with Requirements of Law or, at the option of the Administrative Agent, timely reimburse it for the payment of, any Other Taxes.

(c)      The Borrower, jointly and severally, shall indemnify the Administrative Agent and each Lender within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of any Loan Party under any Loan Document, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.17</u>) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent shall be conclusive absent manifest error.

(d)      As soon as practicable after any payment of any Taxes by a Loan Party to a Governmental Authority pursuant to this <u>Section 2.17</u>, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)      Each Lender shall, at such times as are reasonably requested by Borrower or the Administrative Agent, provide Borrower and the Administrative Agent with any properly completed and executed documentation prescribed by any Requirement of Law, or reasonably requested by Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or

reduction in, any withholding Tax with respect to any payments to be made to such Lender under the Loan Documents. Each such Lender shall, whenever a lapse in time or change in circumstances renders any such documentation expired, obsolete or inaccurate in any respect (including any specific documentation required below in this Section 2.17(e)), deliver promptly to Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify Borrower and the Administrative Agent in writing of its legal ineligibility to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding tax or are subject to Tax at a rate reduced by an applicable tax treaty, Borrower, Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable law from such payments at the applicable statutory rate.

Without limiting the generality of the foregoing:

(i)      Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax.

(ii)      Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) (such Lender, a "Foreign Lender") shall deliver (to the extent it is legally entitled to do so) to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the Administrative Agent) whichever of the following is applicable:

(A)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)      two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of Exhibit C-1, C-2, C-3 or C-4, as applicable, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of such Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to such Borrower as described in Section 881(c)(3)(C) of the Code (any such certificate a "United States Tax Compliance Certificate"), and (y) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(D)      to the extent a Foreign Lender is not the beneficial owner (for example,

55

where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (provided that, if the Lender is a partnership and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)      any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(iii)      If a payment made to any Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has or has not complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

On or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the expiration or lapse of such certification, unless the Administrative Agent promptly notifies Borrower in writing of its legal ineligibility to do so), the Administrative Agent will deliver to Borrower (i) if the Administrative Agent is a U.S. Person, a properly completed and duly signed Internal Revenue Service Form W-9 (or any successor form) certifying that it is not subject to U.S. federal backup withholding, or (ii) if the Administrative Agent is not a U.S. Person, a (A) properly completed and duly signed Internal Revenue Service Form W-8ECI (or any successor form) with respect to any amounts received on its own account and (B) properly completed and duly signed Internal Revenue Service Form W-8IMY (or any successor form) with respect to any amounts payable under any Loan Document to the Administrative Agent for the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and that it is using such form as evidence of its agreement with Borrower to be treated as a U.S. Person (and Borrower and the Administrative Agent agree to so treat the Administrative Agent as a U.S. Person with respect to such payments as contemplated by Treasury Regulations Section 1.1441-1(b)(2)(iv)(A)).

(f)      If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of Taxes as to which it has been indemnified pursuant to this Section 2.17 or with respect to which additional amounts have been paid pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or

additional amounts paid, under this <u>Section 2.17</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u> that the Borrower, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrower pursuant to this <u>Section 2.17(f)</u> (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (<u>provided</u> that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential). Notwithstanding anything to the contrary in this <u>Section 2.17(f)</u>, in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this <u>Section 2.17(f)</u> the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. Notwithstanding anything to the contrary, this <u>Section 2.17(f)</u> shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential) to any Loan Party or any other person.

(g)     The agreements in this <u>Section 2.17</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(h)     For purposes of this <u>Section 2.17</u>, the term "applicable Requirements of Law" includes FATCA.

SECTION 2.18      <u>Payments Generally; Pro Rata Treatment; Sharing of Setoffs</u>.

(a)     The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest or fees, or of amounts payable under <u>Sections 2.15</u>, <u>2.16</u> or <u>2.17</u>, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, except that payments pursuant to <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>9.03</u> shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan shall be made in dollars, all payments of accrued interest payable on a Loan shall be made in dollars, and all other payments under each Loan Document shall be made in dollars. All

payments of principal of any of the Roll-Up Term Loans shall be accompanied by accrued and unpaid post-petition interest thereon.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied towards payment of interest and fees then due hereunder (first, to the interest and fees with respect to the New Money Term Loans and second, to the interest and fees with respect to the Roll-Up Term Loans), ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (B) any disproportionate payment obtained by a Lender of any Class as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.06(a) or Section 2.06(b), Section 2.18(d) or Section 9.03(c), then the Administrative Agent may, in its discretion and in the order determined by the Administrative Agent (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and to be applied to, any future funding obligations of such Lender under any such Section.

SECTION 2.19          Mitigation Obligations; Replacement of Lenders.

(a)          If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event gives rise to the operation of Section 2.23, then such Lender shall (at the request of the Lead Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Sections 2.15 or 2.17 or mitigate the applicability of Section 2.23, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)          If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.23, (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17 or (iii) any Lender is a Defaulting Lender, then the Lead Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Lead Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (C) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (B) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.23, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Lead Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

SECTION 2.20          [Reserved].

SECTION 2.21          [Reserved].

SECTION 2.22          Defaulting Lenders.

(a)          Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in <u>Section 9.02</u>.

(ii)    <u>Reallocation of Payments</u>. Subject to the last sentence of <u>Section 2.11(f)</u>, any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VII</u> or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to <u>Section 9.08</u>), shall be applied at such time or times as may be determined by the Administrative Agent as follows: <u>first</u>, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; <u>third</u>, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; <u>fourth</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to any Loan Party as a result of any judgment of a court of competent jurisdiction obtained by any Loan Party against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and <u>fifth</u>, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if such payment is a payment of the principal amount of any Loans and such Lender is a Defaulting Lender under clause <u>(a)</u> of the definition thereof, such payment shall be applied solely to pay the relevant Loans of the relevant non-Defaulting Lenders on a pro rata basis prior to being applied pursuant to this <u>Section 2.22(a)(ii)</u>. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(b)     <u>Defaulting Lender Cure</u>. If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders, whereupon that Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and <u>provided</u> <u>further</u> that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

SECTION 2.23     <u>Illegality</u>.

If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue SOFR Loans denominated in dollars or to convert ABR Loans denominated in dollars to SOFR Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Alternate Base Rate, the interest

rate on such ABR Loans of such Lender shall be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower shall, upon three (3) Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans denominated in dollars of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate), either on the last day of the Interest Period if the Administrative Agent is advised in writing by such Lender that it may lawfully continue to maintain such SOFR Loans to such day, or immediately, if the Administrative Agent is advised in writing by such Lender that it may not lawfully continue to maintain such SOFR Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Each Lender agrees to notify the Administrative Agent and the Lead Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lenders and each Agent that:

SECTION 3.01    Organization; Powers.

Each Loan Party is a Chapter 11 Debtor and is a debtor in the Chapter 11 Cases.  Each Loan Party and each of their respective Subsidiaries (a) is duly organized or incorporated, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization or incorporation, (b) subject to the entry of the Orders, has the corporate or other organizational power and authority to carry on its business as now conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdictions) in, every jurisdiction where such qualification is required, except, with respect to clause (a) above (other than with respect to the Borrower), clause (b) above (other than with respect to the Borrower) and clause (c) above, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.02    Authorization; Enforceability.

Subject to the entry of the Orders, this Agreement has been duly authorized, executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and (ii) general principles of equity, regardless of whether considered in a proceeding in equity or at law, and similar concepts under applicable law.

SECTION 3.03      Governmental Approvals; No Conflicts.

Subject to the entry of the Orders, the execution, delivery and performance by any Loan Party of this Agreement or any other Loan Document (a) does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of any Loan Party, or (ii) any Requirements of Law applicable to any Loan Party, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon the Loan Parties or any of their respective Subsidiaries or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by the Loan Parties or any of their respective Subsidiaries, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of the Loan Parties or any of their respective Subsidiaries, except Liens created under the Loan Documents or permitted by Section 6.02, except (in the case of each of clauses (a), (b)(ii), (c) and (d)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right, or imposition of Lien, as the case may be, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04      Financial Condition; No Material Adverse Effect.

(a)      The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, including the notes thereto and (ii) fairly present in all material respects the financial condition of the Persons covered thereby as of the respective dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, including the notes thereto.

(b)      The Unaudited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Persons covered thereby as of the respective dates thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)      Since the date of the Restructuring Support Agreement, there has been no Material Adverse Effect.

SECTION 3.05      Properties.

Subject to the entry of the Orders, each of the Loan Parties and their respective Subsidiaries has good title to, or valid interests in, all its real and personal property material to its business, if any (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, in each case, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06      Litigation and Environmental Matters.

(a)      Except as set forth in Schedule 3.06 and the commencement of the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened in writing against or affecting such

Loan Party or any of their respective Subsidiaries that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)        Except as set forth in Schedule 3.06, and except with respect to any other matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Loan Parties or any of their respective Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of such Loan Party, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of such Loan Party, any basis to reasonably expect that such Loan Party or any of its Subsidiaries will become subject to any Environmental Liability.

SECTION 3.07        Compliance with Laws.

Each of the Loan Parties and their respective Subsidiaries is in compliance with all Requirements of Law applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.08        Investment Company Status.

None of the Loan Parties is required to register as an "investment company" under the Investment Company Act of 1940, as amended from time to time.

SECTION 3.09        Taxes.

Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Loan Parties and each of their respective Subsidiaries (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all Taxes levied or imposed on their properties, income or assets otherwise due and payable (whether or not shown on a Tax return), except any Taxes that are being contested in good faith by appropriate proceedings, provided that each Loan Party, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP. There is no proposed Tax assessment, deficiency or other claim against any Loan Party or any of their respective Subsidiaries that would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.10        ERISA; Labor Matters.

(a)        Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)        Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred during the six year period prior to the date on which this representation is made or deemed made or is reasonably expected to occur, and (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

(c)        Except as would not reasonably be expected, individually or in the aggregate to result in a Material Adverse Effect, (i) each employee benefit plan (as defined in Section 3(2) of ERISA) that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such plan is qualified

under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service; (ii) to the knowledge of the Loan Parties, nothing has occurred that would prevent or cause the loss of such tax-qualified status; and (iii) there are no pending or, to the knowledge of the Loan Parties, threatened in writing claims, actions or lawsuits, or action by any Governmental Authority, with respect to any such plan.

(d)      Except as would not reasonably be expected to have a Material Adverse Effect, (i) none of the Loan Parties or their respective Subsidiaries has experienced any labor strike or work stoppage or other collective labor dispute by employees due to labor disagreements and (ii) each of the Loan Parties and their respective Subsidiaries is in compliance in all respects with any collective bargaining agreement to which it is a party.

SECTION 3.11      Disclosure.

(a)      The written reports, financial statements, certificates or other written factual information (other than projections and information of a general economic or industry specific nature) furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished), when taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected and pro forma financial information, the Loan Parties represent only that such information, when taken as a whole, was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered, it being understood that (i) any such projected financial information is merely a prediction as to future events and is not to be viewed as fact, (ii) such projected financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties or any of their respective Subsidiaries and (iii) no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material.

(b)      As of the Effective Date, to the best knowledge of the Loan Parties, the information included in the Beneficial Ownership Certification (if any) provided pursuant to Section 4.01(h) is true and correct in all respects.

SECTION 3.12      Subsidiaries.

Schedule 3.12 sets forth the name of, and the ownership interest of the Loan Parties and each of their subsidiaries in, each subsidiary of the Loan Parties as of the Effective Date.

SECTION 3.13      Intellectual Property; Licenses, Etc.

Except as would not reasonably be expected to have a Material Adverse Effect, to the knowledge of the Loan Parties, each of the Loan Parties and their respective Subsidiaries owns, licenses or possesses the right to use all Intellectual Property that is reasonably necessary for the operation of its business substantially as currently conducted. To the knowledge of the Loan Parties, no Intellectual Property owned by the Loan Parties or any of their respective Subsidiaries and used in the operation of its business as currently conducted infringes upon the Intellectual Property of any Person except for such infringements that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No claim or litigation regarding any of the Intellectual Property is pending or, to the knowledge of the Loan Parties, threatened in writing against the Loan Parties or any of their respective

Subsidiaries, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

SECTION 3.14    [Reserved].

SECTION 3.15    Federal Reserve Regulations.

None of the Loan Parties or any of their respective Subsidiaries is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock. No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

SECTION 3.16    Use of Proceeds.

Subject to the Orders and the other Loan Documents, proceeds of the New Money Term Loans shall be used only for the following purposes: (a) to make adequate protection payments as required in the Loan Documents and the Orders, (b) to pay the administrative costs of the Chapter 11 Cases (including professional fees and expenses) and the Transactions, (c) to fund the Carve-Out and to make payments under the Carve-Out in accordance with the terms of the Orders, and (d) for general corporate purposes, in each case, solely to the extent in accordance with and subject to the Loan Documents and the Orders (including the Approved Budget, subject to the Permitted Variances under Section 6.18).

SECTION 3.17    Anti-Corruption Laws and Sanctions.

(a)    Each Loan Party and each of their respective Subsidiaries will not, directly or to their knowledge indirectly, use the proceeds of the Loans to fund any activity or business with any Person, or in any country or territory that, at the time of such funding, is the subject of Sanctions, or in violation of any Anti-Corruption Laws, the USA PATRIOT Act, any sanctions administered by the Office of Foreign Assets Control of the U.S. Department of Treasury and any successor Governmental Authority, or other applicable anti-money laundering or anti-terrorism laws.

(b)    Each Loan Party and each of their respective Subsidiaries and, to the knowledge of the Loan Parties, the officers, directors, employees and agents of the Loan Parties and their Subsidiaries are in compliance in all material respects with applicable Anti-Corruption Laws and applicable Sanctions, the USA PATRIOT Act, and other applicable anti-money laundering and anti-terrorism laws.

(c)    (i) None of the Loan Parties or any of their respective Subsidiaries and (ii) to the knowledge of the Loan Parties or any of their Subsidiaries, none of their respective directors, officers, employees and agents that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

(d)    The Loan Parties have implemented and maintains in effect policies and procedures reasonably designed to ensure compliance in all material respects by the Loan Parties and their respective Subsidiaries with applicable Anti-Corruption Laws and applicable Sanctions.

SECTION 3.18    Security Documents.

(a)    The Security Documents, after giving effect to the Orders, are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties (other than the Holdco Loan Parties), a legal, valid, enforceable, non-avoidable and automatically and fully perfected security interest in the Collateral described therein and pledged under the Loan Documents and the Orders, in each case, having the priorities set forth in the Orders and subject only to the Carve-Out and other exceptions set forth in the Orders. Upon entry of the Orders, the Collateral Agent shall have a legal, valid, enforceable, non-avoidable and automatically and fully perfected security interest in all right, title and interest in the Collateral, as security for the Secured Obligations, having the priorities set forth in the Orders and subject only to the Carve-Out and other exceptions set forth in the Orders, in each case, for the benefit of the Secured Parties.

(b)    Pursuant to, and except as expressly otherwise set forth in, the Orders, no filing or other action will be necessary under applicable U.S. federal law to perfect or protect such Liens and security interests; provided that the Loan Parties, upon the reasonable request of the Lenders, shall make such filings or take such other actions as necessary to perfect or protect such Liens and security interests.

(c)    Pursuant to and to the extent provided in the Orders, the Secured Obligations of the Loan Parties under this Agreement will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code on a joint and several basis and all superpriority administrative expense claims granted to any other Person, subject only to the Carve-Out and other exceptions set forth in the Orders, which claims shall have recourse to all of the Loan Parties' assets.

SECTION 3.19    Insurance.

Each Loan Party and each of their respective Subsidiaries maintain, with insurance companies that the Lead Borrower believes (in the good faith judgment of the management of the Lead Borrower) were financially sound and responsible at the time the relevant coverage was last placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Lead Borrower believes (in the good faith judgment of management of the Lead Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Lead Borrower believes (in the good faith judgment or the management of the Lead Borrower) are reasonable and prudent in light of the size and nature of its business.

SECTION 3.20    Franchise Agreements.

(a)    Schedule 3.20 sets forth a complete and accurate list as of the Effective Date of all Franchise Agreements to which any Loan Party or any of their respective Subsidiaries is a party.

(b)    Except as set forth on Schedule 3.20, to the knowledge of the Loan Parties, none of the Franchise Agreements contains any grant of exclusive rights to a territory designated therein which conflicts, or potentially conflicts, with any grant of exclusive rights to a territory granted under any other Franchise Agreement. Except as set forth in Schedule 3.20, no current franchisee under a Franchise Agreement has given written notice to a Loan Party's management during the six (6) month period before the date of the Restructuring Support Agreement of its intention to rescind or terminate (with or without cause) any Franchise Agreement.

(c)    Except as could not reasonably be expected to have a Material Adverse Effect, (i)

66

each Loan Party has prepared and maintained each of its Franchise Disclosure Documents, in an accurate and correct manner, (ii) each Loan Party has filed all required Franchise Disclosure Documents required by law in all states and jurisdictions requiring registration and approval prior to any offers or sales of franchises in such states, and (iii) each Loan Party has filed all material changes, amendments, renewals thereto on a timely and accurate basis as required under, and required by applicable Requirements of Law. Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party's Franchise Disclosure Documents were prepared in compliance with applicable Franchise Laws and disclosure guidelines, and there were no misrepresentations or omissions of information in any Franchise Disclosure Documents at the time such Loan Party was using such Franchise Disclosure Documents.  Each Franchise Agreement complies, and the offer and sale of such Franchise Agreement complied, in each case at the time such offer and sale was made, with all Franchise Laws, except to the extent of any non-compliance therewith which could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.21    Budget; Variance Report.  The Initial Budget, each Approved Budget and each Updated Budget is based upon good faith estimates and assumptions believed by management of the Loan Parties to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Agents and the Lenders that such financial information as it relates to future events is not to be viewed as fact, such financial information as it relates to future events are subject to uncertainties and contingencies, many of which are beyond the Loan Parties' control, no assurance can be given that such financial information as it relates to future events will be realized and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein and such differences may be material.  A true and complete copy of the Initial Budget, as agreed to with the Required Lenders as of the Effective Date, is attached as Annex A.  From and after the delivery of any Variance Report in accordance with this Agreement, such Variance Report shall be true, complete and correct in all material respects and fairly represent in all material respects the results of operations of the Loan Parties and their respective Subsidiaries for the period covered thereby and in the detail to be covered thereby.

