**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF CHRISTOPHER GRUBB IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

I, Christopher Grubb, declare under penalty of perjury:

1. I am a Partner at Ducera Partners LLC (together with its affiliates, "Ducera") located at 11 Times Square, New York, NY 10036, and am duly authorized to submit this

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

declaration (the "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 51] (the "DIP Motion").[2] In particular, I submit this Declaration in support of my view that the DIP Facility: (a) is the product of arm's-length, good-faith negotiation processes; (b) is the best available postpetition financing options for the Debtors in light of the facts and circumstances of the Debtors and these Chapter 11 Cases (as defined below); and (c) contains reasonable and appropriate financial terms and conditions under the circumstances.

2. On November 3, 2024, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, initiating the above-captioned chapter 11 cases (the "Chapter 11 Cases").

3. I am over the age of 18 years and am authorized to submit this Declaration on behalf of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") in support of the relief requested in the Motion.

4. Unless otherwise indicated, all facts set forth in this Declaration are based on (i) my personal knowledge or information that I have received from employees of Ducera working directly with me or under my supervision, direction, or control, (ii) information learned from my review of relevant financial and operational data regarding the Debtors, (iii) information received from members of the Debtors' management or other advisors, and (iv) my past experience advising

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

both distressed and non-distressed businesses and companies and their stakeholders. If called upon to testify, I would testify competently to the facts set forth herein.

### I. PROFESSIONAL BACKGROUND AND QUALIFICATIONS

5. Founded in 2015, Ducera is an investment banking firm specializing in providing leading-edge capital structure and restructuring advice to companies, creditors, and investors in bankruptcy. In addition to numerous out-of-court restructurings and sales, Ducera professionals have served as investment bankers to debtors, creditor groups, asset purchasers, committees, boards of directors, and trustees in a number of bankruptcy matters. Ducera provides a broad range of corporate and financial services to its clients, including: (a) general corporate advice; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; and (d) private placements. Ducera and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases.

6. Ducera's seasoned professionals, with roots in complex corporate finance, offer impartial and independent strategic advice to stakeholders in a broad range of transactions and industry sectors. Ducera has more than fifty professionals and is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties in interest involved with financially troubled companies requiring complex financial restructurings, both out of court and in chapter 11 cases. Ducera's business reorganization professionals have served as financial and strategic advisors in a number of recent in-court restructurings, including: In re Enviva Inc., No. 24-10453 (BFK) (Bankr. E.D. Va. 2024); In re Acorda Therapeutics, Inc., No. 24-22284 (DSJ) (Bankr. S.D.N.Y. 2024); In re Casa Systems, Inc., No. 24-10695 (KBO) (Bankr. D. Del. 2024); In re Invitae Corp., No. 24-11362 (MBK) (Bankr. D.N.J. 2024); In re Revitalid Pharmaceutical Corp., No. 23-11704 (BLS) (Bankr. D. Del. 2023); In re Yellow Corp.,

No. 23-11069 (CTG) (Bankr. D. Del. 2023); In re Diebold Holding Co., LLC, No. 23-90602 (DRJ) (Bankr. S.D. Tex. 2023); In re Virgin Orbit Holdings, Inc., No. 23-10405 (KBO) (Bankr. D. Del. 2023); In re Core Scientific, Inc., No. 22-90341 (DRJ) (Bankr. S.D. Tex. 2023); In re Endo Int'l plc., No. 22-22549 (JLG) (Bankr. S.D.N.Y. 2022); In re GBG USA Inc., No. 21-11369 (MEW) (Bankr. S.D.N.Y. 2021); In re Mallinckrodt plc, No. 20-12522 (JTD) (Bankr. D. Del. 2021); and In re Superior Energy Servs., Inc., No. 20-35812 (DRJ) (Bankr. S.D. Tex. 2021). Ducera has experience in a variety of industries, providing specialized advice on matters including, but not limited to, restructurings, mergers, acquisitions, financings, capital structure advisory and chapter 11 sales.

7. I have close to 20 years of restructuring-related experience as a trusted advisor to leading companies on a wide range of complex corporate finance transactions. Since joining Ducera in 2023, I have provided investment banking expertise, including with respect to marketing and sale transactions, to financially distressed companies as well as lenders and strategic investors in distressed and special situations engagements. I currently serve as a Partner at Ducera, where I specialize in providing financial advice to leading companies, creditors groups, and other parties of interest in a range of complex and transformative corporate finance transactions, including financial restructurings, mergers and acquisitions, and court-supervised insolvency proceedings. Prior to joining Ducera, I was a Managing Director at Greenhill for over seventeen years, advising companies and other stakeholders on special situation restructuring and mergers and acquisitions engagements. Prior to that time, I was an investment banker at UBS. I hold a Bachelor of Science degree in Operations Research and Industrial Engineering from Cornell University, a Master of Business Administration from Columbia Business School, and I am a CFA Charterholder.

