## EXHIBIT D

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE PROPOSED RESTRUCTURING TRANSACTIONS OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH VOLUNTARY CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE ON THE TERMS AND SUBJECT TO THE CONDITIONS SET FORTH HEREIN.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS (AS DEFINED HEREIN) DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached hereto in accordance with <u>Section 14.02</u>, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Restructuring Support Agreement**" or this "**Agreement**") is made and entered into as of November 1, 2024 (the "**Execution Date**"), by and among the following parties:[1]

    (i)    Franchise Group, Inc. ("**FRG**"), a Delaware corporation, and each of its subsidiaries and Affiliates, including any parent entities, in each case, listed on **Exhibit A** to this

---

[1]    Capitalized terms used but not defined in the preamble and Recitals to this Agreement have the meanings ascribed to them in <u>Section 1.01</u>.

Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Ad Hoc Group (the Entities in this clause (i), collectively, the "**Company Parties**"); and

(ii)    the undersigned beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, First Lien Claims (the "**Consenting First Lien Lenders**") that have executed and delivered counterpart signature pages to this Agreement or a Joinder to counsel to the Company Parties and counsel to the Ad Hoc Group.

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting First Lien Lenders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the restructuring term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**", and together with the DIP Term Sheet, and including all exhibits, annexes, and schedules thereto, collectively, the "**Term Sheets**" and, such transactions as described in this Agreement (including the Term Sheets) and the Definitive Documents, in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement, and including all exhibits, annexes, and schedules thereto, collectively, the "**Restructuring Transactions**");

**WHEREAS**, the Parties intend to implement the Restructuring Transactions pursuant to this Agreement and the other Definitive Documents by (i) commencing Store-Closing and Liquidation Sales at American Freight and (ii) either (a) effectuating a sale of all or substantially all of the remaining assets of the Debtors, which may be through one or more sales of the assets or Equity Interests of the Debtors, as further set forth herein, pursuant to sections 363 or 1129 of the Bankruptcy Code and the Bidding Procedures (each, a "**Sale Transaction**") or (b) consummating, pursuant to the Plan, the equitization of all allowed First Lien Claims into 100% of Reorganized Common Equity (subject to dilution from (1) the MIP (as defined in the Restructuring Term Sheet), (2) the DIP Premium Conversion (as defined in the Restructuring Term Sheet), if applicable, (3) the DIP Equitization (as defined in the Restructuring Term Sheet), and (4) the New Warrants, if applicable), as further set forth in the Restructuring Term Sheet (a "**Plan Transaction**"), in each case, by having the Debtors commence voluntary cases under chapter 11 of the Bankruptcy Code (the cases commenced, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), on the terms and conditions set forth in this Agreement (including the Term Sheets); provided that, subject to Section 8 hereof, in the event that a Sufficient Bid has not been received by the Bid Deadline, the Sale Process shall be terminated and the Plan Transaction shall be implemented; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Term Sheets.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**   *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>ABL Claims</u>**" means any Claim on account of ABL Loans arising under or pursuant to the ABL Credit Agreement or the other ABL Loan Documents.

"**<u>ABL Credit Agreement</u>**" means that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as a borrower, and the other borrowers and guarantors party thereto, the ABL Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**<u>ABL Credit Agreement Agent</u>**" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent for the lenders under the ABL Credit Agreement.

"**<u>ABL Loan Documents</u>**" means the ABL Credit Agreement and any Financing Agreements (as defined in the ABL Credit Agreement).

"**<u>ABL Loans</u>**" means the loans arising under or pursuant to the ABL Credit Agreement.

"**<u>Ad Hoc Group</u>**" means that certain ad hoc group of Consenting First Lien Lenders, represented by, among others, Paul Hastings and Lazard, as may be reconstituted from time to time.

"**<u>Ad Hoc Group Advisors</u>**" means (a) Paul Hastings LLP, as counsel to the Ad Hoc Group ("**<u>Paul Hastings</u>**"), (b) Lazard Frères & Co., as financial advisor to the Ad Hoc Group ("**<u>Lazard</u>**"), (c) Landis Rath & Cobb LLP, as Delaware counsel to the Ad Hoc Group, and (d) such other professionals that may be retained by or on behalf of the Ad Hoc Group (including the retention of any such professional made by Paul Hastings), solely in the case referred to in this clause (d), with the consent of the Company Parties (each individually an "**<u>Ad Hoc Group Advisor</u>**").

"**<u>Affiliate</u>**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.  For the avoidance of doubt, none of (a) Conn's, Inc., (b) B. Riley Financial Inc. and (c) each of their respective Affiliates (excluding Freedom VCM Holdings, LLC and its subsidiaries) shall be "Affiliates" of the Company Parties for purposes of this Agreement.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached hereto in accordance with <u>Section 14.02</u> (including the Term Sheets, which are expressly incorporated herein and made a part of this Agreement).

"**<u>Agreement Effective Date</u>**" has the meaning set forth in <u>Section 2.01</u>.

"**Agreement Effective Period**" means, with respect to a Party, the period from (a) the later of (i) the Agreement Effective Date and (ii) the date such Party becomes a Party to this Agreement, to (b) the Termination Date applicable to that Party.

"**Alternative Restructuring**" means (a) any sale, disposition, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (debt or equity, including any debtor-in-possession financing or exit financing), use of cash collateral, liquidation or winding up, exchange offer, tender offer, asset sale, share issuance, consent solicitation, recapitalization, plan of reorganization, share exchange, business combination, joint venture, partnership, or similar transaction involving any one or more Company Parties or any controlled Affiliates of the Company Parties or the debt, equity, or other interests in any one or more Company Parties or any controlled Affiliates of the Company Parties, other than as contemplated by this Agreement, including the Term Sheets, and other than actions taken in the ordinary course of business, or (b) any other transaction involving one or more Company Parties or any controlled Affiliates of the Company Parties that is an alternative to and/or inconsistent with the Restructuring Transactions.  For the avoidance of doubt, nothing in this Agreement shall prohibit the Company Parties from soliciting either (i) debtor-in-possession financing proposals or (ii) proposals to use cash collateral, in each case, prior to the Petition Date; provided that the Company Parties cannot enter into any such debtor-in-possession financing or agreement to use cash collateral without either (x) the consent of the Required Consenting First Lien Lenders or (y) an exercise of their fiduciary out and termination of this Agreement, in each case in accordance with Section 12.02(c), to the extent applicable.

"**Alternative Restructuring Proposal**" means any material plan, inquiry, proposal, offer, bid, term sheet or agreement, whether written or oral, with respect to an Alternative Restructuring. For the avoidance of doubt, any bid received by the Company Parties in connection with the Sale Process shall not constitute an Alternative Restructuring Proposal.

"**American Freight**" means American Freight FFO, LLC, Franchise Group Newco Intermediate AF, LLC, and each of Franchise Group Newco Intermediate AF, LLC's subsidiaries.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" has the meaning set forth in the Recitals to this Agreement.

"**Bid Deadline**" has the meaning set forth in Section 4.01(i).

"**Bidding Procedures**" means procedures approved pursuant to the Bidding Procedures Order governing the submission and evaluation of bids to purchase all or substantially all of the Debtors' assets (excluding the assets of American Freight that are subject to the Store-Closing and Liquidation Sales).

"**Bidding Procedures Motion**" means the motion to be filed by the Debtors in the Chapter 11 Cases seeking entry of the Bidding Procedures Order, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving the Bidding Procedures, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

"**Causes of Action**" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the date hereof, in contract, tort, Law, equity, or otherwise.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interest in, any Company Party.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Restructuring Transactions between FRG, on the one hand, and any Consenting First Lien Lender, on the other.

"**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Consent**" means any consent, novation, approval, authorization, qualification, waiver, registration or notification to be obtained from, filed with or delivered to a Governmental Entity or any other Person.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases, which shall be all of the parties set forth in **Exhibit A** to this Agreement.

"**Definitive Documents**" means, collectively, each of the documents listed in (and subject to the terms of) Section 3.01, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Agent**" means the administrative and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement, each of which shall be acceptable to the Required Lenders (as defined therein).

"**DIP Credit Agreement**" means the debtor-in-possession financing agreement by and among certain Company Parties, the DIP Agent, and the lenders party thereto setting forth the terms of the DIP Facility, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Documents**" means, collectively, the DIP Motion, the DIP Orders, and the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Facility**" means the loans under the debtor-in-possession financing facility on the terms and conditions set forth in the DIP Term Sheet.

"**DIP Motion**" means the motion filed by the Company Parties seeking entry of the DIP Orders, together with all exhibits thereto and any declarations, affidavits or other documents filed in connection with such motion, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Orders**" means the Interim DIP Order and Final DIP Order.

"**DIP Term Sheet**" means the debtor in possession financing term sheet attached as Exhibit 1 to the Restructuring Term Sheet.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan and all exhibits, appendices, schedules, related documents, ballots, and procedures related to the solicitation of votes to accept or reject the Plan, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, and any supplements, modifications and amendments thereto, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement as a disclosure statement meeting the applicable requirements of the Bankruptcy Code and, to the extent necessary, approving the related Solicitation Materials, which

shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interest**" means, collectively, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, and any other equity, ownership, membership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, or other equity, ownership, membership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exchange Act**" means the Securities and Exchange Act of 1934, as amended.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Executory Contract**" means any contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

"**Existing Equity Interest**" means any Equity Interest in a Company Party existing as of the Agreement Effective Date.

"**Existing Intercreditor Agreement**" means, collectively, that certain (i) Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, among Franchise Group, Inc., the other grantors referred to therein, the First Lien Credit Agreement Agent, as collateral agent, and the Second Lien Credit Agreement Agent, and (ii) Amended Intercreditor Agreement, dated as of November 22, 2021, among the ABL Credit Agreement Agent, the First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent, Franchise Group, Inc., Valor Acquisition, LLC, Franchise Group Newco Intermediate AF, LLC Pet Supplies "Plus", LLC, as borrowers, the other borrowers from time to time party thereto, and the other loan parties from time to time party thereto, in each case, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"**Final DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the First Lien Lenders on a final basis.

"**Finance Documents**" means, collectively, (a) the First Lien Credit Agreement, and (b) all other documents entered into pursuant to or in connection with the foregoing document in clause (a) of this definition (including, but not limited to, any cash management arrangements and ancillary facilities).

"**First Day Pleadings**" means the first-day and second-day motions, pleadings, applications and related orders that are necessary and/or desirable to file upon the commencement

of the Chapter 11 Cases, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**First Lien Claims**" means any Claim on account of First Lien Loans arising under or pursuant to the First Lien Credit Agreement or the other First Lien Loan Documents.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as lead borrower, the other borrowers and guarantors party thereto, the First Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**First Lien Credit Agreement Agent**" means Wilmington Trust, National Association (as successor to JPMorgan Chase Bank, N.A.), in its capacity as successor administrative agent and successor collateral agent for the First Lien Lenders.

"**First Lien Lenders**" means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, First Lien Claims.

"**First Lien Loan Documents**" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"**First Lien Loans**" means the term loans arising under or pursuant to the First Lien Credit Agreement.

"**FRG**" has the meaning set forth in the preamble to this Agreement.

"**Governmental Entity**" means any U.S. or non-U.S. federal, state, local, or foreign government or any agency, bureau, board, commission, court, or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization. For the avoidance of doubt, the term Governmental Entity includes any Governmental Unit (as such term is defined in section 101(27) of the Bankruptcy Code).

"**HoldCo Credit Agreement**" means that certain Credit Agreement, dated as of August 21, 2023, among Freedom VCM, Inc., as borrower, Freedom VCM Interco, Inc., as holdings, Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**HoldCo Entities**" means Freedom VCM Holdings, LLC, Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, Freedom VCM Receivables, Inc., Freedom VCM Interco, Inc., and Freedom VCM, Inc., collectively.

"**HoldCo Loans**" means the term loans arising under or pursuant to the HoldCo Credit Agreement.

"**Initial Parties**" has the meaning set forth in <u>Section 2.01</u>.

"**Interest**" means any and all issued, authorized, or outstanding Equity Interests in any Debtor, whether or not transferable, and all rights arising with respect thereto.

"**Interim DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the First Lien Lenders on an interim basis.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including, in each case, any common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ or other legal requirement, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Entity of competent jurisdiction.

"**Limited Waiver Amendment**" means that certain Fourth Amendment to First Lien Credit Agreement, dated as of August 19, 2024 among FRG, the other Company Parties party thereto, the First Lien Lenders party thereto, and the First Lien Credit Agreement Agent.

"**Liquidator**" means Hilco Merchant Resources, LLC or another liquidation consultant acceptable to the Required Consenting First Lien Lenders and on terms acceptable to the Required Consenting First Lien Lenders to advise the Company Parties in connection with, among other things, the liquidation of American Freight and the Store-Closing and Liquidation Sales of American Freight.

"**Management Conference Call**" has the meaning set forth in <u>Section 7.01(m)</u>.

"**Manager**" has the meaning set forth in <u>Section 14.21</u>.

"**Milestone**" or "**Milestones**" has the meaning set forth in <u>Section 4.01</u>.

"**New Organizational Documents**" means the new Organizational Documents of the Reorganized Debtors, to be entered into on the Plan Effective Date, including certificates of incorporation, limited liability company agreements, stockholders or shareholders agreements, operating agreements, equity subscription or purchase agreements, charters or by-laws, which shall be consistent in all material respects with this Agreement and the applicable terms of the Restructuring Term Sheet, and otherwise in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**New TopCo**" means Franchise Group, Inc. or any other Entity designated as such that will, directly or indirectly, own 100% of the Equity Interests in, or substantially all of the assets of, Franchise Group, Inc. upon consummation of the Restructuring Transactions, as mutually agreed by the Company Parties and the Required Consenting First Lien Lenders.

"**New Warrants**" means warrants exercisable for Reorganized Common Equity on the terms and conditions set forth in the Restructuring Term Sheet.

"**New Warrants Documentation**" means any and all agreements, certificates, instruments or other documents required to implement, issue, and distribute, or that otherwise govern or evidence, the New Warrants, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**No Recourse Party**" has the meaning set forth in Section 14.24.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as by-laws or a partnership agreement, or an operating, limited liability company or members agreement).

"**Outside Date**" shall mean May 1, 2025, as such date may be extended by the Required Consenting First Lien Lenders for up to three (3) consecutive thirty (30) day periods.

"**Parties**" means the Initial Parties and any other Consenting First Lien Lender that becomes party to this Agreement in accordance with this Agreement.

"**Permits**" means any license, permit, registration, authorization, approval, certificate of authority, accreditation, qualification, or similar document or authority that has been issued or granted by any Governmental Entity or Third Party Association, if applicable.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, a Third Party Association, or any legal Entity or association.

"**Petition Date**" means the first date any of the Company Parties other than the HoldCo Entities commences a Chapter 11 Case.

"**Plan**" means a joint prearranged chapter 11 plan of reorganization for the Debtors through which the Restructuring Transactions will be effectuated, which plan shall be consistent with the Restructuring Term Sheet and the other applicable provisions of this Agreement (including the other Term Sheets), and otherwise in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Plan Effective Date**" has the meaning ascribed to such term in the Restructuring Term Sheet.

"**Plan Release**" means customary mutual releases by the Parties to be included in the Plan as set forth in the Restructuring Term Sheet, and otherwise in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Plan Supplement**" means any compilation of documents and forms of documents (including term sheets), agreements, schedules, and exhibits to the Plan, including (i) the New Organizational Documents, (ii) the Schedule of Retained Causes of Action, (iii) the Take-Back Debt Documents, (iv) the Restructuring Transactions Memorandum, (v) the Rejected Contracts/Lease List, and (vi) any and all other documents necessary to effectuate the Restructuring Transactions or that are contemplated by the Plan subject to this Agreement, which shall be filed by the Debtors prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion, and consistent with the Term Sheets, where applicable.

"**Plan Transaction**" has the meaning set forth in the Recitals to this Agreement.

"**Prepetition HoldCo Loan Claims**" means any Claim on account of HoldCo Loans arising under or pursuant to the HoldCo Credit Agreement.

"**PSP**" means, collectively, Franchise Group Intermediate PSP, LLC and each of its subsidiaries.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests, and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Rejected Contracts/Lease List**" means the list (as determined by the Debtors) of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto), if any, that will be rejected pursuant to the Plan.

"**Related Fund**" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person, or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

"**Reorganized Common Equity**" means the common Equity Interests of the Reorganized Debtors authorized under the New Organizational Documents of the Reorganized Debtors and issued on the Plan Effective Date pursuant to the Plan Transaction or in connection with the consummation of the Sale Transaction.

"**Reorganized Debtors**" means any Debtor, or any successor thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Plan Effective Date, including New TopCo.

"**Required Consenting First Lien Lenders**" means, as of the relevant date, Consenting First Lien Lenders that are members of the Ad Hoc Group holding, collectively, in excess of 66

2/3% of the aggregate outstanding principal amount of First Lien Loans that are held by Consenting First Lien Lenders that are members of the Ad Hoc Group at such time.

"**Restructuring Support Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Restructuring Term Sheet**" has the meaning set forth in the Recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the Recitals to this Agreement.

"**Restructuring Transactions Memorandum**" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including a summary of any transaction steps necessary to complete the Plan, and shall otherwise be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Documents**" means all agreements, instruments, pleadings, orders or other related documents utilized to launch the Sale Process and implement and consummate the Sale Transaction, each of which shall contain terms and conditions that are materially consistent with this Agreement, and otherwise be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Sale Order**" means the order entered by the Bankruptcy Court authorizing and approving the Sale Transaction, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Sale Process**" has the meaning set forth in the Restructuring Term Sheet.

"**Sale Toggle Event**" means entry into one or more qualifying asset purchase agreements or other definitive document to consummate a Sale Transaction, solely to the extent entered into in connection with a Sufficient Bid and in compliance with the Bidding Procedures Order.

"**Sale Transaction**" has the meaning set forth in the Recitals to this Agreement.

"**Schedule of Retained Causes of Action**" means the schedule of Causes of Action that shall vest in the Reorganized Debtors on the Plan Effective Date, which will be contained in the Plan Supplement.

"**Second Lien Claims**" means any Claim on account of term loans arising under or pursuant to the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., and the other borrowers and guarantors party thereto, the Second Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**Second Lien Credit Agreement Agent**" means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the lenders under the Second Lien Credit Agreement.

"**Second Lien Pari Passu Claims**" means any Claim on account of term loans arising under or pursuant to the Second Lien Pari Passu Credit Agreement.

"**Second Lien Pari Passu Credit Agreement**" means that certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, among Franchise Group, Inc., and the other borrowers and guarantors party thereto, the Second Lien Pari Passu Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**Second Lien Pari Passu Credit Agreement Agent**" means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the lenders under the Second Lien Pari Passu Credit Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all documents, ballots, forms and other materials provided in connection with solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code (other than the Disclosure Statement), each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Store-Closing and Liquidation Sales**" has the meaning set forth in the Restructuring Term Sheet.

"**Store-Closing and Liquidation Sales Documents**" means all documents or pleadings necessary or desirable to facilitate the Store-Closing and Liquidation Sales, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Sufficient Bid**" has the meaning set forth in the Restructuring Term Sheet.

"**Take-Back Debt Agent**" means the administrative agent for the Take-Back Debt Lenders under the Take-Back Debt Documents, or any successor administrative agents thereunder.

"**Take-Back Debt Credit Agreement**" means the credit agreement governing or evidencing the Take-Back Debt Facility to be entered into on the Plan Effective Date by and among Reorganized Debtors, the guarantors from time to time party thereto, the Take-Back Debt Lenders, the Take-Back Debt Agent, and the other Entities party thereto from time to time.

"**Take-Back Debt Documents**" means the Take-Back Debt Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Take-Back Debt Facility**" means the take-back debt financing facility reflecting the terms and conditions set forth in the Restructuring Term Sheet.

"**Take-Back Debt Lenders**" means the lenders party to the Take-Back Debt Credit Agreement.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Taxes**" means all present and future taxes, levies, imposts, deductions, charges, assessments, duties and withholdings and any charges of a similar nature (including interest, additions to tax, and penalties with respect thereto) that are imposed by any government or other taxing authority.

"**Term Sheets**" has the meaning set forth in the Recitals to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement is effective in accordance with Sections 12.01, 12.02, 12.03, or 12.04.

"**Third Party Association**" means any trade, industry, business or sector association, body, group or council, or similar Entity.

"**Transaction Expenses**" means all reasonable and documented fees, costs and expenses of each of the Ad Hoc Group Advisors in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, including any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, and, to the extent applicable, consistent with any engagement letters or fee reimbursement letters entered into between the applicable Company Parties, on the one hand, and any Ad Hoc Group Advisor, on the other hand (as supplemented and/or modified by this Agreement).

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, loan, grant, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions); provided however, that any pledge in favor of a bank or broker dealer at which a Consenting First Lien Lender maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally, shall not be deemed a "Transfer" for any purposes hereunder; provided, further, that if a pledge or encumbrance exists, the pledgor maintains its voting rights for purposes of this Agreement.

"**Transferee Qualified Marketmaker**" has the meaning set forth in Section 9.04.

"**Unexpired Lease**" means any lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

1.02.   <u>Interpretation</u>.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; <u>provided</u> that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)   references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)   the use of "include" or "including" is without limitation, whether stated or not; and

(j)   (i) the phrase "counsel to the Company Parties" refers in this Agreement to each counsel specified in <u>Section 14.10(a)</u> and (ii) "counsel to the Ad Hoc Group" refers in this Agreement to each counsel specified in <u>clause (a)</u> in the definition of "Ad Hoc Group Advisors" in <u>Section 1.01</u>.

**Section 2.**   *Effectiveness of this Agreement*.

2.01.   This Agreement shall become effective and binding upon each of the parties that has executed and delivered counterpart signature pages to this Agreement on the date on which all of the following conditions have been satisfied or waived by the applicable Party or Parties in

accordance with this Agreement (such date, the "**Agreement Effective Date**" and such parties, the "**Initial Parties**"):

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and counsel to the Ad Hoc Group;

(b)    the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and counsel to the Ad Hoc Group: holders of at least 50% in number of holders of First Lien Loans and at least 66 2/3% of the aggregate outstanding principal amount of First Lien Loans, in each case, as mutually confirmed by the Company Parties and the Ad Hoc Group, as of the Agreement Effective Date (which may be by email from counsel);

(c)    the Company Parties shall have paid to the applicable advisors all accrued and unpaid Transaction Expenses incurred up to (and including) the Agreement Effective Date in accordance with <u>Section 14.20(a)</u>;

(d)    counsel to the Company Parties shall have given notice to counsel to the Ad Hoc Group in the manner set forth in <u>Section 14.10</u> hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this <u>Section 2.01</u> have occurred.

