## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: TBD**<br>**Objection Deadline: TBD** |

## MOTION OF THE AD HOC GROUP OF FREEDOM LENDERS FOR ENTRY OF AN ORDER (I) TERMINATING EXCLUSIVITY IN THE HOLDCO DEBTORS' CASES, (II) LIFTING THE AUTOMATIC STAY IN THE HOLDCO DEBTORS' CASES, OR (III) APPOINTING A CHAPTER 11 TRUSTEE FOR THE HOLDCO DEBTORS

---

[1]  The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

The Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**") consisting of certain of the Lenders (the "**HoldCo Lenders**"), as defined in that certain Credit Agreement, dated as of August 21, 2023 (as amended, restated, supplemented or otherwise modified, the "**HoldCo Credit Agreement**" and the facility thereunder, the "**HoldCo Facility**"), among Freedom VCM Interco, Inc. as Borrower, Freedom VCM, Inc. as Holdings (together with Freedom VCM Interco, Inc., the "**HoldCo Debtors**"), Alter Domus (US) LLC as administrative agent, and the lenders party thereto, by and through their undersigned counsel, move this Court for entry of an order (i) terminating exclusivity in the HoldCo Debtors' cases, (ii) lifting the automatic stay in the HoldCo Debtors' cases, or (iii) appointing a chapter 11 trustee for the HoldCo Debtors (the "**Motion**").  In support of the Motion, the Freedom Lender Group submits the *Declaration of Brett Bakemeyer in Support of the Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* (the "**Bakemeyer Declaration**") and respectfully request as follows:[1]

## PRELIMINARY STATEMENT

1.      Just 14 months ago, in reliance on what is now questionable information presented to them by then-CEO Brian Kahn (then represented in his personal capacity by Willkie Farr & Gallagher LLP) and sponsor B. Riley Financial, Inc., funds owned or managed by Pacific Investment Management Company LLC and Irradiant Partners LP lent approximately 93% of a $475 million facility to Freedom VCM, Inc.  The proceeds of such loans were used exclusively to purchase the shares of the Company's public shareholders for $30 per share (the "**Take-Private**

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "**First Day Declaration**") and Proposed Plan (as defined below).

**Transaction**"). The funding transaction as structured by the Company created a commonplace holdco-opco structure, in which the new debt was funded into newly-created parent entities sitting above the existing "credit circle" at Franchise Group, Inc. (the "**Company**") and its operating subsidiaries (collectively with the Company, the "**OpCo Debtors**"). While the structure gave the Company access to loan proceeds that it could otherwise not incur at the OpCo Debtor level, that structure also gave the new HoldCo Lenders control over the OpCo Debtors through a pledge of their equity and thus, any disposition of the Company, whether in or out of court. The Take-Private Transaction – again only 14 months ago – valued the Company at $2.6 billion.

2.      Today, the Freedom Lender Group finds itself in an all-consuming fight to recover any of the HoldCo Lenders' investment – all-consuming because they are forced to do so without any assistance from the fiduciaries statutorily charged with protecting and maximizing their recovery and bound by the terms of the HoldCo Facility. To be clear, every single one of the Debtors' officers, directors, and proposed advisors represent all of the other Debtors, leaving the HoldCo Debtors without a single unconflicted fiduciary to act on their behalf. And notwithstanding that the boards of directors of the HoldCo Debtors appear never to have met separately, they authorized the HoldCo Debtors to file chapter 11 petitions and immediately:

- authorized the HoldCo Debtors to incur over $800 million of DIP obligations (including $50 million of fees) that would be senior to, and effectively eliminate any recovery opportunity of the HoldCo Lenders to recover on their deficiency claims—even though the HoldCo Debtors would not receive any proceeds from, and have no use for, the proposed DIP Facility;

- joined the OpCo Debtors in entering into a Restructuring Support Agreement with the First Lien OpCo Lenders (who, absent the proposed DIP Facility, have no claims against the HoldCo Debtors), that contemplates giving the DIP Lenders and First Lien OpCo Lenders 100% ownership of the Company, providing no value to the HoldCo Debtors, and wiping out the HoldCo Lenders; and

- joined the OpCo Debtors in authorizing a quick sale process to be conducted over the holiday season, designed not to maximize value, but rather to validate the

2

contemplated turnover of the Company to the First Lien OpCo Lenders.

3.      Having received these authorizations, the officers, directors and proposed advisors of the HoldCo Debtors then started executing on these authorizations.  First, they joined the OpCo Debtors in seeking interim approval to incur over $800 million in DIP obligations.  Were it not for the Freedom Lender Group's opposition at the two-day first day hearing and this Court's vigilance, the die would have been cast to effectively wipe out the HoldCo Lenders' recoveries on the first day of the Chapter 11 Cases.

4.      But the Freedom Lender Group's fight is far from over.  The final hearing on the DIP Motion is set for December 10, 2024.  There, the Debtors will resume their efforts to approve the HoldCo Debtors as obligors of the DIP Facility even though they still have not articulated any need for funding, even though the DIP Facility would provide them with no value, and even though it seeks to strip their only creditors – the HoldCo Lenders – of legitimate recovery possibilities.

5.      Next, despite not first obtaining Court approval to do so, the HoldCo Debtors joined the OpCo Debtors in launching their contemplated quick-sale process just three days after commencing these Chapter 11 Cases on November 3, 2024.  The HoldCo Debtors have so little faith in the results of that auction they have prewired a plan in which their equity interests in the Company are canceled for no consideration.

6.      Next, the HoldCo Debtors rushed into giving away the value of the other assets in their estates, including the HoldCo Debtors' claims and causes of action (which the Freedom Lender Group continues to investigate) and to support the restructuring of other co-debtors pursuant to a Restructuring Support Agreement, again undertaken without any court approval. Two days after the approval of the Interim DIP Order (and only days into these Chapter 11 Cases), the HoldCo Debtors joined the OpCo Debtors in filing a global proposed plan of reorganization

3

[Docket No. 150] (as to all the Debtors, the "**Proposed Plan**" and, as to the HoldCo Debtors, the "**Proposed HoldCo Plan**").  The HoldCo Debtors filed the Proposed HoldCo Plan without a single discussion with any actual creditor of their estates despite the Freedom Lender Group's requests, in writing, for at least a phone call before the Proposed Plan was filed.  Not surprisingly (since the HoldCo Debtors' restructuring efforts are directed at protecting the recoveries of prepetition creditors of *other* estates) the Proposed HoldCo Plan would cancel the HoldCo Debtors' stake in the Company and would wipe-out the HoldCo Lenders' claims without recovery.  Specifically, unless the proceeds of the sale of the OpCo Debtors' assets are sufficient to clear all the debt of the OpCo Debtors and satisfy all administrative expense claims against the OpCo Debtors – an event which requires at least a $1.5 billion check – there will be zero recoveries for the HoldCo Lenders on their over half billion dollars in prepetition secured loans at the HoldCo Debtors.  Moreover, any of the HoldCo Debtors' claims and causes of action either are released or preserved and vest in the Reorganized Debtors – away from the reach of the HoldCo Lenders who plainly have, at the very least, a right to investigate how the HoldCo Debtors (or the OpCo Debtors who, on belief, were down-streamed the HoldCo Facility proceeds) vaporized their cash-funded capital over the past year.  The Disclosure Statement has been set for hearing on December 17, 2024, with an eye towards confirmation in February.

