# EXHIBIT A

Kansas City, Missouri
11-26-13 FINAL

## OUTLET STORE LEASE

THIS OUTLET STORE LEASE ("Lease") is made this _3 ed_ day of _December_, 2013 (the "**Effective Date**"), between **AF COMPANY, L.L.C.**, a Missouri limited liability company ("**Landlord**"), and **SEARS OUTLET STORES, L.L.C.**, a Delaware limited liability company ("**Tenant**"). The parties agree as follows:

1. <u>Premises</u>

   Landlord is the owner of the land located in the City of Kansas City, County of Jackson, State of Missouri, and the building located thereon (the "**Building**") which consists of approximately 246,000 square feet of gross leasable area, and the drives and parking areas serving such Building (collectively, the "**Demised Premises**"), all as legally described on **Exhibit "A"** attached hereto and made a part hereof, and as shown on the site plan attached hereto as **Exhibit "B"** (the "**Site Plan**"). Landlord wishes to lease the Demised Premises to Tenant and Tenant wishes to lease the Demised Premises from Landlord. The mailing address for the Demised Premises is 3630 E. Front Street, Kansas City, Missouri 64120. Tenant acknowledges that the owner of the property located to the east of the Demised Premises is entitled, without charge, to utilize the most easterly entry drive off Front St. (depicted on the Site Plan as "Shared Access Easement"), and Tenant shall not interfere with such access.

2. <u>Use</u>

   The Demised Premises may be used only for a reconditioning (for resale), testing, product repair and distribution facility with a retail store for the sale and lease-to-own of appliances, mattresses, lawn and garden, tools, apparel, bedding, and related products and any other lawful retail, warehouse or light industrial use, all in compliance with local zoning ordinances (the "**Permitted Use**"), and for no other use or purpose. Tenant agrees to comply with federal, state and local governmental laws, rules, regulations and ordinances (collectively, "**Laws**") applicable to the Permitted Use of the Demised Premises. Tenant will set the hours and days of operation of the Demised Premises in its sole and absolute discretion.

3. <u>Term</u>

   (a)    Pursuant to a License Agreement dated September _25_, 2013 (the "License **Agreement**") between the parties, Landlord has delivered approximately 100,000 square feet of warehouse space within the Demised Premises to Tenant, identified on the Site Plan as the "**Early Delivery Premises**." By reason of the parties' execution of this Lease, the License Agreement has terminated (except that Licensee's indemnity obligation under Section 6 of the License Agreement has

survived such termination with respect to occurrences preceding such termination). As additional space within the Demised Premises becomes vacant, such space shall be delivered to Tenant by written notice to Tenant, and upon such delivery the additional space shall be included within the definition of "Early Delivery Premises" under this Lease. Tenant's acceptance of the Early Delivery Premises shall in no way act as Tenant's approval and acceptance of "Landlord's Work" as required hereunder. The Lease as to the entire Demised Premises will commence upon the date (the "**Commencement Date**") on which Landlord delivers the entirety of the Demised Premises to Tenant free of any occupancy or tenancy rights (other than those of Tenant under this Lease) with Landlord's Work Substantially Complete (as such terms are defined in Section 5). Subject to "Force Majeure" and to "Tenant Delay" (as such terms are defined in Section 5), Landlord covenants and agrees that the entirety of the Demised Premises shall be delivered to Tenant, with all Landlord's Work "Substantially Complete" (as defined in Section 5), no later than February 1, 2014. The parties shall specify the Commencement Date and all punch list items, if any, by executing the Lease Commencement Date Acknowledgement Form attached as **Exhibit "G"** and execute the Lease Supplement attached as **Exhibit "H"**. The parties shall execute and deliver to each other **Exhibit "G"** and **Exhibit "H"** within three (3) business days following the Rent Commencement Date.

(b)     During the period (the "**Interim Term**") beginning with the Effective Date and ending on the day preceding the "Rent Commencement Date" (defined in Section 4), Tenant and Landlord shall have all rights and obligations as provided in this Lease, except that during the Interim Term no rent or any other monetary obligations due hereunder shall be charged (except for utility charges as specified below). Landlord shall pay for all utility charges for the Demised Premises during the Interim Term; provided, however, that with respect to any space delivered to Tenant during the Interim Term, Tenant shall pay for all utility charges with respect to such space from and after the date of delivery. Beginning on the Rent Commencement Date, Tenant shall pay for all utility charges for the entire Demised Premises.

(c)     The term of this Lease shall be for an initial term of ten (10) years, commencing on the Rent Commencement Date and terminating on the date (the "**Expiration Date**") which is ten (10) years thereafter (the "**Initial Term**").

(d)     Provided that Tenant is not then in default under this Lease beyond all applicable cure periods, Tenant may extend the Term of this Lease on the same terms and conditions contained herein for two (2) additional periods of five (5) years each (each an "**Option Term**"; the Initial Term and each Option Term, if exercised, shall hereinafter be referred to as the "**Term**"), by giving Landlord notice, not less than one (1) year prior to the end of the then current Term; it is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any Option Term set forth in this **Section 3(d)** through inadvertent failure to give notice thereof within the time limits prescribed. Accordingly (and notwithstanding the preceding provisions of this Paragraph [d]), if Tenant shall fail to give any such Notice prior to the beginning of the last year of the then

2

current Term, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said 30-day period. During any Option Term, all Sections of this Lease shall be effective, and references to Term will incorporate such Option Term.

(e)     If Landlord notifies Tenant at least 60 days prior to the scheduled Expiration Date that Tenant must vacate by the Expiration Date, then Tenant shall have no right to remain in possession of the Demised Premises beyond the Expiration Date, and if Tenant does so, then in addition to Landlord's other remedies, Tenant shall be deemed a tenant at sufferance at a rental rate equal to 200% of the last rent payable under this Lease. Subject to the foregoing, if Tenant remains in possession of the Demised Premises after expiration, or termination of this Lease, as provided herein, without Landlord's written consent, Tenant's holding over shall constitute a month-to-month tenancy at one hundred twenty five percent (125%) of the last rent payable under and pursuant to and on the same terms of this Lease, terminable by either party on one month's notice. If Tenant continues to holdover more than ninety (90) days following the expiration or termination of this Lease, and neither party has elected to terminate such month to month tenancy, then Tenant's rent shall increase to two hundred percent (200%) of the last rent payable under this Lease prior to such expiration or termination. All obligations of Tenant which by their nature involve performance, in any particular, after the end of the Term, or which cannot be ascertained to have been fully performed until after the end of the Term, shall survive the expiration or sooner termination of the Term.

4.  **Rent**

Rent shall begin to accrue and shall be due to Landlord upon the date which is the later of: (i) the date which is 24 days after all of Landlord's Work is Substantially Complete, or (ii) March 1, 2014 (the later of (i) and (ii) being referred to herein as the "**Rent Commencement Date**"). Tenant agrees to pay "**Fixed Rent**" under the following schedule as of the Rent Commencement Date:

| PERIOD | RENT/MO. | RENT/YR. | RENT/S.F. |
|---|---|---|---|
| Years 1 through 10 | $56,375.00 | $676,500.00 | $2.75 |
| Years 11 through 15 (1st Option Term) | $61,500.00 | $738,000.00 | $3.00 |
| Years 16 through 20 (2nd Option Term) | $66,625.00 | $799,500.00 | $3.25 |

or a proportionate sum during partial months or nonpayment during free rent periods, such Fixed Rent to be payable in advance, without offset or demand, on the first day of each month. Tenant

*Outlet Store Lease for Sears*

shall cause its architect to determine the square footage of the Building, and shall provide Landlord with its determination (and calculations) within 20 days after the date of execution of this Lease. If such determination discloses a square footage different than 246,000 square feet (and the same is not disputed by Landlord), then the Fixed Rent set forth in Section 4 shall be adjusted based on such adjusted square footage. If the parties cannot agree on the square footage of the Building, then the determination shall be made by an independent architect selected by Landlord and reasonably acceptable to Tenant, and whose fees shall be borne equally by the parties, unless such architect shall determine that one of the parties has acted unreasonably with respect to such determination, in which case the unreasonable party shall bear the entire fee of the architect. In addition to the Fixed Rent, Tenant shall pay as additional rent all other charges required to be paid by Tenant under this Lease, whether or not designated as "additional rent". The Fixed Rent and additional rent are collectively called the **"rent"**. If Tenant shall fail to pay any rent under this Lease within 10 days after notice of delinquency, then in addition to Landlord's other remedies, Tenant shall pay Landlord interest on the past due amount from the due date to the date of payment at a rate of interest (the **"Interest Rate"**) which is equal to the lesser of (i) the highest lawful rate of interest per annum that may be charged to Tenant under the laws of the State of Missouri, or (ii) 3% plus the "Prime Rate" (defined in Section 31). The rent shall be made payable to Landlord and mailed to Landlord at c/o The Gottlieb Corporation, PO Box 10107, Fayetteville, Arkansas 72703, until the payee or address is changed by written notice from Landlord. Landlord's Federal Employer Identification Number is 43-1393531. As a condition to the first payment of rent under this Lease, Landlord shall provide Tenant with a copy of its Tax Form W-9 and executed counterparts of **Exhibit "G"** and **Exhibit "H"**; and Tenant shall not be obligated to make its first rent payments until five (5) business days following receipt of the W-9, **Exhibit "G"** and **Exhibit "H"**.

5. **Improvements and Alterations.**

      Landlord agrees, at its sole cost and expense, to deliver to Tenant the Demised Premises on the Commencement Date in the condition which shall include Substantial Completion of all of those items set forth on the attached **Exhibit "C"** (collectively, "**Landlord's Work**"). Landlord shall complete Landlord's Work in compliance with all applicable laws and codes. Tenant acknowledges that Tenant has inspected the Demised Premises, and except for Landlord's performance of Landlord's Work, has found the same to be in satisfactory condition. Except as set forth in this Lease, neither Landlord nor any party purporting to act on behalf of Landlord has made any representation or warranty regarding the condition of the Demised Premises or the suitability of the Demised Premises for Tenant's intended purposes. Except for Landlord's performance of Landlord's Work, Tenant shall accept the Demised Premises in its "AS IS" condition.

      (a)    <u>Landlord Permits</u>. Prior to commencing the performance of Landlord's Work, Landlord, at Landlord's sole cost and expense, shall:

            Diligently pursue and secure all permits, if any, for the performance of Landlord's Work and any consents or approvals of lenders or any other party with approval rights to Tenant's occupancy of the Demised Premises or the performance of Landlord's Work.

