# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (JTD)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 154** |

### LIMITED OBJECTION OF BUDDY MAC HOLDINGS, LLC TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

Buddy Mac Holdings, LLC and its subsidiaries (collectively, "BMH") respectfully file this limited objection (this "Limited Objection") to the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C)*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

*Granting Related Relief Related Relief* [D.I. 154] (the "<u>Bidding Procedures Motion</u>").[2] In support of this Limited Objection, BMH states as follows:

## PRELIMINARY STATEMENT

The Debtors' proposed bidding procedures ("<u>Bidding Procedures</u>") create a playing field that is uneven (and perhaps unplayable) by any party other than those lenders asserting the right to credit bid. The Debtors' enterprise consists of three independent branded business segments that could each be the subject of a robust auction, maximizing value. However, unless a bid or combination of bids exceeds approximately $1.5 billion, it appears all but guaranteed that the Debtors will be equitized. Yet, each bidder, acting alone without collusion, will not know whether its bid, combined with the bids for other segments, meets the minimum requirement, nor will any such bidder know whether its bid for one of the three segments meets the threshold floor for that segment, because no such floor has been identified. These issues could be resolved by establishing a release price for each business segment. In addition to the tilted playing field, the proposed order ("<u>Proposed Order</u>") approving the Bidding Procedures would adjudicate substantive rights of counterparties to executory contracts. The Bidding Procedures and Proposed Order should be revised to establish a release price for each business segment, authorize incentives for stalking horse bidders to participate, if appropriate, and preserve parties' substantive rights.

## FACTUAL BACKGROUND

**I.     The Bankruptcy Cases.**

1. On November 3, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

2. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

---

[2] Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the Bidding Procedures Motion.

2

3.       The official committee of unsecured creditors was appointed on November 19, 2024.

4.       No other trustee or examiner has been appointed in these cases.

5.       The Debtors privately hold and operate franchised businesses. Their current collection of brands and business segments include The Vitamin Shoppe ("Vitamin Shoppe"), Pet Supplies Plus ("Pet Supplies"), Buddy's Home Furnishings ("Buddy's"), and American Freight ("American Freight"). According to the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* [D.I. 15] (the "Orlofky Declaration"), the Debtors oversee what is, collectively, a massive enterprise encompassing approximately 2,200 total retail store locations and 11,900 employees across the United States.

6.       One of the segments, Buddy's, was founded in 1961 and is a specialty retailer of high-quality, name brand consumer electronic, residential furniture, appliances and household accessories through rent-to-own agreements. Orlofky Declaration, ¶29. Buddy's currently operates 34 company-owned stores and has over 300 franchised locations. *Id*. at ¶30.

**II.     The Debtors' Franchise and Development Relationship with BMH**

7.       BMH is the largest franchisee of Buddy's, operating eighty-two (82) Buddy's stores pursuant to Franchise Agreements (each, a "Franchise Agreement" and collectively, the "Franchise Agreements") with Buddy's Franchising and Licensing LLC.

8.       In addition to being the largest franchisee, BMH has development rights for Buddy's stores. Buddy Mac Holdings, LLC and Buddy's Newco LLC are parties to a Development Agreement dated July 2014 (as amended, the "Development Agreement") whereby BMH has the right to develop the Buddy's Retail Home Furnishings® retail business ("Buddy's Retail Business") within its specified development area (the "Development Area").

9.       BMH is interested in potentially bidding for the Buddy's business segment – if the

procedures ultimately approved by the Court are fair and equitable.

**III.    Continuing Breaches of the Development Agreement and Franchise Agreements**

10.     BMH has a long and well-established history with the Buddy's franchise.  The relationship between BMH and Buddy's has not, however, been without its difficulties.  The Development Agreement and Franchise Agreements have been breached by Buddy's in several respects, which breaches are continuing.  The parties' agreements require Buddy's to afford certain protections to BMH and promote the BMH franchisees' stores, and Buddy's has failed to honor these obligations.  For example, within the territory covered by each Franchise Agreement, Buddy's is prohibited from competing with the franchisee by acquiring, establishing, becoming associated with or engaging with any competitive business in that territory.  Buddy's has breached these provisions by operating stores in competition with BMH's franchised stores, in protected BMH territories and areas.

11.     Similarly, the Development Agreement obligates Newco and its affiliates to make reasonable efforts to direct sales, orders, deliveries and customer leads originating or destined for delivery within the Development Area to the nearest brick and mortar location operated by BMH. Buddy's has failed to do so and, worse, has directed sales, orders, deliveries and leads to competing stores owned by affiliates of Buddy's or Newco within protected territories and areas.

