**EXHIBIT B**

**Engagement Letter**



October 11, 2024

Andrew M. Laurence
President and Secretary
Freedom VCM Holdings, LLC
109 Innovation Ct., Suite J
Delaware, Ohio 43015

**Re: Agreement for Interim Management Services**

This letter, together with the attached Schedule(s) and General Terms and Conditions, sets forth the agreement ("Agreement") between AP Services, LLC ("APS"), and Freedom VCM Holdings, LLC and its subsidiaries (the "Company") for the engagement of APS to provide interim management services to the Company.

All defined terms shall have the meanings ascribed to them in this letter and in the attached Schedule(s) and General Terms and Conditions. The Company and APS are each a "Party," and together the "Parties."

The engagement of APS, including any APS employees who serve in Executive Officer positions, shall be under the supervision of the Board of Directors of the Company.

**Objectives and Tasks**

Subject to APS's (i) internal approval from its Risk Management Committee, (ii) confirmation the Company has a Directors and Officers Liability insurance policy in accordance with the Indemnification section of the General Terms and Conditions regarding Directors and Officers Liability Insurance coverage, and (iii) receipt of a copy of the signed Board of Directors' resolution (or similar document as required by the Company's governance documents) as official confirmation of the appointment, APS will provide David Orlofsky to serve as the Company's Chief Restructuring Officer ("CRO"). In his role as CRO, Mr. Orlofsky will report to the Company's Chief Executive Officer. Working collaboratively with the senior management team, the Board of Directors and other Company professionals, Mr. Orlofsky and APS will assist the Company with the following:

- Oversee, advise, and recommend decisions to the Company's management team and Board of Directors with respect to the Company's negotiations amongst its key stakeholders (i.e., the First Lien Term Lenders, Second Lien Term Lenders, HoldCo Lenders, ABL Lenders, and existing equity holders (collectively, the "Key Stakeholders")) regarding a comprehensive restructuring transaction (the "Restructuring Negotiations"). The CRO shall meet with Andrew Laurence, Christopher Meyer, and Todd Arden as frequently as needed, but no less than weekly, to discuss the Restructuring Negotiations. For the avoidance of doubt, (i) the consummation of any comprehensive restructuring transaction shall require approval by the Company's Board of Directors, and (ii) the appointment of the CRO does not alter or reduce any duties, responsibilities, or authority of any member of the Company's management team.

- Provide updates to the Key Stakeholders with respect to the status of the Restructuring Negotiations with other Key Stakeholders.

- Provide all 13-Week Cash Flow Forecasts to Key Stakeholders.

- Design and implement a contingency plan with respect to the Company's American Freight business (including, but not limited to, separation and potential wind down, and/or a potential standalone chapter 11 filing).



Freedom VCM Holdings, LLC
Page 2 of 11

- Complete a general unsecured claims analysis with respect to a standalone chapter 11 proceeding for the American Freight business, as well as a potential chapter 11 proceeding for the entirety of the Company's businesses.

- Analyze and complete a debtor-in-possession financing ("DIP") sizing analysis with respect to a standalone chapter 11 proceeding for American Freight, as well as a potential chapter 11 proceeding for the entirety of the Company's businesses.

- Finalize the analysis with respect to potential liabilities against the Company stemming from lease rejections and other claims in the pending chapter 11 cases of Conn's, Inc.

- Analyze potential risks to, and claims against, the Company arising from the financial distress currently being experienced by B. Riley Financial, Inc.

- Negotiate and assist the Company's advisors in documenting DIP and cash collateral orders, if applicable.

- Communicate with, and promptly respond to information requests from certain of the Company's Key Stakeholders, including at a minimum the members of the Ad Hoc Group of First Lien Term Lenders and its professional advisors.

- Evaluate the Company's business plan and such other related forecasts as may be required in connection with the restructuring process or needed by the Company for other corporate purposes.

- Assist the Company in preparing for and filing bankruptcy petitions, coordinating and providing administrative support for such proceedings and (as may be necessary) developing with the Company's other professionals: (i) a disclosure statement and plan of reorganization; (ii) a liquidation analysis; (iii) statements of financial affairs and schedules of assets and liabilities; (iv) a potential preferences analysis; (v) claims analyses; and (vi) monthly operating reports and other regular reporting required by the U.S. Bankruptcy Court.

- Render testimony, as requested from time to time, regarding any matters to which APS is providing services.

- To the extent not set forth herein, each of the tasks set forth in that certain letter agreement, dated July 29, 2024, by and between Willkie Farr & Gallagher LLP (the "Firm") and AlixPartners, LLP ("AlixPartners") for the engagement of AlixPartners to provide consulting services to the Firm in its representation of the Company (the "Prior Agreement").

