## **EXHIBIT B**

**Engagement Agreement**

*Execution Version*

## REAL ESTATE CONSULTING AND ADVISORY SERVICES AGREEMENT

This Agreement is entered into effective as of October 25, 2024, by and between Hilco Real Estate, LLC ("Hilco") and Franchise Group, Inc., for itself and each of its subsidiaries (individually and collectively, the "Company").

Recitals**:**

WHEREAS, the Company is the owner of the leasehold interests listed on Exhibit A attached hereto (each a "Lease" and collectively, the "Leases"); and

WHEREAS, the Company seeks to engage Hilco to provide certain consulting services in connection with the Leases as provided herein; and

WHEREAS, it is anticipated that the Company will seek protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in a United States Bankruptcy Court (the "Bankruptcy Court") of proper jurisdiction (such cases, the "Chapter 11 Cases"); and

WHEREAS, upon seeking such protection, the effectiveness of this Agreement shall be subject to and contingent upon the entry of an order under sections 327 and 328 of the Bankruptcy Code authorizing the Company's entry into and approval of this Agreement.

Agreement:

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Hilco agree as follows:

1) <u>Consulting and Advisory Services</u>.  Hilco shall provide the consulting and advisory services described below (collectively, the "Services") to the Company with respect to the Leases:

   a) Meet with the Company to ascertain the Company's goals, objectives and financial parameters;

   b) Mutually agree with the Company with respect to a strategic plan for restructuring, assigning, selling, subleasing, or terminating the Leases (the "Strategy");

   c) At the Company's direction and on the Company's behalf, negotiate the terms of restructuring, assignment, sale, sublease and termination agreements with third parties and the landlords under the Leases, in accordance with the Strategy;

   d) Provide written reports periodically to the Company regarding the status of such negotiations; and

   e) Assist the Company in closing the pertinent Lease restructuring, assignment, selling, subleasing and termination agreements.

For the avoidance of doubt, Hilco shall not engage any landlords under the Leases without the prior written consent of the Company (email to suffice).

The parties expect that the Company will add additional leases to Exhibit A with the consent of Hilco (which consent may be provided in email) in which case such additional leases shall be considered "Leases" for purposes of this Agreement and the Company and Hilco shall mutually agree on modifications to the Strategy covering the additional leases.

2) <u>Term and Termination</u>.

   a) <u>Term</u>.  The term of this Agreement shall commence upon the execution hereof and shall expire on the date that is the later of (i) twelve (12) months therefrom and (ii) the disposition of the Leases through the Chapter 11 Cases.

   b) <u>Termination</u>.  The Company shall have the right to terminate this Agreement for cause upon written notice to Hilco.  Termination for cause shall mean any termination as a result of Hilco's failure to diligently perform the Services or any fraud, misrepresentation, gross negligence, willful misconduct or material breach by Hilco of any of the terms of this Agreement, or the failure of the Bankruptcy Court to approve the terms of this Agreement or Hilco's retention in the Chapter 11 Cases.

   c) <u>Effect of Termination</u>.  Upon termination of this Agreement by the Company, Hilco shall: (i) immediately discontinue all Services; and (ii) deliver to the Company all information, reports, papers, and other materials prepared or obtained by Hilco in performing the Services, whether completed or in process.  Upon termination, the Company shall be liable only for payment of accrued and unpaid fees and Expenses (as defined below) of Hilco as of the effective date of the termination, in accordance with Sections 4, 5, and 6 below.

3) <u>Authority</u>.  Hilco shall serve as the Company's exclusive consultant and advisor for the purpose of providing the Services.  All communications and inquiries regarding restructuring, assigning, selling, subleasing, or terminating the Leases, including those directed to the Company (including (without limitation) its officers, agents and employees), shall be redirected to Hilco, unless otherwise agreed to by Hilco and the Company.  Hilco shall promptly advise the Company of all offers made with respect to the Leases.  Hilco is authorized only to negotiate the terms of agreements with respect to the restructuring, assigning, selling, subleasing, or terminating the Leases in accordance with the Strategy at the direction and on the behalf of the Company, but not to commit the Company to any such agreement or arrangement or to sign any instrument on behalf of the Company.  Company has the right, in its sole discretion, to accept or reject any offers with respect to the Leases, and, in the event of such rejection, the Company shall not be liable to Hilco for any fee or compensation, except as provided in Sections 4, 5, and 6 below.

