IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
_____
                               )
In re:                         )  Chapter 11
                               )
FRANCHISE GROUP, INC., et al., )  Case No. 24-12480 (JTD)
                               )
                               )  (Jointly Administered)
              Debtors.         )
                               )  Re: Docket Nos. 7, 128
                               )
                               )  Obj. Deadline: 12/3/24 at 4:00 p.m.
                               )  Hearing Date: 12/10/24 at 10:00 a.m.
_____)
```

**OBJECTION OF CERTAIN UTILITY COMPANIES TO THE DEBTORS'
MOTION FOR INTERIM AND FINAL ORDERS (I) PROHIBITING UTILITY
COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY
SERVICES, (II) DEEMING UTILITY COMPANIES ADEQUATELY ASSURED OF
FUTURE PAYMENT, (III) ESTABLISHING PROCEDURES FOR RESOLVING
OBJECTIONS BY UTILITY COMPANIES AND DETERMINING ADDITIONAL
ADEQUATE ASSURANCE OF PAYMENT, AND (IV) GRANTING RELATED RELIEF**

American Electric Power ("AEP"), Ohio Edison Company ("Ohio
Edison"), Potomac Edison Company ("PE"), West Penn Power Company
("WPP"), Pennsylvania Electric Company ("Penelec"), Monongahela
Power Company ("Mon Power"), Metropolitan Edison Company ("Met-
Ed"), Pennsylvania Power Company ("Penn Power"), Jersey Central
Power & Light Company ("JCP&L"), Toledo Edison Company ("TE"),
The Cleveland Electric Illuminating Company ("CEI"), Virginia
Electric and Power Company d/b/a Dominion Energy Virginia
("DEV"), Dominion Energy South Carolina, Inc. ("DESC"), Georgia
Power Company ("Georgia Power"), PSEG Long Island ("PSEGLI"),
Salt River Project ("SRP"), San Diego Gas and Electric Company
("SDG&E"), Southern California Edison Company ("SCE"), Baltimore

Gas and Electric Company ("BGE"), Commonwealth Edison Company
("ComEd"), PECO Energy Company ("PECO"), The Potomac Electric
Power Company ("Pepco"), Delmarva Power & Light Company ("DPL"),
Atlantic City Electric Company ("ACE"), Tampa Electric Company
("TEC"), Peoples Gas System, Inc. ("Peoples Gas"), Entergy
Arkansas, LLC ("Entergy AR"), Entergy Louisiana, LLC ("Entergy
LA"), Entergy Mississippi, LLC ("Entergy MS"), Entergy Texas,
Inc. ("Entergy TX"), Eversource Gas of Massachusetts ("EGMA"),
The Connecticut Light & Power Company ("CL&P"), Yankee Gas
Services Company ("Yankee Gas"), Public Service Company of New
Hampshire ("PSNH"), NStar Electric Company – Western
Massachusetts ("NStar West"), Orange & Rockland Utilities, Inc.
("ORU"), Consolidated Edison Company of New York, Inc. ("Con
Ed"), Constellation NewEnergy, Inc. ("CNE"), Constellation
NewEnergy – Gas Division, LLC ("CNEG"), CenterPoint Energy
Resources Corp. ("CERC"), New York State Electric and Gas
Corporation ("NYSEG"), Rochester Gas & Electric Corporation
("RG&E"), Florida Power & Light Company ("FPL"), Boston Gas
Company ("BGC"), KeySpan Energy Delivery Long Island ("Kedli"),
KeySpan Energy Deliver New York ("Kedny"), Massachusetts Electric
Company ("MEC"), Niagara Mohawk Power Corporation ("NIMO"), Gexa
Energy, LP ("Gexa") and Tucson Electric Power Company ("TEP")
(collectively, the "Utilities"), hereby object to the *Debtors'*
*Motion For Interim and Final Orders (I) Prohibiting Utility*

*Companies From Altering, Refusing, or Discontinuing Utility*

*Services, (II) Deeming Utility Companies Adequately Assured of*

*Future Payment, (III) Establishing Procedures For Resolving*

*Objections By Utility Companies and Determining Additional*

*Adequate Assurance of Payment, and (IV) Granting Related Relief*

(the "Utility Motion")(Docket No. 7), and set forth the

following:

### Introduction

The Debtors' Utility Motion improperly seeks to shift the

Debtors' obligations under Section 366(c)(3) of the Bankruptcy

Code from seeking to modify the amounts of the adequate assurance

of payment requested by the Utilities under Section 366(c)(2) to

setting the form and amounts of the adequate assurance of payment

acceptable to the Debtors.  This Court should not permit the

Debtors to avoid the plain language and requirements of Section

366(c).

