## EXHIBIT B

**Hill Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF ANDREA HILL IN SUPPORT OF DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF ERNST & YOUNG LLP AS THEIR TAX, ACCOUNTING, AND VALUATION SERVICES PROVIDER EFFECTIVE AS OF NOVEMBER 3, 2024

I, Andrea Hill, hereby declare pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") as follows:

1.     I am a partner of Ernst & Young LLP ("EY LLP").  I provide this Declaration on behalf of EY LLP in support of the application (the "Application") of the debtors and debtors in possession in the above-captioned cases (the "Debtors") to retain EY LLP as their tax, accounting,

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

and valuation services provider, effective as of November 3, 2024 (the "Petition Date"), pursuant

to the terms and conditions set forth in the agreements between the Debtors and EY LLP attached

hereto as Exhibits A-1 through A-10 (collectively, the "Engagement Letters").[2]

2.      The facts set forth in this Declaration are based upon my personal knowledge, upon

information and belief, and upon client matter records kept in the ordinary course of business that

were reviewed by me or professionals of EY LLP and EY US LLP (as defined below) or employees

of other member firms of EYGL (as defined below) under my supervision and direction.

3.      As set forth in further detail in the Engagement Letters, EY LLP has agreed to

provide certain tax, accounting, and valuation services (the "Services") to the Debtors in

connection with these chapter 11 proceedings.  A description of each of the Services is summarized

below and fully described in the Engagement Letters:[3]

- 2023/2024 Tax Compliance [Exhibit A-2][4]:
    - Preparation of tax returns for the years ended December 30, 2023 and December 28, 2024 inclusive of extensions and quarterly estimated payments, if required;

- 2024/2025 Tax Provision [Exhibit A-3]:
    - Preparation of tax provision calculations for 2024 (annual) and 2025 (interim) financial statements;

- IRS Audit and Appeals [Exhibit A-4]:
    - Manage the 2019 IRS audit and Appeals process for Franchise Group New Holdco, LLC;

- State Notice and State Audit Assistance [Exhibit A-5]:
    - Assist in analyzing and responding to notices from state and local jurisdictions and support the Debtors through state tax audits, as required;

---

[2]   Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to such terms in the Engagement Letters.

[3]   The summaries of certain terms of the Engagement Letters herein are qualified in their entirety by reference to the provisions of the Engagement Letters themselves.  To the extent there is any discrepancy between the summaries contained in this Declaration and the terms of the Engagement Letters themselves, the terms of the Engagement Letters shall control.

[4]   Exhibit A-1 to the Application is the Master Services Agreement that governs the specific services that EY LLP will provide under the Statements of Work presented in Exhibits A-2 through A-10 of the Application.

2

- Debt Restructuring Tax Assistance [Exhibit A-6]:
  - Advise Company on tax implications of contemplated restructuring alternatives;

- Routine On-Call advisory [Exhibit A-7]:
  - Routine on-call advisory for miscellaneous tax questions that arise time to time;

- Valuation Assistance [Exhibit A-8]:
  - Annual goodwill and long lived asset impairment testing (ASC 350/ASC 360)
  - Incremental borrowing rate analysis
  - Fresh-start accounting valuation (ASC 852);

- Accounting Assistance [Exhibit A-9]:
  - Ad hoc assistance with general and technical accounting and financial reporting matters during the bankruptcy proceedings; and

- Vector Depreciation [Exhibit A-10]:
  - Compute tax depreciation using EY LLP's Cost Recovery Vector platform ("Vector") for the tax years ending 12/28/2024 and 12/27/2025.

### EY LLP's Disinterestedness

4.      Based on the connections check process that is described herein, to the best of my knowledge, information and belief, EY LLP (a) does not hold or represent an interest adverse to the Debtors' estates, and (b) is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code, as required under section 327(a) of the Bankruptcy Code.  Moreover, to the best of my knowledge, information and belief, EY LLP's retention is not prohibited or restricted by Bankruptcy Rule 5002.  Accordingly, I believe that EY LLP is eligible for retention by the Debtors under Section 327(a) of the Bankruptcy Code.

5.      On or about September 20, 2024, EY LLP received a retainer from the Debtors in the amount of approximately $100,000 for tax and accounting services (the "Retainer").  As of the Petition Date, the balance of the Retainer was approximately $59,516.  EY LLP shall apply the remaining balance of the Retainer toward postpetition fees and expense reimbursements that the Debtors are authorized to pay to EY LLP during these chapter 11 cases.

6.      During the ninety days before the Petition Date, the Debtors paid approximately $552,701 to EY LLP, of which approximately $100,000 constituted the Retainer.

7.      As of November 3, 2024, EY LLP was not owed any money by the Debtors.

**Professional Compensation and Reimbursement of Expenses**

8.      EY LLP intends to charge the Debtors fees for the Services, as set forth in the

Engagement Letters and summarized below.

- 2023/2024 Tax Compliance [Exhibit A-2]:
  - o  Fixed fee of $640,000 broken out as follows:
    - ▪ For short period compliance ended December 30, 2023, the fixed fee is $325,000. Amount has been fully paid by Debtors.
    - ▪ For compliance ending December 28, 2024, the fixed fee is $315,000.

- 2024/2025 Tax Provision [Exhibit A-3]
  - o  Based on the actual time that EY LLP's professionals spend performing the services, billed at the following agreed upon rates for each level:

| Level | Rate |
|---|---|
| Partner/Principal | $900 |
| Managing Director | $875 |
| Senior Manager | $750 |
| Manager | $625 |
| Senior | $410 |
| Staff | $275 |

- IRS Audit and Appeals [Exhibit A-4]:
  - o  Based on the actual time that EY LLP's professionals spend performing the services, billed at the following agreed upon rates for each level:

| Level | Rate |
|---|---|
| Partner/Principal | $900 |
| Managing Director | $875 |
| Senior Manager | $750 |
| Manager | $625 |
| Senior | $410 |
| Staff | $275 |

- State Notice and State Audit Assistance [Exhibit A-5]:
  - o  Based on the actual time that EY LLP's professionals spend performing the services, billed at the following agreed upon rates for each level:

| Level | Standard Rate | National/State Desk Rate |
|---|---|---|
| Partner/Principal | $750 | $900 |
| Managing Director | $750 | $875 |
| Senior Manager | $650 | $750 |
| Manager | $500 | $625 |
| Senior | $300 | $410 |
| Staff | $225 | $275 |

- Debt Restructuring Tax Assistance [Exhibit A-6]:
  - o  Based on the actual time that EY LLP's professionals spend performing the services, billed at the following agreed upon rates for each level:

| Level | Rate |
|---|---|
| Partner/Principal | $1,250 |
| Managing Director | $1,150 |
| Senior Manager | $950 |
| Manager | $850 |
| Senior | $600 |
| Staff | $400 |

- Routine On-Call advisory [Exhibit A-7]:
  - o  Based on the actual time that EY LLP's professionals spend performing the services, billed at the following agreed upon rates for each level:

| Compliance Rate Card | | Consulting Rate Card | |
|---|---|---|---|
| Level | Rate | Level | Rate |
| Partner/Principal | $750 | Partner/Principal | $900 |
| Managing Director | $750 | Managing Director | $875 |
| Senior Manager | $650 | Senior Manager | $750 |
| Manager | $500 | Manager | $625 |
| Senior | $300 | Senior | $410 |
| Staff | $225 | Staff | $275 |

The nature of the specific projects under this statement of work are such that the expected fees associated with professional time incurred for each individual project is not to exceed $25,000.

- Valuation Assistance [Exhibit A-8]:
  - o  Based on the actual time that EY LLP's professionals spend performing the services, billed at the following agreed upon rates for each level:

| Level | Rate |
|---|---|
| Partner/Principal | $750 |
| Managing Director | $700 |
| Senior Manager | $600 |

| | |
|---|---|
| Manager | $500 |
| Senior | $400 |
| Staff | $250 |

- Accounting Assistance [Exhibit A-9]:
  - Based on the actual time that EY LLP's professionals spend performing the services, billed at the following agreed upon rates for each level:

| Level | Rate |
|---|---|
| Partner/Principal | $750 |
| Managing Director | $700 |
| Senior Manager | $600 |
| Manager | $500 |
| Senior | $400 |
| Staff | $250 |

- Vector Depreciation [Exhibit A-10]:
  - Fixed fee of $25,000-$28,000 per processing run.

9.    EY LLP's fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs imposed in respect of the Services, all of which the Debtors shall pay (other than taxes imposed on EY LLP's income generally).

10.    In addition to the fees set forth above, the Debtors shall reimburse EY LLP for any direct expenses incurred in connection with EY LLP's retention in these cases and the performance of the Services set forth in the Engagement Letters, including all taxes, including value-added taxes, sales taxes, and other indirect taxes.  EY LLP's direct expenses shall include, but not be limited to, reasonable and customary out-of-pocket expenses for items such as travel, meals, accommodations and other expenses (including any fees or reasonable expenses of EY LLP's legal counsel) related to the Services.

11.    If EY LLP is requested or authorized by the Debtors, or is required by government regulation, subpoena or other legal process, to produce its documents or personnel as witnesses with respect to the Services or the Engagement Letters, the Debtors would, so long as EY LLP is not a party to the proceeding in which the information is sought, reimburse EY LLP for its

professional time and expenses, as well as the fees and expenses of EY LLP's counsel, incurred in responding to such requests.

12.     EY LLP may receive rebates in connection with certain purchases, which are used to reduce charges that EY LLP would otherwise pass onto its clients.

## Certain Other Terms of the Engagement Letters

13.     EY LLP's provision of Services to the Debtors is contingent upon this Court's approval of each term and condition set forth in the Engagement Letters.

14.     The Engagement Letters may be terminated by EY LLP or the Debtors in accordance with their terms.  The Debtors or EY LLP may terminate the Engagement Letters at any time in writing, but in any event the Engagement Letters will terminate upon the effective date of the Debtors' confirmed plan of reorganization, or the liquidation of the Debtors' assets under chapter 11 or 7 of title 11 of the United States Code (the "Bankruptcy Code"), or otherwise. Notwithstanding such termination, however, the Debtors' estates will remain obligated to pay all accrued fees and expenses as of the effective date of such termination.  Moreover, certain other terms of the Engagement Letters will continue (either indefinitely or for a specified period of time) following termination.

15.     Copies of the Engagement Letters are submitted with this Declaration for approval.[5]  EY LLP's provision of Services to the Debtors is contingent upon the Court's approval of each term and condition set forth in the Engagement Letters.  Included among the terms and conditions set forth in the Engagement Letters is language substantially similar to the following:

> Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of Client or its

---

[5]    To the extent that this Declaration and the terms of the Engagement Letters are inconsistent, the terms of the Engagement Letters shall control.

subsidiaries or of EY) shall be brought in the Bankruptcy Court or the applicable district court (if such District Court withdraws the reference) and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the district court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures as set forth in Appendix 1 to this Agreement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon Client, EY and any all successors and assigns thereof.

### Ernst & Young Global Limited

16.    The Ernst & Young global network comprises independent professional services practices conducted by separate legal entities throughout the world. Such legal entities are members of Ernst & Young Global Limited ("EYGL"), a company incorporated under the laws of England and Wales and limited by guarantee, with no shareholders and no capital. The EYGL member firms have agreed to operate certain of their professional practices in accordance with agreed standards, but remain separate legal entities.

17.    The particular firm that the Debtors seek to retain in these chapter 11 cases, EY LLP, is a member firm of EYGL in the United States. EY LLP does not have a parent entity, but rather is 100% owned by its partners. EY LLP engages in the practice of public accountancy and provides accounting and other professional services. All partners of EY LLP are Certified Public Accountants ("CPAs").

18.    In addition, Ernst & Young U.S. LLP ("EY US LLP"), the owners of which are EY LLP CPA partners and non-CPA principals, is another member firm of EYGL in the United States.

EY US LLP provides infrastructure and support services to EY LLP, including the services of CPA and non-CPA personnel.  In particular, EY LLP uses EY US LLP personnel in providing services to EY LLP's clients.  Such EY US LLP personnel continue to be employed by EY US LLP, but work under EY LLP's supervision in EY LLP engagements.

19.    Certain professionals of Ernst & Young Puerto Rico LLC ("EY Puerto Rico"), a Delaware limited liability company that operates in Puerto Rico and a subsidiary of EY US LLP, will assist in providing the Tax Compliance services described above in this Declaration.  The fees and expenses of the EY Puerto Rico professionals relating to work performed for the Debtors will be included in EY LLP's fee applications in these chapter 11 cases.

### Disclosure of Connections

20.    In connection with EY LLP's proposed retention by the Debtors, Debtors' counsel provided a list of names of parties in interest in these cases (the "PIIL") to EY LLP on or about October 15, 2024.  The specific names that were set forth on the PIIL that EY LLP received from the Debtors' counsel are referred to herein as the "Parties in Interest."

21.    EY LLP has access to a computer database (the "Database") that contains information about actual client engagements and potential engagement activity of all of the member firms of EYGL.  The Database also includes the names of other parties that the professionals on the relevant engagement team have identified as also being involved in each engagement (e.g., adverse parties and co-clients).  Thus, the Database indicates whether any Debtor entity is involved in an engagement by an EYGL member firm, in which a Party in Interest is a client.[6]

---

[6]    The information in the Database is populated by the professionals who are providing services under each engagement.  Therefore, the information in the Database may not be 100% correct with respect to all engagements, as human errors may occur.  Furthermore, financial information pertaining to engagement activity is the

22.     EY LLP caused the names of the Parties in Interest to be run through the Database. The disclosure schedule annexed hereto as <u>Exhibit B</u> lists the names of the Parties in Interest and whether a client engagement has been initiated in the Database during the last three years by EY LLP or any other EYGL member firm.

23.     To the best of my knowledge, information and belief based on the information set forth in the Database, none of the services rendered to Parties in Interest by EY LLP or any other EYGL member firm have been in connection with the Debtors or these chapter 11 cases, except as otherwise stated herein.

24.     Additionally, EY LLP conducted a search to determine whether EY US LLP (but not any other member firm of EYGL) has paid any person or entity that is specified on the PIIL as being a professional service provider that has been retained by a Party in Interest ("<u>Party-Retained Professionals</u>") to provide professional services during the last three years.  Based on its search of that database, EY LLP has determined that EY US LLP has paid the following Party-Retained Professionals during the last three years for professional services:  AlixPartners LLP, Davis Polk & Wardwell LLP, Foley & Lardner LLP, Grant Thornton LLP, Latham & Watkins LLP, Sheppard Mullin Richter & Hampton LLP and Troutman Pepper Hamilton Sanders LLP.

25.     EY LLP cannot prohibit any other EYGL member firm from accepting any client engagements, including in matters that may be adverse to the Debtors or their bankruptcy estates. Nevertheless, if EY LLP becomes aware of any such engagement by another EYGL member firm, EY LLP will file a supplemental declaration with the Court that contains the pertinent information

---

proprietary and confidential information of each individual EYGL member firm.  EY LLP may not have the right to access, or if accessed, disclose, such information relating to other EYGL member firms.

that EY LLP is authorized to disclose.[7]  Moreover, if EY LLP becomes aware that another EYGL member firm represents a Party in Interest in a matter that is adverse to the Debtors or their bankruptcy estates, EY LLP will not permit anyone from such non-US EYGL member firm's engagement team who provides services to the Party in Interest in the adverse matter to be involved in the Services that EY LLP provides for the Debtors during these chapter 11 cases.

26.     In the ordinary course of business, certain EYGL member firms ("EY Support Firms") provide various professional, administrative and back office support services for client-facing EYGL member firms throughout the world, as requested, coordinated and directed by such client-facing EYGL member firms (including EY LLP).  An EY Support Firm assisted EY LLP in performing EY LLP's connections check for these chapter 11 cases.  The costs paid by EY LLP to EY Support Firms for such connections check related services will not be billed to the Debtors. EY Support Firms do not provide client-facing services.  Because the Database against which the names of the Parties in Interest was run for EY LLP's connections check contains client engagement information for all client-facing EYGL member firms, no EY Support Firm will run its own connections check or file a declaration in these chapter 11 cases.

27.     Before the Petition Date, EY Support Firms assisted EY LLP in providing services to the Debtors.

28.     Notwithstanding any use of EY Support Firms, EY LLP shall remain fully and solely responsible for any liabilities and obligations in respect of EY LLP's engagement and Services during these chapter 11 cases.

---

[7]  There may be situations in which EY LLP will be unable to disclose engagements of non-US EYGL member firms.  For example, laws or regulations applicable to a non-US EYGL member firm may preclude that firm from providing information regarding its client engagements to EY LLP, or applicable laws and regulations may prohibit disclosure.  If that issue arises, EY LLP will discuss it with the Office of the United States Trustee to try to reach a resolution.

29.     EY LLP may subcontract with Howard Tucker, a retired EY LLP partner, to assist EY LLP in its provision of certain services to one or more of the Debtors in these chapter 11 cases. His fees and expenses relating to work performed for the Debtors will be included in EY LLP's fee applications in these chapter 11 cases. EY LLP understands that Mr. Tucker will perform his own connections check with regard to the Debtors and Parties in Interest identified in these chapter 11 cases prior to performing any services in these chapter 11 cases and he will file his own declaration with the court disclosing the results of his connections check.

30.     EY LLP and other EYGL member firms may perform services for their clients that relate to the Debtors merely because such clients may be creditors or counterparties to transactions with the Debtors and whose assets and liabilities may thus be affected by the Debtors' status. The disclosures set forth herein do not include specific identification of such services.

31.     As part of its practice, EY LLP appears in cases, proceedings and transactions involving many different attorneys, financial advisors and creditors, some of which may represent or be parties involved in these chapter 11 cases.

32.     EY LLP may currently be a party or participant in certain litigation matters involving Parties in Interest, which matters are unrelated to the Debtors or these chapter 11 cases.

33.     EY LLP does not directly hold any debt or equity securities of the Debtors. In addition, none of the EY LLP or EY US LLP professionals who are currently on the engagement team that is providing Services to the Debtors directly hold any securities in the Debtors, but those engagement team members may hold interests in mutual funds or other investment vehicles that may own securities of the Debtors.

34.     It is possible that professionals of EY LLP and EY US LLP who are not currently on the engagement team that is providing Services to the Debtors may directly or indirectly hold

securities of the Debtors or interests in mutual funds or other investment vehicles that may own securities of the Debtors.  Additionally, EY LLP and EY US LLP professionals, whether or not on the engagement team that is providing services to the Debtors, may have economic interests in or business associations with Parties in Interest.

35.    To the best of my knowledge, information and belief, neither the undersigned nor the professionals expected to assist the Debtors in these matters are connected to the Bankruptcy Judges in this District, the United States Trustee for the region in which these chapter 11 cases are pending, or any person employed in the Office of the United States Trustee in the city in which these chapter 11 cases are pending as identified in the PIIL.  Moreover, to the best of my knowledge, information and belief, EY LLP's retention is not prohibited by Bankruptcy Rule 5002.

36.    Despite the efforts described above to identify and disclose connections with Parties in Interest, because the Debtors are a large enterprise with numerous creditors and other relationships, EY LLP is unable to state with certainty that every client representation or other connection with Parties in Interest has been disclosed herein.  If EY LLP discovers additional information that requires disclosure, EY LLP will file supplemental disclosures with the Court.

37.    Certain Parties in Interest are lenders to EY LLP and/or EY US LLP:  JPMorgan Chase Bank, N.A participates in EY LLP's and EY US LLP's Revolving Credit Program.

38.    To the best of my knowledge, information and belief, prior to the Petition Date, EY LLP performed certain professional services for the Debtors, including tax compliance, tax advisory, accounting support, and valuation services.

39.    At the Debtors' request following the Petition Date and prior to Court approval of EY LLP's engagement in these cases, EY LLP may provide in its sole discretion certain of the

Services described in the Engagement Letters. Thus, EY LLP requests that its retention be authorized as of the Petition Date.

40.    To the extent required by Section 504 of the Bankruptcy Code, except as otherwise set forth herein (*e.g.*, if another EYGL member firm provides services to the Debtors under a subcontracting arrangement with EY LLP), EY LLP has not shared or agreed to share any of its compensation in connection with this matter with any other person, other than the partners, principals and employees of EY LLP, EY US LLP and EY Puerto Rico.

41.    EY LLP intends to apply to the Court for payment of compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court and the Engagement Letters, and pursuant to any additional procedures that may be established by the Court in these cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: December 3, 2024

*/s/ Andrea Hill*
**Andrea Hill**
Ernst & Young LLP

**Exhibit A-1**

**Master Services Agreement**



# MASTER SERVICES AGREEMENT

This Master Services Agreement (this "Agreement") is entered into between Ernst & Young LLP, a Delaware limited liability partnership ("EY") and Franchise Group, Inc. ("Client"), as of November 1, 2024.

## Structure

1.  This Agreement sets out the contractual structure for the provision of services ("Services") by EY to Client subsequent to Client filing a petition under Chapter 11 ("Chapter 11") of the United States Bankruptcy Code ("Bankruptcy Code") on or about November 3, 2024, with the United States Bankruptcy Court for Delaware ("Bankruptcy Court"). EY's performance of Services is contingent upon the Bankruptcy Court's approval of EY's retention in accordance with the terms and conditions that are set forth in this Agreement. This Agreement shall be effective as of November 1, 2024 (the "Effective Date"). EY will perform the Services described in separate Statements of Work entered into between the parties that incorporate the terms of this Agreement as well as the terms of any applicable Module(s) to form a separate and independent contract ("Contract"), which shall be subject to approval of the Bankruptcy Court.

2.  For the purposes of any Contract, (a) "Client" in such Contract (including in this Agreement and the applicable Module(s) as incorporated into such Contract) means the Client Entity that executes the applicable Statement of Work, and (b) "party" means either EY or such Client Entity.

3.  If there is any inconsistency between provisions in different parts of a Contract, those parts shall have precedence as follows (unless expressly agreed otherwise): (a) the applicable Statement of Work and any annexes thereto, (b) any applicable Module, (c) this Agreement, and (d) other annexes to a Contract.

## Definitions

4.  The following terms are defined as specified below:

    (a) "AICPA" means the American Institute of Certified Public Accountants.

    (b) "Client Affiliate" means an entity that controls, is controlled by, or is under common control with, Client.

    (c) "Client Entity" means Client or a Client Affiliate.

    (d) "Client Information" means information obtained by EY from Client or from a third party on Client's behalf.

    (e) "Deliverables" means any advice, communications, information, technology or other content that EY provides under this Agreement.

    (f) "EY Firm" means a member of the EY network and any entity operating under a common branding arrangement with a member of the EY network.

    (g) "EY Persons" means EY's or any other EY Firm's subcontractors, members, shareholders, directors, officers, partners, principals or employees.

    (h) "Internal Support Services" means internal support services utilized by EY, including but not limited to: (a) administrative support, (b) accounting and finance support, (c) network



coordination, (d) IT functions including business applications, system management, and data security, storage and recovery, and (e) conflict checking, risk management and quality reviews.

(i) "Module" means a module, supplemental to this Agreement, entered into by the parties and containing further terms applicable to a particular type of Services.

(j) "Personal Data" means Client Information relating to identified or identifiable natural persons or that is otherwise considered to be "personal data," "personal information" or similar term under applicable data protection laws.

(k) "Report" means a Deliverable (or any portion of a Deliverable) issued on EY letterhead or under the EY brand or otherwise identifiable as being prepared by or in association with EY, any other EY Firm or EY Person.

(l) "Statement of Work" means a document, incorporating this Agreement and any applicable Module, entered into by the parties describing particular Services that EY will perform.

(m) "Support Providers" means external service providers of EY and other EY Firms and their respective subcontractors.

(n) "Tax Advice" means tax matters, including tax advice, tax opinions, tax returns or the tax treatment or tax structure of any transaction to which the Services relate.

## Provision of the Services

5. EY will provide the Services using reasonable skill and care in accordance with applicable professional standards, including those established by the AICPA**.**

6. Subject to Bankruptcy Court approval, EY may subcontract a portion of the Services to one or more EY Firms, as well as to other third parties, who may deal with Client directly. EY will remain solely responsible to Client for the performance of the Services. From time to time, non-CPA personnel may perform the Services.

7. EY will act as an independent contractor and not as Client's employee, agent or partner. Client will remain solely responsible for management decisions relating to the Services and for determining whether the Services are appropriate for its purposes. Client shall assign qualified personnel to oversee the Services, as well as the use and implementation of the Services and Deliverables.

8. Client agrees to promptly provide to EY (or cause others to so provide) Client Information, resources and assistance (including access to records, systems, premises and people) that EY reasonably requires to perform the Services.

9. Client Information will be accurate and complete in all material respects. EY will rely on Client Information and, unless EY expressly agrees otherwise in writing, EY will have no responsibility to verify it. The provision of Client Information (including Personal Data), resources and assistance to EY will be in accordance with applicable law and will not infringe any copyright or other third-party rights.

## Deliverables



**EY**

Building a better
working world

10. All Deliverables are intended for Client's use in accordance with the Contract under which they are provided.

11. Client may not rely on any draft Deliverable. EY shall not be required to update any final Deliverable as a result of circumstances of which EY becomes aware, or events occurring, after its delivery.

12. Unless otherwise provided for in a Contract, Client may not disclose a Report (or any portion or summary of a Report), or refer to EY or to any other EY Firm or EY Person in connection with the Services, except:

(a) to a Client Affiliate (subject to these disclosure restrictions);

(b) to Client's lawyers (subject to these disclosure restrictions), who may review it only in connection with advice relating to the Services;

(c) to Client's independent auditors (subject to these disclosure restrictions) who may review it only in connection with their audit;

(d) to the extent, and for the purposes, required by applicable law (and Client will promptly notify EY of such legal requirement to the extent Client is permitted to do so);

(e) to other persons (with EY's prior written consent), who may use it only as specified in such consent; or

(f) to the extent it contains Tax Advice.

If Client discloses a Report (or a portion thereof), Client shall not alter, edit or modify it from the form provided by EY. Client shall inform those to whom it discloses a Report (other than disclosure of Tax Advice to tax authorities) that they may not rely on it for any purpose without EY's prior written consent. Subject to the foregoing, Client is not prohibited by this Section 12 from using Deliverables that do not qualify as Reports in communication with third parties provided that: (i) there is no reference to, or communication of, EY's or any other EY Firm's involvement in the development of such Deliverables, and (ii) Client assumes sole responsibility for such use and communication.

## **Limitations**

13. As part of the parties' arrangements, the parties have mutually agreed the following limitations of liability (which also apply to others for whom Services are provided under any Contract):

(a) Neither party will be responsible, in contract or tort, under statute or otherwise, for any amount with respect to loss of profit, data or goodwill, or any other consequential, incidental, indirect, punitive or special damages in connection with claims arising out of a Contract or otherwise relating to the Services, whether or not the likelihood of such loss or damage was contemplated.

(b) Client (and any others for whom Services are provided) may not recover from EY, in contract or tort, under statute or otherwise, aggregate damages in excess of the fees actually paid for the Services that directly caused the loss under the respective Contract during the twelve (12) months preceding the date of the event giving rise to the loss. This cap is an aggregate cap across all claims under such Contract prior to such date.



**Building a better
working world**

(c) Client shall make any claim relating to the Services or otherwise under a Contract no later than one (1) year after Client became aware (or ought reasonably to have become aware) of the facts giving rise to any alleged such claim and in any event, no later than two (2) years after the completion of the particular Services.

14. The limitations set out in Sections 13(b) and (c) above will not apply to losses or damages caused by EY's fraud or willful misconduct or to the extent prohibited by applicable law or professional regulations.

15. Client (and any others for whom Services are provided under a Contract) may not make a claim or bring proceedings relating to the Services or otherwise under a Contract against any other EY Firm or EY Person. Client shall make any claim or bring proceedings only against EY.

**No Responsibility to Third Parties**

16. Unless specifically otherwise agreed with Client in writing, EY's responsibility for performance of the Services is to Client and Client alone. Should any Deliverable be disclosed, or otherwise made available, by or through Client (or at Client's request) to a third party (including but not limited to permitted disclosures to third parties under Section 12), Client agrees to indemnify EY, as well as the other EY Firms and the EY Persons, against all claims by third parties, and resulting liabilities, losses, damages, costs and expenses (including reasonable external and internal legal costs) arising out of such disclosure.

**Intellectual Property Rights**

17. Each party retains its rights in its pre-existing intellectual property.  Except as set out in the applicable Contract, any intellectual property developed by EY, and any working papers compiled in connection with the Services (but not Client Information contained in them), shall be the property of EY.

18. Client's right to use Deliverables under a Contract arises following payment for the Services.

**Confidentiality, Data Protection & Security**

19. Except as otherwise permitted by a Contract, neither party may disclose to third parties any information (other than Tax Advice) provided by or on behalf of the other that ought reasonably to be treated as confidential (including, in the case of EY, Client Information). Either party may, however, disclose such information to the extent that it:

(a) is or becomes public other than through a breach of a Contract;

(b) is subsequently received by the recipient from a third party who, to the recipient's knowledge, owes no obligation of confidentiality to the disclosing party with respect to that information;

(c) was known to the recipient at the time of disclosure or is thereafter created independently;

(d) is disclosed as necessary to enforce the recipient's rights under this Agreement; or

(e) must be disclosed under applicable law, legal process or professional regulations.

