## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*, | Case No. 24-12480 (JTD) |
| Debtors.[1] | (Jointly Administered) |
|  | Re: D.I. 192 |

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' RESPONSE TO MOTION OF THE AD HOC GROUP OF FREEDOM LENDERS FOR ENTRY OF AN ORDER (I) TERMINATING EXCLUSIVITY IN THE HOLDCO DEBTORS' CASES, (II) LIFTING THE AUTOMATIC STAY IN THE HOLDCO DEBTORS' CASES, OR (III) APPOINTING A CHAPTER 11 TRUSTEE FOR THE HOLDCO DEBTORS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

The Official Committee of Unsecured Creditors (the "**Committee**") of Franchise Group, Inc. and its debtor affiliates (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), by and through its undersigned proposed counsel, hereby files this response (this "**Response**") to the *Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [D.I. 192] (the "**Motion**")[2] filed by the Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**").  In response to the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The Committee agrees that (a) the Debtors' Proposed Plan is unconfirmable and not in the best interests of creditors and (b) a thorough investigation of claims must be conducted on behalf of each Debtor (including both the OpCo Debtors and the HoldCo Debtors) by a truly independent fiduciary, rather than being released for no value.  But the relief sought in the Motion is, in the Freedom Lender Group's counsel's own words, the "nuclear war button," which would throw these nascent Chapter 11 Cases into chaos.  The nuclear option is unwarranted, and the issues raised in the Motion can be resolved by simply appointing the Committee – an independent estate fiduciary – to investigate the alleged estates' claims and causes of action and to report back to this Court.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

2.      However, in no event should the Court grant the relief requested in the Motion, which would be materially detrimental to all stakeholders other than the two junior investors that comprise the Freedom Lender Group.[3]

3.      First, it would be truly unprecedented for the Court to terminate exclusivity with respect to a single member of a large, corporate enterprise just weeks after the commencement of complex chapter 11 cases like these.  The Freedom Lender Group fails to cite *any* relevant authority in which a court terminated exclusivity under similar circumstances.  Courts impose a very heavy burden on a party moving to terminate a debtor's exclusivity within the statutory period.  The Freedom Lender Group has failed to carry that burden.

4.      Second, the Freedom Lender Group fails to demonstrate that cause exists to terminate the automatic stay to permit the HoldCo Lenders to foreclose on the equity in the OpCo Debtors.  The Freedom Lender Group, which has the burden of proof, has failed to present any evidence that their claims are secured by property of any value or that their collateral (to the extent it has value) is declining in value to warrant any adequate protection.  No cause exists to grant two junior creditors relief from stay, especially when granting such a request would give those junior creditors control over the management of *all* Debtors and completely upend these Chapter 11 Cases at their inception.

5.      Finally, the Freedom Lender Group fails to demonstrate that a chapter 11 trustee should be appointed for the HoldCo Debtors.  While the Committee agrees that the terms of the Proposed Plan must be reworked and that potential claims must be investigated by an independent fiduciary, those goals should be reasonably achievable without undermining any opportunity for a

---

[3]     *See Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [D.I. 229].

successful reorganization, including by introducing an immediate default under the DIP Facility. The Committee – a neutral, well-represented fiduciary of each Debtor's estate – is well-positioned to conduct any investigations and to maximize the value of any claims.

6.      Moreover, nearly every argument made in the Motion is based upon what is almost certainly a false premise:  that the HoldCo Lenders should effectively be handed control over each of the Debtor's cases – *at the expense of every other interested party* – because the HoldCo Lenders are the HoldCo Debtors' only creditors.  Putting aside the untenable legal conclusion that two individual creditors should be given immediate control over complex chapter 11 cases simply because they (like the Committee) oppose the Debtors' first proposed plan of reorganization, it cannot be presumed that the HoldCo Debtors have no other creditors.  A claims bar date has not yet been set in these cases and, to the extent there are other creditors at the HoldCo Debtors – which is not yet known – the Freedom Lender Group does not represent them (or any other stakeholder in this case) and has no fiduciary duty to the Debtors' estates.

