# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 192** |

## DEBTORS' OBJECTION TO MOTION OF
## THE FREEDOM LENDER GROUP FOR ENTRY OF AN ORDER
## (I) TERMINATING EXCLUSIVITY IN THE HOLDCO DEBTORS' CASES,
## (II) LIFTING THE AUTOMATIC STAY IN THE HOLDCO DEBTORS' CASES,
## OR (III) APPOINTING A CHAPTER 11 TRUSTEE FOR THE HOLDCO DEBTORS

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby submit this Objection (the "Objection") to the *Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the Holdco Debtors'*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

*Cases, (II) Lifting the Automatic Stay in the Holdco Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the Holdco Debtors* [Docket No. 192] (the "Motion") filed by the Freedom Lender Group.[2]  The Motion seeks to (i) terminate the plan exclusivity periods under section 1121(d) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") for Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. (together, the "HoldCo Debtors"), (ii) lift the automatic stay imposed by section 362 of the Bankruptcy Code in the HoldCo Debtors' Chapter 11 Cases, or (iii) appoint a chapter 11 trustee under section 1104 of the Bankruptcy Code for the HoldCo Debtors.  For the reasons set forth herein, the requested relief is premature and unwarranted, and should be denied.

## PRELIMINARY STATEMENT[3]

1.      The Debtors have been in bankruptcy for all of thirty days.  Twenty-nine of those have been marked by the relentless litigation of the Freedom Lender Group, complete with unreasonable opposition to standard first day relief, inflammatory statements on the public record at the Debtors' hearings, second-guessing of the Debtors' business judgment, and a near-constant stream of costly and unnecessary discovery.  The Motion is just the latest step in their campaign to dismantle the Debtors' value-maximizing sale process—which is being conducted to benefit all stakeholders—in favor of tactics that only serve the Freedom Lender Group.

2.      The Freedom Lender Group's strategy is transparent.  If the Motion is granted, these junior creditors will not be exercising limited remedies against two empty intermediate holding companies.  Instead, they will take control of the Debtors' full corporate structure solely for their own benefit by foreclosing on a pledge of the equity of Franchise Group, Inc. and/or

---

[2]    As defined in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229].

[3]    Terms used but otherwise not defined herein shall have the meanings ascribed to them in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 15].

exercising the voting rights of the equity of Franchise Group, Inc. to replace the board and management team with individuals who are beholden only to the Freedom Lender Group. The HoldCo Debtors filed for bankruptcy to avoid this exact outcome, among other reasons.

3.      The Motion suggests that the HoldCo Debtors should be conducting their Chapter 11 Cases for the sole benefit of the Freedom Lender Group. To the contrary, the HoldCo Debtors are corporations with fiduciary duties to _all_ of their stakeholders, including the indirect equity holders of the HoldCo Debtors. The HoldCo Debtors are not acting at the behest of any party, nor are they devoid of fiduciaries. Both of the HoldCo Debtors have separate boards of directors. Both boards include John Hartmann, an independent director hand-selected by the Freedom Lender Group itself in January 2024, long before the commencement of these Chapter 11 Cases. Each board signed a separate unanimous written consent exercising the requisite corporate authority to enter into the RSA and commence its individual Chapter 11 Case.[4]

4.      In the month since the Petition Date, the Freedom Lender Group has done next to nothing in terms of identifying a mutually agreeable path forward with the Debtors. Despite challenging every element of the Debtors' bankruptcy process, they have not proposed a single actionable alternative. They have not proposed an alternative to the current DIP facility. They have not proposed a DIP facility solely for the HoldCo Debtors. They have not proposed any alternative exit financing or made a bid for any of the Debtors' assets. Although their counsel suggests these alternatives exist, the reality is that the Freedom Lender Group has tried to obtain financing for alternatives several times and has failed, suggesting strongly that it is a deeply out of

---

[4]    *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, In re Freedom VCM, Inc., Case No. 24-12509 (Bankr. D. Del. Nov. 3, 2024) [Docket No. 1] at 54 (Each Member of Freedom VCM, Inc.'s Board of Directors signing Omnibus Written Consent authorizing the company's entry into Restructuring Support Agreement and commencement of the bankruptcy cases); *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, In re Freedom VCM Interco, Inc., Case No. 24-12502 (Bankr. D. Del. Nov. 3, 2024) [Docket No. 1] at 54 (same).

the money constituency seeking to create leverage through its litigation tactics.  In fact, the only "alternative" it has formulated is a competing chapter 11 plan for the HoldCo Debtors.  That plan would simply implement the foreclosure that the HoldCo Debtors sought the protection of chapter 11 to avoid.  Because the Debtors did not readily agree to file that competing plan, the Freedom Lender Group is now trying to engineer its desired outcome through the Motion instead.[5]

5.      It is not clear why the Freedom Lender Group is pursuing a scorched-earth strategy.  The group comprises junior creditors who are only pushing their own claims further out of the money by saddling the Debtors with the mounting costs of frivolous litigation.  What is clear is that these junior lenders are not concerned with acting in the best interests of all the Debtors' stakeholders.  The group has dedicated all of its attention and resources to one goal: obstructing the RSA and sale process, to the detriment of every other creditor and stakeholder in these Chapter 11 Cases.  Granting any aspect of the relief requested would enable them to achieve that objective, in contravention of one of the core policies underlying chapter 11—to give a debtor the breathing room to develop and negotiate a chapter 11 plan.  For these reasons and those set forth herein, the Motion should be denied.

## **ARGUMENT**

### I.    **The Freedom Lender Group Has Not Shown Cause to Terminate Exclusivity.**

6.      There is no legal basis to terminate the HoldCo Debtors' exclusive right to file and solicit a plan.  Subject only to the Court's ability to shorten or extend exclusivity periods for "cause," section 1121 of the Bankruptcy Code provides a 120-day period in which the Debtors

---

[5]    As explained herein, the Freedom Lender Group filed the Motion less than 72 hours after having an initial, high-level discussion with the Debtors about the possibility of the competing plan.  The Freedom Lender Group has come dangerously close to violating the Debtors' exclusive periods by peppering the public docket with references to its "file-ready" plan, which the Debtors have not approved and do not support.  The Debtors reserve all rights with respect to whether the Freedom Lender Group has violated the Debtors' exclusive periods, including asserting damages.

have the exclusive right propose a plan and a 180-day exclusive period to obtain acceptances to a plan.  11 U.S.C. § 1121(b)–(d).  The determination of "cause" under section 1121(d) is a highly fact-specific inquiry committed to the bankruptcy court's discretion.  See First Am. Bank of New York v. S.W. Gloves & Safety Equip., Inc., 64 B.R. 963, 965 (D. Del. 1986).

7.      The burden is on the party seeking termination or reduction of a debtor's exclusivity periods to show that "cause" exists, which has been described as a "particularly heavy burden."  7 Collier on Bankruptcy ¶ 1121.06[1] n.6; Transcript of Hearing at 97:10-11, In re Samson Res. Corp., Case No. 15-11934 (CSS) (Bankr. D. Del. Sept. 27,2016) [Docket No. 1418] (noting "it is unusual for a Court to either not extend or to terminate exclusivity"); see In re Geriatrics Nursing Home, 187 B.R. 128, 132 (Bankr. D.N.J. 1995) (quoting In re Interco, Inc., 137 B.R. 999, 1000 (Bankr. E.D. Mo. 1992)) (holding that "[a] party in interest which seeks to establish 'cause' to terminate the exclusivity period 'bears a heavy burden'"); In re Texaco, Inc., 81 B.R. 806, 812–13 (Bankr. S.D.N.Y. 1988) (refusing to terminate exclusivity where debtors did not use exclusivity as a "tactical device to put pressure" on creditors or violate any requirements of section 1123).

8.      The standard for "cause" to terminate exclusivity is as follows:

> Courts typically rely on nine enumerated factors: (a) the size and complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists.

*In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) ("<u>Adelphia II</u>") (together, the "<u>Adelphia Factors</u>"); <u>see also</u> Transcript of Hearing at 174:7-13, <u>In re PWM Property Mgmt.</u>, Case No. 21-11445 (MFW) (Bankr. D. Del. Mar. 24, 2022) (considering the <u>Adelphia</u> Factors in determining whether to extend or reduce the debtors' exclusivity period).

