## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (JTD)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 192** |

### OBJECTION OF THE AD HOC GROUP OF FIRST LIEN LENDERS TO THE MOTION OF THE AD HOC GROUP OF FREEDOM LENDERS FOR ENTRY OF AN ORDER (I) TERMINATING EXCLUSIVITY IN THE HOLDCO DEBTORS' CASES, (II) LIFTING THE AUTOMATIC STAY IN THE HOLDCO DEBTORS' CASES, OR (III) APPOINTING A CHAPTER 11 TRUSTEE FOR THE HOLDCO DEBTORS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ...................................................................................................1

**BACKGROUND** ..........................................................................................................................4

    A.    The Take Private Transaction ...............................................................................4

    B.    The Freedom Lender Group Immediately Chokes the OpCo Debtors ................5

    C.    Lead Up To The Chapter 11 Cases .......................................................................6

    D.    The Freedom Lender Group Attempts To Hold Up The Process .......................8

    E.    The Chapter 11 Cases .........................................................................................10

**ARGUMENT** ..............................................................................................................................11

    A.    The Freedom HoldCo Debtors' Plan Exclusivity Should Not Be Terminated ...............11

          1.    The HoldCo Lenders May Not Be The Only Creditors Of The Freedom HoldCo Debtors ...................................................................12

          2.    Cause Does Not Exist to Terminate The Freedom HoldCo Debtors' Exclusive Periods .........................................................................14

                i.    The Freedom HoldCo Debtors' Bankruptcy Cases Are Complex ..........15

                ii.    The Freedom Lender Plan Cannot Quickly Be Confirmed ...................15

                iii.    The Debtors Are Making Good Faith Progress Towards Confirmation ...................................................................................15

                iv.    The Proposed Plan Is Viable ................................................................17

                v.    Entry Into The RSA Does Not Constitute Cause To Terminate Exclusivity ...............................................................................18

    B.    The Court Should Decline To Lift The Automatic Stay .....................................19

          1.    The Freedom Lender Group Fails to Show Cause for Relief from the Automatic Stay ................................................................................20

          2.    The Debtors' Proposed Plan Provides Adequate Protection to the Freedom Lender Group ........................................................................22

    C.    Appointment Of A Chapter 11 Trustee Is Not Appropriate Or Necessary .......................24

          1.    The Debtors Have No Conflict that Warrants Appointment of a Chapter 11 Trustee .........................................................................................25

          2.    The Terms of the Freedom Lender Plan Do Not Constitute Cause under Section 1104(a)(1) .......................................................................26

          3.    Appointing a Trustee is Not in the Estates' Interests ...........................28

**RESERVATION OF RIGHTS** ..................................................................................................30

**CONCLUSION** ..........................................................................................................................31

# TABLE OF AUTHORITIES[2]

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
352 B.R. 578 (Bankr. S.D.N.Y. 2006), *clarified on denial of reconsideration*, No. 02-
41729, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006) ................................................. 14, 15, 18

*In re All Seasons Indus.*,
121 B.R. 1002 (Bankr. N.D. Ind. 1990) ........................................................................................ 17

*In re Armenakis*,
406 B.R. 589 (Bankr. S.D.N.Y. 2009) ........................................................................................... 23

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008)........................................................................................................ 24

*Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ........................................................................................................................ 19

*In re Bicoastal Corp.*,
1989 WL 607352 (Bankr. M.D. Fla. Nov. 21, 1989) ...................................................................... 22

*Matter of Cont'l Airlines, Inc.*,
146 B.R. 536 (Bankr. D. Del. 1992), *subsequently aff'd sub nom. In re Cont'l
Airlines*, 91 F.3d 553 (3d Cir. 1996) .............................................................................................. 23

*In re Country Estates Nursing Home, Inc.*,
268 B.R. 316 (Bankr. D. Mass. 2001) ............................................................................................. 22

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.
Chinery*,
330 F.3d 548 (3d Cir. 2003) ............................................................................................................ 30

*In re Eletson Holdings Inc.*,
659 B.R. 426 (Bankr. S.D.N.Y. 2024) ............................................................................................ 28

*In re G-I Holdings, Inc.*,
295 B.R. 502 (D.N.J. 2003), *aff'd*, 385 F.3d 313 (3d Cir. 2004) ...................................................... 30

*In re G-I Holdings, Inc.*,
385 F.3d 313 (3d Cir. 2004) ............................................................................................................ 25

---

[2]    Because of the voluminous nature of the unpublished legal authorities cited herein that are not readily available on Lexis or Westlaw, they are not attached to this Objection.  Copies are available upon request to the First Lien Group's counsel.

*In re GenCanna Glob. USA, Inc.*,
    619 B.R. 364 (Bankr. E.D. Ky. 2020) ................................................................................ 22

*In re Ionosphere Clubs, Inc.*,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990) ............................................................................... 28

*JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props. (In re Transwest
    Resort Props.)*,
    881 F.3d 724 (9th Cir. 2018) .............................................................................................. 17

*In re Lehigh Valley Pro. Sports Club, Inc.*,
    No. 00-11296DWS, 2000 WL 290187 (Bankr. E.D. Pa. Mar. 14, 2000) ............................ 11

*In re Lucky Bucks*,
    Case No. 23-10758 (KBO) (Bankr. D. Del. 2023) ............................................................. 17

*In re Marvel Ent. Grp., Inc.*,
    1998 WL 181084 (D. Del. Jan. 27, 1998), *rev'd*, 140 F.3d 463 (3d Cir. 1998) .................. 29

*Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.*,
    474 U.S. 494 (1986) ........................................................................................................... 19

*In re Morningstar Marketplace, Ltd*,
    544 B.R. 297 (Bankr. M.D. Pa. 2016) ............................................................................... 29

*N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*,
    571 B.R. 650 (Bankr. D. Del. 2017) .................................................................................. 13

*In re: NESV Ice*,
    LLC, No. 21-11226-CJP, 2023 WL 2278603 (Bankr. D. Mass. Feb. 28, 2023) ................. 18

*Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In Re W.R. Grace
    & Co.)*,
    285 B.R. 148 (Bankr. D. Del. 2002) .................................................................................. 29

*In re Opus East, LLC*,
    528 B.R. 30 (Bankr. D. Del. 2015) .................................................................................... 13

*In re Pliant Corp.*,
    Case No. 09-10443 (MFW) (Bankr. D. Del. 2009) ............................................................ 19

*In re Rexene Products Co.*,
    141 B.R. 574 (Bankr. D. Del. 1992) ......................................................................... 20, 21, 22

*In re RNI Wind Down Corp.*,
    348 B.R. 286 (Bankr. D. Del. 2006) .................................................................................. 20

*In re SCO Grp., Inc.*,
    395 B.R. 852 (Bankr. D. Del. 2007) .................................................................................. 19

*In re Sharon Steel Corp.*,
    871 F.2d 1217 (3d Cir.1989) .............................................................................................. 25

*In re Spansion, Inc.*,
 426 B.R. 114 (Bankr. D. Del. 1991)........................................................................................... 11, 16

*In re TCI2 Holdings, LLC*,
 Case No. 09-13654 (JHW) (Bankr. D.N.J.) ....................................................................................... 19

*In re W.R. Grace & Co.*,
 No. 01 01139 JFK, 2007 WL 1129170 (Bankr. D. Del. Apr. 13, 2007) ....................................... 20, 21

**Statutes**

11 U.S.C. § 361 ................................................................................................................................ 23

11 U.S.C. § 362(d) ........................................................................................................................... 20

11 U.S.C. § 1104 .............................................................................................................................. 25

11 U.S.C. § 1107(a) ......................................................................................................................... 10

11 U.S.C. § 1108 .............................................................................................................................. 10

11 U.S.C. § 1121 .............................................................................................................................. 11

11 U.S.C. § 1129(a)(10) ............................................................................................................. 17, 18

**Other Authorities**

H.R. Rep. No. 95-595 (1977) ............................................................................................................ 28

The Ad Hoc Group of First Lien Lenders (the "First Lien Group"), by and through its undersigned counsel, hereby submits this objection (this "Objection") to the *Motion of the Ad Hoc Group of Freedom Lenders For Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [Docket No. 192] (the "Motion") filed by the Ad Hoc Group of Freedom Lenders (the "Freedom Lender Group").  In support of the Objection, the First Lien Group submits the *Declaration of Daniel A. Fliman in Support of the Objection of the Ad Hoc Group of First Lien Lenders to the Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* (the "Fliman Decl."), and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1. As counsel to the Freedom Lender Group argued at the first day hearing for these Chapter 11 Cases, "audacity, to be successful, often requires subtlety and nuance; there is none of that here."[2]  Ironically, just three weeks later, the Freedom Lender Group lobbed across the Motion -- a scattershot attack at nearly every stakeholder and professional in these cases, that appears oblivious to both its harm and victims.

