## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 154** |

## OBJECTION OF THE AD HOC GROUP OF FREEDOM LENDERS
## TO DEBTORS' BIDDING PROCEDURES MOTION

The Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**")[2] consisting of

certain of the (i) Lenders (the "**HoldCo Lenders**"), as defined in that certain Credit Agreement,

dated as of August 21, 2023 (as amended, restated, supplemented, or otherwise modified), among

---

[1]     The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2]     The Freedom Lender Group is comprised of the entities named in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229], as it may be amended and supplemented from time to time.

Freedom VCM Interco, Inc., Freedom VCM, Inc. (together with Freedom VCM Interco, Inc., the "**HoldCo Debtors**"), Alter Domus (US) LLC as administrative agent, and the lenders party thereto and (ii) Lenders (the "**Second Lien OpCo Lenders**"), as defined in that certain Second Lien Credit Agreement, dated as of March 10, 2021 (as amended, restated, supplemented, or otherwise modified), among Franchise Group Inc. (collectively with its subsidiaries, the "**OpCo Debtors**"), Franchise Group NewCo PSP, LLC, Valor Acquisition, LLC, and Franchise Group NewCo Intermediate AF, LLC, as co-borrowers, Alter Domus (US) LLC, as administrative agent, and the lenders party thereto, by and through their undersigned counsel, hereby file this objection (the "**Objection**") to the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 154] (the "**Motion**").  In support of this Objection, the Freedom Lender Group refers to the declaration of Neil A. Augustine in support of the Objection filed concurrently herewith (the "**Augustine Declaration**") and respectfully represents as follows:[3]

## PRELIMINARY STATEMENT

1.        "Courts have made clear that a debtor has a fiduciary duty to maximize the value of the estate at hand." Mot. ¶ 20.  That is why the Motion should be denied.  The Debtors' proposed sale process is designed not to identify an alternative value-maximizing transaction to the

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Motion or the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "**First Day Declaration**").

equitization of the First Lien OpCo Term Facility in the Debtors' proposed plan of reorganization, but rather as an attempt to defeat any alternatives or objections to that plan.

2.      The HoldCo Debtors, in particular, should not be subject to this flawed sale process. Their assets are not specifically being marketed, and no independent fiduciary for the HoldCo Debtors has made a determination that selling their assets is beneficial to their stakeholders (which are different than the OpCo Debtors' stakeholders).  Rather, the HoldCo Debtors' stakeholders, 93% of which are members of the Freedom Lender Group, do not support this flawed sale process or the Debtors' proposed plan (which would provide them with no recovery) and have filed a motion seeking an alternative path for the HoldCo Debtors, which should be granted.  Therefore, the HoldCo Debtors should be exempted from the sale process and should not have to pay for it.

3.      Even if the HoldCo Debtors are excluded from the proposed sale process, the HoldCo Lenders (as well as the Second Lien OpCo Lenders) have a vested interest in the OpCo Debtors obtaining offers for their assets that exceed their outstanding debt.  But the sale process that was designed by the Debtors (with excessive influence from the First Lien OpCo Lenders) is fatally flawed and designed to fail.

4.      First and foremost is the exceedingly tight timing of the sale process.  The proposed sale process would be a mere 44 days over the Christmas and New Year's holidays when financing markets are effectively shut down, with the members of the Freedom Lender Group (themselves potentially interested parties) only having received access to the Debtors' data site and marketing materials during the week of Thanksgiving.  The Debtors seek to justify this truncated process by claiming that they cannot afford to take more time under their proposed DIP facility.  That is false. The Debtors' own projections show that they have ample time to run a value-maximizing sale process.  The sale process should be extended by at least two months to provide prospective bidders

with the time necessary to undergo diligence efforts, raise financing (if necessary), and formulate bids, which would give the Debtors the best chance at success.  A more appropriate set of sale-related deadlines is attached as Exhibit B to the Augustine Declaration (the "**Proposed Revised Schedule**"), with a suggested bid deadline of March 28, 2025.

