IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (JTD)<br><br>(Jointly Administered)<br><br>Re: Docket No. 154 |

**DECLARATION OF NEIL A. AUGUSTINE IN SUPPORT OF THE
OBJECTION OF THE AD HOC GROUP OF FREEDOM LENDERS
TO DEBTORS' BIDDING PROCEDURES MOTION**

I, Neil A. Augustine, declare under penalty of perjury:

1. I am above 18 years of age, and I am competent to testify. I am Vice Chairman and Co-Head of North American Financing Advisory and Restructuring at Greenhill & Co., LLC ("**Greenhill**"), a leading investment banking firm, which has its principal office at 1271 Avenue

---

[1] The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

of the Americas, New York, NY 10020.  Greenhill has been retained as the investment banker for the Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**") in these chapter 11 cases.

2. I submit this declaration (the "**Declaration**") in support of the *Objection of the Ad Hoc Group of Freedom Lenders to Debtors' Bidding Procedures Motion* (the "**Objection**").[2]

3. The statements in this Declaration are, except as otherwise noted, based on my personal knowledge.  If called upon to testify, I would testify to the facts set forth herein.

4. I have worked at Greenhill since March 2018.  In my role at Greenhill, I have advised various parties in interest and constituencies in numerous restructurings and M&A transactions.  Over the last 35-plus years, my transaction experience has ranged from out-of-court restructurings to in-court insolvencies in the United States, Europe, Canada, Brazil, Chile and Mexico, including involvement in the bankruptcy proceedings of the following companies, among others: Akorn, Inc., American Commercial Lines Inc., Ascena Retail Group, Inc., Atlantic Express Transportation Group, Answers Corporation, Audacy, Inc., Avaya Inc., Blockbuster Inc., Cengage Learning, Inc., Cenveo, Inc., Circuit City Stores, Inc., Cirque du Soleil Canada Inc., David's Bridal, Inc., Destination Maternity Corporation, EXCO Resources, Inc., Fairpoint Communications, Inc., Fusion Connect, Inc., Genco Shipping & Trading Limited, Global Geophysical Services, Inc., Global Eagle Entertainment Inc., GT Advanced Technologies, Inc., The Gymboree Corporation, Harry & David Holdings, Inc., H-Food Holdings, LLC, Inner City Media Corporation, Innovative Communication Corporation, LATAM Airlines Group S.A.,

---

[2] Capitalized terms used herein but otherwise not defined shall have the meanings given to such terms in the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 154] (the "**Motion**") or the Objection, as applicable.

LifeCare Holdings, LLC, Lucky Bucks LLC, M&G USA Corporation, Milacron Holdings Inc., Mobileum, Inc., Momentive Performance Materials, Motor Coach Industries International, Inc., MTE Holdings LLC, My Alarm Center LLC, NanoString Technologies, Inc., Nassau Broadcasting Partners, L.P., New World Pasta Company, NPC International, Inc., Performance Sports Group Ltd., PGX Holdings, Inc., Robertshaw US Holding Corp., The Roman Catholic Diocese of Rockville Centre, New York, rue2l, inc., Sbarro LLC, Skillsoft Corporation, Sports Authority Holdings, Inc., Trident Resources Corp., Trump Entertainment Resorts, Inc., VeraSun Energy Corporation, Vertex Energy, Inc., Werner Co., WestPoint Stevens Inc., and WOM S.A.

5.     Prior to joining Greenhill, I was an Executive Vice Chairman and Co-Head of North American Debt Advisory and Restructuring at Rothschild Inc., where I was employed for 17 years. Prior to working at Rothschild Inc., I was the Group Portfolio Manager for the Distressed Debt Group of Morgens, Waterfall, Vintiadis & Company Inc. and, prior to that, I was the Director of Distressed Debt Research at Lehman Brothers, Inc. and was the Director of Research at Whippoorwill Associates, Inc.  I began my career at Chemical Bank and, prior to entering the principal business, I was one of the founding members of The Blackstone Group's Restructuring and Reorganization Financial Advisory Department.

6.     I hold a B.A degree and an M.B.A. from the University of Rochester.

**I.     The Needlessly Rushed Timeline Proposed by the Debtors**

7.     The Debtors do not face the typical liquidity constraints that doom many retail bankruptcies to failure.  Nonetheless, the Debtors have designed a sale process that copies the type of rushed sale processes that other retailers have been forced to pursue, with similarly poor results likely to follow.

