## **Exhibit B**

Proposed Redacted Objection to the DIP Motion

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
|  | **FILED UNDER SEAL** |
|  | Re: Docket Nos. 51, 134 |

### OBJECTION OF THE AD HOC GROUP OF FREEDOM LENDERS TO FINAL APPROVAL OF THE DEBTORS' DIP MOTION

The Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**")[2] consisting of

certain of the (i) Lenders (the "**HoldCo Lenders**"), as defined in that certain Credit Agreement,

dated as of August 21, 2023 (as amended, restated, supplemented or otherwise modified, the

---

[1] The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] The Freedom Lender Group is comprised of the entities named in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229], as it may be amended and supplemented from time to time.

"**HoldCo Credit Agreement**" and the facility thereunder, the "**HoldCo Facility**"), among Freedom VCM Interco, Inc., Freedom VCM, Inc. (together with Freedom VCM Interco, Inc., the "**HoldCo Debtors**"), Alter Domus (US) LLC as administrative agent, and the lenders party thereto and (ii) Lenders (the "**Second Lien OpCo Lenders**"), as defined in that certain Second Lien Credit Agreement, dated as of March 10, 2021 (as amended, restated, supplemented or otherwise modified, the "**Second Lien OpCo Credit Agreement**," and the facility thereunder, the "**Second Lien OpCo Term Facility**"), among Franchise Group Inc. (collectively with its subsidiaries, the "**OpCo Debtors**"), Franchise Group NewCo PSP, LLC, Valor Acquisition, LLC, and Franchise Group NewCo Intermediate AF, LLC, as co-borrowers, Alter Domus (US) LLC, as administrative agent, and the lenders party thereto, by and through their undersigned counsel, hereby file this objection (the "**Objection**") to final approval of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 51] (the "**DIP Motion**").  In support of this Objection, the Freedom Lender Group respectfully represents as follows:[3]

## PRELIMINARY STATEMENT

1.     Through the DIP Motion, the Debtors seek to rob Peter to pay Paul.  The proposed DIP Facility, which is provided by the First Lien OpCo Lenders, would foist liens and obligations onto the HoldCo Debtors despite providing no loan proceeds or other benefit to those entities.  This would result in the First Lien OpCo Lenders, who today have no recourse to the HoldCo Debtors,

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings given them in the DIP Motion.

being able to look to the HoldCo Debtors' assets for recovery of over $783 million of superpriority administrative expense claims without any justification. Worse still, no independent fiduciary for the HoldCo Debtors approved the DIP Facility, and the vast majority of the HoldCo Debtors' stakeholders oppose it.

2.      In August 2023, the members of the Freedom Lender Group lent approximately 93% of a $475 million facility to Freedom VCM, Inc. under the HoldCo Facility to provide funding for Franchise Group Inc. to purchase the shares of its public shareholders for $30 per share. In connection with this transaction, the Debtors put in place a classic holdco-opco structure pursuant to which the Debtors' operating subsidiaries, the OpCo Debtors, are separated from the Debtors' non-operating holding companies, including the HoldCo Debtors. The OpCo Debtors and the HoldCo Debtors have separate credit facilities and stakeholders. The OpCo Debtors own the Debtors' tangible assets while the HoldCo Debtors' primary asset is its equity ownership of the OpCo Debtors. The structure was intentional, with only one creditor group at the HoldCo Debtors, so that control over the OpCo Debtors and any disposition of the OpCo Debtors (whether in or out of court) could be overseen by the HoldCo Lenders. This transaction, effectuated a mere 14 months ago, valued the OpCo Debtors at $2.6 billion.

3.      Nevertheless, the HoldCo Debtors (without the approval of any independent fiduciaries) now ask this Court to approve: (i) a DIP Facility that would saddle the HoldCo Debtors with over $783 million of additional liabilities for which they would receive no proceeds or other benefits, effectively eliminating any opportunity for the HoldCo Lenders to recover on their deficiency claims, (ii) a plan contemplated by the Debtors' prepetition Restructuring Support Agreement with certain First Lien OpCo Lenders, which contemplates giving the First Lien OpCo Lenders 100% ownership of the OpCo Debtors, providing no value to the HoldCo Debtors, and

wiping out the Second Lien OpCo Lenders and HoldCo Lenders, and (iii) a quick, 44-day sale process over the Christmas and New Year's holiday season, designed not to maximize value but, rather, to validate the contemplated turnover of the OpCo Debtors to the First Lien OpCo Lenders. Under these proposed transactions, the Second Lien OpCo Lenders and HoldCo Lenders would receive no recoveries unless the proceeds of the sale of the Debtors' assets are sufficient to clear all of the prepetition and postpetition first lien secured debt of the OpCo Debtors, and the HoldCo Lenders would be effectively prevented from properly investigating, or receiving any recovery from, litigation claims that stem from the take-private transaction funded by the HoldCo Lenders.

4.      In addition to the unlawful treatment of the HoldCo Debtors generally, the DIP Facility would artificially inflate and create claims at the HoldCo Debtors.  The $500 million two-to-one roll-up component of the DIP Facility at the HoldCo Debtors, as well as the adequate protection claims that would be granted to the First Lien OpCo Lenders at the HoldCo Debtors (despite having no recourse to those entities today), are entirely unjustified.

5.      These improper components of the proposed DIP Facility speak to a pervasive problem in these Chapter 11 Cases: the absence of a non-conflicted fiduciary for the HoldCo Debtors.  The Debtors point to the decisions of their board of directors (which has never met at the HoldCo Debtor level) and the advice of their counsel and advisors, all of whom purport to advocate for what is best for the Debtors collectively.  But that is not what the law requires.  Rather, each Debtor owes fiduciary duties to its own estate and stakeholders.  That matters because what is best for the OpCo Debtors is not necessarily what is best for the HoldCo Debtors.  This potential conflict has now materialized, as demonstrated by the DIP Motion itself, which seeks to make the HoldCo Debtors and their creditors subsidize a Chapter 11 process that was designed by the First Lien OpCo Lenders and is being pursued solely for their own benefit.

6.     The DIP Facility is fatally flawed for other reasons: <u>First</u>, final approval of the DIP Facility is not warranted at this time as the Debtors have ample liquidity. Additional time is needed for parties to work out their differences and to explore alternatives to the DIP Facility and the Debtors' proposed plan in an effort to maximize the value of the Debtors' estates. Therefore, rather than approving the DIP Motion on a final basis now, such approval could be deferred or, at a minimum, the DIP Motion could be approved on a further interim basis (on the same terms as under the Interim DIP Order).

7.     <u>Second</u>, the proposed DIP Facility is meaningfully outsized compared to the Debtors' funding needs to resolve these Chapter 11 Cases, even if they go on for significantly longer than anticipated.

8.     <u>Third</u>, the proposed two-to-one roll-up is unjustified and would improperly skew the playing field for any potential alternative plan.

9.     <u>Fourth</u>, the Debtors are not offering sufficient adequate protection to the Second Lien OpCo Lenders for the use of priming DIP Facility proceeds to make payments on prepetition unsecured claims pursuant to the Debtors' "critical vendor" relief.

10.     <u>Fifth</u>, the DIP Facility is an impermissible *sub rosa* plan because it is inextricably linked to the Debtors' prepetition Restructuring Support Agreement.

11.     <u>Sixth</u>, the DIP Facility would impermissibly provide adequate protection payments to the First Lien OpCo Lenders while preventing such payments from being recharacterized as payments of principal if the First Lien OpCo Lenders are ultimately determined to be undersecured. The Freedom Lender Group does not believe that a properly run sale process would result in this outcome, but the Debtors' have not submitted evidence of any value proposition here and, thus, all rights should be preserved.

