**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF CHRISTOPHER GRUBB IN
SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF ORDERS
(I) (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) SCHEDULING
AN AUCTION AND A SALE HEARING AND APPROVING THE FORM
AND MANNER OF NOTICE THEREOF, (C) APPROVING ASSUMPTION
AND ASSIGNMENT PROCEDURES, AND (D) GRANTING RELATED RELIEF**

I, Christopher Grubb, declare under penalty of perjury:

1. I am a Partner at Ducera Partners LLC (together with its affiliates, "Ducera") located at 11 Times Square, New York, NY 10036, and am duly authorized to submit this

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

declaration (the "Grubb Declaration") in support of the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of all or Substantially all of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 154] (the "Motion").[2]

2. I am over the age of 18 years and am authorized to submit this Grubb Declaration on behalf of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") in support of the relief requested in the Motion.

3. On November 3, 2024, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, initiating the above-captioned chapter 11 cases (together, the "Chapter 11 Cases").

4. On November 19, 2024, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 188] (the "Committee").

5. Unless otherwise indicated, all facts set forth in this Grubb Declaration are based on (i) my personal knowledge or information that I have received from employees of Ducera working directly with me or under my supervision, direction, or control, (ii) information learned from my review of relevant financial and operational data regarding the Debtors, (iii) information

---

[2] Terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures Order, as applicable.

received from members of the Debtors' management or other advisors, and (iv) my past experience advising both distressed and non-distressed businesses and companies and their stakeholders. If called upon to testify, I would testify competently to the facts set forth herein.

## **PROFESSIONAL BACKGROUND AND QUALIFICATIONS**

6. Founded in 2015, Ducera is an investment banking firm specializing in providing leading-edge capital structure and restructuring advice to companies, creditors, and investors in bankruptcy. In addition to numerous out-of-court restructurings and sales, Ducera professionals have served as investment bankers to debtors, creditor groups, asset purchasers, committees, boards of directors, and trustees in a number of bankruptcy matters. Ducera provides a broad range of corporate and financial services to its clients, including: (a) general corporate advice; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; and (d) private placements. Ducera and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases.

7. Ducera's seasoned professionals, with roots in complex corporate finance, offer impartial and independent strategic advice to stakeholders in a broad range of transactions and industry sectors. Ducera has more than fifty professionals and is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties in interest involved with financially troubled companies requiring complex financial restructurings, both out of court and in chapter 11 cases. Ducera's business reorganization professionals have served as financial and strategic advisors in a number of recent in-court restructurings, including: In re Enviva, Inc., No. 24-10453 (BFK) (Bankr. E.D. Va. 2024); In re Acorda Therapeutics, Inc., No. 24-22284 (DSJ) (Bankr. S.D.N.Y. 2024); In re Casa Systems, Inc., No. 24-10695 (KBO) (Bankr. D. Del. 2024); In re Invitae Corp., No. 24-11362 (MBK) (Bankr. D.N.J. 2024); In re Revitalid Pharmaceutical Corp., No. 23-11704 (BLS) (Bankr. D. Del. 2023); In re Yellow Corp.,

No. 23-11069 (CTG) (Bankr. D. Del. 2023); In re Diebold Holding Co., LLC, No. 23-90602 (DRJ) (Bankr. S.D. Tex. 2023); In re Virgin Orbit Holdings, Inc., No. 23-10405 (KBO) (Bankr. D. Del. 2023); In re Core Scientific, Inc., No. 22-90341 (DRJ) (Bankr. S.D. Tex. 2023); In re Endo Int'l plc., No. 22-22549 (JLG) (Bankr. S.D.N.Y. 2022); In re GBG USA Inc., No. 21-11369 (MEW) (Bankr. S.D.N.Y. 2021); In re Mallinckrodt plc, No. 20-12522 (JTD) (Bankr. D. Del. 2021); and In re Superior Energy Servs., Inc., No. 20-35812 (DRJ) (Bankr. S.D. Tex. 2021). Ducera has experience in a variety of industries, providing specialized advice on matters including, but not limited to, restructurings, mergers, acquisitions, financings, capital structure advisory and chapter 11 sales.

