## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |

## SUPPLEMENTAL DECLARATION OF DAVID ORLOFSKY
## IN SUPPORT OF CRITICAL VENDOR MOTION

I, David Orlofsky, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the following to the best of my knowledge, information, and belief:

1. I am a Managing Director of AlixPartners, LLP ("AlixPartners"), an affiliate of AP Services LLC and an internationally recognized restructuring and turnaround firm. APS was retained by the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"). In addition, I have been employed and retained to serve as the Chief Restructuring

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

Officer ("CRO") of Debtors Freedom VCM Holdings, LLC and Franchise Group, Inc. since October 11, 2024.

2. I am familiar with the day-to-day operations and business and financial affairs of the Debtors. All facts set forth in this declaration (the "Supplemental Declaration") are based upon my personal knowledge of the Debtors' operations and financing, information learned from my review of relevant documents, information supplied to me from members of the Debtors' management or the Debtors' advisors, or my opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition. If called to testify, I could and would testify competently to the matters set forth in this Supplemental Declaration.

3. On November 3, 2024 (the "Petition Date"), the Debtors commenced voluntary cases for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On the Petition Date, I submitted the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "First Day Declaration") to provide the Court and other parties in interest with an overview of the Debtors' businesses and to describe the circumstances compelling the commencement of these Chapter 11 Cases. In the First Day Declaration, I explained, "I believe that the requested authority to pay the Critical Vendors Claims, Foreign Vendors Claims, Shippers & Logistics Providers Claims, and 503(b)(9) Claims subject to the applicable caps set forth in the Critical Vendors Motion is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption." First Day Decl. ¶ 130.

4. I submit this Supplemental Declaration in further support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition*

*Claims of Certain Critical Vendors, Foreign Vendors, Shippers & Logistics Providers, and 503(b)(9) Claimants; and (II) Granting Related Relief* [Docket. No. 10] (the "Motion").[2]

### Critical Vendors

5. Since my appointment as CRO, I have become familiar with the critical need to pay the Debtors' Critical Vendors Claims on an emergent basis to deal with concerns relating to ongoing operations (in the case of the PSP, Buddy's, and The Vitamin Shoppe Debtors) and winddown matters (in the case of the American Freight Debtors).

6. As has been demonstrated on multiple occasions at the hearings on November 5, 2024, November 6, 2024, and November 21, 2024, the Debtors need the authority to pay these claims. The Debtors' relationship with their vendors is crucial for the operation of their businesses as the Debtors' critical goods and services providers ensure the Debtors are able to run every aspect of their businesses.

7. As early as the day after the Petition Date, Critical Vendors began requesting to be put on the critical vendor list. Dozens of vendors came forward to say that they would not provide necessary services unless they were put on the critical vendor list, or they threatened tightened trade terms. The Debtors risked losing access to critical goods and services unless the Debtors began negotiating Trade Agreements immediately. Indeed, when the Debtors' hearing on November 5 was adjourned without approval of interim relief on the Motion, a number of trucks in transit to deliver products to the Debtors were ordered to turn around. More than half of the Debtors' vendors stopped shipping to the Debtors or imposed stringent postpetition terms within three days of the Petition Date. This group comprised some of the Debtors' largest and most significant vendors. Jeopardizing the relationship with vendors could empty the Debtors' shelves,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the First Day Declaration, as applicable.

crippling the Debtors' businesses (right before the holiday and post-holiday peak seasons), and destroying enterprise value. Without the interim relief that was ultimately obtained on November 6 and 21, this would have been devastating to all stakeholders.

