# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (JTD)<br><br>(Jointly Administered)<br><br>Ref. Docket Nos. 10, 129, 217, 277 (sealed) & 278 (sealed) |

**DEBTORS' REPLY IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY
CERTAIN PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS, FOREIGN
VENDORS, SHIPPERS & LOGISTICS PROVIDERS, AND 503(B)(9) CLAIMANTS;
AND (II) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby file this reply (this "Reply") (a) in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

*Certain Critical Vendors, Foreign Vendors, Shippers & Logistics Providers, and 503(b)(9) Claimants; and (II) Granting Related Relief* [Docket No. 10] (the "Motion"),[2] and (b) in response to the objection filed by the Freedom Lender Group[3] [Docket No. 278] (the "Objection"). In support of this Reply, the Debtors rely on the First Day Declaration, the testimony submitted at the First Day Hearing and the Emergency Hearing (as defined below), and the *Supplemental Declaration of David Orlofsky in Support of Critical Vendor Motion* [Docket No. 339] (the "Supplemental Declaration"). The Debtors further respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Freedom Lender Group is taking aim at the relief requested in the Motion for a third time. The Debtors have twice successfully rebutted the Freedom Lender Group's arguments—the same ones raised in the Objection. This time should be no different.

2. The Freedom Lender Group spends the majority of its Objection outlining legal standards that do not apply to the relief requested in the Motion and second-guessing the Debtors' business judgment. In the business judgment of the *Debtors*—the relevant decisionmaker for this inquiry—the vendors covered by the Motion are supplying goods and services that are critical to the continuation of the Debtors' businesses and, as a result, the payment of such vendors benefits all stakeholders. Contrary to the Freedom Lender Group's argument, the Court is not required to examine every claim that the Debtors elect to pay on a vendor-by-vendor basis. Rather, the Court must determine that such payments are necessary to protect and preserve the estate, and that there is a sound business purpose for making such payments. For Critical Vendor Claims—as opposed to 503(b)(9) Claims and Shippers & Logistics Claims, this Court need only be satisfied with a

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3] As defined in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229].

showing that the Debtors have an appropriate protocol in place to identify vendors that are truly critical to their businesses. That selection protocol is explained in detail in the Motion and supported by the affirmations in the First Day Declaration that the Debtors intend only to pay truly critical vendors. As to 503(b)(9) Claims, the Court need only find, in its discretion, that payment of such claims now is appropriate. Even though the Debtors have met their burden as to each of the different categories of vendor claims, the Debtors nonetheless are providing detailed reporting regarding <u>all</u> payments under the Motion to all of the key constituencies in this case. As of the date of the filing of this Reply, the Freedom Lender Group—as well as the DIP Lenders, the Ad Hoc Group of First Lien Lenders, the ABL Lenders, and the Official Committee of Unsecured Creditors—has received four critical vendor reports, and a fifth will be sent prior to the hearing on this matter. No party has objected to these reports.

3. Absent approval of the Motion on a final basis, the Debtors will be unable to pay prepetition vendors. The loss of these relationships could cripple the Debtors' businesses and destroy enterprise value to the detriment of all stakeholders, including the Freedom Lender Group.

## **RELEVANT BACKGROUND**

4. On the Petition Date, the Debtors filed the Motion, seeking authority, but not direction, to pay up to $77.65 million of prepetition Critical Vendors Claims, Foreign Vendors Claims, Shippers & Logistics Providers Claims, and 503(b)(9) Claims on an interim basis, and $99.7 million on a final basis.

