## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 51, 134, 274 & 308** |

### DEBTORS' REPLY IN SUPPORT OF MOTION FOR
### POSTPETITION FINANCING AND USE OF CASH COLLATERAL

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") hereby file this reply (the "Reply") in further support of the *Debtors' Motion for Entry*

*of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming*

*Superpriority Postpetition Financing, and (B) Use Cash Collateral, (II) Granting Liens and*

*Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

*Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 51] (the "Motion")[2] and in response to the objection of the Ad Hoc Group of Freedom Lenders (the "Freedom Lenders") to the Motion [Docket No. 274] (the "Objection"), the supplemental objection [Docket No. 308] (the "Supplemental Objection", and together with the Objection, the "Objections"), and the limited objection of Curbline Properties Corp., First Washington Realty, GCP Boom LLC, JLL Property Management (Franklin Mall), and Regency Centers, L.P. (collectively, the "Landlords") [Docket No. 305] (the "Landlords Objection" and together with the Objections, the "DIP Objections").  The Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      Since day one of these Chapter 11 Cases, the Freedom Lenders have engaged in a relentless and quite often specious litigation campaign against the Debtors and their restructuring path.  To distract, obfuscate and burden the estates with additional expense, they have managed, in just the first few weeks of the cases, to engage in a two-day contested hearing, have sought depositions and myriad document discovery, have sought to wrest control of these cases from the Debtors' fiduciaries through a motion to terminate exclusivity, lift the automatic stay or appoint a chapter 11 trustee for the HoldCo Debtors, have objected to a motion to extend time to file schedules and statements, have objected to critical vendor payments, have sought to adjourn the second day hearing and have objected to the Debtors' bidding procedures.  The only purpose of these tactics is to create as much pain and expense as possible to somehow recover on what appears

---

[2]     Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Motion or the DIP Objections, as applicable.

to be an underwater credit position.  Their attacks on the DIP Facility are part and parcel of their litigate-at-all-costs playbook and should be overruled in their entirety.

2.      The truth is, the DIP Facility is the only available path the Debtors have to a successful reorganization.  If any value exists for the Prepetition Second Lien Lenders, or for the OpCo equity that is the only meaningful asset of the HoldCo Debtors, then the DIP Facility is the only way to preserve that potential value.  To date, the Freedom Lenders have not offered a debtor-in-possession facility that could replace the DIP Facility,[3] despite the fact that they have been aware of and involved in negotiations around the Debtors' restructuring for months.  Neither has any other current participant in the Debtors' capital structure.  Nor has any third party lender. There is one and only one option available that provides sufficient liquidity to operate the Debtors' businesses, and that is the DIP Facility.

3.      The Objection, among other things, complains about the amount of professional fees in the budget—which the Freedom Lenders are greatly adding to—and complains about the amount of interest and adequate protection payments in the Approved Budget—again, which they have requested that they be added to, both in their objection and pursuant to the HoldCo DIP Order. If the Freedom Lenders' true purpose was to reduce administrative expenses and lessen the need for $250 million in new money, their activity to date has produced the exact opposite result.

4.      To specifically address the Freedom Lenders' objections to the DIP Facility:

a.      *First* and foremost, the Freedom Lenders' arguments against the DIP Facility on the basis that the HoldCo Debtors should not be guarantors are moot.  The DIP Lenders have agreed that the HoldCo Debtors shall not be obligors under the DIP Facility, except to the

---

[3]      This is true even of their recently proposed HoldCo DIP Order. See Supplemental Obj., Ex. A.  The Debtors have provided the Freedom Lenders with a counter to the terms therein because the existing DIP Facility is a meaningfully better deal for the HoldCo Debtors.

extent of proceeds of the DIP Facility that are transferred to, or otherwise used to make payments

on behalf of, the HoldCo Debtors to fund their ongoing administrative expenses.

        b.     *Second*, it is the Debtors' belief, in their sound business judgment, that

approval of the DIP Facility at this time will bring much-needed stability, confidence and certainty

to these Chapter 11 Cases.  The relief requested in the Final DIP Order would reduce costs and

bring these cases to as swift a conclusion as possible for the Debtors' thousands of constituents,

including their vendors, suppliers, franchisees, landlords, customers, financial creditors and, most

importantly, their nearly 12,000 employees.  Postponing approval of the DIP Facility would only

invite further litigation, incremental costs, and additional distraction from the management of the

Debtors' businesses.

        c.     *Third*, the Debtors sized the DIP Facility conservatively, with the advice of

their financial advisors, to provide breathing room in the event of foreseen and unforeseen

contingencies which may require additional resources.  Prudently, the Debtors determined that

more available liquidity (with modest incremental cost that may ultimately be equitized) is a better

approach to managing their businesses than taking cash down to the wire.  The size of the DIP

projects stability and allows for flexibility as needs arise.  For instance, the Freedom Lenders'

"litigation first" approach will almost certainly cause the Debtors' and DIP Lenders' professionals

to exceed the budgeted professional fees.  The Freedom Lenders wish to substitute their business

judgment for the Debtors.  But, unlike the Debtors, they are not fiduciaries to thousands of other

constituents who would be harmed if the Debtors' projections were incorrect and money ran short.

        d.     *Fourth*, while roll-ups are disfavored, when there is only one game in town

for a DIP facility, they are routinely approved, including in ratios well in excess of 2:1.  Since the

Roll Up in the DIP Facility does not prime any prepetition lenders that are not already behind the

Prepetition First Lien Secured Obligations—particularly as the DIP Lenders have conceded to removing the HoldCo Debtors from the DIP Facility except to the extent those entities are actually benefitting from it, the Roll Up is unlikely to prejudice any of the Debtors' constituents.  As part of a broader package which gives the Debtors the liquidity they need to operate, the Debtors determined in their business judgment that the Roll Up was necessary.

