# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 154, 241, 242, & 335** |

## DEBTORS' REPLY IN SUPPORT
## OF DEBTORS' MOTION FOR ENTRY OF ORDERS
## (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR
## SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) SCHEDULING
## AN AUCTION AND A SALE HEARING AND APPROVING THE FORM
## AND MANNER OF NOTICE THEREOF, (C) APPROVING ASSUMPTION
## AND ASSIGNMENT PROCEDURES, AND (D) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors") hereby file this reply (this "Reply") (a) in further support of the bidding procedures

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

(the "Bidding Procedures") set forth in the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief Related Relief* [D.I. 154] (the "Bidding Procedures Motion"),[2] and (b) in response to the formal objections or responses (each an "Objection" and, collectively, the "Objections") filed by the following parties; (i) Front Street Kansas City, LLC [D.I. 241], (ii) Buddy Mac Holdings, LLC [D.I. 242], (iii) the Freedom Lender Group [D.I. 276], (iv) WPG Legacy, LLC [D.I. 309], and (v) certain Landlords [D.I. 328].  In support of this Reply, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Freedom Lender Group's objection is nothing more than a series of conclusory statements that are unsupported by law or fact.  The evidence in the record shows that the Bidding Procedures establish a thorough process intended to maximize the value of the Debtors' assets.

2.      The proposed Bidding Procedures are not novel.  They are of the type routinely approved in this jurisdiction and are appropriate in the context of these Chapter 11 Cases.  Far from proposing a rushed sale process, they anticipate a sale hearing approximately sixty days following entry of the Bidding Procedures Order—a hearing that will mark the culmination of a process that started in September 2024 and will have lasted over four months in total by the time it concludes.  That process has already been robust by any measure, involving outreach to more

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Motion and Bidding Procedures, as applicable.

than 170 Potential Bidders, and it is not illusory—48 of those Potential Bidders have already signed non-disclosure agreements to conduct diligence.  Those who have not still have 55 more days to do so if they wish.  As is customary, the Bidding Procedures unequivocally state in multiple locations that bids are being accepted "for all or any portion" of the Debtors' Assets.  The rights granted to the Consenting First Lien Lenders in the Bidding Procedures are often granted to a DIP lender who is funding the entire chapter 11 process, even if that lender is also a stalking horse bidder.  The Debtors also continue to enjoy the protection of the fiduciary out in their Restructuring Support Agreement, which is restated in the Bidding Procedures.

3.      Following the filing of the Motion, the Committee expressed certain concerns with the Bidding Procedures.  The Debtors worked collaboratively with the Committee's advisors to make a series of changes to the Bidding Procedures, now evidenced in the Debtors' Revised Bidding Procedures [D.I. 335] (the "Revised Bidding Procedures," and the timeline proposed therein, the "Revised Timeline").  The Revised Bidding Procedures are supported by the Committee—whose constituents will be the direct beneficiaries of any additional value identified by the sale process—and by the Consenting First Lien Lenders.  The Revised Bidding Procedures include the following new provisions:

    a.  The sale and marketing timeline will be adjusted by approximately 1.5 weeks to provide the Debtors with additional time to conduct their sale process.

    b.  Minimum Bid Prices for each of the Debtors' main operating companies will be set as follows:

        i.  Pet Supplies Plus: $900.00 million
       ii.  Vitamin Shoppe: $200.00 million
     iii.  Buddy's: $60.00 million

    c.  If a bid is received for the applicable business segment equal to or greater than the applicable Minimum Bid Price, an Auction will be held for the related Assets, and a Successful Bidder for those Assets will be named at the conclusion of the Auction.

  d. The Freedom Lender Group will receive certain consent and consultation rights as set forth in the Revised Bidding Procedures. These new consultation rights mirror those provided to the Consenting First Lien Lenders and the Committee, and their consent right applies to any modifications to the Bidding Procedures that would impact their consultation rights or their right to credit bid in their capacity as holders of second lien debt.

  e. The Revised Bidding Procedures clarify that the Debtors are not selling commercial tort claims or chapter 5 causes of action unless they relate to a transferred Asset.

  4. Notably, the Debtors' fiduciaries, including the boards of directors of the two HoldCo Debtors, approved of the sale process as expressly contemplated by the Restructuring Support Agreement.[3]  Both of these boards include John Hartmann, an independent director selected and appointed by the Freedom Lender Group. The boards determined that the sale process in the best interests of each HoldCo Debtor <u>and</u> its "creditors, stockholders, members, and other interested parties."  In any event, the Debtors do not anticipate selling any assets held by the HoldCo Debtors (if any), as commercial tort claims and causes of action are not being sold unless they relate to a transferred Asset, and the Debtors are not aware of any other Assets held by the HoldCo Debtors.

