IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (JTD)<br><br>Re: Docket Nos. 194, 297 |

**THE AD HOC GROUP OF FREEDOM LENDERS' REPLY IN SUPPORT OF THEIR EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) ADJOURNING THE SECOND DAY HEARING SET FOR DECEMBER 10, 2024, (II) EXTENDING THE OBJECTION DEADLINES IN CONNECTION WITH THE SECOND DAY HEARING AND (III) GRANTING RELATED RELIEF**

The Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**"),[2] by and through its undersigned counsel, files, this reply (the "**Reply**") to the objection of the above-captioned debtors [Docket No. 297] (the "**Objection**")[3] to the *Freedom Lender Group's*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] The Freedom Lender Group comprises the entities named in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229], as it may be amended and supplemented from time to time.

[3] On December 3, 2024, the Ad Hoc Group of First Lien Lenders (the "**First Lien Group**") filed a *Joinder of the Ad Hoc Group of First Lien Lenders in the Debtors' Objection to the Ad Hoc Group of Freedom Lenders' Emergency Motion for Entry of an Order (I) Adjourning the Second Day Hearing set for December 10, 2024, (II)*

*Emergency Motion for Entry of an Order (I) Adjourning the Second Day Hearing Set for December 10, 2024, (II) Extending the Objection Deadlines in Connection with the Second Day Hearing, and (III) Granting Related Relief* [Docket No. 194] (the "**Motion**"). In support hereof, the Freedom Lender Group submits the Declaration of Erin M. Smith (the "**Smith Declaration**") and its exhibits.

### Preliminary Statement

1. Notwithstanding the Debtors' sharp Objection to the Motion, a short adjournment of a hearing on the final DIP Motion remains appropriate for four independent reasons.

2. ***One***, the DIP Motion should only be addressed after the Court rules on the pending *Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [Docket No. 192] (the "**HoldCo Freedom Motion**"). It makes no practical sense for the Court to enter a final DIP order in the OpCo Cases and then immediately put that DIP into default by modifying exclusivity, lifting the stay at the Holdco Debtors, or appointing a trustee in those Cases. No party has argued against that sequencing at the December 10th hearing, and that is how filed agenda was read.

3. ***Two***, the Debtors' document production with respect to the DIP Motion remains flawed and substantially incomplete. As catalogued in Section I, *infra*, the Debtors here took a defined set of document requests from the Freedom Lender Group, plainly proportionate to the hundreds of millions of dollars of the Freedom Lender Group's collateral that is at risk in the Second Day Motions, and have so botched their production that they are still producing

---

*Extending the Objection Deadlines in Connection with the Second Day Hearing, and (III) Granting Related Relief* [Docket No. 303].

substantive communications that could and should have been produced when they first promised their production would be complete—on November 22, 2024. As a point of reference, more than a third of the Debtors' productions were made between November 29 and December 5, representing most of the Debtors' email productions. While we are all necessarily accustomed to the accelerated, and at times chaotic, nature of contested matters in bankruptcy courts—the Freedom Lender Group is, for example, agreeing to a deposition of the Debtors' CEO on the day before the December 10th hearing to accommodate his week-long vacation—the Debtors here cannot just pick and choose what and when they want to produce and then shrug off their discovery obligations under the guise of having no time to adequately address obvious deficiencies. The timeline is, after all, in their control.

4. **Three**, the Debtors have just announced that they intend to appoint an "independent" director (unnamed as of the time of this filing) to the HoldCo Debtors' boards, with an apparent plan to airlift that individual into the Holdco Debtors' cases, allow him or her to perhaps engage as-of-yet unretained lawyers and financial advisors, and presumably bless or curse the remaining second day motions. Leaving aside whether a synthetic trustee is appropriate under the circumstances—we have not yet been told enough to decide—that person's views cannot be part of the record of Tuesday's hearings as all testifying witnesses have been identified and are being deposed over the next few days. In other words, the Debtors must choose whether they want to proceed on Tuesday on the corporate record as it stands or instead wheel out their proposed last-minute corporate governance fix—they cannot fairly have it both ways.

