## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 192; 298; 299** |

## OMNIBUS REPLY OF THE AD HOC GROUP OF FREEDOM LENDERS IN SUPPORT OF ITS MOTION FOR ENTRY OF AN ORDER (I) TERMINATING EXCLUSIVITY IN THE HOLDCO DEBTORS' CASES, (II) LIFTING THE AUTOMATIC STAY IN THE HOLDCO DEBTORS' CASES, OR (III) APPOINTING A CHAPTER 11 TRUSTEE FOR THE HOLDCO DEBTORS

The Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**"),[2] by and through

its undersigned counsel, submits this reply (the "**Reply**") in support of the *Motion of the Ad Hoc*

---

[1] The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] The Freedom Lender Group is comprised of certain HoldCo Lenders and Second Lien OpCo Lenders, as named in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229], as it may be amended and supplemented from time to time.

*Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [Docket No. 192] (the "**Motion**") and in response to (a) the Debtors' objection to the Motion [Docket No. 298] (the "**Debtors Objection**"), (b) the objection of the Ad Hoc Group of First Lien Lenders (the "**First Lien Group**") to the Motion [Docket No. 299] (the "**First Lien Group Objection**"), and (c) the Official Committee of Unsecured Creditors' (the "**Committee**" and together with the Debtors and the First Lien Group, the "**Objecting Parties**") response to the Motion [Docket No. 294] (the "**Committee Objection**" and, together with the Debtors Objection and the First Lien Group Objection, the "**Objections**") and respectfully represents as follows:[3]

## PRELIMINARY STATEMENT

1.     The primary premise of the Motion, as filed, is that the Debtors are, through their proposed DIP Facility, sale process, and plan, attempting to rob Peter (the HoldCo Debtors) to pay Paul (the OpCo Debtors).  The Objecting Parties do not even attempt to contest that premise.  Instead, the Debtors have embraced that concept and promote the novel legal proposition that it is actually the ***obligation*** of the OpCo Debtors to take value from the HoldCo Debtors and that the HoldCo Debtors should stand down and allow creditors of their estates to receive no recovery – which is exactly what the Debtors seek to achieve through their fleet of rushed motions.  That legal proposition is fatally misguided.  The Debtors ask this Court to ignore controlling Third Circuit precedent holding that co-debtors of separate estates that are not substantively consolidated cannot take or give away each other's assets or value to benefit creditors of one Debtor to benefit creditors of another Debtor.  To prevent an obvious corruption of fundamental bankruptcy policy, these

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Motion.

Chapter 11 Cases require a reset.

2.    Taking their arguments at face value, the Objecting Parties have so distorted and demonized the Motion that it bears no resemblance to the original purpose of what the Freedom Lender Group has set out to accomplish.  There is no dispute that the Freedom Lender Group represents approximately 93% of the only known, non-insider creditors of the HoldCo Debtors. These are the only stakeholders of the HoldCo Debtors that will inevitably be able to carry the water to confirm a plan under section 1129(a)(10) of the Bankruptcy Code.  Nor is there any dispute that, (1) as secured creditors, the HoldCo Lenders have recourse to the assets of the HoldCo Debtors' estates, some of which are well-defined (such as the equity in Freedom VCM, Inc. and Franchise Group, Inc.) and some are yet-to-be-determined (such as the claims and causes of action of the HoldCo Debtors), and (2) those assets have not been valued.

3.    Yet, only seven days after commencement of these Chapter 11 Cases, all of the Debtors, including the HoldCo Debtors, filed their Proposed Plan.  On its face, that plan either gives the HoldCo Debtors' assets to the First Lien OpCo Lenders or releases them for no consideration.  This is the case unless the output of an unnecessarily expedited sale process generates proceeds sufficient to pay in full the first lien secured debt at the OpCo Debtors.  The Debtors and the First Lien Group admit they do not believe this hurdle will be cleared through bidding procedures (even in their recently modified state) designed to fulfill that prophecy.

4.    Immediately recognizing all of this, and to avoid being accused of delay, the Freedom Lender Group quickly proposed an alternative plan for the HoldCo Debtors to the Debtors.  Despite the Debtors' multiple promises to do so, the Debtors still have not provided a single comment to it or proposed modifications to their existing Proposed Plan to reflect its terms, saying that they cannot do so without talking to the First Lien Group, who are indisputably

3

creditors at other estates and who have no claims at the HoldCo Debtors.  Now, the Debtors file over the top pleadings of doom that, other than telling the Freedom Lender Group to file a confirmation objection, do not suggest anything else that the HoldCo Lenders could or should have done to protect their collateral in the HoldCo Debtors' estates.  Instead, they resort to platitudes of complexity and insist these Chapter 11 Cases are in the "very nascent stage," ignoring that the Debtors are a week away from launching solicitation on their Proposed Plan.

5.      Far from seeking a "nuclear option," the relief that the Freedom Lender Group seeks is actually the least disruptive thing possible under the circumstances.  The Freedom Lender Group has simply asked for permission to let the Freedom Lender Group put its own proposed plan (which only would affect the HoldCo Debtors) on file.  This is not destructive; rather, it is the only way that, on the Debtors' unnecessarily condensed timetable, creditors at the HoldCo Debtors would have a viable alternative to a plan that would give them no recovery.  Upon confirmation, the Court and creditors would decide which plan is better – the one which the largest creditors of the HoldCo Debtors have supported or the one they have rejected.

6.      The real problem here is that the Debtors do not contend that allowing the Freedom Lender Group to propose their alternative plan is actually harmful to the HoldCo Debtors but, rather, that giving effect to the HoldCo Debtors' rights would upset the carefully constructed landgrab dictated by the First Lien Group.  This favoritism also flies in the face of well-established bankruptcy law and ethics.

7.      The issue is, put simply: the Freedom Lender Group believes there is value in the HoldCo Debtors' estates – that is why they participated in the Take Private Transaction in the first place.  The Objecting Parties now seem to recognize such value exists; otherwise, they would not be contesting the Motion so zealously.  If nothing is done and the status quo set up by the Debtors

4

(with heavy influence by the First Lien Group) continues, the value bargained for by the HoldCo Lenders will be stolen or given away in exchange for nothing.

8.        The Court should grant the Motion to either: terminate exclusivity and allow the Freedom Lender Group's proposed plan for the HoldCo Debtors to go forward, lift the stay at the HoldCo Debtors to give the Freedom Lender Group access to the assets they bargained for prepetition, or, in the alternative, put a chapter 11 trustee – a truly disinterested fiduciary – in charge of the HoldCo Debtors.

## UNDISPUTED FACTS

9.        Based on statements made in the Objections and other statements made to date, the following facts are not in dispute:

- The holdco-opco structure was created as part of the August 2023 Take Private Transaction, and the proceeds of the HoldCo Facility were used to pay existing shareholders.  First Lien Group Obj. ¶¶ 7, 9; Committee Obj. ¶ 10.

- The HoldCo Debtors have no operations. Debtors Obj. ¶ 2 (calling them "empty intermediate holding companies"); First Lien Group Obj. ¶ 10; Committee Obj. ¶ 10.

- The HoldCo Debtors' only "known" non-contingent liability is ultimately secured by a pledge of Franchise Group, Inc.'s equity and Freedom VCM Interco Holdings, Inc.'s equity.   Debtors Obj. ¶ 49; *see also* First Lien Group Obj. ¶¶ 10, 31; Committee Obj. ¶ 11.

- The principal amount outstanding under the HoldCo Facility as of the Petition Date was $514.7 million.  First Day Decl. ¶ 64; Mot. ¶ 14.

- The HoldCo Facility is secured by a share pledge granted by each of the HoldCo Debtors.  Debtors Obj. ¶ 31; Committee Obj. ¶ 10; First Lien Group Obj. ¶ 49.

- The HoldCo Lenders are not receiving, and have not been offered, adequate protection for any diminution in the value of their collateral. Nov. 5, 2024, Hr'g Tr. 87: 14-22 (admitting that the HoldCo Lenders are not receiving "any adequate protection package by the debtors").

- The same proposed counsel and advisors advise the HoldCo Debtors and the OpCo Debtors.

- There are overlapping board members, management, officers and directors at the HoldCo Debtors and the OpCo Debtors.

- There is one independent director appointed at the HoldCo Debtors and Debtors - Freedom VCM Interco Holdings, Inc. and Freedom VCM Interco Holdings, Inc.

