**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (JTD)<br><br>(Jointly Administered)<br><br>Ref. Docket Nos. 51, 134, 274, 308 & 359 |

**AD HOC GROUP OF FIRST LIEN LENDERS' JOINDER AND REPLY
IN SUPPORT OF DEBTORS' DIP MOTION AND REPLY TO THE
OBJECTION OF THE AD HOC GROUP OF FREEDOM LENDERS
TO FINAL APPROVAL OF THE DEBTORS' DIP MOTION**

The Ad Hoc Group of First Lien Lenders (the "First Lien Group"), by and through its undersigned counsel, hereby file this joinder to the *Debtors' Reply in Support of in support of Motion for Postpetition Financing and Use of Cash Collateral* [Docket No. 359] (the "Debtors' Reply") and reply (this "Joinder and Reply") to the *Objection of the Ad Hoc Group of Freedom*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

*Lenders to Final Approval of the Debtors' DIP Motion* [Docket No. 274] (the "<u>Freedom Group Objection</u>") filed by the ad hoc group of certain junior lenders (the "<u>Freedom Lender Group</u>"), and respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1. As the Debtors demonstrated during two days of testimony and argument at the November 5th and November 6th first day hearings, the DIP Facility provides them with both the liquidity and certainty they require in these Chapter 11 Cases and is their best (and arguably only realistic) path forward for funding. In order to achieve entry of the Interim Order and in response to concerns raised by this Court, the U.S. Trustee and the Freedom Lender Group, the DIP Lenders made various economic and procedural modifications to their DIP Facility. Today, nearly a month later, the Debtors' need for the DIP Facility stands unaltered. But one thing has changed -- its terms have materially improved for the Debtors. Through constructive negotiations with the Debtors and the Official Committee of Unsecured Creditors ("<u>Committee</u>") -- that have delivered the Committee's support of the Motion -- the DIP Lenders have agreed to:

- limit the DIP guarantees at the Freedom HoldCo Debtors, on the terms summarized herein;

- a tiered draw schedule, that simultaneously commits the DIP Lenders to the full amount of funding requested by the Debtors, but also permits the Debtors to defer borrowing and paying the associated interest on the final $75 million draw from the DIP Facility until absolutely necessary;

- a "roll up" of prepetition term loans that only attaches to new money as it is loaned, addressing concerns raised regarding whether the roll up should be granted on committed vs. funded DIP Loans;

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Debtors' Motion for Entry of Interim and Final Order (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 51] (the "<u>DIP Motion</u>") or the Freedom Lender Objection, as appropriate.

- eliminate the Roll Up DIP Loans' liens and claims on commercial tort claims and avoidance action proceeds, as set forth in the proposed revised Final Order; and

- modify certain milestones and provisions to provide the Committee the runway needed to conduct its investigation, and, hopefully, reach a consensual resolution of all case- related issues.

2.  By contrast, the Freedom Lender Group has refused to provide the Debtors with an actionable DIP financing proposal. Instead, the Freedom Lender Group has attacked various customary and standard terms of the DIP Facility and has lodged a series of meritless arguments, including: (a) that the DIP Facility is an improper *sub rosa* plan because it is attached to a restructuring support agreement, despite the fact that this Court stated its disagreement with this at the first day hearings, and the fact that it is a common practice in major chapter 11 cases; and (b) that the DIP Facility is oversized, despite the evidence to the contrary. Most critically, however, the Freedom Lender Group requests that this Court delay final approval of the DIP Facility because the DIP Lenders have sufficiently funded the Chapter 11 Cases. Putting aside the patent illogicality of their premise -- that properly funding a debtor's liquidity under an interim order can provide cause to delay approval on a final basis -- the standard for approving debtor-in-possession financing is not whether a debtor currently has sufficient liquidity. Rather, courts look to the full timeline for the pendency of the chapter 11 cases and determine whether approval of a financing is the exercise of a debtor's sound business judgment, a standard easily met here.

