**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF ANDREW LAURENCE IN SUPPORT OF MOTION FOR
POSTPETITION FINANCING AND USE OF CASH COLLATERAL**

I, Andrew Laurence, declare under penalty of perjury:

1. I am the President and Chief Executive Officer of Franchise Group, Inc., located at 109 Innovation Court, Suite J, Delaware, Ohio 43015, and a number of its affiliated debtors. I have held this current position with the Debtors since January 20, 2024. Previously, I was an Executive Vice President of Franchise Group, Inc. since October 2, 2019. I am also currently a member of the boards of directors (the "Boards") of Debtors Freedom VCM

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

Holdings, LLC, Franchise Group, Inc., and certain of their wholly owned subsidiaries, including Freedom VCM, Inc. and Freedom VCM Interco., Inc. (the "HoldCo Debtors"). I hold a Bachelor of Arts degree from Harvard University.

2. As a result of my tenure with the Debtors, I am familiar with the day-to-day operations and business and financial affairs of the Debtors. All facts set forth in this declaration (the "Declaration") are based upon my personal knowledge of the Debtors' operations and financing, information learned from my review of relevant documents, information supplied to me from other members of the Debtors' management or the Debtors' advisors, or my opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition. If called to testify, I could and would testify competently to the matters set forth in this Declaration.

3. I submit this Declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 51] (the "DIP Motion").[2]

4. I believe that the Debtors are unable to obtain the financing they need on terms more favorable than the DIP Credit Agreement. The Boards and I directed Ducera, the Debtors' investment banker, to run a robust marketing process to seek DIP financing on the best terms we could obtain. The Debtors received five alternative DIP proposals, and based on our

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

assessment and input from our advisors as well as discussions during several board meetings,[3] the Boards concluded in their business judgment that each of those alternatives was worse than the DIP Credit Agreement. In addition, the boards of directors of each of the Debtor entities agreed, in their business judgment, to approve the DIP Credit Agreement by written consent.[4] This includes the boards of directors of the HoldCo Debtors, the members of which were present at the November 3, 2024 meeting and who agreed to enter into the DIP Credit Agreement, acting in the best interests of the HoldCo Debtors.

5.  First, Blue Torch Capital proposed a third-party ABL, but it was inferior to the DIP Credit Agreement because it would only provide $60 million of incremental borrowing capacity. The Debtors' professionals advised that this was not sufficient liquidity to support these Chapter 11 Cases, and that the associated costs were higher than the costs for the same amount of financing under the DIP Credit Agreement.

6.  Second, the existing Prepetition ABL Lenders sent two proposals regarding a new ABL facility. The Debtors' professionals advised that both were inferior to the DIP Credit Agreement because they did not provide meaningful liquidity relative to the Prepetition ABL Facility and included new fees and economics that made the existing structure more expensive.

7.  Third, the Debtors received a proposal from the Ad Hoc Group of Freedom Lenders (the "Freedom Lenders") less than 24 hours before we filed for bankruptcy. It was not actionable. Ducera advised that it was part of a package proposal that would require the Prepetition ABL Lenders' and Prepetition First Lien Lenders' consent (which the Debtors could not obtain),

---

[3] The board of Freedom VCM Holdings, LLC met and discussed the sizing of a DIP facility, the various DIP proposals, and alternatives to the DIP proposals, among other DIP related topics, during board meetings on October 4, 2024, October 11, 2024, October 18, 2024, October 25, 2024, and November 3, 2024.

[4] The members comprising the boards of directors of all of the Debtor entities, including the boards of the HoldCo Debtors, or their authorized signatories attended the November 3, 2024 meeting and authorized the release of written consent signature pages approving the DIP Facility.

it was subject to documentation (which the Freedom Lenders had not provided and the Debtors would have needed time to negotiate with the Prepetition ABL Lenders and Prepetition First Lien Lenders), and that even if the DIP was offered on a standalone basis (which it was not), it was not enough money.

8. Fourth, the Freedom Lenders provided another proposal shortly after 3:00 a.m. the morning before the continued Interim Hearing. The Debtors' professionals advised that this DIP proposal was also not actionable, including because it did not provide enough liquidity for a full chapter 11 process and because it required any sale proceeds to first pay off the DIP (in other words, I understand the Freedom Lenders' DIP proposal was not really a junior DIP).

9. Fifth, on December 4, 2024, the Freedom Lenders provided a one-page term sheet for a DIP to the HoldCo Debtors that contemplated a total of $7.5 million in financing, of which $1.5 million could be used to fund administrative expenses and the remaining $6 million would be used to pay the Freedom Lenders' professional fees and make adequate protection payments. A copy of that proposal is attached as **Exhibit A**. The Debtors, and the members of the HoldCo Debtors' boards of directors, reviewed the proposal with their advisors and concluded the proposal to be inferior to the existing DIP Facility because the proposal (a) would require the HoldCo Debtors to pay incremental fees, (b) would require the HoldCo Debtors to pay interest, and (c) provides only $1.5 million in incremental liquidity. The Debtors have provided the Freedom Lenders with a counterproposal.

10. The Debtors considered each of the alternative proposals. Where appropriate, we tried to obtain more favorable terms from other potential lenders—and to use competing proposals to improve the terms of the DIP Facility.

4

11. All of the Debtors' boards of directors also carefully considered how much financing the Debtors needed. The Boards and I relied on advice from the Debtors' professionals, including AlixPartners. We concluded, based on that advice, that the Debtors needed to access the amount of liquidity provided by the DIP Facility in order to ensure themselves and the market that they will have sufficient funding to successfully complete these Chapter 11 Cases.

12. Ultimately, the members of all Debtor boards of directors and I concluded that the DIP Facility is the Debtors' best and only actionable option for obtaining necessary financing. I believe that the DIP Facility will bring stability, confidence and certainty to these Chapter 11 Cases and provide the Debtors with immediate, critical financing to continue to operate their business, satisfy their liquidity needs, navigate a process to pursue a transaction during the bankruptcy to maximize value for all of their stakeholders, and reassure their suppliers, customers, vendors, employees, and other parties that the Debtors have adequate liquidity to satisfy their obligations going forward in these Chapter 11 Cases. Absent Court approval of the DIP Facility, the Debtors will be unable to satisfy their operational needs and may be forced to cease their operations.

13. Since filing for bankruptcy, the Debtors have been in communication with various stakeholders in an effort to reach consensual resolutions and improved terms on the postpetition financing arrangement the Debtors require to meet their liquidity needs.

14. I am familiar with the DIP Facility, the material terms thereto, and the Debtors' immediate liquidity needs. Based on my experience with the Debtors in particular, I believe that approval of the proposed DIP Facility is essential for the Debtors to fund general and corporate business needs and the administration of these Chapter 11 Cases.

15. Based on the foregoing, I believe approval of the relief requested in the DIP Motion reflects a sound exercise of the Debtors' business judgment and is the best possible option available to the Debtors under the circumstances.

\* \* \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: December 8, 2024

/s/ *Andrew Laurence*  
Andrew Laurence  
Chief Executive Officer  
Franchise Group, Inc., on behalf of itself and its affiliated Debtors