# Exhibit A

## Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No.** |

**ORDER (A) AUTHORIZING DEBTORS TO SELL BY PRIVATE SALE CERTAIN OF
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND
ENCUMBRANCES, WITH SUCH INTERESTS TO ATTACH TO THE PROCEEDS,
AND (B) GRANTING RELATED RELIEF**

Upon consideration of the *Motion of Debtors for Entry of Order (A) Authorizing Debtors*

*to Sell by Private Sale Certain Assets Free and Clear of Liens, Claims, and Encumbrances, with*

*Such Interests to Attach to the Proceeds, and (B) Granting Related Relief* (the "Motion")[2] filed by

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meaning ascribed to such terms in the Motion.

the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") for entry of an order (this "Order"), (a) approving the Private Sale of the Purchased Assets on the terms of the Proposed Order and the Purchase Agreement, a copy of which is attached hereto as Exhibit 2, and (b) granting related relief; and this Court having found that (i) this Court has jurisdiction over the Debtors, their estates, and the property of their estates and to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012, (ii) this Court may enter a final order consistent with Article III of the United States Constitution, (iii) this is a core proceeding under 28 U.S.C § 157(b)(2)(A), (iv) venue of this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409, and (v) no further or other notice of the Motion is required under the circumstances; and this Court having reviewed the Motion and having heard the statements in support of the relief requested in the Motion at a hearing before this Court; and having determined that the legal and factual bases set forth in the Motion and the record of these Chapter 11 Cases establish just cause for the relief granted in this Order; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED AND ORDERED THAT:**

1.      The relief requested in the Motion is granted as set forth herein.

2.      All objections to the Motion or relief provided herein that have not been withdrawn, waived, or settled are hereby overruled and denied on the merits.

3.      The Purchase Agreement and all of its terms and conditions are hereby approved.  The failure to specifically include any particular provisions of the Purchase

Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Purchase Agreement be authorized and approved in its entirety.

4.       Pursuant to Bankruptcy Code sections 105(a), 363, and 365, the Debtors are authorized and directed to consummate the transactions provided for in the Purchase Agreement effective immediately upon entry of this Order.

5.       The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate and implement, the Purchase Agreement and all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further actions as may be necessary for the purposes of assigning, transferring, granting, conveying and conferring to Purchaser of the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement.  For the avoidance of doubt, the Purchased Assets shall not include any (i) commercial tort claims or (ii) claims or causes of action pursuant to 11 U.S.C. §§ 544, 547 and 548 and all state law equivalents.

6.       Pursuant to Bankruptcy Code section 363(f), the sale of the Purchased Assets is, without need for any action by any party, free and clear of all liens, claims, encumbrances and interests, with such liens, claims, encumbrances, and interests attaching to the proceeds of such sale (the "Sale Proceeds") with the same validity, extent and priority as had attached to such Purchased Assets immediately prior to such sale.  The holder of any valid lien, claim, encumbrance, or interest on such Purchased Assets shall, as of the effective date of such sale, be deemed to have waived and released such lien, claim, encumbrance, or interest on the Purchased Assets, without regard to whether such holder has executed or filed any applicable

release, and such lien, claim, encumbrance, or interest shall automatically, and with no further action by any party, attach solely to the Sale Proceeds. As such, Purchaser shall not have any liability for any liens or claims against, or liabilities of, or any interest in any assets of, any Debtor whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability, vicarious liability, or any other similar theory or applicable state or federal law or remedy in equity) except as expressly provided in the Purchase Agreement with respect to Assumed Liabilities. All persons or entities holding liens, claims, encumbrances or interests of any kind or nature whatsoever in, to or against the Purchased Assets or the operation of the Purchased Assets are hereby and forever barred, estopped, and permanently enjoined from asserting against the Purchaser or any of its successors, assigns or property (including, without limitation, the Purchased Assets) any lien, claim, encumbrance or interest existing, accrued or arising prior to the Closing (as defined below). Notwithstanding the foregoing, any such holder of such a lien, claim, encumbrance, or interest shall execute and deliver any waivers, releases or other related documentation, as reasonably requested by the Debtors. Purchaser is not a successor in interest to or continuation of any of the Debtors or their respective estates. The Private Sale does not amount to a consolidation, merger, or de facto merger or Purchaser or any other entity with any Debtor. Purchaser shall have no successor liability under any theory for the obligations of, any Debtor. Except as provided in paragraph 6 of this Order, nothing contained in the Purchase Agreement or this Order shall constitute, or otherwise act as, a release of any party.

7.      This Order shall be good and sufficient evidence of the transfer of title in the Purchased Assets to the Purchaser, and the sale consummated pursuant to this Order and the Purchase Agreement shall be binding upon and shall govern the acts of all persons and entities

who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets sold pursuant to this Order, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state and federal, state and local officials, and each of such persons and entities is here-by authorized to accept this Order as good and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the sales contemplated hereby. A certified copy of this Order may be: (a) filed with the appropriate clerk or similar official, (b) recorded with the applicable recorder of deeds or similar official, and/or (c) filed or recorded with any other governmental agency to evidence the cancellation of any and all liens, claims, encumbrances and interests with respect to the Purchased Assets.

8.      This Order and the Purchase Agreement shall be binding and enforceable in all respects upon (a) the Debtors and all successors and assigns of the Debtors, (b) all creditors or interest holders, in each case, whether known or unknown, of the Debtors, (c) the Purchaser and its successors and permitted assigns, and (d) any subsequent trustee appointed in the chapter 11 cases of the Debtors party to the Purchase Agreement or upon conversion of such cases to chapter 7 of the Bankruptcy Code.

9.      The Purchase Agreement and each of the transactions contemplated therein were negotiated, proposed, and entered into by the Debtors and Purchaser, in good faith, without collusion, and from arm's length bargaining positions.  Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.  None of the Debtors or Purchaser have engaged

in any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. The Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtors.  None of the Debtors or Purchaser is entering into the Purchase Agreement or proposing to consummate the Private Sale, fraudulently, or for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia.  Further, Purchaser is not an "insider" of the Debtors.

10.     Purchaser shall be responsible for the satisfaction of all assumed liabilities set forth in the Purchase Agreement (the "Assumed Liabilities"), and not for any Excluded Liabilities (as defined in the Purchase Agreement).  Except as provided in the Purchase Agreement or this Order, after the closing of the Private Sale (the "Closing"), the Debtors and their estates shall have no further liability or obligations with respect to any of the Assumed Liabilities, including those arising under the unexpired nonresidential leases set forth on Exhibit 1 attached hereto, and assumed and assigned to the Purchaser (the "Assumed Leases"), and all holders of such claims are forever prohibited, barred, and estopped from asserting any claims under any Assumed Liabilities including those arising under the Assumed Leases against the Debtors, their successors or assigns, and their estates.

11.     The Debtors are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to assume and assign the Assumed Leases to Purchaser free and clear of any and all of liens, claims, encumbrances, or other interests, and to execute and deliver to Purchaser such documents or other instruments as may be reasonably necessary to assign

and transfer the Assumed Leases to Purchaser, all as provided in the Purchase Agreement. Upon the assumption and assignment to Purchaser of any Assumed Lease at Closing in accordance with this Order, Purchaser shall succeed to the entirety of the Debtors' rights and obligations in respect of each Assumed Lease so assumed and assigned at Closing.  Except as otherwise provided in this Order or the Purchase Agreement, upon payment of any applicable Cure Amounts, to the extent set forth in section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to each Assumed Lease.

12.    All non-Debtor counterparties to each Assumed Lease shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, section 365(e)(2)(A)(ii) of the Bankruptcy Code, or otherwise, and Purchaser shall enjoy all of the rights and benefits under each such Assumed Lease as of the applicable effective date of assumption and assignment without the necessity of obtaining such person's written consent to the assumption or assignment of such Assumed Lease.  Any non-Debtor counterparty to an Assumed Lease that is a shopping center lease that has not objected to the assignment thereof is deemed to consent to such assignment pursuant to section 365(c) of the Bankruptcy Code.

13.    With respect to any Assumed Lease that is assumed and assigned to Purchaser at Closing, Purchaser shall pay the Cure Amount set forth in Exhibit 1 (the "Assumed Lease Schedule") attached to this Order in the manner set forth in the Purchase Agreement.  The payment of the Cure Amounts shall be deemed to be in full satisfaction of and cure all defaults (as that concept is contemplated by section 365 of the Bankruptcy Code) under the Assumed Leases necessary to effectuate the assumption by the Debtors and the assignment to Purchaser of such Assumed Leases pursuant to section 365 of the Bankruptcy Code, and, upon payment in accordance with the preceding sentence, such Assumed Leases shall be deemed to be in full

force and effect, free of default for such purposes. To the extent a non-Debtor counterparty to an Assumed Lease failed to timely object to any proposed Cure Amounts listed in the Assumed Lease Schedule, the Cure Amounts listed therein have been and shall be deemed to be finally determined and any such non-Debtor counterparty shall be prohibited, barred, and estopped from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time. Each non-Debtor counterparty to an Assumed Lease is forever prohibited, barred, and estopped from asserting against the Debtors or Purchaser, their affiliates, successors or assigns, or the property of any of them, any default existing as of the date of the hearing on this Motion if such default was not raised or asserted in a timely-filed objection. Purchaser shall, upon payment of the Cure Amounts, be deemed to have provided "adequate assurance of future performance" to the applicable non-Debtor counterparties to Assumed Leases as of the Closing.

