**<u>EXHIBIT A</u>**

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket Nos. 154, 334, 411 & 444** |

### ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS
### FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES,
### (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
### CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

Upon the *Debtors' Motion for Entry of Orders (I) (A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the*

---

[1]   The Debtors in the Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

*Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 154] (the "Motion"),[2] pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and Local Rules 2002-1, 6004-1, and 9006-1, seeking entry of an order (this "Order"):  (a) authorizing and approving the sale of the Purchased Assets to [•] (the "Buyer"), in accordance with the terms and conditions contained in the Asset Purchase Agreement, free and clear of all liens, claims, and encumbrances to the fullest extent permitted by law, except where the Debtors agreed to transfer, and the Buyer has expressly agreed to permit or assume, certain encumbrances and certain liabilities of the Debtors [(solely to the extent expressly set forth and defined in the Asset Purchase Agreement as Permitted Encumbrances or the Assumed Liabilities)]; (b) authorizing the assumption and assignment of the Assigned Contracts (as defined below); and (c) granting related relief; and the Court having entered an order on December 16, 2024 [Docket No. 444] (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures in connection with the Sale (as defined below) of the Debtors' Assets, including the process, timeline, and notice thereof; and the Debtors having determined, after a marketing and sale process as provided for in the Bidding Procedures [and the Auction[3] held on February 7, 2025], that the Buyer has submitted the highest or otherwise best bid to purchase the Purchased Assets; and the Debtors having selected the Buyer as the Successful Bidder in accordance with the Bidding Procedures [,and that [•] is the Backup Bidder (as defined in the Bidding Procedures)][4] as set forth in the

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Bidding Procedures Order, or that certain Asset Purchase Agreement by and between [Seller] and [Buyer] dated as of [•] (the "Asset Purchase Agreement"), as applicable.  A copy of the Asset Purchase Agreement is attached hereto as Exhibit 1.

[3]    As set forth herein, Auction refers to that certain auction held on [February 7, 2025] for the sale of [•].

[4]    To be included in the event a Backup Bidder is selected.

Notice of Successful Bidder [Docket No. [•]];and upon due, adequate, and sufficient notice of the Motion, the Asset Purchase Agreement, and all other related transactions contemplated thereunder and in this Order (such transactions collectively, the "Sale"); and upon the declaration of Christopher Grubb in support of the Motion [Docket No. 334] and the declaration of Christopher Grubb in further support of the Motion [Docket No. [•]] (collectively, the "Grubb Declarations"); and due and proper notice of the Motion having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion, the Grubb Declarations, the Asset Purchase Agreement, and all relief related thereto and any objections or other responses thereto; and the Court having held a hearing to consider the relief requested in the Motion (the "Sale Hearing"); and, after due deliberation, the Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and the Court having determined that the relief requested is in the best interests of the Debtors, their estates, their creditors, and all parties in interest,

**THE COURT HEREBY FINDS THAT:**[5]

## I.    Jurisdiction, Final Order, and Statutory Predicates.

A.    This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  Venue of these Chapter 11

---

[5]    These findings and determinations constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

Cases and the Motion is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b).

B.      This Court may enter a final order with respect to the Motion, the Sale, and all related relief, in each case, consistent with Article III of the United States Constitution.

C.      The statutory predicates for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and Local Rules 2002-1, 6004-1, and 9006-1.

**II.    Notice.**

D.      As further evidenced by the affidavits of service previously filed with the Court [Docket Nos. 201, [●] & [●]], and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Sale, the assumption and assignment of the Contracts to be assumed and assigned to the Buyer pursuant to this Order (each, an "Assigned Contract" and, collectively, the "Assigned Contracts"), the cure payments, if any, proposed in respect of each Assigned Contract (each, a "Cure Cost"), and all deadlines related thereto, has been provided to all interested parties and entities, including the Sale Hearing Notice Parties, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  The aforementioned notices, which were required by the Bidding Procedures Order, were and are timely, proper, sufficient, appropriate, fair, and equitable under the circumstances, and reasonably calculated to provide the Sale Hearing Notice Parties and all other interested parties with timely and proper notice under the circumstances of these Chapter 11 Cases.  [The Auction was duly noticed.]  No other or further notice with respect to such matters is, or shall be, required.

E.      A reasonable opportunity to object and be heard with respect to the Sale, the Motion, and the relief requested therein has been afforded to all interested parties.

F.      The disclosures made by the Debtors concerning the Motion, the Asset Purchase Agreement, the Bidding Procedures, [the Auction], and the Sale Hearing were good, complete, and adequate.

## III.   Business Justification.

G.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for entering into the Asset Purchase Agreement, which provides for, among other things, the sale of the Purchased Assets to the Buyer, and consummating the transactions set forth therein and in any Ancillary Agreements, including the assumption, assignment, and/or transfer of the Assigned Contracts..  The Debtors have, among other things, determined in their business judgment that, under the circumstances, the benefits of consummating the Sale on the terms and conditions embodied in the Asset Purchase Agreement are in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

## IV.   Compliance with Bidding Procedures and Bidding Procedures Order

H.      As demonstrated by the Grubb Declarations, the testimony and other evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors have adequately marketed the Purchased Assets and conducted the Sale process in compliance with the Bidding Procedures and the Bidding Procedures Order, and the Sale process was conducted in a noncollusive, fair, and good-faith manner.  The Debtors have afforded potential purchasers a full and fair opportunity to participate in the bidding process for the Purchased Assets and to make higher or otherwise better offers.  In accordance with the Bidding Procedures Order, the Bid submitted by the Buyer and memorialized by the Asset Purchase Agreement was deemed a Qualified Bid and a Sufficient Bid and the Buyer was a Qualified Bidder eligible to participate at the Auction.  In accordance with the Bidding Procedures

and the Bidding Procedures Order, the Debtors determined that the Bid submitted by the Buyer and memorialized by the Asset Purchase Agreement is the highest or otherwise best offer for the Purchased Assets received by the Debtors.

**V.      Sale in Best Interests.**

I.      Approval of the Asset Purchase Agreement, the Sale, and all related transactions at this time, and the actions to be taken by the Debtors and the Buyer, are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications, and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan, in that, among other things, the immediate consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the Debtors' estates.

J.      The Debtors determined, in their reasonable business judgment, in a manner consistent with their fiduciary duties, that the Buyer's Qualified Bid, as memorialized by the Asset Purchase Agreement, was the highest or otherwise best Qualified Bid for the Purchased Assets. Consummating the Sale will yield greater value to the Debtors' estates than would have been provided by any other available alternative transaction.

K.      [The Debtors have also determined, in a valid and sound exercise of their business judgment, that the next highest or otherwise best Qualified Bid (as defined in the Bidding Procedures) for the Purchased Assets was that of [●] on the terms and conditions set forth in that certain Asset Purchase Agreement, dated as of [●], 2025, by and among the Debtors and [●] (the "Backup Bid APA"), as may be further modified by the Debtors and [●] (the "Designated Backup Bid").  Pursuant to the Bidding Procedures Order, the Designated Backup Bid is binding

on [•] until the earlier of (a) the closing of a Sale for the Purchased Assets pursuant to the Successful Bid and (b) ninety (90) days after date of the entry of the Sale Order applicable to such Bid.][6]

## VI.    Good Faith of Buyer.

L.    The Debtors and the Buyer, and their respective counsel and other advisors, have not engaged in any conduct that would cause or permit the Asset Purchase Agreement or the consummation of the Sale to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n).  The Buyer has not acted in a collusive manner with any Person, and the purchase price was not controlled by any agreement among bidders, all of whom acted in good faith, at arm's length, and in a noncollusive manner.  The Asset Purchase Agreement was negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.

M.    None of the Debtors or the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code.  Among other things, (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Debtors and the Buyer complied with the provisions of the Bidding Procedures Order and the Bidding Procedures; (iii) the Buyer agreed to subject its Bid to the competitive Bidding Procedures approved pursuant to the Bidding Procedures Order; (iv) the Debtors and the Buyer, and their respective management teams, board of directors, board of managers (or comparable governing authority), employees, agents, advisors, and representatives, each actively participated in the bidding process [and in the Auction], and each acted in good faith and without collusion or fraud of any kind; (v) all payments to be made by the Buyer, and other

---

[6]    To be included in the event a backup bidder is selected.

agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (vi) the Buyer was designated as the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures and the Bidding Procedures Order; and (vii) no common identity of directors or controlling stockholders exists between the Buyer, on the one hand, and the Debtors, on the other hand.

N.      The Buyer is purchasing the Purchased Assets in good faith and for fair and reasonable consideration, and the Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is not an "insider" of any Debtor (as defined under section 101(31) of the Bankruptcy Code). The protections afforded by section 363(m) of the Bankruptcy Code are integral to the Sale, and the Buyer would not consummate the Sale without such protections. The Buyer is therefore entitled to the full rights, benefits, privileges, and protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and nonbankruptcy law in connection with this proceeding, the Sale, each term of the Asset Purchase Agreement and the Ancillary Agreements, and each term of this Order.

## VII.   Highest or Otherwise Best Offer

O.      As demonstrated by the Grubb Declarations, the evidence proffered or adduced at the Sale Hearing, and the arguments and representations of counsel made on the record at the Sale Hearing, the Debtors' marketing and sale process with respect to the Purchased Assets in accordance with the Bidding Procedures and the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any Person to make the highest or otherwise best offer to purchase the Purchased Assets. The Debtors have adequately marketed the Purchased Assets and conducted the Sale and auction process in accordance with, and have otherwise complied in all respects with,

the Bidding Procedures and the Bidding Procedures Order.  [The Auction was conducted in a noncollusive, fair, and good faith manner.]

P.      As demonstrated by the Grubb Declarations, the evidence proffered or adduced at the Sale Hearing, and the arguments and representations of counsel made on the record at the Sale Hearing, the Buyer's Bid constitutes the highest or otherwise best offer for the Purchased Assets, and the Debtors' determination that the Sale maximizes value for the benefit of the Debtors' estates and constitutes the highest or otherwise best offer for the Purchased Assets each constitutes a valid and sound exercise of the Debtors' business judgment and is in accordance and compliance with the Bidding Procedures and the Bidding Procedures Order.  The Asset Purchase Agreement provides fair and reasonable terms for the purchase of the Purchased Assets.

Q.      Approval of the Motion and the Sale and the prompt consummation of the transactions contemplated thereby will maximize the value of each of the Debtors' estates and are in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

## VIII.  Corporate Authority.

R.      Each applicable Debtor (i) has full requisite corporate or other organizational power and authority to execute, deliver, and perform the Asset Purchase Agreement and the Ancillary Agreements, and to consummate the Sale contemplated thereby, and such execution, delivery, and performance have been duly and validly authorized by all necessary corporate or other organizational action of each applicable Debtor, (ii) has taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery, and performance of the Asset Purchase Agreement and the Ancillary Agreements and the consummation by the Debtors of the Sale contemplated thereby, including as required by their respective organizational documents, and, upon execution thereof, each such agreement executed

by such Debtor will be duly and validly executed and delivered by such Debtor and enforceable against such Debtor in accordance with its terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, will constitute a valid and binding obligation of such Debtor. No government, regulatory, or other consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the execution, delivery, and performance by the Debtors of the Asset Purchase Agreement or for the consummation of the Sale contemplated thereby, or to take, or cause to be taken, all such other actions as may be reasonably necessary to effectuate or evidence the Sale contemplated by the Asset Purchase Agreement.

**IX.    No Merger; Buyer Not an Insider; No Successor Liability.**

S.    The Buyer is not a "successor" to, a mere continuation of, or an alter ego of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Buyer and the Debtors by reason of any theory of law or equity. The Buyer is not holding itself out to the public as a successor to or a continuation of the Debtors or their estates. The Sale does not amount to a consolidation, succession, merger, or *de facto* merger of Buyer and any Debtor. Immediately prior to the Closing Date, the Buyer was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and the Buyer. The transfer of the Purchased Assets to the Buyer, and the assumption of the Assumed Liabilities by the Buyer, except as otherwise explicitly set forth in the Asset Purchase Agreement, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing or by reason of such transfer, including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any, or any theory of,

successor, vicarious, antitrust, environmental, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or benefits, de facto merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, products liability, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise (collectively, the "Successor or Other Liabilities"). [Pursuant to the Asset Purchase Agreement, the Buyer shall have no liability for the Excluded Liabilities].

**X.      Binding and Valid Transfer.**

T.      The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Buyer with all right, title, and interest of the Debtors to the Purchased Assets free and clear, to the fullest extent permitted by law, of all Interests (as defined below) (other than the Permitted Encumbrances and the Assumed Liabilities), as set forth in the Asset Purchase Agreement. Immediately prior to consummating the Sale, the Purchased Assets constitute property of the Debtors' estates and DIP Collateral (as defined in the Final DIP Order), good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. Upon and following the consummation of the Sale, the Buyer shall be vested with good and marketable title to the Purchased Assets, and shall be the sole and rightful owner of the Purchased Assets.

U.      The Asset Purchase Agreement and the Ancillary Agreements are valid and binding contracts between the Debtors and the Buyer. The Asset Purchase Agreement and the Ancillary Agreements were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, or foreign jurisdiction. As demonstrated by the Grubb Declarations,

the consideration provided by the Buyer in respect of the Sale (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased Assets and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and any foreign jurisdiction (including the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, and similar laws and acts).  Neither the Debtors nor the Buyer is entering into the Sale contemplated by the Asset Purchase Agreement fraudulently for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer claims.

**XI.    Section 363(f) Is Satisfied.**

V.    The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full with respect to each Interest in the Purchased Assets; therefore, the Debtors may sell the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities).

W.    The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if (i) the sale of the Purchased Assets to the Buyer was not free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever, or (ii) if the Buyer would, or in the future could, be liable for any of the Interests (other than the Permitted Encumbrances and the Assumed Liabilities).  The Buyer will not consummate the transactions contemplated by the Asset Purchase Agreement unless this Court expressly orders that none of the Buyer, any of the Buyer's affiliates or subsidiaries, or any of their respective officers, directors, partners, principals, direct and indirect shareholders, professionals, or representatives, successors, or assigns, or their respective assets or properties, including, without limitation, the Purchased Assets will have any liability whatsoever

with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, setoff, recoupment, or otherwise, directly or indirectly, any Interests (other than the Permitted Encumbrances and the Assumed Liabilities), including rights or claims based on any Successor or Other Liabilities. The total consideration to be provided under the Asset Purchase Agreement reflects the Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever (including, without limitation, any potential Successor or Other Liabilities).

X.       Not transferring the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities), including rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state, federal, or foreign law or otherwise, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

Y.       The Debtors may sell the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. All Interests (except to the extent that such Encumbrances are Permitted Encumbrances or Assumed Liabilities) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code. Those holders of Interests that did not timely object to the Sale or the Motion or withdrew objections to the Sale or the Motion are deemed to have consented to the Sale and the Motion

pursuant to section 363(f)(2) of the Bankruptcy Code.  Subject to the terms and conditions of this Order, all holders of Interests are adequately protected by having their Interests, if any, in each instance against the Debtors, their estates, or any of the Purchased Assets attach to the net cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such holder alleges an Interest, in the same order of priority, with the same validity, force, and effect that such Interest had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess thereto.

Z.    The Debtors are not selling, pursuant to this Order or the Asset Purchase Agreement (i) any commercial tort claims, and (ii) any claims or causes of action pursuant to 11 U.S.C. §§ 544, 547, and 548 (and all state law equivalents).  Notwithstanding the foregoing, the Debtors may sell, and a Purchased Asset may include, 11 USC §§ 544, 547 and 548 (and all state law equivalent) claims against or in respect of go-forward trade, vendors, and/or landlords of the seller of the transferred asset.  For the avoidance of doubt, nothing herein shall act as, or result in, a release or waiver of any Claims or causes of actions against any Employee (except as set forth in the Bidding Procedures), Insider or former Insider of the Debtors, in any capacity, and all such claims and causes of action are expressly preserved.

## XII.    Cure Costs and Adequate Assurance of Future Performance.

AA.    The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Asset Purchase Agreement and is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.  The assumption and assignment of the Assigned Contracts (i) is necessary to sell the Purchased Assets to the Buyer, (ii) allows the Debtors to maximize the value of the Purchased Assets, including the Assigned Contracts, and (iii)

may increase the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assigned Contracts. For these reasons, the Debtors have exercised sound business judgment in assuming and assigning the Assigned Contracts and such assumption and/or assignment is in the best interests of the Debtors' estates.

BB.    Pursuant to section 365(f) of the Bankruptcy Code, each Assigned Contract to be assumed and assigned under the Asset Purchase Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in such contract prohibiting, restricting, or conditioning its assignment or transfer. No provision of any of the Assigned Contracts that would prohibit, restrict, or condition or purport to prohibit, restrict, or condition, whether directly or indirectly, the use, assumption, or assignment of any of the Assigned Contracts in connection with the Sale shall not have any force or effect.

CC.    Subject to the terms of the Asset Purchase Agreement, the Debtors or the Buyer, as the case may be, have cured or have demonstrated the ability to cure any default under any Assigned Contract with respect to any act or omission that occurred prior to the date of assignment of such Assigned Contract. The Buyer has provided adequate assurance of future performance to any Counterparty as required by sections 365(b)(1)(C), 365(f)(2)(B), and 365(b)(3) of the Bankruptcy Code to the extent that any such assurance was required and not waived by the applicable Counterparty, subject to any timely filed adequate assurance objection pursuant to the Bidding Procedures Order. Pursuant to the Bidding Procedures Order, all counterparties to the Assigned Contracts (the "Counterparties") that failed to file with the Court and serve on the Sale Hearing Notice Parties a timely objection are forever barred from asserting any such objection with regard to the assumption or assignment of their Assigned Contract. The Court finds that, with respect to all such Assigned Contracts, the payment of Cure Costs is appropriate and is deemed,

along with all additional information provided, to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the applicable Debtor to the Buyer of each of the Assigned Contracts.  To the extent any Assigned Contract is not an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of this Order that are applicable to the Purchased Assets.

### XIII.   Not a *Sub Rosa* Plan.

DD.    The Sale does not constitute a *sub rosa* chapter 11 plan or an element of such plan for which approval has been sought without the protection that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of any Debtor's creditors nor impermissibly dictates the terms of a chapter 11 plan for any Debtor.

### XIV.   Necessity of Order.

EE.    The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale without all of the relief provided for in this Order.  The consummation of the Sale pursuant to this Order and the Asset Purchase Agreement is, in the Debtors' determination, necessary to maximize the value of their estates and make cash distributions to creditors as swiftly as possible for the benefit of the Debtors, their estates and creditors, and all other parties in interest.

### XV.   Compelling Circumstances for an Immediate Sale.

FF.    The Debtors' decision to enter into the Asset Purchase Agreement [after the Auction] and to consummate the Sale represents an exercise of sound business judgment.  The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and

justifications for approving the Asset Purchase Agreement and (ii) compelling circumstances for the immediate approval and consummation of the Sale contemplated by the Asset Purchase Agreement and the Ancillary Agreements outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization, in that the prompt consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the Debtors' estates and to expedite cash distributions to creditors. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with respect to the transaction contemplated by this Order.

**XVI.    Final Order.**

GG.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

**THE COURT HEREBY ORDERS THAT:**

**I.    General Provisions.**

1.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these Chapter 11 Cases pursuant to Bankruptcy Rule 9014. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

2.      The Motion and the relief requested therein is granted and approved, and the transactions contemplated in the Motion, the Asset Purchase Agreement, and the Ancillary Agreements are approved, in each case as set forth herein and on the record of the Sale Hearing, which is incorporated herein as if fully set forth in this Order.

3.      All objections to, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the Asset Purchase Agreement, each Ancillary Agreement, the Sale, the entry of this Order, or the relief granted herein, that have not been withdrawn, waived, or settled, or that have not otherwise been resolved pursuant to the Bidding Procedures, the terms hereof, as announced to the Court at the Sale Hearing, or by stipulation filed with the Court, are hereby denied and overruled on the merits with prejudice.  Those parties who did not timely object to the Motion or the entry of this Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes.

4.      [[●] is hereby approved as the Backup Bidder (as defined in the Bidding Procedures), and the terms and conditions set forth in the Backup Bid APA, as may be further modified by the Debtors and [●], are hereby approved and authorized as the Designated Backup Bid.  The Designated Backup Bid is binding on [●] until the earlier of (a) the closing of a Sale for the Purchased Assets pursuant to the Successful Bid and (b) ninety (90) days after date of the entry of the Sale Order applicable to such Bid.][7]

5.      The Court's findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference as if fully set forth in this Order.

## II.      Approval of the Asset Purchase Agreement.

---

[7]    To be included in the event a Backup Bidder is selected.

6.      The Asset Purchase Agreement and the Ancillary Agreements, including, in each case, any prior amendments, supplements, and modifications thereto, and all of the terms and conditions thereof, are hereby approved.

7.      Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement and the Ancillary Agreements, (b) close the Sale as contemplated in the Asset Purchase Agreement and this Order, and (c) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of their obligations as contemplated by the Asset Purchase Agreement or the Ancillary Agreements, including the assumption and assignment to the Buyer of the Assigned Contracts, in each case without further notice to or order of this Court and including any actions that otherwise would require further approval by the Counterparties, shareholders, members, or boards of directors or managers, or similar governing bodies, as the case may be, without the need of obtaining such approvals, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, the Ancillary Agreements, and the Sale.  The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any amounts that become payable by the Debtors pursuant to the Asset Purchase Agreement or any Ancillary Agreement.  Such amounts shall (i) constitute allowed administrative expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; (ii) be treated with such priority if the Chapter 11 Cases convert to cases under chapter 7 of the Bankruptcy Code; and (iii) not be discharged, modified, or

otherwise affected by any reorganization or liquidation plan for any of the Debtors, except by written agreement between the Debtors and the Buyer.

