# **EXHIBIT A**

## GROUND LEASE

THIS GROUND LEASE (this "**Lease**") is made and entered into as of July 20, 2000, by and between **CONTINENTAL 82 FUND, LLC,** a Wisconsin limited liability company ("**Landlord**"), and **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Tenant**").

## RECITALS:

A.    Landlord is or will be the owner of a parcel of land containing approximately 5.15 acres and the improvements located thereon, which land is located on the south side of Veterans Avenue at its intersection with Augusta Boulevard (to be constructed or caused to be constructed by Landlord) and known as Lot 2 of the C.S. Subdivision, Unit 2, in the City of Portage, Porter County, Indiana, as legally described on **Exhibit "A"** (the "**Premises**"). The Premises are part of C. S. Subdivision, Units 2 in the City of Portage, Porter County, Indiana and which contains Lots 1, 2, 3 and 4 (Lots 1 and 2 of said C. S. Subdivision Unit 2, together with all access ways thereto including so-called "Outlot E" may be referred to herein as the "**Entire Tract**").

B.    The Premises will contain, after the construction of "Tenant's Improvements" (as hereinafter defined), approximately 42,918 square feet of Gross Leasable Area (as hereinafter defined), plus the Nursery and the Store Room (as those terms are hereinafter defined), as depicted on the Site Plan, which is attached hereto and incorporated herein as **Exhibit "A-1"**. A copy of the plat of C.S. Subdivision Unit 2 is attached hereto and incorporated herein as **Exhibit "A-2"**.

C.    Landlord desires to lease to Tenant and Tenant desires to lease from Landlord the Premises that will contain an improved compacted building pad, as described in Tenant's final footprint plan, a copy of which has been delivered to Landlord, as such Premises are depicted on the Site Plan attached hereto as **Exhibit "A-1"**.

D.    Subsequent to Landlord delivering the Premises to Tenant in the condition required hereunder, Tenant has the right, at its cost, to construct upon the Premises a retail facility having a total footprint of approximately 55,344 square feet (plus contiguous sidewalks, landscaping, curbing, truck ramps, etc...), which may include a retail store building of approximately 42,918 square feet of Gross Leasable Area, an enclosed (with decorative materials which may include fencing or similar material) outdoor nursery area containing approximately 7,498 square feet (the "**Nursery**"), and an enclosed store room containing approximately 4,928 square feet (the "**Store Room**"), which improvements shall be deemed part of "Tenant's Improvements".

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:



1.    **DEMISE**

    (a)    Landlord leases to Tenant and Tenant takes from Landlord the Premises, in the "improved" condition described herein, together with all rights, appurtenances, servitudes, charges, easements, rights of ingress and egress, parking, licenses and hereditaments thereto.

    (b)    As a condition precedent to the execution of this Lease, Landlord, Tenant and the owner of the adjacent parcel of land which is located to the West of the Premises and identified on **Exhibit "A-2"** (the "**Adjacent Parcel**"), must enter into and record with the Recorder of Deeds of Porter County, Indiana a Reciprocal Easement Agreement (the "**REA**"), in the form attached hereto as **Exhibit "D"**, which REA shall, among other things, (i) grant certain easements, (ii) contain an exclusive for the benefit of Tenant and prohibit certain uses of the Premises and the Adjacent Parcel, in such form as Tenant shall require, and which shall be binding on all owners, tenants or occupants of the Adjacent Parcel, (iii) provide for the common area responsibilities and obligations of all parties to the REA, and (iv) establish the construction, building expansion, signage and parking requirements and/or limitations with respect to all property subject to the REA.

    (c)    Tenant shall have all rights available to Landlord or a tenant of Landlord under any cross access or reciprocal easement agreement that has been or may hereafter be entered into by Landlord and the owner of the Adjacent Parcel, including without limitation, the REA (as hereafter defined), and any other document or instrument relating to the property that is included in any part of C. S. Subdivision, an Addition to the City of Portage, Porter County, Indiana (the "**Subdivision**") or that may be available to Landlord or Landlord's tenants as a result of the inclusion of the Premises or the Entire Tract in the Subdivision or any part thereof, or as a result of any document or instrument relating to the Subdivision or any part thereof, including without limitation that certain Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements for the C.S. Subdivision, Portage, Porter County, Indiana made as of May 31, 2000 by Whiteco Industries, Inc. and Curtis James Investments, and recorded with the Recorder of Deeds of Porter County, Indiana on _____ __, 2000, as Document No. 2000-_____ (the "**Declaration**"); provided, however, Landlord shall obtain the prior written approval of Tenant, which approval shall not be unreasonably withheld, prior to entering into any such cross access or reciprocal easement agreement which affects the Entire Tract or any other part of the Subdivision. The term "**Common Areas**" shall include, without limitation, the following, all automobile parking areas, access roads, sidewalks, traffic lanes, bus

2

stations, taxi stations, entrances and exits from and to public and private (if any) roads, landscaping, and utility facilities depicted on the Site Plan.

(d) "**Gross Leasable Area**" shall mean the total number of square feet of floor space covered and enclosed within a particular store or building which is constructed within the Premises shown on the Site Plan, whether rented or occupied or not, measured to the outside of the exterior walls of the store or building, to the center line of party walls and to the exterior of wall(s) abutting exit or service corridors, but not including Common Areas, exterior open truck docks or truck ramps, outdoor sales area, common service corridors, or enclosures used exclusively for mechanical equipment or basements or mezzanines which are not used as sales area.

(e) Intentionally Omitted.

(f) Intentionally Omitted.

(g) Landlord also grants to Tenant the right to allow its customers, employees, contractors and invitees to park in Tenant's non-exclusive "**Protected Parking Field**" which shall consist of not less than 214 parking spaces.

## 2. <u>USE; EXCLUSIVITY</u>

(a) The Premises may be used for the sale, servicing and storing of merchandise, and all other items or services normally sold in Tenant's stores and any other lawful use.

(b) Subject to municipal approval and the terms and conditions of the Declaration, Tenant shall have the right to display and sell seasonal merchandise on sidewalks and parking and other common areas of the Premises.

(c) Tenant will determine and set its hours and days of operation, if any, in its sole and absolute discretion.

(d) Landlord shall enforce for the benefit of Tenant the provisions of the REA including, without limitation, any provisions thereof that limit or control the uses which may be allowed on Lot 1 and Lot 2 (as those terms are defined in the REA) and any exclusive that is given to the Tenant under the REA. If Landlord does not enforce the provisions of the REA for the benefit of Tenant, Tenant may, in the place and stead of Landlord and as the

3

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



Landlord's attorney-in-fact enforce the REA. The power of attorney granted herein is coupled with an interest and is irrevocable.

3.   **TERM**

(a)   The initial Term of this Lease shall be for ten (10) years, commencing on the earlier to occur of the date (i) Tenant opens for business to the public in the Premises, or (ii) two hundred forty (240) days after the Pad Completion Date (as hereinafter defined), provided that the Premises is delivered to Tenant in accordance with **Section 6** hereof (the "**Commencement Date**"). As used herein, the expressions "**Term**" and "**Term of this Lease**" refer to such initial term and to any renewal thereof as hereinafter provided. Landlord grants to Tenant six (6) consecutive options to renew this Lease for periods of five (5) years each. Provided that Tenant is not in default in the performance of its obligations under this Lease beyond any applicable cure periods at the time of the exercise of such options to renew, each option can be exercised by Tenant giving Landlord written notice of the exercise thereof at least one hundred eighty (180) days prior to the expiration of the then existing Term, provided, however, that if Tenant shall fail to give any such notice within such one hundred eighty (180) day time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant written notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said thirty (30) day period. If such thirty (30) day period expires after the expiration of the initial or any renewal Term, Tenant shall pay the Annual Base Rent set out in **Section 7** for the next renewal Term for that period of time commencing on the first day of such next renewal Term and ending on the expiration of such thirty (30) day period. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any of the options set forth in this **Section 3** through inadvertent failure to give notice thereof within the time limits prescribed. During any extension, all sections of this Lease will be effective, and references to Term will incorporate the extensions.

(b)   Any holding over after the expiration of the Term of this Lease shall be construed to be a tenancy from month-to-month, at an Annual Base Rent equal to 125% of the monthly rental as required to be paid by Tenant in the preceding option period, or if no additional option to extend the Term remains, then at the most recently applicable Annual Base Rent, and such tenancy shall otherwise be on the terms and conditions herein specified, so far as applicable.

4



(c)     The term "**Lease Year**" as used in this Lease shall mean each consecutive twelve (12) calendar month period during the Term with the first Lease Year commencing on the first day of the Term if the Term begins on the first day of a calendar month or the first day of the first full calendar month after the first day of the Term if the first day of the Term is not the first day of a calendar month, and each successive Lease Year shall commence on the anniversary of the first day of the first Lease Year. If the first Lease Year commences on a day other than the first day of a calendar month, then the first Lease Year shall also include the number of days from such date through and including the last day of such calendar month, and any charges or payments due from Tenant hereunder shall be prorated accordingly.

(d)     Notwithstanding anything contained in this Lease to the contrary, Tenant does not expressly or impliedly, directly or indirectly agree to construct, open or operate a store upon the Premises, the rent reserved hereunder constituting the entire consideration for Landlord's entering into this Lease. If Tenant does not commence the construction of the Tenant's Improvements within two years after the delivery of the Premises to Tenant with Landlord's Work completed as required by this Lease, Landlord may terminate this Lease be giving notice to Tenant of its intention to terminate this Lease, which notice shall bear the legend in bold capital letters in at least fourteen point type "THIS IS A NOTICE TO TERMINATE A LEASE FOR SEARS FAILURE TO COMMENCE CONSTRUCTION OF ITS TENANT'S IMPROVEMENTS", whereupon this Lease shall terminate sixty (60) days after the receipt of such notice by Tenant, unless within such sixty (60) day period, Tenant notifies Landlord that Tenant will in due course commence the construction of the Tenant's Improvements.

4.    **INTENTIONALLY OMITTED**

5.    **INTENTIONALLY OMITTED.**

6.    **DELIVERY OF PREMISES; LANDLORD'S WORK; TENANT'S IMPROVEMENTS**

(a)     At Landlord's sole cost and expense and without contribution from Tenant, Landlord shall improve the Premises in accordance with (i) "Sears Construction Standards - Minimum Site Specifications, dated December 16,1999, as amended by Landlord, a copy of which is attached hereto and incorporated herein as **Exhibit "E"**, (ii) Tenant's final footprint plan, a copy of which has been delivered to Landlord prior to the execution of this Lease, and (iii) the Site Plan (collectively, the "**Criteria**"). Prior to the Planned Completion Date, as hereinafter defined, Landlord shall at its sole cost and

5



expense construct the curbing depicted on **Exhibit A-1** and along the access ways to and from the Premises. Tenant's Improvements located within said "perimeter curbing" shall be provided by Tenant.

(b)     Landlord shall, at Landlord's sole cost and expense, construct, install and complete or cause the construction, installation and completion (by third parties not including Tenant) of all related "On- and Off-Site Improvements", required for the development and use of the Premises. Landlord shall be solely responsible for the payment of development, impact and all other fees associated with the Premises, except for the payment of those fees associated directly with (i) the building permit for Tenant's Improvements, (ii) the security alarm, if any, for Tenant's Improvements, (iii) Tenant's business license, and (iv) Tenant's utility tap-in and hook-up fees which shall not exceed Five Thousand and No/100 Dollars ($5,000.00), if any, which shall be at Tenant's expense. Landlord shall pay Tenant's utility tap-in and hook-up fees that exceed Five Thousand and No/100 Dollars ($5,000.00). The term "**On- and Off-Site Improvements**" as used herein shall include without limitation: highway curb cuts onto public and private streets; traffic signals; public roadway improvements; on-site service drives; drive lanes and parking stalls as components of the parking lot and the lighting, striping and signing thereof; landscaping; all curbing and sidewalks (except those sidewalks which are part of the pad to be constructed by Landlord on the Premises), but not including loading docks and directional signs in the parking areas located on the Premises which shall be constructed by Tenant if they are to be constructed; coordination of the installation of natural gas, electric, and telecommunication services and the installation of water and sanitary sewer service to within five (5) feet of the perimeter of the building to be constructed on the Premises, as directed by Tenant (the "**Utility Services**"); storm water handling facilities; and, consistent with the foregoing, all requirements specified by any municipal authority having jurisdiction over the Premises. Landlord shall immediately advise Tenant if natural gas shall not be available at the Premises.

(c)     The work to be performed by Landlord pursuant to **Sections 6(a) and 6(b)** is collectively referred to herein as "**Landlord's Work**".

(d)     Improvement plans and specifications for Landlord's Work to be completed in accordance with the Criteria shall be prepared by Landlord's engineer and submitted to Tenant for review and comment. Landlord's engineer shall revise and resubmit said improvement plans and specifications to Tenant until all of Tenant's comments are either incorporated into the improvement plans and specifications or withdrawn by Tenant in writing. In the event that

6

Tenant's comments add requirements that are not included in the Criteria and the cost to Landlord of doing the Landlord's Work in conformity with such comments is more than the cost of doing the Landlord's Work in compliance with the Criteria, then Tenant shall pay such excess cost. In the event that Tenant's comments add requirements that are not included in the Criteria and the time for Landlord to complete Landlord's Work in conformity with such comments is longer than the time of doing the Landlord's Work in compliance with the Criteria, then the Completion Date, Site Work Damage Date and the Pad Damage Date will be extended accordingly. The improvement plans and specifications shall be referred to as the "**Site Improvement Documents**". Landlord shall diligently pursue all required governmental approvals and permits for the construction and completion of Landlord's Work, and promptly improve the Premises and the Entire Tract (or cause others to improve those portions of the Entire Tract that are not the Premises) as required hereunder for tender to Tenant no later than the "**Pad Damage Date**" and the "**Site Work Damage Date**" respectively, as those terms are hereinafter defined.

(e)   Landlord shall cause all of Landlord's Work to be (i) done in conformity with generally accepted good construction practices and (ii) in compliance with all applicable ordinances, building codes, Environmental Laws (as hereinafter defined), Title III of the Americans with Disabilities Act of 1990, all regulations issued thereunder and the Accessibility Guidelines for Buildings and Facilities issued pursuant thereto, as the same are in effect on the date hereof and may be hereafter modified, amended or supplemented, and all similar state laws (the "**ADA**"), all other applicable laws of the Federal, State, County, Municipal and all other authorities having jurisdiction over the Premises (collectively, "**Laws**"). Landlord acknowledges that Tenant is relying solely upon Landlord as to the Premises' compliance with the Criteria and with Laws.

(f)   Landlord shall provide Tenant with thirty (30) days prior written notice (the "**Pad Planned Completion Date Notice**" or "**Premises Planned Completion Date Notice**") of Landlord's planned completion date for the Pad or the Premises, as the case may be (respectively, the "**Pad Planned Completion Date**" or the "**Premises Planned Completion Date**"). Upon Tenant's receipt of the Pad Planned Completion Date Notice or the Premises Planned Completion Date Notice, as the case may be, Tenant's project manager shall schedule a joint inspection of the Pad and the Premises or the Premises, as the case may be, with Landlord. If the Pad and the preliminary improvements to the Premises or the final improvements to the Premises are mutually agreed to be (or if the inspection occurs prior to the Pad Planned

7

Completion Date or the Premises Planned Completion Date, as the case may be, and it is mutually agreed at such time that the Pad and the Preliminary Improvements or the Premises, as the case may be, will be and, as to the pad only, Landlord's licensed soils engineer certifies that the pad to be constructed on the premises is substantially complete on the Pad Planned Completion Date or the Premises Planned Completion Date, as the case may be, in accordance with the Site Improvement Documents, Tenant shall accept the Pad or the Premises, as the case may be, subject to minor punch list items and except with respect to latent conditions, on the Pad Planned Completion Date or the Premises Planned Completion Date, as the case may be, and thereafter said date shall be deemed to be the "**Pad Completion Date**" or the "**Premises Completion Date**", as the case may be.  As used in this Lease the term **"Preliminary Improvements"** shall mean the improvements to the Premises and the remainder of the Entire Tract that are required by the Criteria to be completed prior to the delivery of the pad to be completed on the Premises by the Landlord, and shall include without limitation a graded staging area, in the place indicated on **Exhibit "A-1"**, temporary utilities, the building pad, and driveways. Notwithstanding the foregoing to the contrary, Landlord agrees that it shall schedule Landlord's Work so that the Premises Completion Date shall not occur between October 15th and February 1st.  In the event the Premises Completion Date occurs between October 15th and February 1st, then (i) Tenant shall not be obligated to accept the Premises prior to February 1st and (ii) the Premises Completion Date shall automatically be deferred to and deemed to be February 1st of such year.

