**EXHIBIT B**

```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3    IN RE:                      .  Chapter 11
                                 .  Case No. 24-12480 (JTD)
4    FRANCHISE GROUP, INC.,      .
     et al.,                     .  Joint Administration Requested
5                                .
                                 .  Courtroom No. 3
6                                .  824 North Market Street
              Debtors.          .  Wilmington, Delaware 19801
7                                .
                                 .  Tuesday, November 5, 2024
8    . . . . . . . . . . . . . . .  9:30 p.m.

9                    TRANSCRIPT OF FIRST DAY HEARING
                   BEFORE THE HONORABLE JOHN T. DORSEY
10                    UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:           Edmon Morton, Esquire
                                YOUNG CONAWAY STARGATT & TAYLOR LLP
13                              Rodney Square
                                1000 North King Street
14                              Wilmington, Delaware 19801

15                              Matthew Feldman, Esquire
                                Debra Sinclair, Esquire
16                              WILLKIE FARR & GALLAGHER LLP
                                787 Seventh Avenue
17                              New York, New York 10019

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:            Gauri Patel, ECRO

21   Transcription Company:     Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For the Debtors:            Andrew Sorkin, Esquire
                                LATHAM & WATKINS, Esquire
3                               Time-Life Building
                                1271 6th Avenue
4                               New York, New York 10020

5   For the U.S. Trustee:       Timothy Fox, Esquire
                                OFFICE OF THE UNITED STATES TRUSTEE
6                               844 King Street, Suite 2207
                                Lockbox 35
7                               Wilmington, Delaware 19801

8   For the Ad Hoc Group
    of First Lien Lenders:      Adam Landis, Esquire
9                               LANDIS RATH & COBB LLP
                                919 Market Street
10                              Suite 1800
                                Wilmington, Delaware 19801
11
                                Jayme Goldstein, Esquire
12                              Daniel Filman, Esquire
                                PAUL HASTINGS LLP
13                              MetLife Building
                                200 Park Avenue
14                              New York, New York 10166

15  For the Ad Hoc Group
    of Freedom Lenders:         Christopher Shore, Esquire
16                              Thomas Lauria, Esquire
                                WHITE & CASE LLP
17                              1221 6th Avenue
                                New York, New York 10020
18
    For Hilco Merchant
19  Resources:                  Steven Fox, Esquire
                                RIEMER & BRAUNSTEIN LLP
20                              7 Times Square
                                Suite 2506
21                              New York, New York 10036

22

23

24

25

INDEX

MOTIONS:                                                        PAGE

Agenda
Item 15:   Debtors' Motion for Entry of Interim and Final      5
           Orders (I) Authorizing the Debtors to (A)
           Obtain Senior Secured Priming Superpriority
           Post-petition Financing and (B) Use Cash
           Collateral, (II) Granting Liens and Providing
           Claims with Superpriority Administrative
           Expense Status, (III) Granting Adequate
           Protection to the Prepetition Secured Parties,
           (IV) Modifying the Automatic Stay, and (V)
           Granting Related Relief
           [Docket No. 51, 11/4/24]

           Court's Ruling:                                     --

INDEX

WITNESSES CALLED
BY THE DEBTORS:                                          PAGE

    DAVID ORLOFSKY

    Direct examination by declaration                    --

    Cross-examination by Mr. Fox                      37,67

    Cross-examination by Mr. Shore                    41,71

    Redirect examination by Mr. Lombardi                 62

    Recross-examination by Mr. Fox                      116

EXHIBITS

DECLARATIONS:                                           PAGE

1) Declaration of David Orlofsky                          20


Transcriptionists' Certificate                          172

1        (Proceedings commenced at 9:35 a.m.)

2            THE COURT:  Good morning, everyone.  This is Judge

3   Dorsey.  We're on the record in Franchise Group, Inc., Case

4   number 24-12480.  Go ahead and turn it over to debtors

5   counsel to run the agenda.

6            MR. MORTON:  Thank you, Your Honor.  Good morning.

7   Ed Morton from Young Conaway on behalf of the debtors.  I'm

8   just going to make some brief introductions and then cede the

9   podium to my co-counsel.  I'll start with them.

10           We're joined by the Willkie Farr and Gallagher

11  firm.  I think the first two people presenting to Your Honor,

12  by way of introductions, will be Matthew Feldman and Debra

13  Sinclair.  Certainly, I'm also joined by my colleagues at

14  Young Conaway, Matt Lund and Allison Mielke and others.

15           I'd also like to introduce the Court very quickly

16  to our two declarants in support of the relief today.  David

17  Orlofsky, the chief restructuring officer, who's a managing

18  partner with Alex Partners, is the declarant in support of

19  the general first day relief.

20           And then we did submit a declaration specifically

21  in support of our DIP financing motion by Christopher Grubb

22  with Ducera Partners.

23           Your Honor, we'd like to certainly thank the Court

24  for accommodating us and making itself available and sifting

25  through what was a fairly thick first day binder.  I'm

1  pleased to report we've made a lot of good progress with Mr.

2  Fox, who has worked with us after hours as well.  We're down

3  to just a couple of items with him, but we do have some

4  issues that will be raised by one of our lender groups

5  through the hearing.

6          So to that end, and to be efficient with the

7  Court's time, I think I'll cede the podium to my co-counsel,

8  Mr. Feldman, to provide a general case overview and then we

9  can get to the rest of today's activities.

10          THE COURT:  All right, thank you.

11          MR. MORTON:  Thank you.  Your Honor.

12          THE COURT:  Mr. Feldman, whenever you're ready.

13  You're muted.  You're still muted.  Can't hear you.  Still

14  can't hear you.  Still not working.

15          MR. FELDMAN:  Are we being heard?

16          THE COURT:  Now I can hear you.

17          MR. FELDMAN:  Thank you.  Apologies, Your Honor.

18  As much as we enjoy remote hearings, they come with their

19  complications.  Again, for the record, Matthew Feldman from

20  the law firm Willkie, Farr & Gallagher, LLP.

21          Your Honor, before I launch into my presentation,

22  just so that the Court is aware, in the room with me today

23  from Willkie Farr are my colleagues Debra Sinclair, Stuart

24  Lombardi, James Dugan, Joseph Brandt, Jessica Graber, and

25  Marine Loison.  All or most of them will be speaking this

1  morning, Your Honor.  And I wanted to make you aware that

2  they were in the room.

3         Also in the room, as indicated by Mr. Morton, are

4  David Orlofsky and Christopher Grubb from Alex Partners and

5  Ducera, respectively.

6         Your Honor, we're here today to present the first

7  day pleadings in connection with the Franchise Group, Inc.

8  and its 52 affiliated debtors.  These cases were filed with

9  the full support of our first lien lenders who are owed

10 approximately $1.1 billion.  And in fact, we have entered

11 into an RSA with those lenders.

12        We have obtained consent today from our ABL

13 lenders for the relief being sought.  They are not parties to

14 the RSA, but I do believe we resolve their open issues.

15 They'll speak for themselves at an appropriate moment in the

16 hearing.

17        Unfortunately, Your Honor, despite months of

18 discussions between months -- after months of discussions,

19 the debtors have been unable to broker peace between our

20 first lien lenders and our second lien and Holdco lenders,

21 who are collectively owed about $625 million in principal.

22 And we do expect the Court to hear some objections today from

23 those lenders with respect to certain relief being sought.

24        But importantly today, Your Honor, the plan that

25 has been the result of months of work between the debtors and

1  the first lien lenders, with a coordinated effort to try to

2  get the junior lenders on board, will be filed in the next

3  few days with the Court.

4         Under that plan, Your Honor, the first lien

5  lenders will convert both the proposed debtor in possession

6  loan that you'll hear more about this morning, as well as

7  their first lien pre-petition debt into 100 percent of the

8  equity and new debt of the reorganized company.

9         We will, Your Honor, in parallel, run a market

10 check as to the value of the assets in order to ensure

11 ourselves as well as the Court as to the appropriateness of

12 the evaluation.  Ultimately, Your Honor, while we would have

13 liked to have found a way to bridge the gap between our

14 lending groups before filing, simply put, the debtors ran out

15 of time because they ran out of liquidity.  And when they ran

16 out of liquidity, the filing became inevitable.

17        Your Honor, I'd like to put up a slide at this

18 point.  And I would ask my colleague Betsy Feldman to raise

19 her hand as to her location so that we can make that slide

20 available to everybody.

21        THE COURT:  You're ready to go.

22        MR. FELDMAN:  Your Honor, I wanted to give a

23 little background on the company.  The Franchise Group, Inc.

24 and its affiliates is a private company that acquires and

25 operates franchisable businesses.  As indicated before, there

1  are 53 debtors that comprise the Franchise Group, Inc.

2  group.

3         The business essentially operates four distinct

4  businesses through franchisees, the Vitamin Shop retailer,

5  Pet Supplies Plus, Buddy's Home Furnishings, and American

6  Freight, which, despite its name, actually sells furniture,

7  mattresses, appliances, and other home accessories at

8  discounted prices.

9         The company operates, Your Honor, through itself

10  and its franchisees, approximately 2,200 store locations and

11  employees directly and through its franchisees, more than

12  11,000 people.  David Orlofsky of Alex Partners is the CRO,

13  and as I indicated, he's in the room with me today.  And

14  Chris Grubb from Ducera is the investment banker for the

15  company, also in the room for me today.  And they are each

16  affianced and available for cross examination as this

17  morning's hearing progresses.

18         I want to briefly talk about how we got here today

19  and frankly, what didn't bring us here today.  You're going

20  to hear more detail throughout the hearing, but the answer is

21  quite simple.  Given inflation, the higher interest rate

22  environment, and macroeconomic issues, the company first

23  struggled and ultimately sank under the weight of too much

24  debt.

25         You may ask yourself why I'm taking up your time

1    on this point since it's contained both in the affidavits as

2    well as will be presented today.  And the answer, Your Honor,

3    is that there is a lot of noise in the market and the press

4    as to other causes which may have led to the company's need

5    to restructure.  And I want to provide the Court with context

6    so that to the extent those other causes or other factors are

7    raised at the hearing today, you're not -- they're not coming

8    to Your Honor with no background.

9            So let's put up the next slide, Betsy.

10           Let me again say that the filing today is not a

11   result of assertions made against Brian Khan.  Brian Khan is

12   the former CEO and former board member.  The issues involving

13   Mr. Khan, which I will detail in a moment, are personal ones

14   to Mr. Khan and do not involve Franchise Group.

15           That said, it is fair to say that the public

16   announcement back at the end of 2023 that there was a

17   government investigation of Mr. Khan did affect the Franchise

18   Group's ability to raise new capital, hoping and intending to

19   address excess leverage.  Whether a de-levering transaction

20   could have been affected without the announcement candidly is

21   unknowable.  And so, again, from the company's perspective,

22   while certainly Mr. Khan's personal issues had an impact, we

23   don't believe that is, in any way, a cause.

24           As alluded to already, at the end of last year,

25   Mr. Khan was identified as an unindicted coconspirator in a

1   securities fraud indictment against a gentleman by the name

2   of John Hughes.  Mr. Hughes was president and chief

3   compliance officer of the hedge fund called Prophecy Asset

4   Management LP.

5            I want to be clear, Your Honor.  Prophecy is not

6   and never was related in any way to Franchise Group or any of

7   its affiliates.  At a high level, the indictment and the

8   parallel SEC complaint alleged that Mr. Hughes engaged in a

9   multiyear fraud with coconspirators that concealed hundreds

10  of millions of dollars in losses from Prophecy's investors.

11  Following the public announcement of Mr. Khan's involvement

12  with Prophecy, Franchise Group started an internal

13  investigation to determine whether anyone at Franchise Group

14  was involved with Mr. Khan's activities.

15           Franchise Group, in fact, hired a well-known white

16  collar lawyer from the law firm Petrillo, Klein & Boxer LLP

17  to conduct the independent investigation.  Petrillo reviewed

18  tens of thousands of documents and interviewed key

19  individuals at the company.  At the end of a multi-month

20  investigation, Petrillo's conclusions were that neither the

21  company nor any of its executive officers or employees had

22  any involvement in Mr. Khan's activities related to Prophecy.

23           Following the conclusion of the investigation in

24  January 2024, Mr. Khan was removed as CEO, resigned his

25  position from the board, and relinquished his right to

1  appoint a majority of the board.

2          The final point I want to make about this is that

3  under the LLC agreement forming Franchise Group, Mr. Khan's

4  consent is required for a Chapter 11 filing.  Requests were

5  made to Mr. Khan through his counsel, and no definitive

6  response, including no objection to the filing, was ever

7  received.

8          As the Court is aware in this district, there's

9  ample case law to support the proposition that in

10 circumstances where liquidity is critical and the company is

11 going to be unable to operate but for filing Chapter 11, that

12 the Chapter 11 filing is authorized and, in fact, the

13 unanimous board of Franchise Group did, in fact, vote to file

14 for Chapter 11.

15         And the final point I'll make before turning the

16 podium over to my co-counsel is that Petrillo, Klein & Boxer

17 have been retained by the independent directors of the board

18 to do some supplemental investigating around what was going

19 on with Mr. Khan and others.  And so you will at some point,

20 Your Honor, hear an application to retain them.  And that is

21 the purpose of the retention.  We do believe that the

22 Prophecy investigation was comprehensive, thorough, and is

23 complete.  But there are some other related issues that the

24 board would like them to investigate.

25         So I'll pause there, and unless the Court has any

1  questions for me, I will cede the podium.

2        THE COURT:  No questions at this time.  Thank you.

3        MR. FELDMAN:  Thank you very much, Your Honor.

4        MS. SINCLAIR:  Good morning, Your Honor.  Debra

5  Sinclair, Willkie, Farr & Gallagher for the debtors.

6        I'll take over where Mr. Feldman left off.  But

7  before I do, I'd like to personally thank everyone that

8  helped us get to this point today, including Mr. Fox at the

9  U.S. Trustee's Office, all of the professionals involved in

10  the matter, and specifically the company's management team,

11  all of whom are on the line listening in.  That's Andy

12  Lawrence, the CEO, Andrew Kaminsky, the Chief Operating

13  officer, Eric Seton, the Chief Financial Officer, and Tiffany

14  McMillan McWaters, who's the General Counsel.  It was not an

15  easy road, and I just wanted to acknowledge everyone's

16  efforts before we move forward.

17        So I'll ask my colleague, Ms. Feldman, to put the

18  slides back up, just to spend a few minutes walking the Court

19  through how we got to where we are today.

20        So, as you can see here on the timeline slide, the

21  company dates back to 2018, when a company called Liberty

22  Tax, which is not part of the business anymore, merged with

23  Buddy's, which is one of the currently operating business

24  lines.

25        Liberty Tax had been a provider of tax preparation

1  services that operated on a franchise business model, and

2  when it acquired Buddy's, the company renamed itself

3  Franchise Group and started pursuing a business model of

4  acquiring other franchisable businesses.

5          From 2019 to late 2021, as you can see here, the

6  company made several acquisitions, including the Sears

7  Hometown Outlet, which it later combined with American

8  Freight, the Vitamin Shop, and Pet Supplies Plus, which are

9  both still operating companies today, and Sylvan Learning and

10 the WS Badcock Corporation, both of which were later sold.

11         Over time, the capital structure of the company

12 evolved, as you see it here today.  We currently have an ABL

13 facility with approximately $250 million outstanding, a first

14 lien term loan facility with approximately $1.1 billion

15 outstanding, a second lien term loan facility with $125

16 million, a pari passu that does not have any principal

17 outstanding, and a Holdco facility in the amount of

18 approximately $515 million.

19         So in August of 2023, after several years of

20 buying and selling franchise companies, as we illustrated on

21 the timeline, Franchise Group completed a take-private

22 transaction.  And the purpose of that was really to reduce

23 some of the burdens that come along with being a public

24 company and also to try to reduce some of that heavy leverage

25 that you saw on the prior slide.

1          The idea was to try to sell or otherwise monetize

2    each of the company's business segments over time.  And the

3    company had started executing on this strategy originally by

4    selling the Badcock Furniture business to Conn's, which I'll

5    talk about in a minute.  But ultimately, Franchise Group

6    wasn't able to fully achieve what they set out to do.  And

7    that's because of a confluence of macroeconomic factors,

8    which I'll speak to in a moment, and the concurrent

9    allegations against Mr. Khan, which my colleague Mr. Feldman

10   alluded to.

11          So even though those allegations, again, had

12   nothing to do with Franchise Group, his involvement

13   complicated some of these processes that the company had

14   tried to put in motion before that news broke.

15          So one example of this, as I just mentioned, is

16   the sale of the Badcock Furniture Company to Conn's.  As Your

17   Honor may know, Conn's is another furniture retailer, which

18   incidentally, is suffering from a lot of these same economic

19   factors and filed its own Chapter 11 cases in July of this

20   year.

21          So Franchise Group had been focused on a sale or

22   another type of business combination involving Badcock

23   because that particular business line, due to the persistent

24   inflationary pressures and rising interest rates, was

25   creating liquidity challenges for the company.

1         The idea was to divest Badcock to eliminate those

2    liquidity challenges.  And, you know, combined with the sale

3    of Sylvan Learning, from which the company saw approximately

4    $159 million in net proceeds, give Franchise Group more

5    runway and time to try to consider other strategic

6    alternatives.

7         The problem ended up being that because of the

8    instability the company experienced at the end of last year

9    once the Brian Khan allegations hit, the Holdco lenders, who

10   at that time had a consent right to the deal, extracted a

11   number of economic concessions in exchange for their consent.

12   That included increasing the interest rate payable on that

13   debt and tightening some other controls on the company, which

14   to a certain extent ended up offsetting the benefits of that

15   sale.

16        Some of the broader issues I'd like to cover that

17   impacted the company's filing are, you know, as we've

18   mentioned a couple of times, you know, there are

19   macroeconomic headwinds that are impacting the retail

20   industry generally.  Franchise Group is no exception to that.

21   It's experienced decreased consumer spending, decreased foot

22   traffic, and lower store openings and franchise sales.

23        Those factors, in conjunction with the gradually

24   increasing debt load, resulted in declining cash flows.  And

25   given that the company relies on its activities and

1  operations to generate new cash flows, they had to keep

2  taking out more debt to keep up with rising interest rates,

3  which then resulted in more money going to debt service.

4         Another broader issue here, again related to the

5  Conn's sale is that the company has a material contingent

6  debt related to Conn's.  Back when Franchise Group owned

7  Badcock, the company guaranteed at least 30, more than 30, I

8  should say, of Badcock's leases.  When the company sold

9  Badcock to Conn's, those lease guarantees traveled over to

10 Conn's, and now that Conn's is in bankruptcy, all of those

11 leases are in jeopardy of being rejected.  And they're

12 exposing Franchise Group to a significant amount of liability

13 from landlords of Conn's in the event that Conn's rejects

14 them.

15         Last but not least, Your Honor, I'd like to cover

16 our out of court restructuring efforts.  We've spent months

17 trying to avoid this Chapter 11 filing and pursuing different

18 avenues to do that.  We explored selling key business

19 segments, including the American Freight business line, as

20 going concerns.

21         We also tried to pursue some other, you know,

22 strategies to monetize the various business lines, but none

23 of them were able to really materialize prior to our

24 liquidity running out and the milestones under our various

25 credit agreements coming due.

1          We tried to pursue out of court restructuring

2  deals in light of our ongoing liquidity problems and in light

3  of those upcoming milestones.  But ultimately, despite months

4  of discussions and negotiations in this regard, really across

5  our capital structure, we were just not able to identify a

6  deal that was going to be universally supported by all of the

7  creditors.

8          So that all leads us to the restructuring support

9  agreement that we signed last Friday, November 1st.  I think

10  my colleague mentioned we've entered Chapter 11 with the

11  support of 80 percent of our first lien lenders to pursue a

12  Chapter 11 plan that's laid out in the terms set forth in the

13  restructuring term sheet.

14          At a high level, I would say that the dual

15  objective of the Chapter 11 cases and of the RSA is, first,

16  to make sure we're commencing an orderly going out of

17  business sale for the American Freight business as we were

18  unable to identify, you know, a potential buyer with

19  committed capital prior to filing.

20          And second, to pursue a reorganization plan around

21  the rest of the operating entities while in parallel

22  conducting a court supervised marketing process.  And that's

23  really to ensure that we've got a market check on value and

24  that we're getting the best deal we possibly can for the

25  three other operating companies.

1          The terms of the plan embodied in the

2   restructuring term sheet would satisfy the DIP, ABL, and

3   first lien loans in full by turning the DIP into a

4   combination of take back paper and equity and also equitizing

5   the first lien loan.  And we, as part of that, pursue one of

6   a couple of options with the ABL, all of which are currently

7   maintained in the restructuring term sheet will have to be

8   determined later, but all of them would have the economic

9   impact of either paying off the ABL in full or keeping it in

10  place.

11          So for that reason, the deal embodied in the RSA

12  can be considered our baseline plan.  If we're able to

13  identify a better deal in the marketing process and that

14  could be through one bid or a combination of bids from

15  different third parties, but if we can identify a deal that

16  could take out the DIP, ABL, and first lien in full in cash,

17  then the RSA prebakes in our ability to toggle to that deal

18  and sell the company in a fashion that would pay off all that

19  debt that would otherwise be addressed under the plan.

20          So we think this is the value maximizing path for

21  the company.  It gives us certainty on the treatment of our

22  two senior lender groups, coupled with the ability to canvas

23  the market in a robust and meaningful way in the event that

24  we are able to find one or more bids that would be

25  economically superior in the aggregate to the deal that's on

1  the table today.  And needless to say, the RSA also gives us

2  access to desperately needed liquidity on the terms set forth

3  in the DIP term sheet.

4  So I'll close out here by saying I'll present the

5  DIP in further detail when we get to that part of the agenda.

6  For now, I'll just highlight that if the DIP is approved, we

7  will have access to $250 million in new money in the form of

8  a delayed draw term loan which will fund the debtors

9  throughout the Chapter 11 cases.  $125 million of that would

10  be granted on the interim order.

11  Last but not least, as I know some other parties

12  may want to speak, just before we move to those commentaries

13  or other points in the agenda, I'd like to move the

14  declaration of David Orlofsky of Alex Partners into evidence.

15  Mr. Orlofsky is our chief restructuring officer, and he's

16  providing the factual evidence that's needed to support the

17  first day relief.  He's in the virtual courtroom with us

18  today, physically here with me, and he's available for cross

19  examination.

20  THE COURT:  Okay.  Is there any objection?

21  Declaration submitted without objections.

22  (Orlofksy declaration received in evidence)

23  THE COURT:  Anyone wish to cross?  Okay.

24  MR. FOX:  Your Honor, may it please the Court.

25  THE COURT:  Yes.

1          MR. FOX:  Tim Fox, on behalf of the United States

2    Trustee.  I may have a few questions to ask of either one or

3    both of the witnesses with respect to the DIP financing.  As

4    Mr. Morton alluded to in his preliminary remarks, we do still

5    have some open issues.

6          Also, it appeared that there might be an audio

7    issue for the White & Case screen, similar to what the

8    Willkie Farr attorneys experienced.  So I think -- we can

9    hear you now.

10          So, Your Honor, I just wanted to reserve rights

11    for cross at an appropriate time.  I don't think we're

12    necessarily doing that at this stage, but I did want to note

13    that there are a few items that we would like some more

14    clarity on with respect to Mr. Orlofsky's declaration and to

15    the extent we admit the declaration in support of the DIP

16    from the personnel at Ducera.

17          THE COURT:  Okay.

18          MR. LANDIS:  Good morning, Your Honor, and may it

19    please the Court.  Adam Landis from Landis, Rath & Cobb on

20    behalf of the ad hoc group of first lien lenders and the DIP

21    lenders.  Co-counsel from Paul Hastings is on the line.

22    Jayme Goldstein, Jeremy Evans, Dan Fliman, and others may

23    want to address the Court at an appropriate time.  Their pro

24    hac motions have been filed, and Your Honor has signed them.

25    So I would invite Mr. Goldstein to address the Court now.

1          THE COURT:  Okay.

2          MR. GOLDSTEIN:  Thank you very much.  Your Honor,

3   can you hear me?

4          THE COURT:  I can.  Thank you.

5          MR. GOLDSTEIN:  Okay, great.  Your Honor, for the

6   record, Jayme Goldstein and Paul Hastings for the ad hoc

7   group of first lien lenders.  It's great to be in front of

8   you this morning.  And I'm joined by my partner, Dan Fliman,

9   who you'll also be hearing from today.

10          So Your Honor, our team and the bankers from

11   (inaudible) represent the debtor's plan sponsors, which

12   comprises over 80 percent of the first lien term loan.  And I

13   want to start today with a very simple premise.  The last

14   thing that our clients wanted is for us to be here today.

