**EXHIBIT C**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3    IN RE:                      .  Chapter 11
                                  .  Case No. 24-12480 (JTD)
 4    FRANCHISE GROUP, INC.,      .
      et al.,                     .  (Jointly Administered)
 5                                .
                                  .  Courtroom No. 3
 6                                .  824 North Market Street
                    Debtors.      .  Wilmington, Delaware 19801
 7                                .
                                  .  Wednesday, November 6, 2024
 8    . . . . . . . . . . . . . .    1:10 p.m.

 9

10              TRANSCRIPT OF CONTINUED HYBRID HEARING
             BEFORE THE HONORABLE JOHN T. DORSEY
11                UNITED STATES BANKRUPTCY JUDGE

12

13    APPEARANCES:

14    For the Debtors:            Kristin L. McElroy, Esquire
                                  YOUNG CONAWAY STARGATT & TAYLOR, LLP
15                                Rodney Square
                                  1000 North King Street
16                                Wilmington, Delaware 19801

17

18

19    (APPEARANCES CONTINUED)

20    Audio Operator:            Gauri Patel, ECRO

21    Transcription Company:     Reliable
                                 The Nemours Building
22                               1007 N. Orange Street, Suite 110
                                 Wilmington, Delaware 19801
23                               Telephone: (302)654-8080
                                 Email:  gmatthews@reliable-co.com
24
      Proceedings recorded by electronic sound recording,
25    transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Debtors:          Matthew A. Feldman, Esquire
                          Debra M. Sinclair, Esquire
                          Stuart R. Lombardi, Esquire
                          James C. Dugan, Esquire
                          Jessica D. Graber, Esquire
                          Marine Loison, Esquire
                          Joseph R. Brandt, Esquire
                          WILLKIE FARR & GALLAGHER LLP
                          787 Seventh Avenue
                          New York, New York 10019


For the U.S. Trustee:     Timothy J. Fox Jr., Esquire
                          OFFICE OF THE UNITED STATES TRUSTEE
                          J. Caleb Boggs Federal Building
                          844 King Street
                          Suite 2207, Lockbox 35
                          Wilmington, Delaware 19801


For the Ad Hoc Group
of First Lien Lenders
and DIP Lenders:          Jayme Goldstein, Esquire
                          Daniel A. Fliman, Esquire
                          PAUL HASTINGS, LLP
                          200 Park Avenue
                          New York, New York 10166


For the Ad Hoc Group
of Freedom Lenders:       J. Christopher Shore, Esquire
                          WHITE & CASE, LLP
                          1221 Avenue of the Americas
                          New York, New York 10020


                          Thomas E. Lauria, Esquire
                          Southeast Financial Center
                          200 South Biscayne Boulevard
                          Suite 4900
                          Miami, Florida 33131

```
1                                  INDEX

2    MOTIONS:                                               PAGE

3    Agenda
     Item 3:    Debtors' Motion for Order Authorizing Joint    --
4               Administration of the Debtors' Chapter 11
                Cases [Docket No. 2, 11/3/24]
5
                Court's Ruling:                                 --
6
     Agenda
7    Item 4:    Debtors' Application for Appointment of Kroll  134
                Restructuring Administration LLC as Claims and
8               Noticing Agent [Docket No. 3, 11/3/24]

9               Court's Ruling:                               135

10   Agenda
     Item 5:    Debtors' Motion for Entry of Interim and Final 132
11              Orders (I) Authorizing the Debtors to Maintain
                and Administer their Existing Customer
12              Programs and Honor Certain Prepetition
                Obligations Related Thereto, (II) Authorizing
13              the Banks to Honor and Process Check and
                Electronic Transfer Requests Related Thereto,
14              and (III) Granting Related Relief
                [Docket No. 4, 11/3/24]
15
                Court's Ruling:                               132
16
     Agenda
17   Item 6:    Debtors' Motion for Interim and Final Orders  135
                Establishing Notice and Hearing Procedures for
18              Transfers of Equity Interests in the Debtors
                and Declarations of Worthlessness with Respect
19              to Equity Interests in Freedom VCM Interco
                Holdings, Inc. [Docket No. 5, 11/3/24]
20
                Court's Ruling:                               137
21

22

23

24

25
```

1                                    INDEX

2  MOTIONS:                                                      PAGE

3   Agenda
    Item 7:    Debtors' Motion for Entry of Interim and Final   141
4              Orders (I) Authorizing the Debtors to Continue
               their Insurance Policies, Including their
5              Insurance Premium Finance Program and to Pay
               All Obligations in Respect Thereof, (II)
6              Authorizing the Debtors' Banks and Other
               Financial Institutions to Honor and Process
7              Checks and Transfers Related Thereto, and
               (III) Granting Related Relief
8              [Docket No. 6, 11/3/24]

9              Court's Ruling:                                  143

10  Agenda
    Item 8:    Debtors' Motion for Interim and Final Orders     137
11             (I) Prohibiting Utility Companies from
               Altering, Refusing, or Discontinuing Utility
12             Services, (II) Deeming Utility Companies
               Adequately Assured of Future Payment, (III)
13             Establishing Procedures for Resolving
               Objections by Utility Companies and
14             Determining Additional Adequate Assurance of
               Payment, and (IV) Granting Related Relief
15             [Docket No. 7, 11/3/24]

16             Court's Ruling:                                  138

17  Agenda
    Item 9:    Debtors' Motion for Entry of an Order (I)          9
18             Authorizing Debtors to Redact Certain
               Personally Identifiable Information, (II)
19             Authorizing Electronic Noticing Procedures for
               Customers, and (III) Granting Related Relief
20             [Docket No. 8, 11/3/24]

21             Court's Ruling:                                   11

22

23

24

25

1

INDEX

MOTIONS:                                                          PAGE

2

Agenda
3  Item 10:   Debtors' Motion for Interim and Final Orders       9
              (I) Authorizing the Debtors to (A) Continue to
4             Maintain their Cash Management System, (B)
              Honor Certain Prepetition Obligations Related
5             Thereto, and (C) Continue to Perform
              Intercompany Transactions; (II) Waiving
6             Certain Operating Guidelines; (III) Suspending
              Time to Comply with Section 345(b) of the
7             Bankruptcy Code; and (IV) Granting Related
              Relief [Docket No. 9, 11/3/24]
8
              Court's Ruling:                                    11
9
Agenda
10 Item 11:   Debtors' Motion for Entry of Interim and Final    132
              Orders (I) Authorizing the Debtors to Pay
11            Certain Prepetition Claims of Certain Critical
              Vendors, Foreign Vendors, Shippers & Logistics
12            Providers, and 503(b)(9) Claimants; and (II)
              Granting Related Relief
13            [Docket No. 10, 11/3/24]

14            Court's Ruling:                                   134

15 Agenda
   Item 12:   Debtors' Motion for Entry of Interim and Final    128
16            Orders (I) Authorizing Debtors to (A) Pay
              Certain Prepetition Employment Obligations and
17            Compensation Obligations and (B) Maintain
              Employee Benefits Programs and Compensation
18            Obligations and (II) Granting Related Relief
              [Docket No. 11, 11/3/24]
19
              Court's Ruling:                                   131
20

21

22

23

24

25

1                                    INDEX

2   MOTIONS:                                                          PAGE

3   Agenda
    Item 13:   Debtors' Motion for Interim and Final Orders      140
4              (I) Authorizing Debtors to Pay Certain
               Prepetition Taxes and Fees and Related
5              Obligations, (II) Authorizing the Banks to
               Honor and Process Check and Electronic
6              Transfer Requests Related Thereto, and (III)
               Granting Related Relief
7              [Docket No. 12, 11/3/24]

8              Court's Ruling:                                   141

9   Agenda
    Item 14:   Debtors' Motion for Entry of Interim and Final   143
10             Orders (I) Authorizing the Debtors to Assume
               the Consulting Agreement, (II) Approving
11             Procedures for Store Closing Sales, and (III)
               Granting Related Relief
12             [Docket No. 14, 11/4/24]

13             Court's Ruling:                                   147

14  Agenda
    Item 15:   Debtors' Motion for Entry of Interim and Final     4
15             Orders (I) Authorizing the Debtors to (A)
               Obtain Senior Secured Priming Superpriority
16             Post-petition Financing and (B) Use Cash
               Collateral, (II) Granting Liens and Providing
17             Claims with Superpriority Administrative
               Expense Status, (III) Granting Adequate
18             Protection to the Prepetition Secured Parties,
               (IV) Modifying the Automatic Stay, and (V)
19             Granting Related Relief
               [Docket No. 51, 11/4/24]
20
               Court's Ruling:                                   127
21

22

23

24

25

1                              INDEX

2

WITNESSES CALLED
3  BY THE DEBTORS:                                      PAGE

4        CHRISTOPHER GRUBB

5              Direct examination by Mr. Lombardi         23

6              Cross-examination by Mr. Shore            47

7              Cross-examination by Mr. Fox             69

8              Redirect examination by Mr. Lombardi       70

9

10       DAVID ORLOFSKY

11             Direct examination by Mr. Dugan          73

12             Cross-examination by Mr. Shore           95

13             Cross-examination by Mr. Fox            104

14

15                            EXHIBITS

16

17 EXHIBITS:                                           PAGE

18 1 - Email                                            36

19 2 - Proposal                                         42

20

21 Transcriptionists' Certificate                      150

22

23

24

25

1        (Proceedings commenced at 1:10 p.m.)

2              THE COURT:  Good afternoon, everyone.  Thank you.

3    Please be seated.

4              Whenever you're ready.

5              MR. FELDMAN:  Good afternoon, Your Honor.  For the

6    record, Matthew Feldman from the law firm Willkie Farr &

7    Gallagher, LLP, proposed counsel to the debtors and debtors-

8    in-possession.

9              Your Honor, when we left you 18 hours ago, it's

10   been an interesting period of time both for this case and,

11   obviously, for broader issues, but when we left we were

12   really talking about whether or not we would go forward with

13   the consensual motions and try to get those out of the way

14   yesterday and I think, the exhaustion everybody had, it made

15   perfect sense not to do that yesterday, but it has created a

16   significant issue for the company.  And so I did want to

17   start today's hearing with just one of those consensual

18   motions that has been signed off on by everybody at this

19   point, and sort of explain to the Court why it is we need to

20   have this heard first, and then we'll move on to the debtor-

21   in-possession financing.

22             Your Honor, I'm here today to present the interim

23   order regarding the use -- I'm sorry, the maintenance of our

24   cash management system, and may I approach the bench with a

25   redline, Your Honor?

1            THE COURT:  Yes, please.

2            MR. FELDMAN:  And it's Docket Number 9, but I have

3    both the original -- both a clean and a redline.

4            THE COURT:  Thank you.

5            MR. FELDMAN:  Your Honor, the company has a

6    payroll that will be due this Friday to its employees.

7    Obviously, we can't make that payroll without approval of

8    cash collateral or debtor-in-possession financing, which is

9    all lumped into one.  But in order to fund the account, we do

10   have sufficient cash to make the payment, but we would need

11   to, number one, not close our bank accounts and reopen them

12   today, which is required under the U.S. Trustee's rules; and,

13   number two, we need to actually move the cash out of their

14   current accounts into the account that manages our payroll so

15   that it hits tomorrow, so that the money -- again, assuming

16   we can get an order from the Court with respect to use of

17   cash collateral or debtor-in-possession financing, so that

18   the money go out Friday to our employees.

19            And so that's the reason for asking the Court to

20   approve this order at this time.  We did in fact make a

21   change in the order, which is embodied in paragraph 16, to

22   accommodate our second lien -- our second lien holders to in

23   essence freeze any monies that are currently held in bank

24   accounts up at the two holding companies where they are

25   lenders, and that's VCM, Inc. and Freedom VCM Interco, Inc.,

1  and if we somehow needed any of the money in those accounts,

2  we have the right to come back to Your Honor.

3          That's really the only change to the form of

4  order.  We did fill in some dates with the assistance of your

5  chambers.  And I can represent to Your Honor that this is

6  supported by the 1Ls, by the ABL, by the U.S. Trustee -- or

7  not objected to by the U.S. Trustee, and supported by the

8  second lien lenders.

9          And with that said, Your Honor, I'm happy to

10 answer any questions, but we would ask the Court to enter the

11 order this afternoon so that we can make that transfer.

12          THE COURT:  Okay.  I don't have any questions.

13          Does anyone else wish to be heard?

14          Mr. Fox.

15          MR. FOX:  Good afternoon, Your Honor, may it

16 please the Court, Tim Fox on behalf of the United States

17 Trustee.  I'm rising briefly and will spare Your Honor the

18 lengthy recitation my office sometimes puts on the record

19 with respect to cash management, but did want to note there

20 are several banks accounts in the cash management system that

21 are banks that are not parties to Uniform Depository

22 Agreements with my office.

23          We understand that the cash management system

24 generally provides for concentration in concentration

25 accounts that are at UDA banks and so, as a result, there's

 1  minimal risk during the 30-day period where the 345(b) waiver

 2  included in the terms of the interim order would be

 3  operative.  We look forward to addressing further issues with

 4  the cash management system with the debtors as these cases

 5  progress, but did just want to note a reservation of rights

 6  with respect to the final relief and that there are non-UDA

 7  accounts in the system.

 8           THE COURT:  Okay.  Thank you.  Understood, Mr.

 9  Fox.

10           Anyone else wish to be heard?

11       (No verbal response)

12           THE COURT:  Okay.

13           MR. FELDMAN:  So, Your Honor, with that out of the

14  way, I'm pleased to report that we have actually made fairly

15  substantial progress --

16           THE COURT:  I need to enter the order first.

17       (Laughter)

18           THE COURT:  I'm satisfied the requested relief is

19  appropriate and I'll enter the order.

20           MR. FELDMAN:  Thank you, Your Honor.

21           So, again, we have made substantial progress in

22  narrowing the disagreements over the debtor-in-possession

23  financing and at an appropriate time we would be prepared to

24  put that on the record.  But, Your Honor, we are very close

25  to a resolution among our creditor constituents and so, while

1  I really dislike starting a hearing this way, we're actually

2  going to ask the Court for a brief adjournment to see if we

3  can narrow and finalize those final open points.  People are

4  communicating with their clients right now in the background.

5  We'd ask the Court's indulgence for 15 minutes.

6          I can assure the Court it's not going to go longer

7  than that because, if we are unable to reach a complete

8  resolution, we absolutely want to have this heard today and

9  it's going to require live testimony.  We understand, you

10  know, we are already at 1:15 or whatever the exact time is in

11  the afternoon.  And so we want to move promptly if we're not

12  able to bridge the final gaps, but I do think it will be time

13  well spent.  I do think we have narrowed the disagreements

14  regardless, and so we would ask the Court's indulgence for a

15  15-minute adjournment.

16          THE COURT:  That's fine with me.  When the parties

17  are talking, it's always a good thing.  So --

18          MR. FELDMAN:  Absolutely.

19          THE COURT:  -- I'm happy to --

20          MR. FELDMAN:  Thank you, Your Honor.

21          THE COURT:  We'll recess until 1:30.

22          MR. FELDMAN:  Thank you.

23      (Recess taken at 1:15 p.m.)

24      (Proceedings resumed at 1:30 p.m.)

25          THE COURT:  Please be seated.  Mr. Feldman, before

1 you start, just to get that cash management order, if you

2 want that entered right away, they need to upload it, it

3 hasn't been uploaded yet.

4          MR. FELDMAN:  They need help with it?  Okay.

5          THE COURT:  They need to upload it, so we can

6 enter the order.

7          MR. FELDMAN:  Upload it, yeah, yeah.  Okay, we'll

8 take care of that, Your Honor.  Thank you.

9          Again, for the record, Matthew Feldman from

10 Willkie Farr & Gallagher.  Your Honor, I believe the 2Ls are

11 still speaking to their client, but I think it makes sense to

12 start.  I'd like to actually cede the podium to Jayme

13 Goldstein from Paul Hastings who's going to take the Court

14 through the changes to the proposed debtor-in-possession

15 financing that we have agreed to between ourselves, many of

16 which are favorable to the second liens and accommodate some

17 of the concerns expressed by Your Honor and by the U.S.

18 Trustee.  We have communicated those to the second liens and

19 the U.S. Trustee, so I don't think they will come as a

20 surprise to them.

21          THE COURT:  Okay.

22          MR. GOLDSTEIN:  Thank you.

23          THE COURT:  Give me just one second.  I'm having

24 difficulties with my tablet here.

25          (Pause)

1          THE COURT:  All right, I'm going to have to go old

2   school.  The tablet is not working here.

3          All right, whenever you're ready.

4          MR. GOLDSTEIN:  Thank you, Your Honor, for the

5   record, Jayme Goldstein from Paul Hastings on behalf of the

6   Ad Hoc First Lien Group.  And, as Mr. Feldman said, we are

7   prepared to push forward on the DIP today.  I'm not going to

8   walk you through the entire interim DIP order, we'll be doing

9   that a little bit later, and we are prepared for argument and

10  we are prepared for any necessary rebuttals today.  But the

11  bottom line is we heard you, and we understand that

12  significant concessions needed to be made and we attempted to

13  do that.

14          We spent a fair amount of time talking to the U.S.

15  Trustee last night and we worked with the company to try to

16  put forward what we thought were material concessions.  We

17  spent a fair amount of time talking to our clients who, at

18  the end of the day, want to do what's best for the company.

19  They want to make sure that the company has the necessary

20  liquidity it has to move forward and hopefully get this

21  company out of the bankruptcy as quickly as possible, that is

22  critical to them, having certainty of process, especially a

23  company, a retailer of this sort, it needs to get out.  And

24  so what we want to do is try to help the company have the

25  liquidity, but also make sure that, you know, we can proceed

1  on the right path with the restructuring term sheet and the

2  restructuring support agreement that we've already put

3  forward and is on the docket today.

4         So with that, Your Honor, one of the concerns that

5  we heard yesterday was the -- from the second liens and the

6  HoldCos was the removal of the unsecured guarantees from two

7  of the HoldCos, and that was from Freedom VIM, Inc. and

8  Freedom ECM Interco.  Those two entities will no longer be

9  guaranteeing the DIP, that's one of the first changes that

10  we're going to be making.

11         Second, as we understand it -- and you're going to

12  hear from the company on this today, Your Honor -- the

13  interim DIP would feature an initial draw of one hundred

14  million instead of $125 million.  Given what the company

15  currently has and what's going to be required to get to the

16  final DIP order, we are comfortable with the reduction of

17  that interim first initial draw being 100 instead of $125

18  million.  We also think that this is something that addresses

19  the concerns of the U.S. Trustee.  I'm sure the U.S. Trustee

20  will have additional things to say about that today, but we

21  think that that's important to them and, therefore, it's

22  important to us.

23         With respect to the roll, we're going to hold on a

24  two-times roll, but it's only going to be on the amount

25  that's funded at this interim DIP order, entry of the interim

1   DIP order under our facility.  So, for $100 million, it would

2   be a two-time roll, so 200 million.

3          With respect to the fees, we understand that Your

4   Honor felt very strongly about that yesterday and,

5   accordingly, we have reduced the fees.  On the backstop, it

6   would be from ten percent to nine percent; on the commitment

7   fee, it would be a reduction of two and a half to one and a

8   half, Your Honor; and on the exit fee, it would remain two

9   and a half, but it would only be on the new money component

10  of the DIP, not the full facility.  That's another what we

11  believe to be a very important point raised by the U.S.

12  Trustee and their office.  So we tried to address the U.S.

13  Trustee's concerns in addition to the concerns of this Court,

14  Your Honor.

15         With respect to the interest rate, we've also

16  reduced that from SOFR plus ten to SOFR plus nine.

17         So we're trying our best to make the DIP not only

18  cheaper, but also featuring significantly reduced rates --

19  fees, I mean, sorry.

20         With that, we're going to move to argument.  We

21  have done everything we can to try to proceed consensually.

22  This has been going on for quite a while, Your Honor.  We

23  thought that we were going to have a consensual resolution

24  with the U.S. Trustee last night; ultimately, we weren't able

25  to achieve that.  We thought that we'd have a consensual

 1  resolution with the seconds and HoldCos; ultimately, we

 2  weren't able to achieve that.  But we believe that the DIP,

 3  as it will be presented to you today, is fair, reasonable,

 4  and we would like to try to move forward with it, Your Honor.

 5          So, thank you.

 6          THE COURT:  All right.

 7          MR. LAURIA:  Good afternoon, Your Honor, Thomas

 8  Lauria with White & Case for the Pimco and Irradiant 2L and

 9  Holdco lenders.

10          Your Honor, we have in fact been working very hard

11  to try to get to a deal.  There are still some open issues

12  with my clients that we have not yet had an opportunity to

13  communicate with counsel to the 1L DIP lender group, and I

14  think we've been hopeful that we would get to a resolution.

