**EXHIBIT D**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3    IN RE:                       .  Chapter 11
                                   .  Case No. 24-12480 (JTD)
 4    FRANCHISE GROUP, INC.,       .
      et al.,                      .  (Jointly Administered)
 5                                 .
                                   .  Courtroom No. 3
 6                                 .  824 North Market Street
                 Debtors.         .  Wilmington, Delaware 19801
 7                                 .
                                   .  Thursday, November 21, 2024
 8    . . . . . . . . . . . . . .  .  4:39 p.m.

 9                       TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
10                  UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:

12    For the Debtors:           Edmon L. Morton, Esquire
                                 YOUNG CONAWAY STARGATT & TAYLOR, LLP
13                               Rodney Square
                                 1000 North King Street
14                               Wilmington, Delaware 19801

15                               -and-

16                               Debra M. Sinclair, Esquire
                                 WILLKIE FARR & GALLAGHER LLP
17                               787 Seventh Avenue
                                 New York, New York 10019

18

19    (APPEARANCES CONTINUED)

20    Audio Operator:           Sharon A. Page, ECRO

21    Transcription Company:    Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
      Proceedings recorded by electronic sound recording,
25    transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Ad Hoc Group
of Freedom Lenders:        J. Christopher Shore, Esquire
                           WHITE & CASE, LLP
                           1221 Avenue of the Americas
                           New York, New York 10020

For the Official
Committee of
Unsecured Creditors:       Bradford J. Sandler, Esquire
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           919 North Market Street
                           17th Floor
                           Wilmington, Delaware 19801

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 1:    Notice of Filing Proposed Second Interim Order    4
4               (I) Authorizing the Debtors to Pay Certain
                Prepetition Claims of Certain Critical
5               Vendors, Foreign Vendors, Shippers & Logistics
                Providers, and 503(b)(9) Claimants; and (II)
6               Granting Related Relief [D.I. 176, 11/14/24]

7               Court's Ruling:                                   33

8

9    Transcriptionists' Certificate                              36

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 4:39 p.m.)

2           THE COURT:  Good afternoon, this is Judge Dorsey.

3   We're on the record in Franchise Group, Inc., Case Number 24-

4   12480.

5           Before we begin, I'll just put on the record that

6   we did a chambers conference this morning in this case where

7   I was looking to see if there was a consensual resolution to

8   the issues regarding the additional use of or the additional

9   payment of critical vendors.  At that hearing -- at that

10  conference, it became clear that there was not a potential

11  resolution and that we were going to need to go forward with

12  a hearing on an expedited basis based on the representations

13  of the debtors that the funding was necessary so they can pay

14  these vendors by Friday without causing harm to the debtors'

15  assets.  So, for those reasons, we are back on the record and

16  we'll go from there.

17          Ms. Sinclair, on behalf of the debtors?

18          MS. SINCLAIR:  Yes, Your Honor.

19          For the record, Debra Sinclair, Willkie Farr &

20  Gallagher, for the debtors.

21          Your Honor, as you noted, the only agenda item

22  today is our proposed second interim order authorizing

23  certain payments to critical and foreign vendors, shippers

24  and logistics providers, and 503(b)(9) payments.  We filed

25  that proposed second interim order last Thursday,

1   November 14th.  The objection deadline was today at 4:00 p.m.

2           The ABL lenders, first lien lenders, and the U.S.

3   Trustee are all signed off on that proposed order.  We've

4   received no written objections to the order, but as you

5   noted, the second lien HoldCo lenders are continuing to

6   contest our need for the interim critical vendor relief, at

7   least, in part.  I'll give Your Honor the update on what's

8   transpired since our status conference this morning.

9           But first, for the benefit of everyone in court,

10  I'd like to quickly bring the Court up to speed on what's

11  transpired in this regard since the first day hearing.  The

12  debtors originally requested an interim cap of $76.6 million

13  for the critical vendor payments.  We then decreased that

14  amount following discussions with the 2L HoldCo lenders to

15  $65 million in an effort to reach compromise with them on the

16  terms of this order.

17          Another piece of that compromise which we agreed

18  to as an accommodation to the second lien and HoldCo lenders

19  was that we would only receive $30 million of that bucket at

20  the first day hearing with the understanding that the company

21  would be able to obtain the rest of the relief, pursuant to a

22  second interim order if we needed to ultimately use the

23  remaining $35 million under the interim cap.

24          We established a lengthy and detailed record at

25  the first day hearing of the need for the relief requested in

1   the motion on the time frame that we requested it.  We did

2   not agree that the second lien and the Holdco lenders to hold

3   another hearing later to relitigate whether there was an

4   actual need to make these payments; the only question was the

5   time frame on which we needed to make them.

6           The answer is that we need to make those payments

7   now.  As Your Honor noted, we need access to the rest of the

8   bucket tomorrow and we are worked diligently with the 2L

9   HoldCo lenders throughout the week, including up to the

10  moments prior to this last hearing to help them understand

11  the urgent need for the second piece for that $65 million

12  bucket.

