**EXHIBIT E**

<pre>
 1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                     .  Chapter 11
                                .  Case No. 24-12480 (JTD)
 4   FRANCHISE GROUP, INC.,     .
     et al.,                    .  (Jointly Administered)
 5                              .
                                .  Courtroom No. 3
 6                              .  824 Market Street
             Debtors.          .  Wilmington, Delaware 19801
 7                              .
                                .  Tuesday, December 10, 2024
 8   . . . . . . . . . . . . .  10:01 a.m.

 9                      TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE JOHN T. DORSEY
10                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Debra M. Sinclair, Esquire
                               James C. Dugan, Esquire
13                             Stuart R. Lombardi, Esquire
                               WILLKIE FARR & GALLAGHER, LLP
14                             787 Seventh Avenue
                               New York, New York 10019
15
     For the Official
16   Committee of
     Unsecured Creditors:      Robert J. Feinstein, Esquire
17                             PACHULSKI, STANG, ZIEHL & JONES, LLP
                               780 Third Avenue
18                             34th Floor
                               New York, New York 10017
19

20   Audio Operator:           Jermaine Cooper, ECRO

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

APPEARANCES (CONTINUED):

For the Ad Hoc Group
of Freedom Lenders:          J. Christopher Shore, Esquire
                             Samuel P. Hershey, Esquire
                             Colin T. West, Esquire
                             Brady Sullivan, Esquire
                             WHITE & CASE, LLP
                             1221 Avenue of the Americas
                             New York, New York 10020

                             Thomas E. Lauria, Esquire
                             Southeast Financial Center
                             200 South Biscayne Boulevard
                             Suite 4900
                             Miami, Florida 33131

For the Ad Hoc Group
of First Lien Lenders
and DIP Lenders:             Daniel Fliman, Esquire
                             Jayme Goldstein, Esquire
                             PAUL HASTINGS, LLP
                             200 Park Avenue
                             New York, New York 10166

1                            INDEX

2  MOTIONS:                                                      PAGE

3  Agenda
   Item 14:   Debtors' Motion for Entry of Interim and Final    111
4             Orders (I) Authorizing the Debtors to Pay
              Certain Prepetition Claims of Certain Critical
5             Vendors, Foreign Vendors, Shippers & Logistics
              Providers, and 503(b)(9) Claimants; and (II)
6             Granting Related Relief [D.I. 10, 11/3/24]

7             Court's Ruling:

8  Agenda
   Item 15:   Debtors' Motion for Entry of Interim and Final
9             Orders (I) Authorizing the Debtors to (A)
              Obtain Senior Secured Priming Superpriority
10            Post-petition Financing and (B) Use Cash
              Collateral, (II) Granting Liens and Providing
11            Claims with Superpriority Administrative
              Expense Status, (III) Granting Adequate
12            Protection to the Prepetition Secured Parties,
              (IV) Modifying the Automatic Stay, and (V)
13            Granting Related Relief [D.I. 51, 11/4/24]

14            Court's Ruling:                                    317

15 Agenda
   Item 16:   Debtors Motion for Entry of Orders (I) (A)
16            Approving Bidding Procedures for the Sale of
              All or Substantially All of the Debtors'
17            Assets, (B) Scheduling an Auction and a Sale
              Hearing and Approving the Form and Manner of
18            Notice Thereof, (C) Approving Assumption and
              Assignment Procedures, and (D) Granting
19            Related Relief; and (II) (A) Approving the
              Sale of the Debtors' Assets Free and Clear of
20            Liens, Claims, Interests, and Encumbrances,
              (B) Approving the Assumption and Assignment of
21            Executory Contracts and Unexpired Leases, and
              (C) Granting Related Relief
22            [D.I. 154, 11/11/24]

23            Court's Ruling:

24

25

```
 1                              INDEX

 2   MOTIONS:                                              PAGE

 3   Agenda
     Item 17:   Motion of the Ad Hoc Group of Freedom Lenders
 4              for Entry of an Order (I) Terminating
                Exclusivity in the Holdco Debtors' Cases, (II)
 5              Lifting the Automatic Stay in the Holdco
                Debtors' Cases, or (III) Appointing a Chapter
 6              11 Trustee for the Holdco Debtors
                [D.I. 192, 11/20/24]
 7
                Court's Ruling:
 8
     Agenda
 9   Item 18:   The Ad Hod Group of Freedom Lenders Emergency
                Motion for Entry of an Order (I) Adjourning
10              the Second Day Hearing Set for December 10,
                2024, (II) Extending the Objection Deadlines
11              in Connection with the Second Day Hearing and
                (III) Granting Related Relief
12              [D.I. 194, 11/20/24]

13              Court's Ruling:

14   Agenda
     Item 20:   Debtors' Motion for Entry of an Order
15              Authorizing the Debtors to Exceed the Page
                Limit Requirement for the Debtors' Objection
16              to Motion of the Freedom Lender Group for
                Entry of an Order (I) Terminating Exclusivity
17              in the Holdco Debtors' Cases, (II) Lifting the
                Automatic Stay in the Holdco Debtors' Cases,
18              or (III) Appointing a Chapter 11 Trustee for
                the Holdco Debtors [D.I. 301, 12/3/24]
19
                Court's Ruling:
20
     Agenda
21   Item 21:   Ad Hoc Group of Freedom Lenders' Motion to
                Seal (I) Its Objection to the Debtors' DIP
22              Motion [D.I. 274; (II) Its Objection to the
                Debtors Critical Vendor Motion [D.I. 277]; and
23              (III) the Bakemeyer Declaration [D.I. 278]
                [D.I. 331, 12/5/24]
24
                Court's Ruling:
25
```

1                                    INDEX

2    <u>MOTIONS</u>:                                              <u>PAGE</u>

3    Agenda
     Item 22:   Debtors' Motion for Entry of an Order (A)
4                Granting the Debtors Leave and Permission to
                 File Replies in Support of the Debtors' (I)
5                Critical Vendors Motion; (II) DIP Motion; and
                 (III) Bidding Procedures Motion; and (B)
6                Authorizing the Debtors to Exceed the Page
                 Limit Requirement in Connection Therewith
7                [D.I. 362, 12/6/24]

8                Court's Ruling:

9    Agenda
     Item 23:   Motion of Ad Hoc Group of First Lien Lenders
10               for Entry of an Order Granting Leave to File
                 Replies in Support of the Debtors' (1) DIP
11               Motion and (2) Bidding Procedures Motion
                 [D.I. 369, 12/6/24]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2
WITNESSES CALLED
3 BY THE DEBTORS:                                      PAGE

4       CHRISTOPHER GRUBB

5       Direct examination by Mr. Lombardi              30

6       Cross-examination by Mr. Shore                  45

7       Redirect examination by Mr. Lombardi           127

8       Recross-examination by Mr. Shore               134

9
        DAVID ORLOFSKY
10
        Direct examination by Mr. Dugan                138
11
        Cross-examination by Mr. West                  147
12
        Redirect examination by Mr. Dugan              170
13

14      ANDREW LAURENCE

15      Direct examination by Mr. Lombardi             172

16      Cross-examination by Mr. Shore                 178

17
18 WITNESSES CALLED
BY THE AD HOC GROUP
19 OF FREEDOM LENDERS:                                 PAGE

20      NEIL A. AUGUSTINE

21      Direct examination by Mr. Hershey              211

22      Cross-examination by Mr. Sullivan              227

23      Cross-examination by Mr. Fliman                247

24      Redirect examination by Mr. Hershey            259

25

1                              EXHIBITS

2    DEBTORS' EXHIBITS:                                PAGE

3    Docket 386 - Debtors' exhibit list                  29

4

5    FREEDOM LENDERS' EXHIBITS:

6    Docket 388 - Freedom Lenders' exhibit list          29

7

8    FIRST LIEN LENDERS' EXHIBITS:

9    Docket 342 - First Lien Lenders' exhibit list       29

10

11

12   DECLARATIONS:                                     PAGE

13   1 - Declaration of Christopher Grubb                38

14   2 - Declaration of Andrew Laurence                 173

15

16

17   Transcriptionists' Certificate                     323

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 10:01 a.m.)

2               THE COURT:  Thank you.  Please be seated.

3    Whenever you're ready.

4               MS. SINCLAIR:  Good morning, Your Honor.  Debra

5    Sinclair, Willkie, Farr & Gallagher for the Debtors.  I'm

6    joined today in the courtroom by my partners, Jim Dugan and

7    Stuart Lombardi, as well as Mr. Morton and Mr. Lunn from the

8    Young Conaway Firm.  I'm also joined by Chris Grubb of

9    Ducera, David Orlofsky of AlixPartners who's the Debtor's

10   chief restructuring officer, and Andy Laurence who is the

11   Debtor's chief executive officer.

12               I want to start just by thanking Your Honor and

13   the Court staff for accommodating us on the schedule today.

14   We appreciate that we have a significant number of contested

15   motions and that we collectively have filed a large volume of

16   pleadings in the lead up to this hearing.  So we're very

17   appreciative, and I know I speak for the other professionals

18   as well when I say that.

19               Before we jump into the agenda, I just wanted to

20   provide the Court with a 60-second update about what we've

21   been doing since we last saw each other on 21st.  First, as

22   you can probably imagine, we have been working around the

23   clock to resolve and narrow as much as we possibly could

24   going forward today.  I'm pleased to announce that with the

25   exception of the critical vendors in the DIP motions, the

1  Court has entered orders approving all of the Debtors'

2  first-day motions on a final basis.

3          The Court has also entered orders approving our

4  customary second-day motions on a -- on a -- I'm sorry -- our

5  customary second-day motions.  The motions we have as yet

6  been unable to resolve are the DIP, the critical vendors, the

7  bidding procedures, and the Freedom Lender Group's

8  exclusivity termination motion, all of which are on for

9  today.

10         Second, when we were last before the Court on

11 November 21st, the UCC had just been engaged.  They have

12 since retained the battery of professionals and have become

13 an important voice in the cases.  We've worked constructively

14 with them to engage their concerns on our first and second

15 day relief, and I'm happy to report that those efforts were,

16 in fact, fruitful.

17         As reflected in the committee's various filings,

18 they are supportive of all of the Debtors' requested relief

19 today, and they are not supportive of the motion to terminate

20 exclusivity.

21         One final item I'd like to note at the outset

22 here, Your Honor.  As you know, much has been made to date by

23 the Freedom Lender Group of the concept of a potential

24 conflict between the HoldCo Debtors where their lien sits on

25 one hand and the other operating Debtors.

1          To resolve any concerns that the lenders have in

2    that regard, the boards of those two entities voted a little

3    over a week ago to appoint an independent director solely at

4    those two boxes.  After an interview and selection process,

5    those two boards have appointed Michael Wartell (phonetic)

6    into the role.

7          You'll hear throughout today's hearing that his

8    role is not to ratify or to second-guess anything that's

9    already happened in these cases.  He's being appointed to

10   investigate intercompany claims that may or may not be held

11   by those two specific HoldCo entities against the OpCos.

12         We understand that Mr. Wartell is engaging the law

13   firm of Akin Gump to assist with his investigation.  And

14   you'll hear that the Debtors believe that Mr. Wartell's

15   appointment and this forthcoming investigation should resolve

16   most, if not all, of the issues that are raised in the

17   exclusivity termination motion, and that's by adding a new

18   layer of independence at those two entities.

19         All of that to say, Your Honor, we're hopeful that

20   we can expeditiously move past the litigious stage of these

21   cases and start focusing on our sale process and maximizing

22   the value of the company.

23         Unless Your Honor has any questions for me, I'll

24   turn the podium to Mr. Lauria to address his adjournment

25   motion, which Your Honor previously ruled will be first in

1   the agenda today.

2           THE COURT:  Yes.  Thank you.

3           MR. SHORE:  Good morning, Your Honor.  Chris Shore

4   from White & Case on behalf of the 2L lender group and the

5   HoldCo lenders.  I'll actually be addressing adjournment, but

6   I thought -- I thought this would be done, but let me give

7   you a sense of what we've agreed to do with respect to the

8   hearing.

9           I'm going to speak briefly with respect to the

10  adjournment request and let you know where we are on that.

11  Then the parties have agreed lists of exhibits that we'll

12  move into evidence, and then we're going to call or have four

13  witnesses testify before the Court today.  It will be Mr.

14  Grubb, then Mr. Orlofsky, then Mr. Laurence, who you haven't

15  heard from, who's the Debtor's CEO, and then Mr. Augustine,

16  our witness.

17          Then we will close the record on all the motions,

18  rather than drop people on and off with respect to various

19  motions and then argue from there.  And depending on how much

20  time we have today, we'll have to come up with a sequence of

21  how we're going to address them.  But -- but I think we've

22  come up with a way of streamlining it as much as -- as

23  possible.

24          So I -- I told the Debtors I would be brief on

25  where we are with respect to the adjournment, and I'd like to

1  make five points with respect to sequencing.

2          The relief requested at the holding company

3  estates would be, if granted, an event of default under the

4  DIP that the Debtors are seeking, that is, the appointment of

5  a trustee, determination of exclusivity, the lifting of the

6  stay.  All of that is an event of default under the OpCo DIP,

7  that is, the -- in the estates which are borrowing money.

8          If we could get all the evidence in today and Your

9  Honor can rule on those motions at the same time, I don't

10  think we'll have a problem.  But if we finish the DIP and the

11  Court is inclined to approve the DIP today, but we haven't

12  finished our motion, then we'll have to address the situation

13  because it doesn't seem right to us that Your Honor would

14  grant the DIP on a final basis and then rule on the motion

15  and -- and modify exclusivity and create an immediate event

16  of default.

17          So at -- at least with respect to sequencing,

18  we're going to, as I said, put all the evidence in today,

19  argue the motions, and we're just going to have to come back

20  at the end of the day, depending on how much time we have.

21  And, in fact, if Your Honor could give us a sense of how long

22  we have today, we can adjust accordingly, and that -- that

23  handles sequencing.

24          I'll say this about the state of the record.

25  Given that I'm going to try to be as brief as possible

1  because we've got a lot to do, I'm not going to go

2  point-by-point on our discovery points, though I'm happy to

3  answer Your Honor's questions.  I'd like to say three things

4  about the discovery.

5           One, notwithstanding everybody wanting to say it,

6  this is not scorched earth that's going on here.  With

7  respect to the motions that are to be heard today, we issued

8  two deposition notices of the people who were going to

9  testify and 30(b)(6)s saying, can you prepare those

10 testifying witnesses to testify on the second-day motions?

11 We've since pared back the 30(b)(6) requests, as everything

12 besides the DIP and the critical vendor motion has been

13 resolved.

14           We issued document requests.  So what we were

15 expecting in this is a document production from the Debtors

16 commensurate with a $750 million DIP and two depositions.

17 That's -- that's all we requested, and that's not scorched

18 earth.

19           If you think about the critical vendor's motion,

20 the reason we're having a hearing today is because we issued

21 a depo notice before the first-day hearing, saying, can we

22 have your witness on critical vendors?  They insisted that we

23 file our objection on the Monday after Thanksgiving, and then

24 they produced the witness.

25           So where we are today, talking about a contested

1  critical vendor motion, is because we had to file an

2  objection before we even got the witnesses' answers under

3  oath with respect to what's going on.

4           As it turns out, when you hear -- and I'll argue,

5  critical vendors today -- all we want is the same provision

6  in the final order that we have in the interim order, that

7  is, the reservation of rights that if the Debtors are out

8  paying critical vendors outside the order -- that is, they're

9  paying people who aren't critical -- we can address that at a

10 later date.

11          We may never need to.  If we get paid in full, we

12 don't need to address that issue.  But if we don't, we may

13 need to.  That's all we're asking for.  That's not scorched

14 earth.  We are trying desperately to reach consensus with the

15 Debtors.  It's their cadence and their lack of engagement

16 that's causing the problem.

17          Point two on discovery.  We're still not

18 getting -- we're still not done with productions of key

19 materials.  I don't even have a certification from the

20 Debtors that they are complete on their document production

21 with respect to the DIP for critical vendors.  I do not have

22 schedules or SOFAs.  Your Honor has extended that.  But

23 importantly, I don't even have a financial statement for any

24 Debtor on a consolidated basis.

25          So if we're talking about what's fair to the

1   HoldCo Debtors, I have no balance sheet and no income

2   statement from either of those debtors, although you'll hear

3   from the CEO today that all he has to do is ask his CFO, and

4   they could print those documents out.

5          We don't have the final DIP budget.  The DIP order

6   says, DIP budget to come.  As I understand it, they're

7   planning on getting us the DIP budget tomorrow, even though

8   it is listed as an attachment to the final order.  So we --

9   we won't have the published, final DIP budget to question the

10  witness on today.

11         We have, as you'll see in testimony, no

12  verification to the interrogatories, which asked for, could

13  you tell us what the assets and liabilities are of the HoldCo

14  Debtors?  All we have is the witnesses saying, I think,

15  subject to clarification.

16         So when we talk particularly, as you'll hear on

17  the HoldCo DIP agreement, we are proceeding on a record in

18  which Your Honor has no testimony with respect to what the

19  assets and liabilities of that Debtor are.  They can't even

20  produce a balance sheet or an income statement for that

21  Debtor.

22         Both with -- now, it's unclear also when we turn

23  to the third point on discovery, what DIP we're proceeding

24  on.  As you'll see in the final DIP order, the treatment of

25  the HoldCos has been changed to a -- in colloquial terms, a

1 formulation like this:

2          The HoldCo Debtors are not permitted to borrow

3 under the DIP, but if they're required to, silent as to who

4 might require them to do it, here are the terms on which they

5 can access DIP funds.

6          So I asked the 30(b)(6) witnesses about that.  No,

7 we're not borrowing from -- we're not taking DIP borrowings

8 at all.  This is what they said, and you're going to hear it

9 from both witnesses today who were designated on

10 different 30(b)(6) topics.

11          What the Debtors want for the HoldCos is not they

12 are guaranteeing the exposure as you heard in the -- in the

13 motion and in the first-day hearing.  What the HoldCo Debtors

14 want to do is enter into a post-petition, debtor-to-debtor,

15 secured DIP facility, by which HoldCo will borrow from the

16 OpCos, funds to pay administrative expenses.

17          And even though the interrogatories, as you'll

18 see, will say, there are no expenses allocable at the HoldCo,

19 they want authority to get a post-petition, secured loan from

20 the OpCos to pay a quantum of expenses, which is completely

21 unknown at this point.  It could be anything.  They could

22 allocate whatever they want.  That is not in the motion.

23          So when we find out today from the CEO and the

24 person running the DIP process, Mr. Grubb, what they're

25 actually seeking from the HoldCos, if they are seeking a

1  post-petition, secured, debtor-to-debtor DIP loan of an

2  indeterminate amount, we're going to -- we're going to have

3  to file a motion on that.

4        So as -- as far as the adjournment goes, I may

5  have to address that issue again if that's what the witnesses

6  come out with.  But they clearly said we're not -- we're no

7  longer a guarantor.  We are a primary obligor on obligations

8  to other debtors.

9        And -- and three with respect to discovery, part

10 of this, to be clear, is we're on a timeline.  The Debtors,

11 as part of this final DIP, want Your Honor to endorse the

12 timeline going forward because those are the milestones under

13 the DIP.  And -- and we're headed towards a confirmation

14 trial, which if we can't get a clearing bid or any bids for

15 the company, we're going to have a valuation trial.

16        We cannot have a valuation trial in March if the

17 Debtors won't meet and confer on search terms or have

18 attorney custodians or get out basic financial information

19 like the projections.  The disclosure statement till -- still

20 to date -- I appreciate that it was moved to January -- the

21 disclosure statement still has not put the projections in.

22        So if we're going to have a valuation of what's

23 being done in this transaction, which is taking the entire

24 value of the enterprise and giving it to the first lien

25 lenders in the absence of a clearing transaction or a cash

1 transaction with a third party -- I don't even have the

2 basics on which to start the valuation exercise.

3          Point three on the adjournment, we just heard

4 about the HoldCo independent director.  I -- I was concerned

5 that what was going to happen was, they were going to bring

6 the HoldCo independent director in to start saying, I've

7 looked at this; this DIP seems fine to me.

8          I think Ms. Sinclair just made this clear.  You

9 are not going -- even though there are perceived to be

10 inter-debtor conflicts -- and I would say that the

11 negotiation of a debtor-to-debtor loan on a secured basis is

12 an inter-debtor conflict -- the independent director is not

13 going to provide you any testimony, or they're not even going

14 to be a proffer by his new counsel, that the terms of the DIP

15 are fair to the HoldCos or the terms of the RSA, which are

16 embedded in the DIP, are fair to the HoldCos.

17          This person is, I think -- although we've asked

18 for the corporate governance and haven't received it yet --

19 this person is only coming in to look at pre-petition claims

20 and causes of action that one -- that the HoldCo Debtor might

21 have against any other debtor.

22          So as far as I'm concerned, the -- the -- although

23 we put it in our reply filed on Friday, that's not an issue

24 for this hearing.

25          What is an issue for the hearing is the fourth

1  reason for the request, which is the Willkie retention.  We

2  still do not have a retention application on file.  We still

3  don't have a timeline as to when they're going to get that

4  retention application on file.  But what we do have is a

5  timeline, which is being built into the DIP.

6          The DIP will default if you don't have your

7  confirmation hearing on this date now, or we don't get out on

8  this date.  And I can promise you this, there is going to be

9  no way that if Willkie can't get retained as 327(a) counsel,

10 we can bring in a new set of counsel and execute on this plan

11 in that timeline.  And it certainly doesn't seem fair that

12 the -- the DIP would go into default because 327(a) counsel

13 comes into the case two months into the case when we finally

14 get to the disclosure.

15         So I think in fairness, if the Debtors are going

16 to say, we're going forward and we want you, Your Honor, to

17 endorse the timeline, we got to have some update on what's

18 going on and when that retention declaration is going to be

19 on file.

20         And the reason I've mentioned it is because, as

21 you recall from the first-day hearing, Mr. Feldman (phonetic)

22 went out of his way to discuss the -- the relationship of Mr.

23 Khan (phonetic) to the business and the various

24 investigations that are going on.

25         You're going to hear today that there are

1   investigations going on on a post-petition basis into the

2   conduct of Mr. Khan and into the take private transaction,

3   and Willkie was representing Mr. Khan in that transaction.

4           So this is not -- in other words, if they want to

5   say, we've just been too busy dealing with document requests

6   and two deposition notices, okay.  But if they're saying,

7   we're trying to work that issue out and trying to figure out

8   how to deal with that on the 327(a) basis, I think we need to

9   know.

10          So I -- in short, I think we can proceed, and we

11  are going to proceed on this record today.  But when I --

12  when this record is done and I come back to you, I may be

13  asking you to push off the final ruling on the DIP until we

14  can get some clarity on some of these issues.

15          THE COURT:  Just so I'm clear.  You're saying

16  you're not asking for an adjournment now.  You might ask for

17  it later in the hearing?

18          MR. SHORE:  I -- I am, depending on a couple of

19  things that I identified.  With respect to what is the

20  intercompany DIP they're seeking, I may have to come back to

21  you and say you can't rule on that.

22          And if we don't get to the -- Your Honor's hearing

23  of our exclusivity motion, as I said, I may have to come back

24  and say, don't authorize a DIP unless the 1L lenders make

25  clear that if you rule that a -- that a termination or

1   modification of exclusivity at the HoldCos is not a proper

2   event of default, that is, they reserve the right that if you

3   grant us relief that you think is appropriate, they have the

4   right to default the DIP.  I may come back on that.

5           THE COURT:  All right.

6           MR. SHORE:  Thank you, Your Honor.

7           THE COURT:  Thank you.

8           MR. DUGAN:  Thank you, Your Honor.  Jim Dugan from

9   Willkie, Farr & Gallagher for the Debtors.  We heard a lot of

10  different subjects touched upon just now.  Your Honor, I'm

11  not going to delve into all of those.

12          I really just want to refocus on why we're here,

13  principally why we, the Debtors, are here and what we're --

14  the relief we're seeking today.  Ability to pay our critical

15  vendors, our 306(b)(9) vendors, our shipper and logistic

16  vendors -- that's -- that's critical.  We're going to have

17  testimony on that.  We're going to have a record on why

18  that's critical, why we need that relief today, and what the

19  consequence will be to the Debtors if it's not granted today.

20  That's our focus.

21          Similarly, with respect to the DIP motion, you're

22  going to hear the record on that, why -- why that needs to be

23  approved today, why that money is needed today.  And I think

24  what you've heard from Mr. Shore and from the Freedom Lenders

25  is, frankly, a parade of horribles, things that might happen,

1  things that could happen, speculative things down the road

2  that could occur if, for instance, Willkie Farr is not

3  approved as -- as a counsel, or if other things happen that

4  might lead to events of default, potentially.

5        The only thing I will say about that, Your Honor,

6  is those are speculative in nature.  There's no evidence that

7  any of the things that Mr. Shore testified about are going to

8  happen imminently or ever.  And it's not a reason not to have

9  our motions go forward today.

10        I don't think we really heard any concrete reason

11  why the relief the Debtors need today cannot be granted

12  today, putting aside exclusivity motion and the remedies that

13  might be able to be fashioned in connection with that motion,

14  if Your Honor deems it appropriate to grant that motion.  The

15  principal relief the Debtors are seeking should be heard

16  today.

17        Mr. Shore referred a lack of discovery, issues

18  with discovery.  Although I did not really hear him say that

19  there was anything the Debtors were supposed to produce in

20  the DIP-related discovery or the critical vendors made a

21  discovery that they did not produce or they withheld, that

22  they feel they need that's material to their assessment.

23        I mean, there was reference to balance sheets and

24  financial statements and things that are in process and

25  things that they probably don't have final versions of.  But,

1  Your Honor, while we've been doing our litigation, with, you

2  know, frankly, 68 document requests that we're responsive to

3  for a second-day motion and 4 deposition notices -- while

4  we're involved in preparing all that litigation and defending

5  it and -- and responding to it, our advisers have all been

6  communicating.

7            The Freedom Lenders have a financial adviser, FTI.

8  They're retained in the case.  They -- they have been

9  communicating on a daily basis with AlixPartners.  They've

10  been communicating frequently with Ducera.  They're

11  exchanging the very kinds of financial information, in draft

12  form and otherwise, that we're hearing now, you know, somehow

13  is -- should prevent our motions from going forward.

14            There really isn't any reason to -- to not hear

15  our motions and decide them today based on the kinds of

16  issues they're referring to, which are really just, you know,

17  sort of the mechanics of the bankruptcy and working the

18  timing of things out.

19            We're not yet even have a date for our hearing

20  on -- on the plan.  The date for our hearing on the discovery

21  statement is in January.  These -- these matters are -- are

22  being worked out and will continue to be worked out as we

23  progress.  But right now, the Debtor needs the relief it's

24  seeking really without delay.

25            And I think that's all I wanted to emphasize.

1           THE COURT:  Okay.  Thank you.  I don't know if

2   it's going to be heard on the adjournment issue, although it

3   sounds like I'm not going to be doing an adjournment at this

4   point.  I'm going to wait and see what happens, but go ahead.

5           MR. FLIMAN:  Your Honor, in that regard, just I

6   think there's one thing I'd like to clarify.  For the record,

7   Dan Fliman with Paul Hastings on account of the first lien

8   group.

9           And -- and I think this is just a confusion that's

10  created, you know, by -- by some of the comments Mr. Shore

11  made that I wanted to clarify because I think they do pertain

12  to his last comment about, you know, reserving rights with

13  respect to the adjournment, depending on what he calls the

14  inter-debtor loan.

15          So with -- and -- and we were going to address

16  this, obviously, in connection to the DIP motion, but I think

17  there's -- there's been argument about it with Mr. Shore

18  already, and he's brought the -- the issue up prematurely.

19  So I just want to clarify the way that -- that we should be

20  thinking about this.  And this is clear in the proposed DIP

21  order that we filed with the Court.

22          As a concession, right, the DIP lenders, instead

23  of insisting that the HoldCo Debtors where Mr. Shore's

24  clients sit -- instead of insisting that those Debtors be

25  obligated on the full amount of debt, as a concession, the

1  DIP lenders have agreed that those Debtors will only be

2  obligated to amounts that are loaned by the DIP lenders, not

3  by the Debtors, by the DIP lenders to the HoldCo Debtors in

4  order to fund the administrative expenses of their cases.

5          If they don't need the money, there's nothing

6  loaned.  If they need money, then they're going to borrow it,

7  and that is the extent to which the DIP lenders are making a

8  loan.

9          Moreover, the DIP lenders have made the following

10  concession, which is that the amounts that the HoldCo Debtors

11  borrow to fund the administrative expenses of their cases are

12  going to be borrowed on an interest-free basis, on a fee-free

13  basis, and on a basis that is only secured on unencumbered

14  assets.

15          Your Honor, this was a big concession made by the

16  DIP lenders.  It's in order to ensure that the HoldCo Debtors

17  have the ability to finance their cases and the admin burn

18  that Mr. Shore's clients are inevitably racking up very

19  quickly at the HoldCo Debtors, and I just wanted to clarify

20  that as to his comments made in connection with the

21  adjournment motion.

22          THE COURT:  Okay.  Thank you.

23          MR. FLIMAN:  Thank you, Your Honor.

24          THE COURT:  Anyone else on the adjournment issue?

25  All right.  Sounds like we're going forward.  So let's

1  proceed with the evidence.  As Mr. Shore laid out, I think

2  that's an appropriate way to proceed, put all the evidence

3  in, and then we'll do the arguments on the individual

4  motions.

5        MR. LOMBARDI:  Yes, Your Honor.  Stuart Lombardi

6  of Willkie, Farr & Gallagher for the Debtors.  I'll kick off

7  that evidentiary presentation.  We have talked with the

8  Freedom Lenders about a plan to streamline the evidentiary

9  presentation today.  It has four core parts, to state them

10  briefly.

11        First of all, we have declarations for direct.

12  We're going to do warm-up questioning, but we have a lot of

13  evidence in the declarations in order to shorten the need for

14  direct.

15        Second of all, we understand that the evidence

16  from the first-day hearing carries over to today, and we

17  intend to rely on it.  The Freedom Lenders can rely on it.

18  That includes the testimony at the November 5th and November

19  6th hearing dates from Mr. Grubb and Mr. Orlofsky, the

20  declaration of David Orlofsky in support of the first day

21  pleadings -- that's Docket 15 -- the declaration of Mr. Grubb

22  in support of the DIP -- that's Docket 52 -- Debtor's

23  Exhibit 1 entered at the November 6th hearing, and Debtor's

24  Exhibit 2 entered into evidence at the November 6th hearing.

25        So we're going to endeavor not to duplicate what

1   Your Honor has already received into evidence.

2           And -- and then third, as Mr. Shore mentioned, we

3   talked with the Freedom Lenders about calling each witness

4   once, of course, with right to call rebuttal witnesses.  But

5   Mr. Grubb, for example, who's going to testify first, will

6   testify in support of the DIP and the bidding procedures.

7   I'll have him cover both at the same time, offer him for

8   cross on both so that we don't have to put him up, put him

9   down, put him up again.

10          Fourth of all, the parties have met and conferred

11  on the exhibits.  I believe we have resolved all evidentiary

12  issues with respect to the exhibits.  Mr. Hershey was going

13  to speak to that briefly, so I'll cede the podium.

14          THE COURT:  Okay.

15          MR. HERSHEY:  Good morning, Your Honor.  Sam

16  Hershey from White & Case for the Ad Hoc Group of Freedom

17  Lenders.

18          Your Honor, the parties have not given the time to

19  be able to submit a joint exhibit list, but we have worked to

20  resolve any issues and streamline things.  So I'll just note

21  that the Debtors' exhibit list is on the docket at Number

22  386.  The Freedom Lender Group's exhibit list is on the

23  docket at 388, and the 1L's exhibit list is on the docket at

24  Number 342.  I want to just flag a few points.

25          The first is that, even though it is not a joint

1  list, we have endeavored not to duplicate documents between

2  lists so as not to burden Your Honor with unnecessary paper

3  or over-long lists.  And so all parties have agreed that

4  parties can use exhibits from any party's list, and that

5  won't be an issue.

6          Second, we have endeavored to resolve any

7  objections parties might have to exhibits, and I think we've

8  been successful in that endeavor.  I do want to note one

9  thing, which is that, the 1L's exhibit list, item number one

10 on that list is Mr. Fliman's declaration, and that attaches

11 certain exhibits.

12         And to be clear, only Exhibits A, G, H, and I from

13 that declaration are being admitted into evidence.  The

14 others are not, and that resolves an objection that the

15 Freedom Lender Group had to that declaration.

16         Additionally, I do want to note that the Freedom

17 Under Group Exhibits 51 and 59 were filed under seal, and

18 they remain under seal.  Those exhibits involve a critical

19 vendors issues.  It -- it is not our intention, and we will

20 not today, disclose the names of any critical vendors, and so

21 that should not be a problem.

22         Additionally, Your Honor, the parties have agreed

23 that the exhibits are being admitted solely for the purposes

24 of the matters being heard today.  If there are other matters

25 heard in the future, exhibits will have to be reintroduced in

1  that context.

2           And finally, to the extent any pleadings are

3  relied on, those are not being relied on for the truth of the

4  matter asserted in those pleadings.  It is just to show the

5  parties' positions on the issues.

6           With that, if the 1Ls or the Debtors would like to

7  add anything, that is our position on the exhibits, and I

8  would seek to move the list that I mentioned into evidence.

9           THE COURT:  Okay.  Thank you.  Anyone else want to

10 appear?

11          MALE VOICE:  Nothing to add, Your Honor.

12          MR. LOMBARDI:  No objection.

13          THE COURT:  Okay.  Then the exhibits are admitted

14 as laid out by counsel.

15      (Debtors' Exhibit List, Docket 386 received in

16 evidence)

17      (Freedom Lenders' Exhibit List, Docket 386 received in

18 evidence)

19      (First Lien Lenders' Exhibit List, Docket 386 received

20 in evidence)

21          MR. LOMBARDI:  Again for the record, Stuart

22 Lombardi of Willkie, Farr & Gallagher for the Debtors.  Your

23 Honor, the Debtors call Christopher Grubb to the stand.

24          THE COURT:  Mr. Grubb, please come forward, take

25 the stand, and remain standing for the oath.

1          THE CLERK:  Please raise your right hand.  Please

2   state your full name and spell your last name for the Court

3   record please.

4          CHRISTOPHER GRUBB, DEBTORS' WITNESS, SWORN

5          THE WITNESS:  Christopher Grubb, G-R-U-B-B.

6          THE CLERK:  Do you affirm that you tell the truth,

7   the whole truth, and nothing but the truth to the best of

8   your knowledge and abilities?

9          THE WITNESS:  I do.

10          THE CLERK:  You may be seated.  Your Honor?

11          MR. LOMBARDI:  May I proceed?

12          THE COURT:  Proceed.

13                      DIRECT EXAMINATION

14   BY MR. LOMBARDI:

15   Q    Mr. Grubb, please reintroduce yourself

16   to the Court.

17   A    Chris Grubb, partner with Ducera Partners.

18   Q    Can you walk the Court through your professional

19   background?

20   A    I joined the restructuring group at UBS in the summer

21   of 2004.  I was a graduate student at Columbia Business

22   School.  That group at the time was run by alumni of Drexel

23   and -- and DLJ.  I went back to UBS in that restructuring

24   group full-time in 2005.

25          Following my time there, I joined Greenhill in 2006.

1   There was not distinct restructuring and M&A groups at

2   Greenhill at the time, but I was hired in a restructuring

3   capacity in 2006 to work at Greenhill.  I spent 17 years in

4   total at Greenhill.  I worked on a wide number of

5   restructuring and M&A transactions during that time period.

6        Following several promotions in 2012, I was named chief

7   financial officer of the firm.  Greenhill was a New York

8   Stock Exchange publicly listed company at the time, and I

9   served in that CFO capacity for four years.  I also joined

10  the management committee at that time and served on the

11  management committee of Greenhill for close to a decade.

12       Following the CFO appointment, I was promoted to

13  managing director at Greenhill and held various titles in

14  that role.  I was co-head of US M&A for a period of time, and

15  then my -- my final position at Greenhill, which I held for

16  about seven years, was head of M&A and restructuring for the

17  western region.

18       Following those 17 years at Greenhill, I joined Ducera

19  Partners last year, where I'm a partner in the firm.  I'm

20  also co-head of M&A in the firm, working on the build-out of

21  that advisory vertical, alongside the other advisory

22  verticals at Ducera.

23  Q    And what's Ducera's role in this case?

24  A    We are investment banker and adviser to the Debtors.

25  Q    What motions are you here to testify in support of

1  today?

2  A      The DIP motion and the bid procedures motion.

3  Q      Let's start with the DIP.  Did you provide a

4  declaration in support of the DIP motion?

5  A      I did.

6  Q      You should have a binder in front of you and Your Honor

7  should, as well, with a green cover that is Debtors'

8  exhibits.  Do you have that binder in front of you?

9  A      I do not.

10  Q      We'll get you a copy.  As folks are getting a copy of

11  your DIP declaration, which is going to be Tab 9, Debtor

12  Exhibit 9 -- it's already in evidence, so let's talk at a

13  high level about the DIP.  Do you recall testifying at the

14  first-day hearing to your assessment of how the DIP proposed

15  in this case compares to DIPs that have been approved in

16  comparable cases since January of last year?

17  A      I do.

18  Q      Has your view changed since the first-day hearing?

19  A      My view has not changed.

20  Q      Could you please remind the Court -- the exhibit should

21  be behind you, I understand.

22         (Inaudible conversation)

23  BY MR. LOMBARDI:

24  Q      Sir, if you take the binder on top, is that labeled

25  Debtor Exhibits Volume I, the one with the green cover?

1  A      Now it is.

2  Q      And if you turn to Tab 9.  Do you recognize that

3  document?  Tab 9, Debtor Exhibit 9.

4  A      I do.

5  Q      What is it?

6  A      It is my declaration in support of the DIP financing.

7  Q      Docket Number 52?

8  A      That's correct.

9          MR. LOMBARDI:  And Your Honor, this is already in

10  evidence, so I'm not going to move it in again.

11  BY MR. LOMBARDI:

12  Q      Turning back to where we were, could you please remind

13  the Court of your assessment of how the DIP proposed in this

14  case compares to DIPs that have been approved in other cases

15  since January of last year?

16  A      We looked at a wide range of DIP financings that have

17  been approved on a final basis in comparable cases.  We

18  worked with the demonstrative during the first-day hearing

19  that listed approximately 20 of those DIPs.  I testified that

20  the terms of this DIP financing were within the range of

21  market precedence observed in other cases and approved on a

22  final basis.

23  Q      Okay.  Do you recall being asked on cross-examination,

24  the November 6th hearing by Mr. Shore, to identify the

25  datasets from which your comparable DIPs were selected?

1   A      I do.

2   Q      And -- and do you remember some complaints that as of

3   the first-day hearing, those datasets had not yet been

4   produced to the Freedom Lenders?

5   A      I recall that.

6   Q      If you know, have those datasets since been produced to

7   the Freedom Lenders?

8   A      They were produced under discovery request.

9   Q      And after they were produced, did Mr. Shore, counsel to

10  the Freedom Lenders, depose you?

11  A      He did.

12  Q      Now, with that deposition or at any other point in

13  time, have you received a competing set of DIP comps from the

14  Freedom Lenders?

15  A      I have not.

16  Q      How about from the Freedom Lenders' bankers?

17  A      I have not.

18  Q      How about from their counsel?

19  A      I have not.

20  Q      To your knowledge, have the Debtors?

21  A      Not to my knowledge.

22  Q      Now, I think there may be a little confusion about how

23  the proposed DIP works with respect to the HoldCo Debtors, so

24  I'd like to talk about that for a minute.  Did you hear

25  during the argument a few minutes ago, Mr. Shore referred to

1  an inter-debtor secured loan?

2  A     I did.

3  Q     Is that your understanding of how the HoldCo Debtor DIP

4  is going to work?

5  A     That is not my understanding.

6  Q     What's your understanding under the proposed DIP

7  facility of how the HoldCo Debtors would be able to access

8  DIP financing?

9  A     My understanding is the HoldCo Debtors would not be

10 required to take any DIP proceeds, but would have those

11 proceeds available to them if required for certain

12 administrative costs of the estate or administration of these

13 cases, that they would have access to funds on a no-fee,

14 no-interest, no-amortization basis, that those obligations

15 would be joint and several, across other Debtors, but that

16 they would be capped at the funds actually used by those

17 HoldCos, and the security -- or the guarantee and liens of

18 those funds would be only against the unencumbered assets of

19 the HoldCos.

20 Q     And -- and what would the extent or what will the

21 extent of the guarantee and the liens be, in your

22 understanding?

23 A     My understanding is that the collateral, of which that

24 is recovery against is -- is the unencumbered assets and that

25 the dollar amount of that would be the actual funds used by

1  the HoldCo Debtors.

2  Q      And to be clear, Mr. Shore referred to a potential

3  security interest to co-debtors.  I want to be clear.  In

4  your understanding, who will hold the security interest and

5  the guarantee rights?

6  A      The DIP lenders.

7  Q      Now, I'd also like to talk briefly about alternative

8  DIPs that the Debtors may have had available to them.  Do you

9  recall being asked at the first-day hearing whether you

10 developed a view on whether the Debtors had a means to obtain

11 financing on a more favorable basis?

12 A      I remember those topics.

13 Q      Has your view changed since that hearing?

14 A      It has not.

15 Q      Could you remind the Court of your view?

16 A      At -- at the time and leading up to the first-day

17 hearings, we had run a marketing process.  We received

18 various DIP proposals from parties as potential lenders to

19 these -- these Debtors.  None of those DIPs were of

20 sufficient size and -- and the terms of which were not on

21 more favorable terms than those provided by the DIP lenders

22 to provide the level of financing required to administer

23 these cases and on terms that we deemed in the best interest

24 of the estate.

25 Q      Now, you mentioned a few minutes ago that the borrowing

1  for the HoldCo Debtors is going to be interest-free and fee-

2  free.  Did anyone else offer the HoldCo Debtors a zero-

3  interest, zero-free DIP?

4  A     No other party offered those terms.

5  Q     Now, let's talk about the bidding procedures motion.

6  Did you provide a declaration in support of the bidding

7  procedures motion?

8  A     I did.

9  Q     Please turn in the same binder to Tab 20, Debtor

10 Exhibit 20, and it may be --

11 A     May I go to a second volume?

12 Q     Do you recognize this document?

13 A     I do.

14 Q     What is it?

15 A     This is my declaration in support of the bidding

16 procedures.

17 Q     And is it a true and correct copy of your declaration

18 filed at Docket Number 334?

19 A     Yes, it is.

20        MR. LOMBARDI:  Your Honor, the Debtors offer into

21 evidence Debtor Exhibit 20, Docket Number 334.

22         THE COURT:  Objection?

23         MR. SHORE:  No objection, subject to cross, Your

24 Honor.

25         THE COURT:  Made without objection.

1        (Grubb declaration received in evidence.)

2  BY MR. LOMBARDI:

3  Q     At a high level, Mr. Grubb, what are the proposed

4  bidding procedures intended to do?

5  A     The bidding procedures are intended to establish a

6  framework and a process for running a robust auction of the

7  Debtors' businesses and administer that process in a way and

8  in a manner that maximizes value for the Debtors' estate.

9  Q     Okay.  And at a high level, what is the marketing

10 process proposed under those bidding procedures?

11 A     The marketing process in total is, we reached out to

12 parties starting on November 4th, the day after the

13 commencement of these cases for the three going concern

14 businesses of the Debtors.  We signed NDAs with -- with many

15 parties during the month of November and continuing today.

16 We have shared confidential information memorandums and

17 opened up data rooms to those parties.

18        We have started to schedule management presentations

19 and engage in the exchange of due diligence information where

20 there are questions from potentially interested parties.

21 We're sitting here today, seeking approval of the bidding

22 procedures.

23        We have an initial indication deadline of December 23rd

24 later this month, which has been extended from December 16th,

25 as originally filed.  We have final bids proposed to be due

1    on February 3rd, which is an extension from the January 23rd

2    initial date.  And to the extent we have bids as of

3    February 3rd, we would then, potentially, hold an auction and

4    pursue other -- other steps in getting a sale approved.

5    Q      Under those procedures, how is the winning bid to be

6    determined?

7    A      The winning bid can come in several forms, depending on

8    the auction structure that's pursued.  We have the ability to

9    auction each business individually and determine a successful

10   bidder out of those auctions, subject to minimum bid

11   thresholds to hold those auctions.

12         To the extent there is interest by parties in one or

13   more -- or in more than one of the businesses, there's the

14   ability to have partial asset bids aggregated into additional

15   auctions relative to a combination bid from another party.

16   Q      Now, did you hear any criticisms of the bidding

17   procedures from the Freedom Lenders?

18   A      We did.

19   Q      What were those criticisms?

20   A      There were two primary criticisms.  One was the

21   timeline was insufficient for running the marketing and sale

22   process, and the second was that the bidding procedures did

23   not incorporate a release price or a maximum price that the

24   1Ls would commit to credit bid for the assets.

25   Q      Now, let's start with the timeline.  Did the Debtors

1   hear concerns about the timeline from anyone else, other than

2   the Freedom Lenders?

3   A      The Unsecured Creditors Committee, through their

4   advisors, also expressed concerns about the timeline.

5   Q      What, if anything, did the Debtors do in response to

6   the concerns expressed by the Unsecured Creditors Committee

7   and the Freedom Lenders?

8   A      Relative to the initial bidding procedures that were

9   put forward, the revised bidding procedures add approximately

10  a week and a half to the dates later in the process and add

11  an additional week to the initial bid deadline later this

12  month.

13  Q      And do you, as investment banker for the Debtors, have

14  a view on whether that proposed timeline is enough time to

15  maximize value?

16  A      I believe it is adequate to run a robust sale process

17  that maximizes the value of these Debtors.

18  Q      Why?

19  A      Based on the marketing process we're able to initiate

20  on November 4th and the outreach we're able to conduct to

21  interested parties and the progress we've made as of today,

22  looking forward on the calendar and the sequence of events

23  that we've established for running the sale process, what we

24  believe to be the availability of information today and

25  incremental information that we'll make available during the

1  process, we believe parties will have sufficient time to

2  diligence the business, to raise financing relative to a bid,

3  to negotiate purchase agreements, and put forward a bid as of

4  the February 3rd, the deadline.

5  Q    Have the Freedom Lenders indicated whether they agree

6  that the February 3rd bid deadline is enough time?

7  A    The declaration put forward by Mr. Augustine proposes a

8  longer timeline, and they have not changed their view on that

9  to my knowledge.

10 Q    Do you have an understanding of why the Freedom Lenders

11 assert more time is needed?

12 A    There are two primary arguments that I recall being put

13 forward.  The first is the availability of information and

14 certain information that they do not believe will be made

15 available until January 3rd, and the -- the fact that the

16 sale process is being run over the holidays.

17 Q    Let's start with the first concern, availability of

18 information.  Do you share the view that more time is needed

19 in the bidding procedures in order to make information

20 available to prospective bidders?

21 A    I do not.

22 Q    Why not?

23 A    The nature of any sale process is that the information

24 available evolves during the case of the sale process, actual

25 results are achieved by the business, the market environment

 1   evolves, the actual sales and margin and other KPIs of a

 2   business are observed in real time during that sale process.

 3   Bidders will ask for diligence information.  They will have

 4   incremental information shared with them as they and other

 5   parties inquire about more information related to the

 6   business.  They may undertake an assessment of the company or

 7   the Debtors' financial projections.  They may create their

 8   own financial projections.  They may seek information related

 9   to things they would do differently as it relates to

10   operating the businesses that may impact the financial,

11   results of that business going forward.

12        They may ascertain a view on their synergies.  And this

13   diligence process and this refinement of their view on

14   information to support their bid naturally evolves and

15   naturally proceeds up until the time of a final bid.

16   Our view is that the cadence of information we'll provide

17   here will be consistent with giving parties adequate time to

18   incorporate that information into their bids.  The timeline

19   put forward by the Freedom Lender suggested January 3rd date

20   for these updated SIMS and analysis.

21        Taking that date, that would give parties a month to

22   incorporate information into a bid on February 3rd, which we

23   believe is sufficient for that information to be

24   incorporated.

25   Q    Now you also mentioned the holidays.  Do you agree with

1  the Freedom Lenders that more time, even more time, is needed

2  in order to account for the holidays?

3  A     I do not.

4  Q     Why not?

5  A     I believe that we have cadence instead of milestones

6  and have communicated to parties what the expectations are

7  such that parties know how to manage their internal time and

8  resource to hit these milestones, that parties motivated to

9  pursue a transaction will themselves as well as request their

10 advisors and support functions to work around the holidays

11 and work through the holidays to pursue a high priority

12 acquisition such as one of the Debtors' businesses.

13 Q     Now, you mentioned earlier that you understand the

14 Freedom Lenders proposed reserve prices in connection with

15 the sale process.  Could you explain to the Court briefly

16 what you understand that to be?

17 A     What I understand they've put forward is a concept of a

18 specific price for each OpCo above which the 1L lenders will

19 agree to not credit bid in excess of that price.

20 Q     What, if anything, did the Debtors do in response to

21 that comment from the Freedom Lenders?

22 A     Relative to the initial bid procedures, we have revised

23 an element of the bid procedures, which is minimum bids for

24 each OpCo.  That sets a price for Buddy's, for Vitamin

25 Shoppe, and for PSP, over which an auction would be held for

1  those individual businesses.

2        We believe, this gives parties that are most interested

3  in one of the businesses and not the entire collection of

4  businesses more clarity and more actionability as it relates

5  to acquiring a single business under these revised bid

6  procedures.  We also believe the minimum bid construct gives

7  them a sense of the level of which must be exceeded to hold

8  an auction.

9        And as a result, we believe more parties will

10  participate.  The marketing process will be more robust.  And

11  to the extent more parties participate, there will be greater

12  competition to maximize value.

13  Q    In your professional experience, stepping back to look

14  at the bidding procedures in their entirety, do you believe

15  that the bidding procedures proposed in this case are

16  designed to maximize value in the circumstances of this case?

17  A    I do.

18  Q    Why?

19  A    I believe they are established to create sufficient

20  time for parties to engage with the Debtors, do their

21  diligence, and formulate bids.  I believe in the context of

22  the information that has been made and will be made available

23  during this process, they will have the information they need

24  to put forward those bids.

25        And I believe with the minimum bid prices, it creates

1 actionability around the individual OpCos, which will

2 incentivize additional parties to engage here as it relates

3 to the business where they would place the highest value.

4           MR. LOMBARDI:  I pass the witness, Your Honor,

5 subject to redirect.

6           THE COURT:  Thank you.

7           MALE VOICE:  Your Honor, no questions on direct,

8 but I reserve for redirect.

9           THE COURT:  Okay.  Well redirect if -- we do we

10 did this before.  Can you redirect if you haven't directed?

11          MALE VOICE:  Well, Your Honor, I'm happy to ask

12 any questions.  But --

13          THE COURT:  All right.  I'll let you reserve.  Go

14 ahead.

15          MR. SHORE:  All right.  Your Honor, Chris Shore

16 from White & Case on behalf of the Freedom Lending Group.

17 We're going to hand out some binders for the witness and if

18 they may approach with copies for Your Honor and your clerk.

19          THE COURT:  I have electronic (inaudible).  I

20 don't take binders.

21          MR. SHORE:  Okay.  Everything in the binder is in

22 evidence.  Some people just like the paper.

23                    CROSS EXAMINATION

24 BY MR. SHORE:

25 Q    All right.  Good morning, Mr. Grubb.  You have that

1  binder?

2  A      I do.

3  Q    Okay.  We've spoken previously, and I'm going to ask

4  you some -- a few more questions today.  But first to orient,

5  there have been some rumblings in the case as to why we're at

6  a final hearing on a DIP and bid procedures with my client

7  having objections that the DIP isn't market and the bid pros

8  haven't been or aren't reasonable and don't give enough time.

9        And I think the suggestion from the Debtors and the 1Ls

10  and the committee is that my clients are not commercial and

11  that this is just a scorched earth tech tactic to get more

12  time.  And that, they say, is the only explanation because

13  the DIP terms are market and the bid procedures are

14  reasonable, and we have enough time.

15        Now, I'm going to focus on for a while on a different

16  explanation.  But to be clear, as far as you know, you're the

17  only witness on behalf of the Debtors, and the committee, and

18  the 1Ls, and the DIP lender who's going to seek to establish

19  that the DIP terms are market, right?

20  A      I defer to counsel where the differentiation between

21  the testimony as the witnesses.  Mr. Orlofsky, I believe, is

22  also speaking on elements of the DIP.  I'm --

23  Q    Okay.  But as far as -- and you're the only witness

24  who's going to testify about the negotiations of the DIP,

25  right?

1   A      Could you be more specific?

2   Q      Yeah.  Are you aware of whether the 1Ls are putting on

3   any witness today to talk about how the DIP was negotiated or

4   whether the committee is going to do so?

5   A      I'm not aware of any witnesses the 1Ls or the committee

6   are putting forth.

7   Q      Okay.  And you're the only witness who's on behalf of

8   the Debtors testifying that the bid procedures are reasonable

9   and there's enough time, right?

10  A      As it relates to the bid procedures, I believe I'm the

11  only one.

12  Q      Right.  The committee hasn't come forward with a

13  witness to say that the bid procedures are reasonable and the

14  1Ls or the DIP lenders haven't done that either, right?

15  A      As it relates to the bid procedures, not to my

16  knowledge.

17  Q      Okay.  So on behalf of the Debtors, the only person the

18  Court's going to hear about bid procedures and the DIP other

19  than Mr. Orlofsky is you, right?

20  A      I don't know to what extent Mr. Laurence may be asked

21  on the DIP.

22           MR. LOMBARDI:  And if I may, Your Honor, and I'm

23  not objecting here, just to note for clarity, Mr. Laurence

24  will also testify with respect to the DIP.

25           THE COURT:  Well, I think all this is pretty

1  irrelevant anyway.  I mean --

2            MR. SHORE:  Well, I'm going to --

3            THE COURT:  -- the evidence is going to be what it

4  is.  So --

5            MR. SHORE:  All right.  Well, let's --

6            THE COURT:  You can argue it at the end.

7  BY MR. SHORE:

8  Q     Mr. Grubb, you described yourself as the point person

9  of the negotiation of this DIP facility for the Debtors,

10  right?

11  A     I played the most active day-to-day role in the

12  negotiation of the DIP facility.

13  Q     Can you answer my question?  You were the point person

14  for the Debtors on the DIP negotiation, right?

15  A     Can you define point person?

16  Q     Well, that's -- all right.  This is -- by the way, this

17  is the first deposition you ever gave was on last Friday,

18  right?

19  A     That's correct.

20  Q     And the first time you ever testified live was at the

21  first-day hearings, right?

22  A     That's correct.

23  Q     Now you understood that when I took your deposition, we

24  were going to have a court reporter write down your answers,

25  right?

1  A      That's correct.

2  Q      And that you were giving answers that were under oath,

3  okay?

4  A      I'm aware of those facts.

5  Q      Okay.  So if you go to Tab Number 1 in your binder, and

6  this is the only thing that Your Honor may need because that

7  was not on the exhibit list, and you go to Page 37 of the

8  transcript, at Line 15, I asked the question.  Are you there?

9  Have you ever looked at a deposition transcript before, sir?

10         MR. LOMBARDI:  Objection, Your Honor.  This is an

11  improper impeachment.  I don't see if there's no mission or a

12  contradiction Mr. Shore is trying to establish, but he can

13  ask the question on cross.

14         MR. SHORE:  I did.

15  BY MR. SHORE:

16  Q      I said, were you the point person?  And you said, could

17  you define it?  Wasn't that your testimony?

18  A      That was my testimony from a few minutes ago.

19  Q      Right.  And so if you look at Line 15, I asked the

20  question, and you would describe yourself as the point person

21  of the negotiation of this DIP, and you answered correct,

22  right?

23  A      That was my testimony.

24  Q      So at that time, you understood what the phrase "point

25  person" was because otherwise, you would have said, Mr.

1 Shore, I have no idea what you're talking about when you say

2 point person, right?

3 A     In the context of the sequence of questions put forward

4 on Friday, I understood the context of the question, and my

5 testimony was a response of correct.

6 Q     Okay.  And in your whole career, you just testified to

7 your experience, right?  Those were the first questions you

8 answered in the context of the examination by counsel, your

9 experience?

10 A    I put -- he asked about my professional experience, and

11 I spoke to my professional experience.

12 Q     And in that whole career that you just testified to,

13 you've been the point person for negotiating only two DIPs

14 before, right?

15 A     That's correct.

16 Q     And one of those DIPs was for Fairway Markets, right?

17 A     That's correct.

18 Q     And the amount of that DIP that you were the point

19 person for was less than $25 million, right?

20 A     That's my recollection.

21 Q     And that was an uncontested DIP, right?

22 A     That's my recollection.

23 Q     And the other DIP that you were the point person on

24 negotiating before in your entire career was the SVXR DIP

25 facility, right?

1  A      That's correct.

2  Q      And the amount of that SVXR DIP was much smaller than

3  $20 million, right?

4  A      That's correct.

5  Q      And was that one contested?

6  A      It was not.

7  Q      Okay.  So this case is the first time that you've given

8  a deposition in support of a contested DIP?

9  A      That's correct.

10  Q      And the first time you've given testimony with respect

11  to a contested DIP in court, right?

12  A      That's correct.

13  Q      And as far as the quantum is concerned for the DIP that

14  we're going forward, this is the largest DIP that you've ever

15  been the point person on by a factor of 30 times at least,

16  right?

17  A      I don't believe it's 30 times, if you look at the new

18  money component, but it's the largest DIP I've been the point

19  person on.

20  Q      Well, to be clear, you're seeking authorization for a

21  $750 million DIP, right?

22  A      Including the roll up, correct.

23  Q      Well, I understand.  So if you -- but the amount of the

24  DIP, the headline amount of the DIP is $750 million, right?

25  A      Correct.

1  Q    And would you agree with my math that if the largest

2  DIP you worked on was less than $25 million, this is at least

3  30 times larger than that?

4  A    I agree with that math.

5  Q    Okay.  In fact, when you -- we'll get to the

6  demonstrative you gave before where you gave the judge, His

7  Honor, a sense of what comparable DIP terms were.  Neither of

8  those two DIPs hit that sheet, right?

9  A    They were not included on the sheet.

10  Q    That's because they weren't comparable to the DIP

11  you're seeking or that you were the point person in

12  negotiating, right?

13  A    They were outside the criteria we used to screen for

14  the cases in the demonstrative.

15  Q    They were significantly smaller than anything you've

16  ever done before, right?

17  A    No.

18  Q    As a point person, you -- I'm sorry.  Is there some

19  other DIP that we're not aware of that you were the point

20  person on negotiating for other than Fairway, SVXR, and this

21  one?

22  A    The question was whether those were smaller than I had

23  previously been associated with.  I was associated with

24  those.

25  Q    Oh, you were associated?  Yeah, you worked for people

1   who worked on DIPs.  But as far as running the process,

2   you've done three.

3   A    That's -- in terms of being a point person, that's

4   correct.

5   Q    Yeah.  Let's talk about your sale process experience.

6   Is it fair to say that you were the debtor's point person in

7   the negotiation or with the -- of the creation of the sale

8   process here?

9   A    Of the elements of the bid procedures.

10  Q    Yeah.  And prior to, notwithstanding all your

11  experience, you've only ever run one other 363 sale in a

12  bankruptcy case as the point person, right?

13  A    That's correct.

14  Q    And SVXR was the other deal on which you were the point

15  person for developing the sale process, right?

16  A    That's correct.

17  Q    And the total value of that estate, which was being

18  marketed, was in the low double-digit millions, right?

19  A    That's correct.

20  Q    So just the math, that 363 sale was hopefully 100 times

21  smaller than the one you are advocating the bid procedures in

22  this case?

23  A    Not taking a view on value today, but hopefully.

24  Q    Yeah.  And SVXR was not a retailer, was it?  I

25  A    t was not.

1  Q     So if we want to look past your lack of Chapter 11

2  experience with Section 363 sales, you've been the lead

3  banker on three sale processes for retailers before, right?

4  A     That's correct.

5  Q     And none of those retail sale processes was consummated

6  in a third-party sale following an auction, right?

7  A     One of them was consummated a third-party sale.

8  Q     But not -- that was in a credit bid, right?

9  A     It was not a credit bid.  It was a third party.

10 (Inaudible).

11 Q     Oh, (inaudible).  Sorry.  That's right.  That was the

12 one that a -- you had a stalking horse bidder, and then you

13 ran an auction, and nobody showed up at that auction to take

14 out the stalking horse.

15 A     I did not run that auction.  It was a parent's matter.

16 We stayed at the parent, and so I negotiated the sale of that

17 retail business, but I did not run the auction.

18 Q     So the record's clear.  You have run the sale process

19 for one retailer before, and you didn't carry that all the

20 way through to the auction.

21 A     Well, I believe you're combining elements of in-court

22 and out-of-court sale processes.  So I've run three -- I've

23 been the point person on running three sell-side transactions

24 for retailers.

25 Q     Um-hum.

1  A    The one that was consummated was consummated in Chapter

2  11.  We acted, and I acted for the parent in that, leading up

3  to the filing of the Chapter 11 cases.  And so I negotiated

4  that stalking horse party in that M&A transaction.  That was

5  then taken over by the sub-banker run marketing process and

6  auction.  And the party that we negotiated with, the stalking

7  horse, was the buyer of this -- that business.

8  Q    Okay.  Thank you for the clarification.  You cut the

9  deal on the stalking horse bid, right?

10 A    Correct.

11 Q    And when there was ultimately an auction, nobody else

12 showed up to challenge that stalking horse bid, right?

13 A    The stalking horse was the acquirer.  There was no

14 auction.

15 Q    Okay.  Now if we look around for experience, you know

16 who Mr. Augustine is, right?

17 A    I know Mr. Augustine.

18 Q    You just testified he's the Freedom Lenders' banker,

19 right?

20 A    Correct.

21 Q    And you don't doubt that Mr. Augustine has substantial

22 specific experience in advising debtors with respect to

23 Section 363 sales in bankruptcy, right?

24 A    I don't know Mr. Augustine's specific 363 experience.

25 Q    Okay.  Let's focus on the new HoldCos DIP that you got

1  asked questions about.  The original motion, is it fair to --

2  first of all, you appeared as a 30(b)(6) witness on behalf of

3  the Debtors with respect to the terms of the DIP, right?

4  A    I appeared as a 30(b)(6) witness related to elements of

5  the DIP on behalf of the debtor.  That's correct.

6  Q    Right.  And you understood that you were committing the

7  company to your views as to what the terms of the DIP were,

8  right?

9  A    I was testifying to my views of the DIP during that

10  30(b)(6) --

11  Q    Okay.

12  A    -- deposition.

13  Q    Now -- no, I took your deposition last Friday, right?

14  A    Correct.

15  Q    Okay.  And, right before your deposition started or the

16  morning your deposition started, that's when the Debtors

17  filed the new amendments to the DIP that they were going to

18  seek in the final order, right?

19  A    I don't recall the exact sequence.

20  Q    Well, it's going to be on the docket.  The original DIP

21  proposed that the HoldCos would be guarantors of the DIP,

22  right?

23  A    That's correct.

24  Q    And you're no longer seeking to have the HoldCos be

25  guarantors of the DIP, right?

1  A     I wouldn't characterize it that way.

2  Q     Well, you said -- first of all, you said, and it's the

3  language in the order, if the Debtors are required to borrow

4  money, required by whom?

5  A     Required by those debtors to pay for cost and expenses

6  of administering the cases.

7  Q     Wait.  Required -- that didn't answer my question, I

8  guess.  Could you be more specific as to which debtors might

9  require that funds be drawn?

10 A     If the HoldCo Debtors require that funds be drawn to

11 meet their administrative expense obligations.

12 Q     So your understanding of the DIP is what the HoldCo

13 lenders are doing is seeking authorization from the Court to

14 borrow money.  We're going to get to from whom in a second.

15 They're seeking authority to borrow money in an indeterminate

16 amount if they deem that they are required to do so.

17 A     My understanding is that they will have the ability to

18 have access to funds to the extent those funds are required

19 to meet their obligations during the cases.

20 Q     You keep shifting to the passive voice, are required.

21 I thought you just testified that the DIP -- the HoldCo

22 lenders will have access to the DIP funds if they require

23 themselves to seek to borrow?

24 A     I don't know the procedures through which that specific

25 draw would be made.

1  Q    Well, who's going to explain to the Court what are the

2  procedures of this new intercompany DIP loan that is not just

3  simply a guarantee as it was published in the initial motion?

4  A    I believe it's clarified.  It's not an intercompany

5  loan.  It is a loan from the DIP lenders.

6  Q    Well, I'm going to get -- I'm going to get to that in

7  just a bit.  I just want to understand who is the person

8  who's requiring.  And I just want to be crystal clear on

9  this.  You're testifying to the Court that you're

10  understanding as the person running the DIP for the point

11  person for the HoldCo lenders is what the HoldCo lenders now

12  are seeking is pre authorization to access funds -- we're

13  going to get to from them in a second -- to access funds if

14  they needed to pay administrative expenses.  Is that your

15  testimony?

16  A    There is a DIP budget for those two HoldCo Debtors that

17  cover certain administrative costs or, like, professional

18  fees and allocation of U.S. Trustee fees and court fees, and

19  that funds would be made available to cover those amounts, as

20  they are incurred.

21  Q    But who gets to make the draw?  The HoldCo lenders --

22  if the HoldCo lenders want money, who do they make the draw

23  request to?

24  A    No.  The HoldCo Debtors would have access to the funds,

25  not the HoldCo lenders.

1  Q     Right.  But the -- is your understanding that the DIP

2  funds are going to be sitting in a HoldCo lender account?

3  A     The funds, if funded, would go into accounts at those

4  HoldCo Debtors to my understanding.

5  Q     Okay.  Let me let me rephrase because I think I said

6  HoldCo lenders.  So it's your understanding now that what's

7  being sought from the Court is the ability of the HoldCo

8  Debtors to access DIP funds and put them in their accounts as

9  a borrower under some arrangement?

10 A     I don't know the specifics of the mechanics of how the

11 cash would flow.

12 Q     Well, what witness can tell me and His Honor what the

13 specific ways in which the HoldCo lenders are going to get

14 money -- HoldCo Debtors.  I keep saying HoldCo lenders.

15 Sorry.

16 A     I'd have to defer to discussion with counsel.

17 Q     Okay.  But -- okay.  The next question I have for you

18 is you mentioned a DIP budget, the DIP budget that shows

19 administrative expenses being allocated to the HoldCo

20 lenders' estates.  Where's that DIP budget?

21 A     It was prepared to size a DIP request that was shared

22 with your firm.

23 Q     You published the DIP budget to be included in the

24 order approving the debt?

25 A     The HoldCo DIP budget?  Not to my knowledge.

1  Q    Yeah.  When are you going to be publishing the budget

2  upon which the HoldCo lenders would not be guaranteeing

3  obligations, but would be primary obligors to somebody?  When

4  is that getting published?

5  A    I don't know that schedule.

6  Q    Okay.  Now, at the time of your deposition, you also

7  hadn't reviewed the -- any amendment to the DIP credit

8  agreement, right --

9  A    That's correct.

10  Q    -- that would reflect any of these terms?

11  A    That -- correct.

12  Q    Okay.  And have you since reviewed any amendments to a

13  DIP credit agreement which would reflect what you just

14  testified to with the HoldCos are now not going to be

15  guarantors, but primary obligors of some amount to somebody,

16  which we'll get to?

17  A    I've had discussion with counsel related to the changes

18  made.

19  Q    Okay.  So you believe that there's a DIP credit

20  agreement out there that reflects some of these terms around

21  which the HoldCo lenders -- sorry -- the HoldCo Debtors are

22  going to be primary obligors under the DIP?

23  A    I believe there's that documentation.

24  Q    When is that going to be filed with the Court?

25  A    I don't know the sequence of those documents.

1  Q     Okay.  But to be clear, you're asking His Honor for

2  final approval on the DIP today with respect to a credit

3  agreement that hasn't been filed on the docket, right?

4  A     We're asking for approval of the DIP.

5  Q     Okay.  But specifically of these terms, which would

6  allow the HoldCo Debtors to borrow money from somebody, in

7  some amount pursuant to a DIP budget which is not on file.

8  A     The HoldCo Debtors would have -- would be borrowers

9  from the DIP lenders in an amount required based on the fees

10 and expenses incurred in administration of these cases.

11 Q     Okay.  Well, let's, what is -- (inaudible).  Actually,

12 I can get -- yeah.  Can we go back to Tab 24?  And this was

13 marked as Exhibit 24 in your in your blinder, and it is

14 Document Number 336 on the docket.  And this is the interim

15 order, isn't it, that the Debtors filed on the morning of

16 your deposition on December 6th as reflected on the document?

17 A     No.

18 Q     What do you mean no?

19 A     You said interim, I believe this says final.

20 Q     Oh, sorry.  Got it.  You're right.  This was the draft

21 of the final order, which was filed on the morning of your

22 deposition in which you were providing testimony on behalf of

23 the Debtors with respect to the terms of the DIP, right?

24 A     Again, I can't speak to the exact sequencing of when

25 things were filed, but this is the proposed final order.

1          THE COURT:  Counsel?

2          MR. SHORE:  Yeah.

3          THE COURT:  I'm looking at Exhibit 24 on your

4   exhibit list, which is not the document that you're

5   reflecting to.

6          MR. SHORE:  It's not exhibit -- it's Exhibit 24 in

7   the binder.  It is a -- it is, I think it's on the witness

8   list or the exhibit list, as well.  Right.  It's Docket

9   Number 336.  We've agreed --

10          THE COURT:  What's the exhibit number?  I need an

11   exhibit number.  I have them in an electronic binder by

12   exhibit number.

13          MR. SHORE:  Was it marked -- it was marked.  Okay.

14   I'll work that out in a second.

15   BY MR. SHORE:

16   Q    Are you aware that the Debtors have filed a proposed --

17   two proposed final orders since your dep -- or one on the

18   morning of your deposition and one yesterday, right?

19   A    I'm aware that a proposed final order is being filed.

20   Q    And are you aware of whether those final orders make

21   any changes to the proposed final DIP order to reflect the

22   terms of a direct borrowing of HoldCo Debtors pursuant to a

23   budget which isn't attached?

24   A    We'd have to go through the document.  I don't recall

25   specifically the language included.

1  Q    Well, as the person who's the point person on the DIP

2  and the negotiation of the DIP, are you -- have you directed

3  counsel to make sure that the DIP order reflects these terms

4  which have been negotiated?

5  A    I'm aware of the terms as they've been negotiated

6  between the Debtors and the 1L lenders and the DIP lenders.

7  I don't -- I have not directed counsel in any capacity.

8  Q    Okay, well, let's talk a little bit more about the

9  terms of the loan, which I don't believe are in any of the

10 final orders.  You keep saying it's a DIP lender.  Is the DIP

11 lenders are the obligors on the loan.  Right?

12 A    The DIP lenders receive a guarantee and lien from the

13 HoldCos up to the amount of borrowings that are used.

14 Q    Right, but who are the, in your knowledge of the deal,

15 who are the HoldCo lenders -- sorry, HoldCo Debtors asking

16 for money?  Are they asking a debtor or are they asking the

17 DIP lenders with a DIP lender draw request.

18 A    My understanding is the flow of proceeds would be

19 through the OpCo Debtors, but the obligation would be to the

20 DIP lenders.

21 Q    So the Debtors, sorry, the HoldCo Debtors, they have a

22 budget.  They see they have administrative expenses.  Your

23 understanding is the one Debtor, one HoldCo Debtor, makes a

24 draw request to another Debtor and that Debtor advances

25 funds?

1   A       I don't know what the form of that would be, a draw

2   request or otherwise.

3   Q       Well, how is the -- the HoldCo lenders are obligating

4   themselves with respect to the DIP, right?

5   A       To the extent they use proceeds.

6   Q       Right, but what right do they have to use proceeds?

7   A       They have the ability to use proceeds to the extent

8   necessary to cover their administrative expenses.

9   Q       But you don't know from whom the obligation is owed.

10  That is, if the money doesn't show up, is the right against

11  other Debtors, is the right against the DIP lenders?  How

12  does that work?

13  A       What do you mean if the money doesn't show up?

14  Q       Okay, so the DIP lenders, you understand, are

15  committing themselves now, instead of being a guarantor,

16  there are circumstances in which they're going to be a

17  primary obligor to somebody.  Right?

18  A       What do you mean?

19  Q       Sorry.  Sorry.  The HoldCo Debtors are undertaking an

20  obligation now, we'll find it in the order somewhere, I

21  guess, to guarantee any money that they get to pay their

22  expenses.  You know that much, right?

23  A       Correct.

24  Q       But who has the primary obligation to pay the funds to

25  the HoldCo Debtors to defray administrative expenses?

1  A    You're asking about the cash management and how the

2  funds flow from one entity to the other?

3  Q    Not asking about cash management.  I'm talking about

4  your DIP request.  What is the DIP request?  Who do the

5  HoldCo Debtors get to say, Your Honor, I am an obligor on

6  this.  I have a right to payment out of DIP funds.  Is that

7  another Debtor?  Is that the 1L lenders?  Is that some -- the

8  DIP lenders?  Is that somebody else?  I don't understand.

9  A    I don't know.

10 Q    Okay.  Now, for Your Honor, Debtors' Exhibit 14 in

11 evidence is the order we've been talking about.  And can you

12 turn to page 36 of the black line?  It's in document 336-2 at

13 page 37 of 115.

14          THE COURT:  Sorry, which page number?

15          MR. SHORE:  37 of 115 is the black line, which

16 includes a new paragraph F, Freedom HoldCo Debtors.

17 BY MR. SHORE:

18 Q    You have that, sir?

19 A    I do.

20 Q    Okay.  And we've been talking about a little of this

21 language.  It says, notwithstanding anything to the contrary

22 herein, to the extent any proceeds of the DIP facility is

23 required to be transferred to or otherwise used to make

24 payments on behalf of the Freedom HoldCo Debtors to fund the

25 Freedom HoldCo Debtors' ongoing administrative expenses.  You

1   see that?

2   A    I do.

3   Q    And at least your understanding as the point person on

4   the negotiation of the DIP that's being approved, is that

5   required to be transferred means if the HoldCo Debtors want

6   it, they can access it.

7   A    My understanding is that they have actual needs for the

8   funds, expenses incurred, they can access it.

9   Q    Okay.  And it says is required to be transferred to.

10  That's in the passive voice.  It doesn't say who has to

11  transfer the money if they want it, right?

12  A    The language does not state the party.

13  Q    Okay.  But nonetheless, if they borrow the money under

14  the DIP from somebody to pay administrative expenses, they

15  are undertaking a primary obligation to repay those funds.

16  A    They become a guarantor and have a joint and several

17  obligation to repay amounts under the DIP.

18  Q    Okay.  And what if they borrow the money from another

19  debtor?  What are their obligations to repay that?

20  A    Their obligations are under the DIP.

21  Q    And the obligations are that, that what's happening

22  then is a debtor-to-debtor loan, right?

23  A    I don't know they'd be characterized as a loan.

24  Q    What would you characterize the movement of money from

25  one estate's accounts to another estate's accounts for the

1  payment of administrative expense?

2  A    I don't know the nature by which that would be

3  documented.

4  Q    Okay.  But nonetheless, you are seeking final approval

5  from the Court of the terms that you've talked about today.

6  A    That's correct.

7  Q    Okay.  Now, just to be clear on who the obligor is

8  here, is it fair to say that I asked you questions about who

9  would be advancing the loan, right?

10 A    You asked questions about that.

11 Q    Right.  And is it fair to say that your understanding

12 is that there will be an intercompany term loan created for

13 any cash utilized by the HoldCo Debtors from the other

14 debtors?

15 A    That's not my testimony today.

16 Q    Okay, could we go to -- go back to the first exhibit in

17 the binder, which is your deposition transcript, and I'm

18 going to draw your attention to page 103, starting at line 9.

19 Actually, let's start at line 103.  Yeah, 103, line 9.  And

20 my question was, are you aware of a provision in the proposed

21 final order which prevents the HoldCo Debtors from accessing

22 any cash collateral without guaranteeing its repayment under

23 the debt?

24      And your answer was, my understanding of the proposed

25 treatment is that there would be an intercompany term loan

1  created for any cash that was utilized by the HoldCo Debtors

2  from other Debtors.  See that?

3  A     I do see that.

4  Q     And when you said intercompany, you didn't mean a loan

5  from the DIP lenders to the HoldCos, right?  Because that's

6  not intercompany.

7  A     That's correct.

8  Q     What you were talking about is a debtor-to-debtor loan.

9  A     That's correct.

10  Q     Right?  And you went on in your deposition to talk

11  about that debtor-to-debtor loan would be a primary

12  obligation of the HoldCo Debtors to repay other Debtors

13  within the company for any advances that were made, right?

14  A     That's correct.

15  Q     And that would be a secured loan with no interest and

16  no amort.  Right?  And no fees, right?

17  A     That's correct.

18  Q     But nonetheless, what you are seeking from the Court is

19  not that the Holdco lenders will be just a guarantor of the

20  1L DIP, but they will have the authority to lend money to

21  each other and borrow from each other on a post-petition

22  secured basis.

23  A     There's no -- I don't believe there's the concept of

24  the HoldCos borrowing money from each other.

25  Q     You're right.  The HoldCo Debtors would only be

1  borrowing from the OpCo Debtors, right?

2  A     They would be receiving funds from the OpCo Debtors.

3  Q     Now, you gave testimony about what market terms are for

4  a DIP.  Have you provided any testimony with respect to what

5  market terms are for a debtor-to-debtor, post-petition

6  financing?

7  A     I've not provided any testimony as it relates to

8  intercompany terms.

9  Q     Right.  And I take it that in your experience in the

10  other two DIPs which you've been the point person on, there

11  wasn't a negotiation of terms of a post-petition inner-debtor

12  DIP.

13  A     That was not a structure negotiated in those matters.

14  Q     So the first time that you've been in charge of a

15  negotiation over a post-petition, debtor-to-debtor DIP is

16  this one?

17  A     Yes, that would be accurate.

18  Q     And did I ask it?  You haven't provided any testimony

19  that those terms are market, right?

20  A     Have I provided any testimony that a no-fee, no-

21  interest, no-amort loan is market?

22  Q     Yeah.

23  A     I have not.

24  Q     Or that it is market for DIP borrowers in a

25  consolidated debtor case?

1  A    I have not provided those that testimony.  Although I

2  find it hard to imagine you could find more favorable terms

3  than no interest, no fees, no amortization.

4  Q    But if you also were wearing a 2L hat or you were a

5  creditor at the HoldCos or what you're saying is that the

6  OpCos are seeking authority to make a under market loan to

7  the HoldCos?

8  A    I'm saying we achieved the best terms possible, which

9  is zero percent interest, zero fees and no amort.

10 Q    Okay, let's get to the we.  Let's talk about the

11 negotiations of this brand new HoldCo DIP.  It was negotiated

12 between or it was in the negotiation involving Ducera.

13 A    Correct.

14 Q    And Willkie Farr, right?

15 A    Correct.

16 Q    And this negotiation was -- now, Ducera is a banker to

17 the OpCo Debtors, right?

18 A    To all the Debtors.

19 Q    And Willkie Farr is legal counsel to both the OpCo

20 Debtors and the HoldCo Debtors, right?

21 A    To all the Debtors.

22 Q    So the negotiation we're talking about and getting the

23 best terms possible, I think you said, was a negotiation

24 involving representatives who have a fiduciary duty to the

25 OpCo Debtors negotiating with themselves in connection with

1  their fiduciary duty to the HoldCo Debtors, right?

2  A    It also required the consent of the DIP lenders and the

3  1L lenders.

4  Q    Right.  So involved in that negotiation was you went to

5  the 1L lenders and said, hey, what do you think about the

6  intercompany loan up to the HoldCos?  Right?

7  A    We explored a number.  Sorry.

8        MR. LOMBARDI:  Your Honor, objection.  I really

9  hate to do this.  I'm just trying to help move us along,

10  given the time that we have today.  Mr. Grubb has already

11  testified that there isn't, in his understanding, an

12  intercompany/inter-debtor loan that's going to exist.

13        I can represent that we are not proposing an

14  inter-debtor loan.  We are proceeding on the credit facility

15  as amended and filed last night, which contemplates a loan

16  from the DIP lenders to the Debtors including the HoldCo

17  Debtors.  That's it.

18  BY MR. SHORE:

19  Q    But just to be clear, you did just testify that you are

20  seeking an inter-debtor loan, right?

21  A    No.

22  Q    Okay, well the transcript is going to say what the

23  transcript says.  I take it that with your counsel standing

24  up with the speaking objection, you now have a different view

25  with respect to what loan you're seeking?

1   A      That didn't change my view.

2   Q      Okay.  And so what access are you seeking today for the

3   HoldCo Debtors to obtain funds to fund administrative

4   expense?

5   A      The HoldCo Debtors would have access to the funds

6   necessary to pay certain administrative costs and expenses of

7   these cases to the extent incurred and required at the HoldCo

8   lenders.

9   Q      Right.  And that access, I think we said, was they want

10  to access the funds from the OpCos.

11  A      It would be the proceeds made available under the DIP

12  facility, and I said multiple times I don't know the manner

13  in which those would be structured.

14  Q      Okay.  So one way or the other you are seeking

15  authorization for the HoldCos to borrow money from somebody.

16  A      The HoldCos would have access to those funds.  Yes.

17  Q      Right.  So instead of being just a guarantor on the

18  loan, they are now seeking authorization to become a borrower

19  from someone.

20  A      They would be obligated for those amounts.

21  Q      Can you answer my question?  The Debtors are seeking --

22  the HoldCo Debtors are seeking authorization to borrow money

23  from somebody as a post-petition Debtor-in-Possession.

24  A      They would have a guarantee for those amounts.  Yes.

25  Q      No, not asking about the guarantee.  It just wanted to

1  understand because counsel got up and said I got it all

2  wrong.  Will the HoldCo lenders have the right, to your

3  knowledge, since you are the banker to the -- to the HoldCo

4  Debtors, have the right to obtain funds from anybody to fund

5  administrative expenses under the terms of the DIP you're

6  seeking approval of now?

7  A    Yes.

8  Q    Okay.  But you don't know whether or not that right is

9  a right to make a DIP loan request under the terms of the DIP

10  credit agreement or whether they can just seek it from

11  another debtor.

12  A    I do not know the mechanics through which that would

13  be --

14  Q    Okay.  But you do know that whatever they borrow will

15  be for an amount of allocated expense.

16  A    That's correct.

17  Q    Okay.  And with respect to the allocated expense, there

18  is no agreed-to process in place to allocate funds or

19  allocate expenses to the HoldCos, right?

20  A    My understanding is separate case matters have been

21  established, but the finalization of the framework and

22  allocation mechanisms are not finalized.

23  Q    Okay.  And to be clear with respect to the allocation

24  concept, you've gotten sign off from the 1Ls and the DIP

25  lenders, right?

1  A     The concept of setting up an allocation methodology is

2  agreed.

3  Q     Did you, as far as you know, did anybody at the Debtors

4  consult the actual creditors of the HoldCos as to whether

5  they agreed to some allocation methodology?

6  A     I don't know if those conversations took place.

7  Q     Okay.  And with respect to the allocation, can you tell

8  me whether it's by the size of the debt at that estate, by

9  the size of the assets at that estate, by the time, how is

10 that allocation methodology working out of, for example, the

11 fees of the United States Trustee?

12 A     Different mechanisms have been discussed around either

13 the scale of obligations or the specific time to the extent

14 it can be identifiable would be used.

15 Q     And to be clear, those discussions have involved the

16 Debtors' advisors who are representing both sides of the

17 transaction, right?

18 A     We have discussed what we think would be appropriate to

19 put forward.

20 Q     But I'm just saying that the discussions have included

21 discussions between the Debtors' advisors who are on both

22 side of that allocation discussion, right?

23 A     And other parties.

24 Q     And other parties being the 1Ls and DIP lenders.

25 A     Correct.

1  Q      But not, to your knowledge, anybody from the HoldCos,

2  HoldCo Debtors agreeing to any kind of allocation

3  methodology?

4  A     I've not been a part of those conversations to the

5  extent they occurred.

6  Q      Right.  And is it your understanding that the DIP

7  budget that the Debtors are going to be operating under is

8  going to contain some kind of allocation of expense to -- as

9  between the OpCos and the HoldCo Debtors?

10  A     I don't know what will be incorporated in the next

11  version of the DIP budget.

12  Q      Okay.  Will Mr. Orlofsky know that to your knowledge?

13  A     You can ask Mr. Orlofsky.

14  Q      And to be clear, this terms of the borrowing that the

15  HoldCos are making, whether they make it from another debtor

16  or they make it from the DIP lenders, we still don't know.

17  Is there any cap on the amount that can be allocated to the

18  HoldCo Debtors?

19  A     I'm not aware that there's a cap on the amount of

20  borrowings that can be made available.

21  Q      Right.  You do know that they can seek funds to pay

22  administrative expenses, but as far as you know, the amount

23  that they can borrow is uncapped.

24  A     I am not aware of a cap.

25  Q      Right.  So if somebody decided, let's say the 1Ls

1   decided I think we should -- first of all, do you know how

2   much reorg expense is in the DIP budget?

3   A      For the entirety of the cases?

4   Q      Um-hum.

5   A      I don't recall the specific number.

6   Q      Hundreds of millions of dollars, right?

7   A      I don't recall a number above 200 million.  Something

8   north of 100 million sounds in the right range.

9   Q      So if the 1L lenders and the DIP lenders and conflicted

10  advisors all decided that $200 million should be allocated to

11  the HoldCo estates, your view is that under the terms of the

12  DIP you are seeking, the HoldCo Debtors will be seeking

13  authorization to incur up to $200 million of reorganization

14  expense in their estates.

15  A      No, that's not my testimony.

16  Q      What is the cap?  What is the limiting factor on how

17  much can be allocated to the HoldCo Debtors, if any?

18  A      I think there is a difference between an allocation

19  methodology that is being determined, the lack of a cap and a

20  suggestion that 100 percent or more than 100 percent of what

21  is budgeted for the total cost of administering the cases

22  would be allocated to the HoldCo.

23  Q      All right, can you turn to what's behind Tab 16 in your

24  binder, and Your Honor, it's the Freedom Lender Group Exhibit

25  32.  And we heard some, at least in these opening statements,

1  something about how difficult the discovery has been in this

2  case.  You saw this document during your deposition, right?

3  A    I did.

4  Q    Okay.  And for the record, it is the HoldCo Debtors'

5  responses and objections to the Ad Hoc Group of Freedom

6  Lenders first set of interrogatories.

7        MR. SHORE:  Now for the record, Your Honor, we

8  still don't have a verification to any of the answers, but I

9  did ask the witness about it, and I'd like to proceed to go

10  through some of the interrogatory responses and his views of

11  them.

12  BY MR. SHORE:

13  Q    Now if we go to page 6 of the Freedom Lender Group

14  Exhibit 32 in evidence, there were requests in interrogatory

15  number two.  The first one is, for each HoldCo Debtor

16  identify the most recent pre-petition unconsolidated balance

17  sheet.  See that?

18  A    I do.

19  Q    Is that, in your mind, unambiguous about what's being

20  asked for there?

21  A    It's clear what the request is.

22  Q    And are you aware of whether the HoldCo Debtors have

23  ever produced an unconsolidated balance sheet, much less than

24  most recent pre-petition one?

25  A    I'm not aware of when they've produced it generally or

1   specifically to these cases.

2   Q     Have you looked at an unconsolidated balance sheet of

3   the HoldCo Debtors who you're advocating should be borrowing

4   money from somebody?

5   A     I have not looked at balance sheet for those entities.

6   Q     Okay.  Income statement.  That's not ambiguous, is it,

7   as to what's being asked for there?

8   A     The request is clear.

9   Q     Okay.  And to your knowledge, have you, as the person

10  negotiating the DIP terms on behalf of the HoldCo Debtors,

11  have you ever seen an income statement for the HoldCo

12  Debtors?

13  A     My understanding is there's no operations or activities

14  at those levels, but I have not seen an income statement for

15  those entities.

16  Q     And would you agree with me that an unconsolidated

17  balance sheet and an unconsolidated income statement is the

18  most basic of financial statements of a debtor?

19  A     Those are basic financial statements of companies,

20  correct.

21  Q     Okay.  What's a trial balance?

22  A     My understanding is that is the backup and accounting

23  records that build into the financial statements of the

24  company.

25  Q     Right.  And have you seen a trial balance for either of

1   the HoldCo Debtors?

2   A     I have not seen a trial balance.

3   Q     And then there are other requests there -- D, E, F, and

4   G.  Have you ever seen any of those documents for any of the

5   HoldCo Debtors who are now going to be primary obligors to

6   somebody for DIP finance?

7   A     I have not seen those documents.

8   Q     Okay, so let's go to request or interrogatory number

9   three.  Identify any projected or anticipated professional

10  fees allocable to the HoldCo Debtors during the pendency of

11  the Chapter 11 cases.  You see that?

12  A     I do.

13  Q     And the answer was subject to general responses and

14  objections, the HoldCo Debtors state to the best of their

15  knowledge there are no known projected or anticipated

16  professional fees allocable solely to the HoldCo Debtors

17  during the pendency of these cases.

18  A     I see that.

19  Q     Now, you don't suppose that somebody whoever wrote

20  these responses was not telling the truth, right?

21  A     I have no reason to believe these aren't truthful

22  responses.

23  Q     But would you agree with me, at least insofar as the

24  record is concerned, the Debtors are saying there are going

25  to be professional fees allocable solely to the HoldCo

1  Debtors, right?

2  A     There are expenses that may be incurred at the HoldCo

3  Debtors.

4  Q     Well, I was just referring to professional fees.  Part

5  of what you're saying is going on right now is that there's

6  some allocation pursuant to some unknown methodology in which

7  there are going to be professional fees allocable solely to

8  the HoldCo Debtors, right?

9  A     My understanding is there's the potential for

10 professional fees to be incurred on behalf of the HoldCo

11 Debtors.

12 Q     Right.  And interrogatory number four, because you

13 raised expenses, identify any projected or anticipated

14 expenses allocable to the HoldCo Debtors during the pendency

15 of the cases.  You see that?  Excluding professional fees.

16 A     I see that.

17 Q     Okay, so just focusing on expenses other than

18 professional fees, it's your understanding that there are

19 going to be certain expenses which are allocable solely to

20 the HoldCo Debtors during these cases, right?

21 A     I can't speak to specific expenses, but I believe it's

22 possible that in conjunction with professional fees and other

23 services there could be expenses.

24 Q     And what about U.S. Trustee fees?  I thought you

25 answered that there is going to be some allocation.  We just

1  don't know how or why or when it's going to happen, right?

2  A     It's possible those may be allocated.

3  Q     Okay.  And since -- in case there was any concern about

4  this, in interrogatory number five, there's identify any

5  projected or anticipated administrative expenses allocable to

6  the HoldCo Debtors during the pendency of the cases and the

7  answer was given, right?

8  A     I see that section.

9  Q     Right.  And has anybody -- I take it that nobody asked

10 you to verify these responses that were given.

11 A     I did not review these responses.

12 Q     Okay, just to be clear, if one were thinking about

13 becoming a DIP lender to a debtor to cover post-petition

14 administrative expenses like fees, expenses, and

15 administrative costs, you'd want to know, hey, what are you

16 projecting to be the professional fees, administrative

17 expenses, and other expenses which are going to be charged by

18 that debtor, right?

19 A     That would have been an assumption.  But we sent you a

20 DIP request, and you submitted a term sheet without

21 requesting such information.

22 Q     Well, without requesting such information, would you

23 consider an interrogatory -- have you ever seen an

24 interrogatory response before?

25 A     I've reviewed them in this case.

1  Q     Okay.  And if somebody, if somebody were trying to size

2  a DIP for the HoldCo Debtors, this document right here would

3  tell you that the HoldCo Debtors don't need a DIP to fund

4  administrative expenses because nothing is allocated there.

5  A     As of the date this was prepared, it states that

6  there's not an expectation, but there currently is an

7  expectation.

8  Q     Okay, so what you're saying is information has changed

9  such that somebody would need to file a supplement to the

10 interrogatories?

11 A     I'm not making a conclusion.

12 Q     Okay, but to be clear, we went through this at your

13 deposition on Friday.

14 A     We went through this document on Friday.

15 Q     And nobody has since asked you to supplement responses

16 and provide verified answers?

17 A     I have not received that request.

18 Q     Okay.  Now, let's talk about what was in the ordinary

19 course of the HoldCo Debtors.  Are you aware of whether or

20 not the HoldCo Debtors were ever allocated expenses in the

21 pre-petition period?

22 A     I'm not aware of the allocation.

23 Q     Okay, and you're not aware of whether or not the HoldCo

24 Debtors even tracked on an intercompany account basis whether

25 there were any expenses which were allocated to the HoldCo

1  Debtors, right?

2  A    I'm not aware of how they administered those.

3  Q    And you're not -- sorry.

4  A    I'm not aware of the tracking or allocation of those

5  expenses if it occurred.

6  Q    Okay.  And you're not testifying, then, that in the

7  pre-petition period, in the ordinary course, the HoldCo

8  Debtors ever borrowed money from other debtors or from third

9  parties on any terms.

10  A    I'm testifying that I don't know the approach they took

11  to those topics.

12  Q    And let me be clear, because that was a bad question.

13  Maybe someone should object.  You are aware that the HoldCo

14  Debtors borrowed $475 million from third-party lenders,

15  right?

16  A    I'm aware of that.

17  Q    And that the Debtors right now, unless they get a

18  clearing transaction through FRG Inc., are going to pay those

19  HoldCo Debtors -- lenders nothing.

20  A    I'm aware those are the terms of the plan.

21  Q    And by the way, you negotiated the DIP, you understand

22  that if the HoldCo lenders get paid anything under the plan

23  in the absence of a clearing transaction, that is default

24  under the DIP, right?

25  A    I don't understand the question.

1  Q     Okay, just to be clear, as the point person, you

2  understood that one of the things the Debtors were committing

3  to under the DIP was not to modify the plan in a way that the

4  DIP lenders didn't agree to, right?

5  A     We have both obligations under the DIP and obligations

6  under the RSA.

7  Q     And one of those obligations is to have a treatment for

8  the creditors at the HoldCo Debtors that is acceptable to the

9  DIP lenders and the 1L lenders, right?

10 A     That's my recollection.

11 Q     Right.  So unless the 1L lenders are okay with assets

12 in those boxes being distributed to the creditors of those

13 boxes, you understand, as the person who's the point person

14 on the DIP, that that's a DIP default.

15 A     I'd have to review the specific defaults.

16 Q     Let's focus on the DIP negotiations of everything other

17 than the HoldCos.  The DIP negotiations with the 1L borrowers

18 is what I'm mostly focusing on.  Okay?  And we talked at your

19 deposition about the negotiations of the DIP which is

20 ultimately in front of His Honor, which is being funded by

21 certain of the 1L holders, right?

22 A     Correct.

23 Q     And those negotiations of that DIP were conducted

24 through the advisors for the Debtors and the 1L lenders,

25 right?

1   A      They were conducted through the advisors to the debtors

2   and the advisors to the 1L lenders.

3   Q      To be clear, Mr. Laurence, the CEO, didn't participate

4   in those DIP negotiations, did he?

5   A      I don't recall his participation directly.

6   Q      Okay.  And for the 1L lenders, when you say the

7   professionals, it was Paul Hastings and Lazard, right?

8   A      That's correct.

9   Q      And you're not aware of any negotiations between the

10  actual principals, that is the debtor management and the

11  holders of the 1L claims, right?

12  A      I am not aware of any negotiations between those

13  parties related to the DIP facility.

14  Q      Right.  And certainly you didn't ever get in a room

15  with the proposed DIP lenders and ask them, are you willing

16  to do a DIP on these terms?

17  A      We did not sit in a room with the lenders to the DIP

18  facility.

19  Q      Nor did you get on a Zoom or even a phone call to talk

20  to the proposed DIP lenders about the terms on which they

21  would actually be willing to provide a DIP.

22  A      We held our negotiations through their professionals.

23  Q      So everything you know about what the actual lending

24  parties are willing to do is getting filtered through Lazard

25  and Paul Hastings, right?

1  A    Our conversations were with Paul Hastings and Lazard.

2  Q    Okay.  Now, the 1L lenders were the party that put

3  forward the first proposal for a DIP, right?

4  A    They did.

5  Q    Okay, can you go to Tab 8 in your binder, which is FLG

6  10, Your Honor.  And we went through this document at your

7  deposition, right?  Or parts of it.

8  A    Portions of it.

9  Q    Okay, can you turn to what's numbered page 66 at the

10  bottom?  And that's the cover page, which reflects a

11  restructuring proposal of July 28, 2024, coming from Lazard

12  and Paul, right?

13  A    That's correct.

14  Q    Okay.  Was this a proposal that the Debtors got from

15  Lazard and Paul Hastings at the end of July 2024?

16  A    That's an accurate description of this document.

17  Q    All right, let's go to page 70 in the Bates numbers.

18  It's exhibit or it's page number 5 in the exhibit or in the

19  deck.  All right, now, to be clear, this DIP proposal was

20  before the debtors ever had a discussion with the DIP lenders

21  regarding the need for a DIP, right?

22          MR. LOMBARDI:  Your Honor, if I may.  You know,

23  I want to object to this line of questioning.  I don't see

24  the relevance of it.  Mr. Grubb's here to testify about this

25  DIP that's before the Court right now that's being sought for

1  approval.  I don't know what the relevance of all this

2  history going way back is.  In particular, something that was

3  pre-petition.

4         MR. SHORE:  Well, Your Honor, this witness is here

5  to testify that the negotiations, among other things, were

6  vigorous and arm's length.  I'm just starting with how the

7  negotiations went.

8         THE COURT:  I'll allow it.

9  BY MR. SHORE:

10  Q    Okay, to be clear, this proposal was made before the

11  Debtors had ever told the 1L lenders what they were looking

12  for as far as substantive terms of a DIP, right?

13  A    We were focused in working on an out-of-court solution

14  and recapitalization to these matters and had not made a DIP

15  request of the 1L lenders at this time.

16  Q    But the 1L lenders, nonetheless, came out with the

17  terms, bracketed though they may be.  This was their opening

18  bid for what a DIP would look like, right?

19  A    Prior to doing diligence and engaging with us around

20  the terms of a restructuring of the business or a

21  contemplation of these cases, they put forward these

22  bracketed preliminary terms in late July.

23  Q    Right.  And the first thing they did was propose a

24  size, r?

25  A    They did.

1  Q     It was a $425 million facility comprised of 175 million
2  delayed draw facility to fund the cases, right?
3  A     Prior to having a budget or doing any diligence, that
4  is what they put forward.
5  Q     Right.  And ultimately what ended up happening is the
6  size came up $75 million of the new money draw, right?
7  A     Correct.
8  Q     And then they proposed a roll up of $250 million of
9  pre-petition debt, right?
10 A     They did.
11 Q     And you would agree with me that's less than the Two-
12 to-one roll up.
13 A     It is less than Two-to-one.
14 Q     So their first discussion out of the gate was we're
15 willing to do a new money DIP with less than a Two-to-one
16 rollout.
17 A     That was their term sheet from July.
18 Q     Okay, let's go to the vendor payments on the next page.
19 For the record, it's at FRG-071.
20 A     I see that.
21 Q     And right out of the gate, it was the DIP lenders -- or
22 sorry, the 1Ls who would be proposed DIP lenders who proposed
23 that they would be funding critical vendor and foreign vendor
24 payments, right.  In some undetermined amount.
25 A     At a TBD amount.

1    Q      Yeah.  And a TBD amount of funding 503(b)(9) payments,

2    right?

3    A      At a TBD amount.

4    Q      With a TBD date.  Some of it immediately, some of it at

5    emergence, right?

6    A      With the TBD date split between during the cases in

7    that emergency.

8    Q      Okay, now let's go back up to the prior page, and let's

9    talk about fees.  The opening bid from the 1L lenders for the

10   backstop fee was 10 percent, right?

11   A      That's correct.

12   Q      And after all of these vigorous negotiations, you ended

13   up with a 10 percent backstop fee, right?

14   A      We sit here today with a 9 percent fee proposed.

15   Q      Well, let me ask that.  With respect to -- because we

16   haven't seen the revision -- or I don't.  Maybe I'm wrong.

17   Have you revised the DIP credit agreement to go back to the

18   interim amount of the commitment fee, or are you asking for

19   10 percent?

20   A      My understanding is we're asking for the amounts read

21   into the record during the first day of 9 percent.

22   Q      Okay.  Are you aware of whether the 1L lenders have

23   committed to fund on those terms?

24   A      That's my understanding.

25   Q      Well, but the interim was only a one-to-one roll up,

1  right?

2  A     On an interim basis.

3  Q     Okay.  They're not agreeing to a one-to-one roll up.

4  They're insisting on a Two-to-one roll up.

5  A     Two-to-one as amounts are drawn.

6  Q     Okay, so just to be clear, you are not seeking

7  authorization to pay a 10 percent backstop fee, but only a 9

8  percent backstop fee?

9  A     That's correct.

10  Q     And what authorization are you asking for with respect

11  to the commitment fee?

12  A     One and a half percent commitment fee.

13  Q     And what about the exit fee?

14  A     Two and a half percent.

15  Q     All right.  And with respect to those fees, you're

16  talking about the changes that they read into the record at

17  the first-day hearing, right?

18  A     That's correct.

19  Q     To be clear, let me rephrase my question then.  After

20  all these vigorous negotiations, when the Debtors first filed

21  the DIP motion, they agreed to the backstop fee that the

22  lenders first proposed in July.

23  A     We proposed 10 percent ahead of the first-day hearings.

24  Q     I'm sorry?

25  A     We proposed a 10 percent backstop fee ahead of the

1 first-day hearings.

2 Q     Right.  So as I said, after all the vigorous

3 negotiations, by the time you filed the DIP motion, you

4 couldn't get them to move at all on the backstop fee.  Right?

5 That they first proposed.

6          MR. LOMBARDI:  Your Honor, I'm sorry, just they're

7 not even objecting to the fees.  I'm not sure what the

8 relevance of any of this line of questions is.

9          THE COURT:  What's the relevance?

10          MR. SHORE:  Well, Your Honor, this witness is

11 standing in front of Your Honor saying, I am control of this

12 process.  I fought hard for these terms.  And I think that

13 you should find that these are market terms based upon the

14 vigorous back-and-forth.

15          I'll get to whether or not he's providing expert

16 evidence of market.  But the Debtors want to say that these

17 are market terms because we fought hard with these guys.  And

18 what I'm saying is actually the only thing they got done in

19 that process was cutting one fee to 2.5 percent from 5.

20 That's the only thing they got done.  Except that they

21 upsized the amount of the roll up, and they upsized the

22 amount of the initial draw.

23          THE COURT:  Well, you can make those arguments in

24 closing.  I don't know why we're spending time with the

25 witness on all this.

1          MR. SHORE:  Well, I'm just -- this is not in the

2    record anywhere right now.  We're not putting in --

3          THE COURT:  These documents are admitted into

4    evidence, I think.

5          MR. SHORE:  Okay.  All right.

6          MR. LOMBARDI:  Thank you.

7    BY MR. SHORE:

8    Q    And by the time this DIP got to court, you provided

9    testimony that's now in evidence that your counsel just put

10   back into evidence that the terms you got when you filed the

11   DIP were the best and only financing available to any of the

12   Debtors, right?

13   A    They were the best financing terms available for the

14   DIP financing the company required to administer these cases.

15   Q    And that was based upon the negotiations that had led

16   up to the final DIP motion which has been filed, right?

17   A    The view that these were the best terms attainable were

18   based on those negotiations.

19   Q    Right.  And I take it you sincerely believe that that

20   was the best and only financing that was available to the

21   Debtors?

22   A    We worked hard to get the lowest cost financing

23   achievable for the Debtors.  And those were the best terms

24   that could be achieved.

25   Q    Right.  And to be clear though, that -- do you remember

1  how much notice anybody got of the first-day hearing?

2  A    I don't recall the sequencing of notices.

3  Q    Okay.  And have you sat for a deposition or anything

4  else to talk to anybody about the term terms of the DIP?

5  A    I had not sat for a deposition prior to the first day.

6  Q    And I'll tell you, I winged it at the first-day

7  hearing.  On a couple days' notice, an objection was filed

8  with respect to the DIP, and the next day the 1L lender group

9  came up and cut the fees that you say they're now agreeing

10 to.

11         THE COURT:  Is there a question?

12 BY MR. SHORE:

13 Q    Well, that's what you did, right?  That's what

14 happened, right?

15 A    The original DIP terms were put forward.  We held a

16 remote first day.  The judge made comments as related to his

17 views on the DIP.  We then held an in-person continuation of

18 the first day.  The judge, again, weighed in on certain

19 matters put in front of him.

20       And during the process of that continuation of the

21 first day here in person, certain concessions were made,

22 including on the terms of the DIP.

23 Q    And all of those concessions that were made were for

24 the benefit of the debtor, right?

25 A    The terms related to the cost of the DIP financing were

1  to the benefit of the Debtor.  There were other concessions

2  and compromises made that day relative to critical vendors

3  and 503(b)(9) and other elements of the cases that were not

4  to the benefit of the debtor, but there was a package of

5  terms negotiated over the two first days.

6  Q    I thought I would just go ahead and have it clear for

7  the record what happened on the first-day hearing is the --

8  after the first date coming into the second day is the debtor

9  got terms for a DIP that were better than what they had

10 negotiated for months with the 1Ls.

11 A    We held all these negotiations as it relates to a

12 package of terms across the size of the DIP, the terms of the

13 DIP, the timeline of the cases, the RSA terms, the DIP terms,

14 the bidding procedures and milestones, was the manner in

15 which we negotiated the interplay between all these various

16 agreements.

17 Q    You got more time under the milestones, right?

18 A    Coming into today, we negotiated for additional time

19 under those milestones.

20 Q    And it's fair to say that in the absence of anybody

21 objecting to the DIP on the first day, if His Honor was

22 willing to enter the order that the debtors proposed, you

23 would have gone ahead with that, right?

24 A    I would defer to the Honor's -- judge's judgment about

25 what he would have entered.

1  Q     Now the --

2           THE COURT:  How much longer do you have, Mr.

3  Shore.

4           MR. SHORE:  Like, 15 minutes, Your Honor.  Want to

5  do that before --

6           THE COURT:  Let's do -- finish it up in 15, and

7  we'll take a lunch break at that point.

8  BY MR. SHORE:

9  Q     And under the terms of the DIP, you said it got

10 reduced, the amount of borrowing got reduced.  The Debtors

11 have had sufficient liquidity to run the business under the

12 interim DIP, right?

13 A     That's my understanding.  David Orlofsky can speak to

14 those matters.

15 Q     Right.  But you, as the banker, you haven't had any

16 concern on your part with respect to whether or not the

17 interim DIP was providing the company with adequate liquidity

18 during its operation, right?

19 A     My understanding is the total DIP and liquidity have

20 been adequate.  I further understand that there have been

21 stress created with vendors around the baskets that were made

22 available under the 503(b)(9) and critical vendor orders.

23 Q     Okay, let's focus on a different type of adequate,

24 which is adequate protection that you're proposing under the

25 final DIP order.  The final DIP motion contains adequate

1  protection disclosures in the summary of the DIP, right?

2  A    That's correct.

3  Q    And your understanding is that adequate protection is

4  compensation for value foregone during the cases by secured

5  lenders to compensate for a diminution of value.

6  A    It's my non-legal business understanding of the concept

7  of adequate protection.

8  Q    Yep.  And your non-legal business understanding is that

9  we're measuring the difference between the petition date

10 through the effective date of the claim, right?

11 A    That's my understanding.

12 Q    Now, under the terms of the DIP, you're going to be

13 layering on some amount of net debt onto the company, right?

14 A    The anticipated budget shows the incurrence of net debt

15 during the cases.

16 Q    And since we don't have the final DIP budget, do you

17 know how much net debt the budget is projecting will be put

18 on the company?

19 A    My recollection of the DIP budget is an incremental,

20 you know, 150 million of incremental net debt.

21 Q    Okay, 100 to 150.  And now to be clear, you're not

22 testifying today whether you -- whether the value of the

23 collateral is going up or down during the pendency of the

24 cases, right?

25 A    I'm not testifying the value today.

1    Q     Okay, let's focus just on the 2L lenders.  You do

2    understand that the 2L lenders have liens on all of the

3    assets at the OpCos, which is junior to the 1L liens, right?

4    A     I understand that.

5    Q     Okay.

6    A     Sorry, just to clarify, I believe there are certain

7    small baskets of unencumbered assets.  But if we can say

8    substantially all.  I agree with the --

9    Q     Okay.  And just so the record is clear, no one has, to

10   your knowledge, done a valuation of value of that collateral

11   for the 2L lenders, right?

12   A     I'm not aware of any such valuation.

13   Q     Nobody has done a look-forward valuation to determine

14   the projected value of the collateral at the effective date

15   of the plan, right?

16   A     I'm not aware of that valuation.

17   Q     Okay.  It could go up, it could go down.

18   A     It could go up or it could go down.

19   Q     Over the --

20   A     Or it could stay the same.

21   Q     Over the 12 to 16 months that this case is in play,

22   right?

23   A     I believe we're working toward a much shorter timeline

24   than that.

25   Q     What's your current idea of the timeline you're looking

1  for?

2  A    There would be a confirmation based on the milestones

3  in the agreements.  We can pull those out if helpful.

4  Q    Now, if the DIP is granted and there's $100 to $150

5  million of net debt that's put on the company, that is going

6  to stand between the collateral and payment to the 2Ls,

7  right?

8  A    It would be senior to recovery of the 2Ls.

9  Q    So in fact, any net borrowings under the DIP raise the

10  hurdle that is necessary to pay off the 2L claim.

11  A    I agree with that.

12  Q    And part of that net debt under the borrowing is to pay

13  -- $100 million essentially to pay critical vendor lien

14  claimants and 503(b)(9) claimants.

15  A    Cash is somewhat fungible once it's in the system, but

16  a use of cash and liquidity during the case is to pay

17  503(b)(9) and critical vendors.

18  Q    Right.  So when that critical vendor process is over,

19  as the banker for the OpCos, how much unsecured debt are the

20  Debtors expecting to have at the HoldCos -- or, sorry, at the

21  OpCos at the end of the case?

22  A    I don't believe we have a view on the total claims that

23  will be put forward in the case.

24  Q    Okay, so let's just focus on your understanding of

25  adequate protection.  If the 2L collateral was worth $100

1   million on the petition date, okay?

2   A     Okay.

3   Q     And we don't know -- it may be, it may not.  I just

4   want to understand how you understand the adequate protection

5   works.  If there's $150 million of net DIP debt put on the

6   balance sheet.  Got that?

7   A     I do.

8   Q     In a static environment, that is over the next 9

9   months, 12 months, 16 months, if the value of the collateral

10  stays exactly the same, by definition, the collateral of the

11  2L has diminished by $50 million.

12  A     Their recovery under the waterfall has been reduced by

13  that amount.

14  Q     Right.  So if, in fact, they only clear by $100 million

15  as of the petition date, in that scenario, you buy $150

16  million, you wipe out all their collateral value during the

17  case, right?

18  A     In a static valuation environment.

19  Q     Right.  I mean, in other words, if we just operate

20  under the status quo, these businesses continue to operate

21  for the next six months the way they've been operating, even

22  though they're not paying interest expense, and they have the

23  benefit of a DIP in everything else.  And they have the

24  protections His Honor's given with respect to vendors and

25  everything else.

1    In that static environment, if the collateral is worth

2  $100 million on the petition date and you borrow $150

3  million, you've wiped out the 2L recovery.

4  A    The arithmetic of the waterfall is accurate.

5  Q    Okay.  Now, let's turn to the -- at least you're

6  providing adequate protection claims for the 2L holders,

7  right?

8  A    That's correct.

9  Q    So that if, in fact, there's something outside these

10  little baskets, outside of the existing collateral package,

11  they get the first look at that before some unknown amount of

12  unsecured creditors get a look at that.

13  A    That's my understanding.

14  Q    Okay.  Now, with respect to the HoldCos, the HoldCos

15  are getting zero adequate protection under this order, right?

16  A    That's correct.

17  Q    You understand that the bottom of the two HoldCo

18  Debtors holds the stock in FRG Inc., right?

19  A    That's correct.

20  Q    And you're not testifying one way or the other as to

21  what the value of that FRG Inc. stock is under the -- at

22  either the petition date or the presumed effective date.

23  A    I'm not giving valuation testimony today.

24  Q    Okay.  But it's possible because the Debtors are

25  running an auction and they have a plan on file that says

1 that that FRG Inc. stock may have value, that, in fact, the

2 FRG Inc. stock may have value as of the petition date, right?

3 A    I don't recall what the plan says about the value of

4 that equity.  I would say we're running a sale process to

5 determine if there are third-party buyers in excess of the

6 obligations at FRG Inc. that would create equity value above

7 FRG Inc.

8 Q    Now, just with respect to the HoldCo Debtor, do you

9 understand that FRG Inc. stock is pledged to the $400 or $500

10 million in HoldCo debt?

11 A    My understanding is the $500 million or such of HoldCo

12 debt is secured at those HoldCo Debtors.

13 Q    And if there was $100 million of value in that HoldCo -

14 - sorry, the FRG Inc. stock as of the petition date, and you

15 borrow $150 million under the DIP as projected, that value of

16 the equity will be wiped out.

17 A    Under a waterfall of value on a static value basis,

18 there would be -- that value would not flow to the HoldCo

19 Debtors.

20 Q    Right.  So and you're providing no actual protection

21 for that, right?

22 A    Correct.

23 Q    And you keep saying the static value.  If you borrow

24 $150 million under the DIP, isn't it fair to say that for the

25 HoldCo secured lenders, the business needs to appreciate by

1  $150 million in the bankruptcy case in order to just keep

2  them where they were on the petition date?

3  A    Part of the benefit to all constituents in these cases

4  is the liquidity provided under the DIP supports the ongoing

5  operations of the business.  And absent that liquidity, value

6  would fall precipitously.  So one of the benefits to all

7  constituents is this liquidity allows for the preservation of

8  value of the businesses.

9  Q    Right.  But it's fair to say you understand that the

10  purpose of adequate protection is to protect for the

11  downside.

12  A    That's my business understanding.

13  Q    Right.  And you're not telling His Honor that under the

14  terms of this DIP, there's definitely going to be 150 million

15  -- sorry.  Under the term -- sorry, you're not telling His

16  Honor that in your expert opinion that there's definitely

17  going to be $150 million of appreciation during the time in

18  which the 2L lenders aren't allowed to touch their FRG Inc.

19  stock?

20  A    I'm not putting forward a view as it relates to what

21  the value creation of that incurrence will be.  I am putting

22  forward a view that in the absence of that DIP financing, the

23  value degradation would be significant if these businesses

24  cannot fund themselves.

25  Q    Is that anywhere in the declarations you filed to date?

1  A      We'd have to review the declarations.

2  Q      Now, let's turn finally to bid procedures.  We

3  discussed those in your deposition, right?

4  A      We did.

5  Q      And I went through your declaration, which you gave to

6  us an hour or two before your deposition started.

7  A      I don't know exactly what time it was filed.  I think

8  it was more than an hour or two, but it was overnight.

9  Q      Okay.  And part of the testimony you've given Your

10  Honor is that time is of the essence for the Debtors.  And

11  the Debtors have already agreed to extend the sale process by

12  11 days.  Right?

13  A      Correct.

14  Q      And you testify in your declaration that time is of the

15  essence because of the limited liquidity available to the

16  Debtors under the post-petition financing facility.  Right?

17  A      Among other reasons.

18  Q      And you have a sentence in your declaration which says

19  Debtors cannot afford to further extend this into an even

20  longer process due to, among other things, the limited

21  liquidity available to them under their post-petition, the

22  financial facility, right?

23  A      I don't have it in front of me, but I believe I stated

24  something to that --

25  Q      Right.  And we went through that sentence in your

1  deposition.  And in fact, someone else wrote that sentence,

2  right?

3  A     Someone else drafted that sentence.  I read it, and I

4  signed the declaration.

5  Q     Right.  And then at the time you wrote that, you had

6  access to the nine-month DIP forecast, right?

7  A     That's correct.

8  Q     Did you have access to the nine-month revised DIP

9  forecast?

10 A     I had not reviewed the revised forecast.

11 Q     Okay.  Now, the proposed time lines -- we could go back

12 to the document that they proposed.  It was the 1LS that

13 first proposed that there would be timelines for a sale

14 process.  Right?

15 A     You're referencing the July 28th document.

16 Q     Yeah.

17 A     There were timelines in that document.

18 Q     Right.  And I won't take His Honor's time or go back to

19 it because it's in evidence now.  But they set forth proposed

20 dates for the IOIs, the binding bid deadline, and the sale

21 hearing, right?

22 A     They did.

23 Q     Okay.  And that was all done prior to the petition,

24 right?

25 A     That was done prior to the petition date.

1    Q     Now, you've reviewed Mr. Augustine's declaration in

2    support of the bid procedures, while we're talking about

3    declarations.  Right?

4    A     I've reviewed his declaration.

5    Q     And you saw that Mr. Augustine testified that with only

6    $50 million of additional pre-petition funding, the Debtors

7    could continue to operate under Chapter 11 at least through

8    June 30th, 2025, right?

9    A     I don't have the declaration in front of me, but I

10   recall statements similar to what you just referenced.

11   Q     And do you recall at your deposition you told me you

12   don't have an opinion on that conclusion one way or the

13   other?

14   A     If that's what the deposition says.

15   Q     Well, just do you --

16   A     We are having a broader discussion around the adequacy

17   of liquidity relative to the length of the case and that

18   there is a DIP budget that puts forward the expectations for

19   receipts and disbursements and the burn of professionals.

20   And that was put forward pre-petition there's -- or not pre-

21   petition, but in conjunction with the original DIP, there's a

22   revised budget that is being developed.

23         And part of that discussion we had was that the

24   stability of terms and vendors and the businesses is

25   dependent on an expectation that these businesses exit

1   Chapter 11.  And there is a belief that that -- we remain on

2   track to do that.  To the extent that was disrupted or

3   changed, the liquidity demands of the business, the liquidity

4   demands of the vendor base could change.

5   Q     I just asked a simple question.  Did you express an

6   opinion that Mr. Augustine was wrong?

7   A     I don't recall disputing that with an alternate

8   (inaudible).

9   Q     And you don't doubt that Mr. Augustine has significant

10  experience in conducting 363 sales for debtors, right?

11  A     As I testified earlier, I'm aware of Mr. Augustine's

12  general restructuring experience.  I don't know his exact 363

13  experience.

14  Q     And the idea of this minimum price floor at the

15  auction, you were the one or the Debtors were the ones who

16  thought that up starting in October?

17  A     Starting in October is part of negotiating the bid

18  procedures, mechanisms, and tools to make the individual

19  OpCos actionable as individual auctions and sales was

20  something we put forward.

21  Q     Okay.  And to be clear, Mr. Augustine testifies about

22  his views about publishing release prices, right?

23  A     His declaration covers his views on release prices.

24  Q     And what you've put forth is not a release price,

25  right?

1   A    The prices we put forward, the levels we put forward

2   are not release prices.  The 1L lenders would retain the

3   ability to credit bid above those levels if they chose to.

4   Q    Right.  So you're not saying that what you put forward

5   is what Mr. Augustine wanted, right?

6   A    There are differences between what we put forward and

7   what Mr. Augustine had in his declaration.

8   Q    And you keep saying what we put forward.  It was the 1L

9   lenders that proposed the numbers for the minimum price

10  floor, right?

11  A    When I refer to we, I mean the Debtors have put forward

12  the bid procedures.

13  Q    Right.  But the numbers that are in there for Buddy's,

14  Vitamin Shoppe, and PSP, those came from the 1L lenders,

15  right?

16  A    Those are levels agreed with the 1L lenders.

17  Q    Okay.  And so you are -- and is it fair to say that

18  those numbers that are being published are the only thing

19  that could arguably be viewed as the Debtors' statement as to

20  what the value of those three businesses is, right?

21  A    I don't view those as statements of value.  I view

22  those as hurdles over which an auction will take place for

23  each of the operating businesses.

24  Q    Okay.  So let's focus on those hurdles.  Vitamin

25  Shoppe, you've listed at $200 million, right?

1  A     That's the hurdle.

2  Q     Okay.  And to be clear, without publishing those

3  prices, if there were ten bidders who were willing to bid

4  $180 million for the business, that would be a great day for

5  you, wouldn't it?

6  A     I would prefer they bid more for the business.

7  Q     Well, but having ten bidders is a great thing, right?

8  A     Ten bidders at the right level and ability to move up

9  would be a good start to an auction.

10 Q     Okay, but to be clear, you haven't actually ever

11 conducted an auction like that before, right?

12 A     I've not conducted a 363 auction with ten bidders in

13 it.

14 Q     Okay.  And with respect to that, is it fair to say that

15 those ten bidders are being told, if you're at $180 million,

16 don't bother showing up because the $200 million check to get

17 into the room?

18 A     What is being indicated in the bid procedures is that

19 bids would need to be in excess of $200 million to hold an

20 auction.  To the extent we had significant interest at 180

21 million, we'd engage with them to understand their level of

22 interest and potentially have conversations as necessary.

23 But an auction would not take place if all bidders were at

24 $180 million under the terms of the bid procedures as put

25 forward.

1  Q    But if you've already told the bidders, don't show up

2  unless you have $200 million and they're at $180 million,

3  what makes you think they're going to put in the bid for $180

4  million and start talking to you and spend the time and money

5  to see if that's an actionable bid?

6  A    The conversations we've had with parties since that

7  filing was put in has been discussions with potential

8  interested parties about their level of interest, their

9  ability to submit bids relative to or above the hurdles, and

10 how they think about the process in that context.

11 Q    But those are the people that have chosen to come

12 forward and talk to you, right?

13 A    We have contacted parties proactively relative to the

14 process, and we speak to those parties at their request or

15 ours.

16 Q    I take it that the bid prices, the floor prices that

17 you set in the bid procedures are not based upon any

18 discussion with third party bidders regarding what they might

19 pay.

20 A    The preliminary views expressed by the market as part

21 of our marketing process were shared with the 1L lenders on a

22 no-names, anonymous basis before those values were set.

23        THE COURT:  All right.  Mr. Shore, you've been

24 gone past your 15 minutes.

25        MR. SHORE:  Yeah.  I've got a few more questions

1  on bid procedures, Your Honor.

2              THE COURT:  Well, let's take our lunch break.

3              MR. SHORE:  Okay.

4              THE COURT:  We'll break until 1 o'clock.  Well,

5  let's make it five after to give 45 minutes, so people can

6  get some lunch.

7              During the break, Mr. Grubb, you're not allowed to

8  talk to anybody about your testimony.

9              THE WITNESS:  Thank you.

10             THE COURT:  In terms of timing, I will check to

11 see how late we can go this evening.  Depends on availability

12 of staff and so forth.  But if not, I would counsel everybody

13 to start looking at coming back tomorrow.  I have two

14 hearings tomorrow that I cannot move.  But we can work in

15 between those two hearings.  They're both virtual, so it

16 won't be an issue.

17             So talk about it over the break, and we'll see

18 where we go from there.  Debtors should let me know if you,

19 you know, if we can move it to another day other than

20 tomorrow.  If the debtors are in a position to do so without

21 causing any problems for the DIP.

22             MS. SINCLAIR:  Briefly, Your Honor, I think it's

23 critical that we have the DIP part decided today.  We're

24 amenable to speaking about scheduling on the other matters,

25 but for the DIP, it is really critical that we have that

1  heard today.

2          THE COURT:  Okay, then parties should talk about

3  the scheduling and we'll go from there.

4          MS. SINCLAIR:  Yes, Your Honor.

5          THE COURT:  Okay.  Because I will finish the DIP

6  today.  We will do that today.  All right.  Thank you.  We're

7  recessed until 1:05.

8      (Recess taken at 12:21 p.m.)

9      (Proceedings resumed at 1:11 p.m.)

10          THE COURT:  Thank you, everyone.  Please be

11  seated.  I said please be seated.

12      (Laughter)

13    CHRISTOPHER GRUBB, WITNESS FOR THE DEBTORS, PREVIOUSLY

14                  AFFIRMED, RESUMES STAND

15          THE COURT:  Yes.

16          MS. SINCLAIR:  Yes, Your Honor.  Before we get

17  started with the witness again, I wanted to make one

18  announcement to the Court, which I think you'll be pleased to

19  hear, which is that we have resolved the critical vendors

20  motion.

21          THE COURT:  Okay.

22          MS. SINCLAIR:  We had one outstanding objection

23  from the Freedom Lender group on that, that we resolved over

24  the lunch break.  We'll be submitting a revised order to Your

25  Honor on that motion.  And we've agreed that, due to our

1  resolution, there will be no need to question witnesses on

2  the critical vendors relief, and there will also be no need

3  for oral presentation of that motion.

4          THE COURT:  Okay.

5          MS. SINCLAIR:  Other than that, Your Honor, I

6  think we're ready to proceed with the witnesses, and we trust

7  everyone will be streamlined, given your accommodation on the

8  hearing today.

9          THE COURT:  Okay.

10          MS. SINCLAIR:  Thanks.

11          THE COURT:  Thank you.

12          Mr. Grubb, I just remind you, you're still under

13  oath.

14          MR. SHORE:  Let me just do something, Your Honor,

15  since we're not going to be questioning the witnesses and we

16  don't have the order, let me just read the agreed language

17  into the record, and I think that then resolves it.  Is that

18  fine?

19          MS. SINCLAIR:  That's fine.

20          THE COURT:  Okay.

21          MR. SHORE:  Okay.  We're going to put a paragraph

22  in the critical vendor -- final critical vendor order that

23  says:

24          "Notwithstanding the relief granted herein and any

25  actions taken hereunder, nothing contained herein shall

1  create, nor is intended to create any rights in favor of or

2  enhance the status of any claim held by any person.

3  Notwithstanding anything to the contrary herein, in the first

4  interim order, in the second interim order, or any order

5  approving post-petition financing for the debtors, the rights

6  of the debtors, the Ad Hoc Group of Freedom Lenders, and any

7  other party-in-interest under the Bankruptcy Code, or

8  applicable non-bankruptcy law with respect to payments under

9  this final order, the first interim order, and/or the second

10  interim order, including with respect to compliance with the

11  first interim order, the second interim order, or this final

12  order are preserved to the fullest extent possible."

13          THE COURT:  Okay.

14          MR. SHORE:  And I think, with that, we'll -- we

15  will pare down -- I think it really impacts the cross of Mr.

16  Orlofsky.

17          THE COURT:  Okay.

18          MR. SHORE:  Okay?

19          THE COURT:  Thank you.

20                  CONTINUED CROSS-EXAMINATION

21  BY MR. SHORE:

22  Q    A few final questions, sir.

23  A    Okay.

24  Q    We were on this, the credit bid aspect of the bid

25  procedures.  Now I think we were on:

1    If no one shows up at the Vitamin Shoppe option, it's

2  your understanding that, under the terms of the plan, that

3  that business just goes to the 1L lenders, right?

4  A    There -- it would be subject to the plan process and

5  there would no auction and it would go to the 1L lenders.

6  Q    Right.

7    And it's your understanding that, since they didn't

8  show up at the Vitamin Shoppe auction, the 1L lenders could

9  show at the auctions, if there are ones, of PSP and Buddy's

10  and credit bid the full $1.2 billion, approximately, that's

11  outstanding under the 1L facility.

12  A    To the extent there's not an auction held, there will

13  not be an allocation of their claim to a credit bid for those

14  assets.

15  Q    And to be clear then, since there's no allocation, they

16  can show up with $1.2 billion of dry credit bid powder to bid

17  against other bidders at the auction.

18  A    Their -- their allowed claim in the amount that's

19  determined would be available to credit bid the other

20  auctions.

21  Q    Okay.  But to be clear, the 1Ls are not committing to

22  credit bid for any business, are they?

23  A    They are not committing to credit bid for any business.

24  Q    Now the under -- your understanding of what the 1Ls are

25  getting in the terms of the proposed plan are all of the

1  assets of the debtors in the event that there is no sale

2  which clears the 1L debt, right?

3  A    They would receive the -- the operating businesses of

4  the debtors, yeah, they would receive the full operations of

5  the business.

6  Q    Okay.  We're going to hear from Mr. Laurence later

7  about $13 million in cash at the very TopCo LLC.  What do you

8  -- do you understand that that $13 million of cash would go

9  to the 1L lenders?

10  A    My -- my understanding is that there are certain causes

11  of action that the $13 million or certain elements of the

12  structure that were not part of my testimony that the

13  operating businesses would go to the 1L lenders.

14  Q    Okay.  Now you prepared CIMs for each of Buddy's --

15  confidential information memorandum -- for each of Buddy's,

16  PSP, and Vitamin Shoppe, right?

17  A    That's correct.

18  Q    But you are not out in the market with a CIM that shows

19  the actual Franchise Group, Inc. business numbers; that is,

20  the roll-up of the three businesses into Franchise Group,

21  Inc., right?

22  A    We do not have marketing materials as it relates to a

23  consolidation of all three businesses.

24  Q    And to date, has anyone requested to see information

25  regarding the asset that's moving under the plan; that is,

1    the consolidated enterprise?

2    A    We -- we have had conversations with parties about

3    potential interest in the entire enterprise, but no party has

4    requested information as it relates to that --

5    Q    So, unless --

6    A    -- for the enterprise.

7    Q    -- something changes, the debtors aren't intending to

8    auction off that which the 1L lenders are getting under the

9    plan, right?

10   A    We have a construct under the bidding procedures where

11   we could aggregate individual bids into a sufficient bid and

12   run a whole company auction.

13   Q    But that's not what's being marketed.

14   A    That's not what's being marketed.

15   Q    Okay.  We got into this conversation regarding the

16   difference between a reserve price and a minimum bid.

17        You agree with Mr. Augustine's suggestion that a

18   reserve price could increase participation in the auction?

19   A    I -- I don't agree that that would be the value-

20   maximizing structure to put forward in the bid procedures.

21   Q    Just listen to my question.

22        You agree that it could increase participation in the

23   auction, right?

24   A    It could or it could not.

25   Q    Okay.  But you don't testify in your written direct

1  that you think it's not value-maximizing; you had no opinion

2  with respect to what Mr. Augustine said, right?

3  A    I -- I'm happy to discuss my opinion, which is I don't

4  think we can determine that a reserve price would or would

5  not be value-maximizing here without discussion of what that

6  reserve price might represent, what level it might be set,

7  and what we believe we have put forward in the bidding

8  procedures is a process and a bid structure -- and a minimum

9  bid structure that will be value-maximizing here.

10 Q    Yeah, we went through this before in your deposition

11 and I think at the first-days.

12       You keep saying "we."  That testimony you're giving is

13 not based upon the fact that you have ever run an auction

14 under Section 363 of the Bankruptcy Code, right?

15 A    When I use the comment "we," I'm reflecting that there

16 is a team at Ducera working on this assignment, there's a

17 team at Willkie working on this assignment, there is a team

18 at AlixPartners working on this assignment, and we deliver

19 advice to the debtors, which include their management team

20 and their board, certain of which have extensive experience

21 in Chapter 11.

22       And so what I'm testifying is to what the debtors have

23 put forward in our motion and procedure and what we seek to

24 achieve approval of.

25 Q    But the -- of all the people you named, the only person

1  I could cross-examine about that opinion is you, right?

2  A     I'm being put forward as -- for testimony on the

3  bidding procedures.

4  Q     An independent director was named, I have a few

5  questions about that.

6        You understand that Willkie and Ducera put forward

7  names for independent directors.

8  A     Among others.

9  Q     And the others included the 1Ls.

10 A     I -- I don't know if they put any names on the list.

11 Q     But they were consulted with respect to the identity of

12 an independent director, right?

13 A     I recall them being consulted on the concept of putting

14 an independent director in at the HoldCos; I don't recall if

15 they were consulted on the names or not.

16 Q     Now, based upon your knowledge of the debtors' capital

17 structure, no one -- not -- the 1L credit facility does not

18 have claims at the HoldCo debtors, right?

19 A     I don't believe the full intercompany matrix and work

20 has been completed, but my -- my understanding is that they

21 are at the FRG, Inc. and OpCo level and not at the HoldCo

22 level.

23 Q     Okay.  And to be clear, as far as your answer is

24 concerned, as far as you know, no one solicited the views of

25 the creditors of the HoldCo debtors with respect to the

1    identity of a HoldCo director.

2    A      I -- I don't know the complete list of creditors at

3    those entities that -- my understanding is no one solicited

4    the views of the hold -- the Freedom Group Lenders, the Ad

5    Hoc Freedom Group.

6    Q      Okay.  And to your knowledge, that's because there was

7    an affirmative decision not to contact the Ad Hoc Group of

8    Freedom Lenders or their advisors to solicit them with

9    respect to independent directors, right?

10          MR. LOMBARDI:  Objection, Your Honor.  Relevance.

11   Ms. Sinclair represented at the beginning of today's

12   presentation that the debtors are not asking a new

13   independent director to bless the DIP or the bidding

14   procedures.  He's coming on board on a go forward basis.

15   This has nothing to do with today's motions.

16          MR. SHORE:  Well, in fact, one of the themes of

17   today's motions, especially within the debtors' papers, is

18   that they've been free and transparent with all the creditor

19   groups and are working to keep everybody moving forward on a

20   collaborative basis.  And I think that the -- just the answer

21   to this decision, that there was an affirmative decision to

22   say, if we're going to put an independent director in place,

23   we're going to talk to everybody in the room, except the

24   parties who are creditors at that estate, kind of undercuts

25   that air of cooperation.

1    THE COURT:  Well, I'm not sure that -- the issue

2  of cooperation amongst the parties is not really at issue in

3  determining whether the DIP is going to be approved or not.

4    But you can answer this one question.

5    THE WITNESS:  I -- I recall being involved in

6  certain preliminary discussions as it relates to the

7  independent director.  I was not on or a party to the

8  discussions when a final determination was made.

9  BY MR. SHORE:

10 Q    By the way, let me just -- I don't think you answered

11 my question.

12    MR. SHORE:  And if I may rephrase it then, Your

13 Honor?

14 BY MR. SHORE:

15 Q    There was an affirmative decision, to your knowledge,

16 not to contact the Ad Hoc Group of Freedom Lenders or their

17 advisors to solicit them with their views as to the identity

18 of an independent director, was there?

19 A    To my knowledge the Freedom Lenders were not contacted.

20 But I was not a part of any final determination or decision

21 that was made related to contacting or not contacting the

22 Freedom Lenders.

23 Q    Okay.  Can we turn to your deposition transcript at

24 Page 33?  So it's behind 1 in your binder.  It's Page 33,

25 Line 25, to 34.  So it's going to carry over in the page of

1   the mini.

2          There's a question.  I say:

3              "Sure.  Was there, as far as you know, was" --

4   A    I apologize, Mr. Shore.  Can I just --

5   Q    Yeah, sure.

6   A    Before we get into it.

7   Q    Yeah, sure.

8   A    You said Page 33?

9   Q    Page 33.

10  A    Yep.

11  Q    Down at the very bottom there's a question that begins

12  at Line 24:

13             "Was there -- as far as you know, was there an

14  affirmative decision on behalf of the debtors not to contact

15  the Ad Hoc Group of Freedom Lenders or their advisors to

16  solicit their input with respect to independent directors?

17             "Answer:  There was a decision made not to reach

18  out at that time.

19             "Question:  And who made that decision?"

20         And you answered in Line 10:

21             "Discussion of debtors' advisors."

22         Do you see that?

23  A    I -- I see that testimony.

24  Q    And that was true testimony when you gave it, right?

25  A    That was true testimony.

1 Q    Okay.  So, when we're on this topic of freedom of

2 information regarding the DIP, as far as you know, no one

3 shared a draft of the final proposed DIP order that was filed

4 on the morning of your deposition with Freedom Lender Group

5 before it was filed, right?

6 A    I -- I'm not aware of the exact sequence of when things

7 were filed.

8 Q    Okay.  And one of the terms of that proposed order and

9 the DIP is the -- and we went through this before -- the

10 commitment of the debtors to proceed with a plan with a

11 certain treatment of HoldCo debtor claims?

12 A    To proceed with a plan.

13 Q    Okay.  Well, it -- also as a treatment of the claims of

14 HoldCo debtor lenders, right?

15 A    That's right.

16 Q    Okay.  And are you -- you are aware that the Freedom

17 Lenders' proposed terms of a HoldCo plan, that is the subject

18 of a different motion today, right?

19 A    That -- I -- I understand there's a HoldCo motion

20 related -- you're referring to the -- to the exclusivity?

21 Q    Yep.

22 A    Okay.  I'm aware of that.

23 Q    And you're aware that there was a plan associated with

24 that.

25 A    I'm aware that a plan was shared in draft form.

1  Q    Okay.  But as the person negotiating the DIP then, and
2  agreeing to the RSA term, as far as you know, there has been
3  no markup of that proposed plan which has been shared with
4  the Freedom Lenders.
5  A    My understanding is the intention is to incorporate
6  treatment into the plan, as opposed to markup a separate
7  plan.
8  Q    Okay.  And as far as your knowledge, the debtors have
9  not filed such a proposed plan which changes the treatment of
10 the claims of holders of HoldCo debtor claims.
11 A    I'm not aware of a revised plan having been filed.
12 Q    And are you aware of the 1L lenders agreeing that -- to
13 the change of the treatment of the claims of the HoldCo
14 lenders?
15 A    Related to what?
16 Q    Related to the DIP.
17     In other words, have they -- have the 1L lenders told
18 you, in form or substance, since you're the point person on
19 this, that they agreed to any particular change to the
20 treatment of the HoldCo lenders, such that it would not be an
21 event of default under the DIP if the debtors filed that plan
22 you're talking about that we haven't seen?
23 A    I -- I don't believe the proposed changes have been
24 finalized.
25 Q    Okay.  So is that -- the answer is that the 1L lenders

1  had not consented to any changes to the HoldCo treatment, as

2  far as you know.

3  A    I -- I'm not aware of where conversations between

4  Willkie and Paul Hastings stand.

5  Q    And to your knowledge, there's been no communications

6  with the principals of the debtors and the principals of the

7  Ad Hoc Group of Freedom Lenders regarding the terms of an

8  acceptable plan, has there?

9  A    There was extensive negotiation between the principals

10 of the debtors and the principals of the Freedom Group

11 leading up to the Chapter 11 cases --

12 Q    Uh-huh.

13 A    -- and what might be a consensual recapitalization of

14 the businesses.

15 Q    Yep.  And what about post-petition?  After you got the

16 draft HoldCo lender plan, are you aware of any discussions

17 between principals regarding the terms of an acceptable

18 treatment at the HoldCo debtors?

19        MR. LOMBARDI:  Objection on relevance again, Your

20 Honor.  I'm sorry that it looks like we're going to burden

21 you with the second day at this point.  But this has nothing

22 to do with the DIP and the critical vendors motions that are

23 before you today.

24        THE COURT:  Well, the critical vendor motion is no

25 longer before me today, so ...

1      (Laughter)

2              MR. LOMBARDI:  You're right, Your Honor.

3              THE COURT:  So -- and I agree, it's not related to

4   the DIP.  Let's move on.

5              MR. SHORE:  Well, it -- okay.  I'm not going to

6   argue with Your Honor, obviously.

7   BY MR. SHORE:

8   Q     Just to be clear, the lack of any contact between the

9   debtors on the one hand, and the Ad Hoc Group of Freedom

10  Lenders on the other, or any of their advisors, is not

11  because you don't know how to contact us, right?

12  A     We have your contact information.

13  Q     Okay.  One last question and just a follow-up.

14         You got questioned by counsel on the demonstrative that

15  was given at the first-day hearing.

16             MR. SHORE:  And for the record, it was not entered

17  into evidence.  The way you resolved my objection is you said

18  it was just a demonstrative.

19  BY MR. SHORE:

20  Q     But there's a demonstrative that was presented to the

21  Court.

22         With respect to the -- that chart, since it was

23  referenced before, you lay out a whole bunch of metrics

24  around roll-ups in connection with those DIPs, right?

25  A     That's correct.

1  Q      And you agree, don't you, as the Court has heard, that

2  the -- whether or not there is a roll-up and whether or

3  not -- the amount of that roll-up is decided by the Court in

4  connection with an interim or a final order with respect to

5  that DIP, right?

6  A      The -- I don't dispute that the Court has the ability

7  to approve or not approve --

8  Q      Right.

9  A      -- terms of --

10 Q      And you didn't --

11 A      -- a DIP --

12 Q      -- prepare --

13 A      -- facility.

14 Q      -- and submit an expert report to the Court on what is

15 a market roll-up, did you?

16 A      We -- we went through the demonstrative that showed

17 there was a range of roll-ups approved on a final basis in

18 other cases.  We did not put forward an expert report.

19 Q      Okay.  And finally, with respect to those debtors that

20 were listed there, they were all in orders that were entered

21 by the Court, not in published decisions in which there was a

22 reasoned decision as to what an appropriate roll-up might be

23 in a particular DIP, was there?

24 A      My understanding is we pulled the data from final

25 orders.

1  Q      Right.

2        In other words, to be clear, you did not pull them from

3  any published decisions laying out what is an appropriate

4  market rate of a roll-up in a final DIP, did you?

5  A      I'm not aware that we've relied on that source of

6  information.

7             MR. SHORE:  Okay.  No further questions, Your

8  Honor.

9             THE COURT:  Thank you.

10            Redirect.

11            MR. LOMBARDI:  For the record, Stuart Lombardi of

12  Willkie, Farr & Gallagher.

13                      REDIRECT EXAMINATION

14  BY MR. LOMBARDI:

15  Q     Mr. Grubb, do you recall being asked a lot of questions

16  on cross-examination about how the HoldCo debtors can access

17  credit under the proposed DIP?

18  A      I do.

19  Q     And you testified today to your business understanding

20  of how that works, right?

21  A      That's correct.

22  Q     And could you walk the Court through that

23  understanding?

24  A      My understanding is that, to the extent there are fees

25  or expenses required to be paid at the HoldCo debtors, they

1  have access to the funds made available to the DIP facility.

2  Those funds would be made available on a no fee, no interest,

3  no amortization basis, and secured against the unencumbered

4  collateral at those HoldCo boxes; they would be joint and

5  severally guaranteed by liens only on unencumbered assets;

6  and that obligation would be capped at the amount of funds

7  used by those HoldCo debtors.

8  Q    Now, in your professional experience, have you ever

9  seen a loan that is more favorable for the borrower than a

10 zero interest, zero fee loan?

11 A    I have not.

12 Q    If someone wanted to see the contractual legal terms on

13 which the HoldCo debtors will borrow, where would they look?

14 A    They would look in the DIP order and the DIP credit

15 agreement.

16 Q    Now do you recall being asked on cross-examination

17 about an inter-debtor loan agreement or an inter-debtor

18 security interest?

19 A    I recall that.

20 Q    Sitting here today, do you have an understanding of

21 whether there will be an inter-debtor loan agreement or an

22 inter-debtor security agreement?

23 A    I -- I'm not aware of an inter-debtor loan agreement

24 that will be entered into.

25 Q    Now did you say something a little different at your

1   deposition the other day?

2   A     I referenced in my deposition an inter-debtor term loan

3   structure.  That was my understanding of the negotiations as

4   they stood at 9:30 Friday morning, when I started the

5   deposition.

6   Q     And is that your understanding of what is being

7   proposed today, several days later?

8   A     My understanding has evolved based on a review of

9   documents and discussion of -- with counsel, as it relates to

10  the current structure being put forward.

11         MR. SHORE:  Objection.  Objection, Your Honor.

12  Move to strike that.  You can't come in on the trial, as far

13  as I'm concerned, and change your 30(b)(6) testimony that was

14  given at the time.  We're trying to deal with something

15  moving in real time.  The witness gave exactly what

16  his 30(b)(6) response was with respecting to the terms.  And

17  crossing the witness and having him recant what testimony he

18  gave on behalf of the debtors isn't fair.

19         MR. LOMBARDI:  If I may, Your Honor.  We're not

20  seeking to change any deposition testimony but as Your Honor

21  can see there are a lot of fights in this case and the

22  debtors would like to focus on the fights for issues that are

23  real.  And an inter-debtor creditor or loan agreement is a

24  ghost, it doesn't exist, it's not being proposed. I'm just

25  trying to clarify that.

1    THE COURT:  I will allow the testimony. He is

2  merely correcting the record based on events that occurred

3  after he took -- after his deposition was taken which,

4  obviously, is something he can do.

5  BY MR. LOMBARDI:

6  Q    Now, do you recall also being asked on cross-

7  examination exactly how much money the Holdco debtors will

8  use under the DIP facility between now and the end of the

9  case whatever next?

10  A    I do.

11  Q    Do you know, sitting here today, exactly how much money

12  the Holdco debtors are going to need in DIP financing to get

13  to the end of the case whenever it ends?

14  A    I don't know that amount.

15  Q    Do you have an understanding of how much money the

16  Holdco debtors will be expected to borrow under the DIP

17  facility?

18  A    Not sitting here today.

19  Q    How will the amount that they borrow under the DIP

20  facility, in your view, be determined?

21  A    My understanding is there will be actual fees and

22  expenses incurred by the Holdco debtors.  There may be

23  amounts that need to be allocated to those Holdco debtors and

24  that requirement, as it relates to funding, would determine

25  the amount borrowed.

1  Q    Now, do you also recall being asked on cross-

2  examination about adequate protection for the Freedom lenders

3  with respect to the Holdco debtor boxes?

4  A    I do.

5  Q    Do you have a business understanding of whether the

6  Freedom lenders at the Holdco debtor boxes are getting

7  primed?

8  A    My understanding is they are not being primed.

9  Q    Do you have an understanding of which assets, if any,

10  at the Holdco debtor, the guarantee, and security interest

11  were attached?

12  A    My understanding is they are unencumbered assets at

13  that level under the loan agreements with the freedom lenders

14  and they would be secured and receive liens against those

15  unencumbered assets.

16  Q    Do you have an understanding of whether any encumbered

17  assets that are subject to a Freedom lender lien would be

18  encumbered by the proposed DIP at the Holdco debtor level?

19  A    The encumbered assets would not be further encumbered,

20  they would be outside the guarantee and liens of the new

21  borrowing.

22  Q    Now let's talk about the bidding procedures briefly.

23  Do you know what investment bank the Freedom lenders have

24  engaged?

25  A    They have engaged Greenhill.

1  Q      Did you ever work there?

2  A      I worked there for 17 years.

3  Q      What were your titles at Greenhill?

4  A      My titles most recently had M&A restructuring for the

5  Western region.  Prior to that I was co-head of US M&A.  I

6  was chief financial officer of the firm.  I was also managing

7  director there and served on the managing committee and I had

8  various titles prior to my promotion to managing director.

9  Q      Now let's talk about the sale process.  If the Freedom

10  lenders were to foreclose on their collateral, the equity and

11  operating companies, do you have an expectation of how, if at

12  all, that would impact the value that could be obtained in

13  the sale process?

14         MR. SHORE:  Objection, Your Honor.  Beyond the

15  scope of cross.  I didn't ask a single question about

16  foreclosure or exercising --

17         MR. LOMBARDI:  If I may, Your Honor.

18         THE COURT:  Go ahead.

19         MR. LOMBARDI:  Mr. Shore actually did ask a number

20  of questions about their motion to terminate exclusivity, the

21  Holdco plan, and the sale process itself. This relates to all

22  of those and in particular the maximization of value under

23  the bidding procedures.

24         THE COURT:  The objection is overruled.

25  BY MR. LOMBARDI:

1    Q    If the Freedom lenders were to foreclose on their

2    collateral at the Holdco boxes do you have an expectation of

3    how, if at all, that foreclosure would impact the value that

4    could be obtained through the sale process?

5    A    I believe that action would create uncertainty.  I

6    believe uncertainty would be disruptive to the sale process.

7    I believe potential bidders who are expending time and

8    resource devoted toward pursuing a transaction would consider

9    that allocation of time and resource relative to the sale

10   process.  And depending on what actions they took following

11   that initial action it could create additional uncertainty if

12   they swapped the board, if they took other governance or

13   actions to influence the cases it would create additional

14   disruption.  Generally, all of those manner -- all that

15   manner of disruption I believe would impair the marketing

16   process and potentially lead to a sub-optimal outcome to the

17   sale process.

18   Q    Now what if a trustee were to be appointed at the

19   Holdco debtor level, do you have a view on how that would

20   impact the value of the sale process?

21              MR. SHORE:  Same objection, Your Honor.  Now we're

22   onto a trustee.

23              MR. LOMBARDI:  Same answer, Your Honor.

24              THE COURT:  Overruled.

25              THE WITNESS:  My view is quite similar that there

1  would be potentially significant uncertainty that the actions

2  that trustee would take, the advisors they may appoint and

3  the strategy they may pursue related to the cases.  That

4  uncertainty would give parties pause as it relates to

5  devoting time and resource toward pursuing an acquisition and

6  that pause would potentially reduce the number of parties

7  participating. It would potentially reduce competition for

8  the assets and lead to a lower value outcome of the sale

9  process.

10          MR. LOMBARDI:  No further questions, Your Honor.

11          MR. SHORE:  Your Honor, I'm going to ask, I know

12  what your general rule is, I would like to talk to this

13  witness because this is the first time that I'm hearing his

14  views about what would happen with a trustee and everything

15  else.  I know your general rule is no redirect, but I am

16  waiting your direction on that.

17          THE COURT:  Well, this would be a recross.  Let's

18  see if one of the lenders want to do their redirect first.

19          UNIDENTIFIED SPEAKER:  No, Your Honor.  No

20  questions.

21          THE COURT:  Go ahead, I will give you some leeway.

22                  RECROSS-EXAMINATION

23  BY MR. SHORE:

24  Q    First of all, tell me your bankruptcy experience when a

25  trustee was appointed?

1  A      I am not recalling off the top of my head.

2  Q      Okay.  Can you tell me how a bidder reacted in a 363

3  sale when a trustee was appointed --

4         (Audio interruption)

5              MR. SHORE:  Can we silence the calls, guys.

6  Somebody is --

7              THE COURT:  Remove that person from the call

8  completely.

9  BY MR. SHORE:

10  Q      To be clear, you have never been running an auction

11  process when a trustee was appointed, right?

12  A      I have not run a 363 auction process when a trustee was

13  appointed.

14  Q      And you have never run an auction when the stay was

15  lifted with respect to a particular asset of a debtor in a

16  case, right?

17  A      I don't recall that sequence of events taking place.

18  Q      Have you had a discussion with any of the potential

19  bidders regarding the possibility of a trustee being

20  appointed or a stay being lifted up at the Holdco debtors?

21  A      We have not addressed any hypotheticals that we think

22  could dissuade them from participating or create uncertainty

23  as it relates to the path forward in these processes.

24  Q      So, now thinking of the cap structure as it exists, I

25  thought we went through this, you are out marketing the three

1  portfolio businesses, Buddy's, Vitamin Shoppe, and PSP,

2  right?

3  A    That's correct.

4  Q    And to date you haven't been telling anybody marketing

5  the assets of the top Holdco, which are the stock in FRG

6  Inc., right?

7  A    We have discussed, as I testified, that the concept of

8  someone buying the full business of FRG but as I testified

9  there is not marketing materials to that effect.

10  Q    So, the fact that the lenders at the top might take the

11  stock isn't interfering with anything you are actually

12  marketing right now, the asset itself?

13  A    The testimony was not the action of taking the stock,

14  it was the action of the uncertainty that could cause the

15  changes in governance that could result from taking that

16  stock.  The interpretation of potential bidders in an

17  uncertain path forward given the change in the administration

18  of the cases.

19  Q    Let me just be clear about this.  What we are talking

20  about is the foreclosure of the ad hoc group lenders at the

21  Freedom group of their one piece of collateral in that box,

22  right?

23  A    I was not aware they had limited it to one piece of

24  collateral.

25  Q    Well, are you aware of any other assets inside that box

1  other then what you said are unencumbered?

2  A    There is speculation there may be causes of action or

3  other claims.

4  Q    Now, you talked about the detriment that would be

5  caused if the lenders were able to foreclose on that, right.

6  That would be a loss of value to the estate, right?

7  A    I testified to the disruption that would have to the

8  sale process.

9  Q    Let's focus on the other side with respect to the

10  lenders.  Have you ever represented a secured lender in a

11  bankruptcy case?

12  A    I have.

13  Q    Have you ever been on a team that represented a secured

14  lender in a bankruptcy case?

15  A    I have.

16  Q    So, you know to some extent there is a zero-sum gain,

17  right, that what is harmful to the estate or what is adverse

18  to the interest of the 1-L could be considered an asset for

19  other lenders in the case, right?

20  A    The allocation of eventual value can be viewed as a

21  zero-sum negotiation. I believe the manner in which cases are

22  administered, the manner in which a sale process is conducted

23  can impact that value that is ultimately distributable.

24  Q    You are not saying that the stock has no value to, at

25  least, the rights that are associated with that stock, they

1  have no value to the Freedom lenders of the Holdco, right?

2  A    I am not here testifying to valuation.

3  Q    But, in fact, if I am following your logic, there is

4  value to the Freedom Holdco lenders in the control rights

5  that come with that stock, right?

6  A    There is control associated with that stock.

7  Q    And that could be valuable.

8  A    Parties may place value on a control.

9          MR. SHORE:  No further questions.

10          THE COURT:  Thank you.  Mr. Grubb, you may step

11  down.

12          THE WITNESS:  Thank you.

13      (Witness excused)

14          MR. DUGAN:  The debtors call David Orlofsky.

15          THE COURT:  Mr. Orlofsky, please come forward,

16  take the stand, and remain standing for the oath.

17          THE CLERK:  Please raise your right hand.  Please

18  state your full name and spell your last name for the Court

19  record, please.

20          MR. ORLOFSKY:  David Orlofsky, O-R-L-O-F-S-K-Y.

21          DAVID ORLOFSKY, DEBTORS' WITNESS, SWORN

22                  DIRECT EXAMINATION

23  BY MR. DUGAN:

24  Q    Good afternoon, Mr. Orlofsky.  Please have a seat.

25  A    Good afternoon.

1   Q      Could you please state for the Court your present title

2   and position?

3   A      So, I am the chief restructuring officer at FRG and the

4   Topco.

5   Q      Briefly, I know we have been through this on the first

6   day, second day hearings, what are your responsibilities in

7   terms of your oversight responsibilities?

8   A      As the chief restructuring officer my job, you know,

9   broadly covers what I would describe as leading the

10  restructuring efforts of the debtors and working with the

11  management team and the other advisors of the case to

12  shepherd the company through an effective and efficient

13  restructuring process where we try to maximize value.

14  Q      Do you have any responsibilities specifically as it

15  relates to the debtor-in-possession financing facility?

16  A      Yes.  Myself and my team worked with the management

17  team to develop the DIP budget from a sizing perspective in

18  terms of the sources, uses and amounts.

19  Q      And have you been in that process of devising a DIP

20  budget in other matters?

21  A      I have.

22  Q      Approximately how many?

23  A      A lot. I mean it's kind of like the nuts and bolts of

24  what we do in most of our cases is working with and preparing

25  -- working with management teams and the company's advisors

1  to prepare DIP budgets.  So, it's kind of something we do all

2  the time.

3  Q    Mr. Orlofsky, if you recall in connection with the

4  first day hearings you did testify to an extent about the DIP

5  facility that was under consideration at that time.  Do you

6  recall that?

7  A    I do.

8  Q    Now we are here at the second day and that facility has

9  been revised, is that accurate?

10  A    The draws of that have been revised and there has been

11  some other changes to the economic terms which I think have

12  been discussed previously.

13  Q    Okay.  So from your perspective as the person

14  responsible for devising the DIP budget what is the

15  significance of the draws that have been revised?

16  A    The draws have been sized to provide adequate funding

17  for the company to operate in the ordinary course, pay their

18  bills when due, give comfort to other stakeholders that the

19  company has sufficient capital to operate in the ordinary

20  course.  Employees know that there is enough capital to make

21  payroll, vendors know they can get paid, you know, things

22  along those lines.

23  Q    What are those draws kind of made to be with respect to

24  the DIP that is before the Court today?

25  A    So, there was a draw of $100 million on day one as part

1  of the first day. There is now a draw of $75 million that

2  would happen assuming the Court approves it, and then that

3  would happen sometime over the next, you know, week or so

4  after this hearing.  Then there is a third draw of $75

5  million that would likely happen towards the end of the case.

6  Q    In your view, Mr. Orlofsky, as the CRO of the debtors,

7  is it important that the DIP be approved and the debtors be

8  able to go forward with the second draw today or tomorrow at

9  least?

10  A    Right. I think it's important that the company gets the

11  capital that it needs to operate the business.

12  Q    And with respect to the budget that you prepared, have

13  you prepared a revised DIP budget in connection with the

14  amended terms of the DIP?

15  A    Right.  So, as part of the DIP we are required to

16  update the 13-week cash flow budget every four weeks.  That

17  budget was due.  It has been prepared. It's been submitted to

18  the 1-L's for their approval.  They approved it and we have

19  distributed it to the financial advisors for the unsecured

20  creditors committee, the ABL lenders, and the 2-L lenders at

21  FTI.  All of them received it last night.

22  Q    And in your -- well, to the extent you are able to, Mr.

23  Orlofsky, can you summarize any significant differences with

24  respect to that 13-week budget?

25  A    There is not a lot of change from the original budget.

1  It goes out one additional month, obviously.  There are some

2  puts and takes that professional fees are a little higher.

3  There is an adequate funding account -- adequate protection

4  account that is related to the American Freight liquidation.

5  That is slightly higher but the over-arching changes between

6  the end of January, which would have been the prior first DIP

7  budget and the second month here which was the end of January

8  in the budget we prepared last night is about $13 million

9  when you take out the funding need that changed, funding draw

10  amounts that changed, and its mostly related to those two

11  items.

12  Q     The first one being professional fees being higher than

13  anticipated?

14  A     They have.

15  Q     What is your understanding as to why that is?

16  A     I mean you can just look around the room.  I mean --

17  you know, I think that is part and parcel of one of the

18  problems of the case right now is the amount of time and

19  money spent on the professionals.

20  Q     And you mentioned something about adequate protection

21  in connection with American Freight.  Could you expand on

22  that?  Are you able to?

23  A     Sure. So, as part of the deal with the ABL lenders as

24  the American Freight entity goes through its winddown, there

25  is a provision that we need to compare the loan balance of

1  the ABL relative to the collateral and if there's a shortfall

2  of the collateral, and there likely will be because we are

3  selling down their collateral at American Freight, cash gets

4  put into an escrow account which we call the adequate

5  protection account.  It sits there and it gets trued up

6  periodically as the winddown process plays out.

7  Q    Mr. Orlofsky, if you can recall in connection with the

8  first day hearings you did testify about the debtors need for

9  the $250 million of new money under the DIP.

10 A    Correct.

11 Q    Is that still the case, is there still a total of $250

12 of new money coming in?

13 A    That's correct.

14 Q    And have your views changed at all since that first day

15 hearing as to the debtors need for that funding?

16 A    No.

17 Q    No change?

18 A    No change.

19 Q    So, Mr. Orlofsky, are you aware that the Freedom

20 lenders in this case have filed motions to terminate

21 exclusivity, to appoint a Chapter 11 Trustee and to terminate

22 the automatic stay that, otherwise, would apply in these

23 proceedings with respect to their ability to exercise

24 remedies?

25 A    I am aware.

1    Q     Would those motions, if they were to be granted, in

2    your understanding, would they constitute an event of default

3    under the DIP?

4    A     That is my understanding.

5    Q     And with respect to that what, in your sense, as a lay

6    person, as a CRO, would be the consequences of that?

7    A     Well, there is a couple of them.  The default, that is,

8    obviously, a bad thing because then the lenders could

9    exercise, the DIP lenders could exercise their remedies.

10   Those three items are typically, in my experience, not things

11   that happen in a case like this.  They tend to happen in

12   cases that have much more problems around them. The company

13   has got fraud, its got some other like bad acts that are

14   happening there.  The case may be rudderless, things like

15   that.

16         This is, in my experience, a very unusual thing to

17   happen at this point in a case like this where we have a

18   fully financed DIP, we have an RSA, we have a plan to get

19   into bankruptcy, we have a plan to get out of bankruptcy, we

20   are working with our creditors, you know, as constructively

21   as possible.

22         So, I don't know why you would want to do one of those

23   things.  It would send a bad message to many of our

24   stakeholders.  As we experienced on the first day hearing

25   with the issues with the first day motions not getting

1  approved, we had many vendors and their lawyers who were

2  listening to the first day hearing and probably are listening

3  to this one.  And when they heard bad things about things not

4  getting approved, they withheld shipment.

5      So, I don't think that we need to do anything like that

6  to upset the apple cart from ordinary course standpoint. I

7  think the business is doing as well as we -- we are trying to

8  do as well as we can. The company is performing.  It could

9  always be performing better, but that seems to me to be a

10 very egregious thing to do at this point in a case like this.

11 Q    Now, you're monitoring the cash, the debtors cash

12 periodically and report out on how the debtor is doing in

13 terms of revenue and income, correct?

14 A    Correct.

15 Q    And with respect to the first two weeks or three weeks

16 or so of bankruptcy, going on four weeks, in your view is the

17 debtor doing better than we expected or worse than expected

18 or as expected?

19 A    We're kind of like on plan. There's a couple of things

20 -- again, there's always puts and takes to this.  The

21 American Freight liquidation has not performed as well but

22 other things have performed better to offset it. I think

23 there is also -- because we have the caps on the first day

24 motion payments that we have not paid we are underpaying

25 disbursements right now and I think that is about the change.

1  It's about a $19 million delta and about $15 of that is

2  merchandise payments.

3  Q    When you say you have been underpaying disbursements do

4  you mean disbursements to vendors?

5  A    Disbursements to vendors as we have been talking about

6  as part of the first day motions that we have dealt with in

7  the first hearing.

8  Q    Does that mean you have been buying less from the

9  vendors then you otherwise would?

10 A    Correct.

11 Q    What is a consequence of that as a business matter with

12 respect to your ability to sell product?

13 A    Well, remember, we don't -- everything that we sell in

14 our stores is something that we buy from a vendor.  So, if we

15 don't have product to buy or product in the stores we can't

16 sell it.  It's kind of that simple and these are businesses

17 that are very profitable, all of them, so less product in the

18 store means less profits at some point, you know, down the

19 road in the process.

20 Q    So, just to summarize, Mr. Orlofsky, you're doing

21 better then you anticipated but there could be negatives?

22 A    We're doing better than we are on a cash perspective

23 because we haven't been able to pay as many vendors, but

24 there are, obviously, things -- you know, we are early in the

25 process.  I would say we're in the early innings of the

1 restructuring.

2          MR. DUGAN:  I would pass the witness, Your Honor.

3          THE COURT:  (Indiscernible).

4          UNIDENTIFIED SPEAKER: If I can reserve for

5 redirect, Your Honor.

6          THE COURT:  Okay, cross.

7          MR. WEST:  Good afternoon, Your Honor. I think we

8 are just going to pass some binders out to the witness.

9          Good afternoon, Your Honor. Just for the record,

10 Colin West of White & Case on behalf of the Freedom Group of

11 Ad Hoc Lenders.

12                    CROSS-EXAMINATION

13 BY MR. WEST:

14 Q    Mr. Orlofsky, nice to see you again.

15 A    Same here.

16 Q    I hope you're not too disappointed that we don't get to

17 talk at length about critical vendors today.

18 A    I had seven hours of it on Friday. I am happy to spend

19 more time on it today if you would like.

20          THE COURT:  Please don't.

21     (Laughter)

22 BY MR. WEST:

23 Q    So, I do want to talk with you, Mr. Orlofsky, about

24 some of the relief that is remaining to be decided by the

25 Court.

1       I want to ask first about the DIP credit agreement that

2  the debtors are seeking to approve.  First, I want to make

3  sure that we're working from the right version.  You are

4  aware that the debtors filed a revised proposed DIP order on

5  Friday morning shortly before your deposition, correct?

6  A    Correct.

7  Q    And then yesterday evening the debtors filed a further

8  revised proposed DIP order, correct?

9  A    I am not sure I have seen that one but I know the one

10 from Friday.

11 Q    Well, then let's take a look at the operative version

12 of that order, the one that was filed.  Maybe I can

13 streamline this a little.  Are you aware of any amendments to

14 the events of default provision in the DIP credit agreement

15 from the version that we looked at, at your deposition?

16 A    I am not -- I don't think so. Like I said, I didn't

17 really look at the one you are talking about that was filed

18 last night but I am aware of the ones we talked about on

19 Friday.

20 Q    Are you aware of any amendments to the minimum

21 liquidity provision in the DIP credit agreement since the

22 version that we looked at, at your deposition?

23 A    Not the covenant, no, if that was your question. The

24 minimum liquidity amount.

25 Q    The minimum liquidity amount.

1  A       No, I am not aware of any change.

2  Q       So, let's please turn to the credit agreement that is

3  attached to the interim DIP order.

4  A       Which section is that?  You're talking about in your

5  binder here?

6  Q       In your binder.

7              THE COURT:  Do you have an exhibit number?

8              MR. WEST:  Yes. I'm sorry, Your Honor, just give

9  me one moment please.

10             THE WITNESS:  I'm not sure I see it in this

11 binder.

12 BY MR. WEST:

13 Q       I apologize, I'm not sure we have it in your binder but

14 we are going to work on pulling it up.

15 A       Okay.

16 Q       You are aware that the DIP credit agreement contains

17 certain events of default provision, correct?

18 A       Correct.

19 Q       Now the debtors have also filed a plan of

20 reorganization, correct?

21 A       Correct.

22 Q       And the debtors have also entered into a restructuring

23 support agreement with the DIP lenders, correct?

24 A       Correct.

25 Q       And we talked about this at your deposition, you are

1   aware that the DIP credit agreement provides that if the

2   debtors file a new plan that is materially inconsistent with

3   the plan or the RSA that would be an event of default under

4   the DIP credit agreement, correct?

5   A     Correct.

6   Q     And as we discussed, an event of default would give the

7   DIP lenders the right to accelerate the outstanding amount

8   under the DIP loan, correct?

9   A     Correct.

10  Q     If the final DIP order were to be approved that would

11  significantly increase the amount of the loan that the DIP

12  lenders could accelerate in that scenario, correct?

13  A     Correct, yes.

14  Q     So, if the Court enters the order -- first of all, an

15  additional $1 million of prepetition first lien debt gets

16  rolled up, correct?

17  A     Maybe more.

18  Q     Before there is an additional draw.

19  A     Oh, okay, yeah.  To get the two to one rollup on the

20  draws but I think it would be two to one on 75.

21  Q     I'm going to get there.

22  A     Oh, I'm sorry.

23  Q     So, your understanding is that under the latest DIP

24  order the debtors would draw an additional approximate -- an

25  additional $75 million at approval, correct?

1    A      Correct.

2    Q      And that would mean that an additional $150 million in

3    prepetition debt would be rolled up as well, correct?

4    A      The borrowing plus the rollup I think is your question,

5    correct.

6    Q      So, the entry of the final order would immediately add

7    $325 million to the principle amount that could be

8    accelerated under the event of default, right. The first $100

9    million is getting rolled up, the new $75 million draw, and

10   the new $150 million rollup, correct?

11   A      I think your math is a little off but I think you are

12   going in the right direction.

13   Q      It could be.  It is --

14   A      Its two to one, right.  So, for every dollar they

15   borrow they get two for one, so buy one get one.

16   Q      Buy one get two.

17   A      Get two, yeah.  Even better.

18   Q      Regardless of whether my math is correct --

19   A      I understand the point.

20   Q      -- you would agree we regardless of the likelihood --

21   A      I understand, yeah.

22   Q      -- that you think the first lien lenders would exercise

23   that remedy, you would agree that the first lien lenders

24   exercise of that remedy would be disastrous for the estates,

25   correct?

1  A      It would not be good.

2  Q      And if the debtors make a further draw of $75 million

3  later in the case as planned that would be an additional $225

4  million that could be accelerated, right?

5  A      Whatever the amount is that would not be good if your

6  question is could they accelerate.

7  Q      So then, let's talk about what is in the plan and the

8  RSA which can't be changed materially without triggering an

9  event of default under the DIP credit agreement.  Let's start

10  with the restructuring support agreement.

11  A      Do you want me to turn to a page here?

12  Q      Well, I think we can discuss it.

13  A      Okay, whatever.

14  Q      You are aware that the restructuring support agreement

15  contemplates that a plan will be filed and that it will

16  include a plan release as defined in the restructuring

17  support agreement, correct?

18  A      Correct.

19  Q      And you are aware that the first lien lenders or some

20  component of them are released under the plan, correct?

21  A      Correct.  We talked about this on Friday.

22  Q      Right.  Would you agree that if the first lien lenders

23  were to be removed as releasees under the plan and if they

24  were not to consent to that treatment that would be an event

25  of default under the DIP, correct?

1    A     That is my understanding.

2    Q     So, as things currently stand, unless the 1-L's consent

3    not to be released, the debtors either have to preserve that

4    release in the plan or trigger an event of default under the

5    DIP, correct?

6    A     In what scenario.

7    Q     As things currently sit.  If the DIP order is approved

8    --

9    A     Right, and you were saying we would do this why?  Like

10   I am not sure of your hypothetical.

11   Q     -- in any scenario in which the debtors determine that

12   it was not appropriate to release the first lien lenders.

13   A     Okay. I guess that is true, yes.

14   Q     And you are aware there is an independent investigation

15   that is being conducted by the debtors?

16   A     I am aware of that.

17   Q     So, even if the independent investigation were to

18   reveal a viable cause of action against the first lien

19   lenders your understanding is that the debtors do not have

20   the right to remove the 1-L's as releasees without their

21   consent without triggering an event of default under the DIP

22   agreement, right?

23   A     I believe that is true; although, as we talked about, I

24   am not involved with the Trilo investigation. So, I am not

25   sure at what he is looking at.

1   Q      You said you're not sure what he is looking at?

2   A      I am not sure of all of the things that he is looking

3   at.

4   Q      And if the debtors were to modify the release provision

5   -- sorry, let me back up. You are aware that under the

6   current plan each debtor releases each other debtor, correct?

7   A      Correct.

8   Q      And if the debtors were to modify the release provision

9   to allow one debtor to bring a cause of action against

10  another debtor that would also be an event of default under

11  the DIP credit facility, correct?

12  A      I think that's right. I think we talked about this on

13  Friday.

14  Q      We did and we have to do this for the benefit of

15  today's record.

16  A      Okay.

17  Q      Willkie Farr is counsel to the debtors, correct?

18  A      They are.

19  Q      And it's fair to say that Willkie Farr has had

20  substantial input into fashioning the relief that is before

21  the Court today?

22  A      They are debtor counsel, so yes.

23  Q      And you understand that the plan includes a release for

24  the debtors counsel, Willkie Farr, correct?

25  A      I believe that is true.

1   Q     If the debtors were to modify the release provision to

2   remove the release of Willkie Farr that would also be an

3   event of default under the DIP credit agreement, correct?

4   A     That is my understanding.

5   Q     Now with respect to debtors counsel you are aware, as

6   we discussed on Friday, that at some point Willkie Farr

7   represented Mr. Kahn, correct?

8   A     I am aware of that.

9   Q     And you are aware that Mr. Kahn is currently the

10  subject of an investigation by the debtors, correct?

11  A     I am aware of that.

12  Q     You don't know when Willkie Farr's representation of

13  Mr. Kahn ended, do you?

14  A     I do not.

15  Q     And, in fact, when I took your deposition on Friday you

16  weren't aware whether Willkie Farr was still representing Mr.

17  Kahn, were you?

18  A     I am not aware.

19  Q     And you told me that as CRO for the debtors you hadn't

20  concerned yourself with the debtors counsel's representation

21  of the target of an investigation by the debtors, correct?

22            MR. DUGAN:  Your Honor, I am objecting simply

23  because I don't see the relevance of this extensive inquiry

24  into what Mr. Orlofsky has said he doesn't know anything

25  about, Kahn and Willkie Farr.  What extensive questioning on

1  this topic is it going to yield.

2          MR. WEST:  First of all, Your Honor, I don't have

3  extensive questioning about him on this topic.

4          MR. DUGAN:  This is question number five.

5          MR. WEST:  I have a handful of additional

6  questions, but I think it clearly relates to the fact, as Mr.

7  Orlofsky testified, that the release of Willkie will,

8  effectively, be locked in and is, effectively, locked in by

9  the DIP credit agreement that the debtors are seeking to have

10  approved.  I think it's fair to explore the extent to which

11  that release is appropriate and what would happen if the

12  debtors were ultimately to determine that that release was

13  inappropriate.

14          THE COURT:  I will give you a little leeway but

15  let's not take too long on it.

16  BY MR. WEST:

17  Q    One of the reasons you weren't' concerned about that

18  fact, the debtors representation the debtors counsel's

19  representation of Mr. Kahn, was because if there were any

20  issue it would come up when Willkie sought to have its

21  retention approved by the Court and it had to make required

22  disclosures, correct?

23  A    That is what I said.

24  Q    Specifically you said that if there is a problem that

25  people will have of this it's going to come out in the light

1  of day and people can make their determination on it, right?

2  A     That is what I said.

3  Q     And you know that debtors counsel normally submits its

4  retention application early on in a case, right?

5  A     I don't know when everybody does it but they do it at

6  some point in time in the case, yes.

7  Q     You are aware that its normally early on in the case,

8  correct?

9  A     Early on, right. I am not sure whether that is a first

10  month, second month, but --

11  Q     The petition date in this case was November 3rd,

12  correct?

13  A     Yup, I believe that is true.

14  Q     And we are more than a month into the case and Willkie

15  still hasn't submitted its retention application, correct?

16  A     That is what you have told me on Friday, yes.

17  Q     So, whatever issues there may be surrounding Willkie's

18  representation of the target of an investigation by the

19  debtors those still haven't' seen the light of day and they

20  won't have seen the light of day by the time the Court is

21  asked to resolve the DIP motion that is before the Court,

22  correct?

23  A     I guess that is true.

24  Q     So, let's talk a little bit more about the relief that

25  the debtors are seeking under the DIP motion.  You are aware

1  that there was a budget submitted in connection with the

2  original DIP motion on or around the petition date, correct?

3  A    Yes.  You mean the 13-week cash flow budget?

4  Q    Yes.

5  A    Yes, I'm aware.

6  Q    And that was dated on or around November 4th, correct?

7  A    Something like that, yes.

8  Q    And you are aware that the debtors prepared a variance

9  report showing actuals to budget for the first three weeks of

10 the case ending around November 22nd, correct?

11 A    Correct.

12 Q    And that variance report, which we discussed at your

13 deposition on Friday, showed that three weeks into the case

14 the debtors cash balance was approximately $23 million higher

15 than projected in the first DIP budget, right?

16 A    I believe that is true.  Should I turn to the page here

17 or do you --

18 Q    I think --

19 A    Okay, it's up to you.

20 Q    -- that is your testimony at the deposition. If you

21 have a different recollection --

22 A    No, I wasn't sure if you were going to go someplace

23 else with it, but --

24 Q    Now the fact that the debtors cash position was $23

25 million higher than forecast just three weeks into the case

1  did not cause the debtors to reconsider how much cash they

2  needed under the DIP motion, did it?

3  A    No.

4  Q    As we discussed at your deposition the budget forecast

5  paying -- and I want to be careful here because I'm not sure

6  what is subject to professionals eyes only treatment, but

7  forecast paying a sum amount in connection with 503(b)(9)

8  claims associated with the American Freight business,

9  correct?

10  A    The -- in the 13-week budget that is towards the

11  backend of the period, that is your question.

12  Q    So, there is a -- in connection with the 13-week budget

13  the debtors also prepared six-month budgets and nine-month

14  budgets, correct?

15  A    That is correct.

16  Q    And in connection with those budgets there is a

17  forecast of paying certain amounts associated with the

18  liquidation of the 503(b)(9) claims associated with the

19  liquidation of the American Freight business, correct?

20  A    That is correct.

21  Q    If American Freight were liquidated in a Chapter 7

22  proceeding one outcome is that the debtors may not need to

23  pay that amount of money, correct?

24  A    Theoretically.

25  Q    And the debtors have talked about potentially putting

1  American Freight into a Chapter 7 proceeding down the line,

2  haven't they?

3  A    The idea has been floated.

4  Q    So, let's set aside for a moment the fact that eh

5  debtors cash position was already $23 million higher and

6  forecast just three weeks into the case and set aside for a

7  moment that the debtors budget forecast payments in

8  connection with the American Freight business that may not

9  need to be made.  You are aware that the debtors also filed a

10 budget in connection with the interim DIP order, correct?

11 A    The -- we filed a budget with the interim but we filed

12 the budget at the first day hearing.  We have a revised

13 budget that we sent around last night. I don't know if that

14 has been filed if that is what you are referring to.

15 Q    That has not been filed and that is not what I am

16 referring to.

17 A    Okay.

18 Q    So, your understanding is that those are the two

19 budgets that have been --

20 A    Those are the two budgets for the -- yes.  I am not

21 quite sure what you are referring to.

22 Q    We will get back to a specific budget.

23 A    Okay.

24 Q    I want to look at the -- you mentioned the final DIP

25 order that was filed last night, correct?

1   A      Right, the DIP order.

2   Q      So, let's turn to the proposed final DIP order that was

3   filed last night.  That is Tab 2 in your binder and its

4   Exhibit 385.

5   A      I have it.

6              THE COURT:  Exhibit what?

7              MR. WEST:  Let me just make sure I have the right

8   exhibit number.  Apologies, Your Honor, this was filed last

9   night. It was not included as an exhibit.  We had it emailed

10  to Chambers during the lunch break. I am not sure if the

11  Court received it.

12             THE COURT:  Do you have a hard copy of that?  Can

13  you just pull up the budget.

14  BY MR. WEST:

15  Q      So, I will ask you to turn to the last page of Tab 2,

16  which is Exhibit 3 to the final DIP order that was filed last

17  night.

18  A      I see it.

19  Q      You see that?

20  A      I see it.

21  Q      Do you see it says Exhibit 3, updated budget to come.

22  A      Yup.

23  Q      And as far as you are aware no budget has actually come

24  yet, correct?

25  A      Well, we sent it to all of the financial advisors of

1   all the constituents in this case including yours.

2   Q      You haven't filed --

3   A      I don't know that it's been filed, but people have it.

4   Q      The Court doesn't have it.

5   A      The Court does not have it, correct.

6   Q      When you say you sent it to the parties you are

7   referring to a budget -- a 13-week budget that was sent

8   around stamped, draft, subject to material change, correct?

9   A      I don't remember what it says on top of it.

10  Q      In any event, the budget that you sent around to the

11  Court -- sent around to the parties hasn't been provided to

12  the Court, right?

13  A      Not yet, no.

14  Q      The last budget that was provided to the Court is the

15  budget that was submitted early on in the case that we

16  discussed just a moment ago, right?

17  A      Correct.

18  Q      That is the budget that the Court has before it in

19  deciding whether to approve the DIP motion, correct?

20  A      That is the budget, yes.

21  Q      So, let's discuss that budget.

22  A      Okay.

23  Q      Before I get into the details of the budget you are

24  aware that the DIP credit agreement has a minimum liquidity

25  covenant of $50 million, correct?

1   A      Correct.

2   Q      You have told me, and you told me in your deposition,

3   that what you would like to see is minimum cash of $100

4   million, correct?

5   A      Correct.  $50 to $100 million.

6   Q      $50 to $100?

7   A      Right.

8   Q      So, I would ask you to turn to Tab 5 which is Freedom

9   Lender Group Exhibit 34.

10  A      Okay.

11  Q      And what these -- so Freedom Lender Group Exhibit 34 is

12  a Excel file that contains the budget that was provided.

13  What is behind the tabs in the binder that you have are three

14  worksheets from that exhibit.  I don't know if the Court has

15  before it the excerpts or the Excel file.  So, the Court has

16  the Excel file.

17       So, there is a tab in the Excel file that says -- that

18  refers to -- the third tab from the left, I believe, that

19  that refers to the 13-week budget and that is the third page

20  behind Tab 5, do you see that?

21  A      I see it.

22  Q      That is the budget that was submitted in connection

23  with the interim DIP order, correct?

24  A      I believe that is true.

25  Q      That is the budget upon which the Court approved the

1  interim DIP order, correct?

2  A      I believe that is true.

3  Q      That is an interim order.  The debtors are now before

4  the Court asking for entry of a final order, correct?

5  A      Correct.

6  Q      Do you know what the maturity date of the credit

7  agreement is?

8  A      I want to say its six months with three one-month

9  potential extensions but you will correct me if I have

10  misstated that.

11  Q      I won't correct you.

12  A      Okay.

13  Q      So, because the maturity date is six months out the

14  debtors prepared -- originally prepared the budget with six

15  month and nine-month scenarios, correct?

16  A      Correct.

17  Q      But no six month or nine-month scenario has been

18  submitted to the Court -- no revised six month or nine-month

19  scenario has been submitted to the Court, correct?

20  A      Correct.

21  Q      In fact, no six month or nine-month scenario at any

22  time has been submitted to the Court. It was just a 13-week

23  budget that was filed in connection with the interim order,

24  correct?

25  A      That is correct.

1  Q     I would like to turn to the six-month scenario that the
2  debtors did prepare which is the first page behind Tab 5 and
3  I believe that is the tab that is farthest to the left.  You
4  may have to -- Your Honor may have to click over on the
5  arrows to get farther then what is originally shown. I don't
6  think it says six months, but I think it says order
7  consolidated.
8       So, looking at this six-month scenario, and assume for
9  the sake of discussion that the DIP -- the latest DIP order
10  or the final DIP order is approved, at least in so far as the
11  new money requests.  So, your understanding is that under the
12  final DIP order that was submitted the debtors would draw an
13  additional $75 million upon approval, correct?
14  A     Correct.
15  Q     Then they would have an additional -- the ability to
16  draw an additional $75 million at a later date in the case,
17  correct?
18  A     That is correct.
19  Q     Now you would agree that if the Court were to grant the
20  debtors that relief under the budget, the latest budget that
21  is before the Court, the company's liquidity position would
22  not prevent the debtors from extending out the sale process
23  by an additional month, correct?
24  A     What do you mean by that in terms of would not, because
25  of liquidity?

1  Q    Correct.  The company's liquidity position under the

2  budget that has been presented to the Court would not prevent

3  the debtors from extending the sale process by an additional

4  month.

5  A    We would have to look at it closely, but I think you

6  could make that -- we would have to see where we are at the

7  time and where cash flows go, but I think that is probably a

8  fair statement.

9  Q    Probably a fair statement. In fact, your understanding

10 is that the debtors would have sufficient liquidity through,

11 at least, May in that scenario, correct?

12 A    Yeah, I think we have to look at, because we talked

13 about this on Friday, potentially.

14 Q    Well, you testified at your deposition that under the

15 latest budget that is before the Court you wouldn't go below

16 what the $100 million would be probably until you got into

17 May, correct?

18 A    Yeah, I think that is what we talked about.

19 Q    And that is based on your stated goal of having, at

20 least, $100 million in cash, correct?

21 A    Right.  But I think we also talked about that these are

22 end of month numbers not intramonth numbers here there is

23 flow, but --

24 Q    That is why you were using the $100 million, right?

25 A    Exactly.  Correct.

1   Q      If you use the $50 million minimum liquidity covenant

2   as a guidepost you would have even longer, correct?

3   A      I think you are in a very dicey area just for what we

4   just talked about in terms of the end of month numbers.

5   Q      How much cash do the debtors have today?

6   A      Before the draw I want to say its $130 to $140 million

7   in that neighborhood. I would have to get you the exact

8   number.

9   Q      You have been present for all of the proceedings today,

10  correct?

11  A      I have.

12  Q      You heard debtors counsel tell the Court, I believe

13  immediately after lunch or maybe it was before lunch, that

14  the final DIP motion absolutely needed to be resolved today,

15  correct?

16  A      Correct.

17  Q      The debtors aren't running out of cash by the end of

18  today, are they?

19  A      No, we are not running out of cash.

20  Q      It's not going to trip their minimum liquidity covenant

21  by the end of today, correct?

22  A      Not by the end of today.

23  Q      And they are not going to trip their minimum liquidity

24  covenant a week from today, are they?

25  A      No, I don't believe so.

1  Q     You are aware, and you heard Mr. Grubb testify, that

2  Mr. Grubb submitted a declaration also on Friday morning

3  shortly before your deposition.

4  A     I am aware.

5  Q     You were not consulted regarding that declaration at

6  all, correct?

7  A     I did not read it, no.

8  Q     In fact, you weren't' even aware that it was being

9  filed until I showed it to you in your deposition, right?

10 A     That is correct.

11 Q     Can we pull that declaration up.  That is Tab 6, Debtor

12 Exhibit 20.

13 A     I see it.

14 Q     If you could turn to Paragraph 28.

15 A     Yup, I see it.

16 Q     Feel free to read to the paragraph but I am going to

17 direct you to the third sentence in the paragraph beginning

18 with "The debtors cannot," do you see that?

19 A     The one that says longer?

20 Q     Paragraph 28 the sentence beginning "The debtors cannot

21 afford."

22 A     Yup.

23 Q     It says, "The debtors cannot afford to further extend

24 this into an even longer process due to, among other things,

25 the limited liquidity available to them under their post-

1  petition financing facility."  Do you see that?

2  A      I see it.

3  Q      Now, again, in the scenario in which the Court proves

4  the ability to draw the new money you would agree that the

5  liquidity position of the company itself would not prevent

6  the debtors from extending the sale process by an additional

7  --

8  A      Correct.

9            MR. WEST:  Your Honor, I think I'm done but may I

10  just have a moment to confer?

11           THE COURT:  Sure.

12  BY MR. WEST:

13  Q      So, first of all, setting aside that has been filed

14  with the Court, to your knowledge there is no new six or nine

15  month budget other than the one that we have looked at,

16  correct?

17  A      Correct.

18  Q      So there is no budget has been prepared by the debtors

19  that carries through the maturity date of the credit

20  agreement that the debtors are seeking to approve, correct?

21  A      A new one you mean?

22  Q      Correct.

23  A      Yeah, there is no new one.  Correct.

24  Q      And there is no budget at all that has been submitted

25  to the Court that carries through the maturity date of the

1  credit agreement, correct?

2  A     That is correct.

3           MR. WEST:  Nothing further, Your Honor.

4           THE COURT:  Redirect.

5                 REDIRECT EXAMINATION

6  BY MR. DUGAN:

7  Q     Just a few questions, Mr. Orlofsky.  Counsel asked you

8  a number of questions on cross regarding with respect to the

9  DIP in particular -- strike that.

10          Regarding with respect to liquidity in particular that

11  the -- you know, he went through a number of scenarios and

12  asked, well, if the DIP isn't' granted today or next week you

13  still liquidity.  Do you remember those questions?

14  A     I remember.

15  Q     So, from your perspective, putting aside the liquidity

16  in connection with the budget that you were looking at,

17  looking now at it from a business perspective as the CRO on

18  the consequences of not getting a DIP granted, what do you

19  believe would be the consequences, the detrimental harm to

20  the debtors business that would come if the DIP is not

21  granted today or tomorrow?

22  A     Right.  So, we have -- as we have talked about we have

23  already experienced enough problems coming out of the first

24  day hearing with things getting delayed.  So, I think people

25  who are hyper-focused on this, particularly the vendor

1  community, as I said earlier, I wouldn't be surprised if they

2  were listening to this hearing.  You know, this is something

3  that I think people want to get approved, it shows a sign

4  that we are moving this process forward.

5       It's a good message to all of our stakeholders, our

6  vendors, our franchisees, some of whom have put us on hold,

7  our employees, everybody.  It's not just the dollars that

8  matter, it's also the message that this sends to all the

9  stakeholders that we are kind of moving this process along.

10 Q    In your view would the ability to get a DIP today would

11 that have a stabilizing effect on the DIP?

12 A    I think it would be a positive sign.

13          MR. DUGAN:  Thank you.

14          THE COURT:  Thank you.

15          UNIDENTIFIED SPEAKER:  No questions, Your Honor.

16          THE COURT:  You may step down.  Thank you.

17      (Witness excused)

18          MR. LOMBARDI:  Your Honor, for the record again

19 Stuart Lombardi of Willkie Farr & Gallagher.

20          The debtors call Andrew Laurence.

21          THE COURT:  Mr. Laurence, please come forward,

22 take the stand and remain standing for the oath.

23          THE CLERK:  Please raise your right hand.  Please

24 state your full name and spell your last name for the Court

25 record.

1      MR. LAURENCE:  Andrew Laurence, L-A-U-R-E-N-C-E.

2      ANDREW LAURENCE, DEBTORS' WITNESS, SWORN

3      MR. LOMBARDI:  May I proceed?

4      THE COURT:  Proceed.

5                    DIRECT EXAMINATION

6  BY MR. LOMBARDI:

7  Q    Mr. Laurence, please introduce yourself to the Court.

8  A    My name is Andrew Laurence, I am CEO of the debtors.

9  Q    What debtor entities do you have a role at to give a

10 few examples?

11 A    Franchise Group, Inc., and various of its affiliates

12 both up and down the chain.

13 Q    What role, if any, do you have at the two Holdco

14 debtors specifically?

15 A    I am an officer and board member.

16 Q    Of both of them?

17 A    Yes.

18 Q    Did you provide a declaration in support of the DIP

19 motion?

20 A    I did.

21 Q    You should have a binder -- if you look behind you do

22 you see a binder marked debtor exhibits?

23 A    I see two.

24 Q    Do you have volume one?

25 A    I do.

1   Q      Please turn to Tab 17, Debtor Exhibit 17.

2   A      17 is in volume two.

3   Q      Volume two.  For the record do you have in front of you

4   Tab 17, Debtor Exhibit 17, Docket No. 370?

5   A      I do.

6   Q      Do you recognize this document?

7   A      I do.

8   Q      What is it?

9   A      It's my declaration.

10  Q      Is it a true and correct copy of the declaration that

11  you provided in support of the DIP motion?

12  A      Yes.

13          MR. LOMBARDI:  Your Honor, I offer into evidence

14  Debtor Exhibit 17.

15          THE COURT:  Any objection?

16          MR. SHORE:  No objection, subject to cross.

17          THE COURT:  Its admitted without objection.

18      (Laurence declaration received into evidence)

19  BY MR. LOMBARDI:

20  Q    Mr. Laurence, I'd like to talk briefly about who

21  decided that the debtors and the Holdco debtors should enter

22  into the DIP facility.  Let's start with the debtors

23  generally.  Who decided that the debtors should enter into

24  the DIP facility?

25  A      Its boards.

1   Q      Are you on the boards of the debtors?

2   A      I am.

3   Q      How did you and your fellow board members make the

4   decision that the debtors should enter into the DIP facility?

5   A      With input from our advisors we used business judgement

6   after contemplation and consideration.

7   Q      Why, in your business judgment and business judgment of

8   the board was it appropriate for the debtors to enter into

9   the DIP facility that they proposed in this case?

10  A      At the time of the petition we were both out of time

11  and out of money.  We had no viable alternative for an

12  alternative DIP financing.

13  Q      I'd like to talk about the Holdco debtors specifically.

14  Who decided that the two Holdco debtors should enter into the

15  DIP facility?

16  A      Their boards.

17  Q      Again, are you on those boards?

18  A      I am.

19  Q      Did you agree with the decision to have the Holdco

20  debtors enter into the DIP facility?

21  A      I did.

22  Q      How was that decision made by the boards of the Holdco

23  debtors to enter into the DIP facility?

24  A      Ultimately by unanimous consent.

25  Q      Why did you believe that the Holdco debtors should

1  enter into the DIP facility?

2  A    Because it was the most attractive option for them at

3  the time providing access to them to capital as required and

4  also at the time, you know, providing the stay on certain

5  remedies that could exist otherwise.

6  Q    You said most attractive option. I'd like to talk about

7  other options, if any, that may have existed.  Let's start

8  with the debtors more generally.  Did the debtors receive

9  competing DIP proposals?

10  A    They did.

11  Q    And did the debtors boards decide to agree to any of

12  those competing DIP proposals?

13  A    They did not.

14  Q    Why not?

15  A    They were not either sufficient from a liquidity

16  standpoint or actionable otherwise.

17  Q    In your business judgment are the debtors able to

18  obtain credit on more favorable terms then the DIP facility

19  that they proposed?

20  A    Not according to our market check as well as the

21  negotiations in where we resulted, no.

22  Q    And let's talk about other options, if any, available

23  to the Holdco debtors specifically.  Did the Holdco debtors

24  receive competing DIP proposals?

25  A    They did.

1    Q      Did the Holdco debtors boards decide to agree to any of

2    those competing DIP proposals?

3    A      They did not.

4    Q      Why not?

5    A      With the advice of our advisors we deemed them to be

6    less attractive with terms that were less attractive then the

7    availability of the current DIP.

8    Q      Do you have an understanding of the interest rate that

9    is to be charged to the Holdco debtors under the proposed DIP

10   facility?

11   A      I do.

12   Q      What is that understanding?

13   A      I understand there to be no interest rate charge.

14   Q      Do you have an understanding of the fees to be charged

15   to the Holdco debtors under the proposed DIP facility?

16   A      I do.

17   Q      What is that understanding?

18   A      No fees as well.

19   Q      Did anyone else, to your knowledge, offer the Holdco

20   debtors a zero interest, zero fee DIP facility?

21   A      No, we did not receive a bid with like terms.

22   Q      So, based on that and other considerations in your

23   judgment are the Holdco debtors able to obtain DIP financing

24   on more favorable terms?

25   A      I don't believe so.

1   Q     Let's talk briefly about the need for financing.

2   Again, we are going to start with the debtors generally and

3   then we will go to the Holdco debtors separately.  Do you

4   have a view on whether the debtors need access to DIP credit?

5   A     I do.

6   Q     What is that view?

7   A     Its now of the mind that they will require access to

8   DIP financing.

9   Q     Why is that?

10  A     Well, this case is evolving to demonstrate that those

11  entities are right in the crosshairs of some of the case

12  motions, objections and the like.

13  Q     And speaking to the Holdco debtors specifically now do

14  you have a view on whether the Holdco debtors need access to

15  DIP credit at this point?

16  A     I'm sorry, I was referring to Holdco debtors. I must

17  have misheard you.  My apologies.

18  Q     I may have misspoken.  So, the Holdco debtors, your

19  view is that the Holdco debtors need access to DIP credit?

20  A     That is my understanding, yes.

21  Q     And you referred to that understanding having changed

22  over time, is that right?

23  A     I did.

24  Q     What caused the change?

25  A     Again, it's our understanding that there are no known

1 claims or assets at those levels beyond ownership down the

2 chain, do not anticipate that part of this case would be

3 really at those levels and as a result, you know, with advice

4 from our advisors we didn't understand that there would be

5 the likelihood of spending administrative costs and

6 professional fees at that level.

7 Q    And you said advice, that answer that you just gave is

8 that your view today or were you describing your view in the

9 past?

10 A    That is where we are.  My view today is that there will

11 be access required at those levels for DIP financing.

12 Q    Why is your view today the Holdco debtors will need

13 access to DIP financing?

14 A    Because those Holdco matters that we're spending a lot

15 of time on today have become front and center and relevant

16 for this case.

17         MR. LOMBARDI:  I pass the witness, Your Honor,

18 subject to redirect.

19         THE COURT:  Okay.

20         MR. SHORE:  May I take a minute, Your Honor.

21 Chris Shore from White & Case.  We are just going to pass out

22 a binder. I think I can be quick here.

23                    CROSS-EXAMINATION

24 BY MR. SHORE:

25 Q    Good afternoon, Mr. Laurence.  I'm Chris Shore from

1  White & Case on behalf of the Ad Hoc Group of Freedom

2  Lenders.

3       Let's just go through some other preliminaries like you

4  do in your declaration.  You first met Brian Kahn in college,

5  right?

6  A    That's true.

7  Q    And you've had a business relationship with Mr. Kahn

8  starting in 2010 through the beginning of 2024, right?

9  A    That's right.

10 Q    You have known him for 14 years?

11 A    No, I have known him for much longer.

12 Q    Oh, you worked him for 14 years?

13 A    That's right.

14 Q    And you worked form an entity called Vintage Capital,

15 right?

16 A    That's right.

17 Q    Then you came over and got a job at Franchise Group,

18 Inc., in 2019, right?

19 A    That's right.

20 Q    And you got that job because you were a long-term

21 partner of Mr. Kahn's, right?

22          MR. LOMBARDI:  Objection, relevance.

23          THE COURT:  Mr. Shore.

24          MR. SHORE:  I'm just getting through the

25 preliminaries.  He's talking about his work experience in the

1  first paragraph of his declaration. I want to spend one

2  minute probing into it.

3          THE COURT:  Overruled.

4          THE WITNESS: I would have been hired by him but

5  was involved with some of the foundational pieces before they

6  became Franchise Group.

7  BY MR. SHORE:

8  Q     Right, but you described him as your long-term partner,

9  right?

10 A     Yeah, in Bost (ph).

11 Q     Okay.  And Brian Kahn departed as CEO of Franchise

12 Group at the beginning of 2024, right?

13 A     That's right.

14 Q     Because there was an investigation into the allegations

15 in the, quote, Prophecy matter?

16 A     That's right.

17 Q     And you were on the board at the time of Mr. Kahn's

18 departure?

19 A     I was.

20 Q     And when we talk about the board, we're talking about

21 the board of directors of Franchise Topco, that is the top

22 LLC on the organizational chart, right?

23 A     That's right.

24 Q     And you've been a member of that board, right?

25 A     Yes.

1  Q      And you've been a member of certain of the

2  subsidiaries' boards?

3  A      Yes, since the take-private transaction.

4  Q      Right.  And to be clear, when we talk about board

5  actions, there's never, to your knowledge, ever been a board

6  meeting in which the directors of any of the subsidiaries got

7  together to discuss matters related to that entity of which

8  they are board members?

9  A      Not separate board meetings, no.

10 Q      In fact, the boards as they go down are made up of

11 different people at different levels, right?

12 A      Well, yeah, there's 60-some-odd entities with, yeah,

13 different constitutions.

14 Q      Right.  And so if somebody wanted to focus just on the

15 interesting relating to the Holdcos, there's never to your

16 knowledge been a meeting in which just the directors of the

17 Holdcos got together to discuss matters relative to the

18 Holdcos independent of all the other debtors?

19 A      Not separate meetings.

20 Q      And you're not aware of any minutes ever been kept of

21 any Holdco board meeting ever?

22 A      That's right.

23 Q      And you're not aware of any minutes being kept of any

24 board meeting throughout the whole capital structure other

25 than minutes of the board up at Freedom Topco?

1   A      That's right.

2   Q      Okay.  Now, the board of Freedom Topco had a discussion

3   at the beginning of 2024 regarding the need for Mr. Kahn to

4   resign, right?

5   A      I believe the discussion started before the beginning

6   of 2024.

7   Q      Okay, but eventually, at the beginning of 2024, the

8   board of Franchise -- or of Freedom Topco came to the view

9   that they wanted Mr. Kahn to leave?

10  A      That's right.

11  Q      And the board expressed this view to Mr. Kahn that they

12  wanted him to leave the board, right?

13  A      That's right.

14  Q      And the board had a meeting where they expressed this

15  view and the views of the constituents, right, as to the need

16  for Mr. Kahn to resign?

17  A      There were multiple meetings on the topic.

18  Q      Okay.  And, again, you don't know when Willkie Farr &

19  Gallagher stopped representing Mr. Kahn in connection with

20  Franchise Group, right?

21  A      I don't know the specific date.

22  Q      Okay.  Now, in addition to -- we talked about an

23  investigation, let's be clear about the record on this.  You

24  know there was a prepetition investigation by the Pirrello

25  firm into the Prophecy matter, right?

1  A      That's right.

2  Q      It's your understanding there's a post-petition

3  investigation going on into, among other things, the take-

4  private transaction, right?

5  A      That's right.

6  Q      And you were involved to some extent in the take-

7  private transaction, right?

8  A      To a limited extent, yes.

9  Q      Now, in connection with either of these two

10  investigations, nobody ever asked you to search your cell

11  phone for any text messages or phone calls with Mr. Kahn,

12  right?

13          MR. LOMBARDI:  Objection, Your Honor, relevance.

14  It's not clear to me what this has to do with the DIP that

15  we're before Your Honor on today.

16          MR. SHORE:  Well, the debtors have made a big --

17  because counsel expanded this beyond the DIP since we're

18  dealing with evidence, remember, you've got the witness on

19  talking about my exclusivity motion, I just want to be clear

20  that when the debtors try to place an aura of legitimacy on

21  this, they're saying there's this big investigation going on,

22  don't worry about it, and I just want to probe for another 22

23  seconds what this witness has been asked in connection with

24  that investigation.

25          THE COURT:  Overruled, I'll allow it.

 1              THE WITNESS:  I actually don't recall whether I

 2   had to produce my cell phone in the prepetition

 3   investigation.

 4   BY MR. SHORE:

 5   Q     Well, you don't recall that you did, right?

 6   A     I don't recall that I did, I don't --

 7   Q     And you didn't --

 8   A     -- recall that I didn't.

 9   Q     -- with respect to the post-petition investigation

10   either?

11   A     I have not been contacted yet on the post-petition.

12   Q     Okay.  And you have communicated with Mr. Kahn on your

13   cell phone, right?

14   A     Yes.

15   Q     You last talked to him on November 2nd, right?

16   A     I believe so.

17   Q     And you last received a text from him on October 31,

18   right?

19   A     I think we established it was the other way around,

20   but, yes, that was recent communication.

21   Q     Okay.  And you recall when I asked you at your

22   deposition, how long is the text thread, that text thread was

23   longer than you could tell me in connection with your review

24   of how many texts you had with Mr. Kahn, right?

25   A     That's right, going back years.

1  Q     But, to be clear, you conduct business on your phone,

2  both the cell phone and the text function message, right?

3  A     That's right.

4  Q     Okay.  And, to be clear, nobody has interviewed you yet

5  with respect to the post-petition investigation, right?

6  A     Not yet.

7  Q     Okay.  There's been some discussion of an independent

8  director already in place at the Holdco debtors and it's a

9  reference to John Hartman, do you recall that?

10 A     I do.

11 Q     Okay.  Now, there's been some suggestion that what

12 happened is the Freedom Holdco lenders put Mr. Hartman on the

13 board of Holdco and I just want to be clear, you were the

14 party who selected Mr. Hartman to be a director at the Holdco

15 entities, right?

16 A     Per a requirement of our amendment with the Holdcos, we

17 produced a list and ultimately made a suggestion to them that

18 they consented to, yes.

19 Q     Right, but to be clear, you picked Mr. Hartman and the

20 Freedom Topco lenders -- or, sorry, the Freedom Holdco

21 lenders consented to that?

22 A     Yeah, I offered him among others and they did consent

23 to it, yes.

24 Q     Right.  The 2L lenders or the Holdco lenders did not

25 propose Mr. Hartman's name as their chosen independent?

1  A     That's right, but it did represent the designee per the

2  amendment, yeah.

3  Q     Now, let's -- because we've talked about two different

4  kinds of independents here -- Mr. Hartman sits on the boards

5  of various debtors within the chain, right?

6  A     He does.

7  Q     So he would also be a director at the Opcos?

8  A     He's a director at the Franchise Group, Inc., yeah.

9  Q     Right, the top Opco?

10 A     Yeah, the top Opco.

11 Q     Okay.  Now, with respect to this second invest --

12 sorry, the third investigation going on, that is the new

13 independent director looking into claims and causes of action

14 that one debtor might have against another, okay?  You

15 understand there's one that may start now that we have an

16 independent director there?

17 A     Yes.

18 Q     Okay.  To be clear, if there's a claim of the Holdcos

19 against Franchise Group, Inc., Mr. Hartman is not independent

20 in connection with that transaction, right --

21 A     That's right.

22 Q     --  because he sits on the board of both?

23 A     He's not uniquely independent to those two entities,

24 yes.

25 Q     Right, he could be, for example --

1  A      He represents a non -- I'm sorry.

2  Q      Sorry.  If we're talking about an investigation of

3  actions taken by the Franchise Group, Inc. board and the

4  Holdco board in the prepetition period, Mr. Hartman would

5  have been involved in those transactions since he was put in

6  place?

7  A      That's right.

8  Q      Now, we went through this at your deposition.  You are

9  aware now that the 1Ls in this case filed a pleading that

10 says that the -- they believe that the Opcos have claims and

11 causes of action against the Holdcos for, among other things,

12 breach of fiduciary duty.  Do you recall seeing that?

13 A      I recall you pointing out that they're exploring

14 whether there are claims there.

15 Q      Okay.

16 A      Yes.

17 Q      And they raised the possibility that in fact you

18 yourself as a director of the Holdcos may have been engaged

19 in conduct which constituted a breach of fiduciary duty in

20 the prepetition period?

21 A      I'm not sure of the scope of that exploration, but it

22 theoretically could include that.

23 Q      Yeah.  I take it you'd want to know that from your

24 lenders as to whether or not they're coming after you for a

25 breach of fiduciary duty?

1  A      I'm getting a little bit numb to being investigated,

2  unfortunately.

3  Q      Fair enough, but let's focus on this independent -- the

4  new independent director's role here, just your understanding

5  because things are fluid and things are moving.  Under the

6  terms of the plan and the RSA, the Holdco debtors need to

7  release all of the other debtors, right?

8  A      That's my understanding.

9  Q      So if this independent director represented by Mr.

10 Stamur (ph), who's very able, comes up with a $50 million

11 cause of action that exists from the Topcos against the

12 Opcos, okay?  Do you understand that?

13 A      Yeah.

14 Q      His choice at that point is to either say but I can't

15 do it because I have to release the other debtors, right, or

16 I'm going to liquidate this company, isn't that the choice?

17 Do you want me to pick that apart for you or do you

18 understand the question?

19 A      I understand the dynamic.

20 Q      Right.  So do you think that's particularly fair to an

21 independent director to come in and say, investigate to your

22 heart's content, but if you find something of value there,

23 your choice is going to be to default the DIP and liquidate

24 the company or make sure that your creditors get recovery on

25 those assets?

1  A     I understand the dynamic, yeah.

2  Q     Now, let's talk about this Holdco DIP that you

3  testified to.  I think I get it, right?  We understand what

4  the security is for the new Holdco DIP, right?  It's going to

5  be a loan that is being done on an interest, no fee, no amort

6  basis, right?

7  A     Yeah, in advance, not loan evidenced, yeah.

8  Q     Okay.  Well, I'm going to get to that in a second.

9        And we know that whatever is advanced is going to be

10 secured by a lien on unencumbered assets, right?

11 A     That's my understanding.

12 Q     Okay.  Who are the Holdco lenders going to borrow from?

13 A     My understanding is they will borrow through Franchise

14 Group, Inc. from DIP financing funds.

15 Q     Right.  So your understanding is when they -- we can

16 get to the language -- when they determine they need money,

17 they can go to Franchise Group, Inc., a debtor, and obtain an

18 advance of funds?

19 A     That's my understanding.

20 Q     And in that case they will be a primary obligor for the

21 amount of those advances, that is, they would be undertaking

22 a post-petition obligation to repay another debtor on the

23 terms we just talked about?

24 A     That is my understanding.

25 Q     Okay.  And in context with that, you said it's an

1  advance, and it's -- is there a credit agreement for this?

2  A     There is.  I believe the existing DIP credit agreement

3  covers draws from the DIP financing and the allegation

4  ability, that's my understanding.

5  Q     Okay.  Do you know when that's going to be filed on the

6  docket?

7  A     I believe that's the currently filed DIP credit

8  agreement.

9  Q     Okay.  Well, I'll let my partner argue about that on

10  the record and we'll see --

11  A     Yeah.

12  Q     -- we'll see whether it's in there.  But, to be clear,

13  the HoldCos are no longer guarantors of the DIP as were

14  proposed in the DIP motion, right?

15  A     I'm sorry, could you repeat that?

16  Q     Sure.  Do you recall that the DIP motion that we went

17  through provided that the HoldCos, your HoldCos that you're a

18  board member and officer of, were only seeking to provide

19  guarantees of the DIP, right?

20  A     Of the amount drawn.

21  Q     Yeah -- well, of the amount drawn on the DIP.

22  A     On the DIP.

23  Q     Right.  And now what you're talking about is the

24  HoldCos becoming a primary obligor to Franchise Group, Inc.

25  for any advances it takes under the DIP?

1  A    I'm not sure that I am tight on where the obligation

2  runs.  I believe the funds flow runs through Franchise Group,

3  Inc.  As it relates to the lien structure, I'd be out over

4  my skis.

5  Q    Well, we went through it in your deposition and I went

6  through it with Mr. Grubb, it says if the Holdco debtors are

7  required to advance money.  Who would require the Holdco

8  debtors to obtain money to pay the administrative expenses,

9  which other people have talked about?

10 A    Yeah, to the extent those entities have expenses

11 related to their portion of the case, there would be the

12 potential for those entities, as addressed by their board, to

13 make draw requests related to those.

14 Q    Well, you said their board, right?  You're the CEO of

15 the two Holdco debtors, right?

16 A    Yes.

17 Q    And are you saying that at some point it may be

18 required that you get some funds to pay the administrative

19 expenses of those estates, right?

20 A    That's my understanding.

21 Q    Okay.  So who are you going to request the money from

22 to pay that?

23 A    I believe there is a mechanism in the DIP credit

24 agreement that an allocation of a draw could be made to the

25 debtors, including the Holdco debtors.

1    Q    Just I'm trying to understand an allocation of the

2    draw.  I thought you said the draw request is the Holdco

3    debtors put a draw request in to Franchise Group, Inc. to

4    have Franchise Group, Inc. advance, if not loan money to the

5    HoldCos?

6    A    I'm sorry, I don't think of those as mutually

7    exclusive.  I thought -- just, please, repeat the question.

8    Q    Well, I take it part of the confusion here is that the

9    same management team that would be making a draw at Franchise

10   Group, Inc. is the same management team that would be making

11   a draw at the HoldCos because it's all one same management

12   and board team, right?

13   A    There is a single DIP with, you know, governments

14   related to that DIP.

15   Q    Right.  So I just want to understand, the creditors of

16   Holdco I think are entitled to know, who is going to be

17   advancing the funds to the Holdco debtors to pay an

18   indeterminate amount of a post-petition secured debt?

19   A    So, again, DIP financing sources through, my

20   understanding, the Franchise Group, Inc.  And, again, this is

21   I'm out over my skis a little bit here on technicalities, but

22   that's my understanding.

23   Q    Okay.  Who would be on top of their skis with respect

24   to this?

25   A    Counsel and advisors.

1   Q     And Mr. Grubb would be your advisor, right?

2   A     One of them.

3   Q     Okay.  As it stands right now, though, right now,

4   you're not aware of any liabilities that the Holdco debtors

5   need to pay right now?

6   A     I'm not aware of any amounts due right now, no.

7   Q     Okay.  And we're talking about, your understanding is

8   that there are fees and expenses that are being accrued by

9   the professionals here that may ultimately need to get paid

10  if you get the ability to allocate expense directly to the

11  Holdco debtors' estates, right?

12  A     That's my understanding.

13  Q     What's your understanding of when that money is going

14  to be due?

15  A     I don't know that exact DIP budget related to this

16  allegation.

17  Q     Okay.  So can you testify under oath right now that

18  this issue needs to be resolved today as opposed to next

19  week?

20  A     I'm sorry?

21  Q     Sure.  What's the problem -- we heard before about all

22  the harm to the vendor community and everything else.  There

23  are no vendors up at Franchise Group HoldCos, right?

24  A     I can testify the DIP order generally needs to be

25  completed today and this is just one portion of it.

1  Q    Right.  And I'm just saying, if there isn't a -- the

2  actual terms of a Holdco debtor facility with a budget that's

3  been approved by the Court and a credit agreement that lays

4  all this out, let's just assume that we don't get there

5  today, is there any reason that you can't just come back and

6  try to get a Holdco debtor loan when you have those documents

7  and we have a professional -- or, sorry, a professional and a

8  fact witness who is over their skis with respect to what's

9  going on?

10 A    Again, I don't believe a credit agreement is required

11 here as it's just, again, part of the same DIP and the

12 ability for Holdco debtors to access.

13 Q    Okay, take that out then.  Why do we have to do this

14 now as opposed to a week from now when we have a budget and

15 some of this is more set in stone?

16 A    Because it is part of the greater package, as I

17 understand it.  The greater package has some real urgencies.

18 Q    But if the 1L lenders told you that they were willing

19 to make Opco loans without having to deal with the Holdco

20 lender box right now, would you have any problem with that?

21 A    I would need to confer with others and understand what

22 that means exactly.

23 Q    Okay.  Can you turn to tab 11 in your binder?  It's

24 Debtors' Exhibit 1 and it's ECF 15, the organizational chart.

25      (Pause)

1   Q      So tab 11 in the binder you just got.

2         (Pause)

3               THE COURT:  Which Debtors' Exhibit did you say?

4               MR. SHORE:  It's Debtors' Exhibit 1.  It should

5   have a two-page organizational chart.

6               THE COURT:  No, Debtors' Exhibit 1 is declaration

7   of Mr. Orlofsky.

8               MR. SHORE:  Yeah, I'm sorry, it's the exhibit, if

9   you go to Exhibit A, it's on page 62 of 170.  I'm sorry, Your

10  Honor.

11        (Pause)

12              THE COURT:  Okay.

13  BY MR. SHORE:

14  Q      All right, so let's put some context on some of the

15  answers you've been giving.  On the first page, you see that

16  there's the entity Franchise Group, Inc., do you see that?

17  A      I do.

18  Q      That's the top Opco, right?

19  A      That's right.  So that's --

20  Q      And then --

21  A      -- the holding company of the operating company.

22  Q      And the two boxes above that, Freedom VCM, Inc. and

23  Freedom VCM Interco, Inc., are the -- what we've been

24  referring to as the Holdco debtors, right?

25  A      That's right.

1    Q    Okay.  And you said those debtors don't have any

2    assets, I think you said in the context of questioning from

3    Counsel, right?

4    A    I understand them to own entities below, that being

5    their primary asset.

6    Q    Right.  So Freedom VCM, Inc., included in its asset

7    package is the stock of Franchise Group, Inc., right?

8    A    That's right.

9    Q    And you're not here testifying today that that stock

10   has no value, are you?

11   A    I'm not here to testify on value.

12   Q    Okay.  And, to be clear, one of the things we're trying

13   to find out by a well-run auction is whether or not that

14   stock does have value, right?

15   A    We believe the M&A process will yield a view on values,

16   yes.

17   Q    Okay.  It may or may not.  I mean, someone may not show

18   up to bid at all, right?

19   A    That could be.

20   Q    Right.  And, to be clear, just as a -- you know, a

21   person who runs a business, if nobody shows up and bids at

22   the auction, that doesn't in your view express the view that

23   the assets are worth zero, right?

24   A    I think that's fair.

25   Q    Right.  It just means that someone didn't bid for the

1  assets, right?

2  A    That's right.

3  Q    Okay.  So, as we move up, the Freedom VCM Interco, Inc.

4  owns stock in Freedom VCM, Inc., right?

5  A    Yes.

6  Q    And that stock will have value if the auction proceeds

7  are sufficient to pay off the $500 million approximately of

8  Holdco notes, right?

9  A    That's fair.

10 Q    And in saying you're not expressing a view one way or

11 the other as to whether that's going to happen or not, right?

12 A    That's still right.

13 Q    Okay.  And then we get up to -- and by the way, in both

14 of those boxes there may be claims and causes of action that

15 belong to those two debtors, right?

16 A    I'm not aware of any now, but there could be in the

17 future.

18 Q    Well, you've -- on behalf of the Holdco debtor board,

19 you've appointed an independent director to look into that,

20 right?

21 A    That's right, that's why --

22 Q    Okay.

23 A    -- I said it could be in the future, yes.

24 Q    Okay.  Well, at least -- there's at least a sufficient

25 possibility that you're willing to spend the money to hire an

1  independent director to look at that, right?

2  A    That's right.

3  Q    By the way, have you hired independent directors at the

4  other debtors to find out whether the other debtors have

5  claims and causes of action against other debtors?

6  A    Which debtors are you referring to?

7  Q    Sure.  Well, I'm just saying an -- you have an

8  independent directors, you sit on the boards of those two

9  Holdco entities, and you come up with the conclusion that you

10  need to pay Akin Gump to help an independent director to look

11  at claims and causes of action that box might have, right?

12  A    That's right.

13  Q    And you would agree with me that that's going to expose

14  that estate to some administrative expense with respect to

15  that, right?

16  A    It could.

17  Q    Okay.  And just -- I just want to say that you as a

18  board member of any of the other entities come to the

19  conclusion that you should be putting a board member in at

20  those entities to look at claims and causes of action that

21  might exist between debtors that are being released under the

22  plan?

23  A    We have not.  We don't have any constituents that have

24  been seeking to look at independent assets and claims.

25  Q    Okay.  Well, to be clear, the time to object to your

1  plan is still weeks -- at least weeks away, right?

2  A    I'm sorry, how is that related to my answer?

3  Q    Well, you say no one has been asking, no one has been

4  asking because at this point you haven't sought a motion

5  which would release those claims for zero, right?

6  A    I'm still unclear what debtors you're referring to.

7  Q    The -- every debtor other than the two Freedom Holdco

8  entities may have claims and causes of action against any

9  other debtor, right?

10 A    They may.

11 Q    But you haven't sought to burden any of those other

12 estates with the costs of an independent director and counsel

13 to look into that, right?

14 A    That's right.  As I look at the chart, the one above is

15 just a pass-through entity that has, you know, the same

16 ownership, no other constituents outside, and does actually

17 have some attributes I believe up there.

18 Q    Yeah, well, let's talk about that.  Each of the boxes

19 above Franchise Group, Inc., the top Holdco, has assets in

20 the form of stock and it has other assets in those boxes that

21 belong to those debtors, right, that may be intangible

22 assets, claims, and causes of action, we just don't know what

23 the quantum is, right?

24 A    Potentially, yes.

25 Q    Okay.  And let's talk about that then as all the Holdco

1  assets, okay?  That is the assets, whatever they're worth, in

2  all the boxes above Franchise Group, Inc., right?  Do you

3  understand me?

4  A    Understood.

5  Q    I'm going to refer to that as the big pot of Holdco

6  assets.

7       Now, included in that pot is $13.9 million of cash

8  sitting at the Topco, right?

9  A    I don't know whether that's the exact amount, but it's

10 in the neighborhood.

11 Q    Okay.  Now, that would be part of the Holdco debtors'

12 asset pool, right?

13 A    No.

14 Q    Well, I'm just saying, if my definition is the Holdco

15 asset pool is everything in every single one of those boxes

16 they included in that, that that definition is the cash?

17 A    Oh, if you drew that circle artificially --

18 Q    Yeah.

19 A    -- around all those entities.

20 Q    Okay.  So in -- I have no question pending, but --

21          MR. LOMBARDI:  I'm just anticipating the next one,

22 but I'll wait.

23      (Laughter)

24          MR. SHORE:  Okay, that's probably better.

25 BY MR. SHORE:

1  Q      Now, none of those HoldCos are operating entities,

2  right?

3  A      That is right.

4  Q      Okay.  Let me just jump off this and I can come back to

5  the topic, but this is where it is in my outline.  You looked

6  to -- you've testified to Mr. Grubb before -- you looked to

7  Mr. Grubb for input on matters related to structures and

8  economics of restructuring matters, right?

9  A      Mr. Grubb, among others, yes.

10  Q      And you personally never had any experience prior to

11  this case with DIP financing, right?

12  A      Limited experience.

13  Q      Okay.  And you deferred to Ducera on matters relating

14  to the sale process, right?

15  A      I collaborated and deferred to them related to the bid

16  procedures and sale processes.

17  Q      And, to your experience, the person sitting on top of

18  the pyramid at Ducera, the person running the M&A process,

19  was Chris Grubb, right?

20  A      That's right.

21  Q      And the board up at Freedom VCM Holdings, LLC, the

22  Freedom Topco, assigned Mr. Grubb to run the DIP process,

23  right?

24  A      Assigned Ducera to and he was one of the critical -- is

25  one of the critical members there, yes.

1    Q     Right.  Well, you understand who's senior to him on the

2    Ducera team?

3    A     I do know his partner Michael Kramer, if you're

4    referring to him, yeah.

5    Q     Okay.  And the board has spent time with Michael Kramer

6    regarding the DIP process, right?

7    A     Lots of time, yes.

8    Q     But Mr. Kramer's role was basically just observing the

9    board and other advisor discussions, right?

10   A     I'd say he was more integrated and involved than just

11   observing.

12   Q     And Mr. Kramer did not, to your recollection, directly

13   provide any advice to the debtor board regarding DIP

14   financing, right?

15   A     I don't recall him specifically weighing in, but their

16   view is always, you know, kind of a unified view of Ducera.

17   Q     Just --

18               THE COURT:  Mr. Shore, before you go on, we're

19   going to take a short recess, afternoon recess.  Let's recess

20   until 3:30.

21               MR. SHORE:  Okay.

22         (Recess taken at 3:10 p.m.)

23         (Proceedings resumed at 3:30 p.m.)

24               THE COURT:  Please be seated.  I guess I'm not

25   talking loud enough these days.

1  BY MR. SHORE:

2  Q    All right.  Good afternoon, Mr. Laurence, just a couple

3  more questions.

4      We ended on a discussion of Mr. Kramer.  Mr. Kramer, to

5  your knowledge, has not participated in the sale process in

6  this case, right?

7  A    Not to my knowledge.

8  Q    Okay.  To your knowledge, prior to the petition date,

9  the two Freedom Holdco debtors that are part of this new

10 Holdco facility hadn't ever borrowed money from affiliates,

11 right?

12 A    That's right, to my knowledge.

13 Q    And, to your knowledge, you're not aware of any secured

14 financing that was ever obtained by the two Freedom Holdco

15 debtors prior to the petition date from affiliates?

16 A    Not to my knowledge.

17 Q    Okay, let's focus on the RSA for a bit and your

18 understanding of it.

19     You do understand that if you make changes to the plan

20 after the Court approves a DIP, if it does, you can't make

21 changes to that plan without potentially creating an event of

22 default, right?

23 A    I've come to understand that, yes.

24 Q    Okay.  Now, let's talk about what happens in the

25 transaction.  One possibility is we have this auction and it

1   turns out that people -- a person or people come together and

2   we end up with enough consideration to pay the 1Ls in full,

3   right?  Have you got in that mind?

4   A      Yeah, I've got that in mind.

5   Q      Okay.  That would be a great day, right?

6   A      It would be a great day.

7   Q      Okay.  And in that case, the way the RSA works is that

8   whatever money is received flows to whomever is entitled it

9   up the chain as we go, right?

10  A      There is a waterfall, yes.

11  Q      Yes.  And in that waterfall the -- if we get a clearing

12  -- and I'll talk about this as a clearing transaction --

13  enough consideration to pay Franchise Group, Inc. and all of

14  its creditors, okay?  Do you understand that?

15  A      A sufficient bid, is that the --

16  Q      A sufficient bid --

17  A      -- defined term?

18  Q      -- a clearing bid --

19  A      Yeah, a clearing bid.

20  Q      -- or a clearing transaction is enough to pay Franchise

21  Group, Inc., creditors, and everybody below involved.  In the

22  event of that, we go through the waterfall, right?

23  A      Right.

24  Q      Now, if we don't get that, in the event we don't get a

25  clearing transaction, you understand that the plan toggles to

1  one in which the 1L lenders get all of the assets of the

2  company, right?

3  A    I understand that they get the -- I believe it to be

4  the equity of the entity.

5  Q    So when I was talking about -- think of all those

6  assets in every Holdco box beneath the Franchise Topco, it's

7  your understanding, under the plan, as a board member of

8  certain of those entities that those entities' assets,

9  whatever they might be, tax attributes, claims and causes of

10 action, anything else, they all go to the 1L lenders, right?

11 A    That is my understanding.

12 Q    Right.  So the plan provides that in order to get a

13 deal done the plan commits the Holdco debtors, including you

14 as CEO and you as board member, to take up all the assets up

15 in the HoldCos and give them to the 1Ls in the event that

16 there's not a clearing transaction, right?

17 A    I think that's right.

18 Q    Right.  And what ended up happening, as I think you

19 explained to me, is the reason you acceded to that as a

20 Holdco debtor was because the 1Ls demanded that, if they were

21 going to fund this case, they wanted assurance that the

22 Holdco debtors where they don't have claims just gathered up

23 all their assets and gave it to the 1L lenders in the event

24 that there wasn't enough money to do a clearing transaction,

25 right?

1  A    I testified that, yeah, we negotiated to where we

2  landed and that was the only best alternative.

3  Q    Right.  So you were just forced as a Holdco board

4  member or a Holdco officer of any of the HoldCos above

5  Franchise Group, Inc. to take your assets and give them to

6  another debtor to be able to pay the 1L lenders, right?

7  A    It was part of a broader consideration and package, you

8  know, it puts in the assets and liabilities.

9  Q    But that's what you did, that's what you've committed

10  to, right?

11  A    That's, yeah, among what we've committed to.

12  Q    So, if you don't take all the assets that belong to the

13  HoldCos above and give them to the 1L lenders under a plan,

14  you're going to be defaulting the DIP that His Honor is being

15  asked to approve?

16  A    I've come to understand that's the mechanic.

17  Q    Okay, but I said all the assets and I forgot one thing.

18  The $13 million in cash, that sits up at Freedom Topco,

19  right?

20  A    That's right.

21  Q    And Freedom Topco doesn't have any creditors, right?

22  A    Not to my knowledge.

23  Q    And you're not allocating any costs of this

24  reorganization to Freedom Topco, right?

25  A    There's no activity up there.

1    Q    Okay.  And so in the event of -- that there's not a

2    clearing transaction, okay, and in the event the DIP is

3    repaid, it's your understanding that that $13 million will

4    remain at Freedom Topco to be distributed to its

5    stakeholders, right?

6            MR. LOMBARDI:  Your Honor, I'm sorry, I just don't

7    see the relevance of this whatsoever.  I would -- we're way

8    past the DIP, way past bid procedures or anything else that's

9    before Your Honor.

10           THE COURT:  Well, we're talking about plan issues

11   at this point.

12           MR. SHORE:  Well, no, it's in the RSA that they've

13   committed themselves to.  This witness was the one who

14   approved the RSA.  And I just want to point out that in

15   connection with this transaction the one benefit that any of

16   the Holdco debtors keep is the ability to give the $13

17   million up there to the shareholders, which includes this

18   witness.

19           THE COURT:  All right, go ahead.

20           THE WITNESS:  So the Topco was never providing

21   liens to any of the credit circles, including the Holdco

22   debtor circles.  And so it right now is providing a lien to

23   the DIP, but, yes, otherwise it would be released.

24   BY MR. SHORE:

25   Q    Right.  So, just to be clear, as long as the DIP gets

1  repaid, you, as a shareholder of the company, get to get your

2  pro rata share of the $13 million that sits up there?

3  A    The board hasn't determined whether to distribute it in

4  that event, or whether it could or would.

5  Q    Well, the board has determined that it's not going to

6  give it to the 1Ls like any of the other HoldCos, right?

7  A    Yeah, that box never provided collateral support for

8  either of the credit circles.

9  Q    Nor did the two HoldCos that we've been referring to as

10 the Freedom HoldCos that you're an officer and director of,

11 right?

12 A    I was under the impression there was an unsecured

13 guaranty there, but I could be wrong.

14 Q    Yeah, just the -- I will tell you, the record will

15 reflect that the two HoldCos that borrowed $475 million for

16 the take-private transaction were outside the credit circle,

17 right, of the Opco debt, right?

18 A    Yeah, the structure your clients came up with required

19 them to be; otherwise, they'd trip the refinancing and the

20 default in the box, yeah.

21 Q    Right.  And in the event we don't get a clearing

22 transaction, you as a Holdco officer and director, in those

23 two boxes it said, whatever claims and causes of action exist

24 in there, they're going to the 1L lenders, right, even though

25 they were not an obligor on the credit circle prepetition?

1  That's what you decided in those two boxes, right?

2  A    That was the best we could do.

3  Q    Right, but the best you could do also provided that

4  with respect to the box that would lead to a distribution to

5  shareholders, assuming that's what the board decides to do

6  with that $13 million, you ring-fenced that for yourselves,

7  right?

8  A    That is not providing collateral support to the credit

9  box, yeah.

10  Q    I understand, but what's happening now under this DIP

11  is that $13 million is not being used to defray

12  administrative expenses in the case at all, right?

13  A    It's not incurring any case logistics or expenses at

14  the --

15  Q    Because you haven't even thought about allocating up in

16  that box, right?  Right?

17  A    Nothing has been allocated.

18  Q    Right.  And because you haven't allocated anything in

19  that box, that's going to allow you as a shareholder,

20  potentially, to get your pro rata share of the distribution

21  of $13 million, right?

22  A    It could be the case.

23        MR. SHORE:  No further questions, Your Honor.

24        THE COURT:  Okay.  Redirect?

25        MR. LOMBARDI:  No redirect, Your Honor.

1          COUNSEL:  None from me, Your Honor.

2          THE COURT:  Okay, thank you.

3          You may step down.  Thank you.

4      (Pause)

5          THE COURT:  No further evidence from the debtors,

6   correct?  No further evidence from the debtors, is that

7   right?

8          MS. SINCLAIR:  That's correct, Your Honor.

9          THE COURT:  Okay.

10         MR. HERSHEY:  Good afternoon, Your Honor, Sam

11  Hershey from White & Case for the Ad Hoc Group of Freedom

12  Lenders.

13         Your Honor, the Freedom lender group submitted a

14  declaration by Neil Augustine in support of our objection to

15  the debtors' bid procedures.  That's Debtors' Exhibit Number

16  19, it's already in evidence, and at this time I'd like to

17  call Mr. Augustine to the stand.

18         THE COURT:  Okay.  Mr. Augustine, please come

19  forward, take the stand, and remain standing for the oath.

20         THE CLERK:  Please raise your right hand.  Please

21  state your full name and spell your last name for the court

22  record, please.

23         THE WITNESS:  Neil Alan Augustine, A-u-g-u-s-t-i-

24  n-e.

25     NEIL A. AUGUSTINE, FREEDOM LENDERS' WITNESS, AFFIRMED

1          THE CLERK:  You may be seated.

2          THE WITNESS:  Thank you.  Good afternoon, Your

3    Honor.

4          MR. HERSHEY:  And, Your Honor, we prepared a very

5    short demonstrative regarding Mr. Augustine's experience, his

6    professional experience.  If I may, I'll approach, Your

7    Honor, to hand a copy to you and one to the witness as well?

8          THE COURT:  Okay, you're going to have to bring it

9    up on the screen.

10          MR. SULLIVAN:  Also objection, we haven't seen any

11    of --

12          MR. HERSHEY:  Yeah, we have copies that we can

13    provide to opposing counsel as well.

14          THE COURT:  You ought to give it to him first.

15          MR. HERSHEY:  Okay, sure.

16       (Pause)

17          MR. HERSHEY:  May I approach, Your Honor?

18          THE COURT:  Yes.

19          THE WITNESS:  Thank you.

20                    DIRECT EXAMINATION

21    BY MR. HERSHEY:

22    Q    Mr. Augustine, you can turn to the second page of this

23    demonstrative, which is the first substantive page.

24          First of all, who prepared this demonstrative?

25    A    My team did, under my leadership.

1  Q     Let me ask you, Mr. Augustine, where are you employed?

2  A     Greenhill & Company.

3  Q     And how long have you been employed at Greenhill &

4  Company?

5  A     I've been at Greenhill for about six and a half years,

6  coming up on seven.

7  Q     And what's your role at Greenhill?

8  A     I'm a vice chairman.  I co-head our financing advisory

9  and restructuring practice.

10 Q     And, just at a high level, what do you do in your role

11 at Greenhill?

12 A     I manage our group.  Our group is about 35

13 professionals or so that are focused on working with debtors,

14 companies, working with creditors, working with buyers of

15 distressed assets.  We also assist companies in raising

16 financing outside the context of a bankruptcy process.

17        Within the work that we do for companies, we do both

18 in-court work and out-of-court work.  On an out-of-court

19 perspective, we'll assist companies in liability management

20 transactions, raising financing, whether or not that's

21 straight secured financing, first lien, second lien,

22 unsecured financing, preferred stock, common stock.  We'll

23 work on exchange offer transactions and recapitalizations.

24 With creditors, we work in a similar capacity, but for

25 creditor constituencies.  And then for buyers, we're

1  typically working with them in their capacity of acquiring

2  assets that are either in a Chapter 11 or in some type of

3  distress.

4  Q    Okay.  You said you've been at Greenhill since 2018,

5  how long have you done the work that you just described?

6  A    A little bit more than 35 years.

7  Q    And looking at this page here, are these representative

8  transactions that you have personally worked on?

9  A    It's not an all-inclusive list, but this is a list of

10  transactions that I have led, broken down between company-

11  side assignments, creditor-side assignments, buyer

12  representations, sponsor representations, and some financing

13  advisory work.

14  Q    And just to coin a phrase, were you the point person on

15  these transactions?

16  A    Yeah, each of these transactions I led.

17  Q    Okay.  Do you have experience with 363 sales?

18  A    I do.

19  Q    And what about 363 sales of retail businesses?

20  A    I do.

21  Q    Okay.  Let's turn the page.  And am I correct in

22  understanding that these are 363 sales on which you were the

23  point person?

24  A    They're both 363 as well as in-court market checks.

25  Substantially all 363s, but there might be a couple on here

1  that there weren't formal bid procedures, but an in-court

2  market test was conducted.

3  Q    Okay.  Is this an exhaustive list of the 363 sale

4  processes that you've worked on as the point person?

5  A    No, it's not an exhaustive list.

6  Q    Okay.  So, looking down at the bottom of this page, it

7  says that you have 19 debtor assignments in which you were

8  the point person on a 363; is that right?

9  A    363 and in-court market checks, correct.

10  Q    And seven of those were in the retail space?

11  A    That is correct.

12  Q    Okay.  And you've also done work on the buy side in

13  connection with 363 sales, right?

14  A    That's correct.

15  Q    And it says here, you have four of those that you've

16  listed, right?

17  A    That's correct.

18  Q    And one was a retail case?

19  A    It had a retail component to it, yes.

20  Q    Okay.  And you've done work on the creditor side as

21  well, right?

22  A    I have.

23  Q    And it lists three here, I guess this case would be

24  number four, is that safe to say?

25  A    That's correct.

1  Q      And one was retail before, this is retail as well,

2  right?

3  A      That is correct as well.

4  Q      Okay.  So, adding these up, you've listed out 26 total

5  in-court transactions of which nine were in the retail

6  sector, right?

7  A      Twenty six in-court sale transactions.  I've done many

8  more in-court transactions, you know, straight away prepacks

9  or pre-negotiated implementation through a plan.

10 Q      Okay, thank you for that clarification.  You can put

11 this to the side.

12        So you've been in court all day today, right, and

13 you've heard the testimony, correct?

14 A      I have.

15 Q      And including you've also heard lawyer statements

16 today, right?

17 A      Yeah, I've heard a number of them, yes.

18 Q      Okay.  So you heard Mr. Dugan state that the advisors

19 are speaking, right?

20 A      Can you repeat that, please?

21 Q      You heard Mr. Dugan, counsel to the debtors, state

22 earlier the advisors are speaking, right?

23 A      Oh, I did hear him say that, yes.

24 Q      Okay.  So just given your experience with 363 sales and

25 given that the advisors are speaking, has anyone from the

1  debtors reached out to you to discuss how to maximize value

2  from this sale process?

3  A     No.

4  Q     Okay.  What about the 1Ls?  It's their collateral

5  that's being sold.  Has anyone from the 1Ls reached out to

6  you to discuss the best way to operate this sale process so

7  we can maximize value here?

8  A     They have not.

9  Q     Okay.  What about Mr. Grubb?  Mr. Grubb actually worked

10 underneath you at Greenhill for six years; is that right?

11 A     That's correct.

12 Q     So, given your relationship with Mr. Grubb, did he at

13 any point reach out to you to sort of talk through with you

14 how we might run this process in a way that maximizes value?

15 A     No.  Mr. Grubb and I spoke after we had been retained

16 by the Freedom Group, but he was not soliciting any of my

17 input around the sale process as part of that conversation.

18 Q     Okay.  And do you recall who initiated that

19 conversation?

20 A     I think I reached out to Chris, I can't remember if it

21 was on Thanksgiving day or the day after, saying, hey, we're

22 getting involved, it would be good just to get caught up,

23 bring me up to speed on what's taken place up to this point.

24 So I reached to him, we set up a time and had a conversation.

25 Q     So, but just to be clear, at no point during that phone

1  call did Mr. Grubb ask any thoughts from you about how to

2  conduct the sale process, right?

3  A      He did not.

4  Q      Okay.  Now, you recall, of course, that you submitted a

5  declaration, I referenced it before, in support of the

6  Freedom lender group's objection to the debtors' bid

7  procedures, right?

8  A      That's correct.

9  Q      And you're aware and Mr. Grubb testified that he

10  submitted a declaration a few days after your declaration was

11  filed; are you aware of that declaration?

12  A      That's correct --

13  Q      And have you --

14  A      -- I'm aware of that.

15  Q      I'm sorry.  Have you reviewed that declaration?

16  A      I have.

17  Q      And you heard Mr. Grubb testify that that declaration

18  was meant to announce certain changes to the sale process

19  that were supposed to address the concerns you had identified

20  in your declaration, right?

21  A      I heard Mr. Grubb say that both at his deposition and

22  then today when he testified.

23  Q      Okay.  So, given that the advisors are speaking, did

24  Mr. Grubb reach out to you before he filed his declaration

25  addressing your concerns to tell you that he was going to

1  file a declaration?

2  A    He did not.

3  Q    And he didn't at any point reach out to discuss with

4  you the ways in which he was hoping to address your concerns

5  to see if they would adequately resolve what you were worried

6  about, right?

7  A    That's correct, I did not hear from him.

8  Q    Okay, let me broaden the scope.  Has anyone, to your

9  knowledge, at the debtors reached out to anyone at your team

10  to discuss your concerns with the sale process and how they

11  might best be addressed?

12  A    Not to my knowledge.

13  Q    Okay.  So the first time you were aware that the

14  debtors were making changes to the sale process to address

15  your concerns was when you saw Mr. Grubb's declaration hit

16  the docket, right?

17  A    I think Mr. Grubb testified it was both the concerns of

18  the committee, as well as the concerns that were raised by

19  Freedom Group, including from my declaration that I filed.

20  Q    Okay.  Well, let's talk about those concerns and how

21  they're being addressed.

22       So Mr. Grubb testified, as you heard, that the debtors

23  had made certain changes to the timeline to address the

24  concerns you had with the timeline, specifically they moved

25  the nonbinding bid deadline back seven days and they moved

1  the final bid deadline back 11 days; is that your

2  understanding?

3  A    That's my understanding, that's correct.

4  Q    Well, does that change resolve your concerns regarding

5  the debtors' timeline?

6  A    No, I think it's still insufficient and not an

7  appropriate process in which to maximize value given the

8  facts and circumstances of this case.

9  Q    Okay.  And what is the basis for your view?

10 A    Well, I think a couple of things.  I heard, you know,

11 Mr. Grubb testify that a number of parties signed NDAs around

12 Thanksgiving.  I also heard Mr. Grubb testify in his

13 deposition and today on the stand that there's still parties

14 that are signing NDAs or negotiating NDAs to be signed.  I'm

15 not sure that the market has been completely canvassed,

16 whether or not there's other bidders out there that might

17 have an interest in pursuing the opportunity.  Based on my

18 review, the SIMMs that are being used and the data room

19 that's available is insufficient for bidders to make

20 determinations if the debtors want to maximize value.  I

21 think there's shortcomings in very critical components of

22 information that doesn't exist.

23        The Vitamin Shoppe, for instance, that SIM does not

24 have a turnaround plan.  The Vitamin Shoppe was a business

25 that was doing 134 million of EBITDA in 2023, you know, was

1  estimated to do approximately 62 million of EBITDA in 2024.
2  There is no vision encapsulated in that SIM to sell to the
3  market to maximize value.

4       There's shortcomings in terms of the identification of
5  company-owned stores that are four wall cash flow negative
6  that if shopped could enhance EBITDA and, thus, enhance
7  value.

8       There was no work done by a real estate consultant that
9  we're aware of that assessed the company-owned portfolio of
10  leases and identified which of those could be renegotiated,
11  could be threatened to be rejected and renegotiated.  That --
12  almost all retailers that I've been involved in have
13  conducted that work with a real estate consultant.  That
14  would enhance cash flow that would maximize, that would help
15  maximize value.

16      There was no contract review that we're aware of, in
17  terms of either renegotiating or terminating certain
18  contracts to enhance cash flow and, thus, help maximize
19  value.  There was no balance sheet data that was provided in
20  any of the SIMMs whatsoever.  There's no CapEx data in the
21  PSP SIMM that's available.

22      I would say the information that exists today for the
23  market, in my opinion, having done this for over 35 years, is
24  not going to lead to a value-maximizing outcome on the basis
25  of a timeline when you overlay the information that doesn't

1  exist.

2  Q    So I want to come back to the timeline, but since you

3  mentioned the marketing materials, let me just ask you, you

4  heard Mr. Grubb testify on direct examination that the

5  debtors are going to supplement the information available to

6  the market as they go, right?

7  A    Correct.

8  Q    Does that not resolve your concern?

9  A    No, it doesn't, because when you're running a sales

10 process, you're interacting with bidders.  Bidders are

11 requesting information and you're providing information to

12 those bidders.  Along the way, you try to maintain a level

13 playing field to make sure all bidders have all information.

14     But from a foundational perspective, when you're

15 actually running a process, the baseline information is what

16 is critical to get out there on the front end of the process,

17 so make sure when you call for non-binding indications of

18 interest, you ultimately get bidders to put their best foot

19 forward so that you can prioritize, as the debtors' advisor,

20 how to allocate resources and time of the management team and

21 the advisors and how are you going to prioritize data flow to

22 bidders?

23     And my view is supplementing is one thing, over time,

24 but having inadequate information at the starting point is

25 going to result, based on that timeline, in subpar outcome.

1    Q      Okay.  Let's go back to the timeline.

2          Why don't you -- I'll just let you explain to the

3    Court, what are your concerns about, not the marketing

4    materials, but the timeline the debtors currently have in

5    place?

6    A      Yeah, my biggest concern is the timing.  If you have

7    the lack of information that I've identified and a bid

8    process that has a non-binding bid deadline now of

9    December 23rd and then binding bids that are due on February

10   the 3rd, you're giving bidders insufficient access and

11   insufficient time to actually conduct the diligence they need

12   to conduct to make a determination of whether or not they're

13   going to move forward.

14         On top of that, as they're doing diligence, their

15   financing parties need to conduct due diligence.

16         And if I look at how the process is set up, as I

17   reviewed the information that's been provided to me, as I

18   heard Mr. Orlofsky testify, this is not a situation that

19   needs to be on a rocket ship from a timeline perspective in

20   running a 363.  This is a process where you have more than

21   sufficient liquidity to operate and value-maximize the

22   various segments of the business with the appropriate time.

23         And here, in my opinion, after having done this for

24   over than 35 years, insufficient information on a quick

25   timeline, we haven't even started talking about the minimum

1  prices, I think, is going to result in less parties being at

2  the auction, less parties submitting qualified bids, and less

3  competitive attention overall.

4  Q    And I'm going to get to the minimum bids in a minute,

5  but before I do, you mentioned liquidity.

6       Are you familiar with Mr. Grubb's statement in his

7  declaration that the debtors need to be on this timeline

8  because of the limited liquidity to which they have access

9  under their post-petition financing?

10  A    I am aware of that; I did read that.

11  Q    And did that statement, in any way, or that testimony,

12  in any way, change your view of the appropriateness of the

13  timeline here?

14  A    No, I mean, he's under that timeline on the basis of

15  the RSA milestones that exist.  They signed up for it.

16       As I said, when you're representing a debtor and you're

17  conducting a 363, you're trying to balance time for value

18  maximization.  When we market businesses that aren't

19  liquidity-constrained, there's a particular process that

20  investment bankers undertake to maximize value.  There's

21  attention between secured lenders and debtors in terms of how

22  long that timeline is and, typically that timeline is

23  dictated by the amount of liquidity that your DIP lenders are

24  willing to provide.  The less liquidity, by definition, the

25  less amount of time that you're going to have to run a case.

1      Here, there's significant liquidity to run a case that,

2 in my opinion, is highly correlated to a case that you would

3 run if you weren't liquidity-constrained in order to maximize

4 value.

5 Q    Okay.  Let's move on to the minimum bids, and before I

6 get there, I want to talk about the concern you had that the

7 minimum bid was supposed to address.

8      You had suggested in your declaration that the debtors

9 implement reserve prices, with regard to credit bids; is that

10 right?

11 A    Yeah, I said reserve or release prices in my

12 declaration.

13 Q    Okay.  And why did you make that recommendation?

14 A    I think the biggest uncertainty that most bidders have

15 in cases with a significant amount of secured debt is

16 actionability, right.  Can I actually consummate a

17 transaction?

18      Most buyers have limited time, limited resources, and

19 want to make sure that they allocate the expenses that

20 they're going to incur from a diligence process to a higher

21 probability of that.  So, if you're allocating time,

22 resources, and money to a process with a low probability,

23 that's a pretty bad decision, with respect to a buyer.

24      And my view at the end of the day is answering the

25 question that most bidders will have around actionability is

1  around at what level with the credit parties, the secured

2  lenders make a determination not to bid and let the

3  competitive tension of a process with third parties play out?

4        To me, that's information that all bidders want to

5  have.

6  Q    Okay.  Well, thank you for explaining that concern.

7        So, you heard Mr. Grubb testify that the debtors did

8  not implement reserve prices and, instead, did something

9  different, which is they implemented minimum-bid

10 requirements.

11       And let me start here, have you ever seen an auction,

12 in all of your years doing this work that involved minimum-

13 bid requirements?

14 A    No, not outside of a stalking horse bid that could

15 exist as part of the bid procedures or during a process, and,

16 by definition, that becomes the floor bid.

17       But outside of that, I've never seen anything like that

18 and it's actually concerning to me.

19 Q    Okay.  Well, let me -- why don't you explain why it's

20 concerning to you.

21 A    Well, a couple of things, and I think it really depends

22 upon the operating segment that you're talking about.

23       But let's take PSP, for instance.  A price, a minimum

24 price of $900 million, if there's five bidders that would pay

25 $850 million for that business, they might make the decision

1   not to actually submit a binding bid that would be qualified

2   that would get five parties in the room in an auction.  And,

3   to me, the success of an auction is a function of the

4   competitive tension that you can create during that auction

5   to drive the price higher.

6        If you create a framework that reduces the number of

7   parties, because they don't think at this point in time,

8   they're going to get there, they don't show up, you have a

9   lower number of qualified bids, you have a lower number of

10  parties that are actually in the auction and, therefore, you

11  have less competitive tension and the likely end result is

12  that you're not maximizing value.  So, that's for PSP.

13       With Vitamin Shoppe, it's -- I don't even understand

14  why that number was put there, $200 million.  I think it puts

15  an aura of a fire sale on that business.  That business

16  currently is generating $62 million of EBITDA; that

17  effectively implies a three-and-change multiple.  This

18  business did $134 million of EBITDA in 2023, right; that's,

19  effectively, a one-and-a-half multiple.

20       I think that that setting of that price, I think there

21  is a negative connotation with respect to the types of bids

22  that will ultimately be received with respect to Vitamin

23  Shoppe.

24  Q    Okay.

25            MR. HERSHEY:  I'm going to pass the witness.

1          Thank you very much, Mr. Augustine.

2          THE COURT:  Thank you.

3          Cross?

4          MR. SULLIVAN:  Good afternoon, Your Honor.

5          For the record, Brady Sullivan, Willkie Farr &

6    Gallagher, for the debtors.

7                         CROSS-EXAMINATION

8    BY MR. SULLIVAN:

9    Q    Mr. Augustine, you should have behind you a binder that

10   says, "Augustine witness binder" that we also passed out to

11   the various parties.

12         Do you have that, sir?

13   A    I do.

14   Q    Mr. Augustine, if you could please turn to Tab 19 in

15   your binder, which, for the record, is Freedom Lenders

16   Exhibit 42; this is your declaration.

17   A    Yeah, that's correct.

18   Q    And I'd like to look at the timeline at the bottom.

19         You're suggesting 108 days between bid procedures

20   motion, today --

21   A    Sorry, you're on Exhibit C?

22   Q    Yes, I am.

23         Are you there, sir?

24   A    Now I am.

25   Q    Okay.  You're suggesting 108 days between bid

1  procedures motion, today, and the binding bid deadline on

2  March 28th; is that correct?

3  A     I'm suggesting 90 days after bidders receive the

4  information they need to submit bids in a process to --

5  Q     That wasn't my question.

6  A     -- maximize value; that's what I'm proposing.

7  Q     That wasn't my question.

8           THE COURT:  Wait until he finishes his answer and

9  then go ahead.

10 BY MR. HERSHEY:

11 Q     Mr. Augustine, my question was, you're proposing a

12 timeline that contemplates 108 days between the bid

13 procedures hearing and the binding bid deadline.

14      It literally says that in your declaration, right?

15 A     That's just math.

16 Q     That is what you're proposing, right?

17 A     I'm proposing bidders having 90 days with all the

18 information I believe they need in order to submit a

19 qualified bid to maximize value.  That so happens to be 108

20 days from the hearing.

21 Q     And you cannot identify an example of a Court-approved

22 bidding procedures timeline that contemplated 108 days

23 between the bid procedures hearing and the bid deadline,

24 right?

25 A     You did ask me this.  I went back and looked at NPC --

1  I didn't want to speculate at the time -- and the NPC process

2  from the commencement of the sale process to the final bid

3  deadline was approximately 120 days.

4  Q    And when you went back after our deposition and looked

5  at NPC, did you also consult the database that Greenhill

6  maintained for 363s?

7  A    I did not.

8  Q    Okay.  You just looked at that one case?

9  A    I looked at NPC, and -- sorry -- I looked at Global

10 Eagle, as well, because you brought that up, so I wanted to

11 refresh my memory on that.

12 Q    And your timeline here, set forth on Exhibit C, you're

13 suggesting 145 days between the petition date and the binding

14 bid deadline; is that right?

15 A    Actually, I haven't done the math.

16      And I think as I testified to in my deposition, I think

17 measuring that against the petition date is irrelevant; what

18 matters is when bidders are under NDA to have access to

19 sufficient information to make a bid.

20 Q    The question wasn't whether you thought it was

21 relevant.

22      My question was whether that is, in fact, what you are

23 putting forth to the Court in your declaration:  145 days

24 between the petition date and the binding bid deadline,

25 right?

1  A      I didn't calculate the math because I don't think about

2  it that way.

3  Q      Do you think I added it up incorrectly; does that sound

4  wrong to you?

5  A      I didn't do the math.

6  Q      Okay.  You made a reference to the Global Eagle case.

7         You represented the debtor in that case, right?

8  A      I did.

9  Q      Okay.  And you testified in support of the debtors'

10 bidding procedures in Global Eagle, right?

11 A      I did.

12 Q      And that was before this Court, in fact, right?

13 A      Yes, it was in front of Your Honor over Zoom during

14 COVID.

15 Q      And in that case, you testified in support of a

16 timeline that had 75 days between the petition date and the

17 bid deadline, right?

18 A      I testified to that timeline.  While we're in, we had

19 actually launched that process much earlier than when bid

20 procedures were filed.

21        That company was a public company.  There were 10-Ks

22 and 10-Qs.  In addition, unlike any other case I've worked

23 on, the SIMM in that case was publicly filed, pursuant to

24 an 8-K before bidders were under an NDA.

25 Q      Okay.

1  A     So that timeline that you're referencing does not take

2  into account, as I testified to yesterday in my deposition,

3  the process that was run before the filing and the process

4  that was run before the bid procedures were filed.

5  Q     Well, didn't you testify to this Court that based on a

6  comparables analysis you performed in the Global Eagle case,

7  75 days from the petition date to the bid deadline was on the

8  outside end of the range of what you would typically see in

9  363?

10 A     I don't recall -- I recall testifying to a concept and

11 I also recall taking into account the pre-marketing that had

12 been done on a prepetition basis.

13 Q     Let's look at your transcript from that case.  This

14 should be designated "Global Eagle transcript."  It doesn't

15 have a tab number, but that should be available in your

16 binder.

17 A     Sorry, it's in a tab somewhere in what's in front of

18 me?

19 Q     Correct.  It should say, "Global Eagle transcript" or

20 something similar to that.

21        If you don't have it, I can give you mine.

22 A     No, I'll find it.

23              THE COURT:  It's an exhibit?

24              MR. SULLIVAN:  No, Your Honor, we're not offering

25 this document into evidence; I'm using it for impeachment

1  purposes.

2        THE COURT:  I need to see it, though.

3        MR. SULLIVAN:  Okay.  May I approach, Your Honor?

4        THE COURT:  Yes.

5     (Pause)

6        THE COURT:  Binder -- you had to give me a binder.

7     (Laughter)

8  BY MR. SULLIVAN:

9  Q    Okay.  Are you there, sir?

10 A    I see it.

11      Sorry, the declaration?

12 Q    No, the transcript --

13 A    Oh, the transcript.  My bad.

14 Q    -- the transcript from the Global Eagle case.

15 A    Okay.  I got it.

16 Q    And I'd direct your attention to page 118.

17      Let me know when you're there.

18 A    I see it.

19 Q    Okay.

20      "Question:  And last question for you, Mr.

21 Augustine, Mr. Genereux also says that the milestones in the

22 debtors' sales process are inconsistent with comparable sales

23 processes.

24      Do you recall reading that in his declaration?

25      "Answer:  I do.

1           "And what is your response to that?

2           "With all due respect to Mr. Genereux, I think

3    he's wrong there, too.  It's pretty clear that the

4    comparables that we evaluated and the comparables that he and

5    his team evaluated prove that 75 days from the petition is on

6    the outside end of the range of what you would typically see

7    in 363s."

8           Was that your testimony, sir?

9    A    Yes, but I'm referring to a comparable set that

10   Mr. Genereux developed.  That's correct.

11   Q    Well, you're also referring to your comparables, right?

12   A    Correct.

13          I'm also taking into account the marketing that we did

14   on a prepetition basis for a number of months before the

15   company actually filed for Chapter 11.

16   Q    And you also told this Court in the Global Eagle case

17   that the general rule of thumb is approximately 75 days to go

18   from initial outreach to binding bid, right?

19   A    I think I testified to bidders having access to

20   information under NDAs having 75 days -- having a period of

21   four weeks from the date they have the information to a

22   nonbinding bid deadline.  And then approximately six weeks

23   from there to get to a binding bid.

24   Q    Well, did you say that 75 days was a general rule of

25   thumb or did you not say that?

1  A      Can you point me to where I said, "general rule of

2  thumb" --

3  Q      Sure.  Page 97.

4  A      -- and I'll react.

5  Q      Page 97.

6  A      97?

7  Q      Actually, let's start on page 96:

8             "Question:  And, ultimately, do you believe that

9  the timeline that's been proposed and the various milestones

10 that are set forth in the bid procedures afford the debtors

11 sufficient time to run a fair and reasonable sales process?

12            "I do.  I'm confident of that.

13            "Why is that?

14            "I've been involved in a number of processes,

15 selling companies or divisions of companies both, outside of

16 Chapter 11 and in Chapter 11.  Typically, what we want to do

17 is give bidders sufficient information to evaluate the

18 opportunity to submit non-binding indications of interest.

19 That window of time, in my opinion, that's reasonable; it's

20 approximately 30 days.

21            We then believe after submission of nonbinding

22 indications of interest, one would need approximately six

23 weeks to finalize their due diligence, to arrange financing,

24 and to markup an asset purchase agreement."

25            And then you said:

1          "So, the general rule of thumb is approximately 75

2    days to go from initial outreach to a binding bid."

3          Was that your testimony?

4    A    My -- my -- that's what I said here.

5          I think what's important to note is what I said in

6    Lines 3 through 12 on page 97, and that is:

7          "What we want to do is give bidders sufficient

8    information to evaluate the opportunity to submit a

9    nonbinding indication of interest.  That window of time, in

10   my opinion; that's reasonable.  It's approximately 30 days.

11   That's exactly what I have here.

12         We then believe after a submission of nonbinding

13   indications of interest, one would need approximately six

14   weeks to finalize their due diligence, to arrange financing,

15   and to markup an asset purchase agreement, and in this case,

16   I'm saying that's eight weeks because of the complexity."

17         So what I said here is very inconsistent with what I

18   said in my declaration.

19   Q    And focusing still on this Global Eagle case --

20   withdrawn.  Let me take a step back.

21         In your declaration in this case, Franchise Group,

22   you've taken the position that the debtors have substantial

23   liquidity to undertake a robust sale process to maximize

24   value, right?

25   A    I testified that the company, the debtor has more than

1  adequate information -- adequate liquidity to run a longer

2  sale process than what is currently being run and I believe

3  that longer sale process would maximize value; that's my

4  testimony.

5  Q    Okay.  And turning back to the Global Eagle case, the

6  Committee in that case raised the same objection, with

7  respect to having substantial liquidity, to the 75-day

8  timeline that you were advocating for in that case, right?

9  A    Can you point me to it?  That was over four years ago.

10 Q    Page 116.

11       By the way, you said you reviewed the Global Eagle case

12 after your deposition, right?

13 A    I didn't read the transcript.

14 Q    116.  It's a question:

15       "And just a few more here, if you will indulge me,

16 Mr. Augustine.  Mr. Genereux also suggests that with the use

17 of the DIP facility, the debtors have sufficient liquidity to

18 allow for a longer, more value-maximizing process.

19       In your opinion, even if there's liquidity that

20 can be accessed to support an extended process, are there

21 risks that might accompany extending the process?"

22       There's an objection.  There's some back-and-forth.

23 I'm going to skip to page 117 when the question is asked

24 again:

25       "Mr. Augustine, in your opinion, even if there's

1  liquidity that might be accessed to support an extended

2  process, are there risks that might accompany extending such

3  a sales process?"

4        There's an objection, and then your answer is:

5             "More is not always better."

6        Do you see that, sir?

7  A    I do see that.

8        But I think it's important to note in this case, that

9  was in a situation where I add marketed the business for two

10 months prior to the filing.  So I already had bid and market.

11       We also filed, publicly, under an 8-K, the SIMM.  We

12 also notified bidders under public filings that the company

13 was reviewing strategic alternatives.

14       So that process had been going on much longer, and in

15 my opinion, in my judgment, we did not need the extra time.

16 And I also thought the liquidity was tight there, based on my

17 memory.

18 Q    Okay.  Now, Mr. Augustine, another one of your

19 criticisms of the debtors' proposed bidding procedures here

20 is that much of the period falls over the Christmas and New

21 Year's holiday, right?

22 A    Yes, if you're unconstrained and you're the seller of

23 an asset, the last thing you're going to do is commence a

24 sale process in the midst of Thanksgiving, Christmas, and New

25 Year's.

1        We're working on a number of sale assignments right now

2   where we're not unconstrained by liquidity and we have

3   made -- we gave the advice to the Board and the Board agreed

4   with that advice, to prepare and get NDAs signed and launch

5   on January 6th, because it's inefficient to run a process if

6   you're unconstrained during the holiday period.

7   Q    And you believe that over the Christmas and New Year's

8   holiday season, the financing markets go on hiatus, right.

9        Those are the exact words you used in your declaration?

10  A    Yeah, and I think we talked about that in my

11  deposition.

12  Q    Okay.  And we also talked about in your deposition how

13  you believe that the same concerns about markets going on

14  hiatus, folks going on vacation, but those are concerns for

15  the month of August, as well, in your view, right?

16  A    I said in the back half of August, but I also think

17  it's different.

18  Q    Well, let's go to your deposition transcript, then.

19  This should be in the spiral-bound, in the back cover of the

20  binder.

21           THE COURT:  Do I have one in my exhibits?

22       (No verbal response)

23           THE COURT:  Do I have his deposition in my

24  exhibits?

25           MR. SULLIVAN:  I don't believe so, Your Honor.

1   We're not offering it into evidence.

2          THE COURT:  Okay.  If you impeach him, I might

3   need to see it, though.

4          MR. SULLIVAN:  Your Honor, it should be in the

5   back of the binder I handed to you.

6          THE COURT:  Oh, in the one you already gave me?

7          Okay.  I got it.

8          MR. SULLIVAN:  Okay.

9   BY MR. SULLIVAN:

10  Q    Okay.  Page 76 -- actually, let's start on page 75,

11  line 11:

12          "So, when you say financing markets go on hiatus

13  during the holidays, I think you testified about a particular

14  type of financing market.  You mentioned leverage finance.

15          And my question is, are there other types of

16  financing markets that you believe go on hiatus around this

17  time of year?

18          "I think the equity capital markets are clearly

19  shut during that time period.  I think the broadly syndicated

20  loan market is effectively shut during that time period.

21          Based on my experience, the private credit markets

22  slow down pretty materially over the holidays.

23          "Question:  And this -- I know you have to get

24  (indiscernible) this will be my last question and we can take

25  a break.

1          Do the same considerations, markets going on

2   hiatus, folks going on vacation, is that a concern for the

3   month of August, as well?

4          "Answer:  I think in August there is clearly a

5   slowdown.  I would sigh the broadly syndicated loan market

6   sort of creeps to a halt in the back half of August.  People

7   try not -- people try not to bring paper.  I think the equity

8   market is the same thing.  I think the private credit markets

9   also slow down."

10        That was your testimony, right?

11  A    Yeah, that's exactly what I just said.

12  Q    And, again, Mr. Augustine, that's not really consistent

13  with what you told this Court previously when you testified

14  for the Global Eagle debtor, right?

15  A    I don't know.

16        Do you want to point me to what you're referring to?

17  Q    Let's go back to the Global Eagle transcript, page 109,

18  and, again, we have another criticism here from the

19  Committee.  You were asked on your direct examination:

20        "Mr. Genereux also claims that it is problematic

21  to have a milestone of this nature that falls shortly after

22  the month of August.  And he said potential financers and

23  buyers are unavailable or difficult to reach in August.

24        Do you recall reading that?"

25        You said, "I do."

1          "Question:  And Mr. Augustine, we're now at

2   August 17th, just over halfway through the month.

3          Have the debtors continued their marketing effort

4   through the first half of August?

5          "We have.

6          "Has there been any problem with those marketing

7   efforts from your perspective?

8          "There have not been.  We've been able to reach

9   out to a number of bidders.  We have been able to get a

10  number of bidders under NDA.

11         I heard Mr. Genereux's deposition where he

12  indicated that markets shut down in August.  I'm in the

13  middle of 363s right now, not including Global Eagle.  Two of

14  them have a binding bid deadline in the month of August and

15  two of them have non-binding indications of interest

16  deadlines in the month of August.  This has not been

17  problematic with any of those.

18         On the two of them that have the binding bid

19  deadline, the financing markets are open.  The financing

20  markets are wide open.  One is a billion-dollar transaction,

21  a little bit more than a billion; the other is a billion-two.

22         And, you know, institutions that provide financing

23  are clearly active in the month of August."

24      Was that your testimony?

25  A    Yeah, because in that situation, we had started

1  marketing the business in June, so financing parties had

2  actually conducted diligence and were very far along in

3  providing committed financing.  So there's no impact on

4  raising financing in August, because it was at the back end.

5       Here, you're effectively talking about the front end of

6  the process through Thanksgiving, Christmas, and New Year's.

7  I see them as two completely different situations.

8  Q    You didn't include that additional information in your

9  response, here, to Mr. Genereux's criticism, did you?

10 A    I wasn't asked.

11 Q    Let's talk briefly about the SIMMs.

12      Paragraph 12 of your declaration, you say the SIMMs do

13 not provide --

14 A    Can I get -- sorry -- apologies -- can I get to it.

15 Q    Of course, and I apologize.

16      If you could go to your declaration, which is, I

17 believe, Tab 19 of the binder, Freedom Lender Exhibit 42.

18      And let me know when you're at paragraph 12.

19 A    Paragraph 12?

20 Q    Yes.

21 A    I'm there.

22 Q    Okay.  And I'm about halfway through where you write:

23      "The SIMMs do not provide information on which

24 stores, under which banners are cash flow negative or could

25 become so in the near term, which can be addressed by

1  terminating leases for those stores or not assuming them,

2  pursuant to a binding bid in bankruptcy."

3        And my question, very simple, Mr. Augustine, that's

4  your testimony in your declaration, right?

5  A     That's part of my testimony in my declaration.

6  Q     Part of your testimony.

7  A     That's part of it, correct.

8  Q     Okay.  And in your experience, though, this type of

9  store-by-store information would probably be in the data

10 room, not necessarily the SIMM, right?

11 A     The -- as we talked about yesterday, at length, in my

12 opinion, having done this for 35 years and run numerous sale

13 processes, you would have in the SIMM, operating initiatives

14 that would enhance and increase cash flow identified in the

15 SIMM.  You would then provide that information, that detailed

16 information that supports those statements, either in a

17 supplemental SIMM or in the data room.

18        That's my testimony.

19 Q     So my question was specifically about what you wrote in

20 your declaration:

21            "Information on which stores, under which banners

22 are cash flow negative or could become so in the near term."

23        And that information, sir, that's information that

24 would probably be in the data room, not the SIMM, right?

25 A     No.

1  Q      Okay.  Let's go --

2  A      As I testified to, what a SIMM should say is that for

3  Vitamin Shoppe:  Identified opportunity.  There's X number of

4  stores that are for well cash flow negative, that, to the

5  extent that they were rejected, would result in line-million

6  of savings.

7       The Vitamin Shoppe lease portfolio has an aggregate

8  rent roll of Y.  We believe renegotiating those, based on a

9  study done by X, Y, Z real estate consultant, could result in

10 Y-million dollars of savings and an increase in EBITDA.

11      That's what a SIMM should state.

12      The backup should either go in a supplemental deck or

13 it should go in the data room.

14 Q      Okay.  Now, Mr. Augustine, if a bidder wanted

15 information on which stores, under which banners are cash

16 flow negative or could become so in the near term, couldn't

17 they just ask for it?

18 A      But as a seller of an asset, why wouldn't you want to

19 identify that to a bidder or a group of bidders if you want

20 to maximize value?

21      You should identify all the opportunities that are

22 credible, that exist to enhance EBITDA to maximize value.

23           MR. SULLIVAN:  Your Honor, I'm trying not to

24 repeat questions and badger the witness, but I, also, am not

25 getting answers to my questions.  So, I would respectfully

1  ask the Court to please instruct the witness to answer the

2  questions that I'm asking him.

3          I asked the question:  Would a bidder be able to

4  ask for that information?

5          I have received nothing approximating an answer to

6  it, and this has been going on.

7          THE COURT:  Well, you can explain your answer, but

8  you need to answer first.  You need to answer the question

9  first and then you can explain it if you want, but you need

10  to answer his question.

11          THE WITNESS:  I did.  I started with, "Yes," Your

12  Honor.

13          THE COURT:  Okay.  I didn't hear that.

14          THE WITNESS:  Yeah.

15  BY MR. SULLIVAN:

16  Q    Okay.  Well, let's try again.

17          Mr. Augustine, if a bidder wanted information on which

18  stores, under which banners are cash flow negative or could

19  become so in the near term, they could just ask for it,

20  right?

21  A    Yes, but as a seller of an asset, the debtor should

22  identify opportunities that exist to enhance cash flow in

23  order to maximize value, in my opinion.

24  Q    Well, would a sophisticated investor who's going to

25  bid, potentially, hundreds of millions of dollars on an asset

1  need to be told that a retail business in bankruptcy might

2  benefit from being able to terminate leases?

3  A    It doesn't need to be told, but should have a view from

4  management.  It should have a view from the debtors' real

5  estate consultant, with respect to leases, in terms of what

6  they believe the opportunity, due diligence that, and then

7  make a decision if they want to do the same thing or if they

8  want to do something else.

9  Q    Okay.  Let's talk just briefly about reserve prices.

10        Just to be clear -- and I think I heard this on your

11  direct --  but you're suggesting that the bidding procedures

12  should have reserve prices for each of the three businesses

13  being sold here; is that right?

14 A    Reserve or release prices, yes.

15 Q    Fair enough.

16        And when you say, "reserve or release prices," you mean

17  a value above which the secured lenders will no longer credit

18  bid, right?

19 A    Correct.

20 Q    And in your 35-plus years of restructuring experience,

21  you're only able to point to one example where a secured

22  lender actually agreed to this construct, right?

23 A    Effective -- I think I said, "effectively agreed to

24  that construct in NPC."

25 Q    Okay.  So you can't even testify to one who, in fact,

1  did agree to this construct, right?

2  A     A very similar construct.

3           MR. SULLIVAN:  Nothing further at this time, Your

4  Honor.  Thank you.

5           THE COURT:  Thank you.

6                    CROSS-EXAMINATION

7  BY MR. FLIMAN:

8  Q     Good afternoon, Mr. Augustine.

9        Let's pick up where Counsel left off, on release prices

10 and minimum bids.  So the difference between release prices

11 and minimum bids is that with the release price, as we just

12 heard, the secured lender pre-agrees that they're not going

13 to bid above a certain amount, right?

14 A     Or makes a statement on the record like they did at

15 NPC, indicating that they would not bid above that level.

16 Q     Okay.  And with a minimum bid, right, which is what we

17 have here, a company goes out and says that a bid would only

18 be a qualified bid, meaning that the process would only

19 advance, there would only be an auction if the bid was above

20 a certain number, right?

21 A     I think that's what the debtor has framed.

22 Q     Is that what you understand "minimum bid" to be?

23 A     That's my understanding of what it means in the context

24 of what Mr. Grubb testified to --

25 Q     Okay.

1  A      -- and based on the revised bid procedures that I

2  reviewed; that's my understanding.

3  Q      Okay.  So Mr. Hershey asked you if you had ever seen a

4  case, ever before with minimum bids.

5         Do you remember that?

6  A      I did.

7  Q      And you said, no, that there's not a single case that

8  you can think of in your -- what was it? -- 35 years of doing

9  this, that has a minimum bid concept; is that right?

10 A      Outside of the stalking horse bid, I think, is what I

11 testified to.

12 Q      Outside of the stalking horse bid.

13 A      Correct.

14 Q      Outside of the stalking horse bid, you don't know of a

15 single case where there's been a bid threshold for what a

16 bid -- whether a bid is qualified or not qualified?

17 A      Sitting here today and sitting at my deposition, I do

18 not recall.

19 Q      Okay.  Now, you occasionally represent secured lenders,

20 right?

21 A      I do.  As I testified to --

22 Q      So, yes?

23 A      -- I do a mixture of company and creditor --

24 Q      So, yes?  Yes you do?

25        Just answer my question.

1   A     Excuse me?

2   Q     Do you occasionally represent secured lenders?

3   A     Yeah, as I testified to, yes.

4   Q     Okay.  And of all the representations that you have of

5   representing secured lenders, you can only -- you remember

6   only one instance, ever, where you recommended that your

7   clients agree to a release bid concept, right, a release

8   price concept?

9   A     I also recalled another one after my testimony, so I

10  know two.

11  Q     So, yesterday in your deposition, you recalled one --

12  A     I recalled one.

13  Q     -- where your clients rejected that proposal and did

14  not agree to a release price, right?

15  A     Correct.

16  Q     And now, you thought of another one?

17  A     I thought of one more.

18  Q     Okay.  I got it.

19        Now, Mr. Hershey asked you whether the 1L professionals

20  had reached out to you to discuss maximizing value in this

21  case.

22        Do you remember that?

23  A     I do remember that question.

24  Q     And you said, No, that that never happened?

25  A     You said, with respect to the timeline and maximizing

1  value was his question.

2  Q    Okay.  And now, it is a fact that just shortly after

3  you got retained in this case, Mr. Khemlani from Lazard

4  reached out to you, right?

5  A    Sanjeev did, but not with respect to the timeline,

6  which was Mr. Hershey's question.

7  Q    Okay.  But he reached out to you, right?

8  A    Yeah, we spoke.

9  Q    And Lazard is the financial advisor for my clients, the

10 First Lien Group?

11 A    Yes.

12 Q    And in the course of that conversation, you discussed

13 the DIP proposal that the Freedom Lenders would be putting

14 forth, right?

15 A    I don't recall.  It was a relatively quick

16 conversation, to be honest.  I don't recall all the topics.

17 I don't know if we discussed the HoldCo DIP or not.  I wasn't

18 intimately involved in the HoldCo DIP.

19 Q    So, how long ago was this conversation, like months

20 ago?

21 A    No, this conversation occurred after Thanksgiving, but

22 it was relatively brief and Sanjeev and I both know one

23 another and respect one another and said, Sure, we're going

24 to have many more conversations.

25 Q    So, it was a recent conversation, but you don't

1  remember it, right?

2  A    I don't remember exactly what we talked about, because

3  it was relatively short.

4  Q    You talked about Franchise Group, about this case?

5  A    Yes.

6  Q    Got it.

7       And you agreed to have further conversations?

8  A    We agreed -- yeah, we agreed to talk more.  I think

9  what we said is, After this hearing, let's talk.

10 Q    Okay.  Now, you're aware that the Freedom Lenders Group

11 in this case has asked the Court permission to foreclose on

12 the pledge of equity they hold in Franchise Group, Inc.,

13 right?

14          MR. SULLIVAN:  Your Honor, I have to object.  This

15 has nothing to do with Mr. Augustine's declaration or my

16 direct examination.

17          MR. FLIMAN:  Your Honor, our exhibit list, as

18 others in this case, have listed -- have called for Mr.

19 Augustine to testify on all issues that are before the Court

20 today, which includes the exclusivity motion.

21          THE COURT:  I'll allow it.

22 BY MR. FLIMAN:

23 Q    Do you want me to repeat the question?

24 A    Yes, please.  Thank you.

25 Q    Yeah, the Freedom Lender Group has asked the Court for

1  permission to foreclose on the equity pledge that they hold

2  in Franchise Group, Inc., right?

3  A    I think -- and I'm not a lawyer -- I think that motion

4  was filed to terminate exclusivity, lift the stay to be able

5  to file a plan, and absent that, to appoint --

6              AUTOMATED VOICE:  Recording in progress.

7              THE WITNESS:  -- an examiner.

8  BY MR. FLIMAN:

9  Q    So, the motion to terminate the stay asks for

10  permission to foreclose on the equity pledge, right?

11  A    I think it's to file a plan.  I don't know, exactly,

12  the details of what was in the motion, but I reviewed it.  I

13  didn't write it and I didn't study it in detail.

14  Q    You would say --

15  A    It was filed -- my apologies.

16  Q    You were listed as a 30(b)(6) witness to give a

17  deposition on the issue of the exclusivity motion, right?

18              UNIDENTIFIED SPEAKER:  Your Honor, I have to

19  object to that.  We objected to designate Mr. Augustine on

20  that topic and said we would not produce a witness.

21              THE COURT:  You're producing no witness on

22  exclusivity?

23              UNIDENTIFIED SPEAKER:  In the context of

24  a 30(b)(6) deposition, Your Honor, we objected to -- and it

25  was actually the debtors who served that notice and they

1  agreed; there was no motion to compel.  We served responsive

2  objections objecting to the topic.  They had asked about

3  exclusivity.

4         THE COURT:  But they still identified him as a

5  witness for the hearing.

6         UNIDENTIFIED SPEAKER:  Yes, Your Honor, but he

7  just asked a question about whether he was designated as

8  a 30(b)(6) witness on this topic.  And it was not a notice

9  served by his client; it was a notice served by the debtors.

10  We objected.  There was no dispute.  I just wanted to clarify

11  the record on that point.

12         THE COURT:  Okay.

13         UNIDENTIFIED SPEAKER:  So you're --

14  BY MR. FLIMAN:

15  Q    So, let's do it this way --

16         UNIDENTIFIED SPEAKER:  Your Honor, I apologize.

17  I'm receiving reports that the Court is muted and nobody can

18  hear us.

19         THE COURT:  Hold on one second.

20         UNIDENTIFIED SPEAKER:  Just when I was going to

21  (indiscernible) --

22     (Pause)

23         THE COURT:  Can you hear me now?  Can they hear

24  me?

25         Just ask if someone on the Zoom call can indicate

1  whether they can hear us.

2        Mr. Gold, you are unmuted.  Can you hear me?

3     (No verbal response)

4        THE COURT:  I'm going to call IT.

5        All right.  Let's take a 10-minute recess and see

6  if we can get this thing working again.

7        If you're on Zoom, you know, it's a live hearing,

8  so you should have been here.

9     (Recess taken at 4:34 p.m.)

10    (Proceedings resumed at 4:48 p.m.)

11       THE COURT:  Back in business.

12 BY MR. FLIMAN:

13 Q    All right.  So, Mr. Augustine, so I think the last

14 question I had asked you was whether you were aware that your

15 clients had asked the Court permission to foreclose on the

16 equity pledge that they hold in Franchise Group, Inc.

17       I think your response was that you're not aware of

18 that; is that right?

19 A    I'm just aware of what was in the motion, generally,

20 and I thought the motion was, with respect to terminating

21 exclusivity, filing a plan, in short of that, the appointment

22 of an examiner?

23 Q    Okay.  So let's just talk about what you've seen in

24 your experience, right.

25       So, based on your experience of doing this for 35

1  years, you can foresee how, in certain circumstances,

2  permitting a creditor to foreclose on its equity pledge on a

3  debtor during a bankruptcy case may impact the restructuring,

4  right?

5  A    Can you repeat the question, please?

6  Q    Given your experience, you could see how -- you could

7  foresee, rather, how in certain circumstances, permitting a

8  creditor to foreclose on its equity pledge in a debtor during

9  a bankruptcy may impact the restructuring, right?

10  A    Well, it depends on what actions they take after they

11  take that action, correct.

12  Q    And, in fact, you think that if a lender just

13  forecloses on the equity of a debtor and does nothing else,

14  that would not impact the restructuring, right?

15  A    Generally, correct.

16      If they take no action relative to what's going on

17  because they're comfortable with what's going on, yeah, it

18  shouldn't impact.

19  Q    And you agree that if a lender forecloses on equity of

20  a debtor in bankruptcy and then changes the board of that

21  debtor, that would impact the restructuring, right?

22  A    It is a hypothetical; it all depends on what actions

23  the Board, then, takes.

24      If the actions that the Board takes are consistent with

25  what the debtor is already doing, I think it's a change in

1  the Board, but it's not a change in the activity of the

2  debtor to maximize value, whatever they might be doing in

3  that hypothetical example.

4  Q    I see.

5       So if a creditor were to foreclose on the equity of the

6  debtor to change the Board and cause the new Board to do

7  something different than the other Board was doing, that

8  would impact the restructuring, right?

9  A    That could.

10      I wouldn't say it would; it could.

11 Q    And you agree that in a lender foreclosed on equity of

12 a debtor in bankruptcy and then alters an ongoing sale

13 process using the equity that it now owns, that would impact

14 the restructuring, right?

15 A    It all depends on the hypothetical.

16      I could make the argument that it would actually

17 improve it if you don't think that the existing sale process

18 will maximize value.

19 Q    I see.

20      Okay.  So your testimony would be that if a creditor

21 were to foreclose on equity and then -- during a bankruptcy

22 for the debtor -- and then use that equity in order to make a

23 sale process more beneficial to that creditor, that may

24 change -- that may impact the restructuring, rather?

25 A    No, that wasn't my testimony.

1  Q     Your testimony is that it depends on what change --

2  A     It doesn't impact that creditor.

3        My testimony is if the Board that was changed out makes

4  changes to the process that's being conducted to maximize

5  value to improve the value at the entity that they're

6  overseeing, that should impact and benefit all stakeholders

7  at that point in time.

8  Q     Okay.  And then you agree that if a lender foreclosed

9  on equity of a debtor in bankruptcy and then alters the

10 existing plan that's on file, that that would have an impact

11 on the restructuring, right?

12 A     I think it could, given the circumstances.  I think

13 that's the very general statement:  I think it could,

14 depending on the facts and circumstances of the case.

15 Q     Now, you recall that at your deposition yesterday, we

16 asked you whether it was the intention of the Freedom Lenders

17 Group to foreclose on the equity or to take control of the

18 bankruptcy case.

19       Do you remember that?

20 A     I don't, to be honest.

21       I remember we had a lot of questioning around this.  I

22 don't remember that specific question.

23 Q     Okay.  You do remember that the question, generally,

24 was asked and you were instructed not to answer it, right?

25 A     Repeat the initial question.

1  Q      Do you remember the topic came up during your

2  deposition yesterday by my partner, Mr. Bassett?

3  A      Yeah.

4  Q      And counsel instructed you not to answer the question,

5  as to the intentions of Freedom Lenders Group if it

6  foreclosed on the equity of the debtor.

7         Do you remember that?

8  A      I do remember that, yes.

9  Q      Okay.  And if you could just tell us right now, are the

10  debtors intending -- I'm sorry -- are the Freedom Lenders

11  Group professionals intending to tell Judge Dorsey today what

12  they intend to do if their clients foreclose on the equity of

13  the debtors?

14  A      I think you'll have to ask them; I'm not sure exactly

15  what they intend to do.

16  Q      Well, you're one of the advisors, right.  Do you know

17  whether they intend to tell the Court today?

18  A      You said what is White & Case going to do --

19  Q      I said, "the advisors."

20  A      -- right.  I don't know what White & Case is going to

21  do, to be honest.

22         I prepared for my testimony.  I'm not sure, broadly,

23  what they're going to say to Your Honor.

24  Q      Okay.  Let me just go back to one thing we talked about

25  before, back on the minimum bids.

1          You had testified that you're not aware of any

2   precedent for minimum bids, outside of a stalking horse sale

3   process, right?

4   A     Not that I can recall.

5   Q     Okay.  But you are aware of minimum bids being set in

6   sale processes where there are stalking horse bids, right?

7   A     By definition, that's what a stalking horse is; it sets

8   a floor price for an asset that are under the APA of that

9   stalking horse.

10  Q     And so, in your experience, when you have a stalking

11  horse, there's inherently always a minimum bid in connection

12  with that sale process, right?

13  A     There is, which is why there's a lot of discussion as

14  to what level the credit bid should be at, so it doesn't

15  chill the bid process.

16          MR. FLIMAN:  All right.  Pass the witness.

17          Thank you.

18          THE WITNESS:  Thank you.

19                    REDIRECT EXAMINATION

20  BY MR. SULLIVAN:

21  Q     Mr. Augustine, I have one or two questions for you.

22          You were just asked some questions about minimum bids,

23  as compared to stalking horse bids.

24          What is the difference between those two things in your

25  mind?

1   A     Well, I think the stalking horse bid is an actual

2   transaction that the debtor has entered into, subject to

3   Court approval, to transact, right.  So it's a live,

4   actionable transaction.

5   A     minimum bid is, effectively, just, you can't enter the

6   auction, but there's no actionable transaction that's

7   attached to it.  Those are the biggest differences that I

8   see.

9   Q     And let's just be clear, if there's an auction where

10  there's a stalking horse and nobody shows up to bid, what

11  does the stalking horse, then, have to do?

12  A     The stalking horse, effectively, closes on that

13  transaction, upon Court approval.

14  Q     And is it your understanding that the 1Ls would be

15  compelled to engage in a transaction regarding any of the

16  assets being sold if nobody shows up to bid if the debtors

17  put a minimum bid in place?

18  A     It's unclear to me, based on how the bid procedures are

19  drafted, whether or not they have to credit bid on all, or a

20  portion, of the assets or just toggle to a plan.  It's a

21  little bit of a gray area in the bid procedures that I see.

22  Q     Okay.  Thank you.

23            THE COURT:  Okay.  Thank you.

24            You may step down, sir.

25        (No verbal response)

1           THE COURT:  You can step down.

2           THE WITNESS:  Thank you, Your Honor.

3      (Witness excused)

4           THE COURT:  Do you have any evidence from the 2Ls?

5           UNIDENTIFIED SPEAKER:  No, Your Honor.

6           THE COURT:  Okay.  Next, we'll go to closings.

7           MS. SINCLAIR:  Yes, Your Honor.  I'd like to start

8  with the DIP motion, per our statement earlier, that we need

9  to have that one decided today.  So, if it's all right with

10  you, we'll start there.

11           THE COURT:  Okay.

12           MS. SINCLAIR:  Debra Sinclair, again, for the

13  record, Willkie Farr & Gallagher, for the debtors.

14           Your Honor, I'd like to start with the pieces of

15  the DIP that we are resolved on, but I'm mindful of the

16  amount you've already heard and what we have yet to get

17  through today.  So I'll assume that you would not like me to

18  walk through every resolution, but I'm happy to answer

19  questions or to do that, if you'd like.

20           THE COURT:  No, no need to do that.

21           MS. SINCLAIR:  All right.  So, suffice it to say,

22  we've resolved all of the open issues, informally, that we

23  had, with respect to certain parties:  the ABL lenders; a

24  number of landlords; the Chubb companies, who are an insurer

25  of the debtors; the Texas Taxing Authorities; and the

1   Official Committee of Unsecured Creditors.

2          When we came to the hearing today, we had two

3   unresolved objections.  One of those has since been resolved

4   and we understand it's going to be withdrawn.  That's a

5   limited objection that was filed by a group of landlords,

6   represented by Kelley Drye.  We spoke to their counsel, who's

7   here today, Mr. LeHane, and confirmed that that objection is

8   resolved.

9          So the only one that remains unresolved right now

10  is that of the Freedom Lenders.  The bulk of our response

11  arguments in response to that objection are set out in our

12  reply papers, filed at Docket 359, but I'd like to address

13  the most material points here.

14         First, Your Honor, I want to revisit the standard

15  for approval of the DIP, because it risks getting lost in the

16  length and the nature of the questioning that we heard today.

17  The DIP is governed by Sections 363 and 364 of the Bankruptcy

18  Code, and whether it should be approved under Section 363 is

19  governed by the business judgment standard.

20         As we know, courts generally do not second-guess a

21  Debtor's business judgment when the decision involves a

22  minimum level of care in making an informed decision in good

23  faith, and with the honest belief that the decision is in the

24  best interests of the debtors.  This means that the judgment

25  of a creditor group that is only acting in the interests of

1   its deeply "out of the money" position should not be given

2   any sort of weight when it comes to a court's consideration

3   of whether to approve a DIP.

4           As Mr. Grubb, Mr. Orlofsky, and Mr. Laurence's

5   testimony all supports, we have obtained what we believe to

6   be the best deal under the circumstances; one that you heard

7   Mr. Grubb testify is within market, and one that, as Your

8   Honor knows, has been further negotiated and revised since

9   the petition date.

10          In addition to the revisions that we read into the

11  record and reflected in the order at the interim hearing, the

12  DIP has since then been revised to provide further changes

13  that are beneficial to the Freedom Lenders.  The roll-up has

14  been revised, such that it only occurs on amounts drawn at

15  the time that they are drawn.  The roll-up is expressly

16  subject to the challenge period, and unless the First Lien

17  Lenders have valid, perfected, and unavoidable liens on

18  commercial tort claims as of the petition date, then they

19  will not receive the benefit of the DIP liens on avoidance

20  actions proceeds or commercial tort claims.  Adequate

21  protection payments to the ABL and the 1L are now expressly

22  subject to recharacterization if either lender is later

23  determined to be undersecured.

24          And probably most importantly, to the Freedom

25  Lenders, the two entities where their lien sits have been

1   removed from the DIP, other than with respect to amounts that

2   they actually use.  The Freedom Lenders initially objected on

3   the grounds that these two HoldCo entities should not be

4   included in the DIP, as borrowers or guarantors.  That has

5   largely become a moot point, because as Mr. Grubb testified,

6   the DIP lenders have agreed that those entities will not have

7   any obligations under the DIP, unless proceeds of the DIP are

8   transferred to those entities or used to make payments on

9   their behalf to the extent of their administrative expenses.

10          Even if the HoldCo debtors ultimately use a

11  portion of the DIP, they're not subject to any interest and

12  they're not subject to any *pro rata* portion of fees.  None of

13  the roll-up is going to sit at those two entities and none of

14  the adequate protection claims will sit there; they're solely

15  a guarantor to the extent of the principal they use.

16          So, together, these concessions should dispose of

17  the issue that the Freedom Lenders spent hours of questioning

18  and nearly half their objection on.  And they are just that,

19  Your Honor:  concessions.  Not a new loan requiring a new

20  motion.

21          I want to spend a minute here because of the level

22  of confusion that Mr. Shore manufactured around what is

23  really a simple concept.  The HoldCos are not becoming

24  borrowers.  There is no debtor-to-debtor DIP.  There is no

25  HoldCo debtor loan.  There is no forthcoming interdebtor

1  agreement.

2          We are talking about the same loan that we have

3  always been talking about.  The 1Ls are the only lenders.

4          The only new concept is if the two HoldCo debtors,

5  where the Freedom Lenders' lien sits need money to pay their

6  administrative expenses, then the DIP is there for them to

7  access as and when they need it.  It's really there to help

8  them.

9          Now, presumably, Your Honor, the actual use will

10 happen in one of two ways.  Either, the expense is self-

11 evident, like the professional fees that we need to accrue to

12 have this fight today, or the individual HoldCo Boards could

13 make a request if they determine that that entity is going to

14 have an administrative expense.

15          What does it mean to make a request?

16          This is all laid out in the credit agreement

17 that's filed on the docket and the technicalities line,

18 Section 2.03 of the DIP credit agreement.  Section 2.03

19 explains that the borrower, not the HoldCos -- "borrower"

20 being Franchise Group, Inc. -- would make a draw request to

21 the DIP agent.  That money would, then, be sent to the HoldCo

22 entity that needs it.

23          The HoldCo does not become a borrower at any point

24 in this process and, again, becomes a guarantor, solely to

25 the extent of the principal amount it receives.  That concept

1   is baked into Section 1, Subsection 1 of the DIP credit

2   agreement.  Again, it's not -- the entity does not become

3   liable for any fees or interest.  All of the other debtors do

4   become jointly and severally liable, but not these HoldCo

5   entities.

6          In the event this happens, it all is going to be

7   subject to the oversight of the DIP lenders and we have to

8   act in accordance with the DIP budget.  So there's no

9   imaginary world where the HoldCo is suddenly shoulder over

10  $200 million in debt, as suggested might be a possibility by

11  Mr. Shore.

12         The funds are solely for administrative expenses;

13  that lives in Section 2(f) of the DIP order.  It's not any

14  conceivable expense; it's administrative expenses.

15         Also in Section 2(f) of the DIP order is a

16  reservation of rights.  If the HoldCo debtors ultimately

17  believe that funds were not properly allocated to them, their

18  rights to later challenge that allocation are expressly

19  reserved.

20         And let's not forget the cash management order

21  that's been entered by this Court already, which expressly

22  provides that if one debtor funds another debtor's expenses,

23  then that debtor would have an administrative expense claim

24  against the other.

25         All of this is to say, Your Honor, this is a large

1  company with a complex cash management system -- that's all -

2  - and that's a fact that Mr. Shore is trying to use to paint

3  the debtors as somehow engaging in nefarious behavior around

4  what's really meant to be an accommodation to his clients.

5              To take a larger step back on that point, the only

6  reason this concession even appears in the DIP is because, as

7  you know, the Freedom Lenders were initially fighting about

8  these two particular entities being DIP borrowers.  So, now,

9  they aren't anymore, and the reason they have allocable

10  professional fees is because the fight their creditors have

11  created around a bunch of nonoperating entities.

12              The Freedom TopCo box that Mr. Shore was focused

13  on with Mr. Laurence does not have these same problems

14  because there's no lien there unless there's no fight there.

15              THE COURT:  Walk me through how the process -- the

16  HoldCo debtors need financing to cover administrative

17  expenses.  I assume they're going to since they now have an

18  independent director who's going to be hiring counsel and

19  who's going to be investigating claims.

20              MS. SINCLAIR:  Yes, Your Honor.

21              THE COURT:  So, how does that process work under

22  the proposed DIP?

23              MS. SINCLAIR:  So I think there's one of two ways

24  that it works, both of which would require that notice that I

25  mentioned, the borrowing notice, to actually be served upon

1   the DIP agent.  So, either an expense is accrued and

2   Franchise Group, Inc. or, you know, another operating entity

3   that has the money in its bank accounts flowing through the

4   cash management system in the ordinary course, would either

5   upstream that money to the HoldCo box or pay the expenses on

6   HoldCo box's behalf.

7          If more liquidity is actually needed to be

8   accessed from the DIP to make that payment, that's where the

9   draw request comes in, made by the borrower Franchise Group,

10  Inc., to the DIP agent, who will then review the request,

11  and, if needed, upstream, you know, additional funds to those

12  entities.

13         The allocation process, again, can be challenged

14  if there's a dispute around whether the box really needed the

15  money.  So I think that's version number one is where the box

16  actually accrued the expense and then, you know, seeks

17  payment.

18             THE COURT:  Well, is that --

19             MS. SINCLAIR:  The other is where the Board would

20  or wouldn't determine.

21             THE COURT:  If the OpCo companies are the ones

22  who's going to be transferring the funds, who are the HoldCo

23  enters -- who are the HoldCo debtors liable to?

24             MS. SINCLAIR:  The HoldCo debtors are not liable -

25  - they're liable to the DIP lenders, solely, with respect to

1  the principal that they actually use.  So, if any funds are

2  used under the DIP for these purposes, all of the other

3  debtors, other than these two HoldCo entities, are becoming

4  jointly and severally liable for the principal for the

5  interest and for the fees.  But the HoldCo debtors, where the

6  Freedom Lenders' loan sits are only becoming guarantors, only

7  with respect to the principal, and only insofar as there are

8  unencumbered assets at that box to secure the loan.  But,

9  again, that claim is held by Mr. Goldstein's clients, not by

10 other OpCos.

11           Now, under the cash management order, if there was

12 an assertion at some point that one of the OpCos had funded

13 administrative expenses for a HoldCo in a way that it

14 shouldn't or vice-versa, then either of those entities would

15 have the appropriate administrative expense claim against the

16 other.

17           So, we're not trying to say that one debtor should

18 be permitted to fund another one's expenses at the expense of

19 that Debtor's creditors.

20           THE COURT:  Okay.

21           MS. SINCLAIR:  Your Honor, another one of the

22 material points the Freedom Lenders are focused on related to

23 this issue of the HoldCo obligors is the issue of events of

24 default related to the HoldCos.  Their motive here is fairly

25 transparent; of course, the HoldCo lenders are seeking to

1  exclude from the events of default, the exact type of relief

2  that they're seeking under their exclusivity-termination

3  motion.

4          There's no other DIP and they seemingly want the

5  1L to subsidize their exercise of remedies.  Now, my

6  colleague Mr. Morton, will cover that motion, either later

7  tonight or tomorrow, as Your Honor wishes, so I won't spend a

8  ton of time here.  But suffice it to say the remedies they're

9  seeking are extreme and if they exercise any of them, we are

10  potentially in a situation where they have swept the Board,

11  or, otherwise, are trying to take control of the

12  restructuring or taking control of it.

13          This is a typical event of default in DIPs for the

14  obvious reason that lenders are not amenable to lending into

15  a situation that has materially changed, unlikely to their

16  detriment.  So that objection should be overruled.

17          THE COURT:  Who's going to address the issue of

18  the releases?  Mr. Shore talked about this quite a bit, about

19  you now have an independent director who's going to be

20  investigating claims.  So if he comes up and says, Yeah, we

21  got claims and they should be pursued, how is that going to

22  affect the releases that are required under the RSA?

23          MS. SINCLAIR:  Your Honor, respectfully, I think

24  that's an issue that we can deal with at the plan stage.  And

25  if there's a question about releases, (A    ), we have

1  sufficient time to work through that before the plan goes up

2  for confirmation.  As you've probably seen, our plan was

3  filed with a number of placeholders in it.  There's still

4  some wood to chop there, even though we have general

5  alignment with our first liens on the path to exit, which I

6  think is fairly standard.

7        THE COURT:  But it's a default.

8        MS. SINCLAIR:  Yes, Your Honor.

9        THE COURT:  If the releases don't happen, under

10  the plan, it's a default.

11        MS. SINCLAIR:  Yes, but all of the documents hang

12  together in the sense that the plan, the DIP, we're

13  extensively working on those, together with the lenders, such

14  that the lenders said differently, I think a more practical

15  standpoint, we're not going to create a foot fault under a

16  DIP where we're all rowing together on the terms of a plan.

17        Now, it's going to depend, obviously, I think if

18  we're still in a litigation posture with our lender -- our

19  Freedom Lenders Group or if we're consensually working

20  towards a plan supported by everybody.  But I do think that

21  issue is premature today for that reason.  When we have time

22  to work through it, when the independent needs to do the

23  investigation, and then, presumably, the results, or at least

24  preliminary conclusions of that investigation, can inform how

25  everybody is thinking about what releases might need to be

1  granted and how, if at all, that might need to modify the

2  DIP.

3          But I don't want to speak for Mr. Goldstein.  I

4  don't think that anybody is trying to, you know, pull a

5  "gotcha" or cause some kind of foot fault to the debtors

6  because of this releases issue that Mr. Shore is focused on.

7          THE COURT:  Well, in the debtors' view, could the

8  1L lenders say, Okay, the independent director came up with

9  potential causes of action, but if you pursue those, we're

10  declaring a default.

11         MS. SINCLAIR:  I think they could, Your Honor.  I

12  also think it would be a little bit of mutually assured

13  destruction in the sense that they are financing a particular

14  path to exit here.

15         THE COURT:  Then why include it?

16         MS. SINCLAIR:  Your Honor, I think that, you know,

17  the lenders need certain protections in the first instance

18  and we, as the debtors, right, as any debtor in bankruptcy,

19  has minimum negotiating leverage around certain types of

20  events of default.  But I think those do protect the lenders

21  and give them the ability to consider those issues and

22  consider how to handle them in real time, as opposed to not

23  having the protection in the first instance.

24         THE COURT:  Okay.  Well, I'm not sure I'm

25  satisfied with that response, but I'll find out from the 1Ls

1  what they're going to do.

2          MS. SINCLAIR:  Yes, Your Honor.

3          I'd like to move on to the size, the timing, and

4  the cost of the DIP.  Much has been made today during the

5  witnesses' testimony around the sizing of the DIP, its costs,

6  and the timing of when the DIP is going to be needed.

7          The DIP's size of $250 million accounts for the

8  general uncertainty that retail businesses encounter in

9  bankruptcy and, also, for the specific needs of this company.

10  Mr. Orlofsky testified on cross that the debtors currently

11  have somewhere in the realm of a hundred and thirty to $140

12  million on hand.  He also testified that the debtors' cash

13  position is ahead of where we expected it in our forecast.

14          But he also said that neither of those things

15  changed his view from the first day hearing, that $250

16  million is the amount that is needed for this company's

17  bankruptcy.  He testified that if the DIP is not granted

18  today, the constituents who are hyperfocused on this,

19  particularly, vendors, franchisees, employees, all of those

20  people are going to receive a bad message.  They want to move

21  this process along.  They want to see a stabilized company

22  that they can continue to work with.

23          Mr. Laurence also testified through his

24  declaration that the debtors need access to the amount of

25  liquidity provided by the DIP facility to ensure themselves

1  and the market, that they will have sufficient funds to

2  successfully complete these cases.

3          Your Honor, as we discussed at length in this

4  hearing and at the first day hearing, part of the reason the

5  company needs this liquidity is to project confidence to the

6  market, that we can get through the bankruptcy without

7  running into liquidity issues.  The DIP is sized for a nine-

8  month case, which so far, has been extremely litigious and

9  mitigates in favor of the conservative manner in which we

10 sized it.

11          We've also revised the draw schedule since the

12 interim hearing to reduce the risk that we're incurring cost

13 on the liquidity that we may not need at a particular moment.

14 A    $75 million second draw reduces interest costs in the

15 near term, but it still gives us access to that whole $150

16 million, if and when we need it.

17          We're also seeking the DIP on the specific

18 schedule we are for a reason.  Mr. Orlofsky testified it's

19 important for the company to get the capital that it needs

20 today.  And even if we don't need that full draw amount

21 today, we still need the certainty that we will be able to

22 access it, if and when, we do.  And as Your Honor knows, the

23 idea of harm caused by uncertainty in this case is not

24 speculative; we've been living it since the first day

25 hearing.

1           And you heard Mr. Laurence testify in response to

2    one of Mr. Shore's more amorphous lines of questioning that

3    we can't just deal with the DIP in pieces and parts.  We

4    can't do some of it now, some of it next week, some of it a

5    month from now.  This is a package deal that's been offered

6    to us by our 1L term DIP lenders and we need that stability

7    now, and from our perspective, the Freedom Group's only

8    purpose in seeking delay is to create more leverage points

9    for themselves.

10           The standard, Your Honor, and the key to all of

11   this, is that the management team who determined that this

12   was the right-sized DIP and the right cadence for the draws

13   are fiduciaries to all of the debtors' stakeholders.  It's a

14   DIP that's supported by the majority of the creditor base at

15   this point, the ABL, the 1L, the UCC; they're all

16   affirmatively on board.

17           The creditors who are objecting are only looking

18   out for their own position and nothing else.  The standard is

19   not for the company to run on fumes or risk future

20   administrative insolvency because a litigious junior creditor

21   group says so, nor is the standard that we have to show that

22   we need every cent of liquidity as of the date of the final

23   hearing.  It's certainly customary in Chapter 11 to approve

24   delayed draw term loans at the second day hearing stage.  The

25   standard, again, is whether the debtors have exercised a

1  reasonable business judgment and that is why those objections

2  should be overruled.

3          Moving on at to roll-up, as Your Honor knows, the

4  roll-up is a critical part of the deal that we reached with

5  the DIP lenders.  The size of the roll-up is 2:1, and as

6  evidenced by the list of precedents in our reply, that's a

7  ratio that's well within Delaware precedent.  The roll-up,

8  importantly, only occurs as and when the amounts are drawn.

9  And the 1Ls are not willing to lend without the roll-up.

10         No other party should be prejudiced by the roll-up

11 because the second lien is behind the first lien, regardless

12 of whether the roll-up exists, but in any event, the 1Ls are

13 not willing to do this loan without a roll-up component, and

14 for that reason, the objection to the roll-up should be

15 overruled.

16         Moving on to adequate protection.  As Your Honor

17 knows, a priming DIP cannot be approved under Section 364

18 unless other parties secured by the assets consent or

19 adequately protect it.  Here, the HoldCo lenders are not

20 being primed, so the only inquiry -- the inquiry, rather, is

21 only relevant for the 2L lenders.

22         The second lien lenders are receiving adequate

23 protection liens.  They're receiving adequate protection

24 claims.  And if they ultimately prove that they have suffered

25 a diminution in value, they can recover through those claims.

1          If they are, ultimately, oversecured, they can

2    seek post-petition interest and fees later, and if they're

3    not, and they're undersecured or totally unsecured, then

4    they're not entitled to it, at all.

5          Your Honor, I'd also note that here, without the

6    DIP, there's no sale process and without the sale process,

7    there's no chance for value to flow up to the second lien

8    lenders and, perhaps, ultimately, to the HoldCo lenders.  And

9    as we noted in our reply papers, courts have found some cases

10   that a sale process adequately protects creditors.  For

11   example, in the ESL Investments v Sears Holding Corporation

12   case, 51 F.3d 53, the Second Circuit held that a creditor had

13   not experienced diminution in value where the debtors pursued

14   a going-concern sale and the valuation, it was favorable to

15   the only real alternative, which was an orderly liquidation.

16   It's very similar to the realistic alternatives we have on

17   the table here, without access to the DIP.

18         Your Honor, the last point I'd like to touch on is

19   the concept of the alternative HoldCo DIP.  Under Section

20   364, the debtors need to show that we can't get credit, other

21   than as set forth in our priming DIP.

22         The debtors don't have any actionable alternative

23   to the 1L DIP facility.  As, Your Honor, knows from our

24   papers, and from the testimony today, the debtors did receive

25   a proposed HoldCo DIP facility from Freedom Lenders.  That

1   proposal does not work for several reasons, most of which you

2   heard from Mr. Grubb and Mr. Laurence, and are also embodied

3   in Mr. Laurence's declaration.  That DIP would impose

4   incremental fees, whereas the 1L DIP would not.  The new

5   HoldCo DIP would impose interest, payable by those HoldCo

6   debtors; whereas, the DIP lenders' proposal does not.  The

7   HoldCo DIP would require payment of up to $6 million in

8   professional fees, which would not exist under the current

9   DIP, and it only provides for payment of $1.5 million in

10  administrative fees upon emergence; whereas, the 1L structure

11  of, you know, making the DIP available if the HoldCo lenders

12  need it, that doesn't have a cap.  And we talked about, you

13  know, the allocation mechanics behind that, protecting this

14  concept of, you know, the HoldCo entities just being saddled

15  with the entire DIP.

16         You heard from Mr. Grubb and Mr. Laurence, both,

17  that this 1L DIP, as revised, is a no-fee, no-interest loan

18  to the HoldCo debtors, solely to the extent that they

19  actually need the cash.  You also heard from Mr. Laurence

20  that the Boards of every debtor individually approved of the

21  DIP because it was the best option in their business

22  judgment.

23         In light of those reasons, and, in particular,

24  because of the carve-out of the HoldCo entities, other than

25  to the extent they need administrative funding, the 1L DIP is

1  the superior proposal of the HoldCo boxes and it's the only

2  proposal available for the other 51 debtors.

3          Your Honor, all of these DIP terms and the

4  decision to accept them has to be evaluated through the lens

5  of the debtors' business judgment.  The Freedom Lenders,

6  obviously, have their own opinion about our DIP.  They may

7  not like most of it, but at the end of the day, they're not

8  in control of the company.

9          The concept of the debtor-in-possession is

10  fundamental to the proper working of this process and this is

11  a group of lenders that doesn't have the same incentives as

12  the debtors' Boards, to look at for every stakeholder at

13  every entity in this structure, not only for one creditor

14  group.

15          For all of these reasons, the Freedom Lenders'

16  objections to the DIP should be overruled.  Thank you.

17          THE COURT:  Thank you.

18          MS. GOLDSTEIN:  Thank you, Your Honor.

19          Jayme Goldstein of Paul Hastings on behalf of the

20  First Lien Group and in support of entry of the final DIP

21  order.

22          And I have to say, Ms. Sinclair did a great job

23  and stole a lot of my thunder now, because I'm not sure how

24  many of my original comments I'm going to say here, but I am

25  also aware that you do have some questions.  So I will start

1   with my presentation.  I will do my best to keep it short,

2   and if you have questions and would like to stop me, please

3   do so.

4          As Ms. Sinclair said, clearly, the debtors require

5   entry of this DIP facility today.  As you heard at the first

6   and second day hearings, this DIP facility, as it stands

7   today, provides the Debtor with liquidity, certainty, and is

8   a product of significant negotiation among the parties.  And

9   as Your Honor is aware, the standard for approving a final

10  DIP order is not whether the debtor needs an immediate

11  liquidity.

12         We need to consider the full timeline of these

13  cases and determine whether approval of the financing, as you

14  heard, and in accordance with Section 364 of the Bankruptcy

15  Code, is in the sound exercise of the debtors' business

16  judgment.  And here it is.

17         The facility was, indeed, determined to be the

18  best one by the debtors and its Board.  Furthermore, and as

19  you will hear from them shortly, it is supported by the

20  Committee and its professionals.  It is also currently the

21  only realistic funding path that will allow the debtors to

22  successfully reorganize in Chapter 11 and provide it and its

23  customers and vendors with the confidence required here.

24  This is why Andrew Laurence, the debtors' CEO, provided in

25  his declaration that without the DIP facility, the debtors

1    simply cannot satisfy their operational needs.

2          There is no reason for the entry of the final DIP

3    order to be delayed and DIP lender should not be prejudiced

4    in any way by the amount that was requested by the debtors,

5    pursuant to the initial DIP draw.  This is because the DIP

6    facility is not oversized.  It provides debtors with what

7    they need for the pendency of their cases to be able to

8    confirm their plan and emerge on their timeline.

9          This timeline, as we've seen today, and as we will

10   see, whether it's tomorrow or the next day or next Tuesday,

11   depending upon the schedule, is protracted because of

12   litigation.  And it may be that why for quite a while.  We

13   still haven't even gotten to exclusivity and the trustee

14   motion, Your Honor.

15         However, ironically, the Freedom Lenders are doing

16   their best to prevent entry of the DIP order, it seems to us,

17   when, if they are to abstain the value that they are seeking

18   in these cases, it will be virtue of the DIP facility, as Ms.

19   Sinclair pointed out, and the process that that DIP facility

20   supports.

21         So I was going to walk through, Your Honor, all

22   the changes that we made to the DIP facility.  You know what

23   happened at the interim DIP hearing and you heard this pretty

24   clearly from Mr. Shore, but we addressed a number of concerns

25   from Your Honor, also from the U.S. Trustee, and I'm not

1   going to walk you through all of those.  But, then, pursuant

2   to additional requests from the company and its

3   professionals, we made some significant changes and you've

4   heard them already, but we have reduced the draws to -- or

5   revised the draws to be two draws of up to $75 million each

6   and that's to lessen the interest burden on the company.

7   We've worked through changes to the roll to make it 2:1, but

8   only on new money, as it's drawn.  And we've made certain

9   significant clarifications with respect to adequate

10  protection payments, which are, of course, subject to

11  recharacterization as principal, and we've done everything

12  that you've heard plenty of times today, with respect to

13  HoldCo monies being accessed by HoldCo and the guaranties

14  that we provide in connection therewith.

15          And then we made very significant concessions, we

16  believe, in connection with, as you will hear shortly, our

17  discussions with the Committee and its professionals.  We

18  believe that those negotiations were very important to try to

19  help the Committee and its constituency as significantly as

20  we could, as early as we could, and try to set the stage for

21  cases that would be very beneficial to unsecured creditors,

22  generally.

23          I could walk through those, but I think Your Honor

24  is aware of the changes that we made.

25          THE COURT:  Okay.

1          MS. GOLDSTEIN:  With respect to the DIP, itself,

2    obviously, we believe the DIP is appropriate and its terms.

3    I can walk you through some of the comments that I had.  You

4    know, a number of these have already been addressed.

5          We feel very clearly that this DIP is not a *sub*

6    *rosa* plan.  DIP loans are, of course, tied to RSAs very

7    frequently in cases of this size.  The RSA, as we've

8    discussed, including at the last hearing, contains a

9    fiduciary out.  It provides the debtors the ability to

10   terminate the RSA and pursue a different plan if they think

11   it's a better path forward for them.

12         Significantly, the equitization of the DIP, which

13   occurs via confirmation of the plan, not the DIP, is a

14   heavily negotiated benefit for the debtors.  It is not a

15   penalty to them.  It helps them to achieve an appropriate

16   amount of leverage upon emergence.  The debtors can always

17   choose to repay the DIP in full in cash if they so choose.

18         This is very much unlike the LATAM situation,

19   which has been referenced now in argument and also in the

20   pleadings by the HoldCo -- by the Freedom Lenders.  It is not

21   an opaque discount that is being provided to equity holders

22   to the detriment of senior secured lenders without visibility

23   from the Court.

24         What this is, is the DIP, which is being

25   equitized, which is being provided by First Lien Lenders, a

1  subsection of First Lien Lenders, and the First Lien Lenders,

2  pursuant to the plan, are already receiving 100 percent of

3  the equity.  So this is not an analogous situation to LATAM

4  at all.  And I think, importantly, with respect to the First

5  Lien Lenders, almost every one of the First Lien Lenders

6  signed the RSA and participated in the DIP and,

7  significantly, that includes funds that are managed by one of

8  the Freedom Lenders.

9          We are -- I think we've talked about the roll-up

10  quite a bit already.  We believe it's reasonable and

11  appropriate, even at 2:1.  We think that roll-ups such as

12  these are approved by this Court very frequently.  It's a

13  very heavily negotiated term of the DIP; most importantly, it

14  does not add leverage to the debtors' balance sheet and they

15  can be paid off in full in cash.

16          The 506(c), 552 -- the equities of the case

17  waiver's marshaling prohibition, liens on avoidance action

18  proceeds, they're all standard in this Court, integral

19  components of the DIP, provide, in exchange for very material

20  DIP terms, such as the carve-out.  And, as again, you'll

21  hear, we're part of a very comprehensive settlement that we

22  reached with the Committee.

23          Fourth, the DIP facility has an adequate remedies

24  notice period with matters that can be brought in front of

25  this Court should there be an event of default.

1         And, you know, we should talk about the DIP events

2    of default.  I know there's been some discussion already

3    concerning whether or not a termination, exclusivity

4    termination would be one.  We believe that the events of

5    default are standard and appropriate for DIPs of this kind

6    and the DIP events of default are based on developments that

7    transpire at all debtors, including the HoldCo debtors, of

8    course, and we believe that this is important because what

9    happens at the HoldCo debtors affects -- which are part of

10   the jointly administered cases -- affects all debtors.

11        And so what we are doing here today, the plan --

12   I'm sorry -- the DIP that we're talking about, the sale

13   process affects all debtors, including the HoldCo debtors,

14   who are hoping to obtain value that continues to rise up to

15   them.

16        THE COURT:  I think we can address the release

17   issue.

18        MS. GOLDSTEIN:  You want me to get to it now or

19   should I get to it at the end?

20        THE COURT:  Yeah, let's do the release issue.

21        MS. GOLDSTEIN:  Okay.  Absolutely.

22        So, on the release issue, here's where we

23   obviously -- we are continuing to think about the issue and

24   may even need to speak to our clients, but what I can tell

25   you today is they are providing $250 million of new money.

1  They believe that they should be receiving releases for that.

2  So it's an inextricable part of the DIP and also part of the

3  plan and the RSA that was very heavily negotiated, and all

4  part of the bundle of the package of rights and benefits that

5  were provided to them.

6          THE COURT:  But I have an unusual situation with,

7  now I've got two debtors within the structure who have an

8  independent director who's investigating potential claims.

9          MS. GOLDSTEIN:  And I think --

10         THE COURT:  That doesn't come up in every case.

11         MS. GOLDSTEIN:  Very fair, Your Honor.

12         I think as it -- if you look at the plan language,

13 as it stands today and the release language, the releases are

14 subject, as Ms. Sinclair stated, to the completion of the

15 Petrillo investigation.  I think we believe that that

16 safeguard, which has been introduced, is incredibly helpful

17 and helps to deal with this unusual situation.

18         Obviously, the work that's being done by the

19 Committee, the work that's going to be done by the new

20 independent director that's been put up, HoldCo, all of those

21 parties, together, are doing everything they can to

22 understand what, if any, claims exist and hopefully deal with

23 that as quickly as possible.

24         But we believe that the releases that have been

25 contemplated under the, you know, draft plan and the

1  restructuring support agreement are appropriate and provided,

2  obviously, in exchange for new value here.

3          THE COURT:  So, if the independent director

4  determines there are potential causes of action, as it

5  currently stands, the 1L lenders could say, You can't pursue

6  them because if you do, we're going to declare a default.

7          MS. GOLDSTEIN:  That is how the documents

8  currently operate today.  If Your Honor has a concern with

9  that, it's something that we can address with the DIP

10  lenders, but they believe that the right to have a say in how

11  claims are dealt with is something that they believe is a

12  bargain for and suitable part of the package that, you know,

13  they have requested and asked for in exchange for the new

14  money that they are providing.

15          THE COURT:  What if it's claims against them?

16          MS. GOLDSTEIN:  Can I have a moment, Your Honor?

17          THE COURT:  Sure.

18          (Pause)

19          MS. GOLDSTEIN:  Yes.  Sorry, Your Honor, I needed

20  to confirm with my co-counsel here.

21          THE COURT:  Sure.

22          MS. GOLDSTEIN:  As we understand it, those

23  potential claims, including claims against us, are carved out

24  of the investigation.  We need to understand.

25          UNIDENTIFIED SPEAKER:  They're carved out of the

1  release --

2           MS. GOLDSTEIN:  Sorry, they're carved out of the

3  release by virtue of the investigation.

4           And so, what we need to do is see how that plays

5  out.  We believe that the process that we've set up allows

6  for, you know, for us to gain the benefit of this, but I

7  think we have to see how this investigation ultimately

8  proceeds to make that determination.

9           THE COURT:  Okay.  So claims, potential claims

10 against the 1L lenders are carved out of any releases,

11 pending a determination of the investigation?

12           (Counsel confers)

13           MR. FLIMAN:  So, Your Honor, there's an ongoing

14 investigation by the Petrillo firm, hired by the debtors.

15 The way the releases are set up right now in the plan, right,

16 is that the releases that must be delivered in order to

17 comply with the requirements under the RSA to avoid tripping

18 a default under the RSA is, it has to be released in the

19 draft plan, which are basically a release of claims, subject

20 to whatever the outcome is of that investigation by the

21 Petrillo firm.

22           And so, if that firm were to conclude that there

23 were claims against the lenders, to Your Honor's question,

24 that would end up being -- and those claims did not get --

25 those claims would fall outside the release, that would still

1   be a compliant plan that would not trigger an event of

2   default.

3            THE COURT:  Run that by me again.

4            MR. FLIMAN:  So the way that the releases are

5   phrased is releases of all claims, subject to the

6   investigation by the Petrillo firm.  So, if that

7   investigation yields claims, a recommendation of claims to be

8   brought against the lenders, right, then that would still be

9   within the confines of the plan, without the need to make

10  modifications of the plan which would effectuate the

11  retention of those claims and the release not covering those

12  claims.

13           THE COURT:  So they wouldn't be released?

14           MR. FLIMAN:  They would not --

15           THE COURT:  Those claims would not be released?

16           MR. FLIMAN:  Those claims would not be released

17  and the lack of release of them would not cause a default

18  under the RSA.

19           THE COURT:  Okay.  And what about the

20  investigation by the HoldCo independent director?

21           MR. FLIMAN:  Frankly, that's not addressed right

22  now by the plan, Your Honor, and so we would need to go back

23  and make sure that we have authority to agree with that.

24           THE COURT:  So, as it stands now, if the HoldCo

25  independent director determines there's a cause of action

1  against the 1Ls, they could declare a default if those claims

2  are pursued?

3         MR. FLIMAN:  Standing here right now, without

4  adding modifications to the language, that's right, Your

5  Honor, just because we haven't addressed this issue yet,

6  frankly, but we can.  We can go back to our clients and make

7  sure that we have authority in order to address that.

8         THE COURT:  I think we need to do that.

9         MR. FLIMAN:  Thank you, Your Honor.  We will.

10         (Pause)

11         MS. GOLDSTEIN:  So, Your Honor, I have just

12  another minute or two here.  I wanted to address the Freedom

13  HoldCo DIP proposal.  As you are aware, it's a $7 and a half

14  million proposal with a million and a half dollars that would

15  be available to the HoldCo debtors, but only upon emergence

16  from Chapter 11.  It would not be used to fund ongoing

17  administrative expenses the way our DIP would.  Six million

18  of the $7 and a half million DIP would be used for

19  professional fees with the Freedom Lenders.

20         I think you've heard, *ad nauseam*, the benefits of

21  what we're providing, with respect to funds that were being

22  made to the HoldCo debtors by virtue of non-fee, non-interest

23  loans, so I'm not going to continue to get into that, but we

24  think that's a very significant difference.

25         And then, finally, Your Honor, in conclusion,

1  having a defaulted DIP just simply is not the risk-free

2  proposition that the Freedom Lender Group purports it to be.

3  They've been purporting it now in two separate hearings and

4  in their papers.

5          And you have heard from Mr. Orlofsky, having a

6  defaulted DIP would wreak havoc with the debtors' cases.

7  They've spent a tremendous amount of time providing structure

8  to them, pursuant to the RSA and they need forward momentum.

9          The Freedom Lenders, as you heard from Mr. Grubb,

10 were given every opportunity to step forward and to fund

11 through direct approaches and by this Court, when you

12 deferred approval of the 2:1 roll-up at the initial -- on the

13 first day hearing for the initial DIP order; however, they

14 elected not to do so.  They did not make a true, junior DIP

15 proposal or any DIP proposal that would truly fund the

16 debtors' cases.

17         Our DIP facility, in contrast, accomplishes that

18 role.  We believe that the order should be approved on a

19 final basis and we thank you for your time.

20         THE COURT:  Okay.  Thank you.

21         MR. FEINSTEIN:  Good afternoon, Your Honor.

22         For the record, my name is Robert Feinstein.  I'm

23 with Pachulski, Stang, Ziehl & Jones.  We are proposed

24 counsel to the Official Creditors Committee, and I will try

25 to be brief, as well.

1          Your Honor, the Committee was formed on November

2    19th.  We were selected as counsel two days later on the

3    21st.  The Committee is an estate fiduciary, as to all

4    debtors and all creditors and we came into, as Your Honor

5    knows, a very litigious, chaotic situation.

6          We've been onboard for 11 business days and I

7    think there have been depositions and hearings on just about

8    every one of those days.  We came into the case, Your Honor,

9    to try to restore order to the chaos, because it's not good

10   for business or creditor recoveries, and we were also mindful

11   of the duty that we owe to all creditors of all estates.

12         And you've heard about a number of the

13   modifications to the DIP that we negotiated with the 1L

14   lenders and the debtors and they're set forth in our

15   statement that is at Docket three thirty-three seventy-seven,

16   so I won't repeat them all.  But I do want to point out that

17   a number of them, Your Honor, were directly responsive to the

18   objections to the DIP that were filed by the HoldCo lenders.

19         So, for example, we extended the milestones.  The

20   process is now longer.  We were -- had the same concern about

21   the brevity of the process and selling through the holidays

22   and so forth, so now we have more time.

23         The HoldCo, the Freedom HoldCo change to the DIP

24   is, in our view, a game changer, Your Honor.  Beforehand, the

25   HoldCo lenders were fully liable on the entire DIP and now

1  they're going to be liable only to the extent that they need

2  monies to pay their own administrative expenses, which I

3  expect will be far smaller than the full amount of the DIP.

4        And we've also addressed the -- excuse me -- the

5  roll-up loans, which everybody complained about.  Now, no

6  longer we'll have the same rights as the new-money loans in

7  terms of access to unencumbered assets.

8        There was also concern expressed by the Freedom

9  HoldCo lenders and us about how avoidance actions and

10  commercial tort claims are being treated and there's

11  substantial changes that basically carve out those causes of

12  action from collateral so that they can be pursued and we've

13  also added marshaling, which wasn't there before.

14        So, Your Honor, we've -- the changes that we made

15  -- again, "no good deed goes unpunished," I guess -- they

16  were not, I guess, embraced by the 2L lenders, but our

17  perception, Your Honor, is that the 2L lenders are doing

18  their best to throw sand in the gears at every turn.

19        And one good example emerged today, Your Honor,

20  which is this strong-man argument that what's really going on

21  here is a DIP loan from OpCo to the HoldCos.  The documents

22  speak otherwise.

23        Counsel inquired of two layperson witnesses:  What

24  do you think is going on?  And they gave their best answer,

25  but, ultimately, the best evidence, Your Honor, is what the

1  DIP loan documents say, which is the lenders are the first,

2  the 1L lenders, the DIP lenders and the borrowers are the

3  HoldCo lenders, only to the extent that they actually need

4  money to pay their administrative expenses.

5          There is no OpCo-HoldCo loan.  That is just

6  manufactured and, really, an attempt to manufacture a

7  conflict that's nonexistent.

8          I do want to address the releases, Your Honor,

9  because the Committee has concerns, as well.  We intend to

10 fully investigate all the facts and circumstances.  That's

11 the Committee's responsibility under 1103 of the Bankruptcy

12 Code.

13         And I won't past on what the independent directors

14 at OpCo are doing or what the new independent director at

15 HoldCo may do.  The Committee is going to discharge its

16 functions and the facts will lead us to wherever they lead.

17 And it may be that we find that some of the releases are

18 inappropriate, but we think those are plan issues, not DIP

19 issues.  And as we get to confirmation, if we find claims,

20 you know, perhaps we'll file a standing motion.  But we can

21 deal with the releases down the road.  So I don't think

22 that's really a today issue.

23         THE COURT:  What about the releases, as I was

24 talking to the 1L lenders about, that they would have the

25 ability to say, The independent director identifies potential

1  causes of action against us, the 1L lenders, but if you

2  pursue those, we're declaring a default.

3          MR. FEINSTEIN:  I understand that, Your Honor.

4          It's not an uncommon provision for the DIP lenders

5  and parties who are senior lenders supporting a plan, to

6  withhold their approval of a plan if they're going to get

7  sued in the process, right.  I think what we need to do to

8  stabilize the case is to get past today to approve the DIP.

9          If something can be done by the 1Ls on the release

10 issue, that's great, but even if they can't, I think the case

11 needs a final DIP and the access to liquidity.  This is --

12 goes beyond the debtors' financial needs.

13         Our Committee includes vendors, and there is a lot

14 of upset in the vendor community about what's going on in

15 this case over critical vendor, over the DIP, and the

16 businesses are not going to sustain -- be sustained with that

17 kind of uncertainty.  So we think it's really important to

18 have the DIP approved, if not today, then tomorrow or

19 whenever, but not denied and not deferred for an extended

20 period of time.

21         In terms of, what do the HoldCo lenders really

22 want, Your Honor?  It's clear to me from my years of

23 practice, representing committees, which often get aggressive

24 and so forth, but I doubt the HoldCo lenders really want to

25 file a plan at HoldCo.  I question whether they think there

1   are real viable claims there.

2          What they're trying to do, it's pretty obvious to

3   us, is throw sand in the gears every which way they can to

4   try to grind the case to a halt in the hopes of gaining

5   leverage and being cut into a deal that gives them equity in

6   the reorganized company.  That's what we think is really

7   going on.

8          And everything shy of that, we think is just

9   noise, intended to disrupt the case, and they've done a great

10  job of disrupting the case.  But like I said, Your Honor,

11  from our vantage point, the case needs stability.  It needs a

12  final DIP.

13         With the changes that we've negotiated, we think

14  we're headed in a good place from the unsecured creditors'

15  perspective, across all entities.  And with the changes that

16  we've negotiated, Your Honor, we'd ask that you approve the

17  final DIP.

18         I'm happy to answer any questions.

19         THE COURT:  Yeah, thank you.  No other questions.

20  Thank you.

21         Anyone else in support of the DIP?

22      (Pause)

23         MR. LAURIA:  Good evening, Your Honor.

24         THE COURT:  Good afternoon.

25         MR. LAURIA:  Tom Lauria with White & Case.  We

1   represent the Freedom Lender Group, comprised of PIMCO Asset

2   Management and Irradiant Partners.  Together, they hold about

3   93 percent of the 2L debt, $125 million, and also the HoldCo

4   debt, $515 million; six forty total.  Ninety-three percent

5   gets you to about $550 million.  It's not a small number; in

6   fact, by the debtors' construct, we're the largest unsecured

7   creditors in these cases.

8           I'm going to start out just by saying that, on

9   behalf of myself, my firm, my partners, and my clients, that

10  we're not going to take offense at the offensive things that

11  have been said about our intentions and objectives here.

12          We have been confronted on a very short timeline

13  with a DIP financing that limits plan alternatives and it

14  ties to an RSA and a plan that includes provisions that we

15  think will ultimately not be confirmable and so we are

16  fighting hard on a short timeline to try to protect our

17  clients' rights and interests in the face of that challenge.

18  It's kind of like in a football game when the flag gets

19  thrown if the second guy throws the punch.  We got hit and

20  now we're fighting back and we're being accused of being the

21  bad guys here.  That's just not the case.

22          So, I'd like to go through our concerns with the

23  DIP and I'm going to start with the HoldCo component of it.

24  I was asked at one point if I was going to quote Shakespeare

25  and I think I'm just going to use a title of the Shakespeare

1   comedy, "Much Ado About Nothing."

2             In fact, we really don't have a HoldCo DIP at

3   present.  We've got three or four different versions of what

4   the HoldCo DIP is and how it works.  I would say it's as

5   clear as mud at this point.  We don't know what the amount

6   is.  We don't really know the mechanics for drawing it.  We

7   don't have a budget for DIP at the HoldCos.  We don't know

8   who decides if the HoldCos need money.  We don't know who

9   lends.  We don't know when these loans occur.  And we don't

10  know how administrative expenses are going to be allocated.

11  It's pretty much a blank check.

12            I don't know how much it's going to be, but I will

13  say this, I've never seen a DIP approved in a case that's

14  that amorphous.  There is no immediate need for DIP financing

15  at the HoldCos.  And I think it would be in the best

16  interests of the parties to take the time to take a step back

17  to figure out how this should work and properly document it

18  in a way that everybody can understand, including the Court.

19            Now, I think, with respect to the HoldCo DIP, it's

20  particularly important to think about the business judgment

21  rule.  The debtors have said that the decision to enter into

22  DIP financing is a matter of the business judgment rule, and

23  I accept that as generally true.  But one thing that's clear

24  on the record that we have today is that there was no

25  negotiation between the OpCos and 1Ls and HoldCos over the

1  DIP.  There certainly was no discussion that involved the

2  HoldCos' creditors.

3         And when you have the same people on both sides of

4  the negotiation, that is a conflict of interest.  And as the

5  Court well knows, Corporate law 101, when directors are

6  conflicted and they decide anyway, they don't get the benefit

7  of the business judgment rule.  The business judgment rule is

8  a rule of judicial deference to decisions made by an

9  unconflicted Board.

10        But when you've got businesspeople, advisors, and

11 directors on both sides of the discussion, you don't have

12 that disinterestedness.  There's a precondition to getting to

13 the business judgment rule and when that precondition is not

14 satisfied, you go to the entire fairness of the transaction.

15        And in my experience, and I'm sure the Court is

16 familiar with this, when you get to entire fairness, over 90

17 percent of the time, the decision is not upheld because of

18 concerns about conflict and extremely high burden that is

19 absorbed by going to entire fairness. So, with respect to the

20 Holdco DIP I think we ought to take a step back and we ought

21 to take some time to try and do it right.  Right now I think

22 it's more amorphous at best and ambiguous, and is only going

23 to result in arguments going forward about how much has been

24 borrowed, who made the decision to borrow, who made the

25 decision to pay, what was the amount, was the amount correct,

1  was the amount overstated, was it understated. It seems like

2  there's way too many issues that we're putting on the table

3  here to make any kind of sense.

4          So, we would urge that the Court, to the extent

5  it's going to approve the DIP, and we really do want DIP

6  financing to be approved here, should defer on the issue of

7  the Holdco mechanic.  There is no evidence that the Holdco's

8  need anything on an urgent basis.  We ought to take the time

9  to get it right.

10          Now, I mentioned that there is no Holdco DIP

11  budget and there isn't. There was reference made to a Holdco

12  DIP budget by one of the witnesses that there was no budget

13  offered.  We have a similar problem with respect to the DIP

14  itself.  We received a document last night, a 13-week updated

15  cash flow projection for the debtors.  That document, to my

16  knowledge, has not been put into the record but is an

17  exhibit, a required exhibit to the DIP order and the DIP

18  credit agreement.  Right now, we don't have that document in

19  the record.

20          Interestingly, the document that we received is an

21  updated 13-week cash flow projection.  What it is not is a

22  six-month projection or nine-month projection which raises

23  the question as to whether or not what we really have is a 13

24  week DIP, not a six month DIP with three successive one month

25  of extension options.  I don't know how we or the Court can

1   know what is going to happen under this DIP if we don't have

2   the DIP budget in the record.  I asked about it during the

3   course of the day and never got an answer.  Why isn't the DIP

4   budget that is an essential component of the DIP that the

5   debtor seeks approval of today part of the record.  Why isn't

6   it attached to the DIP order and credit agreement?

7          Let me talk about the rollup.  We all know rollups

8   happen but the authority is beyond scant when we are talking

9   about a non-consensual rollup, one that is actually objected

10  to.  I found no case that sets forth a standard for

11  evaluating the propriety of a rollup.  I think the bottom

12  line it's a matter committed to the Court's discretion.

13  Here, as the Court considers exercising its discretion, there

14  are a number of troubling factors.

15         The DIP appears to be excessive in size. The

16  projections that we have seen, which only go through the next

17  13 weeks, show the debtors cash balance being substantially

18  in excess of any of the threshold that people have talked

19  about being important or required for the debtor to have

20  adequate liquidity to operate its business.  Now some

21  cushion, fine.  We all understand that concept, but the real

22  consequence of an excessive DIP is double that in the rollup

23  the way it's being sought by the 1L.

24         Now, why is that?  Why does the 1L want a $500

25  million rollup on top of a $250 million DIP?  Well, it's

1    obvious.  That limits the alternatives available to the

2    debtor and to its other stakeholders in terms of treatment of

3    the 1L debt.  Rolled up debt has to be paid in cash in full.

4    It can't be reinstated. It can't be given cramdown treatment.

5    Both things are provided for under the bankruptcy code. The

6    rollup takes that away and puts in the category of an

7    administrative expense claim that has to be paid in cash in

8    full.

9            So, it really eliminates or restricts what may be

10   important plan alternatives in this case and gives the 1L

11   even more power over the outcome then it currently enjoys.

12   Let's not forget the 1L does have a first lien on the assets.

13   The 2L is behind it. The equity that we have rights in is

14   behind that.  We can't reverse that priority.  That priority

15   is locked in.  What we can do is make sure that value is

16   maximized to the benefit of all.

17           I don't know how we maximize benefit for the FRG

18   equity to bring value up to the Holdco creditors without also

19   maximizing value down at the Opco.  It's kind of a physics

20   problem that seems a little bit impossible.  The fact of the

21   matter is we are prepared to work harder and push harder to

22   make sure that value is, in fact, maximized.

23           Now, I think that there are two ways that the

24   Court could consider addressing the rollup problem here.

25   Number one is to stick with one to one.  That gives them $250

1  million of the prepetition debt, becomes administrative

2  expense claim. They can't be reinstated, they can't be

3  crammed. It gives them a lot of lift but it doesn't put quite

4  as much pressure on the process as 500 does.

5         An alternative would be to go with the two to one

6  but limit the amount that is rolled up not just to what is

7  drawn but what is drawn and used. So, for example, if the

8  testimony of Mr. Orlofsky is to be taken at face the

9  expectation is that during the course of the case there will

10 be $150 million of cash burn. That would be the amount of

11 DIP draw that is protected by a rollup. The remaining $100

12 million of DIP draws would be sitting on the balance sheet,

13 cash on the balance sheet that would inure to the benefit of

14 the 1L under a plan.

15        So, it doesn't seem equitable or fair that they

16 should get $200 million of rollup for $100 million of loans

17 that were just sitting on the balance sheet at the effective

18 date and were available to pay down their claims. It kind of

19 challenges the concept of equity and fairness which is, at

20 the end of the day, an important consideration here

21 particularly where we have something that is -- there is no

22 set legal standard for the approval of a rollup. So, we

23 think the Court has discretion and we would ask that the

24 Court exercise that discretion in a way that generates a more

25

1  fair outcome and keeps the playing field as level as

2  possible.

3          Now I would like to talk about the issue of

4  defaults under the DIP.  Much has been said about that and we

5  have had some discussion about releases.  We have had

6  discussion about the possibility that the Holdco lenders are

7  successful in terminating exclusivity or getting the stay

8  lifted so that they can exercise their contractual remedies

9  or that a Chapter 11 Trustee is appointed.  None of those

10  things are going to be done unless cause is shown and this

11  Court agrees that cause has been shown.  If cause has been

12  shown those are an exercise of the rights of the Holdco

13  creditors.

14          It's interesting to think about, Your Honor, the

15  way this case is going.  At present the Opco 1L, who has no

16  rights or claims whatsoever against -- the Holdco debtors are

17  exercising control over the case as to the Holdco debtors.

18  Let's look at this from the perspective of the Holdco

19  creditors, however. When our $475 million came in at a Holdco

20  it came in with really one remedy to protect our right to

21  repayment.  That is a contractual remedy that everybody in

22  this room knows exists and was negotiated for.  That is the

23  right to control our own destiny, to have a seat at the table

24  through the equity if there is going to be a restructuring.

25

1          What everybody in the room wants to do is strip us

2     of that right.  They don't want to adequately protect us.

3     They said, well it doesn't have any value.  Well, let me say

4     this: if it didn't have any value they would have abandoned

5     the stock to us.  That is what you do with worthless assets,

6     would have abandoned it to us but they're fighting tooth and

7     nail to keep us from exercising the rights that we were

8     granted and side by side with a plan that says that equity is

9     going to get wiped out.  That is the default outcome under

10    this plan.

11         The only thing that can prevent that outcome is a

12    sale process that delivers value up to Holdco level.  The

13    Court heard from two witnesses today on that sale process.

14    One is an unquestioned expert with tons of experience and the

15    other is not.  The advocate for the adequacy of the sale

16    process was the second.  The opponent to the sale process was

17    the first.  I don't think you can question Mr. Augustine's

18    credentials or experience or expertise.  He testified that

19    the bid procedures, as they exist --

20         THE COURT:  Are we doing bid procedures now?  I

21    thought we were just doing the DIP.

22         MR. LAURIA:  Well, it's important, Your Honor.

23    No, we're not. It's important though because the DIP, through

24    the RSA, requires that the bid procedures be implemented and

25    approved as they currently exist.  Failure to comply is a

1  default.  Now, it's really hard for a -- this is not like a

2  plan default later where the debtor can say, hey, I have got

3  a better deal and so I am going to exercise my fiduciary duty

4  to walk away from this and then go to the Court to get

5  protection.

6          These bid procedures are going into place now and

7  going to be executed on now when there is no bird in the

8  hand.  So, asking the debtor to default with respect to the

9  bid procedures would have to happen now because once we get

10  to the end of the process there is nothing left to do.  So,

11  we have got a tie-in here and it's just like with the

12  releases, Your Honor.

13          By the way, the releases that we're more concerned

14  about then releases of the 1L lenders are releases by the

15  Holdco of claims against the Opco's, releases by the Holdco's

16  of various third parties who are not debtors.  Releasing

17  claims that are assets of the Holdco estates for the benefit

18  of the Opco's and their creditors, which is what has been

19  argued to the Court, violates fundamental principle first

20  stated by the Second Circuit in (indiscernible) and adopted

21  by the Third Circuit in Owens Corning.  You can't rob Peter

22  to pay Paul.  Absent substantive consolidation, the

23  separateness of each estate must be respected.

24          What is happening here is we have an RSA and a

25  plan tied to a DIP that basically says if the Holdco estate

1  has claims against the Opco those claims must be released. If
2  the Holdco estate has claims against non-debtor release
3  parties who are identified those claims must be released. So,
4  we are going to take value from the Holdco estates and,
5  effectively, we are contributing it to the Opco estates.
6  Circuit law says you can't do that.  That is what this DIP
7  tied to the releases tries to do.  I don't see how you get
8  there.  I think it's a huge problem and I think it needs to
9  be remedied.  It can't be remedied in a way where people say,
10 yeah, well we will think about it and get back to you.  I
11 think it's a fatal flaw that has to be remedied on the front
12 end for this DIP to be approved.
13        Similarly, with respect to exclusivity, lifting
14 stay, and a trustee at the HoldCos, these are valuable rights
15 that belong to the creditors of the HoldCos.
16        The debtors have admitted that the reason the
17 HoldCos went into bankruptcy was to prevent us from
18 exercising our contractual remedies, to impose the automatic
19 stay where they run down a path as fast as they can to
20 implement a plan that's going to wipe those rights out.  Now,
21 if that's not a case for adequate protection, I don't know
22 what is.
23        But one thing is very clear.  This DIP does not
24 include any adequate protection for the HoldCo lenders.  Now
25 they do have collateral.  That collateral is the equity in

1  FRG, Inc.  That equity clearly has value because we wouldn't

2  be seeing this fight about getting it if it was worthless.

3  It clearly has value.  The plan that the debtors have filed,

4  as required by the DIP, and are seeking to confirm will wipe

5  that value out.

6         But you can get to an adequate protection problem

7  another way here.  We've got collateral that has some value.

8  That value -- let's say the 250 million is borrowed.

9  Whatever equity value there is now $250 million more out of

10  the money.  There's a two-hundred-and-fifty-million-dollar

11  higher hurdle to realize value even by exercising our

12  contractual rights, our only rights to protect ourselves when

13  you get to a distressed situation like this, which is to take

14  control of the stock and have a seat at the table.

15         That's not being protected.  It's a hundred

16  percent clear there is no protection being offered to the

17  HoldCo lenders, who are secured creditors and whose value is

18  being diminished by this process and, ultimately, will be

19  eliminated.  I just don't think the Code works that way.  We

20  are secured creditors that have a right to exercise

21  shareholder rights, and those rights are going to be stripped

22  away without compensation.

23         Now people have talked about geez, we're just wild

24  litigators and we're going to waste money on litigation if we

25  control claims and causes of action at the HoldCos.  I'm

1  going to posit to the Court that that argument denies

2  economic reality.  And my clients are economic players here,

3  as they should be.  They're here to protect their financial

4  interests.

5          Now who is a better decider of the value of a

6  claim or cause of action than the guy who has to spend the

7  money to pursue it?  That's a real economic decision.  It's

8  not a -- it's not a theoretical one, it's not one that an

9  expert is testifying to.  It's a guy who has to reach into

10 his pocket and say I believe the claim is valid enough that

11 I'm willing to spend money on it.  I have a hard time

12 believing that that's not the best way to assess claims and

13 causes of action at the HoldCos.

14          I want to talk for a minute about a case that I

15 think is extremely relevant here on these issues.  And again,

16 it all ties to this DIP because the DIP has these tentacles.

17 The Court might remember the Marvel Comics case, years ago.

18 Judge Balick was the Judge.  We had the exact same structure.

19 We had HoldCo debt that was secured by 80 percent of the

20 stock of Marvel Comics, and we had separate lenders down at

21 the OpCos.  We came in to seek relief from the stay.  The

22 debtors fought like hell, fought and fought and fought.

23 Judge Balick, one of the most well-known debtor-friendly

24 judges in the history of Delaware, concluded that she had to

25 lift the stay because that was the only thing we had, our

1  only path to recovery.

2          And so I have a hard time believing here that

3  that's not, at the end of the day, an appropriate remedy.

4  But the DIP lenders are insisting on a DIP loan that will

5  blow up if it turns out that we are entitled to that remedy.

6          The point I'm trying to make, Your Honor, is that

7  the problem that we're facing, that the releases, that the

8  tentacles of the DIP loan to other rights, invasion into

9  estates where the DIP lenders don't have a claim, is endemic

10  right now.  That's what needs to be fixed.  We're not trying

11  to throw sand in the gears.  We're trying to save our lives

12  as creditors.  The guillotine is there and we're being walked

13  to it.  We should have our chance to protect our value.

14          This DIP should be fixed, it can be fixed, and we

15  should go forward in an appropriate fashion to make sure

16  everybody maximizes value and that the principles of

17  Augie/Restivo and Owens Corning are respected, and that each

18  estate maximizes value separately, no estate contributing to

19  another -- value to another estate and muddying the pond.

20          And governance is a real problem here.  I think

21  the evidence is really clear that there has been no real

22  corporate governance at the HoldCos, no separate advisors, no

23  separate directors until a week ago.  We were not consulted.

24  All these decisions were made by unanimous consent of the

25  HoldCo boards, no meeting, no debate, no deliberation, no

1   advice from somebody who wasn't on all sides of the

2   transaction.  That's why we're here.  It's not because we're

3   standing up and saying hey, we've got rights that are

4   entitled to protection.  Thank you.

5           THE COURT:  Thank you.

6           Response?

7           MS. SINCLAIR:  Yes, Your Honor.  I just want to

8   make a couple of quick points.  Again, Debra Sinclair,

9   Willkie, Farr & Gallagher, for the record.

10          One is on the budget.  As I think Your Honor

11  knows, there's a mechanic in the interim DIP order for

12  updating the DIP budget periodically.  So I just want to be

13  clear on the record that we don't have any issue of the DIP

14  budget not existing.  All that's happening here is it's being

15  updated in accordance with the interim budget -- I'm sorry --

16  with the interim order.  Those budgets get filed and attached

17  to the DIP order as they're agreed upon.  In terms of the

18  time period that the budget covers, it's typical to have a

19  thirteen-week budget attached to a DIP order.  Our commitment

20  is still a six-month commitment.  The budget is just

21  reflective of those thirteen-week needs as updated.

22          So, until the 1Ls sign off, which they now have on

23  the approved budget and we can file it, the prior budget is

24  still in place.  I just want to be clear on that, that we

25  don't have a substantive issue.  And Mr. Orlofsky did testify

1  today that little has changed from the prior version of the

2  budget.

3          I think there are just a couple of quick things

4  worth noting in response to Mr. Lauria's arguments around the

5  HoldCo DIP and the conflicts issues, generally.

6          One is there's no entire fairness issue with

7  respect to the proposed structure for putting funds up at the

8  HoldCo entities here because, again, there is no debtor-to-

9  debtor loan.  I think that's maybe where the confusion is

10  arising.  The HoldCo is not ever becoming obligated to the

11  OpCo, it's not happening.  They're getting a no fee, no

12  interest loan from a third party -- or third parties, I

13  should say, who are the DIP lenders, so there's no conflict.

14          What's really at the heart of this argument is

15  that the Freedom Lenders want to substitute their business

16  judgment for the debtors', which is why there's such a poor

17  reaction, for example, to the appointment of the independent

18  director, who is, again, there to protect the interests of

19  their clients.  We would not typically invite an active

20  litigant into our corporate governance, when it comes to

21  selecting who that person is.  But that's really the purpose

22  of appointing that independent, is to guarantee that we have

23  that extra layer of independence there.

24          Second is Mr. Lauria said there's not enough

25  clarity around how these funds are getting allocated to the

1  HoldCos.  And I understand there's a concept of as and when

2  needed.  But frankly, this concept of it's coming in and we

3  don't know when or how or who's using it, that's true about

4  the DIP coming in to the OpCo and then going down to the OpCo

5  subsidiaries.  Those are management decisions.

6       And so I think, if there is a later conflict about

7  the decision to allocate up to the HoldCo as and when needed

8  on account of its administrative expenses, his clients'

9  rights are reserved in the DIP order, to the extent there's

10 any dispute about that.  And as I said earlier, if there is

11 some sort of administrative expense claim because one box did

12 fund another expenses to the detriment of its own creditors,

13 that box would also still have the administrative expense

14 claim.

15      A point of clarification.  The HoldCo lien is not

16 being primed.  Again, if the DIP is used there, the guarantee

17 -- which is, again, in favor of the DIP lenders, not any OpCo

18 -- it's only secured by unencumbered assets.

19      The last point I'll leave you with, Your Honor, is

20 Mr. Lauria is right about what happened in Marvel.  The

21 creditors were allowed to take over.  And the only thing I'd

22 point out to the Court is that whole decision and sequence of

23 events ended up with the point -- with the Court appointing a

24 Chapter 11 Trustee because the case ended up in a situation

25 where a substantial creditor was controlling the debtors.

1  And that would be a terrible outcome here.

2           So, for all of these reasons, we ask that you

3  overrule objection and approve the DIP.

4           THE COURT:  Okay.  Thank you.

5           MR. GOLDSTEIN:  Your Honor, Jayme Goldstein, Paul

6  Hastings, on behalf of the first lien lenders.  Just a few

7  points here.

8           We are not, the DIP lenders are not looking to

9  take away the rights of the HoldCo lenders here.  We believe

10 very strongly that this DIP helps them.  It provides them

11 value through the sale process and provides structure to

12 these cases.  It also, as you've heard now, many, many times,

13 it provides them the ability to have funding, regardless of

14 some of the objections about the process and the cash

15 management system that you heard.  It provides them funding,

16 interest, and fee free.

17          We believe that, no matter what we do, the Freedom

18 Lenders are not going away.  They are here to try to fight

19 and they will keep fighting.  We believe that the Bankruptcy

20 Code provides the Freedom Lenders the protections that Mr.

21 Lauria says that his clients want and are desperately

22 searching for.  They can bid at the auction.  They can object

23 at confirmation, and I think we all know they certainly will.

24 And there are many forums under the DIP order and under the

25 Bankruptcy Code for them to be able to protect their rights.

1          Again, Your Honor, the DIP lenders made

2   significant concessions at the interim hearing, before this

3   final hearing, working with the UCC, and in everything we

4   tried to do, even in having conversations with the Freedom

5   Lenders and their counsel.  We gave up real value to build

6   consensus, but we don't think we're ever really going to be

7   able to achieve consensus with the Freedom Lender Group.

8          We believe that what you're seeing from them right

9   now is a substitution of their business judgment, and out-of-

10  the-money creditor for the judgment of the debtors, which is

11  inappropriate in accordance with Bankruptcy Code Section 364.

12         We believe, again, the DIP is necessary, it's

13  appropriate, it will maximize value for all stakeholders, and

14  it should be approved.

15         THE COURT:  Okay.  Thank you.

16         MR. FEINSTEIN:  Once again for the record, Your

17  Honor, Robert Feinstein, Pachulski, proposed counsel for the

18  committee.

19         I just want to address one point from Mr. Lauria's

20  argument, and that is he says the equity in -- at --  in

21  OpCo, which is held by HoldCo, quote, "clearly has value."

22  So I have to dispute that point, Your Honor.  That equity

23  stands behind at least a billion five of secured debt at

24  OpCo, plus all the unsecured claims at OpCo, which could be

25  material, given the potential lease rejections and so forth.

1  So there's quite a bit of hurdle before any value could flow

2  to the equity of OpCo held by HoldCo.

3          And in fact, if the company were that flush, I

4  doubt it would be in bankruptcy.  But it's here we are in

5  bankruptcy with impaired first lien debt.  And ultimately,

6  Your Honor, on a -- on stay relief, it's the movant's burden

7  of proof to show that the collateral that they are pointing

8  to has value.

9          So Mr. Lauria said the equity clearly has value.

10  As a financial matter, there is no appearance that it does;

11  all appearances are otherwise.  And it's ultimately their

12  burden to show that that equity has economic value.

13          Now it does have leverage value because it carries

14  with it the right to vote and to replace the board and upend

15  this entire case.  Mr. Lauria said all we want is a seat at

16  the table and I dispute that, Your Honor.  What they'd like

17  to do is come in, take control of the equity, replace the

18  OpCo board, and turn the table over and have all the pieces

19  scattered on the floor.  We don't think that should happen,

20  Your Honor.

21          We think that an orderly Chapter 11 process will

22  prevent -- preserve value for all constituents.  And if we're

23  fortunate enough to see value flow up beyond the first and

24  second lien secured debt, all the unsecured debt at OpCo, and

25  reach up to the value of the equity at -- that's held by

1    HoldCo, then there will be economic value.  But today, there

2    is no evidence that there is any economic value whatsoever to

3    the equity in OpCo.  Thank you.

4              THE COURT:  Okay.  Thank you.

5              All right.  Well, it's late.  I will say that I am

6    inclined to grant the motion on a final basis for the DIP

7    loan.  The only outstanding issue I have is this issue about

8    the releases.

9              But I think the evidence has shown that the

10   debtors have exercised their business judgment.  I can't

11   substitute my business judgment or anybody else's business

12   judgment for theirs.

13             I think they've acted in good faith.

14             There's no indication that the amount -- or there

15   is indication that the amount of the debt -- or the DIP is

16   necessary in order to stabilize the debtors and in order to

17   ensure that they can continue to operate as they try to go

18   through the process of selling these companies on a going

19   concern basis, and that's important.

20             The roll-up, I think, is -- as Mr. Lauria pointed

21   out, it's subject to discretion.  And I think, in this case,

22   the discretion is appropriate.  I think, at the initial

23   hearing, I said I wouldn't approve the roll-up on a two-to-

24   one basis at the initial hearing, but that I would do it at

25   the final.  And I have -- nothing I've heard has changed my

1  mind about approving it on a final basis, on a two-to-one

2  roll-up.

3          I don't think that there is an issue -- I think,

4  as Mr. Feinstein just pointed out, there's no indication that

5  the equity value at HoldCo exists.  I don't know that there

6  is any.  I haven't heard any -- one -- not one bit of

7  evidence about any value at the HoldCo debtors.  And it would

8  be turning the world upside-down if I were to I'm not going

9  to approve this DIP and cause a default and all of the events

10 that would occur as a result of that.

11         So what do we do now?  Do we -- I'd like to get a

12 response on the release issue.  We can come back tomorrow, we

13 can get that issue -- you can, either tell you've resolved it

14 with your clients, or that you can convince me that it's not

15 necessary.

16         MR. LAURIA:  Your Honor, if I may, my

17 understanding over the past few days was that we were going

18 to get everything we could get done today, and then we were

19 going to come back on the 17th for whatever remained undone.

20         The problem I have I am -- I'm scheduled to appear

21 in front of Judge Swain in the Southern District of New York

22 tomorrow at 8:30, and I mean, I absolutely have to be there.

23 So I could come back Thursday or Friday or we could kick this

24 to Tuesday, as had previously been contemplated, but I just

25 can't be back tomorrow.

1          THE COURT:  Well, could you appear by Zoom if I

2   have it in the afternoon --

3          MR. LAURIA:  It would have to --

4          THE COURT:  -- tomorrow afternoon?

5          MR. LAURIA:  It would have to be in the afternoon.

6          THE COURT:  I mean, the only thing would be -- the

7   only thing I'm going to do tomorrow -- I think what I need to

8   do tomorrow is finalize the DIP, whether I'm going to approve

9   it or not, and we need to get the bid procedures done, too.

10  Those two things need to be done by tomorrow.

11         MR. LAURIA:  Those -- I'm here to argue the bid

12  procedures, as well.  I suppose, if tomorrow is going to be a

13  Zoom hearing, I could make that.  I don't know -- in the

14  afternoon, it would have be mid-afternoon just to give me

15  some cushion around Judge Swain's schedule.

16         THE COURT:  Okay.  How about -- anybody else want

17  to talk about scheduling issues or --

18         MS. SINCLAIR:  Yes, Your Honor.  From our

19  perspective, it's best to go forward with as much as possible

20  tomorrow.  I think Mr. Goldstein might like to weigh in, as

21  well.

22         THE COURT:  Mr. Goldstein?

23         MR. GOLDSTEIN:  I apologize, Your Honor.  I was

24  just confirming with my co-counsel.  What was the question?

25         MS. SINCLAIR:  He was just asking about scheduling

1  --

2              THE COURT:  Scheduling.

3              MS. SINCLAIR:  -- for tonight and tomorrow.

4              UNIDENTIFIED:  Mid-afternoon tomorrow.

5        (Participants confer)

6              MR. GOLDSTEIN:  Yeah, mid-afternoon tomorrow,

7  Zoom, is going to work for us.  I -- what we were trying to

8  figure out is if we should try to convene a call with our

9  clients tonight.  I don't want to waste Your Honor's time or

10 keep you here longer than necessary if we can try to resolve

11 the DIP order tonight.

12             THE COURT:  Okay.

13             MR. GOLDSTEIN:  But if you'd prefer us to deal

14 with it tomorrow ...

15             THE COURT:  Yeah.  Why don't we do it tomorrow?

16 That will give you time to get a hold of your clients --

17             MR. GOLDSTEIN:  Okay.

18             THE COURT:  -- and talk about it.

19             MR. GOLDSTEIN:  Thank you.

20             THE COURT:  SO let's schedule -- I have an

21 emergency hearing at 10 a.m. tomorrow and a discovery dispute

22 teleconference at one o'clock.  So why don't we say we come

23 back at two o'clock and do it by Zoom?  We'll do it by Zoom,

24 so nobody has to travel back down here tomorrow morning.

25             MS. SINCLAIR:  Yes, Your Honor.  That works for

1  us.

2          Just to clarify, will we go forward with the

3  bidding procedures and the exclusivity motions tomorrow, in

4  addition to the DIP?

5          THE COURT:  Yes, we'll do the DIP tomorrow, we'll

6  do the bidding procedures, exclusivity, and whatever else we

7  can get to.  We have the Chapter 11 Trustee issue and the

8  lifting of the stay, too.  If we can get to that, we'll get

9  to it; if not, we'll push it off to --

10          MS. SINCLAIR:  Yes, Your Honor.

11          THE COURT:  -- a later date.

12          MR. LAURIA:  Your Honor, if I may, just on the --

13  on our motion, I would really strongly prefer to be able to

14  be here in person to argue that.  And you know, I -- until

15  things kind of moved around this afternoon, I thought we were

16  doing that -- whatever we didn't get done on Tuesday --

17  today, we were going to do next Tuesday, the 17th.  So I'd

18  really prefer to continue to use that time for that purpose

19  and take care of the bidding procedures and cleanup of the

20  DIP tomorrow by Zoom, if possible.

21          THE COURT:  Any objection to pushing to the

22  exclusivity to the 17th?

23      (Participants confer)

24          UNIDENTIFIED:  One second, Your Honor.

25      (Participants confer)

1              MS. SINCLAIR:  Your Honor, we would be okay,

2    collectively, going forward with exclusivity on the 17th,

3    solely if Your Honor confirms that the record for evidence is

4    now closed on that motion.

5              THE COURT:  Yes, I think we --

6              MS. SINCLAIR:  And everything else will --

7              THE COURT:  -- we did that --

8              MS. SINCLAIR:  -- go forward tomorrow.

9              THE COURT:  -- at the beginning of the trial --

10             MR. LAURIA:  Yeah.

11             THE COURT:  -- I thought, yeah.

12             MS. SINCLAIR:  Yes, Your Honor.

13             THE COURT:  Okay.  Okay.  So tomorrow, two

14   o'clock, Zoom hearing, DIP and bid procedures.  Come back on

15   the 17th and we'll do the motions from the 2L lenders.  Okay?

16             MS. SINCLAIR:  Yes, Your Honor.  Thank you.

17             THE COURT:  Okay.  All right.  Thank you.

18             We're adjourned.  Thank you, everybody.  I

19   appreciate everybody sticking around to get this done.

20             MS. SINCLAIR:  Thank you very much for

21   accommodating us.

22             UNIDENTIFIED:  We appreciate you sticking around.

23        (Laughter)

24        (Proceedings adjourned to 12/11/24 at 2:00 p.m.)

25        (Concluded at 6:19 p.m.)

1                              CERTIFICATION

2            We certify that the foregoing is a correct

3 transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter to the best of our

5 knowledge and ability.

6

7 /s/ William J. Garling                    December 17, 2024

8 William J. Garling, CET-543

9 Certified Court Transcriptionist

10 For Reliable

11

12 /s/ Tracey J. Williams                    December 17, 2024

13 Tracey J. Williams, CET-914

14 Certified Court Transcriptionist

15 For Reliable

16

17 /s/ Mary Zajaczkowski                     December 17, 2024

18 Mary Zajaczkowski, CET-531

19 Certified Court Transcriptionist

20 For Reliable

21

22 /s/ Coleen Rand                           December 17, 2024

23 Coleen Rand, CET-341

24 Certified Court Transcriptionist

25 For Reliable