**<u>EXHIBIT F</u>**

```
                       UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE


IN RE:                         .  Chapter 11
                               .  Case No. 24-12480 (JTD)
FRANCHISE GROUP, INC.,         .
et al.,                        .  (Jointly Administered)
                               .
                               .  Courtroom No. 5
                               .  824 North Market Street
           Debtors.            .  Wilmington, Delaware 19801
                               .
                               .  Wednesday, December 11, 2024
. . . . . . . . . . . . . . .  2:00 p.m.

                        TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE JOHN T. DORSEY
                  UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Matthew Lunn, Esquire
                          YOUNG CONAWAY STARGATT & TAYLOR LLP
                          Rodney Square
                          1000 North King Street
                          Wilmington, Delaware 19801

                          Debra Sinclair, Esquire
                          WILLKIE FARR & GALLAGHER LLP
                          787 Seventh Avenue
                          New York, New York 10019


(APPEARANCES CONTINUED)

Audio Operator:           Electronically Recorded by
                          Court Personnel

Transcription Company:    Reliable
                          The Nemours Building
                          1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
                          Telephone: (302)654-8080
                          Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

1    APPEARANCES (CONTINUED):

2    For the Ad Hoc Group
     of Freedom Lenders:        Christopher Shore, Esquire
3                               Thomas Lauria, Esquire
                                WHITE & CASE LLP
4                               1221 6th Avenue
                                New York, New York 10020
5
     For the Ad Hoc Group
6    of First Lien Lenders:     Daniel Fliman, Esquire
                                Isaac Sasson, Esquire
7                               PAUL HASTINGS LLP
                                200 Park Avenue
8                               New York, New York 10166

9    For the Committee:         Paul Labov, Esquire
                                PACHULSKI STANG ZIEHL & JONES LLP
10                              780 Third Avenue
                                34th Floor
11                              New York, New York 10017

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                 INDEX

2   MOTIONS:                                                      PAGE

3   Agenda
    Item 16: Debtors Motion for Entry of Orders (I)          4
4            (A) Approving Bidding Procedures for
             the Sale of All or Substantially All
5            of the Debtors' Assets, (B) Scheduling
             an Auction and a Sale Hearing and
6            Approving the Form and Manner of
             Notice Thereof, (C) Approving
7            Assumption and Assignment Procedures,
             and (D) Granting Related Relief; and
8            (II) (A) Approving the Sale of the
             Debtors' Assets Free and Clear of
9            Liens, Claims, Interests, and
             Encumbrances, (B) Approving the
10           Assumption and Assignment of Executory
             Contracts and Unexpired Leases, and
11           (C) Granting Related Relief [D.I. 154,
             11/11/24]
12
             Court's Ruling:                                 6
13
    Agenda
14  Item 23: Motion of Ad Hoc Group of First Lien           23
             Lenders for Entry of an Order Granting
15           Leave to File Replies in Support of
             the Debtors' (1) DIP Motion and (2)
16           Bidding Procedures Motion [D.I. 369,
             12/6/24]
17
             Court's Ruling:                                 34
18

19

20

21

22

23

24

25

1          (Proceedings resumed at 2:00 p.m.)

2          THE COURT:  Good afternoon.  This is Judge Dorsey.

3    We're on the record in Franchise Group, Inc., Case No. 24-

4    12480.

5          I will go ahead and turn it over to debtors

6    counsel to run the agenda and see where we are.

7          MS. SINCLAIR:  Thank you, Your Honor.  Good

8    afternoon.  Debra Sinclair, Willkie Farr & Gallagher, for the

9    record.

10          Your Honor, when we broke yesterday, we were still

11    considering the approval of the DIP order and we understand

12    that Paul Hastings took yesterday evening to confer with

13    their clients and that we collectively believe that we do

14    have a solution that addresses Your Honor's concerns stated

15    on the record yesterday.  So, I will cede the podium to Mr.

16    Fliman to explain to the Court what the proposed solution is.

17          THE COURT:  Okay, thank you.

18          Mr. Fliman.

19          MR. FLIMAN:  Good afternoon, Your Honor. For

20    record Dan Fliman, Paul Hastings, for the first lien group.

21          Your Honor, responsive to your comments yesterday

22    we conferred with our group, our group, which consists of

23    acquired lenders of the DIP.  Based on those discussions I

24    can report to the Court that the first lien group agrees to

25    the debtors revising their plan to provide that any releases

1  of the DIP lenders or the first lien lenders will be subject

2  to the investigation conducted by the Holdco debtors

3  independent director that was appointed.

4          To be clear, Your Honor, the first lien group

5  agrees that making those revisions to the plan will not be an

6  event of default under the DIP or any kind of termination

7  right under the RSA.

8          THE COURT:  Okay, thank you.

9          MR. FLIMAN:  Thank you, Your Honor.

10          THE COURT:  Alright, with that, as I indicated

11  yesterday, I was inclined to and I will enter --

12          MR. LAURIA:  Your Honor, if I may ask one

13  question.

14          THE COURT:  Go ahead.

15          MR. LAURIA:  Is that going to be reflected in an

16  order or somewhere in writing so we don't have to refer to

17  the transcript of this proceeding.

18          THE COURT:  I think Mr. Fliman said they were

19  going to amend the proposed plan to include that.

20          MR. FLIMAN:  Right, Your Honor. The debtors will

21  be revising the proposed plan in an order to reflect that

22  change.  Now in the interim my representation, I think,

23  should be sufficient that the DIP lenders are not going to

24  call default with respect to that change that we just

25  consented to under the DIP or the RSA.

