**<u>EXHIBIT G</u>**

1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2
                                      .  Chapter 11
3    IN RE:                           .  Case No. 24-12480 (JTD)
                                      .
4    FRANCHISE GROUP, INC.,           .  (Jointly Administered)
     *et al.*,                        .
5                                     .
                                      .  Courtroom No. 5
6            Debtors.                 .  824 North Market Street
                                      .  Wilmington, Delaware 19801
7                                     .
                                      .  Tuesday, December 17, 2024
8    . . . . . . . . . . . . . . . .  .  11:00 a.m.

9                        TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
10               CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12
     For the Debtors:          Edmon Morton, Esquire
13                             YOUNG CONAWAY STARGATT & TAYLOR LLP
                               Rodney Square
14                             1000 North King Street
                               Wilmington, Delaware 19801
15
                               Matthew Feldman, Esquire
16                             WILLKIE FARR & GALLAGHER LLP
                               787 Seventh Avenue
17                             New York, New York 10019

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Jermaine Cooper, ECRO

21   Transcription Company:    Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302)654-8080
23                             Email:  gmatthews@reliable-co.com

24   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
25

1    APPEARANCES (Continued):

2    For Pimco Asset
     Management and
3    Irradiant Partners:         Thomas Lauria, Esquire
                                  WHITE & CASE LLP
4                                 200 South Biscayne Boulevard
                                  Miami, Florida 33131
5
6    For the Committee:          Robert Feinstein, Esquire
                                  PACHULSKI STANG ZIEHL & JONES LLP
7                                 780 Third Avenue
                                  34th Floor
8                                 New York, New York 10017

9    For the First Lien
     Group:                      Daniel Fliman, Esquire
10                                PAUL HASTINGS LLP
                                  MetLife Building
11                                200 Park Avenue
                                  New York, New York 10166
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    MOTIONS:                                          PAGE

3    Agenda
     Item 7: Motion of the Ad Hoc Group of Freedom        5
4            Lenders for Entry of an Order (I)
             Terminating Exclusivity in the Holdco
5            Debtors' Cases, (II) Lifting the
             Automatic Stay in the Holdco Debtors'
6            Cases, or (III) Appointing a Chapter
             11 Trustee for the Holdco Debtors
7            [D.I. 192, 11/20/24]

8            Court's Ruling:                             62

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 11:01 a.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Good morning, everyone.  Thank you.

4    You may be seated.

5               MR. MORTON:  Good morning, Your Honor.

6               THE COURT:  Good morning.

7               MR. MORTON:  For the record Edmon Morton from

8    Young Conaway Stargatt & Taylor on behalf of the debtors.

9               Your Honor, we are here today, essentially,

10   primarily on closing arguments with respect to the motion

11   filed by the Holdco Lenders, but before I get to that I just

12   would like to acknowledge the first five items on the agenda

13   were disposed of over the course of yesterday after

14   certifications of counsel were filed. The final item, which

15   is not reflected in our amended agenda, is the Petrillo

16   retention which Your Honor signed earlier this morning.

17               So, with that, I believe that we have disposed of

18   all of the other, what would be, you know, characterized as

19   second day items and I am ready to cede the podium to Mr.

20   Lauria to start his argument on Item No. 7.

21               THE COURT:  Okay, thank you.

22               MR. LAURIA:  Good morning, Your Honor.

23               THE COURT:  Good morning.

24               MR. LAURIA:   Thomas Lauria with White & Case.  We

25   represent Pimco Asset Management and Irradiant Partners in

1   these Chapter 11 cases.

2           Before I get started, I would like to hand out to

3   the parties and make it available to the Court and your clerk

4   a deck that I believe we provided to Chambers electronically.

5   I will not be putting it on the screen or specifically

6   referring to it. I view it more as a compendium of record

7   sites that will support the facts that I rely on in making

8   the argument.

9           THE COURT: I have it electronically.  I don't need

10  a copy of it.  I did see an endless worry that you were going

11  to go through that whole thing.  It's a pretty long deck.

12          MR. LAURIA:  Oh, no. I have got a lot of argument

13  to do but I'm not going to through that.

14          THE COURT:  Alright.

15          MR. LAURIA:  Your Honor, we are here today on our

16  motion to seek a termination of exclusivity of the Holdco

17  debtor cases to seek relief from the automatic stay of the

18  Holdco cases or, alternatively, for the appointment of a

19  Chapter 11 Trustee at the Holdco cases.  When I refer to the

20  term "Holdco's" I am referring to the two parent holding

21  companies directly above FRG, Inc.  I also will be referring

22  to the "Opcos," which are FRG, Inc. and its subsidiaries.

23          Today's hearing is about debtor-on-debtor

24  violence.  It's not about creditor-on-creditor violence in

25  any way that term is typically used these days. It may be

1  relevant at some point in these cases, but its really not

2  before the Court today, nor is it about creditor versus

3  debtor issues.  They are also present here and they may be

4  somewhat relevant but they are certainly not central to the

5  matters that are raised by our motion.

6            The focus today is debtor on debtor violence. The

7  record shows that the path these cases are on was negotiated

8  by an Opco management, the Opco board and its advisors with

9  the Opco first lien lender group and that the holders were

10  then -- sorry, Your Honor, and that the Holdco debtors were

11  then thrown into that deal without separate deliberation or

12  unconflicted advice or having done any valuation work

13  whatsoever simply because the Opco 1L Group required to;

14  despite the fact that the deal contemplates the Holdco's

15  forfeiting their equity in the Opco's and the valuable

16  control rights that go with that ownership interest for

17  nothing, releasing claims for nothing and assigning the

18  remaining claims and causes of action to the Opco's for

19  nothing.  That is debtor on debtor violence.

20            Our motion was filed 17 days into the case.  It

21  seeks extraordinary relief and we seek this relief at an

22  unusually early juncture in the cases.  The Court may ask

23  why.  Why would sophisticated investors that are owed over

24  $500 million file such a motion at this stage of these cases.

25  Your Honor, I think there are two ways of looking at it.

1  One, is it part of a scorched earth litigation strategy by
2  out of the money creditors, to use the words of counsel to
3  the committee, "are we just trying to be sand in the gears,"
4  or maybe we are just mad, mad angry, mad crazy, or is this
5  motion a proper response to a framework set in motion on day
6  one of these cases at the behest of the senior creditors of
7  the Opco's using their positional strength to wipe out the
8  Holdco estates and their creditors.

9       That presumes facts no one has even remotely tried
10  to prove, namely that we are out of the money, that ask the
11  Court to ignore conflicts of interest that have resulted in
12  the officers, directors and advisors of the Holdco's, all of
13  whom have the same roles at the Opco's, agreeing to sacrifice
14  or outright contribute Holdco value for the benefit of the
15  Opco's.  That seems to confirm a plan at the Holdco's even
16  though they will not have an accepting impaired class of
17  third party creditors.  It is being jammed through a speed
18  that is unjustified by the facts and designed to maximize the
19  pressure put on anyone opposing.

20       If the former, the motion should be summarily
21  denied but, Your Honor, if the latter the Court should
22  carefully consider its willingness to countenance and,
23  indeed, to endorse such behavior. The Court should also ask
24  would it really be better that we wait till confirmation to
25  address these issues. Think about the mess we have then if

1  two months down the road, three months down the road we have

2  a plan that can't be confirmed what do we do next.

3           The debtor, the first lien group, and the official

4  committee have used a lot of pejoratives to describe our

5  conduct.  Topping the list relentless litigation,

6  unreasonable opposition to standard relief, making

7  inflammatory statements, second guessing the debtors business

8  judgment, propounding costly and unnecessary discovery,

9  launching a campaign to dismantle a value maximizing sale

10 process.

11          In support of the attack they argue that the

12 Holdco directors owed fiduciary duties to all stakeholders

13 and they argue that despite all our complaining we have done

14 next to nothing.  I think the record establishes that these

15 statements and allegations are provenly false.  The record

16 reflects that we actually agreed to the consensual resolution

17 of all first day motions except two: the DIP and the critical

18 vendor motions.

19          The DIP, as originally presented, glommed onto

20 things that it shouldn't, was grossly overpriced, drove a

21 timeline that is unnecessary and that we think is

22 inconsistent with maximizing value and attaches to

23 unencumbered assets that could be a material source of

24 recovery for the Holdco's and their creditors.  Notably, only

25 after we presented our opposition were many of these problems

1  addressed.  And through the critical vendor motion the

2  debtors sought to upend the bankruptcy code's priority scheme

3  by paying in cash, in full, substantially all of their

4  prepetition unsecured trade debt with priming DIP proceeds

5  despite at the same time filing a plan that pays the second

6  lien at the Opco's and all other unsecured claims at the

7  Opco's, nothing.

8          The order, as entered, preserves the rights of

9  parties to right that wrong.  Does our opposition reflect bad

10  intent.  And when the debtors filed the bid procedures

11  motion, as the Court knows we objected to that too, it sought

12  approval of a process they had improperly launched on the

13  petition date without Court permission in which sought to

14  close out and complete a sale process for three separate

15  operating businesses in less then 60 days including the

16  Thanksgiving, Christmas, and New Years holidays.  Indeed, if

17  you just look from the date of approval its 45 days. It was

18  less then 45 days.  Approval was obtained on the 11th,

19  originally bids were to be made on the 22nd of January.  That

20  date has been pushed back to February 3rd.

21          Its truncated timeline was based on the now

22  admittedly false premise that was necessitated by the debtors

23  lack of liquidity and it is being conducted by a banker who,

24  by  his own testimony, has zero relevant experience. We

25  continue to believe that this process, which was designed by

1  the 1L's to validate their plan to wipe out hundreds of

2  millions of dollars of junior debt, will not generate much

3  less -- will not generate fair much less maximize value but

4  the proof will be in the pudding.  We will all see what they

5  get.

