# EXHIBIT A

2020R01294/BAC

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | Crim. No. 23- |
| | : | |
| JOHN HUGHES | : | 18 U.S.C. § 371 |
| | : | (Conspiracy to Commit |
| | : | Securities Fraud) |
| | : | |

## I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey charges:

### OVERVIEW

1. From in or around January 2015 to in or around March 2020, defendant John Hughes ("HUGHES") conspired with Co-conspirator-1 and Co-conspirator-2 to defraud dozens of investors ("Victims") who had invested approximately $360 million in investment funds managed by Prophecy Asset Management LP ("Prophecy"), through lies, deception, misleading statements, and material omissions relating to, among other things: (a) the purported low-risk, transparent, and diversified nature of Prophecy's funds; (b) the manner and purpose in which HUGHES, Co-conspirator-1, and Co-conspirator-2 used money from those funds; and, (c) the financial position of Prophecy's funds leading up to its collapse in or around March 2020.

### Background

2. At all times relevant to this Information:

 a. Prophecy Trading Advisors International Ltd (the "Fund") was an

1

investment company having a place of business in Tortola, British Virgins Islands. Prophecy Trading Advisors Master Fund, LP (the "Master Fund") (together with the Fund, the "Funds") was a Cayman Islands limited partnership that was formed for the purpose of investing and trading in securities and financial instruments. Prophecy was a Delaware limited partnership and a registered investment adviser that served as the investment manager to the Fund. Prophecy's principal offices were located in South Carolina and New York.

    b.  HUGHES resided in Mahwah, New Jersey, and was Prophecy's Chief Operating Officer, Chief Compliance Officer, and co-founder. HUGHES co-managed Prophecy and the Funds from his residence and from Prophecy's offices in New York.

    c.  Co-conspirator-1 resided in Summit, New Jersey and was Prophecy's Chief Executive Officer ("CEO"), portfolio manager, and its other co-founder. Along with HUGHES, Co-conspirator-1 co-managed Prophecy and the Funds primarily from his New Jersey residence.

    d.  The Fund invested all of its investable assets in the Master Fund, subject to oversight by the Fund's board of directors made up of HUGHES, Co-conspirator-1, and a sole outside director, who was based in Bermuda.

    e.  Co-conspirator-2 was an investment manager (called a "sub-advisor") for Prophecy who was supposed to invest capital from the Funds pursuant to Prophecy's "first-loss" investment model, discussed below. Since in or around 2019, Co-conspirator-2 was also the CEO and President of a multi-billion

dollar company that owned and managed large and diversified retail franchises.

  f. The Victims were domestic and foreign investors in the Funds and included, among others, institutional entities, pension plans, family trusts, and high net worth individuals.

## The Conspiracy

  3. From in or around January 2015 to in or around March 2020, in Union County, in the District of New Jersey, and elsewhere, defendant

## JOHN HUGHES

did intentionally and knowingly, directly and indirectly, conspire and agree with others, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, to use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240. l0b-5.

## Goal of the Conspiracy

  4. The goal of the conspiracy was for HUGHES, Co-conspirator-1, and Co-conspirator-2 to enrich themselves by obtaining hundreds of millions of dollars of

Victims' funds through false and misleading statements and material omissions regarding (a) the low-risk and diversified nature of the Funds, (b) how the Victims' investments would be used, and (c) the Funds' profitability.

## Manner and Means of the Conspiracy

5. It was part of the conspiracy that:

### *Prophecy's False Claims of Low-Risk and Transparent Investment Opportunities*

a. From in or around January 2015 to in or around March 2020, Co-conspirator-1 and HUGHES fraudulently marketed the Funds to prospective investors as safe, diversified, and collateralized investment opportunities. HUGHES and Co-conspirator-1 claimed that the Funds offered access to a "first-loss" trading strategy that purportedly worked as follows:

i. Investor money was allocated to a diverse array of traders, called sub-advisors, who were purportedly sophisticated investors with proven track records of successful investing.

