# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (JTD)<br><br>(Jointly Administered)<br><br>Related Docket Nos. 444, 487<br><br>**Obj. Deadline:  Jan. 3, 2025, 4:00 p.m. (ET)**<br>**Hearing Date:  Feb. 13, 2025, 10:00 a.m. (ET)**<br>**or such other time as the Court may schedule** |

## OBJECTION OF BUDDY MAC HOLDINGS, LLC TO NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT CURE COSTS WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND RESERVATION OF RIGHTS

Buddy Mac Holdings, LLC and its subsidiaries (collectively, "BMH") respectfully file this cure objection and reservation of rights ("Cure Objection") to the proposed assumption and assignment of executory contracts pursuant to the Notice of Possible Assumption and Assignment and Cure Costs with Respect to Executory Contracts and Unexpired Leases [D.I. 487] (the "Notice").  In support of the Cure Objection, BMH respectfully states as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

# I.
# PRELIMINARY STATEMENT

The Debtors seek to assume and assign various agreements with BMH, the largest franchisee of the Buddy's brand. However, the Debtors are in default of many of their agreements with BMH, and the breaches deprived BMH of fundamental and essential elements of BMH's bargain. The breaches have caused BMH severe damage, are historical in nature, and either cannot be cured, or will shortly be incapable of cure. The Debtors' request must be denied.

# II.
# RELEVANT BACKGROUND

A.  **The Bankruptcy Cases**.

1. On November 3, 2024 (the "Petition Date"), the above-captioned Debtors ("Debtors" or "Franchise Group") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court").

2. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Section 11 U.S.C. §§ 1107(a) and 1108. No trustee or examiner has been appointed in these chapter 11 cases.

3. On November 11, 2024, the Debtors filed a motion (the "Bidding Procedures Motion") [D.I. 154] seeking entry of an order approving, among other things, (a) procedures for the solicitation of bids (the "Bidding Procedures") in connection with (i) the proposed sale of substantially all of the Debtors' assets and the assumption of certain liabilities, subject to the submission of higher or otherwise better offers, (ii) the proposed sale transaction and (iii) an auction, (b) the form and manner of notice related to the sale transaction, and (c) procedures for

the assumption and assignment of contracts and leases in connection with the sale transaction (the "Assumption and Assignment Procedures").

4. On December 11, 2024, the Court approved the relief requested in the Bidding Procedures Motion [D.I. 411] (the "Bidding Procedures Order").

5. Pursuant to the Bidding Procedures Order, the Debtors filed the Notice, which included a schedule of executory contracts and unexpired leases that the Debtors assert may potentially be assumed and assigned to the successful bidder at the auction.

B. **The Debtors' Franchise and Development Relationship with BMH**.

6. The Debtors privately hold and operate franchised businesses. Their current collection of brands and business segments include The Vitamin Shoppe ("Vitamin Shoppe"), Pet Supplies Plus ("Pet Supplies"), Buddy's Home Furnishings ("Buddy's"), and American Freight ("American Freight"). According to the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* [D.I. 15] (the "Orlofky Declaration"), the Debtors oversee what is, collectively, an enterprise encompassing approximately 2,200 total retail store locations and 11,900 employees across the United States.

7. The Buddy's Home Furnishings concept was founded in 1961 in Tampa, FL and first franchised in 2010. The branded stores sell home furnishings, electronics, and appliances. Sales are often in the form of rent-to-own ("RTO") contracts, pursuant to which consumers make regular payments until they fully pay off the item. Currently, there are approximately 334 Buddy's stores, 34 of which are corporate owned, and the remaining 300 are owned by franchisees. Orlofky Declaration, ¶30.

8. BMH is the largest franchisee of Buddy's, operating eighty-two (82) Buddy's stores pursuant to Franchise Agreements (each, a "Franchise Agreement" and collectively, the "Franchise Agreements") with Buddy's Franchising and Licensing LLC ("Buddy's

3

Franchising"). For the majority of those stores, each store operates under a separate Franchise Agreement, and each Franchise Agreement creates a territory for the franchisee's operations.

