## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| | Chapter 11 |
| In re: | Case No. 24-12480 (JTD) |
| FRANCHISE GROUP, INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Re: D.I. 151, 152, 654, 655, & 656** |
| | **Hearing Date: Jan. 15, 2025 at 10:00 a.m.  (ET)**<br>**Obj. Deadline: Jan. 8, 2024 at 4:00 p.m. (ET)**<br>**(extended for U.S. Trustee)** |

## UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO
## (I) DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
## FRANCHISE GROUP, INC. AND ITS
## AFFILIATED DEBTORS. AND
## (II) DEBTORS MOTION FOR AN ORDER, *INTER ALIA*,
## APPROVING SOLICITATION AND TABULATION PROCEDURES

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

Andrew R. Vara, the United States Trustee for Region Three (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to: (i) approval of the disclosure statement (the "Disclosure Statement") [D.I. 151]; and (ii) the *Debtors' Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballots and Solicitation Materials and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief* [D.I. 152] (the "Procedures Motion"),[2] and in support of this Objection respectfully states:

## PRELIMINARY STATEMENT

1.      The Court should deny interim approval of the Disclosure Statement for the following reasons:

   **(a)**      **The Disclosure Statement fails to provide adequate disclosures regarding the release provisions of the Debtors' proposed plan.** The Disclosure Statement fails to provide adequate information as to who will receive such releases, what claims are being released, the value of such claims, and the consideration received in exchange for the releases. The Debtors fall far short of meeting their burden under section 1125 of the Bankruptcy Code.

   **(b)**      **The Disclosure Statement contains minimal information on treatment for the voting classes.**

   **(c)**      **The Debtors' proposed plan is patently unconfirmable and should not be solicited using procedures that facilitate the plan's defects.** The Court must deny approval of a disclosure statement if the related proposed plan is not confirmable on its face. Here, the proposed plan is unconfirmable for at least three reasons:

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement and the Procedures Motion, as applicable.

(i)     the plan's third-party release provision seeks relief inconsistent with Supreme Court precedent, the Bankruptcy Code, and applicable law because it extracts non-consensual third-party releases from holders of claims or interests that fail to check an opt-out box on a ballot or engage counsel and lodge an objection—including those who, while entitled to vote, have little information to evaluate their treatment, and unimpaired creditors who must lodge an objection at their own expense;

(ii)    the plan's injunction enforcing the exculpation and third-party release is neither statutorily authorized nor warranted; and

(iii)    the Debtors propose to treat the entire Plan as a settlement and to have the settlement bind parties beyond those that are actively settling their claims with the Debtors.

2.     Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court enter an order or orders: (a) denying approval of the Disclosure Statement; and (b) denying the Procedures Motion.

## JURISDICTION AND STANDING

3.     This Court has jurisdiction to hear and determine the Procedures Motion, approval of the Disclosure Statement and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

4.     Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

5.     The U.S. Trustee has standing to be heard on the Procedures Motion and the Disclosure Statement pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S.

3

Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## BACKGROUND

### A.    The Chapter 11 Cases

6.    On November 3, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, (the "Bankruptcy Code," or "Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors' description of their business(es) and the alleged circumstances leading to these chapter 11 cases are described in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"). D.I. 15.

7.    The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.    An official committee of unsecured creditors in the Chapter 11 Cases has been appointed. D.I. 188.

9.    As of the date hereof, no trustee or examiner has been appointed in the Chapter 11 Cases.[3]

### B.    The Restructuring Support Agreement and Disclosure Statement

10.    On November 4, 2024, the Debtors filed the First Day Declaration which, among other things, provided a copy of the Restructuring Support Agreement (the "RSA") that forms the

---

[3] The Ad Hoc Group of Freedom Lenders filed a motion on November 20, 2024, that among other things sought the appointment of a chapter 11 trustee for the "Holdco" Debtors. The Court denied that motion by order entered December 18, 2024. D.I. 460.

basis of the Plan.   The Debtors intend to consummate either a Sale Transaction or a Plan Transaction through the Plan.   D.I. 15 at p. 66-67.   The RSA was entered into as of November 1, 2024, by and among the Debtors and the Consenting First Lien Lenders.   *Id.* at 66-67.

11.     On December 11, 2024, the Court entered an order authorizing the Debtors to obtain postpetition financing (the "Final DIP Order").   D.I. 414.   The Final DIP Order, among other things, included certain revised milestones for confirming a chapter 11 plan that were required by the RSA.   D.I. 414-1 at p. 21.   Those milestones seek approval of the Disclosure Statement and Solicitation Materials by January 16, 2025.   *Id.*   The Disclosure Statement was filed on November 11, 2024, as required by the initial milestones, which was subsequently amended on January 3, 2025.   [D.I. 654-656].   A Liquidation Analysis was filed on December 30, 2024.   [D.I. 592].

## C.     Specific Provisions of the Debtors' Proposed Plan

12.     On November 11, 2024, the Debtors filed the Disclosure Statement and the Plan. D.I. 150.   The Plan, as amended, D.I. 654 includes the following provisions relevant to this Objection:

### i.       Third-Party Release Provisions

13.     Article XII of the Plan, Section 12.3, provides as follows (the "Third-Party Release[s]"):

> Notwithstanding anything contained in the Plan or the Restructuring Support Agreement to the contrary, and subject to the outcome of the Independent Investigation with respect to the Investigation Related Matters and the Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims,, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other

Persons that might seek to claim under or through such Non-Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third-Party Release") from any and all Claims, Interests, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, *in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors*, including, without limitation, (i) the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the confirmation or consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided*, however*, that the foregoing provisions of this Third-Party Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions,which are subject to this Third-Party Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Non-Debtor Releasing Party to enforce this Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or any Sale Transaction or assumed pursuant to this Plan or any Sale Transaction or Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or

the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; (2) any act or omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates; (3) any retained Causes of Action; or (4) any Avoidance Actions held by Debtors Freedom Receivables II, LLC and Freedom VCM Receivables, Inc. For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

Art. XII. 12.3 (emphasis added).

