## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (JTD)<br>(Jointly Administered)<br><br>**Re: Docket Nos. 152, 657** |

### OBJECTION OF THE AD HOC GROUP OF FREEDOM LENDERS TO
### DEBTORS' DISCLOSURE STATEMENT MOTION

The Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**"),[2] by and

through its undersigned counsel, hereby files this objection (the "**Objection**") to the *Debtors'*

*Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and*

*Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation*

---

[1]    The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2]    The Freedom Lender Group is comprised of the entities named in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229], as it may be amended and supplemented from time to time.

*Packages and Procedures for Distribution, (C) Approving the Form of the Ballots and Solicitation Materials and Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 152] (the "**Disclosure Statement Motion**") and respectfully states as follows:[3]

### PRELIMINARY STATEMENT

1.        The Debtors are rushing headfirst into a confirmation process for a plan, dictated by and for the benefit of the OpCo 1L Group (the "**OpCo 1L Group Plan**"), that is doomed to fail.  The Freedom Lender Group, the members of which constitute a majority and hold 93% of value in the only class at the HoldCo Debtors with identifiable, non-insider claims, will not vote to accept the OpCo 1L Group Plan.  The Debtors have asserted, and their schedules confirm, that there are no other non-insider claims at the HoldCo Debtors.  This is expected given that these are non-operating entities whose sole purpose was to incur the HoldCo Facility.  The lack of an impaired accepting class at the HoldCo Debtors makes the OpCo 1L Group Plan unconfirmable under section 1129(a)(10) of the Bankruptcy Code.  The Debtors have surely been aware of this fatal flaw since they entered into the RSA prepetition, yet they refuse to engage with the Freedom Lender Group on a plan the members of which would support.  Rather than continuing to waste estate resources on costly litigation over a patently unconfirmable plan, the Debtors should take the time to negotiate with the Freedom Lender Group on the terms of a plan that can actually be confirmed.

2.        Not only would the Disclosure Statement Motion result in a waste of estate resources in pursuit of a patently unconfirmable plan, but it proposes a confirmation timeline that

---

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Disclosure Statement Motion, the Disclosure Statement or the OpCo 1L Group Plan, as applicable.

is untenable.  The Debtors' proposed order contemplates a voting and objection deadline of February 14, 2025 and a confirmation hearing on February 21, 2025.  But the Debtors have failed to provide meaningful plan discovery to date.  The Debtors have failed to provide any emails in response to plan discovery requests that the Freedom Lender Group served in the second week of these Chapter 11 Cases, now over two months ago.  In fact, the Debtors have not even served responses and objections to these requests that would allow the parties to meet and confer as the rules require.  Rather, shortly after receiving the requests, the Debtors served preliminary responses asserting that plan-related discovery was "premature" but otherwise provided no substantive responses regarding the Debtors' positions on the discovery requests and what they would or would not produce.  The Debtors have not yet amended these responses, meaning that the plan discovery process effectively has not started.

3.      Before a confirmation hearing can be set, it is critical that the Freedom Lender Group get meaningful engagement from the Debtors on at least two categories of plan discovery: valuation and potential claims arising from the Debtors' prepetition transactions.  With respect to valuation discovery, if there is not a clearing transaction (meaning a sale the proceeds of which would surpass outstanding prepetition and postpetition first lien debt of the OpCo Debtors), the OpCo 1L Group Plan requires that the equity of FRG be canceled and receive no distribution.  If that happens, there will need to be a valuation trial.  Although the burden of proof will be on the Debtors to show that the equity of FRG has no value, the Freedom Lender Group will have the right to challenge the Debtors' assertions and prepare its own rebuttal valuation case to support its position.

4.      Any objection the Freedom Lender Group may make, and any rebuttal valuation case it may present, can only be done following discovery.  The Freedom Lender Group will need

to review documents relevant to valuation and the Debtors' business plan, which is the foundation for a discounted cash flow analysis and comparable companies evaluation. The parties will need to exchange expert valuation reports and rebuttal reports. The parties will need to take fact and expert depositions. Only then, based on this discovery, can the Freedom Lender Group prepare its confirmation objection. To date, the Debtors have not produced a single email regarding valuation, nor have they provided substantive responses to the Freedom Lender Group's long-outstanding discovery requests that would allow a valuation discovery process to move forward.

5.     With respect to discovery regarding prepetition transactions, the Debtors cannot credibly argue that there is nothing for the Freedom Lender Group to investigate. The Debtors have engaged two separate entities, the Petrillo firm and Mr. Wartell, to investigate the prepetition transactions and potential HoldCo Debtor claims arising therefrom against (i) other Debtors, (ii) released parties and (iii) non-released parties. It cannot be that the Debtors are simply wasting estate resources on frivolous inquiries. Nor would the facts support such an argument. Fourteen months prior to the Petition Date, the HoldCo Lenders provided $475 million in financing to the Debtors. That money has since vaporized, and not as the result of any market movements. The Freedom Lender Group has the right to investigate these events to determine what claims the HoldCo Debtors possess against various parties (including other Debtors) and their value before the Debtors seek to confirm a plan that releases or transfers those claims for zero compensation.

6.     Once again, this investigation will take time and the Debtors have done nothing to move that process forward. To the contrary, on a meet-and-confer last week, the Debtors told the Freedom Lender Group that they do not intend to conduct any email searches in connection with the prepetition transactions. That position is not only indefensible, but it means that these searches have not even started.

7.      Moreover, just as they did with the discovery in connection with the Debtors' "second day" relief, the Debtors appear to have run email searches based on search terms that were not shared with the Freedom Lender Group before they were run, even though the Freedom Lender Group previously advised the Debtors that doing so is contrary to the Local Rules.  The Debtors only shared these undisclosed search terms on December 24, 2024.  These search terms were inadequate, as they proposed custodians and date ranges that were too narrow and failed to address key requests relating to (as noted) the Take Private Transaction, other historic transactions, and the two ongoing investigations initiated by the Debtors.  The Freedom Lender Group sent proposed revised search terms to the Debtors on December 31, 2024.  To date, the Debtors have not responded with new proposed terms, and so plan discovery is in limbo.

8.      This is a problem of the Debtors' own making.  Given the amount of work that needs to be done to prepare for confirmation, the Freedom Lender Group and other parties in interest should be given at least 45 days after completion of document discovery before being required to object to confirmation so they can analyze the documents, take depositions and prepare their arguments.

