# Exhibit A

**FRANCHISE AGREEMENT**

**between**

BUDDY'S FRANCHISING AND LICENSING LLC

and

bb BHF Stores LLC
(Name of Franchisee)

Effective Date:

November 10, 2020
(To be completed by us)

# TABLE OF CONTENTS

1. DEFINITIONS ..................................................................................................................... 1

2. GRANT OF LICENSE ......................................................................................................... 3

3. TERM AND RENEWAL ...................................................................................................... 6

4. OUR OBLIGATIONS ........................................................................................................... 6

5. FEES, REPORTING AND AUDIT RIGHTS ....................................................................... 7

6. PREMISES STANDARDS AND MAINTENANCE ......................................................... 10

7. PERSONNEL AND SUPERVISION STANDARDS ........................................................ 12

8. YOUR OTHER OBLIGATIONS; NON-COMPETE COVENANTS; SECURITY INTEREST ..... 13

9. PRODUCTS AND OPERATIONS STANDARDS AND REQUIREMENTS ................... 16

10. TRADEMARKS ................................................................................................................. 22

11. CONFIDENTIAL INFORMATION, INNOVATIONS, COPYRIGHTS ......................... 23

12. MARKETING ..................................................................................................................... 24

13. TRANSFER OF FRANCHISE .......................................................................................... 26

14. DEFAULT AND TERMINATION .................................................................................... 29

15. POST-TERM OBLIGATIONS .......................................................................................... 31

16. DISPUTE RESOLUTION ................................................................................................. 33

17. GENERAL PROVISIONS ................................................................................................. 35

Exhibits

| | |
|---|---|
| A | Authorized Location and Territory |
| B | Ownership and Management |
| C | Electronic Transfer of Funds Authorization |
| D | Guarantee |
| E | Form of Lease Addendum |
| F | Signage Lease Agreement |
| G | Assignment of Telephone Numbers |
| H | Assignment of Domain Name and E-mail Address |
| I | State Addenda |

## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (the "**Agreement**") is made on this 10th day of November, 2020, by and between Buddy's Franchising and Licensing LLC, a Florida limited liability company having its principal place of business at 4705 S. Apopka Vineland Road, Suite 206, Orlando, Florida 32819 ("**we**," "**us**" or "**our**") and bb BHF Stores LLC ("**you**," or "**your**").

## RECITALS

A.    Our parent company, Buddy's Newco, LLC, owns a distinctive System (defined below) for the operation of rent-to-own (also referred to as "lease purchase") home furnishings, electronics and appliances businesses.

B.    We have the right to use and sublicense others to use the System and the BUDDY'S HOME FURNISHINGS® trademark and other trademarks, trade names, and commercial symbols (the "**Trademarks**" as defined below) in connection with the operation of BUDDY'S HOME FURNISHINGS retail businesses (the "**Buddy's Retail Businesses**") within the United States.

C.    You desire to obtain the right and we agree to grant you the right to develop and operate a Buddy's Retail Business using the System and the Trademarks, subject to the terms and conditions of this Agreement.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and consideration below, you and we agree as follows:

**1.    DEFINITIONS**

Capitalized terms used but not otherwise defined herein shall have the following meanings:

(a)    "**Approved Products and Services**" means the range, types and brands of household goods, consumer electronics, and consumer financial services associated with the BUDDY'S HOME FURNISHINGS brand which are specified in the Operations Manual as Core Products and Services or Optional Products and Services, or otherwise approved by us for sale in a Buddy's Retail Business.

(b)    "**Authorized Location**" means the location where you are authorized to operate your Retail Business (defined below) and which is set forth in Exhibit A.

(c)    "**Buddy's Retail Businesses**" means BUDDY'S HOME FURNISHINGS retail businesses developed and operated using the System and the Trademarks.

(d)    "**Competitive Business**" means any rent-to-own, rental purchase, lease purchase or other business that leases, rents, sells or distributes home furnishings, electronics or appliances through any channel, including, without limitation, business conducted by means of retail outlets, internet or direct marketing.

(e)    "**Confidential Information**" means all proprietary information, knowledge, know-how, drawings, technology, marketing plans, strategic plans, business techniques, methods of operation, procedures, supplies, computer systems and programs, the website, domain names and other online communications access and identification codes, data and statistics with respect to the System provided

by us or our affiliates in the ordinary course of business, in any form including the Operations Manual and the System Standards regardless of whether such are labeled confidential, proprietary or trade secret. Confidential Information does not include information which is already in the public domain.

(f)    "**Core Products and Services**" means the products and services that you are required to offer for sale in your Retail Business as further described in Section 9.

(g)    "**General Manager**" means the individual who personally devotes his or her full time and attention and devotes his or her best efforts to the on-premises general management of the day-to-day operations of your Retail Business, as further described in Section 7(a).

(h)    "**Gross Sales**" means all revenue that you receive or otherwise derive from operating your Retail Business, whether from cash, check, credit or debit card, gift card or gift certificate, or other credit transactions, and regardless of collection or when you actually provide the products or services in exchange for the revenue.  If you receive any proceeds from any business interruption insurance applicable to loss of revenue at your Retail Business, there will be added to Gross Sales an amount equal to the imputed gross revenue that the insurer used to calculate those proceeds.  Gross Sales does not include (1) any bona fide returns and credits that are actually provided to customers or (2) any sales or other taxes that you collect from customers and pay directly to the appropriate taxing authority.  You may not deduct payment provider fees (i.e., bank or credit card company fees and gift card vendor fees) from your Gross Sales calculation.

(i)    "**Lease Contract**" means an agreement between a customer and you and/or your Retail Business that provides for the renting or leasing of consumer products or services.

(j)    "**Owner**" means any person who directly or indirectly owns an interest in the franchise for your Retail Business, including the Principal Owner.

(k)    "**Operations Manual**" means any confidential operating manuals and other written materials (including materials provided online or through other electronic media) covering the proper operating and marketing techniques of Buddy's Retail Businesses and the standards and specifications for implementing the System.

(l)    "**Optional Products and Services**" means the products and services you may, at your option, offer for sale in your Retail Business, as further described in Section 9.

(m)    "**Principal Owner**" means any individual who directly or indirectly owns a 51% or greater interest in you if you are a corporation, limited liability company or a similar entity other than a partnership entity.  If you are a partnership entity, then each general partner is a Principal Owner, regardless of the percentage ownership interest.  If you are one or more individuals, each individual is a Principal Owner.  You must have at least one Principal Owner.  Your Principal Owner(s) is identified on the Ownership and Management Addendum attached to this Agreement at <u>Exhibit B</u>.  As used in this Agreement, any reference to Principal Owner includes all Principal Owners.

(n)    "**System**" means the then-current distinctive system, including the Trademarks, System Standards, Operations Manual and other confidential information, developed and owned by or licensed to us for the development, construction and operation of Buddy's Home Furnishings retail outlets which offer high quality consumer goods and associated consumer financial services.

(o)    "**System Standards**" means the then-current standards, requirements and specifications for the development, construction and operation of Buddy's Retail Businesses, including standards related

to design, construction, signage, fixtures, equipment, use of the Trademarks, business techniques, methods of operation, procedures, products, service, marketing, advertising, sales promotion programs, communications, credit policies, personnel, training, purchasing and other standards, requirements and specifications contained in the Operations Manual.

(p)     "**Trademarks**" means certain trade names, service marks, trademarks, logos, emblems and indicia of origin as are now designated and may be designated and changed in the future by us in writing for use in connection with the System, including the trademark "BUDDY'S HOME FURNISHINGS" and other commercial symbols.  Trademarks also means the trade dress, which includes the designs, color schemes and image we authorize you to use in the operation of Buddy's Retail Businesses from time to time.

(q)     "**Territory**" means the geographic area specified on Exhibit A.  The Territory assigned to you may border and/or overlap with the customer base of a territory assigned to another System franchisee, as further described in Section 2.

(r)     "**Website**" means an interactive electronic document, series of symbols or otherwise that is contained in a network of computers linked by communications software.  The term Website includes, but is not limited to, Internet and World Wide Web home pages.

## 2.    GRANT OF LICENSE

(a)     *Grant and Acceptance.*  Upon the terms and conditions set forth in this Agreement, we hereby grant to you the right and license to establish and operate one Buddy's Retail Business at the Authorized Location (your "**Retail Business**"), which must be located in the Territory.  You hereby accept said license and undertake the obligation to operate your Retail Business faithfully, honestly and diligently, using the System in compliance with the System Standards.

(b)     *Your Rights.*  During the term of this Agreement and provided that you are in compliance with the terms and conditions of this Agreement, we will not (i) modify the Territory without your written permission, or (ii) establish either a company-owned or franchised Buddy's Retail Business location within the Territory under the Trademarks, except as may be permitted under Sections 2(e) or 2(f).

(c)     *Restrictions on Your Rights.*  The license granted herein is limited to the right to operate your Retail Business at the Authorized Location and you may not:

(i)     sell products or services identified by the Trademarks through any other channels or methods of distribution (including the Internet or any other form of electronic commerce) or to any other person or entity for resale or further distribution;

(ii)    subfranchise, sublicense, assign or transfer the rights under this Agreement, except as specifically provided in Section 13; or

(iii)   use your Retail Business' premises or any part of your Retail Business' premises for any purpose other than your Retail Business established pursuant to this Agreement.

(d)     *Our Retention of Rights.*  You acknowledge and agree that we and our affiliates retain all rights not expressly granted to you under this Agreement and that we or our affiliates may, among other things, on any terms and conditions we deem advisable:

(i)    operate and grant to others the right to operate Buddy's Retail Businesses at any location outside the Territory regardless of the proximity of such Buddy's Retail Businesses to the Territory;

(ii)    operate and grant to others the right to operate retail businesses or any other business, other than Competitive Businesses, at any location (including within the Territory) that operate under any trademarks, service marks or trade dress (including the Trademarks) and pursuant to such terms and conditions as we deem appropriate;

(iii)    solicit and sell products or services to customers and prospective customers residing within the Territory, including without limitation by catalog, direct advertising over the Internet or other electronic means;

(iv)    merge with, acquire, establish or become associated with any businesses or locations of any kind under other systems and/or other marks, which businesses and locations may offer or sell items, products and services that are the same as or similar to the Approved Products and Services offered at or from your Retail Business and which may be located anywhere within or outside the Territory.  Except as provided in Sections 2(e) and 2(f) below, we may not grant a Competitive Business the right to use the Trademarks at a location in the Territory; and

(v)    engage in any other business activities not expressly prohibited by this Agreement, both within and outside the Territory.

(e)    *Conversion of Non-System Store.*  If we or any of our affiliates acquires any store operating under different trademarks that sells or leases the same, similar or different products and services as those offered and sold by Buddy's Retail Businesses (each a "**Non-System Store**") within the Territory and we and/or our affiliates desire to convert such Non-System Store to a Buddy's Retail Business operating under the Trademarks, we shall deliver to you a written notice of such intent to convert (each, a "**Conversion Notice**").  Provided that you are in compliance with all of the provisions of this Agreement and no default, or event which with the giving of notice or passage of time or both would become a default, exists under this Agreement or any other agreement between you and us, you shall have the option, exercisable within 30 days after receipt of such Conversion Notice, to purchase the Non-System Store and convert it to a Buddy's Retail Business operating under the Trademarks by notifying us in writing.  If you elect to purchase and convert the Non-System Store, you must consummate such purchase and execute our then-current franchise agreement and pay our then-current initial franchise fee (or, at our option, execute an amendment to this Agreement and pay our then-current initial franchise fee) within 30 days from the date of your notice to us of your election to purchase and convert.  If we or our affiliate purchased the Non-System Store during the 180 days prior to our delivery of the Conversion Notice to you, the purchase price to be paid by you shall be the cash equivalent of the consideration paid by us or our affiliate for the Non-System Store (or, if we or our affiliate purchased the Non-System Store in a transaction which was for more than one Non-System Store, the cash equivalent of our or our affiliate's proportionate per store cost, as determined by us or our affiliate in our or its sole discretion).  In addition to the purchase price payable under this Section 2(e), you shall reimburse us or our affiliate for the costs and expenses incurred by us or our affiliate in connection with the acquisition of the Non-System Store (prorated if the Non-System Store was acquired as part of a multiple store purchase).  You acknowledge that the value of the Non-System Store may diminish during the 180-day period after our or our affiliate's acquisition of the Non-System Store.  If we or our affiliate did not purchase the Non-System Store during the 180 days prior to delivery of the Conversion Notice, the purchase price, which shall be paid in cash, will be the fair market value of the Non-System Store.  If the parties cannot agree on

fair market value within a reasonable time, such fair market value shall be determined by two independent appraisers, one of whom shall be chosen by us or our affiliate and the other of whom shall be chosen by you. If such appraisers cannot agree on such fair market value, they shall jointly choose a third independent appraiser whose decision shall be final and binding. Each party shall bear the cost for its chosen appraiser, and the cost for a third appraiser, if any, shall be shared equally between you and us or our affiliate. If you do not elect to purchase and convert the Non-System Store, we may convert and operate, or license a third party to convert and operate, the Non-System Store as a Buddy's Retail Business operating under the Trademarks, without incurring any liability to you.

(f)    *Satellite Location in the Territory*. "Satellite Location" means a Buddy's Retail Business (i) located in an existing business pursuant to a Strategic Relationship (defined below) or (ii) cobranded with a business pursuant to a Strategic Relationship. Satellite Locations operate under the System and Trademarks. You must open in the Territory any Satellite Location as we may determine, in our sole discretion, to satisfy national/regional accounts, agreements or relationships we may establish from time to time in our discretion ("**Strategic Relationships**"). In the event we determine that you must open a Satellite Location in the Territory from which you must operate your Retail Business, we will send you written notice setting forth the specifics of the Satellite Location required by the Strategic Relationship. You must provide us with written notice of your intent to open such Satellite Location within 30 days from the date of our written notice and commence operating the Satellite Location within the timeframe required by the Strategic Relationships (which timeframe shall allow for a reasonable period to commence operating the Satellite Location given the specifics of the situation). If you fail to timely (in accordance with this Section) provide us with written notice of your intent to open any Satellite Location required under any Strategic Relationship or if you fail to timely commence operation of your Retail Business at any Satellite Location you have committed to open under this Section 2(f), we may operate or grant to others the right to operate the Satellite Location in the Territory as required under such Strategic Relationship, without incurring any liability to you.

(g)    *Business Entity Franchisee*. If you are a business entity or association including, but not limited to, a corporation, limited liability company or general or limited partnership (collectively, an "**Entity**"), you agree and represent that:

(i)    You have the authority to execute, deliver and perform your obligations under this Agreement and all related agreements, and you are duly organized or formed and are validly existing in good standing under the laws of the state of your formation;

(ii)    Your organizational documents (including, but not limited to, your bylaws, operating agreement or partnership agreement, as applicable) will recite that this Agreement restricts the issuance and transfer of any equity interests in you, and all certificates and other documents that represent equity interests in you will bear a legend referring to this Agreement's restrictions;

(iii)    Exhibit B to this Agreement completely and accurately describes all of your owners and their interests in you as of the Effective Date. Subject to our rights and your obligations under Section 13, you and your owners agree to update and deliver to us revised Exhibits B to reflect any permitted changes in the information that Exhibit B now contains; and

(iv)    Your development and operation of Buddy's Retail Businesses will be the only business you operate (although your owners may have other, non-competitive business interests).

3.      **TERM AND RENEWAL**

(a)      *Term.*  The initial term of this Agreement is 10 years (the "**Term**"), commencing on the Effective Date. You agree to operate your Buddy's Retail Business  in compliance with this Agreement for the entire Term unless this Agreement is properly terminated under Section 14.

(b)      *Renewal.*  You will have the right to renew this Agreement, at the expiration of the Term, for an additional successive term of 10 years, commencing immediately upon the expiration of this Agreement, provided that:

(i)      you provide us with written notice of your intent to renew at least 12 months, but no more than 18 months, prior to the expiration of the Term;

(ii)      you are not in default of this Agreement and have substantially complied with all the provisions of this Agreement and any other agreement between us and you;

(iii)      you have satisfied, prior to renewal, all monetary obligations owed by you to us, our affiliates or your suppliers or creditors, whether pursuant to this Agreement or otherwise;

(iv)      you are able to maintain possession of the premises or obtain possession of mutually agreeable alternate premises for your Retail Business for the duration of the renewal term and have agreed, in writing, to make such capital expenditures necessary to refurbish, replace and modernize your Retail Business so that it will conform to our then-current standards for Buddy's Retail Businesses;

(v)      you pay us a renewal fee of $2,000;

(vi)      you execute our then-current form of Franchise Agreement, which may contain terms and conditions substantially different from those set forth in this Agreement;

(vii)      you comply with our then-current qualification, accreditation and training requirements, undertaking any training, assessments or examinations (including training for all communications systems including the Computer System) and comply with all of our other requirements applying to new System franchisees;

(viii)      you reimburse to us all of our costs and expenses reasonably incurred as part of the renewal process; and

(ix)      you and your Principal Owners and Guarantors execute a general release of claims in the form we prescribe.

