## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (LSS)<br>(Jointly Administered)<br><br>**Re: Docket No. 474** |

### OBJECTION OF THE AD HOC GROUP OF FREEDOM LENDERS TO DEBTORS' APPLICATION FOR ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF WILLKIE FARR & GALLAGHER LLP AS CO-COUNSEL FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE

The Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**"),[2] by and through

its undersigned counsel, hereby submits this objection (the "**Objection**") to the *Debtors'*

*Application for Order Authorizing the Retention and Employment of Willkie Farr & Gallagher*

---

[1] The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] The Freedom Lender Group is comprised of the entities named in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229], as it may be amended and supplemented from time to time.

*LLP as Co-Counsel for the Debtors, Nunc Pro Tunc to the Petition Date* [Docket No. 474] (the

"**Application**") and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      It is the primary – and perhaps the most important – function of the debtor in

possession in a chapter 11 case to serve as an honest broker between and among its constituents.

The hallmark of a properly functioning chapter 11 case is the development of a plan that is a

compilation of negotiated resolutions that fit together like a mosaic.

2.      In enacting section 327(a), Congress recognized that it is fundamental to the

efficacy of this process that the independence and loyalty of debtor's counsel be beyond reproach,

and set a high bar for the approval of engagement.  For the reorganization process to work properly,

all parties and the Court must understand, and be able to rely on, the independence and impartiality

of debtor's counsel.  Absent that, not only will outcomes be warped, but suspicions and concerns

about favoritism will inevitably interfere with the process, increase litigation and expense and

could ultimately cause things to grind to a halt in a fashion that is inconsistent with the fundamental

principle that estates be efficiently administered.

3.      Here, Willkie Farr & Gallagher LLP ("**Willkie**") cannot clear the high bar set by

Congress.  As set forth herein, the firm's past and overlapping actions, relationships and

engagements prevent it from being "disinterested" as mandated by statute.  The current status of

the case is reflective of this problem.  The litigation in these cases about which everyone complains

is not a "scorched earth" strategy by the Freedom Lender Group, but rather, a consequence of the

absence of "disinterested" counsel for the Debtors.

4.      Wilkie has been acting as proposed bankruptcy co-counsel to all of the Debtors

since they filed these chapter 11 cases (the "**Chapter 11 Cases**") on November 3, 2024.  Yet, three

months later, Willkie still has not been retained as Section 327(a) counsel for those entities.  In the

Application it finally has made for official retention, Willkie fails to make sufficient disclosures regarding past and present representations. Rather than provide comfort, Willkie's disclosures include numerous red flags suggesting conflicts that would be disqualifying under the Bankruptcy Code.

5.     Foremost among these red flags is Willkie's former representation of Brian Kahn, the Debtors' former CEO and controlling stakeholder, who was the primary architect of the take private transaction that set in motion the events leading to these Chapter 11 Cases. Brian Kahn is the subject of ongoing investigations by various parties in these Chapter 11 Cases and federal enforcement agencies which resulted in his exit as CEO of Franchise Group. Willkie has other estate-adverse interests that go beyond conflicts with Brian Kahn. The firm has and continues to represent (i) various entities affiliated with, and controlled by Brian Kahn, including Vintage Capital Management, LLC ("**Vintage Capital**"), and (ii) B. Riley Financial, Inc. ("**BRF**"), the affiliated B. Riley entity that invested in the Debtors in the take private transaction and is currently the Debtors' largest shareholder. There are numerous investigations and potential claims and causes of action involving the Debtors, on the one hand, and Willkie's other clients (such as Brian Kahn, Vintage Capital, and BRF) on the other. Other lawsuits where the Debtors are not named, but other Willkie clients are, could result in indemnification claims against the Debtors. These conflicts are amplified given that Willkie, due to its deep entrenchment in the matters being investigated, may be a target of those same claims sought to be released.

6.     Willkie's multiple competing representations and associated disclosures raise significant unanswered questions regarding the firm's ability to effectively represent the Debtors, including:

- Has Willkie's representation of Brian Kahn truly ceased given its ongoing representation of Brian Kahn's investment vehicle, Vintage Capital?

- Did Willkie provide advice to Brian Kahn with respect to, or otherwise have knowledge of, a loan Vintage Capital took from B. Riley, secured by Brian Kahn's equity in Franchise Group entities, that was not disclosed to other investors in the Debtors' take private transaction?

- Were funds from Prophecy Asset Management LP ("**Prophecy**"), the investment fund that Brian Kahn has been a key member of and that is under federal investigation, used to invest in the Debtors or commingled with the Debtors' cash?

- What was the scope and involvement of Willkie in Prophecy-related matters prior to the allegations made against Brian Kahn by the SEC in November 2023?

- Did Willkie advise Brian Kahn with respect to matters other than the Prophecy actions and his departure from Franchise Group after its ethical screen was put in place in November 2023?

- Have any Willkie attorneys on Brian Kahn's side of the ethical wall ever done work for the Debtors?  Have any Willkie attorneys on the Debtors' side of the ethical wall ever done work for Brian Kahn?

- When Brian Kahn separated from the Debtors in January 2024, were the groups of Willkie attorneys advising Brian Kahn, on the one hand, and the Debtors, on the other, on opposite sides of the ethical wall Willkie refers to in the Application?

- Did Willkie create an ethical wall with respect to attorneys who represent Vintage Capital and other affiliates of Brian Kahn, on the one hand, and attorneys who represent the Debtors, on the other?

- Did Willkie create an ethical wall with respect to attorneys who represent B. Riley and its affiliates, on the one hand, and attorneys who represent the Debtors, on the other?

- Are Willkie's representations of B. Riley truly unrelated to the Chapter 11 Cases, particularly given one (undisclosed) lawsuit in which Willkie represented a B. Riley entity alleged to have violated federal securities laws in selling Franchise Group stock directly to Brian Kahn?

- Did Willkie get informed written consent or waivers from each of its clients for these concurrent representations?

- What role is Willkie playing in the two Debtor-commissioned investigations of Franchise Group's take private transaction?

