## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Ref. Docket Nos. 474, 642, 730, & 885** |

### JOINT REPLY OF THE DEBTORS AND WILLKIE FARR & GALLAGHER LLP IN SUPPORT OF DEBTORS' APPLICATION FOR ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF WILLKIE FARR & GALLAGHER LLP AS CO-COUNSEL FOR THE DEBTORS, *NUNC PRO TUNC* TO THE PETITION DATE

The debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") and Willkie Farr & Gallagher LLP ("Willkie") file this joint reply (the "Reply") in support of the *Debtors' Application for Order Authorizing the Retention and Employment of Willkie Farr & Gallagher LLP As Co-Counsel for the Debtors,* Nunc

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

Pro Tunc *to the Petition Date* [Docket No. 474] (the "Application")[2] and in response to the objections of: (a) the United States Trustee (the "UST") [Docket No. 730] (the "UST Obj."); (b) the Settlement-Related Liquidating Trust 2022-23 (the "Prophecy Trust") [Docket No. 642] (the "Prophecy Trust Obj."); and (c) the Ad Hoc Group of Freedom Lenders (the "Freedom Lenders" and, collectively with the UST and the Prophecy Trust, the "Objectors") [Docket No. 885] (the "Freedom Lenders Obj." and, collectively with the UST Obj. and the Prophecy Trust Obj., the "Objections").  In support of this Reply, the Debtors and Willkie rely on and incorporate by reference the declaration of Matthew A. Feldman, attached to the Application as Exhibit A [Docket No. 474-2] (the "Initial Feldman Declaration") and the supplemental declarations of Matthew A. Feldman (the "Supplemental Feldman Declaration," and, together with the Initial Feldman Declaration, the "Feldman Declarations") and David Orlofsky (the "Supplemental Orlofsky Declaration") in support of the Application, which were filed concurrently herewith, and respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      For all of the ink the Objectors spill in opposition to Willkie's retention, they fail to identify a concrete reason why Willkie, with the customary assistance of conflicts counsel, cannot zealously discharge its duties as Debtors' counsel.  Indeed, while the Objections are rife with innuendo and supposition—and peppered with headline-grabbing allegations about Franchise Group's former Chief Executive Officer—they barely confront the known facts that actually bear on Willkie's retention and are vanishingly thin on meaningful analysis of how section 327 of the Bankruptcy Code applies to these facts.  So why is all the fur flying about professionals' retention

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Application or the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "First Day Declaration").

in these already challenging cases?  The answer lies in a brief review of who does (and does not) object and what each Objector actually seeks to accomplish.

2.        The UST complains about the disclosures set forth in the Initial Feldman Declaration.  Over the past several weeks, Willkie has answered dozens of formal and informal information requests from the UST regarding the firm's retention.  Willkie has now filed the lengthy Supplemental Feldman Declaration, offering still further details regarding its connections to the Debtors and every conceivable party in interest.

3.        Perhaps most notable are two key stakeholders who do <u>not</u> object.  They include (i) the Consenting First Lien Lenders, who have entered into the Restructuring Support Agreement (the "<u>RSA</u>") and funded these Chapter 11 Cases with a substantial DIP commitment and (ii) the Official Committee of Unsecured Creditors (the "<u>Committee</u>").  Both of these creditor constituencies know that it is not yet clear if the distributable value available under the Debtors' Plan[3] will satisfy even the first lien claims, let alone ultimately flow to the Committee's constituents, so both have nothing to gain (and plenty to lose) if the Debtors were to retain counsel somehow incapable of zealously seeking to maximize the estates' value.

4.        The objecting Prophecy Trust, in contrast, asserts its standing as a party in interest based on its purported equity interest in one of the Debtors.  As a result, its potential economic stake is behind both the first and second lien claims and all general unsecured creditors.  In short, the Prophecy Trust has nothing to lose by derailing these cases.

5.        And then there are the Freedom Lenders, the vast majority of whose claims sit at two intermediate holding companies—<u>i.e.</u>, behind more than one billion dollars in first lien claims,

---

[3]    As used herein, "Plan" means the *Second Amended Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors*, which was filed concurrently with this Reply.

second lien claims, and general unsecured claims at the operating company level. By the Freedom Lenders' own admission, the only assets at the holding company ("HoldCo") level are an equity pledge of the operating companies and potential causes of action the Freedom HoldCo Debtors might later bring. The Freedom Lenders sit in a deeply subordinated position in the capital structure and, thus, sit miles out of the money. Viewed in that light, it makes sense that the Freedom Lenders' strategy from the outset was to break these Chapter 11 Cases apart, launching scorched-earth litigation against every significant form of relief the Debtors have sought since the Petition Date and appealing multiple orders Judge Dorsey entered regarding fundamental aspects of these cases. Apparently lacking confidence in those appeals (and rightly so), the Freedom Lenders have now concluded that their best hope of blowing up the RSA and Plan process is to disrupt Willkie's retention. The Freedom Lenders' motivation is transparent and, as the Supplemental Orlofsky Declaration demonstrates, rejecting Willkie's retention will throw these cases into further disarray, thereby accomplishing what the Freedom Lenders' legal challenges to the RSA and Plan cannot. Supplemental Orlofsky Declaration ¶ 8. Indeed, the Freedom Lenders' make no secret of their essential rationale: if Willkie is not supporting our efforts to blow up the RSA, then the firm must somehow be biased. See Freedom Lenders Obj. ¶ 2. That argument—which is grounded in playground pique, not the Bankruptcy Code—is meritless.

6.     As set forth in the Application and further below, Willkie has more than met the disclosure requirements of Bankruptcy Rule 2014 and clearly satisfies the standards for retention under section 327 of the Bankruptcy Code. Willkie's proposed retention should be approved, and the parties in interest should get back to the important work of maximizing the value of the Debtors' estates.

## **BACKGROUND**

7.      Willkie has, for many years, served as primary outside counsel to the Debtors,

handling a wide variety corporate, regulatory, litigation, and other matters.  As a consequence,

Willkie is deeply familiar with the Debtors' operations and businesses and is, therefore, uniquely

qualified to serve as co-counsel to the Debtors in these Chapter 11 Cases.  Willkie has also

previously represented Brian Kahn ("Mr. Kahn") and certain of his affiliates in various matters,

including, as principally relevant to the Application, the Take-Private Transaction, and has acted

as counsel to Mr. Kahn in connection with certain civil and criminal allegations against him that

came to light in November 2023.  These representations were done with the knowledge and consent

of the relevant parties, including Franchise Group.  None of Franchise Group, Mr. Kahn, or their

affiliates object to Willkie serving as counsel to the Debtors, with the assistance of conflicts

counsel.  Willkie's representations are fully disclosed in the Feldman Declarations.

8.      With completion of the Supplemental Feldman Declaration and provision of

extensive formal and informal discovery to the Objectors, the essential facts are established:

- Willkie has represented Franchise Group since July 2019, and represented Franchise Group's corporate predecessor since March 2018.  Willkie has performed extensive work as Franchise Group's primary outside counsel.

- In August 2023, the Debtors effectuated the Take-Private Transaction led by Mr. Kahn.  Public shareholders received $30.00 per share.  The transaction was financed by, among others, B. Riley Principal Investments, LLC (and affiliates) at the operating company ("Opco") level.  At the HoldCo level, the transaction was financed (with debt structurally subordinated to the Opco debt, which had first claim on the Company's assets) by the Freedom Lenders—PIMCO and Irradiant Partners.  The business rationale of the Take-Private Transaction was predicated on a relatively rapid planned deleveraging through monetization transactions involving the various business segments of Franchise Group.

- Willkie represented Mr. Kahn and/or his affiliates on various matters prior to October 16, 2024, including in the Take-Private Transaction.  Troutman Pepper Locke LLP ("Troutman") represented the Debtors in the Take-Private Transaction.

Wachtell, Lipton, Rosen & Katz LLP ("Wachtell") represented the Special Committee of the Board in the Take-Private Transaction.

- On November 2, 2023, the federal government revealed criminal and civil fraud allegations against Mr. Kahn, in connection with his work for a hedge fund called Prophecy Asset Management LP ("Prophecy"). That work was done outside of Mr. Kahn's role as Chief Executive Officer of Franchise Group, and his misconduct was unknown to Franchise Group prior to the federal government's disclosure.

- On November 7, 2023, Willkie established an exclusionary ethical wall between the teams representing the Debtors on matters related to the criminal and civil allegations against Mr. Kahn, on the one hand, and Mr. Kahn on the personal civil and criminal matters, on the other hand.

- The Debtors retained Petrillo Klein + Boxer ("Petrillo") to conduct an independent investigation into whether the Debtors or any of their executive officers or employees at the time (other than Mr. Kahn) were involved in, or had any knowledge of, any of Mr. Kahn's alleged misconduct involving Prophecy. Petrillo concluded its investigation in December 2023.

- Mr. Kahn's employment as the Chief Executive Officer of Franchise Group terminated in January 2024. Mr. Kahn simultaneously resigned as a member of the Debtors' boards of directors. Mr. Kahn remains a minority shareholder of the Debtors.

- As of October 16, 2024, Willkie ceased representing Mr. Kahn and his affiliates (other than the Debtors) in any capacity.

- The Debtors' proposed chapter 11 plan carves out from the proposed releases therein "any act, omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, of any of their Affiliates." Plan § 12.2.

- Willkie currently represents B. Riley Financial, Inc. and certain of its affiliates (collectively, "BRF") in matters unrelated to the Debtors and these Chapter 11 Cases.

- The Committee Settlement contemplates that potential claims and causes of action related to Mr. Kahn, Mr. Bryant Riley, and their respective affiliates held by the OpCo Debtors will be placed into a litigation trust upon the effective date of the Plan.

- The releases in the Plan do not provide Willkie with a release from any claims related to prepetition services that Willkie provided

- Neither Mr. Kahn nor any of his affiliates has objected to Willkie representing the Debtors.

9.       Moreover, Willkie has consistently and zealously represented the Debtors, not once showing any hint of bias towards Mr. Kahn (or his affiliates) or BRF or any other party at the expense of the Debtors.  Nor has Willkie acted in any manner that might lessen the estates' value.  Tellingly, no Objector has identified a single instance in which Willkie has actually fallen short in its duties over the past several months—despite supposedly laboring under debilitating actual and potential conflicts of interest.

