# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 152, 441, 592, 655, 679 & 686** |

## DEBTORS' OMNIBUS REPLY IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT; (II) APPROVING SOLICITATION AND VOTING PROCEDURES, INCLUDING (A) FIXING THE VOTING RECORD DATE, (B) APPROVING THE SOLICITATION PACKAGES AND PROCEDURES FOR DISTRIBUTION, (C) APPROVING THE FORM OF THE BALLOTS AND SOLICITATION MATERIALS AND ESTABLISHING PROCEDURES FOR VOTING; (D) APPROVING PROCEDURES FOR VOTE TABULATION; (III) SCHEDULING A CONFIRMATION HEARING AND ESTABLISHING NOTICE AND OBJECTION PROCEDURES; AND (IV) GRANTING RELATED RELIEF

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

The debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") hereby file this reply (the "Reply") to the objections to the *Debtors' Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballots and Solicitation Materials and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 152] (the "Motion")[2] filed by: (a) Accelerated Services, Inc. ("Accelerated") [Docket No. 441], (b) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") [Docket No. 679], and (c) the Freedom Lender Group[3] (the "Freedom Lenders") [Docket No. 686] (each an "Objection" and collectively, the "Objections").[4]  For the reasons set forth herein, the Debtors respectfully request that the Bankruptcy Court overrule the Objections and approve the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* (as may be amended from time to time, the "Disclosure Statement"), filed contemporaneously herewith.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Plan (as defined herein), as applicable.

[3]    As defined in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229].

[4]    The Debtors also received certain informal comments with respect to the Disclosure Statement from other parties, including (a) JPMorgan Chase Bank, N.A., in its capacity as Prepetition ABL Agent, (b) various parties in interest, including certain landlords represented by (i) Barclay Damon, LLP, (ii) Ballard Spahr LLP, and (iii) Allen Matkins Leck Gamble Mallory & Natsis LLP.  In addition, the United States Securities & Exchange Commission (the "SEC") filed an objection to the Disclosure Statement [Docket No. 486].  The Debtors believe the SEC objection and the other informal comments have been resolved through revisions to the Plan, Disclosure Statement, or Disclosure Statement Order, or will be raised at Plan confirmation.  See Exhibit A.

## PRELIMINARY STATEMENT[5]

1.      The Debtors have reached a critical juncture in their chapter 11 process:  they are positioned to solicit votes on and seek confirmation of their value-maximizing Plan.  Far from "rushing headfirst" into this process, the Debtors have taken extra time to facilitate their proposed restructuring, extending their original timeline by over a month.  The voting deadline, originally proposed for January 21, is now proposed for February 25, and the proposed confirmation hearing will be rescheduled from February 6 to late-March depending on this Court's availability.

2.      The Debtors have used this extended timeframe to negotiate at length with their core creditor constituencies.  These parties include the Debtors' first lien lenders, their ABL lenders, the Committee, a significant number of landlords, the U.S. Trustee, and the SEC.  Those constructive discussions have resulted in a number of revisions to the Plan, Disclosure Statement, and Disclosure Statement Order, filed contemporaneously herewith, which have resolved the vast majority of these parties' objections and comments.  In fact, the Debtors have reached a global resolution with the Committee that favorably resolves and avoids potential protracted expensive and uncertain litigation, and this settlement is memorialized in the revised Plan.

3.      Contrary to the assertions in the Freedom Lenders' Objection, the Debtors have also used this extra time to engage with the Freedom Lenders.  The Debtors sent the proposed revisions to the Plan to the Freedom Lenders on December 31, 2024, ample time for them to have responded or provided comments to the Debtors prior to the revised Plan having been filed on January 3, 2025—but they failed to do so.  As set forth in detail herein, the Debtors have also been actively engaged in responding to the Freedom Lenders' discovery requests relating to the

---

[5]   Capitalized terms used, but not otherwise defined, in this section have the meanings ascribed to them elsewhere in the Reply or in the Plan or Disclosure Statement, as applicable.

Plan.  Although the Freedom Lenders make much of discovery-related disagreements, they are not relevant at this stage.  There is no requirement that plan-related discovery be completed before a disclosure statement can be approved.

4.       The only question before the Court is a simple one—whether the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Court.  That simple question requires only an evaluation of the completeness and accuracy of the information contained in the Disclosure Statement, and a determination regarding the sufficiency of that information to enable creditors that are entitled to vote on the Plan to make an informed decision as to whether to accept or reject the Plan.  The Disclosure Statement easily satisfies this standard.  That there are ongoing discussions among the parties and a number of pending investigations due to the complexity of these Chapter 11 Cases does not mean the Disclosure Statement is insufficient.  Those workstreams are described in the Disclosure Statement in enough detail to enable a hypothetical investor to make an informed decision about whether to support the Plan.  Importantly, the outcome of those ongoing processes can only result in the same or better treatment for the affected creditors, a fact they can take into account when determining whether to vote to accept or reject the Plan.

5.       The remaining Objections generally fall into two broad categories:  (a) objections to the adequacy of disclosure and (b) objections that assert that the Plan should not be confirmed.  As evidenced by the responses set forth in the Objections Chart, to the extent the Objections raise disclosure issues, the Debtors have been and remain willing to modify the Disclosure Statement to address reasonable requests for additional disclosure.  Indeed, the Debtors believe they have resolved the majority of the disclosure issues raised in the Objections.  As a

result, the Debtors have set forth below or in the Objections Chart amendments the Debtors have made to the Plan and Disclosure Statement to resolve certain aspects of the Objections.

6.      With respect to the numerous issues raised in the Objections regarding Plan confirmation, although the Debtors believe that the provisions of the Plan are appropriate, permissible and supported by applicable law, such Objections are premature.  Indeed, notwithstanding arguments to the contrary, none of the confirmation issues raised in the Objections, either individually or collectively, renders the Plan unconfirmable as a matter of law.  Such objections include the Freedom Lenders' Objection that the Plan is not confirmable because of their threat that they will not vote in favor of the Plan.  However, their current indication that they will not vote in favor of the Plan does not mean the Plan is inherently flawed in a manner that cannot be cured by voting, which is the only question that is relevant to the inquiry of whether a plan is "patently unconfirmable" at the disclosure statement approval stage.  And the Freedom Lenders, for their part, may ultimately determine to vote in favor of the Plan after considering information gathered in the discovery process or otherwise.  The Disclosure Statement Hearing provides an opportunity for the Court to review the adequacy of the information contained in the Disclosure Statement.  It should not be transformed into a "mini" confirmation hearing, and the objections to confirmation of the Plan contained in the Objections should be reserved for the Confirmation Hearing.

7.      To facilitate the Court's consideration of the Objections and the Debtors' responses thereto, the remainder of this Reply addresses threshold issues regarding the standards for approving a disclosure statement and the proper scope of the issues to be considered at the Disclosure Statement Hearing, as well as a number of the specific issues raised by certain of the

Objections.  For the reasons set forth in this Reply and the Objections Chart in <u>Exhibit A</u>, each of the Objections should be overruled.

