Exhibit B

EFiled:  Jul 12 2024 03:58PM EDT
Transaction ID 73648030
Case No. 2024-0726-LWW

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRIAN GALE, MARK NOBLE, TERRY PHILIPPAS, and LAWRENCE BASS, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 2024-0726-LWW |
| v. | ) ) ) | **PUBLIC [REDACTED]** |
| VINTAGE CAPITAL MANAGEMENT, LLC, BRIAN KAHN, ANDREW LAURENCE, MATTHEW AVRIL, and B. RILEY FINANCIAL, INC. | ) ) ) ) ) | **VERSION AS FILED ON JULY 12, 2024** |
| Defendants. | ) ) | |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiffs Brian Gale, Mark Noble, Terry Philippas, and Lawrence Bass (collectively, "Plaintiffs"), on behalf of themselves and similarly situated former stockholders of Franchise Group, Inc. ("Franchise Group" or the "Company"), bring this Verified Class Action Complaint (the "Complaint") asserting breaches of fiduciary duty and related claims stemming from the August 21, 2023 management-led take-private of the Company (the "Merger"), in financial partnership with B. Riley Financial, Inc. ("B. Riley") and Irradiant Partners ("Irradiant").

The allegations herein are based on Plaintiffs' knowledge as to themselves and, as to all other matters, on information and belief, including counsel's investigation, review of publicly available information, and the review of certain

books and records produced by Franchise Group in response to Plaintiffs' demands made under 8 *Del. C.* § 220 (collectively, the "Demands").[1]

## **INTRODUCTION**

1.      On August 21, 2023, Franchise Group's Chief Executive Officer, Brian Kahn ("Kahn"), along with his investment vehicle Vintage Capital Management, LLC ("Vintage") and other Company insiders, took Franchise Group private for the unfair price of $30.00 per share (the "Merger").  Kahn, Vintage, and Andrew Laurence ("Laurence") (the Company's Executive Vice President and also a Vintage partner) controlled approximately 43.5% of the Company's voting power and were all members of the buyout consortium.

2.      While the Company's Definitive Proxy Statement (the "Proxy") and other public filings stated that the sale process leading to the Merger began in mid-March of 2023 with an unsolicited offer to acquire the Company for $30 per share by Kahn's long-time investing partner B. Riley, that was not true.  Kahn had begun exploring a take-private transaction at least as early as January 2023.  Then Kahn, through the Company, approached Jefferies LLC ("Jefferies") about providing potential debt financing for a take-private transaction and personally engaged in

_____

[1] On June 17, 2024, the Company certified completeness of its productions in response to the Demands.

discussions with Jefferies for the next two months. During this time, in late February/early March 2023, Jefferies prepared an analysis of theoretical take-private prices between *$30 and $38* per share, which assumed that Kahn would roll over his equity and that B. Riley would roll over its existing preferred equity and make an additional equity investment. *None of this information is disclosed in the Proxy.*

3.      Approximately three weeks later, on March 19, 2023, following discussions with Kahn, B. Riley submitted its offer to acquire the Company for $30 per share, conditioned on Kahn rolling over his equity in the Company. In response, the Company's board of directors (the "Board") formed a special committee (the "Special Committee") comprised of Matthew Avril ("Avril"), Cynthia Dubin ("Dubin"), and Thomas Herskovits ("Herskovits") to evaluate the proposal. But Avril, who was also the Chairman of the Special Committee, was a long-time Kahn associate who was invested in and had served as an advisor to Vintage. Avril immediately took control of the Special Committee and worked with Kahn to engage Jefferies as the Special Committee's financial advisor, despite Jefferies' recent work for Kahn on a potential take-private.

4.      Avril not only excluded the other members of the Special Committee from discussions with the Special Committee's advisors and Kahn, but he also effectively delegated all Merger negotiations *to Kahn*, who ultimately abandoned

the charade of B. Riley being the acquirer of the Company and stepped in as the head of the buying consortium in the Merger.  During the entirety of the six-week Merger process, the Special Committee made one counteroffer of $33 per share and, when it was immediately rejected, simply approved the $30 original offer and recommended it to the Board.

5.     Moreover, during the Special Committee process, Kahn and Laurence drastically slashed the Company's EBITDA projections used by Jefferies in its fairness opinion by approximately 50% across the entire projection period as compared to the projections that Kahn had provided Jefferies for analyzing financing for his potential take-private transaction.  This reduction had the effect of lowering Jefferies' valuation of Franchise Group significantly, rendering the takeout price unfair.  Indeed, B. Riley appeared to acknowledge that the Merger was a steal, publicly touting that the value of just two of Franchise Group's individual business segments were worth well in excess of the $2.8 billion Merger value.

6.     After the Merger closed in August 2023, Kahn was implicated in a multi-hundred million dollar fraud scheme, which appears to have ties to both Franchise Group-related businesses and B. Riley.  The fraud, which pre-dated the Merger, uncovered numerous additional investment ties between Kahn, Vintage, and B. Riley that were never disclosed to Franchise Group stockholders in the Proxy.

4

7. For all the foregoing reasons, the Merger's "facial" compliance with the precepts of *Kahn v. M&F Worldwide Corp.* fails. *See Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 645 (Del. 2014). Plaintiffs bring this entire fairness Action to recover the damages to Franchise Group's minority public stockholders flowing from Defendants' actions.

**PARTIES AND RELEVANT NON-PARTIES**

**I.      PLAINTIFFS**

8. **Plaintiffs** each owned shares of common stock of Franchise Group at all relevant times and each received $30 per share in cash for those shares when the Merger closed.

**II.      DEFENDANTS**

9. **Defendant Vintage Capital Management, LLC** (as defined above, "Vintage") is a value-oriented, operations-focused, private and public equity investor specializing in the consumer, aerospace and defense, and manufacturing sectors.

10. **Defendant Brian Kahn** (as defined above, "Kahn") served as a director of the Company from September 2018 until the closing of the Merger, and as the Company's President and Chief Executive Officer ("CEO") from October 2019 until the closing of the Merger. Kahn founded and has served as the investment

manager of Vintage and its predecessor, Kahn Capital Management, LLC, since 1998.

11.    Kahn, individually and beneficially through a family trust, and through Vintage, owned 41.9% of Franchise Group's common stock before the Merger. Pursuant to amended rollover agreements executed by Kahn and other members of management disclosed on August 8, 2023,[2] Kahn and his affiliates rolled over approximately 11.9 million shares of Company common stock, contributing approximately $357 million to the post-Merger Company.

12.    Upon information and belief, Kahn sold approximately $64.6 million of his rolled-over Franchise Group shares to B. Riley within days after the August 21, 2023 close of the Merger.[3]  On January 22, 2024, in the midst of heavy scrutiny of his involvement with an imploded investment fund accused of defrauding investors out of nearly $300 million, Kahn resigned as the post-Merger Company's CEO.

---

[2] On August 8, 2023, the Company filed several amendments (the "Supplemental Disclosures") to the Franchise Group, Inc. Definitive Proxy Statement (Schedule 14A) (July 14, 2023) (previously defined as the "Proxy").

[3] Jonathan Weil, *Unraveling the Money Trail at B. Riley Financial*, WALL ST. J. (Feb. 12, 2024),         https://www.wsj.com/livecoverage/stock-market-today-dow-jones-02-12-2024/card/unraveling-the-money-trail-at-b-riley-financial-ghNNvsaYRCafETT6ye9z (hereinafter "*Unraveling the Money Trail*").

13.    **Defendant Andrew Laurence** (as defined above, "Laurence") served as the Company's Executive Vice President from October 2019 until the closing of the Merger, and previously served as a Company director from September 2018 until May 2021.  Laurence is a longtime partner at Vintage, where since 2010 he has been "responsible for all aspects of its transaction sourcing, due diligence and execution."[4] Laurence replaced Kahn as the post-Merger Company's CEO.

14.    Laurence owned 573,482 shares of Company common stock, approximately 1.6% of the common stock outstanding.[5]  Pursuant to amended rollover agreements executed by Laurence and other members of management disclosed on August 8, 2023, he rolled over 573,482 shares of Company common stock, contributing approximately $17 million to the post-Merger Company.  In addition to equity interests in the post-Merger Company, Laurence received over $2 million in cash in connection with the acceleration of his Company restricted stock.

15.    **Defendant Matthew Avril** (as defined above, "Avril") served as a director of the Company from September 2018 until the closing of the Merger, and he served as Chairman of the Board at the time of the Merger.  Avril also served as Chairman of the Special Committee.  Additionally, Avril served on Vintage's

---

[4] Proxy at 107.

[5] Proxy at 109.

7

strategic advisory board until at least 2022 (and possibly as late as February 2023),[6] personally invested in certain Vintage-affiliated investments, and owned a limited partnership interest in Vintage.

16.    In connection with his service on Vintage's strategic advisory board, Avril was appointed to the boards of Vintage's portfolio companies, including Aaron's Inc. ("Aaron's"), AP Technologies Corp. ("API"), and Babcock & Wilcox Enterprises, Inc. ("B&W").

17.    With respect to Aaron's, Kahn was appointed to Aaron's board of directors pursuant to a settlement agreement to resolve a proxy contest between Vintage and Aaron's board of directors.  Kahn personally designated Avril to serve alongside him on the Aaron's board as Vintage's second board designee.  In 2016, while Avril was on the board of directors, Aaron's sold its HomeSmart stores to a

---

[6] It remains unclear if, and when, Avril stepped down from his position on Vintage's strategic advisory board.  While the Company's Supplemental Disclosures state Avril served on Vintage's strategic advisory board until 2019, Avril remained listed as a member of the strategic advisory board on Vintage's website until February 2022, and the Company's 2022 proxy statement filed in April 2022 states Avril was *currently* serving on Vintage's strategic advisory board at the time of the filing.  *See* Franchise Group, Inc., Definitive Proxy Statement (Schedule 14A) (April 22, 2022), at 6.  Additionally, on February 16, 2023, in his 2023 Director & Officer Questionnaire, Avril confirmed the information listed in his Proxy Statement Background was "correct and complete," which included the following line: "He is *currently* a member of the strategic advisory board of Vintage Capital Management, LLC[.]"  *See* FG_00001781, -1819 (emphasis added).  Meanwhile, the 2023 Proxy—filed less than two months later in the midst of the Merger process—entirely removed the sentence referencing Avril's service on Vintage's strategic advisory board.

subsidiary of Buddy's Home Furnishing ("Buddy's"), a portfolio company of Vintage. Due to Avril's ties to Vintage, Avril *abstained from the board's vote* on the HomeSmart transaction.

18. With respect to API, Kahn became the chairman and CEO of API in connection with a merger whereby Vintage became API's majority stockholder. Following that merger, Avril joined Kahn on API's board of directors, and Defendant Laurence joined API's management.

19. And finally, with respect to B&W, Kahn and Avril each joined its board of directors in connection with a voting agreement with Vintage. Avril also served as a director of B&W alongside Bryant Riley ("Riley"). Moreover, prior litigation in this Court involving Avril, Kahn, and B. Riley confirmed that Avril "had social ties with Brian Kahn," had previously "noted his lengthy relationship with Kahn in an email[,]" and sent a text message to a potential director at B&W "highlighting the benefits of working with Vintage and Kahn."[7]

20. **Defendant B. Riley Financial, Inc.** (as defined above, "B. Riley") is a diversified financial services platform that provides investment banking, brokerage, wealth management, asset management, direct lending, business advisory, valuation, and asset disposition services to a broad client base spanning public and private

---

[7] *Parker v. Avril*, C.A. No. 2020-0280-PAF (Del. Ch.) (Dkt. 124).

companies, financial sponsors, investors, financial institutions, legal and professional services firms, and individuals.  B. Riley also opportunistically invests in and acquires companies or assets, owning and operating several uncorrelated consumer businesses and investing in brands on a principal basis.  Riley is the founder, director, and co-CEO of B. Riley.

21.     Defendants Vintage, Kahn, and Laurence are referred to herein collectively as the "Controller Defendants."

22.     Defendants Kahn and Avril are referred to herein together as the "Director Defendants."

23.     Defendants Kahn and Laurence are referred to herein together as the "Officer Defendants."

24.     The Controller Defendants, the Director Defendants, the Officer Defendants, and B. Riley are referred to herein collectively as the "Defendants."

