```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3                                      .  Chapter 11
     IN RE:                            .  Case No. 24-12480 (LSS)
4                                      .
     FRANCHISE GROUP, INC.,            .  (Jointly Administered)
     et al.,                           .
5                                      .
                                       .  Courtroom No. 6
6               Debtors.               .  824 North Market Street
                                       .  Wilmington, Delaware 19801
7                                      .
                                       .  Friday, January 31, 2025
8    . . . . . . . . . . . . . . . .   10:00 a.m.

9               TRANSCRIPT OF STATUS CONFERENCE HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Debra Sinclair, Esquire
                               WILLKIE FARR & GALLAGHER LLP
13                             787 Seventh Avenue
                               New York, New York 10019
14

15                             Mark Stancil, Esquire
                               WILLKIE FARR & GALLAGHER LLP
16                             1875 K Street, N.W.
                               Washington, DC 20006
17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           LaCrisha Harden, ECRO
21
     Transcription Company:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
24

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

1   <u>APPEARANCES (Continued)</u>:

2   Ad Hoc Group of
    Freedom Lenders:              Thomas Lauria, Esquire
3                                 WHITE & CASE LLP
                                  200 South Biscayne Boulevard
4                                 Miami, Florida 33131

5   For the First Lien
    Group:                        Daniel Fliman, Esquire
6                                 PAUL HASTINGS LLP
                                  MetLife Building
7                                 200 Park Avenue
                                  New York, New York 10166
8
9   For the Settlement
    Related Liquidating
10  Trust:                        Brian Shaw, Esquire
                                  COZEN O'CONNOR
11                                1234 North Wacker Drive
                                  Suite 1800
12                                Chicago, Illinois 60606

13  For the U.S. Trustee:         Timothy Fox, Esquire
14                                OFFICE OF THE UNITED STATES TRUSTEE
                                  844 King Street, Suite 2207
15                                Lockbox 35
                                  Wilmington, Delaware 19801
16
    For the Committee:            Bradford Sandler, Esquire
17                                PACHULSKI STANG ZIEHL & JONES LLP
                                  780 Third Avenue
18                                34th Floor
                                  New York, New York 10017
19
    For JPMorgan Chase:           Andrew Sorkin, Esquire
20                                LATHAM & WATKINS LLP
                                  555 Eleventh Street, NW
21                                Suite 1000
                                  Washington, DC 20004
22

23

24

25

1  (Proceedings commenced at 10:02 a.m.)

2          THE COURT:  Good morning.  This is Judge

3  Silverstein and we're here for a status conference in

4  Franchise Group.

5          So let me turn it over to debtors counsel to

6  start. And I see --

7          MS. SINCLAIR:  Yes, Your Honor.

8          THE COURT:  Excuse me a moment.  LaCrisha, I see

9  we have a lot of people who just entered the room.  Okay,

10  let's give a moment for that.

11      (Pause)

12          THE COURT:  Okay, thank you.  We can start.

13          MS. SINCLAIR:  Thank you, Your Honor.  Good

14  morning.  Debra Sinclair from the law firm Willkie Farr &

15  Gallagher for the debtors.

16          Thank you for making time for us this morning.

17  Before we get into the meat of the status conference we

18  thought it might make sense, in light of the recent

19  reassignment of the case from Judge Dorsey to Your Honor,

20  just to give you a very brief lay of the land on what's

21  happened so far and where things stand today, how we got to

22  where we are.

23          So, as you may know, we filed these cases in early

24  November for Franchise Group, which is the owner of four

25  Franchise based retail chains.  Those are Pet Supplies Plus,

which is a pet goods store; The Vitamin Shoppe, which is
focused on health and wellness merchandise; Buddy's Home
Furnishings, which is a rent to own furniture shopping
center; and American Freight, which sells discounted
furniture and appliances.

Our capital structure, at a high level, consists
of a DIP and a first lien loan, both of which are represented
by Paul Hastings.  I see members of the Paul Hastings team on
right now, Mr. Goldstein, Mr. Fliman, and Mr. Evans.  We have
an ABL represented by Latham & Watkins. I believe Mr. Sorkin
is on for them this morning.  And we also have a second lien
term loan and a Holdco level term loan, both of which are
represented by Mr. Lauria and Mr. Shore at White & Case, and
who are collectively referred to in these cases as the
Freedom Lender Group.

So, when we filed the cases in November we went in
with an RSA and a Chapter 11 plan pursuant to which the DIP
loan and the prepetition first lien debt would convert into
100 percent of the ownership of the reorganized company
subject to higher and better offers being identified in a
sale process.  Since that point I would say that we have been
focused on a couple of key workstreams in the cases:

One is that sale process, which is still ongoing,
and that is for the three operating business lines; so Pet
Supplies, Vitamin Shoppe and Buddy's.  As Your Honor already

1 knows, we have already completed a chain liquidation of

2 American Freight as well as a subsequent private sale of

3 certain leases and intellectual property related to that

4 business.  So, our bid deadline for the three remaining

5 operating businesses is coming up this Monday, February 3rd.

6 So, that sale process is still ongoing.

7         The second biggest workstream I would say is

8 making sure that the company is operating in a stable fashion

9 in the ordinary course.  We certainly hit some bumps along

10 the way in that regard but we largely have been able to

11 accomplish that goal.  At the first day stage the Freedom

12 Lender Group objected to our DIP motion, our critical vendors

13 motion and our bidding procedures motion and we spent a

14 significant amount of time, you know, both the group among

15 you today, in Court and out of Court addressing the issues

16 around that relief.  We ultimately did obtain approval of

17 those motions.

18         Final core workstream is negotiating the Chapter

19 11 plan.  That has also been marked by significant litigation

20 in the form of a motion by the Freedom Lenders to terminate

21 the debtors exclusivity period at the two holding company

22 entities where that group has their lien.  Judge Dorsey

23 denied that motion in December after oral arguments and he

24 also denied certain alternative relief that was sought in

25 that motion that requested either allowing the lenders to

1  exercise their non-bankruptcy remedies at those boxes or,

2  otherwise, appointing a Chapter 11 Trustee at those boxes.

3       So since then, we have been focused really on

4  trying to negotiate the terms of a plan and attempting to

5  resolve objections to our disclosure statement, which is on

6  file, and to our plan to really get the parties to coalesce

7  around a consensual deal. I think that takes us to the

8  present day and the reasons that we asked you to hold this

9  status conference.

