# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (LSS)<br>(Jointly Administered)<br>Hearing Date: February 6, 2025 at 10:00 a.m. ET<br>Objection Deadline: At the Hearing<br><br>Re: Docket Nos. 152, 657, 686 |

## THE AD HOC GROUP OF FREEDOM LENDERS' (I) MOTION TO ADJOURN DISCLOSURE STATEMENT HEARING AND (II) SUPPLEMENTAL OBJECTION OF THE AD HOC GROUP OF FREEDOM LENDERS TO DEBTORS' DISCLOSURE STATEMENT MOTION

The Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**"),[2] by and through its undersigned counsel, hereby files this (i) motion to adjourn the hearing on the *Debtors'*

---

[1] The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2] The Freedom Lender Group is comprised of the entities named in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229], as it may be amended and supplemented from time to time.

*Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballots and Solicitation Materials and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 152] (the "**Disclosure Statement Motion**") and (ii) supplemental objection to the Disclosure Statement Motion (clauses (i) and (ii), the "**Motion to Adjourn and Supplemental Objection**") and respectfully states as follows:[3]

## INTRODUCTION

1.  On November 11, 2024, the Debtors filed their initial plan (the "**Initial OpCo 1L Group Plan**") and, on January 3, 2025, filed an amended version of it (the "**First Amended OpCo 1L Group Plan**"). On January 8, 2025, the Freedom Lender Group filed an objection to the Disclosure Statement Motion, reserving the right to supplement it [Docket No. 686] (the "**Disclosure Statement Objection**"). With the scheduled hearing on the Disclosure Statement Motion three days away, on February 3, 2025, the Debtors filed a second amended version of the OpCo 1L Group Plan [Docket No. 894] (the "**Second Amended OpCo 1L Group Plan**") and a second amended disclosure statement [Docket No. 895] (the "**Second Amended Disclosure Statement**"). The Second Amended Disclosure Statement does little to address the issues raised in the Disclosure Statement Objection. Instead, the Second Amended OpCo 1L Group Plan and Second Amended Disclosure Statement include material modifications late in the game that raise

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Disclosure Statement Objection or the Second Amended OpCo 1L Group Plan, as applicable.

2

significant additional concerns regarding whether stakeholders are being adequately informed as required under section 1125(b) of the Bankruptcy Code. These changes necessitate the filing of this Motion to Adjourn and Supplemental Objection and demonstrate that the hearing on the Disclosure Statement Motion should be adjourned or, if it goes forward, that the Disclosure Statement Motion should be denied.

## MOTION TO ADJOURN

2. The material changes in the Second Amended OpCo 1L Group Plan (again, filed three days before the scheduled hearing to approve the related disclosure statement) include:

- additional detail regarding the potential creation and administration of a litigation trust at the HoldCo Debtors without any description at all of the claims and causes of action being placed in it or the value of those claims and causes of action;[4]

- a settlement with the Committee that includes the creation of a separate litigation trust at the OpCo Debtors, again without any detail as to the claims and causes of action being placed in it;[5]

- the bifurcation of the claims of the OpCo 1L Term Lenders and OpCo 2L Lenders (without any disclosure of the amount of either deficiency claim or any commitment to disclose that information in advance of the voting deadline or even confirmation) and the separate treatment of the secured and unsecured portion of each;[6] and

- the creation of new classes of unsecured claims at certain of the Debtors without any disclosure about their purpose.[7]

3. Meanwhile, one investigation of litigation claims by the Petrillo firm is being placed on hold with an apparent prohibition on disclosing to anyone (other than the Committee) what Petrillo found (or did not find) while another investigation being conducted by a newly-

---

[4] Second Amended Opco 1L Group Plan §§ 1.98; 7.11.
[5] *Id.* §§ 1.139; 7.10.
[6] *Id.* §§ 1.205; 1.95; 5.4(b); 5.5(b).
[7] *Id.* §§ 5.12; 5.13; 5.14.

3

appointed independent director for the HoldCo Debtors, Michael Wartell, is ongoing. This one ongoing investigation will determine which claims and causes of the action of the HoldCo Debtors will be released and which will be preserved (the central issue of the HoldCo Debtors' cases),[8] but there is no commitment by the Debtors or Mr. Wartell to conclude this investigation and publish its findings in advance of the voting deadline or even confirmation.