SECTION 3.22    Orders.  The Interim DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Required Lenders, amended or modified and no appeal of such Interim DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.  After entry of the Final DIP Order, the Final DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Required Lenders, amended or modified and no appeal of such Final DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

SECTION 3.23    Bankruptcy Matters.

(a)    The Chapter 11 Cases were validly commenced on the Petition Date, and (x) proper notice under the circumstances of the motion seeking approval of the Loan Documents and entry of the Orders was given, and (y) the hearing for the approval of the Interim DIP Order has been held by the Bankruptcy Court.

(b)    After the entry of the Orders, and subject to the terms of the Orders, the Secured Obligations will constitute a DIP Superpriority Claim and the liens securing the Secured Obligations shall be senior secured, valid, enforceable, and automatically and properly perfected priming liens on the Collateral, having the priorities set forth in the Orders, subject in all respects to the Carve-Out and other exceptions set forth in the Orders and the Loan Documents.

ARTICLE IV
CONDITIONS

SECTION 4.01    Effective Date.

The obligation of each Lender to make Loans hereunder on the Effective Date shall be subject to satisfaction of the following conditions (or waiver thereof in accordance with Section 9.02):

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Effective Date, with appropriate insertions, or otherwise in form and substance reasonably satisfactory to the Administrative Agent, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in paragraph (c) of this Section 4.01 or certifying as to no change as to documentation previously delivered by each Loan Party to the Prepetition Senior Priority Secured Parties, and (ii) a certificate of the Loan Parties, dated the Effective Date, substantially in the form of Exhibit B, executed by any Responsible Officer of each Loan Party.

(c)    The Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) with respect to each Loan Party executing the Loan Documents, an incumbency certificate identifying the name and title and bearing the signatures of the authorized signatories of such Loan Party, (iii) copies of resolutions of the Board of Directors of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Effective Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment and (iv) a good standing certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation.

(d)    All first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Required Lenders and subject to Section 3.02 of the Restructuring Support Agreement.

(e)    The Bankruptcy Court shall have entered the Interim DIP Order no later than five (5) days after the Petition Date (or such longer period agreed to by the Required Lenders), which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(f)    The Administrative Agent and the Required Lenders shall have received the Initial Budget.

(g)    The Loan Parties shall have obtained a consent from the Prepetition ABL Agent and Prepetition ABL Secured Parties agreeing to the use of cash collateral and the granting of adequate protection to the Prepetition Secured Parties on an interim basis in accordance with the terms of the Interim DIP Order, which consent shall be in form and substance acceptable to the Administrative Agent and the Required Lenders, in each case, solely to the extent required, and subject to the terms and conditions under

the Existing ABL Intercreditor Agreement; provided that if the Bankruptcy Court has entered into an order permitting the non-consensual use of cash collateral and the granting of adequate protection to the Prepetition Secured Parties on an interim basis then the condition set forth in this clause (g) shall be deemed satisfied.

(h)     The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the Effective Date; provided that, in each case, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that, in each case, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the Effective or on such earlier date, as the case may be.

(i)     At the time of and immediately after giving effect to the borrowing on the Effective Date, no Event of Default shall have occurred and be continuing.

(j)     The Restructuring Support Agreement shall be in full force and effect, and no breach, default or event of default shall have occurred or be continuing thereunder except to the extent such default or event of default has been cured or waived in accordance with the terms of the Restructuring Support Agreement.

(k)     The Administrative Agent shall have received a fully executed and delivered Borrowing Request in accordance with the requirements hereof.

(l)     The Administrative Agent and the Lenders shall have received all other premiums, payments, fees, costs and expenses, including, without limitation, (i) all fees required to be paid on the Effective Date, including the Commitment Premium, DIP Backstop Premium (each of which shall have been paid in accordance with Section 2.09) and the fees pursuant to the Administrative Agent Fee Letter, and (ii) the reasonable and documented fees and expenses of the Lender Professionals and other counsel, financial advisors and other professionals of the Lenders and Administrative Agent due on or prior to the Effective Date (whether incurred before or after the Petition Date but only until the Effective Date), in each case, to the extent earned, due and payable, and invoiced no later than one (1) Business Day prior to the Effective Date.

(m)     (i) The Administrative Agent shall have received at least three (3) Business Days before the Effective Date all documentation and other information about the Loan Parties that the Administrative Agent reasonably determines is required by United States regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the USA PATRIOT Act and (ii) if any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Administrative Agent and each initial Lender that requests a Beneficial Ownership Certification will have received, at least one (1) Business Day prior to the Effective Date, a Beneficial Ownership Certification in relation to such Loan Party, in each case of clauses (i) and (ii), to the extent that the Administrative Agent has reasonably requested such items in writing delivered to the Loan Parties at least ten (10) Business Days prior to the Effective Date.

(n)     The Effective Date shall have occurred on or before the date that is one (1) Business Day after the entry of the Interim DIP Order unless the Required Lenders consent to a later date.

SECTION 4.02    <u>Each Credit Event after the Effective Date</u>.

The obligation of each Lender to make a Loan on the occasion of any Borrowing following the Effective Date is subject to receipt of the request therefor in accordance herewith and to the satisfaction of the following conditions:

(a)    The Bankruptcy Court shall have entered the Final DIP Order no later than forty-five (45) days after the Petition Date, which shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(b)    The Collateral Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interest in, the Collateral, in each case, having the priorities set forth in the Interim DIP Order.

(c)    The Administrative Agent shall have received a fully executed and delivered Borrowing Request in accordance with the requirements hereof.

(d)    The Restructuring Support Agreement shall be in full force and effect, and no breach, default or event of default shall have occurred or be continuing thereunder except to the extent waived or cured in accordance with the terms thereof.

(e)    In the case of any Borrowing, the representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing; <u>provided</u> that, in each case, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; <u>provided</u> <u>further</u> that, in each case, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the date of such credit extension or on such earlier date, as the case may be.

(f)    At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

Each Borrowing (<u>provided</u> that a conversion or a continuation of a Borrowing shall not constitute a "Borrowing" for purposes of this <u>Section 4.02</u>) shall be deemed to constitute a representation and warranty by the Loan Parties on the date thereof as to the matters specified in paragraphs <u>(e)</u> and <u>(f)</u> of this <u>Section 4.02</u>.

ARTICLE V

<u>AFFIRMATIVE COVENANTS</u>

From and after the Effective Date and until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and other amounts (other than contingent amounts not yet due) payable under any Loan Document shall have been paid in full, each Loan Party covenants and agrees with the Lenders that:

SECTION 5.01     Financial Statements and Other Information.

The Loan Parties and their respective Subsidiaries will furnish to the Administrative Agent, on behalf of each Lender:

(a)     (i) on or before the date that is one hundred and twenty (120) days after the end of each fiscal year of Topco, commencing with the fiscal year of Topco ended on or about December 31, 2024, the audited consolidated balance sheet and audited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of Topco and its Subsidiaries as of the end of and for such year, and related notes thereto, setting forth in each case, in comparative form the figures for the previous fiscal year, all reported on by BDO, Deloitte or other independent public accountants of recognized national standing to the effect that such consolidated financial statements present fairly in all material respects the financial condition as of the end of and for such year and results of operations and cash flows of Topco and such Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal year;

(b)     (i) on or before the date that is 30 days after the end of each of the first three fiscal quarters of each fiscal year of Topco, commencing with the first fiscal quarter of Topco ended after the Effective Date, the unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of Topco and its Subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case, in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition as of the end of and for such fiscal quarter and such portion of the fiscal year and results of operations and cash flows of Topco and its Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal quarter;

(c)     on or before the date that is 30 days after the last day of each calendar month of Topco, the unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of Topco and its Subsidiaries as of the end of and for such calendar month, including an income statement for such calendar month, balance sheet as of the end of such month and a cash flow statement for such month; provided, that with respect to any month that is a year-end month, the Lead Borrower will provide preliminary financial statements thirty (30) days respectively after such year-end and final financial statements within ninety (90) calendar days, respectively, of year-end;

(d)     not later than ten (10) Business Days of any delivery of financial statements under paragraph (a) above, a reasonably detailed annual budget for the Loan Parties and their respective Subsidiaries on a consolidated basis, in a form customarily prepared by the Lead Borrower or otherwise as may be reasonably agreed between the Lead Borrower and the Administrative Agent (it being agreed that such annual budget shall not be provided to Public Lenders);

(e)     [reserved];

(f)     [reserved]; and

(g)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Loan Parties or any of their respective

Subsidiaries, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing.

Notwithstanding the foregoing, the obligations in paragraphs (a), (b) and (c) of this Section 5.01 may be satisfied with respect to financial information of the Loan Parties and their respective Subsidiaries by furnishing the Form 10-K or 10-Q (or the equivalent), as applicable, of the Loan Parties (or a parent company thereof) filed with the SEC within the applicable time periods required by applicable law and regulations; provided that such materials are accompanied by a report and opinion of BDO, Deloitte or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards.

Documents required to be delivered pursuant to Section 5.01(a), (b), (c) or (f) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on Schedule 9.01 (or otherwise notified pursuant to Section 9.01(d)); or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent). The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

Notwithstanding anything to the contrary herein, no Loan Party nor any Subsidiary thereof shall be required to deliver, disclose, permit the inspection, examination or making of copies of or excerpts from, or any discussion of, any document, information, or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent (or any Lender (or their respective representatives or contractors)) is prohibited by applicable law, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) with respect to which any Loan Party owes confidentiality obligations (to the extent not created in contemplation of such Loan Party's obligations under this Section 5.01) to any third party.

The Loan Parties hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower or the other Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to the Loan Parties' or their Affiliates' securities. Each Loan Party hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; provided that the Loan Parties' failure to comply with this sentence shall not constitute a Default or an Event of Default under this Agreement or the Loan Documents. Notwithstanding the foregoing, the Loan Parties shall be under no obligation to mark any

Borrower Materials as "PUBLIC". Each Loan Party hereby acknowledges and agrees that, unless the Borrower notifies the Administrative Agent in advance, all financial statements and certificates furnished pursuant to Sections 5.01(a), (b) and (c) above are hereby deemed to be suitable for distribution, and to be made available, to all Lenders and may be treated by the Administrative Agent and the Lenders as not containing any Material Non-Public Information.

SECTION 5.02    Notices of Material Events.

Promptly after any Responsible Officer of any Loan Party or any of their respective Subsidiaries obtains knowledge thereof, the applicable Loan Party or the applicable Subsidiary of such Loan Party will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)    the occurrence of any Default or Event of Default (other than any Default resulting from any non-compliance with Section 5.01);

(b)    the occurrence of any ERISA Event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(c)    any litigation, or governmental investigation or proceeding pending against the Loan Parties or any of their respective Subsidiaries which, either individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect; and

(d)    any other development or event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (including, any default notice received by the Loan Parties with respect to each of the Prepetition Junior Priority Credit Agreements, Holdco Credit Agreement and Prepetition ABL Credit Agreement).

Each notice delivered under this Section 5.02 shall be accompanied by a written statement of a Responsible Officer of the Lead Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03    Information Regarding Collateral.

The Loan Parties will furnish to the Administrative Agent prompt (and in any event within thirty (30) days or such longer period as reasonably agreed to by the Administrative Agent) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or incorporation or like document), (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number to the extent that such Loan Party is organized or owns Material Real Property in a jurisdiction where an organizational identification number is required to be included in a UCC financing statement for such jurisdiction.

SECTION 5.04    Existence; Conduct of Business.

The Loan Parties will, and will cause each of their respective Subsidiaries to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, Material Intellectual Property and Governmental Approvals used in the conduct of its business, except to the extent (other than with respect to the preservation of the existence of any Loan Party) that the failure to do so would not reasonably be expected

to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any Disposition permitted by Section 6.05.

SECTION 5.05    Payment of Taxes, etc.

The Loan Parties will, and will cause each of their respective Subsidiaries to, pay all Taxes (whether or not shown on a Tax return) imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except where (a) the same are being contested in good faith by an appropriate proceeding diligently conducted by the Loan Parties or any of their respective Subsidiaries or (b) the failure to make payment would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 5.06    Maintenance of Properties.

The Loan Parties will, and will cause each of their respective Subsidiaries to, keep and maintain all tangible property material to the conduct of its business in good working order and condition (subject to casualty, condemnation and ordinary wear and tear), except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.07    Insurance.

(a)    The Loan Parties will, and will cause each of their respective Subsidiaries to, maintain, with insurance companies that the Lead Borrower believes (in the good faith judgment of the management of the Lead Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Lead Borrower believes (in the good faith judgment of management of the Lead Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Lead Borrower believes (in the good faith judgment or the management of the Lead Borrower) are reasonable and prudent in light of the size and nature of its business, and will furnish to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the insurance so carried. Upon the reasonable request of the Lenders, the Loan Parties shall use commercially reasonable efforts to deliver to the Collateral Agent endorsements with respect to each such general liability policy of insurance (other than directors and officers policies, workers compensation policies and business interruption insurance), to the extent covering Collateral and to the extent that Collateral Agent can be granted an insurable interest therein, (i) in the case of each such general liability policy, naming the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each such casualty insurance policy, containing a loss payable clause that names the Collateral Agent, on behalf of the Secured Parties as the loss payee thereunder.

SECTION 5.08    Books and Records; Inspection and Audit Rights.

(a)    The Loan Parties will, and will cause each of their respective Subsidiaries to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP (or applicable local standards) consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Loan Parties or their respective Subsidiaries, as the case may be. The Loan Parties will, and will cause each of their respective Subsidiaries that is a Loan Party to, permit any representatives designated by the Administrative Agent or any Lender, during normal business hours and upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that, excluding any such visits and inspections during the continuation of

an Event of Default, only the Administrative Agent (or its designees) on behalf of the Lenders may exercise visitation and inspection rights of the Administrative Agent and the Lenders under this <u>Section 5.08</u> and the Administrative Agent shall not exercise such rights more often than one time during any calendar year absent the existence of an Event of Default and such time shall be at the Loan Parties' expense; <u>provided, further</u> that (a) when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent and the Lenders shall give the Loan Parties the opportunity to participate in any discussions with the Loan Parties' independent public accountants.

(b)     The Lead Borrower will, within 30 days (or, after using commercially reasonable efforts to schedule such call at a later date agreed to by the Required Lenders, at their sole discretion) after the date of the delivery (or, if later, required delivery) of the quarterly and annual financial information pursuant to <u>Sections 5.01(a)</u> and <u>(b)</u>, hold a conference call or teleconference, at a time selected by the Lead Borrower and reasonably acceptable to the Required Lenders, with all of the Lenders that choose to participate, to review the financial results of the previous fiscal quarter or fiscal year of the Lead Borrower, as the case may be, of the Lead Borrower (it being understood that any such call may be combined with any similar call held for any of the Lead Borrower's other lenders or security holders).

SECTION 5.09     <u>Compliance with Laws</u>.

(a)     The Loan Parties will, and will cause each of their respective Subsidiaries to, comply with its Organizational Documents and all Requirements of Law (including ERISA, Environmental Laws, the USA PATRIOT Act, Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the U.S. Foreign Corrupt Practices Act of 1977 and other anti-money laundering, anti-corruption, sanctions and anti-terrorism laws) with respect to it, its property and operations, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)     The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and the other Loan Parties and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country except to the extent permissible for a Person required to comply with Sanctions, (ii) in any manner that would result in the violation of any Sanctions applicable to such Loan Party and their respective Subsidiaries or to the knowledge of the Loan Parties, any other party hereto or (iii) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any legislation.

SECTION 5.10     <u>Use of Proceeds</u>.

The Loan Parties will use the proceeds of the Loans for the purposes set forth in <u>Section 3.16</u>.

SECTION 5.11     <u>Additional Subsidiaries</u>.

If any additional Subsidiary of a Loan Party is formed or acquired after the Effective Date, then, such Loan Party will, concurrently with such formation or acquisition, cause such Subsidiary to satisfy the Collateral and Guarantee Requirement with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party.

SECTION 5.12    Further Assurances.

(a)    The Loan Parties will, and will cause each of their respective Subsidiaries to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Required Lenders may reasonably request, in each case, to cause the "Collateral and Guarantee Requirement" to be and remain satisfied, all at the expense of the Loan Parties.

(b)    If, after the Effective Date, any material assets, including any owned (but not leased or ground-leased) Material Real Property or improvements thereto or any interest therein, are acquired by the Borrower or any other Loan Party or are held by any Subsidiary of any Loan Party on or after the time it becomes a Loan Party pursuant to Section 5.11 (other than assets constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof), the Loan Parties will notify the Administrative Agent thereof, and, if requested by the Administrative Agent or the Required Lenders, the Loan Parties will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Administrative Agent or the Required Lenders to grant and perfect such Liens, including actions described in paragraph (a) of this Section and as required pursuant to the "Collateral and Guarantee Requirement", all at the expense of the Loan Parties and subject to the last paragraph of the definition of the term "Collateral and Guarantee Requirement".

SECTION 5.13    Franchise Agreements.

The Loan Parties will, and will cause each of their respective Subsidiaries to, satisfy and perform in all material respects all obligations of each such Person under each Franchise Agreement, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.14    [Reserved].

SECTION 5.15    Maintenance of Ratings.

The Loan Parties (i) shall use commercially reasonable efforts to maintain a public corporate credit rating (but not any particular rating) from S&P and a public corporate family rating (but not any particular rating) from Moody's, in each case in respect of the Lead Borrower, and (ii) within seventy-five (75) days following the Effective Date, shall use commercially reasonable efforts to obtain a public rating (but not any particular rating) in respect of the Term Loans made available under this Agreement from each of S&P and Moody's.

SECTION 5.16    Additional Chapter 11 Reporting.