## II.     PROPOSED DIP FACILITY

8. Pursuant to the DIP Motion, the Debtors seek authority to obtain secured postpetition financing consisting of a priming secured term loan facility in an aggregate principal amount of up to $750 million, *plus* applicable fees and premiums (the "DIP Facility"), in accordance with the terms and conditions of the DIP Credit Agreement.

9. As further explained in the First Day Declaration, events in the months leading up to the commencement of these Chapter 11 Cases have underscored the Debtors' need to access the proceeds of the DIP Facility and continue use of Cash Collateral. Those events include, among other things, challenges that stressed the Debtors' balance sheet and liquidity profile, macroeconomic headwinds in the retail industry, and rising interest expenses based on the Debtors' overleveraged capital structure.

10. With these concerns in mind and with their operating cash running low, the Debtors retained the following advisors to explore a potential out-of-court sale transaction and various strategic alternatives: Willkie Farr & Gallagher LLP and Young Conaway Stargatt & Taylor, LLP, as co-counsel; AlixPartners, LLP, as restructuring advisor; and Ducera, as investment banker. Over the weeks leading up to the filing of these Chapter 11 Cases, Ducera and the other Debtors' advisors, at the direction of the Debtors, considered actionable alternatives based on the Debtors' actual and projected liquidity, including additional debt or equity financing, or a sale of the Debtors. The Debtors and their advisors also assessed whether a targeted marketing process was the best option to provide liquidity and/or maximize value for all stakeholders. Ultimately, none of the options were feasible enough to avoid these Chapter 11 Cases.

11. As part of the Debtors' preparations for these Chapter 11 Cases, and as further described in the First Day Declaration, my team worked with the Debtors and their other advisors

5

to analyze the liquidity needs necessary to operate the Debtors' business on a postpetition basis and fund the administrative costs and expenses of this chapter 11 process. As discussed further in the First Day Declaration, as part of this analysis, the Debtors and their advisors developed a 13-week cash flow forecast, which accounts for various factors that affect the Debtors' liquidity position. Based on this analysis, Ducera determined that the Debtors would require an immediate capital infusion in the form of the DIP Facility and access to Cash Collateral to administer these Chapter 11 Cases and to continue their efforts to preserve and maximize the value of their estates.

12. The Debtors, in consultation with their advisors, ultimately determined that no viable alternatives were available to obtain new money postpetition financing on an expedited timeline other than the proposed DIP Facility. The lack of viable available alternatives was due to several factors, including: (a) no material unencumbered collateral; (b) limited time before the Debtors would exhaust their liquidity; (c) the fact that any financing secured by a priming lien on the Prepetition ABL Collateral, Prepetition First Lien Collateral, the Prepetition Second Lien Collateral, or the Prepetition Second Lien Sidecar Collateral would be best achieved by obtaining the consent of, as applicable, the Prepetition ABL Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, and/or the Prepetition Second Lien Sidecar Secured Parties; and (d) no third party contacted was willing to extend postpetition financing on a junior basis behind the Prepetition ABL Liens, the Prepetition First Lien Liens, Prepetition Second Lien Liens or the Prepetition Second Lien Sidecar Liens. If the applicable parties did not consent to such financing, any third-party proposal that sought to incur liens with priority senior to such Prepetition Liens would require the Debtors to win a so-called "priming fight" in the beginning of the Debtors' Chapter 11 Cases. It is my understanding that the Prepetition ABL Lenders and the Prepetition First Lien Lenders will not consent to the Debtors' incurrence of

priming financing from a third-party source. I do not believe that any third-party potential financing parties would be willing to enter into a financing agreement with the Debtors on a basis that is junior to the Prepetition Secured Parties or on a basis that could result in such a "priming fight." Based on these facts, among others, I believe that a postpetition financing alternative to the DIP Facility—on a priming, junior secured, or unsecured basis—that would provide sufficient funding for the Chapter 11 Cases was not available under the circumstances.

### III. THE PREPETITION MARKETING PROCESS

13. Given my involvement with the Debtors, I have been directly involved in the process of soliciting and negotiating postpetition financing for the Debtors. As part of this process, my colleagues and I explored, together with the Debtors' management team and other advisors, numerous postpetition financing alternatives on behalf of the Debtors.