**Section 3.    *Definitive Documents*.**

3.01.    The Definitive Documents governing the Restructuring Transactions shall include this Agreement (including the Term Sheets) and all other agreements, instruments, pleadings, orders, forms, questionnaires and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring Transactions, including each of the following, as applicable:

(a)    any documents in connection with any First Day Pleadings and all orders sought pursuant thereto, including any cash management orders and critical vendor orders;

(b)    the DIP Documents (including the DIP Motion and DIP Orders);

(c)    the Disclosure Statement;

(d)    the Disclosure Statement Order;

(e)    the Solicitation Materials;

(f)    the Plan, including the Plan Release;

(g)    the Plan Supplement;

(h)    the Confirmation Order;

(i)      the Take-Back Debt Documents;

(j)      the New Organizational Documents;

(k)      the Bidding Procedures Motion;

(l)      the Bidding Procedures Order;

(m)     the Sale Documents, if applicable;

(n)      the Sale Order, if applicable;

(o)      the New Warrants Documentation;

(p)      the Restructuring Transactions Memorandum;

(q)      the Store-Closing and Liquidation Sales Documents;

(r)      such other material agreements, instruments and definitive documentation relating to a recapitalization or restructuring of the Company Parties as is necessary or desirable to support, facilitate, implement, document, otherwise give effect to, or consummate all or any part of the Restructuring Transactions; and

(s)      any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents and/or agreements relating to any of the foregoing.

3.02.   The Definitive Documents (other than this Agreement) remain subject to negotiation and completion, as applicable.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement, and shall otherwise be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders in their sole discretion.

**Section 4.**     *Milestones; Consummation of the Restructuring Transactions.*

4.01.   On and after the Agreement Effective Date, the Company Parties shall implement the Restructuring Transactions in accordance with the following milestones (each, a "**Milestone**", together, the "**Milestones**"), in each case, unless extended or waived in writing by the Required Consenting First Lien Lenders in their sole discretion (which extension or waiver can be provided via e-mail from counsel to the Required Consenting First Lien Lenders):

(a)      no later than November 4, 2024, the Company Parties shall have delivered substantially complete drafts of the First Day Pleadings, the DIP Documents (including the DIP Motion and the proposed Interim DIP Order), the Bidding Procedures Motion, the proposed Bidding Procedures Order, the Plan, the Disclosure Statement, and the Solicitation Materials to the Ad Hoc Group Advisors;

17

(b)      no later than November 4, 2024, the Company Parties shall have delivered a confidential information memorandum in connection with the Sale Process to the Ad Hoc Group Advisors;

(c)      no later than November 4, 2024, the Company Parties shall have engaged the Liquidator pursuant to that certain Letter Agreement Governing Inventory Disposition;

(d)      no later than November 4, 2024, the Petition Date shall have occurred;

(e)      no later than one (1) day after the Petition Date, the Debtors shall have filed with the Bankruptcy Court the First Day Pleadings, the DIP Motion (including the proposed Interim DIP Order), and the Bidding Procedures Motion (including the proposed Bidding Procedures Order);

(f)      no later than three (3) days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court the Plan, the Disclosure Statement, and the Solicitation Materials;

(g)      no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(h)      no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving procedures for the Store-Closing and Liquidation Sales at American Freight;

(i)      no later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order, which shall require, among other things, the submission of any (i) non-binding indications of interest on or before forty (40) days after the Petition Date and (ii) Qualified Bids (as defined in the Bidding Procedures) by no later than eighty (80) days after the Petition Date (the "**Bid Deadline**"); provided that the Sale Process shall not be terminated prior to the expiration of the Bid Deadline;

(j)      no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(k)      no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have approved the Disclosure Statement and the Solicitation Materials;

(l)      to the extent more than one Sufficient Bid is received by the Bid Deadline, by no later than eighty-five (85) days after the Petition Date, the Debtors shall commence an auction for the Debtors' assets in accordance with the terms of the Bidding Procedures Order; provided that if there is only one Sufficient Bid received by the Bid Deadline, then the Sale Toggle Event shall occur;

(m)      to the extent more than one Sufficient Bid is received by the Bid Deadline, no later than ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order; provided that if there is not more than one Sufficient Bid received by the Bid Deadline, then the Bankruptcy Court shall have entered the Sale Order no later than eighty-seven (87) days after the Petition Date;

(n)      no later than ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(o)      no later than the earlier of (i) ten (10) days after entry of the Confirmation Order and/or the Sale Order, if applicable (ii) one hundred twenty (120) days after the Petition Date, the Plan Effective Date shall have occurred and all the Restructuring Transactions (irrespective of whether the Restructuring Transactions occur pursuant to the Plan Transaction or the Sale Transaction) shall have been implemented and consummated.

**Section 5.**     ***Commitments of the Consenting First Lien Lenders***.

5.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)      During the Agreement Effective Period, each Consenting First Lien Lender, on a several and not joint basis, agrees, in respect of all of its Company Claims/Interests, subject to <u>Section 6</u> hereof, to:

(i)      support the Restructuring Transactions, act in good faith, and vote or consent, to the extent applicable, and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions; <u>provided</u> that no Consenting First Lien Lender shall be obligated to (x) waive (to the extent waivable by such Consenting First Lien Lender) any condition to the consummation of any part of the Restructuring Transactions set forth in (or to be set forth in) any Definitive Document, or (y) approve any Definitive Document that is not in form and substance consistent with its consent rights as set forth herein;

(ii)      subject to the terms of any applicable Confidentiality Agreements, use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders, to the extent reasonably prudent, including by making the Ad Hoc Group Advisors available to such other stakeholders or their advisors, as applicable, for the purposes of responding to inquiries by such stakeholders and/or obtaining support for the Restructuring Transactions;

(iii)      forbear from exercising or directing any Person to exercise remedies on account of, any breach by any Company Party of, and any default or event of default (howsoever described) under, the applicable Finance Documents that shall or may arise as a result of, directly or indirectly, any of the steps, actions, or transactions expressly required or contemplated by, or expressly undertaken pursuant to this Agreement, the Restructuring Term Sheet, any Definitive Document, and commencement of any Chapter 11 Cases; <u>provided</u> that (x) no Consenting First Lien Lender shall be required hereunder to provide any trustee and/or agent or other Person under any applicable Finance Documents with any additional indemnities or similar undertakings in connection with taking any such action other than those contained in any applicable Finance Documents, (y) no Consenting First Lien Lender shall be required to take any actions contemplated by this <u>Section 5.01(a)(iii)</u> unless expressly contemplated by this Agreement, and (z) nothing in this <u>Section 5.01(a)(iii)</u> shall require the Consenting First Lien Lenders to waive any default or event of default, or any of the obligations arising under, or liens or other encumbrances created by,

any of the Finance Documents; provided, further, for the avoidance of doubt, that unless the Restructuring Transactions are consummated, it is understood and agreed that any forbearance granted pursuant to this Section 5.01(a)(iii) shall be effective during the Agreement Effective Period only and shall not be deemed to be a permanent forbearance from the exercise of remedies on account of any default or event of default arising under the First Lien Credit Agreement; and

(iv)     without limiting any rights under Section 12.01, negotiate in good faith and, to the extent it is contemplated to become a party thereto, execute, deliver, and use commercially reasonable efforts to perform their obligations under, and consummate the transactions contemplated by the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement.

(b)     During the Agreement Effective Period, each Consenting First Lien Lender on a several and not joint basis, agrees, in respect of all of its Company Claims/Interests, subject to Section 6 hereof, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose or file any Alternative Restructuring;

(iii)     file or join in any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, is not consistent with this Agreement and the Restructuring Transactions, including the Sale Transaction or the Plan Transaction, as applicable;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     exercise any right or remedy for the enforcement, collection, or recovery of any of Company Claims/Interests;

(vi)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(vii)     direct any other Person to take any of the actions listed in clauses (i) through (vi) of this Section 5.01(b).

5.02.     Commitments with Respect to Chapter 11 Cases.

(a)     In addition to the commitments, covenants, agreements and other obligations set forth in Section 5.01, during the Agreement Effective Period, each Consenting First Lien Lender that is entitled to vote to accept or reject the Plan pursuant to its terms, on a several and not joint basis, agrees that it shall:

(i)      subject to receipt by such Consenting First Lien Lender of the Disclosure Statement and the Solicitation Materials, vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Disclosure Statement and any related Solicitation Materials;

(ii)      subject to receipt by such Consenting First Lien Lender of the Disclosure Statement and the Solicitation Materials, not object to the Plan Releases, and, to the extent it is permitted to elect whether to opt out of the Plan Releases, elect not to opt out of the Plan Releases by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)      to the extent applicable, fund its committed portion of the DIP Facility as and when due pursuant to the terms of the DIP Documents;

(iv)      cooperate, act in good faith, and use commercially reasonable efforts to consummate the Restructuring Transactions, including the Sale Transaction or the Plan Transaction, as applicable;

(v)      support, and not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement;

(vi)      take actions as required by the Bankruptcy Court; and

(vii)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; provided that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Consenting First Lien Lender at any time following the expiration or termination of the Agreement Effective Period with respect to such Consenting First Lien Lender (it being understood that any termination of the Agreement Effective Period with respect to a Consenting First Lien Lender shall entitle such Consenting First Lien Lender to change its vote in accordance with sections 1126 and 1127 or any other applicable provision of the Bankruptcy Code, and the Solicitation Materials with respect to the Plan shall be consistent with this proviso).

**Section 6.      *Additional Provisions Regarding the Consenting First Lien Lenders' Commitments*.** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) subject to any Confidentiality Agreements in place as of the Agreement Effective Date, affect the ability of any Consenting First Lien Lender to consult with any other Consenting First Lien Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) or any foreign proceeding related to the Restructuring Transactions; (b) impair or waive the rights of any Consenting First Lien Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting First Lien Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of a Consenting First Lien Lender under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any

matter arising in the Chapter 11 Cases or any foreign proceeding, in each case, so long as the exercise of any such right is not inconsistent with such Consenting First Lien Lender's obligations under this Agreement; (e) limit the ability of a Consenting First Lien Lender to purchase, sell or enter into any transactions regarding the Company Claims/Interests, subject to the terms of this Agreement including <u>Section 9</u> hereof; (f) except as and to the extent explicitly set forth herein, constitute a waiver or amendment of any term or provision of any Finance Document; (g) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under any Finance Document; (h) except as and to the extent explicitly set forth in this Agreement, require any Consenting First Lien Lender to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting First Lien Lender; (i) prevent a Consenting First Lien Lender from taking any action that is required in order to comply with applicable Law; <u>provided</u> that if any Consenting First Lien Lender proposes to take any action that is otherwise inconsistent with this Agreement or the Restructuring Transactions in order to comply with applicable Law, such Consenting First Lien Lender shall provide, to the extent possible without violating applicable Law, at least five (5) Business Days' advance, written notice to the Parties; (j) prohibit any Consenting First Lien Lender from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (k) except as and to the extent explicitly set forth in this Agreement, limit the ability of any Consenting First Lien Lender to enforce the terms of the Existing Intercreditor Agreement (including exercising any rights or remedies available to the Consenting First Lien Lender); (l) require any Consenting First Lien Lender to fund or commit to fund any additional amounts (other than as agreed in connection with the DIP Facility) without such Consenting First Lien Lender's written consent; or (m) require or obligate any Consenting First Lien Lender to (i) waive (to the extent waivable by such Consenting First Lien Lender) any condition to the consummation of any part of the Restructuring Transactions set forth in (or to be set forth in) any Definitive Document, or (ii) approve any Definitive Document that is not in form and substance consistent with its consent rights set forth herein.

**Section 7.**     ***Commitments of the Company Parties***.

7.01.    <u>Affirmative Commitments</u>.  Except as set forth in <u>Section 8</u>, during the Agreement Effective Period, the Company Parties agree to:

(a)     support, act in good faith, and take all commercially reasonable actions necessary, or reasonably requested by the Required Consenting First Lien Lenders to implement and consummate the Restructuring Transactions as contemplated by this Agreement and the Restructuring Term Sheet, including by promptly (i) commencing the Store-Closing and Liquidation Sales at American Freight, (ii) commencing the Chapter 11 Cases and solicitation of the Plan pursuant to the Disclosure Statement and related Solicitation Materials in accordance with the applicable Milestones; (iii) launching the Sale Process to market all or substantially all of the remaining assets of the Debtors in order to determine the highest and/or best offers for the purchase of such assets subject to the terms of the Bidding Procedures Order and this Agreement; and (iv) (A) to the extent the Sale Toggle Event shall have occurred, consummating the Sale Transaction, and (B) to the extent that a Sufficient Bid has not been received on or prior to the Bid Deadline, promptly terminating the Sale Process, unless otherwise agreed by the Required Consenting First

Lien Lenders, and pursuing exclusively the Plan Transaction, in each case in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all commercially reasonable steps necessary to address any such impediment, including, timely filing a formal objection to any motion, application or other proceeding filed with the Bankruptcy Court by any Person seeking the entry of an order: (i) directing the appointment of an examiner with expanded powers or a trustee; (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Cases; (iv) approving an Alternative Restructuring Proposal; (v) for relief that (x) is inconsistent with this Agreement in any material respect, or (y) would, or would reasonably be expected to, frustrate the purposes of this Agreement in any material respect, including by preventing the consummation of the Restructuring Transactions; (vi) modifying or terminating any Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization; or (vii) challenging (x) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting First Lien Lenders, or (y) the validity, enforceability or perfection of any lien or other encumbrance securing (or purporting to secure) any Company Claims/Interests of any of the Consenting First Lien Lenders;

(c)    use commercially reasonable efforts to obtain any and all Permits, Consents, and/or any other third-party approvals that are necessary for the implementation or consummation of any part of the Restructuring Transactions;

(d)    negotiate in good faith and execute, deliver, perform their obligations under, and consummate the transactions contemplated by, the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f)    subject to the consent rights set forth herein, (i) complete the preparation, as soon as reasonably practicable after the Execution Date, of the Disclosure Statement and any Solicitation Materials in order to commence the solicitation of the Plan in accordance with the Milestones, (ii) provide drafts of the Disclosure Statement, the Plan, any Solicitation Materials, and each other Definitive Document to, and afford a reasonable opportunity for comment and review of such documents by, the Ad Hoc Group Advisors, which opportunity of comment and review shall be not less than five (5) days in advance of any filing with the Bankruptcy Court; provided that if delivery of such document at least five (5) days in advance of such filing is impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable, and shall afford them a reasonable opportunity under the circumstances to comment on such documents, and (iii) consult with the Ad Hoc Group Advisors regarding the form and substance of the Disclosure Statement and Solicitation Materials, the Plan, and each other Definitive Document, sufficiently in advance of the filing with the Bankruptcy Court, and not file with the Bankruptcy Court the Disclosure Statement, Solicitation Materials, the Plan, and each other Definitive Document unless such document is in form and substance consistent with the

consent rights set forth herein; provided that the obligations of the Company Parties under this Section 7.01(f) shall in no way alter or diminish any right expressly provided to any applicable Consenting First Lien Lender under this Agreement to review, comment on, and/or consent to the form and/or substance of any document in accordance with the terms hereof;

(g)    to the extent permitted by Law, promptly notify the Ad Hoc Group Advisors in writing (email being sufficient) (and in any event, for items (i)-(vii) of this paragraph, within one (1) Business Day) of (i) the initiation, institution, or commencement of any proceeding by a Governmental Entity (or communications indicating that the same may be contemplated or threatened) involving any of the Company Parties (including any assets, Permits, businesses, operations, or activities of any of the Company Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (ii) the initiation, institution, or commencement by any Person of any proceeding involving any of the Company Parties (or communications indicating that the same may be contemplated or threatened) that would result in or is likely to have a material impact in any manner on any of the Company Parties' businesses (including any assets, Permits, businesses, operations, or activities of any of the Company Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (iii) the initiation, institution, or commencement of any proceeding by a Governmental Entity or other Person challenging the validity of the transactions contemplated by this Agreement or any other Definitive Document or seeking to enjoin, restrain, or prohibit this Agreement or any other Definitive Document or the consummation of the transactions contemplated hereby or thereby, (iv) any material breach by any of the Company Parties in any respect of any of their obligations, representations, warranties, or covenants set forth in this Agreement, (v) the happening or existence of any event that shall have made any of the conditions precedent to any Person's obligations set forth in (or to be set forth in) any of the Definitive Documents or this Agreement, including the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date", incapable of being satisfied prior to the Outside Date, (vi) the occurrence of a "Termination Event" pursuant to Section 12, and/or (vii) the receipt of notice from any Governmental Entity or other Person alleging that the Consent of such Person is or may be required under any Organizational Document, material contract, Permit, Law, or otherwise in connection with the consummation of any part of the Restructuring Transactions;

(h)    maintain the good standing and legal existence of each Company Party under the Laws of the state or jurisdiction in which it is incorporated, organized, or formed, except to the extent that any failure to maintain such Company Party's good standing arises solely as a result of the filing of the Chapter 11 Cases;

(i)    if any Company Party receives an Alternative Restructuring Proposal, (i) promptly notify the Ad Hoc Group Advisors (in each case, no later than one (1) Business Day after the receipt of such Alternative Restructuring Proposal), with such notification to include the material terms thereof (but not the identity of the Person(s) involved), and (ii) respond promptly to reasonable information requests and questions from the Ad Hoc Group Advisors with respect to the impact of such Alternative Restructuring Proposal on the Restructuring Transactions and any action taken or proposed to be taken by the Company Parties in response thereto, but not to include the identity of the Person(s) involved;

24

(j)      (i) conduct their businesses and operations in the ordinary course in a manner that is consistent with past practices and in compliance with Law, (ii) maintain their physical assets, properties, and facilities in their working order condition and repair as of the Agreement Effective Date, in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law (ordinary wear and tear and casualty and condemnation excepted), (iii) maintain their respective books and records in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law, (iv) maintain all of their material insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law, and (v) use commercially reasonable efforts to preserve intact their business organizations and relationships with third parties (including creditors, lessors, licensors, franchisees, vendors, customers, suppliers, and distributors) and employees in the ordinary course, in a manner that is consistent with past practices, in each case, except (1) as required by Law, (2) as required pursuant to the DIP Orders or as may be required to adhere to the terms of any applicable budget approved in connection with the DIP Facility (or as may otherwise be related thereto), (3) as otherwise agreed by the Required Consenting First Lien Lenders or (4) as otherwise expressly provided in this Agreement or for actions taken by any member of the Company Parties in connection with the Chapter 11 Cases (including, for avoidance of doubt, in connection with the Store-Closing and Liquidation Sales at American Freight) in accordance with the terms of this Agreement and the applicable Definitive Documents;

(k)      provide responses in a reasonably timely manner, whether by directing the Company Parties' advisors to respond or otherwise, to reasonable diligence requests from the Ad Hoc Group Advisors for purposes of the Consenting First Lien Lenders' due diligence investigation in respect of the assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs of the Company Parties;

(l)      unless the Sale Process has been terminated under the terms of this Agreement and/or the Sale Documents, if any Person seeks to submit a bid, indicates any interest in participating in the Sale Process, or otherwise communicates with any Company Party with respect to a potential Sale Transaction in each case, in writing (including by email): (i) promptly notify the Ad Hoc Group Advisors in writing (email being sufficient) with such notification accompanied by a copy of such bid or communication; (ii) use commercially reasonable efforts to promptly make any such Person available to the Ad Hoc Group Advisors, in each case, no later than one (1) Business Day after the receipt of any such bid or communication; and (iii) keep the Ad Hoc Group Advisors informed with respect to all material discussions, negotiations, and communications with any such Person;

(m)      (i) use commercially reasonable efforts to keep the Consenting First Lien Lenders informed about the operations of the Company Parties, (ii) use commercially reasonable efforts to direct the current employees, officers, advisors, and other representatives of the Company Parties to provide, to the Ad Hoc Group Advisors, upon written request to the Company Parties' advisors and subject to obtaining approval of the Company Parties (not to be unreasonably withheld or delayed), (1) reasonable access during normal business hours to the Company Parties' books, records, and facilities, and (2) upon written request to the advisors of the Company Parties (which may be by email), reasonable access to the senior management and advisors of the Company Parties for the purposes of evaluating the Company Parties' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs, and (iii) use commercially reasonable

efforts to arrange for a teleconference (the "Management Conference Call") to take place bi-weekly, which Management Conference Call shall (1) require participation by at least one senior member of the Company Parties' management team and permit participation by the Company Parties' counsel and advisors and such Consenting First Lien Lenders and their advisors as elect to participate therein, who shall be provided with an invitation to, and details of, such Management Conference Call as soon as reasonably practicable prior to the scheduled date therefor, and (2) be intended for purposes of discussing the Company Parties' financials and such other information and matters reasonably related thereto or reasonably requested by the Required Consenting First Lien Lenders;

(n)      if applicable, promptly certify upon request of any Consenting First Lien Lender that pursuant to 26 CFR § 1.1445-2, it is not a "United States real property holding corporation" as defined in the Internal Revenue Code of 1986 (as amended) and any applicable regulations promulgated thereunder;

(o)      unless the Sale Process has been terminated under the terms of this Agreement and/or the Sale Documents, host weekly telephone conference calls on Mondays at 2:00 p.m. (ET) among Ducera Securities LLC and Lazard to provide a status update on the Sale Process;

(p)      support the filing of a customary stock trading order that restricts (i) the accumulation and disposition of stock by Persons who own (as determined for tax Law purposes), or would own, more than approximately 4.5% of the equity of the Company Parties during the pendency of the Chapter 11 Cases, and (ii) the claiming of a worthlessness deduction under section 165 of the Tax Code with respect to the stock of any Company Party;

(q)      to the extent reasonably requested by the Required Consenting First Lien Lenders, commence a process to solicit a whole business securitization of PSP; and

(r)      implement the Restructuring Transactions in accordance with the Milestones, unless waived or extended in writing by the Required Consenting First Lien Lenders (which waiver or extension may be effected through email exchanged between counsel to the Company Parties and counsel to the Ad Hoc Group).