7.      To put it mildly, the HoldCo Lenders now find themselves looking down the barrel of a fully loaded gun.  Certainly, some of the problem here relates to prepetition activities as to which no one has completed an investigation, which cannot properly be addressed in any form at the second day hearing.  But a meaningful cause for the problem is ongoing deficient corporate governance.  The HoldCo Debtors, which are being run by individuals who are also the OpCo Debtors' directors, officers, and proposed advisors, are subject to intractable and obviously

untenable conflicts.  In order for those individuals to maximize creditor recoveries at the OpCo Debtors, they are agreeing to wipe out creditor recoveries at the HoldCo Debtors.  This is plainly impermissible under the established and critically important principles underpinning the Bankruptcy Code.  Unless substantively consolidated, each Debtor's estate must be independently optimized.  This is particularly important where, as here, the OpCo Debtors and the HoldCo Debtors have entirely different creditor bodies and where one of the most important sources of recovery for the HoldCo Debtors' creditors may well be the HoldCo Debtors' claims against the OpCo Debtors and their officers, directors and proposed advisors, including claims related to the down-streaming of the funds in the Take-Private Transaction.

8.      In sum, the Bankruptcy Code's fundamental tenant of unconflicted, disinterested, independence is not currently being observed in these Chapter 11 Cases.  To resolve this conflict and protect the interests of the HoldCo Debtors' creditors, either the HoldCo Debtors' exclusivity period must be terminated to permit the Freedom Lender Group to propose and solicit its own plan for the HoldCo Debtors, or the automatic stay must be lifted to permit the HoldCo Lenders to exercise their non-bankruptcy remedies, or a chapter 11 trustee must be appointed to ensure the fiduciary duties of the HoldCo Debtors are properly respected.

## JURISDICTION AND VENUE

9.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Freedom Lender Group consents to the entry of a final order by the Court in connection with this Motion to

the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory and legal predicates for the relief sought herein are sections 362(d), 1104(a), and 1121(d) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2007.1, 4001, 9006, and 9014 the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-1 and 9006-1 of the Local Rules.

## RELIEF REQUESTED

12.     By this Motion, the Freedom Lender Group respectfully requests the Court to enter an order (the "**Proposed Order**") substantially in the form attached hereto as **Exhibit A**, terminating the HoldCo Debtors' exclusive periods to file and solicit votes on a chapter 11 plan pursuant to Section 1121(d) of the Bankruptcy Code. In the alternative, the Freedom Lender Group respectfully requests that this Court lift the automatic stay in the HoldCo Debtors' cases to permit the HoldCo Lenders to exercise their non-bankruptcy remedies pursuant to section 362(d) of the Bankruptcy Code.  The Freedom Lender Group additionally requests appointment of a chapter 11 trustee in two circumstances: (1) in the instance that the Court declines to (a) terminate the HoldCo Debtors' exclusive periods or (b) lift the HoldCo Debtors' automatic stay; and (2) in the instance the court grants the Freedom Lender Group's motion to terminate exclusivity and the Debtors do not withdraw the Proposed HoldCo Plan.

## BACKGROUND

13.     ***The Take-Private Transaction***.  In August 2023, the Company completed the Take-Private Transaction whereby the Company's former Chief Executive Officer, Brian Kahn, and other members of the management team took private control of the Company.  First Day Decl.

6

¶ 32.  Through the Take-Private Transaction, shareholders were paid $30.00 per share with such funds coming from a combination of an equity investment by B. Riley Financial, Inc. and the incurrence of new indebtedness.  *Id.* at ¶ 33.  The HoldCo Lenders relied on certain disclosures and statements made by B. Riley and Mr. Kahn at the time, but the Freedom Lender Group now has reason to doubt the veracity of these statements.

14.    ***HoldCo Debtors and HoldCo Facility***.  The HoldCo Debtors were created as part of the Take-Private Transaction to borrow and guarantee the HoldCo Facility.  None of the Debtors other than the HoldCo Debtors are obligors under the HoldCo Facility.  First Day Decl. ¶ 63.  The HoldCo Lenders were granted a security interest on all assets of the HoldCo Debtors, including Freedom VCM Interco, Inc.'s equity interests in Freedom VCM, Inc. and Freedom VCM, Inc.'s equity interests in the Company.  *Id.*  On information and belief, to facilitate the payment to the Company's existing shareholders, the proceeds of the HoldCo Facility were down-streamed to the OpCo Debtors.  On the Petition Date, the outstanding principal amount owed under the HoldCo Facility was $514.7 million.  *Id.* at ¶ 64.

15.    ***OpCo Debtors***.  Following the completion of the Take-Private Transaction, the Company had a classic holdco/opco structure.  First Day Decl. ¶ 32.  The HoldCo Debtors have no operations and their main asset is Freedom VCM, Inc.'s 100% equity ownership of the Company.  Nov. 5, 2024 Hr'g Tr. 123:19-23 ("[T]he Holdco entities are not operating entities"); 52:9-12 (acknowledging that "one of the assets [inside the Freedom VCM Inc. box] is the equity it owns in Franchise Group Inc. [] the top OpCo").  The OpCo Debtors consist of Franchise Group, Inc. and its subsidiaries, where the Debtors' operations and tangible assets are held.  The OpCo Debtors have debt of their own, including a $248.7 million ABL facility, a $1.097 billion first lien term loan facility (the "**First Lien OpCo Term Facility**") and a $125 million second lien term

loan facility (collectively with the ABL facility and the First Lien OpCo Term Facility, the "**Prepetition OpCo Debt**").   First Day Decl. ¶¶ 50-61.   Aside from a recent $19.51 million guarantee by the OpCo Debtors of the HoldCo Facility, the credit facilities at the OpCo Debtors and the HoldCo Facility are entirely separate and each has different obligors. *Id.* at ¶ 63.

16.     ***Mr. Laurence and Appointment of Independent Directors***.   The Debtors' Chief Executive Officer, Andrew Laurence, was appointed as CEO in January 2024.   In August 2024 and October 2024, the Debtors needed waivers, amendments, and consents from the First Lien OpCo Lenders to avoid defaults under the First Lien OpCo Term Facility.   First Day Decl. ¶ 14. In exchange for these agreements, the First Lien OpCo Lenders received consultation rights in selecting two independent directors of the board for the Company and Freedom TopCo (the ultimate parent company of the Debtors, which sits above the HoldCo Debtors).   Those board members sit on the Special Committee with Mr. Laurence and oversee the Debtors' restructuring efforts. *Id.*

17.     ***The RSA and the Chapter 11 Cases***.   On November 1, 2024, the Debtors entered into a Restructuring Support Agreement (the "**RSA**") with certain lenders under the First Lien OpCo Term Facility (the "**First Lien OpCo Lenders**"), who collectively hold approximately 80% of the principal amount outstanding under the First Lien OpCo Term Facility.  *Id.* at ¶ 15, Ex. B.