      (b)    <u>Substantial Completion of Landlord's Work</u>. Landlord shall diligently pursue Substantial Completion of Landlord's Work. Landlord shall Substantially

4

Complete Landlord's Work on or before February 1, 2014 (the "**Landlord's Work Deadline**"), which date is subject to extension due to Force Majeure and to Tenant Delay.   When Landlord determines that Landlord has Substantially Completed Landlord's Work, Landlord shall notify Tenant thereof, and within 5 days thereafter, Landlord and Tenant shall inspect Landlord's Work, and Tenant shall concurrently submit to Landlord a punch list of items which Tenant has determined are incomplete (the "**Punch List**").   For purposes of this Lease, "**Substantially Complete**" shall mean that Landlord's Work is complete to Tenant's reasonable satisfaction, other than Punch List items to be completed prior to the Rent Commencement Date.

(i)     If Landlord fails to so Substantially Complete the Landlord's Work by Landlord's Work Deadline, and such failure is not remedied within 5 days after notice to Landlord, then Tenant shall have the right, at Tenant's sole option, to elect any of the following which are cumulative and not exclusive:

(1)     elect to complete the Landlord's Work with Tenant's or Landlord's contractors, in which event Tenant may deduct from any rent or adjustments otherwise due to Landlord the costs expended by Tenant in so completing Landlord's Work, plus interest thereon at the Interest Rate until such amounts have been fully recouped by Tenant; or

(2)     extend the period within which Landlord may Substantially Complete Landlord's Work, in which event to compensate Tenant for its damages in the delay in receiving the Demised Premises, Tenant shall take a credit equal to one (1) day's rent for each day beyond February 25, 2014, that it takes for Landlord to Substantially Complete construction of Landlord's Work; provided, however, if Landlord fails to Substantially Complete Landlord's Work by March 25, 2014, in addition to the foregoing rent credit, Tenant shall have the right to take a credit equal to two (2) day's rent for each day beyond March 25, 2014 that it takes for Landlord to Substantially Complete Landlord's Work; provided, however, if Landlord fails to Substantially Complete Landlord's Work by April 15, 2014, Tenant may terminate this Lease upon written notice to Landlord, with no cost or liability to Tenant. Each of the foregoing dates is subject to extension by reason of Force Majeure and Tenant Delay.  "**Force Majeure**" means a delay in performance by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, riots, insurrection, casualty damage, war or other reason of a like nature not the fault of Landlord, and in the case of Force Majeure, performance of such act shall be excused for the period of the delay.  "**Tenant Delay**" means any delay or interference in the performance of Landlord's Work resulting from the actions of Tenant, including Landlord's inability to complete Landlord's Work in a timely

manner due to Tenant's use of the truck docks and/or performance of Tenant's Work; however, in order for Landlord to avail itself of Tenant Delay, Landlord must afford Tenant at least 5 days notice and opportunity to cure any such Tenant Delay, such Tenant Delay to apply in each case only to the extent delaying the performance and/or substantial completion of the Landlord's Work. If there is a Tenant Delay which is not cured within the foregoing notice and grace period, then the Rent Commencement Date shall occur on the date it would have occurred but for the Tenant Delay.

(ii) Upon completion of Landlord's Work, the Demised Premises shall be in compliance with all zoning, building code and all other governmental regulations as related to the intended use of Tenant, subject to Tenant's completion of the Tenant's Improvements in compliance with all Laws, it being agreed that if the performance of Tenant's Work results in a requirement that any existing improvements (which would have otherwise been "grandfathered" as permitted deviations from current code) be altered to comply with current code requirements, Tenant (and not Landlord) shall be responsible for effecting such alterations as part of Tenant's Work.

(c) <u>Delivery Notice</u>. Not less than five (5) days prior to the entirety of the Demised Premises being delivered to Tenant, Landlord shall notify Tenant (the "**Delivery Notice**") of the date on which Landlord anticipates delivering the entirety of the Demised Premises to Tenant.

(d) <u>Entry During Interim Term</u>. Landlord agrees that Tenant shall have the right to enter into the Demised Premises during the Interim Term, rent free, in order to construct Tenant's Improvements (as defined in **Section 5(f)** below). Such early entry and performance of Tenant's Work, prior to completion of Landlord's Work, shall not be deemed approval or acceptance by Tenant of Landlord's Work or of the Rent Commencement Date.

(e) <u>AS IS</u>. Except for Landlord's completion of the Punch List items, upon completion of the inspection of the Demised Premises contemplated by Paragraph (b) above, Landlord shall deemed to have completed Landlord's Work, and Tenant shall accept the Demised Premises in its "AS IS" condition.

(f) <u>Alterations</u>. Without obtaining Landlord's prior written approval, which approval shall not be unreasonably withheld or delayed, Tenant shall not make any (i) exterior or structural alterations, or (ii) additions, or (iii) alterations that could adversely affect the utility, plumbing, or mechanical (including heating, ventilating or air conditioning) systems on the Demised Premises, or (iv) alterations or additions that could require Landlord to pay for changes necessary to comply with Laws (as contemplated by Section 9(d). Subject to the foregoing, Tenant shall have the right, at Tenant's sole cost, to build-out the Demised Premises as Tenant may require, and, at any time, to install a "Satellite Dish" (in the manner prescribed in paragraph (l) below) to service the Demised Premises (collectively, "**Tenant's Improvements**"). Not later than 15 days prior to

6

commencing the construction of any Tenant's Improvements (whether as initial construction or as subsequent alterations) that require the issuance of a building permit, Tenant shall submit the plans and specifications describing such Tenant's Improvements to Landlord for Landlord's review and reasonable approval, and shall advise Landlord whether such Tenant Improvements will require Landlord to incur any costs to comply with Laws, and if so, describing such costs. The initial Tenant's Improvements are described on **Exhibit "C-1"** attached hereto, and the reconfigured layout of the Building following construction of Tenant's Improvements is depicted on the attached **Exhibit C-2** (the **"Floor Plan"**). Subject to Landlord's rights of approval described above, Landlord shall cooperate with Tenant (at no cost to Landlord) in securing any permits, consents or approvals required for any aspect of Tenant's Improvements, including the initial Tenant's Improvements. Tenant shall complete Tenant's Improvements in compliance with all applicable Laws. Tenant shall ensure that all Tenant's Improvements are completed in a good and workmanlike manner, using new or like-new materials, and in accordance with the provisions of this Lease.

(g)  <u>Tenant's Permits</u>.  Prior to commencing construction of the initial Tenant's Improvements, Tenant, at Tenant's sole cost and expense, shall diligently pursue and secure all permits for the construction of Tenant's Improvements (**"Tenant's Permits"**).

(h)  <u>Tenant Condition for Permits</u>.  Tenant shall apply for Tenant's Permits not later than January 31, 2014, and shall use good faith efforts to obtain the same in an expeditious manner. If Tenant either (a) (after complying with the requirements of the preceding sentence) fails to secure any required Tenant's Permits on or before February 28, 2014 (the **"Permit Deadline"**), or (b) is required to complete work at a total cost in excess of $50,000.00 to bring existing non-conforming improvements in the Premises into compliance with current governmental requirements, then Tenant shall have the right, at Tenant's sole option, to either (x) terminate this Lease on written notice to Landlord on or before the Permit Deadline, or (y) extend the Permit Deadline by 30 days (i.e., to the date 30 days after the originally scheduled Permit Deadline) by notice to Landlord not later than February 28, 2014, provided that Tenant shall have applied for Tenant's Permits not later than January 31, 2014, and shall have used good faith efforts to obtain the same in an expeditious manner. Tenant shall promptly provide Landlord with written notice of Tenant's receipt of all required Permits. No extension of the Permit Deadline shall serve to postpone the Rent Commencement Date.

(i)  <u>Landlord Delay</u>.  If the performance of the initial Tenant's Improvements is delayed due to a Landlord Delay (as defined herein), then the Rent Commencement Date (as defined in **Section 4** above) shall be extended by one (1) day for each one (1) day of Landlord Delay, but not beyond the date Tenant begins operating its business at the Demised Premises. As used herein, the term **"Landlord Delay"** means any delay in Tenant's performance and/or substantial completion of the initial Tenant's Improvements caused by Landlord's breach of this Lease; however, in order for Tenant to avail itself of Landlord Delay, Tenant

7

must afford Landlord at least 5 days notice and opportunity to cure any such Landlord Delay, such Landlord Delay to apply in each case only to the extent delaying the performance and/or substantial completion of the initial Tenant's Improvements. Landlord Delay shall not include any delay that would in any event (i.e., even if the Landlord Delay had not occurred) have resulted from other causes.

(j)    INTENTIONALLY OMITTED

(k)    <u>Surrender</u>.  The title to all alterations, additions, improvements, repairs and decorations (including lighting fixtures, lifts, heating or air conditioning units and any other article affixed or attached to the walls, floors, ceilings or windows) shall vest in Landlord upon the installation thereof and shall be surrendered with the Demised Premises as a part thereof, without charge. All trade fixtures, trade equipment and personal property installed by Tenant (collectively, "**Tenant's Property**") shall be the property of Tenant. The parties agree that if Tenant installs any additional heating, ventilating and cooling equipment, such equipment shall not be deemed part of Tenant's Property, and shall be surrendered to Landlord with the Demised Premises. On the last day of the Term or on the sooner termination thereof, Tenant shall, (i) subject to reasonable wear and tear and to the provisions of <u>Section 15</u>, peaceably surrender the Demised Premises broom-clean and in good order and repair (subject to Landlord's obligations under <u>Section 9</u>), and (ii) at its expense, remove Tenant's Property from the Demised Premises, and any of Tenant's Property not so removed may, at Landlord's option and without limiting Landlord's right to compel the removal thereof, be deemed abandoned, in which event Landlord, in addition to its other rights and remedies and without liability to Tenant or to any other party, shall be entitled to retain such property as its own free and clear of all claims of Tenant or any other party. The removal of any of Tenant's Property shall be at Tenant's expense and Tenant shall not damage the Building or the Demised Premises during the course of such removal. Any expense incurred or damage suffered by Landlord in connection with such removal shall be paid by Tenant.