12.     In the event that Buddy's or its affiliates merge with, acquire, establish or become associated with any business under other systems or marks, in a protected territory or Development Area, that offers or sells items, products and services that are the same or similar to those sold in a Buddy's Retail Business, the Development Agreement and Franchise Agreements grant BMH a right of first refusal to purchase the competitive business from Buddy's.  Buddy's acquisition of brands such as American Freight, operating in protected territories and areas, without honoring the

right of first refusal, was in further breach of the parties' agreements.

13. Buddy's material breaches of the Development Agreement and Franchise Agreements on account of its acquisition of competitive businesses within protected territories, failure to direct customers to BMH (or worse, directing customers to competitors owned by affiliates of Buddy's or Newco), and failure to honor BMH's rights of first refusal are historical events that cannot be reversed and have caused damages to BMH up to tens of millions of dollars.[3]

IV. **The Debtors' Capital Structure**.

14. The Debtors' assets are saddled with a nearly $2 billion capital structure, consisting of (a) approximately $248.7 million in aggregate principal amount outstanding under a senior secured asset-based revolving credit facility (the "ABL Facility"), (b) approximately $1.097 billion in aggregate principal amount outstanding under a first lien secured term loan credit facility (the "First Lien Term Facility"), (c) approximately $125 million in aggregate principal amount outstanding under a second lien secured term loan credit facility (the "Second Lien Term Facility"), (d) approximately $514.7 million in aggregate principal amount outstanding under a junior term loan credit facility (the "HoldCo Term Loan Facility"), and (e) a side car facility that is *pari passu* with the Second Lien Term Facility, with $0 outstanding as of the Petition Date. Orlofky Declaration, ¶50.

15. The lien priorities of the various lender groups with respect to specific assets has not been disclosed, but included with the Orlofsky Declaration is a chart setting forth the relative priorities of the lender groups in "ABL Priority Collateral", "Term Loan Priority Collateral", "Unencumbered Property" and "Claims." Orlofsky Declaration, Exhibit B. The liens of the

---

[3] To the extent that breaches are material in nature, and incurable, section 365(b)(1)(A) of the Bankruptcy Code provides that such agreements may not be assumed, or assumed and assigned. *See In re Empire Equities Capital Corp.*, 405 B.R. 687, 690 (Bankr. S.D.N.Y. 2009). To the extent that executory contracts may be assumed and assigned, all defaults must be cured, including the money damages suffered on account of prior breaches of the agreements.

various lender groups have not been investigated by any creditors' committee.

16.     On November 7, 2024, the Debtors obtained interim approval to draw $100 million of a proposed DIP facility ("the "DIP Facility"), which includes a roll up of up to $100 million of the First Lien Term Facility on an interim basis, with a final hearing on approval of the DIP Facility scheduled for December 10, 2024.

**V.     The RSA and the Proposed Bidding Procedures.**

17.     Prior to the Petition Date, the Debtors entered into a Restructuring Support Agreement ("RSA") with certain of their lenders to, among other things, support a sale process with the goal of paying off the DIP Facility, ABL Facility, and First Lien Term Facility in full, failing which the holders of the First Lien Term Facility loans would receive 100% of the reorganized Debtors' equity.  The 45-page RSA binds the Debtors to an expedited sale process controlled by lenders who are endowed with the power to determine whether a bid or collection of bids is "sufficient" to forestall an equitization transaction.

18.     The proposed Bidding Procedures adhere to the RSA, but the RSA dictates that certain terms survive termination of the RSA, including a prohibition against break-up fees, topping fees, termination fees or similar reimbursements, discouraging any bidder from entering into a stalking horse agreement.  Bidding Procedures, Art. XIX [D.I. 154-2].

19.     The RSA endows the DIP Lenders and the First Lien Secured Parties (the "Bidding Lenders") with an unqualified right to credit bid.  Based on the information provided, it appears that the DIP Lenders and First Lien Secured Parties have powder in the amount of approximately $1.2 billion to bid at an auction, if one occurs.

20.     The parties to the RSA established that, in order to be designated a "Sufficient Bid" that may compete with the credit bid, a bid must satisfy nine requirements -- one of which is that the bid (or collection of bids) must be sufficient to pay all of the claims of the DIP Lenders, First

Lien Secured Parties and the ABL Lenders, an amount estimated to exceed $1.5 billion. See RSA Term Sheet, attached as Exhibit B to the Orlofky Declaration.

21. In other words, the Bidding Lenders are not required to bid, in cash, an amount necessary to retire the ABL Facility, resulting in a $248.7 million difference between the Bidding Lenders' maximum credit bid and the minimum bid required for a Sufficient Bid.

22. Because the Debtors are selling three distinct and independent business segments (Vitamin Shoppe, Pet Supplies and Buddy's), it stands to reason that value would be maximized by facilitating robust auctions of each segment, separate and in addition to an auction for the three segments together. However, the bidding procedures do not include a minimum bid or release price for each of the three business segments individually, thereby forcing bidders to perform all of their diligence simply to bid into a black hole without knowing whether their bid will be accepted as sufficient to release the collateral,.