- Assist the Company with such other mutually agreeable matters, as may be requested by the Company and the First Lien Term Lenders.

**Staffing**

David Orlofsky and Rodion Blokh will be responsible for the engagement, supported by the APS personnel necessary to complete the services provided under the Agreement. In addition, APS and its Affiliates have relationships with, and may periodically use, independent contractors with specialized skills and abilities to assist in this engagement.

We will periodically review the staffing levels to determine the proper mix for this assignment. We will only use the necessary staff required to complete the requested or planned tasks.



Freedom VCM Holdings, LLC
Page 3 of 11

**Timing and Fees**

APS will commence this engagement on or about October 11, 2024 after receipt of a copy of the executed Agreement and confirmation of the Company's compliance with the requirements set forth in the first paragraph of the Objectives and Tasks section above.

Except as otherwise set forth herein, this Agreement supersedes any prior agreements between the Company and AlixPartners, APS and/or any of its subsidiaries or Affiliates, including the Prior Agreement.

The Company shall compensate APS for its services, and reimburse APS for expenses, as set forth on Schedule 1.

In the event the Company seeks protection under the U.S. Bankruptcy Code, the Company will promptly apply to the Bankruptcy Court to obtain approval of APS's retention nunc pro tunc to the date of filing. APS acknowledges its retention and the terms thereof are subject to Bankruptcy Court approval.

*  *  *

If these terms meet with your approval, please sign and return a copy of the executed Agreement.

We look forward to working with you.

Sincerely yours,

*[Signature: David Orlofsky]*          *[Signature: Rodion Blokh]*

David Orlofsky                         Rodion Blokh
Partner & Managing Director            Partner & Managing Director

For and on behalf of AP Services, LLC


Agreement and acceptance confirmed

By: Andrew M. Laurence

*[Signature: Andrew Laurence]*

Its: President and Secretary

Dated: October 11, 2024

For and on behalf of Freedom VCM Holdings, LLC



## Schedule 1

### Fees and Expenses

1. **Fees:**
   APS agrees to a flat fee of $175,000 per month for the services of Mr. Orlofsky as CRO. For the avoidance of doubt, APS shall not be entitled to more than $175,000 per month for the services of Mr. Orlofsky under this Agreement.

   APS's fees will be based on the hours spent by APS personnel at APS's hourly rates, which are:

   | Partner / Partner & Managing Director | USD 1,200 – USD 1,495 |
   |---|---|
   | Senior Vice President / Director | USD 825 – USD 1,125 |
   | Vice President | USD 640 – USD 810 |
   | Analyst / Consultant | USD 230 – USD 625 |

   APS generally reviews and revises its billing rates semi-annually.

   APS's total fees include any retainer, break fee, completion fee or success fee payable hereunder, if any (together, the "Fees"). In the event of a chapter 11 filing, the Fees shall also include the Case Management Platform usage fees set forth in the Bankruptcy Related Matters Section of the General Terms and Conditions.

2. **Completion Fee:**
   In addition to the Fees above, APS will be compensated for its efforts by the payment of a completion fee (the "Completion Fee").

   For purposes of describing and agreeing to the Completion Fee, the Parties acknowledge and agree that the Company has four separate business units: American Freight, which includes Franchise Group Newco Intermediate AF, LLC and its direct and indirect subsidiaries; The Vitamin Shoppe ("VSI"), which includes Franchise Group Intermediate V, LLC and its direct and indirect subsidiaries; Pet Supplies Plus ("PSP"), which includes Franchise Group Intermediate PSP, LLC and its direct and indirect subsidiaries; and Buddy's Home Furnishings ("Buddy's"), which includes Franchise Group Intermediate B, LLC and its direct and indirect subsidiaries.

   For purposes hereof, a "Restructuring" shall mean any restructuring, reorganization, rescheduling and/or recapitalization (whether or not implemented through a bankruptcy filing) of all or substantially all of the Company's material outstanding indebtedness (including bank debt and any other on and off-balance sheet indebtedness) in each case, other than a liquidation.

   APS shall be entitled to receive a Completion Fee as follows:

a. A Completion Fee in the amount of $2.5 million upon the consummation of a Restructuring in which either (i) none of the Company entities commence voluntary chapter 11 cases or (ii) only Company entities <u>other than</u> PSP, VSI, and Buddy's commence voluntary chapter 11 cases;

b. A Completion Fee in the amount of $2.0 million upon the consummation of a Restructuring in

**APServices**

which all Company entities commence voluntary chapter 11 cases and the Bankruptcy Court confirms a chapter 11 plan within 90 days of the commencement date;

c. A Completion Fee in the amount of $1.5 million upon the consummation of a Restructuring in which all Company entities commence voluntary chapter 11 cases and the Bankruptcy Court confirms a chapter 11 plan within 91-180 days of the commencement date; <u>or</u>

d. A Completion Fee in the amount of $1.0 million upon the consummation of a Restructuring in which all Company entities commence voluntary chapter 11 cases and the Bankruptcy Court confirms a chapter 11 plan within 181 or more days of the commencement date.