4) <u>Compensation</u>. As compensation for Hilco's Services, the Company will pay to Hilco compensation in accordance with the following; provided, that for any Restructured Lease that is rejected during the Chapter 11 Cases, fees shall be due or payable with respect to such Restructured Lease solely to the extent that the Company realizes the benefit of any

Restructured Lease Savings prior to rejection, in which case Hilco's compensation shall be calculated solely based on the Restructured Lease Savings realized by the Company prior to rejection.

a)  Certain Definitions.

   i)  "Sold Lease" means any Lease for which the Company enters into a written agreement that has the effect of selling the Lease for cash value paid to the Company; provided, however, that notwithstanding anything herein to the contrary, any Lease that is sold to a purchaser of all or substantially all of the Company's or a business segment of the Company's assets shall not be considered a Sold Lease.

   ii)  "Sold Lease Fee" means, for any Sold Lease, an amount equal to five percent (5%) of any cash value paid to the Company for the Lease.

   iii)  "Lease Savings" means an amount equal to the net savings during the current term (and excluding any kick outs or option terms) created by a Sublet Lease, as the case may be, including (without limitation) the difference between (x) the aggregate base rent, percentage rent, CAM, real estate taxes, insurance, and deferred maintenance or maintenance obligations (including clean up) payable under such Lease for which the Company is relieved from paying under such Lease and (y) the aggregate amount of any sublease or similar fees paid by the Company to the counterparty to such Lease in connection with such Lease.

   iv)  "Restructured Lease" means any Lease for which the Company enters into a written agreement with the applicable landlord that has the effect of modifying the terms of such Lease.

   v)  "Restructured Lease Savings Fee" means, for any Restructured Lease, an amount equal to a base fee of $1,000 plus the aggregate Restructured Lease Savings multiplied by four and one-quarter percent (4.25%).

   vi)  "Restructured Lease Savings" means an amount equal to the net savings created by a Restructured Lease, including (without limitation) the sum of (x) the aggregate reduction of base rent, percentage rent, CAM, real estate taxes, insurance, and deferred maintenance or maintenance obligations (including clean up) payable under a lease (exclusive of term shortening), and (y) the aggregate amount of any tenant improvement allowance dollars secured, minus any restructuring, termination or similar fees paid by the Company to the counterparty to the leased property, or any other party, in connection with the Restructured Lease. Where term is extended and the rent during such extended period is not specifically fixed or calculable within a leased property, Restructured Lease Savings shall be based on the last year's rent immediately prior to the extended period under a leased property.

     (1)  Percentage of sales calculation. To the extent the Company's rents under certain Restructured Leases are converted to a percentage of sales or revenue, the Company and Hilco shall agree in good faith to an appropriate sales projection on a portfolio basis for the period of such savings to determine Hilco's Restructured

Lease Savings Fee. These aforementioned projections will be used to calculate Hilco's Restructured Lease Savings when compared to the scheduled lease rents for each such Restructured Lease converted to a variable or percentage of sales structure.

vii) "Sublet Lease" means any Lease for which the Company enters into a written agreement that has the effect of subleasing all or a portion of the premises under the Lease.

viii) "Sublet Lease Fee" means, for any Sublet Lease, an amount equal to the Lease Savings multiplied by five percent (5%).

ix) "Term Extended Lease" means any Lease for which the Company enters into a written agreement with the applicable landlord that provides the Company with a right to extend the term of such Lease, regardless of whether the Company ever exercises such right, or otherwise has the effect of extending the term of such Lease.

x) "Term Extended Lease Fee" means for any Term Extended Lease, an amount equal to three-quarters (0.75) of one month of gross rent under such Term Extended Lease. To the extent a Lease is both a Restructured Lease and a Term Extended Lease, any costs attributable to the extending of a Restructured Lease term shall not be offset from the calculation of the applicable Restructured Lease Savings Fee.

xi) "Term Shortened Lease" means any Lease for which the Company enters into a written agreement with the applicable landlord that has the effect of (i) terminating the Lease, or (ii) providing the Company with an early termination right, regardless of whether the Company ever exercises such right, or otherwise has the effect of shortening the term of such Lease.