Through the Utility Motion, the Debtors seek to have this

Court approve their form of adequate assurance of payment, which

is a bank account containing $1.26 million which supposedly

reflects approximately 50% of the Debtors' estimated monthly

post-petition utility charges (the "Bank Account"). The Utility

Service List attached at Exhibit "C" to the Utility Motion

reflects that the Bank Account would contain the following on

behalf of the Utilities:  (a) AEP - $34,375.95; (b) Ohio Edison

3

- $17,199.53; (c) PE - $775.18; (d) WPP - $4,620.02; (e) Penelec
- $2,790.13; (f) Mon Power - $3,829.21; (g) Met-Ed - $2,723.99;
(h) Penn Power - $1,586.21; (i) JCP&L - $4,941.70; (j) TE -
$9,610.43; (k) CEI - $16,482.06; (l) Georgia Power - $21,505.97;
(m) SRP - $13,731.86; (n) ACE - $1,971.76; (o) BGE - $7,192.40;
(p) DPL - $6,672.17; (q) ComEd - $26,450.76; (r) PECO -
$8,873.10; (s) Pepco - $2,674.91; (t) TEC - $6,241.41; (u)
Peoples Gas - $131.44; (v) Entergy AR - $1,549.90; (w) Entergy
LA - $3,836.98; (x) Entergy MS - $808.40; (y) Entergy TX -
$1,830.35; (z) NYSEG - $3,926.84; (aa) RG&E - $2,664.63; (bb)
DEV - $22,791.27; (cc) DESC - $8,675.47; (dd) CNE - $33,198.94;
(ee) CNEG - $2,749.10; (ff) Eversource (collectively, EGMA,
CP&P, Yankee Gas, PSNH and NStar West) - $22,894.08; (gg) PSEGLI
- $19,592.39; (hh) SCE - $26,333.99; (ii) CERC - $303.56; (jj)
ORU - $2,666.67; (kk) Con Ed - $12,937.70; (ll) SDG&E -
$12,652.91; (mm) FPL - $28,557.70; (nn) National Grid
(collectively, BGC, Kedli, Kedny, MEC and NIMO) - $29,920.41;
(oo) Gexa - $1,779.18; and (pp) TEP - $1,831.32.

The Court should reject the Debtors' proposed Bank Account
because:  (1) The Utilities bill the Debtors on a monthly basis
and provide the Debtors with generous payment terms pursuant to
applicable state law, tariffs, regulations and/or contracts,
such that a supposed two-week account maintained by the Debtors
is not sufficient in amount or in form to provide the Utilities

with adequate assurance of payment; (2) Section 366(c) of the
Bankruptcy Code specifically defines the forms of adequate
assurance of payment in Section 366(c)(1), none of which include
a segregated bank account; and (3) Even if this Court were to
improperly consider the Bank Account as a form of adequate
assurance of payment for the Utilities (which it should not),
this Court should reject it as an insufficient form of adequate
assurance of payment for the reasons set forth in Section A.1.
of this Objection.

As discussed below, the Debtors filed the *Debtors' Motion
For Entry of Interim and Final Orders (I) Authorizing the
Debtors To Assume the Consulting Agreement, (II) Approving
Procedures For Store Closing Sales, and (III) Granting Related
Relief* (the "Store Closing Sales Procedures Motion") (Docket No.
14) requesting approval of Store Closing Procedures and other
relief.  The Store Closing Sales Procedures Motion does not
include procedures or requirements for the Debtors to timely
contact the applicable Utilities to terminate utility service to
any Debtor store locations once a store closing sale is
completed.  Also, as discussed below, the Debtors filed the
*Debtors' First Omnibus Motion For Entry of An Order, Pursuant To
Sections 105(a), 365(a), and 554 of the Bankruptcy Code
Authorizing the Debtors To (I) Reject Certain (A) Unexpired
Leases of Nonresidential Real Property, (B) Unexpired Leases of*

5

*Nonresidential Property, and (C) Executory Contracts, Effective As of the Petition Date, and (II) Abandon Personal Property* (the "First Lease Rejection Motion")(Docket No. 13).  The First Lease Rejection Motion does not include procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor locations as of the proposed lease rejection date, which is the November 3, 2024 Petition Date (the "Petition Date").  As such, there is no way for a Utility to know when the Debtors no longer require service at a store location where (i) store closings have been completed, or (ii) a lease is rejected.  Outside of bankruptcy, applicable state law and/or tariffs require the Debtors to close accounts when they no longer require utility service.  Accordingly, the Debtors should be required to close their accounts with the Utilities on the date that the Debtors no longer require post-petition utility service or remain administratively obligated for the payment of such charges until they close the applicable account(s).