20. EY uses other EY Firms, EY Persons and Support Providers who may have access to Client Information in connection with delivery of Services as well as to provide Internal Support Services. EY shall be responsible for any use or disclosure of Client Information by other EY Firms, EY Persons or Support Providers to the same extent as if EY had engaged in the conduct itself.



21. Client agrees that Client Information, including Personal Data, may be processed by EY, other EY Firms, EY Persons and their Support Providers in various jurisdictions in which they operate (EY office locations are listed at www.ey.com). Client Information, including any Personal Data, will be processed in accordance with laws and professional regulations applicable to EY, and appropriate technical and organizational security measures designed to protect such information will be implemented. EY will also require any Support Provider that processes Personal Data on its behalf to provide at least the same level of protection for such Personal Data as is required by such legal and regulatory requirements. If Personal Data relating to a data subject in the UK, European Union or Switzerland (collectively, "European Personal Data") is required for EY to perform the Services, the parties agree to negotiate in good faith a data transfer addendum intended to validate the transfer of such European Personal Data by Client to EY prior to such transfer. Transfer of Personal Data among members of the EY network is subject to the EY Binding Corporate Rules Program available at www.ey.com/bcr. Further information about EY's processing of Personal Data is available at www.ey.com/privacy.

22. To the extent permitted by applicable law, regulation or governmental directive, EY will notify Client without undue delay in the event of loss, disclosure or unauthorized or unlawful processing of Personal Data and provide Client with relevant information about the nature and extent of the event.

23. In certain circumstances, individuals may have the right under applicable data protection law to access, correct, erase, port, restrict or object to the processing of their personal data. Such requests may be sent to privacy.office@ey.com. To the extent permitted by law, regulation or governmental directive, EY will notify Client without undue delay upon receipt of any verifiable request from a data subject or supervisory authority relating to a Personal Data right. If EY is required to provide Personal Data in response to such verifiable request, or to a request from Client, providing that data will be part of the Services and, to the extent permitted by applicable law, Client will be responsible for EY's reasonable charges incurred in doing so.

24. As a professional services firm, EY is required to exercise its own judgment in determining the purposes and means of processing any Personal Data when providing the Services. Accordingly, unless otherwise specified in a Contract, when processing Personal Data subject to the General Data Protection Regulation or other applicable data protection law (including, without limitation, state data protection (e.g., the California Consumer Privacy Act)), EY acts as an independent controller (or similar status that determines the purposes and means of processing), and not as a processor under Client's control (or similar status acting on behalf of Client) or as a joint controller with Client. For Services where EY acts as a processor processing Personal Data on Client's behalf, the parties will agree appropriate data processing terms in the applicable Statement of Work.

25. EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

26. If Client requires EY to access or use Client or third-party systems or devices, EY shall have no responsibility for the confidentiality, security or data protection controls of such systems or devices, or for their performance or compliance with Client requirements or applicable law.

27. EY may provide Client access to use certain data, software, designs, utilities, tools, models, systems and other methodologies and know-how that EY owns or licenses for the purpose of Client's receipt of the Services or as otherwise expressly agreed in writing by EY ("EY Tools"). Client shall be



responsible for compliance by all Client personnel and third parties acting on Client's behalf with the terms applicable to the use of such EY Tools. As between EY and Client, EY (or another EY Firm) owns all right, title, interest, and all intellectual property rights in and to the EY Tools, including any enhancements, modifications, and derivative work thereof.

*License to EY Tools During the Statement of Work Term:* To the extent that EY provides Client access to any EY Tools during the term of an applicable Statement of Work, EY hereby grants to Client a nonexclusive, paid-up, internal license, during the term of the applicable Statement of Work, to use, execute, and display the EY Tools, for the sole purpose of Client's receipt of the Services from EY under the applicable Statement of Work.

*License to EY Tools After the Statement of Work Term:* EY may allow Client to use certain EY Tools, after the term of an applicable Statement of Work, for the sole purpose of Client's use and receipt of the benefit of the Services provided by EY under such Statement of Work. Any EY Tools that EY allows Client to use after the term of such Statement of Work will be identified in the Statement of Work as a "Leave Behind EY Tool."  With respect to such an identified Leave Behind EY Tool, to the extent permitted by applicable law and professional regulations, EY hereby grants to Client a nonexclusive, paid-up, internal license,  to use, execute, and display the Leave Behind EY Tool, after the term of the Statement of Work,  for the sole purpose of Client's use and receipt of the benefit of the Services provided by EY under the Statement of Work.

*EY Tools Disclaimers and Acknowledgments:* Client's use of any EY Tools may be subject to additional terms, which EY will provide to Client in writing. Client acknowledges that EY may at any time, modify, replace, direct Client to discontinue use of any EY Tools, or otherwise revoke, limit or condition Client's access and right to use any EY Tools. ALL EY TOOLS ARE PROVIDED "AS IS" AND WITHOUT ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE, OR ANY WARRANTY THAT THE OPERATION OF EY TOOLS WILL BE  UNINTERRUPTED, ERROR FREE OR THAT EY TOOLS WILL BE OR REMAIN COMPATIBLE WITH ANY OF CLIENT'S HARDWARE OR SOFTWARE. IN NO EVENT SHALL EY BE LIABLE FOR LOSS OF OR DAMAGE TO CLIENT'S DATA RESULTING FROM THE CLIENT'S USE OF THE EY TOOLS. Client shall not decompile, dissemble or otherwise reverse engineer the EY Tools, unless authorized by law or the relevant regulatory agency. Client shall not sell, lease, assign or otherwise transfer any portion of the EY Tools.

## Compliance

28.  In connection with the performance of its respective rights and obligations under a Contract, EY and Client each will comply with all laws and regulations of any jurisdiction applicable to it from time to time concerning or relating to bribery or corruption, including, without limitation, the U.S. Foreign Corrupt Practices Act ("FCPA").

## Fees and Expenses Generally

29.  Client shall pay EY's professional fees and specific expenses in connection with the Services as detailed in the applicable Contract. Client shall also reimburse EY for other reasonable expenses incurred in performing the Services.  EY's fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs imposed in respect of the Services, all of which Client shall pay (other than taxes imposed on EY's income generally).



30. Subject to Bankruptcy Court approval, if necessary, EY may charge additional professional fees if events beyond its control (including Client's acts or omissions) affect EY's ability to perform the Services as agreed in the applicable Contract, or if Client asks EY to perform additional tasks.

31. If EY is required by applicable law, legal process or government action to produce information or personnel as witnesses with respect to the Services or a Contract, Client shall reimburse EY for any professional time and expenses (including reasonable external and internal legal costs) incurred to respond to the request, unless EY is a party to the proceeding or the subject of the investigation.

**Force Majeure**

32. Neither party shall be liable for breach of a Contract (other than payment obligations) caused by circumstances beyond such party's reasonable control.

**Term and Termination**

33. A Contract applies to all Services associated with such Contract whenever performed after the date of Client's filling of a Chapter 11 petition (including before the date of the applicable Contract).

34. A Contract shall terminate on the completion of the Services associated with such Contract. This Agreement and/or any or all Contracts may be terminated at any time by Client or EY, but in any event this Agreement including all Statements of Work will expire upon the effective date of Client's confirmed plan of reorganization, or liquidation of Client's assets under Chapter 11 or 7 of the Bankruptcy Code, or otherwise.

35. Client shall pay EY for all work-in-progress, Services already performed, and expenses incurred by EY up to and including the effective date of the termination or expiration of a Contract, as well as any applicable termination fees set forth in the applicable Contract. Payment is due within thirty (30) days following the date of the invoice for these amounts or as quickly as the Bankruptcy Code, Bankruptcy Rules, Local Rules and any relevant orders of the Bankruptcy Court allow.

36. The term of this Agreement will expire five (5) years following the Effective Date (the "Term"), unless the parties mutually agree to renew or extend it, provided Client continue to operate under Chapter 11 bankruptcy protection. For clarity, this Agreement shall survive with respect to any Contract entered into during the Term, even if such Contract remains in effect beyond the Term.

37. The provisions of this Agreement, including Section 12 and Section 38 otherwise with respect to Deliverables and Reports, that give either party rights or obligations beyond its termination shall continue indefinitely following the termination of this Agreement or applicable Contract and shall survive completion of the Client's bankruptcy whether through a confirmed plan of reorganization under Chapter 11, liquidation of the Client's assets under Chapter 7 of the Bankruptcy Code, or otherwise.

**Governing Law and Dispute Resolution**

38. This Agreement, any Contract under this Agreement, and any non-contractual matters or obligations arising out of a Contract or the Services, shall be governed by, and construed in accordance with, the laws of the state of New York applicable to agreements made, and fully to be performed, therein by residents thereof. Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of Client or its subsidiaries



**Building a better working world**

or of EY) shall be brought in the Bankruptcy Court or the applicable district court (if such district court withdraws the reference) and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made.  If the Bankruptcy Court, or the district court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures as set forth in Appendix 1 to these Terms and Conditions.  Judgment on any arbitration award may be entered in any court having proper jurisdiction.  The foregoing is binding upon Client, EY and any all successors and assigns thereof.

## United States Specific Terms

39. The U.S. Department of Labor (DOL) regulations, at 20 CFR § 655.734(a)(1)(ii)(A), require the posting of notice of a Labor Condition Application (LCA) in instances where individuals holding certain visas (e.g., H-1B) will be working onsite. Where applicable, EY and the Client will work together to develop an appropriate notice to enable compliance with this requirement.

## Miscellaneous

40. A Contract constitutes the entire agreement between the parties as to the Services and the other matters it covers, and supersedes all prior agreements, understandings and representations with respect thereto, including any previously agreed confidentiality agreements. Except as expressly provided otherwise herein, this Agreement does not modify the terms or provisions for other professional services executed prior to Client's filing of a Chapter 11 petition in the Bankruptcy Court.

41. Each party may execute this Agreement or a Contract, as well as any modifications to them, by electronic means, and each party may sign a different copy of the same document. Both parties must agree in writing to modify this Agreement or a Contract, subject to Bankruptcy approval, if necessary.

42. Client agrees that EY and the other EY Firms may, subject to professional obligations, act for other clients, including Client's competitors.

43. Neither party may assign any of its rights, obligations or claims under this Agreement or a Contract.

44. If any provision of this Agreement or a Contract (in whole or part) is held to be illegal, invalid or otherwise unenforceable, the other provisions shall remain in full force and effect.

45. Client acknowledges that the U.S. Securities and Exchange Commission regulations indicate that, where auditor independence is required, certain confidentiality restrictions related to tax structure may render the auditor to be deemed to be non-independent or may require specific tax disclosures. Accordingly, if and only to the extent that U.S. Securities and Exchange Commission auditor independence regulations apply to the relationship between Client or any of Client's associated entities and any EY Firm, with respect to the tax treatment or tax structure of any transaction to which the Services relate, Client represents, to the best of its knowledge, as of the date of a Contract,

Docusign Envelope ID: A308763F-6C8E-46CE-847B-E596BB00D44E



that neither Client nor any Client Affiliate has agreed, either orally or in writing, with any other advisor to restrict Client's ability to disclose to anyone such tax treatment or tax structure. Client agrees that the impact of any such agreement is its responsibility.

46. EY and Client acknowledge that Client or a Client Affiliate (the "Local Client") may seek to enter into an agreement with another EY Firm (the "Local EY Firm") for the provision of services in another country (the "Local Services"). The parties agree that the Local Client and the Local EY Firm may enter into a local country agreement (the "Local Agreement") for Local Services that incorporates the terms and conditions of this Agreement, subject to any modifications they deem appropriate under local law, regulation, professional standard, or local custom and practice. For clarity, in such event, (i) the Local Agreement shall govern all Local Services; and (ii) neither the Local Client nor the Local EY Firm will be deemed to be parties to this Agreement in connection with the Local Services.

47. Client represents that Client Affiliates for whom Services are performed by EY in connection with a Contract shall be bound by the terms of such Contract.

48. Neither party may use or reference the other's name, logos or trademarks without its prior written consent, provided that EY may use Client's name publicly to identify Client as a client in connection with specific Services or otherwise.

49. The limitations in Sections 13 and 15 and the provisions of Sections 16, 20, 22 and 37 are intended to benefit the other EY Firms and all EY Persons, who shall be entitled to enforce them.

50. By agreement to the provision of the Services, EY is not providing a guarantee to Client that EY's performance of those services pursuant to the terms and conditions set forth in this Agreement will guarantee Client's successful reorganization under Chapter 11.


**Additional Provisions**

51. EY will provide the Services as described in the applicable Statement of Work to Client, contingent upon the Bankruptcy Court's approval of EY's retention in accordance with the terms of this Agreement.

52. The Services may be modified from time to time by the parties mutual written agreement and approval of the Bankruptcy Court, if required.

53. Client acknowledges and agrees that, whether or not the Statement of Work has been approved by the Bankruptcy Court at the time any Deliverable is rendered, any such Deliverable rendered by EY prior to the delivery of its final Deliverable is preliminary in nature and cannot be relied upon for any purpose, including penalty protection.

54. Any activities not described in the applicable Statement of Work are not covered by the fees stated therein. These services will be considered outside the scope of such Statement of Work and are the responsibility of Client to perform on a timely basis unless otherwise agreed by the parties in writing (in an amendment or a separate Statement of Work) and approved by the Bankruptcy Court.

55. Each Statement of Work will identify the individuals who will lead the EY engagement team in providing the Services. If any of these individuals ceases to provide the Services to the Client pursuant to such Statement of Work, EY will so advise the Client and, if that person is replaced,



provide the Client with the name of the professional's replacement.  Other staff, not identified therein, may be utilized as required to conduct EY's work in an efficient manner.

56.  EY will submit an itemized and detailed billing statement for each applicable Statement of Work, and EY will request payment of EY's fees and expenses, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the Bankruptcy Court and any relevant administrative orders.  EY will submit EY's invoices as the work progresses and payment of them will be made upon receipt, or as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant administrative orders allow.

57.  EY acknowledges that payment of EY's fees and expenses is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of the Bankruptcy Court approving the retention of EY and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications.



**Building a better working world**

**IN WITNESS WHEREOF,** EY and Client have each caused this Agreement to be signed and delivered by its duly authorized representative/s.

*Ernst & Young LLP*

**ERNST & YOUNG LLP**

Signed: _____

Name: _____Andrea Hill_____

Title: _____Partner_____

Franchise Group, Inc., on behalf of itself and its affiliate(s)

By: _____Eric Seeton_____
          Eric Seeton, Chief Financial Officer

Date: _____11/18/2024_____



# Appendix 1

# Dispute resolution procedures

## Mediation

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that the mediator is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, of or beneficial owner with decision-making capacity over any EY Firm audit client.

The mediator shall conduct the mediation as the mediator determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

## Arbitration

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless the arbitrator has agreed in writing to these procedures and has confirmed in writing that the arbitrator is not, and will not become during the term of the arbitration,



an employee, partner, executive officer, director, of or beneficial owner with decision-making capacity over any EY Firm audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction.  In deciding the dispute, the arbitration panel shall apply the limitations period that would be applied by a court deciding the matter in the same jurisdiction, and shall have no power to decide the dispute in any manner not consistent with such limitations period.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

**Exhibit A-2**

**Tax Compliance Statement of Work**



# Statement of Work

This Statement of Work, dated November 1, 2024 (this "SOW"), is made by Ernst & Young LLP ("EY") and Franchise Group, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the Agreement, dated November 1, 2024 (the "Agreement"), between EY and Franchise Group, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about November 3, 2024 with the United States Bankruptcy Court for the State of Delaware (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings.  This SOW shall be effective as of November 1, 2024.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

## Scope of Services

*Tax compliance services*

EY will prepare tax returns for the short period ended December 30, 2023, and full year period ended December 28, 2024.

The specific services EY will provide as part of this engagement include:

- Prepare estimated tax payment computations for federal return(s) and state returns included on Appendix A for periods listed above.
- Prepare extension requests for federal return(s) and state returns included on Appendix A for periods listed above.
- Preparation of the Form 1120 for Freedom VCM Interco Holdings, Inc and Subsidiaries for the short period ended December 30, 2023.
- Preparation of the Form 1120 for Freedom VCM Interco Holdings, Inc and Subsidiaries for the period ending December 28, 2024.
- Preparation of the state and city income/franchise returns (112 total filings) for the short period ended December 30, 2023.
- Preparation of the state and city income/franchise returns (105 total filings) for the period ending December 28, 2024.
- Prepare the required calculations under the Uniform Capitalization (UNICAP) Rules
- Prepare Form 8886, Reportable Transaction Disclosure Statement, if applicable.
- Prepare Form 8594, Asset Acquisition Statement under Section 1060, if applicable.
- Prepare Schedule UTP (Form 1120), Uncertain Tax Position Statement, if applicable.



At the request of Client, upon execution of the Workpaper Acknowledgement form attached hereto in respect of each tax year for which access to such workpapers is sought, EY will provide Client with copies of EY's final workpapers, in a format regularly maintained by EY, produced by EY.

*Foreign Tax compliance services*

> o   EY will prepare the Puerto Rican income tax returns for the year ending December 28, 2024 for Franchise Group Inc., Franchise Group New Holdco, LLC, American Freight Outlet Stores, LLC, and Vitamin Shoppe Industries, LLC.

EY and Client will agree annually on the scope of services should there have been a change from the prior year.
EY may access tax information relating to Client that is posted by governmental entities, partnerships, or others in order to provide tax services to Client, in cases where EY determines that it would be efficient for EY to do so. However, Client remains responsible for making sure that Client has provided EY with all relevant information to support EY's provision of tax services. If EY is preparing returns for Client, this includes either providing EY with all required Forms 1099-G, Schedules K-1, and other tax forms made available to Client, or informing EY specifically that such forms should be obtained online. While EY may access such forms online for purposes of convenience, EY is not responsible for identifying such forms, nor is EY responsible for collecting any particular form on Client's behalf unless Client has specifically requested that EY does so and EY has agreed.

Treasury regulations require taxpayers to file disclosure statements relating to certain tax strategies/transactions that the Internal Revenue Service ("IRS") has identified as Listed Transactions or Transactions of Interest, any transaction that is substantially similar to a Listed Transaction or Transaction of Interest, and Other Reportable Transactions. The disclosure statements must be filed with the proper tax returns and also sent separately to the IRS. In addition, some states have enacted tax shelter legislation requiring taxpayers to file reportable transaction disclosure statements with the appropriate state income and franchise tax returns. Failure to disclose properly any of these transactions/strategies in which Client directly or indirectly participated may result in the imposition of penalties. During the process of gathering data to prepare Client's tax return(s), EY requires Client to complete the Reportable Transaction Questionnaire, which is provided with this SOW. If there is a particular person other than Client who should respond to such questionnaire on behalf of Client, please immediately provide to EY that person's name, position, email address and telephone number. EY shall not be liable for any penalties resulting from Client's failure to accurately and timely respond to the questionnaire or to timely file the required disclosure statements.



Unless Client indicates otherwise, EY will check the box on Client's returns, when the option is available, indicating that the taxing authorities can discuss the return directly with the EY preparer who signed it. These discussions are limited to certain issues related to the processing of the returns. Interactions with taxing authorities beyond the scope of processing issues may require a Power of Attorney that must be signed by Client. Any services that may be performed under this arrangement are subject to the terms and conditions of this SOW but are not considered covered under the fee quoted for the preparation of Client's return(s) and therefore will be billed separately. If Client prefers that this box not be checked, please contact Client's EY tax professional.

This engagement does not include (1) an analysis of any shift in ownership of Client stock, (2) the preparation of statements required by Internal Revenue Code §§382 and 383, or (3) a determination of whether such code sections limit the amount of taxable income or tax that can be offset by net operating loss carryforwards, certain recognized built-in losses, certain excess credits, or net capital loss carryovers. The limitations under these provisions may have a material adverse impact on Client's tax liability. EY will not prepare a return on which taxable income (or tax) is offset by such attributes unless an analysis is performed. If Client would like EY to perform such an analysis, those services would be covered under a separate SOW. Please contact Client's EY tax professional named below if Client would like to discuss additional services and fees associated with the analysis and reporting requirements under these rules.

This engagement does not include any advice or determinations regarding what expenses may be qualified research expenses under Internal Revenue Code §41 or comparable state statutes.

The tax compliance services do not include responding or assisting Client in responding to notices from taxing jurisdictions.

This engagement does not include any compliance or advisory services regarding the proposed regulations by the Department of Treasury's Financial Crimes Enforcement Network (FinCEN) on reporting beneficial ownership information under the Corporate Transparency Act.

In providing the tax compliance services, EY will utilize its standard processes to prepare the applicable tax returns. Because the fee set out below is based on use of the EY standard processes, if Client requests preparation of the tax returns in a manner that does not comport with the EY standard processes, then additional fees will be charged based on the rate card included in this SOW.

All Client copies of the tax return(s) will be presented to Client in an electronic format.

Upon written request, EY will assist Client with other tax compliance services, including preparation of additional returns for the current tax year, and extension requests and computation of estimated tax payments for subsequent tax years. However, these services are not covered under the fee quoted in



this letter. EY will discuss with Client and provide fee estimates for such additional services, which would be invoiced separately and subject to all other terms and conditions of this SOW and the above-referenced Agreement.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Client acknowledges that failure of Client to provide accurate and timely information to EY in accordance with the agreed-upon time period may affect the ability of EY to deliver the Services described. EY shall not be liable for any penalties (and associated interest) resulting from Client's failure to accurately and timely provide such information.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

To use EY Interact My Documents ("EYI MyDocs") for collaboration with Client, EY will create a client collaboration workspace with a sharing library to which Client's employees and external contractors using Client email addresses (collectively, "Client users") designated by Client and at least one member of the EY engagement team are provided access ("Client Library"). Client may use the Client Library to deposit information and retrieve EY deliverables. EY may establish a number of Client Libraries on the client collaboration workspace where Client and EY can exchange documents and information; everyone with access to a particular Client Library will have access to all documents stored in that Client Library. The client collaboration workspace should not be used as a repository by Client. Client is responsible for informing EY in writing of the names and email addresses of Client users who are to have access to each Client Library and for notifying EY in writing when access for any Client user is to be removed. Client will provide the name and email address of the Client representative who will inform EY which Client users are to have access.

A copy of the final deliverables will remain available to Client in EYI MyDocs in a read-only state for up to one (1) year after the engagement closes. Information contained in engagement dashboards (if used) within EYI MyDocs, draft work product and task tracking data will not remain available after the engagement closes.

Client authorizes EY, its affiliates, other members of the global Ernst & Young network, including those located outside the United States, and subcontractors providing services on EY's or their behalf, to disclose Client's tax return information received or generated in connection with the Services



described in this SOW, prior-years' tax return information and information relating to the immediately succeeding tax year, to and among each other for the purpose of rendering the Services, discussing and providing other services to Client (including tax advisory services and bringing to Client's attention planning opportunities EY may identify based upon the preparation and/or review of Client's tax returns), and conducting quality reviews and reviews of compliance with EY policies and professional standards. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will remain valid for three years following the completion of the Services.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

**Fees**

Client shall pay EY a fee of $640,000 (see breakout below) for the US and foreign tax compliance services for the tax short year ending December 30, 2023 and full tax year ending December 28, 2024.

| Year End | Total Annual Fee |
|---|---|
| December 30, 2023 | $325,000 |
| December 28, 2024 | $315,000 |

| Compliance Rate Card | |
|---|---|
| Level | Rate |
| Partner/Principal | $750 |
| Managing Director | $750 |
| Senior Manager | $650 |
| Manager | $500 |
| Senior | $300 |
| Staff | $225 |



The fees for any transaction related, significant changes in tax law, accounting standards, or tax methods of accounting services will be billed at the above agreed upon rate card.

Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client. In addition, a charge will be added to EY's fees reflecting an estimated technology cost incurred equal to 3% of the professional fees for tax compliance services.

Any legislative or regulatory change that significantly alters the scope of the Services, or the amount of time required to deliver the Services, will be considered an event for which EY may modify the fees. EY will communicate with Client regularly regarding any changes that may impact Client's scope and fees. Upon notice to Client, EY will bill for these items based on the rates for each level indicated above.

**Contacts**

Client has identified Eric Seeton as Client's contact with whom EY should communicate about these Services. Client's contact at EY for these Services will be Derrick Wagler and Kelly Winfree.

**IN WITNESS WHEREOF,** EY and Client each caused this SOW to be signed and delivered by its duly authorized representative(s).

*Ernst & Young LLP*

**AGREED:**

Franchise Group, Inc., on behalf of itself and its affiliate(s)

By: _Eric Seeton_
DocuSigned by:
1703A0AAEA6E4E5...