7.      Finally, the relief sought in the Motion – including the termination of exclusivity with respect to a single debtor in a complex, multi-debtor case and the appointment of a chapter 11 trustee – is similar to the relief previously sought by counsel to the Freedom Lender Group in *In re Adelphia Communications Corp.*, 336 B.R. 610, 618 (Bankr. S.D.N.Y. 2006) [hereafter, "*Adelphia*"], *aff'd* 342 B.R. 122 (S.D.N.Y. 2006).  The *Adelphia* court (quoting counsel) described the requested relief as the "nuclear war button" and found that granting such relief would have "devastatingly adverse consequences . . . too numerous to list. . . ." *Id.* at 618.  These Chapter 11 Cases have been pending for less than a month, and the consequences of granting the Motion at this time would be no less devastating here.  The Motion should be denied and the Committee

should be appointed to investigate the various claims and causes of action against the Debtors, their management, and their insiders and to report back to this Court.

## BACKGROUND

8.      On November 3, 2024 (the "**Petition Date**"), each of the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court, thereby commencing the Chapter 11 Cases.

9.      On November 19, 2024, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the Committee pursuant to section 1102 of the Bankruptcy Code. *See* D.I. 188.  On November 21, 2024, the Committee selected Pachulski Stang Ziehl & Jones LLP to serve as its counsel and Province, LLC, to serve as its financial advisor.  Thereafter, on November 25, 2024, the Committee selected Perella Weinberg Partners LP to serve as its investment banker.

10.     The HoldCo Lenders extended the $475 million HoldCo Facility to Freedom VCM, Inc., in August 2023 in connection with the Take-Private Transaction. *See* Mtn. ¶1.  The HoldCo Lenders originally had recourse only against the HoldCo Debtors, which had no operations or assets aside from equity in subsidiaries. *Id.* at 1, 15.  By design, the proceeds of the HoldCo Loans "were used exclusively to purchase the shares of the Company's public shareholders for $30 per share." *Id.* at 1.  With the knowledge and consent of the Freedom Lender Group, the proceeds of the HoldCo Facility were used "to facilitate the payment to the Company's existing shareholders . . . [and] down-streamed to the OpCo Debtors." *Id.* at ¶14.  Thus, the HoldCo Lenders intentionally loaned money into the most junior part of the Debtors' capital structure with full knowledge that the proceeds of their loans would *not* be retained by the HoldCo Debtors.

11.     A claims bar date has not yet been set and the claims pool is not presently known, yet the Freedom Lender Group asserts in the Motion without any support that "the OpCo Debtors

and the HoldCo Debtors have entirely different creditor bodies." *Id.* at 7.  Moreover, the Freedom Lender Group acknowledges that the estates are intertwined; the OpCo Debtors guaranteed a portion of the HoldCo Facility.  *Id.* at 15.

12.    The Freedom Lender Group states that it engaged the Debtors in discussions concerning the Proposed Plan on November 11, 2024, the same day that the Debtors filed the Proposed Plan.  *Id.* at 20.  The Freedom Lender Group drafted a separate proposed plan of reorganization solely for the HoldCo Debtors, which it claims was first sent to the Debtors on November 15, 2024, without first engaging the Debtors in meaningful negotiations.  *Id.* at 26-27. The Freedom Lender Group then filed the Motion on November 20, 2024, less than three weeks after the Petition Date and less than ten days after the Freedom Lender Group appears to have first engaged with the Debtors concerning the plan process.  The *Adelphia* court found that a similar motion to terminate exclusivity and/or appoint a trustee was nothing more than a litigation tactic. Like in *Adelphia*, the Freedom Lender Group's tactic should fail here.

## RESPONSE

### A.    No Cause Exists to Terminate Exclusivity With Respect to the HoldCo Debtors

13.    Section 1121(b) grants the debtor the exclusive right "to file a plan until after 120 days after the date of the order for relief under this chapter."  11 U.S.C. § 1121(b).  Section 1121(d) authorizes a bankruptcy court to "reduce or increase" the debtor's exclusive period for "cause."  11 U.S.C. § 1121(d).  The party seeking to reduce or increase the exclusive period under Section 1121(d) has the burden of establishing that "cause" exists.  *See, e.g., In re LeHigh Valley Prof'l Sports Clubs, Inc.*, 2000 Bankr. LEXIS 237, at *9 (Bankr. E.D. Pa. Mar. 14, 2000).  When the requested change to the exclusive period "is a reduction in the statutory period, the burden is especially heavy."  *Id.; see also In re Excel Mar. Carriers Ltd.*, 2013 Bankr. LEXIS 3920, at *3

(Bankr. S.D.N.Y. Sept. 13, 2013) ("[T]erminating exclusivity—particularly during the initial exclusivity period is an extraordinary thing in a bankruptcy case."); *Geriatrics Nursing Home v. First Fidelity Bankr, N.A. (In re Geriatrics Nursing Home)*, 187 B.R. 128, 132 (D. N.J. 1995) ("A party in interest which seeks to establish 'cause' to terminate the exclusivity period 'bears a heavy burden.'") (citations omitted).