9.        "[C]onsidering termination of an exclusivity period 'is a serious matter' and termination 'should be granted neither routinely nor cavalierly.'" <u>In re Lichtin/Wade, L.L.C.</u>, 478 B.R. 204, 215 (Bankr. E.D.N.C. 2012) (quoting <u>In re Fountain Powerboat Indus., Inc.</u>, Nos. 09-07132-8 (RDD) to 09-07135-8 (RDD), 2009 Bankr. LEXIS 4015 at *6 (Bankr. E.D.N.C. Dec. 4, 2009)).  The Freedom Lender Group has failed to establish that any one of the <u>Adelphia</u> Factors weighs in favor of granting such serious and rare relief.  It is not relevant that the Freedom Lender Group claims that it will not vote in favor of the Plan or that it is ready to propose its own plan. Courts are clear that "[d]ispleasure with a plan on file is not one of the enumerated factors, and is not a basis for terminating exclusivity.  Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals, with or without a formal plan on file."  <u>Adelphia II</u>, 352 B.R. at 587; <u>see</u> <u>In re Geriatrics Nursing Home</u>, 187 B.R. at 134 ("This Court is not satisfied that statements made by creditors and parties in interest that they were prepared to offer more favorable plans if the court were to terminate the exclusivity period constitutes sufficient cause to cut short the debtor's window of opportunity opened by Congress.").

10.        Put simply, there is no "cause" to terminate the Debtors' exclusive right to file and solicit a chapter 11 plan.  The <u>Adelphia</u> Factors are discussed in turn below.

**A.        <u>Adelphia</u> Factors (d), (h), and (*i*):  The Freedom Lender Group Has Failed to Allege Cause Under Three of the Nine <u>Adelphia</u> Factors.**

11.        <u>Adelphia</u> Factors (d) and (h) weigh against granting the Motion, as the Freedom Lender Group has not alleged that the Debtors are not paying their bills as they come due, nor are

they seeking to extend their exclusivity periods.  Likewise, <u>Adelphia</u> Factor (*i*) weighs against terminating exclusivity, as there is no apparent unresolved contingency that, once ripened, would dictate the outcome of these Chapter 11 Cases.  <u>Cf.</u> <u>In re Dow Corning Corp.</u>, 208 B.R. 661, 666 (Bankr. E.D. Mich. 1997) ("In our view, generally, the type of unresolved contingency which would be relevant to a motion to extend or to terminate exclusivity is one which is external to the case itself.").

**B.      <u>Adelphia</u> Factor (a):  The Chapter 11 Cases are Large and Complex.**

12.      These jointly administered Chapter 11 Cases are far from simple.  In <u>Adelphia II</u>, the court made clear that the inquiry into a case's complexity does not take place on an entity-by-entity basis.  It looks across the entire jointly administered estate.  <u>See</u> <u>Adelphia II</u>, 352 B.R at 587 (holding that the case's size and complexity favored preservation of the debtors' exclusivity where the cases involved over two hundred debtors and six different prepetition credit facilities, among other factors); *Declaration of Philip Cook in Support of Chapter 11 Petitions and First Day Motions*, <u>In re Samson Res. Corp.</u>, Case No. 15-11934 (CSS) (Bankr. D. Del. 2016) [Docket No. 2] ¶¶ 20, 50 & Transcript of Hearing at 96:15-17, <u>In re Samson Res. Corp.</u>, Case No. 15-11934 (CSS) (Bankr. D. Del. Sept. 27, 2016) [Docket No. 1418] (the Court remarking "I don't need evidence to know this is a large and complex case" where there were nine debtors with approximately 600 employees, billions of dollars in prepetition liabilities, and interests in approximately 8,700 oil and gas production sites).  In this case, the 53 Debtors collectively operate approximately 2,200 store locations across four business segments, with nearly 12,000 employees across the United States.  <u>See</u> First Day Declaration ¶ 5.  As of the Petition Date, the Debtors had nearly two billion dollars in aggregate prepetition debt across four active prepetition credit facilities—of which the HoldCo Term Loan Facility represents only approximately one quarter.  <u>Id.</u> ¶ 51.  The Freedom Lender Group's oversimplified narrative regarding one debt facility and

two entities ignores the factor.  Adelphia II, 352 B.R. at 587 (holding the nine "cause" factors are not mere "platitudes" and "can't be ignored").

13.     Due to the complexity of the Debtors' corporate structure, every development in these Chapter 11 Cases impacts the enterprise as a whole.  Though the Freedom Lender Group purports to be focused on two specific entities, each incremental stage of its litigation campaign since the Petition Date has had a negative impact on the Debtors' personnel, operations, finances, and business relationships on the whole.  Terminating exclusivity with respect to the HoldCo Debtors at the outset of these cases—a remedy unsupported by any of the Debtors' constituents outside of an isolated junior creditor group—would result in immediate instability across the enterprise, in part because the impact of any plan proposed for the HoldCo Debtors is not likely to be limited to those entities.  The Freedom Lender Group has not met its burden to show that this factor weighs in favor of terminating exclusivity.

**C.     Adelphia Factors (b) and (g):  Only 30 Days of the 120-Day Exclusive Period Have Passed, During Which the Debtors Have Made Significant Progress Despite the Actions of the Freedom Lender Group.**

14.     The Freedom Lender Group's filing of an exclusivity termination motion only seventeen (17) days into the bankruptcy demonstrates its conviction to block *any* plan proposed by the Debtors in favor of grabbing the wheel of this reorganization for themselves.  See In re All Seasons Indus., Inc., 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (citing In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409–10 (Bankr. E.D.N.Y. 1989) (distinguishing case where "recalcitrant" opposition to plan by creditors intending to liquidate, rather than negotiate with debtor to agree on an equitable plan, merited extending debtors' exclusivity period); Motion ¶ 38 ("The Freedom Lender Plan . . . is the only plan that the Freedom Lender Group will support . . . .").  The Freedom Lender Group contends that plan "[n]egotiation would likely be futile," claiming its purported loss of confidence in the Debtors constitutes "cause" to prematurely

8

terminate exclusivity. Motion ¶ 38. Making conclusory statements that no confirmable version of the Plan is achievable simply because the Freedom Lender Group is unhappy with its treatment as currently proposed is an improper use of negotiating leverage and exactly the kind of "interference from creditors" that section 1121(b) of the Bankruptcy Code is designed to protect against. In re Spansion, Inc., 426 B.R. 114, 139–40 (Bankr. D. Del. 2010) ("Spansion II") (citing In re Texaco, Inc., 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988)) ("The purpose of the exclusivity period is to provide a debtor, at the outset of a chapter 11 case, with the *unqualified opportunity to negotiate a settlement* and propose a plan of reorganization without interference from creditors and other interests.") (emphasis added).

15.    The Freedom Lender Group's desire to prematurely end these Chapter 11 Cases is best evidenced by its advisors' communications. In a continuation of their prepetition, good faith efforts to negotiate a consensual resolution across their capital structure,[6] after the Debtors' advisors received a copy of the Freedom Lender Plan from the Freedom Lender Group's lawyers, the Debtors' advisors requested a call on the evening of Sunday, November 17, 2024, for the purpose of understanding the proposed terms of the Freedom Lender Plan. Barely 48 hours after that phone call—and during the same week in which the Debtors had to spend considerable effort defending themselves against the Freedom Lender Group's continued litigation of standard first day relief[7]—the Freedom Lender Group's lawyers communicated via email to the Debtors' lawyers that they felt the need to seek "remedies on an expedited basis," even though they acknowledge in that same email that the Debtors had already agreed to consider the proposal and provide comments. *Declaration of Betsy L. Feldman*, Exhibit A, filed concurrently herewith. Half

---

[6]    First Day Declaration ¶ 78.
[7]    See *Notice of Agenda for Virtual Hearing of Matters Scheduled for November 21, 2024 at 4:30 P.M. (ET)*, [Docket No. 209] at p. 3 (slating Informal Objection from the Ad Hoc Group of Freedom Lenders regarding the Debtors' critical vendors motion as going forward on hearing agenda).

an hour after receiving that email, the Debtors' advisors reiterated their ongoing consideration of the Freedom Lender Plan.  Id.  Nonetheless, the next morning—less than 72 hours after the initial phone call—the Freedom Lender Group filed the Motion.