2. The Motion asks this Court to replace its gavel with a sledgehammer, and to destroy fundamental rights that Congress vested in debtors-in-possession.  Specifically, the Motion seeks to:

- divest the Debtors of their ability to propose a plan of reorganization;

---

[1]   Capitalized terms used in this Preliminary Statement and not defined herein shall have the meanings ascribed to them later in the Objection, or in the Motion or First Day Decl., as applicable.

[2]   (*See* Fliman Decl., Ex. A, Nov. 5, 2024 Hr'g Tr. at 141:10-11.)

1

- force a change of ownership of Debtor entities; and

- appoint a trustee to overtake the Debtors' exercise of business judgment concerning their cases and operations.

3.    The Motion thus demands, merely a month into these Chapter 11 Cases, extraordinary relief that would strip the Debtors of critical rights to control their estates. The Motion ultimately falls short of providing any legitimate bases for the relief sought, much less facts and arguments sufficient to meet the stringent requirements and high hurdles that courts apply when considering such extreme relief.

4.    In support of their request for this broad ranging and extraordinary relief, the Freedom Lender Group principally relies on three assertions: (1) that the Debtors should be prevented from proposing a plan of reorganization, unless it has the Freedom Lender Group's instant support; (2) that the HoldCo Term Loans are the only existing claims against the Freedom HoldCo Debtors; and (3) that the Freedom HoldCo Debtors' existing board of directors is conflicted and cannot exercise its fiduciary duties. As set forth more fully below, none of these assertions withstand scrutiny:

- *First*, the Debtors are at a very nascent stage of these Chapter 11 Cases, and, although the Freedom Lender Group has seemingly decided to object to every substantive request for relief in these Chapter 11 Cases, it is too soon to say that there is no path forward to confirm a plan at the Freedom HoldCo Debtors. Bankruptcy is intended to be a collaborative process, during which terms of proposed plans are negotiated and often changed. Regardless, confirmation arguments will be handled at confirmation. For today, the question is solely whether the Debtors should be stripped of the Congressionally-mandated exclusive opportunity to formulate and to propose a plan. The Freedom Lender Group has presented no cogent arguments supporting such relief.

- *Second*, the HoldCo Term Loan claims do not appear to be the only existing claims against Freedom HoldCo Debtors. Initially, the First Lien Group believes that the OpCo Debtors may have direct claims against the Freedom HoldCo Debtors stemming from, at the least, the $55 million in dividends made by the OpCo Debtors to fund Holdco Term Loan interest payments. The OpCo Debtors may also have fiduciary duty claims against Freedom VCM, Inc. for pre-bankruptcy

conduct.  Moreover, to the extent the Freedom Lender Group is correct that direct claims against the directors and officers of the Freedom HoldCo Debtors exist, those directors and officers will then have indemnification claims back against the Freedom HoldCo Debtors.  Finally, as further set forth below, there are likely additional DIP Facility claims, unsecured claims and potential alter ego claims that sit at the Freedom HoldCo Debtors, each of which will need to be administered and accounted for in any plan of reorganization.

- _Third_, other than citing to premature plan objections, the existence of  potential intercompany claims and the fact of the Freedom HoldCo Debtors agreeing to a DIP Facility guaranty, the Freedom Lender Group has provided **no evidence** that any conflicts of interest exist among the Debtors, and certainly none that would justify handing control of these Chapter 11 Cases to the Freedom Lender Group. Either way, in connection with the final order regarding the DIP Facility (the "Final DIP Order"), the First Lien Group has agreed to limit the DIP Facility guaranty at the Freedom HoldCo Debtors to only the amount of proceeds of the DIP Facility actually used by those entities, and the First Lien Group understands that the Debtors have agreed to appoint a new independent director at the Freedom HoldCo Debtors, who will be vested with the authority to investigate and to address any intercompany claims among the Debtors. Thus, the concerns raised by the Freedom Lender Group -- which are insufficient to warrant the relief sought in the Motion -- have been voluntarily addressed by the First Lien Group and the Debtors.

5.      Make no mistake, the Motion is **_not_** a legitimate path to drive value for the Freedom HoldCo Debtors.  Rather, it is an ill-conceived attempt to besmirch the Debtors' fiduciaries and professionals and to derail these Chapter 11 cases.  Like many of the Freedom Lender Group's tactics and shenanigans in these cases, the Motion represents a Hail Mary attempt from a constituency that clearly believes it has nothing to lose -- it is a misguided effort to use a holding company with no tangible assets to extort a payout from an operating business.[3]  The Freedom Lender Group's attempts to extract a ransom payment from the Debtors must be rejected.

6.      For these reasons and those set forth more fully below and in the Debtors' objection to the Motion, the Motion should be denied.

---

[3]      The First Lien Group reserves all rights with respect to the fees and expenses that the Freedom Lender Group is needlessly causing the estates and the First Lien Group to incur, as well as with respect to any damage that the Freedom Lender Group's tactics may inflict on the value of the estates and of the First Lien Group's collateral.

## BACKGROUND[4]

### A.    The Take Private Transaction

7.      In the summer of 2023, the Debtors, at the direction of the Freedom Lender Group, put in place the "holdco-opco" structure that is the subject of this Motion.  Freedom VCM Interco, Inc. and Freedom VCM, Inc. (together, the "<u>Freedom HoldCo Debtors</u>") were created for the sole purpose of borrowing and guaranteeing the HoldCo Facility, that facilitated the buyout by certain members of Debtor Franchise Group, Inc.'s ("<u>FRG</u>") management team of all of the outstanding shares of FRG's common stock.  (Motion at ¶¶ 1, 13; First Day Decl. at ¶¶ 31-32.)

8.      Consent from the First Lien Term Loan Lenders was neither requested nor obtained in connection with the Take Private Transaction.  In contrast, it was the Freedom Lender Group, and in particular Irradiant Partners LP ("<u>Irradiant</u>"), that was active in structuring, negotiating and implementing the Take Private Transaction.

9.      The First Lien Group understands that none of the proceeds of the HoldCo Facility were "down-streamed" to the OpCo Debtors.  Rather, the Freedom HoldCo Debtors themselves utilized the proceeds to facilitate direct payments to FRG's existing shareholders.  As acknowledged by the Motion, the OpCo Debtors did not receive any meaningful benefit from the borrowing of the HoldCo Facility.  (*See* Motion at ¶ 1 (noting that the proceeds of the HoldCo Facility "were used exclusively to purchase the shares of the Company's public shareholders[.]").)

10.     As the Freedom Lender Group readily admits, the Freedom HoldCo Debtors are shell entities with "no operations."  (*Id.* at ¶ 15.)  The only tangible asset of the Freedom HoldCo Debtors is Freedom VCM, Inc.'s equity in FRG.  (*Id.*)

---

[4]    Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "<u>First Day Decl.</u>").

Case 24-12480-JTD   Doc 299   Filed 12/03/24   Page 10 of 37

**B.      The Freedom Lender Group Immediately Chokes the OpCo Debtors**

11.      Almost immediately after the closing of the Take Private Transaction, however, the Freedom Lender Group attempted to wrest control of the OpCo Debtors, using the HoldCo Term Loans as leverage.

12.      In exchange for providing the consent required for the divesture of then-owned operating subsidiary W.S. Badcock Corporation ("Badcock") -- a transaction that would have been value accretive to all stakeholders, given Badcock's capital intensive business needs -- the Freedom Lender Group insisted that the Debtors amend the HoldCo Credit Agreement to benefit the Freedom Lender Group.  (First Day Decl. at ¶ 12.)  Specifically, the December 2023 amendments (i) significantly increased the interest rate payable on the HoldCo Facility to the HoldCo Lenders, (ii) placed restrictions on how FRG could apply the proceeds from both the Badcock divesture transaction and any other sales of certain of its other business segments, and (iii) provided for the appointment of John Hartmann, an independent director selected by the HoldCo Lenders, to the Board of Directors of both Freedom TopCo and FRG.  (*Id.* at ¶¶ 12, 46.)[5]

13.      In the months following the Badcock transaction, the increased interest expenses and other restrictions that the HoldCo Lenders placed on FRG exacerbated the liquidity challenges that FRG was already facing.  (*Id.* at ¶ 46.)  To that end, the amendments insisted upon by the HoldCo Lenders had the effect of "offset[ting] some of the benefit that Franchise Group received by divesting its capital-intensive Badcock business." (*Id.*)  Thus, when the Debtors sold the Sylvan Learning business in February 2024, the Debtors were constrained to use the $81 million received in the all-cash sale in any meaningful way, eliminating the benefit of that sale.  (*Id.* at ¶¶ 47-48.)