5.      The Bidding Procedures suffer from a number of other fatal flaws.  The Debtors have been using cash collateral to market their assets outside the ordinary course without Court authorization.   And they have been doing so by distributing to potential bidders marketing materials (including projections for each of the Debtors' three businesses) that do not take into account any adjustments for the effect of the Chapter 11 Cases or the Debtors' proposed plan, have not been approved by the Court, and have not been vetted by the Freedom Lender Group (despite it being their collateral being marketed) or the Official Committee of Unsecured Creditors.  There is no assurance that these projections will match those that will be filed with the Debtors' disclosure statement in advance of the related hearing scheduled for December 17.  If there is any discrepancy between the two, it would surely upset bidders' expectations and the sale process generally.

6.       Also, the Debtors own three distinct businesses, The Vitamin Shoppe, Pet Supplies Plus ("**PSP**"), and Buddy's Home Furnishings ("**Buddy's**"), but bidders are not incentivized to bid on any of them individually because the First Lien OpCo Lenders can credit bid the full amount of their claim on any single business or even any single asset.  A sale of any of these businesses could generate significant value by itself, and a "sum of the parts" sale of each of the three separately could exceed a sale of all three together.  To maximize value, the First Lien OpCo Lenders should be required to set a reserve price for each of the three businesses above which they will no longer credit bid.

7.      Further, the proposed Bidding Procedures would give the First Lien OpCo Lenders excessive control over the sale process. Most troubling, the First Lien OpCo Lenders would have a consent right over whether a bid is a "Sufficient Bid," which determines whether an auction will be held and the sale process will advance to a final round. For obvious reasons, stalking horse bidders are never entitled to consent rights regarding whether other bidders are deemed to be qualified or successful. Yet the First Lien OpCo Lenders would be given such rights despite effectively being the stalking horse bidders here, given the default to equitization under the Debtors' proposed plan if bids do not exceed the OpCo Debtors' secured debt. Such rights should fall away if a bid is obtained that would pay in full all first lien secured claims of the OpCo Debtors.

8.      The Bidding Procedures are also confusing to potential bidders because they would be required to submit a bid (or combine their bid with other bids) that exceeds all first lien secured debt at the OpCo Debtors. This includes the OpCo Debtors' prepetition ABL facility, which is being periodically paid down with proceeds of the American Freight liquidation. Therefore, it is unclear to bidders exactly what their bid needs to be in order to be actionable.

9.      If the Court is inclined to grant the Motion (which it should not), it should require modifications to address the foregoing, including extending the sale process as set forth in the Proposed Revised Schedule, plus the following additional modifications: First, the members of the Freedom Lender Group should be designated as Consultation Parties and be given consent rights with respect to any material modifications to the Bidding Procedures. Second, the HoldCo Lenders should have the same consent and consultation rights as the First Lien OpCo Lenders with respect to any potential sale of any of the HoldCo Debtors' assets. Third, all potential bidders should be informed that the members of the Freedom Lender Group are available to discuss providing debt and equity capital to support a bid for any or all of the Debtors' businesses. Fourth,

the Debtors should not be permitted to sell any claims or causes of action or tax attributes.  Finally, any tax or other value allocations between the OpCo Debtors and the HoldCo Debtors should not be binding on the Debtors' estates or their stakeholders.

## **BACKGROUND**

10.     The Debtors filed these chapter 11 cases (the "**Chapter 11 Cases**") on November 3, 2024 (the "**Petition Date**") having entered into a Restructuring Support Agreement (the "**RSA**") with approximately 80% of lenders (the "**First Lien OpCo Lenders**") under the OpCo Debtors' first lien term loan facility (the "**First Lien OpCo Term Facility**") prior to the Petition Date.[4] The RSA requires the Debtors to (i) pursue a sale of all of their assets in accordance with specified milestones and (ii) if such a sale would not result in net proceeds of at least an amount that would repay all secured debt at the OpCo Debtors, a pivot to an equitization of the First Lien OpCo Lenders' debt that would provide no recoveries to the Second Lien OpCo Lenders or any stakeholders of the HoldCo Debtors.[5]  On November 11, 2024, the Debtors filed a proposed plan of reorganization consistent with the RSA [Docket No. 150] (the "**Proposed Plan**").