8. The Debtors' bankruptcy differs in material respects from other retail bankruptcies in which I have been involved. Many retail bankruptcies suffer from limited DIP financing, which has often resulted in a short, restrictive sale process that can quickly pivot to a liquidation. In my experience, these truncated sale processes are part of the reason why retail bankruptcies more often result in unsuccessful going concern sale processes and plans of reorganization than do bankruptcies involving companies operating in other industries.[3]

9. Here, by contrast, the quantum of the DIP financing being offered provides the Company with significant liquidity, which can allow it to avoid the path of many retail bankruptcies that end in a liquidation due to the lack of funding and the risk-averse nature of ABL lenders, who pivot quickly to a liquidation if funding isn't available and their collateral is at risk of deterioration. Based on my review of the Debtors' cash flow projections, the Debtors have substantial liquidity to undertake a robust sale process to maximize value. As demonstrated in the Debtors' 13-week cash flow forecast, attached hereto as **Exhibit A**, and DIP budget going out nine months, which has been separately provided to the Freedom Lender Group and is attached hereto as **Exhibit B**, with only $50 million of additional postpetition funding, the Debtors could continue to operate under Chapter 11 through at least June 30, 2025 (nearly seven months from now) while also abiding by the $50 million minimum liquidity covenant required under the DIP Facility.

10. I understand that the sale process proposed by the Debtors has the following key dates: (i) December 10, 2024 as the scheduled hearing date for the Motion, (ii) December 16, 2024 as the deadline for submissions of indications of interest, and (iii) January 23, 2025 as the deadline for binding bids.

---

[3] Per the June 2024 Fitch Ratings case study titled "*Retail Bankruptcy Enterprise Values and Creditor Recoveries (2024 Fitch Case Studies),*" 44% of retail bankruptcy cases (excluding supermarkets) have resulted in liquidation versus 11% for Fitch's universe of cross-sector U.S. corporate case studies.

11. The rushed timeline in the proposed Bidding Procedures would not give potential bidders sufficient time to do the necessary diligence, obtain third party financing (if necessary), and submit a binding bid, thus eliminating the chances of a value-maximizing competitive process. Bidders would be given only six days after the scheduled hearing on the Motion to submit indications of interest, with only 38 days thereafter to submit binding bids. Much of that 44-day period falls over the Christmas and New Year's holiday season when the financing markets go on hiatus, limiting the competitive tension and number of bidders in the process as a result of the tight timeline to raise external financing. These factors will dissuade bidders from hiring advisors and expending the necessary time and effort to participate in the sale process. For these reasons, companies that are able to avoid launching a sale process until after the holidays frequently choose to do so, unless they are forced to market themselves over the holidays for other reasons.

## II.    Other Problems with the Debtors' Sale Process

12. For any sale process to be successful, bidders must have a view from the Debtors' management and advisors regarding the potential benefits from the chapter 11 process. The Debtors, however, have provided no such insight. The most recent marketing materials, in the form of Confidential Information Memorandums ("**CIMs**") provided to prospective bidders, expressly state that projections included therein do not reflect the impact of the Chapter 11 Cases or the Debtors' proposed plan. The CIMs do not provide information on which stores, under which banners, are cash flow negative or could become so in the near term, which can be addressed by terminating leases for those stores or not assuming them pursuant to a binding bid in bankruptcy. While the bidders will likely conduct their own research on such potential store closings, it is beneficial to have management's view beforehand. The CIMs also do not provide information regarding what negotiations with landlords, if any, the Debtors have undertaken to lower rent going

forward and increase value to their estates. The Debtors should incorporate this information into their sale materials and give bidders time to digest them, to best run a value-maximizing process.

**III.  Advantage of Establishing Reserve Prices**

13. When a debtor has assets within a holding company structure that are not synergistic and do not necessarily belong together to maximize value, it is in the best interests of the estate to inform bidders that (i) these assets can be sold separately and (ii) the bidder does not have to bid on all the assets or rely on others to bid on the remaining assets for their bid to be actionable. This transparency allows bidders to focus on assets that align with their strategic interests, thereby increasing the likelihood of a successful transaction.

14. In such situations, value is more likely to be maximized if the secured creditor with a right to credit bid is required to establish "reserve prices" (also known as "release prices"), setting a value above which they will no longer credit bid. This approach informs bidders that the probability of transacting is higher and not dependent on other bidders purchasing the remaining assets. It creates a more predictable and encouraging environment for potential buyers, thus increasing competitive tension.

**IV.  The Appropriate Timeline for the Debtors' Sale Process**

15. Based on these facts, if I were advising the Debtors, I would propose a sale timeline that provides bidders ample time to conduct due diligence and raise committed financing. This alternative timeline would be approximately 60 days longer than the timeline proposed by the Debtors. For the reasons explained herein, this additional time is necessary to ensure a truly value-maximizing process. For ease of reference, a detailed proposed timeline, with a comparison to the Debtors' proposed timeline, is attached hereto as **Exhibit C**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: December 2, 2024,  
      New York, New York

*/s/ Neil A. Augustine*  
Name: Neil A. Augustine  
Title: Vice Chairman & Co-Head of North American Financing Advisory and Restructuring  
Greenhill & Co., LLC