5

12.    <u>Seventh</u>, the type of extraordinary circumstances necessary to grant liens on proceeds of avoidance actions (which should be preserved for unsecured creditors), waivers of section 506(c) of the Bankruptcy Code the "equities of the case" exception to section 552(b) and prohibition on seeking the equitable doctrine of marshalling do not exist here and such provisions should not be included in any order approving the DIP Motion.

13.    <u>Finally</u>, in the event the Debtors are offered a replacement postpetition financing on a junior or unsecured basis, the Debtors must accept such proposal in lieu of the proposed DIP Facility.  The Freedom Lender Group is actively exploring the possibility of offering postpetition financing for the Debtors, potentially only at the HoldCo Debtors and potentially for all Debtors on a basis similar to that proposed at the First Day Hearing.  If such a proposal is submitted, the Freedom Lender Group will submit a supplement to this Objection addressing it.

## **BACKGROUND**

### I.    **Proposed DIP Facility**

14.    On November 3, 2024 (the "**Petition Date**"), each of the Debtors filed chapter 11 cases (the "**Chapter 11 Cases**").  On November 4, 2024, the Debtors filed the DIP Motion, seeking authority to obtain postpetition financing (the "**DIP Facility**"), which was proposed to be governed by a credit agreement (the form of which was attached as Exhibit 1 to the proposed interim DIP order attached to the DIP Motion) by and among all of the Debtors other than the HoldCo Debtors, as secured obligors, each of the HoldCo Debtors, as unsecured guarantors, Wilmington Trust, National Association, as agent, and the lenders from time to time party thereto, all of whom are also First Lien OpCo Lenders (collectively, the "**DIP Lenders**").

15.    The proposed DIP Facility would consist of (i) a new money first-out delayed draw term loan facility of up to $250 million (the loans extended thereunder, the "**New Money DIP Loans**") and (ii) the conversion of up to $500 million of the DIP Lenders' prepetition first lien

secured claims into superpriority administrative expense claims against the estates of all Debtors, including the HoldCo Debtors (the "**Roll-Up Claims**," and, together with the New Money DIP Loans, the "**DIP Loans**").  The DIP Motion sought, on an interim basis, approval of access to $125 million of New Money DIP Loans and approval of the entire $500 million of Roll-Up Claims.[4]  Originally, the remaining New Money DIP Loans were to be incurred in two draws: $50 million upon entry of a final order approving the DIP Motion and $75 million once the Proposed Plan is confirmed.[5]

16.    The adequate protection package provided to the First Lien OpCo Lenders includes current cash payment of postpetition interest and payment of professional fees and expenses.[6]  The Interim DIP Order provides that the adequate protection payments made to the First Lien OpCo Lenders are not subject to recharacterization as payments of principal.[7]  The Second Lien OpCo Lenders are not provided with any cash payments as adequate protection.[8]  And the HoldCo Lenders are not provided with any form of adequate protection.

## II.    Ties to RSA and Proposed Plan

17.    The DIP Facility is tied to a Restructuring Support Agreement (the "**RSA**") the Debtors entered into prepetition with certain lenders (the "**First Lien OpCo Lenders**") under the OpCo Debtors' first lien term loan facility (the "**First Lien OpCo Term Facility**").[9]  Events of

---

[4]    DIP Mot. ¶ 13(a).

[5]    *Id.* ¶ 13(a)(i); *see also See* Nov. 5, 2024, Hr'g Tr. 69:25-70:3 (Mr. Orlofsky testifying that the DIP Facility was designed such that a third $75 million draw would "be paid at the end of the case to deal with what we anticipate to be all the administrative costs, particularly professional fees that are due and accrued, that will get funded at the end of the case.").

[6]    *Id.* ¶ 10(c)-(e).

[7]    *Id.* ¶ 3(c).

[8]    *Id.* ¶ 10(e).

[9]    A copy of the RSA is attached as Exhibit B to *the Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "**First Day Declaration**").

default under the DIP Facility include (i) termination of the RSA, (ii) failure to satisfy the milestones under the RSA, and (iii) filing a chapter 11 plan of reorganization that is not consistent in all material respects with the RSA.[10]  Further, any act or occurrence that would permit the RSA to be terminated constitutes a termination event under the DIP Facility,[11] including the Debtors exercising their fiduciary out under the RSA to pursue an alternative restructuring.[12]

18.     The proposed plan the Debtors are pursuing consistent with the RSA [Docket No. 150] (the "**Proposed Plan**") includes an equity conversion feature for the DIP Facility, which would (i) permit the DIP Lenders to elect, at their sole discretion, to convert their DIP Backstop Premium, Commitment Premium, or Exit Premium into reorganized equity at a 25% discount to total enterprise value and (ii) provide for any Roll-Up Claims remaining after converting a portion of DIP Loans to an exit facility to be converted automatically into reorganized equity at a 25% discount, in each case, unless a sale of the Debtors' assets is consummated.[13]  The RSA provides that such discount will be determined based on the valuation set forth in a disclosure statement that must be in form and substance acceptable to the Debtors and the required First Lien OpCo Lenders.[14]  The Disclosure Statement filed by the Debtors does not yet include this valuation.[15]

## III.    Lack of Benefit to the HoldCo Debtors

19.     The DIP Facility would not have required liens on the assets of the HoldCo Debtors because such liens would interfere with the HoldCo Facility, which is secured by all assets of the

---

[10]    DIP Credit Agreement §§ 7.01(p)(iii), (v), (xxiii).

[11]    *Id.* §§ 7.01(p)(ii).

[12]    RSA §§ 8.01; 12.01(h).

[13]    DIP Mot. ¶ 61; Proposed Plan § 3.1.

[14]    *See* RSA at 5; RSA, Ex. B, at 5, 8.

[15]    *See Disclosure Statement for the Joint Chapter 11 Plan of Franchise Group, Inc. and its Affiliated Debtors* [Docket No. 151] (the "**Disclosure Statement**") § IV.E(ii) (providing that the discount shall be "based on the total equity value of the Reorganized Debtors as will later be set forth in an amendment to this Disclosure Statement and/or the Plan Supplement").

HoldCo Debtors and under which $514.7 million in principal remains outstanding.[16]   The DIP Motion also contemplated that the HoldCo Debtors would grant adequate protection superpriority claims to the First Lien OpCo Lenders for any diminution in value of their interest in collateral notwithstanding that the First Lien OpCo Lenders do not have any existing claims against the HoldCo Debtors.[17]   None of the proceeds of the DIP Facility are contemplated to be provided or transferred to either of the HoldCo Debtors.[18]

20.     The HoldCo Debtors have multiple assets of potentially substantial value, including (i) their equity interests in the OpCo Debtors, (ii) claims and causes of action against the OpCo Debtors, Brian Kahn (the Debtors' former Chief Executive Officer), other current and former officers and directors, B. Riley, and other parties in connection with the Debtors' August 2023 take-private transaction financed by the HoldCo Lenders, and (iii) potential tax attributes.[19]   The Debtors' Joint Administration Order and Proposed Plan make clear that these Chapter 11 Cases are not substantively consolidated and, therefore, the assets of the HoldCo Debtors belong exclusively to those entities.[20]

21.     The Proposed Plan contemplates that, unless a sale can provide net proceeds exceeding all first lien secured debt of the OpCo Debtors, stakeholders of the HoldCo Debtors would receive nothing and any retained causes of actions (including those owned by the HoldCo

---

[16]   *See* First Day Decl. ¶¶ 63-64.

[17]   DIP Mot. ¶ 14; First Day Decl. ¶ 56.