8. I have approximately 20 years of restructuring-related experience as a trusted advisor to leading companies on a wide range of complex corporate finance transactions. Since joining Ducera in 2023, I have provided investment banking expertise, including with respect to marketing and sale transactions, to financially distressed companies as well as lenders and strategic investors in distressed and special situations engagements. I currently serve as a Partner at Ducera, where I specialize in providing financial advice to leading companies, creditors groups, and other parties of interest in a range of complex and transformative corporate finance transactions, including financial restructurings, mergers and acquisitions, and court-supervised insolvency proceedings. Prior to joining Ducera, I was a Managing Director at Greenhill & Co. for over seventeen years, advising companies and other stakeholders on special situation restructuring and mergers and acquisitions engagements. Prior to that time, I was an investment banker at UBS. I hold a Bachelor of Science degree in Operations Research and Industrial Engineering from Cornell University and a Master of Business Administration from Columbia Business School, and I am a CFA Charterholder.

**MARKETING EFFORTS**

9. Since Ducera's engagement in June 2024, I, along with other members of the Ducera team, have worked closely with the Debtors and their other professional advisors to become knowledgeable about the Debtors' business, finances, operations and systems. As more fully described in the First Day Declaration, in the months prior to the Petition Date, the Debtors faced increasingly tight liquidity, necessitating the commencement of these Chapter 11 Cases and the sale of the Debtors' assets on the timeline contemplated by the Bidding Procedures.

**A. Prepetition Marketing Efforts for the Sale of American Freight**

10. In June 2024, Ducera began advising the Debtors in connection with various strategic opportunities, considering several potential restructuring alternatives in light of the Debtors' increasingly tight liquidity stemming from operational declines and consolidated losses across their businesses due to underperforming retail store locations, inflationary pressure, an overleveraged balance sheet, and rising interest expenses. In September 2024, the Debtors and Ducera commenced an initial market outreach and conducted a robust marketing process with respect to a sale of substantially all of the assets of American Freight.

11. The steps Ducera took in the marketing process for American Freight included (a) identifying the company's assets, (b) developing marketing materials describing those assets, their history, their use, and the opportunities those assets present, (c) creating a virtual data room containing information about those assets, (d) identifying and contacting potential strategic and financial buyers for those assets, (e) facilitating due diligence sessions with potential buyers, and (f) negotiating transaction structures with potential buyers interested in acquiring those assets.

12. In connection with its marketing efforts, Ducera reached out to over 80 potential bidders, of which 29 signed confidentiality agreements and received financial and operational diligence materials through the Debtors' virtual data room. The market outreach yielded two initial

5

indications of interest, each as a joint proposal from two or more interested parties; however, these indications of interest did not prove actionable. At this time, in light of the results from the American Freight marketing process and the liquidity issues associated with maintaining the business line as a going concern, Ducera and the Debtors redirected their efforts to focusing on identifying third-party consultants to evaluate and conduct the American Freight Store Closing Sales and to prepare each Store for turnover to the applicable landlord.

### B. The Restructuring Support Agreement

13. In parallel with the American Freight marketing process, Ducera worked with the Debtors and their other advisors to reorganize around the Debtors' other business lines outside of chapter 11. However, despite extensive negotiations with the Ad Hoc Group of First Lien Lenders, the ABL Lenders and the Freedom Lender Group,[3] it became clear that achieving a comprehensive, consensual out-of-court transaction on the timeline required by the Debtors' liquidity constraints was not feasible.

14. As a result, the Debtors and the Ad Hoc Group of First Lien Lenders quickly pivoted to negotiating the terms of a restructuring that could be implemented through a chapter 11 process with the support of the Consenting First Lien Lenders. These negotiations led to the Debtors' and the Consenting First Lien Lenders' entry into the Restructuring Support Agreement, which memorializes the Consenting First Lien Lenders' agreement to support a sale process for the purpose of identifying one or a combination of Bidders who propose a value-maximizing transaction that pays off the Debtors' obligations under the DIP Facility, ABL Facility, and First Lien Term Loan Facility in full in cash at the closing of such transaction. Importantly, subject to

---

[3] As defined in the Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure [Docket No. 229].

the proposed Bidding Procedures and the terms of the Restructuring Support Agreement, the Debtors may evaluate any Bid received and may aggregate two or more Qualified Bids into a single consolidated Qualified Bid for purposes of determining whether such Qualified Bids, when aggregated, constitute a Sufficient Bid.

15. As set forth in the Restructuring Support Agreement, if the Debtors receive more than one Sufficient Bid at or prior to forty-eight (48) hours prior to the date of the Auction, in accordance with their business judgment, they may conduct an Auction to yield the most value-maximizing Sale of the Assets. Further, pursuant to the terms of the Restructuring Support Agreement, if the Debtors receive only one Sufficient Bid, the Debtors may exercise the "sale toggle" under the Restructuring Support Agreement, name the Sufficient Bid as the Successful Bid, and, subject to Court approval, sell their Assets to the Successful Bidder through a value-maximizing transaction that pays off the Debtors' obligations under the DIP Facility, ABL Facility, and First Lien Term Loan Facility in full in cash at the closing of such transaction (the "Sale Transaction"). If the Debtors do not receive a Sufficient Bid at or prior to forty-eight (48) hours prior to the date of the Auction, the Debtors will pursue the Plan Transaction described in the Restructuring Support Agreement and pursuant to the Debtors' Plan. The Debtors are working diligently to market test the terms of the Sale Transaction to ensure that they maximize the value of the Assets.