8. Merely obtaining the interim relief has not been enough to stabilize the Debtors' businesses. Since the Petition Date, as a direct result of the relentless attacks on the Motion by the Second Lien Term Loan Lenders and HoldCo Lenders, the Debtors' relationships with their vendors have been shaken. Certain vendors advised me, members of my team or members of management that they attended the hearings held on November 5 and 6. Among other things, vendors explained to members of management that (a) following the settlement reached at the November 6 hearing to reduce the caps set forth in the Motion (the "November 6 Settlement"), they no longer believed the companies had sufficient relief to pay their claims, (b) they lost faith that the Debtors will be able to continue operating in the ordinary course of business and make payments authorized by the Court, and (c) they are going to cancel or suspend certain joint marketing or exclusivity arrangements they had with the Debtors until there is more clarity as to where these Chapter 11 Cases are heading. In my opinion, obtaining the final relief requested in the Motion is critical to ensuring that the Debtors can withstand inevitable future attacks without doing further damage to their businesses.

9. Any delay making payments to the Critical Vendors described herein, and any disruption to the relationship between the Debtors and the Critical Vendors described herein, would cause irreparable harm to the Debtors' businesses.

10. Importantly, by the final relief, the Debtors are not seeking authority to pay all of their prepetition creditors. Critical Vendors were identified by the management teams as those vendors that would be critical to the ongoing needs of the particular businesses. The Debtors are

not seeking unfettered discretion to pay them. In fact, there is a specific protocol in place to determine whether or not vendors are eligible for Critical Vendor status. The Critical Vendors satisfy one or more of the following criteria:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, to refuse to ship inventory or to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

None of the Critical Vendors selected pursuant to these criteria have executory contracts as of the Petition Date.

11. Similarly, as described further in the First Day Declaration, prior to the Petition Date, the Debtors did not have the resources or time to build a detailed written analysis for each vendor deemed critical to the business. Accordingly, I understand that the Debtors built their list of Critical Vendors using these criteria, with significant input and guidance from their advisors. I believe that to go back and recreate such a detailed record now would not be a good use of

resources, particularly where, in many cases, the professional fees associated with doing so for each Critical Vendor would cost more than the amount owed to such creditor.

12. Additionally, as to the go-forward businesses at PSP, Buddy's, and The Vitamin Shoppe, as mentioned above, the Debtors considered that, without payment of Critical Vendor Claims, critical vendor relationships may be irredeemably impaired and possibly terminated. When vendors refuse to ship products, the Debtors need to pay the prepetition claim to release the goods, pursue litigation to compel the vendors to continue performing under its contractual obligations. The Debtors urgently need product shipped to their stores. In light of the holiday season, the Debtors do not have the luxury of time, or the availability of resources, to pursue litigation against each of the vendors who have stopped shipping in an effort to resume product shipping. As such, in many situations, the Debtors' only recourse is to pay the prepetition claims to ensure prompt delivery of products to their more than 2,200 retail locations.

13. As to American Freight, I am advised that payment to certain software and marketing providers that were deemed to be Critical Vendors has been imperative to ensuring that the value of the collateral that is set to be liquidated by the end of 2024 does not erode. For example, the American Freight business might not be able to reach its customers if the Debtors are unable to pay certain major search engine and social media company vendors, which have one-of-a-kind data and customer access. After a cost-benefit analysis, the Debtors determined that it would be valuable to pay for such services throughout the winddown process. In my view, it is not worth the time or effort to conduct a profitability analysis for these vendors, given that they are irreplaceable in light of their highly recognizable brands. Without them, the Debtors would simply have lost a key access point to their customers.

**Shippers & Logistics Providers**

14. The Debtors' ability to sell their products depends on a seamless interaction with various Shippers & Logistics Providers to transport and store products. The Shippers & Logistics Providers regularly possess products belonging to the Debtors in the course of storing, transporting, and delivering, and have the ability to hold those products if they are not paid. The refusal of Shippers & Logistics Providers to deliver or return the Debtors' goods as a result of not being paid would severely disrupt the Debtors' operations and potentially cost the Debtors a substantial amount of revenue and future business.