5. At the First Day Hearing, the Freedom Lender Group raised the first of its unfounded attacks on the requested relief, covering much of the same ground as is in its Objection. In equal parts, the Freedom Lender Group stated that the only purpose of paying Critical Vendors

3

was to support an outsized DIP Facility[4] and implied that the Debtors had no rational basis to pay 503(b)(9) Claims.[5] After hours of cross-examination of the Debtors' witnesses, the Debtors resolved the objection by agreeing to reduce the requested interim relief to $65 million. The Debtors further agreed to use only $35 million upon entry of the interim order, reserving all rights to request the remaining $30 million pursuant to a second interim order if and when needed. The Freedom Lender Group indicated that this was acceptable to them. *See* Exhibit A, *Declaration of Betsy L. Feldman in Support of Debtors' Reply in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors, Foreign Vendors, Shippers & Logistics Providers, and 503(b)(9) Claimants; and (II) Granting Related Relief*, filed concurrently herewith. On November 6, 2024, the Court overruled the Freedom Lender Group's objection and entered an order approving the Motion on a first interim basis [Docket No. 129] (the "First Interim Order").

6. On November 14, 2024, the Debtors informed counsel to the Freedom Lender Group of the need for the additional interim relief that had been agreed to at the First Day Hearing. Later that day, the Debtors filed a proposed form of second interim order [Docket No. 176]. *See* Exhibit 1, *Declaration of Brett Bakemeyer in Support of the Objection of the Ad Hoc Group of Freedom Lenders to Final Approval of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors, Foreign Vendors, Shippers & Logistics Providers, and 503(b)(9) Claimants; and (II) Granting Related Relief* [Docket No. 278] (sealed) ("Bakemeyer Declaration"). Reneging on its agreement at the First Day Hearing, and despite the extensive testimony at the First Day Hearing, the Freedom

---

4   See Hr'g. Tr. 151:16-19, In re Franchise Group, Inc. et al. (Nov. 5, 2024) [hereinafter "Nov. 5 Tr."].
5   Nov. 5 Tr. 151:4-7.

4

Lender Group began demanding extensive informal discovery to support the need for relief under the Motion. *See* Exhibits 2-5, Bakemeyer Decl. The Debtors hosted a call among the White & Case team, the Willkie team, and the AlixPartners team (including Chief Restructuring Officer David Orlofsky) on November 18, 2024 to address the White & Case team's questions, and also supplied the following additional information:

- examples of letter agreements that were sent to the vendor community;

- a breakdown of payments (both actual and projected) by business line to the Shippers, Foreign Vendors, Merchandise Suppliers, and Other Critical Vendors;

- a breakdown of payments (both actual and projected) by business line to the 503(b)(9) Claims, broken down by the types of vendors noted in the Motion; and

- a profitability analysis regarding the Critical Vendor and 503(b)(9) Claims proposed to be paid in the American Freight cases.

Notwithstanding this additional information, the Freedom Lender Group informed the Debtors that it was not supportive of the request for the second interim relief for the same reasons that it opposed the First Interim Order.

7. At the request of the Debtors, the Court held an emergency hearing on November 21, 2024 (the "Emergency Hearing") to consider the request for the second interim relief. Twenty minutes prior to the start of the Emergency Hearing, the Freedom Lender Group agreed to drop its objection to the $31 million portion of the proposed $35 million second interim cap earmarked for payments to critical vendors of Pet Supplies Plus, The Vitamin Shoppe, and Buddy's, as long as the Debtors read an agreed-upon reservation of rights into the record. Debtors' counsel did so at the start of the hearing.[6] The Freedom Lender Group then made a number of inappropriate remarks

---

[6] Hr'g. Tr. 6:21-7:2, In re Franchise Group, Inc. et al. (Nov. 21, 2024) [hereinafter "Nov. 21 Tr."].

in response, including reserving rights to unwind payments already made to vendors,[7] implying that the Debtors are not properly administering their Chapter 11 Cases,[8] and suggesting that the Debtors are using the bankruptcy process solely to benefit their DIP lenders.[9] Following argument by counsel, the Court overruled the Freedom Lender Group's objection to the remaining $4 million relating to payments of critical vendors of American Freight, finding that the Debtors would face irreparable harm without the requested relief[10] and that the Debtors' business judgment was sound.[11] The Court entered an order approving the Motion on a second interim basis [Docket No. 217] (the "Second Interim Order").