e.      *Fifth*, the Prepetition Second Lien Lenders are adequately protected and their contention otherwise is just a play for the payment of their legal fees to give them a free shot at upending the Debtors' reorganization for their own benefit.  The sheer fact that the DIP Facility allows the Debtors to continue to operate their businesses and provides the time and funds to market the Debtors as a going concern gives the Freedom Lenders their only opportunity to receive a recovery.  Without the DIP Facility, there would certainly be no recovery for holders of prepetition second lien debt, let alone any proceeds flowing up to the HoldCo Debtors.  With the DIP Facility, there is a chance.  If the Freedom Lenders, in their capacity of holders of prepetition second lien loans, can demonstrate that their interest in the DIP Collateral was diminished during these Chapter 11 Cases they will have a super priority administrative expense claim that must be paid for the Debtors to emerge.  The assertion from the Freedom Lenders that somehow undersecured lenders (to the extent value even flows down to them at all) must be paid current interest and fees during a case in order to be adequately protected is not supported by the Bankruptcy Code—and the Freedom Lenders in fact provide case law asserting the opposite.

f.      *Sixth*, the DIP Facility is not a *sub rosa* plan, and this Court has already made that determination.  If the RSA is terminated, the Debtors and any other party in interest may come to this Court on an emergency basis to seek what relief this Court deems appropriate.

g.      *Seventh*, to the extent that the Interim Order was not clear on the point that the adequate protection payments to the First Lien Secured Parties are subject to potential recharacterization, that clarification has been made in the proposed Final Order.

h.      *Eighth*, the provisions including a section 506(c) and 552(b) waiver, the granting of liens on Avoidance Actions proceeds and the waiver of the doctrine of marshaling are all appropriate provisions customarily included as part of a packaged postpetition financing deal that provides the liquidity the Debtors require to reorganize.

i.      *Ninth*, the Freedom Lenders assert that the Debtors must accept any proposal for junior or unsecured financing.  As the Debtors have received no such proposal, this point is moot.  The Freedom Lenders did, just days ago, provide a term sheet for a secured DIP facility for the HoldCo Debtors; however, while the Debtors are still considering such proposal and have delivered a counterproposal to the Freedom Lenders, for the reasons described herein, such proposed facility currently remains inferior to the modified terms on which the DIP Lenders are willing to extend credit to the HoldCo Debtors set forth in the revised Final Order.

5.      Chapter 11 debtors are afforded great deference by courts in the selection of their lenders and the terms upon which they borrow postpetition loans.  That is especially true when, as here, such selection reflects sound and prudent business judgment.  The Freedom Lenders' attempts to redline specific DIP provisions and to substitute the Debtors' business judgment with their own must be overruled.

## **REPLY**

## I.      **THE OBJECTIONS SHOULD BE OVERRULED AND THE DIP FACILITY SHOULD BE APPROVED ON A FINAL BASIS**

6.      The Court should overrule the Objection and approve the DIP Facility on a final basis. As described in the First Day Declaration, the Debtors commenced these Chapter 11 Cases

to address the prepetition challenges that were stressing their capital structure and liquidity profile. First Day Declaration ¶ 70. Given this, the Debtors and their advisors engaged in extensive arm's-length negotiation with the Prepetition First Lien Lenders, successfully improving the financing terms on offer, and the parties, in good faith and in the Debtors' business judgment, agreed upon the DIP Facility. In exchange for the substantial benefits of the DIP Facility, the Debtors agreed to provisions that are common in debtor-in-possession financings and which do not unduly burden the Debtors' ability to operate or improperly constrain the Debtors' ability to run a fulsome sale process and reorganize.

A.     **The Debtors' Entry into the DIP Facility Represents a Sound and Prudent Exercise of Their Business Judgment.**

7.     Courts generally will not second-guess a debtor's business decisions when those decisions involve a minimum level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. See In re Los Angeles Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011). To determine whether the business judgment test is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." In re AbitibiBowater Inc., 418 B.R. 815, 831 (Bankr. D. Del. 2009). Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003). Courts recognize that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization. Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986). This is because "debtors-in-possession generally enjoy little negotiating power," particularly with their prepetition lenders, despite this dynamic, courts "permit debtors-in-possession to exercise their

basic business judgment consistent with their fiduciary duties." <u>In re Ames Dept. Stores, Inc.</u>, 115

B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (internal citations omitted).   In order to rebut the business

judgment rule, an opposing party must show that the debtor: (i) failed to make a decision; (ii) made

an uninformed decision; (iii) was not disinterested or independent; or (iv) was grossly negligent.

<u>In re L.A. Dodgers LLC</u>, 457 B.R. at 313.

8.    Further, the Court may take into consideration more than just the pure business

terms of a DIP facility when considering the debtor's exercise of its business judgment. Certainty

of closing and whether entry into the proposed DIP facility will lead to a successful reorganization

are also critical considerations.   In <u>In re ION Media Networks, Inc.</u>, the Bankruptcy Court for the

Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally
> motivated to obtain financing on the best possible terms, a business decision
> to obtain credit from a particular lender is almost never based purely on
> economic terms. Relevant features of the financing must be evaluated,
> including non-economic elements such as the timing and certainty of
> closing, the impact on creditor constituencies and the likelihood of a
> successful reorganization. This is particularly true in a bankruptcy setting
> where cooperation and establishing alliances with creditor groups can be a
> vital part of building support for a restructuring that ultimately may lead to
> a confirmable reorganization plan. That which helps to foster consensus
> may be preferable to a notionally better transaction that carries the risk of
> promoting unwanted conflict.