  5. As the Debtors stated in the Motion, the Bidding Procedures were formulated with the goal of maximizing the value of the Debtors' estates for the benefit of their creditors and other stakeholders.  Motion ¶ 20.  The Debtors have further substantiated this statement by filing the Revised Bidding Procedures.  In contrast, the Freedom Lender Group has not introduced a single piece of evidence supporting its view that the sale process is an "attempt to defeat any alternatives

---

[3] *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, <u>In re Freedom VCM, Inc.</u>, Case No. 24-12509 (Bankr. D. Del. Nov. 3, 2024) [D.I. 1] at 54 (Each Member of Freedom VCM, Inc.'s Board of Directors signing Omnibus Written Consent authorizing the company's entry into Restructuring Support Agreement); *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, <u>In re Freedom VCM Interco, Inc.</u>, Case No. 24-12502 (Bankr. D. Del. Nov. 3, 2024) [D.I. 1] at 54 (same); *Declaration of David Orlofsky in Support of Chapter 11 Petitions and First Day Pleadings*, <u>Exhibit B</u>, Restructuring Support Agreement (memorializing that the Debtors' chapter 11 plan will be structured such that the Debtors shall concurrently liquidate their American Freight business segment and conduct a marketing and sale process for the rest of their assets).

or objections" to the proposed chapter 11 plan.  The Debtors have prepared a chart summarizing the other Objections they have received, attached hereto as <u>Exhibit A</u>.  For the reasons set forth herein and on <u>Exhibit A</u>, the Court should overrule the Objections and grant the Motion.

**REPLY**

I.    **The Bidding Procedures and the Timeline Set Forth Therein Are A Product of The Debtors' Sound Business Judgment and Are Appropriate Under the Circumstances.**

6.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A sale of a debtor's assets is authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. <u>See</u>, <u>e.g.</u>, <u>In re Martin</u>, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . .").  The Revised Bidding Procedures accomplish the dual objectives of providing the Debtors and their advisors with ample time to complete a robust, competitive bidding process that is designed to achieve the highest or otherwise best offer for the Assets, while providing Potential Bidders with sufficient time to conduct all necessary due diligence and submit an informed Bid for the Debtors' Assets.

7.    The Debtors' market outreach formally began in September 2024.  This means that by the time that Bids are due under the Bidding Procedures, the marketing process will have been ongoing for approximately four (4) months.  The evidence shows that interested bidders have been actively engaging with the Debtors since the commencement of the process:  as of the date hereof, the Debtors and Ducera have reached out to over 170 potential bidders, of which 48 have signed confidentiality agreements.  Grubb Declaration ¶ 16.

8.    Nonetheless, as set forth in the Revised Timeline, the Debtors, in consultation with the Consenting First Lien Lenders, have agreed to extend the Bid Deadline by 1.5 weeks to January

5

30, 2025 (the "Bid Deadline") to address potential timing concerns raised by the Committee. This means that as of today, any Potential Bidder that has yet to sign a non-disclosure agreement and/or conduct due diligence still has fifty-five (55) days to do so before the Bid Deadline. Courts routinely approve sale timelines of this length, and have often approved significantly shorter timelines in a company's business judgment—even where there are not specific exigencies requiring a rapid sale. See, e.g., In re Express, Inc., Case No. 24-10831 (KBO) (Bankr. D. Del. June 6, 2024) [D.I. 427] (approving bidding procedures order with a sale hearing 8 days later); In re iMedia Brands, Case No. 23-10852 (KBO) (Bankr. D. Del. Aug. 3, 2023) [D.I. 345] (approving bidding procedures order with a sale hearing 11 days later); In re Briggs & Stratton Corp., Case No. 20-43597 (Bankr. E.D. Mo., July 20, 2020) [D.I. 505] (approving bidding procedures order with a sale hearing 28 days later); In re Nova Wildcat Shur-Line Holdings, Inc., Case No. 23-10114 (Bankr. D. Del., Jan. 29, 2023) [D.I. 142] (approving bidding procedures order with a sale hearing 29 days later).