5. **Four**, Willkie Farr and Gallagher LLP ("**Willkie**") has, somewhat shockingly, still failed to file its retention application and accompanying disclosures. While it would be somewhat out of the ordinary in any case for a court to grant final relief on a three-quarter of a billion-dollar DIP negotiated and advocated for by unretained 327(a) counsel, that problem

3

may be more serious here. Willkie individually represented the Debtors' former CEO, Brian Kahn, in connection with the management buyout that the First Lien Group now contends (rather vociferously) has given rise to material breach of fiduciary duty claims in favor of the Opco Debtors' estates against individuals and entities involved in that transaction. As phrased by the First Lien Group, Willkie could plainly be in the firing-line of those claims. To make matters worse, under the terms of the Plan and RSA (which cannot be amended without defaulting the DIP), Willkie is both an Exculpated Party and a Released Party. As a matter of good order, if there is any issue with respect to the firm's retention—and there may be some issue given that the application is now long overdue—it should be resolved before final approval of the DIP, which is plainly tied to the Plain on file as is, is considered by the Court.

I. **The Debtors Have Demonstrated That They Will Not Be Able to Produce the Full Record of Discovery Sufficiently Before the December 10th Hearing Date**

6. In the Objection, the Debtors state that "[t]o the extent the Freedom Lender Group believes discovery has not been completed, that is simply due to its excessive and overly broad discovery requests into matters that are irrelevant to the Second Day Motions." Obj. at ¶ 14. This claim is belied by the requests at issue and Debtors' own conduct with respect to them.

7. *First*, the discovery issued by the Freedom Lender Group is not excessive or overly broad. Rather, it consisted of effectively one set of document requests (Smith Decl. Ex. 1), twelve interrogatories (Smith Decl. Ex. 7), a 30(b)(6) deposition notice [Docket No. 71], and a request to depose the Debtors' testifying witnesses. (That the Debtors have elected to put on three witnesses to support their DIP Motion is a burden of their own making.). As for the document requests, some have been rendered moot as Second Day Motions have been resolved or through the parties' negotiations as they have met and conferred. By our count, there are fewer than 24 operative requests at issue. Some have still never been resolved—for example, Request No. 4 (asking for unconsolidated financials for the HoldCo Debtors). Others,

4

as the Court can see, are stock requests for a DIP Motion, such as Request No. 10 (asking for negotiation materials) and Request No. 8 (asking for DIP marketing materials). These are exactly the type and breadth of requests any debtor seeking a massive priming DIP can expect from its secured creditors and ones which debtors routinely handle without the gnashing of teeth.

8. **Second**, the Debtors' assertion that, in response to the pending requests, "the Debtors have produced all relevant documents in advance of the Second Day Hearing," Obj. ¶ 21, omits that more than one-third of the Debtors' document production—including more than 70% of the Debtors' email production—was made between Thanksgiving and the following Thursday. As noted above, the Debtors had initially committed that their production would be substantially complete on November 22, and the deposition and briefing schedule was constructed around that commitment. It remains unclear whether document production in connection with the Second Day Motions is actually complete as of the filing of this pleading. Most recently, the Debtors made a material production on December 5, 2024—hours before the depositions of two of the Debtors' three 30(b)(6) witnesses, one business day before the deposition of the Debtors' CEO and third 30(b)(6) witness, and two business days before the Second Day Hearing—and yet the cover letter accompanying that production still does not indicate whether it is, in fact, the Debtors' final production. *See* Smith Decl. Ex. 2 (Debtors' document production cover letter, dated December 5, 2024). While counsel to the Freedom Lender Group is working hard to process and review the late production and prepare for the depositions and Second Day Hearing, there will be no opportunity to supplement the Freedom Lender Group's Second Day objections based on the discovery.

9. **Third**, to the extent discovery has still not been timely completed, it is the result of the Debtors' decision to conduct searches without engaging with the Freedom Lender Group on the most basic elements of document collection and production as required under the Local

Rules.  Specifically, despite the Freedom Lender Group's repeated requests and offers to meet and confer, the Debtors determined to choose and run search terms and impose search parameters without ever consulting the Freedom Lender Group at all, in violation of the rules. *See* Del. Bankr. L. R. 7026-3(e) ("The parties shall confer and in good faith attempt to reach agreement as to the method of searching, and the words, terms, and phrases to be searched with the assistance of the respective e-discovery liaisons, who are charged with familiarity with the parties' respective systems.").  Only after the Freedom Lender Group's repeated requests—which were made from the parties' first meet and confer—did the Debtors finally share this information.  Thus, the "compromise" that the Debtors claim to have given the Freedom Lender Group is really their attempt to play catch-up, which could have been avoided had they just conducted the discovery process in an open and transparent manner, as they were required to do.