- Intercompany claims "may" exist between the HoldCo Debtors and the OpCo Debtors.  First Lien Group Obj. ¶¶ 30 (iii-iv), 58; Debtors Obj. ¶¶ 50-51; Committee Obj. ¶ 26.

- Intercompany claims between the HoldCo Debtors and the OpCo Debtors are of indeterminate value.  First Lien Group Obj. ¶¶ 30 (iii-iv), 58; Debtors Obj. ¶¶ 50-51; Committee Obj. ¶ 26.

- The Freedom Lender Group sent a draft proposed plan for the HoldCo Debtors to counsel to the Debtors on November 15, 2024.  Debtors Obj. ¶ 4; Committee Obj. ¶ 12.

- On November 17, 2024, counsel to the Debtors and counsel to the Freedom Lender Group had a "high-level discussion" about the Freedom Lender Plan.  Debtors Obj. ¶¶ 6 n. 5; 15.

- There is no independent investigation into causes of action and the Debtors currently control investigation and prosecution of causes of action as between the HoldCo Debtors and OpCo Debtors.  Debtors Obj. ¶ 49; Committee Obj. ¶¶ 1, 5, 31; First Lien Group Obj. ¶ 4.

- The Debtors are in default with respect to a number of provisions of the HoldCo Credit Agreement.  Debtors Obj. ¶ 36.

- 97% of the First Lien OpCo Lenders support the Proposed Plan.  Debtors Obj. ¶ 37.

- The Debtors do not yet have the committed support of the remainder of their stakeholders on the Proposed Plan. Debtors Obj. ¶ 22; Committee Obj. ¶¶ 1, 6, 30.

10.    On December 4, 2024, the Freedom Lender Group proposed an up to $7.5 million debtor-in-possession credit facility to fund the administration of the HoldCo Debtors' cases if necessary (the **HoldCo DIP Facility**).  *See Supplement to Objection of the Ad Hoc Group of Freedom Lenders to Final Approval of the Debtors' DIP Motion* [Docket No. 308].  Of that $7.5 million, up to $1.5 million is earmarked for payment of administrative expense claims at the HoldCo Debtors, which is the amount of funding the Debtors estimated would be necessary.  The

HoldCo DIP Facility does not suffer from many of the infirmities in the Debtors' existing DIP Facility: it does not seek to give prepetition creditors rights to entities that they do not currently have recourse to, it has significantly lower fees, it has a longer maturity, it does not seek liens on avoidance actions or proceeds thereof, it does not include a waiver of section 506(c) and the "equities of the case" exception of section 552(b) of the Bankruptcy Code, and it is not tied to any particular plan or milestones. The next day, the Debtors filed a new proposed form of final DIP order for their existing DIP Facility that would limit guarantees at the HoldCo Debtors to liens on unencumbered assets with superpriority status and only to the extent DIP proceeds are used by, or for the benefit of, the HoldCo Debtors. *See* Docket No. 336 Ex. A ¶ 2(f).

## NEW FACTS

11.    The Objections allege a number of facts that have not previously been established in these Chapter 11 Cases. These include the following:

- The Debtors and the First Lien Group believe the members of the Freedom Lender Group to be out of the money and, thus, the Debtors' sale process is not expected or intended to obtain bids that would result in net proceeds exceeding the first lien secured debt at the OpCo Debtors. *See* Debtors Obj. ¶ 31 (stating that the members of the Freedom Lender Group are "unsecured creditors who are not entitled to adequate protection" because the only proposed transaction obtained so far is the equitization of the First Lien OpCo Lenders' claims "subject to the outcome of the Debtors' sale process"); First Lien Group Obj. ¶ 49 ("The value of the HoldCo Term Loans' collateral is functionally worthless – an equity pledge in an overleveraged holding company, which sits behind more than $1.5 billion of funded debt, not to mention hundreds of millions of dollars in unsecured claims.").

- Not only are there intercompany claims held by the HoldCo Debtors against the OpCo Debtors, as alleged in the Motion, but there are also allegations of potential claims held by the OpCo Debtors against the HoldCo Debtors. First Lien Group Obj. ¶ 4.

- The First Lien OpCo Lenders have agreed to make the guarantees provided by the HoldCo Debtors under the Debtors' existing DIP Facility limited to the amount of DIP proceeds actually used by those entities. First Lien Group Obj. ¶ 4.

- The Debtors have agreed to appoint a new independent director at the HoldCo

7

Debtors vested with the authority to investigate and address intercompany claims among the Debtors (First Lien Group Obj. ¶ 4) or perhaps to have a consent right over any conflict matter among the Debtors (Debtors Obj. ¶ 52). The Objections are inconsistent on this point.[4]

- The same management and board members negotiated the terms of the DIP and RSA on behalf of both the HoldCo Debtors and the OpCo Debtors and negotiated the terms of the inter-debtor DIP Facility that they now propose for the first time in the latest version of final DIP order, which was filed the morning of this Reply. [Docket No. 336].

## DISPUTED FACTS AND MATERIAL POINTS OF LAW

12.     The Freedom Lender Group submits that there are only a few disputed facts and material points of law that need to be addressed with respect to the Motion, which are the following:

(a)     Whether boards of directors for multiple affiliated entities owe fiduciary duties to each entity individually or to "all of the Debtors' stakeholders" collectively Debtors Obj. ¶ 49 (emphasis in original).

(b)     Whether the only source of recovery for the HoldCo Lenders is maximization of the value of the OpCo Debtors' assets or there are other potential sources of value that should inure to the benefit of the HoldCo Lenders, such as the HoldCo Debtors' claims and causes of action.

(c)     Who should control the HoldCo Debtors' claims and causes of action.

(d)     Whether there is any value in the equity of Franchise Group, Inc.

## REPLY

### I.     The First Lien Group Lacks Standing to Object to the Motion

13.     With regard to the First Lien Group, the Court should disregard their purported objection to the Motion [Docket No. 299] (the "**First Lien Objection**") because they lack standing to make it.  The First Lien Group offers four purported bases for standing, all of which lack merit.

---

[4]     The Freedom Lender Group addresses its issues with the appointment of the new independent director in *The Ad Hoc Group of Freedom Lenders' Reply In Support of their Emergency Motion for Entry of an Order (I) Adjourning the Second Day Hearing set for December 10, 2024, (II) Extending the Objection Deadlines in Connection with the Second Day Hearing and (III) Granting Related Relief*, (the "**Adjournment Reply**") filed concurrently herewith.

14.    ***First***, there are currently no DIP-related claims belonging to the DIP Lenders at the HoldCo Debtors.  The Debtors have admitted as much in their response to the Freedom Lender Group's interrogatories and the DIP Lenders have agreed to remove the HoldCo Debtors as obligors under the DIP Facility as of the date of the filing of this Reply.[5]  Moreover, now that the Freedom Lender Group has offered DIP financing to the HoldCo Debtors, if accepted, the First Lien Group will not have an opportunity to assert any indirect claims against the HoldCo Debtors either.[6]

15.    ***Second***, the First Lien Group fails to identify any other type of claim that they possess against the HoldCo Debtors.  Rather, First Lien Group argues that they may somehow acquire claims against the HoldCo Debtors in the future if the Debtors use the DIP proceeds to fund litigation.  But, claims that might arise in the future do not give rise to standing today. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) ("To establish Article III standing . . . threatened injury must be *certainly impending* . . . and [a]llegations of *possible* future injury are not sufficient.") (emphasis in original) (citations omitted).  Additionally, the First Lien Group identifies purported claims belonging to *other* people, such as potential indemnification claims by the HoldCo Debtors' officers and directors.  First Lien Objection ¶ 30(ii).  The First Lien Group cannot gain standing based on other people's claims.

16.    ***Third***, the First Lien Group identifies purported intercompany claims against the HoldCo Debtors.  First Lien Objection ¶ 30(iii).  These claims may impart standing to the OpCo Debtors, but they do not impart standing to their creditors, including the First Lien Group.  *See In*

---

[5] *See* Response to Interrogatory No. 5 ("Subject to the General Responses and Objections, the HoldCo Debtors state that to the best of their knowledge there are no known projected or anticipated administrative expenses allocable solely to the HoldCo Debtors during the pendency of these jointly-administered Chapter 11 Cases.").