3.  For these reasons and those stated below and in the Debtors' Reply, the Court should overrule the Freedom Group Objection and approve the DIP Motion on a final basis.

## REPLY

**A.     DIP Facility is Not Prejudicial to Freedom HoldCo Debtors**

4.  The Freedom Lender Group focuses much of its objection on the notion that the DIP Facility is prejudicial to Freedom VCM Interco, Inc. and Freedom VCM, Inc. (together, the

3

"Freedom HoldCo Debtors"). (*See* Freedom Group Objection, Part I.) These assertions should be rejected.[3]

5. *Freedom HoldCo Debtors are Only Providing a Limited Guaranty*. As set forth in the proposed revised Final Order,[4] the DIP Lenders have agreed to remove the Freedom HoldCo Debtors as general guarantors of the DIP Facility.[5] (*See* Proposed Final Order at n.2.) The DIP Lenders will instead make proceeds of the DIP Facility available to the Freedom HoldCo Debtors if the Freedom HoldCo Debtors are required to fund any ongoing administrative expenses and do not have the liquidity to do so. In exchange, the Freedom HoldCo Debtors have agreed to become limited guarantors of the DIP Facility, in a principal amount equal to any proceeds made available to them pursuant to this funding arrangement. (*See id.* at ¶ 2(f).) Thus, the Freedom HoldCo Debtors are given the ability to utilize the proceeds of the DIP Facility with no obligation to pay any of the fees and expenses associated therewith. Indeed, and contrary to the Freedom Lender Group's assertions, the DIP Facility actually **benefits** the Freedom HoldCo Debtors, by affording them access to free capital to ensure administrative solvency.

6. To that end, the DIP Facility is significantly cheaper for the Freedom HoldCo Lenders than the financing apparently offered by the Freedom Lender Group on the evening of

---

[3] The Freedom Lender Group objects to the Freedom HoldCo Debtors being "jointly and severally liable for at least $783 million of DIP Facility claims and potential adequate protection claims" for the DIP Lenders. (Freedom Group Objection at ¶ 31.) However, and as the Freedom Lender Group is aware, the DIP Facility was initially structured so that only the $250 million "new money" portion of the DIP Facility would apply to the Freedom HoldCo Debtors. (*See* Ex. A to the *Declaration of Daniel A. Fliman in Support of the Exclusivity Objection* [Docket No. 302] (the "Fliman Decl."), Nov. 5, 2024 Hr'g Tr. at 142:11-13). The references to saddling the Freedom HoldCo Debtors with nearly $800 million in DIP Loans are therefore simply incorrect.

[4] *Notice of Filing of Proposed Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 336 at Ex. A] (the "Proposed Final Order").

[5] The Freedom HoldCo Debtors likewise are not jointly or severally liable for any adequate protection claims in favor of the First Lien OpCo Lenders. (*See* Proposed Final Order at n. 3, ¶ 2(f).)

December 4, 2024.  (*See Supplement to Objection of the Ad Hoc Group of Freedom Lenders to Final Approval of the Debtors' DIP Motion* [Docket No. 308] (the "<u>FLG Supplemental Objection</u>"); Ex. A (the "<u>FLG DIP Facility</u>").)  As to the Freedom HoldCo Debtors, unlike the DIP Facility, the FLG DIP Facility would require the Freedom HoldCo Debtors to agree to pay interest and commitment fees to the Freedom Lender Group, and most critically, to pay the fees and expenses of the Freedom Lender Group's advisors -- which are sure to be voluminous given the Freedom Lender Group's still nascent litigation spree in these Chapter 11 Cases -- saddling the Freedom HoldCo Debtors with at least six million dollars in claims that they would not otherwise be obligated to pay.  (*See* FLG DIP Facility at ¶ H(d) ("all proceeds of the Tranche B HoldCo DIP Loans up to $6.0 million shall be used and/or applied solely to pay the professional fees and expenses of the HoldCo DIP Lenders and adequate protection payments to the members of the Freedom Lender Group").)