14.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser or to the Debtors as a result of the assumption and assignment of the Assumed Leases.

15.     Notwithstanding anything to the contrary in the Purchase Agreement or this Order, for the avoidance of doubt and as part of the Assumed Liabilities under the Purchase Agreement, as of the entry of this Order, Purchaser has assumed all liabilities and obligations under the Assumed Leases that arise or are owed on or after the Closing.

16.     No bulk sales law, bulk transfer law, or similar law of any state or other jurisdiction shall apply in any way to the Sale. The Debtors and Purchaser waive, and hereby shall be deemed to have waived, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any

jurisdiction that may be applicable.

17. In connection with the Purchased Assets, Purchaser shall continue the Debtors' existing policy concerning the transfer of personally identifiable information upon Closing, as may be modified in accordance with the terms of such policy.

18. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall be effective and enforceable immediately upon entry, and the fourteen (14)-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Sale and the Debtors and Purchaser intend to close the Sale as soon as practicable.

19. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order and the Purchase Agreement.

## Exhibit 1

**Assumed Leases**

| | Location of Assumed Lease | Lease Title | Counterparty Address | Cure Amount |
|---|---|---|---|---|
| 1. | Ocala, FL | Lease, dated November 1, 2024, by and between SW 17th Street 1010, LLC, as landlord, and American Freight of Florida, Inc., as tenant. | SW 17th Street 1010, LLC<br>Attn: Steve Belford<br>6649 N. High St., Ste. LL2<br>Worthington, OH 43085 | $879.00 |
| 2. | Louisville, KY | Lease, dated September 9, 2002, by and between Lichtefeld Properties, L.L.C., as landlord, and American Freight of Kentucky, Inc., as tenant, as amended by that certain Addendum #4, dated July 19, 2005, that certain Addendum #5, dated September, 2010, that certain Addendum #6, dated December 15, 2011, that certain Addendum #7, dated August, 2015, and that certain Addendum #8, dated October 14, 2019. | Lichtefeld Development Trust<br>Attn: Marissa Coon<br>9300 Shelbyville Rd, Ste. 1300<br>Louisville, KY 40222 | $1,297.00 |
| 3. | Massillon, OH | Lease Agreement, dated March 28, 2003, by and between Lincoln Associates, as landlord, and American Freight of Ohio, Inc., as tenant, as amended by that certain First Amendment to Lease, dated May 24, 2004, that certain Second Amendment to Lease, dated December 1 2018, and that certain Third Amendment to Lease, dated May 4, 2021. | Lincoln Associates<br>Attn: Bob Dragin; Charles P. Hyde<br>5755 Granger Road, Ste 825<br>Independence, OH 44131 | $1,489.19 |
| 4. | Cincinnati, OH | Lease, dated November 1, 2014, by and between Mulhauser 4782, LLC, as landlord, and American Freight of Southern Ohio, Inc., as tenant. | TLP 4782 Muhlhauser LLC<br>Mike Meyers<br>2215 York Road, Ste. 405<br>Oak Brook Terrace IL 60523 | $1,458.00 |
| 5. | Buffalo, NY | Lease, dated November 1, 2014, by and between Niagara Falls 778, LLC, as landlord and American Freight of Western New York, Inc., as tenant. | Niagara Falls 778, LLC<br>Attn: Steve Belford<br>6649 N. High St., Ste. LL2<br>Worthington, OH 43085 | $1,038.00 |
| 6. | Tallahassee, FL | Lease, dated November 1, 2014, by and between Tharpe 3170, LLC, as landlord and American Freight of Tallahassee, Inc., as tenant. | Bane Holdings Tallahassee<br>Attn: Larry Bane<br>309 Northeast 22nd Street<br>Wilton Manors, FL 33305 | $20,742.34 |
| 7. | Columbus, OH | Lease, dated November 1, 2014, by and between 900-71, LLC, as landlord, and American Freight, Inc., as tenant, as amended by that certain Lease Amendment No. 1, dated March, 2017. | 900-71, LLC<br>Attn: David Belford<br>501 Morrison Rd., Ste. 100<br>Gahanna, OH 43230 | $1,843.00 |

| 8. | Orlando, FL | Lease Agreement, dated August 27, 2008, by and between DCT Presidents Drive, LLC, as landlord, and American Freight, Inc., as tenant, as amended by that certain First Amendment to Lease, dated June 24, 2013 and that certain Second Amendment to Lease, dated June 19, 2018. | DCT Presidents Drive LLC<br>Attn: Chief Marketing Officer Prologis<br>300 S. Orange Avenue, Suite 1110<br>Orlando, FL 32801<br><br>Copy to:<br><br>Attn: General Counsel<br>Prologis 1800 Wazee Street, Suite 500<br>Denver, CO 80202 | $1,694.00 |
|---|---|---|---|---|
| 9. | Ft. Lauderdale, FL | Sub-Lease Agreement, dated February 1, 2014, by and between Marble of the World, Inc., as landlord, and American Freight of South Florida, LLC, as tenant, as amended by that certain Assignment of Lease Agreement, dated September 6, 2019. | 6001 Powerline, LLC<br>Attn: Andrew Naumov<br>1200 Wright Ave<br>Richmond, CA 94804 | $1,685.00 |
| 10. | Orlando, FL | Lease, dated November 20, 2017, by and between 4116 OBT Investments, LLC, as landlord, and America Freight, Inc., as tenant, as amended by that First Amendment, dated November 20, 2017. | 4116 OBT Investments, LLC<br>Attn: Bill Belford<br>2799 NW Second Avenue Ste. 105<br>Boca Raton, FL 33431 | $1,386.00 |
| 11. | Pittsburgh, PA | Lease, dated November 1, 2014, by and between Rodi Road 501, LLC, as landlord, and American Freight of Southern Ohio, Inc., as tenant. | Rodi Road 501, LLC<br>Attn: Steve Belford<br>6649 N. High St., Ste. LL2<br>Worthington, OH 43085 | $993.00 |
| 12. | Fort Wayne, IN | Lease, dated November 1, 2014, by and between Merchant 33, LLC, as landlord and American Freight of Indiana, as tenant. | Merchant 33, LLC<br>Attn: Steve Belford<br>6649 N. High St., Ste. LL2<br>Worthington, OH 43085 | $875.00 |
| 13. | Chattanooga, TN | Lease Agreement, dated August 8, 2007, by and between Daniel P. Hagaman, as landlord and American Freight of Tennessee, Inc., as tenant, as amended by that certain Amendment to Existing Lease, dated August 8, 2007, that certain Second Amendment of Lease, dated May 30, 2017, and that certain Third Amendment of Lease, dated August 12, 2019. | Daniel P. Hagaman<br>Attn: Daniel P. Hagaman<br>5700 Laurel Ridge Road<br>Chattanooga, TN 37416 | $1,113.00 |
| 14. | Morrow, GA | Lease, dated November 1, 2014, by and between 1230 Zion, LLC, as landlord and American Freight of Tennessee, Inc., as tenant. | 1230 Zion LLC<br>Attn: Bill Belford<br>2799 NW Second Avenue, Ste. 105<br>Boca Raton, FL 33431 | $1,024.00 |
| 15. | Livonia, MI | Lease, dated November 1, 2014, by and between Schoolcraft 28300, LLC, as landlord, and American Freight of Michigan, Inc., as tenant, as amended by that certain Lease Amendment, dated June 1, 2020, as assigned to American Freight, Inc. pursuant to that certain Assignment and Assumption of Leases, dated October 1, 2017 and that as assigned to Banner Partners, LLC | Banner Parters LLC<br>c/o Best Real Estate Management LLC<br>Attn: Elizabeth G. Rodriguez<br>601 N. Mesa, Ste. 1500<br>El Paso, TX 79901 | $1,244.00 |