8. This Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in any Debtor, all holders of Claims (whether known or unknown) against the Debtors, all holders of Liens (as defined below) or other Interests against, in, or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtors (including all Counterparties), the Buyer, and all successors and assigns of each of the foregoing, including, without limitation, any trustee subsequently appointed in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to cases under chapter 7 under the Bankruptcy Code, and any Person seeking to assert rights on behalf of any of the foregoing or that belong to the Debtors' estates.

**III.    Transfer of the Purchased Assets.**

9. Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors shall transfer the Purchased Assets, including, but not limited to, the Assigned Contracts, to the Buyer in accordance with the terms of the Asset Purchase Agreement and the Ancillary Agreements.  Such transfer will be a legal, valid, enforceable, and effective sale and transfer of the Purchased Assets and the Assumed Liabilities and (i) will vest the Buyer with all legal, equitable, and beneficial right, title, and interest of the Debtors to the Purchased Assets free and clear of all Interests (as defined below) (other than the Permitted Encumbrances or the Assumed Liabilities) of any kind or nature whatsoever, including, without limitation, rights or claims based on any Successor or Other Liabilities, and (ii) will render the Buyer fully liable for any and all Assumed Liabilities, and assumption of any Assumed Liabilities by the Buyer shall constitute a legal, valid, and effective delegation of any Assumed Liabilities to the Buyer and shall

divest the Debtors of all liability with respect to any Assumed Liabilities. Any and all valid and perfected Interests in the Purchased Assets shall attach to the net proceeds of the Sale attributable to the Purchased Assets in which the holders have an Interest after application of the proceeds in accordance with paragraph 39 of this Order with the same validity, force, and effect, if any, and in the same order of priority, that they have now as against the Purchased Assets, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

10.     The transfer of each of the Purchased Assets to the Buyer vests or will vest the Buyer with all right, title, and interest to the Purchased Assets free and clear of (i) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and Encumbrances (as defined in the Asset Purchase Agreement) relating to, accruing, or arising any time prior to the Closing Date (collectively, the "Liens"), and (ii) all debts (as that term is defined in section 101(12) of the Bankruptcy Code) arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, credits, allowances, options, limitations, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any shareholder or similar agreement or encumbrance, easements, rights of way, encroachments, and matters of any kind and nature, whether arising prior to or subsequent to the

Petition Date, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (A) that purport to give to any party a right or option to effect a setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Buyer's interests in the Purchased Assets, or any similar rights, if any, or (B) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attribute of ownership) (collectively, as defined in this clause (ii), the "Claims," and, together with the Liens and any other interests of any kind or nature whatsoever, the "Interests"), relating to, accruing, or arising any time prior to the Closing Date, with the exception of the Permitted Encumbrances and the Assumed Liabilities.

11.     Except as expressly provided under the Asset Purchase Agreement, the transfer of the Purchased Assets to the Buyer and the assignment to the Buyer of the Assigned Contracts will not subject the Buyer to any liability whatsoever which may become due or owing under the Assigned Contracts prior to the Closing Date, or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities.

12.     The Asset Purchase Agreement and the Ancillary Agreements are valid and binding contracts between the Debtors and the Buyer and shall be enforceable pursuant to their terms.  The Asset Purchase Agreement, the Ancillary Agreements, the Sale, and the consummation thereof

shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, or any converted or successor cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.  The Asset Purchase Agreement and the Ancillary Agreements were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, or foreign jurisdiction.  As demonstrated by the Grubb Declarations, the consideration provided by the Buyer for the Purchased Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased Assets, and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and any foreign jurisdiction (including the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, and similar laws and acts).  Neither the Debtors nor the Buyer is entering into the transactions contemplated by the Asset Purchase Agreement with any fraudulent or otherwise improper purpose, including for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer.

13.      Each and every federal, state, local, and other governmental agency, governmental department, filing agent, filing officer, title agent, recording agency, secretary of state, federal, state, and local official, and any other persons and entity who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets, is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale contemplated by the Asset Purchase Agreement.  Neither the

Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments or documents in order to effectuate, consummate, and implement the provisions of this Order.  The Buyer may, but shall not be required to, file a certified copy of this Order in any filing or recording office in any federal, state, county, or other territory or jurisdiction in which any of the Debtors or their Affiliates is incorporated or has real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Order as of the Closing Date.

14.     On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens, if any, in the Purchased Assets, as such Liens may otherwise exist.  If any Person that has filed a financing statement, mortgage, mechanic's lien, *lis penden*s, or other statement, document, or agreement evidencing an Interest in any portion of the Purchased Assets (other than statements or documents with respect to Permitted Encumbrances or Assumed Liabilities) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases, and/or other similar documents necessary for the purpose of documenting the release of all Interests that such Person has in the Purchased Assets, then (i) the Debtors are hereby authorized to execute and file such statements, instruments, releases, and/or other similar documents on behalf of such Person with respect to the Purchased Assets, (ii) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order that, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Interests of any kind or nature in the Purchased Assets, and (iii) the Buyer may seek in this Court, or any other court of appropriate

jurisdiction, to compel the appropriate parties to execute termination statements, instruments of satisfaction, releases, and/or other similar documents with respect to all Interests that such Person has in the Purchased Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

15.    The Debtors and the Buyer shall have no obligation to proceed with the Closing until all conditions precedent to its obligations to proceed have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

16.    Unless the Buyer otherwise consents, all Persons that are in or come into possession of any portion of the Purchased Assets, at any time prior to the Closing Date, are hereby directed to surrender possession of such Purchased Assets to the Buyer on the Closing Date, or at such time thereafter as the Buyer may request.  Subject to the terms of this Order, all Persons are hereby forever prohibited and enjoined from taking any action that would interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the Asset Purchase Agreement and this Order.

17.    This Order is and shall be binding upon and govern the acts of all Persons (including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons or entities) who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing Persons shall accept for filing any and all of the documents and instruments necessary and appropriate to release,

discharge, and terminate any of the Interests or to otherwise consummate the transactions contemplated by the Asset Purchase Agreement and this Order.

18.     To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations or approvals are deemed to have been, and hereby are, authorized to be transferred to the Buyer as of the Closing Date.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement, including the Sale and the assumption and assignment of the Assigned Contracts.  To the extent any license or permit necessary for the operation of the business of the Debtors is determined not to be an executory contract assumable and assignable under section 365 of the Bankruptcy Code or otherwise transferable to the Buyer, the Buyer may apply for and obtain any necessary license or permit promptly and the Debtors are hereby authorized to cooperate with the Buyer in connection with any such application as the Buyer deems reasonably necessary or desirable, pursuant to the provisions of the Asset Purchase Agreement.

19.     Notwithstanding anything to the contrary herein, as of or following the Closing Date, as applicable, the Buyer shall assume, discharge, perform, or otherwise satisfy or address the Assumed Liabilities, subject to the terms of the Asset Purchase Agreement.

**IV.     Assumption and Assignment of Assigned Contracts.**

20.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the applicable Debtors' assumption and assignment, to the Buyer, and the Buyer's acceptance of, the Assigned Contracts, on the terms set forth in the Asset Purchase Agreement, is hereby approved, and the requirements of section 365(b)(1) and 365(f)(2) with respect thereto are hereby found and deemed to be satisfied.

21.     The Debtors are hereby authorized and, unless the Debtors and the Buyer otherwise agree, directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, effective upon the Closing Date, the Assigned Contracts free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) and (b) execute and deliver to the Buyer such documents or other instruments as Buyer deems may be necessary to assign and transfer the Assigned Contracts to the Buyer.

22.     With respect to the Assigned Contracts, and with respect to the Sale of the Purchased Assets to the Buyer:  (a) the Debtors may assume each of the Assigned Contracts in accordance with section 365 of the Bankruptcy Code; (b) the Debtors may assign each Assigned Contract in accordance with the Asset Purchase Agreement and sections 363 and 365 of the Bankruptcy Code, and, to the extent provided in section 365 of the Bankruptcy Code, such assignment may occur notwithstanding and without giving effect to any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, which provisions constitute unenforceable anti-assignment or ipso facto provisions which are void and of no force and effect; (c) all other requirements and conditions under sections 363 and 365 of the

Bankruptcy Code for the assumption by the Debtors and assignment, as applicable, to the Buyer of each Assigned Contract have been satisfied; and (d) effective upon the Closing Date, the Assigned Contracts shall be transferred and assigned to, and from and following the Closing Date remain in full force and effect, in accordance with their terms (except as otherwise provided herein), for the benefit of, the Buyer, notwithstanding any provision in any Assigned Contract that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Buyer, except as provided in the Asset Purchase Agreement.  To the extent any provision in any Assigned Contract assumed and assigned pursuant to this Order (i) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, such assumption and assignment or assignment (including, without limitation, any "change of control" provision), or (ii) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following:  (A) the commencement of these Chapter 11 Cases, (B) the insolvency or financial condition of any of the Debtors at any time before the closing of these Chapter 11 Cases, (C) the Debtors' assumption and/or assignment of such Assigned Contract, (D) a change of control or similar occurrence, or (E) the consummation of the Sale, then such provision shall be deemed modified so as not to entitle the non-Debtor party thereto to prohibit, restrict, or condition such assumption and assignment or assignment, to modify, terminate, or declare a breach or default under such Assigned Contract, or to exercise any other default-related rights or remedies with respect thereto.  With respect to the Sale of the Purchased Assets to the Buyer, all such provisions constitute unenforceable anti-assignment or ipso facto provisions that are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

23.     All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the Closing Date, or required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts, shall be cured by the Debtors or the Buyer, as applicable, to the extent set forth in the Asset Purchase Agreement and this Order.

24.     All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts have been satisfied.  Each of the Assigned Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms as of the Closing Date, subject to any amendments or modifications agreed to between a Counterparty and the Buyer. Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Assigned Contract, and each Assigned Contract shall be fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited or modified by this Order. To the extent provided in the Asset Purchase Agreement, the Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

25.     Upon payment of the Cure Costs pursuant to the terms hereof and the Asset Purchase Agreement, and the Debtors' assignment of the Assigned Contracts to the Buyer under the provisions of this Order, no default or other obligations arising prior to the Closing Date shall exist under any Assigned Contract, and each Counterparty is forever barred, estopped, and permanently enjoined from (a) declaring a default by the Debtors or the Buyer under such Assigned Contract based on acts or occurrences arising prior to or existing as of the Closing Date, (b) raising or asserting against the Debtors or the Buyer, or the property of either of them, any assignment fee,

default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, or (c) taking any other action against the Buyer as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assigned Contract.  Each Counterparty hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the Buyer, or the property of any of them, any default or Claim arising out of any indemnity or other obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Date, and (ii) imposing or charging against Buyer or its affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to Buyer of the Assigned Contracts.

26.     Subject to the terms and conditions of the Asset Purchase Agreement, and upon the Closing Date, the Debtors shall have:  (i) to the extent necessary, cured and provided adequate assurance of future performance, and cure of, any default existing prior to the date hereof under the Assigned Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code and (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under the Assigned Contracts, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(B) of the Bankruptcy Code.  The Buyer has provided adequate assurance of future performance to any Assigned Contract counterparty as required by section 365(b)(1)(C), 365(f)(2)(B) and 365(b)(3) of the Bankruptcy Code to the extent that any such assurance was required and not waived by the Counterparties, subject to any timely filed adequate assurance objection pursuant to the Bidding Procedures Order.

27.     To the furthest extent permitted by law, any party that may have had the right to consent to the assumption or assignment of an Assigned Contract is deemed to have consented to

such assumption and assignment or assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code if such party failed to timely object to the assumption or assignment of such Assigned Contract in accordance with the Bidding Procedures Order, and the Buyer shall be deemed to have demonstrated adequate assurance of future performance with respect to such Assigned Contract pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. Any counterparty to an applicable Assigned Contract that may be assumed and assigned to the Buyer who has not timely filed and served an objection shall be barred from objecting, or asserting monetary or non-monetary defaults, with respect to any such applicable Assigned Contract, and such applicable Assigned Contract, if designated as an Assigned Contract in accordance with the terms of the Asset Purchase Agreement, shall be deemed assumed by the Debtors and assigned to the Buyer on the Closing Date pursuant to this Order.

28.     To the extent a Counterparty failed to timely object to the Cure Costs for any applicable Assigned Contract in accordance with the Bidding Procedures Order, such Cure Costs shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Costs at any time.

29.     The requirements of Bankruptcy Rule 6006(f)(6) are hereby waived, for cause shown, with respect to the Motion and the relief requested therein.

30.     Upon and as of the Closing Date, the Buyer shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assigned Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

31.     The Counterparties shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, any instruments, applications, consents, or other documents that

may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Purchased Assets.

32.    From the date of the entry of the Order, the Debtors may, in their sole discretion, settle objections to assumption and assignment of any applicable Assigned Contract, including to proposed Cure Costs, without any further notice to or action by any party or order of the Court (including by paying any agreed Cure Cost); provided that notice to and consent of the Buyer shall be required to the extent the Buyer is liable for such Cure Cost pursuant to the Asset Purchase Agreement or the Buyer's rights and remedies are otherwise altered in any way by the resolution. Unless the Court orders otherwise, contemporaneously with the resolution of any such objection, the executory contract or unexpired lease underlying such objection shall be deemed an Assigned Contract without the necessity of obtaining any further order of the Court.

33.    Notwithstanding anything to the contrary herein, no executory contract or unexpired lease as to which a Counterparty timely files and serves an objection shall be considered an Assigned Contract under this Order unless and until any timely objection to the assumption and assignment of such executory contract or unexpired lease has been resolved or overruled in accordance with the procedures set forth in the Bidding Procedures Order.

34.    Nothing in this Order, the Motion, or any other notice or any other document is or shall be deemed an admission by the Debtors or the Buyer that any contract is an executory contract or must be assumed and assigned pursuant to the Asset Purchase Agreement or in order to consummate the Sale.

**V.    No Successor Liability; Prohibition of Actions Against the Buyer.**

35.    To the greatest extent provided by law, the Buyer is not a "successor" to, a mere continuation of, or an alter ego of, any of the Debtors or their estates, and there is no continuity of

enterprise or common identity between the Buyer and the Debtors by reason of any theory of law or equity.  Neither the purchase of the Purchased Assets by the Buyer nor the fact that the Buyer is using any of the Purchased Assets previously operated by the Debtors will cause the Buyer to be deemed a successor to, combination of, or alter ego of, in any respect, any of the Debtors or the Debtors' businesses, or incur any liability derived therefrom within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, de facto merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtors or their Affiliates, or in any way relating to the operation of any of the Purchased Assets or ratings experience of the Debtors prior to the Closing Date, in each case other than the Permitted Encumbrances and Assumed Liabilities.

36.    Except with respect to Permitted Encumbrances and Assumed Liabilities, the Buyer shall not have, assume, or be deemed to assume, or in any way be responsible for, any liability or

obligation of any of the Debtors or their estates, or any of the Debtors' predecessors or Affiliates with respect to the Purchased Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise specifically agreed in the Asset Purchase Agreement, the Buyer shall not have any liability, responsibility, or obligation for any Interests of the Debtors or their estates, including any claims, liabilities, or other obligations related to the Purchased Assets, including, for the avoidance of doubt, and without limiting the generality of the foregoing, any Successor or Other Liabilities, which may become due or owing (a) prior to the Closing Date or (b) from and after the Closing Date but which arise out of or relate to any act, omission, circumstance, breach, default, or other event occurring prior to the Closing Date.

37.     Except with respect to Permitted Encumbrances, Assumed Liabilities, or as otherwise specifically set forth in the Asset Purchase Agreement, all Persons (including but not limited to, all debt holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, contract counterparties, customers, landlords, licensors, employees), and other holders of Interests against or in any of the Debtors or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, known or unknown, contingent or noncontingent, liquidated or unliquidated, senior or subordinate, asserted or unasserted, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing, or the transfer of the Purchased Assets to the Buyer (including without limitation any Successor or Other Liabilities or rights or claims based thereon) shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing against the Buyer, the Interests of any kind or nature whatsoever such Person

had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Purchased Assets, including, without limitation, the following actions:  (a) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral, or other proceeding) against the Buyer (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer, (c) creating, perfecting, or enforcing any Interest against the Buyer, (d) asserting any setoff, or right of subrogation, of any kind against any obligation due the Buyer, (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (f) to the extent prohibited by section 525 of the Bankruptcy Code, revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.  For the avoidance of doubt, notwithstanding anything to the contrary contained in this Order, nothing herein shall act as, or result in, a release or waiver of any Claims or causes of actions against any Employee (except as set forth in the Bidding Procedures), Insider or former Insider of the Debtors, in any capacity, and all such claims and causes of action are expressly preserved.

38.    Except as provided in the Asset Purchase Agreement and without limiting other applicable provisions of this Order, the Buyer is not, by virtue of the consummation of the Sale, assuming, nor shall it be liable or responsible for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) in any way whatsoever relating to or arising from the Debtors, the Purchased Assets, or the Debtors' operation of their businesses or use of the Purchased Assets on or prior to the

Closing Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Closing Date or are to be observed, paid, discharged, or performed on or prior to the Closing Date (in each case, including, without limitation, Successor or Other Liabilities and any liabilities that result from, relate to, or arise out of tort or product liability claims), or any liabilities calculable by reference to the Debtors or their assets or operations (including, without limitation, by reference to the Debtors' experience or similar ratings), or relating to continuing conditions existing on or prior to the Closing Date, including with respect to any of the Debtors' predecessors or Affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to Successor or Other Liability.

## VI.    Use of Proceeds

39.    Notwithstanding anything to the contrary set forth herein, on the Closing Date, or as soon as reasonably practicable thereafter, the Debtors shall transfer, or cause to be transferred proceeds generated from the Sale of the Purchased Assets to the DIP Agent (as defined in the Final DIP Order) for permanent application against the DIP Obligations (as defined in the Final DIP Order) in accordance with the terms and conditions of the Final DIP Order and the DIP Loan Documents (as defined in the Final DIP Order) until the DIP Obligations have been Paid in Full (as defined in the Final DIP Order).

## VII.    Other Provisions.

40.    The transactions contemplated by the Asset Purchase Agreement and this Order are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not alter, affect, limit, or

otherwise impair the validity of the Sale (including the assumption, assignment, and/or transfer of the Assigned Contracts), unless such authorization and consummation of the Sale are duly stayed pending such appeal.  The Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code.  As a good-faith purchaser of the Purchased Assets, the Buyer has not entered into any agreement with any other potential bidders and has not colluded with any potential or actual bidders or any other Person, including any Senior Secured Lender, and therefore, the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

41.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated under the Asset Purchase Agreement.

42.     For cause shown, pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6004(d) are hereby expressly waived and shall not apply.  Accordingly, the Debtors and Buyer are authorized and empowered to close the Sale immediately upon entry of this Order.

43.     The failure to include or specifically reference any particular provision of the Asset Purchase Agreement or any Ancillary Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement and the Ancillary Agreements be authorized and approved in their entirety.

44.     To the extent that this Order is inconsistent with the Motion, the terms of this Order shall control and govern.  To the extent that there are any inconsistencies between the terms of this Order, on the one hand, and the Asset Purchase Agreement or any Ancillary Agreement, on the

other hand, the terms of this Order shall control and govern.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Order shall govern.  To the extent that any plan of reorganization or liquidation, or any order of any type or kind entered in these Chapter 11 Cases or any subsequent chapter 7 case into which these Chapter 11 Cases may be converted, conflicts with or derogates from the terms of the Asset Purchase Agreement or Ancillary Agreement or this Order, solely with respect to the treatment of the Purchased Assets, the terms of the Asset Purchase Agreement or any Ancillary Agreement and this Order, as applicable, shall control and govern to the extent of any such conflict or derogation, solely with respect to the treatment of the Purchased Assets.  Unless otherwise provided herein, to the extent this Order is inconsistent with the Bidding Procedures Order or any other prior order or pleading in these Chapter 11 Cases, or the terms of the Asset Purchase Agreement, this Order shall govern.

45.     The Asset Purchase Agreement may be modified, amended, or supplemented in a writing signed by the parties thereto and in accordance with the terms thereof, without further notice to or order of the Court, so long as any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and does not otherwise conflict with this Order.  Notwithstanding anything to the contrary set forth in this Order, the Asset Purchase Agreement, any Ancillary Agreement, any amendments, modifications, supplements to or waivers of any obligations or rights of the parties thereto that could reasonably adversely impact or affect the rights of the Senior Secured Lenders shall require the prior written consent of the Required Consenting First Lien Lenders as set forth and in accordance with the Bidding Procedures.

46.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without further order of the Court, to allow the Buyer and the Debtors to

deliver any notice provided for in the Asset Purchase Agreement and allow the Buyer and the Debtors to take any and all actions permitted under the Asset Purchase Agreement and the Ancillary Agreements.

47.    From time to time, as and when requested by the other, the Debtor party to the Asset Purchase Agreement and the Buyer, as the case may be, shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale, including, such actions as may be necessary to vest, perfect or confirm, or record or otherwise, in the Buyer its right, title and interest in and to the Purchased Assets and the Assigned Contracts, subject to the provisions of the applicable Agreement.