(g)     Tenant's occupancy of the Premises shall not be deemed an acceptance of the Premises until such time as Landlord has met all criteria of the Site Improvement Documents. Tenant's acceptance of the Premises with latent conditions shall not diminish Landlord's responsibility to improve the Premises in accordance with the Site Improvement Documents and to perform Landlord's Work, including without limitation, the parking lot and the lighting thereof, throughout the Term.

(h)     Provided Tenant has not delayed Landlord in the completion of Landlord's Work, if Landlord fails to complete and deliver to Tenant the pad and Preliminary Improvements in conformity with the Criteria on or before ~~September 1, 2000~~ September 8, 2000 (the "**Pad Damage Date**") and the Premises with the On- and Off-Site Improvements completed in conformity with the Criteria on or before February 1, 2001 (the "**Site Work  Damage Date**") in either case substantially complete in accordance with the Site Improvement Documents, subject to minor punch list items and "Force Majeure" (as hereinafter

8

defined), then upon the Commencement Date, Tenant shall be credited with two (2) days of free Rent (as hereinafter defined) for each one (1) day of delay until the Pad and the preliminary improvements to the Premises or Premises, as the case may be, is substantially completed and delivered to Tenant as required under this Lease (the "**Late Turnover Damage**"). If Landlord is to claim an event of Tenant delay under this **Section 6** or elsewhere in this Lease, such claim must be evidenced by the delivery of written notice from Landlord to Tenant within ten (10) days after the initial occurrence of an event which Landlord claims to have been a Tenant delay, which notice must specifically state the reason(s) for which Landlord claims an event of Tenant delay. Time is of the essence in the delivery of any such notice. If Landlord fails to deliver such notice within said ten (10) day period, Landlord shall not be able to later rely on any such matter being deemed an event of Tenant delay.

(i)     Provided Tenant has not delayed Landlord in the completion of Landlord's Work, if Landlord fails to install the private permanent utilities to the pad to be constructed on the Premises by Landlord in accordance with the Criteria and the provisions of this Lease, subject to minor punch list items and Force Majeure, on or before October 15, 2000 (the "**Utility Damage Date**"), then upon the Commencement Date, in addition to the Late Turnover Damage (if applicable), Tenant shall be credited with one (1) day of free Rent for each one (1) day of delay until such utilities are substantially completed and the Premises are delivered to Tenant as required under this Lease (the "**Late Utility Turnover Damage**").

(j)     Provided Tenant has commenced construction of Tenant's Improvements and further provided that Tenant has not delayed Landlord in the completion of the On - and Off-Site Improvements, if on or before the Site Work Damage Date Landlord has failed to substantially complete the On- and Off-Site Improvements required for the development and use of the Premises and the Entire Tract in accordance with the Criteria, subject to minor punch list items and Force majeure, Tenant may, at its sole option, elect to: (i) defer the Commencement Date on a day-for-day basis for each day of delay until the required On- and Off-Site Improvements are substantially completed in accordance with the Criteria (the "**Site Work Damage**"); (ii) defer the Commencement Date on a day-for-day basis until the required On- and Off-Site Improvements are substantially completed in accordance with the Criteria, and upon five (5) days written notice to Landlord, step in the place of Landlord and complete construction of the On- and Off-Site Improvements and upon the Commencement Date set-off Tenant's construction costs incurred in connection therewith plus interest at the Prime Rate from Rent

9

until Tenant is fully reimbursed; or (iii) terminate this Lease within thirty (30) days after the latter to occur of the Site Work Damage Date or the substantial completion of Tenant's Improvements, by delivering written notice to Landlord and Landlord's failure to substantially complete the On- and Off-Site Improvements within thirty (30) days after the delivery to Landlord of such notice.

(k)     If Landlord fails to complete and deliver the Premises to Tenant substantially complete in accordance with the Criteria, subject to minor punch list items, for any reason whatsoever on or before April 30, 2001 (the "**Termination Date**"), Tenant may at its sole option, elect to: (i) continue to accrue the Late Turnover Damage while Landlord completes the required construction; (ii) continue to accrue the Late Utility Turnover Damage while Landlord completes the required installation; (iii) continue to accrue both the Late Turnover Damage and the Late Utility Turnover Damage, as and to the extent applicable, upon five (5) days written notice to Landlord, step in the place of Landlord and complete Landlord's construction obligations, and upon the Commencement Date set-off Tenant's construction costs therefor plus interest at the Prime Rate from Rent; or (iv) terminate this Lease within thirty (30) days after the Site Work Damage Date by delivering written notice to Landlord and Landlord's failure to complete and deliver the Premises to Tenant substantially complete in accordance with the Criteria, subject to minor punch list items within thirty (30) days after the delivery to Tenant of such notice.

(l)     Commencing with the date of this Lease and throughout the Term, subject to all municipal approvals and approvals required pursuant to the terms of the Declaration, which approvals Landlord shall diligently assist Tenant in obtaining, Landlord grants to Tenant the right to perform all construction, improvements and modifications to and upon the Premises which Tenant deems desirable in the interest of its business ("**Tenant's Improvements**"). Construction plans and specifications for Tenant's Improvements shall be prepared by Tenant.  Subject to the satisfaction of applicable municipal approvals and the approvals required pursuant to the terms of the Declaration, Landlord acknowledges and agrees that Tenant's front building elevation may be up to thirty-five (35) feet in height, and Landlord shall take no action directly or indirectly that would have the effect of preventing the Tenant from obtaining the approval of and constructing its building to a front elevation height of thirty-five (35) feet

(m)     Commencing with the date of this Lease and throughout the Term, Landlord shall assist Tenant in obtaining all municipal approvals and approvals that

10

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)

may be required pursuant to the terms of the Declaration that may be necessary to make repairs, replacements, improvements and/or alterations to the Premises which Tenant deems desirable in the interest of its business. Tenant shall perform all such work in a good and workman-like manner and in compliance with Laws.

(n)    Landlord shall provide to the Tenant a staging area either on the Adjacent Parcel, as set forth in and subject to the provisions of the REA or such part of the Premises as may be reasonably acceptable to Tenant that Tenant may use during the construction of the Tenant's Improvements. Landlord shall give Tenant not less than twenty-five (25) days notice of the relocation of such staging area to a place on the Premises that is reasonably acceptable to Tenant, if such relocation is required pursuant to the REA.

7.    <u>RENT</u>

(a)    Annual base rent (**"Annual Base Rent"**) plus Tenant's reimbursement payment to Landlord of Common Area costs and expenses for the Premises as such costs and expenses are limited by **Section 27** ("**Additional Rent**"), which shall be payable in equal monthly installments, shall begin to accrue from and the initial rental payment shall be due to Landlord on the Commencement Date, subject to, to the extent applicable, the Late Turnover Damage, the Late Utility Turnover Damage and/or the Site Work Damage described in <u>**Section 6**</u>.   (Annual Base Rent and Additional Rent are hereinafter collectively referred to as "**Rent**".) Rent shall be paid in advance on the first day of each month.  If Rent shall not be paid by the fifth day of the month in which it is due and after ten days notice from Landlord, Tenant shall pay to Landlord a late payment penalty fee in the amount of five percent (5.0%) of the amount past due. Landlord will, from time to time, designate some one person, firm or corporation to receive Rent payments. Landlord's Federal Employer Identification Number is 39-1878851.

(b)    Tenant agrees to pay Annual Base Rent, subject to, to the extent applicable, the Late Turnover Damage, the Late Utility Turnover Damage and/or the Site Work Damage described in <u>**Section 6**</u>, under the following schedule as of the Commencement Date:

|  | Per Year | Per Month |
|---|---|---|
| Lease Years 1-10 | $210,000.00 | $17,500.00 |

or a proportionate sum during partial months (or no payment to the extent the Late Turnover Damage, the Late Utility Turnover Damage and/or the Site

11



Work Damage is/are applicable), in advance, on the first day of each month. No overage or percentage Rent shall be paid at any time under this Lease.

(c)     If Tenant exercises its first option to extend this Lease, Tenant agrees to pay as Annual Base Rent during the first extension period (Lease Years 11-15) the sum of $216,300.00 per annum in equal monthly installments of $18,025.00 under the same conditions as set forth in **Subsection 7(a)**.

(d)     If Tenant exercises its second option to extend this Lease, Tenant agrees to pay as Annual Base Rent during the second extension period (Lease Years 16-20) the sum of $216,300.00 per annum in equal monthly installments of $18,025.00 under the same conditions as set forth in **Subsection 7(a)**.

(e)     If Tenant exercises its third option to extend this Lease, Tenant agrees to pay as Annual Base Rent during the third extension period (Lease Years 21-25) the sum of $226,033.50 per annum in equal monthly installments of $18,836.12 under the same conditions as set forth in **Subsection 7(a)**.

(f)     If Tenant exercises its fourth option to extend this Lease, Tenant agrees to pay as Annual Base Rent during the fourth extension period (Lease Years 26-30) the sum of $226,033.50 per annum in equal monthly installments of $18,836.12 under the same conditions as set forth in **Subsection 7(a)**.

(g)     If Tenant exercises its fifth option to extend this Lease, Tenant agrees to pay as Annual Base Rent during the fifth extension period (Lease Years 31-35) the sum of $239,595.56 per annum in equal monthly installments of $19,966.29 under the same conditions as set forth in .

(h)     If Tenant exercises its sixth option to extend this Lease, Tenant agrees to pay as Annual Base Rent during the sixth extension period (Lease Years 36-40) the sum of $239,595.56 per annum in equal monthly installments of $19,966.29 per month under the same conditions as set forth in **Subsection 7(a)**.

8.     **REAL ESTATE TAXES AND ASSESSMENTS**

(a)     Landlord shall, on or before the Commencement Date, have the Premises designated as a separate tax parcel, and Tenant shall pay directly to the taxing authority when due the amount of the real estate taxes so determined and special and/or general assessments which are a lien on the Premises. All of the taxes under this **Section 8** shall be prorated at the commencement

12



and expiration of the Term hereof.   Landlord has provided Tenant with copies of the most recent real estate tax bills for the Premises.

(b)    Notwithstanding anything in this **Section 8** to the contrary, Tenant shall not be required to pay any estate, gift, inheritance, succession, franchise, income or excess profits taxes which may be payable by Landlord or Landlord's legal representative, successors or assigns, nor shall Tenant be required to pay any tax that might become due on account of ownership of property other than that herein leased which may become a lien on the property herein leased or collectable out of the same. If any governmental taxing authority levies, assesses, or imposes any tax or assessment (other than income, franchise or similar taxes) upon or against the rents payable by Tenant to Landlord (a "**Rent Tax**") as a substitution for any existing tax on land, on any buildings or improvements placed upon land, Tenant shall directly pay or reimburse Landlord for the Rent Tax, as the case may be.

(c)    If Tenant shall, in good faith, desire to contest the validity or amount of any tax, assessment, levy or other governmental charge herein agreed to be paid by Tenant, and (i) the Premises are separately assessed, then Tenant shall be permitted to do so; or (ii) if the Premises are not separately assessed, then Tenant shall request, in writing that Landlord undertake such contest, and in the event Landlord declines to undertake such contest, Tenant shall have the right to contest the real estate taxes payable with respect to the Premises and Landlord shall cooperate fully with Tenant in connection with such proceedings, and will execute any documents necessary or appropriate to prosecute such proceedings; and, if legally permitted to do so, to defer payment of tax or charge, the validity or amount of which Tenant is so contesting, until final determination of the contest.   If Landlord does undertake such contest Landlord shall pursue such contest diligently and any settlement and costs and expenses to be incurred shall be subject to Tenant's reasonable approval.  If such contest is brought by Landlord, Tenant agrees to pay its pro rata share of the approved reasonable and necessary expenses incurred thereby, provided that in no event shall Tenant's share of such expenses exceed its reduction in real estate taxes for the tax period contested.

(d)    All rebates on account of any taxes, required to be paid and paid by Tenant under the provisions hereof shall belong to Tenant, and Landlord will, on the request of Tenant, execute any receipts, assignments or other acquittances that may be necessary in the Premises in order to secure the recovery of any such rebates, and will pay over to Tenant any such rebates that may be received by Landlord.

13

(e)     Landlord represents that to Landlord's knowledge there are no additional or proposed assessments affecting the Premises and agrees to pay and hereby indemnifies and holds Tenant harmless from and against all assessments (general or special) imposed upon the Premises as a result of such eventuality for which Tenant has not assumed any direct contractual liability, or imposed upon the Premises as a result of any On- and/or Off-Site Improvements associated with the initial development of Tenant's Improvements or the Premises.

9.    **UTILITIES**

Tenant shall contract in its own name and fully and promptly pay for all Utility Services of every kind that Tenant desires to be furnished to the Premises throughout the Term hereof. If lack of a Utility Service which is caused by Landlord causes Tenant to temporarily cease its operations upon the Premises, Tenant shall be entitled to abate Rent for the period Tenant's business is closed commencing on the fourth (4th) full day of the Utility Service interruption and continuing thereafter until such Utility Service is restored.

10.    **TENANT'S SIGNS**

(a)     Landlord and Tenant acknowledge that Tenant's exterior signage depicted on **Exhibit "F"** and the pylon signage depicted on **Exhibit "F-1"** have received all required municipal approval and any approvals that may be required pursuant to the Declaration, and such signage may be installed by Tenant on the exterior walls of Tenant's Improvements which face parking lots and public roadways and the pylon sign described in **Section 10(b)**. Tenant shall provide and install its exterior building signage at Tenant's expense.

(b)     At no cost to Tenant other than for its cost of the manufacture and installation of its sign panels and the payment of Tenant's share of the costs of manufacture and installation as set forth in this **Section 10(b)**, but subject to the approval by the appropriate governmental agency which Landlord at its cost shall pursue on Tenant's behalf, Tenant may install the sign panel(s) depicted on **Exhibit "F-1"** on the pylon sign(s) to be constructed by Landlord in the locations on US Highway 6 indicated on **Exhibit "A-2"** and in the sizes and at the positions identified on **Exhibit "F-1"** attached hereto(the "**Pylon Sign**") which shall be constructed by Landlord prior to the Site Work Damage Date pursuant to plans and specifications approved by Tenant, and approved by the municipality and acceptable to Tenant. Tenant shall pay its share of the costs of the maintenance, repair and illumination of the Pylon

14

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



sign that are passed-through to Landlord pursuant to the Declaration. Tenant shall reimburse Landlord for Landlord's share of the costs to construct the Pylon Sign in an amount that shall not exceed Nine Thousand Seven Hundred Fifty and No/100 Dollars ($9,750.00).

(c)    If local laws do not permit Tenant's installation of the signage described in this **Section 10** to be available to Tenant, then Landlord, at Landlord's sole cost and expense, shall exert commercially reasonable efforts to obtain municipal authorization to permit the installation of Tenant's signage prior to commencing Landlord's Work, which efforts, if necessary, shall include variance requests to permit Tenant's prototypical signage, and if rejected, Landlord shall pursue, at Landlord's sole cost and expense, at least one (1) appeal to the appropriate Board of the City of Portage.

(d)    If (i) Landlord fails to construct the pylon and/or monument sign upon which Tenant shall have the right to install the sign panels depicted on **Exhibit "F-1"**, or such pylon and/or monument sign are not properly functioning at the time of the completion of the construction thereof or (ii) applicable law or Landlord prohibits or prevents Tenant from installing its sign panels thereon, then in any such case Tenant shall be obligated to pay only one-half of Annual Base Rent required by **Section 7(b)** until such time as such sign is constructed and functioning.

11.    **REPAIRS AND MAINTENANCE OF TENANT'S IMPROVEMENTS AND PREMISES**

(a)    Except as otherwise set forth in this Lease, Tenant shall, at Tenant's cost, maintain and repair the Premises in a first-class manner and in compliance with applicable laws and governmental regulations and the REA and the Declaration.

(b)    Intentionally Omitted.