15          Back almost a year ago, when we were first

16   retained, we assumed that the natural landing spot for this

17   loan would be an amend and expense transaction.  Potentially

18   with a pay down from a successful whole business

19   securitization for the company.

20          Our goal and our client's goal has always been for

21   the company to simply live to see another day in its current

22   form and with its existing capital structure.  However, this

23   game plan, as you heard, unfortunately became impossible.  We

24   all know that the retail industry is a challenging one for

25   operators and investors.  And as you've heard from the

1  company, they experienced those headwinds that have been felt

2  by so many in the sector.

3          They experienced operational declines from

4  underperforming (inaudible), an overleveraged balance sheet

5  with high interest costs, failed M&A transactions such as the

6  Badcock one you heard about that was tied to the Conn's

7  Chapter 11 liquidation, unsuccessful financing attempts,

8  nervous ABL and junior secured lenders --

9          THE COURT:  I'm sorry, Mr. Goldstein, hold on one

10 second.  There's a lot of beeping going on.  I don't know who

11 is not muted.  If you're not speaking, please mute your

12 phone.  Thank you.

13         MR. GOLDSTEIN:  I've been hearing it as well.

14 Trying to ignore it, Your Honor.

15         THE COURT:  Go ahead, Ms. Goldstein.

16         MR. GOLDSTEIN:  Okay, thank you so much.  So, as I

17 was saying, the company was suffering a number of different

18 headwinds that a number of companies in this sector have

19 experienced.  And what I was just touching on was that the

20 company had very nervous ABL and junior secured lenders

21 exerting increasing pressure on them.  And then finally, of

22 course, as you heard, unexpected news involving Brian Kahn

23 and the taint associated with the Prophecy scandal, while not

24 related, still had an effect on the company.  And all of this

25 in the aggregate just became too much for the company to

1  overcome.

2       So our clients were at the top of the capital

3  stack with a $1.1 billion loan, feared the economic risk of

4  the business today, and they decided, after very extensive

5  analysis, that the company had to start preparing for the

6  possibility of a deleveraging balance sheet restructuring.

7       It was very critical to our clients that this

8  transaction, whether in court or out of court, Your Honor, be

9  comprehensive.  As one of our clients very aptly said to us,

10 companies in this sector can hopefully make it through a full

11 restructuring process once, but it rarely happens twice for

12 the same company.  And our clients really wanted to save the

13 time and fees associated with a failed effort.  They thought

14 that was absolutely critical.

15      So accordingly, Your Honor, over the past few

16 months, our clients worked with the debtors on multiple

17 credit agreement amendments that would address the company's

18 time late reporting issues, and ultimately interest payment

19 defaults, and to provide it what we believe was very valuable

20 time.

21      The goal of giving the company this time was to

22 try to let it maximize value for all and hopefully consummate

23 financings that they had been trying to explore in the market

24 for a number of months, maybe even years now, and ideally

25 bridge to some form of soft landing.

1          And then concurrently with all this, Your Honor,

2    we had discussions not only with the company, but with the

3    second lien lenders, and we tried for many months to reach a

4    deal with them to help them salvage their own investment.

5    Because we believe that a consensual path is always best, and

6    we wanted to be as reasonable and rational as we could in

7    those negotiations.

8          However, notwithstanding our desire to achieve a

9    consensual path, it was impossible to agree on such a

10   construct.  And as you just heard from Mr. Feldman at the

11   beginning of this hearing, we simply ran out of time.

12         So while a settlement with the second liens

13   ultimately wasn't achievable, in our view, it certainly

14   wasn't for lack of trying.  And critically, and

15   notwithstanding a great amount of diligence that was done by

16   the second liens and their prior counsel, the fact that the

17   second liens, and also the fact that the second liens had

18   been long standing investors in the company, in our view,

19   they wouldn't consensually agree to equitize their debt and

20   put in junior capital out of court in a manner and scope that

21   was acceptable to us -- to our clients.

22         So we were at a crossroads.  And we decided to

23   give what we believe was one very reasonable last opportunity

24   to the second liens prior to the commencement of these cases

25   to directly buy what would have been a material percentage of

1  the company's post reorganization equity at what would have

2  been an attractive enterprise value strike price and also

3  give them further significant warrant upside.  Unfortunately,

4  they didn't find that proposal appealing.

5        So what you're going to hear at some point during

6  this hearing, probably in a short while from my partner, Dan

7  Fliman and I, is that the second liens did make a late

8  proposal to the company.  This proposal was just not

9  supportable by the company and our clients because it had

10  insufficient new money and other structural infirmities.  And

11  what would have happened was it would have created further

12  uncertainty for a company that needed a quick exit through a

13  prearranged process and not a free fall Chapter 11 that would

14  have been attributable to a terminated RSA.

15        So, Your Honor, I'll end with this.  As Ms.

16  Sinclair noted, a tremendous amount of time and effort has

17  been put into this process over the past year by all parties

18  to help the company reach this point today.  But especially

19  the company's management team, the board, and our clients.

20        Our clients, to an extent, are doubling down now,

21  and they're investing $250 million of new money into this

22  business.  This is a very significant amount of capital under

23  the circumstances.  They -- and we are very proud of what the

24  deal today is embodied in the RSA in front of you.  And we

25  appreciate the hard work done by so many to get to this

1  point.  We look forward to working with them and you to

2  consummate the debtor's plan and begin writing a new chapter

3  for the company.  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MR. FARNAN:  Your Honor, it's Michael Farnan for

6  the ad hoc group of the Freedom Lenders.  And with me from

7  White & Case are Tom Lauria, Chris Shore, Sam Hershey, and

8  Andrew Zatz, and they would like to address the Court and

9  cross examine the witness.  They were having some audio

10 trouble, so can we just check in, make sure they're able to

11 be heard?

12         THE COURT:  Mr. Shore.

13         MR. SHORE:  Can you hear me now, Your Honor?

14         THE COURT:  I can.  Thank you.

15         MR. SHORE:  Can you hear me?

16         THE COURT:  I can.  Can you hear me?  I can hear

17 you.  Can you hear me?

18         MR. SHORE:  Can anybody hear me?

19         THE COURT:  Yes.

20         MR. SHORE:  Can anybody hear me?  There we go.

21 Although (inaudible).  All right.  Okay.  Can you hear me,

22 Your Honor?

23         THE COURT:  I can.  Now I can't hear you.

24         MR. SHORE:  Okay, Your Honor.  Your Honor, sorry

25 for the technical difficulties.  Chris Shore from White &

1  Case on behalf of actually two ad hoc groups consisting of

2  holders of claims in funds managed or controlled by Pimco and

3  Radian (phonetic).  We represent 90 percent of the lenders at

4  two debtors, Freedom VCM Interco and Freedom VCM, and we are

5  the only lenders to those debtors.  They are outside, as

6  you'll hear from the witness, outside the credit circle of

7  the 1L and 2L lenders.

8       We also represent a group of ad hoc 2L lenders at

9  the Opco levels, and we represent 90 percent of those holders

10  as well as to both groups.  The other 10 percent, we believe,

11  is held by a holder of 1L claims who is participating in the

12  DIP.

13       So we are, for the two Holdco debtors, the only

14  creditors who are not benefited by the DIP there, and 90

15  percent of the 2L lenders whose claims are being primed.  All

16  told, then, we represent about $600 million of claims that

17  the debtors are seeking to provide no recovery to in these

18  cases.

19       Rather than go into a lengthy statement of stuff

20  that's not in evidence, I'd like to put out the following

21  plan of attack today.  I would like to cross Mr. Orlofsky on

22  issues raised in the declaration, and then we can argue the

23  motions up until the DIP with some combination of me, Mr.

24  Lauria, and Mr. Zatz.  And then we get to the DIP and they

25  put on Mr. Grubb.  I would like to cross him, as well, and

1   then Mr. Lauria will argue the DIP.

2            And through that process, we hope to show Your

3   Honor that, far from seeking to prevent immediate and

4   irreparable harm at the first day hearing on 24 hours'

5   notice, the debtors, and more importantly, the DIP lenders,

6   are actually seeking to have this court decide much of the

7   case today.  And we don't think you should be doing that.

8            So when Mr. Orlofsky is tendered, I would like to

9   cross him.

10           THE COURT:  Okay.  Thank you.  Anyone else?

11           MS. SINCLAIR:  The only edit I'd like to propose

12  to Mr. Shore's proposed plan of attack is we were planning to

13  go a little bit out of order on the agenda just to knock out

14  the DIP issues at the beginning of the hearing.  As we

15  anticipated, the parties would like to focus on that.  So if

16  I could suggest that to everyone, I'd like to maybe get joint

17  admin approved and then knock out the DIP, if that's

18  acceptable.

19           THE COURT:  That's acceptable to the Court.

20           MS. SINCLAIR:  Thank you, Your Honor.

21           THE COURT:  Anyone else want to be -- anyone else

22  planning on crossing either of the two witnesses?  We still

23  have to get Mr. Grubb's declaration into evidence.  But does

24  anyone else plan to cross examine either those two witnesses?

25           Okay, so Mr. Fox and Mr. Shore will be crossing.

1  All right, we want to go ahead Ms. Sinclair and get in Mr.

2  Grubb's declaration?

3          MS. SINCLAIR:  Yes, Your Honor.  We'd like to move

4  the declaration of Christopher Grubb in support of the DIP

5  motion into evidence.  It's filed at Docket No. 52.  Mr.

6  Grubb, as you may know from our papers, is leading the

7  engagement of Ducera Partners in this case.  And he led the

8  financial negotiations regarding the DIP.

9          Like Mr. Orlofsky, Mr. Grubb is in the room with

10  me here and is available for cross examination.

11          THE COURT:  Okay.  Is there any objection?

12  Submitted without objection, subject to cross examination.

13          MS. SINCLAIR:  Thank you, Your Honor.  Before we

14  get into the DIP, would it be acceptable to the Court to

15  cover off the joint administration motion, Docket No. 2?

16          THE COURT:  Yes.  That motion is granted.

17          MS. SINCLAIR:  Thank you, Your Honor.  We'll take

18  the DIP financing motion next.  And Your Honor, if it pleases

19  the Court, we'll provide a quick overview of the DIP facility

20  before the parties who wish to cross examine question Mr.

21  Orlofsky and Mr. Grubb.

22          THE COURT:  Okay.

23          MS. SINCLAIR:  Your Honor, as we explained in the

24  motion, we're seeking entry of an order approval $750 million

25  in post-petition financing.  That facility is comprised of

1    $250 million in the form of a new money delay draw term loan

2    and a $500 million roll up of pre-petition first lien term

3    loans.

4              As we emphasized in Mr. Orlofsky's first day

5    declaration, as Your Honor likely understands from the

6    papers, there's an urgent need here for the company to access

7    the DIP facility.  The company entered the cases with

8    negative cash and only has around $14 million in its bank

9    account today.

10             That would be quickly depleted absent access to

11   new money.  And the company has no other sources of liquidity

12   right now.  We effectively lost access to our ABL on November

13   3rd when our amendment with them expired.

14             All of that to say that is critical at this point

15   to allow the company to continue operating in the ordinary

16   course.  As you know, this is a retail company.  We're

17   conducting both the liquidation of the American Freight

18   business line and a market check for the operating entities.

19   So we really need liquidity to support that process and

20   frankly, more importantly, to boost confidence in the market.

21             It's key for the company right now to be able to

22   give vendors, suppliers, franchisees, and employees the

23   comfort that the debtors are still operating as usual and

24   that those creditors are going to be paid in the way they

25   usually are.

1       The facility, as you heard from Mr. Goldstein, is

2   being provided by an ad hoc group of certain of the debtor's

3   pre-petition first lien term loan lenders, and we did seek

4   alternatives before reaching the agreement with the ad hoc

5   group.

6       Mr. Grubb testifies in his declaration that

7   Ducera, you know, in addition to negotiating the out of court

8   structures we mentioned earlier, marketed the DIP.  They

9   reached out to around 20 third parties in addition to

10  continuing discussions over the last several weeks with the

11  pre-petition first lien, second lien, and ABL lenders.

12      There was some level of interest in the market on

13  other (inaudible), which you'll hear about from Mr. Grubb,

14  but the process ultimately did not result in any other viable

15  financing alternatives from other lenders.

16      Just a few other highlights of the DIP before we

17  jump into questioning.  So the $250 million is available to

18  the debtors in three draws.  Assuming Your Honor approves

19  this DIP on the interim basis, we would receive the ability

20  to draw up to $125 million upon entry of the interim order.

21  Next, we would have the ability to draw up to $50 million

22  upon entry of the final order.  And finally, we would have

23  the ability to draw up to $75 million upon entry of the

24  confirmation order, which is really intended to cover that

25  period between confirmation and the effective date.

1           As I'm sure you've seen in our papers, we are

2    requesting the full roll up to occur upon entry of the

3    interim order.  I'll spend a moment here as we did have U.S.

4    Trustee discussions on this concept yesterday and presumably

5    our colleagues at White & Case may also be concerned about

6    the same issue.

7           I just want to mention that we went back and forth

8    several times with the lenders on this point, and they made

9    it clear that the DIP facility would not be available absent

10   an immediate roll up of the pre-petition obligations on a two

11   to one basis.

12          So the debtors did push in several different ways

13   on that point.  But we were ultimately not able to get the

14   lenders to agree to any formulation other than the one that

15   you see in front of you in the credit agreement and the DIP

16   order.

17          We are comfortable with this construct in the

18   sense that we're marketing the company and in an asset sale

19   that roll up would have to be paid as part of the first lien

20   debt no matter what.  And the roll up will only convert or

21   equitize if we know we haven't identified another deal by

22   that mid deadline.

23          In terms of rates and pricing, we think that the

24   DIP is generally in line with the market and represents the

25   best deal the debtors were able to obtain under the

1   circumstances.

2          There are a couple of premiums associated with the

3   DIP, which you'll hear about from Mr. Grubb.  I'll just

4   highlight them here.  There are 2.5 percent commitment

5   premium on the new money, a backstop premium of 10 percent on

6   the new money, and a 2.5 percent exit premium which is

7   payable either upon maturity or payment in full of the DIP.

8   And note that those fees would not be paid in cash unless we

9   were in the third party bidder scenario.  They're otherwise

10  going to convert or equitize as part of the terms of their

11  structuring term sheet.

12          I'd also like to just quickly update the Court on

13  some changes we made to the DIP order since we originally

14  filed it, just to address some of the concerns of the other

15  parties on a consensual basis.

16          The red line now reflects feedback from the U.S.

17  Trustee and again, I'd like to thank Mr. Fox for his quick

18  review here.  We made some changes at his request to narrow

19  certain outstanding issues with the DIP lenders.  We had a

20  call among us, Mr. Fox, and Paul Hastings late yesterday

21  evening to narrow the issues that are going to be in front of

22  you today.

23          One particularly important change that was made

24  here is that the lenders have agreed that the roll up will be

25  subject to the third party challenge.  The red line also

1  reflects feedback from our ABL lenders now.  We have been

2  engaged in active discussions with the ABL and the DIP

3  lenders regarding the ABL lender's concerns around the dip.

4  The changes reflected in the order don't ultimately resolve

5  all of the ABL lender's concerns on a final basis.  The

6  specific issue we're working through is what would happen in

7  the event of a borrowing based shortfall.

8         But for now, the modifications in the order have

9  provided the ABL enough comfort in the interim period that we

10  understand they won't be objecting today.  I'll defer to

11  Latham & Watkins if they'd like to speak to that point, but

12  just wanted to let the Court know we will happily continue to

13  negotiate with the ABL lenders and their counsel as we

14  proceed to the final hearing.

15         Finally, we've received outreach from four law

16  firms representing landlords.  Some of those firms provided

17  specific comments to the order which we've incorporated.  Up

18  until right before the hearing, we were working through some

19  final tweaks with one firm representing landlords, so we may

20  have an additional one or two changes after the hearing, but

21  we expect we are largely resolved as to the landlords who

22  came forward yesterday.

23         We also have a couple of minor tweaks that are

24  still being made to the DIP syndication procedures.  I

25  understand they're largely technical, but I wanted the Court

1    to be aware that you probably will see a red line, you know,

2    affecting those procedures after the hearing.  It's largely

3    to make sure the timing of the roll up is clear in the

4    syndication procedures.  I believe that's going to fix the

5    timing of the roll up on November 14th, which will also be

6    the deadline for all 1L lenders to participate in the DIP

7    because it is open to all first lien lenders.

8          So for all these reasons, we ask that the DIP

9    facility be approved on an interim basis.  And for anyone

10   who'd like to cross examine Mr. Grubb, I will cede the

11   microphone to them.  I'd like to note our litigators are in

12   the room here, Your Honor.  Jim Dugan and Stuart Lombardi.

13   They'll be assisting Mr. Grubb in his cross examination, but

14   because of the way our room is set up, they will be off

15   camera.  They do have microphones.

16         THE COURT:  All right, can we just change podium

17   with you?  I'd rather the lawyers be on video when they're

18   cross examining or if they're going to be objecting.

19         MS. SINCLAIR:  Yes, we can have a lawyer up here.

20   I think they may be seated next to the witness, if that's

21   okay with Your Honor.

22         THE COURT:  Excellent.

23         MR. FARNAN:  Your Honor, while we're doing that, I

24   just wanted to note my appearance for the record.  This is

25   Dan Fliman of Paul Hastings, first lien lenders.  I want to

1  note the appearance now as I may be involved in the

2  evidentiary portion of this presentation.

3           THE COURT:  All right, thank you.

4           MR. LOMBARDI:  Good morning, Your Honor.  Stuart

5  Lombardi of Willkie, Farr & Gallagher for the debtors.

6           THE COURT:  Okay.  Mr. Fox, why don't you go ahead

7  and do your cross first?

8           MR. FOX:  Thank you, Your Honor.  I appreciate the

9  time.  Is Mr. Orlofsky seated next to Mr. Lombardi?

10          MR. LOMBARDI:  He is further down in the room,

11 Mr. Fox.  This is Mr. --

12          THE COURT:  We'll do Mr. Grubb first, Mr. Fox.

13 And if you want to do Mr. Orlofsky, we'll do him second.

14          MR. FOX:  Okay.  And I'll pass the witness to

15 counsel at White & Case after I conclude.  I think I'll have

16 limited questions and just would reserve rights if there's

17 anything sparked in additional testimony to follow up further

18 if necessary.

19          THE COURT:  Okay.

20          MR. FOX:  So with respect, again, Timothy Fox, on

21 behalf of the United States Trustee, thank you, Mr. Grubb,

22 for appearing and for your declaration.

23                    CROSS EXAMINATION

24 BY MR. FOX:

25 Q    I did just want to ask a few follow up questions with

1  respect to your testimony embodied in the declaration and

2  wanted to focus first on the structure of the proposed debtor

3  and possession financing.  As I understand it from the motion

4  papers, the debtors propose an aggregate facility in the

5  amount of 750 million.  Is that correct?

6  A    That's correct.

7  Q    And as Ms. Sinclair stated in her remarks, only 125

8  million of that is expected to be borrowed during the interim

9  period if the Court were to enter the interim order?

10  A    Correct.  Up to 125 million.

11  Q    And of that 125 million, it appears from the budget

12  attached as an exhibit, which is at page 252 of 254, at

13  Docket Item 76-1 or page 298 of 300 in the original filed

14  Docket Item 51, that the cash balance for the debtor stays at

15  125 million through week four on that budget.  Am I reading

16  that correctly?

17  A    I don't have it in front of me, but that -- I can

18  either look at the exhibit or --

19         MR. LOMBARDI:  Mr. Fox, if you want to put it up

20  on the screen, or I can get a hard copy for the witness.

21         MR. FOX:  Your Honor, if you would prefer it to be

22  on the screen, I could request permission and display that.

23         THE COURT:  I've got a copy.  You can just hand

24  the witness a hard copy.

25         MR. FOX:  Okay.

1          MR. LOMBARDI:  Hard copy, Your Honor.

2          MR. FOX:  Thank you.  Mr. Lombardi.

3          THE WITNESS:  Yes.  Confirm it's at or above 125

4    million through week four.

5    BY MR. FOX:

6    Q     And so, Mr. Grubb, the first week that it will be below

7    that 125 million cash balance is week five, correct?

8    A     Correct.

9    Q     And then in week six, it goes back above 125 million,

10   correct?

11   A     Correct.

12   Q     And that is before any additional borrowings on the

13   debtor in possession financing would be needed in week six.

14   A     That's correct.

15   Q     And I don't think your declaration touched on this

16   specifically, but with respect to the structure of the

17   financing, was there any requirement to maintain specifically

18   $115 million or more in the debtor's accounts as a cash

19   balance?

20   A     There is not a covenant to that effect.  It was a

21   judgment about the appropriate liquidity for the operating

22   businesses.

23   Q     Thank you.  And Mr. Grubb, if you look at the total

24   operating receipts line towards the top of the budget, the

25   debtors on average expect at least $63 million in operating

1  receipts through each of the first five weeks.

2  A      That looks roughly correct.

3  Q      And Mr. Grubb, I understand certain of the

4  representations made at today's hearing focus on confidence

5  of counterparties with respect to the debtor in possession

6  financing as proposed.  But in your experience in

7  restructuring matters, does the pending request for

8  additional borrowings operate to instill confidence in

9  counterparties as cases progress?

10 A      Can you clarify which -- you referenced two different

11 groups of counterparties.  Can you just clarify which

12 counterparties you're speaking to?

13 Q      Certainly, Mr. Grubb.  So with respect to instilling

14 confidence in counterparties, focusing specifically on

15 business vendors of the debtor in order to maintain trade

16 relationships, would the request pending to borrow funds to

17 ensure liquidity instill confidence in those groups of

18 vendors?

19 A      Yes, it was vendors.  It was also franchisees,

20 employees, and other stakeholders.  But vendors was a large

21 constituent that was considered.

22         MR. FOX:  Your Honor, I think that's all I need

23 for the moment.  Again, would reserve rights to the extent

24 additional information is adduced on further cross from the

25 other parties.

1          THE COURT:  Okay.  Thank you.

2          Mr. Shore?

3          MR. SHORE:  Thank you.  Can you hear me, Your

4   Honor?

5          THE COURT:  I can.

6          MR. SHORE:  Okay, let me start with -- getting an

7   echo.  No one else is.  Everybody turn.

8                    CROSS EXAMINATION

9   BY MR. SHORE:

10  Q    Okay, Mr. Grubb, I'm going to focus on three areas of

11  your cross examination or of your declaration.  Marketing,

12  benefit to the Freedom debtors and the hurdle to a takeout

13  finance.  But first of all, I'm having some technical

14  difficulties.  I would have shared the screen.  Can I ask

15  that you and Your Honor, I guess, pull out the budget that

16  you were just questioned on?  And let me just clarify.  Am I

17  correct that that budget was largely prepared by Alex

18  Partners?

19  A    You're correct.  It was prepared by Alex Partners

20  working with the management team.

21  Q    Okay, so if I had questions about the budget, would you

22  agree with me that it's best to ask those questions to Mr.

23  Orlofsky?

24  A    I'm generally -- I'm generally familiar with the

25  budget, but Mr. Orlofsky was closer to the preparation of

1  that budget.  Yes.

2  Q    Okay, so let's focus on your declaration then.  Let's

3  start at paragraph 15 where you talk about a robust marketing

4  process.  And you say that was started in October.  October

5  was last week.  When in October did you start the marketing

6  process?

7  A    It was the middle of October.  So several -- several

8  weeks ago.

9  Q    Okay.  And when was the first time that you contacted a

10  third party financial institution with respect to providing a

11  potential DIP?

12  A    I don't recall the exact date.  It would be several

13  months ago.  It was less specific to a DIP financing than

14  general financing for the business as we were contemplating

15  various out of court paths that would require financing to

16  implement those.

17  Q    Yeah.  Can you answer my question?  When was the first

18  time a third party was solicited for a DIP proposal?

19  A    I don't recall if a DIP specifically was mentioned in

20  those conversations.

21  Q    So when can you recall being the first time a third

22  party was solicited for a DIP proposal?

23  A    Specifically in middle of October, we contacted the

24  parties.

25  Q    Okay.  Now you understand that there are a number of

1  entities within the capital structure known as the Holdco

2  entities?

3  A     Yes.

4  Q     Okay.  And do you understand that Freedom VCM Inc. is

5  an obligor to certain Holdco term loan lenders?

6  A     At the Holdco, yes.

7  Q     And that the entity above it is a guarantor of those

8  obligations?

9  A     Yes.

10 Q     Okay.  What cash needs do either of those debtors have

11 during the interim period?

12 A     Again, David Orlofsky can speak to the DIP budget.  We

13 don't anticipate cash needs of those entities, although they

14 would have access if needed.