15          I should bring to the Court's attention that part

16  of what we've been doing in the last 18 hours or so is we

17  worked with both of our clients to get firm commitments to be

18  willing to provide DIP financing, not on a priming basis, but

19  on a junior basis to all existing ABL and 1L liens, priming

20  only ourselves at the 2L level.  That DIP would be a single-

21  draw $75 million financing.  It would not include any fees

22  whatsoever, no commitment fee, no exit fee, no backstop fee,

23  things that still under the revised proposal add up to $33

24  million, which would add on to a $100 million claim for new

25  money and 200 million for rolled-up old money during this

1   interim period.  And we would take no guarantees from the

2   HoldCos -- and, to be clear, it would be from none of the

3   HoldCos.  I think I heard Counsel say that they would not

4   take guarantees from the two intervening HoldCos that our

5   clients are lenders to, but it sounds like they still intend

6   to take guarantees from the two HoldCos that are above our

7   borrowers.  We would take no guarantees, secured or

8   unsecured, at the Holdco level, and we would not have any

9   restructuring support agreement commitments or obligations

10  associated with our DIP.

11          Our DIP would not have any kind of call

12  protection, so that it would be a DIP that would truly be a

13  bridge to the company's liquidity and would, we think, based

14  on our review of the numbers and with a reduction in the

15  amount that is paid for critical vendors and 509(b)(3)

16  claims, which are allowed administrative claims that don't

17  have to be paid now, that there's more than enough liquidity

18  actually to get the debtor through at least six weeks, if not

19  two months, but we can figure that out on the record if we

20  need to do that.

21          But we think that we've offered a DIP that is on

22  materially superior terms, there's no priming involved.  The

23  fees are zero.  The interest rate would be SOFR plus five

24  percent.  There would be no guaranty claims up at the

25  parents, the only obligors would be the companies that are

1  currently obligated on the secured debt at the Opco level of

2  the company, and there would be no lock in to any particular

3  plan of reorganization or transaction; that would all be

4  something that would occur in the future.

5         We have provided the debtors with a form of order

6  that we have indicated to them that we are prepared to fund

7  on.  We've put all of the salient terms of our financing in

8  the order, so we wouldn't need to negotiate a credit

9  agreement or a term sheet or any other documents, it would

10 simply be an order that would be signed by the Court, signed

11 by the borrowers, and signed by my clients, and funding would

12 be made promptly available.  And because there's no priming,

13 there's no upset of the apple cart, it's a DIP that could

14 easily be taken out at a point in time in the future when the

15 debtor determines that it needs additional liquidity.  It's

16 really just a bridge.

17        And I think, importantly, we're trying to keep a

18 level playing field in this case so that nobody is locked

19 into anything, nobody has superior rights with respect to the

20 collateral, with respect to a plan transaction.  There's no

21 dictation of what a plan has to look like, there's no

22 dictation of a sale process being conducted with any

23 particular -- in any particular time frame.  I think we give

24 the opportunity for the advisers and professionals to figure

25 out if now is the right time to try to sell the company or it

1    should be sold at another time, and we can always -- all

2    parties can work with the debtor towards a plan of

3    reorganization.

4            We would like there to be a consensual plan here

5    and we believe there is ample opportunity for a consensual

6    plan to be negotiated, but it's not going to be a plan that

7    looks like the one that the 1L wants to lock the debtors into

8    filing today, which is a plan that completely wipes out the

9    2L and Holdco debt, over $640 million of obligations taken to

10   zero.  And so we're prepared to put our money where our mouth

11   is.  We're prepared to write a $75 million check on a junior

12   basis to provide liquidity to the company and to get us all

13   moving forward, recognizing that we're probably going to have

14   to come back on not only future financing, but on a host of

15   other issues, but we would do so with a level playing field.

16           We want to emphasize that we think that it has

17   been valuable for the Court's remarks at yesterday's hearing

18   that there has been movement and there is the possibility

19   that, if we had more time -- I think the debtor said that we

20   don't -- that we would actually get to a consensual

21   arrangement around the DIP that's on the table.  But in that

22   that hasn't happened at this point, I think it's just going

23   to be important as part of the record to establish that we

24   have a competing proposal on the table and that at every box

25   that's important to the Court it's a superior proposal, which

1  really raises the difficult question of whether or not a

2  priming DIP can under those circumstances be approved under

3  360 -- 364(d) -- sorry, Your Honor.

4          And, you know, I guess we'll start going forward,

5  and perhaps we can be talking along the way and see if we can

6  get to a deal at some point.  It's unfortunate, but these are

7  the exigencies that we all face from time to time in these

8  types of situations.

9          THE COURT:  Okay.  Thank you.

10          MR. FELDMAN:  Your Honor, I would just like to

11  briefly respond to Mr. Lauria's superior DIP proposal, and

12  then I would like to begin the hearing as quickly as

13  possible.

14          Your Honor, we've been speaking to the 2Ls, as I

15  think we mentioned yesterday, for many months.  This proposal

16  came in at 3:00 a.m. in an email to us.  We did in fact meet

17  with the majority of our board at 7:15 this morning to

18  discuss it.  In a sense, Your Honor, it's just illusory.

19  It's a six-month, $75 million DIP.  It isn't enough money for

20  the company to operate through this period.  It would limit

21  our ability in terms of critical vendors and 503(b)(9)

22  claims.  You heard Mr. Lauria say it, we don't have to pay

23  those, we can pay those at the end of the case.  That's not

24  realistic for a company like this, Your Honor.  In fact, we

25  had trucks turn around yesterday when the Court was unable to

1  rule and go back to their warehouses, and we are getting

2  calls by the hour, maybe even more frequently, about

3  inventory being low at certain places.  So a DIP that doesn't

4  satisfy our needs is really not a DIP that's actionable to

5  us.

6          I would also point out, Your Honor, we'll blow up

7  our RSA, which is a very important component to bringing

8  stability to our employees, to our vendors.  The plan may not

9  be perfect in Mr. Lauria's eyes, and he'll have more than

10 ample opportunity to make those arguments, but this is just

11 not a DIP that makes sense for this company today.  Yes, I

12 wish we had more time; yes, I wish we didn't get it at 3:00

13 in the morning.   We moved as quickly as possible to make a

14 determination about its viability for us.  And it's also a

15 little bit illusory to say that it's a junior DIP.  It is

16 junior in the sense that it has junior liens, but it has to

17 be the first money out the door ahead of any secured claim.

18 So, even in a liquidation, it would get paid out ahead of

19 secured claims.

20          So that's not the most important part of this,

21 Your Honor.  It just doesn't work for the company for where

22 we are today.  We will continue to work with the 2Ls;

23 hopefully they will come on board during this hearing.  I

24 don't think the open items are all that dramatic, but we have

25 run out of time, we do need a ruling today.  We think we're

1  ready to put on a case that will satisfy Your Honor.  We had

2  pushed our 1Ls as hard as we possibly could, actually with

3  assistance from Mr. Lauria, so I want to thank him for that,

4  and I think we've got a better proposal for the Court to hear

5  today and we'd like to move forward on it.

6          THE COURT:  Okay.  Thank you.

7          MR. LOMBARDI:  Good afternoon, Your Honor, Stuart

8  Lombardi of Willkie Farr & Gallagher for the debtors.

9          The debtors call Christopher Grubb of Ducera.

10          THE COURT:  Mr. Grubb, please come forward, take

11  the stand, and remain standing for the oath.

12          THE CLERK:  Please raise your right hand.  Please

13  state your full name and spell your last name for the record.

14          THE WITNESS:  Christopher Grubb, G-r-u-b-b.

15         CHRISTOPHER GRUBB, DEBTORS' WITNESS, AFFIRMED

16          THE CLERK:  You may be seated.

17                    DIRECT EXAMINATION

18  BY MR. LOMBARDI:

19  Q    Mr. Grubb, when considering DIP facilities that have

20  been proposed in this case, did Ducera undertake an analysis

21  of DIPs that have been approved in other bankruptcies?

22  A    We did.

23  Q    And what did Ducera do to undertake that analysis?

24  A    We looked at a range of previously approved DIP

25  financing facilities across a number of cases.  We looked at

1  the financial terms of those DIP facilities and created an

2  analysis that summarized those terms.

3  Q     How did Ducera choose the DIP facilities from other

4  cases to analyze?

5          MR. SHORE:  Objection to the form, Your Honor.  I

6  think he should be asking the witness what the witness did as

7  opposed to what Ducera did.

8          MR. LOMBARDI:  I can rephrase, Your Honor.

9          THE COURT:  Thank you.

10 BY MR. LOMBARDI:

11 Q     How did you select the DIP facilities that have been

12 approved in other cases to analyze?

13 A     The team and myself, the team reporting to me, looked

14 at a database that Ducera keeps current as it relates to DIP

15 facilities approved.  We looked at a number of facilities for

16 comparable size and duration in comparability to this case.

17 We looked at cases from January 23 to current to have a

18 recent set of cases to observe.

19 Q     And did you prepare a demonstrative reflecting that

20 analysis?

21 A     We did.

22 Q     Would it assist you in your testimony today to have a

23 copy of that demonstrative?

24 A     It would.

25          MR. LOMBARDI:  Your Honor, may I approach?

1          THE COURT:  Yes.

2          MR. LOMBARDI:  Your Honor, do you want a copy as

3   well?  You have an electronic.

4          THE COURT:  Are we going to bring it up on the

5   screen or -- why don't you hand me a copy too, I'll take a

6   copy.  Thank you.

7          MR. LOMBARDI:  I've handed the witness and Your

8   Honor a copy of the demonstrative, and I'll mark it for

9   identification Demonstrative 1.

10  BY MR. LOMBARDI:

11  Q    Mr. Grubb, do you recognize this document?

12  A    I do.

13  Q    What is it?

14  A    This is a two-page analysis that I prepared with the

15  team, the first page being a summary of the statistics on the

16  second page, the second page being the comparable DIP

17  facilities that we identified and analyzed.

18         MR. SHORE:  Your Honor, I'm going to object to the

19  admission of this into evidence.  I could voir dire the

20  witness on this now, but if -- I think it will probably be

21  easier, particularly given the time, if the witness

22  questions, but I am going to reserve my right to seek to

23  strike this for lack of foundation.

24         THE COURT:  Well, I don't think he's moved its

25  admission, he's using it as a demonstrative.

1    MR. LOMBARDI:  That's correct, Your Honor.

2  BY MR. LOMBARDI:

3  Q    Mr. Grubb, I'd like to start briefly on the first page

4  of the document.  Do you see the heading in blue, "Selected

5  DIP analytics side-by-side"?

6  A    I do.

7  Q    Could you describe to the Court briefly what is

8  reflected on this first page?

9  A    We took a summary of the statistics on the second page

10  and summarized them here.  We looked at five key financial

11  metrics related to DIP financing facilities, and looked at

12  the minimum, the maximum, as well as the 25th percentile

13  median and 75th percentile statistic across these five

14  financial metrics.  It's a summary of the information

15  presented on the second page.

16  Q    I'd like to spend most of our time on the second page.

17  Please turn to the second page, Mr. Grubb, and can you

18  describe to the Court at a high level what information is

19  conveyed on this second page?

20  A    We looked at a set of 20 comparable DIP financings

21  completed since January of '23.  We looked at a number of

22  different financial metrics for those spread across the

23  columns to the right of the page.  We then looked at summary

24  statistics at the bottom of the page, and in the final rows

25  we compared it to the DIP facility that was presented

1  yesterday.  As just heard, these statistics have been updated

2  since the time the exhibit was prepared.

3  Q      And do you see going down two rows the heading,

4  "Company"?

5  A      I do.

6  Q      What information is reflected in that column?

7  A      These are the debtors.

8  Q      Could you identify the debtors that Ducera considered

9  in this analysis?

10 A      We identified American Tire Distributors, WheelPros,

11 ConvergeOne, WOM, Enviva, Cano, Charismatic, Air Methods,

12 Mallinckrodt, Instant Brands, Cyxtera Technologies, Genesis

13 Care, Wesco Aircraft, Monitronics, Cox Operating, Venator

14 Materials, SiO2 Medical Products, EVIA, IEH Auto Parts, and

15 Party City.

16 Q      And going one column to the right, what does the date

17 column convey?

18 A      The date represents the petition date of the cases.

19 Q      And what was the oldest petition date out of those

20 approximately 20 cases that Ducera considered?

21 A      January of 2023.

22 Q      Let's look at an example of one of the approved DIPs

23 that you considered in this analysis.  Do you see the fourth

24 company from the bottom, SiO2 Medical Products?

25 A      I do.

1  Q      What was the new money annual rate of the approved DIP

2  facility in that case?

3  A      For SiO2, the new money annual rate being the interest

4  rate on that was 14 percent.

5  Q      And how does that compare to the interest rate on new

6  money in the DIP facility that's been proposed in this case?

7  A      With the revised terms, it is above the 13.7 percent

8  revised proposal.

9  Q      What were the fees as a percentage of new money at exit

10  in the SiO2 Medical Products DIP facility that was approved

11  in that case?

12  A      Five percent exit fees.

13  Q      And how does that compare to the exit fees in the

14  facility that has been proposed in this case?

15  A      With the revised exit fees of two and a half percent,

16  those fees were higher in that case.

17  Q      And how about the annualized absolute return, what was

18  the annualized absolute return in the DIP facility approved

19  in the SiO2 Medical Products case?

20  A      In SiO2, the annualized return was 44.4 percent.

21  Q      And how does that compare to the annualized return

22  contemplated in the DIP proposed in our case?

23  A      Under the revised terms, the annualized rate of those

24  revised terms is between 39 and 40 percent, so the rate in

25  that case was higher.

1   Q     I'd like to go down one section.  Do you see that the

2   next bold heading on the left is summary statistics?

3   A     I do.

4   Q     What is shown in that section?

5   A     In that section, we summarized the 20 data points above

6   into five different metrics below, representing the minimum,

7   the maximum, as well as the 25th percentile median and 75th

8   percentile statistics for those 20 data points.

9   Q     So this summary statistics section reflects statistics

10  that are the compilation of the 20 DIPs that you just

11  identified; is that right, sir?

12  A     That's correct.

13  Q     Let's go through the summary statistics section

14  briefly.  Starting with new dollars, do you see the bold

15  heading near the top of the page "New Dollars"?

16  A     I do

17  Q     What is conveyed in that column?

18  A     The range of new money DIP financings analyzed in this

19  data set range from $60 million to $500 million.

20  Q     And going two columns to the right, "Total," do you see

21  that heading, sir?

22  A     I see.

23  Q     What information is conveyed in the total section of

24  the summary statistics?

25  A     The total DIP size was a summation of the new money

1  DIP, as well as the rollup component, if one existed.  The

2  range of total DIP size in this data set is 110 million to $1

3  billion.

4  Q    And how does that compare to the size of the DIP

5  facility that's been proposed in this case?

6  A    The proposal in this case is within the range of those

7  comparables.

8  Q    Going one column to the right, do you see the heading

9  "Rollup Ratio"?

10  A    I do.

11  Q    What is the rollup ratio?

12  A    The rollup ratio is a comparison of the size of

13  prepetition obligations that are combined with the new money

14  DIP proposal, and so it is a division of the rollup amount by

15  the new money amount.

16  Q    And what was the range of rollup ratios that you

17  observed in the 20 approved DIP financing facilities that you

18  reviewed?

19  A    We observed ratios from zero up to 3.6 times.

20  Q    And how does the rollup ratio contemplated in the DIP

21  facility that's been proposed in this case compare to that

22  range that you observed in prior DIPs that have been approved

23  in other cases?

24  A    The ratio is within that range.

25  Q    Going one column further to the right, do you see the

1  heading "NM Annual Rate"?

2  A     I do.

3  Q     Let's start with NM, what does that mean?

4  A     That's an abbreviation for new money.

5  Q     What's the new money annual rate mean?

6  A     That is the interest rate on the new money financing.

7  Q     And what range of new money annual rates did you

8  observe in the 20 approved DIP facilities that you reviewed?

9  A     For this data set, that interest rate was between eight

10 percent and 18.3 percent.

11 Q     And how does the new money annual rate contemplated in

12 the proposed DIP in our case compare to the range that you

13 observed in other DIPs that have been approved?

14 A     It is within that range and in this case it matches the

15 median interest rate based on the revised terms.

16 Q     Going two columns to the right, do you see the heading

17 "Tenor Interest Percent NM"?

18 A     I do.

19 Q     Let's break that down.  What's tenor interest, sir?

20 A     Tenor interest is the amount of interest that will be

21 earned during the duration of the DIP facility.  So, for a

22 DIP facility that's outstanding for six months, you will earn

23 half the interest rate for that half of a year.

24 Q     And does NM still refer to new money?

25 A     It does.

1   Q      So could you explain to the Court briefly what tenor

2   interest percent new money means?

3   A      That is the amount of interest that will be earned on

4   the new money component during the tenor of the DIP

5   financing, assuming it's outstanding through the maturity

6   date.

7   Q      And what was the range of tenor interest percent on new

8   money that you observed in the 20 approved DIP facilities you

9   reviewed?

10  A      The range was 3.4 percent to 15.1 percent.

11  Q      How does the contemplated tenor interest percent on new

12  money in the DIP proposed in this case compare to the range

13  that you observed in other DIPs that have been approved in

14  other cases?

15  A      Under the revised terms, it would be 6.8 percent, very

16  close to the median again.

17  Q      Now, going one section further to the right, do you see

18  the heading "Illustrative Absolute Return"?

19  A      I do.

20  Q      What information is conveyed in that section, sir?

21  A      What we do in that situation is we normalize both fees

22  and interest rates across the duration of the loan

23  outstanding.  Earning the same amount of fees for a six-month

24  commitment creates more return than an equivalent amount of

25  fees over a 12-month commitment.  So this normalizes into one

1  statistic the relative cost of each DIP financing facility.

2  Q    And how about annualized illustrative absolute return,

3  what does that refer to?

4  A    The annualization takes the tenor-based return and

5  normalizes it for a full 12-month period.

6  Q    What was the range of annualized absolute returns that

7  you observed in the 20 approved DIP facilities that you

8  reviewed?

9  A    The annualized rate was between 10.8 percent and 69

10  percent.

11  Q    And what is the annualized rate contemplated in the DIP

12  that has been proposed in this case?

13  A    Under the revised terms, it's just below 40 percent,

14  between 39 and 40 percent.

15  Q    And how does that compare to the range that you

16  observed in the 20 DIPs that have been approved in other

17  cases?

18  A    It is within the range of comparable DIPs.

19  Q    And how does it compare to the highest end of the range

20  of annualized absolute returns that you observed in the 20

21  approved DIPs that you reviewed?

22  A    It is significantly lower than the higher end, just a

23  bit over half of that rate.

24  Q    Now, let's transition, sir, to talking about the DIP

25  facilities that the debtors received in this case.

1      Do you recall being asked yesterday about a DIP

2  proposal that the 2L lenders made Saturday night, less than

3  24 hours before the debtors filed for bankruptcy?

4  A      I do.

5  Q      Have you seen that proposal before?

6  A      I received it on Saturday night.

7          MR. LOMBARDI:  May I approach, Your Honor?

8          THE COURT:  Yes.

9          MR. LOMBARDI:  Do you want a copy as well, Your

10  Honor?

11          THE COURT:  Yes.  Thank you.

12          MR. LOMBARDI:  Let the record reflect that I am

13  handing the witness a copy of an email dated Saturday night.

14  BY MR. LOMBARDI:

15  Q      Sir, do you recognize this document?

16  A      I recognize the email.

17  Q      What is it?

18          THE COURT:  Hold on one second.

19      (Pause)

20          THE COURT:  Thank you.  Okay, go ahead.

21          MR. LOMBARDI:  Thank you, Your Honor.

22          THE WITNESS:  I also recognize the document.

23  BY MR. LOMBARDI:

24  Q      What is it?

25  A      The email is the transmission from Evercore of the

1  proposal on Saturday night.  The attachment is the

2  recapitalization proposal put forward at that time.

3  Q     And what is Evercore's connection to this case, if you

4  know?

5  A     In the context of this proposal, they're a financial

6  adviser to the 2L and Holdco lenders.

7  Q     And do you see that this Saturday night email from Mr.

8  Patrick Griffin at Evercore was sent to FRG.ducera, among

9  other recipients?

10 A     I do.

11 Q     What is FRG.ducera?

12 A     That is a listserv that enables someone to email one

13 email address and have the contents go to the members of the

14 deal team at Ducera.

15 Q     Do you receive copies of emails sent to that listserv?

16 A     I do.

17 Q     Did you receive a copy of this email on or about the

18 time that it was sent?

19 A     I did.

20 Q     And turning on to page 2 and 3, do you recognize those

21 pages as well?

22 A     I do.

23 Q     What are they?

24 A     This is the recapitalization proposal that Evercore put

25 forward on behalf of their clients on Saturday night.