13          Shortly before the hearing, we reached an

14  agreement with the second lien and the HoldCo lenders on a

15  reservation of rights which we understand will resolve the

16  objection to our usage of $31 million of the $35 million in

17  the second interim bucket that we're requesting.  That is an

18  amount that is not related to the American Freight entities,

19  which I'll return to in a moment.  But the reservation of

20  rights that I'd like to read into the record is:

21          "Notwithstanding anything to the contrary in the

22  first interim order or the second interim order, the rights

23  of the debtors, the Ad Hoc Group of Freedom Lenders, and any

24  other party in interest under the Bankruptcy Code or

25  applicable non-bankruptcy law, including, with respect to

 1   compliance with the first interim order or the second interim
 2   order, are preserved to the fullest extent possible."
 3           Your Honor, with respect to the $4 million in the
 4   second interim bucket that relates to American Freight, we
 5   understand that the objection still stands from the second
 6   lien HoldCo group.  Those claims, I'd like to note, are
 7   really to be paid to warehousemen and logistics providers
 8   who, otherwise, are going to have a lien on inventory that
 9   the debtors are trying to liquidate as part of the
10   liquidation of the American Freight company.  If we can't
11   obtain a release of that property, then we can't liquidate
12   the assets of the company and we can't liquidate them,
13   importantly, on the timeline anticipated by our GOB sale
14   order, which anticipates that the assets will be liquidated
15   by December 31st.  The longer we go past that date, the more
16   we'll incur in terms of administrative expenses, at the very
17   least.
18           As we understand it, as we stated, the reservation
19   of rights that I read into the record resolves the objection
20   for the purposes of the $31 million of the 35, and so we'd
21   like to focusing the rest of our presentation today on the
22   balance of the bucket relating to American Freight, which we
23   do continue to need tomorrow and which we request that the
24   Court grant.
25           THE COURT:  Okay.

1    MS. SINCLAIR:  Before we dive deeper into the

2  reasons that the relief should be granted, I'd like to start

3  by quickly reviewing the relevant legal standards for

4  approving critical vendor relief.  There are three bases for

5  the relief requested in the motion:  Section 363(b) of the

6  Bankruptcy Code, which allows payment to prepetition

7  obligations where sound business purpose exists; Section

8  105(a) of the Bankruptcy Code, which allows the Court to

9  authorize payment of prepetition claims based on the doctrine

10  of necessity; and Rule 6003(b) of the Federal Rules of

11  Bankruptcy Procedure, which allow courts to grant interim

12  period if the debtors show that the relief is necessary to

13  avoid immediate and irreparable harm.

14    Taking each one and turn, the Court applies the

15  business judgment rule under Section 363(b) of the Bankruptcy

16  Code.  In the context of first day relief, courts have

17  interpreted this to mean that the debtor must articulate some

18  business justification for making prepetition payments to

19  creditors and that the Court has broad flexibility to tailor

20  its orders to meet a wide variety of circumstances.  That

21  language can be found, for example, in, In re Ionosphere

22  Clubs, 98 B.R. 174, which we have cited in our motion.

23    The concept is articulated more generally in

24  Delaware case law, as well; for example, in Smith v Van

25  Gorkom, 488 A.2d 858, the Supreme Court of Delaware stated

1 that the business judgment rule is a presumption.  That in

2 making a business decision, the directors of a corporation

3 acted on an informed basis, in good faith, and in the honest

4 belief that the action was taken in the best interests of the

5 company.

6       Similarly, in Aronson v Lewis, 473 A.2d 805, the

7 Supreme Court of Delaware stated that absent an abuse of

8 discretion, a company's business judgment will be respected

9 by the courts, and went on to say that the burden is on the

10 party challenging that decision to establish facts rebutting

11 the presumption.

12       With respect to Section 105(a), the Court may

13 authorize the payment of prepetition obligations under the

14 doctrine of necessity.  The United States Court of Appeals

15 for the Third Circuit recognized this doctrine in, In re

16 Lehigh and New England Railway Corporation, 657 F.2d 570, in

17 which the Third Circuit held that the Court could authorize

18 the payment of prepetition claims if the payment was

19 essential to the continued operations of the debtor.  The

20 Court specifically noted that those payments are justified

21 where there is, quote, "a possibility that the creditor will

22 employ an immediate economic sanction failing such payment."

23      The Third Circuit, in, In re Penn Central

24 Transportation Company, 467 F.2d 100, made a payment -- made

25 a similar finding, holding that the doctrine of necessity

1  permits "immediate payment of claims of creditors where those

2  creditors will not supply services or material essential to

3  the conduct of the business until their pre-reorganization

4  claims have been paid."

5          And, finally, with respect to immediate and

6  irreparable harm, that term is not defined in Rule 6003, but

7  courts have found that it exists where the absence of relief

8  would impair a debtor's ability to reorganize or threaten the

9  debtor's future as a going concern, as stated, for example,

10  in, In re Ames Department Stores, Inc., 115 B.R. 34.

11          Your Honor, at the first day hearing, we offered a

12  substantial amount of evidence supporting the relief

13  requested in accordance with these legal standards.  I'd like

14  to revisit, briefly, some of that evidence today in the

15  context of the request for the second interim bucket.