1        THE COURT:  Okay, and I will accept that

2   representation on the record and will hold them to it.  So,

3   with that I am going to approve the DIP motion.  As I

4   indicated yesterday, I believe the debtors have established

5   that they have used their business judgment in determining

6   which DIP was appropriate and that the terms of the DIP were

7   appropriate.  I think the size is appropriate given the

8   nature of this case and the need to ensure that the debtors

9   preserve value on a going concern basis as they pursue a sale

10  process.  I am not going to substitute my business judgment,

11  if I did at all, in connection with the entry into the DIP by

12  the debtors.

13        The question about whether to apply the entire

14  fairness issue I thought about that last night. I don't think

15  that there is a basis to do so.  There is no conflict here

16  because it's between the debtors and a third-party lender,

17  not intra-debtor debt.  In fact, even if I were to apply the

18  entire fairness standard, I don't think you can get anymore

19  fair then saying that we're going to loan to the Holdco

20  companies on a no fee, no interest, no amortization basis.

21  You certainly are not going to find any better terms then

22  that out in the market place.  So, for those reasons I will

23  approve the order.

24        Do we need to upload an additional revised form of

25  order?

1        MS. SINCLAIR:  Thank you, Your Honor. I will ask

2  Mr. Lunn to weigh in on that. I don't know that we had

3  further revisions to the order that has already been

4  uploaded.

5        MR. LUNN:  Your Honor, I'm not sure that we do.

6  For the record, Matthew Lunn from Young Conaway.  I am not

7  sure that we do but we will coordinate in the back channels

8  here and make sure an appropriate order has been uploaded.

9        THE COURT:  Okay.

10        MS. SINCLAIR:  Thank you, Your Honor.  I will also

11  cede the podium to Mr. Lunn who will be doing the

12  presentation on the bidding procedures for the debtors.

13        THE COURT:  Okay, Mr. Lunn.

14        MR. LAURIA:  Will the order include the budget?

15        MS. SINCLAIR:  For the record Deborah Sinclair.

16  We did file the revised budget last night following the

17  hearing as I stated on the record yesterday.

18        THE COURT:  And I have seen it.

19        MR. LAURIA:  So, its going to be attached to the

20  order?

21        THE COURT:  Yes, it will be.

22        ECRO:  Your Honor, can you have this gentleman

23  identify himself, please.

24        THE COURT:  Its Mr. Lauria. Mr. Lauria, can you -

25  - we need to change your name.  You just have Franchise Group

1  listed on your thing. That way our ECRO can make sure who is

2  speaking and when.

3          MR. LAURIA:  Sorry about that, Your Honor.  I will

4  look to the people who know how to do that kind of thing and

5  see if they can do it. I certainly don't have the know-how or

6  wherewithal to do that. I will make sure to introduce myself

7  each time I speak.

8          THE COURT:  I think we can actually do it from

9  here once we have your name.  So, can you change it to Mr.

10 Lauria's name.

11          You can go ahead while we're waiting to do that.

12          MR. LUNN:  Thank you, Your Honor.  For the record

13 Matthew Lunn from Young Conaway on behalf of the debtors.

14          I will be handling the bid procedures, which is a

15 carryover from yesterday's hearing.  The debtors, through the

16 bid procedures motion, are requesting approval of rules and

17 procedures for the marketing of their assets. The debtors

18 filed revised bid procedures last week which appear at Docket

19 No. 335.  There was a slightly updated procedures filed this

20 morning that appears at Docket No. 404 and this was simply to

21 make some clarifications to the footnote regarding what

22 causes of action may or may not be included in the sale.

23          The revised bid procedures, Your Honor,

24 incorporate enhancements and modifications that have resolved

25 the UCC's issues as well as issues that have been raised by

1  certain landlords. The debtors were also able to reach

2  yesterday, during the course of yesterday's hearing,

3  additional concessions with other landlords; those

4  particularly represented by Mr. LeHane.  Leaving, therefore,

5  the only outstanding objection to the bid procedures was the

6  objection being advanced by the Freedom lenders.

7          With respect to the modifications or enhancements

8  to the procedures, Your Honor, as the Court would expect, the

9  debtors engaged with the committee, facilitated discussions

10 with the 1L's to modify the procedures.  And I am not going

11 to walk Your Honor through to those procedures that have been

12 modified as they have been on file for some time now but I do

13 want to hit the enhancements because I think it's appropriate

14 and I think that was really the crux of the issues yesterday.

15         With respect to the modifications and

16 enhancements, the overall timeline with respect to the sale

17 process is that it has been extended by a week and a half.

18 Initial indications of interest have been extended by a week

19 to December 23rd.  The bid deadline has been extended from

20 December -- excuse me, January 23rd to now February 23rd

21 which is 92 days from the petition date.

22         If bids are received there will be an auction on

23 February 7th, a sale hearing, if there is no auction, Your

24 Honor, would be set for February 10th or if there is an

25 auction on Februa 13th; all subject to Your Honor's

1  availability, of course.  Adequate assurance information will

2  be emailed within 24 hours of receipt of bids.  We also have

3  a one business to send them by mail.

4         Your Honor heard quite a bit about the designation

5  of minimum bid amounts by each company yesterday.  That has

6  been added as well to the procedures so everyone understands

7  the mark that they need to hit to get to an auction.  Freedom

8  lenders have been provided with certain consent and

9  consultation rights.  Those consultation rights are those

10 that mirror those that have been provided to the UCC as well

11 as to the 1L's and consent rights are with respect to

12 modifications that would, otherwise, impact their

13 consultation rights.