6          Does our opposition to these three motions

7  constitute unreasonable opposition to standard relief.  Is it

8  relentless litigation.  Can it be fairly said that we are

9  seeking to dismantle a value maximizing sale process.  Your

10 Honor is it inflammatory to say that there are obvious

11 conflicts of interest between the Holdco's and the Opco's. Is

12 it inflammatory to say that the cases are being driven by the

13 Opco 1L's or are these just facts.

14         Is it second guessing the debtors business

15 judgment when the Holdco board comprised entirely of Opco

16 directors, approved without deliberation or independent

17 advice, but rather by unanimous consent for material actions

18 by the Holdco's guaranteeing $750 million of DIP obligations

19 at the demand of the Opco lender group who, in fact, have no

20 claims against the Holdco's.

21         Joining the Opco's in entering into an RSA with

22 the Opco 1L Group that contemplates a plan that preserve no

23 value for the Opco's or their creditors, gives free releases

24 to related parties, and transfers other claims and causes of

25 action to the Opco's without consideration.  For filing

1  Chapter 11 petitions for the sole purpose of preventing the

2  Holdco creditors from exercising the only rights they have to

3  protect their investment.  Then actually filing and pursuing

4  confirmation of the plan.  All of this was done at the demand

5  of the Opco 1L Group who have no rights or claims against the

6  Holdco's and without any negotiation at all with the Holdco

7  creditors.

8          Is there even an argument that the business

9  judgment rule applies to these decisions.  Is it a consistent

10  stream of costly and unnecessary litigation when we served

11  notices of two 30(b)(6) depositions and designated for

12  deposition the witnesses identified by the debtors for the

13  hearings on these matters.  Stated differently, would have

14  been malpractice if we had pressed our objections without

15  that discovery.

16          Is it next to nothing wherein response to our

17  objections the DIP fees were reduced by 40 percent, the DIP

18  interest rate was reduced by a percent and on an interim

19  basis the rollup was reduced to one to one, the Holdco's were

20  eliminated from the DIP as guarantors, and the Holdco's were

21  no longer providing the Opco 1L lenders with adequate

22  protection.  Was it next to nothing when in response to our

23  proposal of the Holdco only DIP the Opco 1L Group agreed that

24  the Holdco's could have access to funding needed to cover

25  their administrative expenses without paying interest or

1  fees.

2          Is it next to nothing that 12 days into the case

3  we provided the debtors with a Holdco only plan that would be

4  supported by 93 percent of the Holdco creditors, that would

5  be quickly and efficiently confirmed minimizing the Holdco's

6  ongoing expense to unnecessary administrative expense claims

7  and resulting in the Holdco lenders bearing all costs related

8  to the liquidation of the Holdco assets.  And that simply

9  gives the Holdco creditors their contractual and statutory

10  rights.

11          Let's flip it around.  What do you call it when

12  you receive no meaningful engagement from the Holdco debtors

13  regarding such a plan.  When the Holdco debtors say they are

14  too busy to provide comments to such plan.  When they

15  indicate that they can't provide a reaction without

16  consulting with the Opco 1L group who are not creditors of

17  the Holdco's.  If you want to use the term "next to nothing"

18  it seems that that is probably it.

19          If you were standing in our shoes, could you

20  conclude on these facts that anyone was acting as a proper

21  fiduciary who was looking out for the interests of the

22  Holdco's and the creditors, would you conclude that the

23  protection of the Holdco's was being left to the Holdco

24  creditors exercise of self-help.  And then what do you do

25  when you come forward with a simple confirmable Holdco plan

1   and you get nothing in response except that is vigorous

2   criticism for seeking to do exactly what your contract

3   contemplates.  Are you supposed to sit back and wait for more

4   damage to be done.  For the to cancel our collateral under

5   the Opco plan, which is what the Opco plan provides, and then

6   convert the Holdco cases to Chapter 7 when they can't confirm

7   the plan at the Holdco's.

8            What the commentary of the debtors 1L and the

9   committee in opposition to our motion lacks is context.  Our

10  motion was not filed, Your Honor, in a vacuum.  We filed it

11  in response to a rapid fire sequence of measures launched or

12  participated in by the Holdco debtors themselves at the

13  behest of the Opco debtors and the Opco 1L group who have no

14  legal, equitable or contractual right or claim at the

15  Holdco's.

16           The RSA, the DIP, the bid procedures, the plan all

17  directed at wiping out the Holdco's and their creditors in

18  less then 90 days and done without separate independent

19  directors at the Holdco's, all done entirely by directors and

20  advisors on both sides of the V with respect to inter-debtor

21  claims and issues which may prove to be outcome determinative

22  for the Holdco's and also with respect to claims versus the

23  third parties who architected the August 2023 management

24  buyout which was funded by $475 million provided by the

25  Holdco lenders, including claims versus Brian Kahn, the now

1  deposed CEO who was represented in the MBO by proposed

2  debtors counsel.

3          Notably, the plan actually contemplates that

4  certain of Holdco's claims related to these matters will be

5  released and the rest will be assigned to the Opco's for the

6  benefit of the Opco 1L.  We don't know which claims fall into

7  which bucket.  That is going to be filed in a plan supplement

8  that may come a week before we go to confirmation.  All this

9  was put together and agreed to without any negotiation with

10  the Holdco lenders.  This is in no way cured or fixed by the

11  recent appointment of an independent director at the

12  Holdco's. In fact, there is no record evidence whatsoever

13  regarding this directors qualifications or his mandate.

14  Instead, all we have is lawyers saying at the podium that his

15  scope is limited to assessing inter-debtor claims and that he

16  has no power to review and terminate or ratify past actions.

17          Staring down the barrel of this gun we are now

18  characterized as the bad guys, the disruptors because we have

19  the temerity, because we have made the entirely rational

20  decision to fight back by pursuing the rights granted by our

21  contract and the code under these circumstances.  The record

22  makes clear that in launching their comprehensive multi-

23  faceted assault no one was thinking separately about the

24  Holdco's, the value of their assets or the right to their

25  creditors.

1        Every action taken or not taken was at the behest

2   of the Opco 1L group and designed to eliminate and destroy

3   the Holdco's rights.  Under the plan the Holdco's equity in

4   FRG is cancelled and Topco comes down and becomes the new

5   owner.  The Holdco's are cast aside, they're out.  And all of

6   this is to be jammed through on an unreasonably short

7   timeline.

8        The Holdco's were just lumped in with the Opco's

9   to benefit the Opco creditors at the expense of the Holdco's

10  and their creditors. This is patently improper under

11  (indiscernible) Second Circuit in <u>Owens Corning</u>.  Here,

12  indeed, the debtors admit that the Holdco's were not filed

13  for a proper Chapter 11 purpose, but rather to maximize

14  Holdco value for the benefit of the Holdco creditors.

15  Instead, the Holdco cases were filed to hold the Holdco

16  creditors at bay, to prevent them from exercising and

17  realizing on their rights the pledged FRG, Inc. shares so

18  that those rights could be diminished, stripped away, and

19  destroyed through the RSA, the DIP sale process and the plan.

20       To maximize the likelihood of success and to make

21  opposing as difficult as possible, the cases have been teed

22  up as the proverbial melting ice cube even though the numbers

23  irrefutably demonstrate otherwise.  It is indeed odd that the

24  debtors and the 1L now complain that our strategy is to

25  foreclose on or vote the stock.  Why odd?  That is exactly

1   what they bargained for in connection with the provision of

2   our financing to fund the management buyout.  The new money

3   came in from parent SPV's created for the purpose of

4   borrowing the needed funds because the debt could not be

5   incurred at the Opco's.  The only real right given to Holdco

6   lenders was the right to get a seat at the table by taking

7   the FRG stock.  Doing so would allow them to control their

8   own fate, albeit through a junior position. It would give

9   them a seat at the table.

10          Based on the record the Court can reasonably

11  conclude that one of the goals of this Chapter 11 process is

12  to strip away that right so that we can be wiped out without

13  our negotiated for seat at the table, leaving the conflicted

14  board in place who without deliberation or negotiation agree

15  to let the Holdco's be wiped out.  This reminds me very much

16  of the (indiscernible 11:23:56) case.  That case involved

17  very similar facts: an intermediate Holdco was created to

18  borrow money to fund Mr. Pearlman's purchase of the company,

19  the debtors then got together with the Opco lenders and

20  architected a prepack that would dilute the Holdco equity,

21  the Holdco lenders collateral, down to effectively zero.

22  Their efforts were challenged almost on day one by the Holdco

23  bondholders, the same as we have done there.  There, Judge

24  Balick, we all know to have been an extremely debtor friendly

25  judge, lifted the stay and in doing so specifically said that

1  it was improper to prevent the Holdco bondholders from
2  exercising their only right while the Opco's and their
3  creditors worked to destroy it.

4          The same principle should produce the same result
5  here.  Relief is needed to level the playing field. We all
6  know that the Chapter 11 process is much about negotiation as
7  anything. Here, to date, there has been no Holdco negotiation
8  with its creditors.  At present, the Opco 1L group is
9  effectively running the Holdco cases through the DIP and the
10  RSA even though they have no claim or right of any kind
11  against the Holdco's.

12          In contrast, the Holdco lenders have a negotiated
13  for contractual right to control the Opco's, a right that
14  clearly has value -- sorry, Your Honor, a right that clearly
15  has value regardless of any former valuation and that is
16  protected by the code.  Without relief we are not getting our
17  right and its not being protected much less adequately or
18  respected in any way.  Yet, the Opco's and their lenders
19  complain vociferously that disaster will follow if our rights
20  are respected.  They seem to forget that our rights are only
21  into the equity, a junior position in the Opco structure.
22  Having taken our money a mere 15 months ago they now seek to
23  use the Holdco stay and exclusivity to paralyze us until they
24  can complete the planned exercise of wiping the Holdco's out.
25  This should not be permitted.

1        There are three ways the Court can vindicate the

2   Holdco's rights.  It can terminate exclusivity in the Holdco

3   cases so that we can file and confirm a Holdco plan, it can

4   lift the stay in the Holdco cases to permit us to exercise

5   our contractual rights or it can appoint a Chapter 11 Trustee

6   for the Holdco's. We believe termination of exclusivity is

7   the most efficient path.  As the only non-affiliated

8   creditors of the Holdco's, we are prepared to promptly file

9   and propose a plan that we will accept and make confirmable.