ii. In order to gain access to the investors' pooled money, sub-advisors had to provide cash collateral equal to approximately 10% of the money they sought to invest. For example, if a sub-advisor provided cash collateral of $1 million, Prophecy would allocate $10 million from the Funds, which the sub-advisor could use to trade in liquid assets and equities of their choosing.

iii. Sub-advisors were incentivized to generate profits, because they were permitted to keep a percentage of their gains. In turn, Prophecy charged sub-advisors an administrative fee to access the Funds' capital.

    iv. To substantially reduce the risk of any losses to investors, Prophecy monitored and tracked the sub-advisors' trading on a real-time, day-to-day basis using a proprietary trading platform.

    v. Prophecy also restricted sub-advisors from engaging in "off-platform" trading so that trading activity was transparent and closely monitored.

    vi. If a sub-advisor began to experience trading losses that approached the amount of their cash collateral, Prophecy would contact the sub-advisor to replenish their accounts with cash and, if necessary, suspend allocations and trading, or even terminate the sub-advisor if losses were substantial.

    vii. An administrator oversaw the funds on a monthly basis, and Prophecy and the Funds underwent yearly independent audits.

    viii. Using this strategy, according to HUGHES and Co-conspirator-1 the Funds never had a down month since their inception and consistently experienced positive returns.

   b. These claims—which Co-conspirator-1 and HUGHES used to induce investors—were materially false and misleading. For example:

    i. In reality, Prophecy did not use a diverse array of sub-advisors. Rather, over time, without informing investors, HUGHES and Co-conspirator-1 allocated approximately 86% of the Funds' capital to six different trading entities, each controlled by a single sub-advisor, Co-conspirator-2.

    ii. In addition, over time, HUGHES and Co-conspirator-1 continued to provide Co-conspirator-2 large allocations from the Funds but

abandoned the requirement that Co-conspirator-2 provide cash collateral to back potential losses.

          iii.    HUGHES and Co-conspirator-1 failed to suspend Co-Conspirator-2's allocations or trading, even though he sustained millions of dollars in losses that far exceeded his cash collateral.

    c.    HUGHES and Co-conspirator-1 fraudulently concealed all of this and other information from Victims, causing Victims to believe their investments were far more secure than they actually were.

### *Fraudulent Concealment of Co-Conspirator-2's Losses*

    a.    Over time, Co-conspirator-2 sustained substantial trading losses that ultimately wiped out the Funds. These loses increased over time so that Co-conspirator-2, using money from the Funds, had cumulative trading losses of approximately $68 million as of in or around January 2018, approximately $110 million as of in or around January 2019, approximately $270 million as of in or around January 2020, and approximately $294 million as of in or around March 2020. As these repeated losses accumulated, HUGHES and Co-conspirator-1 did not require Co-conspirator-2 to maintain cash collateral to offset and back the losses.

    b.    HUGHES, Co-conspirator-1, and Co-conspirator-2 fraudulently concealed Co-conspirator-2's losses and cash collateral deficits by, among other things: (i) engaging in secret "round-trip" transactions that siphoned off cash from the Funds and gave it to Co-conspirator-2 who then fraudulently used it as "collateral" in order to obtain more investment money from the Funds; (ii) allowing

Co-conspirator-2 to use purported non-cash collateral, such as stocks, to secure allocations from the Funds, without disclosing that information to Victims; and (iii) also failing to disclose to Victims and auditors that Co-conspirator-2 was allowed to provide non-cash collateral without having Prophecy take steps to verify if that non-cash collateral had any actual value.

        c.      ***Secret "Round-Trip" Transactions:*** By in or around October 2017, Co-conspirator-2 had a cash collateral deficit of approximately $19 million based on the amount of money he had been allocated to invest from the Funds. According to the representations Co-conspirator-1 and HUGHES made to Victims, Prophecy should have suspended Co-conspirator-2's trading until he provided additional cash collateral. Instead, HUGHES and Co-conspirator-1 fraudulently engaged in the following series of transactions that used investor money from the Funds to replenish Co-conspirator-2's cash collateral:

        i.      In or around November 2017, HUGHES and Co-conspirator-1 entered into a sham loan agreement with Co-conspirator-2, whereby they purported to use money from the Funds to loan approximately $11 million to a company that Co-conspirator-2 owned ("Company-1"). Based on that purported "loan," Co-conspirator-2 caused Company-1 to engage in two transfers totaling approximately $10 million to another entity that Co-conspirator-2 owned ("Entity-1"). Co-conspirator-2 then wired the approximately $10 million in two separate transactions from Entity-1 back to Prophecy and designated it as a new cash collateral contribution.