9. In the Franchise Agreements, Buddy's Franchising and BMH exchanged various promises that are integral to their bargain. These promises include restrictions on conduct by affiliates. For example:

- OPTION TO PURCHASE: Buddy's Franchising agreed to support BMH's expansion of the Buddy's brand, by offering BMH an option to purchase stores in the event that Buddy's Franchising, or an affiliate of Buddy's Franchising, acquired Competitive Businesses (as defined in the Franchise Agreements) within BMH-protected territories. The Franchise Agreements define "Competitive Business" in pertinent part as

> any rent-to-own, rental purchase, lease purchase or other business that leases, rents, sells or distributes home furnishings, electronics or appliances through any channel including, without limitation, a business conducted by means of retail outlets, internet or direct marketing.

*See, e.g.*, Franchise Agreement dated December 11, 2019, by and between Buddy's Franchising and BMH-TNM 31, LLC, for Lubbock, Texas (the "Lubbock Franchise Agreement") at §1(e).[2] Importantly, the term "Competitive Business" is not limited by any geographic boundary, and it includes business operations over the internet.

The option to purchase was integral to the Franchise Agreements; both BMH and (in theory) Buddy's Franchising had an interest in promoting the Buddy's brand and expanding the reach of Buddy's franchised locations.

- NON-COMPETITION: Buddy's Franchising also agreed to support and promote the BMH Buddy's stores, and Buddy's Franchising retained certain rights of competition, but relinquished others.

---

[2] The Lubbock Franchise Agreement is in the general form of nearly all of the other Franchise Agreements between BMH and Buddy's Franchising. The Lubbock Franchise Agreement and other Franchise Agreements also have an exclusion for a business operating as part of a Multi-Unit Apartment Business, which is not applicable here.

4

For example, Franchise Group retained the right to operate and license Buddy's Retail Businesses outside of the BMH-protected territories, and to sell products and services to customers residing within the protected territories over the internet or by other electronic means. Lubbock Franchise Agreement, §2(d)(i) and (iii).

Importantly, however, with respect to operating other retail businesses, the Franchise Agreements provide the following:

> (d) *Our Retention of Rights*. You acknowledge and agree that we and our affiliates retain all rights not expressly granted to you under this Agreement and that we or our affiliates may, among other things, on any terms and conditions we deem advisable:
>
> \* \* \*
>
> (ii) operate and grant to others the right to operate retail businesses or any other business, <u>other than Competitive Businesses</u>, at any location (including within the Territory) that operate under any trademarks, service marks or trade dress (including the Trademarks) and pursuant to such terms and conditions as we deem appropriate.

Lubbock Franchise Agreement, §2(d)(ii) (emphasis added).

"Affiliates" is defined as "any Entity . . . of which you or your owners (i) own a 51% or greater interest of the issued and outstanding ownership interest and voting rights or (ii) have the right and power to Control such Entity." Lubbock Franchise Agreement, §1(a).[3]

In other words, Franchise Group retained the right to operate other retail businesses, only as long as they were not Competitive Businesses. By corollary, Franchise Group relinquished the right to operate or grant to others the right to operate any Competitive Business, other than Buddy's franchises outside of the territory, and non-brick-and-mortar Competitive Businesses. Competition by Buddy's Franchising (or one of its affiliates) would be

---

[3] "Affiliates" is defined in terms of BMH's relationship to other entities. Applying the definition to Buddy's Franchising, the term would also include all Franchise Group entities.

inherently unfair to BMH, because Buddy's Franchising had access to certain customer and business information that BMH developed in the course of running the Buddy's stores.

- <u>RIGHT OF FIRST REFUSAL</u>: The Franchise Agreements also provided BMH with a right of first refusal with respect to the acquisition of certain business opportunities. Specifically, the agreements contemplated that Franchise Group could acquire other businesses, by permitting Franchise Group to

> (iv) merge with, acquire, establish or become associate with any business or locations of any kind under other systems and/or marks, which businesses and locations may offer or sell items, products and services that are the same as or similar to the Approved Products and Services offered at or from your Retail Business and which businesses or locations may be located anywhere within or outside the Territory. Notwithstanding the preceding sentence, except as provided in Sections 2(e) and 2(f) below, we may not grant a Competitive Business the right to use the Trademarks at a location within the Territory.