14.    The Plan provides the following definition for the term "Released Parties" at Section 1.171:

"**Released Parties**" means, collectively, and each solely in its capacity as such: (a) the Debtors, their Estates, and the Post-Effective Debtors; (b) the DIP Agent and the DIP Lenders; (c) the First Lien Credit Agreement Agent; (d) the Consenting First Lien Lenders; (e) the Creditors' Committee and each of its members solely in their capacity as members of the Creditors' Committee; and *(f) each of such parties' Related Parties; provided that no Person or Entity shall be a Released Party unless they are also a Releasing Party*; provided further, for the avoidance of doubt, notwithstanding the foregoing, that Brian Kahn and Prophecy Asset Management LP and each of their Affiliates shall not be included in the definition of "Released Parties." For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn and/or Prophecy Asset Management LP.

Art. I.A. 1.157 (emphasis added).

15.    The Plan provides the following definition for the term "Releasing Parties":

"**Releasing Parties**" means, collectively, and each solely in its capacity as such: (a) the Debtors, their Estates, and Post-Effective Debtors; (b) the DIP Agent and the DIP Lenders; (c) the First Lien Credit Agreement Agent; (d) the Consenting First Lien Lenders; (e) the Creditors' Committee (if any) and each of its members solely in their capacity as members of the Creditors' Committee; (f) *all Holders of Claims in Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8, 10, and 11 that (i) vote to accept or reject the Plan and do not timely submit a release opt-out indicating such Holder's decision not to participate in the releases set forth in Article XII, or (ii) do not vote to accept or reject the Plan, and either do not timely submit a release opt-out, or do not file an objection to the releases in Article XII of the Plan prior to the deadline to object to confirmation of the Plan;* provided that the Consenting First Lien Lenders shall not opt out of the releases set forth in Article XII of the Plan; and (g) *all unimpaired creditors of the Debtors who do not file an objection to the releases set forth in Article XII of the Plan on or before the deadline to object to confirmation of the Plan*.

Art. I.A. 1.172 (emphasis added).

16.    The Plan provides the following definition for the term "Related Parties":

"**Related Parties**" means collectively with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the date of the Restructuring Support Agreement, and any Person claiming by or through any of them, including such Related Parties' respective heirs, executors, estates, servants, and nominees.

Art. I.A 1.170.

17.    The Plan includes an injunction in support of the Third-Party Release that provides

as follows (the "Plan Injunction"):

Except as otherwise provided herein or for obligations issued pursuant hereto, *all Persons or Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to Exculpation pursuant to Article XII, are permanently enjoined, from and after the Effective Date, from* taking any

of the following actions against, as applicable, the Debtors, the Reorganized Debtors, *the Released Parties*, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties or the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) *commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated or settled pursuant to the Plan.*

Art. XII. 12.6.

18.    The Plan also contains a qualifier "Subject to the outcome of the Independent Investigation with respect to the Investigation Related Matters and the Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims," for the Releases by the Debtors and the Third-Party Release.  Art. XII. 12.2 & 12.3.  Independent Investigation is defined as "any investigation conducted by Petrillo Klien + Boxer, as counsel to the Debtors."  Art. I.A. 1.110.  Investigation Related Matters:

> means all matters related to any claims, rights and Causes of Action that the Estates may have against Mr. Brian Kahn, any current or former officer of the Debtors, or any other party arising from, or related to: (a) the Debtor's sale of W.S. Badcock Corporation to Conn's, Inc. in December 2023; (b) the take-private transaction completed by the Debtors in August 2023 pursuant to, among others, that certain *Agreement and Plan of Merger*, dated as of May 10, 2023, by and among Debtor Franchise Group, Inc. and the other parties thereto; (c) the acquisition by Debtor Freedom VCM Receivables, Inc. of Debtor Freedom Receivables II, LLC and any receivables transactions undertaken by each of the foregoing, including any

potential Avoidance Actions related thereto; (d) any transactions among the Debtors and B. Riley Principal Investments, LLC, B. Riley Financial, Inc., or any of its or their current and former Affiliates; (e) the Debtors' historical transactions and relationship with Mr. Kahn or Prophecy Asset Management LP; and (f) any other matters that may become subject to the Independent Investigation in the future.

Art. I.A 1.116.   The Freedom HoldCo Independent Investigation and Freedom HoldCo Independent Investigation Related matters are defined as, "means any investigation conducted by the Freedom HoldCo Independent Director" and "all matters related to any claims, rights and Causes of Action that may be held by or against the Freedom HoldCo Debtors, and all other matters that may become subject to the Freedom HoldCo Independent Investigation."   Art. I.A. 1.98 & 1.99.