9.      Finally, the Disclosure Statement fails to provide the information necessary to allow creditors to evaluate their treatment and whether the OpCo 1L Group Plan complies with confirmation requirements.  First and foremost, the Disclosure Statement fails to include a valuation analysis which, as described above, will be crucial to the Debtors' confirmation case if they intend to demonstrate that there is no value beyond the first lien debt of the Opco Debtors. The Disclosure Statement also does not include critical information regarding (i) the treatment of the HoldCo Debtors' creditors, (ii) the scope of the Debtor Releases, (iii) the HoldCo Liquidation

Trust and (iv) the HoldCo Debtors' decision-making in pursuing the OpCo 1L Group Plan.  For these reasons, the Disclosure Statement Motion should be denied.

## BACKGROUND

**I.    HoldCo Debtors and OpCo Debtors**

10.    Freedom VCM Interco, Inc. and Freedom VCM, Inc. (the "**HoldCo Debtors**") were created as part of the August 2023 take private transaction (the "**Take Private Transaction**"), whereby the former Chief Executive Officer of Debtor Franchise Group, Inc. ("**FRG**"), Brian Kahn, and other members of the management team took private control of FRG. The HoldCo Debtors have no operations and their main asset is Freedom VCM, Inc.'s 100% equity ownership of FRG.[4]  The Take Private Transaction was funded, in part, with a $475 million facility incurred by the HoldCo Debtors (the "**HoldCo Facility**"), 93% of which was provided by the members of the Freedom Lender Group.[5]  The lenders of the HoldCo Facility (the "**HoldCo Lenders**") are the only known creditors of the HoldCo Debtors.[6]  None of the Debtors other than the HoldCo Debtors are obligors under the HoldCo Facility.[7]  Under the HoldCo Facility, the HoldCo Lenders were granted a security interest in substantially all assets of the HoldCo Debtors, including the equity interests in FRG.[8]  As of the Petition Date, approximately $514.7 million on account of principal amounts, including interest that has been capitalized and added to principal, was outstanding under the HoldCo Facility was $514.7 million.[9]

---

[4]    *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "**First Day Declaration**") ¶ 49.

[5]    Disclosure Statement [Docket No. 655] § II.A.ii.

[6]    *See Schedules of Assets and Liabilities for Freedom VCM, Inc.* [Docket No. 539], Schedule E/F at 32-35; *Schedules of Assets and Liabilities for Freedom VCM Interco, Inc.* [Docket No. 540], Schedule E/F at 32-35.

[7]    First Day Decl. ¶ 63.

[8]    *Id.*

[9]    *Id.* ¶ 64.

11.     FRG and its subsidiaries (the "**OpCo Debtors**") hold all of the Debtors' tangible assets and operating business segments.  The OpCo Debtors are obligated on a $247.8 million asset-based lending facility, a $1.097 first lien term loan facility (the "**OpCo 1L Term Facility**" and the lenders thereunder, the "**OpCo 1L Term Lenders**") and a $125 million second lien term loan facility (the "**OpCo 2L Facility**" and the lenders thereunder, the "**OpCo 2L Lenders**").[10] The members of the Freedom Lender Group hold 93% of the debt under the OpCo 2L Facility. The credit facilities at the OpCo Debtors and the HoldCo Facility are entirely separate and, aside from a recent $19.51 million guarantee by the OpCo Debtors of the HoldCo Facility, each has different obligors.[11]

## II.    OpCo 1L Group Plan and Disclosure Statement

12.     On November 1, 2024, the Debtors entered into a Restructuring Support Agreement (the "**RSA**") with an ad hoc group of OpCo 1L Term Lenders (the "**OpCo 1L Group**").[12]  As required under the RSA, the Debtors filed the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") on November 3, 2024 (the "**Petition Date**").  The terms of the RSA have largely dictated the path and pace of these Chapter 11 Cases.  The RSA requires the Debtors to exclusively pursue the plan contemplated by the RSA, subject to a "fiduciary out" that, if exercised, would cause a default under the Debtors' postpetition financing (the "**DIP Facility**").[13]

13.     On November 11, 2024, the Debtors filed the initial OpCo 1L Group Plan approved by the OpCo 1L Group [Docket No. 150], a disclosure statement in support of the OpCo 1L Group Plan [Docket No. 151], and the Disclosure Statement Motion.

---

[10]    *Id.* ¶¶ 50-61.

[11]    *Id.* ¶ 63.

[12]    First Day Decl. ¶ 15.  A copy of the RSA is attached as Exhibit B to the First Day Declaration.

[13]    RSA §§ 7.01(a), 8.01, 12.01(h); [Docket No. 134], Ex. 1, § 7.01(p)(ii).

14.     As originally filed, the OpCo 1L Group Plan and Disclosure Statement were consistent in all material respects with the terms of the RSA and contemplated a parallel process whereby the Debtors would pursue (i) a sale of substantially all of the Debtors' assets (the "**Sale Transaction**") and (ii) if the Debtors could not effectuate a Sale Transaction that repays all prepetition and postpetition first lien secured debt at the OpCo Debtors in full, an equitization of secured claims of the OpCo 1L Term Lenders into 100% of FRG's reorganized equity, subject to certain dilutions (the "**Equitization Transaction**").[14]  Under the originally-filed OpCo 1L Group Plan, creditors of the Holdco Debtors could receive proceeds of a successful sale but, if the Debtors fail to consummate a Sale Transaction, they would receive nothing.[15]  The Debtors and the OpCo 1L Group assume the restructuring will be consummated through the Equitization Transaction, with the Debtors noting at the first day hearing that the sale process is intended to act as a "market check on value" for the Equitization Transaction.[16]

15.     The Debtors have admitted that they are "not aware of" and "don't expect" any general unsecured claims to be filed against the HoldCo Debtors.[17]  The Schedules filed by the Debtors do not identify any unsecured claims at the HoldCo Debtors.[18]  And the liquidation analysis filed by the Debtors similarly states that, "based on the Debtors' books and records," no other claims exist at the HoldCo Debtors.[19]

16.     The OpCo 1L Group Plan provides that it cannot be confirmed without being

---

[14]   Disclosure Statement [Docket No. 151], § IV.A; OpCo 1L Group Plan [Docket No. 150] §§ 7.2, 7.3.

[15]   OpCo 1L Group Plan [Docket No. 150], §§ 1.97, 1.138, 5.11, 5.12.

[16]   Nov. 5, 2024, Hr'g Tr. 18:23; *see also* [Docket No. 298], ¶ 31 (stating that the members of the Freedom Lender Group are "unsecured creditors who are not entitled to adequate protection" because the only proposed transaction obtained so far is the equitization of the OpCo 1L Term Lenders' claims "subject to the outcome of the Debtors' sale process").

[17]   *See* Dec. 17, 2024, Hr'g Tr. 26:9-11.

[18]   *See* [Docket Nos. 539, 540].