4.      **OUR OBLIGATIONS**

(a)      Subject to your continuing compliance with the terms of this Agreement, we will:

(i)      grant you access to the Operations Manual;

(ii)      provide the initial training program in accordance with Section 8(b);

(iii)    provide site selection and build-out assistance in accordance with Section 6(a) or 6(d);

(iv)    provide pre-grand opening advice and procedural assistance, upon your request, at a time and location of our choice, at least 30 days before opening;

(v)    specify a list of products that are Approved Products and Services and approved supplies in accordance with Section 9(b);

(vi)    establish and administer the Marketing Fund in accordance with Section 12(b); and

(vii)    conduct from time to time such general advertising, marketing or promotion of the System as we consider appropriate.

(b)    *Solicited Assistance.*   We may make available to you, from time to time retail, management, technology, accounting and administrative services.  These services will be provided on a fee for service or usage basis.  You agree to pay us the designated price for any such optional services you select.  You must execute any agreements we require in connection with optional services we provide.

(c)    *Visits.*  We or our representative, may make periodic visits to your Retail Business for the purposes of providing consultation, assistance, and guidance to you in all aspects of the operation and management of your Retail Business.  We, or our representatives, who visit your Retail Business may prepare, for the benefit of both us and you, written reports with respect to such visits outlining any suggested changes or improvements in the operations of your Retail Business and detailing any defaults in such operations which become evident as a result of any such visit.  Failure by you to implement the improvements and suggested changes detailed in such a report will be considered a default under Section 14(b)(i).

## 5.    FEES, REPORTING AND AUDIT RIGHTS

(a)    *Initial Franchise Fee.*  In consideration for the grant of license under this Agreement, you must pay to us an initial franchise fee (the "**Initial Franchise Fee**") in the amount of $0.  The Initial Franchise Fee is due and payable in lump sum upon execution of this Agreement and is fully earned and non-refundable upon receipt.

(b)    *Royalty Fee.*  In addition to the Initial Franchise Fee and in consideration of the rights granted to you, you must pay to us a royalty fee (the "**Royalty Fee**").  You will not have to pay the Royalty Fee during the first 6 months after your Retail Business commences operations.  Commencing the 7th month after your Retail Business commences operations through the remainder of the Term, you must pay us a Royalty Fee in the amount of 6% of Gross Sales of your Retail Business.  For purposes of calculating months in the previous sentence, the first month shall be the month your Retail Business commences operations regardless of the date in such month you commence operations.  Royalty Fees must be paid weekly in accordance with the provisions of Sections 5(d) and 5(e) below.

(c)    *Marketing Fee.*  You must pay to us a weekly marketing fund contribution in the amount we prescribe from time to time (the "**Marketing Fee**").  The Marketing Fee will not exceed the lesser of $15,000 per year or 2% of your annual Gross Sales.  Marketing Fees must be paid in accordance with the provisions of Sections 5(d) and 5(e) below.

(d)    *Computations and Remittances.*  You must pay the Royalty Fee, Marketing Fee and any other recurring payment to us weekly as follows:

(i)    Each Sunday, we shall compute your Gross Sales for the period beginning at midnight on the preceding Sunday and ending at midnight on the Saturday after such preceding Sunday.

(ii)    Before 12:00 p.m. local time in Orlando, Florida on the next business day after we make the computation in Section 5(d)(i) above, we shall notify you of the amount of Gross Sales computed by us.

(iii)    After 2:00 p.m. local time in Orlando, Florida on the next business day after you are notified of the amount of our computation, we will withdraw pursuant to Section 5(e), from an account maintained by you and which permits direct withdrawals by us, all Royalty Fees, Marketing Fees and any other recurring payments due under this Agreement based on the Gross Sales computed by Franchisor and based on the agreements between you and us and/or our affiliates.  You must maintain a sufficient amount of funds in such account to allow permitted withdrawals by us.

(iv)    If we are unable to calculate any fees or other amounts due to us and our affiliates, as provided in this Section 5(d), whether as a result of your failure to make the necessary information available to us, communications failures, force majeure or otherwise, we may estimate the amount of fees due and may make a corresponding withdrawal from your account.  If we overestimate the amount of fees due from you, then you shall receive a credit for the overestimated amount against future fees when such amount has been determined.  If we have underestimated the amount of fees due from you, then we shall be authorized to withdraw the amount of the underpayment from your account immediately upon such determination.

If you give a cash refund or credit to any customer, which refund or credit is for an amount previously included in Gross Sales upon which we have withdrawn Royalty Fees and Marketing Fees from your account, you shall promptly enter the amount of such refund or credit into the Computer System.  We will deduct the amount of each such refund or credit from our first computation of Gross Sales which occurs after you enter the amount of such refund or credit into the Computer System.

If any amount of Gross Sales upon which we have withdrawn fees from your account is subsequently uncollected by you, you shall promptly enter such uncollected amount into the Computer System.  We shall deduct each such uncollected amount from our first computation of Gross Sales that occurs after you have entered such uncollected amount into the Computer System.  If any amount entered into the Computer System by you as uncollected is subsequently collected by you, you shall promptly enter such amount into the Computer System, and we shall add such amount to our first computation of Gross Sales which occurs after you have entered such amount into the Computer System.

If any dispute arises as to the amount of any payment or fee withdrawn by us from your account, our books and records shall be treated as conclusive evidence of the correct amount, except to the extent that either we or you can show a clear error in our computation.  The amounts set forth in our books and records with respect to each withdrawal shall be final and binding, unless either we or you notify the other in writing of any objection to the amount of such withdrawal no later than 30 days after such withdrawal.  You and we shall promptly make all reasonable efforts to resolve any such dispute within a reasonable time after such notification.

(e)    *Electronic Transfer of Funds.*    You must sign an electronic transfer of funds authorization, the current form of which is attached as <u>Exhibit C</u>, and such other documents as we designate from time to time, to authorize and direct your bank or financial institution to transfer either electronically or through some other method of payment designated by us to transfer electronically directly to our account or our affiliates' and to charge to your account all amounts due to us or our affiliates.  Your authorizations must permit us and our affiliates to designate the amount to be transferred from your account.  You must maintain a balance in your account sufficient to allow us and our affiliates to collect the amounts owed when due.  You are responsible for any penalties, fines, fees or other similar expenses associated with the transfer of funds described in this Section.

(f)    *Interest Charges; Late Fees*.  Any and all amounts that you owe to us or to our affiliates will bear interest at the rate of 18% per annum or the maximum contract rate of interest permitted by governing law, whichever is less, from and after the date of accrual.  In addition to interest charges on late Royalty Fee and Marketing Fee payments, you must pay to us a service charge of $100 for each delinquent report or payment that you owe to us under this Agreement.  A payment is delinquent for any of the following reasons: (i) we do not receive the payment on or before the date due; or (ii) there are insufficient funds in your account to collect the total payment by a transfer of funds on or after the date due.   The service charge is not interest or a penalty; it is only to compensate us for increased administrative and management costs due to late payment.

(g)    *No Subordination.*  You may not subordinate to any other obligation your obligation to pay us the royalties or any other fee or charge payable to us, whether under this Agreement or otherwise.

(h)    *Books and Records.*  You must maintain and preserve for the time period specified in the Operations Manual full, complete, and accurate books, records, and accounts in accordance with the standard accounting system prescribed by us in the Operations Manual or otherwise in writing.  We have the right to require submission of any reports electronically via the Computer System and, as described in Section 9(n), we have the right at any time to retrieve and use any data and information from the Computer System that we deem necessary or desirable.

(i)    *Daily and Monthly Reporting Obligation.*  Each day you must enter into the Computer System all transactions related to your Retail Business, including the amount of Gross Sales and gross receipts of your Retail Business and the amount of sales tax.  You must submit to us, on or before the 10th day of each calendar month, a monthly report in the form we periodically prescribe. The monthly report will include, but will not be limited to, the following information for the previous month: (i) an accurate list of names, addresses and contact details of all your suppliers, (ii) a report of all customer information collected in connection with the customer loyalty program; and (iii) a detailed profit and loss statement within 60 days of the end of each month.

(j)    *Additional Reports.*  You also must, at your expense, submit to us within 90 days after the end of each fiscal year a detailed balance sheet, profit and loss statement and statement of cash flows for such fiscal year, prepared in accordance with generally accepted accounting principles.  We may require that the annual financial statements be reviewed by a certified public accountant.  You must certify that all reports are true and correct.  You acknowledge and agree that we have the right to impose these requirements on you regardless of whether we impose the same requirement on our other System franchisees.

(k)    *Right to Inspect and Audit.*  We or our authorized representatives have the right at all times during the business day to enter the premises where your books and records relative to your Retail Business are kept and to evaluate, copy and audit such books and records.  We also have the right to

request information from your suppliers and vendors. In the event that any such evaluation or audit reveals any understatement of your Gross Sales, you must pay for the audit, and in addition to any other rights we may have, we have the right to conduct further periodic audits and evaluations of your books and records as we reasonably deem necessary for up to two years thereafter. Any such further audits and examinations will be at your sole expense, including any professional fees, travel and room and board expenses we incur related thereto. Furthermore, if you intentionally understate or underreport Gross Sales at any time or a subsequent audit or evaluation conducted within the two-year period reveals any understatement of your Gross Sales by 2% or more, in addition to any other remedies provided in this Agreement, we have the right to terminate this Agreement immediately. In order to verify the information that you supply, we have the right to reconstruct your sales through the inventory extension method or any other reasonable method of analyzing and reconstructing sales. You agree to accept any such reconstruction of sales unless you provide evidence in a form satisfactory to us of your sales within 14 days of the date of our notice of understatement or variance.

## 6.    PREMISES STANDARDS AND MAINTENANCE

(a)    *Site Selection.* You are responsible for leasing or purchasing a site that meets our site selection guidelines and subject to the terms and conditions of this Section 6. You must complete and submit our site selection survey, included in <u>Exhibit A</u>. We must consent to the site in writing and, upon obtaining our consent, the location will become the Authorized Location and included on <u>Exhibit A</u>. We make no guarantees concerning the success of your Retail Business located at any site to which we consent.

(b)    *Opening.* You may not open your Retail Business for business until we have notified you in writing that you have satisfied your pre-opening obligations as set forth in Sections 6(c) and 6(d) and we have approved your opening date. Your Retail Business must be open and operating within 270 days of the Effective Date and within 150 days after the date the Authorized Location is designated unless we authorize in writing an extension of time. We are not responsible or liable for any pre-opening obligations, losses or expenses you might incur for your failure to comply with these obligations or your failure to open by a particular date. If we determine, in our sole discretion, that you in good faith have used, and are continuing to use, your best efforts to open and commence operations of your Retail Business within the time periods required under this Section, then upon your written request, and execution of the authorization form required under Section 5(e), we may permit you to extend, for up to 24 months, the date by which you must open and commence operating your Retail Business. We are not obligated to extend the opening date. You must (i) make your written request for an extension before the expiration of the missed required opening date and (ii) have paid the entire Initial Franchise Fee. Only then will you be eligible for the extension program which consists of monthly withdrawals by us from your account (in accordance with Sections 5(d) and 5(e)) per the following schedule: $500 per month for each of the first 12 months of any extension, $1,500 per month for months 13-18 of any extension, then $2,500 per month for months 19-25 of any extension. The monthly extension fees due under this Section shall be drafted from the account specified in such withdrawal authorization form until your Retail Business opens. The monthly extension fees paid under this Section shall not be refunded under any circumstances and shall not be credited against any fee payable to us. Notwithstanding the foregoing, if we grant you any extension under this Section and we subsequently determine, in our sole reasonable discretion, that you are not using your best efforts to open and commence operations of your Retail Business within a reasonable period of time following the date of our grant of an extension, we may terminate the extension grant to you. The termination of any extension grant shall be deemed a default for purposes of this Agreement.

(c)    *Lease from third-party*.  If a third-party will grant a lease or sublease for the premises of the Authorized Location, you must obtain our approval of the lease, and you and the landlord must execute a lease addendum in the form attached as <u>Exhibit E</u>.

(d)    *Pre-Opening Build Out.*  Subject to Section 6(e), you agree that, promptly after obtaining occupancy of the Authorized Location, you must meet the following build out requirements:

       (i)    you must construct, build out and equip your Retail Business in compliance with our current approved specifications and standards pertaining to equipment, inventory, signage, fixtures, furnishings, accessory features and design and layout;

       (ii)    you must have prepared and submitted for our approval a site survey and basic architectural plans and specifications consistent with our general atmosphere, image and color scheme requirements as set forth in the Operations Manual;

       (iii)    you may not commence build out and construction of your Retail Business until you have received our written consent to your construction plans;

       (iv)    you must obtain all required zoning permits, all required building, utility, health, sign permits and licenses, and any other required permits and licenses;

       (v)    you must comply with all applicable legal requirements relating to the building, signs, equipment and premises, including but not limited to, compliance with the Americans with Disabilities Act;

       (vi)    you must use contractors approved by us for all construction, equipment installation and build out;

       (vii)    you must obtain all customary contractors' sworn statements and partial and final waivers of lien for construction, remodeling, decorating and installation services; and

       (viii)    if you fail to complete the requirements of all of the provisions of this Section 6(d) within the required timeframe for opening your Retail Business (unless extended pursuant to Section 6(b)), you will be in default pursuant to Section 14(b)(i).

(e)    *Future Alteration*.  Any change to the building plans or any replacement, reconstruction, addition or modification in the building, interior or exterior décor or image, equipment or signage of your Retail Business to be made after our consent is granted for initial plans, whether at the request of you, us or a third party may be made only with our prior written consent.  You may not commence such replacement, reconstruction, addition or modification until you have received our written consent to your revised plans.

(f)    *Maintenance*.  The building, equipment, fixtures, furnishings, signage and trade dress (including the interior and exterior appearance) employed in the operation of your Retail Business must be maintained and refreshed in accordance with our requirements established periodically and any of our reasonable schedules prepared based upon our periodic evaluations of the premises.  Within a period of 30 to 60 days (as we determine depending on the work needed) after the receipt of a report prepared following an evaluation, you must complete the items of maintenance we designate, including the repair of defective items and the replacement of irreparable or obsolete items of equipment and signage.  If,

however, any condition presents a threat to customers or public health or safety, you must complete the items of maintenance immediately, as further described in Section 9(k).  If you fail to complete the require maintenance, we reserve the right to do so on your behalf and you must reimburse us for our costs and expenses.

(g)  *Relocation*.  You may not relocate your Retail Business without our prior written consent.  Should it become necessary to relocate your Retail Business on account of condemnation, destruction or expiration or cancellation of your lease for reasons other than your breach, we will grant you authority to do so at a site acceptable to us that is within the Territory, is reasonably suited for a Buddy's Retail Business, does not infringe on the rights of any other System franchisee, and is reasonably distant from other Buddy's Retail Businesses provided that (i) your new Retail Business is open and operating within 120 days after your discontinuing operation of your Retail Business at the Authorized Location, all in accordance with our current standards at that time, and (ii) you reimburse us for our costs and expenses incurred in connection with the relocation (including legal fees and time spent by our employees).

(h)  *Modernization or Replacement*.  From time to time as we require, you must effect items of modernization or replacement of the building, premises, trade dress, trade fixtures, flooring, equipment and grounds as may be necessary for your Retail Business to conform to the standards for similarly situated new Buddy's Retail Businesses.  Furthermore, in addition to performing general, continued maintenance and refreshing of the premises when necessary in accordance with Section 6(f), you must effect any required expenditures for equipment or leasehold improvements necessary to prepare new product offerings.  You acknowledge and agree that the requirements of this Section are both reasonable and necessary to ensure continued public acceptance and patronage of Buddy's Retail Businesses and to avoid deterioration in connection with the operation of your Retail Business.  If you fail to make any improvement or comply with our standards, we may, in addition to our other rights in this Agreement, effect such improvement or maintenance on your behalf and you must reimburse us for the costs we incur.