7.      Willkie's request to represent Freedom VCM, Inc. and Freedom VCM Interco, Inc.

(the "**HoldCo Debtors**") is particularly troubling.  The HoldCo Debtors have only ever engaged

in one material transaction prepetition – the take private transaction, which resulted in two material assets for the HoldCo Debtors: (1) related claims and causes of action against third parties and other Debtors and (2) equity in Franchise Group, Inc.  The Debtors, on advice from Willkie and without deferring to conflicts counsel, proposed a plan in which the HoldCo Debtors' claims and causes of action may be released or transferred to creditors of Franchise Group, Inc. and its subsidiaries (collectively, "**Franchise Group**" or the "**OpCo Debtors**") and the equity in Franchise Group is cancelled.  The HoldCo Debtors' claims and causes of action may be the sole potential source of value to their creditors.  The possibility that the claims and causes of action have substantial value is bolstered by the fact that they are being investigated by three separate, estate-funded investigations: one by law firm Petrillo Klein + Boxer ("**Petrillo**"), another by an independent director at the HoldCo Debtors, Michael Wartell (with help from separate counsel), and another by the Official Committee of Unsecured Creditors.  Given the importance of these claims and causes of action, Willkie's prior (and in some cases, continuing) representation of potential defendants (such as Brian Kahn, B. Riley, Vintage Capital, and other Debtors) in lawsuits in which the HoldCo Debtors may be plaintiffs is a conflict of interest that forestalls its retention by the HoldCo Debtors.

8.     Moreover, there is a conflict of interest between the HoldCo Debtors and the OpCo Debtors.  The HoldCo Debtors have fraudulent transfer and other potential claims against the OpCo Debtors that must be independently addressed.  And the Debtors, who all have the same directors, officers and advisors (other than independent director with no decision-making power with respect to the HoldCo Debtors' chapter 11 strategy) have shown a continued willingness (through their prepetition Restructuring Support Agreement, their DIP facility and their proposed plan) to sacrifice the value of the HoldCo Debtors to benefit and appease the first lien lenders at

the OpCo Debtors in violation of *Owens Corning*.  This conflict alone means that Willkie cannot effectively represent the HoldCo Debtors.

9.      Willkie's ethical wall, the Debtors' engagement of independent directors and conflicts counsel, and Willkie's conflict waivers from the Debtors do not resolve Willkie's conflicts.  Willkie has advised and is still advising the Debtors with respect to a multitude of decisions regarding their restructuring process before and during these Chapter 11 Cases.  Chief among them is the Debtors' proposed plan, set in motion by the prepetition Restructuring Support Agreement, which contemplates releases of causes of action where Willkie has advised or is advising both the plaintiff and the defendant.  There is no indication that Willkie's ethical wall truly separates attorneys who have worked on matters for both the Debtors and other third parties Willkie has represented.  And there is no indication that Willkie received conflict waivers from the third parties with respect to which the Debtors have adverse interests, such as Brian Kahn, Vintage Capital and B. Riley.  Finally, the Debtors' retention of conflicts counsel solves nothing given that Willkie is continuing to advise the Debtors on all crucial Chapter 11 decisions, all of which have direct and indirect effects on the Debtors' claims and causes of action.

10.      Willkie has had almost four weeks since the first objection to the Application was lodged to make key supplemental disclosures and, to date, has failed to do so.  Pending further disclosures that would resolve the Application's disclosure deficiencies, Willkie has failed to meet its burden of demonstrating that it is disinterested and can effectively represent the Debtors.  And, even with additional disclosures, Willkie is incapable of satisfying the requirements of Section 327(a) of the Bankruptcy Code with respect to the HoldCo Debtors.

## BACKGROUND

11.    The Application makes a number of disclosures regarding Willkie's representations of third parties that are adverse to the Debtors, but also fails to disclose a number of facts that are potentially dispositive of whether Willkie can be retained as Section 327(a) counsel here.

### I.    What is Disclosed

12.    *Willkie's History with Brian Kahn and Vintage Capital*.  Willkie discloses that it has acted as counsel to Brian Kahn, Franchise Group's former CEO and major shareholder; Vintage Capital, an investment fund founded by Brian Kahn and the Debtors' current CEO, Andrew Laurence;[3] and Vintage Capital affiliates, all purportedly "in matters unrelated to these Chapter 11 Cases." *Declaration of Matthew A. Feldman in Support of Debtors' Application for Order Authorizing the Retention and Employment of Willkie Farr & Gallagher LLP as Co-Counsel for the Debtors, Nunc Pro Tunc to the Petition Date* [Docket No. 474-2] ("**Feldman Declaration**"), ¶¶ 14-18, App. ¶ 3.  Willkie describes Brian Kahn as "synonymous" with Franchise Group and identifies certain representations of Vintage Capital or its affiliates during 2019 – the same year that Franchise Group was formed. *Id.*; App. ¶ 1.  One such representation of Vintage Capital and its affiliates was in connection with their investments in The Vitamin Shoppe, a Franchise Group portfolio company. *Id* at ¶ 17.  Willkie asserts that this representation was unrelated to these Chapter 11 Cases because, at the time Franchise Group purchased The Vitamin Shoppe, Franchise Group was public and the transaction was approved by its board of directors and shareholders. *Id*.

13.    *Representation of Franchise Group*.  Willkie states that its first representation of

---

[3]    The proxy materials filed in connection with the Take Private Transaction describe Mr. Laurence as "a partner of Vintage [Capital] since January 2010, responsible for all aspects of its transaction sourcing, due diligence and execution."  Franchise Group, Inc. Definitive Proxy Statement (Schedule 14A) (July 14, 2023), at 107 http://edgar.secdatabase.com/1462/110465923081018/filing-main.htm

Franchise Group was in July 2019 when Liberty Tax (an entity acquired by an affiliate of Vintage Capital in August 2018) merged with Buddy's Newco, LLC ("**Buddy's**"), and changed its name to Franchise Group, Inc.  Feldman Decl. ¶ 18.  Willkie discloses that it represented both Buddy's and Vintage Capital (as controlling shareholder of Buddy's) at the time.  *Id.*  Franchise Group thereafter engaged in numerous acquisitions, dispositions and an IPO, "substantially all" of which Willkie advised on.  *Id.* at ¶ 19.  Willkie discloses other examples of concurrent representations of Vintage Capital and Brian Kahn during this time.  *Id*. at ¶¶ 17, 19, 21-27.

14.    *Take Private Transaction*.  In August 2023, Franchise Group completed a take private transaction (the "**Take Private Transaction**"), whereby Brian Kahn, Andrew Laurence, and other members of the management team took private control of Franchise Group.  *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] ("**First Day Declaration**") ¶ 32.  At the time of the Take Private Transaction, Franchise Group made certain projections valuing the company at $2.6 billion.  Through the Take Private Transaction, shareholders were paid approximately $30.00 per share with funds coming from (1) a combination of an equity investment by BRF and "certain other equity investors;" (2) contributions of equity by "Rollover Shareholders" including Brian Kahn; and (3) the incurrence of the debt financing facility provided primarily by the Freedom Lender Group (the "**HoldCo Facility**").  *Id.* at ¶¶ 32-33.[4]  Willkie states that it acted as counsel to Brian Kahn (and not Franchise Group, Vintage Capital, BRF or any other party) in the Take Private Transaction.  Feldman Decl. ¶ 21.[5]

---

[4]    *See also* Franchise Group, Inc., Current Report (Form 8-K) (Aug. 21, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001528930/000110465923093924/tm2324214d1_8k.htm.