10.      These cases were commenced on November 3, 2024.  Since that time, there have been contentious disputes and litigation at every substantive hearing, led almost entirely by the Freedom Lenders, including appeals of four orders pending before the United States District Court for the District of Delaware.  This litigation has added layers of difficulty onto a bankruptcy that was already objectively complex: there are 53 Debtors and four separate operating businesses with separate management teams that ultimately report to the C-suite of Franchise Group, Inc., one of which has commenced and completed a full-chain liquidation in chapter 11, three of which are the subject of the Debtors' ongoing sale and exit financing processes, and all of which have needed to face the challenge of managing their ordinary course operations in chapter 11 with Willkie's assistance.  The hearing on the Debtors' proposed disclosure statement is scheduled for February 6, 2024, which the Debtors are hopeful will commence their plan solicitation process and mark a significant initial step on their path to exit.  As set forth in detail in the Supplemental Orlofsky Declaration, replacing Willkie at this critical juncture would be highly detrimental to the Debtors, including adding significant delay and expense to these Chapter 11 Cases.  Supplemental Orlofsky Declaration ¶ 7-8.

**ARGUMENT**

**I.    Willkie's Disclosures Clearly Satisfy the Requirements of Bankruptcy Rule 2014.**

11.    Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 2014(a) requires an applicant to disclose, "to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, [and] any other party in interest." Fed. R. Bankr.P.2014(a).  "Rule 2014 contains no definition of 'connections,' nor does it explain further the level of detail required in a professional's Rule 2014 disclosures." Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US, LLC, 578 B.R. 325, 333 (E.D. Va. 2017), aff'd sub nom., In re Alpha Nat. Res., Inc., 736 F. App'x 412 (4th Cir. 2018).  Moreover, the disclosure requirements do not "require the party to raise with the court every imaginable conflict which may occur in a bankruptcy," nor to "disclose every conceivable interpretation of its connections and possible consequence resulting from the connections." In re eToys, Inc., 331 B.R. 176, 191 (Bankr. D. Del. 2005).  Rather, the function of Bankruptcy Rule 2014 is to elicit sufficient information to evaluate whether the applicant meets the standards for retention.  See 9 Collier on Bankruptcy, ¶ 2014.03 (16th ed. 2024) ("The purpose of the application for authority to employ a professional is to provide the court (and the United States trustee) with information necessary to determine whether the professional's employment meets the broad tests of being in the best interest of the estate and, in the language of Rule 2014, necessary.").

12.    Willkie's disclosures are more than sufficient to satisfy Bankruptcy Rule 2014.  The Feldman Declarations set forth, in detail, Willkie's current and former connections with the Debtors, creditors, and other parties-in-interest in these Chapter 11 Cases.  Initial Feldman Declaration ¶¶ 4-29; Supplemental Feldman Declaration ¶¶ 3-26, 28-36, 38-48.  What is more, since filing its Application, Willkie has engaged with the Objectors regarding their formal and

informal discovery requests, providing information substantiating the Feldman Declarations' contents and seeking to address questions or concerns certain of the Objectors have raised. There are, of course, limits—including the confidentiality obligations Willkie owes to its current and former clients—on what information can be disclosed. But, by any reasonable measure, Willkie's disclosures exceed what Bankruptcy Rule 2014 requires.

13.    The UST Obj. asserts that Willkie's disclosures are not sufficient. See UST Obj. ¶¶ 32-37. Specifically, the UST claims that Willkie failed to disclose its representations of Mr. Kahn and BRF in "two concluded matters of public record:" (a) Pels v. Avril, Case No. 23 CV H 07 0508 (Ohio C.P. 2023);[4] and (b) Calenture, LLC v. B. Riley Financial, Inc., Case No. 21-cv-6087-MKV (S.D.N.Y. 2021). UST Obj. ¶ 2.

14.    As the Supplemental Feldman Declaration makes clear, however, neither example would be a basis for rejecting Willkie's disclosures (much less for denying retention). Supplemental Feldman Declaration ¶¶ 31-32, 36-38. Willkie's involvement in such cases was exceedingly limited. Id. ¶¶ 31, 36. In Pels, Willkie filed a joinder on behalf of Mr. Kahn to a Franchise Group pleading opposing a preliminary injunction regarding the Take-Private Transaction and attended a short hearing in the matter. Id. ¶ 36. Willkie did not represent the Debtors, BRF, or any other defendant. Id. The matter itself lasted all of 24 days, from its filing on July 20, 2023 to its voluntary dismissal on August 14, 2023. Id. ¶ 37.

15.    Willkie's involvement in Calenture was similarly de minimis. Willkie filed a letter motion on behalf of BRF requesting an extension of time to respond to the complaint. Calenture, Case No. 21-cv-6087-MKV [Docket No. 15]; see Supplemental Feldman Declaration ¶ 31. BRF

---

[4]    As disclosed in paragraph 21 of the Initial Feldman Declaration, Willkie represented Mr. Kahn in ancillary matters related to the Take-Private Transaction between March and August of 2023. The Pels matter related to the Take-Private Transaction and lasted from July to August 2023 (at which point the Take-Private Transaction closed).

then retained other counsel in the matter before any responsive pleadings were filed or any other substantive actions occurred.  See Supplemental Feldman Declaration ¶ 31.

16.     This (and other) additional information regarding <u>Pels</u> and <u>Calenture</u> is set forth in the Supplemental Feldman Declaration.  <u>See</u> <u>id</u>. ¶¶ 31, 36-37.  It is worth noting, however, that the essential information <u>disproving</u> the significance of these matters is a matter of public record, which the UST could have readily accessed (or asked Willkie for) before breathlessly claiming that Willkie's initial disclosure "elides and obscures connections to the Debtors, other directors and officers of the Debtors . . . [and] fails to give a full and fulsome accounting of services rendered to Mr. Kahn, even in matters related to the Debtors, that occurred within a year of the Petition Date."  <u>See</u> UST Obj. ¶ 34.  In any event, the UST's conclusions are demonstrably incorrect, as is any implication that Willkie intentionally omitted material information in its disclosures.

17.     Moreover, the Feldman Declarations fully address Willkie's connections to BRF. Most significantly, none of the matters in which Willkie has represented, or currently represents, BRF relate to these Chapter 11 Cases or the Debtors (other than, as noted above, once assisting BRF in obtaining an extension of time in <u>Calenture</u>).  <u>See</u> Initial Feldman Declaration ¶¶ 28-29; <u>see</u> <u>also</u> Supplemental Feldman Declaration ¶¶ 30-31; *Limited Response of B. Riley to the Objection of the United States Trustee to Debtors' Application for an Order Authorizing the Retention and Employment of Willkie Farr & Gallagher LLP as Co-counsel for the Debtors Nunc Pro Tunc to the Petition Date* ¶ 5 [Docket No. 751].  Further, Willkie has answered approximately 50 formal and informal information requests from the UST, including after the UST filed its objection.[5]  Any remaining suggestion that Willkie's disclosures are deficient would go far beyond

---

[5]     As briefly mentioned in the January 31, 2023, status conference, counsel for the Debtors, the UST, and the Prophecy Trust met and conferred on Monday, January 27 regarding the status of the certain pending formal and informal discovery requests UST and Prophecy Trust had made.  Willkie advised that, in addition to producing significant requested information, it would be filing the Supplemental Feldman Declaration that, in Willkie's

the requirements of Bankruptcy Rule 2014. As numerous courts have recognized, "when an attorney seeks employment in a bankruptcy case, the disclosure required by Rule 2014 should not be 'an impossible task subject to endless litigation over what would be enough.'" <u>In re Fundamental Long Term Care</u>, 614 B.R. 753, 761 (Bankr. M.D. Fla. 2020), <u>aff'd sub nom.</u>, <u>In re Fundamental Long Term Care, Inc.</u>, No. 8:11-BK-22258-MGW, 2021 WL 222779 (M.D. Fla. Jan. 22, 2021) (<u>quoting</u> <u>In re Enron Corp.</u>, No. 01-16034(AJG), 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. May 23, 2002), <u>aff'd</u>, No. 02 CIV. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003)). Willkie's disclosures have been "meaningful, forthright, continuous, and sufficiently detailed to fulfill its obligations under Rule 2014." <u>In re Enron Corp.</u>, 2002 WL 32034346 at *5.

## II.    Willkie's Retention Satisfies Section 327(a)

18.    Section 327(a) of the Bankruptcy Code empowers a debtor in possession to employ attorneys "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. 327(a). In particular, a debtor's choice of counsel must be respected if the professional (i) does not hold or represent an interest adverse to the estate and (ii) is a disinterested person. <u>See</u> <u>In re Boy Scouts of Am.</u>, 35 F.4th 149, 157 (3d Cir. 2022). Willkie clearly meets that standard.

19.    With respect to section 327(a)'s first prong, "[t]he Third Circuit has . . . instructed that a professional holds a prohibited 'adverse interest' where that professional holds or represents interests in competition with the debtor that would actually (as opposed to speculatively) impair its service as an estate fiduciary." <u>In re BSA</u>, 630 B.R. 122, 130 (D. Del. 2021), <u>aff'd</u> 35 F. 4th

---

view, would fully address the relevant outstanding issues and obviate the need for the February 6 hearing to be evidentiary. The UST and Prophecy Trust reserved judgment on that question pending review of the Supplemental Feldman Declaration and information to be provided. The Freedom Lenders, which on January 27 had not yet decided to object to Willkie's retention application and had not requested (informally or otherwise) any additional information from Willkie regarding retention, did not participate in the meet-and-confer.

149 (3d. Cir. 2022) (citing In re First Jersey Sec., Inc., 180 F.3d 504, 509 (3d Cir. 1999) and In re

Marvel Ent. Grp., Inc., 140 F.3d 463, 477 (3d Cir. 1998)).  While an actual conflict of interest is

*per se* disqualifying, a *potential* conflict of interest is not.  Rather, "where the conflict is potential

. . . disqualification is within the discretion of the court."  In re BH & P, Inc., 103 B.R. 556, 566

(Bankr. D.N.J. 1989); see Marvel, 140 F. 3d at 476; see Hr'g Tr. at 49:1-7, In re FTX Trading

LTD., No. 22-11068 (JTD) (Bankr. D. Del. Jan. 20, 2023) [Docket No. 558] ("[T]he Third Circuit

has said that a potential conflict is not *per se* disqualifying.").  The court's discretion is guided by

practical reality and judgment—"[i]t is for the court to decide whether the [retention] carries with

it a sufficient threat of material adversity to warrant prophylactic action."  In re BH & P Inc., 949

F.2d 1300, 1312 (3d Cir. 1991).

20.    At the outset, the cases on which Objectors rely bear little resemblance to the facts

here.  In re BH & P, Inc., involved the question of whether a trustee and its counsel could represent

multiple debtors where there were material non-ordinary course intercompany claims by and

among the debtors and there was a possibility that the parties would favor one estate over the other.