<u>**REPLY TO OBJECTIONS TO DISCLOSURE STATEMENT**</u>

**I.     The Disclosure Statement Contains Adequate Information Under Section 1125 of the Bankruptcy Code.**

8.     Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide "adequate information" regarding such plan to holders of impaired claims and interests entitled to vote on such plan.  11 U.S.C. § 1125. Specifically, section 1125(a)(1) of the Bankruptcy Code provides, in relevant part, as follows:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

9.     As detailed in the Motion, the primary purpose of a disclosure statement is to provide adequate information such that creditors and interest holders affected by a proposed plan can make an informed decision regarding whether or not to vote for the plan.  <u>See</u>, <u>e.g.</u>, <u>Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.</u>, 337 F.3d 314, 321 (3d Cir. 2003) (providing that a disclosure statement must contain "adequate information to enable a creditor to make an informed judgment about the Plan.") (internal quotations omitted); <u>Century Glove, Inc. v. First Am. Bank of N.Y.</u>, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

10.     "Adequate information" is a flexible standard, based on the facts and circumstances of each case.  11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records. . . ."). The statute instructs that the court "shall consider the complexity of the case, the benefit of additional information to creditors and parties in interest, and the cost of providing additional information." Id.; see also Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); In re Lisanti Foods, Inc., 329 B.R. 491, 507 (Bankr. D.N.J. 2005) ("The information required will necessarily be governed by the circumstances of the case.") (citation omitted).

11.     In defining the contours of "adequate information," courts have identified categories of information that generally should be included in a disclosure statement. See In re Phx Petroleum Co., 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (listing 19 general categories, yet noting that the categories of information required in any specific case is a fact-specific determination). Importantly, the information in a "disclosure statement only has to provide general descriptions; it doesn't have to provide detailed information." Hr'g Tr. at 59:18-21, In re Mallinckrodt, Case No. 20-12522 (JTD) (Bankr. D. Del. June 2, 2021) [Docket No. 2683].

12.     Here, the Disclosure Statement is well over 100 pages long, excluding exhibits.  It contains fulsome descriptions of—and in many cases, detailed information about—categories of information necessary to make an informed decision, including:

- the purpose of and an overview of the Plan and the Disclosure Statement (Art. I.A & IV);

- the Debtors' corporate history, structure and business operations (Art. II);

- factors leading to the commencement of these Chapter 11 Cases (Art. III);

- material developments since the Petition Date (Art. V);

- a summary of the Plan, which includes classification and treatment of Claims and Interests under the Plan and provisions governing distributions and implementation of the Plan (Art. VI);

- certain risk factors that holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to confirmation of the Plan (Art. IX);

- a summary of certain material U.S. federal income tax consequences of the Plan (Art. XI); and

- information regarding the statutory requirements for confirmation of a plan, certain important effects of confirmation of the Plan and how to vote on the Plan (Art. XVI).

13.    At this stage, only the adequacy of the information contained in the Disclosure Statement needs to be addressed.  Objections relating to the substantive provisions of the Plan are best left for the Confirmation Hearing.  Addressing confirmation issues at the Disclosure Statement Hearing only delays the course of these Chapter 11 Cases unnecessarily by converting the Disclosure Statement Hearing into a premature confirmation hearing.  As detailed in the Motion and for the reasons set forth herein and in the chart attached hereto as Exhibit A (the "Objections Chart"), the Debtors submit that the Disclosure Statement contains "adequate information" necessary to allow all creditors to make an informed decision to vote on the Plan.

**II.    The Debtors' Proposed Confirmation Timeline Is Reasonable and Appropriate.**

14.    The Freedom Lenders contend that the Debtors' proposed timeline is prejudicial and must be extended.  See Freedom Lenders Objection ¶ 33.  As set forth below, the Debtors' proposed timeline complies with the applicable Bankruptcy Rules and Local Rules and is reasonable and appropriate under the circumstances of these Chapter 11 Cases.

15.     First, the Freedom Lenders argue that, as a result of the adjourned hearings on the Motion, the Debtors have not complied with Local Rule 3017-1. <u>See</u> Freedom Lenders Objection ¶ 34. Local Rule 3017-(b) requires a hearing on the voting procedures governing solicitation of a disclosure statement on not less than twenty-one (21) days prior notice. Del. Bankr. L.R. 3017-1(a). However, all parties in interest have received proper and timely notice of the Motion, including having received not less than twenty-one (21) days' notice of the proposed voting procedures. <u>See</u> *Affidavit of Service* [Docket No. 201].

16.     On November 11, 2024, the Debtors filed the Motion, which, in compliance with the Bankruptcy Rules and Local Rules 3017(a) and (b),[6] provided parties in interest 36 days' notice of the December 17, 2024 hearing date on approval of the Disclosure Statement and the proposed procedures to vote on the Disclosure Statement. <u>See</u> *Affidavit of Service* [Docket No. 201]. The Freedom Lenders were properly noticed pursuant to the Local Rules. <u>See</u> <u>id</u>.

17.     On December 6, 2024, the Disclosure Statement hearing date was adjourned to January 15, 2025 by agreement of the parties, including counsel to the Freedom Lender Group. <u>See</u> Exh. A, E-mail from A. Zatz to J. Brandt (Dec. 6, 2024), *Declaration of Betsy L. Feldman in Support of Debtors' Omnibus Reply in Support of Debtors' Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation Packages and Procedures For Distribution, (C) Approving the Form of the Ballots and Solicitation Materials and Establishing Procedures for Voting; (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing*

---

[6]     Bankruptcy Rule 3017(a) requires that creditors and other parties in interest receive 28 days' notice of the hearing to consider a proposed disclosure statement. Bankruptcy Rule 2002(b) requires that creditors and other parties in interest have 28 days' notice of the deadline to object to a proposed disclosure statement. Fed. R. Bankr. P. 3017(a) and 2002(b). Local Rule 3017-1(a) expands upon the notice period provided by the Bankruptcy Rules and requires 35 days' notice of the hearing to consider a proposed disclosure statement. Del. Bankr. L.R. 3017-1(a).

*and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief*, filed concurrently herewith.  On December 9, 2024, the new hearing date was noticed to all parties in interest.  See *Notice of Rescheduled Disclosure Statement Hearing* [Docket No. 373]; *Affidavit of Service* [Docket No. 594].  On January 3, 2025, the Debtors filed a revised form of Disclosure Statement Order [Docket No. 657], which included a proposed voting deadline of February 14, 2025 (42 days from the then scheduled hearing on the Disclosure Statement).  At the request of the Court, the hearing date was further adjourned to January 21, 2025. On January 17, 2025, the Debtors sought a further adjournment of the Disclosure Statement Hearing to February 6, 2025 to afford the Debtors additional time to negotiate and resolve open issues in the Disclosure Statement and Plan.