### III.     RELEVANT NON-PARTIES

25.     **Franchise Group, Inc.** (as defined above, "Franchise Group" or the "Company") was a Delaware corporation that owned and operated franchised and "franchiseable" businesses, with business lines including Pet Supplies Plus, Wag N' Wash, American Freight, The Vitamin Shoppe, Badcock Home Furniture & more ("Badcock"), Buddy's, and Sylvan Learning.  On a combined basis, the Company

operated over 3,000 locations predominantly located in the U.S. that are either Company-run or operated pursuant to franchising and dealer agreements. Before the Merger, the Company's stock traded on the Nasdaq under the ticker "FRG."

26.    **Bryant Riley** (as defined above, "Riley") is B. Riley's founder, co-CEO, and Chairman of its board of directors. Riley owned 1,804 shares of Company common stock. Pursuant to Riley's Schedule 13D/A filed on August 9, 2023, Riley rolled over all of his Company common stock into the post-Merger Company and agreed to vote his shares in favor of the Merger.

27.    **Cynthia S. Dubin** (as defined above, "Dubin") served as a director of the Company from May 2021 until the closing of the Merger. Dubin also served as a member of the Special Committee.

28.    **Thomas Herskovits** (as defined above, "Herskovits") served as a director of the Company from October 2015 until November 2017, and then from March 2018 until the closing of the Merger. Herskovits also served as a member of the Special Committee.

29.    **Irradiant Partners** (as defined above, "Irradiant") is an alternative investment manager, with total assets under management in excess of $9.1 billion, that focuses on credit and private equity opportunities. Irradiant was an existing Company lender prior to the Merger and led debt financing for the Merger.

## SUBSTANTIVE ALLEGATIONS

**I.    VINTAGE AND B. RILEY FORM THE COMPANY**

30.    In July 2018, Vintage and B. Riley invested in Franchise Group's predecessor, Liberty Tax, Inc. ("Liberty Tax"). Vintage acquired the equity interests in Liberty Tax held by the company's founder and former CEO, as well as a former director, for $8.54 per share (the "2018 Transactions"). Thereafter, Vintage retained approximately 1.5 million shares of Liberty Tax common stock and assigned to B. Riley and another investor the right to purchase approximately 3.5 million shares.

31.    As a result of the 2018 Transactions, Vintage and B. Riley obtained 14.8% and 22.1% of Liberty Tax's voting power, respectively, and both also received board representation. In 2019, Vintage appointed Kahn, Laurence, and Avril to Liberty Tax's nine-member board of directors, and B. Riley appointed Riley and Kenneth Young ("Young"), B. Riley's President.

32.    In July 2019, Vintage and Liberty Tax entered a series of strategic transactions, including a tender offer of Liberty Tax's outstanding common stock for $12 per share and the acquisition of Buddy's (the "2019 Transactions"). As a result of the 2019 Transactions, Vintage's stake in Liberty Tax grew from 14.8% (as of October 29, 2018) to 37.0% (as of July 26, 2019). Liberty Tax also changed its name to "Franchise Group, Inc."

12

33.     On March 31, 2020, Riley and Young "voluntarily resigned from the Board" of Franchise Group, "effective immediately." None of the Company, B. Riley, Riley, or Young provided explanations for these resignations.[8] Thereafter, Avril, Vintage's designee, assumed the role of Chairman of the Board.

## II.     VINTAGE AND B. RILEY'S TIES EXTEND BEYOND FRANCHISE GROUP

34.     Kahn and Riley, through their investment firms Vintage and B. Riley, are repeat co-investors and financing partners. Their relationship spans decades.

### A.     Rent-A-Center

35.     On June 18, 2018—prior to B. Riley's and Vintage's investment in Liberty Tax—Vintage announced that it acquired Rent-A-Center, Inc. ("Rent-A-Center") for $15 per share in cash, representing total consideration of approximately $1.365 billion (including net debt). B. Riley served as an equity and debt participant in the transaction.

36.     In a corresponding press release, Riley said: "*We have worked with the Vintage Capital team for over two decades* and have seen firsthand their experience

---

[8] March 31, 2020 is the same day that Deloitte & Touche resigned as an auditor for a fund affiliated with Kahn. As described at ¶¶ 129–138, this fund appears to have been a vehicle used by Kahn and his co-conspirators to defraud investors out of nearly $300 million. Deloitte & Touche reportedly resigned after uncovering the fraud. Jonathan Weil, *How an Unremarkable Deal Became a Big Threat to a Small Investment Bank*, WALL ST. J. (Feb. 12, 2024), https://www.wsj.com/finance/how-an-unremarkable-deal-became-a-big-threat-to-a-small-investment-bank-f819a169 (hereinafter "*An Unremarkable Deal*").

in the space.  We are excited to work with them and leverage the resources across the B. Riley Financial platform."[9]  Kahn added: "*Having worked with the B. Riley team on multiple deals*, I have a great deal of respect for their willingness to think differently to get deals done."[10]

37.    The Rent-A-Center transaction never closed, resulting in Kahn—with B. Riley serving as a guarantor—being on the hook for a significantly above-market termination fee.

38.    On December 18, 2018, Rent-A-Center terminated its merger agreement prior to closing because "Rent-A-Center did not receive an extension notice from Vintage Capital at or prior to 11:59 p.m., Eastern Time, on December 17, 2018, which was the deadline set forth in the Merger Agreement."[11]

39.    On March 14, 2019, this Court affirmed the validity of Rent-A-Center's termination of the merger agreement with Vintage.[12]  According to *Reuters*, "Rent-

---

[9] Press Release, Franchise Group, Inc., *B. Riley Financial Assists Vintage Capital in Announced Acquisition of Rent-A-Center* (Jun. 18, 2018), https://markets.businessinsider.com/news/stocks/b-riley-financial-assists-vintage-capital-in-announced-acquisition-of-rent-a-center-1027176494. (emphasis added).

[10] *Id.* (emphasis added).

[11] Press Release, Rent-A-Center, Inc., *Rent-A-Center Terminates Merger Agreement with Vintage Capital* (Dec. 18, 2018), https://investor.rentacenter.com/news-releases/news-release-details/rent-center-terminates-merger-agreement-vintage-capital.

[12] *Vintage Rodeo Parent, LLC v. Rent-a-Center, Inc.*, 2019 WL 1223026 (Del. Ch. Mar. 14, 2019).

A-Center also maintains that Vintage owes it a $126.5 million termination fee, *which was guaranteed by Vintage Capital's banker, B. Riley Financial Inc.*"[13]

40.    On April 22, 2019, Rent-A-Center announced that it had agreed to settle all litigation with Vintage and B. Riley and that it would receive a payment of $92.5 million.    As described below at Paragraphs 129–138, Kahn may have misappropriated investor funds from one of his affiliated investment vehicles to cover the termination fee that Vintage owed to Rent-A-Center.

### B.    B&W

41.    B. Riley and Vintage also provided capital to B&W, a publicly traded thermal energy company.    On August 9, 2018, B&W "amended its first-lien revolving credit facility and received a commitment for a Last Out Loan that will provide net proceeds of $30 million from Vintage Capital and backstopped by B. Riley."[14]

42.    Approximately one year later, on July 29, 2019, B. Riley entered into an amendment and restatement of certain loan obligations with Vintage.    As part of the loan, Vintage agreed to pledge as collateral 5,000,000 shares of B&W.

---

[13] Brendan Pierson, *Rent-A-Center not bound by merger deal with Vintage Capital -judge*, REUTERS (Mar. 14, 2019), https://www.reuters.com/article/idUSL1N21122N/ (emphasis added).

[14] Press Release, Babcock & Wilcox Enterprises, Inc., *Babcock & Wilcox Announces Second Quarter 2018 Results* (Aug. 9, 2018)

43.     Then, on February 9, 2021, B. Riley and Vintage entered into an agreement pursuant to which B. Riley would purchase approximately 10.7 million shares of B&W common stock from Vintage.

44.     As with the Rent-A-Center deal, B. Riley's and Vintage's investment in B&W culminated in litigation before this Court.[15]  Plaintiffs in that action alleged that B. Riley and Vintage sought to lower the cost of acquiring a majority stake in B&W by driving it to the brink of bankruptcy.[16]  On February 17, 2023, *Bloomberg* reported that B. Riley and Vintage agreed to resolve the B&W litigation for $4.75 million.[17]

### C.     American Freight

45.     In February 2020, B. Riley served as an advisor and provided financing support—by arranging and placing a $675 million credit facility—to Franchise Group in its acquisition of American Freight.  Riley emphasized his connection to Kahn when he stated that he was "pleased to work with Brian Kahn and his team on

---

https://www.babcock.com/home/about/corporate/news/babcock-wilcox-announces-second-quarter-2018-results.

[15] *Parker v. Avril*, C.A. No. 2020-0280-PAF (Del. Ch.).

[16] Mike Leonard, *B. Riley, Vintage Capital Pay $4.75 Million to End Babcock Case*, Bloomberg (Feb. 17, 2023), https://news.bloomberglaw.com/securities-law/b-riley-vintage-capital-pay-4-75-million-to-end-babcock-case.

[17] *Id.*

this transaction and look[ed] forward to continuing to serve as a strategic partner to Franchise Group."[18]

### D.    Other Financings

46.    On January 5, 2023, *The Friendly Bear* reported that Kahn had pledged various stockholdings to B. Riley, according to Uniform Commercial Code ("UCC") filings.  B. Riley made at least ten different loans to Kahn and entities he controlled from 2018 through 2023, according to financing statements filed with state agencies in Nevada, Delaware, and Florida.[19]

47.    The total dollar amount of all loans that B. Riley made to Kahn is currently unknown.  However, a July 2023 slide presentation by the investment bank Nomura, which provided financing to B. Riley as part of the Merger, included information about B. Riley's loans over the years to Kahn.  The earliest one it listed was a $37 million loan in July 2019, and by mid-2023 the principal balance on Kahn's loans was $154 million.[20]

---

[18] Press Release, B. Riley Financial, Inc., *B. Riley Financial Affiliates Serve as Advisor and Provide Financing to Support Franchise Group's Acquisition of American Freight* (Feb. 24, 2020), https://ir.brileyfin.com/2020-02-24-B-Riley-Financial-Affiliates-Serve-as-Advisor-and-Provide-Financing-to-Support-Franchise-Groups-Acquisition-of-American-Freight.

[19] *An Unremarkable Deal*.

[20] *Id.*

III.    **B. RILEY FINANCES VARIOUS COMPANY-RELATED TRANSACTIONS, AND FRANCHISE GROUP SEEKS TO RAPIDLY DE-LEVER**

48.    On November 11, 2020, B. Riley provided funding to Bebe Stores, Inc. so it could acquire 47 Buddy's rent-to-own franchises from Franchise Group.

49.    A year later, in November 2021, Franchise Group acquired Badcock for $580 million in cash (the "Badcock Acquisition"). To finance the Badcock Acquisition, the Company entered into first and second lien credit agreements that provided $575 million in term loans.[21] The Company also maintained a revolving loan facility with certain lenders, and, in August 2022, Franchise Group entered into the Third Amendment to the Company's Third Amended and Restated Loan and Security Agreement, which increased the Company's senior secured revolving loan facility thereunder (the "ABL Revolver") to $400 million.[22]

50.    Following the Badcock Acquisition, Franchise Group disclosed that its "acquisition strategy and capital allocation plan" going forward contemplated "evaluat[ing] alternatives for certain non-core assets to rapidly de-lever the Company back to its target net leverage ratio" and "explor[ing] partnerships with

---

[21] Proxy at 19.

[22] *Id*. at 20.

third-party consumer finance vendors in order to facilitate Badcock's transition out of underwriting, holding and servicing consumer credit accounts."[23]

51.     To achieve the latter goal, Franchise Group unsurprisingly turned to B. Riley.

52.     In December 2021, B. Riley and Badcock entered into a Master Receivables Purchase Agreement (the "Receivables Agreement"), pursuant to which B. Riley paid $400 million to acquire Badcock's existing portfolio of consumer credit receivables.[24]   B. Riley would, per the Receivables Agreement, continue to purchase additional Badcock consumer credit receivables from December 20, 2021 through an undefined future date that Badcock and B. Riley would "specify in writing in their sole discretion."[25]   In connection with entry into the Receivables Agreement, Riley stated: "[t]his transaction is also a continuation of our commitment to enable Franchise Group's success as a leading operator in the franchising sector."[26]

---

[23] *Id*. at 19.