10      So, as you may know, we had February 6th reserved

11  with Judge Dorsey for a hearing on our disclosure statement.

12  We understand that you also have that date available.  We are

13  happy to let you know that we expect that by early next week,

14  in advance of that February 6th date, we will have finalized

15  a deal that will settle the collective issues as they relate

16  to the debtors, the official committee of unsecured

17  creditors, who I should have introduced earlier, I apologize,

18  represented by Mr. Sandler and Mr. Feinstein of Pachulski,

19  and the first lien lenders.  So really a three-way settlement

20  among those groups.  We expect that that would mean the

21  disclosure statement would proceed uncontested as it pertains

22  to the official committee of unsecured creditors.

23      I think the broader point and the reason we're

24  here in front of you today is that, unfortunately, we have

25  not made as much progress as it pertains to the intercreditor

1  issues that remain outstanding between the first lien lenders

2  and the Freedom Lender Group who, again, hold both second

3  lien claims and Holdco level claims.  You may have seen on

4  the docket that the Freedom Lender Group is asserting a

5  number of objections to the disclosure statement and, you

6  know, implied in those objections or objections to the terms

7  of the plan.

8          We have been engaged in discussions in the

9  background with the various creditor constituents in the

10 capital structure including the Freedom Group to try to

11 resolve those objections and to reach a global deal but at

12 this point, at least from the debtors perspective, we believe

13 that the appointment of a judicial mediator to try to help

14 the parties more effectively attempt to bridge their gap is

15 the next best step.

16         From our perspective the case is a good candidate

17 for mediation not because there is so much litigation but

18 also because, again, at least from our perspective, the

19 parties are just having difficulty communicating effectively

20 on those particular inter-creditor issues and we believe

21 there could be a lot of value to one of your judicial

22 colleagues and during the conversation evaluating the

23 potential legal arguments on both sides and maybe helping the

24 parties, you know, communicate with each other a little bit

25 more constructively about bridging the gap.

1          So, as it pertains just to this question of should

2     we mediate, we have been working through this issue in real

3     time, I would say, over the last 48 hours, with all of the

4     parties that you see in front of you today.  At the time we

5     reached out to Chambers we believed that we had all but one

6     party in the capital structure on board with the concept of

7     mediating.  I think its been a little bit more of a fluid

8     conversation in the time since. Parties have continued to

9     think about whether it made sense.  And all of that to say,

10    we were hoping to come to you today with the ability to

11    announce general consensus around mediation.  As I understand

12    it we're not there yet.

13          From our perspective, the main concern is

14    particularly about adding any more days to the case timeline

15    at this point.  One way that we would like to suggest is the

16    debtors to perhaps avoid any sort of unnecessary timeline or

17    pushing hearing dates is to appoint a mediator immediately

18    while we pursue approval of the disclosure statement on the

19    anticipated February 6th timeline in parallel.  But either

20    way, Your Honor, the debtors do think we have an obligation

21    at this juncture to try to push and encourage the parties

22    towards a resolution to minimize the fighting and the amount

23    of time and money that is being spent on litigation.  We

24    believe that the immediate appointment of a mediator is the

25    best way to put an end to that.

1    I will just conclude by saying, before I open it

2 up to, you know, any questions from Your Honor and statements

3 the other creditors would like to make, we think that, you

4 know, regardless of when we appointment a mediator, when we

5 start, that this doesn't have to be a long or drawn-out

6 process.  We can start with a deadline to complete the

7 mediation within, call it, two or three weeks to the

8 mediators appointment so that we can figure out quickly

9 whether this process can break the logjam.

10    Look, again, we don't want to speak on behalf of

11 any of the other creditors or speak out of turn for anyone

12 else in the capital structure, so I will stop there for the

13 moment, ask if Your Honor has any questions, and, otherwise,

14 suggest that the other creditor constituencies be given a

15 chance to weigh-in on the topic.

16    THE COURT:  Does the mediation affect the sale

17 timeline as well as the plan timeline?

18    MS. SINCLAIR:  So, from our perspective there are

19 really two discreet issues.  So, you know, the way that the

20 debtors see it the sale process can proceed on its

21 anticipated timeline while we negotiate these issues that are

22 embedded in the Freedom Lenders objections in parallel.  So,

23 it would really be a matter of, you know, the disclosure

24 statement and the plan hearings being the places where those

25 topics are visited and adjudicated as opposed to the sale

1  which I view as, you know, being on a parallel track.

2  THE COURT:  Okay, so your timeline is basically an

3  immediate timeline in terms of mediation.

4  MS. SINCLAIR:  Yes.

5  THE COURT:  When was confirmation scheduled?

6  MS. SINCLAIR:  So, we had March 18th and 19th

7  reserved for the confirmation hearing with Judge Dorsey.

8  THE COURT:  Okay.  Let me hear from others and you

9  can speak about anything you want to speak about.  How about

10  the Freedom Lenders first.

11  MR. LAURIA:  Can you hear me,  Your Honor?

12  THE COURT:  I can, Mr. Lauria.

13  MR. LAURIA:  Thank you.  Thomas Lauria, White &

14  Case.  I am here with my partners, Chris Shore and Andrew

15  Zatz.  We represent Pimco Asset Management and Irradiant

16  Capital Partners who together hold 93 percent of

17  approximately $150 million of second lien opco claims that

18  were issued by Franchise Group and about $515 million of

19  first lien debt that was issued by Franchise Group's

20  immediate parent, Freedom VCM, Inc., and its parent, Freedom

21  VCM Interco.  I am going to refer to Franchise Group and its

22  subsidiaries as the Opco's, just to make things simple, and I

23  am going to refer to Freedom VCM and Freedom VCM Interco as

24  the Holdco's.  Again, just to have some simplistic

25  terminology.

1          The Holdco's were created for the purpose of

2     financing the management buyout of the Opco's which occurred

3     in August of 2023, a mere 14 months before these cases were

4     commenced.  All of the Holdco first lien debt was put in

5     place in August of 2023 to fund the MBO.  The Opco 2-L debt

6     is secured by a junior lien on all of the Opco assets that

7     secure payment of $1.1 billion of 1-L debt and an additional

8     approximately $200 million of ABL debt at this time.