4. Add to that the fact that the bid deadline in the Debtors' sale process, which determines whether the Debtors will "toggle" to a Sale Transaction, has now passed with the auction (but seemingly not the bid deadline) extended to February 10, 2025.[9] If the Debtors intend to move forward exclusively with the equitization of the OpCo 1L Term Lenders' claims, the Second Amended OpCo 1L Group Plan hides the ball at best, leading voters to believe that a potential sale is still in play and, at worst, seeks to conceal the many conflicts created by maintaining the link between the HoldCo Debtors' and OpCo Debtors' estates. Further, to the extent these Chapter 11 Cases are headed to an equitization plan, the Debtors have yet to provide any indication of valuation to support an equitization of the OpCo 1L Term Lenders' claims and are not committing to ever do so. All of the foregoing ignores the (not remote) possibility that the Debtors' application to retain its main bankruptcy counsel, Willkie Farr & Gallagher LLP, will be denied.

5. These factors all demand that more time and consideration be taken before expending substantial estate resources on solicitation of the Second Amended OpCo 1L Group Plan.

---

[8] *Id.* §§ 1.104; 7.11.
[9] *Notice of Adjournment of Auction* [Docket No. 916].

**SUPPLEMENTAL OBJECTION**

6.  If the Court is not inclined to adjourn the hearing on the Disclosure Statement Motion, the Disclosure Statement Motion should be denied. In the Disclosure Statement Objection, the Freedom Lender Group demonstrated that (i) the Disclosure Statement on file at that time should not be approved because the OpCo 1L Group Plan is unconfirmable, (ii) the Debtors' proposed confirmation timeline is untenable and must be extended, and (iii) the Disclosure Statement lacks adequate information necessary for evaluation of the OpCo 1L Group Plan. The Second Amended Disclosure Statement just filed by the Debtors does little to address these problems and raises additional issues that warrant denial of the Disclosure Statement Motion outright.

**I.  Released Claims and Causes of Action**

7.  In the Initial OpCo 1L Group Plan and the First Amended OpCo 1L Group Plan, little was said about the disposition of claims and causes of action of the Debtors, other than that they would be released or remain with the reorganized Debtors. Now, in light of the Committee Settlement, the Second Amended OpCo 1L Group Plan purports to preserve certain claims and causes of action and place them in various trusts at the OpCo Debtor and HoldCo Debtor levels. Specifically, under the Second Amended OpCo 1L Group Plan, certain claims and causes of action held by the OpCo Debtors will be put into a trust (i.e., the OpCo Litigation Claims) and others will be released.[10] The difference between the OpCo Debtors' claims and causes of action that are preserved and those being released is not based on the nature of the claim or its merits – it is based entirely on who the named defendant would be. For example, claims against Brian Kahn and his investment fund, Vintage Capital Management, LLC, would be preserved and go

---

[10] Second Amended OpCo 1L Group Plan § 7.10(a).

into the OpCo Debtor Litigation Trust. As another example, claims against Andrew Laurence, the Debtors' current CEO (who is also a co-owner of Vintage Capital), and the Debtors' CRO would be fully released.[11] In addition, in a blatantly punitive move, the Second Amended OpCo 1L Group Plan purports to reserve and place into the OpCo Debtor Litigation Trust purported, but undescribed, claims against the members of the Freedom Lender Group but release estate claims against other peer HoldCo Lenders for no consideration.[12]

8. At the HoldCo Debtors, the default treatment in the Second Amended OpCo 1L Group Plan with respect to claims and causes of action to be released is 180 degrees different than at the OpCo Debtors. On the Effective Date, for no consideration, such claims and causes of action will be released unless an investigation currently being conducted by the newly-appointed independent director of the HoldCo Debtors, Michael Wartell, (the "**Wartell Investigation**") identifies them.[13] If preserved, such claims and causes of action will be put into a litigation trust, the formation and mechanics of which appear to be controlled by the OpCo 1L Group. For example, the Freedom HoldCo Debtor Liquidation Trust Agreement, which will be included in the Plan Supplement to be filed a week before the voting deadline, and includes the terms and conditions for the establishment of the HoldCo Debtors' liquidation trust and the appointing of a trustee who has the power to pursue or settle claims and causes of action, must be in form and substance satisfactory to the Debtors and the members of the OpCo 1L Group.[14] This liquidation trust also explicitly has no mechanism to be funded.[15]

---

[11]  *Id.* § 7.10(c)(ii).

[12]  *Id.* §§ 1.186; 7.10(c)(ii).