(a)    Updated Budgets.  No later than 5:00 p.m. (New York City time) on every fourth Thursday following the Petition Date (each such Thursday, the "Updated Budget Deadline"), the Loan Parties shall deliver to the Lender Professionals a supplement to the Initial Budget (each, an "Updated Budget"), covering the then-upcoming 13-week period that commences with Saturday of the calendar week immediately preceding such Updated Budget Deadline, in each case consistent with the form and detail set forth in the Initial Budget and including a forecasted unrestricted cash balance as well as a line-item report setting forth the estimated fees and expenses to be incurred by each professional advisor on a weekly basis; provided, however, that (x) (i) the Updated Budget will be deemed, in each case, conditionally approved unless the Required Lenders provide written notice of their objection to such Updated Budget (which notice

may be provided by one of the Lender Professionals on their behalf via email) within four (4) Business Days of the delivery of such Updated Budget, and during such period, the Initial Budget or most recent Approved Budget, as applicable, shall remain in effect (the "Interim Approval Period"), (ii) following the Interim Approval Period, if no objection is received from the Required Lenders pursuant to clause (i), the Updated Budget shall be deemed the Approved Budget, shall be in full force and effect and shall constitute the "Approved Budget" (which Approved Budget shall be the Initial Budget until superseded by an approved Updated Budget), provided, that the Required Lenders may, at any time after such Interim Approval Period and until the date that is seven (7) Business Days after delivery of the Updated Budget (each such date, an "Objection Deadline"), object to such Updated Budget, and upon receipt of such objection, the Initial Budget or the most recent Approved Budget shall be deemed the Approved Budget and (y) if the Required Lenders do not provide written notice of their objection to such Updated Budget (which notice of objection may be provided by one the Lender Professionals on their behalf via email) by the applicable Objection Deadline, the Updated Budget shall be in full force and effect and shall constitute the Approved Budget for all purposes hereunder; (iii) the Required Lenders shall not have any obligation to approve any Updated Budget, and (iv) no modification to the Initial Budget or any Updated Budget, any reforecasting of any information relating to any period covered thereby or the inclusion of new line items in any Updated Budget, as the case may be, shall in any event be effective without the affirmative written consent of the Required Lenders (which may be provided by one of the Lender Professionals on their behalf via email).

(b)     Variance Reporting.  No later than 5:00 p.m. (New York City time) every Thursday, commencing with the first Thursday immediately following the first full week after the week in which the Petition Date occurs (each such Thursday, the "Variance Report Deadline"), the Loan Parties shall deliver to the Lender Professionals a variance report, each in form, detail and substance satisfactory to the Required Lenders in their sole discretion (each, a "Variance Report"), setting forth the difference between, on a line-by-line and aggregate basis, (i) actual operating receipts and budgeted operating receipts as set forth in the Approved Budget, as the case may be (the "Receipts Variance"), and (ii) actual operating disbursements and budgeted operating disbursements as set forth in the Approved Budget, as the case may be (the "Disbursements Variance"), in each case, for the Applicable Period, in each case, together with a reasonably detailed explanation of such Receipts Variance and Disbursements Variance.

(c)     Management Calls.  On the first [Thursday] immediately following the Effective Date, upon request by the Lender Professionals and on no more than a weekly basis thereafter, at a time to be agreed with the Ad Hoc Lender Group (or the Lender Professionals on their behalf), the Loan Parties shall host a conference call with the Lenders who are subject to a non-disclosure agreement and their advisors (including the Lender Professionals) that choose to participate to discuss, among other things, the Loan Parties' financial performance, the Initial Budget and any Updated Budget, the Variance Report, and any other issues related to the financial affairs, finances, business, assets, operations or condition (financial or otherwise) of the Loan Parties and their respective Subsidiaries with the relevant members of the Loan Parties' management and their advisors, including, to the extent applicable, the Financial Advisor, Willkie Farr & Gallagher LLP, as special counsel to the Loan Parties, and Ducera Partners LLC, as the investment banker for the Loan Parties (collectively, the "Company Advisors").

(d)     Liquidity Reporting.  No later than 5:00 p.m. (New York City time) every Thursday, commencing with the first Thursday immediately following the first full week after the week in which the Petition Date occurs (each such Thursday, the "Liquidity Report Deadline"), the Loan Parties shall deliver to the Lender Professionals and the Lenders a report setting forth the Liquidity as of the Friday most recently ended prior to such Liquidity Report Deadline, in each case, as well as the aggregate amounts outstanding and available under the Prepetition ABL Credit Agreement (to the extent updated information is available to the Loan Parties) and a certification as to compliance with Section 6.15.

SECTION 5.17 [Reserved].

SECTION 5.18 Bankruptcy Related Matters.

(a)     The Loan Parties shall cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Secured Obligations and/or the Loan Documents, the Prepetition Secured Obligations and applicable loan documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (iv) any Plan of Reorganization and/or any disclosure statement related thereto, (v) orders concerning the financial condition of the Chapter 11 Debtors, or other Indebtedness of the Chapter 11 Debtors and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Chapter 11 Debtors, to be in accordance with the terms of this Agreement in all material respects and the relevant consent rights under the Restructuring Support Agreement, to the extent applicable;

(b)     The Loan Parties shall comply in all material respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases Bankruptcy Order;

(c)     The Loan Parties shall deliver to the Administrative Agent and the Lender Professionals not less than five (5) days (or, if not reasonably practicable as a result of exigent circumstances, as soon as reasonably practicable) prior to any filing, copies of all proposed material pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases, and shall consult in good faith with the Lender Professionals and the Required Lenders regarding the form and substance of any such document; and

(d)     The Loan Parties shall if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent and to the Lender Professionals promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest.

## ARTICLE VI

## NEGATIVE COVENANTS

From and after the Effective Date and until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable (other than (i) contingent amounts not yet due and (ii) Cash Management Obligations) under any Loan Document have been paid in full, the Loan Parties covenants and agrees with the Lenders that:

SECTION 6.01     Indebtedness; Certain Equity Securities.

(a)     The Loan Parties will not, and will not permit any of their respective Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(i)     Indebtedness of the Loan Parties and any of their respective Subsidiaries under the Loan Documents (including any Indebtedness incurred pursuant to Sections 2.20 or 2.21);

(ii)     Indebtedness outstanding on the Effective Date and set forth on Schedule 6.01;

(iii)    Guarantees by the Loan Parties and their respective Subsidiaries in respect of Indebtedness of the Loan Parties (other than Holdco Loan Parties) or any of their respective Subsidiaries otherwise permitted hereunder; provided that (A) such Guarantee is otherwise permitted by Section 6.04, (B) no Guarantee by any Subsidiary of a Loan Party of any unsecured Indebtedness for borrowed money that constitutes Material Indebtedness shall be permitted unless such Subsidiary shall have also provided a Guarantee of the applicable Secured Obligations pursuant to the Guaranty, as the case may be, and (C) if the Indebtedness being guaranteed is subordinated to the Secured Obligations, such Guarantee shall be subordinated to the Guarantee of the Secured Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(iv)    Indebtedness of the Loan Parties or any of their respective Subsidiaries owing to the Loan Parties (other than Holdco Loan Parties) or any of their Subsidiaries, to the extent permitted by Section 6.04; provided that all such Indebtedness of any Loan Party owing to any Subsidiary of a Loan Party that is not a Loan Party shall be subordinated to the Secured Obligations (to the extent any such Indebtedness is outstanding at any time after the date that is thirty (30) days after the Effective Date (or the date of acquisition of such Subsidiary) or such later date as the Required Lenders, may reasonably agree) (but only to the extent permitted by applicable law and not giving rise to material adverse tax consequences) on terms otherwise reasonably satisfactory to the Required Lenders;

(v)    Indebtedness (including Capital Lease Obligations and purchase money indebtedness) incurred, issued or assumed by the Borrower or any Subsidiary to finance the acquisition, purchase, lease, construction, repair, replacement or improvement of fixed or capital property, equipment or other assets; provided that, in the case of any purchase money Indebtedness, such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, purchase, lease, construction, repair, replacement or improvement; provided, further that, at the time of any such incurrence of Indebtedness and after giving Pro Forma Effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance of this clause (v) shall not exceed $10,000,000 in the aggregate at any time outstanding, to the extent that the incurrence of such debt and the payments in respect thereof are expressly permitted by the Approved Budget then in effect;

(vi)    [reserved];

(vii)    [reserved];

(viii)    [reserved];

(ix)    [reserved];

(x)    Indebtedness in respect of Cash Management Obligations and other Indebtedness in respect of netting services, automated clearinghouse arrangements, overdraft protections and similar arrangements, in each case, in connection with deposit accounts or from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(xi)    Indebtedness consisting of obligations under deferred compensation (including indemnification obligations, obligations in respect of purchase price adjustments, Earn-Outs, incentive non-competes and other contingent obligations) or other similar arrangements

79

incurred or assumed in connection with any Permitted Acquisition, any other Investment or any Disposition, in each case, permitted under this Agreement;

(xii)    [reserved];

(xiii)   [reserved];

(xiv)   [reserved];

(xv)    Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xvi)   Indebtedness supported by a letter of credit, in a principal amount not to exceed the face amount of such letter of credit;

(xvii)  [reserved];

(xviii) [reserved];

(xix)   [reserved];

(xx)    [reserved];

(xxi)   [reserved];

(xxii)  Indebtedness incurred by the Loan Parties or any of their respective Subsidiaries in respect of letters of credit, bank guarantees, warehouse receipts, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xxiii) obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Loan Parties or any of their respective Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case, in the ordinary course of business or consistent with past practice;

(xxiv)  (x) Indebtedness representing retention payments, deferred compensation or stock-based compensation owed to employees, consultants or independent contractors of the Borrower or its Subsidiaries, to the extent that the incurrence of such debt and the payments in respect thereof are expressly permitted by the Approved Budget then in effect;

(xxv)   [reserved];

(xxvi)  [reserved];

(xxvii) [reserved];

(xxviii) to the extent constituting Indebtedness, motor vehicle leases in the ordinary course of business;

(xxix)  [reserved];

(xxx)  [reserved];

(xxxi)  [reserved];

(xxxii)  [reserved]; and

(xxxiii) all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxxii) above.

(b)    The Loan Parties will not, and will not permit any of their respective Subsidiaries to, issue any preferred Equity Interests or any Disqualified Equity Interests.

For purposes of determining compliance with any dollar denominated restriction on the incurrence of Indebtedness, the dollar equivalent principal amount of Indebtedness denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt. Notwithstanding any other provision of this Section 6.01, the maximum amount of Indebtedness the Loan Parties or any of their respective Subsidiaries may incur pursuant to this Section 6.01 shall not be deemed exceeded by fluctuations in the exchange rate of currencies.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

SECTION 6.02    Liens.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned (but not leased or ground-leased) or hereafter acquired (but not leased or ground-leased) by it, except:

(i)    Liens created under the Loan Documents;

(ii)    Permitted Encumbrances;

(iii)    Liens existing on the Effective Date and set forth on Schedule 6.02;

(iv)    Liens on cash collateral posted to secure insurance policy premiums or other obligations in respect of existing insurance policies in an amount not to exceed $3,000,000 in the aggregate, to the extent expressly permitted by the Approved Budget then in effect;

(v)    (i) easements, leases, licenses, subleases or sublicenses granted to others (including licenses and sublicenses of Intellectual Property) that do not (A) interfere in any material respect with the business of the Loan Parties and their respective Subsidiaries, taken as a whole, or (B) secure any Indebtedness and (ii) any interest or title of a lessor or licensee under any lease or license entered into by the Loan Parties or any of their respective Subsidiaries in the ordinary course of its business and covering only the assets so leased or licensed;

(vi)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)    Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, (B) attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business or (C) in favor of a banking or other financial institution or entity, or electronic payment service provider, arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking or finance industry;

(viii)    Liens consisting of an agreement to dispose of any property in a Disposition permitted under Section 6.05, in each case, solely to the extent such Disposition would have been permitted on the date of the creation of such Lien;

(ix)    [reserved];

(x)    Liens granted by a Subsidiary of a Loan Party that is not a Loan Party in favor of any Subsidiary of a Loan Party or the Borrower and Liens granted by a Loan Party in favor of any other Loan Party (other than Holdco Loan Parties);

(xi)    [reserved];

(xii)    any interest or title of a lessor or sublessor under leases or subleases (other than leases constituting Capital Lease Obligations) entered into by the Loan Parties or any of their respective Subsidiaries in the ordinary course of business;

(xiii)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by the Loan Parties or any of their respective Subsidiaries in the ordinary course of business;

(xiv)    Liens deemed to exist in connection with Investments in repurchase agreements under clause (e) of the definition of the term "Permitted Investments";

(xv)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xvi)    Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Loan Parties and their respective Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Loan Parties or any of their respective Subsidiaries in the ordinary course of business;

(xvii)    [reserved];

(xviii)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)    [reserved];

(xx)     [reserved];

(xxi)     [reserved];

(xxii)     [reserved];

(xxiii)     Liens on cash and Permitted Investments to secure Indebtedness permitted under Section 6.01(a)(x);

(xxiv)     [reserved];

(xxv)     receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxvi)     [reserved];

(xxvii)     [reserved];

(xxviii)  other Liens to the extent contemplated by the Approved Budget then in effect; provided that at the time of the granting of and after giving Pro Forma Effect to any such Lien and the obligations secured thereby (including the use of proceeds thereof) the lesser of (x) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xxviii) and (y) the fair market value of the assets securing such obligations shall not exceed $2,000,000 in the aggregate at any time outstanding;

(xxix)     Liens in favor of credit card issuers and credit card processors arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(xxx)     Liens granted pursuant to the Orders; and

(xxxi)     Liens on motor vehicles securing Indebtedness permitted by clause (xxviii) of Section 6.01.

SECTION 6.03     Fundamental Changes; Lead Borrower Covenant.

(a)     The Loan Parties will not, and will not permit any of their respective Subsidiaries to, merge into or consolidate with any other Person (including pursuant to a division), or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that:

(i)     any Loan Party (other than a Borrower) may merge or consolidate with or into any other Loan Party (other than a Holdco Loan Party);

(ii)     a Borrower may merge or consolidate with any other Person (including another Borrower); provided that a Borrower shall be the continuing or surviving Person (or, if one of the parties to such merger or consolidation is the Lead Borrower, then the Lead Borrower shall be the continuing or surviving Person); and

(iii)     any Subsidiary may effect a merger, dissolution, liquidation, consolidation or amalgamation to effect a Disposition permitted pursuant to Section 6.05.

(b)     No Loan Party nor any of their respective Subsidiaries, shall amend or permit any amendments to such Person's Organizational Documents after the Effective Date in any manner that (when taken as a whole) would be materially adverse to the Lenders.

(c)     The Lead Borrower will not conduct, transact or otherwise engage in any material business or material operations other than (i) the ownership and/or acquisition of the Equity Interests of its Subsidiaries and any other Persons engaged in a Similar Business (subject to Section 6.04), (ii) the performance of obligations under and compliance with its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including as a result of or in connection with the activities of any of its Subsidiaries, and including in connection with the maintenance of its status as public company and any activities related or incidental thereto, including compliance with Requirements of Law and requirements, rules, regulations and guidance (whether or not binding) of the SEC and Nasdaq, Inc., (iii) subject to Section 6.04, repurchases of Indebtedness through open market purchases and Dutch auctions (to the extent not in violation hereof and to the extent any Loans so purchased are automatically and irrevocably cancelled after repurchase), the making of any loan to any officers, directors, managers, members of management, consultants or independent contractors and the making of any Investment in any of its Subsidiaries, (iv) participating in tax, accounting and other administrative matters related to the Lead Borrower and its Subsidiaries, (v) the entry into, and exercise of rights and performance of its obligations under and in connection with the Loan Documents and Guarantees of other Indebtedness not prohibited from being incurred under this Agreement by the Lead Borrower and its Subsidiaries, including borrowings under this Agreement, the Prepetition Senior Priority Credit Agreement, the Prepetition ABL Credit Agreement, each of the Prepetition Junior Priority Credit Agreements and any other Indebtedness not prohibited from being incurred under this Agreement, (vi) any issuance or registration of its Qualified Equity Interests for sale or resale (including, for the avoidance of doubt, the making of any dividend or distribution on account of, or any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of, any shares of any class of Qualified Equity Interests), including the costs, fees and expenses related thereto, (vii) holding of any cash and Permitted Investments, (viii) the payment of dividends or making of distributions, making of loans and contributions to the capital of its Subsidiaries and any other Persons engaged in a Similar Business and guaranteeing the obligations of its Subsidiaries and making Investments, in each case, not in violation of Article VI of this Agreement, (ix) incurring fees, costs and expenses relating to overhead and general operating expenses including professional fees for legal, tax and accounting issues and paying taxes, (x) providing indemnification for its current and former officers, directors, managers, members of management, employees, advisors, consultants or independent contractors, (xi) [reserved], (xii)(1) the payment of Public Company Costs or (2) activities reasonably incidental to the consummation of a Tax Restructuring, (xiii) activities incidental to the businesses or activities described in the foregoing clauses and (xiv) any business or other activities that are identical, reasonably similar, ancillary, incidental, complementary or related to, or a reasonable extension, development or expansion of, the business and activities conducted by or proposed to be conducted by the Lead Borrower on or immediately prior to the Effective Date.