14. Starting in July 2024, Ducera began meeting with advisors to stakeholders in the Debtors, including a group consisting of certain Prepetition First Lien Lenders, Prepetition Second Lien Lenders, and the Prepetition ABL Lenders to discuss a potential deleveraging transaction.

15. In the interest of ensuring a robust marketing process and obtaining the best possible financing available to the Debtors, Ducera also prepared informational materials in October 2024 to solicit proposals for postpetition financing from third parties. The third-party financial institutions involved in the marketing process included well-known commercial banks and specialty lending institutions that routinely provide financings along these lines, including certain lenders that have a historical familiarity with the Debtors. On behalf of the Debtors, my colleagues and I approached 19 traditional banks and alternative lenders as prospective financing sources for both priming and non-priming ABL and term loan postpetition financing, in addition to the Debtors' existing Prepetition ABL Lenders, Prepetition First Lien Lenders, and Prepetition

7

Second Lien Lenders. Ducera identified such potential financing sources based on a number of factors, including, among other things, their ability to complete diligence quickly, their experience or likely interest in providing postpetition financing, and their ability to commit to financing on an expedited basis. Three parties entered into nondisclosure agreements with the Debtors to facilitate confidential negotiations.

16. In October 2024, after certain alternative lenders had entered into nondisclosure agreements, Ducera formally solicited proposals for postpetition financing from them. In particular, Ducera solicited proposals for both priming and non-priming ABL and term-loan postpetition financing in an aggregate principal amount of up to $250 million, *plus* applicable fees and premiums. The size of the ABL or term loan facility was intended to provide new liquidity to the Debtors, based on an analysis of the Debtors' immediate and projected postpetition liquidity needs (at that time) performed by the Debtors in conjunction with the Debtors' retained financial advisor, AlixPartners LLP.[3]

17. To date, the Debtors received only one DIP financing proposal from a third-party lender. Such proposal was found to be insufficient for the Debtors' needs to operate these Chapter 11 Cases and reorganize successfully, given the Debtors' prepetition capital structure. The third-party ABL proposal contemplated only approximately another $60 million dollars of incremental borrowing capacity for the Debtors, a level of liquidity which was determined to be insufficient to support the reorganization of the Debtors through the projected pendency of these Chapter 11 Cases. The cost of this incremental liquidity was also calculated to be in excess of the cost of the comparable level of liquidity provided by the DIP Facility. The Debtors also received two proposals from certain of their Prepetition ABL Lenders, but such proposals were also not viable

---

[3] The First Day Declaration filed contemporaneously herewith, addresses the Debtors' liquidity and the sizing of the debtor-in-possession financing need.

to fulfill the Debtors' liquidity needs. Specifically, the Prepetition ABL Lenders' proposals ultimately did not provide any meaningful incremental liquidity relative to where the current Prepetition ABL Facility sits, and the proposals included additional fees and other economics in exchange for essentially maintaining the current ABL structure.

18. Due to the overall lack of interest from third-party lenders and the insufficiency of the Prepetition ABL Lenders' proposals, the Debtors determined that the most feasible source of postpetition financing would be from the Ad Hoc Lender Group, comprised of certain of the Prepetition First Lien Secured Parties. Accordingly, over the course of multiple weeks, the Debtors' advisors, actively negotiated the terms and provisions of the DIP Facility.

19. These negotiations culminated in the DIP Facility, which provides both a needed infusion of liquidity and a consensual path forward in these Chapter 11 Cases. These good faith, arm's-length negotiations involved exchanging multiple drafts of term sheets, the Interim Order, the DIP Credit Agreement, and other DIP Loan Documents, as well as numerous telephone conferences between the Debtors, the DIP Lenders, and their respective advisors. The terms of the DIP Facility are reasonable under the circumstances and are generally consistent with market terms for debtor-in-possession financing, particularly in light of the circumstances of these Chapter 11 Cases and the robust marketing process undertaken, and represent the most favorable terms available to the Debtors. I do not believe that an extended marketing process was feasible given the Debtors' immediate need for liquidity and the expedited nature of these Chapter 11 Cases.