7.02.   Negative Commitments.   Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not, without the prior written consent of the Required Consenting First Lien Lenders, directly or indirectly:

(a)      object to, delay, impede, or take any other action with the intent to interfere with acceptance, implementation, or consummation of the Restructuring Transactions, other than pursuant to the express terms and conditions of this Agreement;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in, this Agreement (including the Term Sheets), the Plan or any of the other Definitive Documents, other than pursuant to the express terms and conditions of this Agreement;

(c)      (i) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or

effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions, including any Definitive Documents, that, in whole or in part, is not (x) consistent in any material respect with this Agreement or (y) otherwise in form and substance acceptable to the Required Consenting First Lien Lenders pursuant to their respective consent rights set forth herein, or, if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing, or (ii) waive, amend, or modify any of the Definitive Documents, or file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, in either case, which waiver, amendment, modification, or filing contains any provision that is not (x) consistent in all material respects with this Agreement and the Restructuring Term Sheet, or (y) otherwise acceptable to the Required Consenting First Lien Lenders pursuant to their consent rights set forth herein;

(d)     (i) seek discovery in connection with, prepare, or commence any proceeding or other action that challenges (1) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting First Lien Lenders, or (2) the validity, enforceability, or perfection of any lien or other encumbrance securing any Company Claims/Interests of any of the Consenting First Lien Lenders; (ii) otherwise seek to restrict any contractual rights of any of the Consenting First Lien Lenders under the Finance Documents; (iii) otherwise commence any action against any of the Consenting First Lien Lenders; or (iv) support any Person in connection with any of the acts described in clause (i) or clause (ii) of this Section 7.02(d);

(e)     assert, or support any assertion by any third party, that, in order to act on the provisions of Section 12 hereof, the Consenting First Lien Lenders shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and the Company Parties' hereby waive, to the greatest extent possible, the applicability of the automatic stay to the giving of any termination notice in accordance with Section 12 hereof); provided that nothing herein shall prejudice any Party's right to argue that the giving of such termination notice or the exercise of any remedy was not proper under the Agreement;

(f)     except as contemplated by this Agreement, consummate any transaction pursuant to any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements without the advance written consent of the Required Consenting First Lien Lenders;

(g)     grant or agree to grant any increase in the wages, salary, bonus, commissions, retirement benefits, severance, or other compensation or benefits of any director, manager, employee, or officer of any Company Party, whether scheduled prior to, as of or after the Agreement Effective Date, except for any increase that is done in the ordinary course of business consistent with past practices, in accordance with the Restructuring Transactions contemplated by this Agreement, or otherwise with the consent of the Required Consenting First Lien Lenders;

(h)     incur or commit to incur any capital expenditures, other than capital expenditures that are included in any applicable budget approved pursuant to the Interim DIP Order or Final DIP Order, except as approved by the Required Consenting First Lien Lenders;

(i)    make or change any material tax election (including, with respect to any Company Party that is treated as a partnership or disregarded Entity for U.S. federal income tax purposes, an election to be treated as a corporation for U.S. federal income tax purposes), file any material amended tax return, enter into any closing agreement with respect to Taxes for an amount greater than $50,000, consent to any extension or waiver of the limitations period applicable to any material Tax claim or assessment other than in the ordinary course of business, enter into any installment sale transaction, adopt or change any material accounting methods, practices, or periods for Tax purposes, make or request any Tax ruling, enter into any Tax sharing or similar agreement or arrangement (other than agreements entered in the ordinary course of business the primary purpose of which are not Taxes), or settle any Tax claim or assessment for an amount greater than $50,000;

(j)    take or permit any action that would result in a (i) disaffiliation of any Company Party from the Company Parties' consolidated income tax group under section 1502 of the Tax Code, (ii) realization of any material taxable income outside of the ordinary course of business of the Company Parties' business, or (iii) change of ownership of any Company Party under section 382 of the Tax Code, in each case, except as contemplated by the transactions described herein;

(k)    except to the extent permitted by Section 8.02, seek, solicit, knowingly encourage, propose, assist in, consent to, or vote for, enter into, pursue, consummate, or participate in any discussions or any agreement with any Person regarding, any Alternative Restructuring Proposal;

(l)    except to the extent permitted by this Agreement, amend or propose to amend any Company Party's certificate or articles of incorporation, certificate of formation, bylaws, limited liability company agreement, partnership agreement, or similar Organizational Documents;

(m)    commence the solicitation with respect to the Plan unless the Disclosure Statement and the Solicitation Materials shall be in form and substance consistent with the consent rights set forth herein; or

(n)    consummate the Restructuring Transactions unless each of the applicable conditions to the consummation of such transactions set forth in this Agreement, the Restructuring Term Sheet, the Disclosure Statement, and the other applicable Definitive Documents has been satisfied or waived by the applicable Persons in accordance with the terms of this Agreement and the applicable Definitive Documents.

**Section 8.    *Additional Provisions Regarding Company Parties' Commitments*.**

8.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent, upon advice of counsel, they determine, in good faith, that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement; provided that if (and on each occasion) a Company Party determines to take any

action or to refrain from taking any action with respect to the Restructuring Transactions in accordance with this Section 8.01, such Company Party shall provide written notice of such determination to the Ad Hoc Group Advisors promptly, and in no event, later than two (2) days of such Company Party making such determination.

8.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), except as may be set forth in the Bidding Procedures, each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) provide access to non-public information concerning any Company Party to any Entity that provides an unsolicited Alternative Restructuring Proposal and enters into with the Company Parties a reasonable and customary confidentiality agreement, nondisclosure agreement or agreement that includes confidentiality provisions, in any such case that covers such information; and (b) respond to unsolicited Alternative Restructuring Proposals received by any of the Company Parties; provided that if any Company Party receives an unsolicited Alternative Restructuring Proposal, then such Company Party shall (A) within two (2) days of receiving such proposal, notify counsel to the Ad Hoc Group of the receipt of such proposal; (B) provide counsel to the Ad Hoc Group with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (C) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from counsel to the Ad Hoc Group relating to such Alternative Restructuring Proposal.  At all times prior to the date on which the Company Parties enter into a definitive agreement with respect to an Alternative Restructuring, the Company Parties shall provide the Ad Hoc Group Advisors with all relevant information regarding (i) any negotiations and/or material discussions relating to any such Alternative Restructuring, and/or (ii) any amendments, modifications, or other changes to, or any further material developments of, any such Alternative Restructuring, in any such case as is necessary to keep such counsel contemporaneously informed as to the status and substance of such discussions, negotiations, amendments, modifications, changes, and/or developments.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**    *Transfer of Interests and Securities*.

9.01.    During the Agreement Effective Period, except pursuant to the consummation of the Restructuring Transactions, no Consenting First Lien Lender shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Exchange Act) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless either (i) the transferee executes and delivers to counsel to the Company Parties and counsel to the Ad Hoc Group, at or before the time such Transfer is effective, a Joinder or (ii) the transferee is a Consenting First Lien Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claims/Interests Transferred) to counsel to the Company Parties and counsel to the Ad Hoc Group within five (5) days after the occurrence of the Transfer.  For the avoidance of doubt, nothing in this Agreement shall alter the Company Parties' consent rights to Transfers in any applicable Finance Documents.

9.02.    Upon compliance with the requirements of Section 9.01, the transferee shall be deemed a Consenting First Lien Lender, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 9.01 shall be void *ab initio*.  Any Consenting First Lien Lender that effectuates a permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

9.03.    This Agreement shall in no way be construed to preclude the Consenting First Lien Lenders from acquiring additional Company Claims/Interests; provided that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting First Lien Lender be deemed subject to the terms of this Agreement and such Consenting First Lien Lender shall be deemed to have executed this Agreement in respect of all of its Company Claims/Interests (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties and counsel to the Ad Hoc Group); and (b) such Consenting First Lien Lender must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and counsel to the Ad Hoc Group.

9.04.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Joinder in respect of such Company Claims/Interests and shall not be subject to the requirements in the proviso of Section 9.03 hereof if: (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an Entity that is not an Affiliate, Related Fund, or affiliated Entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee; and (c) the Transfer otherwise is a permitted Transfer under Section 9.01. To the extent that a Consenting First Lien Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims/Interests that the Qualified Marketmaker acquires after the Agreement Effective Date from a holder of the Company Claims/Interests who is not a Consenting First Lien Lender without the requirement that the transferee be a Permitted Transferee.  For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims/Interests from a Consenting First Lien Lender and is unable to Transfer such Company Claims/Interests within the ten (10) Business Day-period referred to above, the Qualified Marketmaker shall execute and deliver a Joinder in respect of such Company Claims/Interests. Notwithstanding the immediately preceding sentence, a Qualified Marketmaker may Transfer any right, title, or interest in any Company Claims/Interests that it acquires from a Consenting First Lien Lender to another Qualified Marketmaker (the "**Transferee Qualified Marketmaker**") without the requirement that the Transferee Qualified Marketmaker execute and deliver to each of counsel to the Company Parties and counsel to the Ad Hoc Group, a Joinder in respect of such Company Claims/Interests or be a Permitted Transferee, if such Transferee Qualified Marketmaker Transfers the right, title or interest in such Company Claims/Interests within ten (10) Business Days of its acquisition from the Qualified Marketmaker to a transferee that (A) is a Consenting First Lien Lender or Permitted Transferee at the time of such Transfer or (B) becomes a Consenting First Lien Lender or Permitted Transferee by the date of settlement of such Transfer by signing a Joinder.   From the date of such Qualified Marketmaker's acquisition or such Company

Claims/Interests through the date such Company Claims/Interests are Transferred in accordance herewith, the Qualified Marketmaker shall vote such Company Claims/Interests as the Required Consenting First Lien Lenders shall direct.

9.05.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any Company Claims/Interests in favor of a bank or broker-dealer holding custody of such Company Claims/Interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests; provided that (a) such lien or encumbrance does not provide or otherwise entitle such party to any voting rights with respect to such Company Claims/Interests and (b) upon any foreclosure of any such lien or encumbrance, such bank or broker-dealer holding custody of such Company Claims/Interests shall become a party to this Agreement by executing a Joinder and become subject to, among other items, the restrictions on Transfer set forth in this Section 9.

9.06.    In connection with any Transfer permitted by this Section 9, each of the transferor and the transferee shall deliver to the Company Parties such information and documentation as reasonably requested by such Company Parties (including as requested by any transfer agent of such Company Parties) in order to validly effectuate such Transfer and/or substantiate compliance with any applicable law.

9.07.    In addition, a Person that owns or controls First Lien Claims may become a party hereto as a Consenting First Lien Lender by executing and delivering to counsel to the Company Parties and counsel to Ad Hoc Group a Joinder, in which event such Person shall be deemed to be a Consenting First Lien Lender hereunder to the extent of the First Lien Claims owned and controlled by such Person.

**Section 10.    *Representations and Warranties of Consenting First Lien Lenders*.**    Each Consenting First Lien Lender severally, and not jointly, represents and warrants that the following statements are true and correct, as of the date such Consenting First Lien Lender executes and delivers this Agreement or a Joinder, as applicable:

(a)    it (i) is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in such Consenting First Lien Lender's signature page to this Agreement or a Joinder, as applicable (subject to any Transfer by such Consenting First Lien Lender made after the Agreement Effective Date that is described in a notice delivered pursuant to Section 9.01), and (ii) having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in such Consenting First Lien Lender's signature page to this Agreement or a Joinder, as applicable (subject to any Transfer to such Consenting First Lien Lender made after the Agreement Effective Date that is described in a notice delivered pursuant to Section 9.01);

(b)    it has the full power and authority to act on behalf of, vote, and consent to matters concerning, such Company Claims/Interests (or, with respect to Company Claims/Interests subject to an agreement to purchase which has not closed as of the date hereof, will have such power and authority upon closing);

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting First Lien Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)      it has the full power to vote, approve changes to, and Transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law (or, with respect to Company Claims/Interests subject to an agreement to purchase which has not closed as of the date hereof, will have such power upon closing).

**Section 11.      *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties, on a several and not joint basis, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement or a Joinder, as applicable:

(a)      it is validly existing and in good standing under the Laws of the state or jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval (other than that of the BR Member and BK Member, each as defined in the Second Amended and Restated Limited Liability Company Agreement of Freedom VCM Holdings, LLC, dated January 19, 2024) is required by any other Person in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its Organizational Documents;

(d)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement or any other Person that have not been disclosed to all Parties to this Agreement.

**Section 12.      *Termination Events*.**

12.01.  <u>Consenting First Lien Lender Termination Events</u>.  This Agreement may be terminated with respect to all Parties by the Required Consenting First Lien Lenders upon the delivery to each other Party of a written notice in accordance with <u>Section 14.10</u> at any time upon the occurrence of the following events:

(a)    the execution, delivery, and/or filing of any Definitive Document that is not acceptable to the Required Consenting First Lien Lenders pursuant to their consent rights set forth herein that remains unacceptable to the Required Consenting First Lien Lenders for one (1) calendar day after such terminating Required Consenting First Lien Lenders promptly transmit a written notice to the Company Parties, which may be by email from the Ad Hoc Group Advisors to counsel to the Company Parties, detailing any such lack of acceptance.  For the avoidance of doubt, any such cure period shall apply solely to the Required Consenting First Lien Lenders' lack of consent;

(b)    the breach (or inaccuracy, as applicable) in any respect by a Company Party of any of the representations, warranties, covenants, or other obligations or agreements of the Company Parties set forth in this Agreement, which breach has a material impact on the Company Parties or the Restructuring Transactions, that remains uncured (if susceptible to cure) for five (5) Business Days after such terminating Required Consenting First Lien Lenders transmit a written notice to the Company Parties in accordance with <u>Section 14.10</u> detailing any such breach;

(c)    any of the Milestones is not achieved on the date set forth herein, except where such Milestone has been waived or extended by the Required Consenting First Lien Lenders, or the failure to achieve the Milestone is directly caused by, or results from, an act, omission, or delay by one or more Consenting First Lien Lender;

(d)    the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) days after such terminating Required Consenting First Lien Lenders transmit a written notice to the Company Parties in accordance with <u>Section 14.10</u> hereof detailing any such issuance; <u>provided</u> that this termination right may not be exercised by any Consenting First Lien Lenders that sought or requested such ruling or order in contravention of any obligation set out in this Agreement; <u>provided</u> <u>further</u> that, at the Company Parties' sole cost and expense, the Consenting First Lien Lenders will work in good faith to assist the Company Parties in seeking to overturn or vacate such ruling or order;

(e)    the happening or existence of any event that shall have made any of the conditions precedent to the consummation of the Restructuring Transactions as set forth in this Agreement (if any), the Plan, or the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date", if applicable, incapable of being satisfied prior to the Outside Date, except where such condition precedent has been waived by the applicable Parties; <u>provided</u> that the right to terminate this Agreement under this <u>Section 12.01(e)</u> shall not be available to any Consenting First Lien Lenders if the happening or existence of such event is directly caused by, or results from, the breach by such Consenting First Lien Lenders of its covenants, agreements, or other obligations under this Agreement;

(f)    any Company Party, other than as expressly contemplated herein, without the consent of the Required Consenting First Lien Lenders, (i) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases; (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or a material portion of the property or assets of any Company

Party; (iii) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases; or (iv) makes any general assignment for the benefit of its creditors;

(g)     (i) the commencement of an involuntary case against any Company Party under the Bankruptcy Code that is not dismissed or withdrawn within twenty-one (21) calendar days; or (ii) a court of competent jurisdiction enters a ruling, judgment, or order that appoints, or that authorizes or permits the taking of possession by, a receiver, liquidator (except the Liquidator), assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party, any Interests held by any Company Party, or a material portion of the property or assets of any Company Party;

(h)     any Company Party (i) publicly announces, or communicates in writing to any other Party, its intention not to support or pursue the Restructuring Transactions; (ii) (A) in the event that a Sufficient Bid has been received on or prior to the Bid Deadline, withdraws or terminates any part of the Sale Process or (B) in the event that a Sufficient Bid has not been received at least 48 hours prior to the Auction (as defined in the Bidding Procedures), conducts an Auction (as defined in the Bidding Procedures) for the sale of the Debtors' assets; (iii) provides notice to the Ad Hoc Group Advisors that it is exercising its rights pursuant to Section 8.01; or (iv) publicly announces, or communicates in writing to any other Party, that it intends to enter into, or has entered into, definitive documentation with respect to, an Alternative Restructuring;

(i)     the Plan Effective Date has not occurred by the Outside Date (as such date may have been extended in accordance with the provisions of this Agreement);

(j)     the Bankruptcy Court enters an order denying Confirmation of the Plan and such order remains in effect for three (3) Business Days after entry of such order;

(k)     the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect;

(l)     if applicable, the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting First Lien Lenders), (A) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (C) dismissing any of the Chapter 11 Cases, (D) approving an Alternative Restructuring Proposal, or (E) rejecting this Agreement;

(m)     the Bankruptcy Court enters an order terminating any Company Party's exclusive right to file and/or solicit acceptances of a plan of reorganization or the Company Parties let such periods/rights lapse;

(n)     except as set forth in the Bidding Procedures or in connection with any Sale Transaction, without the prior written consent of the Required Consenting First Lien Lenders, any Debtor (A) withdraws the Plan; (B) publicly announces, or communicates in writing to any other Party, its intention to withdraw the Plan or not support the Plan; (C) moves to voluntarily dismiss any of the Chapter 11 Cases; or (D) moves for court authority to sell any material asset or assets without the written consent of the Required Consenting First Lien Lenders;

(o)    any of the Company Parties (A) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Company Claims/Interests, lien, or interest held by any Consenting First Lien Lender in any capacity; or (B) shall have supported any application, adversary proceeding, or Cause of Action referred to in the immediately preceding subsection (A) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action;

(p)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any asset of the Company Parties having an aggregate fair market value in excess of $3,000,000 without the prior written consent of the Required Consenting First Lien Lenders; provided, however, that any modification of the automatic stay expressly provided by the DIP Orders or any orders entered in connection with any First Day Pleadings, shall not constitute a termination event;

(q)    the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing or limiting, as applicable, any of the First Lien Claims, or any of the encumbrances that secure (or purport to secure) the First Lien Claims;

(r)    any Debtor consummates debtor-in-possession financing, cash collateral usage, exit financing and/or other financing arrangement that is in an amount, on terms and conditions, or otherwise in form and substance, that is/are not acceptable to the Required Consenting First Lien Lenders;

(s)    any Company Party's use of cash collateral or debtor-in-possession financing has been validly terminated in accordance with the respective terms thereof;

(t)    the occurrence of any default or event of default under the DIP Documents or DIP Orders, as applicable, that has not been cured or waived (if susceptible to cure or waiver) by the applicable percentage of lenders in accordance with the terms of the DIP Documents or DIP Orders, as applicable;

(u)    after entry by the Bankruptcy Court of the DIP Orders, Disclosure Statement Order, or Confirmation Order, as applicable, such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended, in each case, in a manner materially inconsistent with this Agreement without the written consent of the Required Consenting First Lien Lenders;

(v)    the occurrence of an Event of Default under the First Lien Credit Agreement that would permit acceleration or otherwise automatically accelerates the outstanding obligations thereunder, other than the "Specified Defaults" (as defined in the Limited Waiver Amendment), or any Event of Default expressly contemplated herein, that shall not have been cured within any applicable grace periods or waived pursuant to the terms of the First Lien Credit Agreement; or

(w)    any Company Party terminates this Agreement pursuant to Section 12.02.

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 upon the occurrence of any of the following events (unless waived in writing by the Company Parties):

(a)    termination by the Required Consenting First Lien Lenders;

(b)    the breach (or inaccuracy, as applicable) in any material respect by the Consenting First Lien Lenders of any of the representations, warranties, covenants or other obligations or agreements of the Consenting First Lien Lenders set forth in this Agreement, such that the non-breaching Consenting First Lien Lenders own or control less than 50% in number of holders of First Lien Loans and less than 66 2/3% in aggregate principal amount of all outstanding prepetition First Lien Loans and such breach remains uncured (if susceptible to cure) for five (5) Business Days after the Company Parties transmit a written notice to the breaching Consenting First Lien Lenders in accordance with <u>Section 14.10</u> detailing any such breach;

(c)    the board of directors, board of managers, or such similar governing body of any Company Party determines in accordance with <u>Section 8.01</u> hereof, after consulting with outside counsel (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; or

(d)    the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for five (5) days after such terminating Company Party transmits a written notice in accordance with <u>Section 14.10</u> detailing any such issuance; <u>provided</u> that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

12.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement between the Company Parties and the Required Consenting First Lien Lenders.

12.04.  <u>Automatic Termination</u>.  This Agreement shall terminate with respect to all Parties automatically (1) without any further required action or notice immediately after the occurrence of the Plan Effective Date, or (2) on the Outside Date (as such date may have been extended in accordance with the provisions of this Agreement).

12.05.  <u>Effect of Termination</u>.   Upon the occurrence of the Termination Date, this Agreement shall be of no further force and effect and each of the Parties shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all commercially reasonable actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve any Party from (i) liability for its willful or intentional breach or non-performance of its obligations under this Agreement prior to the Termination Date or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Upon the occurrence of the Termination Date and, if applicable, prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties before the Termination Date shall be deemed, for all purposes, to

be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, this Agreement or otherwise.  If this Agreement is terminated in accordance with this <u>Section 12</u>, each Consenting First Lien Lender shall have an opportunity to change or withdraw (or cause to change or withdraw) its vote to accept the Plan or its consent (regardless of whether any deadline for votes or consents, or for withdrawal thereof, set forth in the Disclosure Statement has passed) and no Company Party shall oppose any attempt by such Consenting First Lien Lender to change or withdraw (or cause to change or withdraw) such vote or consent at such time.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting First Lien Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before the Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting First Lien Lender, and (b) any right of any Consenting First Lien Lender, or the ability of any Consenting First Lien Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting First Lien Lender.  No Party may terminate this Agreement (a) if such Party is in material breach of the terms of this Agreement and/or (b) on account of a termination event if the occurrence of such termination event was primarily caused by, or primarily resulted from, such Party's own action (or failure to act) in breach of the terms of this Agreement, except a termination pursuant to <u>Section 12.02(c)</u> or <u>(d)</u>.  Nothing in this <u>Section 12.05</u> shall restrict any Company Party's right to terminate this Agreement in accordance with <u>Section 12.02(c)</u>.