18.     With the RSA as its blueprint, the Debtors filed the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") on November 3, 2024 (the "**Petition Date**").   As required under the RSA, the Debtors immediately filed a motion seeking approval of a postpetition credit facility (the "**DIP Facility**") provided by the consenting First Lien OpCo Lenders, consisting of $250 million of new money and a $500 million roll-up of debt under the First Lien OpCo Term Facility [Docket No. 51].   None of the proceeds of the DIP Facility are contemplated to be provided or

transferred to either of the HoldCo Debtors.  Nov. 5, 2024, Hr'g Tr., 92:25-93:5 (testifying that

the proceeds from the DIP Facility are "not really going [to the HoldCo Debtors].").  Following

an objection by the Freedom Lender Group, the interim order approving the DIP Facility [Docket

No. 134] (the "**Interim DIP Order**") was revised to (among other things) exclude the HoldCo

Debtors as obligors.  At the hearing for final approval of the DIP Facility, the Debtors intend to

take another bite at this apple, requesting that the HoldCo Debtors guarantee the entire DIP Facility

totaling at least $783 million and seeking to grant the First Lien OpCo Lenders and DIP Lenders

superpriority administrative expense priority claims against the HoldCo Debtors.  The incurrence

of the DIP Facility and imposition of adequate protection claims and liens would violate the

HoldCo Credit Agreement.

19.    The RSA requires the Debtors to exclusively pursue the Proposed Plan.  *See* RSA

§ 7.01(a).  The RSA milestones require confirmation on or before February 1, 2025.  *Id.* § 4.01(n).

Pursuant to the statutory period proscribed in the Bankruptcy Code, the HoldCo Debtors' exclusive

period to file a plan is set to expire on or about March 3, 2025, and the HoldCo Debtors' exclusive

period to solicit votes on or around May 2, 2025.  *See* 11 U.S.C. § 1121(b), (c).

20.    ***Discussions Before The Proposed Plan was Filed***.  On November 11, 2024,

counsel for the Freedom Lender Group requested counsel to the HoldCo Debtors to "get together

to discuss plan alternatives for [the HoldCo Debtors] before you file a plan for them."  Bakemeyer

Decl. Ex. 1.  Counsel for the HoldCo Debtors responded offering a call the following Wednesday

to discuss the unrelated "independent investigation referenced in the first day declaration."  *Id*.

21.    Later that day, around 8:00 p.m. (EST), the HoldCo Debtors (along with all other

Debtors) filed the Proposed Plan.  About an hour later, counsel to the Freedom Lender Group

questioned Debtors' counsel, stating "I'm a little confused by your offer to meet with us sometime

on Wednesday in response to our request to meet **before** you file a plan with respect to the Holdcos …only to then file a plan that includes such debtors a few hours later." Bakemeyer Decl. Ex. 1. The next morning, counsel to the Debtors replied that "our RSA milestone to file a plan for all debtors expired yesterday evening, so our discussion about potential alternatives for the HoldCo obligors will need to take place in parallel." *Id.*

22.    ***The Proposed Plan.***  Under the Proposed Plan, the Debtors collectively will pursue a sale process and the proceeds, if any, of a sale, would only reach the HoldCo Debtors' estates after payment in full of all the OpCo Debtors' debt and administrative expenses (including all DIP obligations).  Proposed Plan §§ I.E, 5.11.  If no offers are received in the sale process that would pay in full the DIP Facility and all first lien secured debt at the OpCo Debtors, the Proposed Plan would toggle to an equitization (the "**Equitization Transaction**") providing the DIP Lenders and First Lien OpCo Lenders with 100% of the Reorganized Debtors equity (subject to dilution by a management incentive program) and conversion of a portion of the DIP Facility to exit financing. Proposed Plan §§ 1.131, 3.1, 5.4, 7.7.  Under the Equitization Transaction scenario, the HoldCo Lenders would receive no recovery.  *Id.* at §§ I.E, 5.11.

23.    The Proposed Plan explicitly does not contemplate the substantive consolidation of the Debtors, yet it would either give the value of any assets of the HoldCo Debtors to the DIP Lenders and First Lien OpCo Lenders or release them for no consideration.  Proposed Plan §§ 3.1, 5.4, 7.1.  Any retained causes of action under the Proposed Plan are to re-vest in the Reorganized Debtors, which, under the Equitization Transaction, would be owned by the DIP Lenders and the First Lien OpCo Lenders.  *Id.* at §§ 1.173, 3.1, 5.4, 7.4(b).  If the HoldCo Debtors' causes of action are retained, their retention would therefore only be for the benefit of the DIP Lenders and the First Lien OpCo Lenders (as the owners of equity in the Reorganized Debtors).  If such causes of action

are not retained, they would be released without the HoldCo Debtors (or their stakeholders) receiving anything in exchange. *Id.* at § 12.2. In this event, the DIP Lenders and the First Lien OpCo Lenders would still be receiving the benefit of the HoldCo Debtors' causes of action because the Company (that the DIP Lenders and the First Lien OpCo Lenders would then own) would be cleansed of potential liability to the HoldCo Debtors.

24.     ***Conflicts of Interest***.  The conflicts between the HoldCo Debtors and the OpCo Debtors relate to the assets of the HoldCo Debtors, which are the primary source of recovery for the HoldCo Lenders and the other stakeholders of the HoldCo Debtors.  The OpCo Debtors have no claim to these assets.  Nevertheless, the Proposed HoldCo Plan seeks to divert or release these assets for the benefit of the OpCo Debtors.  This creates a clear and irreconcilable conflict of interest.  The HoldCo Debtors also have intercompany claims against the OpCo Debtors related to (among other things) any down-streaming of the proceeds of the HoldCo Facility in connection with the Take-Private Transaction, which the Proposed HoldCo Plan seeks to release for no consideration to the HoldCo Debtors.  This conflict is further exemplified by the Debtors' attempts to burden the HoldCo Debtors with over $783 million of postpetition financing despite receiving no proceeds or other benefit from it and the HoldCo Debtors cosigning a quick-sale process over the holiday season designed solely to validate a handover of the Company to the DIP Lenders and the First Lien OpCo Lenders.

25.     ***Lack of a Fiduciary at the HoldCo Debtors***.  The Debtors' board of directors made the determination to enter into the RSA and the DIP Facility, pursue a quick-sale process, and propose the Proposed HoldCo Plan on the premise that doing so was in the best interests of all of the Debtors collectively.  Disclosure Statement, Art. IV.C.; *see also* Nov. 5, 2024, Hr'g Tr., 51:4-12 (testifying that entry into the DIP Facility is "in the best interest of the debtors" when asked if

entry into the DIP Facility was in the best interests of the HoldCo Debtors).  The boards of the HoldCo Debtors appear to have never met and have not made a determination that these actions were in the best interests of the HoldCo Debtors.  To do so would require taking the view that the HoldCo Debtors should (i) become obligors on the DIP Facility that would provide no proceeds or benefit to the HoldCo Debtors but would saddle them with over $783 million of debt (originally proposed to be over $800 million), (ii) pursue the rushed sale process that is designed solely to justify a handover of the Company to the First Lien OpCo Lenders, and (iii) co-sign the Proposed HoldCo Plan, which would transfer or release the HoldCo Debtors' assets and provide no recovery to any of the HoldCo Debtors' stakeholders.  No identifiable fiduciary is looking out for the HoldCo Debtors and their stakeholders.