(l)    <u>Satellite Dish</u>.  Without additional charge by Landlord, Tenant may install, operate and maintain, at its sole cost and expense, and solely for Tenant's exclusive use (and not for the use of third parties) a satellite dish (the "**Satellite Dish**") on the roof of the Building, the size, weight, design, and exact location of the Satellite Dish to be subject to Landlord's prior approval, which approval shall not be unreasonably withheld. Tenant, at Tenant's sole cost and expense, shall keep the Satellite Dish in good order, condition and repair throughout the Lease Term. Tenant shall not make any alterations to the Satellite Dish without the prior written consent of Landlord in each instance, such consent not to be unreasonably withheld, conditioned or delayed. Tenant shall not perform any work during the Lease Term on the roof of the Building in connection with the Satellite Dish or otherwise without first obtaining the prior written approval of Landlord, such approval not to be unreasonably withheld, conditioned or delayed and any such work shall be performed in a manner which is in accordance with all applicable Laws, and that does not impair Landlord's roof warranty. At

*Outlet Store Lease for Sears*

Landlord's option, Landlord may elect to install roof treads providing access to the Satellite Dish, and if Landlord so elects, Tenant shall reimburse Landlord upon demand for the cost of installing such roof treads, up to a maximum cost of $1,000.00. Upon the expiration or earlier termination of this Lease, Tenant shall, at Tenant's sole cost and expense, remove the Satellite Dish from the roof of the Building and shall repair any damage to the Building caused by such removal. Tenant shall indemnify and save harmless and defend Landlord from and against any and all losses incurred by Landlord by reason of Tenant's installation, maintenance, operation and removal of the Satellite Dish, including the cost to repair any damage to the roof. Landlord shall have the right from time to time, upon 30 days' prior notice to Tenant, to require Tenant, at Tenant's sole cost and expense, to relocate the Satellite Dish to other areas of the roof, to the extent necessary to permit Landlord to repair or replace any portion of the Building roof.

6. **Landlord's Representations, Warranties and Covenants**

    (a)    Landlord warrants and represents that the following shall be true and correct as of the Effective Date:

        (i)    Landlord holds good and marketable title to the Demised Premises, subject to matters of record and to such facts as would be disclosed by an accurate survey;

        (ii)    The execution and delivery of this Lease shall not be precluded by or cause a breach of any other agreement, mortgage, contract or other instrument or document to which Landlord is a party or to which the Demised Premises is subject;

        (iii)    To the best of Landlord's actual knowledge (without inquiry), there is no asbestos or asbestos-containing material in or on the Demised Premises or the Building, and no asbestos or asbestos-containing material has been removed from the Demised Premises or the Building;

        (iv)    The consumption of all utilities, including gas, electric, telephone, water, municipal sanitary sewer and other utilities is separately metered by the applicable utility company providing such service;

        (v)    The existing retail portion of the Demised Premises is equipped with a heating and air-conditioning system sufficient to maintain comfortable occupancy, and the warehouse portion of the Demised Premises contains functioning space heaters; and

        (vi)    To the best of Landlord's actual knowledge (without inquiry), the Building and the balance of the Demised Premises are in full compliance with Title III of the Americans with Disability Act of 1990, all regulations issued thereunder and the Accessibility Guidelines for Buildings and Facilities issued pursuant thereto, as the same are in effect on the date hereof (the "ADA").

    (b)    Landlord hereby covenants to Tenant that the following shall be true and correct as of the Effective Date and shall remain true and correct throughout the Term of this Lease:

*Outlet Store Lease for Sears*

(i)     Landlord has the full power and authority to execute and deliver this Lease and to perform its obligations under this Lease;

(ii)    Tenant, upon performing its obligations under this Lease, shall and may peaceably and quietly have, hold and enjoy the Demised Premises, without interference from Landlord or anyone acting by, through or under Landlord; and

(iii)   The Demised Premises is not subject to any deed of trust.

## 7. Taxes

Landlord shall pay when due all "Taxes" (defined in Section 11) levied or assessed upon the Demised Premises. Tenant is required to reimburse such Taxes to Landlord as outlined in **Section 11** of this Lease.

## 8. Tenant's Signs

Tenant shall have the right to install signage on the Building, at Tenant's sole cost, provided it is in compliance with the applicable signage codes and any requirements of the City of Kansas City. Notwithstanding the foregoing, Tenant shall have the right to seek a variance from the applicable municipality for Tenant's signage. After January 1, 2014, Tenant may erect temporary signage during performance of Landlord's and Tenant's Work, including temporary "Opening Soon" and "Now Hiring" signs, which signs shall be permitted during the thirty (30) day period immediately prior to the date Tenant opens for business to the general public. Tenant shall also have the right, for a period of thirty (30) days after the date Tenant opens for business to the general public, to install and maintain "Grand Opening" signage and temporary fixtures and decorations including pennants, balloons and such other items as may be permitted by applicable law. Tenant shall also be permitted, subject to Landlord's reasonable prior approval, to install a cold inflatable balloon or similar promotional device prior to and up to three (3) weeks following the date on which Tenant opens for business to the general public at the Demised Premises. Tenant shall also have the right, but not the obligation, (i) following January 1, 2014, to occupy the existing pylon and/or monument sign(s) for the Demised Premises (to the extent surrendered to Landlord by the existing tenants of the Demised Premises), and (ii) attach signage to the exterior façade of the Building. All signage installed by Tenant shall constitute part of Tenant's Property.

## 9. Repairs and Maintenance.

(a)     Landlord Repairs. Landlord shall, at its cost, during the Term:

(i)     Except for "Tenant's Alterations" (defined below), maintain, repair and/or replace when necessary the foundation, utilities to the Building, exterior portions of exterior walls (excluding doors and windows), floor slabs, plumbing under the concrete, fire sprinkler systems, roofs and structure of the Building;

(ii)    Subject to Tenant's obligations under Paragraph (b)(ii) below, except for Tenant's Alterations, maintain, repair and/or replace when necessary heating, ventilating and air conditioning ("HVAC") equipment whether on the interior or exterior, including rooftop, of the Demised Premises; and

*Outlet Store Lease for Sears*

(iii)    Make all repairs or replacements necessary due to or arising out of the negligence of Landlord, its agents, employees, or by reason of the breach of this Lease by Landlord.

(iv)    One time during the Initial Term (when necessary), Landlord shall resurface and restripe that area depicted on the Site Plan as the "Customer Parking Area", it being agreed that after such one-time resurfacing and restriping, Landlord shall have no further obligation with respect to such area.

(b)    <u>Tenant Repairs</u>.  Tenant shall, at Tenant's cost, during the Term:

(i)    Maintain in good order and condition, and repair and replace (as necessary) all other portions of the Demised Premises which are not the responsibility of Landlord pursuant to Paragraph (a) of this Section, including, without limitation, the non-structural, interior portions of the Demised Premises, as well as the windows and window frames, doors and door frames and openers, docks and dock equipment, utility lines, parking areas and drives (including maintaining the same free of depressions and pot holes, and appropriately sealed and striped), and all of Tenant's Improvements installed by Tenant, including any plumbing, wires, lighting and tiles;

(ii)    Engage Fagan Company (or if Fagan Company is unavailable, or is not performing in a manner satisfactory to Landlord, then Landlord may require that Fagan Company be replaced, and in such case, the replacement contractor shall be mutually acceptable to Landlord and Tenant, but Tenant cannot require the engagement of a contractor with which Tenant has a multi-location contract) to (1) perform quarterly preventative maintenance of the HVAC, and (2) to perform repairs (but not replacements) of the HVAC, up to the following caps applicable to such repairs (collectively, the "**HVAC Caps**"):  (A) $5,000 per year for Lease Years 1 through 5, (B) $7,500 per year for Lease Years 6 through 10; (C) $10,000 per year for Lease Years 11 through 15, and (D) $12,500 per year for each Lease Year after Lease Year 15, with any costs in excess of such annual HVAC Cap to be the responsibility of Landlord; additionally, Tenant (and not Landlord) shall be responsible for the maintenance, repair and replacement of any HVAC which is installed by Tenant ("**Tenant Installed HVAC Equipment**"), and such costs to maintain, repair and replace Tenant Installed HVAC Equipment shall not apply in reduction of (or be applied as a credit against) the HVAC Caps;

(iii)    Paint the interior and (subject to Landlord's approval of the color) exterior walls of the Demised Premises, as deemed necessary by Tenant, and perform interior decorating;

(iv)    Keep the Demised Premises in a clean condition, meeting applicable city ordinances;

(v)    Make all repairs or replacements necessary due to or arising out of the negligence of Tenant, its agents, employees, or by reason of the breach of this Lease by Tenant; and

(vi)    Make all repairs and replacements to any component of the Demised Premises which is constructed by Tenant, whether as initial Tenant

11

Improvements or as later alterations (collectively, "**Tenant Alterations**"), including any Tenant Installed HVAC Equipment.

(c) <u>Tenant Self-Help</u>. If Landlord fails to complete the obligations in subsection (a) above, after being given thirty (30) days (or such longer period as is required to cure such default with the exercise of reasonable diligence provided Landlord is diligently pursuing same) prior written notice by Tenant of the need for such repair (except for those matters determined by Tenant to be of an emergency nature, in which event subsection (d) below shall govern), Tenant shall have the right, but not the obligation, to make any repairs or cure any defaults under subsection (a) and to recover Tenant's out of pocket cost from Landlord by providing notice to Landlord of the out of pocket costs and expenses incurred by Tenant to cure Landlord's failure to fulfill its obligations under subsection (a) (which notice shall be accompanied by invoices and similar evidence of the costs incurred by Tenant). If the cost is not paid by Landlord within fifteen (15) days of notice and demand by Tenant, Tenant shall have the right to deduct such cost, with interest thereon at the Interest Rate, from any installments of rent or other adjustments payable by Tenant to Landlord. Provided, further, in no event shall Tenant's exercise of its rights under this **Section 9(d)** limit the rights and remedies afforded to Tenant under this Lease.

(d) <u>Compliance with Laws</u>. The term "**Code Compliance**" shall mean the taking of such actions, which may include the construction of alterations, replacements or additions, structural or otherwise, as are necessary to cause the Demised Premises to conform to Laws, whether now in force, or which may hereafter be in force, including those relating to the ADA.