## OBJECTION

### I.  Legal Framework

23. The goal of a sale in bankruptcy should be to maximize proceeds for a debtor's estate and creditors. To effectuate this goal, bankruptcy courts are provided discretion and latitude in conducting a sale.

24. Courts have consistently held that bid procedures must be crafted to "facilitate an open and fair public sale designed to maximize value for all creditors." *In re Nashville Senior Living*, 2008 Bankr. LEXIS 3197, at *1; *see also In re Wintz Co.*, 219 F.3d 807, 812 (8th Cir. 2000) ("[B]ankruptcy courts have wide discretion in structuring sales of estate assets.") (citing *Food Barn Stores*, 107 F.3d 558, 565 (8th Cir. 1997)); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("[B]ankruptcy courts are necessarily given discretion and latitude in conducting [a] sale.").

25. In particular, bidding and sale procedures must be designed to encourage, rather than chill, bidding. *See In re Chrysler LLC*, 405 B.R. 84, 109 (Bankr. S.D.N.Y. 2009) (bidding procedures were approved where the court found that "the bidding procedures would encourage bidding from any interested party with the wherewithal and interest to consummate a purchase transaction to ensure that the highest and best offer was attained"); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551-53 (Bankr. S.D.N.Y. 1997) (rejecting proposed bidding procedures where "the whole bidding arrangement [was] designed not to encourage but to stifle bidding").

26. The right to credit bid serves a valuable purpose – it protects the secured creditor from the risk that its collateral will be sold for less than fair market value. *Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n. 2 (2012); *In re Phila. Newspapers,LLC*, 418 B.R. 548, 563 (Bankr. E.D. Pa. 2009). That right, however, is not unlimited under the Bankruptcy Code. Section 363(k) enables the Court to limit the right "for cause." In the Third Circuit, cause may exist to limit the right to credit bid "in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010).

27. Importantly, the "for cause" requirement "is not limited to those situations where a secured creditor was involved in a bad act or otherwise acted inequitably. *Id. See also In re Fisker Automotive Holdings, Inc.*, 2014 WL 576370, * 2 (D. Del. 2014) (concluding that *Philadelphia Newspapers* is controlling authority on the issue of the Bankruptcy Court's discretion to limit a right to credit bid); *In re The Free Lance-Star Publishing Co. of Fredericksburg, Va.*, 512 B.R. 798, 808 (Bankr. E.D.Va. 2014) (capping lender's credit bid right to specific dollar amounts for different segments of the business); *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014) (finding that cause existed to cap credit bid right, because without the cap bidding would be frozen).

28. Importantly, BMH does not seek by this objection to deprive any secured creditors of their right to credit bid as necessary to protect their interests in ensuring that assets are sold for fair value. However, the Bidding Procedures in this case require certain revisions as set forth herein to ensure that a robust auction occurs, including for each of the business segments individually, and maximum value is achieved.

## II.    The Bidding Procedures Must Accommodate Partial Bids

29. Bidding procedures should be designed to foster open and competitive bidding to maximize value. *See In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests."). The Debtors' failure to meaningfully provide for partial bids for individual business segments and to set the floor for each segment in the Bidding Procedures will have a chilling effect on bidding, and the Bidding Procedures should not be approved by the Court as presented.

30. The Debtors' business is the result of the acquisition of three large companies — Pet Supplies, Vitamin Shoppe and Buddy's. Each of the business segments is large and was well-established for years prior to its acquisition. It is probable, and indeed likely, that many potential bidders will not be interested in the mega business the Debtors created, but instead only be interested in one of the smaller business segments. The Bidding Procedures provide that a bid for less than all the assets may be a Qualified Bid, but only if such bid, coupled with other bids, meets the $1.5 billion threshold. This threshold effectively renders the ability to bid on a single business segment illusory. Unless other bidders bid for the other business segments, and the collective bids exceed the $1.5 billion threshold, the bidder of a single business segment (after expending substantial resources to conduct diligence and formulate its bid) has no assurance that its bid will not be summarily rejected. Nor can a bidder for a single business segment protect itself by seeking to be a stalking horse bidder, as the RSA prohibits the payment of break-up and similar fees.

31. As described above, the Debtors' assets are uniquely situated to potentially maximize value through a set of partial bids, but the $1.5 billion threshold for an auction is value-limiting. *The Bidding Procedures should be modified to permit a bid for a single business segment to be deemed a Qualified Bid, standing alone, so long as the bid clears an established and disclosed release price.* The Bidding Procedures should also be modified to enable the Debtors to enter into stalking horse bidders, if appropriate. These modifications would enable bidders to pursue an individual business without the fear that such pursuit would be an utter waste of their time and resources.