For the avoidance of doubt, APS shall only be entitled to one Completion Fee hereunder.

3. **Expenses:** In addition to the Fees set forth in this Schedule, the Company shall pay directly, or reimburse APS upon receipt of periodic billings, for all reasonable and documented out-of-pocket expenses incurred in connection with this engagement, such as travel, lodging and meals, plus an administrative fee of 1% of the Fees to cover all other indirect administrative costs, including general administrative support, legal and IT support, and any technology costs associated with secure storage and handling of client data not otherwise covered by this Agreement. In the event of a chapter 11 filing, all expenses will be charged at actual cost.

4. **Retainer:** AlixPartners is currently holding a retainer in the amount of USD 200,000 in connection with the Prior Agreement, the balance of which shall be transferred to this Agreement (the "Retainer"). AlixPartners has sole discretion to determine how the Retainer will be applied to its invoices. In the event of a chapter 11 filing, any balance of this Retainer will be held as an evergreen retainer, pending approval of the Bankruptcy Court, or applied to approved post-petition fees and expenses if an evergreen retainer is not approved.

5. **Payment:** APS will submit invoices weekly for services rendered and expenses incurred. All invoices shall be due and payable immediately upon receipt. In the event of a bankruptcy filing, APS will submit invoices in the manner required by the Bankruptcy Court. All invoices will be due and payable immediately upon receipt, subject to Bankruptcy Court approval, as applicable.



**Data Protection Schedule**
**Description of Transfer**

1. **Categories of data subjects whose personal data is transferred**

    __x__  Employees / Members / Contractors of Client

    _____  Customers / Consumers / Clientele / Prospects of Client

    _____  Other:

2. **Categories of personal data transferred**

    _____  Background Check Data (Criminal History, Drug Test Results, References, etc.)

    _____  Biometric Data (Facial Recognition, Fingerprints, Voice Recording, etc.)

    _____  Browsing Data (Cookies, Website History, IP Address, etc.)

    __x__  Contact Information (Contact Details, Address, Email Address, Phone Numbers, etc.)

    __x__  Education and Skills (Academic Transcripts, Degrees, Languages, Training, etc.)

    __x__  Employment Information (Compensation, Job Title, Personnel Number, Workers Comp, Office Location, etc.)

    _____  Family Information (Children, Parents, etc.)

    _____  Financial Personal Information (Bank Accounts, Credit Card Numbers, etc.)

    _____  Genetic Information (Genetic Sequence)

    _____  Government Identifiers (National Identification Number, SSN, Driving License, etc.)

    _____  Personal Identifiers (Name, Age, Date of Birth, Race, Video/Photo, Signature, etc.)

    __x__  Professional Experience & Affiliations (Trade Union Membership, Qualifications/Certifications, etc.)

    _____  Social Media Data (Social Media Accounts, Social Media History, etc.)

    __x__  Travel and Expense (Travel History, Expense Details, etc.)

    _____  User Account Information (Account Age, Account Number, Account Password, etc.)

    _____  Workplace Welfare (Harassment Reports, Disciplinary Action, etc.)

    _____  Other:

3. **Frequency of data transfers**

    The frequency of the transfer will be continuous (multiple transfers).

4. **Processing by APS**

    4.1. <u>Nature of processing</u>: The nature of processing will include receiving, storing, analyzing, transmitting to appropriate parties, and disposing of Personal Data.

    4.2. <u>Purpose of the data transfer and further processing</u>: The purpose of processing is to provide the services described in the agreement above.

    4.3. <u>The period for which the personal data will be retained, or if the period is unknown, the criteria used to determine the period</u>: APS will process Personal Data for the duration of the engagement.

    4.4. <u>Transfer to Sub-processors</u>: Sub-processors may process Personal Data for the duration of the engagement life cycle and for the purposes specified above. See https://www.alixpartners.com/policies/subprocessors/ for a list of sub-processors.

**AP Services, LLC**
General Terms and Conditions

These General Terms and Conditions ("Terms") are incorporated into the Agreement to which these Terms are attached. In case of conflict between the wording in the letter and/or schedule(s) and these Terms, the wording of the letter and/or schedule(s) shall prevail.