xii) "Term Shortened Lease Fee" means for any Term Shortened Lease where the Company is provided with an early termination right or the term of the Lease is otherwise shortened, an amount equal to three-quarters (0.75) of one month of gross rent under such Term Shortened Lease. To the extent a Lease is both a Restructured Lease and a Term Shortened Lease, any lease savings attributable to the shortening of a Restructured Lease term shall be excluded from the calculation of the applicable Restructured Lease Savings Fee, and Hilco shall only be entitled to receive the applicable Term Shortened Lease Fee on account of such Restructured Lease term shortening.

b) <u>Restructuring</u>.  For each Lease that becomes a Restructured Lease, Hilco shall earn a fee equal to the Restructured Lease Savings Fee.  The amounts payable on account of a Restructured Lease shall be paid in a lump sum upon closing of the transaction having the effect of restructuring the Lease.

c) <u>Termination or Term Shortening</u>.  For each Lease that becomes a Term Shortened Lease, Hilco shall earn a fee equal to the Term Shortened Lease Fee.  The amounts payable on account of a Term Shortened Lease shall be paid in a lump sum upon closing of the

transaction that provides the Company with an early termination right or has the effect of terminating or otherwise shortening the term of such Lease.

d) <u>Term Extension</u>.  For each Lease that becomes a Term Extended Lease, Hilco shall earn a fee equal to the Term Extended Lease Fee.  The amounts payable on account of a Term Extended Lease shall be paid in a lump sum upon closing of the transaction that has the effect of extending the term of such Lease.

e) <u>Sales</u>.  For each Lease that becomes a Sold Lease, Hilco shall earn a fee equal to the Sold Lease Fee.  The amounts payable on account of a Sold Lease shall be paid in a lump sum upon closing of the transaction having the effect of selling the Lease, as the case may be.

f) <u>Sublets</u>.  For each Lease that becomes a Sublet Lease, Hilco shall earn a fee equal to the Sublet Lease Fee.  The amounts payable on account of a Sublet Lease shall be paid in a lump sum upon closing of the transaction having the effect of subletting all or a portion of the premises under the Lease.

g) <u>Free and Clear</u>.  All fees payable to Hilco hereunder shall be free and clear of any liens, claims and encumbrances, including the liens of any secured parties.

5) <u>Expenses</u>.  All Expenses (defined below) shall be borne by the Company, and Hilco shall be entitled to reimbursement from the Company for all Expenses.  Billing shall be monthly and invoices are due not later than thirty (30) days after the Company's receipt of the invoice. "Expenses" means all reasonable, documented (through receipts or invoices) out-of-pocket expenses incurred by Hilco in connection with its performance of its Services hereunder, including, without limitation: reasonable expenses of advertising, marketing, coach travel and transportation, including, the cost of out-of-town travel and postage and courier/overnight express fees and other mutually agreed upon expenses incurred in connection with performing the services required by this Agreement.  Expenses shall not exceed $1,000 per month without the Company's prior written approval.

6) <u>Survival</u>.  Within ten (10) calendar days after termination of this Agreement, Hilco shall provide the Company with a list of all third parties, including landlords (each, a "Prospect") that Hilco has engaged in negotiations with respect to the Leases covered hereunder.  If within one hundred and eighty (180) days after the expiration of the Term of this Agreement, or any extension thereof agreed to in writing by the Company and Hilco, the Company and any Prospect should enter into a written agreement covered by this Agreement, incorporating deal terms that are identical or reasonably similar to terms that were negotiated and/or proposed by Hilco in connection with the Leases, Hilco shall be entitled to a fee calculated in accordance with the terms of this Agreement.

7) <u>Hilco and Company Covenants</u>.  In consideration of this Agreement, Hilco agrees to utilize commercially reasonable efforts and diligence to achieve the purpose of this Agreement.  Hilco shall conduct all negotiations on behalf of the Company in a professional and businesslike manner and in accordance with the Company's and its officers', representatives' and counsel's reasonable instructions.  The Company agrees to cooperate reasonably with Hilco and to make available to Hilco such information as Hilco reasonably requests, including true and correct

copies of the Leases, all information relating to occupancy-related expenses for the Leases and related correspondence.