The Utilities are seeking the following cash deposits from the Debtors, which are amounts that they are authorized to obtain pursuant to applicable state law or contract:  (a) AEP – $158,198 (2-month); (b) Ohio Edison - $29,796 (2-month); (c) PE - $3,242 (2-month); (d) WPP - $18,334 (2-month); (e) Penelec - $9,916 (2-month); (f) Mon Power - $15,742 (2-month); (g) Met-Ed - $13,099

(2-month); (h) Penn Power - $2,028 (2-month); (i) JCP&L - $18,714 (2-month); (j) TE - $20,360 (2-month); (k) CEI - $35,192 (2-month); (l) Georgia Power - $58,390 (2-month); (m) SRP - $108,900 (2-month); (n) ACE - $4,280 (2-month); (o) BGE - $20,131 (2-month); (p) DPL - $17,255 (2-month); (q) ComEd - $ 52,130 (2-month); (r) PECO - $35,440 (2-month); (s) Pepco - $8,900 (2-month); (t) TEC - $18,450 (2-month); (u) Peoples Gas - $562 (2-month); (v) Entergy AR - $13,800 (2-month); (w) Entergy LA - $23,320 (2-month); (x) Entergy MS - $9,520 (2-month); (y) Entergy TX - $9,300 (2-month); (z) NYSEG - $12,220 (2-month); (aa) RGE - $11,190 (2-month); (bb) DEV - $82,234 (2-month); (cc) DESC - $48,910 (2-month); (dd) CNE - $76,781 (2-month); (ee) CNEG - $11,865 (2-month); (ff) EGMA - $6,005 (2-month); (gg) CL&P - $14,200 (1.5-month); (hh) Yankee Gas - $2,445 (1.5-month); (ii) PSNH - $18,765 (2-month); (jj) NStar West - $5,920 (2-month); (kk) PSEGLI - $77,396 (2-month); (ll) SCE - $184,755 (2-month); (mm) CERC - $13,180 (2-month); (nn) ORU - $16,452 (2-month); (oo) Con Ed – $57,678 (2-month); (pp) SDG&E - $10,460; (qq) FPL - $141,903 (2-month); (rr) BGC - $8,196 (2-month); (ss) Kedli - $14,286 (2-month); (tt) Kedny – $2,622 (2-month); (uu) MEC - $40,490 (2-month); (vv) NIMO - $36,512 (2-month); (ww) Gexa - $86,482 (2-month); and (xx) TEP - $5,970 (2.5-month). Based on all of the foregoing, this Court should deny the Utility Motion as to the Utilities because the amounts of the Utilities' post-

petition deposit requests are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.    On November 3, 2024 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

2.    The Debtors' Chapter 11 bankruptcy cases are being jointly administered.

### The Utility Motion

3.    On the Petition Date, the Debtors filed the Utility Motion.

4.    On November 6, 2024, the Court entered the *Interim Order (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures For Resolving Objections By Utility Companies and Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief* (the "Interim Utility Order")(Docket No. 128).  The Interim Utility Order set (i) an objection deadline of November 20, 2024 and (ii) the final

8

hearing on the Utility Motion to take place on December 10, 2024 at 10:00 a.m.

5.    The Debtors claim that they pay approximately $2.5 million each month for utility services.  Utility Motion at ¶ 10.

6.    Through the Utility Motion, the Debtors seek to avoid the applicable legal standards under Bankruptcy Code Sections 366(c)(2) and (3) by seeking Court approval for their own proposed form of adequate assurance of payment, which is the Bank Account containing $1.26 million which supposedly reflects approximately 50% of the Debtors' estimated monthly post-petition utility charges.  Utility Motion at ¶ 12.

7.    The Debtors propose to "deposit" $1.26 million into the Bank Account, refer to the monies contained in the Bank Account as the "Utility Deposit," and refer to the Bank Account as the "Utility Deposit Account."  Utility Motion at ¶ 12. However, monies contained in an escrow account controlled by a customer of a utility such as the proposed Bank Account are not recognized by any state public utility commission as a "cash deposit" provided by a customer to a utility.  Additionally, Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated utility bank account.  Simply put, the Debtors are not proposing to provide any of their

utilities with cash deposits as adequate assurance of payment pursuant to Section 366(c) of the Bankruptcy Code.

8.    The proposed Bank Account is not acceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

9.    The Debtors claim that "[i]n general, the Debtors have a long and established history of consistent payments to their Utility Companies."  Utility Motion at ¶ 10.  However, even if true, Section 366(c)(3)(B)(ii) expressly provides that in making an adequate assurance of payment determination, a court may not consider a debtor's timely payment of prepetition utility charges.

10.   The Debtors propose that monies contained in the Bank Account attributable to a utility shall be returned to the Debtors upon the earlier of (i) payment of a final invoice, (ii) the closing of a sale of substantially all of the Debtors' assets, (iii) the effective date of a Chapter 11 Plan, or (iv) such other time as the Debtors' Chapter 11 cases may be closed. Utility Motion at ¶ 14.  The Utilities bill the Debtors in arrears and will likely provide post-petition utility

goods/services to the Debtors through the effective date of a plan, a sale closing date, a store closing date or lease rejection date, meaning that any monies contained in the Bank Account should not be returned to the Debtors until the Debtors confirm that they have paid in full their post-petition utility expenses owed to their utility companies.

11.   The Debtors request that "any security deposits that were in place prior to the Petition Date shall remain in place and shall continue to be held by those Utility Companies holding same, except upon either (i) written agreement(s) between the Debtors a Utility Company without further order of the Court, or (ii) further order(s) of the Court."  Utility Motion at ¶ 17. However, as Section 366(c)(4) of the Bankruptcy Code expressly provides that utilities can offset prepetition cash deposits against prepetition debt without notice or court order, it is not clear why the Debtors believe they can enjoin the Utilities from exercising their rights under Section 366(c)(4). Furthermore, if the Debtors truly require this improper injunctive relief, they should have actually requested it in a proper pleading in accordance with the requirements of Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure. Accordingly, this improper injunctive relief should be vacated by this Court because it was not requested in the Utility Motion or in a pleading that complies with Rules 7001 and 7065 of the

11

Federal Rules of Bankruptcy Procedure.