Eric Seeton, Chief Financial Officer

Date: 11/18/2024



**Appendix A**

**Tax Year End December 30, 2023 (an updated Appendix will provided each year to reflect jurisdictional changes):**

| Entity | Jurisdiction | FEIN | Tax Entity |
|---|---|---|---|
| Freedom VCM Interco Holdings, Inc and Subsidiaries. | Federal | 93-2512436 | Corporation |
| Franchise Group, Inc and Affiliates | Alaska | 27-3561876 | Corporation |
| Franchise Group, Inc | Alabama | 27-3561876 | Corporation |
| Franchise Group, Inc | Alabama | 27-3561876 | Corporation |
| W.S. Badcock Corporation | Alabama | 59-0152010 | Corporation |
| W.S. Badcock Corporation | Alabama | 59-0152010 | Corporation |
| Educate, Inc | Alabama | 37-1465722 | Corporation |
| Educate, Inc | Alabama | 37-1465722 | Corporation |
| Franchise Group, Inc and Affiliates | Arizona | 27-3561876 | Corporation |
| Franchise Group, Inc and Subsidiaries | Arkansas | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | California | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Colorado | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Connecticut | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | District of Columbia | 27-3561876 | Corporation |
| Franchise Group, Inc | Delaware | 27-3561876 | Corporation |
| Educate, Inc | Delaware | 37-1465722 | Corporation |
| Franchise Group, Inc | Florida | 27-3561876 | Corporation |
| W.S. Badcock Corporation | Florida | 59-0152010 | Corporation |
| Educate, Inc | Florida | 37-1465722 | Corporation |
| Franchise Group, Inc | Georgia | 27-3561876 | Corporation |
| W.S. Badcock Corporation | Georgia | 59-0152010 | Corporation |
| Educate, Inc | Georgia | 37-1465722 | Corporation |
| Franchise Group, Inc and Affiliates | Hawaii | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Idaho | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Illinois | 27-3561876 | Corporation |
| Franchise Group, Inc | Indiana | 27-3561876 | Corporation |



| Educate, Inc | Indiana | 37-1465722 | Corporation |
|---|---|---|---|
| Franchise Group, Inc and Subsidiaries | Iowa | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Kansas | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Kentucky | 27-3561876 | Corporation |
| Franchise Group, Inc | Louisiana | 27-3561876 | Corporation |
| Educate, Inc | Louisiana | 37-1465722 | Corporation |
| Franchise Group, Inc and Affiliates | Maine | 27-3561876 | Corporation |
| Franchise Group, Inc | Maryland | 27-3561876 | Corporation |
| Educate, Inc | Maryland | 37-1465722 | Corporation |
| Franchise Group, Inc and Affiliates | Massachusetts | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Michigan | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Minnesota | 27-3561876 | Corporation |
| Franchise Group, Inc | Mississippi | 27-3561876 | Corporation |
| W.S. Badcock Corporation | Mississippi | 59-0152010 | Corporation |
| Educate, Inc | Mississippi | 37-1465722 | Corporation |
| Franchise Group, Inc | Missouri | 27-3561876 | Corporation |
| Educate, Inc | Missouri | 37-1465722 | Corporation |
| Franchise Group, Inc and Affiliates | Montana | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Nebraska | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | New Hampshire | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | New Jersey | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | New Mexico | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | New York | 27-3561876 | Corporation |
| Franchise Group, Inc | North Carolina | 27-3561876 | Corporation |
| W.S. Badcock Corporation | North Carolina | 59-0152010 | Corporation |
| Educate, Inc | North Carolina | 37-1465722 | Corporation |
| Franchise Group, Inc and Affiliates | North Dakota | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Oklahoma | 27-3561876 | Corporation |
| Franchise Group, Inc | Oklahoma | 27-3561876 | Corporation |
| Educate, Inc | Oklahoma | 37-1465722 | Corporation |
| Educate, Inc | Oklahoma | 37-1465722 | Corporation |
| Franchise Group, Inc and Affiliates | Oregon | 27-3561876 | Corporation |
| Franchise Group, Inc | Pennsylvania | 27-3561876 | Corporation |
| Educate, Inc | Pennsylvania | 37-1465722 | Corporation |
| Franchise Group, Inc and Affiliates | Rhode Island | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | South Carolina | 27-3561876 | Corporation |
| Franchise Group, Inc | Tennessee | 27-3561876 | Corporation |



| W.S. Badcock Corporation | Tennessee | 59-0152010 | Corporation |
|---|---|---|---|
| Educate, Inc | Tennessee | 37-1465722 | Corporation |
| Franchise Group, Inc and Affiliates | Texas | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Utah | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Vermont | 27-3561876 | Corporation |
| Franchise Group, Inc and Subsidiaries | Virginia | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | West Virginia | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Wisconsin | 27-3561876 | Corporation |
| American Freight Outlet Stores, LLC | California | 26-2779573 | DRE |
| American Freight Outlet Stores, LLC | New York | 26-2779573 | DRE |
| Vitamin Shoppe Florida, LLC | California | 76-0846590 | DRE |
| Vitamin Shoppe Industries LLC | California | 13-2993785 | DRE |
| Vitamin Shoppe Industries LLC | New York | 13-2993785 | DRE |
| Vitamin Shoppe Procurement | California | 47-2188021 | DRE |
| American Freight, LLC | California | 36-4795940 | DRE |
| American Freight, LLC | New York | 36-4795940 | DRE |
| American Freight Management | California | 20-4081215 | DRE |
| PSP Franchising, LLC | California | 27-3065978 | DRE |
| PSP Midco, LLC | California | 83-2736507 | DRE |
| PSP Service Newco, LLC | California | 27-3246414 | DRE |
| PSP Stores, LLC | California | 38-3249049 | DRE |
| PSP Franchising, LLC | New York | 27-3065978 | DRE |
| PSP Midco, LLC | New York | 83-2736507 | DRE |
| PSP Service Newco, LLC | New York | 27-3246414 | DRE |
| PSP Stores, LLC | New York | 38-3249049 | DRE |
| PSP Stores, LLC | Rhode Island | 38-3249049 | DRE |
| Sylvan In-Home, LLC | California | 82-3550259 | DRE |
| Sylvan Learning, LLC | California | 75-3118959 | DRE |
| Educate Operating Company, LLC | California | 37-1465725 | DRE |
| Sylvan In-Home, LLC | New York | 82-3550259 | DRE |
| Sylvan Learning, LLC | New York | 75-3118959 | DRE |
| Franchise Group, Inc | Oregon - CAT | 27-3561876 | Corporation |
| Franchise Group, Inc. | Boone County, KY | 27-3561876 | Corporation |
| Franchise Group, Inc. | Lexington-Fayette, KY – BOE | 27-3561876 | Corporation |
| Franchise Group, Inc. | Elizabethtown, KY | 27-3561876 | Corporation |
| Franchise Group, Inc. | Florence, KY | 27-3561876 | Corporation |
| Franchise Group, Inc. | Grand Rapids, MI | 27-3561876 | Corporation |



| Franchise Group, Inc. | Kansas City, MO | 27-3561876 | Corporation |
|---|---|---|---|
| Franchise Group, Inc. | Lexington-Fayette, KY – | 27-3561876 | Corporation |
| Franchise Group, Inc. | Kenton County, KY | 27-3561876 | Corporation |
| Franchise Group, Inc. | Louisville, KY | 27-3561876 | Corporation |
| Franchise Group, Inc. and Affiliates | New York City, NY | 27-3561876 | Corporation |
| Franchise Group, Inc. | Philadelphia, PA | 27-3561876 | Corporation |
| Franchise Group, Inc. and Affiliates | Portland, OR | 27-3561876 | Corporation |
| Franchise Group, Inc and Affiliates | Metro Supportive Housing | 27-3561876 | Corporation |
| Franchise Group, Inc. | St. Louis, MO | 27-3561876 | Corporation |
| Franchise Group, Inc. | Walker, MI | 27-3561876 | Corporation |
| Franchise Group, Inc. | Warren County, KY | 27-3561876 | Corporation |
| Franchise Group, Inc. | Municipal Net Profit Return[1] | 27-3561876 | Corporation |
| Franchise Group, Inc. | KY - City of Bowling Green | 27-3561876 | Corporation |

---

[1] This filing will require information from the previously filed OH City returns noted here: CCA Filing, Cincinnati, Columbus, Dublin, East Liverpool, Greenville, Kettering, Lorain, Miamisburg, Norwood, Ontario, Parma, Piqua, RITA, Springdale, Toledo, City of Akron Springfield JEDD, Delaware, Moraine, Maumee, Heath, Alliance, Blue Ash, Canton, Centerville, Defiance, Fairlawn, Findlay, Lakewood, Lancaster, Lima, Newark, Stow, Westerville, Wooster, Coventry JEDD, Columbia Twp JEDD, and Green.

A member firm of Ernst & Young Global Limited



**Workpaper Acknowledgement**

Franchise Group, Inc. ("Client") has asked Ernst & Young LLP ("EY") to provide copies of EY's final tax compliance workpapers created solely for purposes of preparing the Client's tax return, calculating estimated taxes, or preparing an extension (collectively, the "Workpapers") to Client only for (a) Client's internal use or (b) submission solely to taxing authorities for purposes of responding to inquiries in connection with the examination of Client's tax returns or positions.

Client acknowledges that EY created the Workpapers solely for purposes of preparing computations in connection with EY's tax compliance services for Client.  Client further acknowledges that (a) information contained in the Workpapers may have been based upon estimates and assumptions that were made at the time the Workpapers were prepared because complete and accurate information was not available to EY at that time; (b) such estimates and assumptions were discussed with and approved by Client; (c) the bases for these estimates and assumptions have likely changed since the Workpapers were prepared; and (d) the Workpapers have not been updated by EY to reflect information that may have become available subsequent to their preparation.  Furthermore, in preparing the Workpapers, EY relied on information and representations provided by Client and its representatives that were not independently verified by EY at the time the Workpapers were created. As a result, EY may not have identified irregularities or errors if they occurred.  Moreover, EY, in exercising professional judgment, may have assessed tax issues in a different manner than Client might have assessed the same issues.  The Workpapers are not a substitute for any other inquiries or procedures that Client should undertake for the purpose of satisfying itself with respect to Client's tax situation, nor may the Workpapers or the information contained therein be suitable for such purpose or any other purposes of Client.

Client acknowledges and agrees that the Workpapers and all copies thereof provided to Client are and shall remain the sole property of EY.  Client will use the Workpapers and the information contained therein only for the purposes set forth above.

Except as permitted herein or as otherwise required by applicable law or legal process, Client may not disclose, orally or in writing, any of the Workpapers or the information contained therein, in whole or in part, without the prior written consent of EY.  Client shall advise EY promptly if it receives any subpoena, service or other court order for access to the Workpapers or for information contained therein.

Please confirm Client's agreement with the foregoing by signing and dating this document below and returning the completed document to Derrick Wagler.



AGREED:

Franchise Group, Inc., on behalf of itself and its affiliate(s)

By: _____Eric Seeton_____
_____1703A0AAEA6E4E5_____

Eric Seeton, Chief Financial Officer

Date: _____11/18/2024_____



# Reportable Transaction Questionnaire (revised September 2024)

## Franchise Group, Inc. on behalf of itself and its affiliates

**Purpose**:

Ernst & Young LLP (EY) uses this questionnaire to prepare your tax returns. US Treasury Department regulations require disclosure statements relating to certain transactions, plans and arrangements. These disclosure statements must be filed with the tax return and with a separate IRS office. Failure to make a proper disclosure may result in penalties. Some states have similar disclosure requirements. EY shall not be liable for any penalties resulting from your failure to accurately and timely respond to these questions or to timely file disclosure statements.

**Instructions:**

This questionnaire must be completed for each year for which EY prepares an income tax return. If you are completing this questionnaire for one or more individuals or legal entities, your response should take into account the activities of each. If this questionnaire is being completed in connection with a statement of work, it should address all of the taxpayer(s) and return(s) included in the scope of the engagement. Otherwise, we have included an attachment that lists the taxpayers and returns that you should consider as you complete the questionnaire. The terms "you," "your" and "taxpayer" refer collectively to all of these individuals and entities.

**Question:**

Please review the questions on the next two pages for each individual and entity covered by this engagement and check the box below that is applicable.

- ×☐    My answer is no or N/A to all of the questions. (Please sign and date this questionnaire to complete it.)

- ☐    My answer is yes to one or more of the questions and/or I am unsure of my answer to one or more of the questions. (Please complete the box below before signing and dating this questionnaire.)

If your answer is yes or unsure with respect to one or more questions, list in the following box the applicable taxpayer and the question number(s) of the reportable transaction and/or, if applicable, the transaction number(s) of the listed transaction or transaction of interest to which the answer relates.



**Disclosure in connection with a reportable transaction**

If you are completing this questionnaire only with respect to a Regulated Investment Company (RIC), start with question 4. If you are completing this questionnaire for any other taxpayer, start with question 1. Section references are to the Internal Revenue Code of 1986, unless otherwise indicated.

**Questions:**

1. **Loss transactions:** Have you directly or indirectly entered into a transaction that results in claiming a gross loss (no netting against gains) over the loss threshold amounts described below that is deductible pursuant to a provision of the tax code that treats the transaction as a sale or other disposition (for example, Section 741 or Section 988) or otherwise results in a deduction under Section 165?

   Note that this question does not include a loss from a casualty or involuntary conversion. Also, consider this question with regard to losses reported on your federal or California state tax returns for each of the categories of taxpayers described in the paragraphs that follow that applies to you (more than one, if applicable). If you are a US shareholder of a controlled foreign corporation ("CFC", as defined below) or a 10% shareholder of a qualified electing fund ("QEF", as defined below), include any loss that the foreign corporation would report if it were treated as a domestic corporation filing a US return and consider the activities of the CFC or QEF in connection with the other questions below.

   <u>**Loss threshold amounts**</u>

   Individuals and trusts: At least $2 million on this tax return (or $50,000 or greater in the case of a Section 988 foreign currency loss transaction), or at least $4 million when combining this tax return with other years' returns. Include transaction losses that flow through from a partnership or S corporation.

   Partnerships and S corporations: At least $2 million on this tax return, or at least $4 million when combining this tax return with other years' returns. This category includes partnerships with at least one partner that is not a C corporation (looking through any partners that are partnerships).

   Corporate entities: At least $10 million on this tax return, or at least $20 million when combining this tax return with other years' returns. This category includes:



- C corporations
- Tax-exempt entities (with respect to Unrelated Business Taxable losses)
- Partnerships, if every partner is a C corporation (looking through any partners that are partnerships)
- Controlled foreign corporations (CFCs) – a non-US corporation that has US shareholders (i.e., US persons who directly or indirectly own 10% or more of the combined voting power, or, effective for taxable years of foreign corporations beginning after December 31, 2017, the value of all classes of stock of such non-US corporation) that own in the aggregate more than 50% of the total vote or value of such non-US corporation
- Qualified electing funds (QEFs) – a passive foreign investment company that meets the requirements of Section 1295 and the regulations thereunder, which include an annual taxpayer election

2. **Confidentiality agreement:** Have you entered into a transaction offered to you by a paid tax advisor who placed a limitation on your disclosure of the tax treatment or tax structure of the transaction?

3. **Contingent fees or other contractual protection:** Will your tax returns reflect the results of a transaction for which you (or a related party) paid fees to an advisor that were contingent on realizing federal, California or New York tax benefits, or for which you (or a related party) have the right to the refund of any fees if the federal, California or New York tax effects of the transaction are not sustained?

4. **Federal Listed Transactions, Proposed Regulations for Federal Listed Transactions and Transactions of Interest:** Have you participated in any transaction that is a Federal Listed Transaction, a Federal Listed Transaction under proposed regulations, a Federal Transaction of Interest, or a Federal Transaction of Interest under proposed regulations, or that might be considered the same as or substantially similar to any of the Federal Listed Transactions, a Federal Listed Transaction under proposed regulations, a Transaction of Interest, or a Transaction of Interest under proposed regulations and the tax benefits from your participation are expected to be reflected in the current or future year tax returns? The Federal Listed Transactions, Federal Listed Transactions under proposed regulations, Transactions of Interest, and Transactions of Interest under proposed regulations are summarized in the attachment to this questionnaire. If the answer is "yes," please provide us with a copy of any previously filed Form 8886 disclosure.

5. **State Listed Transactions:** If you file a California, Colorado, New York, or Oregon state tax return, have you participated (i.e., in current or previous filing years) in any transaction that is an applicable State Listed Transaction or might be considered substantially similar to any of the applicable State Listed Transactions and the tax benefits from your participation are



expected to be reflected in current or future year tax returns? The State Listed Transactions are summarized in the attachment to this questionnaire. If the answer is "yes," please provide us with a copy of any previously filed Form 8886 disclosure or equivalent state disclosure forms.


Signature on behalf of the identified individuals and entities, including any applicable CFCs and QEFs:



By: _____

Eric Seeton, Chief Financial Officer

Date: ___11/18/2024_____



# Listed Transactions and Transactions of Interest (revised September 2024)

As of September 2024, below are the titles of the transactions identified as "Listed Transactions" and "Transactions of Interest" by the IRS, proposed regulations for transactions identified as "Listed Transactions" or "Transactions of Interest," and "Listed Transactions" by State taxing authorities, along with the citation to the pronouncements describing these transactions in greater detail.

## Federal Listed Transactions

1. Lease strips and other stripping transactions: Transactions that allow one participant to realize rental or other income from property or service contracts and another participant or the same participant in a different tax year reports deductions related to that income. Identified in IRS Notice 95-53 and IRS Notice 2003-55.

2. 401(k) accelerator: Transactions in which taxpayers claim deductions for contributions to a qualified cash or deferred arrangement or matching contributions to a defined contribution plan where the contributions are attributable to compensation earned by plan participants after the end of the taxable year. Identified in Rev. Rul. 90-105.

3. Multiple employer plans: Trust arrangements purported to qualify as multiple employer welfare benefit funds exempt from the limits of §§419 and 419A. Identified in IRS Notice 95-34. (See item #21 below regarding collectively bargained welfare benefit funds.)

4. Certain contingent installment sales by partnerships with tax-indifferent partners: Transactions involving contingent installment sales of securities by partnerships in order to accelerate and allocate income to a tax-indifferent partner, such as a tax-exempt entity or foreign person, and to allocate later losses to another partner. Identified as ACM Transactions. See IRS Notice 2009-59.

5. Distributions from charitable remainder trusts: Transactions involving distributions described in Treas. Reg. §1.643(a)-8 from charitable remainder trusts. This transaction uses a §664 charitable remainder trust to convert appreciated assets into cash, while avoiding the gain on the disposition of the assets. See IRS Notice 2009-59.

6. Lease-in, lease-out transactions (LILOs): Transactions in which a taxpayer purports to lease property and then purports to immediately sublease it back to the lessor (that is, lease-in/lease-out or LILO transactions). See IRS Notice 2009-59.

7. Distribution of encumbered property: Transactions involving the distribution of encumbered property in which taxpayers claim tax losses for capital outlays that they have in fact recovered. Identified in IRS Notice 99-59.



8. Fast-pay arrangements with corporate stock: Transactions involving fast-pay arrangements as defined in Treas. Reg. §1.7701(l)-3(b) in which a corporation's outstanding stock is structured (in whole or in part) to return the stockholder's investment by distributions treated as dividends. Identified as Fast-pay Arrangements. See IRS Notice 2009-59.

9. Counterbalancing debt instruments: Transactions involving the acquisition of two debt instruments the values of which are expected to change significantly at about the same time in opposite directions. Identified in Rev. Rul. 2000-12.

10. Artificially inflated tax basis of partnership interests: Transactions generating losses resulting from artificially inflating the tax basis of partnership interests. Identified in IRS Notice 2000-44.

11. Employee stock transfer: Transactions involving the purchase of a parent corporation's stock by a subsidiary, a subsequent transfer of the purchased parent stock from the subsidiary to the parent's employees, and the eventual liquidation or sale of the subsidiary. Identified in Notice 2000-60.

12. Guamanian trusts: Transactions purporting to apply §935 to Guamanian trusts. Identified in IRS Notice 2000-61.

13. Intermediary ("Midco") transactions: A broad range of "routine" transactions that happen to include the acquisition, disposition, or movement of stock and assets. The typical Midco transaction is one in which a taxpayer desires to sell stock of a corporation and a buyer desires to purchase the assets. These parties conduct the transaction through an intermediary, with the taxpayer selling the stock to the intermediary and the buyer then purchasing the assets from it and claiming a fair market value basis. The intermediary, having enabled the target corporation to not pay tax on the built-in gain in its assets, usually receives compensation for participating in the transaction. See IRS Notice 2008-111 and IRS Notice 2001-16.

14. Contingent liability transactions: Transactions involving a loss on the sale of stock acquired in a purported §351 transfer of a high basis asset to a corporation and the corporation's assumption of a liability that the transferor has not yet taken into account for federal income tax purposes. Identified in IRS Notice 2001-17.

15. Basis shifting on stock redemptions not subject to US tax: Redemptions of stock in transactions not subject to US tax in which the basis of the redeemed stock is purported to shift to a US taxpayer. Identified in IRS Notice 2001-45.

16. Inflated tax basis: Transactions in which the taxpayer as part of an acquisition of assets also assumes debt exceeding their fair market value. The taxpayer claims a higher basis due to the debt assumption. Upon sale of the assets, the taxpayer claims a loss for basis in excess of the fair market value of the assets. Identified in IRS Notice 2002-21.



**EY**
Building a better
working world

17. Reporting payments made on notational principal contracts while disregarding offsetting future payments: Transactions using a notional principal contract to claim deductions for periodic payments made by the taxpayer while disregarding the accrual of a right to receive offsetting payments in the future. Identified in IRS Notice 2002-35.

18. Allocation of straddle gain or loss in a common trust fund or pass-through entity: Transactions involving the creation of straddles in a common trust fund or pass-thru entity (i.e., partnership, S corporation, or grantor trust), with the allocation of gain to one party and loss to another party. Identified in IRS Notice 2002-50, IRS Notice 2002-65 and IRS Notice 2003-54.

19. Prohibited ownership of S corporation securities by an employee stock ownership plan (ESOP): Transaction in which an S corporation and an associated employee stock ownership plan (ESOP), which was formed on or before March 14, 2001, is subsequently transferred and the ESOP claims the benefit of a delayed effective date under §409(p). As a result of the delayed effective date, the earnings of the S corporation are not currently taxed. Identified in IRS Rev. Rul. 2003-6. (See item 26 below regarding S corporation ESOPs involving synthetic equity.)

20. Offshore deferred compensation arrangements involving an offshore employment leasing company: Transactions involving an individual taxpayer who purportedly resigns from his or her current employer or professional corporation and enters an employment contract with an offshore employment leasing company. The offshore leasing company leases the individual's services back to the original employer, typically using one or more intermediaries. The participants claim tax benefits in the form of reduced or avoided individual and corporate income and employment taxes. Identified in IRS Notice 2003-22.

21. Collectively bargained welfare benefit funds: Trust arrangements purporting to qualify as collectively bargained welfare benefit funds exempt from the limits of §§419 and 419A. Identified in IRS Notice 2003-24. (See item #3 above regarding multiple employer plans.)

22. Transfers of compensatory stock options to related persons: Transactions involving an individual, generally an employee, who has been granted a nonstatutory compensatory stock option, and transfers that option to a related person. The individual does not claim compensation income when the related person exercises the stock option or, in cases where the related person pays for the option with a note or other deferred payment, the individual does not claim compensation income until receiving the deferred payments. Identified in IRS Notice 2003-47.

23. Contested liability trusts: Transactions involving transfers to a trust to provide for the satisfaction of contested liabilities in an attempt to accelerate deductions for the contested liabilities under §461(f). Identified in IRS Notice 2003-77.

24. Offsetting foreign currency option contracts: Transactions in which a taxpayer claims a loss upon the assignment of a §1256 foreign currency option contract to a charity but fails to report the



recognition of gain when the taxpayer's obligation under an offsetting non-section 1256 foreign currency option contract terminates. Identified in IRS Notice 2003-81.

**25.** Roth IRA contributions in transactions designed to avoid contribution limits: Transactions designed to avoid the statutory limits on contributions to a Roth IRA contained in §408A using a corporation, substantially all the shares of which are owned or acquired by the Roth IRA. Identified in IRS Notice 2004-8.

**26.** S corporation ESOP involving synthetic equity: Transaction involving an S corporation that is at least 50% owned by an employee stock ownership plan (ESOP,) designed to avoid current taxation of the S corporation's profits generated by the business activities of a specific individual or individuals. The profits are accumulated and held for the benefit of the individual(s) in a qualified subchapter S subsidiary (QSub) or similar entity (such as a limited liability company), the profits are not paid to the individual(s) as compensation within 2½ months after the end of the year in which earned, and the individual or individuals have rights to acquire stock or similar interests equal to 50% or more of the fair market value of the QSub. Identified in IRS Rev. Rul. 2004-4. (See item #19 above also involving S corporation ESOPs.)

**27.** Pension plans involving excessive life insurance: Transactions involving a qualified pension plan that includes life insurance contracts on the life of a participant in the plan with a face amount that exceeds the participant's death benefit under the plan by more than $100,000. Upon the death of the covered employee, the life insurance contract proceeds exceeding the death benefit are applied to the premiums under the plan for other participants. Identified in Rev. Rul. 2004-20.

**28.** Foreign tax credit intermediary transactions: Transactions in which, pursuant to a prearranged plan, a domestic corporation purports to acquire stock in a foreign target corporation and makes an election under §338 before selling all or substantially all of the target corporation's assets in a transaction that triggers foreign tax on built-in gains that are not subject to US tax. The domestic corporation claims foreign tax credits generated with respect to the foreign income tax imposed on the asset sale. Identified in IRS Notice 2004-20. IRS Notice 2020-19 withdraws Notice 2004-20 effective for transactions entered into after April 6, 2020.

**29.** S corporation nonvoting stock issued to tax-exempt organization: Transactions in which S corporation shareholders attempt to transfer the incidence of taxation on S corporation income by donating S corporation nonvoting stock to an exempt organization, while retaining the economic benefits associated with that stock (through warrants issued to the S corporation shareholders that would dilute the shares of nonvoting stock held by the exempt organization or agreements to repurchase the nonvoting stock from the exempt organization at a value that is substantially reduced by reason of the warrants). Identified in IRS Notice 2004-30.

**30.** Intercompany financing through partnerships using guaranteed payments: Transactions in which a corporation that is exempt from US federal income tax, such as a foreign corporation, provides

financing to a domestic subsidiary by investing in the preferred stock of the subsidiary through a partnership in an attempt to convert interest payments that would not be currently deductible under §163(j) into deductible payments. The foreign corporation's return on investment is structured as a guaranteed payment by the partnership, most of which is allocated to, and deducted by, another domestic subsidiary that is a partner in the partnership. In some cases, the guaranteed payments are made to a partner that is unrelated to the foreign corporation and the partnership's obligations to make the guaranteed payments are assured by the foreign corporation or a related party. Identified in IRS Notice 2004-31.

31. Sale-in, lease-out transaction (SILOs) with a tax-indifferent party: Transactions in which a taxpayer/lessor enters into a purported sale-leaseback arrangement with a tax-indifferent person (such as a foreign entity, a domestic tax exempt organization or government, or a company in a net operating loss position or other tax neutral situation) as lessee in which substantially all of the tax-indifferent person's future rental payment obligations and purchase option rights are economically defeased/nullified and the taxpayer's risk of loss from a decline, and opportunity for profit from an increase, in the value of the leased property are substantially limited, and there is an obligation on the lessee to provide to the lessor a service contract arrangement or contingent residual value insurance in the event that the lessee purchase option right is not exercised. These leases are frequently referred to as "lease-to-service contracts" or "QTE leases." Identified in IRS Notice 2005-13.

32. Loss importation transactions: Transactions in which a taxpayer acquires control of a foreign entity treated as a corporation for US tax purposes and uses the foreign entity's offsetting positions with respect to foreign currency or other property for the purpose of importing losses, but not corresponding gains. Gain is not imported because the taxpayer causes the foreign entity to close out the gain position while the foreign entity is still treated as a foreign corporation. The taxpayer enters into a new offsetting position to lock in the unrealized loss on the loss position and eliminate further economic risk. The taxpayer then imports the unrealized loss into the US, typically by making a check-the-box election with respect to the foreign entity and then closing out the loss position. It may also import the assets of the foreign entity into the US in another type of carryover basis transaction such as a reorganization described in section 368(a). The taxpayer must make the check-the-box election or otherwise dispose of the stock of the foreign entity within 30 days of acquiring it, so that the foreign entity will not qualify as a CFC and the gain it recognizes will not be taxable under subpart F. Identified in IRS Notice 2007-57.

33. Welfare benefit funds utilizing cash value life insurance policies: Trust arrangements purporting to provide employees welfare benefits in the form of cash value life insurance policies. In these arrangements the employer claims deductions for its contributions to the trust per the premium amounts paid, but the employee/policy owners include little if any in corresponding income. These arrangements may involve either a taxable trust or a tax-exempt trust. Identified in IRS Notice 2007-83.



**34.** Distressed asset trust: Distressed Asset Trust: Transactions in which trusts are used to shift built-in losses in distressed assets that have been transferred into such trusts by a tax-indifferent party to a beneficiary who is a US taxpayer. The distressed assets are then written off by the US taxpayer under §166 or sold with the US taxpayer claiming a deduction under §165, even though the US taxpayer has not incurred an economic loss. Identified in IRS Notice 2008-34.

**35.** Basket option contract transactions: Transactions in which a taxpayer enters into a contract, denominated as an option with a stated term exceeding one year, to receive a return based on the performance of a basket of assets substantially all of which qualify as actively traded personal property. The taxpayer, or the taxpayer's designee, has exercised discretion to change the assets in the basket or the trading algorithm that determines how the assets in the basket are traded. The taxpayer takes the position on its return that there is a deferral of income to a later taxable year or a conversion of ordinary income or short-term capital gain or loss into long-term capital gain or loss. Identified in IRS Notice 2015-73.

**36.** Syndicated conservation easement transaction: Transactions in which an investor receives promotional materials, oral or written, that offer prospective investors in a pass-through entity the possibility of a charitable contribution deduction that equals or exceeds an amount that significantly exceeds the amount of the investor's investment. The investor purchases an interest, directly or indirectly (through one or more tiers of pass-through entities), in the pass-through entity that holds real property. The pass-through entity that holds the real property contributes a conservation easement encumbering the property to a tax-exempt entity and allocates, directly or through one or more tiers of pass-through entities, a charitable contribution deduction to the investor, which the investor reports on its federal income tax return. Identified in IRS Notice 2017-10.

## Proposed Regulation for Federal Listed Transactions

The following are proposed regulations issued by the Treasury and the IRS that identify, as listed transactions, transactions that are the same or substantially similar to ones that the Treasury and the IRS have determined to be tax avoidance transactions. Although a proposed regulation does not have the force of law, please review, and indicate if you have potentially participated in a transaction similar or substantially similar to the proposed "listed transaction."

Remember: This questionnaire must be completed for each year for which EY prepares an income tax return. If you are completing this questionnaire for one or more individuals or legal entities, your response should take into account the activities of each. If this questionnaire is being completed in connection with a statement of work, it should address all of the taxpayer(s) and return(s) included in the scope of the engagement.

**37.** Micro-Captive Transaction: Certain micro-captive transactions and transactions that are the same as, or substantially similar to, certain micro-captive transactions have been treated as a transaction



of interest (TOI). The Treasury and IRS have now issued a proposed regulation identifying such transactions as a (1) TOI or (2) listed transaction, unless exceptions stipulated in the proposed regulations apply. Identified in REG-109309-22. *See also Proposed Regulation for Federal Transactions of Interest – TOI5 – Micro-Captive Transaction for additional detail.*

**38.** Monetization Installment Sale Transaction: In these transactions, generally, a seller transfers appreciated property to an intermediary in exchange for an installment obligation, and the intermediary immediately transfers the property to a buyer for cash. The seller then obtains proceeds from a third-party loan (often arranged by the intermediary) in an amount approximating the property's sales price and the terms of which generally mirror the terms of the intermediary's installment obligation. The intermediary's cash sales proceeds may serve as collateral on the third-party loan. In effect, the seller has received proceeds equal to the full purchase price while deferring tax on those proceeds. Identified in REG-109348-22.

**39.** Malta Personal Retirement Scheme Transaction: Malta's personal retirement schemes were enacted as part of the Retirement Pensions Act of 2011 and implemented by regulations in 2015. They are tax-favored savings arrangements in Malta that allow individuals or their employers to contribute assets to a trust or other investment vehicle for such individuals' benefit. These transactions in which a U.S. citizen or a U.S. resident alien claim that the pension provisions of the Treaty exempt from U.S. income tax earnings in and distributions from personal retirement schemes established under the laws of Malta. Typically, the transaction is intended to permanently avoid U.S. tax on (1) the built-in-gain of appreciated property transferred to personal retirement schemes established in Malta, (2) income earned by and accumulated in such schemes, and/or (3) distributions from such schemes. The U.S. individuals who participate in these transactions generally lack any connection to Malta other than their participation in these arrangements. These individuals also may fail to comply with their U.S. information reporting requirements, including under section 6048. Identified in REG-106228-22.