14.    Courts have considered a number of factors in determining whether "cause" exists to reduce or increase the exclusivity period; however, "displeasure with a plan on file is not one of the enumerated factors, and is not a basis for terminating exclusivity. Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals, with or without a formal plan on file." *In re Adelphia Communications Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006).[4] "The mere fact that key players want a competing plan is not sufficient cause to terminate a debtor's exclusive periods." *Excel Mar.*, 2013 Bankr. LEXIS 3920, at *4; *see also Geriatrics Nursing Home*, 187 B.R. at 134 ("The Court is not satisfied that statements made by creditors . . . that they were prepared to offer more favorable plans if the court were to terminate the exclusivity period constitutes sufficient cause to cut short [the exclusivity period]. . . .  Further, the Court cannot conclude . . . that the fact that one creditor constituency is not happy with the debtor's plan constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period.").

---

[4]    The court in *Adelphia* enumerated the following factors: (a) the size and complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists. *Id.*

15.    The Freedom Lender Group contends that the HoldCo Debtors' right of exclusivity should be terminated for "cause" just one month into these cases because the HoldCo Lenders allegedly represent the HoldCo Debtors' only creditors and the Proposed HoldCo Plan cannot be confirmed over their objection. *See* Mtn. ¶32. The Freedom Lender Group further contends that "cause" exists to terminate exclusivity because these Chapter 11 Cases are not complex, *id.* at 37, and attempting to negotiate a plan would be futile because the Debtors failed to reach consensus with the Freedom Lender Group after less than ten days of minimal engagement between the parties. *Id.* at 38, 40-41.

16.    The Freedom Lender Group has failed to carry its "extremely heavy burden" for obtaining the "extraordinary" relief it seeks. The Court has yet to set a claims bar date in these Chapter 11 Cases and it is presently unknown what claims may be filed against the HoldCo Debtors. The Committee understands that claims in significant number and amount may be filed by unsecured creditors against the HoldCo Debtors. The interests of these creditors (and the interests of every other stakeholder of every other Debtor) should not be prejudiced simply because two sophisticated investment funds have determined to pursue a hyper-aggressive and value-destructive litigation strategy at the outset of these cases. In any event, it cannot be presumed – as the Freedom Lender Group does throughout the Motion – that the HoldCo Lenders are the only claimants with an interest in the outcome of the HoldCo Debtors' Chapter 11 Cases and that they should, therefore, be permitted to undermine the Debtors' prospects for a consensual reorganization.

17.    Furthermore, the Freedom Lender Group's application of the *Adelphia* factors is not persuasive. These are large and complex cases. Little time has passed since the Petition Date. And, the parties have not had any meaningful opportunity to negotiate the terms of an amended

plan.  The Freedom Lender Group fails to cite any decision in which a court terminated exclusivity

under similar circumstances.  Instead, the Freedom Lender Group relies primarily on three hearing

transcripts from cases that are not analogous and that are factually inapposite.[5]

18.     The *Adelphia* court also denied a motion to terminate exclusivity under similar

circumstances.  In *Adelphia*, a creditor group (represented by the same counsel that represents the

Freedom Lender Group here) moved to terminate exclusivity and to appoint a chapter 11 trustee

for certain debtors in a large, multi-debtor case, due to alleged conflicts of interest arising from

intercompany claims among the debtors.  *See Adelphia*, 336 B.R. at 618.  After a thorough analysis,

the court rejected the motion to terminate exclusivity, finding that the debtors had not abused the

process, were working cooperatively with constituents, and the moving creditors' dissatisfaction

with the plan was not grounds for terminating exclusivity.  *Id.*, at 675-77.  In doing so, the *Adelphia*

court expressly found that a creditor's parochial interest did not constitute 'cause' to terminate

exclusivity.  *Id.*, at 676 ("[T]he notion that creditor constituency unhappiness, without more,

constitutes cause to undermine the debtor's chances of winning final confirmation of its plan