16.      The unrealistic timeline on which the Freedom Lender Group apparently expected to strong-arm the Debtors into filing the Freedom Lender Plan—and its aversion to sharing the terms of such plan with the Ad Hoc Group of First Lien Lenders—shows that the Group is not interested in actually collaborating on the terms of a consensual deal.  The Freedom Lender Group's thinly-veiled objective is to weaponize the Bankruptcy Code to circumvent the Debtors' marketing process and effectuate the exact type of value-destructive foreclosure that the Debtors needed chapter 11 protection to avoid.  In re Capital Food Corp., 490 F.3d 21, 25 (1st Cir. 2007) ("Catastrophic business events, such as an imminent or threatened foreclosure . . .  are precisely the sort of imminent financial distress for which debtors regularly seek chapter 11 protection."). There is no cause to terminate exclusivity under these circumstances, particularly when these chapter 11 cases have been pending for only four weeks.  Cf. Emergency Motion, In re TCI2 Holdings, LLC, Case No. 09-13654 (JHW) (Bankr. D.N.J. Aug. 11, 2009) [Docket No. 530] ¶ 31 & Transcript of Hearing at 33:10, 88:18-20, In re TCI2 Holdings, LLC, Case No. 09-13654 (JHW) (Bankr. D.N.J. Sept. 1, 2009) [Docket No. 621] (terminating exclusivity approximately six months after the petition date when the debtors "had more than ample time to negotiate with their constituents, formulate a consensual plan of reorganization and present a plan to stakeholders" yet failed to formulate their own plan of reorganization); Transcript of Hearing at 68:13–18, 97:20–22, 99:7–10, In re Samson Res. Corp., Case No. 15-11934 (BLS) (Bankr. D. Del. Sept. 27, 2016) [Docket No. 1418]  (terminating exclusivity after more than one year of bankruptcy because exclusivity was not constructive and the debtors failed to show cause to further extend the

exclusive period). Even in <u>TCI2 Holdings</u>, where the debtors failed to confirm a plan after six months of exclusivity, the Court recognized the case "ha[d] gone forward fairly expeditiously" and refused to accuse the debtors of any delay. Transcript of Hearing at 92:21–23, <u>In re Samson Res. Corp.</u>, Case No. 09-13654 (JHW) (Bankr. D.N.J. Sept. 1, 2009) [Docket No. 621].

17.     It is also not relevant that the Freedom Lender Group believes that its "file-ready" plan is simpler or more efficient than the proposed Plan. The <u>Adelphia II</u> court held that the primary consideration for the Court should be "[w]hether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case." 352 B.R. at 590; <u>see also</u>, <u>e.g.</u>, <u>Dow Corning</u>, 208 B.R. at 670. The <u>Adelphia II</u> court also rightly recognized that "termination of exclusivity, just a few weeks before the Debtors might be in the position to confirm a plan, would be at odds with moving the case forward, and could be disastrous," as it could, among other things, "jeopardize current fragile agreements between various stakeholders, re-ignite intercreditor disputes, and push this process back to square one." <u>Id.</u> The Freedom Lender Group has already skirted dangerously close to triggering this avalanche of results by publicly referring to an alternative plan in the Motion. Motion ¶¶ 26–27.

18.     Far short of languishing in chapter 11, the Debtors have taken steps to stabilize their business, obtain postpetition financing, pursue the Plan agreed to by their senior lenders in the RSA, and reach consensus with their creditor base in the thirty days they have spent in bankruptcy—all within the 120-day period to which they are statutorily entitled,[8] and all despite the need to dedicate a significant and growing portion of their limited resources to the seemingly

---

[8]     The Freedom Lender Group's reliance on <u>In re Landmark Park Plaza</u> is misguided, as that case concerned a creditor who, *after the debtor's exclusive period had expired*, sought permission to file a similar, competing plan months after the debtors had filed a plan and weeks before that plan's confirmation hearing. 167 B.R. 752, 753 (Bankr. Del. 1994). In granting the creditor permission to file a competing plan, the <u>Landmark</u> court reasoned that, among other things, blocking a rival plan after exclusivity had expired would violate § 1121 as a "*de facto* extension of the debtor's exclusive period." <u>Id.</u> at 756–57.

endless barrage of litigation and discovery from the Freedom Lender Group.  The Freedom Lender Group has failed to meet its burden to show that either of these factors weighs in favor of terminating exclusivity.

    **D.**    **<u>Adelphia</u> Factors (c) and (f):  The Debtors Have Made Good Faith Progress in Negotiating Their Plan with Creditors.**

    19.    Contrary to the Freedom Lender Group's contentions that the Debtors are "aggressively" using the exclusivity period to pressure creditors into accepting a plan,[9] there is nothing in the record of these Chapter 11 Cases to suggest that the Debtors are not proceeding in good faith towards the filing of a plan.

    20.    Indeed, for the last month, in addition to attempting to engage constructively with the Freedom Lender Group, the Debtors and their advisors have participated in substantive dialogue and worked cooperatively with a significant number of their constituents across the capital structure.  The Debtors have held discussions with their ABL lenders, first lien lenders, the recently-appointed Official Committee of Unsecured Creditors, banks, landlords, and potential bidders, as well as a significant portion of their vendor base given the unrest created by the actions of the Freedom Lender Group at the outset of these chapter 11 cases.  The Debtors and their advisors have spent countless hours responding to emails, communicating by phone calls, and accommodating informational requests to the best of their practical ability.  Tellingly, the Debtors are not embroiled in litigation with any of these parties in interest.  This is not a situation where the Debtors are "using exclusivity as a sword" by dominating negotiations and refusing to engage

---

[9]    These arguments are legally misplaced because the Court is adjudicating a request by a creditor group for termination of exclusivity, not a request by the Debtors for an extension thereof.  <u>Compare</u> Transcript of Hearing at 98:7-99:14, <u>In re Samson Res. Corp.</u>, Case No. 15-11934 (CSS) (Bankr. D. Del. Sept. 27 2016) [Docket No. 1418] (denying debtors' motion to *extend* exclusivity where debtors used exclusivity in an "inappropriately aggressive way" to impede good faith negotiations and progress in the case) <u>with In re Geriatrics Nursing Home</u>, 187 B.R. 128, 134 (D.N.J. 1995) (holding there was no "cause" to prematurely *terminate* debtors' exclusivity period where debtors were "proceeding in good faith to solicit support for their timely plan of reorganization").

with key stakeholders.  See Transcript of Hearing at 97:21–24, 98:13–21, 99:2–6, In re Samson

Res. Corp., Case No. 15-11934 (CSS) (Bankr. D. Del. Sept. 27, 2016) [Docket No. 1418] (denying

motion to further extend exclusivity when debtors "[d]ropped huge developments in the case . . .

with days' notice before filing" despite having worked on those filings for months, and where

exclusivity, which had gone on for one year, was no longer "constructive" due to "a lack of

communication and negotiation among the key stakeholders").  The Freedom Lender Group has

not met its burden to show that these factors weigh in favor of terminating exclusivity.

> **E.    Adelphia Factor (e):  The Debtors Have Filed a Viable Plan.**

21.    The Debtors have already filed the Plan, which is a viable chapter 11 plan for

purposes of determining whether to terminate exclusivity.  The Freedom Lender Group's reliance

on the Tribune opinion is premature at this stage, because this factor does not require the proposed

plan to be confirmable.  Motion ¶ 41; In re Tribune Co., 464 B.R. 126, 135 (Bankr. D. Del. 2011),

aff'd sub nom. In re Tribune Media Co., 587 B.R. 606 (D. Del. 2018), aff'd sub nom. In re Tribune

Co., 972 F.3d 228 (3d Cir. 2020) (assessing the confirmability of two competing plans *after* the

completion of solicitation and voting for each).  Rather, this factor asks only whether "a debtor [is]

able to [obtain] confirmation of at least *some* viable plan, *not necessarily the plan currently*

*proposed*."  Adelphia II, 352 B.R. at 588 (emphasis added); see also In re Apex Pharmaceuticals,

Inc., 203 B.R. 432, 439–41 (N.D. Ind. 1996) (holding that during the debtors' initial exclusive

period, courts merely inquire whether "a reasonable possibility of a successful reorganization

within a reasonable time" exists).  The Debtors are more than willing to negotiate with the Freedom

Lender Group, and the Freedom Lender Group will have the opportunity to raise issues with the

Plan, as it may be amended or modified in the coming weeks, at the confirmation stage.

Terminating exclusivity simply because the Freedom Lender Group does not support the Plan in

its current form would sustain a premature confirmation objection.  See Adelphia II, 352 B.R. at

587 (holding that "creditor constituency unhappiness with a debtor's plan proposal" is not a basis for terminating exclusivity).

22.     Relatedly, the Freedom Lender Group cites to Judge Owens' recent decision in In re Lucky Bucks LLC to argue that these Chapter 11 Cases present a "Gordian knot" that can only be undone by prematurely terminating exclusivity or granting even more drastic relief.  Motion ¶¶ 29–30.  This case is easily distinguished because Lucky Bucks involved a conversion of the holding company-level debtors to a chapter 7 liquidation *after* the debtors proposed and solicited votes for a plan, which one hundred percent of the impaired creditors rejected.  Transcript of Hearing at 7:20–23, 8:3–7, Case No. 23-10758 (KBO) (Bankr. D. Del. July 3, 2023) [Docket No. 133].  In stark contrast, the Debtors in these cases have the support of over 97% of their first lien lenders for the terms of the Plan and are working in earnest to obtain the support of their other constituents.  The Freedom Lender Group has self-servingly reframed its current dissatisfaction with the Plan as an irreconcilable stalemate.  This is far from the impasse that the Lucky Bucks court addressed in its decision.