---

[5]    Curiously, the Freedom Lender Group makes no mention of Mr. Hartmann in the Motion, an independent director they pushed to be appointed.

14.     Most troubling, between the closing of the Take Private Transaction in August 2023 and the Petition Date, the HoldCo Lenders received approximately $55 million as interest payments that were funded via dividends from FRG to Freedom VCM, Inc. (one of the Freedom HoldCo Debtors).  Moreover, the First Lien Group understands that the Freedom HoldCo Debtors received millions of dollars in additional dividends to pay fees and expenses of the Freedom Lender Group and their advisors associated with the Take Private Transaction.

C.     **Lead Up To The Chapter 11 Cases**

15.     In the summer of 2024, the Debtors were forced to address two existential crises.  First, FRG was potentially on the hook for hundreds of millions of dollars in liability resulting from leases likely to be rejected in the Conn's bankruptcy cases -- leases on which FRG was a guarantor.  (*Id.* at ¶ 75.)  Second, the First Lien Group learned that the Debtors were mere days away from defaulting on their financial maintenance covenant under the Prepetition Credit Agreements.  Thus, over the course of the summer, the ABL Lenders, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders and HoldCo Lenders (acting in concert), negotiated with the Debtors on the terms of the Prepetition Credit Agreement Amendments, which provided the Debtors with relief from anticipated defaults while also deferring certain near-term interest obligations.  (*Id.* at ¶ 14.)

16.     In exchange for giving the Debtors concessions through the Prepetition Credit Agreement Amendments, the First Lien Term Loan Lenders negotiated for certain case milestones that would keep the Debtors and their creditors aligned while bridging to a holistic restructuring solution.  (*Id.*)

17.     In stark contrast, the Freedom Lender Group seemed intent on again raiding the OpCo Debtors for its benefit.  In exchange for agreeing to delay the HoldCo Lenders' then-scheduled interest payment (which, given that the Freedom HoldCo Debtors had no operations,

would need to be funded by the OpCo Debtors), the HoldCo Lenders insisted that the OpCo Debtors guarantee up to $19.51 million of the obligations under the HoldCo Credit Agreement. (*Id.* at ¶ 63.)

18.     A few weeks later, on September 24, 2024, the First Lien Group received the first restructuring proposal from the Freedom Lender Group.  (*See* Fliman Decl., Ex. B (the "September 24 Proposal").)  Much to the First Lien Group's chagrin, however, and contrary to the guidance that its advisors had communicated to the then-advisors of the Freedom Lender Group, the September 24 Proposal fell far short of what was needed to address the Debtors' liquidity needs and leverage profile.  To the contrary, the September 24 Proposal sought to further lever the Debtors by placing the Freedom Lender Group's proposed new money check *pari passu* with 40% of the existing first lien term loans.  (*Id.*)  In other words, the Freedom Lender Group was asking the First Lien Term Loan Lenders to dilute their recovery for the benefit of the HoldCo Lenders. Moreover, the September 24 Proposal included a proposed $176.2 million uptier of HoldCo Term Loans to the OpCo Debtors -- loans to which the OpCo Debtors were not obligated -- which would have left the OpCo Debtors even more over-levered.  The September 24 Proposal reflected the Freedom Lender Group's attempts to create value for the HoldCo Term Loans at the expense of the First Lien Term Loan Lenders, implicitly recognizing that the HoldCo Term Loans were "out of the money."  Notably, the September 24 Proposal made no mention of the Freedom HoldCo Debtors' purported claims and causes of action, i.e., the ones that the Freedom Lender Group now claims are their "most important sources of recovery".  (Motion at ¶¶ 6-7.)

19.     The September 24 Proposal was not actionable and was not supported by those stakeholders whose consent was required to fulfill its terms (i.e., the First Lien Term Loan Lenders).  As a result, two and a half weeks later, the Freedom Lender Group provided another

proposal.  (*See* Fliman Decl., Ex. C (the "October 9 Proposal").)   As with the September 24 Proposal, the October 9 Proposal would have ***increased*** the enterprise's total leverage, resulted in the up-tiering of at least $200 million of HoldCo Term Loans to the OpCo Debtors' indebtedness (again, to which the OpCo Debtors were not obligors), and would have required significant concessions from the First Lien Term Loan Lenders in the form of PIKing their interest and maturity extensions.  (*Id.*)   Once more, the October 9 Proposal implicitly recognized that the HoldCo Term Loans were out of the money and again made no mention of the supposedly valuable claims and causes of action belonging to the Freedom HoldCo Debtors.  (*Id.*)   As with the September 24 Proposal, the October 9 Proposal did not have the support of the Debtors' other stakeholders.

20.     Running out of time and options, the Debtors then pivoted, and began working with the First Lien Group on a first lien led restructuring plan.  To be clear, the last thing that the First Lien Group wanted was for the Debtors to end up in bankruptcy.  (*See* Fliman Decl., Ex. A, Nov. 5, 2024 Hr'g Tr. at 22:13-14 (counsel to the First Lien Group stating that "[t]he last thing that our clients wanted is for us to be here today").)  The First Lien Group was (and remains) ready and willing to engage on any constructive proposal that would set the Debtors on a financially sustainable path forward.  Yet, to date, the Freedom Lender Group has been unwilling to provide the Debtors with the tools necessary to right-size their capital structure, such as adequate junior capital and a meaningful deleveraging via the equitization of a significant portion of the Debtors' outstanding obligations.

**D.     The Freedom Lender Group Attempts To Hold Up The Process**

21.     Then, the Freedom Lender Group changed course (and counsel and investment banker).  Rather than providing any additional proposals or offers, seemingly overnight, the Freedom Lender Group adopted an increasingly adversarial posture, making clear that, unless the

First Lien Group capitulated to their demands, they would use the Chapter 11 Cases to extract their pound of flesh from Debtors.

22.     For instance, in a last-ditch effort to hold up the organized bankruptcy for which the Debtors had been preparing, on November 2, 2024, the Freedom Lender Group sent the Debtors and the First Lien Group a proposal for an illusory "junior" debtor-in-possession financing facility.[6]  (*See* Fliman Decl., Ex. E (the "<u>November 2 Proposal</u>").)  While counsel to the Freedom Lender Group disingenuously claimed that the November 2 Proposal was a junior DIP that did not require "anybody to be primed but the 2L" (Fliman Decl., Ex. A, Nov. 5, 2024 Hr'g Tr. at 158:10-13), that was highly misleading.  Rather, like the Freedom Lender Group's previous proposals, the November 2 Proposal required the First Lien Term Loan Lenders' agreement to take a significant haircut on their recoveries, including through equitizing and subordinating 50% of their first lien term loans to the supposed "junior" non-priming DIP (not to mention $125 million of second lien term loans).  (*See* November 2 Proposal.)  Yet again, there was no mention in the November 2 Proposal of the purportedly valuable claims and causes of action held by the Freedom HoldCo Debtors.

23.     Likewise, at 3:17 a.m. (ET) on November 6, 2024, and seemingly with an eye toward creating as much hold-up value as possible at day two of the first day hearing, the Freedom Lender Group proposed a second purported "junior DIP" in the amount of $75 million.  (*See* Fliman Decl., Ex. F (the "<u>November 6 Proposal</u>"); *see also* Fliman Decl., Ex. G, Nov. 6, 2024 Hr'g Tr. at 21:14-19 (counsel to the Debtors describing the November 6 Proposal for the Court).)

---

[6]    Contrary to counsel to the Freedom Lender Group's claims at the first day hearing, the November 2 Proposal was provided by the Freedom Lender Group directly to counsel to the First Lien Group.  (*See* Fliman Decl., Ex. D (November 2, 2024, email); *see also* Fliman Decl., Ex. A, Nov. 5, 2024 Hr'g Tr. at 158:20-159:3 (counsel to Freedom Lender Group erroneously admonishing the Debtors for sending the November 2 Proposal "to the first lien who we're competing with to provide DIP financing").)