11.     The HoldCo Debtors made the determination to file their Chapter 11 Cases, enter into the RSA, file the Debtors' proposed plan, and sign on to the sale process set forth in the Motion without ever holding a board meeting for such entities or otherwise considering their fiduciary duty to maximize value for the HoldCo Debtors' estates.  In particular, the HoldCo Debtors did not consider the interests of the parties constituting 93% of their stakeholders, the members of the Freedom Lender Group.  This is the case notwithstanding that the HoldCo Debtors and OpCo Debtors have distinct assets, liabilities, and creditors and that the HoldCo Debtors have potential claims against the OpCo Debtors.

---

[4]     First Day Decl. ¶¶ 4, 15; Ex. B (RSA).
[5]     RSA Recitals § 4.01; Proposed Plan § I.E.

12.     The Debtors' proposed Bidding Procedures incorporate the RSA milestones including a December 16, 2024 deadline for submission of indications of interest and a January 23, 2025 bid deadline.[6]  That would give parties six days from the scheduled hearing date of the Motion (December 10, 2024) to diligence and formulate an initial offer for any or all of the three businesses and an additional 38 days to submit a binding offer over the Christmas and New Year's holiday season when the financial markets are effectively shut down.  The proposed Bidding Procedures do not contemplate a stalking horse, but the First Lien OpCo Lenders would retain the right to credit bid the full amount of their over $1.38 billion of debt (both prepetition and contemplated postpetition debt) on any single business or asset.[7]  This credit bid right is effectively what the Proposed Plan contemplates in light of the equitization toggle.

13.     Article III of the proposed Bidding Procedures provides the First Lien OpCo Lenders with consultation rights regarding the selection of Potential Bidders, Acceptable Bidders, Qualified Bids and Qualified Bidders, and the Successful Bidder, as well as the rejection of any Bid.[8]  The First Lien OpCo Lenders' consultation rights last unless and until such time as they submit a bid, which they would be permitted to do even after the bid deadline has passed.[9]

14.     The proposed Bidding Procedures also would provide the First Lien OpCo Lenders with consent rights over whether any Qualified Bid would satisfy the requirements of being a Sufficient Bid (which is required to be a Successful Bid) that would result in an auction and a final

---

[6]   Mot. ¶ 16.

[7]   First Day Decl. ¶ 51; *Interim DIP Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 134], ¶ 28; Bidding Procedures, Art. III.C.

[8]   Bidding Procedures, Arts. III.A.2, III.B, IV, VII.B.5, VII.D.

[9]   *Id.*, Arts. III.C, V, XIII.

round of the sale process.[10]  So, for example, if the First Lien OpCo Lenders had a view that a Qualified Bid is not a good faith, *bona fide* bid, does not include sufficient evidence of the proposed bidder's financial ability to timely close the sale transaction, or is not otherwise acceptable for any reason, the bid cannot move forward.  This is the case even if the bid in question would exceed all first lien secured debt at the OpCo Debtors.

## **OBJECTION**

15.    "Bidding procedures should [only] be approved when they provide a benefit to the estate by maximizing the value of the assets."  *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *253 (Bankr. Del. Aug. 15, 2007) (internal citations omitted). The burden rests on each of the Debtors to justify its decision to use or sell assets.  *See In re Decora Indus., Inc.*, Case No. 00-4459 (JJF), 2002 U.S. Dist. LEXIS 27031, at *7 (D. Del. May 20, 2002) ("Generally, a debtor may sell assets outside the ordinary course of business when it has demonstrated that the sale of such assets represents the sound exercise of business judgment."). Because the "purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate . . . bankruptcy courts are necessarily given discretion and latitude in conducting the sale."  *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).

16.    The Debtors have failed to meet their burden because the proposed Bidding Procedures are not designed to obtain the maximum possible value for the Debtors' assets.  Rather, the proposed sale process is designed (with heavy influence by the First Lien OpCo Lenders) not to solicit a topping, value-maximizing bid, but to justify the equitization of the First Lien OpCo Term Facility under the Debtors' Proposed Plan and combat any alternatives or objections.  The Debtors have admitted as much, noting that the marketing and sale process is intended to act as a

---

[10]    *Id.*, Art. VII; RSA, Ex. B, at 26-27 (definition of "Sufficient Bid").

"market check on value" for the equitization under the Proposed Plan.[11]

17.    As such, the Court should deny the Motion or, if it is inclined to grant it, exercise its discretion to require modifications to remedy these flaws.