[18]   *See* Nov. 5, 2024, Hr'g Tr. 43:12-14 ("We don't anticipate cash needs of [the HoldCo Debtors], although they would have access if needed."); 50:9-13 (testifying that no DIP Facility proceeds are forecast to be needed by the HoldCo Debtors and that the HoldCo Debtors cannot borrow under the DIP Facility); 93:4-5 ("The money's not really going [to the HoldCo Debtors]."); 115:9-12 ("Counselor, if you're asking if the DIP funds go to those boxes that your clients have liens in upstairs I think the answer is, yes, there is no money going up there at interim.").

[19]   *See* First Day Decl. ¶ 32.

[20]   *See Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases* [Docket No. 88] (the "**Joint Administration Order**"), ¶ 6 ("Nothing in the Motion or this Order is intended or shall be deemed or otherwise construed as directing or otherwise effecting a substantive consolidation of the Debtors' estates."); Proposed Plan § 7.1 ("The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates[.]").

Debtors) would re-vest in the reorganized Debtors owned by the First Lien OpCo Lenders.[21]

22.　　There are numerous actual and potential conflicts of interest between the HoldCo Debtors and the OpCo Debtors, including claims that the HoldCo Debtors have against the OpCo Debtors and the fact that the HoldCo Debtors are among the Debtors pursuing the Proposed Plan, despite the reallocation of the value of their assets to the First Lien OpCo Lenders and no recoveries being provided to their own stakeholders.　In light of these conflicts of interest, the Freedom Lender Group filed a motion seeking to terminate exclusivity at the HoldCo Debtors or, in the alternative, lifting the automatic stay or appointing a chapter 11 trustee at the HoldCo Debtors [Docket No. 192] (the "**HoldCo Freedom Motion**").　Notwithstanding these conflicts and the pending HoldCo Freedom Motion, the HoldCo Debtors are continuing to seek final approval of the DIP Facility.

**IV.　First Day Hearing**

23.　　At the Debtors' "first day" hearing held on November 5 and 6 (the "**First Day Hearing**"), the Freedom Lender Group objected to interim approval of the DIP Motion.　After an extension of the initial hearing to the next day, the members of the Freedom Lender Group proposing a competing junior DIP facility, and considerable back-and-forth among the parties, the DIP Lenders made a number of concessions.　Such concessions included (i) removing the HoldCo Debtors as obligors on an interim basis, (ii) reducing the initial draw to $100 million (but with the contemplated two additional draws combined into one $150 million draw to be incurred upon final approval), (iii) reducing the roll-up approved on an interim basis to $100 million (a one-to-one roll-up) while reserving the right to seek the full $500 million (two-to-one) roll-up on final approval, (iv) reducing the interest rate on the New Money DIP Loans to adjusted SOFR plus

---

[21]　Proposed Plan §§ 1.131, 1.173, 5.11(a), 7.4(b).

9.0%, (v) reducing the Commitment Premium to 1.5%, (vi) applying the 2.5% Exit Premium only to the New Money DIP Loans and not the Roll-Up Claims, and (vii) reducing the DIP Backstop Premium to 9.0%.[22]

24.    In light of these concessions, on November 7, 2024, the Court entered an order approving the DIP Facility on an interim basis [Docket No. 134] (the "**Interim DIP Order**") with a revised credit agreement attached (the "**DIP Credit Agreement**").   The Interim DIP Order includes certain provisions that are subject to entry of a final order approving the DIP Motion, including granting liens on proceeds of avoidance actions,[23] a waiver of section 506(c) of the Bankruptcy Code,[24] a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code,[25] and a prohibition on seek the equitable doctrine of marshalling.[26]

## V.    The DIP Budget

25.    The Interim DIP Order requires the Debtors to comply with a 13-week cash flow budget, a copy of which is attached as Exhibit 3 to the Interim DIP Order (the "**DIP Budget**"). The DIP Budget shows that the Debtors would have a $141.6 million cash balance upon the initial $100 million draw of the DIP Facility.   The Debtors would reach a low point in the fifth week, with a cash balance of $103 million.   By the end of the 13-week period, the Debtors are projected to have $209.6 million of cash.   If the $150 million second draw of the DIP Facility is not incurred, that would leave the Debtors with $59.6 million of cash (assuming all critical vendor payments are made and professional fees are escrowed, as the DIP Budget assumes).   The DIP Facility includes

---

[22]    Nov. 6, 2024, Hr'g Tr. 15:4-16:16, 112:14-113:5; Interim DIP Order ¶¶ 2(b)-(c); DIP Credit Agreement §§ 1.01, 2.12(b), (c), (d).

[23]    Interim DIP Order ¶¶ 6(b), 6(c)(i).

[24]    *Id.* ¶¶ 7, 17(e), 26, 38.

[25]    *Id.* ¶ 27.

[26]    *Id.* ¶ 27.

a covenant requiring the Debtors to maintain a minimum cash balance of at least $50 million.[27]

26.     The Debtors have provided the Freedom Lender Group with a 13-week cash flow forecast and longer-term DIP budget going out nine months, a copy of which is attached as Exhibit A to the *Declaration of Neil A. Augustine in Support of the Objection of the Ad Hoc Group of Freedom Lenders to Debtors' Bidding Procedures Motion*.  This demonstrates that the Debtors have sufficient cash to get through February 2025 without tripping their $50 million minimum liquidity covenant even if they don't make any more draws on the DIP Facility.  And ignoring the minimum cash requirement would give the Debtors through June 2025 before needing more DIP funding, which is three months past the milestone for consummating a plan under the RSA.[28]  This assumes payments of steep interest and fees on the full $250 million of New Money DIP Loans; if that amount were decreased due to fewer DIP Loans being incurred, the Debtors' cash position would improve accordingly.[29]

27.     Based on the diligence that has been provided, there are various indications of an overly conservative approach in forecasting the Debtors' cash needs.  While diligence remains ongoing, these items include, but may not be limited to, the following:

(a)     Case-to-date liquidity is higher than forecasted by $53.9 million through November 15, 2024, reflecting an ending cash balance 43% higher than the forecast;

(b)     The Debtors include $10 million of contingency as "Other Disbursements," ███████ ███ In addition, the Debtors have reduced operating receipts relative to their business plan to account for business disruption;

(c)     The Debtors have requested to pay $99.7 million of $106 million of aggregate

---

[27]     DIP Credit Agreement § 6.15

[28]     RSA § 4.01(o).

[29]     The Debtors' forecast for a six month case shows $69 million in interest, fees and adequate protection payments and $88 million in professional fees.  In the aggregate, these payments would account for approximately 63% of the proposed $250 million of New Money DIP Loans.  The Debtors' forecast for a nine month case shows $111 million in interest, fees and adequate protection payments and $113 million in professional fees.  In the aggregate, those payments would account for approximately 90% of the proposed $250 million of New Money DIP Loans.

accounts payable ███████████████████████████, representing 94% of outstanding accounts payable.

████████████████████████████████

(d)    For The Vitamin Shoppe, the Debtors' business plan shows approximately $32 million of EBITDA for the period of November 2024 through April 2025, and the cash flow forecasts show a $5 million cash ***need*** throughout that same period;

(e)    On a net basis, the Debtors assume that American Freight will be liquidated for a value millions of dollars less than what their borrowing base shows. In addition, the Debtors intend to spend $17 million to pay additional claims under section 503(b)(9) of the Bankruptcy Code associated with the American Freight business at the end of the Chapter 11 Cases; and

(f)    Instead of attempting a store rationalization process which conserves cash and creates an inflow of working capital, the Debtors are proposing to spend millions of dollars on capital expenditures.