C. **Marketing Efforts for the Sale Transaction**

16. The Debtors initiated formal market outreach to identify prospective bidders in a broad marketing process for the sale of all or substantially all of the Assets on November 4, 2024. Since then, the Debtors and Ducera have reached out to over 170 potential bidders, of which 48 have signed confidentiality agreements. The Debtors' objective was to cast a wide net in an effort to attract multiple proposals and create a robust, competitive bidding process designed to achieve

the highest or otherwise best offer for the Assets. In connection with this robust marketing process, the Debtors actively engaged with these potential bidders and provided parties under confidentiality agreements with detailed information about the Debtors' business plan, including in comprehensive confidential information memoranda (the "CIMs") through access to the Debtors' virtual data rooms.

### D. Negotiation of Revised Bidding Procedures

17. The Debtors bolstered their rigorous existing marketing process by revising the Bidding Procedures (the "Revised Bidding Procedures"). The Revised Bidding Procedures were intended to resolve informal comments from the Committee and to address certain of the objections lodged by the Freedom Lender Group. The Consenting First Lien Lenders were also involved in the negotiation of, and ultimately consented to, these revisions.

18. Among other changes, the Revised Bidding Procedures establish an extended timeline for the submission of Bids and implement new minimum bid prices with respect to each of the Debtors' three business segments being marketed. I believe the new provisions in the Revised Bidding Procedures will further encourage competitive, informed bidding.

19. Other than the Freedom Lender Group, none of the Potential Bidders have indicated any concerns with the proposed milestones embodied in the original Bidding Procedures. Notwithstanding this, the Debtors, with the support of the Consenting First Lien Lenders and the Committee, have agreed to extend the timeline by one and a half weeks for each key deadline in the sale process (the "Revised Timeline"). The Revised Timeline reflects an extension of the Bid Deadline by one and a half weeks to February 3, 2025, meaning that Potential Bidders have fifty-five (55) days from the date hereof (in addition to the time that the 48 Potential Bidders under confidentiality agreements have already spent reviewing information in the CIMs and virtual data rooms) to undergo diligence efforts and submit an informed Bid for the Debtors' Assets. This is

ample time to attract a wide pool of Potential Bidders, allow Potential Bidders to conduct necessary due diligence, facilitate submission of informed Bids, and encourage competitive bidding for a value-maximizing Sale Transaction.

20. Likewise, other than the Freedom Lender Group, none of the Potential Bidders have expressed concerns regarding the quality or volume of marketing materials made available to them. Each Potential Bidder has information pertaining to the value of all debt facilities, including, but not limited to, the ABL Facility as of the Petition Date, and has the right to consult with Ducera to resolve any questions regarding the exact current outstanding amount, pursuant to the Bidding Procedures. The combination of diligence information provided pursuant to NDAs, Potential Bidders' ability to contact Ducera with diligence inquiries, the ongoing creation of incremental diligence information to provide through the virtual data rooms and previous conversations among interested parties about the Debtors has resulted, in my view, in interested parties having access to more than sufficient information to meaningfully participate in the Sale Process. In conjunction with the Revised Timeline, which balances the Debtors' need to thoroughly market the Assets against the need to efficiently exit these Chapter 11 Cases, Potential Bidders have sufficient time and information to submit informed Bids in a competitive Bidding Process.

21. The Revised Bidding Procedures also establish minimum bid prices for each of the Debtors' three business segments being marketed for sale. The addition of minimum bid prices is designed to encourage a competitive bidding process by acting as a price floor for minimum bids and eliminating any doubt that Bidders may have as to (i) whether assets can be sold separately or (ii) whether bidders need to bid on all of the assets or, alternatively, rely on others to bid on assets for their bid to be actionable. Importantly, a minimum bid price for each business segment will generate competitive tension at an Auction, facilitate a greater number of bids, and create the

9

dynamic to achieve higher bids that will ultimately maximize the value of the Assets. The minimum bid prices for each of the Debtors' operating business segments are $60.0 million for Buddy's, $200.0 million for Vitamin Shoppe, and $900.0 million for Pet Supplies Plus.