15. Some Shippers & Logistics Providers are subject to executory contracts executed with the Debtors. Nonetheless, I believe it is important to pay the vast majority of such vendors' claims in accordance with the terms outlined in the Motion. While I understand it is possible that the Debtors could bring action against such Shippers & Logistics Providers, to seek to compel them to comply with contractual obligations, given the cost in pursuing such relief, the likely delay in obtaining such relief, and the pyrrhic victory that may result even if the Debtors ultimately succeed in compelling performance, including, among other things, discouraging such vendors from working with bidders for the Debtors' assets or the Debtors following emergence from bankruptcy, as the case may, I believe it is in the best interest of the Debtors' estates to have the authority to satisfy Shippers & Logistics Providers Claims in an exercise of the Debtors' business judgment. Accordingly, I believe it is essential that the Debtors obtain the authority to satisfy the Shippers & Logistics Providers Claims held by vendors with contracts in accordance with the Motion.

16. Furthermore, paying such Shippers & Logistics Providers for the PSP, Buddy's, and The Vitamin Shoppe Debtors is a "no-brainer," particularly in light of the holiday season. In

my opinion, the Debtors can hardly afford to have empty shelves at a time with seasonally large sales volumes.  Likewise, while the American Freight Debtors are currently undertaking going-out-of-business sales and liquidating, not paying these vendors the amounts necessary to release the goods lengthens the American Freight Debtors' liquidation process and would be value destructive.  Indeed, the longer the Debtors need to liquidate, the more expensive the collateral becomes due to the incurrence of administrative expenses.  Furthermore, the American Freight Debtors will achieve lower profits as delay requires the Debtors to more deeply discount their inventory.  Given the circumstances, the American Freight Debtors' intention to pay their vendors the amounts necessary to release items and then liquidate these according to the Court-approved Store Closing Procedures represents an exercise of the Debtors' sound business judgment.

17.     The American Freight Debtors also analyzed the value in paying Shippers & Logistics Providers Claims in light of their winddown plans.  In consultation with AlixPartners and their other advisors, the American Freight Debtors determined that the value in paying to release goods from certain Shippers & Logistics Providers—particularly goods that had already been ordered—was worth pursuing to avoid having possessory or statutory liens asserted on their property.  I believe there would not have been value in analyzing the potential profits that could be gained by paying these vendors' claims; any profit would go to paying down the obligations owed under Debtors' ABL Facility and would deleverage the business.

### 503(b)(9) Claims

18.     The Debtors have received certain goods from various 503(b)(9) Providers within the twenty (20) days before the Petition Date.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts, or are governed by a master purchase agreement, which does not obligate the 503(b)(9) Provider to enter into subsequent purchase

orders. Rather, the Debtors often obtain products on an order-by-order basis. As a result, a 503(b)(9) Provider may refuse to supply new orders without payment of its prepetition claims. Certain 503(b)(9) Providers have already demanded payment in cash on delivery, further exacerbating the Debtors' liquidity problems.

19. It is my understanding that 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan, and that the timing of such payments is left to the Court's discretion. Based on my experience in other retail cases, I believe that the Debtors' chapter 11 process—whether it is conducted through a sale or an equitization of debt—will conclude in a confirmable chapter 11 plan. Accordingly, the payment of 503(b)(9) Claims is merely a question of timing. For the PSP, Buddy's, and The Vitamin Shoppe Debtors, paying the 503(b)(9) Claims now would be value-accretive to the businesses: paying such vendor claims early in the case ensures that the Debtors get continued trade terms and continued delivery of goods, which has the follow-on effect of having fully-stocked stores and revenue generation. By contrast, not paying such vendor claims early in the case may result in 503(b)(9) Providers requiring cash-on-delivery terms or altogether halting shipments or fulfillment of new orders. In fact, this is precisely what occurred following the November 5 hearing, and what would have occurred if the first Interim Order had not been entered on November 6 or the second Interim Order, on November 21. In my opinion, another standstill in business like what occurred in the afternoon on November 5 would be detrimental to the go-forward businesses.

\*   \*   \*

20. There is ample support to grant the Debtors' request to pay critical vendors, foreign vendors, shippers & logistics providers, and 503(b)(9) claimants. The relief requested in the

Motion reflects the Debtors' business judgment.  As such, I believe that the relief requested in the Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

| | |
|---|---|
| December 6, 2024 | /s/    *David Orlofsky* |
| | David Orlofsky<br>Chief Restructuring Officer |