8. After the First Day Hearing, the Debtors noticed a palpable change of tone from their vendor base: it rapidly became clear that the comments made on the record shook their vendors' confidence in the payments previously made pursuant to this Court's orders and the Debtors' ability to operate in the ordinary course of business during these Chapter 11 Cases without a litigation overhang. See, e.g., Hr'g Tr. 85:18-87:6, In re Franchise Group, Inc. et al. (Nov. 6, 2024) [hereinafter "Nov. 6 Tr."] (Mr. Orlofsky's testimony summarizing the Debtors' injuries following the conclusion of the First Day Hearing on November 5, 2024, including vendors cutting off product and shipment). The events of the Emergency Hearing did not help these challenged vendor relationships. It is ironic that the Freedom Lender Group now purports

---

[7] See Nov. 21 Tr., 27:3-27:9.

[8] Nov. 21 Tr., 27:9-11.

[9] Nov. 21 Tr., 29:12-30:3.

[10] Nov. 21 Tr., 33:15-21.

[11] See Nov. 21 Tr., 33:22-34:5.

to "not wish to impair the Debtors' business operations or diminish their prospects for reorganization," because their actions and words suggest otherwise. Obj. ¶ 4.[12]

## REPLY

9. There is no legal requirement for a debtor to disclose the litany of items the Freedom Lender Group asserts is necessary on a vendor-by-vendor basis to justify critical vendor relief. Objection ¶ 19. Rather, as discussed in the Motion in further detail, it is appropriate for courts to authorize the payment of prepetition obligations, including payments to prepetition vendors, where necessary to protect and preserve the estate. See, e.g., Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973, 985 (2017) (noting that courts "have approved . . . 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices"). Courts routinely rely on sections 105(a), 363(b), 363(c), and 503(b)(9) of the Bankruptcy Code to grant this relief. The Debtors have already met these standards and are not required to present further evidence.[13]

---

[12]  See Exhibits 1, 2, Bakemeyer Decl. (revealing specific critical vendors that had been paid pursuant to the first day order, which prompted other vendors to demand critical vendor relief).

[13]  It is well-settled law that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; see also Duquesne Light Co. v. Westinghouse Elec. Corp., 66 3d. 604, 609 (3d Cir. 1995) (Rule 403 "allows judges to exclude even relevant evidence because of 'considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'"); In re City of Bridgeport, 128 B.R. 589, 590 (Bankr. D. Conn. 1991) ("Rule 403 provides that the court may exclude evidence which consumes more time than its probative value justifies"). In addition, Rule 611(a) instructs courts "to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to avoid needless consumption of time." United States v. Faines, 216 Fed. Appx. 227, 231 n.6 (3d. Cir 2007) (quotations and citations omitted). Here, requiring the Debtors to present any further evidence to justify the Motion would unnecessarily waste the Debtors' limited assets and result in the needless presentation of cumulative evidence. The professional fees alone of establishing a detailed evidentiary record for each Critical Vendor, Foreign Vendor, Shipper & Logistics Provider, and 503(b)(9) Provider would, in many cases, cost more than the amount owed to such creditor. Furthermore, for such evidentiary record to be useful, it would require comparison to the entire vendor population, which is over 6,000 vendors. Surely the Freedom Lender Group agrees that it preferable to use the Debtors' resources to maintain the value of their collateral than pay professionals to defend against the same arguments *ad nauseum*.

**I.    The Doctrine of Necessity Under Section 109(a) of the Bankruptcy Code Supports Payment of the Critical Vendor Claims.**

10. Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses.  See In re Just for Feet, 242 B.R. 821, 825 (D. Del. 1999).  Courts use the power given to them under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "doctrine of necessity."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).  Under the doctrine of necessity, the Debtors must demonstrate that the payment of the claims is "essential to the continued operation of the debtor."  Just for Feet, 242 B.R. at 824–25.