Case No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

9.    The business judgment rule applies to the Debtors' determination to enter into the

DIP Facility, and it has been satisfied.  The Debtors spent months conducting a marketing process

for in- and out-of-court financing to delever the Debtors' capital structure. <u>See</u> Nov. 5, 2024 Hr'g

Tr. 42:2–16; <u>see also</u> Grubb Declaration ¶¶ 15–16.  Prior to the Petition Date, as further detailed

in the Grubb Declaration, Ducera launched a solicitation process to obtain postpetition financing

and commenced negotiations with potential lenders.  Ducera contacted 19 traditional banks and

alternative lenders as prospective financing sources for both priming and non-priming ABL and term loan postpetition financing, in addition to the Debtors' existing Prepetition ABL Secured Parties, Prepetition First Lien Secured Parties, and Prepetition Second Lien Secured Parties.  See Grubb Declaration ¶ 15.  The marketing process yielded three financing alternatives, none of which were viable.  Each of the two proposals received from the Prepetition ABL Lenders and the single offer received from a third-party lender were insufficient to meet the Debtors' financial needs during the pendency of the Chapter 11 Cases.  Faced with no viable alternative, the Debtors negotiated the DIP Facility in good faith and at arm's-length, and believe that the terms of the DIP Facility are competitive and the best that could be obtained under the circumstances.  Moreover, the three members of the board's Special Committee (of which all but one are independent directors) approved the Debtors' entry into the DIP Facility.[4]

10.     The Debtors have not only not received any superior proposals following the Petition Date, they have not received a single actionable alternative to the DIP Facility.  Just two days prior to this filing, the Freedom Lenders did propose a term sheet for a $7.5 million secured DIP facility at the HoldCo Debtors only.  While the Debtors are still reviewing the proposal with their advisors, the terms of the Freedom Lenders' proposal in its current form are inferior to the terms on which the existing DIP Facility would be provided to the HoldCo Debtors in the event either such Debtor requires access to financing (as reflected in the revised Final Order) because (a) the Freedom proposal includes incremental fees, and the DIP Lenders' proposal does not;

---

[4]     Contrary to the assertions made by the Freedom Lenders in various pleadings, there is an independent director on the boards of the HoldCo Debtors, who was specifically appointed by the Freedom Lenders, and who voted to approve the DIP Facility.  Approval of the DIP Facility was authorized by each board of directors at each Debtor entity.  *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, In re Freedom VCM, Inc., Case No. 24-12509 (Bankr. D. Del. Nov. 3, 2024) [Docket No. 1] at 54 (Each Member of Freedom VCM, Inc.'s Board of Directors approving of the DIP Facility); *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, In re Freedom VCM Interco, Inc., Case No. 24-12502 (Bankr. D. Del. Nov. 3, 2024) [Docket No. 1] at 54 (same).

(b) the Freedom proposal includes interest payable at the HoldCo Debtors and the DIP Lenders' proposal does not; (c) the Freedom proposal requires payment of up to $6 million (i.e. 80% of available DIP proceeds) to the HoldCo Lenders and their professionals, when no such fees are payable under the DIP Lenders' proposal; (d) the Freedom proposal only provides for the payment of $1.5 million of HoldCo Debtor administrative expenses upon emergence, and the DIP Lenders' proposal does not provide for a cap on the HoldCo Debtor administrative expenses; (e) the DIP Facility was open to all Prepetition First Lien Lenders who elected to participate, while the Freedom proposal seeks to exclude all lenders other than the Freedom Lenders from participating; and (e) the DIP Lenders' proposal provides for a path to exit from bankruptcy, subject to the Bankruptcy Court's approval, but the Freedom proposal does not.  Further, the DIP Lenders are not seeking to prime any prepetition liens at the HoldCo Debtors, but solely to take a lien on unencumbered assets at the HoldCo Debtors, and solely in the event and to the extent that the HoldCo Debtors require the usage of a portion of the DIP Facility.   This "offer" from the Freedom Lenders is solely to advance their stated intent to terminate exclusivity and place the HoldCo Debtors on a separate plan confirmation track, presumably so that the Freedom Lenders can control the equity of the Debtors' operating companies.

11.    The DIP Facility is the most favorable source of available funding for the HoldCo Debtors and the only source of available funding for the other 51 Debtors.  The DIP Facility, taken as a whole package, is the culmination of the Debtors' prepetition marketing efforts to secure financing, good faith and arm's length negotiations, and substantial input from the Debtors' legal and financial advisors. It cannot be disputed that the DIP Facility creates substantial benefits for the Debtors' estates by providing $250 million in liquidity vital to the Debtors' businesses and the administration of their estates.  But the DIP Facility also provides the intangible benefits alluded

to by the ION Media court.  By working on the DIP Facility with the largest constituent of financial creditors at the top of their capital structure, the Debtors have allied themselves with the creditors with the most skin in the game and that are most motivated to promote a successful and efficient restructuring, which benefits all of the Debtors' stakeholders.

**B.    The Freedom Lenders' Objections to the DIP Facility Must Be Overruled.**

> i.    *Objections to the HoldCo Debtors as Obligors Under the DIP Facility are Either Moot or Should be Overruled.*

12.    The Freedom Lenders dedicate nearly half of their Objection to the argument that the HoldCo Debtors should not be obligors under the DIP Facility—the DIP Lenders have conceded this point and limited the HoldCo Debtors' obligations to any proceeds of the DIP Facility that are transferred to, or otherwise used to make payments on behalf of, the HoldCo Debtors.  However, considering the Debtors' corporate structure and the intertwined nature of these Chapter 11 Cases, it does not make sense to exclude actions taken or occurring at the HoldCo Debtors' level from giving rise to Events of Default under the DIP Credit Agreement, such as the termination of exclusivity, the appointment of a chapter 11 trustee, or the confirmation of an alternate chapter 11 plan.