9.      Parties objecting to sales under section 363 of the Bankruptcy Code are required to produce evidence substantiating their objections. In re Lionel, 722 F.2d 1063, 1071 (2d Cir. 1983); In re Montgomery Ward Holding Corp., 242 B.R. 147, 155 (Bankr. D. Del. 1999) (citing Lionel in noting that, in the context of an objection to the sale, use, or lease of property under section 363 of the Bankruptcy Code, "an objectant is required to produce some evidence supporting its objections").[4]   The Freedom Lender Group makes a conclusory statement that the Debtors'

---

[4]    In its Objection, the Freedom Lender Group reserves the right to "to raise additional issues with respect to the Motion at the hearing, to request additional evidence, and to present evidence at the hearing to consider the Motion." Freedom Lender Group Obj. ¶ 47. However, pursuant to this Court's chambers rules, any party interested in presenting documentary evidence at a hearing must supply such exhibits to "all relevant parties and to the Court as soon as possible, but no later than 2 hours before the hearing." See Chambers Procedures for Chief Judge John T. Dorsey at p. 4 (last visited Dec. 4, 2024). Relatedly, any party interested in presenting live witness testimony must, inter alia, file and submit their intention to do so within at least forty-eight (48) hours prior to the hearing. Id. at p.3. To the extent that the Freedom Lender Group fails to abide by such procedures, the Debtors object to the Freedom Lender Group's presentation of unauthorized evidence at the hearing.

proposed timeline "would not give potential bidders sufficient time to do the necessary diligence, obtain third party financing (if necessary), and submit a binding bid," and, thus, "eliminat[es] the changes of a value-maximizing competitive process."  Freedom Lender Group Obj. ¶ 22.  This assertion is not supported by any facts.  The only Potential Bidder that has raised any issues with the Debtors' Bid Deadline is the Freedom Lender Group.  No other Potential Bidders have indicated any concerns to the Debtors, who have nonetheless agreed to extend the process as set forth in the Revised Timeline. Grubb Declaration ¶ 19.

10.     The Freedom Lender Group—again, without any evidence—states that the holiday season will "dissuade bidders" from expending the necessary time and effort to participate in the sale process, relying on In re Exaeris Inc., 380 B.R. 741 (Bankr. D. Del. 2008) to support its unfounded statement.  Id.  The Freedom Lender Group's suggestion that the sale in Exaeris was denied solely because the sale timeline fell over the holiday season ignores the full story.  In Exaeris, the sale motion contemplated a sale *closing* date three weeks after the motion was filed.  380 B.R. at 745.  In finding that this notice period was not reasonable, the court highlighted that there was "minimal time allotted" and an "absence of evidence of the efforts the Debtor and/or the Committee made to identify potential suitors."  Id.  Furthermore, the Court noted that only four potential purchasers received notice of the sale, and "about a dozen or so" entities received some information."  Id.  These facts stand in stark contrast to those presented here, where the Debtors have contacted over 170 potential purchasers, intend to serve a court-approved sale notice on hundreds (if not thousands)[5] of parties in interest, intend to publish their sale notice to a national

---

[5]     Pursuant to the Revised Bidding Procedures, the Sale Hearing Notice, if approved, will be served on (a) the Notice Parties; (b) all parties to executory contracts and unexpired leases proposed to be assumed, assigned, or rejected as part of the proposed Sale; (c) all parties who have expressed a written interest in some or all of the Assets within six (6) months prior to entry of the Bidding Procedures Order; (d) all known holders of liens, encumbrances, and other claims secured by the Assets; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) each governmental agency that is an interested party with respect to the Sale and

audience in *The New York Times*, and will not be holding a sale hearing until February 10—over three *months* after filing of the Motion, with closing to happen at an even later date. The singular fact that a portion of the Debtors' sale process incidentally falls over the holiday season does not somehow make <u>Exaeris</u> relevant.