10.     The following is a timeline charting the material deficiencies in both the Debtors' discovery process and document production, none of which are (or can be) contested by the Debtors:

- The Debtors initially ran their search terms and selected their custodians without sharing them with the Freedom Lender Group, despite the Freedom Lender Group's repeated requests for the proposed search terms from the first meet and confer and questions about missing documents.  Smith Decl. Ex. 4 (Obj. at Ex. F, pp. 78-79) (email from K. Grinnell, dated November 20, 2024 at 7:28 AM).[4]

- On November 20, 2025, two days before the initially promised substantial completion date, the Debtors finally shared their search terms and custodian list.  That same day, the Freedom Lender Group requested the inclusion of additional or revised search terms and explained the obvious deficiencies with the Debtors' terms.  *See* Obj. ¶ 16; Smith Decl. Ex. 4 (Obj. at Ex. F, pp. 75-78) (email from E. Smith dated November 20, 2024 at 6:54 PM). Also on that date, the Freedom Lender Group filed the Motion, and described to the Court the serious deficiencies in the Debtors' productions at that time (including the complete absence of emails and a refusal to run such obvious and targeted search terms as "RSA," the project name

---

[4] For the Court's convenience, the Freedom Lender Group is providing Exhibits E and F of the Debtors' Objection as Exhibits 3 and 4 of the Smith Declaration, respectively.

("Project Fusion"), or domain names for the DIP lender or its financial advisor). Mot. ¶ 2.

- Five days later, on November 25, 2024, the Debtors informed the Freedom Lender Group that they had run certain additional searches based on a "revised" search protocol. *See* Smith Decl. Ex. 4 (Obj. at Ex. F, pp. 74-75) (email from B. Sullivan, dated November 25, 2024 at 11:51 AM). Notably, the November 25 search protocol (which the Debtors unilaterally adopted) did not include the most important suggestions by the Freedom Lender Group, including "RSA," the apparent project name ("Project Fusion"), any of the Freedom Lender Group's suggested terms to target alternatives to the DIP, or any domain names for the DIP lenders or their financial advisors that would necessarily capture the negotiations of the DIP and RSA. Smith Decl. Ex. 3 (Obj. at Ex. E).

- Also for the first time, on November 25, 2024, the Debtors told the Freedom Lender Group that the Group's proposed and revised search terms "would require the Debtors to review over 50,000 additional documents." Obj. ¶ 16. To this day, the Freedom Lender Group has *no* insight into this claim, because despite the Freedom Lender Group's immediate and repeated requests that the Debtors produce a hit report so that the parties could work cooperatively to tailor the search parameters, the Debtors have categorically refused to do so. *See* Smith Decl. Ex. 4 (Obj. at Ex. F, pp. 73-74) (email from E. Smith, dated November 25, 2024 at 10:13 PM); Smith Decl. Ex. 5 at 5 (email from E. Smith, dated December 3, 2024 at 10:03 PM) ("We understand from the [meet and confer] call that the Debtors refuse to produce a hit report.").

- In their Objection (filed on December 3, 2024), the Debtors state in a footnote that "in the spirit of compromise, the Debtors have reviewed 1,377 additional documents in response to the Freedom Lender Group's additional search requests." *See* Obj. at 10 fn. 12. To be clear, there has been no compromise on search terms between the parties. Rather, the Debtors have chosen to address a handful of the deficiencies in their process and subsequent productions by implementing incremental changes of their choosing. Moreover, this footnote is the first time the Freedom Lender Group learned the number of additional documents reviewed by the Debtors in connection with the revised search terms and parameters. How the additional documents were narrowed to 1,377 from 50,000 remains a mystery.

- The Debtors have failed to apply an appropriate time-period for their document pulls. With respect to Mr. Grubb and Mr. Orlofsky, two of the Debtors' testifying witnesses, the Debtors have pulled documents on the respective date when Ducera's and FTI's engagement letters were <u>executed</u>. Given that relevant communications likely started far before this date, the Freedom Lender Group asked that the Debtors run searches from the earliest date Ducera and Alix Partners began discussing a potential engagement with the Debtors. The Debtors refused. *See* Smith Decl. Ex. 4 (Obj. at Ex. F, p. 73) ("We also reiterate our request that you please run searches from the