*re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("The concept [of party-in-interest standing] does not . . . encompass a creditor of one of the debtor's creditors[.]") (brackets in original); *In re Lifeco Inv. Group, Inc.*, 173 B.R. 478, 487 (Bankr. D. Del. 1994) ("I find no statutory or judicial support to conclude that a creditor of a creditor has standing in a bankruptcy case.").

17.    ***Finally***, the First Lien Group sketches out a far-fetched alter-ego claim that has not even been asserted.  Such hypothetical claims do not form the basis for standing.  *In re Flintkote Co.*, 486 B.R. 99, 115 (Bankr. D. Del. 2012), *aff'd*, 526 B.R. 515 (D. Del. 2014) (holding hypothetical alter ego claim was "speculative" and insufficient to "confer party in interest standing").  Additionally, the First Lien Group admits that these purported claims belong to the OpCo Debtors, not to them.  *See* First Lien Objection ¶ 30(iv) ("[T]he First Lien Group believes there may be a basis for the OpCo Debtors to assert alter ego claims against the Freedom HoldCo Debtors[.]").  Accordingly, as noted, these claims (if they even exist) do not impart standing to the First Lien Group.[7]  The Court should disregard the First Lien Objection.

## II.    The Court Should Terminate Exclusivity for the HoldCo Debtors

18.    The Freedom Lender Group understands and appreciates that terminating exclusivity is a "serious" matter carrying a "particularly heavy burden."  Debtors Obj. ¶¶ 7, 9.  The

---

[7]    Because the First Lien Objection should be disregarded in its entirety, the Freedom Lender Group does not move to strike that objection for its multiple violations of the Rules.  Nonetheless, the Freedom Lender Group notes that these violations are significant in both number and severity.  Repeatedly throughout the Objection, the First Lien Group uses the Freedom Lender Group's settlement communications to dispute the value and validity of certain of the Freedom Lender Group's claims and causes of action, in violation of Rule 408 of the Federal Rules of Evidence.  *See, e.g.*, First Lien Objection ¶ 19 ("Once more, the October 9 Proposal implicitly recognized that the HoldCo Term Loans were out of the money and again made no mention of the supposedly valuable claims and causes of action belonging to the Freedom HoldCo Debtors.").  Moreover, the First Lien Group cites the Freedom Lender Group's proposals and related communications, even though they are clearly marked "confidential," in violation of both Rule 9018-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware and the protective order to which the First Lien Group stipulated *before* they filed the motion.  The Freedom Lender Group immediately emailed the First Lien Group after they filed the First Lien Objection to identify this issue, but the First Lien Group never responded.  It goes without saying that parties in litigation—and especially parties in bankruptcy court, where negotiation among parties is strongly encouraged—should be able to engage in settlement discussions without fear of those communications being improperly used against them.

relief sought in the Motion, however, is narrowly tailored and is being sought in the face of serious rights-stripping, governance problems, irreconcilable conflicts, and value depletion at the HoldCo Debtors.

19.     The Freedom Lender Group seeks only to terminate exclusivity at the HoldCo Debtors.  Prior to the filing of these Chapter 11 Cases, the HoldCo Lenders had specific rights, assets, and expectations (including (i) the ability to foreclose on the voting shares of Franchise Group, Inc., (ii) proper governance at the HoldCo Debtors, and (iii) that no other material creditors would be at the HoldCo Debtors' estates).  The Freedom Lender Group seeks only to preserve and protect those rights in the face of a sale process for which the Debtors and the First Lien Group have no reasonable expectations of succeeding at and have instead designed to fail.  *See generally Objection of the Ad Hoc Group of Freedom Lenders to Debtors' Bidding Procedures Motion* [Docket No. 322] (the "**Bidding Procedures Objection**").

20.     It is imperative that the HoldCo Debtors' exclusivity be terminated now because the Debtors are seeking to resolve these Chapter 11 Cases at breakneck speed.  To honor the milestones under their RSA, the Debtors filed the Proposed Plan on December 11, 2024, seek to obtain indications of interest in their sale process by December 23, 2024, launch solicitation of their Proposed Plan by December 24, 2024, set a bid deadline in their sale process for February 3, 2025, and schedule a plan confirmation hearing for February 6, 2025.  It is unclear when the Debtors will emerge from the "nascent stage"[8] of their Chapter 11 Cases, but the Debtors and First Lien Group will soon be saying that it is impossible for the Debtors to change course.  The Debtors and the First Lien Group tell the Freedom Lender Group to wait for confirmation to raise its objections to the plan, but it is transparent that their intention at that time is to tell the Freedom

---

[8]     First Lien Group Obj. ¶ 4 ("the Debtors are at a very nascent stage of these Chapter 11 Cases.").

Lender Group that it is too late and that there is no time or money available to pursue any other option.[9]  That is precisely why the Motion should be granted now.

21.      To protect its interests, the Freedom Lender Group proposed the Freedom Lender Plan to the Debtors soon after the resolution of the First Day Hearing.  The Objecting Parties argue that the Court must evaluate relief sought in the Motion with all the Debtors' stakeholders in mind. *See* Debtors Obj. ¶¶ 10, 13; First Lien Group Obj. ¶ 34; Committee Obj. ¶ 16.  But that is not the law and is inconsistent with the request made to terminate exclusivity *only* at the HoldCo Debtors.

22.      When it comes to assessing whether exclusivity should be terminated, aside from *Adelphia*, all of the cases the Objecting Parties cite are cases where the request involved the potential termination of the exclusive periods of all affiliated debtors.[10]  In *Adelphia* the Court only considered the stakeholders of the holding company as to which the exclusive periods were being asked to terminate.  *In re Adelphia Commn's Corp.*, 336 B.R. 676 (Bankr. S.D.N.Y. 2006) ("[t]he Arahova Noteholders Committee's motion is not to terminate exclusivity with respect to all Debtors, to address any concerns of other creditors").

23.      The Court should not look further than the scope of the request in front of it.  *See In re Millenium Lab Holdings II, LLC*, 562 B.R. 614, 625 (Bankr. D. Del. 2016) ("When evaluating

---

[9]      Debtors Obj. ¶ 21; First Lien Group Obj. ¶ 32.

[10]     *See e.g.*, *First Am. Bank of N.Y. v. S.W. Gloves & Safety Equip., Inc.*, 64 B.R. 963 (D. Del. 1986) (termination of exclusive period requested on behalf of all debtors in entire enterprise); *see also, In re Samson Res. Corp.*, Case No. 15-11934 (CSS) (Bankr. D. Del. Sept. 27, 2016) [Docket Nos. 977, 1418] (same); *In re Geriatrics Nursing Home*, 187 B.R. 128 (D.N.J. 1995) (same); *In re Texaco, Inc.*, 81 B.R. 806 (Bankr. S.D.N.Y. 1988) (same); *In re Excel Mar. Carriers Ltd.*, Case No. 13-23060 (RDD), 2013 Bankr. LEXIS 3920 (Bankr. S.D.N.Y. Sept. 13, 2013) (same); *In re Lichtin/Wade, L.L.C.*, 478 B.R. 204 (Bankr. E.D.N.C. 2012) (same); *In re Capital Food Corp.*, 490 F.3d 21 (1st Cir. 2007) (same); *In re TCI2 Holdings, LLC*, Case No. 09-13654 (JHW) (Bankr. D.N.J. Aug. 11, 2009) [Docket No. 530] (same); *In re Dow Corning Corp.*, 208 B.R. 661 (Bankr. E.D. Mich. 1997) (same); *In re Trib. Co.*, 464 B.R. 126 (Bankr. D. Del. 2011), on reconsideration in part, 464 B.R. 208 (Bankr. D. Del. 2011), aff'd sub nom. *In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018), aff'd sub nom. *In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020), and aff'd in part sub nom. *In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018), and aff'd sub nom. *In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020) (same); *In re Apex Pharms., Inc.*, 203 B.R. 432 (N.D. Ind. 1996) (same); *In re Lehigh Valley Pro. Sports Clubs, Inc.*, Case No. 00-11296 (DWS), 2000 Bankr. LEXIS 237 (Bankr. E.D. Pa. Mar. 14, 2000) (same).