7.    Out of the $7.5 million of financing the Freedom Lender Group is offering the Freedom HoldCo Debtors, **80%** of the FLG DIP Facility is earmarked to pay the Freedom Lender Group's fees and expenses, with only $1.5 million available to the Freedom HoldCo Debtors.  (*Id.*)  Even then, that $1.5 million would only be available "upon the HoldCo Debtors' emergence from chapter 11" and so would not be available to fund the Freedom HoldCo Debtors' ongoing administrative expenses.  (*Id.*)  Like the prior two debtor-in-possession financing proposals made by the Freedom Lender Group, (*see* Exclusivity Objection at ¶¶ 22-23) the FLG DIP Facility is not only unworkable, but was very likely made with an eye towards papering a record, not a good-faith effort to extend financing to the Freedom HoldCo Debtors.

8.    <u>*Events of Default Are Appropriate*</u>.  According to the Freedom Lender Group, because the proposed DIP Facility provides no benefit to the Freedom HoldCo Debtors, the DIP

Facility should not include events of default based on developments in the Freedom HoldCo Debtors' Chapter 11 Cases. (*See* Freedom Group Objection at ¶ 40.) The Freedom Lender Group's argument here misses the mark.

9. The Freedom HoldCo Debtors are part of the jointly administered Chapter 11 Cases and what happens in the Chapter 11 Cases impacts and benefits all Debtors, including at the Freedom HoldCo Debtors. For example, the sale process currently underway in the Chapter 11 Cases is currently being funded by the DIP Facility and the proceeds of that sale process would inure to the benefit of the Freedom HoldCo Debtors to the extent such proceeds exceed the amount of Franchise Group, Inc. and its operating subsidiaries' (collectively, the "OpCo Debtors") indebtedness. Indeed, nowhere is the interconnectedness of the Debtors more apparent than from the actions of the Freedom Lender Group itself, which is currently trying to use an equity pledge at Franchise Group, Inc. to wrest control of these Chapter 11 Cases. (*See Motion of the Ad Hoc Group of Freedom Lenders For Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors*, Part III [Docket No. 192].) As such, there is a sound basis for the DIP Lenders to require that the DIP Facility include events of default to the extent of activities taken at the Freedom HoldCo Debtors.

10. In any event, as stated above, ongoing costs and expenses of the Freedom HoldCo Debtors will be able to be funded by the DIP Facility, and thus, the DIP Facility provides a benefit to the Freedom HoldCo Debtors. Accordingly, the events of default are appropriate.

**B.     Final Approval of the DIP Facility is Necessary**

11. Despite the Freedom Lender Group's unsupported assertions to the contrary, approval of the DIP Facility on a final basis is necessary and appropriate at this time. The Freedom Lender Group argues that final approval of the DIP Facility is not an actual and necessary cost of

preserving each Debtors' estate. (*See* Freedom Group Objection at ¶¶ 41-42.) However, the standard for approving debtor-in-possession financing is not, as the Freedom Lender Group argues without caselaw support, whether a debtor needs additional liquidity *immediately* (and factoring in the runway provided by interim funding). Rather courts consider the full timeline of a debtor's chapter 11 cases and look to whether approval of the financing under section 364 is in the sound exercise of that debtor's business judgment. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.") *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised . . . .").

12. The Freedom Lender Group's end-goal is unclear. Failing to approve the DIP Facility on a final basis would constitute an event of default under the DIP Credit Agreement, and the Debtors would be left with a defaulted DIP Facility, no viable postpetition financing, no exit-strategy, and, more critically, no access to the additional liquidity they will desperately need to emerge from these Chapter 11 Cases. In other words, delaying approval of the DIP Facility is not a risk-free proposition as the Freedom Lender Group would have this Court believe. (*See* Freedom Group Objection ¶¶ 6, 25–27, 43.) The DIP Motion was properly noticed, discovery was undertaken, and objections were filed -- there is no reason to delay final approval, and the liquidity afforded by the interim DIP funding does not provide a basis otherwise.