| | | pursuant to that certain Assignment and Assumption of Rents and Leases Agreement, dated March, 2022. | | |
|---|---|---|---|---|
| 16. | Jacksonville, FL | Lease, dated November 1, 2014, by and between 103rd Street 6024, LLC, as landlord, and American Freight of Central Florida, Inc., as tenant. | Marta Management, Inc. Attn: Daniela Vargas 1124 Kane Concourse Bay Harbor Islands, FL 33154 | $1,145.00 |
| 17. | Marietta, GA | Industrial Building Lease, dated August 11, 2009, by and between Cobalt Industrial REIT, as landlord, and American Freight of Tennessee, Inc., as tenant, as amended by that certain First Amendment to Lease, dated May 22, 2012, that certain Second Amendment to Lease, dated July 13, 2015, and that certain Third Amendment to Industrial Building Lease, dated June 24, 2020. | EXETER 1075 COBB, LLC c/o Five Radnor Corporate Center Attn: Accounts Receivable Department 100 Matsonford Rd., Ste. 250 Radnor, PA19087 | $1,203.00 |
| 18. | Warren, MI | Net Lease, dated 2009, by and between Bostick Development, L.C., as landlord, and American Freight of Michigan, Inc., as tenant, as amended by that certain First Amendment to Lease, dated November 2012 and that certain Second Amendment of Lease, dated November 21, 2017. | Bostick Development LLC Attn: Colleen Braun 803 W Big Beaver, Ste. 100 Troy, MI 48084 | $882.00 |
| 19. | Melbourne, FL | Lease, dated November 1, 2014, by and between Ellis Holdings, LLC, as landlord, and American Freight of Central Florida, Inc., as tenant. | Ellis Chai, LLC Attn: Tyler John 70 W Hibiscus Blvd. Melbourne, FL 32901 | $3,901.89 |
| 20. | Charleston, WV | Lease, dated August 10, 2011, by and between Meredith, Inc., as landlord, and American Freight of Tennessee, Inc., as tenant, as amended by that certain Agreement to Extend Lease, dated April 15, 2021. | Meredith, Inc Attn: Craig M. Kay 707 Virginia St. East, 15th Floor Charleston, WV 25301 | $843.00 |
| 21. | Savannah, GA | Standard Commercial Lease, dated October 21, 2011, by and between 15000 Abercom, LLC, as landlord, and American Freight of Central Florida, Inc., as tenant, as amended by that certain First Amendment to Lease Agreement, dated March 4, 2015, that certain Second Amendment to Lease Agreement, dated September 2, 2021, that certain Third Amendment to Lease Agreement, dated May 14, 2024. | Sav 150000 Abercorn LLC Attn: Igor Mitnik; Oleg Mitnik 250 Port Street Newark, NJ 07114 | $932.00 |
| 22. | Champaign, IL | Lease, dated April 30, 2013, by and between Champaign Village 2, LLC, as landlord, and American Freight of Illinois, Inc., as tenant, as amended by that certain First Amendment to Lease, dated April 28, 2020. | Champaign Village 2, LLC Attn: John Carson 505 W. University Ave. Champaign, IL 61820 | $978.00 |
| 23. | Augusta, GA | Lease, dated December 1, 2014, by and between Wylds 1708, LLC, as landlord and American Freight of Tennessee, LLC, as tenant. | North Sky, LLC 6649 N. High St., Ste. LL2 Worthington, OH 43085 | $814.58 |

| | | | Copy to:<br><br>David Abdo<br>PO Box 478<br>Charleston, SC 29407 | |
|---|---|---|---|---|
| 24. | Norfolk, VA | Indenture of Lease, dated July 10, 2014, by and between Fivel Family, LLC, as landlord, and American Freight of Virginia, Inc., as tenant, as amended by that certain 1st Extension and Modification of Lease Agreement, dated September 30, 2018 and that certain Second Amendment to Lease, dated January 19, 2024. | Fivel Family, LLC<br>Attn: John F. Sedel<br>1630 Donna Drive, Ste. 101<br>Virginia Beach, VA 23451 | $2,696.20 |
| 25. | Columbia, SC | Commercial Lease Agreement, dated July 17, 2014, by and between 1400 Atlas Properties, LLC, as landlord, and American Freight of South Florida, LLC, as tenant, as amended by that certain First Amendment to Lease Agreement, dated December 1, 2018. | Weston SCIP 2, LLC<br>Attn: Josh Eig; James Asher<br>4760 Richmond Rd., Ste. 200<br>Cleveland, OH 44128 | $946.00 |
| 26. | Lubbock, TX | Lease, dated February 21, 2017, by and between 30X30 34th Street Lubbock Partners, LLC, as landlord, and American Freight, LLC, as tenant, as amended by that First Amendment to lease, dated November 16, 2021. | 30X30 34th Street Lubbock Partners, LLC<br>Attn: Jennifer Janecka<br>2009 Porterfield Way, Ste. P<br>Upland, CA 91786 | $1,022.00 |
| 27. | Jacksonville, FL | Lease Agreement, dated August 8, 2017, by and between Brierwood Village LLC, as landlord, and American Freight, Inc., as tenant. | Brierwood Village LLC<br>C/O TSG Realty<br>Attn: Pamela D. Howard/Ben Stetzer<br>8650 Old Kings Road S, STE 12<br>Jacksonville, FL 32217 | $1393.41 |
| 28. | Bowling Green, KY | Lease, dated May 25, 2018, by and between Boatlanding Development Co., Inc., as landlord, and American Freight, Inc., as tenant. | Boatlanding Development Co., Inc.<br>Attn: David Sears<br>423 State St.<br>Bowling Green, KY 42102 | $874.00 |
| 29. | Elizabethtown, KY | Indenture of Lease dated May 1, 1991, between Hogan Holdings 56, LLC, as successor-in-interest to Starlite Centre, Ltd., as landlord, and American Freight, LLC, as tenant, as successor-in-interest to Factory Surplus Corp., as amended for the first time by an Amendment to Lease dated August 18, 1994, for the second time by an Agreement Extending Lease Term dated April 26, 2001, for the third time by a Lease Amendment dated April 28, 2004, for the fourth time by an Amendment to Lease dated April 7, 2010, for the fifth time by a Fifth Amendment to Lease dated June 30, 2016, for the sixth time by a Sixth Amendment to Lease dated February 6, 2018, for the seventh time by a Seventh Amendment to Lease dated November 11, 2019, and for the eighth time by an Eighth Amendment to Lease dated February 1, 2022. | Hogan Holdings 56, LLC<br>Attn: W. Glenn Hogan<br>C/O Hogan Real Estate<br>9300 Shelbyville Rd, STE 1300<br>Louisville, KY 40222 | $1,531.00 |

| | | | | |
|---|---|---|---|---|
| 30. | Springfield, MO | Lease, dated May 4, 2021, by and between Donna Rainwater Reece, Larry J. Rainwater and R. Bryan Whitmire and Karla J. Whitmire, as landlord, and American Freight, LLC, as tenant. | Donna Rainwater Reece, Larry J. Rainwater, R. Bryan Whitmire and Karle J. Whitmire<br>Attn: R. Bryan Whitmire<br>6806 Rogers Ave.<br>Fort Smith, AR 72903 | $1,719.00 |
| 31. | Livonia, MI (Warehouse) | Lease dated January 23, 1968, between Alissan, LLC c/o Kin Properties, as successor in interest to Gershman Properties, LLC, as successor in interest to A. Alfred Taubman, together with all amendments, schedules, and exhibits thereto and all assignments thereof, as modified by that certain First Amendment to Lease dated July 26, 1958; Sublease Agreement dated October 1, 2012 between Costco-Innovel Properties, LLC and Sears Outlet Stores, LLC together with all amendments, schedules, and exhibits thereto and all assignments thereof, as amended by the certain First Amendment to Sublease dated October 11, 2017. | Alisan LLC and Roseff LLC<br>Attn: General Counsel<br>185 NW Spanish River Blvd. Ste. 100<br>Boca Raton, FL 33431 | $547.07 |

# **Exhibit 2**

## **Purchase Agreement**

**Execution Version**

### ASSET PURCHASE AGREEMENT

### BY AND BETWEEN

### AF NEWCO I, LLC

**as Purchaser,**

**and**

### EDUCATE, INC.

**as Seller**

**Dated as of December 13, 2024**

# TABLE OF CONTENTS

**Page**

## ARTICLE 1.

### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1.  Purchase and Sale of Assets ................................................................................. 1
1.2.  Excluded Assets .................................................................................................... 2
1.3.  Assumption of Liabilities ...................................................................................... 2
1.4.  Excluded Liabilities .............................................................................................. 2
1.5.  Cure Costs ............................................................................................................. 2
1.6.  "As Is" Transaction .............................................................................................. 3

## ARTICLE 2.

### PURCHASE PRICE; DEPOSIT

2.1.  Purchase Price ....................................................................................................... 4
2.2.  No Withholding ..................................................................................................... 4

## ARTICLE 3.

### CLOSING AND TERMINATION

3.1.  Closing ................................................................................................................... 4
3.2.  Closing Deliveries by Seller ................................................................................. 5
3.3.  Closing Deliveries by Purchaser .......................................................................... 5
3.4.  Termination of Agreement .................................................................................... 6
3.5.  Procedure Upon Termination ................................................................................ 7
3.6.  Effect of Termination ........................................................................................... 7

## ARTICLE 4.

### REPRESENTATIONS AND WARRANTIES OF SELLER

4.1.  Corporate Organization ........................................................................................ 8
4.2.  Authority Relative to This Agreement .................................................................. 8
4.3.  Title to Assets ....................................................................................................... 8
4.4.  Brokers and Finders .............................................................................................. 8
4.5.  No Other Representations or Warranties ............................................................... 8