48.    [In the event that the Buyer fails to consummate the Sale, the Backup Bidder will be deemed to have the new prevailing Bid.  The Debtors shall file a notice with the Court of the election to proceed to close a Sale transaction with a Backup Bidder and request a virtual status conference within three (3) Business Days of filing of such notice, subject to the availability of the Court.  At the status conference, if the Court deems a further hearing necessary, an expedited briefing and hearing schedule will be set.  Otherwise, the Debtors will be authorized, without further order of this Court, to consummate the Sale with the Backup Bidder as the Buyer (as such term is used throughout this Order) and such Backup Bid APA as the Asset Purchase Agreement (as such term is used throughout this Order), including assigning the Assigned Contracts (as defined in the Backup Bid APA) to the Backup Bidder.][8]

49.    The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Asset Purchase Agreement, the

---

[8]    To be included in the event a Backup Bidder is selected.

Ancillary Agreements, and any amendments thereto and any waivers and consents given thereunder, and to adjudicate, if necessary, any and all disputes concerning or in any way relating to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) interpret, implement, and enforce the provisions of this Order, including but not limited to the injunctions and limitations of liability set forth in this Order, (c) decide any disputes concerning this Order and the Asset Purchase Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Asset Purchase Agreement and this Order including, but not limited to, the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Purchased Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities), and (d) enter any orders under sections 105, 363, and 365 of the Bankruptcy Code, or otherwise, with respect to the Purchased Assets and the Assigned Contracts.

**<u>Exhibit 1</u>**

**Filing Version**

**ASSET PURCHASE AGREEMENT**

**by and between**

**[SELLER]**[1]

**and**

**[BUYER]**

**Dated as of [•], 2025**

---

[1]    **Note to Draft**: Applicable Seller(s) to be inserted once Purchased Assets/Business to be sold identified by Buyer.

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ................................................................................................2

    1.1    Certain Defined Terms ...............................................................................2
    1.2    Construction ..............................................................................................14

ARTICLE 2 SALE AND PURCHASE OF ASSETS; LIABILITIES ..........................15

    2.1    Sale of Purchased Assets ..........................................................................15
    2.2    Liabilities .................................................................................................16
    2.3    Consideration ............................................................................................17
    2.4    Closing .....................................................................................................18
    2.5    No Offset ..................................................................................................18
    2.6    Deposit .....................................................................................................18

ARTICLE 3 REPRESENTATIONS AND WARRANTIES .......................................19

    3.1    Representations and Warranties of Seller .................................................19
    3.2    Representations and Warranties of Buyer.................................................25
    3.3    Exclusivity of Representations .................................................................27

ARTICLE 4 PRE-CLOSING COVENANTS ..............................................................27

    4.1    Access and Information ............................................................................27
    4.2    Ordinary Course of Business ...................................................................28
    4.3    Notification of Certain Matters ................................................................28
    4.4    Obligation to Consummate the Transaction .............................................29
    4.5    Filings; Other Actions; Notification and Cooperation..............................29

ARTICLE 5 ADDITIONAL COVENANTS.................................................................32

    5.1    Further Assurances ...................................................................................32
    5.2    Publicity ...................................................................................................33
    5.3    Certain Tax Matters .................................................................................33
    5.4    Accounts Receivable and Payable ...........................................................34
    5.5    Wrong Pockets .........................................................................................35
    5.6    Purchased Intellectual Property ...............................................................35
    5.7    Bankruptcy Court Filings and Approval...................................................35
    5.8    Copies of Pleadings..................................................................................37
    5.9    Books and Records ...................................................................................37
    5.10    Trade Notification ....................................................................................38
    5.11    Employee Matters ....................................................................................38
    5.12    Insurance ..................................................................................................40

ARTICLE 6 CONDITIONS PRECEDENT .................................................................41

    6.1    Conditions to Obligations of Buyer and Seller .........................................41
    6.2    Conditions to Obligations of Buyer .........................................................41
    6.3    Conditions to Obligations of Seller .........................................................42

ARTICLE 7 NO SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-CLOSING COVENANTS ...............................................................................43

    7.1    No Survival ........................................................................................43
    7.2    No Recourse ......................................................................................43

ARTICLE 8 TERMINATION ..........................................................................44

    8.1    Termination.......................................................................................44
    8.2    Procedure and Effect of Termination................................................45

ARTICLE 9 MISCELLANEOUS ......................................................................47

    9.1    Governing Law, Jurisdiction, Venue and Service ..............................47
    9.2    Notices .............................................................................................48
    9.3    No Benefit to Third Parties ...............................................................49
    9.4    Waiver .............................................................................................49
    9.5    Expenses ..........................................................................................49
    9.6    Assignment ......................................................................................49
    9.7    Amendment ......................................................................................50
    9.8    Severability ......................................................................................50
    9.9    Equitable Relief ...............................................................................50
    9.10   No Liability......................................................................................50
    9.11   Bulk Sales Statutes...........................................................................50
    9.12   Representation by Counsel ...............................................................50
    9.13   Counterparts .....................................................................................51
    9.14   Entire Agreement .............................................................................51

EXHIBITS

Exhibit A      Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit B      Form of Domain Name Transfer Agreement
Exhibit C      Form of Patent Assignment Agreement
Exhibit D      Form of Trademark Assignment Agreement
Exhibit E      Form of Lease Assignment

**ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and executed as of [•], 2025 (the "**Execution Date**"), by and between [•], a [•] ("**Seller**"), and [•], a [•] ("**Buyer**")[2]. Seller and Buyer may be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

**WHEREAS**, Seller and its Subsidiaries are engaged in the Business;

**WHEREAS**, on November 3, 2024, Seller and certain of its Affiliates (collectively, the "**Debtors**") sought relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the Bankruptcy Court (as defined below);

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, substantially all of its assets and rights associated with the Business, upon the terms and subject to the conditions hereinafter set forth;

**WHEREAS**, the Purchased Assets and Assumed Liabilities are assets and liabilities of Seller and its Subsidiaries which are to be sold and assumed pursuant to the Sale Order and this Agreement, free and clear of all Encumbrances and Liabilities except Assumed Liabilities and Permitted Encumbrances, which Sale Order will include the authorization for the assumption and assignment of certain executory contracts and unexpired leases and liabilities thereunder under section 365 of the Bankruptcy Code, all in the manner and on the terms and subject to the conditions set forth herein and in accordance with other applicable provisions of the Bankruptcy Code; and

**WHEREAS**, in connection with entering into this Agreement, an aggregate amount equal to $[•][3] in cash has been deposited by Buyer on its behalf as a "good faith deposit" (the "**Deposit**") by wire transfer of immediately available funds to the Escrow Agent, to be held in escrow in accordance with the terms of that certain Escrow Agreement, entered into on [•], 2025 (the "**Deposit Escrow Agreement**"), by and among Buyer, Seller and the Escrow Agent.

**NOW, THEREFORE**, in consideration of the mutual benefits to be derived from this Agreement, the representations, warranties, conditions, agreements and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

---

[2]    **Note to Draft**: To the extent Buyer is not a creditworthy entity, Seller will require delivery of binding commitment letters and/or a parent guarantee with respect to the full amount of the Closing Payment.

[3]    **Note to Draft**: Deposit to be equal to 10% of the cash portion of the Purchase Price.

**ARTICLE 1**
**DEFINITIONS**

**1.1      Certain Defined Terms**. As used herein, the following terms shall have the following meanings:

"**Accounting Firm**" has the meaning set forth in <u>Section 2.3.3.</u>

"**Accounts Receivable**" means all amounts (whether current or non-current) primarily related to the Purchased Assets or Acquired Entities that constitute, as of the Closing, accounts receivable, notes receivable and other rights or indebtedness due and owed by any Third Party to Seller or any of its Subsidiaries and primarily related to the Business, in each case, whether billed or unbilled, recorded or unrecorded, written off or not written off.

"**Acquired Entities**" means [•][4].

"**Acquired Entity Plan**" means a Plan that is or was sponsored or maintained by any one or more of the Acquired Entities.

"**Affiliate**" means, with respect to a Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such first Person, and a Person shall be deemed to be controlled by another Person if controlled in any manner whatsoever that results in control in fact by that other Person (or that other Person and any Person or Persons with whom that other Person is acting jointly or in concert), whether directly or indirectly. For purposes of this definition, "control" and, with correlative meanings, the terms "controlled by" and "under common control with" mean, when used with respect to any specified Person, (a) the possession, directly or indirectly, of the power to direct the management or policies of that Person, directly or indirectly, whether through the ownership of securities, by trust, by contract, or otherwise or (b) the ownership, directly or indirectly, of more than 50% of the voting securities or other ownership interest of a business entity (or, with respect to a limited partnership or other similar entity, its general partner or controlling entity).

"**Agreement**" has the meaning set forth in the preamble hereto, and includes all schedules and exhibits hereto, and all instruments supplementing, amending, modifying, restating or otherwise confirming this agreement.

"**Alien Employees**" has the meaning set forth in <u>Section 5.11.6.</u>

"**Allocation**" has the meaning set forth in <u>Section 2.3.3.</u>

"**Alternative Transaction**" means the sale, transfer, or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, foreclosure or other transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of any material portion of the Purchased Assets or the Business, in a single

---

[4]    **Note to Draft**: Insert subsidiaries of Sellers related to the Business that Buyer wishes to acquire, if any.

transaction or a series of transactions, with one or more Persons other than Buyer or any of its Affiliates (other than sales of Inventory in the Ordinary Course).

"**Ancillary Agreements**" means the [Bill of Sale, the Patent Assignment Agreement, the Deposit Escrow Agreement, the Domain Name Transfer Agreement, the Lease Assignment, the Trademark Assignment Agreement] and any other agreements, certificates and other instruments delivered, given or contemplated pursuant to this Agreement.

"**Antitrust Laws**" has the meaning set forth in Section 4.5.2.

"**Appointee**" has the meaning set forth in Section 8.1.5.

"**Apportioned Obligations**" has the meaning set forth in Section 5.3.2(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.2.1.

"**Auction**" means the auction, if any, contemplated to be run in the sales process related to the Business pursuant to the Bidding Procedures Order.

"**Automatic Transfer Employee**" means an employee of any Acquired Entity as of the Closing.

"**Avoidance Actions**" means those actual and/or potential claims and causes of action under sections 502(d) and 544 through 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or any analogous state law.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware and any other court before which the Chapter 11 Cases are held.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and any local rules of the Bankruptcy Court.

"**Bidding Procedures Order**" means the *Order (A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief* [Docket No. •].

"**Bill of Sale**" means the Bill of Sale and Assignment and Assumption Agreement, in substantially the form attached hereto as Exhibit A.

"**Business**" means the business and operations of Seller and its Subsidiaries as of the Closing, including [•][5].

---

[5]    **Note to Draft**: Buyer – please specify to which line(s) of business of FRG your bid and this Agreement relates.

"**Business Day**" means any day other than Saturday, Sunday or a day on which banking institutions in New York, New York are permitted or obligated by Law to remain closed.

"**Business Employee**" means an individual employed by Seller or any of its Subsidiaries as of the Closing, including each such individual who is (a) actively at work, (b) on short-term disability or workers' compensation, or (c) on a leave of absence approved by Seller or the employing Subsidiary, including under the Family and Medical Leave Act, as amended, and the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended.

"**Business Employee Transfer Date**" has the meaning set forth in Section 5.11.5.

"**Buyer**" has the meaning set forth in the preamble hereto.

"**Buyer Benefit Plan**" has the meaning set forth in Section 5.11.3.

"**Chapter 11 Cases**" has the meaning set forth in the recitals.

"**Claims**" mean, collectively, all rights, claims (as that term is defined in Section 101(5) of the Bankruptcy Code) and causes of action, whether class, individual or otherwise in nature, under contract or in law or in equity, known or unknown, contingent or matured, liquidated or unliquidated and all rights and remedies with respect thereto.

"**Closing**" has the meaning set forth in Section 2.4.

"**Closing Date**" has the meaning set forth in Section 2.4.

"**Closing Payment**" has the meaning set forth in Section 2.3.1(b).

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means [•].

"**Continuing Employees**" has the meaning set forth in Section 5.11.1.

"**Contract**" means any legally binding contract, agreement, obligation, lease, sublease, license, sublicense, regulatory license, undertaking, engagement, sales order, purchase order, instrument or other legally binding commitment.

"**Cure Cost Certificate**" has the meaning set forth in Section 2.3.2.

"**Cure Costs**" shall mean the Liabilities and obligations that must be paid or otherwise satisfied to cure all of Debtors' defaults under the Purchased Contracts necessary for the assumption thereof by Seller and assignment to Buyer pursuant to Section 365 of the Bankruptcy Code, as provided herein and in the Sale Order.

"**Debtors**" has the meaning set forth in the recitals hereto.

"**Deposit**" has the meaning set forth in the recitals.

- 4 -

"**Deposit Escrow Agreement**" has the meaning set forth in the recitals.

"**DIP Financing Order**" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 414].

"**Disputed Contract**" has the meaning set forth in Section 5.7.6.

"**Distribution Centers**" mean [•].

"**Domain Name Transfer Agreement**" means the Domain Name Transfer Agreement, in substantially the form attached hereto as Exhibit B.

"**Employment Matters**" has the meaning set forth in Section 5.11.4.

"**Encumbrance**" means any mortgage, lien (statutory or otherwise, including as defined in section 101(37) of the Bankruptcy Code), Claim, license, sublicense, pledge, security interest, charge, hypothecation, restriction, claim of ownership, lease, sublease, option, right of use or possession, preference, encroachment, restrictive covenant, right of first offer or refusal, title defect or other encumbrance or similar restriction of any kind.

"**Enforceability Exceptions**" has the meaning set forth in Section 3.1.2.

"**Environmental Laws**" means all Laws concerning pollution, public or worker health or safety (as it pertains to exposure to Hazardous Materials), or protection of the environment.

"**Equity Securities**" means, (a) if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such entity, whether membership interests or partnership interests, or (b) other securities directly or indirectly convertible into, exercisable or exchangeable for or measured by reference to, any securities described in clause (a) above.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" means Citibank, N.A., together with its permitted successors and assigns.

"**Excluded Assets**" means the following assets, property, rights and interests of Seller and its Subsidiaries (other than, for the avoidance of doubt, the Acquired Entities unless specifically contemplated below): (a) all cash, cash equivalents, bank or other deposits, similar cash items of Seller and its Subsidiaries (including the Acquired Entities); (b) all refunds, rebates, abatements, credits, deposits, prepayments, overpayments, or other recovery for Taxes, claims for refunds or rights to receive refunds from any Taxing Authority with respect to any and all Taxes paid or to be paid by Seller or any of its Subsidiaries (including any and all Taxes paid or to be paid by any of Seller's Subsidiaries and including any other Tax assets (including any net operating or other losses, credits, carryforwards and other Tax attributes)), together with any refund of interest due

thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof), in each case other than in respect solely of the Acquired Entities; (c) (i) any legal or beneficial interest in the capital stock and other Equity Securities of Seller, its Subsidiaries or any other Person, in each case other than in respect of the Acquired Entities, and (ii) the corporate or other entity charter, qualifications to conduct business as a foreign corporation or other form of business entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, Tax Returns and other tax records, seals, minute books, stock transfer books, and similar organizational documents of Seller or any of its Subsidiaries, in each case other than in respect of the Acquired Entities; (d) all Excluded Items; (e) any Excluded Contract; (f) all rights of Seller under this Agreement and the Ancillary Agreements; (g) all insurance policies and all rights and benefits of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to such insurance recoveries, including any directors and officers liability insurance policies; (h)(i) all Claims against current and former directors and officers of Seller and its Subsidiaries; (ii) any commercial tort claims of Seller and its Subsidiaries (including the Acquired Entities) and (iii) Claims or causes of action pursuant to 11 U.S.C. §§ 544, 547 and 548 and all state law equivalents, other than [(x)] Claims or causes of action pursuant to 11 U.S.C. §§ 544, 547 and 548 (and all state law equivalent) against or in respect of go-forward trade, vendors and/or landlords of the Seller or its Subsidiaries (including Acquired Entities) [and (y) Claims against employees of the Seller or its Subsidiaries (including Acquired Entities)];[6] (i) any intercompany accounts receivable/payable owed between or among the Debtors and their Subsidiaries (other than any intercompany accounts receivable/payable owed solely between Acquired Entities); (j) the sponsorship and assets of all Plans that are not Acquired Entity Plans and all right, title and interest in any asset thereof or relating thereto; (k) any intangible assets that are not used primarily in the Business; (l)_all bank accounts of Seller and its Subsidiaries and (m) any asset of Seller and its Subsidiaries that would constitute Purchased Assets (if owned by Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the date of this Agreement until the Closing Date (1) in the Ordinary Course and not in violation of the terms of this Agreement or (2) as otherwise permitted by the terms of this Agreement.

"**Excluded Contract**" has the meaning set forth in <u>Section 2.1.2</u>.

"**Excluded Items**" means any and all (a) books, documents, records, files and other items prepared in connection with or relating to the negotiation and consummation of the Chapter 11 Cases or any of transactions contemplated by this Agreement or the Ancillary Agreements or otherwise prepared in connection with the divestiture of any of the assets, properties, contracts, rights or interests of any of the Debtors in connection with the Chapter 11 Cases, including all (i) bids received from Third Parties (and related analyses) relating to the Business, (ii) confidentiality, joint defense or similar agreements with prospective purchasers of the Business, (iii) strategic, financial or Tax analyses relating to the divestiture of the Purchased Assets, the Assumed Liabilities and the Business, (iv) analyses regarding the competitive landscape (e.g., consultant reports regarding the market and likely future developments) of the Business, (v) presentations or minutes relating to any of the meetings of Debtors' board of directors or committees thereof, including materials relating to strategic alternatives, including the

---

[6]   **Note to Draft**: Solely to the extent the Senior Secured Lender is the Buyer.

transactions contemplated by this Agreement and (vi) presentations or other materials relating to discussion with Seller's lenders or key constituents or counterparties; and (b) all personnel records (including all human resources and other records), whether or not held by Seller or any of its Subsidiaries and whether or not relating to employees (other than the Continuing Employees) of Seller or any of its Subsidiaries.

"**Excluded Liabilities**" means the following Liabilities of Seller or any of its Subsidiaries (other than Liabilities of the Acquired Entities) of whatever nature, whether presently in existence or arising or asserted hereafter: (a) Taxes attributable to periods ending on or prior to the Closing Date; *provided* that Transfer Taxes and Apportioned Obligations shall be allocated between Buyer and Seller as provided in Section 5.3.2; (b) all Liabilities arising out of, resulting from, or relating to any Excluded Assets; (c) all indebtedness of the Debtors' set forth on Section 1.1.2(c) of the Seller Disclosure Schedules; and (d) fees, costs and expenses incurred in connection with the Chapter 11 Cases or the Transactions (except as otherwise contemplated by this Agreement).

"**Execution Date**" has the meaning set forth in the preamble hereto.

"**Final Order**" shall mean an Order or judgment of the Bankruptcy Court entered by the clerk of the Bankruptcy Court or such other court on the docket in the Chapter 11 Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the applicable Bankruptcy Court, or other court of competent jurisdiction shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or a similar rule of such other court of competent jurisdiction; *provided* that, with respect to the Bankruptcy Court, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Authority**" means (i) any governmental or public department, central bank, court, minister, governor-in-council, cabinet, commission, tribunal, board, bureau, agency, commissioner or instrumentality or other regulatory or administrative authority, whether international, multinational, national, federal, provincial, state, municipal, local, or other; (ii) any subdivision or authority of any of the above; (iii) any stock exchange; (iv) any arbitral body (public or private); and (v) any quasi- governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the above.

"**Hazardous Materials**" means any materials, substances or wastes for which Liability or binding standards of conduct may be imposed pursuant to any Environmental Laws, including

any petroleum products or byproducts, asbestos or asbestos-containing materials, polychlorinated biphenyls, per- and polyfluoroalkyl substances, lead, toxic mold or radioactive materials.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Intellectual Property**" means all of the following: (a) Patents; (b) copyrights and other equivalent rights in works of authorship (published or unpublished), moral rights (or other similar rights), copyright registrations and applications for copyright registration ("**Copyrights**"); (c) designs, design registrations, and design registration applications; (d) names, trade names, business names, corporate names, domain names, social media accounts, website names and world wide web addresses, common law trademarks, trademark registrations, trademark applications, unregistered trademarks, service marks, trade dress and logos, slogans, and other designations of source or origin, and all goodwill related to the foregoing ("**Trademarks**"); (e) rights in computer programs and software (whether in source code, object code, or other form), algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing (collectively, "**Technology**"); (f) rights in trade secrets and all other confidential information, know-how, inventions, improvements, processes, formulae, models, techniques, plans, ideas, concepts, designs, business, scientific and technical data or information, and methodologies ("**Trade Secrets**"); (g) registrations and applications for any of the foregoing; (h) all goodwill associated or arising in connection with the forgoing; and (i) all other intellectual property or proprietary rights of any kind or nature arising under any jurisdiction.

"**Interim Period**" means the period between the close of business on the Execution Date and the earlier of (x) Closing and (y) the termination of this Agreement.