(c)    Intentionally Omitted

12.    **LIENS**

(a)    Tenant shall keep all of the Premises, and every part thereof, and the building and other improvements at any time located thereon free and clear of any and all mechanics', materialmen's and other liens for or arising out of or in connection with work or labor done, services performed or materials or appliances used or furnished for or in connection with any operations of

15



Tenant, any alteration, improvement or repairs or additions which Tenant may make or permit or cause to be made, or any work or construction, by, for or permitted by Tenant on or about the Premises, or any obligations of any kind incurred by Tenant, and at all times promptly and fully to pay and discharge any and all claims on which any such lien may or could be based, and to indemnify Landlord and all of the Premises and all buildings and improvements thereon against all such liens and claims of liens and suits or other proceedings pertaining thereto.

(b)     If Tenant desires to contest any such lien, it shall notify Landlord of its intention to do so within thirty (30) days after Tenant receives written notice from Landlord of such lien.  In such case, Tenant shall not be in default hereunder until thirty (30) days after the final determination of the validity thereof, within which time Tenant shall satisfy and discharge such lien to the extent held valid; but the satisfaction and discharge of any such lien shall not, in any case, be delayed until execution is had on any judgment rendered thereon, any such delay shall be a default of Tenant hereunder.  In the event of any such contest, Tenant shall protect and indemnify Landlord against all loss, expense and damage resulting therefrom.

## 13.  LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

(a)     In addition to the other representations and warranties of Landlord to Tenant contained in this Lease, Landlord represents and warrants to Tenant that:

(i)     Landlord owns, or will acquire the Premises. The provisions of this Lease do not violate any other contract, mortgage, lease, operating agreement or any other written or oral agreement to which Landlord is a party or to which the Premises is or will be subject; and

(ii)     Landlord has the full right and lawful authority to enter into and perform its obligations under this Lease for the full Term; and

(iii)     As of the Completion Date, the Premises will be free and clear of all easements, restrictions, violations, mortgages and other liens, encumbrances or defects in title of any nature whatsoever other than the Permitted Encumbrances, and that the rights, easements and privileges granted Tenant in this Lease with respect to the Premises are not in any way affected in a materially adverse manner; and

(iv)     If, on the Commencement Date, the Premises is subject to any mortgage or mortgages, Landlord will furnish Tenant a copy of such

16

mortgage documents, together with Non-Disturbance Agreements executed by each of Landlord's mortgagees in the form attached hereto as **Exhibit "B"**. If Landlord fails to provide Tenant with executed Non-Disturbance Agreements from all such mortgage holders prior to the Commencement Date, Tenant shall have no obligation to pay Rent hereunder until such executed Non-Disturbance Agreements are delivered to Tenant, whereupon Tenant shall pay all Rent that was withheld.

(v)     Upon the Completion Date, Landlord will deliver actual possession of the Premises to Tenant free of all tenancies and occupancies; and

(vi)    Tenant, upon paying the Rent and performing Tenant's other obligations under this Lease, shall peaceably and quietly have, hold and enjoy the Premises for the Term; and

(vii)   To Landlord's actual knowledge, there are no underground storage tanks under the Entire Tract. Landlord agrees, at Landlord's expense, to remove and clean to the satisfaction of all appropriate governmental authorities any Hazardous Materials (as hereinafter defined) other than Tenant's Hazardous materials (as hereafter defined) from the Premises; and

(viii)  Landlord has no knowledge of actual or threatened actions or claims of any nature against the Premises, the Entire Tract or Landlord; and

(ix)    The Premises currently is, or prior to the Completion Date will be, properly zoned to allow (i) Tenant to construct Tenant's Improvements, including the Nursery and the Store Room and without providing any required parking for the Nursery and Store Room, and (ii) Tenant to operate a home improvement store with the Nursery and Store Room at the Premises; and

(x)     Landlord is duly formed, validly existing and in good standing under the laws of its state of incorporation or organization, as the case may be.

(b)     In addition to the other covenants of Landlord to Tenant contained in this Lease, Landlord covenants to Tenant that during the Term:

17

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



(i)     Landlord shall take no actio n or omit to take any action that would cause the Utility Services to be unavailable to the Premises during the Term of this Lease; and

(ii)    Intentionally Omitted.

(iii)   Landlord will indemnify, defend and hold harmless Tenant from and against all claims, causes of action expenses, including attorneys' fees and costs arising out of the inaccuracy of or breach of the warranties and representations contained in this **Section 13**; and

(iv)    Commencing on the Comme ncement Date, Landlord shall, at its sole cost and expense, cause the Common Areas of the Entire Tract to comply with all Laws.

(v)     Intentionally omitted.

14.   **ASSIGNMENT AND SUBLETTING**

Tenant shall have the right at all times throughout the Term, without Landlord's prior written approval, to assign this Lease or sublet all or any portion of the Premises. In such event, Tenant shall remain responsible for the payment of Rent and the performance of its other obligations hereunder. Tenant shall, within thirty (30) days of the date of any such assignment or subletting, notify Landlord in writing of any such assignment or subletting.

15.   **ENCUMBRANCE OF TENANT'S LEASEHOLD INTEREST**

Tenant may, without Landlord's consent, encumber by mortgage or deed of trust, or other proper instrument ("**Leasehold Encumbrance**"), its leasehold interest in the Premises, Tenant's right title and interest in this Lease, together with all buildings and improvements placed by Tenant thereon, as security for any indebtedness of Tenant. Tenant shall, within thirty (30) days of the date of any such Leasehold Encumbrance, notify Landlord in writing of such Leasehold Encumbrance. The execution of any such mortgage, or deed of trust, or other instrument, or the foreclosure thereof, or any sale thereunder, either by judicial proceedings or by virtue of any power reserved in such mortgage or deed of trust, or conveyance by Tenant to the holder of such indebtedness, or the exercising of any right, power or privilege reserved in any mortgage or deed of trust, shall not be held as a violation of any of the terms or conditions hereof, or as an assumption by the holder of such indebtedness personally of the obligations hereof. No such encumbrance, foreclosure, conveyance or exercise of right shall relieve Tenant from

18



its liability hereunder. The holder of any such mortgage, deed of trust or other security instrument being herein referred to as a "**Leasehold Lender**". If a Leasehold Lender shall have given Landlord written notice of the creation of a Leasehold Encumbrance, Landlord shall give to such Leasehold Lender a copy of each notice of any claimed default by Tenant at the same time and whenever any such notice is given to Tenant, addressed to such Leasehold Lender at the address last furnished to Landlord, and no such notice shall be deemed to have been given to Tenant, unless and until a copy thereof shall have been so given to such Leasehold Lender. Such Leasehold Lender shall thereupon have a period of twenty (20) days after service of such notice upon it, for remedying the default or causing the same to be remedied, which twenty (20) day period shall be in addition to any cure period that is given Tenant after service of a similar notice upon it. Such Leasehold Lender, in case Tenant shall be in default hereunder, shall, within such period and otherwise as herein provided, have the right to remedy such default, or cause the same to be remedied. Landlord will accept performance by the Leasehold Lender of any covenant, condition or agreement on Tenant's part to be performed hereunder with the same force and effect as though performed by Tenant. No event of default of Tenant in respect of the performance of work required to be performed, or acts to be done, or conditions to be remedied, shall be deemed to exist, so long as Leasehold Lender shall, in good faith, have commenced promptly to rectify and to prosecute the same to completion with diligence and continuity. If Leasehold Lender cannot reasonably take the action required to cure the default without being in possession of the Premises, the time of Leasehold Lender to cure the default shall be deemed extended to include the period of time required by such Leasehold Lender to obtain such possession with due diligence; provided, however, that during such period all other obligations of Tenant under this Lease, including the payment of rent and other sums required to be paid by Tenant, are being duly performed. No Leasehold Lender shall become liable under the provisions of this Lease, unless and until such time as it becomes, and then only for as long as it remains, the owner of the leasehold interest created by this Lease ("**Leasehold Estate**"), nor shall the consent of Landlord be required to an assignment by a Leasehold Lender, or its successors and assigns, of its or their interest in the Leasehold Estate. From and after receiving notice of the existence of any Leasehold Lender, Landlord and Tenant will not, except as herein provided in case of Tenant's default, cancel, surrender, modify or amend this Lease without the prior consent of Leasehold Lender; provided, however, that Leasehold Lender shall not unreasonably withhold, condition or delay such consent, if withholding, conditioning or delaying such consent would prejudice Landlord's rights or remedies under this Lease. If required by Landlord's lender, Leasehold Lender shall furnish to Landlord's lender a subordination agreement in form reasonably acceptable to Tenant and Landlord's lender.

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



16.  **INSURANCE**

(a)  Intentionally Omitted.

(b)  Tenant shall maintain at Tenant's sole cost and expense:

   (i)  Property Insurance upon all personal property owned by Tenant and located upon the Premises with coverage for perils as set forth under the Causes of Loss - Special Form, in an amount equal to full insurable replacement cost. Such insurance shall contain an agreed valuation provision in lieu of any co-insurance clause, an ordinance and law endorsement, debris removal coverage and a waiver of subrogation endorsement in favor of Landlord; and

   (ii)  Commercial General Liability Insurance, including Contractual Liability Insurance coverage, covering Tenant's operation on the Premises, with combined single limits of not less than $5,000,000.00 for bodily injury or property damage, naming Landlord as an additional insured. Such insurance shall be endorsed to provide that the insurance shall be primary to and not contributory to any similar insurance carried by Landlord, and shall contain a severability of interest clause.

(c)  The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies. At the end of each five (5) full calendar years of the initial Term, and at the beginning of each extension period, or upon either party's request, the parties shall review the coverages and limits of any or all of the policies required above, and at that time, shall cause such coverages and liability limits to be adjusted as reasonably agreed upon by Landlord and Tenant in view of reasonable exposure anticipated over the remainder of the Term of the Lease.

(d)  The insurance required to be maintained by Tenant pursuant to **Section 16(b)(ii)** shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice to Landlord, and that the coverage provided by such insurance policy shall be deemed primary insurance, and that any insurance provided by or on behalf of Landlord shall be in excess of any insurance provided by such policy. If Tenant does not self-insure as permitted in this Lease, Tenant shall provide to Landlord a certificate of the insurance required to be obtained by Tenant under this Lease.

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)

(e)     Notwithstanding anything contained herein to the contrary, so long as Tenant maintains a minimum net worth equal to or greater than $200,000,000.00, Tenant shall have the absolute right to satisfy any of its insurance requirements described in this **Section 16** through a program of self-insurance. If Tenant elects to self-insure, it shall be treated for all purposes of this Lease as if it had obtained the required insurance policies.

17.    **INDEMNIFICATION**

(a)     Landlord agrees to indemnify, protect, defend and hold Tenant, its directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses and liabilities, arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Premises, including the person and property of Tenant, its directors, officers, employees, agents, invitees, licensees or others, which result from or are caused by the willful misconduct or negligent acts or omissions of Landlord.

(b)     Tenant agrees to indemnify, protect, defend and hold Landlord, its directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses and liabilities (except those solely caused by the willful misconduct or negligent acts or omissions of Landlord), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Premises, including the person and property of Landlord, its directors, officers, employees, agents, licensees or others.

18.    **DEFAULTS**

(a)     If Tenant shall be in default under any of the provisions of this Lease and shall remain so for a period of thirty (30) days after notice from Landlord of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (i) terminate this Lease, or (ii) re-enter the Premises by summary proceedings or other lawful means, and at Landlord's option, either terminate or continue this Lease, relet the Premises (making reasonable efforts therefor), and receive the rent therefrom: provided, however, that Tenant shall remain liable for the equivalent amount of all rent and payment obligations reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of the Premises and of any repairs necessary to prepare the Premises for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date provided for the

21



payment of rent in this Lease. If any default of Tenant (except default for the nonpayment of rent) cannot reasonably be remedied or cured within thirty (30) days after notice of such default to Tenant, Tenant shall have such additional time as shall be reasonably necessary (provided that Tenant is diligently attempting to effect such cure) to remedy such default before Landlord shall have the right to exercise its rights and remedies under this Lease or under applicable law. Except for the legal remedy of damages and the equitable remedy of an injunction, the remedies of Landlord set forth in this **Section 18** shall be exclusive of any other remedies that may otherwise be available to Landlord. In all events, Landlord shall be required to mitigate its damages.

(b)     Intentionally Omitted.

(c)     If Landlord is in default in performing any of the terms or provisions of this Lease, and Landlord receives written notice of the default from Tenant, and Landlord fails to cure the default within thirty (30) days after receipt of the written notice, or if the default is of a character as to require more than thirty (30) days to cure, then Tenant may cure the default, at the expense of Landlord, and may deduct from Rent all sums expended, plus interest at the Prime Rate, until Tenant is reimbursed in full or, at Tenant's option, Tenant may terminate this Lease effective upon written notice to Landlord.

(d)     If any of the covenants, conditions or other provisions of this Lease are breached, Landlord or Tenant shall have the right to obtain an injunction or other appropriate judicial relief against the other. No failure by Landlord or Tenant to insist upon the performance or the strict performance of any covenant, condition or other provisions of this Lease or to exercise any right or remedy consequent upon a breach or other default thereof shall constitute a waiver of assumption thereof by the other party, and no acceptance, use or occupancy of the Premises shall constitute a waiver or assumption by Tenant of any duty or obligations of Landlord with respect thereto. The grant or reservation herein or the exercise of any right or remedy, or of any supplementary or alternative rights or remedies, shall not affect or prejudice any other rights or remedies which Tenant may have under this Lease or under law.

(e)     In the event that (i) Tenant in good faith takes the position that Landlord has failed to perform its obligations under this Lease; (ii) subject to the provisions of **Section 18(c)**, Tenant undertakes to cure such failure on the part of Landlord to perform such obligations; and (iii) Tenant withholds rent and/or other charges to the extent permitted under the terms of this Lease after

22



Tenant cures a default of Landlord in order to receive reimbursement for the funds expended in curing the default of Landlord, then, in such event, Landlord shall not have the right to terminate this Lease or to evict Tenant for the non-payment of such amount of Rent or other charges properly withheld from payment to Landlord, nor shall Landlord have the right to commence a proceeding for forcible entry and detainer or other similar action to recover possession of the Premises from Tenant until such dispute is resolved. In the event that a court of competent jurisdiction rules that Tenant did not have the right to withhold Rent or other payments to Landlord under the terms of this Lease, then, upon the issuance of such a judgment, Tenant shall pay to Landlord the amount so withheld plus interest at the Prime Rate.

19. **DAMAGE AND DESTRUCTION OF IMPROVEMENTS**

(a)    Except as set forth below, the damage, destruction or partial destruction of any of Tenant's Improvements which is a part of the Premises shall not release Tenant from its obligations hereunder. In case of damage to or destruction of any such building or improvement on the Premises, Tenant shall have no obligation to repair or restore the same, except as set forth in **Section 19(d)** below. Without limiting such obligations of Tenant, it is agreed that the proceeds of any insurance obtained or paid for by Tenant covering such damage or destruction shall be made immediately available to Tenant upon receipt by Landlord regardless of whether Tenant elects to perform such restoration, repair or replacement.

(b)    Notwithstanding anything to the contrary contained in this **Section 19**, in case of the destruction or damage to more than thirty five percent (35%) of the Gross Leasable Area of Tenant's Improvements or damage thereto from any cause so as to make Tenant's Improvements unusable for Tenant's purposes which occurs during the last two (2) years of the Term hereof or during any extended term, Tenant may elect to terminate this Lease by written notice served on Landlord within one hundred twenty (120) days after the occurrence of such damage or destruction. In the event of such termination, and notwithstanding any provision of the REA or Declaration there shall be no obligation on the part of Tenant to repair or restore the Tenant's Improvements, nor any right on the part of Landlord to receive any proceeds collected under any insurance policies directly obtained or paid for by Tenant covering such building or any part thereof. On such termination, Rent, taxes, and any other sums payable by Tenant to Landlord hereunder shall be prorated as of the termination date and, in the event any rent, taxes or other sums shall have been paid in advance, Landlord shall rebate the same for the unexpired period for which payment shall have been made.

23

(c)   If during the Term, Tenant's Improvements are partially damaged or destroyed by fire or any other casualty, the proceeds of all insurance directly obtained or paid for by Tenant covering such damage or destruction shall be made immediately available to Tenant upon receipt by Landlord, but notwithstanding any provision of the REA or Declaration Tenant shall have no obligation to repair or restore the same. If Landlord fails to immediately make available to Tenant the proceeds of any such insurance covering such damage or destruction, Tenant may terminate this Lease at any time thereafter until Landlord makes such proceeds available by giving written notice to Landlord in addition to pursuing Landlord for recovery of the proceeds of any insurance covering such damage or destruction.