15 Q     Well, let's clarify that.  Are you aware of whether

16 they -- either of those entities have any right to borrow

17 under the DIP?

18 A     I believe they have access to the cash if needed.

19 Q     It's not my question.  My question is do they have the

20 ability to borrow under the DIP as opposed to borrow from

21 other debtors?

22 A     I'm not aware of their ability to borrow directly.

23 Q     Now, did you ever contact any actual Freedom lender to

24 solicit a DIP proposal from them?

25 A     We discussed financing with both Pimco and Radian.

1   Q      Did you solicit from them a DIP proposal from the

2   Holdco lenders?

3   A      We contacted Evercore and discussed financing.

4   Q      Okay.  You do understand that those Holdco lenders are

5   secured creditors, right?

6   A      I understand the second lien lenders are secured

7   creditors.

8   Q      Do you understand whether the Holdco lenders are

9   secured creditors?

10  A      Against -- no, against which entity I guess?

11  Q      Against the Holdco entities.  That is Freedom VCM and

12  Freedom VCM Interco.

13  A      Not specifically.

14  Q      Okay.  With respect to those Holdco lenders, did you

15  reach out to them or did they reach out to you for a DIP

16  proposal?

17  A      We had discussions with Evercore ongoing.  They reached

18  out to us.  We reached out to them.  There was robust

19  discussions with Evercore.

20  Q      Did the debtors reach out first or did they wait for

21  the Holdco lenders to approach the debtors?

22  A      I don't recall.  Calls were frequent.  Daily, multiple

23  times a week.

24  Q      Okay, and did you -- let's focus on the 2L lenders down

25  at the Opcos.  Did the debtors reach out to the 2L lenders or

1   did the 2L lenders reach out to you with respect to a

2   potential dip?

3   A    We had ongoing and frequent conversations with Evercore

4   about multiple forms of financing for the companies.

5   Q    And at paragraph 17 of your declaration, you talk about

6   a third party proposal, right?

7   A    Correct.

8   Q    And that was the result of conversations you had been

9   having with Evercore, right?

10  A    The third party proposal relates to the marketing

11  process we ran.

12  Q    So that third party proposal was proposal by somebody

13  other than a current lender of the company?

14  A    Correct.  That was a party not in the current capital

15  structure.

16  Q    Okay, what was the headline commitment from that party?

17  A    It was a $300 million ABL commitment.

18  Q    Junior or senior to the 1Ls or pari?

19  A    It would be senior to the 1Ls on the ABL collateral,

20  similar to the current ABL.

21  Q    Okay.  What were the fees.

22  A    All in fees were approximately 6 percent.

23  Q    What was the interest rate?

24  A    I don't recall.

25  Q    Since it's a third party lender, there was no roll up

1   component, right?

2   A      Correct.

3   Q      And you rejected that, right?

4   A      We did.

5   Q      You also got a proposal, didn't you, from the entities

6   represented by Evercore?  Right.

7   A      We received a recapitalization proposal from them on

8   Saturday.  Included in that proposal was the concept of a DIP

9   proposal.

10  Q      Okay.  And with respect to that proposed DIP, what was

11  the headline commitment?

12  A      125 million.

13  Q      Was it senior or junior or pari with the 1Ls?

14  A      I don't recall.

15  Q      Do you think that that was the proposal was to prime

16  the 1Ls?

17  A      My answer was I don't recall.

18  Q      Okay.  What were the fees, you recall?

19  A      I do not.

20  Q      What was the interest rate, do you recall?

21  A      I don't recall.

22  Q      But that was rejected by the debtors as well, right?

23  A      That was rejected by both the first lien lenders and

24  the debtors ultimately.

25  Q      Okay.  With respect to the third party proposal that

1  you testified to, did the debtors counter to that?

2  A    The debtors analyzed the third party proposal for the

3  incremental liquidity it provided.  Given the incremental

4  liquidity was insufficient for administration of the cases,

5  there was not a counter to that proposal.

6  Q    Okay.  And yes or no, did the debtors counter to the

7  existing lender alternative proposal?

8  A    Did the debtors counter the 1L proposal?

9  Q    No, the -- well, we're going to come to that in a bit.

10 No, the 2L proposal.

11 A    There was not a counter to the 2L proposal.

12 Q    Okay.  Now, let's talk about the negotiations with the

13 1L lenders.  What was their initial request for interest on

14 the DIP?

15 A    S plus 1000.

16 Q    And what was their request with respect to commitment

17 fees?

18 A    They requested two and a half percent commitment fee.

19 Q    And that's what ended up being in the DIP?

20 A    Correct.

21 Q    And what did they request for the fee to be charged on

22 the outstanding at the time of payment?  Two and a half

23 percent as well.

24 A    They requested 5 percent in the original proposal.

25 Q    Okay.  And the backstop fee, which is currently 10

1  percent.  What was their proposal?

2  A     They requested 10 percent.

3  Q     Okay.  Now, in paragraph 24 of your declaration, you

4  state that the 1Ls demanded a two-to-one roll up as part of

5  their DIP commitment, right?

6  A     Correct.

7  Q     But let's focus on how this works right now.  The roll

8  up is proposed to occur on the funding of the interim, right?

9  A     Correct.

10  Q     And the interim is 125 million, right.

11  A     Up to 125.  Correct.

12  Q     Right.  And so what will happen is a four-to-one roll

13  up of the pre-petition obligations if the interim order is

14  entered.

15  A     We sized off the full commitment amount, not the draw

16  in the interim.

17  Q     Just if somebody comes in to take out the DIP at a

18  later date before the final hearing, they've got to deal with

19  a four-to-one roll up.  Right?

20  A     They would deal with the amount outstanding under the

21  DIP plus a 500 million dollar roll up.

22  Q     Right.  Now, let me pause, and I'm going to come back

23  to the cost here.  But I want to focus on the Freedom

24  debtors, Right.  The entities above Freedom Group Inc.  All

25  right.  First of all, are you aware of any lenders existing

1   in those boxes other than the term loan lenders that are 90

2   percent represented by my group?

3   A     I am not.

4   Q     Okay.  And under this DIP, those entities are

5   guaranteeing the DIP commitment, right?

6   A     Correct.

7   Q     And at the entities in which there are secured

8   creditors, they are doing so on a super priority admin

9   expense only, right?

10  A     Correct.

11  Q     And they're committing themselves, then, in the interim

12  period, to $625 million of super priority administrative

13  expense claim, right?

14  A     Correct.

15  Q     For money they can't borrow.  Right?

16  A     I understand --

17  Q     They're undertaking -- first of all, you understand

18  that the guarantee is joint and several.  Right?

19  A     I didn't understand the unable to borrow portion of

20  your question.

21  Q     Okay.  Oh, I see.  So the undertaking on a joint and

22  several basis, the obligation to pay as an administrative

23  expense claim $625 million if the interim order is entered.

24  Right?

25  A     Sorry, you're talking about the Holdco's inability to

1  borrow.  But to use --

2  Q    I just -- I broke it into two pieces because you seem

3  confused.  So let's just take this in small pieces.  If the

4  interim order is signed, both of those debtors which have

5  secured creditors are committing themselves to a $625 million

6  super priority administrative expense claim at entry of the

7  interim order.

8  A    Correct.

9  Q    But neither of them need any money during the interim

10  period, right?

11  A    I don't believe any is forecast to be needed.

12  Q    Right.  And even if they needed it, they can't borrow.

13  A    They cannot borrow directly.

14       THE COURT:  Hold on, Mr. Shore, I can't hear you.

15  I think I may have accidentally.

16       MR. SHORE:  Can you hear me now?

17       THE COURT:  Now I can hear you.  Yes.

18  BY MR. SHORE:

19  Q    Okay.  At paragraph 32, you testified that the pre-

20  petition secured parties are adequately protected.  I had a

21  hard time tracking down that definition.  Is it your

22  testimony that the Holdco secured parties are adequately

23  protected?

24  A    I don't believe I testified to that.

25  Q    Okay, so you're not providing any testimony at all as

1  to whether or not holders of claims at Holdco are being

2  adequately protected at all?

3  A      Correct.

4  Q      But it is your testimony that the entry of this DIP is

5  in the best interests of these Holdco entities?

6  A      It's in the best interest of the debtors.

7  Q      Well, is it your testimony because we have multi

8  debtors in a not substantially consolidated case, is it your

9  testimony that this DIP is in the best interests of the

10 Holdco entities?  That's Freedom VCM Inc. and Freedom VCM

11 Interco Inc.

12 A      It's in the best interest of the debtors.  Yes.

13 Q      So those debtors, as well, on an individual basis.

14 A      The debtors in totality.

15 Q      Okay, let me just break it into two pieces.  Is this

16 proposed DIP in the best interest of Freedom VCM, Inc. on a

17 standalone basis?

18 A      Yes.

19 Q      And VCM Interco Inc.  It's in their best interest as

20 well.  Right?

21 A      Remind me, what's in that specific entity?

22 Q      Well, I'm just a creditor of that entity.  You are a

23 representative of that entity in this bankruptcy case, right?

24 A      Right.

25 Q      Can you tell the Court what's in that box?

1  A      No.  I was asking for a schedule.

2  Q      Okay, but without getting something from somebody else,

3  you can't testify to the Court what the assets or liabilities

4  are of that entity other than the guarantee obligation.

5  A      Correct.

6  Q      What are the assets and liabilities inside the Freedom

7  VCM Inc. box, other than the Holdco lender claims?

8  A      I don't recall.

9  Q      Well, would you agree with me that one of the assets is

10 the equity it owns in Franchise Group Inc.  The top Opco,

11 right?

12 A      Correct.

13 Q      That's the equity that will be canceled if the

14 restructuring support agreement results in a confirmed plan.

15 A      Correct.

16 Q      And with respect to that equity, do you know whether or

17 not the Holdco lenders have an equity pledge of that?

18 A      I don't recall.

19 Q      Okay.  And with respect to what's in that box, do you

20 understand that the Freedom entities were created as part of

21 a management buyout?

22 A      I'm aware of that transaction.

23 Q      Okay.  And do you understand that the Holdco debt that

24 came in was used to fund the acquisition of the shares?

25 A      That's my understanding.

1  Q      And that half a billion dollars was paid for shares 16

2  months ago?

3  A      I don't recall exactly what was paid for the shares.

4  Q      Well, the money that came in as debt at Freedom Holdco

5  was used to buy equity 16 months ago, right?

6  A      Correct.

7  Q      And that equity is being canceled today?

8  A      Correct.

9  Q      You have a lot of experience in bankruptcy, don't you?

10 A      Yes, sir.

11 Q      All right, well, let's go through this.  Let's assume

12 that between now and the final hearing, Freedom VCM Inc.

13 Obtains a $300 million judgment on a fraudulent conveyance

14 that paid $500 million for equity that was worthless.  Okay.

15 Now, under the terms of this DIP, would you consider a --

16 just not as a legal basis, but just your working

17 understanding that the -- that fraudulent conveyance claim is

18 within the collateral package of a pre-petition secured

19 lender?

20         MALE VOICE:  Objection; speculation.  Incomplete

21 hypothetical.

22         MALE VOICE:  Same objection.

23         THE COURT:  Mr. Shore?

24         MR. SHORE:  Let me just rephrase.

25 //

1  BY MR. SHORE:

2  Q     Is it your experience, and I'm not asking for a legal

3  conclusion, that a pre-petition fraudulent conveyance claim

4  is typically within the collateral package of a pre-petition

5  secured lender?

6              MALE VOICE:  Same Objection, Your Honor.

7              THE COURT:  You can answer.  To the best of your

8  knowledge.

9              THE WITNESS:  It would depend on what entity that

10 claim was created.

11 BY MR. SHORE:

12 Q     Okay.  In this instance, if Freedom VCM collected a

13 $300 million judgment on a fraudulent conveyance claim and it

14 wasn't inside the collateral package of the Freedom lenders,

15 wouldn't that money need to be used to pay the super priority

16 administrative expenses of that entity if it was going to do

17 a plan same?

18              MALE VOICE:  Objection, Your Honor.

19              THE COURT:  You can answer as best you can.

20              THE WITNESS:  You've mixed some pre-petition and

21 post-petition concepts there.  But if the claim was at that

22 outside the collateral pool, it would not be collateral of

23 the 1L lenders.

24 BY MR. SHORE:

25 Q     It wouldn't be collateral of the Holdco lenders either.

1   In other words, let's just state it this way.  Isn't it true

2   that by this interim DIP order, whatever fraudulent

3   conveyance claims exist at Freedom VCM Inc. that are outside

4   of the collateral package will now have to be used to satisfy

5   the super priority administrative expense claims at that box?

6          MALE VOICE:  Objection, Your Honor.  Calls for

7   speculation.  Calls for a legal conclusion.

8          THE COURT:  You can answer.  Overruled.

9          THE WITNESS:  To extend -- to the extent recovery

10  was required from that box, those proceeds would be available

11  for recovery.

12  BY MR. SHORE:

13  Q    Well, are you aware of any marshaling provisions that

14  exist in that box which require the DIP to be collected from

15  entities other than VCM Inc?

16  A    I'm not aware of any.

17  Q    Now to be clear, at the very Topco, Freedom VCM

18  Holdings LLC, the one that's owned by B. Riley and others,

19  you did agree to give them anti marshaling provisions.

20  A    Correct.

21  Q    Right.  So just understand, you gave the -- and that

22  that equity is also out of the money, right?  At least under

23  the RSA?

24  A    Correct.

25  Q    Okay.  But who did you negotiate with there to give

1  them that package?

2  A    That was a negotiation between the board of the company

3  and the 1L lenders.

4  Q    All right, well, let's go to the board of the company.

5  Okay.  You are -- you are retained or seeking to get retained

6  by each of the debtors, right?

7  A    Correct.

8  Q    Are you aware of the identity of any board below the

9  Topco?

10  A    I'm not.

11  Q    Have you ever even attended a board meeting of any of

12  the entities below the Topco?

13  A    No.

14  Q    Do you have any understanding as to who's on the

15  management team of Freedom VCM Inc.

16  A    Of that entity?  No.

17  Q    Yeah.  Do you know?

18  A    Sorry, I responded.  May have been speaking at the same

19  time.  For that entity?  I do not.

20  Q    And what about its parent Freedom VCM Interco, Inc.?

21  Do you have any idea who's on the management team there?

22  A    Not for that entity.

23  Q    So who negotiated their protections as part of this DIP

24  package?

25  A    It was part of the overall negotiation between the

1  management board and professionals.

2  Q     So the board got anti-marshaling provisions to protect

3  its entity, right?

4  A     Correct.

5  Q     But nobody stood up and said, hey, we should probably

6  get some anti-marshaling provisions in for the other entity.

7  A     Correct.

8  Q     Okay.  What role did you personally play in the

9  negotiations over the terms of the DIP?

10  A     I negotiated primarily around the financial terms of

11  the DIP as well as other structural elements of the DIP and

12  syndication process.  I work closely with Alex Partners and

13  Willkie on other elements of the broader terms of the

14  financing.

15  Q     As far as you know, did the debtors ever request a

16  revolving DIP, that is a DIP which would exist as a revolving

17  line of credit?

18  A     We explored various forms of DIP financing, including,

19  you know, an ABL financing that would be revolving in nature.

20  We discussed different structures as it relates to the draw

21  sequence and frequency of the 1L proposal and if amounts

22  repaid could be reborrowed.  We did not explore specifically

23  a revolver at the -- at the 1L level.

24  Q     Just focus on my question.  Did you ever request a

25  revolver?

1  A      We requested third parties submit ABL revolvers.  We

2  also submitted -- we asked the ABL to provide DIP proposals.

3  So in for those, for those conversations, yes.

4  Q      Did you request a revolver from the 1Ls?

5  A      We did not.

6  Q      So let's talk about the -- one of the assets of Freedom

7  VCM Inc., which is the stock in Franchise Group Inc.  One of

8  the things that's occurring over the next 90 days is a sale

9  of the business.  Right?

10 A      We are running a sale process for the business.

11 Q      And the current expectation, given the plan on file, is

12 that the quantum of consideration which will be received will

13 be insufficient to pay off the DIP and the 1L in full.

14 Right?

15 A      I don't believe there's an expectation built in.  There

16 is -- there are terms that get implemented if we do or do not

17 exceed that level.

18 Q      Okay, so in your -- well, first of all, you're not

19 providing any evidence to the Court today with respect to

20 total enterprise value of the debtors, right?

21 A      I am not.

22 Q      Okay.  And so it is possible that the bids could be

23 enough to clear to the 2Ls at the Opcos, right?

24 A      It is possible.

25 Q      And it's possible that you could even clear the 2L's

1  and make an equity distribution out of Franchise Group Inc.

2  into Freedom VCM.  Right?

3  A    It's possible.

4  Q    Okay.  To be clear, the DIP order, though, treats the -

5  - to be clear, the DIP order treats the DIP lender -- sorry,

6  the 1L lenders as being oversecured.  Right?

7  A    It provides adequate protection for the 1L lenders.

8  Q    Right.  And it's paying them post-petition fees and

9  interest, right?

10 A    Correct.

11 Q    And that, as far as you know, that is not subject to

12 recharacterization at a later date if it turns out that the

13 1L lenders were under secured, right?

14 A    Not to my knowledge.

15 Q    Okay.  Now, let's talk about this hurdle then.  Isn't

16 it fair to say that the -- by entry of the interim order, you

17 are raising the hurdle that's going to be necessary to pay

18 off the 1L lenders and the DIP lenders?  Right?

19 A    There are fees connected with the DIP financing that

20 would be incremental payoff required to clear the DIP ABL and

21 1L lenders.

22 Q    Right.  Now, if in fact the 1Ls are undersecured, it's

23 just a right pocket/left pocket issue, right?  That is that

24 all of the fees and expenses and DIP to equity conversion and

25 everything else is just taking consideration away from some

1  1L lenders and giving it to the DIP lenders.  Right?

2  A    Correct.

3  Q    Okay, but let's focus on the instance in which the 1L

4  lenders are oversecured.  In exchange for the interim draw of

5  125, let's talk about what the debtors are committing to now,

6  which is going to raise that hurdle.  First of all, any bid

7  that comes in is going to have to have a $625 million cash

8  component.  Right?

9  A    Subject to other agreement with the lenders.  That's

10  the amount that would be required to pay off the DIP

11  principal amount.

12  Q    Okay.  And that's so -- for example, a structure which

13  reinstates the 1L is off the table if this interim order is

14  approved.  Right?

15  A    There would continue to be a 1L outstanding that could

16  be reinstated.  But a portion of the 1L would have been

17  rolled up into the DIP.

18  Q    Right.  A full reinstatement.  You'd have to come up

19  with, again, $625 million in cash in that bid starting

20  tomorrow.  If the DIP -- if the interim is entered.

21  A    Assuming the 125 is drawn, that's correct.

22  Q    Okay.  And then with 125 drawn, the hurdle gets

23  increased by 2.5 percent going in.  Right?

24  A    That's the commitment fee.  Correct.

25  Q    And then there's at the end of the period, that is when

1  a bid comes in that could pay the 1Ls in full, there's

2  another 2.5 percent on the 125 going out.

3  A       As well as on the roll up.

4  Q       Yeah.  And then there's a 10 percent backstop fee

5  that's adding to the hurdle.

6  A       On the new money, correct?

7  Q       Yep.  And then you're paying 15 percent interest on the

8  borrowings, the fresh money borrowings during that period,

9  right?

10  A      Slightly below that, yes.

11  Q      And you're paying 4-plus percent on the $500 million

12  rolled up during the interim period, right?

13  A      It's more than -- you have (inaudible) added to the 475

14  margin.

15  Q      Okay, so just to be clear then, have you added up all

16  of those costs and what that means for a bid that comes in

17  tomorrow to take out the 1Ls?

18  A      Yes, we've run that math.

19  Q      And how much.  How much, if the interim order is

20  approved today, how much higher does the bid tomorrow have to

21  be if $125 million is drawn?

22  A      I don't have the number top of mind on that specific

23  scenario.

24  Q      Directionally, do you have a sense?  Mr. Lauria can add

25  it up when he argues this, but do you have a sense of just

1  how much higher the bid needs to be tomorrow if you draw $125

2  million today and a bid comes in?

3  A    I believe it's approximately 50 million.

4  Q    And that only goes up as the interest component ticks

5  on the $625 million that's getting -- that is a DIP

6  commitment prior to the final hearing.

7  A    There will be additional costs for an extra six months.

8         MR. SHORE:  Okay.  I have no further questions for

9  this witness.

10         THE COURT:  Thank you.  Redirect?

11         MR. LOMBARDI:  Yes, Your Honor.  Stuart Lombardi,

12  Willkie, Farr & Gallagher for the debtors.

13                     REDIRECT EXAMINATION

14  BY MR. LOMBARDI:

15  Q    Mr. Grubb, do you recall being asked on cross

16  examination about guarantees provided by Freedom debtors?

17  A    Yes.

18  Q    How did the Freedom debtors come to be DIP guarantors?

19  A    It was a requirement of the 1Ls to extend the DIP

20  financing to the debtors.

21  Q    Why did the Freedom debtors agree to that?

22  A    They agreed because they have access to the funds to

23  extend that cash, as necessary, to them.

24  Q    And what other benefits, if any, do they get by being

25  guarantors?

1  A    They get the benefit of the automatic stay and

2  administration with the cases.

3  Q    Now, do you understand that the Freedom debtors hold

4  equity interests in certain subsidiaries?

5  A    I do.

6  Q    And what, if any, benefit do those subsidiaries receive

7  under the DIP?

8  A    The subsidiaries receive the cash they need to continue

9  operating to maintain their going concern businesses.

10  Q    What if you're -- strike that?

11  What in your opinion would happen to the Freedom debtors'

12  equity interest in the subsidiaries if the subsidiaries

13  didn't have the financing they needed?

14  A    The value of those businesses and the resulting equity

15  value would go down precipitously.

16  Q    Now sir, do you also recall being asked on cross

17  examination about a series of other DIP proposals that the

18  debtors received?

19  A    Yes.

20  Q    Why didn't the debtors agree to any of those proposals?

21  A    Each of the proposals in its own way was insufficient.

22  None of them provided the liquidity the company needs to

23  continue operating through these Chapter 11 cases.

24  One of the proposals, the cost of the incremental financing

25  was in excess of the cost of the financing provided by the 1L

1   lenders.  And one of the proposals, you know, specifically

2   the 2L proposal was conditional on a broad recapitalization

3   that was unacceptable to the parties and was not submitted

4   with sufficient time to negotiate that transaction.

5   Q     And that 2L proposal that you referred to, was that

6   received from cross examining counsel's clients?

7   A     It was.

8   Q     When did the debtors receive that proposal?

9   A     On Saturday, three days ago.

10  Q     How far in advance of when the debtors filed for

11  bankruptcy was that?

12  A     Approximately 24 hours.

13  Q     Why didn't the debtors counter that proposal?

14  A     We discussed that proposal with the 1L group and their

15  advisors, and we discussed it with the board of directors of

16  FRG, and it was rejected by the 1L lenders and not viewed as

17  actionable by the debtors.

18  Q     Why wasn't it viewed as actionable by the debtors?

19  A     There were multiple elements of that transaction that

20  would have required the consent and support of the 1L

21  lenders, which they expressed they were unwilling to provide.

22  It also provided insufficient liquidity for the

23  administration of these cases based on the budgeting for the

24  Chapter 11.  And it required consent from the ABL as it

25  relates to ongoing financing and liquidity for the business

1  that was not viewed as achievable, given the timeline.

2  Q    In your professional opinion, do the debtors have

3  access to any alternative DIP financing that is superior to

4  the DIP facility that you're testifying regarding today?

5  A    No.  This is the most attractive financing package that

6  provide the liquidity the business needs to continue

7  operating.

8       MR. LOMBARDI:  No further questions, Your Honor.

9       THE COURT:  Okay, thank you.  All right, let's

10  move on to question.

11       MR. FOX:  Can I have a follow-up question?  Oh,

12  somebody else got a question?

13       THE COURT:  No, no, only cross and redirect.

14  That's it.  Let's go to the next witness.  You know, I just

15  realized that -- let me -- I made a mistake here.  I did not

16  swear in the witness during his testimony.  So let's bring

17  Mr. Grubb back on the stand for one moment so I can get him

18  to swear that the testimony that he gave was true and

19  correct.

20       Okay.  Mr. Grubb, can you please raise your right

21  hand, state your full name for the record.

22       THE WITNESS:  Christopher Grubb.

23       THE COURT:  Do you confirm that the testimony that

24  you just gave was the truth, the whole truth, and nothing but

25  the truth to the best of your knowledge and ability?