1  Q     And are these three pages a true and correct copy of

2  the email sent by Evercore on Saturday night and the

3  attachment to that email?

4  A     They are.

5            MR. LOMBARDI:  I offer it into evidence, Your

6  Honor, as Exhibit 1.

7            THE COURT:  Any objection?

8            MR. SHORE:  No objection, Your Honor.

9            THE COURT:  It's admitted without objection,

10  Debtors' Exhibit 1.

11        (Debtors' Exhibit 1 received in evidence)

12  BY MR. LOMBARDI:

13  Q     Turning, sir, to page 2, do you see that page 2, the

14  first page of the attachment, is titled "Discussion

15  Materials"?

16  A     I do.

17  Q     Turning on to the third page, do you see the words in

18  the top left, "Transaction summary, November 2nd, 2L Holdco

19  proposal"?

20  A     I do.

21  Q     And moving to the right, in the upper right-hand

22  corner, do you see the words, "subject to material revision

23  and ongoing diligence"?

24  A     I do.

25  Q     Did you have a reaction to reading those words when you

1  first read them?

2  A    I did.

3  Q    What was your reaction?

4  A    My reaction was it was a very short time frame between

5  receipt of this proposal and the time we would need to file

6  these cases.  We had entered into an RSA on Friday and had a

7  Sunday filing planned.  The material revision made it read as

8  preliminary and raised questions about where the final terms

9  would be for this proposal, and the ongoing diligence created

10  additional uncertainty.

11  Q    At the time that Evercore sent this proposal on behalf

12  of the 2L lenders Saturday night, what diligence, if any, had

13  the 2L lenders already received?

14  A    They had done significant diligence up until that point

15  in the process.  They had done more diligence than other

16  stakeholders in the capital structure.

17  Q    And over what period of time approximately had that

18  diligence occurred?

19  A    I can speak to my knowledge of the period from June

20  through Saturday when we were involved that it was extensive.

21  Q    Do you see the heading description near the top left

22  corner of the page?

23  A    I do.

24  Q    What did you understand to be conveyed in that row of

25  this page 3?

1  A      This was an introduction for a consensual deleveraging

2  and recapitalization of the businesses between the

3  stakeholders of the ABL, the 1L group and the 2L group.

4  Q      And when you say consensual, what did you understand

5  that to mean?

6  A      I interpreted that to mean that each of those three

7  parties would need to agree to the terms of this

8  recapitalization proposal.

9  Q      Did you understand this proposal to be actionable

10  without the approval of the ABL lenders and the 1L lenders?

11  A      I interpreted it to require their approval.

12  Q      Do you see the first sub-bullet that begins, "To be

13  documented via a restructuring support agreement executed by

14  the company, ABL lenders, AHG of the 1L TL lenders, 2L Holdco

15  lenders," do you see that?

16  A      I see that.

17  Q      What if any documentation had the company received from

18  the 2L lenders at this point in time?

19  A      I have not seen any of that documentation.

20  Q      A term sheet?

21  A      No.

22  Q      A draft DIP facility?

23  A      No.

24  Q      Anything at all other than these three pieces of paper?

25  A      Not as related to this transaction.

1  Q      Did you believe -- strike that.

2         What was your understanding of the scope of the

3  proposal that was being made on this page, the third page of

4  Exhibit 1?

5  A      The scope was a comprehensive recapitalization

6  transaction to address the full capital structure and the

7  constituents therein.

8  Q      And could you remind the Court how long after receiving

9  this proposal the debtors filed for bankruptcy?

10  A      About 19 hours.

11  Q      Why did the debtors file for bankruptcy when they did?

12  A      The debtors had a combination of liquidity constraints

13  that required a filing on Sunday and an RSA had been entered

14  into on Friday, which required the same, and there were a

15  number of defaults that were going to occur on Monday had a

16  filing not been submitted.

17  Q      Did you, in your experience as an investment banker for

18  the company, believe that it was possible to achieve and

19  document the proposal contemplated by this one-pager that

20  would require the consent of the 1L and others before the

21  debtors had to file for bankruptcy?

22  A      Not during that timeline, no.

23  Q      Nonetheless, I'd like to talk about one component of

24  this overall proposal.  Do you see one row down the heading

25  "New Money"?

1  A       I do.

2  Q       And do you see that there are a total of six bullets

3  covering a fraction of the page next to that heading?

4  A       I do.

5  Q       What did you understand to be conveyed in that new

6  money section of this Saturday night proposal?

7  A       I understood a component of the recapitalization

8  transaction was a junior DIP-to-exit facility sized at $125

9  million to support the recapitalization.

10 Q       Is that the Saturday night 2L DIP proposal that you

11 were questioned about yesterday?

12 A       That was my understanding of the questioning.

13 Q       Did Ducera develop a view on whether this DIP portion

14 of the proposal was actionable?

15 A       We formed an opinion.

16 Q       What was that opinion?

17 A       That this DIP was not actionable.

18 Q       Why not?

19 A       It was presented as conditional on all the other terms.

20 In this recapitalization proposal, as we discussed, it states

21 that it's subject to material revision and ongoing diligence

22 and, at a minimum, would be required to be documented.

23 Q       And do you see in the first bullet in the new money

24 section, junior DIP-to-exit 125 million provided by 2L Holdco

25 lenders, do you see that?

1   A      I do see that.

2   Q      Did Ducera develop a view on the sufficiency of the

3   $125 million size of the proposal?

4   A      As it related to the form of cases to be filed on

5   Sunday, the day after receipt of this, $125 million was

6   inadequate to address the DIP budget that AlixPartners had

7   created.

8   Q      Sir, can you put that aside.

9          Since Saturday night at 11:00 p.m., have the debtors

10  received any other DIP proposal from the 2L lenders?

11  A      We received one early this morning.

12  Q      And did you receive a copy of that proposal?

13  A      I did.

14          MR. LOMBARDI:  May I approach, Your Honor?

15          THE COURT:  Yes.  Thank you.

16          MR. LOMBARDI:  Let the record reflect that I am

17  handing the witness a copy of the document identified as

18  proposed Exhibit 2 on the exhibit list that the debtors filed

19  this morning.

20  BY MR. LOMBARDI:

21  Q      Sir, do you recognize this document?

22  A      I do.

23  Q      What is it?

24  A      This is the DIP proposal made earlier this morning by

25  Counsel to the 2L and Holdco lenders, as well as an email

1  exchange between Willkie and White & Case as a follow-up to

2  that proposal.

3  Q     And does this appear to be a true and correct copy of

4  the proposal from the 2L lenders and subsequent

5  correspondence between the debtors and the 2L lenders'

6  counsel that you received earlier today?

7  A     It does.

8           MR. LOMBARDI:  Your Honor, I offer it into

9  evidence as Exhibit 2.

10          THE COURT:  Any objection?

11          MR. SHORE:  No objection, Your Honor.

12          THE COURT:  Admitted without objection.

13       (Debtors' Exhibit 2 received in evidence)

14  BY MR. LOMBARDI:

15  Q     Now, sir, I'd like to start on the second-to-last page

16  near the bottom.  Do you see an email from a Mr. Thomas

17  Lauria dated today, November 6th, 2024, at 3:17 a.m.?

18  A     I do.

19  Q     And is this the 2L proposal received overnight that you

20  referred to a few minutes ago?

21  A     It is.

22  Q     Do you see that the email begins, Debi, my clients are

23  prepared to provide a bridge DIP?

24  A     I see that.

25  Q     Now, turning on -- strike that.  Let's start at the

1  bottom of the first page.  Do you see the first bullet that

2  begins, "Single-draw $75 million DIP secured by a lien," do

3  you see that, sir?

4  A     Can you redirect me to that, please?

5  Q     Yes, I'm sorry.  I am on the second-to-last page, the

6  bottom of the email, the bullet point that begins, "Single-

7  draw" --

8  A     I see that.  Thank you.

9  Q     What was your understanding of the size of the DIP that

10  the 2L lenders were proposing?

11  A     I understood it to be a $75 million DIP facility.

12  Q     And did you have or develop a view on whether that was

13  a sufficient amount of money to provide the debtors the

14  liquidity that they needed?

15  A     Relative to the DIP budget and to get the business from

16  here through confirmation, it is insufficient.

17  Q     Now, turning to the next page, the last page of the

18  document, and continuing in the proposal that Mr. Lauria sent

19  shortly after 3:00 a.m. last night.  Heading down to the

20  fourth bullet, do you see that it begins, "Any sale or

21  disposition of the material portion of the collateral other

22  than the assets of American Freight," do you see that?

23  A     I see that bullet.

24  Q     And do you see that it goes on to say, "whether by a

25  363 sale, foreclosure, credit bid, or otherwise, and whether

1  prior to or after conversion to a Chapter 7, or dismissal of

2  the case of any debtor who owns the collateral, must provide

3  for payment in cash in full upon the closing of such sale or

4  disposition," do you see that?

5  A    I see that.

6  Q    Do the debtors presently intend to convert to Chapter

7  7, sir?

8  A    They do not.

9  Q    Let's go back to the beginning of the document.  I'm

10 going to ask you to turn to the second -- strike that --

11 we'll start at the bottom of the first page.

12      Do you see that at 6:30 a.m. this morning Mr. Lauria

13 wrote to Ms. Sinclair and others an email that began, Debi,

14 we would prefer to advance our discussion, do you see those

15 words?

16 A    I see those.

17 Q    And do you see that the email goes on to contain a

18 number of numbered questions with text under each of the

19 questions?

20 A    I see that.

21 Q    Did you have an understanding of who posed those

22 questions?

23 A    My understanding is Ms. Sinclair at Willkie Farr

24 proposed those questions.

25 Q    Going on to page 2, the middle of the page, do you see

1    number 8, "Does the proposal contemplate a marketing process

2    for the assets," do you see that?

3    A     I see that.

4    Q     And do you see the answer reads, "I think marketing of

5    the assets should be put on hold," do you see those words?

6    A     I do see that.

7    Q     Did you as an investment banker to the debtors develop

8    a view of the advisability of putting the process of

9    marketing debtor assets on hold?

10   A     I did.

11   Q     What was that view?

12   A     My view was that as marketing commenced earlier this

13   week, that it would be disruptive to the process to now put

14   it on hold after potential counterparties to those

15   transactions have already been contacted.

16   Q     And could you remind the Court what assets are being

17   marketed?

18   A     The three going-concern Opcos, the Pet Supplies "Plus"

19   business, Vitamin Shoppe, and Buddy's, as well as the

20   totality of the business.

21   Q     And could you give the Court a sense of the amount of

22   the debtors' overall assets that the pieces you've just

23   described constitute?

24   A     They constitute three of the four operating businesses.

25   We expect American Freight to be liquidated and, therefore,

1  they would be the totality of the debtors' businesses and

2  assets.

3  Q     And, in your experience as an investment banker for the

4  debtors, what if any impact do you believe putting the sale

5  process on hold for 30 days would have on the value that the

6  debtors might obtain in a sale?

7  A     My concern is that launching a sale process and then

8  pausing a sale process would be confusing to counterparties.

9  It may cause certain counterparties to not participate in the

10  process.  To the extent less parties participate in the

11  process, that could lead to less competition for the

12  businesses, and that could have a negative impact on the

13  ultimate value achieved.

14  Q     You can put that aside, sir.

15        Stepping back to the entirety of the DIP proposals that

16  the debtors received, did you develop a view of what package,

17  viewed in its entirety, was the best available DIP facility?

18  A     I did.

19  Q     What was that view?

20  A     The DIP proposal being put forward by the debtors today

21  is the best available financing package for the business.

22  Q     And did you develop a view of how that proposed DIP

23  facility, viewed in its entirety, compares to the DIP

24  facilities approved in 20 other bankruptcies that you

25  reviewed?

1  A     The terms of this DIP facility are within the range

2  observed for other comparable DIP facilities analyzed.

3           MR. LOMBARDI:  I pass the witness, Your Honor.

4           THE COURT:  Thank you.

5           Cross?

6                    CROSS-EXAMINATION

7  BY MR. SHORE:

8  Q     Good afternoon, Mr. Grubb.  Why don't we start with the

9  demonstrative that your counsel gave you.  Do you have any

10 idea when that demonstrative was given to anybody outside the

11 debtors?

12 A     This specific demonstrative would have been shared this

13 morning.

14 Q     All right.  So when we start talking about things that

15 came early in the morning, 3 o'clock in the morning, do you

16 have any idea when the demonstrative was sent to any of the

17 creditors of the debtor?

18 A     I was told it was being sent around 10:00 a.m.

19 Q     Around 10:00 a.m.  So this demonstrative that you

20 prepared, let's start there.  When was this demonstrative

21 actually finished?

22 A     This morning, around --

23 Q     Okay.  When was the demonstrative started?

24 A     Several months ago.

25 Q     Several months ago.  Was this demonstrative ever shown

1  to any board of any debtor?

2  A      This one was not.

3  Q      Okay.  And who actually prepared the demonstrative, was

4  that you typing in or doing Excel spreadsheet work?

5  A      It was the team that reports to me.

6  Q      Okay.  What work, if any, did you do on this

7  demonstrative?

8  A      I commented extensively, I asked questions, I went

9  through it with the team.

10 Q      Okay.  Now, this list of company -- companies on the

11 other side, those are all references to DIP orders, right?

12 A      The names are all debtors.

13 Q      Right, but what you're -- the data here is taken from

14 the DIP orders?

15 A      Correct.

16 Q      Okay.  Which of these DIP orders did you read cover-to-

17 cover?

18 A      None of them.

19 Q      Okay.  Which of these DIP orders were interim orders

20 and which were final?

21 A      I believe these all represent final DIP orders.

22 Q      Final orders.  So, if we're trying to figure out what

23 should happen on an interim order, this chart doesn't tell

24 you anything about it then, right?

25 A      I would not agree it does not tell us anything --

1  Q      Well --

2  A      -- I don't agree with that statement.

3  Q      -- it -- well, let's -- but to be clear, you believe

4  these are all final orders that were entered.  Which of these

5  orders did anybody object to?

6  A      I don't know.

7  Q      So, as far as you know, all of these could be consent

8  orders that were put on a docket that nobody in a case had

9  objected to?

10  A      That's possible.

11  Q      Okay.  Which jurisdiction were these done in?

12  A      It's not included in the schedule.

13  Q      Okay.  Now, just to be clear, did you expect that if

14  you gave the demonstrative to the creditor body at 10:00 a.m.

15  every single creditor would have an opportunity to go through

16  this demonstrative and check to see that you got the data

17  right in these charts?

18  A      Checking the work was not the expectation.

19  Q      Okay.  So what are we supposed to do?  Did you -- are

20  you saying that nobody at Ducera -- first of all, I guess

21  Ducera takes orders, DIP orders, and puts them into a

22  database somewhere?

23  A      We pulled the filings and summarized the information.

24  Q      When you say we, do you do that?

25  A      I did not pull the filings.

1  Q    Okay.  So can you testify under oath that the person,

2  the unnamed person at Ducera who pulled out one of these

3  final orders and wrote down the metrics did it correctly?

4  A    It was represented to me that these were both pulled

5  and checked by the team.

6  Q    Pulled and checked by the team.  Who was that person

7  who did that?

8  A    Keyshawn (ph) was overseeing the team with a number of

9  people reporting to them.

10 Q    Was Keyshawn unavailable to come into court today and

11 testify about the work that he did?

12 A    He was not requested to be here.

13 Q    Okay.  I assume, if you requested him to be here,

14 Keyshawn would have been here to talk about whether he did

15 the work right?

16 A    That's correct.

17 Q    Okay.  Which of these entities had a competing DIP

18 proposed, or which of these orders was in the context of a

19 case in which a competing DIP was put on in place?

20 A    I don't have that detail.

21 Q    Okay.  Do you have knowledge, personal knowledge of how

22 the team, not you, went around selecting the actual ten or

23 twenty here?

24 A    We discussed that process, yes.

25 Q    Okay.  Did you go -- first of all, is the database

1  publicly available?

2  A     The information is all publicly available information.

3  Q     Is the database publicly available?  Does Ducera make

4  it possible for people outside Ducera to access the database

5  and run data?

6  A     We do not share our internal database externally.

7  Q     Okay.  Now, is it your representation that these 20

8  DIPs are the only DIPs in the database that fit the metrics?

9  A     These were the 20 we selected for highest comparability

10  to these cases.

11  Q     Who did the selection?

12  A     The full team, including myself, discussed different

13  cases, which ones to include and exclude.

14  Q     Okay.  So how many did you -- sorry, again, you didn't

15  read any of these orders, right?

16  A     That's accurate.

17  Q     You just looked at some dataset and said let's use

18  these 20?

19  A     No, we discussed the elements of the case, we discussed

20  the dynamics of the DIP treatment, we looked at the size,

21  complexity of the cases.  We looked at a number of factors to

22  determine comparability to this case.

23  Q     When you say -- you keep saying we, I want to know what

24  you did.  What did you do?

25  A     I discussed aspects of many of these that were both

1  included and excluded, I asked the team questions about the

2  filings, questions about the dynamics around the case to

3  determine comparability and whether or not they should be

4  included.

5  Q    Okay.  By the way, have you ever provided an expert

6  opinion as to what is or is not market on an interim DIP?

7  A    I've had testimony proffered, but not an expert report.

8  Q    Okay.  And would you consider this an expert analysis

9  of yours where you're representing to the Court that this is

10 Ducera's view with respect to what is market for an interim

11 DIP?

12 A    This is our representation of what is market for DIPs

13 approved on a final basis.

14 Q    DIPs approved on a final basis.  And, to be clear, did

15 you produce all of the work -- all of the expert reports that

16 Ducera has done over time on the subject of market DIPs?

17 A    I did not review those.

18 Q    Did you provide anybody your CV that lists all of the

19 prior testimony you've given in other cases regarding your

20 testimony either proffered or given in court?

21 A    I don't believe it was requested and it was not

22 provided.

23 Q    Okay.  Now, did you keep a tally of the -- first of

24 all, did you do the selection in -- of you got a dataset, and

25 you decided to exclude some comps and keep some things in --

1    did you keep a dataset of what you excluded?

2    A    There is a broader database that would have DIPs that

3    were excluded.

4    Q    And talk to me about this exclusion process.  Were you

5    all sitting in a room together?

6    A    For some of it; for some of it, we were telephonic.

7    Q    Okay.  And how long did the Ducera team spend sitting

8    around, thinking which ones should we show the Judge and

9    which ones should we not?

10    A    We iterated on it over a period of weeks, if not going

11    back a month or two.

12    Q    No, no, I'm talking about -- I'm talking about the

13    demonstrative that you gave to the Court.

14    A    The demonstrative as, you know, fairly close as of a

15    day or two ago.  So the incremental time spent on it over the

16    last 24 hours is I probably spent two hours on it, the team

17    would have spent significantly more than that.

18    Q    Okay.  So sometime between your testimony yesterday and

19    today you spent two hours massaging a document so that you

20    could give it to the creditor body at 10:00 a.m., and have

21    them come in in the early afternoon and cross you on whether

22    or not any of these things are actually comparable?

23    A    In the last 24 hours, that's approximately correct.

24    Q    Okay.  First of all, do you think that's fair?  Do you

25    think it's fair to ask the creditor body to check your work

1  in a matter of hours while preparing for a hearing?

2  A      I don't understand your characterization of fair.

3  Q      Well, I guess you didn't expect that people were

4  actually going to be able to check your work, right?

5  A      The expectation was that this would be used as a tool

6  to communicate our perspective on market rates and terms for

7  comparable DIP facilities.

8  Q      Which of these cases that are listed in the

9  demonstrative did you personally work on?

10 A      I did not work on any of these cases.

11 Q      Okay.  And just to be clear, what was the scientific

12 method or process by which you went around selecting the

13 comps, would you consider that a scientific process?

14 A      I think it was a diligent process that followed

15 criteria.

16 Q      Right, but as we sit here right now, we don't know

17 actually, nobody knows except you, but you can't tell us, the

18 actual dataset from which the comps you're putting in front

19 of the Court today were selected?

20 A      Well, I disagree with that characterization.  The

21 dataset they were selected from was the DIPs that we track in

22 our database, which I believe to be fairly inclusive, and

23 then we looked through that for DIP facilities of comparable

24 size, duration, and general scale of cases comparable to

25 these.

1  Q      When you say, "fairly" -- by the way, does Ducera track
2  every DIP order that's entered?

3  A      I don't believe we track every DIP order.

4  Q      So we're just guessing as to -- first of all, are you
5  responsible, personally, for deciding which DIPs go into the
6  database?

7  A      Not into the database.

8  Q      Right.  So we're, again, relying on somebody outside of
9  court to be diligent about making sure that when DIPs are
10 entered into, they get into the database?

11 A      We also did screening to make sure no DIPs had been
12 excluded that we thought might be relevant in terms of case
13 filings over the last two years or since January of '23.