16          We first tendered a declaration from Mr. David

17  Orlofsky, the debtors' chief restructuring officer.  In that

18  declaration, Mr. Orlofsky stated the following.  In

19  paragraph 128, Mr. Orlofsky stated, quote:

20          "The debtors' critical goods and services

21  providers support nearly every aspect of the debtors'

22  business, including by storing the debtors' products,

23  shipping the debtors' products to their franchisees and

24  customers, and supplying their products and merchandise."

25          In paragraph 129, Mr. Orlofsky stated, quote:

1          "Moreover, with respect to each of the debtors'

2    businesses, the debtors obtained core products and

3    merchandise from a limited number of highly specialized

4    vendors that are irreplaceable, due to, among other things,

5    demand created by branding and marketing."

6          Continuing in paragraph 129, Mr. Orlofsky stated,

7    quote:

8          "The debtors failed to stop the products that

9    customers have grown accustomed to seeing in their stores and

10   across their e-commerce websites, the effects would extend

11   far beyond simply not offering those particular products.  If

12   consumers become aware that the debtors do not stock a

13   particular item, they simply will not come to the debtors'

14   stores or visit their websites, where they may have purchased

15   additional items beyond the one product that they initially

16   came to purchase."

17         Mr. Orlofsky concludes in paragraph 129 by

18   stating, quote:

19         "I believe that if the debtors' critical goods and

20   services providers refused to continue doing business with

21   the debtors on account of outstanding prepetition amounts,

22   replacing them will cause significant delays in each debtor's

23   ability to deliver the necessary products to its stores,

24   franchisees, and customers during the rapidly approaching

25   holiday season, which would not only jeopardize, but also

1  cause irreparable and potentially irreversible damage to the

2  debtors' business and their estates."

3         Also Levitt to the American Freight piece of this

4  equation is Mr. Orlofsky's statement in paragraph 135 in

5  which he states, quote, "The debtors will realize an

6  immediate benefit in terms of financial liquidity upon the

7  sale of the store-closure assets and the termination of the

8  operations at those stores," both of those terms referring to

9  the American Freight stores.

10         At the first day hearing, you also heard evidence

11  through the live testimony of Mr. Orlofsky, both in his

12  cross-examination and his direct examination.  During his

13  cross-examination, Mr. Orlofsky was asked by Mr. Shore of

14  White & Case:

15         "Question:  When you say, "critical vendors," it's

16  your conclusion and your testimony to the Court that 99

17  percent of the prepetition, unsecured creditors of these

18  debtors are critical?

19         "Answer:  No.  You keep saying they're all

20  critical.  There's a lot that is 503(b)(9), which is not

21  critical; that's just the way the Bankruptcy Code works;

22  that's number one.

23         Number two, when you deal with vendors, they don't

24  want to wait until the end of the case to know that they are

25  getting paid, particularly in retail.  They want to know

1    today that they're getting their money so that they will keep

2    shipping to you and not put you on C.O.D. terms.  The *quid*

3    *pro quo* for paying any of 503(b)(9)s or critical vendor

4    payments is that they get continued trade terms and they keep

5    shipping goods so that we have things in the stores to sell.

6    That's the critical component of this.  That's why we try to

7    pay it early in the case so we keep the vendors happy to try

8    to minimize disruption."

9             That is from the November 5th, 2024, hearing

10   transcript, page 102, line 11, through page 103, line 20.

11            During his redirect examination, Mr. Orlofsky was

12   asked by Mr. Dugan of Willkie Farr:

13            "Question:  You gave testimony in your declaration

14   and cross with respect to critical vendors.  What is a

15   critical vendor?

16            "Answer:  Critical vendors, and you have to

17   understand it in light of the types of businesses we have --

18   The Vitamin Shoppe buys very specialized products from very

19   specialized vendors there, so there are products that you

20   can't really get from other vendors that are hard to replace

21   and things like that.  Things that would be, you know, again,

22   when you have specialized product and people want it, there

23   are only certain places you can get it from, so it disrupts

24   the flow of the customer experience.  It disrupts sales that

25   you need to sell.  And there are things that are kind of

1  unique or troubling; they are unique products or they are

2  'difficult to find' alternative sources from that

3  perspective.

4        "Question:  Why is it important for the debtors to

5  pay their critical vendors within a reasonably short period

6  of time?

7        "Answer:  Well, I mean, we have already had this

8  yesterday and we are having it every day we are here.  We are

9  getting constant vendor calls about 'Where is my payment?  If

10  I don't get paid...'

11        Because vendors understand 503(b)(9), they

12  understand critical vendors.  Some of these vendors will been

13  through other restructurings before so they understand how

14  this works.  If you don't pay them, they put you on hold and

15  they don't send you product.  If you don't have product, it

16  becomes a natural impact.  If you don't have product in

17  stores and if you sell things, people will stop coming to

18  your stores."

19        That testimony is from page 117, line 4, through

20  page 118, line 7, of the November 5th, 2024, hearing

21  transcript.

22        Mr. Orlofsky was further asked by Mr. Dugan:

23        "Question:  So your understanding is as the chief

24  restructuring officer of the debtors, what do you reasonably

25  think would happen to the debtors if they were unable to keep

1  their critical vendors happy and pay them within a reasonable

2  period of time?