14        There was clarification with respect to commercial

15 tort claims and Chapter V causes of action that aren't being

16 sold unless they relate to a transferred asset.  I am not

17 going to overburden the record, Your Honor, with argument.  A

18 lot of this is included in our papers and we will rely on our

19 papers as to why the bid procedures are appropriate and are,

20 in fact, designed to maximize value and, therefore, should be

21 approved.

22        With that being said, the proposed procedures are

23 typical of the procedures that Your Honor is accustomed to

24 seeing and has approved in dozens of cases.  We are not

25 seeking approval of a breakup fee in advance approval of an

1  expense reimbursement. So, one way you can question why the

2  debtors are proceeding to gain approval or entry of an order

3  establishing these procedures.

4      It's important from the debtors perspective that

5  the procedures are approved to set ground rules so that all

6  parties are on notice as to what is expected and what is

7  required to result in an open and fair process.  And an open

8  and fair process the debtors believe is designed to maximize

9  value for the benefit of all of the debtors stakeholders.

10      Importantly, this is a process now that is

11  supported not only by the 1L's but also by the committee, the

12  estate's other fiduciary in these cases.  The complaints that

13  are being advanced by the Freedom lenders are about repour,

14  about time, and essentially delay.  More specifically, about

15  adding time to and delay to a process.  Sixty more days from

16  the end of the process that the debtors propose to be

17  precise. They are claiming 60 more days is necessary because

18  the debtors have liquidity to support another 60 days of a

19  sale process.

20      Necessary because the Freedom lenders believe that

21  the information that the debtors are making available is

22  insufficient.  Not more time because potential bidders,

23  purchasers have said that they don't have sufficient time to

24  formulate a bid, not more time because bidders have claimed

25  that there is a lack of information or questioning the

1  quality of the information that the debtors are making

2  available.

3          As I think everyone recognizes, the due diligence

4  process as conducted by bidders is a fluid process with

5  parties asking for diligence and the debtors responding.  If

6  Freedom lenders want to play Monday morning quarterback, Your

7  Honor, and poke holes in what the debtors have provided thus

8  far and what is not, otherwise, being provided in SIM, ands

9  they are using that as the basis to argue to Your Honor that

10 the timeline needs to be stretched in addition to liquidity.

11 No one, even the debtors cannot predict what a party would

12 want in terms of diligence or what they would want to do in

13 connection with their own analysis as part of their own

14 diligence.

15         The Freedom lenders business judgment you ignore

16 what has become the standard 45-to-60-day sale timeline and

17 instead what they are arguing is that you must key that off

18 of what your liquidity provides.  In the Freedom lenders

19 view, Your Honor, is that the debtors have 60 more days of

20 liquidity so let's use that time, let's use all of the

21 available funds even though the additional time, as Mr. Grubb

22 has testified to, is not necessary to run a fulsome and fair

23 and open process.

24         Even though a longer sale timeline, as everyone

25 understands, will result in administrative expense claims,

1  additional administrative expense claims that have the

2  potential for increasing DIP borrowings which would only put

3  Freedom lenders further away from recovery. It's simply

4  nonsensical to run a process out until the debtors run out of

5  liquidity which is what the Freedom lenders are suggesting

6  that Your Honor do.

7          Why are they insisting on more time?  They are

8  requesting more time and additional time and to delay the

9  overall restructuring of the debtors because that parlays

10 into the Freedom lenders objections to the DIP, as Your Honor

11 heard yesterday, and their motion to terminate exclusivity,

12 appoint a trustee, and relief from the automatic stay that is

13 now scheduled for next Tuesday; however, as the evidence and

14 the testimony from Mr. Grubb demonstrates, additional time is

15 not warranted, necessary or appropriate.

16          Your Honor heard testimony from Mr. Grubb as to

17 why the sale timeline and process maximizes value.  This

18 process is typical of what the debtors are proposing, its

19 typical of the procedures that Your Honor has approved and

20 other Courts in this jurisdiction of multiple 363 sales.  The

21 debtors have been marketing since September of this year.

22 They reached out again immediately after the petition date.

23          This timeline is longer then almost all the

24 timelines, I believe, that Your Honor has seen and approved.

25 In fact, and while Mr. Augustine dodged the questions, even

1   his rule of thumb, as he testified to, is 75 days from the

2   initial outreach.  The debtors process is well beyond that

3   75-day rule of thumb.  As now, as modified, the bids are now

4   due 92 days from the petition date.

5          Ignoring established sale timeline precedent in

6   Mr. Augustine's rule of thumb the Freedom lenders argue that

7   the timeline now must tie to liquidity, again, even if that

8   liquidity means that you get an extra 60 days if the debtors

9   need to use it.  It's simply nonsensical.  Why would the

10  debtors run a process until they effectively run out of

11  liquidity.  There are numerous parties in the process.  The

12  process has been enhanced with modifications and the process

13  now, as modified, is supported by the committee, the other

14  estate fiduciary.

15         Your Honor, I am only going to hit on the reserve

16  price because that was -- it seemed to be a part of an issue

17  that the Freedom lenders were taking, notwithstanding the

18  view from the debtors and I believe as well from the

19  committee that it's an overall enhancement to the process.

20  They are asking for a release price.  I think, as everyone

21  understands, release prices are not very typical.  They are

22  not typical because the secured lender does  not necessarily

23  want everyone to know exactly what they value the collateral

24  at.

25         Here, the debtors were able to negotiate and set

1  minimum bid amounts so that parties actually will know what

2  is necessary to hit the mark to guarantee an auction and, in

3  fact, this is helpful to the estate and the debtors to avoid

4  some random low-ball offer and avoid the debtors wasting time

5  on offers that, otherwise, would not even come near these

6  minimum bids.  With that said, Your Honor, even if there is a

7  bid that may not hit that minimum bid the debtors are

8  cognizant of their fiduciary duty and will still entertain

9  these bids if, in fact, overall, it may maximize value.