10        Doing so will provide multiple benefits to the

11   Holdco estates.  It will end their exposure to ongoing and

12   unnecessary administrative expenses. It will give the Holdco

13   creditors control of the Holdco assets which no one argues

14   will have surplus value for the Topco's.  It will permit the

15   Holdco creditors to have a more direct seat at the table in

16   the Opco restructuring which is exactly what was contemplated

17   by their financing and it will allow the beneficiaries of the

18   Holdco assets to focus on realizing value from them rather

19   then having intermediaries purport to do that on their behalf

20   and at their expense.

21        If this relief is not granted the Holdco's will

22   continue to be dragged through a process that delivers no

23   value to them and that cannot result in a confirmable plan

24   for the Holdco's. I said that a couple of times, why?  There

25   will not be an accepting class of impaired creditors.  All of

1  the contingent claims referred to in the responses to our

2  motion are actually Opco estate claims. This is made clear

3  under Mortgage America and its well-recognized progeny and,

4  thus, will not be counted for purposes of determining if you

5  have an accepting impaired class.  And even if somehow

6  countable it is unconceivable that they could be established

7  for voting purposes in an amount sufficient to make a class

8  that includes the Holdco lenders an accepting class.

9          Importantly, waiting till March to get to that

10  result is not free of charge.  Administrative expenses will

11  pile up and asset values will likely denigrate further and

12  perhaps lost entirely.  Our debtors, the Holdco's, have

13  effectively agreed with the Opco's and their creditors that

14  there is no value available for their creditors without

15  providing any substantiation of that position.  Indeed, all

16  of the financial advisors who testified specifically said

17  that they had performed no valuation work whatsoever.  But in

18  reliance on that premise, unsubstantiated though it is, they

19  are not fighting to capture value on their creditors behalf.

20          As the creditors of the Holdco's, we should have

21  the right at our own expense to test our debtors unproven

22  proposition.  In response the objectors express concern that

23  if granted control of the Holdco's we will launch vexatious

24  and wasteful litigation.  This argument falls flat, it flies

25  in the face of economic reality.  Clearly, the best way to

1   assess the rights of the Holdco's is for the party who will

2   bear the cost of such assessment and then perhaps bringing

3   them to do so. It forces a real economic decision based on

4   cost and benefit by the party who will have to reach into his

5   pocket to pay for the expenses.  As such, I think its clear

6   there is no need to have multiple parties conducting

7   investigations into the value or viability of the Holdco

8   claims. The real test is will the people who have to pay for

9   it be willing to do so.

10          Contrary to the arguments of the objectors, the

11  so-called Adelphia factors, properly considered, weigh

12  strongly in favor of terminating exclusivity here.  The

13  debtors painstaking analysis ignores the fundamental

14  principle of (indiscernible) filed in the Third Circuit by

15  Owens Corning that absent substantive consolidation each

16  debtor must be viewed and treated separately.  Here, no one

17  has alleged that the Holdco's should be substantively

18  consolidated with the Opco's.  Indeed, the opposite is

19  evidenced by the plan which specifically provides otherwise.

20          If they did that allegation would be without merit

21  because there is no confusion regarding which debtor and what

22  assets are liable for what debt.  As such, the Adelphia

23  factors need to be considered at the Holdco's on a standalone

24  basis.  Doing so makes the answer clear.  Complexity of the

25  case, the Holdco's are extremely simple.  They were formed 15

1 months ago to serve as financing vehicles for the Opco

2 management buyout.  Their only creditors are the investors

3 who provided them with $475 million to fund the Opco's

4 purchase of their publicly held shares. Their only assets are

5 the stocks of FRG and the claims and causes of action that

6 may have been generated by the management buyout.

7    Two, do the Holdco debtors need time to negotiate

8 with their creditors, it's a moot point.  They have chosen to

9 proceed with a plan without negotiating with their creditors.

10    Three, are the Holdco debtors making good faith

11 progress towards a confirmable plan.  Again, it's a moot

12 point. They have chosen to advance an unconfirmable plan

13 without negotiating with the creditors. Again, the only

14 third-party creditors at the Holdco's are the Holdco lenders.

15 Ninety-three percent of them are represented by White & Case

16 and they're voting no.

17    Four, are the Holdco debtors paying their bills on

18 a current basis. This is also largely moot because the Holdco

19 debtors are not expected to have any material expenses.

20    Five, are the Holdco debtors proceeding in good

21 faith towards a viable plan. Its already been discussed, Your

22 Honor, no.  Are the Holdco debtors negotiating with their

23 creditors, no.  Do they need time, no.  At this point the die

24 has been cast.  All they are doing is wasting time so that

25 the Opco's can confirm their plan.  Are they using

1  exclusivity to pressure their creditors to submit. Is

2  exclusivity a shield or a sword here.  I think the answer is

3  clear, they are using exclusivity to pin us down.

4          Are there any unresolved contingency that would

5  delay being able to propose a plan?  Absolutely not.  But

6  moot in a sense, because they've already joined the OpCo

7  plan, which will provide the HoldCos with no value and will

8  wipe out the creditors.

9          Based on the foregoing, we think it's obvious that

10 the HoldCos exclusivity should be terminated.

11         Alternatively, the stay should be terminated to

12 permit the HoldCo lenders to exercise their remedies due to

13 lack of adequate protection.  In opposition, the objectors

14 argue that it is our burden to establish that our collateral

15 has value and that we have failed to clear that hurdle.

16         However, the magnitude of the objections to our

17 request for relief demonstrates the presence of value far

18 more convincingly than any expert testimony could.  In that

19 regard, however, Mr. Grubb specifically testified that

20 control provides value.  The right to control is valuable.

21         If the FRG equity, which is owned by the HoldCos,

22 and has been pledged to secure our claims truly has no value,

23 it could and should be abandoned.  That, obviously, is not

24 the debtors' intention here; instead, the OpCos and their

25 creditors seek to use the HoldCo stay to prevent our exercise

1   of obviously valuable control rights until they are

2   extinguished through the OpCo plan, which cancels the shares.

3          No adequate protection has been offered, despite

4   the imminent elimination of our collateral and the

5   destruction of the value it carries.  It's hard to imagine a

6   stronger case for stay relief.

7          Consideration of the comparative harms confirms

8   the propriety of lifting the stay.  If the stay is not

9   lifted, the value of the HoldCo lenders' collateral will be

10  wiped out without compensation.  In contrast, there's no

11  cognizable harm to the HoldCos from lifting the stay and it's

12  really at the HoldCos where this question is to be answered.

13         Doing so will allow their creditors to realize

14  value, which will otherwise be destroyed by the OpCo plan.

15  There's a lot of noise coming from OpCo and its creditors on

16  this topic, but it's irrelevant.  That's collateral to the

17  issue of the stay at the HoldCo case.  Lifting the stay

18  there, the impact of lifting the stay there only causes the

19  potential realization of exactly what the OpCos signed up for

20  when they raised the financing the HoldCo lenders provided.

21  It's hard to call that irreparable harm.  As previously

22  noted, the facts and circumstances here are closely analogous

23  to <u>Marvel</u>, where Judge Balick lifted the stay.

24         The final alternative path for protecting the

25  HoldCo creditors' rights is to install a Chapter 11 Trustee

1  to protect and ensure that value is preserved at the HoldCo

2  level on a disinterested basis.  The HoldCo boards, who were

3  comprised entirely of OpCo directors when the RSA, the DIP,

4  the sale process, and the plan were all negotiated and set in

5  motion, were hopelessly conflicted with respect to all such

6  matters and they acted on such conflicts to the detriment of

7  the HoldCos and their creditors.

8          This problem is not cured by the eleventh-hour

9  insertion of a new director of unknown qualification and with

10  unknown scope.  This case is <u>Lucky Bucks</u> part two.  The

11  existing HoldCo boards here bowed, without even meeting, to

12  all the demands of the OpCo 1L lender group and have no

13  rights or claims -- who have no rights or claims at the

14  HoldCos.

15          For the foregoing reasons, our motion should be

16  granted.

17          THE COURT:  Okay.  Is that it?

18          Okay.  Thank you.

19          Whenever you're ready, Mr. Feldman.

20          MR. FELDMAN:  For the record, Your Honor, Matthew

21  Feldman from Willkie Farr & Gallagher, LLP on behalf of the

22  debtors, Your Honor.

23          It's a little bit hard to know where to start in

24  response to Mr. Lauria, but let me try to address some of the

25  issues he raised directly and then talk a little bit about

1   the law.  Obviously, if the Court has any questions, I'm

2   happy to answer them to the extent I don't cover them in my

3   presentation.

4           Your Honor, we, as fiduciaries for all of the

5   debtors, strongly disagree with Mr. Lauria's motion and I

6   would point out to Your Honor that much of which he talks

7   about actually occurred after the motion was filed, not in

8   anticipation of filing the motion.  In fact, as Mr. Lauria

9   well knows, there is an independent director and has been

10  since before these case were filed, who sits on the board of

11  all of the entities, but was actually put in that position at

12  the behest of the HoldCo lenders, and that's Mr. John

13  Hartman.

14          Now, in fairness to Mr. Lauria, Mr. Hartmann is an

15  industry expert, not a bankruptcy expert, so, in fact, as

16  alluded to, the HoldCo boards have now approved adding a

17  bankruptcy expert and allowing that expert to have his own

18  counsel in order to give this Court a more independent view

19  of what's happening at the HoldCo boxes.  But none of that is

20  of any moment, Your Honor, because the reality is all of the

21  professionals in these cases, as well as the boards, have

22  fiduciary obligations to all of the creditors, be they at the

23  HoldCo or the OpCo, and that has been crystal clear in the

24  case law that that is, in fact, an appropriate way to behave

25  and is an appropriate opposition to a motion to terminate

1  exclusivity.

2          Let me also point out that Mr. Lauria, as he said

3  in his presentation, represents two creditors of the HoldCos.