7

ii. HUGHES and Co-conspirator-1 failed to disclose the fraudulent "round-trip" transactions to Victims.

iii. HUGHES and Co-conspirator-1 also concealed these transactions from the Funds' administrator and auditor by, among other things, having Co-conspirator-2 forge the signature of a former Company-1 colleague on the $11 million loan agreement.

d. ***Non-Cash Collateral:*** From in or around 2015 through in or around 2019, Co-conspirator-2 was unable to provide sufficient cash collateral to secure his allocations from the Funds. During this period, Co-conspirator-2 continued to sustain substantial investment losses using money from the Funds. In response, HUGHES and Co-conspirator-1 allowed Co-conspirator-2 to secure his allocations and disguise his losses with non-cash collateral, like stocks and personal guarantees. Among other things, this allowed Prophecy to claim to its administrator and auditor that Co-conspirator-2's loses were offset by collateral that could be liquidated. However, HUGHES and Co-conspirator-1 actively concealed this arrangement from prospective investors and Victims by falsely claiming that all sub-advisors secured their allocations with cash collateral.

e. ***The Non-Cash Collateral Was Worthless:*** HUGHES and Co-conspirator-1 concealed from Victims and auditor that Prophecy made no effort to verify that Co-conspirator-2's purported non-cash collateral had any actual value. In fact, virtually all of the non-cash collateral was fabricated and worthless. For example:

8

i. By the end of in or around 2018, Co-conspirator-2 had cumulative trading losses in excess of $85 million. To reduce and offset these losses for Prophecy's year-end audit, Conspirator-2 created a fake preferred stock agreement that purported to grant Prophecy ownership of approximately $125 million of stock in a company ("Company-2") that Co-conspirator-2 controlled. The "agreement" was created in or around April 2019 but backdated to on or about January 1, 2018, to enable the stock to be recorded as a credit to the Funds and an asset on the Funds' 2018 balance sheet.

ii. In or around June 2019, Co-conspirator-2 provided HUGHES with approximately two Company-2 convertible stock certificates as proof of the ownership reflected in the preferred stock agreement. The certificates were backdated to on or about January 3, 2018.

iii. HUGHES and Co-conspirator-1 did not conduct any due diligence on the agreement or certificates and did not take any steps to control or liquidate the non-cash collateral in light of Co-conspirator-2's continued losses. Instead, HUGHES provided the Funds' auditor with the preferred stock agreement and the certificates, and Co-conspirator-2 falsely told the auditor that Co-conspirator-2 had authority to issue the preferred stock, which was collateral to secure Co-conspirator-2's trading losses.

iv. In reality, Company-2 never issued the preferred stock, and the certificates were a complete fabrication.

9

*Fraudulent Concealment of losses from Off-Platform Investments*

   a. Despite claiming to investors that Prophecy closely tracked its allocations through its proprietary software platform and restricted the use of the Funds for off-platform investments, HUGHES and Co-conspirator-1 made numerous failed investments and loans that were off-platform and threatened to create substantial losses to the Funds. To conceal these potential losses, HUGHES, Co-conspirator-1, and Co-conspirator-2 engaged in a series of fraudulent transactions that were designed to give the appearance that the investments had been properly redeemed. For example:

     i. From in or around December 2018 to in or around July 2019, through a series of transactions, HUGHES and Co-conspirator-1 used money from the Funds to make off-platform investments valued at approximately $24 million in Company-3, a fund managed by a Pennsylvania investment advisor ("Individual-1").

     ii. In or around late December 2018, Company-3 was in financial distress, so HUGHES and Co-conspirator-1 attempted to redeem the total amount of the investment. The redemption failed, and they were only able to redeem approximately $6.5 million of the $24 million investment, leaving approximately $17.5 million in losses on the Funds' books.