Lubbock Franchise Agreement, §2(d)(iv).

Importantly, however, in the event that Buddy's Franchising, or an affiliate of Buddy's Franchising,

> acquires any store operating under different trademarks that sells or leases the same, similar or different products and services as those offered and sold by Buddy's Retail Businesses (each a "<u>Non-System Store</u>") within the Territory, **we shall promptly thereafter deliver to you a written notice offering you the opportunity to purchase such Non-System Store for the purposes of converting it to a Retail Business** (each, a "Conversion Notice"). Provided that you are in compliance in all material respects with the provisions of this Agreement and there are no continuing uncured events of default of any material terms of this Agreement of which you have been given notice, or an event which, with the giving of notice or the passage of time or both, would become a default, exists under this Agreement, you shall have the option to purchase the Non-System Store, exercisable by providing written notice to us within 30 days after your receipt of the Conversion Notice.

Lubbock Franchise Agreement, § 2(e) (emphasis added). Buddy's Franchising also agreed to provide financing in the event that BMH exercised its option. *Id.*

BMH has never received a notice of default under Lubbock Franchise Agreement, or any other of its Franchise Agreements.

C.     **The Debtors are in Breach of the BMH Agreements**.

10.    The territory covered by the Lubbock Franchise Agreement is the area within a 3-mile radius of the BMH Buddy's store at 2014 50th Street, Lubbock, Texas (the "BMH Lubbock Territory"). BMH acquired the Buddy's store in Lubbock in 2019.

11.    In or about February of 2020, an affiliate of Buddy's Franchising acquired American Freight. Orlofky Declaration at ¶ 20. As a result, an affiliate of Buddy's Franchising became the owner of an American Freight store ("Lubbock American Freight Store") only 2.8 miles from the BMH Buddy's store in Lubbock – i.e., within the BMH Lubbock Territory, in breach of the Lubbock Franchise Agreement. The Lubbock American Freight Store is a Competitive Business and a Non-System Store within the meaning of the Lubbock Franchise Agreement.

12.    There are similar breaches of at least 22 other BMH Franchise Agreements. Franchise Group purchased and operated Competitive Businesses in 22 other BMH-protected territories, without honoring BMH's options under its Franchise Agreements.[4] Some of those Competitive Businesses were operated from leased locations, which leases have now been rejected.[5]

13.    BMH was entitled to receive a Conversion Notice upon Franchise Group's acquisition of American Freight. Instead, Franchise Group ignored BMH's option right.

---

[4]    Indeed, because the definition of Competitive Business has no geographic boundaries, Franchise Group's operation of company-owned American Freight and other branded stores may have caused all of the Franchise Agreements to be incurably breached.

[5]    The American Freight stores in Ada, Oklahoma and in North Richland Hills, Texas, were in BMH-protected territories.

14. BMH notified Franchise Group that the Lubbock Franchise Agreement, and other Franchise Agreements, had been breached on account of, among other things, the acquisition of American Freight and other competing brands and the failure to send Conversion Notices, by letter dated March 1, 2024 ("BMH Demand").  A true and correct copy of the BMH Demand is attached hereto as Exhibit 1.

15. The BMH Demand did not result in Franchise Group sending Conversion Notices as it was required to do.

16. Post-petition, the Debtors continue to disregard BMH's Conversion Notice option.  In the *Motion of Debtors for Entry of Order (A) Approving the Private Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, and (B) Granting Related Relief* (D.I. 435), Educate, Inc. (an affiliate of Buddy's Franchising) seeks approval of a private sale of a group of American Freight stores, including the Lubbock American Freight Store.

17. Franchise Group's failure to send the Conversion Notice is a non-monetary default of the Lubbock Franchise Agreement.  Now, Franchise Group proposes to sell the Lubbock American Freight Store to a third party, which would make it impossible to cure this breach.