19.     The Plan requires the majority of creditors to affirmatively opt out of the Third-Party Release to avoid having it be imposed upon them, notwithstanding the fact that the current Disclosure Statement provides little information as to their treatment under the Plan.  *See* D.I. 655 at p. 34-43) (providing for unsecured creditors "0%[FN] [FN] The estimated recovery for Class 6[] General Unsecured Claims may be greater than 0% depending on the outcome of the Sale Process and any negotiations among major constituent groups.").  No recovery is anticipated for Class 10 Subordinated Claims.   *Id.* at p. 42-43.   Class 10 is still identified as Entitled to vote, notwithstanding no recovery being projected.  *Id.*

### ii.     Plan Settlement

20.     The Plan contains the following at Article VII, Section 7.23, titled "Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights:"

(a) Pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under this Plan, t*he provisions of this Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Interest may have* with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to this Plan on account of any

Allowed Claim or Allowed Interest and this Plan shall be deemed a motion to approve the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. T*he entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (i) in the best interest of the Debtors, the Reorganized Debtors, and their respective Estates and property, and of Holders of Claims or Interests; and (ii) fair, equitable and reasonable*.

(b) Except as provided herein, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and Entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to this Plan.

Art. VII 7.23 (emphasis added).

21.    While the Debtors attach the RSA to the Disclosure Statement, the Debtors do not specifically identify any settlements in the Disclosure Statement.  Instead, the Plan section on "Risk Factors" uses the same broad language seeking to cast the entire Plan as a settlement, notwithstanding that only the Debtors and the Consenting First Lien Lenders are parties to the RSA.  *See* D.I. 655 Art. IX.B.iv; D.I.655-1 at Preamble (i) & (ii).

**D.    The Procedures Motion**

22.    On November 11, 2024, the Debtors filed their Procedures Motion.

23.    In the Procedures Motion, the Debtors seek approval of their Ballots for eight classes and twelve distinct creditor classes in total (Class 6 also having five sub-classes), which will be used for voting and to impose an "opt-out" third-party release election upon creditors. Procedures Mot. ¶¶ 15-18.  Those Ballots have been revised subject to the Amended Plan and

Disclosure Statement, and to incorporate certain informal comments from the U.S. Trustee.  *See* [D.I. 657].

## OMNIBUS OBJECTION

## I.    THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION REGARDING THE THIRD-PARTY RELEASE PROVISIONS.

24.    The disclosure statement requirement of Bankruptcy Code section 1125 is "crucial to the effective functioning of the federal bankruptcy system" and, consequently, "the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417-18 (3d Cir. 1988)). "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)). The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 100 (3d Cir. 1988).  Further, section 1129(a)(2) of the Bankruptcy Code conditions confirmation upon compliance with applicable Code provisions.  The adequate disclosure requirement of section 1125 is one of those provisions.  *See* 11 U.S.C. § 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

25.    The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, *that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan*[.]

*See* 11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

26. To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"). Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives so that they can intelligently accept or reject the plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

27. Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors. *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (citing *Century Glove*, 860 F.2d at 100).

28. Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement if the information is accurate, and its inclusion is not misleading. *See id.* The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan. *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999). The disclosure

13

statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

29.    Applied here, the Disclosure Statement does not provide sufficient disclosures appropriate to the circumstances of these Chapter 11 Cases.  The Disclosure Statement lacks meaningful information regarding creditors' treatment under the Plan, as 0% recoveries are identified with a footnotes as to wide circumstances that may improve such treatment.  D.I. 655.  .

30.    In addition, the Debtors fail to disclose that they are giving two sets of releases benefitting the same Released Parties. The Debtors are both a Released Party and a Releasing Party.  Therefore, the Plan provides that the Debtors will release the Released Parties pursuant to both Article XII. Section 12.2 (Releases by the Debtors) and Article XII Section 12.3 (Third-Party Release).  The Debtors fail to explain which of the two releases will control if there is a conflict, beyond noting in the Disclosure Statement, that:

> without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Non-Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties.

Art. XII.B.iii.

31.    Moreover, the Disclosure Statement does not adequately disclose: (a) why the Debtors will be releasing the Released Parties (whether under the Debtor release or the Third-Party Release); (b) the nature and value of the claims the Debtors are releasing; or (c) what (if anything) the Debtors are receiving as consideration for such releases, just conclusory statements that such are being given for "good and valuable consideration."  *See id.*

14

32.     Also, the Independent Investigation, Investigation Related Matters, the Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action qualifiers built into the Plan means that subsequent developments could meaningfully impact the rights parties have against Released Parties.  Creditors will be voting on a plan without understanding whether a blanket release on contentious issues will be included as part of the Plan's relief, or what (if any) consideration is being provided by the beneficiaries of the releases in exchange for that broad release.

33.     In summary, the Disclosure Statement fails to provide adequate information as to what treatment creditors will receive, the Debtors' status as a recipient of third-party releases and debtor releases, what claims are being released, the value of such claims, and the consideration received in exchange for the releases. Because the Disclosure Statement fails to provide adequate information as to numerous, significant issues, the Court should not approve the Disclosure Statement as having adequate information.

## II.     THE COURT MUST DENY APPROVAL OF THE DISCLOSURE STATEMENT BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE.

34.     If the proposed plan is patently unconfirmable on its face, the bankruptcy court must deny the application to approve the disclosure statement. *See generally In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) *(citing In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

35.     Moreover, the Court should not approve solicitation procedures that facilitate the Plan's defects, and it would be a waste of estate resources for the Debtors to solicit votes on a Plan

that is patently unconfirmable (especially where, as here, the Disclosure Statement is so deficient in information).

36. Here, the Court must deny approval of the Disclosure Statement because the Plan is patently unconfirmable on at least three separate and independent bases. *First*, the Plan is unconfirmable because it proposes non-consensual Third-Party Releases that are not authorized under the Bankruptcy Code. *Second*, the Plan's injunction enforcing the exculpation and third-party release is neither statutorily authorized nor warranted. *Third*, the Plan seeks to treat itself as a comprehensive settlement of all claims and interests without such parties having actively settled their claims.