[19]   [Docket No. 592-1], at 8.

confirmed at each Debtor, and requires all votes on the OpCo 1L Group Plan to be tabulated at each Debtor for purposes of sections 1129(a)(8) and (a)(10).[20]    The OpCo 1L Group Plan explicitly does not contemplate the substantive consolidation of the Debtors' estates and it states that nothing in the OpCo 1L Group Plan shall "constitute an admission that any one of the Debtors is subject to or liable for any Claim against any other Debtor."[21]

17.    The members of the Freedom Lender Group have made clear that, because of the Debtors' refusal to engage with them on their own proposed plan for the HoldCo Debtors, the paltry recovery offered to the OpCo 2L Lenders, the elimination of the FRG equity under the OpCo 1L Group Plan, and the failure under the OpCo 1L Group Plan to give the Freedom Lender Group the power to determine which claims and causes of action to preserve and pursue, they will not vote to accept the OpCo 1L Group Plan.[22]

18.    The Debtors may have valuable claims and causes of action.    To evaluate these potential claims and causes of action, the Debtors are undergoing two separate investigations. One investigation is being conducted by law firm Petrillo Klein + Boxer ("**Petrillo**") regarding potential claims and causes of action the Debtors may have in connection with, among other things, the Take Private Transaction, and the Debtors' historical transactions and relationship with Mr. Kahn, Prophecy Asset Management LP, and B. Riley Financial, Inc. and its affiliates.[23]    The other investigation is being conducted by the newly-appointed independent director of the

---

[20]    OpCo 1L Group Plan [Docket Nos. 150, 654] §§ 6.2, 6.6.

[21]    *Id.* § 7.1; *see also Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases* [Docket No. 88], ¶ 6 ("Nothing in the Motion or this Order is intended or shall be deemed or otherwise construed as directing or otherwise effecting a substantive consolidation of the Debtors' estates.").

[22]    *See Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [Docket No. 192], ¶ 32.

[23]    Disclosure Statement [Docket No. 655], §§ II.A.ii, II.A.iv, II.A.vi.

HoldCo Debtors, Michael Wartell, regarding any potential claims or causes of action held by or against the HoldCo Debtors.[24]

19.    The OpCo 1L Group Plan provides for releases by the Debtors (the "**Debtor Releases**") of certain claims and causes of action against the "Released Parties," which include, among others, the Debtors, the Debtors' affiliates, and the Debtors' current and former directors and officers.[25]  The Debtor Releases cover a broad range of claims and causes of action related to, among other things, the Debtors' restructuring efforts and Chapter 11 Cases, the transactions or events giving rise to claims and equity interests against the Debtors, and the business or contractual arrangements between any Debtor and any Released Parties.[26]  The Debtor Releases state that they are "[s]ubject to the outcome of the [Petrillo investigation] and the [Wartell investigation] and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims . . . ."[27]  Neither the OpCo 1L Group Plan nor the Disclosure Statement makes clear what "subject to" means and whether, if an investigation uncovers a viable claim or cause of action, that would automatically exempt such a claim or cause of action from the releases.

## III.    Plan Discovery

20.    On November 16, 2024, the Freedom Lender Group served its *First Requests for the Production of Documents to the HoldCo Debtors in Connection with the Plan and Disclosure Statement* (the "**First Plan Discovery Requests**").[28]  The First Plan Discovery Requests included requests for production focused on, among other things, the valuation of the Debtors and the

---

[24]    *Id.* § II.A.vi.

[25]    OpCo 1L Group Plan [Docket No. 654], §§ 1.170, 1.171, 12.2.

[26]    *Id.* § 12.2.

[27]    *Id.*

[28]    A copy of the First Plan Discovery Requests is attached as Exhibit A to the declaration of Samuel P. Hershey in support of this Objection filed concurrently herewith (the "**Hershey Declaration**").

Debtors' prepetition transactions relevant to the releases contemplated under the proposed plan. The Debtors responded on December 4, 2024, uniformly declining to provide plan-related discovery at that time on the ground that the discovery was "premature," and providing no further substantive responses to the Freedom Lender Group's requests. *See HoldCo Debtors' Responses and Objections to the HoldCo Lenders' First Requests For the Production of Documents in Connection with the Plan and Disclosure Statement* (the "**Debtors' Initial Response**"), Nos. 1-31.[29] Then, without amending these responses, the Debtors sent search terms to the Freedom Lender Group and, without waiting for approval, immediately made a limited production. The Freedom Lender Group responded on December 31, 2024, shortly after it received the production, with proposed revisions to the search terms. Despite the Freedom Lender Group's repeated requests for both amended responses and revised search terms through this correspondence and at a January 3, 2025 meet-and-confer, the Debtors have not amended their responses or finalized search terms for plan-related discovery.

21. The Debtors have continued to assert that custodial searches and search terms are unnecessary for requests concerning the Take Private Transaction and other prepetition transactions. Accordingly, the Debtors have not searched for (much less produced) a single email in connection with those transactions. Additionally, the Debtors have refused to produce the documents shared with Petrillo and Akin Gump Strauss Hauer & Feld LLP ("**Akin**"), as counsel to Mr. Wartell. Therefore, the Debtors are refusing to produce the documents that will form the basis for the Debtors' and independent directors' decisions regarding (i) what claims and causes of action exist and (ii) the purported value of those claims and causes of action. The Debtors have refused to produce these documents on the grounds that doing so would require a privilege review.

---

[29] A copy of the Debtor's Initial Response is attached as Exhibit B to the Hershey Declaration.

22. Even though the Freedom Lender Group served plan discovery in the second week of these Chapter 11 Cases, the only plan-related document production that the Debtors have made occurred on December 27, 2024. This production included a limited set of 675 non-custodial documents, leaving the majority of the Freedom Lender Group's months-old requests unaddressed and not a single plan-related email produced.

23. In light of these significant delays and roadblocks, the Freedom Lender Group anticipates that Plan discovery will not conclude in time for a confirmation hearing on February 21, 2025.

## IV.    Plan and Disclosure Statement Modifications

24. On January 3, 2025, the Debtors filed an amended version of the OpCo 1L Group Plan [Docket No. 654] and an amended Disclosure Statement [Docket No. 655]. The amended OpCo 1L Group Plan makes a number of changes, the most material of which are as follows:

- If the investigation conducted by Mr. Wartell determines that the HoldCo Debtors have claims and causes of action that are not otherwise settled, discharged or released under the OpCo 1L Group Plan, the HoldCo Debtors are authorized, but not required, to establish a liquidation trust (the "**HoldCo Liquidation Trust**") and transfer their interests in such claims and causes of action to the HoldCo Liquidation Trust.[30] Both the HoldCo Lenders and general unsecured creditors of the HoldCo Debtors (if any) would share in any recovery from the HoldCo Liquidation Trust.[31] The lenders under the DIP Facility also have the option to convert any claims they may have against the HoldCo Debtors to claims against the HoldCo Liquidation Trust with the same priority and security as they have against the HoldCo Debtors.[32] Details regarding the mechanics of the HoldCo Liquidation Trust are largely reserved for an agreement (the "**HoldCo Liquidation Trust Agreement**") to be filed with the Plan Supplement, in form and substance satisfactory to the Debtors and the OpCo 1L Group.[33]

- The Debtor Releases have been revised to explicitly include claims related to the Take Private Transaction and to explicitly provide for the release of avoidance actions sounding in fraud notwithstanding the general carve-out from the releases of claims

---

[30]    OpCo 1L Group Plan [Docket No. 654], § 7.10.