## 7.  PERSONNEL AND SUPERVISION STANDARDS

(a)  *Supervision of the Business*.  You may operate your Retail Business with a General Manager who is not the Principal Owner only with our express written permission.  Your Retail Business must at all times be under the direct supervision of the General Manager who is identified on <u>Exhibit B</u>.  Any individual who will serve as your General Manager must satisfy any requirements or qualification we establish for general managers under the System and attend and complete any training program we require for general managers.  You also must submit an updated <u>Exhibit B</u>.  During any absence of your General Manager, your Retail Business must be under the direct, on-premises supervision of a fully-trained manager who meets our qualifications for supervision of your Retail Business.  You must replace any General Manager who does not meet our qualifications for a general manager under the System or who we deem is ineffective to directly supervise your Retail Business.

(b)  *Training*.  Prior to commencement of your Retail Business at least two individuals, including your General Manager and such other individuals we designate, must attend and successfully complete our training program at a place we designate.  You are responsible for all room, board and travel expenses you incur during training.  You understand that you may not open or operate your Retail Business until and unless you successfully complete the initial training program.  Failure by you, your General Manager or any other individual designated under this Section to complete the training program to our satisfaction will constitute a default under Section 14(b).

(c)  *Ongoing Training*.  We may provide and require your Principal Owner, General Manager and your other employees as we designate to attend ongoing training not to exceed 10 days per year.  If

---

you designate a new General Manager after the initial training program, the General Manager must complete training to our satisfaction and we will provide training to the new General Manger to the extent we can reasonably accommodate them in our regularly scheduled training course. You are responsible for all room, board and travel expenses during ongoing training. In addition, in the event that you are given notice of default as set forth in Section 14(a) and the default relates, in whole or in part, to your failure to meet any operational standards, we may require as a condition of curing the default that your General Manager and such other employees as we deem appropriate, at your expense, again attend and successfully complete our training program at a place we designate.

(d)    *Hiring and Staffing*. You must at all times maintain a sufficient number of trained employees to properly and efficiently service your customers. You must conduct background checks on any prospective employees. You must hire and supervise efficient, competent, and courteous persons as your employees for the operation of your Retail Business and set and pay their wages, commissions and incentives with no liability on us. No employee of yours will be deemed to be an employee of ours for any purpose whatsoever. However, we reserve the right to prohibit you from employing individuals with criminal histories which, if such history became known to the public, could compromise or negatively impact the image of our brand. We do not share or codetermine the terms and conditions of employment of your employees nor do we affect matters relating to the employment relationship between you and your employees, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions. Employees at your Retail Business are your employees and will be under our control in implementing and maintaining operational standards at your Retail Business. As the franchisor of Buddy's Retail Businesses, we do not engage in any employer-type activities for which you are responsible such as employee selection, promotion, termination, hours worked, rates of pay, work assigned, discipline and working conditions.

(e)    *Attendance at Meetings*. Your Principal Owner, General Manager and such other employees as we designate must, at your expense, attend all conferences, conventions, seminars or meetings that we hold for System franchisees to set forth new methods and programs for operation, training, management, sales or marketing. If your Principal Owner and General Manager are unable to attend any such meeting, you must notify us prior to the meeting and have a substitute person from your business, acceptable to us, attend and represent you at such meeting.

## 8.    YOUR OTHER OBLIGATIONS; NON-COMPETE COVENANTS; SECURITY INTEREST

(a)    *Payment of Debts*. You agree to pay promptly when due (i) all payments, obligations, assessments and taxes due and payable to us and our affiliates, to vendors, suppliers, lessors, federal, state or local governments, or creditors in connection with your Retail Business; (ii) all liens and encumbrances of every kind and character created or placed upon or against any of the property used in connection with your Retail Business; and (iii) all accounts and other indebtedness of every kind incurred by you in the conduct of your Retail Business. In the event you default in making any such payment, we are authorized, but not required, to pay the same on your behalf, and you agree promptly to reimburse us on demand for any such payment.

(b)    *Taxes and Indebtedness*. You must promptly pay when due all taxes levied or assessed, including unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by you in the operation of your Retail Business. You must pay us or our affiliates within 10 days after demand:  (i) all sales taxes, corporate taxes, trademark license taxes and any like taxes imposed on, required to be collected by or paid by us or our affiliates on account of products or services we or our

---

Buddy's\FA\0420
EAST\173623178.3

affiliates furnish to you or arrange to furnish to you, through sale, lease or otherwise, or on account of our or our affiliates' collection of any fee related to this Agreement (including products and services you purchase in connection with your Retail Business); (ii) all franchise or like taxes, whether based on gross receipts, gross sales, royalty fees, contributions to the Marketing Fund, or otherwise imposed on, required to be collected by or paid by us or our affiliates; and (iii) all other amounts we or our affiliates pay or must pay for you for any reason.

(c)      *Indemnification by You*.  Nothing in this Agreement authorizes you to make any contract, agreement, warranty or representation on our behalf or to incur any debt or other obligation in our name, and we will in no event assume liability for, or be deemed liable under this Agreement as a result of, any such action; nor will we be liable by reason of any act or omission of yours in your operation of your Retail Business or for any claim or judgment arising against you or us from your operation of your Retail Business.  You waive all claims against us for damages to property or injuries to persons arising out of the operation of your Retail Business.  You must fully protect, defend, indemnify and hold us, our affiliates and the officers, directors, employees, agents, attorneys and shareholders of ours and our affiliates (the "**Indemnitees**") harmless from and against any and all causes of action, claims, proceedings, losses, costs, expenses, liabilities, litigation, damages or other expenses (including settlement costs and attorneys' fees) of any nature whatsoever arising in any manner, directly or indirectly, out of or in connection with or incidental to the operation of your Retail Business (regardless of cause or any concurrent or contributing fault or negligence of us or our affiliates), your conduct under this Agreement, any breach by you, your failure to comply with the terms and conditions of this Agreement, or your noncompliance or alleged noncompliance with any law, ordinance, rule or regulation, including any allegation that we or another Indemnitee is a joint employer or otherwise responsible for your acts or omissions relating to your employees.  You agree that with respect to any threatened or actual litigation, proceeding or dispute which could directly or indirectly affect any of the Indemnitees, the Indemnitees will have the right to:  (i) choose counsel; (ii) direct, manage and/or control the handling of the matter; and (iii) settle on behalf of the Indemnitees, and/or you, any claim against the Indemnitees in their sole discretion.  Indemnitees' exercise of these rights does not affect your obligation to indemnify and hold us harmless in accordance with this Section.  All vouchers, canceled checks, receipts, receipted bills or other evidence of payments for any such losses, liabilities, costs, damages, charges or expenses of whatsoever nature incurred by any Indemnitee will be taken as evidence of your obligation under this Agreement.  This Section will survive the expiration or termination of this Agreement and applies to such claims even if they exceed the limits of your insurance coverage.

(d)      *Insurance Coverage*.  You must purchase and maintain in full force and effect, at your expense, insurance that insures both you and us, our affiliates and any other persons we designate by name.  The insurance policies must be issued from the company we specify to you in writing and must include, at a minimum, the coverages we specify in the Operations Manual or otherwise in writing.

(e)      *Alternate Insurance Coverage*.  If you can purchase insurance policies at better terms than that offered by any company we specify pursuant to Section 8(d), carrying at a minimum the same coverages and under the same terms and conditions as we specify pursuant to Section 8(d), then we may, at our sole option, authorize you to purchase such alternative insurance policies.  If we authorize you to purchase such alternative insurance policies, you must purchase and maintain in full force and effect, at your expense, insurance that insures both you and us, our affiliates and any other persons we designate by name.  The insurance policies must include, at a minimum, the coverages specified by us pursuant to Section 8(d).

(f)      *Insurance Commencement, Proof and Changes*.  The required insurance coverage must commence as of the date the building lease begins, you commence construction of your Retail Business or

on the date you publicly disclose or identify the site as the site of your Retail Business, whichever occurs earlier. You must deliver to us at commencement of coverage and annually or at our request a proper certificate evidencing the existence of such insurance coverage and your compliance with the provisions of this Section. The insurance certificate must show our status as an additional insured and provide that we will be given 30 days' prior written notice of material change in or termination or cancellation of the policy. We also may request copies of all policies. We may modify the required minimum limits from time to time and by written notice to you, as conditions require, to reflect changes in relevant circumstances, industry standards, experiences in the System, standards of liability and higher damage awards. If you do not procure and maintain the insurance coverage required by this Agreement, we have the right, but not the obligation, to procure insurance coverage and to charge the cost of same to you, together with a reasonable fee for the expenses we incur in doing so, payable by you immediately upon notice.

(g)     *Necessity of Covenants*. You acknowledge and agree that (a) you and the other individuals and entities required to comply with Sections 8(h) and 8(i) have received an advantage through the specialized training provided under this Agreement, the knowledge of the day-to-day operations of a Buddy's Retail Business and access to our standards, the Operations Manual, the System, the Confidential Information and our trade secrets, (b) are not designed to deprive you of a means of livelihood and will not do so and (c) the covenants and restrictions in Sections 8(h) and 8(i): (i) are reasonable, appropriate and necessary to protect our standards, the System, the Confidential Information, our trade secrets, other System franchisees, the goodwill of the System, relationships with our prospective and existing customers, and our legitimate interests and (ii) do not cause undue hardship on you or any of the other individuals and entities required by Sections 8(h) and 8(i) to comply with the covenants and restrictions. Unless otherwise specified, the term "you" as used in Sections 8(h) and 8(i) includes, collectively and individually, all Principal Owners, guarantors, officers, directors, members, managers, partners, as the case may be, and holders of any ownership interest in you. We may require you to obtain from your General Manager and other individuals identified in the preceding sentence a signed non-compete agreement in a form satisfactory to us that contains the non-compete provisions of Sections 8(h) and 8(i).

(h)     *In Term Non-compete Covenants*. You covenant that during the Term you will not, either directly or indirectly, for yourself or through, on behalf of or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in any Competitive Business other than one authorized by any other agreement between us and you.

(i)     *Post Term Non-compete Covenants*. You covenant that you will not, for a period of one year after the expiration or termination of this Agreement, regardless of the cause of termination, or within one year of the sale of your Retail Business or any interest in you, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in a Competitive Business: (A) at the Authorized Location; (B) in the Territory; (C) within a 15 mile radius of the Territory; or (D) within a 15 mile radius of the location of any Buddy's Retail Business, whether franchised or owned by us or our affiliates.

(j)     *Non-compete; Additional Terms*. You agree that the length of time in Section 8(i) will be tolled for any period during which you are in breach of the covenants or any other period during which we seek to enforce this Agreement. The parties agree that each of the foregoing covenants will be construed as independent of any other covenant or provision of this Agreement. Further, neither the in-term non-compete in Section 8(h) nor the post-term non-compete in Section 8(i) shall apply to any 5% or less ownership interest in a publicly traded company that operates a similar business. You understand and acknowledge that we have the right, in our sole discretion, to reduce the scope of any obligation imposed

---

on you by Sections 8(h) and/or 8(i), and that such modified provision shall be effective upon your receipt of written notice thereof from us.

(k)     *Grant of Security Interest*.  For valuable consideration, receipt of which is hereby acknowledged, you hereby grant to us a security interest in all of your right in your leasehold interest for your Retail Business and in all of your assets, whether now owned or hereafter acquired, used in connection with your Retail Business, including, without limitation, all goods, equipment (other than leasehold improvements which constitute fixtures), accounts, merchandise, inventory, investment property, general intangibles (including general intangibles that are classified otherwise under Revised Article 9 of the UCC), documents, instruments, chattel paper (including, but not limited to, the Lease Contracts), balances, and books and records, and all products and proceeds of the foregoing and any other property, and any and all additions and accessions thereto, all substitutions and replacements therefore and all products and proceeds thereof or proceeds of insurance thereon, as security for the payment of all obligations owed by you to us or any of our affiliates including, without limitation, all obligations under this Agreement, all amounts due to us or our affiliates by virtue of the franchise relationship created under this Agreement, all purchases of the Approved Products and Services from us or our affiliates, the purchase price of any products and goods, and any and all other fees and amounts owed by you to us or our affiliates under this Agreement.  You acknowledge that this Agreement shall constitute a security agreement under the UCC for purposes of establishing the respective rights of us and you in the above-described personal property and the enforcement of such security interest against you.  You hereby authorizes us simultaneously with the execution of this Agreement to file one or more financing statements pursuant to the UCC.  We agree not to record any such financing statement until a mutually acceptable location for your Retail Business has been agreed upon by you and us.  Upon the occurrence of any of the events described in Section 14 of this Agreement, we shall have the rights and remedies of a secured party under the UCC.

## 9.     PRODUCTS AND OPERATIONS STANDARDS AND REQUIREMENTS

(a)     *Products and Services*.  You may offer and sell only Approved Products and Services in connection with the Trademarks and your Retail Business and must offer for sale the complete range of Core Products and Services as set forth in the Operations Manual and such Optional Products and Services as will enable you to efficiently and profitably operate your Retail Business. You must maintain in stock an inventory of Approved Products and Services sufficient to meet customer demand and as set forth in the Operations Manual.  You may not offer, sell or supply any products or services which are not Approved Products and Services (including products or services that we have withdrawn as described in Section 9(d)) without our prior written consent.  You must also conform to all quality and customer service standards we prescribe in writing.

(b)     *Vendors and Suppliers*.  We will furnish you with lists of approved supplies and approved suppliers (including lists of Approved Products and Services).  You must only use Approved Products and Services, equipment, fixtures, furnishings, signs, advertising materials, trademarked items, novelties and other items in your Retail Business as set forth in the approved supplies/services and approved suppliers lists, as we may amend from time to time.  We reserve the right to approve and change the manufacturer or supplier for approved supplies/services.  You acknowledge and agree that certain approved supplies/services may only be available (due to the availability or our restrictions on whom you must purchase from) from one source or select suppliers designated by us, and we and/or our affiliates may be the only source.  You will pay the then-current price in effect for approved supplies/services you purchase from us or our affiliates.  All products, equipment, supplies, services and other items used in the operation of your Retail Business that are not included in approved supplies/services or approved suppliers lists must conform to the specifications and standards we establish from time to time.  We

---

reserve the right to establish a distribution center, or designate a distributor(s) for the System, for Approved Products and Services and require System franchisees to purchase Approved Products and Services from our distribution center, or a distributor(s) designated by us (no matter if there are alternate suppliers/distributors for the Approved Products and Services that are available to you).

(c)     *NO WARRANTY.*  ALTHOUGH APPROVED BY US, WE MAKE NO WARRANTY AND EXPRESSLY DISCLAIM ALL WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO PRODUCTS, SERVICES, EQUIPMENT, SUPPLIES, FIXTURES, FURNISHINGS OR OTHER APPROVED PRODUCTS AND SERVICES.  WE, HOWEVER, WILL PASS THROUGH ANY APPLICABLE MANUFACTURER WARRANTIES ON PRODUCTS AND EQUIPMENT THAT YOU PURCHASE FROM US, SUBJECT TO ALL WARRANTY TERMS AND CONDITIONS IMPOSED BY THE MANUFACTURER.

(d)     *Withdrawal of Products.*  We may at any time require you to withdraw from supply in your Retail Business any Approved Products and Services or any other product or service which in our reasonable opinion (i) does not conform or no longer conforms with the standards, quality controls and specifications for products or services to be supplied in a Buddy's Retail Business; (ii) does not conform or no longer conforms with the range of products or services to be supplied in a Buddy's Retail Business; or (iii) is, or may be, a health or safety risk.  You must immediately withdraw any products from sale or lease when we require under this Section.

(e)     *Alternate Suppliers.*  The Approved Products and Services may have a single source supplier designated by us or other suppliers designated by us and you may not be able to use alternate suppliers.  If we permit any items to be submitted for approval as Approved Products and Services or permit any Approved Product and Service to be a source from a supplier other than our designated single-source supplier or other select suppliers designated by us, you may propose the item and/or a supplier not on our approved list for our prior written approval.  We may require you to submit sufficient information, specifications and samples concerning the item or supplier for us to determine whether the item or supplier meets our criteria.  We will, within a reasonable time, but at most 30 days of receipt of your request, notify you whether any proposed item or supplier is approved and will not unreasonably withhold our approval.  We may from time to time prescribe procedures for the submission of requests for approved supplies or suppliers and obligations which approved suppliers must assume.  Regardless of whether we approve your request, you must reimburse us for all costs and expenses that we incur in reviewing the alternative item or supplier, including our time spent on the review of the alternative supply or supplier.  Our determination of approved suppliers, brands, manufacturers, distributors or supplies/services will be based on a variety of criteria which may include quality, design, price, insurance, distribution methods, supplier considerations and compatibility with the System.