[5]    *See* Willkie News, *Franchise Group CEO Brian Kahn Completes $2.6 Billion Take Private Transaction*, Willkie Farr & Gallagher LLP (Sept. 8, 2023), https://www.willkie.com/news/2023/09/franchise-group-ceo-brian-kahn-completes-2-6-billion-Take Private-transaction.

15.     *Take Private Class Action*.    Willkie discloses a 2024 class action lawsuit in connection with the Take Private Transaction filed in the Delaware Chancery Court against Brian Kahn, Vintage Capital, BRF and Andrew Laurence, asserting claims for breach of fiduciary duty and aiding and abetting of breaches of fiduciary duties.    *See Gale et al. v. Vintage Capital Management, LLC et al.*, Case No. 2024-0726-LWW (Del. Ch. 2024) (the "**Take Private Class Action**").    The plaintiffs in the Take Private Class Action allege that Brian Kahn and BRF violated fiduciary duties by conspiring to acquire Franchise Group at a significant discount through the Take Private Transaction.    Willkie discloses that it currently represents Franchise Group (not Brian Kahn, Vintage Capital, BRF or any other party) as a non-party in the Take Private Class Action and acknowledges that the lawsuit could lead to Franchise Group owing indemnification obligations to certain of those defendants.    Feldman Decl. ¶ 19(i).    These indemnification obligations potentially are owed to (i) BRF, a current Willkie client (as discussed below), and (ii) Brian Kahn with respect to conduct that Willkie advised him on in connection with the Take Private Transaction.

16.     *Prophecy-Related Matters*.    In November 2023, federal and state governmental authorities filed civil antitrust and criminal charges ("**Prophecy Actions**") against the President and Chief Compliance Officer of Prophecy, an investment fund that Brian Kahn acted as investment manager for.    First Day Decl. ¶ 9.    The Prophecy Actions allege that over time Brian Kahn controlled approximately 86% of Prophecy's assets under management, sustained substantial trading losses that ultimately wiped out Prophecy's funds, and fraudulently concealed such losses through, among other things, (i) engaging in secret "round trip" transactions that siphoned off cash from Prophecy's funds and gave it to Brian Kahn who then used it as "collateral" in order to obtain more investment from Prophecy's funds and (ii) securing such losses with

"fabricated" stock in a company owned by Brian Kahn that was actually never issued. *See United States of America v. John Hughes*, No. 23-cr-867-01 (D.N.J. 2023) [Docket No. 1]. Brian Kahn was identified as an unindicted, co-conspirator in the Prophecy Actions. First Day Decl. ¶ 9.

17.     Willkie discloses that it has represented Brian Kahn in "Prophecy-related matters." App. ¶ 3. Willkie states that, when the Prophecy Actions were filed, it advised Brian Kahn in connection with the criminal and civil allegations against him, including in document production and an arbitration matter. Feldman Decl. ¶ 24. The Debtors cite the allegations against Brian Kahn as one of the reasons why the Debtors failed to sell or otherwise monetize any of their businesses prepetition and had to file for bankruptcy. First Day Decl. ¶ 11. The Debtors claim to have been "suddenly rocked" by the allegations against Brian Kahn in connection with a Prophecy Action initiated by the SEC on November 2, 2023. *Id.* at ¶ 9. Therefore, it was only in November 2023 that Willkie created an ethical wall between the attorneys working for Franchise Group, on the one hand, and the attorneys working on the civil and criminal matters for Brian Kahn, on the other. Feldman Decl. at ¶ 23.

18.     *Brian Kahn's Exit*. In January 2024, Brian Kahn exited his roles as Franchise Group's CEO and a member of the Boards of Directors of Franchise Group and Freedom VCM Holdings, LLC ("**Freedom TopCo**"). First Day Decl. ¶¶ 10, 39. Willkie simultaneously advised both Brian Kahn and Franchise Group in connection with Brian Kahn's separation from Franchise Group. Feldman Decl. ¶ 26.

19.     *Representation of BRF and its Affiliates*. Willkie discloses that its current and former clients include BRF and its affiliates. Feldman Decl. ¶ 28. BRF is an affiliate of B. Riley Principal Investments, LLC, which is the majority equity holder of Freedom TopCo. *Id.* Bryant Riley is the founder and largest shareholder of BRF and currently serves as a director of the

Debtors.  *See Chapter 11 Voluntary Petition* [Docket No. 1].  Willkie states that its representations of BRF and its affiliates are "unrelated to the Debtors and these Chapter 11 Cases."  Feldman Decl. ¶ 28.  Willkie further states that it "intends to continue to represent BRF in matters unrelated to the Debtors or these Chapter 11 Cases."  *Id.* at ¶ 29.

20.    *Representation of the Debtors*.  Since before the Petition Date, Willkie has been lead counsel with respect to the Debtors' reorganization efforts, including negotiating a prepetition Restructuring Support Agreement, postpetition financing, and a plan of reorganization.  In each of these critical components of the Chapter 11 Cases, Willkie, without any apparent support from its conflicts counsel, has advised the Debtors in making decisions with respect to the Debtors' claims and causes of action, particularly with regard to their disclosure, potential value, importance to the estates, and the decision whether to retain or pursue them.[6]

## II.    What is Not Disclosed

21.    *Kahn Take Private Loan*.  "Simultaneously" with the Take Private Transaction, there were a number of side agreements between Brian Kahn and B. Riley that repositioned the parties' relative financial positions to each other.  These included a $200 million loan Vintage Capital borrowed from a BRF subsidiary secured by Brian Kahn's interests in Franchise Group (the "**Kahn Take Private Loan**"), which was amended and restated in part to grant security in the Freedom TopCo, the ultimate parent of the Franchise Group enterprise.[7]  The Kahn Take Private Loan was, upon information and belief, used to supplement Brian Kahn's contributions in the Take

---

[6]    The newly-appointed independent director at the HoldCo Debtors has no power to revisit or ratify any of these decisions and his counsel, upon information and belief, has not been engaged in negotiating or advising on any of these decisions.