Id. at 1315-16.  Based on such possibility—and a finding that counsel had breached its duty of

disclosure—the Third Circuit rejected counsel's retention.  Here, the disclosure is more than

adequate, and every issue on which Objectors claim Willkie is potentially conflicted is being

handled by conflicts counsel, independently investigated, and/or slated for preservation in a

litigation trust.  Under these circumstances, Willkie's proposed retention cannot plausibly result

in one estate being favored over another.

21.    In In re Envirodyne Industries, Inc., 150 B.R. 1008 (Bankr. N.D. Ill. 1993), the

bankruptcy court disqualified proposed counsel based on counsel's concurrent representation of

the debtor and a substantial creditor and equity holder in the bankruptcy case.  Indeed, the law firm

represented the creditor and equity holder in connection with a leveraged buy-out that was central

to the case.  Id. at 1016.  This case is distinguishable because, here, Willkie does not concurrently

represent the Debtors and Mr. Kahn or his affiliates or any other parties (other than the Debtors)

in matters related to the Debtors or these Chapter 11 Cases.  And Willkie's prior representations

are not disqualifying, because, as noted above, these issues are ring-fenced by the role of conflicts

counsel and ongoing (and future) independent investigations.

22.     Likewise, although the Court in In re Marvel Entertainment Group, Inc., 140 F.3d

463, recognized that courts must *per se* disqualify an attorney with an actual conflict of interest,

in that case, the Third Circuit did not disqualify counsel based on the facts of the case.  The trustee's

proposed counsel represented a major secured creditor of the debtor's estate on matters unrelated

to the case, obtained a waiver of conflicts from the relevant creditor, and ceased representing such

creditor prior to the petition date.  Id. at 469.  The Third Circuit held that the trustee's proposed

counsel did not have an actual or potential conflict of interest and approved counsel's retention

under section 327(a) of the Bankruptcy Code.  Id. at 478.

23.     With respect to section 327(a)'s second prong, section 101(14) of the Bankruptcy

Code provides that a "disinterested person":

> (a) is not a creditor, an equity security holder, or an insider;
>
> (b) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
>
> (c) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any director or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

24.     Significantly, the focus of section 101(14)(C) is whether prospective counsel has a materially adverse interest at the time of retention, not whether it at some point in the past represented a party with a materially adverse interest.  See  In re Boy Scouts of Am., 35 F.4th at 158 n.5.  In Boy Scouts, the Third Circuit held that proposed counsel was a disinterested person under section 101(14)(C) for the same reasons such counsel did not hold an interest adverse to the estate under the first prong of section 327(a).  See id. at 157 ("We recognize these two prongs (i.e., not holding an adverse interest and being disinterested) as formally distinct.  That said, in many cases—including this one—they effectively collapse into a single test.") (internal citations omitted); see also In re BH & P, Inc., 103 B.R. at 562 ("Comparison of § 327(a) and § 101[(14)(C)] reveals that 'hold . . . an interest adverse to the estate' in § 327(a) is essentially synonymous with 'have an interest materially adverse to the estate' in § 101[(14)(C)]."); In re Martin, 817 F.2d 175, 179 n. 4 (1st Cir.1987) (noting that "something of a redundancy" exists between section 101[14] and section 327(a)).

25.     In addition, under section 327(c) "a [professional] is not disqualified for employment under [section 327] solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest." 11 U.S.C. 327(c) (emphasis added).  The Third Circuit has held that "(1) Section 327(a), as well as § 327(c), imposes a per se disqualification as [debtor's] counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion—pursuant to § 327(a) and consistent with § 327(c)—disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the appearance of conflict alone."  Marvel, 140 F. 3d at 476.

- 14 -

26.     An actual conflict exists only "when the specific facts before the bankruptcy court suggest that it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest."  In re Boy Scouts of Am., 35 F.4th at 158 (internal citation omitted).  A professional's relationship with another party in interest is not an actual conflict if the relationship does "not affect its ability to advocate on behalf of [the debtor]."  Id. at 159.  Conversely, where competition between two interests "is presently dormant, but may become active if certain contingencies occur," it is merely a potential conflict and, thus, subject to the court's discretionary review and judgment.  In re BH & P, Inc., 103 B.R. at 563.

27.     The Application and Initial Feldman Declaration clearly meet the Debtors' initial burden under section 327 of the Bankruptcy Code.  See In re Caesars Ent. Operating Co., Inc., 561 B.R. 420, 431 (Bankr. N.D. Ill. 2015) ("The burden of proving that section 327(a) has been satisfied rests with the applicant seeking to retain a professional. . . . Under Bankruptcy Rule 2014, the applicant typically meets that burden with its application and the verified statement the rule requires.").  The burden thus shifts to the Objectors to show that the Application somehow violates the Bankruptcy Code.  See In re Boy Scouts of Am., 630 B.R. at 130.  The Objectors have not and cannot carry that burden, and Debtors are accordingly entitled to retain their counsel of choice.

**A.     There Is No Actual Conflict Of Interest.**

28.     Willkie does not suffer from an actual conflict of interest here.  The Objectors' contrary assertions rest on factually erroneous assumptions and a basic failure to distinguish between an "actual" and "potential" conflict.

29.     As a threshold matter, sections 327(a) and (c) "are written in the present tense." *Bench Ruling Delivered May 29, 2020 on Debtors' Application to Retain Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession*, In re Boy Scouts of America and Delaware

BSA, LLC, Case No. 20-10343 (LSS) (Bankr. D. Del June 2, 2020) ("BSA Bench Ruling") [Docket No. 755], aff'd, 630 B.R. 122 (Bankr. D. Del. 2021), aff'd, 35 F.4th 149 (3d. Cir. 2022) (citing In re Muma Service, Inc., 286 B.R. 583, 591 (Bankr. D. Del. 2002)).  Accordingly, "'counsel will be disqualified under §327(a) only if it **presently** holds or represents an interest adverse to the estate, notwithstanding any interest it may have held or represented in the past.'" Id. at 5 (citing Muma and In re AroChem Corp., 176, F. 3d 610, 623 (2d Cir 1999) (emphasis in original)); see also In re Boy Scouts of Am., 35 F.4th at 158 n.5 (collecting cases and explaining that § 327(a) "only allows disqualifications for adverse interests that exist at the time of retention").

30.     None of the Objectors can identify any present, actual conflict of interest prohibiting Willkie's retention.  The Objectors note that Willkie represents certain BRF affiliates in certain ongoing matters.  See UST Obj. ¶ 25–27; see also Prophecy Trust Obj. ¶ 23; Freedom Lenders Obj. ¶ 5.  But, as Willkie has explained, those matters are entirely unrelated to the Debtors and these Chapter 11 Cases.  See Supplemental Feldman Declaration ¶¶ 30; see also Initial Feldman Declaration ¶ 28.  Accordingly, they do not constitute a present, actual conflict of interest.  Similarly, Willkie's purportedly "undisclosed" representations of Mr. Kahn in Pels and BRF in Calenture were concluded long ago and transitory in nature.  Thus, the Objectors arguments fail to support a finding of an actual conflict of interest in these cases.

31.     The Freedom Lenders assert—without support of any kind—that Willkie "continues to represent . . . various entities affiliated with, and controlled by, Brian Kahn, including Vintage Capital Management, LLC."  Freedom Lenders Obj. ¶ 3.  The absence of any citation is unsurprising because this assertion is demonstrably false.  As stated in the Feldman Declarations, Willkie ceased any representation of Mr. Kahn, Vintage Capital, or any affiliates

thereof October 16, 2024—before the Petition Date.  See Initial Feldman Declaration ¶ 24; see also Supplemental Feldman Declaration ¶ 46.

32.    The Objectors also suggest that Willkie is conflicted because a prior iteration of the Plan proposed releases for Willkie and others in connection with their prepetition work for Franchise Group-related matters.  Freedom Lenders Obj. ¶ 42-43; UST Obj. ¶ 12; Prophecy Trust Obj. ¶ 43-44.  Any such concerns are moot.  As set forth in the amended Plan filed concurrently with this Reply, the Plan does not seek any release for Willkie for any prepetition services that Willkie provided.  See Plan §§ 1.185; 7.10(c)(ii).  While the releases proposed for Willkie in the original Plan were not uncommon for debtor's counsel—and the proposed releases were contingent on the outcome of ongoing independent investigations—Willkie has no interest in delaying these Chapter 11 Cases or prejudicing the Debtors' ability to retain their counsel of choice.  The Debtors will not propose any such releases for Willkie in any future iteration of the Plan.  Willkie stands fully behind its work, and the question of releases should be laid to rest.

33.    The bulk of the Objectors' actual conflict arguments betray a fundamental misunderstanding of the difference between actual and potential conflicts.  For example, the Prophecy Trust asserts that:

> Willkie holds actual conflicts of interest because it represented Kahn in the Take-Private Transaction that is currently the subject of litigation for which Kahn *could* seek indemnification by Franchise Group, and Willkie itself *could* be subject to claims of both Kahn and Franchise Group if Kahn is held liable in such litigation. Moreover, the Take-Private Transaction and Willkie's role therein *could* be the subject of significant litigation in these Chapter 11 Cases, as evidenced by filings of the Ad Hoc Group of Freedom Lenders and the Committee related thereto . . . . Moreover, Willkie holds additional actual conflicts of interest because the Debtors *could* hold claims against Willkie stemming from its representation of Kahn at the time of the SEC and DOJ Prophecy-related investigation that led to the Complaint and Indictment . . . .

Prophecy Trust Obj. ¶¶ 43, 44 (emphasis added).

34.     Similarly, the UST asserts that Willkie has an actual conflict because of contingencies that *might* come to pass.  In its objection, the UST suggests that Mr. Kahn could assert claims for indemnity "*potentially* stemming from the Take-Private Transaction, or Mr. Kahn's resignation from the Debtors in January of 2024, on which Willkie represented Mr. Kahn in a matter adverse to the Debtors."  UST Obj. ¶ 41 (emphasis added).  On the Take-Private Transaction, the UST speculates that such a claim "is probable, not theoretical." Id.  This is just a tacit admission that the purported event is, in fact, contingent.  Indeed, the Gale litigation—which the UST notes is "pending" in Delaware Chancery Court—was filed on July 9, 2024, approximately four months before the Petition Date—but the contingency did not materialize. Gale et al. v. Vintage Capital Management, LLC et al., Case No. 2024-0726 (LWW) (Del. Ch. 2024).  In any event, the Objectors do not explain how Mr. Kahn invoking an indemnity obligation would present an actual conflict for Willkie, particularly as Mr. Kahn is represented by sophisticated counsel at Morris, Nichols, Arsht & Tunnell LLP ("MNAT") in connection with these Chapter 11 Cases.  The Objectors do not claim, for example, that the Debtors would or should dispute whether an indemnity obligation exists, and any such suggestion would (even if plausible) raise only a paradigmatically "potential" conflict of interest, and one that would be customarily handled by conflicts counsel.