18.    Contemporaneously with filing this Reply, the Debtors will file a further proposed Disclosure Statement Order (the "Revised Disclosure Statement Order").  Prior to the Disclosure Statement Hearing, the Debtors will file a further revised proposed Disclosure Statement Order with a confirmation timeline that affords parties in interest at least 28 days to file an objection to the Plan and, to the extent eligible, at least 28 days to vote.

19.    As demonstrated above, the Debtors have proposed a voting deadline and related procedures that comply with the Bankruptcy Rules and Local Rules, are appropriate under the circumstances and consistent with due process and permit the process to properly progress.

20.    Second, the Freedom Lenders raise a laundry list of discovery-related grievances, including that the hearing on confirmation of the Plan should be no earlier than 45 days after completion of discovery.  See Freedom Lenders Objection ¶¶ 35-42.  As discussed below, the Debtors propose that the confirmation hearing be held in late-March subject to the Court's availability, which is more than 125 days since the Motion was filed and well over 100 days since

the Plan was initially filed.  The Debtors have engaged and continue to engage with the Freedom

Lenders on their numerous discovery requests and are attempting to reach a consensual Plan

discovery schedule.  The proposed Plan confirmation timeline provides more than sufficient time

to enable the Freedom Lenders to make an informed decision regarding whether to vote to accept

or reject the Plan and, if necessary, to file an objection thereto.  While none of the other discovery-

related grievances are relevant to the question of whether the Disclosure Statement contains

adequate information, the Debtors believe it is important to correct the record.

21.     On November 4, 2024—one day after Petition Date, as the Debtors were preparing

for the First Day Hearing—the Freedom Lenders sent deposition notices under Rule 30(b)(6) of

the Federal Rules of Civil Procedure to the HoldCo and OpCo Debtors in connection with the First

Day Hearing.  On November 8, 2024, the Freedom Lenders renewed these Rule 30(b)(6)

deposition notices in connection with the Second Day Hearing, and also served, in connection with

the Second Day Hearing, Requests for Production and Interrogatories on the HoldCo and OpCo

Debtors (collectively, the "Second Day Hearing Requests").  On November 14, 2024, the Debtors

and the Freedom Lenders conducted a meet-and-confer regarding the Second Day Hearing

Requests.  On November 16, 2024, the Freedom Lenders served Requests for Production and

Interrogatories in connection with the Plan and Disclosure Statement (the "Plan/Disclosure

Statement Requests").  On November 18, 2024, the Debtors served Responses and Objections to

the Second Day Hearing Requests.  On November 26, 2024, the Debtors served Responses and

Objections to the Plan/Disclosure Statement Interrogatories.  On December 3, 2024, the Debtors

and the Freedom Lenders conducted a second meet-and-confer on Second Day Hearing

Requests.  On December 4, 2024, the Debtors served Responses and Objections to the

Plan/Disclosure Statement Document Requests.  Depositions were held for the Debtors' witnesses,

Andrew Laurence, Christopher Grubb, and David Orlofsky, on December 6 and December 9, 2024.

22.    The Freedom Lenders next reached out to the Debtors in connection with the Plan/Disclosure Statement Requests on December 23, 2024.  On December 24, 2024, the Debtors proposed search terms and custodians for Plan discovery and, on December 31, 2024, the Freedom Lenders responded with additional proposed search terms.  On December 27, 2024, the Debtors produced 675 documents in response to the Plan/Disclosure Statement Requests.  The Freedom Lenders and the Debtors conducted another meet-and-confer on January 3, 2025 concerning Plan-related discovery, at which the Freedom Lenders raised *for the first time* that the Debtors' Plan-related Responses and Objections, served on December 4, 2024, needed to be supplemented and said that the Freedom Lenders were not even prepared to discuss their own Requests for Production until the Debtors served supplemental Responses and Objections.  On January 9, 2025, the Debtors agreed to run *all* of the Freedom Lenders' proposed search terms, even though many of them generated a high volume of false hits, and offered additional search terms / custodians.  On January 11, 2025, the Debtors made a production of 1,593 documents.  On January 15, the Debtors agreed to substantially all of the Freedom Lenders' additional search term / custodian proposals. Thousands of additional documents are in the pipeline and will be produced in the coming days. The Debtors have now reviewed over 57,000 documents in connection with Plan discovery alone. This is on top of the more than 3,000 documents already produced in connection with the Freedom Lenders' Second-Day Hearing requests.

23.    In sum, the Debtors have provided responses to each of the Second Day Requests and Plan/Disclosure Statement Requests, produced over 7,200 documents, met-and-conferred with the Freedom Lenders on many occasions, and produced three witnesses for depositions, all within

the three-month life of these Chapter 11 Cases.  Notably, the Debtors have meaningfully and frequently engaged with the Freedom Lenders while administering these Chapter 11 Cases, maintaining operations of three of their business lines, and conducting the going-out-business sales of the American Freight businesses.

24.    Disregarding the Debtors' meaningful engagement with the Freedom Lenders in respect of their discovery requests, as noted above, the Freedom Lenders insist that the proposed timeline to schedule the Confirmation Hearing is insufficient to complete their Plan-related discovery and they require forty-five (45) days between the conclusion of discovery and the Plan objection deadline.  See Freedom Lenders' Objection ¶ 42.  However, the Disclosure Statement Hearing adjournment provided over two weeks' additional time (during which the Debtors have engaged in discovery with the Freedom Lenders), and the Revised Disclosure Statement Order adjourns the rescheduled Confirmation Hearing by more than four weeks to late-March. Accordingly, the Freedom Lenders had and continue to have ample time to obtain additional discovery and file any objection and should not be permitted to unnecessarily extend the confirmation hearing timeline.

**III.    The Plan Is Not Patently Unconfirmable and the Remaining Objections Should Be Addressed at Plan Confirmation.**

25.    The remaining issues raised by the Freedom Lenders and the U.S. Trustee, whether asserted as a "patently unconfirmable" issue or not, are all Plan confirmation issues.

26.    It is well established that, unless the disclosure statement "describes a plan of reorganization which is so fatally flawed that confirmation is ***impossible***" (i.e., the plan is patently unconfirmable), the Court should approve a disclosure statement that otherwise adequately describes the chapter 11 plan at issue.  In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (emphasis added); see also In re Am. Cap. Equip., LLC, 688 F.3d 145, 154 (3d

Cir. 2012) (holding that a "bankruptcy court may address the issue of plan confirmation where it is **obvious** at the disclosure statement stage that a later confirmation hearing would be **futile** because the plan described by the disclosure statement is patently unconfirmable") (emphasis added); In re Smallhold, Inc., Case No. 24-10267 (CTG), 2024 Bankr. LEXIS 2332, at *19-20 (Bankr. D. Del. Sept. 25, 2024) (noting that confirmation issues are reserved for the confirmation hearing unless there is a defect making a plan inherently or patently unconfirmable). "A plan is patently unconfirmable where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." In re Am. Capital Equip. 688 F.3d at 154–55 (internal quotations and citation omitted) (alteration in the original).