[24] *Id*.

[25] Franchise Group, Inc., Current Report (Form 8-K) (Dec. 21, 2021) at Ex. 2.1.

[26] Press Release, B. Riley Financial, Inc., *B. Riley Financial Purchases Receivables Portfolio in Connection with Franchise Group's Recent Acquisition of W.S. Badcock Corporation* (Dec. 20, 2021) https://m.insidertracking.com/b-riley-financial-purchases-receivables-portfolio-in-connection-with-franchise-group-s-recent-acquisition-of-w-s-badcock-corporation.

53.    Following the Badcock Acquisition, beginning in late 2021 and continuing throughout 2022, Franchise Group purportedly solicited proposals from other third-party consumer finance vendors to facilitate Badcock's complete exit from its consumer credit business.[27]  Yet, by the time of the Merger, Franchise Group and Badcock supposedly had not been able to "find a satisfactory solution" with third-party consumer finance vendors.[28]

54.    Thus, beginning in November 2022, the Company "initiated discussions with certain of its lenders to consider modifications to the Company's financing arrangements that would permit Badcock to finance its accounts receivables outside the scope of the covenants under the Company's financing facilities."[29]   The undisclosed lenders communicated that "the necessary amendments to [Franchise Group's] financing facilities to accommodate the necessary working capital financing would likely come at a significant cost to the Company and ultimately may not be approved by the lenders."[30]

55.    Getting the message, in mid-January 2023, the Company pursued an upsizing of its credit facility to "provide additional capacity to finance working

---

[27] Proxy at 20.

[28] *Id.*

[29] *Id.*

[30] *Id.*

capital, including, if necessary, Badcock accounts receivables."[31]   To do so, the Company turned to its FRG First Lien Credit Agreement—one of the two loans used to finance the Badcock Acquisition—and determined to pursue an amendment of its terms for a third time to upsize its credit facility.[32]  Franchise Group also disclosed that it intended to finalize the transition from in-house financing by the end of June 2023.[33]

56.    The January 18, 2023 Board minutes indicate that the Company initially considered ████████████████████████████████████████████████████

████████████[34]  Franchise Group intended to ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  The Board resolutions to the January 18 meeting indicate that the ████████████████████████████

████████████████████[35]

---

[31] *Id.*

[32] *Id.* at 19–20.

[33] *Id.* at 20.

[34] FG_00003050.

[35] FG_00003051.

57.    On February 2, 2023, Franchise Group completed the upsizing of the FRG First Lien Credit Agreement and obtained an incremental term loan facility in the principal amount of $300 million.[36]

### IV.    KAHN AND LAURENCE SET THE STAGE FOR A TRANSACTION BY CAUSING FRANCHISE GROUP TO REPURCHASE MILLIONS OF OUTSTANDING SHARES IN LATE 2022

58.    On  May 18, 2022, as the Company purportedly solicited potential buyers and financing for the Badcock receivables, the Board approved a stock repurchase plan whereby the Company, at the discretion of management (*i.e.*, Kahn and Laurence), could repurchase up to *$500 million* of its outstanding shares of common stock over the next three years.[37]  The stock repurchase plan superseded a previous repurchase plan that was in place since June 2016, which authorized up to *only $10 million* in share repurchases.[38]  Under the previous plan, the Company did not make any repurchases of its common stock in fiscal years 2018 through 2021,

---

[36] Proxy at 20.

[37] Franchise Group, Inc., Current Report (Form 8-K) (May 19, 2022) (stating "[t]he actual timing, number and value of shares, if any, repurchased under the program will be determined by management in its discretion[.]").

[38] Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (June 29, 2016) at 31.

and only repurchased a total of approximately 115,000 shares in fiscal years 2016 and 2017.[39]

59.    Yet beginning in late July 2022, at the direction of Kahn and Laurence, the Company began to rapidly repurchase shares.  From July 24, 2022 to September 24, 2022, the Company repurchased approximately 2.23 million shares, purchasing nearly 1.4 million shares alone between August 21, 2022 and September 24, 2022.[40] From July 24, 2022 to September 20, 2022, the Company's stock price traded above $30 per share, suggesting that the Board and Company management valued Franchise Group on a per share basis in excess of the Merger price during this time. On the August 4, 2022 earning call, in response to a question concerning the

---

[39] Franchise Group, Inc., Annual Report (Form 10-K) (Feb. 23, 2022), at 28 ("During the year ended December 25, 2021, we did not repurchase any shares of our common stock"); Franchise Group, Inc., Annual Report (Form 10-K) (Mar. 10, 2021), at 30 ("During the year ended December 26, 2020, we did not repurchase any shares of our common stock"); Franchise Group, Inc., Annual Report (Form 10-KT) (Apr. 24, 2024), at 38 ("During the Transition Period [May 1, 2019 – December 28, 2019], we did not repurchase any shares of our common stock"); Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (June 27, 2019), at 32 ("During fiscal 2019, we did not repurchase any shares of our common stock."); Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (Oct. 5, 2018), at 32 ("During fiscal 2018, we did not repurchase any shares of our Class A common stock"); Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (July 7, 2017), at 30 (repurchasing 33,153 shares of common stock in FY 2017); Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (June 29, 2016), at 31 (repurchasing 82,355 shares of common stock in FY 2016).

[40] Franchise Group, Inc., Quarterly Report (Form 10-Q) (Nov. 3, 2022), at 37.

Company's $500 million stock buyback plan, Kahn noted the Company would be "opportunistic" with respect to buying back shares.[41]

60.    Indeed, beginning in late October 2022, the Company repurchased approximately 3.7 million additional shares, purchasing nearly 3 million shares alone between November 20, 2022 and December 31, 2022.[42]  In total, by the end of 2022, the Company repurchased more than 5.9 million shares for a total of $172.5 million.[43]

61.    As a result, in the span of just five months, the Company reduced the number of shares outstanding by approximately 15% compared to the start of 2022, setting the stage to initiate the management-led take-private.[44]

## V.    KAHN KICKS OFF THE SALE PROCESS (CONTRARY TO THE PROXY'S DISCLOSURES)

62.    On January 10, 2023, the *Wall Street Journal* reported that Franchise Group was considering a management-led buyout *spearheaded by Kahn* (the "*WSJ Article*").[45]  According to the *WSJ* Article, Kahn would take Franchise Group private

---

[41] Franchise Group, Inc. Q2 2022 Earnings Call (Aug. 4, 2022).

[42] Franchise Group, Inc., Annual Report (Form 10-K) (Feb. 28, 2023), at 29.

[43] *Id*.

[44] Franchise Group, Inc., Current Report (Form 8-K) (Feb. 28, 2023), at Ex. 99.1.

[45] Lauren Thomas, *Vitamin Shoppe Owner Franchise Group Considers Going Private*, WALL ST. J. (Jan. 10, 2023), https://www.wsj.com/articles/vitamin-shoppe-owner-franchise-group-considers-going-private-11673383894.

for somewhere between $30 to $35 per share.  The Proxy is silent about the *WSJ* Article and the initial reports that Kahn was planning a take-private.

63.     The next day, on January 11, 2023, a private equity firm and an investment bank each separately reached out to Kahn to express their respective interest in the management-led take-private reported by the *WSJ* Article.[46]  Kahn agreed to speak with each entity the same day, lending credence to the report that Kahn was in fact planning a take-private at this time.

64.     Moreover, according to Jefferies' April 6, 2023 disclosure letter to the Special Committee concerning Jefferies' relationships with B. Riley (the "Disclosure Letter"), sometime between January 1 and January 15, 2023, Kahn contacted Jefferies "regarding Jefferies possibly participating in a Company debt financing in connection with a potential recapitalization transaction involving the Company."[47]  Jefferies then entered into a confidentiality agreement with Franchise Group on January 16, 2023.[48]  The Disclosure Letter states that "[d]iscussions [concerning the potential recapitalization transaction] took place from time to time through early March 2023 and Jefferies was provided with a Company financial

---

[46] FG_00004162, FG_00004164.

[47] FG_00004115.

[48] *Id.*

model and *Jefferies provided a theoretical analysis* showing sources and uses in connection with such potential transaction under various scenarios (both documents accompany this disclosure)."[49]

65.    Jefferies' banal characterization of its work for Franchise Group management (*i.e.*, Kahn) is belied by the attachment to the Disclosure Letter, *which is an analysis of a take-private transaction of Franchise Group* at prices between $30 per share (*i.e.*, B. Riley's opening offer as well as the Merger price) and $38 per share, *with Kahn rolling over his stakes* and B. Riley rolling over its preferred shares and investing $400 million of new equity (the "Take-Private Analysis").[50]   The Franchise Group share price used by Jefferies to calculate premiums (and other information) for the Take-Private Analysis was from February 24, 2023, and the file name of the document is "AVP Analysis (3.1.2023) 2050.pdf," suggesting that this analysis was done somewhere between February 24 and March 1, 2023, just weeks in advance of B. Riley's March 19, 2023 opening offer discussed below.[51]   Indeed, Jefferies' Disclosure Letter indicates that it "did not have any discussions with [B. Riley] regarding [a potential recapitalization transaction involving the Company]."

---

[49] *Id.* (emphasis added).

[50] FG_00005798.

[51] *Id.*

But Jefferies certainly had discussions with Kahn concerning a take-private where Kahn would rollover his stake in Franchise Group.

66.    As discussed in greater detail below, none of this information concerning Jefferies' work for Kahn on a take-private transaction was disclosed to Franchise Group stockholders in the Proxy, and it is unclear when, or if, it was fully disclosed to the Special Committee.[52]

## VI.    B. RILEY CUTS OFF BADCOCK RECEIVABLES FINANCING TO FACILITATE KAHN'S TAKE-PRIVATE OF THE COMPANY

67.    In late February 2023, only weeks after the Company undertook an additional $300 million credit facility, B. Riley advised the Company that it "had determined not to continue to purchase any further Badcock accounts receivable."[53] Franchise Group then determined "that a failure to continue to sell Badcock Receivables and reduce the outstanding balance of the ABL Revolver[] may result

---

[52] While Jefferies' Disclosure Letter was purportedly reviewed by the Special Committee on March 30, 2023, the projections and the Take-Private Analysis that "accompan[ied]" the Disclosure Letter could not be found by Company counsel in connection with the production of 220 materials responsive to the Demands (but rather only the Disclosure Letter itself).  The projections and Take-Private Analysis were only located within Avril's custodial files and there are no books and records indicating that he provided those documents to the other members of the Special Committee.

[53] Proxy at 20.

in, among other things, . . . a potential default under the FRG First Lien Credit Agreement."[54]

68.    As a purported result of B. Riley's position on the Badcock accounts receivables, Kahn engaged in a series of communications with Riley and certain other representatives of B. Riley throughout late February and early March 2023 concerning the Badcock accounts receivables.[55] ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

69.    Following Kahn's and Riley's communications, B. Riley requested "additional information" on "Badcock and the Company and its other businesses," prompting B. Riley and Franchise Group to enter into a confidentiality agreement on March 7, 2023.[57]  The next day, Kahn sent B. Riley four sets of presentation materials, one of which included projections made by the Company's management as of January 2023 (the "January Projections").[58] ████████████████████

---

[54] *Id*. at 20–21.

[55] *Id*.; *see also* FR_00004170, -4174, -4204, -4212, -4214, -4226, -4626.

[56] FG_00004170.

[57] Proxy at 21.

[58] *Id*.; FG_00004243.

██████████████████████████████████████████████

████████    ████████████████████████████████████████  ██

██████████████████████████████████████████████

████████  █████████████████████████████████████████

██████████████████████        B. Riley reviewed these materials and concluded

that instead of continuing to purchase Badcock accounts receivables pursuant to the

Receivables Agreement, B. Riley "would prefer to explore the acquisition of all of

the outstanding equity of [Franchise Group], rather than expose itself to continued

balance sheet risk of the Company without any equity or similar upside."[63]

70.    In expressing this sentiment, B. Riley declared that it was "willing to

fund Badcock accounts receivables one final time for the first quarter of 2023, but

that it was unwilling to do so for the second quarter of 2023 and beyond."[64]  Thus,

B. Riley informed the Company it was cutting off funding critical to the Company

contemporaneously to initiating a sale process with the Company.