9          None of the Opco debt is secured by or has any

10    claim against the Holdco's.  The Holdco first lien debt is

11    secured by a first lien on 100 percent of the equity in

12    Franchise Group.  As per the debtors schedules, the Holdco

13    lenders are the only non-insider creditors of the Holdco's.

14    The architects of the MBO were the company's former CEO,

15    Brian Kahn, who was represented in connection with the

16    transaction by Willkie and was not proposed to be counsel to

17    all of the debtors, and B. Riley, a private equity shop, who

18    provided equity capital in connection with the transaction.

19         Within months of the MBO's consummation it became

20    apparent that there were serious disclosures and other issues

21    with the transaction.  The SEC has launched civil and

22    criminal investigations which are currently pending.  Mr.

23    Kahn has been dismissed from his position as CEO effective as

24    of January 2024.

25         We believe that the Holdco's and the Holdco

1  lenders have material claims against the Opco's and various

2  current and former insiders and third parties including, in

3  particular, Mr. Kahn and B. Riley.  As of the petition date

4  the boards of our Holdco's were comprised entirely of people

5  who are also directors of Franchise Group.  We believe that

6  this fact pattern creates serious intractable conflicts of

7  interest not only for the Holdco boards but also for proposed

8  debtors counsel, Willkie, who would represent not only the

9  Opco's but also the Holdco's.

10          Prior to the commencement -- and incidentally,

11  Your Honor, the application to retain Willkie has been

12  carried to this point is currently set for hearing on the 6th

13  of February along with the disclosure statement.  Prior to

14  the commencement of these cases all for the debtors,

15  including the Holdco's, entered into a restructuring support

16  agreement, counsel referred to it as the RSA, with a group of

17  first lien lenders pursuant to which, among other things, the

18  debtors were required to do four key things:

19          Number one, all of the debtors would promptly

20  commence Chapter 11 cases.

21          Number two, upon filing they would seek approval

22  of $750 million of DIP financing comprised of $250 of new

23  money and $500 million of rolled up prepetition first lien

24  debt.  The DIP was to be secured by priming liens on all

25  assets of the Opco's and guarantee by the Holdco's even

1  though the Holdco's had no need to borrow under the DIP and

2  the DIP, in fact, prohibited DIP proceeds from being up

3  streamed to the Holdco's.

4  Number three, upon filing the debtors would launch

5  a quickie sale process to be conducted through the

6  Thanksgiving, Christmas, and New Year's holiday seasons.

7  Number four, upon filing the debtors would file,

8  and they did file, and launch a process to quickly obtain

9  confirmation of a plan pursuant to which the Opco 1-L would

10  be converted into 100 percent of the equity in the

11  reorganized company.  The 2-L debt would be wiped out for no

12  consideration.  The Holdco's equity in Franchise Group would

13  be cancelled.  The Holdco's claims and causes of action would

14  be released or transferred to the reorganized company. And

15  the Holdco's would be dissolved and Holdco debt would be

16  wiped out for no consideration.

17  The debtors then filed these Chapter 11 cases and

18  have taken all of the actions required by the RSA.  The

19  Holdco debtors entered into the RSA without independent

20  advice, without engaging negotiations with their only

21  creditors, my clients, the holders of the Holdco 1-L debt,

22  and without even meeting separately.  There is no evidence

23  that they have taken any action to perform their fiduciary

24  duties or taken any action whatsoever to protect or preserve

25  their assets or the interests and rights of their creditors.

1  And, in fact, the evidence so far has shown that the only

2  reason the Holdco's entered into the RSA and filed Chapter 11

3  is because the Opco 1-L group, who have no claims against the

4  Holdco's, demanded it as a condition of not liquidating the

5  Opco's.  And the Holdco's had no one to stand up for them.

6         So, on the morning of November 4th, my clients

7  thus woke up to find themselves tied to the train tracks with

8  a speeding locomotive on its way to spell their doom.  Within

9  90 to 120 days their entire investment, over $600 million,

10  was to be completely wiped out and in the minds of the

11  debtors and the 1-L group the case was effectively over

12  before it started.

13         At the Holdco's, which are separate estates and

14  there is no suggestion by anyone that they should be

15  substantively consolidated with the Opco's, all of the

16  hallmarks of the Chapter 11 process have been dispensed with.

17  The rehabilitative process, the breathing spell, the typical

18  exercise of creditor investigation and analysis, including

19  with respect to value and recovery maximization, and creditor

20  negotiation.  None of that has occurred here.

21         Your Honor wrote, to confirm a plan under a one-

22  sided deal with the Opco 1-L that, effectively, gives them

23  the keys to the company and whitewashes everything associated

24  with the August 2023 management buyout including the Holdco

25  debt.  In response, we did everything you would expect.  We

1  objected to the DIP arguing that it should be smaller, that

2  the rollup was inappropriate, that it was overly expensive,

3  that it improperly locked in terms of a plan and it should

4  not, in any event, be a Holdco obligation.  We objected to

5  the sale process arguing that it was not designed to maximize

6  value but rather to merely validate the turnover of the

7  company to the 1-L's.

8           We objected to the debtors critical vendor motion

9  that, effectively, inverted the codes recovery waterfall by

10 using $100 million of priming DIP proceeds to pay off

11 essentially all of the Opco's unsecured trade debt even

12 though the debtors plan, which had already been filed,

13 provided a zero recovery to the Opco's second lien debt.  We

14 also filed a motion seeking relief that we thought was needed

15 to protect the rights and interests of the Holdco 1-L.

16          First, we sought relief from the automatic stay to

17 prevent the Holdco lenders to exercise remedies with respect

18 to their collateral. The equity in FRG, which the evidence

19 presented established was valuable, before it could be wiped

20 out the debtors plan.  We sought the termination of

21 exclusivity at the Holdco's so that as the only creditors of

22 the Holdco's we could file a simple confirmable plan as

23 compared to the plan that is on file which cannot be

24 confirmed absent the consent of the Holdco lenders because

25 we're the only  non-insider creditors of the Holdco's.  We

1  sought the appointment of a Chapter 11 Trustee at the

2  Holdco's because their board was incapable of being an

3  appropriate fiduciary for the Holdco's and their creditors

4  based on their similar roles on behalf of the Opco debtors.