[13]  *Id.* §§ 5.11(a), 7.11.

[14]  *Id.* §§ 1.99; 1.161.

[15]  Second Amended Disclosure Statement § IX.D.ii.

9. With respect to both the OpCo Debtors' and HoldCo Debtors' litigation claims, the Second Amended Disclosure Statement does not identify the nature of any potential claims or causes of action of any Debtor, let alone the factual support for or purported value of these claims or causes of action. That must be remedied because, if the Debtors fail to disclose any claims or causes of action belonging to them, a creditor defendant (including Brian Kahn) can later argue that the Debtors (or the successor to such claims or causes of action) are estopped from bringing them.[16] Further, without detail regarding these claims and causes of action, voters on the Second Amended OpCo 1L Group Plan cannot adequately assess the legitimacy (or lack thereof) of the Committee Settlement, the releases embedded in the Second Amended OpCo 1L Group Plan, or the purported value they are being offered for their affirmative vote in the form of shares in a litigation trust.[17]

II. **Michael Wartell's Ongoing "Investigation"**

10. There is no indication in the Second Amended OpCo 1L Group or the Second Amended Disclosure Statement that Michael Wartell has any obligation or intention to conclude his investigation and issue a report before voters are given the opportunity to understand and digest his findings. Without any disclosure regarding this ongoing investigation, what materials Mr. Wartell has access to, and what particular claims and causes of action he is investigating, voters on the Second Amended OpCo 1L Group Plan do not have adequate information. The Freedom Lender Group has requested from the Debtors a deadline by which Mr. Wartell's report

---

[16] *See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 320-22 (3d Cir. 2003) (affirming bankruptcy court's dismissal of causes of action not disclosed in a disclosure statement as being barred under the doctrine of judicial estoppel).

[17] *See id.* at 322 ("The Code requires that a debtor list potential causes of action, not claims it actually intends to sue on at the time of the required disclosure."); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (holding that a chapter 11 debtor has a "statutory and fiduciary duty to disclose [its potential claims] during the pendency of the bankruptcy case").

7

...
...

will be produced and for access to documents that Mr. Wartell is reviewing, and the Debtors have refused and reserved the right to disclose all of this as late as at the confirmation hearing if they choose to disclose any findings at all.  Parties determining whether to vote in favor of the Second Amended OpCo 1L Group Plan cannot wait until confirmation to learn the results of Mr. Wartell's investigation.  Rather, as stated above, consideration of the Disclosure Statement Motion should be deferred until Mr. Wartell concludes his investigation and his report is published.

11. This is not to say, however, that Mr. Wartell's investigation is necessarily worth waiting for.  The Debtors' proposed plan has always contemplated the release or transfer of the HoldCo Debtors' claims and causes of action for no consideration to the HoldCo Debtors' creditors, and the Debtors have already incurred substantial administrative expenses pursuing that outcome before any diligence was done.  The appointment of Mr. Wartell and his investigation appears in many respects like the Debtors' attempt to back into their foregone conclusion that no claims exist in favor of an estate that vaporized over a half billion dollars of capital in fifteen months. Claims and causes of action at the HoldCo Debtors are (in the Debtors' opinion) the only distributable assets available for the HoldCo Lenders, who are the sole creditors of the HoldCo Debtors.  The HoldCo Debtors, however, played no part in the selection of Mr. Wartell and have been kept entirely in the dark about his appointment until it was disclosed in open court and have had virtually no access to his ongoing investigation.  Yet the Debtors seek to use Mr. Wartell's conclusions to bind the HoldCo Lenders to releases of claims and causes of action.  As such, parties should have a reasonable chance to see, evaluate, and respond to Mr. Wartell's analysis not only to understand claims and causes of action being preserved but to have the ability to scrutinize and challenge his findings if necessary.