SECTION 6.04     Investments, Loans, Advances, Guarantees and Acquisitions.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, make or hold any Investment, except:

(a)     Permitted Investments at the time such Permitted Investment is made and purchases of assets in the ordinary course of business consistent with past practice;

(b)     loans or advances to officers, members of the Board of Directors and employees of the Loan Parties and their respective Subsidiaries (i) subject to the Approved Budget, for reasonable and

customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) [reserved] and (iii) [reserved];

(c)     [reserved];

(d)     Investments consisting of extensions of trade credit and accommodation guarantees in the ordinary course of business;

(e)     [reserved];

(f)     Investments existing or contemplated on the Effective Date and set forth on Schedule 6.04(e);

(g)     promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 6.05, subject to prior written consent by the Required Lenders in their sole discretion;

(h)     [reserved];

(i)     Investments in connection with the Transactions;

(j)     Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers in the ordinary course of business;

(k)     Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)     subject to prior written consent by the Required Lenders to be granted in their sole discretion, loans and advances to officers or members of the Board of Directors of any equity holder of the Lead Borrower (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to such holder (or such parent) in accordance with Section 6.07(a);

(m)     [reserved];

(n)     advances of payroll payments to employees in the ordinary course of business;

(o)     [reserved];

(p)     [reserved];

(q)     receivables owing to the Loan Parties or any of their respective Subsidiaries, if created or acquired in the ordinary course of business;

(r)     Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business;

(s)     [reserved];

(t)    [reserved];

(u)    Investments consisting of Indebtedness, Liens, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this <u>Section 6.04(u)</u>) under <u>Sections 6.01</u>, <u>6.02</u>, <u>6.03</u>, <u>6.05</u> and <u>6.07</u>, respectively;

(v)    contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Loan Parties;

(w)    to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, or other rights, in each case in the ordinary course of business;

(x)    Investments in any other Loan Party (other than a Holdco Loan Party);

(y)    [reserved];

(z)    [reserved];

(aa)    [reserved];

(bb)    [reserved]; and

(cc)    loans and advances to franchisees in the ordinary course of business to the extent contemplated by the Approved Budget then in effect (A) in connection with the sale of Franchise Rights or (B) to provide working capital to franchisees; <u>provided</u> that (i) such loans and advances in excess of $750,000 individually shall be evidenced by promissory notes and any such promissory notes shall be pledged to the Collateral Agent and (ii) the aggregate outstanding principal amount of such loans and advances made in reliance of this <u>clause (cc)</u> shall not exceed $3,000,000 for the most recently ended Test Period at any time.

Notwithstanding anything to the contrary in this <u>Section 6.04</u>, other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries of the Loan Parties in a transaction not prohibited by this Agreement, no Material Intellectual Property (except for non-exclusive leases or non-exclusive licenses with respect thereto) as of the Effective Date owned or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be contributed and/or assigned as an Investment or otherwise transferred to any non-Loan Party.

SECTION 6.05    <u>Asset Sales</u>.

The Loan Parties will not, and will not permit any of their Subsidiaries to, (i) sell, transfer, lease or otherwise dispose (including pursuant to a division) of any asset, including any Equity Interest owned by it or (ii) permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law and other than issuing Equity Interests to the Loan Parties or any of their respective Subsidiaries in compliance with <u>Section 6.04(c)</u>) (each, a "<u>Disposition</u>" and the term "<u>Dispose</u>" as a verb has the corresponding meaning), except:

(a)    Dispositions of obsolete, damaged, used, surplus or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer

used or useful, or economically practicable to maintain, in the conduct of the business of the Loan Parties and their respective Subsidiaries (including allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, be dedicated to the public domain or be invalidated);

(b)    Dispositions of inventory and other assets in the ordinary course of business and immaterial assets (considered in the aggregate) in the ordinary course of business;

(c)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) an amount equal to Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)    Dispositions of property between or to the Loan Parties (other than a Holdco Loan Party) or any of their respective Subsidiaries; provided that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party or (ii) to the extent constituting an Investment, such Investment must be a Permitted Investment in a Subsidiary that is not a Loan Party in accordance with Section 6.04;

(e)    Dispositions permitted by Section 6.03 and Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.07 and Liens permitted by Section 6.02;

(f)    [reserved];

(g)    Dispositions of Permitted Investments;

(h)    Dispositions of accounts receivable in connection with the collection or compromise thereof (including sales to factors or other third parties);

(i)    leases, subleases, service agreements, product sales, abandonments, licenses, sublicenses or other disposals (including of Intellectual Property), in each case, (A) granted in the ordinary course of business or (B) that do not materially interfere with the business of the Loan Parties and their Subsidiaries, taken as a whole;

(j)    transfers of property subject to Casualty Events;

(k)    Dispositions of property to Persons other than Subsidiaries (including the sale or issuance of Equity Interests of a Subsidiary and including the sale of real property) solely to the extent such Disposition is made in connection with a Sufficient Bid or that is otherwise consented to by the Required Supermajority Lenders in their sole discretion.

(l)    [reserved];

(m)    Dispositions or forgiveness of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(n)    [reserved];

(o)    [reserved];

(p)    transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same

(whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(q)    [reserved];

(r)    [reserved];

(s)    [reserved];

(t)    sales or other dispositions by any Loan Parties or any of their respective Subsidiaries of assets in connection with the closing or sale of a retail store location (the closure of a store is not in and of itself the disposition of assets), warehouse, distribution center or corporate office of such Loan Party or Subsidiary in the ordinary course of business of such Loan Party or Subsidiary, which sale or disposition consists of leasehold interests in the premises of such store or distribution center, the equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such store or distribution center; provided, that, such sale shall be on commercially reasonable prices and terms in a bona fide arm's length transaction; and

(u)    [reserved].

Notwithstanding anything to the contrary in this Section 6.05, (x) other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries in a transaction not prohibited by this Agreement, no Loan Party shall, directly or indirectly, sell or otherwise transfer (except for non-exclusive leases or non-exclusive licenses with respect thereto) any Material Intellectual Property owned as of the Effective Date or thereafter acquired or any interest in any Franchise Agreement to any non-Loan Party (y) on and following the Effective Date, (i) any sales or other dispositions by any Loan Party or any of their respective Subsidiaries of assets outside the ordinary course of business in excess of $5,000,000 in the aggregate require prior written consent by the Required Lenders to be granted in their sole discretion and (ii) no Loan Party nor any of their Subsidiaries shall undertake any receivables securitization, any whole business securitization or any other securitization transaction with respect to its assets or businesses.

SECTION 6.06    [Reserved].

SECTION 6.07    Restricted Payments; Certain Payments of Indebtedness.

(a)    The Loan Parties will not, and will not permit any of their respective Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(i)    each Subsidiary of the Borrower may make Restricted Payments to the Borrower or any other Subsidiary of the Borrower; provided that in the case of any such Restricted Payment by a Subsidiary that is not a Wholly Owned Subsidiary of the Borrower, such Restricted Payment is made to the Borrower and/or any Subsidiary;

(ii)    the Loan Parties and each of their respective Subsidiaries may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person;

(iii)    [reserved];

(iv)    [reserved];

(v)  [reserved];

(vi)  [reserved];

(vii)  [reserved];

(viii)  [reserved];

(ix)  [reserved];

(x)  [reserved];

(xi)  the Loan Parties and each of their respective Subsidiaries may make payments with respect to retention payments, deferred compensation or stock-based compensation owed to employees, consultants or independent contractors of the Borrower or its Subsidiaries, to the extent that such payment is expressly permitted by the Approved Budget then in effect;

(xii)  [reserved];

(xiii)  [reserved];

(xiv)  [reserved];

(xv)  [reserved];

(xvi)  [reserved]; and

(xvii)  [reserved].

(b)  The Loan Parties will not, and will not permit any of their respective Subsidiaries to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of any Prepetition Debt, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, or any other payment (including any payment under any Swap Agreement) that has a substantially similar effect to any of the foregoing, in each case, except:

(i)  payments required by the Orders and payments in accordance with the First Day Orders or otherwise with the consent of the Required Lenders;

(ii)  [reserved];

(iii)  [reserved];

(iv)  [reserved];

(v)  [reserved];

(vi)  [reserved];

(vii)  [reserved];

(viii)  [reserved];

(ix)     [reserved]; and

(x)     the Roll-Up.

Notwithstanding anything to the contrary in this Agreement, no Material Intellectual Property (except for non-exclusive leases, non-exclusive licenses with respect thereto) owned as of the Effective Date or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be made as a Restricted Payment or Investment, or otherwise transferred to or held by, any non-Loan Party.

SECTION 6.08     Transactions with Affiliates.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (i) transactions between or among any Borrower or any Subsidiary of the Borrower or any entity that becomes a Subsidiary of the Borrower as a result of such transaction, (ii) on terms not materially less favorable to the Borrower or such Subsidiary of the Borrower as would be obtainable by such Person at the time in a comparable arm's length transaction with a Person other than an Affiliate (as determined by the majority of the members of the Board of Directors (or a majority of the disinterested members of the Board of Directors of the Lead Borrower in good faith)), (iii) the payment of Transaction Costs, fees and expenses related to the Transactions, (iv) Dispositions in the form of a sale of furniture and assignment of lease agreements to franchisees in the ordinary course of business consistent with past practices, so long as the sale thereof is approved by disinterested members of the Board of Directors, (v) issuances of Equity Interests of the Borrower and its Subsidiaries to the extent otherwise permitted by this Agreement, (vi) employment and severance arrangements and other compensation arrangements between the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Sections 6.04(b) and 6.04(n)), (vii) investments by Affiliates in Indebtedness and preferred Equity Interests of the Borrower and its Subsidiaries, (viii) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board of Directors, officers and employees of the Lead Borrower (or any direct or indirect parent thereof)  and its Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Lead Borrower and its Subsidiaries, (ix) transactions pursuant to agreements in existence or contemplated on the Effective Date and set forth on Schedule 6.08 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect, (x) Restricted Payments permitted under Section 6.07 and Investments permitted under Section 6.04, (xi) payments to or from, and transactions with, any joint venture in the ordinary course of business (including any cash management activities related thereto), and (xii) transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services that are Affiliates, in each case in the ordinary course of business and which are fair to the Borrower and its Subsidiaries, in the reasonable determination of the Lead Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party; provided that, each such transaction (other than any transaction pursuant to clauses (i)(A), (ii), (iii), (iv), (vi), (x) and (xiii)) shall be on terms not materially less favorable to the Borrower or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate.

SECTION 6.09     Restrictive Agreements.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party, after giving effect to the Orders, to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties

with respect to the Secured Obligations or under the Loan Documents; <u>provided</u> that the foregoing shall not apply to:

(a)    restrictions and conditions imposed by (1) Requirements of Law, (2) any Loan Document, (3) [reserved], (4) [reserved] or (5) [reserved];

(b)    customary restrictions and conditions existing on the Effective Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)    restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; <u>provided</u> that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)    customary provisions in leases, licenses, sublicenses and other contracts restricting the assignment thereof;

(e)    restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f)    any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Loan Parties or any of their respective Subsidiaries;

(g)    conditions in any agreement that was effective prior to the Effective Date and to the extent such agreement was permitted under the Prepetition Senior Priority Credit Agreement;

(h)    restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)    restrictions set forth on <u>Schedule 6.09</u> and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)    customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by <u>Section 6.04</u>;

(k)    customary restrictions contained in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto;

(l)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Loan Parties or any of their respective Subsidiaries; and

(m)    customary provisions related to creditworthiness of the tenant contained in real property leases entered into by Subsidiaries of any Borrower, so long as the Lead Borrower has determined in good faith that such creditworthiness provisions could not reasonably be expected to impair the ability of any Borrower and its Subsidiaries to meet their ongoing obligations.

SECTION 6.10          [Reserved].

SECTION 6.11          Changes in Fiscal Periods.

No Loan Party will make any change in its fiscal year; provided, however, that the Lead Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Lead Borrower and the Administrative Agent (acting at the direction of the Required Lenders) will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year, without any requirement of consent by any Lender or other Person (notwithstanding anything to the contrary in Section 9.02).

SECTION 6.12          Amendment of Financing Documents.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, amend, modify, waive, terminate or release any Prepetition ABL Loan Document, any Prepetition Junior Priority Loan Document or any Holdco Loan Document, in each case, in a manner restricted by the terms of any applicable intercreditor or subordination agreement.

SECTION 6.13          Franchise Agreements.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, maintain or distribute any Franchise Disclosure Documents, or enter into any Franchise Agreements, in violation of Section 3.20(c).

SECTION 6.14          [Reserved].

SECTION 6.15          Minimum Liquidity.

The Lead Borrower shall not permit Liquidity of the Lead Borrower and its Subsidiaries, determined in accordance with Section 5.16(d) on a consolidated basis in accordance with GAAP, to be less than $50,000,000.

SECTION 6.16          [Reserved].

SECTION 6.17          Milestones.

 The Loan Parties will not and will not permit any of their respective Subsidiaries to, directly or indirectly, fail to comply with any of the milestones set forth on Schedule 6.17 (the "Milestones"), except with the prior written consent of the Required Lenders (including by one of the Lender Professionals on their behalf via email).

SECTION 6.18          Permitted Variance.

The Loan Parties shall not permit (i) the Receipts Variance on an aggregate basis or (ii) the Disbursements Variance, in each case on an aggregate basis with respect to any Applicable Period, to exceed the Permitted Variance.

SECTION 6.19          Chapter 11 Cases.

The Loan Parties shall not, and shall not permit any of their respective Subsidiaries to:

(a)      except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority claim which is pari passu with, or senior to, the Secured Obligations (except as may be set forth in the Orders or the Loan Documents);

(b)      incur, create, assume, suffer to exist or permit or file any motion seeking, any lien which is pari passu with, or senior to, the liens granted hereunder, (except as may be set forth in the Orders or the Loan Documents);

(c)      make or permit to be made any amendment, modification, supplement or change to the Orders, as applicable, (other than technical modifications to correct grammatical, ministerial or typographical errors) without the prior written consent of the Required Lenders;

(d)      (A) make payments under any management incentive, severance, retention or other bonus or compensation plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, (a) in amounts and on terms and conditions that (i) are approved by order of the Bankruptcy Court after notice and hearing, (ii) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Approved Budget, and (iii) as approved in writing by the Required Lenders, or (B)(1) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (2) pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case, unless in the ordinary course of business;

(e)      commence any adversary proceeding, contested matter or other action (or otherwise support any party) asserting any claims or defenses or otherwise against (or asserting any surcharge under section 506(c) of the Bankruptcy Code or otherwise against) the Administrative Agent, any Lender, any other Secured Party and any Prepetition Secured Parties, the other Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby;

(f)      except as expressly set forth in the Orders and solely to the extent of the budgeted amount set forth therein with respect to an Official Committee investigation prior to the Challenge Deadline, use any cash collateral, proceeds of the Loans, or any cash or other amounts to (i) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the Liens securing the Loans, the Liens securing the Prepetition Debt or the Secured Obligations hereunder, (ii) investigate or initiate any claim or cause of action against any of the Administrative Agent, the Collateral Agent or the Lenders or Prepetition Secured Parties, (iii) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the Lenders or the Prepetition Secured Parties, (iv) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the Loan Documents and the Orders) that are senior to or pari passu with the Liens securing the Prepetition Debt, the DIP Superpriority Claims or the adequate protection liens or claims granted under the Orders or (v) take any other actions prohibited by the Orders; or

(g)      file any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties without consulting with the Lenders and providing the Lenders three (3) Business Days' (or as soon thereafter as is practicable) notice and the opportunity to review and comment on each such motion.

## ARTICLE VII

## EVENTS OF DEFAULT

SECTION 7.01    Events of Default.

If any of the following events (any such event, an "Event of Default") shall occur:

(a)    any Loan Party shall fail to pay any principal or interest on any Loan or any other amount (other than reimbursement of professional fees pursuant to Section 9.03) of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure shall continue unremedied for a period of three (3) days;

(b)    any Loan Party shall fail to pay the reimbursement of any professional fees pursuant to Section 9.03 when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) days;

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party or any of their respective Subsidiaries in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect (or all respects to the extent already qualified by materiality) when made or deemed made, and such incorrect representation or warranty (if curable) shall remain incorrect for a period of thirty (30) days after notice thereof from the Administrative Agent to the Borrower;

(d)    the Loan Parties or any of their respective Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.02(a), 5.04 (with respect to the existence of the Borrower), 5.10, 5.14, 5.16, 5.17, 5.18 or in Article VI (other than Section 6.17);

(e)    the Loan Parties or any of their respective Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section 7.01) and such failure shall continue unremedied for a period of five (5) Business Days after written notice thereof from the Administrative Agent to the Borrower;

(f)    the Loan Parties or any of their respective Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Section 6.17, except where such failure to achieve a Milestone has been waived or extended by the Required Lenders, or the failure to achieve the Milestone is directly caused by, or results from, an act, omission, or delay by one or more Lenders;

(g)    so long as the enforcement of remedies is not subject to the automatic stay as a result of the commencement of the Chapter 11 Cases, any event or condition occurs that results in any Material Indebtedness, Indebtedness under the Prepetition ABL Loan Documents, Indebtedness under the Prepetition Junior Priority Credit Agreements, or Indebtedness under the Secured Holdco Obligations Guarantee becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any such Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, provided that this paragraph (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness, other than on account of failure to make a payment required as a result of such termination or similar events;

(h)    [reserved];

94

(i)     [reserved];

(j)     so long as the enforcement of remedies is not subject to the automatic stay as a result of the commencement of the Chapter 11 Cases, one or more final, non-appealable, enforceable judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by insurance (including self-insurance) as to which the insurer has been notified of such judgment or order and has not denied coverage) shall be rendered against any Loan Parties and any of their respective Subsidiaries or any combination thereof and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan Party that are material to the businesses and operations of the Loan Parties and their Subsidiaries, taken as a whole, to enforce any such judgment;

(k)     an ERISA Event occurs that has resulted or would reasonably be expected to result in a Material Adverse Effect;

(l)     [reserved];

(m)     any material provision of any Loan Document or any material Guarantee of the Secured Obligations shall for any reason be asserted in writing by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)     any material Guarantee of the Secured Obligations by any Loan Party pursuant to the Guaranty shall cease to be in full force and effect (other than in accordance with the terms of the Loan Documents);

(o)     [reserved]; or

(p)     any of the following shall have occurred in the Chapter 11 Cases;

(i)   the Effective Date shall not have occurred within three (3) Business Days after the date of entry of the Interim DIP Order (or such later date as the Required Lenders may agree in their sole discretion);

(ii)  any act or occurrence that would, upon the delivery of notice, permit the Restructuring Support Agreement to be terminated unless such act or occurrence was waived, cured or extended in accordance with the terms of the Restructuring Support Agreement;

(iii) the Loan Parties' failure to satisfy any of the Milestones subject to the waiver or extension of such Milestones pursuant to the terms of the Restructuring Support Agreement;