## IV. ALTERNATIVE DIP AND OTHER RESTRUCTURING PROPOSALS

20. As noted above, the Debtors ultimately did not receive any viable proposals from potential third-party investors, or their Prepetition ABL Lenders. Additionally, just prior to the commencement of these Chapter 11 Cases, the Debtors received an alternative restructuring

proposal from certain of their Prepetition Second Lien Secured Lenders that would have required extensive negotiations among multiple creditor constituencies. This eleventh hour proposal would have required the consent of the Prepetition First Lien Lenders, but the Ad Hoc Lender Group promptly notified the Debtors that the proposal was not workable and that its members would never provide such consents to that proposal. Moreover, the proposal required multiple material economic terms to be negotiated in short order among all of the Debtors' key constituencies, and therefore was determined not to be actionable. Nonetheless, the Debtors were able to negotiate with the Ad Hoc Lender Group to provide adequate protection terms for the Prepetition Secured Parties. Notably, to help facilitate the Prepetition ABL Lenders' consent, the DIP Lenders have agreed to accept liens junior to the liens securing the Prepetition ABL Facility with respect to the ABL Priority Collateral.

21. Further, my understanding is that all of the Debtors' material assets are encumbered by valid and perfected first-priority liens. Based on my experience and review of the Debtors' capital structure and financial records, given that, among other things, (a) no party was willing to provide DIP financing on a junior or unsecured basis and (b) the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders, and the Prepetition ABL Lenders were unwilling to consent to a priming DIP facility, any DIP financing other than the DIP Facility provided by the Prepetition First Lien Lenders would result in a protracted and costly litigation, including a potential priming fight or valuation dispute at the outset of these Chapter 11 Cases. Regardless of the prospect of success, the expense and disruption associated with any such litigation would seriously strain the Debtors' liquidity and jeopardize the Debtors' successful administration of these Chapter 11 Cases at the exact time.

## V. THE TERMS OF THE PROPOSED DIP FACILITY ARE REASONABLE AND SHOULD BE APPROVED

22. Pursuant to the DIP Facility, the DIP Lenders will provide new money first-out delayed-draw term loans totaling up to $250 million in an aggregate principal amount, *plus* applicable fees and premiums ("New Money DIP Loans"), as follows: (i) a principal amount of $125 million to be drawn in one borrowing following the entry of the Interim Order, (ii) a principal amount of $50 million to be drawn in one borrowing following the entry of the Final Order, and (iii) a principal amount of $75 million to be drawn in one borrowing following the entry of the Confirmation Order, each as set forth in the Approved Budget.

23. Additionally, the DIP Facility includes a second-out roll up facility (the "Roll Up DIP Loans") pursuant to which, upon entry of the Interim Order, up to $500 million of the Prepetition First Lien Secured Obligations (together with accrued and unpaid interest thereon) held by the DIP Lenders (or any of their respective designated Approved Funds) will be rolled up and converted into a new tranche of the DIP Facility, on a cashless two dollars of Roll Up DIP Loans for every dollar of principal amount of New Money DIP Loans, for all purposes of the DIP Loan Documents as if originally funded on the Effective Date (as defined in the DIP Credit Agreement) (the "Roll Up").

24. The Roll Up is an indispensable part of the DIP Facility. Throughout the course of the extensive negotiations over the terms of the DIP Facility, the DIP Lenders consistently indicated that they would only agree to provide credit to the Debtors on the basis that they receive postpetition priority with respect to their Prepetition First Lien Secured Obligations at a 2:1 ratio. The DIP Lenders were unwilling to accept any other economic or temporal formulation of the Roll Up, and the parties' negotiations resulted in the roll up mechanic described in the DIP Motion. The DIP Lenders have insisted on the Roll Up based on, among other things, the fact that they

have agreed to extend financing on a basis that is junior to the liens securing the Prepetition ABL Facility, with respect to ABL Priority Collateral.

25. The DIP Facility would not be available absent the specific roll up mechanic embodied in the DIP Credit Agreement. Without the Roll Up, the DIP Lenders have indicated that they are unwilling to provide access to the proposed new money financing pursuant to the DIP Facility, which is critical to the Debtors' ongoing ordinary course operations. The DIP Lenders have insisted on the Roll Up is based on, among other things, the fact that they have agreed to extend financing on a basis that is junior to the liens securing the Prepetition ABL Facility, with respect to the ABL Priority Collateral.

26. Given the circumstances, the Debtors' agreement to the Roll Up of the DIP Facility represents an exercise of the Debtors' sound business judgment and should be approved.

27. Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Agent and the DIP Lenders. The Debtors have also agreed to pay the fees and expenses of counsel and other professionals retained by the DIP Agent and the DIP Lenders as provided for in the DIP Loan Documents. The premiums and fees payable under the DIP Loan Documents include a 2.5% Commitment Premium on the New Money Commitments, due and payable in kind on the date of entry of the Interim Order and added to the principal amount of the New Money DIP Loans, 2.5% Exit Premium on the DIP Obligations, due and payable in the form of New Money DIP Loans upon repayment in full or immediately prior to maturity, a 0.2% Fronting Fee on the New Money Commitments to be paid in accordance with the terms of the Fronting Fee Letter, and a 10% DIP Backstop Premium on the New Money Commitments, due and payable in kind on the date of entry of the Interim Order and to be added to the principal amount of the New Money DIP Loans. The DIP Loans

shall bear interest at a rate per annum equal to the adjusted SOFR rate (subject to a floor of 1.00% plus (a) with respect to the New Money DIP Loans, 10.00%, and (b) with respect to the Roll Up DIP Loans, 4.75%.

28. The Debtors believe that the interest, premiums, and fees to be paid under the DIP Facility are consistent with the market and are reasonable and appropriate, particularly in light of the circumstances of these Chapter 11 Cases and the robust marketing process undertaken, and represent the most favorable terms available to the Debtors.

29. The Debtors considered the premiums and fees when determining in their sound business judgment that the DIP Facility constituted the best, and the only, actionable terms on which the Debtors could obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates. Accordingly, the Court should authorize the Debtors to pay the interest, payments, fees, costs and expenses provided under the DIP Loan Documents in connection with the DIP Facility. Among other things, the premiums and fees payable under the DIP Loan Documents are particularly reasonable given the DIP Lenders' consent to the conversion of the DIP Loans into a combination of take-back debt and reorganized equity as set forth in the Restructuring Term Sheet (as defined in the Restructuring Support Agreement), subject to the terms and conditions of the DIP Loan Documents and the Plan (as defined in the Restructuring Support Agreement).

30. The DIP Facility (i) is the product of arm's-length, good-faith negotiation processes; (ii) is the best available postpetition financing options for the Debtors in light of the facts and circumstances of the Debtors and these Chapter 11 Cases; and (iii) contains reasonable and appropriate financial terms and conditions under the circumstances.

31. As a result of the DIP process, the DIP Facility represents the only viable financing option available under the circumstances and will provide the Debtors with immediate access to liquidity, allow access to Cash Collateral on a consensual basis, and otherwise represent the most realistic and operative path forward.

## VI. THE PREPETITION SECURED PARTIES ARE ADEQUATELY PROTECTED

32. Finally, the Prepetition Secured Parties are adequately protected as a result of the reasonably adequate protection package that the Debtors are providing pursuant to the DIP Orders. The Prepetition Secured Parties will receive adequate protection in exchange for their consent to use Cash Collateral and to prime their liens, in the form (i) replacement liens on any security interests in all DIP Collateral, (ii) superpriority administrative expense claims as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (iii) with respect to the Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties, accrued but unpaid interest at the non-default rate as of the Petition Date and thereafter all interest due under the applicable Prepetition Loan Documents, (iv) the payment of all reasonable and documented fees and out-of-pocket expenses of the Prepetition ABL Agent, the Ad Hoc Lender Group and the Prepetition First Lien Agent, (v) financial reporting, and (vi) and, with respect to the Prepetition ABL Secured Parties, an adequate protection account in which the Debtors will fund an amount representing the diminution in the value of their prepetition collateral, in each case, in accordance with the terms and conditions set forth in the Interim Order and DIP Loan Documents. Moreover, the DIP Liens securing the DIP Facility will be junior to those securing the Prepetition ABL Facility, with respect to ABL Priority Collateral, and the proceeds of the DIP Facility will be utilized to fund the Debtors' continuing operations and these Chapter 11 Cases, including the sales process, all of which will maximize recoveries to the Debtors' stakeholders, including, in

14

particular, the Prepetition Second Lien Secured Parties and the Prepetition Second Lien Sidecar Secured Parties.

33. The Prepetition First Lien Secured Parties have consented to this adequate protection package.

## VII. CONCLUSION

34. The DIP Facility constitutes the best available solution to the Debtors' financing needs because it provides an actionable path forward in (and out of) these Chapter 11 Cases that maximizes value and provides much-needed improvements to their balance sheet upon emergence.

35. The Debtors lack viable postpetition financing alternatives to the DIP Facility. Based on my understanding of the Debtors' projections and liquidity position, the Debtors urgently require access to the DIP Facility. Therefore, the DIP Facility reflects the best possible financing currently available to the Debtors and that the terms thereof, taken as a whole, are reasonable under the facts and circumstances of these Chapter 11 Cases and necessary to preserve the Debtors' assets. As such, I believe that the DIP Facility should be approved.

\* \* \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: November 4, 2024              */s/ Christopher Grubb*
                                     Christopher Grubb
                                     Partner
                                     Ducera Partners LLC