**Section 13.**    *Amendments and Waivers*.

13.01.  <u>Amendments and Waivers</u>.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this <u>Section 13</u>.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing (email being sufficient) signed: (i) in the case of a waiver, by the Party against whom the waiver is to be effective (it being understood that the Required Consenting First Lien Lenders may waive any conditions to the obligations of the Consenting First Lien Lenders or any rights of the Consenting First Lien Lenders under this Agreement), and (ii) in the case of a modification, amendment, or supplement, by the Company Parties and the Required Consenting First Lien Lenders; <u>provided</u> that (A) if the proposed modification, amendment, supplement, or waiver will result in a material change from the terms provided in this Agreement, including the Restructuring Term Sheet and other exhibits hereto or thereto, that has a disproportionate and adverse effect on a Consenting First Lien Lender, relative to all other Consenting First Lien Lenders, then the consent of such disproportionately and adversely affected Consenting First Lien Lender  (solely in its capacity as a Consenting First Lien Lender) shall also be required to effectuate such modification, amendment, supplement or waiver, and such disproportionately and adversely affected Consenting First Lien Lender shall be entitled

to terminate this Agreement as to itself only for any breach of this provision; and (B) any modification, amendment, or supplement to (1) this Section 13.01(b) or the Outside Date shall require the consent of all Parties, and (2) the definition for Required Consenting First Lien Lenders will require the consent of each Consenting First Lien Lender.

(c)       In determining whether any consent or approval has been given by the Required Consenting First Lien Lenders, any Company Claims/Interests held by any then-existing Consenting First Lien Lender that is in material breach of its covenants, obligations, or representations under this Agreement shall be excluded from such determination, and the Company Claims/Interests, as applicable, held by such Consenting First Lien Lender shall be treated as if they were not outstanding.

(d)       Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(e)       The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.**      *Miscellaneous*

14.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a chapter 11 plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter

hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. All actions arising out of or relating to this Agreement shall be brought by the Parties in either a state or federal court of competent jurisdiction in exclusively the State and County of New York, Borough of Manhattan. Notwithstanding anything to the contrary herein, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, (i) the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement and (ii) each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06. <u>TRIAL BY JURY WAIVER</u>. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting First Lien Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting First Lien Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, except that each No Recourse Party (as defined in <u>Section 14.24</u>) shall be a third party beneficiary of <u>Section 14.24</u>, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person, except in accordance with <u>Section 9</u> of this Agreement.

14.10. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)   if to a Company Party, to:

Franchise Group, Inc.
109 Innovation Court, Suite J
Delaware, OH 43015
Attention: Tiffany McMillan-McWaters
E-mail address: tmcwaters@franchisegrp.com

with copies to (which shall not constitute notice):

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Matthew A. Feldman; Debra McElligott Sinclair; Betsy L. Feldman
E-mail address: mfeldman@willkie.com; dsinclair@willkie.com; bfeldman@willkie.com

(b)   if to a Consenting First Lien Lender, to the address or e-mail address set forth on such member's signature page to this Agreement (or on the signature page to a Joinder in the case of any Consenting First Lien Lender that becomes a party hereto after the Agreement Effective Date), with copies to (which shall not constitute notice):

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Jayme Goldstein; Jeremy Evans; Isaac Sasson
E-mail address: jaymegoldstein@paulhastings.com; jeremyevans@paulhastings.com; isaacsasson@paulhastings.com

(c)   Any notice given by delivery, mail, or courier shall be effective when received, and any notice delivered or given by electronic mail shall be effective when sent (so long as a message delivery failure or transmission error notification is not received by the sender).

14.11. <u>Independent Due Diligence and Decision Making</u>. Each Consenting First Lien Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, and financial and other conditions, and prospects of the Company Parties.

14.12. <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  <u>Severability and Construction</u>.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party. No failure of any Party to exercise, and no delay in exercising, any such right, power, or remedy shall operate as a waiver of any such right, power, or remedy.

14.18.  <u>Capacities of Consenting First Lien Lenders</u>.   Each Consenting First Lien Lender has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, notice, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 7.02</u>, <u>Section 13</u>, or otherwise, including a written approval by the Company Parties or the Required Consenting First Lien Lenders, as applicable, such written consent, acceptance, approval, notice, or waiver shall be deemed to have occurred if such written consent, acceptance, approval, notice, or waiver is given or made by the applicable Party(ies) or counsel to the applicable Party(ies) to the other applicable Party(ies) or counsel to the other applicable Party(ies) by electronic mail.

14.20.  <u>Transaction Expenses</u>.

(a)     Whether or not the transactions contemplated by this Agreement are consummated, the Company Parties hereby agree, on a joint and several basis, to pay in cash the Transaction

Expenses as follows: (i) all accrued and unpaid Transaction Expenses incurred up to (and including) the Agreement Effective Date for which reasonably detailed invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and with the level of detail consistent with prior invoices sent by the Ad Hoc Group Advisors to the Company Parties) have been received by the Company Parties no later than the Agreement Effective Date shall be paid in full in cash on the Agreement Effective Date; (ii) prior to the Petition Date and after the Agreement Effective Date, all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Company Parties on a monthly basis within ten (10) days of receipt of reasonably detailed invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and with the level of detail consistent with prior invoices sent by the Ad Hoc Group Advisors to the Company Parties), and otherwise in accordance with the applicable professional's engagement letter or other contractual arrangement with the Company Parties, and, in any event, no later than the Business Day prior to the Petition Date following receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges) to the extent received no fewer than three (3) Business Days prior to such date; (iii) after the Petition Date (to the extent permitted by order of the Bankruptcy Court) all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Company Parties on a regular and continuing basis promptly (but in any event within ten (10) days) following receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges) and shall otherwise be paid in accordance with subsection (v); (iv) upon termination of this Agreement (other than a termination of this Agreement pursuant to Section 12.04, which is addressed in clause (v) of this Section 14.20(a)), all accrued and unpaid Transaction Expenses incurred up to (and including) the Termination Date shall be paid in full in cash promptly (but in any event within ten (10) days) following receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and which shall be in form and substance consistent with Delaware practice); and (v) on the Plan Effective Date, all accrued and unpaid Transaction Expenses incurred up to (and including) the Plan Effective Date shall be paid in full in cash against receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and which shall be in form and substance consistent with Delaware practice).  To the extent applicable, the Plan and any DIP Order shall contain appropriate provisions to give effect to the obligations under this Section 14.20.

(b)      The Company Parties hereby acknowledge and agree that the Consenting First Lien Lenders have expended, and will continue to expend, considerable time, effort, and expense in connection with this Agreement and the negotiation of the Restructuring Transactions, and that this Agreement provides substantial value to, is beneficial to, and is necessary to preserve, the Company Parties, and that the Consenting First Lien Lenders have made a substantial contribution to the Company Parties and the Restructuring Transactions.  To the extent applicable, subject to the approval of the Bankruptcy Court, the Company Parties shall reimburse or pay (as the case may be) all reasonable and documented Transaction Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  The Company Parties hereby acknowledge and agree that the Transaction Expenses are of the type that should be entitled to treatment as, and the Company Parties shall seek treatment of such Transaction Expenses as, administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.  For the avoidance of doubt, nothing in this Section 14.20(b) shall require the Debtors to assume this Agreement during the Chapter 11 Cases.

14.21.  Relationship Among Parties.  It is understood and agreed that no Consenting First Lien Lender owes any duty of trust or confidence of any kind or form to any other Party as a result of entering into this Agreement, and there are no commitments among or between the Consenting First Lien Lenders, in each case except as expressly set forth in this Agreement.  In this regard, it is understood and agreed that any Consenting First Lien Lender may trade in Company Claims/Interests without the consent of any other Party, subject to applicable securities laws and the terms of this Agreement, including Section 9; provided, however, that no Consenting First Lien Lender shall have any responsibility for any such trading to any other Person by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  No Consenting First Lien Lender shall, nor shall any action taken by a Consenting First Lien Lender pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting First Lien Lender with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Consenting First Lien Lenders are in any way acting in concert or as a group.  The decision to commit to enter into the transactions contemplated by this Agreement has been made independently by each Party hereto.  The Parties acknowledge that all representations, warranties, covenants, and other agreements made by or on behalf of any Consenting First Lien Lender that is a separately managed account of an investment manager signatory hereto (the "**Manager**") are being made only with respect to the assets managed by such Manager on behalf of such Consenting First Lien Lender, and shall not apply to (or be deemed to be made in relation to) any assets or interests that may be beneficially owned by such Consenting First Lien Lender that are not held through accounts managed by such Manager.

14.22.  Survival.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the terms, provisions, agreements, and obligations set forth in Section 1.02, Section 12.05, Section 13 and Section 14 (other than Section 14.03 in the event of a termination of this Agreement other than pursuant to clause (1) of Section 12.04), the proviso in Section 5.02(a)(vii), and any defined terms used in any of the foregoing Sections or proviso (solely to the extent used therein), shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.  Notwithstanding the termination of this Agreement, the Company Parties will comply with their obligations (or the obligations of their successors in interest) to pay the Transaction Expenses that have been incurred as of the Termination Date pursuant to Section 14.20 hereof.

14.23.  Publicity; Confidentiality.

(a)     The Company Parties shall submit drafts to the Ad Hoc Group Advisors of any press releases or other public statement or public disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days prior to making any such disclosure; provided that if delivery of such document at least two (2) Business Days in advance of such disclosure is impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.

(b)    Except as required by Law, no Party or its advisors shall (x) other than as necessary during live court proceedings and in filings in connection with the Chapter 11 Cases, use the name of any Consenting First Lien Lender in any public manner (including in any press release) with respect to this Agreement, the Restructuring Transactions, or any of the Definitive Documents, or (y) disclose to any Person, other than advisors to the Company Parties, the principal amount or percentage of any Company Claims/Interests held by any Consenting First Lien Lender without such Consenting First Lien Lender's prior written consent (it being understood and agreed that each Consenting First Lien Lender's signature page to this Agreement shall be redacted to remove the name of such Consenting First Lien Lender and the amount and/or percentage of Company Claims/Interests held by such Consenting First Lien Lender); provided, however, that (i) if such disclosure is required by Law, the disclosing Party shall afford the relevant Consenting First Lien Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all commercially reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims/Interests held by the Consenting First Lien Lenders, collectively.   Notwithstanding the provisions in this Section 14.23, (x) any Party may disclose the identities of the other Parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof, and (y) any Party may disclose, to the extent expressly consented to in writing by a Consenting First Lien Lender such Consenting First Lien Lender's identity and individual holdings.

14.24.  No Recourse.  This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement).  All claims or Causes of Action (whether in contract, tort, equity, or any other theory) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein).   No past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney, or other representative of any party hereto (including any person negotiating or executing this Agreement on behalf of a party hereto), nor any past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney, or other representative of any of the foregoing (other than any of the foregoing that is a Party hereto) (any such Person, a "**No Recourse Party**"), shall have any liability with respect to this Agreement or with respect to any proceeding (whether in contract, tort, equity, or any other theory that seeks to "pierce the corporate veil" or impose liability of an Entity against its owners or Affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement.

14.25.  Computation of Time.  Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

14.26.  Tax Matters.  Each Party hereby acknowledges and agrees that the terms of the Restructuring Transactions shall be structured to minimize the tax impact of the Restructuring Transactions on the Company Parties and the Consenting First Lien Lenders while preserving or otherwise maximizing favorable tax attributes (including tax basis) of the Reorganized Debtors,

as a result of the consummation of the Restructuring Transactions to the extent practicable, in each case as determined by the Consenting First Lien Lenders.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature Pages Follow.*]

**Company Parties' Signature Page to
the Restructuring Support Agreement**

FREEDOM VCM HOLDINGS, LLC
FREEDOM VCM INTERCO HOLDINGS, INC.
FREEDOM VCM INTERCO, INC.
FREEDOM VCM RECEIVABLES II, LLC
FREEDOM VCM RECEIVABLES, INC.
FREEDOM VCM, INC.
FRANCHISE GROUP, INC.
FRANCHISE GROUP ACQUISITION TM, LLC
FRANCHISE GROUP NEW HOLDCO, LLC
FRANCHISE GROUP INTERMEDIATE HOLDCO, LLC
FRANCHISE GROUP INTERMEDIATE L, LLC
FRANCHISE GROUP INTERMEDIATE PSP, LLC
FRANCHISE GROUP NEWCO PSP, LLC
PSP MIDCO, LLC
PET SUPPLIES "PLUS", LLC
PSP GROUP, LLC
PSP SERVICE NEWCO, LLC
WNW FRANCHISING, LLC
WNW STORES, LLC
PSP STORES, LLC
PSP FRANCHISING, LLC
PSP SUBCO, LLC
PSP DISTRIBUTION, LLC
FRANCHISE GROUP INTERMEDIATE V, LLC
FRANCHISE GROUP NEWCO V, LLC
VALOR ACQUISITION, LLC
VITAMIN SHOPPE INDUSTRIES LLC
VITAMIN SHOPPE GLOBAL, LLC
VITAMIN SHOPPE MARINER, LLC
VITAMIN SHOPPE PROCUREMENT SERVICES, LLC
VITAMIN SHOPPE FRANCHISING, LLC
VITAMIN SHOPPE FLORIDA, LLC
BETANCOURT SPORTS NUTRITION, LLC
FRANCHISE GROUP INTERMEDIATE B, LLC
BUDDY'S NEWCO, LLC
BUDDY'S FRANCHISING AND LICENSING, LLC
FRANCHISE GROUP INTERMEDIATE SL, LLC
FRANCHISE GROUP NEWCO SL, LLC
EDUCATE, INC.
AMERICAN FREIGHT FFO, LLC
FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC
AMERICAN FREIGHT GROUP, LLC

AMERICAN FREIGHT HOLDINGS, LLC
AMERICAN FREIGHT, LLC
AMERICAN FREIGHT MANAGEMENT COMPANY, LLC
FRANCHISE GROUP INTERMEDIATE S, LLC
FRANCHISE GROUP NEWCO S, LLC
AMERICAN FREIGHT FRANCHISING, LLC
HOME AND APPLIANCE OUTLET, LLC
AMERICAN FREIGHT OUTLET STORES, LLC
AMERICAN FREIGHT FRANCHISOR, LLC
FRANCHISE GROUP INTERMEDIATE BHF, LLC
FRANCHISE GROUP NEWCO BHF, LLC

By: _____
Name: ANDREW M. LAURENCE
Title: Chief Executive Officer

Authorized Signatory

[*Signature Page to Restructuring Support Agreement*]

[*Consenting First Lien Lenders' signature pages on file with the Company Parties.*]

## EXHIBIT A

### Company Parties

| |
|---|
| 1.  Freedom VCM Holdings, LLC |
| 2.  Freedom VCM Interco Holdings, Inc. |
| 3.  Freedom VCM Interco, Inc. |
| 4.  Freedom Receivables II, LLC |
| 5.  Freedom VCM Receivables, Inc. |
| 6.  Freedom VCM, Inc. |
| 7.  Franchise Group, Inc. |
| 8.  Franchise Group Acquisition TM, LLC |
| 9.  Franchise Group New Holdco, LLC |
| 10. Franchise Group Intermediate Holdco, LLC |
| 11. Franchise Group Intermediate L, LLC |
| 12. Franchise Group Intermediate PSP, LLC |
| 13. Franchise Group Newco PSP, LLC |
| 14. PSP Midco, LLC |
| 15. Pet Supplies "Plus", LLC |
| 16. PSP Group, LLC |
| 17. PSP Service Newco, LLC |
| 18. WNW Franchising, LLC |
| 19. WNW Stores, LLC |
| 20. PSP Stores, LLC |
| 21. PSP Franchising, LLC |
| 22. PSP Subco, LLC |
| 23. PSP Distribution, LLC |
| 24. Franchise Group Intermediate V, LLC |
| 25. Franchise Group Newco V, LLC |
| 26. Valor Acquisition, LLC |
| 27. Vitamin Shoppe Industries LLC |
| 28. Vitamin Shoppe Global, LLC |
| 29. Vitamin Shoppe Mariner, LLC |
| 30. Vitamin Shoppe Procurement Services, LLC |
| 31. Vitamin Shoppe Franchising, LLC |
| 32. Vitamin Shoppe Florida, LLC |
| 33. Betancourt Sports Nutrition, LLC |
| 34. Franchise Group Intermediate B, LLC |
| 35. Buddy's Newco, LLC |
| 36. Buddy's Franchising and Licensing, LLC |
| 37. Franchise Group Intermediate SL, LLC |
| 38. Franchise Group Newco SL, LLC |
| 39. Educate, Inc. |
| 40. American Freight FFO, LLC |
| 41. Franchise Group Newco Intermediate AF, LLC |

| |
|---|
| 42. American Freight Group, LLC |
| 43. American Freight Holdings, LLC |
| 44. American Freight, LLC |
| 45. American Freight Management Company, LLC |
| 46. Franchise Group Intermediate S, LLC |
| 47. Franchise Group Newco S, LLC |
| 48. American Freight Franchising, LLC |
| 49. Home and Appliance Outlet, LLC |
| 50. American Freight Outlet Stores, LLC |
| 51. American Freight Franchisor, LLC |
| 52. Franchise Group Intermediate BHF, LLC |
| 53. Franchise Group Newco BHF, LLC |

**<u>EXHIBIT B</u>**

**Restructuring Term Sheet**

## FRANCHISE GROUP, INC. AND CERTAIN AFFILIATES

## RESTRUCTURING TERM SHEET

## NOVEMBER 1, 2024

This term sheet (together with all exhibits, annexes, and schedules attached hereto, this "**Restructuring Term Sheet**") sets forth certain material terms of the proposed Restructuring Transactions contemplated under the Restructuring Support Agreement, dated as of November 1, 2024 (together with all exhibits, annexes, and schedules attached thereto, including this Restructuring Term Sheet, in each case, as amended, supplemented or modified in accordance with its terms, the "**RSA**"), to which this Restructuring Term Sheet is attached.[1]

**THIS RESTRUCTURING TERM SHEET IS NOT (NOR WILL IT BE CONSTRUED AS) AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, ACCEPTANCE OR SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER LAWS.**

**THIS RESTRUCTURING TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING, AND CONSISTENT WITH, THE TERMS SET FORTH HEREIN AND IN THE RSA.  THE CLOSING OF ANY RESTRUCTURING TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.**

**THIS RESTRUCTURING TERM SHEET HAS BEEN PRODUCED FOR SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER SIMILAR APPLICABLE STATE AND FEDERAL STATUTES, RULES AND LAWS.  NOTHING IN THIS RESTRUCTURING TERM SHEET SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF FACT OR LIABILITY OF ANY KIND OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS AND CONDITIONS DESCRIBED IN THE RSA, DEEMED BINDING ON ANY OF THE PARTIES TO THE RSA.**

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the RSA.

| **OVERVIEW** | |
|---|---|
| **Debtors:** | The Company Parties that are listed on <u>Exhibit A</u> to the RSA, which shall also be signatories to the RSA. |
| **Claims and Interests to be Restructured:** | The Claims against, and the Interests in, the Debtors to be amended, restructured, discharged, compromised, or Unimpaired by the Restructuring Transactions, in each case consistent with the terms and conditions described in this Restructuring Term Sheet will include, without limitation, the following:<br><br>**Prepetition ABL Loan Claims**: consisting of approximately $248.7 million in outstanding principal, plus interest, fees, and other expenses pursuant to the ABL Credit Agreement.<br><br>**Prepetition First Lien Loan Claims**: consisting of approximately $1.097 billion in outstanding principal, plus interest, fees, and other expenses pursuant to the First Lien Credit Agreement.<br><br>**Prepetition Second Lien Loan Claims**: consisting of approximately $125 million in outstanding principal, plus interest, fees, and other expenses pursuant to the Second Lien Credit Agreement.<br><br>**Prepetition HoldCo Loan Claims**: consisting of approximately $514.7 million in outstanding principal, plus interest, fees, and other expenses pursuant to the HoldCo Credit Agreement.<br><br>**General Unsecured Claims**: consisting of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court (collectively, the "**General Unsecured Claims**").  The General Unsecured Claims shall be classified as follows:<br><br>(i)     General Unsecured Claims against Franchise Group, Inc.;<br><br>(ii)    General Unsecured Claims against American Freight;<br><br>(iii)   General Unsecured Claims against Buddy's;<br><br>(iv)   General Unsecured Claims against PSP;<br><br>(v)    General Unsecured Claims against Vitamin Shoppe;<br><br>(vi)   General Unsecured Claims against the HoldCo Entities other than TopCo; and<br><br>(vii)  General Unsecured Claims against TopCo. |

|  | **Subordinated Claims**: consisting of any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise (collectively, the "**Subordinated Claims**").<br><br>**Existing Equity Interests**: consisting of all Equity Interests in the Debtors as of the Plan Effective Date.  The Existing Equity Interests shall be classified as follows:<br><br>(i)     **Existing TopCo Equity Interests**:  any Existing Equity Interests in TopCo; and<br><br>(ii)     **Existing Intercompany Equity Interests**:  any Existing Equity Interests other than Existing TopCo Equity Interests. |
|---|---|
| **Overview of the Restructuring:** | The Restructuring Transactions will be consummated pursuant to confirmation in the Chapter 11 Cases of the Plan implementing the terms and conditions set forth in this Restructuring Term Sheet, the RSA, and the DIP Term Sheet.<br><br>The Plan will be structured such that the Debtors shall concurrently:<br><br>(a)     conduct going out of business sales and implement store closing procedures at American Freight on the terms and conditions set forth in the Store-Closing and Liquidation Sales Documents and the Plan (collectively, the "**Store-Closing and Liquidation Sales**"); and<br><br>(b)     conduct a marketing and sale process pursuant to section 363 of the Bankruptcy Code and the Bidding Procedures (the "**Sale Process**"), and, either (i) solely if a Sufficient Bid (as defined below) is received by the Debtors and a Sale Toggle Event shall have occurred, execute and consummate the Sale Transaction, or (ii) to the extent a Sufficient Bid is not received at least 48 hours prior to the Auction (as defined in the Bidding Procedures), promptly provide for the Sale Process to be terminated and, unless otherwise agreed by the Required Consenting First Lien Lenders, exclusively pursue consummation of the Plan Transaction resulting in the equitization of Allowed Prepetition First Lien Loan Claims into 100% of Reorganized Common Equity (subject to dilution from (1) the MIP (as defined below), (2) the DIP Premium Conversion (as defined below), if applicable, (3) the DIP Equitization (as defined below), and (4) the New Warrants, if applicable);<br><br>in each case, in compliance with the applicable Milestones, which shall be undertaken and prosecuted with the support of the Consenting First Lien Lenders on the terms and conditions set forth in the Plan, and which shall (x) be consistent with the RSA in all material respects or (y) otherwise in form and substance acceptable to the Required Consenting First Lien Lenders pursuant to their respective consent rights set forth in the RSA.  The Plan to be filed in connection with the RSA shall provide for, among other things, the foregoing dual-track process and the classification and treatment of Claims and Interests |

|  | as specifically provided for herein irrespective of whether the Restructuring Transactions occur pursuant to the Plan Transaction or the Sale Transaction. |
|--|--|
|  | In addition to any proceeds from the Store-Closing and Liquidation Sales (the "**Liquidation Proceeds**"), unless otherwise agreed by the Required Consenting First Lien Lenders, in the event the Debtors consummate a Sale Transaction pursuant to a Sufficient Bid, the proceeds therefrom (collectively, the "**Sale Proceeds**") shall be distributed in accordance with this Restructuring Term Sheet and the Plan. |
|  | Irrespective of whether the Restructuring Transactions are consummated through the Plan Transaction or the Sale Transaction, the existing ABL Credit Agreement shall be kept in place during the Chapter 11 Cases on its existing terms and in compliance with the Applicable Borrowing Base (as defined in the DIP Term Sheet), subject to any paydowns of the Prepetition ABL Loan Claims resulting from their ratable share of any Liquidation Proceeds (subject to the Existing ABL Intercreditor Agreement (as defined in the DIP Term Sheet)), and shall otherwise receive the treatment for the Prepetition ABL Loan Claims set forth herein. |
|  | Irrespective of whether the Restructuring Transactions are consummated through the Plan Transaction or the Sale Transaction, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed Claim or Allowed Interest, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to among the Reorganized Debtors, the Required Consenting First Lien Lenders (if applicable, as set forth in this Restructuring Term Sheet), and the holder of such Allowed Claim or Allowed Interest. |
| **Definitive Documents:** | Any documents contemplated by this Restructuring Term Sheet, including any Definitive Documents, that are not executed or remain the subject of negotiation or completion as of the Agreement Effective Date, shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion. Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| | **DIP MATTERS** |
| **DIP Financing:** | As more fully set forth in the debtor in possession financing term sheet attached as **Exhibit 1** hereto (together with all exhibits, annexes, and schedules thereto, the "**DIP Term Sheet**"), certain of the Consenting First Lien Lenders will provide the DIP Facility on the terms and conditions set forth in the RSA and this Restructuring Term Sheet, which shall be backstopped by certain members of the Ad Hoc Group and/or their respective Related Funds (each, a "**DIP Backstop Party**" and collectively, the "**DIP Backstop Parties**"). |