26.     ***The Freedom Lender Plan***.  The Freedom Lender Group has drafted a plan of reorganization solely for the HoldCo Debtors (the "**Freedom Lender Plan**").  The Freedom Lender Plan is simple and provides value to the HoldCo Lenders and other creditors of the HoldCo Debtors (if any).  Confirmation of such a plan would allow the HoldCo Lenders to maximize their recoveries by, at the very least, asserting and prosecuting the claims and causes of action of the Holdco Debtors.  The Freedom Lender Plan is confirmable because the Freedom Lender Group, holding the majority in amount and number of its impaired class, will vote in favor of that plan. And the Freedom Lender Plan would leave the OpCo Debtors free to pursue the Proposed Plan for themselves and maximize recoveries for their stakeholders.

27.     On November 15, 2024, the Freedom Lenders Group sent the Debtors the Freedom Lender Plan and got on a call with Debtors' counsel to discuss it on November 17, 2024.  *See* Bakemeyer Decl. Ex. 3.  During that call, Debtors' counsel requested to share the Freedom Lender Plan with the First Lien OpCo Lenders.  Counsel to the Freedom Lenders Group responded that

doing so was inappropriate because the First Lien OpCo Lenders were not creditors of the HoldCo Debtors and, if shared, it should be a version with the Debtors' support. Debtors' counsel agreed to prepare a markup of the Freedom Lender Plan, acknowledging the urgency. The Debtors only engagement thereafter came on the afternoon of November 19, 2024, when Debtors counsel requested again to share the Freedom Lender Plan with the First Lien OpCo Lenders. Counsel to the Freedom Lender Group responded in writing that they did not consent to the sharing of the Freedom Lender Plan and reiterated its prior position that "[i]t is unacceptable that our fiduciaries, the Holdco Debtors and their boards, won't comment on a proposal from substantially all of their creditors without first talking to a group of lenders who have no claim against the Holdco Debtors, owe no duty to the Holdco Debtors, and in fact hold interests that make them adverse to the Holdco Debtors' estates." *Id.* Counsel to the Debtors responded that they "intend to share" the Freedom Lender Plan "in its current draft form" with the First Lien OpCo Lenders "to comply with our obligations under the RSA." *Id.* The Freedom Lenders Group files this Motion in response.

## **ARGUMENT**

28.     There is nothing uncommon about the holdco/opco structure that was put in place during the Take-Private Transaction, as it is a common structure utilized in merger and acquisition transactions. The use of this special purpose vehicle structure was intentional (as is common) to allow investors to lend into a company without burdening the operating companies and with the recourse, to the extent it would ever be necessary, of exercisable control. Such control includes the ability to take charge of the disposition of the operating company's assets, in or out of court. Under the Take-Private Transaction, the HoldCo Debtors agreed to restrictions and covenants under the HoldCo Credit Agreement that are similar to those entered into with respect to the Prepetition OpCo Debt. However, unlike the treatment that the First Lien OpCo Lenders received in the lead-up to the filing of these Chapter 11 Cases, the HoldCo Lenders were not consulted and

restrictions and covenants under the HoldCo Credit Agreement were not upheld.  And now, any value at the HoldCo Debtors, including valuable potential claims and causes of action and despite the HoldCo Lenders' 2023 investment in a company touted as being worth $2.6 billion at the time of the Take-Private Transaction, are proposed to be wiped out and argued to be worthless, notwithstanding the protective measures taken when structuring the transaction.

29.     A similar holdco/opco debtor case was recently litigated in this district resulting in conversion of the holdco case, which (while similar) is not what the Freedom Lender Group intends to achieve here.  In *In re Lucky Bucks LLC*, a holdco debtor had issued unsecured PIK notes while its opco debtors were obligated under a term loan and credit facility, with separate assets and separate creditors.  Case No. 23-10758 (KBO) (Bankr.  D. Del. 2023) [Docket No. 15] ¶¶ 44-48. Like here, the holdco debtor was structured explicitly to be financially separate from the opco debtors, was non-operational, had one single class of creditors.  *Id.* [Docket No. 50] ¶¶ 2, 35.  The Lucky Bucks holdco had one asset of value: litigation claims against the other debtors.  *Id.*  Like here, the debtors intended to implement a pre-negotiated 9019 settlement which settled the holdco's intercompany and third-party claims and causes of action through their pre-packaged plan.  *Id.* [Docket No. 16].  But when the Lucky Bucks' holdco lenders sought to convert the cases on the basis that they would never vote for the consolidated debtors' plan, Judge Owens agreed: "These facts present what I would call a 'Gordian knot.'  And I'm not Alexander the Great, but I can say that moving forward with the Holdings case, as Holdings want, will not unravel the knot and achieve an outcome supportive of the PIK Noteholders, the only creditors of the Holdings estate.  The only way to deal with the knot, in my opinion, is to convert the case."  *In re Lucky Bucks, LLC*, Case No. 23-10758 (KBO) (Bankr. D. Del. 2023) June 30, 2023, Hr'g Tr.  74:10-16 [Docket No. 133].

30.     As noted, the Freedom Lender Group is not at this time advocating for the draconian remedy of conversion.  Rather, in the view of the Freedom Lender Group, the best way to unravel the "gordian knot" in these HoldCo Debtors' Chapter 11 Cases is to terminate exclusivity so that the Freedom Lender Group can file their Freedom Lender Plan, which can achieve an outcome supportive of the only creditors of the HoldCo Debtors.  Only if the HoldCo Debtors refuse to yield and instead insist that they alone should hold the pen on the plan of reorganization for the HoldCo Debtors, will the Court need to address the relief addressed in Sections II and III, *infra*.

## I.     Motion to Terminate Exclusivity For The HoldCo Debtors

31.     Sections 1121(b) and (c) of the Bankruptcy Code provide for an initial 120-day period and 180-day period after the commencement of a chapter 11 case where the debtor has the exclusive right to file and solicit a chapter 11 plan, respectively.  Section 1121(d)(1) provides that "the court may for cause, reduce" the debtor's exclusivity periods.

32.     Exclusivity should be terminated in the HoldCo Debtors' cases because the Proposed HoldCo Plan is not confirmable.  The HoldCo Debtors have one class of known creditors.  No others have been disclosed.  Therefore, there will only be one impaired class who can vote.  The members of the Freedom Lenders Group will not vote in favor of the Proposed HoldCo Plan, and because they own approximately 93% of the principal amount due on the HoldCo Loans, their rejecting vote will carry the class.