(i)     Subject to Section 5(b)(ii), as part of Landlord's Work, Landlord shall cause the existing improvements to be in Code Compliance as of the Commencement Date, except that if Tenant's initial remodeling results in a requirement that any existing improvements (which would have otherwise been "grandfathered" as permitted deviations from Code Compliance, and which Tenant would not otherwise have been altering as part of Tenant's Work) be altered to meet Code Compliance, then Tenant (and not Landlord) shall be responsible for effecting such alterations or additions as part of Tenant's Work and at Tenant's cost. As provided in Section 5(h), if Tenant determines by the Permit Deadline (i.e., by March 31, 2014) that the cost of effecting Code Compliance with respect to such existing improvements would exceed $50,000.00, Tenant can terminate the Lease.

(ii)     After Tenant's completion of the initial Tenant's Improvements, except as provided in subparagraph (iii) below, Landlord shall be responsible for effecting Code Compliance with respect to the structure of the Building, and with respect to the exterior portions of the exterior walls of the Building (excluding doors and windows), roof, parking area, drives and sidewalks, and Tenant shall be responsible Code Compliance with respect to the balance of the Building and with respect to Tenant's manner of operation in the Demised Premises.

12

(iii)    Notwithstanding the foregoing provisions of this Section 9(d), if the need for Code Compliance arises due to future alterations by Tenant, then Tenant shall be responsible for Code Compliance (even if affecting portions of the Demised Premises which would have otherwise been Landlord's responsibility under subparagraph [ii]) if it is directly due to Tenant's alterations or is due to Tenant's specific use of the Premises- for example, if Tenant cuts a new exit in the wall, and there arises a need for a handicap ramp to serve the new entrance, Tenant would have to construct the ramp;  or if Tenant hired all disabled persons to work in the warehouse, and that triggered a higher standard for handicap access, Tenant would be responsible for required alterations.  On the other hand, if the requirement for Code Compliance is not directly due to the nature of the future alterations by Tenant or due to Tenant's specific manner of operation or use, then Tenant shall effect such Code Compliance, and over the Term of the Lease, Landlord will bear the first $25,000.00 of Code Compliance costs, and any cost over that amount will be borne 50% by Tenant and 50% by Landlord, but in no event shall Landlord be required to spend more than $100,000.00 over the Term of the Lease to effect Code Compliance, and Tenant shall be responsible for any costs in excess of that amount – for example, if Tenant is spending $100,000.00 on a Tenant alteration to the interior of the Building, and that dollar amount of expenditure in and of itself results in a requirement to comply with a new ADA regulation pertaining to the parking area, then Landlord would be responsible for the cost of complying with such new ADA required improvements to the parking area, subject to the dollar limitations set forth in this sentence.  Landlord shall have the right to reasonably approve the plans, contractors and costs of all Code Compliance work for which Landlord is bearing all of a portion of the cost.

(iv)    Tenant shall procure and maintain in the Demised Premises all safety appliances required by Landlord's property insurer to be maintained therein, and Tenant shall comply with all reasonable rules and regulations of such property insurer.

(v)    The provisions of this Section 9(d) are subject to the provisions of Section 21 (captioned "Hazardous Material").

(e)  Emergency Repairs.  With respect to repairs which are otherwise the obligation of Landlord, Tenant shall have the right at all times, at its sole option, without prior notice to Landlord, to make emergency repairs (i.e., those necessary to prevent imminent risk of bodily injury or property damage) as Tenant deems necessary; however, no such emergency repair effected without notice to Landlord shall exceed $5,000.00 in cost.  Upon demand by Tenant (which demand shall be accompanied by reasonable supporting documentation), Landlord shall pay Tenant an amount equal to the cost of the repair (not to exceed $5,000.00 in cost).  If Landlord fails to pay to

13

Tenant the repair cost, then Tenant may deduct such cost, with interest thereon at the Interest Rate, from rent and adjustments owed by Tenant to Landlord.

(f)  Access by Landlord.  Landlord shall, upon prior written notice to Tenant, have access to the Demised Premises, at reasonable intervals during normal business hours, for examining or repairing it, and for any other purpose deemed reasonable by Landlord, and Landlord may enter at any time for emergency repairs. Notwithstanding the foregoing, Landlord shall not interfere with the conduct of Tenant's business.

(g)  Qualifications to Repair Obligations.  The parties' respective obligations under this Section 9 are subject to the provisions of Sections 13 (captioned "Subrogation") and 15 (captioned "Damage and Destruction"), and nothing set forth in this Section shall be construed to require a party to repair damage that results from the negligence or breach of this Lease by the other party.

(h)  Mechanic's Liens.  Tenant shall not create or suffer any mechanics' or materialmen's lien or security interest to be filed against the Demised Premises (other than a security interest in Tenant's Property) by reason of work, labor, services or materials performed or furnished to Tenant or anyone holding any part of the Demised Premises under Tenant.  If any such lien shall at any time be filed as aforesaid, Tenant may contest the same in good faith but notwithstanding such contest Tenant shall, within 45 days (except that this period shall be 30 days if Landlord is in negotiations to sell or finance the Demised Premises) after the filing thereof, cause such lien to be released of record by payment, bond, order of a court of competent jurisdiction, or otherwise.  If Tenant fails to release of record any such lien within the aforesaid period, Landlord may remove such lien by paying the full amount thereof or by bonding or in any other manner Landlord deems appropriate, without investigating the validity thereof and irrespective of the fact that Tenant may contest the propriety or the amount thereof, and Tenant, upon demand, shall pay Landlord the amount so paid out by Landlord in connection with the discharge of such lien, together with expenses incurred in connection therewith, including attorneys' fees.  Nothing contained herein shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Demised Premises to any lien or liability under the lien laws of the State of Missouri.

10. **Intentionally Deleted.**

11. **Adjustments**

(a)  In addition to the Fixed Rent provided for in this Lease, Tenant agrees, from and after the Rent Commencement Date and during the remainder of the Term, to reimburse Landlord as additional rent for the following, which amounts shall be prorated for partial years:

(i)  All real estate taxes, assessments and other governmental charges and levies, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind or nature whatsoever (including assessments on the Demised Premises for public improvements, benefits and benefit districts [whether for on or off-site improvements], and special or

*Outlet Store Lease for Sears*

installment tax bills and interest on unpaid installments thereof) which may be levied, assessed or imposed upon the Demised Premises and arise out of the ownership, use, occupancy or possession of the Demised Premises, from time to time ("**Taxes**") . The reimbursement shall be payable thirty (30) days after presentation of receipts marked paid in full. However, "Taxes" shall not include any capital stock, franchise, estate, inheritance, devolution, succession, transfer, sales, gift or income tax; and

    (ii)    Insurance premiums for the insurance maintained by Landlord as described in Section 12(a) (excluding any premiums attributable to business income or loss of rents coverage), payable thirty (30) days after presentation of receipts marked paid in full.

    (b)    INTENTIONALLY OMITTED

    (c)    Landlord shall, on request, provide Tenant with any applicable financial records and, as required, permit Tenant or Tenant's auditors, with reasonable notice, to inspect all records for Taxes and insurance costs. Landlord shall promptly repay Tenant for any overpayments or unsupported costs which Tenant or its auditors identify. Landlord shall pay the cost of Tenant's audit if overpayments or unsupported costs exceed actual costs by five percent (5%) or more.

12. **Insurance**

    (a)    Landlord shall pay for and maintain, from the Effective Date through the end of the Term, the following policies of insurance covering the Demised Premises, which insurance shall be obtained from companies currently rated "A-/VII" or better as defined in the then-current edition of Bests Insurance Reports (or the equivalent thereof if Bests Insurance Reports is no longer published):

        (i)    Commercial General Liability Insurance covering the ownership of the Demised Premises by Landlord, with combined single limits of not less than $5,000,000 per occurrence for bodily injury and property damage.

        (ii)    Property Insurance insuring the Building, including those perils generally covered on a "Causes of Loss-Special Form," including fire and extended coverage, windstorm, vandalism, malicious mischief, sprinkler leakage, water damage, accidental collapse, and flood, in an amount equal to at least ninety percent (90%) of the full replacement cost (except in the case of flood insurance, which may have a lesser insurance coverage) with an Increased Cost of Construction Endorsement.

        (iii)    INTENTIONALLY OMITTED.

        (iv)    Such other insurance (other than business income or so-called loss of rents insurance) as is customarily maintained by landlords of similar properties in the greater Kansas City metropolitan area, to the extent approved by Tenant, which approval shall not be unreasonably withheld.

        (v)    Landlord shall cause its contractors to maintain Workers' Compensation and Commercial General Liability Insurance, and Landlord shall

15

*Outlet Store Lease for Sears*

indemnify, defend and hold harmless Tenant and its agents from all claims, losses, damages or expenses incurred by Tenant or its agents due to the failure of Landlord's contractors to maintain Worker's Compensation and Commercial General Liability Insurance.

   (vi)  The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies. Each policy shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice to Landlord. Landlord shall give Tenant at least 15 days prior notice of any cancellation of Landlord's insurance. Landlord shall furnish Tenant, or cause to be furnished to Tenant, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates evidencing the insurance required to be maintained pursuant to this **Section 12(a)**.

(b)   Tenant shall maintain a Commercial General Liability insurance policy with respect to the Demised Premises, with combined single limits of $5,000,000.00 per occurrence for bodily injury and property damage, and on which Landlord is named as an additional insured. Tenant shall also maintain Workers' Compensation insurance on its employees employed at the Demised Premises, All-Risk property insurance on Tenant's Property , and if applicable, motor vehicle liability insurance. Tenant shall furnish Landlord, or cause to be furnished to Landlord, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates evidencing the insurance required to be maintained pursuant to this **Section 12(b)**. Tenant acknowledges and agrees that the Commercial Liability Insurance maintained by Landlord pursuant to Section 12(a) is only intended to provide coverage with respect to the negligence or intentional misconduct of Landlord, its agents or contractors, and that Tenant's Commercial Liability Insurance policy is intended to provide the primary coverage with respect to the Demised Premises.