32. Establishment of a release price and providing for stalking horse bidders would also alleviate the inherent unfairness of the lopsided bid requirements (i.e. the Bidding Lenders having a maximum credit bid of $1.1 billion, while the minimum bid for the Qualified Bid is $1.5 billion in cash), the sheer magnitude of the credit bid for the combined enterprise compared to the value of any individual business segment, and the Bidding Lenders' obvious control over the sale process. Finally, it would mitigate the prejudice to the estate in the event that, once a creditors' committee is appointed and conducts an analysis, deficiencies in the Bidding Lenders' liens are discovered.

33. As presented, with a $1.5 billion minimum bid, the Bidding Lenders may well end up purchasing the Debtors' assets, following which the lenders may engage in a more fulsome process to sell the assets – enabling the lenders to enjoy any upside. That would not be a just or equitable result. As the Third Circuit has observed, a secured creditor is not entitled to benefit from the "upside" of collateral when that collateral is part of a bankruptcy estate; the Bankruptcy Code only protects the creditor's "allowed secured claim." *Philadelphia Newspapers*, 599 F.3d at 316.

### III. Substantive Rights Should Not Be Adjudicated in the Bidding Procedures Order

34. It would be premature for a bidding procedures order to adjudicate substantive rights. The proposed Bidding Procedures Order, however, would curtail executory contract counterparties' substantive rights at the outset of the process. Specifically, Paragraph 29 of the Bidding Procedures Order provides, in pertinent part:

> The ***procedures set forth below*** regarding the assumption and assignment of the Contracts (each, an "Assigned Contract," and, collectively, the "Assigned Contracts") that may be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to a Successful Bidder (if any) in connection with the Sale contemplated by such Successful Bidder's Successful Bid, subject to revision prior to the date of the Sale closing (the "Sale Closing") and pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale (the "Assumption and Assignment Procedures") are hereby approved to the extent set forth herein and ***shall govern the potential assumption and assignment of all of the Debtors' Assigned Contracts that may be assumed and assigned in connection with the Sale***, subject to the payment of any amounts necessary to cure any defaults arising under any Assigned Contract (the "Cure Costs"):
>
>     \*    \*    \*
>
> (b) **Cure Costs**. ***The payment of the applicable Cure Costs shall (i) effectuate a cure of all defaults existing under the applicable Assigned Contracts***, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, ***and*** (iii) ***together with the assumption*** of the Assigned Contracts by the Debtors and the assignment of the Assigned Contracts to the Successful Bidder, as applicable, ***constitute adequate assurance of future performance thereof***. If an Auction is held, objections to adequate assurance of future performance of the Assigned Contracts by the Successful Bidder (if any) must be filed with the Court and served on the Objection Notice Parties no later than (x) **January 30, 2025 at 4:00 p.m. (ET)**, if an Auction is held, and (y) twenty-four (24) hours following publication of the Notice of Successful Bidder, if no Auction is held.

Proposed Order, ¶29 (emphasis added).

35. The emphasized language would prejudice counterparties to executory contracts in at least two ways. <u>First</u>, it would transform otherwise incurable historical defaults into defaults that could be cured by the payment of money, contrary to the counterparties' rights to prevent assumption and/or assumption and assignment of such agreements under Section 365(b)(1)(A) of the Bankruptcy Code. <u>Second</u>, the language would eliminate the Debtors' obligation to provide

11

adequate assurance of future performance, by only requiring payment of cure costs and effectuation of the assumption. This is contrary to the requirements of the Bankruptcy Code, which require a debtor to satisfy the obligation to pay cure costs and, separately, provide adequate assurance of future performance. *See* 11 U.S.C. §§365(b)(1)(A) and 365(b)(1)(C).

36. The Bidding Procedures Order should be modified so that substantive rights of contract counterparties are not inadvertently adjudicated prematurely.

## CONCLUSION

37. The Court should not approve the proposed Bidding Procedures or enter the Proposed Order as presented. Instead, the Court should require that the Bidding Procedures be modified to establish a release price for each of the three individual business segments and permit the Debtors to enter into appropriate stalking horse agreements, and the Proposed Order should be modified so that substantive rights are not prematurely adjudicated.

WHEREFORE, for the foregoing reasons and any reason that may be raised at a hearing on the Motion, the Court should enter an Order (i) sustaining this limited objection, and (ii) granting such further relief as is just and proper.

Dated: November 25, 2024
Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Lisa Bittle Tancredi*
Matthew P. Ward (DE Bar No. 4471)
Lisa Bittle Tancredi (DE Bar No. 4657)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: matthew.ward@wbd-us.com
      lisa.tancredi@wbd-us.com

*Counsel to Buddy Mac Holdings, LLC and its Subsidiaries*