### Section 1. Company Responsibilities

APS's performance of the services in accordance with the terms of the Agreement are dependent on the Company's timely and effective completion of the following responsibilities to the extent they are reasonably necessary for such performance: (a) provide timely, reliable, accurate and detailed information, materials, documentation; and (b) make timely decisions, gain relevant approvals, and co-operate with APS as is necessary or desirable for the performance of the services.

### Section 2. Nature of the Services of APS

APS is not an accounting firm or a law firm. APS is providing advisory and consulting services only and will not (i) unless expressly stated otherwise in the Agreement, make management decisions for the Company, (ii) perform accounting audits, or (iii) provide legal services or advice. While APS may, from time-to-time, suggest options that may be available to the Company, the ultimate decision as to such options rests with the Company, and APS makes no promise or guarantee, nor gives any representations, about the outcome of the Company's matters and/ or any decision it makes.

### Section 3. Billing, Payments, and Taxes

**Billing and Payments.** All invoices for Fees and expenses are due as set forth on Schedule 1 (the "Due Date") via wire transfer to APS's bank account, as shown on the invoice. All amounts invoiced are based on services rendered and expenses incurred to date, and are not contingent upon future services or Work Product (as defined below), or the outcome of any case or matter.

There will be no administrative fees or costs charged to AlixPartners for the use of e-billing, procurement, factoring, or other similar services in connection with our invoicing (e.g. Ariba, SAP, Tymetrix, Brightflag, etc.) of this engagement. If the Company requests or requires APS to use the Company's or a third party's e-billing, procurement, factoring, or other similar services in connection with our invoicing and there are fees charged or discounts applied in connection with APS's use of such services, the Company agrees to reimburse APS for those fees or discounts as a reimbursable expense under the Agreement.

Without prejudice to any other rights which AlixPartners may have at law or under the Agreement, prior to any bankruptcy filing, if the Company fails to pay any Fees or expenses by the relevant Due Date or otherwise fails to comply with any of its other obligations under the Agreement, then AlixPartners may, without notice, suspend the provision of the services until such time as the Company performs such obligation(s) to the satisfaction of AlixPartners.

**Taxes.** APS's Fees are exclusive of taxes or similar charges, which shall be the responsibility of the Company (other than taxes imposed on APS's income generally). If APS's Fees are subject to any taxes, such as State sales tax or Value Added Tax, then APS will include such taxes on its invoices as separate line items.

### Section 4. Use of Work Product

"Work Product" means all information, reports, materials, software and other work product that APS creates or develops specifically for the Company in the performance and/or preparation of the services that constitutes, contains and/or comprises APS's advice, observations, assessments, evaluations, theories, formulas, methodologies, opinions, judgement, endorsements, recommendations and/ or proposals.

"Affiliate" means any entity that, directly or indirectly, controls, is controlled by or is under common control with the referenced entity, including the referenced entity's parent. In this definition, control means the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

Except as disclosure may be required by law, regulation or regulatory process, or as allowed below, the Company agrees that the Work Product shall only be used by the Company internally solely for its own benefit and use consistent with the purpose of the services under the Agreement. The Company acknowledges and agrees that APS's only duty of care in respect of the services and the Work Product is to the Company.

The Company may distribute the Work Product on a strictly confidential and non-reliance basis to its auditors, accountants, legal advisors, controlled and controlling Affiliates ("Authorized Recipients") provided that the Company understands and agrees that APS does not accept any liability to any of the Authorized Recipients and APS sole duty of care is to the Company. The Company shall be responsible for any damages resulting from a breach of the terms of the Agreement by its Authorized Recipients.

Except as described above and without APS's prior written approval (not to be unreasonably withheld or delayed), no part of APS's Work Product may be (i) disseminated, reproduced, quoted, or referenced with attribution to APS or an unnamed consultant or (ii) disseminated to third parties without APS's prior written consent and such third parties executing APS's Report Access Letter.

### Section 5. Confidentiality

**Nondisclosure of Confidential Information.** Each Party shall keep confidential all confidential information, in whatever form, relating to a Party or its finances, accounts, business, technologies, products, customers or suppliers obtained from the other Party during the performance of APS's services hereunder (the "Confidential Information"), and neither Party will disclose any Confidential Information to any other person or entity, except as permitted below. Confidential Information includes the terms of the Agreement.

**Disclosure of Confidential Information.** The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, either Party from making such disclosures of

|   |
|---|
| **AP Services, LLC**<br>General Terms and Conditions |

Confidential Information that either Party reasonably believes are required by law or any regulatory requirement or authority, including APS's disclosures to clear client conflicts and as may be required by Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in unrelated bankruptcy matters.