8) <u>Confidentiality</u>.  Hilco acknowledges that information furnished or made available by the Company, its employees or representatives to Hilco and its employees or representatives relating to the Leases and the business or affairs of the Company is confidential and is the property of the Company.  During and after the term of this Agreement, Hilco will not disclose any such information to any person or use any such information for any purpose other than the performance of its obligations hereunder, in each case, without the prior written consent of the Company.

10) <u>Assignment; Successors and Assigns</u>.  Neither party may assign its rights or delegate any of its obligations hereunder without the prior written consent of the other party. Subject to that limitation, this Agreement shall be binding upon and shall inure to the benefit of each party and its successors and assigns.

11) <u>Indemnification</u>.

   a) The Company shall indemnify Hilco and hold it harmless against any and all losses, claims, damages, liabilities and expenses incurred by Hilco, including without limitation, reasonable legal expenses, arising from, related to, or in any way connected with (i) the Company's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement and (ii) the fraud, negligence (including omissions) or willful misconduct of the Company, its officers, directors, employees, agents or representatives.

   b) Hilco shall indemnify the Company and hold it harmless against any and all losses, claims, damages, liabilities and expenses incurred by the Company, including without limitation, reasonable legal expenses, arising from, related to, or in any way connected with (i) Hilco's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement and (ii) the fraud, negligence (including omissions) or willful misconduct of Hilco, its officers, directors, employees, agents or representatives.

12) <u>General Provisions</u>.

   a) The Company and Hilco shall deal with each other fairly and in good faith so as to allow both parties to perform their duties and earn the benefits of this Agreement.

   b) The Company recognizes and acknowledges that the services to be provided by Hilco pursuant to this Agreement are, in general, transactional in nature, and Hilco will not be billing the Company by the hour or maintaining time records.  It is agreed that Hilco is not requested or required to maintain such time records and that its compensation will be fixed on the percentages set forth herein.  Notwithstanding this provision, Hilco acknowledges that this agreement is subject to approval of the Bankruptcy Court and that the Company will use its reasonable best efforts to obtain such approval pursuant to the terms herein.

c) Any correspondence or required notice shall be addressed as follows:

|  |  |
|---|---|
| If to Hilco: | Hilco Real Estate, LLC<br>5 Revere Drive<br>Suite 206<br>Northbrook, Illinois 60062<br>Tel.    (847) 849-2915<br>Attn:   Office of General Counsel<br>Email: legal@hilcoglobal.com |
| If to the Company: | Franchise Group, Inc.<br>109 Innovation Court<br>Suite J<br>Delaware, OH 43015<br>Tel.  757-753-2755<br>Attn: Tiffany McMillan-McWaters<br>Email: tmcwaters@franchisegrp.com |

d) This Agreement shall be deemed drafted by both parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

e) By executing or otherwise accepting this Agreement, the Company and Hilco acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

f) The construction, validity and interpretation of this Agreement will be governed by the internal law of the State of New York, without regard to any choice of law principle that might otherwise result in the application of the law of any other jurisdiction. The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other in respect of any matter arising out of or in connection with this Agreement.

g) This Agreement may be executed in original counterparts, and if executed and delivered via facsimile shall be deemed the equivalent of an original.

h) The parties hereto agree, and the Company hereby expressly acknowledges, that Hilco has not guaranteed the Company any return or results with respect to the services to be provided.

i) This Agreement constitutes the entire agreement between the Company and Hilco and supersedes all prior discussions, negotiations, understandings, representations, and agreements, whether oral or written.  This Agreement shall not be modified or amended in any respect except by a written instrument executed by or on behalf of the parties to this Agreement.

j)  Hilco may (upon the written approval of the Company which shall not be unreasonably withheld) use the Company's name on Hilco's representative client lists, in any advertisements, publications or as a reference.

IN WITNESS WHEREOF, the Company and Hilco have executed and delivered this Agreement as of the date first above written.

**FRANCHISE GROUP, INC.**                     **HILCO REAL ESTATE, LLC**

By:  Andrew Kaminsky                          By: Timothy Dable

Title:  EVP & Chief Administrative Officer    Title: VP, AGC of Managing Member

Date: November 26, 2024                        Date: November 26, 2024

**EXHIBIT A**

Leases

*[Intentionally Omitted]*