12.   The Utility Motion does not address why the Bank Account would be underfunded with supposedly two-weeks of utility charges when the Debtors know that the Utilities are required by applicable state laws, regulations, tariffs or contracts to bill the Debtors monthly.  Moreover, the Debtors presumably want the Utilities to continue to bill them monthly and provide them with the same generous payment terms that they received prepetition.  Accordingly, if the Bank Account is relevant, which the Utilities dispute, and two-week amounts were actually contained in the Bank Account for each of the Utilities, the Debtors need to explain: (A) Why they are only proposing to deposit supposed two-week amounts into the Bank Account; and (B) How such an insufficient amount could even begin to constitute adequate assurance of payment for the Utilities' monthly bills.

13.   Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that the Bank Account, "in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business," constitutes sufficient adequate assurance of payment.  Utility Motion at ¶ 14.

**The Debtors' Financing Motion**

14.  On November 4, 2024, the Debtors filed the *Debtors'*
*Motion For Entry of Interim and Final Orders (I) Authorizing the*
*Debtors To (A) Obtain Senior Secured Priming Superpriority*
*Postpetition Financing and (B) Use Cash Collateral, (II) Granting*
*Liens and Providing Claims With Superpriority Administrative*
*Expense Status, (III) Granting Adequate Protection To the*
*Prepetition Secured Parties, (IV) Modifying the Automatic Stay,*
*and (V) Granting Related Relief* (the "Financing Motion") (Docket
No. 51).

15.  Through the Financing Motion, the Debtors seek
authority to obtain post-petition financing consisting of (i)
$250 million of new money first-out delayed draw term loans, and
(ii) a $500 million second-out roll-up facility.  Financing
Motion at page 11.

16.  The Debtors also seek through the Financing Motion a
carve-out for payments to the Debtors' professionals incurred
prior to the delivery of a Carve-Out Trigger Notice, plus an
additional $4 million after delivery of a Carve-Out Trigger
Notice (the "Carve-Out").  Financing Motion at pages 17-18.

17.  The Debtors have the following Milestones: (i) no later
than 28 days after the Petition Date – entry of Bidding
Procedures Order; (ii) no later than 45 days after the Petition
Date – entry of Final Financing Order; (iii) no later 45 days

after the Petition Date – Court approval of Disclosure Statement and Solicitation Materials; (iv) to the extent more than one Sufficient Bid is received by the Bid Deadline, then no later than 85 days after the Petition Date – Debtors shall commence auction; (v) to the extent more than one Sufficient Bid is received by the Bid Deadline, then no later than 90 days after the Petition Date – entry of Sale Order; (vi) if there is not more than one Sufficient Bid received by the Bid Deadline, then no later than 87 days after the Petition Date – entry of Sale Order; (vii) no later than 90 days after the Petition Date – entry of Confirmation Order; (viii) no later than the earlier of (a) 10 days after entry of the Confirmation order and/or the Sale Order, or (b) no later than 120 days after the Petition Date – Plan Effective Date shall have occurred.  Financing Motion at pages 15-17.

18.   On November 7, 2024, the Court entered the *Interim Order (I) Authorizing the Debtors To (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection To the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "Interim Financing Order")(Docket No. 134).

19.   The Interim Financing Order approved the Carve-Out.

14

Interim Financing Order at pages 69-70.

20.  Attached as Exhibit "3" to the Interim Financing Order is a 13-week initial budget through the week ending January 31, 2025 (collectively, the "Budget").  Importantly, however, the Budget does not include a line-item for the payment of post-petition utility charges.  As such, it is not apparent from the Budget whether sufficient funds have in fact been budgeted for the timely (and full) payment of the Debtors' post-petition utility charges.

## The Debtors' Critical Vendor Motion

21.  On the Petition Date, the Debtors filed the *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors To Pay Certain Prepetition Claims of Certain Critical Vendors, Foreign Vendors, Shippers & Logistics Providers, and (503(b)(9) Claimants; and (II) Granting Related Relief* (the "Critical Vendor Motion")(Docket No. 10).  Through the Critical Vendor Motion, the Debtors sought authority to pay Shippers & Logistics Providers, Foreign Vendors and Critical Vendors claims in an amount up to $23,650,000 on an interim basis, and up to $41,500,000 on a final basis.  Critical Vendor Motion at ¶ 7.

22.  On November 6, 2024, the Court entered the *Interim Order (I) Authorizing the Debtors To Pay Certain Prepetition Claims of Certain Critical Vendors, Foreign Vendors, Shipper & Logistics Providers and 503(b)(9) Claimants; and (II) Granting*

*Related Relief* (the "Interim Critical Vendor Order")(Docket No. 129).  The Interim Critical Vendor Order authorized the Debtors to pay Shippers & Logistics Providers Claims, Foreign Vendor Claims, Critical Vendor Claims and 503(b)(9) Claims up to an aggregate amount of $35 million on an interim basis, subject to the Debtors' ability to request additional relief of $30 million on a further interim basis.  Interim Critical Vendor Order at ¶ 3.