**40.** Charitable Remainder Annuity Trust (CRAT) Transaction: In this transaction, a grantor establishes a purposed CRAT pursuant to IRC Section 664. The grantor contributes property with a fair market value in excess of the property's basis. The trustee of the CRAT sells the contributed property and uses some or all of the proceeds from the sale to purchase an annuity. The trust beneficiary treats the amount payable from the trust as an annuity payment subject to IRC Section 72 on its federal income tax return, instead of as ordinary income and capital gain under IRC Section 664(b). Identified in REG-108761-22.

**41.** Basket Contract Transactions: Transactions in which a taxpayer enters into a contract to receive a return based on the performance of a basket of assets. The contract has a term of more than one year (or overlaps two of the taxpayer's taxable years). The assets in the basket may include



EY
Building a better
working world

actively traded personal property, securities, commodities, foreign currency, digital assets, interests in entities that trade in such assets, or similar property. The taxpayer, or the taxpayer's designee, has exercised discretion to change the assets in the basket, change the algorithm that determines the assets, or to request the counterparty to make either of these changes. On the termination of the contract, the taxpayer receives a settlement based on the performance of the assets in the basket. The taxpayer takes the position on its return that there is a deferral of income to a later taxable year or a conversion of ordinary income or short-term capital gain or loss into long-term capital gain or loss. Identified in REG-102161-23.

## Federal Transactions of Interest

**TOI1.** Contribution of a successor member interest to a charity: A transaction in which a taxpayer acquires a successor interest in an LLC or similar entity that directly or indirectly holds real property, transfers the rights more than one year after the acquisition to a charity described in section 170(c), and claims a charitable contribution deduction that is significantly higher than the amount that the taxpayer paid to acquire the rights. Identified in IRS Notice 2007-72.

**TOI2.** Toggling grantor trusts: Transactions in which grantor creates and funds a grantor trust with four options with values that are expected to move inversely in relation to at least one of the other options. The grantor then gives a unitrust interest to a beneficiary while retaining a noncontingent remainder interest and the power to reacquire trust property at a specified future date by substituting other property of equivalent value. Through a series of successive transactions involving the sale of the remainder interest to an unrelated buyer for an amount substantially equal to the fair market value of the options contributed to the trust, the "activation" of the substitution power on its effective date, the close-out of the "loss options," and the sale of the unitrust interest to the unrelated buyer, the grantor trust status of the trust is purportedly "toggled off" and "toggled on." The grantor claims a tax loss attributable to the close-out of the loss options even though the grantor has not suffered an equivalent economic loss. A variation of the transaction described above involves an initial contribution of liquid assets instead of options, and a subsequent substitution of appreciated property for the liquid assets. This variation is designed to enable the grantor to avoid the recognition of gain upon the disposition of the appreciated assets. Identified in IRS Notice 2007-73.

**TOI3.** Potential for avoidance of tax through sale of charitable remainder trust interests: Transactions involving the sale or other disposition of all interests in a charitable remainder trust (subsequent to the contribution of appreciated assets to the trust but after their sale by the trust). The grantor or other noncharitable claims an increased basis in the annuity or unitrust interest sold based upon the tax basis of assets within the trust (rather than with reference to the tax basis of assets transferred to the trust) thereby recognizing little, if any, gain from such sale or other disposition of the unitrust or annuity interest. Identified in IRS Notice 2008-99.

**TOI4.** Use of domestic partnership with CFC partners to avoid taxable Subpart F inclusions: Transactions involving a US taxpayer owning at least one CFC which is a partner in a



domestic partnership (the other partner(s) may or may not also be CFCs). The domestic partnership owns a CFC Opco that earns income of a type which is subpart F income. The US taxpayer claims that the subpart F income of the CFC Opco is not subpart F income in the hands of the CFC partner (or the partner's US owner) because of the interposition of the domestic partnership. Identified in IRS Notice 2009-7.

## Proposed Regulation for Federal Transactions of Interest

The following are proposed regulations issued by the Treasury and the IRS that identify, as a transaction of interest, transactions that are the same or substantially similar to ones that the Treasury and the IRS believe have the potential for tax avoidance or evasion but lack sufficient information to determine whether the transaction should be identified specifically as a tax avoidance transaction. Although a proposed regulation does not have the force of law, please review, and indicate if you have potentially participated in a transaction similar or substantially similar to the proposed "transaction of interest."

Remember: This questionnaire must be completed for each year for which EY prepares an income tax return. If you are completing this questionnaire for one or more individuals or legal entities, your response should take into account the activities of each. If this questionnaire is being completed in connection with a statement of work, it should address all of the taxpayer(s) and return(s) included in the scope of the engagement.

**TOI5**. Micro-captive transactions: Transactions in which a person ("A"), directly or indirectly owns an interest in a trade or business ("Insured"), which purchases insurance from an entity ("Micro-Captive") or from an intermediary insurance company that initially accepts the risk and premium then subsequently transfers it to Micro-Captive, commonly referred to as a fronting company ("C"). A Micro-Captive is broadly defined as an insurance company that is at least 20% owned in voting power or value by either A, Insured, or a related party within the meaning of § 267(b) or §707(b) and makes an election under section 831(b) to be taxed only on taxable net investment income. During a specified "computation period," which may be five or ten years depending on the facts and circumstances of the arrangement, either (i) Micro-Captive's liabilities for losses and claims administrative expenses are less than 65% of premiums less policyholder dividends, or (ii) a portion of the payment under the insurance contract is, or will, be made available to A, Insured, or any related party in a manner that does not result in taxable income or gain (e.g., loan). Participants to the transaction may include A, Insured, Micro-Captive, and C. Identified in REG-109309-22. *See also Proposed Regulation for Federal Listed Transactions – 37 – Micro-Captive Transaction.*



**TOI6.** Certain Partnership Related-Party Basis Adjustments Transactions: The proposed regulations identify two types of basis adjustment transactions as TOIs: (i) certain transactions involving transfers of partnership interests between partners (Transfer TOIs) and (ii) certain transactions involving partnership distributions (Distribution TOIs and, collectively with the Transfer TOIs, Basis Adjustment TOIs). A Transfer TOI is a transaction in which a partner transfers an interest in a partnership to a "related partner" (as defined later) in a nonrecognition transaction, the basis of one or more partnership properties is increased under IRC Section 743(b)(1) and (c), and the $5m threshold (as defined later) is met. Distribution TOIs include the following types of transactions:

- **IRC Section 734 TOI.** A transaction in which a partnership distributes property to a person that is a "related partner" (as defined later) in a current or liquidating distribution, the partnership increases the basis of one or more of its remaining properties under IRC Section 734(b) and (c), and the $5m threshold is satisfied.
- **IRC Section 732(b) TOI.** A transaction in which a partnership distributes property to a person that is a "related partner" in liquidation of the person's partnership interest (or in complete liquidation of the partnership), the basis of one or more distributed properties is increased under IRC Section 732(b) and (c), and the $5m threshold is satisfied.
- **IRC Section 732(d) TOI.** A transaction in which a partnership distributes property to a person that is a "related partner," the basis of one or more distributed properties is increased under IRC Section 732(d), the related partner acquired all or a part of its interest in the partnership in a transaction that would have been an IRC Section 743 TOI if the partnership had an IRC Section 754 election in effect for the year of the transfer, and the $5m threshold is satisfied.
- For purposes of the Transfer TOI rules, "related partners" means that either the transferee is related to the transferor, or the transferee is related to one or more other partners in the partnership, immediately before or after the transaction.
- For purposes of the Distribution TOI rules, "related partners" means that the partnership has two or more direct or indirect partners that are related immediately before or immediately after a transaction.
- For purposes of these rules, "related" means having a relationship described in section 267(b) of the Code (without regard to section 267(c)(3)) or section 707(b)(1) of the Code.
- The following transactions are specifically identified as "substantially similar transactions":
  - (1) A transaction that would be a Transfer or Distribution TOI except that the partners of the partnership are not related, and one or more partners of the partnership is a tax-indifferent party that facilitates, by receiving a distribution of property from the partnership or otherwise, an increase in the basis of partnership property or an increase in the basis of property held by another partner in the partnership; and



    o   (2) A transaction in which a partner transfers an interest in a partnership to a related partner in a recognition transaction, and the $5 million threshold is met. Identified in REG-124593-23.

## State Listed Transactions

## California Listed Transactions

**CA1.**  Real estate investment trust (REIT) consent dividends: Transactions occurring after February 28, 2000, in which a REIT takes a deduction for a consent dividend, but the REIT's owners do not report the consent dividend as income. Identified in Cal. FTB Chief Counsel Notice 2003-1.

**CA2.**  Wholly owned or controlled regulated investment company (RIC): Transactions occurring after February 28, 2000, in which a corporation forms a wholly owned or controlled entity that registers as a RIC and the parent corporation transfers to the RIC some of its income producing assets. The RIC claims the dividends paid deduction under IRC §852 and the parent corporation claims an intercompany dividend received deduction under the California tax code. Thus, no California income or franchise tax is paid on the income earned by the income producing assets contributed to the RIC. Identified in Cal. FTB Chief Counsel Notice 2003-1.

**CA3.**  Sales factor denominator inflation Intercompany transactions occurring after February 28, 2000, between unitary corporate taxpayers and partnerships to inflate the denominator of the California sales factor and thereby reduce the amount of income apportioned to California. The transactions involve the use of the special sales factor rules in California Regulation 25137-1(f)(3) to include intercompany sales in the denominator of the sales factor. The transactions typically involve a group of corporations filing a California combined report with at least one member (the partner-corporation) of the group owning or acquiring an interest in a partnership and with at least one other corporate member (the nonpartner-corporation) of the combined group not owning an interest in the partnership. The partnership's business is unitary with the combined group and its activities were, or could be, performed by a corporate member of the combined group. The partnership sells goods or services to the nonpartner corporation or the nonpartner corporation makes sales to the partnership. The sales are included in the sales factor denominator but are generally excluded from the sales factor numerator of the unitary group. Identified in Cal. FTB Notice 2011-01.

**CA4.**  Circular cash flow with sale of subsidiary: Transaction occurring after February 28, 2000, involving a parent corporation (Parent) that "artificially" increases its basis in the stock of its wholly owned subsidiary (Subsidiary) through a circular flow of cash from Parent to Subsidiary and back to Parent prior to Parent selling the stock of Subsidiary to a third party. In order to minimize gain on the sale of Subsidiary, Parent contributes a promissory note or other instrument to Subsidiary in a transaction treated as a nontaxable contribution to capital. Parent's contribution to Subsidiary's capital is temporary and is intended to remain with Subsidiary for a short period of time. Subsidiary then generates what it claims are earnings



and profits through the sale or transfer of intangible property to a related entity in a manner that avoids the application of California intercompany transaction rules. Parent pays off the promissory note or instrument issued to Subsidiary. Shortly thereafter, Subsidiary distributes cash or other property back to Parent in a distribution claimed to be a nontaxable dividend not requiring Parent to reduce its basis in Subsidiary. As a result, Parent claims an increased basis in Subsidiary for its contribution of the promissory note or other instrument, but the note or instrument does not remain with Subsidiary. Identified in Cal. FTB Notice 2011-04.

## Colorado Listed Transactions

**CO1.** Captive real estate investment trust (REIT): Transactions in any open tax year, between a captive REIT and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive REIT is defined as a REIT in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the Internal Revenue Code; and (2) not exempt from federal income tax under IRC §501(a). For these purposes, an "association taxable as a corporation" does not include any REIT other than a captive REIT, any qualified REIT subsidiary other than a qualified REIT subsidiary of a captive REIT, any listed Australian property trust, or a qualified foreign entity. Identified in Colorado Reg. 39-22-652.

**CO2.** Captive regulated investment company (RIC): Transactions in any open tax year, between a captive RIC and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive RIC is defined as a RIC in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the IRC; and (2) not exempt from federal income tax under IRC section 501(a). Voting stock in a RIC that is held in a segregated asset account of a life insurance corporation (IRC §817) is not taken into account in determining whether the RIC is captive. Identified in Colorado Reg. 39-22-652.

## New York Listed Transaction

**NY1.** Certain charitable contribution deductions involving remainder interests: A transaction occurring on or after January 1, 2006, involving the purchase of a remainder interest in real property by a newly formed pass-through entity, which after holding the remainder interest for one year, contributes it to an exempt organization thereby meeting the federal requirements for computing the charitable contribution deduction based on the fair market value of the remainder interest. The remainder interest is appraised using an income approach that takes into consideration the amount of lease payments remaining on the long-term lease resulting in



a value of the remainder interest substantially higher than what the pass-through entity paid for it. Following the contribution, the pass-through entity is dissolved, allowing its members/partners to claim a pro-rata share of the charitable contribution deduction. Identified in New York State Department of Taxation and Finance-Office of Tax Policy Analysis Technical Service Division TSB-M-07.

## Oregon Listed Transactions

**OR1.** Certain real estate investment trust (REIT) transactions: Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a REIT: (1) transfers income-producing assets to the REIT; and (2) claims a dividend-received deduction and the REIT claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings. See 2015 Oregon Revised Statute 314-307.

**OR2.** Certain regulated investment company (RIC) transactions: Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a RIC: (1) transfers income-producing assets to the RIC; and (2) claims a dividend-received deduction and the RIC claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings. See 2015 Oregon Revised Statute 314-307.

**Exhibit A-3**

**Tax Provision Statement of Work**



## Statement of Work

This Statement of Work, dated November 1, 2024 (this "SOW"), is made by Ernst & Young LLP ("EY") and Franchise Group, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the Agreement, dated November 1, 2024 (the "Agreement"), between EY and Franchise Group, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about November 3, 2024 with the United States Bankruptcy Court for the state of Delaware (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings. This SOW shall be effective as of November 1, 2024.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

### Scope of Services

EY will provide the following Services (the "Services") to Client.

- Prepare and review tax calculations (including required disclosures) regarding the 2024 and 2025 consolidated tax provisions for each quarter beginning with the quarter ending April 1, 2024 and March 29, 2025.
    - Valuation allowance analysis
    - Tax accounting for any future acquisitions/divestitures not yet contemplated
- Prepare and review tax calculations (including required disclosures) regarding the consolidated tax provision for the year ending December 28, 2024.
- Calculate the additional interest and penalties for the exposure related to uncertain tax positions.

EY does not assume any responsibility for, nor shall EY provide any assurance to Client's independent auditors that, the tax provision, related balance sheet accounts and footnote disclosures are prepared in accordance with U.S. GAAP or otherwise. Furthermore, the services described in this letter are not to be considered "accounting advice" to which AU Section 625 would apply, as the services rendered constitute tax technical services, tax calculations, compilation of tax data, and information related to tax matters at the direction of Client with no judgment relating to accounting matters including liabilities for tax exposure items or valuation allowances. Thus, the required auditor communications pursuant to AU Section 625 are not considered applicable.

Client shall have full responsibility for all decisions on all tax accounting matters, tax accounting procedures, internal controls and the calculation of its tax provision and the effective tax rate, as well as decisions with respect to the appropriate application of U.S. and foreign GAAP Client will, as



**Building a better working world**

reasonably requested by EY, direct its independent auditors to meet with EY to discuss the tax provision and any accounting issues that EY may identify.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

To use EY Interact My Documents ("EYI MyDocs") for collaboration with Client, EY will create a client collaboration workspace with a sharing library to which Client's employees designated by Client and at least one member of the EY engagement team are provided access ("Client Library"). Client may use the Client Library to deposit information and retrieve EY deliverables. EY may establish a number of Client Libraries on the client collaboration workspace where Client and EY can exchange documents and information; everyone with access to a particular library will have access to all documents stored in the library. The client collaboration workspace should not be used as a repository by Client. Client is responsible for informing EY in writing the names and email addresses of Client's employees who are to have access to each EYI MyDocs Client Library and for notifying EY in writing when access for any Client employee is to be removed. Client will provide the name and email address of the Client representative who will inform EY which Client employees are to have access.

A copy of the final deliverables will remain available to Client in EYI MyDocs in a read-only state for up to one (1) year after the engagement closes. Information contained in engagement dashboards (if used) within EYI MyDocs, draft work product and task tracking data will not remain available after the engagement closes.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

EY may subcontract a portion of the Services to one or more EY Firms and to subcontractors working under EY's direction who may communicate directly with Client. EY, however, will remain solely responsible to Client for the performance of the Services. If EY has prepared or reviewed (or will



prepare or review) Client's U.S. income tax returns, Client authorizes the EY Firms, including those located outside the United States, and EY's subcontractors to disclose information received or generated in connection with the preparation of any such U.S. income tax returns of Client to and among each other for the purpose of rendering the Services and discussing and providing other services to Client. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will remain valid for three years following the completion of the Services.

**Contacts**

Client has identified Eric Seeton as Client's contact with whom EY should communicate about these Services. Client's contact at EY for these Services will be Derrick Wagler and Kelly Winfree.

Client shall pay fees for the Services based on the actual time that EY's professionals spend performing them, billed at the following agreed upon rates for each level while the Services under this SOW are being performed. The hourly rates applicable to the Services under this SOW are subject to an annual inflation adjustment based on the Bureau of Labor Statistics Employment Cost Index.

Client shall pay fees for the Services based on the actual time that EY's professionals spend performing them, billed at the following agreed upon rates for each level while the Services under this SOW are being performed.

| Level | Rate |
|---|---|
| Partner/Principal | $900 |
| Managing Director | $875 |
| Senior Manager | $750 |
| Manager | $625 |
| Senior | $410 |
| Staff | $275 |

Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client. In addition, a charge will be added to EY's fees reflecting an estimated technology cost incurred equal to 3% of the professional fees for this engagement.



**EY**

Building a better
working world

EY will bill Client for EY's fees, expenses, and applicable taxes or other charges, if any, on a monthly basis. Payment is due upon receipt of EY's invoice.

**IN WITNESS WHEREOF,** EY and Client each caused this SOW to be signed and delivered by its duly authorized representative(s).

*Ernst & Young LLP*

**AGREED:**

Franchise Group, Inc., on behalf of itself and its affiliate(s)

By: _____
     *Eric Seeton*
     1703A0AAEA6E4E5...

     Eric Seeton, Chief Financial Officer

Date:   11/18/2024
     _____

A member firm of Ernst & Young Global Limited

**Exhibit A-4**

**IRS Audit and Appeals Statement of Work**



**Statement of Work**

This Statement of Work, dated November 1, 2024 (this "SOW"), is made by Ernst & Young LLP ("EY") and Franchise Group, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the Agreement, dated November 1, 2024 (the "Agreement"), between EY and Franchise Group, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about November 3, 2024 with the United States Bankruptcy Court for the state of Delaware (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings.  This SOW shall be effective as of November 1, 2024.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

**Scope of Services**

EY will provide the following services (the "Services") to Client:

EY may provide the following tax advisory services ("the Services") to you under the Agreement relating to the IRS examination of Franchise Group New Holdco LLC's Form 1065 tax return for the reapresentative of Franchise Group Holdco LLC:

- Work with appropriate Client personnel with respect to all aspects of the Examination including representing the Client before IRS Exam.
- Assist the Client with issues relating to the IRS audit process and the scope of the audit.
- Assist Client with responding to Internal Revenue Service ("IRS") Information Document Requests ("IDRs") issued during the Examination.
- Assist Client with responding to issues raised by the IRS during the Examination including researching issues, developing technical responses to issues and, if necessary, drafting written responses to Forms 5701 Notices of Proposed Adjustment.
- Assist Client in the resolution of issues raised by the IRS during the Examination through case manager settlement authority and alternative dispute resolution procedures.
- Preparation or review of examination resolution documents including Forms 870 (waives on restrictions or assessment and acceptance of overassessments) and closing agreements.
- Perform tax and interest computations
- EY will provide to Client tax advice and controversy services concerning any of the IRS's proposed adjustments, including representing Client in the IRS Appeals proceeding and preparing the Protest and other materials necessary for such proceeding.



If the IRS opens any other tax years for examination or opens any related examinations (e.g. related entities, employment tax, excise tax, employee benefit plan, etc.), EY may, after written approval in the form of an Amendment to this SOW or in a new SOW, provide services similar to those described above.  If the Examination is unagreed and Client decides to protest its case to IRS Appeals, EY may prepare or protest, represent the Client before IRS Appeals, and assist the Client with any factual and/or tax technical submissions to IRS Appeals.  EY may also assist with any, IRS penalties, IRS notices, IRS procedural issues, information reporting and withholding issues, and/or IRS account related matters.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

To use EY Interact My Documents ("EYI MyDocs") for collaboration with Client, EY will create a client collaboration workspace with a sharing library to which Client's employees designated by Client and at least one member of the EY engagement team are provided access ("Client Library"). Client may use the Client Library to deposit information and retrieve EY deliverables. EY may establish a number of Client Libraries on the client collaboration workspace where Client and EY can exchange documents and information; everyone with access to a particular library will have access to all documents stored in the library. The client collaboration workspace should not be used as a repository by Client. Client is responsible for informing EY in writing the names and email addresses of Client's employees who are to have access to each EYI MyDocs Client Library and for notifying EY in writing when access for any Client employee is to be removed. Client will provide the name and email address of the Client representative who will inform EY which Client employees are to have access.

A copy of the final deliverables will remain available to Client in EYI MyDocs in a read-only state for up to one (1) year after the engagement closes. Information contained in engagement dashboards (if used) within EYI MyDocs, draft work product and task tracking data will not remain available after the engagement closes.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided



that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

EY may subcontract a portion of the Services to one or more EY Firms and to subcontractors working under EY's direction who may communicate directly with Client. EY, however, will remain solely responsible to Client for the performance of the Services. If EY has prepared or reviewed (or will prepare or review) Client's U.S. income tax returns, Client authorizes the EY Firms, including those located outside the United States, and EY's subcontractors to disclose information received or generated in connection with the preparation of any such U.S. income tax returns of Client to and among each other for the purpose of rendering the Services and discussing and providing other services to Client. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will remain valid for three years following the completion of the Services.

## Contacts

Client has identified Eric Seeton as Client's contact with whom EY should communicate about these Services. Client's contact at EY for these Services will be Derrick Wagler and Kelly Winfree.

## Fees

Client shall pay fees for the Services based on the actual time that EY's professionals spend performing them, billed at the following agreed upon rates for each level while the Services under this SOW are being performed. The hourly rates applicable to the Services under this SOW are subject to an annual inflation adjustment based on the Bureau of Labor Statistics Employment Cost Index.

| Level | Rate |
|---|---|
| Partner/Principal | $900 |
| Managing Director | $875 |
| Senior Manager | $750 |
| Manager | $625 |
| Senior | $410 |
| Staff | $275 |

Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related

Docusign Envelope ID: 8555BB8E-0EEF-493D-9045-A4B343C125B0



**EY**

Building a better
working world

administrative costs that result from billing arrangements specifically requested by Client. In addition, a charge will be added to EY's fees reflecting an estimated technology cost incurred equal to 3% of the professional fees for this engagement.

EY will bill Client for EY's fees, expenses, and applicable taxes or other charges, if any, on a monthly basis. Payment is due upon receipt of EY's invoice.

**IN WITNESS WHEREOF,** EY and Client each caused this SOW to be signed and delivered by its duly authorized representative(s).

*Ernst + Young LLP*

**AGREED:**

Franchise Group, Inc., on behalf of itself and its affiliates

By: _Eric Seeton_
    1703A0AAEA6E4E5...

Eric Seeton, Chief Financial Officer

Date: 11/18/2024

A member firm of Ernst & Young Global Limited

**Exhibit A-5**

**State Notice and State Audit Assistance Statement of Work**



**Statement of Work**

This Statement of Work, dated November 1, 2024 (this "SOW"), is made by Ernst & Young LLP ("EY") and Franchise Group, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the Agreement, dated November 1, 2024 (the "Agreement"), between EY and Franchise Group, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about November 3, 2024 with the United States Bankruptcy Court for the state of Delaware (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings.  This SOW shall be effective as of November 1, 2024.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

**Scope of Services**

EY will provide the following services (the "Services") to Client:

EY will provide to Client tax advice and controversy services concerning issues in current and future examinations conducted by state taxing authorities ("Tax Authorities") of Client's tax obligations during the term of this SOW, including, but not limited to, state income/franchise taxes, sales/use taxes, excise taxes, property taxes and employment taxes.  The specific scope of services to be provided by EY pursuant to this SOW, including the jurisdiction, tax type and years, will be agreed to through mutual written communications between Client and EY, such as e-mails.

Our Services may include assisting Client with any or all of the following, with all such Services to be agreed between the parties and described in writing:

1.  Review and analyze notices, proposed assessments, information requests and other documents, including underlying work papers, received from a Tax Authority and provided to EY (collectively, "Tax Authority Communications");

2.  Maintain a log of all Tax Authority Communications reviewed by EY, including a timeline of required response due dates, amount at issue, type of tax, issues raised, basis of inquiry;

3.  Convey to Client the nature of the issues raised in and the potential impact of the Tax Authority Communications reviewed by EY and the options for responding to the Tax Authority Communications;

4.  Consult with Client to determine the manner in which to respond to the Tax Authority Communications reviewed by EY and who will be responsible for responding;



EY
Building a better working world

5. Draft and submit to Client, for review and approval, responses to the Tax Authority Communications; and

6. As authorized by Client and where permissible by forum rules, represent Client in Tax Authority Forums in connection with the resolution of the Tax Authority communications. Tax Authority Forums include those forums in which the officials hearing the matter(s) are employees of, selected by, or paid by the Tax Authority, or where such officials' decisions are reviewed and approved by the Tax Authority.

Specific tasks that may be involved in connection with the Services described herein include participation in meetings and telephone calls with Client personnel; participation in meetings and telephone calls with Tax Authorities and other third parties; research of technical issues; preparation of technical memoranda, letters, e-mails, and other written documentation; and appearance before Tax Authority forums.

EY shall have no authority to negotiate or enter into any agreements or settlements on behalf of Client or to otherwise bind Client in any way. Any proposed agreements or settlements will be presented to Client for final approval or rejection.

Should Client wish to appeal any determination to the judiciary, EY will be unable to represent Client in any such proceedings. Should Client receive final examination results from any particular Tax Authority which Client does not agree with and wishes to protest, EY will discuss potential available options with Client.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

To use EY Interact My Documents ("EYI MyDocs") for collaboration with Client, EY will create a client collaboration workspace with a sharing library to which Client's employees designated by Client and at least one member of the EY engagement team are provided access ("Client Library"). Client may use the Client Library to deposit information and retrieve EY deliverables. EY may establish a number of Client Libraries on the client collaboration workspace where Client and EY can exchange documents and information; everyone with access to a particular library will have access to all documents stored in the library. The client collaboration workspace should not be used as a repository by Client. Client is responsible for informing EY in writing the names and email addresses

A member firm of Ernst & Young Global Limited



**Building a better working world**

of Client's employees who are to have access to each EYI MyDocs Client Library and for notifying EY in writing when access for any Client employee is to be removed. Client will provide the name and email address of the Client representative who will inform EY which Client employees are to have access.

A copy of the final deliverables will remain available to Client in EYI MyDocs in a read-only state for up to one (1) year after the engagement closes. Information contained in engagement dashboards (if used) within EYI MyDocs, draft work product and task tracking data will not remain available after the engagement closes.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

EY may subcontract a portion of the Services to one or more EY Firms and to subcontractors working under EY's direction who may communicate directly with Client. EY, however, will remain solely responsible to Client for the performance of the Services. If EY has prepared or reviewed (or will prepare or review) Client's U.S. income tax returns, Client authorizes the EY Firms, including those located outside the United States, and EY's subcontractors to disclose information received or generated in connection with the preparation of any such U.S. income tax returns of Client to and among each other for the purpose of rendering the Services and discussing and providing other services to Client. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will remain valid for three years following the completion of the Services.

**Contacts**

Client has identified Eric Seeton as Client's contact with whom EY should communicate about these Services. Client's contact at EY for these Services will be Derrick Wagler and Kelly Winfree.

**Fees**

Client shall pay fees for the Services based on the actual time that EY's professionals spend performing them, billed at the following agreed upon rates for each level while the Services under this SOW are being performed. The hourly rates applicable to the Services under this SOW are subject to an annual inflation adjustment based on the Bureau of Labor Statistics Employment Cost Index.

Client shall pay fees for the Services based on the actual time that EY's professionals spend performing them, billed the following agreed upon rates for each level while the Services under this SOW are being



performed. The hourly rates applicable to the services under this SOW are subject to an annual inflation adjustment based on the Bureau of Labor Statistics Employment Cost Index.

| Level | Standard Rate | National/State Desk Rate |
|---|---|---|
| Partner/Principal | $750 | $900 |
| Managing Director | $750 | $875 |
| Senior Manager | $650 | $750 |
| Manager | $500 | $625 |
| Senior | $300 | $410 |
| Staff | $225 | $275 |

Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client. In addition, a charge will be added to EY's fees reflecting an estimated technology cost incurred equal to 3% of the professional fees for this engagement.