---

[5]  The only case cited in the Motion involving a "holdco/opco" structure is *In re Lucky Bucks, see* Mtn. ¶ 29, but exclusivity was not even at issue in that case.  Indeed, the Freedom Lender Group urges the Court not to adopt here the relief that was imposed in that case.  *Id.* ¶ 30.  Moreover, the facts of *Lucky Bucks* are easily distinguishable from those here.  Among other things, the debtors in *Lucky Bucks* conceded that certain creditors (whose claims were not guaranteed by the other debtors) unanimously represented the only impaired class at the parent entity, a plan for the parent could not be confirmed without the consent of those creditors, the debtors' pre-solicited plan had already been rejected unanimously by that class, the only purpose of the plan for the parent was to obtain insider releases, and the subsidiaries' reorganizations were not dependent upon the parent's.  *In re Lucky Bucks, LLC, et al*, Case No. 23-10758 (KBO) (Bankr. D. Del.), Hr'g Tr. 7:17-25-18:1-7, 9:11-25-10:1, 72:17-25-73:1-21, D.I. 133.  In fact, the debtors' joint plan expressly provided for the parent's plan to be severed in certain circumstances. *See, e.g., id.*, at 58:7-14.  *See also In re TCI2 Holdings, LLC*, Case No. 09-13654 (JHW) (Bankr. D.N.J. 2009), Hr'g Tr. 85:15-25-94:1-17 D.I. 621 (terminating exclusivity only after debtors' original exclusivity period expired, after the court extended the debtor's exclusivity period further, and after debtors filed a plan that was found to not be confirmable); *In re Pliant Corp.*, Case No. 09-10443 (MFW) (Bankr. D. Del. 2009), Hr'g Tr. 228:13-25-231:1-4, D.I. 765 (terminating exclusivity as to *all* debtors to permit competing plan to be solicited simultaneously with the debtors' plan, where competing plan provided objectively better treatment to all creditors).

during the exclusivity period has been judicially rejected.") (citing *Geriatrics Nursing Home,* 187 B.R. at 134).

19.     It would be unprecedented for this Court to terminate exclusivity with respect to a single Debtor in the context of large, multi-debtor chapter 11 cases under these circumstances.  The Proposed Plan is not confirmable and needs substantial revisions.    However, terminating exclusivity one month into the case and before the parties have had an opportunity to engage in any meaningful negotiations is not the right answer.

**B.      No Cause Exists to Grant the Freedom Lender Group Relief From Stay**

20.     The Freedom Lender Group alternatively seeks relief from the automatic stay to permit the HoldCo Lenders to foreclose on the equity interests in the Company, a large operating Debtor, in order to exercise their voting rights in the equity.   The Freedom Lender Group asserts that "cause" exists for granting such relief solely because the HoldCo Lenders are secured creditors that have not been provided with adequate protection.  *See* Mtn. ¶¶ 46-50.  This request should be denied.

21.     Under Section 365(g)(1), the movant has the "burden of proof on the issue of the debtor's equity in property."   Yet, the Freedom Lender Group makes no effort to substantiate its claim that the HoldCo Lenders' collateral has value,[6] that the value of its collateral is declining, or otherwise to establish its *prima facie* case that "cause" exists to terminate the stay.  *See, e.g., In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) *aff'd*, 359 F. App'x 352 (3d Cir. 2010) ("[T]he moving party first must establish its *prima facie* case.  Failure to prove a *prima facie* case requires denial of the requested relief.") (citing *Sonnax Industries, Inc. v. Tri Component*

---

[6]     The HoldCo Lenders have not established that they have a valid or enforceable lien on, or security interest in, any commercial tort claims because no such claims are specifically identified in the loan and security documentation relating to the HoldCo Facility as required by the Uniform Commercial Code.  The HoldCo Lenders also do not have any liens on, or security interests in, avoidance actions or the proceeds thereof.