**F.     No Other Facts Support Prematurely Terminating Exclusivity.**

23.     The Freedom Lender Group reaches past the Adelphia Factors to argue the Court should prematurely terminate exclusivity, relying on an unpublished bench ruling from In re Pliant Co., Case No. 09-10443 (MFW) (Bankr. D. Del. June 30, 2009).  Unlike the current Motion, in Pliant, the motion to terminate exclusivity was not launched just to "gain leverage."  Judge Walrath expressly noted that the debtors were facing "unique circumstances" where the post-reorganization equity would be worth more through a proposed merger with a competitor that would not be available unless exclusivity was terminated.  Id. 229:1–5.  Importantly, the debtors' largest creditor and the unsecured creditors committee both supported terminating exclusivity.  Id. 196:23-197:15; 201:24-202:1.  Judge Walrath emphasized that "[t]he Debtors' right to propose a plan to run its

14

case is a very important right in bankruptcy.  It should not be cut off at the knees except in extreme circumstances or unique circumstances at least.  *The typical situation where . . . another [c]reditor group is simply seeking leverage to negotiate a plan that is not an appropriate case to terminate exclusivity.*"  Id. 229:2-9 (emphasis added).  The Freedom Lender Group's Motion fits squarely into that description, particularly given its reliance on Tribune to justify terminating exclusivity. Motion ¶ 43.  Unlike in Pliant, here, there is no value-maximizing transaction on the other side of exclusivity, and the Debtors' most senior creditors and the official committee of unsecured creditors are *not* supportive of terminating exclusivity.

24.    The Freedom Lender Group also cites In re TCI2 Holdings in support of its Motion, where the Court terminated exclusivity when the debtors had "done little to advance a plan process" after nearly six months of exclusivity, and another "definitive offer [was] on the table." Emergency Motion, In re TCI2 Holdings LLC, Case No. 09-13654 (JHW) (Bankr. D.N.J. Aug. 11, 2009) [Docket No. 530] ¶ 15 & Transcript of Hearing at 91:14–20 [Docket No. 621].  This case is simply not on point.  Unlike here, where the Debtors have already negotiated a RSA with overwhelming support from the First Lien Lenders, in TCI2 the debtors did not negotiate and propose their own plan of reorganization, but merely chose between two competing plans that were presented to them.  In re TCI2 Holdings, Case No. 09-13654 (JHW) (Bankr. D.N.J. 2009) [Docket No. 530] ¶ 4–5.  Those debtors sought extensions of exclusivity as a tactic despite having already decided on a plan—one designed by, and exclusively benefitting, insiders—to disguise the fact that their plan process was a "sham" and "nothing more than a charade and stall tactic" made "in the hope that effective opposition could not be mounted" against their plan.  Id. ¶ 4, 17–18, 26 ("[T]he Debtors never intended to seriously consider any plan but the one presented by [the insiders]," and "had already decided on a plan…nearly a month prior to the filing of the Debtors'

Exclusivity Extension Motion.").  Allowing the Freedom Lender Group to propose a competing plan for the HoldCo Debtors would accomplish nothing but further destabilize the Debtors' business, confuse the marketing process, and add to the ballooning administrative costs being incurred by the estates on account of the Freedom Lender Group's excessive litigation.  It would also leave the operating Debtors in a state of limbo at best (and at worst, expose them to the risk of immediate foreclosure by the Freedom Lender Group).

## II.    The Request to Lift the Automatic Stay for Purposes of Exercising Non-Bankruptcy Remedies Is an Attempt to Immediately Take Control of the Debtors and Should Be Denied.

25.    In the alternative, the Freedom Lender Group requests immediate relief from the automatic stay to "exercise their non-bankruptcy remedies."  Motion ¶ 8.  The automatic stay is a fundamental protection afforded to all debtors.  See Midlantic Nat'l Bank v. N.J. Dep't of Env't. Prot., 474 U.S. 494, 503 (1986).  The stay operates primarily to "stop all creditor collection efforts, stop all harassment of a debtor seeking relief, and to maintain the status quo between the debtor and [its] creditors, thereby affording the parties and the Court an opportunity to appropriately resolve competing economic interests in an orderly and effective way."  Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999) (emphasis omitted). The automatic stay is designed, among other things, to give the debtor a "breathing spell" after the commencement of a chapter 11 case, shielding debtors from creditor harassment and a multitude of litigation in a variety of forums at a time when the debtor's personnel should be focusing on the restructuring.  See, e.g., Borman v. Raymark Indus., 946 F.2d 1031, 1036 (3d Cir. 1991).

26.    Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that the automatic stay may only be modified by the bankruptcy court "for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362.  Whether "cause" exists to lift the automatic stay is a decision entrusted to the sound discretion of the

bankruptcy court.  See, e.g., In re SCO Group, Inc., 395 B.R. 852, 856 (Bankr. D. Del. 2007).

Because section 362(d)(1) does not define "cause," courts determine what constitutes cause based

on the totality of the circumstances and on a case-by-case basis.  See id.

**A.    The Freedom Lender Group is Adequately Protected.**

27.    As an initial matter, although a lack of adequate protection can constitute "cause"

for stay relief, the Freedom Lender Group has not met its burdens of proof in this regard.  The

movant bears the burden of proving its *prima facie* entitlement to relief under section 362(d).  In

re Scarborough-St. James Corp., 535 B.R. 60, 68 (Bankr. D. Del. 2015).  Furthermore, section

362(g) provides, in relevant part, that in any hearing under subsection (d) concerning relief from

the stay of any act under subsection (a) of section 362, then the party requesting such relief has the

burden of proof on the issue of the debtor's equity in the property.  11 U.S.C. § 362(g).

28.    To date, the Freedom Lender Group has not presented any evidence at this juncture

of the value of the HoldCo Debtors' assets (including the stock of Franchise Group, Inc.) or any

actual or threatened diminution in value of such assets.  To the contrary, the Freedom Lender

Group correctly notes that "[n]o evidence has been provided as to the fair market value or the total

enterprise value of the Debtors, collectively or individually"—the exact type of evidence they

would have needed to prevail on stay relief under section 362(d)(1).  The Freedom Lender Group's

argument is also undermined by the fact that it has never filed a motion seeking adequate protection

with respect to the HoldCo Loans or otherwise requested any related relief from the Debtors or the

Court.  See In re R&G Props., Case No. 08-10876 (CAB), 2009 Bankr. LEXIS 1320, at *9 n.6

(Bankr. D. Vt. Apr. 16, 2009) (noting that creditor seeking stay relief made no effort to require

adequate protection payments, "making its arguments for relief from stay under § 362(d)(1) less

than compelling").

29.     Moreover, none of the four cases that the Freedom Lender Group cites as precedent for its requested foreclosure relief on account of a lack of adequate protection are applicable. Motion ¶ 50.  In all four cases, the respective creditors seeking stay relief under section 362(d)(1) had met their burdens under sections 362(d) and 362(g) by presenting evidence of the value of the underlying equity to the court.  In re William A. Smith Constr. Co., 86 B.R. 115, 118 (Bankr. N.D. Ohio 1988) (noting that under section 362(d)(1), the creditor has the burden of proof of the debtor's equity in the property under section 362(g), and finding that creditor in that case had met its burden by relying on multiple valuations); In re Munoz, 83 B.R. 334, 338 (Bankr. E.D. Pa. 1988) (granting stay relief under section 362(d)(1) and making conclusions based on secured creditor's presentation of expert witness testimony on the valuation and financial performance of the underlying company, among other factors); In re Gilece, 7 B.R. 469, 473 (Bankr. E.D. Pa. 1980) (granting stay relief under section 362(d)(1) where secured creditor presented an expert witness who testified to the "weak financial condition" of the underlying company and that the company "would lose the benefit of a substantial net operating loss carried forward for income tax purposes," and that "based on the testimony and other evidence presented," the court found that the debtor had failed to provide adequate protection); In re Sears, No. 10-40275-TLS, 2010 Bankr. LEXIS 1130, at *3 (Bankr. D. Neb. Apr. 12, 2010) (granting stay relief under section 362(d)(1) where evidentiary record showed that (i) holders of promissory notes against two individual debtors who owned underlying company were owed approximately $5.6 million, (ii) underlying company had already gone through voluntary liquidation process, (iii) successful bidders at auction had agreed to pay in excess of $10 million for company's assets, and (iv) the two individual debtors, in their capacity as owners of the underlying company, nonetheless sought to reject those sale contracts).