Counsel to the Freedom Lender Group disingenuously represented to the Court that the November 6 Proposal was "not on a priming basis, but on a junior basis to all existing ABL and 1L liens[.]" (Fliman Decl., Ex. G, Nov. 6, 2024 Hr'g Tr. at 17:15-20.)  As with the November 2 Proposal, the November 6 Proposal was "junior" in name only, as it required that it be repaid in full from any asset sale proceeds, whether in a liquidation or otherwise, notwithstanding that the First Lien Term Loan Lenders had a senior lien on those assets.  (*See id.* at 22:15-19 (counsel to the Debtors explaining that it is "illusory to say that it's a junior DIP. It is junior in the sense that it has junior liens, but it has to be the first money out the door ahead of any secured claim. So, even in a liquidation, it would get paid out ahead of secured claims."); *see also* Fliman Decl., Ex. F (November 6, 2024 email) (providing that "[a]ny sale or disposition of a material portion of the collateral (other than the assets of American Freight), whether by a 363 sale, foreclosure, credit bid or otherwise, and whether prior to or after conversion to chapter 7 or dismissal of the case of any debtor who owns the collateral, ***must provide for payment in cash in full upon closing of such sale or disposition***") (emphasis added).)

### E.    The Chapter 11 Cases

24.    On November 3, 2024 (the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").  The Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

25.    On November 11, 2024, the Debtors filed the *Joint Chapter 11 Plan of Franchise Group, Inc. and its Affiliated Debtors* [Docket No. 150] (the "Proposed Plan").

26.    On November 19, 2024, the Office of the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Committee").  (*See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 188].)

27.    On November 20, 2024, less than three weeks after the Petition Date, the Freedom Lender Group filed the instant Motion, seeking to terminate the Debtors' statutory exclusive right to file a plan, seeking to lift the automatic stay, and seeking appointment of a chapter 11 trustee.

## ARGUMENT

**A.    The Freedom HoldCo Debtors' Plan Exclusivity Should Not Be Terminated**

28.    Pursuant to sections 1121(b) and (c) of the Bankruptcy Code, a debtor is granted the exclusive right to propose a chapter 11 plan for the first 120 days of a chapter 11 case and to solicit votes for its plan for an additional 60 days (with the ability to further extend those periods). 11 U.S.C. §§ 1121(b), (c).  The purpose of the exclusivity period is simple: it provides a debtor with "the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests."  *See In re Spansion, Inc.*, 426 B.R. 114, 140 (Bankr. D. Del. 1991) (citation omitted).

29.    Any party seeking to change or reduce a debtor's exclusivity rights "has the burden of establishing that cause exists . . . and when that change is a reduction in the statutory period, the burden is especially heavy."  *In re Lehigh Valley Pro. Sports Club, Inc.*, No. 00-11296DWS, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) (citations omitted).  To that end, any deviation from the explicit provisions of the Bankruptcy Code should be avoided absent compelling and unusual circumstances.  The Freedom Lender Group has not met the "heavy burden" of establishing that such circumstances exist.

### 1.   The HoldCo Lenders May Not Be The Only Creditors Of The Freedom HoldCo Debtors

30.   The flawed central premise of the Motion is that no plan can be confirmed at the Freedom HoldCo Debtors without the HoldCo Lenders' acceptance because they are the only creditors at those entities.  (Motion at ¶¶ 4, 26, 29, 30, 32, 39, 55, 64.)  Contrary to the Freedom Lender Group's assertions, however, the HoldCo Lenders do not appear to be the only creditors of the Freedom HoldCo Debtors:

 i.   ***DIP Lender Claims***: As of the date of this Objection, the Freedom Lender Group has refused to provide standalone debtor-in-possession financing to the Freedom HoldCo Debtors.  Thus, any ongoing case costs and administrative expenses borne by the Freedom HoldCo Debtors -- which, as a direct consequence of the Freedom Lender Group's litigation spree are sure to be substantial -- will need to be funded by the First Lien Group's debtor-in-possession financing facility or the First Lien Lenders' cash collateral.  As will be set forth in the forthcoming revised Final DIP Order, the First Lien Group has agreed to limit any DIP guarantees by the Freedom HoldCo Debtors only to the amounts directly funded to the Freedom HoldCo Debtors to pay the ongoing case costs and administrative expenses of the Freedom HoldCo Debtors.  It is inevitable that there has been and will continue to be fees and expenses incurred by the Freedom HoldCo Debtors' advisors (including, the costs of responding to the Motion).  Thus, the First Lien Group (as DIP Lenders) necessarily will be creditors of the Freedom HoldCo Debtors.[7]

 ii.   ***Unsecured Claims***: The First Lien Group continues to diligence other unsecured claims that may be asserted against the Freedom HoldCo Debtors.  On information and belief, unsecured claims against the Freedom HoldCo Debtors include, among others, prepetition fees and expenses related to certain advisors to the Holdco Lenders, as well as potential tax and other claims.  Moreover, to the extent that the Freedom Lender Group has claims against the Freedom HoldCo Debtors' officers and directors related to their role in the Take Private Transaction (or otherwise), those officers and directors would have unsecured indemnification claims against the Freedom HoldCo Debtors.  (*See*

---

[7]   Throughout the Motion, the Freedom Lender Group repeatedly and incorrectly claims that the First Lien Term Loan Lenders sought to institute a $783 million or even $800 million debtor-in-possession financing facility at the Freedom HoldCo Debtors at the outset of the Chapter 11 Cases.  (*See* Motion at ¶¶ 2, 3, 18, 24, 25, 33, 56.)  As the Freedom Lender Group is well aware, the debtor-in-possession financing was initially structured so that only the $250 million "new money" portion of the debtor-in-possession financing facility would apply to the Freedom HoldCo Debtors.  (*See* Fliman Decl., Ex. A, Nov. 5, 2024 Hr'g Tr. at 142:11-13 (counsel to the Freedom Lender Group stating that he "appreciate[s] counsel for the DIP lenders' clarification that the guaranty [at the Freedom HoldCo Debtors] will be limited to the new money").)

Fliman Decl., Ex. H at § VIII.8 (Freedom VCM, Inc. Bylaws); Fliman Decl., Ex. I at § VIII.8 (Freedom VCM Interco, Inc. Bylaws).)

iii.   ***Intercompany Claims***: The First Lien Group understands that there are at least two types of intercompany claims that may exist against the Freedom HoldCo Debtors: (x) claims against the Freedom HoldCo Debtors to unwind the $55 million in dividends paid to the Freedom HoldCo Debtors to fund the HoldCo Term Loans' ongoing interest payments (among other potential dividends)[8] and (y) breach of fiduciary duty claims against Freedom VCM, Inc. as the controlling shareholder of FRG for the past sixteen months.[9]   *See N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*, 571 B.R. 650, 659 (Bankr. D. Del. 2017) ("Under Delaware law, although a parent generally does not owe fiduciary duties to a wholly-owned subsidiary, the Supreme Court of Delaware observed that a parent owes fiduciary duties to its subsidiary when that subsidiary is insolvent.") (citation omitted).

iv.   ***Alter Ego Claims***: The First Lien Group is still evaluating all possible claims that may be brought directly against the Freedom HoldCo Debtors by holders of First Lien Term Loan claims.  In particular, given the fact that: (a) the "holdco-opco" structure was created to allow the Freedom HoldCo Debtors to incur indebtedness that would not otherwise have been allowed under the First Lien Term Loan Credit Agreement (*see* Motion at ¶ 1; *supra* at ¶ 7); (b) the Freedom HoldCo Debtors may have been insolvent at all relevant times (*see infra* ¶ 52); (c) assuming the allegations in the Motion are true, corporate formalities among the Freedom HoldCo Debtors and OpCo Debtors were not respected (*see* Motion at ¶ 2); (d) there is a commonality in corporate governance between the Freedom HoldCo Debtors and the OpCo Debtors, given board membership (*see id.* at ¶ 55); and (e) the Freedom HoldCo Debtors received at least $55 million in likely illegal dividends over the past sixteen months and siphoned assets from the OpCo Debtors (*supra* at ¶ 14), the First Lien Group believes there may be a basis for the OpCo Debtors to assert alter ego claims against the Freedom HoldCo Debtors, which means that the First Lien Term Loan Lenders could have a ~$1.1 billion senior secured claim against the Freedom HoldCo Debtors.  *See In re Opus East, LLC*, 528 B.R. 30, 63-65 (Bankr. D. Del. 2015) (discussing elements of corporate veil piercing action).