## I.    The Proposed Bidding Procedures Are Not Designed to Maximize the Value of the HoldCo Debtors' Estates

18.    Where, as here, the Debtors' estates are not substantively consolidated, the value of each Debtor's estate must be maximized independently.  *See In re Innkeepers USA Tr.*, 442 B.R. 227, 235-36 (Bankr. S.D.N.Y. 2010) (holding that "in a case with multiple debtors, the debtors, as fiduciaries, have duties to refrain from favoring or appearing to favor one or another of their estates and its creditors over another . . . ."); *see also* Mot. ¶ 20 ("Courts have made clear that a debtor has a fiduciary duty to maximize the value of the estate at hand.") (citing cases).

19.    The HoldCo Debtors do not stand to benefit from the Debtors' faulty sale process and cannot satisfy their burden of demonstrating that it is designed to maximize the value of their estates.  The HoldCo Debtors have discrete assets, including (i) their equity in the OpCo Debtors, (ii) claims and causes of action against Brian Kahn (the Debtors' former CEO), other current and former officers and directors, B. Riley (the sponsor of the Debtors' take-private transaction), the OpCo Debtors, and others in connection with the Debtors' August 2023 take-private transaction, and (iii) potential tax attributes.  The proposed Bidding Procedures could potentially result in a sale of those assets.[12]  But the Debtors have no prepared marketing materials addressing these specific assets and there is no mechanism in the Bidding Procedures or the Proposed Plan to deliver the value of any such sale to the actual stakeholders of the HoldCo Debtors.[13]  And the HoldCo

---

[11]    Nov. 5, 2024, Hr'g Tr. 18:23.

[12]    *See* Bidding Procedures, Art.  I (providing for the potential sale of all or substantially all of the Debtors' assets).

[13]    *See* Proposed Plan §§ 3.1, 5.4, 7.1 (giving all value of the HoldCo Debtors' estates to the First Lien OpCo Lenders or releasing it for no consideration).

Debtors apparently made the determination to seek approval of the Motion jointly with the OpCo Debtors despite having never held a board meeting for themselves or otherwise considered the interests of stakeholders to whom they owe fiduciary duties.

20.     The members of the Freedom Lender Group, who constitute 93% of the HoldCo Debtors' stakeholders and thus control whether a plan can be confirmed for the HoldCo Debtors, do not support this sale process.  Instead, they have filed a motion seeking to terminate exclusivity at the HoldCo Debtors or, in the alternative, obtain stay relief or appoint a chapter 11 trustee at the HoldCo Debtors.[14]  That motion should be granted, and the HoldCo Debtors should be extricated from the proposed sale process and not be required to pay for it.

## II.     The Proposed Timeline Is Unnecessarily Truncated

21.     The timeline proposed by the Debtors in the Bidding Procedures does not maximize the chances of success.  To ensure that a debtor obtains the highest value for its assets, bidding procedures in chapter 11 cases must establish a framework for competitive bidding.  *See Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 535-37 (3d Cir. 1999) (recognizing that "more competitive bidding" will bring better benefits to the estate). The procedures governing a sale process should be designed to foster the competitive process, and bankruptcy courts should "not allow anything to chill an active marketing and auction process." *Crown Vill. Farm, LLC v. Arl, L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 n.4 (Bankr. D. Del. 2009).

22.     Here, the rushed timeline in the proposed Bidding Procedures would not give potential bidders sufficient time to do the necessary diligence, obtain third party financing (if necessary), and submit a binding bid, thus eliminating the chances of a value-maximizing

---

[14]    Docket No. 192.

competitive process. Bidders would be given only six days after the scheduled hearing on the Motion to submit indications of interest, with only 38 days thereafter to submit binding bids. Much of that 44-day period falls over the Christmas and New Year's holiday season when the financing markets go on hiatus, limiting the competitive tension and number of bidders in the process as a result of the right timeline to raise external financing. These factors will dissuade bidders from hiring advisors and expending the necessary time and effort to participate in the sale process. Such a sale process is woefully inadequate. *See* Augustine Decl. ¶ 11; *see also In re Exaeris Inc.*, 380 B.R. 741, 745 (Bankr. D. Del. 2008) (denying motion to sell substantially all assets and finding three weeks' notice over Christmas and New Year's holidays was not reasonable).[15]

23.    In an attempt to justify this truncated timeline, the Debtors profess that time is of the essence because the Debtors cannot afford a longer process as they have "limited access to postpetition financing under their DIP Facility" and there are events of default tied to the RSA milestones.[16] This is a key example of the First Lien OpCo Lenders (who are providing the DIP Facility) tipping the scales by imposing aggressive deadlines in an attempt to doom the sale process before it starts. But appeasement of major creditors is not a valid business justification for the proposed truncated timeline. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("[T]here must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b).").