## VI.    Request For Final Approval of the DIP Motion

28.    In light of ongoing issues with the Debtors' timeline for providing discovery and scheduling depositions, which persist as of the filing of this Objection, the Freedom Lender Group was forced to file a motion on November 20, 2024, requesting (i) adjournment of the matters scheduled for hearing on December 10, 2024 until a date that is after the Court's decision on the HoldCo Freedom Motion, and (ii) extension of the deadlines to file objections in connection with the matters scheduled at such hearing [Docket No. 194] (the "**Motion to Adjourn**"). Because the Motion to Adjourn has not yet been adjudicated, the Freedom Lender Group is forced to file this Objection and reserve the right to supplement it (i) upon completion of discovery and (ii) if the Freedom Lender Group (or any other party) submits a competing DIP financing proposal.[30]

---

[30]    In light of significant deficiencies in the Debtors' productions thus far, it is almost certain that a supplemental objection will be necessary. In the three weeks since discovery in connection with the DIP Motion was served, the Debtors have failed to produce obvious categories of documents including any unconsolidated financials, or an intercompany matrix. The Debtors' search parameters also present ongoing issues, which at the time of filing remain unresolved. Among other things, the Debtors have so far largely limited their e-mail collection to September 2024 forward, even though the Debtors' advisors were engaged as early as June 2024 and discussions about the Debtors consideration of a restructuring were almost certainly had before then. Additionally, despite repeated requests to engage on proposed search terms, the Debtors ran their searches without engaging with the Freedom Lender Group in violation of their obligations under Del. Bankr. L.R. 7026-3(e). When the Debtors

29.     Despite not having received a proposed final order, based on the record at the First Day Hearing and the terms of the Interim DIP Order and DIP Credit Agreement, the Freedom Lender Group assumes that the Debtors will be seeking approval of (i) the remaining $150 million of DIP commitments, (ii) the HoldCo Debtors becoming unsecured guarantors of the DIP Facility and providers of superpriority adequate protection claims to the First Lien OpCo Lenders, (iii) any term of the Interim DIP Order that is subject to entry of a final order, and (iv) the full $500 million roll-up as originally requested.  If such assumptions are correct, the Debtors' requested obligations under the DIP Facility would total at least $783 million ($250 million of New Money DIP Loans, $500 million of Roll-Up Claims, approximately $33 million of fees, and accruing interest).

## OBJECTION

### I.     The Proposed DIP Facility Is Prejudicial to the HoldCo Debtors and Their Stakeholders

#### A.     The HoldCo Debtors Should Not Be Obligors

30.     A debtor requesting approval of postpetition financing on an unsecured, superpriority basis under section 364(b) of the Bankruptcy Code "bears the burden of establishing that (a) the borrowing facility is a sound exercise of the debtor-in-possession's business judgment as estate fiduciary and (b) that the resulting debt would constitute an administrative expense under 11 U.S.C. § 503(b)(1); that is, it must constitute an actual and necessary cost or expense of preserving the estate."  *In re Shachoy*, Case No. 19-10756-FJB, 2019 Bankr. LEXIS 3950, at *8 (Bankr. D. Mass. Dec. 30, 2019); *see also In re Energy Future Holdings Corp.*, 990 F.3d 728, 741 (3d Cir. 2021) ("Section 503(b)(1)(A) 'limits recovery to those claims that are actual and necessary

---

finally shared their search terms, the Freedom Lender Group pointed out obvious flaws and suggested reasonable alternatives.  The Debtors have rejected essentially all of the Freedom Lender Group's suggestions, including such relevant search terms as "RSA," relevant project names, and the domain names of the DIP Lenders' counsel and financial advisor.

[to] prevent[] the estate from being consumed by administrative expenses[] and preserve[] the estate for the benefit of the creditors.'" (quoting *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 315 (3d Cir. 2011))).  In addition, postpetition financing should not be approved "where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."  *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990).

31.    Here, the proposed DIP Facility seeks to make the HoldCo Debtors jointly and severally liable for at least $783 million of DIP Facility claims and potential adequate protection claims for the First Lien OpCo Lenders.  But the Debtors do not anticipate the HoldCo Debtors receiving any proceeds of the DIP Facility.

32.    Nor are the HoldCo Debtors expected to receive any benefit from the DIP Facility. The Debtors are pursuing a Proposed Plan that contemplates a sale.  For that to provide any benefit to the HoldCo Debtors, the net proceeds of that sale would have to exceed the outstanding obligations under the DIP Facility, the prepetition ABL facility, the First Lien OpCo Term Facility, and the Second Lien OpCo Term Facility, as well as any other administrative expense claims or general unsecured claims against the OpCo Debtors.  A legitimate and well-run sale process could well achieve this result but, as addressed in detail in the Freedom Lender Group's objection to the Debtors' proposed bidding procedures, the sale process the Debtors seek to run makes the prospects of proceeds flowing to the HoldCo Debtors remote.  The foremost reason for this is the Debtors' condensed timeline for a sale, with the Debtors seeking a bid deadline only 44 days from the hearing date on approval of bidding procedures spanning the Christmas and New Year's holiday season.  That process, which the members of the Freedom Lender Group (as the significantly largest creditors of the HoldCo Debtors) had no part in designing and do not support, cannot justify the superpriority claims that the Debtors seek to foist upon the HoldCo Debtors.

Therefore, the obligations that would be imposed on the HoldCo Debtors under the DIP Facility are plainly not an actual and necessary cost or expense of preserving the HoldCo Debtors' estates.

33.     The only apparent reason to burden the HoldCo Debtors with superpriority claims is to benefit the First Lien OpCo Lenders at the expense of the stakeholders of the HoldCo Debtors. Prior to the Petition Date, the First Lien OpCo Lenders solely had recourse to the OpCo Debtors, with the HoldCo Debtors' assets reserved for the HoldCo Debtors' stakeholders alone.  Upon final approval of the proposed DIP Facility, however, the HoldCo Debtors' assets, including its valuable claims and causes of action, would suddenly become available to the First Lien OpCo Lenders, despite providing no direct benefit to the HoldCo Debtors.  Courts have rejected postpetition financing, like the proposed DIP Facility here, that serve only to deliver value to a favored creditor. *See, e.g., In re Laffite's Harbor Dev. I, LP*, Case No. 17-36191 (KKB), 2018 Bankr. LEXIS 2, at *6-7 (Bankr. S.D. Tex. Jan. 2, 2018) (rejecting proposed postpetition financing because it was, among other things, "not in accord with a sound exercise of Debtors' business judgment," and stating that "bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender"); *In re Crouse Grp., Inc.*, 71 B.R. 544, 551 (Bankr. E.D. Pa. 1987) (rejecting DIP facility that served to benefit prepetition creditor rather than preserving assets of debtors' estates).

34.     Courts have repeatedly found that the assets of debtors may not be used to satisfy the debts of other affiliated debtors absent substantive consolidation, which has not occurred here. *See Union Sav. Banking v. Augie/Restivo Baking Co. (In re Augie/Restivo)*, 860 F.2d 515, 518-19 (2d Cir. 1988) ("[L]enders structure their loans according to their expectations regarding that borrower and do not anticipate either having the assets of a more sound company available in the

case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets."); *Schroeder v. New Century Liquidating Tr. (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009) (reversing an order confirming a plan "grouping" debtors to resolve claims, even though it did not explicitly seek substantive consolidation, because it caused "increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually.").

35.     Similarly, courts have held that, where estates are not substantively consolidated, administrative expense claims only accrue against each debtor's estate to the extent of the benefit actually received by such debtor.  *See, e.g., In re Erin Energy Corp.*, Case No. 18-32106, 2024 Bankr. LEXIS 1767, at *13 (Bankr. S.D. Tex. July 31, 2024) ("There has been no substantive consolidation of EEC's and EPNL's estates to justify treating [creditor's] administrative expense claim against EPNL as one arising generally against the 'Erin Group.'").  Accordingly, there is no basis for the HoldCo Debtors to incur administrative expense claims on account of a DIP Facility that solely benefits the OpCo Debtors.