## A SOUND BUSINESS PURPOSE EXISTS FOR THE BIDDING PROCEDURES

22. As set forth in the Motion, the Debtors are seeking approval of the Bidding Procedures to establish a clear and transparent process for the solicitation, receipt, and evaluation of Bids on a court-approved timeline that allows the Debtors to timely consummate a Sale.

23. I have reviewed the Bidding Procedures. Generally speaking, the Bidding Procedures establish, among other things:

a) the availability of and access to conduct due diligence by Potential Bidders;

b) the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction, including the terms and conditions that must be satisfied and the deadline that must be met by any bidder to be considered a "Qualified Bidder" and to participate in the Auction;

c) the manner in which Qualified Bids will be evaluated by the Debtors;

d) the conditions for having the Auction and procedures for conducting the Auction, if any; and

e) various other matters relating to the Sale Process generally, including the designation of the Backup Bid, return of any good faith deposits, and certain reservations of rights.

24. In addition, the Bidding Procedures propose the following key dates and deadlines:

| Event | Date |
|---|---|
| Indications of Interest Deadline | December 23, 2024, at 5:00 p.m. (ET) |
| Sale Objection Deadline | January 3, 2025, at 4:00 p.m. (ET) |
| Bid Deadline | February 3, 2025, at 5:00 p.m. (ET) |
| Deadline to deliver adequate assurance of future performance to requesting contract counterparties | Twenty-four (24) hours after the Bid Deadline for delivery via email, or as soon as reasonably practicable thereafter |

|  | One (1) business day after the Bid Deadline for delivery via first class mail, or as soon as reasonably practicable thereafter |
|---|---|
| Deadline to object to adequate assurance of future performance under Assigned Contracts (if any) | Seven (7) days after delivery of adequate assurance of future performance information |
| Auction (if held) | February 7, 2025, at 10:00 a.m. (ET) |
| Sale Hearing, if no Auction is held | February 10, 2025, at [●] a.m./p.m. (ET), subject to the availability of the Court |
| Sale Hearing, if an Auction is held | February 14, 2025, at [●] a.m./p.m. (ET), subject to the availability of the Court |

25. Based on my experience, the Bidding Procedures are designed to maximize the value received for the Assets by facilitating a fair and competitive bidding process where Potential Bidders are encouraged to participate and submit competing Bids within the specified time frame. As described in the Motion, the proposed Bid Deadline requires Bids for the purchase of the Assets to be delivered no later than February 3, 2025, at 5:00 p.m. (ET). The Bid Deadline thus provides parties with 12 weeks from the filing of the Motion to obtain information and formulate and submit a timely and informed competing bid to purchase some or all of the Assets.

26. The Bidding Procedures will allow the Debtors to review, analyze, and compare one or more Bids for the Assets and to engage with Bidders on an arm's length basis to work to improve the quality of their Bids for the benefit of all parties in interest. The Debtors, together with Ducera, have marketed the Debtors' businesses and solicited offers for the Assets on a postpetition basis, consistent with the Bidding Procedures. The marketing process has included, for example, contacting previously solicited parties, providing Acceptable Bidders with data room access and requested information, and otherwise assisting the Debtors with all efforts to maximize transaction value.

27. Given Ducera's outreach process and the timeline proposed by the Debtors, it is my view, based on my experience and in light of the circumstances, that the proposed Bidding Procedures and timeline related thereto are reasonable and appropriate under the circumstances.

The Bidding Procedures seek to balance the Debtors' need to efficiently consummate a Sale of their business with the need to provide adequate notice of the Debtors' postpetition marketing process to parties in interest and preserve the opportunity to attract the highest or otherwise best offer.

28. Time is of the essence for the Debtors. They have already agreed to extend the Sale Process in an abundance of concern to ensure Potential Bidders have ample time to formulate informed Bids. The Debtors cannot afford to further extend this into an even longer process due to, among other things, the limited liquidity available to them under their postpetition financing facility. A longer in-court process than that set forth in the proposed Bidding Procedures is neither necessary nor the most effective use of the Debtors' limited resources.

[*The remainder of this page is intentionally left blank*]

## CONCLUSION

29. Accordingly, for all the foregoing reasons, the Bidding Procedures and the timeline set forth therein: (a) will encourage bidding for the Debtors' assets; (b) are generally consistent with other procedures previously approved in chapter 11 cases of similar size and complexity; and (c) are appropriate under the circumstances. Given the details described above and based on my experience as a restructuring professional and involvement in other sales transactions, the Bidding Procedures are appropriate and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.

Dated: December 6, 2024

/s/ *Christopher Grubb*
Christopher Grubb
Partner
Ducera Partners LLC