11. For example, in the Just for Feet case cited by the Freedom Lender Group, the debtors filed a motion seeking authority to pay all of their prepetition trade vendors, but only provided evidence sufficient to show that certain categories of trade vendors (as opposed to each individual vendor) were truly critical.  Id. at 824, 826.  There, the court held that those broad categories of trade vendors, such as athletic footwear and apparel vendors, were "essential to the survival of the debtor during the chapter 11 reorganization."  Id.  The court granted the motion, approving categories of payment that it found critical and necessary, but did not require evidence as to each individual vendor nor the amount of each individual payment.  See id.

12. Likewise, in the Kmart case that the Freedom Lender Group finds instructive, the Seventh Circuit did not hold that the debtors must present evidence on a vendor-by-vendor basis.  In re Kmart Corp., 359 F.3d 866, 868 (7th Cir. 2004).[14]  Rather, the Seventh Circuit held that "the

---

[14] Neither the Third Circuit nor any courts in this District have adopted Kmart.  The Freedom Lender Group cites In re GVM, Inc., 606 B.R. 220, 226-28 (Bankr. M.D. Pa. 2019), noting that the United States Bankruptcy Court for the Middle District of Pennsylvania has adopted the Kmart court's standard for approval of payments to critical vendors.  However, the GVM court did not adopt Kmart for its holding that a debtor must provide support for its

8

debtor must *prove*, and not just allege" that vendors would cease dealing with the debtors. Id. (emphasis in original). The Seventh Circuit "did not answer . . . how the debtor must go about proving that the vendor would cease doing business with the debtor absent payment of its prepetition claim." In re Murray Metallurgical Coal Holdings, LLC, 613 B.R. 442, 453 (Bankr. S.D. Ohio 2020). The Murray Metallurgical court—which is the only court that has actually considered how the Kmart standard works from a practical perspective—held that a debtor can meet this burden by establishing "a protocol under which it will pay any particular creditor's prepetition claim only if, among other things, the creditor refuses to provide essential products or services to the debtor if its prepetition balance is not paid." Id.

13. As discussed in the Motion, the Debtors employed a detailed protocol to evaluate their vendor relationships to determine which vendors were critical. The Debtors considered a variety of factors in examining each of their vendor relationships, including:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

---

requested "critical vendor relief" on a vendor-by-vendor basis. Furthermore, the ruling in GVM is merely persuasive (as opposed to binding) authority for this Court.

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, to refuse to ship inventory or to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

Motion ¶ 32. These factors not only include, but also go well beyond, the one that Murray Mettallurgical cited to ("whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, to refuse to ship inventory or to provide critical services on a postpetition basis").

14.  Importantly, under Murray Metallurgical, the Debtors' protocol does not need to expressly obligate them to "negotiate with their supposed critical vendors and identify *only* those who refuse to continue doing business with the Debtors absent payment of prepetition claims" (Obj. ¶ 24); "identify the terms upon which those vendors would transact and confirm that such terms are worse for the Debtors' estates" (Obj. ¶ 25); "ensure if they are to pay prepetition unsecured claims that their disfavored creditors will be at least as well off as they would be if the payments are not made" (Obj. ¶ 25 (citing Kmart, 359 F.3d at 874)); or "offer their preferred creditors reasonable economic accommodations to ensure future payment" (Obj. ¶ 26). Obligating the Debtors to meet these standards would "preclude[] [the] Debtors who actually do have good working relationships with their vendors [from] managing that situation, and creat[e] the type of disruption that this rule is intended to prevent." Tr. of Hrg. at 109, In re Windstream Holdings, Inc., Case No. 19-22312 (Bankr. S.D.N.Y. Apr. 16, 2019). In Windstream, an unsecured creditor objected to the debtors' critical vendor relief, arguing that: (i) the Bankruptcy Court should have determined critical vendor status, not the Debtors; (ii) the Debtors were required to disclose the identities of the critical vendors; and (iii) the Bankruptcy Court failed to impose or identify a

permissible standard for determining which creditors were critical vendors. The court heard testimony from the debtors' consultant about potential harms to the business absent the requested relief and what criteria were used to identify critical vendors, including checking on the availability of other vendors who could have provided the same goods or services. The bankruptcy court granted the requested final critical vendor relief. The court found that the debtors had established a proper framework to determine who was critical to the business.