13.    The HoldCo Debtors, sitting at the parent level of the Debtors' corporate structure, hold the equity of the Debtors' operating companies, where all value resides. It is clear from the Freedom Lenders' Exclusivity Termination Motion[5] that if such approval is granted, the Freedom Lenders intend to propose a chapter 11 plan that results in the Freedom Lenders owning the equity of the HoldCo Entities, making the Freedom Lenders the ultimate parent of the  Debtors' operating companies. Should the Debtors' equity be controlled by self-interested lenders, they may have the

---

[5]    See *Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [Docket No. 192] (the "Exclusivity Termination Motion").

ability to use such control to unfairly benefit their position to the detriment of other parties in interest. As such, the DIP Facility Events of Default which apply to actions taken at the HoldCo Debtor level are appropriate and the Freedom Lenders' objection to such should be overruled.

ii.     *The Court Should Not Delay Approval of the DIP Facility.*

14.     The DIP Facility should be approved on a final basis now. Delaying final approval of the Debtors' postpetition financing conveys uncertainty in the Debtors' ability to successfully emerge from bankruptcy. Uncertainty leads to the Debtors' vendors losing confidence in the Debtors' business prospects, which could lead to vendors restructuring their contracts on worse terms for the Debtors, or terminating performance entirely. This is not speculation. When the Court did not initially approve the DIP Facility on an interim basis, certain vendors cancelled their scheduled deliveries of inventory to the Debtors. See Nov. 6, 2024 Tr. Hr'g 81:19–82:1. With the holidays around the corner, the Debtors are entering a critical consumer shopping period. Not having adequate inventory available for sale will reduce the Debtors' revenues and erode the EBITDA of the Debtors' OpCos, irreparably harming the Debtors' enterprise value. The Freedom Lenders repeatedly assert that the Debtors have sufficient cash to operate their businesses and administer the Chapter 11 Cases—that may not be the case if the Debtors are unable to timely procure the inventory they need, which will greatly diminish cash flow during important trading months.

iii.     *Objections to the Size of the DIP Facility Must be Overruled.*

15.     The Freedom Lenders ask this Court to overrule the Debtors' determination of the appropriate size for the DIP Facility made in conjunction with the Debtors' financial advisors. However, in determining whether the Debtors have exercised sound business judgment in entering into the DIP Facility, a court does not need to determine whether every single business person would make the exact same determination as the debtor, but need only "examine whether a

reasonable business person would make a similar decision under similar circumstances." In re AbitibiBowater Inc., 418 B.R. at 831. The Debtors' determination to enter into a facility which provides $250 million in new money is reasonable.

16.    As Mr. Orlofsky, the Debtors' Chief Restructuring Officer, testified at the hearing held on November 5 and 6, 2024 (the "Interim Hearing"), the Debtors' financial advisors sized the DIP Facility to (a) account for the uncertainties found in retail bankruptcies, (b) have enough liquidity on hand to fund vendors and employees and provide customers with confidence to shop at the Debtors' stores, and (c) be able to administer these Chapter 11 Cases for nine months. See Nov. 6, 2024 Hr'g Tr. 90:16–92:8. The Debtors' management and advisors, who have been involved with the Debtors' operations and businesses for months prior to the Chapter 11 Cases, have a better understanding of the Debtors' financing needs than the Debtors' junior lenders. They also have the duty and motivation to protect the interests of the Debtors as a whole, rather than the bespoke interests of junior creditors.

17.    These Chapter 11 Cases involve over 50 Debtors, four business lines, and a capital structure totaling over $2 billion in debt. First Day Declaration ¶¶ 5, 50. With such a large and varied business structure, it is only prudent for the Debtors to ensure that they will have access to additional funds in the event of unforeseen cost overruns, emergencies, or simply the failure to hit their targeted revenue. Even if such liquidity is not used during the course of the Chapter 11 Cases, the Debtors' ability to demonstrate that their businesses are adequately capitalized may promote better trade terms from vendors and confidence among their franchisees, customers and employees that these cases are no cause for concern. The Freedom Lenders would prefer the Debtors to run on fumes rather than benefit from additional liquidity despite the fact that the incremental cost of such liquidity is minimal given its potential benefits. The Freedom Lenders assert that instead of

an additional $150 million final draw, the Debtors need $82 million to fund a six-month case or $122 million for a nine-month case. See Freedom Obj. ¶¶ 43–44.  Such modifications would give rise to modest cost savings over time ($3.1 million in interest savings in a six-month case or $2.2 million for a nine-month case).  The Debtors and the DIP Lenders have now agreed to modify the structure of the remaining draws on the DIP Facility to further reduce the potential for excess interest expense.  The Debtors now propose a draw of $75 million following the entry of the Final Order and a subsequent $75 million draw as set forth in the Approved Budget.  This structure is even more favorable to the Debtors than the $82  million or $122 million draw scenarios the Freedom Lenders describe because incremental interest costs will be saved by making a smaller second draw now, but the Debtors will still benefit from the full $150 million of additional available liquidity when needed pursuant to their budget.

18.     Further, given the volume of litigation the Debtors have faced since the commencement of these Chapter 11 Cases—and will likely face throughout these cases—the Debtors have been forced to incur additional professional fees which could exceed the projected amounts budgeted.  The size of the DIP Facility allows the Debtors some runway to account for unexpected expenses without risking administrative insolvency.

     iv.     *The Roll Up of a Portion of the Prepetition First Lien Secured Obligations Is Appropriate.*

19.     The DIP Facility includes a two-to-one roll up of $500 million of the Prepetition First Lien Secured Obligations into postpetition DIP Facility obligations.