11.     The Freedom Lender Group's arguments that the sale timeline is "unnecessarily truncated" and the Debtors' assets "are not deteriorating in value over time" are equally misguided. Freedom Lender Group Obj. ¶ 24. The Revised Timeline balances the Debtors' need to thoroughly market the assets against the need to efficiently exit these Chapter 11 Cases. The Freedom Lender Group's request to double the expected length of the sale process would inherently cause administrative costs to increase proportionally—and with diminishing returns, given the amount of engagement the Debtors have already had with Potential Bidders. Those costs would come at the direct expense of creditor recoveries, including any recoveries that could potentially flow to the Freedom Lender Group. Further extensions to the Revised Timeline would also require the consent of the Consenting First Lien Lenders, who—unlike the Freedom Lender Group—are funding these Chapter 11 Cases. The Debtors have determined, in their business judgment and with the assistance of their advisors, that the Revised Timeline provides sufficient time and flexibility to allow Potential Bidders to complete their due diligence and submit informed bids while properly managing the costs of a chapter 11 sale process. The Debtors are not required to

---

transactions proposed thereunder; and (h) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. Revised Bidding Procedures, Art. VII.

substitute their business judgment with that of an aggrieved, out-of-the-money junior creditor group that is using litigation in an attempt to manufacture negotiating leverage.[6]

## II.    The Freedom Lender Group's Attempts to Impose Nonexistent Requirements on the Debtors' Marketing and Sale Process Should be Ignored.

12.    Section 363 of the Bankruptcy Code does not require debtors to obtain court approval to market their assets or speak with potential interested parties.   11 U.S.C. § 363(b) (requiring court approval only to "use, sell, or lease, other than in the ordinary course of business, property of the estate").   Notwithstanding the Freedom Lender Group's assertion that the Debtors should not yet be marketing their Assets, it is customary for debtors to begin a marketing process in the reasonable exercise of their business judgment before official court approval of such procedures.   See, e.g., In Re Tex. Rangers Baseball Partners, Case No. 10-43400 (DML), 2011 Bankr. LEXIS 1247, at *16 (Bankr. N.D. Tex. April 6, 2011) ("It is not uncommon for a financial advisor to begin work prepetition which carries over into a chapter 11 case.").   Under the Freedom Lender Group's construct, every debtor seeking to sell their assets in chapter 11 would need to wait until the entry of a bidding procedures order to start marketing, and companies would needlessly lose weeks or months in bankruptcy that could otherwise be spent maximizing the value of their estates.   Once the bidding procedures were approved, companies would then need to rush through bidder outreach and the diligence process to ensure emergence on the timeline contemplated by the milestones in their postpetition financing facilities.   This is the exact outcome the Freedom Lender Group alleges it wants to avoid.

---

[6]    Ironically, the Freedom Lender Group argues that "appeasement of major creditors is not a valid business justification for the proposed truncated timeline," while asking the Debtors to do exactly that.   Freedom Lender Group Obj. ¶ 23.   In In re Lionel, the Second Circuit held that the lower court's approval of a sale under section 363 of the Bankruptcy Code was an abuse of discretion where the only reason advanced for granting the sale motion was "the Creditors' Committee's insistence on it."   722 F.2d 1063, 1071 (2d Cir. 1983) (finding that this rationale was "insufficient as a matter of fact because it is not a sound business reason," and that it was "insufficient as a matter of law because it ignores the equity interests required to be weighed and considered under Chapter 11").

13.     Confusingly, the Freedom Lender Group also harps on the fact that the HoldCo Debtors should not be required to pay for the Debtors' sale process.  The HoldCo Debtors are not paying for the sale process (other than to the extent of their specific administrative expenses related to chapter 11).  Only the Consenting First Lien Lenders are.  Moreover, the HoldCo Debtors have been carved out of the DIP as borrowers and guarantors, other than to the extent funds are needed to be loaned to those entities—which they should not be for purposes of the sale process because the HoldCo Debtors do not have any assets that are for sale.  The Debtors are not selling claims or causes of action held by the HoldCo Debtors (if any), and the Debtors are not aware of any other assets held by the HoldCo Debtors besides their equity interest in Franchise Group, Inc.[7]

14.     The Freedom Lender Group argues that the marketing materials provided to Potential Bidders were not approved by the Freedom Lender Group and are missing "beneficial" information.  Freedom Lender Group Obj. ¶ 28.  Again, the Debtors have no legal requirement to share their marketing materials with the Freedom Lender Group, and the junior creditors' opinions on those materials are of no consequence with respect to the Court's business judgment inquiry. Moreover, if Potential Bidders have questions or concerns, they are well aware that they can contact Ducera as set forth in the bidding procedures.  To date, no party has voiced concerns about the quality of the Debtors' marketing materials other than the Freedom Lender Group.

**III.    The Consenting First Lien Lenders Have Agreed to Set Minimum Bid Prices.**

15.     As originally proposed, the Bidding Procedures provided the Debtors with considerable leeway to run the type of fulsome "sum of the parts" sale process for which the

---

[7]     See Revised Bidding Procedures n.4 ("For the avoidance of doubt, the Debtors are not selling any commercial tort claims or chapter 5 causes of action unless any such commercial tort claims or chapter 5 causes of action are related to a transferred Asset and/or any employees, business or operations relating to such transferred Asset.").