7

earliest date Ducera and Alix Partners were discussing a potential engagement with the Debtors, rather than the date the engagement letters were formally executed."); Smith Decl. Ex. 3 (Obj. at Ex. E) (showing that data parameters for Ducera and AlixPartner custodians were unchanged). So, for example, the Debtors have not produced any pitch books from either firm. With respect to Mr. Laurence's documents, the Debtors started their document pull from only September 27, 2024—barely a month before the Petition Date—based on their assertion that that was the date the board first considered DIP proposals. *See* Smith Decl. Ex. 4 (Obj. at Ex. F, p. 75) (noting that the Debtors' proposed date range corresponded "more closely to the Board's consideration of the DIP financing"). The Freedom Lender Group repeatedly asked that the Debtors pull Mr. Laurence's emails from the time when the Debtors started considering a restructuring, either in or out of court. The Debtors refused. *See* Smith Decl. Ex. 5 at 5 (email from E. Smith dated December 3, 2024, requesting emails where the Debtors considered restructuring alternatives); *id.* at 3 (email from B. Sullivan dated December 4, 2024, stating Debtors would expand the timeframe parameter 2 months without explanation as to whether that would capture relevant documents and communications concerning restructuring alternatives).

- On December 3, 2025, in a final attempt to get the Debtors to expand the timeframe for their search of Mr. Laurence's emails, the Freedom Lender Group showed the Debtors a July 22, 2024 email in which Mr. Laurence discussed a potential restructuring. *See* Smith Decl. Ex. 5 at 5. On December 4, 2024, *after* their statement in the Objection that their production was complete, Obj. ¶ 21 ("The Debtors have produced all relevant documents in advance of the Second Day Hearing . . . ."), the Debtors agreed to expand the timeframe for their search of Mr. Laurence's emails. *See* Smith Decl. Ex. 5 at 3 (email from B. Sullivan, dated December 4, 2024 at 11:05 AM) ("[W]e will expand the date range for Mr. Laurence—with respect to the additional terms you proposed and that we accepted with modifications—an additional two months, going back to July 27, 2024."). Even then, the Debtors' proposed time frame begins on July 27, 2024—five days *after* the email presented by the Freedom Lender Group showing Mr. Laurence was already involved in restructuring discussions.

- While the Debtors represented that the forthcoming December 5, 2024 production would reflect the expanded timeframe for Mr. Laurence's emails, *see* Smith Decl. Ex. 5 at 3 ("We expect to make this additional Laurence production—which will not be voluminous—by tomorrow."), no additional documents appear to have been produced from July or August 2024.

- Finally, the Debtors appear to have inappropriately redacted for "privilege" multiple emails reflecting negotiations between the Debtors and their DIP lenders on the terms of the DIP. *See* Smith Decl. Ex. 6 at 1.

In sum, coupled with the relatively small number of documents (about 150 emails) reflecting correspondence between the Debtors' advisors and the DIP Lenders' advisors, the

8

Debtors' refusal to run searches based on the domain names for the DIP lenders and their advisors, and multiple references in emails to Willkie's separate correspondence with the DIP Lenders' counsel, which do not appear to be included in the productions to date, the Freedom Lender Group is not confident that the Debtors have met their obligation under the Rules to conduct discovery proportionate to the needs of the case.

11. **_Fourth_**, the Debtors' excuses for why the Debtors failed to respond to discovery in a timely manner are meritless. The Debtors argue that "many of the terms that the Freedom Lender Group demands to be used are totally irrelevant to the Second Day Hearing and concern matters more appropriate for Plan discovery." Obj. ¶ 16. Even if this were correct (and it is not), it is also irrelevant, as the Debtors have conducted discovery only within the narrow scope of the Debtors' definition of what is relevant to the Second Day Hearing. In other words, the Debtors have ignored (and thus spent no time on) the requests that they unilaterally determined are "Plan discovery" matters, even though the Proposed DIP will default if their Plan is modified without the First Lien Group's consent. Additionally, the Debtors have refused to discuss, and have produced zero documents responsive to, the Freedom Lender Group's requests for production concerning the Plan and Disclosure Statement, served on November 16, 2024.[5]

12. The Debtors also complain that the Freedom Lender Group has not produced any documents, as if this somehow excuses the Debtors, as the party seeking relief, from timely completing production of discovery relevant to the Second Day Hearing. See Obj. at ¶ 17. To be clear, the Debtors <u>agreed</u> to a narrow scope of document requests on the Freedom Lender

---

[5] As indicated in the Motion at footnote 3, the Freedom Lender Group has concerns that the time for constructive engagement on the Disclosure Statement and Plan discovery is rapidly running out, given the Debtors' chosen schedule and categorical refusal to engage until after the Second Day Hearing. Despite repeated requests by the Freedom Lender Group, the Debtors have not yet provided their proposed search terms, custodians, or time frame for documents responsive to the Freedom Lender Group's requests for production served on November 16, 2024. *See* Smith Decl. Ex. 4 (Obj. at Ex. F, pp. 75-78).