jurisdiction, the Court will look at the motion in front of it … and not at a future lawsuit that the Trustee may file"); *In re Lana*, Case No. 12-21357, 2019 WL 9242988, at *2 (Bankr. D. Kan. Nov. 7, 2019) ("First and foremost, the Court can only rule on what is in front of it at the moment."). Viewed through the correct legal lens, exclusivity at the HoldCo Debtors should be terminated under the facts and circumstances of the particular cases of the HoldCo Debtors.[11]

## A.    All of the *Adelphia* Factors Have Been Met and Cause Exists to Terminate Exclusivity

24.    The Objections make much of which *Adelphia* factors the Motion does not satisfy. But terminating exclusivity does not require satisfaction of every *Adelphia* factor; rather, a court should determine which factors are relevant and carry the most weight. *See In re R&G Props.*, No. 08-10876, 2009 Bankr. LEXIS 221, at *3 (Bankr. D. Vt. Jan. 28, 2009) (holding that "[n]ot all of the *Adelphia* factors 'are relevant in every case' … it is within the discretion of the bankruptcy court to decide which factors are relevant and give appropriate weight to each") (citing *In re Hoffinger Indus., Inc.*, 292 B.R. 639, 644 (B.A.P. 8th Cir 2003)).  No argument the Objecting Parties have made with respect to any of the *Adelphia* factors outweighs the fact that cause exists to terminate exclusivity solely in the HoldCo Debtors' cases based on the circumstances of these cases and the factors addressed in the Motion and below.

25.    ***Factor (a): The Complexity of the HoldCo Debtors' Cases.***  The HoldCo Debtors' Cases alone are not complex.  The HoldCo Debtors have:

- limited liabilities ($514.7 million in principal amount of secured debt and a handful of contingent claims that may be asserted) (First Day Decl. ¶ 64; Mot. ¶ 14; Debtors Obj. ¶ 49 n. 17);

---

[11]    The fact that the cases are jointly administered is of no consequence.  Each Debtors' estate must be evaluated and treated individually, unless substantively consolidated.  *See, e.g.*, *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 519-21 (Bankr. S.D.N.Y. 1988) (finding that the debt of two debtors must be kept separate where there was no commingling of assets and business functions sufficient to justify substantively consolidating the chapter 11 cases).

- limited assets (equity in the OpCo Debtors, claims and causes of action and potential tax attributes), none of which are being marketed in the Debtors' sale process (Debtors Obj. ¶ 31; Committee Obj. ¶ 10; First Lien Group Obj. ¶ 10);

- one known non-contingent creditor group (the HoldCo Lenders) (Debtors Obj. ¶ 49; First Lien Group Obj. ¶¶ 10, 31; Committee Obj. ¶ 11; Nov. 5, 2024, Hr'g Tr. at 83:16-25 (confirming that the "only creditors" of the HoldCo Debtors are the HoldCo Lenders));

- no known third-party creditors (Debtors Obj. ¶ 49; First Lien Group Obj. ¶¶ 10, 31; Committee Obj. ¶ 11; Nov. 5, 2024, Hr'g Tr. at 83:16-25 (confirming that the "only creditors" of the HoldCo Debtors are the HoldCo Lenders)); and

- no operations or employees (Debtors Obj. ¶ 2; First Lien Group Obj. ¶ 10; Committee Obj. ¶ 10; Nov. 5, 2024, Hr'g Tr. at 123:19-23 ("[T]he Holdco entities are not operating entities")).

26.     The Objecting Parties cite cases which involving debtors that were significantly more complex than the HoldCo Debtors, and with vastly divergent creditor and asset classes.[12] Here, the HoldCo Debtors' cases, taken alone, are extremely simple.

27.     ***Factors (b), (c), (f) and (g): Length the cases have been active; time for negotiation; good faith negotiation; and progress of negotiations.***  The time in which exclusivity is terminated is judged relative to the time that negotiation on a plan has been open or when a plan is on file – not relative to the amount of time passed from the Petition Date. *See* Emergency

---

[12] *See, e.g., In re Texaco Inc.*, 81 B.R. at 807 (involving debtors that were the nation's third-largest oil company at the time in one of the largest chapter 11 cases in history with their largest unsecured creditor in excess of $10 billion); *In re Adelphia Commc'ns Corp.*, Case No. 02-041729 (REG) (Bankr. S.D.N.Y. Feb. 25, 2004) [Docket No. 3909] (involving over two hundred subsidiary debtors that were organized in nine different borrowing groups and party to six prepetition credit facilities of $6.8 billion, as well as 2,700 franchises that were threatening action for breach of contract material provision), clarified on denial of reconsideration, No. 02-41729, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006); *In re Samson Res. Corp.*, Case No. 15-11934 (CSS) (Bankr. D. Del. 2015) Sept. 18, 2015, Hr'g Tr. at 15:4-19:1 [Docket No. 82] (involving 1.6 million acres of operating leases over 7,400 deteriorating oil wells that was supported with $7.2 billion in leveraged financing and preferred equity, including a reserve-based lending facility); *In re Excel Mar. Carriers Ltd.*, Case No. 13-23060 (RDD) (Bankr. S.D.N.Y 2013) July 2, 2013, Hr'g Tr. at 14:1-14:11, 15:13-17:16 [Docket No. 131] (involving 3.4 million deadweight tons across thirty-seven direct debtor subsidiaries and a joint venture that was supported by, among others, a $771 million syndicate credit facility and $150 million of unsecured convertible notes); *Dow Corning Corp.*, 211 B.R. at 573, 577 (involving debtor in a mass tort case subject to "hundreds of thousands" of personal injury claims pending against it); *Trib. Co.*, 464 B.R. at139-41 (involving over one hundred debtor entities in both print and broadcast media, as well as sports entertainment, that was subject to a highly leveraged and unusual employee stock ownership transaction).

Motion, *In re TCI2 Holdings, LLC*, Case No. 09-13654 (JHW) (Bankr. D.N.J. 2009) [Docket No. 530] ¶ 31; *id.* at Aug. 27, 2009, Hr'g Tr. at 91:14-20; 92:9-20 [Docket No. 621] (terminating exclusivity approximately six months after the petition date when the debtors' only plan had proposed that a very large group of creditors "would be wiped out completely" and where the moving creditors had "a definitive offer on the table"); *see also In re Samson Res. Corp.*, Case No. 15-11934 (BLS) (Bankr. D. Del. 2015) Sept. 27, 2016, Hr'g Tr. at 98:7–15, 99:7–10 [Docket No. 1418] (terminating exclusivity after more than one year of bankruptcy when "debtors [had] not engaged constructively" with their creditor constituents).

28.     Here, when taking the Debtors' proposed timeline into account, as well as the lack of engagement with the Freedom Lender Group so far, this factor weighs in favor of terminating exclusivity.  The Debtors make much of the fact that the Freedom Lender Group filed the Motion only seventeen days into the Chapter 11 Cases and compare this to the 120-day initial exclusivity period Debtors are provided under section 1121 the Bankruptcy Code.  Debtors Obj. ¶ 14. However, it is crucial to look at this factor in context.  The Debtors are adhering to a timeline in their RSA with the First Lien Group that requires a sale to close or a plan of reorganization be consummated within 120 days of the Petition Date.  The Proposed Plan was filed seven days into these Chapter 11 Cases.

29.     The Motion, filed only 9 days after the Proposed Plan was on file, is scheduled to be heard on December 10, which is 37 days into the Chapter 11 Cases – over 30% into the Debtors' proposed timeline.  Given this exceedingly fast pace, it is understandable that the Freedom Lender Group felt it was important to send the Freedom Lender Plan to the Debtors quickly and request swift engagement from the Debtors.  Instead, the Debtors immediately filed the Proposed Plan, which the members of the Freedom Lender Group do not support.  And now, 33 days into these

Chapter 11 Cases, the Freedom Lender Group has not received any concrete feedback on its proposed plan. If the Debtors are going to continue pressing to rocket through these Chapter 11 Cases on their proposed timeline, exclusivity should be lifted now so that stakeholders of the HoldCo Debtors can have an alternative plan to consider.

30.     Moreover, despite the "significant progress" the Debtors have claimed to have made with stakeholders outside the Freedom Lender Group, as of the filing of this Reply, the Debtors admit they only have the support of the First Lien Group. Debtors Obj. ¶ 22. The Debtors still do not have the committed support of any other constituencies. *Id.* (the Debtors are "working in earnest to obtain the support of their other constituents."). And, in its objection, even the Committee suggests that more time is needed for plan negotiation. Committee Obj. ¶ 17.