C. **DIP Facility is Not a *Sub Rosa* Plan**

13. The Freedom Lender Group argues that the Proposed DIP Facility is a *sub rosa* plan because it "tethers the Debtors to the predetermined chapter 11 plan contemplated in the RSA" and forecloses "the possibility of alternative restructuring proposals." (Freedom Group Objection at ¶ 58.) Not so. Neither the DIP Facility nor the RSA (as defined below) amounts to a "*sub rosa*"

7

plan. The Freedom Lender Group's objection can be distilled to three arguments, each of which is flawed.

14. *First*, according to the Freedom Lender Group, the events of default, milestones, and covenants foreclose the Debtors' ability to negotiate an alternative plan of reorganization. (*See id.* at ¶¶ 59-60.) This is not the case. As the Court recognized at the first day hearings when expressing disagreement with this very premise in the Freedom Lender Group's objection, the RSA contains a fiduciary out which allows the Debtors to negotiate, and if applicable, terminate the RSA. ((*See* First Day Decl. at Ex. B, Restructuring Support Agreement (the "RSA")) at §§ 8.01, 12.02(c); Fliman Decl. at Ex. A, Nov. 5, 2024 Hr'g Tr. at 126:9-14 ("I don't see the RSA as a sub rosa plan. There is a fiduciary out for the debtors. If the debtors believe that they have a better plan, they can come to me on five days' notice and seek to get relief from the plan.").) Simply put, and by virtue of this provision, the Debtors may consider **any** alternative plan of reorganization during their Chapter 11 Cases if they believe, in the exercise of their fiduciary duties, it presents their creditors and parties in interest a better path forward than the Plan currently in front of this Court.

15. *Second*, on a similar note, the Freedom Lender Group argues that "the draconian nature of these provisions would almost certainly dissuade any party from proposing an alternative plan." (Freedom Group Objection at ¶ 61.) This contention should similarly be disregarded. The remedies provided to the DIP Lenders for providing the DIP Facility are subject to a five business-day Remedies Notice period where parties in interest, including the Debtors, can seek an emergency hearing, requiring judicial intervention by the Court. (*See* Proposed Final Order at ¶ 21(b).) The Freedom Lender Group recognizes this but states "there is no assurance that the Court would restrict the DIP Lenders from taking actions in the face of a default." (Freedom Group

Objection at ¶ 61.) But what is important is that the remedies may be put before this Court for review, and at that time the Freedom Lender Group can make whichever arguments it wishes.

16. *Third*, the Freedom Lender Group asserts the DIP Facility amounts to a *sub rosa* plan on the basis that it contemplates approval of an equity conversion feature based on a 25% discount to a plan value that has not yet been disclosed. (*See* Freedom Group Objection ¶¶ 62–64.) The Freedom Lender Group neglects to mention that the equity conversion is in fact a benefit to the Debtors. Rather than being required to repay the DIP Facility, in full, in cash as a condition precedent to emerging from bankruptcy, the Debtors will have the ability to equitize a portion of the DIP Facility. But the Debtors are always able to repay the DIP Facility in full, in cash to avoid equitization of the DIP Loans, and the associated discount.

17. The Freedom Lender Group refers to *In re LATAM Airlines Grp.*, S.A., 620 B.R. 722 (Bankr. S.D.N.Y. 2020) in support of its argument.[6] The *LATAM* court found an equity conversion feature in a proposed DIP financing constituted a *sub rosa* plan because, in that case, the equity conversion feature was being afforded to LATAM equity holders without payment in full of prepetition creditors, thus violating the absolute priority rule, and the debtors could make an election without approval or oversight of the court, thus, "[t]here is no way of knowing now whether that discount is appropriate." *Id.* But *LATAM* is distinguishable.