## ARTICLE 5.

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

5.1.  Corporate Organization ........................................................................................ 9
5.2.  Authority Relative to This Agreement .................................................................. 9
5.3.  Brokers and Finders .............................................................................................. 9
5.4.  Sufficiency of Funds ............................................................................................. 9
5.5.  Investigation .......................................................................................................... 9

## ARTICLE 6.

## BANKRUPTCY COURT MATTERS

6.1.  Certain Motions and Orders ..................................................................................... 10

## ARTICLE 7.

## COVENANTS AND AGREEMENTS

7.1.  Assignability of Certain Contracts, Etc ................................................................. 10
7.2.  Further Agreements ................................................................................................ 11
7.3.  Consent and Approvals .......................................................................................... 11
7.4.  Preservation of Records; Post-Closing Access to Information ............................. 11
7.5.  Publicity .................................................................................................................. 12
7.6.  Insurance Policies .................................................................................................. 12
7.7.  License Back ........................................................................................................... 12
7.8.  Further Assurances ................................................................................................ 12
7.9.  Lease Payments ...................................................................................................... 13

## ARTICLE 8.

## CONDITIONS TO CLOSING

8.1.  Conditions Precedent to the Obligations of Purchaser and Seller ...................... 13
8.2.  Conditions Precedent to the Obligations of Seller .............................................. 14
8.3.  Conditions Precedent to the Obligations of Purchaser ....................................... 14

## ARTICLE 9.

## DEFINITIONS

9.1.  Certain Definitions ................................................................................................ 15
9.2.  Additional Defined Terms ..................................................................................... 17

## ARTICLE 10.

## TAXES

10.1.  Additional Tax Matters .......................................................................................... 18

## ARTICLE 11.

## MISCELLANEOUS

11.1.  Payment of Expenses .............................................................................................. 19
11.2.  Survival of Representations and Warranties; Survival of Post-Closing Covenants .......... 19
11.3.  No Recourse ........................................................................................................... 19
11.4.  Entire Agreement; Amendments and Waivers ...................................................... 19
11.5.  Counterparts ........................................................................................................... 20
11.6.  Governing Law ....................................................................................................... 20
11.7.  Consent to Jurisdiction and Venue ....................................................................... 20
11.8.  Notices .................................................................................................................... 21

11.9.   Binding Effect; Assignment ........................................................................................22
11.10.  Severability.................................................................................................................22
11.11.  Injunctive Relief .........................................................................................................22
11.12.  Time of the Essence.....................................................................................................22
11.13.  Bulk Sales Statutes .....................................................................................................22
11.14.  Third Party Beneficiaries............................................................................................22
11.15.  Certain Interpretations ................................................................................................23

Annexes:

1.1(a) – Acquired Leases
1.1(b-1) – Domain Names
1.1(b-2) – Trademarks


Exhibits:

Exhibit A – Domain Name Transfer Agreement
Exhibit B – Lease Assignment and Assumption Agreement
Exhibit C – Trademark Assignment Agreement

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of December 13, 2024 (the "Execution Date"), is entered into by and between Educate, Inc., a Delaware corporation, ("Seller"), and AF Newco I, LLC, a Delaware limited liability company, ("Purchaser" and together with Seller, the "Parties" and each a "Party"). Article 9 contains definitions of certain capitalized terms used herein and also provides cross-references to certain capitalized terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, Seller operates the American Freight appliance and furniture retail business (the "Business") and owns certain assets related thereto;

WHEREAS, Seller is a debtor and debtor-in-possession in a bankruptcy case under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), filed on November 3, 2024 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), being jointly administered with the chapter 11 cases of Seller's affiliated debtors-in-possession under Lead Case No. No. 24-12480 (the "Chapter 11 Cases");

WHEREAS, on December 6, 2024, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* (the "Store Closing Order") D.I. 351 authorizing Seller and its Affiliates to conduct store-closing sales at the retail store locations of the Business (the "Store Closing Sales"); and

WHEREAS, Purchaser desires to purchase and assume from Seller, and Seller desires to sell, transfer, and assign to Purchaser, the Purchased Assets and the Assumed Liabilities

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound by this Agreement, Purchaser and Seller hereby agree as follows:

## ARTICLE 1.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1.    Purchase and Sale of Assets. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, on the Closing Date, all of Seller's right, title and interest in, to and under the following assets, properties, rights, as the same shall exist on the Closing Date, collectively, the "Purchased Assets"):

(a)     all of the interest in and rights of the Seller under the leases, subleases or licenses to use or occupy real property set forth on Annex 1.1(a) (the "Acquired Leases"), *provided* that if a landlord timely asserts Cure Costs exceeding Seller's good faith estimate by 20% or more and the amount of such Cure Costs cannot be adjudicated before December 27, 2024 in a manner that results in Cure Costs that don't exceed the estimates provided pursuant to Section 1.5(a) by more than 20%, Purchaser may remove such Acquired Lease from Annex 1.1(a) and any lease so removed shall cease to be an Acquired Lease or the Parties may treat such lease as a Nonassignable Asset and enter into an Interim Arrangement with respect thereto pending resolution of the applicable Cure Costs; provided that the Closing Purchase Price shall not be adjusted as a result of any such lease being removed from the list of Acquired Leases other than the cancellation of the obligation to pay Cure Costs in respect of such lease. For the avoidance of doubt, Purchaser may not remove any Acquired Lease from Annex 1.1(a) after December 27, 2024.

(b)     all intellectual property rights owned or licensed to Seller related to the Business, including but not limited to the domain names and trademarks set forth on Annex 1.1(b-1) and Annex 1.1(b-2) and all of Seller's right, title, and interest in and to all trade dress, unregistered trademarks, trade names, marketing collateral, and other intellectual property related to the Business to the extent transferrable (collectively, the "Acquired Intellectual Property").

(c)     all of the interest in and rights of the Seller in and to the security deposits held by the landlords in respect of the Acquired Leases.

1.2.    Excluded Assets. Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall Seller be deemed to sell, transfer, assign or convey, and Seller shall retain all of its right, title and interest to, in and under all of its assets, properties, rights and interests other than the Purchased Assets (collectively, the "Excluded Assets").

1.3.    Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall assume and discharge when due the following liabilities (collectively, the "Assumed Liabilities"):

(a)     all Liabilities arising out of the operations or ownership of the Purchased Assets by Purchaser or its Affiliates after the Closing;

(b)     all Liabilities under each Acquired Lease arising from and after the Closing (other than any Cure Costs);

(c)     all Transfer Taxes; and

(d)     all Cure Costs.

1.4.    Excluded Liabilities. Except for the Assumed Liabilities set forth in Section 1.3 (which shall, in no event, be Excluded Liabilities), Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of Seller of any nature whatsoever, whether accrued or unaccrued (collectively, the "Excluded Liabilities").

1.5.    Cure Costs.

(a)     On or prior to December 13, 2024, Seller shall provide Purchaser with Schedule 1.5(a) Seller Disclosure Schedule which shall contain a list of each Acquired Lease and Seller's good faith estimate, based upon all information reasonably available to Seller, of the amount of Cure Costs applicable to each such Acquired Lease (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the amount of such Cure Cost has been designated for such Contract as "$0.00").

(b)     Seller shall be responsible for the verification of all Cure Costs for each Acquired Lease and shall use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Acquired Lease prior to the Closing Date.

(c)     Subject to entry of the Sale Order, (a) on or prior to the Closing, Purchaser shall pay the Cure Costs applicable to the Acquired Leases (excluding any Acquired Leases in which there is an objection by a non-debtor Acquired Lease counterparty to the Cure Costs asserted by Seller with regard to any such Acquired Lease or other dispute as to the assumption or assignment of such Acquired Lease (such contract, a "Disputed Contract") for which Cure Costs (or other matters related to the assumption and assignment of such Contract) have not been consensually agreed with the Acquired Lease counterparty and Seller or fixed by an order of the Bankruptcy Court as of the Closing) so that such Acquired Leases may be assumed by Seller and assigned to Purchaser, subject only to payment by Purchaser of the Cure Costs and provision by the Purchaser of such adequate assurance of future performance as may be directed by the Bankruptcy Court, and (b) with respect to each Acquired Lease that is a Disputed Contract for which Cure Costs (or other matters related to the assumption and assignment of such Contract) have not been consensually agreed upon with the Contract counterparty and Seller or fixed by an order of the Bankruptcy Court, within five (5) Business Days after the date on which (i) the Cure Costs with respect to such Acquired Lease have been consensually agreed, or (ii) the Bankruptcy Court has entered an order fixing such Cure Costs, Purchaser shall pay such Cure Costs so that such Acquired Leases may be assumed by the Seller and assigned to the Purchaser (subject to payment by Purchaser of the Cure Costs and provision by the Purchaser of adequate assurance of future performance), in each case of the foregoing clauses (a) and (b), in accordance with the provisions of Section 365 of the Bankruptcy Code, the Sale Order, and this Agreement. Seller agrees that it will promptly take such commercially reasonable actions as are necessary to obtain a final order of the Bankruptcy Court (which may be the Sale Order) providing for the assumption and assignment of each Acquired Lease. For the avoidance of doubt, if there is any inconsistency between this Agreement and the Sale Order with respect to the assumption and assignment of the Acquired Leases, or the payment of the Cure Costs, the Sale Order shall govern.