"**Inventory**" means all inventories primarily relating to the Business which are owned by Seller or its Subsidiaries and which are on hand at the Seller's or its Subsidiaries' Stores, Distribution Center, or in transit thereto, as of the Closing Date. Notwithstanding the foregoing, "Inventory" shall not include: (1) goods which belong to sublessees or concessionaires of the Seller or its Subsidiaries or (2) goods held by the Seller or its Subsidiaries on memo, on consignment, or as bailee.

"**IRS**" means the Internal Revenue Service or any successor Governmental Authority.

"**Joint Written Instructions**" has the meaning set forth in Section 8.2.5.

"**Law**" means any (i) applicable national, supranational, domestic or foreign, federal, state, provincial or local statute, law (including the common law), act, treaty, code, constitution, ordinance, Order, decree, rule, administrative interpretation, regulation, or by-law, and (ii) any other policy, guideline, notice, protocol or requirement having the force of law of any Governmental Authority, in each case as in effect from time to time.

"**Lease Assignment**" means the Lease Assignment and Assumption Agreement, in substantially the form attached as Exhibit E.

"**Leased Real Property**" has the meaning set forth in <u>Section 2.1.1(i)</u>.

"**Liability**" means any debt, loss, liability, obligation, commitment, claim, damage, demand, fine, judgment, deficiency, fee, charge or penalty, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, known or unknown, fixed or contingent, matured or unmatured, direct or indirect, determined or determinable or otherwise (including all adverse reactions, recalls, product and packaging complaints or other liabilities), whether arising under any Law, Order, Contract or otherwise and without regard to when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"**Litigation**" means any claim, action, charge, complaint, audit, investigation, inquiry, arbitration, mediation, hearing, proceeding, suit (whether civil, criminal, administrative, or investigative or appellate proceeding), warning letter, or notice of violation.

"**Look-Back Date**" means August 21, 2023.

"**Material Adverse Effect**" means any event, result, effect, occurrence, state of facts, circumstance, development, condition or change, that, individually or in the aggregate, has had a material adverse effect on the Purchased Assets and the Assumed Liabilities, taken as a whole; *provided, however*, that none of the following, and no event, fact, condition, occurrence, change, development, circumstance or effect to the extent resulting from the following, shall be deemed (individually or in combination) to constitute, or shall be taken into account in determining whether there has been, a "Material Adverse Effect": (i) general political or economic conditions or conditions affecting the capital or financial markets generally, including the worsening of any existing conditions or changes affecting the availability or cost of financing; (ii) conditions generally affecting any industry or industry sector in which the Seller and its Subsidiaries operate or compete or any conditions generally affecting the retail or franchising industry; (iii) any change in accounting requirements, applicable Laws or the enforcement, implementation or interpretation thereof; (iv) any hostility, act of war, sabotage, terrorism or military actions, or any escalation of any of the foregoing; (v) any hurricane, flood, tornado, earthquake, pandemic, epidemic, disease, outbreak, public health crisis or other natural disaster or force majeure event; (vi) (A) the entry into market of a product or products competitive with any of the products of the Seller and its Subsidiaries or any change in the sales or financial results of any such products, or other impact on the products of the Seller and its Subsidiaries, as a result of competition from another product or (B) the outcome of any other development, ruling or judgment related to or arising out of the Litigation set forth on <u>Section 3.1.6</u> of the Seller Disclosure Schedules; (vii) this Agreement, the transactions contemplated hereby or the Chapter 11 Cases, including the public announcement thereof or the impact of such announcement or pendency on the relationship of Seller and its Subsidiaries with any supplier, distributor, customer, partner, franchisee or similar relationship or any loss of employees resulting therefrom; (viii) the failure of the Seller and its Subsidiaries to achieve any financial projections, predictions, forecasts or estimates of revenues for any period (*provided* that the underlying causes of such failure shall not be excluded unless otherwise excluded pursuant to this definition); (ix) any act or omission of Seller or any of its Subsidiaries required or permitted by the terms of this Agreement or at the request of Buyer; (x) actions taken by Buyer or its Affiliates; (xi) (A) the commencement or pendency of the Chapter 11 Cases, (B) any objections in the Bankruptcy Court to (1) this Agreement, any Ancillary Agreement or the Transactions, (2) the reorganization of Seller or any of its

Subsidiaries, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Purchased Contract otherwise in compliance with this Agreement, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller or its Subsidiaries required to be taken (or not taken) to comply therewith; (xii) any act or omission by Seller or any of its Subsidiaries required to be taken pursuant to the terms of the DIP Financing Order; (xiii) any change in the market price, credit rating or trading volume of the Seller's or any of its Subsidiaries' stock or other securities or any change affecting the ratings or the ratings outlook for the Seller or any of its Subsidiaries (*provided* that the underlying factors contributing to any such change shall not be excluded unless such underlying factors would otherwise be excluded from the definition of Material Adverse Effect); (xiv) any cyber attack and (xv) any matter disclosed on the Seller Disclosure Schedules or in any filings by Seller with the Securities and Exchange Commission or Bankruptcy Court; except, in the case of clauses (i) through (v), to the extent that any such event, result, effect, occurrence, fact, circumstance, development, condition or change has a disproportionate and adverse effect on the Purchased Assets and Assumed Liabilities, taken as a whole, relative to other Persons operating businesses similar to the Business.

"**Notice**" has the meaning set forth in <u>Section 9.2.1</u>.

"**Offer Employee**" means each Business Employee who is not an Automatic Transfer Employee.

"**Order**" means any judicial, arbitral, administrative, ministerial, departmental or regulatory writ, judgment, edict, directive, adjudication, decree, injunction, ruling, order, decision, award or other binding obligation, pronouncement, determination or similar action taken by, or applied by, any Governmental Authority (in each case, whether temporary, preliminary or permanent).

"**Ordinary Course**" means, with respect to an action taken by a Person, after taking into account the Chapter 11 Cases, that such action is taken in the ordinary course of the normal day-to-day operations of such Person.

"**Organizational Documents**" means, as applicable, (i) the certificate or articles of incorporation, formation, organization, limited partnership or association, (ii) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person, (iii) the bylaws or any similar governing document adopted in connection with the creation, formation or organization of a Person, (iv) the operating agreement or limited liability company agreement of a limited liability company or limited partnership agreement of a limited partnership, (v) any similar organizational documents or instruments of any other type of foreign or domestic entity and (vi) any amendment or modification to any of the foregoing.

"**Outside Date**" means March 11, 2025.

"**Owned Intellectual Property**" means all Intellectual Property owned by Seller or any of its Subsidiaries.

"**Owned Technology**" means any tangible embodiments of Intellectual Property (including Technology and Trade Secrets), in each case owned by Seller or any of its Subsidiaries.

"**Party(ies)**" has the meaning set forth in the preamble hereto.

"**Patent Assignment Agreement**" means the Patent Assignment Agreement, in substantially the form attached as <u>Exhibit C</u>.

"**Patents**" means all issued patents and patent applications, provisional patent applications, applications for reissues, industrial designs, or invention disclosures in any country or supranational jurisdiction, and any substitutions, divisionals, continuations, continuations-in-part, reissues, renewals, confirmations, re-examinations, extensions, and supplementary protection certificates and the like.

"**Payee**" has the meaning set forth in <u>Section 5.3.1(a)</u>.

"**Payer**" has the meaning set forth in <u>Section 5.3.1(a)</u>.

"**Payments**" has the meaning set forth in <u>Section 5.3.1(a)</u>.

"**Permit**" means with respect to any Person, any permit, license, grant, authorization, consent, registration, certificate, franchise, certification, variance, exemption, Order or approval or similar authorization of any Governmental Authority having jurisdiction over such Person.

"**Permitted Encumbrance**" means any (a) Encumbrance for utilities and Taxes not yet due or delinquent or for those Taxes being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP; (b) Encumbrance imposed by Law that does not or would not be reasonably expected to materially detract from the current value of, or materially interfere with the present use and enjoyment of, any Purchased Asset subject thereto or affected thereby in the Ordinary Course; (c) Encumbrance incurred or deposit made to a Governmental Authority in connection with any Permit, (d) non-exclusive licenses of Intellectual Property granted in the Ordinary Course; (e) mechanics', materialmen's, carriers', workmen's, warehouseman's, repairmen's, landlords' and similar Encumbrances granted or which arise in the Ordinary Course for amounts which are not due and payable; (f) Encumbrances that would not reasonably be expected to materially detract from the property and/or use of the property for its current purpose; (g) matters that would be disclosed by an inspection, a title commitment, or accurate survey of each parcel of Leased Real Property that would not reasonably be expected to materially detract from the property and/or use of the property for its current purposes; (h) Encumbrances expressly contemplated by, or that are removed or released by operation of, the Sale Order; and (i) Encumbrances disclosed on <u>Section 1.1.3</u> of the Seller Disclosure Schedules.

"**Person**" means any individual, partnership, limited partnership, limited liability partnership, limited liability company, unlimited liability company, joint stock company, joint venture, syndicate, sole proprietorship, corporation, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, or any other legal entity, including a Governmental Authority, and pronouns have a similarly extended meaning.

"**Personal Data**" means any information or data that (a) identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or

indirectly, with a particular individual or household, or (b) "personal data," "personal information," "personally identifiable information," "protected health information," or similar term as defined in applicable Laws relating to data protection, data privacy, and data security.

"**Personal Property**" means all tangible personal property primarily relating to the Business that is owned or used by the Seller and/or its Subsidiaries, including apparatus, materials, furniture, fixtures, supplies, parts, equipment, computers, servers, machinery, vehicles, rolling stock, and other tangible property.

"**Plan**" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA and each other stock purchase, stock option, restricted stock, phantom stock, severance, retention, employment, consulting, change-of-control, collective bargaining, bonus, incentive, deferred compensation, retirement, and other compensation or benefit plan, program or arrangement, in each case, that is maintained, sponsored or contributed to by Seller or any of its Subsidiaries and in which any Business Employee, any former employee or current or former independent contractor of Seller or any of its Subsidiaries, or any covered dependents of any of the foregoing participates or is eligible to participate.

"**Post-Closing Tax Period**" has the meaning set forth in Section 5.3.2(b).

"**Pre-Closing Tax Period**" has the meaning set forth in Section 5.3.2(b).

"**Public Statement**" has the meaning set forth in Section 5.2.

"**Purchase Price**" has the meaning set forth in Section 2.3.1(b).

"**Purchased Assets**" has the meaning set forth in Section 2.1.1.

"**Purchased Books and Records**" means all books and records primarily relating to the Business to the extent owned, maintained and in the possession or control of Seller or any of its Subsidiaries.

"**Purchased Contracts**" has the meaning set forth in Section 2.1.1(a).

"**Purchased Intellectual Property**" means the Intellectual Property licensed to Seller or its Subsidiaries under the Purchased Contracts, and all other Owned Intellectual Property.

"**Purchased Leases**" has the meaning set forth in Section 2.1.1(i)

"**Purchased Permits**" has the meaning set forth in Section 2.1.1(d).

"**Purchased Technology**" means all tangible embodiments of Intellectual Property (including Technology and Trade Secrets), in each case licensed to Seller or its Subsidiaries under the Purchased Contracts, and all other Owned Technology.

"**Representatives**" means a Party's officers, directors, employees, agents, attorneys, accountants, consultants, advisors, financing sources and other representatives.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"**Sale Order**" has the meaning set forth in <u>Section 5.7.1</u>.

"**Seller**" has the meaning set forth in the preamble hereto.

"**Seller Disclosure Schedules**" means the disclosure schedules of Seller delivered by Seller pursuant to this Agreement.

"**Seller Insurance Coverage**" has the meaning set forth in <u>Section 5.12</u>.

"**Seller's Knowledge**" means the actual knowledge of any one of Andrew Laurence, Eric Seeton, Andrew Kaminsky and Tiffany McMillan-McWaters without personal liability on the part of any of them.

"**Stores**" means the retail store locations owned by Seller and/or its Subsidiaries that are set forth on <u>Section 1.1.4</u> of the Seller Disclosure Schedules.

"**Subsidiary**" means, with respect to any Person, any entity of which at least a majority of the securities or ownership interests having by their terms voting power to elect a majority of the board of directors or other Persons performing similar functions is directly or indirectly owned or controlled by such Person or by one or more of its respective Subsidiaries. The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"**Tax Laws**" has the meaning set forth in <u>Section 2.3.3</u>.

"**Tax Return**" means any return, declaration, report, election, notice, filing, claim for refund, information return or statement relating to Taxes, including any schedule or attachment thereto, filed or maintained, or required to be filed or maintained, in connection with the calculation, determination, assessment or collection of any Tax and includes any amended returns required as a result of examination adjustments made by the IRS or other Taxing Authority.

"**Taxes**" means all taxes of any kind, and all charges, fees, customs, levies, duties, excises, premiums, imposts, required deposits or other assessments, including all federal, state, local or foreign net income, capital gains, gross income, gross receipt, property, franchise, sales, use, excise, withholding, payroll, employment, social security, worker's compensation, unemployment, occupation, capital stock, transfer, gains, windfall profits, net worth, asset, transaction and other taxes, and any interest, penalties, fines or additions to tax with respect thereto, imposed upon any Person by any Taxing Authority or other Governmental Authority under applicable Law.

"**Taxing Authority**" means any Governmental Authority or any quasi-governmental body exercising tax regulatory authority.

"**Third Party**" means any Person other than Seller, Buyer and their respective Affiliates and permitted successors and assigns.

"**Trademark**" has the meaning set forth in the definition of "Intellectual Property."

"**Trademark Assignment Agreement**" means the Trademark Assignment Agreement, in substantially the form attached as <u>Exhibit D</u>.

"**Transactions**" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"**Transfer Taxes**" has the meaning set forth in <u>Section 5.3.2(a)</u>.

"**U.S.**" or "**United States**" means the United States of America.

    **1.2**    **Construction**. Except where the context otherwise requires, wherever used, the singular includes the plural, the plural the singular, the use of any gender shall be applicable to all genders and the word "or" is used in the inclusive sense (and/or). The captions of this Agreement are for convenience of reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision contained in this Agreement. The terms "include," "includes" and "including" mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and do not limit the generality of any description preceding such term. The language of this Agreement shall be deemed to be the language mutually chosen by the Parties and no rule of strict construction shall be applied against either Party. Unless otherwise specified or where the context otherwise requires, (a) references in this Agreement to any Article, Section, Schedule or Exhibit are references to such Article, Section, Schedule or Exhibit of this Agreement; (b) references in any Section to any clause are references to such clause of such Section; (c) "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (d) references to a Person are also to its successors and permitted assigns; (e) references to a Law include any amendment or modification to such Law and any rules or regulations issued thereunder, in each case, as in effect at the relevant time of reference thereto; (f) references to any agreement, instrument or other document in this Agreement refer to such agreement, instrument or other document as originally executed or, if subsequently amended, replaced or supplemented from time to time, as so amended, replaced or supplemented and in effect at the relevant time of reference thereto; (g) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; (h) all references to "made available" means, when used with respect to any document or other item of information, that such document or other item of information was provided or made available to Buyer in the "virtual data room" prepared by Seller to which Buyer has been provided access prior to the date hereof; and (i) references to monetary amounts are denominated in United States Dollars and all references to "$" shall be deemed to refer to United States dollars. The Parties have participated jointly in the negotiation and drafting of this Agreement and in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party (or any Affiliate thereof) by virtue of the authorship of any of the provisions of this Agreement.

## ARTICLE 2
## SALE AND PURCHASE OF ASSETS; LIABILITIES

**2.1**    **Sale of Purchased Assets**.

2.1.1   <u>Purchase and Sale of Purchased Assets</u>. Upon the terms and subject to the conditions of this Agreement and the Ancillary Agreements, at and effective as of the Closing, Seller shall (or shall cause its applicable Subsidiaries to), sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and accept from Seller (or such Subsidiaries), all rights, title and interests of Seller or its Subsidiaries in and to all of the assets, properties, interests, rights and claims of Seller and its Subsidiaries primarily related to the Business, other than the Excluded Assets, including the following assets primarily related to the Business (collectively, the "**Purchased Assets**"), in each case free and clear of any Encumbrances (other than Permitted Encumbrances and Assumed Liabilities):

(a)    all rights and interests of Seller or its Subsidiaries under the Contracts set forth in <u>Section 2.1.1(a)</u> of the Seller Disclosure Schedules, which Section of the Seller Disclosure Schedules may be modified (unless otherwise indicated in the Seller Disclosure Schedules) from the date hereof through two (2) Business Days prior to the Sale Hearing in accordance with <u>Section 4.3.1</u> (together with the Purchased Leases, the "**Purchased Contracts**");

(b)    the Purchased Books and Records;

(c)    the Purchased Intellectual Property and Purchased Technology, including all rights of action associated therewith;

(d)    all Permits that are listed on <u>Section 2.1.1(d)</u> of the Seller Disclosure Schedule, to the extent assignable or transferable (the "**Purchased Permits**");

(e)    all Inventory;

(f)    all advertising, marketing, sales and promotional materials and all other printed or written materials primarily used in connection with the Business;

(g)    all URLs, websites, social media accounts, website content, fax numbers and telephone numbers;

(h)    all pre-paid expenses and security deposits;

(i)    all rights and interests of Seller or its Subsidiaries for the lease, sublease, license, or other right to use or occupy real property, as set forth in <u>Section 2.1.1(i)</u> of the Seller Disclosure Schedules (such real property, the "**Leased Real Property**", and such leases, the "**Purchased Leases**");

(j)    to the extent permitted by Law, copies of Seller's personnel records with respect to the Continuing Employees;

(k)    all Personal Property;

- 15 -

(l)    all Accounts Receivable;

(m)    all goodwill of Seller as a going concern and any goodwill primarily related to the Business, the Purchased Assets and the Assumed Liabilities;

(n)    all rights of Seller under any non-disclosure or confidentiality, non-compete, non-interference or non-solicitation agreements with current and former employees and agents of Seller or Acquired Entities or with third parties, in each case, primarily related to the Purchased Assets or the Business (or any portion thereof);

(o)    all refunds, overpayments, credits or rebates with respect to Taxes that are Assumed Liabilities;

(p)    all Avoidance Actions against any of Seller's vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Purchased Assets after the Closing and any of their Affiliates;

(q)    the Equity Securities of the Acquired Entities (and, for the avoidance of doubt, thereby indirectly all of the assets, rights, Contracts and Liabilities of the Acquired Entities, including Acquired Entity Plans); and

(r)    all unexpired transferrable warranties, indemnities or guarantees from any third party primarily related to the other Purchased Assets or Assumed Liabilities.

2.1.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, (a) Buyer shall not acquire the Excluded Assets, including any Contract set forth on Section 2.1.2 of the Seller Disclosure Schedules (each such contract an "**Excluded Contract**"), (b) the Purchased Assets shall not include the Excluded Assets, and (c) Seller shall retain the Excluded Assets following the Closing.

2.1.3    Retention of Rights. Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, Seller retains, on behalf of itself and its Affiliates, a right to retain copies of all or any part of all documentation that Seller delivers to Buyer pursuant to this Agreement as may be reasonably necessary to exercise its or its Affiliates' respective rights or perform its or its Affiliates' respective obligations under this Agreement or any Ancillary Agreement, for purposes of administration of the Chapter 11 Cases, and for purposes of complying with Law.

**2.2    Liabilities**.

2.2.1    Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall (or shall cause its applicable Subsidiaries to) assign to Buyer and Buyer shall assume from Seller or its applicable Subsidiaries and agree to pay and discharge when due, all Liabilities of Seller and its Subsidiaries other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), including the following Liabilities (all of which are Assumed Liabilities):

(a)    all Liabilities arising under the Purchased Contracts;

(b)    all Liabilities, including accounts payable, arising from the ownership of the Purchased Assets or the conduct or operation of the Business;

(c)    all Liabilities relating to the ownership of the Equity Securities of the Acquired Entities;

(d)    all Liabilities of the Acquired Entities, including those arising pursuant to or in respect of any Acquired Entity Plan;

(e)    all Liabilities for Transfer Taxes;

(f)    all Cure Costs;

(g)    all Liabilities relating to (i) the employment of the Automatic Transfer Employees, all former employees and current or former independent contractors of any Acquired Entity, and/or (ii) the employment of the Offer Employees who are Continuing Employees, including all Liabilities for (A) any accrued and unused paid time off or sick time accrued prior to or on the Closing by any Continuing Employee to the extent permitted by applicable Law, and (B) wages, salaries and commissions with respect to the Continuing Employees as of the Closing Date;

(h)    all Liabilities related to the litigation matters set forth on <u>Section 3.1.6</u> of the Seller Disclosure Schedules;

(i)    all Liabilities for COBRA Continuation Coverage;

(j)    all Liabilities arising from the sale of merchandise by Seller and/or its Subsidiaries pursuant to product warranties, product returns and rebates; and

(k)    all Liabilities for gift cards, store credits, customer loyalty programs, and gift certificates validly issued by Seller and/or its Subsidiaries and outstanding as of the Closing.

2.2.2    <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, neither Buyer nor any of its Affiliates shall assume, nor shall they be or become responsible for, any Excluded Liabilities or any Liabilities of Seller or any of its Subsidiaries, other than the Assumed Liabilities.  For greater certainty, the Excluded Liabilities shall remain the sole obligation and responsibility of Seller and its Subsidiaries.