(d)   If Tenant elects not to restore Tenant's Improvements and to terminate this Lease as provided herein, and notwithstanding any provision of the REA or Declaration, Tenant shall restore the Premises to a sightly and safe condition and in such a manner as not to materially and adversely interfere with the easement rights affecting the Premises.

(e)   No termination of this Lease by Tenant under any provision of this **Section 19** shall preclude Tenant from recovering from Landlord the proceeds of any insurance policies obtained or paid for by Tenant covering such building or any part thereof.

## 20. **EFFECT OF EMINENT DOMAIN**

(a)   In the event the Premises shall be permanently appropriated or taken under the power of eminent domain by any public or quasi-public authority, this Lease shall terminate and expire as of the date of such taking, and Tenant shall thereupon be released from any liability thereafter accruing hereunder.

(b)   In the event that accessways or other easement rights over the Entire Tract necessary for the convenient use or operation of the Premises, or a portion of the Premises shall be so permanently appropriated or taken and Landlord fails to replace or restore the same to the reasonable satisfaction of Tenant so that the remainder of the property shall not be suitable for the use then being made of the property by Tenant, or if the remainder of the property is not one undivided parcel of property, Tenant shall have the right to terminate this Lease as of the date of such taking on giving to Landlord written notice of such termination within forty-five (45) days after Landlord has notified Tenant in writing that the property has been so appropriated or taken.

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



(c)     In the event of such partial taking and Tenant does not so terminate this Lease, then this Lease shall continue in full force and effect as to the part not taken, and the rental to be paid by Tenant during the remainder of the Term shall be proportionately, on a square footage basis, adjusted.

(d)     In the event of the termination of this Lease as provided in this **Section 20**, then, in any such condemnation proceedings, the rights of Landlord and Tenant to share in the proceeds of any award shall be determined as follows:

   (i)     The court in the condemnation proceedings shall, if not prohibited by law, be requested by both Landlord and Tenant to make separate awards to Landlord (for its fee interest in the Premises encumbered by this Lease) and to Tenant (for the value of the leasehold estate and Tenant's Improvements).

   (ii)    If the court is unwilling or unable to make separate awards, the award shall be divided between Landlord and Tenant in proportion to the fair market value of their respective interests as described in **Section 20(d)(i)** above. If Landlord and Tenant are unable to agree upon the division, it shall be resolved by appraisal conducted by a mutually acceptable neutral appraiser.

(e)     In addition to the other termination rights of Tenant in this **Section 20**, Tenant shall have, at its option, the right to terminate this Lease upon a taking or condemnation of any of the following: any portion of the Protected Parking Field designated on the Site Plan, unless replaced to Tenant's satisfaction within thirty (30) days from the date of the taking or condemnation, or a point of ingress and egress from the Entire Tract to the public roadways as depicted on the Site Plan.

21.   **DISPOSITION OF IMPROVEMENTS ON TERMINATION OF LEASE**

(a)     On termination of this Lease for any cause, Tenant shall deliver to Landlord and Landlord shall become the owner of any building(s) or improvements upon the Premises, if any, in its/their "as is" condition, free and clear of any liens and encumbrances. Tenant shall execute and deliver to Landlord such documents as Landlord may reasonably require to evidence such transfer of title to the Landlord of such buildings and improvements.

(b)     Notwithstanding anything to the contrary in this Lease, Tenant shall have no obligation to repair or restore the Premises or to repair, restore or replace any building or other improvements located upon the Premises at the

25



expiration or other termination of this Lease, except as specifically set forth in **Section 19(d)**.

22.   **HAZARDOUS MATERIALS**

Landlord and Tenant agree as follows with respect to the existence or use of Hazardous Material (as defined herein), on the Premises and Entire Tract:

(a)   Landlord hereby represents and warrants to Tenant, to Landlord's actual knowledge, that:

   (i)   the Premises complies with any applicable Environmental Law(s) (as hereinafter defined);

   (ii)   no Hazardous Material has been used, disposed of or is located on or in, or migrating to or from the soil and ground water on or under the Premises or the Entire Tract; and

   (iii)   Landlord represents and warrants to Tenant that Landlord has delivered to Tenant (A) a copy of all environmental information and reports relating to the Premises in Landlord's possession, and (B) a current Phase I Environmental Site Assessment on the Premises meeting ASTM Standard E1527-97, and prepared by an environmental consultant acceptable to Tenant.

(b)   Landlord hereby covenants to Tenant as follows:

   (i)   Landlord shall be responsible for all costs incurred in complying with any order, ruling or other requirement of any court, governmental body or agency (a) requiring Landlord to comply with any applicable Environmental Law, or (b) relating to or arising out of the presence of any Hazardous Material at the Premises, unless such presence was caused by Tenant or its employees, agents, or contractors ("**Tenant's Hazardous Material**"). Landlord shall diligently pursue to completion all such work required in connection with the same and, to the extent practicable, shall do so in a manner that does not interrupt or interfere with any business or other activities being conducted on the Premises.

   (ii)   Landlord shall indemnify, defend and hold Tenant, its directors, officers, employees, agents and successors harmless from and against any and all claims, judgments, damages, penalties, fines,

26



costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys fees, consultant fees, and expert fees) and all damages relating to or arising out of (a) the presence of any Hazardous Materials at the Premises excluding Tenant's Hazardous Material; (b) Landlord's operation or violation of any Environmental Law at the Premises; or (c) the breach of any representation, warranty or covenant in this **Section 22.** In the event of any beach of any representation, warranty or covenant contained in **Section 22** or in the event of the presence of Hazardous Material excluding Tenant's Hazardous Material located on, under or about the Premises, Tenant has the right (without waiving any of its other remedies) to either (a) terminate this Lease at its sole election by written notice to Landlord, such termination to be effective as of the date of Tenant's written notice, or (b) have its monthly Rent abated in proportion to the extent of interference with Tenant's business until such time as the Premises, and/or the Entire Tract (in the event of the breach of Landlord's representation and warranties relating to the Entire Tract), as the case may be, complies with all laws and/or Landlord has cured such breach in a manner satisfactory to the governmental authority having jurisdiction there over, if applicable, or if no such governmental authority has jurisdiction with respect to such matter or required the clean up or remediation of such Hazardous Materials, in an manner reasonably satisfactory to Tenant. Tenant shall also have the right to perform any necessary repair, cleanup, detoxification or other remedial action of Hazardous Material to which Landlord has failed to perform its obligation to repair, cleanup, detoxify or take remedial action, and to offset from Tenant's monetary obligations hereunder the amount so expended by Tenant.

(c)     Tenant hereby covenants to Landlord as follows:

(i)     Tenant shall be responsible for all costs incurred in complying with any order, ruling or other requirement of any court, governmental body or agency (a) requiring Tenant to comply with any applicable Environmental Law relating to Tenant's Hazardous Material, or (b) relating to or arising out of the presence of Tenant's Hazardous Materials on the Premises.    Tenant shall diligently pursue to completion all such work required in connection with the same. In the event that Tenant acquires knowledge or receives notice of any of the foregoing, Tenant shall promptly notify Landlord of the same.

27

(ii)    Tenant shall indemnify, defend and hold Landlord, its directors, officers, employees, agents and successors harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys fees, consultant fees, and expert fees) and all damages relating to or arising out of (a) the presence of Tenant's Hazardous Material on the Premises; (b) Tenant's operation or violation of any Environmental Law(s) at the Premises; or (c) the inaccuracy or breach of any representation, warranty or covenant in this **Section 22**. Tenant's obligation to indemnify Landlord as set forth in this **Section 22(c)(ii)** shall survive the termination of this Lease for a period of one (1) year.

(d)    As used herein, the term "**Hazardous Material**" means petroleum products, asbestos, underground storage tanks, and any other hazardous or toxic substance, material or waste which is or becomes regulated under any current or future Environmental Law.

(e)    As used herein, the term "**Environmental Law(s)**" means any and all current or future federal, state and local laws or regulations (as well as obligations, duties and requirements relating thereto under common law) pertaining to (a) the protection of health, safety, and the environment, (b) the conservation, management, or use of natural resources and wildlife, (c) the protection or use of surface water, groundwater, water courses and wetlands, (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, discharge, spill, release, threatened release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Material or (e) pollution (including any release to air, land, surface water, and groundwater).

23.   **ALTERATIONS**

(a)    Tenant shall have the right, without Landlord's prior written consent, to make such alterations, improvements and changes to any building which may, from time to time, be located on the Premises as Tenant may deem necessary, or to replace any such building with a new building. Any such alterations, improvements and changes to any building shall be in compliance with Laws.

(b)    Any new building constructed by Tenant on the Premises, and all alterations, improvements, changes or additions made in or to such Premises shall be the property of Tenant for the Term, except as stated otherwise herein.

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



24. **PROHIBITED ACTS; REA, DECLARATION**

    (a)    Landlord shall not modify, amend or terminate the REA, the Declaration or any other agreement relating to the C.S. Subdivision, or take, permit or suffer any action that will adversely affect Tenant, without the prior written approval of Tenant, which Tenant may withhold in its sole discretion.

    (b)    In the event that any of the provisions of this Lease are contrary to the provisions of the REA or the Declaration, as between Landlord and Tenant, the provisions of this Lease shall control.

    (c)    Intentionally omitted.

25. **MERCHANTS' ASSOCIATION**

Tenant shall not be required to join, participate in or contribute to a merchants' association or marketing fund, now existing or formed in the future in connection with the Premises.

26. **LANDLORD'S RIGHT OF ENTRY**

Tenant shall permit Landlord and the agents and employees of Landlord to enter into and upon the Premises at reasonable times and with one (1) business day's prior written notice for the purpose of inspecting the same. If Tenant has not exercised an option to renew, Tenant shall permit Landlord and its agents and employees, at any reasonable time upon reasonable notice during the last Lease Year prior to the expiration of the Term of this Lease in order to exhibit the Premises to prospective tenants at reasonable hours, provided, Landlord agrees not to interfere with Tenant's operations in exercising its rights under this **Section 26.**

27. **COMMON AREA MAINTENANCE**

Tenant shall reimburse Landlord for any costs passed on to Landlord under the Declaration, provided, however that such reimbursement obligation relating to the maintenance, repair, replacement or improvement of stormwater retention or management facilities shall not exceed Five Hundred and No/100 Dollars ($500.00) in any calendar year. Such payment shall be made within sixty (60) days after demand is made therefor, which demand shall be accompanied by sufficient supporting documentation to justify such payment.

29



28. **COMMON AREA ALTERATIONS**

Landlord shall not make or allow any other party to make any material alterations to the Common Areas located within the "**No Build Area**" shown on the Site Plan without first obtaining Tenant's prior written consent.

29. **NOTICES**

Notices shall be in writing and shall be properly served when received or upon refusal of receipt: (a) after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (b) after being deposited with a reputable overnight express carrier (e.g., Federal Express, Airborne, Express Mail) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery, or (c) if personally delivered. Notices shall be addressed as follows:

| | |
|---|---|
| **Tenant:** | SEARS, ROEBUCK AND CO.<br>3333 Beverly Road<br>Department 824RE<br>Hoffman Estates, Illinois 60179<br>Attn: Vice President<br>   Real Estate |
| **Copy to:** | SEARS, ROEBUCK AND CO.<br>3333 Beverly Road<br>Department 766T<br>Hoffman Estates, Illinois 60179<br>Attn: Assistant General Counsel<br>   Real Estate |
| **For Real Estate Tax Invoices:** | SEARS, ROEBUCK AND CO.<br>Real Estate Taxes<br>Department 768TAX<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179 |
| **For Rent and Other Real Estate Invoices:** | SEARS, ROEBUCK AND CO.<br>Real Estate Payments<br>Department 824RE<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179 |

30

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



| With a Copy to: | Store Manager |
| | SEARS, ROEBUCK AND CO. |
| | _____ |
| | Portage, Indiana _____ |

| Landlord: | CONTINENTAL 82 FUND, LLC |
| | W133 N8569 Executive Parkway |
| | P.O. Box 220 |
| | Menomonee Falls, Wisconsin 53052 |
| | Attn: Legal Department |

or to any other address furnished in writing by any of the foregoing. However, any change of addresses furnished shall comply with the notice requirements of this Section and shall include a complete outline of all current addresses to be used for all parties.

## 30.  **WAIVER**

The waiver by either party of, or the failure of either party to take action with respect to any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition, or subsequent breach of the same, or any other term, covenant or condition therein contained.

## 31.  **TRANSFER AND RECORDING TAXES**

Upon execution of this Lease, a memorandum of this Lease in the form attached hereto and made a part hereof as **Exhibit "C"** shall be executed by both parties and Landlord shall pay for and record such memorandum. Landlord will pay all transfer and recording taxes, charges and assessments levied, assessed or incurred upon execution, delivery or recordation of this Agreement, as they become due.

## 32.  **ATTORNEYS' FEES**

In the event that either party resorts to litigation, arbitration, or any alternative resolution process to enforce its rights pursuant to this Lease, each party shall bear the fees and costs of its own attorneys', consultants, experts and any other fees and costs incurred in connection with this Lease.

31

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)

33. **PARTIES BOUND**

The covenants and conditions herein contained shall, subject to the provisions as to assignment, transfer and subletting, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

34. **TIME OF THE ESSENCE**

Time is of the essence of this Lease, and of each and every covenant, term, condition and provision hereof.

35. **BROKER**

Landlord and Tenant represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Lease, except for Stanley Bobowski. ("**Broker**"). Landlord shall pay the commissions due to Broker. Landlord shall indemnify, defend and hold Tenant harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker or other agent claiming by or through Landlord. Tenant shall indemnify, defend and hold Landlord harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker or other agent claiming by or through Tenant.

36. **PRIME RATE**

The term "**Prime Rate**" as used herein shall mean the "Prime Rate" of interest as published from time to time in the Money Rates Section of the Wall Street Journal. If the Wall Street Journal no longer publishes the "Prime Rate" in its Money Rates Section, the "Prime Rate" shall mean the rate of interest announced from time to time by Bank One (or if Bank One is not in existence, the largest bank in the City of Chicago, Illinois, measured in terms of net worth) as its "prime rate" charged to its best commercial customers.

37. **SECTION CAPTIONS**

The captions appearing under the Section number designations of this Lease are for convenience only and are not a part of this lease and do not in any way limit or amplify the terms and provisions of this Lease.

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



38. **REMEDIES CUMULATIVE**

All remedies hereinbefore and hereafter co nferred on Landlord and Tenant shall be deemed cumulative and no one exclusive of the other, or of any other remedy conferred by law.

39. **GOVERNING LAW**

This Lease shall be interpreted and con strued under the laws of the state or commonwealth in which the Premises is located.

40. **NO PARTNERSHIP**

Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant and neither the method of computation of rent nor any other provision contained in this Lease or any acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

41. **SEVERABILITY**

Any provision or provisions of this Lease which are or become a legal or legally void shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions of this Lease shall nevertheless remain in full force and effect.

42. **FORCE MAJEURE**

As used in this Lease, the term "**Force Majeure**" shall mean and be limited exclusively to delays caused by flood, hurricane or other inclement weather, acts of God, or other circumstances that were not reasonably avoidable and are beyond a party's control. Each party shall provide the other party with notice within ten (10) days after the initial occurrence of an event which such party claims to be Force Majeure, and such notice shall specifically state the reason(s) for which the party claims an event of Force Majeure.  Time is of the essence in the delivery of any such notice. If the claiming party fails to deliver such notice within the time period set forth above, such party shall not be able to later rely on any such matter being deemed Force Majeure. Any time limits required to be met under this Lease, shall, unless specifically stated to the contrary elsewhere in this Lease, be automatically extended by the number of days by which any performance called for is delayed due to Force Majeure; provided, however, in no event shall the number of days by

33



which any performance or combination of performances called for be delayed any longer than forty-five (45) days in the aggregate due to any number of Force Majeure delays.