1           THE WITNESS:  I confirm, Your Honor.

2           THE COURT:  Okay, thank you.

3           All right, Mr. Orlofsky.

4           MR. DUGAN:  Thank you.  And Your Honor, just to be

5    clear, this is Jim Dugan from Willkie Farr.  I'll be the

6    redirect counsel.

7           THE COURT:  Okay.  Mr. Orlofsky, can you please

8    raise your right hand, state your full name for the record,

9    and spell your last name.

10          THE WITNESS:  David Orlofsky.  O-R-L-O-F-S-K-Y.

11          THE COURT:  Do you affirm that the testimony

12   you're about to give is the truth, the whole truth, and

13   nothing but the truth to the best of your knowledge and

14   ability?

15          THE WITNESS:  I do.

16            DAVID ORLOFSKY, WITNESS, AFFIRMED

17          THE COURT:  Thank you.

18          Mr. Fox.

19          MR. FOX:  Good morning, Your Honor.  May it please

20   the Court, Tim Fox, on behalf of the United States Trustee.

21          Good morning, Mr. Orlofsky.  Can you hear me all

22   right?

23          THE WITNESS:  I can.  Good morning.

24          MR. FOX:  Good morning.

25   //

CROSS EXAMINATION

MR. FOX:

Q     So again, I'll try to be brief with my questions.  I'm
sure that Mr. Shore has a lot more to cover than I do, but
appreciate the opportunity to ask some follow-ups.  With
respect to Mr. Grubb's testimony, I asked regarding the
budget, do you have a copy of that either at Docket Item 76-1
or at 50 -- Docket Item 51 available to you?

A     Yes, I have.

Q     Thank you.  And I may refer to your declaration
specifically with respect to paragraphs 85 through 91, but
I'll get to that in due course.  But if we need to deal with
that, if you have a copy of that available, that might
streamline things as well.

A     I have a copy of it.

Q     Thank you.  So, Mr. Orlofsky, Mr. Grubb in his
testimony indicated that you and your team at Alex Partners
were closer to the preparation of the budget, is that
correct?

A     That's correct.

Q     And with respect to the liquidity needs of the debtor
here, I understand in your declaration at paragraph 90, the
debtors identify a historical minimum liquidity threshold
between 50 and 100 million; is that correct?

A     Correct.

1   Q     And so with respect to the budget attached to the

2   requested debtor in possession financing, would the $125

3   million of end cash balance included at that bottom line of

4   the budget represent an increase of that historical liquidity

5   threshold?

6   A     It's greater than the top end, yes.

7   Q     And with respect to the specifics in the budget, again,

8   it doesn't appear that there's ending cash balance below the

9   amount of the requested interim borrowings under the DIP; is

10  that correct?

11  A     That's correct.

12  Q     And with respect to the total operating receipts that

13  are identified in weeks one through five, again those appear

14  to average approximately $63 million.  Is that correct?

15  A     Correct.

16  Q     And is there any restriction, other than obtaining the

17  consent of the secured lenders for the use of cash

18  collateral, as to how those operating receipts could be used

19  during that five-week period?

20  A     I don't believe so, no.

21  Q     And with respect to the $125 million interim borrowings

22  that are requested, I asked Mr. Grubb regarding confidence

23  management with respect to stakeholders.  Were you present

24  for that questioning?

25  A     Yes, I was.

1   Q     And Mr. Orlofsky, in your opinion, again noting your

2   restructuring experience, can stakeholders benefit from

3   confidence of anticipated future borrowings with respect to a

4   contemplated DIP facility?

5   A     I think stakeholders appreciate the amount of money you

6   have on the balance sheet today to pay the trade claims and

7   other liabilities and costs of the business.

8   Q     But Mr. Orlofsky, would your testimony be that there is

9   additional confidence for those stakeholders by virtue of

10  having filed the Chapter 11 petitions and requesting

11  financing of an amount to facilitate continued operations of

12  the debtor's business?

13  A     Yeah, that's generally correct.

14  Q     And Mr. Orlofsky, with respect to the structure of the

15  debtor in possession financing facility, the next incremental

16  borrowings are scheduled to occur in week eight of the

17  budget; is that correct?

18  A     Yeah, it was structured too.  That's correct.

19  Q     And Mr. Orlofsky, with respect to the additional new

20  money incremental borrowings, that is subject to confirmation

21  of a plan on behalf of these Chapter 11 debtors; is that

22  correct?

23  A     You're talking about the draw, the next draw?

24  Q     The draw after the 50 million in week eight.

25  A     The second draw is designed to be paid at the end of

1  the case to deal with what we anticipate to be all the

2  administrative costs, particularly professional fees that are

3  due and accrued, that will get funded at the end of the case.

4  So that's why that ending draw will come whenever that time

5  happens.  Whether that's -- I can't predict exactly when

6  it'll happen, but at the end.

7  Q    And so Mr. Orlofsky, based on that response, wouldn't

8  financing of that character be more appropriate to be

9  requested as part of an exit financing facility in connection

10 with the Chapter 11 plan, as opposed to being included in the

11 structure of a first day debtor in possession financing?

12 A    I don't believe so.

13 Q    And can you explain why you don't believe that would be

14 a more appropriate structure?

15 A    Because when you go into bankruptcy, you want to have a

16 clear way to get out of bankruptcy.  We have all the

17 financing today to do that.  It's much safer, cleaner, and

18 we've all been an example in cases before where getting exit

19 financing is much more complicated than you might have

20 anticipated.

21 Q    And Mr. Orlofsky, if -- doesn't front loading the

22 approval of such financing, though, reduce the debtor's

23 ability to pursue alternative transactions that may be more

24 attractive than what they're currently agreeing to at this

25 early stage of the Chapter 11 case?

1  A      I don't believe so, no.

2  Q      And that's notwithstanding the fact that the debtors

3  are requesting authority to roll up $500 million worth of

4  funds as a multiple of the facility that extends this entire

5  duration of the Chapter 11 case that we've been discussing?

6  A      We have a need for capital in this business.  This was

7  the cost of the capital.

8         MR. FOX:  Your Honor, I think that's all I have at the

9  moment.  Again, with just reserve rights to the extent

10 counsel at White & Case educes anything additional that I

11 need to follow up on, but appreciate the opportunity and

12 thank you, Mr. Orlofsky, for your testimony.

13        THE COURT:  Thank you.

14        Mr. Shore?

15        MR. SHORE:  Thank you, Your Honor.  Just a point of

16 clarification.  I know the witness is being tendered on the

17 DIP right now, but I have a few questions, and they are

18 limited with respect to cash management and critical vendor.

19 If I could ask those now, it may streamline things rather

20 than bringing them back up when those motions occur.  They

21 are limited questions.

22        THE COURT:  Yeah, that's fine.  Thank you.

23                      CROSS EXAMINATION

24 BY MR. SHORE:

25 Q      Okay.  Good morning, Mr. Orlofsky.  I'm Chris Shore

1  from White & Case, as I said, on behalf of 90 percent of the

2  Holdco lenders and 90 percent of the 2L lenders.  Could you

3  bring up your organizational chart, which is attached as

4  Exhibit A to your declaration, which shows the one page, the

5  entities above Franchise Group, Inc.  And on another page,

6  the entities below Franchise Group Inc.  You have that?

7  A     Not yet.

8  Q     Okay.

9  A     This is below Franchise Group.  This is above Franchise

10 Group.  Okay.

11 Q     Okay.  So as I understand it, you are the CRO at

12 Freedom VCM holdings, which is the top entity, right?

13 A     Yeah, it's the top entity.

14 Q     And the CRO at Franchise Group Inc.  Right?

15 A     I believe so, yeah.

16 Q     Well, I tell you what, why don't you go to paragraph

17 one of your declaration, and can you confirm for me that you

18 are the CRO of those two entities?

19 A     Yes.

20 Q     Okay.  Are you a CRO at any of the other entities on

21 either of these two charts?

22 A     I don't believe I'm technically the CRO of them, no.

23 Q     Okay.  Do you have any personal role at any of the

24 entities other than Franchise Group Inc. and Freedom VCM

25 Holdings?

1  A     Say that again.  You say --

2  Q     Well, I'll rephrase.  Have you ever been to a board

3  meeting of any entity other than Freedom VCM Holdings?

4  A     I've only been to the board meetings I've been to --

5  no, I don't believe I've been to any of those.

6  Q     Okay.  Do you have any understanding as to who's

7  running the reorganization of the entities other than Freedom

8  VCM holdings and Franchise Group, Inc.?

9  A     No.

10 Q     You have any understanding as who's on the management

11 team of those entities?

12 A     No.

13 Q     Do you know whether any of those entities -- you

14 testified about a special committee and we'll get to that --

15 whether any of those entities have a special committee?

16 A     I don't.

17 Q     You know whether any of them has an independent

18 director?

19 A     No, I don't.

20 Q     But you do know that Alex Partners is seeking to be

21 retained by every single box on those two charts, right?

22 A     They're all debtors.  Yeah.

23 Q     Okay.  Now, are you aware that after you filed your

24 first day declaration my groups sent a notice to the debtors

25 seeking a deposition of parties knowledgeable of issues

1 raised in your first day declaration?

2 A    I heard that from counsel.  I did not see it myself.

3    MR. SHORE:  And just so the Court knows, we did want a

4 deposition, and I got a response that was kind of unhelpful,

5 which is they needed seven days' notice to prepare a witness.

6 But I do want to question this witness on some of the

7 personal knowledge of the things that are in his first day

8 declaration.

9 BY MR. SHORE:

10 Q    You joined the company in October 2024, right?

11 A    Join?  I mean, I --

12 Q    Sorry.  You became the CRO in October.

13 A    Right, that we were -- we had done work before that,

14 but yes, that's effectively when my CRO --

15 Q    What date did you become CRO?  October 11th.  Right?

16 A    Right.  Some -- sometimes around early October, yeah.

17 Q    When was the first time you did any work for Freedom

18 VCM holdings or any of its subsidiaries?

19 A    You talk about the Topcos?

20 Q    Yeah.

21 A    We have not done much work in the top.

22 Q    Okay.  When was the first time Alex Partners did any

23 work for Franchise Group, Inc. and its subsidiaries?

24 A    We've been doing work there since end of July.

25 Q    Oh, end of July 2024.

1   A     Correct.

2   Q     Okay.  And when did you personally start working on the

3   engagement?

4   A     Around that time.

5   Q     Okay.  And prior to July 2024, had you had personally

6   any interactions with Franchise Group Inc. or any of its

7   affiliates?

8   A     No.

9   Q     Okay, so let's go to some sections of your declaration.

10  Paragraphs 5 to 13.

11  A     Okay.

12  Q     That's worth a, is that fair to say, a high level

13  overview of what led to the bankruptcy filings?

14  A     I think that's fair.

15  Q     Okay.  And would you confirm for me that everything in

16  that paragraph, in the paragraphs 5 to 13, predated your

17  joining the company?

18  A     Check the dates here.  Yeah, I think so.

19  Q     Okay, so everything you -- first of all, who drafted

20  those paragraphs?

21  A     Well, we drafted -- it was drafted by, in conjunction

22  with the other advisors and members of management, some of

23  the history, background of the company.

24  Q     Okay.  Did you draft these paragraphs?

25  A     I did not draft every paragraph.

1  Q      Paragraphs 5 to 13, did you draft them?

2  A      I did not.

3  Q      Okay.  And everything you testified to there under oath

4  is something that somebody else drafted and you affixed your

5  signature to?

6  A      I've read it and I understand it to be true based on my

7  conversations with other members of the advisory committee

8  and management.

9  Q      Okay.  At paragraphs 31 to 34, let's go there.

10 A      Okay.

11 Q      It's.  It's under the heading the Take Private

12 Transaction.  You see that?

13 A      I do.

14 Q      You played no personal role in any of the events that

15 are described in paragraphs 31 to 34, right?

16 A      No, that's correct.  Yes, that's correct.  I did not.

17 Q      Right.  Were these also paragraphs that somebody else

18 drafted for you and you affixed your signature too?

19 A      Right.  We reviewed it with various members of the

20 management team and the advisors, yes.

21 Q      Did you personally review any of the documents you

22 referenced in paragraphs 31 to 34, like the merger agreement?

23 A      I did not.

24 Q      Okay, so if I had questions about the structuring of

25 the Take Private Transaction and the creation of those

1 | HoldCos, I'd have to talk to somebody else, right?

2 | A     Correct.

3 | Q     Okay, so in sum, you have no actual personal knowledge

4 | of the events that you described in paragraphs 31 to 34 of

5 | your declaration?

6 | A     Well, I wasn't there when it happened, but I, you know,

7 | I understand this to be true and accurate, from the people

8 | who were there, so.

9 | Q     Right.  Everything you're testifying to there is

10 | something else that somebody else told you about.

11 | A     And yeah, some of it's a matter of public record, but

12 | yes.

13 | Q     By the way, do you know who personally -- what law firm

14 | personally represented Mr. Khan in that take private

15 | transaction?

16 | A     I do not.

17 | Q     Do you understand that the take private transaction is

18 | currently the subject of an investigation being conducted by

19 | the debtors?

20 | A     I understand the investigation?  Yes.

21 | Q     Okay, just let me try to refresh your recollection.

22 | Have you ever heard that Willkie, Farr & Gallagher

23 | represented Mr. Khan in the take private transaction which

24 | the debtors are currently investigating?

25 | A     I was not aware of that.

1    Q    The receivables transaction that starts on paragraph --

2    that runs from paragraphs 35 to 38, who drafted those

3    paragraphs?

4    A    This was members of the Willkie Farr team and the other

5    advisors and members of management.

6    Q    I take it that you have no personal knowledge of these

7    transactions other than what people told you or what you

8    could read in the public record?

9    A    Correct.

10    Q    And did you even read any of the documents that you

11    defined in those paragraphs?

12    A    No.

13    Q    Okay.  Paragraphs 39 through 43, the removal of Mr.

14    Khan and independent investigation.  I take it that somebody

15    else drafted those paragraphs for you since they all predate

16    you ever working for any debtor?

17    A    Correct.

18    Q    Did you read the investigation report that you

19    referenced?

20    A    I've not been provided with the investigation.

21    Q    Okay, so I take it that you're only knowledgeable about

22    the things you testify under oath to in these paragraphs is

23    based upon what other people told you or what might be

24    available in the public record.

25    A    As it relates to your last question?  Yes.  This is

1  stuff that I've had limited involvement with this

2  investigation.

3  Q    Well, what involvement have you had with an

4  investigation that concluded in October?

5  A    The only involvement I've had, I was in a board meeting

6  where there was some discussion about what lawyers had found

7  in their prior investigation, so.

8  Q    Okay, let's go to paragraph 42 within there.  This is -

9  - you're testifying to a current ongoing investigation right

10 now, right?

11 A    Yep.

12 Q    And again, the debtors are currently investigating the

13 take private transaction.

14 A    I don't want to say exactly.  Let me get this wrong.

15 What the investigator -- he's continuing.  He's doing some

16 additional work from his prior investigation that has started

17 since we've gotten engaged.

18 Q    And part of what the investigation is investigating is

19 claims that might exist by the debtors against Mr. Khan.

20 A    Involving Mr. Khan.  I don't know.  I want to say who

21 they're against, but, yeah --

22 Q    Well, let's be clear about this because this is what

23 you testified to.  If you look at the fourth line or the

24 third line, let's start -- let's just start at the beginning.

25 You testify in paragraph 42 in October 2024, and in

1  anticipation of the commencement of these Chapter 11 cases,

2  the debtors engaged Petrillo to conduct another independent

3  investigation into, among other things, potential claims and

4  cause of action that the debtors estates may have against Mr.

5  Khan.  You see that?

6  A     Right.  And with relationship.  Yeah, I get it.

7  Q     Okay, so just to be clear, you're not walking away from

8  your testimony that the investigation is of Mr. Khan.

9  A     It's Mr. Khan, right, and we're not involved in it.

10  Q     Okay.  The Badcock transaction starting on paragraph 44

11  to 46.  That's all before you.  Right?

12  A     Yeah.

13  Q     And this is all paragraphs that somebody else drafted

14  for you?

15  A     We drafted, read.  Yes.

16  Q     Well, when you say we drafted?

17  A     Yes.  It was drafted by others, again, as I said

18  before, other members of the restructuring professionals,

19  members of management, people who were here when it happened.

20  Q     Okay.  So everything you testified to there is

21  something you heard from somebody else at the debtors, right?

22  Who are working for the debtors?

23  A     Generally, yes.

24  Q     Sylvan Learning, paragraphs 47 to 48, that's -- those

25  are paragraphs that somebody else drafted for you?

1  A    Yeah.  I mean, we drafted and we read them.  We

2  understand them to be true.

3  Q    Well, if you understand them to be true based upon what

4  somebody else who isn't in court today told you about what

5  happened?

6  A    Correct.

7  Q    Okay.  And do you understand that my groups had asked

8  for a deposition from the debtors of somebody who actually

9  knew about the events that you're recounting in all these

10  paragraphs of your declaration?

11  A    I didn't see what you asked for.

12  Q    Let's go to the next page.  Paragraph 49.  And you end

13  that paragraph as further described herein, the Freedom

14  entities are not obligors and sit outside of the credit

15  circle with respect to the debtor's senior funded debt

16  facilities.  See that?

17  A    Yes.

18  Q    I want to focus on those Freedom entities.  That is,

19  those are the top entities on the page one of your org chart,

20  right?

21  A    Yeah.

22  Q    And you understand that within those two entities or

23  within that org chart are two entities who are obligors to

24  the Holdco lenders, right?

25  A    Yes.

1    Q      One as a primary obligor and its parent as a guarantor.

2    Right?

3    A      Yep, I see that.

4    Q      Do you understand that -- just to be clear, is it your

5    understanding that 90 percent of that Holdco debt is held by

6    my clients?

7    A      That's what you said.  Yes, I believe that to be true.

8    Q      Okay.  Now in those two boxes, I just want to focus on

9    those two boxes.  Are there any unsecured claims in those

10   boxes?

11   A      I don't know.

12   Q      Is there any trade sitting in those boxes?

13   A      My understanding is that there's not a lot of activity

14   in these boxes.

15   Q      Well, can you answer my question?  Is there any trade

16   in those boxes?

17   A      I'm not sure.

18   Q      Is there any critical vendor in one of those boxes.

19   A      You mean when you say critical vendor, critical vendor

20   as in under the critical vendor order or you're just saying

21   critical vendor as an important --

22   Q      Well, you're the witness who's seeking authorization to

23   pay --

24   A      I'm just trying to clarify your question, sir.

25   Q      Do you --

1  A     And I think the answer is no.

2  Q     Okay.  Have you ever looked at the intercompany claim

3  matrix of these debtors -- of any debtor?

4  A     Intercompany claim matrix?

5  Q     Yeah.

6  A     Not sure what you're referring to.

7  Q     Okay.  What obligations, if any, do either of those two

8  entities have to any other debtor on a pre-petition basis

9  booked in their accounts?

10  A     I'm not aware of any.

11  Q     Okay, so you have no idea whether or not any other

12  debtor is a creditor of either of those two boxes?

13  A     These boxes don't have a lot of activity as I

14  understand it.  So, no, I don't know the answer to your

15  question.

16  Q     Okay, so as far as you know, the only creditors in

17  those two boxes are the holders of Inter -- the Holdco term

18  loan that you reference on the first page of your org chart,

19  which is attached as Exhibit A to your declaration.

20  A     Want to say that again please?

21  Q     Sure.  If you look at the entities which are on the

22  first page of your org chart attached as Exhibit A to your

23  declaration now in evidence, the only creditors you're aware

24  of that exists there are the Holdco term lenders.

25  A     Correct.

1  Q      Okay.  Now let's turn to assets.  What are the assets

2  of Freedom VCM Inc.

3  A      You have the listing in front of you, but I think this

4  -- I'm not sure where the equity sits in these, each one of

5  these boxes.  But --

6  Q      Well, we know one asset of Freedom VCM Inc. is its

7  equity interest in Franchise Group Inc.  Right?

8  A      Right.

9  Q      Okay.  Do either Freedom VCM Inc. or Freedom VCM

10  Interco have any physical assets?

11  A      I don't believe so.

12  Q      Okay.  Do they have any receivables from other debtors?

13  A      I'm not certain.  I don't -- I don't want to speculate,

14  but I'm not certain.

15  Q      Okay.  Do they have any tax assets in those two boxes?

16  A      That, I don't know.

17  Q      Well, the NOL motion talks about substantially all of

18  the NOLs sit at Franchise Group, Inc.  Do you have any

19  understanding as to where other NOLs exist?

20  A      Where other NOLs sit?  I do not.

21  Q      Do you know who the taxpayer is in the consolidated

22  group or taxpayers of federal income tax?

23  A      I don't know which entities are the taxpayers.

24  Q      You know what entities are state court filers in either

25  of the charts attached as Exhibit A to your declaration?

1   A     I'm not a tax expert.

2   Q     Okay, you do understand that one of the things that's

3   being investigated right now is whether or not any of the

4   debtors have commercial tort claims against Mr. Khan.  Right?

5   A     There are -- I'm not familiar with everything that's in

6   that investigation, but there's a lot of claims that are

7   being investigated against Mr. Khan, and we talked about some

8   of those earlier.

9   Q     Okay.  And you are aware that I went over this with Mr.

10  Grubb to some extent, that 16 months ago, the debtors

11  purchased some -- some debtor.  We'll get -- first of all,

12  have you ever seen a flow of funds memo as to how the money

13  moved in the take private transaction?

14  A     No.

15  Q     Okay.  So even though you testified about the take

16  private transaction, you can't answer any questions about how

17  -- where money came in and where it went out?

18  A     I was not here when that happen.

19  Q     Okay.  But as a restructuring professional, you know

20  that one of the things that's going to be investigated is

21  whether or not any of the entities here have potential

22  Chapter 5 cause of action, right?

23  A     There will be an investigation, I guess, not focused on

24  that at this point.

25  Q     And can you conceive of an investigation into whether

1  or not in the debtor that paid for stuff 16 months ago that's

2  getting wiped out under the RSA was a fraudulent conveyance?

3          MALE VOICE:  Objection.  Foundation.  Calls for

4  speculation.

5          THE COURT:  Mr. Shore?

6  BY MR. SHORE:

7  Q    Can you answer that question without speculating?

8  A     In restructurings, people tend to look at historical

9  transactions.  So I can envision a scenario where someone

10  wants to investigate things that happened historically

11  leading up to a bankruptcy.

12  Q    Now, let's focus on the equity that Freedom VCM has in

13  Franchise Group Inc.  You agree with me that equity under the

14  proposed RSA is getting canceled for no consideration.

15  Right?

16  A     It gets canceled.  I'll leave the consideration point

17  for others to determine.

18  Q    Okay.  To be clear, I asked the same question to Mr.

19  Grubb.  You're not providing the Court with any evidence at

20  all.

21  A     I'm just -- I don't want to -- I'm not saying --

22  somebody might say that there was some consideration in terms

23  of the value of the equity would be worse.  I think that's

24  what Mr. Grubb was implying if there was no -- there was no

25  funding of the Opcos.

1  Q     But let me clarify my question.  Under the RSA, the

2  debtors are currently contemplating that there will not be a

3  transaction in which there's sufficient funds to clear all of

4  the debt stack below Franchise Group Inc.  Right?

5  A     As currently structured, that's accurate.

6  Q     Right.  And the plan as currently contemplated will not

7  provide any recovery to the creditors of Freedom VCM or its

8  parent.  Right?

9  A     Yep.

10 Q     But to be clear, you're not providing any testimony

11 today to the Court with respect to the fair market value or

12 the total enterprise value of (inaudible)?

13 A     No, I am not.

14 Q     Okay.  Another clarification.  You do understand that

15 the Holdco term lenders are secured, right?

16 A     Yes.

17 Q     Did you review any of the security documents?

18 A     I did not.

19 Q     Okay.  And to be clear, is it your understanding

20 whether any of the claims of those secured creditors are

21 being offered any adequate protection package by the debtors?

22 A     Any.  I don't think so.

23 Q     Okay.  Now you do testify as part of your cash

24 management motion section of your declaration that Freedom

25 VCM, the primary obligor on the Holdco loans, has a bank

1   account, right?

2   A     Yes.  Where are you in the --

3   Q     You know, I'll represent to you --

4   A     I wasn't sure if you were asking me a question about a

5   specific point of the motion that's in the declaration.

6   Q     That secured borrower of the Holdco term loan has a

7   bank account, right?

8   A     Correct.

9   Q     Can you testify under oath that that account had a zero

10  balance as of the petition date?