14 Q      Okay.  And so just to be clear, this demonstrative that
15 you testified to says nothing about what happens with DIPs at
16 an interim hearing?

17 A      This does not address interim approval.

18 Q      One last question.

19        I'll represent to you the only one of these cases that
20 was cited in the debtors' DIP motion was the first one, ATD.
21 Do you have any understanding as to why none of these other
22 cases were cited in the DIP motion as relevant to the Court's
23 consideration?

24 A      I can't speak to that exclusion.

25 Q      And I guess one last question.

1      You're not making any of these -- you haven't brought

2   each of these DIP orders here today so that we can review

3   them all, right?

4   A      I do not have the documentation with me.

5   Q      Okay.

6           MR. SHORE:  Your Honor, I'm just going to ask to

7   strike the testimony with respect to this.  Fundamentally,

8   it's a fairness one.  I don't know how we're supposed to

9   respond to this.

10          I can bring the team and we could get the orders

11  and I could show you that the math is wrong in some of these,

12  but I don't find that to be particularly persuasive.  And I

13  could bring other orders that were entered in other cases

14  that aren't on this list that have lower fees.

15          But I just find that where we are right now, this

16  isn't particularly probative of the issue that Your Honor

17  raised, so I'd just ask to strike the testimony or afford it

18  the little worth that I think it merits.

19          MR. LOMBARDI:  May I be heard, Your Honor?

20          THE COURT:  Yes.

21          MR. LOMBARDI:  We're here on an interim emergency

22  basis seeking interim approval of a DIP for money that the

23  debtors need desperately.  And we're trying to give Your

24  Honor a sense of precedent from other cases.  There will be

25  time before the final hearing for both sides to put together

1  their assessment of market precedence, which may be very

2  different and present more fulsome testimony to Your Honor,

3  but we offer this today as Your Honor considers emergency

4  relief.

5         THE COURT:  I'm not going to strike it.  I'll take

6  the testimony for what it is.

7         MR. SHORE:  I'm not sure I caught what the exhibit

8  number was.  Could you bring up the or could you bring out

9  the November 2nd email that you were shown.  I guess it was

10 Exhibit 1, was it?  Oh, yeah, Debtors' Exhibit 1.  Okay.

11 BY MR. SHORE:

12 Q    Sir, you were in charge of communicating with Evercore

13 regarding this case, right?

14 A    I was.

15 Q    And you've been back-and-forth with Mr. Aronson since

16 you joined the job, right?

17 A    That's correct.

18 Q    And you find him to be professional, yes?

19 A    I do.

20 Q    And responsive?

21 A    I do.

22 Q    So when you ask him something, he tries to get back to

23 you as quickly as he can?

24 A    That's a fair characterization.

25 Q    Okay.  When did you give -- sorry -- when did the

1  debtors, to your knowledge, first give the DIP term sheet and

2  DIP budget that was included in the DIP motion that was filed

3  on Sunday night?

4  A     I don't know the timing of that.

5  Q     Was it weeks ago or was it sometime last week you gave

6  the DIP budget and DIP term sheet?

7  A     It was sometime last week.

8  Q     Okay.  So when you were saying, They didn't get it to

9  me until Sunday night, isn't it a fact that you didn't give

10 them something to respond to until sometime last week, right?

11 A     No, that's not accurate.

12       They had seen multiple interim DIP budgets.  They had

13 not seen the final DIP budget until last week, but they had

14 seen many versions of DIP budgets for different filings all

15 along the way.

16 Q     And what about the DIP term sheet, so they knew what

17 they were bidding against?

18 A     That was provided, to my understanding, last week.

19 Q     Yeah, so when you were complaining that you didn't get

20 the responsive DIP until Sunday night, it's due, in part, to

21 the fact that you didn't give the DIP term sheet, against

22 which the bid was made, until last week?

23 A     I disagree with the characterization that their

24 proposal was dependent on seeing the DIP term sheet, as they

25 had the information necessary to formulate a proposal.

1  Q     In Mr. Griffin's email, do you find him to be

2  professional?

3  A     I do.

4  Q     And do you find him to be responsive?

5  A     I do.

6  Q     And do you see at the end he says, "Let us know if

7  helpful to discuss."

8        Do you see that?

9  A     I do.

10 Q     Did you try -- you said you had 19 hours between the

11 time you got this and the filing -- did you try to talk to

12 them about this proposal?

13 A     I responded to the email after receiving it, confirmed

14 receipt, and asked if the same proposal had been delivered to

15 the 1L lenders.

16 Q     Okay.  Did you engage, at all, with Evercore or any of

17 the 2Ls, with respect to this particular DIP proposal?

18 A     I did not speak to either Evercore or the 2Ls related

19 to this specific proposal.

20 Q     Are you aware of whether anybody at the company engaged

21 in those 19 hours with anybody from Evercore on behalf of

22 the 2Ls?

23 A     We had a conversation with the 1Ls.  The 1Ls agreed

24 that they were going to reach out to Evercore and communicate

25 that this was not acceptable to them and that would be the

1  communication that this consensual transaction would not be

2  pursued.

3  Q     Just so the record is clear, you're not aware that the

4  debtors ever reached out, directly, to Evercore or any 2L

5  lender representative to discuss the term sheet, which is

6  attached to Exhibit 1?

7  A     I'm not aware.

8  Q     Okay.  So, again, you didn't counter to this at all,

9  right?

10 A     There was no counter.

11 Q     And you said one of the issues was it seemed like the

12 DIP proposal was contingent upon the term sheet, right?

13 A     That was my interpretation of the proposal.

14 Q     How long would it have taken you to type up on email:

15        Hey, Dan, is -- are you willing to do this DIP,

16 not conditioned upon the rest of the transaction?

17 A     It's not a long email.

18 Q     Right.

19        But you didn't do that, right?

20 A     I did not do that.

21 Q     You could have asked any member of your team, write to

22 Dan, say, I got a question here about this DIP proposal.  Can

23 you delink it from the rest of the term sheet?

24        But nobody sent that email, right?

25 A     Not to my knowledge.

1  Q    And nobody picked up the phone and asked that question,

2  right?

3  A    Not to my knowledge.

4  Q    So when you said it was unclear, is it fair to say the

5  reason it was unclear is because you didn't pick up the phone

6  or send an email and ask, right?

7  A    What, specifically, did I say was unclear?

8  Q    Whether or not the DIP could be delinked, the DIP in

9  that second page could be delinked from the rest of the

10 proposal?

11 A    It was not my interpretation of this proposal that that

12 could be delinked from the overall consensual transaction.

13 Q    Were you here this morning when Mr. Goldstein got up

14 and announced that he heard His Honor loud and clear and they

15 were making changes to the DIP?

16 A    I was here for that.

17 Q    When did the 1Ls first propose changes to the DIP that

18 they would be willing to do?

19 A    There was an email late last night around slight

20 changes to the DIP that I saw.

21 Q    Okay.  And what were those changes?

22 A    Those changes related to the two HoldCo entities and

23 potentially the roll-up amount.  I don't remember the second

24 part (indiscernible).

25 Q    Okay.  So it wasn't everything that he laid out today,

1   including the reduction in the fees and the reduction in the

2   interest, and that whole package he talked about, right?

3   A    The first set of proposed terms adjustments was far

4   more limited than what was presented earlier.

5   Q    Right.

6        So now, let's go to Exhibit 2, and I'd ask you to turn

7   to the second-to-last page, which came at 6:18 -- or,

8   sorry -- 6:08 in the morning from Ms. Sinclair.

9        Do you see that?

10  A    I do.

11  Q    And it says:

12          "Please let us know you already sent it to

13  the 1Ls, otherwise, we intend to."

14       Do you see that?

15  A    I see that language.

16  Q    And this DIP, was this email, to your knowledge,

17  forwarded on to the 1Ls?

18  A    Not to my knowledge.

19  Q    Were the 1Ls apprised that there was going to -- there

20  was a proposal being made for a $75 million bridge DIP?

21  A    Not to my knowledge at 6:08.

22       At some point this morning, they were made aware of

23  that.

24  Q    Okay.  So sometime between when Mr. Goldstein said he

25  heard His Honor loud and clear and said, I'll take away --

1  all you can testify to is, I'll take away the HoldCo

2  guaranties, they saw the competing DIP that's in Exhibit 2

3  and came back in a whole host of changes, right?

4  A    The changes that were laid out were communicated to me

5  after 6:08 this morning.

6  Q    Right.

7       So, in other words, Mr. Goldstein and his clients

8  concessions came after they heard the 2L proposal?

9  A    I can speak to the order in which things were

10  communicated to me.

11  Q    Okay.

12  A    The concessions that were communicated to me came after

13  this email that you referenced.

14  Q    Okay.  Now, let's go to the first page of Exhibit 2,

15  and we are available -- where Mr. Lauria says:

16           "We are available to discuss all of this, this

17  morning, whenever convenient for you."

18       Do you see that?

19  A    I do.

20  Q    And that's a repeat of a message that Mr. Lauria gave

21  at 3:17 in the morning, right?

22  A    Slightly different words, but the same message.

23  Q    Yeah.

24       And do you find Mr. Lauria to be responsive?

25  A    I do.

1  Q    Okay.  Between 3:18 in the morning, had you had any

2  substantive discussions with a 2L lender or a 2L

3  representative regarding the matters discussed in Exhibit 2?

4  A    I have not.

5  Q    Okay.  So no emails got sent -- we've got some

6  questions -- no counter was given, anything like that, right?

7  A    I did not send those.

8       Willkie sent comments that we discussed and coordinated

9  on --

10  Q    Okay.  I'm going to come --

11  A    -- to Mr. Lauria.

12  Q    -- to that.

13  A    Okay.

14  Q    Outside of this email chain, are you aware of the

15  debtors' countering to the DIP proposal?

16  A    I'm aware of phone calls that took place today and this

17  email chain.  I'm not aware of a written counter beyond this

18  exchange.

19  Q    Okay.  And one of the things you were concerned about

20  was the amount of liquidity.

21       Do you know whether the debtors ever, ever asked

22  whether or not that 75 could be outside?

23  A    I'm not aware if that question was asked.

24  Q    Okay.  And you heard Mr. Goldstein when he got up and

25  represented to the Court that the 1L lenders are all about

1  saving the company or something to that effect, right?

2  A      I heard what Mr. Goldstein said to the Court.

3  Q      Right.

4        Now, one of the things you said with this DIP would be

5  the risk that it doesn't get taken out, right?  It doesn't

6  provide you enough liquidity to get to the exit?

7  A      I didn't reference whether it was taken out or not; I

8  referenced or I made comment that the $75 million, based on

9  the current budget, is insufficient to get us from here to a

10 confirmation of the plan.

11 Q      But it is sufficient to get you to the beginning of

12 December, right?

13 A      That's not my knowledge, based on AlixPartners'

14 comments this morning on the liquidity necessary to operate

15 the business.

16 Q      Okay.  By the way, there was a reference to a board

17 meeting in the opening remarks.

18        Did you attend the board meeting?

19 A      I did.

20 Q      Okay.  And which board?

21 A      This was the FRG Board.

22 Q      The FRG, Inc. Board or the FRG TopCo Board?

23 A      The TopCo Board.

24 Q      Okay.  So the only board meeting you ever saw was for

25 the equity holders who are five or six levels above the

1   OpCos, right?

2   A    I don't know the constituents of all the OpCo boards

3   and how many of the board members were also on the board call

4   this morning.

5   Q    So I just want to understand the risk that it's not --

6   sorry -- I can ask Mr. Orlofsky, I guess, about how much they

7   need to get to the final hearing and whether we can even

8   expedite a final hearing to bridge us to then.

9        But do you perceive there to be a real risk that what

10  the 2L lenders will do is, instead of going forward with the

11  final DIP, they'll just decide not to fund the case at all

12  and send it into liquidation?

13  A    I don't know the 2Ls' intentions.

14  Q    Okay.  So it is, in your mind, the 2L people that

15  you've been dealing with are of a character to say, You know

16  what, rather than take out a $75 million DIP for no fees or

17  anything else, we're going to send this company into

18  liquidation?

19  A    What I have observed is that the $75 million is

20  insufficient to get us from here through the cases.

21  Q    Uh-huh.

22  A    There would need to be additional financing raised from

23  stakeholders or third parties to continue funding the cases.

24  And as part of this, to the extent the 2Ls didn't fund it,

25  this financing would need to be refinanced at that time.

1  Q      Correct.

2         But the 2Ls have committed to provide $250 million of

3  funding on a final basis, right?

4  A      You said the 2Ls?  I'm not aware --

5  Q      I'm sorry, the 1Ls.  Sorry, the 1Ls, right.

6  A      The 1Ls have, correct.

7  Q      Right.  So -- and that's contained in a motion that's

8  going to be set for a final hearing, right?

9  A      Correct.

10 Q      And is it your concern that what's going to happen is

11 if the $75 million gets funded, the 2Ls are going to --

12 sorry -- the 1Ls are going to say, I'm pulling the motion.

13 I'm not going to provide the $250 million this company needs.

14 I'm sending it into liquidation.

15        That's your concern?

16 A      I have a concern that the RSA would be terminated.

17 We'd be in a very different position, as it relates these

18 cases.

19        I have concerns about the value degradation that could

20 occur from an uncertainty around these cases and insufficient

21 liquidity in the business and what that may do to disrupt

22 eventual emergence from Chapter 11.

23 Q      Are you aware of any 1L lender representative saying

24 they will not go forward with the final DIP if the company

25 accepts a bridge finance to get it to a final hearing?

1  A     I'm not aware of that specific assertion from a 1L

2  lender.

3  Q     Okay.  And you were at the board meeting this morning,

4  did you hear anybody express to the board, in form or

5  substance, that the advisors thought that there was an

6  appreciable concern that if the debtors accept the

7  $75 million bridge finance to get them to a final hearing,

8  the 2L lenders are going to refuse to fund the company with

9  $250 million to get them to the sale of their collateral?

10 A     I apologize for keep going back to this.  I just want

11 to be precise, you referenced the 2L lenders again.

12 Q     Oh, sorry.  And I'll rephrase.  It's been a long night

13 for all of us.

14       You were at the board meeting, right?

15 A     Correct.

16 Q     And did anybody express to the board a concern that if

17 the company accepted a $75 million bridge finance to get us

18 to a final hearing, that the 2L -- sorry -- the 1Ls --

19 the 1Ls would not go forward with the $250 million final DIP?

20 A     That specific hypothetical was not addressed at the

21 board meeting.

22 Q     Okay.

23          MR. SHORE:  I have no further questions, Your

24 Honor.

25          THE COURT:  Any cross, Mr. Fox?

1          MR. FOX:   Good afternoon, Your Honor.

2          Tim Fox on behalf of the United States Trustee.

3    Just a couple of additional points and I'll try not to be

4    duplicative of Mr. Shore's cross-examination.

5                    CROSS-EXAMINATION

6    BY MR. FOX:

7    Q     Good afternoon, Mr. Grubb.

8    A     Good afternoon.

9    Q     So, with respect to the demonstrative and, again, I

10   understand Mr. Shore's earlier comments and the Court's

11   comments on the same, but I just wanted to ask, to your

12   knowledge, were any of the fee comparables listed part of an

13   RSA transaction?

14   A     I don't know.

15   Q     Thank you.

16         And with respect to the comparables, did any of those

17   capital structures feature multiple tranches of secured debt,

18   to your knowledge?

19   A     I don't know, specifically.

20   Q     And I think this was covered, but I just want to

21   confirm.

22         With respect to those comparables, are you aware of any

23   of those being entered over an objection from parties in

24   interest?

25   A     I'm not aware.

1  Q      Thank you.

2            MR. FOX:  That's all I have, Your Honor.

3            THE COURT:  Thank you.

4            Redirect?

5            MR. LOMBARDI:  Briefly, Your Honor.

6            For the record, Stuart Lombardi of Willkie Farr &

7  Gallagher for the debtors.

8                     REDIRECT EXAMINATION

9  BY MR. LOMBARDI:

10 Q    Mr. Grubb, when did you and your team begin the

11 analysis of approved DIPs that you testified about earlier?

12 A    The original analysis was put together as part of the

13 DIP terms negotiations with the 1L lenders.  That process

14 started in either September or early October and it was to

15 prepare a response to the terms sheet that they originally

16 put forward.

17 Q    And you said, "the original analysis," how, if at all,

18 did that analysis evolve over time?

19 A    We looked at additional cases as additional cases were

20 filed.  And inquiry, as it related to a further 1L response

21 to our original terms, we asked Lazard to provide their

22 comparables and cases they would look to in support of their

23 counterproposal to us.  We analyzed those cases.  We included

24 some, but not all of those, in a further revised list.

25 Q    And at that point in time, what were you using the

1  analysis to do?

2  A    We were using the analysis to guide our negotiations of

3  the terms of the 1L lenders.

4  Q    And what, if any, information about that analysis was

5  conveyed to management or the board?

6  A    Management saw an earlier version of this schedule.

7         THE COURT:  Hold on.  We have an objection.

8         MR. SHORE:  Objection, Your Honor.

9         The only scope of cross is I can't get up and ask

10  the witness on recross about what he's testifying to and he's

11  got to be held to the questions or the subjects I asked.

12         I did not ask about what the Board had been

13  advised over time, specifically.

14         MR. LOMBARDI:  Your Honor, what I was getting at

15  here was the purpose for which this analysis was developed,

16  but I can move on.

17         THE COURT:  Okay.

18  BY MR. LOMBARDI:

19  Q    Mr. Grubb, what level of confidence and comfort do you

20  have in the accuracy of the market data that you testified to

21  on direct examination earlier?

22  A    I have a high level of confidence.

23  Q    Why is that?

24  A    The team and the process they were instructed to

25  undertake to pull filings, check the numbers, and scrub these

1   numbers was extensive.  We reviewed it as a team, including

2   myself reviewing it.  We looked for data that didn't match or

3   make sense with our understanding of the various cases and

4   terms.  And we revised the analysis under further inquiry

5   until we were satisfied with the information on this exhibit.

6              MR. LOMBARDI:  Nothing further, Your Honor.

7              THE COURT:  Okay.  Thank you.

8              Thank you, Mr. Grubb.  You may step down.

9              MR. SHORE:  If I may, Your Honor, just a few

10  questions?

11             THE COURT:  Is this redirect?

12             MR. SHORE:  This is redirect, Your Honor.

13             THE COURT:  Redirect?  Well, you didn't direct

14  him; how can you redirect?

15             MR. SHORE:  Supporting party in favor of this,

16  Your Honor.

17             THE COURT:  It's too late.  You should have done

18  that in between, not -- you should have done it after his

19  direct, not now.

20             MR. SHORE:  All right.  Thank you.

21             THE COURT:  Thank you.

22             You may step down.

23             THE WITNESS:  Thank you.

24        (Witness excused)

25             MR. DUGAN:  Good afternoon, Your Honor.

1        This is Jim Dugan from Willkie Farr & Gallagher

2   for the debtors.  The debtors would like to call our next

3   witness, David Orlofsky.

4        THE COURT:  Mr. Orlofsky, please come forward.

5   Please remain standing for the oath.

6        THE CLERK:  Please raise your right hand.

7        Please state your full name and spell your last

8   name for the court record.

9        MR. ORLOFSKY:  David Orlofsky, O-r-l-o-f-s-k-y.

10        DAVID ORLOFSKY, DEBTORS' WITNESS, AFFIRMED

11        THE WITNESS:  I do.

12        THE CLERK:  Please be seated.

13                      DIRECT EXAMINATION

14   BY MR. DUGAN:

15   Q    Good afternoon, Mr. Orlofsky.

16   A    Good afternoon.

17   Q    Can you please state your position at the debtors?

18   A    I am the chief restructuring officer.

19   Q    And what do you do as chief restructuring officer of

20   the debtors, very briefly?

21   A    So, I effectively lead the restructuring aspect of the

22   restructuring process with the -- in conjunction with working

23   with the management team and the other advisors, the lawyers

24   at Willkie Farr, Ducera, and others that are working on this.

25   Q    And are you familiar with, as part of your role, are

1  you familiar with the aspects of the day-to-day operations of

2  the debtors --

3  A    I am.

4  Q    -- such as their cash position?

5  A    I am.

6  Q    Payroll?

7  A    Correct.

8  Q    Their relationship with vendors and the status of

9  payment with the vendors?

10 A    I am, yes.

11 Q    And you also are a managing director at AlixPartners;

12 is that right?

13 A    Correct.

14 Q    And you have a team that reports to you there?

15 A    I do.

16 Q    Now, could you describe, Mr. Orlofsky, the debtors'

17 business?

18 A    So the debtor has for distinct businesses that are kind

19 of all under the same umbrella; we refer to them as the four

20 OpCos.  They have The Vitamin Shoppe, which sells vitamins

21 and health and wellness at a retail.  They have American

22 Freight, which sells just -- unlike the name -- it sells

23 things like mattresses and furniture and appliances.  That

24 business is, unfortunately, in the process of liquidating.