3          "Answer:  I mean, it's bad for the business.  It's

4  bad for the enterprise value.  And if it goes on for too

5  long, you are kind of looking at more situations where you

6  have to potentially liquidate the business, as opposed to

7  reorganize the business, which, as unfortunately, we are

8  seeing with American Freight, is not a good place to be for

9  anybody."

10          That testimony is from page 118, lines 14

11  through 25, of the November 5th, 2024, hearing transcript.

12          The next day at the November 6th, 2024, hearing,

13  Mr. Orlofsky was further questioned by Mr. Dugan as follows:

14          "Question:  Focusing on the 503(b)(9) vendors, why

15  is it important for the company to pay these vendors

16  relatively promptly?

17          "In retail, particularly, because we had the same

18  issue when I was at Party City, vendors in retail get very

19  sketchy with retailers that are in bankruptcy, even ones that

20  have plans to come out, because there's a long history of

21  big-name retailers and smaller-name retailers that actually

22  didn't make it and didn't survive a Chapter 11 and ultimately

23  converted.  So it's an area of interest in many industries,

24  but I believe it's more high-profile or more of an urgent

25  nature for vendors in the retail space.

1      What they like to do is they want to get

2 their 503(b)(9) claims paid during the pendency of the case

3 and they want to know when they are going to be paid early.

4 And if they don't tend to know, they tend to put you on

5 things like C.O.D. or stop shipping, which, unfortunately, is

6 kind of what's happened over the last 72 hours since we filed

7 bankruptcy."

8      That testimony is from page 78, line 8, through

9 page 79, line 24, of the November 6th, 2024, hearing

10 transcript.

11      Mr. Orlofsky was further asked:

12      "Question:  And what can be the consequences to be

13 business of having its vendors put on C.O.D. terms?

14      "Answer:  Besides the trade contraction and the

15 potentially higher payment amount, it is also disruptive;

16 that is not the way companies like to operate.  And it's

17 also, you know, some vendors won't even ship to you on

18 C.O.D.; some of them will just stop.  They are not required

19 to keep shipping to you.

20      A lot of these vendors are on, you know, open to

21 buy, so there is not a commitment to buy; you just set a

22 price and buy the quantity that you," there's an

23 "indiscernible" end to that quote.

24      "Question:  And in the situation where you have

25 vendors putting you on C.O.D. or not shipping, what effect is

1  there on the revenue of the business?

2         "Answer:  If you do not have product in your

3  store, then, naturally --" there's an indiscernible quote --

4  "along in terms of lower sales to the business and less

5  repeat customers.  When we try to talk about bankruptcy, we

6  try to make it as "business as usual" as possible.

7         If customers can come into the store and buy their

8  products and not notice any difference, they'll continue to

9  keep coming back.  They tend not to come back if product is

10 not there.  So if you don't have product, they tend not to

11 come back.  You tend to lose them in sales and then,

12 ultimately, EBITDA, and then kind of falling through the

13 waterfall.  Enterprise value will decline over time if you

14 can't arrest that slide."

15        That testimony is from page 80, line 9, through

16 page 81, line 14, of the November 6th, 2024, hearing

17 transcript.

18        Finally, Mr. Orlofsky was asked:

19        "Question:  How many of your critical vendors have

20 put holds on to your knowledge?

21        "Answer:  I don't have the exact number, but I

22 would say a good proportion.  Probably more than half.

23        "Question:  And what is that doing to the debtors'

24 business right now?

25        "Answer:  Right now, we are kind of at a

1  standstill.  We can't order new products.  And if we can't

2  get new product in the door, we can't sell it.

3           "Question:  Are the debtors sustaining injury

4  right now?

5           "Answer:  We are."

6           Let's look at where we are today in light of the

7  legal standards and the evidence elicited through

8  Mr. Orlofsky.  Unsurprisingly, Your Honor, we ended up

9  needing the rest of our interim critical vendor bucket.

10  We've utilized the original $30 million and we will not be

11  able to honor critical vendor payments this week without

12  access to the balance of that cap by tomorrow, at the latest.

13           It was not a surprise to us that we would need

14  these funds because the company, in its business judgment,

15  had sized the interim cap for the relief that it believed was

16  necessary during the interim period.

17           We informed our lenders over a week ago, last

18  Wednesday, November 13th, that we would need access to the

19  interim bucket.  The Freedom Lenders have since asked for a

20  variety of information regarding the claims in the bucket.

21  We have answered their questions about the exact creditors

22  receiving the payments, the size of those payments, and why

23  making those payments is necessary.  We have sent examples of

24  trade agreements and letters sent to the vendor community.

25  We had a phone call on Monday of this week, where

1  Mr. Orlofsky answered detailed questions from White & Case

2  regarding the vendor payments.  We've also complied with our

3  obligation to provide critical vendor reporting, which shows

4  that we have utilized the $30 million bucket as of last week.

5           As I noted a few minutes ago, we understand that

6  their objection, with respect to those non-American Freight

7  payments is now resolved for purposes of the second interim

8  order by virtue of their reservation of rights.

9           On the American Freight front, which remains

10  unresolved, the Freedom Lenders asked earlier this week for

11  a, quote, "profitability analysis" regarding any creditors of

12  American Freight who are being paid under the critical vendor

13  order; in other words, they would like to know how much

14  profit the debtors will make from a liquidation by paying

15  certain critical vendors of American Freight.