10          In conclusion, Your Honor, you are not hearing

11  that a sale process whit established rules and guidelines

12  shouldn't be approved.  Really what we have is a difference

13  of an opinion and a difference of view as to what is

14  appropriate as to the length of the sale process.  What the

15  debtors determined in the exercise of their business

16  judgment, as is demonstrated by Mr. Grubb's testimony, is

17  that 92 days to a bid deadline from the petition date is

18  enough under the circumstances.

19          The proposed sale process, as I have said, is much

20  longer then what Your Honor has typically seen and approved.

21  Its longer then Mr. Augustine's rule of thumb and in other

22  words the sale process is anything but expedited.  The

23  debtors have to strike a balance of the expediency with the

24  overall time and as the testimony from Mr. Grubb demonstrates

25  the debtors have struck that balance.

1    There is no discernible reason other than the

2  debtors have potential liquidity to go longer and the Freedom

3  lenders want 60 days but that is simply not value maximizing

4  in the debtors view.  The debtors business judgment in

5  setting the timeline should not be substituted for that of

6  the Freedom lenders business judgment, an entity that does

7  not owe any fiduciary duty to these estates.

8    For these reasons, Your Honor, we would request

9  approval of the procedures as have been modified.  I am happy

10  to address any questions Your Honor may have.

11    THE COURT:  Not at this time. Thank you, Mr. Lunn.

12    Mr. Lauria -- oh, I'm sorry, Mr. Sasson, for the

13  1L's.  I'm sorry.

14    MR. SASSON:  No worries, Your Honor.  For the

15  record Isaac Sasson from Paul Hastings on behalf of the ad

16  hoc group of first lien lenders.

17    Your Honor, this is the second time we are before

18  this Court on a spill-over day for a series of contested

19  motions filed by the debtors.  The second time the Freedom

20  lender group junior creditors who to date have not put in one

21  dollar of their own capital at risk will ask this Court to

22  supplant the debtors business judgment for that of their own.

23  The second time the Freedom lender group has tried to blow

24  minor points in a globally negotiated deal out of proportion

25  with the aim of putting these Chapter 11 cases on a path to

1  nowhere.

2            Your Honor, so for now, what seems like the

3  umpteenth time in these Chapter 11 cases we stand before you

4  asking to very simply allow the debtors to exercise their

5  fiduciary duties according to their business judgment. The

6  first lien group filed a joinder to the bidding procedures at

7  Docket No. 368.  We echo many of the points made by the

8  debtors and Mr. Lunn just now. So, we won't belabor the point

9  here.

10           We rise to emphasize two points in response to

11  Freedom lender group's objection.  First, its unclear but it

12  seems that the Freedom lender group are trying to establish

13  that cause exists to cap the first lien groups credit bid

14  price as part of the auction process.  We don't believe there

15  is any cause here.  Second, the sale process timeline, in

16  particular as it has been extended at the request of the

17  debtors and the committee, provides the debtors more than

18  sufficient time for a competitive sale process.

19           Your Honor, I want to start, if I may, with the

20  minimum bid concept.  As Mr. Grubb testified yesterday, the

21  minimum bid prices for each of the debtors business lines,

22  which is an accommodation requested by the debtors of the

23  first lien group, "will encourage competitive informed

24  bidding because the prices will eliminate any doubt that

25  bidders may have as to (I) whether the assets can be sold

1  separately or (II) whether bidders need to bid on all of

2  their assets or alternatively rely on others to bid on assets

3  for their bid to be actionable."  That is at Paragraphs 16

4  and 21 of Mr. Grubb's declaration.

5          The testimony of Mr. Augustine, for what it's

6  worth, is not an estate fiduciary and was retained only a few

7  weeks ago is not to the contrary. While Mr. Augustine

8  generally believes that capping the first lien lenders credit

9  bid rights to probe Mr. Augustine will likely or could result

10 in value being maximized, Mr. Augustine separately testified

11 and, again, this is at Paragraph 13 of Mr. Augustine's

12 declaration, it is in the best interest of the estate to

13 inform bidders that (I) these assets can be sold separately

14 and (II) a bidder does not have to bid on all of the assets

15 or rely on others to bid on the remaining assets for their

16 bid to be actionable.

17          Your Honor, (indiscernible) debtors are doing here

18 as part of the minimum bid prices. Each of the bidders know

19 what they do not have to bid on.  They know they don't have

20 to bid on all the assets, they know where they have to

21 establish their bid to bid on a single asset for their bid to

22 be actionable.  So even Mr. Augustine himself agrees that

23 this is a value maximizing sale process.

24          Your Honor, Mr. Augustine also takes issue with

25 the idea of the minimum bid price altogether, arguing that in

1   his 35-year experience he has only ever seen minimum bid

2   prices in stalking horse sales and in stalking horse sales

3   they are okay.  In this case the Freedom lender group itself,

4   and this is at Paragraph 36 of their objection, argues that

5   the plan toggle and the equitization toggle is akin to a

6   stalking horse bid.  So, the first lien groups is,

7   effectively, a stalking horse bid.

8           In that case, according to Mr. Augustine, the

9   minimum bid price, again, would be typical and customary.

10  For what its worth, setting it at $300 million less than the

11  total debt, so DIP ABL and 1L is $1.4, the minimum bid prices

12  are about $1.1, actually incentivizes further bidding as you

13  don't have to clear all the debt in order to go to auction.