4  He does not represent the entire group of HoldCo creditors,

5  which include at least another 7 percent of the lenders at

6  those boxes that provided the loan that allowed the private

7  action to occur and to the extent other creditors emerge when

8  the bar date passes, which has not yet occurred, there may be

9  other creditors at those boxes, although, I would concede,

10  we're not aware of any other creditors and don't expect there

11  to be any other creditors.

12          Let's also point out, Your Honor, that what really

13  the argument is today, it's an argument about the

14  confirmability of a plan of reorganization.  As this Court

15  knows and everyone in this courtroom knows, plans of

16  reorganization evolve and are negotiated over time; in fact,

17  there was active negotiations with the second lien HoldCo

18  lenders prior to the filing.  They just were not represented

19  by White & Case at the time; they were represented by Davis

20  Polk.  Unfortunately, those negotiations did not result in a

21  consensual Chapter 11 filing and Mr. Lauria was brought in on

22  the eve of the filing, not to renew those negotiations, but

23  for other purposes, that I think are clear through the

24  operation of these cases.

25          Your Honor, I want to really emphasize something

1  that is embedded and I think was said for the first time by

2  Mr. Lauria in his presentation.  The value, if you will, that

3  might inure to the benefit of the HoldCo lenders is not

4  necessarily an asset value, although I want to get back to

5  that in a moment, it is really the holdup value of the HoldCo

6  lenders being able to essentially take over the OpCos if they

7  are given relief in the form of lifting the automatic stay or

8  termination of exclusivity.  They would be immediately able

9  to replace the board through their ownership of the OpCo

10  stock.  These cases would immediately denigrate into even a

11  more litigious posture than we've had to date, and so I don't

12  want there to be a misunderstanding that somehow there's a

13  view by the HoldCo lenders that they can run a more robust

14  sale process or that they can somehow magically generate

15  value at the HoldCo, different from what is contemplated by

16  the plan of reorganization.

17         In terms of the scope of the releases, in terms of

18  the litigation claims, of course, that is going to be

19  negotiated as part of any plan.  And I do acknowledge that

20  while it was after Mr. Lauria's motion to terminate

21  exclusivity, appoint a trustee, provide stay relief, after

22  that motion was filed, we did, in fact, receive a draft plan.

23  We have been, candidly, too busy to negotiate in detail,

24  although, we have given a response orally.  And I'm not going

25  to get into what those negotiations have been and what the

1  back-and-forth has been, but the idea that we're not engaged

2  is just a, in my opinion, a misrepresentation of the facts

3  and not at all accurate.

4          Just to shift gears a little bit, Your Honor, I

5  don't want to go down the morass of Brian Kahn and Mr. Kahn's

6  behavior.  Suffice it to say, he's not been involved with the

7  company for more than a year at this point or about a year at

8  this point and we have been waiting, as has Young Conaway,

9  for today's hearing to be concluded to file our application,

10  which will have a detailed description of the relationship

11  between Willkie Farr & Gallagher and the company and

12  Mr. Kahn, and we are confident that it will fully disclose

13  all of those relationships and it will be different from Mr.

14  Lauria's representations on the record, which he made today

15  for at least the second time that I can remember.

16          Your Honor, I also would point out that

17  Mr. Lauria's own preparation talks about the fact that we are

18  fully engaged.  I agree with everything he said about

19  reaching consensual resolutions in connection with certain of

20  the first day hearings, certain of the second day hearings,

21  and, in fact, there have been concessions made from the

22  original restructuring support agreement, which suggest

23  strongly that these cases are unfolding exactly how

24  Chapter 11 cases are supposed to unfold.  The parties are

25  supposed to negotiate.  The parties are supposed to reach

1  consensual resolution, where possible, and in the event

2  they're unable to reach consensual resolution, bring it to

3  the Court for rulings.  And that is exactly what has been

4  happening and is exactly what I would expect to continue to

5  happen.

6           Just to go back to the law, Your Honor, I think it

7  is worth noting just a couple of cases not cited by

8  Mr. Lauria in his presentation.  The debtors -- and I quote:

9           "The debtors' right to propose a plan to run its

10 case is a very important right in bankruptcy.  It should not

11 be cut off at the knees, except in extreme circumstances or

12 unique circumstances, at least.  The typical situation where

13 a Creditors Committee is simply seeking leverage or another

14 creditor group is simply seeking leverage to negotiate a

15 plan, that is not an appropriate case to terminate

16 exclusivity."

17          And that's the Pliant decision, Your Honor, by

18 Judge Walrath.  It is exactly what this motion is about.  I

19 don't think there is any question or any substantial

20 disagreement.  The HoldCo lenders are unhappy with the

21 current state of the plan and they have threatened to vote

22 against the plan and are using that as an opportunity to say

23 to this Court, let's not wait until March.

24          Your Honor, I would submit to the Court that, in

25 fact, waiting is exactly the right thing to do, where,

1  hopefully, things can be resolved on a consensual basis.  We

2  know what it takes to confirm a plan of reorganization.  We

3  all understand 1129 and we would not want to put forward a

4  plan that is unconfirmable to this Court without some other

5  way or path forward.

6          I would also, Your Honor, quote Adelphia,

7  notwithstanding Mr. Lauria's view that it was not -- not --

8  that it exactly supports his view and this was, again, in

9  connection with exclusivity.  But the motion that the

10 creditors -- I'm sorry, Your Honor, my eyesight is not what

11 it used to be -- but the motion that creditor constituency

12 unhappiness without more constitutes cause to undermine the

13 debtors' chances of winning final confirmation of its plan

14 during the exclusivity period has been judicially rejected.

15         And that was Judge Gerber at 136 B.R. 610.

16         Your Honor, to grant any portion of the motion

17 would be virtually unprecedented, given that we're really

18 only in the second month of these cases.  Such relief would

19 result in a truly dramatic shortening of the debtors'

20 exclusivity and the Freedom Lenders have not really cited a

21 single case in which such a brief time was given to debtors

22 to attempt to formulate and negotiate a plan before losing

23 statutorily prescribed initial exclusive period.

24         This is why virtually every other creditor

25 constituency, including the committee, that has openly

1  acknowledged they do not support the plan in its present

2  form, have filed objections to the motion and has strongly

3  urged the Court to deny it.  I'm not going to characterize it

4  as others have as a nuclear option, but, obviously, it's a

5  very aggressive move by the Freedom Lenders.

6          While the Freedom Lenders are not fans of the

7  overall strategy employed by the debtors, it really cannot be

8  questioned that significant progress has already been made in

9  these cases.  Your Honor, we have obtained debtor-in-

10 possession financing with, ultimately, benefits that were

11 obtained through the process, again, as it's supposed to

12 occur.  We filed and prosecuted and obtained approval of bid

13 procedures for a value-maximizing sale process for which we

14 have the support of virtually every creditor constituency;

15 again, other than the HoldCo Freedom Lenders.

16         And I want to comment on that, Your Honor, because

17 the proof will be in the pudding as -- to quote Mr. Lauria,

18 that is exactly what he said in his presentation.  And what

19 did he mean by that?  What he meant by that was if there is

20 enough value in these assets to flow through the first lien

21 up to the HoldCo, then the HoldCo lenders will benefit from

22 that value.  If there's not enough value, then they're not

23 going to benefit from that value.

24         But that's the way Chapter 11 works, Your Honor.

25 It does not work by handing leverage to one group to extract

1  value that is not otherwise generated by the assets from the

2  other group, and that is really what is being proposed today.

3          Your Honor, we've negotiated the RSA that has the

4  support of 97 percent of the debtors' first lien

5  constituency.  Obviously, we filed the plan that's been

6  discussed today.  We'll see where that plan winds up

7  eventually.  We have now another month until the disclosure

8  statement hearing.  And we have now completed and prosecuted

9  all the standard second day approvals that we sought.

10         And while, again, the Freedom Lenders have argued

11 that they've been locked out of the plan process, we would

12 disagree with that.  They were engaged prepetition and

13 there's been meaningful movement post-petition.  And, again,

14 I'm not going to repeat them, but Mr. Lauria identified the

15 various ways in which the debtor-in-possession financing was

16 improved through the prepetition process.

17         Your Honor, the Adelphia case -- and I'm not going

18 to go through the standards -- but one of the important

19 standards that it says is that anticipatory failure of a plan

20 to confirm itself is not sufficient to terminate exclusivity.

21 And that is -- if you boil down the argument being made today

22 by the Freedom Lenders, that is essentially exactly what

23 they're saying.  They're saying because the plan in its

24 current form, that they will vote against it.  The two

25 lenders that Mr. Lauria represents will vote against it then,

1  in fact, we should terminate exclusivity and let them pursue

2  their own plan.

3          I really would suggest nothing is further from the

4  way this should work; in fact, the way it should work is we

5  should all be forced to the same table together, not to have

6  one table for the Freedom Lenders or the HoldCo lenders or

7  whatever we're calling them today and then a separate table

8  where everyone else sits, particularly, when the Freedom

9  Lenders will have all of the value at that table through

10 their ability to basically put in place, their own board, to

11 wipe out the equity, to threaten the sale process by

12 threatening claims at the OpCos; all of those various tools

13 that will be in their disposal if this Court were to grant

14 any of the three forms of relief, frankly, will undermine the

15 ability to get a consensual plan done in these cases.

16         Your Honor, I'm not going to argue the stay

17 relief, although, I'm happy to do so and I'm happy to answer

18 any questions, because the Court last week essentially found

19 that the Freedom Lenders are not entitled to further adequate

20 protection, which is the underpinning of the stay relief

21 motion.  You were entitled to stay relief only if you're not

22 being adequately protected.  The Court has already

23 essentially ruled on that and I don't think spending time

24 this morning or this afternoon or wherever we are really

25 makes a lot of sense, and so I'm going to skip over that and

1  talk about the trustee.

2          Your Honor, the final form of relief that they've

3  requested is that the Court should appoint a trustee for the

4  HoldCo debtors.  You know, justifying the imposition -- I'm

5  sorry, Your Honor -- the Court should give -- I've gotten

6  lost in my own notes, Your Honor.  I'm sorry.