     iii. To conceal and clear this loss from the Funds' books, HUGHES, Co-conspirator-1, and Co-conspirator-2 agreed to engage in a series of transactions that made it appear that the investment had been legitimately

purchased by an independent third-party. In reality, Co-conspirator-2 secretly purchased the investment.

       iv.   In furtherance of that agreement, on or about May 23, 2019, Co-conspirator-2 wired $17,579,885.15 to the Funds, the exact amount of the outstanding Company-3 investment.

       v.   To conceal Co-conspirator-2's purchase of the investment, HUGHES, Co-conspirator-1, and Co-conspirator-2 had the investment transferred to Company-1.

       vi.   On or about June 12, 2019, Co-conspirator-2 emailed HUGHES an agreement, backdated to April 1, 2019, assigning the interest in the investment to Company-1. In order to hide his involvement in the transaction, and in Company-1, Co-conspirator-2 forged the signature on the agreement, using the first and middle names of his minor son.

       vii.   Pursuant to Company-3's limited partnership agreement, such assignments—even if legitimate—were prohibited. To get around this prohibition, HUGHES and Co-conspirator-1 created a fake version of the limited partnership agreement that allowed for assignments, and they forged Individual-1's signature on that fabricated document.

       viii.   HUGHES provided these fake documents to the Funds' auditor to conceal from the auditor that the investment had been purchased by Co-conspirator-2.

*The Funds' Collapse*

a. Year after year, Co-conspirator-2 continued to suffer substantial trading losses, which were not disclosed to Victims. Nonetheless, HUGHES and Co-conspirator-1, continued to allow Co-conspirator-2 to trade and receive additional allocations from the Funds.

b. In or about March 2020, the Funds' auditor resigned after uncovering HUGHES', Co-conspirator-1's, and Co-conspirator-2's fraudulent activities.

c. In total, as of in and around March 2020, the conspiracy and scheme to defraud caused the Victims to suffer losses in excess of $294 million.

**Overt Acts**

6. In furtherance of the conspiracy and to effect its unlawful object, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

a. On or about November 22, 2017, HUGHES and Co-conspirator-1 wired approximately $5 million to Company-1 and designated the transfer on the Funds' books as an investment in Company-1.

b. On or about November 22, 2017, Co-conspirator-2 wired the approximately $5 million to Entity-1.

c. On or about November 22, 2017, Co-conspirator-2 caused approximately $5 million to be wired back to HUGHES and Co-Conspirator-1, who caused the transfer to be recorded in the Funds' books as a cash collateral contribution from Co-conspirator-2.

  d. On or about November 30, 2017, HUGHES and Co-conspirator-1 wired another approximately $5 million to Company-1 and designated the transfer on the Funds' books as an investment in Company-1.

  e. On or about November 30, 2017, Co-conspirator-2 wired the additional approximately $5 million to Entity-1.

  f. On or about November 30, 2017, Co-conspirator-2 wired approximately $5 million back to HUGHES and Co-Conspirator-1, who caused the transfer to be recorded in the Funds' books as a cash collateral contribution from Co-conspirator-2.

  g. In or around May 2019, Co-conspirator-2 wired approximately $17,579,885.15 to HUGHES and Co-conspirator-1 to purchase the outstanding Company-3 investment.

  h. On or about June 12, 2019, Co-conspirator-2 emailed a forged agreement to HUGHES, which purported to assign the investment in Company-3 to Company-1.

  i. Between on or about June 12, 2019 and on or about June 17, 2019, HUGHES and Co-conspirator-1 altered and forged Company-3's limited partnership agreement to allow for the assignment of Company-3 investment to Company-1.

  j. On or about June 17, 2019, Co-conspirator-1 emailed the Funds' auditor falsely representing that the Company-3 investment had been fully redeemed.

 In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

1.   Upon conviction of the offense charged in this Information, defendant JOHN HUGHES shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, and all property traceable thereto.

## SUBSTITUTE ASSETS PROVISION

2.   If any of the property described above, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendant up to the value of the forfeitable property described above.

*Philip R. Sellinger*
PHILIP R. SELLINGER
United States Attorney