18. While not listed in the Cure Notice, the Debtors are also in breach of the Development Agreement between Buddy's Franchising and Buddy Mac Holdings, LLC dated effective June 2014 (as amended, the "Development Agreement") on account of their acquisition and operation of the Competing Businesses.  In the Development Agreement BMH bargained and paid for the right to develop new Buddy's Retail Businesses in a specified Development Area, echoing the exclusive rights that BMH bargained for in the Franchise Agreements.  Specifically, the Development Agreement provides, in relevant part, that

> If we [Buddy's Franchising], or an affiliate of ours, acquires any store operating under different trademarks that sells or leases the same, similar or different products and services as those offered and sold by Buddy's Retail Businesses (each a "Non-System Store") within the Development Area, we shall promptly thereafter deliver to you [BMH] a written notice offering you the opportunity to purchase such Non-System Store for the purposes of converting it to a Retail Business (each, a "Conversion Notice"). Provided that you are in compliance in all material respects with the provisions of this Agreement and there are no continuing uncured events of default of any material terms of this Agreement of which you have been given notice, or an event which, with the giving of notice or passage of time or both, would become a default, exists under this Agreement, you shall have the option to purchase the Non-System Store, exercisable by providing written notice to us within 30 days after your receipt of such Conversion Notice.

Development Agreement, § 1(c) (as modified in that Amendment to Buddy's Development Agreement). The Development Agreement also offered financing terms in the event that BMH exercised its option to purchase.

19. Franchise Group purchased and operated 13 American Freight stores within BMH's protected Development Area under the Development Agreement. Franchise Group did not send any Conversion Notices with respect to the 13 stores. BMH never received any formal notice of default under the Development Agreement. BMH was entitled to exercise its option to purchase the 13 American Freight stores and convert them to Buddy's-branded stores and was denied that opportunity.

20. BMH has been materially damaged by Buddy's breaches of the Franchise Agreements and Development Agreement, which breaches are continuing.

21. There are numerous other causes of action that BMH has against Franchise Group, and BMH holds claims for substantial damages, including claims for its breaches of contract and those described in the BMH Demand.

D.     **The Debtors' Breaches are Non-Monetary, Material, and Cannot Be Cured**.

22.    The heart of the parties' agreements required Buddy's Franchising, and its affiliates, to afford certain protections to BMH and promote and expand the BMH franchises. These protections went to the very essence of the parties' relationship, yet Buddy's Franchising and its affiliates failed to honor their obligations in critical respects.

23.    The material breaches of the Franchise Agreements and Development Agreement on account of Franchise Group's acquisition and operation of Competitive Businesses (including within protected territories), failure to honor BMH's options and rights of first refusal, and other defaults, are historical events that cannot be reversed. These breaches have caused damages to BMH up to tens of millions of dollars.

E.     **Proposed Assumption and Assignment of the BMH Agreements**.

24.    The Debtors propose to assume and assign agreements with BMH (the "BMH Agreements") as enumerated in the Cure Notice. In the Cure Notice, the Debtors list the cure amounts due under all of the BMH Agreements identified therein as $0.00 (the "Proposed Cure Amount"). *See* D.I. 487. Even assuming that the breaches under the BMH Agreements are curable (which they are not), the cure amount would be substantial. Having damaged BMH severely, the Debtors should not be permitted to reap any upside by the assumption and assignment of the BMH Agreements.

### III.
### LEGAL ARGUMENT

A.     **Assumption of Executory Contracts**.

25.    Section 365(a) authorizes a debtor to assume or reject an executory contract, subject to the court's approval. 11 U.S.C. § 365(a).

26.    Where there has been a default in an executory contract, however, it may not be assumed unless, at the time of assumption, the trustee or debtor:

    (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

    (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

    (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

   27. Courts generally apply the "business judgment" standard when considering whether the proposed contract assumption or rejection is in the best interest of the estate. *In re Extraction Oil & Gas*, 622 B.R. 608, 614 n. 4 (Bankr. D. Del. 2020) (listing cases applying business judgment standard).

   28. However, the benefit to the estate and its creditors is not the only consideration. Courts must also be sensitive to the rights of the non-debtor counterparty, so that the bankruptcy policy of allowing the non-debtor party to receive the benefit of its bargain is fulfilled. *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1990).