### A. *The Plan is Not Confirmable Because It Proposes Non-Consensual Third-Party Releases That are Not Authorized Under the Bankruptcy Code.*

### i. State Contract Law Applies, Not Federal Law

37. The Supreme Court has definitively held that non-consensual third-party releases are not authorized under the Bankruptcy Code. *Harrington v. Purdue Pharma L.P.*, 603 U.S. __, 144 S. Ct. 2071, 2082-88 (2024). The Supreme Court in Purdue did not address whether consensual non-debtor releases can be included in a chapter 11 plan and confirmation order.

38. Whether parties have reached an agreement—including an agreement to release one's claims against another (i.e., not to sue)—is governed by state law. The only exception is if there is federal law that preempts applicable state contract law in some specific context. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

16

39. No such exception applies here. There is no federal law generally governing when or whether the non-debtor Releasing Parties have agreed to release the non-debtor Released Parties. No Bankruptcy Code provision addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor. And no Code provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not otherwise be found to exist as a matter of state law. Nor does 11 U.S.C. § 105(a) itself confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Accordingly, any authority to include third-party releases in a plan must derive from some other source of law. Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties.

40. As courts have recognized, because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state-law contract principles serve as controlling authority when considering whether a release is consensual. *See, e.g., Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, No. 24-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (requiring "some sort of affirmative expression of consent

that would be sufficient as a matter of contract law"); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  As one court recently held, because "nothing in the bankruptcy code contemplates (much less authorizes it)' … any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, No. BK 18-12156 CLB, 2024 WL 4024385, at *2 (Bankr. W.D.N.Y. Aug. 27, 2024) (quoting *Purdue*, 144 S. Ct. at 2086). Accordingly, "any such consensual agreement would be governed by state law." *Id.*

41.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will affirmatively agree to release their property rights in a manner sufficient to demonstrate consent under state law.

**ii.     Under State Law, Silence Is Not Acceptance**

42.     The "general rule of contracts is that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see also*, *e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer").  Moreover, "[o]rdinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); accord 1 CORBIN ON CONTRACTS § 3.19 (2018); 4 WILLISTON ON CONTRACTS § 6:67 (4th ed.); *Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he

offeror cannot prescribe conditions so as to turn silence into acceptance."). Instead, under state law, an agreement to release claims—like any other contract—generally requires a manifestation of assent to that agreement. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."). Consent cannot be imputed or "deemed" based on a party's failure to object—rather, consent must be affirmatively shown to exist. *See, e.g., id.*; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

43.     There are only very limited exceptions to that principle. "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

44.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." Id. § 69, cmt. c (1981); *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

45.     Delaware common law, as a point of reference, is in accord. *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)). Absent limited exceptions not triggered here, silence and inaction are not assent to an offer. *See Urban Green*

*Techs., LLC v. Sustainable Strategies 2050 LLC*, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017); *see also Patterson*, 636 B.R. at 686 (contract law does not support consent by failure to opt out).  For the reasons discussed below, none of those exceptions apply here.

### iii.    Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

46.    Applicable state contract law cannot be disregarded on a default theory, previously applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so. *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023), *abrogated by In re Smallhold, Inc.*, 2024 WL 4296938, at *8-*11; *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts had reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release.  *Cf. Smallhold*, 2024 WL 4296938, at *1 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

47.    After *Purdue*, however, it is now clear that imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan.  *See Purdue*, 144 S. Ct. at 2082-88 & n.1; *see also Smallhold, Inc.*, 2024 WL 4296938, at *2 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection.").  It is therefore "no longer appropriate to require creditors to object

or else be subject to (or be deemed to 'consent' to) such a third-party release." *Smallhold*, 2024 WL 4296938, at *10.

48.     As explained in *Smallhold*, the Supreme Court's *Purdue* decision rejected a fundamental premise of the decisions which had imputed consent for non-debtor releases on a procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *Smallhold*, 2024 WL 4296938, at *1-2; see also id. at *10 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre¬-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *Id.* at *10. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *Id.* at *2; *see also id.* at *9 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

49.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation" that is actually contested. *Id.* at *2; *see also id.* at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate

for a court to enter a default judgment if a litigant failed to do so."). "[After Purdue], that is no longer the case in the context of a third-party release." *Id.* at *13. A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Id.* "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id.* That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. The *Smallhold* court provided an illustration that makes obvious why, even with clear notice, a mere failure to object or opt out of a proposed release does not constitute the manifestation of assent necessary to constitute consent under state law:

> Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the debtor. Just as in the case of Party A's letter to Party B, no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution.

*Id.* at *2 (footnote omitted). None of the cases that allow imposing of a non-debtor release based merely on a creditor's failure to object or opt out "provide[] any limiting principle that would distinguish the third-party release from the college education fund plan. And after *Purdue Pharma*, there is none." *Id.*

50. Because *Purdue* establishes that a nonconsensual third-party release is "per se unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id.* at *2. Rather, absent an affirmative showing of consent, a court lacks any power to approve the non-debtor release. And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as

22

'consent' to the release [that] can withstand analytic scrutiny." *Id.* Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release. Rather, an "affirmative expression of consent that would be sufficient as a matter of contract law" is required. *Id.* at *11 (emphasis added).

iv.    **Failing to Opt Out or Object Does Not Provide the Required Affirmative Consent.**

51.    The Debtors propose that the Third-Party Releases in the Plan, which benefit numerous non-debtors that are Released Parties, bind all holders of claims or equity interests who are sent a ballot or non-voting opt-out form and do not timely elect to opt out of the releases provided by the Plan in accordance with the Solicitation Procedures.