[31]    *Id.* §§ 5.11(a), 5.12(a).

[32]    *Id.* § 3.1.

[33]    *Id.* §§ 1.94, 1.146.

for fraud.[34]

- More detail is provided regarding the warrants being offered to the OpCo 2L Lenders if they vote to accept, including a proposed strike price, term, and adjustments related to the costs of litigation allegedly caused by the Freedom Lender Group.[35]

- Corresponding to changes to the bidding procedures, various modifications allow for the consummation of "Partial Sale Transactions" of one or more of the Debtors' businesses but less than all of the Debtors' assets.[36]  If one or more Partial Sale Transactions are consummated, the OpCo 1L Term Lenders receive the proceeds of any sales of their collateral and their claims then still equitize.[37]

These changes do not sufficiently address concerns raised by the Freedom Lender Group and, thus, the members of the Freedom Lender Group still intend to vote to reject the OpCo 1L Group Plan.

25.    The amended Disclosure Statement largely tracks the amended OpCo 1L Group Plan.  But it also includes some crucial, and extremely concerning, language regarding the valuation case the Debtors intend to put on at confirmation, which reads as follows:

> As described above, the Debtors are presently engaged in marketing their assets for sale and soliciting bids in connection therewith pursuant to the Bidding Procedures. The Debtors believe that this process provides the best method of valuing their enterprise as it allows the market to speak as to that value.  The Debtors' marketing and sale process is a comprehensive and arm's length processes with the goal of identifying counterparties for one or more potential value-maximizing sale transactions.  To ensure that the integrity of the marketing and sale process is preserved and value is maximized, this Disclosure Statement does not identify expected recoveries for Prepetition ABL Claims, Prepetition First Lien Loan Claims, nor does it include a valuation analysis (which the Debtors at this time do not anticipate filing).  See 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets"); In re LBI Media, Inc., Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (Docket No. 360) (order approving disclosure statement without a valuation

---

[34]    *Id.* § 12.2.

[35]    *Id.* § 1.128.  This is the type of punitive "death trap" that cannot be approved.  Moreover, the members of the Freedom Lender Group, who control the class of OpCo 2L Lenders, do not intend to vote to accept the OpCo 1L Group Plan.  Therefore, attempts by the Debtors and the OpCo 1L Group to devalue these warrants as a result of the Freedom Lender Group's efforts to protect their rights are a waste of time and estate resources.

[36]    *See id.* §§ 1.137, 1.138, 7.3.

[37]    *Id.* § 5.4(a).

13

analysis and approving the filing of a valuation analysis at a later date, if necessary).[38]

26.     On January 3, 2025, the Debtors filed a proposed order approving the Disclosure Statement Motion, which requests February 14, 2025 as the deadline for creditors to vote on or object to the OpCo 1L Group Plan and February 21, 2025 as the date for the confirmation hearing.[39]

## OBJECTION

### I.    The Disclosure Statement Should Not Be Approved Because the OpCo 1L Group Plan is Patently Unconfirmable

27.     Courts should deny approval of a disclosure statement where "it appears there is a defect that makes a plan inherently or patently unconfirmable," as "a court should not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (internal quotation marks and citations omitted); *see also In re Quigley Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure must be denied, as solicitation of the vote would be futile." (internal citations omitted)); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."). A plan is considered patently unconfirmable if (i) creditor voting results cannot cure confirmation defects and (ii) such defects concern matters upon which all material facts are not in dispute or have been developed fully at the disclosure statement hearing. *In re Am. Cap.*

---

[38]    Disclosure Statement § XVI.D.iii.

[39]    [Docket No. 657-1], Annex I.

14

*Equip., LLC*, 688 F.3d at 154-55 (citing *In re Monroe Well Serv. Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)).

### A.    The OpCo 1L Group Plan is Patently Unconfirmable at the HoldCo Debtors

28.    The OpCo 1L Group Plan is patently unconfirmable at the HoldCo Debtors.  The Debtors' statements on the record, their filed schedules of assets and liabilities and their liquidation analysis all indicate that there are no claims at the HoldCo Debtors other than (i) the HoldCo Lenders' claims and (ii) contingent claims under the DIP Facility (the holders of which do not have a right to vote).  This is consistent with the "holding company" nature of the HoldCo Debtors, including the fact that they are non-operational.  The OpCo 1L Group Plan does not offer a meaningful recovery to the OpCo 2L Lenders (the revised warrants that penalize the Freedom Lender Group for participating in the Chapter 11 Cases do not help) and do not give the HoldCo Lenders control over their collateral; therefore, the members of the Freedom Lender Group intend to vote to reject the OpCo 1L Group Plan.  The Freedom Lender Group controls the only class of known, non-insider claims at the HoldCo Debtors and, thus, there will be no impaired accepting class at the HoldCo Debtors.  Therefore, the OpCo 1L Group Plan cannot satisfy section 1129(a)(10) of the Bankruptcy Code, which requires at least one class of impaired creditors to vote to accept a plan for it to be confirmable.  *See In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 302-03 (Bankr. D. Del. 2011) (explaining that, while jointly administered debtors collectively had many creditors, one of the debtors that only had one dissenting creditor "cannot confirm a plan over [such creditor's] objection because it could get no accepting class[; t]herefore, in the absence of substantive consolidation, [such debtor] does not have any chance of confirming a plan").

29.    Perhaps recognizing this infirmity, the Debtors have taken two actions: (1) they have amended their Disclosure Statement to estimate that $37.9 million of claims exist in Class 8

(HoldCo General Unsecured Claims) with no further information regarding the nature of these claims and (2) they give creditors of the HoldCo Debtors shares in the potential HoldCo Liquidation Trust, which seemingly gives them some prospect of a recovery.[40]  Neither of these changes solves the problem.  Class 8 is not limited to general unsecured claims against the HoldCo Debtors – it also includes general unsecured claims against Freedom VCM Holdings, LLC, Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, and Freedom VCM Receivables, Inc., which are also holding companies in the Debtors' organization.[41]  In light of the Debtors' repeated acknowledgement that they do not expect any general unsecured claims to be filed against the HoldCo Debtors, the Debtors' estimate for claims in Class 8 must reference general unsecured claims that exist at such other Debtors.  And, while the Disclosure Statement itself fails to specify how the estimated claims are allocated by Debtor, the Debtors' liquidation analysis suggests that the entirety of the estimated $37.9 million of Class 8 claims is expected to be asserted against Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, and Freedom VCM Receivables, Inc.[42]  Accordingly, the existence of general unsecured claims in Class 8 against such other Debtors cannot cure the patent unconfirmability of the OpCo 1L Group Plan as to the HoldCo Debtors.