(f)     *Notice of Our Potential Profit*.  We or our affiliates may from time to time make available to you goods, products and services for use in your Retail Business on the sale of which we or our affiliates may make a profit.  Further, we or our affiliates may from time to time receive payments, discounts or other consideration from suppliers or manufacturers (i) in respect to sales of goods, products or services to you and/or the System, or (ii) in consideration of services rendered or rights licensed to such persons.  You agree that we and our affiliates are entitled to such profits and consideration and may use all amounts received by us and our affiliates without restriction.  We are not required to give you an accounting of any amounts we or our affiliates receive from supplier or manufacturers, other than certain required disclosures (if applicable) included in the Buddy's Home Furnishings Franchise Disclosure Document provided to you in connection with your execution of this Agreement, or to share the benefit of such amounts with you or other System franchisees.

(g)      *Pricing of Products and Services*.  We reserve the right, to the fullest extent allowed by applicable law, to establish maximum, minimum, or other pricing requirements with respect to the prices you may charge for Approved Products and Services.

(h)      *Operations Manual*.  To help protect our reputation and goodwill and to maintain uniform operating standards under the Trademarks and System, you must conduct your Retail Business in accordance with the required standards and procedures contained in the Operations Manual.  You acknowledge that we are providing you with access to the Operations Manual during the Term and that the Operations Manual is at all times our sole property.  You must at all times treat and maintain the Manuals and the information contained therein and any other proprietary information created for or approved for use in the operation of your Retail Business as secret and confidential.  We may from time to time revise the contents of the Operations Manual and you expressly agree to comply with each new or changed standard.  You must at all times insure that your copy of the Operations Manual is kept current and up to date.  In the event of any dispute as to the contents of the Operations Manual, the terms of the master copy of the Operations Manual we maintain will be controlling.  You acknowledge and agree that in the future the Operations Manual and other system communications may only be available on the Internet, our intranet system or other online or computer data transfer communications.

(i)      *Operating Procedures*.  The Operations Manual contains both requirements and recommendations for the operation of a Buddy's Retail Business.  You must adopt and use the required standards, procedures, techniques and systems described in the Operations Manual.  We will revise the Operations Manual and their standards, procedures, techniques and systems periodically to meet changing conditions of operation in the best interest of all businesses operating under the Trademarks.    Any required standards exist to protect our interest in the System and the Trademarks and not for the purpose of establishing any control, or the duty to take control, over those matters that clearly are reserved to you.

(j)      *Customer Experience Programs*.  As required by us, we may establish, or contract with third-parties to provide, customer service, shopper experience, or other service programs designed to audit, survey, or evaluate business operations for Buddy's Retail Businesses ("**Customer Experience Programs**").  You must participate in all Customer Experience Programs we designate for the System and pay any fees associated with your Retail Business.  We have the right to specify all aspects of Customer Experience Programs, the required level of participation for System franchisees, and the provider of the Customer Experience Programs (which may be us or an affiliate of ours).

(k)      *Evaluations*.  We or our authorized representative have the right to enter the Authorized Location at all reasonable times during the business day for the purpose of making periodic evaluations and to ascertain whether you are observing the provisions of this Agreement, to inspect and evaluate your premises used for your Retail Business, and to test, sample, inspect and evaluate your products and services provided to customers.  If we determine that any condition at the premises of your Retail Business presents a threat to customers or public health or safety, we may take whatever measures we deem necessary, including requiring you to immediately close your Retail Business until the situation is remedied to our satisfaction.    Our inspections and evaluations may include Customer Experience Programs.  If you fail any inspection or evaluation, you must pay the costs and expenses of subsequent "mystery shopper" visits.  Further, failure of an inspection or evaluation is a default under Section 14.

(l)      *Continuous Operation of Business*.  Subject to any contrary requirements of local law, your Retail Business must be opened to the public and operated during the core hours designated in the Operations Manual.  You acknowledge and agree that if your Retail Business is closed for a period of two consecutive days or five or more days in any 12-month period without our prior written consent, such

---

closure constitutes your voluntary abandonment of the franchise and business and we have the right, in addition to other remedies provided in this Agreement to terminate this Agreement.

(m)     *Compliance with Law*.  You must at all times conduct your Retail Business in compliance with all applicable laws, regulations, codes and ordinances and secure and maintain in force all required licenses, permits and certificates (including all applicable laws and regulations applicable to lease transactions).  You must promptly notify us of any claim or litigation or proceeding in which you are involved that arises from the operation of your Retail Business.

(n)     *Computer System*.  To ensure the efficient management and operation of your Retail Business, and the transmission of data to and from us, your Retail Business must have, use and maintain, (i) such computer and communication hardware and point of sale system hardware, handheld computer devices or accessories, required dedicated telephone, broadband and/or other Internet and communication access services and power lines, modems, printers, facsimile and other computer related accessories or peripheral equipment as we specify in the Operations Manual or otherwise in writing, and (ii) computer and communication software, used to record, analyze and report sales, labor, inventory and tax information, as we specify in the Operations Manual or otherwise in (collectively, the "**Computer System**").  You must obtain from us our technology package ("**IT Package**") that includes a lease of certain equipment and hardware aspects of the Computer System, a software license(s) for certain software portions of the Computer System, and certain related services.  You will sign a Technology Agreement with us to obtain the IT Package, and you must pay us all fees due under the Technology Agreement.  You must obtain the IT Package from us, and you may not obtain any portion of the Computer System that is part of the IT Package from anyone other than us.  We reserve the right to discontinue providing the IT Package at any point during the Term and require you to obtain replacement products from an alternate supplier(s).  In addition to the IT Package, we reserve the right to designate a single source from whom you must purchase other portions of the Computer System and we may be the designated single source for such other portions of the Computer System or a designated supplier for certain aspects of the Computer System.  In addition to the Technology Agreement, you must sign such agreement(s) designated by us to obtain the Computer System or services necessary for the Computer System.  You may not use any unapproved hardware or software or component of the Computer System that has not been obtained from the source(s) we designate.   You agree to the following:

(i)     Your Computer System must have the capacity to electronically exchange information, messages and other data with other computers, by such means (including the Internet and the Intranet), and using such protocols (e.g. TCP/IP), required in the Operations Manual or otherwise in writing.  You must maintain at all times, access to the Intranet in the manner specified by us in the Operations Manual or otherwise in writing.  If required by us, you must execute such agreements or acknowledge such policies as we may prepare for use of the Intranet, and you agree at all times to comply.  You must maintain  (i) an email account for our direct correspondence with the General Manager; and (ii) a separate email account for your Retail Business;

(ii)     You will provide us with full access to the Computer System and to all data associated with the operation of your Retail Business.  We will have the right, at any time, to retrieve data and information relating to the operations of your Retail Business from your Computer System through direct access, by internet connection, modem or other requested means and use it for any reasonable business purpose both during and after the Term.  We may specify in the Operations Manual or otherwise in writing the information that you must collect and maintain on the Computer System installed at your

Retail Business, and you must provide to us reports as we may request from the data collected and maintained, which must be in the form and format we designate;

(iii)    You must keep your Computer System in good maintenance and repair and, at your expense, must promptly install such additions, changes, modifications, substitutions and/or replacements to the Computer System, telephone and power lines and other computer related facilities, as we direct.   Subject to the requirements in this Agreement, you will have the sole and complete responsibility for:   (a) acquiring, operating, maintaining and upgrading your Computer System; (b) the manner in which your Computer System interfaces with our computer systems and the computer systems of third parties; and (c) any and all consequences that may arise if your Computer System is not properly operated, maintained or upgraded;

(iv)    We may develop or authorize others to develop software programs for use in the System, which you may be required to purchase and/or license and use in connection with your Retail Business and for which you may be required to execute a license, sublicense or maintenance agreement with us or the approved vendor.  All right, title and interest in software programs will remain with the licensor of the software programs;

(v)    If required by us, you must: (i) contract with us or any service providers designated by us to provide infrastructure, platforms and/or computing services and resources to be used in connection with or as part of the Computer System (e.g. web hosting services, cloud computing services) as required by us in the Operations Manual or otherwise; or (ii) obtain such services and resources under any contracts or arrangements we establish to obtain such services and resources for the System.  You acknowledge that we will have no liability to you in connection with any Computer System problems, including any problems caused by any approved supplier or service provider providing products or services related to the Computer System; and

(vi)    You may not use or download any software programs on your computer unless it has been authorized by us in writing.  In the event that you use or download any unauthorized software programs, you are liable for all damages and problems caused by the unauthorized software program in addition to our other remedies provided under this Agreement.

(o)    *Participation in an Internet Website or Other Online Communications*.  You specifically acknowledge and agree that any Website shall be deemed advertising and marketing materials under this Agreement, and will be subject to (among other things) our approval under the provisions of Section 12(d) below.  In connection with any Website, you agree to the following:

(i)    We will have the right, but not the obligation, to establish and maintain a Website, which may, without limitation, promote the Trademarks, any or all of the Approved Products and Services offered under the System, Buddy's Retail Businesses, the franchising of Buddy's Retail Businesses and/or the System ("**System Website**"). We will have the sole right to control all aspects of the System Website, including, without limitation, its design, content, functionality, links to the Websites of third parties, legal notices, and policies and terms of usage.  We will also have the right to discontinue operation of the System Website;

(ii)     You shall not establish a separate Website that displays or uses the Trademarks, or any marks confusingly similar thereto, or that refers to this Agreement, your Retail Business, the Approved Products and Services offered under the System, us, Buddy's Retail Businesses or the System.  If you register any domain name in violation of this Section, in addition to all other rights and remedies of ours under this Agreement, we will  have the right to require you to transfer any such registration(s) to us or our designee, at your expense;

(iii)     We will have the right, but not the obligation, to designate 1 or more webpage(s) to describe you and/or your Retail Business ("**Webpage(s)**"), with such WebPage(s) to be located within the System Website.  You shall comply with our policies with respect to the creation, maintenance and content of any such WebPage(s); and we will have the right to refuse to post and/or discontinue posting any content and/or the operation of any WebPage(s).  We may charge you a fee in connection with WebPage(s) used in connection with your Retail Business; and

(iv)     We will have the right to modify our policies and requirements regarding Websites as we may determine is necessary or appropriate.

Additionally, we may establish and require you, at your expense, to participate in a or multiple intranet/extranet systems or other online communication systems providing private and secure communications between us, you, System franchisees, and other persons and entities as determined by us, in our sole discretion (each, an "**Intranet System**").  We have the right to determine the content and use of any Intranet Systems and will establish the rules under which System franchisees may participate.  We retain all rights relating to Intranet Systems and may alter or terminate any Intranet System without prior notice to you.  Your general conduct on Intranet Systems and specifically your use of the Trademarks or any advertising on Intranet Systems is subject to the provisions of this Agreement.  You acknowledge and agree that certain information obtained through your participation in Intranet Systems may be considered Confidential Information, including access codes and identification codes.  Your right to participate in, and have access to, Intranet Systems will terminate when this Agreement expires or terminates.

(p)     *Social Media*.  You must comply with the System Standards developed by us for the System, in the manner directed by us in the Operations Manual or otherwise, with regard to our authorization to use, and use of, blogs, common social networks (including "Facebook" and "Myspace"), professional networks (including "LinkedIn"), live blogging tools (including "Twitter"), virtual worlds, file , audio and video sharing sites and other similar social networking media or tools ("**Social Media**") that in any way references the Trademarks or involves the System or your Retail Business.

(q)     *Collection of Information; Privacy*.  We may, from time to time, specify in the Operations Manual or otherwise in writing the information that you must collect and maintain on the Computer System installed at your Retail Business, and you must provide to us such reports as we may reasonably request from the data so collected and maintained.  All data pertaining to or derived from your Retail Business (including without limitation data pertaining to or otherwise about your Retail Business' customers) is and will be our exclusive property, and we hereby grant a royalty-free non-exclusive license to you to use said data during the Term.  You must abide by all applicable laws pertaining to the privacy of consumer, employee, and transactional information ("**Privacy Laws**").  You must comply with our standards and policies pertaining to Privacy Laws.  If there is a conflict between our standards and policies pertaining to Privacy Laws and actual applicable law, you must:  (A) comply with the requirements of applicable law; (B) immediately give us written notice of said conflict; (C) promptly and fully cooperate with us and our counsel in determining the most effective way, if any, to meet our

standards and policies pertaining to Privacy Laws within the bounds of applicable law.  You must not publish, disseminate, implement, revise, or rescind a data privacy policy without our prior written consent.

(r)     *Signage*.  We shall provide to you one or more exterior signs for the premises of your Retail Business, which sign(s) shall be leased by us to you pursuant to a Signage Lease Agreement, the current form of which is attached as Exhibit F.  You shall make weekly lease payments to us under the Signage Lease Agreement.  The size of the signs and number of signs shall be determined by us in our sole discretion.  We may limit our acquisition cost of the exterior signage leased to you under this Section to a maximum amount of $30,000.  At our option, we have the right to delegate these obligations related to signage.

(s)     *Customer Relations*.  You shall take such steps as are necessary to ensure that your employees preserve good customer relations; render competent, prompt, courteous and knowledgeable service; and meet such minimum standards as we may establish from time to time in the Operations Manual.  You and your employees shall handle all customer complaints, refunds, returns and other adjustments in a manner that will not detract from the name and goodwill of us and the System.  You must: (i) comply with our customer complaint resolution; and (ii) reimbursing us promptly if we elect to resolve a customer complaint (through a credit or other means) because you fail to do so as or when we require.  As part of your obligation to preserve good customer relations, you must comply with customer transfer policies and procedures (the "**Customer Transfer Policies**") as detailed in the Operations Manual or otherwise.  You acknowledge and agree that the Customer Transfer Policies may obligate you to provide services and support to customers that have purchased Approved Products and Services through a Buddy's Retail Business and moved into the Territory.  The Customer Transfer Polices may require you to purchase customer contracts from another Buddy's Retail Business or reinstate customer contracts for Approved Products and Services that were originally purchased through another Buddy's Retail Business.  You acknowledge and agree that the Customer Transfer Policies may require you to incur additional or extra operational expenses, but the reputation and goodwill of the System necessitates the Customer Transfer Policies.  We reserve the right to change or revise the Customer Transfer Policies.

## 10.    TRADEMARKS

(a)     *Ownership of Trademarks*.  You acknowledge that you have no ownership interest whatsoever in the Trademarks and that your rights to use the Trademarks is limited to the conduct of your Retail Business pursuant to and in compliance with this Agreement.  Any unauthorized use of the Trademarks by you, your affiliates or any related entities constitutes an infringement of our and our affiliates' rights in and to the Trademarks.  You agree that all usage of the Trademarks by you and any goodwill established thereby will inure to our and our affiliates' exclusive benefit.  You acknowledge that this Agreement does not confer any goodwill or other interest in the Trademarks upon you.  Without limiting anything in this Section 10, you agree that you: (i) will not represent that you have acquired any ownership interest in any of the Trademarks; (ii) will not contest, or assist any other party to contest, our rights in the Trademarks; and (iii) will not otherwise take any actions in derogation of our use of or rights to the Trademarks.

(b)     *Use of Trademarks.*  You may not use, or permit the use of, any trademarks, trade names or service marks in connection with your Retail Business except the Trademarks or as we otherwise direct in writing.  You must use the Trademarks only in connection with such products and services as we specify in writing and only in the form and manner we prescribe in writing.

(c)     *Business Identification.*  You must use the name "BUDDY'S HOME FURNISHINGS" as the trade name of your Retail Business and no other words may be used to identify your Retail Business without our prior written consent.  You may not use any Trademarks as part of any corporate or business entity name or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form without our written consent.  You must post a sign in the form and location we designate at the Authorized Location putting your customers on notice that your Retail Business is independently owned and operated by you as our franchisee.

(d)     *Identification of Trademarks.*  You may use the Trademarks on various materials, such as business cards, receipts, stationary, purchase orders, invoices and checks, provided they: (i) accurately depict the Trademarks on the materials; (ii) include a statement on the materials, in immediate proximity to the Trademark, indicating that you independently own and operate your Retail Business; and (iii) do not use the Trademarks in connection with any other trademarks, trade names or service marks except when we specifically approve it in writing prior to the use.

(e)     *Infringements.*   In the event any person or entity improperly uses or infringes the Trademarks or challenges your use or our use or ownership of the Trademarks, we will control all litigation and we have the right to decide as to whether suit will be instituted, prosecuted or settled, the terms of settlement and whether any other action will be taken.  You must promptly notify us of any such use or infringement of which you are aware.  You must promptly inform us of any claim arising out of your use of any Trademark and must, without compensation, cooperate with us in any action we undertake.  We or our affiliate will be responsible for our fees and expenses with any such action, unless the challenge or claim results from your misuse of the Trademarks in violation of this Agreement, in which case you must reimburse us for our fees and expenses.