[7]    B. Riley Financial, Inc., Quarterly Report (Form 10-Q) (Jan. 13, 2025) ("**B. Riley 10-Q**"), at 57 https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=318841838&type=PDF&symbol= RILY&cdn=11d8ac332380423d6be0725cc443ab4e&companyName=B.+Riley+Financial+Inc.&formType=10-Q&dateFiled=2025-01-14.

Private Transaction. The Kahn Take Private Loan gave B. Riley the ability to foreclose on Brian Kahn's pledged equity in Freedom TopCo.[8] The members of the Freedom Lender Group, who were convinced to provide the HoldCo Facility in part because of Brian Kahn's personal stake in the business, were not informed of the Kahn Take Private Loan or ancillary agreements and, thus, have potential fraud, aiding and abetting fraud, and other claims and causes of action against Brian Kahn and others. The members of the Freedom Lender Group are not the only parties with material concerns related to the Kahn Take Private Loan – the SEC has subpoenaed B. Riley in connection with the Debtors, including the Kahn Take Private Loan (contrary to assertions the Debtors have made on the record to the contrary).[9] Willkie does not make any mention of the Kahn Take Private Loan in the Application and, thus, does not indicate whether Willkie was involved with, or knew about, the Kahn Take Private Loan.

22.     *Pels v. Avril*. Willkie does not disclose its representation of Brian Kahn in connection with a complaint filed by certain Franchise Group shareholders on July 19, 2023, alleging the Take Private Transaction resulted in an inadequate purchase price and the process leading to it was flawed and tainted by the personal interests and motivations of Brian Kahn, BRF and other insiders. *See Pels v. Avril et al*, Case No. 23 CV H 07 0508 (Ohio C.P. 2023). On August 15, 2023, the *Pels* action was voluntarily dismissed by the plaintiffs.

23.     *Knowledge of Prophecy Issues*. Although the Debtors claim that they were "rocked" by the allegations raised in the Prophecy Action on November 2, 2023, Willkie fails to disclose whether it was involved in any other "Prophecy-related matters" prior to the November 2023 allegations against Mr. Kahn while it was also representing Franchise Group.

---

[8]     B. Riley 10-Q, at 58.

[9]     B. Riley 10-Q, at 51.

24.    *Connections Between Prophecy and Franchise Group.*  Willkie claims that the Prophecy-related matters have no connection to the Chapter 11 Cases.  App. ¶ 3.  Based on the facts known today, however, this assertion warrants closer scrutiny given the close connections between Brian Kahn and Prophecy, on the one hand, and Brian Kahn, Andrew Laurence, Vintage Capital and other related affiliates and the Debtors, on the other.  The transactions described in the Prophecy Action that occurred in 2018 and 2019 were around the same time that Vintage Capital and Brian Kahn started Franchise Group and were making acquisitions of new companies (such as Buddy's), pledging their stock, and utilizing these companies to engage in transactions.  Willkie does not disclose whether its representation of Brian Kahn goes back prior to this time.  Given these close ties, the numerous accusations of misappropriation of funds at Prophecy and the secret Kahn Take Private Loan, and the commonality of players (including Brian Kahn, Vintage Capital, B. Riley and Willkie) there is at least an implication of some connection between investments by Prophecy and the Debtors.  Willkie does not disclose sufficient detail to refute this plausible (if not likely) relationship.

25.    *Ongoing Representation of Vintage Capital.*  Willkie does not disclose whether its relationship with Brian Kahn has ceased completely despite not directly representing him.  Brian Kahn is the founder and a key individual behind Vintage Capital.  Together, Brian Kahn and Vintage Capital owned over 40% of the equity of Franchise Group and, as a result, had the ability to influence certain actions requiring stockholder approval, including increasing or decreasing the authorized share capital, the election of directors, declaration of dividends, the appointment of management, and other policy decisions.[10]  Willkie discloses that it is continuing to represent

---

[10]    Franchise  Group,  Inc.,  Annual  Report  (Form  10-K)  (Feb.  28,  2023),  at  16,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001528930/000152893023000005/tax-20221231.htm.

Vintage Capital, just not in matters related to these Chapter 11 Cases, and fails to explain how this does not establish a continued relationship with Brian Kahn. Willkie also does not discuss the fact that Andrew Laurence is also a partner of Vintage Capital in the Application, which, given Andrew Laurence's overlapping roles, appears to be relevant.

26.     *Ethical Wall*.  Willkie states that it put an ethical wall in place in November 2023 between the Debtors, on the one hand, and Brian Kahn in connection with the Prophecy-related matters, on the other.  But Willkie does not fill in the obvious gap: what this wall means for other matters Brian Kahn has been involved with unrelated to Prophecy, such as the negotiation of his separation from Franchise Group in January 2024.  Willkie does not disclose what side of the wall that would fall on or whether the ethical wall would even apply.  Willkie also does not disclose whether any Willkie attorneys on one side of the wall offered advice to the client on the other side prior to the wall being established.  Finally, Willkie does not disclose whether a similar ethical wall has been put in place in connection with its ongoing representations of Vintage Capital and other affiliates of Brian Kahn or BRF and its affiliates.

27.     *B. Riley Financial, Inc*.  Willkie does not disclose that it represented BRF in a complaint filed by certain Franchise Group shareholders on July 15, 2021, alleging that BRF violated federal securities laws in selling Franchise Group stock directly to Brian Kahn. *See Calenture, LLC et al v. B. Riley Financial, Inc. et al*, Case No. 21-cv-06087 (S.D.N.Y. 2021).  On November 19, 2021, the *Calenture* action was voluntarily dismissed by the plaintiffs.  The Application does not make clear how long BRF and its affiliates have been clients of the firm, whether an ethical wall has ever been established with respect to any representations between BRF and Franchise Group, or why such representations are "unrelated" to the Chapter 11 Cases.

28.    *Other Engagement Terms*.  Willkie filed a copy of its engagement letter with the Debtors (entered into on August 27, 2024, long after it had represented Franchise Group on the Take Private Transaction and many other transactions).  App.; Ex. C.  This engagement letter contains a broad and non-specific acknowledgment that Willkie might have other clients that may be adverse to the Debtors and requests a waiver.  But the engagement letter is not specific about what conflicts the Debtors are actually waiving, even though Willkie was representing parties who were clearly adverse to the Debtors at the time: Brian Kahn, Vintage Capital and BRF.  Also, the Application does not indicate whether Willkie received a conflicts waiver from Brian Kahn, Vintage Capital and other affiliates of Brian Kahn, BRF or other B. Riley affiliates as it pertains to its ongoing representation of the Debtors on adverse matters.