35.     The same is true for the Objectors' discussion of Willkie's representation of Mr. Kahn in his separation from the company.  See UST Obj. ¶ 41 ("Mr. Kahn *could* assert claims related to the resignation and any agreement related thereto, where Willkie rendered services to Mr. Kahn individually.") (emphasis added).  The UST likewise speculates that "the Debtors' estates *may* have claims and causes of action against Mr. Kahn regarding Mr. Kahn's use of funding connected to Prophecy and other Prophecy-related matters."  Id. ¶ 41(emphasis added).

The UST does not offer a possible factual basis for such claims, much less explain how that is an "actual," as opposed to mere potential, conflict.  So too for the UST's assertion that "[i]t is *foreseeable* that Mr. Kahn *could* assert an advice of counsel defense based upon the advice provided by attorneys at Willkie relating to the Take-Private Transaction or other matters where Willkie represented Mr. Kahn and his affiliates in matters that affect the Debtor."  Id. ¶ 41 (emphasis added).

36.    The Debtors and Willkie address below the (lack of) substance of these assertions. But whatever their merit, these assertions are all merely *potential* claims representing, at most, *potential* conflicts of interest.  Thus, there is no *per se* bar on Willkie's retention, and the Court's analysis is whether, in the Court's discretion, the potential conflicts of interest identified herein may be fully addressed through the use of conflicts counsel and other features of the Plan.

**B.    Any Potential Conflict Is Not Disqualifying And Is Easily Addressed By Employing Conflicts Counsel And Other Measures.**

37.    As the Application makes explicit, "if Willkie's representation of the Debtors in connection with any matter in these Chapter 11 Cases would result in it becoming adverse to a party in interest that gives rise to a professional conflict, Willkie will transfer the representation of the Debtors' interests with respect to such matter against such party solely to Young Conaway Stargatt & Taylor, LLP, the Debtors' proposed co-counsel in these cases."  Application ¶ 4.  Young Conaway's retention has already been approved by the Court.  See Docket No. 715.

38.    Courts have consistently recognized that there are "better solutions than depriving [the Debtors] of [their] chosen counsel," including "the retention of conflicts counsel."  In re Caesars Ent. Operating Co., Inc., 561 B.R. at 435; see also In re Washington Mut., Inc., 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("[I]n most cases the use of conflicts counsel solves the problem."); In re Boy Scouts of Am., 630 B.R. at 132 (finding conflicts counsel "was well-positioned . . . to

- 19 -

address all matters in which [general bankruptcy counsel] might be adverse to [a potential conflicted party]").  This is especially true in large and complex bankruptcy cases—like these Chapter 11 Cases.  See Hr'g Tr. at 49:9-18, In re FTX Trading LTD., No. 22-11068 (JTD) (Bankr. D. Del. Jan. 20, 2023) ("Here, any potential conflicts are ameliorated by the fact that there's conflicts counsel in place. And that's something that happens in every large bankruptcy case. It would be almost impossible to find a case of this size or even – well, this is what we call a super-mega case – even in a mega case you would find – or a large case, it would be difficult to find debtor's counsel that didn't have other clients who might be clients of the debtor's counsel, but that's why we have conflicts counsel. It happens all the time and [is] not something that is disqualifying."); see also 3 Collier on Bankruptcy ¶ 327.04 (16th ed. 2022) ("[I]t is not uncommon for 'conflicts counsel' to be retained, charged with the duty of undertaking specified matters in which general counsel for the debtor has a conflict.").

39.     And the Objectors do not—and cannot—suggest that Young Conaway is somehow not positioned to independently and vigorously pursue every line of inquiry within the ambit of its role as conflicts counsel.  Nor do the Objectors suggest that, in the several months during which Young Conaway has been fulfilling this role on a provisional basis, there has been any breach of or failure regarding this allocation of responsibility.[6]

---

[6]    The Freedom Lenders blithely suggest that "[t]he current status of the case" and "[t]he litigation in these cases about which everyone complains is . . . a consequence of the absence of 'disinterested' counsel for the Debtors." Freedom Lenders Obj. ¶ 3.  But they do not offer a scrap of evidence for that assertion, much less explain how any other law firm serving as proposed or retained Debtors' counsel would have prosecuted these cases to their liking.  Rather, as their voluminous pleadings in these Chapter 11 Cases make clear—as does their decision to appeal several substantive orders that Judge Dorsey entered—that their chief complaint is that the Ad Hoc Group of First Lien Lenders, who entered into the RSA and funded a substantial DIP loan on terms that are highly favorable to the OpCo Debtors, are in the driver's seat.  The Freedom Lenders' position is the product of the fact that they are massively out of the money, sitting behind the ABL Lenders and Ad Hoc Group of First Lien Lenders and, like so many lenders in so many chapter 11 cases, were not invited to exercise remedies on their equity pledges before the Debtors filed these Chapter 11 Cases and the automatic stay under section 362 of the Bankruptcy Code came into effect.  In short, the Freedom Lenders' complaints seem to flow from how the

40.     As noted above, bankruptcy courts must evaluate potential conflicts on a case-by-case basis, and judges have wide latitude to determine whether such conflict "implicates economic interest of the estate and might lessen its value."  In re Boy Scouts, 35 F.4th at 158-59 (citing In re First Jersey Sec., Inc., 180 F. 3d 504, 509 (3d Cir. 1999) ("A Court may consider an interest adverse to the estate when counsel has a competing economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant.") (internal quotations omitted)).  No such competing economic interest plausibly exists or will arise here.

41.     The primary complaint of the Objectors[7] is that Willkie previously represented Mr. Kahn and his affiliates in matters they claim are central to these Chapter 11 Cases, with an almost singular focus on the Take-Private Transaction that closed in August 2023. The Objectors contend, but do not provide any support for the proposition, that investigation of the Take-Private Transaction is essential to a successful reorganization and Willkie's "close connections" with Mr. Kahn render Willkie too conflicted to represent the Debtors in these cases.  See UST Obj. ¶ 3; see also Prophecy Trust Obj. ¶ 42; Freedom Lender Obj. ¶ 44.  The Objectors seek only to cloud the waters; they neither confront the already known facts nor explain how Willkie's prior role in the Take-Private Transaction will prejudice the Debtors or other stakeholders.

42.     First and foremost, it bears repeating that Young Conaway, not Willkie, will handle any matters as the Debtors' counsel pertaining to the Take-Private Transaction, if any.  Despite the Objectors' refrain that the Take-Private Transaction is an integral focus of the bankruptcy, no

---

Bankruptcy Code treats creditors in keeping with their payment- and structural-priorities, not from the legal advice Willkie is providing to the Debtors.

[7]     The Prophecy Trust alleges that it holds an approximately 7.5% interest (Series A) in Freedom VCM Holdings and various claims against the "Opcos" arising from claims against Brian Kahn's conduct at Prophecy.  Prophecy Trust Obj. ¶¶ 32-33.

such matters have materialized in the three months in which these Chapter 11 Cases have already been pending.  Moreover, the question of whether the Freedom Holdco Debtors hold any claims related to the Take-Private Transaction that should be preserved in a litigation trust for the benefit of the Freedom Lender Group is itself being separately investigated by the Freedom Holdco Debtors' ***independent*** director, Mr. Michael Wartell, who himself has retained ***independent*** counsel, Akin Gump Strauss Hauer & Feld LLP ("Akin"), to conduct that review.  Mr. Wartell and Akin are also investigating any other potential causes of action that the Freedom Holdco Debtors may conceivably wish to explore.  Similarly, certain claims held by the OpCo Debtors related to the Take-Private Transaction—to the extent any exist—are being transferred to a litigation trust for the benefit of the OpCo Debtors' general unsecured creditors pursuant to the agreement reached among the Consenting First Lien Lenders, the Committee, and the Debtors and memorialized in the most recent iteration of the Plan.  Any actions brought by either litigation trust would be commenced following the Debtors' emergence from bankruptcy.

43.    Moreover, the Objectors cannot substantiate their assertions that the matters Young Conaway will handle as conflicts counsel are so "central" to these Chapter 11 Cases that they warrant depriving the Debtors of their chosen counsel.  See UST Obj. ¶ 44; see also Prophecy Trust Obj. ¶ 46; Freedom Lenders Obj. ¶ 9.

44.    Regarding Mr. Kahn, he is the former Chief Executive Officer, a former director, and a current minority shareholder of the Debtors.  He left the Debtors in January 2024.  His involvement in these Chapter 11 Cases thus far has been limited to (a) having filed a proof of claim against the Debtors seeking, among other things, indemnity from the Debtors and (b) responding to discovery requests (in both cases, through MNAT).  Willkie has not represented Mr. Kahn or his affiliates since October 16, 2024 and will not represent Mr. Kahn or his affiliates going forward.

Supplemental Feldman Declaration ¶ 46.  Mr. Kahn is represented by sophisticated counsel and has not objected to Willkie representing the Debtors in these Chapter 11 Cases.

45.     Nor is the Take-Private Transaction somehow essential to these Chapter 11 Cases or their success—much less is the particular role Willkie played integral to any element of these Chapter 11 Cases.  The Take-Private Transaction closed in August 2023, more than one year before these Chapter 11 Cases were filed.  The events leading to the commencement of these Chapter 11 Cases are set out in the First Day Declaration.  See First Day Declaration ¶¶ 70-76.  As described in the First Day Declaration, the Debtors faced several challenges that compromised their ability to meet near- and long-term liquidity needs and unduly restricted working capital requirements. Id. ¶¶ 70-75.  Obstacles included significant debt obligations, macroeconomic headwinds in the retail industry, higher interest rates and inflation, and large declines in retail foot traffic.  Id.  As a result, prior to the Petition Date, the Debtors explored potential transactions to monetize their business segments and engaged in extensive negotiations with their key lender constituents to evaluate a consensual out-of-court transaction that was predicated on the Debtors' reorganization around their profitable business lines.  Id. ¶¶ 76-78.  The Take-Private Transaction was not the impetus for those discussions, nor were those discussions centered around the Take-Private Transaction.  Rather, they were focused on right-sizing the Debtors' go-forward balance sheet.

46.     And, although the Debtors believed an appropriate investigation of the Take-Private Transaction had been conducted before these cases were filed, in October 2024 and December 2024, the Debtors agreed to commence additional investigations.  For the first, in anticipation of these Chapter 11 Cases, the Debtors engaged Petrillo to, among other things, investigate potential claims and causes of actions that the Debtors' estates may have against Mr. Kahn, any of their other current or former directors and officers, or any other third-parties arising

from, or related to, among other things: (i) Franchise Group's sale of Badcock to Conn's in December 2023; (ii) the Take-Private Transaction; (iii) the FRII acquisition and any other transactions involving BRPI and its affiliates; and (iv) the Debtors' historical transactions and relationship with Mr. Kahn.  Petrillo's investigation was also to evaluate the appropriateness of any releases by the Debtors' estates of their current directors and officers through these Chapter 11 Cases and under the proposed Plan. See Disclosure Statement § II(A)(vi).