27.    Bankruptcy courts also consistently state that such action must be used carefully so as not to "prematurely convert a disclosure statement hearing into a confirmation hearing." Id. at 154, n. 6 (citing In re Monroe Well Serv., 80 B.R. 324, 332–33 (Bankr. E.D. Pa. 1987)); see also In re Dakota Rail, Inc., 104 B.R. 138, 143 (Bankr. D. Minn. 1989) ("Only where the disclosure statement on its face relates to a plan that cannot be confirmed" is it appropriate to dismiss a proposed plan prior to the solicitation of votes; "otherwise, confirmation issues are left for later consideration.").

28.    At the appropriate time (i.e., the Confirmation Hearing), not the Disclosure Statement Hearing, the Debtors will demonstrate that the Plan complies with and satisfies the confirmation requirements set forth in section 1129 of the Bankruptcy Code. Indeed, courts emphasize that objections related to compliance with section 1129 of the Bankruptcy Code do not rise to the level of making a plan "patently unconfirmable." See, e.g., In re Cardinal Congregate I, 121 B.R. at 763-64 (overruling objections to classification and treatment of claims, protection

of security interests, and feasibility); In re Monroe Well Serv., Inc., 80 B.R. at 333 (holding that objections bearing on confirmability must be limited to defects that could not be overcome by creditor voting results and must also concern matters upon which all material facts are not in dispute or have been fully developed). Thus, issues bearing on class treatment, releases, voting, and section 1129's other requirements are not properly raised in opposition to the Disclosure Statement.

29.     Further, courts routinely approve disclosure statements despite the existence of disputed issues related to confirmation, which may require an evidentiary hearing. See, e.g., In re Hyatt, 509 B.R. 707, 711 (Bankr. D.N.M. 2014) (approving the disclosure statement and finding that the "proposed classification scheme does not render the Plan patently unconfirmable as a matter of law" despite the fact that the debtor's proposed classification scheme required "additional evidence that may be presented at a confirmation hearing[.]"); In re Quigley Co., 377 B.R. 110, 112 (Bankr. S.D.N.Y. 2007) (approving the disclosure statement while acknowledging that settlements with the debtors' non-debtor former parent "implicate several confirmation issues" regarding the rights and incentives of certain claimants under the proposed plan). Indeed, courts caution that "care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing[.]" In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988); see also In re Monroe Well Serv., Inc., 80 B.R. at 333 n.10 (stating that deciding confirmation issues before solicitation may have a disenfranchising effect because the disclosure statement itself is not mailed to all creditors until after court approval is obtained).

30.     The Freedom Lenders, the U.S. Trustee, and all other parties in interest will have the opportunity to prosecute any confirmation objections if they so choose in connection with the Confirmation Hearing. While the Debtors submit that these confirmation objections are

premature, to aid the Court's analysis, the Debtors briefly address below certain confirmation issues raised in the Objections.[7]

> **A.      It is Premature to Determine the Absence of an Accepting Impaired Class at the Holdco Debtors.**

31.     The Freedom Lenders contend that the Plan is patently unconfirmable because they do not intend to vote in favor of the Plan.  See Freedom Lenders Objection ¶ 28.  They further contend that, because they do not intend to vote in favor of the Plan, there is no impaired accepting class for the HoldCo Debtors and, thus, the Plan as to all Debtors is patently unconfirmable.  Id. Both arguments are incorrect.

> **i. Threats of Voting Against the Plan Are Not Evidence of Patent Unconfirmability.**

32.     Approval of the Disclosure Statement and solicitation of the Plan is appropriate notwithstanding the Freedom Lenders' threat that they will not vote to accept the Plan.  That threat is not a Plan defect nor is it persuasive evidence that the Plan is "patently unconfirmable."  This is particularly true where the Freedom Lenders' argument as to why they will not vote on the Plan is wholly unrelated to the adequacy of the Disclosure Statement.

33.     The Freedom Lenders' displeasure with certain provisions of the Plan or potential recoveries under the Plan does not bear on whether the Disclosure Statement contains "adequate information" as required by section 1125.  Mere dissatisfaction with a Plan does not preclude the voting process.  See, e.g., Hr'g Tr. at 45, In re Coldwater Creek, Inc., No. 14-10867 (BLS) (Bankr. D. Del. June 23, 2014) [Docket No. 641] ("So an anticipation or expectation or prediction about what will happen with the voting is, to my likes, not sufficient to determine whether or not a plan can be approved for purposes of disclosure.  Ever[y] plan suffers a risk of creditors not voting for

---

[7]    The Debtors reserve the right to respond to any and all objections asserted in the Objections in connection with confirmation of the Plan and otherwise.

it.  And we make that determination at confirmation, not in the disclosure statement stage.").  The Freedom Lenders are dissatisfied with the recovery provided for their Claims and Interests in the Plan.  See Freedom Lender Objection ¶¶ 17, 28.  However, the Freedom Lenders do not contend that the Disclosure Statement's description of the treatment of Class 7 (Prepetition HoldCo Loan Claims) and Class 8 (HoldCo General Unsecured Claims) is inconsistent with the Bankruptcy Code's confirmation requirements.  Moreover, as set forth on Exhibit A, the Freedom Lenders argument that the Disclosure Statement is deficient in describing the treatment of those Claims is unpersuasive.

34.    The cases cited by the Freedom Lenders in support of their proposition that a threat of a rejecting vote is enough to deny approval of a disclosure statement are distinguishable from the facts here.  In each of In re 18 RVC, LLC, and In re Curtis Ctr. Ltd. P'ship, the plan processes had confirmability issues rooted in actual plan defects, not mere dissatisfaction with the proposed plan.  In both cases, the debtor gerrymandered certain classes by separately classifying an unsecured claim on grounds that were not supportable as a matter of law.  In re 18 RVC, LLC, 485 B.R. 492, 497 (Bankr. E.D.N.Y. 2012); In re Curtis Ctr. Ltd. P'ship, 195 B.R. 631, 642-43 (Bankr. E.D. Pa. 1996).  In such cases, reclassifying the applicable claims would have resulted in an unconfirmable plan; but neither case holds that the threat of rejection of a plan renders such plan patently unconfirmable.  Both court's holdings were based on the infirmities in the proposed plan, namely that the classification scheme violated section 1122 of the Bankruptcy Code.  In re 18 RVC, LLC, 485 B.R. at 497; In re Curtis Ctr. Ltd. P'ship, 195 B.R. at 640-41.  In re Applegate Property, Ltd., also involved a plan process that had confirmability issues rooted in actual plan defects, not mere dissatisfaction with the proposed plan.  In that case, a non-debtor affiliate acquired claims to gain an advantage in the plan voting process.  133 B.R. 827, 828 (Bankr. W.D.