_____

[59] FG_00004244.

[60] FG_00004286.

[61] FG_00004294.

[62] FG_00004317; FG_00004330.

[63] Proxy at 21.

[64] *Id.*

71.    Soon thereafter, on March 16 and 17, 2023, Kahn and Riley met in person to discuss B. Riley's interest in an acquisition of Franchise Group, and Riley indicated that "B. Riley intended to submit a non-binding offer to acquire the Company."[65]

72.    Two days later, on March 19, 2023, B. Riley submitted a written proposal to acquire all of Franchise Group's common stock for $30 per share (the "Original Proposal").[66]    The Original Proposal contemplated "Company management rolling over their equity stake in [Franchise Group] and agreeing to continue to manage the Company on an ongoing basis[.]"[67] In addition to "approval and recommendation" of the proposed transaction by a special committee of the Company's Board, the Original Proposal also referenced approval of the proposed transaction "by holders of a majority of the outstanding shares of [Franchise Group] Common Stock other than participants in any potential transaction."[68]  The Original Proposal was signed by Riley as Chairman and co-CEO of B. Riley.

---

[65] *Id.*

[66] *Id.*; FG_00002886.

[67] *Id.*; FG_00002270.

[68] *Id.*

73.    ███████████████████████████████████████

████████████████████████████[69]    The same day, Kahn forwarded the

Original Proposal to the remainder of the Board,[70] which Avril then forwarded to

Wachtell, Lipton, Rosen & Katz ("Wachtell")—the eventual legal advisor to the yet-

to-be-formed Special Committee.[71]

74.    ███████████████████████████████████████

████████████████████████████████████████

## VII.    THE COMPANY COMMENCES A FLAWED SALE PROCESS

75.    The next day, on March 20, 2023, the Board met to discuss the Original

Proposal and issued a press release,[73] disclosing only that the Company:

> [R]eceived an unsolicited non-binding proposal, which is
> subject to certain conditions, to acquire all of the
> outstanding shares of the common stock of the Company
> for a price of $30.00 per share in cash.  The [Board] will
> carefully evaluate the proposal to determine the course of
> action that it believes is in the best interests of the
> Company and all [Company] stockholders.[74]

---

[69] FG_00004635.

[70] *Id.*

[71] FG_00004644.

[72] *Id.*

[73] FG_00002272.

[74] Press Release, Franchise Group, Inc., *Franchise Group, Inc. Announces Receipt of Unsolicited Proposal* (Mar. 20, 2023), https://www.globenewswire.com/en/news-

31

76.     The March 20, 2023 press release made no mention of the January 2023 proposal of a Kahn-led management buyout of the Company, as reported in the *WSJ* Article published two months prior.

### A.     The Board Forms a Conflicted Special Committee Spearheaded by Long-time Kahn Associate Avril

77.     On March 22, 2023, the Company's counsel, Troutman Pepper Hamilton Sanders LLP ("Troutman"), emailed Avril a draft of the Board resolutions that would form the Special Committee two days later.[75]  The other members of the soon-to-be formed Special Committee (*i.e.*, Herskovits and Dubin) were not copied on this email.

78.     On March 24, 2023, the Board met with Troutman and Wachtell to discuss the formation of the Special Committee and to consider and recommend to the full Board any sale of the Company.

79.     Avril and Kahn personally invited Wachtell to attend the March 24 Board meeting after Avril forwarded Wachtell the Original Proposal.[76]  On March 23, 2023, the day before the Board meeting, Avril emailed Wachtell instructing

---

release/2023/03/20/2630276/0/en/Franchise-Group-Inc-Announces-Receipt-of-Unsolicited-Proposal.html.

[75] FG_00004800.

[76] Proxy at 21; FG_00004644.

Wachtell to attend the meeting and stated that further "info will come from [Kahn]."[77]

80.    At the March 24, 2023 Board meeting, the Board recognized that "certain directors and officers of the Company may be deemed to have an interest in the Original Proposal that is different from, or in addition to, the interests of the Company's Unaffiliated Stockholders."[78]

81.    Indeed, Kahn was directly interested in the Merger, and Avril had long-standing ties to Kahn, Laurence, and Vintage (*i.e.*, the Controller Defendants), as well as Riley.  Specifically, Avril served on the strategic advisory board of Vintage until at least 2022 (and possibly as late as February 2023), joined the Liberty Tax board as a Vintage appointee in connection with the 2018 Transactions (serving alongside Kahn, Laurence, and Riley), and was appointed to the boards of three of Vintage's portfolio companies (*i.e.*, Aaron's, API, and B&W).  Additionally, Avril personally invested in certain investments affiliated with Vintage and owned a limited partnership interest in Vintage.  Considering B. Riley's Original Proposal contemplated Kahn's rollover and continued management of the post-transaction Company, Avril's long-standing and close relationship with Kahn called into

---

[77] FG_00004803.

[78] Proxy at 21.

question his independence and even interestedness considering his investments in Vintage.

82.     Nevertheless, at the March 24, 2023 meeting, the Board formed a special committee comprised of Dubin, Herskovits, and *Avril* (as defined above, the "Special Committee").[79]  The Board, with Kahn in attendance, went out of its way to resolve that Avril, despite his long-standing relationship with Kahn and Laurence, was "independent of the Corporation's management" based on an inquiry directed to Avril "as to any information relevant to determination of [his] eligibility to serve on the Special Committee."[80]  The Board itself, with Kahn in attendance, then appointed Avril as Chairman of the Special Committee, rather than letting the Special Committee select its own chairman.  The newly formed Special Committee immediately determined to engage Wachtell as its legal advisor.[81]  Thereafter, Avril drove the Special Committee process.

83.     Avril's forwarding of the Original Proposal to Wachtell on March 19, 2023, his receipt of the draft Board resolutions to establish the Special Committee prior to the March 24, 2023 Board meeting, and his and Kahn's invitation to

---

[79] FG_00002263.

[80] FG_00002265.

[81] Proxy at 22.

Wachtell to join the March 24, 2023 Board meeting that established the Special Committee indicates that Avril: (i) knew that he would be appointed to the Special Committee (and likely would be appointed its Chairman) and (ii) pre-selected Wachtell as the Special Committee's legal advisor while coordinating with *Kahn* but not with the members of the Special Committee.

84.    Over the following days, Avril, Kahn, and Wachtell coordinated and conducted interviews with potential financial advisors without Herskovits or Dubin.[82]

85.    For example, on March 26, 2023, Kahn personally reached out to potential advisors to schedule interviews with them for the position of the Special Committee's financial advisor.[83]  Kahn scheduled interviews with a total of four potential financial advisors to take place on March 27, 2023.[84]  But Herskovits and Dubin were not copied on any emails that scheduled any of the March 27, 2023 interviews.[85]

86.    Jefferies was purportedly selected by the Special Committee as its advisor.  However, Jefferies' interview was conducted via Zoom on March 27, 2023,

---

[82] FG_00004811.

[83] FG_00004821; FG_00004824.

[84] FG_00004821.

[85] FG_00004811; FG_00004817; FG_00004821; FG_00004828.

and Herskovits and Dubin were not copied on the Zoom invitation sent to Avril and Wachtell.[86]  By contrast, Kahn continued to be copied on email communications between Avril, Wachtell, and Jefferies regarding Jefferies' interview.[87]

87.    Also on March 27, 2023, Jefferies sent Avril and Wachtell (but not the other members of the Special Committee) a 46-page presentation to be reviewed during Jefferies' interview, which included valuable sell-side information, such as

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

88.    The following day, on March 28, 2023, Avril forwarded these materials *to Kahn*.[89]  A day after that, and two days after Jefferies' interview, on March 29, 2023, Avril forwarded the same materials to Herskovits and Dubin telling them to "please find[] attached the proposal from Jeffries [*sic*] to the SC."[90]  From the documentary record, it appears clear that  Herskovits and Dubin were receiving these

---

[86] FG_00004817.

[87] FG_00004819.

[88] FG_00004826 (email); FG_00004830 (attached materials).

[89] FG_00004876.

[90] FG_00004934.

materials for the first time, indicating that they were not present for Jefferies' interview on March 27, 2023.

89.    Two days later, on March 31, 2023, Avril informed the other potential financial advisors that the Special Committee was engaging Jefferies and thus ending its advisor search.[91]  The Special Committee formally engaged Jefferies on April 6, 2023.[92]

90.    The selection of Jefferies, effectively by Avril and Kahn, is particularly problematic because Jefferies had been working with Kahn for the prior three months on a potential take-private where Kahn would rollover his Company shares. According to the Disclosure Letter, as discussed above, Kahn contacted Jefferies in January 2023 "regarding Jefferies possibly participating in a Company debt financing in connection with a potential recapitalization transaction involving the Company."[93]  Jefferies signed a confidentiality agreement with the Company on January 16, 2023 and "[d]iscussions took place from time to time through early March 2023 and Jefferies was provided with a Company financial model and

_____

[91] FG_00005660.

[92] Proxy at 23.

[93] FG_00004115.

Jefferies provided a theoretical analysis showing sources and uses in connection with such a potential transaction under various scenarios . . . ."[94]

91.    The Proxy fails to disclose that: (i) Kahn solicited Jefferies' services with respect to potentially financing debt for a take-private transaction; (ii) Jefferies signed a confidentiality agreement in January 2023 and received various sets of Company projections (notably different than what Jefferies used for purposes of its fairness opinion for the Merger); and (iii) Jefferies and Company management engaged in continued discussions through March 2023, each of which occurred just prior to the Special Committee retaining Jefferies as its "independent" financial advisor.

92.    In light of his recent interaction with Jefferies concerning debt financing for a take-private where Kahn would roll over his shares, Kahn's involvement in the scheduling and interviewing of Jefferies as the Special Committee's potential financial advisor undermines the independence of the Special Committee process.  In fact, Kahn should not have been involved in the Special Committee's advisor selection process at all.

93.    Instead, between March 26 and March 31, 2023, Kahn: (i) reached out directly to potential financial advisors to schedule interviews exclusively with Avril

---

[94] *Id.*

and Wachtell,[95] (ii) provided the Special Committee (through Avril) with his own "fee run" analysis concerning the cost of engaging each potential advisor,[96] and (iii) received a 46-page Jefferies presentation from Avril that included sell-side analyses of the Company.[97]  Despite these conflicts, Jefferies was engaged as the Special Committee's financial advisor, and based on the 220 record, Kahn never disclosed Jefferies' work on a take-private transaction for him to the Special Committee members.

94.    On April 3, 2023, Avril (but not the other members of the Special Committee), Jefferies, and Wachtell met to discuss Jefferies' preliminary financial analysis.[98]  Avril instructed Jefferies to "identify, and conduct outreach to, potential third-party bidders," as well as to "reach out to B. Riley for additional information regarding its proposal."[99]

95.    In connection with Jefferies' preliminary financial analyses, on April 4, 2023, Company management sent Jefferies new management projections for FY2023 through FY2026 (the "Preliminary Management Projections") to be shared

---

[95] FG_00004821; FG_00004824.

[96] FG_00004987.

[97] FG_00004826 (email); FG_00004830 (attached materials).

[98] Proxy at 23; FG_00002579.

[99] Proxy at 23.

with potential bidders.[100]    Company management "updated" the Preliminary Management Projections periodically over the next several weeks with certain cash flow and debt adjustments.  These financial projections differed significantly from what Jefferies had used to create its Take-Private Analysis for Kahn just a month earlier, which incorporated a "theoretical purchase price[]" range of $30 to $38 per share and showed this purchase price range as a multiple to Franchise Group's projected 2023 EBITDA ranging from 9.0x to 9.9x.[101]

96.    Indeed, the Preliminary Management Projections slashed projections for Total Revenue and EBITDA across the projection period from 2023 to 2026, as shown below:

| (Numbers in millions) | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|
| Jefferies Projections | Revenue- $4,468 EBITDA- $370 | Revenue- $4,693 EBITDA- $444 | Revenue- $5,087 EBITDA- $527 | Revenue- $5,540 EBITDA- $613 |
| Preliminary Management Projections | Revenue- $4,227 EBITDA- $244 | Revenue- $4,428 EBITDA- $281 | Revenue- $4,876 EBITDA- $366 | Revenue- $5,334 EBITDA- $440 |

97.    Notably, the reductions made to the EBITDA projections were far more substantial than the modest reductions made to Revenue in the Preliminary Management Projections, which would have an outsized negative impact on the

_____

[100] Proxy at 23.