5       After certain modifications were made to the DIPs,

6  the critical vendor motion, and the sale process, all three

7  motions were granted.  Our requests for relief at the Holdco

8  with respect to the stay exclusivity and a Trustee were

9  denied with the Court, we believe, failing to properly

10  recognize that the Holdco's are separate estates with their

11  own creditors as required by Owens Corning in the Third

12  Circuit and Augie/restivo which is cited too frequently as

13  the standing for the proposition that each debtors separate

14  estate must be respected.

15       We promptly appealed, we quickly filed our opening

16  brief and we asked Judge Ambro, who was hearing the appeals,

17  to expedite argument and decision so that the plan process

18  can be informed by the outcome of the appeals.  As I trust is

19  readily apparent, the plan raises material issues of fact and

20  law.  Very simplistically, say again, we do not understand

21  how a Holdco plan can be confirmed without an accepting class

22  of impaired non-insider creditors.  And if that is true, two

23  important things, I think, are revealed:

24       Number one, it is a waste of everyone's time and

25  money to move the plan process forward with respect to the

1 Holdco's, something that the debtors don't have the option of

2 letting go of because the Opco lenders have required, as a

3 condition to confirmation of the plan at the Opco's, the

4 Holdco plan has to be confirmed as well.

5          Perhaps more importantly, in the absence of a

6 legitimate shot at confirmation, the only purpose of filing

7 Holdco's is to put the automatic stay in place to prevent the

8 exercise of our rights with respect to our collateral, the

9 stock and Franchise Group, until it can be cancelled by the

10 Opco plan.  I know of no bankruptcy principle which would

11 permit this to occur and I know of no precedent that would

12 permit this to occur.

13          Your Honor, we believe that approval of a

14 disclosure statement and the commencement of solicitation

15 should await a ruling on our appeals which we believe will

16 materially impact what the plan that is solicited should

17 contain and failing that, we believe, that the process should

18 nevertheless be designed to permit some effort to attempt to

19 achieve a resolution of the disputes that remain between and

20 among the parties and hopefully with the assistance of a

21 mediator.

22          We think it is impractical and inefficient to

23 launch a disclosure statement that discloses a plan that is

24 currently unacceptable and we believe unconfirmable, and to

25 start soliciting votes on that plan rather than waiting to

1  see if the mediation can produce a plan that can be supported

2  across the board.  We also want to make sure that we have

3  adequate time to fully develop and properly present our case

4  with respect to the issues related to the disclosure

5  statement.

6           So, we support the debtors proposal for a

7  mediator.  We think that appointment should occur immediately

8  but we do think that the timeline should be paused to give

9  the mediator an opportunity to engage and to see if progress

10  can be made toward resolution.  In that regard, I note also

11  that according to the projections that have been put in the

12  record so far there is no urgency here in terms of exit from

13  Chapter 11.  This is not a melting ice cube case.  The only

14  reason we're running as fast as we're running is because the

15  1-L group is forcing us to.

16           I am happy to answer any questions that the Court

17  may have.

18           THE COURT:  Thank you.  Which orders have been

19  appealed?

20           MR. LAURIA:  We have appealed four orders: the

21  order approving the DIP financing, the order approving the

22  sale process, and the order approving the critical vendor

23  relief.  Those are the three motions that the debtor filed

24  that were granted that we have appealed from.  And we have

25  appealed the denial of our single motion that included relief

1  from the stay, termination of exclusivity at the Holdco's,

2  and the appointment of a Trustee at the Holdco's.

3          THE COURT:  Have those appeals been consolidated

4  and assigned to Judge Ambro?

5          MR. LAURIA:  They have been.  Judge Ambro entered

6  a docket order.  Our appellate brief was filed on January

7  7th.  He has ordered that the appellees are to file their

8  responsive brief by February 7th -- I'm sorry, I don't have

9  the dates right here.  And we will have one week after those

10  briefs are filed to file our reply, which we will be prepared

11  to do, which would mean that its fully briefed subject to

12  argument, if Judge Ambro wants argument, and then decision.

13          THE COURT:  Thank you.

14          Let me hear from the 1-L's.

15          MR. FLIMAN:  Good morning, Your Honor.  This is

16  Dan Fliman of Paul Hastings.  Can you hear me.

17          THE COURT:  Yes.

18          MR. FLIMAN:  Excellent.  Your Honor, we represent

19  a group of lenders holding 90 percent of the first lien loans

20  and also providing DIP financing to the debtors.  We

21  appreciate the Court's time this morning.  We genially agree

22  with the presentation from Ms. Sinclair but there's some

23  things I just wanted to add in that regard.

24          When the debtors filed bankruptcy, they had the

25  benefit of a restructuring support agreement with our

 1  clients.  That RSA provided our support for a process in

 2  which, number one, the debtors ran, and are running, a full

 3  sale process.  We have Court approved bid procedures to sell

 4  their assets.  And our clients agreed to support a plan that

 5  either effectuates a sale of the assets, if the bids are

 6  sufficiently high, or, otherwise, our clients agree that they

 7  would equitize their 1-L loans and they would take a

 8  combination of equity and take back debt on their DIP loans.

 9  So, our clients have agreed to a substantial haircut in this

10  case.  Our clients, in the meantime, are funding these cases

11  ad they are doing that to provide that market check, a market

12  check that if it yields value more than the amount of our

13  debt, is going to be accredited to unsecured creditors and to

14  Mr. Lauria's clients.

15          Now our RSA, importantly, provides the debtors

16  certainty of funding and that is funding through the

17  effective date and beyond because its creates liquidity at

18  emergence and it also creates an executable and, we believe,

19  confirmable plan with the support of the debtors largest

20  constituents, our clients, holding more than a billion

21  dollars of debt.  So, from our perspective, the goal here is

22  to get these cases moving in an expedient way on a path

23  towards confirmation.

24          The timing here is already slipped materially.

25  The RSA originally contemplated that a disclosure statement

1  order be entered by mid-December. We then had to extend that

2  to mid-January.  Right now, that deadline is February 6th.

3  The disclosure statement hearing was scheduled under Judge

4  Dorsey.  Now, a large reason why that timing has slipped has

5  been because of the litigation tactics by which Freedom

6  Lender Group represented by Mr. Lauria.  He has objected to

7  nearly everything and has at every turn been unsuccessful

8  with respect to those objections for which he is now

9  appealing those orders.  This has cost time, and time and

10  delay is costing our clients a significant amount of money.