### III.     Results of Sale Process

12.    The Second Amended OpCo 1L Group Plan still posits itself as a "toggle" plan where the recovery of each class of creditors will depend on whether a Sale Transaction (i.e., a sale of all of the Debtors' businesses) is consummated or not.[18]  The bid deadline in the Debtors' postpetition sale process was February 3, 2025.[19]  It may well be the case that the Debtors did not receive any viable bids, just as the Freedom Lender Group predicted when the Debtors embarked on a sale process that was materially flawed.[20]  If that is the case, the non-actionable nature of the sale process and the resulting treatment of stakeholders should be disclosed – otherwise, voting stakeholders would be lead to believe that a Sale Transaction may still be in play when it is not.  Further, it would be a waste of estate resources to solicit the votes of creditors who would receive nothing under the Second Amended OpCo 1L Group Plan if a Sale Transaction cannot be achieved.[21]

13.    Further, if a Sale Transaction cannot be achieved, holders of Prepetition Second Lien Loan Claims are presupposed to be out of the money under the Second Amended OpCo 1L Group Plan, leaving unsecured claims of in excess of $125 million, which will receive some as yet unspecified percentage of a litigation trust.  Yet, up to $99.7 million of prepetition general unsecured claims at the OpCo Debtors have already been paid in full in cash under the Debtors' critical vendors orders [Docket Nos. 129, 217, 410].  These prepetition unsecured claims that

---

[18]  Second Amended OpCo 1L Group Plan § 5.5(a) (describing the alternate treatments of the Prepetition Second Lien Loan Claims).

[19]  *See Order (I)(A) Approving Bidding Procedures for Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief* [Docket No. 444].

[20]  *See generally Objection of the Ad Hoc Group of Freedom Lenders to Debtors' Bidding Procedures Motion* [Docket No. 322].

[21]  *See, e.g.,* Second Amended OpCo 1L Group Plan § 5.13(a)(i) (stating that holders of Allowed HoldCo Receivables General Unsecured Claims will receive no recovery if a Sale Transaction is not consummated, yet are impaired and entitled to vote).

have been repaid in full should be disclosed and the possibility of them being clawed back under section 549 of the Bankruptcy Code specifically preserved.[22] Otherwise, as stated above, such causes of action could be barred under the doctrine of judicial estoppel for lack of disclosure.

### IV.  Lack of Valuation Analysis

14.  As set forth in the Disclosure Statement Objection, the Disclosure Statement Motion should not be approved because (among other reasons), the Debtors have failed to provide a valuation analysis.[23] The Second Amended Disclosure Statement does nothing to remedy this. With the bid deadline having passed, the Debtors know whether a Sale Transaction can be consummated.  If it cannot, the Second Amended OpCo 1L Group Plan would thus be premised on the HoldCo Debtors' equity in the OpCo Debtors being determined to be worthless and, thus, there would be an even more pressing need for the Debtors to provide a valuation analysis.  To be clear, the fact that the Debtors' businesses were put on the block in a failed sale process would not constitute admissible evidence of value.[24]

---

[22] *See Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors, Foreign Venders, Shippers & Logistics Providers, and 503(b)(9) Claimants; and (II) Granting Related Relief* [Docket No. 410], ¶ 10. ("Notwithstanding anything to the contrary herein, in the First Interim Order, in the Second Interim Order, or any order approving postpetition financing for the Debtors, the rights of the Debtors, the Ad Hoc Group of Freedom Lenders and any other party in-interest under the Bankruptcy Code or applicable non-bankruptcy law with respect to payments made under this Final Order, the First Interim Order, and/or the Second Interim Order, including with respect to compliance with the First Interim Order, the Second Interim Order, or this Final Order, are preserved to the fullest extent possible.").

[23] Disclosure Statement Objection ¶¶ 44-52.

[24] *See In re Pullman Const. Indus., Inc.*, 103 B.R. 983, 987 (Bankr. N.D. Ill. 1989) (denying objecting creditor's proffer of evidence at confirmation of conditional purchase offer to support the value of the debtors' assets, noting that conditional offer and conditional acceptance had "no significant probative value" as each are "subject to many unresolved contingencies"); *see also In re 388 Route 22 Readington Holdings, LLC*, Case No. 20-01252, 2020 WL 4282748, at *4 (D.N.J. July 27, 2020), *aff'd*, Case No. 20-2629, 2021 WL 4811409 (3d Cir. Oct. 15, 2021) (holding that "[g]enerally, unaccepted offers are not admissible evidence in support of fair market value of a property" (quoting *In re GGI Properties, LLC*, 588 B.R. 401, 417 (Bankr. D.N.J. 2018))); *In re Tronox Inc.*, 503 B.R. 239, 305 (Bankr. S.D.N.Y. 2013) ("Courts give little weight to unaccepted offers, especially where they lack finality.  Expert testimony based on such evidence is excluded as inadmissible to establish value.").