(iv) the Loan Parties' (i) (A) failure to conduct a marketing and sale process for the Loan Parties' assets or (B) taking of actions during such a marketing and sale process that are not provided by the Bidding Procedures (as defined in the Restructuring Support Agreement), or (ii) subject to the terms of the Restructuring Support Agreement, failure to promptly terminate the Sale Process (as defined in the Restructuring Support Agreement) if the Loan Parties have not received a Sufficient Bid (as defined in the Restructuring Support Agreement) on or before the Bid Deadline (as defined in the Restructuring Support Agreement), in each case, without the prior written consent of the Required Consenting First Lien Lenders (as defined in the Restructuring Support Agreement);

(v)   the filing by any Chapter 11 Debtor of any chapter 11 plan (or any amendment thereof or supplement thereto), other than the Plan of Reorganization, that is inconsistent in any material respect with the Plan of Reorganization or the Restructuring Support Agreement to which the Required Lenders do not consent in writing;

(vi)  the Interim DIP Order (a) at any time ceases to be in full force and effect or (b) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Required Lenders;

(vii)  except with the prior written consent of the Required Lenders, the entry of an order in any of Chapter 11 Cases (a) staying, reversing, amending, supplementing, vacating or otherwise modifying any of the Loan Documents, the Interim DIP Order or the Final DIP Order, or (b) impairing or modifying any of the liens, security interests, claims, rights, remedies, privileges, benefits or protections granted under the Loan Documents or under the Orders to the Secured Parties or the Prepetition Secured Parties;

(viii)  the failure of any of the Chapter 11 Debtors to comply with any of the terms or conditions of the Interim DIP Order or the Final DIP Order;

(ix) the dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a Chapter 7 case;

(x)   the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Chapter 11 Debtor in the Chapter 11 Cases;

(xi) the entry of an order in any of the Chapter 11 Cases authorizing the Chapter 11 Debtors (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment in full in cash of all Secured Obligations under this Agreement (without the prior written consent of the Required Lenders); or (ii) to grant any Lien, other than Liens expressly permitted under this Agreement and the Orders, upon or affecting any Collateral;

(xii)  (a)  the consensual use of prepetition cash collateral is terminated or modified, or (b) the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of cash collateral other than as provided in this Agreement and the Orders, in each case, without the prior written consent of the Required Lenders;

(xiii)  except for the Carve-Out, and except as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any claim against any Chapter 11 Debtor entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is *pari passu* with or senior to the claims of the Secured Parties or the Adequate Protection Claims granted to the Prepetition Secured Parties (without the prior written consent of the Required Lenders or the requisite Prepetition Secured Parties with respect to the obligations owed to each of them);

(xiv)  except for the Carve-Out or as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any Lien in Collateral that is *pari passu* with

or senior to any Lien granted to the Secured Parties, or any Adequate Protection Lien granted to the Prepetition Secured Parties (without the prior written consent of the Required Lenders or the requisite the Prepetition Secured Parties with respect to the obligations owed to each of them);

(xv)     except as provided in the Orders, the making of any adequate protection payment or the granting of any adequate protection (including, without limitation, the granting of any Liens on the Collateral, superpriority claims, the right to receive cash payments or otherwise), without the prior written consent of the Required Lenders and the requisite Prepetition Secured Parties;

(xvi)    the Chapter 11 Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing and/or solicitation of a chapter 11 plan is terminated or shortened for any reason;

(xvii)   the payment of, or any Chapter 11 Debtors file a motion or application seeking authority to pay, any Prepetition Debt or other prepetition claim other than (A) as provided in any of the First Day Orders, (B) to the extent such payment is expressly permitted pursuant to this Agreement and the Approved Budget, or (C) with the prior written consent of the Required Lenders;

(xviii)  the entry of an order in any of the Chapter 11 Cases granting relief from or otherwise modifying any stay of proceeding (including the automatic stay) to allow a third party to execute upon or enforce a Lien against any assets of the Chapter 11 Debtors that have an aggregate value in excess of $2,000,000 or with respect to any Lien of or the granting of any Lien on any assets of the Chapter 11 Debtors to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Secured Parties, without the prior written consent of the Required Lenders;

(xix)    (A) any Chapter 11 Debtor shall (i) challenge or contest the validity or enforceability of the Orders or any Loan Document or deny that it has further liability thereunder, (ii) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the Secured Obligations, Liens securing the Secured Obligations, the DIP Superpriority Claims, Loan Documents, Adequate Protection Liens, Adequate Protection Claims, the Prepetition Senior Priority Obligations, the Liens securing the Prepetition Senior Priority Obligations or the Prepetition Senior Priority Loan Documents, (iii) assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset all or any portion of the Secured Obligations, Liens securing the Secured Obligations, the DIP Superpriority Claims, Loan Documents, Adequate Protection Liens, Adequate Protection Claims, the Prepetition Senior Priority Obligations, the Liens securing the Prepetition Senior Priority Obligations and the Prepetition Senior Priority Loan Documents, (iv) investigate, join or file any motion, application or other pleading in support of, or publicly support any other Person that has asserted any of the claims, challenges or other requested relief contemplated in underlined clauses (i) - (iii) above, or fails to timely contest such claims, challenges or other requested relief in good faith (provided, that responding to any investigation conducted by an Official Committee or other party with respect to the nature, extent, amount, enforceability, validity, priority or perfection of the Prepetition Senior Priority Obligations, the Liens securing the Prepetition Senior Priority

Obligations and the Prepetition Senior Priority Loan Documents, subject in each case to the Orders, shall not, in and of itself, constitute an Event of Default hereunder); or (B) the entry of a judgment or order in any of the Chapter 11 Cases sustaining any of the claims, challenges, causes of action or other relief contemplated in clauses (i) - (iii) above;

(xx)    the entry of an order in any of the Chapter 11 Cases, avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Secured Obligations owing under the Orders, this Agreement, the other Loan Documents;

(xxi)    the entry of any order in any of the Chapter 11 Cases (a) charging any of the Collateral with respect to the Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise or (b) charging any of the Prepetition Senior Priority Collateral with respect to the Prepetition Senior Priority Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xxii)    any Chapter 11 Debtor shall consummate or seek to obtain Bankruptcy Court approval of any sale or other disposition of all or any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code or otherwise (other than in ordinary course of business and that is contemplated by the Approved Budget and not prohibited by this Agreement), without the prior written consent of the Required Lenders;

(xxiii)    the Restructuring Support Agreement is terminated by any party thereto or otherwise terminates in accordance with the terms thereof;

(xxiv)  if any Chapter 11 Debtor is enjoined, restrained, or in any way prevented by court order or a Governmental Authority from continuing to conduct all or any material part of the business affairs of the Chapter 11 Debtors and their Subsidiaries;

(xxv)    any Chapter 11 Debtor initiates, commences, joins, publicly supports, pursues, files any motion, application or other pleading in support of, or fails to contest in good faith, the actions or relief described in clauses (viii), (x) through (xvii), (xxi) and (xxii) of this Section 7.01(k);

then, and in every such event, and at any time thereafter during the continuance of such event and without order from or application to the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the applicable Agent, at the direction of the Required Lenders, to: (A) deliver to the Borrower a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the Commitments, (C) declare the Term Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any cash collateral, (E) terminate this Agreement, (F) charge the default rate of interest under this Agreement, (G) freeze all monies in any deposit accounts of the Loan Parties, (H) exercise any and all rights of setoff, (I) exercise any right or remedy with respect to the Collateral or the Liens created under the Loan Documents, or (J) take any other action or exercise any other right or remedy permitted under the Loan Documents, the Orders or Requirements of Law; provided, however, that in the case of the enforcement of rights against the Collateral pursuant to clauses (D), (F), (G), (H), (I) and (J) above, (i) the Administrative Agent, acting at the request of the Required Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee (if any), and the Office of the United States Trustee with five (5) days' prior written notice (such period, the "Remedies Notice Period"), and (ii) during the Remedies Notice Period, the applicable Agent shall refrain from exercising its rights and

remedies and the Loan Parties and/or any Official Committee shall be permitted to request an emergency hearing before the Bankruptcy Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis) solely to the extent they, in good faith, dispute the occurrence of an Event of Default, to consider on an expedited basis whether an Event of Default has in fact occurred or is continuing; provided, further, that during the Remedies Notice Period, the Loan Parties shall be permitted to use cash collateral solely to fund expenses critically necessary to preserve the value of the Loan Parties' business, as determined by Required Lenders.

SECTION 7.02      [Reserved].

SECTION 7.03      Application of Proceeds.

(a)      Subject to the terms of any applicable Existing Intercreditor Agreement, in connection with the exercise of remedies provided for in Section 7.01, any amounts received on account of the Secured Obligations (including in respect of any sale of, collection from or other realization upon all or any part of the Collateral (including any Collateral consisting of cash) or the Guarantees) shall be applied by the Administrative Agent to the payment of the Secured Obligations as follows:

(i)      first, to the payment of (x) first, all reasonable and documented or invoiced out of pocket costs and expenses incurred by the Agents in connection with such sale, collection, other realization or otherwise and to the payment of all other amounts owing to each of the Administrative Agent, and the Collateral Agent in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all reasonable and documented out of pocket costs and the fees and expenses of its agents and counsel (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of Seward & Kissel LLP, as counsel to the Agents and, if reasonably necessary, of a single firm of local counsel to the Agents, in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions)), the repayment of all advances made by it under any Loan Document on behalf of any Grantor and any other costs or expenses incurred in connection with the exercise of any right or remedy under any Loan Document, in each case, if and to the extent payable pursuant to the terms of the Loan Documents and (y) second, all reasonable and documented out-of-pocket costs and expenses incurred by the Lender Professionals in connection with such sale, collection, other realization or otherwise, in each case to the extent required to be reimbursed pursuant to Section 9.03(a) of this Agreement;

(ii)      second, to the payment in full of the New Money Term Loans, (including both the principal and interest owed thereon) (the amounts so applied to be distributed among such Secured Parties pro rata in accordance with the amounts of the New Money Term Loans owed to them on the date of any such distribution) in accordance with this Agreement;

(iii)      third, to the payment in full of the Roll-Up Term Loans (including both the principal and interest owed thereon) (the amounts so applied to be distributed among such Secured Parties pro rata in accordance with the amounts of the Roll-Up Term Loans owed to them on the date of any such distribution) in accordance with this Agreement;

(iv)      fourth, to any agent of any other junior secured debt, in accordance with any applicable Existing Intercreditor Agreement; and

(v)      fifth, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

In the event that application of payments, Collateral proceeds is to be made after any

bankruptcy or insolvency proceeding has been commenced, references in this Section 7.03(a) with respect to (i) interest shall include interest accruing after the commencement of such bankruptcy or insolvency proceeding whether or not such interest is an allowed claim in such bankruptcy or insolvency proceeding, and (ii) any other amounts shall only include amounts that are allowed claims in such bankruptcy or insolvency proceeding.

(b)    [Reserved]

SECTION 7.04    Bankruptcy Code and Other Remedies.

(a)    Without in any way limiting the foregoing, during the continuance of an Event of Default, subject to the Orders, the applicable Agent (acting at the direction of the Required Lenders) may exercise, in addition to all other rights and remedies granted to it in this Agreement (including, without limitation, Section 7.01) and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation, all rights and remedies of a secured party under the Bankruptcy Code, the Uniform Commercial Code and any other applicable law.

(b)    Disposition of Collateral. Subject to the Orders, without limiting the generality of the foregoing, the Collateral Agent (acting at the direction of the Required Lenders) may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the Orders and any notice required by law referred to below) to or upon any Loan Party or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the Orders)), during the continuance of any Event of Default (directly or through its agents, designees or an acquisition vehicle), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self- help, without judicial process, without first obtaining a final judgment or giving any Loan Party or any other Person notice or opportunity for a hearing on the Collateral Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) dispose of, sell, grant option or options to purchase and deliver any Collateral (enter into contractual obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk, (iv) withdraw all cash and Cash Equivalents in any deposit account or securities account of a Loan Party and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral in satisfaction of the Secured Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any deposit account or securities account pursuant to any related control agreement. The Collateral Agent (directly or via one or more acquisition vehicles), acting at the direction of the Required Lenders, shall have the right, upon any such public sale or sales and, to the extent permitted by the Bankruptcy Code and other applicable Requirements of Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold (and, in lieu of actual payment of the purchase price, may "credit bid" or otherwise set off the amount of such price against all or any portion of the Secured Obligations), free of any right or equity of redemption of any Loan Party, which right or equity is hereby waived and released.

(c)    Management of the Collateral. Subject to the Orders, each Loan Party further agrees, that, during the continuance of any Event of Default, (i) at the Collateral Agent's request (acting at the direction of the Required Lenders), it shall assemble the Collateral and make it available to the Collateral Agent at places that the Collateral Agent shall reasonably select, whether at such Loan Party's premises or elsewhere, (ii) without limiting the foregoing, the Collateral Agent (acting at the direction of the Required Lenders) also has the right to require that each Loan Party store and keep any Collateral pending further action by the Collateral Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral

100

in good condition, (iii) until the Collateral Agent is able to sell any Collateral, the Collateral Agent shall have the right to hold or use such Collateral for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Collateral Agent and (iv) the Collateral Agent may, at the direction of the Required Lenders, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Collateral Agent's remedies (for the benefit of the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment. The Collateral Agent shall not have any obligation to any Loan Party to maintain or preserve the rights of any Loan Party as against third parties with respect to any Collateral.

(d)     Direct Obligation. Subject to the Orders, neither the Collateral Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Loan Party or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof. All of the rights and remedies of the Collateral Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Requirements of Law. To the extent it may lawfully do so, each Loan Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Collateral Agent or any Lender or other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) calendar days before such sale or other disposition.

(e)     Commercially Reasonable. To the extent that any Requirements of Law impose duties on the Collateral Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Collateral Agent to do any of the following: (i) fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Collateral Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition; (ii) fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Requirements of Law, fail to obtain permits or other consents for the collection or disposition of any Collateral; (iii) fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral; (iv) advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring any such Collateral; (v) exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Collateral Agent (acting at the direction of the Required Lenders), obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Collateral Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral; (vi) dispose of assets in wholesale rather than retail markets; (vii) disclaim disposition warranties, such as title, possession or quiet enjoyment; or (viii) purchase insurance or credit enhancements to insure the Collateral Agent against risks of loss, collection or disposition of any Collateral or to provide to the Collateral Agent a guaranteed return from the collection or disposition of any Collateral. Each Loan Party acknowledges that the purpose of clauses (i) through (viii) of this Section 7.04(e) is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not

being indicated in such clauses. Without limitation upon the foregoing, nothing contained herein shall be construed to grant any rights to any Loan Party or to impose any duties on the Collateral Agent that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section 7.04.

(f)    Deficiency. Each Loan Party shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Secured Obligations and the fees and disbursements of brokers, investment bankers, consultants and any attorney or other professionals employed by the Collateral Agent or any other Secured Party to collect such deficiency, in each case to the extent required to be reimbursed pursuant to Section 9.03.

ARTICLE VIII

ADMINISTRATIVE AGENT

SECTION 8.01    Appointment and Authority.

(a)    Each of the Lenders hereby irrevocably (i) designates and appoints (A) Wilmington Trust, National Association to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and (B) Wilmington Trust, National Association to act on its behalf as Collateral Agent hereunder and under the other Loan Documents and (ii) authorizes the Administrative Agent and the Collateral Agent (in their capacities as such), as applicable, to take such actions on such Lender's behalf and to exercise such powers as are expressly delegated to the Administrative Agent and the Collateral Agent, as applicable, by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents, hereby irrevocably appoints Wilmington Trust, National Association to act on its behalf as Collateral Agent under the Security Documents and authorizes Wilmington Trust, National Association (in its capacity as Collateral Agent) to take such actions on such Secured Party's behalf and to exercise such powers as are expressly delegated to the Collateral Agent by the terms hereof or thereof together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirements of Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)    Each of the Lenders and each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents, hereby irrevocably appoints and authorizes the Collateral Agent, as applicable, to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers as are reasonably incidental thereto. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent and/or the Collateral Agent pursuant to Section 8.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article VIII and Article IX (including Section 9.03 as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

102

(c)       Notwithstanding anything to the contrary in the Loan Documents, each of the Lenders hereby authorize and empower each Agent, upon prior written consent by the Required Lenders, to (i) execute all documents and (ii) make all acknowledgements.

SECTION 8.02       Rights as a Lender.

Any Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, own securities of, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 8.03       Exculpatory Provisions.