4

| | |
|---|---|
| **DIP Backstop:** | All holders of First Lien Claims (and/or one or more Related Funds of such holders) who sign the RSA prior to the closing of the DIP syndication process will be eligible to subscribe for their *pro rata* share of the DIP Facility based on their respective *pro rata* holdings of their Allowed First Lien Claims pursuant to syndication procedures acceptable to the Required Consenting First Lien Lenders.  To the extent a holder of First Lien Claims (x) does not execute the RSA and (in which case, such holder shall have no right to subscribe for any portion of the DIP Facility) or (y) executes the RSA but does not subscribe for its portion of the DIP Facility in accordance with the syndication procedures, then (in either case) each DIP Backstop Party shall, severally and not jointly, increase its share of the DIP Facility for any portion of the DIP Facility that is not subscribed for (or not permitted to be subscribed for) by such holder (the "**DIP Backstop**").<br><br>The DIP Backstop Parties shall subscribe for their respective *pro rata* shares of the DIP Backstop based on their respective *pro rata* holdings of First Lien Claims held by all DIP Backstop Parties as of October 30, 2024 (each such respective share, a "**DIP Backstop Percentage**").<br><br>In consideration for the DIP Backstop, the Debtors shall pay to the DIP Backstop Parties a non-refundable put option premium in respect of the DIP Backstop (the "**DIP Backstop Premium**") equal to 10.00% of the aggregate amount of the New Money Commitments (as defined in the DIP Term Sheet) under the DIP Facility, which shall be fully earned upon entry of the Interim DIP Order and due and payable in kind on the date of entry of the Interim DIP Order and to be included in the principal amount of the Tranche A DIP Loans. |
| **DIP Premium Election:** | Subject to entry of the Interim DIP Order, and to the extent the Restructuring Transactions are consummated through the Plan Transaction, each holder of DIP Claims (and/or one or more Related Funds of such holder) that received a DIP Backstop Premium or Commitment Premium (as defined in the DIP Term Sheet) as of closing of the DIP syndication process, and each holder of DIP Claims that receives an Exit Premium (as defined in the DIP Term Sheet) shall be entitled to elect, at its sole discretion, to convert such DIP Backstop Premium, Commitment Premium or Exit Premium into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors based on the midpoint enterprise value set forth in the Disclosure Statement (the "**DIP Premium Conversion**").[2] |
| **EXIT FUNDING** | |
| **Take-Back Debt Facility:** | To the extent the Restructuring Transactions are consummated through the Plan Transaction, on the Plan Effective Date, the Reorganized Debtors shall enter into a Take-Back Debt Facility in the maximum amount necessary to ensure that the Reorganized Debtors are in compliance with the Pro Forma Leverage Cap (as defined below), provided, for the avoidance of doubt, that |

---

[2]   Note to Draft: Mechanics of DIP Premium Conversion to be agreed among the Parties prior to the Confirmation Date.

the Take-Back Debt Facility shall be no greater than the Pro Forma Leverage Cap which will be made up of, as further set forth below, a first-lien term loan consisting of all DIP Claims arising from the Tranche A DIP Loans (as defined in the DIP Term Sheet), and certain DIP Claims arising from the Tranche B DIP Loans (as defined in the DIP Term Sheet), in each case as of the Plan Effective Date, and each having, among other things, the following terms:

(a) <u>Borrower</u>:  New TopCo or some other Entity designated as such, as mutually agreed by the Debtors and the Required Consenting First Lien Lenders.

(b) <u>Guarantor</u>:  Each Reorganized Debtor (other than the Borrower), subject to customary exclusions.

(c) <u>Interest Rate</u>:  SOFR + 8.00%, <u>provided</u> that, at the Borrower's election, the Borrower may pay up to 2.00% of the Take-Back Term Loans in kind.

(d) <u>Maturity</u>:  5 years after the Plan Effective Date.

(e) <u>Call Protection</u>:  103/102/101.

(f) <u>Collateral</u>: First lien on substantially all of the Reorganized Debtors' assets and second lien on any ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), in each case subject to customary exclusions.

(g) <u>Other</u>:

1. the Take-Back Debt Credit Agreement shall include customary affirmative and negative covenants, events of default, representations and warranties, prepayment requirements, indemnities and reimbursements in each case, of transactions of the type described herein;

2. the Take-Back Debt Credit Agreement shall allow for a securitization of PSP, subject to minimum proceeds and maximum pricing thresholds to be agreed to between the Company Parties and the Required Consenting First Lien Lenders, with any such proceeds used to pay down the Take-Back Term Loans on a *pro rata* basis; and

3. the Reorganized Debtors shall use commercially reasonable efforts to obtain within sixty (60) days of the Plan Effective Date a public rating (but not any particular rating) in respect of the Take-Back Debt Facility.

| | |
|---|---|
| **New ABL Facilities:** | To the extent the Restructuring Transactions are consummated through the Plan Transaction, the Prepetition ABL Loan Claims shall be treated in the following alternative manners: (1) if the holders of Prepetition ABL Loan Claims so elect, amending and extending the existing ABL Credit Agreement |

| | |
|---|---|
| | on terms and conditions acceptable to the Debtors, the Required Consenting First Lien Lenders, and the requisite holders of Prepetition ABL Loan Claims (the "**Amended & Restated ABL Facility**"), (2) refinanced by an exit asset based loan facility (the "**Exit ABL Facility**") provided by third parties acceptable to the Debtors and the Required Consenting First Lien Lenders, in an amount necessary to refinance all Allowed Prepetition ABL Loan Claims outstanding under the existing ABL Credit Agreement upon such terms and conditions acceptable to the Required Consenting First Lien Lenders and the Debtors, (3) refinanced by a take-back term facility with an aggregate principal amount equal to the Allowed amount of the Prepetition ABL Loan Claims, which facility shall (a) be secured by the same collateral securing the Prepetition ABL Loan Claims with the same priorities, (b) mature within six (6) years of the Plan Effective Date, and (c) bear an interest rate to be established by the Required Consenting First Lien Lenders and the Debtors, or otherwise set forth by the Bankruptcy Court (the "**Take-Back ABL Term Loan Facility**"), or (4) at the election of the Required Consenting First Lien Lenders, reinstated (together with the Take-Back ABL Term Loan Facility, the Amended & Restated ABL Facility and the Exit ABL Facility, collectively, the "**Applicable ABL Exit Facility**"). |
| **New Warrants:** | To the extent the Restructuring Transactions are consummated through the Plan Transaction and the Second Lien Condition is satisfied, on the Plan Effective Date, New TopCo shall issue to holders of Allowed Prepetition Second Lien Loan Claims New Warrants to purchase up to 5.0% of the outstanding Reorganized Common Equity on the Plan Effective Date (immediately after giving effect to the consummation of the Restructuring Transactions to occur on the Plan Effective Date, including all payments and distributions to be made on or as of the Plan Effective Date, and subject to dilution from the MIP.  The New Warrants shall have a term of five (5) years from the Plan Effective Date (subject to earlier termination upon the occurrence of a "liquidity event") and an initial exercise price equal to the aggregate amount of all Allowed DIP Claims, Allowed Prepetition First Lien Loan Claims, and Allowed Prepetition ABL Loan Claims.  The New Warrants shall not be subject to any anti-dilution provisions (including any economic anti-dilution provisions), other than the adjustments for splits, reverse splits, and similar structural transactions that are not liquidity events. |
| **TREATMENT OF CLAIMS AND INTERESTS** ||
| **Intercompany Claims:** | <u>Restructuring Transaction</u>.  In the event of the Plan Transaction, on or after the Plan Effective Date, (a) any and all Intercompany Claims between and among Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, American Freight, the BHF Entities, Buddy's, Educate, PSP, and Vitamin Shoppe) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (i) extinguished, canceled and/or discharged on the Plan Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired; and (b) any and all Intercompany Claims between and among the HoldCo Entities shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (i) extinguished, |

| | |
|---|---|
| | canceled and/or discharged on the Plan Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Plan Effective Date, any such transaction may be effected on or after the Plan Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>_Sale Transaction_.  In the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (i) extinguished, canceled and/or discharged on the Plan Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Plan Effective Date, any such transaction may be effected on or after the Plan Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. |
| **DIP Claims:** | In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Plan Effective Date, (i) if the Plan Transaction is consummated, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans comprised of the DIP Backstop Premiums, the Commitment Premium, and the Exit Premium that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into loans under the Take-Back Debt Facility, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into the loans under Take-Back Debt Facility, ratably, on a dollar-for-dollar basis, _provided_ that the sum of clauses (x) and (y) hereof together shall be no greater than the amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Plan Effective Date after giving effect to the Restructuring Transactions (the "**Pro Forma Leverage Cap**"), and (z) third, any Allowed DIP Claims (other than Allowed DIP Claims arising from Tranche A DIP Loans) that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors based on the midpoint enterprise value set forth in the Disclosure Statement (the "**DIP Equitization**")[3], or (ii) if a Sale Transaction is consummated, unless otherwise agreed to by the Required DIP Lenders, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from Sale Proceeds.  Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect. |
| **Administrative Claims:** | Except to the extent that a holder of an Allowed Administrative Claim agrees to a different treatment, on the applicable distribution date, or as soon |

| | |
|---|---|
| | thereafter as is reasonably practicable, the holder of such Allowed Administrative Claim shall receive Cash in an amount equal to such Allowed Claim or such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget (as defined in the DIP Term Sheet), Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors in possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, that any Allowed Administrative Claim that has been assumed by a Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan. |
| **Professional Fee Claims:** | The Debtors shall establish and fund the Professional Fee Escrow Account prior to the Plan Effective Date with Cash equal to the Professional Fee Escrow Amount; provided that the Plan Administrator shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Plan Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates. |
| | The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Confirmation Order. The Reorganized Debtors or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash to such Professional Persons in the amount the Bankruptcy Court allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; provided that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Professional Persons, the Plan Administrator shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims. |
| | The terms governing the Professional Fee Escrow Account and submission of Professional Fee Claims will be further delineated in the Plan. |
| **Priority Tax Claims:** | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting First Lien Lenders, each holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge |

---

[3]   Note to Draft: For illustrative purposes, if, after accounting for the conversion of the Tranche A DIP Loans into loans under the Take-Back Debt Facility, there remains $250 million of availability up to the Pro Forma Leverage Cap, and there is $500 million of Tranche B DIP Loans outstanding, each holder of a Tranche B DIP Loan would receive its ratable share of $250 million of Take-Back Term Loans, with the remaining $250 million of Tranche B Term Loans being ratably equitized in accordance with the DIP Equitization.

| | |
|---|---|
| | of each Allowed Priority Tax Claim, either: (a) on the applicable distribution date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Plan Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided that all Allowed Priority Tax Claims that are not due and payable on or before the Plan Effective Date shall be paid in the ordinary course of business as they become due; provided, further, that (i) in the event of the Plan Transaction, notwithstanding any provision of the Plan to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state law shall be assumed by and reinstated against the applicable Reorganized Debtor and (ii) in the event of an Sale Transaction, any Allowed Priority Tax Claim that has been expressly assumed by a Successful Bidder under the Sale Documents shall not be an obligation of the Debtors.  On the Plan Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person.<br><br>Terms governing submission of Priority Tax Claims will be further delineated in the Plan. |
| **U.S. Trustee Fees:** | After the Plan Effective Date, the Debtors, Reorganized Debtors, and Plan Administrator (if appointed), as applicable, shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable.  The Debtors, Reorganized Debtors, and Plan Administrator (if appointed), as applicable, shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors, Reorganized Debtors, or Plan Administrator (if appointed), as applicable, is responsible. |
| <u>**Class 1**</u><br><br>**Priority Non-Tax Claims:** | The legal, equitable and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable distribution date, each holder of an Allowed Priority Non-Tax Claim shall receive, in consultation with the Required Consenting First Lien Lenders: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  In the event of a Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.<br><br>**Unimpaired – Presumed to accept.** |
| <u>**Class 2**</u> | The legal, equitable and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder |

| | |
|---|---|
| **Other Secured Claims:** | of an Allowed Other Secured Claim agrees to a different treatment, on the applicable distribution date each holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget (as defined in the DIP Term Sheet), Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors. |
| | Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Plan Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein.  Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. |
| | **Unimpaired – Presumed to accept.** |
| **Class 3**<br><br>**Prepetition ABL Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition ABL Loan Claim will receive its *pro rata* share of: |
| | (i) to the extent the Restructuring Transactions are consummated through the Plan Transaction (A) the Liquidation Proceeds resulting from the sale of any ABL Priority Collateral, and (B) proceeds of (x) the Exit ABL Facility, (y) the Amended & Restated ABL Facility, or (z) the Take-Back ABL Term Loan Facility; provided that, at the election of the Required Consenting First Lien Lenders in their sole discretion, the Prepetition ABL Loan Claims shall be reinstated; or |
| | (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (a) the Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (b) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim. |
| | **Impaired – Entitled to vote.** |
| **Class 4**<br><br>**Prepetition First Lien Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition First Lien Loan Claim will receive its *pro rata* share of: |
| | (i) to the extent the Restructuring Transactions are consummated through the Plan Transaction, (A) Liquidation Proceeds resulting |

<table>
<tr><td></td><td colspan="2">from the sale of any Term Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) and (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the MIP (as defined below), (2) the DIP Premium Conversion, and (3) the DIP Equitization); or</td></tr>
</table>

|  |  |  |
|---|---|---|
|  | (ii) | to the extent the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim. |
|  | **Impaired – Entitled to vote.** | |
| **Class 5**<br><br>**Prepetition Second Lien Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition Second Lien Loan Claim will receive: | |
|  | (i) | to the extent the Restructuring Transactions are consummated through a Plan Transaction, (A) its *pro rata* share of Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, resulting from the sale of any Term Priority Collateral, and (B)(1) solely if the class votes to accept the Plan, the New Warrants, or (2) if the class votes to reject the Plan, its *pro rata* share of the greater of (x) recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code or (y) any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders; or |
|  | (ii) | to the extent the Restructuring Transactions are consummated through the Sale Transaction, (a) its ratable share of Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, *plus* (b) its *pro rata* share of the Prepetition Second Lien Lender Distribution.  If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim. |
|  | **Impaired – Entitled to vote.** | |
| **Class 6-A**<br><br>**General Unsecured Claims against Franchise Group, Inc.:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at Franchise Group, Inc. will receive: | |
|  | (i) | to the extent the Restructuring Transactions are consummated through a Plan Transaction, its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or |
|  | (ii) | to the extent the Restructuring Transactions are consummated through a Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to Franchise Group, Inc., if any.  If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder |

| | |
|---|---|
| | of a General Unsecured Claim at Franchise Group, Inc. shall receive no further consideration on account of its General Unsecured Claim at Franchise Group, Inc.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-B**<br><br>**General Unsecured Claims against American Freight:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at American Freight will receive the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code (*i.e.*, its *pro rata* share of any residual Liquidation Proceeds), and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-C**<br><br>**General Unsecured Claims against Buddy's:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at Buddy's will receive:<br><br>(i)     to the extent the Restructuring Transactions are consummated through a Plan Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to Buddy's, if any.  If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder of a General Unsecured Claim at Buddy's shall receive no further consideration on account of its General Unsecured Claim at Buddy's.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-D**<br><br>**General Unsecured Claims against PSP:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at PSP will receive:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to PSP, if any. If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder of a |

| | |
|---|---|
| | General Unsecured Claim at PSP shall receive no further consideration on account of its General Unsecured Claim at PSP.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-E**<br><br>**General Unsecured Claims against Vitamin Shoppe:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at Vitamin Shoppe will receive:<br><br>(i) to the extent the Restructuring Transactions are consummated through the Plan Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or<br><br>(ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to Vitamin Shoppe, if any.  If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder of a General Unsecured Claim at Vitamin Shoppe shall receive no further consideration on account of its General Unsecured Claim at Vitamin Shoppe.<br><br>**Impaired – Entitled to vote.** |
| **Class 7**<br><br>**Prepetition HoldCo Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition HoldCo Loan Claim will receive:<br><br>(i) to the extent the Restructuring Transactions are consummated through the Plan Transaction, no consideration on account of its Prepetition HoldCo Loan Claim; or<br><br>(ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Prepetition HoldCo Lender Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Prepetition HoldCo Lender Distribution, then such holder of a Prepetition HoldCo Loan Claim shall receive no further consideration on account of its Prepetition HoldCo Loan Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 8**<br><br>**General Unsecured Claims against the HoldCo Entities:** | Except to the extent that a holder of an Allowed HoldCo General Unsecured Claim agrees to less favorable treatment on account of their claim, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed HoldCo General Unsecured Claim shall receive:<br><br>(i) to the extent the Restructuring Transactions are consummated through the Plan Transaction, no distribution on account of its HoldCo General Unsecured Claim, which shall be released, |

14

| | |
|---|---|
| | discharged and extinguished, as the case may be, and shall be of no further force or effect, and such holder shall receive no recovery on account of such Allowed HoldCo General Unsecured Claim; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such holder of a HoldCo General Unsecured Claims Distribution shall receive no further consideration on account of its HoldCo General Unsecured Claim. |
| | **Impaired – Entitled to vote.** |
| **Class 9**<br><br>**General Unsecured Claims against TopCo:** | Except to the extent that a holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed TopCo General Unsecured Claim shall receive: |
| | (i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, (x) its *pro rata* share of Cash (if any) held by TopCo, or (y) if there is no Cash held at TopCo, then such holder of a TopCo General Unsecured Claim shall receive no further consideration on account of its TopCo General Unsecured Claim; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the TopCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a TopCo General Unsecured Claims Distribution, then such holder of a TopCo General Unsecured Claim shall receive no further consideration on account of its TopCo General Unsecured Claim. |
| | **Impaired – Entitled to vote.** |
| **Class 10**<br><br>**Subordinated Claims:** | Except to the extent that a holder of a Subordinated Claim agrees to less favorable treatment, on the Plan Effective Date, or as soon as practicable thereafter, each holder of a Subordinated Claim shall receive: |
| | (i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, no distribution on account of its Subordinated Claim, which shall be released, discharged and extinguished, as the case may be, and shall be of no further force or effect, and such holder shall receive no recovery on account of such Allowed Subordinated Claim; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any.  If the proceeds of the |

| | |
|---|---|
| | Sale Transaction do not result in a Subordinated Claims Distribution, then such holder of a Subordinated Claim shall receive no further consideration on account of its Subordinated Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 11**<br><br>**Existing TopCo Equity Interests:** | Except to the extent that a holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed Existing TopCo Equity Interest shall receive:<br><br>(i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, (A) its *pro rata* share of Cash (if any) held by TopCo after payment of TopCo General Unsecured Claims, or (B) if (A) does not exist, no consideration on account of its Allowed Existing TopCo Equity Interest; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the TopCo General Unsecured Claims Distribution after payment of TopCo General Unsecured Claims, if any. If the proceeds of the Sale Transaction do not result in a TopCo General Unsecured Claims Distribution in excess of the TopCo General Unsecured Claims, no consideration on account of its TopCo General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 12**<br><br>**Existing Intercompany Equity Interests:** | On the Plan Effective Date, whether the Restructuring Transactions are consummated through the Plan Transaction or the Sale Transaction, each holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Plan Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left Unimpaired; <u>provided</u>, that, in the event the Restructuring Transactions are consummated through the Plan Transaction, such election shall be with the consent of Required Consenting First Lien Lenders.<br><br>**Impaired – Deemed to Reject.** |
| | **GENERAL PROVISIONS** |
| **Executory Contracts and Unexpired Leases:** | On the Plan Effective Date, in the event of a Plan Transaction, except as otherwise provided in herein, any Executory Contracts and Unexpired Leases (i) not previously assumed, or (ii) not previously rejected pursuant to an order of the Bankruptcy Court, will be deemed assumed as of the Plan Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code *except* any Executory Contract or Unexpired Lease (1) identified on the Rejected |