33.     The reason for that lack of support is eminently justifiable: the Proposed HoldCo Plan does not properly account for the HoldCo Debtors' separate estates, assets and liabilities.  It seeks to siphon assets away from the HoldCo Debtors and provides no (or at most illusory) recoveries for the HoldCo Debtors' creditors.  Most egregiously, the Proposed HoldCo Plan either releases the HoldCo Debtors' causes of action or preserves them for the reorganized estates' benefit (after giving no distribution to the HoldCo Debtors' stakeholders).  The Proposed HoldCo

Plan is also premised on the Debtors succeeding in burdening the HoldCo Debtors with over $783 million of obligations under the DIP Facility, the proceeds of which are "not really going [to the HoldCo Debtors]."  Nov. 5, 2024, Hr'g Tr., 92:25-93:5.  No rational creditor of the HoldCo Debtors would ever vote for that result.

34.     In contrast, the Freedom Lender Plan would preserve the HoldCo Debtors' causes of action and their other assets for the benefit of the HoldCo Debtors' creditors.  And, unlike the Proposed HoldCo Plan, the Freedom Lender Plan is confirmable with respect to the HoldCo Debtors because the members of the Freedom Lender Group would vote in favor of it.

35.     The Bankruptcy Code does not define "cause" for modifying the exclusivity period, leaving the decision to the discretion of the courts on a case-by-case basis.  *In re Adelphia Commu'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006).  Courts typically consider the following nine non-exclusive factors set forth in *Adelphia* when considering whether to terminate exclusivity:

> (a) the size and complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time that has elapsed in the case; (h) whether the debtor is [using] exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists.

*Adelphia,* 352 B.R. at 587; *see also In re PWM Property Mgmt.*, Case No. 21-11445 (MFW) (Bankr. D. Del. 2021) Mar. 24, 2022, Hr'g Tr. 174:7-13 [Docket No. 566] (considering the *Adelphia* factors in determining whether to extend or reduce the debtor's exclusivity period).

36.     Cause exists to terminate exclusivity here, and *Adelphia* factors (a), (b), (c), (e), (f) and (g) are particularly applicable.

37.     ***Factor (a): The HoldCo Debtors' Chapter 11 Cases are not complex***.  The size of

the debt at the OpCo Debtors might be large, but, relatively speaking, the HoldCo Debtors' prepetition debt obligations are not. Taken alone (as they must absent substantive consolidation), the HoldCo Debtors' cases are very simple. The HoldCo Debtors have: $514.7 million of debt secured by a defined basket of intangible assets (including their equity in the Company); one group of known creditors (the HoldCo Lenders); and discrete assets (including potential valuable causes of action and potential tax attributes). Those assets should be preserved for the benefit of the HoldCo Lenders as they all constitute collateral under the HoldCo Credit Agreement. Terminating exclusivity in the HoldCo Debtors' cases would allow the Freedom Lender Group to file and solicit their simple and straightforward Freedom Lender Plan for the HoldCo Debtors.

38.     ***Factors (b), (f) and (g): The Freedom Lender Plan can be quickly confirmed***. The parties do not need more time to negotiate a plan. Negotiation would likely be futile, as management has made clear they are not acting in the best interests of the HoldCo Debtors and, as a result, the Freedom Lender Group has lost faith in this process. *See In re All Seasons Indus.*, 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (considering a loss of confidence as a factor in denying a request to extend exclusivity). The Freedom Lender Plan is straightforward and is the only plan that the Freedom Lender Group will support because it is the only plan that gives credence to the HoldCo Lenders' rights to the HoldCo Debtors' assets.

39.     Moreover, confirming the Freedom Lender Plan would be both simple and efficient. Only the lenders under the HoldCo Facility have the right to vote on a plan for the HoldCo Debtors because they are the only known creditors. And, given that the HoldCo Lenders are sophisticated parties, cause exists to truncate the plan and solicitation notice periods for the Freedom Lender Plan to allow it to be considered simultaneously with the Proposed Plan. *See In re Landmark Park Plaza Ltd. P'ship*, 167 B.R. 172 (Bankr. D. Conn. 1994) (shortening notice of disclosure statement

and confirmation hearing on creditor's competing plan so that debtor's plan and creditor's competing plan could be considered simultaneously).

40.     ***Factor (c): The Debtors are not making good faith progress in plan negotiations***. The Debtors have proposed a plan that does not benefit the HoldCo Debtors and their stakeholders in any meaningful way.  The Freedom Lender Group attempted to engage with the Debtors in discussing the Proposed HoldCo Plan before it was filed, but that request was ignored.  Then, when the Freedom Lender Plan was proposed to the Debtors, counsel for the Debtors asked a few questions and immediately asked to share the Freedom Lender Plan with the First Lien OpCo Lenders.  The Debtors did not engage with the Freedom Lender Plan for two days.  Then, the only engagement by the Debtors was to call the Freedom Lender Groups' counsel and reiterate the Debtors' request to share the Freedom Lender Plan with the First Lien OpCo Lenders.  The lack of engagement despite the obvious and egregious issues with the Proposed HoldCo Plan and the desires to share the Freedom Lender Plan with creditors that are not even creditors of the HoldCo Debtors is inconsistent with the fiduciary duties of the HoldCo Debtors and "inappropriately aggressive" *In re Samson Res. Corp.*, Case No. 15-11934 (CSS) (Bankr. D. Del. 2016) Sept. 27, 2016, Hr'g Tr. 97:20-99:14 [Docket No. 1418] (terminating exclusivity when the debtor had used exclusivity "in an inappropriately aggressive way" and had not negotiated with "key stakeholders").

41.     ***Factor (e): The Proposed HoldCo Plan is not viable***.  The Proposed HoldCo Plan is not confirmable with respect to the HoldCo Debtors.  The Freedom Lender Group—representing a majority in number and approximately 93% of value of the HoldCo Lender class—will not accept the Proposed HoldCo Plan.  Therefore, under section 1129(a)(10) of the Bankruptcy Code, the Proposed HoldCo Plan will not have the requisite votes to be confirmed.  The Proposed HoldCo

18

Plan, per its terms, must be confirmed at each Debtor.  *See* Proposed Plan, § 6.6.  But, even if the Debtors, with the consent of the Required Consenting First Lien Lenders, waive this requirement, absent substantive consolidation, section 1129(a)(10) must be satisfied on a debtor-by-debtor basis.  *See In re Tribune Co.*, 464 B.R. 126, 180-83 (Bankr. D. Del. 2011), *aff'd sub nom. In re Tribune Media Co.*, 587 B.R. 606 (D. Del. 2018), *aff'd sub nom. In re Tribune Co.*, 972 F.3d 228 (3d Cir. 2020); *In re Woodbridge Grp. of Cos.*, 592 B.R. 761, 778 (Bankr. D. Del. 2018) (citing and applying the "per debtor" basis for section 1129(a)(10) to proposed plan); *In re JER/Jameson Mezz Borrower II, LLC,* 461 B.R. 293, 302 (Bankr. D. Del. 2011) (same); *see also In re Lucky Bucks*, Case No. 23-10758 (KBO) (Bankr. D. Del. 2023) June 30, 2023, Hr'g Tr.  73:2-9 (finding cause to convert the holdco case to chapter 7 because the only and impaired creditors rejected the chapter 11 plan which made it unconfirmable under 1129(a)(10)) [Docket No. 133].[2]

42.    Moreover, courts are required to reject plans where assets of certain debtors are being used to satisfy the debts of other debtors in a plan absent substantive consolidation.  *See Union Sav. Banking v. Augie/Restivo Baking Co. (In re Augie/Restivo)*, 860 F.2d 515, 521 (2d Cir. 1988) (reversing an order confirming a substantive consolidation plan because, in part, "creditors who make loans on the basis of the financial status of a separate entity  . . . do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets."); *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (reversing order confirming substantive consolidation plan and adopting *Augie/Restivo*); *Schroeder v. New Century Liquidating Tr. (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009) (reversing an order confirming a plan "grouping"

---

[2]    Because of the voluminous nature of the unpublished legal authority cited herein that are not readily available on Lexis or Westlaw, they are not attached to this Motion.  Copies are available upon request to the Freedom Lender Group's counsel.

debtors to resolve claims, even though it did not explicitly seek substantive consolidation, because it caused "increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually").