(c)   Tenant may meet its insurance obligations by maintaining a self-insurance program through the financial backing of its sole member, Sears Hometown and Outlet Stores, Inc., a Delaware corporation ("**SHOS**"), provided that (i) SHOS maintains a net worth of at least Fifty Million and No/100 Dollars ($50,000,000.00) (in 2013 dollars), as demonstrated to Landlord's reasonable satisfaction. SHOS, by its execution of this Lease, agrees to provide such self-insurance for Tenant's benefit at any time that Tenant does not otherwise provide the insurance required by this **Section 12** through other third-party insurance companies. Tenant may only self-insure when Tenant is primarily owned by SHOS; if this Lease should be assigned to a new tenant that is not owned or controlled by SHOS, such assignee shall not have any rights to self-insure and Landlord shall have no right to look to SHOS for insurance on behalf of such third-party assignee, except as otherwise provided in that certain Lease Guaranty provided by SHOS to Landlord in connection with this Lease.

13. **Subrogation**

16

*Outlet Store Lease for Sears*

Anything in this Lease to the contrary notwithstanding, it is agreed that each party (the "**Releasing Party**") hereby releases the other (the "**Released Party**") from any liability which the Released Party would, but for this paragraph, have had to the Releasing Party during the term of this Lease, resulting from the occurrence of any accident or occurrence or casualty (i) which is or would be covered by a property insurance policy on a special causes of loss form (irrespective of whether such coverage is being carried by the Releasing Party), or (ii) covered by any other property damage insurance being carried by the Releasing Party at the time of such occurrence, which accident, occurrence or casualty may have resulted in whole or in part from any act or neglect of the Released Party, its officers, agents or employees. Said mutual waivers shall be in addition to and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties hereto.

14. **Indemnity**

(a)    Subject to Section 13, Landlord agrees to indemnify, protect, defend and hold Tenant, its members, directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses (including, but not limited to, attorneys' fees and court costs) and liabilities to the extent arising out of (1) the negligence of Landlord, its agents or contractors, or (2) a breach by Landlord of this Lease.

(b)    Subject to Section 13, Tenant agrees to indemnify, protect, defend and hold Landlord, its members, directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses (including, but not limited to, attorneys' fees and court costs) and liabilities , arising out of (1) any occurrence on or about the Demised Premises (except to the extent caused by the negligent acts or omissions of Landlord, its agents or contractors), or (2) a breach by Tenant of this Lease.

(c)    Notwithstanding anything in this Lease to the contrary, neither party shall be responsible to the other party for punitive damages.

15. **Damage or Destruction**

(a)    If during the Term the Demised Premises are damaged or destroyed by fire or any other casualty covered or required to be covered by Landlord's property insurance, Landlord shall send Tenant a written estimate, from an independent architect or general contractor selected by Landlord, of the amount of time reasonably required to repair and restore the Demised Premises (other than Tenant's Property) and access thereto, as the case may be ("**Completion Estimate**"). If the Completion Estimate states that the Demised Premises will not be repaired, restored and delivered to Tenant within one year after the casualty without the payment of overtime or other premiums, then Tenant may terminate this Lease by giving Landlord written notice of termination within thirty (30) days after Tenant's receipt of the Completion Estimate (such termination notice to include a termination date providing not more than ninety (90) days for Tenant to vacate the Demised Premises). The estimated completion date set forth in Landlord's Completion Estimate shall be referred to herein as the "**Estimated Completion Date**." If Tenant does not elect to terminate the Lease as provided

17

above, Landlord shall, at Landlord's expense, promptly, with due diligence, rebuild, repair and restore the Demised Premises (excluding Tenant's Property) to substantially the same condition existing just prior to the damage or destruction. Subject to Force Majeure, if Landlord has not Substantially Completed such restoration by the Estimated Completion Date, Tenant shall have the right to terminate this Lease upon not less than thirty (30) days' notice to Landlord, which must be exercised, if at all, prior to delivery of the Demised Premises to Tenant; however, if such restoration is completed within 30 days after receipt of such termination notice from Tenant, such termination shall be nullified and this Lease shall continue in full force and effect. Promptly following Landlord's restoration of the Demised Premises and Tenant's receipt of the necessary permits, Tenant, at Tenant's expense or under insurance coverage carried or required to be carried by Tenant, shall restore Tenant's Property, at Tenant's expense.

(b)     From the date of the damage or destruction until the date that is the earlier to occur of (i) the date Tenant completes its restoration work and re-opens for business from the Demised Premises, or (ii) 30 days after the restoration is Substantially Completed by Landlord and the Demised Premises are delivered to Tenant for reconstruction of Tenant's Property, rent and all adjustments and all other charges payable by Tenant shall abate in the proportion that the square footage of the part of the Demised Premises destroyed or rendered unfit for Tenant's use bears to the total square footage in the Demised Premises. Except as expressly provided herein to the contrary, the provisions of this Lease shall be unaffected by such damage or destruction. Notwithstanding the foregoing, if such a casualty occurs in the last year of the Term of this Lease, and the cost to restore the damage to the Building would exceed 20% of the replacement cost of the Building, Landlord or Tenant may, at its option, elect to terminate this Lease as of the date of the casualty on written notice to the other party to be delivered within thirty (30) days of the date of the casualty; provided, however, if Tenant elects to exercise an available Option Term, Landlord's termination pursuant to this Paragraph (b) shall be vitiated and Landlord shall remain obligated to rebuild, repair and restore as required above.

(c)     If during the Term the Demised Premises is materially destroyed (i.e., the cost to restore is more than 10% of the replacement cost) by a casualty not covered or required to be covered by Landlord's property insurance (or in the case of flood damage, if the difference between the flood insurance proceeds received by Landlord and the cost to restore the Demised Premises is greater than 10% of the replacement cost), then provided Landlord was maintaining the insurance required to be maintained by Landlord under **Section 12(a)(ii)** of the Lease at the time of such uninsured event, Landlord shall have the right to terminate this Lease by providing written notice to Tenant within forty-five (45) days after the date of damage. If Landlord does not elect to terminate this Lease, (i) rent and all adjustments and other charges payable by Tenant shall abate for the timeframe set forth in subsection (b) above, (ii) Landlord shall promptly pay to Tenant any unearned rent, adjustments or other charges paid by Tenant, or Tenant shall promptly pay to Landlord any rent earned and unpaid, and (iii) Landlord shall, at Landlord's expense, promptly, with due diligence, rebuild, repair and restore the

18

*Outlet Store Lease for Sears*

Demised Premises, including Landlord's Work, to substantially the same condition existing just prior to the damage or destruction. Promptly following Landlord's restoration of the Demised Premises and Tenant's receipt of the necessary permits, Tenant, at Tenant's expense or under insurance coverage carried or required to be carried by Tenant, shall restore Tenant's Improvements installed by Tenant, and Tenant's Property.

(d)    If the Demised Premises are restored by Landlord, Tenant shall pay Landlord the amount of any reasonable deductible maintained by Landlord with respect to Landlord's property insurance on the Demised Premises.

## 16. Eminent Domain

(a)    Landlord shall promptly notify Tenant in writing of any proposed taking or condemnation which will affect the Demised Premises.

(b)    In the event of any taking by eminent domain or condemnation or conveyance in lieu thereof wherein the Demised Premises or access thereto are materially adversely affected, whether or not this Lease has been terminated as a result thereof, Tenant shall have the right to make any separate claims allowed by the laws of the State of Missouri against the condemning authority for the following: (a) the value of its Tenant's Property; (b) its relocation expenses; (c) loss of business; and (d) such other separate award as may be permitted by law which does not reduce the award payable to Landlord; however, in no event shall Tenant be entitled to recover for the value of Tenant's leasehold estate and Tenant hereby assigns to Landlord all of Tenant's interest in any condemnation award, except for those matters described in clauses (a) through (c).

(c)    Tenant shall have, at its option, the right to terminate this Lease upon a taking or condemnation of (i) such portion of the Demised Premises as would render access inadequate, (ii) the number of parking spaces insufficient to meet code requirements with respect to the Permitted Use then being conducted by Tenant on the Demised Premises, or (iii) any portion of the Building, provided that in the case of subparts (i) or (ii), Landlord does not within forty-five (45) days of time after such condemnation or conveyance, restore access or parking to the extent necessary to satisfy the foregoing conditions.

(d)    If Tenant elects to terminate this Lease under this **Section 16**, Tenant shall notify Landlord in writing of this election within sixty (60) days after the date the condemnor takes possession. Tenant's rental obligation shall cease as of the date the condemnor takes possession, and Landlord shall promptly refund rent and other charges paid by Tenant for periods beyond that date.

(e)    If Tenant does not elect to terminate this Lease, Landlord shall (to the extent practical and economically feasible), at its sole cost, promptly and diligently repair, alter, raze and restore the remaining part of the Demised Premises, replace the parking area taken and/or replace the points of ingress and egress taken, so the improvements are made into a complete architectural unit, and the Demised Premises, parking areas and points of ingress and egress are returned to, as nearly as reasonably possible, the condition existing prior to the taking or condemnation;

19

*Outlet Store Lease for Sears*

however, the foregoing shall not be construed to require Landlord to construct structured parking facilities. Tenant shall not be obligated to make any payment or contribution toward the repair or restoration work. Tenant's rental obligation shall be proportionately reduced by the percentage of the Building, if any, taken, whether on a temporary or permanent basis.

17. **Defaults**

(a)    Any of the following shall constitute an "**Event of Default**": If Tenant fails to: (i) make within 10 days of receipt of written notice any monetary payment past due hereunder; or (ii) commence to cure any non-monetary covenant or agreement to be performed by Tenant under this Lease within thirty (30) days (or such longer period of time as may be required to cure such default with the exercise of due diligence) after receipt of written notice or shall fail thereafter to continuously cure such default to completion with due diligence, then in addition to Landlord's other remedies, Landlord may do any one or more of the following:

At its option, either (i) terminate this Lease, or (ii) without terminating this Lease, take possession of the Demised Premises, with or without process of law, using such force as may be necessary to remove all persons and personal property therefrom, and in the event of such re-entry without termination, Landlord may (but shall have no obligation to do so), lease the Demised Premises for the remainder of the Term or for a lesser or longer period on such terms and conditions as Landlord, in its sole judgment, deems advisable and for the purpose of such re-letting, Landlord is hereby authorized to make such repairs as Landlord deems necessary. Notwithstanding any re-letting without termination, (y) Tenant shall remain liable for payment of the rent and for the performance of all other obligations to be performed by Tenant under this Lease, and (z) Landlord may at any time thereafter elect to terminate this Lease for such previous breach. The rentals received from any such re-letting shall first be applied to the expenses of such re-letting (including repair expenses, and reasonable brokerage and attorney's fees) and second to the payment of rent due and unpaid hereunder. Tenant shall not be entitled to receive any surplus funds received by Landlord from any such re-letting. If such funds from the re-letting are less than those required to be paid by Tenant hereunder for any month, such deficiency shall be calculated and payable monthly by Tenant. Landlord shall also be entitled to collect from Tenant any other loss or damage which Landlord may sustain by reason of Tenant's default under this Lease, other than punitive damages. No receipt of moneys by Landlord from or for the account of Tenant or from anyone in possession or occupancy of the Demised Premises after the termination in any way of this Lease or after the giving of any notice of termination, shall reinstate, continue or extend the term or affect any notice given to Tenant prior to the receipt of such money, it being agreed that after the service of notice or the commencement of a suit, or after final judgment for possession of the Demised Premises, Landlord may receive and collect any rent or other amounts due Landlord, and such payment shall not waive or affect such notice, suit or judgment.