Either Party may disclose Confidential Information to its Affiliates, and its and their directors, officers, employees, partners, subcontractors, auditors, accountants, agents and legal advisors (collectively, "Representatives"), but only if such Representatives reasonably need to know the Confidential Information as it relates to the services being provided under the Agreement and such Representatives are bound by similar confidentiality obligations. Each Party is responsible for any breach of these confidentiality obligations by any of its Representatives. AlixPartners may use Confidential Information (i) for benchmarking and related activities, and (ii) to train, enhance or test AlixPartners' Artificial Intelligence (AI) technologies to augment or enhance its services. Any such use will only be conducted behind a secure firewall, and any output from such activities will only be used on an aggregated and anonymized basis and will not, in any circumstance, identify the Company in connection with such benchmarking and related purposes in all such cases. In all such activities, AlixPartners shall strictly comply with the terms of this Agreement (including its confidentiality and privacy obligations), applicable laws, and our professional obligations.

**Marketing.** APS will have the right to disclose to any person that it provided services to the Company and a general description of such services, but APS shall not provide any other information about its involvement with the Company.

**Exclusions**. The confidentiality provisions of the Agreement will not apply to any information that (a) is or becomes generally available to the public through no action by either Party or its Representatives (as defined below), (b) are or become available to either Party on a non-confidential basis from a source that such Party reasonably believes is lawfully permitted to so provide, or (c) is independently developed by either Party without the use of the Confidential Information of the other Party.

**Return or Destruction of Information**. At the conclusion of the Agreement, the receiving Party and its Representatives may, and will if so requested in writing by the disclosing Party, promptly return to the disclosing Party all tangible Confidential Information provided to the receiving Party and its Representative and will destroy/delete all summaries, notes, studies, compilations or written or electronic copies and records that reflect any of the Confidential Information prepared by either Party or any of its Representatives. Such destruction/deletion (or return/delivery) will be confirmed in writing. The foregoing obligation to return or destroy documents shall not extend to (i) documents the receiving Party is obligated to retain pursuant to any applicable law, rule, regulation, policy or by a competent authority, or (ii) any computer files or documents created as a result of automatic archiving and backup procedures provided that any such retained documents shall remain subject to the Agreement.

**Expiration.** The obligations of the Parties under this section shall survive the end of any engagement between the Parties for a period of three (3) years.

**Section 6. Intellectual Property**

"Intellectual Property" means patents, registered designs, registered trademarks and applications and the right to apply for any of the foregoing, copyright, design rights, topography rights, database rights, brands, trademarks, utility model rights, rights in the nature of copyright, rights in inventions and all other industrial, commercial and intellectual property rights and all other rights or forms of protection having equivalent or similar effect to any of the foregoing arising anywhere in the world.

"APS Intellectual Property" means any Intellectual Property that APS has created, acquired or developed prior to the date of and/or separately from the Agreement and any enhancements, developments and/or improvements to any of the foregoing by and/or on behalf of APS during the course of, and/or in performance of, the Agreement.

"Company Intellectual Property" means any Intellectual Property that APS creates specifically for the Company in the performance of the services that is not APS Intellectual Property.

As between the Parties, the Company's Intellectual Property shall be owned by the Company upon full payment of all Fees and expenses due to APS and to that effect, subject to the payment of such Fees and expenses, APS hereby assigns its rights and interests in and the Company's Intellectual Property to the Company.

As between the Parties, the APS Intellectual Property shall be owned by APS and except to the extent explicitly agreed hereunder the Company shall not acquire any title or interest in and to the APS Intellectual Property. APS hereby grants to the Company a non-exclusive, non-transferable, irrevocable, royalty-free, worldwide license to use the APS Intellectual Property only to the extent necessary to enable the Company to use and benefit from the results of the services, including the Company's Intellectual Property, subject to and in accordance with the terms of the Agreement.

**Section 7. Limitation of Liability**

THE APS PARTIES SHALL NOT BE LIABLE TO THE COMPANY, OR ANY PARTY ASSERTING CLAIMS ON BEHALF OF THE COMPANY, EXCEPT FOR DIRECT DAMAGES FOUND IN A FINAL DETERMINATION TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE, BAD FAITH, SELF-DEALING OR INTENTIONAL MISCONDUCT OF APS. THE APS PARTIES SHALL NOT BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, LOST PROFITS, LOST DATA, REPUTATIONAL DAMAGES, PUNITIVE DAMAGES OR ANY OTHER SIMILAR DAMAGES UNDER ANY CIRCUMSTANCES, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE APS PARTIES' AGGREGATE LIABILITY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, IS LIMITED TO THE AMOUNT OF FEES PAID TO APS FOR SERVICES UNDER THE AGREEMENT (OR IF THE CLAIM ARISES FROM AN ADDENDUM TO THE AGREEMENT, UNDER THE APPLICABLE ADDENDUM) (THE "LIABILITY CAP").