23.  The Debtors' state in Paragraph 19 of the Utility Motion that "[u]interrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these Chapter 11 Cases."  However, the Critical Vendor Motion does not reflect that the Debtors sought Court authority to pay prepetition utility charges.

**The Debtors' Store Closing Sales Procedures Motion**

24.  On November 4, 2024, the Debtors filed the Store Closing Sales Procedures Motion (Docket No. 14), requesting approval of Store Closing Procedures and other relief.

25.  On November 6, 2024, the Court entered the *Interim Order (I) Authorizing the Debtors To Assume the Consulting Agreement, (II) Approving Procedures For Store Closing Sales, and (III) Granting Related Relief* (the "Interim Store Closing Sales Procedures Order")(Docket No. 132).

26.  The Interim Store Closing Sales Procedures Order does

16

not set forth procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor store locations as of a store closing date.

### The First Lease Rejection Motion

27.   On the Petition Date, the Debtors filed the First Lease Rejection Motion (Docket No. 13).

28.   Through the First Lease Rejection Motion, the Debtors seek authorization to reject certain leases and executory contract effective as of the Petition Date.

29.   The First Lease Rejection Motion does not set forth procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor stores as of a lease rejection date.

### The Bid Procedures Motion

30.   On November 11, 2024, the Debtors filed the *Debtors' Motion For Entry of Orders (I)(A) Approving Bidding Procedures For the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling An Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Bid Procedures

17

Motion")(Docket No. 154).

31.  The Debtors' propose the following key dates and deadlines:  (i) December 11, 2024 – entry of Bid Procedures Order; (ii) fourteen days after service of the Sale Hearing Notice – Sale Objection deadline; (iii) December 16, 2024 – deadline for Acceptable Bidders to submit non-binding Indications of Interest; (iv) December 20, 2024 – deadline to file and serve Assumption and Assignment Notice; (v) fourteen days after service of the Assumption and Assignment Notice – deadline to object to the Assumption and Assignment Notice; (vi) January 23, 2025 – Bid deadline; (vi) no later than 48 hours prior to auction, if applicable – deadline to designate Qualified Bidders; (vii) 24 hours following publication of the Notice of Successful Bidder, if no auction is held – deadline to object to adequate assurance of future performance under Assignment Contracts (if any); (viii) January 28, 2025 – auction, solely in the event the Debtors receive more than one Qualified Bid prior to the Bid Deadline that constitutes a Sufficient Bid; (ix) January 30, 2025 – deadline to object to (a) conduct at auction (if any) and (b) adequate assurance of future performance under Assigned Contracts (if any); (x) January 28, 2025, if no auction is held – deadline to Reply to Sale Objection; (xi) February 2, 2025, if an auction is held – deadline to Reply to Sale Objection; (xii) January 30, 2025, if no auction is held – Sale hearing; and (xiii) February

3, 2025, if an auction is held – Sale hearing.  Bid Procedures
Motion at ¶ 16.

## **<u>Facts Regarding CNE</u>**

32.   CNE provides electricity and related services to the
Debtors pursuant to multiple electricity supply agreements
(collectively, the "Electricity Agreements") that set forth the
terms and conditions concerning CNE's provision of electricity
and related services to the Debtors.  CNE has continued to
provide the Debtors with electricity and related services
pursuant to the Electricity Agreements since the Petition Date.

33.   Pursuant to the Electricity Agreements, the Debtors
receive approximately one month of electricity and related
services before CNE issues a bill.  Once a bill is issued, the
Debtors have several weeks after an invoice date to pay the bill.
Accordingly, the Debtors could receive at least two months of
electricity and related services before CNE could terminate the
Electricity Agreements after a post-petition payment default.

34.   The pre-petition debt owed by the Debtors to CNE is
estimated to be not less than $64,267.  CNE is requesting a two-
month cash deposit of $76,781 as adequate assurance of payment
from the Debtors, which is an amount it can obtain from the
Debtors pursuant to the terms and conditions of the Electricity
Agreements.

19

## Facts Regarding CNEG

35.   CNEG provides natural gas and related services to the Debtors pursuant to Debtors pursuant to multiple gas supply agreements (collectively, the "Gas Agreements") that set forth the terms and conditions concerning CNEG's provision of natural gas and related services to the Debtors.  CNEG has continued to provide the Debtors with natural gas and related services pursuant to the Gas Agreements since the Petition Date.

36.   Pursuant to the Gas Agreements, the Debtors receive approximately one month of natural gas and related services before CNEG issues a bill.  Once a bill is issued, the Debtors have several weeks after the date of an invoice to pay the applicable bill.  Accordingly, the Debtors could receive more than two months of natural gas and related services before CNEG could terminate the Gas Agreements after a post-petition payment default.

37.   The pre-petition debt owed by the Debtors to CNEG is estimated to be not less than $3,297.  CNEG is requesting a two-month cash deposit of $11,865 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Gas Agreements.