EY will bill Client for EY's fees, expenses, and applicable taxes or other charges, if any, on a monthly basis. Payment is due upon receipt of EY's invoice.

**IN WITNESS WHEREOF,** EY and Client each caused this SOW to be signed and delivered by its duly authorized representative(s).

*Ernst & Young LLP*

**AGREED:**

Franchise Group, Inc., on behalf of itself and its affiliate(s)

By: _Eric Seeton_
1703A0AAEA6E4E5...

Eric Seeton, Chief Financial Officer

Date: 11/18/2024

**Exhibit A-6**

**Debt Restructuring Tax Assistance Statement of Work**



## Statement of Work

This Statement of Work, dated November 7, 2024 (this "SOW"), is made by Ernst & Young LLP ("EY") and Franchise Group, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the Agreement, dated November 3, 2024 (the "Agreement"), between EY and Franchise Group, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about November 3, 2024 with the United States Bankruptcy Court for the state of Delaware (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings.  This SOW shall be effective as of November 7, 2024.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

## Scope of Services

EY will provide tax consulting and structuring services ("Services") in connection with Client's bankruptcy proceedings ("Transaction"). Such Services
may include the following procedures:

- Advise Client personnel in developing an understanding of the tax issues and options related to Client's Chapter 11 filing, taking into account Client's specific facts and circumstances, for US federal and state & local tax purposes.

- Advise on the federal and state & local income and indirect tax consequences of proposed plans of reorganization, including, if necessary, assisting in the preparation of IRS ruling requests regarding the tax consequences of alternative reorganization structures and tax opinions.

- Understand, advise on and model the tax implications of reorganization and/or restructuring alternatives Client is evaluating with existing creditors that may result in a change in the equity, capitalization and/or ownership of the shares of Client and its assets.

- Gather information and prepare calculations to model out the tax implications of applying Section 382(l)(5) or Section 382(l)(6) for net operating losses, disallowed business interest expense, and other tax attribute carryforward that may survive following an emergence from Chapter 11 or similar proceeding.

- As applicable, gather information, prepare calculations ("Section 382 Calculations") and apply the appropriate federal and state & local tax law to historic information regarding changes in



the ownership of Client's stock prior to emergence from Client's Chapter 11 filing to calculate whether any of the shifts in stock ownership may have caused an ownership change that will restrict the use of tax attributes (such as net operating loss, capital loss, credit carry forwards, and built in losses) and the amount of any such limitation.

- Participate in discussions with Client and legal counsel regarding any measures that can be taken to protect the availability of tax attributes (e.g. rights agreements, trading orders, etc.).

- Prepare calculations and apply the appropriate federal and state & local tax law to determine the amount of tax attribute reduction related to debt cancellation income and modeling of tax consequences of such reduction.

- If necessary, prepare or assist in tax basis balance sheets and computations of stock basis as of certain relevant dates for purposes of analyzing the tax consequences of alternative reorganization structures.

- Analyze federal and state & local tax treatment of the costs and fees incurred by the Client in connection with the bankruptcy proceedings, including tax return disclosure and presentation.

- Analyze federal and state & local tax treatment of interest and financing costs related to debt subject to automatic stay, and new debt incurred as the Client emerges from bankruptcy, including tax return disclosure and presentation.

- Analyze federal and state & local tax consequences of restructuring and rationalization of inter-company accounts, and upon written request, we will analyze tax impacts of transfer pricing and related cash management.

- Analyze federal and state & local tax consequences of potential bad debt and worthless stock deductions, including tax return disclosure and presentation.

- Analyze federal and state & local tax consequences of employee benefit plans, as requested in writing.

- Advise Client personnel on the bankruptcy tax process and procedure lifecycle, the typical tax issues, options and opportunities related to a Chapter 11 filing, the typical impact of a Chapter 11 filing on a corporate tax department's operations, and leading practices for addressing such impact areas while operating in bankruptcy and the post-emergence period.



**EY**
Building a better
working world

- Assist with various tax, compliance, tax account registration/deregistration and/or audit issues arising in the ordinary course of business while in bankruptcy, including but not limited to: IRS and/or state and local income and indirect tax audit defense, voluntary disclosure assistance and/or compliance questions, notices or issues related to: federal, state & local income/franchise tax, sales and use tax, excise tax, property tax, employment tax, credit & incentive agreements and other miscellaneous taxes or regulatory assessments and fees. These services, if requested and if permissible, may be subject to a separate Statement of Work mutually agreed to by the parties.

- Advise as requested and as permissible, with determining the validity and amount of bankruptcy tax claims or assessments, including but not limited to the following types of taxes: income taxes, franchise taxes, sales taxes, use taxes, employment taxes, property taxes, severance taxes, excise taxes, credit & incentive agreements, and other miscellaneous taxes or regulatory assessments and fees.

- Scope, assist and advise on the potential for seeking cash tax refunds, including but not limited to the following types of taxes: income taxes, franchise taxes, sales taxes, use taxes, employment taxes, property taxes, tax credit & incentive agreements and other miscellaneous taxes or regulatory assessments and fees.

- Provide documentation, as appropriate or necessary, of tax matters, of tax analysis, opinions, recommendations, conclusions and correspondence for any proposed restructuring alternative, bankruptcy tax issue, or other tax matter described above, including as it relates to any historical transactions (e.g., acquisitions, mergers, dispositions, liquidations, or any materially similar transactions, associated with Client's internal restructuring or otherwise). The Client will be responsible for all accounting and management decisions.

## Other Provisions

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.



EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

EY may subcontract a portion of the Services to one or more EY Firms and to subcontractors working under EY's direction who may communicate directly with Client. EY, however, will remain solely responsible to Client for the performance of the Services. If EY has prepared or reviewed (or will prepare or review) Client's U.S. income tax returns, Client authorizes the EY Firms, including those located outside the United States, and EY's subcontractors to disclose information received or generated in connection with the preparation of any such U.S. income tax returns of Client to and among each other for the purpose of rendering the Services and discussing and providing other services to Client. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will remain valid for three years following the completion of the Services.

**Contacts**

Client has identified Eric Seeton as Client's contact with whom EY should communicate about these Services. Client's contact at EY for these Services will be Derrick Wagler, Brian Korbutt and Kelly Winfree.

**Fees**

Client shall pay fees for the Services based on the actual time that EY's professionals spend performing them, billed at the following agreed upon rates for each level while the Services under this SOW are being performed. The hourly rates applicable to the Services under this SOW are subject to an annual inflation adjustment based on the Bureau of Labor Statistics Employment Cost Index.

| Level | Rate |
|---|---|
| Partner/Principal | $1,250 |
| Managing Director | $1,150 |
| Senior Manager | $950 |
| Manager | $850 |
| Senior | $600 |
| Staff | $400 |



Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client.

EY will bill Client for EY's fees, expenses, and applicable taxes or other charges, if any, on a monthly basis. Payment is due upon receipt of EY's invoice.

**IN WITNESS WHEREOF,** EY and Client each caused this SOW to be signed and delivered by its duly authorized representative(s).

*Ernst & Young LLP*

**AGREED:**

Franchise Group, Inc., on behalf of itself and its affiliates

By: _Eric Seeton_
    1703A0AAEA6E4E5...

    Eric Seeton, Chief Financial Officer

Date: 11/18/2024

A member firm of Ernst & Young Global Limited

**Exhibit A-7**

**Routine On-Call Advisory Statement of Work**



**Statement of Work**

This Statement of Work, dated November 1, 2024 (this "SOW"), is made by Ernst & Young LLP ("EY") and Franchise Group, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the Agreement, dated November 1, 2024 (the "Agreement"), between EY and Franchise Group, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about November 3, 2024 with the United States Bankruptcy Court for the state of Delaware (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings. This SOW shall be effective as of November 1, 2024.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

**Scope of Services**

EY will provide the following services (the "Services") to Client:

EY will provide to Client routine on-call tax advisory and compliance services concerning issues as requested by Client when such projects are not covered by a separate SOW and do not involve any significant tax planning or projects. This SOW applies to routine on-call projects commenced on or before the termination of the Agreement and is intended to be used for engagements to respond to general tax questions and assignments that are expected, at the beginning of the project, to involve total professional time not to exceed (with respect to the specific project) $25,000 in professional fees.

<u>On-call tax advisory services</u>

The scope of on-call tax advisory services to be performed pursuant to this SOW may be agreed to orally or through written communications with Client such as e-mails.

The projects covered by this SOW include assistance with tax issues by answering one-off questions, drafting memos describing how specific tax rules work, assisting with general transactional issues, and assisting Client in connection with its dealings with tax authorities (other than representing Client in an examination or an appeal before the IRS or other taxing authority).

Specific tasks that may be involved in connection with the services include the following: participating in meetings and telephone calls with Client; participating in meetings and telephone calls with taxing authorities and other third parties where EY is not representing Client in an examination or an appeal before the taxing authority; reviewing transaction-related documentation;

A member firm of Ernst & Young Global Limited



researching technical issues; and preparing technical memoranda, letters, e-mails, and other written documentation.

This SOW is not intended to cover services related to significant tax planning or other projects where a mutual understanding of the scope of the engagement should be formally documented.

Accordingly, in lieu of this SOW, separate SOWs generally will be entered into in connection with such services, including but not limited to the following: services related to a transaction that is a reportable transaction, transaction of interest or transaction similarly designated by a tax authority; engagements where EY will render formal opinions or opinions that will be relied upon by third parties; studies with respect to Client's tax attributes (e.g., basis studies or repairs and maintenance studies); loaned or assigned staff engagements; and due diligence engagements.

On-call tax compliance services

The on-call tax compliance services covered by this SOW include, upon Client's written request, the preparation of estimated tax computations and related vouchers and requests for extensions of tax return due dates, and the one-off preparation of sales, use, excise, and property tax returns. In lieu of this SOW, separate SOWs generally will be entered into for engagements when EY prepares or reviews income tax returns, entries on income tax returns, Reports of Foreign Bank and Financial Accounts (FBARs / FinCEN Form 114), or when EY will prepare sales, use, excise and property tax returns on a continuing basis.

The scope of on-call tax compliance services will be agreed to through written communications with Client such as an exchange of e-mails

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided



**EY**

Building a better
working world

that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

EY may subcontract a portion of the Services to one or more EY Firms and to subcontractors working under EY's direction who may communicate directly with Client. EY, however, will remain solely responsible to Client for the performance of the Services. If EY has prepared or reviewed (or will prepare or review) Client's U.S. income tax returns, Client authorizes the EY Firms, including those located outside the United States, and EY's subcontractors to disclose information received or generated in connection with the preparation of any such U.S. income tax returns of Client to and among each other for the purpose of rendering the Services and discussing and providing other services to Client. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will remain valid for three years following the completion of the Services.

**Contacts**

Client has identified Eric Seeton as Client's contact with whom EY should communicate about these Services. Client's contact at EY for these Services will be Derrick Wagler and Kelly Winfree.

**Fees**

Client shall pay fees for the Services based on the actual time that EY's professionals spend performing them, billed at the following agreed upon rates for each level while the Services under this SOW are being performed. The hourly rates applicable to the Services under this SOW are subject to an annual inflation adjustment based on the Bureau of Labor Statistics Employment Cost Index.

| Compliance Rate Card | | Consulting Rate Card | |
|---|---|---|---|
| Level | Rate | Level | Rate |
| Partner/Principal | $750 | Partner/Principal | $900 |
| Managing Director | $750 | Managing Director | $875 |
| Senior Manager | $650 | Senior Manager | $750 |
| Manager | $500 | Manager | $625 |
| Senior | $300 | Senior | $410 |
| Staff | $225 | Staff | $275 |



Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client. In addition, a charge will be added to EY's fees reflecting an estimated technology cost incurred equal to 3% of the professional fees for this engagement.

EY will bill Client for EY's fees, expenses, and applicable taxes or other charges, if any, on a monthly basis. Payment is due upon receipt of EY's invoice.

**IN WITNESS WHEREOF,** EY and Client each caused this SOW to be signed and delivered by its duly authorized representative(s).

*Ernst & Young LLP*

**AGREED:**

Franchise Group, Inc., on behalf of itself and its affiliates

By: _____
Eric Seeton
1703A0AAEA6E4E5...

Eric Seeton, Chief Financial Officer

Date: _____11/18/2024_____

**Exhibit A-8**

**Valuation Assistance Statement of Work**



EY
Building a better
working world

**Valuation Services**
**Statement of Work**

This Statement of Work, dated 3 November 2024 (this "SOW"), is made by Ernst & Young LLP ("EY") and Franchise Group, Inc. on behalf of itself and its affiliated entities ("Client" or "Company"); pursuant to the Agreement, dated 1 November 2024 (the "Agreement"), between EY and Franchise Group, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about 3 November 2024 with the United States Bankruptcy Court for the state of Delaware (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings.  This SOW shall be effective as of 3 November 2024.

Except as otherwise set forth in this SOW, this SOW incorporates by reference, and is deemed to be a part of, the Agreement. The additional terms and conditions of this SOW shall apply only to the Services covered by this SOW and not to Services covered by any other Statement of Work pursuant to the Agreement. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement, and references in the Agreement to "you" or "Client" shall be deemed references to you.

**Engagement Team**

Kris Shirley (Principal) and Chade Lowe (Senior Manager) will lead the EY team in providing the Services.

**Objective and purpose**

The objective of our engagement is to assist the Client with certain valuation assistance (the "Services"), described further below related to the Client's filing of a petition under Chapter 11 for the Bankruptcy Court and financial reporting considerations.

We will provide these Services to you, contingent upon the Bankruptcy Court's approval of our retention in accordance with the terms and conditions that are set forth in the Agreement (inclusive of this SOW).

The Services may be modified from time to time by our mutual written agreement and approval of the Bankruptcy Court, if required.

Client acknowledges and agrees that, whether or not this SOW has been approved by the Bankruptcy Court at the time any Report is rendered, any such Report rendered by EY prior to the delivery of its final Report is preliminary in nature and cannot be relied upon for any purpose, including penalty protection.



*Pre-emergence impairment related services*

We understand that the Company has goodwill and long-lived assets reported on its financial statements as a result of prior acquisitions. We further understand that the Company is required to periodically test this goodwill balance for impairment in accordance with the professional guidance outlined in Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 350, Intangibles – Goodwill and Other, ("ASC 350"), Accounting Standards Codification Topic 360, Property, Plant and Equipment ("ASC 360") and FASB Accounting Standards Codification Topic 820, Fair Value Measurements ("ASC 820"). You have requested that EY provide valuation advisory services related to its annual impairment test under ASC 350 for the reporting units (individually the "Reporting Unit" and collectively "Reporting Units") as defined by Client Management ("Management") and, if required, long-lived asset impairment test under ASC 360 for the asset groups defined by Management (the "Asset Groups"), as of Management's annual impairment testing date in the fourth quarter of 2024 (the "Impairment Valuation Date").

Accordingly, the purpose of our engagement is to assist Management with its impairment testing procedures by estimating the fair value of the enterprise value of the Reporting Units.

We understand that the results of our analysis will be used solely for the purpose of assisting Management in its implementation of ASC 350 (and ASC 360, if required) for financial reporting purposes.

*Post-emergence fresh start accounting services*

We understand that the Company is undergoing a pre-packaged bankruptcy for which it expects to emerge as of a to be determined date in January or February of 2024. Upon emergence, the Company will require fresh start accounting in accordance with ASC 852 – Reorganizations ("ASC 852"). As part of the requirements of ASC 852, the Company will need assistance with the valuation of any identified tangible and intangible assets, and any Client successor reporting units (the "Successor Reporting Units").

**Standard and definition of value**

According to ASC 852, fresh-start accounting for post-emergence opening balance sheet follows ASC Topic 805 ("ASC 805"), *Business combinations.* Per ASC 805 and ASC 350, the standard of value to be used is Fair Value which is defined in ASC Topic 820 ("ASC 820"), *Fair Value Measurement* as:

> *"Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."*



**Scope of services**

We will perform the Services under this SOW in accordance with applicable standards established by the American Institute of Certified Public Accountants ("AICPA"). The Valuation Services under this SOW may also be subject to the requirements of the Principles of Appraisal Practice and Code of Ethics and the Business Valuation Standards of the American Society of Appraisers; the Code of Professional Ethics of the Appraisal Institute; the Code of Ethics and Standards of Professional Conduct of the CFA Institute; and the Uniform Standards of Professional Appraisal Practice ("USPAP") as set forth by the Appraisal Standards Board of the Appraisal Foundation, with which we will comply as applicable.

We understand you have requested that we estimate the fair value of certain tangible and intangible assets (collectively, the "Assets") as of the future date of your emergence (the "Transaction") from Chapter 11 (the "Valuation Date") for financial reporting purposes.

We understand that the results of our analysis will be used by the Client in its financial reporting of the Transaction under ASC 852 and ASC 820, as of the Valuation Date.

The scope of the Services related to the Transaction will be delivered in two phases. Phase 1 will include Services prior to the confirmation of the Company's ownership structure at emergence. Phase 2 will include potential Services after confirmation of the Company's ownership structure and related independence restrictions at emergence.

### *Phase 1: Pre-emergence impairment related services*

Based on your requests, as well as our understanding of the overall scope of the proposed engagement and our experiences with similar engagements, the scope of our engagement will include the following:

*Goodwill and indefinite-lived intangible impairment*

- Consideration of any business plans, future performance estimates or budgets for the infrastructure assets and network assets that collectively form the Reporting Units;

- Consideration of applicable economic, industry and competitive environments, including relevant historical and future estimated trends;

- Valuation analysis of the Reporting Units and indefinite-lived intangibles by giving consideration to the appropriate approaches to value;

- Application of the Income and Market approaches to value using, where appropriate, financial data that is based on a market participant perspective; and,

- Preparation of an executive summary deck and supporting exhibits providing an overview of recommendations of fair value and key value drivers.



*Long-lived asset impairment (if required)*

- Interviews with Management concerning the following for the Asset Groups:

  o Understanding the nature of the long-lived assets that comprise the Asset Groups; and

  o Understanding the Asset Group level cash flows

- Estimating the sum of the undiscounted and pre-tax cash flows for the Asset Groups and comparing them against their respective carrying values;

- Analysis of the industry, as well as the economic and competitive environments in which the Asset Groups operate; and

- If Management concludes the Asset Groups have failed the recoverability test, we will perform a valuation of the Asset Groups based on a discounted cash flow methodology.

- Preparation of a consolidated executive summary deck and supporting exhibits for the Reporting Units and Asset Groups detailing the assumptions on which our analysis and recoverability test were based, and where applicable, our recommendations of fair value.

### Phase 2: Fresh Start Assistance

The following scope will include potential Services after confirmation of the Company's ownership structure at emergence and related independence restrictions are sorted. The Services will include the following:

Based on your request, our understanding of the overall engagement and our experience with similar engagements, the scope of our engagement will include the following procedures:

*General procedures*

- Perform interviews with Management concerning the nature of the identified tangible and intangible assets and the Successor Reporting Units;

- Consider any business plans, future performance estimates or budgets for the Client;

- Give consideration to applicable economic, industry, and competitive environments, including relevant historical and future estimated trends;

- Give consideration to the guidance on fair value measurements and market participant assumptions contained in ASC 820; and

- Apply the Income, Market, and/or Cost Approaches to value using, where appropriate, financial data that is based on a market participant perspective.



*Personal property*

- Perform a desktop valuation analysis of the owned personal property and leasehold improvements (the Personal Property) of the Reporting Units, giving consideration to appropriate approaches to value relying on the fixed asset records as our initial point of reference. While our analysis will consider all three approaches to value, we anticipate our analysis will primarily rely upon the Cost approach and the Market Approach.

  o Construction in progress will be included at its reported cost basis as provided by each Reporting Units' management to the extent that the Company will continue to fund the completion of these projects;
  o Because we are performing a desktop valuation, which does not include a site visit, we will coordinate and conduct due diligence conference calls with each respective Reporting Units' management to discuss significant locations and the Personal Property, as needed;
  o A valuation of any above or below-market leasehold interest associated with the personal property right of use assets is not included in our scope. We remain available to value these interests to the extent these assets are deemed to be material; and,
- Preparation of a "flat file" in electronic format which includes the fixed asset data we received from each Reporting Unit along with our recommendations of fair value and valuation life remaining to be uploaded into the respective fixed asset systems.

*Real property and leasehold interests*

Using Client provided portfolio data, we will recommend certain owned and leased properties to be in our valuation scope (the "Subject Properties", and the "Subject Leases", respectively). We will then value these Subject Properties and Subject Leases considering the three commonly accepted approaches in real estate valuation, which are the sales comparison, cost, and income approaches. For the Subject Properties, in addition to total property value, we will value the land, site improvements, and building improvements separately. The Subject Leases will be used to adjust the Right-of-use asset.

*Inventory and Intangible assets*

- Valuation analysis of the tangible and intangible assets (the "Subject Assets") of the Company considering appropriate approaches to value as of the Valuation Date. It is our understanding that these Subject Assets may include, but are not limited to:
  o Inventory;
  o Trademarks and trade names;
  o Franchise / dealer relationships
  o Customer / distributor relationships
  o Technology / Content
  o Above/below market leases (discussed above);



- o   Non-competition agreements (as applicable);
- Perform a weighted average cost of capital and weighted average return on assets to assess the discount rates applied to the tangible and intangible assets acquired;
- Application of the Income, Market and/or Cost Approaches to value using, where appropriate, financial data that was based on a market participant perspective;

*Reporting Units*

We anticipate performing the following procedures and tasks as part of our valuation analysis of the business enterprise of the Successor Reporting Units:

- Allocate the overall reorganization value to each Successor Reporting Unit for Management's assessment of residual goodwill (if any);
- Apply the Income and Market Approaches using, where appropriate, financial data that is based on a market participant perspective; and
- Develop a recommendation of fair of value for the business enterprise of the Successor Reporting Units as of the Valuation Date.

*Incremental borrowing rate*
- Estimate a term-structure of incremental borrowing rates as of the Valuation Date considering the credit quality of the lessee, term of the leases, currency of the leases and seniority adjustments

We will perform the Services based on methods and techniques that we consider appropriate under the circumstances. We will deliver to you written narrative report with supporting exhibits. Our calculations will be based on methods and techniques that we consider appropriate under the circumstances. In the event that you require a full recommendation or opinion, and accompanying narrative report, prior to emergence we will issue an addendum to this SOW.

We will provide you with periodic progress updates and, at your written request, meet with you periodically to review our results.

**EY will prepare the following Reports:**

- <u>Pre-emergence impairment related services</u>: Executive summary and supporting exhibits

- <u>Fresh Start Assistance</u>: Executive summary and supporting exhibits

- <u>Incremental borrowing rate</u>: Executive summary and supporting exhibits



EY's Report is not a fairness opinion or investment advice. Client will not rely on any of them as such, nor will Client use them, or permit them to be used, as the basis to set a transaction price. EY assumes no responsibility to any buyer or seller to negotiate a purchase or sale at the value set forth in the Report.

The Report is subject to EY's Statement of Limiting Conditions ("SLC"), a draft of which is attached hereto as Appendix 1. If EY concludes that modifications or additions to the SLC will be required, EY will notify Client.

**Out-of-Scope Services**

Any activities not described as Services, as indicated above under Scope of Services, are not covered by the fees stated herein. These services will be considered outside the scope of this SOW and are the responsibility of Client to perform on a timely basis unless otherwise agreed by the parties in writing (in a separate SOW or an amendment to this SOW) and approved by the Bankruptcy Court.

**Limitations on scope**

The Services under this SOW do not include the valuation of any assets, liabilities or interests not listed in the Scope section. If EY discovers significant amounts of such property, Client will either (1) engage EY to perform a separate valuation of these items (subject to the Agreement as to scope and fees) or (2) represent to EY the value of those items, on which EY would rely without further investigation for EY's use in performing the services under this SOW.

The specific nature of the Services will depend both on the amount of detail you provide to us and the timeframe within which you require our assistance. EY will not, in connection with the performance of the Services or otherwise, (i) act as a broker for the sale of any securities, (ii) solicit any potential buyer or seller (including Client) to engage in any transaction, or (iii) act as a negotiator of a transaction.

As used herein, the term "Review" is not intended to constitute a review within the scope of the AICPA standards for Accounting & Review Services.

The Services under this SOW do not include EY estimating the business enterprise (or shareholders' equity) of Company upon emergence from bankruptcy. We understand that Management will provide EY with these values.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.



Client will not, and Client will not permit others to, quote or refer to the Reports, any portion, summary or abstract thereof, or to EY or any other EY Firm, in any document filed or distributed in connection with (i) a purchase or sale of securities to which United States or state securities laws ("Securities Laws") are applicable, or (ii) periodic reporting obligations under Securities Laws. Client will not contend that any provisions of Securities Laws could invalidate any provision of this Agreement.

Notwithstanding the restrictions on disclosure set forth in the Agreement, Client may disclose EY's Reports prepared pursuant to this SOW to Client's professional advisors, acting strictly in an advisory capacity to Client, who may use it only to give Client advice related to EY's Services under this SOW and any related Transaction, provided such advisors have agreed not to further disclose such Reports or use them for any other purpose without EY's written consent and not to make any claims against EY arising out of or in connection with the Reports.  In addition, in no event will any advisor be permitted to obtain access, directly or indirectly, to any Reports pursuant to this paragraph in connection with any function other than for the provision of such advice, such as in connection with any fairness opinion, credit rating or credit enhancement, brokering or underwriting of any insurance, or financing (in the role of investor, agent, intermediary, underwriter, syndicator, lender, or other similar capacity) without EY's consent and the execution of an access letter described below.

Notwithstanding the requirements of the Agreement, Client may also disclose the Reports and refer to EY in connection with the Services under this SOW to Client's external independent auditor to be used in conjunction with the intended use of the Reports outlined in the SOW, subject to its agreement that (a) none of the Reports or any portion thereof shall be further disclosed to any other person or entity except as required by law or professional obligation, and (b) it shall not make any claims against EY arising out of, or in connection with the Reports.

The Services are advisory in nature. None of the Services or any Reports will constitute any legal opinion or legal advice. Where EY's written consent under the Agreement is required for Client to disclose to a third party any of EY's Reports (other than Tax Advice), EY will also require that third party to execute a non-reliance and release letter acceptable to EY in form and substance.

If EY receives a request from a third party for any information relating to EY's Tax Advice, EY will notify Client and will not release any such information unless Client has executed an appropriate written consent authorizing such disclosure and the third party has executed a non-reliance and release letter acceptable to EY in form and substance.

EY will perform the Services under this SOW in accordance with applicable standards established by the American Institute of Certified Public Accountants ("AICPA"). The Services under this SOW may also be subject to the requirements of the Principles of Appraisal Practice and Code of Ethics and the Business Valuation Standards of the American Society of Appraisers; the Code of Professional Ethics of the Appraisal Institute; the Code of Ethics and Standards of Professional Conduct of the CFA Institute; and the Uniform Standards of Professional Appraisal Practice ("USPAP") as set forth by the Appraisal Standards Board of the Appraisal Foundation, with which EY will comply as applicable.



Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

The U.S. Department of Labor (DOL) regulations, at 20 CFR § 655.734(a)(1)(ii)(A), require the posting of notice of a Labor Condition Application (LCA) in instances where individuals holding certain visas (e.g., H-1B) will be working onsite. Where applicable, EY and the Client will work together to develop an appropriate notice to enable compliance with this requirement.

In providing the Services, EY also will utilize and rely on data and information from third party sources (including publicly-available information).

The Reports are based on facts of which EY is aware, estimates, assumptions and other information derived from its research, knowledge of the industry and meetings with Client or Client's advisors. EY will state EY's information sources and the basis of EY's estimates and assumptions in any written Report. All such estimates and assumptions are inherently subject to uncertainty and variation depending upon future events, which cannot be accurately foreseen. EY's estimates will in any event be based on general economic conditions as they exist on the date of the analysis and will not contemplate the potential for any sudden or sharp rise or decline in those conditions. EY makes no representation, and gives no assurance, that any estimates or results can or will be achieved. Actual results may vary materially from the estimates presented.

Any financial analyses contained in the Reports are not forecasts or projections as defined by the AICPA. Rather, they are used as contemplated by the Uniform Standards of Professional Appraisal Practice ("USPAP"). Accordingly, terms such as "project," "projections," or "forecast" in the Reports relate to broad and generally perceived expectations of future events or market conditions.

EY will not conduct any architectural, engineering, soil or subsoil study, property survey, or environmental investigation, and will not assume any liability in connection with such matters.

Reports may be subject to review by the Appraisal Institute or its duly authorized representatives. These Services do not include any property appraisal in accordance with the USPAP.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client.  After the completion of the Transaction, all information relating to the Target obtained by EY in connection with this SOW shall be Client Information. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

**Timetable**

Unless otherwise agreed, and subject to the terms of the Agreement, EY expects to perform the Services during the period from the date of execution of this agreement through the date of emergence from bankruptcy, expected by January or February of 2025  .



**Contacts**

Client has identified Jonathan Arsenault and Eric Seeton as Client's contacts with whom EY should communicate about these Services. Client's contact at EY for these Services will be Chade Lowe and Kris Shirley.