*Prods. Corp. (In re Sonnax Industries, Inc.*), 907 F.2d 1280, 1285 (2d Cir. 1990)).  "[T]he secured creditor lacks adequate protection if the value of its collateral is declining as a result of the stay.  It must, therefore, prove this decline in value – or the threat of a decline – in order to establish a *prima facie* case."  *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).  The Freedom Lender Group has failed to prove that the HoldCo Lenders hold even a partially secured claim or that the value of their collateral is declining.  The Freedom Lender Group is, therefore, not entitled to adequate protection and no cause exists to terminate the stay.[7]

22.    The Freedom Lender Group seeks to terminate the automatic stay, not to protect the value of its collateral, but to secure the right to appoint the management of (a) the HoldCo Debtors, and (b) because the HoldCo Debtors can vote their equity to replace management at the OpCo Debtors, the OpCo Debtors.  *See* Mtn. ¶ 50.  In other words, the Freedom Lender Group, without any evidence of "cause," wants to use Section 362 as a backdoor to Section 1104 and to replace current management with management that will serve the Freedom Lender Group's parochial interest rather than the interests of the Debtors' stakeholders as a whole.  Not surprisingly, the

---

[7]    The Freedom Lender Group cites only to *In re Munoz*, 83 B.R. 334 (Bankr. E.D. Pa. 1988) in support of its argument that the equity in the Company must be deemed to have value absent evidence to the contrary.  *See* Mtn. ¶ 49.  *Munoz* does not stand for that proposition.  The court in *Munoz* concluded, after considering *evidence* of the value of certain pledged equity, including expert testimony, that the equity was "worth substantially in excess of" the amount the debtor proposed to pay the secured creditor under a plan.  *Id.* at 336.  No such evidence of value has been presented here.

Freedom Lender Group fails to cite *any* decision in which a court granted such relief in a case involving similar circumstances.[8]

## C.    No Grounds Exist to Appoint a Chapter 11 Trustee

23.    The Freedom Lender Group finally seeks as alternative relief the appointment of a chapter 11 trustee for the HoldCo Debtors.  This request must also be denied. The appointment of a trustee under Section 1104 is an "extraordinary remedy that is the exception, and not the rule." *U.S. Bank. Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 128 (Bankr. D. Del. 2010); *see also Sharon Steel Corp.*, 871 F.2d 1217, 1125 (3d Cir. 1989) ("It is settled that appointment of a trustee should be the exception, rather than the rule.") (citing cases); *In re Marvel Entm't Grp.*, 140 F.3d 463, 471 (3d Cir. 1998) (same).

24.    The moving party has the burden of proving the "need for a trustee under either subsection [of Section 1104(a)] by clear and convincing evidence." *Marvel*, 140 F.3d at 471; *see also Sharon Steel*, 871 F.2d at 1125 (citing cases).  "[T]he standard for § 1104 appointment is very high . . . ." *Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541, 546 (quoting *Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 (2d Cir. 2005)).  In the Third Circuit, there is a "strong presumption" that "current management is generally best suited to orchestrate the process of rehabilitation . . . ." *Id*.[9]

---

[8]    In addition to *Munoz*, which is distinguishable for the reasons explained above, the remaining cases cited in the Motion involved small debtors that pledged equity in small, closely-held *non-debtor* entities.  These cases bear no resemblance to the Debtors' Chapter 11 Cases.  *See In re Gilece*, 7 B.R. 469, 471-72 (Bankr. E.D. Pa. 1980) (movant presented "extensive expert valuation testimony" showing that the "debtor has no equity in the collateral" and that cause existed to terminate the automatic stay); *In re William A. Smith Constr. Co.*, 86 B.R. 115, 118-19 (Bankr. N.D. Oh. 1988) (movant sought relief from the automatic stay under Sections 362(d)(1) and (2) and carried its "burden of proof … to establish that the Debtor has no equity in the property"); *In re Sears*, 2010 Bankr. LEXIS 1130, at *2-7 (Bankr. D. Neb. Apr. 12, 2010) (addressing whether creditor who sold stock in family business to two individual debtors should be granted relief from stay to exercise "voting and other rights" with respect to the company but providing no analysis regarding the value of the stock or whether there was any value that required adequate protection).

[9]    The Freedom Lender Group cites *Marvel* for the proposition that the presumption in favor of preserving current management should not apply because the Debtors' management has been in place less than a year.  *See* Mtn. ¶

25.     Section 1104(a)(1) provides that a trustee shall be appointed for "cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." 11 U.S.C. § 1104(a)(1).   The Freedom Lender Group has not alleged fraud, dishonesty, incompetence, or gross mismanagement here.   Instead, it asserts that a chapter 11 trustee is warranted because (i) the HoldCo Lenders are the HoldCo Debtors' only creditors; (ii) the OpCo Debtors have different assets and liabilities and debt obligations from the HoldCo Debtors; (iii) the Debtors have overlapping fiduciaries; (iv) the Debtors may have claims against each other; and (v) the Proposed Plan is not in the best interest of the HoldCo Debtors' estates. *See* Mtn. at 55-59.   None of these alleged issues rises to the level of "cause" to warrant the "extraordinary" relief of appointing a chapter 11 trustee.