30.    Separately, the impact of a secured creditor foreclosing on a stock pledge in these four cases is simply not comparable to the far-reaching, deleterious impact that such a foreclosure on Franchise Group's operating entities would have on the thousands of employees, vendors, and other stakeholders associated with the company's multiple business lines.  Three of the four cases cited by the Freedom Lender Group involved individual people who had filed for bankruptcy and had pledged stock owned in their personal capacities.  The fourth involved a company worth approximately $2.5 million.  It is disingenuous to characterize these cases as analogous to a chapter 11 case of the size and scope of Franchise Group's.

31.    In addition to simply failing to meet its legal burden, the practical reality is that the Freedom Lender Group is not entitled to adequate protection.  The collateral securing the HoldCo Loans consists of pledges of the equity of Franchise Group, Inc. and its direct parent, Freedom VCM, Inc.  The HoldCo Loans are structurally subordinated to all claims against Franchise Group, Inc., including general unsecured claims against that entity.  To date, no party has proposed any viable restructuring transaction other than the prepetition first lien lenders (as memorialized in the DIP documents and the RSA), pursuant to which the Debtors' prepetition first lien debt would equitize subject to the outcome of the Debtors' sale process.  The only way the Debtors' assets' value will flow past the prepetition first lien debt is if the Debtors identify a better deal during that process, which the Debtors—with funding only from the prepetition first lien lenders—are conducting to ensure they are maximizing the value of their assets for the benefit of all of their stakeholders.  In other words, the Freedom Lender Group consists of unsecured creditors who are not entitled to adequate protection, and who are in any event being adequately protected by the Debtors' pursuit of the sale process.  In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 90 (2d Cir. 2003)("The adequate protection of 11 U.S.C. § 361 protects only secured creditors." ); In

19

re Chama, Inc., 265 B.R. 662, 669 (D. Del. 2000) (holding that unsecured creditor was not entitled to adequate protection) (citations omitted).

**B.    The Freedom Lender Group Has Not Otherwise Established "Cause" to Lift the Automatic Stay.**

32.    Courts in this District generally employ a three-prong balancing test to determine whether "cause" exists to lift the automatic stay to permit non-bankruptcy proceedings to commence—a test the Freedom Lender Group neither acknowledges nor applies in its Motion despite its burden to do so.[10]  The balancing test considers: (1) whether the estate or the debtors would be prejudiced by lifting the stay; (2) whether the hardship suffered by plaintiff in the underlying proceeding "considerably outweigh[s]" the hardship to the debtors or the estate; and (3) whether the plaintiff has "a probability of prevailing on the merits."  Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.), 141 B.R. 574, 576 (Bankr. D. Del. 1992); accord Am. Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 152 B.R. 420, 424 (D. Del. 1993).

33.    Courts also consider other factors to determine whether cause exists to lift the automatic stay, including the degree of interference with the debtor's bankruptcy case.  See, e.g., In re DBSI, Inc., 407 B.R. 159, 166–67 (Bankr. D. Del. 2009).  "Even slight interference with the administration [of the debtor's estates] may be enough to preclude relief in the absence of a commensurate benefit."  In re W.R. Grace & Co., Case No. 01-01139 (JKF), 2007 Bankr. LEXIS 1214, at *2, n.7 (Bankr. D. Del. Apr. 13, 2007) ("W.R. Grace & Co. II") (quoting In re Curtis, 40 B.R. 795, 806 (Bankr. D. Utah 1984)) (denying relief from stay); see also In re DBSI, Inc., 407

---

[10]    Instead of citing to the Rexene factors, the Freedom Lender Group cites only to Scarborough-St. James Corp. for the principle that "cause" is a "flexible concept" that is "fact intensive and is to be determined case-by-case upon consideration of the totality of the circumstances."  535 B.R. at 67.  To be clear, the Scarborough-St. James Corp. court was not offering a different interpretation of "cause" in this portion of its opinion.  It stated in the next sentence that courts apply the three-prong balancing test established in Rexene in considering whether "cause" exists under section 362(d).  Id.

B.R. at 167 ("Courts also place emphasis on whether lifting the automatic stay will impeded [sic] the orderly administration of the debtor's estate.").

34.    As described herein, the Freedom Lender Group has not met its burden to show that "cause" exists under the <u>Rexene</u> factors, which are not even referenced in their Motion.

> **i.    The Debtors Will Suffer Significant Prejudice If the Freedom Lender Group Is Granted Relief from the Automatic Stay.**

35.    If the Freedom Lender Group's stay relief request is granted, a small group of junior lenders will be able to immediately foreclose on the equity of Freedom VCM, Inc. and Franchise Group, Inc., which would improperly deprive all of the company's stakeholders of the benefits of the marketing process.  They would also be able to immediately sweep the board of Franchise Group, Inc. and replace the directors and management team with individuals selected by the Freedom Lender Group and beholden only to them.

36.    The Freedom Lender Group has not shown any "cause" to justify such an extreme result at the outset of the chapter 11 cases.[11]  Indeed, preventing these adverse outcomes was among the primary reasons the HoldCo Debtors filed bankruptcy petitions.  Without the protections of the automatic stay, the Debtors are exposed to immediate action by the Freedom Lender Group under the following provisions of the HoldCo Term Loan Credit Agreement:

---

[11]    The extreme nature of the remedies sought by the Freedom Lender Group makes its automatic stay motion more akin to a dismissal motion.  The Freedom Lender Group cannot meet the standard for dismissal under section 1112 or the sixteen factors courts often consider to determine if dismissal is warranted.  <u>In re BH S&B Holdings, LLC</u>, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) (noting that Section 1112(b)(4) includes a list of sixteen non-exhaustive factors that may constitute cause and identifying ten additional factors courts use in determining cause).  Notably, there are no allegations of gross mismanagement, fraud, or abuse of the bankruptcy process.  Even if cause to dismiss the HoldCo Debtors' Chapter 11 Cases did exist, sections 305 and 1112 of the Bankruptcy Code also require the court to evaluate whether dismissal is in the best interests of the estate and creditors.  Dismissal would patently be value-destructive to the Debtors and as a result, is clearly not in the best interests of the estates or creditors.  It is generally accepted in this District that "when a business enterprise includes multiple debtors, the dismissal analysis is not performed with respect to a debtor in isolation—the court must consider such debtors 'holistically.'"  <u>In re Eht Us1</u>, 630 B.R. 410, 430–31 (Bankr. D. Del. 2021); <u>In re JER/Jameson Mezz II Borrower, LLC</u>, 461 B.R. 293, 301 (Bank. D. Del. 2011) ("[T]he Court concludes it must consider the Debtors holistically in order to determine if there is a realistic possibility that Mezz II can be rehabilitated."); <u>In re Energy Future Holdings Corp.</u>, 561 B.R. 630, 641 (Bankr. D. Del. 2016) (same).

a. The Debtors' obligations under the HoldCo Term Loan Credit Agreement are secured by a pledge of the equity interests in Debtor Franchise Group, Inc., which in turn owns all of the Debtors' operating subsidiaries.  HoldCo Term Loan Credit Agreement § 1.01(c).

b. The HoldCo Term Loan Credit Agreement is in default due to the Debtors' failure to meet the November 3, 2024 milestone to achieve an out-of-court restructuring transaction supported by the HoldCo Lenders.  HoldCo Term Loan Credit Agreement § 5.17(i)(vii); see First Day Declaration ¶¶ 79-80 (describing events of default that would have arisen on November 4, 2024 that would have been a cross-default under the HoldCo Term Loan Credit Agreement).

c. Absent the commencement of the Chapter 11 Cases, that default would have given the Freedom Lender Group the immediate right to foreclose on the equity of Franchise Group, Inc.  HoldCo Collateral Agreement § 4.01(b) ("If an Event of Default shall occur and be continuing, the Collateral Agent, on behalf of the Secured Parties, may exercise . . . (b) with or without legal process and with or without prior notice or demand for performance, to take possession of the Article 9 Collateral and the Pledged Collateral.")

d. Absent the commencement of the Chapter 11 Cases, the Freedom Lender Group would have been able to immediately exercise the voting rights of Franchise Group, Inc.'s equity, permitting the Freedom Lender Group to take governance-related actions at Franchise Group, Inc.  HoldCo Collateral Agreement § 4.01(b).  Most troublingly, the Freedom Lender Group would have been able to remove all board members and replace them with individuals of the lenders' selection.

e. Either or both of these actions could have occurred immediately upon the occurrence of the Event of Default: the HoldCo Term Loan Credit Agreement does not require advance written notice of the Event of Default to be provided to the Debtors in advance of exercising either remedy, nor does it provide any sort of grace period with respect to the Event of Default.  HoldCo Collateral Agreement § 2.05.