---

[8]   The First Lien Group expressly reserves the right to seek to recover any and all avoidable transfers both from Freedom VCM, Inc. and any subsequent transferee who received the proceeds of such dividends.

[9]   The First Lien Group expressly reserves the right to bring claims against any parties who aided and abetted breaches of fiduciary duties and knowingly participated in such breaches via their effective control of the Freedom HoldCo Debtors.

31.     The Freedom Lender Group's arguments in the Motion are based on the misguided premise that they are the only creditors of the Freedom HoldCo Debtors' estates and, therefore, are the only constituency that can deliver the votes necessary to confirm a plan of reorganization for the Freedom HoldCo Debtors.  As set forth above, it is very likely that other stakeholders will have the right to vote on the Freedom HoldCo Debtors' plan.

2.     Cause Does Not Exist to Terminate The Freedom HoldCo Debtors' Exclusive Periods

32.     Even if the HoldCo Lenders are the only creditors of the Freedom HoldCo Debtors' estates (they are not), cause does not exist to terminate the Freedom HoldCo Debtors' exclusivity periods.  At most, the Freedom Lender Group's arguments constitute confirmation issues to be presented and considered at confirmation.  The Chapter 11 Cases are not yet at confirmation.  Rather, the Debtors are within the statutory period that Congress has vested in debtors-in-possession to formulate and to propose a plan, on an exclusive basis.  The Freedom Lender Group's attempts to pre-litigate confirmation issues, disguised as an exclusivity termination request, should be rejected.

33.     The standards for terminating exclusivity are well-known and the Freedom Lender Group has not come anywhere close to meeting them.  While the Bankruptcy Code does not define "cause," bankruptcy courts typically consider the factors set forth in *In re Adelphia Commu'ns Corp.* when determining whether "cause" exists to increase or reduce a debtor's exclusivity.  352 B.R. 578, 586-87 (Bankr. S.D.N.Y. 2006) (listing nine enumerated factors courts typically rely on when determining whether "cause" exists to reduce or increase debtor's exclusivity period) (citing *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997)).  Critically, as the court in *Adelphia* noted, "displeasure with a plan on file is not one of the enumerated factors, and is not a basis for terminating exclusivity . . . [n]or, without more, is creditor constituency unhappiness

14

with a debtor's plan proposals, with or without a formal plan on file." *Adelphia*, 352 B.R. at 587 (citation omitted).  As set forth below, the *Adelphia* factors weigh in favor of leaving the Freedom HoldCo Debtors' current exclusivity in place.

### i.   The Freedom HoldCo Debtors' Bankruptcy Cases Are Complex

34.     Contrary to the Freedom Lender Group's assertions (Motion at ¶ 37), the Freedom HoldCo Debtors' chapter 11 cases *are* complex.  These jointly-administered Chapter 11 Cases deal with a nationwide retailer with nearly $2 billion in funded debt, made up of fifty-three debtors with multiple operating business lines, thousands of employees, countless contract counterparties, and scores of franchisees and landlords.  While the Motion myopically focuses on two among the fifty-three debtors, the Motion seeks to grant the Freedom Lender Group control of the equity in FRG, and by extension, the parent of forty-seven of the fifty-three debtors.  Indeed, the Motion's focus on inter-estate causes of action and inter-estate equity interests further highlights the intertwined nature of the Debtors' estates, and the attendant complexity.

### ii.   The Freedom Lender Plan Cannot Quickly Be Confirmed

35.     Despite the Freedom Lender Group's arguments to the contrary (Motion at ¶¶ 38-39), the Freedom Lender Plan cannot quickly be confirmed.  The Freedom Lender Group has, to date, not provided any basis for funding the case cost and advisors' fees and expenses associated with the Freedom HoldCo Debtors' chapter 11 cases.  Nor has the Freedom Lender Group articulated what purpose termination of exclusivity would serve and what they are really looking to do in foreclosing on the equity in FRG.  In the absence of a concrete path forward, and a mechanism to fund it, no alternate plan can be finalized and solicited, let alone confirmed.

### iii.   The Debtors Are Making Good Faith Progress Towards Confirmation

36.     Over the past few months, the Debtors have given the Freedom Lender Group every opportunity to propose an actionable restructuring path forward.  Yet the Freedom Lender Group

has refused to engage meaningfully, and now purports to use their refusal as a basis to terminate exclusivity.  (*See* Motion at ¶ 40.)

37.     While the Freedom Lender Group has argued that it cannot make a proposal without receiving additional information for the Debtors, that is totally unbelievable.  Irradiant, one of the two members of the Freedom Lender Group, has been involved in the Debtors' capital structure for years, and indeed, helped to structure the Take Private Transaction.  The Freedom Lender Group certainly had enough information about the Debtors, just 2 months ago, to submit two restructuring proposals (*see* Fliman Decl., Exs. B, C), followed, last month, by two DIP proposals. (*See* Fliman Decl., Exs. E, F.)

38.     To be clear, it is not the Debtors that are "not making good faith progress in plan negotiations" (*id.*), but the Freedom Lender Group.  Since the Petition Date, every move the Freedom Lender Group has made has been calibrated and designed to cause a delay, not to move these cases forward or to achieve a confirmable plan.  Had the Freedom Lender Group actually been willing to engage on the terms of a chapter 11 plan, the First Lien Group is certain that a positive negotiation would have ensued.  Instead, at each and every turn, the Freedom Lender Group has chosen litigation.

39.     Moreover, while the Freedom Lender Group claims that negotiation on the Proposed Plan "would likely be futile," because they have "lost faith" in the process (Motion at ¶ 38), the "purpose of the exclusivity period is to provide a debtor, at the outset of a chapter 11 case, with 'the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests.'"  *Spansion*, 426 B.R. at 139-40 (quoting *In re Texaco, Inc.*, 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988)).  Such time is intended to facilitate a collaborative process during which terms of proposed plans are collectively

negotiated and often change.  That the Freedom Lender Group lost faith in the chapter 11 process is no reason to cut off that collaborative process and to terminate exclusivity.[10]

> *iv.  The Proposed Plan Is Viable*

40.     Just because the Freedom Lender Group does not support the Proposed Plan, at this time, does not mean that the Proposed Plan is not viable or confirmable.[11]  (Motion at ¶ 41.) Moreover, as discussed herein, the HoldCo Lenders do not appear to be the only class of creditors of the Freedom HoldCo Debtors.  (*See* Proposed Plan at §§ 1.96, 1.139, 5.11, 5.12.)  Thus, they might not be the only creditors who can deliver the requisite votes to confirm the Proposed Plan. (*Supra* at ¶ 30.)

41.     Even if they were, the Proposed Plan may be confirmed because there is at least one impaired accepting class of claims in the Proposed Plan itself.  The Third Circuit Court of Appeals has never explicitly endorsed the "per debtor" approach to section 1129(a)(10) and the First Lien Group submits that this Court could follow the number of courts that have instead found that section 1129(a)(10) of the Bankruptcy Code requires that only one class of impaired claims accept the plan, even if that class sits at another debtor (known as the "per plan" approach).  *See e.g.*, *JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props. (In re Transwest Resort Props.)*, 881 F.3d 724, 729 (9th Cir. 2018) ("The plain language of the statute supports the 'per plan' approach . . . [as] Section 1129(a)(10) requires that one impaired class 'under the plan'

---

[10]   The cases cited in the Motion do not support a contrary result. *See, e.g.*, *In re All Seasons Indus.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990) (denying motion to extend exclusive period in order to allow for more time to get a plan on file in the first instance, where debtor did not have plan on file and hoped "during an extended period of exclusivity its financial situation will improve"); *see also In re Lucky Bucks*, Case No. 23-10758 (KBO) (Bankr. D. Del. 2023), June 30, 2023, Hr'g Tr. 73:2-9 [Docket No. 133] (unlike here, lenders in *Lucky Bucks* had already voted unanimously to reject the plan after it had been solicited and scheduled for confirmation).

[11]   Notably, while the Freedom Lender Group is comprised of funds owned or managed by both Irradiant and Pacific Investment Management Company LLC ("PIMCO"), certain funds managed by PIMCO in fact signed the RSA, participated in the DIP Facility, and have committed to supporting the Proposed Plan.  Thus, even within the family of funds managed by a member of the Freedom Lender Group, there is support for the Proposed Plan.

approve 'the plan.'"); *In re: NESV Ice*, LLC, No. 21-11226-CJP, 2023 WL 2278603, at *19 (Bankr. D. Mass. Feb. 28, 2023) ("I interpret § 1129(a)(10) to permit confirmation of a joint plan of reorganization where at least one class of impaired creditors of one debtor has accepted the plan under certain discrete circumstances where limited consolidation is proposed as a good faith means of implementing the plan."). The First Lien Group, which has committed to support the Proposed Plan, would be that impaired accepting class.