---

[15] In considering the length of the sale process, the Debtors should be given no credit for whatever unauthorized postpetition marketing they have already undertaken. As set forth in Section III below, the Debtors' use of cash collateral outside the ordinary course in this way is improper. And prospective bidders have not, to date, been able to participate in the sale process with the confidence of knowing that the procedures and deadlines are those that the Court will ultimately approve.

[16] Mot. ¶ 12.

24.     As demonstrated by the Debtors' projections, the Debtors' assets are not deteriorating in value over time.  Therefore, there is no legitimate justification for approving a sale process on such a fast track.  *See, e.g., In re Gulf Coast Oil Corp.*, 404 B.R. 407, 423 (Bankr. S.D. Tex. 2009) ("Not every sale is an emergency, and . . . the reliability of uncontested evidence (and particularly the reliability of testimony that is not adequately cross-examined), is suspect.").  And even if it were, the "need for expedition . . . is not a justification for abandoning proper standards." *Lionel Corp.*, 722 F.2d at 1071  (quoting *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 450 (1968)).  Simply put, there is no "material risk" that "the patient will die on the operating table" if the proposed sale transaction does not proceed on this timetable.  *In re Gen. Motors Corp.*, 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009).

25.     In any event, the argument that the Debtors lack sufficient liquidity to conduct a better sale process rings false.  As discussed in the Freedom Lender Group's objection to final approval of the Debtors' proposed DIP Facility and as described in the Augustine Declaration, the Debtors have ample liquidity to conduct a sale process on a reasonable timeline.  *See* Augustine Decl. ¶ 9.

26.     Therefore, the proposed sale timeline should be extended to give bidders the necessary time to conduct diligence, raise financing, and formulate offers and, thus, maximize the chances of success.  In order to give potential bidders a full opportunity to submit viable bids, the sale timeline should be modified as set forth in the Proposed Revised Schedule, including a bid deadline of March 28, 2025.

## III.   The Debtors Have Been Running an Unauthorized and Improper Postpetition Marketing Process

27.     The marketing of a debtor's assets constitutes a transaction outside the ordinary course of business that requires bankruptcy court approval.  *See In re Del. & Hudson Ry. Co.*, 124

B.R. 169, 175 (D. Del. 1991) ("If a trustee wishes to sell assets of a debtor outside of the ordinary

course of business of the debtor . . . , the trustee must comply with section 363 [and] the Bankruptcy

Court must conduct a hearing.").  Here, the Debtors claim to have been running a marketing

process during the pendency of these Chapter 11 Cases without any Court approval for the use of

cash collateral to do so.[17]  Given that expending cash to market assets for a sale is outside the

ordinary course of business, the Debtors have not been in compliance with section 363 of the

Bankruptcy Code.  *See, e.g., In re Direct Media Power, Inc.*, 582 B.R. 739, 752-53 (Bankr. N.D.

Ill. 2018) ("The Cash Collateral Orders set the parameters on the use of cash collateral, including

both the positive and negative limits.  When [debtor and its president] exceeded those limits, they

violated the terms of the Cash Collateral Orders . . . and therefore are in contempt . . . ."); *In re

Visicon S'holders Tr.*, 478 B.R. 292, 312-14 (Bankr. S.D. Ohio. 2012) (finding debtor's repeated

use of cash collateral without authorization was additional cause for dismissing bankruptcy case).