36.     The Debtors cannot meet their burden of demonstrating that the HoldCo Debtors are exercising their sound business judgment in determining to become obligors under the DIP Facility.  That is because the HoldCo Debtors do not have a non-conflicted, independent fiduciary making decisions for them.  Nor do the HoldCo Debtors have their own legal and financial advisors.  Rather, the same board of directors (which has never met at the HoldCo Debtor level) and the same group of counsel and advisors are making decisions for the Debtors collectively.[31] But, as described in paragraph 22 above, the interests of the OpCo Debtors and their creditors

---

[31]   *See* Nov. 5, 2024, Hr'g Tr. 112:17-18 (Mr. Orlofsky testifying that decisions were based on "what is in the best interest for all of the debtors").

(which stand to reap all of the benefits from the Debtors' proposed bankruptcy process) and the interests of the HoldCo Debtors and their creditors (which stand to reap no benefit) are not aligned.

37.    Under these circumstances, the Court should not approve the new superpriority claims that the Debtors unjustifiably seek to impose on the HoldCo Debtors and their constituents. *See, e.g.*, *In re Lucky Bucks, LLC*, Case No. 23-10758 (KBO) (Bankr. D. Del. June 30, 2023) June 30, 2023, Hr'g Tr. 37:8-16 [Docket No. 133] (converting, in a similar holdco/opco debtor case, the holdco chapter 11 case to chapter 7 where, among other things, "moving forward would diminish the Holdings estate because proceeding would require, as we sit here today, that a DIP be provided that would encumber and diminish the litigation proceeds" available for creditors of the holdco estate); *In re Horsehead Holding Corp.*, Case No. 16-10287 (CSS) (Bankr. D. Del. Feb. 5, 2016) Feb. 5, 2016, Hr'g Tr. 26:21-29:23 [Docket No. 96] (declining to approve interim DIP to the extent it would obligate debtor subsidiary, who did not have an independent director with independent counsel to approve such obligation, on the full amount of a DIP financed by prepetition lenders of the other debtors and noting the court would "consider a facility that obligates them only to the extent there is a direct benefit").

B.    **The Roll-Up Claims and Adequate Protection Claims Should Not Be Obligations of the HoldCo Debtors**

38.    The HoldCo Debtors should not be obligors under any portion of the DIP Facility, but they particularly should not be responsible for the Roll-Up Claims.  The roll-up is a $500 million two-for-one conversion of prepetition claims held by the Prepetition First Lien Lenders to DIP Obligations.  The First Lien OpCo Lenders had no recourse to the assets of the HoldCo Debtors prior to the Petition Date, and any attempt to give them access to those assets pursuant to

the roll-up is a blatant overreach that should not be permitted.[32]

39.    Similarly, the HoldCo Debtors should not grant adequate protection claims to the First Lien OpCo Lenders.  The HoldCo Debtors are not even purported to give adequate protection to their own constituents, the HoldCo Lenders, under the proposed DIP Facility.  And yet the DIP Facility would allow prepetition creditors solely of the OpCo Debtors to gain access to the assets of the HoldCo Debtors for any diminution in value of collateral that sits entirely outside the HoldCo Debtors.    That should not be permitted under *Augie/Restivo* and other case law establishing that the value of one estate should not subsidize the claims of another.

### C.    Events of Default Should Not Be Triggered by the HoldCo Debtors

40.    Because the proposed DIP Facility provides no benefit to the HoldCo Debtors, the DIP Facility should not include events of default based on developments in the HoldCo Debtors' Chapter 11 Cases, such as pursuit of an alternative plan for the HoldCo Debtors, conversion of the HoldCo Debtors' Chapter 11 Cases, or appointment of a Chapter 11 trustee for the HoldCo Debtors.  These events of default are a transparent attempt by the DIP Lenders to curb the rights of the HoldCo Debtors and lock them into confirmation of the Proposed Plan.  They also interfere with the relief requested in the HoldCo Freedom Motion, which should be granted for the reasons set forth therein.  The Court should not allow these improper tactics.

## II.    Final Approval of the DIP Facility Is Not Necessary at this Time

41.    The Debtors do not need an additional draw of the DIP Facility at this time.  The Debtors' DIP Budget shows that, if the Debtors do not incur the contemplated second $150 million draw of the DIP Facility, they still will have almost $60 million of cash after the first thirteen weeks of these Chapter 11 Cases.  This is in excess of the $50 million minimum cash covenant

---

[32]    For the reasons set forth in Section IV below, the Roll-Up Claims should not be approved at <u>any</u> Debtor, but certainly not at the HoldCo Debtors.

under the DIP Facility.  The Debtors have more than enough cash on hand to bridge until at least February 2025 without taking into account savings on debt service on the DIP Facility.  And, ignoring the minimum liquidity requirement, the Debtors could get through June 2025 without an additional draw of the DIP Facility (three months beyond the RSA milestone for consummation of a plan), again ignoring savings on debt service.

42.     As provided above, approval of a DIP Facility requires a showing by the Debtors that it is an actual and necessary cost of preserving each Debtor's estate.  Final approval of the DIP Facility is not actual and necessary at this time given the Debtors' cash position.  The only urgency is created by the milestones under the RSA, which has not been approved by the Court (nor are the Debtors seeking such approval).  Rather than blessing a timeline set forth in an agreement that is not even binding on the Debtors, the Court should defer any final approval of the DIP Facility or, at a minimum, only approve the DIP Motion on a further interim basis (on the same terms as under the Interim DIP Order) to (i) give the Freedom Lender Group and other objectors time to work with the Debtors and attempt to resolve their differences and (ii) to give the Freedom Lender Group and other parties sufficient time to explore alternatives to the DIP Facility or the Proposed Plan in an effort to maximize the value of the Debtors' estates.

### III.   The DIP Facility is Oversized

43.     The DIP Motion also should not be approved on a final basis because the second $150 million draw the Debtors seek to incur is vastly oversized.  Based on the Debtors' own seemingly conservative projections, only another $122 million is required to bridge to the end of a nine month case (which would be well in excess of the milestone in the RSA for consummation of the Proposed Plan four months into the case).  The Debtors contemplate a case timeline of six months in their longer-term projections but, in that instance, only $82 million of additional liquidity is required to fund these Chapter 11 Cases to completion.  Therefore, even if the Debtors'

emergence from bankruptcy takes significantly longer than anticipated, the proposed DIP Facility is still be substantially larger than necessary to fund the Chapter 11 Cases.

44.     This dynamic is due, in part, to the Debtors having effectively built their contemplated exit financing into the DIP Facility, as indicated by the original $75 million draw of the DIP facility that would not be incurred until after confirmation of a plan.  This construct is improper, as the Debtors cannot demonstrate any need to secure exit financing at this time that would justify the significant expenses under the DIP Facility.  Moreover, the Debtors could likely procure exit financing on better terms once they are closer to deleveraging and closing on a securitization facility at Pet Supplies Plus (which the Debtors have been actively pursuing).[33] Worse still, the Debtors now seek to incur the full remaining $150 million immediately upon entry of a final order, further front-loading the cost of the exit financing component of the DIP Facility.

45.     The artificially high requested amount of the DIP Facility is also due to certain assumptions that the Debtors make in their projections that are overly conservative and, at times, contradictory, which are specified in paragraph 27 above.  Also, the Debtors contemplate spending approximately $17 million to pay, pursuant to section 503(b)(9) of the Bankruptcy Code, prepetition unsecured creditors of American Freight, which is in the process of liquidating. ██████

████████████████████████████████████████████████████████████████

██████████████████     It is not a proper exercise of the Debtors' business judgment to incur substantial postpetition obligations and priming liens to pay prepetition unsecured claims of a Debtor that will not continue as a going concern, to the detriment of secured creditors of the remaining Debtors' estates.