15. Here, the Debtors established a framework for determining who is a Critical Vendor in the Motion. See Motion at 15–16 (enumerating eight factors that the Debtors considered in examining their vendor relationships for purposes of identifying critical vendors, along with "the status of each vendor relationship, the vendor's familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be otherwise satisfied as part of the chapter 11 process."); see also Supplemental Decl. ¶¶ 10-13. At the November 6 hearing, Mr. Orlofsky also described how critical vendors are selected: "unique product," products that are "small in nature." Nov. 6 Tr. 76:17-77:4. Contrary to the Freedom Lender Group's assertion in the Objection (Obj. ¶ 29), the Debtors have established a more-than-sufficient evidentiary record in support of their proposed protocol. The Debtors respectfully request that the Court overrule the Objection on the grounds that the Debtors have met their burden.

**II. The Business Judgment Rule, as Applied Under Section 363(b) of the Bankruptcy Code, Supports Payment of the Critical Vendor Claims.**

16. Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so. See, e.g., Ionosphere Clubs, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); contra Nov. 21 Tr. 29:13-18 (Mr. Shore: "I disagree that 363(b) authorizes

management, in their business judgment, to pay prepetition claims . . ."). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

17. The Debtors have amply supported their business justification to honor prepetition Critical Vendor Claims:

- As set forth in the First Day Declaration, "the requested authority to pay the Critical Vendors Claims, Foreign Vendors Claims, Shippers & Logistics Providers Claims, and 503(b)(9) Claims subject to the applicable caps set forth in the Critical Vendors Motion is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption. The relief requested in the Critical Vendors Motion is also necessary to preserve and maximize value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise." First Day Decl. ¶ 130.

- As Mr. Orlofsky also testified at the First Day Hearing, failure to pay critical vendors to the Pet Supplies "Plus," The Vitamin Shoppe, and Buddy's Debtors results in vendors "put[ting] you on things like [cash-on-delivery ("C.O.D.")] or stop shipping, which unfortunately, is kind of what's happened over the last, you know, 72 hours since we filed bankruptcy."[15] The consequences of being put on C.O.D. terms is, "Besides the trade contraction and the potentially higher payment amount, it's also disruptive. That's not the way most companies like to operate. And it's also, you know, some vendors won't even ship you on C.O.D.; some of them will just stop. They are not required to keep shipping you."[16] The effect on revenue when vendors impose C.O.D. terms or simply don't ship is "lower sales to the business, less repeat customers. . . . They tend not to come back when product isn't there. . . . You tend to lose them in sales and then, ultimately EBITDA, and then, you know, kind of falling through the waterfall, ultimate, you know, enterprise value will decline over time if you can't, you know, arrest that slide."[17]

- As Mr. Orlofsky further testified, the Debtors sought to pay certain 503(b)(9) Providers and Shippers & Logistics Providers for American

---

[15] Nov. 6 Tr. 79:9-12.

[16] Nov. 6 Tr. 80:11-16.

[17] Nov. 6 Tr. 81:3-14.

12

> Freight to avoid the risk that their goods would be reclaimed (in the case of the 503(b)(9) Providers) or in limbo in a warehouse (in the case of the Shippers & Logistics Providers), as doing so would maximize the proceeds from the going out of business sales and a store closing process.[18]

- In addition to the reporting required under the First Interim Order, the Debtors provided at least two updates on November 14 and November 17 about what had been paid under the First Interim Order to date (broken down by vendor and by Debtor). Exhibits 1, 2, Bakemeyer Decl.

- On November 17, the Debtors also provided (i) what was being proposed to be paid with the requested second interim amount (broken down by vendor and by Debtor), and (ii) an explanation that none of the vendors were party to executory contracts with the Debtors. Exhibit 2, Bakemeyer Decl.