20.     The Freedom Lenders argue that even courts that have previously approved roll ups "have cautioned that it 'should only be used as a last resort.'" Freedom Obj. ¶ 47 (quoting Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1494–95 (11th Cir. 1992).  What is the DIP Facility, if not a last resort?  As has been repeatedly shown throughout these Chapter

11 Cases, the DIP Facility was and remains the Debtors' only viable option to finance these cases and operate their businesses. The Roll Up is an integral component of the DIP Facility. See Grubb Declaration ¶ 24. In fact, the Roll Up is a condition precedent to the Ad Hoc Lender Group's agreement to provide postpetition financing. See id.

21. Moreover, the Roll Up is also well within the range of reasonableness as compared to other similar provisions that have been approved in this District in the past three years. See, e.g., In re Airspan Networks Holdings Inc., No. 24-10621 (TMH) (Bankr. D. Del. Apr. 19, 2024) (authorizing a $53.8 million DIP facility, including a $37.3 million roll-up, constituting a 2.26:1 ratio); In re Sientra, Inc., No. 24-10245 (JTD) (Bankr. D. Del. Mar. 3, 2024) (authorizing a $90 million DIP facility, including a $67.5 million roll-up, constituting a 3:1 ratio); In re NanoString Technologies, Inc., No. 24-10160 (CTG) (Bankr. D. Del. Feb. 6, 2024) (authorizing $142.5 million DIP facility, including a $95 million roll-up); In re Restoration Forest Products Group, LLC, No. 24-10120 (KBO) (Bankr. D. Del. Feb. 1, 2024) (authorizing approx. $93.3 million DIP facility, including approx. $64.3 million roll-up, constituting a 2.2:1 ratio); In re Phoenix Servs. Topco LLC, Case No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) (approving a $100 million interim DIP facility with a 3:1 roll-up ratio consisting of $75 million of prepetition debt and $25 million of new money); In re TPC Grp. Inc., Case No. 22-10493 (CTG) (Bankr. D. Del. June 3, 2022) (approving an interim DIP facility with a 1.85:1 roll-up ratio); In re Carbonlite Holdings LLC, Case No. 21-10527 (JTD) (Bankr. D. Del. Mar. 10, 2021) (approving a $42 million interim DIP facility with a 2:1 roll-up ratio);  In re Shiloh Industries Inc., No. 20-12024 (LSS) (Bankr. D. Del. Sep. 1, 2020) (authorizing roll-up on a 4.5:1 basis).

22. Roll-ups have become common in other jurisdictions as well, in which courts routinely approve roll-ups on 2:1 bases, if not more. See, e.g., In re Vertex Energy, Inc., No. 24-

90507 (CML) (Bankr. S.D.Tex. Oct. 29, 2024) (approving a roll-up on a 2.5:1 basis); In re Thrasio

Holdings, Inc., No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 4, 2024) (approving a roll-up on a 3:1

basis); In re MLCJR LLC (Cox Operating), No. 23-90324 (CML) (Bankr. S.D.Tex. May 19, 2023)

(approving a roll-up on a 3.6:1 basis).

23.    The Roll Up does not prejudice other Prepetition Secured Parties.  The Prepetition

Second Lien Secured Obligations are, and will continue to be, subordinated to the Prepetition First

Lien Secured Obligations, regardless of the terms of the Roll Up. And, importantly, the proposed

Final Order subjects the Roll Up to investigation and challenge. Final Order ¶ 24(e).  Given the

circumstances, the Debtors' agreement to the Roll Up under the DIP Facility represents an exercise

of the Debtors' sound business judgment as part of an overall package which provides the liquidity

that will allow the Debtors to continue to operate and should be approved. Grubb Declaration ¶ 26.

v.    *The Prepetition Second Lien Lenders Are Adequately Protected.*

24.    Pursuant to the DIP Orders, the Prepetition Second Lien Lenders are receiving

adequate protection through the Second Lien Adequate Protection Claims and the Second Lien

Adequate Protection Liens.  Further, their interest in the prepetition collateral is supported by the

DIP Facility, without which the estates would quickly become administratively insolvent and there

would no longer even be the opportunity for value to reach the Prepetition Second Lien Lenders.

As undersecured (or unsecured) creditors, there is no legal support for the Prepetition Second Lien

Lenders' request of current pay postpetition interest and payment of their prepetition and

postpetition professional fees as adequate protection. See Freedom Obj. ¶ 56.  This should not be

in dispute, as the Freedom Lenders helpfully note in their Objection that undersecured creditors

are not entitled to payment of postpetition interest and fees as adequate protection. See id. ¶ 65;

see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 375 (1988)

(court held that undersecured creditors who are not eligible for interest under section 506(b) are not entitled to adequate protection "for interest lost during the stay").

25.     Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. See In re Cont'l Airlines, 91 F.3d 553, 556 (3d Cir. 1996). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. In re Swedeland Dev. Grp., Inc., 16 F.3d 552, 564 (3d Cir. 1994); In re Satcon Tech. Corp., 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); In re N.J. Affordable Homes Corp., 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); In re Columbia Gas Sys., Inc., 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see also In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 COLLIER ON BANKRUPTCY ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

26.     The DIP Facility is value additive. It provides the liquidity needed to support the Debtors' businesses and maximize the value of the estates for all of the Debtors' stakeholders, preventing a value-destructive liquidation. The purpose of adequate protection "is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor." In re Energy Future Holdings Corp., 546 B.R. 566, 581 (Bankr. D. Del. 2016) (further citation omitted). The sale process that is funded by the DIP Facility will maximize, or at least establish, the value of the Debtors' estates, and by extension, the Prepetition Second Lien Lenders' interest in the collateral. See ESL Invs., L.P. v. Sears Holdings Corp. Debtor-Appellee (In re Sears Holdings Corp.), 51 F.4th 53, 61 (2d Cir. 2022) (holding that secured

creditors had not experienced any diminution in value where the debtors pursued a going concern sale, as such valuation was compared favorably to what would have been obtained in a net orderly liquidation, the realistic alternative on the petition date).  Given the Prepetition Second Lien Lenders' position behind the Prepetition ABL Lenders and the Prepetition First Lien Lenders, administrative insolvency in these Chapter 11 Cases would be a death knell to any possible recovery.