Freedom Lender Group advocates.  Among other rights the Debtors have under the Bidding Procedures:

- o  the Debtors may evaluate any Bid received;

- o  the Debtors may aggregate two or more Qualified Bids into a single consolidated Qualified Bid for purposes of determining whether such Qualified Bids, when aggregated, constitute a Sufficient Bid; and

- o  between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction (if held), the Debtors may further discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.

16.    In addition to the above, as of the date hereof, and as evidenced by the Revised Bidding Procedures Order, the Consenting First Lien Lenders have informed the Debtors that they will set Minimum Bid Prices for each of the Debtors' business segments.  The Minimum Bid Prices, set at $60.00 million for Buddy's, $200.00 million for The Vitamin Shoppe, and $900.00 million for Pet Supplies Plus (collectively, the "Minimum Bid Prices"), make the Bidding Procedures even more favorable to the Debtors and their stakeholders:  these prices are intended to encourage participation by Potential Bidders who might not have otherwise submitted a bid by providing information regarding the price at which the Consenting First Lien Lenders will support an auction for each specific business segment.  The Consenting First Lien Lenders have reserved their rights to credit bid at any such auction(s), increasing the competition around each of the Debtors' business segments.  The Minimum Bid Prices eliminate any doubt that bidders could have had regarding whether (i) assets can be sold separately and (ii) the bidder does not have to bid on all the assets or rely on others to bid on the remaining assets for their bid to be actionable. See Augustine Declaration ¶ 13; Grubb Declaration ¶ 21.

17.     Taken together with the existing bidding procedures, the Minimum Bid Prices assist the Debtors in maximizing their chances of identifying a "sum of the parts" sale.[8]  It is not necessary for this court to requiring the Consenting First Lien Lenders to release the assets if the Minimum Bid Price is reached, as the Freedom Lender Group indicates is necessary.  A release at that juncture may not be the value-maximizing path because the Consenting First Lien Lenders have reserved the rights to, and may ultimately wish to, submit bids in excess of the applicable Minimum Bid Prices, which would generate competitive tension at an auction and result in a higher price for the applicable assets.  Furthermore, a release price that bidders consider to be too steep may have the opposite effect and chill bidding altogether, which the Debtors (and, presumably, the Freedom Lender Group) wish to avoid.[9]  Until the Debtors know that they have identified the highest or otherwise best offer for any particular business segment, they should not be required to select a Successful Bidder for those assets.

## IV.  The Consenting First Lien Lenders' Consent and Consultation Rights Are Customary, and the Freedom Lender Group Has Appropriate Consent and Consultation Rights.

18.     The rights provided to the Consenting First Lien Lenders under the Debtors' Bidding Procedures are customary and appropriate under the circumstances because the Consenting First Lien Lenders are <u>not</u> a stalking horse bidder.  The Consenting First Lien Lenders' consent rights relate to determining whether (i) the economics of a Qualified Bid or combination

---

[8]   Relatedly, the Freedom Lender Group's argument that Potential Bidders are chilled because they do not know the exact amount of the ABL Facility that exists on each day of the case is not compelling (as this slight uncertainty is present in almost every chapter 11 case where debt incrementally increases or decreases), but, in any event, the argument is no longer relevant because the revisions to the definition of "Sufficient Bid" make it exceedingly clear that the ABL does not need to be taken out for a bid to constitute a Sufficient Bid.

[9]   Contrary to the Freedom Lender Group's assertions, the fact that the Consenting First Lien Lenders can potentially submit a credit bid in excess of a bid for a particular business segment does not inherently chill bidding.  If anything, it may create beneficial competitive tension that encourages Potential Bidders to put their best foot forward.

of Qualified Bids rise to the level of a Sufficient Bid, as it is now defined in the Revised Bidding Procedures, and (ii) the likelihood that the Sufficient Bid can be consummated. These rights have been granted because the Consenting First Lien Lenders, who are not yet a bidder in the sale process, are funding the Debtors' entire sale process. Pursuant to the terms of the RSA, these lenders have already committed to equitize their debt if they are <u>not</u> paid off in full—and if they do become bidders, their consultation and consent rights fall away.