Group, for which the Group confirmed it has no responsive documents. In other words, the creditors did their work timely, consensually, and in accordance with the rules.

13. For all these reasons, adjournment of the December 10 hearing is warranted to allow for the full factual record to be developed by the Freedom Lender Group (the largest unsecured creditor in these cases, according to the Debtors) before the Court may approve the DIP on a final basis.

## II. Adjournment of the Second Day Hearing is Warranted Based on New Information Since the Motion Was Filed

### A. The Debtors' Recent Proposal of an Independent Director Warrants An Adjournment

14. In the *Debtors' Objection to Motion of the Freedom Lender Group for Entry of an Order (I) Terminating the Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the Holdco Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [Docket No. 298], the Debtors announced for the first time that "the Board of Directors of the direct equity owners of each of the HoldCo Debtors are supportive of appointing a new independent director solely at the HoldCo Debtors." *Id.* at ¶ 52. Such independent director would be "required to deal with any conflict matters among the Debtors" and empowered to investigate, prosecute, and settle claims, and to engage independent counsel. *Id.* Apparently, "the applicable boards have already voted in favor" of this proposal. *Id.*

15. While this late-breaking news could be promising, the Freedom Lender Group has no information on which to evaluate the proposal or understand the effect on the Cases. During a meet and confer with the Debtors on December 5, 2024, the Freedom Lender Group asked for basic information about this "new director." Debtors' counsel advised that he had no additional information to share beyond what was in the Debtors' filings. Accordingly, the Freedom Lender Group followed up with a written request that the Debtors (i) identify who is or will be the independent director, (ii) the date on which the boards considered and voted to

10

appoint a new independent director (as well as to provide the related board materials), and (iii) identify counsel to the new independent director (if already retained) so that the Freedom Lender Group might contact them.  *See* Smith Decl. Ex. 5 at 1.  The Debtors have not answered these basic questions, let alone articulated how the independent director could possibly get up to speed before the December 10th hearing to evaluate the DIP Motion as an independent HoldCo fiduciary.  This morning, during the ongoing deposition of Mr. Grubb (one of the Debtors' designated 30(b)(6) witnesses), the Freedom Lender Group learned that an independent director has not yet been appointed and that the management team is interviewing candidates to recommend to the board from a slate proposed by conflicted management and supported by the First Lien Group—who are not even creditors of the Holdco Debtors.

16. In any case, the proposed new independent director's views cannot properly be made part of the Second Day record, as all testifying witnesses have already been identified and are being deposed.  If, on the other hand, and as seems to be the current situation, an independent director is appointed after the DIP Order has been entered on a final basis, the independent director's evaluation will transform into a question of whether—even if the independent director believes (as the Freedom Lender Group does) that it is not in the best interests of the HoldCo Debtors to enter into the DIP—a decision to default under the DIP is in the HoldCo Debtors' interests.

17. An adjournment of the Second Day Hearing is thus warranted to give the Debtors and the Freedom Lender Group time to determine together whether an independent director at the HoldCo Debtors is useful, and if so, to give the independent director the runway to evaluate the DIP and proposed Plan as a HoldCo-only fiduciary.

    **B.    The Ongoing Failure of Debtors' Counsel to File Their Retention Application Warrants Adjournment**

18.    To date, Debtors' counsel, Willkie, has not filed its retention application.[6] As a consequence, the Debtors are now proposing that the Court approve not only a Final DIP Order but also the Disclosure Statement, currently scheduled to be heard on January 17, 2024, without any party seeing the Willkie retention application, let alone having an opportunity to object and be heard with respect to any concerns about Willkie's disclosures of interests which may be adverse to the estate.

19.    This is a potentially material, material problem. Under the terms of the DIP Credit Agreement, "any act or occurrence that would . . . permit the Restructuring Support Agreement to be terminated" or "the Loan Parties' failure to satisfy any of the Milestones" constitutes an Event of Default. *See* DIP Credit Agreement § 7.01(p)(ii)-(iii). In turn, the Restructuring Support Agreement ("**RSA**") states that the "execution, delivery, and/or filing of any Definitive Document that is not acceptable to the Required Consenting First Lien Lenders pursuant to their consent rights" constitutes a Termination Event. *See* First Day Decl., Ex. B, RSA § 12.01(a) [Docket No. 15]. Taken together, essentially any variance from the RSA or the plan contemplated in the RSA could qualify as an event of default under the DIP Credit Agreement.