31.     ***Factor (e): The Proposed Plan is Not Viable for the HoldCo Debtors.*** The Debtors' and the First Lien Group's claims that the arguments raised in the Motion are best left for confirmation are contrary to the widely accepted *Adelphia* factor that the Debtors must demonstrate that the Proposed Plan (or a modification of it) "will secure a favorable reaction" from the parties entitled to vote on it. *Adelphia Commc'ns Corp.*, 352 B.R. at 588. Even in the cases the Objecting Parties cite, great weight is given to *Adelphia* factor (e) when courts weigh whether cause exists to terminate exclusivity. *Id.* ("This factor, which I consider to be the most important under the facts of these cases, also strongly favors retention of exclusivity by the Debtors."); *see also In re GMG Cap. Partners III, L.P.*, 503 B.R. 596, 602 (Bankr. S.D.N.Y. 2014) (terminating exclusivity where debtor was unable to propose a viable plan due to the inability to satisfy section 1129(a)(10) because the only impaired class controlling nearly 90% of claims would not accept debtor's proposed plan).

32.     As further explained in the Motion, the Proposed Plan is not viable as to the HoldCo

Debtors for two reasons: (1) these debtors will not have an impaired accepting class and (2) absent substantive consolidation, section 1129(a)(10) must be satisfied on a debtor-by-debtor basis.  Mot. ¶ 41.  The Objecting Parties fail to adequately contest these points.  <u>First</u>, contrary to multiple statements made during the First Day Hearings, the Objecting Parties suggest now, with only speculation and "information and belief," that there are "claims in significant amount and number" that will be filed at the HoldCo Debtors.  Committee Obj. ¶ 16; First Lien Group Obj. ¶ 30(ii). Even if such claims exist, there is still no chance of confirmation of the Proposed Plan at the HoldCo Debtors because (i) the HoldCo Lenders' claim would be entirely unsecured based on the Proposed Plan's treatment and there is no justification for separately classifying that deficiency claim from general unsecured claims and (ii) general unsecured creditors will not vote on a plan that provides them with no recovery.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (holding that deficiency claim and general unsecured claims being separately classified was unreasonable); *In re Fairfield Exec. Assocs.*, 161 B.R. 595, 604 (D.N.J. 1993) (holding that separately classifying deficiency claim from general unsecured claims was "to disenfranchise [creditor] and ensure that there would be at least one class that would approve the Plan."); *In re Lucky Bucks*, Case No. 23-10758 (KBO) (Bankr. D. Del. 2023) June 30, 2023, Hr'g Tr. 73:2-9 [Docket No. 133] (finding proposed plan for holdco debtor as unconfirmable under section 1129(a)(10) which paid nothing to the holdco debtor's only impaired class and which the holdco debtor's only impaired class had rejected).

33.     Further, any contingent intra-debtor and insider claims that "may" exist against the HoldCo Debtors (*see* First Lien Group Obj. ¶¶ 30 (iii-iv), 58) cannot be counted for purposes of section 1129(a)(10) of the Bankruptcy Code to cram down the HoldCo Lenders.  11 U.S.C. § 1129(a)(10) ("at least one class of claims that is impaired under the plan has accepted the plan,

determined without including any acceptance of the plan by any insider.").

34.     Second, the First Lien Group cannot credibly argue that the "per debtor" standard for confirmation, whereby each debtor must be able to confirm its own individual plan, should not be employed in a case where debtors are not substantively consolidated because that is not the prevailing law in the Third Circuit.[13]  The two out of circuit cases the First Lien Group cites (*In re Transwest Resort Props.* and *In re: NESV Ice, LLC*) are contrary to prevailing Third Circuit caselaw and the principle set forth in *Owens Corning* that the claims of creditors of one debtor cannot be satisfied with the assets of another affiliated debtor absent substantive consolidation.  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (holding that courts should "respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.").

## B.     Other Reasons Cause Exists to Terminate the HoldCo Debtors' Exclusive Periods

35.     The Debtors filed these Chapter 11 Case with a committed plan of action – a flawed sale process over the Christmas and New Year's holidays and a Proposed Plan that would give the HoldCo Debtors' stakeholders nothing if that sale process fails.  Their action plan gives the HoldCo Lenders no reasonable hope of the value of their unique obligors being realized.  Immediately recognizing the truth of this, the Freedom Lender Group expeditiously proposed to the Debtors a viable confirmable alternative path for the HoldCo Debtors that does not take anything away from the OpCo Debtors' estates.

36.     To date that proposal has received: one 20-minute high level phone call, as yet unfulfilled promises to comment on or incorporate those plan terms, requests to share with

---

[13]  *See In re Trib.*, 464 B.R. at180-83 ; *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 302 (Bankr. D. Del. 2011) ("I find nothing ambiguous about the language of § 1129(a)(10), which, absent substantive consolidation or consent, must be satisfied by each debtor in a joint plan.").

creditors of affiliates, actual sharing with creditors of affiliates despite refusal, multiple ignored emails and disappointment that court intervention (and thus "relentless" litigation) has been sought.   The lack of responsiveness would be more forgivable if the Debtors were not simultaneously speeding to completion of their sale process and confirmation of their Proposed Plan.  The "exclusivity sword" is in the hands of the Debtors (backed by the First Lien OpCo Lenders) here.  *See In re Samson Res. Corp.*, Case No. 15-11934 (CSS) (Bankr. D. Del. 2015) Sept. 27, 2016, Hr'g Tr. 97:20-99:14 [Docket No. 1418] (terminating exclusivity when the debtor had used exclusivity "in an inappropriately aggressive way" and had not negotiated with "key stakeholders"); *see also Tchrs. Ins. & Annuity Ass'n of Am. v. Lake in the Woods (In re Lake in the Woods)*, 10 B.R. 338, 345-46 (E.D. Mich. 1981) ("extensions [of exclusivity] are impermissible if they are for the purpose of allowing the debtor to prolong reorganization while pressuring a creditor to accede to its point of view on an issue in dispute"); *In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (exclusivity "should not be employed as a tactical device to put pressure on creditors to yield to a plan that they might consider unsatisfactory").

37.     In circumstances where illegal treatment is proposed on one group of creditors and, once identified, is met with lackluster engagement by the debtors when viable alternatives are proposed, paired with a response that highlights counsel's favoritism toward one group of lenders over others, Court intervention is necessary.  *See Adelphia Commc'ns Corp.*, 336 B.R. at 618 ("in a case with multiple debtors, the debtors, as fiduciaries, have duties to refrain from favoring or appearing to favor one or another of their estates and its creditors over another"); *In re Innkeepers USA Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) (same).

38.     The Committee spends much of its objection referencing the *Adelphia* case where White & Case LLP ("**White & Case**"), on behalf of its clients there, filed and lost similar motions

to appoint a trustee and terminate exclusivity.   Committee Obj. ¶¶ 1, 7, 27, 30.   The Committee argues that, therefore, the same "tactic" should fail here.  *Id.* at ¶ 12.   The positions the debtors (and their counsel at the time, Willkie Farr & Gallagher ("**Willkie**"), which is the same proposed counsel for the Debtors here) took in that case are not far from what is happening in these Chapter 11 Cases.   There, Willkie represented all the debtors, with no independent fiduciary officers and directors to make decisions on behalf of the conflicting estates, despite the existence of significant intercreditor issues.  *Adelphia Commc'ns Corp.*, 336 B.R. at 623, 672.   After objection by White & Case because of the same type of conflicts that exist here, the *Adelphia* court made it "mandatory" that Willkie remain neutral as to inter-debtor disputes (*Id*. at 678) and found that in a case with multiple debtors, the fiduciaries have duties to refrain from favoring or appearing to favor one or another of the estates and its creditors over another. *Id.* at 669-671.   Because the same conflict also applied to the unsecured creditors committee appointed in that case, represented by Kasowitz Benson Torres LLP, the committee also remained neutral to the inter-debtor disputes.