18. Here, the equity conversion feature does not affect any of the Debtors' creditors, other than the Prepetition First Lien Lenders. The way in which the equity conversion feature here

---

[6] The Freedom Lender Group also cites to *In re SAS AB*, 644 B.R. 267, 271-72 (Bankr. S.D.N.Y. 2022) and *In re Belk Props., LLC*, 421 B.R. 221 (Bankr. N.D. Miss. 2009), but these cases are inapposite. The court *In re SAS AB* approved a DIP transaction that allowed the DIP lenders to convert their outstanding DIP obligations to equity and merely cautioned against cases that would lock in a specified equity percentage. But as explained, there is a fiduciary out in the RSA so no specified equity percentage is being permanently locked in here. Moreover, in *Belk*, the court denied a debtor in possession financing where the term sheet (i) called for the lender to act as debtor's chief manager and obtain at least 51%, and as much as 90% of reorganized equity, and (ii) loosely detailed the manner in which existing creditors were to be treated. *See Belk Props., LLC*, 421 B.R. at 225-26. This is distinguishable from our case because unlike *Belk*, the Debtors, not the DIP Lenders, remain in control of these Chapter 11 Cases.

is structured, the DIP Lenders have each agreed, assuming the RSA is still in effect, that their DIP Loans can be converted into take-back debt and equity at a discount on the effective date of the Joint Chapter 11 Plan of Franchise Group, Inc. and its Affiliated Debtors [Docket No. 150] (the "Proposed Plan"). (*See* DIP Credit Agreement at § 2.09.) As currently proposed, the Prepetition First Lien Lenders are set to receive 100% of the reorganized equity, subject to dilution from any equitization of the DIP Loans. (*See* Proposed Plan at § 5.4.) It is therefore only the Prepetition First Lien Lenders -- who nearly unanimously subscribed to the DIP Facility -- that may be prejudiced by the discount.[7] It is thus unclear why the Freedom Lender Group, who only hold claims on account of the Prepetition Second Lien Facility and Prepetition HoldCo Facility, are objecting on this basis. Indeed, absent confirmation of the Proposed Plan (and, by extension, Court approval of the equitization feature), the equitization feature, and the objected to discount, is moot.

D.  **The Objections to the Roll Up Should be Overruled**

19.     The Freedom Lender Group next objects to the Roll Up as improper and prejudicial, arguing the Roll Up (a) will not provide a benefit to the estate or disfavored creditors and (b) is unreasonable. (*See* Freedom Group Objection at ¶¶ 46-50.) The Freedom Lender Group's assertions should be rejected.

20.     First and foremost, contrary to the Freedom Lender Group's position, roll ups are customary in debtor-in-possession financing arrangements and, 2x1 roll ups, are routinely granted in this District.[8] Each component of the DIP Facility was vigorously negotiated, in good faith,

---

[7]     It should be noted that while the Freedom Lender Group is comprised of funds owned or managed by both Irradiant and Pacific Investment Management Company LLC ("PIMCO"), certain funds managed by PIMCO in fact signed the RSA, participated in the DIP Facility, and have committed to supporting the Proposed Plan. Thus, even within the family of funds managed by a member of the Freedom Lender Group, there is support for the equitization feature.

[8]     *See, e.g.*, *In re Never Slip Holdings, Inc.*, No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024) [Docket No. 133] (approving 3:1 roll up: $120 million DIP facility comprised of $30 million of new money and a $90 million roll up); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) [Docket No. 168] (approving 3:1 roll up: $90 million DIP facility comprised of $22.5 million of new money and a $67.5 million roll up); *In re Vesta Holdings,*

between the Debtors and the DIP Lenders, including the Roll Up, without which the DIP Lenders would not have committed to provide the DIP Facility. (*See* Grubb Decl. at ¶ 25.) Perhaps more critical, the Freedom Lender Group has not identified (and cannot identify) any resulting harm or prejudice to the Debtors from the Roll Up. The Roll Up does not add any leverage to the Debtors' balance sheet, as it simply replaces the fulcrum security Prepetition First Lien Secured Obligations that were secured by substantially all of the Debtors' assets. And, the Roll Up does not inhibit the Debtors' restructuring efforts, as the DIP Lenders have already agreed that, as part of the Proposed Plan, the Roll Up DIP Loans do not need to be paid off in full in cash and can instead be satisfied via takeback debt and equity. (*See* DIP Credit Agreement at § 2.09.)