1.6.    "As Is" Transaction. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 4 OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE 2.

## PURCHASE PRICE; DEPOSIT

2.1.    <u>Purchase Price</u>.

(a)    As consideration for the Purchased Assets, at the Closing, Purchaser shall assume the Assumed Liabilities and shall pay to Seller:

(i)    an amount (such amount, the "<u>Closing Purchase Price</u>") equal to $1,120,000 less the Deposit; and

(ii)    strictly in trust for the benefit of, and for immediate payment to, the applicable Acquired Lease counterparties, and not as property of Seller's estate, all Cure Costs, *provided* that, at the election of Purchaser and upon Seller's prior written consent (which consent shall not be unreasonably withheld), Purchaser may pay the Cure Costs directly to any Acquired Lease counterparties on the terms and in the manner agreed between Purchaser, Seller and the applicable counterparties.

(b)    On or prior to the Execution Date, Purchaser and Seller have entered into an escrow agreement (as amended, supplemented or otherwise modified from time to time, the "<u>Escrow Agreement</u>") with a mutually agreed escrow agent (the "<u>Escrow Agent</u>"). Concurrently with the execution and delivery of the Escrow Agreement by Seller, Purchaser and the Escrow Agent, Purchaser deposited $112,000 (the "<u>Deposit</u>") with the Escrow Agent by wire transfer of immediately available funds. The Escrow Agent shall hold the Deposit in a segregated, non-interest-bearing account (the "<u>Escrow Account</u>"), which may be the attorney trust account of Purchaser's counsel, pursuant to the Escrow Agreement (if applicable).  All interest or other earnings on amounts held in the Escrow Account pursuant to the Escrow Agreement shall automatically become a part of the Deposit as such interest or earnings accrue.

(c)    The Deposit shall be released to Seller at the Closing. If this Agreement is validly terminated prior to the Closing, the Deposit in the Escrow Account shall be released and distributed to Purchaser or Seller in accordance with <u>Section 3.6</u>.

2.2.    <u>No Withholding</u>. Any amounts payable pursuant to this Agreement to Seller will be made free and clear of any withholding or other Tax.

## ARTICLE 3.

## CLOSING AND TERMINATION

3.1.    <u>Closing</u>. Subject to the satisfaction of the conditions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.3</u>, or the waiver thereof by the party entitled to waive the applicable condition, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Willkie Farr & Gallagher LLP at 787 Seventh Avenue, New York New York 10019 (or at such other place as the parties may mutually designate in writing) on the date that is no later than the second (2nd) Business Day following the date on which all of the conditions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.3</u> are satisfied or waived by the party entitled to waive the

applicable condition (other than conditions that by their nature are to be satisfied at the Closing). The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>".

      3.2.   <u>Closing Deliveries by Seller</u>. At the Closing, Seller shall deliver to Purchaser:

      (a)   duly executed Domain Name Transfer Agreement;

      (b)   duly executed Lease Assignment Agreement;

      (c)   duly executed Trademark Assignment Agreement;

      (d)   a true and correct copy of the Sale Order and case docket reflecting that the Sale Order is in effect;

      (e)   the officer's certificates required to be delivered pursuant to <u>Sections 8.3(a)</u> and <u>8.3(b)</u>; and

      (f)   all other previously undelivered Seller Ancillary Agreements required by this Agreement to be delivered by Seller at or prior to the Closing in connection with the transactions contemplated by this Agreement.

      3.3.   <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

      (a)   an amount equal to (i) the Closing Purchase Price, by wire transfer of immediately available funds to the account of Seller in accordance with written instructions delivered by Seller to Purchaser at least two (2) Business Days prior to the Closing Date;

      (b)   an amount equal to the Cure Costs (unless, subject to <u>Section 2.1(a)(ii)</u>, Purchaser elects to pay the Cure Costs directly to any Acquired Lease counterparties, in which instance such amounts shall be directly paid on the terms and in the manner agreed between Purchaser, Seller and the applicable counterparties);

      (c)   duly executed Domain Name Transfer Agreement;

      (d)   duly executed Lease Assignment Agreement;

      (e)   duly executed Trademark Assignment Agreement;

      (f)   the officer's certificates required to be delivered pursuant to <u>Sections 8.2(a)</u> and <u>8.2(b)</u>; and

      (g)   all other previously undelivered Purchaser Ancillary Agreements required by this Agreement to be delivered by Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.4.    <u>Termination of Agreement</u>. This Agreement may be terminated as follows:

(a)    by the mutual written consent of Seller and Purchaser at any time prior to the Closing;

(b)    by Purchaser or Seller, if the Closing shall not have been consummated on or prior to January 28, 2025 (the "<u>Outside Date</u>"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 3.4(b)</u> shall not be available to a Party that is in material breach or violation of any of its representations, warranties, covenants or agreements under this Agreement;

(c)    by Purchaser or Seller, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, it being agreed that the Parties shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence) unless otherwise actually agreed by the Parties;

(d)    by Seller, if all of the conditions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.3</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and Purchaser fails to deliver any portion of the Closing Purchase Price (other than the Deposit) at the Closing;

(e)    by Purchaser, if all of the conditions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.3</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and Seller fails to consummate the transactions contemplated hereby at the Closing;

(f)    by Purchaser, (i) if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in <u>clause (i)</u> (A) would result in a failure of any condition set forth in <u>Section 8.3(a)</u>, <u>Section 8.3(b)</u> or <u>Section 8.3(c)</u> and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) five (5) days after written notice of such breach, failure or occurrence is given to Seller by Purchaser; <u>provided</u>, that the right of Purchaser to terminate this Agreement under this <u>Section 3.4(f)</u> shall not be available if Purchaser is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement; or

(g)    by Seller, (i) if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in <u>clause (i)</u> (A) would result in a failure of a condition set forth in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u> and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) five (5) days after written notice of such breach, failure or occurrence is given to the Purchaser by Seller or one (1) day in the event of a breach of <u>Section 7.9</u>; <u>provided</u>,

that the right of Seller to terminate this Agreement under this <u>Section 3.4(g)</u> shall not be available if Seller is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement; or

3.5.    <u>Procedure Upon Termination</u>. In the event of a termination of this Agreement by Purchaser or Seller, or both, pursuant to <u>Section 3.4</u>, (a) written notice of such termination shall be given promptly by the terminating party to the other Party, specifying the provision hereof pursuant to which such termination is made, and (b) except as set forth in <u>Section 3.6</u>, this Agreement shall thereupon terminate and become void and of no further force or effect, and the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the Parties. Any termination of this Agreement by Purchaser or Seller, or both, pursuant to <u>Section 3.4</u> shall be effective on the date that written notice of such termination is given by the terminating party to the other Party.

3.6.    <u>Effect of Termination</u>.

(a)    In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Purchaser or Seller or any of their respective Affiliates, except as expressly set forth in this <u>Section 3.6</u>; <u>provided</u>, <u>however</u>, that such termination shall not relieve any party from Liability for its intentional breach of this Agreement prior to such termination. The provisions of <u>Section 3.4</u>, <u>Section 3.5</u>, this <u>Section 3.6</u> and <u>Article 11</u> shall survive any termination of this Agreement and shall remain in full force and effect.

(b)    In the event this Agreement is terminated pursuant to <u>Section 3.4</u> (other than pursuant to <u>Section 3.4(d)</u> or <u>3.4(g)</u>) or by Seller pursuant to <u>Section 3.4(b)</u>) then Purchaser shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account.

(c)    If Seller terminates this Agreement pursuant to <u>Section 3.4(b)</u> or <u>3.4(d)</u> or <u>3.4(g)</u>, then Seller shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account.

(d)    In the event that this Agreement is terminated pursuant to <u>Section 3.4</u> and Seller or Purchaser is entitled to receive the Deposit, then Seller or Purchaser may deliver to the Escrow Agent, at any time following the effective date of any such termination, a letter instructing the Escrow Agent to pay to Seller or Purchaser, as applicable, the Deposit from the Escrow Account and the distribution of the Deposit by the Escrow Agent shall be subject to the terms of the Escrow Agreement.

## ARTICLE 4.

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the representations and warranties in this <u>Article 4</u> to Purchaser as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date). Each Section of the <u>Seller Disclosure</u>

<u>Schedule</u> is numbered by reference to representations and warranties in a specific Section of this <u>Article 4</u>. Any event, item, or matter disclosed in any Section or numbered part of the <u>Seller Disclosure Schedule</u> shall be deemed to be disclosed with respect to every other representation and warranty in this <u>Article 4</u> to the extent any description of facts regarding the event, item, or matter disclosed is adequate so as to make reasonably apparent on its face that such event, item or matter is applicable to such other representations or warranties.