**2.3    Consideration**.

2.3.1    <u>Purchase Price</u>. Upon the terms and subject to the conditions of this Agreement, in consideration of the conveyances contemplated under <u>Section 2.1</u>, Buyer shall:

(a)    at the Closing, pay to Seller an amount equal to $[•] (the "**Cash Purchase Price**"), *less* the Deposit (together with any and all investment interest thereon, if any,

that is released to the Seller), *plus* the amount of the Cure Costs, by wire transfer of immediately available funds to the account designated by Seller by Notice to Buyer, such Notice to be provided at least five (5) Business Days prior to the Closing Date (such amount, the "**Closing Payment**"); and

        (b)    at the Closing, assume the Assumed Liabilities (together with the Cash Purchase Price, the "**Purchase Price**").

        2.3.2   <u>Cure Costs</u>. As soon as reasonably practicable and, in any event no later than when filed with the Bankruptcy Court, Seller shall deliver to Buyer a certificate setting forth the Cure Costs (together with reasonable supporting documentation) (the "**Cure Cost Certificate**").

        2.3.3   <u>Allocation of Consideration</u>. Seller shall reasonably allocate the Purchase Price (including the Assumed Liabilities, to the extent properly taken into account under applicable tax laws "**Tax Laws**"), among the Purchased Assets in accordance with Section 1060 of the Code and all other applicable Tax Laws (the "**Allocation**") within ninety (90) days following the Closing and shall deliver to Buyer a copy of such proposed Allocation promptly after such determination. Buyer shall have the right to review and raise any reasonable objections in writing to the Allocation during the thirty (30) day period after its receipt thereof. If Buyer disagrees with respect to any item in the Allocation, the Parties shall negotiate in good faith to attempt to resolve the dispute. To the extent Buyer and Seller cannot resolve any such dispute, the dispute will be referred to a nationally recognized accounting firm to be mutually agreed on by Buyer and Seller (the "**Accounting Firm**") for resolution. Buyer and Seller agree to file their respective IRS Form 8594 and all federal, state and local Tax Returns in accordance with the Allocation (as agreed by the Parties or as resolved by the Accounting Firm) and agree not to take any position inconsistent with the Allocation in any Tax Return, in any refund claim, in any litigation or otherwise, except as otherwise required by a "determination" as defined in Section 1313(a) of the Code (or corresponding provision of state or local law).

    **2.4**    **Closing**. Pursuant to the terms and subject to the conditions of this Agreement, the closing of the transactions contemplated hereby (the "**Closing**") shall take place at the New York, New York offices of Willkie Farr & Gallagher LLP, at 10:00 a.m. local time, on the second (2nd) Business Day following satisfaction of all conditions (other than those that by their terms are to be satisfied or taken at the Closing) set forth in <u>Article 6</u> (or, to the extent permitted by applicable Law, waived by the Party entitled to the benefits thereof), or such other time and place as the Parties may mutually agree to in writing (such date of the Closing being hereinafter referred to as the "**Closing Date**").

    **2.5**    **No Offset**. Buyer's obligations under this <u>Article 2</u> shall not be subject to offset or reduction.

    **2.6**    **Deposit**. At Closing, Buyer and Seller shall deliver Joint Written Instructions to the Escrow Agent to release the Deposit (together with any and all investment interest thereon, if any) to Seller in accordance with the Deposit Escrow Agreement.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

**3.1     Representations and Warranties of Seller**. Seller represents and warrants to Buyer as of the date hereof (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date) as follows, with each such representation and warranty subject to such exceptions, if any, as are set forth in the corresponding section of the Seller Disclosure Schedules. Disclosures in any section or paragraph of the Seller Disclosure Schedules shall be deemed disclosed with respect to any other sections or paragraphs of this Agreement to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other sections or paragraphs.

3.1.1   <u>Organization; Good Standing; Qualification</u>. Seller is a [•] validly existing and in good standing under the Laws of the State of [•]. Each Acquired Entity is validly existing and in good standing under the Laws of the jurisdiction of its organization (to the extent such concept exists in such jurisdiction). Seller is duly qualified to carry on business in each jurisdiction in which the nature or character of the properties and assets owned, leased or operated by it, including for greater certainty, the Purchased Assets, or the nature of its business or activities, including for greater certainty, the operation of the Business, makes such qualification necessary, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect. Each Acquired Entity is duly qualified or otherwise authorized to carry on business in each jurisdiction in which the nature or character of the properties and assets owned, leased or operated by it or the nature of its business or activities makes such qualification necessary, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

3.1.2   <u>Authority and Enforceability</u>. Seller has the requisite power, authority and capacity to enter into this Agreement and the Ancillary Agreements to which it is or will be a party and, subject to the Bidding Procedures Order and Sale Order, to perform its obligations hereunder or thereunder and to complete the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each Ancillary Agreement to which it is or will be a party, the performance of the obligations hereunder or thereunder and the consummation of the transactions contemplated hereby or thereby have been, or will be at or prior to Closing, duly authorized by all necessary action on the part of Seller. This Agreement and each of the Ancillary Agreements to which Seller is or will be a party, have been, or will be at or prior to Closing, duly executed and delivered by Seller, and, subject to the Bankruptcy Court's entry of the Sale Order, constitute or will constitute a legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium and other similar Laws relating to limitations of actions or affecting the availability of equitable remedies and the enforcement of creditors' rights generally and by general principles of equity (the "**Enforceability Exceptions**").

3.1.3   <u>Authorizations and Consents</u>. Except for (a) the entry of the Bidding Procedures Order and the Sale Order and, as applicable, the expiration or waiver of the Bankruptcy Court of the applicable 14-day period set forth in Rule 6004(h) of the Bankruptcy Rules and (b) items disclosed in <u>Section 3.1.3</u> of the Seller Disclosure Schedules, no material

Order, Permit, license, consent, approval, waiver, notification or filing, in each case, with a Governmental Authority, is required on the part of Seller for the execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder or thereunder and the consummation of the transactions contemplated hereby and thereby, including, for greater certainty, the transfer of the Purchased Assets.

        3.1.4   No Broker. Seller has not used any broker or finder in connection with the transactions contemplated hereby for which the Buyer is or will become liable.

        3.1.5   Capitalization. Section 3.1.5(a) of the Seller Disclosure Schedules sets forth the authorized Equity Securities of each Acquired Entity and a complete and correct list of the issued and outstanding Equity Securities of each Acquired Entity. All of the outstanding Equity Securities of each Acquired Entity have been validly issued and, if applicable, are fully paid and non-assessable and are held of record by Seller or a Subsidiary of Seller. Except as set forth on Section 3.1.5(b) of the Seller Disclosure Schedules, no Acquired Entity owns or otherwise holds, directly or indirectly, any Equity Security in any Person.

        3.1.6   Litigation. Section 3.1.6 of the Seller Disclosure Schedules sets forth a list of all material Litigation to which Seller or any of its Subsidiaries is a party as of the date hereof relating to any of the Purchased Assets, the Assumed Liabilities, or the Business. Except for the Chapter 11 Cases and the Litigation listed on Section 3.1.6 of the Seller Disclosure Schedules, there are no, and since the Look-Back Date to the date hereof there has not been any, material Litigation pending or, to Seller's Knowledge, threatened against the Purchased Assets or, to the extent involving or related to the operations or conduct of the Business (including with respect to any current or former employees or other individual service providers who provided services to the Business), against Seller or its Subsidiaries. Except as set forth on Section 3.1.6 of the Seller Disclosure Schedules, as of the date hereof, there are no material Orders of or by a court of competent jurisdiction or other Governmental Authority outstanding against Seller with respect to the Business or any of the Purchased Assets, except for the Chapter 11 Cases.

        3.1.7   No Violation. Subject to (a) the entry of the Bidding Procedures Order and the Sale Order and, as applicable, the expiration or waiver of the Bankruptcy Court of the applicable 14-day period set forth in Rule 6004(h) of the Bankruptcy Rules and (b) items disclosed in Section 3.1.7 of the Seller Disclosure Schedules, the execution and delivery by Seller of this Agreement and each Ancillary Agreement to which it is or will be a party, the performance by Seller of its obligations hereunder or thereunder and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) result in a violation of any Law applicable to Seller; (ii) result in a breach of, or conflict with, the constituent documents of Seller or the Acquired Entities; (iii) result in a breach of, or result in the loss of any rights or the imposition of obligations under, any Purchased Contract or Purchased Permit; or (iv) result in the creation of any Encumbrance (other than any Permitted Encumbrance) upon the Purchased Assets other than Encumbrances created by Buyer and assumption of the Assumed Liabilities, in each case, except as would not have a Material Adverse Effect.

3.1.8    <u>Purchased Assets</u>.  Except as set forth in <u>Section 3.1.8</u> of the Seller Disclosure Schedules, Seller has good and valid title to, a valid leasehold interest in or the right to use, all of the Purchased Assets. Upon the entry and effectiveness of the Sale Order, Seller will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to the Buyer the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances and Assumed Liabilities. Other than Encumbrances that will be released upon the entry and effectiveness of the Sale Order, Seller owns or has rights to, and upon delivery to Buyer at the Closing will transfer to Buyer, good title to or a valid leasehold interest in all of the Purchased Assets, free and clear of all Encumbrances, except for Permitted Encumbrances and Assumed Liabilities.

3.1.9    <u>Intellectual Property</u>.

(a)    <u>Section 3.1.9(a)</u> of the Seller Disclosure Schedules sets forth a correct and complete list of all Owned Intellectual Property that is registered, issued, or the subject of an application for registration or issuance, including Patents, Trademarks, Copyrights, and domain names. Except as would not reasonably be expected to have a Material Adverse Effect, all Intellectual Property set forth on <u>Section 3.1.9(a)</u> of the Seller Disclosure Schedules is, to Seller's Knowledge, subsisting, valid and enforceable.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, Seller or its Subsidiaries own all right, title and interest in and to, free and clear of all Encumbrances (other than Permitted Encumbrances) all Owned Intellectual Property, and have a valid right to use, under a Purchased Contract, all other Purchased Intellectual Property.

(c)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) to Seller's Knowledge, the operation of the Business has not, in the past three (3) years, infringed, misappropriated or violated any Intellectual Property of any Third Party and (ii) no Claims or actions are pending or, to Seller's Knowledge, threatened in writing, (A) regarding infringement, misappropriation, dilution, or other violation of the Intellectual Property of any Person against Seller or its Subsidiaries in respect of the conduct or operation of the Business by Seller or its Subsidiaries, or (B) challenging the ownership, validity, enforceability or use of any Owned Intellectual Property or, to Seller's Knowledge, other Purchased Intellectual Property to which Seller or its Subsidiaries have exclusive rights (except, in each case, for non-final office actions).

(d)    Except as would not reasonably be expected to have Material Adverse Effect, to Seller's Knowledge, no Person is, or has been since Look-Back Date, infringing, misappropriating or otherwise violating any Owned Intellectual Property or other Purchased Intellectual Property to which Seller or its Subsidiaries have exclusive rights, and no such Claims have been asserted or threatened against any Person by Seller, or to Seller's Knowledge, any other Person, since the Look-Back Date.

(e)    Except as would not reasonably be expected to have a Material Adverse Effect, since the Look-Back Date, Seller and its Subsidiaries have been in compliance with all applicable Laws, privacy policies, and Contracts relating to the collection, use, storage, destruction, modification, transfer, and other processing of Personal Data collected or used by

- 21 -

Seller and its Subsidiaries in the conduct of the Business. To Seller's Knowledge (i) there has been no material unauthorized access to any information technology systems used in the operation of the Business (or data stored in or processed thereby), nor (ii) any unauthorized access, disclosure, destruction, modification, or use of Personal Data that would require notification of individuals, other affected Persons, or any Governmental Authority.

3.1.10 <u>Employee and Benefit Matters</u>.

(a)    <u>Section 3.1.10(a)</u> of the Seller Disclosure Schedules lists each material Plan. Each Plan is and has been maintained and administered in all material respects in accordance with its express terms and with the requirements of ERISA, the Code and other applicable Law (except with respect to each Plan that is not an Acquired Entity Plan, to the extent that the failure to so maintain and administer, would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect).

(b)    No Plan is (i) a multiemployer plan within the meaning of Section 3(37) of ERISA or has two or more contributing sponsors, at least two of whom are not under common control, within the meaning of Section 4063 of ERISA, (ii) subject to Section 4063 or 4064 ERISA, or (iii) subject to Section 412 of the Code, Section 430 of the Code or Title IV of ERISA.

(c)    If intended to be qualified within the meaning of Code Section 401(a), each Plan has received a favorable determination letter from the IRS as to its qualification, and to the Seller's Knowledge, nothing has occurred that would reasonably be expected to cause the loss of such qualification.

(d)    Except as disclosed in <u>Section 3.1.10(d)</u> of the Seller Disclosure Schedules, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will, alone or together with any other event, result in or cause the accelerated vesting, funding or delivery of, or increase the amount or value of, any payment, compensation or benefit, including severance, to any Business Employee.

(e)    As of the date of this Agreement, there are no pending or, to the Seller's Knowledge, threatened (i) investigations by any Governmental Authority involving the Plans, or (ii) claims or litigation with respect to any Plans that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(f)    Seller is not a party to any collective bargaining agreement in respect of the Business, nor to the Seller's Knowledge, are there any activities or proceedings of any labor union to organize any Business Employees.

3.1.11 <u>Compliance with Laws</u>.

(a)    Except as set forth in <u>Section 3.1.11(a)</u> of the Seller Disclosure Schedules, the Business is currently being, and since the Look-Back Date has been, conducted in compliance, in all material respects, with all applicable Laws. Seller has not received any written notice of any actual or alleged material non-compliance or violation of any Laws in connection with the ownership of the Purchased Assets or the operation of the Business.

(b)    Seller and its Subsidiaries are and have been since the Look-Back Date in possession of all material Permits pursuant to any applicable Law required for the ownership or operation of the Purchased Assets or Assumed Liabilities. All such Permits are in full force and effect, no default (with or without notice, lapse of time or both) has occurred under any such Permit, and none of Seller or any of its Subsidiaries has received any written notice from any Governmental Authority threatening to suspend, revoke, or withdraw any such Permit, in each case except as would not have a Material Adverse Effect.

3.1.12  Purchased Contracts. As of the date hereof, each Purchased Contract listed or described in Section 2.1.1(a) of the Seller Disclosure Schedules is in full force and effect and is a valid and binding obligation of Seller or its Subsidiaries and, to Seller's Knowledge, the other parties thereto, in accordance with its terms and conditions, in each case except (a) as such enforceability may be limited by the Enforceability Exceptions and (b) as set forth on Section 3.1.12 of the Seller Disclosure Schedules. Except for those arising out of the Chapter 11 Cases, as set forth on Section 3.1.12 of the Seller Disclosure Schedules and payment of the Cure Costs set forth in the certificate to be delivered pursuant to Section 2.3.2, as of the date hereof, (i) Seller is not in material breach or default of its obligations under any Purchased Contract, (ii) to Seller's Knowledge, no condition exists that with notice or lapse of time or both would constitute a material default by Seller or its applicable Subsidiary under any such Purchased Contract, and (iii) to Seller's Knowledge, no other party to any such Purchased Contract is in material breach or default thereunder. Except as set forth on Section 3.1.12 of the Seller Disclosure Schedules, (x) neither Seller nor any Subsidiary has subleased, licensed or otherwise granted to any Third Party the right to use or occupy any Leased Real Property or any portion thereof and (y) neither Seller nor any Subsidiary has collaterally assigned or granted any other security interest in any Leased Real Property or any interest therein (other than Permitted Encumbrances).

3.1.13  Environmental Matters.

(a)    The Business is, and since the Look-Back Date has been, conducted in compliance in all material respects with all Environmental Laws, which compliance has included obtaining, maintaining and complying in all material respects with all Permits required under Environmental Law.

(b)    Neither Seller nor any of its Subsidiaries have received any written notice, and no Claim is pending or, to Seller's Knowledge, threatened, in each case, alleging any material violation of, or material Liability under, Environmental Laws.

(c)    Neither Seller nor any of its Subsidiaries (nor, to Seller's Knowledge, any other Person to the extent giving rise to Liability for Seller or any of its Subsidiaries) have treated, stored, disposed of, arranged for or permitted disposal of, transported, handled, manufactured, distributed, released, exposed any Person to, or owned or operated any property or facility contaminated by, any Hazardous Materials, in each case, so as to give rise to any material Liability of Seller and its Subsidiaries under Environmental Law.

(d)    Seller and its Subsidiaries have furnished to Buyer all material environmental audits, reports, assessments and other material environmental, health and safety

documents relating to the current properties, facilities or operations of the Business or the Purchased Assets, in each case, that are in their possession or under their reasonable control.

3.1.14  <u>Taxes</u>.

(a)     (i) All material Tax Returns required to be filed by the Acquired Entities, or with respect to any Purchased Assets, have been timely filed (taking into account extensions) and all such Tax Returns are true, correct and complete in all material respects, (ii) all material Taxes required to be paid by Acquired Entities (or due and payable with respect to the Purchased Assets) have been timely paid, whether or not shown on any Tax Return, and (iii) all material Tax withholding, collection and deposit obligations imposed on or with respect to Acquired Entities or the Purchased Assets have been satisfied in all respects.

(b)     (i) No Tax proceeding for material unpaid Taxes with respect to the Acquired Entities or any Purchased Asset is ongoing, pending or being proposed or threatened in writing by a Governmental Authority, (ii) no assessment, deficiency or adjustment with respect to material Taxes has been asserted, or proposed or threatened in writing, with respect to the Acquired Entities or any Purchased Asset, other than any assessment, deficiency or adjustment which has been fully satisfied by payment, settled or withdrawn, and (iii) in the past three years, no claim has been made by a Governmental Authority in a jurisdiction in which Seller and its Subsidiaries do not file Tax Returns or pay Taxes that Seller or any of its Subsidiaries is or may be required to file a Tax Return or pay Taxes in that jurisdiction with respect to the Acquired Entities or any Purchased Asset.

(c)     No Acquired Entity is a party to or bound by any Tax allocation, sharing, or indemnity agreement or arrangement with any Person (including any advance pricing agreement or other similar agreement relating to Taxes with any Governmental Authority) (other than any such agreement or arrangement entered into in the Ordinary Course that is not primarily related to Taxes) for which it will have any obligation after the Closing.

(d)     No Acquired Entity has requested or consented to extend the time or is the beneficiary of any extension of time (i) with respect to the due date for the filing of any Tax Return of any Acquired Entity (other than any automatic or automatically granted extension) or (ii) in which any Tax may be assessed or collected by any Governmental Authority (other than any extension which is no longer in effect or any automatic extension as a result of any ongoing Tax proceeding).

(e)     No Acquired Entity is subject to Tax in any jurisdiction, other than the country in which it is organized, by virtue of having, or being deemed to have, a permanent establishment, fixed place of business or similar presence.

(f)     There are no Encumbrances with respect to Taxes upon any of the Purchased Assets other than Permitted Encumbrances.

(g)     After the Closing, the Acquired Entities will not be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any Post-Closing Tax Period as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) "closing agreement" as described in

Section 7121 of the Code (or any corresponding or similar provision of U.S. state or local or non-U.S. Tax Law) executed prior to the Closing; (iii) intercompany transaction or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of U.S. state or local or non-U.S. Tax Law) entered into or created prior to the Closing; (iv) installment sale or open transaction disposition made prior to the Closing; or (v) cash method of accounting or long-term contract method of accounting utilized prior to the Closing.

(h)     Each of the Acquired Entities is classified for U.S. federal income Tax purposes as set forth on <u>Schedule 3.1.14(h)</u>.

**3.2     Representations and Warranties of Buyer**. Buyer represents and warrants to Seller as of the date hereof (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date) as follows.

3.2.1     <u>Entity Status</u>. Buyer is duly formed and validly existing under the laws of its jurisdiction of formation and has the requisite corporate power to enter into and perform its obligations under this Agreement and the Ancillary Agreements to which it is or will be a party.

3.2.2     <u>Authority</u>. The execution and delivery of and performance by Buyer of this Agreement and the Ancillary Agreements to which it is or will be a party have been, or will be at or prior to Closing, authorized by all necessary corporate action on the part of Buyer.

3.2.3     <u>No Conflict</u>. The execution and delivery of and performance by Buyer of this Agreement and the Ancillary Agreements to which it is or will be a party (a) do not and will not constitute or result in a violation or breach of, or conflict with, or allow any Person to exercise any rights under, any of the terms or provisions of Buyer's Organizational Documents, (b) do not and will not constitute or result in a breach or violation of, or conflict with or allow any Person to exercise any rights under, any Contract, license, lease or instrument to which it is a party; and (c) do not result in the violation of any Law applicable to Buyer, except in the case of clauses (b) and (c), as would not materially adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

3.2.4     <u>Required Authorizations</u>. Other than the entry of the Sale Order, no filing with (other than as required under the HSR Act), notice to or Order, Permit, approval, consent, waiver, license or similar authorization of, any Governmental Authority is required on the part of Buyer as a condition to the lawful consummation of the transactions contemplated by this Agreement or the Ancillary Agreements to which it is or will be a party.

3.2.5     <u>Execution and Binding Obligation</u>. This Agreement and the Ancillary Agreements to which Buyer is or will be a party have been, or will be, duly executed and delivered by Buyer and constitute, or will constitute, legal, valid and binding agreements of Buyer, enforceable against it in accordance with its terms, subject only to the Enforceability Exceptions.

3.2.6   <u>Financial Capacity</u>. Buyer has, and at Closing will have, sufficient cash to pay the Purchase Price and to make any other necessary payment contemplated by this Agreement or any of the Ancillary Agreements to be made at Closing.   Buyer's obligations under this Agreement are not and will not be subject to the receipt by Buyer of any financing.