43. **APPROVALS**

Any review, approval or consent made or given by Landlord or Tenant shall be made or given solely for the benefit of the party making or giving such review, approval or consent; provided, however, that any such approval or consent shall satisfy any requirement of this Lease for such approval or consent.  Except as set forth above, any such review, approval or consent shall not be for the benefit of any other person or entity, and no other person or entity shall have any right of action based thereon, right to claim any right or benefit from the terms contained therein or the effect thereof, or be deemed a third party beneficiary thereunder.  No such approval or consent shall be: construed to be a representation, warranty, covenant or acknowledgment that the matter approved or consented to (a) is or shall be safe and protect its users, occupants, or others from property damage, personal injury, loss, expense or damage, including attorneys' fees, or (b) complies or conforms with any statute, law, ordinance, rule or regulation of the City of Portage, County of Porter, State of Indiana, United States of America, and any other governmental body or agency having or purporting to have jurisdiction over the Premises; or an evaluation of the quality, design, method, fitness, safety or soundness of the matter to which such review, approval or consent relates.

44. **DAMAGES**

The parties acknowledge that a default by Landlord under this Lease or a delay in the performance of the obligations to be performed by Landlord under this Lease will cause damages to be suffered by Tenant, but that in certain circumstances it is impossible to calculate the amount of such damages, and in such cases, the parties have agreed upon the method for compensating Tenant for such damages as set forth herein.  The parties acknowledge and agree that such method for the computation thereof is intended not as a penalty, but as fully liquidated damages in the event of a default or the failure of the Landlord to timely perform the obligation to which such method of computation applies, and as a reasonable approximation of the amount of such damages that will be incurred by Tenant as a result of such breach or failure.

*[EXECUTIONS ARE ON THE FOLLOWING PAGE]*

34



**IN WITNESS WHEREOF**, the parties have caused this Lease to be executed:

LANDLORD:

CONTINENTAL 82 FUND LLC,
a Wisconsin limited liability company
By: Continental Properties Company, Inc.,
its Managing Member

By: _____
Name:    Daniel J. Minahan
Title:    Executive Vice President

ATTEST:

By: _____
Assistant Secretary

TENANT:

SEARS, ROEBUCK AND CO.

By: _____
Name:    Chester J. Wolan
Title:    Sr. Real Estate Director



R.E. DIRECTOR
RWK
CJ
LEGAL

**Attachments:**

Exhibit "A"
Exhibit "A-1"   Site Plan
Exhibit "A-2"   Plat of C.S. Subdivision Unit 2
Exhibit "B"     Non-Disturbance Agreement
Exhibit "C"     Memorandum of Lease
Exhibit "D"     REA
Exhibit "E"     The Criteria
Exhibit "F"     Tenant's Building Signage
Exhibit "F-1"   Tenant's Pylon Sign Depiction

STATE OF <u>WISCONSIN</u>        )
                                ) SS:
COUNTY OF <u>WAUKESHA</u>        )


      THE undersigned, a Notary Public, in and for the County and State aforesaid, does hereby certify, that <u>Daniel J. Minahan</u> personally known to me to be <u>Executive Vice President of</u> Continental Properties Company, Inc., the managing member of CONTINENTAL 82 FUND  LLC, a Wisconsin limited liability company, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that as such <u>Executive Vice President</u> of Continental Properties Company, Inc. he signed and delivered the said instrument pursuant to authority duly given to them by said ~~managing member.~~ corporation.

      Given under my hand and seal this *19ᵗʰ* day of _____ July _____, 2000.


Carol K. Thorson
Notary Public
State of Wisconsin
My Comm. Expires Sept. 22, 2002

_____
Notary Public

My Commission Expires:

_9-22-2002_



STATE OF ILLINOIS          )
                                             ) SS:
COUNTY OF COOK          )

**THE** undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that Chester J. Wolan, personally known to me to be the Senior Real Estate Director of **SEARS, ROEBUCK AND CO.**, a New York corporation, appeared before me this day in person and acknowledged under oath that in such capacity he signed and delivered the said instrument pursuant to authority duly given to him by said corporation.

**GIVEN** under my hand and seal this 20th day of July, 2000.

_____
                   Notary Public

My Commission Expires:

```
"OFFICIAL SEAL"
MARY J. PECHOUS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6/14/2003
```

_____

37(a)

STATE OF ILLINOIS          )
                                              ) SS:
COUNTY OF COOK           )

**THE** undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that Victoria S. Berghel, personally known to me to be the Assistant Secretary of **SEARS, ROEBUCK AND CO.**, a New York corporation, appeared before me this day in person and acknowledged under oath that in such capacity she signed and delivered the said instrument pursuant to authority duly given to her by said corporation.

    **GIVEN** under my hand and seal this 20th day of July, 2000.

                               Notary Public

My Commission Expires:

37(b)



## EXHIBIT "A"
## LEGAL DESCRIPTION

Lot 2 in the C.S. Subdivision Unit 2, an addition to the City of Portage, Porter County, Indiana, Recorded as Plat No. 2000-012319

38

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



**EXHIBIT "A-1"**

**SITE PLAN**

SEE ATTACHED

39

## EXHIBIT "A-2"

## PLAT OF C.S. SUBDIVISION UNIT 2

### SEE ATTACHED

40



C.S. SUBDIVISION UNIT 2

PORTAGE, INDIANA

PLAT OF SUBDIVISION

MANHARD CONSULTING LTD.
ENGINEERS • SURVEYORS • PLANNERS



C.S. SUBDIVISION UNIT 2

AN ADDITION TO THE CITY OF PORTAGE, PORTER COUNTY, INDIANA

BEING A SUBDIVISION OF PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 36 NORTH RANGE 7 WEST OF THE SECOND PRINCIPAL MERIDIAN, IN THE CITY OF PORTAGE, PORTER COUNTY, INDIANA.

C.S. SUBDIVISION UNIT 2

PORTAGE, INDIANA

PLAT OF SUBDIVISION

MANHARD CONSULTING LTD.
ENGINEERS • SURVEYORS • PLANNERS



EXHIBIT A-2    PAGE 3 OF 4



 

### EXHIBIT "B"

### NON-DISTURBANCE AGREEMENT

**THIS AGREEMENT** is made and entered into as of the _____ day of _____, 2000, by and between _____ ("Lender") and **SEARS, ROEBUCK AND CO.**, 3333 Beverly Road, Hoffman Estates, Illinois 60179 ("Tenant").

### WITNESSETH:

**WHEREAS**, by the Ground Lease dated _____, 200_ (the "Lease"), the Tenant has leased from **CONTINENTAL 82 FUND, LLC**, a Wisconsin limited liability company ("Landlord") certain premises, containing approximately 5.15 acres and the improvements located thereon which land is located on the south side of US Highway 6 at its intersection with Augusta Drive east of Willow Creek Road in the City of Portage, Porter County, in the State of Indiana, which land is legally described on Exhibit "A", together with various easements and rights relating thereto (the "Premises"),

**WHEREAS**, Lender is the holder of a mortgage on the Premises, given to the Lender by Landlord dated as of _____, recorded on _____, 2000, in the Office of the Recorder of Deeds [Registrar of Titles] of _____ County, _____ in Book _____ at Page _____, as Document No. _____ (collectively referred to herein with any other documents securing the debt secured by the mortgage as the "Mortgage").

**NOW, THEREFORE**, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Lender hereby consents to the Lease.

2.    In the event that Lender shall commence an action to foreclose the Mortgage or to obtain a receiver of the Premises, or shall foreclose the Mortgage by advertisement, entry and sale according to any procedure available under the laws of the state where the Premises is located, Tenant shall not be joined as a party defendant in any such action or proceeding and Tenant shall not be disturbed in its possession of the Premises.

41

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)





3.    In the event that Lender shall acquire the Premises upon foreclosure, or by deed in lieu of foreclosure, or by any other means:

(a)    Tenant shall be deemed to have made a full and complete attornment to Lender as the landlord under the Lease so as to establish direct privity between the Lender and Tenant;

(b)    All rights and obligations of Tenant under the Lease shall continue in full force and effect and be enforceable by and against Tenant respectively with the same force and effect as if the lease had originally been made and entered into directly by and between Lender as the landlord thereunder, and Tenant; and

(c)    Lender shall recognize and accept the rights of Tenant and shall thereafter assume the obligations of Landlord under the Lease.

4.    Nothing herein contained shall impose any obligations upon Lender to perform any of the obligations of Landlord as landlord under the Lease, unless and until Lender shall become owner or mortgagee in possession of the Premises.

5.    Any notice required or desired to be given under this Agreement shall be in writing and shall be properly served when received or upon refusal of receipt: (a) after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (b) after being deposited with a reputable overnight express carrier (e.g., Federal Express, Airborne, Express Mail) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery, or (c) if personally delivered, and addressed as follows:

**If to Lender**:    _____
                     _____
                     _____
                     _____

If to Tenant:    SEARS, ROEBUCK AND CO.
                 3333 Beverly Road
                 Hoffman Estates, Illinois  60179
                 Attention:    Vice President
                               Real Estate
                               Department 824RE

42

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



 

With a copy to:       SEARS, ROEBUCK AND CO.
                         3333 Beverly Road
                         Hoffman Estates, Illinois  60179
                         Attention:    Assistant General Counsel
                                          Real Estate
                                        Department 766T

Either party, at any time and from time to time (by providing notice to the other party in the manner set forth above), may designate a different address or person, or both, to whom such notice may be sent.

6.     This Agreement shall be binding upon and inure to the benefit of any person or entity acquiring rights to the Premises by virtue of the Mortgage, and the successors, administrators and assigns of the parties hereto.

7.     No personalty or fixtures of the Tenant are subject to the lien of the Mortgage.

**IN WITNESS WHEREOF**, this Non-Disturbance Agreement has been signed and sealed on the day and year first above set forth.

ATTEST:                   Lender

                                    _____

_____     By:_____
                                    Name:_____
                                    Title:_____

ATTEST:                   Tenant:

                                    **SEARS, ROEBUCK AND CO.**

_____     By:_____
Assistant Secretary           Name:_____
                                    Title:_____

**Prepared by and returned to when recorded:**
ARNSTEIN & LEHR
120 South Riverside Plaza, Suite 1200
Chicago, Illinois 60606
Attn:  Raymond J. Werner
        10265-0054

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



STATE OF _____  )
                           ) SS:
COUNTY OF _____     )


     THE undersigned, a Notary Public, in and for the County and State/Commonwealth aforesaid, does hereby certify, that _____ and _____ personally known to me to be _____ of _____, a _____, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that as such _____ and _____ they signed and delivered the said instrument pursuant to authority duly given to them by said _____.

     Given under my hand and seal this _____ day of _____, 20___.


_____
Notary Public


My Commission Expires:


_____


44

STATE OF ILLINOIS     )
                     ) SS:
COUNTY OF COOK     )

       THE undersigned, a Notary Public, in and for the County and State aforesaid, does hereby certify, that _____ and _____ personally known to me to be the _____ and Assistant Secretary of SEARS, ROEBUCK AND CO. , a New York corporation, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that as such _____ and Assistant Secretary they signed and delivered the said instrument pursuant to authority duly given to them by said corporation.

       Given under my hand and seal this _____ day of _____, _____.


                            _____
                                Notary Public

My Commission Expires:


_____

45

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)

# C.S. SUBDIVISION UNIT 2

AN ADDITION TO THE CITY OF PORTAGE, PORTER COUNTY, INDIANA

BEING A SUBDIVISION OF PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 36 NORTH, RANGE 7 WEST OF THE SECOND PRINCIPAL MERIDIAN, IN THE CITY OF PORTAGE, PORTER COUNTY, INDIANA.

PLAT OF SUBDIVISION
PORTAGE, INDIANA
C.S. SUBDIVISION UNIT 2

# C.S. SUBDIVISION UNIT 2

### AN ADDITION TO THE CITY OF PORTAGE, PORTER COUNTY, INDIANA

BEING A SUBDIVISION OF PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 36 NORTH, RANGE 7 WEST OF THE SECOND PRINCIPAL MERIDIAN, IN THE CITY OF PORTAGE, PORTER COUNTY, INDIANA.

36-B-18

MANHARD CONSULTING, Ltd.
ENGINEERS • SURVEYORS • PLANNERS
900 Woodlands Parkway, Vernon Hills, Illinois 60061
tel. 847/634-5550 fax 847/634-0095 http://www.manhard.com

PLAT OF SUBDIVISION
PORTAGE, INDIANA
C.S. SUBDIVISION UNIT 2

SHEET 2 OF 2

**RETAIL EXHIBIT**

**CONTINENTAL PROPERTIES**
COMPANY, INC.
P.O. Box 220, Menomonee Falls, Wisconsin 53052
PHONE: (262)502-5500 FAX: (262)502-5522 E-MAIL: cod_dwg@cproperties.com

MANHARD CONSULTING ltd.
ENGINEERS · SURVEYORS · PLANNERS

Sheet No.
EXA-1
PAGE 1 OF 3





CONTINENTAL PROPERTIES
COMPANY, INC.
P.O. Box 220,  Menomonee Falls,  Wisconsin 53052
PHONE: (262)502-5500 FAX: (262)502-5522 E-MAIL: cad_dwg@cpropertties.com

RETAIL
EXHIBIT

REVISIONS
| REV | DESCRIPTION | DATE |
|-----|-------------|------|

## EXHIBIT "C"

### MEMORANDUM OF LEASE

THIS **MEMORANDUM OF LEASE** ("Memorandum") made this ___ day of _____, 2000, by and between **CONTINENTAL 82 FUND, LLC,** a Wisconsin limited liability company ("Landlord"), and **SEARS, ROEBUCK AND CO.,** a New York corporation ("Tenant").

### WITNESSETH:

1. Landlord and Tenant have entered into a certain Ground Lease dated as of _____, 2000 (the "Lease"), pursuant to which Landlord has leased to Tenant certain premises (the "Premises") which contains approximately 5.15 acres and the improvements located thereon, which land is part of that certain shopping center to be developed on the real property located on the south side of US Highway 6 at its intersection with Augusta Drive east of Willow Creek Road in the City of Portage, Porter County, in the State of Indiana, which real property is described in Exhibit "A" attached hereto and made a part hereof.

2. The addresses of the parties to the Lease are as follows:

    (a)   Landlord -   **CONTINENTAL 82 FUND, LLC**
    W133 N8569 Executive Parkway
    P.O. Box 220
    Menomonee Falls, Wisconsin 53052
    Attn: _____

    (b)   Tenant -   **SEARS, ROEBUCK AND CO.**
    3333 Beverly Road
    Department 824RE
    Hoffman Estates, Illinois  60179

3. The Term of the Lease, more particularly described in Section 3 of the Lease, shall be for ten (10) years, commencing on the earlier to occur of the date (i) Tenant opens for business to the public in the Premises or (ii) two hundred forty (240) days after the Completion Date (as that term is defined in the Lease) provided that the Premises is delivered to Tenant in accordance with <u>Section 6</u> of the Lease

4. Tenant has the right to extend the Term of the Lease for six (6) additional periods of five (5) years each as more particularly set forth in the Lease.

46

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



 

5.    This Memorandum is not a complete summary of the Lease, nor shall any provisions of this Memorandum be used in interpreting the provisions of the Lease. In the event of any conflict between this Memorandum and the Lease, the Lease shall control.

6.    This Memorandum is being executed and delivered for recording in the Office of the Clerk of Porter County, Indiana.

**[EXECUTIONS ARE ON THE FOLLOWING PAGE]**

47

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



 

**IN WITNESS WHEREOF**, this Memorandum has been executed and delivered as a sealed instrument by the parties hereto on the day, month and year first above written.

LANDLORD:

**CONTINENTAL 82 FUND, LLC**

By: _____
Name: _____
Title: _____

ATTEST:                                TENANT:

                                       **SEARS, ROEBUCK AND CO.**

By: _____           By: _____
    Assistant Secretary               Name: _____
                                       Title: _____

(Corporate Seal)

This instrument was prepared by and after recording should be returned to:

ARNSTEIN & LEHR
120 S. Riverside Plaza
Suite 1200
Chicago, Illinois 60606
Attn:   Raymond J. Werner
        10265-0054

48



STATE OF _____    )
                                     ) SS:
COUNTY OF _____    )

        THE undersigned, a Notary Public, in and for the County and State aforesaid, does hereby certify, that _____ and _____ personally known to me to be _____ of CONTINENTAL 82 FUND, LLC, a Wisconsin limited liability company, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that as such _____ and _____ they signed and delivered the said instrument pursuant to authority duly given to them by said _____.