11  A     I don't remember.  I don't recall what the balance is

12  in that account.

13  Q     Okay, but what -- if it's a positive balance in that

14  cash account as of the petition date, you were offering no

15  adequate protection to the Holdco lenders.  Right?

16  A     Correct.

17  Q     Okay.  And do you have any understanding as to what

18  that account was used for?

19  A     I think if you're referring to an account that happened

20  as part of the -- I've heard about this.  I don't know the

21  details about it, but it's part of the -- there was a take

22  private -- part of the take private transaction.  There was

23  some excess cash that got left in an account somewhere, if

24  that's what you're referring to.

25  Q     Let's be clear.  I'm not asking you to speculate.  Do

1  you have personal knowledge about what that account was used

2  for prior to --

3  A     I don't.  I do not.  I don't want to speculate.

4  Q     Okay.  Let's focus on critical vendors for a second and

5  let's get away from the HoldCos and move down to Franchise

6  Group Inc. and its subsidiaries.  Those -- can you testify

7  under oath that those entities do have what you consider to

8  be critical vendors?  Right?

9  A     They do.

10 Q     And at paragraph 69 of your declaration, I just want to

11 clear this up.  Let's go to 69.  You testify in that

12 paragraph that the debtors have $106 million outstanding on

13 account of liquidated unsecured claims.  Does that include

14 the trade vendors who you consider to be critical or is the

15 trade unsecured in addition to that?

16 A     This is trade-related vendor business operations.

17 Q     Okay, so as it stands right now, it's your testimony

18 that the debtors owe $106 million on a liquidated basis to

19 their trade vendors.

20 A     Yes.

21 Q     And to be clear, just based on your prior testimony,

22 none of that $106 million sits up at the Holdco entities?

23 A     I do.  I believe it does not.

24 Q     Okay.  And by the critical vendor motion, the Opco

25 debtors are seeking authority today to pay $77 million of

1  that $106 million of pre-petition obligations, right?

2  A    Yes, that's correct.

3  Q    Now, the current contemplation of the debtors is that

4  the 2L is completely unsecured at this point.  Right?

5  A    Unsecured or undersecured?

6  Q    Well, does it, does it really matter?  In other words,

7  the value of the --

8  A    I'm just trying to be precise, counsel.  I understand

9  your question.  I'm not trying to be cute.

10  Q    I understand.  To be clear, you're not seeking

11  authority to pay any portion of that pre-petition.

12  A    We're not.

13  Q    So is it fair to say that on day one you're seeking to

14  pay about three-quarters of all of your pre-petition

15  unsecured claims other than any unsecured portion of a 2L

16  claim?

17  A    That's correct.

18  Q    Okay.  And you're seeking $99,700,000 on a final basis

19  to pay of that $106,000,000?

20  A    We are.

21  Q    You know who the unlucky or the unlucky unsecured

22  creditor is who's not getting their $6 million paid as part

23  of this critical vendor motion?

24  A    I do not.

25  Q    Okay, but some -- but everybody other than the holder

1  or holders of that $6 million claim will be paid if the

2  critical vendor motion is authorized.

3  A    It's not all critical vendors.  Some of this is

4  503(b)(9) (inaudible).

5  Q    Well, you're right.  And I'll put it under the umbrella

6  of critical vendors.  When I was asking critical vendors,

7  those are the people you're seeking authority to pay, whether

8  they be 503(b)(9) claimants or just general unsecured

9  creditors.  Right?

10  A    And to be clear, most of this is 503(b)(9).

11  Q    Okay.  How much of the 503(b)(9) claims are being paid

12  to vendors at American Heritage?

13  A    American Freight, you mean.

14  Q    Sorry, American Freight.  Yep.

15  A    I don't have the breakdown in front of me, but I think

16  we can get that.  I mean, it's --

17  Q    But it's your understanding that some portion of these

18  critical vendor dollars on an interim basis are going to be

19  paid to vendors of American Freight?

20  A    It's probably more likely 503(b)(9) dollars, but there

21  will be some money that goes out.

22  Q    Okay, and just to be clear, that's the entity that's

23  getting liquidated right now, right?

24  A    It is.

25  Q    So you're seeking court authority to pay503(b)(9)

1  vendors at American Freight to deliver inventory that you're

2  going to liquidate during the case?

3  A     Well, they've already delivered it as 503(b)(9).

4  Q     Okay.  And if that entity just decided to file a

5  Chapter 7 --

6  A     Yep.

7  Q     -- you wouldn't have to pay any of that, right?

8  A     Potentially.

9  Q     Okay.  Has anybody had a serious discussion about

10  whether or not any of the vendors at American Freight should

11  be getting critical vendor dollars which you're going to

12  borrow -- which other debtors are going to borrow to pay the

13  cost of liquidating one of the debtors?

14  A     Counselor, I don't have the schedule in front of me.

15  Most of these dollars are going to the Opco companies that

16  are staying in place.  I don't have the exact amounts, but at

17  some point we can share that with you.  Yes.

18  Q     Okay.  Let's focus on the DIP, which is what you were

19  tendered for here.  You start at paragraph 84, testifying

20  about the debtors.  And in that paragraph you state the

21  debtors will be getting $125 million as initial draw.  Right?

22  A     Correct.

23  Q     And you say that's critical for the debtors.

24  A     Correct.

25  Q     Let's put your Freedom hat back on.  Again, just so

1   we're clear, as a business understanding, do you understand

2   whether or not the Holdco debtors have any authority to

3   borrow money under the DIP?

4   A     I don't know if they have authority.  The money's not

5   really going there.

6   Q     Right.  They're not -- in the interim period, you're

7   not projecting that any of the DIP money is going to be going

8   into the Holdco lenders, right?

9   A     Correct.

10  Q     But they are -- sorry, the 1Ls, I think the prior

11  testimony was, is it your understanding as well that the 1Ls

12  demanded that they be given a guarantee in that box as a

13  condition to providing a DIP?

14  A     Required.  Yes, I believe that's true.

15  Q     Okay.  And to be clear, as of right now, they have --

16  the 1L lenders have no debt in that box, right?

17  A     That is my understanding.

18  Q     So the debtors are undertaking on a post-petition basis

19  to allow them into that box to assert a super priority

20  administrative expense claim for the full amount of the DIP

21  if that's what they choose to do.

22  A     I think that's true.

23  Q     Right.  And when I say the full amount of the DIP,

24  that's the $125 million in new borrowings plus the $500

25  million in roll up.

1  A     I think that's how.

2  Q     Yeah.  So just to be clear, if there's money in that

3  box, that's outside the collateral package of the Holdco

4  lenders, the 1L lenders who are advancing the DIP are getting

5  a first look at those assets.

6  A     I believe that's true.

7  Q     Okay, let's bring up the budget and at paragraph 89

8  then you testify that it is reasonable.  Can you pull up the

9  budget?

10 A     I have it.

11 Q     Let me get my copy.  Okay, first of all, what I'm

12 looking at is, is the last page of the DIP, which is docket

13 51, 298 of 300.  I don't know which one you're looking at

14 because I'm not there to give it to you.

15 A     Same thing?  Yeah, I have a copy.

16 Q     All right, first of all, this is presented on a

17 consolidated basis only, right?

18 A     Correct.

19 Q     So you can't see which debtor requires any amount of

20 DIP funding during the case, right?

21 A     Correct.

22 Q     But they're all becoming jointly and severally liable

23 for the DIP, right?

24 A     I believe so.

25 Q     Okay, so let's assume that we can get to a final

1   hearing at the end of week five.  Somehow we bridge that long

2   without converting.  Okay, I want to focus on this.  Over

3   that five week period, you're taking in a little over $300

4   million in operating receipts, right?

5   A     Yep.  Correct.

6   Q     Okay.  And then the total operating disbursements line,

7   that includes the more than $75 million in critical vendor

8   payments during that five-week period, right?

9   A     On the interim draw.

10  Q     Yeah.

11  A     We have the -- well, we have the right to pay it.  You

12  have to negotiate it with them, with all the vendors.  But it

13  could be in there.  Yeah.

14  Q     Well, this is kind of critical.  And you're the --

15  you're the person on the budget here.  Does that -- do those

16  lines reflect the payment in full of all $77 million of

17  interim trade critical vendors?

18  A     I believe that it includes a lot of it.  The way the

19  budget is, the way it works is we have to talk to the vendors

20  and make sure they give us the trade terms to continue to

21  service products.  So it may spread out over longer periods.

22  I don't know exactly the week by week breakout of when all of

23  that money goes out.

24  Q     Okay, but just to be clear, the total operating

25  disbursements line is net of whatever critical vendor

1  payments are made in the interim period.

2  A    The disbursement is inclusive of whatever.

3  Q    Right.  So if you do a bang up job and don't have to

4  pay anybody critical vendor money, that -- those operating

5  disbursements are going to go down.  Right?

6  A    But you use critical vendor and I think you're kind of

7  using critical vendor and 503(b)(9).

8  Q    Yes, yes.

9  A    Let's just be clear.  So that would incorporate all of

10 those.  There's a chance that, well, 503(b)(9) is going to

11 get paid.  Right.  There's no question about that.

12 Q    When?

13 A    Well, that will determine -- that'll be determined by

14 based on how the discussions go with each of the vendors.  We

15 have the authority to pay it.

16 Q    You just said it's got to be paid, and I just want to

17 test your knowledge of that.  When does the 503(b)(9) --

18 A    It can be paid during the case or paid at the end of.

19 Q    Correct.  So in the event of a conversion of one or

20 more of these cases, if you pay the 503(b)(9) claimants ahead

21 of time, you've given up value which could otherwise be used

22 in the liquidation, right?

23 A    If you think there's going to be a liquidation.  That's

24 correct.

25 Q    Okay, well, let's talk about this.  Think there's going

1  to be a liquidation?  You see the professional fee line?

2  A    Yes.

3  Q    And you're projecting about $15 million of professional

4  fees in those first five weeks?

5  A    Approximately.

6  Q    Okay.  Now, obviously, if we're not at the second day

7  hearing yet, none of those fees are actually going to be

8  paid.  Right?

9  A    Right.  Now, some of this gets put into escrow.

10  Q    Now, let's talk about that escrow.  One of the features

11  of this is you're borrowing under the DIP to fund $6.3

12  million in a professional fee escrow, right?

13  A    We are funding a professional escrow, yes.

14  Q    Right.  And because you're taking in $125 million of

15  fresh cash, if you weren't funding that escrow, you wouldn't

16  need that $6.3 million.  Right?

17  A    I'm not sure where you're calculating 6.3 from.

18  Q    Well, let's go to paragraph 86 of your declaration.

19  A    Oh, I thought you were looking at the budget weeks.

20  Q    No, no.  Just let's make sure we get this right.

21  Paragraph 86.  Let's carry over on page 36.  You're funding

22  $6.3 million into an escrow account, right?

23  A    Right.  Right.

24  Q    Okay.  For professional fees that won't have to be paid

25  until after the interim period, right?

1   A      Right.   That's correct.

2   Q      Who is that money being held for?   What professionals?

3   A      It's accrued for the debtor's professionals.   And we're

4   trying to take estimates of the creditor constituents that

5   we're going to have to pay in this case.

6   Q      Which creditor constituents?

7   A      The 1Ls.

8   Q      Okay, so who did the budgeting part to figure out that

9   there'd need to be a $6.3 million escrow account for

10  professionals?

11  A      Correct.

12  Q      Well, who did.   Who did it?

13  A      What do you mean who did it?   We did it.   Myself and my

14  firm did it.

15  Q      Okay, so just to be clear, you do understand that the

16  fees would otherwise have an administrative expense priority,

17  right?

18  A      I understand.

19  Q      Okay.   And the only scenario in which the

20  administrative expenses aren't going to be paid is either if

21  the Court disallows the fees or if the case converts, right?

22  A      Correct.

23  Q      So in the interim period, the debtors are borrowing

24  $6.3 million of additional DIP so that the professionals for

25  the debtors and the 1Ls don't have to lose sleep at night

1  over what happens in a conversion?

2  A    We're doing this to make sure we fully fund the

3  administrative costs of the case.

4  Q    Okay, but don't you fully fund the administrative costs

5  of the case by giving people administrative claims?

6  A    You can do that, and we just wanted to make sure we

7  fully accounted for these costs.

8  Q    Okay.  And by the way, are your fees included in that

9  $6.3 million?

10 A    There's an accrual for our fees in those, yes.

11 Q    Okay.  As you sit here today, are you concerned that

12 there's going to be a conversion of one or more of these

13 cases before the final hearing?

14 A    I do not think that there will be a conversion.

15 Q    Right, so can't we just push off the funding at escrow

16 until the final hearing?

17 A    We wanted to fund the -- show the costs of the case,

18 and that's how we accrued for it.

19 Q    Okay, let's go down in the line on the net cash flow,

20 which shows a number of things, but effectively over that

21 five-week period, you're showing $165 million in cash getting

22 burned down to $115 million in cash at the end of the five-

23 week period.  Right.

24 A    Getting spent.  Yes.

25 Q    Yes.  So that's about a $40 million drop in cash.

1  A     Correct.

2  Q     I'm sorry, 50.  You're the math guy.  So please, if I

3  get it wrong, let me know.

4  A     It's 50.

5  Q     Okay, now that again, assumes that you used some or all

6  of your critical vendor dollars.

7  A     Correct.  And 503(b)(9)s.

8  Q     And 503(b)(9).  Again, the people you're seeking to pay

9  under the critical vendor motion.

10  A     Right.

11  Q     That assumes you've used some or all of that money in

12  the interim period, right?  Yeah?

13  A     Yes.  I said yes.

14  Q     Okay.  Now, what role personally did you play in the

15  DIP negotiations with the 1L lenders?

16  A     In terms of negotiating terms and things like that,

17  that was more Sarah thing and Sarah's, you know, lane.  Our

18  role was more in preparing the budget and the amounts and the

19  13-week cash flow and that sort of thing.  Wasn't involved in

20  negotiating terms.

21  Q     Okay, I'm sorry, I may have cut you off there.

22  A     Yeah, I was not involved in negotiating interest rates

23  or fees or backstop.

24  Q     Okay.  So just so we understand the economics here, for

25  that -- to protect that $50 million of drop in the first five

1  weeks, drop in cash, you want to do -- that's being caused by

2  the payments that you're seeking to make under the critical

3  vendor motion in the interim period, right?

4  A      It's included in there.  Yeah.

5  Q      And the funding of the -- the lawyers get to sleep at

6  night escrow fund.  Right?

7  A      There is a professional fee included in there.

8  Q      Okay.  And for that, for that, the debtors are

9  borrowing $120 million, right?

10 A      Correct.

11 Q      And on that they're paying 2.5 percent on that 125

12 going in.

13 A      If you're talking about the fee, the fees, right?

14 Q      Yeah.

15 A      I think that's correct.

16 Q      And then they're paying 2.5 percent on the -- what's

17 due at the end of it, which is going to be the 125 plus 500.

18 Right?

19 A      As Mr. Grubb testified to.

20 Q      Yeah.  And just to be clear, so -- and you're paying 15

21 percent interest on that borrowed money?

22 A      Slightly less.

23 Q      Well, okay.  Slightly less.  Just be clear so that the

24 lawyers don't have to run the risk of a conversion, the

25 debtors are paying 15 percent on borrowed money plus a 2.5

1  percent commitment going in and a 2.5 percent commitment

2  going out.

3          MALE VOICE:  Objection.  Misstates testimony, lack

4  of foundation.

5          THE COURT:  Overruled.  Answer the question.

6          THE WITNESS:  The money is being borrowed to pay

7  the items that are noted on the DIP budget.  I mean, there

8  are other things on this DIP budget besides things you've

9  accounted for.

10 BY MR. SHORE:

11 Q    Right, but if you didn't have this, if you didn't spend

12 the critical vendor dollars or that much of the critical

13 vendor dollars and didn't fund the escrow in the interim

14 period, you'd have to borrow less in the interim period.

15 Right?

16 A    Not paying critical vendors during the interim period

17 has impacts on the operations of the business.

18 Q    When you say critical vendors, it's your conclusion and

19 your testimony to the Court that 99 percent of the pre-

20 petition unsecured creditors of these debtors are critical.

21 A    No, you keep saying they're all critical.  There's a

22 lot that is 503(b)(9) which is not critical.  That's just the

23 way the Bankruptcy Code works.  That's number one.  No, no.

24 Number two, when you deal with vendors, they don't want to

25 wait till the end of the case to know that they're getting

1  paid, particularly in a retail.  They want to know today that

2  they're getting their money so they will keep shipping you

3  and not put you on COD terms.

4       The quid pro quo for paying any of these 503(b)(9)s or

5  critical vendors payments is that they get continued trade

6  terms and they keep shipping goods so we have things in the

7  store to sell.  That's the critical component of this.

8  That's why we try to pay it early in the case so we keep the

9  vendors happy, try to minimize disruption.

10 Q    So by your definition, what's the difference between a

11 pre-petition vendor and a critical vendor?

12 A    Pre-petition vendor.  Critical vendor.  Yeah.  No,

13 there is a difference.  I mean critical vendors are those

14 vendors that are deemed critical to keep the operations

15 going.  They sometimes they have unique products, sometimes

16 they're products that you can't resource from other vendors

17 because of their uniqueness to them.  Sometimes, you know,

18 they have other, you know, unique attributes to them.

19 They're all kind of individual, and we take them on a case by

20 case basis.

21 Q    And what's the difference between the $99 million that

22 you're seeking authority to pay and the $6 million?

23 A    I don't have the details, but remember, there's other

24 things that go into critical vendor.  There's shipping

25 vendors or there's shipping issues.  There's the 503(b)(9),

1  and the critical vendor piece is not the biggest part of

2  this.

3  Q     And again, 503(b)(9) --

4  A     Yeah, but 503(b)(9) is just the way the Bankruptcy Code

5  works.  We've got to pay that to emerge.  And we'd like to

6  pay it during the case because it allows us to keep this --

7  keep -- our vendors to keep shipping to us.  It's common in a

8  lot of these cases.  It's not controversial.

9  Q     So you're saying that other than with respect to $6

10  million in pre-petition trade --

11  A     It will fall into other buckets.

12  Q     I'm sorry, what other credit -- what other creditors

13  are there of any of these debtors, other than the trade, the

14  credit circle within the opcos and the Holdco lenders?  Are

15  there any other creditors of these debtors we're missing?

16  You went through them all in your declaration.

17  A     Counselor, my point is most of those payments that are

18  getting paid that you're concerned about are -- most of them

19  are 503(b)(9).  There are some other portions of that that

20  gets covered under various other motions like shippers and

21  some of that is critical vendors.  You're focused on this $7

22  million.

23  Q     I'm sorry, I'm asking -- I'll ask one last time and

24  then I'll -- if we could take a break for a minute, Your

25  Honor, and make sure I'm finished with all of this.  Just to

1  be clear, your declaration lays out the capital structure and

2  the buckets.  And as I read it, you have Holdco lenders who

3  are secured, right?

4  A     Yeah.

5  Q     You have the 1Ls and 2Ls at the Opcos who are also

6  secured, right?

7  A     Correct.

8  Q     You have $106 million in liquidated pre-petition

9  unsecured claims.  Right?

10  A     Mostly trade.  Correct.

11  Q     What other creditors are there within the capital

12  structure that you know of as you sit here today?  Obviously

13  when you file a bar date order, people will come out, but are

14  you aware of any other creditors of these debtors?

15  A     I am out.

16         MR. SHORE:  Okay.  If we could take a short break,

17  Your Honor, and I can go through my notes to make sure I got

18  everything.  We've been going some time now.

19         THE COURT:  Well, I'm actually -- I have to take a

20  -- I have some other matters I need to attend to.  So I was -

21  - I didn't know coming into this that this was going to be

22  this lengthy of a first day hearing.  They usually don't last

23  that long.

24         So I'm going to take a break until 2:00 p.m., and

25  then we'll come back.  Mr. Shore, you can finish across and

1  then we'll have redirect of Mr. Orlofsky.  During that period

2  of time, you're not permitted to talk to anyone about your

3  testimony, so please avoid any conversations about it.  So

4  we'll stand in recess until 2:00 p.m., and to let you know,

5  at the rate we're going, I don't know if we're going to

6  finish today at all.  If we don't, I have tomorrow open.  So

7  we can continue the hearing tomorrow morning if we need to.

8            MR. SHORE:  Very good, Your Honor.  Thank you.

9            THE COURT:  All right, we're in recess until 2

10 o'clock.

11      (Recess taken at 11:57 a.m.)

12      (Proceedings resumed at 2:00 p.m.)

13            THE COURT:  Good afternoon, everyone.  This is

14 Judge Dorsey.  We are back on the record.

15            Mr. Orlofsky, are you there?

16      (No verbal response)

17            THE COURT:  Mr. Shore, are you ready to continue

18 with your cross?

19            MR. SHORE:  I am, Your Honor.  Just to confirm

20 that you can hear me.

21            THE COURT:  I can.  Thank you.

22                 CROSS-EXAMINATION (RESUMES)

23 BY MR. SHORE:

24 Q    Good afternoon, Mr. Orlofsky.  I have just a few more

25 questions.

1    We ended before the break talking about the DIP budget

2  that you are proceeding under now. I take it that Alix has

3  prepared multiple DIP budgets for these debtors over time?

4  A    You prior iterations of this?

5  Q    Yes.

6  A    Yeah, we have had different versions of this.  Sure.

7  Q    And some of them, those versions show that you needed

8  less DIP borrowings then you are seeking now?

9  A    Well, I have to understand which version you are

10 looking at because there's different scenarios in terms of

11 duration, which entities were filing, you know, was it a full

12 Holdco company filing, was it just a prepack or prearrange.

13 There is a much of different scenarios.  Yes, that is

14 correct. I just -- you know, some had less funding but it

15 also could be that the structure of the deal was different.

16 Q    When was the first time  you showed any DIP budget to

17 the 1-L lenders?

18 A    I can't tell you the exact date. I mean I could find

19 it.  It was -- it had to be several weeks ago.  Sometime in

20 October, I would say. I can't tell you exactly when.

21 Q    And when was the first time that you showed the DIP

22 budget to the 2-L lenders, any DIP budget?

23 A    I have to check. I think we shared a budget with

24 Evercore at different times. I don't remember the exact

25 dates, but they were shared around the same times. I don't

1  want to, you know, get caught in the footfall here, but I

2  believe they were shared some versions of DIP budgets

3  previously.

4  Q     When was the first time that you prepared a budget that

5  showed a $250 million need with a $500 million rollup?

6  A     Well, let's be clear, we just prepared the DIP budget

7  that showed the need.  The rollup was not -- you know, was a

8  construct of the negotiations of the budget.  So, I don't

9  remember the first iteration, you know, how much that was.

10 It was a large number but it had different assumptions in it.

11      So, we have been floating around, you know, with the

12 whole company.  If you are talking about the whole company

13 filing that we have today we have been floating around, you

14 know, numbers this large for quite some time.

15 Q     Your quite right to point out that some of the aspects

16 of this current DIP are covered in the DIP term sheet?

17 A     Right.  We were just preparing the numbers.  We weren't

18 negotiating the rollup terms.

19 Q     You know when the first time the debtors presented the

20 2-L lenders with the DIP term sheet and the current budget

21 that you are proceeding under?

22 A     I don't know when, no.

23 Q     Was it before last week?

24 A     That we presented them with -- I mean, just -- I want

25 to answer your question.  What precisely -- when was what

1 | presented to who?  You are talking about the DIP budget?

2 | Q     When was the first time that the company disclosed to

3 | the 2-L lenders that it needed $250 million of fresh cash and

4 | was being asked to rollup $500 million of prepetition

5 | (indiscernible).

6 | A     right. I am not going to answer the second part of that

7 | question because I don't know.  That was not really the area

8 | of my -- what I was focused on.  I would have to look back

9 | and see what versions we sent to Evercore.  I don't --

10 | Evercore saw versions of the DIP budget.

11 |     You know, candidly, I don't recall which versions we

12 | sent with them. I mean, we weren't hiding anything.  They saw

13 | different versions of this.  They saw a version where it was

14 | just the Holdco filings.  So, I would have to go back and

15 | check what we sent to them when, but I don't recall what was

16 | sent when.

17 | Q     So, to be clear, Mr. Grubb testified on redirect that

18 | he didn't get a 2-L alternative DIP proposal until over the

19 | weekend.  Can you provide the Court with any color -- sorry,

20 | can you testify to the Court that the 2-L's were presented

21 | with the terms of the DIP and the budgeting needs before last

22 | week?