25 They have a Buddy's business, which also sells on a franchise

1  basis, furniture, as well, and then the pet supply business,

2  PSP, which sells Pet Supplies, you know, at retail and has a

3  franchise network that it uses to do that.

4  Q    And do these different businesses that you're

5  describing, do they have different vendor bases?

6  A    They do.

7  Q    And how does that affect their cash use, the cash use

8  of the business of Franchise Group?

9  A    Yeah, they each have a different -- they all kind of

10  manage, under normal circumstances, manage their businesses

11  independently and then funnel cash up to the TopCo, as

12  needed, to pay for certain corporate expenses and things like

13  that.  But they each have to manage their own business and

14  manage their payables and their vendors and the like.

15  Q    And with respect to the amount of cash that's used, do

16  you have a sense, in terms of a weekly basis, the cash use of

17  the enterprise?

18  A    At the individual level, yes.  We have -- it's in

19  the 13-week cash flow forecast that we provided, the DIP

20  budget, and we have been helping the company prepare those

21  forecasts since we got involved in late July.

22  Q    What would you say, you know, on an average what would

23  be the -- you describe as the cash use of the business?

24  A    On a consolidated basis, it's like $55ish million per

25  week.

1  Q      And am I correct, Mr. Orlofsky, then, as part of the

2  first day motions, the debtor is seeking to pay certain

3  critical vendors 503(b)(9) vendors, shippers, and foreign

4  vendors?

5  A      Correct.

6  Q      Okay.  And can we go through those categories and

7  just --

8  A      Sure.

9  Q      -- describe your understanding of what those --

10 A      Sure.

11        503(b)(9) is part of the Bankruptcy Code; it deals with

12 goods received 20 days prior to the bankruptcy.  They --

13 those goods receive administrative priority status and can be

14 paid either during the pendency of the case or at the end of

15 the case.  But in order to emerge from bankruptcy, the

16 administrative claims need to be paid.

17        Critical vendor is another bucket that has a more

18 subjective nature to it that the company, as we've developed

19 the list of the critical vendors, in conjunction with the

20 management teams at the various entities to identify those

21 vendors who have certain, provide certain critical products,

22 whether it's a unique product that's maybe small in nature,

23 that's -- particularly, to places like The Vitamin Shoppe

24 that kind of has a lot of unique products and that's kind of

25 what their brand is, to more important products that maybe

1   are needed at, or expected at other stores.  But it covers a

2   wide variety of different things and we go through it and

3   it's more, sometimes -- you know, it's subjective in nature

4   and what's critical and what's not.

5       The shippers is typically a product that is held by

6   various trucking agencies or shipping companies and we like

7   to pay those because sometimes if you don't pay them, they

8   don't deliver, so -- but -- and then there's some foreign

9   vendors here, which we also pay.  That's a smaller number of

10  the component piece; it's the smallest of the four.

11  Q    Now, do you understand, Mr. Orlofsky, how much the

12  debtors were, originally, in their motion, seeking to pay on

13  an interim basis, the vendors -- the sort of vendors you're

14  discussing?

15  A    Yes.  Originally, it was $77 million.

16  Q    And has that been revised?

17  A    It has.

18  Q    What is it now?

19  A    Sixty-five.

20  Q    And is there a breakdown in that 65?

21  A    Thirty-five today, effectively, and then 30 on an

22  interim piece, which, as I understand it, could be in the

23  next couple of weeks, over the next couple of weeks.

24  Q    Do you know -- do you have an understanding as to

25  whether, in that terms of that 30, there'd be any requirement

1  to go to court or seem some Court approval for that?

2  A     For the second draw, yes, we would need to come back to

3  get Court approval.

4  Q     Now, in terms of the breakdown, if we'd be receiving

5  these funds, what's your sense of who the largest group would

6  be in this category of vendors?

7  A     In terms of the 503(b)(9) or...

8  Q     Just in terms of the vendors who would be receiving the

9  money through this motion to pay for the --

10 A     Yes, these are all the vendors that are important to

11 the company.  Most of them are at PSP and Vitamin Shoppe,

12 which are our two biggest entities.  And there are a lot of

13 their major vendors that they get product from frequently.

14       You have to understand that PSP has a lot of

15 franchisees.  Those franchisees buy their product directly

16 from PSP and they don't have direct relationships with these

17 vendors, so if PSP can't deliver those products to their

18 franchisees, those franchisees can't get their product.

19 Q     Focusing on the 503(b)(9) vendors, why is it important

20 for the company to pay these vendors relatively promptly?

21 A     Yeah, so in retail, particularly, because we had this

22 same issue when I was at Party City, vendors in retail get

23 very sketchy with retailers that are in bankruptcy, even ones

24 that have plans to come out, because there are a long history

25 of, you know, big-name retailers and smaller-name retailers

1  that actually didn't make it and didn't survive a Chapter 11

2  and ultimately converted.

3        So, you know, it's an area of interest in many

4  industries, but it's, I think -- I believe it's more high-

5  profile or more of an urgent nature for vendors in the retail

6  space.  So what they like to do is they want to get

7  their 503(b)(9) claims paid during the pendency of the case

8  and they want to know when they're going to be paid early.

9  And if they don't tend to know, they tend to put you on

10 things like C.O.D. or stop shipping, which, unfortunately, is

11 kind of what's happened over the last, you know, 72 hours

12 since we filed bankruptcy.

13 Q    And with respect to the critical vendors, again, what's

14 the importance of paying them relatively promptly?

15 A    Yeah, the critical vendors and 503(b)(9) vendors, what

16 we do with both of them is we pay them these amounts

17 particularly during the pendency of the case and the trade-

18 off for that is that they continue to provide normal trade

19 terms.  So, if they had given us 15- or 30-day terms

20 previously, they continue to give us those 15- or 30-day

21 terms.  So they don't put us on C.O.D.; that's the trade-off.

22       That's the benefit that the estate gets because we

23 don't have to have the run of the bank, so to speak, when

24 companies put you on C.O.D.

25 Q    So what happens when you're put on C.O.D., just to

1  explain?

2  A     So, basically, if you ordered goods today, if you

3  ordered -- I'll make up a number -- $100 worth of goods

4  today, if you would normally pay for it in 30 days or 15 days

5  or whatever the terms would be, you have to make that payment

6  today before they will ship you the product.  So your trade

7  credit kind of tightens and the need for capital, you know,

8  increases accordingly.

9  Q     And what can be the consequences to the business of

10 having its vendors put it on C.O.D. terms?

11 A     Besides the trade contraction and the potentially

12 higher payment amount, it's also disruptive.  That's not the

13 way most companies like to operate.

14       And it's also, you know, some vendors won't even ship

15 you on C.O.D.; some of them will just stop.  They're not

16 required to keep shipping you.  A lot of these vendors are

17 on, you know, open to buy, so there's not a commitment to

18 buy, but just a set price and you buy the quantity that you

19 (indiscernible).

20       But if -- we've seen this in other cases where they

21 simply don't ship or will threaten to not ship if they don't

22 get their -- whether it's critical vendor status or 503(b)(9)

23 status, or any, you know, something along those lines.

24 Q     And in the situation where you have vendors putting you

25 on C.O.D. or not shipping, what effect is there on revenue of

1  the business?

2  A     If you don't have product in your store, it naturally

3  (indiscernible) along in terms of, you know, lower sales to

4  the business, less repeat customers.

5      When we try to talk about bankruptcy, we try to make it

6  as "business as usual" as possible.  And if customers can

7  come into the store and buy their product and not notice a

8  difference, they'll continue to kind of keep coming back.

9      They tend not to come back when product isn't there.

10  So if you don't have product, they tend not to come back.

11  You tend to lose them in sales and then, ultimately, EBITDA,

12  and then, you know, kind of falling through the waterfall,

13  ultimate, you know, enterprise value will decline over time

14  if you can't, you know, arrest that slide.

15  Q    One of the categories we didn't touch on, but I will

16  touch on with you now is the shippers.

17      What -- how are they different from the others in terms

18  of payment?

19  A    They -- first of all, they typically get paid pretty

20  quickly, but they also have the ability of possession of the

21  product.  So they simply -- and we had this yesterday when --

22  and Mr. Feldman alluded to it earlier -- some of the vendors

23  had heard that this, that some of the critical vendor stuff

24  was not, you know, approved, the DIP was not approved and

25  they literally called their shippers and told them, turn

1 around and come back.

2          MR. SHORE:  Objection; motion to strike, hearsay,

3 Your Honor.

4          THE WITNESS:  It's not hearsay; that's what I

5 talked to the management team about.

6          MR. DUGAN:  Well, let me just -- I'll address the

7 Court.

8      (Laughter)

9          MR. DUGAN:  I don't think you're the lawyer,

10 Mr. Orlofsky.  I'll address the comment.

11      (Laughter)

12          MR. DUGAN:  Your Honor, I believe Mr. Orlofsky is

13 simply reciting his understanding of what happens in the

14 business from certain actions that are occurring; I don't

15 think he's saying, Someone talked to me and now I'm telling

16 you what they said.

17          THE COURT:  Well, to the extent that you're

18 repeating what somebody else told you, you can't do that;

19 that's hearsay.

20          THE WITNESS:  Okay.  I'm sorry.

21 BY MR. DUGAN:

22 Q    Now, Mr. Orlofsky, Mr. Lauria, you heard, yesterday --

23 I'm not asking you a hearsay question -- Mr. Lauria, you

24 heard yesterday in court, made reference to, well, the

25 debtors can exercise a stay if anyone, if any of the vendors

1  threaten not to ship or if any of the vendors slow ship or

2  whatever they do.

3       What's your reaction to that?

4  A    I'm not sure if you legally can do this or not, so I

5  wasn't sure if you're going to --

6            THE COURT:  I think you preempted his objection.

7  BY MR. DUGAN:

8  Q    I'm asking your reaction as a layperson.

9  A    I'm not making a legal -- I'm not going to tell

10 Mr. Lauria --

11 Q    Understood.

12 A    -- how to practice law; that's not my expertise.

13 Q    Understood.

14 A    My point is that in whether that's legally allowed to

15 do or not allowed to do from a business perspective, what

16 typically happens is they will tell you, the vendors will

17 tell you, I'm not shipping.  And when you have a lot of

18 vendors who do that, you're not really able to go, whether

19 you're able -- whether you legally you can do this or cannot

20 do it, it's not practical to go sue your vendors and all of

21 these people to do this, number one, because there's a lot of

22 them.

23       And, second of all, it just takes too much time, right.

24 We need this product today; we don't need it three months

25 from now or whenever a potential litigation would get

1  resolved.

2  Q    Now, forgive me if we touched upon this, but with

3  respect to source of funds, if the debtors don't have an

4  approved DIP after today, will there be a source of funds

5  that they can use to pay these vendors?

6  A    Right.  The only source of funds the company currently

7  has right now is the cash flow -- is the cash that's received

8  from its customers -- from its cash receipts from its

9  operations.  We don't have access to our ABL any longer and

10  it's basically, you know, whatever cash that comes in the

11  door, that's what we have.

12  Q    Are you able to use that cash freely at this point if

13  you don't have an approved DIP?

14  A    Not yet, no.  We don't have -- we don't have a DIP and

15  we don't have cash collateral approval, so we're not allowed

16  to use it.

17  Q    So would there be any ability as things stand now, in

18  the absence of a DIP, for the debtors to fund any of these

19  vendors?

20  A    No, we can't fund anything right now.

21  Q    And based on your experience, what do you think the

22  consequences would be to the vendors if -- I'm sorry -- to

23  the debtors if none of their vendors could be paid?

24  A    It's detrimental.  I mean, we need the product.  We

25  need to keep the operations flowing -- excuse me -- it's

1  never good for customers to go into stores and not be able to

2  buy product and it's not good for the employees who are

3  trying to buy product or trying to fill their stores, not to

4  be able to do so.

5  Q    Are you familiar with a term of art called "irreparable

6  injury"?

7  A    Yes.

8  Q    What's your understanding of that term?

9  A    It's something that I think -- again, I'm not going to

10 practice law without a license -- but I think it means

11 something that can't be resolved with money and it's

12 something that is detrimental, that once it happens, you

13 can't undo it.

14 Q    If the vendors -- if the debtors can't pay their

15 vendors, will the debtors suffer irreparable injury in your

16 opinion?

17 A    If this keeps going, yes.

18 Q    Now, yesterday we left the proceedings without a DIP in

19 place.

20     Have you heard from -- have the debtors experienced

21 problems with their vendors as a result of there being no DIP

22 in place?

23 A    We have, yes.

24 Q    What are the problems the debtors have experienced?

25 A    So, I've received numerous, and had conversations with

1   members of the management team --

2   Q    We don't want to hear about hearsay.

3   A    Okay.

4   Q    Just tell me the problems.

5   A    The problems are vendors have stopped shipping us,

6   period.

7   Q    How many?

8   A    At least 40 to 50 at VSI and about the same at PSP.

9   Q    Is Nestle a big vendor of Pet Supplies?

10  A    It's our largest.

11  Q    Have they put a hold on?

12  A    They have.

13  Q    Is Mars a big vendor of Pet Supplies?

14  A    Yes.

15  Q    Have they put a hold on?

16  A    Yes.

17  Q    Expeditors, they're a big shipper?

18  A    Yes.

19  Q    Have they put a hold on?

20  A    Yes.

21  Q    How many of your critical vendors have put holds on, to

22  your knowledge?

23  A    I don't have the exact number, but I would say a good

24  proportion; probably more than half.

25  Q    And what is that doing to the debtors' business right

1  now?

2  A    Right now, we're kind of at a standstill; we can't

3  order new products and if we can't get new product in the

4  doors, we can't sell it.

5  Q    Are the debtors sustaining injury right now?

6  A    We are.

7  Q    Have the -- strike that.

8       Do you believe if you're able to get funding today in

9  the form of a DIP, that these problems with the vendors can

10  be alleviated?

11  A    They can be alleviated, yes.

12  Q    Now, I want to switch gears for a moment, Mr. Orlofsky,

13  and talk about employees.

14  A    Sure.

15  Q    How many employees do these debtors have?

16  A    I believe there are 12,000.

17  Q    Okay.  And with respect to, again, the ability to get

18  financing and DIP financing, in particular, is there a

19  payroll coming up soon?

20  A    There's a payroll on Friday.

21  Q    And what do the debtors have to do today to make the

22  payroll on Friday?

23  A    We need to get our cash management motion approved and

24  we also need to have our DIP approved.

25  Q    Why do you need to have the DIP approved to be able to

1    pay -- make payroll on Friday?

2    A     Within the DIP is our use of cash collateral, so we

3    need to be able to use funds both, that we have on hand and

4    the new capital to transfer funds and move funds so we can

5    pay third parties, pay employees, pay vendors, pay others.

6    Q     Does that transfer of funds that you're referring to

7    have to happen today for the employees to be paid on Friday?

8    A     The payroll stuff has to happen today, later today.

9    Q     (Indiscernible) strike that.

10         My understanding is that it, in fact, has happened, so

11   let me not pursue that any further.

12         But other for the fact that going forward -- let's not

13   talk about Friday, but going forward, as we go into the case,

14   in the absence of a DIP, will you be able to make payroll?

15   A     No.

16   Q     And what will happen to the debtors if they can't make

17   payroll?

18   A     I mean not being able to pay employees is typically a

19   director and officer liability in many states, so we would

20   probably have to go into some form of liquidation.

21   Q     And would that be, in your understanding, an

22   irreparable injury to the debtors?

23   A     I think so.

24   Q     Let's shift gears and talk about the DIP budget?

25   A     Sure.

1  Q     Mr. Orlofsky, did you have a role in preparing the DIP
2  budget?

3  A     I did.

4  Q     And approximately when did you do that?

5  A     I'm sorry, when?

6  Q     Yeah.

7  A     The DIP budget for the HoldCo structure that we're
8  talking about was probably first started at the end of
9  September or early October.

10 Q     And did you have others that assisted you in preparing
11 that?

12 A     I do; I have employees -- I have my colleagues working
13 with me on this project.

14 Q     And who are they?

15 A     James Shand, who's in the room, Dan Kelsall, Rodi
16 Blokh, and many others.  There are several others.

17 Q     And they are employed by AlixPartners?

18 A     They are.

19 Q     And did you actively supervise them?

20 A     I did.

21 Q     Just describe a little bit, the process of how that DIP
22 budget was prepared.

23 A     So we worked with -- and we do this with the management
24 team, as well; we don't do it in isolation -- as I said
25 earlier, there's four operating units.  We worked with those

1   operating entities to understand their cash flows at the

2   operating level, understanding the sources and the uses, the

3   ins and the outs of their needs and the timing of their

4   payments and things like that, understanding what their trade

5   terms are, the payment terms, and the like.

6        So they each have their own individual budgets.  Those

7   would roll up into a consolidated one.  We would have to

8   understand the consolidated corporate expenses, as well, that

9   need to get paid, and then other, you know, kind of things

10  like insurance and, you know, things along those lines and

11  any other restructuring fees or one-time items or things like

12  that.  That's kind of how we, you know, build it up from the

13  bottom up, in conjunction with management, and then kind of

14  have a consolidated one that we're able to run out and run

15  some scenarios off of.

16  Q    And did you come to a view as to what amount of DIP

17  financing the debtors would need in this case?

18  A    We did.

19  Q    What was that view?

20  A    $250 million.

21  Q    Why, in your opinion, would the debtors need

22  $250 million to get through this case?

23  A    So, we sized this scenario to try to account for some

24  of the uncertainties that you have and some of the issues

25  that, you know, you have in, particularly in retail, and

1  we've seen this in some of the other cases.  We also tried to

2  size this for a nine-month scenario, as well as a six-month.

3      While we would love to be out of bankruptcy in six

4  months, or even sooner, if possible, we need to be aware of

5  some things that may be delayed in the process, whether it's

6  litigation, something unforeseen that happens, so we can

7  actually have enough money to stay and be administratively

8  solvent and not have to go back to our DIP lenders at some

9  point in time in the future and ask for more capital.

10     If you're in that scenario where you have to ask for

11  more capital later, it's sometimes hard to get because,

12  usually, something -- if you're asking for more capital at

13  that point in time, something bad has probably happened.

14     So the idea being, let's avoid that issue, let's get

15  enough capital to fund the case, let's have a little bit

16  of -- let's have enough cushion to get to a nine-month case.

17  We thought that was kind of enough time to solve any of our

18  realistic problems, and, therefore, we used that length of

19  time as kind of the outside date of what the amount of

20  capital that we needed to get there, to operate the business,

21  operate it in the ordinary course, not on a shoestring

22  budget, provide enough liquidity to give the vendors, the

23  employees, and the constituents, you know, confidence that

24  we're going to be here, that they can come shop with us, that

25  we'll be able to buy the goods that we need and deliver on

1 the promises that we -- or the, you know, kind of themes that

2 we have historically, and business as usual.  And that's kind

3 of how we sized it.

4 Q    And in terms of your understanding of what the debtors

5 might need in this case to exit --

6 A    Yeah.

7 Q    -- and the DIP would take them through it, right?

8 A    Correct.

9 Q    And to your understanding, would there by any

10 contingency around being funded through a DIP that's on the

11 table?

12 A    There was no -- in terms of, when you say,

13 "contingency" --

14 Q    With respect to the funding, the certainty of funding.

15 A    No, the funding is once it's approved, obviously, Court

16 approval, yes, it would be -- it's certain, then.

17 Q    And you have been the chief restructuring officer of

18 other retailers, correct?

19 A    I have.

20 Q    Specifically, which ones?

21 A    Party City.

22 Q    Okay.  And is your understanding of what is needed in

23 terms of the DIP budget informed by that experience?

24 A    It is.

25 Q    Now, you heard earlier that the draw, the initial draw

1  on the DIP has been revised down from 125 to 100?

2  A     Correct.

3  Q     In your opinion, is that the right number to start

4  with?

5  A     It's a number that will work; yes, it's the right

6  number.

7  Q     And in your view, was there belt-tightening that had to

8  be done to get to 100 from the 125?

9  A     I think it's manageable.  I mean, I think for -- but,

10  yeah, I think nothing that would be disruptive, but we can

11  manage.  Because, again, we would only have to get to the

12  interim, you know, to the final hearing, so it's four weeks

13  or thereabouts.

14  Q     And among the things, the belt-tightening, there was

15  the reduction in what's being paid to the critical vendors?

16  A     Right, the critical vendors, 503(b)(9).

17  Q     Now, you, Mr. Orlofsky, have heard, and, in fact,

18  you're aware that there was a 2L DIP proposal from early this

19  morning?