16           We've been working on that analysis.  We've agreed

17  to provide it and since this morning, we've made enough

18  progress on that analysis that AlixPartners was able to share

19  it with the lenders' advisors in advance of this hearing.  It

20  remains subject to discussion, but the conclusion is that

21  double-digit millions of dollars in revenue are protected by

22  the cash outlay in the vendor bucket associated with American

23  Freight, which is $4 million.

24           We understand that the lenders are reviewing the

25  document, but nonetheless, the none of our efforts have

1  resulted in the 2L HoldCo lenders agreeing to this relief;

2  instead, they simply sent more information requests.  Among

3  other things, they asked us on Tuesday morning of this week

4  for evidence showing every delivery covered within

5  the 503(b)(9) period was made in connection with, and I

6  quote:

7           "The vendor's standard terms of service and

8  contractually defined deliveries, including the contracts

9  and/or terms of service that set forth such payment terms,

10 payment deadlines, and delivery dates and any oral or written

11 modifications made thereto in the three months prior to the

12 bankruptcy filing."

13          Well, on that same day, they asked for an

14 accounting of every payment the debtors made within the 90

15 days prior to the bankruptcy filing and all contractual terms

16 governing those payments, including any written or oral

17 modification to those contracts within the 90 days pre-

18 bankruptcy; information that far exceeds the scope of the

19 relief being requested in the critical vendor motion.

20          Your Honor, this is not the level of detail that

21 is required to obtain interim critical vendor relief.  It is

22 justified by business judgment and the doctrine of necessity,

23 on which we've established a robust record, particularly

24 through the evidence attested to by Mr. Orlofsky.  More

25 importantly, this is Freedom Lenders' effort to substitute

1   their business judgment for that of the company, which is

2   entitled to deference under applicable bankruptcy law and

3   Delaware law and, particularly, here because the 2L HoldCo

4   lenders have not shown any evidence to rebut the presumption

5   that the debtors' business judgment should be respected.

6         They are attempting to establish a new standard of

7   what "business judgment" means and based on all of the

8   information requests we've been responding to, we have

9   constantly moving goalposts that they're trying to make the

10  debtors meet, including, now evaluating whether the

11  profitability analysis we're providing shows that we are

12  profitable enough from American Freight's liquidation, again,

13  in their judgment, when, in the company's business judgment,

14  we have already established that the best way to maximize the

15  value of that asset is to liquidate it in accordance with the

16  already-approved GOB procedures and pay the warehousemen and

17  distribution centers the amounts necessary to release and

18  then actually liquidate those assets.

19        Our business judgment, Your Honor, has been, and

20  remains that we need access to the balance of the interim cap

21  tomorrow, the full $35 million.  We cannot afford further

22  instability of this business or any delay in the liquidation

23  of American Freight, which is supposed to be finished by

24  December 31 of this year to maximize the value of that

25  company.

1          Delay and not allowing us access to the box is

2   detrimental to every stakeholder, including the 2L HoldCo

3   lenders, and we'd ask that Your Honor enter the second

4   interim order today for that reason.  Thank you.

5          THE COURT:  Thank you.

6          THE COURT:  Thank you.

7          Mr. Shore.

8          MR. SHORE:  Thank you, Your Honor.  Chris Shore

9   from White & Case on behalf of the HoldCo and 2L Claimants.

10          I would also like to talk briefly about where we

11   have been, confirm where we are right now and then focus my

12   presentation on American Freight which is the open issue.

13   Again, American Freight, an entity that is going to be

14   liquidated by the end of the year.  Then at the end, just so

15   I don't forget, I would like to take a minute to get some

16   clarification on scheduling.

17          Point one, where have we been since the first day

18   hearings ended.  You got a long recitation of what the

19   testimony was.  I hope Your Honor will also recall, at the

20   end of the second day of the first days, when talking about

21   critical vendors, Mr. Orlofsky testified that he was

22   uncertain about the breakdown of payments being sought to

23   make under the critical vendor order including a debtor-by-

24   debtor breakdown, particularly what pertained to American

25   Freight, and how much was critical vendor, how much

1  was 503(b)(9), how much was lien claimant because it had all

2  been subsumed under one motion and one order.

3          Ultimately, he said, and this is from the

4  November 5th transcript at 92, "I don't have the exact

5  amounts but at some point, we can share with you."

6  Notwithstanding his lack of precision, the debtors were clear

7  in their motion about why they wanted authority to pay those

8  amounts and in addition to what Ms. Sinclair put on the

9  record about what was in the testimony, the motion, at

10  Paragraph 9, "The debtors businesses depend on the

11  uninterrupted flow of inventory and other goods through their

12  distribution networks."

13          Paragraph 10, "If consumers become aware that the

14  debtors do not stock a particular item, they will simply not

15  come to the debtor stores or visit their websites."