14          Just the last piece on minimum bid prices, Mr.

15  Augustine yesterday took the actual prices that were

16  discussed. He simultaneously argued that PSP is set too high

17  and this would discourage any hypothetical bidders who would

18  only bid $850 million but the VSI price, for what its worth,

19  was set too low and would provide a disincentive for bidders

20  to participate because in his view it signals a fire sale.

21          Putting aside the absurdity of that premise, we

22  have eight separate bidders who would bid exactly below the

23  minimum bid price only to raise their bid at auction but they

24  wouldn't actually bid the minimum bid price at auction. It's

25  not clear what Mr. Augustine was pushing for.  Are lower

1  prices value maximizing or do they signal a fire sale.  Do

2  higher prices incentive bidding or do they insure that eight

3  hypothetical bidders all would be willing to bid exactly what

4  is below the minimum price.  As Mr. Lunn mentioned earlier,

5  this process is fluid and Mr. Augustine's goldilocks view on

6  how to run a 363 auction should not be credence by the Court

7  today.

8          In any event, as Mr. Grubb testified yesterday,

9  the minimum bid prices requested by the debtors and provided

10 by the first lien group as an accommodation provides for a

11 value maximizing proposition and sale process.  There is no

12 evidence to the contrary and no evidence to cap the first

13 lien lenders ability to bid above that.

14          Your Honor, unless you have any questions on

15 minimum bid prices I will move to the timeline.

16          THE COURT:  Okay.

17          MR. SASSON:  On the timeline it's the same thing.

18 As a request of the committee and the debtors the first lien

19 group has agreed to extend the timeline by approximately a

20 week and a half.  The current bid deadline of February 3rd is

21 92 days after the petition date, 84 days after when the

22 motion was filed, 54 days from today, and 30 days after the

23 end of the holiday season that the first lien group seems so

24 focused on.

25          Initially, Your Honor, it's unclear whether the

1  Freedom lender group actually believed that the timeline set

2  forth in this sale process is inadequate.  As was apparent

3  from Mr. Augustine's testimony yesterday, Mr. Augustine

4  doesn't necessarily take aim at the timing itself, timing

5  that Mr. Augustine when he's on the debtors' side has

6  testified is sufficient, but takes aim with the information

7  the debtors are including in their CIMs and how much that may

8  affect the timeline.  However, much to Mr. Augustine's

9  apparent chagrin, Greenhill is not the debtors' investment

10  banker, and the Freedom lender group cannot supplant the

11  debtors' views as to maximizing value.  While Mr. Augustine

12  is not sure, to quote his testimony yesterday, that the

13  market is being canvassed, or while he would prefer four wall

14  EBITDA information to be included in a CIM and not a data

15  room, that does not provide a basis to elongate the process

16  by an additional two months.

17         And, Your Honor, on this point, Mr. Grubb's

18  testimony in his declaration is informative.  Mr. Grubb's

19  point, other than the Freedom lender group itself, who, for

20  what it's worth, had months to put in a bid as part of the

21  prepetition restructuring negotiation, then failed to do so,

22  not one of the potential bidders had indicated any concerns

23  with the proposed milestones embodied in the original bidding

24  procedures, let alone a deadline as agreed set forth in the

25  revised.  And, Your Honor, that's in Mr. Grubb's declaration

1  at paragraph 19.

2        So the timeline as proposed was meant to ensure a

3  robust, to quote Mr. Grubb, sale process, and give bidders

4  sufficient time to submit a bid for the assets.  As amended,

5  the revised timeline gives bidders even more time, and the

6  first lien group admits there's no basis to further lengthen

7  the timeline today.

8        But, Your Honor, unless you have any further

9  questions, we respectfully ask that for these reasons and the

10 reasons stated by the debtors the Court grant the motion.

11       THE COURT:  Okay, no questions.  Thank you.

12       Mr. Labov for the committee?

13       MR. LABOV:  Thank you, Your Honor.  Good

14 afternoon, Paul Labov, Pachulski Stang Ziehl & Jones, on

15 behalf of the committee, Your Honor.

16       Your Honor, I thought it might be helpful if we

17 just took a step back and give you the committee perspective

18 with respect to the bidding procedures.  I won't get too much

19 into what transpired over the last couple of days, but as

20 Your Honor knows, the committee walked into a situation in

21 which there seemed to be, putting it mildly, a great deal of

22 disagreement among the debtors and the 1Ls on the one side

23 and the 2Ls on the other.  And so as the committee, you know,

24 that's actually a very privileged position for us because

25 what we'd like to do to come into that position is try to

1  bring people together and try to make the process work, if at

2  all possible.  And if not, that's the nice thing about being

3  the committee because we can evaluate what's already happened

4  and we can see what the strategy is moving forward.  And we

5  don't pick favorites and we don't play sides.  What we get to

6  do is be thoughtful about the process.

7          And so what we -- our mission statement here is

8  twofold:  Do no harm and improve upon a process, if that's at

9  all possible.  And so we had our investment bankers, Perella

10 Weinberg Partners, take a look at the process itself.  And we

11 of course at Pachulski have a great deal of experience in

12 this space, we looked at the process ourselves, and we

13 determined that this process was in fact framed out

14 appropriately from the get-go; however, there were further

15 improvements that needed to be made to the process.

16         And so rather than tear down the structure of what

17 was already there, and the costs and the uncertainty that

18 Your Honor heard so much about yesterday that would entail if

19 in fact the process was moved out or turned upside down, we

20 endeavored to really improve upon it.

21         And so there were really three areas, I'll get

22 into them briefly.  The first was the timeline.