7          THE COURT:  It happens.

8          MR. FELDMAN:  Justify -- well, it was a lot to

9  respond to and I had to go off-script -- no question about

10 that.

11         There really is no showing, Your Honor, that an

12 appointment of a trustee would benefit all creditors.  We

13 don't even know that it would necessarily benefit all

14 creditors at the HoldCo because, again, Mr. Lauria does not

15 represent all of the creditors at the HoldCo and it may be

16 that the minority of creditors think a sale process, a robust

17 sale process is their best chance for getting relief.  We

18 don't know the answer to that, but we do know it does not

19 necessarily benefit all creditors.

20         And the conclusory statements by a subordinated

21 creditor group concerning potential lack of confidence should

22 be given no weight in the analysis.  That's what Judge Gerber

23 said in Adelphia.

24         And the final point I would make, Your Honor, is I

25 really believe that the reliance on Marvel is misplaced.  In

1  that case, the Court was faced with a slate of directors and

2  officers that had been appointed after the cases were filed,

3  after a foreclosure was permitted by the Bankruptcy Court.

4  In a decision that repeatedly states it's not creating *per se*

5  rules, it notes that the relative newness of the actors

6  involved who were not those running the business in the years

7  prior to the bankruptcy filing do not enjoy the same level of

8  presumptive deference as would be more traditional for

9  longstanding officers and directors, such as we have here.

10         The Court gave primary weight to the fact that the

11  two hats being worn by the debtors, whose principals

12  maintained their secured creditor positions, had led to

13  creditor acrimony so deep that it warranted trustee

14  appointment.  As such, Marvel is a cautionary tale about the

15  end result if the relief requested in this motion is granted.

16         We don't have that same level of acrimony.  The

17  debtors have all that is in their power to try to bring the

18  parties together and will continue to do so and, in fact, we

19  very much think the next 30 days will be an important

20  opportunity to see whether we can make progress in that

21  regard.  And, Your Honor, I would say that if we need help in

22  those negotiations, and I hope we don't -- I hope we are all

23  mature enough restructuring professionals that we can find a

24  way to bring ourselves together -- but we would reserve the

25  right if we do need help, to come back to Your Honor and

1  perhaps seek the appointment of one of your colleagues as a

2  mediator in the case.  I don't think we're there at the

3  moment and I don't want to prejudge where we might get to,

4  but we do intend to use this next 30 days before the

5  disclosure statement hearing to try and make as much progress

6  as possible, to try to limit issues as much as possible, and

7  to, perhaps, even close the gap on these cases.

8           So, I will cede the podium to others who want to

9  be heard, unless the Court has questions.

10          THE COURT:  One question.  Can you address

11  Mr. Lauria's argument about the conflict of interest between

12  the OpCos and the HoldCos?

13          MR. FELDMAN:  Certainly, Your Honor.

14          There really is no conflict of interest because,

15  in fact, the value that will ultimately flow up to the HoldCo

16  is based on getting through the value of the OpCo.  Everyone

17  should have a value -- everyone should have the same

18  direction here and be rowing in the same direction, namely,

19  to enter into a maximizing-value transaction.

20          If we can sell these companies through the sale

21  process at enough value to yield value up to the HoldCos,

22  that would be great for the OpCos, the OpCos' creditors, and

23  great for the HoldCos.

24          I think what Mr. Lauria is really saying, and hard

25  to disagree with this, is that that would be a very, very

1    good day and perhaps an unlikely day, but whether it's likely

2    or unlikely, the opportunity to create value at the HoldCos

3    exists for everyone in the same way.  I think what he's going

4    on to say is that the real HoldCo value is in holdup value

5    against the OpCos and, therefore, taking control of those

6    HoldCos would be incredibly beneficial to the HoldCo

7    creditors.

8            That may or may not be true because there may or

9    may not be claims between the HoldCos and the OpCos and we

10   have, as Mr. Lauria alluded to, the HoldCo boards have

11   appointed an independent director to look into that issue

12   with separate counsel.  So that is, I think, appropriate and

13   important.

14           And while Mr. Lauria may argue that the people who

15   control the pocketbook and who will reach into their own

16   wallets to pay for that litigation ought to be the ones to be

17   allowed to embark on it, but, candidly, Your Honor, I

18   couldn't disagree more.  I think that is exactly the wrong

19   direction to take these cases.  I think it is exactly what

20   Chapter 11 is not intended to do, at least not until the

21   parties sort of run out of room to make a consensual deal

22   happen, because I can assure this Court that if the relief

23   sought today is granted, there will not be a consensual deal

24   in these cases.

25           And if the Court were to deny the relief

1  requested, Mr. Lauria could renew it next week or next month

2  or two months from now, but the reality is it will hopefully

3  bring everyone together and try to find a way through this.

4          THE COURT:  Okay.  Thank you.

5          MR. FELDMAN:  Thank you, Your Honor.

6          MR. FLIMAN:  Good morning, Your Honor.

7          Dan Fliman, Paul Hastings, for the First Lien

8  Group.  Your Honor, I will try to avoid any overlap with

9  Mr. Feldman's excellent presentation and really try to focus

10 on three issues that I wanted to flag for the Court.  The

11 first is responding to something we heard from Mr. Lauria in

12 presentation that I think needs to be addressed.  The second

13 is to address for the Court, the evidence and the burdens

14 that are placed on movant in connection with this motion.

15 And the third is to focus on the release that's really being

16 sought in connection with exclusivity termination by the

17 movants here, by the Freedom Lender Group and what they were

18 actually planning to do if they were to obtain that relief.

19         So, first, Your Honor, we heard a lot from

20 Mr. Lauria with terms such as eliminating and destroying the

21 value to the HoldCo debtors.  And you heard some of this from

22 Mr. Feldman, but I think it's important to highlight, yet

23 again, the plan structure here is that if there is value

24 generated as a result of the sale process that clears the

25 OpCo debt, it will be delivered to Mr. Lauria's clients as

1    HoldCo creditors.  That is not being deprived of his clients

2    or to his clients in connection with this plan.  And so, to

3    the extent that he is using those terms in order to

4    characterize the plan or I would say mischaracterize the

5    plan, we need to be mindful that this is not a situation

6    where we just jump directly into a plan by the lenders, the

7    First Lien Lenders that equitizes their debt.  We're running

8    the sale process as a market check, using Court-approved sale

9    procedures in order to find out what the value is.  And to

10   the extent there is value, that value, if it clears the OpCo

11   debt, will be delivered to his clients.

12           The second thing I wanted to talk about, Your

13   Honor, is the burden on the motion that's before the Court.

14   There's no doubt that the burden sits with the Freedom Lender

15   Group.  As to the exclusivity termination, the movant has the

16   burden to show the Adelphia factors weigh in its favor.

17   That's how courts have interpreted the cause element of

18   exclusivity termination.  Moreover, Your Honor, I think an

19   additional part of the Adelphia decision that is worth

20   flagging is a comment made by Judge Gerber after walking

21   through the nine-factor test and he explained the primary

22   consideration in weighing whether to terminate exclusivity is

23   determining whether terminating exclusivity would move the

24   case forward materially to a degree that wouldn't otherwise

25   be the case.

1          And I would submit that really is the burden

2   placed on Mr. Lauria's client in connection with this

3   hearing, is to show that the cases will move forward

4   materially faster than they would have otherwise with

5   exclusivity remaining in place.  And I would submit they have

6   not met that burden for reasons that I'll address in a

7   moment.

8          As to stay relief, the movant here has to

9   establish cause which, as Mr. Feldman addressed, given the

10  nature of their arguments, relates to proving a lack of

11  adequate protection, which Your Honor has found they are

12  being provided in connection with these proceedings.  And,

13  second, they need to establish that the prejudice to the

14  Freedom Lender Group from being subjected to the automatic

15  stay outweighs the harm to the estate from a foreclosure on

16  the equity.

17         Now, Mr. Lauria characterized the application of

18  the standard as weighing the harm to his clients versus the

19  harm to the HoldCo debtors, but I would submit that is

20  incorrect, Your Honor.  When we look at the relief they are

21  seeking, they are seeking the ability to foreclose on the

22  equity pledge that the HoldCo debtors hold in freedom -- in

23  Franchise Group, Inc., and then having done so, to utilize

24  that equity in order to change the board and to take control

25  of the entity.

1          So there's two actions being contemplated and
2    proposed:  one at the HoldCo debtors, one at the OpCo
3    debtors.  And I would submit that the second form of relief,
4    which is having now obtained that equity, taking control of
5    the box, we have to look at the harm that that would impose
6    on the OpCo estates.  And there's no doubt that the OpCo
7    estates, now being subjected to a new board, a new direction,
8    are going to suffer harm.  And, in fact, we have evidence on
9    that in connection with the proceeding that I'll get to in a
10   minute.

11          As to the trustee appointment, the Freedom Lender
12   Group has the burden to show cause where that, otherwise,
13   appointment is in the best interests of the creditors and any
14   equity security holders and interests of the estate.

15          The Freedom Lender Group has put forth no
16   evidence, none, in support of its motion.  Mr. Augustine,
17   who's the sole witness put forth by the Freedom Lender
18   Group -- with all due respect to Mr. Augustine -- did not
19   even know what relief his clients were seeking in this
20   motion; in fact, he was instructed not to even answer
21   questions at his deposition about what exactly it is the
22   Freedom Lender Group is intending to do if they get the
23   relief they're asking Your Honor to give.

24          The Freedom Lender Group obtained no testimony
25   from the debtors' witnesses supporting the relief that

1  they're seeking.  And while it is the Freedom Lender Group

2  that has the burden here, not the objectors, I would point

3  out the following evidence supporting the objections, Your

4  Honor.

5            First, we heard from Mr. Grubb that foreclosure on

6  the equity would be disruptive for the sale process, would

7  impair the marketing process, and potentially lead to, as he

8  put it, a suboptimal outcome in a sale process.  We have also

9  testimony from Mr. Grubb that appointment of a trustee at the

10  HoldCo debtors would create significant uncertainty for

11  bidders, potentially reducing competition for the assets, and

12  lead to a lower value outcome of the sale process.  And even

13  Mr. Augustine on his cross agreed that when a lender

14  forecloses on equity of another -- of a debtor and then

15  utilizes that to take control of a board and to reverse

16  decisions that the board had implemented, that that impacts

17  restructuring, the restructuring process, and that's what we

18  have here.  I'd submit that by no measure has the Freedom

19  Lender Group met their burden in connection with the extreme

20  relief that they're seeking from the Court.