   29. Section 365 endeavors to strike a balance, between the non-debtor's interest in retaining the material and economic benefit of its bargain, and the interests of the debtors' creditors in maximizing the estate. *Fleming*, 499 F.3d at 306. One way that a balance is achieved is the requirement that contracts be assumed *cum onere*, subject to all of the benefits and the burdens thereunder. *In re ANC Rental Corp.*, 277 B.R. 226, 238 (Bankr. D. Del. 2002).

30. A bankruptcy assignment may not modify the terms of the contract. "[A]n assignment is intended to change only who performs an obligation, not the obligation to be performed." *In re Fleming Companies, Inc.*, 499 F.3d 300, 308 (3d Cir. 2007) (quotation omitted). If the prospective assignee cannot perform the material obligations of the contract, on account of the debtor's past actions or otherwise, the contract may not be assumed and assigned. *Id.* (holding that contract could not be assigned because the debtor had rejected a separate lease, which was necessary to fulfil an integral term of the contract).

31. The standard is not whether a term is "economically material" but, rather, whether the term is important within the overall bargain struck between the parties (i.e., is material) and whether the performance of that term is necessary to ensure that the party receives the full benefit of its bargain (i.e., is economically significant). *Fleming*, at 306.

32. In *Fleming*, the United States Court of Appeals for the Third Circuit gave examples of provisions that go to the very essence of contracts and bargained for exchanges, one of which is a right of first refusal. *See Fleming*, 499 F.3d at 306 (also citing cases recognizing the essential nature of minimum annual sales provisions (*Joshua Slocum*, 922 F.2d at 1092), time of the essence clauses (*In re New Breed Realty Enter. Inc.*, 278 B.R. 314, 324025 (Bankr. E.D.N.Y. 2002)); and applicable standards of contractual performance (*In re Southern Biotech, Inc.*, 37 B.R. 311, 317 (Bankr. M.D.Fla. 1983))).

B. **The Debtors' Breaches are Non-Monetary, Material and Cannot Be Cured**.

33. Prior to the 2005 amendments to the Bankruptcy Code, there was a split of authority as to whether, under section 365, non-monetary defaults had to be cured at all. *See In re Empire Equities Capital Corp.*, 405 B.R. 687, 690 (Bankr. S.D.N.Y. 2009) (comparing pre-2005 cases which held that debtors were relieved from curing non-monetary defaults altogether, with cases requiring that non-monetary defaults be cured and absent cure, could not be assumed).

34. When Congress amended the Bankruptcy Code in 2005, it provided a limited exception to the cure requirement for non-monetary defaults, applicable to non-monetary obligations under an unexpired real property lease. *Id.* at 691. By making an exception only for unexpired real property leases, Congress made clear its intention that non-monetary defaults in executory contracts must be cured. *Id*.

35. A material, non-monetary default under an executory contract that cannot be cured precludes assumption of the executory contract, making it impossible for the contract to be assigned. *Id. See also Fleming*, 499 F.3d at 302 (affirming bankruptcy court's decision to deny a request to excise a provision which would have required the assignee to supply groceries to the non-debtor from a specific location); *In re Eagle Creek Subdivision, LLC*, 397 B.R. 758, 763-64 (Bankr. E.D.N.C. 2008) (debtor's failure to complete lots by the contractual deadline was a material, non-monetary default that could not be cured, and accordingly, the contracts could not be assumed); *In re Escarent Entities, L.P.*, 423 Fed. Appx. 462, 465 (5th Cir. Apr. 28, 2011) (failure of seller to close by the specified date in the contract was a material breach that could not be cured, preventing assumption of the contract); *Ring v. Ted's Jumbo Red Hots, Inc*., 2022 WL 465075 *5 (W.D.N.Y. Feb. 15, 2022) (violation of non-disparagement clause was a non-monetary default that could not be cured, affirming the bankruptcy court's denial of motion to assume executory contract).