52.    An affirmative agreement — something more than the failure to opt out or object — is required for a non-debtor release to be consensual. *See In re Tonawanda Coke Corp.,* 2024 WL 4024385, at *2; *Patterson*, 636 B.R. at 686. Failing to "opt out" of, or object to, an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). For example, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt-out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688.

53.    The Ninth Circuit's decision in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*,

682 F. App'x 113, 117-18 (3d Cir. 2017), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *See id*. The customer did not take any steps to opt out. *See id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *See id*. at 1282-83.

54.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. … [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

55.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly — because there was no applicable federal law — the court applied the "general rule," applicable under California law, that "silence or inaction

24

does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Southern Cal. Acoustics Co. v. C.V. Holder, Inc.*, 456 P.2d 975, 978 (Cal. 1969). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id.* at 1286 (quotation marks and citation omitted).

56.     The Ninth Circuit explained that there are two exceptions to this rule—when the offeree has a duty to respond or when the offeree retains the offered benefits—but held neither exception applied. *See Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id*. at 1286.

57.     Here, too, the debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

**v.     Voting to Accept a Plan Without Opting Out Is Not Consent to Release Non-Debtors**

58.     Through the definition of "Releasing Parties" in the Plan, the Debtors propose that the non-debtor releases in the Plan bind all parties who vote to accept or reject the Plan but do not opt out.

59.     *First*, voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

60.     As an initial matter, merely voting to approve a plan is not an expression of consent to a non-debtor release.  *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (reaching same conclusion).  As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it.  211 B.R. at 507 (emphasis in original).  There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release.  Instead, the "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order."  *Id.* (citation and alterations omitted).  Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan" in order to destroy its rights under nonbankruptcy law.  *Id.* (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).  Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt."  *Arrowmill*, 211 B.R. at 507.

61.     Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors.  Voting to accept a plan but remaining silent about a non-debtor release by failing to check an opt-out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

62.     Creditors who vote for a plan without opting out of a non-debtor release are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). The only benefits received by the creditors are distributions from the debtor's chapter 11 plan. Thus, "[e]ssentially, creditors are being asked to give releases to third parties for no consideration." *Tonawanda Coke Corp.*, 662 B.R. at 222. Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the non-debtor releases, consent to the non-debtor release cannot be inferred from mere acceptance of the benefits of the debtor's plan. *See Norcia*, 845 F.3d at 1286 (explaining that customer's failure to opt out did not imply his consent where warranty applied regardless, meaning that customer did not thereby obtain any additional benefit). Further, non-debtors have no right to prevent a debtor's creditors from receiving distributions under the debtor's chapter 11 plan, and thus acceptance of those distributions does not manifest acceptance of an offer to release non-debtors. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

63.     Nor does voting to approve a chapter 11 plan while remaining silent about a non-debtor release "manifest [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors. Rather, voting on a chapter 11 plan is governed by the Bankruptcy

Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.

64.     And as in *Norcia*, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released non-debtors that would impose such a duty.  *See Norcia*, 845 F.3d at 1285-86.  Nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt out.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison, Inc.*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence).  A claimant's vote in favor of a plan while remaining silent regarding a non-debtor release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

65.     Further, imputing consent from a vote in favor of a plan assumes that the creditor understands that the ballot includes a non-debtor release and understands its terms, but that assumption lacks evidentiary support.  Here, the Ballots do not provide a full definition of all the parties to whom a creditor would be giving a release.  "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia*, 845 F.3d at 1285 (quotation marks omitted); *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017) (reaffirming that a person cannot be presumed to have agreed to contractual provisions unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement").  Hence, voting for a plan does not reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would

be difficult for any layperson to comprehend all of its details." *In re Congoleum Corp.*, 362 B.R. at 194.

vi.     **Voting to Reject a Plan Without Opting Out Is Not Consent to Release Non-Debtors**

66.     *Second*, for the same reasons, releases cannot be imposed on those who vote to reject the plan but do not opt out.  It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release.  Not only is there no "mutual agreement" as to the Plan, much less the Third-Party Release, the creditor has expressly stated its rejection of the Plan.  As the court in *Chassix Holdings, Inc.* reasoned, "a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*" 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

67.     Whether or not a creditor votes to accept or reject the Plan, such creditors may not have understood the solicitation package and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).

vii.    *Smallhold***'s Conclusion that Voting Plus a Failure to Opt Out Equals Consent to a Non-Debtor Release Is Incorrect**

68.     The U.S. Trustee recognizes that Judge Goldblatt in *Smallhold* found that, in at least some circumstances, the act of voting on a debtor's plan (whether to accept or reject it) combined with a failure to exercise an opt-out option can constitute consent to a non-debtor release.  *See*

*Smallhold,* 2024 WL 4296938, at *14.  The *Smallhold* decision, however, although stating it was applying "ordinary contract principles," 2024 WL 4296938, at *3, failed to faithfully apply those principles to the question of when silence can constitute consent.  For the reasons discussed above, contract principles do not support imputing consent for a third-party release based merely upon a creditor's neglect to exercise an opt-out option and that remains true even when that option is conspicuous or well-advertised.