30.    But even if there were any legitimate, non-insider unsecured claims at the HoldCo Debtors (which there are not), such claims could not be a basis to determine that the OpCo 1L Group Plan may be confirmable at the HoldCo Debtors.  Hope of a speculative and unlikely recovery is not a basis to determine that creditors are entitled to vote, rather than being deemed

---

[40]    Disclosure Statement [Docket No. 655], § VI.C.i; OpCo 1L Group Plan [Docket No. 654], §§ 5.11(a), 5.12(a).

[41]    OpCo 1L Group Plan [Docket No. 654], §§ 1.105, 1.106.

[42]    [Docket No. 592-1], at 15-16 (estimating $37.9 million of Class 8 claims against such Debtors and zero Class 8 claims against the HoldCo Debtors).

to reject a plan under section 1126(g) of the Bankruptcy Code. *See In re Walnut Equip. Leasing Co., Inc.*, Case No. 97-19699 (DWS), 1999 Bankr. LEXIS 1460, at *10 (Bankr. E.D. Pa. Nov. 23, 1999) (disregarding a class's acceptance of a plan, for purposes of allowing a creditor in such class to raise confirmation objections under section 1129(b), where solicitation was based on "an extremely remote and unlikely" possibility of recovery and "but for the solicitation intended to give this Class a franchise in the plan process, the plan would have been deemed rejected" by such class). The Debtors and the OpCo 1L Group are on record as viewing the chances of proceeds in a Sale Transaction reaching the HoldCo Debtors as remote.[43] And voters will know, by the voting deadline, whether a Sale Transaction will be effectuated.[44] In an Equitization Transaction scenario, there still is no certainty that the HoldCo Liquidation Trust will be formed or that any claims or causes of action will be transferred to it. If anything, given that the Debtors and the OpCo 1L Group have the decision-making power as to whether the HoldCo Liquidation Trust will be created, it should be presumed that it will not. If the HoldCo Liquidation Trust does not come to fruition, creditors of the HoldCo Debtors should not be entitled to vote on the plan because they will receive no recovery. And general unsecured creditors of the HoldCo Debtors (if any) have an even more unrealistic chance of recovery given that any claim or cause of action is either encumbered by the HoldCo Lenders' liens (and thus, proceeds must exceed at least $514.7 million to get to unsecured creditors) or is unencumbered (and thus may be behind some potential to-be-determined amount of DIP Facility obligations).

---

[43] *See* [Docket No. 298], ¶ 31 (stating that the members of the Freedom Lender Group are "unsecured creditors who are not entitled to adequate protection" because the only proposed transaction obtained so far is the equitization of the First Lien OpCo Lenders' claims "subject to the outcome of the Debtors' sale process"); [Docket No. 299], ¶ 49 ("The value of the HoldCo Term Loans' collateral is functionally worthless – an equity pledge in an overleveraged holding company, which sits behind more than $1.5 billion of funded debt, not to mention hundreds of millions of dollars in unsecured claims.").

[44] *See* [Docket No. 454] (scheduling sale hearing for February 13, 2025); [Docket No. 657-1], Annex I (proposing February 14, 2025 as the voting deadline).

31.     Accordingly, there is no scenario in which the OpCo 1L Group Plan can be confirmed at the HoldCo Debtors.   Therefore, the Disclosure Statement must be denied, as soliciting votes on the OpCo 1L Group Plan is precisely the sort of exercise in futility that precludes approval.  *See, e.g., In re 18 RVC, LLC*, 485 B.R. 492, 494-95, 497 (Bankr. E.D.N.Y. 2012) (denying approval of disclosure statement after finding that debtor could not satisfy section 1129(a)(10) without impermissible gerrymandering of deficiency claim); *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 638, 643 (Bankr. E.D. Pa. 1996) (denying approval of the debtor's disclosure statement on patent unconfirmability grounds where the debtor unsuccessfully attempted to create an impaired accepting class of creditors); *In re Applegate Property, Ltd.*, 133 B.R. 827, 830-31 (Bankr. W.D. Tex. 1991) (finding that disclosure had been inadequate where debtor had failed to disclose information "material to the court's determination of whether the confirmation standards have been met, as claims acquired by an insider entity might no longer count toward acceptance for purposes of section 1129(a)(10)").

## B.      The OpCo 1L Group Plan Cannot Be Confirmed Without Confirmation at the HoldCo Debtors

32.     In accordance with its terms, the OpCo 1L Group Plan cannot be confirmed unless it is confirmed at each Debtor.[45]  Moreover, under Third Circuit caselaw, where a joint plan is proposed for the reorganization of debtors that are not substantively consolidated, section 1129(a)(10) must be satisfied on a debtor-by-debtor basis.  *See In re Tribune Co.*, 464 B.R. 126, 180-83 (Bankr. D. Del. 2011), *aff'd sub nom. In re Tribune Media Co.*, 587 B.R. 606 (D. Del. 2018), *aff'd sub nom. In re Tribune Co.*, 972 F.3d 228 (3d Cir. 2020); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. at 302-03 (citing to *Tribune* and holding, in dicta, that the debtors

---

[45]     *See* OpCo 1L Group Plan [Docket No. 654], § 6.6.

18

did not have a reasonable likelihood of reorganization because they could not confirm a joint plan where one of the debtors only had one, non-accepting class).  Accordingly, the OpCo 1L Group Plan cannot be confirmed if it is not accepted at the HoldCo Debtors, rendering the OpCo 1L Group Plan patently unconfirmable in its entirety.

## II.    The Debtors' Proposed Timeline is Untenable and Must Be Extended

33.    The Debtors have failed to timely comply with their notice and discovery requirements in connection with seeking approval of the Disclosure Statement and confirmation of the OpCo 1L Group Plan.  Therefore, their proposed timeline is prejudicial to creditors and must be extended.