(f)     *Modifications.*  You may not make any modifications or substitutions to the Trademarks unless directed by us in writing.  We reserve the right to change the Trademarks at any time.  Upon our notice to you, you must, at your expense, cease using the former Trademarks and commence using the changed Trademarks.  In the limited circumstance that we require you to change the Trademarks in response to a third party claim that its rights to use the Trademarks are superior to our rights, you must make the change at your expense, except that we will reimburse you for any new signage that we determine is necessary, provided that you have cooperated with any action we undertook with regard to the third party claim. We will not reimburse you for any other costs, alleged losses or expenses associated with any Trademark change.  All provisions of this Agreement applicable to the Trademarks apply to any additional trademarks, service marks and commercial symbols we hereafter authorize you to use pursuant to this Agreement.

## 11.     CONFIDENTIAL INFORMATION, INNOVATIONS, COPYRIGHTS

(a)     *Confidential Information.*   You acknowledge that the Confidential Information is disclosed to you by us and that the Confidential Information is proprietary, confidential and our trade secret.  You agree that you will maintain the confidentiality of the Confidential Information both during and after the term of this Agreement, disclosing the Confidential Information to your employees only to the extent necessary for compliance with this Agreement.  You agree that you will not use Confidential Information in any business other than your Retail Business or in any manner not specifically approved in writing by us.

(b)     *Innovations.*  You must not implement any change to the System without our prior written consent.  Without limiting any other provisions in this Agreement, we have the exclusive (i) right of ownership and use, and (ii) authority to license all ideas, plans, innovation, enhancement,

---

improvements, invention, concepts, formulas, ideas, methods and techniques relating to the development or operation (including marketing, advertising and promotions) of a Buddy's Retail Business or any similar business conceived, suggested or developed by you, any Principal Owner or your employees during the term of this Agreement (collectively, "**Innovations**").  You will disclose to us any Innovations.  We will have all right, title and interest in any Innovations, and  you will have no (1) right, title or interest in any and all Innovations or (2) right to copyright, register and/or protect any Innovations in your name.  We and our affiliates own and have the right to authorize other Buddy's Retail Businesses to use any Innovations without any compensation to you, any Principal Owner or your employees.  If we, at our sole discretion and expense, elect to file a copyright, domain name registration or similar protection or registration relating to any such Innovations, you will execute such documents and provide us with such information as we may reasonably request in order to perfect such a filing.  We will not be obligated to approve or accept any request to implement any Innovation.  We may from time to time revoke our approval of any particular change or amendment to the System.  Upon receipt of written notice of such revocation, you must modify your activities in the manner described by us.  Nothing in this Section modifies your obligation to comply with System Standards and the Operations Manual.

(c)     *Copyrights.*  You hereby acknowledge and agree that the ownership of all printed, audio and visual material and any other material whatsoever (including all Confidential Information) being part of your Retail Business, Buddy's Retail Businesses or the System (the "**work**") belongs to us or our affiliates and any copyright in respect to the work belongs to us.  In addition, You acknowledge that you have no right to manufacture any component of the work or duplicate the work and agree to purchase all components of (or rights of access to) the work exclusively from us.  You have no right to claim any proprietary interest in any of the work.  You must immediately notify us of any known infringement to the work or to our copyright interest therein.  We have the right to control any litigation related to our copyrights or the work.  You agree to assist us, as directed by us, in any claim or action against the infringer.

(d)     *Modification of System-Exercise of Judgment.*  You recognize and agree that from time to time hereafter we may change or modify the System as then-presently described in the Operations Manual and the Trademarks . You will accept and use for the purposes of this Agreement any such changes in the System as if they were part of this Agreement as of the Effective Date. You will make such expenditures as such changes or modifications in the System may reasonably require. You shall not change, modify, or alter the System in any way without our prior written consent. We have the right to operate, develop, and change the System in any manner that is not specifically prohibited by this Agreement. Whenever we have reserved in this Agreement a right to take or to withhold an action, or to grant or decline to grant you a right to take or omit an action, we may, except as otherwise specifically provided in this Agreement, make our decision or exercise its rights based on information readily available to us and our judgment of what is in its and/or the System's best interests at the time its decision is made, without regard to either whether we could have made other reasonable or even arguably preferable alternative decisions or whether its decision promotes its financial or other individual interest.

## 12.     MARKETING

(a)     *Required Monthly Marketing Expenditures.* We reserve the right to require that you, during each month, expend or contribute on marketing and advertising an amount, which, in the aggregate, is equal to 4.5% of your monthly Gross Sales during the preceding month to market and advertise your Retail Business (the "**Advertising Obligation**").  The Advertising Obligation shall be in the form of the following, and in such proportions as may be designated by us in writing from time to time: (i) Marketing Fees (defined below) pursuant to Sections 12(b) and 5(c), (ii) local marketing

---

expenditures pursuant to Section 12(c) below, and (iii) contributions to Marketing Cooperatives (defined below) pursuant to Section 12(f) below.

(b)     *Marketing Fund*.  You must pay us the Marketing Fee set forth in Section 5(c).  All Marketing Fees will be placed in a Marketing Fund that we own and manage (the "**Marketing Fund**"). The Marketing Fund is not a trust or escrow account and we have no fiduciary obligation to System franchisees with respect to the Marketing Fund.  We have the right to determine the expenditures of the amounts collected and the methods of marketing, advertising, media employed and contents, terms and conditions of marketing campaigns and promotional programs.  We will direct all programs that the Marketing Fund finances, with sole control over the creative concepts, materials, and endorsements used and their geographic, market, and media placement and allocation.  The Marketing Fund may pay for preparing and producing video, audio, and written materials and electronic media; developing, implementing, and maintaining an electronic commerce Website and/or related strategies; administering regional and multi-regional marketing and advertising programs including, but not limited to, purchasing trade journal, direct mail, and other media advertising and using advertising, promotion, and marketing agencies and other advisors to provide assistance; and supporting public relations, market research, and other advertising, promotion, and marketing activities (including Social Media).  Because of the methods used, we are not required to spend a prorated amount on each store or in each advertising market.  We have the right to make disbursements from the Marketing Fund for expenses incurred in connection with the cost of formulating, developing and implementing marketing, advertising and promotional campaigns. The disbursements may include payments to us for the expense of administering the Marketing Fund, including accounting expenses and salaries and benefits paid to our employees engaged in the advertising functions.  If requested, we will provide you an annual unaudited statement of the financial condition of the Marketing Fund.

(c)     *Local Marketing Expenditures*.  You must use your best efforts to promote and advertise your Retail Business and participate in any local marketing and promotional programs we establish from time to time.  In addition to the Marketing Fee, you must spend at least 2% of your Gross Sales on approved local marketing and promotion.  Upon our request and at least quarterly, you must provide us with itemization and proof of your local marketing expenditures and an accounting of the monies that you have spent for approved local marketing.  If you fail to make the required expenditure, we have the right to collect and contribute the deficiency to the Marketing Fund.

(d)     *Approved Materials*.  You must use only such advertising and marketing materials as we furnish, approve or make available, and the materials must be used only in a manner that we prescribe. Further, any promotional activities you conduct at your Retail Business or on its premises are subject to our approval.  We will not unreasonably withhold approval of any sales promotion materials and activities; provided that they are current, in good condition, in good taste, accurately depict the Marks and are used in a manner that we have prescribed.  We will approve or decline proposed marketing materials within 14 days of receipt.

(e)     *Yellow Pages.*  If we request, you must place a separate listing, or participate in a joint listing, in the yellow pages of your local phone directory according to our specifications.  The cost of the listing (which will be pro-rated if a joint listing is used) must be paid by you and can be included in your local marketing requirements under Section 12(c).

(f)     *Marketing Cooperatives*.  We have the right to designate local advertising markets ("**Marketing Cooperatives**") and, if designated, you must direct some or all (as designated by us) of your local marketing expenditures to the Marketing Cooperative in your designated local advertising market. Each Buddy's Retail Business within a designated local advertising area will be a member of the

_____

applicable Marketing Cooperative and each Buddy's Retail Business will have one vote on all matters requiring a vote.  We reserve the right to designate the bylaws that govern the operation of Marketing Cooperatives, although the bylaws cannot modify the voting structure set forth in the prior sentence.  We may also designate the amount that you must contribute to the Marketing Cooperative.

(g)     *Promotional Programs; Customer Loyalty Programs*.  You must participate fully in any promotional programs that we specify from time to time.  You must also participate fully in any customer loyalty programs we establish from time to time, including (i) purchasing from us any cards, application forms and other materials for use in connection with any customer loyalty program; and (ii) honoring any customer loyalty points or rewards a customer has accrued whether from your Retail Business or elsewhere.  You acknowledge and agree that (i) we may vary the terms or withdraw from supply of the cards, application forms and other materials used in connection with a customer loyalty program; and (ii) when a customer redeems customer loyalty points at your Retail Business, you are not entitled to reimbursement for the costs of goods provided to the customer in exchange for the redemption.

(h)     *Grand Opening Promotion*.  You must conduct certain advertising and public relations activities in connection with the opening of your Retail Business, as we specify in writing.  You must spend a minimum of $10,000 on these grand opening activities.

## 13.     TRANSFER OF FRANCHISE

(a)     *Transfer by Us*.  We have the right to sell, transfer, subcontract or assign, in whole or in part, our interest in and our rights and obligations under this Agreement.

(b)     *Transfer by You - Definition.*  In this Agreement, transfer means any sale (including installment sale), transfer, merger, conveyance, lease, give away, pledge, mortgage, assignment, bequest, gift, or other encumbrance, either voluntarily or by operation of law (such as through divorce or bankruptcy proceedings) of:  (i) any interest in this Agreement, (ii) any interest in your Retail Business, (iii) any interest in the Authorized Location, (iv) the lease, or any interest in the lease, for the Authorized Location, (v) if you are a business entity, any ownership interests in you, (vi) substantially all of the assets of your Retail Business, or (vii) all or part of the daily operation of your Retail Business to a person or entity who shares in the losses or profits of the business in a manner other than as an employee.

(c)     *No Transfer Without Our Consent.*  We have entered into this Agreement with specific reliance upon your financial qualifications, experience, skills and managerial qualifications as being essential to the satisfactory operation of your Retail Business.  Consequently, neither you nor any of your owners may undertake any transfer or permit any transfer to occur without first tendering to us the right of first refusal in accordance with Section 13(h) and, if we do not exercise such right, obtaining our prior written consent, and complying with the transfer conditions described in Section 13(f).  You must notify us immediately of any proposed transfer and must submit promptly to us the application for consent to transfer.  Any attempted transfer by you without our prior written consent or otherwise not in compliance with the terms of this Agreement will be void.

(d)     *Insolvency.*  In the event of your insolvency or the filing of any petition by or against you under any provisions of any bankruptcy or insolvency law, if your legal representative, successor, receiver or trustee desires to succeed to your interest in this Agreement or the business conducted hereunder, such person first must notify us, tender the right of first refusal provided for in Section 13(h), and if we do not exercise such right, must apply for and obtain our consent to the transfer and satisfy the transfer conditions described in Section 13(f).  In addition, you or the assignee must pay the attorneys' fees and costs that we incur in any bankruptcy or insolvency proceeding pertaining to you.

(e)     *No Publicity of Transfer.*  You may not place in, on or upon the location of your Retail Business, within the Territory, or in any communication media or any form of advertising, any information relating to the sale of your Retail Business or the rights under this Agreement, without our prior written consent.

(f)     *Conditions of Transfer.*  Application for our consent to a transfer and tender of the right of first refusal must be made by submission of our form of application for consent to transfer, which must be accompanied by the documents (including a copy of the proposed purchase or other transfer agreement) or other information that we require.  Any agreement used in connection with a transfer will be subject to our prior written approval.  We condition our consent to any proposed transfer upon the following:

(i)     the assignee must meet all of our then-current requirements for new System franchisees, including, but not limited to, possessing sufficient net worth and sources of capital and being qualified to provide active supervision over the operation of your Retail Business;

(ii)     the assignee must assume all of your obligations in connection with your Retail Business;

(iii)     all of your ascertained and liquidated debts in connection with your Retail Business, including amounts owed to us or any of our affiliates or your suppliers must be paid in full;

(iv)     you are not in default under any provision of this Agreement;

(v)     the assignee executes our then-current form of franchise agreement and all other agreements, instruments and legal documents then customarily used by us with respect to new System franchisees, which may vary materially from the agreements, legal instruments and documents currently in use by us, including the payment of higher fees;

(vi)     if your Retail Business has not been modernized pursuant to Section 6(h) within 3 years of the proposed transfer, that the assignee must, at assignee's expense and in a manner satisfactory to us, modernize, refurbish, and/or renovate your Retail Business, and expend such funds as we require in doing so, to conform to the image and standards for similarly situated new Buddy's Retail Businesses, including structural changes, remodeling, redecoration and modifications to existing improvements;

(vii)     the assignee must complete the training program required of new System franchisees;

(viii)     you or the assignee has paid a transfer fee of $10,000;

(ix)     in the case of an installment sale for which we have consented that you or any Principal Owner retain a security interest or other financial interest in this Agreement or the business operated thereunder, you or such Principal Owner, and the guarantors, are obligated to guarantee the performance under this Agreement until the final close of the installment sale or the termination of such interest, as the case may be;

(x)     you, your Principal Owner and each guarantor must sign a general release of all claims arising out of or relating to this Agreement, your Retail Business, the

Authorized Location or the parties' business relationship, in the form we designate, releasing us and our affiliates;

(xi)    you, your Principal Owner and all guarantors, officers, directors and shareholders agree to comply with the post-term non-compete covenant set forth in Section 8(i); and

(xii)    you and/or the assignee must have complied with any other conditions that we reasonably require from time to time as part of our transfer policies.

(g)    *Death, Disability or Incapacity*.  If any individual who is a Principal Owner dies or becomes disabled or incapacitated and the decedent's or disabled or incapacitated person's heir or successor-in-interest wishes to continue as a Principal Owner, such person or entity must apply for our consent under Section 13(c) and satisfy the transfer conditions as in any other case of a proposed transfer, all within 120 days of the death or event of disability or incapacity.  During any transition period to an heir or successor-in-interest, your Retail Business still must be operated in accordance with the terms and conditions of this Agreement.  During any transition period, in addition to collecting any other fees due to us under this Agreement, we retain the right, at our sole option, to assume management and control of the day to day operations of your Retail Business.  If we assume management and control responsibilities during such transition period, we will be reimbursed from the revenues of your Retail Business for our reasonable expenses in conducting such activities.  If the assignee of the decedent or disabled or incapacitated person is the spouse or child of such person, no transfer fee will be payable to us and we will waive the right of first refusal set forth in Section 13(h).

(h)    *Right of First Refusal*.  We have the right, exercisable within 30 days after receipt of your notice of your intent to transfer and such documentation and information that we require, to send written notice to you that we intend to purchase the interest proposed to be transferred.  We may assign our right of first refusal to a third party either before or after we exercise it.  If the transfer is proposed to be made pursuant to a sale, we or our assignee may purchase the interest proposed to be transferred on the same economic terms and conditions offered by the third-party.  Closing on the purchase must occur within 60 days after the date of our notice to the seller electing to purchase the interest (or, if the parties cannot agree on the cash equivalent as provided in the following sentence, within 60 days after the appraisers' determination).  If we cannot reasonably be expected to provide the same consideration as the third-party, we may substitute the reasonable equivalent in cash.  If you and we cannot agree on the reasonable equivalent in cash within a reasonable time, the fair market value of the interest proposed to be transferred will be determined by two independent appraisers, one of whom will be chosen by us and the other of whom will be chosen by you.  If such appraisers cannot agree on such fair market value, they will jointly choose a third independent appraiser, whose decision will be final and binding.  Each party will bear the cost for its chosen appraiser, and the cost of the third appraiser, if applicable, will be shared equally between the parties.  We may purchase the interest at the fair market value determined by the appraisers or may elect at that time to not exercise our rights.  Any material change in the terms of the third party offer after we have elected not to purchase the seller's interest will constitute a new offer subject to the same right of first refusal as the third party's initial offer.  In addition, unless otherwise agreed to in writing by us and you, the transaction documents, which we will prepare, will be those customary for this type of transaction and will include representations and warranties then customary for this type of transaction.  If we and/or our designee decline to exercise the right of first refusal granted under this Section, that decision will not constitute our consent to the proposed transfer or waiver of any other provision of this Section 13 with respect to the proposed transfer.