29.    *Ongoing Investigations*.  As described below, there are numerous ongoing independent investigations into potential claims and causes of actions belonging to the Debtors being undertaken in these Chapter 11 Cases and that are continuing.  Willkie does not disclose what role, if any, it is playing in connection with these investigations.

### III.    Ongoing Debtor Investigations

30.    The actions taken by Brian Kahn, Vintage Capital, BRF and others involved in the Take Private Transaction gives rise to a number of potential claims and causes of action that the Debtors (among others) own.[11]  The Debtors have hired a law firm, Petrillo, to conduct an investigation of those claims.  First Day Decl. ¶ 42.  The Debtors have also appointed (belatedly, as described more fully below) an independent director for the HoldCo Debtors, Michael Wartell (who has himself hired another law firm, Akin Gump Strauss Hauer & Feld LLP) to conduct

---

[11]    A list of these potential causes of action can be found in the proofs of claim filed by the agent under the HoldCo Facility and the members of the Freedom Lender Group.  *See* Claim Nos. 1804, 1847, 1862, 1878, 1898, 1904, 1913, 1924, 1955, 1961, 1975, 1977, 1980, 2006, 2054, 2098, 2106, 2107, 2109, 2110, 2171, 2137.

another investigation of intercompany claims held by or against the HoldCo Debtors.  *See Application of Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. for Entry of an Order Authorizing the Employment and Retention of Akin Gump Strauss Hauer & Feld LLP as Special Co-Counsel on Behalf of and at the Sole Discretion of the Independent Director, Michael J. Wartell, Effective as of December 9, 2024* [Docket No. 702].  The Official Committee of Unsecured Creditors is conducting its own investigation of claims and causes of action the Debtors may have.  Notwithstanding these three ongoing investigations (in addition to those being conducted by numerous federal agencies), Willkie has repeatedly downplayed and suppressed the value of potential claims and causes of action that could be value accretive to the Debtors' estates. *See Notice of Filing of Exhibits to Disclosure Statement for the Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* [Docket No. 592] at Ex. 1 ("**Liquidation Analysis**"), General Notes & Assumptions No. 7 (stating that "subject to the completion of the [Petrillo and Wartell] investigations, the Debtors do not believe that any such claims and causes of action exist. Accordingly, no value has been assigned to any such claims and causes of action.").

IV.    **HoldCo Debtors**

31.    The HoldCo Debtors were created solely to incur the HoldCo Facility (of which 93% was provided by the members of the Freedom Lender Group) and immediately distribute the proceeds thereof in the Take Private Transaction and have not engaged in any material transactions since.  The HoldCo Debtors have only one non-insider creditor: the lenders under the HoldCo Facility.  The HoldCo Debtors have no independent fiduciary looking out for the interests of the HoldCo Debtors' stakeholders – instead, there is a near total overlap of directors, officers and advisors between the HoldCo Debtors and the OpCo Debtors.  Even Mr. Wartell, the only arguably independent fiduciary on behalf of the HoldCo Debtors, has no decision-making power with

respect to the HoldCo Debtors' chapter 11 strategy. He does not even have the power to ensure that the very causes of action he was appointed to investigate are preserved for the benefit of the HoldCo Debtors and their creditors, rather than released as currently contemplated. That decision will be made by the conflicted board. Mr. Wartell was only appointed long after the Debtors' chapter 11 strategy (including with respect to causes of action) was set in motion by the Restructuring Support Agreement and the filing of a Plan that proposes to release and/or give away the HoldCo Debtors' causes of action. This lack of independence of the HoldCo Debtors is evidenced by every action the Debtors have taken in these Chapter 11 Cases, from the entering into a prepetition Restructuring Support Agreement without any input from, or consideration of, its sole creditors, to its attempt to saddle the HoldCo Debtors with over $250 million of postpetition financing for which it would receive no benefit, to the pursuit of a plan that would extinguish the HoldCo Debtors' only valuable assets.

32.    Through its Application, Willkie seeks to be retained as Section 327(a) counsel for each of the 53 Debtors, including the HoldCo Debtors. The Application does not explain why the HoldCo Debtors have determined that it is in the best interests of their estates and their stakeholders to retain the same law firm that has represented (and, in certain cases, continues to represent) defendants of claims and causes of action that may be the HoldCo Debtors' only recoverable asset, including claims stemming from the Take Private Transaction.

## **OBJECTION**

33.    Section 327(a) of the Bankruptcy Code authorizes a debtor in possession, with court approval, to employ professionals only if they (1) "do not hold or represent an interest adverse to the estate" and are (2) "disinterested persons." 11 U.S.C. § 327(a); *In re BH & P, Inc.*, 949 F.2d 1300, 1314 (3d Cir. 1991). Under sections 327(a) and (c) of the Bankruptcy Code, the Court must

disqualify an attorney with an actual conflict of interest and may disqualify an attorney with a potential conflict of interest. *See In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 476 (3d Cir. 1998).

34.     Willkie, as the professional seeking to be retained under section 327(a), "bears the burden of establishing that it is 'both disinterested and [does] not represent an interest adverse to the estate.'" *In re Vascular Access Ctrs, L.P.*, 613 B.R. 613, 624 (Bankr. E.D. Pa. 2020) (quoting *In re Big Mac Marine, Inc.*, 326 B.R. 150, 154 (8th Cir. BAP 2005)). Willkie is thus obligated to provide complete disclosures regarding, among other things, all of its connections with the Debtors, creditors and any other party in interest. Fed. R. Bankr. P. 2014; Del. R. Bankr. P. 2014-1. Willkie's compliance with Bankruptcy Rule 2014 is mandatory and ongoing. *In re eToys, Inc.*, 331 B.R. 176, 188-90 (Bankr. D. Del. 2005).

## I.     Willkie Has Failed to Provide Adequate Disclosures Regarding All Connections to the Debtors and Other Parties In Interest

35.     Bankruptcy Rule 2014 requires that the attorney seeking employment disclose to the Court "*all connections* with parties in interest in the case, rather than furnishing only those which appear to implicate 'disinterestedness' or 'adverse interest' concerns under section 327(a)." *In re eToys, Inc.*, 331 B.R. at 190 (emphasis in original) (citing *In re Filene's Basement, Inc.*, 239 B.R. 850, 856 (Bankr. D. Mass 1999)). Moreover, Willkie's disclosures must be complete. Fed. R. Bankr. P. 2014; Del. R. Bankr. P. 2014-1. The four corners of a retention application must contain enough information for a court and parties in interest to make a determination that the counsel is disinterested for purposes of section 327(a) of the Bankruptcy Code. *See In re eToys, Inc.*, 331 B.R. at 193 ("It is not sufficient that the information might be mined from petitions,

schedules, section 341 meeting testimony, or other sources.") (quoting *In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 236 (Bankr. E.D. Cal. 1988)).