47.    In response to assertions by certain stakeholders that the interests of the Freedom HoldCo Debtors were not being independently represented by the Freedom HoldCo Debtors' existing boards of directors, the boards of directors of each of the Freedom HoldCo Debtors appointed Mr. Wartell as independent director to the Boards of directors at each Freedom HoldCo Debtor.  Mr. Wartell is authorized to engage separate advisors and to investigate all matters relating to any claims, rights, and Causes of Action that may be held by or against the Freedom HoldCo Debtors.  Id.  Mr. Wartell is also empowered and authorized by each of the Freedom HoldCo Debtors to (a) grant or enter into any agreement that provides for the release(s) of (i) Intercompany Claims the Freedom HoldCo Debtors may have against Franchise Group and/or any of its subsidiaries that are identified in the Freedom HoldCo Independent Investigation or (ii) Claims that the Freedom HoldCo Debtors may have against the Freedom HoldCo Debtors' or their subsidiaries' directors and/or officers that are identified in the Freedom HoldCo Independent Investigation; (b) preserve the Claims that are identified in the Freedom HoldCo Independent Investigation for the benefit of the Freedom HoldCo Debtors and their stakeholders; and (c) settle or enter into any agreement that provides for the settlement(s) of the Claims that are identified in the Freedom HoldCo Independent Investigation for the benefit of the Freedom HoldCo Debtors and their stakeholders.  Id.; see infra ¶¶ 61, 82.  Moreover, even if the transaction were integral,

Willkie represented Mr. Kahn/Vintage alongside Troutman's independent representation of Franchise Group and Mr. Wartell's independent representation of the Special Committee. Thus, this is not a circumstance in which Young Conaway would be severely hamstrung by the fact that the Debtors' primary counsel served as company counsel on the disputed transaction, but would be walled off from participating. Here, Young Conaway will have access both to Troutman's and Wachtell's knowledge and experience with the transaction, as needed.

48.    Likewise, the alleged civil and criminal misconduct by Mr. Kahn does not require denying the Debtors their counsel of choice. As detailed in the Feldman Declarations, certain Willkie attorneys—none of whom are involved in these Chapter 11 Cases—worked on Mr. Kahn's personal civil and criminal matters in the wake of the November 2, 2023 revelations until such representation terminated on October 16, 2024. Initial Feldman Declaration ¶ 24; Supplemental Feldman Declaration ¶ 46. The allegations against Mr. Kahn stemmed from Mr. Kahn's work as a sub-advisor to the Prophecy hedge funds, which he conducted outside of his role as Chief Executive Officer of Franchise Group. Thus, any relation of the core wrongdoing alleged in the Prophecy matters is, at most, indirectly relevant to the chapter 11 proceedings. Moreover, the Debtors hired Petrillo to lead an investigation into that conduct when the allegations were revealed. While certain parties in interest (including the Prophecy Trust) may wish to challenge the Petrillo-led investigation, that does not make Willkie's former representation of Mr. Kahn in his individual capacity a "central" component of these Chapter 11 Cases. Rather, it is a paradigmatic example of the kind of issue that conflicts counsel, estate fiduciaries, and other parties in interest can explore.

49.    Moreover, as discussed further below (see infra ¶ 84), Willkie promptly established an exclusionary ethical wall on November 7, 2023 after learning of the fraud allegations related to

Prophecy and Mr. Kahn.  The wall worked as intended, which was to avoid potential professional conflicts arising from the firm's representation of Franchise Group on matters related to the criminal and civil allegations against Mr. Kahn, on one hand, and its representation of Mr. Kahn on personal criminal and civil matters, on the other hand.

50.     What is more, the Plan carves out from the proposed releases "any act, omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, of any of their Affiliates" (which excludes the Debtors).  See Plan at §§ 12.2, 12.3.  The Plan releases also do not include a release of claims related to prepetition conduct of Willkie.  Plan §§ 12.2, 12.3.

51.     Against that backdrop, the cases on which the Objectors rely are plainly inapposite. In In re Project Orange Assocs., LLC, the debtor's proposed bankruptcy counsel also represented the debtor's largest unsecured creditor and essential supplier.  431 B.R. 363, 365 (Bankr. S.D.N.Y. 2010).  In support of its application, proposed counsel argued that there was no disqualifying conflict and, in any event, use of conflicts counsel would resolve any concerns.  Id. at 366.  In Project Orange, however, the debtor acknowledged that "resolving all past and future issues with [the creditor/essential supplier]—the supplier of gas turbines to [d]ebtors' operations—[was] essential to the [d]ebtor's successful reorganization."  Id.  While a settlement had been negotiated by the creditor/essential supplier for the return and installation of the turbines, the settlement had not been approved by the court at the time that the proposed counsel's retention application was heard, and, even if it had, the court was concerned that any disagreement stemming from the settlement could give rise to contentious proceedings.  Id. at 375-76.  Because the creditor/essential supplier was a current client of proposed bankruptcy counsel, the largest creditor of the debtor with issues central to the case, and an active participant in the debtor's chapter 11 case, the court

denied the proposed counsel's retention application. Id. at 379.  The court explained that addressing the issues between the debtor and creditor would be a broad undertaking, above and beyond what special conflicts counsel retained under section 327(e) of the Bankruptcy Code should handle. Id.

52.     Here, by contrast, Mr. Kahn is not remotely the debtor's largest creditor (nor a significant creditor), nor is he a major past client of Willkie or a current client at all.  In 2024, Willkie's representations of Mr. Kahn and Vintage Capital, his affiliate, accounted for just 0.07% of Willkie's total annual revenue.  Supplemental Feldman Declaration ¶46.  And, to state the obvious, Mr. Kahn is not likely to be a future client of Willkie's in any form.  Willkie has already zealously represented the Debtors in these Chapter 11 Cases in matters adverse to Mr. Kahn and will continue to do so.  Indeed, the Debtors' current Plan, which Willkie negotiated with various stakeholders on the Debtors' behalf, preserves all estate claims against Mr. Kahn.  Likewise, the Plan has been amended to (i) include a litigation trust at the OpCo Debtors, with all claims against Mr. Kahn being included in such litigation trust and (ii) exclude a release for Willkie on account of its prepetition representation of the Debtors.  Further, Young Conaway is retained under section 327(a) of the Bankruptcy Code as general bankruptcy counsel to the Debtors, not special counsel under section 327(e) of the Bankruptcy Code.

53.     In In re WM Distribution, Inc., the bankruptcy court denied the debtor's application because the proposed firm concurrently represented an affiliated debtor in a separate bankruptcy where there were multiple, actual conflicts based on the claims between the two debtors.  571 B.R. 866, 873-74 (Bankr. D.N.M. 2017).  The two debtors were owned by a divorced couple, each of whom owned one debtor in a 90% share, and their child owned the remaining 10% in both debtors.  Id. at 868.  The court found multiple conflicts between the debtors because the two

entities had a purchaser/supplier relationship, making one debtor a creditor of the other in an amount representing more than 50% of the debtor-purchaser's total unsecured debt. Id. at 873. In addition, the debtor-purchaser owned the trademark of the debtor-supplier's most valuable brand of products, but there was no licensing agreement between them and it was unclear whether the debtor-supplier-licensee would be negatively impacted by what happened to the license in the restructuring. Id. The court noted that there was no *per se* prohibition regarding multi-debtor representations, but found that the use of conflicts counsel was not appropriate where the adverse interests between the two debtors were central to each other's reorganization efforts as was the case there. Id. at 874.

54.     Here, by contrast, the Debtors' current chapter 11 Plan provides that (i) all claims held by any of the Debtors against Mr. Kahn are not released and (ii) (a) subject to the outcome of the ongoing independent investigation by Mr. Wartell (in which Willkie is not involved), claims held by the Freedom HoldCo Debtors related to the Take-Private Transaction and other matters involving Mr. Kahn will be placed in a litigation trust at the Freedom HoldCo Debtors for potential prosecution following these Chapter 11 Cases and (b) similar claims held by the OpCo Debtors will be transferred to a litigation trust for the benefit of the OpCo Debtors' general unsecured creditors, as set forth in greater detail in the Plan. If the issues claimed by the Freedom Lenders to be central to these Chapter 11 Cases can be parked in a litigation trust for later investigation and pursuit, it is exceedingly unlikely that such claims are nonetheless "integral" or "essential" to the Debtors' reorganization. Rather, the central issues that will be addressed during these Chapter 11 Cases include the Debtors' ongoing sale process and efforts to build consensus around a value maximizing plan of reorganization—not the Take-Private Transaction or the resolution of any related litigation.

55.     In <u>In Git-n-Go Inc.</u>, the debtor's proposed counsel concurrently represented the debtor, multiple creditors, and a holding company that owned approximately 87% of the debtor's equity as well as had numerous other connections to the debtor.  321 B.R. 54, 61-62 (Bankr. N.D. Okla. 2004).    The bankruptcy court determined that, considering the multiple concurrent representations by the debtor's counsel, conflicts waivers and the use of conflicts counsel were not sufficient to render retention appropriate under section 327 of the Bankruptcy Code.  Here, unlike in <u>Git-n-Go</u>, Willkie does not represent any party other than the Debtors in connection with these Chapter 11 Cases.

56.     In sum, while these Chapter 11 cases and the factual landscape are complex, the safeguards of highly able conflicts counsel, a robust Creditors Committee, and transparent Plan guardrails are more than sufficient to address Willkie's potential conflicts.

## C.     The Existence of Potential Intercompany Claims Between The Freedom HoldCo Debtors and OpCo Debtors Does Not Disqualify Willkie.

57.     The Freedom Lenders argue that the potential existence of intercompany claims and causes of action between the Freedom HoldCo Debtors and the OpCo Debtors should disqualify Willkie from representing the Freedom HoldCo Debtors in these Chapter 11 Cases.  Freedom Lenders Obj. ¶ 47.  However, the mere existence of potential intercompany claims between debtor entities cannot justify disqualification.  <u>See</u> <u>In re BH & P Inc.</u>, 949 F.2d 1300, 1310 (3d Cir. 1991) (recognizing that a single representative of multiple estates "is often able to maximize the return to jointly administered estates through increased economy and efficiency"); <u>In re Glob. Marine, Inc.</u>, 108 B.R. 998, 1004 (Bankr. S.D. Tex. 1987) ("[T]here is a fundamental distinction between the 'potentially' conflicting interests that may arise in every instance of joint representation and an 'actual conflict of interest' as envisioned by § 327(c)."); <u>see</u> <u>also</u> 3 Collier on Bankruptcy ¶ 327.04[5][a]-[b] (16th ed. rev. 2022) ("[C]ases suggest that, rather than

disapproving of multi-debtor representation as a per se conflict, courts should examine the factual circumstances surrounding the representation to determine whether it is appropriate.").