Tex. 1991). At plan confirmation, the court ruled that such acquisitions by an insider, which were not previously disclosed in the debtor's disclosure statement, rendered the plan unconfirmable as the claims acquired by the insider would no longer count toward acceptance of the plan. Id. at 833.

35. Here, the only purported confirmation defect is one that could be cured by a vote—and that vote has not yet occurred. The fact that the Freedom Lenders may vote against the Plan is not the type of defect that would make it unconfirmable.[8] See In re Am. Cap. Equip., 688 F.3d at 154-55; In re Unichem Corp., 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987) (courts should disapprove of the adequacy of the disclosure statement on confirmability grounds only "where it is readily apparent that the plan accompanying the disclosure statement could never legally be confirmed").

### ii. The Plan Is a Joint Plan That May Be Confirmed on a Per Debtor Basis.

36. The Freedom Lenders also argue that, if the Plan is not accepted at the HoldCo Debtors, it is patently unconfirmable at all other Debtors. See Freedom Lender Objection ¶¶ 32. The Freedom Lenders would like to have it all ways. On the one hand, they argue that the Plan is

---

[8] Further, the Freedom Lenders have asserted time and again that the Freedom HoldCo Debtors have valuable claims that inure to the benefit of the Freedom Lenders. See Hr'g Tr. at 17:12-16; 22:16-20, In re Franchise Grp. Inc., 24-12480 (CTD) (Bankr. D. Del. Dec. 17, 2024) [Docket No. 471] (the Freedom Lender Group states that "[T]he Holdco lenders have a negotiated for contractual right to control the Opco's, a right that clearly has value . . . a right that clearly has value regardless of any former valuation and that is protected by the code." The Freedom Lender Group further notes, "[h]owever, the magnitude of the objections to our request for relief demonstrates the presence of value far more convincingly than any expert testimony could. In that regard, however, Mr. Grubb specifically testified that control provides value. The right to control is valuable."); see The Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors ¶ 28 [Docket No. 192] ("And now, any value at the HoldCo Debtors, including valuable potential claims and causes of action and despite the HoldCo Lenders' 2023 investment in a company touted as being worth $2.6 billion at the time of the Take-Private Transaction, are proposed to be wiped out and argued to be worthless, notwithstanding the protective measures taken when structuring the transaction."). Yet, now they argue that the Plan is patently unconfirmable because their recoveries are speculative and they should be deemed to reject the Plan pursuant to Section 1126(g). Freedom Lenders Objection ¶ 30. The Freedom Lenders cannot have it both ways. In any event, as set forth on Exhibit A, the Debtors have revised the Disclosure Statement to include information regarding the Freedom HoldCo Debtor Liquidation Trust and the Plan Supplement will contain the form of the Freedom HoldCo Debtor Liquidation Trust. See Disclosure Statement § XII(O).

not a substantively consolidated Plan; thus, this Court should consider section 1129(a)(10) of the Bankruptcy Code on a per debtor rather than a per plan basis.  See id. ¶¶ 28-31.  On the other hand, they argue that the entirety of the Plan must fail if, in fact, Classes 7 and 8 (each at the HoldCo Debtors) do not vote in favor of the Plan.  Id. ¶ 32.  Challenges to voting and whether a joint, non-substantively consolidated plan can be confirmed on a per debtor basis or per plan are objections that are properly addressed at confirmation.  In any event, the Debtors have added language to the Disclosure Statement making it even clearer that the Plan constitutes a separate chapter 11 plan for each Debtor and that they intend to seek confirmation of the Plan as to all Debtors where they meet the standards under section 1129 of the Bankruptcy Code.  See Disclosure Statement § IX(B)(ii).

### B.    A Valuation Analysis Is Not Required to Approve the Disclosure Statement.

37.    The Freedom Lenders argue that the Disclosure Statement cannot be approved because the Debtors have not filed or committed to provide to parties in interest a valuation analysis.  Freedom Lenders' Objection ¶ 51.  This argument is meritless.

38.    First, the Bankruptcy Code expressly provides that a disclosure statement may be approved "without a valuation of the debtor or an appraisal of the debtor's assets."  11 U.S.C. § 1125(b).

39.    Second, as disclosed in the Disclosure Statement, the Debtors are running a sale process concurrent with Plan solicitation.  Contrary to the Freedom Lenders' belief that it is "indisputably essential" to have a valuation in a plan where debt is being equitized, under the facts of these Chapter 11 Cases, filing a valuation while the sale process is ongoing would be harmful to such process and not serve to maximize value.  Disclosure Statement § I(A).  Valuing the companies both through the ongoing marketing process and through a banker-produced valuation

could result in dueling appraisals of the Debtors' companies that could interfere with the Debtors' ability to maximize the value of their estates. As Judge Carey said in <u>Spansion</u>, "[e]ntity valuation is much like a guess compounded by an estimate." <u>U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)</u>, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (internal quotation omitted). Letting potential buyers decide the value of the Debtors is the better way to demonstrate value of the Debtors' enterprise at this stage of the Chapter 11 Cases. <u>In re SubMicron Sys. Corp.</u>, 432 F.3d 448, 461 (3d Cir. 2006) ("Section 363 attempts to avoid the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price. The provision is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth."); <u>In re Virgin Orbit, LLC</u>, 659 B.R. 36, 43 (Bankr. D. Del. 2024) ("The value of the Debtors' assets was determined by the marketplace after an open and fair sale process overseen by this Court. This valuation method is the 'gold standard.'") (internal citation omitted); <u>In re Samson Res. Corp.</u>, No. 15-11934 (BLS), 2023 WL 4003815, at *1 (Bankr. D. Del. June 14, 2023), <u>cert</u>. <u>denied</u>, No. 15-11934 (BLS), 2024 WL 2390401 (D. Del. May 23, 2024) ("It is black letter law in this Circuit that the gold standard for determining the value of an asset is to sell it in an open and fair market."); <u>In re Allonhill, LLC</u>, No. 14-20663 (BLS), 2019 WL 1868610, at *40 (Bankr. D. Del. Apr. 25, 2019), <u>aff'd in part</u>, No. 19-879 (LPS), 2020 WL 1542376, at *11 (D. Del. Mar. 31, 2020) ("[The] best evidence of fair market value is the actual price negotiated by a willing buyer and a willing seller after an extensive marketing process and negotiations."); <u>Youngman v. Yucaipa Am. All. Fund I, L.P. (In re ASHINC Corp.)</u>, 640 B.R. 1, 51 (Bankr. D. Del. 2022) ("Objective evidence from the public debt market is a more reliable measure of value than the subjective estimates of an expert witnesses."). If no buyers emerge, the Debtors will proceed with the Plan Equitization Transaction and submit

information that is required to support confirmation of the Plan, including, if necessary, a valuation analysis in support of the Plan with sufficient time for parties in interest to assert their confirmation objections.  Cf. Freedom Lenders' Objection ¶ 51.[9]