[101] FG_00005798.

Company's free cash flows and would, in turn, have an outsized negative impact on the Company's valuation.

98.    When the Special Committee met to review the Preliminary Management Projections on April 12, 2023, attendees at the meeting included Company management, Troutman, and Wachtell, but not Jefferies, the Special Committee's financial advisor.[102]   There is no record of Jefferies raising any concerns with the significant reductions in the Company's financial projections for purposes of their Special Committee engagement, despite knowing that management had provided Jefferies with far higher projections during Jefferies' discussions with Kahn.  Indeed, at the Special Committee's next meeting on April 14, 2023, Jefferies proceeded with an update on its third-party outreach and presented its preliminary financial analysis based on the Preliminary Management Projections.[103]  The Special Committee instructed Jefferies to continue its outreach "to identify any viable alternative buyers for the Company or certain of its businesses" and to continue "diligence and negotiations" with B. Riley.[104]

---

[102] *Id*.; FG_00002578.

[103] Proxy at 24; FG_00002600-01.

[104] Proxy at 24; FG_00002601.

### B.    Kahn "Joins" the Sale Process and Leads Price Negotiations

99.    Also on April 14, 2023, Kahn's legal advisor Willkie Farr & Gallagher LLP ("Willkie") met with Wachtell and Avril (but not with the other members of the Special Committee).[105]    According to the Proxy, the group discussed B. Riley's Original Proposal.[106]    Avril then communicated "the Special Committee's view on Brian Kahn speaking directly with B. Riley regarding the potential transaction proposed by B. Riley or potential alternative acquisition transactions."[107]    Between April 14 and April 16, 2023, Avril (but not the other members of the Special Committee) and Wachtell discussed "these and related matters," and Wachtell and Willkie "had several telephone calls."[108]

100.    On April 16, 2023, Avril (but not the other members of the Special Committee), Kahn, Wachtell, and Willkie met.    That day, "the Special Committee granted Brian Kahn permission to pursue discussions, negotiations and actions in connection with any potential acquisition transaction (with B. Riley or other potential bidders) so long as Brian Kahn kept the Special Committee and its counsel

---

[105] Proxy at 24.

[106] *Id*.

[107] *Id*.

[108] *Id*.

reasonably informed on a current basis regarding any such discussions, negotiations, or actions."[109]

101.    In other words, Avril unilaterally shirked the full scope of the Special Committee's negotiation responsibilities, which specifically included "all power and authority of the Board, to the fullest extent permitted by law, to take actions with respect to any Potential Transaction and any review, discussion, consideration, deliberation, examination, investigation, analysis, assessment, evaluation, exploration, response, negotiation, termination, rejection, approval and/or authorization on behalf of the Corporation of the terms and conditions of any Potential Transaction, or any other strategic alternatives available to the Corporation"[110]—so long as Kahn kept the Special Committee and its counsel reasonably informed.  In an internal email from the same day, Wachtell confirmed that the Special Committee was providing Kahn "broad latitude" with respect to his involvement in the Transaction.[111]

---

[109] Proxy at 24.

[110] FG_00002266.  Indeed, the Special Committee was specifically provided "the power and authority on behalf of the Corporation to formulate, structure, negotiate and document any Potential Transaction, including, without limitation, proposals, agreements or transaction in connection with any Potential Transaction with any of the corporation, *any of the Corporation's officers, directors or employees, and/or any of their affiliates or associates, and any third parties*."  *Id.* at 2266–2267 (emphasis added).

[111] FG_00005695.

102.  In response, Kahn informed Avril that he "would consider engaging in discussions with any bidder that makes [a potential acquisition transaction proposal], *if there would be a role for [Kahn] in connection with any such alternative acquisition transaction*."[112]  In other words, Kahn wanted to remain CEO of the Company and roll over his equity stake, consistent with the modeling that Jefferies had performed for Kahn in late February/early March 2023.  Of course, as the Company's controlling stockholder, Kahn had the power to make that happen, especially in light of Avril allowing him to shepherd the sale process.

103.  The next day, on April 17, 2023, Kahn and Vintage filed an amended Schedule 13D.[113]  Referencing a purportedly unsolicited proposal to acquire the Company for $30 per share, the Schedule 13D disclosed that Kahn and Vintage "determined that they wish to discuss the Proposed Transaction with the Bidder and may negotiate with the Bidder (and other interested parties, including the Issuer) with respect to their participation in, and take other actions in furtherance of, that or any other acquisition transaction."[114]  However, like the March Press Release, the Schedule 13D failed to disclose the identity of the "Bidder" (*i.e.*, B. Riley—Kahn's

---

[112] Proxy at 24 (emphasis added).

[113] Franchise Group, Inc., Schedule 13D/A (No. 21) (Apr. 17, 2023) (Vintage Capital Management, LLC).

[114] *Id.*

44

and Vintage's long-time business partner). Later that day, Avril forwarded the Schedule 13D to the Board and noted that it was filed "in connection with conversations [B]rian [Kahn] is having with the *bidder* to better understand how they envision Brian's role should the transaction occur and he 'rolls' his equity as required under the bid."[115]

104.   On April 18, 2023, Kahn and Willkie met with B. Riley and its legal advisor, Sullivan & Cromwell LLP ("S&C"), to "discuss certain terms relating to a potential transaction."[116]  The next day, on April 19, 2023, the Special Committee met to receive an update on the Original Proposal and instructed Jefferies "to continue to engage with B. Riley and Brian Kahn with respect to the proposal initiated by B. Riley."[117]

105.   At an April 26, 2023 meeting, the Special Committee again abdicated its responsibilities and deferred its authority to Avril, requesting that Avril "speak with Brian Kahn to discuss his willingness to enter into a proposed transaction with

---

[115] FG_00005721 (emphasis added).

[116] Proxy at 24.

[117] *Id*. at 24–25; FG_00002580.

B. Riley on the terms of the Original Proposal."[118]  Avril did so, and Kahn "indicated his willingness to proceed with negotiations with B. Riley."[119]

106.    Two days later, on April 28, 2023, the Special Committee convened and, according to the minutes for the meeting, Avril "confirmed that Brian Kahn indicated his willingness to proceed with negotiations with B. Riley and was supportive of the [Special] Committee making a counteroffer to B. Riley with an increased price per share over $30.00."[120]   Accordingly, the Special Committee instructed Jefferies to communicate the Special Committee's *first and only* counteroffer of $33 per share.[121]  B. Riley shot down the counteroffer the same day and reiterated its original offer of $30 per share.[122]  Additionally, B. Riley insisted on expediting the Merger negotiations "to facilitate a deal announcement prior to, or contemporaneous with, the Company's planned earnings announcement on May 10, 2023."[123]

---

[118] Proxy at 25; FG_00002590–91.

[119] Proxy at 25.

[120] FG_00002585.

[121] *Id.*

[122] Proxy at 25; FG_00002596.

[123] Proxy at 25.

107.    On April 29, 2023, the Special Committee met to discuss B. Riley's response to their counteroffer and directed Jefferies to ask B. Riley if it "would be willing to pay more than $30.00 per share in cash under any other circumstances."[124] Neither the Proxy nor the Board meeting minutes disclose any further price negotiations.

108.    On May 2, 2023, the Board met to discuss the Merger.  According to the Proxy, at this meeting, "Kahn provided an update to the Board on the Company's operations and performance and departed such meeting after providing such update."[125]  But the minutes for this meeting make clear that Kahn did not leave after providing the operations and performance update.  Instead, Kahn "reported on the potential transaction with B. Riley Financial, Inc." and "indicated that he was prepared to move forward with the proposal from B. Riley."[126]  The minutes then record a discussion of the Merger with Kahn present and participating, only after which Kahn departed.[127]  The Proxy does not disclose this discussion or Kahn's unilateral statement that *he* (not the Special Committee) was prepared to move forward.

---

[124] *Id*.; FG_00002597.

[125] Proxy at 26.

[126] FG_00002545.

[127] *Id.*

109.    On May 4, 2023, Company management sent Jefferies' final updated projections from the series of preliminary management projections provided throughout April (the "Management Projections").[128]  In a March 31, 2023 email, Jefferies had informed Avril (who in turn informed Kahn) that it "will need [to] ultimately [] work with *approved* projections" to generate its analysis of the Company in connection with a potential transaction.[129]  Unsurprisingly then, the Proxy disclosed that the Management Projections "were reviewed and approved by the Special Committee for purposes of Jefferies' financial analysis," but the Proxy does not disclose when that review and approval occurred.[130]

110.    The Special Committee minutes similarly fail to shed light on this purported approval, as Company management first sent the Preliminary Management Projections to the Special Committee on April 4, but the Committee did not formally approve those projections during any of the seven meetings it held between April 4 and May 4, 2023.[131]  In fact, the April 12, 2023 Special Committee minutes are the only one of those seven minutes that reference the Preliminary

---

[128] Proxy at 23.

[129] FG_00005603 (emphasis added).

[130] Proxy at 23.

[131] The Special Committee convened on April 12 (FG_00002579), April 14 (FG_00002600), April 19 (FG_00002580), April 26 (FG_00002590), April 28 (FG_00002584), April 29 (FG_00002596), and May 2 (FG_00002545).

Management Projections, and those minutes merely indicate that the Special Committee "reviewed and discussed" the Preliminary Management Projections but do not state that the Preliminary Management Projections were *approved*.[132]  Thus, it is reasonably conceivable that Company management sent the Management Projections to Jefferies on May 4, 2023 without the Special Committee's approval.

111.   Moreover, while the Management Projections left revenue projections virtually untouched from the Preliminary Management Projections, they made non-corresponding drastic downward revisions to the EBITDA projections (down from the already outsized downward revisions to EBITDA in the Preliminary Management Projections from the Jefferies Projections):

| (Numbers in millions) | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|
| Preliminary Management Projections | Revenue- $4,227 EBITDA- $244 | Revenue- $4,428 EBITDA- $281 | Revenue- $4,876 EBITDA- $366 | Revenue- $5,334 EBITDA- $440 |
| Management Projections | Revenue- $4,223 EBITDA- $162 | Revenue- $4,428 EBITDA- $199 | Revenue-$4,876 EBITDA - $288 | Revenue- $5,334 EBITDA- $363 |

112.   Once again, Jefferies failed to raise any concerns with the revised projections despite their significant departure from the projections Jefferies received from Kahn for purposes of the Take-Private Analysis.

---

[132] FG_00002578.

### C.    Kahn Replaces B. Riley as the Company's Acquirer at the Eleventh Hour

113.   Between April 30 and May 9, 2023, the Proxy indicates that B. Riley held discussions with Kahn regarding the potential transaction and the relationship among the parties with respect thereto.[133]

114.



115.   At the May 5, 2023 Board meeting, according to the minutes, Kahn informed the Board that "B. Riley determined that, while it remained interested in providing financing to facilitate a transaction, it would be necessary to do so in a manner that would not result in it controlling or having to consolidate the Company

---

[133] Proxy at 26.

[134] FG_00004675 (emphasis added).

[135] FG_00004684.

into its financial statements."[136]    No explanation was provided why this would purportedly be "necessary."

116.    It is incredibly odd that a sophisticated financier like B. Riley suddenly discovered, after making an offer to acquire the Company, that it no longer could participate in an acquisition that would result in B. Riley having a controlling interest in the Company.    Rather, it is reasonably conceivable that this was a charade orchestrated by Kahn and B. Riley to make it appear that B. Riley was the initiator of the sale process rather than Kahn himself.

117.    In response to B. Riley's statement, Kahn came to the rescue, announcing that he and B. Riley determined that if a transaction were to proceed, "*Kahn would control the surviving company from a governance perspective and may own, directly or indirectly, a majority of the outstanding equity of the surviving company.*"[137]

118.    Thus, Kahn precipitously informed the Board that following further discussions with B. Riley, the parties now contemplated that "Kahn and his affiliates

---

[136] Proxy at 26.