11       Every week that goes by that these cases are

12  delayed it costs these estates millions of dollars of

13  incremental professional fees paid by the estate.  That

14  reduces the cash that is available on the balance sheet at

15  emergence and if our clients end up owning this company,

16  which the plan contemplates may happen, there will be that

17  much less cash in order to fund the operations of this

18  business after the emergence from bankruptcy.

19       The DIP here, the DIP financing has been sized

20  with a particular timeframe, a particular burn of

21  professional fees.  Incremental delays cause incremental

22  costs and starts to upset the economic bargain negotiated in

23  connection with these cases. Its for that reason, Your Honor,

24  that we have done everything that we could in order to move

25  these cases quickly and efficiently through the bankruptcy

1  process.

2          As you heard from Ms. Sinclar, a settlement has

3  been reached in principle between the UCC, our clients, and

4  the debtors. This is a substantial milestone in these cases.

5  Its one that was reached with a lot of work not just by the

6  professionals but with our clients and by the committee

7  members who were commercial and reasonable in trying to

8  achieve a resolution that yields the UCC's support for a plan

9  confirmation on a go forward basis.

10          We have tried to reach resolution with Mr. Lauria

11  and his clients.  We have made several proposals going back

12  even before the bankruptcy filing to which they never

13  responded.  And we are trying to reach a resolution.  We have

14  done everything we can to move these cases and we are now at

15  this juncture, Your Honor.

16          Mr. Lauria just made an extensive and impassioned

17  presentation, as he always does.  Your Honor is new to the

18  case but to the rest of us what we just heard sounds very,

19  very familiar and that is because it is, for the most part,

20  the same thing that Mr. Lauria has argued at every hearing so

21  far in this case including when he made the objections that

22  were summarily overruled by Judge Dorsey. It's also familiar

23  in the sense that from the beginning of this case Mr. Lauria

24  has tried to pre-litigate confirmation issues before

25  confirmation and that is what we have here today.  Mr. Lauria

1  believes he has got confirmation objections and we look

2  forward to addressing those under a lack of merit when

3  confirmation rolls around, but today is not the day for that

4  and those objections are certainly not the reason to in any

5  way modify the timeframe and the schedules before the Court.

6          With respect to mediation, Your Honor, frankly, we

7  do not agree with the debtors that mediation made sense and

8  we let them know that when the idea first arose.  Our clients

9  do not believe that mediation will be beneficial.  We

10  actually think that at this point there is a very low

11  likelihood that mediation will resolve the issues in this

12  case.  That there is a very high likelihood that mediation is

13  going to cause incremental expenses.

14          We believe that the path forward is to provide an

15  additional opportunity for bilateral negotiation between us

16  and the Freedom Lender Group and from our perspective we got

17  a confirmable plan and Mr. Lauria's objections are going to

18  get overruled but we will try, and we have tried, to reach

19  common ground and our clients have been very commercially

20  minded in trying to explore resolution.

21          So, from our perspective, Your Honor, we are not

22  supportive of mediation.  We don't think that that made

23  sense.  Now we are mindful of the realities here, we are

24  mindful that, you know, there is a lot going on and if Your

25  Honor is inclined to send us to mediation then what we would

1  say is that the timeframe that we have right now absolutely

2  needs to stay in place.  We can proceed to the disclosure

3  statement on the 6th, we then have the solicitation period

4  between approval of the disclosure statement and confirmation

5  to continue the dialog with the Freedom Lender Group.  Then

6  we can proceed to confirmation in mid-March, having seen

7  whether a deal is achievable or not achievable.

8          From our perspective it is critical, given the

9  admin burn in these cases and incremental costs that will be

10  ultimately a burden to our clients, that the disclosure

11  statement hearing proceed next week as scheduled and that we

12  go forward in the current timeframe contemplated for

13  confirmation.

14          Thank you, Your Honor.

15          THE COURT:  Thank you.

16          Does the NDL lender want to address the Court?

17          MR. SORKIN:  Yes, Your Honor, I would.  Thank you.

18  Andrew Sorkin of Latham & Watkins on behalf of JPMorgan Chase

19  Bank as administrative agent and collateral agent under the

20  ABL facility.

21          Just by way of background, Your Honor, there is at

22  least $249 million in outstanding principle amount owing to

23  three lenders under our facility.  Those obligations are

24  secured by a first lien on the debtors inventory receivables

25  and other categories of specified ABL priority collateral and

1  the proceeds, and we have a junior lien on everything else.

2  In other words, we sit at the top of one side of the typical

3  split collateral structure that you often see where there is

4  an ABL involved.

5          Your Honor, so I don't bury the lead, we are not

6  opposed to mediation and if it moves forward, we will be

7  there and we will participate in good faith but I do want to

8  provide some perspective.  These cases are at an inflection

9  point from the standpoint of the ABL and we face our own set

10  of issues that are, you know, entirely separate from the

11  freedom lenders.  Specifically, the proposed plan here

12  provides that, at least in a reorganization scenario, the

13  debtors are either going to take out the existing ABL

14  facility with the proceeds of a new exit facility, that could

15  come from the existing ABL lenders or a third party, or,

16  alternatively, they will cram the ABL down for the takeback

17  instrument.

18          As I am sure Your Honor can imagine, we have no

19  issue with the first form of treatment but we will have

20  significant issues with the latter.  As far as we are aware,

21  cramming down an ABL facility is unchartered territory in

22  complex Chapter 11 cases and we don't intend to become the

23  first example.  I say that only to preview that there is

24  potentially intensive and costly litigation coming our way if

25  that is the path that the plan supporters intend to pursue.

1          That being said, we have been constructive

2   participants throughout this case.  We have proposed

3   financing alternatives before and after the petition date

4   that we will eliminate the need for that cramdown fight and

5   the plan support parties wanted to keep that option on the

6   table. That is their prerogative.  Notwithstanding that, we

7   have been able to get to agreement to allow our cash

8   collateral to be used to fund these cases on a consensual

9   basis even though we have never been "in the deal" so to

10  speak.