V.  **Deficiency Claims**

15.  In the Initial OpCo 1L Group Plan and the First Amended OpCo 1L Group Plan, there was no provision for deficiency claims of the OpCo 1L Term Lenders or the OpCo 2L Lenders. Now, the Second Amended Disclosure Statement references these deficiency claims but provides no information regarding the purported quantum or range of the deficiency claims of the OpCo 1L Term Lenders and OpCo 2L Lenders. Instead, the Second Amended OpCo 1L Group Plan intimates that those claims will be set after the Effective Date. This information is crucially important in connection with the Second Amended Disclosure Statement because, unlike prior iterations of the Debtors' proposed plan, the Second Amended OpCo 1L Group Plan would give such deficiency claims the same treatment, on a *pro rata* basis, as other unsecured claims.[25] Therefore, OpCo 1L Term Lenders, OpCo 2L Lenders and holders of General Unsecured Claims cannot know how much of the unsecured creditor distribution they would be entitled to until the deficiency claims are set. Among other things, to the extent that the OpCo 1L Term Lenders assert a material deficiency claim and are entitled to share in the OpCo Debtor Litigation Trust, they will literally be reducing the value of their purported settlement with the Committee. Further, deficiency claim information will be necessary to tabulate votes because it is entirely possible that the OpCo 2L Lenders' alleged deficiency claim (as calculated by the Debtors) would have a blocking position in certain (or all) of the classes of general unsecured creditors at the OpCo Debtors.

VI.  **OpCo 2L Adequate Protection Claim**

16.  The Second Amended Disclosure Statement fails to provide adequate information because it does not make any mention of the adequate protection claim belonging to Alter Domus

---

[25]  Second Amended OpCo 1L Group Plan §§ 5.4(b), 5.5(b).

11

(US) LLC, as administrative agent and collateral agent (in such capacities, the "**OpCo 2L Agent**") under the OpCo 2L Facility, in the event of an equitization plan. Under paragraph 10(e) of the Final DIP Order, the OpCo 2L Agent, on behalf of itself and the OpCo 2L Lenders, has a superpriority administrative expense claim under section 507(b) of the Bankruptcy Code for the diminution in value of its interests in collateral during the pendency of these Chapter 11 Cases, caused by (among other things) priming liens under the Debtors' DIP Facility.[26] The Debtors are authorized under their DIP Facility to borrow up to $250 million of new money term loans secured by priming liens on all assets.[27] The Freedom Lender Group believes that, on the Petition Date, the OpCo 2L Lenders were oversecured but that they became undersecured during the Chapter 11 Cases due to (among other things) the Debtors' incurrence of up to $250 million under the DIP Facility and the related priming liens. Further, the Debtors have used such DIP proceeds to pay almost $100 million of unsecured claims (nearly 95% of all unsecured claims known at the time) under the guise of "critical vendor" relief and to pay professional fees in connection with pursuit of the Debtors' proposed plan that treats the OpCo 2L Lenders as entirely unsecured. None of these expenditures has done anything to enhance or protect the value of the OpCo 2L Lenders' collateral, all of which will be given to the OpCo 1L Term Lenders under the equitization plan with no consideration to the OpCo 2L Lenders. This movement from positive Petition Date value of the OpCo 2L Lenders' interest in their collateral to a zero recovery has created a clear diminution in value giving rise to superpriority adequate protection claims that must be paid in full in cash under any plan. The Freedom Lender Group intends to soon file a motion for allowance of that claim. The Second Amended Disclosure Statement must disclose the existence

---

[26] Final DIP Order ¶ 10(e).

[27] *Id.* ¶ 2(b).

of this adequate protection claim and the impact of it (namely, whether the Debtors will have sufficient cash to pay it in full) in order for stakeholders to be adequately informed about the feasibility of the Second Amended OpCo 1L Group Plan.

## **CONCLUSION**

17. The Court should adjourn the hearing on the Disclosure Statement Motion or, if it is not inclined to do so, deny the Disclosure Statement Motion for the reasons set forth in the Disclosure Statement Objection and this Motion to Adjourn and Supplemental Objection.

Dated: February 5, 2025
      Wilmington, Delaware

*/s/ Michael J. Farnan*
**FARNAN LLP**
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: bfarnan@farnanlaw.com
      mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**
Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
      azatz@whitecase.com
      sam.hershey@whitecase.com
      erin.smith@whitecase.com
      brett.bakemeyer@whitecase.com

*Counsel to the Ad Hoc Group of Freedom Lenders*