No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, each Agent:

(a)       shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)       shall not have any duty to take any discretionary action or exercise any discretionary powers, and shall not be required to exercise any discretion or to take any action, but shall be required to act or refrain from acting (and shall be fully protected in so acting or refraining from acting) as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that such Agent shall not be required to take any action (i) unless it is furnished with an indemnification satisfactory to such Agent from the Lenders with respect thereto or (ii) that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law;

(c)       shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity;

(d)       shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions;

(e)       shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents)  or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment;

(f)　　　shall be deemed not to have knowledge of any Default unless and until written notice describing such Default conspicuously marked as a "notice of default" is given to such Agent by the Borrower or a Lender and received by an officer of such Agent responsible for the administration of this Agreement;

(g)　　　shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien or security interests purported to be granted to such Agent pursuant to this Agreement or any other Loan Document have been or will continue to be properly or sufficiently or lawfully created, perfected or enforced or are entitled to any particular priority, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u>, or (vii) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents;

(h)　　　shall not be responsible for nor have any duty to monitor the performance or any action of the Borrower or other Loan Party, or any of their directors, members, officers, agents, affiliates or employees, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party, and may assume performance by all such Persons of their respective obligations and shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other Person;

(i)　　　shall not be liable for any action taken in good faith and reasonably believed by it to be within the powers conferred upon it, or taken by it pursuant to any direction or instruction by which it is governed, or omitted to be taken by it by reason of the lack of direction or instruction required hereby for such action (including without limitation for refusing to exercise discretion or for withholding its consent in the absence of its receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instructions to exercise such discretion or grant such consent from any such Lender, as applicable);

(j)　　　shall not be liable for any error of judgment made by it (or by an officer or other employee of such Agent) in good faith;

(k)　　　not be liable for any indirect, special, punitive or consequential damages (including, without limitation, lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action;

(l)　　　not be required to take any action under this Agreement, the other Loan Documents or any related document if taking such action would (A) subject such Agent to a tax in any jurisdiction where it is not then subject to a tax or (B) would require such Agent to qualify to do business in any jurisdiction where it is not then so qualified;

(m)　　　shall not have any duty as to any collateral in its possession or in the possession of someone under its control or in the possession or control of any agent or nominee of the Agents or any income thereon or as to the preservation of rights prior parties or any other rights pertaining thereto, except the duty to accord such of the collateral as may be in its possession substantially the same care as it accords similar assets held for the benefit of third parties and the duty to account for monies received by it. The

Agents shall not be under any obligation to independently request or examine insurance coverage with respect to any collateral nor shall the Agent's be liable for the acts or omissions of any bank, depositary bank, custodian, independent counsel of any other Person or any other party selected by the Agents with reasonable care or selected by any other party hereto that may hold or possess collateral or documents related to collateral, and the Agents shall not be required to monitor the performance of any such Persons holding collateral. For the avoidance of doubt, the Agents shall not be responsible to the Lenders for the perfection of any lien or for the filing, form, content or renewal of any UCC financing statements, fixture filings, mortgages, deeds of trust and such other documents or instruments;

(n)     notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, shall not be under any obligation (i) to monitor, determine or verify the unavailability or cessation of any Benchmark (or other applicable benchmark interest rate), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any date on which such rate may be required to be transitioned or replaced in accordance with the terms of the Loan Documents, applicable law or otherwise, (ii) to select, determine or designate any replacement to such rate, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied, (iii) to select, determine or designate any adjustment or modifier to any replacement or successor index, or (iv) to determine whether or what any amendments to this Agreement or the other Loan Documents are necessary or advisable, if any, in connection with any of the foregoing. The Agents shall not be liable for any inability, failure or delay on its part to perform any of its duties set forth in this Agreement or any other Loan Document as a result of the unavailability of any Benchmark (or other applicable benchmark interest rate), including as a result of any inability, delay, error or inaccuracy on the part of any other party, including without limitation any Lenders or any Borrower, in providing any direction, instruction, notice or information required or contemplated by the terms of this Agreement and reasonably required for the performance of such duties. The Agents shall have no liability for any interest rate published by any publication that is the source for determining the interest rates of the Loans, including but not limited to Bloomberg (or any successor source) and the Bloomberg or Reuters screen (or any successor source), or for any rates published on any publicly available source, including without limitation the Federal Reserve Bank of New York's Website or any website administered by the Term SOFR Administrator, or in any of the foregoing cases for any delay, error or inaccuracy in the publication of any such rates, or for any subsequent correction or adjustment thereto; and

(o)     if at any time an Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any Collateral), such Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate, and if such Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, such Agent shall not be liable to any of the parties hereto or to any other Person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

The Agents' rights, protections, indemnities and immunities provided in this Agreement shall apply to such Agent for any actions taken or omitted to be taken under this agreement and any other Loan Documents and any other related agreements in any of its respective capacities.

SECTION 8.04     Reliance by Agents.

Each Agent shall be entitled to conclusively rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent

also may conclusively rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. As to any matters not expressly provided for in this Agreement and in the other Loan Documents (including enforcement or collection), the Administrative Agent and/or the Collateral Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Lender. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders. Notwithstanding anything herein or in any other Loan Document to the contrary, and without limiting any rights, protections, immunities or indemnities to the Agents hereunder, phrases such as "satisfactory to the [Administrative Agent][Collateral Agent]," "approved by the [Administrative Agent][Collateral Agent]," "acceptable to the [Administrative Agent][Collateral Agent]," "as determined by the [Administrative Agent][Collateral Agent]," "in the [Administrative Agent][Collateral Agent]'s discretion," "selected by the [Administrative Agent][Collateral Agent]," "elected by the [Administrative Agent][Collateral Agent]," "requested by the [Administrative Agent][Collateral Agent]," and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to take such action or to exercise such rights. Upon request by the Administrative Agent and/or the Collateral Agent, as the case may be, the Required Lenders shall confirm in writing the Administrative Agent's authority and/or the Collateral Agent's authority, as the case may be, to take any action in accordance with the terms of the Loan Documents and this <u>Section 8.04</u> and may refrain from acting until such confirmation has been provided.

Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement, or any other Loan Document, to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent or the Collateral Agent, it is understood that in all cases the Administrative Agent or such Collateral Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document). The Administrative Agent and Collateral Agent shall have no liability for any failure or delay in taking any actions contemplated above as a result of a failure or delay on the part of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document) to provide such instruction, advice or concurrence. This provision is intended solely for the benefit of each of the Administrative Agent and the Collateral Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

The Administrative Agent and the Collateral Agent shall in all cases be fully justified in failing or refusing to act unless it shall receive further assurances to its reasonable satisfaction, including indemnification, from the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  No provision of this Agreement or any Loan Document shall require the Administrative Agent or the Collateral Agent to take any action that it reasonably believes to be contrary to applicable law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

SECTION 8.05        Delegation of Duties.

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent.  Any Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. No Agent shall be responsible for the acts or omissions of any sub-agents selected by it without gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of any Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the DIP Facility as well as activities as such Agent.

SECTION 8.06        Resignation of Administrative Agent; Mergers.

Each Agent may resign upon thirty (30) days' notice to the Lenders and the Lead Borrower, whether or not a successor Agent has been appointed. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Lead Borrower's consent (such consent not to be unreasonably withheld or delayed) unless an Event of Default has occurred and is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may (but shall not be obligated to) on behalf of the Lenders, appoint, or petition a court of competent jurisdiction to appoint, a successor Agent, which shall be an Approved Bank with an office in New York, New York, or an Affiliate of any such Approved Bank (the date upon which the retiring Agent is replaced, the "Resignation Effective Date"); provided that if the retiring Agent shall notify the Lead Borrower and the Lenders that no qualifying Person accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice.

If the Person serving as an Agent is a Defaulting Lender, the Required Lenders and the Lead Borrower may, to the extent permitted by applicable law, by notice in writing to such Person remove such Person as Agent and, with the consent of the Lead Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except (i) that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed and (ii) with respect to any outstanding payment obligations) and (2) except for any

indemnity payments or other amounts then owed to the retiring or removed Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents as set forth in this Section. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 9.04 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

Any corporation or association into which an Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which an Agent is a party, will be and become the successor Agent under this Agreement and related Loan Documents and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

SECTION 8.07    Non-Reliance on Agents and Lenders.

Each Lender acknowledges that it has, independently and without reliance upon any Agent, any Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Agents and/or the Lenders on the Effective Date.

No Lender and no other Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent and the Collateral Agent on behalf of the Lenders and the other Secured Parties in accordance with the terms thereof. In the event of a foreclosure by the Administrative Agent or the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent or such Collateral Agent, as agent for and representative of the Lenders and the other Secured Parties (but not any Lender, Lenders, Secured Party or Secured Parties in its or their respective individual capacities) (either directly or through one or more acquisition vehicles), upon instructions from Required Lenders, shall be entitled, for the

purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations (other than Secured Obligations owing to the Agents) as a credit on account of the purchase price for any collateral payable by the Administrative Agent or the Collateral Agent on behalf of the Lenders at such sale or other disposition. Each Lender, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and the Guarantees of the Secured Obligations, to have agreed to the foregoing provisions.

SECTION 8.08   Existing Intercreditor Agreements.

The parties hereto acknowledge and agree that: (a) in accordance with the Interim DIP Order and any other order of the Bankruptcy Court, each Agent shall be subject to the terms of the Existing Intercreditor Agreements as if the Agents were party thereto as a "First Lien Term Loan Representative" (as defined in each of the Existing Intercreditor Agreements) and (b) each Agent, acting in the capacity as a First Lien Term Loan Representative, is authorized to perform and take or refrain from taking any actions, and providing any consents or directions, in connection with the Existing Intercreditor Agreements.

SECTION 8.09   Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, and any Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and such Agent and their respective agents and counsel and all other amounts due the Lenders and each Agent under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

(b)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and, by its acceptance of the benefits of the Security Documents, each Secured Party that is not a party hereto, to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of any Agent and its agents and counsel, and any other amounts due such Agent under Sections 2.12 and 9.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any Secured Party that is not a party hereto any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or any Secured Party that is not a party hereto to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

SECTION 8.10   No Waiver; Cumulative Remedies; Enforcement.

No failure by any Lender or any Agent to exercise, and no delay by any such Person in

exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Article VII for the benefit of all the Secured Parties; provided, however, that the foregoing shall not prohibit (a) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 9.08 (subject to the terms of Section 2.18), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided further that if at any time there is no Person acting as an Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to such Agent pursuant to Article VII and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.18, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

SECTION 8.11      Withholding Taxes.

To the extent required by any applicable Requirements of Law (as determined in good faith by the Administrative Agent), the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Loan Parties pursuant to Section 2.17 and without limiting any obligation of the Loan Parties to do so pursuant to such Section) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 8.11. The agreements in this Section 8.11 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

SECTION 8.12      Credit Bidding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (other than any Secured

Obligations owing to the Agents) (including by accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, such Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid, (i) the Administrative Agent (or the Required Lenders on its behalf) shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Required Lenders shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) each of the Secured Parties shall be authorized to receive, ratably on account of the relevant Secured Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of Secured Obligations credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Secured Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Secured Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent or the Required Lenders may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

SECTION 8.13    <u>Erroneous Payments</u>.

(a)    If the Administrative Agent (x) notifies a Lender, Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient (and each of their respective successors and assigns), a "<u>Payment Recipient</u>") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under

immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all time remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 8.13 and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of the Administrative Agent to any Payment Recipient under this Section 8.13 shall be conclusive, absent manifest error.

(b)      Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it (or a Payment Recipient on its behalf) receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees distribution or otherwise) from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)      it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)      such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.13(b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this Section 8.13(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 8.13(a) or on whether or not an Erroneous Payment has been made.

(c)      Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured

Party under any Loan Document or from any other source against any amount that the Administrative Agent has demanded to be returned under the immediately preceding clause (a).

(d)      The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event an Erroneous Payment (or portion thereof) are not recovered from any Payment Recipient that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Secured Obligations owed by any Borrower or any other Loan Party; provided that this Section 8.13(d) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Secured Obligations of the Borrower relative to the amount of the Secured Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided further, that for the avoidance of doubt, the immediately preceding clauses, (x) and (y) shall not apply, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for purposes of making such Erroneous Payment.

(e)      Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, in no event shall the occurrence of an Erroneous Payment (or the existence of any Erroneous Payment Subrogation Rights or other rights of the Administrative Agent in respect of an Erroneous Payment) result in the Administrative Agent becoming, or being deemed to be, a Lender hereunder or the holder of any Loans hereunder.

(f)      To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(g)      Notwithstanding anything in this Section 8.13 to the contrary, the Borrower shall not be liable for the losses of any party due to an Erroneous Payment. Each party's obligations under this Section 8.13 shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Secured Obligations under any Loan Document.

ARTICLE IX

MISCELLANEOUS

SECTION 9.01      Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)      if to the Borrower, the Administrative Agent or the Collateral Agent, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)     if to any other Lender, to it at its address (or fax number, telephone number or e-mail address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain Material Non-Public Information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax or other electronic transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in <u>subsection (b)</u> below shall be effective as provided in such <u>subsection (b)</u>.

(b)     <u>Electronic Communications</u>. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause <u>(i)</u> of notification that such notice or communication is available and identifying the website address therefor.

(c)     <u>The Platform</u>. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, <u>provided</u>, <u>further</u>, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     <u>Change of Address, Etc</u>. Each of the Borrower and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto. Each other Lender may change its address, fax or telephone number for notices and other communications hereunder by notice to the Borrower and the

Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)      Reliance by Administrative Agent and Lenders. The Agents and the Lenders shall be entitled to conclusively rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the each Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent and each of the parties hereto hereby consents to such recording.

SECTION 9.02      Waivers; Amendments.

(a)      No failure or delay by the Agents or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agents or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)      Except as provided in Section 2.14, neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Lead Borrower, the Administrative Agent (to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of the Administrative Agent under this Agreement, the Administrative Agent shall execute such waiver, amendment or other modification to the extent approved by the Required Lenders) and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent or the Collateral Agent, as the case may be, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; provided that no such agreement shall (i) increase the Commitment of any Lender or change any ratable sharing or payment provision that directly and adversely affects any Lender (with only such Lenders whose entitlement to a payment under such provisions is reduced being "directly and adversely affected") without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute a reduction or forgiveness of principal) or reduce the rate of interest thereon, or reduce any fees

payable hereunder, without the written consent of each Lender directly and adversely affected thereby, provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to Section 2.13(c), (iii) postpone the maturity of any Loan (other than pursuant to (A) a Sale Transaction Qualified Extension or (B) an extension of the Outside Date up to ninety (90) days pursuant to the definition thereof, which in each case of clauses (A) or (B), shall require approval by the Required Supermajority Lenders), or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension of any maturity date, any scheduled amortization payment or the date for payment of any interest or fees), without the written consent of each Lender directly and adversely affected thereby, (iv) change any of the provisions of this Section without the written consent of each Lender directly and adversely affected thereby; provided that any such change which is in favor of a Class of Lenders holding Loans maturing after the maturity of other Classes of Lenders (and only takes effect after the maturity of such other Classes of Loans or Commitments) will require the written consent of the Required Lenders with respect to each Class directly and adversely affected thereby, (v) change the percentage set forth in the definition of "Required Lenders", "Majority in Interest" or any other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (or each Lender of such Class, as the case may be), (vi) subordinate (or have the effect of subordinating) Liens securing any material portion of the Collateral, without the written consent of each Lender directly and adversely affected thereby, (vii) release (or have the effect of releasing) all or substantially all or any material portion of the value of the Guarantees under the Guaranty (except as expressly provided in the Loan Documents) without the written consent of each Lender (other than a Defaulting Lender), (viii) release (or have the effect of releasing) all or substantially all or any material portion of the Collateral from the Liens of the Security Documents, without the written consent of each Lender (other than a Defaulting Lender) except as expressly provided in the Loan Documents, (ix) change any pro rata sharing and/or payment provisions or any payment "waterfall" herein or in any other Loan Document, without the written consent of each Lender directly and adversely affected thereby, or (x) change any provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of any Class differently than those holding Loans of any other Class, without the written consent of the Required Lenders with respect to any Class directly and adversely affected thereby; provided further that (A) no such agreement shall amend, modify or otherwise affect the rights, duties, immunities, or indemnities of the Administrative Agent or the Collateral Agent without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable, (B) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Lead Borrower and the Administrative Agent in order (i) to comply with local law or advice of local counsel, (ii) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Lead Borrower and counsel to the Required Lenders, so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof, or (iii) to add any provisions to any Loan Documents that, in the reasonable judgment of counsel to the Required Lenders, are more favorable to the Lenders (or to the applicable subset thereof), so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof, (C) any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Lead Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time and (D) no Lenders other than the Lenders holding a Majority in Interest of the applicable Class shall be required to waive, amend,

supplement or modify the conditions precedent to any Borrowings of Loans of such Class. Notwithstanding the foregoing, (a) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Lead Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion and (b) guarantees, Security Documents and related documents in connection with this Agreement may be in a form reasonably determined by the Administrative Agent (acting at the direction of the Required Lenders) and may be, together with this Agreement and the other Loan Documents, amended and waived with the consent of the Administrative Agent (acting at the direction of the Required Lenders) at the request of the Lead Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Lead Borrower and counsel to the Required Lenders, so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

(c)     In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders (and, to the extent any Proposed Change requires the consent of Lenders holding Loans of any Class pursuant to clause (iv), (v) or (ix) of paragraph (b) of this Section 9.02, the consent of a Majority in Interest of the outstanding Loans and unused Commitments of such Class) to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section 9.02 being referred to as a "Non-Consenting Lender"), then, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, (i) if no Event of Default under Sections 7.01(a) or (b) exists, permanently prepay all of the Loans of any Class owing by it to, and terminate any Commitments of, such Non-Consenting Lender or (ii) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, conditioned or delayed, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding par principal amount of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder (including pursuant to Section 2.11(a)(i)) from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

(d)     Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, Term Loans of any Lender that is at the time a Defaulting Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of a Class), all affected Lenders (or all affected Lenders of a Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 9.02); provided that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any

waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

SECTION 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Borrower shall pay, if the Effective Date occurs and the Transactions have been consummated, (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Agents and the Required Lenders (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of (A) Seward & Kissel LLP, as counsel to the Administrative Agent, and (B) Paul Hastings LLP, as counsel to the Required Lenders and, if reasonably necessary, of a single firm of local counsel to the Agents, taken as a whole and to a single firm of local counsel to the Required Lenders, taken as a whole, in each case, in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and of such other counsel retained with the Lead Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), in each case incurred in connection with the DIP Facility, and the preparation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof and including the reasonable and documented fees and expense of Lazard Frères & Co., as financial advisor to the Required Lenders) and (ii) all reasonable and documented out-of-pocket expenses incurred by each Agent or any Lender, including the fees, charges and disbursements of counsel for such Agent and the Lenders, in connection with the preservation, enforcement or protection of any rights or remedies (A) in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws), including its rights under this Section 9.03 or (B) in connection with the Loans made hereunder, including all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to one lead counsel and one local counsel to the Agents, taken as a whole, and one lead counsel and one local counsel to the Lenders, taken as a whole, in each case, in each applicable jurisdiction (exclusive of any reasonably necessary special counsel) (and, in the case of a conflict of interest, where each Agent or any Lender affected by such conflict notifies the Lead Borrower of the existence of such conflict and thereafter retains its own counsel, one additional counsel) and such other counsel as may be retained with the Lead Borrower's consent (such consent not to be unreasonably withheld or delayed).   Notwithstanding the foregoing, the expenses of counsel shall not include any allocated costs of in-house counsel.