|  | Contracts/Lease List (which shall initially be filed with the Plan Supplement) as a contract or lease to be rejected, (2) that is the subject of a separate motion or notice to reject pending as of the Confirmation Date, or (3) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).<br><br>The Company Parties and the Required Consenting First Lien Lenders will work together in good faith to determine which Executory Contracts and Unexpired Leases shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases; provided that, to the extent the Restructuring Transactions are consummated through the Plan Transaction, if requested by the Required Consenting First Lien Lenders, (x) Vitamin Shoppe shall reject any and all Executory Contracts or Unexpired Leases held by such Debtor(s), and (y) the Debtors shall reject any Executory Contracts or Unexpired Leases explicitly identified by the Required Consenting First Lien Lenders between (i) any of the Debtors, on the one hand, and (ii) any Specified Party, on the other hand.<br><br>On the Plan Effective Date, in the event of a Sale Transaction, except as otherwise provided herein, any Executory Contract or Unexpired Lease (i) not previously assumed, (ii) not assumed and assigned in accordance with any Sale Documents, (iii) not previously rejected pursuant to an order of the Bankruptcy Court, or (iv) not subject of a pending motion to reject, assume or assume and assign, will be deemed rejected as of the Plan Effective Date. |
|---|---|
| **New Board:** | In the event of a Plan Transaction the new board of directors or board of managers of New TopCo (the "**New Board**") and the new board of directors, board of managers or similar governing body of the Reorganized Debtors shall be appointed on the Plan Effective Date by the Required Consenting First Lien Lenders, in their sole discretion, and consist of a number of members determined by the Required Consenting First Lien Lenders, in their sole discretion. |
| **Management/Employee Incentive Plans:** | In the event of a Plan Transaction, the New Board shall: (x) adopt and implement management incentive plans (collectively, the "**MIP**") at each operating company or (y) shall assume, amend or reject the existing long term incentive plans with the current members of the senior management team of Franchise Group's direct or indirect subsidiaries, in each case structured to incentivize operating performance and align economic interests on terms and conditions acceptable to the New Board and the Required Consenting First Lien Lenders.  If applicable, the MIP shall provide for the issuance of equity or equity-linked awards representing up to 10% of the Reorganized Common Equity on a fully diluted basis, to be allocated by the New Board. |
| **Employment Arrangements:** | In the event of a Plan Transaction, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of Franchise Group, or will enter into new compensation arrangements, as applicable, on the Plan Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting First Lien Lenders and |

| | |
|---|---|
| | which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting First Lien Lenders. |
| **Vesting of Assets:** | In the event of a Plan Transaction, on the Plan Effective Date, pursuant to sections 1141(b)–(c) of the Bankruptcy Code, all assets of the Debtors (other than the assets of American Freight sold in the Store-Closing and Liquidation Sales) will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances. |
| **Conditions Precedent to Confirmation:** | Confirmation of the Plan is subject to the satisfaction or waiver of the following conditions to confirmation of the Plan: <br><br> (a) the DIP Order shall have been entered by the Bankruptcy Court and shall remain in full force and effect; <br><br> (b) the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Transaction Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Order; <br><br> (c) the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan; <br><br> (d) entry of the Disclosure Statement Order; <br><br> (e) entry of the Confirmation Order; <br><br> (f) the RSA, the DIP Facility, and the DIP Order, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the RSA or the DIP Order, or the DIP Facility in accordance with its respective terms upon the expiration of such time; and <br><br> (g) in the event of a Sale Transaction, the receipt of a Sufficient Bid and the Sale Documents shall not have been terminated in accordance with its terms. |
| **Conditions Precedent to the Plan Effective Date:** | The occurrence of the Plan Effective Date will be subject to the satisfaction or waiver of the following conditions to effectiveness of the Plan: <br><br> (a) the Confirmation Order shall have become a final and non-appealable order, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified, unless otherwise agreed by the Debtors and the Required Consenting First Lien Lenders; <br><br> (b) each of the applicable Definitive Documents shall have been executed and effectuated and remain in full force and effect, and any conditions |

precedent related thereto or contained therein shall have been satisfied before or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived in accordance with such applicable Definitive Documents;

(c) any non-technical and/or immaterial amendments, modifications or supplements to the Plan shall be acceptable to the Debtors and the Required Consenting First Lien Lenders, except as otherwise provided in Section 14.3 of the Plan;

(d) the RSA, the DIP Facility, and the DIP Order, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the RSA or the DIP Order, or the DIP Facility in accordance with its respective terms upon the expiration of such time;

(e) to the extent a Plan Transaction is implemented, all of the actions set forth in the Restructuring Transactions Memorandum, as applicable, shall have been completed and implemented;

(f) there shall not have been instituted or threatened or be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Entity (x) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transaction contemplated herein, in the RSA, and in the Definitive Documents or (y) imposing a material award, claim, injunction, fine or penalty that, in each case, both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

(g) the Debtors have obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and filing all notices and reports, if any, required to be filed, by the Debtors in connection with the Plan's effectiveness;

(h) the Reorganized Common Equity to be issued and/or delivered on the Plan Effective Date (as set forth in the Plan) shall have been validly issued by New TopCo, shall be fully paid and non-assessable, and shall be free and clear of all taxes, liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents of New TopCo;

(i) all conditions precedent to the effectiveness of the Take-Back Credit Agreement shall have been satisfied or duly waived by the party whose

|  | consent is required thereunder, and the Take-Back Credit Agreement shall be in full force and effect; |
|---|---|
|  | (j) all conditions precedent to the effectiveness of the Applicable ABL Exit Facility shall have been satisfied or duly waived by the party whose consent is required thereunder, and the Applicable ABL Exit Facility shall be in full force and effect; |
|  | (k) all requisite filings with any Governmental Entity and third parties shall have become effective, and all such Governmental Entity and third parties shall have approved or consented to the Restructuring Transactions, to the extent required; |
|  | (l) the New Organizational Documents shall be in full force and effect; |
|  | (m) any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions shall have been obtained; |
|  | (n) all accrued and unpaid Transaction Expenses shall have been paid in full by the Debtors; |
|  | (o) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; |
|  | (p) in the event of a Sale Transaction, the Sale Documents, as applicable, not having been terminated in accordance with their terms; and |
|  | (q) all closing conditions and other conditions precedent in the RSA shall have been satisfied or waived in accordance with the terms thereof. |
| **Discharge and Injunction:** | In the event of a Plan Transaction, the Plan will contain customary discharge and injunction provisions acceptable to the Company Parties and the Required Consenting First Lien Lenders. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Plan Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |
| **Restructuring Transactions:** | In the event of a Plan Transaction, on the Plan Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan. |

| **Freedom Allocated Fees and Expenses:** | Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "Freedom Allocated Fees and Expenses").  Freedom VCM Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such Freedom Allocated Fees and Expenses, if any; provided, that, for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the Freedom Allocated Fees and Expenses; provided, further, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims. |
|---|---|
| **Securities Exemption:** | In the event of a Plan Transaction, the issuance and distribution under the Plan of the Reorganized Common Equity and the New Warrants shall be exempt from registration under the Securities Act under section 1145(a) of the Bankruptcy Code, and/or Section 4(a)(2) of the Securities Act or Regulation D of the Securities Act. |
| **Tax Considerations:** | To the extent practicable, a Plan Transaction contemplated by this Restructuring Term Sheet will be structured in a manner that is the most tax-efficient for the Reorganized Debtors (for the avoidance of doubt, such contemplated structure may include a "Bruno's transaction" pursuant to which the Debtors sell the assets and/or equity of all or certain Debtors in a taxable transaction to an indirect subsidiary of a Reorganized Debtor), which structure shall be acceptable to the Required Consenting First Lien Lenders and the Debtors in their sole discretion. |
| | **SELECT ADDITIONAL DEFINITIONS** |
| **"Administrative Claim"** | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Plan Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), and (ii) Transaction Expenses. |
| **"Allowed"** | With reference to any Claim or Interest against a Debtor, any Claim or Interest against a Debtor (a)(i) that is timely filed by the Bar Date or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the DIP Order, the Bankruptcy Rules or a Final Order, (b)(i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan, the DIP Order, or by a Final Order.  With respect to any Claim described in clause (a) above, such Claim will be |

| | considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; provided, however, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan. |
|---|---|
| "**American Freight**" | Collectively, Franchise Group Newco Intermediate AF, LLC and each of its subsidiaries, and American Freight FFO, LLC. |
| "**Bar Date**" | The dates by which proofs of claim must be filed with respect to Claims against the Debtors, as ordered by the Bankruptcy Court pursuant to a bar date order or other applicable order, or pursuant to the Plan. |
| "**BHF Entities**" | Collectively, Franchise Group Intermediate BHF, LLC and Franchise Group Newco BHF, LLC.  For the avoidance of doubt, "BHF Entities" does not include Conn's, Inc. |
| "**Buddy's**" | Collectively, Franchise Group Intermediate B, LLC and each of its subsidiaries. |
| "**Cash**" | The legal currency of the United States and equivalents thereof. |
| "**Confirmation Date**" | The date on which the Bankruptcy Court enters the Confirmation Order. |
| "**DIP Claims**" | Any Claim on account of DIP Loans arising under or pursuant to the DIP Credit Agreement or the other DIP Documents. |
| "**DIP Closing Date**" | The date of the satisfaction (or waiver) of each of the conditions precedent to the initial funding of the DIP Facility after entry of the Interim DIP Order. |
| "**DIP Loans**" | Loans arising under or pursuant to the DIP Credit Agreement. |
| "**Educate**" | Collectively, Franchise Group Intermediate SL, LLC, Franchise Group Newco SL, LLC, and Educate, Inc. |
| "**Estate(s)**" | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| "**Existing Intercompany Equity Interests**" | Any Existing Equity Interests other than the Existing TopCo Equity Interest. |

| "**Final Order**" | An order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; *provided, however*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
|---|---|
| "**HoldCo Entities**" | Collectively, Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, Freedom VCM Receivables, Inc., Freedom VCM Interco, Inc., Freedom VCM, Inc., and TopCo. |
| "**HoldCo General Unsecured Claim**" | Any General Unsecured Claims against the HoldCo Entities other than TopCo. |
| "**HoldCo General Unsecured Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular HoldCo Entity, *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to HoldCo General Unsecured Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, without limitation, the satisfaction in full of the DIP Claims, and, if applicable, the Prepetition HoldCo Loan Claims including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Impaired**" | With respect to a Claim, Interest, or a class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(3) and 1124 of the Bankruptcy Code. |
| "**Intercompany Claim**" | Any Claim against a Debtor held by another Debtor. |
| "**Lien**" | Any "lien," as defined in section 101(37) of the Bankruptcy Code. |
| "**OpCo General Unsecured Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor (other than any HoldCo Entity), *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to General Unsecured Claims of that particular Debtor in priority of payment under the Bankruptcy Code (including the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, and the Prepetition Second Lien Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Other Priority Claim**" | Any Claim other than an Administrative Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| "**Other Secured Claim**" | A Secured Claim other than an Administrative Claim, Priority Tax Claim, Other Priority Claim, DIP Claim, Prepetition ABL Loan Claim, Prepetition |

| | First Lien Loan Claim, Prepetition Second Lien Loan Claim, or Prepetition HoldCo Loan Claim. |
|---|---|
| "**Plan Administrator**" | The Person or Entity (or any successor thereto) who, on and after the Plan Effective Date, shall have the rights, powers, and duties set forth in the Plan, and whose identity and compensation shall be agreed to by the Debtors in consultation with the Required Consenting First Lien Lenders and shall be set forth in the Plan Supplement; <u>provided</u> to the extent the Restructuring Transactions are consummated pursuant to the Plan Transaction, the Plan Administrator shall be appointed by the Required Consenting First Lien Lenders. |
| "**Plan Effective Date**" | The date that the Plan confirmed by the Bankruptcy Court becomes effective. |
| "**Plan Transaction**" | Has the meaning ascribed to it in the recitals to the RSA. |
| "**Prepetition HoldCo Lender Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to Freedom VCM Interco, Inc. or Freedom VCM, Inc. (after taking into account any structurally senior claims) *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims after taking into account all structurally senior Allowed Claims and all Allowed Claims that are senior to Prepetition HoldCo Loan Claims in priority of payment under the Bankruptcy Code (including the satisfaction in full of the DIP Claims including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Prepetition Second Lien Lender Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Prepetition Second Lien Loan Claims in priority of payment under the Bankruptcy Code (including, without limitation, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, and the Prepetition First Lien Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Priority Non-Tax Claims**" | Any Claim, other than a DIP Claim, an Administrative Claim, a Professional Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| "**Priority Tax Claim**" | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| "**Professional Fee Claim**" | Any Claim by a Professional Person for compensation for services rendered or reimbursement of expenses incurred by such Professional Person on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a |

| | Professional Persons's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim. |
|---|---|
| "**Professional Fee Escrow Account**" | An account funded by the Debtors with Cash no later than the Plan Effective Date in the amount equal to the Professional Fee Escrow Amount. |
| "**Professional Fee Escrow Amount**" | The aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professional Persons have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Plan Effective Date, which shall be estimated pursuant to the method set forth in the Plan. |
| "**Professional Person**" | All Persons (a) retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |
| "**PSP**" | Collectively, Franchise Group Intermediate PSP, LLC and each of its subsidiaries. |
| "**Required DIP Lenders**" | The lenders constituting "Required Lenders" under the DIP Credit Agreement. |
| "**Sale Transaction**" | Has the meaning ascribed to it in the recitals to the RSA. |
| "**Schedules**" | The schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code. |
| "**Second Lien Condition**" | The class of Prepetition Second Lien Loan Claims shall have voted to accept the Plan by the Voting Deadline. |
| "**Secured Claim**" | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| "**Specified Party**" | Any of the following: (a) any current or former holders of Interests (other than Franchise Group, Inc. or any of its subsidiaries), (b) any current or former Affiliate of any Person described in clause (a) of this definition, or (c) any current or former partner, officer, director, principal, employee or agent of any Person described in clause (a) or clause (b) of this definition. |
| "**Subordinated Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor, *less* (b) the aggregate amount |

| | required to pay in full in Cash all Allowed Claims that are senior to Subordinated Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, to the extent applicable, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, the Prepetition Second Lien Loan Claims, the Prepetition HoldCo Loan Claims, the HoldCo General Unsecured Claims, and the TopCo General Unsecured Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
|---|---|
| "**Successful Bidder**" | Has the meaning ascribed to such term in the Bidding Procedures. |
| "**Sufficient Bid**" | A qualified bid for a Sale Transaction, or series of qualified bids (so long as each such qualified bid does not contemplate a sale of any assets covered by any other qualified bid as of at least 48 hours prior to the Auction) for a Sale Transaction aggregated together, that the Debtors and the Required Consenting First Lien Lenders determine have satisfied, among other things, the following conditions and are otherwise acceptable to the Debtors and the Required Consenting First Lien Lenders: (a) be a good faith, *bona fide*, irrevocable bid, (b) be in writing and executed by a duly authorized representative of the bidder, (c) unless otherwise agreed by the Required Consenting First Lien Lenders in their sole discretion, provide for receipt by the Debtors of aggregate Cash consideration sufficient for the indefeasible payment in full in Cash at the closing of the Sale Transaction contemplated by such qualified bid(s) of: (1) all of the Prepetition First Lien Loan Claims, (2) all of the Prepetition ABL Loan Claims, and (3) all of the DIP Claims, in each case, including any fees, premiums and accrued but unpaid interest (including postpetition interest at the default contract rate, if applicable) on any of such Claims, (d) be accompanied by a Cash deposit equal to at least 10% of the purchase price, (e) include written evidence acceptable to the Company Parties demonstrating appropriate corporate or similar governance authorization of the bidder(s) to consummate the Sale Transaction contemplated by the proposed bid(s), (f) include written evidence that demonstrates that the bidder has the necessary financial ability to timely close the Sale Transaction contemplated by the proposed qualified bid(s) (including written evidence of the bidder's internal financial resources and ability to finance its bid with Cash on hand, available lines of credit, uncalled capital commitments or otherwise available funds), (g) not contain conditions or contingencies of any kind, relating to financing, internal approvals, due diligence, third party consents or approvals (other than governmental or regulatory consents that may be required to consummate the proposed Sale Transaction, including any antitrust approval that may be required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, which shall be described in the bid together with evidence satisfactory to the Debtors and the Required Consenting First Lien Lenders of the ability to obtain such approvals or consents as soon as reasonably practicable), the satisfaction or achievement of any financial targets, thresholds or metrics, the absence of any material adverse effect since a date earlier than the date the bid was submitted, or any other conditions or contingencies other than conditions to closing that are customary for sales to non-"stalking horse" bidders in sales of assets under section 363 of the Bankruptcy Code (but, for the avoidance of doubt, excluding any of the |

|  | conditions set forth in this clause (g)), (h) be reasonably likely to be consummated (if selected as the winning bid) promptly following entry of the Sale Order or Confirmation Order, as applicable, or otherwise within a time frame acceptable to the Debtors and the Required Consenting First Lien Lenders, and (j) in the case of a series of qualified bids (so long as each such qualified bid does not contemplate a sale of any assets covered by any such other qualified bid as of at least 48 hours prior to the Auction) for a Sale Transaction aggregated together, each qualified bid in such series is conditioned on the consummation of the other qualified bid(s) in such series at substantially the same time by no later than March 4, 2025. |
|---|---|
| "**Take-Back Term Loans**" | Any term loans arising under or pursuant to the Take-Back Debt Credit Agreement. |
| "**TopCo**" | Freedom VCM Holdings, LLC. |
| "**TopCo General Unsecured Claim**" | General Unsecured Claims against TopCo. |
| "**TopCo General Unsecured Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to TopCo, *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to TopCo General Unsecured Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, without limitation, the satisfaction in full of the DIP Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Unimpaired**" | With respect to a Claim, Interest, or a class of Claims or Interests, not "Impaired". |
| "**Vitamin Shoppe**" | Collectively, Franchise Group Intermediate V, LLC and each of its subsidiaries. |
| "**Voting Deadline**" | The date and time to be set by the Bankruptcy Court as the deadline for holders of Impaired Claims to vote to accept or reject the Plan. |

# **EXHIBIT 1**

**DIP Term Sheet**

*Execution Version*

**Franchise Group, Inc.**

**DIP Term Sheet**

This term sheet (together with all exhibits, annexes, and schedules attached hereto, this "**DIP Term Sheet**") sets forth certain material terms of the proposed DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement, dated as of November 1, 2024 (together with all exhibits, annexes, and schedules attached thereto, including the Term Sheets, in each case, as amended, supplemented or modified in accordance with its terms, the "**RSA**"), to which this DIP Term Sheet is attached as an exhibit to the Restructuring Term Sheet.

This DIP Term Sheet does not constitute a commitment to lend or provide any financing nor does it address all terms that would be required in connection with the DIP Facility or that will be set forth in the DIP Documents (as defined below), which are subject to negotiation and further subject to execution of definitive documents, pleadings and proposed forms of orders, all of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

| | |
|---|---|
| **Borrowers** | Franchise Group, Inc., a Delaware corporation (the "**Lead Borrower**"), Franchise Group Newco PSP, LLC, a Delaware limited liability company ("**FG Newco PSP**"), Valor Acquisition, LLC, a Delaware limited liability company ("**Valor**"), Franchise Group Newco Intermediate AF, LLC, a Delaware limited liability company ("**FG Newco Intermediate AF**", and together with the Lead Borrower, FG Newco PSP and Valor, individually, a "**Borrower**" and, collectively, the "**Borrowers**"), each in their respective capacities as debtors and debtors-in-possession. |
| **Guarantors** | Each direct or indirect subsidiary of any of the Borrowers, as secured obligors, and each of Freedom VCM Holdings, LLC, Freedom Receivables II, LLC, Freedom VCM Interco Holdings, Inc., and Freedom VCM Receivables, Inc., as secured obligors solely with respect to the outstanding DIP Obligations of the Tranche A DIP Loans (each as defined below) (collectively, together with the Borrowers, the "**Secured Loan Parties**"), and each of Freedom VCM, Inc., and Freedom VCM Interco, Inc., as unsecured obligors unless, with respect to Freedom VCM, Inc., and Freedom VCM Interco, Inc., the requisite holders of Holdco Claims consent to such parties being secured obligors (collectively, together with the Secured Loan Parties, the "**Loan Parties**"), each in their respective capacities as debtors and debtors-in-possession. |
| | With respect to Freedom VCM Holdings, LLC, the DIP Obligations shall be repaid, first from DIP Collateral comprised of Unencumbered Property of all Secured Loan Parties (other than Freedom VCM Holdings, LLC), second, from all other DIP Collateral of all Secured Loan Parties (other than Freedom VCM Holdings, LLC), and third, from assets at Freedom VCM Holdings, LLC. Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "**Freedom Allocated Fees and Expenses**").   Freedom VCM |

|  | Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such Freedom Allocated Fees and Expenses, if any; _provided_, that, for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the Freedom Allocated Fees and Expenses; _provided_, _further_, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims. |
|---|---|
| **DIP Agent** | The administrative agent and the collateral agent for the DIP Lenders (as defined below) with respect to the DIP Facility (in such capacities, the "**DIP Agent**") shall be a financial institution selected by, and qualified to perform the duties customarily associated with such roles as determined by, the Required DIP Lenders (as defined below), which shall be reasonably acceptable to the Lead Borrower (it being understood that Wilmington Trust, National Association is acceptable to the Lead Borrower). |
| **DIP Lenders** | One or more beneficial holders of First Lien Loans (or any designated Related Funds (as defined in the RSA) of such holders) who become party to the DIP Credit Agreement (as defined below) from time to time in accordance with its terms (each a "**DIP Lender**", and collectively, the "**DIP Lenders**"); _provided_ that any DIP Lender must be a party to the RSA prior to acquiring any DIP Loans (as defined below); _provided_ _further_ that all beneficial holders of First Lien Claims shall be presented with the option to become a party to the RSA pursuant to the Syndication Procedures (as defined below). |
| **Prepetition ABL Facility** | That certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among the Borrowers, each of the other loan parties party thereto, JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent (in such capacities, the "**ABL Credit Agreement Agent**"), and the lenders party thereto from time to time (collectively, the "**ABL Lenders**", and together with the ABL Credit Agreement Agent and the other secured parties under the ABL Credit Agreement and the other ABL Loan Documents, collectively, the "**ABL Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Credit Agreement**"; the obligations thereunder and under the other ABL Loan Documents, the "**ABL Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**ABL Liens**") (the "**ABL Facility**"). |
| **Prepetition First Lien Facility** | That certain First Lien Credit Agreement, dated as of March 10, 2021, among the Borrowers, each of the other loan parties party thereto, Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent (in such capacities, the "**First Lien Credit Agreement Agent**"), and the lenders party thereto from time to time (collectively, the "**First Lien Lenders**", and together with the First Lien Credit Agreement Agent and the other secured parties under the First Lien Credit Agreement and the other First Lien Loan Documents, collectively, the "**First Lien Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"; the obligations thereunder and |

| | |
|---|---|
| | under the other First Lien Loan Documents, the "**First Lien Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**First Lien Liens**") (the "**First Lien Facility**"). |
| **Prepetition Second Lien Facility** | That certain Second Lien Credit Agreement, dated as of March 10, 2021, among the Borrowers, each of the other loan parties party thereto, Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "**Second Lien Credit Agreement Agent**"), and the lenders party thereto from time to time (the "**Second Lien Lenders**", and together with the Second Lien Credit Agreement Agent and the other secured parties under the Second Lien Credit Agreement and the other Second Lien Loan Documents[1], collectively, the "**Second Lien Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"; the obligations thereunder and under the other Second Lien Loan Documents, the "**Second Lien Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**Second Lien Liens**") (the "**Second Lien Facility**"). |
| **Prepetition Second Lien Sidecar Facility** | That certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, among the Borrowers, each of the other loan parties party thereto, Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "**Second Lien Sidecar Credit Agreement Agent**"), and the lenders party thereto from time to time (the "**Second Lien Sidecar Lenders**", and together with the Second Lien Sidecar Credit Agreement Agent and the other secured parties under the Second Lien Sidecar Credit Agreement and the other Second Lien Sidecar Loan Documents[2], collectively, the "**Second Lien Sidecar Secured Parties**" and, together with the ABL Secured Parties, the First Lien Secured Parties, and the Second Lien Secured Parties, the "**Prepetition Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Sidecar Credit Agreement**"; the obligations thereunder and under the other Second Lien Sidecar Loan Documents, the "**Second Lien Sidecar Secured Obligations**" and, together with the ABL Secured Obligations, the First Lien Secured Obligations, and the Second Lien Secured Obligations, the "**Prepetition Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**Second Lien Sidecar Liens**" and, together with the ABL Liens, the First Lien Liens, and the Second Lien Liens, the "**Prepetition Liens**") (the "**Second Lien Sidecar Facility**"). |
| **Existing Intercreditor Agreements** | That certain (i) Amended and Restated Intercreditor Agreement, dated as of November 22, 2021, among the Lead Borrower, the other Loan Parties from time to time thereto, the ABL Credit Agreement Agent, the First Lien Credit |

---

[1] As used herein, "**Second Lien Loan Documents**" means the "Loan Documents" as defined in the Second Lien Credit Agreement.