43.     Here, there is more than sufficient cause to terminate exclusivity as to the HoldCo Debtors under the *Adelphia* factors.  But courts often look beyond the *Adelphia* factors for "cause." For example, in *In re Pliant Corp.* the court terminated the debtors' exclusivity in similar circumstances.  Case No. 09-10443 (MFW) (Bankr.  D. Del. 2009).  There, the debtors had a lock-up agreement with their senior lenders, which required the debtors to pursue a plan that would give their first lien lenders 100% of their equity and the unsecured creditors with warrants with an indeterminable value.  *Id.* at [Docket No. 498] ¶¶ 14-17.  The restructuring support agreement there also had a tight timeline which incentivized management with an "emergency bonus" if they confirmed a plan by certain date.  *Id.* at ¶ 44.  Noting that the official committee of unsecured creditors was not objecting just to "gain leverage," Judge Walrath terminated exclusivity because, in part, "[c]reditor constituents have a right to… see whether or not there is a plan that can give them some value without eliminating or otherwise violating the rights of the first-lien holders." Case No. 09-10443 (MFW) (Bankr.  D. Del. 2009) June 30, 2009, Hr'g Tr.  228:13-230:6 [Docket No. 765].  Exclusivity was terminated, allowing pursuit of a "fully baked" plan proposed by the creditors committee.

44.     In *In re TCI2 Holdings, LLC*, the debtors, arm-in-arm with their first lien lender, proposed a plan seeking to reinstate a credit agreement with some adjustments and infuse the debtors with $100 million of new money in exchange for 100% of the new equity for the first lien lenders.  Case No. 09-13654 (JHW) (Bankr.  D.N.J. 2009) [Docket No. 530] ¶ 18.  Holders of unsecured notes and other unsecured creditors were slotted to receive nothing.  *Id.* A group of

noteholders sought to terminate exclusivity.   In granting that relief, Judge Wizmur expressed doubts with respect to the confirmability of the debtors' proposed plan and noted that "a very large group of creditors, who … would be wiped out completely by the plan that is presently offered by the debtors, is a significant basis for termination."   Case No. 09-13654 Aug. 27, 2009, Hr'g Tr. 92:9-20 [Docket No. 621].   There the noteholders, like the Freedom Lender Group also had a plan that they were prepared to file.

45.     The Freedom Lender Plan is a file-ready alternative to the Proposed HoldCo Plan that does not completely wipe out a large group of creditors, is confirmable and does not otherwise disrupt the progress of the Debtors' Proposed Plan as to the OpCo Debtors.   Under the RSA, the Proposed HoldCo Plan is slated to be confirmed and consummated before the HoldCo Debtors' current exclusivity period expires.   As such if the HoldCo Creditors are ever going to have an opportunity to vote on a plan they want, the time is now.   The HoldCo Debtors' exclusivity period should be terminated.

## II.     Motion To Grant the Freedom Lender Group Relief from The Automatic Stay in the HoldCo Debtors' Cases

46.     Section 362(d)(1) of the Bankruptcy Code allows a party to obtain relief from the automatic stay for "cause, including the lack of adequate protection of an interest in property of such party in interest."   The Bankruptcy Code does not define "cause."   It is a "flexible concept" that "is fact intensive and is to be determined case-by-case upon consideration of the totality of the circumstances." *In re Scarborough St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015).

47.     The term "adequate protection" in section 362(d)(1) is also not defined in the Bankruptcy Code; however, courts generally recognize that "the concept of adequate protection requires a debtor to propose some form of relief that will preserve the secured creditor's interest in the collateral, pending the outcome of bankruptcy proceedings." *In re Monroe Park*, 17 B.R.

934, 937 (D. Del. 1982).  Section 361 of the Bankruptcy Code offers three non-exclusive means of providing adequate protection: (1) periodic cash payments from the debtor to the secured creditor, (2) the tender of an additional or replacement lien on other property of the debtor, and (3) a catch all provision, permitting such other means of relief as will result in the realization by the secured creditor of the "indubitable equivalent" of his interest in property.  Legislative history makes clear that, under the "indubitable equivalent" prong, the secured creditor may not be deprived of the "benefit of its bargain, though the creditor might not receive his bargain in kind[,] the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for." *Id.* at 937-938.  (citation omitted).

48.     The Debtors have recognized that the HoldCo Lenders are secured by liens on the HoldCo Debtors' assets.  Nov. 5, 2024, Hr'g Tr., 87:14-16 (acknowledging that the HoldCo Lenders are "secured").  Mr. Orlofsky testified at the First Day hearing that the HoldCo Lenders are not being offered any adequate protection.  Nov. 5, 2024, Hr'g Tr. 87: 14-22 (admitting that the HoldCo Lenders are not receiving "any adequate protection package by the debtors").  The HoldCo Lenders are not receiving (i) any cash payments, (ii) additional or replacement liens, or (iii) anything close to the indubitable equivalent of their interests in the HoldCo Debtors' property. The Debtors have not even offered any.  This is unlike the lenders on the Prepetition OpCo Debt who were all granted adequate protection under the DIP Facility.  Interim DIP Order ¶ 10.

49.     The HoldCo Lenders' collateral under the HoldCo Credit Agreement includes two share pledges: Freedom VCM Interco, Inc. pledged 100% of its equity interest in Freedom VCM, Inc.'s equity and Freedom VCM, Inc. pledged 100% of its equity interest in Franchise Group, Inc. The Debtors' Proposed Plan proposes to extinguish any Existing Equity Interest in a Debtor or a subsidiary of a Debtor that are owned or held by another Debtor.  *See* Proposed Plan, § 5.15.  In

other words, the Debtors appear to believe such equity is worthless.  But, it is not at all clear that the equity interests held by the HoldCo Debtors are actually worthless.  No evidence has been provided as to the fair market value or the total enterprise value of the Debtors, collectively or individually.  *See* Nov. 5, 2024, Hr'g Tr. 87:10-13 (Q: "But to be clear, you're not providing any testimony today to the Court with respect to the fair market value or the total enterprise value?" A: "No, I am not.").  Without such evidence and unless or until it is extinguished, the voting stock of the Company has value.  *In re Munoz*, 83 B.R. 334, 338 (Bankr. E.D. Pa. 1988) ("Although liabilities still exceed assets and the stock has no book value, the stock may have fair market value to the extent of potential future profitability.").