*Outlet Store Lease for Sears*

(b)    If Tenant fails to perform any agreement or obligation on its part to be performed under this Lease, Landlord shall have the right (i) if no emergency exists, to perform the same after the expiration of the notice and grace period described in Paragraph (a) of this Section, and (ii) in any emergency situation to perform the same immediately without notice or delay. For the purpose of rectifying Tenant's defaults as aforesaid, Landlord shall have the right to enter the Demised Premises. Tenant shall on demand reimburse Landlord for the costs and expenses incurred by Landlord (excluding any administrative fee to Landlord) in rectifying Tenant's defaults as aforesaid, including reasonable attorneys' fees. Except for gross negligence by Landlord, Landlord shall not be liable or in any way responsible for any loss, inconvenience, annoyance or damage resulting to Tenant or anyone holding under Tenant for any action taken by Landlord pursuant to this Paragraph (b). Any act or thing done by Landlord pursuant to this Paragraph (b) shall not constitute a waiver of any such default by Tenant or a waiver of any covenant, term or condition herein contained or the performance thereof.

(c)    If Landlord defaults in its obligations under this Lease and (1) such default continues for 90 days following written notice from Tenant and Landlord has not commenced the cure of such condition within such 90 day period, and (2) such default materially, adversely affects Tenant's operations, then Tenant may, in addition to its other remedies, elect to terminate this Lease on written notice to Landlord; however, if Tenant elects to terminate this Lease pursuant to this Paragraph, Landlord may negate such termination election if Landlord cures such default within 10 days after receipt of Tenant's notice of termination, and in such case, this Lease shall continue in full force and effect in accordance with its terms. Notwithstanding the foregoing, with regard to Landlord's maintenance and repair obligations under this Lease, Tenant shall have the rights provided in **Section 9**.

18. **Subordination, Non-Disturbance and Attornment and Estoppels**

(a)    Upon request of the holder of any deed of trust hereafter intended to encumber the Demised Premises, Tenant will subordinate its rights under this Lease to the lien thereof and to all advances made or hereafter to be made upon the security thereof, and Tenant shall, within 30 days after demand therefor, execute, acknowledge and deliver an instrument, in the form customarily used by such encumbrance holder, effecting such subordination; however, as a condition of any such subordination, Landlord's lender shall be required to enter into an agreement with Tenant in form reasonably acceptable to the parties (an "**SNDA**") pursuant to which, among other matters, the lender agrees with Tenant that so long as no Event of Default exists, Tenant's possession of the Demised Premises shall not be disturbed in connection with the enforcement of such lender's rights under the deed of trust, and Tenant shall attorn to the purchaser upon any foreclosure (or deed in lieu of foreclosure) of such deed of trust, and Tenant shall not be required to otherwise agree to subordinate its rights under this Lease.

(b)    The payment of rent or any other sums by Tenant to any mortgagee pursuant to the terms of any SNDA executed by Tenant shall be credited to Tenant as if such sums had been paid directly to Landlord pursuant to this Lease Landlord shall be obligated to pay any processing or administrative fees charged by Landlord's

21

lender in connection with the negotiation and execution of any SNDA between Tenant, Landlord and Landlord's lender.

(c)   Tenant's Property shall not be encumbered by the lien of Landlord's mortgage.

(d)   Tenant shall furnish Landlord upon 20 days' prior written request therefor, an estoppel certificate in the form attached hereto as **Exhibit "E"** (or other form reasonably approved by Tenant), and such estoppel certificate shall be addressed to the mortgagee, proposed mortgagee, financial institution, proposed purchaser or such other party designated by Landlord. For each estoppel certificate requested by Landlord, Landlord shall pay Tenant a processing fee of $500.00.

(e)   Landlord shall furnish Tenant upon 20 days' prior written request therefor, an estoppel certificate addressed to Tenant or such other party designated by Tenant, providing the following information (to the extent true and correct and stating any exceptions therefrom):

(i)   that Landlord has completed all of Landlord's Work (if applicable);

(ii)   the Commencement Date of the Lease and the expiration date of the Lease;

(iii)   the Rent Commencement Date of the Lease;

(iv)   that Tenant has opened for business within the Demised Premises;

(v)   that to Landlord's actual knowledge, Landlord has no claim, set-off or recoupment against Tenant (and if Landlord does have such a claim it shall be stated in specific detail);

(vi)   that to Landlord's actual knowledge, there are no defaults or events which with the passage of time or giving of notice, or both, would constitute a default by Tenant or Landlord under the Lease (and if such defaults or events exist, they shall be stated in reasonable detail); and

(vii)   such other factual information regarding the Lease or the parties performance of the terms and conditions under the Lease as Tenant shall reasonably request.

For each estoppel certificate requested by Tenant, Tenant shall pay Landlord a processing fee of $500.00.

19. **Assignment and Sublease**

(a)   Tenant shall have the right, without Landlord's consent, to assign this Lease or sublet all or part of the Demised Premises; provided, however, Tenant shall remain liable for the payment of rent and the performance of its other obligations hereunder. As a condition of any assignment of this Lease by Tenant, the assignee thereof shall be required to execute and deliver to Landlord an agreement, in recordable form, whereby such assignee assumes and agrees with Landlord to discharge all obligations of Tenant under this Lease arising after the date of such assignment.

*Outlet Store Lease for Sears*

(b)   Nothing contained herein shall be deemed to prevent or limit Tenant from licensing space within the Demised Premises to third parties, or leasing, engaging in a sale-leaseback for, and/or granting security interests to any third party in any of Tenant's Property or any services produced by Tenant at the Demised Premises, without the consent of Landlord, which may include (without limitation) a lease or sale-leaseback of Tenant's Property to a tax-exempt and/or governmental entity for purposes of abating or reducing personal property or other taxes payable with respect thereto.

(c)   If Landlord conveys or transfers its interest in the Demised Premises, upon such conveyance or transfer, Landlord (and in the case of any subsequent conveyances or transfers, the then grantor or transferor) shall be entirely released from all liability with respect to the performance of any obligations on the part of Landlord to be performed hereunder from and after the date of such conveyance or transfer.

## 20. Notices

Any notice or approval required or given in connection with this Lease shall be in writing and shall either be delivered by hand or shall be sent Federal Express or other national overnight courier service ("**Overnight Courier**"). Notices shall be addressed as follows:

Tenant:                 Sears Outlet Stores, L.L.C.
                        5500 Trillium Blvd., Suite 501
                        Hoffman Estates, Illinois 60192
                        Attn: Vice President – Real Estate

Copy to:                Sears Outlet Stores, L.L.C.
                        5500 Trillium Blvd., Suite 501
                        Hoffman Estates, Illinois 60192
                        Attn: General Counsel

Landlord:               AF Company, L.L.C.
                        c/o The Gottlieb Corporation
                        4257 Gabel Drive, Suite 1B
                        Fayetteville, Arkansas 72703

or to any other address furnished in writing by any of the foregoing. However, any change of addresses furnished shall comply with the notice requirements of this **Section 20** and shall include a complete outline of all current notice addresses to be used for the party providing such notice. All notices shall be effective upon delivery to the Overnight Courier; however, the time period in which a response to any such notice must be given shall commence to run from the date of receipt by the addressee thereof. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given, shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

## 21. Hazardous Material

(a)   Definitions:

23

*Outlet Store Lease for Sears*

(i)      "**Environmental Laws**" means all federal, state and local laws, statutes, ordinances, regulations, criteria, guidelines, rules, standards, rules of common law now or hereafter in effect, and in each case as amended, and any judicial or administrative order, consent decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources.

(ii)      "**Hazardous Material**" means any hazardous or toxic substance, chemical, material or waste, or any pollutant, contaminant or other substance, that is or becomes defined, listed, or regulated by Environmental Laws, including, without limitation, polychlorinated biphenyls, asbestos, radioactive materials and petroleum, crude oil or any fraction thereof.

(b)      <u>Landlord's Representations and Warranties</u>. Landlord hereby represents and warrants to Tenant that, to Landlord's knowledge, without inquiry, (i) no Hazardous Material in violation of Environmental Laws has been used, stored, released, disposed of or is located in the Demised Premises, and (ii) Landlord has not received any notice of violation of any Environmental Laws with respect to the Demised Premises and the improvements thereon.

(c)      <u>Tenant's Covenants</u>. Tenant shall not use, store, generate, treat, sell or dispose of any Hazardous Materials on or about the Demised Premises, except for those Hazardous Materials which are customarily used in compliance with Environmental Laws in conjunction with Tenant's conduct of the Permitted Use in the Demised Premises. To the extent Tenant utilizes Hazardous Materials as permitted by this Paragraph, Tenant shall comply with all Environmental Laws with respect thereto, and shall concurrently furnish Landlord with any applications, permits, and reports which Tenant is required to file with governmental authorities relating to such Hazardous Materials. If Tenant learns of the existence of Hazardous Material in violation of Environmental Laws on the Demised Premises, Tenant shall promptly disclose the nature of such material to Landlord. Tenant shall comply with all Environmental Laws with respect to the Demised Premises to the extent that the necessity of such compliance arises out of the use of Hazardous Materials by Tenant, its agents, contractors, customers, licensees, subtenants or employees ("**Used by Tenant**"), including, without limitation, any requirement to perform repair, cleanup, remediation, abatement or detoxification work or prepare any closure or other plans required as a result of a release, spill or discharge of Hazardous Material (collectively, "**Remediate Hazardous Materials**"), and shall diligently pursue to completion all such work in accordance with applicable Environmental Laws, and in a manner reasonably approved by Landlord, and during the period of such Remediation, there shall be no abatement of the rent. Subject to Paragraph (f) of this Section, Landlord shall Remediate all other Hazardous Materials in violation of Environmental Laws, if the existence of such Hazardous Materials materially interferes with Tenant's use and enjoyment of the Demised Premises or Tenant's conduct of business within the Demised Premises. If Landlord fails to do so, Tenant shall provide 30 days written notice to Landlord of such failure to Remediate Hazardous Materials, and

24

concurrently with such notice, shall provide Landlord with all materials and reports in Tenant's possession relating to such matters. If Landlord shall fail to Remediate Hazardous Materials within such 30-day period, Tenant shall send a subsequent written notice to Landlord of such failure (the "**Second Notice**"), which Notice shall state in bold, conspicuous and all capital letters "**LANDLORD'S FAILURE TO RESPOND WITHIN THIRTY (30) DAYS WILL RESULT IN TENANT HAVING THE RIGHT TO TERMINATE THE LEASE**". If within 30 days after Landlord's receipt of the Second Notice, Landlord shall fail to commence Remediate Hazardous Materials, or shall thereafter fail to pursue the Remediation to completion with due diligence, Tenant shall have the right, but not the obligation, to terminate the Lease.