Nothing in the Agreement, including the Liability Cap, shall be deemed to limit or exclude APS's liability for (a) death or personal injury caused by negligence, (b) gross negligence, fraud or willful misconduct, or (c) to the extent such claim cannot by capped or limited by applicable law.

| AP Services, LLC |
| --- |
| General Terms and Conditions |

APS is not responsible for any third-party products or services separately procured by the Company. The Company's sole and exclusive rights and remedies with respect to any such third-party products or services are against the third-party vendor and not against APS, whether or not APS is instrumental in procuring such third-party product or service.

**Section 8. Indemnification**

The Company shall indemnify, hold harmless and defend APS and its Affiliates and its and their partners, directors, officers and employees (collectively, the "APS Parties") from and against all claims (including without limitation claims from Authorized Recipients), liabilities, losses, expenses and damages ("Loss") incurred or suffered arising out of or as a result of the performance by APS of the services or its obligations hereunder, or any third party's use of or reliance on the services provided under the Agreement or Work Product. The indemnity herein shall not apply to the extent such Loss directly arises as a result of APS' Parties gross negligence or willful misconduct. The Company shall pay Losses as incurred, including reasonable legal fees and disbursements of counsel. If, in the opinion of counsel, representing both Parties in the matter covered by this indemnification creates a potential conflict of interest, the APS Parties may engage separate counsel to represent them at the Company's expense.

The Company shall specifically include and cover APS employees and agents serving as directors or officers of the Company or Affiliates with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees ("D&O insurance") in at least $10 million for any one incident. The Company will maintain such D&O insurance coverage for the period through which claims can be made against such persons. The Company shall, at the request of APS, provide a copy of its current D&O policy, a certificate(s) of insurance evidencing the policy is in full force and effect, and any other documents as APS may reasonably request evidencing the appointment and coverage of the indemnitees. The Company disclaims a right to distribution from the D&O insurance coverage with respect to such persons. In the event that the Company is unable to include APS employees and agents under the Company's policy or does not have first dollar coverage acceptable to APS (e.g., there are claims or threatened claims against the policy), APS may, at its option, purchase a separate D&O insurance policy (at the Company's expense) to cover APS employees and agents only.

APS employees serving as directors or officers of the Company or Affiliates will receive the benefit of the most favorable indemnification provisions provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise. The Company's indemnification obligations in this Section shall be primary to, and without allocation against, any similar indemnification obligations that APS may offer to its personnel generally, and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to, and without allocation against, any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by APS or otherwise).

**Section 9. Non-Solicitation of Employees**

The Company acknowledges and agrees that APS has made a significant monetary investment recruiting, hiring and training its personnel. During the term of the Agreement and for a period of one year after its termination or expiration (the "Restrictive Period"), the Company agrees not to directly or indirectly solicit the employment of any of APS's Partner & Managing Directors, Partners, Directors, or other employees/contractors who performed services under the Agreement or whom the Company or its Affiliates had interactions with as a result of the services provided under the Agreement. The following shall not be a violation of this section: (i) general solicitations, or recruitment through advertisements, job boards, websites, or other similar channels not targeted at APS personnel, or (ii) hiring former APS personnel who have not been employed by APS for a period of six (6) months prior to being contacted by the Company.

If during the Restrictive Period the Company directly or indirectly solicits away, hires or contracts with any of APS's Partner & Managing Directors, Partners, Directors, or other employees/contractors in violation of the preceding paragraph, the Company agrees to pay to APS as liquidated damages and not as a penalty the total cash compensation (salary plus any cash bonuses) paid to such person during the preceding twelve months. The Company acknowledges and agrees that liquidated damages in such amounts are (x) fair, reasonable and necessary under the circumstances to reimburse APS for the costs of recruiting, hiring and training its employees as well as the lost profits and opportunity costs related to such personnel, and to protect the significant investment that APS has made in its Partner & Managing Directors, Partners, Directors, and other employees/ consultants; and (y) appropriate due to the difficulty of calculating the exact amount and value of that investment.

The provisions of this section shall apply except to the extent the provisions conflict with applicable law.

**Section 10. Governing Law and Arbitration**

The Agreement is governed by and shall be construed in accordance with the laws of the State of New York with respect to contracts made and to be performed entirely therein and without regard to choice of law or principles thereof.

Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration. Each Party shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within 30 days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association (AAA). The arbitration shall be conducted in New York, New York under the AAA's Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing Party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

Notwithstanding the foregoing, any Party may proceed directly to a court of competent jurisdiction to enforce the terms of the Agreement for any claim in connection with (i) the non-payment of Fees or expenses due under the Agreement, or (ii) the non-performance of obligations under the Indemnification section of these Terms. For the purposes of this paragraph, the Parties expressly consent

| AP Services, LLC |
|---|
| General Terms and Conditions |

to the jurisdiction of all Federal and state courts located in New York, New York.