## Facts Regarding Gexa

38.   Gexa provides electricity and related services to the

20

Debtors pursuant to the Business Electricity Authorization Texas Large Commercial Sales, related Electric Supply Terms and Conditions of Service, and related addenda and exhibits thereto (collectively, the "Electricity Agreement") that sets forth the terms and conditions concerning Gexa's provision of electricity and related services to the Debtors. Gexa has continued to provide the Debtors with electricity and related services pursuant to the Electricity Agreement since the Petition Date.

39. Pursuant to the Electricity Agreement, the Debtors receive approximately one month of electricity and related services before Gexa issues a bill. Once a bill is issued, the Debtors have thirty (30) days after an invoice date to pay the bill. Accordingly, the Debtors could receive at least two months of electricity and related services before Gexa could terminate the Electricity Agreement after a post-petition payment default.

40. Gexa is requesting a two-month cash deposit of $86,482 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Electricity Agreement.

**Facts Regarding the Utilities Other Than CNE, CNEG and Gexa**

41. Each of the Utilities provided the Debtors with prepetition utility goods and/or services, and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

21

42.  Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges.  Once a bill is issued, the Debtors have approximately 15 days to pay the applicable bill.  If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account.  If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or their service will be disconnected.  Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

43.  To avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' web-site links to their tariffs and/or state laws, regulations and/or ordinances are set forth in **Exhibit "A"** attached hereto.

44.  Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional

accounts belonging to the Debtors are subsequently identified, the Utilities' estimated prepetition debt and post-petition deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---|---|---|---|
| AEP | 55 | $42,095.60 | $158,198 (2-month) |
| Ohio Edison | 26 | $37,706.53 | $29,796 (2-month) |
| PE | 5 | $1,561.80 | $3,242 (2-month) |
| WPP | 6 | $9,954.96 | $18,334 (2-month) |
| Penelec | 5 | $3,190.29 | $9,916 (2-month) |
| Mon Power | 5 | $10,306.33 | $15,742 (2-month) |
| Met-Ed | 7 | $5,500.94 | $13,099 (2-month) |
| Penn Power | 3 | $3,018.27 | $2,028 (2-month) |
| JCP&L | 12 | $10,623.80 | $18,714 (2-month) |
| TE | 13 | $24,250.39 | $20,360 (2-month) |
| CEI | 27 | $49,908.29 | $35,192 (2-month) |
| Georgia Power | 26 | To be supplemented | $58,390 (2-month) |
| SRP | 13 | $28,568.98 | $108,900 (2-month) |
| ACE | 8 | $3,020.85 | $4,280 (2-month) |
| BGE | 21 | $14,906.96 | $20,131 (2-month) |
| DPL | 7 | $10,611 | $17,255 (2-month) |
| ComEd | 35 | $11,203.13 | $52,130 (2-month) |
| PECO | 20 | $11,057 | $35,440 (2-month) |
| Pepco | 6 | $4,241.51 | $8,900 (2-month) |
| TEC | 16 | $18,673.50 | $18,450 (2-month) |

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---|---|---|---|
| Peoples Gas | 5 | $1,099.69 | $562 (2-month) |
| Entergy AR | 3 | $4,030 | $13,800 (2-month) |
| Entergy LA | 9 | $9,138.58 | $23,320 (2-month) |
| Entergy MS | 2 | $685 | $9,520 (2-month) |
| Entergy TX | 3 | $2,590 | $9,300 (2-month) |
| NYSEG | 13 | To be supplemented | $12,220 (2-month) |
| RG&E | 7 | To be supplemented | $11,190 (2-month) |
| DEV | 27 | $38,840 | $82,234 (2-month) |
| DESC | 16 | $8,672.47 | $48,910 (2-month) |
| EGMA | 5 | To be supplemented | $6,005 (2-month) |
| CL&P | 7 | $10,771.55 | $14,200 (1.5-month) |
| Yankee Gas | 3 | $848.33 | $2,445 (1.5-month) |
| PSNH | 5 | $8,183.52 | $18,765 (2-month) |
| NStar West | 2 | $4,385.44 | $5,920 (2-month) |
| PSEGLI | 29 | $46,671.96 | $77,396 (2-month) |
| SCE | 36 | $_____ | $184,755 (2-month) |
| CERC | 17 | $1,411.53 | $13,180 (2-month) |
| ORU | 5 | $3,334.60 | $16,452 (2-month) |
| Con Ed | 26 | To be supplemented | $57,678 (2-month) |
| SDG&E | 8 | $8,496.73 | $10,460 (2-month) |
| FPL | 90 | $77,700.67 | $141,903 (2-month) |
| BGC | 15 | $1,542.38 | $8,196 (2-month) |
| Kedli | 27 | $2,500.23 | $14,286 (2-month) |

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---------|---------------|-------------------|--------------|
| Kedny | 7 | $539.63 | $2,622 (2-month) |
| MEC | 16 | $15,716.02 | $40,490 (2-month) |
| NIMO | 31 | $14,244 | $36,512 (2-month) |
| TEP | 2 | $1,289.54 | $5,970 (2.5-month) |

45.  AEP held prepetition cash deposits totaling $5,772.12 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

46.  Ohio Edison held a prepetition cash deposit in the amount of $1,304 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

47.  PE held a prepetition cash deposit in the amount of $344 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

48.  WPP held a prepetition cash deposit in the amount of $268 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

49.  Mon Power held a prepetition cash deposit in the amount of $1,722 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit

amount remains after recoupment.