**Fees and expenses**

The General Terms and Conditions of the Agreement address our fees and expenses generally. You shall pay fees for the Services, which fees are based on the time that our professionals spend performing them. The table below reflects our agreed upon rates, by level of professional, as follows:

| Valuation Rates | |
|---|---|
| **Level** | **Hourly Rates** |
| Partner | $750 |
| Managing Director | $700 |
| Senior Manager | $600 |
| Manager | $500 |
| Senior | $400 |
| Staff | $250 |

In addition, Client shall reimburse EY for expenses incurred in connection with the performance of the Services, including reasonable and customary out-of-pocket expenses such as travel, meals accommodations and other expenses specifically related to this engagement, as well as costs of purchasing data and proprietary technology costs. EY may receive rebates in connection with certain purchases, which are used to reduce charges that EY would otherwise pass on to its clients. Actual out-of-pocket costs incurred by EY while executing the Services will be billed separately, not to exceed 5% of fees.

We will submit an itemized and detailed billing statement, and we will request payment of our fees and expenses, in accordance with the United States Bankruptcy Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the United States Bankruptcy Court for Delaware ("Local Rules") and any relevant administrative orders. We will submit our invoices as the work progresses and payment of them will be made upon receipt, or as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant administrative orders allow.



**Building a better working world**

We acknowledge that payment of our fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of the Bankruptcy Court approving the retention of us and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications.

Client shall also pay all applicable taxes (including VAT and others imposed) incurred in connection with the delivery of the Services or the Reports (except for taxes imposed on EY's income). Client shall also pay any administrative costs that result from billing arrangements specifically requested by Client. EY reserves the right to suspend the Services if any invoices are more than 60 days overdue.

Client's obligation to pay EY's fees and expenses is not contingent upon the results of the Services or the consummation of the proposed transaction.

********

IN WITNESS WHEREOF, EY and Client each caused the SOW to be signed and delivered by its duly authorized representative(s).

*Ernst & Young LLP*

**AGREED:**

Franchise Group, Inc., on behalf of itself and its affiliates

By:_____
DocuSigned by:
*Eric Seeton*
1703A0AAEA6E4E3...

Eric Seeton, Chief Financial Officer

Date:_____
11/18/2024



# Appendix 1 - Statement of Limiting Conditions

1. Nothing has come to EY's attention to cause EY to conclude that the facts and data set forth in this Report are not correct.

2. No investigation of the title to the subject company and subject assets has been made, and the owner's claim to the subject company and subject assets is assumed to be valid. To the extent that Ernst & Young LLP's services include any analysis of assets, properties or business interests, Ernst & Young LLP assumes no responsibility for matters of legal description or title, and Ernst & Young LLP shall be entitled to make the following assumptions: (i) title is good and marketable, (ii) there exist no liens or encumbrances, (iii) there is full compliance with all applicable regulations and laws, and (iv) all required licenses, certificates of occupancy, consents, or legislative or administrative authority have been or can be obtained or renewed for any use on which Ernst & Young LLP services are to be based.

   Where real estate is included in EY's analysis, Ernst & Young LLP shall not assume any responsibility for identifying structural conditions of property. No analysis will be made of the subsurface or the hazardous waste conditions, if any. EY's services shall not take into consideration the possibility of the existence of toxic substances, hazardous or contaminated conditions, or underground storage tanks, nor the costs associated with remediating such substances or conditions. Ernst & Young LLP is not qualified to detect, and shall not be responsible for detecting, such substance or conditions.

3. This Report has been prepared solely for the purpose stated, and may not be used for any other purpose. Neither this Report nor any portions hereof may be copied or disseminated through advertising, public relations, news, sales, Securities and Exchange Commission disclosure documents or any other public (or private) media without the express prior written approval of Ernst & Young LLP.

4. The recommendations, opinions, or calculations of values contained herein are not intended to represent the values of the subject company, assets, or interests at any time other than the effective date that is specifically stated in this Report. Changes in market conditions could result in values substantially different than those presented at the stated effective date. EY assumes no responsibility for changes in market conditions or for the inability of the owner to locate a purchaser of the subject company, assets or interests at the values stated herein.

   With respect to EY's analysis, EY's work did not include an analysis of the potential impact of any unexpected sharp rise or decline in local or general financial market or economic conditions or technological changes.

5. No responsibility is assumed for information furnished by others, including management, and such information is concluded to be reliable.

   In the course of EY's analysis, EY was provided with written information, oral information, and/or data in electronic form, related to the structure, operation, and financial performance of the subject company / assets / interests. EY has relied upon this information in EY's analyses and in the preparation of this Report and have not independently verified its accuracy or completeness.



6. Certain historical financial data used in EY's valuation were derived from audited and/or unaudited financial statements and are the responsibility of management. The financial statements may include disclosures required by generally accepted accounting principles. EY has not independently verified the accuracy or completeness of this data provided and do not express an opinion or offer any form of assurance regarding its accuracy or completeness.

7. The estimates of cash flow data included herein are solely for use in the valuation analysis and are not intended for use as forecasts or projections of future operations. EY has not performed an examination or compilation, nor has EY performed an agreed-upon procedures engagement with regard to the accompanying cash flow data in accordance with standards prescribed by the American Institute of Certified Public Accountants, and, accordingly, do not express an opinion or offer any form of assurance on the accompanying cash flow data or their underlying assumptions. Furthermore, there will usually be differences between estimated and actual results because events and circumstances frequently do not occur as expected, and those differences may be significant.

8. EY assumes no responsibility for any financial and tax reporting judgments, which are appropriately those of management. It is EY's understanding that management accepts responsibility for any financial statement and tax reporting issues with respect to the subject company / assets / interests covered by EY's analysis, and for the ultimate use of EY's Report.

9. Ernst & Young LLP is not required to furnish additional work or services, or to give testimony, or be in attendance in court with reference to the company / assets, interests in question or to update any Report, recommendation, opinion, calculation, analysis, conclusion or other document relating to its services for any events or circumstances unless arrangements acceptable to Ernst & Young LLP have been separately agreed with the Company.

10. This Report does not comprise a Comprehensive Written Business Valuation Report as described in BVS-VIII, by the Business Valuation Committee of the American Society of Appraisers (ASA) and approved by the ASA Board of Governors. Certain sections may have been omitted from this Report. Where applicable, the data underlying these sections will be retained in EY's working papers.

Disclosure of the contents of this Report may be governed by the Bylaws and Regulations of the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. Possession of this Report or a copy thereof, or any part thereof, does not carry with it the right of publication, nor may it be used by anyone but the party for whom it has been prepared without the prior written consent and approval of Ernst & Young LLP.

**Exhibit A-9**

**Accounting Assistance Statement of Work**

## Statement of Work

This Statement of Work, dated November 15, 2024 (this "SOW"), is made by Ernst & Young LLP ("EY") and Franchise Group, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the Agreement, dated November 1 2024 (the "Agreement"), between EY and Franchise Group, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about November 3, 2024 with the United States Bankruptcy Court for the state of Delaware (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings.  This SOW shall be effective as of November 3, 2024.

Except as otherwise set forth in this SOW, this SOW incorporates by reference, and is deemed to be a part of, the Agreement. The additional terms and conditions of this SOW shall apply only to the Services covered by this SOW and not to Services covered by any other Statement of Work pursuant to the Agreement. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement, and references in the Agreement to "you" or "Client" shall be deemed references to you.

### Objective and Purpose

The objective of our engagement is to assist the Client with certain accounting assistance (the "Services"), described further below related to the Client's filing of a petition under Chapter 11 for the Bankruptcy Court (the "Transaction") and other accounting and financial reporting considerations as part of their periodic financial statements close.

We will provide these Services to you, contingent upon the Bankruptcy Court's approval of our retention in accordance with the terms and conditions that are set forth in the Agreement (inclusive of this SOW).

The Services may be modified from time to time by our mutual written agreement and approval of the Bankruptcy Court, if required.

Client acknowledges and agrees that, whether or not this SOW has been approved by the Bankruptcy Court at the time any Report is rendered, any such Report rendered by EY prior to the delivery of its final Report is preliminary in nature and cannot be relied upon for any purpose, including penalty protection.

### Scope of services

We will perform the Services under this SOW in accordance with applicable standards established by the American Institute of Certified Public Accountants ("AICPA").

Our scope of services will primarily focus on assisting you with general and technical accounting matters around your financial reporting and documentation of various accounting matters and policies in connection with your preparation of financial statements.  We will also provide assistance with the assessment of the accounting impact of emergence from bankruptcy to allow you to apply fresh-start

accounting in accordance with ASC 852. The Accounting Services related to the Transaction will be delivered in two phases, further described below.

The Services will consist of the following:

**Phase 1 –Fresh Start Assistance**

The following Phase 1 will include services related to fresh-start accounting and the accounting impact of emergence from bankruptcy prior to the confirmation of the Company's ownership structure at emergence.

- Advise and provide insights, observations and training on the general aspects of financial accounting and reporting while in bankruptcy, including, Generally Accepted Accounting Principals (GAAP) and tax accounting matters.

- Advise and provide insights on accounting and reporting issues related to the bankruptcy filing by summarizing the applicable guidance and providing a high level interpretation to an illustrative fact pattern.

- Assist you with your preparation of technical accounting whitepapers addressing client's selection of bankruptcy accounting treatment in compliance with ASC 852, related to the bankruptcy filing and DIP financial statements, including disclosures. Examples of issues include: classification of liabilities subject to compromise and expenses to be included in reorganization expense.

- Assist you with your preparation of debtor in possession financial statements including presentation and disclosures.

- Assist you with your preparation of debtor in possession financial information included in the draft and final Plan of Reorganization. Such information may include historical financial information and summary analysis of the impact of the plan of reorganization (e.g., payment of liabilities subject to compromise and related gain)

- Participate in discussions to help management understand the accounting and reporting implications while in bankruptcy and considerations upon emergence, including GAAP and tax accounting matters.

- Advise and provide insights and observations regarding the preparation of the fresh-start accounting required work steps and provide comments on management's overall project timeline.  Provide generic templates of project charters, status reports and issue logs for company's own customization.

- Advise and provide insights on the technical fresh-start accounting and reporting requirements, including advising on the identification of accounts (including income tax accounts) typically impacted by fresh-start accounting and the fresh start reporting date.  This may include providing examples of fresh-start accounting disclosures, publications or examples of the application of fresh-start accounting, or other information that may assist management with the application of fresh-start accounting.

- Advise and provide comments on technical whitepapers drafted by management related to the analysis of fresh start criteria and disclosures based upon preliminary Plan of Reorganization discussions

- Provide management with generic examples of the application of accounting standards, financial statement presentations or disclosure practices in public filings or other public materials.

**Phase 2 –Fresh Start Assistance**

The following Phase 2 scope will include potential Services after confirmation of the Company's ownership structure and related independence restrictions at emergence. The Accounting Services will include the following:

- Assist you with your preparation of technical accounting whitepapers related to the analysis of fresh start criteria and disclosures based upon final Plan of Reorganization discussions.

- Assist you with your preparation of templates for the financial statement disclosure requirements for the financial statements upon emergence.

- Advise the project management office (PMO) on preparation of the fresh-start accounting required work steps, project setup, governance, training needs, communication protocols and status update and project activity reporting.

- Assist management in drafting any of the related PMO documentation, including (i) drafting project management documentation, (ii) documentation of the minutes or notes of meetings for use by the PMO or management, (iii) coordinating or tracking project activities and performing internal reporting (e.g., status, issues, progress), (iv) coordinating or tracking resources (people, budget, etc.), including tracking overall project or client hours.

- Assist management with the technical fresh-start accounting and reporting requirements, including the applicability of fresh-start, identification of accounts (including income tax accounts) impacted by fresh-start accounting and the fresh start reporting date. Such assistance could include preparation of spreadsheets and journal entries to be approved and recorded by the client to summarize the implications of fresh start accounting.

**Other Accounting Services**

Additionally, at your direction, we will also provide the following accounting assistance in connection with your periodic reporting requirements while emerging from bankruptcy:

- Provide a general interpretation of accounting standards, including general provisions and high-level application to an illustrative fact pattern
- Identify relevant existing authoritative guidance or literature
- Benchmark your accounting policies and financial statement disclosures with industry practice
- Assist you in developing the overall architecture of the accounting policy manual
  Assist you in drafting for your review and approval specific chapters of the accounting policy manual using your existing documentation and accounting policies that you have selected

We understand that you seek assistance in understanding the typical requirements associated with an entity emerging from bankruptcy. We will not conclude on the appropriate accounting treatment based on specific facts or recommend an accounting policy or treatment. Our observations are intended to help you reach your own conclusions and will not constitute concurrence with or support of your proposed accounting or reporting.

In connection with the Services, we may engage in discussions with your personnel, including officers and employees, and outside consultants, as determined by you. We may also read documentation, including contracts and memoranda, as specified by you. Further, we may identify factors or considerations that are relevant to your analysis of identified accounting and financial reporting matters.

As part of the Services, we may assist you on interpreting the relevant accounting and reporting literature based on your general circumstances and provide our views on those factors (including your characteristics and structure) which may influence the choice of your accounting policy. We will not conclude on the appropriate accounting treatment based on specific facts or recommend which accounting policy/treatment you should select/adopt. Any observations we provide are intended to assist you as you reach, document and implement your own conclusions and will not constitute our concurrence with, or support of, your proposed accounting or reporting.

As part of the Services, we may provide certain observations as to our understanding of the views of your independent auditor or the staff of the SEC and/or the Financial Accounting Standards Board ("FASB"). We may provide such observations without having any prior discussion with your independent auditor or the staffs of the SEC and/or FASB and accordingly, their actual views on a particular topic or issue may differ.

The Services will not include any review of your tax situation or the tax principles you apply in connection with your restructuring outside the above-mentioned Services.

We may also provide your personnel, at your written request, with a general training sessions on certain accounting and financial reporting topics, including periodic updates on financial reporting developments.

At your request, we will provide you with the following written Reports[1] in connection with the Services, subject to the other conditions herein:

- Fresh-start accounting work plan timeline
- List of accounts impacted by fresh-start accounting
- Draft workbooks that support your fresh-start accounting disclosures and journal entries
- Draft fresh-start accounting disclosures
- Co-developed examples of calculations and journal entries specific to FTR's transactions (e.g., how to calculate and record a particular reserve) based on accounting treatments you selected
- Examples of the application of accounting standards, financial statement presentations or

---

[1] "Reports" is defined in the General Terms and Conditions as including all information, advice, recommendations or other content of any reports, presentations or other communications we provide to you.

disclosure practices in public filings or other materials

- Feedback and observations on accounting memoranda on complex technical accounting and financial reporting matters

- Comments and guidance, as necessary, on complex accounting matters relevant to the preparation of your financial statements

- Excerpts of relevant technical accounting publications

- Documentation of accounting positions and policies selected by Management

- Draft technical memorandums which outline relevant accounting or reporting standards, including general provisions and application to illustrative fact patterns, and the accounting policies you selected

- Training materials regarding developments on certain accounting and financial reporting topics

- An illustrative accounting policy manual (or certain sections thereof), which will require further adaptation by Client for Client's specific facts and circumstances

- Draft sections of Client's accounting policy manual, based on Client's decisions, to document the policies and accounting practices Client selected

- Examples of calculations and journal entries specific to Client's transactions (e.g., how to calculate and record a particular reserve) based on accounting treatments Client selected

- Findings and recommendations on potential changes in accounting/reporting processes and procedures and related impact on financial systems

- Training materials regarding developments on certain accounting and financial reporting topics

We may, upon your written request, assist you in documenting the conclusions you have reached or positions you have taken on accounting and reporting matters related to the purchase price allocation, including the accounting policies you select.

You will be responsible for implementing and further customizing these Reports, and for your use thereof and their effectiveness. We will have no obligation with respect thereto.

**Out-of-Scope Services**

Any activities not described as Services, as indicated above under Scope of Services, are not covered by the fees stated herein. These services will be considered outside the scope of this SOW and are the responsibility of Client to perform on a timely basis unless otherwise agreed by the parties in writing (in a separate SOW or an amendment to this SOW) and approved by the Bankruptcy Court.

**Limitations on scope**

We will not identify, address or correct any errors or defects in your computer systems, other devices or components thereof ("Systems"), whether or not due to imprecise or ambiguous entry, storage,

interpretation or processing or reporting of data. We will not be responsible for any defect or problem arising out of or related to data processing in any Systems.

The Services will not include any review of your tax situation or the tax principles you apply in connection with your Transaction or otherwise.

The specific nature of the Services will depend both on the amount of detail you provide to us and the timeframe within which you require our assistance. We will not, in connection with the performance of the Services or otherwise, (i) act as a broker for the sale of any securities, (ii) solicit any potential buyer or seller (including you) to engage in any transaction, or (iii) act as a negotiator of a transaction.

**Your specific obligations**

You alone are responsible for the scope and sufficiency of the Services. We also draw your attention to the reservations set out in paragraph 5 of the General Terms and Conditions of the Agreement, as well as your management responsibilities under paragraph 6, your obligations under paragraphs 11 and 12, and your representation, as of the date hereof, under paragraph 26 thereof.

You alone are responsible for any decisions to implement actions identified in the Services, including implementing all aspects of the fresh-start accounting.

You alone are responsible for any decisions to implement actions identified in the Services, including as necessary to apply generally accepted accounting principles ("GAAP") appropriately and for compliance with applicable regulatory requirements, including the determination of your accounting policies. You are solely responsible for the preparation of your financial statements, including making all of the judgments inherent in preparing them.

You are responsible for notifying your independent auditor of the performance of the Accounting Services and consulting with them on the application of accounting principles and your related accounting policies. You agree that we may make inquiries of your independent auditor in connection with the performance of the Accounting Services, provided that, representatives from Client are present during the discussion. You will arrange for periodic status meetings (including consultation, as needed) that include representatives from Client, EY, and your independent auditor.

Notwithstanding the requirements of the Agreement, you may disclose the Reports and refer to us in connection with the Services under this SOW to (1) your external independent auditor to be used in conjunction with the intended use of the Reports outlined in our SOW, subject to its agreement that (a) none of the Reports or any portion thereof shall be further disclosed to any other person or entity except as required by law or professional obligation, and (b) it shall not make any claims against EY arising out of, or in connection with the Reports or our discussions.

You will not, and you will not permit others to, quote or refer to the Reports, any portion, summary or abstract thereof, or to EY or any other EY Firm, in any document filed or distributed in connection with (i) a purchase or sale of securities to which United States or state securities laws ("Securities Laws") are applicable, or (ii) periodic reporting obligations under Securities Laws. You will not contend that any provisions of Securities Laws could invalidate any provision of this Agreement.

**Specific additional terms and conditions**

EY will not render an assurance report or assurance opinion under the Agreement, nor will the Services constitute an audit, review, examination, or other form of attestation, as those terms are identified by the AICPA or by the Public Company Accounting Oversight Board ("PCAOB"). Accordingly, we will not express any form of assurance on accounting matters, financial statements, any financial or other information or internal controls as part of the Services. None of the Services or any Reports will constitute any legal opinion or legal advice. We will not conduct a review to detect fraud or illegal acts.

Notwithstanding anything to the contrary in the Agreement or this SOW, we do not assume any responsibility for any third-party products, programs or services, their performance or compliance with your specifications or otherwise.

We will base any comments or recommendations as to the functional or technical capabilities of any products in use or being considered by you solely on information provided by your vendors, directly or through you. We are not responsible for the completeness or accuracy of any such information or for confirming any of it.

If Client requires or requests EY to access or use Client or third-party systems or devices, EY shall have no responsibility for the confidentiality, security or data protection controls of such systems or devices or for their performance or compliance with Client requirements or applicable law.

Unless prohibited by applicable law, we may provide Client Information to other EY Firms, EY Persons and external third parties, who may collect, use, transfer, store or otherwise process such information in various jurisdictions in which they operate in order to provide support services to any EY Firm and/or assist in the performance of the Services.

Our Reports may contain advice or communications that may be privileged under Internal Revenue Code Section 7525. If such information is provided to persons other than your management, directors, or your legal counsel involved in its preparation or responsible for determining whether to implement it, you may waive such privilege.

Where our written consent under the Agreement is required for you to disclose to a third party any of our Reports (other than Tax Advice), we will also require that third party to execute a non-reliance and release letter acceptable to us in form and substance.

If we receive a request from a third party for any information relating to our Tax Advice, we will notify you and will not release any such information unless you have executed an appropriate written consent authorizing such disclosure and the third party has executed a non-reliance and release letter acceptable to us in form and substance.

The Reports will be based on facts of which EY is aware, estimates, assumptions and other information derived from its research, knowledge of the industry and meetings with you or your advisors. We will state our information sources and the basis of our estimates and assumptions in the Valuation. All such estimates and assumptions are inherently subject to uncertainty and variation depending upon future events, which cannot be accurately foreseen. Our estimates will in any event be based on general economic conditions as they exist on the date of the analysis and will not contemplate the potential for any sudden or sharp rise or decline in those conditions. We make no representation, and give no

assurance, that any estimates or results can or will be achieved. Actual results may vary materially from the estimates presented.

Any financial analyses contained in the Report are not forecasts or projections as defined by the AICPA. Rather, they are used as contemplated by the USPAP. Accordingly, terms such as "project," "projections," or "forecast" in the Reports relate to broad and generally perceived expectations of future events or market conditions.

The Report may be subject to review by the Appraisal Institute or its duly authorized representatives.

To the extent that the Services include the development of training materials ("Training Materials"), the Training Materials are "Materials" as set forth in the General Terms and Conditions and will be delivered solely for implementation by Client and its personnel or by EY for Client. Notwithstanding anything contained in the General Terms and Conditions or this SOW to the contrary, you shall not disclose any Training Materials to any third party for any purpose, including implementation thereof for Client.

Compliance with U.S. immigration requirements may require EY to provide certain information to the U.S. Citizenship and Immigration Services ("USCIS") to confirm that EY employees on certain visas are, in fact, EY employees and not employees of Client or other clients of EY.  This will include providing certain information regarding work locations to support compliance with the visa requirements.  As such, EY may disclose to USCIS information regarding this SOW, including Client's identity and location, as well as redacted agreements.  Upon providing this information, EY will request that USCIS keep any such information confidential.  In further support of these legal requirements, the U.S. Department of Labor (DOL) regulations, at 20 CFR § 655.734(a)(1)(ii)(A), require the posting of notice of a Labor Condition Application (LCA) in instances where individuals holding H-1B visas will be working on Client's premises.  EY and Client will work together to develop an appropriate notice as required.

EY resources will be operating at all times as an employee of and under the direction and control of Ernst & Young U.S. LLP's management, and all activities including supervision, hiring and firing decisions, and performance evaluations are controlled by Ernst & Young U.S. LLP. Client will not have the right to control EY resources. At all times, EY resources will receive direction from an EY Manager while on-site at Client premises.

The Services may touch upon business relationships (such as transactions, agreements, products purchased) you have with a third party (an "EY Client") for which EY (or another EY Firm) performs, or has performed, services unrelated to the business relationships. On behalf of yourself and your affiliates, you acknowledge and consent to our performance of such services for any EY Client, and agree that neither you nor your affiliates will make a claim that these circumstances present a conflict of interest, real or perceived, for us or any other EY Firm. If, however, our services for an EY Client directly relate to the business relationships, we will seek the consent of both you and the EY Client to the continued performance of the Services.  In any event, we confirm that, except as you and the EY Client otherwise agree in writing, your respective confidential or privileged information will remain confidential in accordance with applicable professional standards.

Notwithstanding any obligation under any confidentiality agreement to return or destroy any such

material, you acknowledge that we will retain, in confidence, a file copy of our work papers and Report in accordance with our professional obligations. Nothing contained herein shall benefit or create any right in, or any duty or obligation on our part to, anyone other than you.

We may retain, disclose and use Client Information that we collect in connection with any services we perform for you for research and thought leadership purposes, as well as for the purpose of providing services to other clients, as long as we identify you only in general terms in connection with such information.

You shall not, while we are performing the Services hereunder and for a period of 12 months after they are completed, solicit for employment, or hire, any EY personnel involved in the performance of the Services, provided, that you may generally advertise available positions and hire EY personnel who either respond to such advertisements or who come to you on their own initiative without direct or indirect encouragement from you.

**Timetable**

Unless otherwise agreed, and subject to the General Terms and Conditions of the Agreement, we expect to perform the Services during the period from November 2024 to March 2025.

**Contacts**

You have identified Eric Seeton as your contact with whom we should communicate about these Services. Your contact at EY for these Services will be Georges Leno.

**Engagement Team**

Georges Leno will lead the EY team in providing the Services. If any of these individuals ceases to provide the Services to the Client pursuant to this SOW, EY will so advise the Client and, if that person is replaced, provide the Client with the name of the professional's replacement.  Other staff, not identified herein, may be utilized as required to conduct our work in an efficient manner.

**Fees**

The General Terms and Conditions of the Agreement address our fees and expenses generally.

You shall pay fees for the Services, which fees are based on the time that our professionals spend performing them.  The table below reflects our agreed upon rates, by level of professional, as follows:

| Title | Hourly Rate (USD) |
|---|---|
| Partner/Principal | $750 |
| Managing Director | $700 |
| Senior Manager | $600 |
| Manager | $500 |
| Senior | $400 |
| Staff | $250 |

EY will provide fee updates on a monthly basis.

In addition, you shall reimburse EY for expenses incurred in connection with the performance of the Services, including reasonable and customary out-of-pocket expenses such as travel, meals accommodations and other expenses specifically related to this engagement.

**Billing and Payment**

EY will submit invoices monthly basis in arrears for actual hours and expenses incurred. Payment is due within 30 days following receipt of EY's invoices.

You shall also pay all applicable taxes (including VAT and others imposed) incurred in connection with the delivery of the Services or the Reports (except for taxes imposed on EY's income).  You shall also pay any administrative costs that result from billing arrangements specifically requested by you.

Your obligation to pay our fees and expenses is not contingent upon the results of the Services or the consummation of the proposed transaction.

We will submit an itemized and detailed billing statement, and we will request payment of our fees and expenses, in accordance with the United States Bankruptcy Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the United States Bankruptcy Court for the Southern District of Texas ("Local Rules") and any relevant administrative orders.  We will submit our invoices as the work progresses and payment of them will be made upon receipt, or as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant administrative orders allow.

We acknowledge that payment of our fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of the Bankruptcy Court approving the retention of us and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications.

********

IN WITNESS WHEREOF, EY and Client each caused the SOW to be signed and delivered by its duly authorized representative(s).

*Ernst & Young LLP*

**AGREED:**

Franchise Group, Inc., on behalf of itself and its affiliates

By:_____*Eric Seeton*_____

Eric Seeton, Chief Financial Officer

Date:____11/18/2024_____

**Exhibit A-10**

**Vector Depreciation Statement of Work**

Docusign Envelope ID: 6F7BE5E0-3AEE-474A-987A-D7641AD6B1F51



**Building a better working world**

## Statement of Work

This Statement of Work, dated November 7, 2024 (this "SOW"), is made by Ernst & Young LLP ("EY") and Franchise Group, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the Agreement, dated November 3, 2024 (the "Agreement"), between EY and Franchise Group, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about November 3, 2024 with the United States Bankruptcy Court for the state of Delaware (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings.  This SOW shall be effective as of November 7, 2024.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

**Scope of Services**

EY will provide the following services (the "Services") to Client:

EY will compute tax depreciation using EY's Cost Recovery Vector platform ("Vector") for the tax years ending 12/28/2024 and 12/27/2025. The Services will include:

***Periodic Depreciation Processing***

EY will perform one processing run for the tax years ending 12/28/2024 and 12/27/2025. Additional processing runs may be performed at the request of Client. Each processing run includes the following services:

- Prepare tax additions, disposals, transfers, and cost adjustment Vector import templates. Validate that Client has provided the information necessary to process current period activity. Our scope with respect to this phase of the engagement assumes the following:

  - The information provided by Client reconciles to the general ledger and includes all data points required by the Vector import templates. Any time spent investigating missing/invalid information is out of scope.
  - Dispositions, transfers and cost adjustment detail provided by Client will align with an asset ID within Vector. Time spent tracking down book disposals/transfers that do not align with a corresponding tax asset within Vector is out of scope.

- Process current period depreciation activity for Federal (MACRS), Federal (MACRS) no bonus, and ADS books.

- Provide the following reports / deliverables:

A member firm of Ernst & Young Global Limited



**EY**

Building a better
working world

- o Depreciation Detail Reports (Federal, Federal no Bonus and ADS)
- o Depreciation Summary Reports (Federal, Federal no Bonus and ADS)
- o Depreciation Forecast Report (Based on year to date asset population) (Federal Only)
- o Summary Tax Roll-forward Report (Cost and Accumulated Depreciation) (Federal Only)
- o Summary Box Roll-forward Report (Cost only)
- o Book/Tax Roll-forward and Reconciliation (Book accumulated depreciation included at summary level)

*Out of Scope Activities*

In general, activities not specifically described in the scope of services section are out of scope. Such activities include, but are not limited to the following:

- The reconciliation of unknown book/tax variances. We will assist with reconstructing the tax (including topside schedule pushdowns, if applicable), but our scope assumes that these reconciliations have already been performed and the necessary reconciling detail exists at the asset level.