26.     As explained above, the HoldCo Lenders are almost certainly *not* the HoldCo Debtors' only creditors, and the Freedom Lender Group itself contends that the Debtors' obligations are not entirely separate.   *See* Mtn. ¶ 15.   Moreover, it is not unusual for affiliated chapter 11 debtors to have overlapping fiduciaries or for intercompany claims to exist among affiliated debtors; in such cases, a creditors' committee – an independent fiduciary – is often tasked

---

53. In *Marvel*, Carl Icahn took control of the debtors six months *after* its bankruptcy filing through a scorched-earth activist campaign, resulting in Mr. Icahn being both the debtors' control person and one of its largest creditors. *Marvel*, 140 F.3d at 467. Mr. Icahn subsequently used his control over the debtor to engage in an acrimonious crusade against Marvel's other creditors, which ultimately led to his removal.  The facts of *Marvel* bear no resemblance to those here.

with investigating those claims.[10] *See, e.g., Preliminary Report of the Official Committee of Unsecured Creditors Regarding the Bankruptcy Estates' Litigation Claims Against Neiman Marcus Group, Inc., the Equity Sponsors and Directors of Neiman Marcus Group, Inc., and Other Parties*, Case No. 20-32519, D.I. 1346 (Bankr. S.D. Tex. Jul. 24, 2020) (appointing committee to investigate and report on intercompany transactions where debtor management was allegedly conflicted and/or unable to conduct an independent review of interdebtor claims); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 2192 *21-24 (Bankr. S.D.N.Y. 2003) (denying motion to appoint examiner in multi-debtor case due to intercompany claims that could be investigated by the creditors' committee and finding "the majority of arguments raised by the Movants are more properly characterized as objections to confirmation of the Plan."); *In re Allsun Juices, Inc.*, 34 B.R. 162 (Bankr. M.D. Fla. 1983) (denying motion to appoint a trustee to formulate plan for a single debtor due to conflicts allegedly arising from intercompany claims because creditors could pursue those claims and stating the court was "not aware of any provision of the Code which would permit the appointment of a trustee for the sole purpose of depriving the Debtor of its right to the 120 days exclusivity period and if creditors desire to file a Plan, they certainly are entitled to do so after the expiration of the exclusivity period and they do not need a trustee for that purpose.").

---

[10] The Freedom Lender Group cites several cases in which a debtor's fiduciaries had obvious conflicts of interest that a court determined would prevent the fiduciaries from fulfilling their duties to the debtor. *See, e.g., Marvel*, 140 F.3d at 467 (debtor's control person was one of its largest creditors and used its position of control to engage in an acrimonious crusade against debtor's other creditors); *Sharon Steel*, 871 F.3d at 1128 (appointing trustee when "management appears to have engaged on the eve of bankruptcy in a systematic syphoning of Sharon's assets to other companies under common control"); *In re Biolitic, Inc.*, 2013 Bankr. LEXIS 1377, at *32 (Bankr. D.N.J. Apr. 3, 2013) (finding extreme acrimony, multiple prepetition lawsuits and significant prepetition transfers to non-debtor entities under common ownership); *In re Vascular Access Ctrs., L.P.*, 611 B.R. 742, 765 (Bankr. E.D. Pa. 2020) (appointing trustee when management orchestrated an involuntary petition using separate entities under common control to avoid grant of sanctions); *In re 942 Penn RR, LLC*, 642 B.R. 89 (Bankr. S.D. Fla. 2022) (appointing trustee in light of significant prepetition misconduct and unauthorized postpetition use of cash collateral to pay insiders, an improper attempt to dismiss bankruptcy, and a plan that only allowed insider secured creditors the opportunity to vote). The Freedom Lender Group has not alleged the existence of any similar conflicts here.

27.     *Adelphia* is again especially instructive.  As mentioned above, a creditor group

moved to terminate exclusivity and to appoint a chapter 11 trustee for certain debtors in a large,

multi-debtor case, due to alleged conflicts of interest arising from intercompany claims among the

debtors.  *See Adelphia*, 336 B.R. at 618.  The creditor group's counsel described the requested

relief as the "nuclear war button," and the court found that granting such relief would have

"devastatingly adverse consequences . . . too numerous to list . . . ."  *Id.* at 618.  After conducting

a detailed analysis of sixteen large cases involving similar issues – none of which resulted in the

appointment of a trustee over a debtor's objection – the court concluded that "interdebtor disputes

are common in multi-debtor chapter 11 cases.  But the appointment of chapter 11 trustees to deal

with them is not."  *Id.* at 653.