37.     These outcomes would be fatal to the transactions proposed in the RSA, which are supported by over 97% of the Debtors' prepetition First Lien Lenders and which the Debtors are discussing in good faith with their other creditor constituencies, including their prepetition ABL lenders and the Official Committee of Unsecured Creditors.  Perhaps most problematic, however, is that the Freedom Lender Group has not conceived of another restructuring transaction and has shown, to date, that it has no way of financing one.  The Freedom Lender Group has proposed zero

workable alternatives to the Plan embodied in the RSA. Its pre-petition out-of-court restructuring proposals were not actionable, and neither were its last-minute proposals for debtor-in-possession financing. Since the first day hearing, despite having ample time to do so, the Freedom Lender Group has not come forward with any proposals for a competing junior, enterprise-wide DIP, a HoldCo-level DIP, an exit financing, and/or a bid to acquire all or some of the Debtors' assets.

38.    Moreover, termination of the stay with respect to the HoldCo Debtors would not be isolated to an exercise of remedies at those two entities. Rather, it would result in (among other things) an immediate default under the DIP Facility and the RSA, which impacts the entire enterprise. Restructuring Support Agreement § 12.01(p). The Debtors will lose access to their postpetition financing and the deal under the RSA will disintegrate. Because the Freedom Lender Group has no path forward for the company, this course of action serves no purpose other than to torpedo the Debtors' marketing process, create chaos, and drive the debtors towards liquidation. Without the DIP and the RSA, absent a simultaneous replacement DIP—i.e., a loan of a size that the Freedom Lender Group has never been willing to propose, let alone actually able to provide— the Debtors will quickly become administratively insolvent and will have little choice but to liquidate to the detriment of their stakeholders, including the thousands of employees, customers, and vendors.

**ii.    The Freedom Lender Group Will Not be Prejudiced If the Automatic Stay Is Maintained.**

39.    By contrast, the Freedom Lender Group will suffer no prejudice if the Automatic Stay remains in place. As set forth above, the Freedom Lender Group is adequately protected and benefits by allowing the sale process to run its course. Moreover, the lenders have an adequate remedy to resolve their concerns with the Plan: filing a Plan objection, like every other creditor

affected by the Plan.  The Debtors continue to invite the Freedom Lender Group to engage with them constructively on the applicable terms of the Plan.

### iii. The Freedom Lender Group Has Not Established a Likelihood of Success in Pursuing Its Proposed Foreclosure.

40.     A foreclosure is not certain to benefit the Freedom Lender Group—for the same reason it does not benefit any of the Debtors' stakeholders.  The Freedom Lender Group has not shown that the equity interests of HoldCo Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. and Debtor Franchise Group, Inc. are valuable assets, and the only viable transaction proposed by any party thus far shows that they are not.  If there is any value attributable to those equity interests, the only way it will be realized is if the Debtors can finish their marketing process.[12]

41.     For the foregoing reasons, the Freedom Lender Group has failed to satisfy its burden to establish cause for lifting the automatic stay. The Court should decline to lift the automatic stay at this critical period in these chapter 11 cases so that the Debtors—including the HoldCo Debtors—can focus their time and resources on achieving a successful reorganization, rather than defending against an action commenced by a single creditor in a separate forum.

### III. The Motion to Appoint a Chapter 11 Trustee for the HoldCo Debtors Should Be Denied.

42.     The Freedom Lender Group's motion to appoint a chapter 11 trustee should be denied.  Appointment of a trustee is an extreme remedy in any bankruptcy, and one that is totally

---

[12]   Even assuming *arguendo* that the Freedom Lender Group has established a likelihood of success on the merits (which it has not), courts have held that this factor is not crucial if the debtor would be harmed by lifting the automatic stay and the harm is not outweighed by hardship on the movant.  See In re Spansion, 418 B.R. 84, 97 (Bankr. D. Del. 2009) (finding that "the third factor is not crucial to [the court's] determination" because the other factors "weigh heavily in favor of staying the [action]"), vacated on other grounds, Samsung Elecs. Co. v. Ad Hoc Consortium of Floating Rate Noteholders, No. 09-0836 (RBK), 2010 U.S. Dist. LEXIS 64499*, at *1 (D. Del. June 29, 2010).

unmerited in this case.  Section 1104(a) of the Bankruptcy Code provides, in relevant part, that

upon request of a party in interest, and after a notice and a hearing, the court shall appoint a trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current management,
> either before or after the commencement of the case, or similar
> cause, but not including the number of holders of securities of the
> debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity
> security holders, and other interests of the estate, without regard to
> the number of holders of securities of the debtor or the amount of
> assets or liabilities of the debtor.

11  U.S.C. § 1104(a).

43.     A movant must demonstrate the need for a trustee by clear and convincing

evidence, a high standard of proof that requires the movant to "overcome a strong presumption

that the debtor is to remain in possession." In re LHC, LLC, 497 B.R. 281, 291 (Bankr. N.D. Ill.

2013) (citation omitted).  Evidence is "clear and convincing evidence" only if:

> "it produces in the mind of the trier of fact a firm belief or conviction
> as to the truth of the allegations sought to be established, evidence
> so clear, direct and weighty and convincing as to enable the fact
> finder to come to a clear conviction, without hesitancy, of the truth
> of the precise facts in issue."

Official Comm. Of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 295 B.R.

502, 507–08 (D.N.J. 2003) (internal citations omitted), aff'd, 385 F.3d 313 (3d Cir. 2004) ("G-I

Holdings II"); In re LHC, LLC, 497 B.R. 281, 291 (Bankr. N.D. Ill. 2013) ("Applying the clear

and convincing evidence standard appears to the Court to be more consistent with the presumptions

that a debtor should generally be permitted to remain in control and possession of its business and

that the appointment of a Chapter 11 trustee is an extraordinary remedy.").

44.     "It is settled that appointment of a trustee should be the exception, rather than the

rule." In re Sharon Steel Corp., 871 F.2d 1217, 1225 (3d Cir. 1989) (citations omitted).  "The

basis for the strong presumption against appointing an outside trustee is that there is often no need for one: 'The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization.'" In re Marvel Ent. Grp., Inc., 140 F.3d 463, 471 (3d Cir. 1998) (citations omitted).

45.    The Freedom Lender Group incorrectly relies on Marvel to argue that the presumption against a trustee should not be afforded weight here.  In Marvel, the company was owned by two entities controlled by Carl Icahn, who had gained control of the debtors' equity following months of litigation against the company during its chapter 11 case.  The Icahn entities subsequently wore "two hats—one as creditors of the holding companies that controlled Marvel; the other as debtor-in-possession of Marvel."  140 F.3d at 467.  In finding that the presumption against a trustee did not apply in this case, the Court noted that "[t]he Icahn interests took control over Marvel's management six months after the chapter 11 filing.  *We are not confronted with a debtor who possesses extensive familiarity with the company's operations*.  It is therefore inappropriate to suggest that the usual presumption should be applied to a Johnny-come-lately debtor-in-possession, *especially one that is also as substantial creditor*."[13] Id. at 471.

46.    The facts of the current case could not be much more different from the extreme facts the court encountered in Marvel.  As set forth in the First Day Declaration, Franchise Group has existed since July 2019.  First Day Declaration ¶ 19.  None of the core members of the company's management team are substantial creditors of the Debtors, and they have all been employed in senior management roles since the company's inception:[14]

>    a.    Andrew Laurence, the Chief Executive Officer of the Debtors and a board member of the HoldCo Debtors, was an Executive Vice President of the Debtors from

---

[13]    Ironically, this is the exact fact pattern the Freedom Lender Group would be able to create if its motion to lift the automatic stay were granted.

[14]    *Our Team*, FRANCHISE GRP., INC., https://franchisegrp.com/our-team/ (last accessed November 30, 2024).