42.     Regardless, the Motion misapplies this *Adelphia* factor. (*See* Motion at ¶ 41.) The *Adelphia* court explicitly noted that the factor requires "only that a debtor be able to attain confirmation of at least *some* viable plan, not necessarily the plan currently proposed." *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 588 (Bankr. S.D.N.Y. 2006), *clarified on denial of reconsideration*, No. 02-41729, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006) (emphasis in original). Even if the Freedom Lender Group is correct that the Proposed Plan is not viable (they are not), the Debtors are able to attain confirmation of some viable plan, and thus this factor is satisfied.

<em>v.   Entry Into The RSA Does Not Constitute Cause To Terminate Exclusivity</em>

43.     Finally, the Freedom Lender Group states that it filed the Motion requesting to terminate the Freedom HoldCo Debtors' exclusivity "in response" to the Debtors' indication that they intended to share the Freedom Lender Plan with the First Lien Group to comply with their obligations under the RSA. (*See* Motion at ¶ 27.) Additionally, the Motion argues that the determination by the Debtors' board of directors to enter into the RSA evidences a lack of fiduciary duties being exercised for the Freedom HoldCo Debtors, warranting a termination of the Freedom HoldCo Debtors' exclusivity. (*Id.* at ¶ 25.)

44.     However, simply entering into a restructuring support agreement does not (and cannot) give rise to cause to terminate exclusivity. As a starting point, as the Court noted during

the first day hearing on November 6, 2024, the Debtors retain a broad fiduciary out under the RSA, thus giving the Court comfort that the Debtors can negotiate as they determine necessary during the pendency of these Chapter 11 Cases.  (*See* Fliman Decl., Ex. G, Nov. 6, 2024 Hr'g Tr. at 126:9-10 (this Court stating "I don't see the RSA as a sub rosa plan. There is a fiduciary out for the debtors").)  Furthermore, restructuring support agreements provide the Debtors with a valuable tool -- comfort that they will have a confirmable plan and a smooth path towards exiting bankruptcy -- and because of that, a substantial portion of filed chapter 11 cases involve some kind of restructuring support agreement.  If entering into a restructuring support agreement gave rise to a basis to terminate exclusivity, debtors would be at risk of losing exclusivity in nearly every major bankruptcy case.[12]

## B.     The Court Should Decline To Lift The Automatic Stay

45.     The automatic stay is one of the most "fundamental . . . protections" provided to a debtor.  *Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.*, 474 U.S. 494, 503 (1986).  The purpose of the automatic stay is "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor."  *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007) (quoting *Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir.

---

[12]    The cases cited by the Freedom Lender Group in support of their argument that cause exists to terminate exclusivity are inapposite.  Unlike here, the lockup agreement in *In re Pliant Corp.*, which the Freedom Lender Group heavily relies on in the Motion (Motion at ¶ 43) did not permit the debtors to exercise a fiduciary out, *In re Pliant Corp.*, Case No. 09-10443 (MFW) (Bankr. D. Del. 2009) [Docket No. 498] at ¶ 14, nor did it allow the debtors to consider alternative restructuring proposals.  *Id.* at ¶ 14.  And, unlike here, the court in *In re TCI2 Holdings, LLC*, terminated exclusivity, in large part, based on *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999), and the existence of an existing equity holder who was providing new value as part of the proposed plan.  *In re TCI2 Holdings, LLC*, Case No. 09-13654 (JHW) (Bankr. D.N.J.) [Docket No. 621], Aug. 27, 2009 Hr'g Tr. at 88:18-90:21.

1982)).  Believing they are exempt from the clear statutory and caselaw directives, the Freedom Lender Group tries to evade the Bankruptcy Code and lift the automatic stay for their own advantage.

46.     Pursuant to section 362(d) of the Bankruptcy Code, creditors have the ability to seek relief from the automatic stay upon making a threshold showing that "cause" exists.  11 U.S.C. § 362(d).  Although the Bankruptcy Code does not define what constitutes "cause," requests for relief from the automatic stay are customarily evaluated under the three-factor test articulated in *In re Rexene Products Co.*, 141 B.R. 574 (Bankr. D. Del. 1992).  Specifically, courts look to whether: "a) [a]ny great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit, b) the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship of the debtor and c) the creditor has a probability of prevailing on the merits."  *Id.* at 576.  In the absence of compelling evidence demonstrating that these factors significantly weigh in the movant's favor, as is the case here, relief from the automatic stay should be denied.  *See, e.g.*, *In re W.R. Grace & Co.*, No. 01 01139 JFK, 2007 WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) (denying motion to lift stay because movant "presented no compelling evidence that the balance of the hardships [was] in its favor"); *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) (denying motion to lift stay because movant failed to demonstrate "that the balance of hardships from not obtaining relief tips significantly in [its] favor").

1.  The Freedom Lender Group Fails to Show Cause for Relief from the Automatic Stay

47.     As a threshold matter, because the Freedom Lender Group fails to even mention the relevant legal standard in its papers, let alone make any effort to demonstrate that the balance of hardships tips significantly in its favor, the requested relief set forth in section II of the Motion

20

should be denied.  (*See* Motion at ¶¶ 46-50, *see also* Motion at ¶ 46 (acknowledging that "cause" to lift the automatic stay "is fact intensive and is to be determined case-by-case upon consideration of the totality of the circumstances") (citing *In re Scarborough St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015)).)  In any case, as set forth below, the *Rexene* factors strongly militate against lifting the automatic stay.

48.     *First*, and most importantly, significant prejudice to the Debtors will result if the stay is lifted.  The effect that granting relief from the automatic stay would have on the administration of the Debtors' estates is the primary factor considered by courts in determining whether cause for such relief exists.  *See W.R. Grace*, 2007 WL 1129170, at *2 n.7 ("Even slight interference . . . may be enough to preclude relief in the absence of a commensurate benefit.") (citation omitted).  Allowing the Freedom Lender Group to foreclose on the equity of FRG -- the parent company of the operating businesses with approximately 220 store locations and 11,900 employees that the Debtors are actively engaged in marketing and trying to sell or, in the absence of a successful sale, successfully reorganize -- would have a highly prejudicial effect on these Chapter 11 Cases, making it extremely difficult or even impossible to implement a successful reorganization.  For that reason alone, the Motion should be denied.

49.     *Second*, the Freedom Lender Group will not be prejudiced if the Motion is denied. The value of the HoldCo Term Loans' collateral is functionally worthless -- an equity pledge in an overleveraged holding company, which sits behind more than $1.5 billion of funded debt, not to mention hundreds of millions of dollars in unsecured claims.  Thus, there would be nothing for the group to gain by the enforcement of its pledge on such collateral other than its own desire to

21

redirect value in these Chapter 11 Cases for its benefit.[13]  And, to the extent there is value in the collateral, the Proposed Plan actually *provides* value to the Freedom HoldCo Debtors to the extent sale proceeds exceed the amount of debt at the OpCo Debtors.  (*See* Proposed Plan at § 5.11.)  It does not, as the Freedom Lender Group intimates, divert value away from the Freedom HoldCo Debtors.[14]  Thus, there would be no prejudice to the Freedom Lender Group in denying the Motion.

50.     *Finally*, the Freedom Lender Group does not even attempt to demonstrate that it will ultimately prevail on the enforcement of its pledge under applicable state law, a prerequisite to lifting the stay.  Although the requisite showing for this element is "slight," *see Rexene*, 141 B.R. at 577, where, as here, the movant has failed to make *any* showing that it will prevail, it cannot show a probability of success on the merits no matter how "slight" the burden may be.