28.    Further, the Debtors have been running this unauthorized postpetition marketing

process using marketing materials, in the form of Confidential Information Memorandums

("**CIMs**") provided to prospective bidders, that expressly state that projections included therein do

not reflect the impact of the Chapter 11 Cases or the Debtors' proposed plan.  The CIMs do not

provide information on which stores, under which banners, are cash flow negative or could become

so in the near term, which can be addressed by terminating leases for those stores or not assuming

them pursuant to a bid in bankruptcy.  While the bidders will likely conduct their own research on

such potential store closings, it is beneficial to have management's view beforehand.  The CIMs

also do not provide information regarding what negotiations with landlords, if any, the Debtors

---

[17]    *See, e.g., Disclosure Statement for the Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors*
[Docket No. 151] (the "**Disclosure Statement**"), at 19 ("Simultaneously with the commencement of these
Chapter 11 Cases, the Debtors have launched a fulsome marketing process that will permit the solicitation of bids
for all or some of the Debtors' assets.").

have undertaken to lower rent going forward and increase value to their estates.  *See* Augustine Decl. ¶ 12.  These marketing materials have not been approved by the Court, nor were they previewed with the Freedom Lender Group (despite it being their collateral being sold) or the Official Committee of Unsecured Creditors before being sent to prospective bidders.  If these projections are at all different from those that will be attached to the Disclosure Statement, it would upset the marketplace for the Debtors' assets and harm the Debtors' estates.

## IV.   The Bidding Procedures Lack Reserve Prices for Each of the Debtors' Three Businesses

29.     Again, the "paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate." *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS at *253. The Bidding Procedures are not designed to maximize value of the Debtors' estates because they fail to properly incentivize bidders who may be interested in only one of the Debtors' three businesses (The Vitamin Shoppe, PSP, or Buddy's) but not the others, thus foreclosing a potential path to maximizing value.

30.     The Debtors are not like many other companies where there are internal synergies between various segments of the business.  Rather, each of The Vitamin Shoppe, PSP, and Buddy's is a wholly separate company unto itself.  Each is an entirely different business: vitamin and other nutrition products, pet supplies and services, and home furniture and appliances, respectively.[18] And each has its own separate management team and has been run independently for years before being acquired by the Debtors.  The Debtors recognize these distinctions by separating the proposed treatment for holders of general unsecured claims against each of The Vitamin Shoppe Debtors, the PSP Debtors, and the Buddy's Debtors in their Proposed Plan.[19]  Therefore, it stands

---

[18]   First Day Decl. ¶¶ 21-25, 29-30.

[19]   *See* Proposed Plan § 4.3.

to reason that a bidder might want to bid on only one of these businesses.

31.     It is self-evident that a sale of each of these businesses independently could add up to a "sum of the parts" sale that, in the aggregate, would exceed what the Debtors could obtain in a sale of all three together.  *See United States v. Rodgers*, 461 U.S. 677, 694 (1983) ("It requires no citation to point out that interests in property, when sold separately, may be worth either significantly more or significantly less than the sum of their parts.").  Such a sale would further enhance potential value because bidders can consider the impact of removing legacy corporate overhead as they bid on specific assets.

32.     But a "sum of the parts" sale is unlikely under the Debtors' proposed Bidding Procedures given the looming prospect of the First Lien OpCo Lenders' credit bid.  With over $1.38 billion principal amount of prepetition and postpetition debt (or at least $1.23 billion prior to the second contemplated draw of the DIP Facility), the First Lien OpCo Lenders would preserve the right to credit bid all of their secured debt obligations on any one business, or even any one asset.[20]  This will chill a "sum of the parts" sale that could exceed the secured debt at the OpCo Debtors and could provide a more value-maximizing outcome than the equitization contemplated in the Debtors' Proposed Plan.

33.     The remedy for this deficiency is simple: the Court should require the First Lien OpCo Lenders to set a reserve price (also known as a "release price") for each of the Debtors' three businesses, setting a value above which the First Lien OpCo Lenders will no longer credit bid. *See In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (denying bidding procedures that chilled bidder interest and observing that "[s]tructured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective

---

[20]     Bidding Procedures, Art. III.C.

bidders' interests."). This practice informs bidders that the probability of transacting is higher and not dependent on other bidders purchasing the remaining assets. It creates a more predictable and encouraging environment for potential buyers, thus increasing competitive tension. *See* Augustine Decl. ¶¶ 13-14.