---

[33]   *See* First Day Decl. ¶¶ 11, 76-77 (describing the Debtors' efforts to put a securitization facility at PSP in place); DIP Credit Agreement, § 7.01(q) (permitting the Debtors to pursue a "whole business securitization of PSP").

**IV.    The Roll-Up Is Improper and Prejudicial**

46.    Roll-ups are generally disfavored and should not be approved unless the debtor has made a substantial showing that it is justified.  *See In VeraSun Energy Corp.*, Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 3, 2008) Dec. 3, 2018, Hr'g Tr. 32:20-25 [Docket No. 316] (noting that the Bankruptcy Court for the District of Delaware and other courts have found that "rollups are not favored.  They are strongly discouraged on day one, and the bottom line is that for approval a substantial showing has to be made . . . ." (emphasis added)).  Provisions that serve to elevate a prepetition creditor's position above other creditors, like roll-ups and cross-collateralization, have been found by some courts to be *per se* impermissible, because they are "directly contrary to the fundamental priority scheme of the Bankruptcy Code."  *Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.)*, 963 F.2d 1490, 1495 (11th Cir. 1992); *see also In re Monach Circuit Indus., Inc.*, 41 B.R. 859, 861-62 (Bankr. E.D. Pa. 1984) (rejecting DIP that secured DIP lender's "preexisting, prepetition indebtedness with the debtor's collateral" and accorded lender "a priority over administrative expenses on its prepetition indebtedness" because "the terms of § 364(c) appear to limit the extent of the priority or lien to the amount of the credit obtained or debt incurred *after* court approval").

47.    Even courts that have approved cross collateralization, like the proposed roll-up here, have cautioned that it "should only be used as a last resort."  *In re Saybrook Mfg. Co.*, 963 F.2d at 1494-95 (internal citation omitted).  For example, courts have been more willing to approve roll-ups when market conditions make the availability of DIP financing scarce, as during the COVID-19 pandemic.  *See, e.g.*, *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 790 (Bankr. S.D.N.Y. 2020) (finding that factors including the existence "of a global pandemic which has no precedent in the history of commercial aviation" should "be accounted for in assessing the fairness of the [DIP] pricing").

48.    A roll-up changes the priority of a debtor's prepetition debt and, thus, must provide some benefit to the estate, such as "enabl[ing] a successful reorganization and mak[ing] even the disfavored creditors better off." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (citations omitted).  A roll-up cannot only be for the purpose of elevating a prepetition lender's claim.  *See In re Wildcat Met Mining, Inc.*, Case No. 1:22-bk-10080, 2024 Bankr. LEXIS 586, at *29-30 (Bankr. S.D. W. Va. Mar. 8, 2024) (finding that "proposed 'roll-up' was patently unapprovable[, as r]oll-ups are generally disfavored and this particular 'roll-up' would have unquestionably elevated [lender's] prepetition claim . . . to the detriment of other creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 39 (finding that proposed cross-collateralization warrants "examin[ation of] all the facts and circumstances to determine if the estate is being benefitted rather than principally the pre-petition creditor," whose loan may be elevated ahead of similar claims).

49.    The Roll-Up Claims sought here are excessive and will not provide any benefit to the estate or disfavored creditors.  The Debtors have not provided any evidence that current market conditions justify a roll-up here.  Further, the DIP Lenders, whose prepetition claims are already secured by first-priority liens at the OpCo Debtors, have no need to protect their position by rolling up $500 million of their prepetition claims to be paid upon the Debtors' emergence from chapter 11.  The proposed roll-up serves no purpose aside from providing the First Lien OpCo Lenders with excessive control over the outcome of these Chapter 11 Cases by taking plan options like cram down and reinstatement off the table.

50.    In addition, the size of the proposed Roll-Up Claims is disproportionate to the amount of new money provided.  Courts have expressed a preference to limit roll-ups, when they are deemed appropriate, to a dollar-for-dollar refinancing.  *See, e.g., In re SiO2 Medical Products,*

*Inc.*, Case No. 23-10366-JTD (Bankr. D. Del. Apr. 26, 2023) [Docket No. 216] (authorizing DIP lenders to roll up prepetition claims "in an amount equal to 100% of the amount of New Money Loans borrowed under such New Money Loan borrowing"); *In re Knotel, Inc.*, Case No. 21-10146 (Bankr. D. Del. Mar. 2, 2021) [Docket No. 330] (permitting a $20.4 million roll-up where the DIP provided $20.4 million in new money); *In re Libbey Glass Inc.*, Case No. 20-11439 (Bankr. D. Del. Jul. 2, 2020) [Docket No. 234] (approving a $60 million roll-up "on a dollar-for-dollar basis"); In *re Southland Royalty Company LLC*, Case No. 20-10158 (Bankr. D. Del. Feb. 26, 2020) [Docket No. 188] (approving roll-up "on a dollar-for-dollar basis").  The Debtors' requested two-for-one roll-up cannot be justified here.

**V.      The Second Lien OpCo Lenders Are Not Receiving Sufficient Adequate Protection**

51.      To obtain postpetition financing secured by priming liens pursuant to section 364(d) of the Bankruptcy Code, the debtor has the burden of demonstrating that any existing secured creditor subject to the priming liens is adequately protected, such that "the creditor receives the value for which he bargained prebankruptcy."  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).  "The purpose of adequate protection 'is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor.'"  *In re Energy Future Holdings Corp.*, 546 B.R. 566, 581 (Bankr. D. Del. 2016) (quoting *In re Satcon Tech. Corp.*, Case No. 12-12869 KG, 2012 Bankr. LEXIS 5812, at *17 (Bankr. D. Del. Dec. 7, 2012)).

52.      Because "super priority financing displaces liens on which creditors have relied in extending credit," courts must be "particularly cautious" and require "projections grounded on a firm evidentiary basis" in finding that such creditors are adequately protected.  *In re Packard Square LLC*, 574 B.R. 107, 117 (Bankr. E.D. Mich. 2017) (quoting *In re Mosello*, 195 B.R. 277, 289, 292 (Bankr. S.D.N.Y. 1996)); *see also In re LTAP US, LLLP*, Case No. 10-14125 (KG), 2011

Bankr. LEXIS 667, at *9 (Bankr. D. Del. February 18, 2011) ("Bankruptcy judges are required to grant section 364(d) financing only upon a tangible demonstration of adequate protection. The Court must be cautious in assuring that [secured creditor] has received genuine adequate protection, and the facts simply do not provide the Court with confidence that the DIP financing protects [creditor's] security interest.").

53.    Courts must exercise particular discretion in assessing whether to approve priming liens where a secured creditor's adequate protection is based on a projected increase in collateral value and, accordingly, courts have routinely rejected proposed financings where the enhancement of collateral value is too speculative. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d at 566 (reversing finding that undersecured creditor was adequately protected because, among other things, unsupported assertion that construction funded by post-petition financing would increase the value of creditor's collateral was insufficient to find the creditor was adequately protected); *In re Packard Square, LLC*, 574 B.R. at 118-19, 122 (noting that "[n]umerous reported cases confirm the need for courts to use great caution in granting a priming lien, where adequate protection is based on predictions of future value" and finding debtor failed to meet its burden where appraisal evidence was "inherently uncertain and speculative to some extent" (collecting cases)).

54.    The Debtors assert that the Second Lien OpCo Lenders are adequately protected by the use of proceeds of the DIP Facility "to fund the Debtors' continuing operations and these chapter 11 cases, including the sales process, all of which will maximize recoveries to the Debtors' stakeholders."[34] This speculation fails to satisfy the Debtors' required burden, particularly given that approximately $100 million of DIP proceeds (40% of the New Money DIP Loans) is being used to pay prepetition unsecured claims of vendors, including claims under section 503(b)(9) of

---

[34]    DIP Mot. ¶ 54; Grubb Declaration, ¶ 32.

the Bankruptcy Code. These claims, even those with administrative priority, are junior to the claims of the Second Lien OpCo Lenders because it is the collateral of the Second Lien OpCo Lenders that is either being used or is being made subject to priming liens to make these payments.