- On November 19, the Debtors provided an analysis of projected payments (i) showing breakout by category and operating business, and (ii) showing a breakout of 503(b)(9) amounts versus critical vendor amounts, by operating business. Exhibit 3, Bakemeyer Decl.

- On November 21, the Debtors provided a detailed analysis of the American Freight claims paid pursuant to the First Interim Order, the size of their prepetition claim, the business purpose of the creditor, and the reason for payment. Exhibit B, Feldman Declaration.

### III. Immediate Payment of 503(b)(9) Claims Is Appropriate.

18. The Freedom Lender Group asserts that immediate payment of Section 503(b)(9) claims is not needed, and that using the DIP Facility to pay them is not warranted. Obj ¶¶ 27–28. Contrary to the Freedom Lender Group's assertions, payment of these claims is within the Court's discretion.

19. **Immediate Payment.** The timing of payment for administrative expenses does not require proof that "immediate payment . . . is necessary (a) to preserve their ability to restructure, and (b) avoid immediate irreparable harm to their businesses." Obj. ¶ 28. The Freedom HoldCo Lenders cite no source for requirement. Actually, whether to require immediate payment of an

---

[18] See, e.g., Nov. 21 Tr. 7:3-17.

allowed administrative expense is a matter left to the discretion of the bankruptcy court. In re Garden Ridge Corp., 323 B.R. 136, 143 (Bankr. D. Del. 2005). Courts in this jurisdiction have identified three factors that guide that discretion: (i) the prejudice to the debtors; (ii) the hardship to the claimant; and (iii) potential detriment to other creditors. Id.; see also In re Global Home Products, LLC, Case No. 06-10340 (KG), 2006 WL 3791955, *4 (Bankr. D. Del. Dec. 21, 2006).

20.     None of the cases cited by the Freedom Lender Group apply their artificially heightened standard. For example, in In re NE Opco, Inc., 501 B.R. 233 (Bankr. D. Del. 2013), the Court actually relied on the three Garden Ridge factors—not the preservation of restructuring abilities, or the avoidance of immediate irreparable harm. Obj. ¶ 28. The NE Opco, Inc. court expressly held that the record showed that requiring immediate payment would unduly prejudice the debtors, *i.e.*, that the second Garden Ridge factor mitigated against immediate payment. NE Opco, Inc., 501 B.R. at 259. Similarly, in Global Home Products, the court also applied the Garden Ridge factors, finding that the prejudice in making the debtors pay a prepetition claim far outweighed the prejudice to the creditor. Finally, in Matter of Cont'l Airlines, Inc., 146 B.R. 520, 531 (Bankr. D. Del. 1992), the Court relied on its discretion to determine that there was no need for "exceptional" immediate payment of a creditor's 503(b)(9) claim. Each of these cases was presented as a request for immediate allowance and payment of an administrative expense claim, which presents a different fact pattern than when debtors, as here, are affirmatively seeking to make immediate payment.

21.     The Debtors have met the Garden Ridge standards. At the First Day Hearing, in response to why it would be important to pay its critical vendors within a reasonably short period of time, Mr. Orlofsky testified that, "If you don't pay [vendors] they put you on hold and they

don't send you product.  If you don't have product, . . . people will stop coming to your stores."[19]  The balance of harms tips in favor of paying 503(b)(9) Claims immediately because the Debtors would otherwise suffer significant prejudice.  These payments are not being made at the expense of other creditors, as the payment of the 503(b)(9) Claims preserves the Debtors' enterprise value for the benefit of all stakeholders.  Mr. Orlofsky went on to say that not paying critical vendors within a reasonable period of time would be "bad for the business.  It's bad for the enterprise value.  And if it goes on for too long, you know, you are kind of looking at more situations where you have to potentially liquidate the business as opposed to reorganize the business."[20]

22.     **DIP Facility.**  Separate from the issue of when timing of payment is warranted, the Freedom Lender Group also attempts to impose a higher standard on the Debtors with regard to why the DIP Facility should not be used to pay 503(b)(9) Providers.  Obj. ¶ 27 ("using extremely expensive borrowed money").  The Freedom Lender Group argues that use of the DIP Facility must be "necessary or valuable to the Debtors' estates."  Id.  This is not the correct standard, and again, the Freedom HoldCo Lenders cite no source.  The two cases that the Freedom HoldCo Lenders cite are inapposite.