27.    If the Prepetition Second Lien Lenders establish that they have suffered a diminution in value, their claim will be afforded administrative superpriority subject to the waterfall set forth in the Final Order, which must be paid by the Debtors if they are to reorganize under chapter 11.

vi.    *The DIP Facility Does Not Constitute a Sub Rosa Plan.*

28.    The Freedom Lenders' contention that the DIP Facility constitutes an impermissible *sub rosa* plan is erroneous and contrary to this Court's prior finding.  A *sub rosa* plan "has the effect of dictating the terms of a prospective chapter 11 plan," by "either (i) dispos[ing] of all claims against the estate or (ii) restrict[ing] creditors' rights to vote." In re Energy Future Holding Corp., 527 B.R. 157, 168 (D. Del. 2015) (quoting In re Capmark Fin. Grp., Inc., 438 B.R. 471, 513 (Bankr. D. Del. 2010)).  Courts generally will not disapprove transactions on the basis of *sub rosa* plan arguments unless the proposed transaction (i) restricts creditors' rights to vote on a plan, (ii) disposes of virtually all of the debtor's assets, or (iii) dictates the terms of a plan. See, e.g., Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.), 241 F.R.D. 162 (S.D.N.Y. 2006) (finding no *sub rosa* plan without these three elements); Official Comm. of Unsecured Creditors v. Cajun Electric Power Coop., Inc. (In re Cajun Electric Power Coop., Inc.), 119 F.3d 349 (5th Cir. 1997) (same).

29.     The Freedom Lenders argue that the DIP Facility is a *sub rosa* plan for the following three reasons: (1) there is a cross-termination provision with the RSA; (2) the roll-up features of the DIP Facility would require any alternative plan sponsor to write a $783 million check to pay off claims under the DIP Facility in order to pursue an alternative plan or the Debtors would face a DIP default; and (3) if the plan set forth in the RSA is implemented, it would allow the conversion to equity of the DIP *fees only* (not DIP principal) at a 25% discount to plan value.

30.     *First*, it is an uncontroversial norm in complex bankruptcies that prepetition lenders are generally unwilling to commit a substantial amount of capital without coming to terms with the Debtors on a path to exit the Chapter 11 Cases. The RSA is highly beneficial to the Debtors as well, because it provides the framework for an orderly emergence from bankruptcy with a greatly reduced debt burden, and incremental liquidity.  However, neither the RSA nor the DIP Facility constitute a *sub rosa* plan. By virtue of the approval of the DIP Facility, no plan will have been approved by this Court and no assets of the Debtors will have been disposed of.  A hearing on the Debtors' disclosure statement has already been scheduled by this Court.  Subsequently, a hearing on confirmation of the Debtors' proposed plan will be scheduled.  This Court can hear all objections with respect to the plan and disclosure statement, and will ultimately have the authority to approve (or decline to approve) each of the disclosure statement and the plan at the appropriate juncture.  All arguments regarding the confirmability of the plan are preserved and will be made at the appropriate time.

31.     *Second*, if a termination of the RSA gives rise to a default under the DIP Facility, this Court has the ability to fashion appropriate relief at an emergency hearing. Final Order ¶ 21(b) ("[T]he Debtors, the Official Committee or any other party in interest shall be permitted to request an emergency hearing before the Court . . . to consider any appropriate relief. . .").

32.     *Third*, while there is a feature in the Debtors' plan and RSA allowing for the DIP fees *only* (i.e., the DIP Backstop Premium, Commitment Premium and Exit Premium), but not the DIP principal amounts, to equitize upon exit at a 25% discount to plan value, that is by no means a fait accompli.  The Debtors are pursuing a parallel marketing and sale process, which may instead give rise to the payment in full in cash of the DIP Facility.  Any ultimate distribution of equity (if any) will be made in accordance with a subsequent court-approved plan. No distribution is being pre-approved now.  The DIP Facility itself just locks the DIP Lenders into the terms on which they would convert their DIP claims into debt or equity *if* the RSA remains in effect and *if* the Debtors ultimately restructure through the plan described in the RSA.  See DIP Credit Agreement § 2.09.

33.     In their argument asserting that the DIP Facility constitutes a *sub rosa* plan,  the Freedom Lenders rely heavily on Judge Garrity's decision denying the proposed DIP financing in LATAM Airlines. However, the LATAM DIP financing package greatly differs from the DIP Facility in significant ways. The LATAM DIP financing was provided by the debtor's shareholders, and included a provision that the Debtors could elect to repay the DIP through an equity subscription made to shareholders at a 20% discount to plan value *without any further approval or oversight of the court*.  In re LATAM Airlines Group, S.A., 620 B.R. 722, 819 (Bankr. S.D.N.Y. 2020). The DIP's subscription election would "prematurely allocat[e] reorganization value to LATAM's existing equity holders." LATAM Airlines, 620 B.R. at 820.  In this case, any future equity distribution (or discount to plan value with respect to that distribution) is subject to further order of this Court in connection with plan confirmation.