19.     Debtors in chapter 11 cases often provide DIP lenders who are funding the cases with consent and/or consultation rights over the bidding procedures and sale process (including, at times, where those DIP lenders are stalking horse bidders). <u>See</u>, <u>e.g.</u>, <u>In re WOM S.A.</u>, Case No. 24-10628 (KBO) (Bankr. D. Del. July 16, 2024) [D.I. 536] (order approving bidding procedures whereby DIP agent maintained a consent right over the debtors' ability to accept any bid for an amount less than that required to repay in full in cash all outstanding obligations under the DIP Facility); <u>In re Edgio, Inc.</u>, Case No. 24-11985 (KBO) (Bankr. D. Del. Sept. 30, 2024) [D.I. 141] (order approving bidding procedures without a hearing whereby DIP lender (who was also the stalking horse bidder) maintained a consent right over the debtors' ability to terminate the sale transaction processes with respect to any and all assets and various consultation rights, including over whether a bidder's bid qualified for participation in the auction); <u>In re Lumio Holdings, Inc.</u>, Case No. 24-11916 (Bankr. D. Del. Sept. 25, 2024) [D.I. 139] (order approving bidding procedures whereby DIP lender (who was also the stalking horse) maintained consent rights over the sale of any portion of DIP collateral as set forth in the DIP credit agreement and the debtor maintained the right to consult with the DIP agent with respect to any non-cash bid received); <u>In re PWM Property Management LLC</u>, Case No. 21-11445 (MFW) (Bankr D. Del. July 14, 2022) [D.I. 792] (order approving bidding procedures whereby stalking horse bidder, who intended to equitize

prepetition debt absent a higher or better deal, had consent right over debtors' ability to modify the minimum bid and/or overbid, extend the bidding procedures' key dates and deadlines, or waive or modify the outside closing date required under the bid terms).

20.     The Revised Bidding Procedures now propose consultation and consent rights throughout for the Freedom Lender Group that, where appropriate, match the rights given to the Consenting First Lien Lenders.  These include consent rights over certain provisions that directly impact the Freedom Lender Group (solely in their capacity as holders of prepetition second lien debt) and, in particular, its ability to credit bid its debt.  Given that the Freedom Lender Group is not funding these Chapter 11 Cases, they are not entitled to further rights than those reflected in the Revised Bidding Procedures.

## V.     The Remaining Objections Should Be Overruled.

21.     The Debtors have received several other Objections with respect to the Bidding Procedures Motion.  The Debtors have prepared a summary chart, attached hereto as Exhibit A, which: (i) identifies each objecting party and sets forth the main points of each Objection; (ii) provides the Debtors' reply to each Objection (including, where applicable, a reference to additional or revised language in the proposed Revised Bidding Procedures or proposed Revised Bidding Procedures Order intended to address such Objection); and (iii) provides a status update indicating whether each Objection is resolved, adjourned, moot, or going forward at the hearing.

*[The remainder of this page is intentionally left blank]*

**WHEREFORE**, the Debtors respectfully request that the Court (a) overrule the Objections, (b) enter the Revised Bidding Procedures Order and approve the Revised Bidding Procedures, and (c) grant such other and further relief as this Court deems just and appropriate.

Dated: December 6, 2024
      Wilmington, Delaware

      **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

      */s/ Shella Borovinskaya*
      Edmon L. Morton (Del. No. 3856)
      Matthew B. Lunn (Del. No. 4119)
      Allison S. Mielke (Del. No. 5934)
      Shella Borovinskaya (Del. No. 6758)
      Rodney Square
      1000 North King Street
      Wilmington, Delaware 19801
      Telephone:  (302) 571-6600
      Facsimile:  (302) 571-1253
      emorton@ycst.com
      mlunn@ycst.com
      amielke@ycst.com
      sborovinskaya@ycst.com

      -and-

      **WILLKIE FARR & GALLAGHER LLP**
      Debra M. Sinclair (admitted *pro hac vice*)
      Matthew A. Feldman (admitted *pro hac vice*)
      Betsy L. Feldman (Del. No. 6410)
      Joseph R. Brandt (admitted *pro hac vice*)
      787 Seventh Avenue
      New York, New York 10019
      Telephone:  (212) 728-8000
      Facsimile:  (212) 728-8111
      dsinclair@willkie.com
      mfeldman@willkie.com
      bfeldman@willkie.com
      jbrandt@willkie.com

      *Proposed Co-Counsel to the Debtors and Debtors in Possession*