20.    As currently drafted, Willkie is both a Released Party and an Exculpated Party under the Plan.[7] However, as the Plan itself implicitly acknowledges, there are unresolved

---

[6] The Debtors' failure to file a retention application for Willkie is surprising for at least two reasons. ***First***, according to the U.S. Trustee's Program Manual and Policies on Chapter 11 Case Administration, "[t]he best practice is for the professional to file an application for employment as soon as possible after the petition date or retention, whichever comes first."

*See* https://www.justice.gov/ust/file/volume_3_chapter_11_case_administration.pdf/dl?inline. ***Second***, on November 26, 2024, the Debtors filed retention applications for at least five of their other proposed professionals and on December 3, 2024 the Debtors filed two additional retention applications.

[7] The Proposed Plan defines "Released Parties" to include "Related Parties" of the Debtors, which includes the Debtors' attorneys or other professionals. *See* Proposed Plan §§ 1.156, 1.157. Willkie would therefore constitute a Related Party of the Debtors, and would be released. Willkie would be an Exculpated Party as well. *See* Proposed Plan § 1.75.

issues remaining with respect to the Debtors' former CEO Brian Kahn. Both the definitions of "Released Party" and "Exculpated Party" carve out "Brian Kahn and Prophecy Asset Management LP and each of their Affiliates." *See* Proposed Plan §§ 1.75; 1.157. That is because the Take-Private Transaction, as well as "the Company's transactions and relationship with its former CEO and controlling Shareholder, Brian Kahn," is currently being "investigated" by the Debtors' Special Counsel. *Debtors' Application for an Order Authorizing the Retention and Employment of Petrillo Klein + Boxer LLP as Special Counsel to the Debtors and Debtors in Possession Effective as of the Petition Date* [Docket No. 252] at Ex. F, Engagement Agreement. Given the (appropriate) carve-out for Mr. Kahn, it is unclear how Willkie can be both a Released Party and Exculpated Party without having been approved as disinterested counsel. Willkie's own website touts the firm's representation of Mr. Kahn in connection with the Take-Private Transaction.[8] On information and belief, Willkie's representation of Mr. Kahn also extended (perhaps until quite recently) into his pending civil and criminal investigations.

21. Without seeing Willkie's retention application, including the disclosures regarding its disinterestedness, it is impossible for the Freedom Lender Group, any other party to the Chapter 11 Cases, and most importantly the Court, to fully understand Willkie's prior involvement with Mr. Kahn. It may very well be that revision of the Proposed Plan is necessary and that, in turn, could trigger an Event of Default under the DIP Credit Agreement. As a matter of good order, a debtor should only be incurring a multi-hundred million dollar DIP, and making key disclosures to its creditor body in a disclosure statement, with the advice of disinterested, 327(a) counsel who has been subject to appropriate scrutiny and approved by the Court.

---

[8] *See* Willkie, *Franchise Group CEO Brian Kahn Completes $2.6 Billoin Take-Private Transaction* (Sept. 8, 2023), https://www.willkie.com/news/2023/09/franchise-group-ceo-brian-kahn-completes-2-6-billion-take-private-transaction.

22. In sum, the Final DIP Order cannot and should not be entered in this case until there is sufficient disclosure around Willkie's prior engagement(s) with Brian Kahn, particularly in light of the risk that any change to the Release or Exculpation provisions in the plan to carve-out Willkie could be an event of default under the DIP.

## **CONCLUSION**

23. For all the reasons stated above and the Motion, the Freedom Lender Group respectfully requests that the Court adjourn the Second Day Hearing until after a decision on the HoldCo Freedom Motion and grant such other relief as the Court deems just and proper.

*[Remainder of this page intentionally left blank]*

Dated: December 6, 2024
      Wilmington, Delaware

*/s/ Michael J. Farnan*
**FARNAN LLP**
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
       mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**
Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
       azatz@whitecase.com
       sam.hershey@whitecase.com
       erin.smith@whitecase.com
       brett.bakemeyer@whitecase.com

*Counsel for the Ad Hoc Group of Freedom Lenders*