39.     And, contrary to the conclusions the Committee urges this Court to draw from its objection, as a result of the "nuclear war button" threat made in *Adelphia*, the result was actually value maximizing: White & Case's clients proposed recoveries increased from 24% to 102% under the confirmed plan, in part because of the settlement on the intercompany issues that resulted in a transfer of $1.08 billion in aggregate to creditors of debtors against whom White & Case's clients held claims.  *See In re Adelphia Commc'ns Corp.,* Case No. 02-41729 (REG) (Bankr. S.D.N.Y. 2002) Jan. 6, 2006, Hr'g Tr. at 3.82:17-24; *Debtors' Fourth Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code* [Docket No. 8866-1] at Art. II.A.2; *Second Disclosure Statement Supplement Relating to Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain Affiliated Debtors* [Docket No. 11832] at Art. I.E-I.F,

II.B. *Adelphia* demonstrates that restricting conflicted debtors from taking actions that are good for some but not for others can be value maximizing, as it would be here.

40.     Contrary to the assertions of the Objecting Parties, the *Lucky Bucks* case also demonstrates that terminating exclusivity is warranted here.  The Debtors suggest that *Lucky Bucks* is "easily distinguished" because that was a conversion *after* solicitation of a plan that impaired creditors rejected.   Debtors Obj. ¶ 22.   But, conversion was asked for and decided before confirmation of the other debtors' plans and, at the conversion hearing, it was determined to enter the order after confirmation of the other debtors' plans.  *In re Lucky Bucks*, Case No. 23-10758 (KBO) (Bankr. D. Del. 2023) June 30, 2023, Hr'g Tr. 72:2-79:1 [Docket No. 133] (holding that "the present facts and circumstances support conversion" but waiting to enter the conversion order after confirmation of the opco debtors' plans so as to not disturb certain gaming licenses held by the debtors).  The underlying principle in *Lucky Bucks* stands here: in the face of a truncated confirmation deadline due to a sale process for a proposed plan that treats holding companies improperly such that a plan cannot be confirmed for those entities, those entities must have a path of their own.  *Id.* at 73:2-9 (finding cause to convert the holdco case to chapter 7 because the only and impaired creditors rejected the chapter 11 plan which made it unconfirmable under 1129(a)(10)).

**III.     Cause Exists to Lift the Automatic Stay**

41.     The Objecting Parties argue that the Freedom Lender Group cannot obtain relief from the automatic stay because (1) the collateral the Freedom Lender Group seeks ownership of has no value and (2) the *Rexene* factors are not met.  The Objecting Parties' arguments fail.

**A.     The Equity in Franchise Group, Inc. Has Value**

42.     The Objecting Parties argue that a lack of adequate protection is insufficient grounds to lift the automatic stay here because the Freedom Lender Group has not demonstrated

that the HoldCo Lenders' pledge of the equity of Franchise Group, Inc. has value that is in danger of diminishing.  Debtors Obj. ¶ 28; First Lien Group Obj. ¶ 49; Committee Obj. ¶ 21.  But, as will be shown at the evidentiary hearing on the Motion, this is contrary to the testimony of their 30(b)(6) witness on the topic as diminishment in the equity value occurs with the draws under the DIP Facility, discussed further below.  The Objecting Parties are also incorrect that the Freedom Lender Group needs to demonstrate an exact dollar value in the OpCo Debtors' assets that would flow up to the HoldCo Debtors on account of their equity interests; rather, it is inherent that the value of that equity is the potential of such a distribution even if that potential is unlikely or even remote. Further, the equity interests in the OpCo Debtors have value by virtue of the control rights they provide.

43.     This is exactly the evidence that the *Munoz* court considered in granting the lender relief from the automatic stay under 362(d)(1).  *In re Munoz*, 83 B.R. 334 (Bankr. E.D. Pa. 1988). There, the owner of a video tape store in chapter 11 also filed for chapter 11 himself.  Prior to bankruptcy, the former owner of the store loaned funds in connection with the sale to the now-bankrupt current owner, secured by a pledge over the equity of the store.  *Id.* at 335.  The store's chapter 11 plan called for the current stock to be cancelled and the individual's proposed plan contemplated paying the lender 5% of its claim over a five-year period.  *Id.* at 336.  It was clear on these facts to the *Munoz* court that "control over [the bankrupt video store] has some significant monetary value.  Not only does control allow the majority holder to appoint an officer or officers who will draw a significant salary, but also [the bankrupt video store's] financial picture, in bankruptcy, appears to be improving."  *Id*.  The *Munoz* court lifted the stay pursuant to section 362(d)(1) noting:

> The debtors' theory that the stock has no value is belied by the very fact that there is a dispute over the stock in the instant action.  If the stock is worth

nothing, why is Munoz fighting so hard to keep it?  The answer, I believe is fairly obvious.  The stock of [the video store] has some value, inter alia, insofar as it provides control of [the video store].  The individual with control of [the video store]'s stock can and apparently will thereby derive substantial income by making himself or family members salaried employees of the corporation. Additionally, it appears, based on the evidence, that [the video store] is currently somewhat profitable.  Although liabilities still exceed assets and the stock has no book value, the stock may have fair market value to the extent of potential future profitability.  I have thus concluded, that the stock of [the video store] is worth substantially more than [5% of the lender's claim in the individual's bankruptcy].

*Id* at 338.

44.     The facts here are similar to those in *Munoz*.  There is a proposed plan on file that would give the HoldCo Lenders no recovery.  The Freedom Lender Group is not required to submit evidence of the value of the equity of the OpCo Debtors here.  Rather, the Freedom Lender Group needs only to provide evidence that the equity is worth something more than nothing and less than the amount of the Freedom Lender Group's secured claim.  That must be the case, particularly given how hard the Objecting Parties are fighting to prevent the HoldCo Lenders from having control over it.  *See* Debtors Obj. ¶ 36(d) ("among the primary reasons the HoldCo Debtors filed bankruptcy petitions" was to "prevent the adverse outcome" of the Freedom Lender Group's ability "to immediately exercise the voting rights of Franchise Group, Inc.'s equity, permitting the Freedom Lender Group to take governance-related actions at Franchise Group, Inc.").[14]

45.     The Debtors want to distinguish *Munoz* on the basis that it involved individuals. But, there is no meaningful distinction between individuals who pledge stock they own and file for chapter 11, and a company that pledges its own stock and files for chapter 11.

---

[14]    Even if the Freedom Lender Group wanted to provide evidence on the value of the stock, it could not, as no evidence has been produced to date to the Freedom Lender Group (despite formal requests for such made only days into these cases).  The First Lien Group's contention that prior financing proposals have been made (and improperly filed on the docket) do not constitute credible evidence of value.  The Debtors cannot withhold information necessary to conduct a valuation and at the same time fault the Freedom Lender Group for failing to have done that valuation.

## B.    The *Rexene* Factors Are Inapplicable But, In Any Event, Are Met Here

46.    The Objecting Parties seek to have this Court apply the *Rexene* factors to the lift stay relief the Freedom Lender Group requested pursuant to the Motion.  Debtors Obj. ¶¶ 32-41; First Lien Group Obj. ¶¶ 47-50.  However, as the Debtors correctly point out, the *Rexene* factors are appropriate to deploy only when a court is considering whether to grant relief from the automatic stay "to permit non-bankruptcy proceedings to commence." Debtors Obj. ¶ 32.  The *Rexene* decision provides a standard for considering a motion for relief from the automatic stay to prosecute a claim against a debtor in another forum. *See In re Yellow Corp.*, Case No. 23-11069 (CTG), 2024 WL 1313308, at *11 (Bankr. D. Del. Mar. 27, 2024). The Court is not required to apply the *Rexene* factors here, where a creditor is seeking relief from the automatic stay to take ownership of equity interests.  *See In re Point Investments, Ltd.,* Case No. 22-10261 (TMH), 2024 WL 4262832 (D. Del. 2024) (citing *In re DBSI, Inc.*, 407 B.R. 159, 166-167 (Bankr. D. Del. 2009) ("This Court has developed a three-part balancing test to evaluate whether cause exists in a specific case: Whether any great prejudice to either the bankrupt estate or the debtor will result *from the continuation of the civil suit . . .*") (citations omitted)); *In re Trump Entm't Resorts, Inc.*, 526 B.R. 116, 122 (Bankr. D. Del. 2015) ("Cause under Section 362(d)(1) though, is a flexible concept and not confined solely to the *Rexene* factors."); *In re Trib. Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009) ("Bankruptcy Courts in this district generally rely upon [the *Rexene*] three-pronged balancing test to determine whether 'cause' exists for granting relief from the stay to continue litigation.").[15]