E.     **The Freedom Lender Group's Remaining Arguments are Without Merit**

- Second Lien OpCo Lenders' Interests Are Adequately Protected:  The Freedom Lender Group's argument that the Second Lien OpCo Lenders' obligations are not receiving adequate protection in connection with the DIP Facility is unfounded. (*See* Freedom Group Objection at ¶ 56.)  The Second Lien OpCo Lenders are being adequately protected by way of replacement liens and claims, in addition to the protections they are receiving by the DIP Lenders funding the administration of the Chapter 11 Cases.  Specifically, the Debtors are conducting a marketing and sale process for the Debtors' assets -- funded by the DIP Lenders -- in which substantially all of the Debtors' assets would be sold.  The proceeds from the sale process would inure to the benefit of the Second Lien OpCo Lenders. Moreover, the Freedom Lender Group's focus on the Debtors' payment of certain prepetition critical vendors (*see* Freedom Group Objection at ¶¶ 54-56) is a red herring. The payments the Debtors are making to prepetition unsecured claims are payments that this Court has already ruled (or, if additional payments will go out, will rule) are critical and necessary to maintaining the Debtors' business operations and associated value.  It is axiomatic, then, that making such payments preserves the Debtors' value for all stakeholders, including, the Second Lien OpCo Lenders.  Thus, the Second Lien OpCo Lenders' interests are being adequately protected. *See In re Armenakis*, 406 B.R. 589, 621

---

*LLC*, No. 22- 11019 (LSS) (Bankr. D. Del. Dec. 2, 2022) [Docket No. 141] (approving 2:1 roll up: $37.87 million DIP facility comprised of $12.625 of new money and a $25.25 million roll up); *In re Phoenix Servs. Topco LLC*, Case No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) [Docket No. 237] (approving 3:1 roll up: $100 million DIP facility comprised of $25 million of new money and a $75 million roll up); *In re Alamo Drafthouse Cinemas Holdings, LLC*, Case No. 21-10474 (MFW) [Docket No. 249] (Bankr. D. Del. April 1, 2021) (approving 2:1 roll up; $60 million DIP facility comprised of $20 million of new money and a $40 million roll up); *In re American Apparel, Inc.*, Case No. 15-12055 (BLS) (Bankr. D. Del. Oct. 5, 2015) [Docket No. 248] (approving 2:1 roll up: $90 million DIP facility comprised of $30 million of new money and a $60 million roll up).

(Bankr. S.D.N.Y. 2009) (noting that a debtor's "good prospects for successful reorganization" could satisfy need for adequate protection).

- The DIP Facility is Not Oversized: At the request of the Debtors, the DIP Lenders have agreed to bifurcate the second draw into two $75 million draws. The DIP Lenders are therefore providing the Debtors with the certainty of sufficient liquidity through emergence -- a critical safeguard in a retail bankruptcy -- without the associated interest expense. The Freedom Lender Group's views on liquidity cannot supplant the Debtors' business judgment, and their arguments as to the proper sizing of the DIP Facility should be denied. (*See* Fliman Decl. at Ex. G, Nov. 6, 2024 Hr'g Tr. at 125-126:22-8 (Court explaining that "[t]he three operating companies need to make sure that their creditors, their vendors, are comfortable with what's going to happen with this case, that there's going to be funding available to pay them in order for the debtors to receive the materials that they need to continue in operation . . .").)

- Adequate Protection Payments are Subject to Recharacterization: It is not, and has never been, the intention of the DIP Lenders to prevent potential recharacterization of adequate protection payments. Clarifying language has been added to the Final Order to make clear that any adequate protection payments are subject to recharacterization. (*See* Proposed Final Order at ¶ 3(c).)