4.1.   <u>Corporate Organization</u>. Seller is a corporation, duly organized, and validly existing under the Laws of the State of Delaware. Seller has all requisite power and authority to own, lease, and operate the Purchased Assets, subject to the provisions of the Bankruptcy Code.

4.2.   <u>Authority Relative to This Agreement</u>. Except for such authorization as is required from the Bankruptcy Court, Seller has all requisite corporate power, authority, and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver Seller Ancillary Agreements to be executed by Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed by such Seller, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of the Seller Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of Seller, subject only to Court approval. This Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution, and delivery by the Parties and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered will constitute, legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with its respective terms and the terms of the Sale Order and the Bankruptcy Code.

4.3.   <u>Title to Assets</u>. At the Closing, Seller will have good and marketable title or a valid leasehold interest, as applicable, in and to each of the Purchased Assets.

4.4.   <u>Brokers and Finders</u>.  All fees or commissions due by Seller to any investment banker, broker, consultant, or other advisor retained or otherwise employed by Seller in connection with the transactions contemplated by this Agreement are the sole responsibility of Seller.

4.5.   <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Article 4</u>, neither Seller nor any other Person on behalf of Seller makes any express or implied representation or warranty with respect to any other information provided to Purchaser in connection with the transactions contemplated hereby, including, without limitation, as to the probable success or profitability of the ownership, use, or operation of the Purchased Assets. Seller shall not have or be subject to any liability to Purchaser resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts, or other materials made available to Purchaser in expectation of the transactions contemplated by this Agreement.

## ARTICLE 5.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the representations and warranties in this Article 5 to Seller as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

5.1.     Corporate Organization. Purchaser is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Delaware.

5.2.     Authority Relative to This Agreement. Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, and (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby. The execution, delivery, and performance by Purchaser of this Agreement and each of the Purchaser Ancillary Agreements have been duly authorized by all necessary limited liability company action on behalf of Purchaser. This Agreement has been, and at or prior to the Closing the Purchaser Ancillary Agreements shall be, duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the Parties and entry of the Sale Order) this Agreement constitutes, and of each of the Purchaser Ancillary Agreements when so executed and delivered shall constitute, legal, valid, and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms and the terms of the Sale Order and the Bankruptcy Code.

5.3.     Brokers and Finders. Purchaser has not employed, and to the knowledge of Purchaser, no other Person has made any arrangement by or on behalf of Purchaser with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would give rise to any valid claim against Seller and their Affiliates for investment banking, brokerage, finder's, or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

5.4.     Sufficiency of Funds. Purchaser has and shall have at the Closing funds that are sufficient to pay the Closing Purchase Price, the Cure Costs, and all related fees, expenses and obligations for which Purchaser shall be responsible hereunder.

5.5.     Investigation. In entering into this Agreement, Purchaser has relied upon its own investigation, and analysis as well as the representations and warranties made by Seller in Article 4, and Purchaser acknowledges that neither Seller nor any of their respective Affiliates makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Purchaser or any of its Affiliates, except as and only to the extent expressly set forth in Article 4.

## ARTICLE 6.

## BANKRUPTCY COURT MATTERS

6.1.  <u>Certain Motions and Orders</u>.

(a)  Seller shall use its commercially reasonable efforts to: (i) obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable under Fed. R. Bankr. P. 2002 and any applicable Local Bankruptcy Rules (including requesting a hearing date earlier than the scheduled January omnibus hearing date) but in no event later than January 21, 2025, subject to the availability of the Bankruptcy Court to conduct a hearing to consider the entry of the Sale Order, and (ii) subject to the satisfaction of the conditions precedent contained in this Agreement, consummate the Closing as soon as reasonably practicable after the entry by the Bankruptcy Court of the Sale Order.

(b)  The Sale Order, including any exhibits thereto and any notices or other materials in connection therewith, must be in form and substance reasonably satisfactory to Purchaser.

## ARTICLE 7.

## COVENANTS AND AGREEMENTS

7.1.  <u>Assignability of Certain Contracts, Etc</u>.

(a)  To the extent that the assignment to Purchaser of any Purchased Asset pursuant to this Agreement is not permitted without the consent, waiver, confirmation, or other approval of a third party or is prohibited by applicable Law and such consent, waiver, confirmation, or other approval or waiver of such prohibition in compliance with Law cannot be obtained prior to the Closing or overridden or canceled by the Sale Order or other related order of the Bankruptcy Court (such Purchased Assets, the "<u>Nonassignable Assets</u>"), then this Agreement shall not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such consent, waiver, confirmation or other approval is obtained or such prohibition is waived in compliance with Law provided that such inability to convey such Nonassignable Asset at the Closing shall not be a condition to Closing and will not reduce or affect the Closing Purchase Price.

(b)  If any such consent, waiver, confirmation, or other approval or such waiver is not obtained prior to the Closing Date in respect of a Nonassignable Asset, then, solely to the extent not prohibited under applicable Law (including, without limitation, the Bankruptcy Code) or the terms of such Nonassignable Asset, and at the election of Purchaser, Purchaser and Seller shall reasonably cooperate with each other, as of and for twelve months after the Closing Date, in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations of such Nonassignable Asset (an "<u>Interim Arrangement</u>"). Purchaser shall be responsible for performing all obligations under each such Nonassignable Asset required to be performed by Seller after the Closing Date to the extent that if such Nonassignable Asset were

purchased by Purchaser as of the Closing Date, the obligations thereunder would have constituted Assumed Liabilities.

(c)     All Interim Arrangements shall be at Purchaser's sole cost and expense (excluding Seller's reasonable and documented professional fees).

(d)     Following the Closing, Seller and Purchaser shall cooperate using their respective commercially reasonable efforts (at Purchaser's sole cost and expense, excluding Seller's reasonable and documented professional fees) to obtain as expeditiously as possible the applicable consent, waiver, confirmation, or other approval with respect to each Nonassignable Asset and/or a waiver of any prohibition under applicable Law necessary for the assignment thereof to Purchaser.

7.2.    <u>Further Agreements</u>. After the Closing, Seller shall promptly deliver to Purchaser any mail or other communication received by Seller and relating to the Purchased Assets or the Assumed Liabilities. After the Closing, Purchaser shall promptly deliver to Seller any mail or other communication received by Purchaser and relating to the Excluded Assets or the Excluded Liabilities. From and after the Closing Date, Seller shall refer all inquiries with respect to the Purchased Assets and the Assumed Liabilities to Purchaser, and Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Seller.

7.3.    <u>Consent and Approvals</u>. Prior to Closing, Purchaser shall, at Purchaser's sole cost and expense (excluding Seller's reasonable and documented professional fees): (i) use its commercially reasonable efforts, as promptly as practicable, to obtain all approvals, authorizations, clearances, consents, and waivers of, and to file all notices and other filings with, regulatory and other Governmental Bodies and all other Persons that are necessary or required of Seller to consummate the transactions set forth herein; (ii) provide such other information and communications to regulatory and other Governmental Bodies and other Persons as Purchaser or such Governmental Bodies or other Persons may reasonably request; and (iii) provide reasonable cooperation to Purchaser in obtaining or making, as soon as practicable, all approvals, authorizations, clearances, consents, waivers, notices, and filings of or with regulatory and other Governmental Bodies and all other Persons required of Purchaser to consummate the transactions set forth herein.

7.4.    <u>Preservation of Records; Post-Closing Access to Information</u>. Seller and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Purchased Assets and the Assumed Liabilities until the later of the closing of the Chapter 11 Case and the liquidation and winding up of Seller's estates (but in no event later than six (6) years after the Closing Date except, in the case of Tax matters, until thirty (30) days following the expiration of the period of any applicable statute of limitations) and shall make such records available to the other party as may be reasonably required by such other party (at the requesting party's expense for any out-of-pocket costs) in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of Seller or Purchaser or any of their respective Affiliates, administration of Seller's Chapter 11 Case, or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document, or instrument contemplated hereby or thereby.

7.5.    Publicity. Seller and Purchaser agree to communicate with each other and cooperate with each other prior to any public disclosure of this Agreement or the transactions contemplated hereby. Each of Seller and Purchaser agrees that it shall not issue, and it shall cause its respective Affiliates and Representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party, except as such release or announcement may be required by applicable Law or by the Bankruptcy Court (which shall include the filings to be made with the Bankruptcy Court in connection with this Agreement), in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance. Unless otherwise required by the Bankruptcy Court, this Agreement shall be filed with the Bankruptcy Court without Seller Disclosure Schedules. For purposes of this Section 7.5, Seller may freely communicate with its employees regarding this Agreement and the sale of the Purchased Assets; provided, however, that prior to making any written communications to its employees pertaining. For the avoidance of doubt, nothing in this Section 7.5 shall restrict Purchaser's ability to conduct ordinary advertising and marketing activities in support of the Business.