3.2.7   <u>Litigation</u>. There is no material Litigation in progress, pending, or to Buyer's knowledge, threatened against Buyer, which prohibits, restricts or seeks to enjoin the transactions contemplated by this Agreement or the Ancillary Agreements.

3.2.8   <u>Qualification</u>.   As of the Closing, Buyer will be capable of satisfying the conditions contained in sections 365(b)(l)(C) and 365(f) of the Bankruptcy Code with respect to the Purchased Contracts. To the knowledge of Buyer, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

3.2.9   <u>No Broker</u>. No broker, agent or other intermediary is entitled to any fee, commission or other remuneration in connection with the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of Buyer.

3.2.10   <u>Solvency</u>. Assuming (x) the accuracy of the representations and warranties set forth in <u>Section 3.1</u> and (y) the performance by Seller of the covenants and agreements required to be performed by it under this Agreement prior to the Closing, immediately after giving effect to the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements (including any financings being entered into in connection therewith) and taking into account all obligations of Buyer pursuant to this Agreement and the Ancillary Agreements to which it is a party: (a) the fair saleable value of the assets of Buyer will be greater than the total amount of its Liabilities; (b) Buyer will be solvent and able to pay its debts and obligations in the Ordinary Course as they become due; (c) no transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement and the Ancillary Agreements with the intent to hinder, delay or defraud either present or future creditors of Buyer in connection with the transactions contemplated by this Agreement and/or the Ancillary Agreements; and (d) Buyer will have adequate capital to carry on its business and all businesses in which Buyer is about to engage.

3.2.11   <u>Independent Investigation</u>.   Buyer knowingly, willingly, irrevocably and expressly represents, warrants, acknowledges and agrees, on its own behalf and on behalf of its Affiliates, that Buyer has conducted to its satisfaction its own independent review and analysis of, and based thereon has formed an independent judgment concerning, the Transactions, the Business, the Purchased Assets and the Assumed Liabilities.   In entering into this Agreement, Buyer has relied solely upon its own review and analysis, and the specific representations and warranties of Seller expressly set forth in <u>Section 3.1</u> (as qualified or modified by the Seller Disclosure Schedule), and has not relied on, and hereby disclaims reliance on, any other representations, warranties, statements or omissions

(whether by Seller or another Person). Buyer confirms that Seller has made available to Buyer and Buyer's Representatives such opportunity to ask questions of the personnel of the Seller and its Subsidiaries, as well as such access to the offices, properties and books and records of the business of the Seller and its Subsidiaries as deemed appropriate by Buyer in connection with its determination to enter into this Agreement and consummate the Transactions.

3.3     **Exclusivity of Representations**. Except for the representations and warranties made by Seller in Section 3.1 or in any Ancillary Agreement to be delivered by Seller pursuant to this Agreement, neither Seller nor any other Person makes any express or implied representation or warranty with respect to Seller, its Subsidiaries or their businesses, assets, operations, liabilities, condition (financial or otherwise) or prospects, and Seller hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made by Seller in Section 3.1 or in any Ancillary Agreement to be delivered by Seller pursuant to this Agreement, neither Seller nor any of its Subsidiaries or Affiliates or any other Person makes or has made any representation or warranty to Buyer or any of its respective representatives, with respect to, nor has Buyer or any of its respective representatives relied on, (i) any financial projection, forecast, estimate, budget or prospective information relating to Seller, its Subsidiaries or the Business or (ii) any oral or written information furnished or made available to Buyer or any of its representatives in the course of its due diligence investigation of Seller and its Subsidiaries, the Business, the negotiation of this Agreement and the Ancillary Agreements or the consummation of the transactions contemplated hereby and thereby, including the accuracy, completeness or currency thereof, and neither Seller nor any of its Subsidiaries or Affiliates or any other Person will have any liability to Buyer or any other Person in respect of such information, including any subsequent use of such information.

## ARTICLE 4
## PRE-CLOSING COVENANTS

4.1     **Access and Information**.

4.1.1     During the Interim Period, Seller shall, and shall cause its Subsidiaries to, (a) afford Buyer and its Representatives reasonable access to the Business and the Purchased Assets, including the Acquired Entities, and information reasonably requested by Buyer pertaining to the Assumed Liabilities, and (b) use commercially reasonable efforts to cause its employees and Representatives to cooperate with and aid Buyer and its Representatives in its investigation of the Business. Any request or investigation under this Section 4.1.1 shall be made or conducted on a reasonable basis by Buyer providing reasonable Notice to Seller and shall be conducted during normal business hours in such a manner as not to interfere unreasonably with the conduct of the Business. Buyer acknowledges and agrees that Seller shall be entitled to restrict any such access to or restrict information (x) as determined, in its respective reasonable discretion, to be appropriate to ensure compliance with any Law, (y) that in the reasonable judgment of Seller would result in the disclosure of any Trade Secrets or any violation of any of its obligations with respect to confidentiality and/or (z) to preserve any applicable attorney client privilege, attorney work product or other legal privilege; *provided* that in the event any information is withheld pursuant to this sentence, Seller shall promptly notify Buyer and at Buyer's request, Seller

shall use commercially reasonable efforts to the extent feasible to develop an arrangement to communicate or provide the applicable information (or a portion thereof) in a manner that would not conflict with the foregoing clauses (x) and (y).

4.1.2    During the Interim Period, Buyer hereby agrees it shall not contact, and it shall cause its Affiliates or Representatives to not contact, any employee, licensor, licensee, competitor, supplier, distributor, franchisee, or customer of Seller or its Subsidiaries with respect to the Purchased Assets, the Business, this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby, without the prior written consent of Seller.

**4.2    Ordinary Course of Business**.  Except (w) with the prior written consent of Buyer, which consent shall not be unreasonably withheld or delayed, (x) as required by applicable Law or Order of the Bankruptcy Court, including the DIP Financing Order, (y) as expressly provided in this Agreement or on Section 4.2 of the Seller Disclosure Schedules, or (z) for actions taken by Seller or its Subsidiaries as required in connection with the Chapter 11 Cases, during the Interim Period, Seller shall:  (i) use commercially reasonable efforts to operate and/or maintain the tangible Purchased Assets in the Ordinary Course and in compliance with applicable Laws in all material respects, taking into account the resources (financial or otherwise) and personnel available to Seller, (ii) (A) not terminate or cancel any of the Purchased Contracts or Purchased Permits other than expirations of any Purchased Contracts in accordance with the terms of such Purchased Contracts, or (B) amend in any material respect or release, assign or waive any material rights under any Purchased Contract other than in the Ordinary Course or as provided for in the DIP Financing Order or as contemplated or permitted in the DIP Budget (as defined in the DIP Financing Order), (iii) not abandon or allow to lapse any rights in any material Owned Intellectual Property other than (A) in the Ordinary Course or (B) due to the expiration of issued or registered Owned Intellectual Property at the end of the maximum statutory term, (iv) not voluntarily permit any of the material Purchased Assets to become subject to any Encumbrance, except for Permitted Encumbrances, and (v) not sell, assign, license, transfer, convey, lease, sublease, surrender, relinquish, terminate or otherwise dispose of any material portion of the Purchased Assets other than (A) in the Ordinary Course or (B) the disposition of obsolete, worn out, used or immaterial assets.

**4.3    Notification of Certain Matters**.

4.3.1    From the Execution Date through two (2) Business Days prior to the Sale Hearing (and in any event within two (2) Business Days after Seller discovers the existence of any such Contract), Seller shall use commercially reasonable efforts to provide Buyer Notice of any Contract to which Seller or any of its Subsidiaries is a party as of the Execution Date that was not set forth on Section 2.1.1(a) of the Seller Disclosure Schedules and was not an Excluded Contract, and any Contracts that are entered into after the Execution Date, and Buyer shall be entitled, in its sole discretion and upon Notice to Seller (email to counsel being sufficient), to add any such Contract to Section 2.1.1(a) of the Seller Disclosure Schedules; *provided* that any dispute regarding Cure Costs associated with any of the foregoing Contracts shall be addressed as set forth in the Bidding Procedures Order. Notwithstanding anything to the contrary set forth herein, (i) Buyer shall have no right to add any Contract rejected, in accordance with Section 365 of the Bankruptcy Code, by Seller

prior to Seller receiving Notice from Buyer to include such Contract on <u>Section 2.1.1(a)</u> of the Seller Disclosure Schedules and (ii) Seller shall not reject any Contract set forth on <u>Section 2.1.1(a)</u> of the Seller Disclosure Schedules during the Interim Period without the prior written consent of Buyer.

4.3.2    If any Contract is added to <u>Section 2.1.1(a)</u> of the Seller Disclosure Schedules, the Seller shall promptly take such steps as are reasonably necessary, and shall promptly deliver notice to the non-debtor counterparty, to the extent necessary to cause any such added Contracts to be assumed by the Seller and assigned to the Buyer on the Closing Date or as soon as reasonably practicable thereafter.

4.3.3    Buyer's receipt of information under this <u>Section 4.3</u> shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement (including <u>Section 7.1</u>) and shall not be deemed to amend or supplement the Seller Disclosure Schedules.

**4.4    Obligation to Consummate the Transaction**. Each of the Parties agrees that it shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to the extent permissible under applicable Law, to consummate and make effective the transactions contemplated by this Agreement and to ensure that the conditions set forth in <u>Article 6</u> are satisfied.

**4.5    Filings; Other Actions; Notification and Cooperation**.

4.5.1    Seller and Buyer shall cooperate with each other and use, and shall cause their respective Affiliates and Subsidiaries to use, their respective reasonable best efforts to take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable under this Agreement and applicable Law to consummate and make effective the Transactions as expeditiously as reasonably practicable after the date of this Agreement, including: (i) preparing and filing all documentation to effect all necessary notices, reports and other filings (and in any event, by filing by no later twenty (20) Business Days after the date hereof, any notifications, filings and other information required to be filed under the HSR Act with respect to the Transactions, unless mutually agreed otherwise); (ii) obtaining as expeditiously as practicable all consents, registrations, approvals, permits and authorizations necessary to be obtained from any Governmental Authority in order to consummate the Transactions; and (iii) executing and delivering any reasonable additional instruments necessary to consummate the Transactions and to fully carry out the purposes of this Agreement. Nothing herein shall require Seller or any of its Subsidiaries to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations.

4.5.2    Buyer shall not, and shall cause its respective Subsidiaries not to, enter into a definitive agreement providing for, or consummate, any transaction which would reasonably be expected to materially delay or prevent consummation of the Transactions. Neither Party, without the other Party's prior written consent, shall: (i)

enter into any timing, settlement or similar agreement, or otherwise agree or commit to any arrangement, that would have the effect of extending, suspending, lengthening or otherwise tolling the expiration or termination of the waiting period applicable to the contemplated transactions under the HSR Act or any Antitrust Laws; or (ii) enter into any timing or similar agreement, or otherwise agree or commit to any arrangement, that would bind or commit the Parties not to consummate the Transactions (or that would otherwise prevent or prohibit the Parties from consummating the Transactions). As used in this Agreement, the term "**Antitrust Laws**" means the Sherman Act of 1890, the Clayton Act of 1914, the Federal Trade Commission Act of 1914, the HSR Act and all other federal, state and foreign statutes, rules, regulations, orders, decrees and other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition.

4.5.3   Buyer and Seller shall cooperate with one another, and consider in good faith the views of one another, with respect to the appropriate course of action with respect to obtaining the consents, approvals, permits, waiting period expirations or authorizations of any Governmental Authority required to consummate the Transactions prior to the Outside Date. No Party hereto or its counsel shall independently participate in any substantive call or meeting with any Governmental Authority in respect of any such filing, investigation, or other inquiry relating to the matters that are the subject of this Section 4.5 without giving the other Party or its counsel reasonable prior notice of such call or meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and participate. In furtherance of the foregoing and to the extent permitted by applicable Law: (i) each party shall notify the other, as far in advance as practicable, of any filing or material or substantive communication or inquiry it or any of its Subsidiaries intends to make with any Governmental Authority relating to the matters that are the subject of this Section 4.5; (ii) prior to submitting any such filing or making any such communication or inquiry, such Party shall provide the other Party and its counsel a reasonable opportunity to review, and shall consider in good faith the comments of the other Party in connection with, any such filing, communication or inquiry; (iii) promptly following the submission of such filing or making such communication or inquiry, such Party shall provide the other Party with a copy of any such filing or, if in written form, communication or inquiry; and (iv) each Party shall consult with the other Party in connection with any inquiry, hearing, investigation or litigation by, or negotiations with, any Governmental Authority relating to the Transactions, including the scheduling of, and strategic planning for, any meetings with any Governmental Authority relating thereto. In exercising the foregoing cooperation rights, Seller and Buyer each shall act reasonably and as promptly as reasonably practicable. Notwithstanding the foregoing, materials provided pursuant to this Section 4.5 may be reasonably redacted to (A) remove references concerning valuation, (B) comply with contractual arrangements, (C) comply with applicable Law, and (D) address legal privilege or confidentiality concerns.

4.5.4   In furtherance and not in limitation of the covenants of the Parties contained in this Section 4.5, Buyer, including its Affiliates, shall use its reasonable best efforts to resolve such objections, if any, as may be asserted by any Governmental

Authority under any Antitrust Law with respect to the Transactions and to avoid the entry of, or effect the dissolution of, any decree, order, judgment, injunction, temporary restraining order or other order in any suit or proceeding, as may be asserted by any Governmental Authority under any Antitrust Law that would otherwise have the effect of preventing, conditioning, delaying or otherwise hindering the consummation of the Transactions. For the purposes of this Section 4.5, "reasonable best efforts" shall mean taking any and all actions reasonably necessary to obtain the consents, approvals, permits, waiting period expirations or authorizations of any Governmental Authority required to consummate the Transactions no later than the Outside Date, including: (x) committing, agreeing or submitting (or offering to commit, agree or submit) to any consent decree, hold separate order, sale, divestiture, lease, license, transfer, disposal, Encumbrance, other change or restructuring of, or operating restriction with respect to the businesses, properties, product lines, assets, permits, operations, rights or interest therein of Buyer, its Affiliates, the Purchased Assets or any of the Business; or (y) committing, agreeing or submitting (or offering to commit, agree or submit) to any action or agreeing to any remedies, terms or conditions in connection with its obligations under this Section 4.5; *provided* that those actions, remedies, terms or conditions are conditioned on the consummation of the Transactions contemplated by this Agreement.

4.5.5    In furtherance and not in limitation of the covenants of the Parties contained in this Section 4.5, if any administrative or judicial action or proceeding, including any proceeding by a private party, is instituted challenging the Transactions as violative of any Antitrust Law, each of Seller and Buyer shall use reasonable best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the Transactions.

4.5.6    Seller and Buyer each shall, upon request by the other, promptly furnish the other with all information concerning itself, its Affiliates, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of Buyer, Seller or any of their respective Affiliates to any Third Party or any Governmental Authority in connection with the Transactions, all of which information shall be true and correct in all material respects when provided; *provided* that each Party shall be entitled to redact discussions of the transaction value and competitively sensitive information, and may reasonably designate applicable materials to be reviewed solely by the other Party's outside counsel.

4.5.7    Seller and Buyer each shall keep the other reasonably apprised of the status of matters relating to completion of the Transactions, including promptly furnishing the other with copies of notices or other communications received by Seller or Buyer, as the case may be, or any of their respective Affiliates from any Third Party or any Governmental Authority with respect to the Transactions, other than immaterial communications and communications on the docket in any of the Chapter 11 Cases.

4.5.8    Buyer shall bear the cost of any filing fee payable to a Governmental Authority in connection with any filings made under this Section 4.5.

# ARTICLE 5
## ADDITIONAL COVENANTS

**5.1    Further Assurances**.

5.1.1    Each of Seller and Buyer shall, at any time or from time to time after the Closing, at the request and expense of the other Party, take, or cause to be taken, all reasonable actions, and to do, or cause to be done, and to assist and cooperate with the other Party in doing, all reasonable things necessary to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including executing and delivering to the other Party all such reasonable instruments and documents or further reasonable assurances as the other Party may reasonably request, in each case that are consistent with the terms of this Agreement, in order to (a) vest in Buyer all of Seller's right, title and interest in and to the Purchased Assets (including the Purchased Intellectual Property) as contemplated hereby, (b) effectuate Buyer's assumption of the Assumed Liabilities, (c) confirm Seller's retention of the Excluded Assets and the Excluded Liabilities, and (d) grant to each Party all rights contemplated to be granted to such Party under this Agreement and the Ancillary Agreements; *provided, however*, that after the Closing, apart from such foregoing customary further assurances, neither Seller nor Buyer shall have any other obligations except as specifically set forth and described herein or in the Ancillary Agreements.

5.1.2    At the Closing (a) Seller shall, pursuant to the Sale Order, assign to Buyer each of the Purchased Contracts that is capable of being assigned and (b) Seller shall pay all Cure Costs (if any) set forth in the certificate to be delivered pursuant to <u>Section 2.3.2</u> to the extent Buyer has paid the amount of such Cure Costs to Seller pursuant to <u>Section 2.3.1</u>, in each case in connection with such assignment, and Buyer shall assume and discharge when due the Assumed Liabilities (if any) under the Purchased Contracts. Except as to Purchased Contracts assigned pursuant to section 365 of the Bankruptcy Code or the Sale Order, anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Contract or other Purchased Asset or any right thereunder if an attempted assignment, without the consent of a Third Party, would constitute a breach or in any way adversely affect the rights of Buyer or Seller thereunder, and Seller, at Buyer's expense (if any), shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible.  If such consent is not obtained or such assignment is not attainable pursuant to section 365 of the Bankruptcy Code or the Sale Order, or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Assets (including with respect to the Equity Securities of the Acquired Entities) in question so that Buyer would not in effect acquire the benefit of all such rights, then Seller, to the maximum extent permitted by applicable Law, shall act after the Closing, at Buyer's request and expense, as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by applicable Law, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Seller and its Subsidiaries are not under any obligation to pay any money to a Third Party (unless Buyer agrees in writing to reimburse Seller in advance for such payment), incur any material obligations, commence any Litigation (provided that Seller shall, at the sole cost and expense of Buyer, reasonably cooperate in any Litigation initiated by Buyer in the Bankruptcy Court

- 32 -

regarding the assumption and assignment of any Purchased Contract and matters related thereto) or offer or grant any material accommodation (financial or otherwise) to any Third Party in order to obtain any approval, consent or waiver. All obligations of Seller under this Section 5.1.2 shall expire on the date that is twelve (12) months after the Closing Date.

**5.2    Publicity**. No press release, public statement or announcement or other public disclosure (a "**Public Statement**") with respect to this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby may be made except (a) with the prior written consent and joint approval of Buyer and Seller, not to be unreasonably withheld, or (b) if required by applicable Law, the Chapter 11 Cases, a Governmental Authority, or stock exchange requirements. Where the Public Statement is required by applicable Law, the Chapter 11 Cases, a Governmental Authority, or stock exchange requirement, the Party required to make the Public Statement will use its commercially reasonable efforts to consult with the other Party, and consider in good faith any revisions proposed by the other Party, prior to making such disclosure, and shall limit such disclosure to only that information that is legally or otherwise required to be disclosed.

**5.3    Certain Tax Matters**.

5.3.1    Withholding Taxes.

(a)    The amounts payable by one Party (the "**Payer**") to another Party (the "**Payee**") pursuant to this Agreement ("**Payments**") shall not be reduced on account of any Taxes unless required by applicable Law. The Payee alone shall be responsible for paying any and all Taxes (other than withholding Taxes required to be paid by the Payer under applicable Law) levied on account of, or measured in whole or in part by reference to, any Payments it receives. The Payer shall deduct or withhold from the Payments any Taxes that it is required by applicable Law to deduct or withhold, and all such amounts deducted and withheld that are timely remitted to the appropriate Governmental Authority shall be treated for all purposes of this Agreement as having been paid to Payee. Notwithstanding the foregoing, if the Payee is entitled under any applicable Law or Tax treaty to a reduction of rate of, or the elimination of, or recovery of, applicable withholding Tax, it shall timely deliver to the Payer or the appropriate Governmental Authority (with the assistance of the Payer to the extent that this is reasonably required) the prescribed forms necessary to reduce the applicable rate of withholding or to relieve the Payer of its obligation to withhold Tax, and the Payer shall apply the reduced rate of withholding, or dispense with the withholding, as the case may be, to the extent it complies with the applicable Law or Tax treaty. If, in accordance with the foregoing, the Payer withholds any amount, it shall make timely payment to the proper Taxing Authority of the withheld amount, and send to the Payee proof of such payment as soon as reasonably practicable.

(b)    Seller shall deliver to Buyer a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to section 1445 of the Code stating that Seller is not a "foreign person" as defined in section 1445 of the Code or a properly completed IRS Form W-9.

5.3.2    Transfer Taxes and Apportioned Obligations.

(a)     All amounts payable hereunder or under any Ancillary Agreement are exclusive of all recordation, transfer, documentary, stamp, conveyance, value added, sales, consumption, goods and services taxes or other similar Taxes and fees imposed or levied by reason of, in connection with or attributable to this Agreement and the Ancillary Agreements or the transactions contemplated hereby and thereby (collectively, "**Transfer Taxes**"). Buyer shall be responsible for the payment of all Transfer Taxes, and shall pay all amounts due and owing in respect of any Transfer Taxes, these amounts in addition to the sums otherwise payable, at the rate in force at the due time for payment or such other time as is stipulated under applicable Law and shall timely and properly file all Tax Returns with respect to any Transfer Taxes.