        Given under my hand and seal this _____ day of _____, 2000.


                                       _____
                                          Notary Public


My Commission Expires:


_____

49

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



STATE OF ILLINOIS    )
                              ) SS:
COUNTY OF COOK    )

      THE undersigned, a Notary Public, in and for the County and State aforesaid, does hereby certify, that _____ and _____ personally known to me to be the _____ and Assistant Secretary of **SEARS, ROEBUCK AND CO.** , a New York corporation, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that as such _____ and Assistant Secretary they signed and delivered the said instrument pursuant to authority duly given to them by said corporation.

      Given under my hand and seal this _____ day of _____, 199___.


                                                _____
                                                   Notary Public

My Commission Expires:


_____

50

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)

**EXHIBIT "D"**

**REA**

SEE ATTACHED

51



## RECIPROCAL ACCESS EASEMENT AGREEMENT

THIS RECIPROCAL ACCESS EASEMENT AGREEMENT (hereinafter, the "**Agreement**"), made and entered into as of the _____ day of July, 2000, by and between CONTINENTAL 82 FUND LLC, a Wisconsin limited liability company ("**Continental 82**"), and WHITECO INDUSTRIES, INC., a Nebraska corporation ("**Whiteco**").

### WITNESSETH:

WHEREAS, Continental 82 is the owner in fee simple of a Tract (as hereinafter defined) of land located in the City of Portage, County of Porter, State of Indiana, which land is more particularly described on **Exhibit "A"** attached hereto and made a part hereof, and shown as Unit 2, Lot 2 upon the site plan attached hereto as **Exhibit "C"** (hereinafter referred to as "**Lot 2**"); and

WHEREAS, Whiteco is the owner in fee simple of a Tract of land located in the City of Portage, County of Porter, State of Indiana, which land is more particularly described on **Exhibit "B"** attached hereto and made a part hereof, and shown as Unit 2, Lot 1 upon the site plan attached hereto as **Exhibit "C"** (hereinafter referred to as "**Lot 1**"); and

WHEREAS, the Parties desire to establish for the benefit of Lot 1 and Lot 2 certain easements in, to, over and across their respective Tracts of land.

NOW, THEREFORE, in consideration of the foregoing, and the covenants and declarations, as hereafter set forth, IT IS AGREED as follows:

### ARTICLE I
### DEFINITIONS

As used hereinafter in this Agreement, the following terms shall have the following respective meanings:

A.    ACCESS DRIVES. The term "**Access Drives**" refers to (i) the access drive that is to be constructed on, over and along the northerly portions of Lots 1 and 2 which will cross the property line between Lots 1 and 2 and provide access to Augusta Boulevard and Veterans Avenue, all as shown on **Exhibit "C"** attached hereto, or as the same may hereafter be modified as required by any governmental authority, and (ii) any other access drive that may be constructed on Lot 1 which connects to the access drive that is to be constructed on the southerly portion of Lot 2 behind the building, all as shown on **Exhibit "C"** attached hereto, or as the same may hereafter be modified as required by any governmental authority. The Access Drives located on Lot 1 will provide vehicular and pedestrian access to Veterans Avenue, and the Access Drives located on Lot 2 will provide vehicular and pedestrian access to Augusta Boulevard.

.B.    EFFECTIVE DATE. The term "**Effective Date**" refers to and means July _____, 2000.

- 1 -

C.   PARTY or PARTIES.  The term **"Party"** or **"Parties"** refers to the then-current owners of Lot 1 and Lot 2, or any portions thereof in the event that Lot 1 and/or Lot 2 are legally divided as provided herein.

D.   PERMITTEES.  The term **"Permittees"** refers to all Parties and each of their respective officers, directors, partners, employees, agents, contractors, customers, visitors, invitees, licensees, tenants, subtenants and concessionaires, and the employees, agents, contractors, customers, visitors, invitees and licensees of any tenant, subtenant or concessionaire.

E.   PERSON.  The word **"Person"** refers to and shall include individuals, partnerships, firms, associations and corporations, or any other form of business or government entity, and the use of the singular shall include the plural.

F.   TRACT OR TRACTS.  The term **"Tract"** or **"Tracts"** refers to Lot 1 and/or Lot 2, as the context may require.

## ARTICLE II
## EASEMENTS AND OTHER AGREEMENTS

A.   EASEMENTS FOR ACCESS, INGRESS AND EGRESS.  To become effective on the Effective Date:

1.   _Easement over Lot 2._  Continental 82 hereby grants to Whiteco, for its use and benefit and for the use and benefit of all Permittees of Lot 1, an easement on, over and across the Access Drives located on Lot 2 for ingress to and egress from Lot 1, for the passage of vehicles and pedestrians, and the doing of such other things as are authorized or required to be done within the Access Drives pursuant to this Agreement, all subject to the agreements and restrictions hereinafter set forth.

2.   _Easement over Lot 1._  Whiteco hereby grants to Continental 82, for its use and benefit and for the use and benefit of all Permittees of Lot 2, an easement on, over and across the Access Drives located on Lot 1 for ingress to and egress from Lot 2, for the passage of vehicles and pedestrians, and the doing of such other things as are authorized or required to be done within the Access Drives pursuant to this Agreement, all subject to the agreements and restrictions hereinafter set forth.

3.   _Restrictions on Use of Access Drives._  Truck traffic shall be restricted to those areas designated for truck traffic.  Truck traffic traveling over Lot 2 and servicing Lot 1 shall use the Access Drive located to the south and rear of the building located on Lot 2 only.  Each Party reserves the right to make reasonable rules and restrictions governing traffic and parking on its Tract.  No Party shall be required to remove or relocate then-existing parking, structures or improvements to accommodate vehicle or pedestrian ingress, egress or passage.



EXHIBIT C        PAGE 2 OF 3



CONTINENTAL PROPERTIES
COMPANY, INC.
P.O. Box 220,  Menomonee Falls,  Wisconsin 53052
PHONE: (262)502-5500 FAX: (262)502-5522 E-MAIL: cod_dwg@cproperties.com

RETAIL
EXHIBIT

CITY: PORTAGE
STREET: VETRANS AVE. & AUGUSTA ST.

EXHIBIT C        PAGE 3 OF 3

**EXHIBIT "E"**

**THE CRITERIA**

SEE ATTACHED

52

Sears Paint & Hardware
Portage, IN
535476_7 (7/13/00)



  

 

EXHIBIT E

## SEARS CONSTRUCTION STANDARDS
### DEVELOPER RESPONSIBILITIES

<u>MINIMUM SITE SPECIFICATIONS</u>

I.    <u>GENERAL CONDITIONS</u>

II.    <u>PHASE I – SITE INVESTIGATION</u>
     A.    Soil Testing, Analysis and Report
     B.    Survey and Topography
     C.    Preliminary Site Plan Approval

III.    <u>PHASE II – SITE DEVELOPMENT PLANNING</u>
     A.    General
     B.    Site Plan
     C.    Site Grading Plan
     D.    Site Lighting Plan
     E.    Landscaping and Irrigation Plan
     F.    Approvals

IV.    <u>PHASE III – SITE AND PAD PREPARATION STANDARDS</u>
     A.    Grading
     B.    Pavement, Sidewalks, Curbs and Signs
     C.    Construction Road and Staging Areas
     D.    Site Lighting
     E.    Traffic Signalization
     F.    Utilities
     G.    Landscaping and Retaining Walls
     H.    Building Pad Preparation
     I.    Schedule
     J.    Strip Center

Revised 5/19/00 RWF
REVISED 6/14/00

## MINIMUM SITE SPECIFICATIONS

I.    GENERAL CONDITIONS

The following standards are intended to establish an understanding of "minimum" level of performance, by Developer, acceptable to Sears.  However, Sears reserves the right to amend these specifications for specific project conditions.  Developer shall be solely responsible for compliance with the standards set forth herein and must bear all costs should corrective measures be required.  In addition to the specific requirements called for within these specifications, the Developer's design and construction of all on-site and off-site improvements shall conform to applicable federal, state and municipal governmental requirements, including but not limited to, local zoning and highway ordinances, fire and building codes, accessibility codes, regional planning directives and regulations pertaining to health, safety and environmental protection.  In the event that any governmental agency places any restrictions or imposes any conditions relative to compliance with these minimum site specifications before occupancy permits can be issued, Developer, upon receiving such notice of restrictions or condition, shall immediately notify Sears and shall participate in the remedy.

Developer/Landlord is required to furnish all equipment, materials, labor, etc., as required to incorporate and complete all work as described in the following Minimum Site Specifications.  Unless otherwise stated below, all work shall be completed to provide a complete and operational system for all utilities, sitework, landscaping, offsite work, etc., as required by the Minimum Site Specifications.

Sears building construction type will be designed as BOCA type 2C, unprotected with unlimited area or similar designation for codes other than BOCA.  Developer shall bear any additional building costs that are required to change Sears building construction type to a more restrictive type due to site plan layout, property line location and/or adjacent building construction.

II.    PHASE I – SITE INVESTIGATION

A.    Soil Testing, Analysis and Report

Developer shall retain the services of a professional, licensed geotechnical engineering consultant satisfactory to Sears for the purpose of investigating subsurface conditions by analyzing and evaluating test data to make specific grading, pad preparation and foundation recommendations.  Developer shall provide to this consultant specific information regarding the development, including but not limited to, building size, location, column layout, maximum loading and proposed finish floor elevation.

For the purposes of this Phase I analysis only, the Sears building shall be assumed to be a one story structure with a slab-on-grade.  Exterior walls will be load bearing concrete masonry units and the superstructure will be structural steel and bar joist.

Borings within the building footprint shall be a minimum of twenty (20) feet in depth unless refusals is encountered at a shallower depth or suitable bearing material is not encountered at the twenty (20) foot depth.  Borings in the parking

area shall be a minimum of ten (10) feet unless refusal is encountered at a
shallow depth. Samples shall be taken at intervals not to exceed five (5) feet as
defined by the Standard Penetration Test (ASTM D-1586). A minimum of
twelve (12) such borings shall be performed, one at each outside corner of the
building and one (1) at the center of the building from front to rear, and five (5)
well distributed throughout the parking area.

B.    **Survey and Topography**

1.    Developer shall provide Sears a certified ALTA survey meeting the
following general criteria:

(a)    Calculated metes and bounds boundary data shown on the
drawing orientation, etc

(b)    Narrative legal description as recorded in local records (County
Recorder of Deeds) together with a metes and bounds boundary
survey. The survey must show all items to which reference is
made in the legal description.

(c)    Location, description (with any recorded data) of all easements,
servitudes, right-of-ways and other encroachments, whether
recorded or otherwise evident.

(d)    Location and size of all utilities including water, electricity, gas,
telephone, sanitary sewer, storm sewer, etc.

(e)    Topography contours and terrain features shown on the drawing
with a benchmark noted relative to local established datum.
One permanent benchmark shall be set on the site and identified
on the survey for Sears to use during construction.

(f)    Size, variety and location of existing plantings.

(g)    Adjoining property owners of record.

(h)    Setbacks, building lines and other local or deed restrictions.

(i)    Zoning of parcel.

(j)    Location and nature of existing site improvements including
curbs, catch basins, sidewalks, etc.

(k)    Location and orientation of the building on the site.

(l)    Dot any previously recorded lot lines, servitudes, etc., that have
been replatted or vacated.

(m)  . Size of lot in square feet and acres.

(n)    Topographic map prepared from a fifty (50) foot grid survey



showing one (1) foot contour intervals. Any terrain breaks shall be shown and detailed.

2.    Developer shall obtain written confirmation from the appropriate public agencies, and/or utility companies, that the property will be served with all necessary utilities and other services (such as fire and police protection) and that the reserve capacities of all utility lines are adequate to serve the development.

    (a)    Obtain written commitments acceptable to Sears verifying that The property will be served all utilities.

    (b)    Locate nearest point to all utilities to which the site would connect.

    (c)    Street and other off-site improvements shall show right-of-way dedications required by governmental agencies with jurisdiction.

    (d)    Fees or Charges: advise if there are area fees or other assessments required in connection with development of the property.

    (e)    Location and extent of Flood Plain (if applicable) as established by HUD and any other governmental agencies having local jurisdiction of same.

C.    <u>Preliminary Site Plan Approval</u>    *RK*

1.    Site Layout Plan — ~~Sears~~ *Developer* will prepare the site layout plan based upon survey information provided and will furnish the site layout plan to ~~Developer~~ *RK Sears* with a ~~proposed~~ *finished* floor elevation.

2.    Development Plans — Using the ~~Sears~~ *approved RK* site layout plan, Developer shall prepare preliminary development plans and specifications. No deviations from Sears proposed layout shall be made without Sears prior written approval. Upon completion of design, one (1) set of reproducibles shall be submitted to Sears for approval prior to Developer's commencing with final site development planning. Preliminary plans submitted for Sears approval shall include, without limitation, site layout, traffic, striping, preliminary grading, utilities and finished floor elevation.

III.    <u>PHASE II – SITE DEVELOPMENT PLANNING</u>

A.    <u>General</u>

Final site development planning shall proceed only after approval of the preliminary site plan, as described in Phase I, by Sears as evidenced by signatures of its authorized representative. No modification to this approved layout shall be implemented without prior written approval of Sears. A qualified, licensed engineer shall prepare all site development documents.

 

The following list of general information shall be included within the final site development drawings.

**B.    Site Plan**

1.    The Site Plan shall include the location, size, invert elevations and material of all existing and proposed utilities. The limits of Developer versus Sears' responsibility for utility and tap installations shall be clearly shown. Utilities shall include, without limitation to, storm drains, sanitary sewers, water, gas, electric and telephone. A separate Site Utility Plan may be submitted in lieu of locating utilities on the Site Plan.

2.    The site plan shall include all traffic patterns, parking layouts, striping details, signalization and directional signaling. All existing and proposed curbs, sidewalks, retaining walls, etc., shall be shown. The location of all existing and proposed monument, directional, pylon or road signs shall be shown.

3.    The site plan shall show limits of heavy duty and standard duty pavements, concrete slabs, loading docks, etc. Limits of heavy duty versus standard duty pavements shall be as follows:

(a)    Heavy duty pavement: all perimeter roads, main driveways and truck thoroughfares.

(b)    Standard duty pavement: all automobile aisles and stalls.

**C.    Site Grading Plan**

The site grading plan shall show both existing and proposed contours at one (1) foot intervals. Site grading shall be designed as practical to balance cut and fill within the parameters established by the approved preliminary site plan. Profiles of the existing and proposed grading shall be provided by the Developer as required by Sears.

**D.    Site Lighting Plan**

The site lighting plan shall include location of all site lighting, photometric curves, circuiting, proposed pole and luminare catalog cuts, detail of base, pole and luminare assembly and any other information required to evaluate the lighting plan. Power to illuminate existing or proposed monument, pylon, road or directional signs shall be shown.

*RK*

**E.    Landscaping and Irrigation Plan**    *(if required by generally accepted practice)*

The landscaping plan shall indicate all proposed planting (size, variety, and location) and seeding/sodding (turf mix, density, rate, etc.) The landscaping plan shall be designed by a registered professional in accordance with local standards and designed suitable for the climate.

F.    Approvals

Upon completion of the final site development plans one (1) reproducible set of plans shall be submitted to Sears for review and approval. Sears will sign and return a blueline set noting any required revisions. After the Sears required modifications have been implemented, Developer shall submit documents to the appropriate governmental agencies. All necessary governmental approvals shall be the sole responsibility of the Developer. Monthly approval review status reports shall be furnished to Sears.

IV.    PHASE III – SITE AND PAD PREPARATION STANDARDS

Except as amended and approved by Sears, the following criteria shall establish the minimum acceptable standards for design and construction of the site work and pad preparation. All drawings, specifications and construction shall, as minimum, conform to the following specifications and requirements.

A.    Grading

1.    Developer shall grade, excavate and place structural fill on the site in conformance with these specifications or the recommendations of Developer's geotechnical engineer, whichever is more stringent.

2.    All paved areas, unless otherwise required by law, shall be designed at a 4% maximum and 1% minimum grade, with no retaining walls or embankments forming a break in grade.

3.    All landscaped areas shall have a maximum slope of three (3) horizontal to one (1) vertical.

4.    All grading shall be performed to a tolerance of plus or minus one-tenth (1/10) of one (1) foot within the building and paved area. This tolerance may be increased to plus or minus one-half (1/2) of one (1) foot within landscaped areas.