23 | A     We gave them whatever budgets we had.  I would have to

24 | go back and check what was -- I am not trying to get myself

25 | in a footfall here, counselor. I am happy to go back and

1  check what was provided when.  If Evercore wanted something

2  we were not hiding it from them.  So, I would have to go back

3  and check what was provided when.

4  Q    Can you testify to the Court when the DIP term sheet

5  was provided to the 2-L lenders?

6  A    I don't know when it was provided to the lenders.

7  Q    The last couple of questions.  You attached as Exhibit

8  B to your declaration the restructuring support agreement, is

9  that right?

10  A    Yup.

11  Q    And you have approved that restructuring support

12  agreement as the CRO of the two entities.  That is the Topco

13  and FRG?

14  A    Well, meaning I approved them.  It was approved by the

15  -- the board approved it.  I don't have authority to approve

16  it on my own if that is your question.

17  Q    Did you recommend that the debtors in those two boxes

18  support the restructuring support agreement?

19  A    I am supportive of the restructuring support agreement.

20  Q    As CRO of those two debtors?

21  A    As the CRO of all the entities that I am the CRO of.

22  Q    Okay.  Now, do you understand that the debtors

23  performance of that restructuring support agreement, in

24  several respects, is a condition of its continued use of the

25  DIP?

1   A      I understand that.

2   Q      Even on an interim basis, right?

3   A      I understand there's certain things we have to do,

4   correct.

5   Q      So, for example, there's milestones under the DIP,

6   right?

7   A      There are.

8   Q      And one of those milestones is, I think, you have to

9   file a plan by tomorrow?

10  A      I forgot the exact date, but its soon.

11  Q      And you understand that the business deal is if you

12  fail to file that plan by the date, which I think is five

13  days after the filing of the petition -- sorry, three days

14  after the filing of the petition, you might lose your ability

15  to borrow under the DIP at all, right?

16  A      I understand that is a term of the agreement, yes.

17  Q      And if you actually borrow money under the DIP you have

18  to repay $675 million to the first lien lenders if you don't

19  file a plan by three days after the petition date?

20  A      Potentially.

21  Q      Do these 1-L lenders seem like entities you want to

22  play chicken with as far as blowing through deadlines and

23  asking for forgiveness later?

24  A      I don't know how to answer that question.

25  Q      Okay.  Another term is that the debtors proceed with a

1  plan that effectuates or consummates restructuring

2  transactions, right?

3  A      Yup.

4  Q      Okay.  I think your testimony is this, you don't have

5  any idea who is making the restructuring decisions for the

6  Holdco debtors, do you?

7  A      The Holdco debtors?

8  Q      That is the lender on the Holdco term loans which is

9  Freedom VCM, or its parent, Freedom VCM Interco, right?

10 A      You mean the boxes that your clients are lenders to?

11 Q      Yeah.

12 A      I don't know who is making it for them, but, you know,

13 you are here today advocating for them.

14 Q      Okay.  But who is the fiduciary in those boxes who is

15 making a determination whether or not that is in the best

16 interest of these debtors?

17 A      Well, I think you have to look at what is in the best

18 interest for all of the debtors.

19 Q      Okay.  Even though they are not substantively

20 consolidated at this point?

21 A      We are where we are in the process, counsel.

22 Q      And to be clear, the debtors are committing themselves,

23 under the DIP, to proceed with a plan for Holdco even though

24 the 90 percent of the creditors of that entity are opposed to

25 what is going on here?

1  A     That is the plan at the moment?

2  Q     And so if whoever is making the fiduciary decision in

3  the Holdco boxes from pursuing a plan decides, you know what,

4  I want to go forward with a plan that is actually supported

5  by my creditors and not opposed by 90 percent of my

6  creditors, that causes a DIP default, right?

7  A     Not sure I am -- that may be true. I think we should

8  ask the lawyers that question, but, you know…

9  Q     Well, you are the business person here and your one of

10  the only two business people I have here testifying.  Do you

11  know what the business deal is if a fiduciary actually wakes

12  up in the holding box and says I am not proceeding with a

13  plan that 90 percent of my creditors are against. Is it your

14  understanding that a business matter that causes a default

15  under the DIP?

16          UNIDENTIFIED SPEAKER:  Objection.  Foundation.  It

17  states the prior testimony.  Calls for a legal conclusion.

18          THE COURT:  Overruled.  He can answer to the best

19  of his ability based on his business understanding of the

20  DIP.

21          THE WITNESS:  Counselor, can you repeat your

22  question? You lost me for a second.

23  BY MR. SHORE:

24  Q     If a fiduciary in the holding box, whoever that might

25  be, decides that he or she does not want to proceed or they

1   do not want to proceed with a plan for the Holdco debtors,

2   which is opposed by 90 percent of their creditors, and

3   decides to do a plan that is supported by them, that could

4   cause an event of default under the DIP, right?

5           UNIDENTIFIED SPEAKER:  Same objection.

6           THE COURT:  Overruled.

7           THE WITNESS:  Potentially, counselor.  I think

8   there is a broader question here because there is a whole

9   other bunch of other boxes here that you are omitting that we

10  have to deal with as well.

11  BY MR. SHORE:

12  Q    Well, I hear you on that but I am just wearing my

13  capacity as counsel for a group of lenders who were lending

14  to that entity and they are the only creditors that you know

15  of in that entity. I am just trying to figure out what is

16  going on here.

17        In the event of an event of default Holdings, the

18  entity who is being signed up for an RSA with a plan that is

19  opposed by 90 percent of its creditors, is undertaking an

20  obligation to pay more than $600 million to creditors of

21  entities that aren't currently prepetition lenders in those

22  boxes, right?

23  A    I think you are correct.  Again, there is a lot that

24  goes into -- your question, I think, is a little bit more

25  narrow then the things that we have to think about here for

1  all the boxes.

2  Q     Okay.  And in that instance that obligation to pay

3  creditors who weren't in that box before is for a DIP which

4  Holdings -- sorry, for an interim draw on a DIP which is not

5  needed at all by Holdings before a final hearing?

6          UNIDENTIFIED SPEAKER:  Objection, Your Honnor.

7  Mischaracterizes the testimony.

8          THE COURT:  Overruled.

9          THE WITNESS:  Counselor, if you're asking if the

10  DIP funds go to those boxes that your clients have liens in

11  upstairs I think the answer is, yes, there is no money going

12  up there at the interim.

13          MR. SHORE:  I think that is all the questions I

14  have for this witness.

15          THE COURT:  Okay.

16          MR. SHORE:  Before I turn him though, Your Honor,

17  we're at a first day hearing and it's a bench trial. I don't

18  need to move to strike those paragraphs that I went through

19  where he admitted he has no knowledge other then what people

20  told him, but I would ask the Court to take those for what

21  their worth and hopefully we don't have to hear about them in

22  closing since it's not competent evidence.

23          THE COURT:  Understood.  Thank you.

24          Redirect.

25          MR. FOX:  Yes.  Thank you, Your Honor.

1                        RECROSS-EXAMINATION

2   BY MR. FOX:

3   Q     Mr. Orlofsky, you gave testimony in cross and in your

4   declaration regarding the DIP money that is coming to the

5   debtors.  It's your understanding, as the chief restructuring

6   officer of the debtors, what will happen fi the debtors don't

7   get the benefit of the DIP money?

8   A     Well, since we don't have any money, we don't have much

9   money, and we have no access to any other form of capital, if

10  we don't get access to the DIP we can't pay our vendors, we

11  can't pay employees.  We have fiduciary obligations at that

12  point to D's and O's, and you have a lot of bad things that

13  happen at the Opco's if they can't pay their vendors and

14  can't pay their employees.

15  Q     Based on your understanding of the current cash

16  position of the debtors, how long can the debtors continue in

17  business without access to the DIP funds?

18  A     I don't think we could -- I don't want to speak for

19  other D's and O's, but we don't have enough money to make all

20  the payroll, incur all the obligations that we have at least

21  right now. So, I don't think we could last very long. I

22  haven't really looked at how long we could stretch it out or

23  what we could do to mitigate that, but it's not a good

24  position to be in and it's not value maximizing for sure.

25  Q     Is there another viable source of funding for the

1  debtors if the DIP money is -- if the DIP is not approved and

2  the money is not forthcoming?

3  A    No.

4  Q    You gave testimony in your declaration and cross with

5  respect to critical vendors.  What is a critical vendor?

6  A    Critical vendors, and you have to understand it in

7  light of the types of businesses we have.  You know, a

8  vitamin shop buys very specialized products from very

9  specialized vendors here.  So, there are products that you

10 can't really get from other vendors that are hard to replace

11 and things like that.  Things that would be -- you know,

12 again, when you have specialized product and people want it

13 there is only certain places you can get it front.

14      So, it disrupts the flow of the customer experience.

15 It disrupts your sales that you need to sell.  And there are

16 things that are just kind of unique or troubling to -- they

17 are unique products or they are difficult to find alternative

18 sources of from that perspective.

19 Q    Why is it important for the debtors to pay its critical

20 vendors within a reasonably short period of time?

21 A    Well, I mean we have already had this yesterday and

22 we're having it every day we are here, we are getting

23 constant vendor calls about where is my payment.  If I don't

24 get paid, because vendors understand 503(b)(9), they

25 understand critical vendors, you know, some of these vendors

1  have been through other restructuring before so they

2  understand how this works.  If you don't pay them they put

3  you on hold and they don't send you product. If you don't

4  have product,  you know, it just becomes a natural impact of

5  you don't have product in the stores, if you can't sell

6  things people will stop coming to your stores and it's

7  like --

8          (Phone interference)

9              THE WITNESS:  Excuse me. I think somebody was --

10             THE COURT:  If you are not speaking, mute your

11 line.

12             THE WITNESS:  Sorry, counselor.

13 BY MR. FOX:

14 Q    That's okay. So, your understanding is, as the chief

15 restructuring officer of the debtors, what do you think

16 reasonably would happen to the debtors if they were unable to

17 keep the critical vendors happy and pay them within a

18 reasonable period of time?

19 A    Yeah. I mean it's bad for the business.  It's bad for

20 the enterprise value.  And if it goes on for too long, you

21 know, you are kind of looking at more situations where you

22 have to potentially liquidate the business as opposed to

23 reorganize the business which as, unfortunately, we are

24 seeing with American freight is not a good place to be for

25 anybody.

1          MR. FOX:  No further questions.  Thank you.

2          THE COURT:  Thank you.

3          Any other witnesses for the debtor?

4      (No verbal response)

5          THE COURT:  Okay.  We will move onto argument.

6          MS. SINCLAR:  Good afternoon, Your Honor.  Debra

7  Sinclar, Willkie Farr & Gallagher, for the record.

8          We have heard a lot about some of the more

9  specific terms of the DIP during the witness testimony and

10 some of the perceived detriments to the Holdco debtors as a

11 result of those provisions.  I would like to take a moment to

12 remind the Court of the bigger picture here, take a step back

13 and from our perspective that bigger picture boils down to a

14 few points.

15         The first is that this is the only DIP on the

16 table and we need it immediately.  We have no liquidity

17 without the DIP.  We don't have access to our ABL anymore and

18 our cash receipts are not going to keep the company afloat in

19 the ordinary course.  As you heard from Mr. Grubb, the DIP

20 was the product of significant negotiations with the lenders

21 and a marketing process that involved many discussions both

22 with the existing lenders and third parties.

23         Were we happy with every term of the DIP that we

24 ended up with, of course not, that is the way negotiations go

25 but it was a hard fought negotiation.  I think that dovetails

1  into the second part, part of this bigger picture, which is

2  that we don't have any other options.  We have no access to a

3  superior DIP facility today. The hypotheticals that were

4  eluded to in questioning about how our marketing process

5  might look different with a different DIP in place are just

6  irrelevant in the sense that they aren't available to the

7  debtors.  Other DIPs aren't on the table. So, we can't

8  consider them as real alternatives to the DIP that we have.

9          Similarly, the argument that a better DIP was

10  available to us simply isn't true.  You heard from Mr. Grubb

11  that the cost of the single third party DIP proposal we

12  received was in excess of the cost of the same portion of the

13  1-L DIP. The ABL lenders prepetition proposals ultimately did

14  not provide meaningful liquidity incremental to where the ABL

15  sits right now.  It proposed additional fees and other

16  economics that ultimately really would have just lead to us

17  maintaining the existing ABL structure at a higher expense.

18          I also want to address the concept of a purported

19  2-L specifically as we heard a little bit about that in

20  questioning as well.  You heard Mr. Grubb testify that none

21  of the other proposals we received, including the one the

22  second lien submitted less than 24 hours before we put the

23  company into bankruptcy would have provided the liquidity

24  that we need for Chapter 11.  More importantly, the 2-L

25  proposal was conditioned on a complex out of Court

1  recapitalization that would have taken weeks to negotiate. It

2  wasn't a standalone DIP proposal that could be credibly

3  considered as an alternative to fund the case that you are

4  hearing today.

5         Again, we received that proposal at 11:15 p.m. on

6  Saturday night in advance of our Chapter 11 filing around 6

7  p.m. the next day.  It would have taken weeks for us to

8  negotiate that proposal in the best case scenario where the

9  other lenders whose consent was required to that structure

10  had been amenable to the opening terms.  Nonetheless, the

11  board considered the proposal in earnest.  We discussed it

12  with the board, among the company's advisors, and the

13  company's advisors also discussed it with the first lien

14  lenders advisors.

15         As you heard from Mr. Grubb, we did not ultimately

16  counter that proposal and that is because after we discussed

17  it with the first lien lenders it became clear that the

18  lenders were not going to accept it.  There were multiple

19  elements of that transaction that would have required their

20  consent and support, not to mention the ABL support.  That is

21  why the debtors could not consider it actionable. So, to

22  assert that the 2-L put forth a credible DIP proposal that

23  was flat out rejected is simply not accurate.

24         I would like to address a few more points in

25  detail.  One of them is the size of the DIP budget and the

1  commitment that you are considering today. Mr. Orlofsky

2  explained that the Alix team sized the budget with the

3  company's management team.  There is ample evidence in the

4  record that in the company's business judgment $125 million

5  is the minimum that the company needs at this interim stage.

6  Both Mr. Orlofsky and Mr. Grubb explain that a key element of

7  this DIP, given the nature of the business, is the company's

8  ability to send a message of confidence to vendors,

9  franchisees and employees at the outset of this case. The

10 level of liquidity also ensures that the company stays above

11 its minimum liquidity needs as determined in its business

12 judgment.

13        I also would like to address the size and the

14 timing of the rollup.  The lenders were not willing to

15 provide the DIP that we have proposed without a two to one

16 rollup.  That rollup is sized based on the fully committed

17 amount of $250 million. I think it's important to note that

18 all $250 million of that money is committed today even though

19 only $125 million is available on the interim draw.

20        As I mentioned earlier in the hearing, we did have

21 some spirited discussions with the lenders advisors around

22 the size of the rollup and the need for the $500 million to

23 roll-up in its entirety on day one.  We proposed different

24 alternatives that would have resulted in less rollup at the

25 interim stage, but the lenders were not willing to live with

1   any other construct then the one you see in front of us

2   today.

3           We don't think other creditors are ultimately

4   prejudiced by this because the 1-L's plan proposal will be

5   the economically best candidate for a value maximizing

6   transaction unless and until another bid would come forward

7   in our auction process, one that pays off the DIP, the ABL

8   and the 1-L in full.  Again, the hypotheticals about a

9   different rollup are not relevant because they're not

10  available.

11          We also spent a significant amount of time talking

12  about why the two Holdco boxes are unsecured guarantors and

13  about the governance at the Freedom level generally. I will

14  start with that second category first.  You may have noticed

15  that Mr. Orlofsky and Mr. Grubb did not have quite as much

16  fluency in this piece of the corporate structure as they did

17  with the entities at the Franchise Group Inc. level and

18  below.  This is for a few reasons.

19          The main one is that the Holdco entities are not

20  operating entities.  They are part of the full enterprise and

21  given the Holdco debt and the obligations thereunder we did

22  make them filers in this case but they have no assets and no

23  creditors that we know of other then the Holdco lenders.

24  They have no trade creditors because they have no operations.

25  There are separate boards of the Holdco debtors.  They are

1  comprised of a subset of the board that sits at the top

2  entity in the structure, which is Freedom VCM Holdings LLC.

3  The governance of the rest of the entities in the structure

4  underneath Franchise Group rolls up to that box.

5          So, really in summary, Your Honor, when the boards

6  considered this transaction, and this is evidenced by our

7  petitions and the resolutions attached to the petitions,

8  those boards approved the filing for all of the entities in

9  the structure.  The individual boards of each individual

10 entity approved the filing, approved the RSA, and approved

11 the terms set forth in the restructuring term sheet.

12         The broader point is that Franchise Group is one

13 enterprise and the DIP lenders are considering it to be such.

14 I will allow Mr. Goldstein and Mr. Filman to speak to that.

15 But from our perspective we aren't ignoring the Holdco

16 entities in some way.  They just aren't where the operations

17 sit.  The structure is totally outside of the credit circle

18 and the only reason the Freedom entities exist in the first

19 place is because of the financial structure that was

20 associated with the take private.

21         Moving onto why those Holdco boxes are unsecured

22 guarantors.  This was largely the legal point and it's

23 another one that we spent time going back and forth with,

24 with counsel to the first liens a we negotiated the DIP.  The

25 view of the first liens in our negotiations was that because

1  they are the DIP lender each box has the benefit of the DIP

2  and, thus, should secure it.  We pushed back on this point

3  and said that the two Freedom boxes that are borrower and

4  guarantor of the Holdco debt should not be secured

5  guarantors.  The primary reason for that was because, as you

6  know, the Holdco debt sits there, has a lien at those boxes

7  and we did not want to start these cases with a day one

8  priming fight.

9          The first liens ultimately agreed to that and that

10  is the agreement you see in the DIP term sheet attached to

11  the RSA.  We specifically agreed for the Holdco boxes to be

12  unsecured guarantors so that we would not be priming those

13  Holdco liens and that is why there is no adequate protection

14  package proposed at either the Holdco borrower or guarantor.

15          There were also a number of questions about what

16  benefit the Holdco boxes get from the DIP.  They aren't

17  direct borrowers but the credit agreement does contemplate

18  that their expenses, certain of their expenses, can be paid

19  by the DIP.  Also, again, we can't look at the Holdco debtors

20  in a vacuum.  I would note that the restructuring term sheet

21  provides that if a bid comes in to top the current 1-L

22  proposal the Holdco lenders would be slated to receive value

23  if it flowed down to that level in the structure.

24          If we don't obtain the DIP then we are not going

25  to be able to support the operating companies in the ordinary

1  course and that is the primary benefit to the Holdco lenders.

2  If they stand to recover at all in these cases they will

3  recover if those operating companies are able to operate in

4  the ordinary course and maximize their value.   If we don't

5  have a DIP then those companies are not going to survive and

6  the Holdco will have a much more difficult time receiving any

7  value in these cases.

8          If the Holdco boxes have any claims of their own,

9  litigation or otherwise, nothing about the DIP will foreclose

10  those entities from ultimately brining those claims.   The

11  situation in which proceeds of any of those claims, which was

12  eluded to during some of the questioning you heard today, the

13  situation in which those proceeds would need to be used to

14  pay down the DIP is extremely remote given that we know what

15  the baseline plan embodied in the RSA provides and that any

16  economically superior bid would pay off the DIP in full in

17  cash.

18          Your Honor, if that remote situation were to

19  befall us, the cash management order would provide any debtor

20  who fronts the cost of another debtor in the structure has an

21  administrative claim against the debtor who benefitted.

22  There's not a scenario here, where one debtor is funding the

23  cost of another at the expense of its own creditors.

24     Your Honor, I'll conclude by saying again, this is the

25  only financing on the table.   If we leave court today without

1  access to the interim DIP, we will have no further access to

2  liquidity and the company would start to imminently consider

3  alternatives.  Shut down the business in light of its

4  inability to access cash. We have no other financing

5  alternatives and for those reasons we would ask that Your

6  Honor enter the DIP order on an interim basis.  Thank you.

7          THE COURT:  Thank you.

8          Anyone else in support?

9          MR. FLIMAN:  Yeah, good afternoon, Your Honor.

10         For the record, this is Dan Fliman with Paul

11  Hastings on behalf of the ad hoc first lien lender group.

12         Your Honor, just to begin, one quick cleanup item,

13  and Ms. Sinclair noted this, and I wanted to emphasize it and

14  then add one more piece, there was a lot in the colloquy

15  before and the cross-examination with respect to what

16  obligations are being taken on at these HoldCo entities where

17  Mr. Shorespond (phonetic) set and as Ms. Sinclair just

18  clarified, there's unsecured guaranties in favor of the DIP

19  that are being unsecured in those boxes, not secured

20  guaranties, and that's why we don't even need to talk about

21  adequate protection.

22         There's one more point I wanted to make, Your

23  Honor, which is those entities, which are undertaking

24  unsecured guaranties and administrative claims are only doing

25  so to the extent that the new money under the DIP, not the

1  roll-up portion of the DIP, and so to the extent that we

2  heard in the cross-examination, concerns about a huge amount

3  of a $750 million claim eventually becoming an obligation of

4  these HoldCo entities, the limitation is going to be to only

5  the new portion, the new-money portion, the Tranche A of the

6  DIP that's being put in.  That was always the intention and

7  to the extent there needs to be clarification for the DIP

8  order, we can do that, as well.  But I can represent to you

9  that that was the economic deal that was struck, and so I

10 wanted to throw that in, in the beginning in way of

11 clarification.

12        Moving on, Your Honor, I think it's worth

13 stressing that our clients, they're stepping up to fund these

14 debtors through these Chapter 11 cases, that their funding is

15 going to pave the way for either, an asset sale, a process

16 that's going to market test these assets for the benefit of

17 all stakeholders, or else, our clients are prepared to take a

18 combination of equity and some takeback debt in order to pave

19 the way for the debtors to exit bankruptcy.  And so our

20 clients have not only come forward with the DIP, but with a

21 structure that allows the debtors to market test their assets

22 and to emerge on a basis that's quick and efficient.

23        Now, the agreement by our clients to do so is

24 premised on certain economic consideration and that's

25 consideration in order to protect their investment and to

1  compensate them for their investment.  And that's the DIP

2  economics that we've heard about this morning and this

3  afternoon.

4          Looking at any subpart of the DIP economics is

5  misleading, given that it was a comprehensive package,

6  negotiated at arm's-length, between our group and by -- and

7  the debtors and their professionals.  Our clients underwrote

8  the new-money investment and agreed to backstop portions that

9  are not being funded by other lenders on the basis of that

10 comprehensive, economic package.

11         Everything was a push-and-pull in those

12 negotiations.  Adjusting one portion would make the entire

13 economic consideration fall apart.  So with that being said,

14 let's look at the motion itself and the relief that's being

15 sought in front of the Court today.  The guidance, here,

16 obviously exists under Sections 363 and 364 of the Code and

17 under Bankruptcy Rule 4001.  The tests that exist under those

18 three applicable rules and statutes are, number one, the

19 debtors have to establish that the funding and the cash

20 collateral use that's being proposed today are supported by

21 their business judgment and the authority is necessary to

22 avoid immediate and irreparable harm pending a final hearing.

23 The second element that needs to be established here is that

24 the debtors were unable to obtain other financing on a junior

25 basis or an unsecured basis.  And the third, the debtors need

1    to establish that there's adequate protection being provided

2    to secure creditors that have liens in the cash collateral or

3    in the collateral that's being primed by virtue of the DIP.

4    We contend the debtors have met their burden with respect to

5    all three of these requirements and for that reason, the DIP

6    motion should be approved.

7            Ms. Sinclair did an admirable job of walking

8    through all the facts that are in the record supporting each

9    of these elements, in particular, number one and number two,

10   which is the need to the funding and the inability of the

11   debtors to obtain alternative financing, and so I'll skip to

12   the adequate protection that's relevant here today.

13           With respect to adequate protection, Your Honor,

14   let's look through each of the constituents here that are

15   implicated by adequate protection rights.  We start with the

16   ABL lenders.  The ABL lenders are not objecting to the cash

17   collateral usage or to the DIP motion.  The ABL lenders --

18   and we spent a lot of time negotiating with them in order to

19   get them comfortable with the relief that's being sought

20   today -- they're receiving first priority liens on their

21   priority collateral.

22           We have a negotiated adequate protection

23   percentage that mirrors, if not, is identical, to, basically,

24   the protections that the ABL lenders had in their prepetition

25   loan documents and they're receiving replacement liens and

1    superpriority liens.