20  A     I'm aware.

21  Q     And in your view, is that a workable proposal?

22  A     It's not.

23  Q     Why not?

24  A     Put aside the issues of what it does to the RSA, just

25  on a numbers perspective, it's not enough capital to get to

1 the -- to get to the case and be administratively insolvent.

2 Q    Well, you heard the 2Ls' counsel suggest that maybe

3 it's not important to get all the way to the end and maybe

4 this is just okay for a few weeks or, you know, maybe two

5 months.

6        What's your thoughts on that?

7 A    I don't think that dog hunts.  We've got too many

8 vendors, too many employees who are expecting payments to go

9 out today.  They are expecting us to have a plan.  We've

10 already announced that we have a plan, that not only do we

11 have funding today, but we have a way to get out of

12 bankruptcy.

13       You never want to go into bankruptcy without a way to

14 get out of it.  It's kind of one of the things you always try

15 to do.

16       And their proposal kind of says, we're going to give

17 you some money and then we're going to kind of figure it out

18 later, which is not a great message, you know, to give to

19 your stakeholders, in my view.

20 Q    Including your vendors and the employees?

21 A    Vendors, employees, you name it.

22 Q    You mentioned putting aside the effects on the RSA.

23       What, to your understanding, would be the effects to

24 the RSA if the debtors were to accept the 2L proposal?

25 A    I think we violate the RSA and it could be terminated,

1  as I understand it.

2         MR. DUGAN:  I pass the witness, Your Honor.

3         THE COURT:  Okay.  Not this time?

4         MR. DUGAN:  I'm not sure if our 1L colleagues want

5  to --

6         MR. SHORE:  No direct, Your Honor.

7     (Laughter)

8         MR. SHORE:  Fool me once.

9     (Laughter)

10                     CROSS-EXAMINATION

11 BY MR. SHORE:

12 Q    I'll be very brief, Mr. Orlofsky.

13       First of all, you said, again, at the beginning, you're

14 the CRO of the debtors.  In fact, you're the CRO of two

15 debtors, right?

16 A    Correct, we covered this yesterday.

17 Q    Okay.  So just to be clear, you're in the testifying as

18 the CRO of any entity, other than the TopCo and FRG, Inc.,

19 right?

20 A    Right.  We covered this yesterday.

21 Q    Okay.  I just wanted to make sure we weren't

22 backtracking.

23 A    I understand.

24 Q    Okay.  Let's talk about what you didn't testify to

25 today.

1  A      Okay.

2  Q      You didn't, unless I missed something, you didn't talk

3  about any board processes at your debtors that you're the CRO

4  of, right?

5           MR. DUGAN:  Your Honor, objection.  Cross is going

6  beyond the scope of the direct.  I object to that.

7           THE COURT:  Well, he can go beyond the scope of

8  the direct.  He can't -- you can't go beyond the scope of

9  cross.

10           MR. DUGAN:  I take it.  I was just trying to

11  goose-gander thing, but I --

12           THE COURT:  In the form of this hearing, I mean, I

13  would assume Mr. Shore would have said they're going to

14  designate him as a witness, as well, if we had more time.

15  This is a shortened time frame, it's an interim hearing, so

16  I'll allow it.

17           THE WITNESS:  I'm sorry, what was your question

18  again?

19  BY MR. SHORE:

20  Q      You didn't -- were you here or were you on the Zoom

21  when the judge expressed his concerns about the DIP that was

22  on the table?

23  A      You mean yesterday?

24  Q      Yes.

25  A      Yeah, yeah, yeah, I was here.

1  Q     Okay.  And I just want to be clear, you didn't testify

2  today, unless I missed it, about any of the board processes

3  that have occurred with respect to this, these debtors,

4  right?

5  A     You mean between yesterday and today?

6  Q     Or -- yeah.

7  A     No.  Yeah, no, I did not testify; I wasn't asked about

8  it.

9  Q     Okay.  And you didn't testify about whether or not the

10 DIP fees were reasonable, right?

11 A     I did not.

12 Q     Or whether any of the DIP terms were reasonable, right?

13 A     You're talking about the DIP, that proposal that came

14 this morning.

15 Q     Or even the 1L DIP.

16 A     No, I did not testify on that.

17 Q     Okay.  Now, you also didn't testify about any direct

18 communications that you have had with any critical vendors of

19 the debtors post-petition, right?

20 A     Me, personally?  No.

21 Q     Yeah.

22        Nor did you testify about any direct communications you

23 had with any 503(b)(9) claimants of the debtors, right?

24 A     I did not, no.

25 Q     Nor did you testify about any direct conversations or

1  communications you had with any of the shippers of the

2  debtors post-petition, right?

3  A     Correct.

4  Q     There are people at the debtors who have had

5  communications with people, I think, is your point, right?

6  A     Right, including my employees at AlixPartners.

7  Q     Right.  And I take it, if you had asked one of your

8  employees to be here today to tell His Honor what's going on

9  in these conversations, they could have done it, right?

10 A     They could have, yes.

11 Q     And you didn't testify about what your team has told

12 these critical vendors, including 503(b)(9) claimants, and

13 shippers, as laid out in the motion.  We went over that

14 yesterday.

15        You didn't tell the Court what they had told them

16 either, right?

17 A     No.

18 Q     Okay.  The -- you didn't testify to the Court --

19 remember we had this issue yesterday about how much of the

20 critical vendor, which would include critical vendor

21 503(b)(9) shippers pertaining to American Freight?

22 A     It's a small number, but no, we didn't talk about the

23 exact number.

24 Q     Okay.  So you're still seeking authority to pay, for

25 example, someone who had shipped goods to American Freight.

1  You want to pay them, rather than just give them their goods

2  back and --

3  A     Do you want to go into the details of this?  I'm happy

4  to explain it.

5  Q     I asked a very specific question and if you could

6  answer it --

7  A     No, we did not talk about that --

8  Q     Okay.

9  A     -- correct.

10 Q     And I'm, just to be clear, I'm saying you are seeking

11 authority from the Court to make payments to what you call

12 "critical vendors" of American Freight while their

13 liquidation is going on?

14 A     It's not really critical vendors in that basket; it's

15 mostly shippers, but ...

16 Q     Again, we went through this problem yesterday --

17 A     I'm just trying to be precise.

18 Q     Yeah.  Your critical vendor motion seeks,

19 monolithically, the authorization to pay the now-reduced

20 amount, whether they be shippers --

21 A     Correct.

22 Q     -- critical vendors, or 503(b)(9) claimants, right?

23 A     Agreed.

24 Q     Part of your ask is still that you be able to make

25 payments, whether they be to shippers, 503(b)(9) claimants,

1    or critical vendors, relating to the company that's

2    liquidating right now?

3    A      A very small amount, correct.

4    Q      Now, in the critical vendor motion -- we went through

5    this yesterday -- you did go out to your critical vendor

6    community in your first day declaration and set the

7    expectation that everybody who was a vendor of the debtors

8    was going to be paid their prepetition claim, right?

9    A      So, you said this yesterday, too, and you need to

10   understand the 503(b)(9) aspect of this --

11   Q      Uh-huh.

12   A      -- because 70 percent of the interim draw is 503(b)(9),

13   which is statutory; it needs to be paid.  It's an admin

14   claim, right.  And as long as we come out, we have to pay it.

15        So the bulk of those payments in the ask is 503(b)(9)

16   and they fall into that way because most of the trade terms

17   are on a payment period that's with -- inside the 20-day

18   period.  So that's why it's a large percentage of that.

19        There are some other things in there that are shippers.

20   The critical vendor piece is about 15 percent of the total

21   and then there's some other some foreign vendors.

22        So -- but, yeah, correct.

23   Q      All right.  You told your critical vendor community,

24   again, 503(b)(9) claimants, shippers, critical vendors, on

25   the first day of the case, we are paying you in full and

1  we're going to get DIP money to do that, right?

2  A    Yep.

3  Q    And is it surprising to you, then, that a critical

4  vendor who was told you're going to get paid in full is

5  questioning whether or not they're going to get paid in full

6  now?

7  A    They're questioning it because we don't have approval

8  yet.

9  Q    Okay.  And but when you filed the motion, did you have

10  a pre-approval?  No one told you, we're, 100 percent, going

11  to win this motion?

12  A    Understood.

13  Q    Right.  So you just went out and you conditioned the

14  community to that they were going to get paid a hundred cent

15  dollars out of the DIP, right?

16  A    We -- it was in the motion.

17  Q    Yeah.  And what's happened here is now you're coming to

18  the Court saying, I started a fire in my critical vendor

19  community and I must get buckets of cash to throw into that

20  to fix the problem that I created.

21        Isn't that what you're doing here?

22  A    No, that's not what we're doing.

23  Q    Now, one of the things --

24        MR. SHORE:  Oops, I don't think I brought my

25  transcript up.  Excuse me, Your Honor.

1       (Pause)

2   BY MR. SHORE:

3   Q     You testified about the DIP budget and you said that

4   the DIP that was proposed by the 2Ls earlier this morning

5   wasn't enough to get you to the end.

6         But yesterday you said something interesting when we

7   were talking about irreparable harm.  You testified -- and

8   for the record, this is object page 114 of the transcript,

9   starting at line 12 -- I said:

10        Well, I hear you on that, but I'm just wearing my

11  capacity as counsel for a group -- I think (indiscernible) --

12  or my hat as counsel for a group of lenders who are lending

13  to that entity -- no.  Sorry, I have the wrong one.

14        It says, "yellow tab" and I couldn't figure that out.

15  It's going to be on page 116.

16  A     I don't have the transcript.

17  Q     I know.  I'm going to read it to you.

18  A     Okay.

19  Q     But I'm just going to draw your attention to the way

20  you phrased this.

21  A     Okay.

22  Q     You were asked by your counsel:

23            "Based on your understanding of the current cash

24  position of the debtors, how long can the debtors continue in

25  business without access to the DIP funds?"

1    And you answered:

2         "I don't think we could.  I don't want to speak

3    for other Ds and Os."

4    And just to be clear, you were referring -- you were

5    concerned about a personal liability you might have if you

6    didn't get DIP funds, right?

7  A    I think we were talking about the ability to make

8    payroll.

9  Q    Yeah.

10 A    Right.

11 Q    And failure to make payroll might put you in the hot

12   seat?

13 A    All Ds and Os, as I understand it -- again, I'm not

14   going to practice law without a license, but ...

15 Q    "But we don't have enough money to make all the

16   payroll, incur all the obligations that we have, at least,

17   right now, so I don't think we could last very long."

18        And this is what you said:

19        "I haven't really looked at how long we could

20   stretch it out or what we could do to mitigate that."

21   Okay.  Has anybody asked you to figure out how long you

22   could live on $75 million of cash?

23 A    No.

24 Q    Okay.  And are you testifying to the Court that that

25   wouldn't bridge you to a hearing in two weeks; you couldn't

1  make it two weeks with $75 million of cash?

2  A     I didn't say that.

3  Q     Okay.  So, in fact, you haven't told the Court at all

4  as part of your direct testimony, that $75 million won't get

5  you to a final hearing of the DIP?

6  A     The math could work; it's the other aspects of the

7  question that you're kind of leaving out, but mathematically,

8  it could work, yes.

9  Q     Mathematically, you could.  If you only had

10 $75 million, you could make it work until we got to a final

11 hearing without having the Court have to resolve things like

12 whether or not the RSA is a good or bad RSA, right?

13 A     If you just want to look at it from the math

14 perspective, yes, you could make it work.

15               MR. SHORE:  I have no further questions, Your

16 Honor.

17               THE COURT:  Okay.  Redirect?

18               Oh, I'm sorry, Mr. Fox?

19               MR. FOX:  Good afternoon, Your Honor.

20               May I please Court?  Tim Fox on behalf of the

21 United States Trustee.

22                          CROSS-EXAMINATION

23 BY MR. FOX:

24 Q     Mr. Orlofsky, good afternoon.

25 A     Good afternoon.

1  Q      I just got a couple of questions.

2  A      Sure.

3  Q      Again, I'll try not to be duplicative of Mr. Shore.

4  A      Okay.

5  Q      So, we talked yesterday about the sizing of the budget

6  and the cash flows.  And I understand based on counsel's

7  representations today that instead of the $125 million

8  figure, the current ask is now $100 million; is that correct?

9  A      Correct.

10 Q      And in your declaration in support of the first day

11 relief, $100 million was identified as the upper end of the

12 range, prepetition, that the debtors had operated with in

13 terms of available liquidity?

14 A      I think what you're referring to is the minimum cash

15 that we would like to have on the balance sheet at all times,

16 between 50 and 100.  I think that's what you're referring to,

17 Counselor.

18 Q      That's correct.

19 A      Okay.

20 Q      But $100 million was the upper end of that range --

21 A      Correct.

22 Q      -- of a minimum of cash on hand prepetition?

23 A      Correct.  Well, I mean, it's -- that last point about

24 prepetition, like, when it's prepetition or now, I think we'd

25 like to have 50 to 100, but --

1  Q    But historically speaking, $100 million was the --

2  A    It's not what we had; we would like to have had.

3       We've been operating, since we've been there in July,

4  with less than that.  We've been under, like --

5  Q    And how far under have you been operating in that

6  prepetition period, then?

7  A    I mean, we ran out of money, but at the last week of

8  the case.  I mean, this isn't the way you want to run the

9  case, right.  You don't want to run a company on, you know,

10 on that kind of -- you know, on fumes like that.

11 Q    But in order to maintain the business and preserve

12 going-concern value, you could operate the business on less

13 than $100 million of borrowings?

14 A    Well, we said between 50 and 100.

15 Q    Okay.

16 A    Yeah.

17 Q    And in response to direct testimony today, your answer

18 was that number will work, I believe; is that right?

19 A    A hundred million of interim draw, I think, was your

20 question --

21 Q    Well --

22 A    -- or draw today.  That was your --

23 Q    That was the question posed by debtors' counsel --

24 A    Right.

25 Q    -- and your response, if I remember correctly, was,

1  "that number will work."

2  A    That number will work, right.

3  Q    I believe you also commented in the rest of that

4  colloquy that it would be manageable?

5  A    Right, because as I understand it, the 25 we're not

6  taking now, we can draw it -- we can come back and get at the

7  second hearing, at the second day.

8  Q    And your testimony in response to my questioning was

9  that the debtors had been able to operate on a going-concern

10  basis with a cash position less than $100 million for a

11  period; again, understanding that that is not ideal, but that

12  was your testimony, correct?

13  A    I think you're taking it -- let's be clear,

14  Counselor -- and I'm not trying to be cute here -- but the

15  last three to four weeks before we filed, we operated

16  below -- at a sub-optimal level of cash flow and had to move

17  cash around in a way that you would not want to do.  Not that

18  we did anything illegal or anything like that, but you were

19  literally managing cash day-to-day and that's not how you

20  want to operate the business.  That's all I'm trying to say.

21  Q    Okay.  I understand your distinction there --

22  A    Okay.

23  Q    -- Mr. Orlofsky.  But, again, based on the information

24  available in the budget, $100 million still remains a

25  substantial increase from the cash position that the debtors

1  have been able to operate the business on?

2  A    I understand, right.

3  Q    And then just one overarching point here; again,

4  understanding that the facility is designed to get to an

5  exit, in your experience, isn't it frequently available for

6  debtors to operate on bridge financing in order to figure out

7  what will make sense in terms of a case proceeding if there

8  are questions about various constituencies?

9  A    You mean a bridge financing for a couple of weeks with

10  no, kind of, future to it; is that what you're saying?  I

11  mean, like the proposal that we got this morning, is that

12  your question?

13  Q    Mr. Orlofsky, I'm asking if, in your experience,

14  debtors will operate on a bridge financing in order to

15  preserve going-concern value, as opposed to relying on the

16  certainty of an extended draw?

17  A    I guess we could operate on a bridge financing.  I

18  don't know why you would do it, because you don't provide the

19  certainty to your stakeholders that we talked about earlier.

20      If you're saying -- and, again, I'm just trying to

21  clarify the point -- if you're saying we're going to get a

22  certain amount of money for some period of time and then in

23  three weeks, four weeks, six weeks, whatever period it is,

24  we've got to go find more, that's not a great message to go

25  tell stakeholders who have already, you know, who are already

1  nervous enough about what's happened over the last 72 hours.

2  Q    But, Mr. Orlofsky, would that bridge financing be a

3  superior alternative to pivoting towards liquidation?

4  A    Towards liquidation; yes, it would be better than

5  liquidation.

6  Q    And, Mr. Orlofsky, in the event that the debtors are

7  faced with a choice between bridge financing and liquidation,

8  what would the debtors' choice be?

9  A    I think we would take the bridge financing.

10          MR. FOX:  Thank you, Your Honor.  That's all I

11  have.

12          THE COURT:  Thank you.

13          Redirect?

14          MR. DUGAN:  No redirect, Your Honor.

15          THE COURT:  Okay.  Thank you.

16      (Witness excused)

17          THE COURT:  Any other witnesses?

18      (No verbal response)

19          THE COURT:  All right.  I'd like to take a recess

20  and during that recess, I'd like to meet with counsel in

21  chambers, including debtors, 1Ls, 2Ls, the U.S. Trustee.

22          ABL -- is somebody here for the ABL lenders?

23          UNIDENTIFIED SPEAKER:  I am, Your Honor.

24          THE COURT:  You, as well.

25          We'll open up this conference room right over here

 1  so everybody can go in and chat for a few minutes before we

 2  go to closing arguments, okay.  Thank you.

 3         (Recess taken at 3:32 p.m.)

 4         (Proceedings resumed at 4:21 p.m.)

 5             THE COURT:  All right.  So just let me put on the

 6  record that I did hold a chambers conference with the parties

 7  about the DIP financing to see if there was any further

 8  movement on a potential resolution.  It did not appear that

 9  there was.

10             I also laid out for the parties what my concerns

11  were about the DIP and whether they could address those

12  issues in advance of continuing the hearing.

13             So let's find out where we are.

14             MR. GOLDSTEIN:  Okay if I begin?

15             Your Honor, for the record, Jayme Goldstein, on

16  behalf of the Ad Hoc First Lien Group.

17             Really appreciate the time that Your Honor gave us

18  over the past 45 minutes or so.  I'd like to report that,

19  while we were not able to reach a consensual resolution with

20  the second liens and the HoldCos, we have spoken to our

21  clients and they were willing to reduce the roll-up on an

22  interim basis to one-to-one.

23             We heard the concerns that Your Honor had and

24  we'll pick this back up the Second Day Hearing on a final

25  basis.

1          THE COURT:  Okay.

2          MR. GOLDSTEIN:  And so we also heard Your Honor's

3    comments about a junior DIP and what you would expect to see,

4    and we do hope that, if the seconds and the HoldCos are able

5    to put together a truly junior DIP, we'll all see where that

6    ultimately takes us by the Second Day Hearing and the Final

7    DIP Order.

8          THE COURT:  Okay.  Thank you.

9          MR. GOLDSTEIN:  So, thank you very much.

10          THE COURT:  Thank you.

11          MS. SINCLAIR:  Good afternoon, Your Honor.

12          Debra Sinclair, Willkie Farr & Gallagher, for the

13    record.

14          I'd just like to make a brief presentation in

15    favor of the DIP as well, Your Honor, particularly in light

16    of the First Lien Lenders' Agreement to further decrease the

17    roll-up.

18          Your Honor, as you heard today, the company is

19    facing severe exigencies right now because we currently do

20    not have access to a DIP.  You know, Franchise Group is a

21    retail company and the survival of the business right now is

22    dependent on providing stability and certainty.

23          This is a critical juncture in the Chapter 11

24    cases.  We have four different companies.  They all have

25    their own vendors and industry dynamics and right now I think

1  you heard the evidence today from both Mr. Orlofsky and Mr.

2  Grubb.  We're facing a lot of uncertainty.

3         We have 40 to 50 vendors at Vitamin Shoppe and PSP

4  each refusing to ship products, putting the company on COD

5  and stop ship terms.  So I just want to emphasize how

6  critical obtaining the DIP is today.

7         I also wanted to note for the record that the

8  lenders have made a number of concessions, both throughout

9  the night and on our way to court this morning and again as

10 we were here today and all of those together we believe show

11 that the DIP is truly a sound exercise of the debtors'

12 business judgement, made with the honest belief that this is

13 the best financing available to the business right now.

14        There's been a decrease of the interim draw to

15 $100 million.  You heard Mr. Orlofsky's testimony in favor of

16 that amount.  You know, we think it's prudent to have a

17 little more on hand than we need.  You heard his testimony

18 that we shouldn't be operating the business on fumes.

19        We've excised the HoldCo guarantors, which was an

20 issue of major contention yesterday, the one who also agreed

21 to take those two boxes out of the DIP guarantee.

22        They've agreed, as Mr. Goldstein just said, to the

23 one-to-one roll-up at the interim stage solely on the interim

24 amount.