16  Paragraph 10, again, "If the debtors critical goods and

17  services providers refuse to continue to do business on

18  account of outstanding prepetition amounts, replacing them

19  would cause significant delays in…"

20          I could go on and on.  All of that has to do with

21  an operating debtor who has customers, who would have to

22  replace a vendor, who needs more inventory to sell to

23  generate profits to get more inventory.  None of that has

24  anything to do with American Freight.  In fact, Ms. Sinclair

25  cited from that long recitation of the evidence, I counted

1  one statement by Mr. Orlofsky having anything to do with

2  American Freight.

3       As you may recall or as I said, he said he would

4  be sharing that information. The Court entered the first

5  interim order on the 6th.  We got the first report on the

6  11th showing almost no spend.  That was great, but then on

7  November 13th Betsy Feldman from Willkie called Andrew Zatz,

8  my partner, to say the debtors want to tap the additional $30

9  million and it needs to be consented to in a week, otherwise

10 you are going to have to object because our funding will run

11 out tomorrow.  Mr. Zatz responded immediately, "Please get us

12 the vendor-by-vendor and debtor-by-debtor list."

13      Later that night, Ms. Feldman sent the off the

14 shelf reports, a new form of order, and a message that we are

15 going to have to go to Court. In the meantime, Alix is

16 working on that analysis.  Okay, Mr. Zatz, the next morning,

17 the 14th, "Can we please have a call."  On the 17th we get

18 the Alix spreadsheet, we say, great, let's hop on the phone.

19 On the 18th we have a call that Ms. Sinclair was just talking

20 about including Mr. Orlofsky.

21      Two things came out of that call.  It appeared to

22 us that the debtors were looking to write checks for vendors

23 of the operating debtors no matter what. If you are a trade

24 creditor of a debtor we will stroke you a check.  Two, the

25 debtors wanted to use money under the order to "make more

1 profit" in their liquidation of American Freight.

2 　　　　　As to this first part, in most cases there is

3 always an air in critical vendor.  Your Honor, we would like

4 the maximum amount possible.  We are not being asked to -- we

5 are not being ordered to pay this money, we want a pool of

6 assets from which we can go out to our vendor community and

7 convince them to work with us post-petition. We have a DIP in

8 place, we have money, we can pay you some of your prepetition

9 claim.  The whole point of doing that exercise, getting as

10 much money as possible, but not being ordered to spend it is

11 to really determine in the market how much does management

12 really need to pay of prepetition unsecured claims

13 or 503(b)(9) admin claims in order to get people to do

14 business post-petition.

15 　　　　　There should be, I think everyone will say, an eye

16 towards paying as little as possible of the prepetition

17 claims to continue the virtuous cycle of taking an inventory,

18 converting it into cash, buying more inventory, and

19 preserving distributable value for all creditors, not just a

20 few creditors.  So, when we got the first interim report that

21 looked good.  You got all this authorization, you have spent

22 very little of it.

23 　　　　　The November 13th call buried that.  The

24 November 18th call even worse because far from the debtors

25 trying to make any effort to talk to their vendors and say I

1   don't want to pay you your prepetition claim, I am not paying

2   any of my other prepetition claims, will you do business with

3   me, Mr. Orlofsky made it clear that he wasn't trying to save

4   what he called "every shekel."  He wanted to make sure that

5   as soon as they got to an agreed amount of a prepetition

6   claim, that is the debtors books say this, do you agree with

7   this, a check was getting cut. It was a two-step process, how

8   much money do we owe you, here comes the check.

9         It is also clear that that process was being done

10  based solely on Alix's and management's view that the

11  creditor was being covered by the order.  That is they were

12  looking at trade and saying we want a delivery from you post-

13  petition we will pay your prepetition claim, we just want

14  terms.  So, imagine that, Vitamin Shop has a vendor with a

15  $40,000 prepetition unsecured claim and $20,000 of that is

16  a 503(b)(9) claim.

17        What the debtors have been doing under the order

18  is, in order to get the next $20,000 shipment, paying $40,000

19  without regard to whether or not they could pay less than

20  $40,000 and having to, because the way the company's money

21  works right now, borrow DIP money to do that transaction.

22  That 15 percent interest and, effectively, priming everybody

23  else in the capital structure.

24        That didn't seem right to us, that didn't seem

25  fair to us but to be clear, we are not trying to stop the

1 business.  As Mr. Lauria said, as I will say to you, we

2 understand critical vendors, we are not fighting the doctrine

3 of necessity but there has to be some guardrails.  So, what

4 we have resolved through this is to say, look, we are not

5 trying to get in the way of your spending the money,

6 Mr. Orlofsky, but if what is happening here is you are

7 taking 503(b)(9) money and paying it to someone who delivered

8 services to the debtors or delivered goods 30 days prior to

9 petition, we are going to have to unwind that because the

10 vibe we were getting on the call was there was no governance

11 going on.

12           So, we put the reservation in place and that's

13 done.  The reason we asked for all the backup is now the

14 debtors know what we want.  When we get to the point of

15 having to go through what was done on a post basis we are

16 going to need -- someone is going to need to, whether it's

17 the committee, or the 2Ls or the HoldCo lenders or somebody

18 is going to be looking at that stuff. They now have a

19 document hold in place on that, they know what people want,

20 they know what tracking needs to be done.