23         Now, when we looked at the initial timeline and we

24 saw that there was a holiday in the middle of it, Christmas

25 and New Year's, we went immediately to our investment

1  bankers, who have a great deal of experience, as I said, in

2  this area, and we said, what looks good here?  And they told

3  us, look, if we could get one to two weeks and get past the

4  holidays, the people that are bidding on these assets, the

5  entities, they're very sophisticated, they know what these

6  assets look like; that would be wonderful.  And that's

7  exactly what we did, we went out, we asked for two weeks, we

8  got a week and a half, and we were very comfortable with

9  that.

10        There was another area that really kind of caused

11  us some consternation and that was the messaging.  If Your

12  Honor goes back and look, we will show that we were able to

13  disaggregate the bid.  So, initially, when you looked at

14  these bidding procedures, it looked like you have to come to

15  the party with a $1.6 billion bid.  Now, that's actually not

16  the case.  If you dug deep enough, you would find that in

17  fact you could disaggregate the bid.  We moved all of that

18  information into the bidding procedures themselves, so that

19  if anybody looked they would be able to understand that they

20  didn't need to come to the party with a $1.6 billion bid.

21  They could bid on individual business segments.

22        In addition to that messaging, Your Honor, there's

23  actually a substantive piece, and you've heard all about it

24  with the reserved pricing or the minimum bid pricing.

25        Just so Your Honor is very clear on this, those

1  are not numbers that were pulled out of thin air; those are

2  numbers that were vetted by, at least on our side, our

3  investment bankers.  Those were numbers that were designed to

4  actually encourage bidding and increase bidding.  And you did

5  hear yesterday Mr. Augustine's testimony that one was too

6  high and one was too low, and certainly I can appreciate that

7  and we can appreciate his opinion on that, but our investment

8  banker said, no, these numbers are actually where we think

9  increased bidding will be encouraged.  So that's the second

10 area.

11         The third area that we think needed improvement --

12 and we think, again, it was a bit of a struggle, but we got

13 there -- was that we were able to carve out commercial tort

14 claims and avoidance actions, and those are -- those will be

15 left behind with the estate, we'll be dealing with those

16 later, but we think that doing so will absolutely inure to

17 the benefit of all the debtors' stakeholders.

18         So those were the three areas.  I will say that it

19 was not a walk in the park, but we had an open ear with

20 Willkie, we had an open ear with the 1Ls' counsel.  And even

21 until late last evening, Your Honor, we were negotiating

22 final points on this.

23         And so we think, after all that, I actually want

24 to thank Ms. Graber and Sinclair, Ms. Feldman, and then of

25 course Mr. Sasson and his team, because we actually got to

1   where we believe, as the committee, we have a really good set

2   of bidding procedures that will encourage bidding and

3   eventually maximize value.

4           I'm happy to answer any questions, Your Honor.

5           THE COURT:  No questions.  Thank you.

6           Anyone else in support of the motion?

7       (No verbal response)

8           THE COURT:  Okay.  Mr. Lauria.

9           MR. LAURIA:  Good afternoon, Your Honor.  Can you

10  hear me okay?

11          THE COURT:  I can.  Thank you.

12          MR. LAURIA:  My name is Thomas Lauria, I'm with

13  White & Case, we represent the Freedom Holdco Lender Group.

14          I guess I want to start out just by observing a

15  couple of things about the commentary that was made by some

16  of the supporters of the bid procedures.  I guess I've been

17  characterized as a Monday morning quarterback here.  In my

18  understanding of that phrase, it refers to someone who

19  criticizes something after the fact, and my understanding is

20  that the bid procedures are still alive and before the Court

21  for consideration.  So I don't know how I could be a Monday

22  morning quarterback.

23          With respect to the comments of the committee, I

24  think it's interesting -- two things I'd like to quickly

25  make.  Number one, the committee has portrayed itself as a

1  peacemaker here.  I can tell you as a matter of fact that I

2  have not been contacted by any representative of the

3  committee by email, text, or phone call since the committee

4  came into place.  So if they're working to make peace,

5  they're certainly not doing it through contact with me.

6        Secondly, Counsel made a number of references to

7  the views of the committee's FA.  I'll just note for the

8  record that the committee's FA did not testify.  So any

9  representations regarding what the committee's FA thinks are

10 outside the record and are, if nothing else, hearsay -- not

11 even hearsay because it's not being offered by a witness,

12 it's just a lawyer talking.

13        So let's turn to the standard first of all.  I

14 think, as this Court knows, courts in Delaware have held that

15 bid procedures should provide benefit to the estate by

16 maximizing the value of the assets.  I can cite to Dura,

17 there are other cases that have held similarly.  As such, the

18 Court in connection with assessing bid procedures is not

19 required to defer to the business judgment.  This is not a

20 business judgment rule determination.  The Court is

21 completely free to do what it believes will achieve the

22 important objective of maximizing value based on the evidence

23 and the record provided to it.

24        Here, interestingly, I think everybody has

25 acknowledged that the procedures were largely dictated by the

1 first lien lenders who, rather than seeking to maximize

2 value, may in fact just want to own the assets themselves.

3 And so bidding procedures designed by the first lien lenders

4 may not necessarily advance the objective of maximizing the

5 value of the assets.

6 So I think we've got three points that we really

7 want to address and ask the Court to consider.  Number one is

8 whether or not the timeline should be extended.  Mr.

9 Augustine testified that the bid deadline should be

10 approximately 90 days from the date when bidders receive

11 complete information.  Here, he felt that that information

12 should include Q4 results, it should include benefits that

13 can be obtained from the Chapter 11 process, and it should

14 include four wall financial information for the stores.