21            The last point I wanted to make, Your Honor,

22  subject to any questions you may have, is when we focus on

23  the exclusivity request, the exclusivity termination request,

24  we need to be mindful of what exactly it is that the Freedom

25  Lender Group is proposing to the Court.  And for the relief

1   that they're seeking to make sense for them, we need to

2   realize that what they're really asking to do is to jam

3   through their plan of the HoldCo estate quicker than the OpCo

4   debtors' plan goes through, and here's why, if the plan were

5   confirmed today as to the OpCo debtors, the equity, unless

6   there's a sale process, right, that yields a successful sale,

7   but if there's an equitization transaction, the equity of

8   Franchise Group, Inc. would belong to my clients.

9           It would do nothing for Mr. Lauria to then achieve

10  a confirmation of the HoldCo plan because the equity at that

11  point, already belongs to us.  So for this plan of his or

12  this design of his to make sense, what he's not telling Your

13  Honor is he's planning to use the exclusivity termination to

14  file a HoldCo plan and to put that through to confirmation

15  before the plan at the OpCos reach confirmation.  And this is

16  no different than in his request in order to terminate the

17  stay.  This is all intended to effectuate a foreclosure on

18  the equity in order to take control of the OpCos for one

19  purpose, which is to basically reverse path on the sale and

20  on the plan.

21          You're not hearing that today, Your Honor, but

22  that is the only way that their request to terminate

23  exclusivity makes sense to them and we can only assume that

24  that is the plan that they have in mind here.

25          So, Your Honor, just to kind of wrap up, it's

1  clear the Freedom Lender Group is unhappy with the treatment

2  that they're being proposed to receive under the debtors'

3  plan on file.  There's no doubt about that and we get that.

4            There's an ongoing sale process being financed by

5  my clients that's going to provide a true market check on the

6  value of the debtors' assets and tell us all with finality

7  whether value flows up to the Freedom Lender Group via their

8  claims at the HoldCo entities.

9            So, going to confirmation, we will know the value.

10  We will know where the value begins, where the value stops,

11  and whether Mr. Lauria's clients are entitled to any of the

12  value that flows up from the OpCos.  In the meantime,

13  Mr. Lauria's clients are free to bid in connection with the

14  sale process.  If they believe that there is value that's

15  being left on the table, they're free to come where their

16  checkbook.  As a matter of fact, we heard from Mr. Lauria at

17  the last hearing saying that the best market check and the

18  best indicator is when somebody actually shows up with a

19  check in order to put value on the table.

20            But those are the rights that the Freedom Lender

21  Group has.  They have the ability to bid.  They have the

22  ability to object at confirmation, and I'm sure they will,

23  but they don't have the ability, they don't have the right

24  during the pendency of this bankruptcy proceeding to take

25  over the debtors, to change the board, and to change the path

1   the debtors' fiduciaries have set forth.

2           Unless Your Honor has any questions, we'd ask that

3   the motion be denied.

4           THE COURT:  No questions.  Thank you.

5           MR. FEINSTEIN:  Good afternoon, Your Honor, Robert

6   Feinstein, Pachulski Stang Ziehl & Jones, proposed counsel to

7   the official creditors committee.

8           Your Honor, the committee is appointed to

9   represent the creditors of all the estates and we're a

10  fiduciary for creditors of all the estates.  We are

11  unburdened by parochial interests, as I think just about

12  every other party before you today is; we don't have an

13  agenda like the 1Ls, we don't have an agenda like the 2Ls.

14  We're here to take a holistic view of the case and try to

15  advance the interests of all unsecured creditors.

16          And to that end, Your Honor, in connection with

17  the DIP motion, there were a significant number of changes

18  made to the terms of that loan that benefited creditors of

19  all the estates, including the Holdco estate, which is no

20  longer directly liable on the rollup loan, which will only be

21  liable to the extent they actually use funds, the milestones

22  were extended, a number of other significant changes were

23  made at our behest that benefited all unsecured creditors.

24          Mr. Lauria contends that his two clients are

25  really the only creditors at Holdco.  That's an unknown today

1  because the bar date hasn't passed, but whatever the

2  creditors are in that entity they'll be represented and their

3  interests will be advanced by the committee.

4          Now, it should be clear, Your Honor, that while we

5  stand here alongside the 1Ls and the debtors in opposing the

6  2L Holdco lenders' motions, the committee at present does not

7  support the plan.  We have real concerns about the

8  independent directors conducting an investigation.  This is

9  the bailiwick of the committee.  Under 1103 of the Bankruptcy

10 Code, the committee is charged with investigating the

11 prepetition conduct, acts, et cetera of the debtor, and

12 that's exactly what we plan to do.  We'll be serving

13 discovery shortly and we will look at the viability of claims

14 at the Holdco level and at the Opco level arising out of the

15 prepetition transactions that occurred in this case.

16         So we're not on board with the plan, but by the

17 same token, Your Honor, we oppose the items of relief sought

18 by the Holdco lenders today as not being the solution, but

19 actually, potentially creating far more problems.  So let me

20 look -- let's discuss, if you will, the standards for each of

21 these three items of relief and why they're not met.

22         On the motion to terminate exclusivity, as we

23 pointed out in our brief, the noteholders bear "an extremely

24 heavy burden," and we don't think that they have carried that

25 today.  And remember, Your Honor, that we're talking about

1  not opposing an extension of exclusivity, but terminating the

2  debtors' 120-day exclusivity period under the statute.  That

3  is truly extraordinary relief.  Whatever happened to the

4  breathing spell to allow debtors to file bankruptcy and try

5  to negotiate with their constituents?  Granting the motion to

6  terminate exclusivity here, as others have noted, will not

7  solve the problem, but lead to more chaos in this case that's

8  already been plagued by chaos since the petition date.

9        One benefit of maintaining exclusivity, which

10 counsel noted, is that that actually encourages people to

11 negotiate with each other, and that is one of the primary

12 functions of Chapter 11 is to try to forge consensus and

13 achieve a consensual plan.  I daresay, Your Honor, that if

14 you terminate exclusivity at the Holdco level, that will be

15 the end of negotiations.  Parties will go their separate

16 paths; there will be competing plans, there will be more

17 acrimony, more fighting, more expense.  None of that is good

18 for the business, none of that is good for the sale process,

19 none of that is good for the debtors and their creditors,

20 whom we are trying to look out for.

21        So, Your Honor, we would urge you to deny the

22 motion to terminate exclusivity.  And if the parties can't

23 achieve consensus, the 2Ls can always come back and seek to

24 oppose exclusivity, if the debtors seek to extend it, or to

25 seek termination at a later date, but in the first instance

1  the parties should be allowed, really compelled to sit at the

2  same table and negotiate with one another to try to achieve a

3  consensual plan, and termination of exclusivity will

4  terminate that process, to be certain.

5           With respect to the appointment of a trustee, Your

6  Honor, there are problems in this case, as we've noted.  We

7  don't like the notion that a conflicted board is appointing

8  directors to investigate themselves.  Again, the real

9  investigation that's going to be independent and thorough

10 will be done by the committee.  In this regard, Your Honor,

11 there are far -- there are many less destructive alternatives

12 in this case to address those problems than appointing a

13 Chapter 11 trustee or terminating exclusivity.  And to that

14 end, you know, it is the Holdco lenders' burden to show cause

15 that the appointment of a trustee is -- there's either cause

16 or it's in the best interest of creditors.  For the reasons

17 I'm pointing out, Your Honor, this is not in the best

18 interest of creditors, it is just the opposite; it will throw

19 this case into further chaos.

20          With respect to Marvel, I know many courts, Your

21 Honor, since Marvel have pointed out that you can't simply

22 come into a case, gin up acrimony, and then point to the

23 acrimony as founds for a trustee, and we think that's what's

24 going on here.

25          So with respect to the less intrusive ways to deal

1  with these problems, in the first instance, Your Honor, we

2  would note that the committee is the only truly independent

3  party to conduct an investigation.  And in similar

4  circumstances in the midst of a lot of acrimony, in the

5  Neiman Marcus case, Your Honor, where we represented the

6  committee, the court essentially requested that the committee

7  conduct the kind of independent investigation that we're

8  contemplating here, and that investigation will then be

9  available to other parties in interest, they can argue about

10 whether there are claims or not, whether claims should be

11 settled under a plan, whether claims exist at Holdco or Opco

12 or both.  We've already begun that investigation and, again,

13 we will roll out formal discovery to pursue that.  And there

14 are many potential targets, Your Honor, the Opco board is a

15 target, the Holdco board is a target, the 1L and 2L lenders

16 have to be investigated, and I note that the independent

17 director is -- will have problems going after the 1Ls based

18 on the construct that we've seen in the documents.

19         So we don't think that terminating exclusivity or

20 appointment of a trustee is going to lead to good things in

21 this case.  We think maintaining exclusivity, forcing the

22 parties to negotiate, and having an independent investigation

23 conducted is the path forward.

24         Lastly, Your Honor, I'll address the automatic

25 stay.  We did discuss this at the last hearing.  The burden

1  is on the movants to show that they have valuable collateral

2  at stake; they have failed in their burden of establishing

3  that their equity has any value.  The right to vote is not

4  value.  The only, quote, evidence that they have for that

5  proposition is the statement by a layperson, and it's just

6  mistaken, Your Honor.  There is no economic value to the

7  right to vote, but there is plenty of leverage and hold-up

8  value.  So we think the predicate for the lift-stay motion

9  has not been established.