36. In *Empire Equities*, the executory contract in question was an option contract, and the deadline for exercising the option had expired. The Court found that the failure to exercise the option by the deadline was a material and incurable default that would have precluded assumption, had the debtor not been able to extend the deadline under section 108 of the Bankruptcy Code. *Id*. at 691.

13

37. Franchise Group has materially, and incurably, breached the BMH Agreements – both pre-petition and post-petition. Franchise Group operated Competitive Businesses, including within BMH protected territories. Franchise Group failed to send Conversion Notices to BMH as required under the Franchise Agreements. In the course of these bankruptcy cases, the Debtors have rejected certain American Freight leases, rendering it impossible for the Debtors to send Conversion Notices with respect to those stores. The Debtors propose to sell the Lubbock American Freight store to another party.

38. The Debtors have continued post-petition to operate Competitive Businesses, including within protected territories. BMH has been heavily damaged by the operation of Competitive Businesses within its protected territories and areas, as well as the failure to send Conversion Notices affording BMH its option and right of first refusal (and depriving BMH of the valuable business opportunities for which it bargained). The request to assume and assign the BMH Agreements must be denied.

### C. To the Extent the Defaults May Be Reduced to Money Damages, They Must Be Cured and There Must Be Adequate Assurance of Future Performance

39. BMH objects to the Proposed Cure Amount of $0.00. To the extent the Debtors may assume and/or assign any of the affected BMH Agreements (which BMH does not concede), BMH objects to any such assumption or assignment unless and until the Debtors pay the substantial damages incurred on account of the breaches of the BMH Agreements.

40. Section 365(b)(1) of the Bankruptcy Code provides, in relevant part, as follows:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract of lease, the trustee —
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . .

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default . . .

11 U.S.C. § 365(b)(1).

41. Here, the Proposed Cure Amount of $0.00 makes no attempt to "cure" the BMH Agreements. Attached hereto as <u>Exhibit 2</u> is a preliminary, partial estimate of the damages that BMH has suffered on account of the breaches of the BMH Agreements that the Debtors propose to assume and assign. BMH is prepared to prove the damages set forth on Exhibit 2. However, extensive discovery would be necessary to fully develop all of the contractual damages that BMH has sustained. For example, BMH suffered lost profits on account of lost potential conversions of retail sales to rent to own contracts, and additional damages as may be determined following discovery.

42. To the extent the Debtors seek to assume and/or assign the BMH Agreements, the Debtors must pay the cure amount in full. BMH objects to the assumption and assignment of the BMH Agreements unless the Debtors fully comply with all of the requirements of the Bankruptcy Code, including § 365(b). Absent such full compliance, any proposed assumption and/or assignment must be denied.

43. The Debtors' breaches have continued after the Petition Date. Accordingly, any Order approving the assumption and/or assignment of the BMH Agreements must provide that, the Debtors shall be liable for all damages regardless of whether those amounts arose pre- or post-petition and regardless of when the amounts accrued.

44. Finally, and importantly, Franchise Group must not be permitted to assign any of the BMH Agreements to a competitor of BMH.

## RESERVATION OF RIGHTS

45.     BMH does not waive (and expressly reserves) its right to amend, modify and supplement this objection at or prior to the conclusion of the hearing to consider this Cure Objection, including but not limited to, asserting additional objections to the assumption and/or assignment of the BMH Agreements. BMH further reserves the right to modify or supplement the damages claimed as its cure amount.

WHEREFORE, for all of the foregoing reasons, BMH respectfully requests the entry of an Order (i) denying the Debtors' request to assume and assign the BMH Agreements, or in the alternative conditioning the Debtor's request to assume and assign the BMH Agreements on BMH's consent and payment of cure to BMH in the amount to be proved at trial, and (ii) granting such further relief as may be appropriate.

**WOMBLE BOND DICKINSON (US) LLP**

Dated: January 3, 2025
Wilmington, Delaware

By: */s/ Lisa Bittle Tancredi*
Matthew P. Ward (Del. Bar No. 4471)
Lisa Bittle Tancredi (Del. Bar No. 4657)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: matthew.ward@wbd-us.com
           lisa.tancredi@wbd-us.com

*Counsel for Buddy Mac Holdings, LLC and Subsidiaries*