69.     In *Smallhold*, Judge Goldblatt reasoned that consent to a non-debtor release could be understood to exist because the act of voting on a debtor's plan is an "affirmative step" taken after being told that failing to opt out would bind the voter to the non-debtor release.  *Smallhold,* 2024 WL 4296938, at *14.  But while voting is certainly an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). The bankruptcy exists to resolve debtor's liabilities, not those of third parties.  And because, as noted above, *supra* ¶¶ 37-45, creditors have no affirmative obligation to act even as to the Debtors' plan, they certainly can have no duty to respond to an offer to release non-debtors of liabilities that exist outside the bankruptcy case entirely.  Further, because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors.  Thus, the act of voting on a plan without taking an additional step to opt out is still merely silence with respect to the non-debtor release.

70.     As explained by the Restatement, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction"—in this case, the freedom to vote on a chapter 11 plan—"or impose on him any duty to speak," such as by checking an opt out box or

returning an opt out form.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct

manifesting consent to the non-debtor release.  Just like the hypothetical creditors in *Smallhold*

could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children

merely because they failed to return a ballot with an "opt out" box, *Smallhold*, 2024 WL 4296938,

at *2, creditors who cast such a ballot should not be forced to make such a contribution merely

because they failed to check that "opt out" box.  State law affords no basis to conclude that consent

to release *third-party* claims (which are governed by *nonbankruptcy* law) can properly be inferred

from a party's mere failure to check an opt-out box on a ballot expressing views about the proposed

treatment of a creditor's claims against the *debtor* (governed by *bankruptcy* law).  *See supra* ¶¶

37-45.  As a result, the "general proposition" that *Smallhold* recognized continues to apply:

"creditors must *affirmatively express consent to the release* in order to be bound by it."  *Id.* at *8

(emphasis added); *accord* at *10 ("[I]t is no longer appropriate to require creditors to object or else

be subject to (or be deemed to 'consent' to) such a third-party release.").

      71.    Notably, the Ninth and Second Circuit cases cited by *Smallhold* do not support its

conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-

debtor release constitutes consent.  *Smallhold,* 2024 WL 4296938, at *14 n.60 (citing *Berman v.*

*Freedom Fin. Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Techs., Inc.*, 868 F.3d

66, 75 (2d Cir. 2017)).  Those cases emphasize the importance of notice as one prerequisite to

consent, recognizing that "an offeree, *regardless of apparent manifestation of his consent*, is not

bound by inconspicuous contractual provisions of which he is unaware, contained in a document

whose contractual nature is not obvious."  *Meyer*, 868 F.3d at 74 (internal quotation marks omitted;

emphasis added).  Those cases thus concern the requirements for when someone can be deemed

on "inquiry notice" of terms they did not read. *See Berman*, 30 F.4th at 856; *Meyer*, 868 F.3d at 75. But while notice of a contractual term is certainly a necessary precondition to finding consent, notice is not alone sufficient. *See, e.g., Meyer*, 868 F.3d at 74; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Whether there has been sufficient notice of an offer is a distinct question from whether there has been a manifestation of an intent to accept that offer, particularly where the offer—*i.e.*, the proposed third-party release— amounts to a side agreement governed by nonbankruptcy law and benefiting distinct parties. As explained above, for that side agreement to be valid, there must also be a manifestation of consent to that agreement. *See, e.g., Berman*, 30 F.4th at 85; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

### viii. Not Voting and Not Opting Out—or Not Objecting—Is Not Consent to Release Non-Debtors

72.     *Third*, the Plan impermissibly imposes non-consensual third-party releases on those who do not vote on the plan, including (i) those who are eligible to vote but abstain and (ii) those who are not eligible to vote because they are deemed to have accepted the plan. Those eligible or ineligible to vote but deemed to accept are apparently bound to the Third-Party Release unless they return the opt out form or object. As numerous courts in this district have held, third-partyreleases cannot be imposed on those who do not vote and do not opt out. *See Smallhold*, 2024 WL 4296938, at \*2; *SunEdison*, 576 B.R. at 458–61; *Chassix Holdings*, 533 B.R. at 81–82; *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). This applies equally to those creditors who simply abstain from voting and those creditors who are not entitled to vote on a plan. Those who abstain from voting cannot be said to be consenting to anything—they are taking no action with respect to the plan. The same is true for those who have no right to vote on a plan, such as the unimpaired creditors here who will be deemed to consent to releases unless they file an objection to them.

Creditors who do not vote on a plan do not manifest consent to a non-debtor release by failing to return an opt out form or failing to object to confirmation.

73.    Even where there are conspicuous warnings in the ballots or an opt-out form that silence or inaction will constitute consent to a release, that is not sufficient to recast a party's silence as consent to the release. *SunEdison*, 576 B.R. at 458–61.  Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan.[4]  And creditors who have no intention of voting in the first place are unlikely to do so.  Moreover, parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. This is especially the case where, as here, the three classes of creditors are bound despite their silence unless they take specific, but different, actions: creditors who vote must select the opt out box on the ballot; creditors who can vote but do not can opt out either through returning the ballot with the opt out box checked or by objecting to confirmation; and creditors who are not entitled to vote must object to confirmation. This creates unnecessary confusion and further demonstrates that the opt out process is a trap for the unwary.

74.    Thus, the court in *SunEdison* rejected the debtors' argument that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to or reject the Combined Plan should be deemed their consent to the release. *Id*. at 460–61.  The court found that the nonvoting creditors' silence was not misleading and did not signify their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id*. at 460-61.

75.    Simply put, as Judge Walrath has explained, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release." *Washington Mut.*, 442 B.R. at 355;

---

[4]  Here, the Plan and associated materials will run to at least 100 pages.