34.    The Debtors currently propose February 14, 2025 as the deadline for creditors to vote on object to the OpCo 1L Group Plan and February 21, 2025 as the confirmation hearing. The Debtors' former proposed confirmation timeline became obsolete on December 6, 2024 when the Debtors agreed to adjourn the hearing on the Disclosure Statement.  The Debtors failed to inform the Freedom Lender Group of their new proposed timeline until filing their proposed order with respect to the Disclosure Statement Motion on January 3, 2025.  Pursuant to Rule 3017-1 of the Local Rules for the District of Delaware Bankruptcy Court, the Debtors were required to file a motion for approval of voting procedures, which must include "the time and manner of voting," no less than [21] days prior to the hearing on the Disclosure Statement.  Although the Debtors initially filed their Disclosure Statement Motion well in advance of the deadline, the proposed order notifying creditors of the new voting deadline was filed only 12 days before the scheduled hearing.  The Debtors' failure to meet this deadline is indicative of a larger pattern of the Debtors rushing the confirmation process along on the timeline demanded by the OpCo 1L Group, despite being unwilling or unable to satisfy their obligations to other parties in interest.

35.    In addition, the Debtors' failure to comply with the Freedom Lender Group's

discovery requests in a timely manner has effectively mooted their proposed confirmation hearing date.  On November 16, 2024, the Freedom Lender Group served its First Plan Discovery Requests.  The Debtors responded on December 4, 2024, uniformly declining to provide plan-related discovery at that time on the ground that the discovery was "premature," and providing no further substantive responses to the Freedom Lender Group's requests.[46]  Despite repeated requests in prior correspondence and at the January 3, 2025 meet-and-confer, the Debtors have not amended these responses or finalized search terms for plan-related discovery.

36.     Before a confirmation hearing can be set, it is critical that the Freedom Lender Group get meaningful engagement from the Debtors on at least two categories of plan discovery: valuation and potential claims arising from the Debtors' prepetition transactions.  With respect to valuation discovery, if there is not a clearing sale transaction, the OpCo 1L Group Plan requires that the equity of FRG be canceled and receive no distribution.  If that happens, there will need to be a valuation trial.  The Freedom Lender Group will have the right to challenge the Debtors' assertions and prepare its own rebuttal valuation case to support its position.[47]

37.     Additionally, the Debtors have continued to assert that custodial searches and search terms are unnecessary for requests concerning the Take Private Transaction and other prepetition transactions.[48]  Accordingly, the Debtors have not searched for (much less produced) a single email in connection with those transactions.  This position is indefensible, and it makes

---

[46]    *See* Debtors' Initial Response, Nos. 1-31.

[47]    The Debtors do not intend do provide a valuation analysis, which is a problem unto itself, as addressed in Section III.A below.

[48]    This constitutes a violation of the Local Rules.  *See* Del. Bankr. L.R. 7026-3(e) ("The parties shall confer and in good faith attempt to reach agreement as to the method of searching, and the words, terms, and phrases to be searched with the assistance of the respective e-discovery liaisons, who are charged with familiarity with the parties' respective systems.").

it impossible for the Freedom Lender Group (or any other creditor or creditor constituency) to assess potential claims arising from these transactions.  Additionally, the Debtors have refused to produce the documents shared with Akin and Petrillo with respect to the ongoing investigations.  Therefore, the Debtors are refusing to produce the documents that will form the basis for the Debtors' and their independent directors' decisions regarding (i) what claims and causes of action exist and (ii) the purported value of those claims and causes of action.  The Debtors have refused to produce these documents on the grounds that doing so would require a privilege review.  That is not a valid basis for withholding the documents that underpin what is likely to be the entire recovery (if any) to the HoldCo Debtors' creditors.  Without these documents, the Freedom Lender Group will have no ability to challenge the Debtors' and independent directors' determinations, which the Debtors will rely on in determining the recoveries afforded to creditors of the HoldCo Debtors.  That is a violation of due process that this Court cannot let stand.

38.     Despite the fact that the Freedom Lender Group served plan discovery in the second week of these Chapter 11 Cases, the only plan-related document production that the Debtors have made occurred on December 27, 2024.  This production included a limited set of 675 non-custodial documents, leaving the majority of the Freedom Lender Group's months-old requests unaddressed and not a single plan-related email produced.

39.     Because the Debtors have dragged their feet and failed to meet their discovery obligations, the Freedom Lender Group and other creditors would have barely four weeks from the hearing on the Disclosure Statement to prepare confirmation objections, with virtually no plan-related discovery having been produced to date and many relevant searches (such as searches related to historical transactions and documents provided to Petrillo and Mr. Wartell) apparently

having not been started.  Any objection the Freedom Lender Group may make regarding valuation, and any rebuttal valuation case it may present, can only be done following discovery. The Freedom Lender Group will need to review documents relevant to valuation and the Debtors' business plan, which is the foundation for a discounted cash flow analysis and comparable companies evaluation.  The parties will need to exchange expert valuation reports and rebuttal reports.  The parties will need to take fact and expert depositions.  Only then, based on this discovery, can the Freedom Lender Group prepare its confirmation objection.  To date, the Debtors have not produced a single email regarding valuation, nor have they provided substantive responses to the Freedom Lender Group's long-outstanding discovery requests that would allow a valuation discovery process to move forward.  With regard to claims and causes of action, the Freedom Lender Group will need to review, at minimum, the documents provided to Petrillo and Mr. Wartell that will inform the basis for their determinations—something the Debtors have thus far refused to provide—and then conduct depositions (including third party depositions) to form an assessment of the claims and their viability.

40.    Forcing the Freedom Lender Group to litigate confirmation without adequate time to review and process documents and information, prepare expert reports, and conduct fact and expert depositions is prejudicial.  The Debtors have offered no justification for rushing this process, which they have delayed to the point that their proposed schedule is unworkable.

41.    In addition, despite the Debtors' position on the record at the hearing on December 17, 2024, the Freedom Lender Group has received no outreach from the Debtors regarding further plan negotiations.  On the contrary, the amended OpCo 1L Group Plan filed by the Debtors reflected zero input from the Freedom Lender Group, despite the Freedom Lender Group representing 93% of the creditor groups affected by the changes therein.  This strategy stands in

direct opposition to the Debtors' stated intent to bring *all* parties to the table to resolve plan disputes.  The Court should not countenance the Debtors' attempt to silence dissenting creditors with inadequate time and information.  Instead, the Court should extend the current timeline to provide the parties with time for meaningful negotiation, which could facilitate a consensual resolution of outstanding issues and result in less expense and time-consuming confirmation litigation.

42.      Accordingly, the Freedom Lender Group submits that the timeline proposed by the Debtors should be modified such that parties are given at least 45 days after completion of document discovery before being required to object to confirmation so they can analyze the documents, take depositions, and prepare their arguments.

### III.    The Disclosure Statement Lacks Adequate Information Necessary for Evaluation of the OpCo 1L Group Plan

43.      Under section 1125(b) of the Bankruptcy Code, a debtor has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to reach an informed judgement about the plan.  *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).  The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail . . . that would enable . . . a hypothetical investor . . . to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  In essence, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *In re Ferretti,* 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  For the reasons set forth below, the Disclosure Statement does not provide stakeholders with adequate information to determine whether to vote on the OpCo 1L Group Plan.