14.     **DEFAULT AND TERMINATION**

(a)     *Defaults*.  You are in default if we determine that you or any Principal Owner or guarantor has breached any of the terms of this Agreement or any other agreement between you and us or our affiliates, which without limiting the generality of the foregoing, includes: (i) making any false report to us; (ii) failing to pay when due any amounts required to be paid to us or any of our affiliates, any vendor or any other third party for expenses related to your Retail Business; (iii) conviction of you, a Principal Owner, or a guarantor of (or pleading no contest to) (A) any felony or (B) any misdemeanor that brings or tends to bring any of the Trademarks into disrepute or impairs or tends to impair your or our reputation or the goodwill of any of the Trademarks, your Retail Business or the System; (iv) filing of tax or other liens that may affect this Agreement, voluntary or involuntary bankruptcy by or against you or any Principal Owner or guarantor, insolvency, making an assignment for the benefit of creditors or any similar voluntary or involuntary arrangement for the disposition of assets for the benefit of creditors.

(b)     *Termination by Us*.  We have the right to terminate this Agreement in accordance with the following provisions:

(i)     *Termination After Opportunity to Cure*.  Except as otherwise provided in this Section 14:

(A)     you will have 30 days from the date of our issuance of a written notice of default to cure any default under this Agreement, other than a failure to pay amounts due or submit required reports, in which case you will have 10 days to cure those defaults;

(B)     your failure to cure a default within the 30-day or 10-day period will provide us with good cause to terminate this Agreement;

(C)     the termination will be accomplished by mailing or delivering to you written notice of termination that will identify the grounds for the termination; and

(D)     the termination will be effective immediately upon our issuance of the written notice of termination.

(ii)     *Immediate Termination With No Opportunity to Cure*.  In the event any of the following defaults occurs, you will have no right or opportunity to cure the default and this Agreement will terminate effective immediately on our issuance of written notice of termination:

(A)     any material misrepresentation or omission in your franchise application or willful and material falsification of any report, statement or other written data furnished to us;

(B)     your voluntary abandonment of this Agreement, the Authorized Location or the Territory;

(C)     your failure to timely cure a default under your lease or the loss of your right of possession of the Authorized Location or failure to relocate in accordance with 6(h);

(D)    any unauthorized use of the Confidential Information;

(E)    insolvency of you, a Principal Owner or guarantor;

(F)    you, a Principal Owner or a guarantor making an assignment or entering into any similar arrangement for the benefit of creditors;

(G)    you, any Principal Owners or guarantors are convicted of (or pleading no contest to) (1) any misdemeanor that brings or tends to bring any of the Trademarks into disrepute or impairs or tends to impair your or our reputation or the goodwill of the Trademarks, your Retail Business or the System, or (2) any felony;

(H)    you, any Principal Owner, guarantor or an affiliate of any of you are listed by the United States or the United Nations as being a terrorist, financier of terrorism, or otherwise restricted from doing business in or with the United States;

(I)    you make any unauthorized transfer or assignment in violation of Section 13; or

(J)    any default by you that is the third same or similar default within any 12-month consecutive period.

(iii)    *Immediate Termination After No More than 24 Hours to Cure*.  In the event that a default under this Agreement occurs that materially impairs the goodwill associated with any of the Trademarks (other than as provide in 15(b)(ii)(H) above), violates any health safety law or regulation, or if the operation of your Retail Business presents a health or safety hazard to your customers or to the public:

(A)    you will have no more than 24 hours after we provide written notice of the default to cure the default; and

(B)    this Agreement will terminate effective immediately on our issuance of written notice of termination.

(iv)    *Effect of Other Laws*.  The provisions of any valid, applicable law or regulation prescribing permissible grounds, cure rights or minimum periods of notice for termination of this franchise supersede any provision of this Agreement that is less favorable to you.

(c)    *Termination by You*.  You may terminate this Agreement as a result of a breach by us of a material provision of this Agreement provided that:  (i) you provide us with written notice of the breach that identifies the grounds for the breach; and (ii) we fail to cure the breach within 30 days after our receipt of the written notice.  If we fail to cure the breach, the termination will be effective 60 days after our receipt of your written notice of breach.  Your termination of this Agreement under this Section will not release or modify your post-term obligations under Section 15 of this Agreement.

15.     **POST-TERM OBLIGATIONS**

The provisions of this Section 15 apply upon termination or expiration of this Agreement.

(a)      *Reversion of Rights; Discontinuation of Trademark Use*.  All of your rights to the use of the Trademarks and all other rights and licenses granted herein and the right and license to conduct business under the Trademarks will revert to us without further act or deed of any party.  All of your right, title and interest in, to and under this Agreement will become our property.  Upon our demand, you must assign to us or our assignee your remaining interest in any lease then in effect for the Authorized Location (although we will not assume any past due obligations).  You must immediately comply with the post-term non-compete obligations under Section 8(i), cease all use and display of the Trademarks and of any proprietary material (including the Operations Manual and any related written materials) and of all or any portion of promotional materials and flyers furnished or approved by us, assign all right, title and interest in the telephone numbers, website and e-mail addresses for your Retail Business and cancel or assign, at our option, any assumed name rights or equivalent registrations filed with authorities.  You must pay all sums due to us, our affiliates or designees and all sums you owe to third parties that have been guaranteed by us or any of our affiliates.  You must immediately return to us, at your expense, all copies of the Operations Manual and other written materials then in your possession or control or previously disseminated to your employees and continue to comply with the confidentiality provisions of Section 4(a).  You must promptly at your expense remove or obliterate all vehicle signage, trade dress, displays or other materials in your possession in the Territory or elsewhere that bear any of the Trademarks.  If, however, you refuse to comply with the provisions of the preceding sentence within 30 days, we have the right to enter the Authorized Location and remove all signage, displays or other materials in your possession (including vehicles) or elsewhere that bear any of the Trademarks or names or material confusingly similar to the Trademarks, and you must reimburse us for our costs incurred. Notwithstanding the foregoing, in the event of expiration or termination of this Agreement, you will remain liable for your obligations pursuant to this Agreement or any other agreement between you and us or our affiliates that expressly or by their nature survive the expiration or termination of this Agreement.

(b)      *Purchase Option*.  Upon the expiration or termination of this Agreement for any reason, we will have the option to purchase from you some or all of your Business Assets.  "Business Assets" mean all Lease Contracts, inventory, supplies, equipment and fixtures utilized by you in the operation of your Retail Business ("Location Assets"), excluding inventory, supplies, equipment and fixtures not customarily utilized in Buddy's Retail Businesses operated by us and our affiliates and any factor or increment for any goodwill or "going concern."  We may exercise our option by giving written notice to you at any time following expiration or termination up until 30 days after the later of:  the effective date of expiration or termination; the date you cease operating your Retail Business; or our receipt of the schedules described in the following sentence.  You and we shall arrange for a review to be made, at your expense, by an auditor appointed by us and an independent, licensed, certified public accountant appointed by you, of all Location Assets, and such auditor and such accountant shall jointly prepare a reasonably detailed schedule of all of such Location Assets upon the completion of such review.  In connection with such purchase, we shall assume no liabilities of yours whatsoever, except for the lease obligation described in Section 15(b)(v) and any other obligations expressly agreed to in writing by us.

(i)      If we exercise our option to purchase the Business Assets, the purchase price for the Business Assets, except for Lease Contracts and the items leased under such Lease Contracts, shall be their fair market value.  If we and you are unable to agree upon the fair market value of any Business Asset(s) other than Lease Contracts and the items leased under such Lease Contracts within 10 days after we notify you that we desire to exercise our option to purchase the Business Assets, such value shall be determined by

two independent appraisers, one of whom shall be chosen by us and the other of whom shall be chosen by you. If such independent appraisers cannot agree upon such fair market value, they shall jointly choose a third appraiser, whose decision shall be final and binding. Each party shall bear the cost for its chosen appraiser, and the cost for a third appraiser, if any, shall be shared equally between you and us. The purchase price for the Business Assets shall be paid by us in cash at the closing of the purchase and sale of the Business Assets, which purchase price shall be reduced by any amounts then owed by you to us and/or any of our affiliates under this Agreement or otherwise. The closing of the purchase of the Business Assets shall take place not later than 90 days after all appraisals have been finalized; provided, however, we shall have the unilateral right to accelerate the date of closing for such transaction.

(ii)    If we exercise our option to purchase the Business Assets, the purchase price for each Lease Contract and the items leased under each such Lease Contract, except for the Lease Contracts and the items leased under such Lease Contracts described in Section15(b)(iii),shall be the lesser of:

(A)    five times the average monthly rental revenue derived from the Lease Contract for the trailing three months, excluding processing charges, ancillary program fees, late charges, revenues generated from the exercise of early purchase options, and sales taxes collected; or

(B)    50% of the total remaining balance of the Lease Contract; provided, that for any monthly Lease Contract with a term in excess of 12 months, no more than 24 payments shall be considered in computing such amount and for any weekly Lease Contract with a term in excess of 52 weeks, no more than 103 payments shall be considered in computing such amount.

(iii)    Notwithstanding anything contained in this Agreement to the contrary, you shall transfer to us, but we shall not be obligated to pay for, (i) any Lease Contract with respect to which any sum due under such Lease Contract is 15 days or more past due (each, a "**Doubtful Lease Contract**") and (ii) any items leased under any Doubtful Lease Contract. We will give no consideration to any credits or payment extensions posted to an account under any Doubtful Lease Contract or any partial payment to an account under any Doubtful Lease Contract within 30 days preceding the closing of the purchase and sale of the Business Assets.

(iv)    Any advance lease payments received by us under any of the Lease Contracts included in the Business Assets shall be our property to the extent such advance payments relate to periods after the closing of the purchase and sale of the Business Assets. The purchase price to be paid by us for the Business Assets shall be reduced by the total amount of all such advance lease payments to the extent such advance payments relate to periods after such closing.

(v)    If we exercise our option to purchase the Business Assets, you shall also assign to us or our designee your interest in any lease or sublease for the premises of your Retail Business, and we agree to assume your obligations thereunder, subject to any consents that may be required from your landlord under such lease or sublease. Such

assignment and assumption shall be self-operative and shall be deemed to have been made simultaneously with the closing of the purchase of the Business Assets. No further assignment or agreement, written or otherwise, need be executed by you or us to effect such assignment. You hereby authorize the landlord or sub-landlord under such lease or sublease to accept and recognize us as a substitute tenant or sub-tenant in the event of any such assignment, without requiring any further action on the part of you or us. You shall indemnify us and hold us harmless from, against and in respect of any claim, liability, damage, loss, cost or expense, including reasonable attorney's fees and court costs, suffered or incurred by us which arises out of or relates to the assignment to us of your lease or your failure to have performed any of your obligations under such lease prior to our assumption of such obligations. Any amount required to be paid to us pursuant to such indemnification obligation shall be paid by you within 15 days after our demand therefor. Notwithstanding the foregoing, we or our designee may reassign such lease or sublease to you, and you shall upon such reassignment assume all of the duties and obligations thereunder, upon 60 days' written notice to you, provided that neither we nor our designee shall be permitted to notify you of any such reassignment before the date which is 120 days after the date of the closing of the purchase and sale of the Business Assets.

(vi)    If we exercise our option to purchase the Business Assets, you shall execute such documents and do such other acts or things as may be necessary in our opinion to consummate the purchase and sale of the Business Assets, including but not limited to, a general release in a form prescribed by us, of any and all claims against us, our affiliates and the officers, directors, shareholders, agents and employees of ours and our affiliates' in their corporate and individual capacities, including without limitation claims arising under federal, state and local laws, rules and regulations, the assignment by you of your interest in any lease or sublease, and the assumption by you of the obligations under such lease or sublease in the event of any reassignment by us to you. We shall also be entitled to all customary warranties and representations relating to the Business Assets purchased including, but not limited to, representations and warranties as to the accuracy of the information provided related to the Business Assets and your good title to the Business Assets (including, but not limited to, your ownership of the Business Assets free and clear of any liens and encumbrances). If we exercise our option to purchase the Business Assets, you shall refrain from interfering, directly or indirectly, with the conduct of business by us or our designee with respect to the Lease Contracts included in the Business Assets or with respect to any customers under such Lease Contracts.

(c)    *Claims*. You and your Principal Owners and guarantors may not assert any claim or cause of action against us or our affiliates relating to this Agreement or your Retail Business after the shorter period of the applicable statute of limitations or one year following the effective date of termination of this Agreement; provided that where the one-year limitation of time is prohibited or invalid by or under any applicable law, then and in that event no suit or action may be commenced or maintained unless commenced within the applicable statute of limitations.

## 16.    DISPUTE RESOLUTION

(a)    *Arbitration*. Except as qualified in Section 16(b), any dispute between you and us or any of our or your affiliates arising under, out of, in connection with or in relation to this Agreement or any other agreement between you and us, any System Standard, any lease or sublease for your Retail

---

Business, the parties' relationship, your Retail Business or the scope or validity of this Agreement or any other agreement between you and us (including the validity and scope of the arbitration obligation under this Section 16(a), which you and we acknowledge is to be determined by an arbitrator and not by a court, must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association. The arbitration proceedings must be conducted in accordance with the then-current commercial rules and procedures of the American Arbitration Association. All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.).

(i)    In connection with any arbitration proceeding, each party will submit or file any claim which would constitute a compulsory counterclaim (as defined by the then-current Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed in such proceeding will be barred.

(ii)    Any arbitration must be on an individual basis and the parties and the arbitrator will have no authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any claim or any other proceeding involving third parties. If a court or arbitrator determines that this limitation on joinder of or class action certification of claims is unenforceable, then the agreement to arbitrate the dispute will be null and void and the parties must submit all claims to the jurisdiction of the courts.

(iii)    The arbitration must take place in the city where our headquarters is located at the time of the dispute. The arbitrator has no authority or discretion to alter the terms of this provision.

(iv)    The arbitrator must follow the law and not disregard the terms of this Agreement. The arbitrator must have at least five years of experience in franchise law. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us. The arbitrator will also have the right to make a determination as to any procedural matters as would a court of competent jurisdiction be permitted to make in the state in which our main office is located. The arbitrator will also decide any factual, procedural, or legal questions relating in any way to the dispute between the parties, including, but not limited to any decision as to whether forum and venue provisions are applicable and enforceable against the parties, subject matter, timeliness, scope, remedies, unconscionability, and any alleged fraud in the inducement.

(v)    The arbitrator can issue summary orders disposing of all or part of a claim and provide for temporary restraining orders, preliminary injunctions, injunctions, attachments, claim and delivery proceedings, temporary protective orders, receiverships, and other equitable and/or interim/final relief. Each party consents to the enforcement of such orders, injunctions, etc., by any court having jurisdiction. The arbitrator has the right to award or include in his or her award any relief which he or she deems proper including, but not limited to, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief, and attorneys' fees and costs, provided that the arbitrator may not declare any Trademark generic or otherwise invalid or, except as expressly provided in Section 17(k) below, award any punitive or exemplary damages against either party (we and you hereby waiving to the fullest extent permitted by law, except as expressly provided in Section 17(k) below, any right to or claim for any punitive or exemplary damages against the other).

(vi)    All other procedural matters will be determined by applying the statutory, common laws, and rules of procedure that control a court of competent jurisdiction in which our main office is then located.  Other than as may be required by law, the entire arbitration proceedings (including, but not limited to, any rulings, decisions or orders of the arbitrator) will remain confidential and will not be disclosed to anyone other than the parties to this Agreement.

(vii)    The judgment of the arbitrator on any preliminary or final arbitration award will be final and binding and may be entered in any court having jurisdiction.

(viii)    We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished our right to seek recovery of those costs.

(b)    *Exceptions to Arbitration*.  Notwithstanding Sections 16(a), the parties agree that the following claims will not be subject to arbitration:

(i)    any action for equitable relief, including, without limitation, seeking preliminary or permanent injunctive relief, specific performance, other relief in the nature of equity to enjoin any harm or threat of harm to such party's tangible or intangible property, brought at any time, including without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

(ii)    any action in ejectment or for possession of any interest in real or personal property; or

(iii)    any action which by applicable law cannot be arbitrated.

(c)    *Costs and Attorneys' Fees*.  The prevailing party in any action or proceeding arising under, out of, in connection with, or in relation to this Agreement will be entitled to recover its reasonable costs and expenses (including attorneys' fees, arbitrator's fees and expert witness fees, costs of investigation and proof of facts, court costs, and other arbitration or litigation expenses) incurred in connection with the claims on which it prevailed.  For the purposes of this Agreement in general and this Section specifically, the "**Prevailing Party**" will be deemed to be that party which has obtained the greatest net judgment or award in terms of money or money equivalent.  If money or money equivalent has not been awarded, then the Prevailing Party will be that party, as determined by the arbitrator, which has prevailed on a majority of the material issues decided.  The "net judgment" is determined by subtracting the smallest award of money or money equivalent from the largest award.  If there is a mixed decision involving an award of money or money equivalent and equitable relief, the arbitrator will award the above fees to the party that it deems has prevailed over the other party using reasonable business and arbitrator(s)'s judgment.