36.     As stated above, there are numerous gaps and unanswered questions in the disclosures made in the Application.  Willkie has not provided sufficient information regarding its prior and ongoing representations of Brian Kahn, Vintage Capital, BRF, Prophecy or any other entity affiliated with Brian Kahn for parties to fully evaluate whether Willkie is disinterested. Willkie does not mention that Andrew Laurence is also an owner of Vintage Capital.  Willkie also failed to disclose at least two lawsuits where it has represented entities other than Franchise Group that relate to the Take Private Transaction.  Willkie entirely fails in the Application to mention the existence of the Kahn Take Private Loan, which is a crucial component of the Take Private Transaction and related investigations and potential claims and causes of action.[12]   Additionally, little is disclosed (in the Application or otherwise) about the current holdings and connections between Vintage Capital, Brian Kahn, Mr. Laurence, and the transactions discussed in the Prophecy Action.

37.     Willkie's disclosures of overlapping and simultaneous representation of entities with competing interests (without sufficient ethical walls being put into place) suggest Willkie has allegiances to clients currently at odds with the Debtors that render it unable to effectively represent the Debtors.  For instance, Willkie discloses that, starting in 2019, it advised Vintage Capital, Brian Kahn, and Franchise Group at the same time, interchangeably and without any ethical walls established.  Willkie also discloses that it advised Brian Kahn in matters specifically involving Franchise Group.  Most concerning is its representations of Brian Kahn with respect to (i) the Take Private Transaction that set in motion the events leading to the Debtors filing for

---

[12]    B. Riley 10-Q, at 16.

bankruptcy and (ii) the recent separation of Brian Kahn from Franchise Group, with respect to which Willkie discloses that it simultaneously represented both Brian Kahn and Franchise Group, but doesn't make clear whether its ethical wall applied to that negotiation.  Feldman Decl. ¶¶ 21, 26.  And there is little information disclosed regarding Willkie's representation of BRF and its affiliates, particularly at the time of the Take Private Transaction.

38.    Now, Willkie seeks permission to advise each of the Debtors with respect to how to address potential claims and causes of action against other Debtors and third parties that, in some cases, are related to the advice Willkie to the defendant.  These claims and causes of action are of potentially significant value and, in the case of the HoldCo Debtors, are likely the only source of value to distribute to their stakeholders.  And, in some cases, the Debtors are not named parties to pending lawsuits but such causes of action may give his to indemnification claims held by current and former clients of Willkie against the Debtors.  Further, given that Willkie provided advice to Brian Kahn in connection with the Take Private Transaction and potentially other matters giving rise to viable causes of action, the firm itself could potentially be a target of lawsuits.

## II.    Willkie's Disclosure Failures Implicate a Disqualifying Conflict

39.    Willkie's inadequate disclosures suggests that actual, or at least potential, conflicts exist.  Although section 327(a) contains two prongs, in many cases they collapse into a single test – whether the professional holds an interest materially adverse to the interest of the estate.  *In re Boy Scouts of Am.*, 35 F.4th 149, 157 (3d Cir. 2022).  In determining whether a professional has an interest materially adverse to the interest of the estate, the Court may consider "whether a possible conflict implicates the economic interests of the estate and might lessen its value." *Id.* at 158 (citing *U.S. Tr. v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 509 (3d Cir. 1999) ("A [c]ourt may consider an interest adverse to the estate when counsel has 'a competing

economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant.'")). The Third Circuit has held that:

> (1) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion – pursuant to § 327(a) and consistent with § 327(c) – disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the appearance of conflict alone.

*Staiano v. Pillowtex, Inc. (In re Pillowtex, Inc.)*, 304 F.3d 246, 251 (3d Cir. 2002) (quoting *In re Marvel*, 140 F.3d at 476).

40.     The Bankruptcy Code does not define "actual conflict of interest." *See In re Pillowtex*, 304 F.3d at 251. "Pragmatically, a conflict is actual when the specific facts before the bankruptcy court suggest that 'it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest.'" *In re Boy Scouts of Am.*, 35 F.4th at 158 (quoting *Pillowtex*, 304 F.3d at 251). Courts should also "generally disapprove employment of a professional with a potential conflict." *In re BH & P, Inc.*, 103 B.R. 556, 564 (Bankr. D.N.J. 1989), *aff'd*, 949 F.2d at 1316.

41.     As described above, Willkie (i) has advised and is advising third parties who are potential defendants of claims and causes of action belonging to the Debtors, including (in some cases) with respect to the same actions giving rise to those claims and causes of action, (ii) is currently representing all of the Debtors with respect to all strategic decisions regarding these Chapter 11 Cases (such as the Debtors' proposed plan) that implicate how the Debtors will address potential claims and causes of action, (iii) has given advice with respect to claims and causes of action as to which it may itself be a defendant, and (iv) is advising the Debtors in connection with

potential indemnification claims against the Debtors arising from suits against Brian Kahn, Vintage Capital and BRF, all current and former clients of Willkie.

42.     Willkie's delegation of investigations of certain potential claims to Petrillo and Michael Wartell does not cure the conflict because Willkie continues to guide the trajectory of these Chapter 11 Cases.  Every decision the Debtors make – from the terms of the Restructuring Support Agreement, to their postpetition financing, to their disclosure statement, to their payment of prepetition "critical" vendor claims, to the bidding procedures in their sale process and to the plan they are pursuing – implicates, in some way, the pursuit of claims and causes of action against third parties and the potential releases of those claims.  Willkie is the one drafting, negotiating and advising the Debtors on those releases.  To that end, the Debtors' proposed plan does not make clear that viable claims and causes of action identified in either investigation will be preserved for the benefit of creditors and not released.  *See First Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* [Docket No. 654] §§ 7.10 (stating that, if the independent investigation at the HoldCo Debtors uncovers claims or causes of action that are not otherwise released, the HoldCo Debtors are authorized – but not required – to set up a liquidation trust to hold such claims or causes of action); 12.2 (stating that the Debtors' plan releases are subject to ongoing investigations but not making clear that any claims or causes of action identified in an investigation will not be released).  Further, Willkie does not disclose whether it has any involvement or role in these supposedly independent investigations.