58.    Notably, this retention Application is not the first time the Freedom Lenders have argued that potential intercompany issues should be a basis to derail these Chapter 11 Cases.  Each one was rejected by Judge Dorsey.  See, e.g., Hr'g Tr. at 317:5-8, In re Franchise Group, Inc., Case No. 24-12480 (JTD) (Bankr. D. Del. Dec. 11, 2024) (overruling the Freedom Lenders' DIP objection, which included arguments regarding potential conflicts between the Freedom HoldCo Debtors and OpCo Debtors); Hr'g Tr. at 65:7-66:25, In re Franchise Group, Inc., Case No. 24-12480 (JTD) (Bankr. D. Del. Dec. 17, 2024) (overruling the Freedom Lenders' motion to terminate exclusivity, which included arguments regarding potential conflicts between the Freedom HoldCo Debtors and OpCo Debtors).  The Freedom Lenders' assertions of supposedly intractable intercompany conflicts are thus best directed at the District Court in their pending appeals.

59.    In any event, because the causes of action that the Freedom Lenders assert as potential assets are, *by their own admission*, speculative, the answer is not disqualification.  Rather, as with other "potential" conflicts, conflicts counsel (namely, Young Conaway) is more than capable of handling disputes if they arise.  In their objection to the Disclosure Statement, the Freedom Lenders argue that the Plan is patently unconfirmable and note that "[h]ope of a *speculative and unlikely* recovery [at the HoldCo Debtors] is not a basis to determine that creditors are entitled to vote, rather than being deemed to reject a plan . . . ."  See *Objection of the Ad Hoc Group of Freedom Lenders to Debtors' Disclosure Statement Motion* ¶ 30 [Docket No. 686] (emphasis added); see also In re International Oil Co., 427 F.2d 186, 187 (2d Cir. 1970) (holding that the existence of intercompany claims was not "sufficient to saddle---estates of [four affiliated corporations] with the expenses of separate . . . trustee's attorneys at the present time"); In re

<u>Caesars Ent. Operating Co., Inc.</u>, 561 B.R. at 4351 (noting that, in the face of a conflict, there are "better solutions than depriving [the Debtors] of [their] chosen counsel," including "the retention of conflicts counsel").

60.    In <u>In re Caesars Entm't Operating Co.</u>, 561 B.R. 420, the court noted that relying upon conflicts counsel to assist with the investigation and treatment of intercompany claims is a "better solution[] than depriving [a debtor] of its choice of counsel."  561 B.R. at 436; <u>see</u> <u>also</u> <u>id.</u> at 431("A debtor has wide latitude in selecting counsel, and his choice will be disturbed only in the rarest cases.") (citation and internal quotations omitted).  There, the debtors' proposed counsel represented several operating-level subsidiaries of the investment funds Apollo and TPG.  Both Apollo and TPG indirectly controlled the debtors as majority owners of debtor subsidiaries in the bankruptcy cases.  <u>Id.</u> at 432.  Directors of both Apollo and TPG also "dominate[d]" the debtors' board of directors.  <u>Id.</u>  Additionally, the debtors' proposed counsel was involved with an investigation by the debtors' special governance committee (the "<u>SGC</u>") into certain prepetition transactions taken by the debtors, which the SGC ultimately determined were constructively fraudulent.  <u>Id.</u> at 435.  The debtors' proposed counsel "advised and [was] still advising the SGC in its investigation" during the chapter 11 cases.  <u>Id.</u>at 435.  The court rejected the objecting party's argument that the debtors' proposed bankruptcy counsel had "a demonstrable and disqualifying bias" in favor of their former clients and the debtors' non-debtor affiliates and, thus, would "place the interests of those entities above the interests of the debtors and their estates."  <u>Id.</u> at 429.  Representation of the unrelated operating entities was "too remote from the bankruptcy cases to conclude that [the proposed debtors' counsel] would be predisposed to act adversely to the estates." <u>Id.</u> at 433.  Further, the court emphasized that questions regarding the debtors' willingness to

pursue claims belonging to the bankruptcy estates could be solved through the use of conflicts counsel. Id. at 435.

61.     Willkie has not, and is not, making decisions on the "causes of action" that purport to exist between the Freedom HoldCo Debtors and the OpCo Debtors.  Nevertheless, Willkie has implemented appropriate measures in these Chapter 11 Cases to address these concerns.  First, the boards of directors at each Freedom HoldCo Debtor appointed Mr. Wartell as independent director of the Freedom HoldCo Debtors.  In this role, Mr. Wartell—*not* Willkie—is tasked with investigating all matters relating to any claims, rights, and causes of action that may be held by or against the Freedom HoldCo Debtors through his independent counsel, Akin.  The Freedom Lenders' Objection inaccurately argues that Mr. Wartell lacks "the power to ensure that the very causes of action he was appointed to investigate are preserved for the benefit of the HoldCo Debtors and their creditors, rather than released as currently contemplated."  Freedom Lenders Obj. ¶ 31.  That is misguided.  Mr. Wartell is empowered and authorized by each of the Freedom HoldCo Debtors to release certain claims, preserve, or settle claims for the benefit of the Freedom HoldCo Debtors and their stakeholders.  Any claims that are not released or settled will be placed in the Freedom HoldCo Debtors litigation trust for potential prosecution following these Chapter 11 Cases.  Willkie is not involved in that investigation other than facilitating discovery requests. See Disclosure Statement § II(A)(vi).  Any claims that are not released or settled will be placed in the Freedom HoldCo Debtors litigation trust for potential prosecution following these Chapter 11 Cases.  See supra ¶ 47; infra ¶ 82.  Despite the Freedom Lenders' arguments to the contrary, each measure implemented by Willkie to date has further attenuated Willkie's involvement in the treatment of any potential claims and causes of action that sit at the forefront of the Freedom Lenders' Objection.

62.     The Freedom Lenders' Objection should be seen for what it is:  a disgruntled creditor group raising the same arguments repeatedly to hamstring the progress of these Chapter 11 Cases that currently propose a Plan with treatment that the Freedom Lenders disfavor, all under the guise that Debtors' counsel cannot represent Debtors that *may* be differently situated in presenting such Plan for approval.

**D.     Willkie Is Not A Creditor Of The Debtors.**

63.     Willkie has provided the UST with, and likewise disclosed in the Supplemental Feldman Declaration, additional details regarding the Debtors' payments to Willkie in the 90 days prior to the Petition Date.  Willkie believes that such payments were either on account of retainers received during such time period or are subject to complete defenses, including the ordinary course of business defense and the subsequent new value defense.  Willkie has also waived any prepetition fees and expenses that were outstanding as of the Petition Date.  Thus, Willkie is not a creditor of the Debtors and cannot be rendered not disinterested on such grounds.

**E.     Willkie's Disqualification Would Cause Significant Harm to the Debtors' Estates and These Chapter 11 Cases.**

64.     Lastly, the UST also asserts that Willkie should be disqualified because the disqualification of one Willkie attorney "results in disqualification of the entire firm."  UST Obj. ¶ 45.  The UST's argument misses the point entirely.  Imputation of conflicts under Rule 1.10(a) is irrelevant where, as here, (1) no conflict under Rule 1.9 exists, and (2) even if one did, the relevant clients have given their informed consent to the proposed representation.  Model Rules of Pro. Conduct R. 1.10(a) (Am. Bar Ass'n 2024).  To the extent the UST appears to take issue with the ethical screens imposed by Willkie, that argument fails because the UST has not offered any argument, much less evidence, that Willkie's screening procedures are deficient.

65. Depriving the Debtors of their chosen counsel, who possesses extensive Chapter 11 experience and institutional knowledge, would cause significant harm to the Debtors, including by adding significant delay and expense to these cases. Willkie has represented the Debtors for months in connection with their restructuring efforts, including in these Chapter 11 Cases, and has been diligently working to maximize value for all of the Debtors' stakeholders.[8] Moreover, through its various representations of the Debtors for the past several years, Willkie has developed a deep and unmatched institutional knowledge of the Debtors' operations and businesses. As a result, Willkie is better equipped than any other law firm to continue advising the Debtors on their financing facilities, the divestiture of their business lines, their continued compliance with the DIP Facility and the RSA, the prosecution of their chapter 11 plan, and the culmination of these Chapter 11 Cases generally. Conversely, if Willkie is not retained, the Debtors will be required to bring on replacement counsel, which will (a) impose significant delay on the Debtors' restructuring process and (b) deprive the Debtors of Willkie's historical knowledge and experience, both of which would cause significant harm to the Debtors and the estates' stakeholders going forward.

66. These Chapter 11 Cases have been marked by a high volume of complex litigation since their inception. Replacement counsel would be required to assume responsibility for several ongoing disputes and litigation that involve all of the Debtors' key creditor constituents. These

---

[8] The Freedom Lenders imply that something is amiss because "Willkie has been acting as proposed bankruptcy co-counsel to all of the Debtors [since] November 3, 2024, . . . [y]et, three months later Willkie still has not been retained." Freedom Lenders Obj.¶ 2; see also id. ¶ 3 ("In the Application it finally has made for official retention . . . .") (emphasis added). That accusation is deeply ironic. For the first two-plus months of these cases, the vast majority of Willkie's full energies have been devoted to addressing the mountains of litigation the Freedom Lender group launched seeking to derail the Chapter 11 cases, challenging everything from the DIP order to the Debtors' payments to their critical vendors. Moreover, the Freedom Lenders neglect to mention that Willkie filed the Application on December 19, 2024—just six weeks after the Petition Date—and since then have engaged with the UST and Prophecy Trust constructively regarding retention-related discovery. The Freedom Lenders have chosen to keep their options open, and only after apparently concluding that an acceptable consensual result is not forthcoming, they objected to Willkie's retention on February 1, 2025. If anything, the fact that Willkie has now represented Debtors for three months as proposed counsel (and, thus, faces non-trivial financial losses if its retention is not approved) demonstrates that it is fully committed to the best interests of the Debtors.

disputes relate to, among other things, the terms of the Debtors' proposed Disclosure Statement and Plan, the Debtors' restructuring strategy, and a series of appeals regarding the Court's approval of the Debtors' DIP Facility, bidding procedures, payments to critical vendors, and the Debtors' ability to avail themselves of their exclusivity period under the Bankruptcy Code.  All of these disputes and litigations—almost all of which involve time-sensitive discovery and hearing schedules and that are each the subject of ongoing, fluid, and, in some cases interdependent, settlement discussions among the Debtors and the various creditor constituencies—will require significant estate resources to resolve.  Introducing new counsel would further exacerbate this situation.