40.    Third, valuation issues do not serve as a valid basis to deny approval of the Disclosure Statement and are fully reserved for confirmation.  Courts in this District have ruled that a party's dispute with a debtor's valuation methodology can and should be addressed in connection with confirmation.  In re Spansion, Inc., 426 B.R. at 126 ("At bottom, what the Movants resist are the underlying assumptions in the Debtors' enterprise valuation.  Such objections are appropriately considered as objections to confirmation."); see Hr'g Tr. at 30:9-12; 31:1-13, In re Mac Acquisition, LLC, Case No. 17-12224 (MFW) (Bankr. D. Del. Dec. 27, 2017) [Docket. No. 346] (overruling committee's objection that disclosure statement lacked a valuation analysis and questioning committee's inability to obtain required valuation information through discovery to avoid "possibly affecting the marketing process"); Hr'g Tr. at 63:24-64:4, In re Premier Int'l Holdings, Inc., Case No. 09-12019 (CSS) (Bankr. D. Del. Dec. 8, 2009) [Docket No. 1294] ("I don't think we need to get into that granularity.  I am sure it will come out and I will hear about it at confirmation . . . . And I don't think it's necessary to vote—you know, for voting yes or no."); In re Calpine Corp., Case No. 05-60200 (BRL), 2007 WL 2908200, at *1 (Bankr. S.D.N.Y. Oct. 4, 2007) (noting that the court will assess valuation based on expert testimony at the confirmation hearing).

41.    Fourth, no valuation analysis is needed for the Freedom Lenders to understand their recovery and make an informed decision on how to vote on the Plan.  The Freedom Lenders are

---

[9]    The Freedom Lenders incorrectly assert that the Debtors "state in their Disclosure Statement that they do not intend to [file a valuation analysis]."  Freedom Lenders' Objection ¶ 44.  The Disclosure Statement makes no such representation.  See Disclosure Statement § 16(D)(iii).

part of Class 5 (Prepetition Second Lien Loan Claims) and Class 7 (Prepetition HoldCo Loan Claims). The Plan clearly sets forth the recovery the Holders of Allowed Claims in both Classes will receive. Plan §§ 5.5, 5.11. As more fully set forth in the Plan and Disclosure Statement, Class 5 creditors will receive their *pro rata* share of either (a) in the event there is no Sale Transaction, certain sale proceeds and either New Warrants if the Class votes to accept the Plan, or the amount they would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code if the Class votes to reject the Plan or (b) in the event of a Sale Transaction, certain sale proceeds after payment in full of senior claims (including payment in full in cash of the Prepetition First Lien Loan Claims) and their *pro rata* share of the Prepetition Second Lien Lender Distribution.[10] Class 7 creditors are structurally subordinated to all creditors at the non-HoldCo Debtors. Class 7 creditors will receive their *pro rata* share of any Prepetition HoldCo Lender Distribution,[11] and any recovery from the Freedom HoldCo Debtor Liquidation Trust after accounting for any DIP Claims. If there is no such recovery, then they will receive no consideration on account of their Class 7 Claims. Accordingly, the information the Freedom Lenders seek is unnecessary for their determination

---

[10] "Prepetition Second Lien Lender Distribution" means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) (in the event of a Partial Sale Transaction, as allocable to the to the applicable Partial Sale Transaction Debtor (after taking into account any taxes due on account of any Sale Transaction or Partial Sale Transaction)) *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Prepetition Second Lien Loan Claims in priority of payment under the Bankruptcy Code (including, without limitation, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, and the Prepetition First Lien Loan Claims, including any interest, fees, or premiums payable thereon, and in the event of a Partial Sale Transaction, as allocable to the to the applicable Partial Sale Transaction Debtors) or applicable nonbankruptcy law. Plan §1.154.

[11] "Prepetition HoldCo Lender Distribution" means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any of the HoldCo Debtors (after taking into account any structurally senior Allowed Claims and any taxes due on account of any Sale Transaction or Partial Sale Transaction) *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims after taking into account all structurally senior Allowed Claims and all Allowed Claims that are senior to Prepetition HoldCo Loan Claims in priority of payment under the Bankruptcy Code (including, if applicable, the DIP Claims allocable to the Freedom HoldCo Debtors in accordance with the Final DIP Order) or applicable nonbankruptcy law. Plan §1.151.

regarding how to vote on the Plan.  Based on the updated confirmation timeline, there is sufficient time for the Freedom Lenders to conclude fact discovery, which is already underway.

42.    Moreover, notwithstanding their protestations, the Freedom Lenders have received a significant amount of information about the potential sale value of the Debtors' business.  The Freedom Lenders have had routine and regular access to the Debtors and their management team since they joined the capital structure in 2023 and had a front-row seat throughout the prepetition marketing process.  Presently, the Freedom Lenders have a consultation right under the Bidding Procedures Order to obtain information about the progress of the Sale Process.  Bidding Procedures § VII.10.B.  Since December 19, 2024, there have been four meetings between the Freedom Lenders' and the Debtors' advisors to discuss the bids received to date and the status of the American Freight liquidation process.  Furthermore, the Debtors' advisors have shared with the Freedom Lenders' advisors regular updates on the status of outreach to potential bidders on a professional eyes' only basis, as well as updates that can be shared with the Freedom Lenders themselves.  Accordingly, any argument that the Freedom Lenders lack sufficient information to vote on the Plan is simply not credible.

### C.    The Third-Party Release Is Permissible.

#### i.    The Third-Party Release Is Consensual under Applicable Law.

43.    The U.S. Trustee argues that the Disclosure Statement is patently unconfirmable on the basis that the Plan's Third-Party Releases are nonconsensual and disallowed by the Supreme Court's recent decision in Harrington v. Purdue Pharma, L.P., 603 U.S. 204, 144 S. Ct. 2071, 2082-88 (2024).  Courts in this District have consistently held that arguments regarding the propriety of releases are properly raised at plan confirmation, not disclosure statement approval.  See, e.g., Hr'g Tr. at 161:22-162:12, In re Imerys Talc Am., Inc., Case No. 19-10289 (LSS) (Bankr. D. Del. Oct. 8, 2024) [Docket No. 6710] (at the disclosure statement hearing, expressly saving the propriety of

the proposed third-party releases for approval at the confirmation hearing); Hr'g Tr. at 24:24-25:8, In re Alto Maipo Delaware LLC, Case No. 21-11507 (KBO) (Bankr. D. Del. Apr. 6, 2022) [Docket No. 479] (approving disclosure statement over objections by the United States Trustee to the definition of releasing party, and finding it to be an issue for confirmation); Hr'g Tr. at 90:20, In re Emerge Energy Servs., Case No. 19-11563 (KBO) (Bankr. D. Del. Sept. 9, 2019) [Docket No. 348] (noting that, "[o]n the releases, it's a confirmation issue"); Hr'g Tr. at 28:14-15, In re GT Real Estate Holdings, LLC, Case No. 22-10505 (KBO) (Bankr. D. Del. Sept. 19, 2022) [Docket No. 410] (approving disclosure statement and overruling objections in connection with the releases as confirmation issues); Hr'g Tr. at 199:9-13, In re TK Holdings, Inc., Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 3, 2018) [Docket No. 1642] (approving disclosure statement while declining to rule on releases at the hearing, as such issues are "classically [for] a confirmation hearing"); Hr'g Tr. at 67:12 14-15, In re Molycorp, Inc., Case No. 15 11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) [Docket No. 1050] (noting that potential issues with releases should be dealt with at confirmation); Hr'g Tr. at 57:3-8, In re Energy Future Holdings Corp., Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 21, 2015) [Docket No. 6132] ("To say that releases [are] an issue for confirmation doesn't make the [proposed plan] patently unconfirmable.  It can either be addressed in one of two ways and we'll figure that out when we get to confirmation.  And I think that really goes to the heart of all of the confirmation, certainly patently unconfirmable confirmation objections.").