[137] *Id.*

will have control of the surviving company, with B. Riley participating in the transaction as a financing source, including from an equity perspective."[138]

119.    Aside from the Special Committee's meeting later on May 5, 2023 to "discuss the status of the proposed transaction and next steps related thereto,"[139] the Proxy's disclosures do not include any subsequent action taken by the Special Committee to discuss or address the change to the Merger structure, seek additional Merger consideration, or engage in substantive negotiation with Kahn and B. Riley. According to the May 5, 2023 Special Committee meeting minutes, the Special Committee determined that the "proposed change in structure ha[d] not impacted the material terms of the Proposed Transaction."[140]  However, neither the May 5 Board minutes nor the May 5 Special Committee minutes indicate that Kahn disclosed specific terms for his proposal as the Company's "new" acquirer.[141]

120.    Nevertheless, according to the May 5 minutes, the Special Committee concluded it would "discuss final transaction terms with Wachtell" concerning the proposed transaction over the following week.[142]

---

[138] *Id.*

[139] *Id.*

[140] FG_00002595

[141] *See* Proxy at 26; FG_00002508 (Board minutes); FG_00002594 (Special Committee minutes).

[142] FG_00002595.

121.   Also on May 5, 2023, Irradiant, the lead source of debt financing for the Merger, sent an "initial draft of the Irradiant Fee Letter" to Kahn's counsel, Willkie,[143] which contemplated a fee to be received by Irradiant in consideration of debt financing arrangements in connection with the Merger.[144]  The draft Irradiant fee letter also bound Kahn personally to work exclusively with Irradiant on any debt financing connected with the Merger.[145]  The existence of the draft Irradiant fee letter dated May 5, 2023, *i.e.*, the same day Kahn informed the Board that he would control the post-Merger Company, combined with the fact that a managing director of Irradiant forwarded the *WSJ Article* to Kahn on January 10, 2023, implies coordination between Irradiant, Kahn, and B. Riley in the days or weeks leading to Kahn supplanting B. Riley as the Company's eventual acquiror.[146]

122.   On May 8, 2023, the Special Committee convened again.  The Proxy indicates that the Special Committee and Jefferies discussed "the status of representatives of Jefferies' outreach to potential bidders[,]"[147] yet the meeting minutes indicate only that "Jefferies confirmed to the [Special] Committee that . . .

---

[143] FG_00004706; FG_00004707.

[144] FG_00004707.

[145] FG_00004709.

[146] FG_00004126.  An April 2023 presentation prepared by Jefferies also references ongoing discussions between Jefferies and Irradiant concerning the Merger.  FG00002371.

[147] Proxy at 27.

there had still been no *inbound* interest from any third-party with respect to a full or partial acquisition of the Company."[148]  The minutes, however, discuss no *outreach* by Jefferies, Kahn, or the Special Committee members since Kahn's proposal to acquire Franchise Group three days earlier.

123.  In fact, of the eight Board and Special Committee meetings held between Kahn's May 5, 2023 proposal and the Special Committee's resolution to recommend the Board approve the Merger Agreement, *none* of the meeting minutes there from describe any outreach to third-party potential transaction partners by Jefferies, Kahn, or the Special Committee.[149]  The Proxy likewise makes no other mention of any outreach over this period.

124.  The Special Committee met three times on May 9, 2023.  At the first two meetings, the Special Committee discussed and reviewed "transaction documents" and Jefferies' "update to its preliminary financial analysis."[150]  At the third meeting that evening, the Special Committee reviewed the Merger Agreement, a voting agreement dated May 10, 2023 (the "Voting Agreement"), and Kahn and

---

[148] FG_00002576 (emphasis added).

[149] The Board convened on May 7 and May 9 (twice), and the Special Committee convened on May 8 (twice) and May 9 (thrice).  *See* Proxy at 27–28.

[150] Proxy at 27; FG_00002574; FG_00002598.

Laurence's rollover agreements.[151]  The Special Committee also reviewed an equity commitment letter entered into between the Company and B. Riley pursuant to which B. Riley would contribute $560 million in equity financing.[152]  Jefferies then rendered its opinion that the Merger's $30 per share price – that was never negotiated since B. Riley's opening offer and was at the very bottom of Jefferies' "theoretical purchase price[]" range of $30 to $38 in their Take-Private Analysis for Kahn – was financially fair to the Company's unaffiliated stockholders.  The Special Committee then approved the Merger Agreement.[153]

125.    Later, on May 9, 2023, the Board, excluding Kahn, approved the Merger Agreement.[154]  The Merger Agreement was executed the next day, on May 10, 2023, and prior to the market's open, Franchise Group issued a press release announcing the Merger.[155]

126.    On July 14, 2023, the Company issued the Proxy.

127.    On August 17, 2023, Company stockholders approved the Merger.

---

[151] Proxy at 27–28; FG_00002602–03.

[152] *Id.*

[153] Proxy at 27; FG_00002603.

[154] Proxy at 28; FG_00002515–16.

[155] Proxy at 28.

128.    Sometime between the issuance of the Proxy on July 14, 2023 and August 25, 2023, B. Riley purchased $64.6 million of Kahn's rollover shares.[156]

## VIII.    THE MERGER'S AFTERMATH

129.    The Merger's aftermath has been riddled with controversy, including revelations that Kahn was involved with a fraudulent $300 million investment fund and Kahn's subsequent resignation as the post-Merger Company's CEO.

### A.    Kahn is Implicated in a Criminal Conspiracy

130.    On November 2, 2023, the U.S. Attorney's Office for the District of New Jersey announced that John Hughes ("Hughes"), the former co-founder and executive of the investment fund Prophecy Asset Management LP ("Prophecy"), pleaded guilty to conspiring to defraud dozens of victim investors out of $294 million in funds.  Hughes admitted that he worked with two co-conspirators—a co-founder of Prophecy and the CEO of a multibillion-dollar retail franchise company.  *Bloomberg reported that the latter was Kahn.*[157]

131.    Hughes admitted he helped raise hundreds of millions of dollars by falsely marketing Prophecy as following a low-risk and transparent investment

---

[156] *Unraveling the Money Trail.*

[157] David Voreacos, *Prophecy Fund Co-Founder Pleads Guilty to $294 Million Fraud*, BLOOMBERG (Nov. 2, 2023), https://www.bloomberg.com/news/articles/2023-11-02/prophecy-fund-co-founder-pleads-guilty-to-294-million-fraud?embedded-checkout=true.

strategy in which investors money were spread among many so-called sub-advisers with successful track records. These sub-advisers were also supposed to provide cash collateral equivalent to 10% of the Prophecy funds they were accessing.

132. As part of the fraud, in December 2019—shortly before the fund's collapse—Prophecy showed an astonishing 99 consecutive months of positive returns:

**PROPHECY** Asset Management, LP

**THE FLAGSHIP FIRST-LOSS STRATEGY**

Prophecy Trading Advisors, L.P.
December 2019

**INVESTMENT OBJECTIVE**

Generate absolute returns in all market conditions by providing notional allocations to sub-advisors who invest in equities and other asset classes. Preserve capital and achieve risk-adjusted returns by utilizing a contractual structure that requires each sub-advisor to participate in profits and losses within their allocation. Develop a diversified portfolio of sub-advisors that generate consistent returns, while achieving a favorable risk/reward dynamic for fund investors.

**FUND STRATEGY**

The fund seeks to generate returns by making notional allocations to a diverse group of sub-advisors running a variety of discretionary...

MONTHLY FUND RETURNS (IN %)

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 0.54 | 0.56 | 0.52 | 0.57 | 0.68 | 0.69 | 0.57 | 0.55 | 0.51 | 0.55 | 0.53 | 0.55 | 7.04 |
| 2018 | 0.62 | 0.56 | 0.57 | 0.70 | 0.81 | 0.79 | 0.75 | 0.64 | 0.54 | 0.53 | 0.55 | 0.60 | 7.94 |
| 2017 | 0.67 | 0.54 | 0.62 | 0.67 | 0.67 | 0.65 | 0.52 | 0.61 | 0.55 | 0.59 | 0.60 | 0.67 | 7.61 |
| 2016 | 0.42 | 0.33 | 0.53 | 0.49 | 0.42 | 0.43 | 0.42 | 0.43 | 0.57 | 0.63 | 0.92 | 0.67 | 6.44 |
| 2015 | 0.66 | 0.80 | 0.94 | 0.69 | 0.84 | 0.68 | 0.79 | 1.52 | 0.76 | 0.89 | 0.83 | 0.68 | 10.56 |
| 2014 | 0.82 | 0.72 | 0.70 | 1.01 | 0.82 | 0.52 | 0.70 | 0.59 | 0.49 | 0.56 | 0.62 | 0.40 | 8.24 |
| 2013 | 0.78 | 0.69 | 0.54 | 0.32 | 0.45 | 0.47 | 0.60 | 0.43 | 0.74 | 1.00 | 0.94 | 0.76 | 8.00 |
| 2012 | 1.29 | 0.93 | 0.71 | 0.55 | 0.47 | 0.96 | 0.98 | 0.86 | 1.06 | 0.43 | 0.79 | 0.48 | 9.93 |
| 2011 | | | | | | | | | | 0.65 | 0.30 | 0.91 | 1.86 |

133. In reality, 86% of Prophecy's funds were allocated to just six trading entities controlled by Kahn, who was largely exempted from the collateral requirements. Those entities lost $294 million by March 2020, but Hughes, Kahn, and another co-conspirator concealed the losses from investors and their auditor through bogus transactions and forged documents.[158]

---

[158] *Id.* Market participants have speculated that some of these losses are attributable to Vintage's $92.5 million termination fee owed to Rent-A-Center in April or May 2019. *See*

134.    Kahn agreed to pay more than $200 million to compensate Prophecy's investors, including cash and Franchise Group stock.    According to a trustee overseeing the settlement, however, Kahn failed to pay $1.5 million in cash or turn over $5 million in Franchise Group shares by the January 31, 2024 deadline.[159]

## B.    Additional B. Riley Entanglements with Kahn are Revealed

135.    On December 13, 2023, B. Riley hosted an investor day and published an investor presentation that showed a $201 million loan maturing in 2027 from B. Riley to Kahn's Vintage.[160]  Vintage secured this loan with Franchise Group shares, though it appears that Kahn pledged those *same* shares to compensate Prophecy victims.[161]

136.    On December 21, 2023, Vintage deleted its website.[162]

---

¶40; *see also* Matt Levine, *Don't Forget to Do Your Merger*, BLOOMBERG (Mar. 15, 2019), https://www.bloomberg.com/opinion/articles/2019-03-15/don-t-forget-to-do-your-merger.  From March 2019 to May 2019, Kahn's trading losses for Prophecy increased by about $105 million, from $164.9 million to $270.4 million.  Edwin Dorsey, *Problems at a Billion Dollar Mess*, BEAR CAVE (Feb. 1, 2024), https://thebearcave.substack.com/p/problems-at-a-billion-dollar-mess (hereinafter "*Billion Dollar Mess*").  *See An Unremarkable Deal*.

[159] Donal Griffin & David Voreacos, *B. Riley Client Misses Date to Repay Investors in Collapsed Fund*, BLOOMBERG (Feb. 26, 2024), https://www.bloomberg.com/news/articles/2024-02-26/b-riley-client-misses-date-to-repay-investors-in-collapsed-fund.

[160] *Billion Dollar Mess*.

[161] *An Unremarkable Deal*.

[162] *Billion Dollar Mess*.

137.  On January 21, 2024, *Bloomberg* reported that the "Securities & Exchange Commission carried out interviews in recent months about B. Riley and its relationship with Brian Kahn," and that "the probe is in its early stages."[163]

138.  On January 22, 2024, Kahn resigned as CEO of Franchise Group.[164] Laurence replaced Kahn as CEO.

## IX.    THE MERGER WAS A CONFLICTED CONTROLLER TRANSACTION UNFAIR TO THE COMPANY'S MINORITY STOCKHOLDERS

### A.    Kahn Controlled Franchise Group and Received Non-Ratable Benefits Through the Merger

139.  Kahn was the *de facto* controller of the Company.

140.  Kahn was the Company's largest stockholder.  As of July 13, 2023, Kahn wielded 41.9% of the Company's voting power.