11         Wen the focus shifted to the plan process and a

12  (indiscernible) remained on the table and despite there being

13  no specific terms proposed for the cramdown instrument, we

14  were able to work with the plan support parties to get to

15  agreement about when we learn what those terms are and what

16  the overall confirmation litigation timeline would be.  We

17  did all that,  Your Honor, without filing a single objection.

18         So, we are fully capable of working with the other

19  constituents here and consistent with that we tried not to

20  jump the gun and cause the estate to incur unnecessary

21  litigation related expenses and give peace a chance to break

22  out.  We are very close, however, to the point where we can't

23  wait any longer.  So, all that is to say we are here, we are

24  ready to work constructively, whether that is in mediation or

25  otherwise, but we are running out of time before the

1  optionality contained in this plan has real costs to the

2  estate.

3          Unless Your Honor has any questions, I will yield

4  to anyone else who would like to be heard.

5          THE COURT:  Thank you.  No, I appreciate that

6  perspective because, as you said, you didn't file anything.

7  So, I didn't have a sense of what the ABL issues are.  Thank

8  you.

9          Let me hear from the committee.

10          MR. SANDLER:  Good morning, Your Honor.  Brad

11  Sandler, Pachulski, Stang, Ziehl & Jones.  Can you hear me

12  okay?

13          THE COURT:  I can.

14          MR. SANDLER:  Fantastic.

15          Welcome to the party, Your Honor.

16          Let me just say, regardless of some of the comments

17  that you've heard today, there has been, actually, remarkable

18  progress over the last couple of months, certainly since the

19  committee was formed.

20          And Your Honor, the committee is formed of major

21  creditors of the debtors, as you can imagine, but names like

22  Nestle, Federal Warranty, Solstice, National Retail

23  Properties; big names.

24          From the committee's --

25          THE COURT:  Mister --

 1          MR. SANDLER:  -- perspective, Your Honor --

 2          THE COURT:  Mr. Sandler, is it both OpCo and HoldCo

 3 creditors?

 4          MR. SANDLER:  So it is just at the OpCo level, Your

 5 Honor, where the creditors are located --

 6          THE COURT:  Okay.

 7          MR. SANDLER:  -- on the committee.

 8          So, from the committee's perspective, Your Honor,

 9 we are focused on moving the case along as promptly as

10 possible because, as Your Honor knows and I think everybody

11 in this virtual room knows, retail cases do not do well with

12 long stays in bankruptcy, and certainly not for those who

13 have an interest in the go forward concern.

14          And from our perspective, we're focused on go

15 forward vendors, landlords, and employees.  And the risk

16 profile goes up each day that passes by because of the added

17 expenses and the continued uncertainty as to the ultimate

18 outcome.

19          And the worst thing that can happen, from a value

20 perspective, here is delay because, if the trade vendors

21 decide to cut supplies, Your Honor, it's going to lead to a

22 substantial operational issue, right?  It's going to create a

23 downward spiral, we've seen it in other retail cases, and

24 that's going to be value-destructive.

25          And that's not to say that mediation, at some

1  point, is not appropriate, and maybe it will be appropriate

2  at some point, but today is not the day.  We think the

3  disclosure statement should move forward next week, or

4  certainly whatever works for Your Honor's schedule.  And let

5  me explain what I mean by that.  All right?

6           As is typical in any case with a complex capital

7  structure, there were significant challenges from the

8  committee's perspective.  We didn't like the DIP, we didn't

9  like the plan that was on file, there were other issues.  So

10  what did we do?  We dual-tracked our approach.  We engaged in

11  both litigation, but we also engaged in constructive

12  dialogue.  And it's taken about two months to get to where we

13  are today.  But through both litigation and dialogue, we've

14  reached what we think is a resolution in principle with both

15  the debtors and the 1Ls, frankly, without the need for

16  mediation.  And our dual track approach has led to a large

17  piece of this complex puzzle getting solved, which is going

18  to be a huge step forward towards a consensual confirmation.

19           Our view is that parallel paths, right now, are

20  beneficial to the process.  And we would suggest that the

21  parties move forward with the disclosure statement hearing

22  next week to create some type of certainty, time certainty,

23  Your Honor.  And then, after the plan is out on vote, if the

24  parties can't resolve their issues themselves, they can dual-

25  track it with mediation and planned litigation, right?  You

1  can go forward on parallel paths, right?

2          By going the route that I'm suggesting, Your Honor,

3  we reduce the financial burden of any delay, we maximize

4  disability of operations of having a known end date, which is

5  going to be important to the go forward trade creditors and

6  landlords and the employees who are going to be supporting

7  this business.  All of that is critical, in our view.

8          And I'm -- frankly, I'm confident with now three of

9  the four key parties aligned, collectively, we'll be able to

10  work together after the disclosure statement hearing to

11  maximize the likelihood of a consensual path forward.  And if

12  it turns out there's an issue, we can always go into

13  mediation before the plan.

14          But our view is that today is not the right time

15  for mediation, some point maybe, but we think the disclosure

16  statement should go forward next week.

17          And with that, Your Honor, I'll open it up to any

18  questions you may have for me.

19          THE COURT:  Thank you.  I do not have any

20  questions.

21          MR. FOX:  Good morning, Your Honor.  May I be

22  heard?

23          THE COURT:  Mr. Fox, yes.

24          MR. FOX:  Good morning.  May it please the Court,

25  Tim Fox on behalf of the United States Trustee.

1    I'm rising to note that my office currently has two

2  objections lodged to items that are scheduled for February

3  6th:

4    First, as Your Honor has heard much about, the plan

5  and disclosure statement, which features kind of the usual

6  issues that Your Honor might expect from my office with

7  respect to certain mechanics of the plan and the third-party

8  releases.

9    My office has not had any information regarding the

10  settlement in principle, regarding the debtors, the

11  committee, and the first lien lenders.  And so those changes

12  that could be implemented to the plan, I have no basis to

13  evaluate whether they address any issues in that objection,

14  but expect that, especially with respect to the third-party

15  release relief, my office's objection will remain pending and

16  does present a request that the Court deny solicitation on

17  the grounds that the plan would be patently unconfirmable.