(b)    The Borrower shall indemnify each Agent, each Lender and each Related Party of any of the foregoing Persons (but excluding any such Person to the extent such Person is acting as a financial advisor to the Investors in connection with the Transactions (any such Person to the extent acting in such capacity, an "Excluded Party")) (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from (without duplication), any and all losses, claims, damages, liabilities and reasonable and documented out-of-pocket fees and expenses (limited, in the case of legal fees and expenses, to the reasonable and documented fees, charges and disbursements of one counsel for the Agents, to the extent reasonably necessary, a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for the Agents, taken as a whole, and one counsel for all other Indemnitees, to the extent reasonably necessary, a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Indemnitees, taken as a whole (and, solely in the case of an actual or potential conflict of interest, where the Indemnitee affected by such conflict notifies the Lead Borrower of the existence of such conflict and thereafter retains its own counsel after receipt of consent from the Lead Borrower (not to be unreasonably withheld or delayed), of one additional firm of counsel for the affected Indemnitees, and, if reasonably necessary, one additional firm of local counsel in each appropriate material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for such affected Indemnitees, taken

as a whole)), incurred by or asserted against any Indemnitee by any third party or by the Borrower or any Subsidiary arising out of, in connection with, or as a result of any claim, litigation, investigation or proceeding (including any inquiry or investigation), regardless of whether any such Indemnitee is a party thereto, whether based on contract, tort or any other theory, relating to (i) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder, the consummation of the Transactions or any other transactions contemplated thereby, the syndication of the DIP Facility or the enforcement of any obligations of a Loan Party hereunder or under any other Loan Document, (ii) any Loan or the use of the proceeds therefrom or (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any property currently or formerly owned or operated by the Borrower or any Subsidiary, or any other Environmental Liability related in any way to the Borrower or any Subsidiary; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (w) resulted from the gross negligence or willful misconduct of such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitee (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment), (x) (other than with respect to the Agents and their Related Parties) resulted from a material breach of the Loan Documents by, or the bad faith of, such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitees (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (y) arise from disputes between or among Indemnitees (other than disputes involving claims against the Agents in their respective capacities) that does not arise from an act or omission by the Borrower or any Subsidiary. This <u>Section 9.03</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c) To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent or any Lender under paragraph <u>(a)</u> or <u>(b)</u> of this <u>Section 9.03</u>, each Lender severally agrees to pay to such Agent or such Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent or such Lender in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate outstanding Term Loans and unused Commitments at such time (or if all such amounts have been reduced to zero, at the time immediately preceding such reduction). The obligations of the Lenders under this paragraph <u>(c)</u> are subject to the last sentence of <u>Section 2.02(a)</u> (which shall apply *mutatis mutandis* to the Lenders' obligations under this paragraph <u>(c)</u>).

(d) To the extent permitted by applicable law, (i) the Borrower shall not assert, and each hereby waives, any claim against any Indemnitee for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such direct or actual damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties and (ii) no Loan Party (or any Affiliate thereof), Investor (or any Affiliate thereof), or Indemnitee shall be liable for any special, indirect, consequential, incidental, exemplary or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Financing Transactions, any Loan or the use of the proceeds thereof; <u>provided</u> that nothing in this paragraph shall limit any Loan Party's (or any Affiliate thereof) or

Investor's (or any Affiliate thereof) indemnity and reimbursement obligations to the extent that such indirect, special, punitive or consequential damages are included in any claim by a third party unaffiliated with the applicable Indemnitee with respect to which the applicable Indemnitee is entitled to indemnification as set forth in this Section 9.03.

(e)    All amounts due under this Section 9.03 shall be payable not later than thirty (30) Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

SECTION 9.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the acknowledgement of the Administrative Agent (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no assignment shall be made to any Defaulting Lender or any of its Subsidiaries, or any Persons who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (ii) and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 9.04), the Indemnitees and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent (except with respect to assignments to competitors of the Borrower) not to be unreasonably withheld, conditioned or delayed) of (A) the Lead Borrower; provided that no consent of the Lead Borrower shall be required for an assignment (x) by a Term Lender to any other Lender, any Affiliate of a Lender or any Approved Fund, or (y) if an Event of Default with respect to the Lead Borrower has occurred and is continuing (other than in respect of a proposed assignment to a Disqualified Lender); provided further that no assignee contemplated by the immediately preceding proviso shall be entitled to receive any greater payment under Section 2.15 or Section 2.17 than the applicable assignor would have been entitled to receive with respect to the assignment made to such assignee, unless the assignment to such assignee is made with the Lead Borrower's prior written consent; provided further that the Lead Borrower shall have the right to withhold its consent to any assignment if in order for such assignment to comply with applicable law, the Lead Borrower or any Subsidiary would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority and (B) the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan or Term Commitment to (x) a Lender, an Affiliate of a Lender or an Approved Fund or (y) subject to Section 9.04(g), the Borrower or any of its Subsidiaries. Notwithstanding anything in this Section 9.04 to the contrary, if the Lead Borrower has not given the Administrative Agent written notice of its objection to an assignment of Loans within five (5) Business Days after written notice of such assignment, the Lead Borrower shall be deemed to have consented to such assignment (other than in respect of a proposed assignment to a Disqualified Lender).

(i)        Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $2,500,000 (and integral multiples of $500,000 in excess thereof), unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld, conditioned or delayed), (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided that (x) this clause (B) shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans, (y) the Fronting Lender may not assign New Money Term Loans separate from any New Money Term Loan Commitments held by it at the time of such assignment and (z) any Assigning Lender seeking to assign New Money Term Loans or New Money Term Loan Commitments must also assign a proportionate amount of New Money Term Loan Commitments (in the case of an assignment of New Money Term Loans) or New Money Term Loans (in the case of an assignment of New Money Term Loan Commitments) held by such Assigning Lender; provided, further, this clause (z) shall not apply where an Assigning Lender is assigning such New Money Term Loans or New Money Term Loan Commitments, as applicable, to a Lender, an Affiliate of a Lender or an Approved Fund, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, and, in each case, together with a processing and recordation fee of $3,500; provided that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided further that any such Assignment and Assumption shall include a representation by the assignee that the assignee is not a Disqualified Lender or an Affiliate of a Disqualified Lender; provided further that assignments made pursuant to Section 2.19(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective, (D) the assignee, if it shall not be a Lender, shall deliver to the Lead Borrower and the Administrative Agent any tax forms required by Section 2.17(e) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain Material Non-Public Information about the Borrower, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws; and (E) no assignment may be made to any Person who is not a party to the Restructuring Support Agreement or who does not, concurrently with the closing of such assignment, become a party to the Restructuring Support Agreement; provided however that in no event shall any Agent be responsible or liable for monitoring or confirming whether any assignee or proposed assignee is a party, or will subsequently become a party, to the Restructuring Support Agreement.

(ii)       Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 9.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the

benefits of (and subject to the obligations and limitations of) Sections 2.15, 2.16, 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section 9.04.

(iii)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(iv)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms required by Section 2.17(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(v)     The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)     (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons (other than to a Person that is not an Eligible Assignee) (a "Participant"), that are a party to the Restructuring Support Agreement or that, concurrently with the closing of such participation, becomes a party to the Restructuring Support Agreement, in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C)  the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents; provided that such agreement or instrument may provide that

such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. Subject to paragraph (c)(iii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations thereof and Section 2.19, it being understood that any tax forms required by Section 2.17(e) shall be provided solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.04. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

(i)       Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related stated interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and the parties hereto shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of its Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or other obligations under the Loan Documents) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any Loan or other obligation under the Loan Documents is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury regulations.

(ii)       A Participant shall not be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld, conditioned or delayed).

(d)       Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)       In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Lead Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agents or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of

this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

        (f)      [Reserved].

        (g)      [Reserved].

        (h)      Notwithstanding the foregoing, no assignment may be made or participation sold to a Disqualified Lender without the prior written consent of the Lead Borrower.  Upon inquiry by any Lender to the Administrative Agent as to whether a specified potential assignee or prospective participant is on the list of Disqualified Lenders, the Administrative Agent shall be permitted to make the list of Disqualified Lenders available to such Lender for inspection.  Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, if any Lender was a Disqualified Lender at the time of the assignment of any Loans or Commitments to such Lender, following written notice from the Lead Borrower to such Lender and the Administrative Agent: (1) such Lender shall promptly assign all Loans and Commitments held by such Lender to an Eligible Assignee; provided that (A) the Administrative Agent shall not have any obligation to the Borrower, such Lender or any other Person to find such a replacement Lender, (B) the Borrower shall not have any obligation to such Disqualified Lender or any other Person to find a replacement Lender or accept or consent to any such assignment to itself or any other Person subject to the Lead Borrower's consent in accordance with Section 9.04(b)(i) and (C) the assignment of such Loans and/or Commitments, as the case may be, shall be at par plus accrued and unpaid interest and fees; (2) such Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of any Class), all affected Lenders (or all affected Lenders of any Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 9.02); provided that (x) the Commitment of any Disqualified Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Disqualified Lender adversely and in a manner that is disproportionate to other affected Lenders shall require the consent of such Disqualified Lender; and (3) no Disqualified Lender is entitled to receive information provided solely to Lenders by the Administrative Agent or any Lender or will be permitted to attend or participate in meetings attended solely by the Lenders and the Administrative Agent, other than the right to receive notices or Borrowings, notices or prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Article II.

        SECTION 9.05      Survival.

        All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and all other amounts payable hereunder, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof or the resignation or removal of any Agent.

SECTION 9.06    Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Agents or the syndication of the Loans and Commitments (including, without limitation, the Fronting Fee Letter) constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of (x) this Agreement, (y) any other Loan Document and/or (z) any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Administrative Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of the Borrower or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (ii) upon the request of the Administrative Agent (whether on its own behalf or on behalf of any Lender), any Electronic Signature shall be promptly followed by a manually executed counterpart.  Without limiting the generality of the foregoing, the Borrower and each Loan Party hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and the Loan Parties, Electronic Signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (ii) the Administrative Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (iii) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (iv) waives any claim against the Administrative Agent, any Lender or any Affiliates or Related Parties of any of the foregoing for any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising solely from the Administrative Agent's and/or any Lender's reliance on or use of Electronic

Signatures and/or transmissions by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

SECTION 9.07    Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 9.07, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent then such provisions shall be deemed to be in effect only to the extent not so limited.

SECTION 9.08    Right of Setoff.

If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have. Notwithstanding the foregoing, no amount set off from any Loan Party (other than the Borrower) shall be applied to any Excluded Swap Obligation of such Loan Party (other than the Borrower).

SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    This Agreement shall be construed in accordance with and governed by the laws of the State of New York and, as may be applicable, the Bankruptcy Code, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, solely to the extent that the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over any matter, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising

out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court and, to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in any Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)        Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section 9.09. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)        Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10        WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

SECTION 9.11        Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12        Confidentiality.

(a)        Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors, in each case, who need to know such Information in connection with the Transactions (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons acting on behalf of the Administrative Agent or the relevant Lender to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent or the relevant

Lender, as applicable), (ii) to the extent requested by any governmental authority or self-regulatory authority having jurisdiction over the Administrative Agent, any Lender or any Affiliates of any of the foregoing, as applicable, or, based on reasonable advice of counsel, to the extent required by (A) an order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, (B) applicable law or by any subpoena or similar compulsory legal process or (C) in connection with the exercise of remedies or enforcement of rights hereunder in any suit, action or proceeding relating to this Agreement; provided that (x) solely to the extent permitted by law and other than in connection with routine audits and reviews by bank accountants or governmental or self-regulatory authorities exercising examination or regulatory authority, each Lender and the Administrative Agent shall notify the Lead Borrower as promptly as practicable of any such requested or required disclosure and (y) in the case of clause (ii) only, each Lender and the Administrative Agent shall use commercially reasonable efforts to ensure that such Information is kept confidential in connection with the exercise of such remedies, and provided further that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any of its subsidiaries, (iii) to any other party to this Agreement, (iv) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section 9.12, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any direct or indirect contractual counterparty to any Swap Agreement or derivative transaction relating to any Loan Party or its subsidiaries and its obligations under the Loan Documents or (C) any pledgee referred to in Section 9.04(d), (v) if required by any rating agency in connection with obtaining a rating; provided that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information, (vi) to service providers (including any numbering, administration or settlement service providers) providing administrative and ministerial services solely in connection with the syndication and administration of the Loan Documents and the DIP Facility (e.g., identities of parties, maturity dates, interest rates, etc.) on a confidential basis, (vii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 9.12 or otherwise by reason of improper disclosure by the Administrative Agent any Lender or any Affiliates or Related Parties of any of the foregoing (including the Persons referred to in clauses (i) above) in violation of any confidentiality obligations owing to the Loan Parties or any subsidiaries, Affiliates or Related Parties of any of the foregoing or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower or any subsidiary, which source is not known by the recipient of such information to be subject to a confidentiality obligation, or (viii) to the extent that such information was already in the possession of the Administrative Agent or any Lender prior to any duty or other undertaking of confidentiality or is independently developed by the Administrative Agent or any Lender without the use of such information and without otherwise violating the terms of this Section 9.12. For the purposes hereof, "Information" means all information received from or on behalf of the Borrower or any of its subsidiaries relating to the Borrower, any of its subsidiaries or their business. Any Person required to maintain the confidentiality of Information as provided in this Section 9.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Notwithstanding the foregoing, other than as set forth in the proviso below, (x) no such information shall be disclosed to a Disqualified Lender or Excluded Party that constitutes a Disqualified Lender or Excluded Party, as applicable, at the time of such disclosure without the Lead Borrower's prior written consent and (y) in connection with any proposed assignment of Loans and/or Commitments in accordance with Section 9.04, upon request by the applicable potential assignee therefor, the applicable potential assigning Lender may disclose the list of Disqualified Lenders to such potential assignee solely for purposes of enabling such assignee to make a representation in its applicable Assignment and Assumption that such prospective assignee is an Eligible Assignee, provided, however, that, subject to an agreement containing confidentiality undertakings substantially similar to those of this Section 9.12, the list of Disqualified Lenders may be disclosed to any bona fide potential assignee or Participant, so that such potential assignee or Participant can represent and warrant that it is neither a Disqualified Lender nor an Affiliate of a Disqualified Lender.

(b)     EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN THIS SECTION 9.12) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)     ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

SECTION 9.13     USA PATRIOT Act.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.

SECTION 9.14     Release of Liens and Guarantees.

(a)     A Loan Party shall automatically be released from its obligations under the Loan Documents (including its Guarantee) and all security interests created by the Security Documents in Collateral owned by such Loan Party shall be automatically released, (1) upon the consummation of any transaction or designation permitted by this Agreement as a result of which such Loan Party ceases to be a Subsidiary (including pursuant to a permitted merger with a Subsidiary that is not a Loan Party) or (2) upon the request of the Lead Borrower, in connection with a transaction permitted under this Agreement (but only a transaction (x) in which such Loan Party becomes a bona fide joint venture and the other Person taking an equity interest in such Loan Party takes such equity interest for fair market value (as determined in good faith by the Lead Borrower) and is not an Investor, an Affiliate of an Investor or an Affiliate of the Borrower (other than as a result of such joint venture), (y) in which such Loan Party does not own or have an exclusive license of any Material Intellectual Property or own any Equity Interests of any Person that owns or is the exclusive licensee of any Material Intellectual Property and (z) the primary purpose (as determined by the Lead Borrower in good faith) of which is not the release of any Guarantee of or Lien on the assets of such Loan Party) as a result of which such Loan Party ceases to be a Wholly Owned Subsidiary. Upon any sale or other transfer by any Loan Party (other than to the Borrower or any Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral, the security interests in such Collateral created by the Security Documents shall be automatically released.  Upon the release of any Loan Party from its Guarantee in compliance with this Agreement, the security interest in

any Collateral owned by such Subsidiary created by the Security Documents shall be automatically released. Upon termination of the aggregate Commitments and payment in full of all Secured Obligations (other than contingent indemnification obligations), all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released. In connection with any termination or release pursuant to this Section 9.14, each Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request and prepare to evidence such termination or release so long as the Borrower or applicable Loan Party shall have provided such Agent a certificate, upon which such Agent may conclusively rely and shall be fully protected in acting in reliance upon, of a Responsible Officer certifying that the release of such Loan Party or Lien or such other release and the transactions related thereto (and the execution and delivery of any instruments or documents by such Agent in connection therewith) are authorized or permitted by the terms of this Agreement and the other Loan Documents.

(b)    The Administrative Agent or the Collateral Agent, as the case may be, will, subject to such Agent's receipt of a certificate of a Responsible Officer of the Borrower as provided for in Section 9.14(a), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request and prepare to subordinate its Lien on any property granted to or held by the Administrative Agent or the Collateral Agent, as the case may be, under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv).

(c)    Each of the Lenders, and by accepting the benefits of the Security Documents, each Secured Party that is not a party hereto, irrevocably authorizes the Administrative Agent or the Collateral Agent, as the case may be, to provide any release or evidence of release, termination or subordination contemplated by this Section 9.14. Upon request by the Administrative Agent or the Collateral Agent, as the case may be, at any time, the Required Lenders will confirm in writing the Administrative Agent's authority or that Collateral Agent's authority, as the case may be, to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Documents and this Section 9.14.

SECTION 9.15    No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent and the Lenders on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, any of its Affiliates or any other Person and (B) none of the Administrative Agent and the Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent and the Lenders has any obligation to disclose any of such interests to the Borrower or any of its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent

and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.16    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

SECTION 9.17    [Reserved].

SECTION 9.18    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or under any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with the normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from them to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or the relevant Lender of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or the relevant Lender may in accordance with the normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or such Lender from the Borrower in the Agreement Currency, each Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent, or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or such Lender in such currency, the Administrative Agent or such Lender agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

SECTION 9.19    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

1.    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

2.       the effects of any Bail-In Action on any such liability, including, if applicable:

    i.       a reduction in full or in part or cancellation of any such liability;

    ii.      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

    iii.     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 9.20       Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

SECTION 9.21       Orders Control.  To the extent that any specific provision hereof is inconsistent with any of the Orders, the Interim DIP Order or Final DIP Order (as applicable) shall control.