[2] As used herein, "**Second Lien Sidecar Loan Documents**" means the "Loan Documents" as defined in the Second Lien Sidecar Credit Agreement (and together with the ABL Loan Documents, the First Lien Loan Documents, and the Second Lien Loan Documents, collectively, the "**Prepetition Loan Documents**").

|  | Agreement Agent, the Second Lien Credit Agreement Agent, and the Second Lien Sidecar Credit Agreement Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing ABL Intercreditor Agreement**"); and (ii) Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, among the Lead Borrower, the other Loan Parties from time to time party thereto, the First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent, and the Second Lien Sidecar Credit Agreement Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing 1L/2L Intercreditor Agreement**", and together with the Existing ABL Intercreditor Agreement, collectively, the "**Existing Intercreditor Agreements**"). |
|---|---|
| **Permitted Liens** | (a) Any valid liens ("**Permitted Prior Liens**") that are (i) in existence on the Petition Date, (ii) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (iii) senior in priority to the Prepetition Liens, and (iv) permitted to be incurred under the Prepetition Loan Documents; and<br><br>(b) liens permitted to have seniority over the DIP Liens (as defined below) securing the DIP Facility as specified in the DIP Credit Agreement (as determined by the Required DIP Lenders). |
| **Interim and Final DIP Orders** | The order approving the DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the DIP Agent and the Required DIP Lenders (the "**Interim DIP Order**"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the DIP Documents, (ii) the making of the DIP Loans (as defined below), (iii) the granting of the superpriority claims and liens against the Loan Parties and their assets in accordance with the DIP Documents with respect to the DIP Collateral (as defined below), (iv) the payment of the DIP Premiums (as defined in the Restructuring Term Sheet), (v) those items set forth below in "Stipulations, Waivers, Releases and Protections", (vi) the use of Cash Collateral (as defined below), and (vii) the granting of adequate protection to the ABL Secured Parties, the First Lien Secured Parties, the Second Lien Secured Parties, and the Second Lien Sidecar Secured Parties (collectively, the "**DIP Matters**").<br><br>The order approving the DIP Facility on a final basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the DIP Agent and the Required DIP Lenders (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), shall authorize and approve on a final basis, among other matters, the DIP Matters. |
| **Adequate Protection** | As adequate protection against the risk of any post-petition diminution in the value of the ABL Liens in all collateral securing the ABL Secured Obligations (collectively, the "**ABL Collateral**"), the First Lien Liens in all collateral securing the First Lien Secured Obligations (collectively, the "**First Lien Collateral**"), the Second Lien Liens in all collateral securing the Second Lien Secured Obligations (collectively, the "**Second Lien Collateral**"), and the Second Lien Sidecar Liens in all collateral securing the Second Lien Sidecar |

- 4 -

Secured Obligations (collectively, the "**Second Lien Sidecar Collateral**" and, together with the ABL Collateral, the First Lien Collateral, and the Second Lien Collateral, the "**Prepetition Collateral**"), in each case, which is as a result of, or arises from, or is attributable to, among other things, the imposition of the automatic stay, the use, sale or lease of such Prepetition Collateral, including Cash Collateral, the granting of priming liens and claims as set forth herein and the imposition of the Carve-Out (as defined below) (any such diminution, "**Diminution in Value**"), the Prepetition Secured Parties shall be granted the following adequate protection, subject in all cases to the Carve-Out and the Permitted Prior Liens, and, to the extent set forth in **Annex II** attached hereto, the DIP Liens and the DIP Superpriority Claims (as defined below):

(a) The First Lien Credit Agreement Agent, on behalf of the First Lien Secured Parties, shall be granted the following as adequate protection: (A) to the extent of any Diminution in Value of the First Lien Liens in First Lien Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**First Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; (B) to the extent of any Diminution in Value of the First Lien Liens in First Lien Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**First Lien Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable; (C) payment of accrued but unpaid post-petition interest in cash at the non-default rate as the same becomes due and payable under the First Lien Credit Agreement (other than with respect to the interest payment due in October 2024 added to the principal amount of the First Lien Loans); (D) the payment of the reasonable and documented out-of-pocket fees and expenses of the First Lien Credit Agreement Agent and the Consenting First Lien Lenders; provided, however, that the foregoing shall be limited to the pre-petition and post-petition fees and expenses of (i) Seward & Kissel LLP, as counsel to the First Lien Credit Agreement Agent, (ii) a single firm as local counsel to the First Lien Credit Agreement Agent, and (iii) the Ad Hoc Group Advisors; and (E) the Borrowers shall provide copies of any financial reports (including the weekly delivery of a rolling 13 week cash flow, budget, and supporting information) to the aforementioned counsel and advisors to the extent otherwise provided to the DIP Lenders; and

(b) The ABL Credit Agreement Agent, on behalf of the ABL Secured Parties, shall be granted the following adequate protection: (A) to the extent of any Diminution in Value of the ABL Liens in ABL Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**ABL Adequate Protection Liens**"), which

replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; and (B) to the extent of any Diminution in Value of the ABL Liens in ABL Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**ABL Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable.

(c) Additional adequate protection for the ABL Lenders, as agreed to by the Debtors and the Required Consenting First Lien Lenders.

(d) The Second Lien Credit Agreement Agent, on behalf of the Second Lien Secured Parties, shall be granted the following as adequate protection: (A) to the extent of any Diminution in Value of the Second Lien Liens in Second Lien Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Second Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; and (B) to the extent of any Diminution in Value of the Second Lien Liens in Second Lien Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**Second Lien Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable.

(e) The Second Lien Sidecar Credit Agreement Agent, on behalf of the Second Lien Sidecar Secured Parties, shall be granted the following as adequate protection: (A) to the extent of any Diminution in Value of the Second Lien Sidecar Liens in Second Lien Sidecar Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Second Lien Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens, the ABL Adequate Protection Liens, and the Second Lien Adequate Protections Liens, the "**Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; and (B) to the extent of any Diminution in Value of the Second Lien Sidecar Liens in Second Lien Sidecar Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and

| | |
|---|---|
| | all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Carve-Out) (the "**Second Lien Sidecar Adequate Protection Claims**" and, together with the First Lien Adequate Protection Claims, the ABL Adequate Protection Claims, and the Second Lien Adequate Protection Claims, the "**Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable. |
| **Carve-Out** | The Prepetition Liens, the DIP Liens, the Adequate Protection Liens, and all Adequate Protection Claims granted under the DIP Orders, shall be subject to and subordinate to the Carve-Out. |
| | For purposes hereof, "**Carve-Out**" means an amount equal to the sum of (i) all unpaid fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the Office of the United States Trustee (the "**U.S. Trustee**") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below) (collectively, the "**Statutory Fees**"), which Statutory Fees shall not be subject to any budget; (ii) all unpaid reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all accrued and unpaid fees and expenses (in each case, including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Loan Parties when and if earned pursuant to the terms and conditions of an engagement letter approved by the Bankruptcy Court in these Chapter 11 Cases) (collectively, "**Allowed Professional Fees**") incurred by persons or firms retained by the Loan Parties pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Loan Party Professionals**") and any official statutory committee of unsecured creditors (the "**Official Committee**"), if appointed in the Chapter 11 Cases, pursuant to sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**"), at any time before or on the first day following delivery by the DIP Agent or, if applicable, the First Lien Credit Agreement Agent, of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and, in the case of any Committee Professionals, not to exceed the aggregate amounts set forth for the Committee Professionals in the Approved Budget (as defined below); and (iv) Allowed Professional Fees of Loan Party Professionals and any Committee Professionals, in an aggregate amount not to exceed $4,000,000, incurred after the first day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**"). |
| | For purposes of the foregoing, the "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent, acting at the direction of the Required DIP Lenders under the DIP Documents |

<table>
<tr><td></td><td>(or, after the DIP Obligations have been paid in full, the First Lien Credit Agreement Agent acting at the direction of the Required Consenting First Lien Lenders under the First Lien Credit Agreement) to the Loan Parties, their lead restructuring counsel, the U.S. Trustee, and counsel to the Official Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below), stating that the Post-Carve-Out Trigger Notice Cap has been invoked; <u>provided</u>, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u> or <u>(iv)</u> above on any grounds.</td></tr>
<tr><td><strong>Type and Amount of the DIP Facility</strong></td><td>Senior secured superpriority debtor-in-possession term loan credit facility (the "<strong>DIP Facility</strong>", and the loans outstanding thereunder, the "<strong>DIP Loans</strong>"), comprised of the following:

(a) aggregate principal amount of commitments of up to $250 million, <em>plus</em> applicable fees and premiums (the "<strong>New Money Commitments</strong>"), pursuant to which the DIP Lenders shall provide new money first-out delayed-draw term loans ("<strong>Tranche A DIP Loans</strong>") as follows, in each case, subject to the Approved Budget: (A) $125,000,000 shall be borrowed in a single borrowing on the Closing Date, (B) an aggregate principal amount not to exceed $50,000,000 shall be borrowed in a single borrowing on or after the entry of the Final Order, and (C) an aggregate principal amount not to exceed $75,000,000 may be borrowed in a single borrowing on or after the entry of the Confirmation Order, and (iv) other amounts not to exceed the New Money Commitments, after accounting for the draws under the foregoing subclauses (i)–(iii), may be drawn solely to the extent set forth in the Approved Budget and approved by the Required DIP Lenders in their sole discretion; and

(b) a second-out roll up facility (the "<strong>Tranche B DIP Loans</strong>") pursuant to which, effective immediately upon the completion of the Syndication on the Syndication Date (each as defined in the Syndication Procedures), up to $500 million of the First Lien Secured Obligations (together with accrued and unpaid interest thereon) held by the DIP Lenders (or any of their respective designated Related Funds) as of the Syndication Date shall be, on the Syndication Date, automatically deemed "rolled up" and converted into the DIP Facility, on a cashless two dollars of Tranche B DIP Loans for every dollar of principal amount of Tranche A DIP Loans (i.e., $250,000,000 ), based upon such Person's (or any of its designated Approved Funds) pro rata share of principal amount of Tranche A DIP Loans, and, shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Tranche B DIP Loans for all purposes hereunder as if originally funded on the Closing Date.

DIP Loans that are repaid or prepaid may not be reborrowed.</td></tr>
<tr><td><strong>Use of Proceeds</strong></td><td>The proceeds of the Tranche A DIP Loans shall be used only (i) to make adequate protection payments as required in the DIP Documents and the DIP Orders, (ii) to pay the administrative costs of the Chapter 11 Cases (including professional fees and expenses) and the Restructuring Transactions, (iii) to fund</td></tr>
</table>

| | |
|---|---|
| | the Carve-Out and to make payments under the Carve-Out in accordance with the terms of the DIP Orders and (iv) for general corporate purposes, in each case, solely to the extent in accordance with and subject to the credit agreement governing the terms of the DIP Facility (the "**DIP Credit Agreement**", and together with all security and collateral agreements related thereto, the "**DIP Documents**") and the DIP Orders (including the Approved Budget, subject to the Permitted Variance Covenant (as defined below)). |
| **Closing Date** | The date of the satisfaction (or waiver) of each of the conditions precedent to the initial funding of the DIP Facility after entry of the Interim DIP Order (the "**Closing Date**"). |
| **Maturity** | The DIP Facility shall mature on the earliest to occur of: <br><br> (i) one hundred and eighty (180) days after the Closing Date, which may be extended by the Required Supermajority Lenders for up to three (3) consecutive 30-day periods; <br><br> (ii) 11:59 p.m. New York City Time on the date that is five (5) days after the Petition Date if the Interim DIP Order, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion, has not been entered by the Bankruptcy Court prior to such date and time; <br><br> (iii) 11:59 p.m. New York City Time on the date that is forty-five (45) days after the Petition Date if the Final DIP Order, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion, has not been entered by the Bankruptcy Court prior to such date and time; <br><br> (iv) the Plan Effective Date; <br><br> (v) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code; <br><br> (vi) consummation of a sale of all or substantially all assets or equity of the Loan Parties (other than to another Loan Party), other than a sale transaction pursuant to a Sufficient Bid or is otherwise consented to by the Required Supermajority Lenders in their sole discretion; <br><br> (vii) termination of the RSA; and <br><br> (viii) the acceleration of the DIP Loans and the termination of the commitments under the DIP Facility in accordance with the terms of the DIP Documents. |
| **Amortization** | None. |
| **Payments and Interest Rates** | As set forth on **Annex I** attached hereto. |
| **Mandatory Prepayments** | Mandatory prepayments of the DIP Loans shall be required in an amount equal to (i) 100% of net cash proceeds of any event of loss (excluding D&O and business interruption insurance) or condemnation (subject to the Existing |

| | |
|---|---|
| | Intercreditor Agreements, as applicable), (ii) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement, (iii) 100% of net cash proceeds from the post-petition issuance of any equity of the Borrowers or any controlled subsidiary thereof, (iv) 100% of the net cash proceeds of extraordinary receipts (excluding D&O insurance, to the extent such proceeds are not payable to the Debtors or the estates pursuant to the terms of any such applicable D&O insurance policy, and business interruption insurance), and (v) 100% of the net cash proceeds of any sale of assets of any of the Loan Parties or their subsidiaries (other than asset sales in the ordinary course of business) (subject to the Existing Intercreditor Agreements, as applicable), in each case, subject to the Documentation Principles (as defined below). Net cash proceeds from any mandatory prepayment shall be applied toward repayment of the DIP Loans on a *pro rata* basis and will result in a dollar-for-dollar permanent reduction of then outstanding principal amounts thereof and shall be without premium or penalty. Proceeds from any mandatory prepayment shall first be applied toward repayment of the Tranche A DIP Loans on a *pro rata* basis and then to the repayment of the Tranche B DIP Loan on a *pro rata* basis. |
| **Voluntary Prepayments** | Permitted, in whole or in part, subject to limitations as to minimum amounts, without premium or penalty. Proceeds from any voluntary prepayment shall first be applied toward repayment of the Tranche A DIP Loans on a *pro rata* basis and then to the repayment of the Tranche B DIP Loans on a *pro rata* basis. |
| **Collateral and Priority** | Subject to the Carve-Out and to Permitted Prior Liens, as security for the prompt payment and performance of all amounts due under the DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities or other amounts (collectively, the "**DIP Obligations**"), effective as of the Petition Date, the DIP Agent, for the benefit of itself and the DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("**DIP Liens**") in all assets and properties of each of the Secured Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, the Secured Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Secured Loan Parties' rights, title and interests in (1) all ABL Collateral and First Lien Collateral, (2) all money, cash and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds; (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds (excluding D&O and business interruption insurance, but not |

proceeds from any D&O insurance policies, to the extent such proceeds are not payable to the Debtors or the estates, which shall be subject to the DIP Liens); (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims; (19) subject to entry of a Final DIP Order, all proceeds of or property recovered, whether by judgment, settlement or otherwise, from any and all claims and causes of action of any Secured Loan Party's estate seeking avoidance under chapter 5 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or any other similar state statute, common law or otherwise ("**Avoidance Action Proceeds**"); (20) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Secured Loan Parties, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Secured Loan Party from time to time with respect to any of the foregoing (collectively, the "**DIP Collateral**"); provided, that DIP Collateral shall exclude other assets to be mutually agreed among the Borrowers and the Required DIP Lenders, but shall include any and all proceeds and products of such excluded assets, unless such proceeds and products otherwise separately constitute excluded assets. Notwithstanding anything herein to the contrary, the security interest over the DIP Collateral shall be created and perfected by the Interim DIP Order and Final DIP Order, as applicable, and no mortgages or other perfection documentation (other than UCC-1 financing statements), including mortgages, control agreements, landlord waivers, foreign law perfection actions or third-party consents or orders, shall be required; provided, further, upon the reasonable request of the DIP Lenders, the Loan Parties shall make filings or take any other actions with respect to the perfection of liens.

The DIP Liens shall have the following priorities (subject in all cases to the Carve-Out):

    i.    *First Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, subject to entry of the Final DIP Order, Avoidance Action Proceeds (collectively, "**Unencumbered Property**"), which DIP Liens shall be subject and subordinate only to the Carve-Out.

    ii.    *Priming DIP Liens and Liens Junior to Certain Other Liens*. Pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully

| | |
|---|---|
| | and automatically perfected in all DIP Collateral (other than as described in clause (i) above), which DIP Liens (a) shall be subject and subordinate only to (1) the Carve-Out, (2) Permitted Prior Liens, (3) solely with respect to ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) and DIP Collateral of a type that would otherwise constitute ABL Priority Collateral (which, for the avoidance of doubt, shall not include any proceeds of the DIP Facility), the ABL Liens, (b) shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in any DIP Collateral that would otherwise be subject to the First Lien Liens (including, without limitation, any First Lien Adequate Protection Liens), the Second Lien Liens, and the Second Lien Sidecar Liens, and (c) shall otherwise be subject to the priorities set forth in **Annex II** attached hereto. |
| | iii.    *Liens Senior to Other Liens.* Except to the extent expressly permitted hereunder, subject to the Carve-Out and Permitted Prior Liens, the DIP Liens and the DIP Superpriority Claims (as defined below) shall not be made subject to or *pari passu* with (a) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Secured Loan Parties, (b) any lien or security interest that is avoided or preserved for the benefit of the Secured Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien or security interest of the Secured Loan Parties or their affiliates, or (d) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
| | Subject to entry of the Interim DIP Order, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Unencumbered Property and (b) second, from all other DIP Collateral. |
| **Guarantees** | Each Loan Guarantor shall unconditionally guarantee, on a joint and several basis, all DIP Obligations arising under or in connection with the DIP Facility. |
| **DIP Superpriority Claims** | Subject to the Carve-Out, the DIP Obligations shall be allowed superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claims shall have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, with recourse against all DIP Collateral (the "**DIP Superpriority Claims**"), which DIP Superpriority Claims shall be subject to the priorities set forth in **Annex II** attached hereto. |
| **Use of Cash** | The Loan Parties shall be permitted to use Cash Collateral for the purposes and solely to the extent provided for in the Approved Budget, the Interim DIP Order |

| | |
|---|---|
| **Collateral** | and the Final DIP Order. |
| **Milestones** | The Loan Parties shall comply with the Milestones set forth in Section 4.01 of the RSA (as such Milestones may be extended in accordance with the terms therein), which Milestones shall be incorporated into the DIP Credit Agreement. |
| **Documentation** | The DIP Facility (including the terms and conditions applicable thereto) shall be documented pursuant to and evidenced by (a) the DIP Credit Agreement, negotiated in good faith, in form and substance reasonably acceptable to the Borrowers and the Required DIP Lenders, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the Interim DIP Order or the Final DIP Order, as applicable, (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby, as determined by the Borrowers and the Required DIP Lenders, (iv) be based on the First Lien Credit Agreement and (v) be mutually agreed among the Borrowers and the Required DIP Lenders, (b) the Interim DIP Order, (c) the Final DIP Order, and (d) other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as determined by the Loan Parties and the Required DIP Lenders (this paragraph, the "**Documentation Principles**"); _provided_, that, notwithstanding anything herein to the contrary, the DIP Liens on the DIP Collateral shall be created and perfected by the Interim DIP Order and Final DIP Order, as applicable, and no mortgages or other perfection documentation (other than UCC-1 financing statements), including mortgages, control agreements, landlord waivers, foreign law perfection actions or third party consents or orders, shall be required; _provided_, _further_, upon the reasonable request of the DIP Lenders, the Loan Parties shall make filings or take any other actions with respect to the perfection of liens. |
| **Representations and Warranties** | The DIP Documents shall contain usual and customary representations and warranties, subject to the Documentation Principles. |
| **Cash Flow Reporting; Variance Reporting; Variance Testing** | No later than 5:00 p.m. (New York City time) on every fourth Thursday following the Petition Date (each such Thursday, the "**Updated Budget Deadline**"), the Loan Parties shall deliver to the Ad Hoc Group Advisors and the DIP Agent a supplement to the Initial DIP Budget (each, an "**Updated Budget**"), covering the then-upcoming 13-week period that commences with Saturday of the calendar week immediately preceding such Updated Budget Deadline, in each case consistent with the form and detail set forth in the Initial DIP Budget and including a forecasted unrestricted cash balance as well as a line-item report setting forth the estimated fees and expenses to be incurred by each professional advisor on a weekly basis; _provided_, _however_, that (x) (i) the Updated Budget will be deemed, in each case, conditionally approved unless the Required DIP Lenders provide written notice of their objection to such Updated Budget (which notice may be provided by one of the Lender Professionals on their behalf via email) within four (4) Business Days of the delivery of such Updated Budget, and during such period, the Initial DIP Budget or most recent Approved Budget, as applicable, shall remain in effect (the "**Interim Approval Period**"), (ii) following the Interim Approval Period, if no objection is received |

from the Required DIP Lenders pursuant to clause (i), the Updated Budget shall be deemed the "**Approved Budget**," shall be in full force and effect and shall constitute the Approved Budget (which Approved Budget shall be the Initial DIP Budget until superseded by an approved Updated Budget), provided, that the Required DIP Lenders may, at any time after such four (4) Business Day period and until the date that is seven (7) Business Days after delivery of the Updated Budget, object to such Updated Budget, whereupon the Initial DIP Budget or most recent Approved Budget shall be deemed the Approved Budget, and (y) if the Required DIP Lenders do not provide written notice of their objection to such Updated Budget (which notice of disapproval may be provided by one the Ad Hoc Group Advisors on their behalf via email) within such seven (7) Business Days period, the Updated Budget shall be in full force and effect and shall constitute the Approved Budget; (iii) the Required DIP Lenders shall not have any obligation to approve any Updated Budget, and (iv) no modification to the Initial DIP Budget or any Updated Budget, any reforecasting of any information relating to any period covered thereby or the inclusion of new line items in any Updated Budget, as the case may be, shall in any event be effective without the affirmative written consent of the Required DIP Lenders (which may be provided by one of the Ad Hoc Group Advisors on their behalf via email).