50.    The equity voting rights of Freedom VCM, Inc. are property of Freedom VCM Interco, Inc.'s estate and the equity voting rights of the Company are property of Freedom VCM, Inc.'s estate.  Foreclosing on these rights requires relief from the automatic stay.  By the Motion, and solely in the event the Court refuses to terminate exclusivity in the HoldCo Debtors' cases, the Freedom Lender Group requests relief from the automatic stay to exercise their rights in the equity interests of Freedom VCM Inc. and the Company.  Similar relief has been granted by other courts in analogous situations and should be awarded here.  *See e.g. In re Sears*, Nos. BK10-40275-TLS, BK10-40277-TLS, 2010 Bankr. LEXIS 1130, at *11 (Bankr. D. Neb. Apr. 12, 2010) (lifting the stay to allow secured creditors to foreclose on pledged stock in order to replace individual chapter 11 debtors as officers and directors of corporation, because creditors were not adequately protected "from deprivation of their ability to exercise their voting and other rights with respect to [debtor corporation,]"); *In re Munoz*, 83 B.R. at 338   (lifting the stay for secured creditor to foreclose on pledged stock upon finding that secured creditor was not adequately protected) (citing *In re Gilece*, 7 B.R. 469, 473 (Bankr. E.D. Pa. 1980) (granting relief from the stay for lack of

23

adequate protection to secured creditor to foreclose on stock)); *In re William A. Smith Constr. Co.*, 86 B.R. 115, 119-20 (Bankr. N.D. Ohio 1988) (lifting the stay to allow secured creditor to exercise rights under stock pledge agreement and sell the pledged stock, based upon finding that the debtor was in default and debtor had no equity in the collateral).

### III.     Motion to Appoint a Chapter 11 Trustee For the HoldCo Debtors

51.     The Freedom Lender Group seeks the following relief in this Section III only in two circumstances: (1) if the Court declines to grant either the relief requested in Sections I and II above or (2) if the Court grants the Motion to terminate the exclusive periods of the HoldCo Debtors and yet the Debtors do not withdraw (and continue to pursue) the Proposed HoldCo Plan, despite its patent unconfirmability.

52.     Pursuant to section 1104 of the Bankruptcy Code, the Court may appoint a chapter 11 trustee "[a]t any time after the commencement of the case but before confirmation of a plan, on request of a party in interest" if the movant shows either (a) "cause" exists or (b) the appointment would be "in the interests of creditors, any equity security holders, and other interests of the estate." The movant must prove the need for a trustee under either subsection by clear and convincing evidence. *In re Marvel Entm't Grp.*, 140 F.3d 463, 471 (3d Cir. 1998). If the movant meets its burden on either standard, the court is required to appoint a trustee. 11 U.S.C. § 1104 (the court "shall order the appointment of a trustee").

53.     Underlying the consideration of trustee appointment is a "strong" presumption that current management, because of its usual familiarity with the business it already manages at the time of the bankruptcy filing, is typically the best party to conduct operations during the reorganization. *Marvel Entm't Grp.*, 140 F.3d at 471. The facts here, however, militate against this presumption. Mr. Orlofsky had only been the Chief Restructuring Officer for 23 days before the bankruptcy filing, and at the First Day hearing, admitted lack of familiarity with the HoldCo

Debtors.  Nov. 5, 2024, Hr'g Tr., 73:1-9 (testifying that he does not have "any understanding" as to who is running the reorganizations of the entities other than Freedom VCM Holdings, LLC and the Company).  Andrew Laurence has been chief executive officer for less than a year.  The "independent" directors and special committees – appointed at the Company and Freedom VCM Holdings, LLC – were put in place in August of this year.  First Day Decl. ¶ 14.  Thus, the court should not give this presumption much weight here.  *Marvel Entm't Grp.*, 140 F.3d at 471 (noting the presumption did not apply under those facts and circumstances because management had only been in place a short time).

### A.   Cause Under Section 1104(a)(1) Exists to Appoint A Chapter 11 Trustee

54.    The Third Circuit recognizes that courts have the discretionary authority to determine if a debtor-in-possession's conduct rises to a level sufficient to warrant the appointment of a trustee, which may cover "the concepts of incompetence, dishonesty, gross mismanagement and even fraud" but also "cover a wide range of conduct."  *Marvel Entm't Grp.*, 140 F.3d at 471; *see also Mfrs. & Traders Tr. Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016) (holding that factors include "the unwillingness or inability of management to pursue claims or causes of action; and conflicts of interest") (citation omitted).

### 1.   Conflicts between the OpCo Debtors and the HoldCo Debtors Constitute Cause to Appoint a Trustee for the HoldCo Debtors

55.    Mr. Orlofsky admitted at the First Day hearing that the HoldCo Lenders are the only creditors of the HoldCo Debtors.  Nov. 5, 2024, Hr'g Tr. 83:16-25 (confirming that the "only creditors" of the HoldCo Debtors are the HoldCo Lenders).  The Debtors also recognize that the OpCo Debtors have different assets and liabilities and debt obligations from the HoldCo Debtors. The Debtors have not appointed independent directors, or separate boards with fiduciary duties for

the HoldCo Debtors. *Id.* at 73:6-22 (acknowledging that the HoldCo Debtors do not have an appointed special committee or independent director). In fact, Mr. Orlofsky testified that he believed he must act "in the best interest for all of the debtors." *Id.* at 112:17-18. All of these facts indicate that there is no party focused on honoring the fiduciary obligations of the HoldCo Debtors.

56. The Debtors' lack of independent fiduciaries for the HoldCo Debtors is particularly problematic given the conflicts of interest between the HoldCo Debtors and the OpCo Debtors. The HoldCo Debtors may have direct claims against the OpCo Debtors. The Debtors are pursuing approval of a DIP Facility and quick-sale process that only would benefit the stakeholders of the OpCo Debtors and would saddle the HoldCo Debtors with over $783 million of obligations without receiving any benefit. And the Debtors are pursuing the Proposed HoldCo Plan, which would distribute all value to the DIP Lenders and First Lien OpCo Lenders and deprive the stakeholders of the HoldCo Debtors the value of the HoldCo Debtors' assets.

57. Courts have concluded that where debtors' management has conflicting fiduciary interests or where management is unable or unwilling to discharge its fiduciary responsibilities, such conflicts rise to the level of cause under section 1104(a)(1). *See e.g. Marvel Entm't Grp.*, 140 F.3d at 471 (appointing a chapter 11 trustee, concluding that "acrimony" and a conflict whereby management in control of the debtors had conflicting interests constituted cause under 1104(a)(1)); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) (affirming appointment of trustee where questions about management's ability to fulfill its fiduciary duties existed); *In re Biolitec, Inc.,* Case No. 13-11157*, 2013 Bankr. LEXIS 1377, at *34, 37 (Bankr. D.N.J. Apr. 3, 2013) (appointing chapter 11 trustee where current management, lacking sufficient independence from the ultimate owner, was "unable to act as a disinterested fiduciary for the estate"); *In re*

*Vascular Access Ctrs., L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020) ("A debtor-in-possession's inability or unwillingness to discharge its fiduciary responsibilities necessitates the appointment of an independent trustee who can"); *In re 942 Penn RR, LLC*, 642 B.R. 89, 94-95 (Bankr. S.D. Fla. 2022) ("conflicts prevent the insiders from acting consistent with their fiduciary duties."). The conflicts between the OpCo Debtors and the HoldCo Debtors require the same result.