(d)     Landlord's Indemnity.  Subject to Paragraph (f) of this Section, Landlord shall defend, indemnify and hold harmless Tenant, its directors, officers, employees and agents against and from any and all claims, actions, liabilities and losses including, but not limited to, all costs and expenses, including attorneys' fees, paid or incurred by Tenant in defending or otherwise responding to, such claims, actions, liabilities and losses arising from or related to (1) violations of Environmental Laws that precede the date of the License Agreement ("**Pre-Existing Contamination**"), or (2) the breach of any representation, warranty or covenant by Landlord contained in this Section.

(e)     Tenant's Covenants.  Tenant hereby covenants to Landlord that Tenant shall comply with all Environmental Laws with respect to Hazardous Materials Used by Tenant, including, without limitation, performance of any repair, cleanup, remediation, abatement or detoxification work and the preparation of any closure or other plans required as a result of a release, spill or discharge of Hazardous Material, and shall diligently pursue to completion all such work in accordance with applicable Environmental Laws and shall pay all costs and expenses of such compliance and performance. Tenant shall defend, indemnify and hold harmless Landlord, its directors, officers, employees and agents against and from any and all claims, actions, liabilities and losses including, but not limited to, all costs and expenses, including attorneys' fees, paid or incurred by Landlord in defending or otherwise responding to, such claims, actions, liabilities and losses arising from or related to (1) any breach of Environmental Laws with respect to Hazardous Materials Used by Tenant, or (2) the breach of any representation, warranty or covenant by Tenant contained in this Section.

(f)     Environmental Investigations.  Tenant shall obtain a Phase I Environmental Report with respect to the Premises, and shall provide a copy to Landlord by December 15, 2013. If such Report (or any further investigations undertaken by Tenant) discloses the presence of Hazardous Materials in violation of Environmental Laws, Tenant shall notify Landlord thereof not later than December 15, 2013. Within 15 days after receipt of such notice from Tenant, Landlord shall advise Tenant whether Landlord is willing to remediate such Hazardous Materials, at Landlord's expense, so that the Premises will not be in violation of Environmental Laws. If Landlord is not willing to perform such remediation, Tenant shall have the right to terminate this Lease by notice to

*Outlet Store Lease for Sears*

Landlord not later than January 15, 2014. If Tenant fails to terminate this Lease, Tenant shall cause such remediation to be accomplished, at Tenant's expense, in a manner reasonably acceptable to Landlord and in compliance with all Environmental Laws.

### 22. Time of Essence

Time is of the essence in this Lease.

### 23. Entire Agreement

This Lease and the attached exhibits constitute the entire agreement between Landlord and Tenant with respect to the Demised Premises. Neither this Lease nor any of its provisions may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the parties.

### 24. Choice of Law

This Lease shall be construed in accordance with and governed by the laws of the state in which the Demised Premises is located.

### 25. Binding Effect

(a)  This Lease shall inure to the benefit of and be binding upon Landlord and Tenant and their respective heirs, executors, legal representatives and successors and assigns.

(b)  Tenant will not be bound by any assignment of this Lease by Landlord unless Tenant has received written notice and evidence of such assignment.

### 26. Broker

Landlord and Tenant each represents to each other that it has not dealt with any broker in connection with the negotiation or execution of this Lease. Landlord shall indemnify, defend and hold Tenant harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker engaged by Landlord. Tenant shall indemnify, defend and hold Landlord harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker engaged by Tenant.

### 27. No Partnership

Nothing contained in this Lease shall be construed to make Landlord and Tenant partners or joint venturers or to render either party liable for the debts or the obligations of the other.

### 28. Third Party Beneficiaries

No other person, subtenant, customer, employee or invitee of Tenant or any other third party shall be deemed to be a third party beneficiary of any of the provisions herein.

### 29. Partial Invalidity

If any section, paragraph, subparagraph, sentence, clause or phrase of this Lease shall be declared or judged invalid or unconstitutional, such adjudication shall not affect the other

*Outlet Store Lease for Sears*

sections, paragraphs, subparagraphs, sentences, clauses or phrases which shall remain in full force and effect.

## 30. Recordings

Either party may require the other to execute all documents necessary to record a short form of this Lease.

## 31. Prime Rate

The term **"Prime Rate"** as used herein shall mean the rate of interest announced from time to time by JPMorgan Chase & Co. (or if JPMorgan Chase & Co. is not in existence, the largest bank in the City of Chicago, Illinois, measured in terms of net worth) as its "prime rate".

## 32. Headings

The section headings are for convenience and are not a part of this Lease.

## 33. Construction

This Lease shall be construed without regard to any presumption or any other rule requiring construction against the party drafting a document. The parties acknowledge that this Lease is the result of negotiations between the parties, and in construing any ambiguity hereunder no presumption shall be made in favor of either party.

## 34. Counterparts

This Lease may be executed in counterparts and shall be deemed to have become effective when and only when one or more of such counterparts shall have been signed by or on behalf of each of the parties to this Lease (although it shall not be necessary that any single counterpart be signed by or upon behalf of each of the parties hereto and all such counterparts shall be deemed to constitute but one and the same instrument) and shall have been delivered by each of the parties to the other. Furthermore, the parties agree that: (i) this Lease may be transmitted between them by telecopier or e-mail; (ii) this Lease may be executed by telecopier or e-mail signature but upon request by either party, original signatures shall be subsequently delivered after e-mail signatures have been circulated; (iii) telecopier and e-mail signatures shall have the effect of original signatures; and (iv) that a faxed or e-mailed Agreement containing the signatures (original, faxed or e-mailed) of all parties hereto shall be binding on a party when the signature page of such party is transmitted to the other party.

## 35. Attorneys' Fees

If any legal action, suit or proceeding is commenced between Tenant and Landlord regarding their respective rights and obligations under this Lease, the prevailing party shall be entitled to recover, in addition to damages or other relief, reasonable costs and expenses, attorneys' fees and court costs (including, without limitation, expert witness fees). As used herein, the term "prevailing party" shall mean the party which obtains the principal relief it has sought, whether by compromise, settlement or judgment. If the party which commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of the other party, such other party shall be deemed the prevailing party.

27

*Outlet Store Lease for Sears*

36. <u>No Waiver</u>

The waiver by either party of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained. No covenant, term or condition of this Lease shall be deemed to have been waived by either party unless such waiver is in writing and executed by either party. Neither acceptance of rent by Landlord or payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein reserved shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or on any letter accompanying any check be deemed an accord.

37. <u>OFAC Certification</u>

Tenant and Landlord (each, a "**Representing Party**") each represents and warrants to the other (i) that, to its knowledge, neither the Representing Party nor any of its officers, directors or managing members is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 (the "**Executive Order**") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Person Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, (ii) that, to its knowledge, the Representing Party's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "**Money Laundering Act**"), and (iii) that throughout the Term of this Lease the Representing Party shall comply as required with the Executive Order and with the Money Laundering Act.

38.    **Limitation of Landlord's Liability**. Notwithstanding anything set forth in this Lease to the contrary, it is agreed that Tenant shall look solely to the equity of Landlord in the Demised Premises, including any casualty or condemnation proceeds received by Landlord after notice of default from Tenant, or the rents and profits of the Demised Premises received by Landlord after notice of default from Tenant for the satisfaction of the remedies of Tenant in the event of a breach by Landlord of any of the provisions of this Lease, and Landlord shall not be liable for any such breach except to the extent of Landlord's equity as aforesaid.

THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, OR TENANT'S USE AND OCCUPANCY OF THE DEMISED PREMISES.

*[Remainder of this page intentionally left blank; signature page follows.]*

IN WITNESS WHEREOF, the parties have caused this Outlet Store Lease to be executed as of the Effective Date.

**LANDLORD:**

**AF COMPANY, L.L.C.,**
a Missouri limited liability company

By:
Name: Fred Stuckey
Its:     Manager

**TENANT:**

**SEARS OUTLET STORES, L.L.C.,** a Delaware limited liability company

By:     Sears Hometown and Outlet Stores, Inc.,
        a Delaware corporation
Its:     Sole Member

        By:
        Name:
        Its:

Solely to evidence the specific obligations set forth in Section 12(c) and no other purpose,

**SHOS:**

**SEARS HOMETOWN AND OUTLET STORES, INC.,** a Delaware corporation

By:
Name:
Its:



29

**List of Exhibits:**

| | |
|---|---|
| A | Legal Description – Demised Premises |
| B | Site Plan |
| C | Landlord's Work |
| C-1 | Initial Tenant's Improvements |
| C-2 | Floor Plan |
| D | INTENTIONALLY OMITTED |
| E | Estoppel Certificate |
| F | INTENTIONALLY OMITTED |
| G | Lease Commencement Date Acknowledgement |
| H | Lease Supplement |

*Outlet Store Lease for Sears*

EXHIBIT "A"

## LEGAL DESCRIPTION – DEMISED PREMISES

Demised Premises Description:
Lease Area is a portion of a tract of land situated in the Northeast Quarter of Section 27, Township 50 North, Range 33 West of the Fifth Principle Meridian in Kansas City, Jackson County, Missouri, being the tract described as Tract 1 by Instrument Number 1999K 0053256, said Tract 1 being more particularly described by a survey completed on April 24, 2013.  Said Demised Premises is more particularly described as follows.