In any court proceeding arising out of the Agreement, the Parties hereby waive any right to trial by jury.

**Equitable Remedies.** Each Party acknowledges and agrees that money damages alone may not be an adequate remedy for a breach of the Agreement. Each Party agrees that the non-breaching Party shall have the right to seek a restraining order and/or an injunction for any breach of the Agreement.

### Section 11. Termination and Survival

The Agreement may be terminated at any time by written notice by one Party to the other; provided, however, that notwithstanding such termination APS will be entitled to any Fees and expenses incurred through the termination date (for fixed fee engagements, fees will be pro rata based on the amount of time completed). Such payment obligation shall inure to the benefit of any successor or assignee of APS.

Additionally, unless the Agreement is terminated by the Company due to APS's material breach (and such material breach continues after 30 days' written notice thereof and opportunity to cure) APS shall remain entitled to the completion or success fee(s), if any, that otherwise would be payable during the 12 months after the date of termination of the Agreement.

Sections 2, 4, 5, 7, 8, 9 10, 11, 12, 13, and 14 of these Terms, the provisions of Schedule 1 and the obligation to pay accrued fees and expenses shall survive the expiration or termination of the Agreement.

### Section 12. General

**Force Majeure.** "Force Majeure Event" means any action, omission, act, event or circumstance which is beyond the reasonable control of APS and which prevents APS from performing any of its obligations under the Agreement, including failure to meet any standard of performance.

If a Force Majeure Event occurs, APS will, as soon as reasonably practicable, notify the Company of its occurrence, nature and the anticipated impact it will have on APS's ability to perform its obligations under the Agreement and APS will have no liability in respect of the non-performance of such obligations during the continuation of the Force Majeure Event and for such time after its ends as is reasonably necessary for APS to recommence its affected performance under the Agreement.

**Anti-Money Laundering Compliance.** APS is obliged to and shall comply with certain regulations pertaining to its activities, including client take-on and the services contemplated during this engagement (for example UK, US and European anti- money laundering regulations as well as economic sanctions regulations administered by OFAC and/ or the Department of State in the US). The Company acknowledges and agrees that APS will conduct customer due diligence checks at the outset of the business relationship and periodically thereafter, which may involve verifying the identity of the Company, the beneficial owners of the Company, or their associated persons and entities, as well as other persons and entities with which APS is dealing in connection with this engagement. In that context, APS may request such information and documentation as is required for these purposes and APS shall retain all information and documentation provided in accordance with applicable laws and its document retention policy, as amended from time to time.

**Anti-Bribery and Corruption.** The Parties shall comply with all applicable laws, statutes, regulations, and codes relating to anti-bribery and anti-corruption (including but not limited to the Bribery Act 2010). Each Party shall notify the other immediately if it has reason to suspect that any breach of the foregoing has occurred, is occurring or is likely to occur in connection with the Agreement, its subject matter or the receipt or payment (as the case may be) of any moneys from or by or on behalf of the Company.

If either Party (the "Defaulting Party") breaches this section, the other Party (the "Non-Defaulting Party") may, notwithstanding any other terms of the Agreement terminate the Agreement and may recover from the Defaulting Party any loss or damage suffered by the Non-Defaulting Party resulting from such termination.

The rights and remedies under this section entitled 'Anti-Bribery and Corruption' shall survive acceptance and payment of any moneys and be without prejudice to any other right or remedy available to the Non-Defaulting Party.

**Severability.** If any provision(s) of the Agreement are, in any jurisdiction, found to be invalid or unenforceable, that provision or parts thereof (as the case may be) will to that extent and in that jurisdiction be deemed not to form part of the Agreement and the enforceability of the remainder will not be affected in such jurisdiction.

**Entire Agreement.** The Agreement, including the letter, the Terms and the schedule(s), contains the entire understanding of the Parties relating to the services and supersedes any and all prior proposals, communications, agreements, understandings, representations, or estimates among the Parties with respect to such services. Each Party agrees that in entering into the Agreement other than as expressly included in the Agreement it does not rely on any statement, representation, undertaking, agreement or understanding of any nature made by any person. The Agreement, including the letter, the Terms and the schedule(s), may not be amended or modified in any respect except in a writing signed by the Parties.

**Related Matters.** If an APS Party is required by applicable law, legal process or government action to produce information or testimony as a witness with respect to the Agreement, the Company shall reimburse APS for any professional time and expenses (including reasonable external and internal legal costs and e-discovery costs) incurred to respond to the request, except in cases where an APS Party is a party to the proceeding or the subject of the investigation.