50. TE held a prepetition cash deposit in the amount of $1,052 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. No prepetition deposit amount remains after recoupment.

51. SRP held prepetition cash deposits plus interest totaling $102,459.84 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. Any prepetition deposit amount remaining after recoupment can be applied to the SRP post-petition deposit request.

52. BGE held prepetition cash deposits totaling $14,177 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. No prepetition deposit amount remains after recoupment.

53. DPL held prepetition cash deposits totaling $6,475 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. No prepetition deposit amount remains after recoupment.

54. Pepco held a prepetition cash deposit in the amount of $2,670 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. No prepetition deposit amount remains after recoupment.

55. TEC held prepetition cash deposits totaling $17,087 that it recouped against prepetition debt pursuant to Section

366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

56.  Peoples Gas held prepetition cash deposits totaling $990 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

57.  Entergy AR held prepetition cash deposits totaling $13,347 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the Entergy AR post-petition deposit request.

58.  Entergy LA held prepetition cash deposits totaling $18,600 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the Entergy LA post-petition deposit request.

59.  Entergy MS held prepetition cash deposits totaling $6,134 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the Entergy MS post-petition deposit request.

60.  Entergy TX held a prepetition cash deposit in the amount of $4,530 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any

prepetition deposit amount remaining after recoupment can be applied to the Entergy TX post-petition deposit request.

61.  NYSEG held a prepetition cash deposit in the amount of $576 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount with remain after recoupment.

62.  PSEGLI held prepetition cash deposits totaling $3,395 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

63.  SCE held a prepetition cash deposit in the amount of $81,800 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the SCE post-petition deposit request.

64.  Con Ed held prepetition cash deposits totaling $835 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

65.  FPL held prepetition cash deposits totaling $130,043 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the FPL post-petition deposit request.

28

66.   Kedli held prepetition cash deposits totaling $888 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

67.   MEC held a prepetition cash deposit in the amount of $3,775 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

68.   TEP held a prepetition cash deposit in the amount of $2,895 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the TEP post-petition deposit request.

## Discussion

### A.   THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the Supreme Court of the United States,

"[i]t is well-established that 'when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd- is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. *In re* Lucre, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005). If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Accordingly, this Court should not reward the

Debtors for their failure to comply with the requirements of Section 366(c), and it should deny the Utility Motion as to the Utilities.

> **1.    The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A).  Moreover, even if this Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

1. Unlike the statutorily approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

2. It is underfunded from the outset because even if the Debtors were to place two-week amounts in the Bank Account for the Utilities, the Utilities issue monthly bills and by the time a default notice is issued, the Debtors will have received approximately 60 days of commodity or service.

3. The Debtors fail to state whether draws from the Bank Account would be limited to two-week amounts.

31

4. The Debtors should not reduce the amount of the Bank Account on account of the termination of utility services to a Debtor account until the Debtors confirm that all post-petition charges on a closed account are paid in full.

Accordingly, this Court should not approve the Bank Account as adequate assurance as to the Utilities because the Bank Account: (a) Is not the **form** of adequate assurance requested by the Utilities; (b) Is not a form recognized by Section 366(c)(1)(A); and (c) Is an otherwise unreliable form of adequate assurance.

2. **The Utility Motion Should Be Denied As To The Utilities Because The Debtors Have Not Set Forth Any Basis For Modifying The Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amounts of the Utilities' requests for adequate assurance of payment. Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified. *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof). However, the Debtors do not provide this Court with any evidence or factually supported documentation to explain why the amounts of the Utilities' adequate assurance requests should be modified. Accordingly, this Court should

32

deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

**B.   THIS COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), holding that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor."  *In re Coastal Dry*

33

*Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986).
In making such a determination, it is appropriate for the Court
to consider "the length of time necessary for the utility to
effect termination once one billing cycle is missed." *In re
Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

The Utilities bill the Debtors on a monthly basis for the
charges already incurred by the Debtors in the prior month.  They
then provide the Debtors with 20 to 30 days to pay the bill, the
timing of which is set forth in applicable state laws, tariffs,
regulations, and/or contracts.  Based on the foregoing state-
mandated, or contract-mandated, billing cycles, the minimum
period of time the Debtors could receive service from the
Utilities before termination of service for non-payment of post-
petition bills is approximately two (2) months.  Moreover, even
if the Debtors timely pay their post-petition utility bills, the
Utilities still have potential exposure of approximately 60 days
or more based on their billing cycles.  Furthermore, the forms
and amounts of the Utilities' adequate assurance requests are the
forms and amounts that the applicable public service commission,
which is a neutral third-party entity, or contract, permits a
Utility to request from its customers.  The Utilities are not
taking the position that the cash deposits that they are entitled
to obtain under applicable state law or contract are binding on
this Court, but instead are introducing those forms and amounts

as evidence of the forms and amounts that the applicable
regulatory entity or contract permit the Utilities to request
from their customers.