- Remediation of impermissible depreciation methods with respect to legacy assets (i.e., identification of method change opportunities, filing of Forms 3115, etc.).

- Creation of any tax books not already in existence in Client source system (e.g., if E&P tax book does not already exist, recreating it from scratch is out of scope).

- Modifications to standard Vector reports or creation of new custom Vector reports after the implementation year.

- Designing specific state adjustment methodologies to account for improper state adjustments in prior years.
- Performing an implementation for newly acquired entities after the initial implementation year.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.



To use EY Interact My Documents ("EYI MyDocs") for collaboration with Client, EY will create a client collaboration workspace with a sharing library to which Client's employees designated by Client and at least one member of the EY engagement team are provided access ("Client Library"). Client may use the Client Library to deposit information and retrieve EY deliverables. EY may establish a number of Client Libraries on the client collaboration workspace where Client and EY can exchange documents and information; everyone with access to a particular library will have access to all documents stored in the library. The client collaboration workspace should not be used as a repository by Client. Client is responsible for informing EY in writing the names and email addresses of Client's employees who are to have access to each EYI MyDocs Client Library and for notifying EY in writing when access for any Client employee is to be removed. Client will provide the name and email address of the Client representative who will inform EY which Client employees are to have access.

A copy of the final deliverables will remain available to Client in EYI MyDocs in a read-only state for up to one (1) year after the engagement closes. Information contained in engagement dashboards (if used) within EYI MyDocs, draft work product and task tracking data will not remain available after the engagement closes.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

EY may subcontract a portion of the Services to one or more EY Firms and to subcontractors working under EY's direction who may communicate directly with Client. EY, however, will remain solely responsible to Client for the performance of the Services. If EY has prepared or reviewed (or will prepare or review) Client's U.S. income tax returns, Client authorizes the EY Firms, including those located outside the United States, and EY's subcontractors to disclose information received or generated in connection with the preparation of any such U.S. income tax returns of Client to and among each other for the purpose of rendering the Services and discussing and providing other services to Client. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will remain valid for three years following the completion of the Services.

## Contacts

Client has identified Eric Seeton as Client's contact with whom EY should communicate about these Services. Client's contact at EY for these Services will be Derrick Wagler and Kelly Winfree.



**Fees**

The fees for the engagement will be between $25,000 and $28,000 per processing run. Any additional processing runs requested by Client will require additional fees and will be dependent upon the specific fact pattern for required entities. If additional entities are acquired, a separate implementation related to only those entities may be required. This implementation will result in additional fees and will be dependent upon the specific fact pattern for that entity. Any additional fees will be agreed upon prior to the commencement of the additional work to be performed. Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client. In addition, a charge will be added to EY's fees reflecting an estimated technology cost incurred equal to 3% of the professional fees for this engagement.

Any fee, or estimate thereof, for the Services under this SOW assumes that Client will, in a timely manner, provide, or cause to be provided, to EY all appropriate information and assistance, and that the scope and complexity of such Services will be consistent with our prior discussions, as well as the description thereof above. During the term of this SOW, if EY determines that any additional work is necessary, whether at Client's request, because the complexity of the project increases, or Client is not able to perform its obligations as mentioned above, EY will promptly contact Client to discuss any adjustments to the scope of work or EY's fees.

**IN WITNESS WHEREOF,** EY and Client each caused this SOW to be signed and delivered by its duly authorized representative(s).

*Ernst & Young LLP*

**AGREED:**

Franchise Group, Inc., on behalf of itself and its affiliates

By: _Eric Seton_
    1703A0AEA6E4E5...

    Eric Seeton, Chief Financial Officer

Date: 11/18/2024

**Exhibit B**

**Names of Parties in Interest and whether a Client Engagement has been Initiated by
EYGL Member Firms During the Last Three Years**

Results of Connections Check

| No. | Category | Entity Name (Full Name as per PIIL) | Connection | No Connection |
|---|---|---|---|---|
| 1 | Debtor Entities & Related Subsidiaries | American Freight FFO, LLC | X | |
| 2 | Debtor Entities & Related Subsidiaries | American Freight Franchising, LLC | X | |
| 3 | Debtor Entities & Related Subsidiaries | American Freight Franchisor, LLC | X | |
| 4 | Debtor Entities & Related Subsidiaries | American Freight Group, LLC | X | |
| 5 | Debtor Entities & Related Subsidiaries | American Freight Holdings, LLC | X | |
| 6 | Debtor Entities & Related Subsidiaries | American Freight Management Company, LLC | X | |
| 7 | Debtor Entities & Related Subsidiaries | American Freight Outlet Stores, LLC | X | |
| 8 | Debtor Entities & Related Subsidiaries | American Freight, LLC | X | |
| 9 | Debtor Entities & Related Subsidiaries | B. Riley Receivables II, LLC | X | |
| 10 | Debtor Entities & Related Subsidiaries | Betancourt Sports Nutrition, LLC | X | |
| 11 | Debtor Entities & Related Subsidiaries | Buddy's Franchising and Licensing, LLC | X | |
| 12 | Debtor Entities & Related Subsidiaries | Buddy's New Co, LLC | X | |
| 13 | Debtor Entities & Related Subsidiaries | Educate, Inc. | X | |
| 14 | Debtor Entities & Related Subsidiaries | Franchise Group Acquisition TM, LLC | X | |
| 15 | Debtor Entities & Related Subsidiaries | Franchise Group Intermediate AF, LLC | X | |
| 16 | Debtor Entities & Related Subsidiaries | Franchise Group Intermediate B, LLC | X | |
| 17 | Debtor Entities & Related Subsidiaries | Franchise Group Intermediate BHF LLC | X | |
| 18 | Debtor Entities & Related Subsidiaries | Franchise Group Intermediate Holdco, LLC | X | |
| 19 | Debtor Entities & Related Subsidiaries | Franchise Group Intermediate L, LLC | X | |
| 20 | Debtor Entities & Related Subsidiaries | Franchise Group Intermediate PSP, LLC | X | |
| 21 | Debtor Entities & Related Subsidiaries | Franchise Group Intermediate S, LLC | X | |
| 22 | Debtor Entities & Related Subsidiaries | Franchise Group Intermediate SL, LLC | X | |
| 23 | Debtor Entities & Related Subsidiaries | Franchise Group Intermediate V, LLC | X | |
| 24 | Debtor Entities & Related Subsidiaries | Franchise Group New Holdco, LLC | X | |
| 25 | Debtor Entities & Related Subsidiaries | Franchise Group Newco BHF, LLC | X | |
| 26 | Debtor Entities & Related Subsidiaries | Franchise Group Newco PSP, LLC | X | |
| 27 | Debtor Entities & Related Subsidiaries | Franchise Group Newco S, LLC | X | |
| 28 | Debtor Entities & Related Subsidiaries | Franchise Group Newco SL, LLC | X | |
| 29 | Debtor Entities & Related Subsidiaries | Franchise Group Newco V, LLC | X | |
| 30 | Debtor Entities & Related Subsidiaries | Franchise Group, Inc. | X | |
| 31 | Debtor Entities & Related Subsidiaries | Freedom VCM Holdings, LLC | X | |
| 32 | Debtor Entities & Related Subsidiaries | Freedom VCM Interco Holdings, Inc. | X | |
| 33 | Debtor Entities & Related Subsidiaries | Freedom VCM Interco, Inc. | X | |
| 34 | Debtor Entities & Related Subsidiaries | Freedom VCM Receivables, Inc. | X | |
| 35 | Debtor Entities & Related Subsidiaries | Freedom VCM, Inc. | X | |
| 36 | Debtor Entities & Related Subsidiaries | Home and Appliance Outlet LLC | X | |
| 37 | Debtor Entities & Related Subsidiaries | Pet Supplies "Plus", LLC | X | |
| 38 | Debtor Entities & Related Subsidiaries | PSP Distribution, LLC | X | |
| 39 | Debtor Entities & Related Subsidiaries | PSP Franchising, LLC | X | |
| 40 | Debtor Entities & Related Subsidiaries | PSP Group, LLC | X | |
| 41 | Debtor Entities & Related Subsidiaries | PSP Midco, LLC | X | |
| 42 | Debtor Entities & Related Subsidiaries | PSP Service Newco, LLC | X | |
| 43 | Debtor Entities & Related Subsidiaries | PSP Stores, LLC (Ohio) | X | |
| 44 | Debtor Entities & Related Subsidiaries | PSP Subco, LLC | X | |
| 45 | Debtor Entities & Related Subsidiaries | Valor Acquisition, LLC | X | |
| 46 | Debtor Entities & Related Subsidiaries | Vitamin Shoppe Florida, LLC | X | |
| 47 | Debtor Entities & Related Subsidiaries | Vitamin Shoppe Franchising, LLC | X | |
| 48 | Debtor Entities & Related Subsidiaries | Vitamin Shoppe Global, LLC | X | |
| 49 | Debtor Entities & Related Subsidiaries | Vitamin Shoppe Industries LLC | X | |
| 50 | Debtor Entities & Related Subsidiaries | Vitamin Shoppe Mariner, LLC | X | |
| 51 | Debtor Entities & Related Subsidiaries | Vitamin Shoppe Procurement Services, LLC | X | |
| 52 | Debtor Entities & Related Subsidiaries | W.S. Badcock Corporation | X | |
| 53 | Debtor Entities & Related Subsidiaries | WNW Franchising, LLC | X | |
| 54 | Debtor Entities & Related Subsidiaries | WNW Stores, LLC | X | |
| 55 | Directors and Officers | Aaron Granger | | X |
| 56 | Directors and Officers | Alissa Ahlman | | X |
| 57 | Directors and Officers | Andrew Kaminsky | | X |
| 58 | Directors and Officers | Andrew Laudato | | X |
| 59 | Directors and Officers | Andrew M. Laurence | | X |
| 60 | Directors and Officers | Anthony Block-Belmonte | | X |
| 61 | Directors and Officers | Brian Hoke | | X |
| 62 | Directors and Officers | Bryant R. Riley | | X |
| 63 | Directors and Officers | Chris Meyer | | X |
| 64 | Directors and Officers | Christopher Rowland | | X |
| 65 | Directors and Officers | Daniel McNamara | | X |
| 66 | Directors and Officers | Eric Seeton | | X |
| 67 | Directors and Officers | Jacob Jones | | X |
| 68 | Directors and Officers | Jeff Van Orden | | X |
| 69 | Directors and Officers | Jeffrey Seghi | | X |
| 70 | Directors and Officers | Jemma Lawrance | | X |
| 71 | Directors and Officers | John Hartmann | | X |
| 72 | Directors and Officers | Kenneth Miles Tedder | | X |

Results of Connections Check

| No. | Category | Entity Name (Full Name as per PIIL) | Connection | No Connection |
|---|---|---|---|---|
| 73 | Directors and Officers | Lee Wright | | X |
| 74 | Directors and Officers | Michael Bennett | | X |
| 75 | Directors and Officers | Mike Gray | | X |
| 76 | Directors and Officers | Muriel Gonzalez | | X |
| 77 | Directors and Officers | Neal Panza | | X |
| 78 | Directors and Officers | Norman McLeod | | X |
| 79 | Directors and Officers | Peter Corsa | | X |
| 80 | Directors and Officers | Philip Etter | | X |
| 81 | Directors and Officers | Teresa Orth | | X |
| 82 | Directors and Officers | Tiffany McMillan-McWaters | | X |
| 83 | Directors and Officers | Todd Arden | | X |
| 84 | Directors and Officers | Todd Evans | | X |
| 85 | Professionals | AlixPartners LLP | X | |
| 86 | Professionals | Davis Polk & Wardwell LLP | X | |
| 87 | Professionals | Deloitte & Touche LLP | X | |
| 88 | Professionals | Ducera Partners LLC | | X |
| 89 | Professionals | Evercore LP | X | |
| 90 | Professionals | Foley & Lardner LLP | X | |
| 91 | Professionals | Gordon Brothers Asset Advisors, LLC | | X |
| 92 | Professionals | Gordon Rees Scully Mansukhani, LLP | X | |
| 93 | Professionals | Grant Thornton LLP | X | |
| 94 | Professionals | Guggenheim Securities, LLC | X | |
| 95 | Professionals | Holland & Knight, LLP | X | |
| 96 | Professionals | Latham & Watkins LLP | X | |
| 97 | Professionals | Lazard Group LLC | X | |
| 98 | Professionals | M3 Advisory Partners, LP | | X |
| 99 | Professionals | Morris, Nichols, Arsht & Tunnell LLP | X | |
| 100 | Professionals | Paul Hastings LLP | X | |
| 101 | Professionals | Paul, Weiss, Rifkind, Whaton & Garrison LLP | X | |
| 102 | Professionals | Porter Wright Morris & Arthur LLP | | X |
| 103 | Professionals | Ryan, LLC | | X |
| 104 | Professionals | Sheppard Mullin Richter & Hampton LLP | X | |
| 105 | Professionals | Troutman Pepper Hamilton Sanders LLP | X | |
| 106 | Professionals | Willkie Farr & Gallagher LLP | X | |
| 107 | Professionals | Young Conaway Stargatt & Taylor, LLP | | X |
| 108 | Administrative and Collateral Agents | Alter Domus (US) LLC | X | |
| 109 | Administrative and Collateral Agents | JPMorgan Chase Bank, N.A. | X | |
| 110 | DE – Judges | Chan, Ashely M. | | X |
| 111 | DE – Judges | Dorsey, John T. | | X |
| 112 | DE – Judges | Goldblatt, Craig T. | | X |
| 113 | DE – Judges | Horan, Thomas M. | | X |
| 114 | DE – Judges | Owens, Karen B. | | X |
| 115 | DE – Judges | Shannon, Brendan L. | | X |
| 116 | DE – Judges | Silverstein, Laurie Selber | | X |
| 117 | DE – Judges | Stickles, J. Kate | | X |
| 118 | DE – Judges | Walrath, Mary F. | | X |
| 119 | DE – Office of the United States Trustee | Andrew R. Vara | | X |
| 120 | DE – Office of the United States Trustee | Benjamin Hackman | | X |
| 121 | DE – Office of the United States Trustee | Christine Green | | X |
| 122 | DE – Office of the United States Trustee | Diane Giordano | | X |
| 123 | DE – Office of the United States Trustee | Dion Wynn | | X |
| 124 | DE – Office of the United States Trustee | Edith A. Serrano | | X |
| 125 | DE – Office of the United States Trustee | Elizabeth Thomas | | X |
| 126 | DE – Office of the United States Trustee | Fang Bu | | X |
| 127 | DE – Office of the United States Trustee | Hannah M. McCollum | | X |
| 128 | DE – Office of the United States Trustee | Holly Dice | | X |
| 129 | DE – Office of the United States Trustee | James R. O'Malley | | X |
| 130 | DE – Office of the United States Trustee | Jane Leamy | | X |
| 131 | DE – Office of the United States Trustee | Jonathan Lipshie | | X |
| 132 | DE – Office of the United States Trustee | Jonathan Nyaku | | X |
| 133 | DE – Office of the United States Trustee | Joseph Cudia | | X |
| 134 | DE – Office of the United States Trustee | Joseph McMahon | | X |
| 135 | DE – Office of the United States Trustee | Lauren Attix | | X |
| 136 | DE – Office of the United States Trustee | Linda Casey | | X |
| 137 | DE – Office of the United States Trustee | Linda Richenderfer | | X |
| 138 | DE – Office of the United States Trustee | Malcolm M. Bates | | X |
| 139 | DE – Office of the United States Trustee | Michael Girello | | X |
| 140 | DE – Office of the United States Trustee | Nyanquoi Jones | | X |
| 141 | DE – Office of the United States Trustee | Richard Schepacarter | | X |
| 142 | DE – Office of the United States Trustee | Rosa Sierra-Fox | | X |
| 143 | DE – Office of the United States Trustee | Shakima L. Dortch | | X |
| 144 | DE – Office of the United States Trustee | Timothy J. Fox, Jr. | | X |

Results of Connections Check

| No. | Category | Entity Name (Full Name as per PIIL) | Connection | No Connection |
|---|---|---|---|---|
| 145 | Landlords & Lessors | 103rd STREET 6024, LLC | | X |
| 146 | Landlords & Lessors | 1210 Morena West LLC | | X |
| 147 | Landlords & Lessors | 1230 Zion, LLC | | X |
| 148 | Landlords & Lessors | 1700 Eubank, LLC | | X |
| 149 | Landlords & Lessors | 1997 GRP Limited Partnership | | X |
| 150 | Landlords & Lessors | 2151 Highland Partners, LLC | | X |
| 151 | Landlords & Lessors | 2885 Gender Road, LLC | | X |
| 152 | Landlords & Lessors | 30X30 34th Street Lubbock Partners, LLC | | X |
| 153 | Landlords & Lessors | 3200 HWY 13, LLC | | X |
| 154 | Landlords & Lessors | 4100 Tomlynn Street-Rebkee, LLC and Tomlynn Street-Fountainhead, LLC | | X |
| 155 | Landlords & Lessors | 4116 OBT Investments, LLC | | X |
| 156 | Landlords & Lessors | 425 Broadway RE Holdings LLC & 431 Broadway RE Holdings LLC | | X |
| 157 | Landlords & Lessors | 4801 Washtenaw LLC | | X |
| 158 | Landlords & Lessors | 5737-5848 North Elizabeth Street Holdings, LLC | | X |
| 159 | Landlords & Lessors | 6001 Powerline, LLC | | X |
| 160 | Landlords & Lessors | 65 Holmes Investment Partners LLC | | X |
| 161 | Landlords & Lessors | 6588 LLC | | X |
| 162 | Landlords & Lessors | 7000 S May Ave, LLC | | X |
| 163 | Landlords & Lessors | 801 South Ft. Hood, LLC | | X |
| 164 | Landlords & Lessors | 900-71, LLC | | X |
| 165 | Landlords & Lessors | A. Roland Kimbrell Trust | | X |
| 166 | Landlords & Lessors | Acorn Ridge Properties LLC, JDM Capital, LLC, MO Partners, LLC, Confluence Investment LLC | | X |
| 167 | Landlords & Lessors | Afreight Holdings, LLC | | X |
| 168 | Landlords & Lessors | AJDC 2, LLC | | X |
| 169 | Landlords & Lessors | Albany Plaza Shopping Center LLC | | X |
| 170 | Landlords & Lessors | Alisan LLC and Roseff LLC | | X |
| 171 | Landlords & Lessors | All American Association, LLC and Yvonne Keff | | X |
| 172 | Landlords & Lessors | Allentex, LP | | X |
| 173 | Landlords & Lessors | Amerco Real Estate Company | | X |
| 174 | Landlords & Lessors | AMG Properties Inc. | | X |
| 175 | Landlords & Lessors | Amplify Credit Union | | X |
| 176 | Landlords & Lessors | Anderson Plaza, LLC | | X |
| 177 | Landlords & Lessors | Arch Village Management Realty LLC | | X |
| 178 | Landlords & Lessors | Ares Holdings, L.L.C. | X | |
| 179 | Landlords & Lessors | Arizona Mills Mall, LLC | | X |
| 180 | Landlords & Lessors | AR-Park Shopping Center, LLC and JSP-Park Shopping Center, LLC | | X |
| 181 | Landlords & Lessors | Atlanta Industrial TT, LLC | | X |
| 182 | Landlords & Lessors | B.J. McCord D/B/A McCord Business Center | | X |
| 183 | Landlords & Lessors | B33 Broadview Village LLC | | X |
| 184 | Landlords & Lessors | Baldwin Gardens, Inc. | | X |
| 185 | Landlords & Lessors | Bane Holdings of Tallahassee, LLC | | X |
| 186 | Landlords & Lessors | Banner Partners, LLC | | X |
| 187 | Landlords & Lessors | Bardstown S.C., LLC | | X |
| 188 | Landlords & Lessors | BC Airport, LLC | | X |
| 189 | Landlords & Lessors | Bell-51st, LLC | | X |
| 190 | Landlords & Lessors | Belt 98, Inc. | | X |
| 191 | Landlords & Lessors | Berryessa Plaza LLC | | X |
| 192 | Landlords & Lessors | BG Plaza, LLC | | X |
| 193 | Landlords & Lessors | Boatlanding Development Co., Inc. | | X |
| 194 | Landlords & Lessors | Bostick Development, L.C. | | X |
| 195 | Landlords & Lessors | BRC Hendersonville, LLC | | X |
| 196 | Landlords & Lessors | BRE Mariner Venice Shopping Center LLC | | X |
| 197 | Landlords & Lessors | BRE Retail NP Festival Centre Owner LLC | | X |
| 198 | Landlords & Lessors | Brierwood Village LLC | | X |
| 199 | Landlords & Lessors | Brighton Landmark, LLC | | X |
| 200 | Landlords & Lessors | Brixmor Holdings 8 SPE, LLC | | X |
| 201 | Landlords & Lessors | Brixmor SPE 5 LLC | | X |
| 202 | Landlords & Lessors | Brixton Rogue, LLC | | X |
| 203 | Landlords & Lessors | Brookhill V Acquisition, LLC | | X |
| 204 | Landlords & Lessors | Brooksville Commercial Properties, LLC and Oak Tree Lane, LLC | | X |
| 205 | Landlords & Lessors | Brown Deer Mall, LLC | | X |
| 206 | Landlords & Lessors | Bruce Howe Trust | | X |
| 207 | Landlords & Lessors | BSW/DMW Properties LLC | | X |
| 208 | Landlords & Lessors | Cafaro Leasing Company, LTD. | | X |
| 209 | Landlords & Lessors | Candler RD Plaza GA LLC | | X |
| 210 | Landlords & Lessors | Cedar Golden Triangle, LLC | | X |
| 211 | Landlords & Lessors | Centerpoint 550, LLC | | X |
| 212 | Landlords & Lessors | Centerview Plaza, LLC | | X |
| 213 | Landlords & Lessors | Central Mall Port Arthur Realty Holding, LLC | | X |
| 214 | Landlords & Lessors | Certified Capital, LP, Horowitz Holdings, LLC, Asset Acquisitions, LLC, and 3610 Partners, GP | | X |

Results of Connections Check

| No. | Category | Entity Name (Full Name as per PIIL) | Connection | No Connection |
|---|---|---|---|---|
| 215 | Landlords & Lessors | CETA Group Limited Partnership | X | |
| 216 | Landlords & Lessors | Chapel Hills Realty LLC, Chapel Hills CH LLC, and Chapel Hills Nassim LLC | | X |
| 217 | Landlords & Lessors | Charleigh Davis and TCCB Properties | | X |
| 218 | Landlords & Lessors | Chicago Title & Trust Company, As Trustee Under Trust Agreement Dated 10/10/1984 and Known as Trust No. 1086065 | | X |
| 219 | Landlords & Lessors | Chillicothe Shopping Center, LP | | X |
| 220 | Landlords & Lessors | Chris McCarty Company, LLC | | X |
| 221 | Landlords & Lessors | Cielo Paso Las Tiendas, L.P. | | X |
| 222 | Landlords & Lessors | Circle City Property Group Inc. | | X |
| 223 | Landlords & Lessors | Citimark Charleston, LLC | | X |
| 224 | Landlords & Lessors | CJM Limited Liability Limited Partnership | | X |
| 225 | Landlords & Lessors | Clear Creek Brothers - CV, LLC | | X |
| 226 | Landlords & Lessors | Clear Lake Center, L.P. | | X |
| 227 | Landlords & Lessors | Clendenin Partners | | X |
| 228 | Landlords & Lessors | CLPF-Essex Green, LLC | | X |
| 229 | Landlords & Lessors | Cobblestone Square Company, Ltd. | | X |
| 230 | Landlords & Lessors | ColFin 2015-2 Industrial Owner, LLC | | X |
| 231 | Landlords & Lessors | Colony Mills Enterprises, LLC | | X |
| 232 | Landlords & Lessors | Combined Properties Limited Partnership | | X |
| 233 | Landlords & Lessors | Commercial Properties Associates, LLP | | X |
| 234 | Landlords & Lessors | Concord Retail Investment Group, LLC | | X |
| 235 | Landlords & Lessors | Core MR Westview, LLC | | X |
| 236 | Landlords & Lessors | Costco-Innovel Owner LLC | | X |
| 237 | Landlords & Lessors | Costco-Innovel Properties LLC | | X |
| 238 | Landlords & Lessors | Creekstone/Juban I, LLC | | X |
| 239 | Landlords & Lessors | Crossing Point LLC | | X |
| 240 | Landlords & Lessors | Crossroads Centre II, LLC | | X |
| 241 | Landlords & Lessors | Crossroads Plaza, LLC | | X |
| 242 | Landlords & Lessors | Crossroads Sunset Holdings, LLC | | X |
| 243 | Landlords & Lessors | Cuyahoga Investments, LLC | | X |
| 244 | Landlords & Lessors | CWP/Arlington LLC | | X |
| 245 | Landlords & Lessors | D3 New Albany, LLC | | X |
| 246 | Landlords & Lessors | Daniel G. Kamin Wadsworth Enterprises | | X |
| 247 | Landlords & Lessors | Daniel P. Hagaman | | X |
| 248 | Landlords & Lessors | Danville Riverside Partners, LLC | | X |
| 249 | Landlords & Lessors | Daytona Commons, LLC | | X |
| 250 | Landlords & Lessors | DCT Presidents Drive LLC | | X |
| 251 | Landlords & Lessors | DDR Carolina Pavilion LP | | X |
| 252 | Landlords & Lessors | Dennis R. Phillips Revocable Trust | | X |
| 253 | Landlords & Lessors | Derby Improvements, LLC | | X |
| 254 | Landlords & Lessors | DES 2015, LLC and CJCM, LLC-Series CV505 | | X |
| 255 | Landlords & Lessors | Dixie Manor, LLC | | X |
| 256 | Landlords & Lessors | Donna M. Rainwater & Larry J. Rainwater | | X |
| 257 | Landlords & Lessors | Donna Rainwater Reece, Larry J. Rainwater, R. Bryan Whitmire and Karla J. Whitmire | | X |
| 258 | Landlords & Lessors | Douglas C. Foyt and Trailers for Sale or Rent, Inc. | | X |
| 259 | Landlords & Lessors | Dyn Sycamore Investments, L.L.C. | | X |
| 260 | Landlords & Lessors | E & L Investments LLC | | X |
| 261 | Landlords & Lessors | E.W. Thompson, Inc. | | X |
| 262 | Landlords & Lessors | Eagle Water, LLC | | X |
| 263 | Landlords & Lessors | Eagle-North Hills Shopping Centre LP | | X |
| 264 | Landlords & Lessors | Eastlake Edison LLC and Eastlake Milford LLC | | X |
| 265 | Landlords & Lessors | Economy Square, Inc. | | X |
| 266 | Landlords & Lessors | Ellis Chai LLC | | X |
| 267 | Landlords & Lessors | Esue LLC | | X |
| 268 | Landlords & Lessors | Ethan Conrad Properties, Inc. | | X |
| 269 | Landlords & Lessors | Excel Realty Partners, L.P. | | X |
| 270 | Landlords & Lessors | ExchangeRight Value-Add Portfolio 2 Master Lessee, LLC | | X |
| 271 | Landlords & Lessors | F.M.K., LLC | | X |
| 272 | Landlords & Lessors | Fairview Heights Realty, LLC and Fairview Nassim LLC | | X |
| 273 | Landlords & Lessors | Fall River Shopping Center North, LLC | | X |
| 274 | Landlords & Lessors | Faye Gross | | X |
| 275 | Landlords & Lessors | Fiddler's Run, LLC | | X |
| 276 | Landlords & Lessors | Fivel Family, LLC | | X |
| 277 | Landlords & Lessors | Fox Jr. Development Inc. | | X |
| 278 | Landlords & Lessors | Franklin Mills Associates Limited Partnership | | X |
| 279 | Landlords & Lessors | Franklin Towne Plaza LLC | | X |
| 280 | Landlords & Lessors | Frayer Enterprises, LLC | | X |
| 281 | Landlords & Lessors | Fredric Singer | | X |
| 282 | Landlords & Lessors | Front Street Kansas City, LLC | | X |