28.     The court further stated:

> Where interdebtor issues exist and are material, they cannot, of course, be swept
> under the rug.  Even though consensual resolution is the normal (and preferred)
> practice, some means, consistent with fairness, due process, and appropriate
> advocacy, must be formulated to resolve them if those issues cannot be settled.  But
> the means established to resolve them should be the least destructive available.  And
> neither the interests of a debtor's creditor body, nor the integrity of the bankruptcy
> system, can tolerate the use of motions like these as a tactic to assist creditor groups
> wishing to augment their personal recoveries.

*Id.* at 620; *see also id.* at 677-78 ("The bringing of motions like these is not unethical, or

sanctionable, but neither should it be encouraged, or rewarded.  Motions that would bring on

intolerable consequences for an estate should not be used as a tactic to augment a particular

constituency's recovery.").

29.     The appointment of a chapter 11 trustee – which would be expensive, disruptive,

and generally value-destructive to the Debtors' estates – would also not be in the best interests of

*all* interested stakeholders so as to warrant relief under Section 1104(a)(2).  *See id.* at 619 (movants

did "not come close to satisfying the requirements" for the appointment of a trustee, which would

have been "*antithetical* to creditor interests, subjecting them to actual and potential prejudice in many ways, with no corresponding benefit") (emphasis in original).  Two creditors' alleged loss of confidence in the Debtors' management after just a few weeks into these Chapter 11 Cases does not demonstrate that a chapter 11 trustee would be in the best interests of all interested parties.  This is especially true now that the Committee is in place and acting as a fiduciary of each Debtor's estate.  *In re YC Atlanta Hotel, LLC*, 630 B.R. 348, 370 (Bankr. N.D. Ga. 2021) (denying motion for trustee notwithstanding significant interdebtor claims and management's acknowledged failure to address those claims after management subsequently acknowledged their fiduciary obligations and agreed to address the interdebtor transfers); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1104.02 (16th ed. 2024) ("When current management is competent and able to adjust to its new obligations under chapter 11, and when the creditors' committee is functioning properly, there may in fact be little or no benefit to the appointment of a trustee.").

30.     The Committee agrees with the Freedom Lender Group that the Proposed Plan is not in the best interest of the Debtors' estates and must be revised substantially.  However, the parties should be allowed a reasonable opportunity to resolve issues concerning the Proposed Plan, without reaching immediately for the "nuclear war button" and causing "devastatingly adverse consequences" for all involved.  *See Adelphia*, 336 B.R. at 618.

31.     While the Committee does not believe the Motion is ripe or that the relief requested therein should be granted, the Committee does agree that all potentially viable claims must be investigated and not released.  The Committee – an independent fiduciary of each of the Debtors' estates – is prepared to, and should be permitted the opportunity to, conduct those investigations and report back to this Court.  In short, while the Freedom Lender Group raises some valid concerns, the Committee believes those concerns can be addressed without the appointment of a

chapter 11 trustee or termination of the exclusivity period or the automatic stay – each of which would be materially detrimental to these nascent Chapter 11 Cases.

## <u>CONCLUSION</u>

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the relief sought in the Motion without prejudice, (ii) enter an Order that directs the Committee to immediately investigate alleged estate claims and submit a report of its findings to this Court, and (iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated:    December 3, 2024          Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Bradford J. Sandler*
Bradford J. Sandler, Esq.
Colin R. Robinson, Esq.
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:   (302) 652-4100
Facsimile:    (302) 652-4400
Email:        bsandler@pszjlaw.com
              crobinson@pszjlaw.com

-and-

Robert J. Feinstein, Esq.    (admitted *pro hac vice*)
Alan J. Kornfeld, Esq.       (admitted *pro hac vice*)
Theodore S. Heckel, Esq.    (admitted *pro hac vice*)
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:   (212) 561-7700
Facsimile:    (212) 561-7777
Email:        rfeinstein@pszjlaw.com
              akornfeld@pszjlaw.com
              theckel@pszjlaw.com

*Proposed Counsel to the Official Committee
of Unsecured Creditors*