October 2019 and served in that role for more than four years until his appointment to Chief Executive Officer in January 2024.

b.  Andrew Kaminsky, the Chief Administrative Officer of the Debtors and a board member of the HoldCo Debtors, has been an Executive Vice President of the Debtors since October 2019.

c.  Tiffany McMillan-McWaters, General Counsel of the Debtors and a board member of the HoldCo Debtors, was Assistant General Counsel from October 2019 through July 2021, at which point she was appointed General Counsel.

d.  Eric Seeton, the Chief Financial Officer of the Debtors, has served in his role since October 2019.

e.  The other board members of the HoldCo Debtors, Bryant Riley and independent director John Hartmann, have served in their roles since August 2023 and January 2024, respectively.  Notably, despite the Freedom Lender Group's reference to "independent" directors in the Motion, it was the Freedom Lender Group itself that selected and required the appointment of Mr. Hartmann at the beginning of 2024.[15] See Second Amended and Restated Limited Liability Company Agreement of Freedom VCM Holdings, LLC Art. 5, § 5.1(c)(i) (noting that the board of Freedom VCM Holdings, LLC shall include "one additional individual . . . that satisfies the requirements set forth in the Holdco Credit Agreement").[16]

f.  Mr. Orlofsky's appointment as Chief Restructuring Officer in October 2024 also stems from a requirement of the Freedom Lender Group.  In connection with its August 2024 agreement to provide certain covenant relief, the Freedom Lender Group required the Debtors to hire AlixPartners, LLP ("Alix"), or another financial advisor reasonably acceptable to the lenders, as their financial advisor.  See Fifth Amendment to HoldCo Credit Agreement, § 5.17(h).  The Freedom Lender Group required the terms of Alix's retention to be acceptable to it.  Id.  Prior to filing the Motion, the Freedom Lender Group had not indicated any dissatisfaction to the Debtors regarding Mr. Orlofsky, Alix, or the terms of their engagement.

47.  The Freedom Lender Group does not cite any other precedent supporting its contention that the strong presumption in favor of leaving a debtor in possession of its estate should apply here, nor has it shown that either prong of Section 1104(a) applies.

---

[15]  The other independent directors in this case, Christopher Meyer and Todd Arden, do not sit on the Boards of Directors of the HoldCo Debtors.

[16]  Given the voluminous nature of the Second Amended and Restated Limited Liability Company Agreement of Freedom VCM Holdings, LLC and the Third Amendment to Credit Agreement, these documents are not attached hereto, but are available upon request from the Debtors.

A.    **The Freedom Lender Group Has Failed to Demonstrate that "Cause" Exists to Appoint a Chapter 11 Trustee Pursuant to Section 1104(a)(1) of the Bankruptcy Code.**

48.    The Freedom Lender Group fails to set forth "clear and convincing evidence" that "cause" exists under Section 1104(a)(1) of the Bankruptcy Code.  The Freedom Lender Group cites two grounds for appointment of a trustee: the existence of purported conflicts between the HoldCo Debtors and the operating subsidiaries, and the proposed Plan.  Both fail to constitute "cause" for the reasons set forth below.

49.    Contrary to the Freedom Lender Group's assertion that "no identifiable fiduciary" is looking out for the HoldCo Debtors, both of the HoldCo Debtors are corporations and, as a result, have their own boards of directors.  Those boards each have five members: Andrew Laurence, Andrew Kaminsky, Tiffany McMillan-McWaters, Bryant Riley, and the Freedom Lender Group's designated independent director, John Hartmann.  Those boards owe fiduciary duties to <u>all of the Debtors' stakeholders</u>, not solely to the Freedom Lender Group.  Importantly, these boards do not have conflicting fiduciary interests, because the HoldCo Debtors' interests do not diverge from those of the operating subsidiaries.  The Debtors filed for chapter 11 bankruptcy to maximize the value of the Debtors' assets for all of the Debtors' stakeholders, and the HoldCo Debtors (whose only known, non-contingent liability is ultimately secured by a pledge of Franchise Group, Inc.'s equity)[17] likely only have a chance of recovery in these cases if the Debtors can maximize the value of the assets held by the operating subsidiaries.  In the event an issue did arise that impacted the Freedom Lender Group specifically in its members' capacities as creditors of the HoldCo Debtors, their interests are well represented by Mr. Hartmann's presence on the

---

[17]    The HoldCo Debtors may have other claimants besides the Freedom Lender Group, including contingent, unliquidated claims for indemnification that may be asserted by directors, officers, employees, and agents of either or both entities.

boards of those HoldCo Debtors, as well as on the boards of Franchise Group, Inc. and the ultimate parent.

50.    The Debtors do not believe the HoldCo Debtors hold any viable claims against the other Debtors with respect to the take-private transaction.  That deal was financed in large part by the Freedom Lender Group, who was represented by sophisticated counsel throughout and, notably, was primarily responsible for creating the structure of the transaction.  Since the transaction closed over one year ago, the Freedom Lender Group had never so much as broached the topic of litigation related to the transaction.  Claims between two entities—which the Freedom Lender Group itself labels a "classic holdco/opco structure"—do not justify appointment of a trustee, particularly where those claims are hypothetical, unsubstantiated, and were mentioned for the first time upon commencement of the bankruptcy.  In re Adelphia Commc'ns Corp., 336 B.R. 610, 645, 659 n.121 (Bankr. S.D.N.Y. 2006) (emphasizing that "no case has ever held that the presence of interdebtor disputes, without more, makes the appointment of a trustee mandatory, under either subsection (a)(1), or subsection (a)(2);" that "the Court looks to the presence of interdebtor disputes as a factor to be considered, to be weighed along with the other factors tending to favor, or oppose, the appointment of a trustee;" and that "[m]ulti-debtor chapter 11 cases with disputes or apparent conflicts between or amongst debtors are quite common"); see also In re Int'l Oil Co., 427 F.2d 186, 187 (2d Cir. 1970) (noting that the existence of intercompany claims by itself was not a basis "to saddle [the] estates with the expense of separate trustees and trustees' attorneys.").

51.    Nonetheless, the Debtors have not indicated that they would refuse to investigate, prosecute, settle, or preserve any such claims if they do exist, and speculation about a debtor's future conduct "does not overcome the strong presumption that the debtor should be permitted to

remain in possession in a Chapter 11 case or justify the additional costs of a trustee." <u>In re Sletteland</u>, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (citation omitted).[18]  To the contrary, as described in the First Day Declaration, in October, the independent directors of the Debtors (including Mr. Hartmann) decided to retain the independent law firm of Petrillo Klein + Boxer LLP ("<u>Petrillo</u>") to undertake an investigation of, among other things, the take-private transaction. This investigation is not limited to considering any specific types of claims and/or any specific list of parties against whom those claims may be asserted—to the contrary, the independent directors can request that Petrillo consider any transactions "deemed material" by those independent directors.[19]  Importantly, all of the releases in the proposed chapter 11 plan regarding the "Investigation Related Matters" (as defined therein), including releases provided by the Debtors to other Debtors with respect to the take-private transaction, are subject to the outcome of Petrillo's investigation.  Plan at Article 12.2.

52.    Although the Debtors do not believe it is necessary in light of the foregoing, and although the Freedom Lender Group has not requested it—despite the fact that it would have been a much less draconian request than anything sought in the Motion, and that it would not have required litigation—the Boards of Directors of the direct equity owners of each of the HoldCo Debtors are supportive of appointing a new independent director solely at the HoldCo Debtors. The new independent director would have all the same rights and obligations as the other directors

---

[18]    Even if the Debtors had already refused to bring the avoidance action with which the Freedom Lender Group purport to be concerned, that refusal on its own would not rise to the level of establishing "cause" to appoint a trustee.  Official Comm. Of Asbestos Personal Injury Claimants v. Sealed Air Corp. (<u>In re W.R. Grace & Co.</u>), 285 B.R. 148, 158 (Bankr. D. Del. 2002) (denying request for appointment of a trustee where, among other things, the debtor had declined to pursue potential avoidance actions to insiders, and stating that "where the impetus for a trustee stems from the single issue of the fraudulent conveyance action, the Court believes that a trustee should be a last resort").

[19]    Debtors' Application for an Order Authorizing the Retention and Employment of Petrillo Klein + Boxer LLP as Special Counsel to the Debtors and Debtors in Possession Effective as of the Petition Date, <u>Exhibit F</u>.

at those entities, <u>except</u> that the consent of the new independent director would be required to deal with any conflict matters among the Debtors.  The new director would be empowered to conduct an investigation into whether any such claims exist, as well as prosecute and settle such claims, and would be free to select counsel of his or her choosing to assist with these actions.  This solution, which the applicable boards have already voted in favor of implementing, would efficiently accomplish the purported objective of the Freedom Lender Group without the major disruption that appointment of a chapter 11 trustee would entail.

53.    Furthermore, the Debtors understand that the Ad Hoc Group of First Lien Lenders has agreed that the HoldCo Debtors need not serve as guarantors (either secured or unsecured) under the DIP Facility.  This concession eliminates the Freedom Lender Group's argument that the Debtors' DIP Facility "would saddle the HoldCo Debtors with over $783 million of obligation without receiving any benefit."  Motion ¶ 50.

54.    The Freedom Lender Group's allegations amount, once again, to nothing more than its dissatisfaction with its treatment under the proposed Plan.  Its discontent does not justify the appointment of a trustee.  "Unhappy creditors" cannot remove debtors-in-possession "by their obstinate refusal to cooperate."  <u>Marvel</u>, 140 F.3d at 473 (noting that there "is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee").