    2.  The Debtors' Proposed Plan Provides Adequate Protection to the Freedom
        Lender Group

51.     In addition to the foregoing, the Court should decline to lift the stay because the Freedom Lender Group's interest in its collateral is being adequately protected.  As acknowledged

---

[13]   Even if this Court were to grant the relief sought, the automatic stay in the OpCo Debtors' bankruptcy cases would preclude the Freedom Lender Group from taking any actions to influence the OpCo Debtors' operations, rendering the relief sought moot.  Given the commonality in ownership between the HoldCo Term Loans and the Second Lien Term Loans, it is clear that the Freedom Lender Group would use its newly foreclosed equity in FRG to redirect value to their second lien term loan holdings, violating the automatic stay.  *See In re Bicoastal Corp.*, 1989 WL 607352, at*5 (Bankr. M.D. Fla. Nov. 21, 1989) (declining to lift the automatic stay where, as here, the creditor seeking such relief "is not a stockholder who desires to obtain control of the management of [the debtor] for the reason stockholders undertake such actions at all, but only to obtain control of the management in order to assure that this promissory note is repaid," and finding therefore that "cause" did not exist to modify the automatic stay); *In re GenCanna Glob. USA, Inc.*, 619 B.R. 364, 369 (Bankr. E.D. Ky. 2020) (finding "a party that abuses its equity voting rights merely to enhance its position as a creditor violates the automatic stay"); *In re Country Estates Nursing Home, Inc*., 268 B.R. 316, 320-21 (Bankr. D. Mass. 2001) (finding an exercise of voting rights to enforce a lien to collect a debt violates §§ 362(a)(3) and (4)).

[14]   The Freedom Lender Group incorrectly states in the Motion that, under the Proposed Plan, equity interests in FRG would be "canceled for no consideration."  (Motion at ¶ 5.)  The Proposed Plan is structured to provide for either a sale transaction for all or substantially all of the Debtors' assets or the consummation of an equitization transaction whereby the prepetition debt is converted post-confirmation into the equity in FRG.  (*See* Proposed Plan at §§ 3.1, 5.4, 7.9.)  Any pre-existing equity interests would be canceled only if the sale process is unsuccessful and thus it is clear that the equity is worthless.

22

by the Motion, section 361 of the Bankruptcy Code provides *non-exclusive* means of providing adequate protection.  (*See* Motion at ¶ 47.)  Pursuant to the RSA, and as set forth in the Proposed Plan and motion to approve bidding procedures (*see* [Docket Nos. 150, 154]), the Debtors intend to conduct a marketing and sale process for the OpCo Debtors' assets -- funded by the First Lien Term Loan Lenders -- in which substantially all of the OpCo Debtors' assets would be sold.  The proceeds from the sale process would inure to the benefit of the Freedom HoldCo Debtors to the extent such proceeds exceed the amount of the OpCo Debtors' indebtedness.  Accordingly, contrary to the claims of the Freedom Lender Group, the nature of these Chapter 11 Cases provides the necessary adequate protection of the interests of the HoldCo Term Loans.[15]  *See In re Armenakis*, 406 B.R. 589, 621 (Bankr. S.D.N.Y. 2009) (noting that a debtor's "good prospects for successful reorganization" could satisfy need for adequate protection).

52.     Either way, secured creditors are generally only entitled to receive adequate protection to the extent of any diminution in value of their security interest since the date of their initial request for such protection.  *See Matter of Cont'l Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992), *subsequently aff'd sub nom. In re Cont'l Airlines*, 91 F.3d 553 (3d Cir. 1996) ("[S]ecured creditor could only receive adequate protection to the extent the collateral declined in value after it filed its motion for adequate protection, rather than receiving compensation for all post-petition decline in value.") (citing *In re Best Products Co., Inc.*, 138 B.R. 155 (Bankr. S.D.N.Y. 1992)).  Here, because the OpCo Debtors were likely insolvent as of the Petition Date -- and the Freedom Lender Group has not provided any evidence to the contrary -- there simply

---

[15]   The Freedom Lender Group further argues that it is being treated unfairly in relation to the lenders on the prepetition OpCo Debtors' indebtedness who are being granted adequate protection under the DIP Facility.  (*See* Motion at ¶ 48.)  This, however, is a false equivalence -- unlike the OpCo Debtors' indebtedness under the DIP Facility, the Freedom HoldCo Debtors' indebtedness is not being primed.

cannot be any diminution in the value of the at-issue collateral, equity interests in the parent of insolvent operating business.  (*See* First Day Decl. at ¶¶ 6, 46, 70-76 (outlining the significant financial challenges during the months and years leading up to the chapter 11 filing, the Debtors' struggle to service their debt obligations, the Debtors' liquidity constraints and the macroeconomic headwinds that had lasting impacts on the retail industry following the COVID-19 pandemic); *see also ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 400 (S.D. Tex. 2008) (applying Delaware law and finding inability to service debt obligations as indicia of insolvency).)[16]

53.     Accordingly, the Freedom Lender Group's motion for relief from the automatic stay should be denied.

## C.     Appointment Of A Chapter 11 Trustee Is Not Appropriate Or Necessary

54.     As a threshold matter, while the Motion claims that its request for a chapter 11 trustee is simply an alternative in the event exclusivity is not terminated (*see* Motion at ¶ 51), the reality is the that Freedom Lender Group is seeking the appointment of a chapter 11 trustee unless and until the Court allows them to foreclose on their equity in FRG or the Debtors give in to the Freedom Lender Group's demands and relinquish their statutory right to exclusively propose a plan of reorganization -- a request to which the Freedom Lender Group knows the Debtors will never agree.  Although they try and shy away from it, there is no basis for this Court to issue the extraordinary remedy of appointing a chapter 11 trustee, and the Freedom Lender Group's efforts to frame their request as simply in the alternative is telling.

---

[16]   The Freedom Lender Group tacitly acknowledges that the Freedom HoldCo Debtors were likely rendered insolvent by the Take Private Transaction (and so may have been insolvent at all times that the Freedom HoldCo Debtors have been in existence), given their focus on claims related to the "down-streaming" of the funds in the Take Private Transaction giving rise to a potential fraudulent transfer action.  (*See* Motion at ¶¶ 6, 7, 14, 24, 59.)

55.     Under section 1104 of the Bankruptcy Code, the party moving for appointment of a trustee must prove the need for a trustee by clear and convincing evidence, for cause including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, and that the appointment of a trustee is in the best interest of creditors or equity security holders of a corporate debtor.  *In re G-I Holdings, Inc.*, 385 F.3d 313, 317-18 (3d Cir. 2004) (citing *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 473 (3d Cir. 1998)); *see also In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir.1989).  The party seeking appointment of a chapter 11 trustee must meet a high standard, as the appointment of a chapter 11 trustee is an extraordinary remedy and "should be the exception, rather than the rule."  *Sharon Steel*, 871 F.2d at 1225.  That standard has not been met here.

   1.   The Debtors Have No Conflict that Warrants Appointment of a Chapter 11 Trustee

56.     In support of its Motion, the Freedom Lender Group repeatedly makes reference to various perceived conflicts of interest between the Freedom HoldCo Debtors and the OpCo Debtors.  (Motion at ¶¶ 7, 24, 55, 56, 66.)  As evidence, the Freedom Lender Group points to the debtor-in-possession financing that the Freedom HoldCo Debtors agreed to prepetition and certain potential inter-estate claims that the Freedom Lender Group "doubts" will be investigated.  (Motion at ¶¶ 24, 56, 59.)  These "conflicts," according to the Freedom Lender Group, can only be resolved by the appointment of a trustee.  The Freedom Lender Group, however, provides no evidence that any such conflicts do in fact exist, and for that reason alone, the Motion should be denied.

57.     As to the debtor-in-possession financing, although to date the Freedom Lender Group has failed to provide any post-petition financing to fund these entities, the First Lien Term Loan Lenders have agreed to remove the Freedom HoldCo Debtors as full unsecured guarantors

of the DIP Facility.  In its stead, the Freedom HoldCo Debtors negotiated the ability to use the proceeds of the DIP Facility to the extent necessary to pay any ongoing administrative expense claims that arise in these Chapter 11 Cases, but that their guaranty would be limited only to the extent of the proceeds they used -- a benefit not afforded to any other Debtor receiving the benefit of the DIP Facility proceeds.  Thus, even to the extent the DIP Facility created a conflict among the Debtors, such conflict no longer exists.

58.     Likewise, mere allegations and the fact that an interested party is currently "investigating" potential claims that one debtor may have against the other, does not create a conflict, nor does it amount to cause for the exceptional remedy of appointment of a chapter 11 trustee.

59.     In any event, since the Freedom Lender Group filed its Motion, the First Lien Group understands that the Debtors have determined to appoint an independent fiduciary party to oversee any inter-estate claims that may arise between the OpCo Debtors and the Freedom HoldCo Debtors in these Chapter 11 Cases.  The presence of such independent fiduciary should assuage any concerns that there is a conflict of interest between the Freedom HoldCo Debtors and the OpCo Debtors.  Thus, there is simply no need for a chapter 11 trustee to be appointed.