34.    The Court has the power to impose this requirement under section 363(k) of the Bankruptcy Code, which allows it to limit the First Lien OpCo Lenders' credit bid for "cause." The Third Circuit has rejected lenders' arguments that the "for cause" exemption "is limited to situations in which a secured creditor has engaged in inequitable conduct. . . . A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010); *see also Hybrid Tech Holdings, LLC v. Official Comm. of Unsecured Creditors (In re Fisker Auto. Holdings, Inc.*), Case No. 13-13087 (KG), Case No. 14-99 (GMS), 2014 U.S. Dist. LEXIS 17689, at *4 (D. Del. Feb. 12, 2014) (recognizing "controlling authority in the form of 11 U.S.C. § 363(k) and the Third Circuit's decision in *Philadelphia Newspapers*" on "the issue of a bankruptcy court's authority to limit or deny a secured creditor's right to credit bid for the purposes of fostering a competitive auction").

35.    Courts have approved reserve prices to ensure that bidding is not chilled in other cases. *See, e.g., QR Triptych, LLC v. LV Midtown, LLC*, 659 B.R. 132, 137, 139 (S.D. Fla. 2024) (describing settlement between debtor and secured creditor where parties agreed that secured creditor's potential credit bid would be capped at an amount less than its outstanding obligations); *In re Sungevity, Inc.*, Case No. 17-10561 (KG) (Bankr. D. Del. Mar. 31, 2017) [Docket No. 142] (reflecting agreed cap on prepetition secured creditor's potential credit bid). The Court should

exercise that power here to require a credit bid reserve price for each of the Debtors' three businesses.

## V.     The Bidding Procedures Give the First Lien Lenders Excessive Influence Over the Sale Process

36.     The First Lien OpCo Lenders have consent and consultation rights in the proposed Bidding Procedures that would create an unlevel playing field by giving them an inappropriate amount of influence over a process in which they are participants, thereby chilling bidding.  If a bid, or combination of bids, does not result in net proceeds that would repay all first lien secured debt at the OpCo Debtors, the Debtors will pivot to an equitization of all of the First Lien OpCo Lenders' claims.  The Debtors' plan equitization toggle is well known to prospective bidders and is the cornerstone of the Debtors' public chapter 11 strategy.  Therefore, the plan equitization toggle makes the First Lien OpCo Lenders' potential credit bid effectively a stalking horse bid that aggregate bids must clear.

37.     Typically, once a prepetition secured lender submits a credit bid, that lender must relinquish its consent and consultation rights with respect to a sale process.  *See, e.g., In re MTE Holdings LLC*, Case No. 19-12269 (CTG), 2021 Bankr. LEXIS 2225, at *9 (Bankr. D. Del. Aug. 17, 2021) ("Of course, if [secured lenders] are credit bidders, it would not be a level playing field if they also had consent rights over a process that they were participating in.").

38.     Despite effectively being the stalking horse bidder for the Debtors' assets, the required First Lien OpCo Lenders have consent rights over whether the Debtors can designate a Qualified Bid as a "Sufficient Bid" (as defined in the RSA) that would result in an auction and a final round of bids.[21]  To qualify as a Sufficient Bid requires meeting ten different requirements, some of which are subjective, including (i) being deemed a good faith, *bona fide*, irrevocable bid,

---

[21]     Bidding Procedures, Art. VII; RSA, Ex. B, at 26-27.

(ii) providing written evidence demonstrating that the bidder has the financial ability to timely close the sale transaction, and (iii) being reasonably likely to be consummated.[22]  Beyond these ten conditions, the Debtors and the required First Lien OpCo Lenders can reject a bid if they do not find it "otherwise acceptable" for any unnamed reason.[23]  The determination regarding whether these factors are met is made by the Debtors and the required First Lien OpCo Lenders ***even if*** the bid would exceed the first lien secured debt of the OpCo Debtors.[24]  This essentially gives the First Lien OpCo Lenders a veto power over the entire sale process, thereby tipping the scales in favor of the plan equitization and potentially chilling bidding.  *See In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009) ("[U]nless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value.").

39.    Additionally, the Debtors are unable to make any amendments or modifications, directly or indirectly, to a number of provisions of the Bidding Procedures without obtaining prior written consent of the required First Lien OpCo Lenders, including their credit bid rights, even if the RSA is validly terminated.[25]  The First Lien OpCo Lenders are also given a host of consultation rights in the Bidding Procedures.[26]  Taken together, these consent and consultation rights would chill bidding and should not be approved.  At a minimum, the First Lien OpCo Lenders should not have consent rights over what constitutes a Sufficient Bid with respect to any bid that would repay

---

[22]    RSA, Ex. B, at 26-27 (definition of "Sufficient Bid").