55. The Debtors have offered no evidence that paying these claims will preserve or enhance the value of the Second Lien OpCo Lenders' collateral. ████████████████

████████████████████████████████████████████████

Moreover, the Debtors' Proposed Plan contemplates that the Second Lien OpCo Lenders will receive no recovery absent a successful sale. And, for the reasons set forth in the Freedom Lender Group's objection to the Debtor's proposed bidding procedures, the Debtors' sale process is not designed to do anything more than justify a handover of the OpCo Debtors to the First Lien OpCo Lenders, providing no benefit to the Second Lien OpCo Lenders.

56. Further, the proposed DIP Facility offers only illusory adequate protection, which is plainly insufficient under section 364(d). The proposed Second Lien Adequate Protection Claims and Second Lien Adequate Protection Liens cannot adequately protect the Second Lien OpCo Lenders against the decline in collateral value caused by incurring priming liens to pay junior creditors given the senior adequate protection liens and claims granted to the First Lien OpCo Lenders. With approximately $100 million of payments projected to pay unsecured creditors and the claims of the Second Lien OpCo Lenders totaling $125 million of principal, these payments could be the difference between the Second Lien OpCo Lenders getting a recovery or not regardless of the adequate protection currently offered. And the Debtors have not provided any evidence of value to substantiate that the Second Lien OpCo Lenders are adequately protected. Therefore, the DIP Motion should not be approved on a final basis but, at a minimum, the Second Lien OpCo Lenders should receive the same adequate protection package as the First Lien OpCo

Lenders, including current cash payments of interest and professional fees.

## VI.    The DIP Facility is a *Sub Rosa* Plan

57.    In evaluating a proposed DIP financing, courts "cannot, under the guise of Section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements."  *See In re Laffite's Harbor Dev. I, LP*, 2018 Bankr. LEXIS 2, at *6. Therefore, any postpetition financing that dictates specific plan terms, otherwise known as a *sub rosa* plan, should not be approved.  *See Jevic Holding Corp.*, 580 U.S. at 468 (noting that debtors are not permitted to enter into transactions that "circumvent the Code's procedural safeguards." (internal citations omitted)); *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (explaining that "*sub rosa* plans are prohibited" to prevent "transactions that will, in effect, short circuit the requirements of chapter 11 for confirmation of a reorganization plan").

58.    The proposed DIP Facility is a *sub rosa* plan because it tethers the Debtors to the predetermined chapter 11 plan contemplated in the RSA.  The Debtors are not seeking approval of the RSA, yet the Debtors seek to have certain terms of it effectively approved through the DIP Facility, foreclosing the possibility of alternative restructuring proposals.

59.    <u>First</u>, the DIP Facility includes events of default, milestones, and covenants that restrict parties from seeking confirmation of restructuring plans other than the one dictated by the RSA.  Such provisions approved through postpetition financing are disfavored because they "effectively lock up any future plan of reorganization to be only the" plan supported by the debtor and the DIP lenders.  *See In re LATAM Airlines Grp. S.A.*, 620 B.R. at 820 (denying DIP with covenants that "mandate that only a Company Approved Reorganization Plan may be confirmed in these Chapter 11 Cases, regardless of exclusivity, or an Event of Default will be triggered").

60.    According to the terms of the DIP Facility, if the Debtors do not meet the milestones under the RSA, an event of default occurs.  If the Debtors file a plan of reorganization "that is

inconsistent in any material respect" with the RSA, an event of default occurs.[35]  While the RSA provides the Debtors with a fiduciary out,[36] the act of exercising it constitutes an event of default under the DIP Credit Agreement, rendering the fiduciary out illusory.[37]  These DIP provisions are equally, if not more, coercive than those soundly rejected by the *LATAM* court.  *See In re LATAM Airlines Grp. S.A.*, 620 B.R. at 814-15, 820 (finding that DIP covenants including (i) milestones for the debtors to file, and the court to confirm, a "Company Approved Reorganization Plan," and (ii) an event of default for confirmation of a plan other than a "Company Approved Reorganization Plan," established an impermissible *sub rosa* plan).

61.  Second, the draconian nature of these provisions would almost certainly dissuade any party from proposing an alternative plan.  An event of default under the proposed DIP Facility caused by the Debtors pursuing an alternative plan is potentially fatal to these Chapter 11 Cases. Upon an event of default, the DIP Lenders would have the right to accelerate the DIP Loans, immediately triggering the Debtors' obligation to repay all outstanding obligations, including the Roll-Up Claims and the 2.5% Exit Premium.[38]  The financial consequences of defaulting on the proposed DIP Facility would serve to effectively eliminate the possibility that any other party may propose a competing plan of reorganization unless the sponsor of such competing plan is immediately able to write a check for at least $783 million.  It is still too early in these Chapter 11 Cases, with an Official Committee of Unsecured Creditors just having been appointed and the Freedom Lender Group still working to obtain crucial information from the Debtors, to set this high a bar for potential alternatives.  Although the DIP Lenders have agreed to make certain

---

[35]  *See* DIP Credit Agreement *id.* § 7.01(p)(v).

[36]  *See* RSA § 8.01.

[37]  *See* DIP Credit Agreement § 7.01(p)(ii).

[38]  *See* Interim DIP Order ¶ 21(b); DIP Credit Agreement § 2.12(c).

remedies subject to a five-day Remedies Notice Period during which the Debtors and other parties in interest can seek an emergency hearing,[39] there is no assurance that the Court would restrict the DIP Lenders from taking actions in the face of a default.  Therefore, the Debtors would not take the risk of administrative insolvency by pursuing an alternative plan.

62.     Finally, the DIP Facility contemplates approval of an equity conversion feature based on a 25% discount to a not yet disclosed plan value.  Courts have refused to authorize post-petition financing that predetermines material terms of recovery under an eventual plan, including fixed distributions of reorganized equity.  *See, e.g., In re Sas Ab*, 644 B.R. 267, 271-72 (Bankr. S.D.N.Y. 2022) ("I have, in fact, had some prior cases in which parties have proposed that DIP lenders receive a specified percentage of the reorganized equity in consideration for their DIP loans. . . I flatly denied the proposed terms in each of those prior cases.  I think it is very clear that decisions about the issuance of equity in the reorganized debtors should be reserved for the plan process."); *In re Belk Props., LLC*, 421 B.R. at 225 (declining to approve DIP financing that would allow prepetition lender to obtain a 51% interest in the reorganized debtor, "loosely dictat[ing]" the manner in which existing creditors would be treated).

63.     In *LATAM Airlines*, for example, the court found that a substantially similar equity conversion feature prevented the court from approving an otherwise justified DIP financing, holding that it "subverts the reorganization process because the discount is not market-tested, the Debtors can make this election without the approval or oversight of the Court, and [equity conversion feature] dictates key terms of an eventual plan of reorganization by prematurely allocating reorganization value to [debtor's] existing equity holders."  620 B.R. at 819-20.  The court found that a provision in the DIP facility which provided the debtors with the right to elect

---

[39]    *See* Interim DIP Order ¶ 21(b).

to distribute stock, in lieu of cash, to repay DIP obligations "necessarily determine[d] plan terms giving the Debtors the right to distribute equity in the reorganized Debtors to the [DIP] Lenders." *Id.* at 819.  In addition, the proposed DIP Facility would "lock[] into place the 20% discount to plan value," at a time when "[t]here [wa]s no way of knowing . . . whether that discount is appropriate." *Id.*  The court found that such provisions "'short circuit[]' the chapter 11 plan review process under the Bankruptcy Code, by establishing plan terms *sub rosa* in the [proposed] DIP Facility." *Id.*

64.    The same is true here where the Debtors would be locked in to equitizing a portion of the DIP Facility at a discount to a not yet disclosed plan value.  Worse still, the plan value is subject to a consent right by the First Lien OpCo Lenders themselves.  The only way the Debtors can possibly avoid this pre-wired equity conversion feature is by exercising their fiduciary out under the RSA.  But, as explained above, there is too much uncertainty about the repercussions of doing so to realistically expect the Debtors to do so.