23.     In In re MTE Holdings LLC, a creditor requested allowance and immediate payment of an administrative claim for post-petition consulting work.  Case No. 19-12269 (CTG), 2021 WL 2258270, at *1 (Bankr. D. Del. June 2, 2021).  The case analyzes the legal standards for establishing entitlement to an administrative claim (id. at *5-8) and the legal standards for immediate payment (id. at *8).  But the case does not discuss permissible sources of funding for administrative claims.

---

[19]   See Hr'g. Tr. 117:21-118:7, In re Franchise Group, Inc. et al. (Nov. 5, 2024) [hereinafter "Nov. 5 Tr."].
[20]   Nov. 5 Tr. 118:19-25.

24. In NE Opco, Inc., on request of a creditor for allowance and immediate payment of an administrative claim for the electricity and natural gas it provided to the debtors in the 20-day period before the bankruptcy case, the court considered whether electricity and natural gas were "goods" for purposes of section 503(b)(9) of the Bankruptcy Code. The court also considered the timing of payment. Here, the court was not persuaded by the creditor's evidence to support the need for immediate payment and did not find that the balance of harms tipped in favor of the creditor. Again, the case does not discuss permissible sources of funding for administrative claims.

25. The legal standard for payment of an administrative expense does not consider where the funds used to pay the claim have come from.[21] Here, the DIP Facility can be used "to pay the administrative costs of the Chapter 11 Cases (including professional fees and expenses) and the Transactions." DIP Cr. Agr. § 3.16(b). Accordingly, it is of no moment that the Debtors may use DIP funding to pay 503(b)(9) Claims.

### IV. Payment of the Shippers & Logistics Providers Claims Is Well Within the Debtors' Discretion.

26. Last, the Freedom Lender Group imposes two legal theories on the payment of Shippers & Logistics Providers that ignore the underlying fact that makes these claimants distinct: they hold or could perfect possessory liens on the Debtors' goods. First, the Freedom Lender Group suggests that any Shippers & Logistics Providers need not be paid under the Motion because they are parties with contracts that simply must be compelled to perform. Obj. ¶ 32. Second, the Freedom Lender Group suggests that the automatic stay under section 362 can compel such parties to refrain from exercising control over estate property. Obj. ¶¶ 33–34. However, in practice,

---

[21] Nor does such a payment using DIP funds require any of the other things the Freedom Lender Group purports are required to justify the payment, i.e., proof on a claimant-by-claimant basis; a showing that, absent payment, the creditor will stop transacting; a showing that the creditor is a sole-source provider or that it has been afforded reasonable financial accommodation; or support that the claim is indeed eligible for treatment as a 503(b)(9) Claim. Obj. ¶ 2.

neither of these legal theories stands up to the reality that, if the Debtors' goods are in a warehouse not in their immediate possession, the Debtors have only three realistic options: pay the prepetition claim to release the goods, embark on a potentially costly path of compelling the warehouseman to perform on its contractual obligations, or deal with the consequences of the warehouseman asserting a lien on such goods or proceeds thereof in an attempt to secure payment of their prepetition claim. See 11 U.S.C. § 362(b)(3) (the act of perfecting a lien, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay).

27. Even if the Debtors were to compel contractual performance, warehousemen could still decline to deliver the goods on account of a perfected possessory lien. For example, Article 7 of the Uniform Commercial Code governs warehouse liens on goods in its possession, and a warehouse may have a specific or general lien on goods it is storing. U.C.C. § 7-209. A warehouse may be entitled to adequate protection in the form of a possessory lien, and warehouses may refuse to release property in their possession before prepetition claims are paid and the liens are redeemed.[22] Thus, paying prepetition claims of such Shippers & Logistics Providers and recovering the goods from such providers is sometimes the only realistic path forward and has valid business justifications. See, e.g., First Day Decl. ¶ 135 ("the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets").