34.     Further, this Court has already found that the RSA was not a *sub rosa* plan. See Nov. 6, 2024 Hr'g Tr. 126:9–14. This Court, acknowledging the Debtors' fiduciary out in the RSA, determined the Debtors have the ability to terminate the RSA. See id. In that event, during the

Remedies Notice Period, the Debtors may seek appropriate relief from the Court. See Final Order ¶ 21(b).

           vii.    *The DIP Orders Provide the Adequate Protection Payments are Subject to Recharacterization.*

35.    To the extent that the Interim Order was not clear, the proposed Final Order explicitly provides that the adequate protection payments made to prepetition secured parties will be subject to recharacterization to the extent that the prepetition secured parties are determined to be undersecured as of the Petition Date.  Final Order ¶ 3(c) ("[E]xcept to the extent of any Diminution in Value, any adequate protection payments made in respect of the Prepetition ABL Facility or the Prepetition First Lien Facility pursuant to paragraphs 10(b)(i) and 10(d)(i) of the Interim Order and this Final Order shall be without prejudice as to whether such payments should be recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code as payments of principal under the Prepetition ABL Facility or the Prepetition First Lien Facility, as applicable, in the event the Prepetition First Lien Facility or the Prepetition ABL Facility is determined to be undersecured, as determined, upon notice and a hearing, by a final non-appealable order of this Court. . .").

           viii.    *The "Extraordinary Provisions" Should be Approved as Part of a Packaged Deal.*

36.    The Freedom Lenders also argue that certain other provisions of the DIP Credit Agreement and/or proposed Final Order, when viewed in isolation, must be struck or modified. But, as stated above, the Freedom Lenders cannot insert their business judgment in the place of the Debtors, nor can they be allowed to cherry-pick which parts of the DIP Facility to keep and which to discard. Section 364(c) of the Bankruptcy Code does not require the Debtors to demonstrate that each and every aspect of the DIP Facility is individually necessary to preserve

the Debtors' estates; the determination is whether facility as a whole is necessary to preserve the estate.

37.     With the need for financing established, the DIP Facility and its terms and conditions must be considered in their totality, as a package of economic and legal terms and consideration granted in exchange for the critical funding the Debtors need to continue operating and to successfully administer the Chapter 11 Cases. When viewed as a whole, and in light of the particular circumstances of these Chapter 11 Cases, the terms of the DIP Facility are reasonable. See, e.g., In re Farmland Indus., Inc., 294 B.R. 855, 879–92 (Bankr. W.D. Mo. 2003) (finding that terms of postpetition financing transaction were reasonable when "taken in context, and considering the relative circumstances of the parties," even those that "might appear to be extreme or even unreasonable in isolation").  The Court should not substitute the Debtors' sound and prudent business judgment with that of the Freedom Lenders.  See In re Spansion, Inc., 426 B.R. 114, 140 (Bankr. D. Del. 2010) ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors.").

38.     The Freedom Lenders object to the Debtors' (i) granting liens on proceeds of Avoidance Actions (both as collateral under the DIP Facility and as adequate protection liens), and (ii) waivers of (a) their Section 506(c) rights, (b) the "equities of the case" exception under section 552(b), and (c) the equitable doctrine of "marshaling."

39.     The Freedom Lenders offer no credible argument why the Debtors cannot grant liens on their unencumbered assets in exchange for the DIP Facility.  As with any estate asset and as specifically permitted by the Bankruptcy Code, a debtor may grant liens on avoidance actions (or their proceeds) or any other unencumbered asset to secure postpetition financing or provide adequate protection, and it can also grant superpriority claims payable from all of a debtor's

unencumbered assets. See 11 U.S.C. §§ 361(2), 364(c)(2); In re Applied Theory Corp., 2008 WL 1869770, at *1 (Bankr S.D.N.Y. Apr. 24, 2008) ("Of course those assets started out unencumbered. But those assets can thereafter be encumbered (or made available to satisfy superpriority claims), if necessary to provide adequate protection. That's expressly authorized under section 361(2)."). These causes of action are estate assets that may be used in the debtor's business judgment. See 11 U.S.C. §§ 550(a) (preserving recoveries on avoidance actions "for the benefit of the estate"), 541(a)(3), 541(a)(4). These types of lender protections are common in complex cases and have been granted in many financing orders entered in this District.  See, e.g., In re Never Slip Holdings, Inc., No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024); In re Number Holdings, Inc., No. 24-10719 (JKS) (Bankr. D. Del. May 9, 2024); In re View, Inc., No. 24-10692 (CTG) (Bankr. D. Del. Apr. 23, 2024); In re Airspan Networks Holdings Inc., No. 24-10621 (TMH) (Bankr. D. Del. Apr. 19, 2024); In re JoAnn Inc., No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) (same). Moreover, as part of concessions made at the behest of the Committee, the DIP Lenders have agreed to only attach DIP Liens on Avoidance Action proceeds, commercial tort claims, and the proceeds thereof to secure the amount of the New Money DIP Commitments and any fees under the DIP Facility that are payable in kind. The Roll Up Loans will be secured by proceeds of those claims only to the extent the Prepetition First Lien Secured Obligations were secured by such claims as of the Petition Date.

40.    Courts in this District routinely approve section 506(c) waivers, especially to the extent the relevant DIP financing contemplates a professional fee carve-out. See, e.g., In re Never Slip Holdings, Inc., No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024) (approving waiver of section 506(c) in the final DIP order); In re JoAnn Inc., No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) (same); In re Lucky Bucks, LLC, No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023)

(same); <u>In re DeCurtis Holdings, LLC</u>, No. 23-10548 (JKS) (Bankr. D. Del. June 23, 2023) (same); <u>In re Plastiq Inc.</u>, No. 23-10671 (BLS) (Bankr. D. Del. June 22, 2023) (same); <u>In re Christmas Tree Shops, LLC</u>, No. 23-10576 (TMH) (Bankr. D. Del. June 5, 2023) (same); <u>In re Structurlam Mass Timber U.S., Inc.</u>, No. 23-10497 (CTG) (Bankr. D. Del. May 19, 2023) (same).