47.    In any event, contrary to the arguments of the Objecting Parties, if the *Rexene*

---

[15]    The Debtors are correct that the *Scarborough-St. James Corp.* court applied the *Rexene* factors in considering whether "cause" existed under section 362(d).  However, the Debtors omit that, there, relief from the automatic stay was sought to allow a landlord to proceed against a debtor with state court eviction proceedings. *In re Scarborough St. James Corp.*, 535 B.R. 60, 62-64 (Bankr. D. Del. 2015).

factors are determined to be relevant here, they are satisfied.  First, the OpCo Debtors will actually not suffer any prejudice if the HoldCo Lenders are able to exercise their rights under the share pledge, which the Debtors bargained to provide and knew could be exercised by the HoldCo Debtors in the event of a default.  Debtors Obj. ¶ 36(c)-(d).  The most that the Freedom Lender Group could possibly do with respect to voting their shares is replace the boards of Freedom VCM, Inc. or Franchise Group, Inc., which is a right that is preserved in bankruptcy and is recognized in some of the cases to which the Objecting Parties cite.[16]

48.     Rather than allow the HoldCo Lender to take control of the equity in the OpCo Debtors that the Debtors have effectively abandoned, the Debtors argue that it would have a "deleterious impact" and threaten relationships with employees, vendors, and other stakeholders. Debtors Obj. ¶¶ 30, 35.  But the Debtors do not provide any real support as to why they believe that is true.  The mere replacement of board members does not mean that the adverse consequences the Debtors currently fear will come to fruition.  *See Marvel*, 209 B.R. at 838 ("The fact that the shareholders' action may be motivated by a desire to arrogate more bargaining power in the negotiation of a reorganization plan, without more, does not constitute clear abuse.").  In fact, it is the longstanding relationship established between the Freedom Lender Group and the Debtors, and being junior to the First Lien Group, that actually would incentivize the Freedom Lender Group toward an even greater value maximizing path.  Moreover, as explained above, this consideration should be limited to the benefits or detriments of the HoldCo Debtors against which the instant relief in the Motion is sought.

---

[16]   *See, e.g., In re Marvel Entm't Grp., Inc.*, 209 B.R. 832, 838 (D. Del. 1997) (citing *In re Johns-Manville Corp.*, 801 F.2d 60, 64 (2d Cir. 1986)) ("[i]t is well settled that the right of shareholders to compel a shareholders' meeting for the purpose of electing a new board of directors subsists during reorganization proceedings."); *In re Gencanna Glob. USA, Inc.*, 619 B.R. 364, 369 (Bankr. E.D. Ky. 2020) ("[b]ased on the ruling in *Manville* and other cases that follow its holding, it is generally understood that the exercise of a shareholder's voting rights is not prohibited by the automatic stay.").

49.     <u>Second</u>, it is undisputed that the HoldCo Lenders are getting no value from this restructuring in light of the Debtors' flawed sale process.  *See generally* Bidding Procedures Objection; Debtors Obj. ¶ 31 ("The only way the Debtors' assets' value will flow past the prepetition first lien debt is if the Debtors identify a better deal during that process").  The Debtors admit that they affirmatively filed the chapter 11 cases of the HoldCo Debtors to prevent the HoldCo Lenders from foreclosing on their rights.  Debtors Obj. ¶¶ 2, 4, 16.  These are clear indicators of prejudice against a creditor that weigh in favor of lifting the stay.

50.     The Debtors suggest an "adequate remedy" exists in filing a plan objection. Debtors Obj. ¶ 39.  This offer is disingenuous to say the least, and is a distraction from the real issues that the Freedom Lender Group is trying to address by the Motion, which is not merely their dissatisfaction with the Debtors' Proposed Plan.  By the proposed deadline to file an objection to the Proposed Plan, January 21, 2024, the opportunity to remedy the real issue that shadows these cases, the Debtors' intra-debtor conflicts and the Debtors' inability to fix them, will have passed.

**C.     The HoldCo Lenders' Collateral is Diminishing and the HoldCo Lenders Are Not Receiving Adequate Protection**

51.     Finally, the Debtors concede that they are not providing the HoldCo Lenders with any adequate protection for the diminution of value in their collateral.  The Debtors' Interim DIP Order and proposed final DIP order do not even purport to provide any.  The First Lien Group argues that this is fine because the HoldCo Lenders are not being primed.  First Lien Group Obj. ¶ 51 n. 15.  But that misses the point.  As the Objecting Parties all agree, the HoldCo Lenders' primary source of collateral is the HoldCo Debtor's equity ownership of the OpCo Debtors.  To the extent the value of the OpCo Debtors' assets are being impaired, so diminishes the value of that equity.  Here, the Debtors seek approval of a $750 million DIP facility at the OpCo Debtors (of which $250 million is new money).  Unless the Debtors can demonstrate that this DIP facility

is enhancing the value of the OpCo Debtors' assets or is preserving them at level equal to the incurrence of debt, there is definitionally a diminution in value. And, as discussed above, there is value in the equity in the OpCo Debtors. *See* ¶ 43, supra. Therefore, the HoldCo Lenders are experience a clear diminution in value of their collateral for which they are not being adequately protected, which is one of the quintessential demonstrations of cause for lifting the automatic stay. *See* 11 U.S.C. § 362(d)(1).

52.     Therefore cause exists to lift the automatic stay.

## IV.     A Chapter 11 Trustee for the HoldCo Debtors Should Be Appointed

53.     The Freedom Lender Group recognizes that appointment of a trustee should be "the exception rather than the rule." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989). As further outlined in the Motion, the Freedom Lender Group only seeks appointment of a chapter 11 trustee at the HoldCo Debtors in the circumstances that the Court is not inclined to grant the other relief requested. Despite this being an alternative form of relief, the case for appointment of a trustee, is strongly present here and the Objecting Parties' arguments fall short.

### A.     Cause Exists Under Section 1104(a)(1) of the Bankruptcy Code

54.     The Objecting Parties identify two main reasons for the assertion that they believe weigh against the Court finding that cause exists here: (1) no conflict exists between the HoldCo Debtors and the OpCo Debtors; and (2) the Freedom Lender Group's dissatisfaction with the Proposed Plan. Debtors Obj. ¶¶ 49, 54; First Lien Group Obj. ¶¶ 54, 56, 58. Both arguments fail.

#### 1.     Clear Conflicts Exist Here

55.     The Debtors concede that intercompany claims exist between the HoldCo Debtors and the OpCo Debtors. Debtors Obj. ¶¶ 51 ("releases provided by the Debtors to other Debtors" are subject to an independent law firm retained to investigate the take private transaction). In the Motion, the Freedom Lender Group points out that the HoldCo Debtors have potential claims

27

against the OpCo Debtors in connection with the Take Private Transaction.  Mot. ¶¶ 24, 59.  The First Lien Group, in its objection, argues that there may be claims that the OpCo Debtors have against the HoldCo Debtors.  First Lien Group Obj. ¶¶ 30 (iii-iv), 58.  The Freedom Lender Group reserves all rights to contest this assertion, but the point remains: what is good for the OpCo Debtors may not be good for the HoldCo Debtors and vice versa.  This is the very definition of a conflict.  *Adelphia Commc'ns Corp.*, 336 B.R. at 617 (where holdco debtors and operating debtors had different creditor bodies and claims between them, the court found an "interdebtor dispute" existed); *see also In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988) (conflicts such as "inappropriate relations between corporate parents and subsidiaries" or "the misuse of assets and funds" are considered under a 1104(a)(1) determination); *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 176-177 (Bankr. E.D. Pa. 1984) ("an obvious conflict of interest exists ... because the officers and principals of the parent corporation are the same individuals as the officers and the principals of the debtor.").

56.     There are a number of other examples of the conflicts between the HoldCo Debtors and the OpCo Debtors here, including (i) the HoldCo Debtors signing onto a DIP facility, a flawed sale process, and a plan that would provide no benefits or recovery to their stakeholders and (ii) a potential allocation of administrative expenses between the HoldCo Debtors and the OpCo Debtors.  Yet, the First Lien Group and the Debtors continue to insist that no conflict between the HoldCo Debtors and the OpCo Debtors exists.  Debtors Obj. ¶ 49; First Lien Group Obj. ¶¶ 4, 56, 58.  They argue this despite an almost complete overlap of advisors, officers, and directors of the HoldCo Debtors and the OpCo Debtors.