- Lien on Avoidance Actions, and 506(c), Equities of the Case, and Marshalling Waivers: The Freedom Lender Group objects to the (i) waiver of section 506(c) of the Bankruptcy Code; (ii) waiver of the "equities of the case" exception of section 552(b) of the Bankruptcy Code; (iii) prohibition on seeking the equitable doctrine of marshaling; and (iv) granting of liens on proceeds of Avoidance Actions, arguing each of these should be preserved for unsecured creditors. (*See* Freedom Group Objection at ¶¶ 12, 68.) However, each of these provisions, which are market standard for DIP facilities of this type, were specifically requested and negotiated for by the DIP Lenders, are an integral component of the value the DIP Lenders are receiving in exchange for providing the DIP Facility. Critically, the Debtors, the DIP Lenders, and the Committee have reached a compromise and resolution on these items. Thus, there is no basis to remove these provisions.

- *Junior* Postpetition Financing: Finally, the Freedom Lender Group asserts that the Debtors must consider any junior postpetition financing proposals, including any potential offer from them, as an alternative to the DIP Facility. (*See* Freedom Group Objection at ¶¶ 13, 70–71.) This contention should be disregarded. The Debtors have given the Freedom Lender Group every opportunity to make a postpetition financing proposal and requested that any such proposal be made prior to November 27, 2024, to give the Debtors sufficient time to analyze, consider, and negotiate the terms of the proposed alternative DIP Facility. To date the Debtors have received no viable proposals (and indeed only received the Freedom Lender Group's proposal just for the Freedom HoldCo Debtors). The Freedom Lender Group cannot continue to reserve their rights to throw the Chapter 11 Cases into disarray by making a last-ditch junior debtor-in-possession financing proposal, that will likely not be actionable, solely to try and gain an advantage at the upcoming hearing.

## RESERVATION OF RIGHTS

21.     The First Lien Group reserves the right to supplement and to amend this Joinder and Reply, to seek discovery with respect to the same, and to introduce evidence at any hearing relating to the DIP Motion and expressly reserves all rights under applicable law and otherwise.

## CONCLUSION

WHEREFORE the First Lien Group respectfully requests that this Court overrule the Freedom Group Objection and grant the DIP Motion on a final basis.

[*Remainder of Page Intentionally Left Blank*]

| | |
|---|---|
| Dated: December 6, 2024<br>Wilmington, Delaware | Respectfully submitted,<br><br>**LANDIS RATH & COBB LLP**<br><br>*/s/ Matthew B. McGuire*<br>Adam G. Landis (No. 3407)<br>Matthew B. McGuire (No. 4366)<br>Elizabeth A. Rogers (No. 7335)<br>919 Market Street, Suite 1800<br>Wilmington, Delaware 19801<br>Telephone: (302) 467-4400<br>Facsimile: (302) 467-4450<br>Email: landis@lrclaw.com<br>        mcguire@lrclaw.com<br>        erogers@lrclaw.com<br><br>-and-<br><br>**PAUL HASTINGS LLP**<br><br>Jayme T. Goldstein (admitted *pro hac vice*)<br>Daniel A. Fliman (admitted *pro hac vice*)<br>Jeremy D. Evans (admitted *pro hac vice*)<br>Isaac S. Sasson (admitted *pro hac vice*)<br>200 Park Avenue<br>New York, New York 10166<br>Telephone: (212) 318-6000<br>Facsimile: (212) 319-4090<br>Email: jaymegoldstein@paulhastings.com<br>        danfliman@paulhastings.com<br>        jeremyevans@paulhastings.com<br>        isaacsasson@paulhastings.com<br><br>Nicholas A. Bassett (admitted *pro hac vice*)<br>2050 M Street NW<br>Washington, DC 20036<br>Telephone: (202) 551-1700<br>Facsimile: (202) 551-1705<br>Email: nicholasbassett@paulhastings.com<br><br>*Counsel to the Ad Hoc Group of First Lien Lenders* |