7.6.    Insurance Policies. Purchaser hereby acknowledges that, as of and following the Closing, it shall be responsible for securing and maintaining insurance policies to cover the Purchased Assets.

7.7.    License Back. During the period from the Closing Date and continuing until the end of the Sale Term, as that term is used in the Store Closing Order, Purchaser hereby grants to Seller and each of its Subsidiaries a non-exclusive, worldwide, irrevocable, fully paid-up, royalty-free license to use the Acquired Intellectual Property in connection with and solely for the duration of the Store Closing Sales.

7.8.    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, the Sale Order, and applicable Law, Seller and Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent to the other party's obligations hereunder set forth in this Agreement are satisfied and to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

(b)    Subject to the terms and conditions of this Agreement, at and following the Closing, each of the Parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to Purchaser and its successors and assigns, all of the Purchased Assets, and for Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby. Nothing in this Section 7.8 shall obligate any Party to waive any right or condition under this Agreement. To the extent any Purchased Asset is determined to be property of the estate of any Affiliate of Seller, the Sale Order shall (i) deem all of such Affiliate's right, title, and interest in and to such Purchased Asset transferred and sold to Purchaser and (ii) direct such Affiliate to take all steps necessary to transfer all its right, title, and interest in and to, and

possession, custody and control of, such Purchased Asset to Purchaser, and Seller shall cooperate in facilitating such transfer.

(c)    Promptly following the Closing, at Purchaser's sole cost and expense (excluding Seller's reasonable and documented professional fees), Seller shall take such further commercially reasonable actions and execute such further documents as may be necessary or reasonably requested by Purchaser to effectuate, evidence, and perfect the assignment and transfer of the Acquired Intellectual Property to Purchaser, including making such filings with any Governmental Bodies as may be required to transfer the Acquired Intellectual Property to Purchaser.

(d)    The obligations of Seller pursuant to this Section 7.8 shall be subject to any orders, approvals or authorizations granted or required by the Bankruptcy Court or under the Bankruptcy Code (including in connection with the Chapter 11 Case), and Seller's obligations as a debtor in possession to comply with any order of the Bankruptcy Court.

7.9.    Lease Payments. On or prior to December 27, 2024, Purchaser shall deliver to Seller by wire transfer of immediately available funds to the account of Seller in accordance with written instructions delivered by Seller to Purchaser at least two (2) Business Days prior to December 27, 2024, an amount equal to $529,290.09 (the "January Rent Advance"). Seller shall not use the January Rent Advance for any purpose other than to make payment for any rent obligations in respect of the Acquired Leases for the period beginning January 1, 2025 and ending January 31, 2025, and shall hold the January Rent Advance strictly in trust for the benefit of the counterparties of the Acquired Leases until all such payments have been made.  In the event this Agreement is terminated by Purchaser pursuant to Section 3.4(e) or Section 3.4(f), Seller shall immediately refund the January Rent Advance to Purchaser by wire transfer of immediately available funds. In the event that an Acquired Lease is removed from Annex 1.1(a) in accordance with Section 1.1(a) and following the payment of January Rent Advance, Seller shall, as soon as reasonably practicable, refund the amount of the January Rent Advance that is attributable to the removed Acquired Lease to Purchaser by wire transfer of immediately available funds to the account specified by Purchaser in writing.

## ARTICLE 8.

## CONDITIONS TO CLOSING

8.1.    Conditions Precedent to the Obligations of Purchaser and Seller. The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller and Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)    no temporary restraining order, preliminary or permanent injunction, or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall there be any statute, rule, regulation, order, or other Law promulgated, enacted, entered, or

enforced which makes the consummation of the transactions contemplated by this Agreement illegal, void, or rescinded; and

(b)      the Bankruptcy Court shall have entered the Sale Order, and such order shall be a Final Order; provided, however, if the Sale Order as entered contains a waiver of the requirements under the Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), then the requirement that such order be a Final Order shall not apply as long as such order is in full force and effect and has not been stayed.

8.2.    Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller, in whole or in part, to the extent permitted by applicable Law):

(a)      each of (i) the representations and warranties of Purchaser in this Agreement that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects and (ii) the representations, warranties of Purchaser in this Agreement that are qualified as to "materiality" or "material adverse effect" shall be true and correct, in each case of clauses (i) and (ii), at and as of the Execution Date and at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and Seller shall have received a certificate signed by an authorized person of Purchaser, dated the Closing Date, to the foregoing effect;

(b)      Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)      Purchaser shall have delivered, or caused to be delivered, to Seller (or at the direction of Seller) all of the items set forth in Section 3.3.

8.3.    Conditions Precedent to the Obligations of Purchaser. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)      each of (i) the representations and warranties of Seller set forth in Section 4.1 and Section 4.2 shall be true and correct in all respects and (ii) the other representations and warranties of Seller in this Agreement shall be true and correct in all respects (without regard for any "materiality" or "material adverse effect" qualifiers set forth therein) except where the failure of such representations and warranties to be so true and correct would not, in the aggregate, have materially and adversely effect the value or the intended use of the Purchased Assets taken as a whole, in each case of clauses (i) and (ii), at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Seller on or prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect; and

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 3.2</u>.

**ARTICLE 9.**

**DEFINITIONS**

9.1.    <u>Certain Definitions</u>. As used herein:

(a)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.  For the avoidance of doubt and without limitation, each of the debtors in possession in the Chapter 11 Cases is an Affiliate of Seller.

(b)    "<u>Ancillary Agreements</u>" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(c)    "<u>Business Day</u>" means any day other than a Saturday, Sunday, or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(d)    "<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

(e)    "<u>Contract</u>" means any written or oral contract, indenture, note, bond, lease, license, commitment, or instrument or other agreement or arrangement primarily related to the Purchased Assets.

(f)    "<u>Cure Costs</u>" means the amounts necessary to cure all defaults, if any, and that must be paid in connection with the assumption of each Acquired Lease pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code.

(g)    "<u>Domain Name Transfer Agreement</u>" means the Domain Name Transfer Agreement, in substantially the form attached hereto as <u>Exhibit A</u>.

(h)    "<u>Final Order</u>" means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Case (or by the clerk of such other court of competent jurisdiction on the docket of such court) that: (i) is in full force and effect and (ii) has not been stayed; and (iii) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari.

(i)      "<u>Governmental Body</u>" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature or any self-regulatory agency, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private).

(j)      "<u>Laws</u>" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies (including any court of competent jurisdiction), or other requirement or rule of law.

(k)      "<u>Lease Assignment Agreement</u>" means the Lease Assignment and Assumption Agreement, in substantially the form attached as <u>Exhibit B</u>.

(l)       "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(m)      "<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(n)      "<u>Purchaser Ancillary Agreements</u>" means, collectively, each certificate, agreement or document (other than this Agreement) that Purchaser is required to execute and/or deliver in connection with this Agreement.

(o)      "<u>Sale Order</u>" means the order of the Bankruptcy Court, in form and substance reasonably satisfactory to Purchaser, which shall, among other things, (i) authorize the sale of the Purchased Assets to Purchaser pursuant to this Agreement, (ii) authorize the assumption of the Acquired Leases by Seller and the assignment of the Acquired Leases to Purchaser subject to payment of the Cure Costs and (iii) authorize the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and all other transactions and agreements contemplated hereby or thereby.

(p)      "<u>Seller Ancillary Agreements</u>" means, collectively, each certificate, agreement or document (other than this Agreement) that Seller is required to execute and/or deliver in connection with this Agreement.

(q)      "<u>Seller Disclosure Schedule</u>" means the disclosure schedules which are attached hereto and delivered by Seller.

(r)      "<u>Subsidiary</u>" means, with respect to any Person (the "<u>Owner</u>"), any corporation or other Person of which securities or other interests having the power to elect a

majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person, are held by the Owner and/or one or more of its Subsidiaries.

(s)     "Tax" and "Taxes" mean (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever; (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described in clause (i); and (iii) any Liability in respect of any items described in clauses (i) and/or (ii) payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

(t)     "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(u)     "Trademark Assignment Agreement" means the Trademark Assignment Agreement, in substantially the form attached as Exhibit C.

9.2.    Additional Defined Terms. The following terms have the meanings set forth in the Sections set forth below:

| Defined Term | Location |
| --- | --- |
| Acquired Intellectual Property | Section 1.1(b) |
| Acquired Leases | Section 1.1(a) |
| Agreement | Preamble |
| Allocation | Section 10.1(b) |
| Assumed Liabilities | Section 1.3 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Chapter 11 Case | Recitals |
| Closing | Section 3.1 |
| Closing Date | Section 3.1 |
| Closing Purchase Price | Section 2.1(a)(i) |
| Deposit | Section 2.1(b) |
| Disputed Contract | Section 1.5(c) |
| Escrow Account | Section 2.1(b) |
| Escrow Agent | Section 2.1(b) |
| Escrow Agreement | Section 2.1(b) |
| Excluded Assets | Section 1.2 |
| Excluded Liabilities | Section 1.4 |

| **Defined Term** | **Location** |
| --- | --- |
| Execution Date | Preamble |
| Interim Arrangement | Section 7.1(b) |
| January Rent Advance | Section 7.9(a) |
| Nonassignable Assets | Section 7.1(a) |
| Outside Date | Section 3.4(b) |
| Purchased Assets | Section 1.1 |
| Purchaser | Preamble |
| Seller | Preamble |
| Transfer Taxes | Section 10.1(a) |

## ARTICLE 10.

## TAXES

10.1.   <u>Additional Tax Matters</u>.