(b)     All personal property and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Seller and Buyer based on the number of days of such taxable period ending on the Closing Date (such portion of such taxable period, the "**Pre-Closing Tax Period**") and the number of days of such taxable period beginning on the day after the Closing Date (such portion of such taxable period, the "**Post-Closing Tax Period**"). Seller shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Post-Closing Tax Period.

5.3.3   <u>Cooperation and Exchange of Information</u>. Each of Seller and Buyer shall (a) provide the other with such assistance as may reasonably be requested by the other Party (subject to reimbursement of reasonable out-of-pocket expenses) in connection with the preparation of any Tax Return, audit or other examination by any Taxing Authority or judicial or administrative proceeding relating to Liability for Taxes in connection with the Business or the Purchased Assets, (b) retain and provide the other Party with any records or other information that may be relevant to such Tax Return, audit or examination, or proceeding and (c) inform the other Party of any final determination of any such audit or examination or proceeding that affects any amount required to be shown on any Tax Return of the other for any period.

**5.4     Accounts Receivable and Payable**.

5.4.1   <u>Accounts Receivable</u>. The Parties acknowledge and agree that all Accounts Receivable that are Purchased Assets shall become the property of Buyer subsequent to the Closing. In the event that, subsequent to the Closing, Seller or any of its Subsidiaries receives any payments from any obligor with respect to an such Accounts Receivable outstanding on the Closing Date, then Seller shall, or shall cause such Subsidiary to, within thirty (30) days after receipt of such payment, remit the full amount of such payment to Buyer.

5.4.2   <u>Accounts Payable</u>. In the event that, subsequent to the Closing, Seller or any of its Subsidiaries receives any invoices from any Third Party with respect to any account payable of the Business, then Seller shall remit such invoice to Buyer and Buyer shall be responsible for payment thereof.

5.5     **Wrong Pockets**.

5.5.1   <u>Assets</u>. Without limiting <u>Section 5.1</u>, if either Buyer or Seller becomes aware subsequent to the Closing that any of the Purchased Assets has not been transferred to Buyer or that any of the Excluded Assets has been transferred to Buyer, it shall promptly notify the other Party and the Parties shall, and shall cause their Subsidiaries to, as soon as reasonably practicable, take all commercially reasonable actions (including executing any further instruments or documents) to ensure that such property is transferred, with any necessary prior Third Party consent or approval, to (a) Buyer, in the case of any Purchased Asset that was not transferred to Buyer at the Closing; or (b) Seller, in the case of any Excluded Asset that was transferred to Buyer at the Closing.

5.5.2   <u>Payments</u>. If, on or after the Closing, either Party shall receive any payments or other funds due to or belonging to the other Party pursuant to the terms of this Agreement or any Ancillary Agreement, then the Party receiving such funds shall, within thirty (30) days after receipt of such funds, forward such funds to the proper Party. The Parties acknowledge and agree there is no right of offset regarding such payments and a Party may not withhold funds received from Third Parties for the account of the other Party in the event there is a dispute regarding any other issue under this Agreement or any of the Ancillary Agreements.

5.6     **Purchased Intellectual Property**. Promptly following the Closing, at Buyer's sole cost and expense, Seller shall take such further commercially reasonable actions and execute such further reasonable documents as may be necessary or reasonably requested by Buyer to effectuate, evidence and perfect the assignment and transfer of the Owned Intellectual Property to Buyer, including making such filings with any Governmental Authorities as may be required to transfer the Owned Intellectual Property to Buyer.

5.7     **Bankruptcy Court Filings and Approval**.

5.7.1   Seller shall use its commercially reasonable efforts to obtain entry of the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated by this Agreement. Promptly after execution of this Agreement, Seller shall file with the Bankruptcy Court the proposed Sale Order in form and substance acceptable to Seller and Buyer seeking entry of an order substantially in the form to be filed with the Bankruptcy Court, which proposed form shall be in form and substance acceptable to the Seller and the Buyer, and with such changes the Seller and the Buyer find reasonably acceptable, authorizing and approving pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, inter alia, (a) the sale of the Purchased Assets of the Seller to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances (to the extent set forth herein), other than Permitted Encumbrances and Assumed Liabilities, (b) the assumption and assignment of the Purchased Contracts to Buyer; (c) Seller has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (d) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, and (e) Buyer shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the

Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (as amended, modified, or supplemented, the "**Sale Order**") and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated by this Agreement.

5.7.2   Seller shall give appropriate notice, and provide appropriate opportunity for hearing, to all Persons entitled thereto, of all motions, orders, hearings, and other proceedings relating to this Agreement or any Ancillary Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

5.7.3   Seller and Buyer shall take all commercially reasonable actions as may be reasonably necessary to cause the Sale Order to become a Final Order, including, to the extent reasonably practicable, furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Buyer agrees that it will promptly take such commercially reasonable actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of (x) providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

5.7.4   Buyer acknowledges that under the Bankruptcy Code, the sale is subject to approval of the Bankruptcy Court. Buyer acknowledges that to obtain such approval Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best bid possible for the assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the assets to prospective Qualified Bidders (as defined in the Bidding Procedures Order), and entertaining any higher or otherwise better offers from prospective Qualified Bidders.

5.7.5   If the Bidding Procedures Order, Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order, Bidding Procedures Order or other such order), and this Agreement has not otherwise been terminated pursuant to Section 8.1, Seller shall immediately notify Buyer of such appeal, petition, or motion and shall use commercially reasonable efforts to defend such appeal, petition, or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition, or motion.

5.7.6   Subject to entry of the Sale Order, (a) on or prior to the Closing, Buyer shall pay the Cure Costs to Seller in accordance with Section 2.3.1 and cure any and all other defaults and breaches under the Purchased Contracts to the extent required under section 365

of the Bankruptcy Code (excluding any Purchased Contracts in which there is an unresolved objection by a non-debtor Purchased Contract counterparty to the Cure Costs asserted by Seller with regard to any such Contract or other dispute as to the assumption or assignment of such Contract as of the Sale Hearing (such contract, a "**Disputed Contract**") for which Cure Costs (or other matters related to the assumption and assignment of such Contract) have not been consensually agreed with the Contract counterparty and Seller or fixed by an order of the Bankruptcy Court as of the Closing) so that such Purchased Contracts may be assumed by Seller and assigned to Buyer (subject to payment by Buyer of the Cure Costs to Seller and provision by the Buyer of adequate assurance of future performance), and (b) with respect to each Purchased Contract that is a Disputed Contract for which Cure Costs (or other matters related to the assumption and assignment of such Contract) have not been consensually agreed upon with the Contract counterparty and Seller or fixed by an order of the Bankruptcy Court, on the date that is five (5) Business Days after the date on which (i) the Cure Costs with respect to such Purchased Contract have been consensually agreed, or (ii) the Bankruptcy Court has entered an order fixing such Cure Costs, Buyer shall pay such Cure Costs to Seller in accordance with <u>Section 2.3.1</u> so that such Purchased Contracts may be assumed by the Seller and assigned to the Buyer (subject to provision by the Buyer of adequate assurance of future performance), in each case of the foregoing clauses (a) and (b), in accordance with the provisions of Section 365 of the Bankruptcy Code, the Bidding Procedures Order, the Sale Order, and this Agreement.

**5.8**    **Copies of Pleadings**. Seller shall consult with Buyer concerning the Sale Order and any other Orders of the Bankruptcy Court relating to the transactions contemplated hereby, and the bankruptcy pleadings and proceedings in connection therewith. To the extent reasonably practicable prior to filing thereof, Seller shall provide Buyer with drafts of all documents, motions, orders, filings or pleadings that Seller proposes to file with the Bankruptcy Court that relate to the approval of this Agreement, the Sale Order and the consummation of the transactions contemplated hereby. Seller shall also promptly provide Buyer with copies of all pleadings received by or served by or upon Seller in connection with the Chapter 11 Cases that relate to or, in Seller's judgment, are reasonably expected to affect the transactions provided for in this Agreement and which have not, to the actual knowledge of Seller, otherwise been served on Buyer.

**5.9**    **Books and Records**. For a period of six (6) years after the Closing, Buyer shall: (a) retain all books and records related to the Purchased Assets, the Assumed Liabilities and the Business (including all Purchased Books and Records); and (b) upon reasonable notice and during normal business hours, cooperate with and provide Seller, any of Seller's Affiliates, and the officers, employees, agents and Representatives of Seller and Seller's Affiliates reasonable access (including the right to make copies at Seller's expense or the expense of any Affiliate of Seller) to such books and records and to Buyer's Representatives, to the extent necessary for a reasonable business purpose, including as may be necessary for the preparation of financial statements, withholding or tax forms, Tax Returns, in connection with any Litigation, or in connection with the administration of the Chapter 11 Cases or the wind-down of its remaining business and operations, and to any and all books and records relating to any Purchase Price payments or any related reports, including all documents, work papers, schedules, memoranda, and records used by or prepared by Buyer or its Representatives in preparing any such reports, together with any other information related thereto which Seller may reasonably request. Notwithstanding the foregoing, Buyer shall not be required by this <u>Section 5.9</u> to provide Seller, any of Seller's Affiliates, and the

officers, employees, agents and Representatives of Seller and Seller's Affiliates with access to or to disclose information (i) the disclosure of which would violate applicable Law, (ii) that in the reasonable judgment of Buyer would result in the disclosure of any Trade Secrets of third parties or violate any of its obligations with respect to confidentiality or (iii) the disclosure of which would cause the loss of any attorney-client, attorney work product or other legal privilege.

**5.10     Trade Notification**. Seller and Buyer shall consult with each other on the timing, method, form and content of notifications to customers and suppliers regarding the transactions contemplated by this Agreement, and shall consider in good faith any comments or proposed changes received from the other Party.

**5.11     Employee Matters**.

5.11.1 <u>Offers of Employment</u>. No later than twenty (20) Business Days prior to the Closing Date, Buyer shall offer employment on an at-will basis to be effective as of the Closing to each Offer Employee (the Offer Employees who accept such an offer of employment, together with the Automatic Transfer Employees, collectively referred to herein as the "**Continuing Employees**"). Seller will cooperate with any reasonable requests by Buyer in order to facilitate the offers of employment and delivery of such offers to the Offer Employees. Each offer made pursuant to this <u>Section 5.11.1</u> shall provide for (a) base salary or hourly wage rate, as applicable, not less than such Offer Employee's base salary or hourly wage rate as in effect immediately prior to the Closing Date, (b) annual cash incentive compensation opportunities (excluding any equity-based, long-term incentive or retention opportunities), to the extent applicable, that are reasonably comparable, in the aggregate, to the annual cash incentive compensation opportunities provided to such Offer Employee by Seller and its Subsidiaries immediately prior to the Closing Date, to the extent applicable, and (c) employee benefits (including health, welfare, severance, and retirement benefits but excluding deferred compensation, post-employment welfare benefits and qualified and non-qualified defined benefit pension benefits) that are reasonably comparable, in the aggregate, to the employee benefits (including health, welfare, severance, and retirement benefits but excluding deferred compensation, post-employment welfare benefits and qualified and non-qualified defined benefit pension benefits) provided to such Offer Employee by Seller and its Subsidiaries immediately prior to the Closing Date.

5.11.2 <u>Terms and Conditions of Employment</u>. Until December 31, 2025 (or, if earlier, until the relevant Continuing Employee's termination of service following the Closing), (i) Buyer shall not, and shall cause its Affiliates not to, with respect to any Continuing Employee subject to an offer of employment made and accepted in accordance with <u>Section 5.11.1</u>, reduce, decrease or detrimentally change the terms and conditions of the employment of any such Continuing Employee, as set forth in the applicable offer of employment described in <u>Section 5.11.1</u>, and (ii) each Automatic Transfer Employee shall receive (a) base salary or hourly wage rate, as applicable, not less than such Automatic Transfer Employee's base salary or hourly wage rate as in effect immediately prior to the Closing Date, (b) annual cash incentive compensation opportunities (excluding any equity-based, long-term incentive or retention opportunities), to the extent applicable, that are reasonably comparable, in the aggregate, to the annual cash incentive compensation opportunities provided to such Automatic Transfer Employee by Seller and its Subsidiaries

- 38 -

immediately prior to the Closing Date, to the extent applicable, and (c) employee benefits (including health, welfare, severance, and retirement benefits but excluding deferred compensation, post-employment welfare benefits and qualified and non-qualified defined benefit pension benefits) that are reasonably comparable, in the aggregate, to the employee benefits (including health, welfare, severance, and retirement benefits but excluding deferred compensation, post-employment welfare benefits and qualified and non-qualified defined benefit pension benefits) provided to such Automatic Transfer Employee by Seller and its Subsidiaries immediately prior to the Closing Date.

5.11.3 <u>Buyer Benefit Plans</u>. In respect of all employee benefit plans, programs, policies, contracts, or other arrangements (whether written or unwritten) established or maintained by Buyer or its Affiliates (collectively, "**Buyer Benefit Plans**"), Buyer shall (i) waive all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to each Continuing Employee, (ii) for the year in which the Closing Date occurs, provide each Continuing Employee with credit for all co-payments and deductibles paid by such Continuing Employee prior to the Closing Date, and (iii) for purposes of determining eligibility to participate, vesting, benefit accrual and determination of the level of benefits (excluding for purposes of (A) benefit accruals under any defined benefit pension plan or retiree health or welfare plan or arrangement and (B) vesting in any equity or equity based or other compensation plan), recognize each Continuing Employee's service with Seller and its Subsidiaries to the same extent that such service was recognized under the corresponding Plans prior to the Closing Date; <u>provided</u> that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits.

5.11.4 <u>Employee Communications</u>. Prior to the Closing, except as required by Law, Buyer shall not issue any communication (including any electronic communication) to any Business Employee or Automatic Transfer Employee without the prior written approval of Seller. Except as required by Law, the Parties shall mutually consider and agree to the contents, scope, form and timing of any communications by Buyer with the Business Employees and Automatic Transfer Employees on all employment-related matters pertaining to the Transactions (the "**Employment Matters**"). The Parties agree that at all times prior to the Closing they will consult with each other prior to carrying out any communication sessions relating to Employment Matters or otherwise effecting any communications to the Business Employees and/or Automatic Transfer Employees relating to Employment Matters.

5.11.5 <u>Offer Employee Transfer Date</u>.   The Parties intend for the employment of the Offer Employees to continue uninterrupted on and after the Closing Date. Accordingly, unless a written acceptance is required by applicable Law, an Offer Employee who receives an offer of employment from Buyer and who is employed, as of the Closing Date, with Seller or its Affiliate and who continues employment with Buyer or any of its Affiliates shall be deemed to have accepted the offer of employment unless it is affirmatively declined by such Business Employee in a writing addressed to Buyer (the Closing Date, unless declined, the "**Business Employee Transfer Date**").   Upon the Business Employee Transfer Date, such Business Employee will become an employee of Buyer or its Affiliate and as of the Business Employee Transfer Date, such Business Employee shall terminate

employment with the Seller and its Affiliates and cease to actively participate in or accrue benefits under any Plan other than any Acquired Entity Plan.

5.11.6 <u>Alien Employees</u>.  Buyer shall employ, or cause its Affiliates to employ, those Offer Employees who are foreign nationals working in the United States in non-immigrant status and those Offer Employees for whom there are pending or approved I-140 immigrant petitions as of the Closing Date (collectively, the "**Alien Employees**"), under terms and conditions such that Buyer and its Affiliates qualify as a "successor employer" under applicable United States immigration laws effective as of the Closing Date, including, but not limited to, 8 U.S.C. 1184(c)(10).  As of the day after the Closing Date, the Buyer and its Affiliates shall assume all immigration-related liabilities and responsibilities under applicable United States immigration laws with respect to such Alien Employees.

5.11.7 <u>COBRA Continuation Coverage</u>.  Buyer shall be responsible for, and shall assume all Liabilities in respect of, affording continuation coverage under Section 4980B of the Code (and any comparable state law) for all individuals who are "M&A qualified beneficiaries," as such term is defined in U.S. Treasury Regulation Section 54.4980B-9, from and after the Closing ("**COBRA Continuation Coverage**").

5.11.8 <u>Third-Party Beneficiaries</u>. This <u>Section 5.11</u> shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement; nothing in this <u>Section 5.11</u>, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature whatever; and no provision of this <u>Section 5.11</u> will create any third-party beneficiary rights in any current or former employee, officer, director or individual independent contractor of Seller or any of its Affiliates in respect of continued employment (or resumed employment) or service or any other matter. This <u>Section 5.11</u> shall not be considered, or deemed to be, an amendment to any Plan or any compensation or benefit plan, program, agreement or arrangement of Buyer or any of its Affiliates. Nothing in this <u>Section 5.11</u> shall (i) obligate Buyer or any of its Affiliates to continue to employ any Continuing Employee for any specific period of time following the Closing Date, subject to the requirements of applicable Law or (ii) except as expressly set forth in this <u>Section 5.11</u>, limit the right of Buyer, Seller or any of their respective Affiliates to, at any time, change or modify any incentive compensation or employee benefit plan or arrangement at any time and in any manner.

**5.12     Insurance**. Buyer hereby acknowledges and agrees that, effective upon the Closing, all policies of, and binders evidencing, any form or type of insurance that are owned or maintained by Seller or any of its Affiliates that cover or relate to Seller, its Subsidiaries, or any of their respective assets, liabilities, employees, businesses or operations (such policies and binders, the "**Seller Insurance Coverage**") may be terminated or modified by Seller or any of its Affiliates to exclude coverage of the Purchased Assets (including the Acquired Entities), the Continuing Employees and the Assumed Liabilities, and neither Seller nor any of its Affiliates will be purchasing or otherwise acquiring any "tail" policy or other additional or substitute coverage for the foregoing.  Any refund, rebate, credit or other amount paid, distributed or returned by any insurance provider or other Person in respect of, or relating to, Seller's or any of its Affiliates' termination or modification of any Seller Insurance Coverage shall be the property of Seller or such Affiliate.

- 40 -

**ARTICLE 6**
**CONDITIONS PRECEDENT**

    **6.1**    **Conditions to Obligations of Buyer and Seller**. The obligations of Buyer and Seller to complete the transactions contemplated by this Agreement are subject to the satisfaction or waiver (if permitted by applicable Law) at or prior to the Closing of the following conditions:

        6.1.1    <u>No Illegality or Law</u>. There shall not be in effect any applicable Law that enjoins or prohibits the transactions contemplated by this Agreement.

        6.1.2    <u>Bankruptcy Orders</u>. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and such order shall not have been reversed or stayed.

        6.1.3    <u>Regulatory Approvals</u>. Any waiting period (including any extension thereof) or approvals applicable to the consummation of the transactions contemplated by this Agreement under the HSR Act [and the Laws set forth on <u>Section 6.1.3</u> of the Seller Disclosure Schedules] shall have expired or terminated.

    **6.2**    **Conditions to Obligations of Buyer**. The obligation of Buyer to complete the transactions contemplated by this Agreement is subject to the satisfaction, or waiver (if permitted by applicable Law) by Buyer, at or prior to the Closing of the following additional conditions:

        6.2.1    <u>Truth of Representations and Warranties</u>. The representations and warranties of Seller contained in <u>Section 3.1.1</u> (*Organization; Good Standing; Qualification*), <u>Section 3.1.2</u> (*Authority and Enforceability*), <u>Section 3.1.4</u> (*No Broker*), and <u>Section 3.1.5</u> (*Capitalization*) must be true and correct in all material respects as of the Closing with the same force and effect as if such representations and warranties were made on and as of such date (*provided* that if a representation and warranty speaks only as of a specific date it only needs to be true and correct as of that date) and all other representations and warranties of Seller contained in <u>Section 3.1</u> must be true and correct (disregarding any "materiality", "Material Adverse Effect" or similar qualifications contained therein) as of the Closing with the same force and effect as if such representations and warranties were made on and as of such date (*provided* that if a representation and warranty speaks only as of a specific date it only needs to be true and correct as of that date), except where the failure of such representations and warranties to be so true and correct would not have, or be reasonably expected to have, a Material Adverse Effect. Seller shall also have executed and delivered a certificate confirming the foregoing signed by an officer of Seller.

        6.2.2    <u>Performance of Covenants</u>. Seller must have fulfilled or complied, in all material respects, with all covenants contained in this Agreement required to be fulfilled or complied with by it at or prior to the Closing. Seller shall also have executed and delivered a certificate confirming the foregoing signed by an officer of Seller.

        6.2.3    <u>Material Adverse Effect</u>.  Since the date of this Agreement, there shall not have occurred a Material Adverse Effect.

6.2.4   <u>Closing Deliveries</u>. At or prior to the Closing, Buyer must have received the following:

(a)    a true and complete copy of the Sale Order, as entered by the Bankruptcy Court;

(b)    the certificates referred to in <u>Section 6.2.1</u> and <u>Section 6.2.2</u>;

(c)    a receipt acknowledging receipt of the Closing Payment, in satisfaction of Buyer's obligations pursuant to <u>Section 2.3</u>, validly executed by a duly authorized representative of Seller; and

(d)    each of the Ancillary Agreements to which Seller or any of its Subsidiaries is a party, validly executed by a duly authorized representative of Seller or its applicable Subsidiary.