5.    All structural fill shall be placed in accordance with the following densities, as defined by ASTM D-1557 MODIFIED PROCTOR:

| Paved areas | 95% |
| Below foundations | 95% |
| Below building slab | 95% |

6.    Developer shall be responsible to remove all rock formations within the Sears pad to a depth of 36" below final grade elevation.

B.    Pavement, Sidewalks, Curbs and Signs

1.    Pavement design shall be as recommended by Developer's geotechnical Engineer and shall consider such variables as the California Bearing Ratio (CRB) of the soil, anticipated traffic volume and vehicle mix (i.e.:



automobiles, single axle trucks, double axle trucks, etc.)  The design shall also be based on sound geotechnical practices, existing soil conditions, knowledge of local conditions, availability of material and pavement performance.

2.  Pavement design shall include both standard duty and heavy duty pavement and shall be based on the following criteria:

> Standard Duty Pavement:  Equivalent Axle Loading (EAL) design value of 0.6/day (500 automobiles per day) and general parking.

> Heavy Duty Pavement:  Equivalent Axle Loading (EAL) Design value of 1.4/day (500 automobiles per day plus 3 tractor trailers per day with 9,000 lb wheel loads).

3.  Pavement design shall be based on a minimum design period of twenty (20) years.

4.  Pavement shall be classified as heavy duty and standard duty as delineated in Section III, B, 3. of these specifications.

5.  Parking Module – the width of an aisle plus the depth of the parking stall on either side, measured perpendicular to the aisle shall be a minimum of sixty-two (62) feet for 90 degree parking or as required by the local authority.  Angled parking may be used with written approval from Sears.

6.  Perpendicular width between center lines or between mid-points of . parallel lines of adjacent stall striping shall be nine (9) feet.

7.  All parking stalls shall be separated using stripes four (4) inches in width.  Striping shall have two (2) coats of paint, alkyd base synthetic resin, Fed. Spec. TTP-115 TYPE 1.  Striping shall be white unless a specific color is required by a governing law or code.  If seal coat is used, it shall be compatible with striping paint compound.

8.  Accessible stalls shall be provided per requirements of local ordinances the Americans with Disabilities Act (ADA).  Locate required accessible parking at the end of the parking rows immediately closest to the drive lane from the store entrance.  Indicate location, size and accessible route to the store entrance in accordance with local and ADA requirements.

9.  Access roads, parking lot perimeters, parking lot islands, landscape enclosures and any other areas requiring adequate drainage shall have six (6) inch by eighteen (18) inch cast-in-place concrete curbs, unless otherwise required by a governing law or code.  Asphalt curbs are not permitted.  All integral type curb and gutters shall be concrete.  Deck curbs shall not be used.

MAY.19.2000  2:36PM    SEARS REAL ESTATE                    NO.094    P.9



10.     All sidewalks shall have a minimum slope of one-quarter (1/4) inch foot and shall be scored concrete, minimum four (4) inches thick over a suitable granular base unless otherwise required by a governing law or code. Accessible routes shall have a maximum 2% cross slope.

*Directional signs are the responsibility of Sears.* RfK

Developer shall obtain all permits for, provide and erect all monument, road, pylon and/or directional signs, in a timely manner. Developer shall endeavor to erect said signs as early as possible, but no later than substantial completion of the Sears building. *Monument sign to be constructed by Whitco with Sears having the top panel, Sears to obtain permits for building signage.* RfK BfM

C.     **Construction Road and Staging Areas**

A temporary crushed rock construction road, connecting to an existing roadway adjacent to the Sears parcel and staging area shall be constructed and maintained in good condition by Developer throughout the construction process to provide access to and around the building site. Staging areas for workers' parking, material storage and contractor's trailers and sheds shall be completed two (2) weeks before the start of construction of the Sears building. *as a* RfK BfM The construction road shall be a minimum of thirty (30) feet in width and the staging area a minimum of 40,000 sq. ft., both constructed of an eight (8) inch crushed rock base with rock binder course. Developer cannot relocate staging area during construction period of the Sears facility without written approval from Sears. If approval is given Developer shall bear all costs for relocating staging area. In final phase, Developer can request moving of construction trailer to permit any final paving to be accomplished.

*condition of pad turnover*

D.     **Site Lighting**

1.     Illumination shall be measured thirty (30) inches above the adjacent ground, and shall be:

(a)     1.00 foot candle minimum maintained.

(b)     1.50 foot candle average maintained (to include Sears perimeter sidewalks).

2.     Selection of fixture type and control of parking area lighting shall be subject to review and approval of Sears.

3.     Satisfactory security lighting (25% of total luminares) shall be provided.

E.     **Traffic Signalization** — N/A

RfK BfM

The location of traffic signals shall be determined in coordination with governmental agencies subject to Sears approval. For each traffic signal, Developer shall have a traffic signal design plan prepared, in the jurisdiction where the project is located, by a licensed engineer. This plan shall be subject to Sears' review and approval prior to final submission to the appropriate governmental agencies. The plan shall show, as a minimum, the geometrics of the entrance/exit, the location of standards, signal heads, controller, power course, detectors and conduit, as well as the suggested signal phase and wiring.

Revised Date 12/15/98 - Sears Minimum Site Specifications                    7




MAY.19.2000  2:37PM    SEARS REAL ESTATE                    NO.094    P.10

diagram, and shall otherwise be in sufficient detail to permit obtaining bids for
the installation of the signal.

F.    **Utilities**

1.    Temporary Utilities.

Developer shall provide the following temporary utility services to a
point not more than twenty-five (25) feet from Sears building pad, which
point shall be approved by Sears.

(a)    Water: as a minimum service, a two (2) inch line at a pressure
suitable for use without the need for pumping.

(b)    Electricity:  service, at 120/208 volts with a minimum of 400
amps three phase-four wire and terminating in a weatherproof
and rainproof fused disconnect switch and subpanel. Developer
shall provide one (1) 400 watt flood light on a temporary power
pole in the staging area.

(c)    Telephone:  Developer to provide twenty (20) pair temporary
phone lines to Sears staging area before the start of construction
of the Sears facility.

(d)    Storm Drainage:  In addition to the above referenced utilities,
Developer shall provide adequate soil erosion protection which
shall include, without limitation, temporary ditches, hay bales,
silt fences, etc., as necessary to divert surface storm water runoff
from the building pad and staging areas, in accordance with all
applicable laws and codes. Developer shall maintain all such
soil erosion measures until permanent storm water drains have
been completed and made operational. *If Sears modifies*
*Developer's erosion control system Sears is*
*responsible to repair at necessary.*

*Sears shall maintain*
*erosion control if*
*necessary due to Sears*
*store construction or*
*Sears use of staging*
*area.*

2.    Permanent Utilities.

Developer shall furnish and install the following permanent utility
services to a point five (5) feet from the Sears exterior building wall,
which point shall be at an elevation and specific point of entry selected
by Sears. Developer shall provide all the necessary coordination with the
various utility companies to assure adequate service. Final connections
shall be made by the Sears contractor. All utilities will be underground
unless approved by Sears. Such permanent utilities shall be furnished in
accordance with the following requirements:

(a)    Sanitary sewer line inverts shall be sufficiently deep as to receive
all building flow by gravity.  Sewer laterals shall be a minimum
of six (6) inches in diameter.

(b)    (1)    Storm sewer drain line invert shall be sufficiently deep
as to receive all roof drainage and truck dock drainage

MAY.19.2000    2:57PM    SEARS REAL ESTATE                    NO.094    P. 11




by gravity. Developer shall furnish, install and maintain dock pump discharges to the nearest stormwater drain.

(2)     The stormwater drainage system shall include underground lateral connections for Sears roof drainage, which shall be provided by Developer at locations specified by Sears. All lateral connections shall be provided to within five (5) feet of the exterior building wall.

(3)     The storm drainage system shall include all pertinent inlet and outlet structures, rip-rap and bank protection, with an overall design based on the following (unless superseded by local codes):

-       A minimum of eighteen (18) inches of freeboard shall be maintained between finished floor elevation and the water surface resulting from a 100 year frequency storm.

-       Discharge velocities shall be low enough so as to prevent damage downstream.

-       A hydraulic analysis prepared by a registered Civil Engineer which shall be submitted to Sears for review and approval, if so requested.

-       Roof stormwater retention is not permitted.

-       No parking lot retention shall be permitted.

*RvK*

(c)     Domestic water shall be provided at the point of entry as determined by Sears. The domestic water line shall be a *BJm* minimum two (2) inch diameter line, ~~at 50 psi residual or three (3) inch line diameter at 50 to 50 psi residual. If residual~~ *See attachment* ~~pressure is less than 50 psi, developer will supply three (3) inch~~ *RvK A.* ~~line along with a booster pump at developer's con-~~

(d)     Electrical service cables of the size and in the quantity customarily supplied by the utility company furnishing primary electricity, in a supply of sufficient capacity as specified by *local utility* ~~Sears in conduits and ducts~~ connected to a pad mounted *company requirements* transformer in a manner satisfactory to Sears and the utility *RvK* company. Developer is responsible for coordination with utility company to pull primary conductor to transformer, set *BJm* transformer, energize transformer and, if transformer is more than five (5) feet from the building wall, provide conduit and pull string to within five (5) feet of the building.

*BJm RvK*

(e)    Telephone ducts, conduit, cable and manhole structures capable of supporting 200 pair service cable for the great indoors and 25 pair service cable for all other Sears facilities, as required by the utility company furnishing the telephone service.  Minimum two inch to four inch conduits from telephone splice box.

(f)    Natural gas shall be provided from a source and in a supply of sufficient capacity to meet Sears' needs.  Developer is responsible for conduit and services to a location at the building as designed by Sears.  Sears contractor to provide and install meter.  (if required ∥∥ RWK

(g)    Actual connections with stubbed out utilities at points of connection shall be made by Sears and permits for these connections shall be obtained by Sears.  Permit fees for building connection shall also be Sears' responsibility, unless fees are a contribution to the costs of public system improvement, or extension thereof, in which event the fee will be Developer's responsibility as part of the Common Area work.

(h)    All permanent utilities required hereunder shall be available and operational by the dates in section I of this document.

3.    Permanent Fire Protection

(a)    Fire hydrants shall be located at intervals of three hundred (300) feet, or as may be required by the local Fire Marshal and Public Health and Safety Offices.

(b)    Underground water mains shall be of sufficient size to adequately supply both fire protection and domestic demands simultaneously.  ~~Minimum water flow will be at least 1,750 GPM at grade level (50 PSIG residual)~~.  See attachment A.

The minimum water flow and pressure as indicated is based on standard design criteria.  In the event local and/or state governing agencies require an upgraded system design, the Developer shall be required to provide adequate pressure and flow for the use intended to meet the regular fire protection requirements.  ~~In the event adequate flow and pressure is not available, the Developer shall be responsible to bear all costs associated with the installation of a fire pump, jockey pump and/or all necessary equipment requirements (i.e., tank, power, etc.,) to meet the code requirements.~~  See attachment B  RWK

(c)    Developer shall bring an eight (8) inch minimum loop-valved stub-out to within five (5) feet of the exterior building wall at a location and elevation specified by Sears.

(d)    In the event that buildings being constructed, adjacent to the area of the Sears facility, are of different types, levels or uses other

MAY.19.2000    2:38PM    SEARS REAL ESTATE    NO.094    P.13

than Sears' prototype use (i.e.: UBC-IIN Sprinklered Construction; Standard-Type IV Unprotected Sprinklered; BOCA-2C Unprotected Sprinklered) the Developer shall be responsible for costs incurred to upgrade the Sears building to meet applicable codes.

(e) Sears will be provided with a dedicated sprinkler riser in new buildings.

G.  **Landscaping and Retaining Walls**

1.  Where retaining walls are required on one or more sides of a building, the minimum requirements shall be followed.

    (a) Developer shall stockpile on the site sufficient suitable fill material to completely backfill the area behind the retaining wall up to subgrade, which fill material shall be tested by Developer's geotechnical engineer certified as suitable for backfill and compaction. Certification should be by an engineer licensed in the jurisdiction of the project.

    (b) All retaining walls on the site shall be designed in accordance with the recommendations as described in Developer's geotechnical engineer's report.

    (c) The type, quality and finished appearance of all retaining walls shall be coordinated with exteriors of the building.

    (d) Retaining walls which are necessary for and part of Sears' depressed dock and trash compactor facilities shall be Sears' responsibility, ~~provided that screen walls will be provided by the Developer.~~  RWK  SAm

2.  Planting material shall be compatible with site climatic conditions and location on the site.

H.  .  **Building Pad Preparation**

    The ~~following standards~~ shall be followed for the preparation of the Sears building pad, except when superseded by more stringent requirements as set forth by Developer's geotechnical engineer. The building pad shall be defined as the Sears building footprint inclusive of adjacent concrete pads, loading docks and sidewalks.

    1.  The building pad soils shall have a minimum allowable bearing capacity of 3,000 p.s.f. for support of the Sears building on conventional, shallow spread footings and slab-on-grade. This shall be achieved by Developer through removal and/or replacement of unsuitable soils and/or filling to proposed grade in accordance with these specifications. If subsurface conditions prevail such that conventional spread footings are not considered feasible (i.e.: rock, excessively expansive soils, organics,

MAY.19.2000   2:39    SEARS REAL ESTATE    NO.094   P.14



etc.) Developer shall reimburse Sears for any added construction costs incurred. This shall include, but not be limited to, extra costs incurred due to over-excavation of unsuitable materials, extension of footings, extra concrete and reinforcement which are over the costs of conventional spread footings and slab-on-grade.

2. Structural fill shall be placed in accordance with the following densities as defined by ASTM D-1557 Modified Proctor:

Below Foundations    95%
Below Building Slab    95%

3. All structural fill shall be placed in horizontal lifts not exceeding ten (10) inches in loose measurement, before compaction.

4. All fill shall consist of a readily compacted borrow material free of clay, rock or gravel larger than two (2) inches in any dimension, debris, waste, frozen material, organics or other deleterious material. All borrow material shall be inspected and certified by a licensed geotechnical engineer, in the jurisdiction where the project is located, prior to placement for use as structural fill.

5. The building pad shall be ~~eight (8) inches~~ eleven (11) inches below proposed finished floor elevation to provide for a ~~four (4)~~ five (5) inch concrete slab and a ~~four (4)~~ six (6) inch granular layer. The top twelve (12) inches of subgrade shall be compacted to 95% maximum dry density Modified Proctor.

6. All fill shall be verified by field inspection and documented by Developer's licensed geotechnical engineer. A minimum of one (1) field density test shall be made for each 5,000 square feet of building pad per 10" lift of structural fill placed.

7. Certification

(a) Certification of Fill Material and Compaction: a signed and sealed certificate of compliance with compaction and proper use of materials shall be submitted to Sears by Developer's licensed geotechnical engineer ~~for approval~~ prior to pad delivery.

(b) Certification of Grade and Location: A signed and sealed certificate of compliance with grade (plus or minus one-tenth (1/10) of one (1) foot on a grid 25' x 25' (max.) shall be submitted to Sears by Developer's licensed surveyor. In addition, Developer's surveyor shall provide a certification of location of the building pad with relation to appropriate property lines, etc. Grade and location certifications shall include the location and elevation of the permanent benchmark used for said certifications. Both certifications shall be submitted by Developer to Sears ~~for approval~~ prior to pad delivery.



    (c)    Sears reserves the right to reject the pad or demand corrective measures be taken by Developer, at no cost to Sears, if the building pad is not prepared in accordance with these specifications or the proper certification not submitted.

**8.**    Pad Preparation

Building pad preparation shall include the building footprint plus 10' beyond the building line and all appurtenances.

**I.**    <u>Schedule</u>

Prior to Lease execution, Developer shall provide a construction schedule showing completion dates, acceptable to Sears, for the following work:

**1.**    To the Sears building:
    (1)    Electrical Service
    (2)    Gas Service
    (3)    Water Service/Fire Protection
    (4)    Telephone
    (5)    Storm Drainage
    (6)    Sanitary Sewer

**2.**    The remaining sitework:
    (1)    Final paving and site concrete
    (2)    Parking lot striping
    (3)    Landscaping
    (4)    Pylon signage
    (5)    Permanent entrances

**J.**    <u>Strip Centers</u>

The following terms and conditions, as outlined below, shall apply to all Strip Center buildings.