2          Second in the waterfall are our clients with the

3    first lien loans.  As you've heard earlier today, 80 percent

4    of the first lien lenders are in support of the relief today

5    under an RSA supporting the DIP, as well as the restructuring

6    contemplated in the RSA.  Next in the waterfall we have the

7    second lien lenders.  The second lien lenders' liens are

8    fully junior to the 1Ls, to my clients, and also as to the

9    ABL priority collateral, are junior to the ABL.

10          Now, to the extent that after those obligations,

11   meaning after the first liens and the after the second --

12   after the ABL and the first liens, there's going to be value

13   to the second liens and the market test will tell us that,

14   the second liens are entitled to adequate protection.  And so

15   let's look at the adequate protection the second liens are

16   receiving here today.  Number one, let's look at the way the

17   cash collateral and the DIP proceeds are going to be

18   utilized.  As I said at the top, the proceeds here are going

19   to be utilized in order to have the debtors survive through

20   Chapter 11, have their operations continue, and fund the sale

21   process that, ultimately, will market test the value of these

22   assets.  And if there's value, there's (indiscernible) for

23   the second lien lenders or, theoretically, the HoldCo

24   lenders, it will deliver and unlock that value for their

25   benefit.

1          The second is that the second lien lenders are

2    receiving replacement and the same collateral and the same

3    priority as they have prepetition and the second lien lenders

4    are receiving superpriority claims for any diminution in

5    value of any (indiscernible).

6          Now, let's turn to the HoldCo debt that we've

7    heard a lot about this morning and this afternoon.  The

8    debtors are obligors on the HoldCo debt.  The entities, I

9    should say, that are obligors on the HoldCo debt, as I just

10   noted and as Ms. Sinclair said, are not granting any liens in

11   connection with the DIP at those entities.  There's going to

12   be unsecured guaranties in favor of the DIP at those

13   entities, limited to the amount of the new-money funding, not

14   to the roll-up itself.  And that's, likewise, with respect to

15   the superpriority claims that are being undertaken at the

16   HoldCo obligor boxes that's being limited to the new-money

17   portion of the DIP.

18         Now, as to why the HoldCos are incurring these

19   unsecured guaranties and taking on superpriority claims, I

20   think you just heard some of this from Ms. Sinclair, but the

21   reality is that the boxes are benefiting from being part of

22   the entire debtor structure and the entire Chapter 11 process

23   before you, and I would also note that the professional fees

24   are going to be across the board at all of these entities and

25   that the DIP proceeds, as well as the cash collateral are

1  going to go towards funding the professional fee incurrence

2  during the course of the case, including at these HoldCo

3  entities.

4         And last is the TopCo entities.  Those entities --

5  and these are the entities that structurally junior to the

6  HoldCo entities that we heard about today.  At those boxes,

7  they're going to be secured guaranties in favor of the DIP.

8         Now, for those boxes that don't have any secured

9  claims, which is why we don't have any adequate protection

10  issues with the priming going on, because there's no secured

11  debt at those boxes.  But we've also negotiated with the

12  debtors, part of the arm's-length negotiation that's happened

13  over the last month or so, that at the TopCo boxes, we're

14  going to agree to basically marshal the recovery and we're

15  agreeing to first look to other sources of recovery before

16  looking at the secured claim that's going to be granted at

17  the TopCo boxes.

18         Your Honor, I contend that running through the

19  adequate protection package that's being granted here,

20  looking at all the parties that have liens with respect to

21  any of the collateral that's being primed or any of the cash

22  collateral that's being utilized, all those constituents are

23  being adequately protected, consistent with the Bankruptcy

24  Code and as required under Section 363 and 364.

25         For that reason, Your Honor, we ask, respectfully,

1  that you approve the DIP motion and the cash collateral use

2  that's being proposed to you on an interim basis, and if Your

3  Honor has any questions, I'm happy to answer them.

4          THE COURT:  No questions at this time.  Thank you.

5          MR. FLIMAN:  Thank you.

6          THE COURT:  Anyone else in support?

7          MR. SORKIN:  Yes, Your Honor.

8          And this is Andrew Sorkin of Latham & Watkins.

9  I'm appearing on behalf of JPMorgan Chase Bank, N.A., as

10 administrative and collateral agent under the ABL facility.

11         As you've heard from debtors' counsel, and just

12 now from Mr. Fliman, my client is not objecting to entry of

13 the interim DIP order today.  I did want to briefly share

14 with the Court where we stand on the motion more generally

15 and make sure we reserve certain rights.

16         Your Honor, today's hearing has obviously been

17 largely focused on the proposed DIP facility itself.  My

18 client and the other ABL lenders are providing the other

19 source of funding for these cases, which is the use of the

20 ABL lenders' cash collateral.  We spent the last several days

21 with the debtors and the DIP lenders to try to get to

22 agreement on a form of order that provides appropriate

23 adequate protection to the ABL lenders and enables the

24 debtors to get access to that cash collateral.  Thanks to the

25 efforts of the parties and the advisors, and a special thanks

1  for the Wilkie team, those discussions have been productive

2  and in the interests of ensuring that the debtors can start

3  these cases off on the right foot, we are not objecting to

4  entry of the interim order in its current form.

5          However, as Ms. Sinclair noted in her opening

6  presentation, we're not done yet and there are still

7  unresolved issues that we'll need to work through in the

8  coming weeks, so I do need to reserve all of the ABL agent's

9  and lender's rights in connection with the final hearing, and

10 make clear that while we've agreed to live with the proposed

11 adequate protection package and the other terms of the

12 interim order for purposes of this interim period, that

13 shouldn't, in any way, be construed as an acknowledgment or

14 an admission by the ABL lenders that the proposed adequate

15 protection is sufficient over the longer term.

16         Separately, Your Honor, just so I don't have to

17 pop back up again in connection with some of the motions that

18 are to come on the agenda, I should note that certain of

19 those open cash collateral issues relate to the treatment of

20 proceeds from the American freight liquidation and,

21 therefore, implicate the proposed adequate protections and

22 certain other aspects of the going-out-of-business sales

23 motion.

24         Similarly, not raising any objection to entry of

25 that interim order today, but just wanted to note that we may

1  take issue with that on a final basis, as well, if we're

2  unable to achieve a resolution.

3          So, with that, Your Honor, I'll just conclude by

4  assuring the Court that we intend to work constructively with

5  the debtors, the DIP lenders, and all other parties to try to

6  get to an agreement before the second day hearing.

7          Thank you, Your Honor.

8          THE COURT:  Thank you.

9          Anyone else in support?

10      (No verbal response)

11          THE COURT:  Okay.  Objectors?

12          Mr. Fox, do you want to go first?

13          MR. FOX:  Good afternoon, Your Honor.  May I

14  please the Court?  Tim Fox on behalf of the United States

15  Trustee.

16          I did speak with counsel at White & Case during

17  the break and they indicated that I should lead and they'll

18  follow.  So I appreciate the courtesy on that front and thank

19  you, Your Honor, for the time.

20          As noted, the U.S. Trustee still has open issues

21  and interposes and objection to the interim DIP financing

22  relief that's sought here today and there are principally

23  three categories that I want to focus Your Honor's attention

24  with respect to, as to what the U.S. Trustee interposes an

25  objection on.  The first is the structure of the interim

1  borrowings not being consistent with the needs of the company

2  in this interim period.

3          As the evidence adduced through the testimony of

4  the two witnesses and included in the filings shows, the

5  debtors only suffer a cash deficit of about $10 million below

6  the purported or the requested interim borrowings of $125

7  million.  Your Honor, it doesn't appear that immediate and

8  irreparable harm will follow if there is an agreed interim

9  financing of a smaller amount than $125 million.  The

10  testimony from Mr. Orlofsky indicated that the $125 million

11  figure that is being used at present is an increase of what

12  historically the liquidity cushion that the debtors operated

13  on prepetition and, as a result, again, demonstrates that

14  this is not necessary to avoid immediate and irreparable

15  harm.

16          In structuring this facility to be so front-

17  loaded, it creates issues that go into the two next

18  categories that the U.S. Trustee wanted to focus on, and the

19  second piece here is the requested roll-up.  While the U.S.

20  Trustee greatly appreciates the first lien lenders and DIP

21  lenders, proposed DIP lenders agreeing to ensure that the

22  roll-up will be subject to the challenge provisions of the

23  interim order, as drafted, it doesn't affect what is

24  customarily an exercise in restraint in terms of time, what

25  should be rolled up to new money that is actually advanced

1    during the interim period to minimize the change in the

2    *status quo* that occurs at this emergency hearing and in these

3    early stages in a Chapter 11 case, as the procedural

4    safeguards of Chapter 11 allow other parties notice and an

5    opportunity to be heard on a more fulsome record.

6              The economics that are proposed here, you know,

7    seeks to have a roll-up of $500 million attached to total

8    borrowings of new money of $250 million.  Piggybacking on the

9    structural issue that I noted in my first item, again, there

10   is $125 million requested, which appears to be an inflated

11   number for purposes of interim liquidity through when a final

12   hearing may be held, with respect to these issues, but,

13   additionally, in calculating what the ratio is, there is $75

14   million of the borrowings, as new money under the DIP, that

15   isn't available as a draw until we get to the confirmation

16   stage on a proposed Chapter 11 plan, which is forthcoming

17   under the milestones included in connection with the RSA and

18   incorporated into the terms of the debtor-in-possession

19   financing.

20             Inclusion of that $75 million, for purposes of

21   calculating the roll-up figure, again, is not consistent with

22   custom and practice in terms of orienting what new money is

23   actually going to be available for the debtor with what

24   should be afforded to the lenders as part of that benefit of

25   extending the debtor-in-possession financing.

1          And that leads into the last main issue that I'd

2     like to focus on for purposes of the U.S. Trustee's

3     objection, the interim debtor-in-possession financing, and

4     that is the approval of all the fees associated with the

5     facility by virtue of entry of the interim order.  Your

6     Honor, while the fees may not be subject to cash payment

7     until some later date or may be equitized and rolled forward

8     as part of the contemplated plan transactions that have been

9     discussed throughout today's hearing, there is no need to

10    approve them on an emergency interim basis and, again, it is

11    not consistent with avoiding immediate and irreparable harm

12    to afford the lenders the entirely of their fee structure on

13    one day's notice, especially in the context of the factual

14    issues that have been identified throughout today's hearing.

15         Again, in many cases, that issue is left for

16    purposes of the final order and the U.S. Trustee would,

17    again, argue that it would be more appropriate to put off

18    consideration of fees that aren't tied to the borrowings that

19    need to be made to facilitate these Chapter 11 cases until

20    the final order and not preapprove them all by entry of the

21    interim order today, if Your Honor is so inclined.

22         So, Your Honor, that encompasses the high-level

23    issues that are still pending from the U.S. Trustee's

24    perspective.  Again, the form of order that was filed as an

25    exhibit prior to this morning's hearing, does address a

1  number of other changes requested by the U.S. Trustee, but

2  the three issues that I've discussed are imperative to be

3  resolved and, again, focuses on how much borrowing is

4  necessary for these debtors in order to facilitate successful

5  Chapter 11 cases when the budget indicates what it indicates

6  in terms of collections and a liquidity need, as well as the

7  testimony as to what the prepetition practice was for the

8  debtors' liquidity.

9         So unless Your Honor has any questions, I'll pass

10  the virtual podium to counsel at White & Case to argue their

11  objection, as well, but I appreciate the time and thank you,

12  Your Honor, for your consideration.

13         THE COURT:  Thank you, Mr. Fox.

14         Next?

15         MR. LAURIA:  Good afternoon -- sorry.

16         THE COURT:  Go ahead, Mr. Lauria.

17         MR. LAURIA:  Good afternoon, Your Honor.  My name

18  is Thomas Lauria, with my partner at White & Case, and we

19  represent funds that are owned or managed by Pimco and

20  Irradiant Partners that together hold over 90 percent of the

21  main company, Opco 2L, and the Holdco debt, in the aggregate

22  amount of about $640 million today.

23         I'm going to address six issues that we've

24  identified with respect to the DIP:  Pricing, priming and

25  adequate protection, quantum of the DIP and propriety of the

1   rollup, Holdco absorbing obligations with respect to the DIP,

2   and whether or not the DIP is an improper *sub rosa* plan.

3         I've been toiling in the vineyards of the law for

4   38 years now, it's kind of hard to believe, and over that

5   time I've come to be a greater admirer of audacity, doing the

6   unexpected, employing creative, novel approaches, being

7   aggressive, finding new ways to solve old problems.  And now,

8   as I read through the DIP papers, at first I thought to

9   myself, wow, these first lien lenders are really being

10  audacious, but audacity, to be successful, often requires

11  subtlety and nuance; there is none of that here.  It is an

12  out-in-the-open ham-handed grab.

13        On the first day of the case, the 1L seeks to

14  effectively end the case without providing time to perform

15  any much less reasonable diligence, without meaningful

16  negotiation between and among the debtors and all material

17  stakeholders, without providing the parties with a reasonable

18  opportunity to go and present a proper evidentiary record for

19  the Court regarding matters that are going to be locked in by

20  this interim DIP order.  The 1L has pressed or induced the

21  debtors to seeking relief that would, number one, impose $625

22  million, plus $50 million of fees, so $675 million total of

23  priming post-petition first lien debt on FRG and its

24  subsidiaries that will go into default if the debtors fail to

25  timely -- and by I mean timely tomorrow -- file a plan that

1  equitizes the 1L and wipes out $640 million of second lien

2  and Holdco debt.

3        Number two, not only that, but this massive DIP,

4  only 125 million of which is new money on an interim basis,

5  the rest of it is a rollup of prepetition debt, would be

6  guaranteed by the Holdco debtors, including the direct

7  obligors of the 515 million of Holdco debt, providing the 1L

8  DIP lenders with an administrative expense claim even though

9  the Holdco debtors don't need or have access to the DIP

10 proceeds, in other words, for zero benefit.

11       Now, I appreciate counsel for the DIP lenders'

12 clarification that the guaranty will be limited to the new

13 money, but that does not take away the problem.

14       Right now, the debtors take the view, as reflected

15 by the RSA, that the Opco equity of the HoldCos is worthless.

16 So, until that changes, the Holdco's other rights are our

17 gold standard, and this DIP puts $250 million of

18 superpriority administrative expense claims ahead of our

19 ability to get repaid today.

20       To be clear, 1L does not currently have a claim

21 against the HoldCos.  The DIP would bring 250 million up and,

22 with respect to anything that's not our collateral, put them

23 in a senior position as to those assets at Holdco.

24       As icing on the cake, the combination of the DIP

25 and the plan it requires the debtors to file tomorrow and get

1  confirmed in 90 days encumbers claims and causes of action at

2  the Opcos and will likely release or preserve only for the

3  benefit of the 1L intercompany and estate claims, all of

4  which may be an important component of the 2L and Holdco

5  lender recoveries, indeed, it could be all of our recovery,

6  and to prevent any resistance to creditor relief at the

7  Holdco level such as stay relief, the termination of

8  exclusivity, the appointment of an independent trustee, or

9  conversion to Chapter 7 at the Holdco level, any of those

10 things would default the DIP.

11         So when we seek any of those remedies, what we're

12 going to hear is it will be ruinous to the debtors because it

13 will result in a default under this DIP.

14         There are other bells and whistles that I will

15 address in a moment, but one thing is undeniable:  If the

16 interim DIP is approved in its current form as proposed, as a

17 practical matter, the case will be scotched.  Refinancing the

18 outside DIP will be all but impossible.  Failure of the

19 debtors to file and confirm the 1L's plan, the underpinnings

20 of which have not been established by the record, will

21 default the DIP, entitling the DIP lenders to foreclose or

22 otherwise dispose of their collateral without the need for

23 further permission from this Court and with other creditors'

24 rights to object having been stripped.  We've never seen

25 anything like that.

1          Your Honor, when people ask me how I'm doing, I

2     like to say, with a smile on my face, I'm fighting crime,

3     we're getting away with it, it depends on your perspective.

4     Today, it is clear which of those I'm doing.

5          The 1L went into their laboratory and formulated a

6     DIP that is a concoction of elements stitched together to

7     create a real monster, one that like Frankenstein's monster,

8     if unchecked by this Court, will wreck havoc on the

9     fundamental workings of the Bankruptcy Code in these cases.

10          Let me turn to six points I want to address

11     specifically.

12          Pricing.  The DIP is beyond exorbitant, it is

13     priced as follows.  The 2.5 percent commitment fee on the new

14     money, the 2.5 percent exit fee on the outstanding

15     obligations at repayment, a ten percent backstop fee with

16     respect to the new money, and interest at the rate of SOFR

17     plus ten percent.  That's approximately 15 percent today.  I

18     think, as the witness pointed out, it's slightly less, but

19     for government purposes we can call it 15 percent.

20          Now, if this DIP were a $100 million obligation,

21     fully approved on an interim basis, it was outstanding for a

22     month before takeout, the fees would be two and a half

23     million, plus two and a half million, plus ten million, plus

24     1.25 million of interest, for a total $16.25 million.  That's

25     a 16.25 percent return in a month; annualized, that's 195

1  percent return.

2          That's nice, but let's go for some more.  Let's

3  make it a $250 million DIP with an interim draw of 125, to

4  get even better results.  Now, using the formula which is set

5  forth in paragraph 27 on pages 13 and 14 of the Grubb

6  declaration, the fees would be $6.25 million, plus another

7  $6.25 million, plus $25 million, plus $3.12 million of

8  interest, for a total of $40.625 million.  That's a 32.5

9  percent return in a month; annualized, 390 percent.

10          So let's look at the DIP we actually have, which

11  is B plus the $500 million rollup on day one of the case.

12  Here we get really great results if you're a DIP lender.  The

13  fees would now be 6.25 million, plus 15.625 million, plus 25

14  million, plus $3.125 million of interest, for a grand total

15  of exactly $50 million.  That's a 40 percent return on 125

16  million in one month, an annualized return of 480 percent.

17          The 1L lenders, of course, required, as they told

18  you, the last option.  In that regard, it is noteworthy that

19  the debtor is proposing to use the DIP proceeds to pay in

20  full, effectively, and effectively convert $77.6 million of

21  prepetition unsecured obligations into priming DIP

22  obligations, in a case where they say the 2L will be paid

23  nothing.

24          Let's talk about the quantum of the DIP.

25  Applicable to today's hearing is Bankruptcy Rule 4001(c)(2),

1  which says that the debtor can borrow an amount limited to

2  what is needed to avoid immediate and irreparable harm to the

3  debtor until the Court can hold a final hearing.  I don't

4  think we actually heard any testimony about that today.  What

5  we did hear is that the debtor needs financing.  The only

6  evidence regarding the quantum of financing required on an

7  interim basis is the DIP budget attached to Mr. Orlofsky's

8  declaration, that's at Docket 51, page 298 of 300.  What does

9  that say?

10          Well, it says that at the end of this week,

11 without a DIP, the debtor will have about $42 million to

12 cash.  It started out with 14.3, it's anticipating 28.2

13 million of net revenues, and it's going to spend two million

14 this week to fund a draw on going-out-of-business-sales

15 escrow.  Next week, the debtor has negative cash flow of

16 about $19 million.  That would take the 40, 41, down to 22.

17 The following week, it reports negative cash flow, including

18 the going-out-of-business-sale proceeds, of about $19

19 million.  It would still be cash positive at that point.  The

20 following week, it reports positive cash flow from operations

21 of 1.9 and three million going into the going-out-of-business

22 escrow, and that would take it negative, if in fact the

23 going-out-of-business escrow has to be funded and I'm not

24 sure I understand the mechanics there at all.

25          The point is, Your Honor, that the idea that the

1  house is on fire and it's going to burn down today if the DIP

2  is proposed as is requested is just not reflected by the

3  record evidence.  What the evidence says is that we have at

4  least two weeks to sort this out to get to a more workable

5  transaction, and perhaps during that two weeks we can get the

6  debtor to listen to our proposal for a junior, non-priming

7  DIP at much less cost.

8          Now, you've heard testimony that the debtor

9  received a proposal from us and, after consulting with the

10 first lien, determined not to counter.  And that's true, they

11 didn't counter, but the question is why they didn't counter.

12 If the quantum offered was not enough, why didn't they tell

13 us they needed more?  If its connection to a potential global

14 restructuring was insufficient or unworkable, why didn't they

15 ask us would we make the DIP financing available without

16 that?  They didn't.  There was no effort to see if there was

17 a deal to do.  I understand that they have to file when they

18 have to file, but the record evidence shows that they're not

19 out of cash at any time this week or next week or the

20 following week.  And I'm not saying that it's prudent to take

21 it right to the edge, but I am saying two things:  one, that

22 we have time, and, two, that the quantum of interim borrowing

23 doesn't match up with the requirement of Bankruptcy Rule

24 4001(c)(2) on this record.

25          What this record shows -- I'm going back to the

1  budget -- is that the debtor has negative cash flow of

2  approximately $50 million over the first five weeks of the

3  case.  That $50 million of negative cash flow includes paying

4  or escrowing $15.1 million for professional fees that will

5  not be owed during the period.  So if we're looking at a true

6  cash flow, those numbers would not be there.

7        It also includes payment of $77.6 million to

8  critical vendors and 503(b)(9) creditors.  Let's talk about

9  both those items -- actually, I'm going to come back to that.

10       It's a total of $93.9 million that they're paying

11  in respect to those items.  If you back those out, if you

12  don't pay those items, during the first five weeks of the

13  case, without any DIP financing, the debtor is approximately

14  $44 million cash positive, meaning that from the 42 million

15  it starts with at the end of this week it would have $86

16  million in cash at the end of five weeks.  But, nevertheless,

17  we're told that today the Court must sign an order awarding

18  $125 million of DIP financing and appending to that a $500

19  million rollup, and $50 million of fees.

20       Let's take a middle point, Your Honor.  Let's

21  assume that the debtor pays professional fees of $5 million.

22  I don't know why they would do that until professionals are

23  retained and orders are entered authorizing them to be paid

24  and they complete the process for getting paid, but let's

25  just say they pay, out of the goodness of their heart, $5

1  million of professional fees.  And let's say, instead of 77.6

2  million of critical vendors and 503(b)(9) claims, they pay

3  half of that, 38.8 million.  And let's say they tell these

4  creditors who they say will stop doing business with them,

5  who are preparing special products for the debtor, but will

6  not sell them to the debtor if they don't get paid their

7  prepetition claims, there's a name for that under the

8  Bankruptcy Code, it's called a stay violation.  If a creditor

9  tries to do something to extract payment of a prepetition

10  claim outside of a plan, that is a stay violation, it's

11  quintessential.

12          And indeed there are critical vendor orders that

13  have been entered in other courts that provide that, they

14  give the debtor a much more limited budget, they say you can

15  come back if you need more, but you need to inform your

16  vendors that if they threaten to not do business with you

17  post-petition because you will not pay what they are owed

18  prepetition, that is a violation of the stay for which they

19  will answer.

20          In any event, if we cut what we're spending on

21  those items down to $45 million, we have a debtor who will

22  lose over the first five weeks of the case 1.4 million.  In

23  other words, the 42.5 that they'll have at the end of this

24  week will go down to 41.1.  Now, Your Honor, I just want to

25  be clear, I'm taking all these numbers from the budget.  Does

1   that debtor need to borrow $125 million on day one of the

2   case?  Does that debtor need $125 million of financing to get

3   to a final DIP hearing when we'll have the opportunity to

4   take discovery and to develop some evidence for this Court to

5   make a decision on?  I think the answer is no.

6          Even in the case where the debtor pays the $93

7   million out, 77.6 for critical vendors and 503(b)(9), $15

8   million for professional fees that aren't owed, the debtor

9   starts with 42.5, burns 50.3, and winds up negative cash 7.8.

10  Does that debtor need to borrow $125 million on day one of

11  the case, or does it need to borrow 40 or 50 or $60 million

12  to be sure that it can meet that cash shortfall and have some

13  cushion?  I think the answer is pretty clear, Your Honor.

14         I just want to point out, Your Honor, that even in

15  the case where the debtor borrows the whole $125 million, but

16  only utilizes ten or 15, or as much as 50, if they use 50,

17  you know what the ratio between the utilized DIP and the fees

18  will be?  One to one.  In other words, to borrow $50 million,

19  the debtor is going to incur $50 million of fees.  That's a

20  good exercise of business judgment?  Dig the hole deeper,

21  that's what they're doing.  As such, Your Honor, I think this

22  DIP is obviously oversized.

23         I want to -- I guess I've address the 503(b)(9)

24  point.  The Code provides those creditors with an

25  administrative claim, it doesn't say that it has to be paid

1    at the beginning of the case, it doesn't say that it has to

2    be paid in the first two weeks of the case, three or four or

3    five weeks of the case.  It's an administrative claim; that's

4    its protection and that could be paid under a plan.  So what

5    we're doing today with respect to those claims is we're

6    rushing in, we're borrowing money at exorbitant costs to pay

7    claims that we don't have to pay until the end of the case.