25        They've agreed to significant concessions to their

1  fees on the backstop premium, moving it from 10 percent to 9

2  percent, moving the commitment fee down from 2.5 to 1.5 and

3  moving the exit premium just to be on the new money piece of

4  the DIP.  And they also decreased the rate, as you know, from

5  SOFR plus10 to SOFR plus9.

6          So all of this to say, we don't believe that the

7  second lien purported bridge DIP is the answer to our

8  problems today.  We are willing to listen to, you know,

9  credible proposals that the junior creditors put forward, but

10 to Mr. Goldstein's point, any proposal has to be a truly

11 junior DIP.

12         You know, the DIP they put forward today would've

13 required any proceeds of a sale or liquidation to pay it off

14 so it really wasn't truly a truly DIP, even though it was

15 labeled that way.

16         So for all of those reasons, Your Honor, we would

17 ask that you approve the DIP financing, supported by the one

18 all and that we're proposing to you today.

19         We will revise the Interim Order to reflect a

20 couple of things, one of which is the provision in the Order

21 that stats that we can only come to court on an emergency

22 basis, on five days' notice, to discuss what is or is not an

23 event of default.  We're going to broaden that language so

24 that if there's any sort of dispute about defaults under the

25 DIP, we have the ability to come to court and be heard by

1   Your Honor.

2          The other issue we're working through that I

3   believe we resolved is on the carveout.  We've had some

4   concerns from the ABL lenders just about the mechanic there,

5   specifically as it regards the professional fee escrow, which

6   is one of the ways we were able to decrease the interim draw

7   was by removing that escrow from the interim amount.

8          I think the solution there that you'll see

9   reflected in the Interim DIP Order is that we'll remove the

10  carveout solely for the interim period and we will speak with

11  each other about a solution that works, put the carveout back

12  in the Order for the final period.

13          THE COURT:  Okay.  Thank you.

14          MS. SINCLAIR:  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          MR. FLIMAN:  Good afternoon, Your Honor.

17          Daniel Fliman, Paul Hastings, for the Ad Hoc Group

18  of First Lien Lenders.

19          Your Honor, I'll be very brief.

20          Yesterday, I walked through some of the standards

21  under 364, 363 and Bankruptcy Rule 4001.  I think the

22  evidence yesterday, supplemented by evidence today, shows the

23  debtors have more than met their burden with respect to the

24  proposed financing and the cash collateral use.

25          Your Honor, our proposal, our DIP, is fair, was

1  fair, in its original terms and now we believe is even more

2  fair towards the debtors with the accommodations that we've

3  made over the last 24 hours.

4          It's real.  It's serious.  It's not put together

5  in a one-page email.  It's not thrown together 19 hours

6  before a filing.  There's a commitment behind it.  There's

7  money behind it and we're ready to go.

8          Our clients are supportive of this company,

9  supportive of its process, and we look forward to working

10  towards a confirmable plan.

11          Thank you.

12          THE COURT:  Thank you.

13          Anyone else wish to speak in support?

14      (No verbal response)

15          THE COURT:  Okay.  Any objectors?

16          Mr. Fox?

17          MR. FOX:  Good afternoon, Your Honor.

18          May it please the Court, Tim Fox, on behalf of the

19  United States Trustee.

20          I'm rising to indicate that, subject to the

21  revisions discussed on the record, the U.S. Trustee's

22  informal objections to the interim DIP are adequately

23  addressed for purposes of this interim relief.

24          I did want to note on the record with respect to

25  the carveout issue and the like that there have been some

1    discussions regarding ensuring that quarterly fees for the

2    United States Trustee are still accounted for, to the extent

3    that there is an issue, that the carveout would have been

4    implicated for.  Those discussions will remain ongoing and we

5    appreciate the parties' willingness to work on that issue.

6              Again, with respect to the additional refinements

7    to the form of debtor-in-possession financing, that's

8    adequate to address the concerns voiced by the U.S. Trustee

9    and we appreciate the parties moving on those points.

10             THE COURT:  All right.  Thank you, Mr. Fox.

11             Mr. Lauria?

12             MR. LAURIA:  Good afternoon, Your Honor.

13             Thomas Lauria with White & Case, representing the

14   Irradiant and PIMPCO lenders to the HoldCos and the 2L.

15             I guess I draw the unfortunate task of having to

16   continue to express objections to the DIP.

17             While we are certainly pleased with the

18   modifications and improvements that have been made to the DIP

19   over the past 24 hours, we think there are still some very

20   significant problems with the DIP, particularly on the basis

21   of the record that's been presented.

22             First of all, Your Honor, we think that the

23   debtors continue to have a 364(d) problem because they're

24   required to establish that they can't get credit on otherwise

25   more favorable terms.

1          And we believe that the proposal that we've made,

2    in fact, does constitute superior terms.  We have offered $75

3    million with junior liens.  We have requested or provided for

4    a payment priority in that DIP but that is not violative of

5    the intercreditor agreement, which only requires that our

6    proposal be on a junior lien basis, which it is.

7          It is not uncommon to see lien structures and

8    financing structures that have payment priorities.  That's

9    what we've proposed.

10         The lien -- the proposed financing is much

11   cheaper.  It's SOFA, plus 5 percent, with no other fees

12   associated.  It's the same six months.  It has no covenants,

13   no milestones, no RSA association, and it does not

14   contemplate priming so it doesn't give rise to all the

15   adequate protection issues of the DIP on the table.

16         The debtor spent a lot of time today putting on

17   evidence, or attempting to put on evidence, that the $75

18   million was inadequate, and what I would like to do is refer

19   the Court to page 298 of Docket 51, which is the DIP budget.

20   I've got a paper copy if I might --

21              THE COURT:  I got a copy.

22              MR. LAURIA:  Okay, great.  Thank you, Your Honor.

23         So, the debtor, at the beginning of this week,

24   according to that DIP budget, had $14.3 million and $28.2

25   million as coming in in that cashflow, which gets you to

1   $42.5 million.

2           If you put aside the proposed $125 million advance

3   in week one and just look at the movement in the net cash

4   balance of the debtor over the next not two weeks, not four

5   weeks, not six weeks, but 12 weeks, the cash goes from 165.5

6   to 150.2.  Now, you have to back out 50 of that because it

7   assumes a second advance of 50 on December 21st.  So the cash

8   goes from 165.5 to 100.2.  That is a total negative movement

9   of $65 million.

10          So the debtor starts out with 42 1/2 and, under

11  our proposal, plus 75, the debtor would have $117.5 million.

12          The worst the debtor ever gets over the next three

13  months is a cash balance of $52.5 million, which is more than

14  the $50 million cash reserve contemplated by the DIP on the

15  table.

16          So to say that there's any issue created --

17  liquidity issue created by a $75 million DIP during this

18  three-month period just is belied by looking at the debtors'

19  own evidence on liquidity.

20          So we think that not only is our DIP on superior

21  terms, it also addresses the debtors' liquidity at least for

22  three months.  And we don't have the benefit of projections

23  beyond that three-month period.

24          So, you know, we don't know what happens in

25  January and February and March.  We don't know how long the

1   case is going to go.  But we do know that we have a DIP

2   that's junior and is easily takeoutable [sic] -- that's not a

3   word, I'm sorry, with a replacement DIP, which could be a

4   priming DIP.

5          There's no prohibition against that.  There's

6   nothing that stops that and we think that three months of

7   clear sailing from a liquidity perspective is adequate and

8   certainly is better than a DIP that, on an interim basis,

9   really dictates, in large part, the outcome of the case.

10          Now, I know that there's been some discussion

11  about making clear that there's going to be a fiduciary out

12  in the RSA or -- and in the DIP Order, such that if the

13  debtor terminates the RSA in the exercise of its fiduciary

14  duties, it has five days to come into the court and get a

15  remedy to block the DIP lenders from exercising remedies.

16          I'm not clear on where that language is going to

17  land or has landed, but it seems to me that it needs to be

18  clear that if the debtor properly exercises its fiduciary

19  duties, the Court is going to have the power under the Order

20  to enjoin or prevent the 1Ls from exercising remedies.

21          If it's just an argument about whether or not

22  failing to continue the RSA as a default, that's kind of a

23  hollow victory because I think it's pretty clear that failing

24  to continue with the RSA is a default.

25          So, you know, we're concerned that there is, at

1  this juncture, an improper linkage between the DIP financing

2  and the RSA, which really, you know, is tantamount to being a

3  sub rosa plan.

4         Again, I would cite the Court to the decision in

5  Latham where the court refused to approve plan-related

6  provisions in connection with the approval of a DIP.  I think

7  we've got the same problem here.

8         I would comment to the Court that this notion that

9  a debtor is always better off with a -- an RSA at the

10 beginning of the case because it gives everybody comfort as

11 to the certainty of outcome is really not true.

12        We've all been in cases where RSAs at the

13 beginning of the case, because they only involve part of the

14 capital structure, actually resulted in extending the

15 bankruptcy case, rather than hastening the exit.

16        I think Energy Futures is probably the best

17 example of that where, in Judge Sontchi's court, the debtors

18 came in with an RSA with the senior creditors, resulted in a

19 big fight with the junior creditors, and the case completely

20 shattered following that.  I don't think EFH got out of

21 bankruptcy for over four years, and I don't think that's an

22 example of an RSA really being very important to a debtors'

23 successful reorganization efforts.

24        I would also point as another example -- all

25 public information.  Think about the Hertz Chapter 11 case.

1   That case was filed at the trough of the COVID pandemic.

2   Hertz's business was down 90 percent.  If we had entered into

3   an RSA at the beginning of that case, or before we filed,

4   that RSA, most certainly, would have provided that the senior

5   creditors were going to get the company and that the junior

6   creditors and shareholders would have been wiped out.

7   There's no question about that, if you look at the numbers

8   for the Hertz business at that time.

9        We didn't have an RSA and a year later we emerged

10  from bankruptcy paying all creditors, R, plus accrued, and

11  providing an $8 a share return to shareholders.

12       I only mention this because there's no playbook

13  rule that says having an RSA on day one of a case is going to

14  be beneficial or assure a successful outcome and, in fact,

15  the risk you have is the risk you have here, that you have an

16  RSA only with part of the capital structure, the senior part,

17  and it's leaving the juniors out and positioning the juniors

18  to have to fight from the very beginning of the case against

19  odds that it's already difficult enough being a junior

20  creditor.  But to have to fight a debtor who's locked into a

21  plan -- and, sure, the debtor would have the right, assuming

22  the language gets worked out, to come to the Court and seek

23  relief if it terminates the RSA in the exercise of fiduciary

24  duties, that's not a clean thing.  That's not a certainty.

25       And if they come in and they seek that relief and

1  you determine it's not important, where is the debtor at that

2  point?  It's got a defaulted and matured DIP and it's got

3  a -- who has a -- an Order that permits the DIP lenders to

4  then exercise remedies to strike to a value to everybody

5  else.

6       So I continue to believe that the DIP as currently

7  structured does constitute an improper sub rosa plan.  It

8  improperly benefits the first lien lenders.  It puts the

9  second lien and HoldCo creditors at an unfair disadvantage.

10 And, more importantly, it requires the debtor to pursue a

11 particular plan at the very outset of this case before

12 anybody has had an opportunity to really do the homework they

13 got to do, before anybody has had the opportunity to have the

14 engagement they ought to have for a proper Chapter 11 plan

15 process to function.

16      The pricing on the DIP is still exorbitant.  It

17 was originally 50 million of fees would be locked in when the

18 DIP is approved on an interim basis.  That number is now down

19 to about $33 million.  There's -- so there's been some

20 reduction, but it's still a large fee.

21      And in that regard, what I'd really like to do is

22 talk to this -- the testimony and the exhibit that was

23 offered regarding DIP pricing and other deals that -- some of

24 which involved roll-ups.

25      The fact of the matter is that that exhibit is not

1  reliable.  The witness was not aware of the methodology that

2  was used to decide what cases were included and what cases

3  were excluded, although he acknowledged that there were cases

4  that were excluded.  There has been no ability to test the

5  accuracy of the information contained in the exhibit and that

6  the math is -- has been done the right way.  We don't know

7  what was taken out.  And none of the examples, according to

8  the witness, involved interim DIP approval, or at least the

9  witness didn't know whether any of them did.

10         And, importantly -- importantly, the witness

11  testified clearly that this document and the information

12  contained in it was not required -- was not relied upon by

13  any of the boards in determining whether or not the DIP was

14  properly priced and was, in fact, a fair exercise of the

15  debtors' business judgment.

16         And to the point of business judgment, sitting

17  here today, we still have no evidence that any of the debtors

18  -- any of the HoldCo debtors, other than TopCo and then going

19  all the way down to Franchise Group, actually did exercise

20  their business judgment in connection with agreeing to enter

21  into this DIP.

22         We have no testimony about that process.  We have

23  no testimony from anybody who was involved in that process.

24  And, in fact, the record is devoid of who actually was

25  involved in that process.

1          Now, Your Honor, we -- this is important because,

2    from our perspective, the DIP protections, including who is

3    obligated and who is providing adequate protection should be

4    limited to those obligors under the pre-petition first lien

5    debt.

6          The idea of using the DIP to expand the family of

7    companies or debtors who the first lien can look to just

8    doesn't seem right to me.  There's no basis for it.  And, in

9    fact, the carveout that has been agreed to on the record of

10   the two HoldCos that are issuers to the HoldCo debt -- one

11   that issued and one a guarantor of the HoldCo debt, are not

12   the only HoldCos.  There are, in fact, six HoldCos, and

13   there's really no evidence supporting the attachment of the

14   DIP to those other HoldCos.

15         So we would certainly ask that if the DIP is going

16   to be approved, that at least on an interim basis, that it

17   not attach to any of the HoldCo debtors, and that's something

18   that we'll take up, with respect to whether that's

19   appropriate or not, at the final hearing.

20         Your Honor, those are my points.

21         THE COURT:  Okay.

22         MR. LAURIA:  I'm happy to answer any questions.

23         THE COURT:  No questions.  Thank you.

24         Ms. Sinclair, any response?

25         MS. SINCLAIR:  Nothing else, Your Honor.

1          THE COURT:  Okay.  All right.  I'm going to

2   overrule the objections.

3          I think we are here on an interim basis and the

4   purpose of the hearing -- or the purpose of the interim

5   relief is to prevent irreparable harm to the debtors and I

6   think the debtors have put on evidence to establish that,

7   absent approval of the DIP, as revised, and as it's going to

8   be revised, as presented on the record today, will help --

9   will alleviate the possibility of irreparable harm to the

10  debtors and they've shown me that, through the exercise of

11  their business judgment, that that is an appropriate

12  resolution.

13         They've also shown that they cannot obtain funding

14  on a more favorable basis.  The funding provided -- or

15  proposed to be provided by the 2L lenders was substantially

16  below what the debtors' witnesses testified was necessary in

17  order to allow the debtors to get through the case as a whole

18  and I -- the proposed -- the alternative proposed DIP was

19  only a bridge DIP and it would still require some further

20  financing later on down the road, whereas I have a complete

21  financing package today in front of me.

22         The amount of the DIP, I think the debtors have

23  established why it's necessary.  We have three operating

24  companies.  One is being liquidated.  The three operating

25  companies need to make sure that their creditors, their

1 vendors, are comfortable with what's going to happen with

2 this case, that there's going to be funding available to pay

3 them in order for the debtors to receive the materials that

4 they need to continue in operation and I think that's

5 particularly important in a case such as this where we have

6 retail credit -- or retail debtors who need to have the goods

7 that they need to sell.  If they don't have them, they can't

8 sell them and they don't earn money and it destroys value.

9         I don't see the RSA as a sub rosa plan.  There is

10 a fiduciary out for the debtors.  If the debtors believe that

11 they have a better plan, they can come to me on five days'

12 notice and seek to get relief from the plan.  I don't think

13 that automatically constitutes then a breach under the DIP if

14 I determine that they -- a fiduciary out is appropriate.

15         Pricing on the DIP, the 1L lenders have agreed to

16 reduce the financing -- the fees and the interest rate and,

17 pursuant to Mr. Grubb's testimony, it appears that they were

18 within the market value.  And I understand that the 2L

19 lenders didn't have the opportunity to really challenge what

20 Mr. Grubb was putting before them because they didn't have

21 the opportunity to review and put on their own witnesses, but

22 that opportunity will come when we get to the final hearing

23 and they'll have an opportunity to do that.

24         Whether or not the DIP, again, attaches to the --

25 any of -- the guarantee attaches to -- any of the liens

1  attach to any of the HoldCo debtors, that's something to be

2  dealt with on a final basis.  That -- I didn't have no

3  problem with the way the debtors have structured it for the

4  HoldCo debtors at this point.  They can always be removed if,

5  on a final hearing, I decide it's not appropriate.  But at

6  this point in the case, I think it is.

7             So I will, as I said, overrule the objections.  I

8  will approve the DIP on an interim basis and we will move

9  forward with the final hearing.

10            The parties will submit a revised DIP under COC.

11            MR. FELDMAN:  We will do so, Your Honor, as

12  quickly as possible, although I suspect it will be tomorrow

13  morning before you're going to be in a position to sign it.

14            THE COURT:  That's fine.

15            MR. FELDMAN:  But we're going to work tonight to

16  get it done.

17            THE COURT:  Okay.  Thank you.

18            MR. FELDMAN:  Thank you.

19            THE COURT:  All right.  Let's go forward with the

20  rest of the matters.

21            MR. FELDMAN:  Yeah, I'm going to cede the podium

22  to my colleague, Your Honor, and I'm going to actually take a

23  seat in the back, if that's okay with Your Honor.

24            THE COURT:  That's fine.  Thank you.

25            MR. FELDMAN:  Thank you.

1          Your Honor, I was asked if the Court would be

2   prepared to so order use of cash collaterals so that we can

3   continue to make that payroll.

4          THE COURT:  Yes, I will so order that.

5          MR. FELDMAN:  Thank you, Your Honor.

6          THE COURT:  Yep.

7          MR. FELDMAN:  That will be reflected in the

8   record.  Very much appreciated.  Thank you.

9          THE COURT:  Thank you.

10          MS. GRABER:  Good afternoon, Your Honor.

11          Jessica Graber on behalf of the debtors, from

12   Willkie Farr & Gallagher.

13          We will now begin going through the rest of the

14   agenda, if that is all right with Your Honor.

15          THE COURT:  Yes.  Thank you.

16          MS. GRABER:  Thank you.

17          I'll be starting with Agenda Item Number 12, which

18   is the Wages Motion.  This appears at Docket Number 11.

19          Through the Wages Motion, the debtors are seeking

20   authority to continue certain employee benefits in the

21   ordinary course and pay certain pre-petition claims owed to

22   the workforce, both subject to the terms of the Proposed

23   Order and an interim cap of approximately $26.3 million.

24          A large portion of the interim cap accounts for

25   pre-petition compensation obligations owed to the debtors'

1  workforce.

2         The debtors are not requesting to pay any amounts

3  in excess of the 15,150 cap under Section 507 of the

4  Bankruptcy Code.

5         A significant, yet smaller portion, of the interim

6  amount requested relates to the withholdings obligations.

7  And the remaining amount accounts for employee benefit

8  obligations, reimbursable expenses, and paid leave amounts.

9         The debtors offer their employees certain

10  compensation programs.  With respect to their annual

11  incentive program, the debtors are just seeking authorization

12  to continue the program for non-insiders in the ordinary

13  course.  They are current on all payments under this program

14  and do not expect to make any payments until 2025.

15         With respect to the commission program, the

16  debtors are seeking authority to honor pre-petition amounts

17  on an interim basis equal to approximately $1.9 million.

18  There are no payments owed to insiders, as defined under

19  Section 101 of the Bankruptcy Code.  For some of these

20  employees, the amounts earned under the commission program

21  constitute their entire salary.

22         Finally, as discussed with the U.S. Trustee prior

23  to filing, I would like to flag that the debtors are seeking

24  authority to continue their informal severance practices and,

25  pursuant only to entry of a Final Order, remit approximately

1  $115,000 in pre-petition amounts outstanding to non-insiders.

2          For the avoidance of doubt, no payments are owed

3  to insiders under this practice and, if approved under the

4  Final Order, no amounts paid on account of severance will

5  exceed the cap under Section 507 of the Code.

6          We've agreed to add language to the Ad -- from the

7  Ad Hoc Group of Freedom Lenders into a revised proposed form

8  of order that we plan to upload to the docket this evening.

9          We also conferred with the U.S. Trustee prior to

10  filing and incorporated all requested changes into the as-

11  filed Order.

12          Unless Your Honor has any questions, we

13  respectfully request entry of the revised proposed form of

14  order once it's been uploaded.