21           So, we resolved everything having to do with the

22 operating business.  The other thing that came up, and that

23 was between the time of the November 18th call and now, we

24 reached out to them to see if we could settle this, we just

25 got to the settlement now.  Operating business, fine.  What

1   about American Freight, it is not an insignificant amount of

2   money they are seeking now or later and certainly worth

3   dealing with today particularly for someone who is being told

4   they are getting zero under the plan.  Don't forget the 2L

5   lenders have a lien on the inventory and the cash that the

6   debtors are seeking authority to spend here.  The debtors

7   are, by virtue of this order and the DIP order converting

8   unsecured prepetition claims at American Freight into priming

9   DIP claims at 15 percent interest.

10          So, what about this profit. I think what people

11   are talking about is if we pay to bring inventory in, borrow

12   money to pay to bring inventory in we can profit.  We had a

13   problem with that concept and were very up front about it on

14   that call and have been over the last few days.  The problem

15   we have is that Your Honor has no record in this concept of

16   profit making to support a finding of irreparable harm as

17   required by Rule 6003.

18          Simply, the failure to earn more profits is not

19   irreparable harm. We are not shutting down.  You haven't

20   heard anybody even proffer that you are going to have to shut

21   down the liquidation or anything else.  There are just going

22   to be some goods that are not taken in, and not sold, and

23   therefore won't earn more "profit."

24          Three points on that.  The motion doesn't even

25   contend that the failure to earn profit is irreparable harm.

1  Each of the sections, all of this testimony that got cited to

2  you is all about operating businesses.  What we are talking

3  about here is that the money that would come in, if that

4  inventory sold, is not part of a virtuous circle. It's not

5  getting reinvested, it's not bringing in new customers.  It's

6  not creating a need to go out and find new suppliers.  And

7  Mr. Orlofsky is not here to explain why borrowing DIP money

8  at 15 percent to pay down -- to do this when all we are doing

9  is paying down an ABL at SOFR plus two.  And it makes even

10 less economic sense when in order to do that transaction you

11 have to roll up every dollar borrowed by one to one.

12         Second, the debtors have cited no authority for

13 their view. I get it on the doctrine of necessity. I disagree

14 that 363(b) authorizes management, in their business

15 judgment, to pay prepetition claims and Rule 6003 has nothing

16 to do with it but I am not, a I said, fighting the doctrine

17 of necessity.  This is the doctrine of profit making that

18 they are talking about and it's a bad rule.

19         Why wouldn't you just argue that if we are

20 authorized to pay all of our prepetition unsecured creditors

21 on day 1, we don't need an unsecured creditors committee.

22 That would save money, it would streamline the plan process,

23 we could all figure out ways in which distributable value

24 might be increased by doing that, but that is not how the

25 code works.  The code is the code is the code and it has to

1    stop somewhere. They can't take, under the doctrine of

2    necessity, borrow DIP money, and use it to make more profits

3    for the DIP lender by paying off prepetition claims.

4           Part three, you have no record of a profit here.

5    I will give you an example: if a creditor has a $40,000

6    prepetition unsecured claim, $20,000 is 503(b)(9), and

7    $20,000 in order to get the new goods in. The debtors want to

8    borrow the money to pay 15 percent on that for a 503(b)(9)

9    claim that isn't certain to be paid.  Again, they want to

10   prepay and admin claim that only has to be paid in the event

11   of a Chapter 11 plan, prepaid in cash.  We have no idea where

12   American Freight is going to go after its all liquidated.

13          They want to pay a GUC claim there that will never

14   be paid under any plan. In order for American Freight,

15   general unsecured creditor, to get a distribution outside of

16   this critical vendor order you would have to pay off the DIP,

17   the ABL, the 1L and the 2L, all which exist in that box, and

18   then you have to pay 15 percent interest on it all.

19          So, I asked for the profitability analysis, we got

20   it. I got it in my inbox 15 minutes ago.  We may get there

21   with them, they may be able to convince us, but Your Honor

22   doesn't have a profitability analysis for you and, again,

23   even if they came in and said we will make a million dollars

24   of profit in the face of an objection, especially since we

25   are still in the 21 days since the petition date, there needs

1 to be an evidentiary showing of irreparable harm.  There has

2 not been an evidentiary showing of irreparable harm at least

3 as it pertains to American Freight.

4 　　　　Failure to earn profits, more profits, is not

5 irreparable harm.  So, we would ask the Court to deny that

6 aspect of the order, again, without prejudice to their trying

7 to come back and do it at a later time but this is not a

8 record from which the Court can conclude that that money has

9 to go out now.

10 　　　　THE COURT:  All right.  Just -- I am going to get

11 to you, Mr. Sandler, hold on a second.  My other hearing that

12 started this afternoon is not done. So, I have got a room

13 full of lawyers who are waiting to restart that hearing.  So,

14 I need to move this along.

15 　　　　Mr. Sandler, I know you have been, I guess,

16 retained five minutes ago to represent the committee but go

17 ahead.

18 　　　　MR. SANDLER:  That is about right, Your Honor.

19 For the record Brad Sandler, Pachulski Stang Ziehl & Jones,

20 on behalf of the newly formed committee.

21 　　　　Your Honor, we joined this dysfunctional party, I

22 guess, about maybe two to three hours ago after the committee

23 selected Pachulski as its counsel, interviewed financial

24 advisors, and selected Province roughly maybe two hours ago

25 at this point.  You know, obviously, we are drinking from a

1  fire hose, we are getting up to speed.

2         We learned about this hearing probably about maybe

3  two hours ago or so.  As soon as Province was brought up to

4  speed or was selected by the committee, they reached out to

5  AlixPartners, they spoke with Mr. Orlofsky.  They reported to

6  me that they agree with Mr. Orlofsky's assessment here.

7  Obviously, Ms. Sinclair's excellent presentation and the

8  prior evidence and the declaration is already in evidence.

9  It supports the payment of the $4 million to the American

10 Freight vendors.  This is relatively small dollars, Your

11 Honor, and the committee is going to defer in this instance

12 under the current facts to the debtors' business judgment for

13 the $4 million.  We support the relief.

14        So, with that, Your Honor, I am going to stand

15 down but there is a lot of work that the committee has to do

16 here. We understand the dynamics, I will say. I think they

17 are fairly transparent with the various parties.  We expect

18 to be extremely active in these cases in due course.  Thank

19 you, Your Honor.

20        THE COURT:  Thank you, Mr. Sandler.

21        Ms. Sinclair, one question.  You indicated that

22 these are -- that the $4 million is going to warehousemen and

23 distribution centers. I assume this is for product that

24 American Freight already purchased and its sitting in a

25 warehouse or distribution center, and the debtors want to

1 liquidate American Freight in order to maximize value.  So,

2 how is the value going to be impacted if this -- if the $4

3 million is not granted today but is granted a week or two?

4         MS. SINCLAIR:  The issue, as I understand it, Your

5 Honor, is that the longer it takes for us to liquidate this

6 collateral the more expensive it becomes for us to do so in

7 the form of ongoing administrative expenses and the less

8 price we may be able to ultimately achieve for those assets

9 in the sense that we may need to more deeply discount them

10 with more and more time.  So, each day that passes is

11 incrementally more important to us in that regard.

12         THE COURT:  Okay.  I am going to grant the motion.

13 I think, as Mr. Sandler pointed out, relatively speaking the

14 dollars we are talking about are small in this case, in

15 connection with this case. I think the debtors have shown

16 that there will be some harm to the debtors, probably

17 irreparable harm, if they have to spend additional funds to

18 or if they have products sitting in a warehouse that they

19 can't liquidate and it becomes more expensive to liquidate it

20 as the process goes along.  Those are dollars that aren't

21 going to be recovered.

22         It seems to me that in their business judgment

23 they have determined that if we spend this $4 million to get

24 that product released, we can sell it and we can make more

25 money, and it goes to that profitability argument.  If they

1 made that conclusion then I think the doctrine of necessity

2 has been met. These aren't continued operations, obviously,

3 in the sense of its an ongoing business but its continued

4 operations in the sense that they are trying to liquidate

5 this debtor in order to maximize value for all creditors.

6 So, for those reasons I am going to grant the motion.

7            Do we have a form of order uploaded or filed?

8            MR. MORTON:  Your Honor, good evening.  Ed Morton

9 from Young Conaway.

10           I believe we are able to upload the form of order

11 now.  There was an ongoing dialog during the hearing where

12 all the other points that we were trading back and forth with

13 White & Case on are resolved. I think it's just the exclusion

14 of their suggested prohibition on American Freight payments.

15 So, I think we should be able to have that filed under

16 certification of counsel and uploaded before you are done

17 with your other hearing.

18           THE COURT:  Thank you.

19           Anything else before we adjourn?

20           MR. SHORE:  One last thing, Your Honor.  We

21 discussed with the debtors the calendaring of our motion in

22 the HoldCo case that was filed the other night.  They have

23 agreed that it can go on for the 10th.  We just got to agree

24 with them on an objection deadline which we probably just

25 default to the rules since it's a 21-day motion, if that is

1  all right with Your Honor.  Then we are still trying to work

2  through the depo of the CEO.  We are trying to work around

3  his vacation.  So, I hope we can work that out but if not, we

4  will -- I don't know, I am not quite sure how we are going to

5  handle it.  Is Your Honor going to be unavailable next week

6  entirely?

7        THE COURT:  That is correct but we do have a duty

8  judge if you need to. I did speak with Judge Owens who is a

9  duty judge and she said she is available if necessary to deal

10 with any discovery disputes or scheduling disputes.

11       MR. SHORE:  Very good, Your Honor. With that we

12 wish you the best of luck on your procedure and a happy

13 thanksgiving to everybody, I guess, right.

14       THE COURT:  Thank you.  Same to everybody from me.

15 We are adjourned.  Thank you.

16     (Proceedings concluded at 5:23 p.m.)

17

18

19

20

21

22

23

24

25

<u>C</u>ERTIFICATION

1

2       We certify that the foregoing is a correct

3 transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter to the best of our

5 knowledge and ability.

6

7 /s/ William J. Garling_____       November 6, 2024

8 William J. Garling, CET-543

9 Certified Court Transcriptionist

10 For Reliable

11

12 /s/ Mary Zajaczkowski_____       November 22, 2024

13 Mary Zajaczkowski, CET-531

14 Certified Court Transcriptionist

15 For Reliable