15 I note this because I believe Mr. Augustine was by

16 far the most credible witness on this, and maybe the only

17 witness that could be qualified as an expert on the topic.

18 He testified that he had conducted or participated in a total

19 of 26 363 sales, 19 on the debtor's side and seven involving

20 retail, and seven additional transactions, two of which

21 involved retail.  In comparison, Mr. Grubb clearly

22 established by his testimony he had insufficient experience

23 with running 363 sales, much less in the retail space, to be

24 considered an expert.

25 So I think that you have quite compelling

1  testimony from Neil Augustine that -- a couple of things:

2  that we really should have a 90-day process for the bidders

3  to get good information, that it's disadvantageous to launch

4  a process during the holiday season, and that he would think

5  that you would look for IOIs at the end of January and have

6  bids at the end of March.

7          To be clear, Mr. Augustine didn't suggest, and nor

8  do I today, that we should just extend the bid process out

9  because that's what the debtors' liquidity will accommodate.

10 The process needs to be set in a rational way that furthers

11 the objective of maximizing the value of the assets.  Now, it

12 is noteworthy that Mr. Orlofsky testified that, based on the

13 current 13-week cash flow of the debtor, there would be no

14 liquidity issues from extending the bid process.

15          Now, whether the Court thinks that the best thing

16 to do is to adopt Mr. Augustine's view, which contemplates a

17 March 28th bid deadline, or some other date, I think it's

18 fair to say that we have no credible testimony that longer

19 isn't better.  And, indeed, Mr. Augustine specifically

20 testified that longer is better.  So whether or not we get

21 out to the end of March or some further date, whatever amount

22 of time we could get this deadline kicked out is going to

23 help make our process better.  I don't think there's any

24 evidence in the record to contest that.

25          Point number two.  With respect to the minimum

1  bids, again, Mr. Augustine testified that he thought that

2  putting in minimum bids would do nothing but chill the

3  bidding process and that minimum bids are not the equivalent

4  of a stalking horse bid because, unlike a stalking horse bid,

5  which is actionable if the bid is not topped, these minimum

6  bids are not actionable, they're just numbers and there's no

7  reason to drive potential bidders away by setting a number.

8  Let the market speak, let the market speak freely.  The

9  debtor is under no obligation to accept any bid that it

10 doesn't think is fair or value-maximizing.  And any bid that

11 the debtor does bring forward is going to be subject to a

12 topping bid, either a credit bid by the 1L lenders -- they

13 have, I think, until six hours before the commencement of an

14 auction to submit a credit bid -- so if any bid that is

15 brought forward that's a qualified bid is too low, the 1Ls

16 have their right to come in and top the credit bid, and they

17 have a significant amount of debt that they can use for that

18 purpose.

19        I think that what Mr. Augustine testified is that

20 more bidders is better because it creates competitive

21 tension.  Competition is what results in bidders increasing

22 their bids.  So, if we can increase competition, we're more

23 likely to get a higher price.  So we think that, as supported

24 by Mr. Augustine's testimony, the minimum bids should be

25 removed.

1          The final thing that I'd like to raise is really

2     two points of clarification that, as I read through the

3     bidding procedures, I can't quite understand.  Number one, I

4     think it should be clear that if the 1Ls' credit bid, they

5     cannot credit bid in the aggregate more than they're owed.

6     They can only credit bid, whether it's against one entity or

7     across all three, the aggregate credit bid cannot exceed the

8     amount that they're owed.  I'm not suggesting there should be

9     a cap other than the amount that they're owed.  I would be

10    surprised and disappointed if the 1L lenders believe that

11    they should somehow be able to credit bid more than the

12    amount of their debt.

13         The second clarification that I'd ask for, Your

14    Honor, is that if the 1Ls credit bid, once they credit bid up

15    to the full amount that they're owed, they don't get to keep

16    or receive other assets of the debtors.  They make their

17    credit bid, it gets up to the full amount they're owed,

18    that's it.  That's their debt, it's now being satisfied with

19    the assets that they get with their credit bid, or cash, if

20    their credit bid gets topped, in which case there's more cash

21    coming into the estates than they're owed, but in any event

22    their recovery should be limited to the amount they're owed

23    in either case.

24         Your Honor, with those, hopefully some

25    consideration of the timeline, some consideration on whether

1 or not the minimum bids are helpful, and with those

2 clarifications, we would be content to have the bidding

3 procedures approved.

4          THE COURT:  Okay.  Thank you, Mr. Lauria.

5          Mr. Lunn, any response?

6          MR. LUNN:  Just very briefly, Your Honor.  Again,

7 we heard about the information and the lack of information,

8 and a Monday morning quarterback is someone looking at what's

9 already out there and saying, ah, that's not right, that's

10 not enough, and that's exactly what's happening.  They're

11 saying that the information that's in or that is not in is

12 information that should be forthcoming.  The debtors will

13 update due diligence, they'll update the data room as and

14 when this information comes, that is the process, that is

15 what always happens.

16          With respect to -- and also with respect to the

17 process and the timeline, Your Honor hasn't heard anyone

18 saying and there hasn't been any testimony to say that people

19 are upset with what is happening now in terms of the timeline

20 or the information that's there.  In fact, it's the opposite.

21 You have the estate fiduciary, the committee standing up and

22 saying we support this timeline, we believe it's fair, it

23 will maximize value for everybody, and the debtors agree that

24 the timeline that the debtors have proposed, now as modified,

25 will result in a robust and fulsome process that is designed

1  to maximize value.

2          Your Honor again heard, you know, sometimes, hey,

3  let's have more time.  And I'm going to quote Judge Sontchi,

4  I can't remember the case, he once said that Chapter 11 cases

5  are not like a fine wine, they don't get better with age.  We

6  should not be extending the process to simply extend the

7  process because we have more liquidity or we don't.  It's

8  important to adhere to this timeline that we're talking about

9  here, again, supported by the other estate fiduciaries, Your

10 Honor.

11          And now I heard that the minimum bids requirement,

12 or at least that enhancement, should now be removed because

13 it somehow discourages the competitiveness, and I just -- I

14 don't -- I'm sorry, I just don't follow that.  These parties

15 will now know with the minimum bid what is necessary to hit

16 the mark to get to an auction.  That, from the debtors'

17 perspective, is an enhancement as it alerts parties to know

18 that, again, all of these different segments can be bought,

19 can be purchased on an individualized basis as well.  This is

20 an enhancement; removing that, from the debtors' perspective,

21 would go backwards, Your Honor.

22          Unless Your Honor has any other questions, we

23 would again request approval of the bid procedures as

24 modified.

25          THE COURT:  Okay.  Thank you.

1          Mr. Sasson.

2          MR. SASSON:  Your Honor, for the record, Isaac

3    Sasson from Paul Hastings.  Unless you have any questions, we

4    don't have anything to add.

5          THE COURT:  Okay.  Thank you.

6          Mr. Labov?

7          MR. LABOV:  Thank you, Your Honor.  Nothing to add

8    from the committee's perspective.

9          THE COURT:  Okay.  Thank you.  All right.

10          Obviously, parties can always disagree over

11    bidding procedures and what's appropriate and what's not

12    appropriate.  I haven't heard anything that leads me to

13    conclude that the debtors' determination that the process

14    needs to be carried out within the time that they provided

15    for -- and they've been successful in getting the 1L debtors

16    -- or, yeah, 1L lenders to extend that timeline, along with

17    the committee.  Mr. Augustine's testimony, while he says he

18    would choose a different path, doesn't convince me that what

19    the debtors have proposed is somehow flawed, or that it would

20    not result in a maximization of value here for the debtors.

21          The timeline I think is appropriate, it's

22    certainly within the realm of what I have approved, and other

23    judges in this district and around the country have approved,

24    in connection with a sale process.  And, therefore, I don't

25    think it's necessary to extend that timeline any further than

1  what it already has been extended.

2          The fact that there's a holiday, we're talking

3  about a big company with a lot of interests and sophisticated

4  parties who are going to be bidding on this.  You know, they

5  know how to work through the holidays and they do it on a

6  regular basis.  I've never seen any case where because there

7  was a holiday there was some concern that the bids weren't

8  going to come in the way that they should.

9          On the minimum bid issue, again, Mr. Augustine

10  takes a view that it will chill bidding.  The debtors say it

11  won't chill bidding; in fact it will improve the bidding

12  process.  I haven't heard anything that would convince me

13  that having the minimum bid somehow will chill that, I think,

14  other than Mr. Augustine's opinion that it will, but there's

15  nothing -- no concrete evidence was presented to me that in

16  the past where there's been minimum bids -- we see it all the

17  time in stalking horse cases, there's always a minimum bid in

18  a stalking horse case.  And here, clearly the 1L lenders,

19  everybody knows what they're owed, and they know that they

20  can credit bid and they can credit bid up to the amount of

21  their debt.

22          So putting in a minimum bid I think will actually

23  increase the bidding process and go a long way to maximizing

24  value.

25          The same holds true for the -- that the 1Ls can't

1  credit bid more than their debt.  That's a given.  I mean,

2  you can't credit bid more than what you're owed, that's just

3  the way it is.  So they can't credit bid, I don't think

4  there's anything -- I don't think we need to put anything in

5  the bid procedures that says that, that's a foregone

6  conclusion.  So I don't think there's any need to modify the

7  bid procedures on that issue either.

8          So, for those reasons, I will approve the bidding

9  procedures.  Do we have a final uploaded order?  Mr. Lunn,

10 you mentioned there was some small changes that were made

11 earlier.

12         MR. LUNN:  Yeah, there were, Your Honor.  Again,

13 for the record, Matthew Lunn.  I do believe that we would

14 need hearing dates and times for February 10th and the 14th

15 to plug into the order, and then otherwise I think we can

16 upload the order as it has been filed recently.

17         THE COURT:  Okay.  Once it's uploaded, we'll get

18 that order entered.

19         MR. LUNN:  Okay, great.  Thank you, Your Honor.

20         THE COURT:  All right.  Anything else for today?

21         MR. LUNN:  Not from the debtors' perspective, Your

22 Honor.

23         THE COURT:  Okay.  So we are on for -- let me try

24 to get the date right -- the 19th, is that when we're getting

25 back together again?  No.

1          COUNSEL:  The 17th, Your Honor.

2          THE COURT:  The 17th, 17th, yes.  All right, I do

3  have -- just so you know, I've got three other hearings that

4  day.  I've scheduled this for 11:00, I've got a 10 o'clock;

5  I've got a 2 o'clock and a 3 o'clock.  Hopefully, those

6  afternoon ones might go away, so if we do need to go further

7  -- although we did close the record, so there should be no

8  additional evidence, we're just talking about oral argument,

9  so I don't anticipate it will take too much time on the

10 calendar.

11         So, with that, I will see everybody on the 17th.

12         COUNSEL:  Thank you, Your Honor.

13         THE COURT:  Thank you all.  We're adjourned.

14      (Proceedings concluded at 2:49 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                December 12, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                December 12, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25