10         And Mr. Lauria argued that -- in his argument

11  today that the magnitude of the objections to their motion

12  shows value and that doesn't make any sense to me, Your

13  Honor.  There's either economic value or there isn't.  The

14  economic value, it's their burden to show and they haven't

15  produced any evidence.  And if the outcry over shareholders'

16  right to vote is a basis for lifting the stay or appointing a

17  trustee, I suppose in every Chapter 11 case every shareholder

18  could come in and try to raise a ruckus that they're being

19  deprived of something in the case when the stock they're

20  holding is worthless.  So it's just an argument that doesn't

21  fly here, Your Honor.

22         What can the 2Ls do to advance their interests?

23  So, if you deny the relief requested, they can do what every

24  creditors committee does, they can conduct discovery, they

25  can see whether there is value to the claims that they claim

1   to exist at the Holdco level and, if they can establish that,

2   they can move for standing just like creditors committees do

3   all the time.  There is a conventional path to pursue and

4   prosecute claims like this, but what the Holdco lenders are

5   advancing is an unconventional path through termination of

6   exclusivity, appointment of a trustee, or lifting of the

7   stay, all those are essentially killing an ant with an anvil,

8   Your Honor.  There are better solutions than granting any of

9   the relief requested.

10          I'm happy to answer questions; otherwise, I'll

11  take a seat.

12          THE COURT:  No questions.  Thank you.

13          MR. FEINSTEIN:  Thank you.

14          THE COURT:  Mr. Lauria?

15          MR. LAURIA:  Thank you, Your Honor.

16          Counsel for the debtors started out by saying that

17  they're fiduciaries for all debtors, and really that is the

18  problem.  They're trying to be fiduciaries for all debtors,

19  but they can't, by definition, be on both sides of the V.

20  You can't have the same businesspeople and the same lawyers

21  effectively being the defendant with respect to a claim and

22  the proponent with respect to a claim.  That was ultimately

23  the problem that took hold in the Adelphia case, which

24  everybody has felt so free to refer to.

25          Outside the published opinion that people are

1  talking about, what Judge Gerber actually did there was he

2  determined that debtors' counsel and the debtors' officers

3  were in fact conflicted, and he deputized the various

4  creditor groups to represent their estate's interests in

5  resolving the intercompany claims.  This resulted in a lot of

6  litigation for a short period of time and then a completely

7  consensual resolution of the case, but Judge Gerber did not

8  turn a blind eye to the conflict problems there.  Counsel and

9  the debtors' officers were effectively sidelined so that the

10 claims and causes of action between and among the estates

11 could be resolved by people who had economic interests

12 located to a particular debtor group.

13        To suggest that the debtors here and their

14 advisers here can properly be on both sides of the V just

15 denies all experience and any notion of what fiduciary duties

16 truly are.  By definition, you've got to be un-conflicted;

17 you can't be on the other side of the argument.

18        Counsel made a reference to the level of

19 engagement.  In fact, the record evidence that we have

20 offered the Court shows that there is no engagement and that

21 when we provided our plan, although we were told that we

22 would get a response and comments, we never did.  To this

23 day, we have not received any response or engagement on our

24 alternative plan.  So the record is that there has been no

25 plan engagement.

1          Now, I want to try to clarify a point here that I

2    think gets conflated by all of the opponents.  When we're

3    talking about exclusivity relating to plan negotiations and

4    is it in the best interests of all creditors, we're not

5    talking about all creditors of all the debtors.  This is a

6    motion at the Holdco debtors.  We're talking about relief at

7    the Holdco debtors and because there's no substantial or

8    substantive consolidation going on here, you've got to look

9    at those estates separately and see what's happening with

10   respect to those estates.  And what in fact has happened, as

11   the record establishes, is that a deal was made by the Opcos

12   with their lenders and that deal, through the RSA, through

13   the DIP, through the plan, through the sale process has now

14   dictated what's happening at the Holdcos in the complete

15   absence of any facsimile of board or governance process at

16   the Holdcos.

17          The testimony is from Mr. Orlofsky that he's

18   unaware of the Holdco boards ever having met, and the

19   testimony is that the only actions taken by the Holdco boards

20   were unanimous consent, and the testimony is that the Holdco

21   boards never met separately to consider any of these material

22   actions.  That's in the record, anything else is lawyers

23   talking.

24          People talk about timing that this is only the

25   second month of the case.  Well, the case is going to be a

1  three or four-month case if the debtors and the 1L get their

2  way.  So we're well down the road here and, again, I don't

3  think that what we're supposed to do is just lay down on the

4  tracks and wait for that moment to come.

5         Counsel for the debtor said that we only speak for

6  93 percent of the creditors at the Holdcos and that they

7  don't expect any other creditors there.  Ninety three percent

8  is an accepting class, Your Honor, and it's pretty close to

9  substantially all.  In fact, I have a hard time thinking of a

10  case where more than 93 percent of creditors in a class voted

11  to accept the plan.

12         Mr. Hartman, who's referred to, doesn't solve any

13  problems here.  The only record evidence is that he's on the

14  board of the Holdcos and on the board of the Opcos.  He lacks

15  the independence that's necessary to address the inter-debtor

16  issues here.

17         The fact of the matter is that the debtors have

18  locked themselves into an RSA with the 1L and they're

19  marching down a path, and they're talking about the potential

20  of future engagement, but the past is a teacher and there has

21  been no engagement, that's what the record shows.  Talk about

22  the -- whatever is being mentioned about prior engagement,

23  it's not in the record.  The record is that there was no

24  engagement.

25         A number of parties have argued that the Court has

1   already ruled on the issue of adequate protection.  The only

2   thing I believe the Court addressed was the fact that because

3   we weren't getting primed in connection with the DIP that the

4   DIP didn't give rise to a right to adequate protection.  I

5   don't think there was a binding determination by the Court

6   with respect to adequate protection of our interest in the

7   equity collateral at the Holdcos.  And in fact, when you look

8   at the plan, what's intended, and counsel for the 1L stated

9   it clearly -- it's kind of interesting to me, he almost

10  argued again, I think, their position -- he said their

11  intention is to cancel the equity of the Holdcos and that we

12  shouldn't be permitted to go forward quickly to get that

13  equity because, if we aren't, that issue is going to become

14  moot because the equity will be gone.  That's exactly our

15  problem; that is exactly our problem that something that has

16  value today is going to be gone in the future if we don't act

17  quickly.

18          And counsel for the committee talked about

19  economic value.  The Code doesn't actually say economic

20  value, what the Code says is value.  And I think everybody

21  can take notice of the fact that we all understand what a

22  control premium is.  People who have the right to exercise

23  control get a premium, that's not news to anybody in this

24  room.

25          Now, another conflation, the automatic stay in a

1  corporate debtor's bankruptcy does not affect governance or

2  shareholder voting in that bankruptcy, it does not.  There

3  are plenty of cases that stand for the proposition that

4  shareholders can meet, they can elect directors, and do all

5  the things that shareholders do during the pendency of a

6  bankruptcy case.  In fact, there are cases that actually

7  require a debtor to do that.  What is being conflated here is

8  the stay at the Holdco cases is being used to prevent that

9  from happening without any benefit, without any

10 reorganization intention, and in fact, again, looking to the

11 plan, looking to the evidence, the plan contemplates in an

12 equitization scenario that claims of the Holdcos are going to

13 be released and whatever isn't released is going to be

14 transferred to the reorganized company, which will not

15 include the Holdcos or their creditors.  The Holdco creditors

16 get wiped out.

17         Now, that's what this stay is being used to

18 achieve, that's what exclusivity is being used to achieve,

19 and to talk about all the debtors as a lump, again, misses

20 the point.  These debtors are separate, the protections that

21 their creditors are entitled to should be determined on a

22 separate basis.

23         Counsel didn't satisfactorily address the issue of

24 the conflicts.  The conflicts are manifest.  There are

25 claims, everybody knows it, between the two debtor groups,

1  the Holdcos and the Opcos.  The committee has the same

2  problem as the debtors have here.  The committee is a

3  committee for all the debtors, the Holdcos and the Opcos, so

4  the committee has put itself on both sides of the V here.

5  And just like in Adelphia, when Judge Gerber sidelined the

6  debtors' counsel and the debtors' officers to do nothing but

7  be witnesses with respect to the intercompany disputes, the

8  committee was also sidelined for the exact same reason.  The

9  committee was pregnant because it was a committee for all the

10  debtors, with the exact same conflicts that the debtor and

11  its advisers were breaking with.

12          So, just pointing to the committee and saying,

13  hey, we'll solve everything, we're the only truly independent

14  party here, the committee has got duties to both groups.  How

15  do you serve two masters?  How do you allocate the dollars,

16  how do you help one that might hurt the other?  All

17  (indiscernible) in Owens Corning say you can't do that.

18          Now, everybody seems to suppose that, if relief is

19  granted, chaos will follow.  There's no record evidence

20  regarding what the lenders will do at the Holdco level if the

21  relief is granted, there's no -- and there's no basis for

22  supposing that they will be crazy.  Craziness denigrates

23  value.  I can assure the Court that my clients are commercial

24  investors, the record speaks for itself.  PIMCO manages over

25  $2 trillion of money, investing it and making money for its

1  clients and its investors.  This is not a crazy group, this

2  is a group that's trying to protect their rights that they

3  negotiated for, it's a matter of contract, and they're

4  protected by the Code.

5          I thought it was fascinating that parties

6  complained that if we could get exclusivity terminated we

7  would try to, quote-unquote, jam through a Holdco plan, when

8  in fact, when you look at the realm of Chapter 11 cases,

9  that's exactly what's happening right now.  A Holdco plan is

10 being jammed through without the consent or support of its

11 creditors, and without any negotiation with its creditor

12 regarding the terms of that plan.  That's not a process

13 working the way it's supposed to, that's a process that's

14 broken down, that's a process where creditors and another

15 debtor have been allowed to take undue and improper influence

16 at a debtor where they have no claims.  That's what's

17 happening here.

18          I think to give credence to the concerns about

19 chaos you have to assume that my clients are suicidal, that's

20 we're just going to come in and destroy everything for

21 everybody.  That's not a value-maximizing proposition.

22          Now, people have talked about Marvel.  Marvel had

23 two components to it.  The first component was where Judge

24 Balick lifted the stay and allowed the bondholders to change

25 the board of the Opcos.  Six months later, when the court

1  determined that that was not going to result in a viable

2  plan, plan negotiations had broken down, the court determined

3  the right thing to do was to appoint a trustee to take over

4  for that board after it had been changed.  Two completely

5  different pieces to the puzzle.  What Marvel does show,

6  though, through the two pieces is, number one, that the

7  rights of the bondholders at the Holdco could be respected

8  and, if they didn't get done what they needed to get done,

9  the court had further remedies at its fingertips to protect

10  the estates.

11       And in fact a plan was confirmed in the Marvel

12  case, consensually, and I think we all know what the story of

13  Marvel Comics has been since that Chapter 11 case has

14  concluded.  Marvel has exploded into a multi-billion-dollar

15  business, completely successful.  So to suggest that going

16  down this path is a dead end that will result in destruction

17  of value is certainly disproved by Marvel.

18       (Pause)

19       MR. LAURIA:  One comment that I guess merits being

20  addressed by the committee about the importance of the

21  breathing spell provided by the automatic stay.  I think, as

22  the Court knows, there's been no breathing spell here.  This

23  debtor isn't figuring out how to reorganize and taking its

24  time and negotiating with creditors, that's all been done.

25  On day one of the case, the RSA was filed, the plan followed

1  shortly thereafter, and we are racing to the finish line.  To

2  say that the debtors' breathing spell should be respected,

3  and that means that creditors have to stand still, whether

4  losing their rights, really doesn't make sense.

5          Your Honor, I think on a review of the record the

6  Court will find that in fact we've satisfied our burden for

7  all three of the remedies we seek.  I will state again, I

8  think that the best outcome here is a termination of

9  exclusivity at the Holdcos.  We can have a plan on file very

10 quickly and we can get to confirmation very quickly.  To the

11 extent there are contingent claims that show up, our plan

12 will address them.  We share the debtors' view that there

13 shouldn't be any claims there.  These are special purpose

14 vehicles that were created 15 months ago and incurred debt to

15 fund the management buyout.  It doesn't have any employees;

16 they don't have any business activities, they aren't engaged

17 with anybody outside of the corporate family here.  There may

18 be related-party transaction claims, we'll sort those out,

19 those will be addressed under the plan, but it can be done

20 very quickly and we can cut off the incurrence of

21 administrative expense claims in those two boxes.

22         We can avoid the unnecessary expense of paying for

23 investigations when, again, the people who will have to come

24 out of pocket to pursue those claims will have to make that

25 cost/benefit analysis and, if they do decide to go forward,

1  they go forward on their own dime, not on any of these

2  estates' nickel.

3         So, Your Honor, I do think that the relief

4  requested should be granted.  I think the termination of

5  exclusivity at the Holdcos is the best path, but I also think

6  that we have established that we're entitled to relief from

7  the stay to exercise our shareholder rights.  Remember, the

8  stay at the Opcos doesn't achieve anything from a corporate

9  governance perspective; they're relying on the stay at the

10  Holdcos to do that.  To suggest that the stay at the Opcos is

11  somehow relevant, it's not.  We're not seeking relief from

12  the Opcos stay, where we're seeking relief is from the

13  Holdcos, and all everybody wants to do is try to mush it all

14  together, but they can't do that as a matter of law.  And I

15  also think that a trustee could be very helpful to solving

16  problems here at the Holdco level.

17         Any questions, Your Honor?

18         THE COURT:  No questions.  Thank you, Mr. Lauria.

19  All right.

20         MR. FELDMAN:  Your Honor, just one very small

21  point, if I could, Your Honor?

22         THE COURT:  Okay.

23         MR. FELDMAN:  I don't have to, but I think it's

24  worth reminding --

25         THE COURT:  All right, go ahead.

1          MR. FELDMAN:  -- let me just very quickly, Your

2    Honor.  For the record, Matthew Feldman for the debtors.

3          I just want to remind the Court, as Mr. Lauria

4    mentioned, the debtors being tied up in the RSA twice, I just

5    want to remind the Court, as we discussed at the first day,

6    the RSA has a robust fiduciary out for any purpose.  So, yes,

7    we are parties to the RSA, but if a better version of a plan

8    or sale process emerges, we are certainly able to exercise

9    our fiduciary duties.

10          THE COURT:  Okay.

11          MR. FELDMAN:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          All right, why don't we take a lunch break?  We'll

14    come back and I'll give you my ruling at that time.  So let's

15    recess until 1:30, we'll come back and hear my ruling.

16          Thank you.

17       (Recess taken at 12:33 p.m.)

18       (Proceedings resumed at 1:39 p.m.)

19          THE COURT:  Thank you all.  Please be seated.

20          All right.  Well, I've been asked to consider

21    three motions by two creditors of the Holdco debtors within

22    the corporate structure.  Those lenders provided funding that

23    was used in a go-private transaction that occurred

24    approximately 15 months ago, well before the debtors filed

25    for bankruptcy protection.  The Holdco entities were

1  purportedly created for the purposes of providing the funding

2  necessary to complete the transaction.  As collateral for the

3  loans being provided, the lenders received a lien on the

4  equity interest in the Opco entities within the corporate

5  structure, which sit below the Holdco entities in that

6  structure.

7          The Opco entities are borrowers as well.  The

8  lenders say the Opco entities are senior to the Holdco

9  lenders in the debt structure.  In order for the Holdco

10  lenders to recover on their debt, any restructuring or sale

11  process must first clear the Opco first lien lender's debt.

12          Prior to the petition date, the debtors, including

13  both the Opco and the Holdco entities, entered into an RSA

14  with the first lien lenders in which debtors agreed to a sale

15  process, and the first lien lenders agreed to provide DIP

16  financing in order to pay for that process.  I've already

17  approved both the DIP loan and the bid procedures motion

18  allowing the sale process to proceed over the objection of

19  the Holdco lenders, who believed that the process was flawed

20  and did not provide them adequate protection.  I concluded

21  the sale process was proper and in the best interests of all

22  the estate constituencies, and that the replacement liens --

23  and including liens on certain unencumbered assets was

24  sufficient to provide adequate protection to the Holdco

25  lenders at that time.

1          Not surprisingly, the Holdco lenders are concerned

2    that the sale process might not generate sufficient proceeds

3    to cover the first lien debt, which would leave them with no

4    recovery on their debt.  As a result, they have been and I

5    assume will continue to press whatever process they can to

6    either improve the process or gain some leverage in the

7    negotiation.  As Mr. Lauria already delineated, their efforts

8    have resulted in a number of concessions by the DIP lenders,

9    including extending the sale process timeline.

10          As part of their efforts, the Holdco lenders have

11    brought these three motions, the motion to terminate

12    exclusivity, the motion to lift the automatic stay, and/or a

13    motion to appoint a Chapter 11 trustee.  Now, as part of

14    their efforts, they have argued that their rights are not

15    being adequately represented by the debtors and their

16    advisers, and that there is a conflict between the two lender

17    groups -- excuse me, between the two debtor groups which

18    makes it impossible for them to adequately consider the

19    Holdco lenders' position.

20          The conflict the Holdco lenders assert arises from

21    potential claims by the Holdco debtors against the Opco

22    entities over the go-private transaction.  The Holdco lenders

23    concede, however, that there are currently no claims brought,

24    and the record here does not reflect the existence of any

25    claims or what those claims might even be at this point in

1   time.

2          Now, the potential for conflicts is not unusual in

3   any large corporate Chapter 11 case.  There are almost always

4   intercompany claims.  To argue that such claims create a

5   disabling conflict between debtor entities would create an

6   untenable problem in every large corporate case.

7          The burden of establishing the termination of

8   exclusivity is on the moving party and is extremely high.

9   Debtors should in the first instance have the ability to put

10  forward a plan of reorganization unless there is cause to

11  terminate.  Here, the Holdco lenders have failed to establish

12  cause to terminate exclusivity.

13         These cases are large and complex cases, and the

14  debtors have made a good faith effort to put forward a plan.

15  The proposed plan is still a work in progress and subject to

16  negotiation with various constituency groups, including the

17  Holdco lenders and the unsecured creditors committee.  The

18  sale process is the best way to test and determine whether

19  the Holdco lenders' collateral has any value.  It is unclear

20  whether the Holdco lenders would put forward a plan that

21  would alter that conclusion.

22         Second, the Holdco lenders have failed to meet

23  their burden to establish the need to lift the automatic

24  stay.  It was their burden to show value that needs to be

25  protected and they did not put any evidence on that there's

1   any value in the Opco stock.  Again, if there is, it will be

2   determined through the sale process.  Lifting the stay now

3   would cause a disruption of that sale process.  As the record

4   reflects and as the witness has testified, a change in

5   control at this point would cause concern amongst the

6   debtors' creditors and potentially chill the sale process as

7   potential buyers try to determine what the change of control

8   could bring.  It would certainly delay the sale process, if

9   nothing else.

10          For the same reasons, the appointment of a Chapter

11  11 trustee would also create uncertainty and delay.  The

12  Holdco debtors have not established that the appointment of a

13  Chapter 11 trustee is in the best interests of all of the

14  estate constituencies and, therefore, I'll deny that motion

15  as well.

16          The Holdco lenders can certainly continue to press

17  for their interests in these cases, and I fully expect that

18  they will continue to do so.  Hopefully, it is through a

19  negotiation process rather than a litigation process that can

20  result in the filing of a fully consensual plan of

21  reorganization, and I hope that's how we can move forward

22  here.  I think negotiations are appropriate and I fully

23  expect they will continue, and I fully expect that the plan

24  that is currently on file will change over the course of the

25  next couple of months.  We'll see how things go.

1          Any questions, concerns?

2      (No verbal response)

3          THE COURT:  Okay.  Anything else for today?

4          MR. FELDMAN:  That's it, Your Honor.

5          THE COURT:  Okay, thank you all very much.  We are

6  adjourned.

7      (Proceedings concluded at 1:45 p.m.)

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    December 18, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    December 18, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25