*see also Chassix Holdings*, 533 B.R. at 81–82.  An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)."  *Washington Mut.*, 442 B.R. at 355.

76.    "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point."  *Chassix Holdings*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy."  *Smallhold, Inc.*, 2024 WL 4296938, at *12; *see also id.* at *10 (discussing *Chassix*).  As Judge Owens similarly explained in *Emerge Energy Services, LP*, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as implied consent through a party's silence or inaction.  No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).  "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake."  *Id.*

### ix.    There Was Insufficient Notice of the Non-Debtor Releases for There to Be Consent

77.    There is no acceptance of an offer when there is insufficient notice of the alleged contractual terms.  *See Norcia*, 845 F.3d at 1285 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.") (quotation marks

omitted). There is no way any creditor, no matter how sophisticated—even if it reviews every single document the Debtors provide or put on a website—can identify all the Related Parties who are included as Released Parties and thus, there can be no consent from any creditor to release those parties.

78.    Furthermore, as noted above, failure to return the opt-out election form is not consent to the Third-Party Releases because—whether they are asked to vote or not—claimants have no reason to expect that an offer to contract with non-debtors will be included in the plan solicitation.  As the Third Circuit has explained, there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement." *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017).  *See also Norcia*, 845 F.3d at 1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.") (quotation marks omitted).

**x.    Rule 23's Opt-Out Rule Is Legally Irrelevant Because Congress Has Not Included Anything Like That in the Bankruptcy Code**

79.    In *Smallhold*, Judge Goldblatt raised the issue of whether opt outs could constitute consent because, under Federal Rule of Civil Procedure 23, a court-approved class action settlement may bind class members who do not opt out of the class action.  *See Smallhold, Inc.*, 2024 WL 4296938, at *15.  That analogy to class-action procedure is inapt.  Rule 23, incorporated by Bankruptcy Rule 7023 only for adversary proceedings, is irrelevant.  This is not an adversary proceeding to which Bankruptcy Rule 7023 applies and no one has sought class treatment here. Fed. R. Bankr. P. 7023.  Thus, by their own terms, neither Rule 23 nor Bankruptcy Rule 7023 applies.

80.     And Congress has not seen fit to enact a Code provision authorizing imposing non-debtor releases in chapter 11 plans on those who fail to opt out.  Importantly, "people who fail to respond to class action notices are bound because that is the legal consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder in an action." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, "[t]here is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism." *Id*.  Absent a duly enacted statute or federal rule of procedure, a court cannot unilaterally transplant Rule 23(b)(3)'s class-action "opt out" procedure to bankruptcy proceedings to confirm a chapter 11 plan.

81.     Further, a rule of procedure, including Bankruptcy Rule 7023, cannot modify or abridge state law regarding what constitutes consent to a release.  28 U.S.C. § 2075.  That follows from the fact that no provision in the Code authorizes treatment of creditors' claims against non-debtors as a class action.  There is no federal class action statute that preempts state contract law, which (as discussed above) requires affirmative consent.

82.     Indeed, as the court found in *Patterson*, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure."[5] 636 B.R. at 686.

---

[5] Further, "in the class action context there is a public policy that favors the consolidation of similar cases and that justifies the imposition of a rule that binds class members who have not affirmatively opted out." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of making third party releases applicable to as many creditors as possible." *Id*.

83.     Federal class actions may proceed only after a court certifies that the class meets a series of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-wide litigation.   For any class to be certified, Rule 23(a) requires a court to find: (1) commonality ("questions of law or fact common to the class"); (2) typicality (named parties' claims or defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").   *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards protect against the variability of equitable justice).

84.     Once those threshold showings are made, Rule 23(b) then requires that one of three further predicates satisfied.   Speaking generally, Rule 23(b)(1) authorizes class treatment where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2) authorizes class actions where "the relief sought must perforce affect the entire class at once."   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).   Rule 23(b)(3), in turn, authorizes class treatment only where a court finds both that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).   Opt-out procedures are only available in class actions under Rule 23(b)(3)— and not those under Rule 23(b)(1) and 23(b)(2).   *See Wal-Mart Stores*, 564 U.S. at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").)

85.     Class action procedures also entail additional procedural safeguards.   A class must be specifically defined to identify the class members and the class claims.   Fed. R. Civ. P. 23(c)(1)(B).   Moreover, the court must appoint class counsel that can best "represent the interests of the class."   Fed. R. Civ. P. 23(g). And for classes certified under Rule 23(b)(3), class members

must receive "the best notice practicable" that must "clearly and concisely state in plain, easily understood language:" the nature of the action, who the class is, what their claims or defenses are; their right to appear in the action through an attorney; their right to exclude themselves from the action; how and when to exclude themselves; and the binding nature of the judgment if they do not.  In other words, the Federal Rules of Civil Procedure set objective procedural protections before a class can be certified and potential members bound.

86.     Further, "any class settlement that would bind absent class members requires court approval." *Patterson*, 636 B.R. at 686 (citing Fed. R. Civ. P. 23(e)).  And approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'"  *Id*. at 687 (quoting Fed. R. Civ. P. 23(e)(2)).  "The inquiry appropriate under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

87.     "None of these protections exist in the context of a non-debtor release in a bankruptcy action." *Patterson*, 636 B.R. at 686.  "[N]o party litigates on behalf of the absent releasing party." *Id*.; *see also In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *12 n.53 (Sept. 25, 2024) ("[I]n the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class members. In the plan context, there is no named plaintiff, found by the court to be an adequate representative, whose actions may presumptively bind others.").  And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent

releasing party." *Patterson*, 636 B.R. at 686. "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead."[6] *Id*.

88. Finally, in a class action, members that fail to opt out have claims litigated on their behalf, and they may receive whatever proceeds are won in that litigation. Under a chapter 11 plan with non-debtor releases, although the releasing creditors may receive a distribution under the plan for their claims against a debtor, they lose their claims against the released non-debtors and any corresponding compensation forever if they fail to take affirmative action to opt out or object. Indeed, if a mere failure to opt out constitutes consent to a non-debtor release in bankruptcy, "then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties." *Patterson*, 636 B.R. at 687.

89. Notably, state law also provides class-action procedures, with similar procedural protections to federal class actions, in which unnamed class members are bound by a court-approved class settlement unless they opt out. *See, e.g.,* Del. Super. Ct. R. Civ. P. 23. But outside of that class-action context, ordinary contract principles apply as discussed above, and a person cannot force a contract on someone else by deeming silence, such as a failure to "opt out," to be consent, except in narrow circumstances inapplicable here. ¶¶ 37-45, *supra*.

90. In sum, there will be no affirmative consent to Third-Party Releases given by the numerous persons and entities on whom such releases will be imposed. Such releases are therefore non-consensual.

**B.    *The Plan Cannot Be Confirmed Because There Is No Authority for the Injunction Against Bringing Claims Against Non-Debtors.***

---

[6] Although the official committee of unsecured creditors owes a fiduciary duty to the creditor body as a whole, it does not owe a duty to any individual creditor or any specific group of creditors, and the diverse body of creditors to whom it owes duties often has conflicting interests. *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members"). Further, the committee's duties relate only to claims against the debtor, not claims against non-debtors.

88.     This Court also may not approve the injunction enforcing the release by barring claims against non-debtors.  *Purdue* clearly stands for the proposition that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code. *See Purdue Pharma L.P.*, 144 S. Ct. at 2088. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *See id.* at 2085 (citing 11 U.S.C. § 524(e)).

89.     Even if non-debtor releases are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief. Parties seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Purdue Pharma*, 144 S. Ct. at 2085 (noting that an injunction is an "extraordinary remedy"); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1119 (3d Cir. 1989) ("We have long followed the principle that equitable remedies are available once legal remedies are found to be inadequate.") (citing *Weinberger*).

40

90.     The Debtors have made no attempt to show that any of these factors are met.  Nor could they.  If the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estates or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

91.     Similarly, there is no statutory authority in the Bankruptcy Code that justifies an injunction to enforce an exculpation, and the Debtors have shown no need for an injunction to prevent "irreparable harm" to either the estates or the released parties.

### C.  *The Plan is Impermissibly Deemed to Be a Settlement.*

92.     Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A) (emphasis added).

93.     Section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that creditors and interest holders may have against it, which is what Plan § 6.9 seeks to do. *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.' . . .  It is significant that there is no parallel

authorization regarding claims against the estate.") (quoting section 1123(b)(3)(A)) (internal citation omitted).

94.     The resolution of claims against the Debtors is governed by sections 1129 and 1141.

95.     A plan may incorporate one or more negotiated settlements, but a plan is not itself a settlement.  Sending a plan to impaired creditors for a vote is not equivalent to parties negotiating a settlement among themselves. A "settlement" is "an agreement ending a dispute or lawsuit." BLACK'S LAW DICTIONARY (10th ed. 2014). An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Id.*

96.     Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

97.     The decision whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Washington Mut.*, 442 B.R. at 338 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). In contrast, chapter 11 plans are subject to the requirements of Bankruptcy Code sections 1123 and 1129. What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

98.     In Plan Art. VII. Section 7.23, the Debtors attempt to impermissibly designate the entire Plan as a Rule 9019 "settlement." Further, it appears Art. VII. Section 7.23. is not limited to settling claims belonging to the Debtors or the estate. Thus, Art. Art. VII. Section 7.23. exceeds the scope of what can be settled under section 1123(b)(3)(A). Unless Art. VII. Section 7.23. is narrowed so that (i) it pertains only to claims the Debtors are settling against others and (ii) the Plan itself is not a settlement, the Plan does not comply with section 1123(b)(3)(A) and does not satisfy section 1129(a)(1). Consequently, the settlement and compromise language contained in Art. VII. Section 7.22. should be removed from the Plan

## **RESERVATION OF RIGHTS**

99.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Objection, assert any objection, file any appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required, and to assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order or orders: (i) denying interim approval of the Disclosure Statement; (ii) denying the Procedures Motion; and (iii) granting such other and further relief as the Court deems just and equitable.

Dated: January 8, 2025                                   Respectfully submitted,

                                                   **ANDREW R. VARA**
                                                   **UNITED STATES TRUSTEE**
                                                   **REGIONS 3 AND 9**

                                        By:   */s/ Timothy J. Fox*
                                              Timothy J. Fox, Jr. (DE Bar No. 6737)
                                              Trial Attorney
                                              United States Department of Justice
                                              Office of the United States Trustee
                                              J. Caleb Boggs Federal Building
                                              844 N. King Street, Room 2207, Lockbox 35
                                              Wilmington, DE 19801
                                              Telephone: (302) 573-6491
                                              Email:   Timothy.Fox@usdoj.gov

44

## <u>CERTIFICATE OF SERVICE</u>

I, Timothy J. Fox, Jr., hereby certify that on January 8, 2025, I caused to be served a copy of this Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were sent via email to parties in interest.

Dated: January 8, 2025                         */s/ Timothy J. Fox*
                                                                Timothy J. Fox, Jr.