A.      **Failure to Provide Valuation Analysis**

44.      The Debtors have not filed a valuation analysis and state in their Disclosure Statement that they do not intend to.  They cite to section 1125(b) of the Bankruptcy Code to justify this, which states: "The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."  As legislative history to section 1125(b) makes clear, the word "may" means that the determination as to whether a valuation analysis is required is dependent on the facts and circumstances of the case at hand.  *See* House Report No. 95-595, 95th Cong., 1st Sess. 408 (1977) ("The subsection permits approval of the statement without the necessity of a valuation of the debtor or an appraisal of the debtor's assets.  However, in some cases, a valuation or appraisal will be necessary to develop adequate information.  The court will be able to determine what is necessary in light of the facts and circumstances off each particular case."); Senate Report No. 95-595, 95th Cong., 2d Sess. 120 (1978) ("As under present law, determinations of value, by appraisal or otherwise, are not required if not needed to accomplish the purpose specified in [Section 1125(a)]."

45.      The Debtors, however, would have this Court believe that section 1125(b) stands for the proposition that a valuation analysis is never required for approval of a disclosure statement.  That is simply not the case.  Courts routinely find that a valuation analysis is required to provide adequate information, particularly where the debtor's plan necessarily takes a position on the value of its assets.   For example, in *In re East Redley Corp.*, the court held that, in a case where the debtor was taking a position that property exceeded a set value, the debtor was required to provide a valuation analysis in order for its disclosure statement to be approved.  16 B.R. 429, 430 (Bankr. E.D. Pa. 1982); *see also, e.g., In re Fierman*, 21 B.R. 314, 315 (Bankr. E.D. Pa. 1982) (denying approval of disclosure statement that provided no factual basis for the purported value of the debtor's property); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y.

1988) (denying approval of disclosure statement that did not include a true valuation and was premised on a "speculative sale"); *In re Metrocraft Pub. Serv., Inc.*, 39 B.R. 567, 570 (Bankr. N.D. Ga. 1984) (denying approval of disclosure statement and finding that "[a]bsent a valuation of the assets … the disclosure statement does not provide adequate information as required by the Bankruptcy Code").

46.    The only case the Debtors cite to excuse their failure to include a valuation analysis, *LBI Media*, is only an order approving a disclosure statement that did not include a valuation analysis – not an analysis of section 1125 of the Bankruptcy Code.    Moreover, "[a]dequate information" under section 1125 is "determined by the facts and circumstances of each case." *In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417-18 (3d Cir. 1988).    Whether a valuation analysis was not required for approval of a disclosure statement in another case has no bearing on whether it is necessary here.

47.    In this case, it is indisputably essential to have a valuation to confirm the OpCo 1L Group Plan, which seeks to equitize the debt under the OpCo 1L Term Facility.    For that to be legally tenable, the Debtors must prove that the reorganized equity distributed to the OpCo 1L Term Lenders, combined with any other distribution provided to them, does not exceed the amount of their prepetition claims.    That is because section 1129(b) prevents a creditor from receiving payment in excess of the full value of its claim, which is also known as the corollary to the absolute priority rule. *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claim . . . excess value must be allocated to junior classes."); *In re Exide Techs.*, 303 B.R. 48, 60-61 (Bankr. D. Del. 2003) ("A determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b). .

. Courts have decided that 'a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.'" (internal citations omitted)).  This is particularly at issue here because the recent modifications to the OpCo 1L Group Plan ensure that the OpCo 1L Term Lenders will receive 100% of the reorganized equity regardless of how much of their prepetition claims are paid off with proceeds of any Partial Sale Transactions that are consummated.

48.     This is why, in cases where a debtor's distribution of equity to senior creditors calls into question whether the plan is fair and equitable, the debtor must provide a valuation analysis to satisfy its burden under section 1129(b).  *See, e.g., In re Granite Broad Corp.*, 369 B.R. at 140-41 (holding that it was "necessary to determine a reasonable value for the Debtors in order to determine whether the Secured Creditors are receiving more than full payment" where junior creditors argued that an undervaluation of debtors' reorganized equity would provide senior creditors "with a recovery in excess of their allowed claims"); *In re Exide Techs.*, 303 B.R. at 62 (holding that "[a] determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b)" where creditors' committee argued that the plan would pay senior lenders "more than 100% of their claims to the detriment of the unsecured creditors").  Unsurprisingly, in both *In re Granite Broad Corp.* and *In re Exide Techs.*, the debtors filed their valuation analyses as exhibits to the disclosure statement.

49.     The OpCo 1L Group Plan expressly acknowledges this requirement, noting that "no Holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan)."[49]  Yet, without a valuation analysis, there is no way to determine whether the distributions made under

---

[49]   OpCo 1L Group Plan [Docket No. 654], § 7.1.

the OpCo 1L Group Plan will violate this provision.  Moreover, creditors, such as the members of the Freedom Lender Group, who are being deprived of any recovery cannot be expected to cast their vote without any evidence that they are not entitled to any excess value of reorganized equity.

50.     In order to determine whether this confirmation requirements is honored, parties in interest must understand the Debtors' position on value.  The results of the Debtors' sale process will not suffice if they do not lead to an actual transaction.  *See In re Exide Techs.*, 303 B.R. at 61 ("In determining the Debtor's value for purposes of deciding whether the Debtor's Plan is fair and equitable, it is appropriate to include the benefit of the Debtor's restructuring. Part of the purpose of this exercise is to determine whether the Debtor's intent to give common stock to the Prepetition Lenders results in paying the Prepetition Lender more than 100% of the value of their claims.  This requires a forward-looking valuation.").  A bid submitted in the Debtors' sale process is probative of nothing other than it is a price at which a party is willing to pay.  But if the Debtors are not willing to sell at that price, it is not "fair market value," and may in fact be a severe underbid to test the waters or merely obtain information.  This is particularly the case with respect to the sale process the Debtors are running, where potential bidders are given little time to conduct diligence and formulate bids (particularly if they require outside financing), are facing the prospect of a substantial credit bid by the OpCo 1L Term Lenders, and are provided with materials that do not reflect potential benefits that can be achieved in bankruptcy such as contract and lease rejections.[50]

51.     Therefore, the Disclosure Statement cannot be approved unless the Debtors file a valuation analysis or commit to provide one to parties in interest with sufficient time to assess

---

[50]     *See generally Objection of the Ad Hoc Group of Freedom Lenders to Debtors' Bidding Procedures Motion* [Docket No. 322].

and prepare their objection.  This is especially the case here given the complexity, as the Debtors have three separate, independent businesses, each of which must be valued individually and in a "sum of the parts" valuation.  And the stakes here are extremely high, as the Debtors are seeking to eliminate over $640 million of debt without providing its holders with any identifiable recovery.

52.    The Debtors argue in the Disclosure Statement that filing a valuation analysis would potentially upset their ongoing marketing process.  This argument does not track, as potential bidders with access to the Debtors' marketing materials have all the same financial data that the Debtors would base their valuation analysis on and can form their own view – otherwise, what would be the point of parties conducting diligence and bidding against each other?  It also is confusing that the Debtors are skittish about divulging their view of value while having no problem ascribing a minimum bid to each of the businesses they are selling in their bidding procedures, a similar indication of value.

**B.    Inadequate Disclosure Regarding the Treatment of Creditors of the HoldCo Debtors**

53.    The unlikelihood of sale proceeds reaching the HoldCo Debtors and total lack of clarity regarding whether the HoldCo Liquidation Trust will be formed fails to inform creditors of the HoldCo Debtors whether they are slated to receive *any* recovery under the OpCo 1L Group Plan.  Even if the Court is not inclined to rule that the OpCo 1L Group Plan is patently unconfirmable at this time, the lack of clarity as to whether creditors of the HoldCo Debtors will be impaired and whether their class will be relied on under section 1129(a)(8) of the Bankruptcy Code renders the Disclosure Statement insufficient. *See In re Copy Crafters Quickprint, Inc.*, 92 B.R. at 982 (denying approval of disclosure statement that failed to provide information regarding whether certain creditors' claims were actually impaired "and whether their acceptances will be

necessary pursuant to Code § 1129(a)(8)[, as t]his is the 'adequate information' that the entire creditor body has a right to know so that they can make informed choices with regard to voting").

### C.    Inadequate Information Regarding the Debtor Releases

54.    There are currently two investigations pending that the Debtors have initiated: one by Petrillo for potential claims the Debtors may have against third parties and another by Mr. Wartell for potential claims held by or against the HoldCo Debtors.  The relationship between these investigations and the Debtor Releases is unclear under the OpCo 1L Group Plan and the Disclosure Statement does nothing to remedy this confusion.  <u>First</u>, there is a question as to whether the investigations need to be concluded and their findings made public by a deadline in advance of confirmation.  If not, there is a clear disclosure deficiency.  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 321-22 (3d Cir. 2003) (holding that section 1125(a)(1) requires a debtor to disclose all "'legal and equitable' property interests," including "contingent assets [such] as any [potential] cause[s] of action" known to the debtor).  <u>Second</u>, there is uncertainty as to whether the identification of a claim or cause of action by Petrillo or Mr. Wartell necessarily means that such claim or cause of action is exempt from the Debtor Releases under the OpCo 1L Group Plan.  <u>Third</u>, if it is not automatic that claims and causes of action identified in an investigation are exempt from the Debtor Releases, it is unclear what the mechanism is for determining whether they would become exempt and what party would make that decision.  <u>Fourth</u>, there is no disclosure of what consideration is being given with respect to the released claims or the value of the claims being released.  The answers to these questions may well determine whether the OpCo 1L Group Plan is confirmable.  But in any event, voters should know what the answers to these questions are if the Disclosure Statement is to be approved.

**D.  Inadequate Disclosure Regarding HoldCo Liquidation Trust**

55.    The Disclosure Statement also fails to disclose adequate information regarding the HoldCo Liquidation Trust, which is likely the only potential source of recovery for creditors of the HoldCo Debtors.  The OpCo 1L Group Plan raises a number of questions with respect to the HoldCo Liquidation Trust, which the Disclosure Statement does nothing to resolve, including:

- Do the Debtors have the discretion to not create the HoldCo Liquidation Trust even if Mr. Wartell, as the independent director for the HoldCo Debtors, determines that the HoldCo Debtors have viable claims or causes of action?

- Do the Debtors need to make a determination as to whether the HoldCo Liquidation Trust will be formed in advance of the voting and objection deadline?

- Who will determine whether a trustee is appointed and, if so, who that trustee will be?

- Why are general unsecured creditors at the HoldCo Debtors (if any) receiving a "pro rata" share of the HoldCo Liquidation Trust (if one is created)?

- Who will have the power to determine whether to settle claims and causes of action in the HoldCo Liquidation Trust?

56.    Perhaps some of these questions will be answered in the HoldCo Liquidation Trust Agreement to be filed with the Plan Supplement.  If that is the case, the Debtors should at least be required to commit now to providing that information in the HoldCo Liquidation Trust Agreement.  Otherwise, there will remain insufficient disclosure regarding the mechanics of the HoldCo Liquidation Trust for creditors of the HoldCo Debtors to make an informed vote.

**E.  Inadequate Disclosure Regarding the HoldCo Debtors**

57.    The Disclosure Statement does not disclose any information regarding the HoldCo Debtors' determination to pursue the OpCo 1L Group Plan, including whether any board meetings were held at the HoldCo Debtor level to approve the proposal of the OpCo 1L Group Plan, what information was considered by the HoldCo Debtors' fiduciaries in determining to propose the OpCo 1L Group Plan, and on what basis the HoldCo Debtors' fiduciaries determined the OpCo

30

1L Group Plan was in the best interest of the HoldCo Debtors' estates.  Without such information, it is impossible for creditors to evaluate whether the OpCo 1L Group Plan was proposed in good faith, as required by section 1129(a)(3).  *See In re Tribune Co.*, 464 B.R. at 183 (explaining that a joint plan cannot satisfy section 1129(a)(3) "if only one or more – but fewer than all – debtors proposing a joint plan satisfies" the requirement).

## <u>RESERVATION OF RIGHTS</u>

58.     The Freedom Lender Group reserves all rights with respect to the Disclosure Statement Motion, the Disclosure Statement, and the OpCo 1L Group Plan, including the right to supplement or amend this Objection at or before the hearing and present evidence at such hearing on the Disclosure Statement Motion.  For the avoidance of doubt, the confirmation objections previewed herein shall not prejudice the Freedom Lender Group's right to supplement such arguments and raise additional confirmation objections at the appropriate time.

## <u>CONCLUSION</u>

59.     The Court should deny the Disclosure Statement Motion for the reasons stated herein.

Dated: January 8, 2025
      Wilmington, Delaware

/s/ Michael J. Farnan

**FARNAN LLP**
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: bfarnan@farnanlaw.com
       mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**
Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
      azatz@whitecase.com
      sam.hershey@whitecase.com
      erin.smith@whitecase.com
      brett.bakemeyer@whitecase.com

*Counsel to the Ad Hoc Group of Freedom
Lenders*