(d)    *Survival*.  The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 17.    GENERAL PROVISIONS

(a)    *Severability*.  Should one or more clauses of this Agreement be held void or unenforceable for any reason by any court or tribunal of competent jurisdiction, such clause or clauses

---

will be deemed to be separable in such jurisdiction and the remainder of this Agreement is valid and in full force and effect and the terms of this Agreement must be equitably adjusted so as to compensate the appropriate party for any consideration lost because of the elimination of such clause or clauses. It is the intent and expectation of each of the parties that each provision of this Agreement will be honored, carried out and enforced as written. Consequently, each of the parties agrees that any provision of this Agreement sought to be enforced in any proceeding must, at the election of the party seeking enforcement and notwithstanding the availability of an adequate remedy at law, be enforced by specific performance or any other equitable remedy.

(b)    *Waiver/Integration*.  No waiver by either party of any breach by the other party, nor any delay or failure by either party to enforce any provision of this Agreement, will be deemed to be a waiver of any other or subsequent breach or be deemed an estoppel to enforce the non-breaching party's rights with respect to that or any other or subsequent breach.  Subject to our rights to modify the System, System Standards, Operations Manual, Trademarks and Approved Products and Services, this Agreement may not be waived, altered or rescinded, in whole or in part, except by a writing signed by you and us. This Agreement, together with any addenda and exhibits hereto, constitutes the sole agreement between you and us with respect to the entire subject matter of this Agreement and embodies all prior agreements and negotiations with respect to your Retail Business authorized hereunder.  Nothing in this Agreement, however, is intended to disclaim the representations contained in the Franchise Disclosure Document we provided to you.  You acknowledge and agree that you have not received any warranty or guarantee, express or implied, as to the potential volume, profits or success of your Retail Business.  There are no representations or warranties of any kind, express or implied, except as contained herein or in the Franchise Disclosure Document we provided to you in connection with this Agreement.

(c)    *Notices*.  All notices will be addressed to the parties at the addresses set forth below their signatures on the signature page hereto or to such other address as any party may notify the other parties of in a writing delivered in accordance with this Section.  Any notice required or permitted to be given under this Agreement will be deemed given:  (i) when delivered personally to the party to receive such notice, if a natural person, or to an officer of any party which is a corporation or limited liability company or to any member or partner as the case may be of any party which is a partnership; (ii) 5 days after mailing by express courier service, fully prepaid, addressed as herein provided, or upon actual receipt of such mailing, whichever will first occur; or (iii) upon receipt of confirmation from the addressee acknowledging receipt of such notice if by e-mail, facsimile or other electronic transmission service (provided that in the case of notice delivered in accordance with this clause (iii), a copy of the notice is also simultaneously sent in accordance with clause (ii) above).

(d)    *Authority*.    Any modification, consent, approval, authorization or waiver granted hereunder required to be effective by writing will only be valid if in writing executed by you or, if on behalf of us, in writing executed by our President or other duly authorized officers.

(e)    *References*.  If you are two or more persons, the persons are jointly and severally liable, and references to you in this Agreement includes all of the persons.  Headings and captions contained herein are for convenience of reference and may not be taken into account in construing or interpreting this Agreement.

(f)    *Guarantee*.  All Principal Owners and any other person who owns, directly or indirectly, 10% or more of the franchisee entity must execute the form of undertaking and guarantee at the end of this Agreement.  We may also require spouses of the guarantors to execute the form of undertaking and guarantee at the end of this Agreement.  Any person or entity that at any time after the Effective Date

becomes a Principal Owner or direct or indirect 10% owner also must execute the form of undertaking and guarantee at the end of this Agreement.

(g)     *Successors/Assigns*.  Subject to the terms of Section 13 hereof, this Agreement is binding upon and inures to the benefit of the administrators, executors, heirs, successors and assigns of the parties.

(h)     *Interpretation of Rights and Obligations*.  The following provisions apply to and govern the interpretation of this Agreement, the parties' rights under this Agreement, and the relationship between the parties:

(i)     *Applicable Law and Waiver*.  All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.).  Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1964 (Lanham Act, 15 U.S.C. Sections 1051 et seq.), or other Federal Law, this Agreement, the franchise, and all claims arising from the relationship between us and you will be governed by the laws of the State of Florida, without regard to its conflict of law rules; provided, however, (1) any Florida law regulating the sale of franchises or governing the relationship of a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this Section and (2) the laws of the state in which your Retail Business is located shall apply to the construction and enforcement of the obligations set forth in Sections 8(h) and 8(i) hereof, without regard to its conflict of law rules.  You expressly waive any rights or protections you have or may have under any statute or law of any other state to the fullest extent permitted by law.

(ii)     *Our Rights*.  Whenever this Agreement provides that we have a certain right, that right is absolute and the parties intend that our exercise of that right will not be subject to any limitation or review.  We have the right to operate, administrate, develop, and change the System in any manner that is not specifically precluded by the provisions of this Agreement.

(iii)     *Our Reasonable Business Judgment*.  Whenever we reserve discretion in a particular area or where we agree to exercise our rights reasonably or in good faith, we will satisfy our obligations whenever we exercise Reasonable Business Judgment in making our decision or exercising our rights.  Our decisions or actions will be deemed to be the result of Reasonable Business Judgment, even if other reasonable or even arguably preferable alternatives are available, if our decision or action is intended, in whole or significant part, to promote or benefit the System generally even if the decision or action also promotes our financial or other individual interest.  Examples of items that will promote or benefit the System include, without limitation, enhancing the value of the Trademarks, improving customer service and satisfaction, improving product quality, improving uniformity, enhancing or encouraging modernization and improving the competitive position of the System.

(i)     *Venue*.  Any cause of action, claim, suit or demand allegedly arising from or related to the terms of this Agreement or the relationship of the parties that is not subject to arbitration under Section 16, must be brought in the state or federal district court located in the county or district where our headquarters are located.  Both parties hereto irrevocably submit themselves to, and consent to, the jurisdiction of said courts.  The provisions of this Section 17(i) will survive the termination of this Agreement.  You are aware of the business purposes and needs underlying the language of this Section 17(i), and with a complete understanding thereof, agree to be bound in the manner set forth.

(j)    *JURY WAIVER.*  **ALL PARTIES HEREBY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN CONNECTION WITH THE ENFORCEMENT OR INTERPRETATION BY JUDICIAL PROCESS OF ANY PROVISION OF THIS AGREEMENT, AND IN CONNECTION WITH ALLEGATIONS OF STATE OR FEDERAL STATUTORY VIOLATIONS, FRAUD, MISREPRESENTATION OR SIMILAR CAUSES OF ACTION OR ANY LEGAL ACTION INITIATED FOR THE RECOVERY OF DAMAGES FOR BREACH OF THIS AGREEMENT.**

(k)    *WAIVER OF PUNITIVE DAMAGES.*  **YOU AND WE (AND OUR RESPECTIVE AFFILIATES, OWNERS AND GUARANTORS, AS APPLICABLE) AGREE TO WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF ANY DISPUTE BETWEEN US, EACH WILL BE LIMITED TO THE RECOVERY OF ACTUAL DAMAGES SUSTAINED BY IT.**

(l)    *Relationship of the Parties.*  You and we are independent contractors.  Neither party is the agent, legal representative, partner, subsidiary, joint venturer or employee of the other.  Neither party may obligate the other or represent any right to do so.  This Agreement does not reflect or create a fiduciary relationship or a relationship of special trust or confidence.

(m)    *Force Majeure.*  If a party's default under this Agreement (other than your obligations with respect to insurance and indemnification and to pay all fees and other amounts due us and our affiliates under this Agreement or any other agreement between you and us or our affiliates), is caused in whole or in part by a force majeure, such default and any right of the other party to terminate this Agreement for such default is suspended for as long as the default is reasonably caused by such force majeure.  Any suspension is effective only from the delivery of a notice of the force majeure to the other party stating the party's intention to invoke the force majeure. However, if such suspension continues for longer than six months and such default still exists, either party has the right to terminate this Agreement upon 30 days' notice to the other party.  Events of force majeure are those that cannot be prevented, avoided or removed by the party invoking the force majeure despite the exercise of reasonable diligence, including acts of God, actions of the elements, lockouts, strikes, wars, riots, acts of terrorism, civil commotion, and acts of governmental authorities, (not including a governmental authority's delaying or refusing to grant building permits, licenses and other permissions and approvals), and except as specifically provided for elsewhere in this Agreement.

(n)    *Adaptations and Variances.*  Complete and detailed uniformity under many varying conditions may not always be possible, practical, or in the best interest of the System.  Accordingly, we have the right to vary the Approved Products and Services and other standards, specifications, and requirements for any Buddy's Retail Business or System franchisee based upon the customs or circumstances of a particular franchise or operating agreement, site or location, population density, business potential, trade area population, existing business practice, competitive circumstance or any other condition that we deem to be of importance to the operation of such business or the System.  We are not required to grant to you a like or other variation as a result of any variation from standard inventory items, specifications or requirements granted to any other System franchisee.  You acknowledge that you are aware that other System franchisees operate under a number of different forms of agreement that were entered into at different times and that, consequently, the obligations and rights of the parties to other agreements may differ materially in certain instances from your rights and obligations under this Agreement.

(o)    *Compliance with Anti-terrorism Laws*.  You and your owners agree to comply, and to assist us to the fullest extent possible in our efforts to comply, with Anti-Terrorism Laws (defined below). In connection with that compliance, you and your owners certify, represent, and warrant that none of your property or interests are subject to being blocked under, and that you and your owners otherwise are not in violation of, any of the Anti-Terrorism Laws.  "**Anti-Terrorism Laws**" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state, and local laws, ordinances, regulations, policies, lists, and other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war.  Any violation of the Anti-Terrorism Laws by you or your owners, or any blocking of your or your owners' assets under the Anti-Terrorism Laws, shall constitute good cause for immediate termination of this Agreement, as provided in Section 15(b)(ii)(H) above.

(p)    *Success Depends on Franchisee and No Warranties*.  You assume sole responsibility for the operation of your Retail Business and acknowledge that, while we may furnish advice and assistance to you from time to time during the Term, we have no legal or other obligation to do so except as specifically set forth in this Agreement.  In addition, you acknowledge that we do not guarantee the success or profitability of your Retail Business in any manner whatsoever and shall not be liable therefor; in particular, you understand and acknowledge that the success and profitability of your Retail Business depend on many factors outside the control of either us or you (such as interest rates, unemployment rates, demographic trends and the general economic climate) and there are significant risks in any business venture, but principally depend on your efforts in the operation of your Retail Business and the primary factor in your success or failure in your Retail Business will be your own efforts.  IN ADDITION, YOU ACKNOWLEDGE AND AGREE THAT WE AND OUR REPRESENTATIVES HAVE MADE NO REPRESENTATIONS OR WARRANTIES TO YOU OTHER THAN OR INCONSISTENT WITH THE MATTERS SET FORTH IN THIS AGREEMENT, AND THAT YOU HAVE UNDERTAKEN THIS VENTURE SOLELY IN RELIANCE UPON THE MATTERS SET FORTH HEREIN AND YOUR OWN INDEPENDENT INVESTIGATION OF THE MERITS OF THIS VENTURE.

(q)    *Control During Crisis Situation*.  If an event occurs at your Retail Business that has or reasonably may cause harm or injury to customers or employees (*i.e.*, slip and fall injuries, natural disasters, robberies, shootings, etc.) or may damage the Trademarks, the System, or our reputation (collectively, "**Crisis Situation**"), you must:  (1) immediately contact appropriate emergency care providers to assist you in curing the harm or injury; and (2) immediately inform us by telephone of the Crisis Situation.  You must refrain from making any internal or external announcements (*i.e.*, no communication with the news media) regarding the Crisis Situation (unless otherwise directed by us or public health officials).

To the extent we deem appropriate, in our sole and absolute discretion, we or our designee may control the manner in which the Crisis Situation is handled by the parties, including, without limitation, conducting all communication with the news media, providing care for injured persons and/or temporarily closing your Retail Center.  The parties acknowledge that, in directing the management of any Crisis Situation, we or our designee may engage the services of attorneys, experts, doctors, testing laboratories, public relations firms, and those other professionals as we deem appropriate.  You and your employees must cooperate fully with us or our designee in our efforts and activities in this regard and will be bound by all further Crisis Situation procedures developed by us from time to time hereafter.  The indemnification in Section 8(c) will include all losses and expenses that may result from the exercise by us or our designee of the management rights granted in this subsection (q).

(r)    *Effective Date*.  We will designate the "**Effective Date**" of this Agreement in the space provided on the cover page.  If no Effective Date is designated on the cover page, the Effective Date is the date when we sign this Agreement.

(s)    *Special Stipulation*. You acknowledge and agree that you are prohibited from entering into a Reciprocal Purchase Agreement with a Competitor or a Competitor's franchisee.  For purposes of this Agreement, a "Reciprocal Purchase Agreement" is a contingent agreement or series of contingent agreements through which we or you agree to close an RTO Retail Center and sell the Center's Consumer Rental Contracts to a Competitor or its franchisee, and that Competitor or its franchisee agrees to close a different RTO Retail Center and sell the Center's Consumer Rental Contracts to you or a System franchisee.  For purposes of this Agreement, "Competitor" means any third party, other than a System franchisee, that, directly or through a subsidiary, owns operates, or is a franchisor of, one or more RTO Retail Centers in the United States, including Centers under the Aaron's and Rent-A-Center brands. "RTO" means "Rent to Own."

[Signature Page Follows]

**IN WITNESS WHEREOF,** the parties hereto have duly signed and delivered this Agreement in duplicate effective as of the Effective Date.

**We:**                                                 **You:**

Buddy's Franchising and Licensing LLC          bb BHF Stores LLC

By:_____          By: _Gary Bosch_____

Printed Name: Michael Bennett                    Printed Name: Gary Bosch

Title: Chief Executive Officer                      Title: President and Secretary


**Address for Notices**:                          **Address for Notices**:
4705 South Apopka Vineland Road, Suite 206    552 Wisconsin Street
_____    San Francisco, CA  94107
Orlando, FL  32819                              _____
_____    Attn: Gary Bosch
Attn: Michael Bennett                           Phone: 415-251-3355
Phone: 813-540-6163                             Fax:_____
Fax:_____    E-mail: gbosch@bebe.untd.com
E-mail: mbennett@buddyrents.com

---

Buddy's Franchising and Licensing LLC —Franchise Agreement

**IN WITNESS WHEREOF,** the parties hereto have duly signed and delivered this Agreement in duplicate effective as of the Effective Date.

**We:**                                                                **You:**

Buddy's Franchising and Licensing LLC            bb BHF Stores LLC

By:_____

Printed Name: Michael Bennett _____         By:_____

Title: Chief Executive Officer _____         Printed Name: Gary Bosch _____

                                                                Title: President and Secretary _____


**Address for Notices:**                                    **Address for Notices:**
4705 South Apopka Vineland Road, Suite 206      552 Wisconsin Street _____
_____                San Francisco, CA  94107 _____
Orlando, FL  32819 _____                    _____
_____                Attn: Gary Bosch _____
Attn: Michael Bennett _____                 Phone: 415-251-3355 _____
Phone: 813-540-6163 _____                   Fax:_____
Fax:_____            E-mail: gbosch@bebe.untd.com _____
E-mail: mbennett@buddyrents.com _____

---

Buddy's Franchising and Licensing LLC —Franchise Agreement
Buddy's\FA\0420

## EXHIBIT A
## AUTHORIZED LOCATION AND TERRITORY

**A.      Authorized Location**

120 RALEIGH RD                    HENDERSON          NC    27536

**B.      Territory**

5 miles around authorized location.
120 RALEIGH RD                    HENDERSON          NC    27536

**We:**

Buddy's Franchising and Licensing LLC

By:_____

Printed Name: Michael Bennett_____

Title: Chief Executive Officer_____

**You:**

bb BHF Stores LLC

By:_____

Printed Name: Gary Bosch_____

Title: President and Secretary_____

**EXHIBIT A**
**AUTHORIZED LOCATION AND TERRITORY**

**A.      Authorized Location**

120 RALEIGH RD                    HENDERSON          NC    27536

**B.      Territory**

5 miles around authorized location.
120 RALEIGH RD                    HENDERSON          NC    27536

**We:**                                                    **You:**

Buddy's Franchising and Licensing LLC              bb BHF Stores LLC

By:_____              By: _Gary Bosch_____

Printed Name: Michael Bennett                     Printed Name: Gary Bosch

Title: Chief Executive Officer                    Title: President and Secretary

---

**EXHIBIT B**
**OWNERSHIP AND MANAGEMENT**

**A.    Owners.**

You represent and warrant that the following is a complete and accurate list of all Owners of equity interests in you, including the full name and home address of each Owner, and fully describes the nature and extent of each Owners' equity interest. You, and each Owner as to his or her ownership interest in you, represents and warrants that each Owner is the sole and exclusive legal and beneficial owner of his or her interest, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Agreement.

| NAME | HOME ADDRESS | EQUITY INTEREST |
|------|-------------|-----------------|
| bb BAF Inc. | 552 Wisconsin Street<br>San Francisco, CA  94107 | 100% |

**B.    General Manager**

The General Manager is: _____

Date: _____

**You:**

By: *Gary Bosch* _____
Its:  President

**Owners:**

By: *Gary Bosch* _____
Its:  President

By: _____
Its:  _____

By: _____
Its:  _____

**EXHIBIT C**
**ELECTRONIC TRANSFER OF FUNDS AUTHORIZATION**

Franchisee: <u>bb BHF Stores LLC</u>
Location: <u>See Addendum A</u>
Date:   <u>11-10-2020</u>

| NEW | CHANGE |
|-----|--------|
| X   |        |

Attention:  Bookkeeping Department

The undersigned hereby authorizes BUDDY'S FRANCHISING AND LICENSING LLC or any affiliated entity (collectively, "BUDDY'S FRANCHISING"), to initiate weekly ACH debit entries against the account of the undersigned with you in payment of amounts for Royalty Fees, Marketing Fees, Technology Fees, signage lease payments, or other amounts that become payable by the undersigned to BUDDY'S FRANCHISING or its affiliates.  The dollar amount to be debited per payment will vary.

Subject to the provisions of this letter of authorization, you are hereby directed to honor any such ACH debit entry initiated by BUDDY'S FRANCHISING or its affiliates.

This authorization is binding and will remain in full force and effect until 90 days prior written notice has been given to you by the undersigned.  The undersigned is responsible for, and must pay on demand, all costs or charges relating to the handling of ACH debit entries pursuant to this letter of authorization.

Please honor ACH debit entries initiated in accordance with the terms of this letter of authorization, subject to there being sufficient funds in the undersigned's account to cover such ACH debit entries.

Sincerely yours,

*DocuSigned by:*
*Gary Bosch*
7CA0FBCD4562407

\*\*\* We also need a VOIDED Check \*\*\*

_____          _____
Account Name                                      Street Address

_____          _____
Bank Name                                            Street Address

_____          _____
Branch                        City          State          Zip Code

_____          _____
Street Address                                    Telephone Number

_____          By_____
City        State        Zip Code

_____          Its_____
Bank Telephone Number

_____          Date_____
Bank's Account Number

_____
Customer's Account Number

**EXHIBIT D**

**GUARANTEE AND AGREEMENT TO BE BOUND**
BY THE TERMS AND CONDITIONS
OF THE FRANCHISE AGREEMENT (this "Guarantee")

In consideration of the execution of the Franchise Agreement by and between Buddy's Franchising and Licensing LLC ("we," "us" or "our") and bb BHF Stores LLC ("Franchisee") dated November 10, 2020 (the "Franchise Agreement") and for other good and valuable consideration, the undersigned, for themselves, their heirs, successors, and assigns, do jointly, individually and severally hereby become surety and guarantor for the payment of all amounts and the performance of the covenants, terms and conditions in the Franchise Agreement (including any amendments or modifications of the Agreement), to be paid, kept and performed by Franchisee, including without limitation the arbitration and other dispute resolution provisions of the Franchise Agreement.

Further, the undersigned, individually and jointly, hereby agree to be bound by each and every condition and term contained in the Franchise Agreement (including any amendments or modifications of the Agreement), including but not limited to the non-compete provisions in Sections 8(h) and 8(i) of the Franchise Agreement, and agree that this Guarantee will be construed as though the undersigned and each of them executed a Franchise Agreement containing the identical terms and conditions of this Franchise Agreement.

Each of the undersigned waives: (i) all rights to payments and claims for reimbursement or subrogation that any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guarantee, for the express purpose that none of the undersigned shall be deemed a "creditor" of Franchisee under any applicable bankruptcy law with respect to Franchisee's obligations to us; (ii) all rights to require us to proceed against Franchisee for any payment required under the Franchise Agreement, proceed against or exhaust any security from Franchisee, take any action to assist any of the undersigned in seeking reimbursement or subrogation in connection with this Guarantee or pursue, enforce or exhaust any remedy, including any legal or equitable relief, against Franchisee; (iii) any benefit of, and any right to participate in, any security now or hereafter held by us; and (iv) acceptance and notice of acceptance by us of his, her or its undertakings under this Guarantee, all presentments, demands and notices of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest, notices of dishonor, notices of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices and legal or equitable defenses to which he, she or it may be entitled.

We shall have no present or future duty or obligation to the undersigned under this Guarantee, and each of the undersigned waives any right to claim or assert any such duty or obligation, to discover or disclose to the undersigned any information, financial or otherwise, concerning Franchisee, any other guarantor, or any collateral securing any obligations of Franchisee to us. The undersigned expressly acknowledge that the obligations hereunder survive the expiration or termination of the Franchise Agreement. This Guarantee will continue in full force and effect for (and as to) any extension or modification of the Franchise Agreement and despite the transfer of any interest in the Franchise Agreement or Franchisee, and each of the undersigned waives notice of any and all renewals, extensions, modifications, amendments, or transfers.

In addition, the undersigned consents and agrees that: (1) the undersigned's liability will not be contingent or conditioned upon our pursuit of any remedies against Franchisee or any other person; and (2) such liability will not be diminished, relieved or otherwise affected by Franchisee's insolvency, bankruptcy or reorganization, the invalidity, illegality or unenforceability of all or any part of the

Franchise Agreement, or the amendment or extension of the Franchise Agreement with or without notice to the undersigned.

If we are required to enforce this Guarantee in a judicial or arbitration proceeding, and prevail in such proceeding, the undersigned must reimburse our costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether incurred prior to, in preparation for, or in contemplation of the filing of any such proceeding. If we are required to engage legal counsel in connection with any failure by the undersigned to comply with this Guarantee, the undersigned shall reimburse us for any of the above-listed costs and expenses we incur, even if we do not commence a judicial or arbitration proceeding.

It is further understood and agreed by the undersigned that the provisions, covenants and conditions of this Guarantee will inure to the benefit of our successors and assigns.

Section 16 of the Franchise Agreement (Dispute Resolution) is incorporated by reference into this Guarantee and will be applicable to any disputes between Franchisor and any of the Guarantors, as though Guarantor was the "Franchisee" referred to in the Franchise Agreement.

GUARANTORS:

<u>bebe stores, inc.</u>

DocuSigned by:

*Manny Mashouf*

D4AD4E6A5217478...

By:   Manny  Mashouf,  Chief  Executive  Officer

552 Wisconsin Street
San Francisco, California 94107
(415) 251-3355


Percentage of Ownership in Franchisee <u>100</u>%

**EXHIBIT E**
ADDENDUM TO LEASE

This Lease Addendum ("**Addendum**"), dated _____, 20__, is entered into between _____("**Lessor**"), and _____("**Lessee**").

RECITALS

A.  The parties have entered into a Lease Agreement, dated _____, 20__, (the "**Lease**") for the premises located at _____ (the "**Premises**").

B.  Lessee has agreed to use the Premises only for the operation of a rent-to-own (also referred to as "lease purchase") home furnishings, electronics and appliances business pursuant to a Franchise Agreement (the "**Franchise Agreement**") with Buddy's Franchising and Licensing LLC ("**Buddy's Franchising**") under the name Buddy's Home Furnishings or other name **Buddy's Franchising** designates (the "**Business**").

C.  The parties desire to amend the Lease in accordance with the terms and conditions contained in this Addendum.

AGREEMENT

Lessor and Lessee agree as follows:

1.  <u>Remodeling and Decor</u>.  Lessor agrees to allow Lessee to remodel, equip, paint and decorate the interior of the Premises and to display such proprietary marks and signs on the interior and exterior of the Premises pursuant to the Franchise Agreement and any successor Franchise Agreement.

2.  <u>Assignment</u>.  Lessee has the right to assign all of its right, title and interest in the Lease to Buddy's Franchising or Buddy's Franchising's affiliates or successors at any time during the term of the Lease, including any extensions or renewals, without first obtaining Lessor's consent.  No assignment will be effective, however, until BUDDY'S FRANCHISING or its designated affiliate or successor gives Lessor written notice of its acceptance of the assignment.  If Buddy's Franchising elects to assume the lease under this paragraph or unilaterally assumes the lease as provided for in subparagraphs 3(c) or 4(a), Lessor and Lessee agree that (i) Lessee will remain liable for the responsibilities and obligations, including amounts owed to Lessor, prior to the date of assignment and assumption, and (ii) Buddy's Franchising will have the right to sublease the Premises to another licensee, provided the licensee agrees to operate the Business as a BUDDY'S HOME FURNISHINGS Business pursuant to a Franchise Agreement with Buddy's Franchising.  Buddy's Franchising will be responsible for the lease obligations incurred after the effective date of the assignment.

3.  <u>Default and Notice</u>.

    (a)      In the event there is a default or violation by Lessee under the terms of the Lease, Lessor agrees to give Lessee and Buddy's Franchising written notice of such default or violation within a reasonable time after Lessor knows of its occurrence.  Lessor agrees to provide Buddy's Franchising the written notice of default as written and on the same day Lessor gives it to Lessee.  Although

Buddy's Franchising is under no obligation to cure the default, Buddy's Franchising will notify Lessor if it intends to cure the default and unilaterally assume Lessee's interest in the lease as provided in Paragraph 3(c). Buddy's Franchising will have an additional 15 days from the expiration of Lessee's cure period in which to cure the default or violation.

(b)     All notices to Buddy's Franchising must be sent by registered or certified mail, postage prepaid, to the following address:

> Buddy's Franchising and Licensing LLC
> 4705 S. Apopka Vineland Road
> Suite 206
> Orlando, Florida 32819
> Attention: President

Buddy's Franchising may change its address for receiving notices by giving Lessor written notice of the new address. Lessor agrees to notify both Lessee and Buddy's Franchising of any change in Lessor's mailing address to which notices should be sent.

(c)     Upon Lessee's default and failure to cure a default under either the Lease or the Franchise Agreement, Buddy's Franchising has the right (but not the obligation) to unilaterally assume Lessee's interest in the Lease in accordance with Paragraph 2.

4.     Termination or Expiration.

(a)     Upon the expiration or termination of the Franchise Agreement, Buddy's Franchising has the right (but not the obligation) to unilaterally assume Lessee's interest in the Lease in accordance with Paragraph 2.

(b)     Upon the expiration or termination of the Lease, if Buddy's Franchising does not assume Lessee's interest in the Lease, Lessor agrees to cooperate and allow Buddy's Franchising to enter the Premises, without cost and without being guilty of trespass and without incurring any liability to Lessor, to remove all signs, awnings, and all other items identifying the Premises as a BUDDY'S HOME FURNISHINGS Business and to make such other modifications as are reasonably necessary to protect the marks and system, and to distinguish the Premises from BUDDY'S HOME FURNISHINGS Facilities. In the event Buddy's Franchising exercises its option to purchase assets of Lessee, Lessor agrees to permit Buddy's Franchising to remove all such assets being purchased by Buddy's Franchising.

5.     Consideration; No Liability.

(a)     Lessor acknowledges that the provisions of this Addendum are required pursuant to the Franchise Agreement and that Lessee may not lease the Premises without this Addendum.

(b)     Lessor acknowledges that Lessee is not an agent or employee of Buddy's Franchising and Lessee has no authority or power to act for, or to create any liability on behalf of, or to in any way bind Buddy's Franchising or any affiliate of Buddy's Franchising and that Lessor has entered into this Addendum with full

understanding that it creates no duties, obligations or liabilities of or against Buddy's Franchising or any affiliate of Buddy's Franchising.

(c)     Nothing contained in this Addendum makes Buddy's Franchising or its affiliates a party or guarantor to the Lease, and does not create any liability or obligation of Buddy's Franchising or its affiliates.

6.     <u>Modification</u>.  No amendment or variation of the terms of this Addendum is valid unless made in writing and signed by the parties and the parties have obtained Buddy's Franchising's written consent.

7.     <u>Reaffirmation of Lease</u>.  Except as amended or modified in this Addendum, all of the terms, conditions and covenants of the Lease remain in full force and effect.

8.     <u>Miscellaneous</u>.

(a)     Buddy's Franchising is a third party beneficiary of this Addendum.

(b)     References to the Lease and to the Franchise Agreement include all amendments, addenda, extensions and renewals to the documents.

(c)     References to Lessor, Lessee and Buddy's Franchising include the successors and assigns of each of the parties.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date written above.

LESSEE:                              LESSOR:

_____      _____

By: _____      By: _____

Title: _____      Title: _____

**EXHIBIT F**
SIGNAGE LEASE AGREEMENT


(see attached)

**EXHIBIT G**
ASSIGNMENT OF TELEPHONE NUMBERS

Date:  11-10-2020

This assignment is effective as of the date of termination of the Franchise Agreement entered into between Buddy's Franchising and Licensing LLC ("we," "us" or "our") and bb BHF Stores LLC ("you" or "your").  You hereby irrevocably assign to us or our designee the telephone number or numbers and listings issued to you with respect to each and all of your BUDDY'S HOME FURNISHINGS businesses ("telephone numbers").  This assignment is for collateral purposes only and we have no liability or obligation of any kind whatsoever arising from this assignment, unless we desire to take possession and control over the telephone numbers.

We hereby are authorized and empowered upon termination of the Franchise Agreement and without any further notice to you to notify the telephone company, as well as any other company that publishes telephone directories ("telephone companies"), to transfer the telephone numbers to us or such other person or entity as we designate.  You hereby grant to us an irrevocable power of attorney and appoint us as your attorney-in-fact to take any necessary actions to assign the telephone numbers, including but not limited to, executing any forms that the telephone companies may require to effectuate the assignment.  This assignment is also for the benefit of the telephone companies, and the telephone companies may accept this assignment and our instructions as conclusive evidence of our rights in the telephone numbers and our authority to direct the amendment, termination or transfer of the telephone numbers, as if they had originally been issued to us.  In addition, you agree to hold the telephone companies harmless from any and all claims against them arising out of any actions or instructions by us regarding the telephone numbers.

Us:

You:

bb BHF Stores LLC

BUDDY'S FRANCHISING AND LICENSING LLC

By:_____

    Its:  Chief Executive Officer

By:_____

Printed Name:  Gary Bosch

Title: President and Secretary

Notary for Your Signature

Subscribed and sworn to before me
this _____ day of _____, _____.

_____
Notary Public

**EXHIBIT H**
ASSIGNMENT OF DOMAIN NAME AND E-MAIL ADDRESS

Date:  11-10-2020

This assignment is effective as of the date of termination of the Franchise Agreement entered into between Buddy's Franchising and Licensing LLC ("we," "us" or "our") and bb BHF Stores LLC ("you" or "your").  You hereby irrevocably assign to us or our designee the domain names and e-mail addresses issued to you with respect to each and all of your BUDDY'S HOME FURNISHINGS businesses.  You agree to pay all amounts, whether due and payable or not, that any domain name registry ("Registry") or internet service provider ("ISP") may require in connection with such transfer.  This assignment is for collateral purposes only and we have no liability or obligation of any kind whatsoever arising from this assignment, unless we desire to take possession and control over the domain names and e-mail addresses.

We are hereby authorized and empowered upon termination of the Franchise Agreement and without any further notice to you to notify the Registry and the ISP to transfer the domain names and e-mail addresses to us or such other person or firm as is designated by us.  In furtherance thereof, you hereby grant an irrevocable power of attorney to us and appoints us as your attorney-in-fact to take any necessary actions to assign the domain names and e-mail addresses, including but not limited to, executing any forms that the Registry and the ISP may require to effectuate the assignment.  This assignment is also for the benefit of the Registry and the ISP, and the Registry and the ISP may accept this assignment and our instructions as conclusive evidence of our rights in the domain names and e-mail addresses and our authority to direct the amendment, termination or transfer of the domain names and e-mail addresses, as if they had originally been issued to us.  In addition, you agree to hold the Registry and the ISP harmless from any and all claims against them arising out of any actions or instructions by us regarding the domain names and e-mail addresses.

Us:                                                      You:

                                                         bb BHF Stores LLC

BUDDY'S FRANCHISING AND LICENSING LLC

By:_____
      Its: Chief Executive Officer

                                                         By:_____

                                                         Printed Name:  Gary Bosch

                                                         Title: President and Secretary

Notary for Your Signature

Subscribed and sworn to before me
this _____ day of _____, _____.


_____
Notary Public