43.     Given these dynamics, instances of Willkie's economic interests potentially deviating from those of the Debtors and lack of general disinterestedness are not difficult to identify.  Willkie has an incentive to ensure that claims and causes of action against Brian Kahn, Vintage Capital (and by virtue Mr. Laurence), BRF and others who participated in the Take Private

Transaction are not pursued because, in some cases, Willkie gave advice to those parties in connection with the same matters giving rise to those claims and causes of action. Willkie's incentive to downplay claims and causes of action against its current and former clients (including in lawsuits related to the Take Private Transaction it did not originally disclose) is directly at odds with the Debtors' fiduciary duty to protect and maximize the value of their estates' assets, which include any such claims and causes of action. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (citing *In re Marvel*, 140 F.3d at 474); *see also In re Harris Agency, LLC*, 451 B.R. 378, 391 (Bankr. E.D. Pa. 2011) ("As counsel to a bankruptcy estate, it is the job of a firm to maximize value for both the debtor *and* its creditors.") (emphasis in original) (citations omitted).

44.    The best example of Willkie's conflicts is the transaction pursuant to which Brian Kahn separated from Franchise Group where Willkie simultaneously represented both parties, without disclosing whether the ethical wall was in effect thereto. This is a clear and irreconcilable conflict that cannot be cured and has created a ripple effect that permeates every aspect of these Chapter 11 Cases. And this is particularly the case with respect to Willkie itself, which could very well be implicated in any claim or cause of action because of knowledge it possessed and advice it provided to defendants. It is illogical that Brian Kahn had to step down from Franchise Group given pending investigations and allegations against him but Willkie, who advised Brian Kahn throughout the actions he took that lead to this, remains as counsel to Franchise Group. The potential claims and causes of action against third parties that Willkie advised in connection with the very actions giving rise to such actions create irreconcilable conflicts for Willkie, economically, reputationally and with respect to its own potential liability, and suggest that Willkie cannot effectively represent the Debtors as a result.

45.     Willkie is also incentivized, and in some instances required, to avoid any liability for Brian Kahn, Vintage Capital, BRF and other parties that participated in the Take Private Transaction to avoid indemnification claims against the Debtors, which is understandable in theory but is directly at odds with potentially valuable claims and causes of action the Debtors may have against those same third parties (particularly given that the Debtors do not necessary have to pay unsecured claims against them in full). *See In re B.E.S. Concrete Prods, Inc.*, 93 B.R. at 235 (holding that parties seeking indemnification from the bankruptcy estate hold "adverse" positions to the debtor).

46.     In light of the foregoing, Willkie likely has actual conflicts, or at least potential conflicts.  The Third Circuit has held that courts should generally disapprove employment of a professional with a potential conflict, subject to certain exceptions. *In re BH&P, Inc.*, 949 F.2d at 1316.  These exceptions are (i) in large cases where every competent professional in a particular field is already employed by a creditor or a party in interest, or (ii) where the possibility that the potential conflict will become actual is remote, and the reasons for employing the professional in question are particularly compelling. *Id.*  Here, there is no showing that every competent law firm is already employed in these Chapter 11 Cases.  Further, it cannot be determined that the chance the conflict becomes actual here is remote given the numerous allegations pending against Brian Kahn, the need to have multiple investigations regarding the claims and causes of action that would create the conflict, and the fact that those investigations remain pending.  It cannot be the case that parties must wait until the end of the Chapter 11 Cases to see if the investigations have identified claims and causes of action that would conflict Willkie and whether such claims are being released to determine whether Willkie should be retained as Debtors' counsel.

### III.    Willkie's Conflicts Are Particularly Disqualifying for the HoldCo Debtors

47.    In light of the disclosure deficiencies in the Application and the potential and actual conflicts of interest that it identifies, the Application should be denied for all Debtors – but the proposed retention of Willkie as Section 327(a) is counsel is particularly inappropriate with respect to the HoldCo Debtors.  The HoldCo Debtors have two assets (1) causes of action and (2) the equity in Francise Group.  The claims and causes of action against other Debtors and against third parties such as Brian Kahn, Vintage Capital, BRF and others involved in the Take Private Transaction may ultimately be the only asset that has provides value to the HoldCo Debtors' creditors.  Therefore, every decision made by the HoldCo Debtors in these Chapter 11 Cases is colored by the treatment of these claims and causes of action.  Willkie has taken the lead since before the Petition Date on advising the Debtors with respect to these decisions, including entering into the Restructuring Support Agreement and pursuing the DIP facility, the sale, and now the Debtors' proposed plan, each resulting in a diversion of the value of the HoldCo Debtors' assets to the OpCo Debtors' stakeholders.  All of these actions results in the diversion of value of the HoldCo Debtors to the OpCo Debtors' stakeholders – an action prohibited by Owens Corning and its progeny.  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (holding that courts should "respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.").  By virtue of its past, and in some cases continuing, representation of potential defendants in these claims and causes of action, Willkie should not be representing the HoldCo Debtors in these Chapter 11 Cases with respect to decisions made with respect to these causes of action, regardless of what any purportedly independent investigation concludes.

48.    As for the HoldCo Debtors' other asset, its equity in Franchise Group, Inc., in 2023, the Debtors presented the Freedom Lender Group with projections about how well the business

would do, and the members of the Freedom Lender Group entered into the Take Private Transaction, receiving a pledge of the equity of Franchise Group, Inc. on the basis of those projections. Sixteen months later, the Debtors' proposed plan will cancel it, potentially for no value. Moreover, it is not currently anticipated that any recoveries from the Debtors' rushed and deeply flawed sale process (if any sale is even consummated) will flow to equity of any of the Debtors. Willkie should not represent the HoldCo Debtors with respect to any negotiation of their claims against any potential defendant with respect to those misleading projections, including Brian Kahn, the other Debtors in existence at the time, or potentially Willkie itself.

## IV.    Willkie Has Failed to Provide Adequate Disclosures Regarding Its Ethical Wall

49.    Willkie may argue that its otherwise-disqualifying conflicts are cured because of an ethical wall it put in place with respect to Brian Kahn and Franchise Group in November 2023. In determining whether an ethical wall is adequate, courts in this district look to five factors: (1) the substantiality of the relationship between the attorney and the client; (2) the time lapse between the matters in dispute; (3) the size of the firm and the number of disqualified attorneys; (4) the nature of the disqualified attorney's involvement; and (5) the timing of the ethical wall. *In re Maxus Energy Corp.*, 626 B.R. 249, 257 (Bankr. D. Del. 2021) (citing *Enzo Life Scis., Inc. v. Adipogen Corp.*, No. 11-cv-00088 (RGA), 2013 WL 6138791, at *3 (D. Del. Nov. 20, 2013)).

50.    As discussed above, the Application fails to disclose all connections that Willkie has to Brian Kahn, BRF, Vintage Capital, and other parties that participated in the Take Private Transaction. The Application also fails to even make clear how many years Willkie has represented Brian Kahn, Vintage Capital, or any other entities affiliated with Brian Kahn. Therefore, the Application currently makes it impossible to assess whether Willkie's ethical wall satisfies the first, second, and fourth factors used to determine its adequacy.

51.    What is disclosed is that, in November 2023, Willkie established an ethical wall

upon learning of the Prophecy-related allegations against Brian Kahn. Feldman Decl. ¶ 23. This ethical wall was established long after Willkie had represented and provided substantial advice to Franchise Group for at least four years and Brian Kahn and Vintage Capital for potentially years longer. The wall was established after Willkie represented Kahn in the Take Private Transaction and only with respect to issues between Franchise Group and Brian Kahn – not with respect to any other of Willkie's concurrent representations. *Id.* at ¶ 21, 23. And, the Application does not disclose any ethical wall in place with respect to BRF (which provided the equity financing in the Take Private Transaction, is a defendant in the Take Private Class Action, whose founder and largest shareholder currently serves as a director of the Debtors and whom Willkie represented in connection with the *Calenture* complaint) or its affiliates (one of which is currently owed over $200 million from Vintage Capital). BRF itself has disclosed that both BRF and Bryant Riley have each received subpoenas from the United States Securities and Exchange Commission, requesting the production of documents and other information primarily related to, among other things, (i) BRF's business dealings with Brian Kahn and (ii) Franchise Group (including Freedom TopCo).[13] The Application is also not clear whether the ethical wall was in effect during Willkie's concurrent representations during Brian Kahn's separation from Franchise Group.

52. Even though ethical walls may, at times, cure or prevent disqualifying conflicts from occurring, the depth of Willkie's existing clients and the insufficiency of the ethical wall cannot help Willkie to establish its "disinterestedness" here, particularly with respect to advice it gave prior to putting the ethical wall in place. *See In re Enviva Inc.*, No. 24-10453 (BFK), 2024 WL 2795274, at *9 (Bankr. E.D. Va. May 30, 2024) (finding establishment of an ethical wall could not cure conflicts where attorneys at V&E had been representing two clients with competing

---

[13]   B. Riley 10-Q, at 51.

interests at the same time); *Intell. Ventures I LLC v. Checkpoint Software Techs. Ltd.*, No. 10-1067 (LPS), 2011 WL 2692968, at *13 (D. Del. Jun. 22, 2011) (finding ethical wall would not be adequate where defendant's law firm had formerly represented plaintiff's law firm in substantially related matter, and had lawyers from both matters in the same office); *James v. Teleflex, Inc.*, No. 97-1206, 1999 WL 98559, at *6 (E.D. Pa. Feb. 24, 1999) (holding that even "facially sufficient" screen does not cure conflict of interest when factors weigh in favor of disqualification).

## V.    Willkie's Conflicts of Interest Cannot Be Waived

53.    Pursuant to their engagement letter with Willkie, the Debtors purport to have waived "any conflict of interest that exists or might be asserted to exist and any other basis that might be asserted to preclude, challenge or otherwise disqualify Willkie." App., Exhibit C. Advance prepetition conflict waivers, however, are not effective to establish disinterestedness under 327(a) because creditors and the estate have no ability to agree to that waiver. *See In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005) (holding that for purposes of the disinterestedness standard under section 327(a), waivers are "ordinarily not effective") (citing *In re Granite Partners L.P.*, 219 B.R. 22, 34 (Bankr. S.D.N.Y. 1998)); *In re Decade S.A.C., LLC*, No. 18-11668 (CSS), 2022 WL 486952, at *7 (Bankr. D. Del. Feb. 17, 2022) (chapter 7 trustee's special counsel was on both sides of negotiation and thus in position to favor one interest over another, creating "an actual, non-waivable conflict" requiring special counsel's disqualification); *In re Project Orange Assocs., LLC*, 431 B.R. 363, 374 (Bankr. S.D.N.Y. 2010) ("Even if GE agreed that DLA Piper could act against GE on all issues, through litigation, negotiation or otherwise, DLA Piper must still satisfy the statutory requirements of section 327(a) to be retained as general bankruptcy counsel."); *In re Jeep Eagle 17, Inc.*, No. 09-23708 (DHS), 2009 Bankr. LEXIS 3614, at *14 (Bankr. D.N.J. Jul. 13, 2009) ("Consent by a Chapter 11 debtor to waive

conflicts is insufficient because the ultimate parties in interest are the bankruptcy estate's creditors.").

54.    Further, the general waiver Willkie received in the engagement letter cannot meet the standard for knowing and informed consent under the Model Rules of Professional Conduct of the American Bar Association because it does not directly identify Willkie's concurrent representations of Brian Kahn, Vintage Capital, or BRF or its affiliates, particularly where such representations are clearly in matters "substantially related" to the Debtors. *See* Local Rule 9010-1(f); Model R. Prof'l Conduct 1.0(e) (defining "informed consent" as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct"); *In re 1H 1, Inc.*, 441 B.R. 742, 746 (Bankr. D. Del. 2011) (finding that under Model Rule of Professional Conduct 1.9, matters are "substantially related" if (1) they involve the same transaction or (2) if there is a risk that the attorney gained confidential, relevant information from the former client); *see also In re Meridian Auto. Sys.-Composite Operations, Inc.*, 340 B.R. 740, 748 (Bankr. D. Del. 2006) (holding general, open-ended consent to a future conflict as ineffective and not within the Model Rules of Professional Conduct's definition of "informed consent").

## **RESERVATION OF RIGHTS**

55.    The Freedom Lender Group reserves the right to supplement this Objection based on any additional information it receives from Willkie or any other party regarding the matters set forth herein.

## **CONCLUSION**

56.    For the reasons set forth above, the Freedom Lender Group respectfully requests that the Court deny the Application and grant such other relief as it may deem just and proper.

Dated: January 31, 2025
       Wilmington, Delaware

**FARNAN LLP**

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: bfarnan@farnanlaw.com
      mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**

Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
      azatz@whitecase.com
      sam.hershey@whitecase.com
      erin.smith@whitecase.com
      brett.bakemeyer@whitecase.com

*Counsel to the Freedom Lender Group*