67.    Moreover, replacement counsel cannot reasonably be expected to abruptly pick up the day-to-day management of these Chapter 11 Cases on their existing timeline.  Replacing Willkie would likely require the Debtors to push their currently scheduled February 13 sale hearing and confirmation hearing in March by at least a month or two.  Extending the sale process at this juncture would threaten progress made with potential bidders to date and signal a lack of stability to such parties, resulting in a loss of value for all stakeholders.

68.    Finally, without the consent of the Required Consenting First Lien Lenders—who have already agreed to push the confirmation hearing by more than six weeks from the original RSA milestone of February 1—the Debtors risk defaulting under their RSA and DIP Facility if required to extend their case timeline.  Absent consent of the Required Consenting First Lien Lenders, pursuant to the RSA, the Debtors must emerge from bankruptcy by May 6, 2025, which is the date on which the DIP Facility will mature.  This irreparable harm is among the very reasons why disqualification has long been disfavored by bankruptcy courts in this Circuit.  See In re Truong, 557 B.R. 326, 336 (Bankr. D.N.J. 2016) (noting that a motion to disqualify is viewed with

disfavor, and disqualification is a "drastic measure," which should only be used only when necessary); see also In re Invitae Corp., No. 24-11362 (MBK), 2024 WL 2230069, at *6 (Bankr. D.N.J. May 16, 2024) ("Further supporting this decision are policy considerations . . . Given the time and effort already invested by [debtor's counsel] and the circumstances of these chapter 11 cases—which may result in little, if any, recovery for unsecured creditors—disqualification of [debtor's counsel] would cause undue delay and significant additional expense.   Moreover, Debtors chose [debtor's counsel] to represent them in this bankruptcy case. Where possible, debtors' choice of counsel should be afforded deference.").

**F.      Willkie Does Not Hold an Interest Materially Adverse to Class 10 Subordinate Claims**

69.      The UST asserts that Willkie's representation of the Debtors in Gale, Case No. 2024-0726-LWW, renders Willkie "materially adverse as to those Subordinated Claim Class 10 creditors and, by extension . . . not disinterested under section 101(14)(C)."[9]  UST Obj. ¶ 46.  The Gale action involves claims related to the Take-Private Transaction.  See Supplemental Feldman Declaration ¶¶ 12-14.  None of the Debtors are named as defendants in the action.  Rather, Willkie represents Franchise Group (not Mr. Kahn or any of his affiliates) in the Gale action in its capacity as a **non-party** in the litigation.  Id. ¶ 13.  Franchise Group is indirectly involved with Gale because Franchise Group was the asset taken private in the Take-Private Transaction.  Id. ¶ 14.  Willkie has and will continue to represent Franchise Group in this limited capacity to protect Franchise Group's interests.  However, Willkie is not involved in any underlying investigation of the Take-Private Transaction.  Further, none of the plaintiffs in the Gale action have filed proofs of claim in these Chapter 11 Cases.  Thus, the statement by the UST that the Gale plaintiffs fall into Class 10

---

[9]      Class 10 of the Plan is comprised of holders of prepetition claims that are subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise.

under the Plan is factually incorrect.  In addition, taken to its logical conclusion, the UST's argument that Willkie cannot be adverse to creditors of the Debtors' estates is non-sensical.  It is necessarily always the case in large, complex chapter 11 cases that debtors' counsel—by virtue of negotiating and drafting a plan of reorganization that compromises creditors' claims—is adverse to those creditors whose claims are compromised under the Plan.

70.     The Prophecy Trust also raises issues with Willkie's representation of Franchise Group in Gale.  Prophecy Trust Obj. ¶26.  Because Franchise Group may have indemnification obligations stemming from any liability that may be found in respect of former directors and officers, including Mr. Kahn, related to the Take-Private Transaction, the Prophecy Trust concludes Willkie is conflicted.  Mr. Kahn is represented by sophisticated counsel and has filed proofs of claim against the Debtors, asserting, among other things, indemnification claims.  The bar date in these Chapter 11 Cases passed on January 23, 2025 and the claims reconciliation process has not yet begun.  Willkie has not and will not be involved in the reconciliation of Mr. Kahn's claims.  Moreover, Mr. Kahn's indemnification claims are not central to or otherwise featured in these Chapter 11 Cases and Mr. Kahn may have contractual rights to reimbursement of defense costs from the Debtors' D&O policy that Willkie would have no occasion on which to opine.  When the claims reconciliation process occurs, the law firm for the OpCo Debtor Litigation Trust or any Freedom HoldCo Debtor Liquidation Trust or another appropriate law firm other than Willkie will handle Mr. Kahn's indemnification claims or the D&O insurer's reimbursement claims.

## III.    Willkie's Representation of the Debtors in these Chapter 11 Cases Does Not Violate Model Rules.

71.     The UST also asserts that Willkie ***may*** be disqualified because Willkie allegedly did not obtain informed consent from Mr. Kahn in connection with its representation of the Debtors

in contravention of Model Rule of Professional Conduct 1.9 ("Rule 1.9").  See UST Obj. ¶¶ 48-57.  Willkie's clients consented to the representations identified by the UST, and even if Willkie could or should have obtained further written confirmation, there is no basis to disqualify Willkie.

72.    In relevant part, Rule 1.9 provides that

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Model Rules of Pro. Conduct R. 1.9 (Am. Bar Ass'n 2023).

73.    "Disqualification of counsel [pursuant to Rule 1.9] is a remedy designed to ensure that a client's confidential communications to his lawyer are not used against that client when his lawyer later represents a party adverse to the former client. As such, its use is only appropriate when the subject matter of the new litigation is substantially related to that of the past representation."  Manchester v. Narragansett Cap., Inc., No. 89-10822, 1989 WL 125190, at *9 (Del. Ch. Oct. 19, 1989) (internal citations omitted).

74.    In examining the question of substantial relationship, the Court must determine: "(1) [] the nature and scope of the prior representation at issue; (2) [] the nature of the present lawsuit against the former client; and (3) in the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action and, in particular, could any such confidence be detrimental to the former client in the current litigation." Integrated Health Servs. v. THCI Co. LLC, 327 B.R. 200, 206-7 (Bankr. D. Del. 2005) (internal quotations omitted).  As the party alleging the existence of a conflict under Rule 1.9, the UST and the Prophecy Trust bear the burden of proving—and not merely asserting—that a substantial relationship exists between the current matter and those in which Willkie formerly represented Mr. Kahn. Id.; Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington, 652 F. Supp. 1281,

1283 (D. Del. 1987) ("The burden of proving there is a substantial relationship falls upon the moving party.") (citation omitted).

75.     Those objections all fail because Willkie's representation of the Debtors in these Chapter 11 Cases complies with Rule 1.9 for at least the following three reasons: (1) Willkie's representation of the Debtors in these Chapter 11 Cases does not include any matters adverse to Mr. Kahn that are "substantially related" to Willkie's prior representation of Mr. Kahn; (2) there is no evidence that Willkie, in representing the Debtors in these Chapter 11 Cases, has used or will use any confidential information of Mr. Kahn to his detriment; and (3) both Mr. Kahn and the Debtors have provided their informed consent to Willkie's representation of the Debtors in these Chapter 11 Cases.

76.     First, there is no merit to the UST's conclusory contentions that Willkie's work for the Debtors in these Chapter 11 Cases is "substantially related" to the Take-Private Transaction or any other matter in which Willkie previously represented Mr. Kahn.  As noted, conflicts counsel will handle matters related to the Take-Private Transaction and the personal criminal and civil allegations against Mr. Kahn.  Initial Feldman Declaration ¶ 30.  The Objectors do not explain how, despite that undisputed fact, Willkie would actually undertake representations on the matters they claim are "related" to Willkie's prior work.  Their failure to present any evidence in support of this conclusion is fatal.  See In re David Cutler Indus., Ltd., 432 B.R. 529, 549 (Bankr. E.D. Pa. 2010) ("[The party seeking disqualification] has failed to satisfy its burden of proving that the information it likely disclosed to Weir during the course of the prior representation is substantially related to the present litigation within the meaning of Pa. RPC 1.9(a)."); see also In re Persaud, 467 B.R. 26, 43 (Bankr. E.D.N.Y. 2012), aff'd, 496 B.R. 667 (E.D.N.Y. 2013) ("Accordingly, based on the entire record, the Court concludes that there is not a substantial relationship between

the subject matter of Troutman's representation of GRV and potential representation of Mr. Klein, and the issues in the present retention."); <u>Headfirst Baseball LLC v. Elwood</u>, 999 F. Supp. 2d 199, 213 (D.D.C. 2013) ("Given the lack of evidence, and bearing in mind that the defendants have the heavy burden of persuading the Court that the alleged prior representation is substantially related to the present litigation. . . .it would be inappropriate on this record to find that Rule 1.9 has been violated and to disqualify [proposed counsel] as the plaintiffs' counsel on that basis at this time.").

77.     Nor will Willkie represent the Debtors on any indemnification claims that Mr. Kahn may bring against the Debtors related to the <u>Gale</u> litigation, or in connection with Mr. Kahn's separation from Franchise Group.  And, the Objectors do not even assert, much less prove, that any of the other Franchise Group-related matters in which Willkie previously represented Mr. Kahn relate in any way to these Chapter 11 Cases.  Accordingly, there is no basis to conclude that Willkie's representation of the Debtors would violate Rule 1.9 because they would be adverse to Mr. Kahn on the same or a substantially related matter in which Willkie previously represented Mr. Kahn.

78.     Likewise, the Objectors make much of a number of different matters where the interests of the Debtors and Mr. Kahn are supposedly adverse to each other:  <u>See</u> UST Obj. ¶¶ 16-24, 35, 41, 46, 49, 54; <u>see also</u> Freedom Lenders' Obj. ¶¶ 5-7, 21-29; Prophecy Trust Obj. ¶¶ 5-11.

79.     But Willkie does not represent the Debtors in any of those matters.  First, the Objectors cite an ongoing SEC and DOJ investigation of Mr. Kahn related to the collapse of Prophecy.  They do not, however, even allege that Willkie represents the Debtors in those matters.  Thus, even if the SEC and DOJ investigation of Mr. Kahn is somehow implicated in these Chapter 11 Cases, any representation of the Debtors could be handled by Willkie's co-counsel at Young Conaway.

80.     The Objectors also cite two pending investigations in these cases, with one of those investigations expected to end in the near term as a result of a recently reached settlement among the Debtors, the Ad Hoc Group of First Lien Lenders, and the Committee (the "Committee Settlement").  As demonstrated below, Willkie's representation of the Debtors in these Chapter 11 Cases does not include any of those matters.

81.     As to the first investigation, prepetition, in October 2024, in anticipation of the commencement of these Chapter 11 Cases, the Debtors engaged Petrillo to conduct another independent investigation.  Supplemental Feldman Declaration ¶ 14.  That investigation includes potential claims and causes of actions that the Debtors' estates may have against Mr. Kahn, any of their other current or former directors and officers, or any other third-parties arising from, or related to, among other things: (i) Franchise Group's sale of Badcock to Conn's in December 2023; (ii) the Take-Private Transaction; (iii) the FRII acquisition and any other transactions involving BRPI and its affiliates; (iv) the Debtors' historical transactions and relationship with Mr. Kahn; and (v) the appropriateness of the releases by the Debtors' estates of their current directors and officers through these Chapter 11 Cases and under their proposed chapter 11 plan.  As reflected in the amended Plan and Disclosure Statement that is being filed concurrently herewith (or will be filed soon thereafter), the Committee Settlement provides, in part and subject to certain exceptions, for (i) the cessation of the Petrillo investigation upon agreement of the term sheet by the parties thereto and (ii) the following to be transferred to a litigation trust for the benefit of the holders of allowed general unsecured creditors of the OpCo Debtors' estates: (a) all potential claims and causes of action held by the OpCo Debtors against former directors and officers of the debtors, including Mr. Kahn; (b) all potential claims and causes of action held by the OpCo Debtors against various other persons and entities, including B. Riley Financial, Inc.; and (c) all potential and

causes of action held by the OpCo Debtors against the HoldCo Debtors. Thus, any claims or causes of action that may arise therefrom will be dealt with as of the effective date of the Plan and will be handled by separate counsel.

82.     As to the second investigation, in December 2024, in response to assertions by certain stakeholders that the interests of Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. (the "Freedom HoldCo Debtors") were not being independently represented by the Freedom HoldCo Debtors' existing boards of directors, the boards of directors of each of the Freedom HoldCo Debtors appointed Michael Wartell as independent director to the boards of directors at each Freedom HoldCo Debtor. Mr. Wartell engaged separate advisors and is investigating all matters relating to any claims, rights, and Causes of Action that may be held by or against the Freedom HoldCo Debtors. Subject to Court approval as necessary, Mr. Wartell is empowered and authorized by each of the Freedom HoldCo Debtors to release certain claims, preserve, or settle claims for the benefit of the Freedom HoldCo Debtors and their stakeholders. Willkie is not involved in that investigation other than facilitating discovery requests.

83.     In short, the Objectors have failed to meet their burden of establishing that Willkie's actual contemplated representation of the Debtors in these Chapter 11 Cases is "substantially related" to the Take-Private Transaction or any other matter in which Willkie previously represented Mr. Kahn.[10]

---

[10]   The UST cites In re Meridian Automotive Systems-Composite Operations, Inc. in support of its position. 340 B.R. 740 (Bankr. D. Del. 2006). In Meridian, a law firm was hired by a first lien secured lender to analyze a credit agreement related to the company's debt and intercreditor agreement for the purposes of protecting its second lien position. Id. at 743, 747. The representation was deemed terminated before the bankruptcy. Id. at 745. In anticipation of the bankruptcy, the law firm was retained by an informal committee of first lien lenders that also owned second lien debt. Id. at 743. The law firm claimed the assignment was related to intercreditor issues arising within the bankruptcy cases and separate from its prepetition services to the original first lien lender client. Id at 745. The court disagreed and stated that its representation was specifically advising each tranche of secured debt holders as to its rights against the other under the applicable loan documents. Id. at 746. In other words, the law firm was directly advising the new client on competing matters it had advised the original client on. The law firm also did not obtain the consent of the original client. These facts are distinguishable from

84.    <u>Second</u>, at the heart of Rule 1.9 lies the protection of a former client's confidential information and the Objectors offer no evidence that Willkie, in representing the Debtors in these Chapter 11 Cases, has used or will use any confidential information of Mr. Kahn to his detriment. <u>See</u> <u>In re BSA</u>, 630 B.R. at 130-31 (affirming bankruptcy court's finding that moving party failed to establish counsel could not effectively represent debtor, despite privity to confidential information of major creditor); <u>see</u> <u>generally</u> <u>Regalo Int'l v. Munchkin, Inc.</u>, 211 F.Supp.3d 682, 694 (D. Del. 2016) (denying movant's motion to disqualify opposing party's counsel, with whom movant had a prior working relationship, and finding that movant failed to demonstrate how proposed counsel's knowledge of confidential information from previous representations of movant would prove relevant in the issues of the current case).  On the contrary, as set forth in the Supplemental Feldman Declaration, Willkie has established that it promptly established industry-standard ethical wall procedures to ensure that none of the lawyers who represent the Debtors in these Chapter 11 Cases can access any electronic or hard copy files relating to the Firm's prior representation of Mr. Kahn.  Supplemental Feldman Declaration ¶¶ 27-29.  Similarly, Willkie established an internal exclusionary wall to avoid potential professional conflicts arising from the firm's representation of Franchise Group on matters related to the criminal and civil allegations against Mr. Kahn, on one hand, and its representation of Mr. Kahn on personal criminal and civil matters, on the other hand.

85.    The efficacy of such ethical wall procedures has been endorsed repeatedly by both the Third Circuit, among other courts.  <u>See</u>, <u>e.g.</u>, <u>In re SAS AB</u>, 645 B.R. 37, 43 (Bankr. S.D.N.Y.

---

Willkie's representation of Mr. Kahn in the Take-Private Transaction, which was a corporate transaction whereby the Debtors were taken private but Willkie did not advise Mr. Kahn or any other party regarding any intersection between these Chapter 11 Cases and the Take-Private Transaction.  Mr. Kahn and his affiliates are excluded from the releases in the Plan.  Moreover, Mr. Kahn has not objected to Willkie's representation of the Debtors in these Chapter 11 Cases.

2022) ("Furthermore, as this Court noted during oral argument, it is routine in this district, and in other districts to this Court's personal knowledge, that "ethical walls" are relied upon in cases. . . . The US Trustee itself has endorsed the use of ethical walls in such situations in a countless number of cases, including many cases in which I participated both as a private attorney and during my time on the bench.  I see no reason why such arrangements would not be sufficient to protect against any risks that one might posit. . . ."); In re Enron Corp., No. 01-16034(AJG), 2002 WL 32034346, at *11 (Bankr. S.D.N.Y. May 23, 2002), aff'd, No. 02 CIV. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) ("There is no basis in this record to question the adequacy of this procedure or the internal ethical walls established at Milbank.  Conflicts counsel, limited engagement agreements, and ethical walls have been acceptable procedures to address conflict of interests issues.").  As a result, the Objectors have failed to meet their burden of proving that Willkie's representation of the Debtors in these Chapter 11 Cases would result in the Firm using Mr. Kahn's confidential information to his detriment.

86.    Third, even if the Objectors could establish that Willkie's representation of the Debtors in these Chapter 11 Cases were adverse to Mr. Kahn on a matter that is substantially related to the Firm's prior representation of Mr. Kahn—and they have not—Willkie's conduct was entirely consistent with Rule 1.9 because both clients have given their informed consent to the Firm's current representation of the Debtors.

87.    As an initial matter, it is important to emphasize that only the UST and Prophecy Trust have made bald assertions that Willkie has a conflict under Rule 1.9.  Neither Mr. Kahn nor the Debtors—the only parties whose interests Rule 1.9 protects—have made any allegation that Willkie failed to comply with its ethical obligations under this Rule.

88.     That is for good reason: both Mr. Kahn and the Debtors have provided informed

consent to Willkie's representation of the Debtors in these Chapter 11 Cases.  See Supplemental

Feldman Declaration ¶ 44.   Neither the Model Rules nor the Delaware Rules of Professional

Conduct (which bankruptcy courts in this District find instructive) specify a particular form of

informed consent.   See In re Maxus Energy Corp., 49 F.4th 223, 228 (3d Cir. 2022) ("The

Bankruptcy Court for the District of Delaware [has] incorporated the Model Rules in its local rules

governing professional conduct.")   Rather, all that is required is "agreement by a person to a

proposed course of conduct after the lawyer has communicated adequate information and

explanation about the material risks of and reasonably available alternatives to the proposed course

of action."  Del. R. Pro. Conduct 1.0(e).  The commentary to Rule 1.0(e) recognizes that "[c]onsent

may be inferred . . . from the conduct of a client or other person who has reasonably adequate

information about the matter." Id., Comm. 7; see In re A&T Paramus Co., Inc., 253 B.R. 606, 614

(Bankr. D.N.J. 1999) ("A finding of waiver is justified when a former client was concededly aware

of the former attorney's representation of an adversary but failed to raise an objection promptly

when he had the opportunity.").

89.     Prior to undertaking this representation of the Debtors, Willkie explained to the

Debtors that it had formerly represented Mr. Kahn in Franchise Group-related matters.   Armed

with this knowledge, the Debtors made clear their desire to have Willkie represent them in these

Chapter 11 Cases—a desire that continues to this day.  Supplemental Feldman Declaration ¶ 7.

Similarly, Mr. Kahn, who is represented by sophisticated counsel, has provided an implied waiver.

He has not objected or otherwise raised any concerns regarding Willkie's representation of the

Debtors in these Chapter 11 Cases, which have now been pending for three months.  Accordingly,

the Objectors have failed to show that either the Debtors or Mr. Kahn have failed to provide their

informed consent to Willkie's representation of the Debtors in these Chapter 11 Cases, notwithstanding the Firm's prior representation of Mr. Kahn.

## **<u>CONCLUSION</u>**

90.     For the reasons stated herein, Willkie does not hold an interest adverse to the estates, nor does Willkie represent any interest adverse to these chapter 11 estates under section 327(a) of the Bankruptcy Code, and Willkie is disinterested as the term is defined by section 101(14) of the Bankruptcy Code.  Moreover, based on the totality of the circumstances in these cases, there are no potential conflicts that rise to the level of requiring Willkie to be disqualified. Accordingly, the Objections should be overruled and the Application should be granted.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court overrule the Objections and approve the Application.

Dated: February 3, 2025
        Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Allison S. Mielke*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
Mark T. Stancil (admitted *pro hac vice*)
Robin Spigel (*pro hac vice* forthcoming)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
mstancil@willkie.com
rspigel@willkie.com

*Co-Counsel and Proposed Counsel to the Debtors and Debtors in Possession*