44.    Nonetheless, the Debtors briefly respond to the U.S. Trustee's argument.  To reach its conclusion that the Third-Party Releases render the Plan patently unconfirmable, the U.S. Trustee asserts that Purdue mandates revisiting what constitutes "consent" and that a Releasing

Party's failure to opt out of the Third-Party Releases is insufficient to demonstrate consent.  U.S;

Trustee Objection ¶ 57.

45.    However, the Supreme Court did not opine on consensual third-party releases in

Purdue, and only addressed whether a bankruptcy court may approve a plan of reorganization with

a release and injunction that extinguishes claims against non-debtor third parties without the

consent of affected claimants, holding that it may not.  Purdue Pharma, 603 U.S. at 226.[12]  Indeed,

the U.S. Trustee concedes this in its Objection.  U.S. Trustee Objection ¶ 37 ("The Supreme Court

in Purdue did not address whether consensual non-debtor releases can be included in a chapter 11

plan and confirmation order.").  Nevertheless, the U.S. Trustee ignores the very limitation that it

concedes and misapplies Purdue in furtherance of its ongoing and opportunistic attempts[13] to upset

well-established law on consensual third-party releases, dedicating the bulk of its Objection to its

position that various provisions of state contract law, rather than federal bankruptcy law, should

govern whether non-debtor releases in a chapter 11 plan are consensual.  This is not the law.  See,

e.g., In re Millennium Lab Holdings II, LLC, 575 B.R. 252, 273 (Bankr. D. Del. 2017) ("[T]here

is no state law equivalent to confirmation of a plan.  And, third party releases do not exist without

regard to the bankruptcy proceeding.   Rather, a ruling approving third party releases is a

determination that the plan at issue meets the federally created requisites for confirmation and third

party releases."); Hr'g Tr. at 80:21-25, In re Extraction Oil & Gas, Inc., Case No. 20-11548 (CSS)

(Bankr. D. Del. Dec. 22, 2020) [Docket No. 1534] ("Very importantly, these are consensual

releases, these are not nonconsensual releases.  I have repeatedly ruled that you can imply consent

---

[12]    The Supreme Court expressly stated:  "Nothing in what we have said should be construed to call into question
*consensual* third-party releases offered in connection with a bankruptcy reorganization plan." Id. at 226 (emphasis
added).

[13]    See In re Robertshaw U.S. Holdings Corp., Case No. 24-90052 (CML), 2024 WL 3897812, at *17 (Bankr. S.D.
Tex. Aug. 16, 2024) ("[T]he Trustee wants to use the *Purdue* holding as an opportunity to advance its long-held
position that consensual third-party releases in a plan should require an opt-in feature, rather than an outout.").

by failing to opt out or respond to a plan, either through a ballot or on the docket, that calls for a release.  I don't believe this is necessarily a contractual point . . . as much as it is a point of notice under the Bankruptcy Code and the Bankruptcy Rules, because it's the plan that serves as the mechanism to have the release take effect and, thus, it's really the rules, the Federal Rules of Bankruptcy Procedures that figure out whether someone has achieved proper notice and has, by not responding, given their implied consent.").  Rather, the law and longstanding precedent by courts in the Third Circuit and other Circuits approves third-party releases where creditors have the opportunity to opt out, consistently finding  that opt-out release provisions are consensual.  See, e.g., Arsenal Intermediate Holdings, LLC, Case No. 23-10097 (CTG) (Bankr. D. Del. Mar. 27, 2023) [Docket No. 176] (same); In re Kabbage, Inc., Case No. 22-10951 (CTG) (Bankr. D. Del. Jan. 19, 2023) [Docket No. 680] (approving plan containing third-party releases with opt-out mechanism); In re Mallinckrodt, 639 B.R. 837, 879 (Bankr. D. Del. 2022) (same); In re True Religion Apparel, Inc., Case No. 20-10941 (CSS) (Bankr. D. Del. Oct. 6, 2020) [Docket No. 586] (same); In re DBSD N. Am, Inc., 419 B.R. 179 (Bankr. S.D.N.Y. 2009), rev'd in part on other grounds, 627 F.3d 496 (2d Cir. 2010); In re Indianapolis Downs, LLC, 486 B.R. 286, 306 (Bankr. D. Del. 2013).

46.    This remains the law and despite the U.S. Trustee's best efforts to recharacterize the opt-out structure as non-consensual, the Third Party Releases fit squarely within the contours of what this Court, and numerous other courts in this Circuit have determined to be consensual and permissible post-Purdue.  See, e.g., In re Fisker, Inc., Case No. 24-11390 (TMH) (Bankr. D. Del. Oct. 16, 2024) [Docket No. 722]; In re Wheel Pros, LLC, Case No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) [Docket No. 255]; In re FTX Trading Ltd., Case No. 22-11068 (JTD) (Bankr. D. Del. Oct. 8, 2024) [Docket No. 26404]; In re Bowflex Inc., Case No. 24-12364 (ABA) (Bankr.

D.N.J. Aug. 19, 2024) [Docket No. 614]; In re Sam Ash Music Corp., Case No. 24-14727 (SLM) (Bankr D.N.J. Aug. 15, 2024) [Docket No. 460]; In re Invitae Corp., Case No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) [Docket No. 913]; see also In re Robertshaw US Holding Corp., Case No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) [Docket No. 960].  Indeed, with respect to Purdue, Judge Dorsey recently stated that "the Supreme Court was not saying that third-party consensual releases through an opt out process are per se improper.  I think opt out releases remain a valid way for a debtor to be able to obtain releases through the plan process and do so on a consensual basis because the parties are given the opportunity to opt out." Hr'g Tr. at 115:25-116:7, In re FTX Trading Ltd., Case No. 22-11068 (JTD) (Bankr. D. Del. Oct. 7, 2024) [Docket No. 26412].

47.    For these same reasons, and notwithstanding the U.S. Trustee's objection to the contrary, the Third-Party Release is consensual as to both the (a) holders of Claims that are eligible to accept or reject the Plan but abstain from voting and (b) holders of unimpaired Claims who do not file an objection to the Third-Party Release.  See U.S. Trustee Objection ¶ 72.  With respect to the holders of Claims who abstain from voting, the proposed Third-Party Releases and consequences thereof are clearly and conspicuously stated on the Ballots that each holder will receive.  Specifically, the Ballots contain a bolded section setting forth the proposed release language and a single box to opt-out of the Third-Party Releases:

**AS A HOLDER OF A CLAIM IN CLASS 3 UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN SECTION 12.3 OF THE PLAN, AS SET FORTH BELOW, IF YOU DO NOT OPT OUT OF OR OBJECT TO THE RELEASE PROVISIONS OF THE PLAN.  YOUR DECISION ON THE ELECTION TO OPT OUT DOES NOT AFFECT WHAT WILL BE AVAILABLE FOR DISTRIBUTION OR THE AMOUNT OF THE DISTRIBUTION YOU WILL RECEIVE UNDER THE PLAN.**

If the Bankruptcy Court confirms the Plan, as of and subject to the occurrence of the Effective Date, certain release, injunction, and exculpation provisions set forth in Article 12 of the Plan will become effective.  In determining how to cast your vote on the Plan, it is important to read the provisions contained in Article 12 of the Plan very carefully so that

you understand how such provisions will affect you and any Claim(s) you may hold against the Released Parties under the Plan.

---

The undersigned holder of the [●] in Class [●] set forth in Item 1 elects to:

☐ Opt Out of the Third-Party Release.

---

<u>See</u> Revised Disclosure Statement Order, Ex. 3-A.

48.     Likewise, the Notice of Non-Voting Status, which the holders of unimpaired Claims will receive, conspicuously describes the Third-Party Release and consequences of not objecting thereto:

> **UNDER THE TERMS OF THE PLAN, HOLDERS OF CLAIMS IN CLASSES 1 AND 2 ARE UNIMPAIRED UNDER THE PLAN AND, THEREFORE, PURSUANT TO THE PLAN AND BANKRUPTCY CODE SECTION 1126(f), ARE (I) DEEMED TO HAVE ACCEPTED THE PLAN AND (II) NOT ENTITLED TO VOTE ON THE PLAN.**

> **UNDER THE TERMS OF THE PLAN, HOLDERS OF CLAIMS IN CLASS 9 AND HOLDERS OF INTERESTS IN CLASS 12 ARE IMPAIRED UNDER THE PLAN AND ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY ON ACCOUNT OF THEIR INTERESTS IN THIS CLASS AND, THEREFORE, PURSUANT TO BANKRUPTCY CODE SECTION 1126(g), ARE (I) DEEMED TO HAVE REJECTED THE PLAN AND (II) NOT ENTITLED TO VOTE ON THE PLAN.**

> ***ARTICLE XII OF THE PLAN CONTAINS CERTAIN RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS.  YOU ARE ENCOURAGED TO CAREFULLY REVIEW THE PLAN, INCLUDING THESE PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED, REGARDLESS OF WHETHER OF YOU ARE UNIMPAIRED OR IMPAIRED UNDER THE PLAN.***

> **PURSUANT TO SECTION 12.3 OF THE PLAN, HOLDERS OF CLAIMS IN CLASSES 1 AND 2 UNDER THE PLAN THAT DO NOT FILE AN OBJECTION TO THE RELEASES IN SECTION 12.3 OF THE PLAN PRIOR TO THE DEADLINE TO OBJECT TO CONFIRMATION OF THE PLAN WILL BE DEEMED TO HAVE COMPLETELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED THE RELEASED PARTIES TO THE EXTENT PROVIDED IN SECTION 12.3 OF THE PLAN.**

<u>See</u> Revised Disclosure Statement Order, Ex. 4.  Further, courts recognize that creditors have an obligation to read their mail.  <u>See</u>, <u>e.g.</u>, <u>In re Mallinckrodt</u>, 639 B.R. at 880 (<u>quoting</u> Hr'g Tr. at

214:9-12, In re EV Energy Partners, Case No. 18-10814 (CSS) (Bankr. D. Del. May 16, 2018)

[Docket No. 252] ("[S]hareholders and creditors have to read legal notices; that's just the way it

is.  And if you don't know that, then you're proceeding at your own risk when you invest in stocks

and credit and bonds.")); see also In re Arsenal Intermediate Holdings, LLC, Case No. 23-10097

(CTG), 2023 WL 2655592, at *7 (Bankr. D. Del. Mar. 27, 2023) ("[T]he creditor who throws away

the plan unopened is barred from arguing that the third-party release failed to meet the Continental

standard.").

49.    The Plan gives all holders of Claims and Interests (other than holders of Interests

in Classes 9 and 12, who are deemed to reject the Plan and not subject to the Plan's Third-Party

Release) the right to opt out of the Third-Party Release, even those who are deemed to accept the

Plan.  In other words, the Third-Party Release is consensual and permissible with respect to all

holders of Claims under the Plan, because they only release claims if such holders consent (i.e., by

not opting out or objecting to the releases).

### ii.    A Permanent Injunction Is Appropriate to Enforce the Releases and Exculpation.

50.    The U.S. Trustee objects to the injunction provision set forth in Article XII of the

Plan (the "Injunction Provision").  Objections to the Injunction Provision are challenges to the

confirmability of the Plan, not objections to the adequacy of the information contained in the

Disclosure Statement.  As noted above, confirmation objections are not the proper subject of a

disclosure statement hearing.

51.    At the Confirmation Hearing, the Debtors will seek approval of the Injunction

Provision, which is an integral component of the Plan.  The U.S. Trustee argues, among other

things, that, in light of Purdue, the Injunction Provision may not be enforced.  U.S. Trustee

Objection ¶ 88.  However, in Purdue, the Supreme Court held that the Bankruptcy Code does not

"authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor **_without the consent of affected claimants_**." Purdue, 603 U.S. at 207 (emphasis added).  As noted above, the Supreme Court clearly stated that "[n]othing in what we have said should be construed to call into question _consensual_ third-party releases offered in connection with a bankruptcy reorganization plan . . . ." Id. (emphasis in original).  As also set forth above, the Third-Party Release in the Plan is fully consensual.  Thus, in the event that the Court confirms and approves the Third-Party Release and exculpation provisions enumerated in the Plan, the Injunction Provision should also be approved and the U.S. Trustee's objection should be overruled.

## **CONCLUSION**

52.    For these reasons and those set forth in the Motion, the Debtors submit that good and sufficient cause exists to approve the Motion and approve the Disclosure Statement.

WHEREFORE, the Debtors respectfully request that the Court (a) overrule the Objections, (b) enter the Proposed Order, and (c) grant such other and further relief as this Court deems just and appropriate.

Dated: February 3, 2025
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Allison S. Mielke*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
Betsy L. Feldman (Del. No. 6410)
Joseph R. Brandt (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com
jbrandt@willkie.com

*Co-Counsel and Proposed Counsel to the Debtors and Debtors in Possession*