141.  Kahn's control over Franchise Group was not limited to mere voting power.  Kahn exerted actual control over the Company's operations as a Company officer, serving as Franchise Group's President and CEO since October 2019. Additionally, Laurence, the Company's Executive Vice President, is also a partner

---

[163] Donal Griffin & David Voreacos, *SEC Probes B. Riley Deals With Client Tied to Failed Fund*, BLOOMBERG (Jan. 22, 2024), https://www.bloomberg.com/news/articles/2024-01-22/sec-probes-b-riley-deals-with-client-tied-to-failed-hedge-fund.

[164] *Franchise Group CEO steps down amid SEC probe*, InvestmentNews (Jan. 24, 2024), https://www.investmentnews.com/regulation-and-legislation/news/franchise-group-ceo-steps-down-amid-sec-probe-248315.

at Kahn's Vintage.  Not only is Laurence beholden to Kahn for the reasons described

above, but Laurence also owned 1.6% of the Company's voting power.  Together,

the Controller Defendants wielded 43.5% of the Company's voting power.  Indeed,

the Company acknowledged the Controller Defendants' significant control in its

public filings:

> As a result of substantial ownership of our stock, and Mr. Kahn's participation on the Board, Vintage currently has the ability to influence certain actions requiring stockholder approval, including increasing or decreasing the authorized share capital, the election of directors, declaration of dividends, the appointment of management, and other policy decisions. The interests of Mr. Kahn and Vintage may be different from the interests of our other stockholders. While any future transaction with Mr. Kahn and Vintage or other significant stockholders could benefit us, the interests of Mr. Kahn and Vintage could at times conflict with the interests of other stockholders. Conflicts of interest may also arise between us and Mr. Kahn and Vintage, which may result in the conclusion of transactions on terms not determined by market forces. Any such conflicts of interest could adversely affect our business, financial condition and results of operations, and the trading price of our common stock. Moreover, the concentration of ownership may delay, deter or prevent acts that would be favored by other stockholders or deprive our stockholders of an opportunity to receive a premium for their shares of our common stock as part of a sale of us.[165]

142.  Moreover, as discussed above, Kahn exerted situational control over

the sale process and the Special Committee.  For example, Kahn initiated the sale

process and put the Company in play.  Additionally, Kahn has deep ties to Avril, the

---

[165] Franchise Group, Inc., Annual Report (Form 10-K), at 16 (Feb. 28, 2023).

Chairman of the Special Committee, who on multiple occasions unilaterally made decisions and conducted negotiations on behalf of the Special Committee without the participation of Dubin and Herskovits (the other members of the Special Committee), but with Kahn in attendance. As such, the Special Committee failed to act independently from Kahn given Kahn's interference and Avril's deep ties to Kahn.

143. Kahn plainly received non-ratable benefits through the Merger that were not shared with the Company's minority stockholders, including:

- Kahn was able to rollover his equity stake into the post-Merger Company, instead of being cashed out at the unfair Merger price.

- Not only was Kahn able to roll over his equity stake, but the Merger also allowed him to turn his *de facto* control over Franchise Group into mathematical control of the post-Merger Company (with *zero* cost to him).

- Kahn remained the CEO of the post-Merger Company.

- Certain affiliates of Kahn received payments upon closing of the Merger because, pursuant to the terms of a tax receivables agreement entered into with the Company in July 2019 in connection with the Company's acquisition of Buddy's (which will terminate upon the closing of the Merger in accordance with its terms), the former equity holders of Buddy's were to receive payments upon such termination.[166]

---

[166] Franchise Group, Inc., Amendment to Definitive Proxy Statement (Schedule 14A) (July 6, 2023) ("Proxy").

## B.    The Merger Consideration is Unfair

144.    A review of the Company's historical trading prices suggests that the acquisition of the Company for $30 per share does not represent the fair value of Franchise Group's common stock.  The Company touted the $30 per share Merger price as a 31.9% premium to the Company's $22.75 trading price on March 17, 2023,[167] but only two weeks before, on March 1, 2023, Franchise Group's common stock maintained intraday values up to $30.44 per share.  Indeed, $22.75 was the lowest price at which the Company's stock had traded in well over a year, indicating that B. Riley's Original Proposal was opportunistically timed.

145.    Moreover, as discussed, the Management Projections disclosed in the Proxy were manipulated with downward revisions to validate the only price proposal submitted by B. Riley and Kahn and do not appear to be management's best estimate of Franchise Group's future performance.[168]  Comparing the Jefferies Projections to the Management Projections illuminates that in the two months of Merger negotiations with B. Riley and Kahn, Company management significantly reduced their projections.[169]  Compared against the EBITDA values in the Jefferies

---

[167] Proxy at 29.

[168] Proxy at 55–57.

[169] *Id.*

Projections, *the EBITDA values used in connection with the Merger in the Management Projections reflect reductions of 56.2% in FY2023, 55.2% in FY2024, 45.4% in FY2025, and 41% in FY2026.*

146.   Setting aside Jefferies' "theoretical purchase price[]" range of $30 to $38 per share set forth in the Take-Private Analysis that Jefferies presented to Kahn, which were premised on the Jefferies Projections, several of Jefferies' analyses presented to the Special Committee and disclosed in Franchise Group's Schedule 13E-3 filed on June 8, 2023 suggest that the $30 per share Merger price is not fair.

147.   For example, Jefferies' April 14, 2023 presentation listed Franchise Group price targets from five analysts.  The median price target was $39 per share, well above the Merger price.[170]  Even applying a range of discount rates to determine the present value of the median $39 per share price target still reflected a value range of $31.25–$33.50 per share in Jefferies' presentation.[171]  Similarly, Jefferies' final presentation to the Special Committee on May 9, 2023 uses the same price targets of the same five analysts; however, this time, Jefferies uses the lower mean price target of $36.80 per share, rather than the higher median price target of $39 per share

---

[170] Franchise Group, Inc., Transaction Statement (Schedule 13E-3) (June 8, 2023), Ex 99.(C)(1) ("Jefferies April 14 Presentation") at 10.

[171] *Id.*

that was used in the April 14, 2023 materials.[172]  Nevertheless, the mean and median price targets are well in excess of the $30 per share Merger price.

148.   As another example, the sum of the parts analysis Jefferies presented to the Special Committee on April 14, 2023 generates a per share price range of $31–$39.25 per share.[173]  This range, completely above the $30 per share offered in B. Riley's Original Proposal received in March and prior to the Special Committee's only counteroffer, suggests that the Special Committee recognized that $30 per share did not represent fair value for a sale of the Company.

149.   Finally, on a December 13, 2023 B. Riley analyst/investor day call, Kahn conceded that the Merger was an opportunistic acquisition at a bargain-basement price, stating: "as we saw 2 of their businesses . . . what we think were great businesses, suffer because of the pull-up of COVID and the stock go from 50 down to 21, we thought there was an opportunity for B. Riley to buy the company.  So we bid for the company, and we bid $30 a share based on the thought that a $2.8 billion enterprise value was cheap and really based on the fact that there's

---

[172] Franchise Group, Inc., Amended Schedule 13E-3 (July 6, 2023), Ex. 99.(c)(6) ("Jefferies May 9 Presentation") at 11.

[173] Jefferies April 14 Presentation at 29.

2 assets in that $2.8 billion enterprise value that are worth combined significantly more, in our opinion, than that valuation."[174]

### C.    The Merger Process Was Unfair

150.    The Merger negotiation process contains numerous indicia of unfairness, including:

- The Special Committee's financial advisor, Jefferies, had already been engaged in discussions for months with Kahn concerning financing a potential take-private *prior* to being retained by the Special Committee with Kahn's involvement.

- Avril, the Chairman of the Special Committee, was conflicted due to his significant ties to Vintage, Kahn, and Laurence, *and* due to his investments in Vintage. As described above, Avril previously served on Vintage's strategic advisory board, co-invested with Vintage, and received over $4.2 million in Merger consideration from his Company stock ownership that he only held as a result of his relationship with Kahn and Vintage.

- Furthermore, Avril often acted *unilaterally* on behalf of the Special Committee, without the participation of the other Special Committee members, including by: (i) pre-selecting Wachtell as the Special Committee's advisor; (ii) meeting with potential financial advisors; (iii) discussing Jefferies's financial analyses; (iv) meeting with Kahn's legal counsel; and (v) delegating the Special Committee's powers to negotiate with third parties, including B. Riley, to Kahn. Indeed, Avril's unilateral negotiations resulted in him having to "convene[] a number of information sessions with the independent directors of the Company (*including the members of the Special Committee*), to provide

---

[174] B. Riley Financial, Inc. - Analyst/Investor Day Transcript (Dec. 12, 2023), BamSEC, https://www.bamsec.com/transcripts/1bb434f0-b7d5-41b9-b41b-419fc3c72a2d.

periodic updates regarding a potential transaction and alternatives to a potential transaction."[175]

- Avril's utter failure to utilize negotiating leverage demonstrates his controlled mindset, *i.e.*, his actions demonstrate his predisposition to pleasing Kahn. For instance, Avril allowed Kahn to conduct negotiations in connection with the sale process on behalf of the Company even *after* Kahn informed Avril that he would *only* consider engaging with bidders that contemplated a role for Kahn in a post-transaction entity. As another example, after Kahn precipitously told the Board that B. Riley wanted to change the transactional structure so that Kahn would control the post-Merger Company, the Special Committee, spearheaded by Avril, entirely failed to discuss or address the change to the merger structure, seek additional merger consideration, or engage in substantive negotiations with Kahn and B. Riley.

- Additionally, in contravention of the Special Committee's conditional authorization that allowed Kahn to conduct negotiations with potential bidders, including B. Riley, on the Company's behalf, Kahn failed to keep the Special Committee reasonably informed regarding those negotiations. Instead, Kahn had near free rein to negotiate the sale process with B. Riley, his long-time business partner, without meaningful assessment, feedback, and/or direction from the Special Committee.

- After Kahn changed the Merger structure, proposing to acquire the Company himself, at the May 5, 2023 Board meeting, the Special Committee, spearheaded by Avril, agreed to maintain the unnecessarily expedited May 10, 2023 deadline to reach an agreement purportedly *set by B. Riley*. Had Avril and the Special Committee taken time to consider Kahn's proposal, the Special Committee may have been able to obtain a more favorable per share Merger price after the May 10, 2023 earnings call.

---

[175] Proxy at 26.

**D.    The Proxy and Supplemental Disclosures Were Materially Misleading and Incomplete**

151.    The Proxy and related Supplemental Disclosures are materially false and misleading.

**i.    The Proxy Misled Public Stockholders as to Key Events Related to the Merger Negotiations**

152.    Despite the awareness of the *WSJ* Article by at least Kahn and Laurence,[176] the Proxy does not even disclose the *WSJ* Article, let alone discuss how the Board responded to its publication, or that Kahn expressed an interest in taking the Company private in January 2023.  The Proxy also fails to disclose that Kahn reached out to Jefferies, around the time of the *WSJ* Article and worked with them through early March 2023 regarding debt financing in connection with a potential recapitalization transaction involving the Company (*i.e.*, a take-private).  During this time, Jefferies entered into a confidentiality agreement, dated January 16, 2023, and was provided with a Company financial model (materially different from the Management Projections) and provided the Take-Private Analysis.[177]  None of this information was ever disclosed to stockholders in the Proxy.  Jefferies' extensive dealings with Kahn and Company management related to debt financing for a

---

[176] *See* supra ¶¶ 63, 121; *see also* FG_00004168 (Kahn forwarding an email referencing the WSJ Article to Laurence).

[177] FG_00004115.

potential take-private transaction that contemplated Kahn's rollover in the three months leading up to B. Riley's Original Proposal, and right before the Special Committee retained Jefferies, is material information that Franchise Group stockholders would want to know to evaluate Jefferies' and the Special Committee's independence, as well as the reliability of Jefferies' fairness opinion, which was at the very bottom of the "theoretical purchase price[]" range of $30 to $38 in its Take-Private Analysis.

153.   The Proxy does not disclose that Kahn led a discussion of the Merger during a May 2, 2023 Board meeting or that he told the Board "he was prepared to move forward with the proposal from B. Riley."[178]  The Proxy instead misleadingly states that Kahn discussed only Company operations and performance before leaving the meeting.[179]  Kahn's participation in this discussion and unilateral statement that he was prepared to move forward with a transaction would be material information that Franchise Group stockholders would want to know to evaluate Kahn's interest in the Merger.

154.   Finally, the Proxy does not disclose how Laurence entered the sale process to become a member of the buyer consortium (although it is reasonably

---

[178] FG_00002545.

[179] Proxy at 26.

conceivable that he interacted with Jefferies in connection with their Take-Private Analysis and related discussions with Kahn). Likewise, the Supplemental Disclosures do not disclose how Eric Seeton (Franchise Group's Chief Financing Officer), Andrew Kaminsky (Franchise Group's Executive Vice President and Chief Administrative Officer), and Todd Evans (Franchise Group's Chief Franchising Officer) entered the sale process to become members of the buyer consortium.[180]

> **ii.   The Proxy Failed to Include Information About Kahn and B. Riley's Long-Standing Business Relationship**

155.   Glaringly, the Proxy fails to document the close, long-standing, and legally problematic ties between Kahn and B. Riley. The substance and breadth of this relationship provide evidence that Franchise Group and Kahn's ability to negotiate a Merger with B. Riley that was fair to minority stockholders was compromised.

156.   In particular, the Proxy does not disclose the close business relationship between Kahn's Vintage and Riley's B. Riley. As described above, in 2018, B. Riley served as an equity and debt participant in Vintage's purchase of Rent-A-Center. When the Rent-A-Center transaction failed to close, B. Riley was the guarantor of

---

[180] Franchise Group, Inc., Amendment to Definitive Proxy Statement (Schedule 14A) (July 6, 2023).

Vintage's termination fee.  Rent-A-Center sued Vintage and B. Riley to recover this fee.

157.    Starting in 2018, Vintage and B. Riley served as co-investors in B&W. Similar to the Rent-A-Center debacle, B&W sued Vintage and B. Riley for allegedly trying to drive B&W to the brink of bankruptcy so that they could acquire a majority stake in B&W at a bargain price.

158.    And in 2020, B. Riley provided financing support to Franchise Group in its acquisition of American Freight.

159.    None of the Rent-A-Center, B&W, or American Freight transactions were mentioned in the Proxy.  Franchise Group also failed to disclose that two of these deals ended with Vintage and B. Riley serving as co-defendants in civil litigation.

160.    And sometime between July 14, 2023 and August 25, 2023, B. Riley purchased $64.6 million worth of the Franchise Group shares that Kahn rolled over into the post-Merger Franchise Group.  The Proxy did not inform minority stockholders of any agreement for B. Riley to purchase Kahn's rollover shares.

161.    Without information about any of these transactions, the Proxy lacked material facts that show the significant and long-standing ties between Franchise Group, Kahn, and B. Riley.

### iii.    Franchise Group Did Not Acknowledge the Criminal Legal Issues Facing Kahn and B. Riley

162.    Worse still, Franchise Group did not disclose—and is likely trying to conceal—the fact that B. Riley has aided and abetted Kahn in defrauding investors in the Prophecy fund.

163.    Kahn managed 86% of the Prophecy investments.  He illegally covered up $294 million in lost Prophecy funds.

164.    In fact, Kahn's impetus for Franchise Group's take-private Merger may have been to avoid public company scrutiny of his fraudulent transactions.  The Proxy does not provide information regarding this key issue.

165.    Also, new details of loans by B. Riley to Kahn show a longer and closer relationship than previously known.  They also raise questions about whether Franchise Group should have disclosed more details about some of the loans years ago, when the Company's board included two B. Riley executives as directors.

166.    B. Riley's loans to Kahn also date back longer than previously known. B. Riley made at least 10 different loans to Kahn and entities he controlled from 2018 through 2023, according to UCC financing statements filed with state agencies in Nevada, Delaware and Florida.  The UCC filings do not show the amounts borrowed, but a presentation generated by an investment bank that provided financing to B. Riley as part of the Merger indicated that the principal balance on

71

Kahn's loans was $154 million by mid-2023. The Proxy does not disclose the existence of these loans.

167.   Kahn has agreed to pay more than $200 million, including cash and Franchise Group stock, to compensate Prophecy's investors. At the same time, Kahn has pledged Franchise Group stock as collateral for a $200 million loan from B. Riley to Vintage. Unsurprisingly, Kahn's double-pledging of Franchise Group stock also was not disclosed in the Proxy.

168.   Minority stockholders were not informed of either B. Riley's longtime financing of various Kahn-controlled operations or B. Riley and Kahn's connections to the Prophecy fraud, even though Kahn obviously had knowledge of their relationship and their shared involvement in the fraud. Thus, the Proxy did not adequately show the close ties and sway that B. Riley had with respect to Kahn and Franchise Group.

## CLASS ALLEGATIONS

169.   Plaintiffs bring this action individually and as a class action pursuant to Rule 23 on behalf of themselves and all other stockholders whose shares of the Company's common stock were exchanged for $30 per share in cash in the Merger (the "Class"). The Class excludes the Defendants and any persons or entities affiliated with or controlled by Defendants as of the closing of the Merger.

170.    This action is properly maintainable as a class action.

171.    A class action is superior to other available methods for fair and efficient adjudication of this controversy.

172.    The Class is so numerous that joinder of all members is impracticable. The number of Class members is believed to be in the thousands and Class members are likely scattered across the United States.

173.    There are questions of law and fact which are common to all Class members and which predominate over any questions affecting only individuals, including, without limitation:

    a.    Whether the Merger is entirely fair;

    b.    Whether Defendants breached their fiduciary duties or aided and abetted in the breach of fiduciary duties to Plaintiffs and the Class;

    c.    The existence and extent of any injury to Plaintiffs and the Class caused by any breach;

    d.    The proper measure of the Class's damages; and

    e.    The appropriateness of any other relief, including any equitable remedies.

174.    Plaintiffs' claims and defenses are typical of the claims and defenses of other Class members, and Plaintiffs have no interests antagonistic or adverse to the interests of other Class members.  Plaintiffs will fairly and adequately protect the interest of the Class.

175.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

176.   Defendants have acted in a manner that affects Plaintiffs and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

177.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other Class members or substantially impair or impede their ability to protect their interests.

## COUNT I

**(Claim for Breach of Fiduciary Duty Against the Controller Defendants)**

178.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

179.   The Controller Defendants were the controlling stockholders of the Company.  As such, the Controller Defendants owed Plaintiffs and the Class the utmost fiduciary duties of care, loyalty, good faith, and candor.

180.   At all relevant times, the Controller Defendants had the power to control, influence, and cause—and actually did control, influence, and cause—the Company to enter into the Merger Agreement.  The Merger consideration was inadequate and unfair, reflecting an unfair price and unfair process, and the Proxy and related filings were materially misleading and contained material omissions.

181.   Plaintiffs and the Class suffered damages in an amount to be determined at trial.

182.   Plaintiffs and the Class do not have an adequate remedy at law.

## COUNT II

**(Claim for Breach of Fiduciary Duty Against the Director Defendants)**

183.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

184.   As directors of the Company, the Director Defendants owed Plaintiffs and the Class the utmost fiduciary duties of care, loyalty, good faith, and candor in their capacity as Company directors.

185.   These duties required them to place the interests of Company stockholders above their personal interests and the interests of any controller, third party, and/or themselves.

186.   Through the events and actions described herein, the Director Defendants breached their fiduciary duties by approving the Merger without maximizing the Merger consideration and ensuring that the Merger was entirely fair to Plaintiffs and other public stockholders.

187.   Plaintiffs and the Class suffered damages in an amount to be determined at trial.

188.   Plaintiffs and the Class do not have an adequate remedy at law.

## COUNT III

### (Claim for Breach of Fiduciary Duty Against the Officer Defendants)

189.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

190.   As the senior officers of the Company, the Officer Defendants owed Plaintiffs and the Class the utmost fiduciary duties of care, loyalty, good faith, and candor.

191.   These duties required the Officer Defendants to place the interests of Company stockholders above their personal interests and the interest of any controller, third party, and/or themselves.

192.   Through the events and actions described herein, the Officer Defendants breached their fiduciary duties by orchestrating the Merger without

maximizing the Merger consideration and ensuring that the Merger was entirely fair to Plaintiffs and other public stockholders.

193.  Upon information and belief, by virtue of their roles at the Company, the Officer Defendants would have been involved in drafting and disseminating a Proxy that they knew or should have known to be misleading and materially incomplete.

194.  These breaches of duty in their capacity as Franchise Group officers are not exculpable, as the Company did not amend its certificate of incorporation to provide exculpation for its officers pursuant to 8 *Del. C.* § 102(b)(7).

195.  Plaintiffs and the Class suffered damages in an amount to be determined at trial.

196.  Plaintiffs and the Class do not have an adequate remedy at law.

## COUNT IV

### (Claim for Aiding and Abetting Against B. Riley)

197.  Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

198.  As alleged above, the Controller Defendants, the Director Defendants, and the Officer Defendants breached fiduciary duties of loyalty and care.

77

199.    B. Riley aided and abetted the foregoing breaches of fiduciary duties by knowingly participating in and facilitating the Controller Defendants', Director Defendants', and Officer Defendants' implementation and oversight of the sale process leading to the Merger. ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████

200.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

201.    Plaintiffs and the Class do not have an adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in favor of themselves and the Class and against each Defendant as follows:

78

A.      Declaring that this action is properly maintainable as a class action, and certifying Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

B.      Declaring that the Controller Defendants were the Company's controlling stockholders;

C.      Declaring that the Controller Defendants, Director Defendants, and Officer Defendants breached their fiduciary duties to Plaintiffs and the Class;

D.      Declaring that B. Riley aided and abetted the Controller Defendants', Director Defendants', and Officer Defendants' breaches of fiduciary duty;

E.      Awarding damages, including rescissory damages and/or quasi-appraisal damages, to Plaintiffs and the Class;

F.      Ordering disgorgement of the Controller Defendants' and B. Riley's profits (plus pre-judgment and post-judgment interest) resulting from the Controller Defendants' breaches of fiduciary duty and B. Riley's aiding and abetting thereof as alleged herein;

G.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and expert witnesses' fees and other costs;

H.      Awarding pre- and post-judgment interest from the effective time of the Merger to and including the date of payment; and

I.      Granting Plaintiffs and the Class such further relief as the Court deems just and equitable.

Dated:  July 9, 2024

OF COUNSEL:

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jeroen van Kwawegen
Ed Timlin
Christopher J. Orrico
Shiva Mohan
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

**KESSLER TOPAZ MELTZER & CHECK, LLP**
J. Daniel Albert
Michael McCutcheon
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**BLOCK & LEVITON LLP**
Jason Leviton
Joseph Kiefer
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Daniel E. Meyer*
Daniel E. Meyer (Bar No. 6876)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
(302) 364-3600
daniel.meyer@blbglaw.com

*Counsel for Plaintiffs Brian Gale, Mark Noble, and Terry Philippas*

**BLOCK & LEVITON LLP**

*/s/ Kimberly A. Evans*
Kimberly A. Evans (Bar No. 5888)
Irene R. Lax (Bar No. 6361)
Robert Erikson (Bar No. 7099)
3801 Kennett Pike, Suite C-305
Wilmington, DE 19807
(302) 499-3600
kim@blockleviton.com
irene@blockleviton.com
robby@blockleviton.com

*Counsel for Plaintiff Lawrence Bass*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr.
7817 Ivanhoe Ave., Suite 102
La Jolla, CA 92037
(858) 914-2001

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel E. Meyer, hereby certify that, on July 12, 2024, the foregoing *Public*

*[Redacted] Version of the Verified Class Action Complaint* was filed and served via

File & Serve*Xpress* upon the following counsel of record:

Kimberly A. Evans, Esq.
Irene R. Lax, Esq.
Robert Erikson, Esq.
BLOCK & LEVITON LLP
3801 Kennett Pike, Suite C-305
Wilmington, DE 19807


*/s/ Daniel E. Meyer*
Daniel E. Meyer (Bar No. 6876)