18    I know Your Honor has handled those matters in the

19  past, and I don't know if the specific facts and

20  circumstances will adequately address that.  But I did want

21  to note that that objection is pending and seeks to avoid

22  unnecessary solicitation of a plan that the U.S. Trustee

23  determines is patently unconfirmable in its current form.

24    We have narrowed certain issues with the debtors

25  and will continue to engage with those points, but I believe

1  we are at an impasse as it relates to several points, and

2  we'll address those accordingly.

3          And perhaps more importantly -- and Mr. Lauria's

4  comments initially previewed this -- the U.S. Trustee has

5  objected to the retention of Willkie, Farr & Gallagher as co-

6  counsel to the debtors here.  We've been engaged in active

7  informal and formal discovery with respect to that objection.

8          We had a meet-and-confer on Monday, January the

9  27th, at which time counsel at Willkie identified that a

10  supplemental declaration is expected to be filed on February

11  the 3rd.

12          The information provided in response to our formal

13  discovery has not lessened any of the concerns articulated in

14  the U.S. Trustee's objection; in fact, I believe we're more

15  concerned than we were.  And our objection identified a

16  disclosure concern as one of the prongs for denial of the

17  retention, as noted in the filed objection.

18          With respect to that matter, my client may

19  determine that more formal discovery is necessary, which may

20  make that January -- February 6th date untenable for that

21  retention.  And I have had discussions with parties where

22  they've identified a concern with proceeding with the

23  disclosure statement relief when Willkie's status as an

24  estate-retained professional is still contingent and subject

25  to that objection.

1          THE COURT:  Uh-huh.

2          MR. FOX:  And so, Your Honor, another point of

3    information and that Your Honor will have to evaluate is

4    whether it's appropriate to proceed with the disclosure

5    statement when we haven't yet sorted out the retention relief

6    given the current factual items that are of import to these

7    cases on a go forward basis.

8          Again, Mr. Lauria's comments do highlight the

9    concerns that exist between Willkie's representation of other

10   parties than the debtor in a take private transaction that

11   forms the current capital structure of these debtors, and

12   then being the party with the pen with respect to the

13   restructuring support agreement and the proposed plan and

14   disclosure statement.

15         So, Your Honor, at this time, we expect to receive

16   the supplemental declaration on Monday.  We may need more

17   time to evaluate the information contained in the

18   supplemental declaration and to potentially take a deposition

19   or otherwise ask questions related to that, in light of the

20   documents that we've currently received.  And so, again,

21   February 6th seems to be a little bit too ambitious to go

22   forward on both of those matters, in light of these

23   circumstances.

24         I'm happy to address any questions that Your Honor

25   may have, but I wanted to note that these are concerning

1   factual scenarios and that the time line has been awfully

2   compressed with respect to when this information is available

3   and my office's ability to evaluate it.

4        THE COURT:  Mr. Fox, are you then anticipating that

5   the hearing on the Willkie retention would be evidentiary,

6   with witnesses?

7        MR. FOX:  I expect it would be, yes.

8        MR. SHAW:  Your Honor, if -- Brian Shaw on behalf

9   of the settlement-related liquidating trust.  My client is

10  the other party that has the pending objection to the Willkie

11  application.  It's been pending, the objection, since January

12  3rd.

13        In 31 years, I've only filed two of these.  There

14  are very serious issues that were raised.  We did have a call

15  with the U.S. Trustee and Willkie on the 27th.  We have

16  pending interrogatories and pending deposition notices, that

17  has still not been responded to.  And we are waiting for the

18  supplemental declaration, also.

19        I have a slightly different view on the facts as

20  Mr. Fox.  I do think there's a chance that, at least as

21  between my client and Willkie and the debtor, there may not

22  be that many disputed facts.  But having said that, I can't

23  evaluate that until the 6th.

24        And I will say that I am assuming the judge -- the

25  Court hasn't had time to read the documents on this topic,

1  but they raise really, really serious concerns.

2          THE COURT:  I've read them.

3          MR. SHAW:  And Mr. Lauria --

4          THE COURT:  I have read them.

5          MR. SHAW:  Okay.  Thank you, Judge.

6          Mr. Lauria -- and I -- that comment only was that I

7  know you've got feet of paper in front of you on this case

8  now.

9          Mr. Lauria raised a correct issue.  And my concern

10 -- and I don't expect to be in the -- in this mediation -- is

11 that not the speed of the train, the so-called confirmation

12 train, necessarily; my concern is who's the conductor.  And

13 our client is not okay with the conductor that is currently

14 driving this train.  That's also -- it's just problematic,

15 the representation, the concurrent representation of B.

16 Riley, of Brian Kahn, of his entities, and FRG Group went

17 back to 2018.  And this is an issue that needs to be fleshed

18 out before the Court.

19          The question in my mind I have, again, but I don't

20 necessarily agree on Mr. Fox with, is whether there's factual

21 disputes from our perspective.  And we did speak to debtor --

22 the debtor and to Willkie about that.  And the hope was that,

23 when we get the supplemental declaration on the 6th -- and I

24 would -- I've been speaking to Mr. Lombardi, who I believe is

25 on the phone -- we can sit down and, in good faith, try to

1  determine whether at least my client believes there needs to

2  be an evidentiary hearing.

3         But these are very serious issues.  No one is

4  enjoying this.  But we just -- it seems like this retention

5  is patently not doable under 327(a).

6         THE COURT:  Thank you.

7         Let me ask.  Ms. Sinclair, when am I going to get a

8  reply on the legal issues that have been raised on the

9  retention because I did not --

10         MS. SINCLAIR:  Yes.  Right now --

11         THE COURT:  I did not see one.

12         MS. SINCLAIR:  Yes, Your Honor.  Right now, we are

13  planning to file both the supplemental declaration and the

14  reply on Monday, February 3rd, so they'll come to you

15  together.  And you know, to Mr. Fox and Mr. Shaw's points,

16  it's been a little bit of a moving target as we've worked

17  through dates around discovery and when that hearing would

18  take place.  But that is, right now, our deadline to reply

19  and file that supplemental dec.

20         MR. STANCIL:  Your Honor, this is Mark Stancil from

21  Willkie.  I feel like I should put my hand up for just one

22  second.  I hoped not to say anything, since I wasn't really

23  fully anticipating that some of the folks would sort of

24  venture into merits arguments on retention.  I just wanted to

25  give you a couple of clarifying points because I do think it

1  might well bear on the scheduling question.

2       So Mr. Lauria had suggested, I think, that the

3  companies are being investigated by SEC and DOJ.  That's not

4  correct, nor is the take private transaction that closed in

5  August of 2023 the subject of a government investigation.

6  The D -- and this is all in the papers, this is not secret.

7  The DOJ and SEC are investigating the conduct of Mr. Kahn in

8  his private investment activities outside of his role at

9  Franchise Group.  It's a hedge fund you're going to hear a

10  lot about called "Prophecy."

11       THE COURT:  Uh-huh.

12       MR. STANCIL:  And Mr. Shaw represents, I believe, a

13  litigation trust coming out of the Prophecy hedge fund, but

14  Prophecy has no relationship with Franchise Group.  And in

15  fact, independent counsel, when this broke, investigated and

16  confirmed that nobody at Franchise Group knew anything about

17  the alleged wrongdoing by Mr. Kahn at Prophecy.

18       And you know, with respect to this take private

19  transaction, again, I think Your Honor will hear a lot about

20  it.  We're confident that's not an issue and we're happy to

21  take that up in the retention application.  But I think it's

22  imperative for Your Honor to know that there's an independent

23  director with independent counsel at the HoldCo investigating

24  the take private and any other potential causes of action.

25       So whatever our metaphor is about who's driving the

1  train, like there is absolutely nothing that Willkie will do,

2  say, or conduct as the debtors' counsel that will, you know,

3  implicate a conflict.

4          And we do appreciate Mr. Fox and his comments.  I

5  appreciate that we have more information to bring to the

6  trustee.  And we're in the process of producing documents.

7  And as the guy who is holding the pen on supplemental

8  declarations, I can just -- he'll have to take my word for it

9  that it has been detailed and exhaustive and we're headed

10  there.  There will be a lot more information that, candidly,

11  we think will fully address any remaining concerns, but you

12  know, he'll have to see it and he'll make his judgment for

13  his client.  But I do think -- I just wanted to make sure

14  Your Honor knows that there's a lot more to this story.

15          I don't know if Ms. Sinclair has anything else to

16  add, but I just wanted to make sure, as the guy who's holding

17  the pen, I don't miss my opportunity.

18          THE COURT:  Okay.

19          MR. STANCIL:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. SHAW:  Your Honor, just a heads-up.  If that is

22  going to be the position that's taken, there will be -- have

23  to be an evidentiary hearing because it's just simply

24  incorrect.

25          THE COURT:  Okay.  Well, we'll deal with it.

1          Is there anyone else who would like to address the

2  Court?

3      (No verbal response)

4          THE COURT:  Okay.  I don't hear anyone.

5          So we're going to go forward on the 6th.  I cleared

6  a day, since Judge Dorsey had already scheduled matters for

7  that day.  And given the number of parties and counsel who

8  had already had that on their calendar, I was able to move a

9  few matters and -- on cases with lesser involvement from

10 parties.  So we're going to go forward on that day.  I'm not

11 going to change it at this point.  We'll see what goes

12 forward, depending on what I have in front of me.

13         So far, the only things I'm aware of are the

14 Willkie Farr retention and disclosure statement.  Is there

15 anything else that is else that is scheduled to go forward on

16 that day?

17         Ms. Sinclair?

18         MS. SINCLAIR:  I don't believe so, Your Honor.

19 Those are the two items that we had scheduled for that date.

20         THE COURT:  Okay.  As for a request for judicial

21 mediation, I will honestly say I have no clue whether I have

22 a colleague who is available, and available in the time frame

23 that I'm hearing.

24         And I'm also going to give some thought to whether,

25 given that the committee and the first lien lenders are not

 1  in favor of mediation, whether I should even reach out, at

 2  this point.  Sending people to mediation who don't want to be

 3  there is not, in my experience, necessarily the best use of

 4  time, but I'll consider that.

 5        But again, I don't even know if any of my

 6  colleagues are available in this time frame.  I will let you

 7  know.

 8        I think that's really all I have for today.  This

 9  was helpful.  I have been busy reading the filings.

10        Oh, the other request from Mr. Lauria was to hold

11  things in abeyance until we see what Judge Ambro may do with

12  the appeals.  Today, I'm not inclined to do that, but I'll

13  see how things continue on and I'll take a look at the

14  appeals.  But no, today, I'm not inclined.  I wanted to make

15  sure that I addressed that.  I think those were sort of the

16  three things that came up.

17        So I will see you all here on the 6th.  As I'm sure

18  all of you know, I'm an in-person hearing judge, I expect

19  counsel and witnesses to be here.

20        I'm a paper judge, in case you don't know that.  I

21  want the exhibits in a binder, in paper form, or handed up to

22  me.

23        If there's no agreement, you know, we'll deal with

24  that.  I want people to try to work out objections to

25  exhibits ahead of time, if possible.

1    And obviously, anyone who's just observing can

2 appear by Zoom, not a problem if what you're doing is

3 observing.  But if you're making an argument, you're crossing

4 a witness, you're putting on direct, you need to be in

5 person.

6    Any questions?

7    MS. SINCLAIR:  None from the debtors, Your Honor.

8 Thank you.

9    THE COURT:  Okay.  Thank you very much then.  We're

10 adjourned.

11    UNIDENTIFIED:  Thank you, Your Honor.  Have a nice

12 weekend.

13    UNIDENTIFIED:  Thank you, Your Honor.

14    THE COURT:  Thank you.

15    UNIDENTIFIED:  Thank you, Your Honor.

16    (Proceedings concluded at 10:57 a.m.)

17

18

19

20

21

22

23

24

25

1

2                         CERTIFICATION

3            We certify that the foregoing is a correct

4    transcript from the electronic sound recording of the

5    proceedings in the above-entitled matter to the best of our

6    knowledge and ability.

7

8    /s/ William J. Garling                  January 31, 2025

9    William J. Garling, CET-543

10   Certified Court Transcriptionist

11   For Reliable

12

13   /s/ Tracey J. Williams                  January 31, 2025

14   Tracey J. Williams, CET-914

15   Certified Court Transcriptionist

16   For Reliable

17

18

19

20

21

22

23

24

25