ARTICLE X

GUARANTEE

SECTION 10.01       Guarantee.   Each Guarantor absolutely, irrevocably and unconditionally guarantees, as primary obligor and not merely as surety, to each of the Secured Parties, jointly with the other Guarantors and severally, the due and punctual payment and performance of the

Secured Obligations (which shall not be secured by any liens on the assets of the Holdco Borrower or the Holdco Intermediate Parent). Each Guarantor further agrees that the Secured Obligations may be increased, extended or renewed, in whole or in part, or amended or modified, without notice to or further assent from it, and that it will remain bound upon its guarantee hereunder notwithstanding any such increase, extension or renewal, or amendment or modification, of any of the Secured Obligations. Each Guarantor waives presentment to, demand of payment from and protest to the Borrower or any other Loan Party of any of the Secured Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment, notice of dishonor, default and nonpayment. Notwithstanding anything to the contrary contained herein, the obligations of each Guarantor hereunder at any time shall be limited to an aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable provisions of any other applicable law.

SECTION 10.02    Guarantee of Payment; Continuing Guarantee.   Each Guarantor further agrees that its guarantee hereunder constitutes a guarantee of payment when due (whether or not any bankruptcy or similar proceeding shall have stayed the accrual of collection of any of the Secured Obligations or operated as a discharge thereof) and not merely of collection, and waives diligence, marshaling (other than with respect to TopCo, whose guarantee shall be in all respects subject to paragraph 33 of the Interim DIP Order), and any right to require that any resort be had by the Administrative Agent or any other Secured Party to any security held for the payment of any of the Secured Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent or any other Secured Party in favor of any Borrower, any other Loan Party or any other Person. Each Guarantor agrees that its guarantee hereunder is continuing in nature and applies to all of the Secured Obligations, whether currently existing or hereafter incurred.

SECTION 10.03    No Limitations.

(a)    Except for (x) the termination or release of a Guarantor's obligations hereunder as expressly provided in Section 9.14 and (y) the limitations set forth in Section 10.01, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise of any of the Secured Obligations, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Secured Obligations, any impossibility in the performance of any of the Secured Obligations or otherwise. Without limiting the generality of the foregoing, except for (x) the termination or release of a Guarantor's obligations hereunder as expressly provided in Section 9.14 and (y) the limitations set forth in Section 10.01, the obligations of each Guarantor hereunder, to the fullest extent permitted by applicable Requirements of Law, shall not be discharged or impaired or otherwise affected by:

(i)    the failure of any Secured Party or any other Person to assert any claim or demand or to enforce any right or remedy under the provisions of any Loan Document or otherwise;

(ii)    any rescission, waiver, amendment, supplement, restatement or modification of, or any release or departure from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Guarantor under this Agreement;

(iii)    the release of, or any impairment of or failure to perfect any Lien on, any security held by any Secured Party for any of the Secured Obligations;

(iv) any default, failure or delay, willful or otherwise, in the performance of any of the Secured Obligations;

(v) any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the payment in full in cash of all the Secured Obligations (excluding contingent obligations as to which no claim has been made or which are otherwise not due));

(vi) any illegality, lack of validity or lack of enforceability of any of this Agreement, any other Loan Document, or the Secured Obligations;

(vii)     any change in the corporate existence, structure or ownership of any Loan Party, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Loan Party or its assets or any resulting release or discharge of any of the Secured Obligations (other than the payment in full in cash of all the Secured Obligations (excluding contingent obligations as to which no claim has been made or which are otherwise not due));

(viii)    the existence of any claim, set-off or other rights that any Guarantor may have at any time against the Borrower, any other Guarantor, the Administrative Agent, any other Secured Party or any other Person, whether in connection with this Agreement, the other Loan Documents or any unrelated transaction;

(ix) this Agreement having been determined (on whatsoever grounds) to be invalid, non-binding or unenforceable against any other Guarantor ab initio or at any time after the Effective Date;

(x) the fact that any Person that, pursuant to the Loan Documents, was required to become a party hereto may not have executed or is not effectually bound by this Agreement, whether or not this fact is known to the Secured Parties;

(xi) any action permitted or authorized hereunder;

(xii)     any other circumstance (including any statute of limitations), or any existence of or reliance on any representation by the Administrative Agent, any other Secured Party or any other Person, that might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower, any other Guarantor or any other guarantor or surety (other than the payment in full in cash of all the Secured Obligations (excluding contingent obligations as to which no claim has been made or which are otherwise not due)); or

(xiii)    any renewal, extension or acceleration of, or any increase in the amount of the Secured Obligations.

(b)      Each Guarantor expressly authorizes the Secured Parties to take and hold security in accordance with the terms of the Loan Documents for the payment and performance of the Secured Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the Secured Obligations, all without affecting the obligations of any Guarantor hereunder.

(c)     To the fullest extent permitted by applicable Requirements of Law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any other Loan Party or the unenforceability of the Secured Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower or any other Loan Party, other than the payment in full in cash of all the Secured Obligations and/or the termination or release of such Guarantor's obligations hereunder as expressly provided under Section 9.14. Any Agent (acting at the direction of the Required Lenders) and the other Secured Parties, at their election and in accordance with the terms of the Loan Documents, may foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Secured Obligations, make any other accommodation with the Borrower or any other Loan Party or exercise any other right or remedy available to them against the Borrower or any other Loan Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Secured Obligations have been paid in full in cash and/or such Guarantor has been subject to the termination or release of such Guarantor's obligations hereunder as expressly provided in Section 9.14. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against the Borrower or any other Loan Party, as the case may be, or any security.

SECTION 10.04     Reinstatement. Each Guarantor agrees that, unless released pursuant to Section 9.14, its guarantee hereunder shall continue to be effective or automatically and immediately be reinstated, as the case may be, if at any time payment, or any part thereof, of any Secured Obligations is rescinded or must otherwise be restored by any Secured Party upon the bankruptcy or reorganization (or any analogous proceeding in any jurisdiction) of the Borrower, any other Loan Party or otherwise.

SECTION 10.05     Agreement to Pay; Subrogation.  In furtherance of the foregoing and not in limitation of any other right that the Administrative Agent or any other Secured Party has at applicable law or in equity against any Guarantor by virtue hereof, upon the failure of the Borrower or any other Loan Party to pay any Secured Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the Administrative Agent for distribution to the applicable Secured Parties, in cash the amount of such unpaid Secured Obligation. Upon payment by any Guarantor of any sums to the Administrative Agent as provided above, all rights of such Guarantor against the Borrower or any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subject to Sections 10.08, 10.09 and 10.10.

SECTION 10.06     Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's and each other Loan Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Secured Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that none of the Secured Parties will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

SECTION 10.07     [Reserved].

SECTION 10.08     Indemnity and Subrogation. In addition to all such rights of indemnity and subrogation as the Guarantors may have under applicable law (but subject to Section 10.10) in respect of any payment hereunder, each Borrower agrees that (a) in the event a payment in respect of any obligation of any Borrower shall be made by any Guarantor (other than a Borrower in respect of its own obligations) under this Agreement, the Borrower shall indemnify such Guarantor for the full amount of such payment and such Guarantor shall be subrogated to the rights of the Person to whom such payment shall have been

made to the extent of such payment and (b) in the event any assets of any Guarantor (other than a Borrower in respect of its own obligations) shall be sold pursuant to any Security Document to satisfy in whole or in part any Secured Obligations owed to any Secured Party, the Borrower shall indemnify such Guarantor in an amount equal to the greater of the book value or the fair market value of the assets so sold.

SECTION 10.09    Contribution and Subrogation.  Each Guarantor (a "Contributing Party") agrees (subject to Section 10.10) that, in the event a payment shall be made by any other Guarantor hereunder in respect of any Secured Obligations (other than payments made by a Borrower with respect to its own obligations) or assets of any other Guarantor (other than a Borrower in satisfaction of its own obligations) shall be sold pursuant to any Security Document to satisfy any Secured Obligation owed to any Secured Party and such other Guarantor (the "Claiming Party") shall not have been fully indemnified as provided in Section 10.07, the Contributing Party shall indemnify the Claiming Party in an amount equal to the amount of such payment or the greater of the book value or the fair market value of such assets, as the case may be, in each case multiplied by a fraction of which the numerator shall be the net worth of the Contributing Party on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 5.11, the date of a joinder executed and delivered by such Guarantor) and the denominator shall be the aggregate net worth of all the Guarantors on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 5.11, such other date). Any Contributing Party making any payment to a Claiming Party pursuant to this Section 10.09 shall be subrogated to the rights of such Claiming Party under Section 10.08 to the extent of such payment.

SECTION 10.10    Subordination.

(a)    Notwithstanding any provision of this Agreement to the contrary, all rights of the Guarantors under Sections 10.08 and 10.09 and all other rights of the Guarantors of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the payment in full in cash of all the Secured Obligations to the extent set forth in Section 10.10(b). No failure on the part of the Borrower or any Guarantor to make the payments required by Sections 10.08 and 10.09 (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder.

(b)    Each Guarantor hereby agrees that upon the occurrence and during the continuance of an Event of Default, all Indebtedness and other monetary obligations owed by it to, or to it by, any other Guarantor or any other Subsidiary shall be fully subordinated to the payment in full in cash of all the Secured Obligations, and any such Indebtedness collected or received by such Guarantor after an Event of Default has occurred and continuing shall be held in trust for the Administrative Agent on behalf of the Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of the Secured Parties to be credited and applied against the Secured Obligations, but without affecting, impairing or limiting in any manner the liability such Guarantor under any other provision hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWER:**                                    **FRANCHISE GROUP, INC.**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO PSP, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC**

By: _____
Name:
Title:

**VALOR ACQUISITION, LLC**

By: _____
Name:
Title:

**GUARANTORS:**                                 **VITAMIN SHOPPE INDUSTRIES LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT GROUP, LLC**

By: _____
Name:
Title:

[Signature Page to Senior Secured Super-Priority Priming Term Loan
Debtor-In-Possession Credit Agreement]

**PET SUPPLIES "PLUS", LLC**

By: _____
Name:
Title:

**VITAMIN SHOPPE MARINER, LLC**

By: _____
Name:
Title:

**VITAMIN SHOPPE GLOBAL, LLC**

By: _____
Name:
Title:

**VITAMIN SHOP FLORIDA, LLC**

By: _____
Name:
Title:

**BETANCOURT SPORTS NUTRITION, LLC**

By: _____
Name:
Title:

**VITAMIN SHOPPE PROCUREMENT SERVICES, LLC**

By: _____
Name:
Title:

**VITAMIN SHOPPE FRANCHISING, LLC**

By: _____
Name:
Title:

[Signature Page to Senior Secured Super-Priority Priming Term Loan
Debtor-In-Possession Credit Agreement]

**FRANCHISE GROUP INTERMEDIATE HOLDCO, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE S, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT HOLDINGS, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT MANAGEMENT COMPANY, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT OUTLET STORES, LLC**

By: _____
Name:
Title:

**HOME & APPLIANCE OUTLET, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO S, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT FRANCHISING, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT FRANCHISOR, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEW HOLDCO, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE V, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO V, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE B, LLC**

By: _____
Name:
Title:

**BUDDY'S NEWCO, LLC**

By: _____
Name:
Title:

**BUDDY'S FRANCHISING AND LICENSING LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT FFO, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP ACQUISITION TM, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE PSP, LLC**

By: _____
Name:
Title:

**PSP MIDCO, LLC**

By: _____
Name:
Title:

**PSP GROUP, LLC**

By: _____
Name:
Title:

**PSP SERVICE NEWCO, LLC**

By: _____
Name:
Title:

**PSP STORES, LLC**

By: _____
Name:
Title:

**PSP SUBCO, LLC**

By: _____
Name:
Title:

**PSP FRANCHISING, LLC**

By: _____
Name:
Title:

**PSP DISTRIBUTION, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE BHF, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO BHF, LLC**

By: _____
Name:
Title:

[Signature Page to Senior Secured Super-Priority Priming Term Loan
Debtor-In-Possession Credit Agreement]

**FRANCHISE GROUP INTERMEDIATE SL, LLC**,

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO SL, LLC**

By: _____
Name:
Title:

**EDUCATE, INC.**

By: _____
Name:
Title:

**FREEDOM VCM HOLDINGS, LLC**

By: _____
Name:
Title:

**FREEDOM VCM, INC.**

By: _____
Name:
Title:

**FREEDOM VCM INTERCO, INC.**

By: _____
Name:
Title:

**FREEDOM VCM INTERCO HOLDINGS, INC.**

By: _____
Name:
Title:

**FREEDOM VCM RECEIVABLES, INC.**

By: _____
Name:
Title:

**FREEDOM RECEIVABLES II, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE L, LLC**

By: _____
Name:
Title:

**WNW FRANCHISING, LLC**

By: _____
Name:
Title:

**WNW STORES, LLC**

By: _____
Name:
Title:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent and Collateral Agent

By: _____
Name:
Title:

**JEFFRIES CAPITAL SERVICES, LLC**, as a Lender

By: _____
Name:
Title:

## **Exhibit 2**

**Syndication Procedures**

*[To Come]*

**<u>Exhibit 3</u>**

**Initial Budget**

**Franchise Group, Inc.**
**13-wk Cash Flow Forecast**

| ($ in millions) | Post Petition | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Type: | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | 13-Weeks |
| Period Starting: | 11/2/2024 | 11/9/2024 | 11/16/2024 | 11/23/2024 | 11/30/2024 | 12/7/2024 | 12/14/2024 | 12/21/2024 | 12/28/2024 | 1/4/2025 | 1/11/2025 | 1/18/2025 | 1/25/2025 | Fcst |
| Period Ending: | 11/8/2024 | 11/15/2024 | 11/22/2024 | 11/29/2024 | 12/6/2024 | 12/13/2024 | 12/20/2024 | 12/27/2024 | 1/3/2025 | 1/10/2025 | 1/17/2025 | 1/24/2025 | 1/31/2025 | |
| **Total Operating Receipts** | 62.3 | 66.4 | 64.9 | 61.9 | 63.7 | 65.9 | 61.9 | 57.8 | 50.6 | 50.2 | 45.8 | 44.9 | 49.4 | 745.7 |
| **Total Operating Disbursements** | (31.3) | (75.6) | (67.6) | (57.4) | (60.3) | (39.1) | (51.2) | (47.0) | (56.1) | (42.7) | (36.9) | (52.8) | (61.3) | (679.3) |
| **Net Operating Cash Flow** | 31.0 | (9.2) | (2.7) | 4.6 | 3.3 | 26.9 | 10.6 | 10.8 | (5.5) | 7.4 | 8.9 | (7.8) | (11.9) | 66.4 |
| **Non Operating Disbursements** | | | | | | | | | | | | | | |
| Debt Service | (0.1) | (0.1) | (0.7) | (0.2) | (0.1) | - | - | (0.2) | (0.2) | (0.1) | (21.2) | (0.6) | (0.3) | (23.7) |
| AF Liquidator Fees | - | - | (0.1) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.6) | - | - | - | (2.4) |
| Other Expenses | (0.5) | (1.8) | - | - | - | - | - | - | - | - | - | - | - | (2.3) |
| **Total Non Operating Disbursements** | (0.6) | (1.9) | (0.9) | (0.4) | (0.3) | (0.3) | (0.3) | (0.5) | (0.6) | (0.7) | (21.2) | (0.6) | (0.3) | (28.4) |
| **Total Disbursements Prior to Professional Fees** | (31.9) | (77.5) | (68.4) | (57.8) | (60.7) | (39.4) | (51.5) | (47.5) | (56.6) | (43.4) | (58.1) | (53.4) | (61.6) | (707.6) |
| Professional Fees | (2.3) | (2.1) | (2.3) | (2.3) | (6.1) | (1.8) | (1.9) | (1.9) | (1.8) | (4.4) | (1.8) | (1.8) | (1.7) | (32.1) |
| **Total Disbursements** | (34.1) | (79.6) | (70.7) | (60.1) | (66.8) | (41.1) | (53.4) | (49.4) | (58.4) | (47.8) | (59.9) | (55.2) | (63.3) | (739.7) |
| **Net Cash Flow** | 28.2 | (13.2) | (5.8) | 1.9 | (3.1) | 24.8 | 8.5 | 8.4 | (7.8) | 2.4 | (14.1) | (10.3) | (13.9) | 6.0 |
| BOP Cash Balance | 14.3 | 165.5 | 146.3 | 126.5 | 125.4 | 115.2 | 131.1 | 127.5 | 179.0 | 170.2 | 174.6 | 160.5 | 150.2 | 14.3 |
| Net Cash Flow | 28.2 | (13.2) | (5.8) | 1.9 | (3.1) | 24.8 | 8.5 | 8.4 | (7.8) | 2.4 | (14.1) | (10.3) | (13.9) | 6.0 |
| DIP New Money Draw | 125.0 | - | - | - | - | - | - | 50.0 | - | - | - | - | - | 175.0 |
| (Funding)/Draw of GOB Proceeds Escrow | (2.0) | (6.0) | (14.0) | (3.0) | (7.0) | (9.0) | (12.0) | (7.0) | (1.0) | 2.0 | - | - | - | (59.0) |
| **EOP Cash Balance** | 165.5 | 146.3 | 126.5 | 125.4 | 115.2 | 131.1 | 127.5 | 179.0 | 170.2 | 174.6 | 160.5 | 150.2 | 136.3 | 136.3 |

**Exhibit 4**

| Priority | DIP Collateral that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral that constitutes Term Loan Priority Collateral or that would otherwise constitute Term Loan Priority Collateral | Unencumbered Property | Claims |
|---|---|---|---|---|
| *First* | Carve Out and Permitted Prior Liens | Carve Out and Permitted Prior Liens | Carve Out | Carve Out |
| *Second* | ABL Adequate Protection Liens | DIP Liens | DIP Liens | DIP Superpriority Claims |
| *Third* | Prepetition ABL Liens | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens and ABL Adequate Protection Liens | First Lien Adequate Protection Claims and ABL Adequate Protection Claims |
| *Fourth* | DIP Liens | Prepetition First Lien Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | Second Lien Adequate Protection Claims and Second Lien Sidecar Adequate Protection Claims |
| *Fifth* | First Lien Adequate Protection Liens | Prepetition Second Lien Liens and Prepetition Second Lien Sidecar Liens | | |
| *Sixth* | Prepetition First Lien Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | | |
| *Seventh* | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | ABL Adequate Protection Liens | | |

| *__Eighth__* | Prepetition Second Lien Liens and Prepetition Second Lien Sidecar Liens | Prepetition ABL Liens | | |
|---|---|---|---|---|