Not later than 5:00 p.m. New York City time every Thursday (commencing with Thursday of the week immediately following the first full week after the week in which the Petition Date occurs) (each such Thursday, the "**Variance Report Deadline**"), the Borrower shall deliver to the Ad Hoc Group Advisors and the DIP Lenders a variance report, each in form, detail and substance satisfactory to the Required DIP Lenders in their sole discretion (each, a "**Variance Report**"), setting forth the difference between, on a line-by-line and aggregate basis, (i) actual operating receipts and budgeted operating receipts as set forth in the Approved Budget in effect for the relevant periods, as the case may be (the "**Receipts Variance**"), and (ii) actual operating disbursements and budgeted operating disbursements as set forth in the Approved Budget in effect for the relevant periods, as the case may be (the "**Disbursements Variance**"), in each case, for the Applicable Period (as defined below), in each case, together with a reasonably detailed explanation of such Receipts Variance and Disbursements Variance.

The Loan Parties shall not permit the Receipts Variance or the Disbursements Variance with respect to any Applicable Period to exceed the Permitted Variance (as defined below) (the "**Permitted Variance Covenant**").

"**Applicable Period**" means, (w) with respect to the first Variance Report, the first full one-week period ending on the Friday of the week immediately preceding the first Variance Report Deadline, (x) with respect to the second Variance Report, the first full two-week period ending on the Friday of the week immediately preceding the second Variance Report Deadline, (y) with respect to the third Variance Report, the first full three-week period ending on the Friday of the week immediately preceding the third Variance Report Deadline, and (z) with respect to the fourth Variance Report, and each Variance Report thereafter, the four-week period ending on the Friday of the week immediately preceding the applicable Variance Report Deadline.

| | |
|---|---|
| | "**Permitted Variance**" means, (i) with respect to the first Variance Report, no limitations on Disbursements Variance and Receipts Variance, (ii) with respect to the second Variance Report, Disbursements Variance less than 25% and Receipts Variance less than 25%, (iii) with respect to the third Variance Report, Disbursements Variance less than 20% and Receipts Variance less than 20% and (iv) with respect to the fourth Variance Report and every Variance Report thereafter, Disbursements Variance less than 15% and Receipts Variance less than 15%, in each case under the foregoing clauses (i) through (iv), on an aggregate basis (and not on a line item basis) and excluding, in any event, any professional fees. |
| **Affirmative and Negative Covenants** | The DIP Documents shall contain usual and customary affirmative and negative covenants for facilities of this type, including limitations on all non-ordinary course incurrence of indebtedness, liens, dispositions of assets, mergers, restricted payments, investments, fundamental changes, transactions with affiliates, burdensome agreements, prepayments of debt and use of proceeds of DIP Facility and Cash Collateral, subject to the Documentation Principles; provided, that, without limitation, the DIP Documents shall require:
<br><br>(i)    five (5) days' advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Loan Parties in the Chapter 11 Cases to the Ad Hoc Group Advisors, unless not reasonably practicable under the circumstances (in which case, as soon as reasonably practicable prior to filing);
<br><br>(ii)    compliance with the Milestones and the Permitted Variance Covenant;
<br><br>(iii)    the Borrower and its subsidiaries shall maintain Liquidity (as defined in the First Lien Credit Agreement) at all times of at least $50 million (the "**Liquidity Covenant**"), to be determined as of the Friday of the immediately preceding testing period, and the Borrower shall certify as to compliance with such minimum Liquidity Covenant on a weekly basis in connection with delivery of the Variance Report;
<br><br>(iv)    the Borrower shall use commercially reasonable efforts to obtain a public rating (but not any particular rating) in respect of the DIP Loans made available under this Agreement from each of S&P and Moody's on or before seventy-five (75) days after the Closing Date;
<br><br>(v)    delivery of monthly financial statements including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month;
<br><br>(vi)    weekly conference calls and/or video calls among the Loan Parties' relevant senior management, the Loan Parties' advisors, the Ad Hoc Group Advisors and the DIP Lenders, which update calls may cover the Loan Parties' financial performance, the latest budget approved for variance testing, the Loan Parties' variance reports, and the other information provided pursuant to the reporting covenant described above; and
<br><br>(vii)    certain covenants materially consistent with those set forth in the RSA and Section 5.16 of the First Lien Credit Agreement.
<br><br>For the avoidance of doubt, the DIP Documents shall not include any financial |

- 15 -

| | |
|---|---|
| | maintenance covenants not otherwise set forth herein. |
| **Conditions Precedent to Closing and the Initial Borrowing** | The Closing Date under the DIP Facility, and the initial borrowing thereunder, shall be subject to customary conditions to closing for facilities of this type, including the following:<br><br>(i)    no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required DIP Lenders;<br><br>(ii)    the preparation, authorization and execution of the DIP Documents with respect to the DIP Facility, in form and substance consistent with this DIP Facility Term Sheet and otherwise reasonably acceptable to the Loan Parties, the Required DIP Lenders and the DIP Agent;<br><br>(iii)    the delivery of a 13-week cash flow projection (the "**Initial DIP Budget**") in form and substance acceptable to the Required DIP Lenders, reflecting (i) the Loan Parties' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth calendar week thereafter, and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by the Loan Party Professionals, the Committee Professionals (if any), and other professionals during the thirteen week period;<br><br>(iv)    the ABL Secured Parties shall have agreed to permit the use of Cash Collateral, and adequate protection, pursuant to the Interim DIP Order on terms and conditions set forth herein and otherwise acceptable to the Required DIP Lenders, in each case, solely to the extent required, and subject to the terms and conditions, under the Existing ABL Intercreditor Agreement;<br><br>(v)    the delivery of (i) a secretary's (or other officer's) certificate or a statement of no change as to documentation previously delivered of the Borrowers and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Borrowers;<br><br>(vi)    all premiums, payments, fees, costs and expenses (including, without limitation, the fees and expenses of the Ad Hoc Group Advisors and all other counsel, financial advisors and other professionals of the DIP Lenders and DIP Agent (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date) then due and payable shall have been paid;<br><br>(vii)    the DIP Lenders shall have received from the Borrowers and each of the Loan Parties, at least three (3) Business Days prior to the Closing Date, (a) documentation and other information requested by any DIP Lender that is required by regulatory authorities under applicable "know your |

| | |
|---|---|
| | customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (b) if a Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the DIP Lenders shall have received from such Borrower, at least one (1) Business Day prior to the Closing Date, a beneficial ownership certification in relation to such Borrower; |
| | (viii)  payment of the applicable Commitment Premium and the DIP Backstop Premium (as defined in the Restructuring Term Sheet); and |
| | (ix)  the Closing Date shall have occurred on or before the date that is one (1) Business Day after the date of entry of the Interim DIP Order unless the Required DIP Lenders consent to a later date. |
| **Conditions to Each Borrowing** | In addition to the conditions precedent noted above, each borrowing under the DIP Facility shall be subject to further customary conditions to closing for facilities of this type, including, without limitation: |
| | (i)  solely in the case of any borrowing after the Closing Date, no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order. |
| | (ii)  the DIP Agent shall have a fully perfected lien on the DIP Collateral pursuant to the Interim DIP Order to the extent required by the DIP Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order; |
| | (iii)  the DIP Agent shall have received a signed borrowing request from the Borrower; |
| | (iv)  since the date of the Agreement Effective Date, there shall have been no event, development or circumstance that has had, or would reasonably be expected to have, a material adverse effect (pursuant to the Documentation Principles); |
| | (v)  the representations and warranties of each Loan Party set forth in the DIP Credit Agreement and in each other DIP Document shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; provided, that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; |
| | (vi)  all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion; |
| | (vii)  no Event of Default shall exist or would result from the initial borrowing |

|  | or from the application of the proceeds therefrom; and |
|  | (viii) the RSA shall have been executed and be in full force and effect and no event of default shall have occurred and be continuing thereunder except to the extent such default or event of default has been cured or waived in accordance with the terms of the RSA. |
| **Events of Default** | The DIP Documents shall contain usual and customary events of default for facilities of this type, subject to the Documentation Principles (including grace periods and materiality qualifiers), including, without limitation (the "**Events of Default**"): |
|  | (i) the Loan Parties' failure to pay principal, or interest and other amounts (other than professional fees) when due under the DIP Documents or the DIP Orders, subject, in each case, to a three (3) day grace period; |
|  | (ii) the Loan Parties' failure to pay professional fees when due under the DIP Documents or DIP Orders, subject to a three (3) day grace period; |
|  | (iii) the Closing Date shall not have occurred within three (3) Business Days after the date of entry of the Interim DIP Order unless the Required DIP Lenders consent to a later date; |
|  | (iv) any act or occurrence that would, upon the delivery of notice, permit the RSA to be terminated, unless such act or occurrence was waived, cured, or extended in accordance with the terms of the RSA; |
|  | (v) the Loan Parties' failure to satisfy in any materials respect any of the Milestones, subject to any waiver or extension of such Milestones pursuant to the terms of the RSA; |
|  | (vi) the Loan Parties' failure to (i) conduct a marketing and sale process for the Loan Parties' assets, other than pursuant to the Bidding Procedures, or (ii) promptly terminate the Sale Process if the Loan Parties have not received a Sufficient Bid on or before the Bid Deadline, in each case, without the consent of the Required Consenting First Lien Lenders; |
|  | (vii) the Loan Parties' breach of the Permitted Variance Covenant; and |
|  | (viii) the filing by the Loan Parties of chapter 11 plan of reorganization (or any amendment thereof) other than a Plan that is consistent in all material respects with the RSA, without the consent of the Required Consenting First Lien Lenders. |
|  | Upon the occurrence and during the continuation of an Event of Default, at the written direction of the Required DIP Lenders, in accordance with the DIP Orders, without further order from or application to the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent, acting at the direction of the Required DIP Lenders, to (A) deliver to the Borrowers a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the DIP Facility, (C) declare the DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the DIP Facility, (F) charge the default rate |

<table>
<tr><td></td><td>

of interest under the DIP Facility, (G) freeze all monies in any deposit accounts of the Loan Parties, (H) exercise any and all rights of setoff, (I) exercise any right or remedy with respect to the DIP Collateral or the DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the DIP Documents, the DIP Orders or applicable law; provided, however, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (D), (F), (G), (H), (I) and (J) above, (i) the DIP Agent, acting at the request of the Required DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee (if any), and the Office of the United States Trustee with five (5) days' prior written notice (such period, the "**Remedies Notice Period**"), and (ii) during the Remedies Notice Period, the DIP Agent shall refrain from exercising its rights and remedies and the Loan Parties and/or any Official Committee shall be permitted to request an emergency hearing before the Bankruptcy Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis) solely to the extent they, in good faith, dispute the occurrence of an Event of Default, to consider on an expedited basis whether an Event of Default has in fact occurred or is continuing; provided, further, that during the Remedies Notice Period, the Loan Parties shall be permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Loan Parties' business, as determined by Required DIP Lenders.

The DIP Lenders' right to enforce the remedies provided in the DIP Orders and in the DIP Credit Agreement is subject to the DIP Lenders satisfying their obligations occasioned by the issuance of a Carve-Out Trigger Notice.

</td></tr>
<tr><td>

**Stipulations, Waivers, Releases and Protections**

</td><td>

Upon entry of the Interim DIP Order:

1.  The Loan Parties shall stipulate (a) to the validity, extent, security, enforceability, priority and perfection of the First Lien Liens, (b) to the amount, validity and lack of defense, counterclaim or offset of any kind to the First Lien Secured Obligations, and (c) that all cash of the Loan Parties constitutes "cash collateral" of the First Lien Secured Parties for purposes of section 363 of the Bankruptcy Code ("**Cash Collateral**"). The DIP Orders shall provide that an Official Committee and any other party in interest must file a pleading with the Bankruptcy Court challenging the validity, extent, perfection and/or priority of any claims or security interest of the First Lien Secured Parties prior to the date that is seventy-five (75) days after entry of the Interim DIP Order by the Bankruptcy Court in the Chapter 11 Cases (the "**Challenge Period**"). Failure of the Official Committee or any other party in interest to file such a pleading with the Bankruptcy Court shall forever bar such party from making such a challenge.

2.  The Loan Parties shall, subject to the Final DIP Order, waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the DIP Lenders and the First Lien Collateral with respect to the First Lien Secured Parties.

3.  The Loan Parties shall, subject to the Final DIP Order, waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Lenders and the First Lien Collateral with respect to the First Lien Secured

</td></tr>
</table>

|  | Parties. |
|---|---|
|  | 4. The First Lien Secured Parties shall, subject to the Final DIP Order, be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Loan Parties shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the First Lien Secured Parties. |
|  | 5. The Loan Parties shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Lenders and the First Lien Secured Parties (and their respective related parties and representatives) as of the date of the applicable DIP Order. |
|  | 6. Except for an Official Committee investigation (but not to litigate, contest, initiate, assert, join, commence, support or prosecute any claim, cause of action or other challenge, including by way of discovery, with respect to the validity, extent, enforceability, security, perfection or priority of any of the DIP Liens, First Lien Liens, DIP Obligations, or First Lien Secured Obligations) during the Challenge Period and subject to an investigation budget acceptable to the Required DIP Lenders, no Cash Collateral, proceeds of the DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the validity, extent, enforceability, security, perfection or priority of any of the DIP Liens, First Lien Liens, DIP Obligations, or First Lien Secured Obligations, (b) investigate or initiate any claim or cause of action against any of the DIP Lenders or the First Lien Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the DIP Lenders or the First Lien Secured Parties, or (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Documents and the DIP Orders) that are senior to or *pari passu* with the DIP Liens, DIP Superpriority Claims, the Adequate Protection Liens or Adequate Protection Claims granted hereunder, or the First Lien Liens. |
|  | 7. The DIP Lenders shall have the unqualified right to credit bid all DIP Obligations and the First Lien Secured Parties shall have the unqualified right to credit bid all First Lien Secured Obligations. |
|  | 8. The DIP Lenders and the First Lien Secured Parties shall be entitled to good faith protection under section 364(e) of the Bankruptcy Code. |
| **Expenses and Indemnification** | The DIP Credit Agreement shall provide for the payment of all reasonable, documented, out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders, including, without limitation, the payment of all reasonable, documented, out-of-pocket fees and expenses of the Ad Hoc Group Advisors.<br><br>The DIP Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the DIP Lenders (together with their related parties and representatives). |
| **Assignments** | The DIP Credit Agreement shall contain assignment provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles and shall also require that each assignee or |

|  | participant shall become a party to the RSA prior to or concurrently with acquiring any DIP Loans. |
|---|---|
| **Amendments** | Usual and customary for facilities of this type requiring the consent of the Required DIP Lenders, except for amendments customarily requiring approval by adversely affected DIP Lenders under the DIP Facility. |
|  | "**Required DIP Lenders**" shall mean DIP Lenders (other than the fronting lender) holding greater than 50.1% of the aggregate amount of commitments in respect of the Tranche A DIP Loans. |
|  | "**Required Supermajority DIP Lenders**" shall mean DIP Lenders (other than the fronting lender) holding greater than 66.67% of the aggregate amount of commitments in respect of the Tranche A DIP Loans. |
| **Governing Law** | This DIP Facility Term Sheet and the DIP Documents shall be governed by the laws of the State of New York (except as otherwise set forth therein). During the pendency of the Chapter 11 Cases, the Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the DIP Documents and the exercise of the remedies by the DIP Lenders and preservation of the value of the DIP Collateral. |
| **Counsel to the DIP Lenders** | Paul Hastings LLP. |
| **Investment Banker to the DIP Lenders** | Lazard Frères & Co. |
| **Syndication and Fronting** | All beneficial holders of First Lien Claims who sign the RSA on or before closing of the syndication process may participate in the DIP Facility on a *pro rata* basis based upon their holdings of First Lien Loans pursuant to syndication procedures acceptable to the Required DIP Lenders (the "**Syndication Procedures**"), which procedures shall be attached as an exhibit to the Interim DIP Order. Company Parties shall facilitate, and pay for all fees and expenses concerning, fronting the Tranche A DIP Loans. |
| **Agreement to Roll** | Notwithstanding anything to the contrary herein, each DIP Lender shall agree that, on the Plan Effective Date and so long as the RSA remains in effect (and there shall not have occurred and be continuing any event, act, or omission that, upon the delivery of a notice would permit the Required Consenting First Lien Lenders to terminate the RSA), the Tranche A DIP Loans and Tranche B DIP Loans held by each DIP Lender (or any of its designated Related Funds) shall convert either into "Loans" under the Take-Back Debt Facility (as such term is defined in the RSA) or Reorganized Common Equity, in each case in accordance with the terms set forth in the RSA and Restructuring Term Sheet (as may be amended). |

**Annex I**

Interest and Certain Payments

| | |
|---|---|
| Interest Rate: | The DIP Loans shall bear interest at a rate per annum equal to the adjusted SOFR rate (subject to a floor of 1.0%) <u>plus</u> (i) with respect to the Tranche A DIP Loans, 10.00%, and (ii) with respect to the Tranche B DIP Loans, 4.75%. |
| Interest Payment Dates: | Interest shall be payable in cash on a quarterly basis in arrears, upon any prepayment due to acceleration and at final maturity. |
| Commitment Premium: | The Borrowers shall pay to the DIP Lenders a non-refundable commitment premium (the "**Commitment Premium**") equal to 2.5% of the aggregate principal amount of the New Money Commitment of each DIP Lender, which shall be fully earned upon entry of the Interim DIP Order, and due and payable in kind on the date of entry of the Interim DIP Order and to be included in the principal amount of the Tranche A DIP Loans. |
| Exit Premium: | The Borrowers shall pay to the DIP Lenders a non-refundable exit premium (the "**Exit Premium**") equal to 2.5% of the aggregate amount of the DIP Obligations as of the Plan Effective Date, which shall be fully earned upon entry of the Interim DIP Order and due and payable in the form of Tranche A DIP Loans upon any prepayment in full or immediately prior to the Maturity Date. |
| Default Rate: | During the continuance of an event of default, principal, overdue interest, overdue premium and fees and other overdue amounts shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations. |
| Rate and Payment Basis: | All per annum rates shall be calculated on the basis of a year of 360 days. All amounts payable under this DIP Term Sheet shall be made in Dollars. |

\*        \*        \*        \*

**Annex II**

| Priority | DIP Collateral that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral that constitutes Term Loan Priority Collateral[3] or that would otherwise constitute Term Loan Priority Collateral | Unencumbered Property | Claims |
|---|---|---|---|---|
| ***First*** | Carve-Out and Permitted Prior Liens | Carve-Out and Permitted Prior Liens | Carve-Out | Carve-Out |
| ***Second*** | ABL Adequate Protection Liens | DIP Liens | DIP Liens | DIP Superpriority Claims |
| ***Third*** | ABL Liens | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens and ABL Adequate Protection Liens | First Lien Adequate Protection Claims and ABL Adequate Protection Claims |
| ***Fourth*** | DIP Liens | First Lien Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | Second Lien Adequate Protection Claims and Second Lien Sidecar Adequate Protection Liens |
| ***Fifth*** | First Lien Adequate Protection Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | | |
| ***Sixth*** | First Lien Liens | Second Lien Liens and Second Lien Sidecar Liens | | |
| ***Seventh*** | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | ABL Adequate Protection Liens | | |
| ***Eighth*** | Second Lien Liens and Second Lien Sidecar Liens | ABL Liens | | |

---

[3]    <u>Note to Draft</u>:  As defined in the Existing ABL Intercreditor Agreement.

## EXHIBIT C

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of November 1, 2024 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among the Company Parties and the Consenting First Lien Lenders party thereto.  Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1.        Agreement to be Bound.  The Joinder Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as **Annex I** (as the same has been or may hereafter be amended, supplemented, amended and restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joinder Party shall hereafter be deemed to be a "Consenting First Lien Lenders" and a "Party" for all purposes under the Agreement and with respect to all Company Claims/Interests held such Joinder Party.

2.        Representations and Warranties.   The Joinder Party hereby makes the representations and warranties of the Parties and Consenting First Lien Lenders set forth in the Agreement to each other Party.

3.        Notice.  The Joinder Party shall deliver an executed copy of this joinder agreement (the "**Joinder**") to the Parties identified in Section 14.10 of the Agreement.

*[Signature Page Follows.]*

**[JOINING PARTY]**

_____

Name:

Title:


Address:


E-mail address(es):


| _Aggregate Amounts Beneficially Owned or Managed on Account of:_ | |
|---|---|
| First Lien Claims: | |
| Second Lien Claims: | |
| Second Lien Pari Passu Claims: | |
| Prepetition HoldCo Loan Claims: | |
| ABL Claims: | |
| Existing Equity Interests: | |

**<u>Annex I to Joinder</u>**

Restructuring Support Agreement

[*intentionally omitted*]