### 2. The Terms of the Proposed HoldCo Plan Also Constitute Cause under Section 1104(a)(1)

58.     Cause may also exist when management is not respecting the corporate structure and siphoning assets from one debtor to creditors at another debtor. *See In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 177 (Bankr. E.D. Pa. 1984) (appointing a chapter 11 trustee where debtors' management approved transfers from one debtor to the detriment of creditors at another debtor). The Debtors are currently attempting to put a "one size fits all" plan in place, even though there are distinct and important differences between the creditor bodies.

59.     The HoldCo Debtors are not obligated on the Prepetition OpCo Debt and the OpCo Debtor are not obligated under the HoldCo Facility (except under a limited, subordinated guarantee). Nevertheless, the Debtors are attempting to obligate the HoldCo Debtors on the DIP Facility, but do not anticipate that HoldCo will receive any benefit from those debt obligations nor do they need any of that financing. *See* Nov. 5, 2024, Hr'g Tr. 92:25-93:5 (testifying that the proceeds from the DIP Facility are "not really going [to the HoldCo Debtors]."). Additionally, the Proposed HoldCo Plan purports to transfer the HoldCo Debtors' causes of action either to the Reorganized Debtors or release them but, in any event, such assets will not inure to the benefit of the HoldCo Lenders. Proposed Plan § 7.4. Not only are there potential causes of action against third parties, which the Freedom Lender Group is investigating, but there is also evidence of intercompany transactions that need further investigation. The Freedom Lender Group doubts that

current management would properly investigate or, if necessary, pursue any fraudulent transfer claims between the HoldCo Debtors and the OpCo Debtors, absent the involvement of a HoldCo Debtor-only fiduciary.  *See In re Sharon Steel*, 871 F.2d 1217 (3d Cir. 1989) (affirming the appointment of a trustee in part on the ground that the debtor refused to pursue avoidance actions over pre-petition transfer of assets); *In re PRS Ins. Grp., Inc.*, 274 B.R. 381, 389 (Bankr. D. Del. 2001) (appointing a trustee "[s]ince the causes of action against insiders is such a significant asset of this estate and since there are no business operations requiring current management"). Therefore, the Freedom Lender Group submits cause exists to appoint a Chapter 11 Trustee in the HoldCo Debtors' Chapter 11 Cases to protect the interests of the HoldCo Debtors' constituencies.

**B.    Appointment of a Chapter 11 Trustee is in the Best Interests of the HoldCo Debtors**

60.    Section 1104(a)(2) has a more flexible standard, giving the court discretion to appoint a trustee "when to do so would serve the parties' and estate's interests." *Marvel Entm't Grp.*, 140 F.3d at 474.  Courts often consider the following factors, all of which weigh heavily in favor of a trustee: (i) trustworthiness of the Debtors, (ii) the Debtors' past and present performance and prospects for rehabilitation, (iii) the confidence (or lack thereof) of the business community and of creditors in present management and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.  *Morningstar Marketplace*, 544 B.R. at 304; *In re Ionosphere Clubs Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (citations omitted).

**1.    The Debtors' Management and Board Cannot Be Expected to Act in the Best Interest of the HoldCo Debtors**

61.    As discussed above, the Debtors are treating the assets and liabilities of the HoldCo Debtors as assets and liabilities available to the remainder of the other Debtors.  Creditors of the HoldCo Debtors cannot trust that current management and board of the Debtors are capable of looking out for their interests.  And the Debtors have filed the Proposed HoldCo Plan, which

diverts value and assets away from the Freedom Lender Group, obligating the HoldCo Debtors on financing that they do not need nor will receive any benefit from, and provide no recoveries to the HoldCo Lenders.

## 2. The Debtors' Past and Present Performance and Prospects for Rehabilitation Warrant Appointment of a Trustee

62.     By the Debtors' own admission, there have recently been changes in management, failures to sell business lines and allegations of mismanagement.  First Day Decl. ¶¶ 9-14.  Now, the Debtors are either (i) seeking a quick sale of all their assets over the holidays, which may only be consummated if there are enough proceeds to pay the ABL facility, the First Lien OpCo Term Facility, and the post-petition DIP obligations, which approximately $1.596 billion (not including fees) or (ii) equitizing the First Lien OpCo Term Facility, leaving the Second Lien OpCo Lenders and the HoldCo Lenders with nothing.  Proposed Plan, §§ 5.4, 5.5, 5.11. Whatever prospects for rehabilitation there are for any of the Debtors, it is clearly designed to be to the detriment of the HoldCo Lenders.

63.     The Proposed HoldCo Plan is also patently unconfirmable for the reasons stated in Section I.A above.  Again, because the Proposed HoldCo Plan as to the HoldCo Debtors cannot be confirmed because there will not be an impaired accepting class.   Additionally, without substantive consolidation, the siphoning of assets away from the HoldCo creditors constitutes an impermissible plan construct under *Owens Corning* and *Augie/Restivo*.  *See supra* ¶ 44.

## 3. The Freedom Lenders' Lack of Confidence in Current Management

64.     The members of the Freedom Lender Group – the vast majority of the HoldCo Lenders who are the only creditors of the HoldCo Debtors – have no confidence in current management at the HoldCo Debtors because they are not considering what is in the best interest of the HoldCo Debtors' estates.

#### 4.  A Trustee Will Be Beneficial to the HoldCo Debtors' Estates

65.     Any trustee appointed in the Chapter 11 Cases of the HoldCo Debtors will have the fiduciary duty to protect the assets and liabilities of the HoldCo Debtors and act in a way that will benefit the stakeholders of the HoldCo Debtors.  *Marvel Entm't Grp.*, 140 F.3d at 474 ("appointment of a trustee is the installation of a court officer charged with fiduciary duties"); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996) (holding that "a trustee has a fiduciary relationship with all creditors of the estate").

66.     As Debtors' management has admitted, they believe they are only obligated to act in the "best interests for all of the debtors."  *See* Nov. 5, 2024, Hr'g Tr., 112: 17-18.  This clear conflict can only be cured by new management or appointment of a Chapter 11 Trustee for the HoldCo Debtors.

### <u>RESERVATION OF RIGHTS</u>

67.     The Freedom Lender Group reserves the right to supplement and amend this Motion, seek discovery with respect to the same, and introduce evidence at any hearing relating to the Motion and expressly reserves all rights under applicable law, and otherwise.


*[Remainder of Page Intentionally Left Blank]*

Dated:  November 20, 2024
        Wilmington, Delaware

Respectfully submitted,

**FARNAN LLP**

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
         mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**
Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
         azatz@whitecase.com
         sam.hershey@whitecase.com
         erin.smith@whitecase.com
         brett.bakemeyer@whitecase.com

*Counsel to the Ad Hoc Group of
Freedom Lenders*

31