Commencing at a 1/2" rebar found on the North Right-of-Way line of East Front Street at the Southwest corner of said Tract 1; thence along said North Right-of-Way line South 87°40'25" East for a distance of 302.52 feet to the point of beginning; thence leaving said North Right-of-Way line North 02°31'16" East for a distance of 383.60 feet to the Easterly Right-of-Way lines of the KCS/IMRL Rail Road as shown on the City Street Map; thence along said Easterly Right-of-Way line North 40° 42' 23" East a distance of 197.41 feet to a 5/8" rebar found without a cap; thence along a non-tangent curve to the right along said lines, with a length of 181.93 feet, having a radius of 575.00 feet, through a central angle of 18° 07' 42", and having a chord which bears North 83° 15' 24" East, a distance of 181.17 feet to a 5/8" rebar found with a flasher; thence South 87° 40' 45" East along said lines, a distance of 773.83 feet to a 5/8" rebar set with a "PLS 2007017964" cap; thence leaving said line South 02° 12' 10" West along a line parallel with the East line of said Tract 1 a distance of 188.39 feet to a 5/8" rebar set with a "PLS 2007017964" cap; thence North 87°40'45" West along a line parallel with said North line of said Tract 1 a distance of 84.78 feet to a to a 5/8" rebar set with a "PLS 2007017964" cap; Thence South 02°12'10" West along a line parallel with said East line of said Tract 1 a distance of 378.59 feet to said North Right-of-Way line; thence North 87°40'25" West for a distance of 993.05 feet to the point of beginning and containing 563,464 square feet or 12.94 acres, more or less.

Error! Unknown document property name.

EXHIBIT "B"

SITE PLAN

(see attached)

B-1

Error! Unknown document property name.

EXHIBIT 5 - SITE PLAN



## EXHIBIT "C"
### LANDLORD'S WORK

1. All mechanical, electrical, and plumbing systems shall be in good working order.

2. Subject to Section 5(b)(ii) of the Lease, do whatever work is necessary to ensure that the Building and parking areas of the Demised Premises, as the same currently exists (and with respect to the current operations) is compliant with local codes, including the ADA.

3. Place all hard surfaces on the exterior of the Premises (including the 3 entry drives) in a condition that is free of depressions and potholes, and compliant with any local and national codes, including the ADA, and with respect to the "Customer Parking Lot" depicted on the Site Plan, striped and sealed.

4. The roof shall be in good condition and free of leaks.

5. The Demised Premises shall be free of asbestos and any other Hazardous Material, all to the extent any of the same are currently in violation of Environmental Laws.

6. The loading dock shall be in good operating condition, with dock plates functional.

7. The overhead doors shall work properly.

8. The parking lot lights shall be operational.

9. The fire doors shall work properly.

Landlord warrants Landlord's Work to be free of defect for 90 days following the Commencement Date.

Error! Unknown document property name.

## EXHIBIT "C-1"

### INITIAL TENANT'S IMPROVEMENTS

A. Expand and modify the existing Outlet which will include demo, new stockroom demising walls, electrical changes, flooring repairs and painting.

B. Relocate and expand Tenant's warehouse functions with an expansion of Tenant's testing stations, addition of an apparel processing area and enlarging existing functional areas; including re-organization of flow. This portion of work will include mechanical, electrical and plumbing changes.

C. Re-open existing fire doors to allow pass though between existing fire wall currently closed off.

D. Update the restroom and demo unnecessary drywall partition walls as needed/required to open the space up and become functional for Tenant's usage.

Tenant's Initial Improvements shall substantially conform to the layout depicted on the Floor Plan.

Error! Unknown document property name.

EXHIBIT C-2
FLOOR PLAN
(see attached drawing)

C-1-2

Error! Unknown document property name.



## EXHIBIT "D"
## INTENTIONALLY OMITTED

Error! Unknown document property name.

## EXHIBIT "E"

### ESTOPPEL CERTIFICATE

[Kansas City, Missouri/Store #]

Date

To:    ("**Lender**")

       ("**Purchaser**")

Re:    3630 Front St., Kansas City, Missouri  (the "**Demised Premises**")

The undersigned, **SEARS OUTLET STORES, L.L.C.** ( "**Tenant**"), under that certain Lease dated _____, 2013, by and between AF Company, LLC (as "**Landlord**"), and Tenant, as amended by _____ (collectively, the "**Lease**"), covering the Demised Premises, and as more particularly described in the Lease, hereby certifies that as of the date hereof:

Subject to the provisions herein, Tenant hereby certifies that:

1.  Tenant has not received nor given any notice of default pursuant to the terms of the Lease which has not been cured.

2.  The current term of the Lease expires on February 28, 2024, but may be extended or terminated as specified in the Lease.

3.  All payments under the Lease have been made through _____. The current monthly Fixed Rent is $ _____.

4.  The Lease is in full force and effect and has not been amended, except as noted above.

5.  If any conflict between the terms of this document and the Lease should arise, the terms of the Lease shall prevail.

Error! Unknown document property name.

6.  This Estoppel Certificate is given solely for the information of the party or parties to whom addressed, and it may not be relied upon by any other person or entity. This Estoppel Certificate shall not subject the party furnishing it to any liability, notwithstanding the negligent or otherwise inadvertent failure of Tenant to disclose correct and/or relevant information; however, Tenant shall not be permitted to assert or enforce any claim against the person to whom it is delivered (or against such person's property) which is inconsistent with the statements contained in this Estoppel Certificate, except to the extent that the person against whom the claim would otherwise be asserted or enforced had actual knowledge of facts to the contrary at the time the person acted in reliance on the statement.

**SEARS OUTLET STORES, L.L.C.**, a Delaware limited liability company

By:   Sears Hometown and Outlet Stores, Inc., a Delaware corporation

Its:   Sole Member

By:    _____

Name:  _____

Its:   _____

Error! Unknown document property name.

## EXHIBIT "F"
### INTENTIONALLY OMITTED

Error! Unknown document property name.

## EXHIBIT "G"

### LEASE COMMENCEMENT DATE ACKNOWLEDGEMENT

Date _____

Attention:    Project Manager
              Sears Outlet Stores, L.L.C.

Landlord:        _____
                 (Name and Company)

                 _____
                 (Address)

                 _____
                 (City/State/Zip Code)

Landlord's Agent:  _____
                   (Name and Company)

                   _____
                   (Address)

                   _____
                   (City/State/Zip Code)

RE:    Facility Inspection/Sears Unit #_____

To Whom It May Concern:

The undersigned Landlord and Tenant hereby acknowledge that they have toured the Demised Premises.    The parties acknowledge that the Commencement Date for the Lease is _____. Tenant is in receipt of all keys and Tenant agrees that Landlord's Work has been Substantially Completed in accordance with the lease documents, except for completion of the "Punch List" items described below, if any.

Tenant takes possession of the above-mentioned Demised Premises in what appears to be a good and satisfactory condition, subject to the Punch List items listed below being completed on or before _____.

Except as otherwise defined herein, all capitalized terms used but not defined herein shall have the same meaning ascribed to such terms in the Lease, dated as of _____, between Sears Outlet Stores, L.L.C., and AF Company, LLC.

Punch List Completion Date _____

                          Items

_____

Error! Unknown document property name.

*[Remainder of this page intentionally left blank; signature page follows.]*

Error! Unknown document property name.

IN WITNESS WHEREOF, this Lease Commencement Date Acknowledgment is executed as of the day and year first above set forth.

LANDLORD/LANDLORD'S AGENT:                TENANT:

AF Company, LLC,                          SEARS OUTLET STORES, L.L.C., a
Missouri limited liability company        Delaware limited liability company

By: _____            By:  Sears Hometown and Outlet Stores, Inc., a
Name: Fred Stuckey                             Delaware corporation, its sole member
Its:    Manager
                                               By:    _____
                                               Name:  _____
                                               Its:   _____

G-3

Error! Unknown document property name.

## EXHIBIT "H"

### LEASE SUPPLEMENT

**THIS LEASE SUPPLEMENT** ("Supplement") is made on _____, _____, between _____, a _____ ("Landlord") and **SEARS OUTLET STORES, L.L.C.,** a Delaware limited liability company ("Tenant").

### RECITALS:

A.    Landlord and Tenant entered into an Outlet Store Lease dated _____, _____ (the "**Lease**"), for certain property in the City of Kansas City, County of Jackson, State of Missouri, more specifically described in the Lease (the "**Premises**").

B.    Section/Article/Paragraph _____ of the Lease provides that Landlord and Tenant shall specify the Commencement Date of the Lease by supplemental agreement.

C.    Section/Article/Paragraph 4 of the Lease provides that the Rent Commencement Date shall be the later of (i) the date which is 24 days after all of Landlord's Work is Substantially Complete, or (ii) March 1, 2014.

**NOW, THEREFORE,** Landlord and Tenant agree to supplement the Lease as follows:

1.    Tenant opened for business to the general public on _____, 20__, and the Rent Commencement Date is _____, 20__.

2.    The Commencement Date of the Lease is _____, 20__.

3.    The Initial Term of the Lease is _____, 20__, through _____, 2024.

4.    Landlord's estimate of the Taxes and insurance payable by Tenant for the first year are as follows: (i) Taxes $_____; and (ii) $_____.

5.    The Lease, except as herein supplemented, is in all other respects fully ratified and confirmed.

6.    Except as otherwise defined herein, all capitalized terms used in this Supplement shall have the meaning ascribed to such terms in the Lease.

7.    Landlord represents and warrants that Landlord has full right, power and authority to enter into this Supplement.

*[Remainder of this page intentionally left blank; signature page follows.]*

Error! Unknown document property name.

H-1

IN WITNESS WHEREOF, Landlord and Tenant have caused this Supplement to be executed as of the day and year first above set forth.

LANDLORD:

AF COMPANY, LLC,
a(n) _____

By: _____
Name: Fred Stuckey
Its:    Manager


TENANT:

**SEARS OUTLET STORES, L.L.C.**, a Delaware limited liability company

By:    Sears Hometown and Outlet Stores, Inc.,
       a Delaware corporation
Its:   Sole Member

       By: _____
       Name: _____
       Its: _____

Error! Unknown document property name.