**Joint and Several Liability.** If more than one counterparty enters into the Agreement with APS, the liability of each such counterparty shall be joint and several, and APS may take action against, or release or compromise the liability of, any counterparty, without affecting the liability of any other counterparty.

**Third-Party Beneficiaries.** Except where expressly stated to be for the benefit of Affiliates of APS (and such

| AP Services, LLC |
|---|
| General Terms and Conditions |

Affiliates will acquire rights to enforce the relevant terms), a person who is not a party to the Agreement has no rights to enforce any terms of the Agreement.

**Notices.** All notices required or permitted to be delivered under the Agreement shall be sent, if to APS, to:

AP Services, LLC
2000 Town Center, Suite 2400
Southfield, MI 48075
Attention: Chief Legal Officer

and if to the Company, to the address set forth in the Agreement, to the attention of the Company's General Counsel, or to such other name or address as may be given in writing to APS. All notices under the Agreement shall be sufficient only if delivered by overnight mail. Any notice shall be deemed to be given only upon actual receipt.

**Section 13. Bankruptcy Related Matters**

Notwithstanding anything to the contrary in these Terms, in the event the Company files for protection under the U.S. Bankruptcy Code, the following provisions will prevail:

The Company shall promptly apply to the Bankruptcy Court for approval of the Company's retention of APS under the terms of the Agreement. The form of retention application and proposed order shall be reasonably acceptable to APS. APS shall have no obligation to provide any further services if the Company becomes a debtor under the U.S. Bankruptcy Code unless APS's retention under the terms of the Agreement is approved by a final order of the Bankruptcy Court reasonably acceptable to APS. The Company shall assist, or cause its counsel to assist, with filing, serving and noticing of papers related to APS's fee and expense matters.

The Company and APS agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with the Agreement.

APS will have the right to obtain independent legal counsel to obtain advice with respect to its services under the Agreement. The Company will reimburse APS for the reasonable fees and expenses of such independent legal counsel, following approval by the Bankruptcy Court.

APS acknowledges that, during the pendency of any Bankruptcy Court approved retention, the indemnification provisions and Liability Cap set forth above may be subject to modification as stated within the Bankruptcy Court's retention order.

Due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the date of filing, APS may have incurred but not billed fees and reimbursable expenses which relate to the prepetition period. APS will seek Bankruptcy Court approval to apply the retainer to these amounts.

If APS finds it desirable to augment its consulting staff with independent contractors (an "I/C") in the chapter 11 case, (i) APS will file, and require the I/C to file, Bankruptcy Rule 2014 affidavits indicating that the I/C has reviewed the list of the interested parties in the chapter 11 case, disclosing the I/C's relationships, if any, with the interested parties and indicating that the I/C is disinterested; (ii) the I/C must remain disinterested during the time that APS is involved in providing services on behalf of the Company; and (iii) the I/C must represent that he/she will not work for the Company or other parties in interest in the chapter 11 case case during the time APS is involved in providing services to the Company. APS's standard practice is to charge for an I/C's services at the rate equal to the compensation provided by APS to such I/C.

**Case Management Platform.** APS may, where applicable, grant the Company usage of APS's proprietary suite of digital tools to enable Bankruptcy Court reporting (the "Case Management Platform"). APS will grant the Company access and use of the Case Management Platform to pre-approved authorized users at the Company (as agreed to by the Parties). The Company understands the Case Management Platform is APS Intellectual Property as that term is defined in the Intellectual Property Section of the Terms. The Company shall not acquire any other interest in the Case Management Platform other than the limited non-transferable ability to access and use the Case Management Platform. When APS is providing the Company access to the Case Management Platform, the usage charges below will apply in addition to the Fees set forth on Schedule 1.

| Number of Authorized Users | Monthly Fee |
|---|---|
| 1-25 | USD 20,000 |
| 26-50 | USD 35,000 |
| 51-75 | USD 45,000 |
| 76-100 | USD 50,000 |
| Over 100 | USD 65,000 |

The Case Management Platform usage fee will be invoiced in accordance with the Billing, Payments, and Taxes Section of the Terms.

Any custom modification or enhancement requests from the Company regarding the Case Management Platform may be performed at an additional cost to the Company (as agreed by the Parties). Any such modifications or enhancements will be billed at APS's standard hourly rates.

**Section 14. Data Protection**

To the extent applicable, the Company and APS shall comply with the terms of the APS Data Protection Addendum (located at: https://www.alixpartners.com/data-protection-addendum/), which form part of the Agreement. The Data Protection Schedule of the Agreement shall apply to the Data Protection Addendum.