    In contrast, the Debtors failed to address in the Utility
Motion why this Court should modify, if at all, the amounts of
the Utilities' adequate assurance of payment requests, which is
the Debtors' statutory burden.  Instead, the Debtors merely asked
this Court to approve the Bank Account supposedly containing
approximately two-weeks of the Debtors' utility charges.  The
Debtors did not provide an objective, much less an evidentiary,
basis for their proposed adequate assurance in the form of the
Bank Account.  Moreover, in contrast to the improper treatment
proposed to the Utilities, the Debtors have made certain that
supposed "critical vendors" and post-petition professionals are
favored creditors over the Utilities by ensuring (i) to pay
Shippers & Logistics Providers, Foreign Vendors and Critical
Vendors claims in an amount up to $23,650,000 on an interim
basis, and up to $41,500,000 on a final basis, and (ii) the post-
petition bills/expenses of Debtors' counsel are paid, even in the
event of a post-petition default on the use of DIP financing and
cash collateral, by obtaining a $4 million professionals' carve-
out for the payment of their fees/expenses after a default and a
guarantee of payment for fees incurred up to a default.

35

Additionally, the store closing sales procedures and lease rejection procedures do not include procedures or requirements for the Debtors to timely: (i) Contact the applicable Utilities to terminate utility service to any Debtor store locations as of a proposed lease rejection date; (ii) Contact the applicable Utilities to terminate utility service to any Debtor store locations once a store closing sale is completed and the Debtors no longer require utility services at an applicable closed Debtor store; or (iii) Close a post-petition account with the Utilities when the Debtors no longer require post-petition service for that account.  As such, there is no way for a Utility to know when the Debtors no longer require service at a store location where (i) store closings have been completed or (ii) the lease is rejected.  The Debtors should be required to close accounts with the Utilities when they no longer require post-petition service for such accounts, or otherwise they should remain administratively responsible for such charges until they do close the applicable account(s).

Despite the fact that the Utilities continue to provide the Debtors with admittedly crucial post-petition utility goods/services on the same generous terms that were provided prepetition, with the risk of non-payment, the Debtors are seeking to deprive the Utilities of any adequate assurance of payment for which they are entitled to receive for continuing to

provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security that they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.    Denying the Utility Motion as to the Utilities;

2.    Awarding the Utilities the post-petition adequate assurance of payments pursuant to Section 366 in the amount and form satisfactory to the Utilities, which is the form and amount requested herein;

3.    Require the Debtors to close accounts with the Utilities when they no longer require post-petition service from the Utility for that account or remain administratively responsible for such charges until they do close the account(s); and

4.    Providing such other and further relief as the Court deems just and appropriate.

Dated: December 2, 2024          WHITEFORD TAYLOR & PRESTON LLC

                                 /s/ *William F. Taylor, Jr.*
                                 William F. Taylor, Jr. (#2936)
                                 600 North King Street, Suite 300
                                 Wilmington, Delaware 19801
                                 Telephone: (302) 353-4145
                                 wtaylor@whitefordlaw.com

                                 and

LAW FIRM OF RUSSELL R. JOHNSON III, PLC
Russell R. Johnson III (VSB No. 31468)
John M. Craig (VSB No. 32977)
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
russell@russelljohnsonlawfirm.com
john@russelljohnsonlawfirm.com

*Counsel for American Electric Power,
Ohio Edison Company, Potomac Edison
Company, West Penn Power Company,
Pennsylvania Electric Company,
Monongahela Power Company,
Metropolitan Edison Company,
Pennsylvania Power Company, Jersey
Central Power & Light Company, Toledo
Edison Company, The Cleveland Electric
Illuminating Company, Virginia
Electric and Power Company d/b/a
Dominion Energy Virginia, Dominion
Energy South Carolina, Inc., Georgia
Power Company, PSEG Long Island, Salt
River Project, San Diego Gas and
Electric Company, Southern California
Edison Company, Baltimore Gas and
Electric Company, Commonwealth Edison
Company, PECO Energy Company, The
Potomac Electric Power Company,
Delmarva Power & Light Company,
Atlantic City Electric Company, Tampa
Electric Company, Peoples Gas System,
Inc., Entergy Arkansas, LLC, Entergy
Louisiana, LLC, Entergy Mississippi,
LLC, Entergy Texas, Inc., Eversource
Gas of Massachusetts, The Connecticut
Light & Power Company, Yankee Gas
Services Company, Public Service
Company of New Hampshire, NStar
Electric Company – Western
Massachusetts, Orange & Rockland
Utilities, Inc., Consolidated Edison
Company of New York, Inc.,
Constellation NewEnergy, Inc.,
Constellation NewEnergy – Gas
Division, LLC, CenterPoint Energy
Resources Corp., New York State*

38

*Electric and Gas Corporation,*
*Rochester Gas & Electric Corporation,*
*Florida Power & Light Company, Boston*
*Gas Company, KeySpan Energy Delivery*
*Long Island, KeySpan Energy Deliver*
*New York, Massachusetts Electric*
*Company, Niagara Mohawk Power*
*Corporation, Gexa Energy, LP and*
*Tucson Electric Power Company*