| No. | Category | Entity Name (Full Name as per PIIL) | Connection | No Connection |
|-----|----------|-------------------------------------|------------|---------------|
| 283 | Landlords & Lessors | FSC West Covina, LLC | | X |
| 284 | Landlords & Lessors | FSH Galleria Plaza, LLC | | X |
| 285 | Landlords & Lessors | G&I X Industrial IN LLC | | X |
| 286 | Landlords & Lessors | Gamble Brothers, LLC | | X |
| 287 | Landlords & Lessors | Gary Mehan, DBA G.M. Properties | | X |
| 288 | Landlords & Lessors | Gateway Retail Partner III, LLC | | X |
| 289 | Landlords & Lessors | Gateway South, LLC #1 | | X |
| 290 | Landlords & Lessors | GBUZZ, LLC | | X |
| 291 | Landlords & Lessors | GCP Boom, LLC | | X |
| 292 | Landlords & Lessors | Giuffre IV, LLC | | X |
| 293 | Landlords & Lessors | GKI Industrial Dallas, LLC | | X |
| 294 | Landlords & Lessors | Glendale Galleria Center, LLC | | X |
| 295 | Landlords & Lessors | GLL BVK Properties, L.P. | | X |
| 296 | Landlords & Lessors | Gosula Holdings Ltd. | | X |
| 297 | Landlords & Lessors | Gravois Bluffs East 8-A, LLC | | X |
| 298 | Landlords & Lessors | Greater Orlando Aviation Authority | | X |
| 299 | Landlords & Lessors | Greenfield Plaza LLC | | X |
| 300 | Landlords & Lessors | Greenlight Development, LLC | | X |
| 301 | Landlords & Lessors | GRH Goodyear LLC, Gaston Holdings LLC, and MRH Venture Capital LLC | | X |
| 302 | Landlords & Lessors | Gridley Square Property, LLC | | X |
| 303 | Landlords & Lessors | GS Centennial LLC | | X |
| 304 | Landlords & Lessors | Gulson Retail LLC | | X |
| 305 | Landlords & Lessors | Halltown Farms, LLC | | X |
| 306 | Landlords & Lessors | Hankins Real Estate Partnership | | X |
| 307 | Landlords & Lessors | Hart & Hart Corp. | | X |
| 308 | Landlords & Lessors | Henry Fine Trust | | X |
| 309 | Landlords & Lessors | Hidden Hill Road Associates, LLC | | X |
| 310 | Landlords & Lessors | High Cotton Palisades, LLC, High Cotton Shoals, LLC and Pharo Palisades I, LLC | | X |
| 311 | Landlords & Lessors | Himaloy Taylor LLC | | X |
| 312 | Landlords & Lessors | HM Peachtree Corners I LLC | | X |
| 313 | Landlords & Lessors | Hogan Holdings 56, LLC | | X |
| 314 | Landlords & Lessors | HV Center LLC, HV Center TIC 1 LLC, and HV Center TIC 2 LLC | | X |
| 315 | Landlords & Lessors | IH 35 LOOP 340 INVESTORS, LTD. | | X |
| 316 | Landlords & Lessors | IH-10 Hayden, Ltd. | | X |
| 317 | Landlords & Lessors | Indian Trail Square, LLC | | X |
| 318 | Landlords & Lessors | Inland Commercial Real Estate Services LLC | | X |
| 319 | Landlords & Lessors | Innovation Realty IN, LLC | | X |
| 320 | Landlords & Lessors | Integra CRE, LLC | | X |
| 321 | Landlords & Lessors | IRC Park Center Plaza, L.L.C. | | X |
| 322 | Landlords & Lessors | Ireland Corner, LLC | | X |
| 323 | Landlords & Lessors | Isador Schreiber & Associates, LLC | | X |
| 324 | Landlords & Lessors | J & F Gainesville Properties, LLC | | X |
| 325 | Landlords & Lessors | J&L Development Company, LLC | | X |
| 326 | Landlords & Lessors | Jackson Street Group, LLC | | X |
| 327 | Landlords & Lessors | Jeffnan U.S.A. Inc. | | X |
| 328 | Landlords & Lessors | JHG Properties, LLC | | X |
| 329 | Landlords & Lessors | JMK5 Winchester, LLC | | X |
| 330 | Landlords & Lessors | JMW Hebron, LLC | | X |
| 331 | Landlords & Lessors | Joe Amato East End Centre, LP | | X |
| 332 | Landlords & Lessors | JRF Texas Properties, LLC | | X |
| 333 | Landlords & Lessors | JSM Land Group, LLC | | X |
| 334 | Landlords & Lessors | Kelley Commercial Realty, LLC and Stephanie D. Kelley | | X |
| 335 | Landlords & Lessors | Keyser Oak Investors, LLC | | X |
| 336 | Landlords & Lessors | KGI Military LLC | | X |
| 337 | Landlords & Lessors | Kin Properties Inc. | | X |
| 338 | Landlords & Lessors | Kings Mountain Investments | | X |
| 339 | Landlords & Lessors | Kingsport Green AC Managing Company, LLC | | X |
| 340 | Landlords & Lessors | Kinsman Investors | | X |
| 341 | Landlords & Lessors | Kitty Wells, Inc. | | X |
| 342 | Landlords & Lessors | KMD, LLC | X | |
| 343 | Landlords & Lessors | KRG Houston Royal Oaks Village II, LLC | | X |
| 344 | Landlords & Lessors | KRG Plaza Green, LLC | | X |
| 345 | Landlords & Lessors | L.W. Miller Holding Company | | X |
| 346 | Landlords & Lessors | Laurie Industries, Inc., Kinpark Associates and Fundamentals Company | | X |
| 347 | Landlords & Lessors | LAWRENCE F. KOLB & CATHERINE M. KOLB, TRUSTEES OF THE LAWRENCE F. KOLB AND CATHERINE M. KOLB JLRT U/A/D APRIL 12, 2018 and 2233 & 2235 MO BLVD, LLC | | X |
| 348 | Landlords & Lessors | LBD Properties, LLC | | X |
| 349 | Landlords & Lessors | LCRF, LLC | X | |
| 350 | Landlords & Lessors | LDC Silvertree, LLC | | X |
| 351 | Landlords & Lessors | Leland J3, LLC | | X |

Results of Connections Check

| No. | Category | Entity Name (Full Name as per PIIL) | Connection | No Connection |
|---|---|---|---|---|
| 352 | Landlords & Lessors | Leveraged Holdings, L.L.C. | | X |
| 353 | Landlords & Lessors | Lexington 2770, LLC | | X |
| 354 | Landlords & Lessors | Lichtefeld Development Trust | | X |
| 355 | Landlords & Lessors | Lidl US Operations, LLC | | X |
| 356 | Landlords & Lessors | Lincoln Associates | | X |
| 357 | Landlords & Lessors | LIT-ENVP Limited Partnership | | X |
| 358 | Landlords & Lessors | LoLo Enterprises, LLC | | X |
| 359 | Landlords & Lessors | Lovell 2.5, LLC | | X |
| 360 | Landlords & Lessors | LU Candlers Station Holdings, LLC | | X |
| 361 | Landlords & Lessors | Lynch Butler | | X |
| 362 | Landlords & Lessors | M3 Ventures, LLC | | X |
| 363 | Landlords & Lessors | Macon Center, LLC | | X |
| 364 | Landlords & Lessors | Malco T.I.C. | | X |
| 365 | Landlords & Lessors | Mall at Potomac Mills, LLC | | X |
| 366 | Landlords & Lessors | Marathon Management, LLC | | X |
| 367 | Landlords & Lessors | Marc NaperW LLC and NaperW, LLC | | X |
| 368 | Landlords & Lessors | MarketFair North, LLC | | X |
| 369 | Landlords & Lessors | McRae Mortgage & Investments, LLC | | X |
| 370 | Landlords & Lessors | Meditrina Properties, LLC | | X |
| 371 | Landlords & Lessors | Melvin C. McClung, Trustee of the Tommie Louise McClung Family Trust | | X |
| 372 | Landlords & Lessors | Menard, Inc. | X | |
| 373 | Landlords & Lessors | Merchant 33 LLC | | X |
| 374 | Landlords & Lessors | Merchant's Investors, LLC | | X |
| 375 | Landlords & Lessors | Meredith, Inc. | | X |
| 376 | Landlords & Lessors | Midwest Commercial Funding, LLC | | X |
| 377 | Landlords & Lessors | Missouri Boulevard Investment Company, LLC | | X |
| 378 | Landlords & Lessors | Mobile Highway 4500, LLC | | X |
| 379 | Landlords & Lessors | Mojack Holdings, LLC | | X |
| 380 | Landlords & Lessors | Mongia Capital Michigan, LLC | | X |
| 381 | Landlords & Lessors | Moon Village, LLC | | X |
| 382 | Landlords & Lessors | Morningside Plaza, L.P. | | X |
| 383 | Landlords & Lessors | MR Stealth LLC | | X |
| 384 | Landlords & Lessors | Muenchens Unlimited, LLC | | X |
| 385 | Landlords & Lessors | NDF III MJ Crossing, LLC | | X |
| 386 | Landlords & Lessors | New Bern Development LLC | | X |
| 387 | Landlords & Lessors | New Plaza Management, LLC | | X |
| 388 | Landlords & Lessors | Newport Crossing Investors, LLC | | X |
| 389 | Landlords & Lessors | Niagara Falls 778, LLC | | X |
| 390 | Landlords & Lessors | North County Columbia Realty, LLC | | X |
| 391 | Landlords & Lessors | Northern McFadden Limited Partnership | | X |
| 392 | Landlords & Lessors | Northside Village Conyers, LLC | | X |
| 393 | Landlords & Lessors | Northtowne Center Investors, LLC | | X |
| 394 | Landlords & Lessors | Oak Forest Group, LTD | | X |
| 395 | Landlords & Lessors | Okee Realty Associates, LLC | | X |
| 396 | Landlords & Lessors | Old Orchard, LLC | | X |
| 397 | Landlords & Lessors | One Home Realty, Inc. | | X |
| 398 | Landlords & Lessors | One Land Company, LLC | | X |
| 399 | Landlords & Lessors | One Oak Investments, LLC | | X |
| 400 | Landlords & Lessors | Osborne Properties Limited Partnership | | X |
| 401 | Landlords & Lessors | Oxford Street Huntsville | | X |
| 402 | Landlords & Lessors | P & S Axelrod, L.L.C. | | X |
| 403 | Landlords & Lessors | P&H Investments, LLC | | X |
| 404 | Landlords & Lessors | Pacifica Muskegon, LLC | | X |
| 405 | Landlords & Lessors | Parker-Anderson, LLC | | X |
| 406 | Landlords & Lessors | Parkway Mall, LLC | | X |
| 407 | Landlords & Lessors | PCRIF Spring Park Holdings, LLC | | X |
| 408 | Landlords & Lessors | Pensacola Corners LLC | | X |
| 409 | Landlords & Lessors | PFIILP - Parr Boulevard, LLC | | X |
| 410 | Landlords & Lessors | Pilchers Summit Limited Partnership | | X |
| 411 | Landlords & Lessors | Pinellas Park Square, LLC | | X |
| 412 | Landlords & Lessors | Piqua Investment Partners, LLC | | X |
| 413 | Landlords & Lessors | PK II El Camino North L.P. | | X |
| 414 | Landlords & Lessors | Plaza North Shopping Center, LLC | | X |
| 415 | Landlords & Lessors | Polk County Partners, LLC | | X |
| 416 | Landlords & Lessors | Port St. Lucie Plaza I, II, III, LLC | | X |
| 417 | Landlords & Lessors | Prattville Partners, Limited Partnership | | X |
| 418 | Landlords & Lessors | Prologis Targeted U.S. Logistics Fund, L.P. | | X |
| 419 | Landlords & Lessors | Pullman Square Associates | | X |
| 420 | Landlords & Lessors | Rainbow Investment Co. | | X |
| 421 | Landlords & Lessors | Randall M. Schulz | | X |
| 422 | Landlords & Lessors | Ravi Randal Investment Group, LLC | | X |
| 423 | Landlords & Lessors | RE Pecan, LLC | | X |

Results of Connections Check

| No. | Category | Entity Name (Full Name as per PIIL) | Connection | No Connection |
|---|---|---|---|---|
| 424 | Landlords & Lessors | Realty Income Corporation | X | |
| 425 | Landlords & Lessors | Regions Bank as Trustee of the Thomas H. Willings Jr. Family Trust | | X |
| 426 | Landlords & Lessors | Repwest Insurance Company | | X |
| 427 | Landlords & Lessors | Richard Briggs and John Nathan Briggs, as Trustees of the Stephanie R. Briggs Irrevocable Trust dated October 15, 2009; and Stephanie R. Briggs and John Nathan Briggs, as Trustees of the Richard M. Briggs Irrevocable Trust dated October 15, 2009 | | X |
| 428 | Landlords & Lessors | Ridgewater Commerce LLC | | X |
| 429 | Landlords & Lessors | Rini Realty Company | | X |
| 430 | Landlords & Lessors | River Oaks Properties, Ltd. | | X |
| 431 | Landlords & Lessors | Riverdale Center North, LLC | | X |
| 432 | Landlords & Lessors | Riverplace Shopping Center, LLC | | X |
| 433 | Landlords & Lessors | Rock N Roll Development, LLC | | X |
| 434 | Landlords & Lessors | Rockhill Center, LLC | | X |
| 435 | Landlords & Lessors | Rodi Road 501, LLC | | X |
| 436 | Landlords & Lessors | Rogers Commercial Properties, LLC | | X |
| 437 | Landlords & Lessors | Rose & Rose, LLC | | X |
| 438 | Landlords & Lessors | RPI Ridgmar Town Square, Ltd. | | X |
| 439 | Landlords & Lessors | RRG LLC | X | |
| 440 | Landlords & Lessors | Sabatine BK Development, LLC | | X |
| 441 | Landlords & Lessors | Saia Family Limited Partnership | | X |
| 442 | Landlords & Lessors | Sarabara Corp. | | X |
| 443 | Landlords & Lessors | Sav 15000 Abercorn, LLC | | X |
| 444 | Landlords & Lessors | Sears Authorized Hometown Stores, LLC | | X |
| 445 | Landlords & Lessors | SEK 7753, LLC | | X |
| 446 | Landlords & Lessors | Shrewsbury Village Limited Partnership | | X |
| 447 | Landlords & Lessors | Sissel Juliano | | X |
| 448 | Landlords & Lessors | SJN Realty Holdings, LLC | | X |
| 449 | Landlords & Lessors | Slidell Athletic Club Property, L.L.C. | | X |
| 450 | Landlords & Lessors | Somera Road - Athens Georgia II, LLC | | X |
| 451 | Landlords & Lessors | South Tulsa Storage, LLC | | X |
| 452 | Landlords & Lessors | Southern Hills Center, Ltd. | | X |
| 453 | Landlords & Lessors | Southgate Properties, LLC | | X |
| 454 | Landlords & Lessors | Southtown Plaza Realty LLC and Southtown Nassim LLC | | X |
| 455 | Landlords & Lessors | Southview Dothan Investors, LLC | | X |
| 456 | Landlords & Lessors | Space For Lease of Tennessee | | X |
| 457 | Landlords & Lessors | State Road 4201, LLC | | X |
| 458 | Landlords & Lessors | Stature High Ridge, LLC | | X |
| 459 | Landlords & Lessors | Sterling Equities II, LLC | X | |
| 460 | Landlords & Lessors | Stewart & Hamilton Properties, LLC | | X |
| 461 | Landlords & Lessors | Stone Mountain Square Shopping Center, LLC | | X |
| 462 | Landlords & Lessors | SVR Investments, LLC | | X |
| 463 | Landlords & Lessors | SW 17th Street 1010, LLC | | X |
| 464 | Landlords & Lessors | Sylvan Park Apartments, LLC | | X |
| 465 | Landlords & Lessors | T.B.R. Property Group, LLC | | X |
| 466 | Landlords & Lessors | T18 Investments, LLC | | X |
| 467 | Landlords & Lessors | Tanglewood Venture, LLC | | X |
| 468 | Landlords & Lessors | TB Garrett Creek, LLC | | X |
| 469 | Landlords & Lessors | TBF Group Battle Creek, LLC | | X |
| 470 | Landlords & Lessors | TCP Enterprise Parkway, LLC | | X |
| 471 | Landlords & Lessors | Tejas Center, LTD. | | X |
| 472 | Landlords & Lessors | Tenalok, LLC | | X |
| 473 | Landlords & Lessors | Texas Main Street, LLC | | X |
| 474 | Landlords & Lessors | The Collins Investment Trust | | X |
| 475 | Landlords & Lessors | TKC CCXXXIX, LLC | | X |
| 476 | Landlords & Lessors | TKG Colerain Towne Center, LLC | | X |
| 477 | Landlords & Lessors | TKG Cranston Development, L.L.C. | | X |
| 478 | Landlords & Lessors | TKG Fairhaven Commons, LLC | | X |
| 479 | Landlords & Lessors | TLP 4782 Muhlhauser LLC | | X |
| 480 | Landlords & Lessors | Tops Holding, LLC | | X |
| 481 | Landlords & Lessors | Town Real Estate Enterprises, LLC | | X |
| 482 | Landlords & Lessors | Tucson Speedway Square, LLC | | X |
| 483 | Landlords & Lessors | Tumon Bay Resort & Spa, LLC | X | |
| 484 | Landlords & Lessors | Turfway Baceline, LLC | | X |
| 485 | Landlords & Lessors | Two by Two Properties, LLC | | X |
| 486 | Landlords & Lessors | Tycer Heirs Separate Property, LLC | | X |
| 487 | Landlords & Lessors | University Realty Associates, LLC | | X |
| 488 | Landlords & Lessors | US Investments | | X |
| 489 | Landlords & Lessors | Victory River Square, LLC | | X |
| 490 | Landlords & Lessors | Vishal Kalmia Plaza, LLC | | X |
| 491 | Landlords & Lessors | W.H. Warehouse, L.L.C. | | X |
| 492 | Landlords & Lessors | Wal-Austin, LLC | | X |

Results of Connections Check

| No. | Category | Entity Name (Full Name as per PIIL) | Connection | No Connection |
|---|---|---|---|---|
| 493 | Landlords & Lessors | Warner Robins Perlmix, LLC | | X |
| 494 | Landlords & Lessors | Watson Village Retail, LLC | | X |
| 495 | Landlords & Lessors | Waverly Plaza Shopping Center, Inc. | | X |
| 496 | Landlords & Lessors | West County Investors, LLC | | X |
| 497 | Landlords & Lessors | Weston SCIP 2 LLC | | X |
| 498 | Landlords & Lessors | Westphal Leasing, LLC | | X |
| 499 | Landlords & Lessors | Westside Village Shopping Center of Rome, Inc. | | X |
| 500 | Landlords & Lessors | WFD Investments, L.L.C. | | X |
| 501 | Landlords & Lessors | White Lane, LLC | | X |
| 502 | Landlords & Lessors | Whitehall Crossing D, LLC | | X |
| 503 | Landlords & Lessors | William Shane Courtney | | X |
| 504 | Landlords & Lessors | Woodcrest Akers, LLC | | X |
| 505 | Landlords & Lessors | Woodforest Mini-City Partners, LP and JLCM Partners, LP, TIC | | X |
| 506 | Landlords & Lessors | Wylds 1708, LLC | | X |
| 507 | Landlords & Lessors | YEK #9, LLC | | X |
| 508 | Landlords & Lessors | York Realty Investment, LLC | | X |
| 509 | Other Parties | BCDC Portfolio Owners LLC | | X |
| 510 | Other Parties | BCHQ Owner LLC | | X |
| 511 | Other Parties | National Retail Properties, LP | X | |
| 512 | Significant Counterparties to Material Agreements | CAPTURIS | | X |
| 513 | Significant Counterparties to Material Agreements | Engie Resources Llc | | X |
| 514 | Significant Litigation Matters | Buddy's Mac Holdings, LLC | | X |
| 515 | Significant Litigation Matters | Charles Knight | | X |
| 516 | Significant Litigation Matters | Gale et al [Class Action] | | X |
| 517 | Significant Litigation Matters | Health Advocate | | X |
| 518 | Significant Litigation Matters | Joseph F Gazzo III | | X |
| 519 | Significant Litigation Matters | Matthew Giffuni | | X |
| 520 | Significant Litigation Matters | Quadre Investment Advisors LLC | | X |
| 521 | Significant Suppliers and Vendors | A TEAM SALES LLC | | X |
| 522 | Significant Suppliers and Vendors | Affordable Furniture Mfg Inc | | X |
| 523 | Significant Suppliers and Vendors | Alani Nutrition | | X |
| 524 | Significant Suppliers and Vendors | American Agco (ADMC) | | X |
| 525 | Significant Suppliers and Vendors | Animal Supply Co Lone Star | | X |
| 526 | Significant Suppliers and Vendors | Animal Supply Co Wholesome | | X |
| 527 | Significant Suppliers and Vendors | Ashley Furniture Industries Inc | X | |
| 528 | Significant Suppliers and Vendors | Brodnax Printing Company I, LLC dba Brodnax 21c Printers | | X |
| 529 | Significant Suppliers and Vendors | California Pet Partners LLC | | X |
| 530 | Significant Suppliers and Vendors | Capstone Nutrition | | X |
| 531 | Significant Suppliers and Vendors | CRAMCO | | X |
| 532 | Significant Suppliers and Vendors | Crown Mark Imports Inc | | X |
| 533 | Significant Suppliers and Vendors | DAS LABS LLC | | X |
| 534 | Significant Suppliers and Vendors | Elytus Ltd | | X |
| 535 | Significant Suppliers and Vendors | Enterprise FM Trust | | X |
| 536 | Significant Suppliers and Vendors | Flexport | X | |
| 537 | Significant Suppliers and Vendors | Florida State Games Inc. | | X |
| 538 | Significant Suppliers and Vendors | Garden of Life | X | |
| 539 | Significant Suppliers and Vendors | Generis Tek Inc | | X |
| 540 | Significant Suppliers and Vendors | GHOST, LLC. | | X |
| 541 | Significant Suppliers and Vendors | Gorilla Mind | | X |
| 542 | Significant Suppliers and Vendors | KFM247 LTD | | X |
| 543 | Significant Suppliers and Vendors | KITH FURNITURE | | X |
| 544 | Significant Suppliers and Vendors | Korber Supply Chain US, Inc. | | X |
| 545 | Significant Suppliers and Vendors | LUMISOURCE, LLC | | X |
| 546 | Significant Suppliers and Vendors | Marcone Appliance Parts Company | | X |
| 547 | Significant Suppliers and Vendors | Mars Petcare | | X |
| 548 | Significant Suppliers and Vendors | Media Works, Ltd. | | X |
| 549 | Significant Suppliers and Vendors | Merrick Pet Foods Inc | | X |
| 550 | Significant Suppliers and Vendors | Meta Platforms, Inc. | X | |
| 551 | Significant Suppliers and Vendors | MMXXI Investments LLC | | X |
| 552 | Significant Suppliers and Vendors | Nutrivo, LLC | | X |
| 553 | Significant Suppliers and Vendors | ODP BUSINESS SOLUTIONS, LLC (OFFICE DEPOT) | | X |
| 554 | Significant Suppliers and Vendors | One Stop Facilities Maintenance Corp | | X |
| 555 | Significant Suppliers and Vendors | Optimum Nutrition | X | |
| 556 | Significant Suppliers and Vendors | Origin | X | |
| 557 | Significant Suppliers and Vendors | Peak Living | | X |
| 558 | Significant Suppliers and Vendors | Phillips Lansing Facility | | X |
| 559 | Significant Suppliers and Vendors | Planitretail LLC | | X |
| 560 | Significant Suppliers and Vendors | Prime Hydration LLC | | X |
| 561 | Significant Suppliers and Vendors | PRO-FORM LABORATORIES | | X |
| 562 | Significant Suppliers and Vendors | QUEST NUTRITION, LLC | X | |
| 563 | Significant Suppliers and Vendors | Raw Sport Supplement Company | | X |
| 564 | Significant Suppliers and Vendors | REDCON 1 | | X |

Results of Connections Check

| No. | Category | Entity Name (Full Name as per PIIL) | Connection | No Connection |
|---|---|---|---|---|
| 565 | Significant Suppliers and Vendors | Royal Canin | X | |
| 566 | Significant Suppliers and Vendors | Ryse Up Sports Nutrition LLC | | X |
| 567 | Significant Suppliers and Vendors | Seaboard International Forest Products LLC | | X |
| 568 | Significant Suppliers and Vendors | Sealy Mattress Company | | X |
| 569 | Significant Suppliers and Vendors | SEMINOLE FURNITURE | | X |
| 570 | Significant Suppliers and Vendors | STEVE SILVER COMPANY | | X |
| 571 | Significant Suppliers and Vendors | Uber Freight US LLC | X | |
| 572 | Significant Suppliers and Vendors | Velosio LLC | | X |
| 573 | Significant Suppliers and Vendors | VITALITY WORKS, INC | | X |
| 574 | Significant Suppliers and Vendors | WEX BANK | | X |
| 575 | 5% or Greater Equity Holders | B. Riley Private Shares 2023-2 QP, LLC | | X |
| 576 | 5% or Greater Equity Holders | B. Riley Securities, Inc. | X | |
| 577 | 5% or Greater Equity Holders | BRF Investments, LLC | | X |
| 578 | 5% or Greater Equity Holders | Brian Kahn and Lauren Kahn Joint Tenants by Entirety | | X |
| 579 | 5% or Greater Equity Holders | Vintage Opportunity Partners, L.P. | | X |
| 580 | Top Unsecured Creditors | ALBANY INDUSTRIES INC | | X |
| 581 | Top Unsecured Creditors | Alphia Inc | | X |
| 582 | Top Unsecured Creditors | Aquatic & Reptile - Central Garden & Pet | | X |
| 583 | Top Unsecured Creditors | Arizona Nutritional Supplement | | X |
| 584 | Top Unsecured Creditors | Assurant Inc. | X | |
| 585 | Top Unsecured Creditors | Champion Petfoods USA | | X |
| 586 | Top Unsecured Creditors | Climatic Home Products | | X |
| 587 | Top Unsecured Creditors | COYOTE LOGISTICS | X | |
| 588 | Top Unsecured Creditors | DELTA FURNITURE | | X |
| 589 | Top Unsecured Creditors | Earth Animal Ventures | | X |
| 590 | Top Unsecured Creditors | EHPLABS LLC | X | |
| 591 | Top Unsecured Creditors | Elanco US Inc | | X |
| 592 | Top Unsecured Creditors | ELEMENTS INTERNATIONAL GROUP LLC | X | |
| 593 | Top Unsecured Creditors | EMA Electrolux/Frigidaire | | X |
| 594 | Top Unsecured Creditors | Force Factor Brands LLC | | X |
| 595 | Top Unsecured Creditors | GE Appliances | X | |
| 596 | Top Unsecured Creditors | GE General Electric-Haier US Appliance | X | |
| 597 | Top Unsecured Creditors | GOOGLE | X | |
| 598 | Top Unsecured Creditors | Hartz Mountain - VMX | | X |
| 599 | Top Unsecured Creditors | Hill's Pet Nutrition | | X |
| 600 | Top Unsecured Creditors | Kong Company | | X |
| 601 | Top Unsecured Creditors | Living Style (Singapore) Pte. Limited | | X |
| 602 | Top Unsecured Creditors | Lowes Companies Inc | X | |
| 603 | Top Unsecured Creditors | M I Industries Inc | | X |
| 604 | Top Unsecured Creditors | Madix Inc | | X |
| 605 | Top Unsecured Creditors | Midwestern Pet Foods | | X |
| 606 | Top Unsecured Creditors | Muebles Briss S.A. De C.V.(Marby) | | X |
| 607 | Top Unsecured Creditors | Natural Balance Pet Foods Inc | | X |
| 608 | Top Unsecured Creditors | Nestle Purina Petcare Company | X | |
| 609 | Top Unsecured Creditors | Open Farm Inc | X | |
| 610 | Top Unsecured Creditors | Order Groove Inc | | X |
| 611 | Top Unsecured Creditors | O'Rourke Bros., Inc. | | X |
| 612 | Top Unsecured Creditors | O'Rourke Sales Company | | X |
| 613 | Top Unsecured Creditors | PEAK LIVING, INC. | | X |
| 614 | Top Unsecured Creditors | Phillips Feed and Pet Supply | | X |
| 615 | Top Unsecured Creditors | Premier Nutrition Company, LLC | | X |
| 616 | Top Unsecured Creditors | Radio Systems Corporation | X | |
| 617 | Top Unsecured Creditors | SEALY MATTRESS MANUFACTURING COMPANY | | X |
| 618 | Top Unsecured Creditors | Simmons Pet Food Inc | | X |
| 619 | Top Unsecured Creditors | SOLSTICE SLEEP COMPANY | | X |
| 620 | Top Unsecured Creditors | Spectrum Brands Pet LLC | | X |
| 621 | Top Unsecured Creditors | STANDARD FURNITURE MFG CO INC | | X |
| 622 | Top Unsecured Creditors | Stella and Chewys LLC | | X |
| 623 | Top Unsecured Creditors | Surest/UnitedHealthcare Inc. | | X |
| 624 | Top Unsecured Creditors | Titanic Furniture | | X |
| 625 | Top Unsecured Creditors | Transform Holdco LLC (3PL) | | X |
| 626 | Top Unsecured Creditors | UPS (Ocean Freight) | | X |
| 627 | Top Unsecured Creditors | Vitamin Well USA LLC | | X |
| 628 | Top Unsecured Creditors | Wellness Pet LLC | X | |
| 629 | Top Unsecured Creditors | Weruva International Inc | | X |
| 630 | Top Unsecured Creditors | Whirlpool | X | |
| 631 | Top Unsecured Creditors | ZINATEX IMPORTS, INC | | X |