**B.    The Freedom Lender Group Has Failed to Demonstrate that the Appointment of a Chapter 11 Trustee Would Be "in the Interests of Creditors, Any Equity Security Holders, and Other Interests of the Estate" Pursuant to Section 1104(a)(2) of the Bankruptcy Code.**

55.    Under section 1104(a)(2) of the Bankruptcy Code, courts utilize a cost/benefit analysis and general principles of equity to determine whether appointment of trustee is "is in the interests of creditors, any equity security holders, and other interests of the estate . . . ."  11 U.S.C.

§ 1104(a)(2); see 7 Collier on Bankruptcy ¶ 1104.02[3][d][ii] (summarizing the cost/benefit analysis under § 1104(a)(2)); In re LHC, LLC, 497 B.R. at 293 ("Determining whether appointment of a trustee is in the interests of the various constituencies of the estate is fact-specific and requires the court to balance the benefits of such an appointment against its anticipated costs.").  In balancing these anticipated benefits and accompanying costs, courts consider the following factors: "(1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for rehabilitation; (3) whether the business community and creditors of the estate have confidence in the debtor; and (4) whether the benefits outweigh the costs."  In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); see also In re V. Savino Oil & Heating Co., Inc. 99 B.R. 518, 527 n. 11 (Bankr. E.D.N.Y. 1989) ("[T]he factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great deal of judicial discretion.").

56.     The appointment of a chapter 11 trustee is only in the "interests of the estate if the benefits to *all interests* of the estate to be derived from a trustee outweigh the detriment to the estate." 7 Collier on Bankruptcy ¶ 1104.02[3][d][ii] (emphasis added).  As explained in the House Report summarizing Congress's rationale behind adopting a flexible standard for the appointment of a trustee under section 1104(a)(2) of the Bankruptcy Code, "the twin goals of the standard for the appointment of a trustee should be protection of the public interest and the interests of creditors . . . and facilitation of a reorganization that will benefit both the creditors and the debtors . . . ." H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 (1977).  Thus, *all* creditors must be considered in making this decision.  Notably, "when equity security holders or other ownership interests properly and in good faith support the debtor's current management, it will be difficult to obtain an order

for the appointment of a trustee under the "interests" standard, as such an appointment will presumably not be in the interest of equity."  See 7 Collier on Bankruptcy ¶ 1104.02[3][d][i].

57.     Each of the following factors weighs heavily against appointing a chapter 11 trustee pursuant to section 1104(a)(2).

> **i.     The Debtors are Trustworthy, and Their Past and Present Performance and Prospects for Rehabilitation Weigh Against Appointment of a Chapter 11 Trustee.**

58.     The Freedom Lender Group has failed to show "clear and convincing evidence" that the Debtors are untrustworthy and are incapable of rehabilitation.  The Freedom Lender Group's bizarre attempt to cast the Debtors' management team as new to the business and unfamiliar with the Debtors' operations is not factual and should not be afforded any weight.  The management team has been operating the company since it started five years ago.  See infra para. 46.  The "strong presumption" against appointing a chapter 11 trustee "finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization." G-I Holdings II, 385 F.3d at 319 (citing In re Marvel Entm't Group, Inc., 140 F.3d at 471).

59.     Furthermore, the Debtors filed for bankruptcy less than three weeks before the Freedom Lender Group filed its Motion seeking to take control of the HoldCo Debtors' estates (and, ultimately, the equity of Franchise Group, Inc.).  Appointing a trustee now would violate a key purpose of chapter 11, which is "to give the debtor breathing room to create a strategic plan to pay back its debts" and benefit from the automatic stay.  In re LHC, LLC, 497 B.R. at 310.  Prior to filing these Chapter 11 Cases, the HoldCo Debtors faced a default under the HoldCo Credit Agreement that would have given the Freedom Lender Group the right to take control of Franchise Group, Inc.  See infra para. 29.  In light of the applicable directors' proper discharge of their

33

fiduciary duties to all stakeholders in determining to file the HoldCo Debtors' chapter 11 petitions to obtain the protections of the automatic stay, the Motion is unsupportable.  Even if the relief requested in the Motion was justified, which it is not, such relief is premature at best.  See Marvel, 140 F.3d at 472 (granting appointment of chapter 11 trustee one year after petition date); In re Morningstar Marketplace, Ltd., 544 B.R. 297, 301 (Bankr. M.D. Pa. 2016) (granting appointment of chapter 11 trustee one and a half years after petition date); In re Sharon Steel Corp., 871 F.2d at 1219 (granting appointment of chapter 11 trustee five months after petition date); In re Biolitec, Inc., Case No. 13-11157 (DHS), 2013 Bankr. LEXIS 1377 (Bankr. D.N.J. Apr. 3, 2013) (requesting appointment of chapter 11 trustee one month after petition date after *ten years* of prepetition litigation between movants and debtors).

      **ii.    The Freedom Lender Group's Purported Lack of Confidence in Current Management is Unfounded.**

    60.    The Freedom Lender Group has failed to produce evidence supporting its alleged lack of confidence in the Debtors.  The Freedom Lender Group makes a single conclusory allegation that the management team "is not considering what is in the best interest of the HoldCo Debtors' estates," which is demonstrably false and, in any event, in no way sufficient to justify a remedy as costly and disruptive as appointing a chapter 11 trustee.  Mfrs. & Traders Trust Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.), 544 B.R. 297 (Bankr. M.D. Pa. 2016) (noting that "[l]ack of confidence must be more than a personal dislike for management and should relate to the objectives of the case"); In re Century Glove, Inc., 73 B.R. 528, 537 (Bankr. D. Del. 1987) ("The appointment of a trustee imposes substantial financial burdens on a debtor's estate which can preclude the possibility of reorganization."); In re Stein & Day, Inc., 87 B.R. 290, 295 (Bankr. S.D.N.Y. 1988) ("Not only will the costs of a trustee burden this estate, but current management's experience and knowledge are essential to the debtor's future.").

### iii.    Appointment of a Chapter 11 Trustee Will Not Benefit All Creditors, As Required Under Section 1104(a)(2) of the Bankruptcy Code.

61.    The Court should not entertain the Freedom Lender Group's overt attempt to disenfranchise other creditors through the appointment of a chapter 11 trustee.  7 Collier on Bankruptcy ¶ 1104.02[3][d][i].  "[A] creditor group, no matter how dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it would be in its interests." Sletteland, 260 B.R. at 672.  Instead, such creditor  "must show that the appointment is in the interests of *all those with a stake in the estate . . . .*" Id. (emphasis added).

62.    In WorldCom, the court refused to appoint a chapter 11 trustee, noting that:

> The appointment of a trustee would be very costly to the Debtors and their estates, with no apparent benefit. Given the size and complexity of the Debtors and their operations, the delay and expense that would be caused by the trustee's (and new professionals') need to learn about the Debtors' assets, liabilities, businesses, and chapter 11 cases would be substantial and would likely seriously and adversely affect the prospects of rehabilitation. The appointment of a trustee would severely impede the Debtors' ability to confirm a consensual chapter 11 plan of reorganization within the next few months. As has been stated previously in this decision, the issues raised by the Movants throughout are most appropriately addressed in the context of the Plan confirmation process.

In re WorldCom, Inc., Case No. 02-13533 (AJG), 2003 Bankr. LEXIS 2192, at *38-39 (Bankr. S.D.N.Y. May 16, 2003).  For the same reasons, the appointment of a chapter 11 trustee here is not warranted.  The disruption, instability, and financial costs associated with the appointment of a chapter 11 trustee in these Chapter 11 Cases, in exchange for no cognizable benefit to the estates, weigh heavily against granting the Motion.  Compare In re Morningstar Marketplace, Ltd., 544 B.R. 297 (concluding that the appointment of a chapter 11 trustee funded by the movants was in the best interest of creditors and other interests of the estate because reorganization was not possible, the debtors had failed to sell their assets as a going concern for almost two years, evidence

showed that the debtor's principal was motivated to protect his own interests rather than the interests of creditors, and benefits of appointing a trustee outweighed the costs).

## **RESERVATION OF RIGHTS**

63.     The Debtors reserve the right to supplement and amend this Objection, to seek discovery with respect to the same, and to introduce evidence at any hearing relating to the Motion, and expressly reserve all rights under applicable law and otherwise.

## **CONCLUSION**

64.     The Freedom Lender Group has not shouldered its burdens to meet any of the applicable legal standards to obtain the relief it is requesting in the Motion.  The Motion should be denied.

[*Remainder of Page Intentionally Left Blank*]

Dated: December 3, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Matthew A. Feldman (admitted pro hac vice)
Betsy L. Feldman (Del. No. 6410)
Joseph R. Brandt (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com
jbrandt@willkie.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*