2.     The Terms of the Freedom Lender Plan Do Not Constitute Cause under Section 1104(a)(1)

60.     The Freedom Lender Group goes to great lengths in describing aspects of the Proposed Plan, which it characterizes as "patently unconfirmable," in support of its request to appoint a trustee.  (Motion at ¶ 63.)  Putting aside the fact that it is entirely premature to raise confirmation objections at this juncture, the provisions of the Proposed Plan with which the Freedom Lender Group takes issue, do not actually reflect anything that would constitute "cause" to appoint a chapter 11 trustee under section 1104(a)(1).

61.    *First*, as described above, despite the Motion's assertion that the Proposed Plan "diverts value away from the Freedom Lender Group" (Motion at ¶ 61), the Proposed Plan *does* provide the HoldCo Lenders with any value that may exist on account of their FRG equity interests. (*See* Proposed Plan at § 5.11.)  It is axiomatic that, absent payment of all debts in full, equity cannot receive any recovery in bankruptcy.  Thus, it is no surprise that the Proposed Plan provides no recovery to the HoldCo Term Loans in the absence of a successful sale and attendant satisfaction of the OpCo Debtors' debt.

62.    *Second*, the Motion claims that the Freedom HoldCo Debtors have certain intercompany claims against the OpCo Debtors, which would receive no distribution under the Proposed Plan.  (*See* Motion at ¶ 24.)  Again, while such argument is premature, this likewise does not provide a legitimate basis to appoint a chapter 11 trustee.  Any intercompany claims related to the prepetition Take Private Transaction would be a prepetition claim against FRG, an apparently insolvent entity.  It is no surprise that the Proposed Plan did not account for the Freedom HoldCo Debtors' intercompany claims against the OpCo Debtors when there is no available value to distribute.  But simply saying that there may be potential claims that are being released does not make it so, nor does it establish cause to appoint a trustee.

63.    *Finally*, the Motion argues that the Proposed Plan is deficient because it provides for releases of those very same vague causes of action that the Freedom Lender Group believes to be of significant value.  (Motion at ¶ 59.)  But, to the extent the members of the Freedom Lender Group themselves have any direct claims or causes of action against Debtors or third parties, they are permitted under the Proposed Plan to opt out of the releases and to pursue such claims.[17]  And,

---

[17]    *See Debtors' Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation Packages and Procedures For Distribution, (C) Approving the Form of the Ballots and Solicitation Materials and Establishing Procedures for*

any Debtor releases are subject to the outcome of the independent investigation.  (*See* Proposed

Plan § 12.2.)  If the Freedom Lender Group believes that the Proposed Plan is not confirmable

under the requirements of the Bankruptcy Code, it is free to raise such objections at the

confirmation hearing -- but now is not the appropriate time, and appointment of a chapter 11 trustee

mere weeks into the Chapter 11 Cases is not appropriate relief.

### 3.    Appointing a Trustee is Not in the Estates' Interests

64.    Section 1104(a)(2) of the Bankruptcy Code provides that a trustee may be

appointed "if such appointment is in the interests of creditors, any equity security holders, and

other interests of the estate."  11 U.S.C. § 1104(a)(2).  In determining whether appointment of a

chapter 11 trustee is in the interests of stakeholders, courts typically engage in a cost-benefit

analysis.  *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (recognizing

that one of the factors courts consider is weighing benefits derived by appoint of trustee against

cost of such appointment); *see also* H.R. Rep. No. 95-595 (1977) (finding courts "may order

appointment ***only*** if the protection afforded by a trustee is needed and the costs and expenses of a

trustee would not be disproportionately higher than the value of the protection afforded")

(emphasis added).  In conducting such analysis, courts look to both the direct cost that appointment

of a trustee places on a chapter 11 debtor, and the substantial indirect cost resulting from the

displacement of the debtor's existing management.  *See, e.g.*, *In re Eletson Holdings Inc.*, 659 B.R.

426, 453 (Bankr. S.D.N.Y. 2024) (finding analysis of whether appointment of Chapter 11 trustee

is in best interest of creditors requires examination of numerous factors, including trustworthiness

of the debtor; debtor's past and present performance and prospects for rehabilitation; confidence,

---

*Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 152-2], Ex. 3-E.

or lack thereof, of business community and of creditors in present management; and benefits derived from appointment of trustee, balanced against cost of appointment) (citation omitted). This is why bankruptcy courts are highly reluctant to take possession away from debtors, and thus, appointing a trustee is seen as the "last resort," reserved only for dire situations. *See Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In Re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002) ("[T]he Court recognizes that appointing a trustee must be considered a last resort.").

65.     Given that the Chapter 11 Cases were commenced less than three weeks prior to the Freedom Lender Group's Motion, the Motion cannot be a "last resort."  Indeed, in none of the cases to which the Freedom Lender Group cites did a bankruptcy court appoint a chapter 11 trustee within a year -- let alone a month -- of the Petition Date.  (*See e.g.*, Motion at ¶ 60, *citing Ionosphere Clubs*, 113 B.R. at 166 (appointing a trustee thirteen months after the petition date); *In re Morningstar Marketplace, Ltd*, 544 B.R. 297, 299 (Bankr. M.D. Pa. 2016) (appointing a trustee nearly two years after the petition date); *In re Marvel Ent. Grp., Inc.*, 1998 WL 181084, at *8 (D. Del. Jan. 27, 1998), *rev'd*, 140 F.3d 463 (3d Cir. 1998) (appointing a trustee one year after the petition date).)

66.     Nor is the situation dire.  To the contrary, over the past few weeks, the Debtors have been doing what Debtors should be doing, including maintaining operations and stabilizing their business.  There has been no decision made by the Freedom HoldCo Debtors that would prejudice the Freedom Lender Group's rights; rather, the Freedom Lender Group is currently the residual beneficiary of the sale process being run and funded by the OpCo Debtors and the First Lien Term Loan Lenders.

67.     Lastly, appointing a chapter 11 trustee in these Chapter 11 Cases would accomplish only one thing -- significant and unnecessary administrative cost at the expense of all the Debtors' stakeholders.  The costs associated with the appointment of a trustee, including the significant indirect harms attendant to the displacement of the Debtors' existing management,[18] would outweigh the purported benefits (if any exist) that a trustee could provide.  *See Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003) (declining to appoint a trustee and recognizing that, as here, "[t]he problem is that appointing a trustee amounts to replacing much of a debtor's high-level management, and that creates immense costs in two ways.  First, there is a statutory fee (which can be substantial) to which trustees are entitled for their services . . . . More important, however, is the cost implicit in replacing current management with a team that is less familiar with the debtor specifically and its market generally."); *see also In re G-I Holdings, Inc.*, 295 B.R. 502, 512 (D.N.J. 2003), *aff'd*, 385 F.3d 313 (3d Cir. 2004) (affirming bankruptcy court's denial of motion to appoint a trustee where bankruptcy court properly applied the "strong presumption" in favor of debtor's current management).

68.     Accordingly, for the foregoing reasons, the request to appoint a chapter 11 trustee should be denied.

## RESERVATION OF RIGHTS

69.     The First Lien Group reserves the right to supplement and amend this Objection, to seek discovery with respect to the same, and to introduce evidence at any hearing relating to the Motion and expressly reserves all rights under applicable law and otherwise.

---

[18]    As will be set forth in the Debtors' objection to the Motion, contrary to the Freedom Lender Group's claims (*see* Motion at ¶ 53), the Debtors' core management team has been employed at the Debtors for years.

## **CONCLUSION**

WHEREFORE the First Lien Group respectfully requests that this Court deny the Motion in its entirety, and grant such other and further relief as the Court finds just and appropriate.

*[Remainder of Page Intentionally Left Blank]*

Dated: December 3, 2024
      Wilmington, Delaware

Respectfully submitted,

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Elizabeth A. Rogers (No. 7335)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mcguire@lrclaw.com
      erogers@lrclaw.com

-and-

**PAUL HASTINGS LLP**

Jayme T. Goldstein (admitted *pro hac vice*)
Daniel A. Fliman (admitted *pro hac vice*)
Jeremy D. Evans (admitted *pro hac vice*)
Isaac S. Sasson (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: jaymegoldstein@paulhastings.com
      danfliman@paulhastings.com
      jeremyevans@paulhastings.com
      isaacsasson@paulhastings.com

Nicholas A. Bassett (admitted *pro hac vice*)
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1700
Facsimile: (202) 551-1705
Email: nicholasbassett@paulhastings.com

*Counsel to the Ad Hoc Group of First Lien Lenders*