[23]    *Id.*

[24]    *Id.*

[25]    Bidding Procedures, Arts. VII.B.10, XIX.

[26]    *Id.*, Arts. III.A (participation requirements for a Potential Bidder to be an Acceptable Bidder eligible to receive due diligence information), IV (requirements for Qualified Bids), VII (auction procedures, including minimum overbid, highest or best offer, rejection of bids, modification of procedures; right to negotiate with Qualified Bidders; and determination of Successful Bid), VIII (Backup Bidder), XIV (reservation of rights to modify Bidding Procedures).

in full the first lien secured debt of the OpCo Debtors.

## VI.    The Price Bidders Need to Bid Against Is Unclear

40.    The proposed Bidding Procedures are also not designed to achieve the best results because they will make it unnecessarily difficult for proposed bidders to formulate and propose bids, thereby deterring bidders from participating in the sale process.  The Debtors' RSA and Proposed Plan provide that the Debtors will only pursue a sale that results in net proceeds exceeding all first lien secured debt at the OpCo Debtors, including their ABL facility, which is being periodically repaid with proceeds of the liquidation of the American Freight business.[27]  As such, the Bidding Procedures create uncertainty for bidders regarding the quantum of first lien debt they would need to clear for their bid to prevail.

## VII.    Other Modifications to the Bidding Procedures Are Warranted

41.    The Motion should not be approved, but, if the Court is inclined to grant it, it should be modified to address the issues discussed above, including extending the timing of the sale process as set forth in the Proposed Revised Schedule.  In addition, the following modifications should be required:

42.    <u>First</u>, the members of the Freedom Lender Group should be designated as Consultation Parties and be given consent rights with respect to any material modifications to the Bidding Procedures.  Because their collateral is contemplated to be sold, they should be equally informed and given the opportunity to engage with the Debtors as the sale process progresses.

43.    <u>Second</u>, the HoldCo Lenders should have the same consent and consultation rights as the First Lien OpCo Lenders with respect to any potential sale of any of the HoldCo Debtors'

---

[27]    *See* Nov. 5, 2024, Hr'g Tr. 163:1-5 ("The ABL collateral is being reduced in real time and not replaced because of the GOB sale of American Freight, and if we start using that cash to fund other things, then they aren't going to be adequately protected.").

assets. It stands to reason that the creditors with senior liens on the HoldCo Debtors' assets should have the same consent and consultation rights as those with senior liens on the OpCo Debtors' assets.

44.    <u>Third</u>, the Debtors should not be permitted to sell any claims or causes of action or tax attributes. Such assets are unencumbered and, thus, should be preserved for unsecured creditors, including any potential deficiency claims. Further, these assets are not actively being marketed so there is no way to determine whether a fair price for them is obtained in the sale process.

45.    <u>Fourth</u>, all potential bidders should be informed that the members of the Freedom Lender Group are available to discuss providing debt and equity capital to support a bid for any or all of the Debtors' businesses.

46.    <u>Finally</u>, any tax or other value allocations between the OpCo Debtors and the HoldCo Debtors should not be binding on the Debtors' estates or their stakeholders. Allocations of value by potential bidders are only the opinions of such bidders and may be determined for tactical reasons. They should not be given any probative weight.

## **<u>RESERVATION OF RIGHTS</u>**

47.    The Freedom Lender Group reserves all of its rights to supplement or amend this Objection and to raise additional issues with respect to the Motion at the hearing, to request additional evidence, and to present evidence at the hearing to consider the Motion.

## **<u>CONCLUSION</u>**

48.    For the reasons stated above, the Court should (i) deny the Motion, (ii) in the alternative, require modifications to address the infirmities described herein, and (iii) award such other and further relief as the Court deems just and proper.

Dated: December 2, 2024
Wilmington, Delaware

Respectfully submitted,

**FARNAN LLP**

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**
Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
        azatz@whitecase.com
        sam.hershey@whitecase.com
        erin.smith@whitecase.com
        brett.bakemeyer@whitecase.com

*Counsel to the Ad Hoc Group of*
*Freedom Lenders*