**VII.    Adequate Protection Payments Should Be Subject to Recharacterization**

65.    The proposed DIP Facility is also flawed because the Debtors seek to shield adequate protection payments provided to the First Lien OpCo Lenders from recharacterization. That is not allowed.  The Bankruptcy Code is clear that only oversecured creditors are entitled to payment of post-petition interest and fees.  *See In re B456 Sys.*, Case No. 12-12859, 2017 Bankr. LEXIS 4399, at *62 (Bankr. D. Del. Dec. 22, 2017) ("[T]he plain language of Bankruptcy Code § 502(b) and § 506(b), when read together, indicate that postpetition interest, attorney's fees and costs are recoverable only by oversecured creditors.").  Undersecured creditors cannot sidestep this prohibition by seeking payment of post-petition interest under the guise of adequate protection. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 374-75 (1988) (holding that undersecured creditors, who are "not eligible for interest under § 506(b)," are not

entitled to adequate protection "for interest lost during the stay").

66.     Courts have found, however, that secured creditors may receive payment of post-petition interest and fees as adequate protection during a bankruptcy proceeding if such payments remain subject to recharacterization as principal payments if the creditors are later determined to be undersecured.  *See, e.g., In re Freedom Communs. Holdings, Inc.*, Case No. 09-825 (SLR), 2009 U.S. Dist. LEXIS 113725 at *4-5 (D. Del. Dec. 4, 2009) (finding that cash collateral order providing for recharacterization satisfies "the concern of the Supreme Court in *Timbers*" regarding payment of adequate protection payments to undersecured creditors).

67.     Here, the First Lien OpCo Lenders may well be oversecured, which will be revealed if the Debtors are required to modify their bidding procedures to run a proper sale process.  But, in the meantime, the Debtors have provided no evidence of value to demonstrate this.  Therefore, adequate protection payments made to the First Lien OpCo Lenders should be subject to recharacterization as payment of principal if they are later determined to be undersecured.

## VIII.  Certain Extraordinary Provisions of the DIP Facility Should Not Be Approved

68.     As stated above, the Freedom Lender Group has not been provided with a draft of the Debtors' proposed final order approving the DIP Motion.  The Interim DIP Order, however, indicates that the Debtors will be seeking in any such final order (i) granting liens on proceeds of Avoidance Actions (both for the security interests under the DIP Facility and adequate protection liens), (ii) a waiver of section 506(c) of the Bankruptcy Code, (iii) a waiver of the "equities of the case" exception of section 552(b) of the Bankruptcy Code and (iv) a prohibition on seeking the equitable doctrine of marshalling.  These are the type of provisions that the Delaware Local Bankruptcy Rules label as only being permitted in an interim order under "extraordinary circumstances."  Del. L. R. 4001-2(b)(ii); *see also* Del. L. R. 3001-2(a)(i)(U)-(X).  The Debtors have preserved these issues for a final order but, even upon final approval, these type of

extraordinary provisions are inappropriate here for the following reasons:

- Liens on proceeds of Avoidance Actions, which are unencumbered assets, should be preserved for unsecured creditors and not provided to the First Lien OpCo Lenders. *See In re Cybergenics Corp.*, 226 F.3d 237, 243-44 (3d Cir. 2000) (explaining that avoidance actions are tools to fulfill the "obligation[] to maximize the bankruptcy estate for the benefit of creditors" and may not be pursued to "benefit . . . the debtors themselves").

- A section 506(c) waiver is appropriate only in exchange for a carve-out. But only the Debtors and the Committee get the benefit of the carve-out here. Second Lien OpCo Lenders and HoldCo Lenders should not be bound by such a waiver.

- A waiver of the "equities of the case" exception of section 552(b) and a prohibition on the equitable doctrine of marshalling cannot be forced on nonconsenting parties; the Debtors may deem it appropriate to waive it on their own behalf but should not be able to bind other parties who have not consented to the order approving the DIP Motion to them, just as they cannot force their stipulations and releases on third parties until the expiration of a challenge period. *See, e.g., In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 Bankr. LEXIS 1533, at *20 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make. If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lender's rights, the Court will consider it.").

## IX.    The Debtors Must Accept Any Junior or Unsecured Alternative Financing

69.    To obtain financing secured by a priming or equal lien under section 364(d) of the Bankruptcy Code, the debtor must show that it attempted but failed to obtain financing on better terms and that credit under the other subsections of section 364 is unattainable. 11 U.S.C. § 364(d)(1)(A); *see In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (holding that "obtaining credit under section 364(d) may not be authorized if it appears that credit can be obtained under the other subsections of 364.").

70.    The Freedom Lender Group has not completed discovery regarding the Debtors' prepetition and postpetition marketing efforts and reserves all rights to supplement and amend this Objection based on the full record from discovery. However, to the extent the Debtors have received, or receive in advance of the hearing on final approval of the DIP Motion, an offer for

replacement or supplemental postpetition financing on a junior or unsecured basis, the Debtors must accept such proposal under the express terms of section 364(d) of the Bankruptcy Code. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313-14 (Bankr. D. Del. 2011) (denying approval of priming postpetition financing, where the debtors had received a competing proposal on an unsecured basis, "based foremost on Debtors' failure to satisfy the statutory predicate for the [priming financing]").

71.     The Freedom Lender Group is continuing to explore the possibility of offering an alternative DIP facility only at the HoldCo Debtors or for all Debtors on similar terms to those proposed at the First Day Hearing.  If they submit such a proposal, the Freedom Lender Group reserves the rights to supplement this Objection accordingly.

## RESERVATION OF RIGHTS

72.     As noted in the Motion to Adjourn, the Freedom Lender Group repeatedly sought an extension of its deadline to file this Objection so that it could rely on the full record from discovery.  The Debtors, however, refused to provide the Freedom Lender Group with an adequate extension of its objection deadline.  Accordingly, the Freedom Lender Group reserves the right to supplement and amend this Objection, seek further discovery, and introduce evidence at any hearing in connection with the DIP Motion and this Objection.  The Freedom Lender Group reserves all rights under the HoldCo Credit Agreement and the Second Lien OpCo Credit Agreement, under applicable law, and otherwise.

## CONCLUSION

73.     For the reasons stated above, the DIP Motion should not be approved on a final basis and the Court should award any other relief it deems proper.

Dated: December 2, 2024
Wilmington, Delaware

Respectfully submitted,

**FARNAN LLP**

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**
Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
        azatz@whitecase.com
        sam.hershey@whitecase.com
        erin.smith@whitecase.com
        brett.bakemeyer@whitecase.com

*Counsel to the Ad Hoc Group of
Freedom Lenders*

## CERTIFICATE OF SERVICE

I, Michael J. Farnan, hereby certify that on December 2, 2024, a copy of the foregoing

document was served via e-mail on:

| | |
|---|---|
| Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY   10019<br>Debra M. Sinclair<br>Matthew A. Feldman<br>Betsy L. Feldman<br>Joseph R. Brandt | Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE   19801<br>Edmon L. Morton<br>Matthew B. Lunn<br>Allison S. Mielke<br>Shella Borovinskaya |
| Office of The United States Trustee<br>844 King Street<br>Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801<br>Timothy Fox | |

/s/ Michael J. Farnan
Michael J. Farnan (Bar No. 5165)