**V.    Payments Made Pursuant to the Motion Are Subject to Significant Oversight.**

28. The Debtors' payments to prepetition vendors are subject to significant oversight from various parties in interest, including, among others, the Freedom Lender Group. These parties include the ABL Lenders, the Ad Hoc Group of First Lien Lenders, the Official Committee

---

[22] Diane Lourdes Dick, Article 7 Meets Chapter 11: Exploring the Debtor's Request to Pay Prepetition Claims of Shippers and Warehouses, Comm. Law World, Jan./Feb./Marc. 2017, at 31.

of Unsecured Creditors,[23] and the U.S. Trustee. All of these parties are incentivized to keep payments to critical vendors to only those that are absolutely necessary because their recoveries (or those of the constituents they represent) all stand to be diminished following payment of Critical Vendor Claims, Foreign Vendors Claims, Shippers & Logistics Providers Claims, and 503(b)(9) Claims. To date, these parties have received four reports regarding critical vendors payments on a vendor-by-vendor basis, and a fifth report will be sent prior to the hearing on this matter. And to date, none of these parties other than the Freedom Lender Group has raised any formal objections or informal concerns regarding the payments reflected in the reports.

29. Finally, the Budget specifically contemplates the payment of the Critical Vendor Claims, Foreign Vendor Claims, Shippers & Logistics Providers Claims, and 503(b)(9) Claims. As a condition to the Debtors' DIP Financing, the Debtors have agreed that the proceeds of such financing will be used in a manner consistent with the Budget. Moreover, the First Interim Order, Second Interim Order, and proposed Final Order all include provisions that subject all payments made under the Motion to the Budget. See, e.g., First Interim Order ¶ 20. Thus, there is no need for additional oversight from a junior creditor whose interests are adequately protected by the other overseeing parties. The conditions set forth in paragraph 37 of the Objection are overly burdensome, unnecessary, and inappropriate.

## VI. The Relief Requested Is Appropriately Tailored.

30. Finally, the "comparable" cases that the Freedom Lender Group collected to demonstrate that the relief requested is outsized (Obj. ¶ 30) are misleading because they do not delineate how much of the relief relates to critical and foreign vendors, shippers and logistics

---

[23] Importantly, certain of the members of the Committee operate regularly in the retail space and have extensive knowledge of how crucial vendor payments are to the Debtors' businesses (and which vendor payments are most crucial).

providers, and 503(b)(9) claimants.  As discussed above, the distinction between these categories is relevant, as the legal basis for paying such claims differs.

31.     Here, 503(b)(9) Claims accounted for 64% of the requested interim relief[24] and 58% of the requested final relief.  By contrast, Critical Vendors accounted for 20% of the requested interim relief[25] and 26% of the requested final relief.  In comparison to the approximately $150 million of prepetition trade payables outstanding which included $106 million of invoiced accounts payable and an estimated additional $44 million of uninvoiced accounts payable, the requested relief for the Critical Vendor Claims is well within the ranges collected by the Freedom Lender Group, representing only approximately 9% of the total outstanding trade being paid on an interim basis and approximately 17% of the total outstanding trade being paid on a final basis.

[*Remainder of Page Intentionally Left Blank*]

---

[24]    As revised following the settlement reached at the First Day Hearing.

[25]    As revised following the settlement reached at the First Day Hearing.

WHEREFORE, the Debtors respectfully request that the Court (a) overrule the Objection, (b) enter the proposed Final Order, and (c) grant such other and further relief as this Court deems just and appropriate.

Dated: December 6, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
Betsy L. Feldman (Del. No. 6410)
Joseph R. Brandt (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com
jbrandt@willkie.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*