41.    Likewise, the proposed section 552(b) waiver is reasonable and appropriate, given the DIP Lenders' continued funding of the Debtors' ongoing operations.  The "equities of the case" exception in section 552(b) is primarily intended to prevent a debtor's secured creditors from reaping any disproportionate windfall from the debtor's use of unencumbered assets to increase the value of the secured creditors' collateral. <u>See</u> <u>generally</u> <u>In re Tower Air, Inc.</u>, 397 F.3d 191, 205 (3rd Cir. 2005) ("[T]he normal application of the equity exception is in Chapter 11 cases, to prevent an oversecured lender from receiving a windfall by taking assets that would otherwise go to rehabilitating the debtor."); <u>In re J. Catton Farms, Inc.</u>, 779 F.2d 1242, 1246 (7th Cir. 1985) ("The equit[ies] exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral."); <u>In re Muma Servs., Inc.</u>, 322 B.R. 541, 558–59 (Bankr. D. Del. 2005) (quoting <u>Delbridge v. Prod. Credit Ass'n & Fed. Land Bank</u>, 104 B.R. 844, 826 (E.D. Mich. 1989)).  Notably, this exception has been found to be inapplicable where the secured creditor has a lien over substantially all the debtor's assets such that any appreciation in estate assets will necessarily originate from the use of the lender's collateral. <u>See</u> <u>Muma Servs. Inc.</u>, 322 at 559. Here, the Prepetition ABL Secured Parties and the Prepetition First Lien Secured Parties have liens on substantially all of the Debtors' assets, so the rationale behind the section 552(b) waiver is inapplicable in these cases.  Further, in cases where secured parties have agreed to subordinate their claims to a carve-out and have agreed to be primed by substantial postpetition financing,

24

courts in this District routinely have approved waivers of the "equities of the case" exception as part of consensual adequate protection packages. See, e.g., In re Never Slip Holdings, Inc., No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024) (approving waiver of section 552(b) "equities of the case" exception upon entry of the final DIP order); In re JoAnn Inc., No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) (same); In re Lucky Bucks, LLC, No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) (same); In re DeCurtis Holdings, LLC, No. 23-10548 (JKS) (Bankr. D. Del. June 23, 2023) (same); In re Plastiq Inc., No. 23-10671 (BLS) (Bankr. D. Del. June 22, 2023) (same); In re Christmas Tree Shops, LLC, No. 23-10576 (TMH) (Bankr. D. Del. June 5, 2023) (same); In re Structurlam Mass Timber U.S., Inc., No. 23-10497 (CTG) (Bankr. D. Del. May 19, 2023) (same).

42.    Additionally, waivers of the marshaling doctrine are commonplace in postpetition lending arrangements. See, e.g., In re Never Slip Holdings, Inc., Case No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024) (approving waiver of marshaling doctrine upon entry of the final DIP order); In re JoAnn Inc., No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) (same); In re Lucky Bucks, LLC, No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) (same); In re DeCurtis Holdings, LLC, No. 23-10548 (JKS) (Bankr. D. Del. June 23, 2023) (same); In re Plastiq Inc., No. 23-10671 (BLS) (Bankr. D. Del. June 22, 2023) (same); In re Christmas Tree Shops, LLC, No. 23-10576 (TMH) (Bankr. D. Del. June 5, 2023) (same); In re Structurlam Mass Timber U.S., Inc., No. 23-10497 (CTG) (Bankr. D. Del. May 19, 2023) (same). Nonetheless, in negotiations with the Committee, the DIP Lenders agreed to incorporate a reverse marshaling concept for the benefit of unsecured creditors with respect to the Adequate Protection Claims payable under the DIP Facility, such that those payments are funded last from Avoidance Action proceeds, commercial tort claims, and the proceeds thereof.

25

43.     Overall, as part of a packaged deal that provides significant financial benefits, and which also includes carve-out concessions, the provisions that the Freedom Lenders object to are routinely approved as courts review DIP packages holistically.  Accordingly, the Court should overrule the Freedom Lenders' objections to the "extraordinary provisions" and approve them as part of a necessary package of concessions to incentivize lenders to provide $250 million in new money.

ix.     *No Junior or Unsecured DIP Financing is Available.*

44.     The Freedom Lenders also contend that the Debtors must consent to an alternative DIP financing provided to them on a junior or unsecured basis.  No such financing has been offered.

## II.     THE DEBTORS EXPECT TO RESOLVE THE LANDLORDS' OBJECTION

45.     The Landlords Objection can be fully resolved with the payment of postpetition November Stub Rent.  <u>See</u> Landlords Obj. ¶ 17.  As is recognized by the Landlords in their preliminary statement, the Debtors fully intend to make those payments. <u>See</u> <u>id.</u> at p. 2.  The Debtors are actively working with the Landlords to ensure payment in the proper amount is received, and will continue to work toward resolution prior to the hearing on this Motion.

## <u>CONCLUSION</u>

46.     The Court should defer to the Debtors' business judgment that the DIP Facility offers them postpetition financing on the best available terms and is in the best interests of all stakeholders in these Chapter 11 Cases, and accordingly overrule the Objections and approve the DIP Facility on a final basis.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of the proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and equitable.

Dated: December 6, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac vice*)
Debra M. Sinclair (admitted *pro hac vice*)
Betsy L. Feldman (Del. No. 6410)
Yara Kass-Gergi (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
mfeldman@willkie.com
dsinclair@willkie.com
bfeldman@willkie.com
ykass-gergi@willkie.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

27