57.     The last minute audible with respect to the Debtors' proposed DIP Facility does not change this.  Serious inter-debtor conflicts remain, as evidenced by the fact that it took this long

into the process for the HoldCo Debtors to seek to limit their liability under the DIP Facility (or, more likely, that the First Lien Group agreed to this modification in a half-baked attempt to "cure" these conflicts).

58.    All parties seem to agree that there are claims between Debtors here that are of the "zero sum" variety.  What is disputed, however, is how fiduciary duties are to be properly discharged in multi-debtor cases where there are different groups of lenders at different groups of affiliated debtors.  Despite the Objecting Parties' assertions to the contrary, the law is on the Freedom Lender Group's side.  Board members owe fiduciary duties to the equity holders (or if insolvent, to the creditors) of the entity of which they are a board member—not *all* Debtors and therefore *all* stakeholders at the same time.  *See Innkeepers USA Trust*, 442 B.R. at 235 (holding that it is "Bankruptcy 101" that a debtor and its board of directors owe fiduciary duties to maximize the value of "each of the estates in a multi-debtor case"); *see also Adelphia Commc'ns Corp.*, 336 B.R. at 669-670 (stating that in multi-debtor cases, a specific debtor's officers and directors have fiduciary duties to that specific debtor); *In re Coram Healthcare Corp.*, 271 B.R. 228, 238 (Bankr. D. Del. 2001) (holding that debtor's chief executive officer and president had fiduciary duties to bankruptcy estate and could not be "serving more than one master.").  The Committee's proposed solution – that it instead step in as an independent investigator on behalf of *all Debtors* – is equally insufficient to resolve these conflicts because either there are no unsecured creditors at the HoldCo Debtors, in which case the Committee has no standing to determine what value the HoldCo Debtors are entitled to on account of inter-debtor claims or there are some unsecured claims at the HoldCo Debtors, in which case the Committee is just as conflicted as the Debtors.  Committee Obj. ¶ 31. The Committee's reliance upon *Adelphia* is distinguishable for the same reasons.  *Adelphia Commc'ns Corp.*, 336 B.R. at 669-671 (recognizing that estate fiduciaries includes statutory

committees in bankruptcy).

59.     Nevertheless, whether the Debtors admit that the Freedom Lender Group has called out a serious flaw in their process because of their Motion or not, the Debtors have reacted by agreeing to appoint a new independent director at the HoldCo Debtors.  The powers this independent director would have are unclear.  The Debtors also fail to specify whether this independent director has actually been appointed and, if so, what his or her qualifications are.  As further outlined in the Freedom Lender Group's Adjournment Reply, appointing an independent director does not resolve the conflicts here.  The HoldCo Debtors, as well as the OpCo Debtors, are in too deep having signed onto the RSA, the Debtors' proposed DIP facility, the proposed sale process, and the Proposed Plan.  Advised by the same counsel representing the OpCo Debtors, such independent director will be told that undoing all of that will cause the First Lien OpCo Lenders to call a DIP default and unravel the cases, thus causing a liquidation of the entire enterprise.  Therefore, whatever independence this director would bring to the process is doomed to be illusory.  What is required here is a reset – appointment of a truly independent fiduciary with his or her own advisors that has exclusive decision-making powers for the HoldCo Debtors.

### 2.     The Proposed Plan's Infirmities Go Well Beyond the Freedom Lender Group's Unhappiness With It

60.     The Objecting Parties seek to minimize the Motion by arguing that the members of the Freedom Lender Group are merely "unhappy" or "dissatisfied" with the Proposed Plan. Debtors Obj. ¶ 54; First Lien Group Obj. ¶ 63.  The Freedom Lender Group is not only unhappy with the Proposed Plan at the HoldCo Debtors; rather, the Freedom Lender Group has identified material infirmities with respect to the conduct and governance of the Debtors.

61.     As discussed further in the Motion, starting even before filing the Proposed Plan, the Debtors (including the HoldCo Debtors) have made it abundantly clear that, rather than

honoring their fiduciary duties to their stakeholders, they instead cannot act without the permission

of the First Lien Group in light of their obligations under the RSA, which has not been approved

by the Court (nor is it intended to be).   Case in point: counsel for the Debtors deemed it necessary

to first bring the Freedom Lender Group's proposed plan for the HoldCo Debtors to the First Lien

Group before providing any feedback, despite the First Lien OpCo Lenders having no recourse to,

or interest in, the HoldCo Debtors.   Bakemeyer Decl. Ex. 3.   Given the HoldCo Debtors

unwillingness to honor their fiduciary duties and the Debtors' unnecessarily fast timeline, the

situation here is "dire" (First Lien Group Obj. ¶ 66) and, without the Court's assistance in

addressing these fundamental issues, it will soon be too late to remedy them.

### B.    Appointment of a Chapter 11 Trustee for the HoldCo Debtors Is in the Best Interests of the HoldCo Debtors' Stakeholders

62.    The Objecting Parties' notion that an analysis of all interests of all estates must be

considered when considering the appointment of a trustee at only two debtors is misplaced.

Debtors Obj. ¶ 56; Committee Obj. ¶ 29; First Lien Group Obj. ¶ 64.   The cases the Objecting

Parties cite for this proposition are inapposite because, in each one, either (i) the movant sought

appointment of a trustee at all the debtors collectively and, therefore, the courts considered the

interests of the collective estates, or (ii) the case involved a singular debtor, rendering this

consideration irrelevant.[17]   Further, the court in *In re Century Glove, Inc.* considered whether the

---

[17]    *See In re WorldCom, Inc.*, Case No. 02-13533 (AJG), 2003 Bankr. LEXIS 2192, at *37-39 (Bankr. S.D.N.Y. May 16, 2003) (considering whether appointment of a trustee was in the best interests of all Debtors); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 166 (Bankr. S.D.N.Y. 1990) (considering whether to appoint a trustee for all Debtors); *In re Eletson Holdings Inc.*, 659 B.R. 426, 431 (Bankr. S.D.N.Y. 2024) (same); *In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 301-02 (Bankr. M.D. Pa. 2016) (considering whether to appoint a trustee for a case with a single debtor-in-possession); *In re W.R. Grace & Co.*, 285 B.R. 148, 152 (Bankr. D. Del. 2002) (same); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 n. 11 (Bankr. E.D.N.Y. 1989) (same); *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003) (same); *In re G-I Holdings, Inc.*, 295 B.R. 502, 504 (D.N.J. 2003) (same); *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (declining to appoint a trustee or examiner with expanded powers for an individual chapter 11 debtor); *In re Int'l Oil Co.*, 427 F.2d 186, 187 (2d Cir. 1970) (decided under the Bankruptcy Act of 1898)

appointment of a trustee for just one of the debtors was appropriate, and only considered the interests of that debtor in declining to appoint a trustee.  73 B.R. 528, 537 (Bankr. D. Del. 1987).

63.     The Debtors' citations to Collier and the legislative history fare no better, as they do not address the point for which Debtors cite them.  Because the Freedom Lender Group is only seeking appointment of a trustee at the HoldCo Debtors, only the interests of the stakeholders at the HoldCo Debtors should be considered and be in line with the principles of *Owens Corning*.

64.     The additional factors cited by the Debtors regarding the trust and confidence in officers and directors should be evaluated solely at the HoldCo Debtors.  The Freedom Lender Group has undoubtedly met its burden by showing that an uncurable conflict between the OpCo Debtors and the HoldCo Debtors exists, as further described herein and in the Motion.  There is no true independent fiduciary looking out for the interests of the HoldCo Debtors' stakeholders here.  Therefore, the distrust of the members of the Freedom Lender Group in the HoldCo Debtors' officers and directors is entirely justified.

## **CONCLUSION**

65.     For the reasons stated above, the Freedom Lender Group respectfully requests that the Court enter the Proposed Order, substantially in the form attached to the Motion as Exhibit A thereto, granting the relief requested in the Motion and such other and any further relief as the Court may deem just and proper.


*[Remainder of Page Intentionally Left Blank]*

Dated: December 6, 2024
       Wilmington, Delaware

/s/ Michael J. Farnan
**FARNAN LLP**
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
       mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**
Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
       azatz@whitecase.com
       sam.hershey@whitecase.com
       erin.smith@whitecase.com
       brett.bakemeyer@whitecase.com

*Counsel to the Ad Hoc Group of*
*Freedom Lenders*