(a)     Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall indemnify, defend (with counsel reasonably satisfactory to Seller), protect, and save and hold Seller harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes.

(b)     Purchaser shall, not later than one hundred twenty (120) days after the Closing Date, prepare and deliver to Seller for its consent (which consent shall not be unreasonably withheld, delayed, or conditioned) a schedule allocating the Closing Purchase Price and any other items that are required for U.S. federal income tax purposes to be treated as consideration among the Purchased Assets (such schedule, the "<u>Allocation</u>"). If Seller raises any objection to the Allocation within twenty (20) days of the receipt thereof, Purchaser and Seller shall negotiate in good faith to resolve such objection(s). If Seller does not raise any objection to the Allocation within twenty (20) days of the receipt thereof, Seller shall be deemed to have conclusively accepted the Allocation. If and to the extent the Parties are unable to agree on the Allocation, the parties shall retain a mutually agreed upon accounting firm of national repute to resolve such dispute. Purchaser and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally agreed upon or determined by the accounting firm, as applicable, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Body or any other proceeding) without first giving the other Party prior written notice; <u>provided</u>, <u>however</u>, that nothing contained herein shall prevent Purchaser or Seller from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and neither Purchaser or Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging such Allocation. Purchaser and Seller shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with

respect to the Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Closing Purchase Price. Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 10.1(b)</u> shall survive the Closing without limitation.

## ARTICLE 11.

## MISCELLANEOUS

11.1.   <u>Payment of Expenses</u>. Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each Party shall bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that (a) all Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto) shall be borne solely by Purchaser and (b) all filing fees (but not the costs and expenses of preparing any applicable filings) in connection with any required filings or submissions under any competition Law shall be borne by Purchaser.

11.2.   <u>Survival of Representations and Warranties; Survival of Post-Closing Covenants</u>. The Parties agree that the representations and warranties contained in this Agreement and covenants to be performed prior to the Closing shall expire automatically and immediately upon the Closing. The Parties agree that the covenants contained in this Agreement to be performed after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

11.3.   <u>No Recourse</u>. Except to the extent otherwise expressly provided in <u>Section 11.11</u>, Purchaser's sole and exclusive remedy (a) for a breach of any representation or warranty made by Seller herein or in any document, certificate or instrument delivered pursuant hereto or (b) for a breach of any covenant made by Seller herein or in any document, certificate or instrument delivered pursuant hereto and required to be performed by Seller on or prior to the Closing, shall, in either case, be limited to Purchaser's right to terminate this Agreement solely to the extent permitted pursuant to <u>Section 3.4</u>, in which case Seller shall have no liability except for the return of the Deposit as set forth in <u>Section 3.6</u> (whether in equity or at Law, in Contract, in tort or otherwise). Except to the extent otherwise expressly provided in <u>Section 11.11</u>, Seller's sole and exclusive remedy (a) for a breach of any representation or warranty made by Purchaser herein or in any document, certificate or instrument delivered pursuant hereto or (b) for a breach of any covenant made by Purchaser herein or in any document, certificate or instrument delivered pursuant hereto and required to be performed by Purchaser on or prior to the Closing, shall, in either case, be limited to Seller's right to terminate this Agreement solely to the extent permitted pursuant to <u>Section 3.4</u> and to receive the Deposit pursuant to <u>Section 3.6</u>, in which case Purchaser shall have not any further liability of any kind (whether in equity or at Law, in Contract, in tort or otherwise), except for as set forth in <u>Section 3.6</u>.

11.4.   <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the Schedules hereto) and the Ancillary Agreements represent the entire understanding and agreement between the Parties with respect to the subject matter hereof. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in

the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective. No action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any Party shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

11.5.    Counterparts. For the convenience of the Parties, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.6.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, IN EACH CASE WITHOUT REFERENCE TO ANY CONFLICTS OR CHOICE OF LAW RULE OR PRINCIPLE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION) THAT MIGHT OTHERWISE REFER CONSTRUCTION OR INTERPRETATION OF THIS AGREEMENT TO THE SUBSTANTIVE LAW OF ANOTHER JURISDICTION.

11.7.    Consent to Jurisdiction and Venue.

(a)      Subject to Section 11.11, the Party hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the Bankruptcy Court for any action, suit, or proceeding (other than appeals therefrom) arising out of or relating to this Agreement or any Ancillary Agreement, and agree not to commence any action, suit or proceeding (other than appeals therefrom) related thereto except in such court. The Parties further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding (other than appeals therefrom) arising out of or relating to this Agreement in the Bankruptcy Court, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum. Notwithstanding the foregoing consent to Bankruptcy Court jurisdiction, in the event Seller's Chapter 11 Cases are closed or the Bankruptcy Court otherwise declines to exercise jurisdiction over the Parties or any dispute arising out of or related to this Agreement or any Ancillary Agreement, any litigation arising out of or relating to this Agreement or any Ancillary Agreement shall be heard and determined exclusively in the federal and state courts in the State of Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such litigation and irrevocably waive the defense of any inconvenient forum to the maintenance of any such litigation.

(b)      THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY

20

LITIGATION (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

11.8.   Notices. Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by e-mail transmission, and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to Seller:

> Educate, Inc.
> c/o Franchise Group, Inc.
> 109 Innovation Court, Suite J,
> Delaware, Ohio 43015
> Attention: Tiffany McMillan-McWaters
> Email: tmcwaters@Franchisegrp.com

> with a copy (which shall not constitute effective notice) to:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019
> Attention: Debra Sinclair, Matthew A. Feldman, Russell Leaf and Thomas Mark
> Email: dsinclair@willkie.com; mfeldman@willkie.com; rleaf@willkie.com; and tmark@willkie.com

If to Purchaser:

> AF Newco I, LLC
> Attention: Michael Piper
> Email: mp@velocityrecoveries.com

> with a copy (which shall not constitute effective notice) to:

> Lowenstein Sandler LLP
> One Lowenstein Drive
> Roseland, New Jersey 07068
> Attention: Andrew Behlmann
> Email: abehlmann@lowenstein.com

Or to such other Persons, addresses, or e-mail addresses as may be designated in writing from time to time by the Party to receive such notice.

11.9.    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to entry of the Sale Order, Seller, and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case and any reorganized Seller. No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents shall be void; *provided, however*, that Seller may assign this Agreement to a liquidating trust or similar vehicle under a Chapter 11 plan in the Chapter 11 Cases without consent of the Purchaser.

11.10.    <u>Severability</u>. If any term, condition, or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any Party. Upon such determination that any term, condition, or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

11.11.    <u>Injunctive Relief</u>. The Parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the Parties, and, accordingly, each of Seller and Purchaser shall be entitled to seek injunctive relief with respect to any such breach, including, without limitation, specific performance of such covenants, promises, or agreements or an order enjoining the other Party from any threatened, or from the continuation of any actual, breach of the covenants, promises, or agreements contained in this Agreement by such Party, all without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond. The rights set forth in this <u>Section 11.11</u> shall be in addition to any other rights which Seller or Purchaser may have at Law or in equity pursuant to this Agreement.

11.12.    <u>Time of the Essence</u>. Time is of the essence in the performance of each of the obligations of the Parties and with respect to all covenants and conditions to be satisfied by the Parties in this Agreement and all documents, acknowledgments, and instruments delivered in connection herewith.

11.13.    <u>Bulk Sales Statutes</u>. Purchaser hereby waives compliance by Seller with the requirements and provisions of any applicable bulk sales or bulk transfer Laws in any jurisdiction that may otherwise be applicable in connection with the transactions contemplated by this Agreement.

11.14.    <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties and their successors and permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties and such successors and permitted assigns (including, for the avoidance of doubt, any chief restructuring officer or similar officer administering Seller's assets in their Chapter 11 Case), any legal or equitable rights hereunder.

11.15. <u>Certain Interpretations</u>. (a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)      All references in this Agreement to Articles, Sections, clauses, parts, and Schedules shall be deemed to refer to Articles, Sections, clauses, parts, and Schedules to this Agreement unless otherwise specified.

(ii)      All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)      The Article, Section, and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement, and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)      The words "include," includes," and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

(v)      When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)      Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)      Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)      The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)      The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER:**</u>

**EDUCATE, INC.**

By: _Andrew Laurence_
        3DD40E9195E24D4
Name:    Andrew Laurence
Title:     Vice President

**PURCHASER:**

**AF NEWCO I, LLC**

By:
Name:    Michael S. Piper
Title:    Member