**6.3    Conditions to Obligations of Seller**. The obligation of Seller to complete the transactions contemplated by this Agreement is subject to the satisfaction, or waiver (if permitted by applicable Law) by Seller, at or prior to the Closing of the following additional conditions:

6.3.1   <u>Truth of Representations and Warranties</u>**.** The representations and warranties of Buyer contained in <u>Section 3.2</u> must be true and correct in all respects (disregarding any "materiality" or similar qualifications contained therein) as of the Closing with the same force and effect as if such representations and warranties were made on and as of such date (*provided* that if a representation and warranty speaks only as of a specific date it only needs to be true and correct as of that date), except where the failure of such representations and warranties to be so true and correct would not, or be reasonably expected, to, materially adversely affect the ability of Buyer to consummate the transactions contemplated hereby. Buyer shall also have executed and delivered a certificate confirming the foregoing, signed by an officer of Buyer.

6.3.2   <u>Performance of Covenants</u>. Buyer must have fulfilled or complied, in all material respects, with all covenants contained in this Agreement required to be fulfilled or complied with by it at or prior to the Closing. Buyer shall also have executed and delivered a certificate confirming the foregoing, signed by an officer of Buyer.

6.3.3   <u>Closing Deliveries</u>. At or prior to the Closing, Seller must have received the following:

(a)    a true and complete copy of the Sale Order, as entered by the Bankruptcy Court;

(b)    the certificates referred to in <u>Section 6.3.1</u> and <u>Section 6.3.2</u>;

(c)    each of the Ancillary Agreements to which Buyer or any of its Affiliates is a party, validly executed by a duly authorized representative of Buyer or its applicable Affiliate;

(d)     the Closing Payment in accordance with <u>Section 2.3.1</u> (along with a U.S. Federal Reserve reference or similar number evidencing execution of such payment);

(e)     the Deposit (together with all accrued interest or other earnings thereon) from the Escrow Agent.

6.3.4   <u>Concurrent Closing</u>. [The transactions contemplated by [•, [including by the applicable Back-up Bidders (as specified in the Sale Order or other Order of the Bankruptcy Court) for such assets]] shall have been consummated substantially concurrently with, and subject to the occurrence of, the Closing.][7]

# ARTICLE 7
# NO SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-CLOSING COVENANTS

**7.1**    **No Survival**. The representations and warranties of the Parties and the covenants and agreements of the Parties that are to be performed prior to the Closing, whether contained in this Agreement or in any agreement or document delivered pursuant to this Agreement, shall not survive beyond the Closing and there shall be no liability following the Closing in respect thereof, whether such liability has accrued prior to or after the Closing, on the part of any Party or any of its officers, directors, equityholders, managers, agents or Affiliates; *provided*, *however*, that this <u>Section 7.1</u> shall not limit any covenant or agreement of the Parties that by its terms contemplates performance after the Closing, and such covenants or agreements shall survive until fully performed in accordance with the terms of this Agreement.

**7.2**    **No Recourse**. Except to the extent otherwise expressly provided in <u>Section 9.9</u>, Buyer's sole and exclusive remedy (a) for a breach of any representation or warranty made by Seller herein or in any document, certificate or instrument delivered pursuant hereto or (b) for a breach of any covenant made by Seller herein or in any document, certificate or instrument delivered pursuant hereto and required to be performed by Seller at or prior to the Closing, shall, in either case, be limited to Buyer's right to terminate this Agreement solely to the extent permitted pursuant to <u>Section 8.1</u>, in which case Seller shall not have any liability except to the extent expressly provided in <u>Section 8.2</u> (whether in equity or at Law, in Contract, in tort or otherwise). Except to the extent otherwise expressly provided in <u>Section 9.9</u>, Seller's sole and exclusive remedy (i) for a breach of any representation or warranty made by Buyer herein or in any document, certificate or instrument delivered pursuant hereto or (ii) for a breach of any covenant made by Buyer herein or in any document, certificate or instrument delivered pursuant hereto and required to be performed by Buyer at or prior to the Closing, shall, in either case, be limited to Seller's right to terminate this Agreement solely to the extent permitted pursuant to <u>Section 8.1.2</u> and to receive the Deposit pursuant to <u>Section 8.2</u>, in which case Buyer shall not have any further liability of any kind (whether in equity or at Law, in Contract, in tort or otherwise), except for intentional breach of this Agreement.

---

[7]   **Note to Draft**: Section to be removed to the extent that this Agreement constitutes a Sufficient Bid on its own.

## ARTICLE 8
## TERMINATION

**8.1**     **Termination**. This Agreement may, by Notice given prior to the Closing, be terminated:

8.1.1    by mutual written agreement of Buyer and Seller;

8.1.2    by Buyer or Seller if there has been a material breach of the Sale Order or this Agreement by the other Party such that the conditions of Closing (a) set forth in Section 6.2.1 or Section 6.2.2, in the case of a termination by Buyer, or (b) set forth in Section 6.3.1 or Section 6.3.2, in the case of a termination by Seller, would not be satisfied (*provided* that the non-breaching Party is not also in breach of this Agreement so as to cause the conditions of Closing for the benefit of the other Party to not be satisfied), and such breach has not been cured within twenty (20) days following Notice of such breach by the non-breaching Party; *provided* that, for greater certainty, a failure by Buyer to provide, or cause to be provided, Seller with sufficient funds to complete the transactions contemplated by this Agreement at the time which the Closing should have occurred shall not be subject to this Section 8.1.2 and shall only be subject to Section 8.1.8;

8.1.3    by Buyer or Seller if an Alternative Transaction is entered into other than in connection with an Auction;

8.1.4    by Buyer, if, following the date of this Agreement, the Sale Order is stayed, reversed, modified, vacated or amended in any  manner materially adverse to Buyer without the prior written consent of Buyer  (with email being sufficient), which consent may not be unreasonably withheld, conditioned, or delayed, and such stay, reversal, modification, amendment or vacation is not eliminated or undone within thirty (30) days; *provided* that the right to terminate this Agreement under this Section 8.1.4 shall not be available to Buyer if Buyer failed to fulfill any material obligation under this Agreement and such failure is the cause of, or resulted in, such stay, reversal, modification, amendment or vacation;

8.1.5    by Buyer, if the Bankruptcy Court enters a Final Order with respect to the Business (a) dismissing the Chapter 11 Cases or converting the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code, or (b) appointing a trustee, receiver or other Person responsible for operation or administration of Seller or its business or assets, or a responsible officer for Seller, or an examiner with enlarged powers relating to the operation or administration of Seller or its business or assets (each, an "**Appointee**"); *provided* that, the definition of "Appointee" shall not include any chief restructuring officer that has been or that may be appointed by the Seller and authorized by the Bankruptcy Court in the Chapter 11 Cases;

8.1.6    by Buyer or Seller if Closing has not occurred by the Outside Date; *provided* that such terminating Party is not in material breach of this Agreement at the time of such termination; *provided, further*, that if the Closing shall not have occurred on or prior to the Outside Date because any approval of a Governmental Authority pursuant to the HSR Act [or the Laws set forth on Section 6.1.3 of the Seller Disclosure Schedules] has not been

obtained by the Outside Date (or any waiting period under the HSR Act or any such other Law has not expired by the Outside Date), and if all other conditions to the Closing were satisfied or waived as of the Outside Date (other than those conditions which are to be satisfied only on the Closing Date), then, at the sole option of Seller or Buyer, the Outside Date shall be extended from time to time for a period of up to one (1) Business Day before the then-existing Maturity Date (as defined in the DIP Credit Agreement (as defined in the Final DIP Order)) and on the date that is one (1) Business Day after receipt of such approval(s) is obtained (or such waiting period has expired), all of the conditions to the Closing shall be deemed satisfied or waived (other than those conditions which are to be satisfied only on the Closing Date);

8.1.7   by Buyer or Seller (*provided* such terminating Party is not in material breach of this Agreement) if a Governmental Authority of competent jurisdiction shall have issued a final and non-appealable Order or taken any other non-appealable final action, in each case, having the effect of permanently making the consummation of the transactions contemplated by this Agreement illegal or otherwise permanently restraining or prohibiting consummation of the transactions contemplated by this Agreement; and

8.1.8   by Seller, if (a) (i) all of the conditions set forth in Sections 6.1 and 6.2 are satisfied or waived by Buyer as of the Closing Date (other than those conditions that, by their nature, can only be satisfied as of the Closing Date, but which would be satisfied as of the Closing Date), (ii) Seller has notified Buyer in writing that (x) it is ready, willing and able to consummate the transactions contemplated by this Agreement and (y) all conditions set forth in Section 6.3 have been satisfied (other than those conditions that, by their nature, can only be satisfied as of the Closing Date) or that it is willing to irrevocably waive any unsatisfied conditions set forth in Section 6.3, (iii) Seller has given Buyer Notice at least two (2) Business Days prior to such termination stating Seller's intention to terminate this Agreement pursuant to this Section 8.1.8, and (iv) Buyer does not provide, or cause to be provided, Seller with immediately available funds in amount equal to the Closing Payment at the time which the Closing should have occurred by the expiration of the two (2) Business Day period contemplated by clause (iii) hereof, or (b) Seller or its board of directors (or other applicable body), determines in its good faith business judgment that proceeding with the transactions contemplated by this Agreement would violate Law or be inconsistent with its fiduciary obligations under Law.

**8.2     Procedure and Effect of Termination**.

8.2.1   Termination of this Agreement by either Buyer or Seller shall be by delivery of a Notice to the other Party. Such Notice shall state the termination provision in this Agreement that such terminating Party is claiming provides a basis for termination of this Agreement. Termination of this Agreement pursuant to the provisions of Section 8.1 shall be effective upon and as of the date of delivery of such Notice as determined pursuant to Section 9.2.

8.2.2   If a Party waives compliance with any of the conditions, obligations or covenants contained in this Agreement, the waiver will be without prejudice to any of its

rights of termination in the event of non-fulfilment, non-observance or non-performance of any other condition, obligation or covenant in whole or in part.

8.2.3    If this Agreement is terminated, the Parties are released from all of their obligations under this Agreement, except that each Party's obligations under Sections 5.2, 7.1, 7.2, and 8.2, and Article 9 will survive.

8.2.4    As soon as practicable following a termination of this Agreement for any reason, but in no event more than thirty (30) days after such termination, Buyer and Seller shall, to the extent practicable, withdraw all filings, applications and other submissions relating to the transactions contemplated by this Agreement filed or submitted by or on behalf of such Party to any Governmental Authority or other Person.

8.2.5    Notwithstanding Section 8.2.3, in the event of a termination of this Agreement by Seller pursuant to Section 8.1.2 or Section 8.1.8(a), then Buyer and Seller shall, within two (2) Business Days after the date of such termination, deliver joint written instructions ("**Joint Written Instructions**") to the Escrow Agent directing the Escrow Agent to deliver to Seller an amount equal to the Deposit plus any accrued interest or other earnings thereon. Buyer acknowledges that the agreements contained in this Section 8.2.5 are an integral part of the Transactions, and that without these agreements, Seller would not have entered into this Agreement; accordingly, if Buyer fails to deliver such Joint Written Instructions or pay any amount due pursuant to this Section 8.2.5 and, in order to obtain any such Joint Written Instructions and/or to obtain such payment, Seller commences a Litigation which results in a judgment against Buyer for any Joint Written Instructions and/or payment set forth in this Section 8.2.5, Buyer shall pay Seller its costs and expenses (including attorneys' fees and disbursements) in connection with such Litigation, together with interest on such payment at 3% per annum (for the avoidance of doubt, using the payment described in this sentence as the applicable payment) through the date such payment was actually received.

8.2.6    Notwithstanding Section 8.2.3 and subject to Section 8.2.5, in the event of a termination of this Agreement other than by Seller pursuant to Section 8.1.2 or Section 8.1.8(a), then Buyer and Seller shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver to Buyer an amount equal to the Deposit plus any accrued investment interest thereon (less any fees or expenses owing to the Escrow Agent).

8.2.7    [In the event of termination of this Agreement pursuant to Section 8.1: (a) Buyer shall return all documents and other material received from Seller relating to Seller and its Subsidiaries, the Business, the Purchased Assets and/or the Transactions, whether so obtained before or after the execution hereof, to Seller; and (b) all confidential information received by Buyer with respect to Seller and its Subsidiaries, the Business, the Purchased Assets and/or the Transactions shall be treated in accordance with the Confidentiality Agreement, and with the Confidentiality Agreement remaining

in full force and effect in accordance with its terms, notwithstanding the termination of this Agreement.][8]

## ARTICLE 9
## MISCELLANEOUS

9.1     **Governing Law, Jurisdiction, Venue and Service**.

9.1.1     <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, including all matters of construction, validity and performance, in each case without reference to any conflicts or choice of Law rule or principle (whether of the State of Delaware or any other jurisdiction) that might otherwise refer construction or interpretation of this Agreement to the substantive Law of another jurisdiction.

9.1.2     <u>Consent to Jurisdiction and Venue</u>.

(a)     Subject to <u>Section 9.9</u>, the Parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the Bankruptcy Court for any action, suit or proceeding (other than appeals therefrom) arising out of or relating to this Agreement or any Ancillary Agreement, and agree not to commence any action, suit or proceeding (other than appeals therefrom) related thereto except in such court. The Parties further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding (other than appeals therefrom) arising out of or relating to this Agreement in the Bankruptcy Court, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum. If Seller's Chapter 11 Cases are closed, any Litigation arising out of or relating to this Agreement or any Ancillary Agreement shall be heard and determined exclusively in the federal and state courts in the State of Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Litigation and irrevocably waive the defense of any inconvenient forum to the maintenance of any such Litigation.

(b)     THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

9.1.3     <u>Service</u>. Each Party further agrees that service of any process, summons, notice or document by registered mail to its address set forth in <u>Section 9.2.2</u> shall be effective service of process for any action, suit or proceeding brought against it under this Agreement in any such court.

---

[8]     **Note to Draft**: To be revised, if necessary, based on the terms of the Confidentiality Agreement entered into with Buyer.

**9.2     Notices**.

      9.2.1   <u>Notice Requirements</u>. Any notice, request, demand, waiver, consent, approval or other communication permitted or required under this Agreement (each, a "**Notice**") shall be in writing, shall refer specifically to this Agreement and shall be deemed given only if delivered by hand or sent by email or by internationally recognized overnight delivery service that maintains records of delivery, addressed to the Parties at their respective addresses specified in <u>Section 9.2.2</u> or to such other address as the Party to whom Notice is to be given may have provided to the other Party at least five (5) days' prior to such address taking effect in accordance with this <u>Section 9.2</u>. Such Notice shall be deemed to have been given as of the date delivered by hand or internationally recognized overnight delivery service or when sent by email (with no bounce back or other notification of failure to be delivered). If a Notice deemed given upon receipt is given after 5:00 p.m. in the place of receipt (the Parties understand and agree that the foregoing applies only to Notice and not to copies), such Notice will be deemed given on the next succeeding Business Day.

      9.2.2   <u>Address for Notice</u>.

If to Seller, to:

c/o Franchise Group, Inc.
109 Innovation Court, Suite J,
Delaware, Ohio 43015
Attention: Tiffany McMillan-McWaters
Email:

with a copy (which shall not constitute effective notice) to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Debra Sinclair, Matthew A. Feldman, Russell Leaf, Thomas Mark and Jeffrey Daniel
Email: dsinclair@willkie.com; mfeldman@willkie.com; rleaf@willkie.com; tmark@willkie.com; and jdaniel@willkie.com

If to Buyer, to:

[•]
[Address]
Attention:
Email:

with a copy (which shall not constitute effective notice) to:

[•]
[Address]
Attention:
Email:

**9.3**     **No Benefit to Third Parties**. Seller and Buyer intend that this Agreement will not benefit or create any right or cause of action in favor of any Person, other than the Parties and their respective heirs, administrators, executors, legal representatives successors and permitted assigns. No Person, other than the Parties and their respective heirs, administrators, executors, legal representatives successors and permitted assigns, is entitled to rely on the provisions of this Agreement in any action, suit, proceeding, hearing or other forum. The Parties reserve their right to vary or rescind the rights at any time and in any way whatsoever, if any, granted by or under this Agreement to any Person who is not a Party, without notice to or consent of that Person.

**9.4**     **Waiver**. No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision (whether or not similar). No waiver will be binding unless executed in writing by the Party against whom the waiver is to be effective. A Party's failure or delay in exercising any right under this Agreement will not operate as a waiver of that right. A single or partial exercise of any right will not preclude a Party from any other or further exercise of that right or the exercise of any other right.

**9.5**     **Expenses**. Except as otherwise expressly provided in this Agreement and whether or not the transactions contemplated hereby are consummated**,** each Party will pay for their own costs and expenses incurred in connection with this Agreement and the Ancillary Agreements, and the transactions contemplated hereby and thereby; *provided*, *however*, Buyer shall be responsible for all fees and expenses of the Escrow Agent.

**9.6**     **Assignment**.

9.6.1     This Agreement becomes effective only when executed by Seller and Buyer. After that time, it will be binding upon and inure to the benefit of Seller, Buyer and their respective heirs, administrators, executors, legal representatives successors and permitted assigns.

9.6.2     Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned or transferred, in whole or in part, by any Party without the prior written consent of the other Party; *provided*, *however*, that (a) Seller may transfer or assign such rights and obligations under this Agreement pursuant to any chapter 11 plan of reorganization or to a liquidation trust or similar vehicle under a confirmed chapter 11 plan of liquidation in the Chapter 11 Cases and (b) Buyer may transfer or assign such rights and/or obligations (or any document to be delivered by Buyer pursuant hereto) under this

- 49 -

Agreement to one or more Affiliates of Buyer, but no such assignment shall relieve Buyer of its obligations hereunder and Buyer shall in all cases remain responsible for all such obligations.  Any transferee of any Purchased Asset or any interest therein shall be a creditworthy entity and shall agree to assume all obligations under this Agreement and the Ancillary Agreements.

**9.7     Amendment**. This Agreement may only be amended, supplemented or otherwise modified by written agreement signed by Buyer and Seller.

**9.8     Severability**. If any provision of this Agreement is determined to be illegal, invalid or unenforceable by an arbitrator or any court of competent jurisdiction, that provision will be severed from this Agreement and the remaining provisions shall remain in full force and effect.

**9.9     Equitable Relief**.

9.9.1    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that a Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each Party hereby waives (a) any requirement that the other Party post a bond or other security as a condition for obtaining any such relief and (b) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate.

9.9.2    Each Party hereby agrees not to raise any objections to the availability of equitable remedies to the extent provided for herein, and the Parties further agree that nothing set forth in this Section 9.9 shall require any Party hereto to institute any proceeding for (or limit any Party's right to institute any proceeding for) specific performance under this Section 9.9 prior or as a condition to exercising any termination right under this Agreement, nor shall the commencement of any legal action or legal proceeding pursuant to this Section 9.9 or anything set forth in this Section 9.9 restrict or limit any Party's right to terminate this Agreement in accordance with the terms hereof.

**9.10     No Liability**. No director, officer or employee of Buyer or its Affiliates shall have any personal liability whatsoever to Seller under this Agreement or any other document delivered in connection with the transactions contemplated hereby on behalf of Buyer. No director, officer, employee or Affiliate of Seller or its Subsidiaries shall have any personal liability whatsoever to Buyer or its Affiliates under this Agreement or any other document delivered in connection with the transactions contemplated hereby on behalf of Seller.

**9.11     Bulk Sales Statutes**. Buyer hereby acknowledges that Seller will not comply with the requirements and provisions of any applicable bulk sales or bulk transfer Laws in any jurisdiction that may otherwise be applicable in connection with the transactions contemplated by this Agreement and hereby waives all claims related to the non-compliance therewith.

**9.12     Representation by Counsel**. Each Party represents and agrees with the other that (a) it has been represented by, or had the opportunity to be represented by, independent counsel of its own choosing, and that it has had the full right and opportunity to consult with its respective

attorney(s) to the extent that it desired, (b) it availed itself of this right and opportunity, (c) it or its authorized officers (as the case may be) have carefully read and fully understand this Agreement and the Ancillary Agreements in their entirety and have had them fully explained to them by such Party's respective counsel, (d) each is fully aware of the contents hereof and thereof and their meaning, intent and legal effect, and (e) it or its authorized officer (as the case may be) is competent to execute this Agreement and has executed this Agreement free from coercion, duress or undue influence.

**9.13    Counterparts**. This Agreement may be executed in any number of counterparts, each of which is deemed to be an original, and such counterparts together constitute one and the same instrument. Transmission of an executed signature page by email or other electronic means is as effective as a manually executed counterpart of this Agreement.

**9.14    Entire Agreement**. This Agreement, together with the Schedules and Exhibits expressly contemplated hereby and attached hereto, the Seller Disclosure Schedules, the Ancillary Agreements, the Confidentiality Agreement and the other agreements, certificates and documents delivered in connection herewith or therewith or otherwise in connection with the transactions contemplated hereby and thereby, contain the entire agreement between the Parties with respect to the transactions contemplated hereby or thereby and supersede all prior agreements, understandings, promises and representations, whether written or oral, between the Parties with respect to the subject matter hereof and thereof. In the event of any inconsistency between any such Schedules and Exhibits and this Agreement, the terms of this Agreement shall govern.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Execution Date.

**[SELLER]**

By: _____
    Name:
    Title:

*Signature Page to Asset Purchase Agreement*

**[BUYER]**


By: _____
     Name:
     Title:

*Signature Page to Asset Purchase Agreement*