**1.**    Review of Drawings:  Sears shall have the right to review common areas, interior and exterior plans, including without limitation, ornamental structures, landscaping finishes, lighting, seating arrangement.

**2.**    Developer shall provide and install flashing to reglet in Sears building at Sears wall abutting the Strip Center.

**3.**    Strip Center roof structures shall not drain onto Sears roof.

**4.**    Demising wall between Sears and adjacent building ~~shall be constructed~~ and ~~paid~~ by the Developer.  ~~This wall shall~~ be of the fire rating required ~~by local codes.~~

**5.**    Common foundations for the adjacent building and Sears building are not allowed.

*Sears shall provide a weather tight block wall on any side of the building which will house future tenants. Sears shall not be responsible to upgrade walls' fire rating caused by use or building type of construction.*

6. All levies, expenses, or fees charged by governmental or quasi-governmental agencies for any of the off-site work in connection with the development shall be at the Developer's sole cost. Such levies include, but are not limited to the following: impact fees, upgrading of utilities, sewers, roads, traffic signals; atypical hook ups; and charges for schools or other infrastructures. Sears shall pay utility tap-in and hook-up fees for Lot 2 which shall not exceed $5000.00.

## ATTACHMENT A

The cost of a fire pump, the design of the fire pump system, and the installation of the fire pump will be shared equally by Sears and Developer in the event that (i) less than 1,000 gpm is available at the fire hydrant located at the northwest corner of Augusta Boulevard and Veterans Avenue and (ii) after all reasonable efforts have been expended by both Sears and Developer, at their respective costs, a workable fire protection system is not realized as determined by the fire protection system designer. Sears and Developer shall jointly agree to the cost of the fire pump and installation before its installation. As the fire protection system is being designed by Sears' engineer and a fire pump system would be installed in the Sears' building, Sears will be responsible for coordination, sizing, furnishing, and installation of the fire pump.

## EXHIBIT "F"

## TENANT'S BUILDING SIGNAGE

SEE ATTACHED

53



EXHIBIT F (PAGE 1 OF 7)



EXHIBIT F (PAGE 2 OF 7)

MAIN SIGN – FRONT FACADE

54"

55'-0"

# SEARS HARDWARE

**FRONT ELEVATION**

**FAIRMONT**
Sign Company
3750 EAST OUTER DRIVE
DETROIT, MICHIGAN 48234-2900
TEL. (313) 368-4000
FAX. (313) 368-9335
E-MAIL: FAIRMNTX@FLASH.NET

FILE: ADOBEDWG\SEARS\SEAL54
DRWAN BY: JWH

EXHIBIT F (PAGE 3 OF 7)

"FRONT FACADE ON EAST SIDE OF BUILDING

*Complete* **Hardware & Garden!**

39'-3 1/2"

11'-1 3/16"

11'-9 3/16"

1'-7 13/16"

9'-8 3/8"

2'-0"

3'-3 1/4"

All Sears red "Complete Hardware & Garden" with underscore and exclamation mark.

FAIRMONT Sign Company
3795 EAST OUTER DRIVE • DETROIT, MICHIGAN  48234-3000
TEL. (313) 368-4000  FAX. (313) 368-9335
E-MAIL: fairmt6@flash.net

SEARS - COMPLETE HARDWARE & GARDEN (RED)    SHEET ___ of ___
CUSTOMER: ___    TN ___
ADDRESS: ___    2/1/00    (DESIGNED BY)
DATE ___    SEARS/ALL SIZES/DIMENSIONED ART
CITY: ___    (STATE)    (ZIP.)

NOTE: ALL ORIGINAL ART IS EXCLUSIVE PROPERTY OF FAIRMONT SIGN COMPANY AND MAY NOT BE COPIED WITHOUT PROPER AUTHORIZATION.  PRINTED COLORS MAY VARY FROM ACTUAL COLORS OF PRODUCT.

RWK

FRONT FACADE ON WEST SIDE OF BUILDING



19'-11 3/4"

1'-6"

**Customer Drive-Thru**

INDIVIDUALLY ILLUMINATED
CHANNEL LETTERS

**FAIRMONT**
Sign Company

3710 EAST OUTER DRIVE • DETROIT, MICHIGAN 48234-2903
TEL. (313) 368-4000  FAX. (313) 368-9335
E-MAIL: fairmnt6@flash.net

NOTE: ALL ORIGINAL ART IS EXCLUSIVE PROPERTY OF FAIRMONT SIGN COMPANY AND MAY NOT BE COPIED WITHOUT PROPER AUTHORIZATION. PRINTED COLORS MAY VARY FROM ACTUAL COLORS OF PRODUCT.

SEARS CUSTOMER DRIVE-THRU
(CUSTOMER)

(ADDRESS)

(CITY)                    (STATE)  (ZIP)

DATE  2/1/00

SEARS/ALL SIZES/DIMENSIONED ART

SHEET ____ OF ____

TN
(RENDERED BY)

EXHIBIT F (PAGE 6 OF 7)

FRONT FACADE ON WEST SIDE OF BUILDING

6'-1 1/4"

3'-0"

# CUSTOMER DRIVE-THRU ENTRANCE

ILLUMINATED WALL SIGN

**FAIRMONT**
Sign Company
3140 EAST OUTER DRIVE • DETROIT, MICHIGAN  48234-3900
TEL. (313) 368-4000  FAX. (313) 368-9335
E-MAIL: fairmnt6@flash.net

SEARS CUSTOMER DRIVE-THRU ENTRANCE
(CUSTOMER)
(ADDRESS)
(CITY)          (STATE)  (ZIP.)

2/1/00
(DATE)

SHEET    OF

IN
(RENDERED BY)

SEARS ALL SIZES DIMENSIONED ART

NOTE: ALL ORIGINAL ART IS EXCLUSIVE PROPERTY OF FAIRMONT SIGN COMPANY AND MAY NOT BE COPIED WITHOUT PROPER AUTHORIZATION.  PRINTED COLORS MAY VARY FROM ACTUAL COLORS OF PRODUCT.

SIDE ELEVATION (EAST SIDE ALONG AUGUSTA STREET)

EXHIBIT F (PAGE 6 OF 7)

# SEARS HARDWARE

13'-9"   1'-6"   35'-10 1/4"   21'-11"   3'

INDIVIDUALLY ILLUMINATED
CHANNEL LETTERS

SEARS HARDWARE (IN-LINE VERSION)

FAIRMONT
Sign Company



REAR ELEVATION

6'-1 1/4"

3'-0"

CUSTOMER DRIVE-THRU

ILLUMINATED WALL SIGN

FAIRMONT
Sign Company
3760 EAST OUTER DRIVE • DETROIT, MICHIGAN 48234-2906
TEL. (313) 368-4000  FAX. (313) 368-9335
E-MAIL: fairmnt06@flash.net

SEARS CUSTOMER DRIVE-THRU ENTRANCE ____ SHEET ____ OF ____
(CUSTOMER)
(ADDRESS)
(CITY)                    (STATE)  (TEL)
_____  2/1/00  _____ TN _____
             (DATE)            (ENGINEER BY)
SEARS/ALL SIZES/DIMENSIONED ART

NOTE: ALL ORIGINAL ART IS EXCLUSIVE PROPERTY OF FAIRMONT SIGN COMPANY AND MAY NOT BE COPIED WITHOUT PROPER AUTHORIZATION. PRINTED COLORS MAY VARY FROM ACTUAL COLORS OF PRODUCT.

## EXHIBIT "F-1"

## TENANT'S PYLON SIGN DEPICTION

### SEE ATTACHED

54

EXHIBIT F–1



PLAN

1'-6"

12'-0"

6"

5'

**Portage Place**

**SEARS HARDWARE**

tenant LOT 4

tenant LOT 1

tenant LOT 3

2'-6"
3'-6"
3'-6"
2'-6"
2'-6"

20'-0"

3" neon in reveals

open

ELEVATION

DOUBLE FACE ILLUMINATED DISPLAY

QTY 1

Lexan tenant panels, qty 5 per face.
(19'-6"dia; total square footage of 6 panels)

Double face fabricated cabinet, enamel finish. Color TBD.
H.O. illumination in cabinet, neon in reveals. Color TBD.

WHITE WAY SIGN COMPANY
1317 N. CLYBOURN  CHI, IL  60610  312-642-4500
FAX 312-642-6277

White Co Industries
6181 US Highway 6
Portage

| | | | | | DATE | APPROVAL |
|---|---|---|---|---|---|---|
| | | | | | | |

CAMERA READY ART REQUIRED

FIELD SURVEY REQUIRED

| | REVISE PANEL SIZES  QTY  0 - RSO | | 04-26-00 | RS |
| | MODIFY HT. ADD LOWERS  BRSO | | 03-15-00 | |
| C0 | ADD SEARS HARDWARE  0.  - RSO | | 02-02-00 | |
| B0 | CHANGE NAME  0.  - RSO0 | | 01-21-00 | James Lynch |
| A0 | ADD POSTS & NAME - RS00 | | 01-14-00 | 76202 |

*Confidential Execution Version*

# ASSIGNMENT OF LEASE AND RELEASE

**THIS ASSIGNMENT OF LEASE AND RELEASE** (this "**Agreement**") is made and entered into as of this __22nd__ day of April, 2021 (the "**Effective Date**"), by and between **MEL INDIANA, LLC**, as successor-in-interest to Continental 82 Fund, LLC, a Wisconsin limited liability company ("**Landlord**"), **SEARS AUTHORIZED HOMETOWN STORES, LLC**, a Delaware limited liability company ("**Existing Tenant**"), and **AMERICAN FREIGHT OUTLET STORES, LLC**, a Delaware limited liability company ("**New Tenant**"). Each of Landlord, Existing Tenant and New Tenant may hereinafter be referred to as a "**Party**" or together as the "**Parties**."

## Preliminary Statements:

The following preliminary statements are a material part of this Agreement.

A.      Landlord and Existing Tenant are the current landlord and tenant under that certain Ground Lease dated July 20, 2000 (the "**Lease**") for approximately 5.15 acres (the "**Leased Premises**") located at 6169 US Route 6, Portage, Indiana.

B.      Existing Tenant wishes to assign the Lease to New Tenant and be released from future liability under the Lease.

## Agreements:

**NOW THEREFORE,** in consideration of the mutual covenants and conditions set forth in this Agreement, and for other good, lawful and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

1.      **Assignment and Assumption of Lease**. Existing Tenant hereby assigns to New Tenant and New Tenant hereby assumes from Existing Tenant all rights and obligations set forth in the Lease on the terms set forth in this **Section 1**. No affiliate of Existing Tenant, nor any of Existing Tenant's or the affiliates of Existing Tenant's respective beneficiaries, shareholders, partners, officers, agents, or employees, heirs, successors or assigns shall have any personal liability of any kind or nature for or by reason of any matter or thing whatsoever under, in connection with, arising out of or in any way related to this assignment and the transaction contemplated in this Section 1, and New Tenant hereby waives for itself and anyone who may claim by, through or under New Tenant any and all rights to sue or recover on account of such alleged personal liability. New Tenant hereby accepts the foregoing assignment as of the Effective Date and as of such date hereby assumes the performance of all the terms, covenants and conditions of tenant under the Lease. New Tenant hereby agrees to indemnify, defend and hold Existing Tenant harmless from and against any and all claims, damages, costs, and expenses (including, but not limited to, reasonable attorneys' fees) arising from liabilities and obligations of the tenant under the Lease that accrue from and after the Effective Date. No affiliate of New Tenant, nor of New Tenant's or the affiliates of New Tenant's respective beneficiaries, shareholders, partners, members, officers, agents or employees, heirs, successors or assigns shall have any personal liability of any kind or nature for or by reason of any matter or thing whatsoever under, in connection with, arising out of or in any way related to this acceptance and the transaction contemplated in this Section 1, and Existing Tenant hereby waives for

itself and anyone who may claim by, through or under Existing Tenant any and all rights to sue or recover on account of such alleged personal liability.

2. **Consent to Assignment of Lease; Release**. Landlord hereby consents to the assignment of the Lease from Existing Tenant to New Tenant and acknowledges and agrees that Existing Tenant is hereby fully released and discharged of all of tenant's obligations under the Lease, except those obligations and liabilities which expressly survive or otherwise arise prior to the expiration of the current term of the Lease which ends on April 30, 2021 (the "Excluded Liabilities"). Nothing herein shall extend Existing Tenant's liability for matters assumed by New Tenant pursuant to this Assignment. Landlord and its successors, heirs, assigns and representatives hereby expressly release Existing Tenant and its owners, agents, affiliates and related entities from any and all claims, actions, causes of action, demands, costs, losses, expenses and suits of every kind or character which have accrued through or arise after the Effective Date relating to the Lease, except for the Excluded Liabilities.

3. **Representations, Warranties and Covenants of Existing Tenant**. Existing Tenant hereby represents and warrants that: (a) there is no known uncured default by either Landlord or Existing Tenant under the terms of the Lease; and (b) there are no leasehold mortgages encumbering the Leased Premises.

4. **Estoppel of Basic Lease Terms**. Landlord and New Tenant agree upon the following basic terms under the Lease:

   a. The current term of the Lease expires on April 30, 2021.

   b. The current Annual Base Rent due under the Lease is $216,300.00.

   c. Annual Base Rent is paid through April 30, 2021.

   d. The current security deposit held by Landlord is $0.

   e. There are four (4) remaining rights to extend the Lease for five (5) years each, pursuant to Section 7 of the Lease.

   f. There is no known uncured default by either Landlord or Existing Tenant under the terms of the Lease.

   g. There have been no amendments to the Lease.

5. **Notices**. The Parties agree and acknowledge that all notices provided to New Tenant and Landlord pursuant to the Lease shall be sent to the following addresses:

New Tenant:          American Freight Outlet Stores, LLC
190 Innovation Court, Suite J
Delaware, Ohio 43015
Attn: Vice President – Real Estate

4833-3197-5654, v. 2

Copy to:          American Freight Outlet Stores, LLC
190 Innovation Court, Suite J
Delaware, Ohio 43015
Attn: General Counsel

Landlord:        MEL Indiana, LLC
700 Bishop Street, Suite 1928
Honolulu, Hawaii 96813

6.    **Successors and Assigns**.  This Agreement shall bind and inure to the benefit of the Parties hereof and to their respective successors and assigns.

7.    **Counterparts**.  This Agreement may be executed in multiple counterparts which, when taken together, shall constitute one and the same document.  This Agreement may be executed by facsimile signature. The exchange of copies of this Agreement and of signature pages by facsimile, scanned, e-mail transmission or electronic signature shall constitute effective execution and delivery of this Agreement as to the exchanging Parties and may be used in lieu of the original Agreement for all purposes. The Parties may rely on signatures transmitted via facsimile or electronic mail.  This Amendment shall become effective upon execution by all Parties hereto.

8.    **Entire Agreement**.  Except as expressly modified by this Agreement, all other terms and conditions of the Lease shall remain in full force and effect and binding upon Landlord and New Tenant.  In the event of any conflict or inconsistency between the terms and condition of this Agreement and the terms and conditions of the Lease, the terms and conditions of this Agreement shall control and govern.  In all other respects, the terms and conditions of the Lease are hereby ratified in their entirety.

9.    **Ratification of Lease**.  The Parties acknowledge and agree that except as expressly modified by this Agreement, the Lease remains in full force and effect and is hereby ratified in all respects.

10.    **Authority.**  The Parties represent and warrant to each other that they have the full right, power and authority to enter into this Agreement.

*The remainder of this page is intentionally left blank*

3

**IN WITNESS WHEREOF**, the Parties have executed this Agreement effective the date and year first set forth above.

LANDLORD:

**MEL INDIANA, LLC**,
a Delaware limited liability company

By:    Malulani Investments, Limited,
       a Delaware limited liability company,
       its sole managing member

By:    _____
       Easton T. Manson, President

4

*Confidential Execution Version*

EXISTING TENANT:

**SEARS AUTHORIZED HOMETOWN STORES, LLC**, a Delaware limited liability company

By: _____

Name: Kenneth Peters

Title: VP-Stores

4833-3197-5654, v. 2

NEW TENANT:

**AMERICAN FREIGHT OUTLET STORES, LLC**, a Delaware limited liability company

By: *Jon Phillips*

Name: Jon Phillips

Title: VP, Business Development and Treasurer

6