8         And with respect to the critical vendors, this is

9    the exception that has apparently eaten the rule.  As the

10   Court knows, general unsecured creditors are supposed to be

11   paid under a plan, there are supposed to be extraordinary

12   circumstances that would entitle a prepetition unsecured

13   creditor to be paid outside of a plan.  For example, where a

14   supplier of the debtor is going to go out of business and

15   won't be able to provide the supplies because of that

16   happening, similar type extraordinary circumstances.  This

17   debtor is telling you that effectively all of its trade,

18   every single one is a critical vendor or a 503(b)(9) creditor

19   who they want to pay now even though they don't have to.

20        So including those amounts in the DIP budget --

21   and the testimony is that they are included in the DIP budget

22   -- serves really one purpose, and that is to justify a larger

23   DIP than is needed.  Why does the 1L want that?  Well, I've

24   already done the math on that.  Who wouldn't want a 280

25   percent annualized return?  I'd sign up for that if it was

1   available to me, Your Honor.

2            Let's talk about the rollup.  The prejudice to the

3   Opco estates and their creditors is worsened by the, quote-

4   unquote, "two-to-one rollup" of $500 million of prepetition

5   1L into the DIP.

6            First of all, as of today, if the order is

7   entered, the debtor can only borrow $125 million.  By my

8   math, that's not two to one, that's four to one.  I've never

9   seen a four-to-one DIP rollup in any case I've been involved

10  in over the last 37 years.

11           Second, if you consider the fact that the actual

12  utilization is likely to be 50 million or less, and perhaps

13  even zero if a rational limit is placed on critical vendor

14  payments and a realistic view is taken regarding the

15  professional fees will actually be paid during the interim

16  period, the rollup ratio is ten-to-one, maybe (indiscernible)

17  maybe the debtor borrows no money, uses no money, and it

18  still has a $500 million rollup of prepetition secured debt.

19           Third, the rollup means that any replacement DIP

20  presented between now and the final hearing would have to be

21  not for the amount that is funded or utilized, but rather

22  would have to be for $675 million, the 625 plus the $50

23  million of fees.  I ask, does that create a barrier to entry

24  for more favorable DIP financing?

25           And fourth, Your Honor, the rollup also means that

1  under any plan in these cases the rollup amount would have to

2  be paid in cash in full.  Rather than leaving the rollup

3  amount as a prepetition secured claim that could receive

4  alternative consensual or nonconsensual treatment.  I say

5  consensual just most simplistically, the first lien could be

6  reinstated.  When I say nonconsensual, the first lien could

7  get back new paper that extends the maturity and that the

8  Court finds provides it with terms that give it the full

9  value of the value of its collateral -- of the value of its

10 interest in the collateral.  Those alternatives are being

11 irrevocably removed from the menu of these Chapter 11 cases

12 on the first day of the case.

13         I'd like to now turn to the propriety of the

14 Holdco obligation, which we now understand is limited to $250

15 million, and we need to make sure that all of the papers

16 reflect that limitation because, coming into today's hearing,

17 they did not.

18         Under the DIP as proposed, it would be guaranteed

19 by the HoldCos above FRG, including the borrowers of the $475

20 million, now $515 million of Holdco debt.  This makes no

21 sense and is extremely prejudicial to the Holdco debtors and

22 their separate creditors.

23         The Holdco debtors have no operations that need to

24 be funded and are not obligors under the prepetition 1L.  As

25 such, absent the DIP, any value at the HoldCos, whether

1  surplus value at FRG, claims and causes of action against FRG

2  and others, deriving from the $475 million lent to Holdco and

3  advanced into FRG just over one year ago, which the 1L and

4  the debtors now say is entirely worthless, or tax attributes,

5  is currently available to provide value and recovery to the

6  Holdco claims.  But if the DIP is put in place as proposed,

7  their right to recovery will effectively be subordinated to

8  $250 million of debt, which will be an administrative expense

9  against their borrowers.  And if we don't have collateral, it

10 turns out that there's no real collateral or value at the

11 HoldCos, we're just unsecured creditors, so we'll be in line

12 behind those administrative expenses.

13          Now, at the same time, the DIP provides no value

14 to us or the HoldCos.  Expenses, if any, at the HoldCos are

15 de minimis, they are not permitted to borrow under the DIP,

16 and I do believe that the DIP does not currently provide for

17 DIP borrowings to be advanced up into the Holdco if there are

18 any expenses.  But, quite frankly, looking at the HoldCos

19 where they have no operations, I think it's a fair question

20 and something that we have to look into, would the HoldCos

21 and their stakeholders be better off in Chapter 7?  Would

22 they be better off with the stay lifted so that they can

23 exercise whatever rights and remedies they have to try to

24 recover?  Would they be better off with a trustee?  Would

25 they be better off with exclusivity terminated?  We don't get

1   to think about any of these things, we don't get to present

2   evidence on any of these things because the DIP is

3   constructed to push it into default if we are successful.

4   But arguably, as we sit here today, any of these outcomes

5   could be better for the HoldCos and their creditors, and, in

6   any event, far better than the imposition of the massive DIP

7   guaranty claim.

8           Now, the fact that someone purporting to be a

9   fiduciary for the HoldCos would agree to this raises a number

10  of important questions.  And I say someone because, contrary

11  to the representations of counsel at the commencement of

12  argument, the record actually is devoid of any evidence

13  regarding anyone who exercised fiduciary duties on behalf of

14  the (indiscernible) debtors with respect to the authorization

15  of the (indiscernible) debtors to enter into the DIP.  There

16  is no evidence that there was any exercise of business

17  judgment at the Holdco level and there is no evidence

18  regarding any emergency or need for cash at the Holdco level.

19          So, questions to be answered.  Who are these

20  fiduciaries?  Are they conflicted?  Who is advising these

21  fiduciaries?  Are they conflicted?  What are the HoldCos

22  getting in giving up the DIP guaranties?  Until these

23  questions are properly answered with record evidence, there

24  is no basis for approving the guaranty of the DIP by the

25  HoldCos.

1           Your Honor, I want to talk about the claims that

2    are at the HoldCos because this is no run-of-the-mill claim

3    case.  Just over one year ago, FRG was taken private in a

4    transaction that valued the company at over $26 million --

5    $2.6 billion.  Sorry, Your Honor, $2.6 billion.  It

6    purportedly had EBITDA of nearly $400 million at that time,

7    August of 2023.  To facilitate that transaction, 475 million

8    of financing was raised at the Holdco level, the proceeds of

9    which were down-streamed into FRG.  Now, today, approximately

10   14 months later, we are told that the company is worth less

11   than $1 billion and its EBITDA is less than $100 million.  We

12   and the Court are entitled to know how that happened and to

13   think about alternative paths to maximizing value.

14          We're not alone.  The SEC wants to know too.  At

15   present, that transaction, which was based in part on the

16   nondisclosure of material information, is now the subject of

17   pending SEC criminal and civil investigations focused on the

18   CEO of the company at the time of the go-private transaction,

19   who was represented in connection with that transaction by

20   proposed debtors' counsel.

21          I mention this because when I talk about the

22   importance of materiality of claims and causes of action, I

23   want the Court to understand that this is no treaty, that

24   there's smoke here.  We should all be more informed before we

25   start encumbering claims and teeing them up to be released.

1          There are two issues, I think, that are going to

2  have to be addressed going forward.  Number one, despite the

3  representations of Counsel at the beginning of the case that

4  all this stuff involving Mr. Kahn is irrelevant, the question

5  is the company's failure to disclose information regarding

6  the company's stock that was owned by the company's CEO and

7  that in fact had been lent to the sponsor of the take-private

8  transaction and was not disclosed.  Now, I don't know how

9  something that could be within the knowledge of the CEO at

10  the time of the transaction would not be imputed to the

11  company.

12          The second issue:  Is Willkie Farr qualified to be

13  counsel under 327 despite its representation of Mr. Kahn in a

14  transaction that is now under investigation by the SEC and

15  that may be the basis of material claims by the Holdco

16  debtors, the Holdco lenders, and even FRG, against Mr. Kahn

17  and those who work with him.

18          I don't know the answer to these questions, Your

19  Honor, today, but I think they're important issues that are

20  going to have to be addressed as this case unfolds.

21          Just a second, Your Honor.  I apologize.  Ah, here

22  we go.

23          I want to go back to talking about an element of

24  the approvability of the DIP.  Since this is a priming

25  financing, you look to 364(b), and it can only be approved if

1   the debtor is unable to otherwise obtain financing and

2   provide adequate protection.  Here, the evidence in the

3   process is pretty scant, but the testimony was that sometime

4   in mid-October the company started to solicit DIP proposals.

5   Well, it's November 5th.  Going from mid-October to November

6   5th says that probably more like two weeks is what -- when --

7   was the robust solicitation process.

8           And what we can tell you and what the testimony

9   reflects is that we received the current DIP term sheet

10  proposal last week.  We responded to it as quickly as we

11  could and gave a proposal for a junior DIP on Saturday that

12  was priced at SOFR plus five percent, not ten percent.  It

13  didn't require anybody to be primed but the 2L that we

14  offered.

15          Now, the testimony is that that proposal was not

16  countered, and the testimony is also that the one third party

17  proposal that was made was not countered.  It's almost as if

18  they were just checking the boxes to say they got proposals

19  and considered them and didn't respond.

20          I also think it's of note that the witnesses both

21  testified, when they received our proposal, the first thing

22  they did was send it on to the first lien who we're competing

23  with to provide DIP financing.  Since when does one of the

24  competitors get to evaluate and have input on the other

25  competitor's proposal, one that is facially superior because

1  it does not include any priming liens, any *pari passu* liens,

2  only junior liens to existing secured positions and is priced

3  much cheaper.  The idea it would have taken weeks or months

4  to convert that into an actionable financing is unsupported.

5          Now, Your Honor, I was going to complain about

6  releases today.  Those are brought in by the plan.  As heard

7  from the testimony, the DIP requires the debtor to file a

8  plan of reorganization under, the terms specified, actually

9  by tomorrow is the current milestones, November 6th, and to

10  take appropriate steps with intervening milestones to get

11  that plan confirmed within 90 days of the petition date.

12          Now, that plan has asked lienholders for releases,

13  but we'll know, maybe as soon as tomorrow, what those

14  releases are, and I think we need to look carefully if the

15  HoldCos are releasing their liens against the Opcos, if the

16  HoldCos are releasing their claims against third parties,

17  including B. Riley and the former CEO, if all of the debtors

18  are releasing claims against third parties, including B.

19  Riley and the former CEO.  We'll have to wait, but I wanted

20  to put a flag on that because that's all to be included in

21  the plan that, if the plan is not to the satisfaction of the

22  DIP lenders, it's a default.

23          I guess I'm going to finish on the final point,

24  the obvious one, I've danced around it, I think, throughout

25  my argument, and that is the DIP loan with its attachment to

1  the plan reflected by the RSA is a quintessential *sub rosa*

2  plan, and this was a fatal flaw of the court in the <u>LATAM</u>

3  case where plan terms were dictated by the DIP and the court

4  found that it did not have a proper evidentiary record to

5  determine that those plan terms were proper in conjunction

6  with the requested approval of the DIP.

7           Here, the plan provides for the distribution of

8  the value of the company to the first lien lenders and the

9  wipeout of the 2L and the Holdco debt.  There's no evidence

10  to support that as an appropriate outcome in this case today.

11  I can assure the Court that, absent them being put on the

12  scale by the 1L, that will be a contested issue.

13           So the point is that a *sub rosa* plan is one that

14  eliminates optionality on the part of a debtor outside --

15  with respect to a plan -- outside of the plan process, and

16  here that's exactly what the DIP, together with the RSA,

17  does.  Not only does the rollup actually officially eliminate

18  potential plan alternatives, but when tied to the RSA

19  obligations it requires the debtor to file and pursue and

20  makes very costly anybody successfully defeating that plan.

21  Six hundred and seventy five million dollars more interest

22  the longer it takes will become immediately due and payable;

23  that can be enforced without further relief from this Court.

24           So, Your Honor, I think it's fair to say that, for

25  all six of the reasons that I've described, this DIP should

1  not be approved in this form.  The 1L should be directed to

2  go back into the laboratory and come up with something that

3  is workable and that permits the parties to engage and

4  explore the options to become informed to inform the Court

5  and to develop a plan, which could be a plan like the one

6  that they insist on filing.  There's no reason that that plan

7  has to be completed in 90 days, or any plan has to be

8  completed in 90 days, for that matter.  In fact, the DIP

9  budget doesn't reflect the expenditure of $250 million of DIP

10 borrowing; it reflects expenditure of far less than that.

11          So, give us time.  Let's get a reasonable DIP here

12 and let's do this case the way Chapter 11 cases are supposed

13 to be done:  transparency, with interaction, with engagement,

14 and, ultimately, with an eye towards building consensus.

15          Thank you.

16          THE COURT:  Okay.  Thank you.

17          Anyone else wish to speak in opposition to the

18 DIP?

19      (No verbal response)

20          THE COURT:  Okay.  Response, Ms. Sinclair?

21          MS. SINCLAIR:  Yes, Your Honor, if I can address a

22 few of Mr. Fox and Mr. Lauria's points briefly.

23          So, I know the U.S. Trustee's Office is focused on

24 the three-draw structure of the DIP, and I just want to

25 highlight another way to think about it because, again, all

1  of the $250 million of new money is fully committed, and

2  that's that the delay draw actually benefits the company by

3  causing interest payment savings.  The purpose of that last

4  draw is to get us from the period between plan confirmation

5  and plan effectiveness when, for example, some of the larger

6  fees like transaction expenses all have to be paid at one

7  time.  So this staging we think is actually one of the

8  benefits we received from the lenders here because we know

9  the money is fully committed to us, but we don't have to draw

10  it and start accruing interest until shortly prior to

11  actually using those funds.

12        So I think the point is we want to be able to

13  project confidence into the market, we can do that with

14  fully-committed financing.  We can perhaps access cash, you

15  know, at an earlier stage of the case that we intend if we

16  need to because all that money is committed, assuming the

17  lenders were to consent, but we do get that incremental

18  benefit of not paying interest that quickly.

19        Second, I want to address some of Mr. Lauria's

20  editorializing about our budget because I think it's based on

21  an entirely false premise, and that's the idea that we can

22  use cash collateral without having access to the DIP.  I want

23  to be clear that we have no such agreement with our ABL

24  lenders, and in fact the ABL lenders have indicated to us

25  that they will not agree to that.  So, again, it's another

1   alternative that doesn't exist.  The ABL collateral is being

2   reduced in real time and not replaced because of the GOB sale

3   of American Freight, and if we start using that cash to fund

4   other things, then they aren't going to be adequately

5   protected.

6            I'll say that as to Mr. Lauria's analysis of our

7   budget generally, without the interim DIP, we have zero

8   chance to achieve any of the figures in that budget.  We have

9   no liquidity, we are a retailer that can't pay vendors and

10   employees, and our trade credit will quickly dry up.  In

11   these cases, Your Honor, the judgment of the junior creditor

12   group should not be substituted for the judgment of the

13   debtors, particularly at a time when the company is

14   undergoing a lot of instability and a lot of uncertainty that

15   needs to be alleviated, and particularly in a situation when

16   that same creditor group is providing no actual alternative

17   to the deal that's on the table.

18            Thank you.

19            THE COURT:  Okay.  Thank you.

20            All right --

21            MR. FLIMAN:  If I may, Your Honor, just quickly?

22            THE COURT:  Go ahead.

23            MR. FLIMAN:  For the record, Dan Fliman, Paul

24   Hastings, for the Ad Hoc Group of First Lien Lenders.

25            Just to echo a few points of Ms. Sinclair.  You

1 know, Your Honor, Mr. Lauria's extensive argument can

2 basically be boiled down to the following, he thinks the

3 Court should ignore the debtors' business judgment and defer

4 to Mr. Lauria's business judgment instead, and let me give

5 you three quick examples.

6          He questions the debtors' decision of how much

7 cash they need and when they need it, and he relies on his

8 own forecasting and his own budgeting process and thinks the

9 key -- that his view of the debtors' cash needs should be --

10 should, you know, overrule over the debtors' own assessment,

11 and the debtors' management and the debtors' advisers.

12          The second example is on the question of which

13 vendors should get paid and which claims should get paid.

14 Rather than deferring to the debtors' management team and

15 advisers, he believes they should be able to dictate that,

16 and that in particular this debtor, which is a retailer, the

17 debtor should be able to rely on the automatic stay.  Your

18 Honor, like many other retailers, if not all other retailers,

19 the debtors need to make their own decisions with respect to

20 which claims they need to pay in order to make sure they can

21 keep the lights on.

22          And, third, on the economics of the DIP itself,

23 where you've heard testimony from the debtors' declarants,

24 the debtors' business judgment is that the economics are

25 reasonable, Mr. Lauria wants to instead impart his own

1  business judgment on these issues.  He thinks that they're

2  too rich, he thinks that these fees are excessive, he

3  provides no precedent, no authority, much less any expert

4  testimony on this, and instead asks us to defer to his own

5  prospectus.

6          Your Honor, the record here has been established,

7  we know how the debtors reached their decision, we know what

8  decision they reached, the Court should defer to the debtors'

9  business judgment.  They know their business, they know how

10 to operate it, and they know what needs to happen on a go-

11 forward basis.

12         And on that basis, Your Honor, I ask that you

13 please grant the motion.  Thank you.

14         THE COURT:  Thank you.

15         Anyone else?

16     (No verbal response)

17         THE COURT:  All right, let's take a recess until

18 3:45.  We'll come back on the record.

19     (Recess taken at 3:33 p.m.)

20     (Proceedings resumed at 3:51 p.m.)

21         THE COURT:  Okay, we're back on the record.

22         First of all, I'd like to say that I was surprised

23 by the fact that there was the amount of objections that were

24 raised today in connection with the DIP.  And in my chambers

25 procedures I have that DIP hearings are virtual unless there

1    is some major issue.  So I wish the debtors had told me that

2    this was going to happen because I would have had everybody

3    in the courtroom instead of virtually, because it makes it

4    difficult to do these things virtually.

5              So, in the future, if you have -- or if you know

6    there's going to be major objections to first day motions,

7    you need to let me know so that we can schedule this as a

8    live hearing.

9              That said, having heard what I've heard today, I

10   have concerns, and I don't think that I am able to make a

11   decision on the DIP one way or the other based on the record

12   that I have before me right now.  I'm just not comfortable as

13   to what the consequences are going to be if I do approve the

14   budget at this point -- or, excuse me, approve the DIP at

15   this point, and how that's going to affect all the parties in

16   this case.  You're asking me for a lot of relief on day one,

17   a full DIP with a roll-up at least two times the new coming

18   in, and how that's going to impact this case going forward.

19             So I'm going to adjourn the hearing today and I'm

20   going to reconvene tomorrow at noon, and I'm going to direct

21   the parties to be here in the courtroom for that hearing, if

22   they can make it.  I understand this is a first day hearing

23   and if it's not possible given the shortened notice, then

24   parties can appear virtually and I'm not going to hold that

25   against you at this point.  But I do want to have the parties

1  here so that maybe you can talk to each other, and maybe you

2  can talk to each other tonight in the interim before we come

3  back tomorrow, but at this point I'm just uncertain as to how

4  I'm going to rule on this and I think I need more.  And if

5  that means more evidence, then put on that evidence.

6         And I do have concern about the pricing.  I don't

7  know that this is within market.  I've never seen pricing

8  this high in a case before, except for the one where someone

9  wanted a 325-percent interest rate up front and I said no on

10  that one.  So the fees seem high and I'd like to know whether

11  that's in market or not, and I didn't hear anything from any

12  of the parties about whether that was in market.  So that's

13  one of the issues that I'm concerned about, and the other, as

14  I said, is the effect on the constituencies in this case if I

15  approve this DIP on an interim basis without the opportunity

16  to challenge it later on.  And I know there is a challenge on

17  the rollup, but that's limited, it's not necessarily going to

18  address all of the issues that I have right now.

19         So, with that, are there any questions before we

20  adjourn and we'll come back tomorrow?

21         MS. SINCLAIR:  One question, Your Honor, if I may

22  be heard, Debra Sinclair?

23         THE COURT:  Yes.

24         MS. SINCLAIR:  Would your preference be to hear

25  the balance of the first days tomorrow because I think our

1  ideal preference would be, given that the bulk of them are

2  uncontested -- our understanding is everything actually is

3  uncontested and agreed to with all parties who sent us

4  informal comments other than vendors, which I anticipate

5  given the questioning our colleagues at White & Case may have

6  an objection to.  So we were hoping to perhaps get those

7  entered today, if we could, but understand if you'd like to

8  have those heard tomorrow.

9        THE COURT:  Well, I guess the question is, if I

10  decide that I'm not going to approve this DIP or that I'm

11  going to require changes to it in order to make it

12  approvable, the first lien lenders have said they're going to

13  walk, they're not going to fund.  So why would I enter all

14  the other relief if this case is going to convert to a 7?

15        MS. SINCLAIR:  Understood, Your Honor.  I think

16  everyone's collective goal, I hope, would be to avoid that

17  outcome, and obviously the first day relief and the payments

18  we're able to make thereunder would all be contingent on the

19  DIP being entered.  I'm just trying to resolve perhaps the

20  issues we are consensually agreed upon at this point.

21        THE COURT:  Okay.  Anyone else have a position on

22  that?

23        MR. LAURIA:  Your Honor, Thomas Lauria of White &

24  Case for the 2L and Holdco lenders.  I think we have some

25  minor objections to cash management, I would hope that we'd

1  be able to get those worked out.  I do think we have

2  substantial objections as we (indiscernible) with respect to

3  critical vendors.  And I do agree with the Court's view that

4  the time should be spent trying to get to a resolution of the

5  financing of this case, doing otherwise kind of puts the cart

6  before the horse.

7          THE COURT:  Okay.  Mr. Fox, any -- does the U.S.

8  Trustee have any position?

9          MR. FOX:  Thank you, Your Honor.  May it please

10  the Court, Tim Fox on behalf of the United States Trustee.

11          Your Honor, my office's informal comments on the

12  other first day items were resolved prior to today's hearing

13  start.  I would note that the form of order for each of the

14  operational motions does include a reference to the approved

15  budget.  And so, until the DIP has been dealt with

16  sufficiently, those orders, you know, do tie back into the

17  DIP and the approved budget, and so it may be better to hold

18  off on consideration until we have a greater consensus on

19  what's happening with respect to the DIP.  But, Your Honor,

20  in terms of the form of order for all the other items, my

21  office has resolved here, you know, counsel at White & Case,

22  with their issues on the cash management and critical vendor

23  orders.

24          So, other than perhaps going through the

25  uncontested ones, I don't see much benefit in going forward

1  today in light of the need for parties to interact and figure

2  out how they want to proceed, it may be better used having

3  negotiations with respect to the DIP as opposed to running

4  through the rest of the agenda, but would defer to Your Honor

5  as to whether or not you want to do the uncontested first day

6  matters other than cash management and critical vendor.

7           THE COURT:  Okay, let's hold off on those until

8  tomorrow.  I think the DIP is the most important thing, we

9  need to get that resolved, and then the others we can

10 probably move through pretty quickly.

11          Mr. Lauria, can you preview for me what your

12 objection is on the cash management?

13          MR. LAURIA:  Your Honor, if I may, I'm going to

14 defer to my partner Andrew Zatz who is going to handle that

15 component of the hearing.

16          THE COURT:  Okay.  Mr. Zatz?

17          MR. ZATZ:  It simply pertains to the bank account

18 that sits at the Holdco entity, and I think we had -- you

19 know, we have questions that need to be answered there and

20 today's witnesses are not able to provide those answers.  So

21 our hope would be that that cash can just be frozen on

22 interim, but we'd like to discuss that option with the

23 debtors.

24          THE COURT:  Okay.  Well, that is something else

25 you can talk about tonight maybe.

1          Okay.  All right, so then we are adjourned until

2   tomorrow at noon.  I will see everybody who can make it in

3   the courtroom.  If you cannot make it, I understand and you

4   are permitted to appear virtually, but I'm hoping that at

5   least the key folks can make it here live.  Okay?

6          MS. SINCLAIR:  Yes, Your Honor.  Thank you.

7          THE COURT:  All right.  Thank you all very much.

8   We're adjourned until noon tomorrow.

9          COUNSEL:  Thank you, Your Honor.

10       (Proceedings concluded at 3:58 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           <u>C</u><u>ERTIFICATION</u>

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    <u>/s/ William J. Garling</u>              <u>November 6, 2024</u>

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   <u>/s/ Tracey J. Williams</u>              <u>November 6, 2024</u>

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25