15          THE COURT:  Thank you.  I have no questions.

16          Anyone else wish to be heard?

17          Mr. Fox?

18          MR. FOX:  Good evening, Your Honor.

19          May it please the Court, Tim Fox, on behalf of the

20  United States Trustee.

21          Rising briefly now to indicate with respect to the

22  balance of the First Day items, my office's informal comments

23  were either reserved pre-filing or subject to minimal changes

24  that will come up.  I expect to only get up to the podium one

25  more time when we discuss the store closings, going-out-of-

1  business motion, but appreciate debtors' counsel working

2  through those issues and the U.S. Trustee does not object to

3  the form of Interim Orders with respect to the balance of

4  today's proceedings.

5          THE COURT:  All right.  Thank you.

6          Anyone else?

7      (No verbal response)

8          THE COURT:  All right.  I'm satisfied the

9  requested relief is appropriate and I'll enter the Order.

10         MR. LAURIA:  Your Honor?  If I may be excused?

11 Mr. Zatz is going to be here to say that we agree to all the

12 rest of the motions in due course, as required.  I'm going to

13 try to make the train, get home for my anniversary.

14         THE COURT:  No.  Yes, you got to keep the wife

15 happy.  Yeah.

16         MR. LAURIA:  Yes.

17         THE COURT:  Yes.

18         MR. LAURIA:  Yes, I do.

19         THE COURT:  Yes.

20         MR. LAURIA:  Thank you, Your Honor.

21         MS. GRABER:  Thank you, Your Honor.

22         The next item on the agenda is Item Number 5,

23 which is the Customer Programs Motion.  This appears at

24 Docket Number 4.

25         I won't rehash everything that we set forth in the

1  motion, but the debtors are seeking authority to maintain and

2  continue various customer programs and to pay any pre-

3  petition obligations relating to such programs in the interim

4  amount of up to $14.86 million.

5         These programs incentivize their customers to buy

6  or promote the debtors' products and are designed to

7  encourage consumer loyalty and foster goodwill for the

8  company.

9         We've agreed to add additional language requested

10  from the Ad Hoc Group of Freedom Lenders to the Order.

11  Additionally, we've conferred with the U.S. Trustee prior to

12  filing and incorporated all changes into the as-filed Order.

13         Unless Your Honor has any questions, we

14  respectfully request entry of a revised form of order once

15  uploaded.

16         THE COURT:  Okay.  I have no questions.  Anyone

17  else wish to be heard?

18      (No verbal response)

19         THE COURT:  All right.  I'm satisfied the

20  requested relief is appropriate and I will enter the Order.

21         MS. GRABER:  Thank you, Your Honor.

22         Next up is the Critical Vendors Motion, which is

23  Agenda Item Number 11 and Docket Number 10.

24         The debtors are seeking a revised interim cap of

25  $35 million to cover certain pre-petition amounts owed to

1  critical vendors across all four of the debtors' operating

2  companies, Vitamin Shoppe, Pet Supplies, Buddies, and

3  American Freight.

4        The motion requests customary critical vendor

5  relief which, as been set forth for Your Honor today, the

6  debtors believe is immediately necessary to preserve value.

7        We believe the terms that I will lay out for Your

8  Honor resolve the 2L and HoldCo lenders' objections and

9  maintain the debtors' ability to preserve the enterprise

10 value for the benefit of all creditors.

11        In addition to the reduced requested interim cap

12 of $35 million, the debtors plan to bake into their proposed

13 interim order certain reporting requirements of payments made

14 under the critical vendors bucket.

15        This will be a report provided to the U.S. Trustee

16 and advisors, to the DIP lenders, Ad Hoc Group of First Lien

17 lenders, Second Lien Term Loan Lenders, ABL lenders, HoldCo

18 lenders, and the Official Committee of Unsecured Creditors,

19 if and when appointed.

20        The debtors would like to reserve their right to

21 come back in front of Your Honor or, if it please the Court,

22 submit an Order under certification of counsel with a request

23 for a second interim amount of an incremental $30 million for

24 additional relief when the need arises.

25        This makes the total interim amount $65 million,

1  which we believe is acceptable to the 2L and HoldCo lenders,

2  but we need the benefit of more time to discuss.

3          Unless Your Honor has any questions, we

4  respectfully request entry of the revised proposed Order when

5  uploaded.

6          THE COURT:  Okay.  I have no questions.  Anyone

7  else wish to be heard?

8      (No verbal response)

9          THE COURT:  I'm satisfied the requested relief is

10 appropriate.  I'll enter the Order.

11         MS. GRABER:  Thank you, Your Honor.

12         I will now pass the podium over to Mrs. McElroy.

13         THE COURT:  Okay.

14         MS. MCELROY:  Good afternoon, Your Honor.

15         Kristin McElroy, from Young Conaway Stargatt &

16 Taylor, proposed co-counsel for the debtors.

17         I will be presenting Agenda Items 4, 6, 8, and 9

18 before turning over the podium to my colleague, Ms. Loison.

19         Item Number 4 on the agenda is the Debtors'

20 Application to Retain Kroll Restructuring Administration, LLC

21 as Claims and Noticing Agent Under Section 156(c) of the

22 Bankruptcy Code.

23         The debtors have submitted a declaration in

24 support of this application, which is attached as Exhibit B.

25         In this case, we have more than 200 creditors and,

1   therefore, Local Rule 2002-1(f) requires the appointment of a

2   claims agent.

3        The debtors' solicited proposals from at least two

4   other court-appointed claims and noticing agents in

5   compliance with the Court's claims agent retention protocol.

6        We sent the application to the United States

7   Trustee prior to filing and incorporated the few comments we

8   received.

9        Unless Your Honor has any questions, we

10  respectfully request entry of the Order.

11       THE COURT:  Okay.  I have no questions.  Anyone

12  else wish to be heard?

13       (No verbal response)

14       THE COURT:  All right.  I'm satisfied the

15  retention is appropriate and I'll enter the Order.

16       MS. MCELROY:  Thank you, Your Honor.

17       Moving on to Item 6 on the agenda is the Debtors'

18  Motion for an Order Approving Notice Procedures for Trading

19  in Certain Equity Interests in the Claiming of Worthless

20  Stock Deductions.

21       The purpose of this motion is to protect and

22  preserve the value of the debtors' tax attributes, including

23  net operating losses, which are booked at debtor, Franchise

24  Group, Inc.

25       As of the petition date, debtor, Franchise Group,

1  Inc., has tax attributes, including NOLs estimated at over

2  $200 million.

3          An ownership change under Section 382 of the Tax

4  Code can result from trading in equity interests or declaring

5  a worthless stock deduction and can impair the debtors'

6  ability to use the tax attributes in net operating loss

7  carry-forwards.

8          Once the use of the NOLs is limited, impaired, or

9  lost by the company under the Tax Code, they are gone forever

10 and cannot be revived.

11         Certain transfers of the debtors' equity interests

12 effectuated during the bankruptcy case prior to the company's

13 emergency from bankruptcy could seriously impair or eliminate

14 these valuable assets.

15         As a result, the debtors are proposing these

16 procedures as a safeguard to avoid immediate and irreparable

17 to the estates.

18         We sent the motion to the United States Trustee

19 prior to filing and incorporated the few comments we

20 received.

21         In addition, prior to the hearing, we received

22 comments from the Ad Hoc Group of Freedom Lenders and the

23 debtors have agreed to incorporate the requested language.

24         Unless Your Honor has any questions, we will

25 submit a revised form of order under certification of counsel

1  and ask the Court grant the Order, as revised.

2          THE COURT:  Okay.  I have no questions.  Does

3  anyone else wish to be heard?

4      (No verbal response)

5          THE COURT:  All right.  I'm satisfied the

6  requested relief is appropriate and I will enter the Order.

7          MS. MCELROY:  Thank you, Your Honor.

8          Next up for me is Item Number 8 on the agenda,

9  which is the Debtors' Motion Seeking an Order Prohibiting the

10 Utility Companies from Cutting Off Service and Establishing

11 Certain Procedures for Adequate Assurance of Future Payment.

12         The debtors propose to deposit $1.26 million into

13 a segregated account which equals approximately 50 percent of

14 the debtors' estimated monthly cost of utility services.

15         The debtors rely on the utility companies to

16 provide various utility services to the debtors at their

17 corporate offices and retail locations.  If the utility

18 companies were to refuse or discontinue service, the debtors

19 would not be able to operate their business, resulting in

20 immediate and irreparable harm to the debtors' business

21 operations and the value of the estate.

22         The procedures are consistent with Section 366 of

23 the Bankruptcy Code and also consistent with other procedures

24 routinely approved in this District.

25         We sent the motion to the United States Trustee

1  prior to filing and incorporated the few comments we

2  received.

3  Also, prior to the hearing, we received comments

4  from the Ad Hoc Group of Freedom Lenders and the debtors have

5  agreed to incorporate the requested language.

6  Unless Your Honor has questions, we will submit a

7  revised form of order under certification of counsel and ask

8  the Court grant the Order, as revised.

9  THE COURT:  I have no questions.  Anyone else wish

10  to be heard?

11  (No verbal response)

12  THE COURT:  All right.  I'm satisfied the

13  requested relief is appropriate and I will enter the Order.

14  MS. MCELROY:  Thank you, Your Honor.

15  Last up for me is Item 9 on today's agenda, which

16  is the Debtors' Motion to Redact Certain Personal Identifying

17  Information from the Creditor Matrix and Similar Pleadings.

18  We sent the motion to the United States Trustee

19  prior to filing and following discussions with Mr. Fox post-

20  filing, the debtors agreed to remove the request for

21  electronic noticing procedures from the Order.  These changes

22  were filed yesterday under notice of blackline at Docket

23  Number 74.

24  The debtors submit that certain personal

25  identifying information, namely home and email addresses of

1  individuals, should be redacted from the creditor matrix and

2  other documents filed in this case.

3          Section 107(b) of the Bankruptcy Code authorizes

4  the Court to grant this relief by permitting the Court to

5  issue Orders that protect parties from disclosure of

6  confidential information.  This protective measure will serve

7  to prevent identity theft or unlawful injury to these

8  creditors by virtue of disclosure of this information.

9          Therefore, the debtors submit that redaction is

10  appropriate.

11          Additionally, the debtors have agreed to provide

12  an unredacted copy of the creditor matrix and similar

13  pleadings to the U.S. Trustee, the Court, and any Committee

14  appointed in this case.

15          Unless Your Honor has any questions, we

16  respectfully request entry of the Order.

17          THE COURT:  Okay.  I have no questions.  Anyone

18  else wish to be heard?

19      (No verbal response)

20          THE COURT:  All right.  I'm satisfied the

21  requested relief is appropriate and I will enter the Order.

22          MS. MCELROY:  Thank you, Your Honor.

23          I now cede the podium to Ms. Loison of Willkie

24  Farr & Gallagher.

25          THE COURT:  Okay.

1          MS. LOISON:   Good afternoon, Your Honor.

2          For the record, Marine Loison, Willkie Farr &

3   Gallagher, proposed co-counsel for the debtors.

4          I will be presenting Agenda Items Number 7 and 13

5   this afternoon.

6          First is Agenda Item Number 13, the Debtors'

7   Motion to Pay Pre-Petition Taxes, which is filed at Docket

8   Number 12.

9          Through this motion, the debtors seek authority to

10   pay pre-petition taxes and to continue paying taxing

11   authorities in the ordinary course of business as such taxes

12   become due.

13          The debtors pay all taxes and fees periodically in

14   the ordinary course.  The taxes and fees here include sale

15   and use taxes, income and franchise taxes, regulatory tax and

16   fees, and personal property and real estate taxes.

17          The debtors are seeking relief in the amount of

18   $21.5 million in taxes and fees owed pre-petition, 15.07

19   million of which the debtors believe are going to come due

20   within the first 21 days of the case.

21          None of the taxes the debtors are seeking

22   authority to pay represent old, unpaid taxes.

23          The debtors are seeking relief under Rule 6003(b)

24   and believe there would be immediate and irreparable harm

25   without the entry of this Interim Order.

1          The debtors previewed this motion with the United

2     States Trustee and accepted all informal comments.

3          We have also added language at the request of the

4     Ad Hoc Group of Freedom Lenders, which will be reflected in a

5     Revised Order filed under certification of counsel.

6          Unless Your Honor has any questions, we

7     respectfully request entry of the Revised Interim Tax Order

8     when uploaded.

9          THE COURT:  I have no questions.  Anyone else wish

10    to be heard?

11        (No verbal response)

12        THE COURT:  I'm satisfied the requested relief is

13    appropriate and I will enter the Order.

14        MS. LOISON:  Thank you, Your Honor.

15        The next agenda item is Item Number 7, the

16    Debtors' Motion for Authority to Continue their Insurance

17    Programs, Including their Premium Financing Program and to

18    Pay Associated Premiums, which is filed at Docket Number 6.

19        Through this motion, the debtors seek authority to

20    maintain and perform under their insurance policies in the

21    ordinary course, including their insurance premium finance

22    agreement.

23        The debtors maintain a comprehensive insurance

24    program, including commercial, general liability, director

25    and officer liability, and property liability, among others,

1  which are designed to protect and preserve the debtors'

2  assets.

3        The list of the debtors' insurance policies is

4  attached to the motion as Exhibit A.  Certain of these

5  insurance premiums are financed with First Insurance Funding,

6  the debtors' insurance lender.

7        The debtors also work with an insurance broker who

8  assists the debtors in obtaining and managing the debtors'

9  insurance policies.

10        The debtors are seeking authority to pay $450,000

11  on account of the first installment payment under the premium

12  financing agreement and payments due under certain flood

13  insurance.

14        If these premiums were to go unpaid, the insurance

15  carriers could cancel the policies or refuse to do business

16  with the debtors.  Such loss of insurance coverage would be a

17  large financial burden on the debtors.

18        Further, the United States Trustee guidelines

19  require debtors maintain these insurance policies and any

20  lapse could render the debtors non-compliant with these

21  guidelines.

22        The debtors are, again, seeking relief under Rule

23  6003(b) and believe there would be immediate and irreparable

24  harm without the entry of this Interim Order.

25        The debtors previewed this motion with the United

1   States Trustee and accepted all informal comments.

2           We have also added language at the request of the

3   Ad Hoc Group of Freedom Lenders, which will be reflected in a

4   Revised Order filed under certification of counsel.

5           Unless Your Honor has any questions, we

6   respectfully request entry of the revised insurance Order

7   when uploaded.

8           THE COURT:  All right.  I have no questions.

9   Anyone else wish to be heard?

10       (No verbal response)

11          THE COURT:  All right.  I'm satisfied the

12  requested relief is appropriate and I will enter the Order.

13          MS. LOISON:  Thank you, Your Honor.

14          I will pass the podium to my colleague, Joseph

15  Brandt.

16          THE COURT:  Thank you.

17          MR. BRANDT:  Good evening, Your Honor.

18          For the record, Joseph Brant of Willkie Farr &

19  Gallagher, proposed co-counsel to the debtors.

20          The last item on today's agenda, Your Honor, is

21  Item Number 14, which is the Debtors' Motion to Assume the

22  Liquidator Consulting Agreement with HilCo Merchant Retailers

23  and to Approve Store Closing Procedures in Connection with

24  the Liquidation of their American Freight Business.

25          The debtors are also seeking the approval of a

1   customary bonus program for certain non-insider store level

2   employees who work in the stores and distribution centers

3   that will be liquidated and closed through this process.

4          The motion is supported by the First Day

5   Declaration of Mr. Orlofsky, and specifically paragraphs 131

6   to 143 of his Declaration.

7          A revised form of the Interim Order approving the

8   motion was uploaded at Docket Number 75 to reflect the

9   handful of changes that were made in response to comments

10  received from both the U.S Trustee and certain language.

11         I'll keep my presentation very brief, Your Honor,

12  as my colleague has described a key component of the debtors'

13  reorganization efforts in these cases.  It's a liquidation

14  and wind-down of their American Freight business line.

15         As explained in the motion and the Orlofsky

16  Declaration, the difficult decision to liquidate American

17  Freight was made only after the debtors' careful

18  consideration of other strategic options and potential

19  transactions to try and preserve the business at a going

20  concern.

21         Ultimately, the debtors selected HilCo to assist

22  and consult the debtors on the store closing sales and the

23  parties negotiated and entered into a consulting agreement

24  that is attached as an exhibit to the motion.

25         For the reasons set forth in the motion and the

1    Orlofsky Declaration, Your Honor, the debtors believe that

2    the services provided by HilCo under the consulting agreement

3    are necessary to execute the store closing sale process and

4    to do so in a value-maximizing timely and orderly manner.

5              A final point on the motion.  The debtors also

6    seek the approval of a customary store bonus program.  It

7    will cover approximately 780 of American Freight's non-

8    insider store level employees.

9              The aggregate cost of the program is approximately

10   $2.9 million and the maximum store bonus that will be

11   provided to any individual employee is approximately $2,500.

12             The store bonuses are conditioned on eligible

13   employees remaining employed for the duration of their store

14   closing sales.

15             Your Honor, as explained in the Orlofsky

16   Declaration, the debtors believe that the store bonus program

17   is necessary to sustain employee morale and to facilitate the

18   store closing sales during the cases.

19             Without the store bonuses, the debtors are likely

20   to lose key store personnel that are critical to administer

21   the sales.  This will result in less value realized through

22   the store closing sales and threaten the overall success of

23   the process, all to the detriment of the debtors'

24   stakeholders.

25             The structure, size, and scope of the store bonus

1  program is recommended by HilCo, who has significant

2  expertise and experience developing these types of programs

3  in other similar cases.

4          And importantly, the store bonus program is

5  supported by the debtors' DIP lenders and the Ad Hoc Group of

6  First Lien lenders.

7          Accordingly, Your Honor, the debtors submit that

8  the store bonus program is a valid exercise of their business

9  judgment and the approval of the program is warranted under

10 Section 363.

11         With that, Your Honor, the debtors will rely on

12 the motion and the Orlofsky Declaration for approval of the

13 Interim Order.

14         I'm happy to answer any questions that Your Honor

15 has.

16         THE COURT:  Okay.  I have no questions.  I know

17 Mr. Fox wanted to be heard.

18         MR. FOX:  Good evening again, Your Honor.

19         May it please the Court, Tim Fox, on behalf of the

20 United States Trustee.

21         Again, rising to indicate that there's no

22 objection to the revised form of order for purposes of

23 interim relief with respect to this motion.

24         I did just want to note on the record that these

25 issues continue to be an important point of concern for the

1   U.S. Trustee and we reserve all rights in connection with the

2   Final Order.

3           We understand that the Interim Order provides for

4   the filing of a declaration disclosing connections that HilCo

5   may have to other parties in interest in the case and we will

6   evaluate that in due course.

7           Additionally, while it's not yet contemplated that

8   there would be a sale of the other operating companies to

9   HilCo or its affiliates, we reserve all rights to the extent

10  that sale or relief is sought later in the case as well.

11          THE COURT:  All right.

12          MR. FOX:  Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Fox.

14          Anyone else?

15      (No verbal response)

16          THE COURT:  All right.  I'm satisfied the

17  requested relief is appropriate and I will enter the Order.

18          MR. BRANDT:  Thank you, Your Honor.

19          Unless any of my colleagues tell me otherwise, I

20  believe that concludes the agenda for today.

21          THE COURT:  All right.  Thank you.

22          Ms. Sinclair?

23          MS. SINCLAIR:  Yes, Your Honor,  very quickly.

24          Debra Sinclair, Willkie Farr, again, for the

25  record.

1         Just before we conclude today, I would like to

2  make sure we have a time set for the final hearing.  I

3  believe your chambers provided us with December 10th.  I

4  wanted to make sure that still worked for you all, and if you

5  have a specific time, we'll make a note of that as well.

6         THE COURT:  I have it on my calendar for December

7  10th at 10:00 a.m.

8         MS. SINCLAIR:  Thank you, Your Honor.

9         We'll see you again then.

10        THE COURT:  All right.  Thank you.

11        Just to put something on the radar, given the size

12  of this case, I will need a fee examiner.  But we'll deal

13  with that once a committee gets appointed so that's -- or too

14  early for now.  But I just wanted to mention it.

15        MR. FOX:  One last point, Your Honor.

16        Again, Tim Fox, on behalf of the United States

17  Trustee.

18        My office did commence its solicitation for

19  interest in an Official Committee of Unsecured Creditors

20  yesterday, setting a response deadline for a week from today

21  on November the 13th.

22        To the extent any creditor has not received that

23  solicitation and would like a copy, please just send me an

24  email at timothy.fox@usdoj.gov and we'll ensure you get a

25  copy of the questionnaire.

1        THE COURT:  All right.

2        MR. FOX:  Thank you.

3        THE COURT:  Thank you, Mr. Fox.

4        All right.  Anything else?

5    (No verbal response)

6        THE COURT:  All right.  Thank you all very much.

7        We are adjourned.

8        COUNSEL:  Thank you, Your Honor.

9    (Proceedings concluded at 5:08 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**C**ERTIFICATION</u>

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling _____          November 6, 2024

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams _____          November 6, 2024

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable