## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.* | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF FRANCHISE GROUP, INC. AND ITS AFFILIATED DEBTORS

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
Betsy L. Feldman (Del. No. 6410)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com

*Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: February 5, 2025

**This Disclosure Statement contains only a summary of the Debtors' joint chapter 11 plan disclosed herein (as may be amended). The Disclosure Statement is not intended to replace careful and detailed review and analysis of the Plan, but to aid and supplement such review. This Disclosure Statement is qualified in its entirety by reference to the more detailed provisions set forth in the Plan (which is included as <u>Exhibit A</u> to this Disclosure Statement), which is incorporated herein by reference. In the event of a conflict between the Plan and the Disclosure Statement, the provisions of the Plan will govern. All Holders of Claims and Interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits annexed hereto, before deciding whether to vote to accept or reject the Plan.**

**The statements contained in this Disclosure Statement are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstances, create any implication that the information contained herein is correct at any time after the date hereof.**

**This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure. Dissemination of this Disclosure Statement is controlled by Bankruptcy Rule 3017. This Disclosure Statement was prepared to provide parties in interest in these Chapter 11 Cases with "adequate information" (as defined in section 1125 of the Bankruptcy Code) so that those creditors who are entitled to vote with respect to the Plan can make an informed judgment regarding such vote on the Plan.**

**Holders of Claims and Interests should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice. Each such Holder should, therefore, consult with his or her own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan and the transactions contemplated thereby.**

**Information contained herein is subject to completion or amendment. The Debtors reserve the right to file an amended plan and related disclosure statement from time to time, subject to the terms of the Plan. This Disclosure Statement does not constitute an offer to sell, or the solicitation of an offer to buy, any securities.**

**The effectiveness of the Plan is subject to several conditions precedent. There is no assurance that these conditions will be satisfied or waived.**

**No person has been authorized by the Debtors in connection with the Plan or the Solicitation to give any information or to make any representation other than as contained in this Disclosure Statement, the Plan and the exhibits, notices and schedules attached to or incorporated by reference or referred to in this Disclosure Statement and/or the Plan, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.**

**Except where specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles.**

## TABLE OF CONTENTS

I.      INTRODUCTION..................................................................................................1
        A.    Purpose of this Disclosure Statement ....................................................1

II.     GENERAL HISTORICAL INFORMATION ABOUT THE DEBTORS..................4
        A.    General Background, Corporate History, and Business Operations......................4
        B.    Corporate Structure...............................................................10
        C.    Prepetition Capital Structure...................................................10

III.    KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11
        CASES...........................................................................................13

IV.     SUMMARY OF THE PLAN AND RESTRUCTURING SUPPORT AGREEMENT
        ......................................................................................................15
        A.    The Plan ..............................................................................15
        B.    Other Material Terms of the Restructuring Support Agreement .............21
        C.    Acceptance of the Plan.......................................................23
        D.    Management/Employee Incentive Plans........................................23

V.      MATERIAL DEVELOPMENTS SINCE THE PETITION DATE............................24
        A.    The Debtors' First-Day Motions and Certain Related Relief..............24
        B.    Bidding Procedures and Sale Process......................................25
        C.    Claims Process and Bar Date................................................26
        D.    Freedom Lender Group's Motion to Terminate Exclusivity ................28
        E.    Committee Settlement..........................................................28

VI.     SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11 CASES
        AND THE PLAN..............................................................................29
        A.    Voting on the Plan ..............................................................29
        B.    The Confirmation Hearing....................................................30
        C.    Summary of Classification and Treatment Under the Plan ................31
        D.    Summary of Treatment Under the Plan ......................................44

VII.    SECURITIES LAWS MATTERS..................................................................62
        A.    Issuance and Resale of the Reorganized Common Equity and the New
              Warrants Under the Plan....................................................62

VIII.   ALTERNATIVES TO CONSUMMATION OF THE PLAN.......................................63
        A.    Liquidation Under the Bankruptcy Code....................................63
        B.    Alternative Plan of Reorganization..........................................64
        C.    Inaction/Maintenance of Status Quo..........................................64

IX.     RISK FACTORS..................................................................................65
        A.    Risks Associated with the Debtors' Business.............................65
        B.    Certain Bankruptcy Considerations..........................................70
        C.    Risks Relating to Tax and Accounting Consequences of the Plan ..........74
        D.    Other Risks..........................................................................75

**X.    DESCRIPTION OF SECURITIES TO BE ISSUED IN CONNECTION WITH THE PLAN..................................................................................................................76**

    A.      Reorganized Common Equity.............................................................................76
    B.      New Warrants .....................................................................................................76

**XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ...............................77**

    A.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors.........................................................................................78
    B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Consenting First Lien Term Loan Claims, ABL Loan Claims, Second Lien Term Loan Claims, Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests ...............................82
    C.      Information Reporting and Back-Up Withholding ...............................................98

**XII.    IMPLEMENTATION OF THE PLAN ......................................................................99**

    A.      Plan Distributions and Transactions ...................................................................99
    B.      Continued Corporate Existence and Corporate Action.......................................100
    C.      Effectuating Documents and Further Transactions.............................................102
    D.      Cancellation of Certain Existing Agreements....................................................102
    E.      Release of Liens, Claims and Interests ..............................................................102
    F.      Directors of the Reorganized Debtors................................................................103
    G.      Management/Employee Incentive Plans.............................................................103
    H.      General Distribution Mechanics ........................................................................104
    I.      Allocation of Plan Distributions Between Principal and Interest .......................105
    J.      Withholding Taxes ............................................................................................105
    K.      Exemption from Certain Transfer Taxes ...........................................................105
    L.      Exemption from Securities Laws.......................................................................106
    M.      Setoffs and Recoupments..................................................................................107
    N.      Solicitation of Debtors......................................................................................107
    O.      OpCo Debtor Litigation Trust...........................................................................107
    P.      Freedom HoldCo Debtor Litigation Trust ............**Error! Bookmark not defined.**

**XIII.    EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND INTERESTS ..........................................................................................................................114**

    A.      Discharge .........................................................................................................114
    B.      Release of Claims .............................................................................................115
    C.      Objections to Claims and Interests ....................................................................119

**XIV.    EXECUTORY CONTRACTS UNDER THE PLAN .................................................120**

    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ........120
    B.      Cure of Defaults for Assumed Executory Contracts or Unexpired Leases .........121
    C.      Ipso Facto and Similar Provisions Ineffective ...................................................122
    D.      Insurance Policies .............................................................................................123
    E.      Survival of Certain Indemnification Obligations................................................123
    F.      Postpetition Contracts and Leases .....................................................................123

**XV.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ....................................................................................................**124**

    A.    Conditions to Confirmation .....................................................................124
    B.    Conditions to the Effective Date.............................................................124
    C.    Waiver of Conditions Precedent ..............................................................127
    D.    Effect of Failure of Conditions ...............................................................127
    E.    Binding Effect...........................................................................................127
    F.    Withdrawal of the Plan ............................................................................128

**XVI.    CONFIRMATION OF THE PLAN** ...........................................................................**128**

    A.    Confirmation Generally ...........................................................................128
    B.    Voting Procedures and Standards ............................................................128
    C.    Acceptance................................................................................................131
    D.    Confirmation and Consummation.............................................................132

**XVII.  ADDITIONAL INFORMATION** ............................................................................**137**

**XVIII. CONCLUSION** ........................................................................................................**138**

## INDEX OF EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Liquidation Analysis

EXHIBIT C    Financial Projections

EXHIBIT D    Restructuring Support Agreement

## I.    INTRODUCTION

### A.    Purpose of this Disclosure Statement

On November 3, 2024, Franchise Group, Inc. ("Franchise Group") and each of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Prior to the commencement of these Chapter 11 Cases, on November 1, 2024, the Debtors and certain beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts, that beneficially hold more than at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the aggregate outstanding principal amount of the Prepetition First Lien Loan Claims (the "Consenting First Lien Lenders") entered into that certain Restructuring Support Agreement (the "Restructuring Support Agreement"), annexed hereto as **Exhibit D**.

**Pursuant to the Restructuring Support Agreement, simultaneously with the filing of the Plan, the Debtors are conducting Store-Closing and Liquidation Sales at American Freight and conducting a marketing and sale process for all of their assets pursuant to section 363 of the Bankruptcy Code.**

The Debtors jointly submit this *Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances or rejections from Holders of Claims and Interests against the Debtors with respect to the *Third*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

*Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors*, annexed hereto as **Exhibit A** (the "Plan").

All capitalized terms used in this Disclosure Statement that are not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Restructuring Support Agreement, as applicable.

The Debtors urge all parties in interest to read this Disclosure Statement and the Plan carefully. This Disclosure Statement does not include a description of each and every term of the Plan. Accordingly, the description of the Plan set forth herein is qualified by the entirety of the Plan, which is incorporated by reference into this Disclosure Statement.

This Disclosure Statement contains information regarding the history of the Debtors and their businesses, the events leading up to these Chapter 11 Cases, factors supporting approval of the Committee Settlement, and descriptions of the Plan and the Plan Supplement, including the Committee Settlement. It is being provided to Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, General Unsecured Claims, Prepetition HoldCo Loan Claims, Subordinated Claims, and Existing TopCo Equity Interests.

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders and to enhance the ongoing financial viability of the Debtors.

Generally, to the extent the Restructuring Transactions (as defined in the Restructuring Support Agreement) are consummated through the Plan Equitization Transaction:

- Allowed DIP Claims will be converted into a mix of (i) loans under the Take-back Debt Facility on a dollar-for-dollar basis and (ii) Reorganized Common Equity (subject to dilution) at a 25% discount to plan value, which value will be determined during the Chapter 11 Cases;

- Allowed Prepetition First Lien Loan Claims will be equitized into 100% of Reorganized Common Equity (subject to dilution);

- Solely if they vote to accept the Plan, New Warrants convertible into 5% of Reorganized Common Equity will be delivered to the OpCo Debtors Litigation Trust for further distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of Prepetition Second Lien Loan Claims and OpCo Debtor Litigation Trust Units;

- Allowed General Unsecured Claims will receive their *pro rata* share of (i) the distribution from a pool of assets allocable to the respective Debtor against which the Holders of such Allowed General Unsecured Claim hold Claims, and (ii) the OpCo Debtor Litigation Trust Units allocable to the respective Debtor against which the Holders of such Allowed General Unsecured Claim hold Claims.

**PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT, THE CONSENTING FIRST LIEN LENDERS, REPRESENTING OVER TWO-THIRDS (2/3) IN DOLLAR AMOUNT AND MORE THAN ONE-HALF (1/2) IN NUMBER OF PREPETITION FIRST LIEN LOAN CLAIMS HAVE ALREADY AGREED TO CONSENT TO THE PLAN.**

Additional copies of this Disclosure Statement (including its Exhibits) are available upon request made to the office of the Debtors' counsel:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York 10019
> Attention:          Debra M. Sinclair
>                            Matthew A. Feldman
>                            Betsy L. Feldman
>
> E-mail address: dsinclair@willkie.com
>                            mfeldman@willkie.com
>                            bfeldman@willkie.com
>
> and
>
> Young Conaway Stargatt & Taylor, LLP
> Rodney Square
> 1000 North King Street
> Wilmington, Delaware 19801
> Attention:          Edmon L. Morton
>                            Matthew B. Lunn
>                            Allison S. Mielke
>
> E-mail address: emorton@ycst.com
>                            mlunn@ycst.com
>                            amielke@ycst.com

If you have any questions concerning the procedures for voting on the Plan (including the Plan), please contact the Claims Agent at:

> Franchise Group, Inc. Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue
> Suite 412
> Brooklyn, New York 11232
> Telephone:          (844) 285-4564 (U.S./Canada, toll free) or
>                            +1 (646) 937-7751 (international, toll)
>
> Email:                 FRGInfo@ra.kroll.com

## II.    GENERAL HISTORICAL INFORMATION ABOUT THE DEBTORS

Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "Orlofsky Declaration").

### A.    General Background, Corporate History, and Business Operations

As described in further detail in the Orlofsky Declaration, the Debtors are a privately held operator and acquirer of franchised and franchisable businesses.  The Debtors' business segments include a diverse collection of highly recognized, market-leading, and emerging retail brands, including The Vitamin Shoppe, Pet Supplies Plus ("PSP"), American Freight, and Buddy's Home Furnishings ("Buddy's").  The Debtors operate both franchise and corporate-owned programs with respect to each of their business segments.  Across all brands, the Debtors have approximately 2,200 total retail store locations (including both corporate-owned and franchised locations), approximately 11,900 total employees, and operations spanning across the United States.

    i.    The Debtors' Business Segments

- **The Vitamin Shoppe**.  Founded in 1977, The Vitamin Shoppe is an omnichannel specialty retailer and wellness lifestyle company with the mission of providing customers with the most trusted products, guidance and services to help them become their best selves, however they define it.  The Vitamin Shoppe offers a comprehensive assortment of nutritional solutions, including vitamins, minerals, specialty supplements, herbs, sports nutrition, homeopathic remedies, green living products, and natural beauty aids through proprietary brands and approximately 700 national brands.  The company's broad product offering enables it to provide its loyal customer base with a depth of selection of products that may not be readily available at other specialty retailers or mass merchants, such as discount stores, supermarkets, drug stores and wholesale clubs.  Approximately 85% of The Vitamin Shoppe's customers are members of its customer loyalty program.  The Vitamin Shoppe's commitment to good health for *all* is reflected in its dedicated teams that serve numerous communities.  The Vitamin Shoppe operates approximately 680 company-operated retail store locations and 20 franchised locations across the United States and Canada.  The Vitamin Shoppe also sells its products directly to its customers through its online store, at vitaminshoppe.com.  The Vitamin Shoppe maintains its headquarters in Secaucus, New Jersey and has over 4,000 employees.

- **Pet Supplies Plus**.  PSP was founded in 1988 and is a leading omnichannel retail chain and franchisor of pet supplies and services.  PSP offers a curated selection of premium brands and proprietary private label and specialty products with retail price parity with online competitors.  Additionally, PSP offers grooming, pet wash, and other services in most of its locations.  The company's wholly owned subsidiary, Wag N' Wash, is a grooming, pet-wash and natural pet food franchise primarily focused on dogs.  Wag N' Wash is operated by the PSP management team.  PSP is headquartered in Livonia, Michigan and has over 4,000 employees.  The company

has approximately 240 company-operated retail locations, in addition to approximately 550 franchised locations, across the country (inclusive of Wag N' Wash locations). PSP also sells its products directly to its customers through its online store, at petsuppliesplus.com, and offers same-day home product delivery from its stores.

- **American Freight**. Founded in 1994, American Freight is a retail chain that offers in-store and online access to furniture, mattresses, new and out-of-box home appliances and home accessories at discount prices. American Freight buys direct from manufacturers and sells direct in warehouse-style stores. By cutting out the middleman and keeping overhead costs low, American Freight is able to offer quality products at low prices. American Freight provides its customers with multiple payment options, including third-party financing, which provides its customers with access to high-quality products and brand name appliances that may otherwise remain aspirational. American Freight also serves as a liquidation channel for major appliance vendors. American Freight operates specialty distribution centers that test out-of-box appliances before they are offered for sale. Customers are typically covered by the original manufacturer's warranty and are offered the opportunity to purchase a full suite of extended-service plans and services. In February 2020, Sears Hometown Outlet, one of the nation's leading retailers of appliance and appliance-related products, combined with American Freight, making American Freight a leading national value retailer and one-stop-shop for furniture, mattresses and appliances. American Freight has its headquarters in Delaware, Ohio and operates 357 locations across the country, consisting of 344 company-owned locations and 13 franchise-operated locations. The company has approximately 3,000 total employees.

- **Buddy's Home Furnishings**. Buddy's was founded in 1961 and is a specialty retailer of high quality, name brand consumer electronic, residential furniture, appliances, and household accessories through rent-to-own agreements. The rental transaction allows the company's customers the opportunity to benefit from the use of high-quality products under flexible rental purchase agreements without long-term obligations. Buddy's currently operates 34 company-operated stores and has over 300 franchised locations. Buddy's is headquartered in Orlando, Florida and has approximately 230 employees.

    ii.    <u>The Take-Private Transaction</u>

In March 2023, the Board of Directors of Franchise Group received a non-binding, unsolicited proposal from B. Riley Financial, Inc. ("<u>BRF</u>") (an affiliate of B. Riley Principal Investments, LLC ("<u>BRPI</u>")) to acquire all of the outstanding shares of Franchise Group's common stock for a price of $30.00 per share, subject to the participation of certain members of Franchise Group's management team in the transaction, including Mr. Kahn. Between the time of BRF's initial proposal and early May 2023, BRF determined that it was interested in providing financing to facilitate a transaction, but would need to do so in a manner that would not result in BRF controlling or consolidating Franchise Group. Ultimately, a transaction proposal materialized whereby Mr. Kahn and his affiliates would take private control of Franchise Group,

with the transaction being financed, in part, with equity financing provided by various investors, including BRF and certain affiliated entities, and debt financing provided by several lenders, including Irradiant Partners.  During this period, an independent committee of Franchise Group's Board of Directors, and the independent committee's advisors, conducted a review of Mr. Kahn's take-private proposal and other strategic alternatives that were available to Franchise Group, including the potential sale of The Vitamin Shoppe, with a focus on obtaining the best outcome for Franchise Group's public shareholders.  The independent committee ultimately determined that Mr. Kahn's proposal was in the best interests of Franchise Group and its public shareholders, as it would deliver immediate and certain value for public shareholders at a significant premium to Franchise Group's unaffected share price.

In August 2023, Franchise Group completed the take-private transaction (the "Take-Private Transaction") pursuant to that certain *Agreement and Plan of Merger*, dated as of May 10, 2023 (the "Merger Agreement"), by and among Franchise Group, Freedom VCM, Inc., and Freedom VCM Subco, Inc.  Freedom VCM Holdings, LLC ("TopCo") and its subsidiaries that sit above Franchise Group (the "Freedom Entities") were created in connection with the Take-Private Transaction.  Specifically, TopCo was established as Franchise Group's new holding company, through which the Take-Private Transaction investors acquired private ownership of Franchise Group.  Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. were created to borrow and guarantee the HoldCo Term Loan Facility, which provided the debt financing for the transaction; and Debtors Freedom VCM Receivables, Inc. and Freedom Receivables II, LLC were also established in connection with the transaction (as further described herein).

Franchise Group's common shareholders, other than Mr. Kahn and certain other shareholders of Franchise Group that agreed to "roll-over" their Franchise Group equity into equity in TopCo, received $30.00 in cash for each share of Franchise Group's common shares that they held.  This represented a premium of 31.9% to Franchise Group's unaffected closing common stock price on March 17, 2023, the last trading day before Franchise Group announced the receipt of the unsolicited proposal.  Moreover, Franchise Group's preferred stock was redeemed in cash for a redemption price equal to $25.00 per share, plus any accrued and unpaid dividends thereon.  As a result of the Take-Private Transaction, Franchise Group's common stock and preferred stock ceased trading and were delisted from the Nasdaq Global Select Market.

The Take-Private Transaction was predicated on continuing the strategy of Franchise Group, which included the potential for rapid deleveraging of the Debtors through monetization transactions involving the various business segments of Franchise Group.  However, this strategy did not materialize due to, among other things, the business headwinds described herein and the allegations made against Mr. Kahn regarding his alleged business association with Prophecy Asset Management LP ("Prophecy").  For example, the allegations against Mr. Kahn complicated and delayed the pursuit of a potential securitization financing of PSP, as the investment banker conducting that process had to undertake additional due diligence regarding the transaction in light of the allegations, including reviews by its internal risk committees.  These delays, coupled with the macroeconomic issues impacting the Debtors and the need to undertake the restructuring transactions described herein, ultimately required Franchise Group to defer further pursuit of the potential securitization financing until its overall capital structure issues were adequately addressed.

iii.    The Receivables Transaction

In September of 2022, an affiliate of BRPI, B. Riley Receivables II, LLC ("BRRII"), acquired certain accounts receivable (the "Tranche 1 Receivables") from W.S. Badcock Corporation ("Badcock").  To finance its purchase of the Tranche 1 Receivables, BRRII entered into that certain Credit Agreement, dated as of September 23, 2022, by and among Freedom II, PLC Agent LLC (the "PLC Agent"), and the lender thereunder (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Pathlight Credit Facility").  This transaction provided valuable liquidity to Badcock, particularly given that Badcock was experiencing difficulty in implementing third-party financing solutions for its receivables portfolio.

As part of the Take-Private Transaction, Freedom VCM Receivables, Inc., an indirect subsidiary of TopCo, acquired BRRII, which has since been renamed Freedom Receivables II, LLC ("Freedom II"), for consideration consisting of a promissory note (the "Promissory Note") in favor of BRPI (and the Klotz Family Trust, a minority owner of BRRII) (the "Receivables Acquisition"), which had recourse solely against the receivables assets.  Freedom II then acquired additional accounts receivable from Badcock in August 2023 (the "Tranche 2 Receivables") with the incremental debt provided under the Pathlight Credit Facility and pledged the Tranche 2 Receivables to the PLC Agent to secure the obligations under the facility.  The acquisition was structured in this manner because Pathlight Capital LP was willing to provide incremental debt to Freedom II to finance the purchase of additional accounts receivable, but could not do so absent the Receivables Acquisition due to fund-level restrictions.

Freedom II sold the Tranche 2 Receivables to Conn's, Inc. ("Conn's") as part of the sale of Badcock to Conn's in December 2023.  However, due to certain restrictions within the Pathlight Credit Facility, the Debtors could not deliver the Tranche 2 Receivables to Conn's at closing.  In addition, BRPI, the Klotz Family Trust, Freedom II, Freedom VCM Interco Holdings, Inc., and Freedom VCM Receivables, Inc. entered into that certain Amended & Restated Funding Agreement, dated as of December 18, 2023 (the "Funding Agreement"), which governed the repayment of the Pathlight Credit Facility and the Promissory Note.  Following the payment of the Pathlight Credit Facility debt, Freedom II was obligated to deliver the Tranche 1 Receivables to an affiliate of BRPI (with any remaining amounts due on the Promissory Note canceled) up to the amount of approximately $15.3 million (the "Deferred Accrual"), and deliver the Tranche 2 Receivables to Conn's.

The Pathlight Credit Facility was repaid in June 2024.  In early October 2024, the full amount of the Deferred Accrual was paid and the Promissory Note was canceled in accordance with the terms of the Funding Agreement.  Freedom VCM Receivables, Inc. has no economic interest in any of the Tranche 1 Receivables or Tranche 2 Receivables.  As of the Petition Date, Freedom II currently does not hold any Tranche 1 Receivables that it was contractually obligated to deliver an affiliate of BRPI, but it does hold certain Tranche 2 Receivables that it is contractually obligated to deliver to Conn's.

iv.      Removal of Mr. Kahn and Independent Investigation

Shortly after the Take-Private Transaction, in January 2024, Mr. Kahn stepped down from his roles as Franchise Group's Chief Executive Officer and a member of the Boards of Directors of Franchise Group and TopCo.  Mr. Kahn also relinquished his board member rights, which he held in his capacity as an equity holder of TopCo.  These events unfolded in light of the SEC and DOJ's pending investigations into Mr. Kahn's alleged involvement in the collapse of Prophecy. Specifically, in November 2023, Mr. Kahn was identified by federal prosecutors as an unindicted co-conspirator in a securities fraud Indictment (as defined in the Orlofsky Declaration) against Mr. Hughes, the former president and chief compliance officer of Prophecy, for, as set forth in the Indictment, his involvement in a multi-year fraud that concealed losses of hundreds of millions of dollars from Prophecy's investors.  Mr. Hughes was also charged civilly by the SEC for his involvement in the fraud pursuant to the Complaint (as defined in the Orlofsky Declaration). Franchise Group learned that Mr. Kahn was one of two unindicted co-conspirators referred to in both the Complaint and the Indictment.  Mr. Hughes eventually pled guilty to the allegations against him.

Promptly following the Indictment and Complaint, Franchise Group engaged Petrillo Klein + Boxer ("Petrillo") to conduct the Independent Investigation into whether Franchise Group or any of its executive officers or employees at the time, were involved in, or had any knowledge of, any of Mr. Kahn's alleged misconduct.  The Independent Investigation was fulsome, and included, among other things, Petrillo's review of approximately 18,000 documents, as well as interviews of numerous individuals, including members of Franchise Group's executive team and Board of Directors.

The Independent Investigation concluded in December 2023, and Petrillo ultimately found that neither Franchise Group, nor any of its executive officers, current or former directors and officers, or employees (other than Mr. Kahn) had any involvement in, nor any knowledge of, Mr. Kahn's alleged misconduct.  Petrillo also concluded that no business relationship ever existed between Franchise Group and Prophecy.  Finally, Petrillo found that Mr. Kahn's alleged misconduct occurred outside the scope of his roles as Franchise Group's Chief Executive Officer and a member of its Board of Directors, and that Mr. Kahn's alleged misconduct should not be imputed to Franchise Group.  Petrillo's findings in the Independent Investigation were also consistent with the Indictment and Complaint, which did not allege any wrongdoing on the part of Franchise Group or any of its executive officers or employees, other than Mr. Kahn.

v.      The Badcock and Sylvan Learning Transactions

Following the Take-Private Transaction, Franchise Group undertook efforts to improve its liquidity profile and reduce the liquidity issues associated with certain of its capital-intensive businesses through strategic mergers and acquisitions transactions.  In December 2023, Franchise Group completed the combination of its then-owned subsidiary Badcock with Conn's and in February 2024, Franchise Group sold its Sylvan Learning business for significant cash proceeds.

Although the Badcock combination and Sylvan Learning sale had a positive impact on Franchise Group's liquidity profile, Franchise Group's other operating businesses continued to encounter headwinds driven by the macro-economic and other factors, which made it increasingly

8

difficult for Franchise Group to sufficiently deleverage its balance sheet and reduce the related liquidity and cash flow burdens associated with its high debt levels.

vi.    The Additional Independent Investigations

In October 2024, in anticipation of the commencement of these Chapter 11 Cases, the Debtors engaged Petrillo to conduct another independent investigation (the "Independent Investigation") into, among other things, potential claims and causes of actions that the Debtors' estates may have against Mr. Kahn, any of their other current or former directors and officers, or any other third-parties arising from, or related to, among other things: (i) Franchise Group's sale of Badcock to Conn's in December 2023; (ii) the Take-Private Transaction; (iii) the FRII acquisition and any other transactions involving BRPI and its affiliates; and (iv) the Debtors' historical transactions and relationship with Mr. Kahn.

The Independent Investigation will also evaluate the appropriateness of any releases by the Debtors' estates of their current directors and officers through these Chapter 11 Cases and under their proposed chapter 11 plan.

In December 2024, in response to assertions by certain stakeholders that the interests of Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. (the "Freedom HoldCo Debtors") were not being independently represented by the Freedom HoldCo Debtors' existing boards of directors, the boards of directors of each of the Freedom HoldCo Debtors appointed Michael Wartell as independent director to the boards of directors at each Freedom HoldCo Debtor. Mr. Wartell is authorized to engage separate advisors and to investigate all matters relating to any claims, rights, and Causes of Action that may be held by or against the Freedom HoldCo Debtors (such investigation, the "Freedom HoldCo Independent Investigation" and such matters, along with all other matters that may become subject to the Freedom HoldCo Independent Investigation, the "Freedom HoldCo Independent Investigation Related Matters"). Mr. Wartell is also empowered and authorized by each of the Freedom HoldCo Debtors to (a) grant or enter into any agreement that provides for the release(s) of (i) Intercompany Claims the Freedom HoldCo Debtors may have against Franchise Group and/or any of its subsidiaries that are identified in the Freedom HoldCo Independent Investigation or (ii) Claims that the Freedom HoldCo Debtors may have against the Freedom HoldCo Debtors' or their subsidiaries' directors and/or officers that are identified in the Freedom HoldCo Independent Investigation; (b) preserve the Claims that are identified in the Freedom HoldCo Independent Investigation for the benefit of the Freedom HoldCo Debtors and their stakeholders; and (c) settle or enter into any agreement that provides for the settlement(s) of the Claims that are identified in the Freedom HoldCo Independent Investigation for the benefit of the Freedom HoldCo Debtors and their stakeholders.

**For the avoidance of doubt, neither the Freedom HoldCo Debtor Litigation Trust Claims nor the OpCo Litigation Claims are released under or pursuant to the Plan. Furthermore, the Freedom HoldCo Independent Investigation may identify Claims and Causes of Action that are not otherwise settled or released under or pursuant to the Plan. Subject to the Committee Settlement and any other global settlements that the Debtors and their creditors may reach, any such Claims or Causes of Action will not be released pursuant to Section 12.2 of the Plan and will be retained by the applicable Debtor. Such Claims and Causes of Action may be pursued by the Freedom HoldCo Debtor Litigation Trustee.**

### B.    Corporate Structure

Each of the Debtors is privately held.  Prior to the Take-Private Transaction, Franchise Group was a publicly traded company whose common shares traded on the Nasdaq Global Select Market under the ticker FRG.  TopCo is the Debtors' ultimate parent company.  In connection with the Take-Private Transaction, Mr. Kahn "rolled over" his entire stake in Franchise Group, resulting in him and his affiliates owning approximately 32.4% of the outstanding equity of TopCo.  BRPI and its affiliates provided equity financing in connection with the Take-Private Transaction, and own approximately 58.9% of the outstanding equity of TopCo.  TopCo wholly owns Freedom VCM Interco Holdings, Inc., which, in turn wholly owns, directly and indirectly, each of the other subsidiaries in the Debtors' corporate structure.  As further described herein, the Freedom Entities are not obligors, and sit outside of the "credit circle," with respect to the Debtors' senior funded debt facilities—the ABL Facility (as defined herein), First Lien Term Loan Facility (as defined herein), and Second Lien Term Loan Facility (as defined herein).

### C.    Prepetition Capital Structure

As of the Petition Date, the Debtors have approximately $1.985 billion in prepetition debt, consisting of (a) approximately $248.7 million in aggregate principal amount outstanding under their senior secured asset-based revolving credit facility (the "ABL Facility"); (b) approximately $1.13 billion in aggregate principal amount outstanding under their first lien secured term loan credit facility (the "First Lien Term Loan Facility"); (c) approximately $125 million in aggregate principal amount outstanding under their second lien secured term loan credit facility (the "Second Lien Term Loan Facility"); (d) approximately $514.7 million in aggregate principal amount outstanding under their junior term loan credit facility (the "HoldCo Term Loan Facility"); and $0 in aggregate principal amount outstanding under their sidecar *pari passu* second lien secured term loan credit facility (the "Pari Passu Second Lien Term Loan Facility").

The Debtors' capital structure as of the Petition Date is generally described below:

### i.    ABL Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, each as a borrower, the guarantors party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the ABL Lenders, are parties the ABL Credit Agreement.  The ABL Credit Agreement provides for a senior secured revolving credit facility, maturing March 2026, in an amount up to $400 million (subject to borrowing base availability).  Debtor Franchise Group and each of its direct and indirect subsidiaries guarantee the ABL Facility.

Subject to the terms of the Existing ABL Intercreditor Agreement, the Debtors' obligations under the ABL Credit Agreement are secured by: (a) a first priority lien on all ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement); and (b) a third priority lien on all Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement).  As of the Petition Date, approximately $248.7 million on account of principal amounts was outstanding under the ABL Facility, in addition to approximately $12.9 million in face amount of letters of credit outstanding.

ii.    First Lien Term Loan Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the borrowers, the guarantors party thereto, and Wilmington Trust, National Association, as successor administrative agent, and the First Lien Lenders, are parties to the First Lien Credit Agreement.

The First Lien Credit Agreement provides for a senior secured term loan credit facility, which was issued in an original aggregate principal amount of $1 billion, and, in February 2023, was subsequently upsized through an incremental amendment providing for an additional $300 million of aggregate principal amount.  The First Lien Term Loan Facility matures in March 2026. Debtor Franchise Group and each of its direct and indirect subsidiaries guarantee the First Lien Term Loan Facility.

Subject to the terms of the Existing ABL Intercreditor Agreement and the Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, among Franchise Group, Inc., the other grantors referred to therein, the First Lien Credit Agreement Agent, as collateral agent, and the Second Lien Credit Agreement Agent (the "Existing First Lien/Second Lien Intercreditor Agreement"), the First Lien Term Loan Facility is secured by (x) a first priority lien on all Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement); and (y) a second priority lien on all ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement).  As of the Petition Date, approximately $1.13 billion on account of principal amounts was outstanding under the First Lien Term Loan Facility.

iii.    Second Lien Term Loan Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the borrowers, the guarantors party thereto, and Alter Domus (US) LLC, as administrative agent, and Second Lien Lenders are parties to the Second Lien Credit Agreement.

The Second Lien Credit Agreement provides for a junior secured term loan credit facility, which was issued in the original aggregate principal amount of $300 million.  The Second Lien Term Loan Facility matures in September 2026.  Franchise Group and each of its direct and indirect subsidiaries guarantee the Second Lien Term Loan Facility.

Subject to the terms of the Existing ABL Intercreditor Agreement and the Existing First Lien/Second Lien Intercreditor Agreement, the Second Lien Term Loan Facility is secured by a (x) second priority lien on all Term Loan Priority Collateral; and (y) a third priority lien on all ABL Priority Collateral.  As of the Petition Date, approximately $125 million on account of principal amounts was outstanding under the Second Lien Term Loan Facility.

iv.    Pari Passu Second Lien Term Loan Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the borrowers, the guarantors party thereto, and Alter Domus (US) LLC, as administrative agent, and the lenders party thereto from time to time, are parties to that certain *Sidecar Pari Passu Second Lien Credit Agreement*, dated as of August

21, 2023 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Pari Passu Second Lien Term Loan Credit Agreement").

The Pari Passu Second Lien Term Loan Credit Agreement provides for the Pari Passu Second Lien Term Loan Credit Agreement facility. Debtor Franchise Group and each of its direct and indirect subsidiaries guarantee the Pari Passu Second Lien Term Loan Credit Agreement facility. Subject to the terms of the Pari Passu Second Lien Intercreditor Agreement (as defined in the Orlofsky Declaration), the Pari Passu Second Lien Term Loan Credit Agreement facility is secured by the same assets that secure the Second Lien Term Loan Facility and is *pari passu* with the Second Lien Credit Agreement facility with respect to lien priority. As of the Petition Date, there is no principal amount outstanding under the Pari Passu Second Lien Term Loan Facility.

> v.    HoldCo Term Loan Facility

Freedom VCM, Inc., as the borrower, Freedom VCM Interco, Inc., as Holdings, the guarantors from time to time party thereto, and Alter Domus (US) LLC, as administrative agent, and the HoldCo Lenders, are parties to the HoldCo Credit Agreement.

The HoldCo Credit Agreement provides for the HoldCo Credit Agreement facility. The HoldCo Credit Agreement facility matures in March 2026 and is secured by substantially all of the assets of Freedom VCM Interco, Inc. and Freedom VCM, Inc. Pursuant to that certain Supplement No. 1, dated as of August 19, 2024, certain of the Debtors obligated under the ABL Credit Agreement, the First Lien Term Loan Credit Agreement, or the Second Lien Term Loan Credit Agreement provided a guarantee of the obligations under the HoldCo Credit Agreement in an amount not to exceed $19.51 million, and pursuant to that certain Fifth Amendment to the Second Lien Term Loan Credit Agreement, dated as of August 19, 2024, certain of the Debtors agreed to treat the "Secured Holdco Guarantee Obligations" as "Secured Obligations" (each as defined in the Second Lien Term Loan Credit Agreement).

As of the Petition Date, approximately $514.7 million on account of principal amounts, including any interest that has been capitalized and added to principal, was outstanding under the HoldCo Credit Agreement facility. In connection with the Take-Private Transaction, approximately $175 million in principal amount outstanding under the Second Lien Credit Agreement facility was purchased using proceeds of the HoldCo Credit Agreement facility and subsequently canceled. None of the Debtors obligated under the ABL Credit Agreement, the First Lien Credit Agreement, or the Second Lien Credit Agreement are obligated under the HoldCo Credit Agreement.

> vi.    Unsecured Claims

The Debtors also have outstanding unsecured claims as of the Petition Date, including both liquidated and unliquidated and contingent claims. These claims include obligations payable by each of the Debtors' business segments to vendors, shippers, utility providers, landlords, and other parties in the ordinary course of business. As of the Petition Date, the Debtors estimate that approximately $106 million remained outstanding on account of liquidated unsecured claims.

### III.    KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

#### A.    Liquidity Constraints

Prior to the Petition Date, the Debtors faced several challenges that stressed their capital structure and liquidity profile.  Although the Debtors own and operate a strong collection of assets which generate meaningful cash flow, several factors, among others, impacted the Debtors' ability to meet their near- and long-term liquidity needs, working capital requirements, and debt obligations.

- **Macroeconomic Headwinds in the Retail Industry**.   In recent years, macroeconomic headwinds in the retail industry have negatively impacted the financial performance of the Debtors' various business segments.  Higher interest rates and inflation have slowed new store openings and franchise sales, and consumer discretionary spending has decreased, especially with respect to lower-income consumers, who comprise the core customer bases of American Freight and Buddy's. With respect to American Freight and Buddy's, although the COVID-19 pandemic saw a dramatic spike and "pull-forward" in consumer expenditures with respect to home remodeling and furnishing, a steady increase of inflationary pressures and interest rates following the pandemic had a substantial impact on consumer discretionary spending—resulting in consumers moving away from financing for discretionary home appliances and accessories.  Large declines in retail foot traffic have also negatively and disproportionally affected furniture and big-ticket retailers.

- **Overleverage and Rising Interest Expenses**.   Over the past several years, the Debtors have relied upon cash flows generated by their ongoing activities and the issuance of debt to fund their operations and strategic initiatives.  As discussed herein, the Debtors have approximately $1.985 billion in funded debt obligations outstanding as of the Petition Date. The interest owed on these obligations fluctuates based on certain base rates (i.e., SOFR).  As interest rates have increased, so too have the expenses associated with the Debtors' outstanding indebtedness.  The ongoing increase in interest rates and the Debtors' increased leverage profile undertaken in connection with the Take-Private Transaction, combined with the macroeconomic headwinds impacting their businesses, has detrimentally impacted the Debtors' cash flow and related ability to service their debt obligations.

- **Material Contingent Obligations**.  Following Franchise Group's acquisition of Badcock in November 2021, Badcock effectuated several sale and leaseback transactions of properties associated with headquarters, retail stores, offices, and distribution centers, which generated approximately $260 million in proceeds.  In connection with these transactions, Badcock entered into long-term lease arrangements to utilize the real estate that was the subject of these transactions. Franchise Group executed lease guaranty agreements (the "<u>Lease Guaranty Agreements</u>") with respect to certain of Badcock's lease agreements (the "<u>Badcock Lease Agreements</u>"), covering certain of Badcock's retail store locations, distribution centers, and its headquarters that were the subject of the sale and leaseback

transactions.  As described above, in December 2023, Franchise Group combined Badcock with Conn's, which resulted in Badcock becoming a wholly owned subsidiary of Conn's.  Conn's did not meet the requirements under the Badcock Lease Agreements to allow for the substitution and release of the Franchise Group guarantee of Badcock's obligations as tenant thereunder.  As a result, Franchise Group remained as the guarantor in respect of the Badcock Lease Agreements following the completion of the combination of Badcock and Conn's.  In July 2024, Conn's and its subsidiaries, including Badcock, filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.  Conn's chapter 11 cases are currently pending.  The rejection of one or more of the Badcock Lease Agreements in Conn's chapter 11 cases could potentially result in the landlords under such agreements asserting claims against Franchise Group pursuant to the Lease Guaranty Agreements.

**B.      Prepetition Marketing Process & Out-of-Court Restructuring Efforts**

In light of these challenges, in the year leading up to the Petition Date, the Debtors and their advisors pursued and evaluated several strategic initiatives intended to preserve the Debtors' value and liquidity.  These included a potential securitization financing of the Debtors' PSP business, potential monetization of The Vitamin Shoppe and Buddy's businesses, and the marketing of American Freight on a going concern basis.  Indeed, the Debtors retained a leading international investment bank in April 2023 and undertook a broad outreach for the potential sale of The Vitamin Shoppe.  The sale of The Vitamin Shoppe was considered as an alternative to the Take-Private Transaction and was evaluated by the independent committee of Franchise Group's Board of Directors, which ultimately determined that the Take-Private Transaction was in the best interests of Franchise Group and its public shareholders.  Following the Take-Private Transaction, the Debtors continued to broadly market The Vitamin Shoppe with the same leading international investment bank for a potential going-concern sale of the business.

Similarly, in September 2023, the Debtors engaged a leading international investment bank to pursue a whole business securitization of the PSP business, and the Debtors have been actively soliciting interest in the sale of Buddy's for the past several months.  Finally, and as further described in the Debtors' motion to approve bidding procedures and declarations in support thereof, prior to the Petition Date, the Debtors and their advisors ran a robust marketing process to sell American Freight.  The Debtors' objective was to raise proceeds that could be applied to reduce the Debtors' funded debt obligations and provide an immediate, near-term deleveraging of their balance sheet.  Despite their efforts, and in light of some of the issues facing the Debtors as summarized herein, the Debtors were unable to complete any of these transactions.

In addition to exploring potential transactions to monetize their business segments, in the months leading up to the Petition Date, the Debtors attempted to restructure outside of chapter 11 and engaged in extensive negotiations with their key lender constituents to evaluate a consensual out-of-court transaction that was predicated on the Debtors' reorganization around their profitable business lines.  Notwithstanding these efforts, in the weeks leading up to the Petition Date, it became clear that achieving a consensual out-of-court transaction on the timeline required by the Debtors' liquidity constraints was not feasible.  Following this conclusion, the Debtors and the Ad Hoc Group of First Lien Lenders quickly pivoted to negotiating the terms of a restructuring that

14

could be implemented through a chapter 11 process, with the support of the Consenting First Lien Lenders.  To that end, shortly before the Petition Date, the Debtors entered into the Restructuring Support Agreement with the Consenting First Lien Lenders and negotiated the DIP Facility, which is fully backstopped by certain members of the Ad Hoc Group of First Lien Lenders.

Given continuing liquidity constraints, on October 15, 2024, First Lien Term Lenders constituting "Required Lenders" under the First Lien Term Loan Facility entered into an amendment to the First Lien Term Loan Facility under which, among other things, the First Lien Term Lenders agreed to extend the grace period by which any default for failure to pay interest under the First Lien Term Loan Facility would mature into an "Event of Default" until November 3, 2024. The October 15, 2024, amendment gave the Debtors much-needed runway to prepare for a structured and orderly bankruptcy filing.

Notwithstanding the First Lien Term Lenders' agreement to defer their interest payment, around the same time, the ABL Lenders informed the Debtors of their intent to increase certain reserves under the ABL Facility.  Following extensive negotiations with the ABL Lenders, on October 24, 2024, the Debtors entered into an amendment to the ABL Facility which provided for, among other things, an $18 million prepayment of the outstanding Revolving Loans and Swingline Loans under the ABL Facility.  In exchange, the ABL Lenders agreed to waive any events of default under the ABL Facility to November 3, 2024.

## IV.    SUMMARY OF THE PLAN AND RESTRUCTURING SUPPORT AGREEMENT

### A.    The Plan

The Debtors will be soliciting acceptances, subject to the conditions set forth in this Disclosure Statement, from all voting Classes under the Plan consistent with sections 1125 and 1126 of the Bankruptcy Code, Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law (the "Solicitation").  Pursuant to the Plan, among other things, Holders of Claims and Interests against the Debtors shall receive the following treatment as of the Effective Date:

- In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, (i) if the Plan Equitization Transaction is consummated and there is no Partial Sale Transaction, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into Take-Back Term Loans, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into Take-Back Term Loans, ratably, on a dollar-for-dollar basis in an amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Effective Date after giving effect to the Restructuring Transactions (the "Pro Forma Leverage Cap"), and (z) third, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in this Disclosure Statement and/or Plan Supplement, or (ii) if a Plan Equitization Transaction is consummated and there is a

Partial Sale Transaction, (x) first, all Allowed DIP Claims allocable to the applicable Partial Sale Transaction Debtors shall be indefeasibly paid in full in Cash from the applicable net Sale Proceeds, and (y) second, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clause (y) hereof shall be treated in accordance with the foregoing clause (i) hereof, provided, however, that at the election of the Required Consenting First Lien Lenders and DIP Lenders, which election shall be made in good faith and in consultation with the Debtors, the Pro Forma Leverage Cap shall be reduced to account for any assets sold as part of the Partial Sale Transaction that will no longer vest in the Reorganized Debtors, with the method of calculation of any such reduction to be reasonably agreed to by the Required Consenting First Lien Lenders and the Debtors, and (iii) if a Sale Transaction is consummated, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from net Sale Proceeds.  Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

Notwithstanding anything to the contrary contained herein, in the event of a Plan Equitization Transaction (whether or not a Partial Sale Transaction has occurred), at the election of the Required Consenting First Lien Lenders and DIP Lenders, all DIP Claims against the Freedom HoldCo Debtors, shall, in lieu of the treatment set forth in the previous paragraph, convert *mutatis mutandis* into claims against the Freedom HoldCo Debtor Litigation Trust in the same amount, with the same priority and security interest in, and otherwise having the same economic terms as the DIP Claims currently outstanding against the Freedom HoldCo Debtors (the "Freedom HoldCo DIP Election").  For the avoidance of doubt, to the extent the Freedom HoldCo DIP Election is made, the DIP Claims that are converted in accordance with the immediately preceding sentence shall not convert into Take-Back Term Loans or Reorganized Common Equity and any remaining DIP Claims shall be converted in accordance with the immediately preceding paragraph.

- Holders of Allowed Prepetition ABL Loan Claims will receive its *pro rata* share of: (i) to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) proceeds of (x) the Exit ABL Facility, or (y) the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.

- Holders of Allowed Prepetition First Lien Loan Claims will receive its *pro rata* share of: (i) to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial

Sale Transaction, if any) (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), and (C) to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claims), the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim against each applicable Debtor, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.

- Holders of Allowed Prepetition Second Lien Loan Claims shall receive: (i) to the extent the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to accept the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably with OpCo General Unsecured Claims, or (2) if the Class votes to reject the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution. If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.

- Holders of Allowed General Unsecured Claims against Franchise Group, Inc. shall receive: whether the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to Franchise Group, Inc.

17

- Holders of Allowed General Unsecured Claims against the American Freight Debtors shall receive its pro rata share of the OpCo Debtor Litigation Trust Units allocable to the American Freight Debtors.

- Holders of Allowed General Unsecured Claims against the Buddy's Debtors shall receive: whether the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the Buddy's Debtors.

- Holders of Allowed General Unsecured Claims against the PSP Debtors shall receive: whether the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the PSP Debtors.

- Holders of Allowed General Unsecured Claims against the Vitamin Shoppe Debtors shall receive: whether the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the Vitamin Shoppe Debtors.

- Holders of Allowed Prepetition HoldCo Loan Claims shall receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election. If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

- Except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its claim, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to the Freedom HoldCo Debtors resulting from any Partial Sale Transaction, if any, and (B) its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust. If the proceeds of the Partial Sale

18

Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any and (B) its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.

- Except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its claim, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc. resulting from any Partial Sale Transaction, if any.  If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim.

- Except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its claim, each Holder of an Allowed TopCo General Unsecured Claim shall receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.3(c) of the Plan, and (B) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to TopCo resulting from any Partial Sale Transaction, if any.  If (x) there is no Cash held at TopCo following the allocation described in Section 3.3(c) of the Plan, and (y) the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale

Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.

- On the Effective Date, each Holder of an Allowed Intercompany Claim shall receive: (i) in the event of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), on or after the Effective Date: (A) any and all Intercompany Claims between, among and/or against, Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; and (B) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date, or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; provided, however, that notwithstanding the foregoing, any Intercompany Claims, held by or against or among any of the Freedom HoldCo Debtors shall receive the recovery that such Intercompany Claim would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if such Intercompany Claim is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date. To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; or (ii) in the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (A) extinguished, canceled and/or discharged on the Effective Date or (B) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired. To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

- Except to the extent that a Holder of a Subordinated Claim agrees to less favorable treatment, each Holder of a Subordinated Claim shall receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale

Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any).  If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.

- Except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (A) its *pro rata* share of Cash (if any) held by TopCo following all distributions required under the Plan and the allocation described in Section 3.3(c) of the Plan, or (B) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest.

- Whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired; <u>provided</u> that in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, such election shall be with the consent of Required Consenting First Lien Lenders; <u>provided</u>, <u>further</u>, that, notwithstanding the foregoing, the Allowed Existing Intercompany Equity Interests held by any of the Freedom HoldCo Debtors shall be extinguished, canceled, and/or discharged on the Effective Date.

In addition to the foregoing, the Plan shall provide as follows:

- Holders of Allowed Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, U.S. Trustee Fees, Other Secured Claims, and Priority Non-Tax Claims shall be paid in full in Cash or receive such other treatment that renders such Claims unimpaired.

### B.    Other Material Terms of the Restructuring Support Agreement

The Restructuring Support Agreement contains a number of termination events that may be triggered if, among other things, the Debtors pursue a restructuring transaction that is

inconsistent with the Plan and the applicable term sheets appended to the Restructuring Support Agreement, or otherwise file restructuring documents that are not in form and substance consistent with the terms and consent rights contemplated by the Restructuring Support Agreement. Importantly, the Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement and can terminate the Restructuring Support Agreement if the board of directors, board of managers, or such similar governing body of any of the Debtors, in good faith and after consulting with outside counsel, determines that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law, or, in the exercise of its fiduciary duties, determines to pursue an alternative restructuring transaction.

The Restructuring Support Agreement also contains a number of milestones for these Chapter 11 Cases. Unless otherwise extended with the consent of the Required Consenting First Lien Lenders, failure to achieve these milestones provides the Required Consenting First Lien Lenders with the right to terminate their obligations under the Restructuring Support Agreement.

Pursuant to the Restructuring Support Agreement and the Plan, the Debtors shall concurrently (i) conduct the Store Closing and Liquidation Sales of the American Freight Debtors and (ii) (a) effectuate a sale of all or substantially all of the remaining assets of the Debtors pursuant to a Sufficient Bid and consummate a Sale Transaction, (b) effectuate a sale of all or substantially all of the remaining assets of the applicable Partial Sale Transaction Debtors and consummate a Partial Sale Transaction, and exclusively pursue consummation of the Plan Equitization Transaction with respect to the applicable Non-Partial Sale Transaction Debtor(s), or (c) consummate the Plan Equitization Transaction. In the event of the consummation of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), all Allowed Prepetition First Lien Loan Claims will be equitized into 100% of Reorganized Common Equity (subject to dilution from (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable).

Simultaneously with the commencement of these Chapter 11 Cases, the Debtors have launched a fulsome marketing process that will permit the solicitation of bids for all or some of the Debtors' assets. The Sale Transaction is an alternative to the Plan Equitization Transaction and operates as a "market check" to ensure that the Debtors are maximizing the value of their assets for the benefit of all stakeholders. A Sale Toggle Event will occur if the Debtors enter into one or more qualifying asset purchase agreements or other definitive document to consummate a Sale Transaction, solely to the extent entered into in connection with a Sufficient Bid. A Sufficient Bid (i.e., a bid that allows the Debtors to "toggle," or pivot from a Plan Equitization Transaction to a Sale Transaction) is one that, among other things, (i) will substantially contemporaneously with closing of such Sale Transaction satisfy in full, in cash the Allowed DIP Claims, Allowed Prepetition First Lien Loan Claims, and Allowed Prepetition ABL Loan Claims, or (2) is otherwise consented to by the Consenting First Lien Lenders. The Debtors may consummate a Partial Sale Transaction (i.e., a sale of all or substantially all of the assets or Equity Interests of the Buddy's Debtors, the Vitamin Shoppe Debtors, the PSP Debtors, or a combination of two or more of the foregoing), solely if a Sufficient Bid for a Partial Sale Transaction is received by the applicable Partial Sale Transaction Debtors in accordance with the Bidding Procedures and subject to the Auction.

### C.    Acceptance of the Plan

An acceptance of the Plan will constitute an acceptance and consent to all of the terms and provisions in the Plan, including, without limitation, the releases, exculpations, and injunction provisions included therein.

**All voting Classes are urged to read this Disclosure Statement and the documents attached hereto and enclosed herewith in full.  The Debtors believe that the Plan is in the best interests of the Debtors, their Estates, and all of its stakeholders, including the voting Classes.  Accordingly, the voting Classes are urged to vote in favor of the Plan.**

**No person has been authorized to give any information or make any representation about the Plan not contained in this Disclosure Statement.  The statements in this Disclosure Statement are made as of the date hereof.  Neither this Disclosure Statement's distribution nor the consummation of Plan will, under any circumstance, create any implication that the information herein is correct as of any time after the date hereof.  All summaries herein are qualified by reference to the actual terms of each of the documents attached to this Disclosure Statement.  In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability, but shall be deemed a statement made in settlement negotiations.  Unless otherwise indicated, the Debtors have provided the factual information in this Disclosure Statement.**

### D.    Management/Employee Incentive Plans

In the event of a Plan Equitization Transaction, the New Board shall: (x) adopt and implement Management Incentive Plans at each operating company or (y) assume, assume as amended, or reject the existing long term incentive plans of Franchise Group's direct or indirect subsidiaries, in each case structured to incentivize operating performance and align economic interests on terms and conditions acceptable to the New Board and the Required Consenting First Lien Lenders.  If applicable, the Management Incentive Plan shall provide for the issuance of equity or equity-linked awards representing up to 10% of the Reorganized Common Equity on a fully diluted basis, to be allocated by the New Board.  The form of the awards under the Management Incentive Plan, if applicable (*i.e.*, options, restricted stock or units, appreciation rights, etc.), the participants in the Management Incentive Plan, the allocations of the awards to such participants (including the amount of allocations and the timing of the grant of the awards), and the terms and conditions of the awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion.

In the event of a Sale Transaction, the compensation and benefits programs shall either be assumed and assigned upon consummation of an applicable Sale Transaction in accordance with the terms and conditions of the applicable Sale Documents or, if no Successful Bidder assumes the compensation and benefits programs, rejected.  On the Effective Date, or in the event of assumption by a Successful Bidder of the compensation and benefits programs, all Proofs of Claim filed for amounts due under any compensation and benefits programs shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan.

## V.    MATERIAL DEVELOPMENTS SINCE THE PETITION DATE

### A.    The Debtors' First-Day Motions and Certain Related Relief

#### i.    Operational First-Day Pleadings

As described in further detail in the Orlofsky Declaration, to minimize disruption to the Debtors' operations and effectuate the terms of the Plan, upon the commencement of these Chapter 11 Cases, the Debtors filed various first-day motions seeking authority to, among other things, (i) jointly administer the Chapter 11 Cases, (ii) appoint the Claims Agent, (iii) honor customer obligations and otherwise continue prepetition customer programs in the ordinary course of business, (iv) establishing notice and hearing procedures for transfers of membership interests in TopCo and declarations of worthlessness with respect to Equity Interests in Freedom VCM Interco Holdings, Inc., (v) pay prepetition claims owed due to maintaining insurance and continue maintaining the Debtors' insurance, (vi) provide adequate assurance of payment to utility companies, (vii) redact certain personally identifiable information of customers form publicly filed documents, (viii) continue using the Debtors' existing cash management system; (ix) pay prepetition claims owed to certain critical vendors, (x) pay prepetition claims owed to employees and on account of employee benefit programs and to continue offering employee benefit programs postpetition, (xi) pay prepetition claims owed to taxing authorities and continue paying taxes in the ordinary course of business; (xii) approve the Debtors' entry into the consulting agreement and commence store closing procedures with respect to the liquidation of American Freight, and (xiii) obtain debtor-in-possession financing and use cash collateral.

The Freedom Lender Group opposed the Debtors' motion to pay prepetition claims owed to certain critical vendors (item (ix) above, the "Critical Vendors Motion") on various grounds. Following an agreed resolution between the Debtors and the Freedom Lender Group, on November 6, 2024, the Bankruptcy Court entered a first interim order approving the Critical Vendors Motion [Docket No. 129]. Following entry of the first interim order, the Debtors sought further interim relief with respect to the Critical Vendors Motion. The Freedom Lender Group opposed the Debtors' request for such further interim relief. Following a hearing on November 21, 2024, the Bankruptcy Court overruled the Freedom Lender Group's objection and entered a second interim order approving the Critical Vendors Motion [Docket No. 217]. Following entry of the second interim order, the Freedom Lender Group filed an objection to the approval of the Critical Vendors Motion on a final basis [Docket No. 277]. Following an agreed resolution between the Debtors and the Freedom Lender Group, the Freedom Lender Group withdrew its objection and, on December 11, 2024, the Bankruptcy Court entered an order approving the Critical Vendors Motion on a final basis [Docket No. 410]. On December 18, 2024, the Freedom Lender Group filed an appeal of the final order approving the Critical Vendors Motion, which appeal is currently pending before the United States District Court for the District of Delaware, Case No. 24-1403.

#### ii.    Postpetition Debtor-in-Possession Financing

The Debtors sought approval of the DIP Facility on an interim and final basis. The DIP provides up to $250 million in new money financing and ensures the Debtors have access to sufficient liquidity during these Chapter 11 Cases. The DIP Facility includes a conversion, or "roll up," of certain outstanding obligations under the First Lien Term Loan Facility into obligations

under the DIP Facility. The DIP Facility bears interest at a rate equal to S+9.00% with respect to the Tranche A DIP Loans and S+4.75% with respect to Tranche B DIP Loans per annum. The Debtors sought entry into the DIP Facility to permit them to (i) pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with these Chapter 11 Cases, and (ii) obtain necessary funds to be used for working capital needs and general corporate purposes.

The Freedom Lender Group objected to the approval of the DIP Facility on both an interim and final basis. Following a hearing on November 6, 2024, the Bankruptcy Court overruled the Freedom Lender Group's objection and approved the DIP Facility on an interim basis. On November 7, 2024, the Bankruptcy Court entered an interim order approving the DIP Facility [Docket No. 134] (the "Interim DIP Order"). Following entry of the Interim DIP Order, the Debtors drew $100 million of the new money financing available under the DIP Facility (the "Interim Draw"). As a result of the Interim Draw, $100 million of the First Lien Term Loan Facility was rolled up, or converted, into Tranche B DIP Loans.

Following a hearing on December 10, 2024, the Bankruptcy Court overruled the Freedom Lender Group's objection and approved the DIP Facility on a final basis. On December 11, 2024, the Bankruptcy Court entered a final order approving the DIP Facility [Docket No. 414].

All Holders of Prepetition First Lien Loan Claims (and/or one or more Related Funds of such Holders) who signed the Restructuring Support Agreement prior to the closing of the DIP syndication process were eligible to subscribe for their *pro rata* share of the DIP Facility based on their respective *pro rata* holdings of their Allowed Prepetition First Lien Loan Claims pursuant to syndication procedures approved under the Interim DIP Order. To the extent a Holder of Prepetition First Lien Loan Claims (x) did not execute the Restructuring Support Agreement and (in which case, such Holder had no right to subscribe for any portion of the DIP Facility) or (y) executed the Restructuring Support Agreement but did not subscribe for its portion of the DIP Facility in accordance with the syndication procedures, then (in either case) each DIP backstop party had the option to, severally and not jointly, increase its share of the DIP Facility for any portion of the DIP Facility that is not subscribed for (or not permitted to be subscribed for) by such Holder.

On December 18, 2024, the Freedom Lender Group filed an appeal of the Final DIP Order, which is currently pending before the United States District Court for the District of Delaware, Case No. 24-1404.

### B.    Bidding Procedures and Sale Process

On the November 11, 2024, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 154], pursuant to which the Debtors sought to establish certain procedures (the "Proposed Bidding Procedures") with respect

to a competitive sale and marketing process for their assets. A number of parties, including the Committee, submitted informal responses to the Proposed Bidding Procedures, which the Debtors resolved with certain changes to the Proposed Bidding Procedures. Certain landlords filed a limited objection to the Proposed Bidding Procedures [Docket No. 305], which the Debtors resolved at the hearing scheduled to consider the Proposed Bidding Procedures. The Freedom Lender Group also filed an objection to the Proposed Bidding Procedures, which the Bankruptcy Court overruled at the hearing. On December 16, 2024, the Bankruptcy Court entered an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") [Docket No. 444], including the revised Proposed Bidding Procedures (as revised, the "Bidding Procedures").

Pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order, interested parties are required to submit bids on the Debtors' assets no later than 4:00 p.m. (prevailing Eastern Time) on February 3, 2025 (the "Bid Deadline"). Interested parties may submit bids for all of the Debtors' assets, and may also submit bids on individual business lines. For a bid to be considered a "Qualified Bid" or a "Sufficient Bid" under the Bidding Procedures, the bid must have met the various requirements described therein, including with respect to bids for the individual business lines, meeting specified minimum bid prices. Pursuant to the Bidding Procedures, if the Debtors receive at least one Sufficient Bid at least forty-eight (48) hours prior to the date of the Auction, then the Debtors shall hold an auction (the "Auction") for the Assets (as defined in the Bidding Procedures) that are the subject of such Sufficient Bid unless the Debtors do not receive another Qualified Bid that covers such Assets prior to the later of (x) six (6) hours prior to the commencement of the Auction and (y) twenty-four (24) hours after the Debtors designate Qualified Bidders (in which case, the Debtors shall not hold an Auction with respect to the Assets that are the subject of that Sufficient Bid and the Debtors shall proceed with such Sufficient Bid). At the Auction, the Debtors, consistent with the Bidding Procedures, will select the Successful Bidder for the Debtors' assets. If the Debtors do not receive any Sufficient Bids prior to the Bid Deadline, after consultation with the Consultation Parties, the Debtors shall file with the Court, serve on the Sale Hearing Notice Parties (as defined below), and cause to be published a notice canceling the Auction.

On December 18, 2024, the Freedom Lender Group filed an appeal of the Bidding Procedures Order, which is currently pending before the United States District Court for the District of Delaware, Case No. 24-1405.

### C.  Claims Process and Bar Date

#### i.  Schedules of Assets and Liabilities and Statements of Financial Affairs

On December 24, 2024, the Debtors filed their schedules of assets and liabilities, and statements of financial affairs [Docket Nos. 500-552; 553-558 (sealed)] (collectively, the "Schedules and Statements"). On December 31, 2024, the Debtor Vitamin Shoppe Industries LLC (Case No. 24-12521) filed an amendment to its Schedule A/B [Docket No. 584].

#### ii.  Claim Bar Dates

On December 6, 2024, the Bankruptcy Court entered that certain *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising under*

*503(b)(9) of the Bankruptcy Code) and (B) Approving the Form and Manner of Notice Thereof* [Docket No. 354] (the "Bar Date Order"). On December 26, 2024, after the Debtors filed the Schedules and Statements, the Debtors filed that certain *Notice of Deadline for the Filing of Proofs of Claim, Including for Claims Asserted under Section 503(b)(9) of the Bankruptcy Code* [Docket No. 562] (the "Bar Date Notice"), which set the following deadlines:

- General Bar Date: January 23, 2025 at 11:59 p.m. (prevailing Eastern Time). The "General Bar Date" is the last date for all entities (except governmental units) to file a proof of claim in respect of any claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code.

- Government Bar Date: May 2, 2025 at 11:59 p.m. (prevailing Eastern Time). The "Governmental Bar Date" is the last date for a governmental unit, as defined in section 101(27) of the Bankruptcy Code, to file a proof of claim against the Debtors in respect of any claims against the Debtors (whether secured, unsecured priority, or unsecured non-priority) that arose on or prior to the Petition Date, including governmental units with claims against the Debtors for unpaid taxes, whether such claims arise from prepetition tax years or periods or prepetition transactions to which the Debtors were a party.

Additionally, pursuant to the Bar Date Order, unless otherwise ordered by the Court, all entities holding claims against the Debtors arising from the rejection of executory contracts and unexpired leases of the Debtors are required to file Proofs of Claim by the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, (ii) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors, and (iii) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following the effective date of the rejection of any executory contract or unexpired lease of the Debtors pursuant to operation of any Court order (the "Rejection Damages Bar Date").

The Bar Date Order also provides that if, subsequent to the date of the Bar Date Notice, the Debtors amend or supplement the Schedules and Statements to reduce the undisputed, noncontingent, and liquidated amount of a claim listed in the Schedules and Statements, to change the nature or classification of a claim against the Debtors reflected in the Schedules and Statements, or to add a new claim to the Schedules and Statements, then the Debtors shall give notice of any such amendment or supplement to the holders of claims affected thereby, the affected creditor is required to file a Proof of Claim or amend any previously filed Proof of Claim in respect of the amended scheduled claim by the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days from the date on which the Debtors mail notice of the amendment to the Schedules (or another time period as may be fixed by the Court) (the "Supplemental Bar Date," and collectively with the General Bar Date, the Government Bar Date, and the Rejection Damages Bar Date, the "Bar Dates").

Notice of the Bar Dates was provided by mail and publication in accordance with the procedures outlined in the Bar Date Order.

D.      **Freedom Lender Group's Motion to Terminate Exclusivity**

On November 20, 2024, the Freedom Lender Group filed the *Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the Holdco Debtors' Cases, (II) Lifting the Automatic Stay in the Holdco Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the Holdco Debtors* [Docket No. 192] (the "Exclusivity Termination Motion"). On December 3, 2024, the Committee [Docket No. 294], the Debtors [Docket No. 298], and the Ad Hoc Group of First Lien Lenders [Docket No. 299] filed objections to the Exclusivity Termination Motion. On December 6, 2024, the Freedom Lender Group filed an omnibus reply in support of the Exclusivity Termination Motion [Docket No. 365]. On December 10 and 17, 2024, the Bankruptcy Court held a hearing to consider the Exclusivity Termination Motion. For the reasons set forth on the record at the hearing on December 17, 2024, the Bankruptcy Court overruled the Exclusivity Termination Motion on all grounds. On December 18, 2024, the Court entered an order denying the Exclusivity Termination Motion (the "Exclusivity Termination Order").

On December 18, 2024, the Freedom Lender Group filed an appeal of the Exclusivity Termination Order, which is currently pending before the United States District Court for the District of Delaware, Case No. 24-1394. The Freedom Lender Group filed its Appellant's Brief on January 8, 2025. The Creditors' Committee moved to intervene in the appeal on January 16, 2025, which was granted on January 28, 2025.

E.      **Committee Settlement**

In parallel with the ongoing Independent Investigation and the Freedom HoldCo Independent Investigation, the Committee undertook an extensive investigation of the prepetition conduct of the Debtors and their Affiliates and certain third parties affiliated with the Debtors. In connection with its investigation, the Committee took formal and informal discovery from the Debtors. The Committee requested and received several thousand pages of documents and diligence materials in furtherance of its investigation. As of the date of this Disclosure Statement, the Committee's investigation is ongoing. Ultimately, the investigations have revealed certain transactions and events in the Debtors' recent corporate history that may give rise to potential claims or causes of action—namely, the OpCo Litigation Claims.

The Debtors, the Consenting First Lien Lenders, and the Creditors' Committee engaged in extensive, good-faith and arms' length negotiations with respect to the OpCo Litigation Claims, which resulted in a global compromise (as defined in the Plan, the "Committee Settlement"). The Committee Settlement not only resolves the OpCo Litigation Claims, but also paves the way for the resolution of these Chapter 11 Cases and confirmation of the Plan with support from the Creditors' Committee and the Consenting First Lien Lenders.

The Committee Settlement is described more fully in Article XV of the Plan, and the term sheet memorializing the Committee Settlement is attached as Exhibit I to the Plan, which is fully

incorporated as a material component of the Plan.[2]  In general, the Committee Settlement Parties have agreed to the Committee Settlement on the following terms:

(i)      any and all disputes between the Committee Settlement Parties will be resolved;

(ii)      the OpCo Debtor Litigation Trust will be established;

(iii)      the OpCo Debtor Litigation Trust Escrow Amount will be funded;

(iv)      the Independent Investigation will be terminated;

(v)      the Committee Settlement Parties have agreed to mutual releases as provided for in the Plan; and

(vi)      the Committee and the Consenting First Lien Lenders have agreed to support the Plan.

The Committee Settlement provides significant value to the Debtors and their Estates, favorably resolves and avoids potential protracted expensive and uncertain litigation, and enables the prompt and efficient wind-down of the Debtors' Estates through the Plan.  The Plan shall serve as a motion to approve the Committee Settlement pursuant to Bankruptcy Rule 9019.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Committee Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Holders of Claims, and other parties in interest, and are fair, equitable, and reasonable.

## VI.    SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11 CASES AND THE PLAN

This Article details certain issues in connection with these Chapter 11 Cases and the Plan.

### A.    Voting on the Plan

As described herein and in the Plan, only certain classes under the Plan are entitled to vote on the Plan.  Specifically, Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, General Unsecured Claims, Prepetition HoldCo Loan Claims, Freedom HoldCo General Unsecured Claims, HoldCo Receivables General Unsecured Claims, TopCo General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests are members of the only Classes that are "impaired" and entitled to vote to accept or reject the Plan.  Any Holder of a Claim whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan, or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code, is considered "impaired."  Each Holder of a Claim or Interest of a Class that is deemed to accept or reject the Plan will receive a notice of

---

[2]    To the extent that there is any inconsistency between this summary of the primary terms of the Committee Settlement and the description of the Committee Settlement in the Plan, the Plan controls.

non-voting status after the Petition Date, but will not have received a Ballot because they are not eligible to vote on the Plan.  All Holders of Claims or Interests may receive a copy of these documents and/or the Plan Supplement, if applicable, by mailing a written request to the Claims Agent.

---

**Which Classes of Claims and Interests Are Entitled to Vote on the Plan?**

Classes of Claims and Interests are entitled to vote on the Plan as follows:

- Claims and Interests in Classes 1 and 2 are unimpaired under the Plan, are deemed to have accepted the Plan, and are not entitled to vote on the Plan.

- Claims and Interests in Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 are impaired and entitled to vote on the Plan.

- Interests in Classes 9, 10, and 12 are impaired and deemed to have rejected the Plan and are not entitled to vote on the Plan.

---

For a description of the Classes of Claims and Interests and their treatment under the Plan, see Article VI.C, "*Summary of Classification and Treatment Under the Plan,*" below.

Under the Bankruptcy Code, a Class of Claims shall have accepted the Plan if it is accepted or deemed accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Holders of the Allowed Claims or Interests in such Class that have voted on the Plan. The votes in favor of the Plan must be obtained from one impaired accepting Class, excluding the votes of any insiders.

## B.     The Confirmation Hearing

The Debtors will request that the Court schedule, as promptly as practicable, a hearing to approve this Disclosure Statement as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code.

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to confirm a plan.  Section 1128(b) provides that a party-in-interest may object to confirmation of a plan.  Objections to confirmation must be filed with the Bankruptcy Court and served on the Debtors as well as the other parties set forth in the notice of the Confirmation Hearing (the "Notice of Confirmation Hearing") by the objection deadline, as set forth in the Notice of Confirmation Hearing.  The Notice of Confirmation Hearing will be mailed to parties at a later date, after the filing of these Chapter 11 Cases.

At the Confirmation Hearing, the Bankruptcy Court will:

- determine whether the solicitation of votes on the Plan was in compliance with section 1126 of the Bankruptcy Code;

- determine whether the Plan has been accepted by a sufficient number of Holders and amount of claims entitled to vote on the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

### C.    Summary of Classification and Treatment Under the Plan

The following table and description summarize the classification and treatment of Claims and Interests and the consideration contemplated to be distributed to the Holders of Allowed Claims and Interests under the Plan. The recoveries set forth in the following table assume that the Plan Equitization Transaction is consummated on the Effective Date of the Plan. Unless otherwise noted, these estimates are as of the date hereof. For an explanation of the assumptions and uncertainties regarding these calculations, see Article IX, "*Risk Factors.*"

A number of events may occur that may result in recoveries being higher than are reflected in the following table. First, a Sale Transaction or a Partial Sale Transaction could result in Cash Sale Proceeds for the benefit of applicable creditors. Additionally, the Debtors and their creditors may reach a negotiated resolution of certain issues, resulting in the exchange of valuable consideration for the benefit of applicable creditors. Finally, the Freedom HoldCo Independent Investigation may result in Claims and Causes of Action that will be retained by the applicable Debtor if they are not otherwise settled, discharged, or released under or pursuant to the Plan.

---

**Important Note on Estimates**

Statements regarding projected amounts of Claims and Interests or distributions are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts. Except as otherwise indicated, these statements are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.

---

**Note on Numerical Information. The numerical information in this Disclosure Statement, including the Financial Projections annexed as <u>Exhibit C</u> hereto and the estimated Allowed amounts, has been prepared by the Debtors, with the assistance of its investment banker, Ducera Partners LLC. The assumptions used in preparing such Financial Projections and estimates are inherently subject to significant uncertainties and actual results may differ from such Financial Projections and estimates, as further described in <u>Article XVI.D.ii</u>.**

i.      Summary of Classification and Treatment of Claims

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| Class 1:<br><br>Priority Non-Tax Claims | The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable Distribution Date, each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Required Consenting First Lien Lenders): (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  In the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.<br><br>**Unimpaired – Presumed to accept.** | N/A | 100% |
| Class 2:<br><br>Other Secured Claims | The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each Holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim | N/A | 100% |

---

[3]    The amounts set forth in this chart reflect the Debtors' most current estimates of projected claim amounts, and does not reflect potential unsecured damages claims resulting from the rejection of any Executory Contracts or Unexpired Leases.  Additional Claims and Interests may be asserted against the Debtors prior to the applicable Bar Dates for filing proofs of Claim or Interests in these Chapter 11 Cases, which, as of the date of this Disclosure Statement, have not passed.  Thus, the total amount of Claims may be materially more or less than the estimate set forth in this Disclosure Statement.

[4]    This chart does not purport to set forth a valuation of the Debtors' assets.

unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Sale Transaction or a Partial Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

Each Holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein. Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person and the Holder of such Claims shall deliver to the Debtors or Post-Effective Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, or lis pendens, or similar interests or documents. Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Post-Effective Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

Deficiency Claims: To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim, only as applicable, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, Class 6-E Claim, Class 8-A Claim, Class 8-B Claim, or Class 8-C Claim, only as applicable.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | **Unimpaired – Presumed to accept.** | | |
| Class 3:<br><br>Prepetition ABL Loan Claims | On the Effective Date, the Prepetition ABL Loan Claims shall be Allowed under the Plan in the amount of $248.7 million plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims (including, without limitation, any reimbursement obligations under outstanding letters of credit), and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition ABL Loan Claim, except to the extent that the ABL Credit Agreement Agent or a Holder of a Prepetition ABL Loan Claim agrees to different treatment with respect to such Holder's Claim, on the Effective Date, or as soon as practicable thereafter, each ABL Lender shall receive its *pro rata* share of:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) (x) proceeds of the Exit ABL Facility, or (y) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.<br><br>**Impaired – Entitled to vote.** | $248.7 million, plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims. | 100% |

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| Class 4:<br><br>Prepetition First Lien Loan Claims | On the Effective Date, the Prepetition First Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition First Lien Loan Claim, except to the extent that the First Lien Credit Agreement Agent or a Holder of a Prepetition First Lien Loan Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each First Lien Lender shall receive, subject to the terms of the Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), and (C) to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claims), the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim against each applicable Debtor, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.<br><br><u>Deficiency Claims</u>:  If applicable, any First Lien Deficiency Claims shall be classified and treated as a Class | $1.13 billion, plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition First Lien Loan Claims | TBD |

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.<br><br>**Impaired – Entitled to vote.** | | |
| Class 5:<br><br>Prepetition Second Lien Loan Claims | On the Effective Date, the Prepetition Second Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition Second Lien Loan Claim, except to the extent that a Holder of a Prepetition Second Lien Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition Second Lien Loan Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to <u>accept</u> the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably with OpCo General Unsecured Claims, or (2) if the Class votes to <u>reject</u> the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution.  If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such | $125 million, plus accrued but unpaid prepetition interest and fees through the Effective Date | 0% - TBD[5] |

---

[5]    The value of the New Warrants is undetermined at this time.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.<br><br>Deficiency Claims:    If applicable, any Second Lien Deficiency Claims shall be treated for all purposes under the Plan as a General Unsecured Claim only against the applicable Debtor, and shall be classified and treated as the applicable Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, only as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.<br><br>**Impaired – Entitled to vote.** | | |
| Class 6-A:<br><br>General Unsecured Claims against Franchise Group, Inc. | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim at Franchise Group, Inc., except to the extent that a Holder of a General Unsecured Claim against Franchise Group, Inc. agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim at Franchise Group, Inc. shall receive, its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to Franchise Group, Inc.<br><br>**Impaired – Entitled to vote.** | $6.1 million | 0%[6] |
| Class 6-B:<br><br>General Unsecured Claims against the American Freight Debtors | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the American Freight Debtors, on the Effective Date, each Holder of an Allowed General Unsecured Claim against the American Freight Debtors shall receive its pro rata share of the OpCo Debtor Litigation Trust Units allocable to the American Freight Debtors.<br><br>**Impaired – Entitled to vote.** | $36.9 million | 0%[7] |

---

[6]    As discussed above in Section II(A)(vi) and Section VI(C), the estimated recovery for General Unsecured Claims in Class 6-A, Class 6-B, Class 6-C, Class 6-D, and Class 6-E may be greater than 0% depending on the outcome of the Sale Process and any negotiations among major constituent groups.

[7]    See footnote 5.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| **Class 6-C:**<br><br>General Unsecured Claims against the Buddy's Debtors | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Buddy's Debtors, except to the extent that a Holder of a General Unsecured Claim against the Buddy's Debtors agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Buddy's Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the Buddy's Debtors.<br><br>**Impaired – Entitled to vote.** | $0.5 million | 0%[8] |
| **Class 6-D:**<br><br>General Unsecured Claims against the PSP Debtors | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the PSP Debtors, except to the extent that a Holder of a General Unsecured Claim against the PSP Debtors agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the PSP Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the PSP Debtors.<br><br>**Impaired – Entitled to vote.** | $5.9 million | 0%[9] |
| **Class 6-E:**<br><br>General Unsecured Claims against the Vitamin Shoppe Debtors | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Vitamin Shoppe Debtors, except to the extent that a Holder of a General Unsecured Claim against the Vitamin Shoppe Debtors agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Vitamin Shoppe Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the Vitamin Shoppe Debtors.<br><br>**Impaired – Entitled to vote.** | $15.1 million | 0%[10] |
| **Class 7:** | In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition HoldCo Loan Claim, except to the extent that a Holder of a Prepetition | $514.8 million, plus accrued but unpaid | 0%[11] |

---

[8]    See footnote 5.

[9]    See footnote 5.

[10]   See footnote 5.

[11]   As discussed above in Section II(A)(vi) and Section VI(C), the estimated recovery for Class 7 Prepetition HoldCo Loan Claims, Class 8-A Freedom HoldCo General Unsecured Claims, Class 8-B HoldCo Receivables General

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| Prepetition HoldCo Loan Claims | HoldCo Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition HoldCo Loan Claim shall receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election. If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.<br><br>**Impaired – Entitled to vote.** | prepetition interest and fees through the Effective Date | |
| Class 8-A:<br><br>Freedom HoldCo General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Freedom HoldCo General Unsecured Claim, except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to the Freedom HoldCo Debtors resulting from any Partial Sale Transaction, if any, and (B) its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust. If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim | $0 | 0%[12] |

Unsecured Claims, and Class 8-C TopCo General Unsecured Claims may be greater than 0% depending on the outcome of the Sale Process, the outcome of the Freedom HoldCo Independent Investigation, or any negotiations among major constituent groups.

[12] See footnote 10.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any and (B) its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** | | |
| Class 8-B:<br><br>HoldCo Receivables General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo Receivables General Unsecured Claim, except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc. resulting from any Partial Sale Transaction, if any. If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no | $37.9 million | 0%[13] |

---

[13]    See footnote 10.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | consideration on account of its HoldCo Receivables General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** | | |
| Class 8-C:<br><br>TopCo General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed TopCo General Unsecured Claim, except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed TopCo General Unsecured Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.3(c) of the Plan, and (B) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to TopCo resulting from any Partial Sale Transaction, if any.  If (x) there is no Cash held at TopCo following the allocation described in Section 3.3(c) of the Plan, and (y) the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** | $0 | 0%[14] |
| Class 9:<br><br>Intercompany Claims | On the Effective Date, each Holder of an Allowed Intercompany Claim shall receive the following treatment:<br><br>(i) in the event of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), on or after the Effective Date: (A) any and all Intercompany Claims between, among and/or against, Franchise Group, Inc. and any of its | N/A | N/A |

---

[14]    See footnote 10.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; and (B) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date, or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; provided, however, that notwithstanding the foregoing, any Intercompany Claims, held by or against or among any of the Freedom HoldCo Debtors shall receive the recovery that such Intercompany Claim would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if such Intercompany Claim is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date. To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; or

(ii) in the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (A) extinguished, canceled and/or discharged on the Effective Date or (B) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired. To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. | | |

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | **Impaired – Deemed to reject.** | | |
| Class 10:<br><br>Subordinated Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Subordinated Claim, except to the extent that a Holder of a Subordinated Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Subordinated Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any).  If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.<br><br>**Impaired – Deemed to reject.** | N/A | 0% |
| Class 11:<br><br>Existing TopCo Equity Interests | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing TopCo Equity Interest, except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (A) its *pro rata* share of Cash (if any) held by TopCo following all distributions required under the Plan and the allocation described in Section 3.3(c) of the Plan, or (B) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no | N/A | 0%[15] |

---

[15]    The estimated recovery for Class 11 Existing TopCo Equity Interests may be greater than 0% depending on whether there are any TopCo Allocated Fees and Expenses.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|-------|-----------|------------------------|-------------------|
| | further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest.<br><br>**Impaired – Entitled to vote.** | | |
| Class 12:<br><br>Existing Intercompany Equity Interests | On the Effective Date, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired; provided that in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, such election shall be with the consent of Required Consenting First Lien Lenders; provided, further, that, notwithstanding the foregoing, the Allowed Existing Intercompany Equity Interests held by any of the Freedom HoldCo Debtors shall be extinguished, canceled, and/or discharged on the Effective Date.<br><br>**Impaired – Deemed to reject.** | N/A | 0% |

### D.  Summary of Treatment Under the Plan

The following section describes more fully the treatment to be provided to each Class of Claims and Interests under the Plan. This description is only a summary of certain important provisions of the Plan and should not replace careful review of the Plan. Each Holder of a Claim or Interest should read the Plan carefully. Please refer particularly to Articles IV and V of the Plan, Article VII below, and the liquidation analysis annexed as Exhibit B hereto (the "Liquidation Analysis") for a more detailed description of the classification and treatment of Claims and Interests provided under the Plan.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not designate Classes of Claims for: DIP Claims, Administrative Claims, Fee Claims, Priority Tax Claims, and U.S. Trustee Fees. The Plan designates twelve Classes of Claims and Interests: Class 1 - Priority Non-Tax Claims, Class 2 - Other Secured Claims, Class 3 - Prepetition ABL Loan Claims, Class 4 - Prepetition First Lien Loan Claims, Class 5 - Prepetition Second Lien Loan Claims, Class 6 - General Unsecured Claims against (A) Franchise Group, Inc., (B) the American Freight Debtors,

(C) the Buddy's Debtors, (D) the PSP Debtors, and (E) the Vitamin Shoppe Debtors, Class 7 - Prepetition HoldCo Loan Claims, Class 8 - General Unsecured Claims against (A) the Freedom HoldCo Debtors, (B) Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc., and (C) TopCo, Class 9 - Intercompany Claims, Class 10 - Subordinated Claims, Class 11 - Existing TopCo Equity Interests, and Class 12 - Existing Intercompany Equity Interests.

i.    DIP Claims

To the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, (i) each Holder of DIP Claims (and/or one or more Related Funds of such Holder, to the extent such Related Funds are Holders of DIP Claims) that received a DIP Backstop Premium or Commitment Premium (as defined in the DIP Credit Agreement) as of closing of the DIP syndication process, and (ii) each Holder of DIP Claims that receives an Exit Premium (as defined in the DIP Credit Agreement) shall be entitled to elect, at its sole discretion, to convert such DIP Backstop Premium, Commitment Premium and/or Exit Premium into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in an amendment to this Disclosure Statement and/or Plan Supplement.

On the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, (i) if the Plan Equitization Transaction is consummated and there is no Partial Sale Transaction, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into Take-Back Term Loans, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into Take-Back Term Loans, ratably, on a dollar-for-dollar basis in an amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Effective Date after giving effect to the Restructuring Transactions, and (z) third, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in an amendment to this Disclosure Statement and/or Plan Supplement, (ii) if a Plan Equitization Transaction is consummated and there is a Partial Sale Transaction, (x) first, all Allowed DIP Claims allocable to the applicable Partial Sale Transaction Debtors shall be indefeasibly paid in full in Cash from the applicable net Sale Proceeds, and (y) second, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clause (y) hereof shall be treated in accordance with the foregoing clause (i) hereof, provided, however, that at the election of the Required Consenting First Lien Lenders and DIP Lenders, which election shall be made in good faith and in consultation with the Debtors, the Pro Forma Leverage Cap shall be reduced to account for any assets sold as part of the Partial Sale Transaction that will no longer vest in the Reorganized Debtors, with the method of calculation of any such reduction to be reasonably agreed to by the Required Consenting First Lien Lenders and the Debtors, and (iii) if a Sale Transaction is consummated, all Allowed DIP Claims shall be

indefeasibly paid in full in Cash from net Sale Proceeds.  Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

Notwithstanding anything to the contrary contained herein, in the event of a Plan Equitization Transaction (whether or not a Partial Sale Transaction has occurred), at the election of the Required Consenting First Lien Lenders and DIP Lenders, all DIP Claims against the Freedom HoldCo Debtors, shall, in lieu of the treatment set forth in the previous paragraph, convert *mutatis mutandis* into claims against the Freedom HoldCo Debtor Litigation Trust in the same amount, with the same priority and security interest in, and otherwise having the same economic terms as the DIP Claims currently outstanding against the Freedom HoldCo Debtors.  For the avoidance of doubt, to the extent the Freedom HoldCo DIP Election is made, the DIP Claims that are converted in accordance with the immediately preceding sentence shall not convert into Take-Back Term Loans or Reorganized Common Equity and any remaining DIP Claims shall be converted in accordance with the immediately preceding paragraph.

ii.    Administrative Claims

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the Holder of such Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim or such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors-in-possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, that any Allowed Administrative Expense Claim that has been assumed by a Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan.

iii.    Fee Claims

Any Professional Person seeking allowance of a Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred on and prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than forty-five (45) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.  Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order.

a.    Professional Fee Escrow Account

The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Confirmation Order.  The Post-Effective Debtors or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash to such Professional Persons in the amount the Bankruptcy Court allows from funds held in the Professional Fee Escrow

46

Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; provided that the Debtors' and the Post-Effective Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Debtors' Professional Persons, the Post-Effective Debtors or the Plan Administrator, as applicable, shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Creditors' Committee's Professional Persons, the OpCo Debtor Litigation Trust shall fund any shortfall into the Professional Fee Escrow Account.

Professional Persons shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than three (3) Business Days before the anticipated Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional Person's final request for payment in the Chapter 11 Cases. If a Professional Person does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional Person.

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash on hand of the Debtors, subject to the terms of Section 3.3(c) of the Plan, equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professional Persons and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the Bankruptcy Court. No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable. Notwithstanding the foregoing sentence, funding of the Professional Fee Escrow Account will not be reported as a disbursement from the Estates, and disbursements from the Professional Fee Escrow Account on account of payment of Allowed Professional Fee Claims will be reported as disbursements from the Estates on the relevant monthly operating report(s). When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be remitted to the Post-Effective Debtors or the Plan Administrator, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Any further disbursements of such funds shall be reported in accordance with the Bankruptcy Rules.

The Professional Persons shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors (which estimate may include a reasonable cushion to cover unexpected or unknown fees) before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than three (3) Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation

47

with respect to the amount of the fees and expenses that are the subject of a Professional Person's final request for payment of Professional Fee Claims filed with the Bankruptcy Court, and such Professional Persons are not bound to any extent by the estimates.  If a Professional Person does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional Person for inclusion in the Professional Fee Escrow Amount.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; provided that the Post-Effective Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

Following the Effective Date, the Plan Administrator shall have authority with respect to matters related to Professional Fee Claim requests by Professional Persons, if any, acting at their direction in accordance with the terms of the Plan.

### b.   Allocation of Payment of Certain Fees and Expenses.

Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "TopCo Allocated Fees and Expenses").  Freedom VCM Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such TopCo Allocated Fees and Expenses, if any; provided that for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the TopCo Allocated Fees and Expenses; provided, further, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims.

Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to the Freedom HoldCo Debtors with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be subject to the terms of, (i) in the case of the fees and expenses of the Freedom HoldCo Independent Director, that certain letter agreement dated as of December 9, 2024 between the Freedom HoldCo Debtors and Michael J. Wartell of Bluerose Associates LLC, (ii) in the case of the fees and expenses of any advisors hired by the Freedom HoldCo Independent Director, any order approving the retention of the same, and (iii) in the case of any other fees and expenses allocable to the Freedom HoldCo Debtors, Paragraphs 2(c) and (j) of the Interim Compensation Order.

### iv.   Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting First Lien Lenders, each Holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, either: (a) on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to

such Claim; or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the Holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due; provided, further, that (i) in the event of a Plan Equitization Transaction, notwithstanding any provision of the Plan or the Restructuring Support Agreement to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state law shall be assumed by and reinstated against the applicable Reorganized Debtor and (ii) in the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Tax Claim that has been expressly assumed by a Successful Bidder under the Sale Documents shall not be an obligation of the Debtors.  On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person.

v.      U.S. Trustee Fees and Related Reporting Obligations

All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  After the Effective Date, the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable.  The Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, is responsible.  The U.S. Trustee shall not be treated as providing any release under the Plan. U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to file any Proof of Claim or any request for administrative expense for U.S. Trustee Fees. The provisions of this paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary.

vi.      Priority Non-Tax Claims – Class 1

Classification:  Class 1 consists of Priority Non-Tax Claims against each Debtor.

Treatment:  The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable Distribution Date, each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Required Consenting First Lien Lenders): (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority

49

Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. In the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

Impairment and Voting: Priority Non-Tax Claims are not impaired Claims. In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

vii.    Other Secured Claims – Class 2

Classification: Class 2 consists of Other Secured Claims against each Debtor.

Treatment: The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan. In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each Holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Sale Transaction or a Partial Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

Each Holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein. Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person and the Holder of such Claims shall deliver to the Debtors or Post-Effective Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, or *lis pendens*, or similar interests or documents. Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Post-Effective Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

Deficiency Claims: To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim, only as applicable, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, Class 6-E Claim, Class 8-A Claim, Class 8-B Claim, or Class 8-C Claim, only as applicable.

Impairment and Voting: The Other Secured Claims are not impaired Claims. In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

      viii.    Prepetition ABL Loan Claims – Class 3

Classification: Class 3 consists of approximately $248.7 million plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims.

Treatment: On the Effective Date, the Prepetition ABL Loan Claims shall be Allowed under the Plan in the amount of $248.7 million plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims (including, without limitation, any reimbursement obligations under outstanding letters of credit), and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person. In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition ABL Loan Claim, except to the extent that the ABL Credit Agreement Agent or a Holder of a Prepetition ABL Loan Claim agrees to different treatment with respect to such Holder's Claim, on the Effective Date, or as soon as practicable thereafter, each ABL Lender shall receive its *pro rata* share of:

    (i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) (x) proceeds of the Exit ABL Facility, or (y) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or

    (ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.

Impairment and Voting:  The Prepetition ABL Loan Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition ABL Loan Claims.

ix.     Prepetition First Lien Loan Claims – Class 4

Classification:  Class 4 consists of approximately $1.13 billion in outstanding principal, plus interest, fees, and other expenses pursuant to the First Lien Credit Agreement.

Treatment:  On the Effective Date, the Prepetition First Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition First Lien Loan Claim, except to the extent that the First Lien Credit Agreement Agent or a Holder of a Prepetition First Lien Loan Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each First Lien Lender shall receive, subject to the terms of the Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of:

(i)      in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), and (C) to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claim), the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim against each applicable Debtor, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class; or

(ii)     in the event the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.

Deficiency Claims:  If applicable, any First Lien Deficiency Claims shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E

Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.

Impairment and Voting: The Prepetition First Lien Loan Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition First Lien Loan Claims.

x.    Prepetition Second Lien Loan Claims – Class 5

Classification:  Class 5 consists of approximately $125 million in outstanding principal, plus interest, fees, and other expenses pursuant to the Second Lien Credit Agreement.

Treatment:  On the Effective Date, the Prepetition Second Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition Second Lien Loan Claim, except to the extent that a Holder of a Prepetition Second Lien Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition Second Lien Loan Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to accept the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably with OpCo General Unsecured Claims, or (2) if the Class votes to reject the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution. If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.

Deficiency Claims:  If applicable, any Second Lien Deficiency Claims shall be treated for all purposes under the Plan as a General Unsecured Claim only against the applicable Debtor, and shall be classified and treated as the applicable Class 6-A Claim, Class 6-B Claim, Class 6-C

Claim, Class 6-D Claim, or Class 6-E Claim, only as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.

Impairment and Voting:  The Prepetition Second Lien Loan Claims are impaired Claims. In accordance with section 1126(g) of the Bankruptcy Code.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition Second Lien Loan Claims.

xi.    General Unsecured Claim against Franchise Group, Inc. – Class 6-A

Classification: Class 6-A consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against Franchise Group, Inc.

Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim at Franchise Group, Inc., except to the extent that a Holder of a General Unsecured Claim against Franchise Group, Inc. agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim at Franchise Group, Inc. shall receive, its *pro rata* share of  the OpCo Debtor Litigation Trust Units allocable to Franchise Group, Inc.

Impairment and Voting: The General Unsecured Claims at Franchise Group, Inc. are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims at Franchise Group, Inc.

xii.    General Unsecured Claim against American Freight – Class 6-B

Classification:  Class 6-B consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against American Freight.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the American Freight Debtors, on the Effective Date, each Holder of an Allowed General Unsecured Claim against the American Freight Debtors shall receive its pro rata share of the OpCo Debtor Litigation Trust Units allocable to the American Freight Debtors.

Impairment and Voting:  The General Unsecured Claims against the American Freight Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the American Freight Debtors.

xiii.    General Unsecured Claim against Buddy's – Class 6-C

Classification:  Class 6-C consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against Buddy's.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Buddy's Debtors, except to the extent that a Holder of a General Unsecured Claim against the Buddy's Debtors agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Buddy's Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the Buddy's Debtors.

Impairment and Voting: The General Unsecured Claims against the Buddy's Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the Buddy's Debtors.

xiv.    General Unsecured Claim against PSP – Class 6-D

Classification:  Class 6-D consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against PSP.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the PSP Debtors, except to the extent that a Holder of a General Unsecured Claim against the PSP Debtors agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the PSP Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the PSP Debtors.

Impairment and Voting:  The General Unsecured Claims against the PSP Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the PSP Debtors.

xv.    General Unsecured Claim against Vitamin Shoppe – Class 6-E

Classification:  Class 6-E consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against Vitamin Shoppe.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Vitamin Shoppe Debtors, except to the extent that a Holder of a General Unsecured Claim against the Vitamin Shoppe Debtors agrees to less

favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Vitamin Shoppe Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the Vitamin Shoppe Debtors.

Impairment and Voting:  The General Unsecured Claims against the Vitamin Shoppe Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the Vitamin Shoppe Debtors.

xvi.    Prepetition HoldCo Claims – Class 7

Classification:  Class 7 consists of approximately $514.7 million in outstanding principal, plus interest, fees, and other expenses pursuant to the HoldCo Credit Agreement.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition HoldCo Loan Claim, except to the extent that a Holder of a Prepetition HoldCo Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition HoldCo Loan Claim shall receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election.  If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

Impairment and Voting:  The Prepetition HoldCo Loan Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition HoldCo Loan Claims.

xvii.    General Unsecured Claims against the Freedom HoldCo Debtors – Class 8-A

Classification: Class 8-A consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against the HoldCo Debtors.

Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Freedom HoldCo General Unsecured Claim, except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive:

(i)     in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to the Freedom HoldCo Debtors resulting from any Partial Sale Transaction, if any, and (B) its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust.  If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any and (B) its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.

Impairment and Voting: The Freedom HoldCo General Unsecured Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Freedom HoldCo General Unsecured Claims.

xviii.   HoldCo Receivables General Unsecured Claims – Class 8-B

Classification:  Class 8-B consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo Receivables General Unsecured Claim, except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive:

(i)     in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc. resulting from any Partial Sale Transaction, if any.  If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim; or

(ii)     in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim.

Impairment and Voting:  The HoldCo Receivables General Unsecured Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such HoldCo Receivables General Unsecured Claims.

   xix.  TopCo General Unsecured Claims – Class 8-C

Classification:  Class 8-C consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against TopCo.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed TopCo General Unsecured Claim, except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed TopCo General Unsecured Claim shall receive:

(i)      in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.3(c) of the Plan, and (B) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to TopCo resulting from any Partial Sale Transaction, if any.  If (x) there is no Cash held at TopCo following the allocation described in Section 3.3(c) of the Plan, and (y) the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim; or

(ii)     in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.

Impairment and Voting:  The TopCo General Unsecured Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such TopCo General Unsecured Claims.

xx.    Intercompany Claims – Class 9

Classification:  Class 9 consists of any prepetition Claim, Cause of Action, or remedy held by or asserted against a Debtor by another Debtor.

Treatment:  On the Effective Date, each Holder of an Allowed Intercompany Claim shall receive the following treatment:

(i)    in the event of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), on or after the Effective Date: (A) any and all Intercompany Claims between, among and/or against, Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; and (B) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date, or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; provided, however, that notwithstanding the foregoing, any Intercompany Claims, held by or against or among any of the Freedom HoldCo Debtors shall receive the recovery that such Intercompany Claim would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if such Intercompany Claim is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date.  To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; or

(ii)    in the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (A) extinguished, canceled and/or discharged on the Effective Date or (B) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Impairment and Voting:  The Intercompany Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Intercompany Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Intercompany Claims.

xxi.    Subordinated Claims – Class 10

Classification:  Class 10 consists of any prepetition Claim that is subject to subordination pursuant to sections 510(b)-(c) of the Bankruptcy Code or otherwise.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Subordinated Claim, except to the extent that a Holder of a Subordinated Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Subordinated Claim shall receive:

(i)     in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any).  If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.

Impairment and Voting:  The Subordinated Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Subordinated Claims.

xxii.   Existing TopCo Equity Interests – Class 11

Classification:  Class 11 consists of any Existing Equity Interests in TopCo.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing TopCo Equity Interest, except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (A) its *pro rata* share of Cash (if any) held by TopCo following all distributions required under the Plan and the allocation described in Section 3.3(c) of the Plan, or

(B) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest.

Impairment and Voting: The Existing TopCo Equity Interests are impaired Interests. Holders of such Interests are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Existing TopCo Equity Interests.

xxiii.    Existing Intercompany Equity Interest – Class 12

Classification:  Class 12 consists of any Existing Equity Interests other than Existing TopCo Equity Interests.

Treatment:  On the Effective Date, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired; provided that in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, such election shall be with the consent of the Required Consenting First Lien Lenders; provided, further, that, notwithstanding the foregoing, the Allowed Existing Intercompany Equity Interests held by any of the Freedom HoldCo Debtors shall be extinguished, canceled, and/or discharged on the Effective Date.

Impairment and Voting:  The Existing Intercompany Equity Interests are impaired Interests.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Existing Intercompany Equity Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Existing Intercompany Equity Interests.

## VII.    SECURITIES LAWS MATTERS

> **The Issuance of the Reorganized Common Equity and the New Warrants Raises Issues Under U.S. Federal and State Securities Laws.**
>
> The issuance of the Reorganized Common Equity and the New Warrants under the Plan raises certain securities law issues under the Bankruptcy Code and U.S. federal and state securities laws that are discussed in this section.    The information in this section should not be considered applicable to all situations or to all Holders of Claims receiving the Reorganized Common Equity and the New Warrants.  Holders of Claims should consult their own legal counsel concerning the facts Reorganized Common Equity and the New Warrants.

### A.    Issuance and Resale of the Reorganized Common Equity and the New Warrants Under the Plan

The Debtors will seek, pursuant to section 1145 of the Bankruptcy Code, to exempt the Reorganized Common Equity and the New Warrants from the registration requirements of the Securities Act of 1933 (as amended, the "Securities Act") (and of any state securities or "blue sky" laws).  Section 1145 exempts from registration the sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administration expense in a case concerning, such debtor.  In reliance upon this exemption, the Debtors believe that the Reorganized Common Equity and the New Warrants generally will be exempt from the registration requirements of the Securities Act.  The Debtors intend that recipients will be able to resell the Reorganized Common Equity and the New Warrants without registration under the Securities Act or other federal securities laws, unless the recipient is (i) an "underwriter" with respect to such securities, within the meaning of section 1145(b) of the Bankruptcy Code, or (ii) an affiliate of the issuer.  Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan, or (iv) is an "issuer" of the relevant security, as such term is used in section 2(11) of the Securities Act.  An entity is not an "underwriter" under section 2(a)(11) of the Securities Act with regard to securities received under section 1145(a)(1), in "ordinary trading transactions" made on a national securities exchange.  However, the Debtors do not anticipate that the Reorganized Common Equity and/or the New Warrants will be listed in the near term on a stock exchange.  What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC.  Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating

to the Plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), or (iii) payment of special compensation to brokers or dealers in connection with the sale.  The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(l)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer.  Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a "controlling person" and therefore a statutory underwriter within the meaning of section 1145(b)(i) of the Bankruptcy Code.

You should confer with your own legal advisors to determine whether or not you are an "underwriter" or an "affiliate."

## VIII.   ALTERNATIVES TO CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain over-leveraged and the Debtors may be unable to service their debt obligations.  Accordingly, if the Plan is not consummated, the alternatives include:

### A.   Liquidation Under the Bankruptcy Code

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code.  A discussion of how a chapter 7 liquidation would affect the recoveries of the Holders of Claims is set forth in this Article VIII.  The Debtors believe that liquidation would result in either the same, or lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in attached Exhibit B to this Disclosure Statement.

Specifically, in the event of a chapter 7 liquidation, the Liquidation Analysis provides that the Holders of Prepetition First Lien Loan Claims would receive no recovery.  In contrast, under the Plan, the Holders of Prepetition First Lien Loan Claims would receive their *pro rata* share of (i) to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, and (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable); or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction,

payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim. Accordingly, such Holders would receive greater value under the Plan than such Holders would receive in a chapter 7 liquidation.

Similarly, in the event of a chapter 7 liquidation, the Liquidation Analysis provides that the Holders of Prepetition Second Lien Loan Claims would receive no recovery. Under the Plan, the Holders of Prepetition Second Lien Loan Claims would receive their *pro rata* share of to the extent the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) (1) solely if the class votes to <u>accept</u> the Plan, the New Warrants, or (2) if the class votes to <u>reject</u> the Plan, its *pro rata* share of the greater of (x) recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution. If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim. Accordingly, such Holders would receive greater value under the Plan than such Holders would receive in a chapter 7 liquidation.

Finally, Holders of General Unsecured Claims, Subordinated Claims, and Existing Equity Interests in the event of a chapter 7 liquidation would receive no recovery.

### B.    Alternative Plan of Reorganization

In formulating and developing the Plan, the Debtors have explored other alternatives, and have engaged in a negotiating process with the Consenting First Lien Lenders. The Debtors believe that the Plan fairly adjusts the rights of various Classes of Claims, and also provides superior recoveries to Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 over any likely alternative (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns.

**THE DEBTORS BELIEVE THAT THE PLAN IS PREFERABLE TO ANY ALTERNATIVE PLAN OR TRANSACTION BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL FIRST LIEN LENDERS AND ALL SECOND LIEN TERM LOAN LENDERS CONSENT TO ACCEPT THE PLAN.**

### C.    Inaction/Maintenance of Status Quo

If the Restructuring Transactions are not consummated, the Debtors could be in default under the ABL Credit Agreement, First Lien Credit Agreement, Second Lien Credit Agreement,

and HoldCo Credit Agreement.  As the Debtors believe they will be unable to repay such indebtedness if it were to be accelerated or upon maturity, the Debtors believe that inaction is not an option.  Further, if the Debtors are forced to file for bankruptcy protection without a consensual restructuring agreement among its creditors, the bankruptcy cases could be time-consuming and much more costly than the current contemplated restructuring.  The Debtors believe that these actions could seriously undermine its ability to obtain financing and could possibly lead to its inability to restructure its debt obligations.  Therefore, the Debtors believe that inaction is not a viable alternative to consummation of the Restructuring Transaction.

## IX.    RISK FACTORS

> **Important Risks to Be Considered**
>
> **Holders of Claims against and Interests in the Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Supplement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan before voting to accept or reject the Plan.**
>
> **These risk factors should not, however, be regarded as constituting the only risks involved in connection with the implementation of the Plan.**

### A.    Risks Associated with the Debtors' Business

      i.    <u>The Reorganized Debtors may not be able to Generate Sufficient Cash to Service all of their Indebtedness</u>

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness.

      ii.    <u>The Debtors Rely on a Limited Number of Key Vendors to Operate its Business</u>

The loss of any of the Debtors' key vendors or an interruption of production at these vendors from work stoppages, equipment failures or other adverse events or quality control failure would adversely affect the Debtors' ability to provide services and fill customer orders.  The Debtors may not be able to find replacement vendors to provide critical supplies on attractive rates.

### iii.    The Debtors are Subject to the Conditions of the General Economy

Unfavorable economic conditions may adversely affect the Debtors' business, financial condition or results of operations.  The Debtors are globally vulnerable to general economic downturns.  Any decline in demand for the Debtors' services resulting from a general economic downturn could materially and adversely affect the Debtors' business, financial condition or results of operations.  A prolonged period of sluggish economic conditions has had and may continue to have an adverse impact on the level of maintenance expenditures of the Debtors' customers and their ability to maintain historic levels of these expenditures.  As a result of significantly increased volatility and instability in the international financial markets and unfavorable global economic conditions, it is difficult for the Debtors, their customers and their suppliers to forecast demand trends accurately.  The Debtors are unable to accurately predict the extent or duration of cycles or their effect on the Debtors' financial condition or results of operations and can give no assurance as to the timing, extent or duration of the current or future business cycles.

### iv.    Loss of Key Management or Personnel could Negatively Impact the Debtors' Business

The Debtors have an experienced management team and key personnel who play critical roles in the Debtors' operations.  The Debtors believe their ability to be successful in the future will be due, in part, to their management team and key personnel.  Losing the services of one or more members of the Debtors' management team or key personnel could adversely affect their business.

### v.    The Difficulty in Attracting and Retaining Qualified Employees could Detrimentally Impact the Debtors' Business

Both the Debtors and their franchisees and dealers depend on the ability to find, hire and retain qualified employees to manage day-to-day business activities.  The Debtors also need qualified and competent personnel to execute their business plans and serve their customers.  The Debtors' inability to recruit and retain qualified and competent managers and personnel could have a material adverse effect on their business, financial condition, and results of operations.

### vi.    The Debtors' Operations may be Negatively Impacted by Unfavorable Publicity or Consumer Perception

The Debtors depend significantly on consumer perception regarding the safety and quality of their products, as well as similar products distributed by other companies.  Consumer perception of products can be significantly influenced by adverse publicity in the form of published scientific research, national media attention or other publicity, whether or not accurate, that associates consumption of Vitamin Shoppe's products or any other similar products with illness or other adverse effects, or questions the benefits of these or similar products or that claims that any such products are ineffective.  A new product may initially be received favorably, resulting in high sales of that product, but that sales level may not be sustainable as consumer preferences change.  Future scientific research or publicity could be unfavorable to Vitamin Shoppe's industry or any of its particular products and may not be consistent with earlier favorable research or publicity.

Unfavorable research or publicity could have a material adverse effect on the Debtors' ability to generate sales within Vitamin Shoppe.

       vii.    <u>Product Recalls, Withdrawals or Seizures may Materially and Adversely Affect the Debtors' Business</u>

The Debtors may be subject to product recalls, withdrawals or seizures if any of the products they sell are believed to cause injury or illness or if the Debtors are alleged to have violated governmental regulations in the manufacturing, labeling, promotion, sale or distribution of those products. A significant recall, withdrawal or seizure of any of the products the Debtors manufacture or sell may require significant management attention, which would likely result in substantial and unexpected costs and may materially and adversely affect the Debtors' business. Furthermore, a recall, withdrawal or seizure of any of the Debtors' products may adversely affect consumer confidence in their brands and thus decrease consumer demand for the Debtors' products. In some cases, the Debtors rely on their contract manufacturers and suppliers to ensure that the products they manufacture and sell to them comply with all applicable regulatory and legislative requirements. In general, the Debtors seek representations and warranties, indemnification and/or insurance from their contract manufacturers and suppliers. However, even with adequate insurance and indemnification, any claims of non-compliance could significantly damage the Debtors' reputation and consumer confidence in the Debtors' products. In addition, the failure of those products to comply with applicable regulatory and legislative requirements could prevent the Debtors from marketing the products or require them to recall or remove such products from the market, which in certain cases could materially and adversely affect their business, financial condition and results of operations.

       viii.    <u>The Success of the Debtors' Different Business Segments is Dependent on Factors Affecting Consumer Spending Outside of the Debtors' Control</u>

Consumer spending is affected by general economic conditions and other factors including levels of employment, disposable consumer income, prevailing interest rates, consumer debt and availability of credit, costs of fuel, inflation, recession and fears of recession, war and fears of war, pandemics (such as the COVID-19 pandemic), inclement weather, tariff policies, tax rates and rate increases, timing of receipt of tax refunds, consumer confidence in future economic conditions and political conditions, and consumer perceptions of personal well-being and security. Unfavorable changes in factors affecting discretionary spending could reduce demand for the Debtors' products and services resulting in lower revenue and negatively impacting their business and financial results.

       ix.    <u>The Debtors' Operating Results will be Adversely Affected if they do Not Manage their Inventory Levels</u>

The Debtors must maintain sufficient inventory levels to operate their business successfully. However, the Debtors also must avoid accumulating excess inventory as they seek to minimize out-of-stock levels across all product categories and to maintain in-stock levels. The Debtors continue to rely on and obtain significant portions of their inventory from vendors located outside the United States. Some of these vendors often require the Debtors to provide lengthy advance notice of their requirements in order to be able to supply products in the quantities they

request. This usually requires the Debtors to order merchandise and enter into purchase order contracts for the purchase and manufacture of such merchandise, well in advance of the time these products will be offered for sale. As a result, the Debtors may experience difficulty in responding to a changing retail environment, which makes them vulnerable to changes in price and consumer preferences. If the Debtors do not accurately anticipate the future demand for a particular product or the time it will take to obtain new inventory, their inventory levels will not be appropriate, and the results of operations may be negatively impacted.

> x. The Debtors' Vitamin Shoppe and PSP Segments Sell Food, Dietary Supplements, Topical Products and/or Pet Products Containing Cannabidiol which may Open the Debtors to Regulatory Enforcement Action

Products that contain cannabidiol ("CBD") are subject to various state and federal laws regarding the production and sale of hemp-based products. Historically, the Drug Enforcement Administration ("DEA") considered CBD to be a Schedule I controlled substance subject to the Controlled Substances Act ("CSA") under the definition for "marijuana." However, the Agriculture Improvement Act of 2018 (the "2018 Farm Bill") removed "hemp" from the definition of "marijuana." "Hemp" is defined as the plant *Cannabis sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol ("THC") concentration of not more than 0.3 percent on a dry weight basis. As a result of the enactment of the 2018 Farm Bill, the Debtors believe that Vitamin Shoppe's CBD products and the hemp from which they are derived are not Schedule I controlled substances under the CSA. However, there is a risk that the Debtors could be subject to DEA enforcement action, including prosecution, if any of Vitamin Shoppe's products are determined to not meet the definition of "hemp" and to constitute "marijuana" based on THC levels or other violations.

In addition, although hemp and hemp-derived CBD are no longer controlled substances subject to regulation under the CSA, the FDA has stated publicly that it is nonetheless unlawful under the Federal Food, Drug, and Cosmetic Act ("FDCA") to market foods or dietary supplements containing CBD, even if lawful under the 2018 Farm Bill. Specifically, the FDCA prohibits the introduction or delivery for introduction into interstate commerce of any food or dietary supplement that contains an approved drug or a drug for which substantial clinical investigations have been instituted and made public, unless a statutory exemption applies. The FDA has stated its conclusion that this statutory prohibition applies and none of the exceptions has been met for CBD.

The FDA has held public meetings and formed an internal working group to evaluate the potential pathways to market for CBD products, which could include seeking statutory changes from Congress or promulgating new regulations. If legislative action is necessary, such legislative changes could take years to finalize and may not include provisions that would enable Vitamin Shoppe and PSP to produce, market and/or sell CBD products, and FDA could similarly take years to promulgate new regulations. Additionally, while the agency's enforcement focus to date has primarily been on CBD products that are associated with therapeutic claims, the agency has recently issued warning letters to companies marketing CBD products without such claims, and there is a risk that FDA could take enforcement action against Vitamin Shoppe and PSP, their third party contract manufacturers or suppliers, or those marketing similar products, which could limit

or prevent these segments from marketing CBD products.  While the FDA announced on March 5, 2020 that it is currently evaluating a risk-based enforcement policy for CBD to provide more clarity to industry and the public while the agency takes potential steps to establish a clear regulatory pathway, it remains unclear whether or when FDA will ultimately issue such an enforcement policy.

Moreover, local, state, federal, and international CBD, hemp and cannabis laws and regulations are rapidly changing and subject to evolving interpretations, which could require Vitamin Shoppe and PSP to incur substantial costs associated with compliance requirements or alteration of certain aspects of their business plan in the event that their CBD products become subject to new restrictions.  In addition, violations of these laws, or allegations of such violations, could disrupt the businesses and result in a material adverse effect on their operations.  The Debtors cannot predict the nature of any future laws, regulations, interpretations, or applications, nor can they determine what effect additional governmental regulations or administrative policies and procedures, when and if promulgated, could have on Vitamin Shoppe and PSP's activities in the hemp and CBD industry. The constant evolution of laws and regulations may require these segments to incur substantial costs associated with legal and compliance fees and ultimately require them to alter their current business plans.

<div style="text-align:center">xi.    The Debtors' Financial Success is Tied to the Growth and Effective Operations of the Debtors' Owned Locations, Franchises and Dealers, and the Franchise and Dealer Operations</div>

The Debtors' financial success depends on how effectively they operate the Debtor-owned locations and how their franchisees and dealers operate and develop their businesses.  The Debtors do not exercise direct control over the day-to-day operations of the franchises and dealers, and the franchisees and dealers may not operate their businesses in a manner consistent with the Debtors' philosophy and standards and may not increase the level of revenues generated compared to prior years.  The Debtors' growth and revenues may, therefore, be adversely affected.

There can be no assurance that the training programs and quality control procedures the Debtors have established will be effective in enabling franchisees and dealers to run profitable businesses or that the Debtors will be able to identify problems or take corrective action quickly enough.  In addition, failure by a franchisee or dealer to provide service at acceptable levels may result in adverse publicity that can materially adversely affect the Debtors' reputation and ability to compete in the market in which the franchisee or dealer is located.

<div style="text-align:center">xii.    The Debtors' Business Lines Involve Substantial Litigation which may Damage the Debtors' Reputation or Result in Material Liabilities</div>

The Debtors have been named, from time to time, as a defendant in various legal actions, including arbitration, class-actions, and other litigation arising in connection with their various business activities.  Adverse outcomes related to litigation could result in substantial damages and could materially affect the Debtors' liquidity and capital resources and cause the Debtors' net income to decline or may require them to alter their business operations.  Negative public opinion can also result from the Debtors' actual or alleged conduct in such claims, possibly damaging their reputation, which could negatively impact their financial performance.

Some of the products the Debtors sell may expose them to product liability claims relating to personal injury, death, or property damage caused by such products, and may require them to take actions such as product recalls. Although the Debtors maintain liability insurance, they cannot be certain that their coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to them on commercially reasonable terms, or at all. Vitamin Shoppe, in particular, as a retailer and direct marketer of products designed for human consumption, is subject to product liability claims if the use of its products is alleged to have resulted in injury or to include inadequate instructions for use or inadequate warnings concerning possible side effects and interactions with other substances. In addition, third-party manufacturers produce many of the products the Debtors sell which may expose them to product liability claims for products they do not manufacture. While the Debtors attempt to manage these risks by obtaining indemnification agreements from the manufacturers of products that they sell and insurance, third parties may not satisfy their indemnification obligations to the Debtors and/or their insurance policies may not be sufficient or available. A product liability claim against the Debtors, whether with respect to products of a third-party or their branded products, could result in increased costs and could adversely affect their reputation with their customers, which in turn could materially adversely affect their business, financial condition and results of operations.

xiii.    The Debtors' Business Relies on Technology Systems and Electronics Communications which, if disrupted, could materially Affect the Debtors' Business

The Debtors depend heavily upon their information technology systems in the conduct of their business. The Debtors develop, own and license or otherwise contract for sophisticated technology systems and services. If they experience significant disruptions to their systems, the Debtors could experience a loss of business, which could have a material adverse effect on their business, financial condition, and results of operations. Any data breach or severe disruption of the Debtors' network or electronic communications could have a material adverse effect on their business, financial condition, and results of operations. The Debtors rely on certain software vendors to maintain and periodically upgrade many of these systems so that they can continue to support the Debtors' business. The software programs supporting many of their systems were licensed to the Debtors by independent software developers. The inability of these developers or the Debtors to continue to maintain and upgrade these information systems and software programs would disrupt or reduce the efficiency of their operations if they were unable to convert to alternate systems in an efficient and timely manner.

**B.    Certain Bankruptcy Considerations**

i.    General

While the Debtors believe that these Chapter 11 Cases, commenced in order to implement the Plan, will be of short duration and will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, these Chapter 11 Cases could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key vendors and suppliers, customers, employees and agents. Bankruptcy proceedings also will involve additional expenses and may divert the attention of the Debtors' management away from the operation of the business.

The extent to which bankruptcy proceedings disrupt the Debtors' business will likely be directly related to the length of time it takes to complete the proceedings. If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while it tries to develop a different reorganization plan that can be confirmed. That would increase both the probability and the magnitude of the potentially adverse effects described herein.

ii.     Failure to Receive Adequate Acceptances

The Debtors believe they will receive the requisite amount of votes in favor of the Plan in light of the fact that, as set forth herein, the Consenting First Lien Lenders who hold more than 80% of the Prepetition First Lien Loan Claims agreed to vote for, support and not object to the Plan. However, the Plan constitutes a separate chapter 11 plan for each Debtor and all references to the Plan are intended on an individual and per-Debtor basis. The Plan groups (but does not substantively consolidate) certain Debtors solely for purposes of describing treatment of Claims against and Interests in the Debtors under the Plan. As a result, if for some reason the Debtors do not receive, with respect to each Debtor, votes from Holders of at least two-thirds in dollar amount and a majority in number of Holders (the "Requisite Acceptances") with respect to at least one Class of Claims that is impaired and entitled to vote (excluding insiders), the Debtors will not be able to seek confirmation of the Plan as to those Debtors that do not receive Requisite Acceptances under the Plan, and the Debtors will seek confirmation of the Plan as to all other Debtors that meet the standards under section 1129 of the Bankruptcy Code. Further, if the Requisite Acceptances are not received, the Debtors may, subject to the terms and conditions of the Restructuring Support Agreement, seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Consenting First Lien Lenders and/or the Debtors may be required to sell their business under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

iii.    Failure to Confirm the Plan

Even if the Requisite Acceptances are received, there is some risk that the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may deny confirmation of the Plan. A non-accepting (or deemed rejecting) creditor or equity security Holder of the Debtors might, among other things, challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code

sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting Holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such Holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  While the Debtors cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will satisfy the statutory requirements for confirmation and will not be followed by a need for further financial reorganization and that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a restructuring of the Debtors could be implemented and what distribution Holders of Claims ultimately would receive with respect to their Claims, which may constitute less favorable treatment than they would receive under the Plan.  If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case the Debtors believe that Holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

    iv. <u>Failure to Receive Bankruptcy Court Approval of the Compromises and Settlements Contemplated by the Plan</u>

The Plan provides for certain releases, injunctions and exculpations that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties.  The releases, injunctions, and exculpations may not be approved, in which case certain Released Parties may withdraw their support from the Plan, notwithstanding the existence of the Restructuring Support Agreement.

    v. <u>Alternative Plans of Reorganization may be Proposed</u>

If these Chapter 11 Cases are commenced, other parties-in-interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization.  Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization.  However, such exclusivity period can be reduced or terminated upon a showing of cause and an order of the Bankruptcy Court.  Were such an order to be entered, other parties-in-interest would then have the opportunity to propose alternative plans of reorganization.

If other parties-in-interest were to propose an alternative plan following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to Holders of Claims or Interests.  If there are competing plans of reorganization, these Chapter 11 Cases are likely to become longer and more complicated.

vi.     Failure to Consummate the Plan

Article XI of the Plan contains various conditions to consummation of the Plan, including the Confirmation Order having become final and non-appealable, the Debtors having entered into the Plan Documents, and all conditions precedent to effectiveness of such agreements having been satisfied or waived in accordance with the terms thereof.  As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.  If the Plan is not consummated and the restructuring completed, these Chapter 11 Cases will be prolonged and the Debtors may lack sufficient liquidity to effect a successful restructuring under chapter 11 of the Bankruptcy Code.

vii.    Extended Stay in a Bankruptcy Proceeding

While the Debtors expects that a chapter 11 bankruptcy filing solely for the purpose of implementing the Plan would be of short duration and would not be unduly disruptive to the Debtors' business, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan would be confirmed.  Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business.  There is a risk, due to uncertainty about the Debtors' future, that:

- customers could seek alternative sources of products from the Debtors' competitors, including competitors that are in little or no relative financial or operational distress;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- vendors, suppliers or agents and other business partners could terminate their relationship with the Debtors or require financial assurances or trade terms which are materially different from what the Debtors have today.

A lengthy bankruptcy proceeding would also involve significant expenses and divert the attention of management from operating the Debtors' business, as well as creating concerns for employees, suppliers and customers.

The disruption that a bankruptcy proceeding could inflict upon the Debtors' business would increase with the length of time it takes to complete these Chapter 11 Cases and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties on whom the Debtors depend, including vendors, employees, agents and customers.  If the Debtors are unable to obtain confirmation of the Plan on a timely basis, because of a challenge to the Plan or a failure to satisfy the conditions to the effectiveness of the Plan, the Debtors may be forced to operate in bankruptcy for an extended period while they try to develop a different reorganization plan that can be confirmed.  A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

viii.    Termination of the Restructuring Support Agreement in Certain Circumstances

Pursuant to the Restructuring Support Agreement, the Consenting First Lien Lenders have agreed to support the Plan, however, such support can be terminated and such votes revoked pursuant to the terms and conditions thereof upon the occurrence of certain "Termination Events" (as defined therein) under the Restructuring Support Agreement.  Such Termination Events include, among other things, the failure of the Debtors to reach certain milestones in these Chapter 11 Cases in a timely manner.  While the Debtors believe that they will be able to meet such milestones, there can be no assurance that will be the case.  Additional events that constitute Termination Events under the Restructuring Support Agreement include the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, a material breach by the Debtors of their obligations under the Restructuring Support Agreement, or a final determination by a governmental agency of competent jurisdiction that the Restructuring Transactions contemplated by the Plan cannot legally go forward.  See Exhibit D for additional detail.  If a Termination Event occurs and the support of the Consenting First Lien Lenders were to be withdrawn, and the votes of such Holders were revoked, the Debtors may need to amend the Plan and re-solicit votes thereon, or formulate a new chapter 11 plan and solicit votes on such new plan.  Such amendment and/or re-solicitation could cause material delay in these Chapter 11 Cases, and may adversely impact the Debtors' businesses and its ability to reorganize.

ix.    Distributions could be Delayed

If the Plan is confirmed, the date of the distributions to be made pursuant to the Plan will not occur until the Effective Date.  The Debtors estimate that the process of obtaining confirmation of the Plan will be no longer than ninety (90) days from the date of the commencement of the Debtors' Chapter 11 Cases and, if these Chapter 11 Cases are filed, intends to seek to confirm the Plan on an expedited timeframe.  While the Debtors anticipate making distributions under the Plan upon or shortly after entry of the Confirmation Order, they may be delayed for a substantially longer period if the conditions to consummation of the Plan have not yet been met.

x.    Objections to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**C.    Risks Relating to Tax and Accounting Consequences of the Plan**

i.    Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors currently do not intend to seek any ruling from the Internal Revenue Service (the "IRS") on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling

would be issued before the Effective Date. In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment of the Plan, or that a court would not sustain such a challenge. Holders of Claims and Interests should carefully review <u>Article XI</u> hereof, "*Certain U.S. Federal Income Tax Considerations*," to determine how the tax implications of the Plan may adversely affect the Debtors, Reorganized Debtors, and Holders of Claims and Interests.

<div align="center">ii.   <u>Use of Historical Financial Information</u></div>

As a result of the consummation of the Plan and the transactions contemplated thereby, the Debtors believe they will be subject to the fresh start accounting rules. Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued. This process is guided by purchase price allocation standards under GAAP. Application of fresh start accounting rules could result in the values of certain of the Debtors' assets being written down.

**D.    Other Risks**

<div align="center">i.   <u>The Effective Date May Not Occur</u></div>

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur. Effectiveness of the Plan is also subject to certain conditions as described in Article XI of the Plan. If these conditions have not occurred or have not been waived as set forth in the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to the Claims and Interests would remain unchanged.

<div align="center">ii.   <u>The Freedom HoldCo Debtor Litigation Trust May Not Be Funded</u></div>

The Debtors are investigating potential Claims and Causes of Action that may exist at the Freedom HoldCo Debtors through the Freedom HoldCo Independent Investigation. As of the date hereof, the Freedom HoldCo Debtors do not have any Cash assets. Accordingly, if any Claims or Causes of Action are identified and are not otherwise settled, discharged, or released under or pursuant to the Plan, the Freedom HoldCo Debtor Litigation Trust would need to be funded to enable the Trustee thereof to pursue such Claims and/or Causes of Action. There can be no assurance that the Freedom HoldCo Debtor Litigation Trust will be funded. Further, even if the Freedom HoldCo Debtor Litigation Trust is funded, there can be no assurance that any such Claims or Causes of Action so identified will be successful.

<div align="center">iii.   <u>The Debtors Have No Duty to Update</u></div>

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that

date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

iv.    No representations outside this Disclosure Statement are Authorized

No representations concerning or related to the Debtors or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your vote to accept the Plan, other than those contained in or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

v.    No legal or tax advice is provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to provide you with information regarding the Debtors and the proposed Restructuring Transactions to assist you in making a decision regarding whether or not to support the Plan.

## X.    DESCRIPTION OF SECURITIES TO BE ISSUED IN CONNECTION WITH THE PLAN

### A.    Reorganized Common Equity

In the event of a Plan Equitization Transaction, the common equity in New TopCo will be authorized, issued, or reserved on the Effective Date.  The Reorganized Common Equity shall be described in the Plan Supplement.

### B.    New Warrants

In the event of a Plan Equitization Transaction, on the Effective Date, in accordance with the terms of the Plan and the Restructuring Transactions Memorandum and as further set forth in the New Warrant Documentation, New TopCo shall issue and deliver all of the New Warrants to (subject to dilution by the Management Incentive Plan) to the OpCo Debtors Litigation Trust for further distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of OpCo General Unsecured Claims, pursuant to the terms and conditions of the Restructuring Support Agreement, the OpCo Debtor Litigation Trust Agreement, and the New Warrant Documentation.  The issuance of New Warrants pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, and all of the New Warrants issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  On the Effective Date, the New Warrant Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

The New Warrants shall be distributed in a single instrument to be held by the OpCo Litigation Trustee.

## XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims entitled to vote on the Plan. This summary is based on the United States Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes to, or new interpretations of, the Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the Reorganized Common Equity or New Warrants as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, people who use the accrual method of accounting and report income on an "applicable financial statement," and Holders who are in bankruptcy). Further, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than as a Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary generally does not address the U.S. federal income tax consequences to Non-U.S. Holders (as defined below).  In addition, this discussion does not address U.S. federal taxes other than income taxes.

For purposes of this discussion, a U.S. Holder is a Holder of a Claim that is: (i) an individual citizen or resident of the United States for U.S. federal income tax purposes; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii)

an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "<u>Non-U.S. Holder</u>" is a Holder that is not a U.S. Holder.

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult with their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**A.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

i.      <u>Characterization of the Plan</u>

Certain tax consequences of the Plan will depend on whether the Plan is consummated pursuant to a Sale Transaction or a Plan Equitization Transaction (including, for the avoidance of doubt, following a Partial Sale Transaction, if any). The Debtors anticipate that a Plan Equitization Transaction will be effectuated pursuant to one of two potential structures. In one structure, the New ABL Facility, Take-Back Term Loans, Reorganized Common Equity and New Warrants will be issued by New TopCo, which will continue to own its subsidiaries (the "<u>Existing Structure</u>"). In the alternative structure, the Debtors' assets will be transferred to a newly-formed entity ("<u>Newco</u>") (the "<u>Newco Structure</u>"). The tax consequences of a Plan Equitization Transaction will depend on whether the Existing Structure or the Newco Structure will be used.

(a)      Sale Transaction; Partial Sale Transaction

A Sale Transaction would effectuate a sale of all or substantially all of the Debtors' assets and a Partial Sale Transaction would effectuate a sale of a portion of the Debtors' assets. The Debtors generally would recognize gain or loss upon a Sale Transaction in an amount equal to the difference, if any, between (i) the sum of (x) proceeds from such Sale Transaction or Partial Sale Transaction, as applicable, and (y) the amount of any liabilities directly or indirectly assumed by the acquirer and (ii) the tax basis in the assets transferred (including any assets deemed transferred, such as by reason of the transfer of the membership interests in a wholly-owned limited liability

company that is disregarded for U.S. federal income tax purposes). Any gain not offset by the Debtors' net operating loss carryforwards (the "NOLs") or other tax attributes would result in a cash tax liability.

<div align="center">(b)     Plan Equitization Transaction</div>

The Debtors and the Consenting First Lien Lenders have not yet determined how a potential Plan Equitization Transaction will be structured, assuming there is no Sale Transaction. Such decision may principally depend on whether a determination can be reached that the Newco Structure would not result in significant cash tax liability for the Debtors.

It is currently contemplated that the Newco Structure would be structured as a direct acquisition of all of the assets of Franchise Group, Inc. (after otherwise giving effect to the Plan) and a constructive acquisition of all of the then assets of Franchise Group, Inc.'s direct and indirect subsidiaries. The constructive asset acquisition occurs by reason of the fact that all of Franchise Group, Inc.'s subsidiaries (other than Educate, Inc.) are limited liability companies that are treated as disregarded entities for U.S. federal income tax purposes such that, by acquiring the membership interests of such direct and indirect subsidiaries, Newco would be treated for U.S. federal income tax purposes as acquiring all of the underlying assets of such subsidiaries. The consideration for the acquisition of the assets in the Newco Structure would be the Reorganized Common Equity, New Warrants, the issuance or assumption of the New ABL Facility and Take-Back Term Loans, and the direct and indirect assumption of all of the obligations of the Reorganized Debtors under the Plan.

The Reorganized Debtors would recognize gain or loss upon the transfer in an amount equal to the difference, if any, between (i) the sum of (x) the fair market value of the Reorganized Common Equity and Warrants, (y) the "issue price" of the New ABL Facility (to be distributed to Holders of Allowed Prepetition ABL Loan Claims) and Take-Back Term Loans, and (z) the amount of any other obligations of the Reorganized Debtors directly or indirectly assumed by Newco and its subsidiaries and (ii) the adjusted tax basis in the assets transferred including any assets deemed transferred, such as by reason of the transfer of the membership interests in the directly and indirectly wholly-owned limited liability company subsidiaries that are treated as disregarded entities for U.S. federal income tax purposes. Any gain not offset by the Debtors' NOLs or other tax attributes would result in a cash tax liability. The determination as to whether or not to elect the Newco Structure will be based on all facts and circumstances as of the time the election is made, including the projected enterprise value of the Reorganized Debtors, the timing of the Effective Date, estimated available tax attributes and other factors. Nevertheless, the actual facts may vary from those projected, estimated or assumed, and the Reorganized Debtors' ability to utilize applicable tax attributes to offset any gain attributable to the transfer may be subject to limitation, which could result in tax consequences different from those expected, and any resulting tax liability would remain subject to audit and adjustment by the IRS or other applicable taxing authorities.

<div align="center">ii.     Cancellation of Debt</div>

The Debtors expect to incur a substantial amount of cancellation of indebtedness income ("COD Income") as a result of the Plan.

<div align="center">79</div>

In general, absent an exception, COD Income is includable in a taxpayer's gross income upon the satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. If COD Income is recognized by a debtor in a case under chapter 11 and the discharge of the debt occurs pursuant to the bankruptcy case, it is generally excluded from the debtor's gross income. The Tax Code provides that where COD Income is excluded because of this bankruptcy exception, the debtor must reduce certain of its tax attributes, such as NOLs, current year losses, tax credits and tax basis in property, by the amount of any excluded COD Income after the determination of the U.S. federal income tax for the year of the discharge of the debt. Although not free from doubt, it is expected that carryover of disallowed business interest expense would not be a tax attribute subject to such reduction. In applying the attribute reduction rule to the tax basis in property, the Tax Code limits the reduction in tax basis to the amount by which the tax basis exceeds the debtor's post-emergence liabilities (often referred to as the "liability floor"). If advantageous, the debtors can elect to reduce the basis of depreciable property prior to any reduction of its NOL carryforwards or other tax attributes. The Debtors expect that COD Income realized as a result of the implementation of the Plan will be excluded from the Debtors' gross income, resulting in a reduction of certain tax attributes.

The amount of the COD Income will generally equal the excess of (i) the adjusted issue price of the indebtedness satisfied over (ii) the sum of (a) the amount of Cash paid, (b) the issue price of any new indebtedness of the taxpayer issued, and (c) the fair market value of any other consideration (including stock of the debtor or a party related to the debtor) given in satisfaction of such indebtedness at the time of the exchange, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD Income (such as where the payment of the canceled debt would have given rise to a tax deduction). To the extent the amount of COD Income exceeds the tax attributes available for reduction, the remaining COD Income is without further current or future tax cost to the debtor. Special rules apply where the excluded COD Income is recognized by a debtor that is a member of a consolidated group. Under these rules, the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member) are first subject to reduction. To the extent that the excluded COD Income exceeds the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member), the Treasury Regulations generally require the reduction of certain consolidated tax attributes attributable to other members of the group. If one of the attributes of the debtor member reduced under the above rules is the basis of stock of another member of the group, a "look-through rule" applies requiring that certain corresponding reductions be made to the tax attributes of the lower-tier member (including consolidated tax attributes of such lower-tier member).

If COD Income is realized, the amount of COD Income will depend, in part, on the issue price of the New ABL Facility and the fair market value of the Reorganized Common Equity and the New Warrants distributed in discharge of Claims. Under the rules discussed above, certain tax attributes of the Debtors (including tax basis in assets, capital losses, and NOLs) could be substantially reduced if there is significant COD Income.

Any reduction in tax attributes attributable to the COD Income incurred in a reorganization transaction does not occur until the end of the taxable year in which the Plan goes effective. As a result, the Debtors do not expect the attribute reduction to affect the U.S. federal income tax treatment to Debtors of the Newco Structure, including the computation of gain or loss on the transfer.

The Debtors anticipate that a sale or taxable transfer of all or substantially all of the Debtors' assets pursuant to the Plan would be treated as a plan of liquidation for U.S. federal income tax purposes.  In such a scenario, the Debtors intend to take the position that no COD Income should be incurred by any Debtor at the time of the implementation of the Plan and prior to the disposition by such Debtor of all or substantially all of its assets and distribution of Sale Proceeds to holders of Claims (other than to the extent that all remaining assets and Claims are transferred to Wind Down Co or any Allowed Claim's distribution is subject to a maximum amount, or has been or is separately settled for less than its carrying value).  In that event, the reduction of tax attributes resulting from such COD Income (which, as indicated, only occurs as of the end of the tax year in which the COD Income occurs) would not generally be expected to have a material impact on the Debtors.  Given the lack of direct authoritative guidance as to when COD Income occurs in the context of a liquidating chapter 11 plan, there can be no assurance that the IRS will not challenge this position, and there can be no assurance that all or a substantial amount of the COD Income will not be incurred earlier than as described above.

      iii.    <u>Section 382</u>

Section 382 of the Tax Code places significant limitations upon the use of a corporation's (or consolidated group's) NOLs and certain other tax attributes if an "ownership change" occurs with respect to such corporation's stock.  Section 382 generally imposes an annual limitation on the use of pre-ownership change losses equal to the product of (i) the fair market value of the corporation immediately before the ownership change multiplied by (ii) the "long term tax-exempt rate" for the month in which the ownership change occurs. If a corporation (or consolidated group) recognizes tax losses during the tax year in which an ownership change occurs, the tax losses are generally apportioned between the period prior to the ownership change and the period after the ownership change using a "daily proration" methodology. Losses that are apportioned to the period prior to the ownership change will be subject to the section 382 limitations on the use of NOLs and certain other tax attributes, and losses that are apportioned to the period after the ownership change will not be subject to such limitations.  Absent the Newco Structure, it is anticipated that an ownership change will occur with respect to the Debtors on the Effective Date.

If a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then built-in losses recognized during the five-year period following the ownership change generally will be treated as pre-ownership change losses and will be subject to the annual limitation provided under section 382.  If a corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the five-year period following the ownership change generally will increase the annual limitation in the year such gains are recognized.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "<u>382(l)(5) Exception</u>"). Under the 382(l)(5) Exception, a debtor's pre-ownership change losses are not limited on an annual basis, but, instead, NOLs will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the

Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' pre-ownership change losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) Exception the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without triggering the elimination of its pre-ownership change losses. Instead, if a subsequent ownership change occurs, the resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not yet determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

As discussed above, in the Newco Structure, Newco should obtain a tax basis in the assets acquired (or deemed acquired) from the Debtors equal to the fair market value of such assets, and Newco would not succeed to any of the tax attributes of the Debtors. Accordingly, the discussion above regarding section 382 would be generally irrelevant for Newco.

**B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Consenting First Lien Term Loan Claims, ABL Loan Claims, Second Lien Term Loan Claims, Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests**

U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Plan.

i.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests; General

Each Holder of Allowed Prepetition ABL Loan Claims will receive its *pro rata* share of: (i) to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting

from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) proceeds of (x) the Exit ABL Facility, or (y) the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.

Each Holder of Allowed Prepetition First Lien Loan Claims will receive its *pro rata* share of: (i) to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), and (C) to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claims), the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim against each applicable Debtor, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.

Each Holder of Allowed Prepetition Second Lien Loan Claims will receive: (i) to the extent the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to <u>accept</u> the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably among Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim), or (2) if the Class votes to <u>reject</u> the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution. If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.

Each Holder of Allowed Prepetition HoldCo Loan Claims will receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election. If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor Litigation Trust (to the extent even applicable), then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

Each Holder of a Subordinated Claim will receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any). If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any. If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.

Each Holder of Allowed Existing TopCo Equity Interests will receive (A) its pro rata share of Cash (if any) held by TopCo following all distributions required under the Plan and the allocation described in Section 3.3(c) of the Plan, or (B) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest.

The treatment of each Holder of General Unsecured Claims is set forth in Article V of the Plan.

The tax consequences of the Plan to a U.S. Holder of a Claim may depend in part upon (i) whether such Claim is based on an obligation that constitutes a "security" for U.S. federal income tax purposes and (ii) whether all or a portion of the consideration received for such Claim is an obligation that constitutes a "security" for U.S. federal income tax purposes. Neither the Tax Code nor Treasury Regulations define the term "security." The determination of whether a debt obligation constitutes a "security" for U.S. federal tax purposes is complex and depends on the facts and circumstances surrounding the origin and nature of the claim, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. Generally, obligations arising out of the extension of trade credit have been held not to be securities, while corporate debt obligations evidenced by written instruments with original maturities of ten (10) years or more have been held

to be securities. An instrument with a term of less than five (5) years generally has been held not to be a security. However, the IRS has ruled that new debt obligations with a term of less than five (5) years issued in exchange for and bearing the same terms (other than interest rate) as securities may also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the issuing corporation in substantially the same form.  It is uncertain whether the debt obligations under the ABL Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement will be considered securities for U.S. federal income tax purposes and U.S. Holders are advised to consult their tax advisors with respect to this issue.  It is uncertain what form the New ABL Facility will take, and what the maturity date of the New ABL Facility would be if issued. The discussion herein assumes that the New ABL Facility will not constitute securities for U.S. federal income tax purposes.

If the debt obligations under the ABL Credit Agreement, First Lien Credit Agreement, and Second Lien Credit Agreement, respectively, are considered securities for U.S. federal income tax purposes, then each U.S. Holder of Prepetition ABL Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, respectively, should recognize gain, but not loss (other than amounts received in payment of accrued but unpaid interest, as discussed below), in an amount equal to the lesser of (i) the sum of the issue price of the New ABL Facility and the amount of Cash received, and (ii) the excess of (a) the sum of Cash, fair market value of the Reorganized Common Equity or New Common Warrants (as applicable), and the issue price of the New ABL Facility received over (b) the adjusted tax basis of the U.S. Holder's Claim.  Such U.S. Holder's holding period in the Reorganized Common Equity or New Warrants (as applicable) would include the U.S. Holder's holding period in its Claim, while the U.S. Holder would start a new holding period in the New ABL Facility. Such U.S. Holder's adjusted tax basis in the Reorganized Common Equity or New Warrants (as applicable) received would equal the U.S. Holder's basis in its Claim, less the issue price of the New ABL Facility, the amount of Cash received and any deductions claimed in respect of any previously accrued but unpaid interest income, plus the amount of gain or interest income, if any, recognized on the exchange.

If the debt obligations under the ABL Credit Agreement, First Lien Credit Agreement, or Second Lien Credit Agreement, respectively, are not considered securities for U.S. federal income tax purposes then, other than with respect to any amounts received that are attributable to accrued but unpaid interest, each such U.S. Holder would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) Cash plus (b) the fair market value of Reorganized Common Equity or New Warrants (if any) plus (c) the issue price of the loans under the New ABL Facility, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

Other than with respect to any amounts received that are attributable to accrued but unpaid interest, each U.S. Holder of Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) Cash (if any) plus (b) the fair market value of such U.S. Holder's share (if any) of net assets of the Freedom HoldCo Debtor Litigation Trust, as applicable, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

In the event of the subsequent disallowance of any Disputed Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, or Existing TopCo Equity Interests, a holder of a previously Allowed Prepetition HoldCo Loan Claim, General Unsecured Claim, Subordinated Claim, or Existing TopCo Equity Interest may receive additional distributions in respect of its Claim or Interest. Accordingly, it is possible that such a holder may have additional gain (if any) and/or imputed interest income in respect of any additional Cash or property distributions received in respect of its Claim or Interest. In addition, it is possible that the recognition of any loss realized by a holder of such an Allowed Claim or Interest as to which additional Cash or property could be received may be deferred until all Disputed Claims are Allowed or not allowed. See Article XI.B.i, "*Treatment of the Freedom HoldCo Debtor Litigation Trust*," below.

If the Newco Structure is used, all U.S. Holders of Claims should be treated as engaging in a fully taxable exchange, and therefore, each U.S. Holder would recognize gain or loss equal to the difference, if any, between (i) the sum of (a) Cash plus (b) the fair market value of Reorganized Common Equity or New Warrants (if any) plus (c) the issue price of the loans under the New ABL Facility received, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss will be determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount" and accrued but untaxed interest, whether the Claim constitutes a capital asset within the meaning of section 1221 of the Tax Code in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If such recognized gain or loss is capital in nature, it generally would be a long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

ii.    Treatment of the Freedom HoldCo Debtor Litigation Trust

Although not free from doubt, other than with respect to any assets that are subject to potential Disputed Claims of ownership or uncertain distributions, the Freedom HoldCo Debtor Litigation Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the U.S. Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims.  The Debtors intend to take the position that this treatment applies to the extent reasonably practicable.  In such case, any beneficiaries of the Freedom HoldCo Debtor Litigation Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the Freedom HoldCo Debtor Litigation Trust net assets and then contributed such undivided interest in the Freedom HoldCo Debtor Litigation Trust net assets to the Freedom HoldCo Debtor Litigation Trust.  If this treatment applies, the person or persons responsible for administering the Freedom HoldCo Debtor Litigation Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the Freedom HoldCo Debtor Litigation Trust pursuant to the Plan and not unduly prolong its duration.  The Freedom HoldCo Debtor Litigation Trust would not be deemed a successor in interest of the Debtors for any purpose

other than as specifically set forth in the Plan or in the governing documents for the Freedom HoldCo Debtor Litigation Trust.

Other than with respect to any assets of the Freedom HoldCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable U.S. Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims prior to the contribution of such assets to the Freedom HoldCo Debtor Litigation Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

As soon as reasonably practicable after the transfer of the Debtors' applicable assets to the Freedom HoldCo Debtor Litigation Trust, the Freedom HoldCo Debtor Litigation Trust (or its designee) shall make a good faith valuation of such assets. All parties to the Freedom HoldCo Debtor Litigation Trust (including, without limitation, the Debtors, Reorganized Debtors, the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims and beneficiaries of the Freedom HoldCo Debtor Litigation Trust) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Other than with respect to any assets of the Freedom HoldCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Freedom HoldCo Debtor Litigation Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Freedom HoldCo Debtor Litigation Trust, even if no distributions are made. Allocations of taxable income with respect to the Freedom HoldCo Debtor Litigation Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the Freedom HoldCo Debtor Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the Freedom HoldCo Debtor Litigation Trust. Similarly, taxable losses of the Freedom HoldCo Debtor Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any U.S. Holder of a beneficial interest in the Freedom HoldCo Debtor Litigation Trust, and the ability of such U.S. Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the U.S. Holder. Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the Freedom HoldCo Debtor Litigation Trust and not as income or loss with respect to such beneficiary's applicable Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims. In the event any tax is imposed on the Freedom HoldCo Debtor Litigation Trust, the person or persons responsible for

administering the Freedom HoldCo Debtor Litigation Trust shall be responsible for payment, solely out of the assets of the Freedom HoldCo Debtor Litigation Trust, of any such taxes imposed on the Freedom HoldCo Debtor Litigation Trust.

Other than with respect to any assets of the Freedom HoldCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, after the Effective Date, a U.S. Holder's share of any collections received on the assets of the Freedom HoldCo Debtor Litigation Trust should not be included, for U.S. federal income tax purposes, in the U.S. Holder's amount realized in respect of its Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims but should be separately treated as amounts realized in respect of such U.S. Holder's ownership interest in the underlying assets of the Freedom HoldCo Debtor Litigation Trust.

The person or persons responsible for administering the Freedom HoldCo Debtor Litigation Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all U.S. federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income.  The Freedom HoldCo Debtor Litigation Trustee, or such other person or persons responsible for administering the Freedom HoldCo Debtor Litigation Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the Freedom HoldCo Debtor Litigation Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations.  As soon as reasonably practicable after the close of each taxable year, the Freedom HoldCo Debtor Litigation Trust or such other person or persons responsible for administering the Freedom HoldCo Debtor Litigation Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Freedom HoldCo Debtor Litigation Trustee of a private letter ruling if the Freedom HoldCo Debtor Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the Freedom HoldCo Debtor Litigation Trustee), the Freedom HoldCo Debtor Litigation Trustee may timely elect to (i) treat any portion of the Freedom HoldCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the Freedom HoldCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the Freedom HoldCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of

the Freedom HoldCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The Freedom HoldCo Debtor Litigation Trustee may request an expedited determination of taxes of the Freedom HoldCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Freedom HoldCo Debtor Litigation Trust for all taxable periods through the dissolution of the Freedom HoldCo Debtor Litigation Trust.

<p style="text-align: center;">iii.   <u>Treatment of the OpCo Debtor Litigation Trust</u></p>

Although not free from doubt, other than with respect to any assets that are subject to potential Disputed Claims of ownership or uncertain distributions, the OpCo Debtor Litigation Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim). The Debtors intend to take the position that this treatment applies to the extent reasonably practicable. In such case, any beneficiaries of the OpCo Debtor Litigation Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the OpCo Debtor Litigation Trust net assets and then contributed such undivided interest in the OpCo Debtor Litigation Trust net assets to the OpCo Debtor Litigation Trust. If this treatment applies, the person or persons responsible for administering the OpCo Debtor Litigation Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the OpCo Debtor Litigation Trust pursuant to the Plan and not unduly prolong its duration. The OpCo Debtor Litigation Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the governing documents for the OpCo Debtor Litigation Trust.

Other than with respect to any assets of the OpCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable U.S. Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) prior to the contribution of such assets to the OpCo Debtor Litigation Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

As soon as reasonably practicable after the transfer of the Debtors' applicable assets to the OpCo Debtor Litigation Trust, the OpCo Debtor Litigation Trust (or its designee) shall make a good faith valuation of such assets. All parties to the OpCo Debtor Litigation Trust (including, without limitation, the Debtors, Reorganized Debtors, the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim)) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Other than with respect to any assets of the OpCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the OpCo Debtor Litigation Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the OpCo Debtor Litigation Trust, even if no distributions are made. Allocations of taxable income with respect to the OpCo Debtor Litigation Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the OpCo Debtor Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the OpCo Debtor Litigation Trust. Similarly, taxable losses of the OpCo Debtor Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any U.S. Holder of a beneficial interest in the OpCo Debtor Litigation Trust, and the ability of such U.S. Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the U.S. Holder. Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the OpCo Debtor Litigation Trust and not as income or loss with respect to such beneficiary's applicable Prepetition Second Lien Loan Claims or Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim). In the event any tax is imposed on the OpCo Debtor Litigation Trust, the person or persons responsible for administering the OpCo Debtor Litigation Trust shall be responsible for payment, solely out of the assets of the OpCo Debtor Litigation Trust, of any such taxes imposed on the OpCo Debtor Litigation Trust.

Other than with respect to any assets of the OpCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, after the Effective Date, a U.S. Holder's share of any collections received on the assets of the OpCo Debtor Litigation Trust should not be included, for U.S. federal income tax purposes, in the U.S. Holder's amount realized in respect of its Prepetition Second Lien Loan Claims or Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) but should be separately treated as amounts realized in respect of such U.S. Holder's ownership interest in the underlying assets of the OpCo Debtor Litigation Trust.

The person or persons responsible for administering the OpCo Debtor Litigation Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all U.S. federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income.

The OpCo Litigation Trustee, or such other person or persons responsible for administering the OpCo Debtor Litigation Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the OpCo Debtor Litigation Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations. As soon as reasonably practicable after the close of each taxable year, the OpCo Debtor Litigation Trust or such other person or persons responsible for administering the OpCo Debtor Litigation Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the OpCo Litigation Trustee of a private letter ruling if the OpCo Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the OpCo Litigation Trustee), the OpCo Litigation Trustee may timely elect to (i) treat any portion of the OpCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the OpCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, and Holders of Allowed Prepetition Second Lien Loan Claims and General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the OpCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the OpCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The OpCo Litigation Trustee may request an expedited determination of taxes of the OpCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the OpCo Debtor Litigation Trust for all taxable periods through the dissolution of the OpCo Debtor Litigation Trust.

iv.    Accrued Interest

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest (or original issue discount ("OID"), if any) on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be

distributed to U.S. Holders of Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to untaxed interest that accrued but was not previously paid on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

> v.      Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  U.S. Holders are urged to consult their tax advisors concerning the application of the market discount rules to the Claims.

> vi.      Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan or the Plan.

> vii.      U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Reorganized Common Equity

In the event that a Newco Structure is utilized, it has not yet been determined whether New TopCo will be an entity that is treated as a corporation or as a partnership for U.S. federal income tax purposes.

a.    *If New TopCo is a Corporation for U.S. Federal Income Tax Purposes*

1.    *Dividends on Reorganized Common Equity*

Generally, distributions made on account of the Reorganized Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the issuer of such Reorganized Common Equity as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's tax basis in its shares of the Reorganized Common Equity.  Any such distributions in excess of the U.S. Holder's adjusted tax basis in its shares (determined on a share-by share basis) generally will be treated as capital gain. Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividend-received deduction may be disallowed.

2.    *Sale, Redemption, or Repurchase of Reorganized Common Equity*

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the Reorganized Common Equity.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the Reorganized Common Equity for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

3.    *Ownership, Exercise, and Disposition of New Warrants*

A U.S. Holder that elects to exercise the New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the Reorganized Common Equity it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the New Warrants. A U.S. Holder's aggregate tax basis in the Reorganized Common Equity will equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its New Warrants plus (ii) such U.S. Holder's adjusted tax basis in its New Warrants immediately before the New Warrants are exercised. A U.S. Holder's holding period in the Reorganized Common Equity will begin on the day after the exercise date of the New Warrants.

Under section 305 of the Tax Code, certain transactions that have the effect of increasing the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder

93

or warrant holder in respect of such "stock" interest. Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the U.S. Holder in connection with such distribution.

A U.S. Holder that elects not to exercise the New Warrants and instead allows the New Warrants to lapse may be entitled to claim a capital loss upon expiration of the New Warrants in an amount equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants. In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the Reorganized Common Equity to which the New Warrants relate would have had in the hands of the U.S. Holder if such stock had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants.

b.    *If New TopCo is a Partnership for U.S. Federal Income Tax Purposes*

The Debtors currently contemplate, and the following discussion also assumes, that if New TopCo is treated as a partnership for U.S. federal income tax purposes then the receipt by a Holder of Reorganized Common Equity and/or New Warrants will be treated for U.S. federal income tax purposes as though the Holder received equity and/or warrants in the first-tier subsidiary of New TopCo that is treated as a corporation for U.S. federal income tax purposes (referred to herein as "Parent") and then immediately exchanged such equity and/or warrants for the Reorganized Common Equity and/or New Warrants.

1.    *Ownership and Disposition of Reorganized Common Equity*

As noted above, it is intended that the receipt by a Holder of Reorganized Common Equity on the Effective Date pursuant to the Plan will be treated for U.S. federal income tax purposes as though the Holder received equity in Parent, and then immediately exchanged such equity for the Reorganized Common Equity.  Assuming that treatment is respected, the exchange by a U.S. Holder of equity in Parent for the Reorganized Common Equity will generally be treated a tax-free exchange pursuant to section 721 of the Tax Code (in a transaction described in Situation 2 of IRS Revenue Ruling 99-5, 1999-1 C.B. 434) and should result in a U.S. Holder having a tax basis in, and holding period with respect to, the Reorganized Common Equity equal to the U.S. Holder's tax basis in, and holding period with respect to, the equity in Parent exchanged therefore.

Because the Reorganized Common Equity will be equity of an entity that will be treated for U.S. federal income tax purposes as a partnership, a U.S. Holder receiving Reorganized Common Equity will be treated as a partner in New TopCo.  Accordingly, as a partnership, New TopCo itself will not be subject to U.S. federal income tax. Instead, each U.S. Holder will be required to report on its U.S. federal income tax return its distributive share (whether or not

distributed) of New TopCo's income, gains, losses, deductions, and credits for New TopCo's taxable year ending with or within such U.S. Holder's taxable year even if New TopCo does not make a concurrent distribution to such U.S. Holder. However, because it is expected that New TopCo's sole asset will be its equity in Parent, an entity classified as a corporation for U.S. federal income tax purposes, absent an actual distribution from Parent that is treated as a "dividend" for purposes of the Tax Code or a sale (or other taxable disposition) by New TopCo of any of its equity in Parent, any partner in New TopCo should not generally have any current allocations of taxable income or loss.

In general, a U.S. Holder of Reorganized Common Equity will not recognize taxable income as a consequence of receiving a distribution (whether in cash or in kind) from New TopCo, except to the extent that any cash (and/or fair market value of any marketable securities) distributed exceeds such U.S. Holder's adjusted tax basis in its Reorganized Common Equity. Any such excess will be treated as gain from the sale of such U.S. Holder's Reorganized Common Equity and will be treated as capital gain. A U.S. Holder generally will not recognize a loss for U.S. federal income tax purposes as a consequence of receiving a distribution from New TopCo, except that if a U.S. Holder receives a distribution solely of cash (and/or marketable securities) in complete liquidation of its interest in New TopCo, the U.S. Holder will recognize a capital loss equal to the excess, if any, of its adjusted tax basis in its Reorganized Common Equity over the amount of such cash (and/or marketable securities). If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

Gain or loss recognized by a U.S. Holder on the disposition of all or any portion of its Reorganized Common Equity will generally, subject to the application of certain recharacterization rules (i.e., related to a sale of "hot assets" like unrealized receivables or inventory of the partnership under section 751 of the Tax Code) be capital gain or loss. If a U.S. Holder transfers less than all of its Reorganized Common Equity, the U.S. Holder will take into account the percentage of its adjusted tax basis in its Reorganized Common Equity that is transferred, determined by comparing the relative fair market values of the portion of the Reorganized Common Equity that is transferred and the portion of the Reorganized Common Equity that is retained.

New TopCo intends to furnish to each Holder of Reorganized Common Equity, after the close of each calendar year, specific tax information, including a Schedule K-1, which describes such Holder's allocable share of New TopCo's income, gain, loss and deductions for New TopCo's preceding taxable year. In preparing this information, New TopCo will take various accounting and reporting positions to determine each Holder's allocable share of such income, gain, loss and deductions. However, New TopCo cannot provide assurances that those positions will yield a result that conforms to the requirements of the Tax Code, applicable Treasury Regulations or administrative interpretations of the IRS. Furthermore, New TopCo cannot provide assurances that the IRS will not successfully contend in court that those positions are impermissible.

Pursuant to the Bipartisan Budget Act of 2015, for U.S. federal income tax purposes, any audit adjustment to New TopCo's tax items (or any partner's distributive share of such item) may result in the imposition of tax (including any applicable penalties and interest) at the New TopCo level. Generally, New TopCo will have the ability to elect to have the partners take such audit adjustment into account in accordance with their interests in New TopCo during the taxable year

under audit, but there can be no assurance that New TopCo will choose to make such election or that such election will be effective in all circumstances. If New TopCo is unable to have the partners take into account such audit adjustment in accordance with their interests in New TopCo during the taxable year under audit, or New TopCo chooses not to do so, the partners in the year of such audit adjustment may bear some or all of the tax liability resulting from such audit adjustment, without regard to each such partner's ownership interest in New TopCo (if any) during the taxable year under audit. In addition, New TopCo may be able to reduce the amount owed by New TopCo in certain cases based on the status of the partners or if certain partners file amended returns to take into account such adjustments, but there is no assurance New TopCo will be able to obtain any such reduction. If, as a result of any such audit adjustment, New TopCo is required to make payments of taxes, penalties, and/or interest, New TopCo's operating agreement may provide that each partner's share of such amounts shall be treated as an advance against amounts otherwise distributable to such partner or as a loan to such partner. Future Treasury Regulations, other administrative guidance or judicial decisions may affect the application of these rules to New TopCo and the Holders of Reorganized Common Equity and, as a result, the application of these rules to New TopCo and the Holders of Reorganized Common Equity is uncertain.

U.S. Holders generally will recognize gain or loss upon the sale or taxable disposition of the Reorganized Common Equity in an amount equal to the difference, if any, between (i) the U.S. Holder's adjusted tax basis in the Reorganized Common Equity exchanged and (ii) the sum of the cash and the fair market value of any property received in such disposition. Any such gain or loss generally should be long-term capital gain or loss if at the time of the sale, redemption, or other taxable disposition, the U.S. Holder has held its Reorganized Common Equity for more than one year (a U.S. Holder may have a split holding period in the Reorganized Common Equity if it contributes property to New TopCo or otherwise acquires Reorganized Common Equity on multiples dates), subject to the application of certain recharacterization rules discussed above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

a.    Non-Partner Status.

Based on their currently contemplated terms, the New Warrants are expected to be treated as "noncompensatory options" pursuant to Treasury Regulation Sections 1.704-1, 1.721-2 and 1.761-3 (the "Noncompensatory Option Regulations"). Accordingly, ownership of a New Warrant alone generally should not cause a U.S. Holder to be treated as a partner of New TopCo, as the New Warrants do not convey any interest in New TopCo's capital or profits unless or until the point at which a New Warrant is exercised and Reorganized Common Equity is issued. However, there can be no assurance that the IRS would not express a contrary view, including, that the terms of the New Warrants could cause the New Warrants to be treated as additional Reorganized Common Equity prior to their exercise.

b.    Sale or Other Disposition of New Warrants.

In general, a U.S. Holder will recognize gain or loss for U.S. federal income tax purposes upon the sale, exchange or other taxable disposition of a New Warrant in an amount equal to the difference, if any, between the amount realized and such U.S. Holder's adjusted tax basis in the

New Warrant. The amount realized upon the sale or other taxable disposition of the New Warrants will be measured by the sum of all consideration received. Any gain or loss generally will be capital gain or loss, and generally will be long-term capital gain or loss if at the time of the sale, exchange or other taxable disposition, the U.S. Holder has held its New Warrants for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

<div align="center">c. Exercise or Lapse of New Warrants.</div>

Generally, a U.S. Holder will not recognize gain or loss on the receipt of Reorganized Common Equity after exercising a New Warrant. An exercising U.S. Holder of a New Warrant will be treated as having contributed, in exchange for newly issued Reorganized Common Equity, an amount of money equal the amount paid to exercise such New Warrant and purchase the Reorganized Common Equity. A U.S. Holder's initial tax basis in Reorganized Common Equity received on exercise of a New Warrant will generally equal the sum of any money paid to exercise such New Warrant and the U.S. Holder's adjusted basis in such New Warrant. On the lapse of a New Warrant, a U.S. Holder may be entitled to claim a capital loss upon expiration of the New Warrants in an amount equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants.

**The tax consequences to a U.S. Holder of owning interests in New TopCo where New TopCo is a treated as a partnership for U.S. federal income tax purposes are complex, and U.S. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of owning Reorganized Common Equity and/or New Warrants.**

<div align="center">viii.    U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of the New ABL Facility</div>

<div align="center">*a.  Interest and Original Issue Discount*</div>

Payments of stated interest under the New ABL Facility will constitute payments of "qualified stated interest" and generally will be taxable to holders as ordinary income at the time the payments are received or accrued, in accordance with the holder's method of tax accounting. The preceding discussion assumes the New ABL Facility will not be issued with OID. The New ABL Facility generally would be treated as issued with OID if the principal amount of the New ABL Facility, plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeds the issue price of the debt instrument by more than a de minimis amount. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (i.e., interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. If the new debt instrument is publicly traded, its issue price

<div align="center">97</div>

generally will be its trading price immediately following issuance. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange. A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium. However, a debt instrument will generally not be treated as publicly traded if at the time the determination is made the outstanding stated principal amount of the issue that includes the debt instrument does not exceed $100 million.

### b.  Sale, Retirement or Other Taxable Disposition

A U.S. Holder of the New ABL Facility will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the obligations due under the New ABL Facility equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in New ABL Facility.  Any such gain or loss generally will be capital gain or loss, and will be long term capital gain or loss if the U.S. Holder has held the New ABL Facility for more than one year as of the date of disposition. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

### C.    Information Reporting and Back-Up Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a non-U.S. Holder is resident.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XII.    IMPLEMENTATION OF THE PLAN

### A.    Plan Distributions and Transactions

As soon as reasonably practicable after the Effective Date, the distributions provided for under the Plan will be effectuated pursuant to the following restructuring transactions, which shall take place, *in seriatim*, pursuant to documentation reasonably satisfactory to the Debtors and the Consenting First Lien Lenders:

- the Debtors will implement the transactions as set forth in Article VII of the Plan;

- the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order;

- certificates of incorporation, by-laws and other organizational documents of the Reorganized Debtors, in form and substance satisfactory to the Consenting First Lien Lenders, shall be amended and restated as necessary to effectuate the terms of the Plan;

- the Debtors shall implement the Committee Settlement, pursuant to which, among other things, any and all disputes among the Committee Settlement Parties are resolved.

- the OpCo Debtors shall execute the OpCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the OpCo Debtor Litigation Trust in accordance with the terms of the Plan;

- the Freedom HoldCo Debtors shall execute the Freedom HoldCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the Freedom HoldCo Debtor Litigation Trust in accordance with the terms of the Plan;

- New TopCo shall issue the Reorganized Common Equity, if applicable, pursuant to the terms of the Plan;

- New TopCo shall issue the New Warrants, if applicable pursuant to the terms of the Plan;

- the Debtors shall consummate the Plan by: (i) making distributions of the Reorganized Common Equity to the First Lien Lenders; (ii) making distributions of the New Warrants to the Second Lien Lenders if certain conditions are met; (iii) satisfying all DIP Claims in full by conversion to Take-Back Term Loans and, if certain conditions are met, by conversion to Reorganized Common Equity; and (iv) entering into either the Exit ABL Facility or the Take-Back ABL Term Loan Facility; and

- the releases provided for in the Plan, which are an essential element of the Restructuring Transactions, shall become effective.

## B.    Continued Corporate Existence and Corporate Action

Subject to the terms and conditions of the Restructuring Support Agreement, except as otherwise provided in the Plan or as otherwise may be agreed between the Debtors and the Required Consenting First Lien Lenders, each of the Debtors, as Reorganized Debtors, and, if the Plan Equitization Transaction occurs, New TopCo, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor or New TopCo, each of the Reorganized Debtors and New TopCo, as applicable (and in the event of the Plan Equitization Transaction, in consultation with the Required Consenting First Lien Lenders), may take such action as permitted by applicable law and such Reorganized Debtor's or New TopCo's New Organizational Documents, as such Reorganized Debtor or New TopCo, as applicable, may determine is reasonable and appropriate, including, but not limited to, causing: (a) a Reorganized Debtor or New TopCo to be merged with and into another Reorganized Debtor, or a subsidiary and/or Affiliate of a Reorganized Debtor or New TopCo; (b) a Reorganized Debtor or New TopCo to be dissolved; (c) the conversion of a Reorganized Debtor or New TopCo from one Entity type to another Entity type; (d) the legal name of a Reorganized Debtor or New TopCo to be changed; (e) the closure of a Reorganized Debtor's or New TopCo's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor or New TopCo under the law of jurisdictions other than the law under which the Debtor currently is incorporated.

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to

applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates, wherever located, including all claims, rights and Causes of Action and any property, wherever located, acquired by the Debtors under or in connection with the Plan, shall vest in the applicable Post-Effective Debtor, free and clear of all Claims, Liens, charges, other encumbrances and Interests, except for those Claims, Liens, charges, other encumbrances and Interests arising from or related to the Take-Back Debt Documents or the New ABL Facility Documents. On and after the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, each applicable Post-Effective Debtor and New TopCo may operate its business(es) and may use, acquire and dispose of property, wherever located, and each Reorganized Debtor and New TopCo, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims), Interests and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Without limiting the foregoing, the Post-Effective Debtors and New TopCo may pay the charges that they incur on or after the Effective Date, if any, for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court. Anything in the Plan to the contrary notwithstanding, any unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor, Reorganized Debtor or New TopCo by virtue of the Plan, the Chapter 11 Cases, or otherwise.

On or as soon as reasonably practicable after the Effective Date, in the event a Sale Transaction is consummated, the Wind Down Debtors shall be authorized, following the consummation of such Sale Transaction and the completion of the distributions set forth in Article V of the Plan, to merge, dissolve and/or wind down the Wind Down Debtors under applicable law; provided that, notwithstanding such dissolution, Wind Down Debtors shall remain authorized to continue the wind down of the Wind Down Debtors, including filing any necessary documents with the appropriate authorities, including any tax returns, and to facilitate the closing of the Chapter 11 Cases as to such Debtors. On or as soon as reasonably practicable after the Effective Date, in the event a Partial Sale Transaction is consummated, the Reorganized Debtors shall be authorized, following the consummation of such Partial Sale Transaction and the completion of the distributions set forth in Article V of the Plan, to merge, dissolve and/or wind down the Partial Sale Transaction Debtors under applicable law.

On the Effective Date, these Chapter 11 Cases for all of the Debtors, other than Franchise Group, Inc. (or other such entity that may be designated by the Debtors and the Consenting First Lien Lenders), shall be closed without the need to file any further documents with the Bankruptcy Court, and the Confirmation Order shall act as a final decree closing each of such other Debtor's Chapter 11 Cases; provided that, notwithstanding the foregoing, the Reorganized Debtors shall pay when due all U.S. Trustee Fees owing through the day before the Effective Date; provided, further, that in no way will the closing of such Chapter 11 Cases prejudice the treatment of any Holder of an Allowed Claim, including any right to receive distributions under the Plan, nor will the closing of such Chapter 11 Cases otherwise alter or modify the terms of the Plan.

C.      **Effectuating Documents and Further Transactions**

The Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements (including the Plan Documents) and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, shareholder, or shareholder approval or action.

D.      **Cancellation of Certain Existing Agreements**

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise expressly provided in the Plan, on the Effective Date, all notes, instruments, and certificates related to the ABL Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement, the HoldCo Credit Agreement, and the Existing Equity Interests shall be deemed surrendered and canceled and obligations of the Debtors thereunder shall be discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or any requirement of further action, vote or other approval or authorization by any Person.

E.      **Release of Liens, Claims and Interests**

Except as otherwise provided in the Confirmation Order, in the Plan, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with the Plan and DIP Claims subject to the Freedom HoldCo DIP Election, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns or, in the event of a Sale Transaction, the Plan Administrator.  Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any Collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Plan Administrator, or any administrative agent, collateral agent or indenture trustee under any Take-Back Debt Facility (at the expense of

the Debtors or Reorganized Debtors, as applicable) that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Reorganized Debtors or Plan Administrator, as applicable, shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

## F.    Directors of the Reorganized Debtors

### i.    Boards

In the event of a Plan Equitization Transaction, subject to the terms of the Restructuring Support Agreement and the applicable New Organizational Documents, on the Effective Date, the New Boards shall consist of those individuals identified in the Plan Supplement to be filed with the Bankruptcy Court at or before the Confirmation Hearing.  Unless reappointed, the members of the boards of the Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors or to New TopCo on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor or to New TopCo on the Effective Date.  Commencing on the Effective Date, each of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Debtor or New TopCo, as applicable, and may be replaced or removed in accordance therewith, as applicable.

In the event of a Sale Transaction, the Plan Administrator shall be the sole director, manager or managing member, as applicable, of each of the Reorganized Debtors from and following the Effective Date.  The members of the boards of the Non-Liquidating Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

### ii.    Management

In the event of a Plan Equitization Transaction, as of the Effective Date, the individuals who will serve in certain senior management positions of the Reorganized Debtors shall consist of those individuals set forth in the Plan Supplement.  In the event of a Sale Transaction, from and after the Effective Date, the Wind Down Debtors shall be managed and administered by the Plan Administrator, who shall be appointed the sole officer of each of the Wind Down Debtors and shall have full authority to administer the provisions of the Plan.  The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.

## G.    Management/Employee Incentive Plans

The Confirmation Order, if any, shall authorize the New Board to (i) adopt and implement Management Incentive Plans at each operating company or (ii) shall assume, amend or reject the existing long term incentive plans with the current members of the senior management team of Franchise Group's direct or indirect subsidiaries.

The securities issued under the Management Incentive Plan shall dilute the Reorganized Common Equity and New Warrants issued by New TopCo.  On the Effective Date, New TopCo shall issue or cause to be delivered the applicable Interests in the Debtors directly to applicable members of management in accordance with the terms of the Management Incentive Plan.

### H.    General Distribution Mechanics

- <u>Distributions on Account of Allowed Claims Only</u>.  Notwithstanding anything in the Plan to the contrary, no distribution shall be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.

- <u>Disbursing Agent</u>.  Except as otherwise provided in the Plan, all distributions under the Plan, including the distribution of the Reorganized Common Equity and New Warrants, shall be made by the Disbursing Agent or by such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.

- <u>Distribution Record Date</u>.  Distributions under the Plan to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date.  Any transfers of Claims after the Distribution Record Date shall not be recognized for purposes of the Plan unless otherwise provided herein.

- <u>No Recourse</u>.  Except with respect to Claims which are reinstated, no claimant shall have recourse to the Reorganized Debtors (or any property thereof), other than with regard to the enforcement of rights or distributions under the Plan.

- <u>Method of Cash Distributions</u>.  Any Cash payment to be made pursuant to the Plan will be made in U.S. dollars and may be made by draft, check, or wire transfer, in the sole discretion of the Debtors or the Reorganized Debtors, or as otherwise required or provided in any relevant agreement or applicable law.

- <u>Distributions on Non-Business Days</u>.  Any payment or distribution under the Plan due on a day other than a Business Day may be made, without interest, on the next Business Day.

- <u>No Distribution in Excess of Allowed Amount of Claim</u>.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive in respect of such Claim any distribution under the Plan in excess of the Allowed amount of such Claim.

- <u>Disputed Payments</u>.  If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any distribution under the Plan, the Reorganized Debtors may, in lieu of making such distribution to such Person, make such distribution into a segregated account until the disposition thereof shall be determined by Court order or by written agreement among the interested parties.

- <u>Fractional Shares</u>.  No fractional interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.

### I.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall for U.S. federal (and applicable state and local) income tax purposes be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (but solely to the extent that such other amount is an allowable portion of such Allowed Claim).

### J.    Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities and shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate.  From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on them by any Governmental Unit in accordance with applicable law with respect to such withholding taxes.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws.  Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

### K.    Exemption from Certain Transfer Taxes

To the fullest extent permitted by applicable law, all transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by the Debtors of any owned property pursuant to section 363(b) or 1123(b)(4) of the Bankruptcy Code, any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, and the creation, modification, consolidation or recording of any mortgage pursuant to the terms of the Plan, or any ancillary documents, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the

foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### L.    Exemption from Securities Laws

The Debtors intend to rely on one or more exemptions from the registration provisions of the Securities Act regarding the issuance and distribution of the Reorganized Common Equity and New Warrants. However, the SEC has expressed no views concerning the validity of the exemptive claim under the Securities Act as to the transactions contemplated under the Plan. Therefore, no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

The Debtors believe that the issuance of and the distribution under the Plan of the Reorganized Common Equity and New Warrants is exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, Regulation D promulgated under the Securities Act Regulation S promulgated under the Securities Act, to the maximum extent permitted thereunder.

Except as otherwise set forth immediately below, the Reorganized Common Equity and New Warrants issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. The Debtors believe that the Reorganized Common Equity and New Warrants issued under the Plan, in reliance upon section 1145 of the Bankruptcy Code, are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. The Debtors believe that the Reorganized Common Equity and New Warrants issued pursuant to section 1145 of the Bankruptcy Code are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and, subject to the terms of the applicable Amended LLC Agreements, Amended Certificates of Formation and any other applicable amended and restated corporate organizational documents of each of the Reorganized Debtors, are freely tradable and transferable by any holder thereof that: (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act; (ii) has not been an "affiliate" within 90 days of such transfer; (iii) has not acquired the Reorganized Common Equity and New Warrants from an "affiliate" within one year of such transfer; and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, THE DEBTORS DO NOT MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE DEBT EXCHANGE. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE DEBT EXCHANGE CONSULT THEIR OWN COUNSEL CONCERNING WHETHER

THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

### M.    Setoffs and Recoupments

Except as expressly provided in the Plan and except with respect to the Secured Claims, the Reorganized Debtors may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any distributions under the Plan to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action that the applicable Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount between the applicable Reorganized Debtor and the Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or any of their respective successors of any and all claims, rights and Causes of Action that such Persons or any of their respective successors may possess against the applicable Holder.

### N.    Solicitation of Debtors

Notwithstanding anything to the contrary in the Plan, each Debtor and all non-Debtor direct or indirect subsidiaries of any Debtor that would otherwise be entitled to vote to accept or reject the Plan as a Holder of a Claim against or Interest in another Debtor shall not be solicited for voting purposes, and such Debtor or non-Debtor subsidiary will be deemed to have voted to accept the Plan.

### O.    OpCo Debtor Litigation Trust

i.    General

In connection with the Committee Settlement, on the Effective Date, (i) the OpCo Debtors shall execute the OpCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the OpCo Debtor Litigation Trust in accordance with the terms of the Plan and the beneficial interests therein shall be for the benefit of the Holders of OpCo General Unsecured Claims, and (ii) the OpCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the OpCo Debtor Litigation Trust all of their rights, title and interest in the OpCo Debtor Litigation Trust Assets. Pursuant to section 1141 of the Bankruptcy Code, such OpCo Debtor Litigation Trust Assets shall automatically vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests, except as otherwise set forth in the Plan. For the avoidance of doubt, any right, title and interest in the Claims and Causes of Action belonging to the HoldCo Debtors (if any) shall not be transferred to or vest in the OpCo Debtor Litigation Trust.

The (i) establishment, purpose, and administration of the OpCo Debtor Litigation Trust, (ii) appointment, rights, and powers, of the OpCo Litigation Trustee, and (iii) treatment of the OpCo Debtor Litigation Trust for federal income tax purposes, among other things, shall be governed by the OpCo Debtor Litigation Trust Agreement. On and after the Effective Date, the OpCo Litigation Trustee shall be authorized, in accordance with the terms of the Plan and the

OpCo Debtor Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any OpCo Debtor Litigation Trust Assets.

In furtherance of this section of the Plan, (i) it is intended that the OpCo Debtor Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim), consistent with the terms of the Plan, and accordingly, all assets held by the OpCo Debtor Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim), and then contributed by the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) to the OpCo Debtor Litigation Trust in exchange for their interest in the OpCo Debtor Litigation Trust; (ii) the sole purpose of the OpCo Debtor Litigation Trust shall be the liquidation and distribution of the net assets of the OpCo Debtor Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with the valuation of the assets transferred to the OpCo Debtor Litigation Trust as determined by the OpCo Litigation Trustee (or its designee); (v) the OpCo Litigation Trustee shall be responsible for filing all applicable tax returns for the OpCo Debtor Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the OpCo Litigation Trustee shall annually send to each Holder of an interest in the OpCo Debtor Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the OpCo Litigation Trustee of a private letter ruling if the OpCo Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the OpCo Litigation Trustee), the OpCo Litigation Trustee may timely elect to (i) treat any portion of the OpCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii)

to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the OpCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the OpCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the OpCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The OpCo Litigation Trustee may request an expedited determination of taxes of the OpCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the OpCo Debtor Litigation Trust for all taxable periods through the dissolution of the OpCo Debtor Litigation Trust.

<div align="center">ii.    <u>OpCo Litigation Trustee</u></div>

The Creditors' Committee, in consultation with the Debtors, shall select in the Plan Supplement the Person who initially will serve as the OpCo Litigation Trustee, which trustee shall be reasonably acceptable to the Required Consenting First Lien Lenders. On or after the Effective Date, the OpCo Litigation Trustee shall assume all of its obligations, powers and authority under the OpCo Debtor Litigation Trust Agreement to (x) reconcile General Unsecured Claims, First Lien Deficiency Claims (though not the quantum thereof, which shall be in an amount consistent with the description in Section 5.5(b) of the Plan), and any Prepetition Second Lien Loan Claims (though not the quantum thereof, which shall be the amount set forth in any Allowed Proof of Claim asserting such Claims), and (y) investigate, pursue, litigate and/or settle OpCo Litigation Claims that are transferred to the OpCo Debtor Litigation Trust (collectively, the "<u>OpCo Litigation Trustee Duties</u>").

The OpCo Litigation Trustee shall be a fiduciary of the Post-Effective Debtors, shall have such qualifications and experience as are sufficient to enable the OpCo Litigation Trustee to perform its obligations under the Plan and under the OpCo Debtor Litigation Trust Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the OpCo Debtor Litigation Trust Agreement. To the extent necessary, following the Effective Date, the OpCo Litigation Trustee shall be deemed to be a judicial substitute for the Post-Effective Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code. The OpCo Litigation Trustee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers, including upon advice of counsel, unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

The OpCo Litigation Trustee may be removed by the Bankruptcy Court upon application by any party-in-interest for cause shown. In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the OpCo Litigation Trustee, the Bankruptcy Court shall

<div align="center">109</div>

designate another Person to become the OpCo Litigation Trustee and thereupon the successor OpCo Litigation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

iii.    OpCo Debtor Litigation Trustee Agreement

Provisions of Agreement and Order.  The OpCo Debtor Litigation Trust Agreement and the Confirmation Order shall provide that: (i) the OpCo Litigation Trustee shall be a fiduciary of the Post-Effective Debtors and the beneficiaries of the OpCo Debtor Litigation Trust; and (ii) neither the Post-Effective Debtors (except as expressly set forth in the OpCo Debtor Litigation Trust Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the OpCo Litigation Trustee in performing the OpCo Litigation Trustee Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to the Plan on account of any such action taken or omitted to be taken.

The OpCo Debtor Litigation Trust Agreement will be filed with the Plan Supplement and will provide for, among other things: (1) the transfer of the OpCo Debtor Litigation Trust Assets to the OpCo Debtor Litigation Trust; (2) the payment of OpCo Debtor Litigation Trust Expenses from the OpCo Debtor Litigation Trust Assets; (3) distributions to Holders of Allowed OpCo General Unsecured Claims, as provided herein and in the OpCo Debtor Litigation Trust Agreement; (4) reasonable access to the Debtors' books and records; (5) the identity of the OpCo Litigation Trustee; (6) the terms of the OpCo Litigation Trustee's engagement; (7) reasonable and customary provisions that allow for limitation of liability and indemnification of the OpCo Litigation Trustee and its professionals by the OpCo Debtor Litigation Trust; provided that any such indemnification shall be the sole responsibility of the OpCo Debtor Litigation Trust and payable solely from the OpCo Debtor Litigation Trust Assets; and (8) the term and dissolution of the OpCo Debtor Litigation Trust.  Following the Effective Date, the OpCo Litigation Trustee shall be responsible for all decisions and duties with respect to the OpCo Litigation Trustee Duties, except as otherwise provided in the Plan, the Confirmation Order, or the OpCo Debtor Litigation Trust Agreement.

OpCo Litigation Claims. Notwithstanding anything to the contrary in the Plan, including Article XII thereof, the following Claims and Causes of Action belonging to the OpCo Debtors (collectively, the "OpCo Litigation Claims") shall not be released pursuant to the Plan, and shall be transferred to the OpCo Debtor Litigation Trust: (x) all potential Claims and Causes of Action against former directors and officers of the Debtors in their capacity as such as of the Effective Date; and (y) all potential Claims and Causes of Action against Brian Kahn, Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., Irradiant Partners, LP, Vintage Capital Management LLC, Lauren Kahn, members of the Freedom Lender Group, the HoldCo Debtors, and solely in the case of Brian Kahn, Prophecy Asset Management LP, B. Riley Financial, Inc. and Irradiant Partners, LP, each of their affiliates, directors, officers, managers, partners, and owners (in each case, solely in their capacity as such, and, for the avoidance of doubt, not including any of the Debtors).

For the avoidance of doubt, the following shall be released pursuant to the Plan and shall not be transferred to the OpCo Debtor Litigation Trust: (a) all potential Claims and Causes of

Action against the members of the Ad Hoc Group; (b) all potential Claims and Causes of Action belonging to the OpCo Debtors against any party that contributes Cash to the OpCo Debtor Litigation Trust Escrow Account in an amount agreed to by the Creditors' Committee in consultation with the Required Consenting First Lien Lenders; (c) all potential Claims and Causes of Action against current employees of the Debtors, including management and directors (including, without limitation the Independent Directors, and officers (including the CRO), but excluding Bryant Riley), in each case who are employed by the Debtors or Reorganized Debtors as of the Effective Date; (d) all potential Claims and Causes of Action against former employees and directors of the Debtors that were terminated without cause between February 3, 2025 and the Effective Date of the Plan; and (e) all potential Claims and Causes of Action against any prepetition Estate Professionals and postpetition Estate Professionals in their capacity as such.  For the avoidance of doubt, notwithstanding the foregoing, any potential Claims and Causes of Action against WFG for prepetition services rendered are not released pursuant to the Plan.

New Warrants.  Solely to the extent that Holders of Claims in Class 5 vote to accept the Plan, the New Warrants shall be vested in the OpCo Debtor Litigation Trust for distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of OpCo General Unsecured Claims.

### iv.    OpCo Debtor Litigation Trust Funding

On the Effective Date, the Debtors and other parties (if applicable) shall fund the OpCo Debtor Litigation Trust Escrow Account in an amount equal to the OpCo Debtor Litigation Trust Escrow Amount.  The OpCo Debtor Litigation Trust Escrow Amount shall automatically and irrevocably vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests.  The OpCo Debtor Litigation Trust Escrow Amount shall be used for the administration of the OpCo Debtor Litigation Trust, to pay OpCo Debtor Litigation Trust Expenses, and to pursue the OpCo Litigation Claims, with any excess amount being used to distribute to Holders of General Unsecured Claims.  All proceeds from the pursuit of the OpCo Litigation Claims shall be used by the OpCo Litigation Trustee to pay for the costs and expenses of administration of the OpCo Debtor Litigation Trust, pursuit of the OpCo Litigation Claims, and distribution to Holders of OpCo General Unsecured Claims.  The OpCo Litigation Trustee shall exercise its fiduciary duty and business judgment to allocate such proceeds among the Classes of Claims receiving interests in the OpCo Debtor Litigation Trust.  The OpCo Litigation Trustee, on behalf of the OpCo Debtor Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the OpCo Debtor Litigation Trust Assets in accordance with the Plan and the OpCo Debtor Litigation Trust Agreement.

### v.    OpCo Debtor Litigation Trust Units

Any and all OpCo Debtor Litigation Trust Units shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.  In addition, any and all OpCo Debtor Litigation Trust Units will not be registered pursuant to the Securities Act or any applicable state or local securities law pursuant to section 1145 of the Bankruptcy Code, and will

be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

**P.    Freedom HoldCo Debtor Litigation Trust**

   i. <u>General</u>.

On the Effective Date of the Plan, (i) the Freedom HoldCo Debtors shall execute the Freedom HoldCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the Freedom HoldCo Debtor Litigation Trust in accordance with the terms of the Plan and the beneficial interests therein, which shall be for the benefit of the Holders of Allowed Claims against the Freedom HoldCo Debtors, Debtors, including to the extent the Freedom HoldCo DIP Election is made, the Allowed DIP Claims currently outstanding against the Freedom HoldCo Debtors and (ii) the Freedom HoldCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Freedom HoldCo Debtor Litigation Trust all of their rights, title and interest in the Freedom HoldCo Debtor Litigation Trust Claims.  Pursuant to section 1141 of the Bankruptcy Code, such Claims and Causes of Action (if any) shall automatically vest in the Freedom HoldCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests.

For the avoidance of doubt, prior to the Effective Date of the Plan, the Freedom HoldCo Independent Director has the sole power and authority to conduct the Freedom HoldCo Independent Investigation.  Notwithstanding any language in the definition of Released Parties, if the Freedom HoldCo Independent Director identifies potential Claims through the Freedom HoldCo Independent Investigation, the Freedom HoldCo Independent Director shall have the sole power and authority (i) to settle or release such Claims (other than the Freedom HoldCo Debtor Litigation Trust Claims), subject to further order of the Bankruptcy Court after notice and a hearing, or (ii) to preserve such Claims for transfer to the Freedom HoldCo Debtor Litigation Trust.

The (i) establishment, purpose, and administration of the Freedom HoldCo Debtor Litigation Trust; (ii) appointment, rights, and powers, of the Freedom HoldCo Debtor Litigation Trustee; and (iii) treatment of the Freedom HoldCo Debtor Litigation Trust for federal income tax purposes, among other things, shall be governed by the Freedom HoldCo Debtor Litigation Trust Agreement.  On and after the Effective Date, the Freedom HoldCo Debtor Litigation Trustee shall be authorized, in accordance with the terms of the Plan and the Freedom HoldCo Debtor Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of the assets of the Freedom HoldCo Debtor Litigation Trust.

In furtherance of this section of the Plan, (i) it is intended that the Freedom HoldCo Debtor Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the Freedom HoldCo Debtor Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Prepetition

HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, and then contributed by the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims to the Freedom HoldCo Debtor Litigation Trust in exchange for their interest in the Freedom HoldCo Debtor Litigation Trust; (ii) the sole purpose of the Freedom HoldCo Debtor Litigation Trust shall be the liquidation and distribution of the net assets of the Freedom HoldCo Debtor Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report consistently with the valuation of the assets transferred to the Freedom HoldCo Debtor Litigation Trust as determined by the Freedom HoldCo Debtor Litigation Trustee (or its designee); (v) the Freedom HoldCo Debtor Litigation Trustee shall be responsible for filing all applicable tax returns for the Freedom HoldCo Debtor Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the Freedom HoldCo Debtor Litigation Trustee shall annually send to each Holder of an interest in the Freedom HoldCo Debtor Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Freedom HoldCo Debtor Litigation Trustee of a private letter ruling if the Freedom HoldCo Debtor Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the Freedom HoldCo Debtor Litigation Trustee), the Freedom HoldCo Debtor Litigation Trustee may timely elect to (i) treat any portion of the Freedom HoldCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the Freedom HoldCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the Freedom HoldCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Freedom HoldCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The Freedom HoldCo Debtor Litigation Trustee may request an expedited determination of taxes of the Freedom HoldCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Freedom HoldCo Debtor

Litigation Trust for all taxable periods through the dissolution of the Freedom HoldCo Debtor Litigation Trust.

## XIII.  EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND INTERESTS

### A.    Discharge of Claims and Termination of Certain Equity Interests

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim is Allowed; or (3) the Holder of such Claim or Equity Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.  For the avoidance of doubt, (i) nothing in Section 12.1 of the Plan shall affect the rights of Holders of Claims to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims are entitled under the Plan, and (ii) notwithstanding any other Plan provision or provision in the Restructuring Support Agreement to the contrary, in the event a Sale Transaction is consummated, the Debtors shall not receive a discharge, pursuant to section 1141(d)(3) of the Bankruptcy Code.

In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.   In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims against the Debtors and their Estates, as well as claims and Causes of Action against other Entities.

B.    **Release of Claims**

i.    Releases by the Debtors

Subject to the outcome of the Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtor Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release, to the maximum extent permitted by law, to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all claims, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; (vii) the Take-Private Transaction and/or (viii) the confirmation or consummation of the Plan or the solicitation of votes on the Plan, in each case, that such Debtor Releasing Party would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; **provided, however,** that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Debtor Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Debtor Releasing Party to enforce the Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements

or documents delivered under or in connection with the Plan or any Sale Transaction or assumed pursuant to the Plan or any Sale Transaction or assumed pursuant to Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in <u>Article XII.2</u> of the Plan shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; (2) any act or omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates; (3) any retained Causes of Action; (4) any OpCo Litigation Claims; (5) any Freedom HoldCo Debtor Litigation Trust Claims; or (6) any Avoidance Actions held by Debtors Freedom Receivables II, LLC and Freedom VCM Receivables, Inc. For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

ii.    <u>Third Party Release</u>

Notwithstanding anything contained in the Plan or the Restructuring Support Agreement to the contrary, and subject to the outcome of Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise

**modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Non-Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third-Party Release</u>") from any and all Claims, Interests, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the confirmation or consummation of the Plan or the solicitation of votes on the Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; <u>provided</u>, <u>however</u>, that the foregoing provisions of this Third-Party Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Third-Party Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Non-Debtor Releasing Party to enforce the Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or any Sale Transaction or assumed pursuant to the Plan or any Sale Transaction or Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations,**

suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; (2) any act or omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates; (3) any retained Causes of Action; (4) any OpCo Litigation Claims; (5) any Freedom HoldCo Debtor Litigation Trust Claims; or (6) any Avoidance Actions held by Debtors Freedom Receivables II, LLC and Freedom VCM Receivables, Inc.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

iii.    Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of confirmation and consummation of the Plan, making distributions under the Plan, the Disclosure Statement, the Sale Process, the Sale Order, or the solicitation of votes for, or confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing, including but not limited to the Restructuring Support Agreement; the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure

**Statement or confirmation or consummation of the Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this Exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Exculpation), or gross negligence of such applicable Exculpated Party; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; <u>provided</u>, <u>further</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in <u>Article XII.4</u> of the Plan shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpations set forth above do not exculpate Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.**

### C.    Objections to Claims and Interests

Other than with respect to Fee Claims, (i) only the Reorganized Debtors or New TopCo, or (ii) in the event of a Sale Transaction, only Wind Down Co, on behalf of itself and the other the Wind Down Debtors, shall be entitled to object to Claims (other than OpCo General Unsecured Claims, Prepetition HoldCo Loan Claims, and Allowed Freedom HoldCo General Unsecured Claims) on and after the Effective Date, except that nothing herein shall be understood to waive the Reorganized Debtors', New TopCo's or the Wind Down Debtors' right to argue that a Claim filed against the Debtors or the Reorganized Debtors has been discharged under the Plan.  Only the OpCo Debtor Litigation Trust shall be entitled to object to OpCo General Unsecured Claims on and after the Effective Date.  Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) one hundred eighty (180) days following the later of (x) the Effective Date and (y) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof.  From and after the Effective Date, either (i) the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, (ii) the Wind Down Debtors, (iii) the OpCo Debtor Litigation Trust, or (iv) the Freedom HoldCo Debtor Litigation Trust, as applicable, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

If an objection to a Claim is filed as set forth in Section 9.2 of the Plan, except as otherwise agreed by (i) the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, or (ii) the Wind Down Debtors, as applicable, if any portion of a Claim (other than a Fee Claim) is a Disputed Claim, no payment or distribution (partial or otherwise) provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

## XIV.  EXECUTORY CONTRACTS UNDER THE PLAN

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

In the event a Sale Transaction or Partial Sale Transaction is consummated, to the extent assumption has not already occurred, the Assumed Contracts to be assumed and assigned in connection with such Sale Transaction or Partial Sale Transaction will be assumed and assigned to the applicable Successful Bidder pursuant to a Sale Order in accordance with the applicable Sale Documents.  Effective as of the Effective Date, in the event a Sale Transaction is consummated, except as otherwise provided herein, any Executory Contract or Unexpired Lease (i) not previously assumed, (ii) not assumed and assigned in accordance with any Sale Documents, (iii) not previously rejected pursuant to an order of the Bankruptcy Court, or (iv) not subject of a pending motion to reject, assume or assume and assign, will be rejected effective as of the Effective Date pursuant to the Confirmation Order.

In the event of a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), except as otherwise provided in the Plan, any Executory Contracts and Unexpired Leases (i) not previously assumed, (ii) not previously assumed and assigned in accordance with any Partial Sale Transaction or other order approving such assumption and assignment, or (iii) not previously rejected pursuant to an order of the Bankruptcy Court, will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order except any Executory Contract or Unexpired Lease (1) identified on the Rejected Contracts/Lease List (which shall initially be filed with the Plan Supplement) as a contract or lease to be rejected, (2) that is the subject of a separate motion or notice to reject, assume, or assume and assign pending as of the Confirmation Date, or (3) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).  In the event of a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such later date as may be identified on the Rejected Contracts/Lease List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

The Debtors and the Required Consenting First Lien Lenders will work together in good faith to determine which Executory Contracts and Unexpired Leases shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases; provided that, to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, if requested by the Required Consenting First Lien Lenders, (x) absent a Partial Sale Transaction involving the

Vitamin Shoppe Debtors, the Vitamin Shoppe Debtors shall reject any and all Executory Contracts or Unexpired Leases held by such Debtor(s), and (y) the Debtors shall reject any Executory Contracts or Unexpired Leases between (i) any of the Debtors, on the one hand, and (ii) any Specified Party, on the other hand.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party (including the applicable Successful Bidder in the event of a Sale Transaction or Partial Sale Transaction, if any) on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by an order of the Bankruptcy Court. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, or increases, accelerates or otherwise alters any obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder as a result of, or creates any Lien on any asset or property of the Debtors or the Reorganized Debtors as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed unenforceable (solely for purposes of the transactions contemplated under the Plan) and modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder, or create or impose a Lien on any asset or property of the Debtors or the Reorganized Debtors. For the avoidance of doubt, confirmation of the Plan shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary in the Plan and in the Restructuring Support Agreement, the Debtors or Reorganized Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts/Lease List in their discretion prior to the Confirmation Date (or such later date as may be agreed with a counterparty); provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

### B.      Cure of Defaults for Assumed Executory Contracts or Unexpired Leases

Notwithstanding anything to the contrary in the Plan and in the Restructuring Support Agreement, in the event the Restructuring Transactions are consummated through the Sale Transaction or a Partial Sale Transaction (if any), the terms of any Sale Documents and any Sale Order shall govern the cure of defaults, assumption and assignment, and compliance with section 365 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases assumed and assigned pursuant to such Sale Documents and Sale Order.

In the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), the applicable terms of the Bidding Procedures Order and section 365 of the Bankruptcy Code shall govern the process for cure of defaults, assumption, assumption and assignment (if applicable) with respect to any Executory Contracts or Unexpired Leases assumed or assumed and assigned by the Debtors pursuant to the Plan. Notwithstanding the foregoing, any Assumption and Assignment Notices (as defined in the Bidding Procedures Order), including, but not limited to, those filed at Docket Nos. 487, 499, 597 & 650, shall constitute notice of the potential assumption and proposed Cure Costs. Any objection by a contract or lease counterparty to the proposed Cure Cost (as defined in the Bidding Procedures Order) must be filed, served, and actually received by the Debtors by the date set forth in the applicable Assumption and Assignment Notice (a "Cure Dispute"). In the event that a non-Debtor contract counterparty files a timely Cure Dispute and the Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard at the Confirmation Hearing or such other date on at least seven (7) days' notice to the applicable non-Debtor contract counterparty, or such date as the parties agree, subject to the Court's calendar. Any objection by a contract or lease counterparty to (i) the ability of the applicable Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned, or (ii) any other matter pertaining to the proposed assumption (such objection, an "Assumption Dispute") must be filed, served, and actually received by the Debtors by the date on which objections to confirmation of the Plan are due.

In the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, the Debtors shall pay any Cure Costs, if monetary, in full in Cash either (i) on the Effective Date or as soon as reasonably practicable thereafter, or (ii) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (x) the Effective Date or as soon as reasonably practicable thereafter and (y) seven (7) days after the date on which such Cure Dispute has been resolved.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan and payment or performance of the applicable Cure Costs shall result in the full satisfaction and cure of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption.

## C.    Ipso Facto and Similar Provisions Ineffective

Any term of any policy, contract, or other obligation applicable to a Debtor shall be unenforceable with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Person or entity based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of any of these Chapter 11 Cases; (iii) confirmation or consummation of

the Plan, including any change of control that will occur as a result of such consummation; or (iv) the Restructuring Transactions.

### D.    Insurance Policies

In accordance with the Plan, (i) on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, which "tail policy" shall not be otherwise terminated or reduced) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed; (iii) the Debtors and the Reorganized Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary; and (iv) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies.

For the avoidance of doubt, on and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

### E.    Survival of Certain Indemnification Obligations

On and as of the Effective Date, all indemnification obligations of the Debtors that are in place as of the Petition Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements or otherwise) for the current directors, officers and managers, of the Debtors, except any indemnification obligations of the Debtors on account of any Freedom HoldCo Debtor Litigation Trust Claims that are transferred to the OpCo Debtor Litigation Trust and any OpCo Litigation Claims that are transferred to the OpCo Debtor Litigation Trust, shall be assumed or assumed and assigned and remain in full force and effect after the Effective Date, and shall survive unimpaired and unaffected, irrespective of when such obligation arose, as applicable.

### F.    Postpetition Contracts and Leases

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

## XV.  CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Conditions to Confirmation

It shall be a condition the confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI of the Plan:

- the DIP Orders shall have been entered by the Bankruptcy Court and shall remain in full force and effect;

- the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Orders;

- the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan;

- entry of the Disclosure Statement Order;

- entry of the Confirmation Order;

- the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time; and

- in the event of a Sale Transaction, the receipt of a Sufficient Bid and the Sale Documents shall not have been terminated in accordance with their terms.

### B.    Conditions to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI of the Plan:

- the DIP Orders, Disclosure Statement Order, and Confirmation Order having become Final Orders in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified, unless otherwise agreed by the Debtors and the Required Consenting First Lien Lenders;

- no court of competent jurisdiction or other competent governmental or regulatory authority having issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

- each of the applicable Definitive Documents having been executed, delivered, acknowledged, and/or filed, as applicable, by the Entities and Persons intended to be parties thereto and effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein having been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Definitive Documents;

- any non-technical and/or immaterial amendments, modifications or supplements to the Plan having been acceptable to the Debtors and the Required Consenting First Lien Lenders, except as otherwise provided in Section 14.3 of the Plan;

- in the event of the Plan Equitization Transaction, each of the offers, issuances, sales, and/or deliveries of Reorganized Common Equity in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no proceeding by any Governmental Unit or other Entity or Person that alleges that any such offer, issuance, sale and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such proceeding shall be threatened in writing or instituted by any Governmental Unit on or prior to the Effective Date;

- the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, having not been terminated in accordance with its respective terms, and there having not occurred and been continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time;

- to the extent a Plan Equitization Transaction is implemented, all of the actions set forth in the Restructuring Transactions Memorandum, as applicable, having been completed and implemented;

- there not having been instituted or threatened to be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Unit (x) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transaction contemplated herein, in the Restructuring Support Agreement, and in the Definitive Documents or (y) imposing a material award, claim, injunction, fine or penalty that, in each case, both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

- the Debtors having obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and having filed all notices and reports, if any, required to be filed, including with any Governmental Unit, by the Debtors in connection with the Plan's effectiveness, in each case, as may be required by a Governmental Unit;

- in the event of the Plan Equitization Transaction, the Reorganized Common Equity to be issued and/or delivered on the Effective Date having been validly issued by New TopCo, having been fully paid and non-assessable, and being free and clear of all taxes, Liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents of New TopCo;

- all conditions precedent to the effectiveness of the OpCo Debtor Litigation Trust Agreement and the Freedom HoldCo Debtor Litigation Trust Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the OpCo Debtor Litigation Trust Agreement and the Freedom HoldCo Debtor Litigation Trust Agreement shall be in full force and effect;

- the OpCo Debtor Litigation Trust Escrow Amount shall have been paid to the OpCo Debtor Litigation Trust;

- all conditions precedent to the effectiveness of the Take-Back Debt Credit Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the Take-Back Debt Credit Agreement shall be in full force and effect;

- all conditions precedent to the effectiveness of the New ABL Facility having been satisfied or duly waived by the party whose consent is required thereunder, and the New ABL Facility shall be in full force and effect;

- all requisite filings with any Governmental Unit and third parties having become effective, and all such Governmental Unit and third parties having approved or consented to the Restructuring Transactions, to the extent required;

- any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions having been obtained;

- all accrued and unpaid Restructuring Expenses having been paid in full in Cash by the Debtors;

- in the event of a Sale Transaction, the Sale Documents, as applicable, not having been terminated in accordance with their terms;

- substantially contemporaneous with the consummation of the Restructuring Transactions, and not having been, as applicable, stayed, modified, reversed, vacated, subject to any pending appeal, and/or terminated prior to the Effective Date: (a) the New Organizational Documents; (b) if applicable, any Sale Order; (c) the Exit ABL Facility; (d) the Take-Back Debt Credit Agreement (if applicable); (e) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (f) all other documents necessary to consummate a

transaction of the type contemplated by the Plan to the extent not otherwise listed above; and

- all closing conditions and other conditions precedent in the Restructuring Support Agreement having been satisfied or waived in accordance with the terms thereof.

### C.    Satisfaction and Waiver of Conditions Precedent

Except as otherwise provided herein, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Sections 11.1 and 11.2 of the Plan may be waived in whole or part upon agreement by the Debtors, the Consenting First Lien Lenders, and the Creditors' Committee, and as the case may be, without notice and a hearing, and the Debtors' benefits under any "mootness" doctrine, but only to the extent applicable, shall be unaffected by any provision hereof.  The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

### D.    Effect of Failure of Conditions

If all of the conditions to effectiveness have not been satisfied (as provided in Sections 11.1 and 11.2 of the Plan) or duly waived (as provided in Section 11.3 of the Plan) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors may file a motion to vacate the Confirmation Order.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Sections 11.1 and 11.2 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this Section 11.4, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under the Plan shall be made, the Debtors and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

### E.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan and whether or not such Holder has accepted the Plan.

### F.    Withdrawal of the Plan

Subject to the terms and conditions of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

## XVI.  CONFIRMATION OF THE PLAN

### A.    Confirmation Generally

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code.  It requires further that a debtor's disclosures concerning its plan of reorganization are adequate.

If the Plan is confirmed, the Debtors expect the Effective Date to occur no later than one hundred twenty (120) days after the Petition Date, or ten (10) days after the Confirmation Date.

To confirm the Plan, the Bankruptcy Court must find that all of the requirements of section 1129 of the Bankruptcy Code have been met.  Thus, even if the statutorily required majority vote in number and dollar amount is achieved for Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 (the only Classes entitled to vote under the Plan), the Bankruptcy Court must make independent findings respecting the Plan's satisfaction of the requirements of the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are discussed below.

### B.    Voting Procedures and Standards

Holders of Claims and Interests in Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 (the only Classes entitled to vote under the Plan) as of the Distribution Record Date will receive prior to the commencement of these Chapter 11 Cases, this Disclosure Statement, the Plan, a Ballot for accepting or rejecting the Plan and Plan, and related credit and investment documents.  Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 are entitled to vote because they are Classes that are impaired under the Plan.

A class is "impaired" under a plan unless, with respect to each Claim or Interest of such class, the Plan:

> (i)    leaves unaltered the legal, equitable and contractual rights to which the Claim or Interest entitles the Holder of such claim or interest; or

(ii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the Holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such Holder based on such claim or interest.

A class that is not impaired under a plan of reorganization is deemed to have accepted the Plan, or is impaired and deemed to have rejected the Plan and, therefore, solicitation of acceptances with respect to such class is not required and will not occur.

Among other things, the following are the Voting Procedures in connection with voting on the Plan and Plan:

(a) For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Interests held by a single Holder against the Debtors in a voting Class will be aggregated as if such Holder held a single Claim or Interest against the Debtors in the voting Class, and the votes related to those Claims or Interests shall be treated as a single vote on the Plan; provided, however, that separate Claims or Interests held as of the Petition Date by different entities (even if related, affiliated, or properly and timely assigned or transferred prior to the Voting Record Date) shall not be deemed to be held by a single Holder pursuant to this provision, and the votes with respect to any such Claims or Interests shall be treated as separate votes on the Plan.

(b) Holders with multiple Claims or Interests within each voting Class must vote all such Claims or Interests to either accept or reject the Plan, and may not split their vote(s) within the voting Class. Accordingly, an individual Ballot that partially rejects and partially accepts the Plan on account of multiple Claims or Interests within the voting Class will not be counted.

(c) Each Holder will be provided a single individual Ballot for all Claims or Interests held by such Holder in each voting Class against the Debtors.

(d) If a Claim or Interest is transferred after the date established as the voting record date pursuant to the Disclosure Statement Order (the "Voting Record Date"), only the Holder of such Claim or Interest as of the Voting Record Date may execute and submit a Ballot to the Claims Agent, the transferee of such Claim or Interest shall be bound by any such vote (and the consequences thereof) made by the Holder of such transferred Claim or Interest as of the Voting Record Date, and no "cause" will exist to permit any vote change under Bankruptcy Rule 3018(a).

(e) The delivery of a Ballot will be deemed made only when the Claims Agent actually receives the executed Ballot or a Ballot is received via electronic mail.

(f) Any party who has previously submitted to the Claims Agent prior to the date and time set forth in the Disclosure Statement Order by which Ballots for accepting or rejecting the Plan must be received by the Claims Agent (the "Voting Deadline"), a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Claims Agent prior to the Voting Deadline a subsequent properly completed Ballot.  If multiple Ballots are received from the same Holder with respect to the same Claim or Interest prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that Holder's intent and will supersede and revoke any Ballot previously received.

(g) If a Holder of a Claim or Interest casts multiple Ballots on account of the same Claim or Interest, which are received by the Claims Agent on the same day and at the same time, but which are voted inconsistently, such Ballots shall not be counted.

(h) Except as otherwise provided in subsection (f) hereof, any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Claims Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims or Interests to which it relates and the aggregate principal amount represented by such Claims or Interests, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims or Interests and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Claims Agent prior to the Voting Deadline.  The Debtors expressly reserve the right to contest the validity of any such withdrawals of Ballots.

The following types of Ballots will not be counted in determining whether the Plan has been accepted or rejected.

(1) Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan.

(2) Any Ballot received after the Voting Deadline, except by order of the Bankruptcy Court or if the Debtors have granted an extension of the Voting Deadline, in writing, with respect to such Ballot;

(3) Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

(4) Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

(5) Any Ballot cast by an Entity that does not hold a Claim in the voting Classes;

(6) Any unsigned Ballot; and

(7) Any Ballot submitted by any means other than as set forth herein and in the Ballots, unless approved by the Debtors in writing or otherwise ordered by the Court.

In connection with these Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to approve the process by which Holders of Claims submit their votes (the "Voting Procedures"). In the event these Chapter 11 Cases are commenced, to the extent that the Bankruptcy Court does not or is unable to approve any portion of these Voting Procedures, the Debtors reserve the right to modify the Voting Procedures and recalculate the balloting in accordance with such modified procedures.

**If a Ballot is damaged or lost or if you have any questions concerning Voting Procedures, you may contact the Claims Agent at**

> **Franchise Group, Inc. Ballot Processing Center**
> **c/o Kroll Restructuring Administration LLC**
> **850 3rd Avenue, Suite 412**
> **Brooklyn, NY 11232**

**A vote may be designated (i.e., disregarded) if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not made or solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.**

**Under the Bankruptcy Code, the Plan will be "accepted" by a voting Class if (excluding insiders) at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims in such voting Class that cast Ballots to accept or reject the Plan vote in favor of the Plan.**

**A vote in favor of the Plan also shall be a vote in favor of the Plan, including the agreement to provide the releases set forth in Article XII of the Plan.**

### C.     Acceptance

The Bankruptcy Code provides that a class of claims will have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims in such class that have voted on the Plan. There must be one impaired accepting class excluding insiders. Here, acceptance of the Plan need only be solicited from Holders of Claims in Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 as those are the only Classes which are impaired and entitled to vote under the Plan. Except in the context of a "cram down" (described below), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each impaired Class accepts the Plan. If these Chapter 11 Cases are filed, the Debtors intend to request confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any voting Classes that vote to reject or are deemed to reject the Plan. This

procedure is commonly referred to as a "cram down." For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation of the Plan notwithstanding rejection by certain impaired Classes, see <u>Article XVI.D.iv</u>, "*Cram Down*," below.

### D.    Confirmation and Consummation

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all impaired Classes of Claims or Interests, or if rejected by an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith. Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code;

- the Plan has been proposed in good faith and not by any means forbidden by law;

- any payment made or to be made by the proponent, by the debtor or by a person issuing securities under the Plan, for services or for costs and expenses in, or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the bankruptcy court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the Plan with the debtor, or a successor to the debtor under the Plan. The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such claim or interest, property of a value, as of the Effective Date of

the Plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the Plan or is not impaired under the Plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that allowed administrative expenses and priority claims (other than priority tax claims) will be paid in full on the Effective Date (except that if a class of priority claims has voted to accept the Plan, holders of such claims may receive deferred cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amounts of such claims) and that holders of priority tax claims may receive on account of such claims regular installment payments in cash of a total value, as of the Effective Date, equal to the allowed amount of such claims over a period that ends no later than 5 years from the petition date and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan;

- if a class of claims is impaired, at least one impaired class of claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class; and

- confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a more detailed summary of certain statutory confirmation requirements.

   i.  <u>Best Interests of Holders of Claims and Interests</u>

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.  Thus, with respect to each impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accept the Plan or (ii) receive

or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In determining whether this test is satisfied, the first step is to determine the dollar amount that would be generated from the liquidation of each of the Debtors' assets and properties in a chapter 7 liquidation case. The gross amount of cash available in such a liquidation would be the sum of the proceeds from the disposition of such Debtor's assets and the cash held by such Debtor at the time of the commencement of the chapter 7 case. This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the applicable Debtor's business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders of the applicable Debtor in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

See the Liquidation Analysis annexed as <u>Exhibit B</u> hereto and <u>Article XVI.D.i</u> herein for a further discussion of how the Plan satisfies the "best interests" test. The Liquidation Analysis is incorporated herein by reference and was prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors.

THE DEBTORS HAVE DETERMINED, AS DISCUSSED IN THE LIQUIDATION ANALYSIS ATTACHED AS <u>EXHIBIT B</u> HERETO, THAT CONFIRMATION OF THE PLAN WILL PROVIDE EACH CREDITOR AND INTEREST HOLDER OF EACH DEBTOR WITH A RECOVERY THAT IS NOT LESS THAN IT WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE APPLICABLE DEBTOR UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. AND, AS REFLECTED IN THE LIQUIDATION ANALYSIS, THE DEBTORS BELIEVE THAT LIQUIDATION OF THE DEBTORS' BUSINESSES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE WOULD RESULT IN SUBSTANTIAL DIMINUTION IN THE VALUE TO BE REALIZED BY HOLDERS OF CLAIMS AS COMPARED TO DISTRIBUTIONS CONTEMPLATED UNDER THE PLAN. CONSEQUENTLY, THE DEBTORS AND THEIR MANAGEMENT BELIEVE THAT CONFIRMATION OF THE PLAN WILL PROVIDE A SUBSTANTIALLY GREATER RETURN TO HOLDERS OF CLAIMS THAN WOULD A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

ii.    Financial Feasibility

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtors have prepared projections of the financial performance of the Reorganized Debtors for the fiscal years 2025 through 2029 (the "Financial Projections"). The Financial Projections, and certain of the assumptions on which they are based, are set forth in the projected financial information contained in <u>Exhibit D</u> hereto.

THE PROJECTIONS SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE

PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS. THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED ABOVE IN ARTICLE IX.A. IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE PROJECTIONS.

The Debtors prepared these Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. The Financial Projections have not been examined or compiled by independent accountants. The Debtors makes no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period of the Financial Projections may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

The Financial Projections indicate, on a pro forma basis, that the projected level of cash flow is sufficient to satisfy the Debtors' future capital expenditures and other obligations during the applicable period. Accordingly, if these Chapter 11 Cases are commenced, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

        iii.   <u>Valuation</u>

As described above, the Debtors are presently engaged in marketing their assets for sale and soliciting bids in connection therewith pursuant to the Bidding Procedures. The Debtors believe that this process provides the best method of valuing their enterprise, as it allows the market to speak as to that value. The Debtors' marketing and sale process is a comprehensive and arm's length processes with the goal of identifying counterparties for one or more potential value-maximizing sale transactions. To ensure that the integrity of the marketing and sale process is preserved and value is maximized, this Disclosure Statement does not identify expected recoveries for Prepetition ABL Claims, Prepetition First Lien Loan Claims, nor does it include a valuation analysis (which the Debtors at this time do not anticipate filing). <u>See</u> 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); <u>In re LBI Media, Inc.</u>, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (Docket No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary).

iv.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

v.    Cram Down

The Bankruptcy Code contains provisions for confirmation of a plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the Plan does not discriminate unfairly with respect to each non accepting impaired class;

- the Plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the Plan.

vi.    No Unfair Discrimination; Fair and Equitable Test

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims, or equity interests. In general, section 1129(b) of the

Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive any value under the Plan on account of such junior claims or interests.

The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

Specifically, with respect to equity interests, a plan is "fair and equitable" if either (i) each holder of an equity interest will receive or retain under the Plan a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the Plan on account of such interest.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

<div align="center">

vii.  <u>Classification of Claims and Interests</u>

</div>

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a plan of reorganization place each claim or interest into a class with other claims or interests that are "substantially similar."

# XVII.  ADDITIONAL INFORMATION

All of the exhibits to the Plan, the Plan Supplement and to this Disclosure Statement will be available for inspection by contacting the Claims Agent.

<div align="center">

[*Remainder of Page Intentionally Left Blank*]

</div>

## XVIII. CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, General Unsecured Claims against Franchise Group, Inc., General Unsecured Claims against the American Freight Debtors, General Unsecured Claims against the Buddy's Debtors, General Unsecured Claims against the PSP Debtors, General Unsecured Claims against the Vitamin Shoppe Debtors, Prepetition HoldCo Loan Claims, General Unsecured Claims against the HoldCo Debtors, HoldCo Receivables General Unsecured Claims, General Unsecured Claims against TopCo, Subordinated Claims, and Existing TopCo Equity Interest to **ACCEPT** the Plan, and to duly complete and return their Ballots so that they will be **ACTUALLY RECEIVED** on or before **5:00 p.m. (prevailing Eastern Time) on March 13, 2025**.

Dated: February 5, 2025
      Wilmington, Delaware

                              Franchise Group, Inc.
                              Freedom VCM Holdings, LLC
                              Freedom VCM Interco Holdings, Inc.
                              Freedom Receivables II, LLC
                              Freedom VCM Receivables, Inc.
                              Freedom VCM Interco, Inc.
                              Freedom VCM, Inc.
                              Franchise Group New Holdco, LLC
                              American Freight FFO, LLC
                              Franchise Group Acquisition TM, LLC
                              Franchise Group Intermediate Holdco, LLC
                              Franchise Group Intermediate L, LLC
                              Franchise Group Newco Intermediate AF, LLC
                              American Freight Group, LLC
                              American Freight Holdings, LLC
                              American Freight, LLC
                              American Freight Management Company, LLC
                              Franchise Group Intermediate S, LLC
                              Franchise Group Newco S, LLC
                              American Freight Franchising, LLC
                              Home & Appliance Outlet, LLC
                              American Freight Outlet Stores, LLC
                              American Freight Franchisor, LLC
                              Franchise Group Intermediate B, LLC
                              Buddy's Newco, LLC
                              Buddy's Franchising and Licensing LLC
                              Franchise Group Intermediate V, LLC
                              Franchise Group Newco V, LLC
                              Franchise Group Intermediate BHF, LLC
                              Franchise Group Newco BHF, LLC

Valor Acquisition, LLC
Vitamin Shoppe Industries LLC
Vitamin Shoppe Global, LLC
Vitamin Shoppe Mariner, LLC
Vitamin Shoppe Procurement Services, LLC
Vitamin Shoppe Franchising, LLC
Vitamin Shoppe Florida, LLC
Betancourt Sports Nutrition, LLC
Franchise Group Intermediate PSP, LLC
Franchise Group Newco PSP, LLC
PSP Midco, LLC
Pet Supplies "Plus", LLC
PSP Group, LLC
PSP Service Newco, LLC
WNW Franchising, LLC
WNW Stores, LLC
PSP Stores, LLC
PSP Franchising, LLC
PSP Subco, LLC
PSP Distribution, LLC
Franchise Group Intermediate SL, LLC
Franchise Group Newco SL, LLC
Educate, Inc.


By: /s/ DRAFT _____

    Name: Andrew Laurence

    Title: Chief Executive Officer

# EXHIBIT A

**Plan of Reorganization**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |

## THIRD AMENDED JOINT CHAPTER 11 PLAN OF
## FRANCHISE GROUP, INC. AND ITS AFFILIATED DEBTORS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com

*Counsel to the Debtors
and Debtors in Possession*

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
Betsy L. Feldman (Del. No. 6410)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Dated: February 5, 2025

## <u>TABLE OF CONTENTS</u>

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ........................................................**2**

A.    Definitions. ....................................................................................................2
B.    Interpretation; Application of Definitions and Rules of Construction.............................29
C.    Appendices and Plan Documents..................................................................29
D.    Definitive Document Consent Rights. ...........................................................30
E.    Nature of the Restructuring Transactions. ......................................................30

**ARTICLE II. CERTAIN INTERCREDITOR AND INTER-DEBTOR ISSUES** .................**30**

2.1.    Settlement of Certain Intercreditor and Inter-Debtor Issues..............................30
2.2.    Formation of Debtor Groups for Convenience Purposes.................................30

**ARTICLE III. DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS**.......................................**31**

3.1.    DIP Claims.....................................................................................31
3.2.    Administrative Expense Claims...............................................................32
3.3.    Fee Claims....................................................................................33
3.4.    Priority Tax Claims...........................................................................36
3.5.    U.S. Trustee Fees and Related Reporting Obligations. ..................................37

**ARTICLE IV. CLASSIFICATION OF CLAIMS AND INTERESTS**.................................**37**

4.1.    Classification of Claims and Interests.......................................................37
4.2.    Unimpaired Classes of Claims...............................................................38
4.3.    Impaired Classes of Claims. .................................................................38
4.4.    Separate Classification of Other Secured Claims. .......................................39

**ARTICLE V. TREATMENT OF CLAIMS AND INTERESTS** .......................................**39**

5.1.    Priority Non-Tax Claims (Class 1). .........................................................39
5.2.    Other Secured Claims (Class 2)..............................................................40
5.3.    Prepetition ABL Loan Claims (Class 3). ..................................................41
5.4.    Prepetition First Lien Loan Claims (Class 4). ...........................................42
5.5.    Prepetition Second Lien Loan Claims (Class 5)..........................................42
5.6.    Franchise Group, Inc. General Unsecured Claims (Class 6-A). ........................43
5.7.    American Freight General Unsecured Claims (Class 6-B)...............................44
5.8.    Buddy's General Unsecured Claims (Class 6-C)..........................................44
5.9.    PSP General Unsecured Claims (Class 6-D). .............................................44
5.10.   Vitamin Shoppe General Unsecured Claims (Class 6-E). ...............................45
5.11.   Prepetition HoldCo Loan Claims (Class 7). ..............................................45
5.12.   Freedom HoldCo General Unsecured Claims (Class 8-A)...............................45
5.13.   HoldCo Receivables General Unsecured Claims (Class 8-B) ..........................46
5.14.   TopCo General Unsecured Claims (Class 8-C) ..........................................47
5.15.   Intercompany Claims (Class 9)..............................................................47

5.16.  Subordinated Claims (Class 10)..................................................................48
5.17.  Existing TopCo Equity Interests (Class 11)..................................................49
5.18.  Existing Intercompany Equity Interests (Class 12). ......................................49

**ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN;  EFFECT OF REJECTION BY ONE OR MORE  CLASSES OF CLAIMS OR INTERESTS..................50**

6.1.  Class Acceptance Requirement..................................................................50
6.2.  Tabulation of Votes on a Non-Consolidated Basis........................................50
6.3.  Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown." .....50
6.4.  Voting Classes; Deemed Acceptance or Rejection by Non-Voting Classes. ..................50
6.5.  Confirmation of All Cases. ......................................................................51
6.6.  Vacant and Abstaining Classes. ...............................................................51
6.7.  Controversy Concerning Impairment. .......................................................51

**ARTICLE VII. MEANS FOR IMPLEMENTATION ..............................................51**

7.1.  Non-Substantive Consolidation. ..............................................................51
7.2.  Plan Equitization Transaction. ................................................................52
7.3.  Sale Transaction or Partial Sale Transaction. ............................................53
7.4.  Continued Corporate Existence in Certain Debtors; Vesting of Assets; Dissolution of Certain Debtors. ......................................................................................53
7.5.  Indemnification Provisions in Organizational Documents. ...........................54
7.6.  Sources for Cash Distributions under this Plan. .........................................54
7.7.  Take-Back Debt Facility. ........................................................................55
7.8.  New ABL Facility. .................................................................................56
7.9.  Reorganized Debtors' Ownership. ............................................................57
7.10.  OpCo Debtor Litigation Trust. ...............................................................57
7.11.  Freedom HoldCo Debtor Litigation Trust. ...............................................62
7.12.  New Warrants. ....................................................................................64
7.13.  Exemption from Registration Requirements. .............................................64
7.14.  Organizational Documents .....................................................................65
7.15.  Exemption from Certain Transfer Taxes and Recording Fees..........................65
7.16.  Other Tax Matters. ...............................................................................66
7.17.  Cancellation of Existing Securities and Agreements....................................66
7.18.  Boards. ...............................................................................................67
7.19.  Management. ........................................................................................68
7.20.  Directors and Officers Insurance Policies..................................................68
7.21.  Corporate Action. .................................................................................68
7.22.  Plan Administrator. ...............................................................................69
7.23.  Wind Down of the Debtors' Estates. .......................................................70
7.24.  Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights. ...................................................................................71
7.25.  Additional Transactions Authorized Under this Plan. ..................................72

**ARTICLE VIII. DISTRIBUTIONS** ......................................................................**72**

8.1.    Distributions. ....................................................................................................72
8.2.    No Postpetition Interest on Claims. ..................................................................72
8.3.    Date of Distributions. ........................................................................................72
8.4.    Distribution Record Date. ..................................................................................72
8.5.    Disbursing Agent. ..............................................................................................73
8.6.    Delivery of Distribution. ...................................................................................74
8.7.    Unclaimed Property. ..........................................................................................74
8.8.    Satisfaction of Claims. ......................................................................................74
8.9.    Manner of Payment Under Plan. .......................................................................75
8.10.   De Minimis Cash Distributions. .......................................................................75
8.11.   Distributions on Account of Allowed Claims Only. .........................................75
8.12.   Fractional Shares. ..............................................................................................75
8.13.   No Distribution in Excess of Amount of Allowed Claim. ................................75
8.14.   Setoffs and Recoupments. .................................................................................75
8.15.   Withholding and Reporting Requirements. .......................................................76

**ARTICLE IX. PROCEDURES FOR RESOLVING CLAIMS** ...............................**76**

9.1.    Claims Process. ..................................................................................................76
9.2.    Objections to Claims. .........................................................................................76
9.3.    Payments and Distributions with Respect to Disputed Claims. ........................77

**ARTICLE X. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .........................**77**

10.1.   Assumption and Rejection of Executory Contracts and Unexpired Leases. ....................77
10.2.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...................79
10.3.   Claims Based on Rejection of Executory Contracts and Unexpired Leases. ...................80
10.4.   Contracts and Leases Entered into After the Petition Date. ...............................80
10.5.   Reservation of Rights. ........................................................................................80
10.6.   Employee Compensation and Benefits. .............................................................80

**ARTICLE XI. CONDITIONS PRECEDENT TO CONSUMMATION OF THE
PLAN.** ...........................................................................................................................**82**

11.1.   Conditions Precedent to Confirmation. .............................................................82
11.2.   Conditions Precedent to the Effective Date. .....................................................82
11.3.   Satisfaction and Waiver of Conditions Precedent. ...........................................85
11.4.   Effect of Failure of Conditions. ........................................................................85
11.5.   Binding Effect. ...................................................................................................85
11.6.   Substantial Consummation. ...............................................................................85

**ARTICLE XII. RELEASE, INJUNCTION, AND RELATED PROVISIONS** .....................**86**

12.1.   Discharge of Claims and Termination of Certain Equity Interests; Compromise and
        Settlement of Claims, Certain Equity Interests, and Controversies. ...................86
12.2.   Releases by the Debtors. ....................................................................................87

12.3.  Third-Party Release. ...........................................................................................88
12.4.  Exculpation. ...................................................................................................90
12.5.  Discharge of Claims and Termination of Interests. ......................................91
12.6.  Injunction. ......................................................................................................92
12.7.  Setoffs and Recoupment. ...............................................................................92
12.8.  Release of Liens. ............................................................................................93

**ARTICLE XIII. RETENTION OF JURISDICTION** ................................................**93**

**ARTICLE XIV. MISCELLANEOUS PROVISIONS** ..................................................**95**

14.1.  Dissolution of Creditors' Committee. ...........................................................95
14.2.  Termination of Professional Persons. ...........................................................95
14.3.  Amendments. ..................................................................................................96
14.4.  Revocation or Withdrawal of this Plan. ........................................................96
14.5.  Allocation of Distributions under this Plan Between Principal and Interest. ..............96
14.6.  Severability. ...................................................................................................97
14.7.  Governing Law. ..............................................................................................97
14.8.  Section 1125(e) of the Bankruptcy Code. .....................................................97
14.9.  Inconsistency ..................................................................................................97
14.10.  Time. .............................................................................................................98
14.11.  Exhibits. ........................................................................................................98
14.12.  Notices. .........................................................................................................98
14.13.  Filing of Additional Documents. ..................................................................99
14.14.  Reservation of Rights. ...................................................................................99
14.15.  Closing of Chapter 11 Cases. ........................................................................99
14.16.  Tax Matters. ..................................................................................................99

**ARTICLE XV. COMMITTEE SETTLEMENT** .........................................................**99**

## THIRD AMENDED JOINT CHAPTER 11 PLAN OF
## FRANCHISE GROUP, INC. AND ITS AFFILIATED DEBTORS

Franchise Group, Inc. and each of the debtors and debtors-in-possession in the above-captioned cases (each, a "***Debtor***," and collectively, the "***Debtors***") propose this joint chapter 11 plan for the resolution of the outstanding Claims against, and Interests in, the Debtors.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement, filed contemporaneously with this Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.

**The Non-Liquidating Debtors are pursuing on parallel paths both the Plan Equitization Transaction and a Sale Transaction, all as described in further detail in the Disclosure Statement.**

**The American Freight Debtors are pursuing Store-Closing and Liquidation Sales, all as described in further detail in the Disclosure Statement. Following the Store-Closing and Liquidation Sales, the American Freight Debtors will be wound down. The proceeds of the Store-Closing and Liquidation Sales shall be distributed in accordance with the applicable provisions of this Plan.**

In addition, this Plan provides for and implements the Committee Settlement, as incorporated into this Plan and embodied in the term sheet dated February 3, 2025 annexed hereto as **Exhibit I**, by and among the Committee Settlement Parties. Pursuant to the Committee Settlement, the Committee Settlement Parties have agreed to, among other things, resolve any and all disputes between the Required Consenting First Lien Lenders, the Debtors, and the Creditors' Committee in exchange for: (i) the establishment of the OpCo Debtor Litigation Trust; (ii) funding of the OpCo Debtor Litigation Trust Escrow Amount; (iii) mutual releases as provided for in this Plan; and (iv) support for this Plan. This Plan serves as a motion to approve the Committee Settlement pursuant to Bankruptcy Rule 9019. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Committee Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Holders of Claims, and other parties in interest, and are fair, equitable, and reasonable.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

# ARTICLE I.
## DEFINITIONS AND INTERPRETATION

### A.    *Definitions.*

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1.    *ABL Credit Agreement*** means that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as a borrower, and the other borrowers and guarantors party thereto, the ABL Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

**1.2.    *ABL Credit Agreement Agent*** means JPMorgan Chase Bank, N.A., together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the ABL Credit Agreement, in its capacity as administrative agent and collateral agent for the lenders under the ABL Credit Agreement.

**1.3.    *ABL Lenders*** means, collectively, and as of the relevant time, those lenders that are party to the ABL Credit Agreement.

**1.4.    *ABL Loan Documents*** means the ABL Credit Agreement and any Financing Agreements (as defined in the ABL Credit Agreement).

**1.5.    *ABL Loans*** means the loans arising under or pursuant to the ABL Credit Agreement.

**1.6.    *ABL Priority Collateral*** means any Collateral securing the obligations arising under the ABL Credit Agreement.

**1.7.    *Ad Hoc Group*** means that certain ad hoc group of certain Consenting First Lien Lenders, represented by, among others, Paul Hastings LLP, Landis Rath & Cobb LLP, and Lazard Frères & Co., as may be reconstituted from time to time.

**1.8.    *Ad Hoc Group Advisors*** means (a) Paul Hastings LLP, as counsel to the Ad Hoc Group, (b) Lazard Frères & Co., as financial advisor to the Ad Hoc Group, (c) Landis Rath & Cobb LLP, as Delaware counsel to the Ad Hoc Group, and (d) such other professionals that may be retained by or on behalf of the Ad Hoc Group (including the retention of any such professional made by Paul Hastings), solely in the case referred to in this clause (d), with the consent of the Debtors.

**1.9.    *Administrative Bar Date*** means the first Business Day that is or follows the date that is the thirtieth (30th) day after the Effective Date, or such other date as is ordered by the Bankruptcy Court.

**1.10.    *Administrative Expense Claim*** means a Claim (other than any DIP Claim) for costs and expenses of administration of the Chapter 11 Cases Allowed under Bankruptcy Code sections

503(b), 507(a)(2), 507(b), or, if applicable, 1114(e)(2), including, but not limited to: (a) any actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including, but not limited to, wages, salaries, commissions for services, and payments for inventories, leased equipment, and premises); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330, 331, 363, or 503(b) to the extent incurred on or before the Effective Date; (c) all U.S. Trustee Fees; (d) any 503(b)(9) Claims; and (e) any Claims that have been designated "Administrative Claims" by Final Order of the Bankruptcy Court.

1.11.   *Affiliate* has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.  For the avoidance of doubt, none of (a) Conn's, Inc., (b) B. Riley Financial, Inc., and (c) each of their respective Affiliates (excluding Freedom VCM Holdings, LLC and its subsidiaries) shall be "Affiliates" of the Debtors for purposes of this Plan.

1.12.   *Allowed* means, with respect to a Claim under this Plan, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim or Proof of Interest filed by the Bar Date or a request for payment of an Administrative Expense Claim filed by the Administrative Bar Date, as applicable (or for which Claim a Proof of Claim or Proof of Interest is not required under the Plan, the Bankruptcy Code, the Bar Date Order, or a Final Order, including the Interim DIP Order and Final DIP Order); (b) a Claim that is scheduled by the Debtors as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim or Proof of Interest, as applicable, has been timely filed; or (c) a Claim allowed pursuant to the Plan or a Final Order, including the Interim DIP Order and Final DIP Order; provided that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim or Proof of Interest is or has been timely filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt, a Proof of Claim or Proof of Interest filed after the Bar Date or a request for payment of an Administrative Expense Claim filed after the Administrative Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

**1.13.** ***American Freight Debtors*** means, collectively, American Freight FFO, LLC, Franchise Group Newco Intermediate AF, LLC, and each of Franchise Group Newco Intermediate AF, LLC's direct and indirect subsidiaries.

**1.14.** ***American Freight Liquidation Proceeds*** means net Cash proceeds generated by the sale, lease, liquidation, or other disposition of property owned by the American Freight Debtors.

**1.15.** ***Assumed Contracts*** means those Executory Contracts and Unexpired Leases that shall be (i) in the event the Restructuring Transactions are consummated through the Sale Transaction or a Partial Sale Transaction (if any), assumed by the Non-Liquidating Debtors and assigned to the applicable Successful Bidder or its designee pursuant to and as set forth in any applicable Sale Documents, or (ii) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), assumed by the Non-Liquidating Debtors.

**1.16.** ***Assumed Contracts List*** means the list or lists of Assumed Contracts, which (i) in the event the Restructuring Transactions are consummated through the Sale Transaction or a Partial Sale Transaction (if any), will be included in the applicable Sale Documents and filed with the Bankruptcy Court no later than two (2) Business Days prior to the Sale Hearing, or (ii) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), will be included in the Plan Supplement and may be amended or supplemented up to and including the Effective Date.

**1.17.** ***Assumed Liabilities*** has the meaning set forth in any Sale Documents (or other such similar term as may be used in such Sale Documents).

**1.18.** ***Auction*** means an auction (if any) conducted by the Non-Liquidating Debtors to solicit bids for a Sale Transaction or a Partial Sale Transaction, free and clear of all Liens, Claims, encumbrances, and other interests pursuant to section 363 of the Bankruptcy Code, pursuant to the terms and conditions of the Bidding Procedures.

**1.19.** ***Avoidance Actions*** means any and all avoidance, recovery, subordination, or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5, and section 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

**1.20.** ***Ballot*** means the form distributed by the Debtors or the Claims Agent to Holders of impaired Claims entitled to vote on this Plan on which the acceptance or rejection of this Plan is to be indicated.

**1.21.** ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.22.**  ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware, or any other court exercising competent jurisdiction over the Chapter 11 Cases or any proceeding therein.

**1.23.**  ***Bankruptcy Rules*** means (a) the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, (b) the Local Rules, and (c) any chambers rules of the Bankruptcy Court.

**1.24.**  ***Bar Date*** means the applicable date established by the Bar Date Order by which respective Proofs of Claim and Interests must be filed.

**1.25.**  ***Bar Date Order*** means the *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising under 503(b)(9) of the Bankruptcy Code) and (B) Approving the Form and Manner of Notice Thereof* [Docket No. 354], entered by the Bankruptcy Court on December 6, 2024.

**1.26.**  ***Bidding Procedures*** means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

**1.27.**  ***Bidding Procedures Order*** means the *Order (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief* [Docket No. 444], entered by the Bankruptcy Court on December 16, 2024.

**1.28.**  ***Buddy's Debtors*** means collectively, Franchise Group Intermediate B, LLC and each of its subsidiaries.

**1.29.**  ***Business Day*** means any day other than a Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or a day on which banks are not open for general business in New York, New York.

**1.30.**  ***Cash*** means the legal currency of the United States and equivalents thereof.

**1.31.**  ***Cash Sale Proceeds*** means the Sale Proceeds that are Cash.

**1.32.**  ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).

**1.33.    *Chapter 11 Cases*** means the cases (jointly administered) under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court.

**1.34.    *Claim*** means any "claim" as defined in section 101(5) of the Bankruptcy Code against any Debtor or property of any Debtor, including any Claim arising after the Petition Date.

**1.35.    *Claims Agent*** means Kroll Restructuring Administration LLC in its capacity as noticing, claims and solicitation agent for the Debtors.

**1.36.    *Claims Objection Deadline*** means the deadline for objecting to a Claim, which shall be on the date that is 180 days after the Effective Date, which may be extended by an order of the Bankruptcy Court.

**1.37.    *Claims Register*** means the official register of Claims maintained by the Claims Agent.

**1.38.    *Class*** means a category of Claims or Interests established under <u>Article IV</u> of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.39.    *Collateral*** means any property, wherever located, or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim.

**1.40.    *Committee Settlement*** means the settlement agreed to by the Committee Settlement Parties, as incorporated into this Plan and embodied in the term sheet dated February 3, 2025 annexed hereto as **<u>Exhibit I</u>**, which settlement resolves various disputes, provides valuable consideration to the Debtors and the Estates, and grants certain releases on the terms and conditions provided for therein.

**1.41.    *Committee Settlement Parties*** means the Required Consenting First Lien Lenders, the Debtors, and the Creditors' Committee.

**1.42.    *Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.43.    *Confirmation Hearing*** means a hearing to be held by the Bankruptcy Court regarding confirmation of this Plan (as may be amended pursuant to <u>Section 14.3</u> of this Plan), as such hearing may be adjourned or continued from time to time.

**1.44.    *Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as may be amended, modified, or supplemented from time to time, which shall be subject to the Definitive Document Consent Rights and shall be reasonably acceptable to the Creditors' Committee.

**1.45.    *Consenting First Lien Lenders*** means, as of the relevant time, those First Lien Lenders that are party to the Restructuring Support Agreement.

**1.46.    *Creditors' Committee*** means the statutory committee of unsecured creditors, appointed in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, as

identified in the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 188], filed by the U.S. Trustee on November 19, 2024, as the same may be reconstituted from time to time.

    **1.47.**   **CRO** means David Orlofsky, as Chief Restructuring Officer of the Debtors.

    **1.48.**   **Cure Cost** means (i) all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) and (ii) to the extent required to be cured by the Bankruptcy Code, other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

    **1.49.**   **Cure Dispute** has the meaning set forth in Section 10.2 of this Plan.

    **1.50.**   **D&O Liability Insurance Policies** means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to or providing coverage to any of the Debtors for current or former directors', managers', and officers' liability.

    **1.51.**   **Debtor(s)** has the meaning set forth in the preamble.

    **1.52.**   **Debtor Releasing Party** means any Releasing Party that is a Debtor.

    **1.53.**   **Definitive Document Consent Rights** means the documentation principles set forth in Section I.D. hereof.

    **1.54.**   **Definitive Documents** has the meaning set forth in the Restructuring Support Agreement.

    **1.55.**   **DIP Agent** means the administrative and the collateral agent for the DIP Lenders with respect to the DIP Facility, which shall be either (a) Wilmington Trust, National Association or (b) another financial institution selected by, and qualified to perform the duties customarily associated with such roles as determined by, the Required DIP Lenders and reasonably acceptable to Franchise Group, Inc.

    **1.56.**   **DIP Backstop Premium** has the meaning set forth in the DIP Credit Agreement.

    **1.57.**   **DIP Budget** means the 13-week cash flow projection in form and substance acceptable to the Required DIP Lenders, reflecting (i) the loan parties under the DIP Credit Agreement's anticipated Cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth calendar week thereafter, and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by Professional Persons during the thirteen week period.

    **1.58.**   **DIP Claims** means all Claims of the DIP Agent and/or the DIP Lenders related to, arising under, or in connection with the Interim DIP Order, Final DIP Order and the DIP Documents, including, without limitation, Claims for all principal amounts outstanding, interest,

fees, reasonable and documented expenses (including the reasonable and documented expenses of counsel as set forth in the DIP Credit Agreement), costs and other charges of the DIP Agent and the DIP Lenders in respect of the obligations of the Debtors arising under the DIP Credit Agreement, including, without limitation, the Tranche A DIP Loan Claims and the Tranche B DIP Loan Claims.

1.59.   *DIP Credit Agreement* means the Senior Secured Super-Priority Priming Term Loan Debtor-in-Possession Credit Agreement, dated as of November 7, 2024, by and among the Debtors and the DIP Lenders, as the same may be modified, amended or supplemented from time to time, in accordance with the terms thereof (and including any and all documents and instruments executed in connection therewith).

1.60.   *DIP Documents* means collectively, the DIP Motion, the DIP Orders, and the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof, each of which shall be subject to the Definitive Document Consent Rights.

1.61.   *DIP Equitization* has the meaning set forth in Section 3.1 of this Plan.

1.62.   *DIP Facility* means the debtor-in-possession financing facility on the terms and conditions set forth in the DIP Credit Agreement.

1.63.   *DIP Lenders* means, collectively, and as of the relevant time, those lenders that are party to the DIP Credit Agreement.

1.64.   *DIP Loans* means the Tranche A DIP Loans and the Tranche B DIP Loans.

1.65.   *DIP Motion* means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 51], filed by the Debtors on November 4, 2024.

1.66.   *DIP Orders* means the Interim DIP Order and Final DIP Order.

1.67.   *DIP Premium Conversion* means, in the event of a Plan Equitization Transaction, the conversion by any Holder of a DIP Claim (and/or one or more Related Funds of such Holder) that received a DIP Backstop Premium and/or Commitment Premium (each as defined in the DIP Credit Agreement), as of closing of the syndication process for the DIP Facility and an Exit Premium (as defined in, and in accordance with, the DIP Credit Agreement), of its DIP Backstop Premium, Commitment Premium and/or its Exit Premium (as defined in the DIP Credit Agreement), as applicable, into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in the Disclosure Statement and/or Plan Supplement.

**1.68.** *Disallowed* means a finding or conclusion of law of the Bankruptcy Court in a Final Order, or provision in the Confirmation Order, disallowing a Claim or Interest.

**1.69.** *Disbursing Agent* means the Post-Effective Debtors or the Entity designated by the Post-Effective Debtors, who may be the Plan Administrator, to make distributions under this Plan.

**1.70.** *Disclosure Statement* means the disclosure statement that relates to this Plan, including all exhibits and schedules annexed thereto or referred to therein (in each case, as it or they may be amended, modified, or supplemented from time to time), which shall be subject to the Definitive Document Consent Rights.

**1.71.** *Disclosure Statement Hearing* means a hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

**1.72.** *Disclosure Statement Order* means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, as may be amended, modified, or supplemented from time to time, which shall be subject to the Definitive Document Consent Rights.

**1.73.** *Disputed Claim* means, as of any relevant date, any Claim, or any portion thereof: (a) that is not an Allowed Claim as of the relevant date; and/or (b) is otherwise disputed by any of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled; or (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors or any party in interest has interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order as of the relevant date.

**1.74.** *Distribution Date* means: (a) with respect to Administrative Expense Claims, Priority Non-Tax Claims, Priority Tax Claims, Other Secured Claims, and U.S. Trustee Fees, the date that is the latest of: (i) the Effective Date (or any date within thirty (30) days thereafter); (ii) the date such Claim would be due and payable in the ordinary course of business; and (iii) any date that is within thirty (30) days after such Claim becomes an Allowed Claim or otherwise becomes payable under this Plan (or, if such date is not a Business Day, on the next Business Day thereafter); (b) with respect to Fee Claims, the date (or as soon thereafter as reasonably practicable) that such Claims become Allowed Claims; and (c) with respect to all other Claims, the Effective Date or as soon as reasonably practicable thereafter.

**1.75.** *Distribution Record Date* means the date for determining which Holders of Claims are eligible to receive initial distributions under the Plan, which date shall be the Confirmation Date, or such later date as shall be agreed by the Debtors and the Required Consenting First Lien Lenders; underline provided that the Distribution Record Date shall not apply to any securities of the Debtors deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

**1.76.** *DTC* means The Depository Trust Company.

**1.77.**    *Effective Date* means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 11.2 of this Plan have been satisfied or waived and no stay of the Confirmation Order is in effect.

**1.78.**    *Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.79.**    *Equity Interest* means collectively, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, and any other equity, ownership, membership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, or other equity, ownership, membership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement).

**1.80.**    *Estate* means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**1.81.**    *Estate Professional(s)* means any Person(s) retained by the Estates.

**1.82.**    *Exculpated Party* means (a) the Debtors, (b) the Debtors' directors and officers who served at any time between the Petition Date and the Effective Date, (c) the Creditors' Committee, (d) the members of the Creditors' Committee and the individuals who served on the Creditors' Committee on behalf of each member in their capacities as such, (e) the Professional Persons, (f) as to all Debtors who are limited liability companies, their members, and (g) with respect to each of the foregoing in clauses (a) and (c), solely to the extent they are Estate fiduciaries, and without duplication of parties otherwise set forth above, each such Entity's current and former Affiliates, and each such Entity's and its current and former Affiliates' current and former subsidiaries, officers, directors (including any sub-committee of directors), managers, principals, members (including ex officio members and managing members), employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such on or before the Petition Date and prior to or on the Effective Date; provided that, for purposes of the foregoing clause (g), any "former" party shall only be treated as an "Exculpated Party" to the extent they acted as an Estate fiduciary after the Petition Date; provided, for the avoidance of doubt, notwithstanding the foregoing, that Brian Kahn and Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., and each of their Affiliates, shall not be included in the definition of "Exculpated Parties"; provided, further, for the avoidance of doubt, that none of the Debtors are Affiliates of Brian Kahn and/or Prophecy Asset Management LP.

**1.83.**    *Exculpation* means the exculpation provision set forth in Article XII of this Plan.

**1.84.**    *Executory Contract* means a contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

10

**1.85.** ***Existing ABL Intercreditor Agreement*** means that certain Amended Intercreditor Agreement, dated as of November 22, 2021, among the ABL Credit Agreement Agent, the First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent, Franchise Group, Inc., Valor Acquisition, LLC, Franchise Group Newco Intermediate AF, LLC Pet Supplies "Plus", LLC, as borrowers, the other borrowers from time to time party thereto, and the other loan parties from time to time party thereto, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

**1.86.** ***Existing Equity Interests*** means Equity Interests existing as of the Effective Date.

**1.87.** ***Existing Intercompany Equity Interests*** means any Existing Equity Interests in a Debtor or a subsidiary of a Debtor that are owned or held by another Debtor.

**1.88.** ***Existing TopCo Equity Interests*** means any Existing Equity Interests in TopCo.

**1.89.** ***Exit ABL Facility*** means an exit asset based loan facility provided by third parties acceptable to the Debtors and the Required Consenting First Lien Lenders, in an amount necessary to refinance all Allowed Prepetition ABL Loan Claims outstanding under the existing ABL Credit Agreement upon such terms and conditions acceptable to the Required Consenting First Lien Lenders and the Debtors.

**1.90.** ***Fee Claim*** means a Claim by a Professional Person for compensation, indemnification or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, including in connection with final fee applications of such Professional Persons.

**1.91.** ***Final DIP Order*** means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 414], entered by the Bankruptcy Court on December 11, 2024.

**1.92.** ***Final Order*** means an order, ruling or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; <u>provided</u> that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment;

provided, further, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

1.93.    ***First Lien Credit Agreement*** means that certain First Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as lead borrower, the other borrowers and guarantors party thereto, the First Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

1.94.    ***First Lien Credit Agreement Agent*** means Wilmington Trust, National Association (as successor to JPMorgan Chase Bank, N.A.), in its capacity as successor administrative agent and successor collateral agent for the First Lien Lenders.

1.95.    ***First Lien Deficiency Claim(s)*** means, to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claims), the undersecured portion of such Allowed Claim.

1.96.    ***First Lien Lenders*** means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, Prepetition First Lien Loan Claims.

1.97.    ***First Lien Loan Documents*** means the "Loan Documents" as defined in the First Lien Credit Agreement.

1.98.    ***Freedom HoldCo Debtor(s)*** means, collectively and individually, Freedom VCM Interco, Inc. and Freedom VCM, Inc.

1.99.    ***Freedom HoldCo Debtor Litigation Trust*** means the trust to be established on the Effective Date to administer any Claims or Causes of Action of the Freedom HoldCo Debtors that are not settled, discharged, or released as part of the Plan.

1.100.    ***Freedom HoldCo Debtor Litigation Trust Agreement*** means that certain agreement entered into no later than the Effective Date setting forth, among other things, the terms and conditions for the establishment of the Freedom HoldCo Debtor Litigation Trust and the appointment of the Freedom HoldCo Debtor Litigation Trustee, all of which shall be consistent with the applicable provisions of the Plan and which shall be in form and substance satisfactory to the Debtors and the DIP Lenders.

1.101.    ***Freedom HoldCo Debtor Litigation Trust Claims*** means the following Claims and Causes of Action belonging to the Freedom HoldCo Debtors, which shall not be released pursuant to this Plan, and shall be transferred to the Freedom HoldCo Debtor Litigation Trust: (x) all potential Claims and Causes of Action against former directors and officers of the Debtors; (y) all potential Claims and Causes of Action against Brian Kahn, Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., Vintage Capital Management LLC, Lauren Kahn, the OpCo Debtors, and solely in the case of Brian Kahn, Prophecy Asset Management LP and B. Riley Financial, Inc., each of their affiliates, directors, officers, managers, partners, and owners (in each case, solely in their capacity

as such, and, for the avoidance of doubt, not including any of the Debtors); provided that, for the avoidance of doubt, any Claims and Causes of Action against the OpCo Debtors belonging to the Freedom HoldCo Debtors shall continue to be treated as a Class 9 Intercompany Claim; and (z) any other Claims and Causes of Action that the Freedom HoldCo Independent Director does not settle or release with the approval of the Bankruptcy Court and instead transfers to the Freedom HoldCo Debtor Litigation Trust.

1.102.  *Freedom HoldCo Debtor Litigation Trustee* means the Person or Entity (or any successor thereto) who or which, on and after the Effective Date, shall have the rights, powers, and duties as set forth in this Plan and the Freedom HoldCo Debtor Litigation Trust Agreement, who shall be chosen by the Debtors, in consultation with the DIP Lenders, and whose identity shall be set forth in the Plan Supplement, that has the authority and power to determine whether to pursue or settle Claims and Causes of Action that are vested in the Freedom HoldCo Debtor Litigation Trust and to make distributions to Holders of Allowed Prepetition HoldCo Loan Claims (after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election) and Allowed Freedom HoldCo General Unsecured Claims, all of which shall be consistent with the applicable provisions of the Plan.

1.103.  *Freedom HoldCo DIP Election* has the meaning set forth in Section 3.1 of this Plan.

1.104.  *Freedom HoldCo General Unsecured Claim* means any General Unsecured Claim against any of the Freedom HoldCo Debtors.

1.105.  *Freedom HoldCo Independent Director* means Michael Wartell, as independent director appointed to the board of directors at each Freedom HoldCo Debtor.

1.106.  *Freedom HoldCo Independent Investigation* means any investigation conducted by the Freedom HoldCo Independent Director.

1.107.  *Freedom HoldCo Independent Investigation Related Matters* means all matters related to any claims, rights and Causes of Action that may be held by or against the Freedom HoldCo Debtors, and all other matters that may become subject to the Freedom HoldCo Independent Investigation.

1.108.  *Freedom Lender Group* means that certain ad hoc group of certain HoldCo Lenders, as may be reconstituted from time to time, as identified in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedures* [Docket No. 229], filed November 22, 2024, as may be amended or supplemented from time to time.

1.109.  *General Unsecured Claim* means any unsecured Claim, other than an Administrative Expense Claim, a DIP Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Secured Claim, an Intercompany Claim, or a Subordinated Claim, including, without limitation, Claims arising from the rejection of Executory Contracts and Unexpired Leases, and Claims arising from any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by, a Debtor in connection therewith.  For the avoidance of doubt, a General Unsecured Claim excludes any Equity Interests.

1.110. *Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.111. *HoldCo Credit Agreement* means that certain Credit Agreement, dated as of August 21, 2023, among Freedom VCM, Inc., as borrower, Freedom VCM Interco, Inc., as holdings, the HoldCo Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

1.112. *HoldCo Credit Agreement Agent* means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the HoldCo Lenders.

1.113. *HoldCo Debtor(s)* means, collectively and individually, Freedom VCM Holdings, LLC, Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, Freedom VCM Receivables, Inc., and each Freedom HoldCo Debtor.

1.114. *HoldCo General Unsecured Claims Distribution* means, in the event the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular HoldCo Debtor, less (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Freedom HoldCo General Unsecured Claims, HoldCo Receivables General Unsecured Claims, and TopCo General Unsecured Claims, as applicable, in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims and any taxes due on account of any Sale Transaction or Partial Sale Transaction) (including, without limitation, the satisfaction in full of any DIP Claims at any HoldCo Debtor, and, if applicable, the Prepetition HoldCo Loan Claims including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law.

1.115. *HoldCo Lenders* means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, Prepetition HoldCo Loan Claims.

1.116. *HoldCo Receivables General Unsecured Claim* means any General Unsecured Claim against Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc.

1.117. *Holder* means any Entity or Person holding a Claim or Interest.

1.118. *Independent Directors* means Todd Arden, John Hartmann, Christopher P. Meyer, and Michael Wartell each in their capacities as members of the board of directors of any of the Debtors.

1.119. *Initial Strike Price* means an exercise price equal to approximately $1.6 billion, representing the equity value of the Reorganized Debtors implied by a total enterprise value equal to the aggregate amount of all Allowed DIP Claims, Allowed Prepetition First Lien Loan Claims, and Allowed Prepetition ABL Loan Claims.

1.120. *Intercompany Claim* means any Claim, Cause of Action, or remedy held by or asserted against a Debtor by another Debtor.

**1.121.  *Interests*** means, collectively, Equity Interests and Existing Intercompany Equity Interests.

**1.122.  *Interim Compensation Order*** means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Estate Professionals* [Docket No. 353], entered by the Bankruptcy Court on December 6, 2024.

**1.123.  *Interim DIP Order*** means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 134], entered by the Bankruptcy Court on November 7, 2024.

**1.124.  *Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.125.  *Local Rules*** means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.126.  *Management Incentive Plan*** means, to the extent applicable, the management incentive plan of the Reorganized Debtors, which shall be implemented by the New Board.

**1.127.  *New ABL Credit Agreement*** means the loan agreement memorializing the New ABL Facility, the material terms of which shall be included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Debtors, the New ABL Credit Agreement Agent, and the New ABL Facility Lenders.

**1.128.  *New ABL Credit Agreement Agent*** means the administrative agent under the New ABL Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New ABL Credit Agreement.

**1.129.  *New ABL Facility*** means, as applicable, the Take-Back ABL Term Loan Facility, and the Exit ABL Facility, each in accordance with the terms of the New ABL Facility Documents.

**1.130.  *New ABL Facility Documents*** means, collectively, the New ABL Credit Agreement and any other agreements or documents related to or executed in connection with the New ABL Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof; provided that with the consent of the ABL Credit Agreement Agent and, unless expressly provided otherwise herein or in the New ABL Facility Documents, all ABL Loan Documents shall be deemed to be New ABL Facility Documents.

**1.131.  *New ABL Facility Lenders*** means the lenders party to the New ABL Credit Agreement.

**1.132.  *New Boards*** means the initial boards of the Reorganized Debtors.

**1.133.  *New Organizational Documents*** means the new Organizational Documents of the Post-Effective Debtors (including New TopCo), to be entered into on the Effective Date, including

certificates of incorporation, limited liability company agreements, stockholders or shareholders agreements, operating agreements, equity subscription or purchase agreements, charters or by-laws, which shall be consistent in all material respects with the Restructuring Support Agreement, and each of which shall be subject to the Definitive Document Consent Rights.

1.134. *New TopCo* means Franchise Group, Inc. or any other Entity designated as such that will, directly or indirectly, own 100% of the Equity Interests in, or substantially all of the assets of, Franchise Group, Inc. upon consummation of the Restructuring Transactions, as mutually agreed by the Debtors and the Required Consenting First Lien Lenders.

1.135. *New Warrants* means warrants exercisable for up to 5.0% of the Reorganized Common Equity as of the Effective Date (subject to dilution from the Management Incentive Plan), which warrants shall expire five (5) years from the Effective Date (subject to earlier termination upon the occurrence of a "liquidity event") and have an initial exercise price equal to the Initial Strike Price; provided that the Initial Strike Price shall increase, on a dollar-for-dollar basis (the "*Strike Price Multiplier*"), in an amount equal to all of the fees and expenses incurred by any Professional Persons and/or the Ad Hoc Group Advisors related to any litigation initiated by the Freedom Lender Group since the Petition Date, as determined, in good faith, by the Debtors and the Required Consenting First Lien Lenders, including, without limitation, all fees and expenses of the Freedom HoldCo Debtors; provided, further, that for every week that the confirmation of the Plan is delayed because of litigation brought or initiated by the Freedom Lender Group, the Initial Strike Price shall be further increased by the lesser of (x) actual costs incurred by the Debtors as a result of the delay (e.g., any resulting value degradation, additional rent payments, overhead, etc.) or (y) an increase of the Strike Price Multiplier by a simple multiple of 0.25x for every week that the confirmation of the Plan is delayed beyond the Debtors' current timeline,[2] in each case, as determined in good faith by the Debtors and the Required Consenting First Lien Lenders. The New Warrants shall not be subject to any anti-dilution provisions (including any economic anti-dilution provisions), other than the adjustments for splits, reverse splits, and similar structural transactions that are not liquidity events. The New Warrants shall not be entitled to Black-Scholes or similar protections.

1.136. *New Warrants Documentation* means any and all agreements, certificates, instruments or other documents required to implement, issue, and distribute, or that otherwise govern or evidence, the New Warrants, each of which shall be subject to the Definitive Document Consent Rights.

1.137. *Non-Debtor Releasing Party* means any Releasing Party that is not a Debtor.

1.138. *Non-Liquidating Debtor(s)* means any Debtor other than the American Freight Debtors.

---

[2] For example, if confirmation of the Plan is delayed by two (2) weeks beyond the Debtors' current timeline as a result of litigation brought or initiated by the Freedom Lender Group, the Strike Price Multiplier shall increase by one and a half dollars ($1.50) for every one dollar ($1.00) of fees and expenses incurred by any Professional Persons and/or the Ad Hoc Group Advisors related to responding to any litigation initiated by the Freedom Lender Group.

16

**1.139.** ***Non-Partial Sale Transaction Debtor(s)*** means any Non-Liquidating Debtor other than a Partial Sale Transaction Debtor.

**1.140.** ***OpCo Debtor(s)*** means any particular Debtor other than any HoldCo Debtor.

**1.141.** ***OpCo Debtor Litigation Trust*** means the trust to be established on the Effective Date to administer the OpCo Litigation Claims.

**1.142.** ***OpCo Debtor Litigation Trust Agreement*** means that certain agreement entered into no later than the Effective Date setting forth, among other things, the terms and conditions for the establishment of the OpCo Debtor Litigation Trust and the appointment of the OpCo Litigation Trustee.

**1.143.** ***OpCo Debtor Litigation Trust Assets*** means (i) the OpCo Debtor Litigation Trust Escrow Account, (ii) the OpCo Litigation Claims, and (iii) solely to the extent that Holders of Claims in Class 5 vote to accept the Plan, the New Warrants, *plus* any additional amounts funded into the OpCo Debtor Litigation Trust Escrow Account following the Effective Date.

**1.144.** ***OpCo Debtor Litigation Trust Escrow Account*** means an account funded and paid to the OpCo Debtor Litigation Trust by the Debtors and other parties (if applicable) with Cash no later than the Effective Date in an amount equal to the OpCo Debtor Litigation Trust Escrow Amount.

**1.145.** ***OpCo Debtor Litigation Trust Escrow Amount*** means the aggregate amount equal to (x) $21 million *minus* (y) the total amount of fees and expenses (including transaction and success fees) incurred on or after the Petition Date through the Effective Date by all Professional Persons retained by the Creditors' Committee under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5), or any other provision of the Bankruptcy Code, which amount, shall include, without limitation, the Professional Fee Escrow Amount for all Professional Persons retained by the Creditors' Committee.

**1.146.** ***OpCo Debtor Litigation Trust Expenses*** means the reasonable expenses (including any taxes imposed on or payable by the OpCo Debtor Litigation Trust and professional fees) incurred by the OpCo Debtor Litigation Trust, any professionals retained by the OpCo Debtor Litigation Trust, and any additional amount determined to be necessary by the OpCo Litigation Trustee to adequately reserve for the operating expenses of the OpCo Debtor Litigation Trust that shall be paid out of the OpCo Debtor Litigation Trust Escrow Account.

**1.147.** ***OpCo Debtor Litigation Trust Units*** means the non-certificated beneficial interests in the OpCo Debtor Litigation Trust granted to each Holder of Allowed OpCo General Unsecured Claims, which shall entitle such Holder to a *pro rata* share of the OpCo General Unsecured Claims Distribution net of OpCo Debtor Litigation Trust Expenses, subject to the terms of the Plan and the OpCo Debtor Litigation Trust Agreement.

**1.148.** ***OpCo General Unsecured Claim(s)*** means, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, any Allowed General Unsecured Claim against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and

6-E, including, for the avoidance of doubt, any First Lien Deficiency Claims and any Prepetition Second Lien Loan Claims (including, without duplication, any Second Lien Deficiency Claims).

**1.149.** ***OpCo General Unsecured Claims Distribution*** means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor (other than any HoldCo Debtor) (after taking into account any taxes due on account of any Sale Transaction or Partial Sale Transaction), *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to General Unsecured Claims of that particular Debtor in priority of payment under the Bankruptcy Code(including the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, and the Prepetition Second Lien Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law.

**1.150.** ***OpCo Litigation Claims*** has the meaning set forth in Section 7.10(c)(iii) of this Plan.

**1.151.** ***OpCo Litigation Trustee*** means, the Person or Entity (or any successor thereto) who or which, on and after the Effective Date, shall have the rights, powers, and duties as set forth in this Plan and the OpCo Debtor Litigation Trust Agreement, who shall be chosen by the Creditors' Committee and shall be reasonably acceptable to the Required Consenting First Lien Lenders, and in consultation with Debtors and whose identity shall be set forth in the Plan Supplement, that has the authority and power to determine whether to pursue or settle Claims and Causes of Action that are vested in the OpCo Debtor Litigation Trust and to make distributions to holders of OpCo Debtor Litigation Trust Units, all of which shall be consistent with the applicable provisions of the Plan and the Committee Settlement and which shall be in form and substance satisfactory to the Debtors, the Creditors' Committee, the DIP Lenders, and the Required Consenting First Lien Lenders.

**1.152.** ***OpCo Litigation Trustee Duties*** has the meaning set forth in Section 7.10(b)(i) of this Plan.

**1.153.** ***Organizational Documents*** means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as by-laws or a partnership agreement, or an operating, limited liability company or members agreement).

**1.154.** ***Other Priority Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**1.155.** ***Other Secured Claim*** means any Secured Claim against a Debtor other than a Prepetition First Lien Loan Claim, DIP Claim, or Prepetition Second Lien Loan Claim or any Prepetition HoldCo Loan Claim.

**1.156.** ***Partial Sale Transaction*** means a sale of all or substantially all of the assets or Equity Interests of the Buddy's Debtors, the Vitamin Shoppe Debtors, the PSP Debtors, or a

18

combination of two or more of the foregoing, as further set forth herein, pursuant to sections 363 or 1129 of the Bankruptcy Code and the Bidding Procedures, solely if a Sufficient Bid is received by the Debtors; provided, for the avoidance of doubt, that a sale of all or substantially all of the assets or Equity Interest of the Debtors (taken as a whole) shall not be a Partial Sale Transaction.

**1.157.** *Partial Sale Transaction Debtor(s)* means any of the Buddy's Debtors, the Vitamin Shoppe Debtors and/or the PSP Debtors, as applicable, in each case that sells all or substantially all of its assets or its Equity Interests through one or more Partial Sale Transactions.

**1.158.** *Person* has the meaning set forth in section 101(14) of the Bankruptcy Code and also means any individual, corporation, partnership, association, indenture trustee, limited liability company, cooperative, organization, joint stock company, joint venture, estate, fund, trust, unincorporated organization, Governmental Unit or any political subdivision thereof, or any other Entity or organization of whatever nature.

**1.159.** *Petition Date* means November 3, 2024.

**1.160.** *Plan* means this joint chapter 11 plan proposed by the Debtors, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Restructuring Support Agreement, the Committee Settlement, and the terms hereof.  If the Plan is withdrawn as the Plan for a particular Debtor, the defined term "Plan" shall not include the plan of reorganization or liquidation for such Debtor in its Chapter 11 Case where the context otherwise requires.

**1.161.** *Plan Administrator* means, the Person or Entity (or any successor thereto) who or which, on and after the Effective Date, shall have the rights, powers, and duties as set forth in this Plan and the Plan Administrator Agreement, and whose identity and compensation shall be agreed to by the Debtors in consultation with the Required Consenting First Lien Lenders and shall be set forth in the Plan Supplement, if applicable; provided that to the extent the Restructuring Transactions are consummated pursuant to the Plan Equitization Transaction, (i) the Plan Administrator shall be appointed by the Required Consenting First Lien Lenders, and may be the Reorganized Debtors, (ii) compensation of the Plan Administrator shall be agreed to by the Debtors with the consent of the Required Consenting First Lien Lenders, and (iii) the identity and compensation of the Plan Administrator shall be set forth in the Plan Supplement.

**1.162.** *Plan Administrator Agreement* means, if applicable, that certain agreement entered into no later than the Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan and which, solely in the event of a Plan Equitization Transaction, shall be in form and substance satisfactory to the Debtors, the DIP Lenders, and the Required Consenting First Lien Lenders.

**1.163.** *Plan Documents* means the documents, other than this Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including the documents to be included in the Plan Supplement and any and all exhibits to this Plan and the Disclosure Statement, each of which shall be subject to the Definitive Document Consent Rights.

**1.164.** *Plan Equitization Transaction* means the equitization of all Allowed Prepetition First Lien Loan Claims into 100% of Reorganized Common Equity (subject to dilution from (1) the Management Incentive Plan, (2) the DIP Premium Conversion, if applicable, (3) the DIP Equitization, and (4) the New Warrants, if applicable), as further set forth in the Restructuring Support Agreement.

**1.165.** *Plan Supplement* means any compilation of documents and forms of documents (including term sheets), agreements, schedules, and exhibits to the Plan, which may be amended from time to time, including (i) the New Organizational Documents, (ii) the Schedule of Retained Causes of Action, (iii) the Take-Back Debt Documents, (iv) the Restructuring Transactions Memorandum, (v) the Rejected Contracts/Lease List, (vi) the Plan Administrator Agreement, (vii) to the extent known, the identity of the known members of the New Board and the nature and compensation for any director who is an "insider" under the Bankruptcy Code, (viii) the New ABL Facility Documents, (ix) the New Warrants Documentation, (x) the OpCo Debtor Litigation Trust Agreement, (xi) the identity of the OpCo Litigation Trustee, (xii) the Freedom HoldCo Debtor Litigation Trust Agreement, (xiii) the identity of the Freedom HoldCo Debtor Litigation Trustee, (xiv) in the case of a Plan Equitization Transaction, the Assumed Contracts List, (xv) in the event of a Sale Transaction, the Wind Down Budget, and (xvi) any and all other documents necessary to effectuate the Restructuring Transactions or that are contemplated by the Plan subject to this Agreement, which shall be filed by the Debtors prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be subject to the Definitive Document Consent Rights.

**1.166.** *Post-Effective Debtors* means, as applicable, either (a) in the case of a Plan Equitization Transaction (including, for the avoidance of doubt, following a Partial Sale Transaction, if any), the Reorganized Debtors, or (b) in the case of a Sale Transaction, the Wind Down Debtors.

**1.167.** *Pre-Effective Date PA Duties* has the meaning set forth in <u>Section 7.22(a)</u> of this Plan.

**1.168.** *Prepetition ABL Loan Claims* means any Claim on account of ABL Loans arising under or pursuant to the ABL Credit Agreement or the other ABL Loan Documents.

**1.169.** *Prepetition First Lien Loan Claims* means any Claim on account of Prepetition First Lien Loans arising under or pursuant to the First Lien Credit Agreement or the other First Lien Loan Documents.

**1.170.** *Prepetition First Lien Loans* means the term loans arising under or pursuant to the First Lien Credit Agreement.

**1.171.** *Prepetition HoldCo Lender Distribution* means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any of the HoldCo Debtors (after taking into account any structurally senior Allowed Claims and any taxes due on account of any Sale Transaction or Partial Sale Transaction) *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims after taking into account all structurally

senior Allowed Claims and all Allowed Claims that are senior to Prepetition HoldCo Loan Claims in priority of payment under the Bankruptcy Code (including, if applicable, the DIP Claims allocable to the Freedom HoldCo Debtors in accordance with the Final DIP Order) or applicable nonbankruptcy law.

**1.172.**   ***Prepetition HoldCo Loan Claims*** means any Claim on account of Prepetition HoldCo Loans arising under or pursuant to the HoldCo Credit Agreement.

**1.173.**   ***Prepetition HoldCo Loans*** means the term loans arising under or pursuant to the HoldCo Credit Agreement.

**1.174.**   ***Prepetition Second Lien Lender Distribution*** means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) (in the event of a Partial Sale Transaction, as allocable to the to the applicable Partial Sale Transaction Debtor (after taking into account any taxes due on account of any Sale Transaction or Partial Sale Transaction)) *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Prepetition Second Lien Loan Claims in priority of payment under the Bankruptcy Code (including, without limitation, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, and the Prepetition First Lien Loan Claims, including any interest, fees, or premiums payable thereon, and in the event of a Partial Sale Transaction, as allocable to the to the applicable Partial Sale Transaction Debtors) or applicable nonbankruptcy law.

**1.175.**   ***Prepetition Second Lien Loan Claims*** means any Claim on account of term loans arising under or pursuant to the Second Lien Credit Agreement.

**1.176.**   ***Priority Non-Tax Claim*** means any Claim, other than a DIP Claim, an Administrative Expense Claim, a Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**1.177.**   ***Priority Tax Claim*** means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.178.**   ***Priority Tax Claims Bar Date*** means the date that is 180 days after the Petition Date.

**1.179.**   ***Pro Forma Leverage Cap*** has the meaning set forth in Section 3.1 of this Plan.

**1.180.**   ***Professional Fee Claim*** means any Claim by a Professional Person for compensation for services rendered or reimbursement of expenses incurred by such Professional Person on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional Person's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

**1.181.** ***Professional Fee Escrow Account*** means an account funded by the Debtors with Cash no later than the Effective Date in the amount equal to the Professional Fee Escrow Amount.

**1.182.** ***Professional Fee Escrow Amount*** means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professional Persons have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Effective Date, which shall be estimated pursuant to the method set forth in Article III of this Plan.

**1.183.** ***Professional Person(s)*** means any Persons (a) retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.184.** ***Proof of Claim*** means a proof of Claim filed by a Holder of a Claim against any of the Debtors in the Chapter 11 Cases.

**1.185.** ***Proof of Interest*** means a proof of Interest filed by a Holder of any Interests in any of the Debtors the Chapter 11 Cases.

**1.186.** ***PSP Debtors*** means, collectively, Franchise Group Intermediate PSP, LLC and each of its subsidiaries.

**1.187.** ***Rejected Contracts/Lease List*** means the list (as determined by the Debtors) of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto), if any, that will be rejected pursuant to the Plan.

**1.188.** ***Related Funds*** means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person, or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

**1.189.** ***Related Parties*** means collectively with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the date of the Restructuring Support Agreement, and any Person claiming by or through any of them, including such Related Parties' respective heirs, executors, estates, servants, and nominees.

**1.190.** ***Released Parties*** means, collectively, and each solely in its capacity as such: (a) the Debtors, their Estates, and the Post-Effective Debtors; (b) the DIP Agent and the DIP Lenders; (c) the First Lien Credit Agreement Agent; (d) the Consenting First Lien Lenders; (e) the Creditors' Committee and each of its members solely in their capacity as members of the Creditors' Committee; (f) the Holders of General Unsecured Claims in Classes 6-A, 6-B, 6-C, 6-D, and 6-E

who vote to approve the Plan; and (g) each of such parties' Related Parties; _provided_, that no Person or Entity shall be a Released Party if they opt-out of the releases provided for in Article XII of this Plan; _provided_, further that, notwithstanding the foregoing, Released Parties shall not include: (i) former directors of the Debtors, other than those terminated without cause between February 3, 2025 and the Effective Date of the Plan; (ii) former employees, including officers, of the Debtors other than those terminated without cause between February 3, 2025 and the Effective Date of the Plan; (iii) Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., and each of their Affiliates and Related Parties (provided, that none of Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., shall be deemed Affiliates of the Debtors for purposes of this proviso); (iv) Irradiant Partners, LP and the members of the Freedom Lender Group; (v) Brian Kahn, Lauren Kahn, Vintage Capital Management LLC, Prophecy Asset Management LP, and each of their Affiliates and Related Parties (provided, that none of Brian Kahn, Lauren Kahn, Vintage Capital Management LLC, and Prophecy Asset Management LP, shall be deemed Affiliates of the Debtors for purposes of this proviso); and (vi) WFG solely for any prepetition services rendered; _provided_, _further_, that, notwithstanding the foregoing, any party that contributes Cash to the OpCo Debtor Litigation Trust Escrow Account in an amount agreed to by the Creditors' Committee, in consultation with the Required Consenting First Lien Lenders, shall be a Released Party for purposes of releases granted by the OpCo Debtors.

   **1.191.** _**Releasing Parties**_ means, collectively, and each solely in its capacity as such: (a) the Debtors, their Estates, and Post-Effective Debtors; (b) the DIP Agent and the DIP Lenders; (c) the First Lien Credit Agreement Agent; (d) the Consenting First Lien Lenders; (e) the Creditors' Committee (if any) and each of its members solely in their capacity as members of the Creditors' Committee; (f) all Holders of Claims in Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 that (i) vote to accept or reject the Plan and do not timely submit a release opt-out indicating such Holder's decision not to participate in the releases set forth in Article XII, or (ii) do not vote to accept or reject the Plan, and either do not timely submit a release opt-out, or do not file an objection to the releases in Article XII of the Plan prior to the deadline to object to confirmation of the Plan; _provided_ that the Consenting First Lien Lenders shall not opt out of the releases set forth in Article XII of the Plan; and (g) all unimpaired creditors of the Debtors who do not file an objection to the releases set forth in Article XII of the Plan on or before the deadline to object to confirmation of the Plan.  Holders who were not provided a Ballot or opt-out form and are not listed in clauses (a) through (g) above are not Releasing Parties.

   **1.192.** _**Reorganized Common Equity**_ means the common Equity Interests of New TopCo authorized under the New Organizational Documents of the Reorganized Debtors and issued and/or distributed on the Effective Date in accordance with this Plan.

   **1.193.** _**Reorganized Debtor(s)**_ means, on or after the Effective Date, the Debtors, as reorganized pursuant to and under the Plan Equitization Transaction, or any successors thereto, by merger, consolidation, reorganization or otherwise, as the case may be, including New TopCo and any Non-Partial Sale Transaction Debtors that are reorganized pursuant to and under the Plan Equitization Transaction following the consummation of a Partial Sale Transaction.

   **1.194.** _**Required Consenting First Lien Lenders**_ means, as of the relevant date, Consenting First Lien Lenders that are members of the Ad Hoc Group holding, collectively, in

excess of 66 2/3% of the aggregate outstanding principal amount of Prepetition First Lien Loans that are held by Consenting First Lien Lenders that are members of the Ad Hoc Group at such time.

1.195.  ***Required DIP Lenders*** means the "Required Lenders" as defined in the DIP Credit Agreement.

1.196.  ***Restructuring Expenses*** means all reasonable and documented fees, costs and expenses of each of the Ad Hoc Group Advisors.

1.197.  ***Restructuring Support Agreement*** means the Restructuring Support Agreement, dated as of November 1, 2024, inclusive of all exhibits and schedules thereto, by and among the Debtors, the Consenting First Lien Lenders, and any other Person that may become a party to such agreement pursuant to its terms, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

1.198.  ***Restructuring Transactions*** means (a) the Plan Equitization Transaction, (b) the Sale Transaction, (c) a Partial Sale Transaction, or (d) each of the Plan Equitization Transaction, the Sale Transaction, and a Partial Sale Transaction, as the context requires.

1.199.  ***Restructuring Transactions Memorandum*** means, solely in the event of the Plan Equitization Transaction, a document to be included in the Plan Supplement that will set forth the material components of the applicable Restructuring Transactions, including a summary of any transaction steps necessary to complete the Plan, and shall otherwise be in form and substance acceptable to the applicable Debtors and the Required Consenting First Lien Lenders, each in their sole discretion.

1.200.  ***Sale Documents*** means one or more asset purchase agreements, other agreements, instruments, pleadings, orders and related documents, including, without limitation, the applicable Assumed Contracts List, pursuant to which the Non-Liquidating Debtors implement and consummate any Sale Transaction or Partial Sale Transaction, each of which shall be subject to the Definitive Document Consent Rights.

1.201.  ***Sale Order*** means the order entered by the Bankruptcy Court authorizing and approving the Sale Transaction or Partial Sale Transaction, which shall be subject to the Definitive Document Consent Rights.

1.202.  ***Sale Proceeds*** means all proceeds from consummation of a Sale Transaction or Partial Sale Transaction, as applicable, that are distributable or payable to the Estates, which proceeds shall consist of Cash.

1.203.  ***Sale Process*** means the sale process conducted in accordance with the Bidding Procedures Order.

1.204.  ***Sale Toggle Event*** means entry into one or more qualifying asset purchase agreements or other definitive document to consummate a Sale Transaction or Partial Sale Transaction, solely to the extent entered into in connection with a Sufficient Bid and in compliance with the Bidding Procedures Order.

**1.205.** ***Sale Transaction*** means a sale of all or substantially all of the remaining assets of the Debtors after the consummation of the Store-Closing and Liquidation Sales, which may be through one or more sales of the assets or Equity Interests of the Debtors, as further set forth herein, pursuant to sections 363 or 1129 of the Bankruptcy Code and the Bidding Procedures, solely if a Sufficient Bid is received by the Debtors; <u>provided</u>, for the avoidance of doubt, that a Partial Sale Transaction shall not constitute a Sale Transaction.

**1.206.** ***Schedule of Retained Causes of Action*** means the schedule of those Causes of Action that shall vest in the Post-Effective Debtors on the Effective Date, which will be contained in the Plan Supplement; <u>provided</u>, for the avoidance of doubt, that the OpCo Litigation Claims shall vest in the OpCo Debtor Litigation Trust and not in the Reorganized Debtors, and the Freedom HoldCo Debtor Litigation Trust Claims shall vest in the Freedom HoldCo Debtor Litigation Trust and not in the Reorganized Debtors.

**1.207.** ***Second Lien Credit Agreement*** means that certain Second Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., and the other borrowers and guarantors party thereto, the Second Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

**1.208.** ***Second Lien Credit Agreement Agent*** means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the Second Lien Lenders.

**1.209.** ***Second Lien Deficiency Claim(s)*** means, to the extent that the value of the Collateral securing any Prepetition Second Lien Loan Claim is less than the Allowed amount of such Prepetition Second Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition Second Lien Loan Claims), the undersecured portion of such Allowed Claim.

**1.210.** ***Second Lien Lenders*** means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, Prepetition Second Lien Loan Claims.

**1.211.** ***Secured Claim*** means a Claim: (a) that is secured by a valid, perfected and enforceable Lien on Collateral, to the extent of the value of the Claim Holder's interest in such Collateral as of the Confirmation Date; (b) to the extent that the Holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code; or (c) otherwise Allowed pursuant to the Plan or order of the Bankruptcy Court as a secured claim.

**1.212.** ***Securities Act*** means the Securities Act of 1933, as amended.

**1.213.** ***Specified Party*** means any of the following: (a) any current or former Holders of Interests (other than Franchise Group, Inc. or any of its subsidiaries); (b) any current or former Affiliate of any Person described in clause (a) of this definition; or (c) any current or former partner, officer, director, principal, employee or agent of any Person described in clause (a) or clause (b) of this definition.

**1.214.** ***Store-Closing and Liquidation Sales*** means the going out of business sales and store closing procedures at the American Freight Debtors on the terms and conditions set forth in the Store-Closing and Liquidation Sales Documents and the Plan.

**1.215.** ***Store-Closing and Liquidation Sales Documents*** means the Store-Closing and Liquidation Sales Orders and all documents or pleadings necessary or desirable to facilitate the Store-Closing and Liquidation Sales, each of which shall be subject to the Definitive Document Consent Rights.

**1.216.** ***Store-Closing and Liquidation Sales Orders*** means, collectively, (a) the *Interim Order I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 132], entered by the Bankruptcy Court on November 6, 2024, and (b) the *Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 351], entered by the Bankruptcy Court on December 6, 2024.

**1.217.** ***Subordinated Claim*** means any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise.

**1.218.** ***Subordinated Claims Distribution*** means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor, *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Subordinated Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims and any taxes due on account of any Sale Transaction or Partial Sale Transaction) (including, to the extent applicable, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, the Prepetition Second Lien Loan Claims, the General Unsecured Claims, the Prepetition HoldCo Loan Claims, the Freedom HoldCo General Unsecured Claims, the HoldCo Receivables General Unsecured Claims, and the TopCo General Unsecured Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law.

**1.219.** ***Successful Bidder*** means any Entity or Entities whose bid(s) for all or substantially all of the Non-Liquidating Debtors' assets pursuant to a Sufficient Bid is the highest and otherwise best bid for such assets or equity, respectively, pursuant to a Sale Order. For the avoidance of doubt, the Successful Bidder may be more than one Entity, submitting one or more bids, and if applicable, use of the term "Successful Bidder" herein may be read as "Successful Bidders." Where a Successful Bidder has consent rights (or is referenced) under the Plan, such consent rights (or reference) only apply to the extent such consent right (or reference) relates to the respective Successful Bidder's Sale Transaction.

**1.220.** ***Sufficient Bid*** shall have the meaning set forth in the Bidding Procedures.

**1.221.** ***Take-Back ABL Term Loan Facility*** means a take-back debt asset-backed term facility with an aggregate principal amount equal to the Allowed amount of the Prepetition ABL Loan Claims, which facility shall (a) be secured by the same Collateral securing the Prepetition ABL Loan Claims with the same priorities as set forth in the ABL Loan Documents (including the

26

Existing ABL Intercreditor Agreement), (b) mature within six (6) years of the Effective Date, and (c) bear an interest rate to be established by the Required Consenting First Lien Lenders and the Debtors, or otherwise set forth by the Bankruptcy Court.

1.222.  ***Take-Back Debt Agent*** means the administrative and collateral agent for the Take-Back Debt Lenders under the Take-Back Debt Documents, or any successor administrative agents thereunder.

1.223.  ***Take-Back Debt Credit Agreement*** means the credit agreement governing or evidencing the Take-Back Debt Facility to be entered into on the Effective Date by and among the Reorganized Debtors, the guarantors from time to time party thereto, the Take-Back Debt Lenders, the Take-Back Debt Agent, and the other Entities party thereto from time to time.

1.224.  ***Take-Back Debt Documents*** means the Take-Back Debt Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, each of which shall be subject to the Definitive Document Consent Rights.

1.225.  ***Take-Back Debt Facility*** means the take-back debt financing facility on the terms and conditions set forth in the Restructuring Support Agreement.

1.226.  ***Take-Back Debt Lenders*** means the lenders party to the Take-Back Debt Credit Agreement.

1.227.  ***Take-Back Term Loans*** means the term loans arising under or pursuant to the Take-Back Debt Credit Agreement.

1.228.  ***Take-Private Transaction*** shall have the meaning set forth in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15], filed November 4, 2024.

1.229.  ***Third-Party Release*** means the releases set forth in <u>Article XII</u> of this Plan.

1.230.  ***TopCo*** means Freedom VCM Holdings, LLC.

1.231.  ***TopCo Allocated Fees and Expenses*** has the meaning set forth in <u>Section 3.3(c)</u> of this Plan.

1.232.  ***TopCo General Unsecured Claim*** means any General Unsecured Claim against TopCo.

1.233.  ***Tranche A DIP Loan Claims*** means Claims arising on account of the Tranche A DIP Loans.

1.234.  ***Tranche A DIP Loans*** means the new money first-out delayed-draw term loans arising under or pursuant to the DIP Credit Agreement.

**1.235.** ***Tranche B DIP Loan Claims*** means Claims arising on account of the Tranche B DIP Loans.

**1.236.** ***Tranche B DIP Loans*** means the second-out roll up facility arising under or pursuant to the DIP Credit Agreement.

**1.237.** ***U.S. Trustee*** means the United States Trustee for Region 2.

**1.238.** ***U.S. Trustee Fees*** means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.239.** ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

**1.240.** ***Vitamin Shoppe Debtors*** means Franchise Group Intermediate V, LLC and each of its subsidiaries.

**1.241.** ***WFG*** means Willkie Farr & Gallagher LLP, in its capacity as counsel to the Debtors.

**1.242.** ***Wind Down Account*** means an account funded by the Debtors with Cash no later than the Effective Date in the amount equal to the Wind Down Amount.

**1.243.** ***Wind Down Amount*** means, in the event of a Sale Transaction, an amount sufficient to fund (a) the payment in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims to the extent not otherwise assumed under any Sale Documents, and (b) the costs to wind down the Estates and Chapter 11 Cases in accordance with the Wind Down Budget, which amount shall be funded from the Sale Proceeds and shall be determined in consultation with the Creditors' Committee.

**1.244.** ***Wind Down Budget*** means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases in the event of a Sale Transaction, as set forth in the Plan Supplement, which budget shall be prepared in consultation with the Creditors' Committee.

**1.245.** ***Wind Down Co*** means, in the event of a Sale Transaction, Franchise Group, Inc., or an Entity that, in the discretion of Debtors, may be established on the Effective Date for the benefit of Holders of Claims against the Debtors (which Entity may be a liquidating trust or one of the Debtors other than any Reorganized Debtors) in connection with the distribution of proceeds from the Sale Transaction and any other assets of the Debtors (as determined by the Debtors or in accordance with the Restructuring Transactions Memorandum).

**1.246.** ***Wind Down Debtors*** means, on or after the Effective Date, the Debtors, as reorganized pursuant to and under the Sale Transaction, or any successors thereto, by merger, consolidation or otherwise.

### B.    *Interpretation; Application of Definitions and Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein.  The use of "include" or "including" is without limitation, whether stated or not.  Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  Any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented.  References to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Equity Interests," "Holders of Interests," "Disputed Interests," and the like, as applicable.  Subject to the provisions of any contracts, certificates or articles of incorporation, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.  The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns.  Any reference to directors or board of directors includes managers, managing members or any similar governing body, as the context requires, and references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws.

### C.    *Appendices and Plan Documents.*

All Plan Documents and appendices to this Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or, free of charge, via the Debtors' restructuring website maintained by the Claims Agent at https://cases.ra.kroll.com/FRG, or obtain a copy of any of the Plan Documents, at the Debtors' expense, by a written request sent to the Claims Agent at the following mailing or email addresses or by calling the Claims Agent at the following telephone numbers:

<div align="center">

Franchise Group, Inc.
Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232
(844) 285-4564 (U.S./Canada, Toll-Free); +1 (646) 937-7751 (International, Toll)
FRGInfo@ra.kroll.com

</div>

### D.    *Definitive Document Consent Rights.*

Notwithstanding anything to the contrary in this Plan, certain of the Definitive Documents remain subject to negotiation and completion, as applicable.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of the Restructuring Support Agreement, and shall otherwise be in form and substance acceptable to the Debtors and the Required Consenting First Lien Lenders in their sole discretion.

### E.    *Nature of the Restructuring Transactions.*

The Restructuring Transactions will be consummated (i) on the terms and conditions set forth in the Restructuring Support Agreement and (ii) pursuant to confirmation of this Plan in the Chapter 11 Cases.

Subject in all respects to the Restructuring Support Agreement, the Debtors shall concurrently (a) conduct the Store-Closing and Liquidation Sales consistent with the Store-Closing and Liquidation Sales Documents, and (b) conduct the Sale Process, and, (i) solely if a Sufficient Bid for a Sale Transaction is received by the Debtors and a Sale Toggle Event shall have occurred, execute and consummate the Sale Transaction, (ii) solely if a Sufficient Bid for a Partial Sale Transaction is received by the applicable Partial Sale Transaction Debtors in accordance with the Bidding Procedures and subject to the Auction, execute and consummate the Partial Sale Transaction with respect to the applicable Partial Sale Transaction Debtor and exclusively pursue consummation of the Plan Equitization Transaction with respect to the applicable Non-Partial Sale Transaction Debtor(s), subject to distribution of the proceeds of the Partial Sale Transaction(s) in accordance with this Plan, or (iii) to the extent a Sufficient Bid for a Sale Transaction or a Partial Sale Transaction, as applicable, is not received by at least forty-eight (48) hours prior to the date of the Auction, promptly provide for the Sale Process to be terminated and, unless otherwise agreed by the Required Consenting First Lien Lenders, exclusively pursue consummation of the Plan Equitization Transaction, which shall be undertaken and prosecuted with the support of the Consenting First Lien Lenders.

## ARTICLE II.
## CERTAIN INTERCREDITOR AND INTER-DEBTOR ISSUES

### 2.1.    *Settlement of Certain Intercreditor and Inter-Debtor Issues.*

The treatment of Claims and Interests under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor and inter-debtor disputes.

### 2.2.    *Formation of Debtor Groups for Convenience Purposes.*

The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making distributions under this Plan in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of

any legal Entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal Entities.

## ARTICLE III.
## DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,
## FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

The Plan constitutes a joint plan of reorganization for all of the Debtors.  All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on this Plan.

A Claim or Interest is placed in a particular Class only to the extent that any portion of such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

### 3.1.   *DIP Claims.*

To the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, (i) each Holder of DIP Claims (and/or one or more Related Funds of such Holder, to the extent such Related Funds are Holders of DIP Claims) that received a DIP Backstop Premium or Commitment Premium (as defined in the DIP Credit Agreement) as of closing of the DIP syndication process, and (ii) each Holder of DIP Claims that receives an Exit Premium (as defined in the DIP Credit Agreement) shall be entitled to elect, at its sole discretion, to convert such DIP Backstop Premium, Commitment Premium and/or Exit Premium into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in the Disclosure Statement and/or Plan Supplement.

On the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, (i) if the Plan Equitization Transaction is consummated and there is no Partial Sale Transaction, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into Take-Back Term Loans, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into Take-Back Term

Loans, ratably, on a dollar-for-dollar basis in an amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Effective Date after giving effect to the Restructuring Transactions (the "***Pro Forma Leverage Cap***"), and (z) third, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in the Disclosure Statement and/or Plan Supplement (the "***DIP Equitization***"), (ii) if a Plan Equitization Transaction is consummated and there is a Partial Sale Transaction, (x) first, all Allowed DIP Claims allocable to the applicable Partial Sale Transaction Debtors shall be indefeasibly paid in full in Cash from the applicable net Sale Proceeds, and (y) second, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clause (y) hereof shall be treated in accordance with the foregoing clause (i) hereof, provided, however, that at the election of the Required Consenting First Lien Lenders and DIP Lenders, which election shall be made in good faith and in consultation with the Debtors, the Pro Forma Leverage Cap shall be reduced to account for any assets sold as part of the Partial Sale Transaction that will no longer vest in the Reorganized Debtors, with the method of calculation of any such reduction to be reasonably agreed to by the Required Consenting First Lien Lenders and the Debtors, and (iii) if a Sale Transaction is consummated, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from net Sale Proceeds.  Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

Notwithstanding anything to the contrary contained herein, in the event of a Plan Equitization Transaction (whether or not a Partial Sale Transaction has occurred), at the election of the Required Consenting First Lien Lenders and DIP Lenders, all DIP Claims against the Freedom HoldCo Debtors, shall, in lieu of the treatment set forth in the previous paragraph, convert *mutatis mutandis* into claims against the Freedom HoldCo Debtor Litigation Trust in the same amount, with the same priority and security interest in, and otherwise having the same economic terms as the DIP Claims currently outstanding against the Freedom HoldCo Debtors (the "***Freedom HoldCo DIP Election***").  For the avoidance of doubt, to the extent the Freedom HoldCo DIP Election is made, the DIP Claims that are converted in accordance with the immediately preceding sentence shall not convert into Take-Back Term Loans or Reorganized Common Equity and any remaining DIP Claims shall be converted in accordance with the immediately preceding paragraph.

    **3.2.**    ***Administrative Expense Claims.***

        (a)    Time for Filing Administrative Expense Claims.

The Holder of an Administrative Expense Claim, other than DIP Claims, Fee Claims, Intercompany Claims, or U.S. Trustee fees that accrued on or before the Effective Date other than in the ordinary course of business must file with the Bankruptcy Court and serve on the Reorganized Debtors, the Wind Down Debtors, and the Plan Administrator (if appointed) proof of such Administrative Expense Claim no later than the Administrative Bar Date.  Such proof of Administrative Expense Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim, and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the Holder of the Administrative Expense Claim; (3) the asserted

amount of the Administrative Expense Claim; (4) the basis of the Administrative Expense Claim; and (5) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

The Debtors, the Post-Effective Debtors or the Plan Administrator, as applicable, in consultation with the Required Consenting First Lien Lenders, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors, the Post-Effective Debtors, or the Plan Administrator, as applicable, may also choose to object to any Administrative Expense Claim (other than a Cure Cost, which will be addressed pursuant to Section 10.2 of this Plan) no later than the Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors, the Post-Effective Debtors, or the Plan Administrator, as applicable (or other party with standing) object to a timely-filed and properly served Administrative Expense Claim, such Administrative Expense Claim will be deemed Allowed in the amount requested after expiration of the Claims Objection Deadline (as may be extended). In the event that the Debtors, the Post-Effective Debtors, or the Plan Administrator object(s) to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

<div align="center">(b)    Treatment of Administrative Expense Claims.</div>

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the Holder of such Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim or such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors-in-possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, that any Allowed Administrative Expense Claim that has been assumed by a Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan.

### 3.3. *Fee Claims.*

<div align="center">(a)    Time for Filing Fee Claims.</div>

Any Professional Person seeking allowance of a Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred on and prior to the Effective Date and in connection with the preparation and

<div align="center">33</div>

prosecution of such final application no later than forty-five (45) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.  Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order.

        (b)        <u>Treatment of Fee Claims</u>.

The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Confirmation Order.  The Post-Effective Debtors or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash to such Professional Persons in the amount the Bankruptcy Court allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; <u>provided</u> that the Debtors' and the Post-Effective Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Debtors' Professional Persons, the Post-Effective Debtors or the Plan Administrator, as applicable, shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Creditors' Committee's Professional Persons, the OpCo Debtor Litigation Trust shall fund any shortfall into the Professional Fee Escrow Account.

Professional Persons shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than three (3) days before the anticipated Effective Date; <u>provided</u> that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional Person's final request for payment in the Chapter 11 Cases.  If a Professional Person does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional Person.

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash on hand of the Debtors, subject to the terms of <u>Section 3.3(c)</u> of this Plan, equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professional Persons and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the Bankruptcy Court.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable.  Notwithstanding the foregoing sentence, funding of the Professional Fee Escrow Account will not be reported as a disbursement from the Estates, and disbursements from the Professional Fee Escrow Account on account of payment of Allowed Professional Fee Claims will be reported as disbursements from the Estates on the relevant monthly operating report(s).  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the

Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be remitted to the Post-Effective Debtors or the Plan Administrator, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Any further disbursements of such funds shall be reported in accordance with the Bankruptcy Rules.

The Professional Persons shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors (which estimate may include a reasonable cushion to cover unexpected or unknown fees) before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than three (3) Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional Person's final request for payment of Professional Fee Claims filed with the Bankruptcy Court, and such Professional Persons are not bound to any extent by the estimates. If a Professional Person does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional Person for inclusion in the Professional Fee Escrow Amount. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; provided that the Post-Effective Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

Following the Effective Date, the Plan Administrator shall have authority with respect to matters related to Professional Fee Claim requests by Professional Persons, if any, acting at their direction in accordance with the terms of the Plan.

(c)     Allocation of Payment of Certain Fees and Expenses.

Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "*TopCo Allocated Fees and Expenses*"). Freedom VCM Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such TopCo Allocated Fees and Expenses, if any; provided that, for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the TopCo Allocated Fees and Expenses; provided, further, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims.

Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to the Freedom HoldCo Debtors with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be subject to the terms of, (i) in the case of the fees and expenses of the Freedom HoldCo Independent Director, that certain letter agreement dated as of December 9, 2024 between the Freedom HoldCo Debtors and Michael J. Wartell of Bluerose Associates LLC, (ii) in the case of the fees and

expenses of any advisors hired by the Freedom HoldCo Independent Director, any order approving the retention of the same, and (iii) in the case of any other fees and expenses allocable to the Freedom HoldCo Debtors, Paragraphs 2(c) and (j) of the Interim Compensation Order.

**3.4.** *Priority Tax Claims.*

(a)    Time for Filing Priority Tax Claims.

The Holder of a Priority Tax Claim must file with the Bankruptcy Court and serve on the Post-Effective Debtors, the Plan Administrator (if appointed), the Claims Agent, and the U.S. Trustee, proof of such Priority Tax Claim by the Priority Tax Claims Bar Date.  Such proof of Priority Tax Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Priority Tax Claim and if the Priority Tax Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the Holder of the Priority Tax Claim; (3) the asserted amount of the Priority Tax Claim; (4) the basis of the Priority Tax Claim; and (5) supporting documentation for the Priority Tax Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF PRIORITY TAX CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH PRIORITY TAX CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

(b)    Treatment of Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting First Lien Lenders, each Holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, either: (a) on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the Holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due; provided, further, that (i) in the event of a Plan Equitization Transaction, notwithstanding any provision of the Plan or the Restructuring Support Agreement to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state law shall be assumed by and reinstated against the applicable Reorganized Debtor and (ii) in the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Tax Claim that has been expressly assumed by a Successful Bidder under the Sale Documents shall not be an obligation of the Debtors. On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person.

**3.5.** *U.S. Trustee Fees and Related Reporting Obligations.*

All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  After the Effective Date, the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable.  The Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, is responsible.  The U.S. Trustee shall not be treated as providing any release under the Plan. U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to file any Proof of Claim or any request for administrative expense for U.S. Trustee Fees. The provisions of this paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary.

**ARTICLE IV.**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

**4.1.** *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (a) impaired or unimpaired by this Plan; (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; or (c) deemed to accept or reject this Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | No | No (deemed to accept) |
| Class 2 | Other Secured Claims | No | No (deemed to accept) |
| Class 3 | Prepetition ABL Loan Claims | Yes | Yes |
| Class 4 | Prepetition First Lien Loan Claims | Yes | Yes |
| Class 5 | Prepetition Second Lien Loan Claims | Yes | Yes |
| Class 6-A | General Unsecured Claims against Franchise Group, Inc. | Yes | Yes |
| Class 6-B | General Unsecured Claims against the American Freight Debtors | Yes | Yes |
| Class 6-C | General Unsecured Claims against the Buddy's Debtors | Yes | Yes |
| Class 6-D | General Unsecured Claims against the PSP Debtors | Yes | Yes |
| Class 6-E | General Unsecured Claims against the Vitamin Shoppe Debtors | Yes | Yes |
| Class 7 | Prepetition HoldCo Loan Claims | Yes | Yes |

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 8-A | Freedom HoldCo General Unsecured Claims | Yes | Yes |
| Class 8-B | HoldCo Receivables General Unsecured Claims | Yes | Yes |
| Class 8-C | TopCo General Unsecured Claims | Yes | Yes |
| Class 9 | Intercompany Claims | Yes | No (deemed to reject) |
| Class 10 | Subordinated Claims | Yes | No (deemed to reject) |
| Class 11 | Existing TopCo Equity Interests | Yes | Yes |
| Class 12 | Existing Intercompany Equity Interests | Yes | No (deemed to reject) |

The Plan constitutes a separate chapter 11 plan for each Debtor. Except for the Claims addressed in Article III above (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the applicable Debtors.

The Plan consolidates certain Claims against all Debtors solely for purposes of voting and confirmation. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Expense Claims, DIP Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, as described in Article III.

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

**4.2.    *Unimpaired Classes of Claims.***

The following Classes of Claims are unimpaired and, therefore, deemed to have accepted this Plan and are not entitled to vote on this Plan under section 1126(f) of the Bankruptcy Code:

(a)    Class 1: Class 1 consists of all Priority Non-Tax Claims.

(b)    Class 2: Class 2 consists of all Other Secured Claims.

**4.3.    *Impaired Classes of Claims.***

The following Classes of Claims are impaired and entitled to vote on this Plan:

(a)    Class 3: Class 3 consists of all Prepetition ABL Loan Claims.

(b)    Class 4: Class 4 consists of all Prepetition First Lien Loan Claims.

(c)    Class 5: Class 5 consists of all Prepetition Second Lien Loan Claims.

(d)    Class 6-A: Class 6-A consists of all General Unsecured Claims against Franchise Group, Inc.

(e)    Class 6-B: Class 6-B consists of all General Unsecured Claims against the American Freight Debtors.

(f)    Class 6-C: Class 6-C consists of all General Unsecured Claims against the Buddy's Debtors.

(g)    Class 6-D: Class 6-D consists of all General Unsecured Claims against the PSP Debtors.

(h)    Class 6-E: Class 6-E consists of all General Unsecured Claims against the Vitamin Shoppe Debtors.

(i)    Class 7: Class 7 consists of all Prepetition HoldCo Loan Claims.

(j)    Class 8-A: Class 8-A consists of all Freedom HoldCo General Unsecured Claims.

(k)    Class 8-B: Class 8-B consists of all HoldCo Receivables General Unsecured Claims.

(l)    Class 8-C: Class 8-C consists of all TopCo General Unsecured Claims.

(m)    Class 11: Class 11 consists of all Existing TopCo Equity Interests.

The following Classes of Claims are impaired and are not entitled to vote on this Plan:

(a)    Class 9: Class 9 consists of all Intercompany Claims.

(b)    Class 10: Class 10 consists of all Subordinated Claims.

(c)    Class 12: Class 12 consists of all Existing Intercompany Equity Interests.

**4.4.**    *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under this Plan.

### ARTICLE V.
### TREATMENT OF CLAIMS AND INTERESTS

**5.1.**    *Priority Non-Tax Claims (Class 1).*

(a)    <u>Treatment</u>: The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  In full and final satisfaction,

compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable Distribution Date, each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Required Consenting First Lien Lenders): (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  In the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

(b)    Voting: Priority Non-Tax Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 5.2.   *Other Secured Claims (Class 2).*

(a)    Treatment: The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each Holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Sale Transaction or a Partial Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

Each Holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein.  Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person and the Holder of such Claims shall deliver to the Debtors or Post-Effective Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, or *lis pendens*, or similar interests or documents.  Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Post-Effective Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence

the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

(b)    Deficiency Claims: To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under this Plan as a General Unsecured Claim, only as applicable, and shall be classified and treated as the applicable Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, Class 6-E Claim, Class 8-A Claim, Class 8-B Claim, or Class 8-C Claim, only as applicable.

(c)    Voting: The Other Secured Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

### 5.3.    *Prepetition ABL Loan Claims (Class 3).*

(a)    Treatment:  On the Effective Date, the Prepetition ABL Loan Claims shall be Allowed under this Plan in the amount of $248.7 million plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims (including, without limitation, any reimbursement obligations under outstanding letters of credit), and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition ABL Loan Claim, except to the extent that the ABL Credit Agreement Agent or a Holder of a Prepetition ABL Loan Claim agrees to different treatment with respect to such Holder's Claim, on the Effective Date, or as soon as practicable thereafter, each ABL Lender shall receive its *pro rata* share of:

(i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) (x) proceeds of the Exit ABL Facility, or (y) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.

(b)     Voting:  The Prepetition ABL Loan Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition ABL Loan Claims.

### 5.4.    *Prepetition First Lien Loan Claims (Class 4).*

(a)     Treatment:  On the Effective Date, the Prepetition First Lien Loan Claims shall be Allowed under this Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition First Lien Loan Claim, except to the extent that the First Lien Credit Agreement Agent or a Holder of a Prepetition First Lien Loan Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each First Lien Lender shall receive, subject to the terms of this Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of:

(i)     in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, and (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable); or

(ii)     in the event the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.

(b)     Deficiency Claims:  If applicable, any First Lien Deficiency Claims shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.

(c)     Voting:  The Prepetition First Lien Loan Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition First Lien Loan Claims.

### 5.5.    *Prepetition Second Lien Loan Claims (Class 5).*

(a)     Treatment:  On the Effective Date, the Prepetition Second Lien Loan Claims shall be Allowed under this Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and

discharge of each Prepetition Second Lien Loan Claim, except to the extent that a Holder of a Prepetition Second Lien Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition Second Lien Loan Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to <u>accept</u> the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably with OpCo General Unsecured Claims, or (2) if the Class votes to <u>reject</u> the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution.  If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.

(b)    <u>Deficiency Claims</u>:  If applicable, any Second Lien Deficiency Claims shall be treated for all purposes under this Plan as a General Unsecured Claim only against the applicable Debtor, and shall be classified and treated as the applicable Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, only as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.

(c)    <u>Voting</u>:  The Prepetition Second Lien Loan Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition Second Lien Loan Claims.

### 5.6.    *Franchise Group, Inc. General Unsecured Claims (Class 6-A).*

(a)    <u>Treatment</u>:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim at Franchise Group, Inc., except to the extent that a Holder of a General Unsecured Claim against Franchise Group, Inc. agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim at Franchise Group, Inc. shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to Franchise Group, Inc.

(b)    Voting:  The General Unsecured Claims at Franchise Group, Inc. are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims at Franchise Group, Inc.

### 5.7.    *American Freight General Unsecured Claims (Class 6-B).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the American Freight Debtors, on the Effective Date, each Holder of an Allowed General Unsecured Claim against the American Freight Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the American Freight Debtors.

(b)    Voting:  The General Unsecured Claims against the American Freight Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the American Freight Debtors.

### 5.8.    *Buddy's General Unsecured Claims (Class 6-C).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Buddy's Debtors, except to the extent that a Holder of a General Unsecured Claim against the Buddy's Debtors agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Buddy's Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the Buddy's Debtors.

(b)    Voting:  The General Unsecured Claims against the Buddy's Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the Buddy's Debtors.

### 5.9.    *PSP General Unsecured Claims (Class 6-D).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the PSP Debtors, except to the extent that a Holder of a General Unsecured Claim against the PSP Debtors agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the PSP Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the PSP Debtors.

(b)    Voting:  The General Unsecured Claims against the PSP Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the PSP Debtors.

**5.10.** *Vitamin Shoppe General Unsecured Claims (Class 6-E).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Vitamin Shoppe Debtors, except to the extent that a Holder of a General Unsecured Claim against the Vitamin Shoppe Debtors agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Vitamin Shoppe Debtors shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the Vitamin Shoppe Debtors.

(b)    Voting:  The General Unsecured Claims against the Vitamin Shoppe Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the Vitamin Shoppe Debtors.

**5.11.** *Prepetition HoldCo Loan Claims (Class 7).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition HoldCo Loan Claim, except to the extent that a Holder of a Prepetition HoldCo Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition HoldCo Loan Claim shall receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election.  If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

(b)    Voting:  The Prepetition HoldCo Loan Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition HoldCo Loan Claims.

**5.12.** *Freedom HoldCo General Unsecured Claims (Class 8-A).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Freedom HoldCo General Unsecured Claim, except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to the Freedom HoldCo Debtors resulting from

any Partial Sale Transaction, if any, and (B) its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust. If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any and (B) its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.

(b)    <u>Voting</u>:  The Freedom HoldCo General Unsecured Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Freedom HoldCo General Unsecured Claims.

### 5.13.  *HoldCo Receivables General Unsecured Claims (Class 8-B)*

(a)    <u>Treatment</u>:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo Receivables General Unsecured Claim, except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc. resulting from any Partial Sale Transaction, if any. If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim.

(b)     Voting:  The HoldCo Receivables General Unsecured Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such HoldCo Receivables General Unsecured Claims.

### 5.14.    *TopCo General Unsecured Claims (Class 8-C)*

(a)     Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed TopCo General Unsecured Claim, except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed TopCo General Unsecured Claim shall receive:

(i)     in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.3(c) hereof, and (B) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to TopCo resulting from any Partial Sale Transaction, if any.  If (x) there is no Cash held at TopCo following the allocation described in Section 3.3(c) hereof, and (y) the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim; or

(ii)     in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.

(b)     Voting:  The TopCo General Unsecured Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such TopCo General Unsecured Claims.

### 5.15.    *Intercompany Claims (Class 9).*

(a)     Treatment:    On the Effective Date, each Holder of an Allowed Intercompany Claim shall receive the following treatment:

(i)     Plan Equitization Transaction.  In the event of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), on or after the Effective Date: (A) any and all Intercompany Claims between, among and/or against, Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date or (y) reinstated and otherwise survive the Debtors'

47

restructuring by virtue of such Intercompany Claims being left unimpaired; and (B) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date, or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; provided, however, that notwithstanding the foregoing, any Intercompany Claims, held by or against or among any of the Freedom HoldCo Debtors shall receive the recovery that such Intercompany Claim would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if such Intercompany Claim is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date.  To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(ii)    Sale Transaction.  In the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (A) extinguished, canceled and/or discharged on the Effective Date or (B) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired. To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(b)    Voting:  The Intercompany Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Intercompany Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Intercompany Claims.

### 5.16.  *Subordinated Claims (Class 10).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Subordinated Claim, except to the extent that a Holder of a Subordinated Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Subordinated Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any).  If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then

such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.

(b)    Voting:  The Subordinated Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Subordinated Claims.

### 5.17.    *Existing TopCo Equity Interests (Class 11).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing TopCo Equity Interest, except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (A) its *pro rata* share of Cash (if any) held by TopCo following all distributions required under this Plan and the allocation described in Section 3.3(c) hereof, or (B) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under this Plan on account of such Allowed Existing TopCo Equity Interest.

(b)    Voting:  The Existing TopCo Equity Interests are impaired Interests. Holders of such Interests are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Existing TopCo Equity Interests.

### 5.18.    *Existing Intercompany Equity Interests (Class 12).*

(a)    Treatment:  On the Effective Date, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired; provided that in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, such election shall be with the consent of Required Consenting First Lien Lenders; provided, further, that, notwithstanding the foregoing, the Allowed Existing

Intercompany Equity Interests held by any of the Freedom HoldCo Debtors shall be extinguished, canceled, and/or discharged on the Effective Date.

(b)    Voting:  The Existing Intercompany Equity Interests are impaired Interests. In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Existing Intercompany Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Existing Intercompany Equity Interests.

## ARTICLE VI.
## ACCEPTANCE OR REJECTION OF THE PLAN;
## EFFECT OF REJECTION BY ONE OR MORE
## CLASSES OF CLAIMS OR INTERESTS

### 6.1.    *Class Acceptance Requirement.*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Holders of the Allowed Claims in such Class that have voted on the Plan.  A Class of Interests that is entitled to vote on the Plan has accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of Allowed Interests of such Class that have voted on the Plan.

### 6.2.    *Tabulation of Votes on a Non-Consolidated Basis.*

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.

### 6.3.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."*

Because certain Classes are deemed to have rejected this Plan, the Debtors will request confirmation of this Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Section 14.3 and Section 14.4 of this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to Section 14.3 and Section 14.4 of this Plan, the Debtors also reserve the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

### 6.4.    *Voting Classes; Deemed Acceptance or Rejection by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

Claims in Classes 1 and 2 are unimpaired under this Plan and Holders of Claims or Interests in such Classes are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 1 and 2 are not entitled to vote to accept or reject this Plan.

Claims in Classes 9, 10 and 12 are impaired and shall receive no distributions under this Plan and Holders of Claims or Interests in such Classes are, therefore, conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 9, 10 and 12 are not entitled to vote on this Plan and votes of such Holders shall not be solicited.

### 6.5.    *Confirmation of All Cases.*

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; provided, however, that the Debtors, with the consent of the Required Consenting First Lien Lenders, may at any time waive this Section 6.5.

### 6.6.    *Vacant and Abstaining Classes.*

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  Moreover, any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept this Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 6.7.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) is impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date, absent consensual resolution of such controversy consistent with the Restructuring Support Agreement among the Debtors and the complaining Entity or Entities, in consultation with the Required Consenting First Lien Lenders.

## ARTICLE VII.
## MEANS FOR IMPLEMENTATION

### 7.1.    *Non-Substantive Consolidation.*

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth herein, nothing in this Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any Claim against any other Debtor.  Additionally, claimants holding Claims and Interests against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will

be treated as holding a separate Claim or separate Interest, as applicable, against each Debtor's Estate; provided, however, that no Holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.

### 7.2. *Plan Equitization Transaction.*

The Plan Equitization Transaction will be consummated (regardless of whether there is a Partial Sale Transaction) unless the Debtors receive Cash Sale Proceeds in an amount sufficient to pay off, in full, in Cash, all Allowed DIP Claims, Prepetition ABL Loan Claims and Prepetition First Lien Loan Claims.

Following entry of the Confirmation Order and subject to any applicable limitations set forth in any post-Effective Date agreements, or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors or New TopCo, as applicable, may, consistent with the terms of the Restructuring Support Agreement, take all actions as may be necessary or appropriate to effect the Restructuring Transaction (including any transaction described in, approved by, contemplated by or necessary to effectuate this Plan), and as set forth in the Restructuring Transactions Memorandum, including: (a) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, migration, consolidation, or other Organizational Documents with the appropriate governmental authorities pursuant to applicable law; (d) the execution, delivery, and filing, if applicable, of the New Organizational Documents and the Take-Back Debt Documents; (e) the New ABL Facility; (f) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (g) all other actions that the Reorganized Debtors reasonably determine, in consultation with the Required Consenting First Lien Lenders, are necessary or appropriate, including making filings or recordings that may be required by applicable law.  For the purposes of effectuating this Plan, none of the Restructuring Transactions contemplated herein shall constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction or matter that would result in a violation, breach, or default under, or increase, accelerate, or otherwise alter any obligations, rights or liabilities of the Debtors, the Reorganized Debtors or New TopCo under, or result in the creation or imposition of a Lien upon any property or asset of the Debtors, the Reorganized Debtors or New TopCo pursuant to, any agreement, contract, or document of the Debtors, and any consent or advance notice required under any agreement, contract, or document of the Debtors shall be deemed satisfied by confirmation.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**7.3.**    *Sale Transaction or Partial Sale Transaction.*

In the event a Sale Transaction or a Partial Sale Transaction is consummated, the Sale Proceeds, the Professional Fee Escrow Amount, the Wind Down Amount, any reserves required pursuant to the applicable Sale Documents, the Non-Liquidating Debtors' rights under the applicable Sale Documents, payments made directly by the applicable Successful Bidder(s) on account of any Assumed Liabilities under the applicable Sale Documents, payments of Cure Costs made by the applicable Successful Bidder(s) pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in this Plan. Unless otherwise agreed in writing by the Non-Liquidating Debtors or the Non-Partial Sale Transaction Debtors, as applicable, and the applicable Successful Bidder(s), distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the applicable Successful Bidder(s) even if such Claim is Allowed against the Debtors, and such Claims shall have no recovery from the Debtors under the terms of the Plan.

**7.4.**    *Continued Corporate Existence in Certain Debtors; Vesting of Assets; Dissolution of Certain Debtors.*

(a)    General. Subject to the terms and conditions of the Restructuring Support Agreement, except as otherwise provided in this Plan or as otherwise may be agreed between the Debtors and the Required Consenting First Lien Lenders, each of the Debtors, as Reorganized Debtors, and, if the Plan Equitization Transaction occurs, New TopCo, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor or New TopCo, each of the Reorganized Debtors and New TopCo, as applicable (and in the event of the Plan Equitization Transaction, in consultation with the Required Consenting First Lien Lenders), may take such action as permitted by applicable law and such Reorganized Debtor's or New TopCo's New Organizational Documents, as such Reorganized Debtor or New TopCo, as applicable, may determine is reasonable and appropriate, including, but not limited to, causing: (a) a Reorganized Debtor or New TopCo to be merged with and into another Reorganized Debtor, or a subsidiary and/or Affiliate of a Reorganized Debtor or New TopCo; (b) a Reorganized Debtor or New TopCo to be dissolved; (c) the conversion of a Reorganized Debtor or New TopCo from one Entity type to another Entity type; (d) the legal name of a Reorganized Debtor or New TopCo to be changed; (e) the closure of a Reorganized Debtor's or New TopCo's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor or New TopCo under the law of jurisdictions other than the law under which the Debtor currently is incorporated.

(b)    Vesting of Assets. Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estates, wherever located, including all claims, rights and Causes of Action and any property, wherever located, acquired by the Debtors under or in connection with this Plan, shall vest in the applicable Post-Effective Debtor, free and clear of all

Claims, Liens, charges, other encumbrances and Interests, except for those Claims, Liens, charges, other encumbrances and Interests arising from or related to the Take-Back Debt Documents, the New ABL Facility Documents, or to the extent the Freedom HoldCo DIP Election is made, the DIP Claims at the Freedom HoldCo Debtors.  On and after the Effective Date, except as otherwise provided in this Plan or in the Confirmation Order, each applicable Post-Effective Debtor and New TopCo may operate its business(es) and may use, acquire and dispose of property, wherever located, and each Reorganized Debtor and New TopCo, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims), Interests and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.  Without limiting the foregoing, the Post-Effective Debtors and New TopCo may pay the charges that they incur on or after the Effective Date, if any, for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.  Anything in this Plan to the contrary notwithstanding, any unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor, Reorganized Debtor or New TopCo by virtue of this Plan, the Chapter 11 Cases, or otherwise.

(c)    <u>Dissolving the Wind Down Debtors</u>.  On or as soon as reasonably practicable after the Effective Date, in the event a Sale Transaction is consummated, the Wind Down Debtors shall be authorized, following the consummation of such Sale Transaction and the completion of the distributions set forth in Article V hereof, to merge, dissolve and/or wind down the Wind Down Debtors under applicable law; <u>provided</u> that, notwithstanding such dissolution, Wind Down Debtors shall remain authorized to continue the wind down of the Wind Down Debtors, including filing any necessary documents with the appropriate authorities, including any tax returns, and to facilitate the closing of the Chapter 11 Cases as to such Debtors.  On or as soon as reasonably practicable after the Effective Date, in the event a Partial Sale Transaction is consummated, the Reorganized Debtors shall be authorized, following the consummation of such Partial Sale Transaction and the completion of the distributions set forth in Article V hereof, to merge, dissolve and/or wind down the Partial Sale Transaction Debtors under applicable law.

### 7.5.    *Indemnification Provisions in Organizational Documents.*

On and as of the Effective Date, all indemnification obligations of the Debtors that are in place as of the Petition Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements or otherwise) for the current directors, officers and managers, of the Debtors, except any indemnification obligations of the Debtors on account of any Freedom HoldCo Debtor Litigation Trust Claims that are transferred to the Freedom HoldCo Debtor Litigation Trust and any OpCo Litigation Claims that are transferred to the OpCo Debtor Litigation Trust, shall be assumed or assumed and assigned and remain in full force and effect after the Effective Date, and shall survive unimpaired and unaffected, irrespective of when such obligation arose, as applicable.

### 7.6.    *Sources for Cash Distributions under this Plan.*

In the event of a Plan Equitization Transaction, the Debtors shall fund Cash distributions under the Plan with Cash on hand, including Cash from operations, the American Freight

Liquidation Proceeds, the Sale Proceeds (if any) and the proceeds of the DIP Facility.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors or the Disbursing Agent in accordance with Article VIII.

In the event of a Sale Transaction or a Partial Sale Transaction, the Debtors shall fund Cash distributions under the Plan from Cash on hand (if any), the American Freight Liquidation Proceeds, and the Sale Proceeds in accordance with the terms of the Sale Documents and the Plan.

The Debtors shall fund distributions to Allowed Claims against the Freedom HoldCo Debtors from proceeds of the Freedom HoldCo Debtor Litigation Trust.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the New Organizational Documents, the New ABL Facility Documents, and the Take-Back Debt Documents), the Post-Effective Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of managers or directors, as applicable (or other applicable governing bodies), of the applicable Reorganized Debtors deem appropriate.

### 7.7.    *Take-Back Debt Facility.*

To the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, on the Effective Date, the Reorganized Debtors shall enter into a Take-Back Debt Facility in the maximum amount necessary to ensure that the Reorganized Debtors are in compliance with the Pro Forma Leverage Cap,[3] which will be made up of, as further set forth below, a first-lien term loan consisting of all DIP Claims arising from the Tranche A DIP Loans, and certain DIP Claims arising from the Tranche B DIP Loans, in each case as of the Effective Date, and each being consistent with the terms and conditions set forth in the Restructuring Support Agreement.

In the event of a Plan Equitization Transaction, confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Take-Back Debt Facility and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Take-Back Debt Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations in connection with the Take-Back Debt Facility, pursuant to the terms and conditions of the Restructuring Support Agreement.

On the Effective Date, the agreements with respect to the Take-Back Debt Facility shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Take-Back Debt Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance,

---

[3]    Estimates as of the Petition Date are that the Take-Back Debt Facility will equal approximately $510 million.

recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in connection with the Take-Back Debt Facility (1) shall be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the Take-Back Debt Facility, (3) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under in connection with the Take-Back Debt Facility, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

Any Holder entitled to receive Take-Back Term Loans hereunder may designate that all or a portion of such Holder's share of the Take-Back Term Loans to be distributed as part of the treatment of such Holder's Allowed Claims, be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Claims Agent at least five (5) Business Days prior to the Effective Date.

### 7.8.    *New ABL Facility.*

In the event of a Plan Equitization Transaction, confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the New ABL Facility and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the New ABL Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations in connection with the New ABL Facility, pursuant to the terms and conditions of the Restructuring Support Agreement.

On the Effective Date, the agreements with respect to the New ABL Facility shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New ABL Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the

Liens and security interests to be granted in connection with the New ABL Facility (1) shall be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the New ABL Facility, (3) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under in connection with the New ABL Facility, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 7.9. *Reorganized Debtors' Ownership.*

In the event of a Plan Equitization Transaction, on the Effective Date, in accordance with the terms of the Plan and the Restructuring Transactions Memorandum and as further set forth in the Plan Supplement, New TopCo shall issue and deliver all of the Reorganized Common Equity to Holders of Prepetition First Lien Loan Claims and certain of the DIP Claims, pursuant to the terms and conditions of this Plan, the New Organizational Documents and the DIP Credit Agreement.  The issuance of Reorganized Common Equity pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, and all of the Reorganized Common Equity issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Any Holder of an Allowed Prepetition First Lien Loan Claim or Allowed DIP Claim may designate that all or a portion of such Holder's *pro rata* share of the Reorganized Common Equity to be distributed as part of the treatment of such Allowed Prepetition First Lien Loan Claims, be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Claims Agent at least five (5) Business Days prior to the Effective Date. Any such designee shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

### 7.10. *OpCo Debtor Litigation Trust.*

(a)    General.  In connection with the Committee Settlement, on the Effective Date, (i) the OpCo Debtors shall execute the OpCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the OpCo Debtor Litigation Trust in accordance with the terms of the Plan and the beneficial interests therein shall be for the benefit of the Holders of OpCo General Unsecured Claims, and (ii) the OpCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the OpCo Debtor Litigation Trust all of their rights, title and interest

in the OpCo Debtor Litigation Trust Assets. Pursuant to section 1141 of the Bankruptcy Code, such OpCo Debtor Litigation Trust Assets shall automatically vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests, except as otherwise set forth in this Plan. For the avoidance of doubt, any right, title and interest in the Claims and Causes of Action belonging to the HoldCo Debtors (if any) shall not be transferred to or vest in the OpCo Debtor Litigation Trust.

The (i) establishment, purpose, and administration of the OpCo Debtor Litigation Trust, (ii) appointment, rights, and powers, of the OpCo Litigation Trustee, and (iii) treatment of the OpCo Debtor Litigation Trust for federal income tax purposes, among other things, shall be governed by the OpCo Debtor Litigation Trust Agreement. On and after the Effective Date, the OpCo Litigation Trustee shall be authorized, in accordance with the terms of this Plan and the OpCo Debtor Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any OpCo Debtor Litigation Trust Assets.

In furtherance of this section of the Plan, (i) it is intended that the OpCo Debtor Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of OpCo General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the OpCo Debtor Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of OpCo General Unsecured Claims, and then contributed by the Holders of OpCo General Unsecured Claims to the OpCo Debtor Litigation Trust in exchange for their interest in the OpCo Debtor Litigation Trust; (ii) the sole purpose of the OpCo Debtor Litigation Trust shall be the liquidation and distribution of the net assets of the OpCo Debtor Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with the valuation of the assets transferred to the OpCo Debtor Litigation Trust as determined by the OpCo Litigation Trustee (or its designee); (v) the OpCo Litigation Trustee shall be responsible for filing all applicable tax returns for the OpCo Debtor Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the OpCo Litigation Trustee shall annually send to each Holder of an interest in the OpCo Debtor Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the OpCo Litigation Trustee of a private letter ruling if the OpCo Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the

OpCo Litigation Trustee), the OpCo Litigation Trustee may timely elect to (i) treat any portion of the OpCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes.  If a "disputed ownership fund" election is made, (i) the portion of the OpCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing.  Any taxes (including with respect to earned interest, if any) imposed on the OpCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the OpCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  The OpCo Litigation Trustee may request an expedited determination of taxes of the OpCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the OpCo Debtor Litigation Trust for all taxable periods through the dissolution of the OpCo Debtor Litigation Trust.

     (b)    OpCo Litigation Trustee.

     (i)    *Appointment; Duties*.  The Creditors' Committee, in consultation with the Debtors, shall select the Person who initially will serve as the OpCo Litigation Trustee, which trustee shall be reasonably acceptable to the Required Consenting First Lien Lenders.  On or after the Effective Date, the OpCo Litigation Trustee shall assume all of its obligations, powers and authority under the OpCo Debtor Litigation Trust Agreement to (x) reconcile General Unsecured Claims, First Lien Deficiency Claims (though not the quantum thereof, which shall be in an amount consistent with the description in Section 5.5(b) hereof), and any Prepetition Second Lien Loan Claims, and (y) investigate, pursue, litigate and/or settle OpCo Litigation Claims that are transferred to the OpCo Debtor Litigation Trust (collectively, the "***OpCo Litigation Trustee Duties***").

     (ii)    *OpCo Litigation Trustee as Fiduciary*.  The OpCo Litigation Trustee shall be a fiduciary of the Post-Effective Debtors, shall have such qualifications and experience as are sufficient to enable the OpCo Litigation Trustee to perform its obligations under this Plan and under the OpCo Debtor Litigation Trust Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the OpCo Debtor Litigation Trust Agreement.  To the extent necessary, following the Effective Date, the OpCo Litigation Trustee shall be deemed to be a judicial substitute for the Post-Effective Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.  The OpCo Litigation Trustee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers, including upon advice of counsel, unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

(iii)    *Resignation, Death or Removal*.  The OpCo Litigation Trustee may be removed by the Bankruptcy Court upon application by any party-in-interest for cause shown.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the OpCo Litigation Trustee, the Bankruptcy Court shall designate another Person to become the OpCo Litigation Trustee and thereupon the successor OpCo Litigation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

(c)    OpCo Debtor Litigation Trustee Agreement.

(i)    *Provisions of Agreement and Order*.  The OpCo Debtor Litigation Trust Agreement and the Confirmation Order shall provide that: (i) the OpCo Litigation Trustee shall be a fiduciary of the Post-Effective Debtors and the beneficiaries of the OpCo Debtor Litigation Trust; and (ii) neither the Post-Effective Debtors (except as expressly set forth in the OpCo Debtor Litigation Trust Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the OpCo Litigation Trustee in performing the OpCo Litigation Trustee Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to this Plan on account of any such action taken or omitted to be taken.

(ii)    The OpCo Debtor Litigation Trust Agreement will be filed with the Plan Supplement and will provide for, among other things: (1) the transfer of the OpCo Debtor Litigation Trust Assets to the OpCo Debtor Litigation Trust; (2) the payment of OpCo Debtor Litigation Trust Expenses from the OpCo Debtor Litigation Trust Assets; (3) distributions to Holders of Allowed OpCo General Unsecured Claims, as provided herein and in the OpCo Debtor Litigation Trust Agreement; (4) reasonable access to the Debtors' books and records; (5) the identity of the OpCo Litigation Trustee; (6) the terms of the OpCo Litigation Trustee's engagement; (7) reasonable and customary provisions that allow for limitation of liability and indemnification of the OpCo Litigation Trustee and its professionals by the OpCo Debtor Litigation Trust; <u>provided</u> that any such indemnification shall be the sole responsibility of the OpCo Debtor Litigation Trust and payable solely from the OpCo Debtor Litigation Trust Assets; and (8) the term and dissolution of the OpCo Debtor Litigation Trust.  Following the Effective Date, the OpCo Litigation Trustee shall be responsible for all decisions and duties with respect to the OpCo Litigation Trustee Duties, except as otherwise provided in the Plan, the Confirmation Order, or the OpCo Debtor Litigation Trust Agreement.

(iii)    *OpCo Litigation Claims*.  Notwithstanding anything to the contrary in this Plan, including <u>Article XII</u> hereof, the following Claims and Causes of Action belonging to the OpCo Debtors (collectively, the "***OpCo Litigation Claims***") shall not be released pursuant to this Plan, and shall be transferred to the OpCo Debtor Litigation Trust: (x) all potential Claims and Causes of Action against former directors and officers of the Debtors in their capacity as such as of the Effective Date and (y) all potential Claims and Causes of Action against Brian Kahn, Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., Irradiant Partners, LP, Vintage Capital Management LLC, Lauren Kahn, members of the

60

Freedom Lender Group, the HoldCo Debtors, and solely in the case of Brian Kahn, Prophecy Asset Management LP, B. Riley Financial, Inc. and Irradiant Partners, LP, each of their affiliates, directors, officers, managers, partners, and owners (in each case, solely in their capacity as such, and, for the avoidance of doubt, not including any of the Debtors).

For the avoidance of doubt, the following shall be released pursuant to this Plan and shall not be transferred to the OpCo Debtor Litigation Trust:  (a) all potential Claims and Causes of Action against the members of the Ad Hoc Group; (b) all potential Claims and Causes of Action belonging to the OpCo Debtors against any party that contributes Cash to the OpCo Debtor Litigation Trust Escrow Account in an amount agreed to by the Creditors' Committee in consultation with the Required Consenting First Lien Lenders; (c) all potential Claims and Causes of Action against current employees of the Debtors, including management and directors (including, without limitation the Independent Directors, and officers (including the CRO), but excluding Bryant Riley), in each case who are employed by the Debtors or Reorganized Debtors as of the Effective Date; (d) all potential Claims and Causes of Action against former employees and directors of the Debtors that were terminated without cause between February 3, 2025 and the Effective Date of the Plan; and (e) all potential Claims and Causes of Action against any prepetition Estate Professionals and postpetition Estate Professionals in their capacities as such.  For the avoidance of doubt, notwithstanding the foregoing, any potential Claims and Causes of Action against WFG for prepetition services rendered are not released pursuant to this Plan.

(iv)    *New Warrants*.  Solely to the extent that Holders of Claims in Class 5 vote to accept the Plan, the New Warrants shall be vested in the OpCo Debtor Litigation Trust for distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of OpCo General Unsecured Claims.

(d)    <u>OpCo Debtor Litigation Trust Funding</u>.  On the Effective Date, the Debtors and other parties (if applicable) shall fund the OpCo Debtor Litigation Trust Escrow Account in an amount equal to the OpCo Debtor Litigation Trust Escrow Amount.  The OpCo Debtor Litigation Trust Escrow Amount shall automatically and irrevocably vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests.  The OpCo Debtor Litigation Trust Escrow Amount shall be used for the administration of the OpCo Debtor Litigation Trust, to pay OpCo Debtor Litigation Trust Expenses, and to pursue the OpCo Litigation Claims, with any excess amount being used to distribute to Holders of General Unsecured Claims.  All proceeds from the pursuit of the OpCo Litigation Claims shall be used by the OpCo Litigation Trustee to pay for the costs and expenses of administration of the OpCo Debtor Litigation Trust, pursuit of the OpCo Litigation Claims, and distribution to Holders of OpCo General Unsecured Claims.  The OpCo Litigation Trustee shall exercise its fiduciary duty and business judgment to allocate such proceeds among the Classes of Claims receiving interests in the OpCo Debtor Litigation Trust.  The OpCo Litigation Trustee, on behalf of the OpCo Debtor Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the OpCo Debtor Litigation Trust Assets in accordance with the Plan and the OpCo Debtor Litigation Trust Agreement.

(e)    OpCo Debtor Litigation Trust Units.  Any and all OpCo Debtor Litigation Trust Units shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.  In addition, any and all OpCo Debtor Litigation Trust Units will not be registered pursuant to the Securities Act or any applicable state or local securities law pursuant to section 1145 of the Bankruptcy Code, and will be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

### 7.11.  *Freedom HoldCo Debtor Litigation Trust.*

(a)    General.  On the Effective Date of the Plan, (i) the Freedom HoldCo Debtors shall execute the Freedom HoldCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the Freedom HoldCo Debtor Litigation Trust in accordance with the terms of the Plan and the beneficial interests therein, which shall be for the benefit of the Holders of Allowed Claims against the Freedom HoldCo Debtors, including to the extent the Freedom HoldCo DIP Election is made, the Allowed DIP Claims currently outstanding against the Freedom HoldCo Debtors, and (ii) the Freedom HoldCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Freedom HoldCo Debtor Litigation Trust all of their rights, title and interest in the Freedom HoldCo Debtor Litigation Trust Claims.  Pursuant to section 1141 of the Bankruptcy Code, such Claims and Causes of Action (if any) shall automatically vest in the Freedom HoldCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests.

For the avoidance of doubt, prior to the Effective Date of the Plan, the Freedom HoldCo Independent Director has the sole power and authority to conduct the Freedom HoldCo Independent Investigation.  Notwithstanding any language in the definition of Released Parties, if the Freedom HoldCo Independent Director identifies potential Claims through the Freedom HoldCo Independent Investigation, the Freedom HoldCo Independent Director shall have the sole power and authority (i) to settle or release such Claims (other than the Freedom HoldCo Debtor Litigation Trust Claims), subject to further order of the Bankruptcy Court after notice and a hearing, or (ii) to preserve such Claims for transfer to the Freedom HoldCo Debtor Litigation Trust.

The (i) establishment, purpose, and administration of the Freedom HoldCo Debtor Litigation Trust; (ii) appointment, rights, and powers, of the Freedom HoldCo Debtor Litigation Trustee; and (iii) treatment of the Freedom HoldCo Debtor Litigation Trust for federal income tax purposes, among other things, shall be governed by the Freedom HoldCo Debtor Litigation Trust Agreement.  On and after the Effective Date, the Freedom HoldCo Debtor Litigation Trustee shall be authorized, in accordance with the terms of the Plan and the Freedom HoldCo Debtor Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any assets of the Freedom HoldCo Debtor Litigation Trust.

In furtherance of this section of the Plan, (i) it is intended that the Freedom HoldCo Debtor Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, consistent with

the terms of the Plan, and accordingly, all assets held by the Freedom HoldCo Debtor Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, and then contributed by the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims to the Freedom HoldCo Debtor Litigation Trust in exchange for their interest in the Freedom HoldCo Debtor Litigation Trust; (ii) the sole purpose of the Freedom HoldCo Debtor Litigation Trust shall be the liquidation and distribution of the net assets of the Freedom HoldCo Debtor Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report consistently with the valuation of the assets transferred to the Freedom HoldCo Debtor Litigation Trust as determined by the Freedom HoldCo Debtor Litigation Trustee (or its designee); (v) the Freedom HoldCo Debtor Litigation Trustee shall be responsible for filing all applicable tax returns for the Freedom HoldCo Debtor Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the Freedom HoldCo Debtor Litigation Trustee shall annually send to each Holder of an interest in the Freedom HoldCo Debtor Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Freedom HoldCo Debtor Litigation Trustee of a private letter ruling if the Freedom HoldCo Debtor Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the Freedom HoldCo Debtor Litigation Trustee), the Freedom HoldCo Debtor Litigation Trustee may timely elect to (i) treat any portion of the Freedom HoldCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the Freedom HoldCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the Freedom HoldCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Freedom HoldCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The Freedom HoldCo Debtor Litigation Trustee may request an expedited determination of taxes of the Freedom HoldCo Debtor

Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Freedom HoldCo Debtor Litigation Trust for all taxable periods through the dissolution of the Freedom HoldCo Debtor Litigation Trust.

### 7.12.    *New Warrants.*

In the event of a Plan Equitization Transaction, on the Effective Date, in accordance with the terms of the Plan and the Restructuring Transactions Memorandum and as further set forth in the New Warrant Documentation, New TopCo shall issue and deliver all of the New Warrants (subject to dilution by the Management Incentive Plan) to the OpCo Debtors Litigation Trust for further distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of OpCo General Unsecured Claims, pursuant to the terms and conditions of the Restructuring Support Agreement, the OpCo Debtor Litigation Trust Agreement, and the New Warrant Documentation.  The issuance of New Warrants pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, and all of the New Warrants issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  On the Effective Date, the New Warrant Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

The New Warrants shall be distributed in a single instrument to be held by the OpCo Litigation Trustee.

### 7.13.    *Exemption from Registration Requirements.*

The offering, issuance, and distribution of any securities, including the Reorganized Common Equity and the New Warrants, in exchange for Claims pursuant to Article III or Article V of the Plan, shall be exempt from, among other things, the registration requirements of the Securities Act and any other applicable U.S. state or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).  Except as otherwise provided in the Plan or the governing certificates or instruments, any and all such Reorganized Common Equity and the New Warrants so issued under the Plan (a) will not be "restricted securities" (as defined under the Securities Act), and (b) will be freely tradable and transferable under the Securities Act by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Debtors, the Reorganized Debtors or New TopCo, in each case, subject to (x) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (y) compliance with applicable securities laws and any rules and regulations, including those of the United States Securities and Exchange Commission or U.S. state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments, and (z) any restrictions in the New Organizational Documents of New TopCo.

Notwithstanding anything to the contrary in the Plan or the Restructuring Support Agreement, no Entity shall be entitled to require a legal opinion regarding the validity of any

transaction contemplated by the Plan, including, for the avoidance of doubt, whether issuance of the Reorganized Common Equity and/or the New Warrants is exempt from registration.

### 7.14.  *Organizational Documents.*

In the event of a Plan Equitization Transaction, the Reorganized Debtors or New TopCo, as applicable, shall enter into such agreements and/or amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan and the Bankruptcy Code, which shall: (1) contain terms consistent with the Plan Supplement; and (2) authorize the issuance, distribution, and reservation of the Reorganized Common Equity and the New Warrants to the Entities entitled to receive such issuances, distributions and reservations, as applicable under the Plan. The New Organizational Documents will be deemed to be modified to prohibit (and will include a provision prohibiting) the issuance of non-voting equity securities, pursuant to and solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. Without limiting the generality of the foregoing, as of the Effective Date, the Reorganized Debtors and New TopCo shall be governed by the New Organizational Documents applicable to it.  On or immediately before the Effective Date, each Debtor, each Reorganized Debtor and New TopCo, as applicable, will file its respective New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of its state of incorporation or formation, to the extent required under this Plan or applicable nonbankruptcy law for such New Organizational Documents to become effective.  After the Effective Date, the Reorganized Debtors and New TopCo may amend and restate the formation, incorporation, organizational, and constituent documents, as applicable, as permitted by the laws of its respective jurisdiction of formation or incorporation, as applicable, and the terms of such documents.

As a condition to receiving (1) the Reorganized Common Equity, Holders of Allowed Prepetition First Lien Loan Claims and/or Allowed DIP Claims and/or any of their respective designees for receipt of Reorganized Common Equity and (2) the New Warrants, Holders of OpCo General Unsecured Claims that vote to accept the Plan and/or any of their respective designees for receipt of New Warrants, in each case, will be required to execute and deliver the applicable New Organizational Documents for New TopCo.  For the avoidance of doubt, any Entity's or Person's receipt of Reorganized Common Equity and/or New Warrants under, or as contemplated by, the Plan shall be deemed as its agreement to the applicable New Organizational Documents for New TopCo, and such Entities and Persons shall be deemed signatories to the applicable New Organizational Documents for New TopCo without further action required on their part (solely in their capacity as members of New TopCo).  The New Organizational Documents for New TopCo will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of Reorganized Common Equity and/or New Warrants will be bound thereby in all respects even if such Holder has not actually executed and delivered a counterpart thereof.

### 7.15.  *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to or in connection with the Plan (including, if applicable, the Sale Transaction), including: (1) the issuance, distribution, transfer,

or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any U.S. federal, state or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate U.S. federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Plan.

### 7.16.    *Other Tax Matters.*

In the event of a Plan Equitization Transaction, from and after the Effective Date, the Reorganized Debtors, including New TopCo, shall be authorized to make and to instruct any of their wholly-owned subsidiaries to make any elections available to them under applicable law with respect to the tax treatment of the Restructuring Transaction as specified in the Restructuring Transactions Memorandum.

### 7.17.    *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to distribution under this Plan, and except as otherwise set forth in this Plan or in the Restructuring Transactions Memorandum, on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents directly or indirectly evidencing, related to or connected with any Claim, other than (x) to the extent the Freedom HoldCo DIP Election is made, DIP Claims against the Freedom HoldCo Debtors, or (y) certain Intercompany Claims and Existing Intercompany Equity Interests, in each case as expressly set forth in the Plan, and any rights of any Holder in respect thereof, shall be deemed canceled, discharged and of no force or effect without further act or action under any applicable agreement, law, regulation, order, or rule.  The holders of or parties to such canceled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.  Notwithstanding anything to the contrary herein and in the Restructuring Support Agreement, each of the DIP Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement, and the HoldCo Credit Agreement shall continue in effect solely to the extent necessary to: (a) permit Holders of the DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims and Prepetition HoldCo Loan Claims to receive distributions under this Plan on account of such respective Claims; and (b) permit the Second Lien Credit Agreement Agent and HoldCo Credit Agreement Agent, respectively, to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this

Plan. Except as provided pursuant to this Plan, upon satisfaction of the DIP Claims, Prepetition First Lien Loan Claims, the Prepetition Second Lien Loan Claims and the Prepetition HoldCo Loan Claims, respectively (and as the case may be), each of the DIP Credit Agreement, First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent and the HoldCo Credit Agreement Agent, respectively (and as the case may be), shall be discharged of all of their respective obligations associated with the DIP Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement, and the HoldCo Credit Agreement, respectively (and as the case may be).

On the Effective Date, except as otherwise specifically provided for in this Plan (including in the Restructuring Transactions Memorandum): (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to this Plan, if any) shall be canceled, terminated and of no further force or effect solely as to the Debtors, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to this Plan, if any) shall be automatically and fully released and discharged.

## 7.18. *Boards.*

(a)     In the event of a Plan Equitization Transaction, subject to the terms of the Restructuring Support Agreement and the applicable New Organizational Documents, on the Effective Date, the New Boards shall consist of those individuals identified in the Plan Supplement to be filed with the Bankruptcy Court at or before the Confirmation Hearing. Unless reappointed, the members of the boards of the Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors or to New TopCo on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor or to New TopCo on the Effective Date. Commencing on the Effective Date, each of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Debtor or New TopCo, as applicable, and may be replaced or removed in accordance therewith, as applicable.

(b)     In the event of a Sale Transaction, the Plan Administrator shall be the sole director, manager or managing member, as applicable, of each of the Reorganized Debtors from and following the Effective Date. The members of the boards of the Non-Liquidating Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors on and

after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

**7.19.    *Management.***

In the event of a Plan Equitization Transaction, as of the Effective Date, the individuals who will serve in certain senior management positions of the Reorganized Debtors shall consist of those individuals set forth in the Plan Supplement.  In the event of a Sale Transaction, from and after the Effective Date, the Wind Down Debtors shall be managed and administered by the Plan Administrator, who shall be appointed the sole officer of each of the Wind Down Debtors and shall have full authority to administer the provisions of the Plan.  The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.

**7.20.    *Directors and Officers Insurance Policies.***

In accordance with the Plan, (i) on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, which "tail policy" shall not be otherwise terminated or reduced) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim or Proof of Interest need be filed; (iii) the Debtors and the Reorganized Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary; and (iv) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies.

For the avoidance of doubt, on and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

**7.21.    *Corporate Action.***

(a)    On the Effective Date, the New Organizational Documents and any other applicable amended and restated corporate Organizational Documents of each of the Reorganized Debtors and New TopCo, shall be deemed authorized in all respects.  On the Effective Date, all actions contemplated by this Plan (including any transaction described in, or contemplated by, the Restructuring Transactions Memorandum) and the Restructuring Transaction shall be deemed authorized and approved in all respects, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.

(b)    Any action under the Plan to be taken by or required of the Debtors, the Reorganized Debtors or New TopCo, including the adoption or amendment of certificates of

formation, incorporation and by-laws, the issuance of securities and instruments, or the selection of officers or directors shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors', the Reorganized Debtors' or New TopCo's equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

(c)     On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors or New TopCo, as applicable, shall be authorized and, as applicable, directed to issue, execute, deliver, acknowledge, file, and/or record, as applicable, such securities, documents, contracts, instruments, releases and other agreements and take such other action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, in the name of and on behalf of the Debtors, the Reorganized Debtors and New TopCo, as applicable, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, or shareholder approval or action.  In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors and New TopCo as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Debtor or New TopCo.

(d)     The authorizations, approvals and directives contemplated by this Section 7.21 shall be effective notwithstanding any requirements under non-bankruptcy Law.

### 7.22.   *Plan Administrator.*

(a)     Appointment; Duties.    The Post-Effective Debtors shall designate the Person who initially will serve as the Plan Administrator in the Plan Supplement; provided, however, that: (i) the Debtors shall have the right at any time prior to the Effective Date to remove the Plan Administrator without cause; and (ii) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time.  On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan to: (y) establish bank accounts as may be required to fulfill the Debtors' obligations under this Plan; and (z) exercise such other power and authority as may be set forth in the Confirmation Order (collectively, the "***Pre-Effective Date PA Duties***").  On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan.

(b)     Qualifications; Plan Administrator Agreement.

(i)     *Plan Administrator as Fiduciary*.    The Plan Administrator shall be a fiduciary of the Post-Effective Debtors, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under this Plan and under the Plan Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement. To the extent necessary, following the Effective Date, the Plan Administrator shall be deemed to be a judicial substitute for the Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

(ii)    *Provisions of Agreement and Order.*    The Plan Administrator Agreement and the Confirmation Order shall provide that: (i) the Plan Administrator shall be a fiduciary of the Post-Effective Debtors; (ii) neither the Debtors (except as expressly set forth in the Plan Administrator Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the Plan Administrator in performing the Pre-Effective Date PA Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to this Plan on account of any such action taken or omitted to be taken; and (iii) if the Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Plan Administrator position shall thereafter be dissolved automatically.

(c)    <u>Resignation, Death or Removal</u>.  The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Bankruptcy Court shall designate another Person to become Plan Administrator and thereupon the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

(d)    <u>Wind Down Funds</u>.  In the case of a Sale Transaction, the Plan Administrator shall establish and fund the Wind Down Account from all Cash of the Debtors as of the Effective Date, *minus* the distributions to Holders of Claims required by this Plan, *plus* any Cash received by the Wind Down Debtors on and after the Effective Date.

### 7.23.  *Wind Down of the Debtors' Estates.*

(a)    In the event of a Sale Transaction, the Plan Administrator shall oversee the wind down of the Wind Down Debtors and shall make distributions to, and otherwise hold all property of the Estates for the benefit of, Holders of Allowed Claims and Allowed Interests in accordance with the Plan and the Confirmation Order.  Neither the Wind Down Debtors nor the Plan Administrator shall be required to post a bond in favor of the United States.

(b)    In the event of a Sale Transaction, as set forth in the Plan Administrator Agreement, the Plan Administrator shall have the power and authority to perform the following acts with respect to the Wind Down Debtors, in addition to any powers granted by law or conferred by any other provision of the Plan and orders of the Bankruptcy Court: (i) take all steps and execute all instruments and documents necessary to make distributions to Holders of Allowed Claims and Allowed Interests that the Wind Down Debtors are responsible for payment of pursuant to the terms of this Plan; (ii) object to Claims, if any, as provided in this Plan and prosecute such objections; (iii) resolve, compromise and/or settle any objections to the amount, validity, priority, treatment or allowance of Claims, Administrative Expense Claims, or Interests; (iv) comply with this Plan and the obligations hereunder; (v) if necessary, employ, retain, or replace professionals to represent it with respect to its responsibilities; (vi) take all actions necessary or appropriate to

70

enforce the Wind Down Debtors' rights and fulfill the Wind Down Debtors' obligations under the Sale Documents; (vii) prepare and file applicable tax returns for the Reorganized Debtors; (viii) deposit Estate funds, draw checks and make disbursements consistent with the terms of this Plan; (ix) purchase or continue insurance protecting the Wind Down Debtors, the Plan Administrator and property of the applicable Estates; (x) seek entry of a final decree in any of the Wind Down Debtors' Chapter 11 Cases at the appropriate time; (xi) resolve, compromise and/or settle any Cure Disputes; (xii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization (as such term is described in Internal Revenue Code section 501(c)(3) (whose contributions are deductible under Internal Revenue Code section 170)) of the Plan Administrator's choice, any Estate assets that are of no material benefit, including distributable Cash under this Plan; and (xiii) take such other action as the Plan Administrator may determine to be necessary or desirable to carry out the purpose of this Plan.

(c)    In the event of a Sale Transaction, following the Effective Date, none of the Wind Down Debtors shall engage in any business activities or take any actions except those necessary to effectuate the Plan (including under the Sale Documents) and the wind down of the Wind Down Debtors.  On and after the Effective Date, the Plan Administrator may, in the name of the Wind Down Debtors, take such action and settle and compromise Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order.

**7.24.    *Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights.***

(a)    Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, or controversies (i) belonging to the Debtors or the Debtors' Estates as set forth in the Plan and (ii) by and among the Debtors, the Creditors' Committee, the DIP Lenders, and the Consenting First Lien Lenders.  This Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies belonging to the Debtors or the Debtors' Estates pursuant to section 1123 of the Bankruptcy Code and, with respect to the compromise and settlement by and among the Debtors, the DIP Lenders, and the Consenting First Lien Lenders, Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests, Causes of Action, or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (i) in the best interest of the Debtors, the Reorganized Debtors, and their respective Estates and property, and of Holders of Claims or Interests; and (ii) fair, equitable and reasonable.

(b)    Except as provided herein, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) or 510(c) of the

71

Bankruptcy Code or otherwise, and any and all such rights against the Debtors and/or their estates are terminated pursuant to the Plan.

**7.25.    *Additional Transactions Authorized Under this Plan.***

On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to reinstate Claims or Interests or render Claims or Interests not impaired, as provided for under this Plan.

<div align="center">

**ARTICLE VIII.**
**DISTRIBUTIONS**

</div>

**8.1.    *Distributions.***

The Disbursing Agent shall make all distributions under this Plan to the applicable Holders of Allowed Claims in accordance with the terms of this Plan.

**8.2.    *No Postpetition Interest on Claims.***

Except with respect to Allowed DIP Claims and the Prepetition First Lien Loan Claims and unless otherwise specifically provided for in the Confirmation Order or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

**8.3.    *Date of Distributions.***

Unless otherwise provided herein, any distributions under this Plan and deliveries to be made hereunder shall be made on the applicable Distribution Date; provided that the Reorganized Debtors may utilize periodic Distribution Dates to the extent that use of a periodic Distribution Date does not delay payment of the Allowed Claim more than thirty (30) days. The manner of distributions to Holders of Allowed OpCo General Unsecured Claims shall be in the sole discretion of the OpCo Litigation Trustee after reserving for Disputed Claims and expenses of the OpCo Debtor Litigation Trust. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**8.4.    *Distribution Record Date.***

As of the close of business on the Distribution Record Date, the various lists of Holders of Claims in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims after the Distribution Record Date. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Costs or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' Executory Contracts and Unexpired Leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired

Lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Costs.  For the avoidance of doubt, the Distribution Record Date shall not apply to any securities of the Debtors deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

**8.5.    *Disbursing Agent.***

(a)    <u>Powers of Disbursing Agent</u>.  The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions under this Plan or payments contemplated hereby in respect of the Reorganized Debtors; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)    <u>Expenses Incurred by the Disbursing Agent On or After the Effective Date</u>.  Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Wind Down Debtors (solely if the Plan Administrator is not the Disbursing Agent), the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash and will not be deducted from distributions under this Plan made to Holders of Allowed Claims by the Disbursing Agent.  The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Wind Down Debtors and without the need for approval by the Bankruptcy Court, as set forth in <u>Section 3.3(c)</u> of this Plan.  In the event that the Disbursing Agent and the Wind Down Debtors are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

(c)    <u>Bond</u>.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.  Furthermore, any such Entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

(d)    <u>Cooperation with Disbursing Agent</u>.  The Wind Down Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of Holders of Claims, in each case, that are entitled to receive distributions under this Plan, as set forth in the Debtors' or the applicable Reorganized Debtors' books and records.  The Wind Down Debtors will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in <u>Section 8.15</u> of this Plan.

**8.6.** *Delivery of Distribution.*

Subject to the provisions contained in this <u>Article VIII</u>, with respect to distributions required to be made to Holders of Allowed Claims by the Reorganized Debtors under this Plan, the Disbursing Agent will, subject to Bankruptcy Rule 9010, make all distributions under this Plan or payments to any Holder of an Allowed Claim as and when required by this Plan at: (a) the address of such Holder on the books and records of the Debtors or their agents; or (b) the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed Proofs of Claim or transfers of Claim filed with the Bankruptcy Court. In the event that any distribution under this Plan to any such Holder is returned as undeliverable, no distribution or payment to such Holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter such distribution under this Plan shall be made to such Holder without interest; <u>provided</u>, <u>however</u>, that such distributions under this Plan or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of ninety (90) days from: (i) the Effective Date; and (ii) the first Distribution Date after such Holder's Claim is first Allowed. Notwithstanding the foregoing, all distributions to be made on account of (w) the Prepetition ABL Loan Claims shall be delivered to the ABL Credit Agreement Agent for the benefit of itself and the ABL Lenders in accordance with the terms of the ABL Credit Agreement; (x) the Prepetition First Lien Loan Claims shall be delivered to the First Lien Credit Agreement Agent for the benefit of itself and the First Lien Lenders in accordance with the terms of the First Lien Credit Agreement; (y) the Prepetition Second Lien Loan Claims shall be delivered to the Second Lien Credit Agreement Agent for the benefit of itself and the Second Lien Lenders in accordance with the terms of the Second Lien Credit Agreement, and (z) the Prepetition HoldCo Loan Claims shall be delivered to the HoldCo Credit Agreement Agent for the benefit of itself and the HoldCo Lenders in accordance with the terms of the HoldCo Credit Agreement.

**8.7.** *Unclaimed Property.*

Ninety (90) days from the later of: (i) the Effective Date, and (ii) the first Distribution Date after such Holder's Claim is first Allowed, all unclaimed property, wherever located, or interests in property distributable hereunder on account of such Claim shall revert to the applicable Reorganized Debtor or its successor or assign and be deposited in the Wind Down Account, and any Claim or right of the Holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred. The Wind Down Debtors and the Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records, and the Proofs of Claim filed against the Debtors, as reflected on the Claims Register maintained by the Claims Agent.

**8.8.** *Satisfaction of Claims.*

Unless otherwise specifically provided herein, any distributions under this Plan and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

**8.9.    *Manner of Payment Under Plan.***

Except as specifically provided herein, at the option of the Wind Down Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or the applicable Reorganized Debtor, as the case may be.

**8.10.    *De Minimis Cash Distributions.***

None of the Reorganized Debtors, the Plan Administrator or the Disbursing Agent shall have any obligation to make a distribution that is less than $50.00 in Cash.

**8.11.    *Distributions on Account of Allowed Claims Only.***

Notwithstanding anything herein and in the Restructuring Support Agreement to the contrary, no distribution under this Plan shall be made on account of a Claim until such Claim becomes an Allowed Claim.

**8.12.    *Fractional Shares.***

No fractional interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution would otherwise result in the issuance of a number of interests that is not a whole number, the actual distribution of interests shall be rounded as follows: (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized interests to be distributed shall be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC will be treated as a single Holder, if applicable.

**8.13.    *No Distribution in Excess of Amount of Allowed Claim.***

Notwithstanding anything herein and in the Restructuring Support Agreement to the contrary, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution under this Plan of a value in excess of the Allowed amount of such Claim.

**8.14.    *Setoffs and Recoupments.***

Except as expressly provided in this Plan and except with respect to the Secured Claims, the Reorganized Debtors may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any distributions under this Plan to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action that the applicable Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount between the applicable Reorganized Debtor and the Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or any of their respective successors of any and all claims, rights and Causes

of Action that such Persons or any of their respective successors may possess against the applicable Holder.

### 8.15.  *Withholding and Reporting Requirements.*

In connection with this Plan and all distributions under this Plan hereunder, the Post-Effective Debtors, Wind Down Co, the OpCo Debtor Litigation Trust, the Freedom HoldCo Debtor Litigation Trust, the Disbursing Agent and any Claims Agent shall comply with all withholding and reporting requirements imposed by any U.S. federal, state, provincial, local or foreign taxing authority, and all distributions under this Plan hereunder shall be subject to any such withholding and reporting requirements.  The Post-Effective Debtors, Wind Down Co, the OpCo Debtor Litigation Trust, the Freedom HoldCo Debtor Litigation Trust, the Disbursing Agent and any Claims Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including requiring a Holder of a Claim to submit appropriate tax and withholding certifications.  Notwithstanding any other provision of this Plan: (a) each Holder of an Allowed Claim that is to receive a distribution under this Plan under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations on account of such distribution; and (b) no distributions under this Plan shall be required to be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Post-Effective Debtors, Wind Down Co, the OpCo Debtor Litigation Trust, the Freedom HoldCo Debtor Litigation Trust, the Disbursing Agent or the Claims Agent, as applicable, for the payment and satisfaction of such tax obligations or has, to their satisfaction, established an exemption therefrom.

## ARTICLE IX.
## PROCEDURES FOR RESOLVING CLAIMS

### 9.1.  *Claims Process.*

Except as otherwise required by order of the Bankruptcy Court, Holders of Claims need not file Proofs of Claim with the Claims Agent or the Bankruptcy Court and shall be subject to the Bankruptcy Court claims process only to the extent set forth in this Plan and/or Confirmation Order.

### 9.2.  *Objections to Claims.*

Other than with respect to Fee Claims, (i) only the Reorganized Debtors or New TopCo, or (ii) in the event of a Sale Transaction, only Wind Down Co, on behalf of itself and the other the Wind Down Debtors, shall be entitled to object to Claims (other than OpCo General Unsecured Claims, Prepetition HoldCo Loan Claims, and Allowed Freedom HoldCo General Unsecured Claims) on and after the Effective Date, except that nothing herein shall be understood to waive the Reorganized Debtors', New TopCo's or the Wind Down Debtors' right to argue that a Claim filed against the Debtors or the Reorganized Debtors has been discharged under the Plan.  Only the OpCo Debtor Litigation Trust shall be entitled to object to OpCo General Unsecured Claims on and after the Effective Date.  Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) one hundred eighty (180) days

following the later of (x) the Effective Date and (y) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof.  From and after the Effective Date, either (i) the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, (ii) the Wind Down Debtors, (iii) the OpCo Debtor Litigation Trust, or (iv) the Freedom HoldCo Debtor Litigation Trust, as applicable, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**9.3.    *Payments and Distributions with Respect to Disputed Claims.***

If an objection to a Claim is filed as set forth in Section 9.2 of this Plan, except as otherwise agreed by (i) the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, or (ii) the Wind Down Debtors, as applicable, if any portion of a Claim (other than a Fee Claim) is a Disputed Claim, no payment or distribution (partial or otherwise) provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**ARTICLE X.**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**10.1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.***

In the event a Sale Transaction or Partial Sale Transaction is consummated, to the extent assumption has not already occurred, the Assumed Contracts to be assumed and assigned in connection with such Sale Transaction or Partial Sale Transaction will be assumed (unless previously assumed pursuant to a separate order of the Bankruptcy Court) and assigned to the applicable Successful Bidder pursuant to a Sale Order in accordance with the applicable Sale Documents.  Effective as of the Effective Date, in the event a Sale Transaction is consummated, except as otherwise provided herein, any Executory Contract or Unexpired Lease (i) not previously assumed, (ii) not assumed and assigned in accordance with any Sale Documents, (iii) not previously rejected pursuant to an order of the Bankruptcy Court, or (iv) not subject of a pending motion to reject, assume or assume and assign, will be rejected effective as of the Effective Date pursuant to the Confirmation Order.

In the event of a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), except as otherwise provided herein, any Executory Contracts and Unexpired Leases (i) not previously assumed, (ii) not previously assumed and assigned in accordance with any Partial Sale Transaction or other order approving such assumption and assignment, or (iii) not previously rejected pursuant to an order of the Bankruptcy Court, will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order except any Executory Contract or Unexpired Lease (1) identified on the Rejected Contracts/Lease List (which shall initially be filed with the Plan Supplement) as a contract or lease to be rejected, (2) that is the subject of a separate motion or notice to reject, assume, or assume and assign pending as of the Confirmation Date, or (3) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).  In the event of a Plan Equitization Transaction (including, for the

avoidance of doubt, following any Partial Sale Transaction, if any), entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such later date as may be identified on the Rejected Contracts/Lease List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

The Debtors and the Required Consenting First Lien Lenders will work together in good faith to determine which Executory Contracts and Unexpired Leases shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases; provided that, to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, if requested by the Required Consenting First Lien Lenders, (x) absent a Partial Sale Transaction involving the Vitamin Shoppe Debtors, the Vitamin Shoppe Debtors shall reject any and all Executory Contracts or Unexpired Leases held by such Debtor(s), and (y) the Debtors shall reject any Executory Contracts or Unexpired Leases between (i) any of the Debtors, on the one hand, and (ii) any Specified Party, on the other hand.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party (including the applicable Successful Bidder in the event of a Sale Transaction or Partial Sale Transaction, if any) on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by an order of the Bankruptcy Court.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, or increases, accelerates or otherwise alters any obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder as a result of, or creates any Lien on any asset or property of the Debtors or the Reorganized Debtors as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed unenforceable (solely for purposes of the transactions contemplated under this Plan) and modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder, or create or impose a Lien on any asset or property of the Debtors or the Reorganized Debtors.  For the avoidance of doubt, confirmation of the Plan shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary herein and in the Restructuring Support Agreement, the Debtors or Reorganized Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts/Lease List in their discretion prior to the Confirmation Date (or such later date as may be agreed with a counterparty); provided that the Debtors shall give prompt notice of any such amendment or

supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

### 10.2.  *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Notwithstanding anything to the contrary herein and in the Restructuring Support Agreement, in the event the Restructuring Transactions are consummated through the Sale Transaction or a Partial Sale Transaction (if any), the terms of any Sale Documents and any Sale Order shall govern the cure of defaults, assumption and assignment, and compliance with section 365 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases assumed and assigned pursuant to such Sale Documents and Sale Order.

In the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), the applicable terms of the Bidding Procedures Order and section 365 of the Bankruptcy Code shall govern the process for cure of defaults, assumption, assumption and assignment (if applicable) with respect to any Executory Contracts or Unexpired Leases assumed or assumed and assigned by the Debtors pursuant to this Plan.  Notwithstanding the foregoing, any Assumption and Assignment Notices (as defined in the Bidding Procedures Order), including, but not limited to, those filed at Docket Nos. 487, 499, 597 & 650, shall constitute notice of the potential assumption and proposed Cure Costs.  Any objection by a contract or lease counterparty to the proposed Cure Cost (as defined in the Bidding Procedures Order) must be filed, served, and actually received by the Debtors by the date set forth in the applicable Assumption and Assignment Notice (a "***Cure Dispute***").  In the event that a non-Debtor contract counterparty files a timely Cure Dispute and the Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard at the Confirmation Hearing or such other date on at least seven (7) days' notice to the applicable non-Debtor contract counterparty, or such date as the parties agree, subject to the Court's calendar.  Any objection by a contract or lease counterparty to (i) the ability of the applicable Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned, or (ii) any other matter pertaining to the proposed assumption (such objection, an "***Assumption Dispute***") must be filed, served, and actually received by the Debtors by the date on which objections to confirmation of the Plan are due.

In the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, the Debtors shall pay any Cure Costs, if monetary, in full in Cash either (i) on the Effective Date or as soon as reasonably practicable thereafter, or (ii) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (x) the Effective Date or as soon as reasonably practicable thereafter and (y) seven (7) days after the date on which such Cure Dispute has been resolved.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan and payment or performance of the applicable Cure Costs shall result in the full satisfaction and cure of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions

restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption.

### 10.3. *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases under this Plan must be filed with the Claims Agent within thirty (30) days after the date of the effectiveness of the rejection of the applicable Executory Contract or Unexpired Lease. **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely filed shall be subject to disallowance by further order of the Court upon objection on such grounds.** All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article IV.

### 10.4. *Contracts and Leases Entered into After the Petition Date.*

The Debtors or Reorganized Debtors, and, to the extent assigned to a Successful Bidder in the event of a Sale Transaction, the Successful Bidder, as applicable, will perform under any contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by any Debtor, and will be liable thereunder in the ordinary course of business.

### 10.5. *Reservation of Rights.*

Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts/Lease List or Assumed Contracts List, as applicable, nor anything contained in the Plan or Sale Documents, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Cost to any contract and lease counterparties, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors or Plan Administrator, as applicable, shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article XIII.

### 10.6. *Employee Compensation and Benefits.*

Subject to the provisions of the Plan or any applicable Sale Order or Sale Documents, all compensation and benefits programs shall be treated as Executory Contracts.

In the event of a Plan Equitization Transaction, unless otherwise rejected, to the extent consented to by the Required Consenting First Lien Lenders, all compensation and benefits programs (other than any equity or equity based (including any phantom equity) compensation or

benefits plans) shall be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Confirmation of the Plan, or any assumption of compensation and benefits programs pursuant to the terms herein, shall not be deemed to trigger any applicable change of control, assignment, vesting, termination, acceleration or similar provisions therein.  No counterparty shall have rights under a compensation and benefits programs assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

In the event of a Plan Equitization Transaction, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of the Debtors, or will enter into new compensation arrangements, as applicable, on the Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting First Lien Lenders and which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting First Lien Lenders.

In the event of a Plan Equitization Transaction, the New Board shall: (x) adopt and implement Management Incentive Plans at each operating company or (y) assume, assume as amended, or reject the existing long term incentive plans of Franchise Group's direct or indirect subsidiaries, in each case structured to incentivize operating performance and align economic interests on terms and conditions acceptable to the New Board and the Required Consenting First Lien Lenders.  If applicable, the Management Incentive Plan shall provide for the issuance of equity or equity-linked awards representing up to 10% of the Reorganized Common Equity on a fully diluted basis, to be allocated by the New Board.  The form of the awards under the Management Incentive Plan, if applicable (*i.e.*, options, restricted stock or units, appreciation rights, etc.), the participants in the Management Incentive Plan, the allocations of the awards to such participants (including the amount of allocations and the timing of the grant of the awards), and the terms and conditions of the awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion.

In the event of a Sale Transaction, the compensation and benefits programs shall either be assumed and assigned upon consummation of an applicable Sale Transaction in accordance with the terms and conditions of the applicable Sale Documents or, if no Successful Bidder assumes the compensation and benefits programs, rejected.  On the Effective Date, or in the event of assumption by a Successful Bidder of the compensation and benefits programs, all Proofs of Claim filed for amounts due under any compensation and benefits programs shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan.

## ARTICLE XI.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

**11.1.** *Conditions Precedent to Confirmation.*

Confirmation of this Plan is subject to the satisfaction or waiver of the following conditions:

(a)     the DIP Orders shall have been entered by the Bankruptcy Court and shall remain in full force and effect;

(b)     the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Orders;

(c)     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan;

(d)     entry of the Disclosure Statement Order;

(e)     entry of the Confirmation Order;

(f)     the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time; and

(g)     in the event of a Sale Transaction, the receipt of a Sufficient Bid and the Sale Documents shall not have been terminated in accordance with their terms.

**11.2.** *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date is subject to the satisfaction or waiver of the following conditions:

(a)     the DIP Orders, Disclosure Statement Order, and Confirmation Order having become Final Orders in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified, unless otherwise agreed by the Debtors and the Required Consenting First Lien Lenders;

(b)     no court of competent jurisdiction or other competent governmental or regulatory authority having issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

(c)     each of the applicable Definitive Documents having been executed, delivered, acknowledged, and/or filed, as applicable, by the Entities and Persons intended to be parties thereto and effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein having been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Definitive Documents;

(d)     any non-technical and/or immaterial amendments, modifications or supplements to the Plan having been acceptable to the Debtors and the Required Consenting First Lien Lenders, except as otherwise provided in Section 14.3 of this Plan;

(e)     in the event of the Plan Equitization Transaction, each of the offers, issuances, sales, and/or deliveries of Reorganized Common Equity in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no proceeding by any Governmental Unit or other Entity or Person that alleges that any such offer, issuance, sale and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such proceeding shall be threatened in writing or instituted by any Governmental Unit on or prior to the Effective Date;

(f)     the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, having not been terminated in accordance with its respective terms, and there having not occurred and been continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time;

(g)     to the extent a Plan Equitization Transaction is implemented, all of the actions set forth in the Restructuring Transactions Memorandum, as applicable, having been completed and implemented;

(h)     there not having been instituted or threatened to be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Unit (x) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transaction contemplated herein, in the Restructuring Support Agreement, and in the Definitive Documents or (y) imposing a material award, claim, injunction, fine or penalty that, in each case, both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

(i)     the Debtors having obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and having filed all notices and reports, if any, required to be filed, including with any Governmental Unit, by the Debtors in connection with this Plan's effectiveness, in each case, as may be required by a Governmental Unit;

(j)     in the event of the Plan Equitization Transaction, the Reorganized Common Equity to be issued and/or delivered on the Effective Date having been validly issued by New

TopCo, having been fully paid and non-assessable, and being free and clear of all taxes, Liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents of New TopCo;

(k)      all conditions precedent to the effectiveness of the OpCo Debtor Litigation Trust Agreement and the Freedom HoldCo Debtor Litigation Trust Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the OpCo Debtor Litigation Trust Agreement and the Freedom HoldCo Debtor Litigation Trust Agreement shall be in full force and effect;

(l)      the OpCo Debtor Litigation Trust Escrow Amount shall have been paid to the OpCo Debtor Litigation Trust;

(m)      all conditions precedent to the effectiveness of the Take-Back Debt Credit Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the Take-Back Debt Credit Agreement shall be in full force and effect;

(n)      all conditions precedent to the effectiveness of the New ABL Facility having been satisfied or duly waived by the party whose consent is required thereunder, and the New ABL Facility shall be in full force and effect;

(o)      all requisite filings with any Governmental Unit and third parties having become effective, and all such Governmental Unit and third parties having approved or consented to the Restructuring Transactions, to the extent required;

(p)      any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions having been obtained;

(q)      all accrued and unpaid Restructuring Expenses having been paid in full in Cash by the Debtors;

(r)      in the event of a Sale Transaction, the Sale Documents, as applicable, not having been terminated in accordance with their terms;

(s)      the following documents being in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions, and not having been, as applicable, stayed, modified, reversed, vacated, subject to any pending appeal, and/or terminated prior to the Effective Date: (a) the New Organizational Documents; (b) if applicable, any Sale Order; (c) the Exit ABL Facility; (d) the Take-Back Debt Credit Agreement (if applicable); (e) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (f) all other documents necessary to consummate a transaction of the type contemplated by this Plan to the extent not otherwise listed above; and

(t)      all closing conditions and other conditions precedent in the Restructuring Support Agreement having been satisfied or waived in accordance with the terms thereof.

### 11.3.  *Satisfaction and Waiver of Conditions Precedent.*

Except as otherwise provided herein or in the Restructuring Support Agreement, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in <u>Section 11.1</u> and <u>Section 11.2</u> of this Plan may be waived in whole or part upon agreement by the Debtors, the Required Consenting First Lien Lenders, and the Creditors' Committee, and as the case may be, without notice and a hearing, and the Debtors' benefits under any "mootness" doctrine, but only to the extent applicable, shall be unaffected by any provision hereof.  The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

### 11.4.  *Effect of Failure of Conditions.*

If all of the conditions to effectiveness have not been satisfied (as provided in <u>Section 11.1</u> and <u>Section 11.2</u> hereof) or duly waived (as provided in <u>Section 11.3</u> hereof) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors may file a motion to vacate the Confirmation Order.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in <u>Section 11.1</u> and <u>Section 11.2</u> hereof are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this <u>Section 11.4</u>, this Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under this Plan shall be made, the Debtors and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

### 11.5.  *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under this Plan and whether or not such Holder has accepted this Plan.

### 11.6.  *Substantial Consummation.*

Substantial consummation of this Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE XII.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

**12.1.** *Discharge of Claims and Termination of Certain Equity Interests; Compromise and Settlement of Claims, Certain Equity Interests, and Controversies.*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim is Allowed; or (3) the Holder of such Claim or Equity Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. For the avoidance of doubt, (i) nothing in this Section 12.1 shall affect the rights of Holders of Claims to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims are entitled under the Plan, and (ii) notwithstanding any other Plan provision or provision in the Restructuring Support Agreement to the contrary, in the event a Sale Transaction is consummated, the Debtors shall not receive a discharge, pursuant to section 1141(d)(3) of the Bankruptcy Code.

In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims against the Debtors and their Estates, as well as claims and Causes of Action against other Entities.

**12.2.    *Releases by the Debtors.***

Subject to the outcome of the Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtor Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release, to the maximum extent permitted by law, to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all claims, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; (vii) the Take-Private Transaction and/or (viii) the confirmation or consummation of this Plan or the solicitation of votes on this Plan, in each case, that such Debtor Releasing Party would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; provided, however, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Debtor Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Debtor Releasing Party to enforce this Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or any Sale Transaction or assumed pursuant to this Plan or any Sale Transaction or assumed pursuant

to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in this <u>Article XII.2</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; (2) any act or omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates; (3) any retained Causes of Action; (4) any OpCo Litigation Claims; (5) any Freedom HoldCo Debtor Litigation Trust Claims; or (6) any Avoidance Actions held by Debtors Freedom Receivables II, LLC and Freedom VCM Receivables, Inc.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

12.3.   *Third-Party Release.*

Notwithstanding anything contained in the Plan or the Restructuring Support Agreement to the contrary, and subject to the outcome of Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other Persons that might seek

to claim under or through such Non-Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third-Party Release**") from any and all Claims, Interests, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the confirmation or consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; **provided, however,** that the foregoing provisions of this Third-Party Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Third-Party Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Non-Debtor Releasing Party to enforce this Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or any Sale Transaction or assumed pursuant to this Plan or any Sale Transaction or Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release.  Notwithstanding anything to the contrary in the

foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; (2) any act or omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates; (3) any retained Causes of Action; (4) any OpCo Litigation Claims; (5) any Freedom HoldCo Debtor Litigation Trust Claims; or (6) any Avoidance Actions held by Debtors Freedom Receivables II, LLC and Freedom VCM Receivables, Inc.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

### 12.4. *Exculpation.*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of confirmation and consummation of this Plan, making distributions under this Plan, the Disclosure Statement, the Sale Process, the Sale Order, or the solicitation of votes for, or confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing, including but not limited to the Restructuring Support Agreement; the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation or consummation of this Plan; provided, however, that the foregoing provisions of this Exculpation shall not operate to

waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Exculpation), or gross negligence of such applicable Exculpated Party; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; <u>provided</u>, <u>further</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this <u>Article XII.4</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpations set forth above do not exculpate Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

### 12.5.  *Discharge of Claims and Termination of Interests.*

Except as otherwise provided for herein and in the Restructuring Support Agreement, effective as of the Effective Date, with respect to the Non-Liquidating Debtors: (a) the rights afforded in the Plan and the treatment of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property or Estates; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  In accordance with section 1141(d)(3) of the Bankruptcy Code, this Plan does not discharge the American Freight Debtors.  For the avoidance of doubt, in the event of a Plan Equitization Transaction, at the election of the Required Consenting First Lien Lenders in their sole discretion, the existing ABL Credit Agreement (as defined in the Restructuring Support Agreement), and the

Prepetition ABL Loan Claims (as defined in the Restructuring Support Agreement), may be reinstated.

### 12.6. *Injunction.*

Except as otherwise provided herein or for obligations issued pursuant hereto, all Persons or Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to Exculpation pursuant to Article XII, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties or the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated or settled pursuant to the Plan.

### 12.7. *Setoffs and Recoupment.*

Except as otherwise provided herein, each Reorganized Debtor or the Plan Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); provided that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor or the Plan Administrator, as applicable, of any such claims, rights, and Causes of Action.  In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Causes of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

12.8.    *Release of Liens.*

Except as otherwise provided in the Confirmation Order, herein or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with this Plan and DIP Claims subject to the Freedom HoldCo DIP Election, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns or, in the event of a Sale Transaction, the Plan Administrator.  Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any Collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Plan Administrator, or any administrative agent, collateral agent or indenture trustee under any Take-Back Debt Facility (at the expense of the Debtors or Reorganized Debtors, as applicable) that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Reorganized Debtors or Plan Administrator, as applicable, shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    To hear and determine applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the Cure Disputes resulting therefrom;

(b)     To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)     To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     To ensure that distributions under this Plan to Holders of Allowed Claims are accomplished as provided herein;

(e)     To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(g)     To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     To hear and determine all Fee Claims;

(j)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any Sale Documents (if any), or any agreement, instrument, or other document governing or relating to any of the foregoing; provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(k)     To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(l)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     To hear and determine all disputes involving the existence, nature or scope of the discharge, releases and injunction provisions contained in the Plan;

(n)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)     To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement Hearing, the Confirmation Hearing, the Administrative Bar Date, or the deadline for responding or objecting to a Cure Cost, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(q)     To recover all assets of the Debtors and property of the Estates, wherever located; and

(r)     To enter a final decree closing each of the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of this Article XIII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

### 14.1.  *Dissolution of Creditors' Committee.*

The Creditors' Committee shall be automatically dissolved on the Effective Date and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases under the Bankruptcy Code, except for purposes of filing applications for Professional Person compensation in accordance with this Plan.

### 14.2.  *Termination of Professional Persons.*

On the Effective Date, the engagement of each Professional Person retained by the Debtors and the Creditors' Committee shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Fee Claims, and the Reorganized Debtors shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Fee Claims.  Nothing herein shall preclude any Reorganized Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

### 14.3.    *Amendments.*

Subject to the terms and conditions of the Restructuring Support Agreement and this Plan, this Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Required Consenting First Lien Lenders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of Holders of Allowed Claims and Allowed Interests pursuant to this Plan, the Debtors may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.  With the consent of the Required Consenting First Lien Lenders, the Debtors may make technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; provided, however, that, such technical adjustments and modifications are immaterial or do not adversely affect the treatment of Holders of Claims or Interests under the Plan.

### 14.4.    *Revocation or Withdrawal of this Plan.*

Subject to the terms and conditions of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw this Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Person.

### 14.5.    *Allocation of Distributions under this Plan Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall for U.S. federal (and applicable state and local) income tax purposes be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (but solely to the extent that such other amount is an allowable portion of such Allowed Claim).

### 14.6. *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.    Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.7. *Governing Law.*

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

### 14.8. *Section 1125(e) of the Bankruptcy Code.*

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors, and the Consenting First Lien Lenders (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under this Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

### 14.9. *Inconsistency.*

In the event of any inconsistency among the Plan, the Disclosure Statement, the Restructuring Support Agreement, any exhibit to the Plan, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern; provided, however, that the parties to the Restructuring Support Agreement shall use commercially reasonable efforts to eliminate any such inconsistency by agreement prior to the provisions of this section becoming applicable and enforceable; provided, further, that the foregoing shall not abrogate any party's consent rights.  In the event of a conflict between any provision of this Plan and the Confirmation Order, the Confirmation Order shall govern and control.

**14.10.** *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

**14.11.** *Exhibits.*

All exhibits to this Plan (including, without limitation, all documents filed with the Plan Supplement and all exhibits and ancillary agreements thereto) are incorporated and are a part of this Plan as if set forth in full herein.

**14.12.** *Notices.*

All notices, demands, or requests in connection with the Plan shall be in writing (including by facsimile or electronic mail transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or electronic mail transmission, when received and telephonically confirmed, addressed as follows:

(a)      if to the Debtors, to:

Franchise Group, Inc.
109 Innovation Court, Suite J
Delaware, OH 43015
Attention: Tiffany McMillan-McWaters
E-mail address: tmcwaters@franchisegrp.com

with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Debra M. Sinclair; Matthew A. Feldman; Betsy L. Feldman
E-mail address: dsinclair@willkie.com; mfeldman@willkie.com;
bfeldman@willkie.com

(b)      if to a Consenting First Lien Lender:

c/o Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Jayme Goldstein; Jeremy Evans; Isaac Sasson
E-mail address: jaymegoldstein@paulhastings.com;
jeremyevans@paulhastings.com; isaacsasson@paulhastings.com

### 14.13. *Filing of Additional Documents.*

Subject to the terms and conditions of the Restructuring Support Agreement, on or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 14.14. *Reservation of Rights.*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

### 14.15. *Closing of Chapter 11 Cases.*

The Claims Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

### 14.16. *Tax Matters.*

The Debtors will cooperate with any advisors selected by the Required Consenting First Lien Lenders in respect of all tax structuring matters.

The Post-Effective Debtors or Wind Down Co, as applicable, shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date. In the event of a Sale Transaction, from and after the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences relating to the activities of the Reorganized Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

## ARTICLE XV.
## COMMITTEE SETTLEMENT

Following good faith and arm's length negotiations, in exchange for the releases and other valuable consideration provided for in this Plan, the Committee Settlement Parties have agreed to the settlement provided for in the Committee Settlement term sheet annexed hereto as Exhibit I and fully incorporated herein as a material component of the Plan. The Committee Settlement provides significant value to the Debtors and their Estates, favorably resolve and avoid potential protracted expensive and uncertain litigation, and enable the prompt and efficient wind-down of the Debtors' Estates through this Plan. The Committee Settlement is integral to the development and implementation of this Plan. This Plan, taken together with the Disclosure Statement, shall serve as a motion to approve the Committee Settlement pursuant to Bankruptcy Rule 9019. The

entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Committee Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Holders of Claims and Interests and other parties in interest, and are fair, equitable, and reasonable.

[*Remainder of Page Intentionally Left Blank*]

Dated: February 5, 2025
        Wilmington, Delaware

                                        Respectfully submitted,

                                          **FRANCHISE GROUP, INC.,** on behalf of itself and its affiliated Debtors

                                          By: /s/ DRAFT
                                          Name: Andrew Laurence
                                          Title: Chief Executive Officer

**<u>Exhibit I</u>**

**Committee Settlement Term Sheet**

The Ad Hoc Group of First Lien Lenders ("AHG"), the Official Committee of Unsecured Creditors (the "Committee"), and the Debtors in the chapter 11 cases of *In re Franchise Group, Inc., et al.*, Case No. 24-12480 (LSS) (the "Chapter 11 Cases") have reviewed the Debtors' proposed Plan and Disclosure Statement, and have reached the following settlement.   The AHG, the Committee, and the Debtors reserve all rights with respect to the Plan and Disclosure Statement.  The settlement proposal set forth herein shall remain subject to mutually acceptable documentation among the Debtors, the AHG, and the Committee.

| # | Issue | AHG/Committee Plan Modifications |
|---|-------|----------------------------------|
| 1. | Litigation Trust | The Plan shall be modified to provide for a litigation trust with a litigation trustee (the "Litigation Trustee") selected by the Committee in consultation with the Debtors, which trustee shall be reasonably acceptable to the AHG.  The beneficiaries of the Litigation Trust shall be all general unsecured creditors in Class 5 and Classes 6A through 6E.  For the avoidance of doubt, (i) creditors of Freedom VCM, Inc. and/or Freedom VCM Interco, Inc. (the "HoldCo Debtors"), including the Ad Hoc Group of Freedom Lenders (i.e., Pimco and Irradiant), solely in their capacities as creditors of the HoldCo Debtors, shall not recover from the OpCo Litigation Trust, and (ii) 1L deficiency claims, if any, are to share ratably with the listed classes of unsecured creditors. |
| 2. | Litigation Trust Claims | The Litigation Trustee shall be responsible for reconciling general unsecured claims held by the OpCo Debtors[1] and investigating, pursuing, litigating and/or settling all outbound Litigation Claims that are transferred to the Litigation Trust. |
| 3. | Litigation Claims | All potential claims held by the OpCo Debtors against former directors and officers (including, without limitation, Brian Kahn) and all claims against Bryant Riley shall not be released under the Plan and shall be transferred to the Litigation Trust.<br><br>All potential claims held by the OpCo Debtors against B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., Irradiant Partners, LP, Vintage Capital Management LLC, and Lauren Kahn, and solely in the case of B. Riley Financial, Inc. and Irradiant Partners, LP, each of their affiliates, directors, officers, managers, partners, and owners (in each case, solely in their capacity as such, and, for the avoidance of doubt, not including any of the Debtors) shall not be released under the Plan and shall be transferred to the Litigation Trust.<br><br>All potential claims held by the OpCo Debtors against HoldCo Debtors shall not be released and shall be transferred to the Litigation Trust.<br><br>Notwithstanding anything herein to the contrary, to the extent a party contributes to the Litigation Trust Funding in an amount agreed with the Committee, in consultation with the AHG, such party or parties shall be released under the Plan. For the avoidance of doubt, the members of the AHG shall be released under the Plan.<br><br>All potential claims held by the OpCo Debtors against the members of the Ad Hoc |

---

[1]        "OpCo Debtors" means Franchise Group, Inc. and its subsidiaries as debtors-in-possession in the Chapter 11 Cases.

| | | Group of Freedom Lenders shall not be released under the Plan and shall be transferred to the Litigation Trust.<br><br>Notwithstanding the above, Litigation Claims shall not include claims against (a) any current employees of the Debtors (including management, directors or officers but excluding Bryant Riley) who remain employed by the Debtors as of the effective date of the Plan; provided, that any such current employees that are terminated without cause between the date on which the terms of this settlement are agreed in principle (which agreement shall be memorialized in writing by and between counsel) and the effective date of the Plan shall receive a release, (b) current independent directors of the Debtors (Todd Arden, John Hartmann and Chris Meyer), (c) the Chief Restructuring Officer of the Debtors (David Orlofsky), and (e) any pre- and postpetition estate professionals (i.e., carve out should not affect prepetition releases or postpetition exculpation of estate professionals) with respect to any Debtor, all of which shall be released and/or exculpated (if applicable).<br><br>As (i) part of investigating whether any Litigation Claim is viable and (ii) before commencing any action in respect of any Litigation Claim, as applicable, the Litigation Trustee shall meet and confer with Petrillo Klein + Boxer LLP ("Petrillo") regarding Petrillo's evaluation of such Litigation Claims.  Upon the effective date of the Plan, Petrillo shall transfer to the Litigation Trustee all of Petrillo's analysis and documents supporting such analysis, including, without limitation, such documents that may be subject to privilege, which privilege shall be transferred to the Litigation Trustee.<br><br>Upon the Debtors agreeing to the terms of this term sheet, the Debtors shall (i) terminate the Petrillo investigation, and (ii) provide to the Committee analysis that supports the releases contemplated in this Section. |
| 4. | Trust Funding | The Plan shall be amended to provide for Initial Trust Funding of funding for the Litigation Trust on the Effective Date of the Plan.  Initial Trust Funding shall be equal to (x) $21 million minus (y) the total amount of fees and expenses incurred by all Committee professionals through the plan effective date.<br><br>The Initial Trust Funding shall be used for the administration of the Trust and to pursue the Litigation Claims, with any excess amount being used to distribute to general unsecured creditors.  All recoveries from the Litigation Claims shall be used by the Litigation Trustee for administration of the Trust, pursue the Litigation Claims, and distribution to general unsecured creditors. The Litigation Trustee to exercise fiduciary duty and business judgment to allocate Trust Funding among classes. |
| 5. | Warrants | Solely if Class 5 votes to accept the plan, holders of Classes 6A through 6E would receive their pro rata share of five-year warrants to purchase up to 5% of reorganized equity.  The warrants for Class 6A through 6E would be distributed in a single instrument to be held by the Litigation Trustee; provided, however, that (1) such warrants will be subject to the strike price mechanics set forth in the proposed plan and (2) the 1L deficiency claims, if any, are to share ratably with the listed classes of unsecured creditors. |

| | | |
|---|---|---|
| 6. | Releases | Subject to point 3, holders of Claims in Classes 6A through 6E who vote in favor of the Plan shall receive a release under the Plan.<br><br>Holders of Claims in Classes 3 and 4 shall provide to, and receive a release from, the Released Parties under the Plan (including, without limitation, the AHG and its members). |
| 7. | Plan Support | Debtors, Committee, and AHG agree to support the Plan as long as no modifications adversely affect the economics of the terms of this Settlement, provided, however, each of the Debtors, Committee, and AHG may agree to a modification of the Plan that adversely affects them, but not one of the other parties to this settlement; provided, further, however, that AHG agreement to terms herein is contingent on Class 5 recovery being limited to as set forth in items 1 and 5 above, and the Freedom Debtors and Lenders being treated consistent with item 1 above (except as any term may be changed if (i) the AHG agrees to such change, or (ii) the UCC agrees to a different treatment of Class 5 that does not adversely affect the AHG).  No terms of this Settlement as to the Debtors may be revised or amended without the consent of the Debtors. |

## **EXHIBIT B**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS

## INTRODUCTION

The Debtors believe that the *Joint Chapter 11 Plan of Franchise Group, Inc. and its Affiliated Debtors* [Docket No. 150] (as may be amended, revised, or supplemented from time to time, the "Plan") satisfies section 1129(a)(7) of the Bankruptcy Code and that each Holder of an Allowed Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such Holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7"). This liquidation analysis (the "Liquidation Analysis") and the conclusions set forth herein represent the Debtors' best judgment regarding the results of a hypothetical Chapter 7 liquidation. This Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code and should not be used for any other purpose. Nothing contained in this Liquidation Analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical Chapter 7 liquidation analysis for purposes of meeting the requirements of section 1129(a)(7) of the Bankruptcy Code. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

The first step in determining whether the best interests test has been met is to determine the dollar amount that would be generated from the hypothetical liquidation of the Debtors' assets in the context of a Chapter 7 liquidation. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the Chapter 7 case. Such amount would then be reduced by the amount of: (a) any Claims secured by such assets; (b) the costs and expenses of the liquidation and such additional administrative expenses that may result from the termination of the Debtors' business and the use of Chapter 7 for the purposes of liquidation; and (c) chapter 11 Allowed Administrative Expenses, Allowed U.S. Trustee Fees, and Allowed Priority Tax Claims. Any remaining net cash would be allocated to creditors and, if applicable, shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code.

A number of estimates and assumptions underlie the analysis. While the Debtors and their advisors consider these to be reasonable, they are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Independent accountants have not examined or reviewed this Liquidation Analysis. Moreover, no independent appraisals were conducted in preparing this Liquidation Analysis. This Liquidation Analysis does not purport to be a valuation of the Debtors' assets in the context of a going-concern reorganization.

**THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO LIQUIDATE UNDER CHAPTER 7**.

The Liquidation Analysis contains an estimate of the value of Claims, to the extent such value can be reasonably estimated as of the date of the Liquidation Analysis, that ultimately will become Allowed Claims. The Debtors have not completed a final evaluation of, nor has the Bankruptcy Court determined, the amount of each such Claim. Accordingly, the final amount of Allowed Claims may differ from the Claim amounts presented in this Liquidation Analysis. The

Debtors do not believe that any variance between the estimates contained herein and the final Allowed Claims would have a material effect on the Liquidation Analysis for purposes of section 1129(a)(7) of the Bankruptcy Code.

The Debtors have determined, as summarized in the Liquidation Analysis, that confirmation of the Plan would provide Holders of Claims and Interests with a recovery that is not less than what they would otherwise receive in a Chapter 7 liquidation. The Debtors reserve all rights to supplement, modify, or amend this Liquidation Analysis, including by changing the assumptions and analyses set forth herein, at any time.

## GENERAL NOTES AND ASSUMPTIONS

1.    **Presentation on Consolidated Basis**.  The Liquidation Analysis is presented on a consolidated basis with respect to certain Debtors.  The Liquidation Analysis assumes that the Debtors would be liquidated in their jointly administered cases and that each Debtor would undertake a parallel liquidation.  The Plan does not provide for the substantive consolidation of any of the Debtors.  Any consolidation reflected in the Liquidation Analysis is solely for presentation purposes.

2.    **Liquidation Date**.  The Liquidation Analysis was prepared assuming that the Debtors hypothetically commence a liquidation under Chapter 7 on or about March 1, 2025 (the "Liquidation Date").

3.    **Dependence on Forecasted Financials**.  The Liquidation Analysis relies on estimates and assumptions drawn from the Debtors' books and records as of the Petition Date, rolled forward to the Liquidation Date.  The Liquidation Analysis includes numerous estimated amounts that are still under review and remain subject to further legal and accounting analysis.

4.    **Assets**.  The Liquidation Analysis includes estimated value ranges for all assets where such estimates could reasonably be made under current facts and circumstances.  The ranges utilized in the Liquidation Analysis include "lower" and "higher" estimates.  There is no assurance that in an actual Chapter 7 liquidation, recoveries on any individual asset category, or in total, would be within the presented ranges.  For purposes of the Liquidation Analysis, no value has been assigned to the Debtors' goodwill.  The Liquidation Proceeds from Cash and Cash Equivalents are estimated to be 100% of the pro forma balance as of the Liquidation Date on both a lower and higher recovery basis, with the exception of the FRG Debtors (as defined below), where the lower recovery basis is estimated at 95% of the pro forma balance to account for potential negative variances in cash flows from operations prior to the Liquidation Date.

5.    **Chapter 7 Liquidation Costs and Length of Liquidation Process**.  Unless otherwise stated herein, it is assumed that the Bankruptcy Court would appoint a Chapter 7 trustee (the "Trustee") on the Liquidation Date to oversee the liquidation of the Debtors' estates, during which process substantially all of the Debtors' assets would be sold, abandoned, surrendered, or otherwise liquidated, as applicable, and the cash proceeds, net of liquidation-related costs, distributed in accordance with applicable law.  These activities, together with claims reconciliation, dissolution of corporate entities, and other associated matters, are assumed to occur expeditiously and take approximately six months to complete.  While it is possible that the liquidation period could be extended, this would increase the risk of additional liquidation costs and reduce overall distributable proceeds and recoveries.  Trustee fees are estimated to be 3% of gross distributable proceeds.

6.    **Claims Estimates**.  The Liquidation Analysis contains an estimate of the amount of certain Claims that may ultimately become Allowed Claims.  The Debtors developed the estimate for each type of Claim based on the Debtors' books and records as of the Petition Date.  With respect to certain Debtors, the amount of certain Claims or Interests is undetermined as of the date of this Liquidation Analysis.  Additional Claims or Interests may be asserted against the Debtors prior to the applicable deadlines for filing proofs of Claim or Interests in these Chapter 11

Cases, which, as of the date of this Liquidation Analysis, have not passed. The Liquidation Analysis assumes that all asset proceeds and creditor recoveries are at nominal amounts and does not consider the discounting of values over time. The discounting of values would result in lower recoveries to stakeholders than those presented.

7. **Litigation Claims**. The Liquidation Analysis does not include any estimated recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other estate causes of action and does not include estimated costs associated with pursuing any such actions. As described in the Disclosure Statement, Petrillo is currently conducting an independent investigation into, among other things, potential claims and causes of actions that the Debtors' estates may have against Mr. Kahn, any of the Debtors' other current or former directors and officers, or any other third-parties arising from, or related to, certain historical transactions involving the Debtors. Moreover, Michael Wartell, an independent director of Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc., is currently conducting an independent investigation into potential claims and causes of actions that these Debtors' estates may have against certain parties. Subject to the completion of the investigations, the Debtors do not believe that any such claims and causes of action exist. Accordingly, no value has been assigned to any such claims and causes of action.

8. **Tax Consequences**. The Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation of the Debtors in the manner described above.

9. **DIP Claims**. The Liquidation Analysis assumes that in a Chapter 7 liquidation, DIP Claims would remain outstanding and would have to be satisfied in Cash. The Liquidation Analysis also assumes that in a Chapter 7 liquidation, each Borrower and Guarantor (as defined in the Final DIP Order) would be jointly and severally liable with respect to the DIP Claims. The Liquidation Analysis also assumes that in a Chapter 7 liquidation, the total available net distributable proceeds would not be sufficient to provide Holders of DIP Claims with a par recovery. The Liquidation Analysis does not adjust projected recoveries on DIP Claims in a Chapter 7 liquidation with respect to any Debtor on account of marshaling provisions provided in the Final DIP Order.

10. **DIP Loans, Prepetition ABL Loans, and Prepetition First Lien Loans**. The Liquidation Analysis assumes that upon conversion of the Chapter 11 Cases to Chapter 7, the DIP Agent, the ABL Credit Agreement Agent, and the First Lien Credit Agreement Agent would seek relief from the automatic stay to foreclose on the Debtors' assets under the jurisdiction of the Bankruptcy Court to recover on their outstanding Claims. The Holders of DIP Claims, Prepetition ABL Claims, and Prepetition First Lien Term Loan Claims would have the ability to recover on their respective secured positions on substantially all of the Debtors' assets, in accordance with the priorities of their respective liens on such assets, as set forth on <u>Exhibit 2</u> to the Final DIP Order.

11. **General Unsecured Claims**. The estimate of General Unsecured Claims is based on the Debtors' Schedules of Assets and Liabilities. This estimate does not include any General Unsecured Claims for which the Claim amount is uncertain as of the date of this Liquidation Analysis. This estimate also does not include potential unsecured damages claims resulting from

the rejection of any Executory Contracts or Unexpired Leases.  Additional General Unsecured Claims may be asserted against the Debtors prior to the applicable deadlines for filing proofs of Claim or Interests in these Chapter 11 Cases, which, as of the date of this Liquidation Analysis, have not passed.

       **12.**      **Distribution of Net Proceeds**.  Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and U.S. Trustee Fees that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance of those proceeds will be made available to pay pre-bankruptcy priority, secured, and general unsecured claims.  Under the absolute priority rule pursuant to section 1129(b) of the Bankruptcy Code, no junior creditor of any Debtor would receive any distribution until all senior creditors of the Debtor are paid in full, and no equity holder of any Debtor would receive any distribution until all creditors of the Debtor are paid in full.  The assumed distributions to creditors reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

## SPECIFIC NOTES AND ASSUMPTIONS

### Debtor Freedom VCM Holdings, LLC

**A.    Current Receivables**.  Debtor Freedom VCM Holdings, LLC ("Freedom TopCo") holds certain *de minimis* intercompany receivables.  The Liquidation Analysis does not assume any recovery value with respect to the intercompany receivables.

**B.    Non-current Assets.**  These assets are composed of Freedom TopCo's direct equity interests in Debtor Freedom VCM Interco Holdings, Inc. and indirect equity interests in Franchise Group, Inc. The book value of such equity interests is undetermined as of the date of this Liquidation Analysis and the Liquidation Analysis does not ascribe any recovery value with respect to the equity interests.  These assets are also composed of a receivable arising from a promissory note issued by Mr. Kahn to Freedom TopCo (the "Promissory Note Receivable").  Freedom TopCo's ability to recover any portion of the Promissory Note Receivable is uncertain as of the date of this Liquidation Analysis and no recovery value has been assigned to the Promissory Note Receivable.

**C.    Existing TopCo Equity Interests**.  The book value of the Existing TopCo Equity Interests is undetermined as of the date of this Liquidation Analysis.  The Liquidation Analysis assumes that an allocation described in Section 3.3(c) of the Plan does receivable not occur prior to the Liquidation Date.  The Liquidation Analysis also assumes that no Cash at Freedom TopCo is used to pay any Freedom Allocated Fees and Expenses (as defined in the Final DIP Order), pursuant to ¶33 of the Final DIP Order, prior to the Liquidation Date.

**D.    Other Claims Against Freedom TopCo**.  The Liquidation Analysis assumes that no Claims or Interests, other than DIP Claims and Existing TopCo Equity Interests, exist against, or in, Freedom TopCo.  This assumption is based on the Debtors' books and records as of the Petition Date.  Additional Claims or Interests may be asserted against Freedom TopCo prior to the applicable deadlines for filing proofs of Claim or Interests in these Chapter 11 Cases, which, as of the date of this Liquidation Analysis, have not passed.

***Debtors Freedom VCM Interco Holdings, Inc., Freedom VCM Receivables, Inc., and Freedom Receivables II, LLC (collectively, the "<u>Receivables Debtors</u>")***

     **A.**     **Current Receivables**.  Debtor Freedom Receivables II, LLC holds certain accounts receivable of W.S. Badcock Corporation (the "<u>Tranche E Receivables</u>").  The Liquidation Analysis assumes a lower recovery value of 40% and a higher recovery value of 85% with respect to the Tranche E Receivables.  The value of the Tranche E Receivables is based on a review of the Receivables Debtors' unaudited books and records as of the Petition Date.

     **B.**     **Non-current Assets**.  These assets are composed of Freedom VCM Interco Holdings, Inc.'s direct equity interests in Debtor Freedom VCM Interco, Inc. and indirect equity interests in Franchise Group, Inc. The book value of such equity interests is undetermined as of the date of this Liquidation Analysis and the Liquidation Analysis does not ascribe any recovery value with respect to the equity interests.

     **C.**     **HoldCo Receivables General Unsecured Claims**.  These claims represent the residual claims in the Tranche E Receivables that Freedom VCM Interco Holdings, Inc. is contractually obligated to deliver to Conn's, Inc.

     **D.**     **Other Claims Against the Receivables Debtors**.  The Liquidation Analysis assumes that no Claims or Interests, other than DIP Claims and claims related to the Tranche E Receivables, exist against the Receivables Debtors.  This assumption is based on the Debtors' books and records as of the Petition Date.  Additional Claims or Interests may be asserted against the Receivables Debtors prior to the applicable deadlines for filing proofs of Claim or Interests in these Chapter 11 Cases, which, as of the date of this Liquidation Analysis, have not passed.

***Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. (together, the "<u>HoldCo Debtors</u>")***

**A.    Non-current Assets**.  These assets are composed of Debtors Freedom VCM Interco, Inc.'s indirect and Freedom VCM, Inc.'s direct equity interests in Franchise Group, Inc.  The book value of such equity interests is undetermined as of the date of this Liquidation Analysis and the Liquidation Analysis does not ascribe any recovery value with respect to the equity interests.

**B.    Liquidation Costs**.  The Liquidation Analysis assumes no estimated recovery from the liquidation of the HoldCo Debtors' assets.  In the event that any proceeds were realized from the liquidation of the HoldCo Debtors' assets, such proceeds would first be applied to satisfy any liquidation costs.

**C.    DIP Claims Against HoldCo Debtors**.  Under the Final DIP Order, the HoldCo Debtors are entitled to borrow DIP Loans, as needed, to fund the administrative expenses (if any) incurred by HoldCo Debtors during these Chapter 11 Cases.  Moreover, under the Final DIP Order, the HoldCo Debtors are obligors under the DIP Facility solely to the extent of the DIP Loans that the HoldCo Debtors borrow to fund such administrative expenses (if any).  Accordingly, DIP Claims could exist against the HoldCo Debtors, but the amount of any such DIP Claims is undetermined as of the date of this Liquidation Analysis.

**D.    Prepetition HoldCo Loan Claims**.  These claims represent the projected term loan balance as of the Petition Date under the HoldCo Credit Agreement, including accrued and unpaid interest and fees.  The Liquidation Analysis provides a 0% recovery on Prepetition HoldCo Loan Claims on both a lower and higher recovery basis.

**E.    Other Claims Against the HoldCo Debtors.**  The Liquidation Analysis assumes that no Claims or Interests, other than contingent DIP Claims and Prepetition HoldCo Loan Claims, exist against the HoldCo Debtors.  This assumption is based on the Debtors' books and records as of the Petition Date.  Additional Claims or Interests may be asserted against the HoldCo Debtors prior to the applicable deadlines for filing Claims or Interest in these Chapter 11 Cases, which, as of the date of this Liquidation Analysis, have not passed.

*Debtor Franchise Group, Inc. and Its Direct and Indirect Subsidiaries (collectively, the "FRG Debtors")*

      **A.**     **GOB Sale Process**.  The Liquidation Analysis assumes that an orderly liquidation of inventory and store level assets through a going out of business sale process (the "GOB Process") would generate greater recoveries than an immediate distressed sale by the Trustee.  The Liquidation Analysis also assumes that a nationally known retail liquidator (the "Liquidator) would commence the GOB Process on or about the Liquidation Date at all of the FRG Debtors' locations.  The Liquidation Analysis also assumes that the GOB Process would be completed in approximately 13 weeks, the FRG Debtors' remaining real property leases would be rejected, and the FRG Debtors' chapter 11 Cases would ultimately convert to a Chapter 7 liquidation.  Recovery assumptions for the GOB Process are based on historical inventory appraisals, adjusted for certain factors.  The Liquidation Analysis also assumes that the FRG Debtors' operations and estates would be fully wound down within 90 days of the conclusion of the GOB Process.

      The Liquidation Analysis also assumes that the liquidation and wind down of the American Freight Debtors through the Store-Closing and Liquidation Sales would be completed prior to the Liquation Date.

      **B.**     **Current Assets.**

- **Current Receivables**.  These assets are primarily composed of credit card and other trade receivables, rebate receivables, and franchise receivables.  These assets may also include certain tax receivables, but the value of any such receivables is undetermined as of the date of the Liquidation Analysis.  Recovery estimates for accounts receivable are brand-specific, made at the sub-classification level, and take certain factors into consideration, such as counterparty, aging, concentration, and potential offsets.  Franchise receivables were assigned no recovery value under the assumption that franchise agreement would be rejected and such amounts would either be set-off against creditors' claim amounts, or would be challenging to collect in a liquidation scenario.  The analysis resulted in a blended lower recovery estimate of approximately 49% and a higher recovery estimate of approximately 68%.

- **Inventory**.  Eligible on-hand inventory as of the Liquidation Date is assumed to result in a lower recovery estimate of 64% and a higher recovery estimate of 80%.  This level of recovery has been informed by the net orderly liquidation value range contained within an appraisal the FRG Debtors received, adjusted for certain factors.  Inventory appraisals and recoveries are based on brand-specific assumptions.  The estimated recovery also assumes that "equity bids" are received from liquidators and that the recoveries are net of store related liquidation expenses, including items such as payroll and rent.

- **Prepaid Expenses & Other Current Assets**.  These assets consist of prepaid items that may be irrecoverable in the event of a liquidation, including prepaid IT, advertising, rent, insurance, taxes and other expenses that are amortized over the applicable license, rental, or other period.  These items have been examined

individually and on a brand-specific basis.  On a blended basis, an 17% to 34% recovery has been estimated for these prepaid amounts, on a lower and a higher recovery basis, respectively.

C.    **Non-current Assets**.

- **Property, Plant and Equipment (PP&E)**.  The net book value of PP&E consists of leasehold improvements, furniture, fixtures, equipment, software, and vehicles.  Recovery value is based on a review of the fixed asset registers for each of the Debtors' brand and informed by previous liquidations of similar properties.  No recovery has been assigned to construction-in-progress and financing leases of right-of-use assets, as these assets are not owned by the FRG Debtors.  Minimal recovery has been assigned to software asset, as these are either capitalized software investments or bespoke assets with limited recovery value.  In total, the implied recovery of PP&E relative to net book value is 2% on a lower recovery estimate and 5% on a higher recovery estimate.

- **Non-current Notes & Other Receivables**.  No recovery value has been assigned to the value of the FRG Debtors' notes and other non-current receivables, which primarily consist of franchise receivables.  All franchise agreements are assumed to be rejected as part of the liquidation process.

- **Other Intangible Assets**.  These assets include the FRG Debtors' other intangible assets, including but not limited to trade names (along with their associated logos and URLs).  The value of trade names was estimated by examining actual trade name transactions that resulted from the liquidations of other retailers.  The value of the trade names was estimated to be $0.9 million to $14.3 million on a lower and higher recovery basis, respectively.  The FRG Debtors' Liquidation Analysis assumes that all franchise agreements and customer contracts are rejected as of the Liquidation Date and no value is recoverable.  On a blended basis, the recovery is approximately 0.1% to 1.5% of net book value on a lower and higher recovery basis, respectively.

- **Right-of-Use and Other Assets**.  The net book value of Right-of-Use and Other Assets primarily consists of operating lease right of use assets, as well as deposits for rent and utilities.  Deposits were similarly deemed to have partial value under the assumption that those amounts would be set-off against creditors' claim amounts.  Items have been examined individually and on a brand-specific basis.  The recovery value of these assets is estimated to be between $0.5 million (4%) to $1.5 million (11%) on a lower and higher recovery basis, respectively.

D.    **Non-Operating Assets**.  The Liquidation Analysis assumes that all non-operating assets would be disposed of through sale, liquidation, termination and/or abandonment, as appropriate.

      **E.**      **Estimate of Net Proceeds**. The FRG Debtors would liquidate the majority of other assets during the liquidation period. The Liquidation Analysis relies on near-term cash forecasts, adjusted for the GOB Process, to estimate the value of Cash & Cash Equivalents, credit card receivables, trade receivables, inventory, and postpetition liabilities, among other assets and liabilities.

      There is no assurance that an orderly liquidation could be completed during the liquidation period or that the assumed net orderly liquidation value would be realized.

      **F.**      **Liquidation Costs**. The Liquidation Analysis assumes that the Liquidator would acquire the FRG Debtors' assets pursuant to an "equity bid" and, therefore, would be responsible for all store operating expenses during the liquidation period. The FRG Debtors would be responsible for corporate-related wind down costs, professional fee expenses, and Trustee fees. The liquidation costs estimate assumes a conversion to a Chapter 7 proceeding immediately after the completion of the GOB Process.

      **G.**      **Capital Leases**. The Liquidation Analysis assumes that assets subject to capital leases (generally leased furniture and computer hardware) will be returned to the lessor. The Liquidation Analysis has not estimated any applicable deficiency claims associated with such leases.

      **H.**      **Prepetition ABL Claims**. These claims represent the aggregate principal amount outstanding under the ABL Credit Agreement, plus any accrued and unpaid interest and fees, and outstanding letters of credit as of the Liquidation Date. The Liquidation Analysis provides a 100% recovery on these claims on both a lower and higher recovery estimate.

      **I.**      **Prepetition First Lien Loan Claims**. These claims represent the projected term loan balance, including accrued interest and fees, as of the Liquidation Date under the First Lien Credit Agreement. The Liquidation Analysis provides a 0% recovery on these claims on both a lower and higher recovery basis.

      **J.**      **Prepetition Second Lien Loan Claims**. These claims represent the projected term loan balance as of the Liquidation Date under the Second Lien Credit Agreement, including accrued and unpaid interest and fees. The Liquidation Analysis provides a 0% recovery on these claims on both a lower and higher recovery basis.

*Debtors WNW Franchising, LLC, WNW Stores, LLC, and Franchise Group Intermediate L, LLC*

      **A.**      **Excluded Entities**.  WNW Franchising, LLC ("WNW Franchising") and WNW Stores, LLC ("WNW Stores" and together with WNW Franchising, the "WNW Entities") are neither Borrowers nor Guarantors under the First Lien Credit Agreement, the Second Lien Credit Agreement, nor the ABL Credit Agreement.  As a result, the recoveries from the hypothetical liquidation of the WNW Entities are presented separate from the FRG Debtors.[1]  All balances related to the FRG Debtors exclude the WNW Entities' balances.

      **B.**      **WNW Franchising Current Assets**.  The Liquidation Analysis assumes that WNW Franchising would be subject to a liquidation strategy consistent with the other FRG Debtors and, accordingly, the Liquidation Analysis uses an asset recovery methodology that is substantially consistent with the other FRG Debtors.

- **Current Receivables**.  These assets are primarily composed of intercompany receivables with other FRG Debtor entities.  No recovery is assumed on the intercompany receivables.  The assumed recovery on non-intercompany receivables is $0.003 million and $0.021 million, representing a blended recovery of 0.2% and 1.3%, on a lower and higher recovery basis respectively.

- **Prepaid Expenses & Other Current Assets**.  These assets consist of prepaid items that may be irrecoverable in the event of a liquidation, including prepaid IT, advertising, rent, insurance, taxes and other expenses that are amortized over the applicable license, rental, or other period.  On a blended basis, a 13% to 25% recovery has been estimated for these prepaid amounts, on a lower and a higher recovery basis, respectively.

- **Property, Plant and Equipment (PP&E)**.  The net book value of PP&E consists of a 2022 Chevrolet Equinox 5552. The implied recovery of PP&E relative to net book value is 16% on a lower recovery estimate and 19% on a higher recovery estimate.

- **Other Intangible Assets**.  The net book value includes the value of trade names and franchise agreements.  The value of the trade names was estimated by examining actual trade name transactions that resulted from the liquidations of other retailers.  The value of the trade names was estimated to be $0 on both a lower and higher recovery basis.  The Liquidation Analysis assumes that all franchise agreements and customer contracts are rejected as of the Liquidation Date and no value is recoverable.

---

[1]    Franchise Group Intermediate L, LLC is also an excluded entity and therefore neither Borrower nor Guarantor under the FRG Debtors' First Lien Credit Agreement, Second Lien Credit Agreement, or ABL Credit Agreement. Based on a review of the books and records of Franchise Group Intermediate L, LLC, there are no assets or liabilities at this entity and therefore no balances related to this entity are included within the Liquidation Analysis.

**C.    WNW Stores Current Assets**.  The Liquidation Analysis assumes that WNW Stores would be subject to a liquidation strategy consistent with the other FRG Debtors and, accordingly, the Liquidation Analysis uses an asset recovery methodology that is substantially consistent with the other FRG Debtors.

- **Inventory**.  Eligible inventory as of the Liquidation Date, which is comprised of in-transit and on-hand inventory, is assumed to result in a lower recovery estimate of 60% and a higher recovery estimate of 96%.  This level of recovery has been informed by the net orderly liquidation value range contained within an appraisal of the FRG Debtors received related to certain other FRG Debtors, adjusted for certain factors.  The estimated recovery assumes that "equity bids" are received from liquidators and that the recoveries are net of store related liquidation expenses, including items such as payroll and rent.

- **Prepaid Expenses & Other Current Assets**.  Prepaid Expenses & Other Current Assets consist of prepaid items that may be irrecoverable in the event of a liquidation, including prepaid IT, advertising, rent, insurance, taxes and other expenses that are amortized over the applicable license, rental, or other period.  These items have been examined individually and on a brand-specific basis.  On a blended basis, a 20% to 40% recovery has been estimated for these prepaid amounts, on a lower and a higher recovery basis, respectively.

- **Property, Plant and Equipment (PP&E)**.  The net book value of PP&E consists primarily of leasehold and other improvements.  The implied recovery of PP&E relative to net book value is 2% on a lower recovery estimate and 7% on a higher recovery estimate.

**D.    WNW Franchising/WNW Stores Liquidation Costs**.  WNW Franchising wind down costs, including professional fees, are estimated at $0.0 million to $0.1 million, capped at asset recoveries, on a lower and higher recovery basis, respectively. WNW Stores wind down costs, including professional fees, are estimated at $0.6 million, capped at asset recoveries on a lower recovery basis.  Chapter 7 Trustee fees are estimated at 3.0% of gross distributable proceeds, recognizing that when the Chapter 7 Trustee would be appointed following the 3-month orderly liquidation, the estates' assets would largely consist of cash.

**E.    Claims Against WNW Franchising/WNW Stores**.  The total amount of Claims, other than DIP Claims, against the WNW Entities is undetermined as of the date of this Liquidation Analysis.  The Liquidation Analysis provides a 0% recovery on any such claims on both a lower and higher recovery basis.

*[Liquidation Analysis Follows]*

13

**Freedom VCM Holdings, LLC**
**Hypothetical Liquidation Analysis**

*($ million)*

| | Estimated Book Value as of 3/1/25 | Estimated Recovery Value | | Estimated Recovery % | | Note |
|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | |
| **Current Assets** | | | | | | |
| Cash & Cash Equivalents | 13.2 | 13.2 | 13.2 | 100.0% | 100.0% | [General Notes] |
| Current Receivables, net | 0.0 | - | - | 0.0% | 0.0% | [A] |
| **Total Current Assets** | **13.2** | **13.2** | **13.2** | **100.0%** | **100.0%** | |
| | | | | | | |
| **Non-Current Assets** | | | | | | [B] |
| Other Assets, net - Equity Interests in Subsidiaries | Undetermined | - | - | 0.0% | 0.0% | |
| Other Assets, net - Promissory Note Receivable | 15.5 | - | - | 0.0% | 0.0% | |
| **Total Non-Current Assets** | **15.5** | **0.0** | **0.0** | **0.0%** | **0.0%** | |
| | | | | | | |
| **Total Assets & Recovery Estimate** | **28.8** | **13.2** | **13.2** | **46.0%** | **46.0%** | |

| Liquidation Costs | | Estimated Liquidation Costs | | |
|---|---|---|---|---|
| | | Lower | Higher | |
| Estate Wind-down Costs | | (0.4) | (0.3) | |
| Professional Fees | | (0.3) | (0.3) | |
| Chapter 7 Trustee Fees | | (0.4) | (0.4) | |
| **Total Liquidation Adjustments** | | **(1.1)** | **(1.0)** | [General Notes] |
| | | | | |
| **Net Proceeds Available for Distribution to Creditors** | | **12.1** | **12.3** | |

| Allocation of Net Proceeds Available for Distribution to Creditors | Estimated Claim Amount | Estimated Recovery Value | | Estimated Recovery % | | |
|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | |
| **DIP Claims** | 788.5 | | | | | |
| DIP Claims Recovery Value | | 12.1 | 12.3 | 1.5% | 1.6% | |
| | | | | | | |
| **Priority Non-Tax Claims (Class 1)** | 0.0 | | | | | [D] |
| Priority Non-Tax Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Other Secured Claims (Class 2)** | 0.0 | | | | | [D] |
| Other Secured Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **TopCo General Unsecured Claims (Class 8-C)** | 0.0 | | | | | [D] |
| HoldCo General Unsecured Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Subordinated Claims (Class 10)** | 0.0 | | | | | [D] |
| Subordinated Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Existing TopCo Equity Interests (Class 11)** | Undetermined | | | | | [C] |
| Existing TopCo Equity Interests Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |

**Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, and Freedom VCM Receivables, Inc. Hypothetical Liquidation Analysis**

($ million)

| | Estimated Book Value as of 3/1/25 | Estimated Recovery Value Lower | Higher | Estimated Recovery % Lower | Higher | Note |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash & Cash Equivalents | 0.0 | 0.0 | 0.0 | 100.0% | 100.0% | [General Notes] |
| Current Receivables, net | 37.9 | 15.1 | 32.2 | 40.0% | 85.0% | [A] |
| **Total Current Assets** | 37.9 | 15.2 | 32.2 | 40.0% | 85.0% | |
| **Non-Current Assets** | | | | | | |
| Other Assets, net - Equity Interests in Subsidiaries | Undetermined | - | - | 0.0% | 0.0% | [B] |
| **Total Non-Current Assets** | 0.0 | 0.0 | 0.0 | 0.0% | 0.0% | |
| **Total Assets & Recovery Estimate** | 37.9 | 15.2 | 32.2 | 40.0% | 85.0% | |

| Liquidation Costs | Estimated Liquidation Costs Lower | Higher |
|---|---|---|
| Estate Wind-down Costs | (0.6) | (0.5) |
| Professional Fees | (0.3) | (0.3) |
| Chapter 7 Trustee Fees | (0.5) | (1.0) |
| **Total Liquidation Adjustments** | (1.4) | (1.7) | [General Notes] |
| **Net Proceeds Available for Distribution to Creditors** | 13.8 | 30.5 |

| Allocation of Net Proceeds Available for Distribution to Creditors | Estimated Claim Amount | Estimated Recovery Value Lower | Higher | Estimated Recovery % Lower | Higher | Note |
|---|---|---|---|---|---|---|
| **DIP Claims** | 788.5 | | | | | |
| DIP Claims Recovery | | 13.8 | 30.5 | 1.7% | 3.9% | [General Notes] |
| **Priority Non-Tax Claims (Class 1)** | 0.0 | | | | | |
| Priority Non-Tax Recovery | | 0.0 | 0.0 | 0.0 | 0.0 | [D] |
| **Other Secured Claims (Class 2)** | 0.0 | | | | | |
| Other Secured Recovery | | 0.0 | 0.0 | 0.0 | 0.0 | [D] |
| **HoldCo Receivables General Unsecured Claims (Class 8-B)** | 37.9 | | | | | |
| General Unsecured Claims Recovery | | 0.0 | 0.0 | 0.0 | 0.0 | [C] |
| **Subordinated Claims (Class 10)** | 0.0 | | | | | |
| Subordinated Claims Recovery | | 0.0 | 0.0 | 0.0 | 0.0 | [D] |

**Freedom VCM Interco, Inc. & Freedom VCM, Inc.**
**Hypothetical Liquidation Analysis**

($ million)

| | Estimated Book Value as of 3/1/25 | Estimated Recovery Value | | Estimated Recovery % | | Note |
|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | |
| **Non-Current Assets** | | | | | | |
| Other Assets, net - Equity Interests in Subsidiaries | Undetermined | - | - | 0.0% | 0.0% | **[A]** |
| **Total Non-Current Assets** | **0.0** | **0.0** | **0.0** | **0.0%** | **0.0%** | |
| | | | | | | |
| **Total Assets & Recovery Estimate** | **0.0** | **0.0** | **0.0** | **0.0%** | **0.0%** | |

| **Liquidation Costs** | Estimated Liquidation Costs | | | | |
|---|---|---|---|---|---|
| | Lower | Higher | | | |
| Estate Wind-down Costs | - | - | | | |
| Professional Fees | - | - | | | |
| Chapter 7 Trustee Fees | - | - | | | |
| **Total Liquidation Adjustments** | **-** | **-** | | | **[B]** |
| | | | | | |
| **Net Proceeds Available for Distribution to Creditors** | **0.0** | **0.0** | | | |

| **Allocation of Net Proceeds Available for Distribution to Creditors** | Estimated Claim Amount | Estimated Recovery Value | | Estimated Recovery % | | Note |
|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | |
| **DIP Claims** | **Undetermined** | | | | | **[C]** |
| DIP Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Prepetition HoldCo Loan Claims (Class 7)** | **560.7** | | | | | **[D]** |
| Prepetition HoldCo Loan Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Priority Non-Tax Claims (Class 1)** | **0.0** | | | | | **[E]** |
| Priority Non-Tax Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Other Secured Claims (Class 2)** | **0.0** | | | | | **[E]** |
| Other Secured Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Freedom HoldCo General Unsecured Claims (Class 8-A)** | **0.0** | | | | | **[E]** |
| HoldCo General Unsecured Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Subordinated Claims (Class 10)** | **0.0** | | | | | **[E]** |
| Subordinated Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |

Franchise Group, Inc. and its direct and indirect subsidiaries
Consolidated Hypothetical Liquidation Analysis

($ million)

| | Estimated Book Value as of 3/1/26 | Estimated Recovery Value | | Estimated Recovery % | | Note |
|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | |
| **Current Assets** | | | | | | |
| Cash & Cash Equivalents | 251.9 | 239.3 | 251.9 | 95.0% | 100.0% | [General Notes] |
| Current Receivables, net | 69.9 | 34.0 | 47.3 | 48.7% | 67.7% | [B] |
| Inventory, net | 358.8 | 230.7 | 287.1 | 64.3% | 80.0% | [B] |
| Prepaid Expenses & Other Current Assets | 27.3 | 4.7 | 9.4 | 17.2% | 34.4% | [B] |
| **Total Current Assets** | 707.9 | 508.8 | 595.7 | 71.9% | 84.2% | |
| | | | | | | |
| **Non-Current Assets** | | | | | | |
| Property, Plant & Equipment, net | 144.6 | 2.7 | 7.1 | 1.9% | 4.9% | [C] |
| Notes & Other Receivables, Non-Current | - | - | - | 0.0% | 0.0% | [C] |
| Goodwill | 848.2 | - | - | 0.0% | 0.0% | [C] |
| Other Intangible Assets, net | 978.5 | 0.9 | 14.3 | 0.1% | 1.5% | [C] |
| Right-of-Use Assets | 480.6 | - | - | 0.0% | 0.0% | [C] |
| Other Assets, net | 13.1 | 0.5 | 1.5 | 3.8% | 11.3% | [C] |
| **Total Non-Current Assets** | 2,464.9 | 4.1 | 22.9 | 0.2% | 0.9% | |
| | | | | | | |
| **Total Assets & Recovery Estimate** | 3,172.8 | 512.9 | 618.6 | 16.2% | 19.5% | |

| **Liquidation Costs** | Estimated Liquidation Costs | | [F] |
|---|---|---|---|
| | Lower | Higher | |
| Estate Wind-down Costs | (27.7) | (22.2) | |
| Professional Fees | (33.0) | (26.4) | |
| Chapter 7 Trustee Fees | (15.4) | (18.6) | |
| **Total Liquidation Adjustments** | (76.1) | (67.1) | [General Notes] |
| | | | |
| **Net Proceeds Available for Distribution to Creditors** | 436.9 | 551.5 | [E] |

| Allocation of Net Proceeds Available for Distribution to Creditors | Estimated Claim Amount | Estimated Recovery Value | | Estimated Recovery % | | |
|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | |
| **Proceeds From ABL Priority Collateral** | | | | | | |
| Cash & Cash Equivalents | | 120.0 | 123.0 | | | |
| Current Receivables, Net | | 33.8 | 46.6 | | | |
| Inventory, net | | 230.7 | 287.1 | | | |
| Liquidation Cost | | (70.3) | (60.5) | | | |
| **Total Net Proceeds From ABL Collateral** | | 314.2 | 396.2 | | | |
| | | | | | | |
| **Prepetition ABL Loan Claims (Class 3)** | 262.9 | | | | | [H]; [General Notes] |
| Prepetition ABL Loan Claims Recovery | | 262.9 | 262.9 | 100.0% | 100.0% | |
| | | | | | | |
| **Surplus Proceeds From ABL Priority Collateral Available for Distribution to Other Creditors** | | 51.4 | 133.3 | | | |
| | | | | | | |
| **Proceeds From DIP Collateral That is Not ABL-Priority Collateral** | | | | | | |
| Cash & Cash Equivalents | | 119.4 | 129.0 | | | |
| Current Receivables, Net | | 0.2 | 0.7 | | | |
| Prepaid Expenses & Other Current Assets | | 4.7 | 9.4 | | | |
| Property, Plant & Equipment, net | | 2.7 | 7.1 | | | |
| Other Intangible Assets, net | | 0.9 | 14.3 | | | |
| Other Assets, net | | 0.5 | 1.5 | | | |
| Liquidation Cost | | (5.8) | (6.6) | | | |
| **Total Net Proceeds Available for Distribution to Other Creditors** | | 174.0 | 288.6 | | | |
| | | | | | | |
| **DIP Claims** | 788.5 | | | | | [General Notes] |
| DIP Claims Recovery | | 174.0 | 288.6 | 22.1% | 36.6% | |
| | | | | | | |
| **Prepetition First Lien Loan Claims (Class 4)** | 631.8 | | | | | [I]; [General Notes] |
| Prepetition First Lien Loan Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Prepetition Second Lien Loan Claims (Class 5)** | 137.6 | | | | | [J] |
| Prepetition Second Lien Loan Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Priority Non-tax Claims (Class 1)** | Undetermined | | | | | [General Notes] |
| Priority Non-tax Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Other Secured Claims (Class 2)** | Undetermined | | | | | [General Notes] |
| Other Secured Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **General Unsecured Claims (Classes 6-A, 6-B, 6-C, 6-D and 6-E)** | 61.4 | | | | | [General Notes] |
| General Unsecured Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| | | | | | | |
| **Subordinated Claims (Class 10)** | 0.0 | | | | | [General Notes] |
| Subordinated Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |

**WNW Franchising, LLC, WNW Stores, LLC, and Franchise Group Intermediate L, LLC**
**Consolidated Hypothetical Liquidation Analysis**

*($ million)*

| | Estimated Book Value as of 3/1/25 | Estimated Recovery Value Lower | Higher | Estimated Recovery % Lower | Higher | Note |
|---|---|---|---|---|---|---|
| **WNW Franchising Assets** | | | | | | |
| Cash & Cash Equivalents | 0.0 | 0.0 | 0.0 | 100.0% | 100.0% | [B] |
| Current Receivables, net | 1.5 | 0.0 | 0.0 | 0.2% | 1.3% | [B] |
| Prepaid Expenses & Other Current Assets | 0.0 | 0.0 | 0.0 | 12.6% | 25.1% | [B] |
| Property, Plant & Equipment, net | 0.0 | 0.0 | 0.0 | 15.5% | 18.5% | [B] |
| Other Intangible Assets, net | 0.0 | - | - | 0.0% | 0.0% | [B] |
| Liquidation Costs | | (0.0) | (0.1) | | | [D] |
| **Net WNW Franchising Assets Available for Distribution to Creditors** | **1.6** | **-** | **-** | | | |

| Allocation of Net Proceeds Available for Distribution to Creditors | Estimated Claim Amount | Estimated Recovery Value Lower | Higher | Estimated Recovery % Lower | Higher | |
|---|---|---|---|---|---|---|
| **DIP Claims** | **788.5** | | | | | [General Notes] |
| DIP Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |
| **WNW Franchising All Other Claims** | **Undetermined** | | | | | [E] |
| WNW Franchising All Other Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |

| | Estimated Book Value as of 3/1/25 | Estimated Recovery Value Lower | Higher | Estimated Recovery % Lower | Higher | Note |
|---|---|---|---|---|---|---|
| **WNW Stores Assets** | | | | | | |
| Cash & Cash Equivalents | 0.0 | 0.0 | 0.0 | 100.0% | 100.0% | [C] |
| Inventory, net | 0.9 | 0.5 | 0.8 | 60.0% | 96.1% | [C] |
| Prepaid Expenses & Other Current Assets | 0.2 | 0.0 | 0.1 | 19.8% | 39.6% | [C] |
| Property, Plant & Equipment, net | 2.3 | 0.1 | 0.2 | 2.2% | 6.5% | [C] |
| Liquidation Costs | | (0.6) | (0.6) | | | [D] |
| **Net WNW Stores Assets Available for Distribution to Creditors** | **3.4** | **-** | **0.4** | | | |

| Allocation of Net Proceeds Available for Distribution to Creditors | Estimated Claim Amount | Estimated Recovery Value Lower | Higher | Estimated Recovery % Lower | Higher | |
|---|---|---|---|---|---|---|
| **DIP Claims** | **788.5** | | | | | [General Notes] |
| DIP Claims Recovery | | 0.0 | 0.4 | 0.0% | 0.1% | |
| **WNW Stores All Other Claims** | **Undetermined** | | | | | [E] |
| WNW Stores All Other Claims Recovery | | 0.0 | 0.0 | 0.0% | 0.0% | |

**<u>EXHIBIT C</u>**

**Financial Projections**

[Filed at Docket No. 592]

## EXHIBIT D

**Restructuring Support Agreement**

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE PROPOSED RESTRUCTURING TRANSACTIONS OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH VOLUNTARY CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE ON THE TERMS AND SUBJECT TO THE CONDITIONS SET FORTH HEREIN.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS (AS DEFINED HEREIN) DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached hereto in accordance with <u>Section 14.02</u>, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Restructuring Support Agreement**" or this "**Agreement**") is made and entered into as of November 1, 2024 (the "**Execution Date**"), by and among the following parties:[1]

    (i)    Franchise Group, Inc. ("**FRG**"), a Delaware corporation, and each of its subsidiaries and Affiliates, including any parent entities, in each case, listed on **Exhibit A** to this

---

[1] Capitalized terms used but not defined in the preamble and Recitals to this Agreement have the meanings ascribed to them in <u>Section 1.01</u>.

Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Ad Hoc Group (the Entities in this clause (i), collectively, the "**Company Parties**"); and

(ii)     the undersigned beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, First Lien Claims (the "**Consenting First Lien Lenders**") that have executed and delivered counterpart signature pages to this Agreement or a Joinder to counsel to the Company Parties and counsel to the Ad Hoc Group.

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting First Lien Lenders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the restructuring term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**", and together with the DIP Term Sheet, and including all exhibits, annexes, and schedules thereto, collectively, the "**Term Sheets**" and, such transactions as described in this Agreement (including the Term Sheets) and the Definitive Documents, in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement, and including all exhibits, annexes, and schedules thereto, collectively, the "**Restructuring Transactions**");

**WHEREAS**, the Parties intend to implement the Restructuring Transactions pursuant to this Agreement and the other Definitive Documents by (i) commencing Store-Closing and Liquidation Sales at American Freight and (ii) either (a) effectuating a sale of all or substantially all of the remaining assets of the Debtors, which may be through one or more sales of the assets or Equity Interests of the Debtors, as further set forth herein, pursuant to sections 363 or 1129 of the Bankruptcy Code and the Bidding Procedures (each, a "**Sale Transaction**") or (b) consummating, pursuant to the Plan, the equitization of all allowed First Lien Claims into 100% of Reorganized Common Equity (subject to dilution from (1) the MIP (as defined in the Restructuring Term Sheet), (2) the DIP Premium Conversion (as defined in the Restructuring Term Sheet), if applicable, (3) the DIP Equitization (as defined in the Restructuring Term Sheet), and (4) the New Warrants, if applicable), as further set forth in the Restructuring Term Sheet (a "**Plan Transaction**"), in each case, by having the Debtors commence voluntary cases under chapter 11 of the Bankruptcy Code (the cases commenced, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), on the terms and conditions set forth in this Agreement (including the Term Sheets); provided that, subject to Section 8 hereof, in the event that a Sufficient Bid has not been received by the Bid Deadline, the Sale Process shall be terminated and the Plan Transaction shall be implemented; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Term Sheets.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

2

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>ABL Claims</u>**" means any Claim on account of ABL Loans arising under or pursuant to the ABL Credit Agreement or the other ABL Loan Documents.

"**<u>ABL Credit Agreement</u>**" means that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as a borrower, and the other borrowers and guarantors party thereto, the ABL Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**<u>ABL Credit Agreement Agent</u>**" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent for the lenders under the ABL Credit Agreement.

"**<u>ABL Loan Documents</u>**" means the ABL Credit Agreement and any Financing Agreements (as defined in the ABL Credit Agreement).

"**<u>ABL Loans</u>**" means the loans arising under or pursuant to the ABL Credit Agreement.

"**<u>Ad Hoc Group</u>**" means that certain ad hoc group of Consenting First Lien Lenders, represented by, among others, Paul Hastings and Lazard, as may be reconstituted from time to time.

"**<u>Ad Hoc Group Advisors</u>**" means (a) Paul Hastings LLP, as counsel to the Ad Hoc Group ("**<u>Paul Hastings</u>**"), (b) Lazard Frères & Co., as financial advisor to the Ad Hoc Group ("**<u>Lazard</u>**"), (c) Landis Rath & Cobb LLP, as Delaware counsel to the Ad Hoc Group, and (d) such other professionals that may be retained by or on behalf of the Ad Hoc Group (including the retention of any such professional made by Paul Hastings), solely in the case referred to in this clause (d), with the consent of the Company Parties (each individually an "**<u>Ad Hoc Group Advisor</u>**").

"**<u>Affiliate</u>**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.  For the avoidance of doubt, none of (a) Conn's, Inc., (b) B. Riley Financial Inc. and (c) each of their respective Affiliates (excluding Freedom VCM Holdings, LLC and its subsidiaries) shall be "Affiliates" of the Company Parties for purposes of this Agreement.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached hereto in accordance with <u>Section 14.02</u> (including the Term Sheets, which are expressly incorporated herein and made a part of this Agreement).

"**<u>Agreement Effective Date</u>**" has the meaning set forth in <u>Section 2.01</u>.

"**Agreement Effective Period**" means, with respect to a Party, the period from (a) the later of (i) the Agreement Effective Date and (ii) the date such Party becomes a Party to this Agreement, to (b) the Termination Date applicable to that Party.

"**Alternative Restructuring**" means (a) any sale, disposition, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (debt or equity, including any debtor-in-possession financing or exit financing), use of cash collateral, liquidation or winding up, exchange offer, tender offer, asset sale, share issuance, consent solicitation, recapitalization, plan of reorganization, share exchange, business combination, joint venture, partnership, or similar transaction involving any one or more Company Parties or any controlled Affiliates of the Company Parties or the debt, equity, or other interests in any one or more Company Parties or any controlled Affiliates of the Company Parties, other than as contemplated by this Agreement, including the Term Sheets, and other than actions taken in the ordinary course of business, or (b) any other transaction involving one or more Company Parties or any controlled Affiliates of the Company Parties that is an alternative to and/or inconsistent with the Restructuring Transactions.  For the avoidance of doubt, nothing in this Agreement shall prohibit the Company Parties from soliciting either (i) debtor-in-possession financing proposals or (ii) proposals to use cash collateral, in each case, prior to the Petition Date; provided that the Company Parties cannot enter into any such debtor-in-possession financing or agreement to use cash collateral without either (x) the consent of the Required Consenting First Lien Lenders or (y) an exercise of their fiduciary out and termination of this Agreement, in each case in accordance with Section 12.02(c), to the extent applicable.

"**Alternative Restructuring Proposal**" means any material plan, inquiry, proposal, offer, bid, term sheet or agreement, whether written or oral, with respect to an Alternative Restructuring. For the avoidance of doubt, any bid received by the Company Parties in connection with the Sale Process shall not constitute an Alternative Restructuring Proposal.

"**American Freight**" means American Freight FFO, LLC, Franchise Group Newco Intermediate AF, LLC, and each of Franchise Group Newco Intermediate AF, LLC's subsidiaries.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" has the meaning set forth in the Recitals to this Agreement.

"**Bid Deadline**" has the meaning set forth in Section 4.01(i).

"**Bidding Procedures**" means procedures approved pursuant to the Bidding Procedures Order governing the submission and evaluation of bids to purchase all or substantially all of the Debtors' assets (excluding the assets of American Freight that are subject to the Store-Closing and Liquidation Sales).

"**Bidding Procedures Motion**" means the motion to be filed by the Debtors in the Chapter 11 Cases seeking entry of the Bidding Procedures Order, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

4

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving the Bidding Procedures, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

"**Causes of Action**" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the date hereof, in contract, tort, Law, equity, or otherwise.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interest in, any Company Party.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Restructuring Transactions between FRG, on the one hand, and any Consenting First Lien Lender, on the other.

"**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Consent**" means any consent, novation, approval, authorization, qualification, waiver, registration or notification to be obtained from, filed with or delivered to a Governmental Entity or any other Person.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases, which shall be all of the parties set forth in **Exhibit A** to this Agreement.

"**Definitive Documents**" means, collectively, each of the documents listed in (and subject to the terms of) Section 3.01, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Agent**" means the administrative and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement, each of which shall be acceptable to the Required Lenders (as defined therein).

"**DIP Credit Agreement**" means the debtor-in-possession financing agreement by and among certain Company Parties, the DIP Agent, and the lenders party thereto setting forth the terms of the DIP Facility, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Documents**" means, collectively, the DIP Motion, the DIP Orders, and the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Facility**" means the loans under the debtor-in-possession financing facility on the terms and conditions set forth in the DIP Term Sheet.

"**DIP Motion**" means the motion filed by the Company Parties seeking entry of the DIP Orders, together with all exhibits thereto and any declarations, affidavits or other documents filed in connection with such motion, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Orders**" means the Interim DIP Order and Final DIP Order.

"**DIP Term Sheet**" means the debtor in possession financing term sheet attached as Exhibit 1 to the Restructuring Term Sheet.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan and all exhibits, appendices, schedules, related documents, ballots, and procedures related to the solicitation of votes to accept or reject the Plan, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, and any supplements, modifications and amendments thereto, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement as a disclosure statement meeting the applicable requirements of the Bankruptcy Code and, to the extent necessary, approving the related Solicitation Materials, which

shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interest**" means, collectively, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, and any other equity, ownership, membership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, or other equity, ownership, membership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exchange Act**" means the Securities and Exchange Act of 1934, as amended.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Executory Contract**" means any contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

"**Existing Equity Interest**" means any Equity Interest in a Company Party existing as of the Agreement Effective Date.

"**Existing Intercreditor Agreement**" means, collectively, that certain (i) Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, among Franchise Group, Inc., the other grantors referred to therein, the First Lien Credit Agreement Agent, as collateral agent, and the Second Lien Credit Agreement Agent, and (ii) Amended Intercreditor Agreement, dated as of November 22, 2021, among the ABL Credit Agreement Agent, the First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent, Franchise Group, Inc., Valor Acquisition, LLC, Franchise Group Newco Intermediate AF, LLC Pet Supplies "Plus", LLC, as borrowers, the other borrowers from time to time party thereto, and the other loan parties from time to time party thereto, in each case, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"**Final DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the First Lien Lenders on a final basis.

"**Finance Documents**" means, collectively, (a) the First Lien Credit Agreement, and (b) all other documents entered into pursuant to or in connection with the foregoing document in clause (a) of this definition (including, but not limited to, any cash management arrangements and ancillary facilities).

"**First Day Pleadings**" means the first-day and second-day motions, pleadings, applications and related orders that are necessary and/or desirable to file upon the commencement

of the Chapter 11 Cases, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**First Lien Claims**" means any Claim on account of First Lien Loans arising under or pursuant to the First Lien Credit Agreement or the other First Lien Loan Documents.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as lead borrower, the other borrowers and guarantors party thereto, the First Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**First Lien Credit Agreement Agent**" means Wilmington Trust, National Association (as successor to JPMorgan Chase Bank, N.A.), in its capacity as successor administrative agent and successor collateral agent for the First Lien Lenders.

"**First Lien Lenders**" means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, First Lien Claims.

"**First Lien Loan Documents**" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"**First Lien Loans**" means the term loans arising under or pursuant to the First Lien Credit Agreement.

"**FRG**" has the meaning set forth in the preamble to this Agreement.

"**Governmental Entity**" means any U.S. or non-U.S. federal, state, local, or foreign government or any agency, bureau, board, commission, court, or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization. For the avoidance of doubt, the term Governmental Entity includes any Governmental Unit (as such term is defined in section 101(27) of the Bankruptcy Code).

"**HoldCo Credit Agreement**" means that certain Credit Agreement, dated as of August 21, 2023, among Freedom VCM, Inc., as borrower, Freedom VCM Interco, Inc., as holdings, Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**HoldCo Entities**" means Freedom VCM Holdings, LLC, Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, Freedom VCM Receivables, Inc., Freedom VCM Interco, Inc., and Freedom VCM, Inc., collectively.

"**HoldCo Loans**" means the term loans arising under or pursuant to the HoldCo Credit Agreement.

"**Initial Parties**" has the meaning set forth in <u>Section 2.01</u>.

"**Interest**" means any and all issued, authorized, or outstanding Equity Interests in any Debtor, whether or not transferable, and all rights arising with respect thereto.

"**Interim DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the First Lien Lenders on an interim basis.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including, in each case, any common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ or other legal requirement, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Entity of competent jurisdiction.

"**Limited Waiver Amendment**" means that certain Fourth Amendment to First Lien Credit Agreement, dated as of August 19, 2024 among FRG, the other Company Parties party thereto, the First Lien Lenders party thereto, and the First Lien Credit Agreement Agent.

"**Liquidator**" means Hilco Merchant Resources, LLC or another liquidation consultant acceptable to the Required Consenting First Lien Lenders and on terms acceptable to the Required Consenting First Lien Lenders to advise the Company Parties in connection with, among other things, the liquidation of American Freight and the Store-Closing and Liquidation Sales of American Freight.

"**Management Conference Call**" has the meaning set forth in <u>Section 7.01(m)</u>.

"**Manager**" has the meaning set forth in <u>Section 14.21</u>.

"**Milestone**" or "**Milestones**" has the meaning set forth in <u>Section 4.01</u>.

"**New Organizational Documents**" means the new Organizational Documents of the Reorganized Debtors, to be entered into on the Plan Effective Date, including certificates of incorporation, limited liability company agreements, stockholders or shareholders agreements, operating agreements, equity subscription or purchase agreements, charters or by-laws, which shall be consistent in all material respects with this Agreement and the applicable terms of the Restructuring Term Sheet, and otherwise in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**New TopCo**" means Franchise Group, Inc. or any other Entity designated as such that will, directly or indirectly, own 100% of the Equity Interests in, or substantially all of the assets of, Franchise Group, Inc. upon consummation of the Restructuring Transactions, as mutually agreed by the Company Parties and the Required Consenting First Lien Lenders.

"**New Warrants**" means warrants exercisable for Reorganized Common Equity on the terms and conditions set forth in the Restructuring Term Sheet.

"**New Warrants Documentation**" means any and all agreements, certificates, instruments or other documents required to implement, issue, and distribute, or that otherwise govern or evidence, the New Warrants, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**No Recourse Party**" has the meaning set forth in Section 14.24.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as by-laws or a partnership agreement, or an operating, limited liability company or members agreement).

"**Outside Date**" shall mean May 1, 2025, as such date may be extended by the Required Consenting First Lien Lenders for up to three (3) consecutive thirty (30) day periods.

"**Parties**" means the Initial Parties and any other Consenting First Lien Lender that becomes party to this Agreement in accordance with this Agreement.

"**Permits**" means any license, permit, registration, authorization, approval, certificate of authority, accreditation, qualification, or similar document or authority that has been issued or granted by any Governmental Entity or Third Party Association, if applicable.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, a Third Party Association, or any legal Entity or association.

"**Petition Date**" means the first date any of the Company Parties other than the HoldCo Entities commences a Chapter 11 Case.

"**Plan**" means a joint prearranged chapter 11 plan of reorganization for the Debtors through which the Restructuring Transactions will be effectuated, which plan shall be consistent with the Restructuring Term Sheet and the other applicable provisions of this Agreement (including the other Term Sheets), and otherwise in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Plan Effective Date**" has the meaning ascribed to such term in the Restructuring Term Sheet.

"**Plan Release**" means customary mutual releases by the Parties to be included in the Plan as set forth in the Restructuring Term Sheet, and otherwise in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Plan Supplement**" means any compilation of documents and forms of documents (including term sheets), agreements, schedules, and exhibits to the Plan, including (i) the New Organizational Documents, (ii) the Schedule of Retained Causes of Action, (iii) the Take-Back Debt Documents, (iv) the Restructuring Transactions Memorandum, (v) the Rejected Contracts/Lease List, and (vi) any and all other documents necessary to effectuate the Restructuring Transactions or that are contemplated by the Plan subject to this Agreement, which shall be filed by the Debtors prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion, and consistent with the Term Sheets, where applicable.

"**Plan Transaction**" has the meaning set forth in the Recitals to this Agreement.

"**Prepetition HoldCo Loan Claims**" means any Claim on account of HoldCo Loans arising under or pursuant to the HoldCo Credit Agreement.

"**PSP**" means, collectively, Franchise Group Intermediate PSP, LLC and each of its subsidiaries.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests, and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Rejected Contracts/Lease List**" means the list (as determined by the Debtors) of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto), if any, that will be rejected pursuant to the Plan.

"**Related Fund**" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person, or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

"**Reorganized Common Equity**" means the common Equity Interests of the Reorganized Debtors authorized under the New Organizational Documents of the Reorganized Debtors and issued on the Plan Effective Date pursuant to the Plan Transaction or in connection with the consummation of the Sale Transaction.

"**Reorganized Debtors**" means any Debtor, or any successor thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Plan Effective Date, including New TopCo.

"**Required Consenting First Lien Lenders**" means, as of the relevant date, Consenting First Lien Lenders that are members of the Ad Hoc Group holding, collectively, in excess of 66

2/3% of the aggregate outstanding principal amount of First Lien Loans that are held by Consenting First Lien Lenders that are members of the Ad Hoc Group at such time.

"**Restructuring Support Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Restructuring Term Sheet**" has the meaning set forth in the Recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the Recitals to this Agreement.

"**Restructuring Transactions Memorandum**" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including a summary of any transaction steps necessary to complete the Plan, and shall otherwise be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Documents**" means all agreements, instruments, pleadings, orders or other related documents utilized to launch the Sale Process and implement and consummate the Sale Transaction, each of which shall contain terms and conditions that are materially consistent with this Agreement, and otherwise be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Sale Order**" means the order entered by the Bankruptcy Court authorizing and approving the Sale Transaction, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Sale Process**" has the meaning set forth in the Restructuring Term Sheet.

"**Sale Toggle Event**" means entry into one or more qualifying asset purchase agreements or other definitive document to consummate a Sale Transaction, solely to the extent entered into in connection with a Sufficient Bid and in compliance with the Bidding Procedures Order.

"**Sale Transaction**" has the meaning set forth in the Recitals to this Agreement.

"**Schedule of Retained Causes of Action**" means the schedule of Causes of Action that shall vest in the Reorganized Debtors on the Plan Effective Date, which will be contained in the Plan Supplement.

"**Second Lien Claims**" means any Claim on account of term loans arising under or pursuant to the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., and the other borrowers and guarantors party thereto, the Second Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**Second Lien Credit Agreement Agent**" means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the lenders under the Second Lien Credit Agreement.

"**Second Lien Pari Passu Claims**" means any Claim on account of term loans arising under or pursuant to the Second Lien Pari Passu Credit Agreement.

"**Second Lien Pari Passu Credit Agreement**" means that certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, among Franchise Group, Inc., and the other borrowers and guarantors party thereto, the Second Lien Pari Passu Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**Second Lien Pari Passu Credit Agreement Agent**" means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the lenders under the Second Lien Pari Passu Credit Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all documents, ballots, forms and other materials provided in connection with solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code (other than the Disclosure Statement), each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Store-Closing and Liquidation Sales**" has the meaning set forth in the Restructuring Term Sheet.

"**Store-Closing and Liquidation Sales Documents**" means all documents or pleadings necessary or desirable to facilitate the Store-Closing and Liquidation Sales, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Sufficient Bid**" has the meaning set forth in the Restructuring Term Sheet.

"**Take-Back Debt Agent**" means the administrative agent for the Take-Back Debt Lenders under the Take-Back Debt Documents, or any successor administrative agents thereunder.

"**Take-Back Debt Credit Agreement**" means the credit agreement governing or evidencing the Take-Back Debt Facility to be entered into on the Plan Effective Date by and among Reorganized Debtors, the guarantors from time to time party thereto, the Take-Back Debt Lenders, the Take-Back Debt Agent, and the other Entities party thereto from time to time.

"**Take-Back Debt Documents**" means the Take-Back Debt Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Take-Back Debt Facility**" means the take-back debt financing facility reflecting the terms and conditions set forth in the Restructuring Term Sheet.

"**Take-Back Debt Lenders**" means the lenders party to the Take-Back Debt Credit Agreement.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Taxes**" means all present and future taxes, levies, imposts, deductions, charges, assessments, duties and withholdings and any charges of a similar nature (including interest, additions to tax, and penalties with respect thereto) that are imposed by any government or other taxing authority.

"**Term Sheets**" has the meaning set forth in the Recitals to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement is effective in accordance with Sections 12.01, 12.02, 12.03, or 12.04.

"**Third Party Association**" means any trade, industry, business or sector association, body, group or council, or similar Entity.

"**Transaction Expenses**" means all reasonable and documented fees, costs and expenses of each of the Ad Hoc Group Advisors in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, including any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, and, to the extent applicable, consistent with any engagement letters or fee reimbursement letters entered into between the applicable Company Parties, on the one hand, and any Ad Hoc Group Advisor, on the other hand (as supplemented and/or modified by this Agreement).

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, loan, grant, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions); provided however, that any pledge in favor of a bank or broker dealer at which a Consenting First Lien Lender maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally, shall not be deemed a "Transfer" for any purposes hereunder; provided, further, that if a pledge or encumbrance exists, the pledgor maintains its voting rights for purposes of this Agreement.

"**Transferee Qualified Marketmaker**" has the meaning set forth in Section 9.04.

"**Unexpired Lease**" means any lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    the use of "include" or "including" is without limitation, whether stated or not; and

(j)    (i) the phrase "counsel to the Company Parties" refers in this Agreement to each counsel specified in Section 14.10(a) and (ii) "counsel to the Ad Hoc Group" refers in this Agreement to each counsel specified in clause (a) in the definition of "Ad Hoc Group Advisors" in Section 1.01.

## Section 2.    *Effectiveness of this Agreement*.

2.01.    This Agreement shall become effective and binding upon each of the parties that has executed and delivered counterpart signature pages to this Agreement on the date on which all of the following conditions have been satisfied or waived by the applicable Party or Parties in

accordance with this Agreement (such date, the "**Agreement Effective Date**" and such parties, the "**Initial Parties**"):

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and counsel to the Ad Hoc Group;

(b)    the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and counsel to the Ad Hoc Group:  holders of at least 50% in number of holders of First Lien Loans and at least 66 2/3% of the aggregate outstanding principal amount of First Lien Loans, in each case, as mutually confirmed by the Company Parties and the Ad Hoc Group, as of the Agreement Effective Date (which may be by email from counsel);

(c)    the Company Parties shall have paid to the applicable advisors all accrued and unpaid Transaction Expenses incurred up to (and including) the Agreement Effective Date in accordance with Section 14.20(a);

(d)    counsel to the Company Parties shall have given notice to counsel to the Ad Hoc Group in the manner set forth in Section 14.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2.01 have occurred.

**Section 3.    *Definitive Documents*.**

3.01.    The Definitive Documents governing the Restructuring Transactions shall include this Agreement (including the Term Sheets) and all other agreements, instruments, pleadings, orders, forms, questionnaires and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring Transactions, including each of the following, as applicable:

(a)    any documents in connection with any First Day Pleadings and all orders sought pursuant thereto, including any cash management orders and critical vendor orders;

(b)    the DIP Documents (including the DIP Motion and DIP Orders);

(c)    the Disclosure Statement;

(d)    the Disclosure Statement Order;

(e)    the Solicitation Materials;

(f)    the Plan, including the Plan Release;

(g)    the Plan Supplement;

(h)    the Confirmation Order;

(i)      the Take-Back Debt Documents;

(j)      the New Organizational Documents;

(k)      the Bidding Procedures Motion;

(l)      the Bidding Procedures Order;

(m)      the Sale Documents, if applicable;

(n)      the Sale Order, if applicable;

(o)      the New Warrants Documentation;

(p)      the Restructuring Transactions Memorandum;

(q)      the Store-Closing and Liquidation Sales Documents;

(r)      such other material agreements, instruments and definitive documentation relating to a recapitalization or restructuring of the Company Parties as is necessary or desirable to support, facilitate, implement, document, otherwise give effect to, or consummate all or any part of the Restructuring Transactions; and

(s)      any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents and/or agreements relating to any of the foregoing.

3.02.    The Definitive Documents (other than this Agreement) remain subject to negotiation and completion, as applicable.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement, and shall otherwise be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders in their sole discretion.

**Section 4.**      *Milestones; Consummation of the Restructuring Transactions.*

4.01.    On and after the Agreement Effective Date, the Company Parties shall implement the Restructuring Transactions in accordance with the following milestones (each, a "**Milestone**", together, the "**Milestones**"), in each case, unless extended or waived in writing by the Required Consenting First Lien Lenders in their sole discretion (which extension or waiver can be provided via e-mail from counsel to the Required Consenting First Lien Lenders):

(a)      no later than November 4, 2024, the Company Parties shall have delivered substantially complete drafts of the First Day Pleadings, the DIP Documents (including the DIP Motion and the proposed Interim DIP Order), the Bidding Procedures Motion, the proposed Bidding Procedures Order, the Plan, the Disclosure Statement, and the Solicitation Materials to the Ad Hoc Group Advisors;

(b)      no later than November 4, 2024, the Company Parties shall have delivered a confidential information memorandum in connection with the Sale Process to the Ad Hoc Group Advisors;

(c)      no later than November 4, 2024, the Company Parties shall have engaged the Liquidator pursuant to that certain Letter Agreement Governing Inventory Disposition;

(d)      no later than November 4, 2024, the Petition Date shall have occurred;

(e)      no later than one (1) day after the Petition Date, the Debtors shall have filed with the Bankruptcy Court the First Day Pleadings, the DIP Motion (including the proposed Interim DIP Order), and the Bidding Procedures Motion (including the proposed Bidding Procedures Order);

(f)      no later than three (3) days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court the Plan, the Disclosure Statement, and the Solicitation Materials;

(g)      no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(h)      no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving procedures for the Store-Closing and Liquidation Sales at American Freight;

(i)      no later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order, which shall require, among other things, the submission of any (i) non-binding indications of interest on or before forty (40) days after the Petition Date and (ii) Qualified Bids (as defined in the Bidding Procedures) by no later than eighty (80) days after the Petition Date (the "**Bid Deadline**"); provided that the Sale Process shall not be terminated prior to the expiration of the Bid Deadline;

(j)      no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(k)      no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have approved the Disclosure Statement and the Solicitation Materials;

(l)      to the extent more than one Sufficient Bid is received by the Bid Deadline, by no later than eighty-five (85) days after the Petition Date, the Debtors shall commence an auction for the Debtors' assets in accordance with the terms of the Bidding Procedures Order; provided that if there is only one Sufficient Bid received by the Bid Deadline, then the Sale Toggle Event shall occur;

(m)      to the extent more than one Sufficient Bid is received by the Bid Deadline, no later than ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order; provided that if there is not more than one Sufficient Bid received by the Bid Deadline, then the Bankruptcy Court shall have entered the Sale Order no later than eighty-seven (87) days after the Petition Date;

(n)     no later than ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(o)     no later than the earlier of (i) ten (10) days after entry of the Confirmation Order and/or the Sale Order, if applicable (ii) one hundred twenty (120) days after the Petition Date, the Plan Effective Date shall have occurred and all the Restructuring Transactions (irrespective of whether the Restructuring Transactions occur pursuant to the Plan Transaction or the Sale Transaction) shall have been implemented and consummated.

**Section 5.**     *Commitments of the Consenting First Lien Lenders.*

5.01.   General Commitments, Forbearances, and Waivers.

(a)     During the Agreement Effective Period, each Consenting First Lien Lender, on a several and not joint basis, agrees, in respect of all of its Company Claims/Interests, subject to Section 6 hereof, to:

(i)     support the Restructuring Transactions, act in good faith, and vote or consent, to the extent applicable, and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions; provided that no Consenting First Lien Lender shall be obligated to (x) waive (to the extent waivable by such Consenting First Lien Lender) any condition to the consummation of any part of the Restructuring Transactions set forth in (or to be set forth in) any Definitive Document, or (y) approve any Definitive Document that is not in form and substance consistent with its consent rights as set forth herein;

(ii)     subject to the terms of any applicable Confidentiality Agreements, use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders, to the extent reasonably prudent, including by making the Ad Hoc Group Advisors available to such other stakeholders or their advisors, as applicable, for the purposes of responding to inquiries by such stakeholders and/or obtaining support for the Restructuring Transactions;

(iii)     forbear from exercising or directing any Person to exercise remedies on account of, any breach by any Company Party of, and any default or event of default (howsoever described) under, the applicable Finance Documents that shall or may arise as a result of, directly or indirectly, any of the steps, actions, or transactions expressly required or contemplated by, or expressly undertaken pursuant to this Agreement, the Restructuring Term Sheet, any Definitive Document, and commencement of any Chapter 11 Cases; provided that (x) no Consenting First Lien Lender shall be required hereunder to provide any trustee and/or agent or other Person under any applicable Finance Documents with any additional indemnities or similar undertakings in connection with taking any such action other than those contained in any applicable Finance Documents, (y) no Consenting First Lien Lender shall be required to take any actions contemplated by this Section 5.01(a)(iii) unless expressly contemplated by this Agreement, and (z) nothing in this Section 5.01(a)(iii) shall require the Consenting First Lien Lenders to waive any default or event of default, or any of the obligations arising under, or liens or other encumbrances created by,

any of the Finance Documents; provided, further, for the avoidance of doubt, that unless the Restructuring Transactions are consummated, it is understood and agreed that any forbearance granted pursuant to this Section 5.01(a)(iii) shall be effective during the Agreement Effective Period only and shall not be deemed to be a permanent forbearance from the exercise of remedies on account of any default or event of default arising under the First Lien Credit Agreement; and

(iv)     without limiting any rights under Section 12.01, negotiate in good faith and, to the extent it is contemplated to become a party thereto, execute, deliver, and use commercially reasonable efforts to perform their obligations under, and consummate the transactions contemplated by the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement.

(b)     During the Agreement Effective Period, each Consenting First Lien Lender on a several and not joint basis, agrees, in respect of all of its Company Claims/Interests, subject to Section 6 hereof, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose or file any Alternative Restructuring;

(iii)     file or join in any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, is not consistent with this Agreement and the Restructuring Transactions, including the Sale Transaction or the Plan Transaction, as applicable;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     exercise any right or remedy for the enforcement, collection, or recovery of any of Company Claims/Interests;

(vi)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(vii)     direct any other Person to take any of the actions listed in clauses (i) through (vi) of this Section 5.01(b).

5.02.    Commitments with Respect to Chapter 11 Cases.

(a)     In addition to the commitments, covenants, agreements and other obligations set forth in Section 5.01, during the Agreement Effective Period, each Consenting First Lien Lender that is entitled to vote to accept or reject the Plan pursuant to its terms, on a several and not joint basis, agrees that it shall:

(i)    subject to receipt by such Consenting First Lien Lender of the Disclosure Statement and the Solicitation Materials, vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Disclosure Statement and any related Solicitation Materials;

(ii)    subject to receipt by such Consenting First Lien Lender of the Disclosure Statement and the Solicitation Materials, not object to the Plan Releases, and, to the extent it is permitted to elect whether to opt out of the Plan Releases, elect not to opt out of the Plan Releases by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)    to the extent applicable, fund its committed portion of the DIP Facility as and when due pursuant to the terms of the DIP Documents;

(iv)    cooperate, act in good faith, and use commercially reasonable efforts to consummate the Restructuring Transactions, including the Sale Transaction or the Plan Transaction, as applicable;

(v)    support, and not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement;

(vi)    take actions as required by the Bankruptcy Court; and

(vii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; provided that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Consenting First Lien Lender at any time following the expiration or termination of the Agreement Effective Period with respect to such Consenting First Lien Lender (it being understood that any termination of the Agreement Effective Period with respect to a Consenting First Lien Lender shall entitle such Consenting First Lien Lender to change its vote in accordance with sections 1126 and 1127 or any other applicable provision of the Bankruptcy Code, and the Solicitation Materials with respect to the Plan shall be consistent with this proviso).

**Section 6.    *Additional Provisions Regarding the Consenting First Lien Lenders' Commitments*.** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) subject to any Confidentiality Agreements in place as of the Agreement Effective Date, affect the ability of any Consenting First Lien Lender to consult with any other Consenting First Lien Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) or any foreign proceeding related to the Restructuring Transactions; (b) impair or waive the rights of any Consenting First Lien Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting First Lien Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of a Consenting First Lien Lender under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any

matter arising in the Chapter 11 Cases or any foreign proceeding, in each case, so long as the exercise of any such right is not inconsistent with such Consenting First Lien Lender's obligations under this Agreement; (e) limit the ability of a Consenting First Lien Lender to purchase, sell or enter into any transactions regarding the Company Claims/Interests, subject to the terms of this Agreement including Section 9 hereof; (f) except as and to the extent explicitly set forth herein, constitute a waiver or amendment of any term or provision of any Finance Document; (g) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under any Finance Document; (h) except as and to the extent explicitly set forth in this Agreement, require any Consenting First Lien Lender to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting First Lien Lender; (i) prevent a Consenting First Lien Lender from taking any action that is required in order to comply with applicable Law; provided that if any Consenting First Lien Lender proposes to take any action that is otherwise inconsistent with this Agreement or the Restructuring Transactions in order to comply with applicable Law, such Consenting First Lien Lender shall provide, to the extent possible without violating applicable Law, at least five (5) Business Days' advance, written notice to the Parties; (j) prohibit any Consenting First Lien Lender from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (k) except as and to the extent explicitly set forth in this Agreement, limit the ability of any Consenting First Lien Lender to enforce the terms of the Existing Intercreditor Agreement (including exercising any rights or remedies available to the Consenting First Lien Lender); (l) require any Consenting First Lien Lender to fund or commit to fund any additional amounts (other than as agreed in connection with the DIP Facility) without such Consenting First Lien Lender's written consent; or (m) require or obligate any Consenting First Lien Lender to (i) waive (to the extent waivable by such Consenting First Lien Lender) any condition to the consummation of any part of the Restructuring Transactions set forth in (or to be set forth in) any Definitive Document, or (ii) approve any Definitive Document that is not in form and substance consistent with its consent rights set forth herein.

**Section 7.**    *Commitments of the Company Parties*.

7.01.    Affirmative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)    support, act in good faith, and take all commercially reasonable actions necessary, or reasonably requested by the Required Consenting First Lien Lenders to implement and consummate the Restructuring Transactions as contemplated by this Agreement and the Restructuring Term Sheet, including by promptly (i) commencing the Store-Closing and Liquidation Sales at American Freight, (ii) commencing the Chapter 11 Cases and solicitation of the Plan pursuant to the Disclosure Statement and related Solicitation Materials in accordance with the applicable Milestones; (iii) launching the Sale Process to market all or substantially all of the remaining assets of the Debtors in order to determine the highest and/or best offers for the purchase of such assets subject to the terms of the Bidding Procedures Order and this Agreement; and (iv) (A) to the extent the Sale Toggle Event shall have occurred, consummating the Sale Transaction, and (B) to the extent that a Sufficient Bid has not been received on or prior to the Bid Deadline, promptly terminating the Sale Process, unless otherwise agreed by the Required Consenting First

Lien Lenders, and pursuing exclusively the Plan Transaction, in each case in accordance with this Agreement;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all commercially reasonable steps necessary to address any such impediment, including, timely filing a formal objection to any motion, application or other proceeding filed with the Bankruptcy Court by any Person seeking the entry of an order: (i) directing the appointment of an examiner with expanded powers or a trustee; (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Cases; (iv) approving an Alternative Restructuring Proposal; (v) for relief that (x) is inconsistent with this Agreement in any material respect, or (y) would, or would reasonably be expected to, frustrate the purposes of this Agreement in any material respect, including by preventing the consummation of the Restructuring Transactions; (vi) modifying or terminating any Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization; or (vii) challenging (x) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting First Lien Lenders, or (y) the validity, enforceability or perfection of any lien or other encumbrance securing (or purporting to secure) any Company Claims/Interests of any of the Consenting First Lien Lenders;

(c)      use commercially reasonable efforts to obtain any and all Permits, Consents, and/or any other third-party approvals that are necessary for the implementation or consummation of any part of the Restructuring Transactions;

(d)      negotiate in good faith and execute, deliver, perform their obligations under, and consummate the transactions contemplated by, the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f)      subject to the consent rights set forth herein, (i) complete the preparation, as soon as reasonably practicable after the Execution Date, of the Disclosure Statement and any Solicitation Materials in order to commence the solicitation of the Plan in accordance with the Milestones, (ii) provide drafts of the Disclosure Statement, the Plan, any Solicitation Materials, and each other Definitive Document to, and afford a reasonable opportunity for comment and review of such documents by, the Ad Hoc Group Advisors, which opportunity of comment and review shall be not less than five (5) days in advance of any filing with the Bankruptcy Court; provided that if delivery of such document at least five (5) days in advance of such filing is impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable, and shall afford them a reasonable opportunity under the circumstances to comment on such documents, and (iii) consult with the Ad Hoc Group Advisors regarding the form and substance of the Disclosure Statement and Solicitation Materials, the Plan, and each other Definitive Document, sufficiently in advance of the filing with the Bankruptcy Court, and not file with the Bankruptcy Court the Disclosure Statement, Solicitation Materials, the Plan, and each other Definitive Document unless such document is in form and substance consistent with the

consent rights set forth herein; <u>provided</u> that the obligations of the Company Parties under this <u>Section 7.01(f)</u> shall in no way alter or diminish any right expressly provided to any applicable Consenting First Lien Lender under this Agreement to review, comment on, and/or consent to the form and/or substance of any document in accordance with the terms hereof;

(g)      to the extent permitted by Law, promptly notify the Ad Hoc Group Advisors in writing (email being sufficient) (and in any event, for items (i)-(vii) of this paragraph, within one (1) Business Day) of (i) the initiation, institution, or commencement of any proceeding by a Governmental Entity (or communications indicating that the same may be contemplated or threatened) involving any of the Company Parties (including any assets, Permits, businesses, operations, or activities of any of the Company Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (ii) the initiation, institution, or commencement by any Person of any proceeding involving any of the Company Parties (or communications indicating that the same may be contemplated or threatened) that would result in or is likely to have a material impact in any manner on any of the Company Parties' businesses (including any assets, Permits, businesses, operations, or activities of any of the Company Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (iii) the initiation, institution, or commencement of any proceeding by a Governmental Entity or other Person challenging the validity of the transactions contemplated by this Agreement or any other Definitive Document or seeking to enjoin, restrain, or prohibit this Agreement or any other Definitive Document or the consummation of the transactions contemplated hereby or thereby, (iv) any material breach by any of the Company Parties in any respect of any of their obligations, representations, warranties, or covenants set forth in this Agreement, (v) the happening or existence of any event that shall have made any of the conditions precedent to any Person's obligations set forth in (or to be set forth in) any of the Definitive Documents or this Agreement, including the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date", incapable of being satisfied prior to the Outside Date, (vi) the occurrence of a "Termination Event" pursuant to <u>Section 12</u>, and/or (vii) the receipt of notice from any Governmental Entity or other Person alleging that the Consent of such Person is or may be required under any Organizational Document, material contract, Permit, Law, or otherwise in connection with the consummation of any part of the Restructuring Transactions;

(h)      maintain the good standing and legal existence of each Company Party under the Laws of the state or jurisdiction in which it is incorporated, organized, or formed, except to the extent that any failure to maintain such Company Party's good standing arises solely as a result of the filing of the Chapter 11 Cases;

(i)      if any Company Party receives an Alternative Restructuring Proposal, (i) promptly notify the Ad Hoc Group Advisors (in each case, no later than one (1) Business Day after the receipt of such Alternative Restructuring Proposal), with such notification to include the material terms thereof (but not the identity of the Person(s) involved), and (ii) respond promptly to reasonable information requests and questions from the Ad Hoc Group Advisors with respect to the impact of such Alternative Restructuring Proposal on the Restructuring Transactions and any action taken or proposed to be taken by the Company Parties in response thereto, but not to include the identity of the Person(s) involved;

24

(j)      (i) conduct their businesses and operations in the ordinary course in a manner that is consistent with past practices and in compliance with Law, (ii) maintain their physical assets, properties, and facilities in their working order condition and repair as of the Agreement Effective Date, in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law (ordinary wear and tear and casualty and condemnation excepted), (iii) maintain their respective books and records in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law, (iv) maintain all of their material insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law, and (v) use commercially reasonable efforts to preserve intact their business organizations and relationships with third parties (including creditors, lessors, licensors, franchisees, vendors, customers, suppliers, and distributors) and employees in the ordinary course, in a manner that is consistent with past practices, in each case, except (1) as required by Law, (2) as required pursuant to the DIP Orders or as may be required to adhere to the terms of any applicable budget approved in connection with the DIP Facility (or as may otherwise be related thereto), (3) as otherwise agreed by the Required Consenting First Lien Lenders or (4) as otherwise expressly provided in this Agreement or for actions taken by any member of the Company Parties in connection with the Chapter 11 Cases (including, for avoidance of doubt, in connection with the Store-Closing and Liquidation Sales at American Freight) in accordance with the terms of this Agreement and the applicable Definitive Documents;

(k)      provide responses in a reasonably timely manner, whether by directing the Company Parties' advisors to respond or otherwise, to reasonable diligence requests from the Ad Hoc Group Advisors for purposes of the Consenting First Lien Lenders' due diligence investigation in respect of the assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs of the Company Parties;

(l)      unless the Sale Process has been terminated under the terms of this Agreement and/or the Sale Documents, if any Person seeks to submit a bid, indicates any interest in participating in the Sale Process, or otherwise communicates with any Company Party with respect to a potential Sale Transaction in each case, in writing (including by email): (i) promptly notify the Ad Hoc Group Advisors in writing (email being sufficient) with such notification accompanied by a copy of such bid or communication; (ii) use commercially reasonable efforts to promptly make any such Person available to the Ad Hoc Group Advisors, in each case, no later than one (1) Business Day after the receipt of any such bid or communication; and (iii) keep the Ad Hoc Group Advisors informed with respect to all material discussions, negotiations, and communications with any such Person;

(m)      (i) use commercially reasonable efforts to keep the Consenting First Lien Lenders informed about the operations of the Company Parties, (ii) use commercially reasonable efforts to direct the current employees, officers, advisors, and other representatives of the Company Parties to provide, to the Ad Hoc Group Advisors, upon written request to the Company Parties' advisors and subject to obtaining approval of the Company Parties (not to be unreasonably withheld or delayed), (1) reasonable access during normal business hours to the Company Parties' books, records, and facilities, and (2) upon written request to the advisors of the Company Parties (which may be by email), reasonable access to the senior management and advisors of the Company Parties for the purposes of evaluating the Company Parties' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs, and (iii) use commercially reasonable

25

efforts to arrange for a teleconference (the "Management Conference Call") to take place bi-weekly, which Management Conference Call shall (1) require participation by at least one senior member of the Company Parties' management team and permit participation by the Company Parties' counsel and advisors and such Consenting First Lien Lenders and their advisors as elect to participate therein, who shall be provided with an invitation to, and details of, such Management Conference Call as soon as reasonably practicable prior to the scheduled date therefor, and (2) be intended for purposes of discussing the Company Parties' financials and such other information and matters reasonably related thereto or reasonably requested by the Required Consenting First Lien Lenders;

(n)    if applicable, promptly certify upon request of any Consenting First Lien Lender that pursuant to 26 CFR § 1.1445-2, it is not a "United States real property holding corporation" as defined in the Internal Revenue Code of 1986 (as amended) and any applicable regulations promulgated thereunder;

(o)    unless the Sale Process has been terminated under the terms of this Agreement and/or the Sale Documents, host weekly telephone conference calls on Mondays at 2:00 p.m. (ET) among Ducera Securities LLC and Lazard to provide a status update on the Sale Process;

(p)    support the filing of a customary stock trading order that restricts (i) the accumulation and disposition of stock by Persons who own (as determined for tax Law purposes), or would own, more than approximately 4.5% of the equity of the Company Parties during the pendency of the Chapter 11 Cases, and (ii) the claiming of a worthlessness deduction under section 165 of the Tax Code with respect to the stock of any Company Party;

(q)    to the extent reasonably requested by the Required Consenting First Lien Lenders, commence a process to solicit a whole business securitization of PSP; and

(r)    implement the Restructuring Transactions in accordance with the Milestones, unless waived or extended in writing by the Required Consenting First Lien Lenders (which waiver or extension may be effected through email exchanged between counsel to the Company Parties and counsel to the Ad Hoc Group).

7.02.    Negative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not, without the prior written consent of the Required Consenting First Lien Lenders, directly or indirectly:

(a)    object to, delay, impede, or take any other action with the intent to interfere with acceptance, implementation, or consummation of the Restructuring Transactions, other than pursuant to the express terms and conditions of this Agreement;

(b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in, this Agreement (including the Term Sheets), the Plan or any of the other Definitive Documents, other than pursuant to the express terms and conditions of this Agreement;

(c)    (i) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or

effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions, including any Definitive Documents, that, in whole or in part, is not (x) consistent in any material respect with this Agreement or (y) otherwise in form and substance acceptable to the Required Consenting First Lien Lenders pursuant to their respective consent rights set forth herein, or, if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing, or (ii) waive, amend, or modify any of the Definitive Documents, or file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, in either case, which waiver, amendment, modification, or filing contains any provision that is not (x) consistent in all material respects with this Agreement and the Restructuring Term Sheet, or (y) otherwise acceptable to the Required Consenting First Lien Lenders pursuant to their consent rights set forth herein;

(d)    (i) seek discovery in connection with, prepare, or commence any proceeding or other action that challenges (1) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting First Lien Lenders, or (2) the validity, enforceability, or perfection of any lien or other encumbrance securing any Company Claims/Interests of any of the Consenting First Lien Lenders; (ii) otherwise seek to restrict any contractual rights of any of the Consenting First Lien Lenders under the Finance Documents; (iii) otherwise commence any action against any of the Consenting First Lien Lenders; or (iv) support any Person in connection with any of the acts described in clause (i) or clause (ii) of this Section 7.02(d);

(e)    assert, or support any assertion by any third party, that, in order to act on the provisions of Section 12 hereof, the Consenting First Lien Lenders shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and the Company Parties' hereby waive, to the greatest extent possible, the applicability of the automatic stay to the giving of any termination notice in accordance with Section 12 hereof); provided that nothing herein shall prejudice any Party's right to argue that the giving of such termination notice or the exercise of any remedy was not proper under the Agreement;

(f)    except as contemplated by this Agreement, consummate any transaction pursuant to any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements without the advance written consent of the Required Consenting First Lien Lenders;

(g)    grant or agree to grant any increase in the wages, salary, bonus, commissions, retirement benefits, severance, or other compensation or benefits of any director, manager, employee, or officer of any Company Party, whether scheduled prior to, as of or after the Agreement Effective Date, except for any increase that is done in the ordinary course of business consistent with past practices, in accordance with the Restructuring Transactions contemplated by this Agreement, or otherwise with the consent of the Required Consenting First Lien Lenders;

(h)    incur or commit to incur any capital expenditures, other than capital expenditures that are included in any applicable budget approved pursuant to the Interim DIP Order or Final DIP Order, except as approved by the Required Consenting First Lien Lenders;

(i)     make or change any material tax election (including, with respect to any Company Party that is treated as a partnership or disregarded Entity for U.S. federal income tax purposes, an election to be treated as a corporation for U.S. federal income tax purposes), file any material amended tax return, enter into any closing agreement with respect to Taxes for an amount greater than $50,000, consent to any extension or waiver of the limitations period applicable to any material Tax claim or assessment other than in the ordinary course of business, enter into any installment sale transaction, adopt or change any material accounting methods, practices, or periods for Tax purposes, make or request any Tax ruling, enter into any Tax sharing or similar agreement or arrangement (other than agreements entered in the ordinary course of business the primary purpose of which are not Taxes), or settle any Tax claim or assessment for an amount greater than $50,000;

(j)     take or permit any action that would result in a (i) disaffiliation of any Company Party from the Company Parties' consolidated income tax group under section 1502 of the Tax Code, (ii) realization of any material taxable income outside of the ordinary course of business of the Company Parties' business, or (iii) change of ownership of any Company Party under section 382 of the Tax Code, in each case, except as contemplated by the transactions described herein;

(k)     except to the extent permitted by Section 8.02, seek, solicit, knowingly encourage, propose, assist in, consent to, or vote for, enter into, pursue, consummate, or participate in any discussions or any agreement with any Person regarding, any Alternative Restructuring Proposal;

(l)     except to the extent permitted by this Agreement, amend or propose to amend any Company Party's certificate or articles of incorporation, certificate of formation, bylaws, limited liability company agreement, partnership agreement, or similar Organizational Documents;

(m)     commence the solicitation with respect to the Plan unless the Disclosure Statement and the Solicitation Materials shall be in form and substance consistent with the consent rights set forth herein; or

(n)     consummate the Restructuring Transactions unless each of the applicable conditions to the consummation of such transactions set forth in this Agreement, the Restructuring Term Sheet, the Disclosure Statement, and the other applicable Definitive Documents has been satisfied or waived by the applicable Persons in accordance with the terms of this Agreement and the applicable Definitive Documents.

**Section 8.     *Additional Provisions Regarding Company Parties' Commitments*.**

8.01.     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent, upon advice of counsel, they determine, in good faith, that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement; provided that if (and on each occasion) a Company Party determines to take any

action or to refrain from taking any action with respect to the Restructuring Transactions in accordance with this Section 8.01, such Company Party shall provide written notice of such determination to the Ad Hoc Group Advisors promptly, and in no event, later than two (2) days of such Company Party making such determination.

8.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), except as may be set forth in the Bidding Procedures, each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) provide access to non-public information concerning any Company Party to any Entity that provides an unsolicited Alternative Restructuring Proposal and enters into with the Company Parties a reasonable and customary confidentiality agreement, nondisclosure agreement or agreement that includes confidentiality provisions, in any such case that covers such information; and (b) respond to unsolicited Alternative Restructuring Proposals received by any of the Company Parties; provided that if any Company Party receives an unsolicited Alternative Restructuring Proposal, then such Company Party shall (A) within two (2) days of receiving such proposal, notify counsel to the Ad Hoc Group of the receipt of such proposal; (B) provide counsel to the Ad Hoc Group with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (C) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from counsel to the Ad Hoc Group relating to such Alternative Restructuring Proposal.  At all times prior to the date on which the Company Parties enter into a definitive agreement with respect to an Alternative Restructuring, the Company Parties shall provide the Ad Hoc Group Advisors with all relevant information regarding (i) any negotiations and/or material discussions relating to any such Alternative Restructuring, and/or (ii) any amendments, modifications, or other changes to, or any further material developments of, any such Alternative Restructuring, in any such case as is necessary to keep such counsel contemporaneously informed as to the status and substance of such discussions, negotiations, amendments, modifications, changes, and/or developments.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**      *Transfer of Interests and Securities*.

9.01.    During the Agreement Effective Period, except pursuant to the consummation of the Restructuring Transactions, no Consenting First Lien Lender shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Exchange Act) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless either (i) the transferee executes and delivers to counsel to the Company Parties and counsel to the Ad Hoc Group, at or before the time such Transfer is effective, a Joinder or (ii) the transferee is a Consenting First Lien Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claims/Interests Transferred) to counsel to the Company Parties and counsel to the Ad Hoc Group within five (5) days after the occurrence of the Transfer.  For the avoidance of doubt, nothing in this Agreement shall alter the Company Parties' consent rights to Transfers in any applicable Finance Documents.

9.02.    Upon compliance with the requirements of <u>Section 9.01</u>, the transferee shall be deemed a Consenting First Lien Lender, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of <u>Section 9.01</u> shall be void *ab initio*.  Any Consenting First Lien Lender that effectuates a permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

9.03.    This Agreement shall in no way be construed to preclude the Consenting First Lien Lenders from acquiring additional Company Claims/Interests; <u>provided</u> that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting First Lien Lender be deemed subject to the terms of this Agreement and such Consenting First Lien Lender shall be deemed to have executed this Agreement in respect of all of its Company Claims/Interests (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties and counsel to the Ad Hoc Group); and (b) such Consenting First Lien Lender must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and counsel to the Ad Hoc Group.

9.04.    Notwithstanding <u>Section 9.01</u>, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Joinder in respect of such Company Claims/Interests and shall not be subject to the requirements in the proviso of <u>Section 9.03</u> hereof if: (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an Entity that is not an Affiliate, Related Fund, or affiliated Entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee; and (c) the Transfer otherwise is a permitted Transfer under <u>Section 9.01</u>. To the extent that a Consenting First Lien Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims/Interests that the Qualified Marketmaker acquires after the Agreement Effective Date from a holder of the Company Claims/Interests who is not a Consenting First Lien Lender without the requirement that the transferee be a Permitted Transferee.  For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims/Interests from a Consenting First Lien Lender and is unable to Transfer such Company Claims/Interests within the ten (10) Business Day-period referred to above, the Qualified Marketmaker shall execute and deliver a Joinder in respect of such Company Claims/Interests. Notwithstanding the immediately preceding sentence, a Qualified Marketmaker may Transfer any right, title, or interest in any Company Claims/Interests that it acquires from a Consenting First Lien Lender to another Qualified Marketmaker (the "**Transferee Qualified Marketmaker**") without the requirement that the Transferee Qualified Marketmaker execute and deliver to each of counsel to the Company Parties and counsel to the Ad Hoc Group, a Joinder in respect of such Company Claims/Interests or be a Permitted Transferee, if such Transferee Qualified Marketmaker Transfers the right, title or interest in such Company Claims/Interests within ten (10) Business Days of its acquisition from the Qualified Marketmaker to a transferee that (A) is a Consenting First Lien Lender or Permitted Transferee at the time of such Transfer or (B) becomes a Consenting First Lien Lender or Permitted Transferee by the date of settlement of such Transfer by signing a Joinder.  From the date of such Qualified Marketmaker's acquisition or such Company

Claims/Interests through the date such Company Claims/Interests are Transferred in accordance herewith, the Qualified Marketmaker shall vote such Company Claims/Interests as the Required Consenting First Lien Lenders shall direct.

9.05.    Notwithstanding anything to the contrary in this <u>Section 9</u>, the restrictions on Transfer set forth in this <u>Section 9</u> shall not apply to the grant of any liens or encumbrances on any Company Claims/Interests in favor of a bank or broker-dealer holding custody of such Company Claims/Interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests; <u>provided</u> that (a) such lien or encumbrance does not provide or otherwise entitle such party to any voting rights with respect to such Company Claims/Interests and (b) upon any foreclosure of any such lien or encumbrance, such bank or broker-dealer holding custody of such Company Claims/Interests shall become a party to this Agreement by executing a Joinder and become subject to, among other items, the restrictions on Transfer set forth in this <u>Section 9</u>.

9.06.    In connection with any Transfer permitted by this <u>Section 9</u>, each of the transferor and the transferee shall deliver to the Company Parties such information and documentation as reasonably requested by such Company Parties (including as requested by any transfer agent of such Company Parties) in order to validly effectuate such Transfer and/or substantiate compliance with any applicable law.

9.07.    In addition, a Person that owns or controls First Lien Claims may become a party hereto as a Consenting First Lien Lender by executing and delivering to counsel to the Company Parties and counsel to Ad Hoc Group a Joinder, in which event such Person shall be deemed to be a Consenting First Lien Lender hereunder to the extent of the First Lien Claims owned and controlled by such Person.

**Section 10.    *Representations and Warranties of Consenting First Lien Lenders*.**    Each Consenting First Lien Lender severally, and not jointly, represents and warrants that the following statements are true and correct, as of the date such Consenting First Lien Lender executes and delivers this Agreement or a Joinder, as applicable:

(a)    it (i) is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in such Consenting First Lien Lender's signature page to this Agreement or a Joinder, as applicable (subject to any Transfer by such Consenting First Lien Lender made after the Agreement Effective Date that is described in a notice delivered pursuant to <u>Section 9.01</u>), and (ii) having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in such Consenting First Lien Lender's signature page to this Agreement or a Joinder, as applicable (subject to any Transfer to such Consenting First Lien Lender made after the Agreement Effective Date that is described in a notice delivered pursuant to <u>Section 9.01</u>);

(b)    it has the full power and authority to act on behalf of, vote, and consent to matters concerning, such Company Claims/Interests (or, with respect to Company Claims/Interests subject to an agreement to purchase which has not closed as of the date hereof, will have such power and authority upon closing);

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting First Lien Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)      it has the full power to vote, approve changes to, and Transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law (or, with respect to Company Claims/Interests subject to an agreement to purchase which has not closed as of the date hereof, will have such power upon closing).

**Section 11.      *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties, on a several and not joint basis, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement or a Joinder, as applicable:

(a)      it is validly existing and in good standing under the Laws of the state or jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval (other than that of the BR Member and BK Member, each as defined in the Second Amended and Restated Limited Liability Company Agreement of Freedom VCM Holdings, LLC, dated January 19, 2024) is required by any other Person in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its Organizational Documents;

(d)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement or any other Person that have not been disclosed to all Parties to this Agreement.

**Section 12.      *Termination Events*.**

12.01.  <u>Consenting First Lien Lender Termination Events</u>.  This Agreement may be terminated with respect to all Parties by the Required Consenting First Lien Lenders upon the delivery to each other Party of a written notice in accordance with <u>Section 14.10</u> at any time upon the occurrence of the following events:

(a)    the execution, delivery, and/or filing of any Definitive Document that is not acceptable to the Required Consenting First Lien Lenders pursuant to their consent rights set forth herein that remains unacceptable to the Required Consenting First Lien Lenders for one (1) calendar day after such terminating Required Consenting First Lien Lenders promptly transmit a written notice to the Company Parties, which may be by email from the Ad Hoc Group Advisors to counsel to the Company Parties, detailing any such lack of acceptance.  For the avoidance of doubt, any such cure period shall apply solely to the Required Consenting First Lien Lenders' lack of consent;

(b)    the breach (or inaccuracy, as applicable) in any respect by a Company Party of any of the representations, warranties, covenants, or other obligations or agreements of the Company Parties set forth in this Agreement, which breach has a material impact on the Company Parties or the Restructuring Transactions, that remains uncured (if susceptible to cure) for five (5) Business Days after such terminating Required Consenting First Lien Lenders transmit a written notice to the Company Parties in accordance with Section 14.10 detailing any such breach;

(c)    any of the Milestones is not achieved on the date set forth herein, except where such Milestone has been waived or extended by the Required Consenting First Lien Lenders, or the failure to achieve the Milestone is directly caused by, or results from, an act, omission, or delay by one or more Consenting First Lien Lender;

(d)    the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) days after such terminating Required Consenting First Lien Lenders transmit a written notice to the Company Parties in accordance with Section 14.10 hereof detailing any such issuance; provided that this termination right may not be exercised by any Consenting First Lien Lenders that sought or requested such ruling or order in contravention of any obligation set out in this Agreement; provided further that, at the Company Parties' sole cost and expense, the Consenting First Lien Lenders will work in good faith to assist the Company Parties in seeking to overturn or vacate such ruling or order;

(e)    the happening or existence of any event that shall have made any of the conditions precedent to the consummation of the Restructuring Transactions as set forth in this Agreement (if any), the Plan, or the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date", if applicable, incapable of being satisfied prior to the Outside Date, except where such condition precedent has been waived by the applicable Parties; provided that the right to terminate this Agreement under this Section 12.01(e) shall not be available to any Consenting First Lien Lenders if the happening or existence of such event is directly caused by, or results from, the breach by such Consenting First Lien Lenders of its covenants, agreements, or other obligations under this Agreement;

(f)    any Company Party, other than as expressly contemplated herein, without the consent of the Required Consenting First Lien Lenders, (i) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases; (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or a material portion of the property or assets of any Company

Party; (iii) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases; or (iv) makes any general assignment for the benefit of its creditors;

(g)    (i) the commencement of an involuntary case against any Company Party under the Bankruptcy Code that is not dismissed or withdrawn within twenty-one (21) calendar days; or (ii) a court of competent jurisdiction enters a ruling, judgment, or order that appoints, or that authorizes or permits the taking of possession by, a receiver, liquidator (except the Liquidator), assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party, any Interests held by any Company Party, or a material portion of the property or assets of any Company Party;

(h)    any Company Party (i) publicly announces, or communicates in writing to any other Party, its intention not to support or pursue the Restructuring Transactions; (ii) (A) in the event that a Sufficient Bid has been received on or prior to the Bid Deadline, withdraws or terminates any part of the Sale Process or (B) in the event that a Sufficient Bid has not been received at least 48 hours prior to the Auction (as defined in the Bidding Procedures), conducts an Auction (as defined in the Bidding Procedures) for the sale of the Debtors' assets; (iii) provides notice to the Ad Hoc Group Advisors that it is exercising its rights pursuant to Section 8.01; or (iv) publicly announces, or communicates in writing to any other Party, that it intends to enter into, or has entered into, definitive documentation with respect to, an Alternative Restructuring;

(i)    the Plan Effective Date has not occurred by the Outside Date (as such date may have been extended in accordance with the provisions of this Agreement);

(j)    the Bankruptcy Court enters an order denying Confirmation of the Plan and such order remains in effect for three (3) Business Days after entry of such order;

(k)    the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect;

(l)    if applicable, the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting First Lien Lenders), (A) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (C) dismissing any of the Chapter 11 Cases, (D) approving an Alternative Restructuring Proposal, or (E) rejecting this Agreement;

(m)    the Bankruptcy Court enters an order terminating any Company Party's exclusive right to file and/or solicit acceptances of a plan of reorganization or the Company Parties let such periods/rights lapse;

(n)    except as set forth in the Bidding Procedures or in connection with any Sale Transaction, without the prior written consent of the Required Consenting First Lien Lenders, any Debtor (A) withdraws the Plan; (B) publicly announces, or communicates in writing to any other Party, its intention to withdraw the Plan or not support the Plan; (C) moves to voluntarily dismiss any of the Chapter 11 Cases; or (D) moves for court authority to sell any material asset or assets without the written consent of the Required Consenting First Lien Lenders;

(o)    any of the Company Parties (A) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Company Claims/Interests, lien, or interest held by any Consenting First Lien Lender in any capacity; or (B) shall have supported any application, adversary proceeding, or Cause of Action referred to in the immediately preceding subsection (A) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action;

(p)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any asset of the Company Parties having an aggregate fair market value in excess of $3,000,000 without the prior written consent of the Required Consenting First Lien Lenders; provided, however, that any modification of the automatic stay expressly provided by the DIP Orders or any orders entered in connection with any First Day Pleadings, shall not constitute a termination event;

(q)    the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing or limiting, as applicable, any of the First Lien Claims, or any of the encumbrances that secure (or purport to secure) the First Lien Claims;

(r)    any Debtor consummates debtor-in-possession financing, cash collateral usage, exit financing and/or other financing arrangement that is in an amount, on terms and conditions, or otherwise in form and substance, that is/are not acceptable to the Required Consenting First Lien Lenders;

(s)    any Company Party's use of cash collateral or debtor-in-possession financing has been validly terminated in accordance with the respective terms thereof;

(t)    the occurrence of any default or event of default under the DIP Documents or DIP Orders, as applicable, that has not been cured or waived (if susceptible to cure or waiver) by the applicable percentage of lenders in accordance with the terms of the DIP Documents or DIP Orders, as applicable;

(u)    after entry by the Bankruptcy Court of the DIP Orders, Disclosure Statement Order, or Confirmation Order, as applicable, such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended, in each case, in a manner materially inconsistent with this Agreement without the written consent of the Required Consenting First Lien Lenders;

(v)    the occurrence of an Event of Default under the First Lien Credit Agreement that would permit acceleration or otherwise automatically accelerates the outstanding obligations thereunder, other than the "Specified Defaults" (as defined in the Limited Waiver Amendment), or any Event of Default expressly contemplated herein, that shall not have been cured within any applicable grace periods or waived pursuant to the terms of the First Lien Credit Agreement; or

(w)    any Company Party terminates this Agreement pursuant to Section 12.02.

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 upon the occurrence of any of the following events (unless waived in writing by the Company Parties):

(a)     termination by the Required Consenting First Lien Lenders;

(b)     the breach (or inaccuracy, as applicable) in any material respect by the Consenting First Lien Lenders of any of the representations, warranties, covenants or other obligations or agreements of the Consenting First Lien Lenders set forth in this Agreement, such that the non-breaching Consenting First Lien Lenders own or control less than 50% in number of holders of First Lien Loans and less than 66 2/3% in aggregate principal amount of all outstanding prepetition First Lien Loans and such breach remains uncured (if susceptible to cure) for five (5) Business Days after the Company Parties transmit a written notice to the breaching Consenting First Lien Lenders in accordance with <u>Section 14.10</u> detailing any such breach;

(c)     the board of directors, board of managers, or such similar governing body of any Company Party determines in accordance with <u>Section 8.01</u> hereof, after consulting with outside counsel (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; or

(d)     the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for five (5) days after such terminating Company Party transmits a written notice in accordance with <u>Section 14.10</u> detailing any such issuance; <u>provided</u> that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

12.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement between the Company Parties and the Required Consenting First Lien Lenders.

12.04.  <u>Automatic Termination</u>.  This Agreement shall terminate with respect to all Parties automatically (1) without any further required action or notice immediately after the occurrence of the Plan Effective Date, or (2) on the Outside Date (as such date may have been extended in accordance with the provisions of this Agreement).

12.05.  <u>Effect of Termination</u>.  Upon the occurrence of the Termination Date, this Agreement shall be of no further force and effect and each of the Parties shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all commercially reasonable actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve any Party from (i) liability for its willful or intentional breach or non-performance of its obligations under this Agreement prior to the Termination Date or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Upon the occurrence of the Termination Date and, if applicable, prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties before the Termination Date shall be deemed, for all purposes, to

be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, this Agreement or otherwise. If this Agreement is terminated in accordance with this <u>Section 12</u>, each Consenting First Lien Lender shall have an opportunity to change or withdraw (or cause to change or withdraw) its vote to accept the Plan or its consent (regardless of whether any deadline for votes or consents, or for withdrawal thereof, set forth in the Disclosure Statement has passed) and no Company Party shall oppose any attempt by such Consenting First Lien Lender to change or withdraw (or cause to change or withdraw) such vote or consent at such time. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting First Lien Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before the Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting First Lien Lender, and (b) any right of any Consenting First Lien Lender, or the ability of any Consenting First Lien Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting First Lien Lender. No Party may terminate this Agreement (a) if such Party is in material breach of the terms of this Agreement and/or (b) on account of a termination event if the occurrence of such termination event was primarily caused by, or primarily resulted from, such Party's own action (or failure to act) in breach of the terms of this Agreement, except a termination pursuant to <u>Section 12.02(c)</u> or <u>(d)</u>. Nothing in this <u>Section 12.05</u> shall restrict any Company Party's right to terminate this Agreement in accordance with <u>Section 12.02(c)</u>.

**Section 13.     *Amendments and Waivers*.**

13.01. <u>Amendments and Waivers</u>.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this <u>Section 13</u>.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing (email being sufficient) signed: (i) in the case of a waiver, by the Party against whom the waiver is to be effective (it being understood that the Required Consenting First Lien Lenders may waive any conditions to the obligations of the Consenting First Lien Lenders or any rights of the Consenting First Lien Lenders under this Agreement), and (ii) in the case of a modification, amendment, or supplement, by the Company Parties and the Required Consenting First Lien Lenders; <u>provided</u> that (A) if the proposed modification, amendment, supplement, or waiver will result in a material change from the terms provided in this Agreement, including the Restructuring Term Sheet and other exhibits hereto or thereto, that has a disproportionate and adverse effect on a Consenting First Lien Lender, relative to all other Consenting First Lien Lenders, then the consent of such disproportionately and adversely affected Consenting First Lien Lender  (solely in its capacity as a Consenting First Lien Lender) shall also be required to effectuate such modification, amendment, supplement or waiver, and such disproportionately and adversely affected Consenting First Lien Lender shall be entitled

to terminate this Agreement as to itself only for any breach of this provision; and (B) any modification, amendment, or supplement to (1) this Section 13.01(b) or the Outside Date shall require the consent of all Parties, and (2) the definition for Required Consenting First Lien Lenders will require the consent of each Consenting First Lien Lender.

(c)    In determining whether any consent or approval has been given by the Required Consenting First Lien Lenders, any Company Claims/Interests held by any then-existing Consenting First Lien Lender that is in material breach of its covenants, obligations, or representations under this Agreement shall be excluded from such determination, and the Company Claims/Interests, as applicable, held by such Consenting First Lien Lender shall be treated as if they were not outstanding.

(d)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(e)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.**    *Miscellaneous*

14.01.    Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a chapter 11 plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.    Exhibits Incorporated by Reference; Conflicts.    Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.    Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.    Complete Agreement.    Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter

hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  All actions arising out of or relating to this Agreement shall be brought by the Parties in either a state or federal court of competent jurisdiction in exclusively the State and County of New York, Borough of Manhattan. Notwithstanding anything to the contrary herein, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, (i) the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement and (ii) each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06. <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08. <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting First Lien Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting First Lien Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09. <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, except that each No Recourse Party (as defined in <u>Section 14.24</u>) shall be a third party beneficiary of <u>Section 14.24</u>, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person, except in accordance with <u>Section 9</u> of this Agreement.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Company Party, to:

Franchise Group, Inc.
109 Innovation Court, Suite J
Delaware, OH 43015
Attention: Tiffany McMillan-McWaters
E-mail address: tmcwaters@franchisegrp.com

with copies to (which shall not constitute notice):

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Matthew A. Feldman; Debra McElligott Sinclair; Betsy L. Feldman
E-mail address: mfeldman@willkie.com; dsinclair@willkie.com;
bfeldman@willkie.com

(b)    if to a Consenting First Lien Lender, to the address or e-mail address set forth on such member's signature page to this Agreement (or on the signature page to a Joinder in the case of any Consenting First Lien Lender that becomes a party hereto after the Agreement Effective Date), with copies to (which shall not constitute notice):

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention:  Jayme Goldstein; Jeremy Evans; Isaac Sasson
E-mail address: jaymegoldstein@paulhastings.com;
jeremyevans@paulhastings.com; isaacsasson@paulhastings.com

(c)    Any notice given by delivery, mail, or courier shall be effective when received, and any notice delivered or given by electronic mail shall be effective when sent (so long as a message delivery failure or transmission error notification is not received by the sender).

14.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting First Lien Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, and financial and other conditions, and prospects of the Company Parties.

14.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party. No failure of any Party to exercise, and no delay in exercising, any such right, power, or remedy shall operate as a waiver of any such right, power, or remedy.

14.18.  <u>Capacities of Consenting First Lien Lenders</u>.  Each Consenting First Lien Lender has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, notice, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 7.02</u>, <u>Section 13</u>, or otherwise, including a written approval by the Company Parties or the Required Consenting First Lien Lenders, as applicable, such written consent, acceptance, approval, notice, or waiver shall be deemed to have occurred if such written consent, acceptance, approval, notice, or waiver is given or made by the applicable Party(ies) or counsel to the applicable Party(ies) to the other applicable Party(ies) or counsel to the other applicable Party(ies) by electronic mail.

14.20.  <u>Transaction Expenses</u>.

(a)   Whether or not the transactions contemplated by this Agreement are consummated, the Company Parties hereby agree, on a joint and several basis, to pay in cash the Transaction

41

Expenses as follows: (i) all accrued and unpaid Transaction Expenses incurred up to (and including) the Agreement Effective Date for which reasonably detailed invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and with the level of detail consistent with prior invoices sent by the Ad Hoc Group Advisors to the Company Parties) have been received by the Company Parties no later than the Agreement Effective Date shall be paid in full in cash on the Agreement Effective Date; (ii) prior to the Petition Date and after the Agreement Effective Date, all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Company Parties on a monthly basis within ten (10) days of receipt of reasonably detailed invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and with the level of detail consistent with prior invoices sent by the Ad Hoc Group Advisors to the Company Parties), and otherwise in accordance with the applicable professional's engagement letter or other contractual arrangement with the Company Parties, and, in any event, no later than the Business Day prior to the Petition Date following receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges) to the extent received no fewer than three (3) Business Days prior to such date; (iii) after the Petition Date (to the extent permitted by order of the Bankruptcy Court) all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Company Parties on a regular and continuing basis promptly (but in any event within ten (10) days) following receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges) and shall otherwise be paid in accordance with subsection (v); (iv) upon termination of this Agreement (other than a termination of this Agreement pursuant to Section 12.04, which is addressed in clause (v) of this Section 14.20(a)), all accrued and unpaid Transaction Expenses incurred up to (and including) the Termination Date shall be paid in full in cash promptly (but in any event within ten (10) days) following receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and which shall be in form and substance consistent with Delaware practice); and (v) on the Plan Effective Date, all accrued and unpaid Transaction Expenses incurred up to (and including) the Plan Effective Date shall be paid in full in cash against receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and which shall be in form and substance consistent with Delaware practice).  To the extent applicable, the Plan and any DIP Order shall contain appropriate provisions to give effect to the obligations under this Section 14.20.

(b)    The Company Parties hereby acknowledge and agree that the Consenting First Lien Lenders have expended, and will continue to expend, considerable time, effort, and expense in connection with this Agreement and the negotiation of the Restructuring Transactions, and that this Agreement provides substantial value to, is beneficial to, and is necessary to preserve, the Company Parties, and that the Consenting First Lien Lenders have made a substantial contribution to the Company Parties and the Restructuring Transactions.  To the extent applicable, subject to the approval of the Bankruptcy Court, the Company Parties shall reimburse or pay (as the case may be) all reasonable and documented Transaction Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  The Company Parties hereby acknowledge and agree that the Transaction Expenses are of the type that should be entitled to treatment as, and the Company Parties shall seek treatment of such Transaction Expenses as, administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.  For the avoidance of doubt, nothing in this Section 14.20(b) shall require the Debtors to assume this Agreement during the Chapter 11 Cases.

14.21.  <u>Relationship Among Parties</u>.  It is understood and agreed that no Consenting First Lien Lender owes any duty of trust or confidence of any kind or form to any other Party as a result of entering into this Agreement, and there are no commitments among or between the Consenting First Lien Lenders, in each case except as expressly set forth in this Agreement.  In this regard, it is understood and agreed that any Consenting First Lien Lender may trade in Company Claims/Interests without the consent of any other Party, subject to applicable securities laws and the terms of this Agreement, including <u>Section 9</u>; <u>provided</u>, <u>however</u>, that no Consenting First Lien Lender shall have any responsibility for any such trading to any other Person by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  No Consenting First Lien Lender shall, nor shall any action taken by a Consenting First Lien Lender pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting First Lien Lender with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Consenting First Lien Lenders are in any way acting in concert or as a group.  The decision to commit to enter into the transactions contemplated by this Agreement has been made independently by each Party hereto.  The Parties acknowledge that all representations, warranties, covenants, and other agreements made by or on behalf of any Consenting First Lien Lender that is a separately managed account of an investment manager signatory hereto (the "<u>**Manager**</u>") are being made only with respect to the assets managed by such Manager on behalf of such Consenting First Lien Lender, and shall not apply to (or be deemed to be made in relation to) any assets or interests that may be beneficially owned by such Consenting First Lien Lender that are not held through accounts managed by such Manager.

14.22.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the terms, provisions, agreements, and obligations set forth in <u>Section 1.02</u>, <u>Section 12.05</u>, <u>Section 13</u> and <u>Section 14</u> (other than <u>Section 14.03</u> in the event of a termination of this Agreement other than pursuant to clause (1) of <u>Section 12.04</u>), the proviso in <u>Section 5.02(a)(vii)</u>, and any defined terms used in any of the foregoing Sections or proviso (solely to the extent used therein), shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.  Notwithstanding the termination of this Agreement, the Company Parties will comply with their obligations (or the obligations of their successors in interest) to pay the Transaction Expenses that have been incurred as of the Termination Date pursuant to <u>Section 14.20</u> hereof.

14.23.  <u>Publicity; Confidentiality</u>.

(a)    The Company Parties shall submit drafts to the Ad Hoc Group Advisors of any press releases or other public statement or public disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days prior to making any such disclosure; <u>provided</u> that if delivery of such document at least two (2) Business Days in advance of such disclosure is impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.

(b)     Except as required by Law, no Party or its advisors shall (x) other than as necessary during live court proceedings and in filings in connection with the Chapter 11 Cases, use the name of any Consenting First Lien Lender in any public manner (including in any press release) with respect to this Agreement, the Restructuring Transactions, or any of the Definitive Documents, or (y) disclose to any Person, other than advisors to the Company Parties, the principal amount or percentage of any Company Claims/Interests held by any Consenting First Lien Lender without such Consenting First Lien Lender's prior written consent (it being understood and agreed that each Consenting First Lien Lender's signature page to this Agreement shall be redacted to remove the name of such Consenting First Lien Lender and the amount and/or percentage of Company Claims/Interests held by such Consenting First Lien Lender); provided, however, that (i) if such disclosure is required by Law, the disclosing Party shall afford the relevant Consenting First Lien Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all commercially reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims/Interests held by the Consenting First Lien Lenders, collectively.  Notwithstanding the provisions in this Section 14.23, (x) any Party may disclose the identities of the other Parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof, and (y) any Party may disclose, to the extent expressly consented to in writing by a Consenting First Lien Lender such Consenting First Lien Lender's identity and individual holdings.

14.24.  No Recourse.  This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement).  All claims or Causes of Action (whether in contract, tort, equity, or any other theory) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein).  No past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney, or other representative of any party hereto (including any person negotiating or executing this Agreement on behalf of a party hereto), nor any past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney, or other representative of any of the foregoing (other than any of the foregoing that is a Party hereto) (any such Person, a "**No Recourse Party**"), shall have any liability with respect to this Agreement or with respect to any proceeding (whether in contract, tort, equity, or any other theory that seeks to "pierce the corporate veil" or impose liability of an Entity against its owners or Affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement.

14.25.  Computation of Time.  Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

14.26.  Tax Matters.  Each Party hereby acknowledges and agrees that the terms of the Restructuring Transactions shall be structured to minimize the tax impact of the Restructuring Transactions on the Company Parties and the Consenting First Lien Lenders while preserving or otherwise maximizing favorable tax attributes (including tax basis) of the Reorganized Debtors,

as a result of the consummation of the Restructuring Transactions to the extent practicable, in each case as determined by the Consenting First Lien Lenders.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature Pages Follow.*]

**Company Parties' Signature Page to
the Restructuring Support Agreement**

FREEDOM VCM HOLDINGS, LLC
FREEDOM VCM INTERCO HOLDINGS, INC.
FREEDOM VCM INTERCO, INC.
FREEDOM VCM RECEIVABLES II, LLC
FREEDOM VCM RECEIVABLES, INC.
FREEDOM VCM, INC.
FRANCHISE GROUP, INC.
FRANCHISE GROUP ACQUISITION TM, LLC
FRANCHISE GROUP NEW HOLDCO, LLC
FRANCHISE GROUP INTERMEDIATE HOLDCO, LLC
FRANCHISE GROUP INTERMEDIATE L, LLC
FRANCHISE GROUP INTERMEDIATE PSP, LLC
FRANCHISE GROUP NEWCO PSP, LLC
PSP MIDCO, LLC
PET SUPPLIES "PLUS", LLC
PSP GROUP, LLC
PSP SERVICE NEWCO, LLC
WNW FRANCHISING, LLC
WNW STORES, LLC
PSP STORES, LLC
PSP FRANCHISING, LLC
PSP SUBCO, LLC
PSP DISTRIBUTION, LLC
FRANCHISE GROUP INTERMEDIATE V, LLC
FRANCHISE GROUP NEWCO V, LLC
VALOR ACQUISITION, LLC
VITAMIN SHOPPE INDUSTRIES LLC
VITAMIN SHOPPE GLOBAL, LLC
VITAMIN SHOPPE MARINER, LLC
VITAMIN SHOPPE PROCUREMENT SERVICES, LLC
VITAMIN SHOPPE FRANCHISING, LLC
VITAMIN SHOPPE FLORIDA, LLC
BETANCOURT SPORTS NUTRITION, LLC
FRANCHISE GROUP INTERMEDIATE B, LLC
BUDDY'S NEWCO, LLC
BUDDY'S FRANCHISING AND LICENSING, LLC
FRANCHISE GROUP INTERMEDIATE SL, LLC
FRANCHISE GROUP NEWCO SL, LLC
EDUCATE, INC.
AMERICAN FREIGHT FFO, LLC
FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC
AMERICAN FREIGHT GROUP, LLC

*[Signature Page to Restructuring Support Agreement]*

AMERICAN FREIGHT HOLDINGS, LLC
AMERICAN FREIGHT, LLC
AMERICAN FREIGHT MANAGEMENT COMPANY, LLC
FRANCHISE GROUP INTERMEDIATE S, LLC
FRANCHISE GROUP NEWCO S, LLC
AMERICAN FREIGHT FRANCHISING, LLC
HOME AND APPLIANCE OUTLET, LLC
AMERICAN FREIGHT OUTLET STORES, LLC
AMERICAN FREIGHT FRANCHISOR, LLC
FRANCHISE GROUP INTERMEDIATE BHF, LLC
FRANCHISE GROUP NEWCO BHF, LLC

By: _____
Name: ANDREW M. LAURENCE
Title: Chief Executive Officer

Authorized Signatory

[*Signature Page to Restructuring Support Agreement*]

[*Consenting First Lien Lenders' signature pages on file with the Company Parties.*]

## EXHIBIT A

## Company Parties

| |
|---|
| 1.  Freedom VCM Holdings, LLC |
| 2.  Freedom VCM Interco Holdings, Inc. |
| 3.  Freedom VCM Interco, Inc. |
| 4.  Freedom Receivables II, LLC |
| 5.  Freedom VCM Receivables, Inc. |
| 6.  Freedom VCM, Inc. |
| 7.  Franchise Group, Inc. |
| 8.  Franchise Group Acquisition TM, LLC |
| 9.  Franchise Group New Holdco, LLC |
| 10. Franchise Group Intermediate Holdco, LLC |
| 11. Franchise Group Intermediate L, LLC |
| 12. Franchise Group Intermediate PSP, LLC |
| 13. Franchise Group Newco PSP, LLC |
| 14. PSP Midco, LLC |
| 15. Pet Supplies "Plus", LLC |
| 16. PSP Group, LLC |
| 17. PSP Service Newco, LLC |
| 18. WNW Franchising, LLC |
| 19. WNW Stores, LLC |
| 20. PSP Stores, LLC |
| 21. PSP Franchising, LLC |
| 22. PSP Subco, LLC |
| 23. PSP Distribution, LLC |
| 24. Franchise Group Intermediate V, LLC |
| 25. Franchise Group Newco V, LLC |
| 26. Valor Acquisition, LLC |
| 27. Vitamin Shoppe Industries LLC |
| 28. Vitamin Shoppe Global, LLC |
| 29. Vitamin Shoppe Mariner, LLC |
| 30. Vitamin Shoppe Procurement Services, LLC |
| 31. Vitamin Shoppe Franchising, LLC |
| 32. Vitamin Shoppe Florida, LLC |
| 33. Betancourt Sports Nutrition, LLC |
| 34. Franchise Group Intermediate B, LLC |
| 35. Buddy's Newco, LLC |
| 36. Buddy's Franchising and Licensing, LLC |
| 37. Franchise Group Intermediate SL, LLC |
| 38. Franchise Group Newco SL, LLC |
| 39. Educate, Inc. |
| 40. American Freight FFO, LLC |
| 41. Franchise Group Newco Intermediate AF, LLC |

| |
|---|
| 42. American Freight Group, LLC |
| 43. American Freight Holdings, LLC |
| 44. American Freight, LLC |
| 45. American Freight Management Company, LLC |
| 46. Franchise Group Intermediate S, LLC |
| 47. Franchise Group Newco S, LLC |
| 48. American Freight Franchising, LLC |
| 49. Home and Appliance Outlet, LLC |
| 50. American Freight Outlet Stores, LLC |
| 51. American Freight Franchisor, LLC |
| 52. Franchise Group Intermediate BHF, LLC |
| 53. Franchise Group Newco BHF, LLC |

## **EXHIBIT B**

**Restructuring Term Sheet**

*Execution Version*

## FRANCHISE GROUP, INC. AND CERTAIN AFFILIATES

## RESTRUCTURING TERM SHEET

## NOVEMBER 1, 2024

This term sheet (together with all exhibits, annexes, and schedules attached hereto, this "**Restructuring Term Sheet**") sets forth certain material terms of the proposed Restructuring Transactions contemplated under the Restructuring Support Agreement, dated as of November 1, 2024 (together with all exhibits, annexes, and schedules attached thereto, including this Restructuring Term Sheet, in each case, as amended, supplemented or modified in accordance with its terms, the "**RSA**"), to which this Restructuring Term Sheet is attached.[1]

**THIS RESTRUCTURING TERM SHEET IS NOT (NOR WILL IT BE CONSTRUED AS) AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, ACCEPTANCE OR SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER LAWS.**

**THIS RESTRUCTURING TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING, AND CONSISTENT WITH, THE TERMS SET FORTH HEREIN AND IN THE RSA. THE CLOSING OF ANY RESTRUCTURING TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.**

**THIS RESTRUCTURING TERM SHEET HAS BEEN PRODUCED FOR SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER SIMILAR APPLICABLE STATE AND FEDERAL STATUTES, RULES AND LAWS. NOTHING IN THIS RESTRUCTURING TERM SHEET SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF FACT OR LIABILITY OF ANY KIND OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS AND CONDITIONS DESCRIBED IN THE RSA, DEEMED BINDING ON ANY OF THE PARTIES TO THE RSA.**

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the RSA.

| | |
|---|---|
| **OVERVIEW** | |
| **Debtors:** | The Company Parties that are listed on <u>Exhibit A</u> to the RSA, which shall also be signatories to the RSA. |
| **Claims and Interests to be Restructured:** | The Claims against, and the Interests in, the Debtors to be amended, restructured, discharged, compromised, or Unimpaired by the Restructuring Transactions, in each case consistent with the terms and conditions described in this Restructuring Term Sheet will include, without limitation, the following:<br><br>**Prepetition ABL Loan Claims**: consisting of approximately $248.7 million in outstanding principal, plus interest, fees, and other expenses pursuant to the ABL Credit Agreement.<br><br>**Prepetition First Lien Loan Claims**: consisting of approximately $1.097 billion in outstanding principal, plus interest, fees, and other expenses pursuant to the First Lien Credit Agreement.<br><br>**Prepetition Second Lien Loan Claims**: consisting of approximately $125 million in outstanding principal, plus interest, fees, and other expenses pursuant to the Second Lien Credit Agreement.<br><br>**Prepetition HoldCo Loan Claims**: consisting of approximately $514.7 million in outstanding principal, plus interest, fees, and other expenses pursuant to the HoldCo Credit Agreement.<br><br>**General Unsecured Claims**: consisting of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court (collectively, the "**General Unsecured Claims**"). The General Unsecured Claims shall be classified as follows:<br><br>(i)     General Unsecured Claims against Franchise Group, Inc.;<br><br>(ii)    General Unsecured Claims against American Freight;<br><br>(iii)   General Unsecured Claims against Buddy's;<br><br>(iv)   General Unsecured Claims against PSP;<br><br>(v)    General Unsecured Claims against Vitamin Shoppe;<br><br>(vi)   General Unsecured Claims against the HoldCo Entities other than TopCo; and<br><br>(vii)  General Unsecured Claims against TopCo. |

| | |
|---|---|
| | **Subordinated Claims**: consisting of any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise (collectively, the "**Subordinated Claims**").<br><br>**Existing Equity Interests**: consisting of all Equity Interests in the Debtors as of the Plan Effective Date.  The Existing Equity Interests shall be classified as follows:<br><br>(i)    **Existing TopCo Equity Interests**:  any Existing Equity Interests in TopCo; and<br><br>(ii)    **Existing Intercompany Equity Interests**:  any Existing Equity Interests other than Existing TopCo Equity Interests. |
| **Overview of the Restructuring:** | The Restructuring Transactions will be consummated pursuant to confirmation in the Chapter 11 Cases of the Plan implementing the terms and conditions set forth in this Restructuring Term Sheet, the RSA, and the DIP Term Sheet.<br><br>The Plan will be structured such that the Debtors shall concurrently:<br><br>(a)    conduct going out of business sales and implement store closing procedures at American Freight on the terms and conditions set forth in the Store-Closing and Liquidation Sales Documents and the Plan (collectively, the "**Store-Closing and Liquidation Sales**"); and<br><br>(b)    conduct a marketing and sale process pursuant to section 363 of the Bankruptcy Code and the Bidding Procedures (the "**Sale Process**"), and, either (i) solely if a Sufficient Bid (as defined below) is received by the Debtors and a Sale Toggle Event shall have occurred, execute and consummate the Sale Transaction, or (ii) to the extent a Sufficient Bid is not received at least 48 hours prior to the Auction (as defined in the Bidding Procedures), promptly provide for the Sale Process to be terminated and, unless otherwise agreed by the Required Consenting First Lien Lenders, exclusively pursue consummation of the Plan Transaction resulting in the equitization of Allowed Prepetition First Lien Loan Claims into 100% of Reorganized Common Equity (subject to dilution from (1) the MIP (as defined below), (2) the DIP Premium Conversion (as defined below), if applicable, (3) the DIP Equitization (as defined below), and (4) the New Warrants, if applicable);<br><br>in each case, in compliance with the applicable Milestones, which shall be undertaken and prosecuted with the support of the Consenting First Lien Lenders on the terms and conditions set forth in the Plan, and which shall (x) be consistent with the RSA in all material respects or (y) otherwise in form and substance acceptable to the Required Consenting First Lien Lenders pursuant to their respective consent rights set forth in the RSA.  The Plan to be filed in connection with the RSA shall provide for, among other things, the foregoing dual-track process and the classification and treatment of Claims and Interests |

|  | as specifically provided for herein irrespective of whether the Restructuring Transactions occur pursuant to the Plan Transaction or the Sale Transaction. |
|--|--|
|  | In addition to any proceeds from the Store-Closing and Liquidation Sales (the "**Liquidation Proceeds**"), unless otherwise agreed by the Required Consenting First Lien Lenders, in the event the Debtors consummate a Sale Transaction pursuant to a Sufficient Bid, the proceeds therefrom (collectively, the "**Sale Proceeds**") shall be distributed in accordance with this Restructuring Term Sheet and the Plan. |
|  | Irrespective of whether the Restructuring Transactions are consummated through the Plan Transaction or the Sale Transaction, the existing ABL Credit Agreement shall be kept in place during the Chapter 11 Cases on its existing terms and in compliance with the Applicable Borrowing Base (as defined in the DIP Term Sheet), subject to any paydowns of the Prepetition ABL Loan Claims resulting from their ratable share of any Liquidation Proceeds (subject to the Existing ABL Intercreditor Agreement (as defined in the DIP Term Sheet)), and shall otherwise receive the treatment for the Prepetition ABL Loan Claims set forth herein. |
|  | Irrespective of whether the Restructuring Transactions are consummated through the Plan Transaction or the Sale Transaction, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed Claim or Allowed Interest, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to among the Reorganized Debtors, the Required Consenting First Lien Lenders (if applicable, as set forth in this Restructuring Term Sheet), and the holder of such Allowed Claim or Allowed Interest. |
| **Definitive Documents:** | Any documents contemplated by this Restructuring Term Sheet, including any Definitive Documents, that are not executed or remain the subject of negotiation or completion as of the Agreement Effective Date, shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion. Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| **DIP MATTERS** | |
| **DIP Financing:** | As more fully set forth in the debtor in possession financing term sheet attached as **Exhibit 1** hereto (together with all exhibits, annexes, and schedules thereto, the "**DIP Term Sheet**"), certain of the Consenting First Lien Lenders will provide the DIP Facility on the terms and conditions set forth in the RSA and this Restructuring Term Sheet, which shall be backstopped by certain members of the Ad Hoc Group and/or their respective Related Funds (each, a "**DIP Backstop Party**" and collectively, the "**DIP Backstop Parties**"). |

| | |
|---|---|
| **DIP Backstop:** | All holders of First Lien Claims (and/or one or more Related Funds of such holders) who sign the RSA prior to the closing of the DIP syndication process will be eligible to subscribe for their *pro rata* share of the DIP Facility based on their respective *pro rata* holdings of their Allowed First Lien Claims pursuant to syndication procedures acceptable to the Required Consenting First Lien Lenders.  To the extent a holder of First Lien Claims (x) does not execute the RSA and (in which case, such holder shall have no right to subscribe for any portion of the DIP Facility) or (y) executes the RSA but does not subscribe for its portion of the DIP Facility in accordance with the syndication procedures, then (in either case) each DIP Backstop Party shall, severally and not jointly, increase its share of the DIP Facility for any portion of the DIP Facility that is not subscribed for (or not permitted to be subscribed for) by such holder (the "**DIP Backstop**"). <br><br> The DIP Backstop Parties shall subscribe for their respective *pro rata* shares of the DIP Backstop based on their respective *pro rata* holdings of First Lien Claims held by all DIP Backstop Parties as of October 30, 2024 (each such respective share, a "**DIP Backstop Percentage**"). <br><br> In consideration for the DIP Backstop, the Debtors shall pay to the DIP Backstop Parties a non-refundable put option premium in respect of the DIP Backstop (the "**DIP Backstop Premium**") equal to 10.00% of the aggregate amount of the New Money Commitments (as defined in the DIP Term Sheet) under the DIP Facility, which shall be fully earned upon entry of the Interim DIP Order and due and payable in kind on the date of entry of the Interim DIP Order and to be included in the principal amount of the Tranche A DIP Loans. |
| **DIP Premium Election:** | Subject to entry of the Interim DIP Order, and to the extent the Restructuring Transactions are consummated through the Plan Transaction, each holder of DIP Claims (and/or one or more Related Funds of such holder) that received a DIP Backstop Premium or Commitment Premium (as defined in the DIP Term Sheet) as of closing of the DIP syndication process, and each holder of DIP Claims that receives an Exit Premium (as defined in the DIP Term Sheet) shall be entitled to elect, at its sole discretion, to convert such DIP Backstop Premium, Commitment Premium or Exit Premium into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors based on the midpoint enterprise value set forth in the Disclosure Statement (the "**DIP Premium Conversion**").[2] |
| **EXIT FUNDING** | |
| **Take-Back Debt Facility:** | To the extent the Restructuring Transactions are consummated through the Plan Transaction, on the Plan Effective Date, the Reorganized Debtors shall enter into a Take-Back Debt Facility in the maximum amount necessary to ensure that the Reorganized Debtors are in compliance with the Pro Forma Leverage Cap (as defined below), provided, for the avoidance of doubt, that |

---

[2]    Note to Draft: Mechanics of DIP Premium Conversion to be agreed among the Parties prior to the Confirmation Date.

the Take-Back Debt Facility shall be no greater than the Pro Forma Leverage Cap which will be made up of, as further set forth below, a first-lien term loan consisting of all DIP Claims arising from the Tranche A DIP Loans (as defined in the DIP Term Sheet), and certain DIP Claims arising from the Tranche B DIP Loans (as defined in the DIP Term Sheet), in each case as of the Plan Effective Date, and each having, among other things, the following terms:

(a) <u>Borrower</u>: New TopCo or some other Entity designated as such, as mutually agreed by the Debtors and the Required Consenting First Lien Lenders.

(b) <u>Guarantor</u>: Each Reorganized Debtor (other than the Borrower), subject to customary exclusions.

(c) <u>Interest Rate</u>: SOFR + 8.00%, <u>provided</u> that, at the Borrower's election, the Borrower may pay up to 2.00% of the Take-Back Term Loans in kind.

(d) <u>Maturity</u>: 5 years after the Plan Effective Date.

(e) <u>Call Protection</u>: 103/102/101.

(f) <u>Collateral</u>: First lien on substantially all of the Reorganized Debtors' assets and second lien on any ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), in each case subject to customary exclusions.

(g) <u>Other</u>:

1. the Take-Back Debt Credit Agreement shall include customary affirmative and negative covenants, events of default, representations and warranties, prepayment requirements, indemnities and reimbursements in each case, of transactions of the type described herein;

2. the Take-Back Debt Credit Agreement shall allow for a securitization of PSP, subject to minimum proceeds and maximum pricing thresholds to be agreed to between the Company Parties and the Required Consenting First Lien Lenders, with any such proceeds used to pay down the Take-Back Term Loans on a *pro rata* basis; and

3. the Reorganized Debtors shall use commercially reasonable efforts to obtain within sixty (60) days of the Plan Effective Date a public rating (but not any particular rating) in respect of the Take-Back Debt Facility.

| | |
|---|---|
| **New ABL Facilities:** | To the extent the Restructuring Transactions are consummated through the Plan Transaction, the Prepetition ABL Loan Claims shall be treated in the following alternative manners: (1) if the holders of Prepetition ABL Loan Claims so elect, amending and extending the existing ABL Credit Agreement |

| | |
|---|---|
| | on terms and conditions acceptable to the Debtors, the Required Consenting First Lien Lenders, and the requisite holders of Prepetition ABL Loan Claims (the "**Amended & Restated ABL Facility**"), (2) refinanced by an exit asset based loan facility (the "**Exit ABL Facility**") provided by third parties acceptable to the Debtors and the Required Consenting First Lien Lenders, in an amount necessary to refinance all Allowed Prepetition ABL Loan Claims outstanding under the existing ABL Credit Agreement upon such terms and conditions acceptable to the Required Consenting First Lien Lenders and the Debtors, (3) refinanced by a take-back term facility with an aggregate principal amount equal to the Allowed amount of the Prepetition ABL Loan Claims, which facility shall (a) be secured by the same collateral securing the Prepetition ABL Loan Claims with the same priorities, (b) mature within six (6) years of the Plan Effective Date, and (c) bear an interest rate to be established by the Required Consenting First Lien Lenders and the Debtors, or otherwise set forth by the Bankruptcy Court (the "**Take-Back ABL Term Loan Facility**"), or (4) at the election of the Required Consenting First Lien Lenders, reinstated (together with the Take-Back ABL Term Loan Facility, the Amended & Restated ABL Facility and the Exit ABL Facility, collectively, the "**Applicable ABL Exit Facility**"). |
| **New Warrants:** | To the extent the Restructuring Transactions are consummated through the Plan Transaction and the Second Lien Condition is satisfied, on the Plan Effective Date, New TopCo shall issue to holders of Allowed Prepetition Second Lien Loan Claims New Warrants to purchase up to 5.0% of the outstanding Reorganized Common Equity on the Plan Effective Date (immediately after giving effect to the consummation of the Restructuring Transactions to occur on the Plan Effective Date, including all payments and distributions to be made on or as of the Plan Effective Date, and subject to dilution from the MIP. The New Warrants shall have a term of five (5) years from the Plan Effective Date (subject to earlier termination upon the occurrence of a "liquidity event") and an initial exercise price equal to the aggregate amount of all Allowed DIP Claims, Allowed Prepetition First Lien Loan Claims, and Allowed Prepetition ABL Loan Claims. The New Warrants shall not be subject to any anti-dilution provisions (including any economic anti-dilution provisions), other than the adjustments for splits, reverse splits, and similar structural transactions that are not liquidity events. |
| <div align="center">**TREATMENT OF CLAIMS AND INTERESTS**</div> | |
| **Intercompany Claims:** | <u>Restructuring Transaction</u>. In the event of the Plan Transaction, on or after the Plan Effective Date, (a) any and all Intercompany Claims between and among Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, American Freight, the BHF Entities, Buddy's, Educate, PSP, and Vitamin Shoppe) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (i) extinguished, canceled and/or discharged on the Plan Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired; and (b) any and all Intercompany Claims between and among the HoldCo Entities shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (i) extinguished, |

|  | canceled and/or discharged on the Plan Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Plan Effective Date, any such transaction may be effected on or after the Plan Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>Sale Transaction.  In the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (i) extinguished, canceled and/or discharged on the Plan Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Plan Effective Date, any such transaction may be effected on or after the Plan Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. |
|---|---|
| **DIP Claims:** | In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Plan Effective Date, (i) if the Plan Transaction is consummated, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans comprised of the DIP Backstop Premiums, the Commitment Premium, and the Exit Premium that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into loans under the Take-Back Debt Facility, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into the loans under Take-Back Debt Facility, ratably, on a dollar-for-dollar basis, <u>provided</u> that the sum of clauses (x) and (y) hereof together shall be no greater than the amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Plan Effective Date after giving effect to the Restructuring Transactions (the "**Pro Forma Leverage Cap**"), and (z) third, any Allowed DIP Claims (other than Allowed DIP Claims arising from Tranche A DIP Loans) that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors based on the midpoint enterprise value set forth in the Disclosure Statement (the "**DIP Equitization**")[3], or (ii) if a Sale Transaction is consummated, unless otherwise agreed to by the Required DIP Lenders, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from Sale Proceeds.  Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect. |
| **Administrative Claims:** | Except to the extent that a holder of an Allowed Administrative Claim agrees to a different treatment, on the applicable distribution date, or as soon |

| | |
|---|---|
| | thereafter as is reasonably practicable, the holder of such Allowed Administrative Claim shall receive Cash in an amount equal to such Allowed Claim or such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget (as defined in the DIP Term Sheet), Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors in possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, that any Allowed Administrative Claim that has been assumed by a Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan. |
| **Professional Fee Claims:** | The Debtors shall establish and fund the Professional Fee Escrow Account prior to the Plan Effective Date with Cash equal to the Professional Fee Escrow Amount; provided that the Plan Administrator shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Plan Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.<br><br>The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Confirmation Order. The Reorganized Debtors or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash to such Professional Persons in the amount the Bankruptcy Court allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; provided that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Professional Persons, the Plan Administrator shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims.<br><br>The terms governing the Professional Fee Escrow Account and submission of Professional Fee Claims will be further delineated in the Plan. |
| **Priority Tax Claims:** | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting First Lien Lenders, each holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge |

---

[3]    Note to Draft: For illustrative purposes, if, after accounting for the conversion of the Tranche A DIP Loans into loans under the Take-Back Debt Facility, there remains $250 million of availability up to the Pro Forma Leverage Cap, and there is $500 million of Tranche B DIP Loans outstanding, each holder of a Tranche B DIP Loan would receive its ratable share of $250 million of Take-Back Term Loans, with the remaining $250 million of Tranche B Term Loans being ratably equitized in accordance with the DIP Equitization.

| | |
|---|---|
| | of each Allowed Priority Tax Claim, either: (a) on the applicable distribution date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Plan Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided that all Allowed Priority Tax Claims that are not due and payable on or before the Plan Effective Date shall be paid in the ordinary course of business as they become due; provided, further, that (i) in the event of the Plan Transaction, notwithstanding any provision of the Plan to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state law shall be assumed by and reinstated against the applicable Reorganized Debtor and (ii) in the event of an Sale Transaction, any Allowed Priority Tax Claim that has been expressly assumed by a Successful Bidder under the Sale Documents shall not be an obligation of the Debtors.  On the Plan Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person.<br><br>Terms governing submission of Priority Tax Claims will be further delineated in the Plan. |
| **U.S. Trustee Fees:** | After the Plan Effective Date, the Debtors, Reorganized Debtors, and Plan Administrator (if appointed), as applicable, shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable.  The Debtors, Reorganized Debtors, and Plan Administrator (if appointed), as applicable, shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors, Reorganized Debtors, or Plan Administrator (if appointed), as applicable, is responsible. |
| **Class 1**<br><br>**Priority Non-Tax Claims:** | The legal, equitable and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable distribution date, each holder of an Allowed Priority Non-Tax Claim shall receive, in consultation with the Required Consenting First Lien Lenders: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  In the event of a Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.<br><br>**Unimpaired – Presumed to accept.** |
| **Class 2** | The legal, equitable and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder |

| | |
|---|---|
| **Other Secured Claims:** | of an Allowed Other Secured Claim agrees to a different treatment, on the applicable distribution date each holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget (as defined in the DIP Term Sheet), Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.<br><br>Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Plan Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein. Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>**Unimpaired – Presumed to accept.** |
| **Class 3**<br><br>**Prepetition ABL Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition ABL Loan Claim will receive its *pro rata* share of:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction (A) the Liquidation Proceeds resulting from the sale of any ABL Priority Collateral, and (B) proceeds of (x) the Exit ABL Facility, (y) the Amended & Restated ABL Facility, or (z) the Take-Back ABL Term Loan Facility; provided that, at the election of the Required Consenting First Lien Lenders in their sole discretion, the Prepetition ABL Loan Claims shall be reinstated; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, (a) the Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (b) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 4**<br><br>**Prepetition First Lien Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition First Lien Loan Claim will receive its *pro rata* share of:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction, (A) Liquidation Proceeds resulting |

| | |
|---|---|
| | from the sale of any Term Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) and (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the MIP (as defined below), (2) the DIP Premium Conversion, and (3) the DIP Equitization); or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim. |
| | **Impaired – Entitled to vote.** |
| **Class 5**<br><br>**Prepetition Second Lien Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition Second Lien Loan Claim will receive: |
| | (i)    to the extent the Restructuring Transactions are consummated through a Plan Transaction, (A) its *pro rata* share of Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, resulting from the sale of any Term Priority Collateral, and (B)(1) solely if the class votes to <u>accept</u> the Plan, the New Warrants, or (2) if the class votes to <u>reject</u> the Plan, its *pro rata* share of the greater of (x) recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code or (y) any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, (a) its ratable share of Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, *plus* (b) its *pro rata* share of the Prepetition Second Lien Lender Distribution.  If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim. |
| | **Impaired – Entitled to vote.** |
| **Class 6-A**<br><br>**General Unsecured Claims against Franchise Group, Inc.:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at Franchise Group, Inc. will receive: |
| | (i)    to the extent the Restructuring Transactions are consummated through a Plan Transaction, its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through a Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to Franchise Group, Inc., if any.  If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder |

| | |
|---|---|
| | of a General Unsecured Claim at Franchise Group, Inc. shall receive no further consideration on account of its General Unsecured Claim at Franchise Group, Inc.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-B**<br><br>**General Unsecured Claims against American Freight:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at American Freight will receive the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code (*i.e.*, its *pro rata* share of any residual Liquidation Proceeds), and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-C**<br><br>**General Unsecured Claims against Buddy's:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at Buddy's will receive:<br><br>(i)     to the extent the Restructuring Transactions are consummated through a Plan Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or<br><br>(ii)     to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to Buddy's, if any. If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder of a General Unsecured Claim at Buddy's shall receive no further consideration on account of its General Unsecured Claim at Buddy's.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-D**<br><br>**General Unsecured Claims against PSP:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at PSP will receive:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or<br><br>(ii)     to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to PSP, if any. If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder of a |

| | |
|---|---|
| | General Unsecured Claim at PSP shall receive no further consideration on account of its General Unsecured Claim at PSP.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-E**<br><br>**General Unsecured Claims against Vitamin Shoppe:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at Vitamin Shoppe will receive:<br><br>(i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to Vitamin Shoppe, if any. If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder of a General Unsecured Claim at Vitamin Shoppe shall receive no further consideration on account of its General Unsecured Claim at Vitamin Shoppe.<br><br>**Impaired – Entitled to vote.** |
| **Class 7**<br><br>**Prepetition HoldCo Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition HoldCo Loan Claim will receive:<br><br>(i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, no consideration on account of its Prepetition HoldCo Loan Claim; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Prepetition HoldCo Lender Distribution, if any. If the proceeds of the Sale Transaction do not result in a Prepetition HoldCo Lender Distribution, then such holder of a Prepetition HoldCo Loan Claim shall receive no further consideration on account of its Prepetition HoldCo Loan Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 8**<br><br>**General Unsecured Claims against the HoldCo Entities:** | Except to the extent that a holder of an Allowed HoldCo General Unsecured Claim agrees to less favorable treatment on account of their claim, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed HoldCo General Unsecured Claim shall receive:<br><br>(i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, no distribution on account of its HoldCo General Unsecured Claim, which shall be released, |

| | |
|---|---|
| | discharged and extinguished, as the case may be, and shall be of no further force or effect, and such holder shall receive no recovery on account of such Allowed HoldCo General Unsecured Claim; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such holder of a HoldCo General Unsecured Claims Distribution shall receive no further consideration on account of its HoldCo General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 9**<br><br>**General Unsecured Claims against TopCo:** | Except to the extent that a holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed TopCo General Unsecured Claim shall receive:<br><br>(i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, (x) its *pro rata* share of Cash (if any) held by TopCo, or (y) if there is no Cash held at TopCo, then such holder of a TopCo General Unsecured Claim shall receive no further consideration on account of its TopCo General Unsecured Claim; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the TopCo General Unsecured Claims Distribution, if any. If the proceeds of the Sale Transaction do not result in a TopCo General Unsecured Claims Distribution, then such holder of a TopCo General Unsecured Claim shall receive no further consideration on account of its TopCo General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 10**<br><br>**Subordinated Claims:** | Except to the extent that a holder of a Subordinated Claim agrees to less favorable treatment, on the Plan Effective Date, or as soon as practicable thereafter, each holder of a Subordinated Claim shall receive:<br><br>(i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, no distribution on account of its Subordinated Claim, which shall be released, discharged and extinguished, as the case may be, and shall be of no further force or effect, and such holder shall receive no recovery on account of such Allowed Subordinated Claim; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any. If the proceeds of the |

|  | Sale Transaction do not result in a Subordinated Claims Distribution, then such holder of a Subordinated Claim shall receive no further consideration on account of its Subordinated Claim.<br><br>**Impaired – Entitled to vote.** |
|---|---|
| **Class 11**<br><br>**Existing TopCo Equity Interests:** | Except to the extent that a holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed Existing TopCo Equity Interest shall receive:<br><br>(i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, (A) its *pro rata* share of Cash (if any) held by TopCo after payment of TopCo General Unsecured Claims, or (B) if (A) does not exist, no consideration on account of its Allowed Existing TopCo Equity Interest; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the TopCo General Unsecured Claims Distribution after payment of TopCo General Unsecured Claims, if any.  If the proceeds of the Sale Transaction do not result in a TopCo General Unsecured Claims Distribution in excess of the TopCo General Unsecured Claims, no consideration on account of its TopCo General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 12**<br><br>**Existing Intercompany Equity Interests:** | On the Plan Effective Date, whether the Restructuring Transactions are consummated through the Plan Transaction or the Sale Transaction, each holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Plan Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left Unimpaired; <u>provided</u>, that, in the event the Restructuring Transactions are consummated through the Plan Transaction, such election shall be with the consent of Required Consenting First Lien Lenders.<br><br>**Impaired – Deemed to Reject.** |
| | **GENERAL PROVISIONS** |
| **Executory Contracts and Unexpired Leases:** | On the Plan Effective Date, in the event of a Plan Transaction, except as otherwise provided in herein, any Executory Contracts and Unexpired Leases (i) not previously assumed, or (ii) not previously rejected pursuant to an order of the Bankruptcy Court, will be deemed assumed as of the Plan Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code *except* any Executory Contract or Unexpired Lease (1) identified on the Rejected |

| | Contracts/Lease List (which shall initially be filed with the Plan Supplement) as a contract or lease to be rejected, (2) that is the subject of a separate motion or notice to reject pending as of the Confirmation Date, or (3) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).<br><br>The Company Parties and the Required Consenting First Lien Lenders will work together in good faith to determine which Executory Contracts and Unexpired Leases shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases; provided that, to the extent the Restructuring Transactions are consummated through the Plan Transaction, if requested by the Required Consenting First Lien Lenders, (x) Vitamin Shoppe shall reject any and all Executory Contracts or Unexpired Leases held by such Debtor(s), and (y) the Debtors shall reject any Executory Contracts or Unexpired Leases explicitly identified by the Required Consenting First Lien Lenders between (i) any of the Debtors, on the one hand, and (ii) any Specified Party, on the other hand.<br><br>On the Plan Effective Date, in the event of a Sale Transaction, except as otherwise provided herein, any Executory Contract or Unexpired Lease (i) not previously assumed, (ii) not assumed and assigned in accordance with any Sale Documents, (iii) not previously rejected pursuant to an order of the Bankruptcy Court, or (iv) not subject of a pending motion to reject, assume or assign, will be deemed rejected as of the Plan Effective Date. |
|---|---|
| **New Board:** | In the event of a Plan Transaction the new board of directors or board of managers of New TopCo (the "**New Board**") and the new board of directors, board of managers or similar governing body of the Reorganized Debtors shall be appointed on the Plan Effective Date by the Required Consenting First Lien Lenders, in their sole discretion, and consist of a number of members determined by the Required Consenting First Lien Lenders, in their sole discretion. |
| **Management/Employee Incentive Plans:** | In the event of a Plan Transaction, the New Board shall: (x) adopt and implement management incentive plans (collectively, the "**MIP**") at each operating company or (y) shall assume, amend or reject the existing long term incentive plans with the current members of the senior management team of Franchise Group's direct or indirect subsidiaries, in each case structured to incentivize operating performance and align economic interests on terms and conditions acceptable to the New Board and the Required Consenting First Lien Lenders. If applicable, the MIP shall provide for the issuance of equity or equity-linked awards representing up to 10% of the Reorganized Common Equity on a fully diluted basis, to be allocated by the New Board. |
| **Employment Arrangements:** | In the event of a Plan Transaction, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of Franchise Group, or will enter into new compensation arrangements, as applicable, on the Plan Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting First Lien Lenders and |

17

| | |
|---|---|
| | which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting First Lien Lenders. |
| **Vesting of Assets:** | In the event of a Plan Transaction, on the Plan Effective Date, pursuant to sections 1141(b)–(c) of the Bankruptcy Code, all assets of the Debtors (other than the assets of American Freight sold in the Store-Closing and Liquidation Sales) will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances. |
| **Conditions Precedent to Confirmation:** | Confirmation of the Plan is subject to the satisfaction or waiver of the following conditions to confirmation of the Plan:<br><br>(a) the DIP Order shall have been entered by the Bankruptcy Court and shall remain in full force and effect;<br><br>(b) the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Transaction Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Order;<br><br>(c) the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan;<br><br>(d) entry of the Disclosure Statement Order;<br><br>(e) entry of the Confirmation Order;<br><br>(f) the RSA, the DIP Facility, and the DIP Order, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the RSA or the DIP Order, or the DIP Facility in accordance with its respective terms upon the expiration of such time; and<br><br>(g) in the event of a Sale Transaction, the receipt of a Sufficient Bid and the Sale Documents shall not have been terminated in accordance with its terms. |
| **Conditions Precedent to the Plan Effective Date:** | The occurrence of the Plan Effective Date will be subject to the satisfaction or waiver of the following conditions to effectiveness of the Plan:<br><br>(a) the Confirmation Order shall have become a final and non-appealable order, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified, unless otherwise agreed by the Debtors and the Required Consenting First Lien Lenders;<br><br>(b) each of the applicable Definitive Documents shall have been executed and effectuated and remain in full force and effect, and any conditions |

precedent related thereto or contained therein shall have been satisfied before or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived in accordance with such applicable Definitive Documents;

(c) any non-technical and/or immaterial amendments, modifications or supplements to the Plan shall be acceptable to the Debtors and the Required Consenting First Lien Lenders, except as otherwise provided in Section 14.3 of the Plan;

(d) the RSA, the DIP Facility, and the DIP Order, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the RSA or the DIP Order, or the DIP Facility in accordance with its respective terms upon the expiration of such time;

(e) to the extent a Plan Transaction is implemented, all of the actions set forth in the Restructuring Transactions Memorandum, as applicable, shall have been completed and implemented;

(f) there shall not have been instituted or threatened or be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Entity (x) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transaction contemplated herein, in the RSA, and in the Definitive Documents or (y) imposing a material award, claim, injunction, fine or penalty that, in each case, both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

(g) the Debtors have obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and filing all notices and reports, if any, required to be filed, by the Debtors in connection with the Plan's effectiveness;

(h) the Reorganized Common Equity to be issued and/or delivered on the Plan Effective Date (as set forth in the Plan) shall have been validly issued by New TopCo, shall be fully paid and non-assessable, and shall be free and clear of all taxes, liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents of New TopCo;

(i) all conditions precedent to the effectiveness of the Take-Back Credit Agreement shall have been satisfied or duly waived by the party whose

|  | consent is required thereunder, and the Take-Back Credit Agreement shall be in full force and effect; |
|--|--|
|  | (j) all conditions precedent to the effectiveness of the Applicable ABL Exit Facility shall have been satisfied or duly waived by the party whose consent is required thereunder, and the Applicable ABL Exit Facility shall be in full force and effect; |
|  | (k) all requisite filings with any Governmental Entity and third parties shall have become effective, and all such Governmental Entity and third parties shall have approved or consented to the Restructuring Transactions, to the extent required; |
|  | (l) the New Organizational Documents shall be in full force and effect; |
|  | (m) any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions shall have been obtained; |
|  | (n) all accrued and unpaid Transaction Expenses shall have been paid in full by the Debtors; |
|  | (o) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; |
|  | (p) in the event of a Sale Transaction, the Sale Documents, as applicable, not having been terminated in accordance with their terms; and |
|  | (q) all closing conditions and other conditions precedent in the RSA shall have been satisfied or waived in accordance with the terms thereof. |
| **Discharge and Injunction:** | In the event of a Plan Transaction, the Plan will contain customary discharge and injunction provisions acceptable to the Company Parties and the Required Consenting First Lien Lenders. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Plan Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |
| **Restructuring Transactions:** | In the event of a Plan Transaction, on the Plan Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan. |

| **Freedom Allocated Fees and Expenses:** | Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "<u>Freedom Allocated Fees and Expenses</u>").  Freedom VCM Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such Freedom Allocated Fees and Expenses, if any; <u>provided</u>, that, for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the Freedom Allocated Fees and Expenses; <u>provided</u>, <u>further</u>, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims. |
| --- | --- |
| **Securities Exemption:** | In the event of a Plan Transaction, the issuance and distribution under the Plan of the Reorganized Common Equity and the New Warrants shall be exempt from registration under the Securities Act under section 1145(a) of the Bankruptcy Code, and/or Section 4(a)(2) of the Securities Act or Regulation D of the Securities Act. |
| **Tax Considerations:** | To the extent practicable, a Plan Transaction contemplated by this Restructuring Term Sheet will be structured in a manner that is the most tax-efficient for the Reorganized Debtors (for the avoidance of doubt, such contemplated structure may include a "Bruno's transaction" pursuant to which the Debtors sell the assets and/or equity of all or certain Debtors in a taxable transaction to an indirect subsidiary of a Reorganized Debtor), which structure shall be acceptable to the Required Consenting First Lien Lenders and the Debtors in their sole discretion. |
| **SELECT ADDITIONAL DEFINITIONS** | |
| "**<u>Administrative Claim</u>**" | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Plan Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), and (ii) Transaction Expenses. |
| "**<u>Allowed</u>**" | With reference to any Claim or Interest against a Debtor, any Claim or Interest against a Debtor (a)(i) that is timely filed by the Bar Date or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the DIP Order, the Bankruptcy Rules or a Final Order, (b)(i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan, the DIP Order, or by a Final Order.  With respect to any Claim described in clause (a) above, such Claim will be |

| | |
|---|---|
| | considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; provided, however, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan. |
| "**American Freight**" | Collectively, Franchise Group Newco Intermediate AF, LLC and each of its subsidiaries, and American Freight FFO, LLC. |
| "**Bar Date**" | The dates by which proofs of claim must be filed with respect to Claims against the Debtors, as ordered by the Bankruptcy Court pursuant to a bar date order or other applicable order, or pursuant to the Plan. |
| "**BHF Entities**" | Collectively, Franchise Group Intermediate BHF, LLC and Franchise Group Newco BHF, LLC.  For the avoidance of doubt, "BHF Entities" does not include Conn's, Inc. |
| "**Buddy's**" | Collectively, Franchise Group Intermediate B, LLC and each of its subsidiaries. |
| "**Cash**" | The legal currency of the United States and equivalents thereof. |
| "**Confirmation Date**" | The date on which the Bankruptcy Court enters the Confirmation Order. |
| "**DIP Claims**" | Any Claim on account of DIP Loans arising under or pursuant to the DIP Credit Agreement or the other DIP Documents. |
| "**DIP Closing Date**" | The date of the satisfaction (or waiver) of each of the conditions precedent to the initial funding of the DIP Facility after entry of the Interim DIP Order. |
| "**DIP Loans**" | Loans arising under or pursuant to the DIP Credit Agreement. |
| "**Educate**" | Collectively, Franchise Group Intermediate SL, LLC, Franchise Group Newco SL, LLC, and Educate, Inc. |
| "**Estate(s)**" | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| "**Existing Intercompany Equity Interests**" | Any Existing Equity Interests other than the Existing TopCo Equity Interest. |

| "**Final Order**" | An order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; *provided, however*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
|---|---|
| "**HoldCo Entities**" | Collectively, Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, Freedom VCM Receivables, Inc., Freedom VCM Interco, Inc., Freedom VCM, Inc., and TopCo. |
| "**HoldCo General Unsecured Claim**" | Any General Unsecured Claims against the HoldCo Entities other than TopCo. |
| "**HoldCo General Unsecured Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular HoldCo Entity, *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to HoldCo General Unsecured Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, without limitation, the satisfaction in full of the DIP Claims, and, if applicable, the Prepetition HoldCo Loan Claims including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Impaired**" | With respect to a Claim, Interest, or a class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(3) and 1124 of the Bankruptcy Code. |
| "**Intercompany Claim**" | Any Claim against a Debtor held by another Debtor. |
| "**Lien**" | Any "lien," as defined in section 101(37) of the Bankruptcy Code. |
| "**OpCo General Unsecured Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor (other than any HoldCo Entity), *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to General Unsecured Claims of that particular Debtor in priority of payment under the Bankruptcy Code (including the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, and the Prepetition Second Lien Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Other Priority Claim**" | Any Claim other than an Administrative Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| "**Other Secured Claim**" | A Secured Claim other than an Administrative Claim, Priority Tax Claim, Other Priority Claim, DIP Claim, Prepetition ABL Loan Claim, Prepetition |

| | |
|---|---|
| | First Lien Loan Claim, Prepetition Second Lien Loan Claim, or Prepetition HoldCo Loan Claim. |
| "**Plan Administrator**" | The Person or Entity (or any successor thereto) who, on and after the Plan Effective Date, shall have the rights, powers, and duties set forth in the Plan, and whose identity and compensation shall be agreed to by the Debtors in consultation with the Required Consenting First Lien Lenders and shall be set forth in the Plan Supplement; <u>provided</u> to the extent the Restructuring Transactions are consummated pursuant to the Plan Transaction, the Plan Administrator shall be appointed by the Required Consenting First Lien Lenders. |
| "**Plan Effective Date**" | The date that the Plan confirmed by the Bankruptcy Court becomes effective. |
| "**Plan Transaction**" | Has the meaning ascribed to it in the recitals to the RSA. |
| "**Prepetition HoldCo Lender Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to Freedom VCM Interco, Inc. or Freedom VCM, Inc. (after taking into account any structurally senior claims) *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims after taking into account all structurally senior Allowed Claims and all Allowed Claims that are senior to Prepetition HoldCo Loan Claims in priority of payment under the Bankruptcy Code (including the satisfaction in full of the DIP Claims including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Prepetition Second Lien Lender Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Prepetition Second Lien Loan Claims in priority of payment under the Bankruptcy Code (including, without limitation, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, and the Prepetition First Lien Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Priority Non-Tax Claims**" | Any Claim, other than a DIP Claim, an Administrative Claim, a Professional Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| "**Priority Tax Claim**" | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| "**Professional Fee Claim**" | Any Claim by a Professional Person for compensation for services rendered or reimbursement of expenses incurred by such Professional Person on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a |

| | |
|---|---|
| | Professional Persons's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim. |
| "**Professional Fee Escrow Account**" | An account funded by the Debtors with Cash no later than the Plan Effective Date in the amount equal to the Professional Fee Escrow Amount. |
| "**Professional Fee Escrow Amount**" | The aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professional Persons have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Plan Effective Date, which shall be estimated pursuant to the method set forth in the Plan. |
| "**Professional Person**" | All Persons (a) retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |
| "**PSP**" | Collectively, Franchise Group Intermediate PSP, LLC and each of its subsidiaries. |
| "**Required DIP Lenders**" | The lenders constituting "Required Lenders" under the DIP Credit Agreement. |
| "**Sale Transaction**" | Has the meaning ascribed to it in the recitals to the RSA. |
| "**Schedules**" | The schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code. |
| "**Second Lien Condition**" | The class of Prepetition Second Lien Loan Claims shall have voted to accept the Plan by the Voting Deadline. |
| "**Secured Claim**" | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| "**Specified Party**" | Any of the following: (a) any current or former holders of Interests (other than Franchise Group, Inc. or any of its subsidiaries), (b) any current or former Affiliate of any Person described in clause (a) of this definition, or (c) any current or former partner, officer, director, principal, employee or agent of any Person described in clause (a) or clause (b) of this definition. |
| "**Subordinated Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor, *less* (b) the aggregate amount |

| | required to pay in full in Cash all Allowed Claims that are senior to Subordinated Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, to the extent applicable, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, the Prepetition Second Lien Loan Claims, the Prepetition HoldCo Loan Claims, the HoldCo General Unsecured Claims, and the TopCo General Unsecured Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
|---|---|
| **"Successful Bidder"** | Has the meaning ascribed to such term in the Bidding Procedures. |
| **"Sufficient Bid"** | A qualified bid for a Sale Transaction, or series of qualified bids (so long as each such qualified bid does not contemplate a sale of any assets covered by any such other qualified bid as of at least 48 hours prior to the Auction) for a Sale Transaction aggregated together, that the Debtors and the Required Consenting First Lien Lenders determine have satisfied, among other things, the following conditions and are otherwise acceptable to the Debtors and the Required Consenting First Lien Lenders: (a) be a good faith, *bona fide*, irrevocable bid, (b) be in writing and executed by a duly authorized representative of the bidder, (c) unless otherwise agreed by the Required Consenting First Lien Lenders in their sole discretion, provide for receipt by the Debtors of aggregate Cash consideration sufficient for the indefeasible payment in full in Cash at the closing of the Sale Transaction contemplated by such qualified bid(s) of: (1) all of the Prepetition First Lien Loan Claims, (2) all of the Prepetition ABL Loan Claims, and (3) all of the DIP Claims, in each case, including any fees, premiums and accrued but unpaid interest (including postpetition interest at the default contract rate, if applicable) on any of such Claims, (d) be accompanied by a Cash deposit equal to at least 10% of the purchase price, (e) include written evidence acceptable to the Company Parties demonstrating appropriate corporate or similar governance authorization of the bidder(s) to consummate the Sale Transaction contemplated by the proposed bid(s), (f) include written evidence that demonstrates that the bidder has the necessary financial ability to timely close the Sale Transaction contemplated by the proposed qualified bid(s) (including written evidence of the bidder's internal financial resources and ability to finance its bid with Cash on hand, available lines of credit, uncalled capital commitments or otherwise available funds), (g) not contain conditions or contingencies of any kind, relating to financing, internal approvals, due diligence, third party consents or approvals (other than governmental or regulatory consents that may be required to consummate the proposed Sale Transaction, including any antitrust approval that may be required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, which shall be described in the bid together with evidence satisfactory to the Debtors and the Required Consenting First Lien Lenders of the ability to obtain such approvals or consents as soon as reasonably practicable), the satisfaction or achievement of any financial targets, thresholds or metrics, the absence of any material adverse effect since a date earlier than the date the bid was submitted, or any other conditions or contingencies other than conditions to closing that are customary for sales to non-"stalking horse" bidders in sales of assets under section 363 of the Bankruptcy Code (but, for the avoidance of doubt, excluding any of the |

| | |
|---|---|
| | conditions set forth in this clause (g)), (h) be reasonably likely to be consummated (if selected as the winning bid) promptly following entry of the Sale Order or Confirmation Order, as applicable, or otherwise within a time frame acceptable to the Debtors and the Required Consenting First Lien Lenders, and (j) in the case of a series of qualified bids (so long as each such qualified bid does not contemplate a sale of any assets covered by any such other qualified bid as of at least 48 hours prior to the Auction) for a Sale Transaction aggregated together, each qualified bid in such series is conditioned on the consummation of the other qualified bid(s) in such series at substantially the same time by no later than March 4, 2025. |
| "**Take-Back Term Loans**" | Any term loans arising under or pursuant to the Take-Back Debt Credit Agreement. |
| "**TopCo**" | Freedom VCM Holdings, LLC. |
| "**TopCo General Unsecured Claim**" | General Unsecured Claims against TopCo. |
| "**TopCo General Unsecured Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to TopCo, *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to TopCo General Unsecured Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, without limitation, the satisfaction in full of the DIP Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Unimpaired**" | With respect to a Claim, Interest, or a class of Claims or Interests, not "Impaired". |
| "**Vitamin Shoppe**" | Collectively, Franchise Group Intermediate V, LLC and each of its subsidiaries. |
| "**Voting Deadline**" | The date and time to be set by the Bankruptcy Court as the deadline for holders of Impaired Claims to vote to accept or reject the Plan. |

**<u>EXHIBIT 1</u>**

**DIP Term Sheet**

*Execution Version*

**Franchise Group, Inc.**

**DIP Term Sheet**

This term sheet (together with all exhibits, annexes, and schedules attached hereto, this "**DIP Term Sheet**") sets forth certain material terms of the proposed DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement, dated as of November 1, 2024 (together with all exhibits, annexes, and schedules attached thereto, including the Term Sheets, in each case, as amended, supplemented or modified in accordance with its terms, the "**RSA**"), to which this DIP Term Sheet is attached as an exhibit to the Restructuring Term Sheet.

This DIP Term Sheet does not constitute a commitment to lend or provide any financing nor does it address all terms that would be required in connection with the DIP Facility or that will be set forth in the DIP Documents (as defined below), which are subject to negotiation and further subject to execution of definitive documents, pleadings and proposed forms of orders, all of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

| | |
|---|---|
| **Borrowers** | Franchise Group, Inc., a Delaware corporation (the "**Lead Borrower**"), Franchise Group Newco PSP, LLC, a Delaware limited liability company ("**FG Newco PSP**"), Valor Acquisition, LLC, a Delaware limited liability company ("**Valor**"), Franchise Group Newco Intermediate AF, LLC, a Delaware limited liability company ("**FG Newco Intermediate AF**", and together with the Lead Borrower, FG Newco PSP and Valor, individually, a "**Borrower**" and, collectively, the "**Borrowers**"), each in their respective capacities as debtors and debtors-in-possession. |
| **Guarantors** | Each direct or indirect subsidiary of any of the Borrowers, as secured obligors, and each of Freedom VCM Holdings, LLC, Freedom Receivables II, LLC, Freedom VCM Interco Holdings, Inc., and Freedom VCM Receivables, Inc., as secured obligors solely with respect to the outstanding DIP Obligations of the Tranche A DIP Loans (each as defined below) (collectively, together with the Borrowers, the "**Secured Loan Parties**"), and each of Freedom VCM, Inc., and Freedom VCM Interco, Inc., as unsecured obligors unless, with respect to Freedom VCM, Inc., and Freedom VCM Interco, Inc., the requisite holders of Holdco Claims consent to such parties being secured obligors (collectively, together with the Secured Loan Parties, the "**Loan Parties**"), each in their respective capacities as debtors and debtors-in-possession. |
| | With respect to Freedom VCM Holdings, LLC, the DIP Obligations shall be repaid, first from DIP Collateral comprised of Unencumbered Property of all Secured Loan Parties (other than Freedom VCM Holdings, LLC), second, from all other DIP Collateral of all Secured Loan Parties (other than Freedom VCM Holdings, LLC), and third, from assets at Freedom VCM Holdings, LLC. Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "*Freedom Allocated Fees and Expenses*").    Freedom VCM |

| | Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such Freedom Allocated Fees and Expenses, if any; _provided_, that, for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the Freedom Allocated Fees and Expenses; _provided_, _further_, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims. |
|---|---|
| **DIP Agent** | The administrative agent and the collateral agent for the DIP Lenders (as defined below) with respect to the DIP Facility (in such capacities, the "**DIP Agent**") shall be a financial institution selected by, and qualified to perform the duties customarily associated with such roles as determined by, the Required DIP Lenders (as defined below), which shall be reasonably acceptable to the Lead Borrower (it being understood that Wilmington Trust, National Association is acceptable to the Lead Borrower). |
| **DIP Lenders** | One or more beneficial holders of First Lien Loans (or any designated Related Funds (as defined in the RSA) of such holders) who become party to the DIP Credit Agreement (as defined below) from time to time in accordance with its terms (each a "**DIP Lender**", and collectively, the "**DIP Lenders**"); _provided_ that any DIP Lender must be a party to the RSA prior to acquiring any DIP Loans (as defined below); _provided_ _further_ that all beneficial holders of First Lien Claims shall be presented with the option to become a party to the RSA pursuant to the Syndication Procedures (as defined below). |
| **Prepetition ABL Facility** | That certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among the Borrowers, each of the other loan parties party thereto, JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent (in such capacities, the "**ABL Credit Agreement Agent**"), and the lenders party thereto from time to time (collectively, the "**ABL Lenders**", and together with the ABL Credit Agreement Agent and the other ABL secured parties under the ABL Credit Agreement and the other ABL Loan Documents, collectively, the "**ABL Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Credit Agreement**"; the obligations thereunder and under the other ABL Loan Documents, the "**ABL Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**ABL Liens**") (the "**ABL Facility**"). |
| **Prepetition First Lien Facility** | That certain First Lien Credit Agreement, dated as of March 10, 2021, among the Borrowers, each of the other loan parties party thereto, Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent (in such capacities, the "**First Lien Credit Agreement Agent**"), and the lenders party thereto from time to time (collectively, the "**First Lien Lenders**", and together with the First Lien Credit Agreement Agent and the other secured parties under the First Lien Credit Agreement and the other First Lien Loan Documents, collectively, the "**First Lien Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"; the obligations thereunder and |

| | |
|---|---|
| | under the other First Lien Loan Documents, the "**First Lien Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**First Lien Liens**") (the "**First Lien Facility**"). |
| **Prepetition Second Lien Facility** | That certain Second Lien Credit Agreement, dated as of March 10, 2021, among the Borrowers, each of the other loan parties party thereto, Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "**Second Lien Credit Agreement Agent**"), and the lenders party thereto from time to time (the "**Second Lien Lenders**", and together with the Second Lien Credit Agreement Agent and the other secured parties under the Second Lien Credit Agreement and the other Second Lien Loan Documents[1], collectively, the "**Second Lien Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"; the obligations thereunder and under the other Second Lien Loan Documents, the "**Second Lien Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**Second Lien Liens**") (the "**Second Lien Facility**"). |
| **Prepetition Second Lien Sidecar Facility** | That certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, among the Borrowers, each of the other loan parties party thereto, Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "**Second Lien Sidecar Credit Agreement Agent**"), and the lenders party thereto from time to time (the "**Second Lien Sidecar Lenders**", and together with the Second Lien Sidecar Credit Agreement Agent and the other secured parties under the Second Lien Sidecar Credit Agreement and the other Second Lien Sidecar Loan Documents[2], collectively, the "**Second Lien Sidecar Secured Parties**" and, together with the ABL Secured Parties, the First Lien Secured Parties, and the Second Lien Secured Parties, the "**Prepetition Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Sidecar Credit Agreement**"; the obligations thereunder and under the other Second Lien Sidecar Loan Documents, the "**Second Lien Sidecar Secured Obligations**" and, together with the ABL Secured Obligations, the First Lien Secured Obligations, and the Second Lien Secured Obligations, the "**Prepetition Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**Second Lien Sidecar Liens**" and, together with the ABL Liens, the First Lien Liens, and the Second Lien Liens, the "**Prepetition Liens**") (the "**Second Lien Sidecar Facility**"). |
| **Existing Intercreditor Agreements** | That certain (i) Amended and Restated Intercreditor Agreement, dated as of November 22, 2021, among the Lead Borrower, the other Loan Parties from time to time thereto, the ABL Credit Agreement Agent, the First Lien Credit |

---

[1] As used herein, "**Second Lien Loan Documents**" means the "Loan Documents" as defined in the Second Lien Credit Agreement.

[2] As used herein, "**Second Lien Sidecar Loan Documents**" means the "Loan Documents" as defined in the Second Lien Sidecar Credit Agreement (and together with the ABL Loan Documents, the First Lien Loan Documents, and the Second Lien Loan Documents, collectively, the "**Prepetition Loan Documents**").

| | |
|---|---|
| | Agreement Agent, the Second Lien Credit Agreement Agent, and the Second Lien Sidecar Credit Agreement Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing ABL Intercreditor Agreement**"); and (ii) Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, among the Lead Borrower, the other Loan Parties from time to time party thereto, the First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent, and the Second Lien Sidecar Credit Agreement Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing 1L/2L Intercreditor Agreement**", and together with the Existing ABL Intercreditor Agreement, collectively, the "**Existing Intercreditor Agreements**"). |
| **Permitted Liens** | (a) Any valid liens ("**Permitted Prior Liens**") that are (i) in existence on the Petition Date, (ii) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (iii) senior in priority to the Prepetition Liens, and (iv) permitted to be incurred under the Prepetition Loan Documents; and<br><br>(b) liens permitted to have seniority over the DIP Liens (as defined below) securing the DIP Facility as specified in the DIP Credit Agreement (as determined by the Required DIP Lenders). |
| **Interim and Final DIP Orders** | The order approving the DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the DIP Agent and the Required DIP Lenders (the "**Interim DIP Order**"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the DIP Documents, (ii) the making of the DIP Loans (as defined below), (iii) the granting of the superpriority claims and liens against the Loan Parties and their assets in accordance with the DIP Documents with respect to the DIP Collateral (as defined below), (iv) the payment of the DIP Premiums (as defined in the Restructuring Term Sheet), (v) those items set forth below in "Stipulations, Waivers, Releases and Protections", (vi) the use of Cash Collateral (as defined below), and (vii) the granting of adequate protection to the ABL Secured Parties, the First Lien Secured Parties, the Second Lien Secured Parties, and the Second Lien Sidecar Secured Parties  (collectively, the "**DIP Matters**").<br><br>The order approving the DIP Facility on a final basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the DIP Agent and the Required DIP Lenders (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), shall authorize and approve on a final basis, among other matters, the DIP Matters. |
| **Adequate Protection** | As adequate protection against the risk of any post-petition diminution in the value of the ABL Liens in all collateral securing the ABL Secured Obligations (collectively, the "**ABL Collateral**"), the First Lien Liens in all collateral securing the First Lien Secured Obligations (collectively, the "**First Lien Collateral**"), the Second Lien Liens in all collateral securing the Second Lien Secured Obligations (collectively, the "**Second Lien Collateral**"), and the Second Lien Sidecar Liens in all collateral securing the Second Lien Sidecar |

Secured Obligations (collectively, the "**Second Lien Sidecar Collateral**" and, together with the ABL Collateral, the First Lien Collateral, and the Second Lien Collateral, the "**Prepetition Collateral**"), in each case, which is as a result of, or arises from, or is attributable to, among other things, the imposition of the automatic stay, the use, sale or lease of such Prepetition Collateral, including Cash Collateral, the granting of priming liens and claims as set forth herein and the imposition of the Carve-Out (as defined below) (any such diminution, "**Diminution in Value**"), the Prepetition Secured Parties shall be granted the following adequate protection, subject in all cases to the Carve-Out and the Permitted Prior Liens, and, to the extent set forth in **Annex II** attached hereto, the DIP Liens and the DIP Superpriority Claims (as defined below):

(a) The First Lien Credit Agreement Agent, on behalf of the First Lien Secured Parties, shall be granted the following as adequate protection: (A) to the extent of any Diminution in Value of the First Lien Liens in First Lien Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**First Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; (B) to the extent of any Diminution in Value of the First Lien Liens in First Lien Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**First Lien Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable; (C) payment of accrued but unpaid post-petition interest in cash at the non-default rate as the same becomes due and payable under the First Lien Credit Agreement (other than with respect to the interest payment due in October 2024 added to the principal amount of the First Lien Loans); (D) the payment of the reasonable and documented out-of-pocket fees and expenses of the First Lien Credit Agreement Agent and the Consenting First Lien Lenders; provided, however, that the foregoing shall be limited to the pre-petition and post-petition fees and expenses of (i) Seward & Kissel LLP, as counsel to the First Lien Credit Agreement Agent, (ii) a single firm as local counsel to the First Lien Credit Agreement Agent, and (iii) the Ad Hoc Group Advisors; and (E) the Borrowers shall provide copies of any financial reports (including the weekly delivery of a rolling 13 week cash flow, budget, and supporting information) to the aforementioned counsel and advisors to the extent otherwise provided to the DIP Lenders; and

(b) The ABL Credit Agreement Agent, on behalf of the ABL Secured Parties, shall be granted the following adequate protection: (A) to the extent of any Diminution in Value of the ABL Liens in ABL Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**ABL Adequate Protection Liens**"), which

- 5 -

replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; and (B) to the extent of any Diminution in Value of the ABL Liens in ABL Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**ABL Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable.

(c) Additional adequate protection for the ABL Lenders, as agreed to by the Debtors and the Required Consenting First Lien Lenders.

(d) The Second Lien Credit Agreement Agent, on behalf of the Second Lien Secured Parties, shall be granted the following as adequate protection: (A) to the extent of any Diminution in Value of the Second Lien Liens in Second Lien Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Second Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; and (B) to the extent of any Diminution in Value of the Second Lien Liens in Second Lien Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**Second Lien Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable.

(e) The Second Lien Sidecar Credit Agreement Agent, on behalf of the Second Lien Sidecar Secured Parties, shall be granted the following as adequate protection: (A) to the extent of any Diminution in Value of the Second Lien Sidecar Liens in Second Lien Sidecar Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Second Lien Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens, the ABL Adequate Protection Liens, and the Second Lien Adequate Protections Liens, the "**Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; and (B) to the extent of any Diminution in Value of the Second Lien Sidecar Liens in Second Lien Sidecar Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and

<table>
<tr><td></td><td>all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "<b>Second Lien Sidecar Adequate Protection Claims</b>" and, together with the First Lien Adequate Protection Claims, the ABL Adequate Protection Claims, and the Second Lien Adequate Protection Claims, the "<b>Adequate Protection Claims</b>"), and (ii) be subject to the priorities set forth on <b>Annex II</b> attached hereto, as applicable.</td></tr>
<tr><td><b>Carve-Out</b></td><td>The Prepetition Liens, the DIP Liens, the Adequate Protection Liens, and all Adequate Protection Claims granted under the DIP Orders, shall be subject to and subordinate to the Carve-Out.

For purposes hereof, "<b>Carve-Out</b>" means an amount equal to the sum of (i) all unpaid fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the Office of the United States Trustee (the "<b>U.S. Trustee</b>") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below) (collectively, the "<b>Statutory Fees</b>"), which Statutory Fees shall not be subject to any budget; (ii) all unpaid reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all accrued and unpaid fees and expenses (in each case, including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Loan Parties when and if earned pursuant to the terms and conditions of an engagement letter approved by the Bankruptcy Court in these Chapter 11 Cases) (collectively, "<b>Allowed Professional Fees</b>") incurred by persons or firms retained by the Loan Parties pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "<b>Loan Party Professionals</b>") and any official statutory committee of unsecured creditors (the "<b>Official Committee</b>"), if appointed in the Chapter 11 Cases, pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<b>Committee Professionals</b>"), at any time before or on the first day following delivery by the DIP Agent or, if applicable, the First Lien Credit Agreement Agent, of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and, in the case of any Committee Professionals, not to exceed the aggregate amounts set forth for the Committee Professionals in the Approved Budget (as defined below); and (iv) Allowed Professional Fees of Loan Party Professionals and any Committee Professionals, in an aggregate amount not to exceed $4,000,000, incurred after the first day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<b>Post-Carve-Out Trigger Notice Cap</b>").

For purposes of the foregoing, the "<b>Carve-Out Trigger Notice</b>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent, acting at the direction of the Required DIP Lenders under the DIP Documents</td></tr>
</table>

|  | (or, after the DIP Obligations have been paid in full, the First Lien Credit Agreement Agent acting at the direction of the Required Consenting First Lien Lenders under the First Lien Credit Agreement) to the Loan Parties, their lead restructuring counsel, the U.S. Trustee, and counsel to the Official Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below), stating that the Post-Carve-Out Trigger Notice Cap has been invoked; provided, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii), (iii) or (iv) above on any grounds. |
|---|---|
| **Type and Amount of the DIP Facility** | Senior secured superpriority debtor-in-possession term loan credit facility (the "**DIP Facility**", and the loans outstanding thereunder, the "**DIP Loans**"), comprised of the following: |
|  | (a) aggregate principal amount of commitments of up to $250 million, *plus* applicable fees and premiums (the "**New Money Commitments**"), pursuant to which the DIP Lenders shall provide new money first-out delayed-draw term loans ("**Tranche A DIP Loans**") as follows, in each case, subject to the Approved Budget: (A) $125,000,000 shall be borrowed in a single borrowing on the Closing Date, (B) an aggregate principal amount not to exceed $50,000,000 shall be borrowed in a single borrowing on or after the entry of the Final Order, and (C) an aggregate principal amount not to exceed $75,000,000 may be borrowed in a single borrowing on or after the entry of the Confirmation Order, and (iv) other amounts not to exceed the New Money Commitments, after accounting for the draws under the foregoing subclauses (i)–(iii), may be drawn solely to the extent set forth in the Approved Budget and approved by the Required DIP Lenders in their sole discretion; and |
|  | (b) a second-out roll up facility (the "**Tranche B DIP Loans**") pursuant to which, effective immediately upon the completion of the Syndication on the Syndication Date (each as defined in the Syndication Procedures), up to $500 million of the First Lien Secured Obligations (together with accrued and unpaid interest thereon) held by the DIP Lenders (or any of their respective designated Related Funds) as of the Syndication Date shall be, on the Syndication Date, automatically deemed "rolled up" and converted into the DIP Facility, on a cashless two dollars of Tranche B DIP Loans for every dollar of principal amount of Tranche A DIP Loans (i.e., $250,000,000 ), based upon such Person's (or any of its designated Approved Funds) pro rata share of principal amount of Tranche A DIP Loans, and, shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Tranche B DIP Loans for all purposes hereunder as if originally funded on the Closing Date. |
|  | DIP Loans that are repaid or prepaid may not be reborrowed. |
| **Use of Proceeds** | The proceeds of the Tranche A DIP Loans shall be used only (i) to make adequate protection payments as required in the DIP Documents and the DIP Orders, (ii) to pay the administrative costs of the Chapter 11 Cases (including professional fees and expenses) and the Restructuring Transactions, (iii) to fund |

| | the Carve-Out and to make payments under the Carve-Out in accordance with the terms of the DIP Orders and (iv) for general corporate purposes, in each case, solely to the extent in accordance with and subject to the credit agreement governing the terms of the DIP Facility (the "**DIP Credit Agreement**", and together with all security and collateral agreements related thereto, the "**DIP Documents**") and the DIP Orders (including the Approved Budget, subject to the Permitted Variance Covenant (as defined below)). |
|---|---|
| **Closing Date** | The date of the satisfaction (or waiver) of each of the conditions precedent to the initial funding of the DIP Facility after entry of the Interim DIP Order (the "**Closing Date**"). |
| **Maturity** | The DIP Facility shall mature on the earliest to occur of:<br><br>(i)    one hundred and eighty (180) days after the Closing Date, which may be extended by the Required Supermajority Lenders for up to three (3) consecutive 30-day periods;<br><br>(ii)    11:59 p.m. New York City Time on the date that is five (5) days after the Petition Date if the Interim DIP Order, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion, has not been entered by the Bankruptcy Court prior to such date and time;<br><br>(iii)    11:59 p.m. New York City Time on the date that is forty-five (45) days after the Petition Date if the Final DIP Order, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion, has not been entered by the Bankruptcy Court prior to such date and time;<br><br>(iv)    the Plan Effective Date;<br><br>(v)    dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code;<br><br>(vi)    consummation of a sale of all or substantially all assets or equity of the Loan Parties (other than to another Loan Party), other than a sale transaction pursuant to a Sufficient Bid or is otherwise consented to by the Required Supermajority Lenders in their sole discretion;<br><br>(vii)    termination of the RSA; and<br><br>(viii)    the acceleration of the DIP Loans and the termination of the commitments under the DIP Facility in accordance with the terms of the DIP Documents. |
| **Amortization** | None. |
| **Payments and Interest Rates** | As set forth on **Annex I** attached hereto. |
| **Mandatory Prepayments** | Mandatory prepayments of the DIP Loans shall be required in an amount equal to (i) 100% of net cash proceeds of any event of loss (excluding D&O and business interruption insurance) or condemnation (subject to the Existing |

| | |
|---|---|
| | Intercreditor Agreements, as applicable), (ii) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement, (iii) 100% of net cash proceeds from the post-petition issuance of any equity of the Borrowers or any controlled subsidiary thereof, (iv) 100% of the net cash proceeds of extraordinary receipts (excluding D&O insurance, to the extent such proceeds are not payable to the Debtors or the estates pursuant to the terms of any such applicable D&O insurance policy, and business interruption insurance), and (v) 100% of the net cash proceeds of any sale of assets of any of the Loan Parties or their subsidiaries (other than asset sales in the ordinary course of business) (subject to the Existing Intercreditor Agreements, as applicable), in each case, subject to the Documentation Principles (as defined below). Net cash proceeds from any mandatory prepayment shall be applied toward repayment of the DIP Loans on a *pro rata* basis and will result in a dollar-for-dollar permanent reduction of then outstanding principal amounts thereof and shall be without premium or penalty. <br><br> Proceeds from any mandatory prepayment shall first be applied toward repayment of the Tranche A DIP Loans on a *pro rata* basis and then to the repayment of the Tranche B DIP Loan on a *pro rata* basis. |
| **Voluntary Prepayments** | Permitted, in whole or in part, subject to limitations as to minimum amounts, without premium or penalty. Proceeds from any voluntary prepayment shall first be applied toward repayment of the Tranche A DIP Loans on a *pro rata* basis and then to the repayment of the Tranche B DIP Loans on a *pro rata* basis. |
| **Collateral and Priority** | Subject to the Carve-Out and to Permitted Prior Liens, as security for the prompt payment and performance of all amounts due under the DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities or other amounts (collectively, the "**DIP Obligations**"), effective as of the Petition Date, the DIP Agent, for the benefit of itself and the DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("**DIP Liens**") in all assets and properties of each of the Secured Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, the Secured Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Secured Loan Parties' rights, title and interests in (1) all ABL Collateral and First Lien Collateral, (2) all money, cash and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds; (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds (excluding D&O and business interruption insurance, but not |

proceeds from any D&O insurance policies, to the extent such proceeds are not payable to the Debtors or the estates, which shall be subject to the DIP Liens); (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims; (19) subject to entry of a Final DIP Order, all proceeds of or property recovered, whether by judgment, settlement or otherwise, from any and all claims and causes of action of any Secured Loan Party's estate seeking avoidance under chapter 5 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or any other similar state statute, common law or otherwise ("**Avoidance Action Proceeds**"); (20) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Secured Loan Parties, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Secured Loan Party from time to time with respect to any of the foregoing (collectively, the "**DIP Collateral**"); provided, that DIP Collateral shall exclude other assets to be mutually agreed among the Borrowers and the Required DIP Lenders, but shall include any and all proceeds and products of such excluded assets, unless such proceeds and products otherwise separately constitute excluded assets. Notwithstanding anything herein to the contrary, the security interest over the DIP Collateral shall be created and perfected by the Interim DIP Order and Final DIP Order, as applicable, and no mortgages or other perfection documentation (other than UCC-1 financing statements), including mortgages, control agreements, landlord waivers, foreign law perfection actions or third-party consents or orders, shall be required; provided, further, upon the reasonable request of the DIP Lenders, the Loan Parties shall make filings or take any other actions with respect to the perfection of liens.

The DIP Liens shall have the following priorities (subject in all cases to the Carve-Out):

i.    *First Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, subject to entry of the Final DIP Order, Avoidance Action Proceeds (collectively, "**Unencumbered Property**"), which DIP Liens shall be subject and subordinate only to the Carve-Out.

ii.   *Priming DIP Liens and Liens Junior to Certain Other Liens*. Pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully

|  | and automatically perfected in all DIP Collateral (other than as described in <u>clause (i)</u> above), which DIP Liens (a) shall be subject and subordinate only to (1) the Carve-Out, (2) Permitted Prior Liens, (3) solely with respect to ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) and DIP Collateral of a type that would otherwise constitute ABL Priority Collateral (which, for the avoidance of doubt, shall not include any proceeds of the DIP Facility), the ABL Liens, (b) shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in any DIP Collateral that would otherwise be subject to the First Lien Liens (including, without limitation, any First Lien Adequate Protection Liens), the Second Lien Liens, and the Second Lien Sidecar Liens, and (c) shall otherwise be subject to the priorities set forth in **Annex II** attached hereto. |
|  | iii. *Liens Senior to Other Liens.* Except to the extent expressly permitted hereunder, subject to the Carve-Out and Permitted Prior Liens, the DIP Liens and the DIP Superpriority Claims (as defined below) shall not be made subject to or *pari passu* with (a) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Secured Loan Parties, (b) any lien or security interest that is avoided or preserved for the benefit of the Secured Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien or security interest of the Secured Loan Parties or their affiliates, or (d) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
|  | Subject to entry of the Interim DIP Order, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Unencumbered Property and (b) second, from all other DIP Collateral. |
| **Guarantees** | Each Loan Guarantor shall unconditionally guarantee, on a joint and several basis, all DIP Obligations arising under or in connection with the DIP Facility. |
| **DIP Superpriority Claims** | Subject to the Carve-Out, the DIP Obligations shall be allowed superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claims shall have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, with recourse against all DIP Collateral (the "**DIP Superpriority Claims**"), which DIP Superpriority Claims shall be subject to the priorities set forth in **Annex II** attached hereto. |
| **Use of Cash** | The Loan Parties shall be permitted to use Cash Collateral for the purposes and solely to the extent provided for in the Approved Budget, the Interim DIP Order |

| | |
|---|---|
| **Collateral** | and the Final DIP Order. |
| **Milestones** | The Loan Parties shall comply with the Milestones set forth in Section 4.01 of the RSA (as such Milestones may be extended in accordance with the terms therein), which Milestones shall be incorporated into the DIP Credit Agreement. |
| **Documentation** | The DIP Facility (including the terms and conditions applicable thereto) shall be documented pursuant to and evidenced by (a) the DIP Credit Agreement, negotiated in good faith, in form and substance reasonably acceptable to the Borrowers and the Required DIP Lenders, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the Interim DIP Order or the Final DIP Order, as applicable, (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby, as determined by the Borrowers and the Required DIP Lenders, (iv) be based on the First Lien Credit Agreement and (v) be mutually agreed among the Borrowers and the Required DIP Lenders, (b) the Interim DIP Order, (c) the Final DIP Order, and (d) other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as determined by the Loan Parties and the Required DIP Lenders (this paragraph, the "**Documentation Principles**"); provided, that, notwithstanding anything herein to the contrary, the DIP Liens on the DIP Collateral shall be created and perfected by the Interim DIP Order and Final DIP Order, as applicable, and no mortgages or other perfection documentation (other than UCC-1 financing statements), including mortgages, control agreements, landlord waivers, foreign law perfection actions or third party consents or orders, shall be required; provided, further, upon the reasonable request of the DIP Lenders, the Loan Parties shall make filings or take any other actions with respect to the perfection of liens. |
| **Representations and Warranties** | The DIP Documents shall contain usual and customary representations and warranties, subject to the Documentation Principles. |
| **Cash Flow Reporting; Variance Reporting; Variance Testing** | No later than 5:00 p.m. (New York City time) on every fourth Thursday following the Petition Date (each such Thursday, the "**Updated Budget Deadline**"), the Loan Parties shall deliver to the Ad Hoc Group Advisors and the DIP Agent a supplement to the Initial DIP Budget (each, an "**Updated Budget**"), covering the then-upcoming 13-week period that commences with Saturday of the calendar week immediately preceding such Updated Budget Deadline, in each case consistent with the form and detail set forth in the Initial DIP Budget and including a forecasted unrestricted cash balance as well as a line-item report setting forth the estimated fees and expenses to be incurred by each professional advisor on a weekly basis; provided, however, that (x) (i) the Updated Budget will be deemed, in each case, conditionally approved unless the Required DIP Lenders provide written notice of their objection to such Updated Budget (which notice may be provided by one of the Lender Professionals on their behalf via email) within four (4) Business Days of the delivery of such Updated Budget, and during such period, the Initial DIP Budget or most recent Approved Budget, as applicable, shall remain in effect (the "**Interim Approval Period**"), (ii) following the Interim Approval Period, if no objection is received |

from the Required DIP Lenders pursuant to clause (i), the Updated Budget shall be deemed the "**Approved Budget**," shall be in full force and effect and shall constitute the Approved Budget (which Approved Budget shall be the Initial DIP Budget until superseded by an approved Updated Budget), provided, that the Required DIP Lenders may, at any time after such four (4) Business Day period and until the date that is seven (7) Business Days after delivery of the Updated Budget, object to such Updated Budget, whereupon the Initial DIP Budget or most recent Approved Budget shall be deemed the Approved Budget, and (y) if the Required DIP Lenders do not provide written notice of their objection to such Updated Budget (which notice of disapproval may be provided by one the Ad Hoc Group Advisors on their behalf via email) within such seven (7) Business Days period, the Updated Budget shall be in full force and effect and shall constitute the Approved Budget; (iii) the Required DIP Lenders shall not have any obligation to approve any Updated Budget, and (iv) no modification to the Initial DIP Budget or any Updated Budget, any reforecasting of any information relating to any period covered thereby or the inclusion of new line items in any Updated Budget, as the case may be, shall in any event be effective without the affirmative written consent of the Required DIP Lenders (which may be provided by one of the Ad Hoc Group Advisors on their behalf via email).

Not later than 5:00 p.m. New York City time every Thursday (commencing with Thursday of the week immediately following the first full week after the week in which the Petition Date occurs) (each such Thursday, the "**Variance Report Deadline**"), the Borrower shall deliver to the Ad Hoc Group Advisors and the DIP Lenders a variance report, each in form, detail and substance satisfactory to the Required DIP Lenders in their sole discretion (each, a "**Variance Report**"), setting forth the difference between, on a line-by-line and aggregate basis, (i) actual operating receipts and budgeted operating receipts as set forth in the Approved Budget in effect for the relevant periods, as the case may be (the "**Receipts Variance**"), and (ii) actual operating disbursements and budgeted operating disbursements as set forth in the Approved Budget in effect for the relevant periods, as the case may be (the "**Disbursements Variance**"), in each case, for the Applicable Period (as defined below), in each case, together with a reasonably detailed explanation of such Receipts Variance and Disbursements Variance.

The Loan Parties shall not permit the Receipts Variance or the Disbursements Variance with respect to any Applicable Period to exceed the Permitted Variance (as defined below) (the "**Permitted Variance Covenant**").

"**Applicable Period**" means, (w) with respect to the first Variance Report, the first full one-week period ending on the Friday of the week immediately preceding the first Variance Report Deadline, (x) with respect to the second Variance Report, the first full two-week period ending on the Friday of the week immediately preceding the second Variance Report Deadline, (y) with respect to the third Variance Report, the first full three-week period ending on the Friday of the week immediately preceding the third Variance Report Deadline, and (z) with respect to the fourth Variance Report, and each Variance Report thereafter, the four-week period ending on the Friday of the week immediately preceding the applicable Variance Report Deadline.

| | |
|---|---|
| | "**Permitted Variance**" means, (i) with respect to the first Variance Report, no limitations on Disbursements Variance and Receipts Variance, (ii) with respect to the second Variance Report, Disbursements Variance less than 25% and Receipts Variance less than 25%, (iii) with respect to the third Variance Report, Disbursements Variance less than 20% and Receipts Variance less than 20% and (iv) with respect to the fourth Variance Report and every Variance Report thereafter, Disbursements Variance less than 15% and Receipts Variance less than 15%, in each case under the foregoing clauses (i) through (iv), on an aggregate basis (and not on a line item basis) and excluding, in any event, any professional fees. |
| **Affirmative and Negative Covenants** | The DIP Documents shall contain usual and customary affirmative and negative covenants for facilities of this type, including limitations on all non-ordinary course incurrence of indebtedness, liens, dispositions of assets, mergers, restricted payments, investments, fundamental changes, transactions with affiliates, burdensome agreements, prepayments of debt and use of proceeds of DIP Facility and Cash Collateral, subject to the Documentation Principles; <u>provided</u>, that, without limitation, the DIP Documents shall require: |
| | (i)     five (5) days' advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Loan Parties in the Chapter 11 Cases to the Ad Hoc Group Advisors, unless not reasonably practicable under the circumstances (in which case, as soon as reasonably practicable prior to filing); |
| | (ii)    compliance with the Milestones and the Permitted Variance Covenant; |
| | (iii)   the Borrower and its subsidiaries shall maintain Liquidity (as defined in the First Lien Credit Agreement) at all times of at least $50 million (the "**Liquidity Covenant**"), to be determined as of the Friday of the immediately preceding testing period, and the Borrower shall certify as to compliance with such minimum Liquidity Covenant on a weekly basis in connection with delivery of the Variance Report; |
| | (iv)    the Borrower shall use commercially reasonable efforts to obtain a public rating (but not any particular rating) in respect of the DIP Loans made available under this Agreement from each of S&P and Moody's on or before seventy-five (75) days after the Closing Date; |
| | (v)     delivery of monthly financial statements including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month; |
| | (vi)    weekly conference calls and/or video calls among the Loan Parties' relevant senior management, the Loan Parties' advisors, the Ad Hoc Group Advisors and the DIP Lenders, which update calls may cover the Loan Parties' financial performance, the latest budget approved for variance testing, the Loan Parties' variance reports, and the other information provided pursuant to the reporting covenant described above; and |
| | (vii)   certain covenants materially consistent with those set forth in the RSA and Section 5.16 of the First Lien Credit Agreement. |
| | For the avoidance of doubt, the DIP Documents shall not include any financial |

| | |
|---|---|
| | maintenance covenants not otherwise set forth herein. |
| **Conditions Precedent to Closing and the Initial Borrowing** | The Closing Date under the DIP Facility, and the initial borrowing thereunder, shall be subject to customary conditions to closing for facilities of this type, including the following:<br><br>(i)     no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required DIP Lenders;<br><br>(ii)     the preparation, authorization and execution of the DIP Documents with respect to the DIP Facility, in form and substance consistent with this DIP Facility Term Sheet and otherwise reasonably acceptable to the Loan Parties, the Required DIP Lenders and the DIP Agent;<br><br>(iii)     the delivery of a 13-week cash flow projection (the "**Initial DIP Budget**") in form and substance acceptable to the Required DIP Lenders, reflecting (i) the Loan Parties' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth calendar week thereafter, and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by the Loan Party Professionals, the Committee Professionals (if any), and other professionals during the thirteen week period;<br><br>(iv)     the ABL Secured Parties shall have agreed to permit the use of Cash Collateral, and adequate protection, pursuant to the Interim DIP Order on terms and conditions set forth herein and otherwise acceptable to the Required DIP Lenders, in each case, solely to the extent required, and subject to the terms and conditions, under the Existing ABL Intercreditor Agreement;<br><br>(v)     the delivery of (i) a secretary's (or other officer's) certificate or a statement of no change as to documentation previously delivered of the Borrowers and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Borrowers;<br><br>(vi)     all premiums, payments, fees, costs and expenses (including, without limitation, the fees and expenses of the Ad Hoc Group Advisors and all other counsel, financial advisors and other professionals of the DIP Lenders and DIP Agent (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date) then due and payable shall have been paid;<br><br>(vii)     the DIP Lenders shall have received from the Borrowers and each of the Loan Parties, at least three (3) Business Days prior to the Closing Date, (a) documentation and other information requested by any DIP Lender that is required by regulatory authorities under applicable "know your |

| | |
|---|---|
| | customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (b) if a Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the DIP Lenders shall have received from such Borrower, at least one (1) Business Day prior to the Closing Date, a beneficial ownership certification in relation to such Borrower; |
| | (viii)  payment of the applicable Commitment Premium and the DIP Backstop Premium (as defined in the Restructuring Term Sheet); and |
| | (ix)  the Closing Date shall have occurred on or before the date that is one (1) Business Day after the date of entry of the Interim DIP Order unless the Required DIP Lenders consent to a later date. |
| **Conditions to Each Borrowing** | In addition to the conditions precedent noted above, each borrowing under the DIP Facility shall be subject to further customary conditions to closing for facilities of this type, including, without limitation: |
| | (i)  solely in the case of any borrowing after the Closing Date, no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order. |
| | (ii)  the DIP Agent shall have a fully perfected lien on the DIP Collateral pursuant to the Interim DIP Order to the extent required by the DIP Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order; |
| | (iii)  the DIP Agent shall have received a signed borrowing request from the Borrower; |
| | (iv)  since the date of the Agreement Effective Date, there shall have been no event, development or circumstance that has had, or would reasonably be expected to have, a material adverse effect (pursuant to the Documentation Principles); |
| | (v)  the representations and warranties of each Loan Party set forth in the DIP Credit Agreement and in each other DIP Document shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; provided, that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; |
| | (vi)  all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion; |
| | (vii)  no Event of Default shall exist or would result from the initial borrowing |

- 17 -

|  | or from the application of the proceeds therefrom; and |
|---|---|
|  | (viii)  the RSA shall have been executed and be in full force and effect and no event of default shall have occurred and be continuing thereunder except to the extent such default or event of default has been cured or waived in accordance with the terms of the RSA. |
| **Events of Default** | The DIP Documents shall contain usual and customary events of default for facilities of this type, subject to the Documentation Principles (including grace periods and materiality qualifiers), including, without limitation (the "**Events of Default**"): |

(i)     the Loan Parties' failure to pay principal, or interest and other amounts (other than professional fees) when due under the DIP Documents or the DIP Orders, subject, in each case, to a three (3) day grace period;

(ii)    the Loan Parties' failure to pay professional fees when due under the DIP Documents or DIP Orders, subject to a three (3) day grace period;

(iii)   the Closing Date shall not have occurred within three (3) Business Days after the date of entry of the Interim DIP Order unless the Required DIP Lenders consent to a later date;

(iv)    any act or occurrence that would, upon the delivery of notice, permit the RSA to be terminated, unless such act or occurrence was waived, cured, or extended in accordance with the terms of the RSA;

(v)     the Loan Parties' failure to satisfy in any materials respect any of the Milestones, subject to any waiver or extension of such Milestones pursuant to the terms of the RSA;

(vi)    the Loan Parties' failure to (i) conduct a marketing and sale process for the Loan Parties' assets, other than pursuant to the Bidding Procedures, or (ii) promptly terminate the Sale Process if the Loan Parties have not received a Sufficient Bid on or before the Bid Deadline, in each case, without the consent of the Required Consenting First Lien Lenders;

(vii)   the Loan Parties' breach of the Permitted Variance Covenant; and

(viii)  the filing by the Loan Parties of chapter 11 plan of reorganization (or any amendment thereof) other than a Plan that is consistent in all material respects with the RSA, without the consent of the Required Consenting First Lien Lenders.

Upon the occurrence and during the continuation of an Event of Default, at the written direction of the Required DIP Lenders, in accordance with the DIP Orders, without further order from or application to the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent, acting at the direction of the Required DIP Lenders, to (A) deliver to the Borrowers a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the DIP Facility, (C) declare the DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the DIP Facility, (F) charge the default rate

of interest under the DIP Facility, (G) freeze all monies in any deposit accounts of the Loan Parties, (H) exercise any and all rights of setoff, (I) exercise any right or remedy with respect to the DIP Collateral or the DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the DIP Documents, the DIP Orders or applicable law; provided, however, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (D), (F), (G), (H), (I) and (J) above, (i) the DIP Agent, acting at the request of the Required DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee (if any), and the Office of the United States Trustee with five (5) days' prior written notice (such period, the "**Remedies Notice Period**"), and (ii) during the Remedies Notice Period, the DIP Agent shall refrain from exercising its rights and remedies and the Loan Parties and/or any Official Committee shall be permitted to request an emergency hearing before the Bankruptcy Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis) solely to the extent they, in good faith, dispute the occurrence of an Event of Default, to consider on an expedited basis whether an Event of Default has in fact occurred or is continuing; provided, further, that during the Remedies Notice Period, the Loan Parties shall be permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Loan Parties' business, as determined by Required DIP Lenders.

The DIP Lenders' right to enforce the remedies provided in the DIP Orders and in the DIP Credit Agreement is subject to the DIP Lenders satisfying their obligations occasioned by the issuance of a Carve-Out Trigger Notice.

| | |
|---|---|
| **Stipulations, Waivers, Releases and Protections** | Upon entry of the Interim DIP Order:<br><br>1. The Loan Parties shall stipulate (a) to the validity, extent, security, enforceability, priority and perfection of the First Lien Liens, (b) to the amount, validity and lack of defense, counterclaim or offset of any kind to the First Lien Secured Obligations, and (c) that all cash of the Loan Parties constitutes "cash collateral" of the First Lien Secured Parties for purposes of section 363 of the Bankruptcy Code ("**Cash Collateral**"). The DIP Orders shall provide that an Official Committee and any other party in interest must file a pleading with the Bankruptcy Court challenging the validity, extent, perfection and/or priority of any claims or security interest of the First Lien Secured Parties prior to the date that is seventy-five (75) days after entry of the Interim DIP Order by the Bankruptcy Court in the Chapter 11 Cases (the "**Challenge Period**"). Failure of the Official Committee or any other party in interest to file such a pleading with the Bankruptcy Court shall forever bar such party from making such a challenge.<br><br>2. The Loan Parties shall, subject to the Final DIP Order, waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the DIP Lenders and the First Lien Collateral with respect to the First Lien Secured Parties.<br><br>3. The Loan Parties shall, subject to the Final DIP Order, waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Lenders and the First Lien Collateral with respect to the First Lien Secured |

|  | Parties. |
|---|---|
|  | 4. The First Lien Secured Parties shall, subject to the Final DIP Order, be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Loan Parties shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the First Lien Secured Parties. |
|  | 5. The Loan Parties shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Lenders and the First Lien Secured Parties (and their respective related parties and representatives) as of the date of the applicable DIP Order. |
|  | 6. Except for an Official Committee investigation (but not to litigate, contest, initiate, assert, join, commence, support or prosecute any claim, cause of action or other challenge, including by way of discovery, with respect to the validity, extent, enforceability, security, perfection or priority of any of the DIP Liens, First Lien Liens, DIP Obligations, or First Lien Secured Obligations) during the Challenge Period and subject to an investigation budget acceptable to the Required DIP Lenders, no Cash Collateral, proceeds of the DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the validity, extent, enforceability, security, perfection or priority of any of the DIP Liens, First Lien Liens, DIP Obligations, or First Lien Secured Obligations, (b) investigate or initiate any claim or cause of action against any of the DIP Lenders or the First Lien Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the DIP Lenders or the First Lien Secured Parties, or (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Documents and the DIP Orders) that are senior to or *pari passu* with the DIP Liens, DIP Superpriority Claims, the Adequate Protection Liens or Adequate Protection Claims granted hereunder, or the First Lien Liens. |
|  | 7. The DIP Lenders shall have the unqualified right to credit bid all DIP Obligations and the First Lien Secured Parties shall have the unqualified right to credit bid all First Lien Secured Obligations. |
|  | 8. The DIP Lenders and the First Lien Secured Parties shall be entitled to good faith protection under section 364(e) of the Bankruptcy Code. |
| **Expenses and Indemnification** | The DIP Credit Agreement shall provide for the payment of all reasonable, documented, out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders, including, without limitation, the payment of all reasonable, documented, out-of-pocket fees and expenses of the Ad Hoc Group Advisors. |
|  | The DIP Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the DIP Lenders (together with their related parties and representatives). |
| **Assignments** | The DIP Credit Agreement shall contain assignment provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles and shall also require that each assignee or |

| | |
|---|---|
| | participant shall become a party to the RSA prior to or concurrently with acquiring any DIP Loans. |
| **Amendments** | Usual and customary for facilities of this type requiring the consent of the Required DIP Lenders, except for amendments customarily requiring approval by adversely affected DIP Lenders under the DIP Facility.<br><br>"**Required DIP Lenders**" shall mean DIP Lenders (other than the fronting lender) holding greater than 50.1% of the aggregate amount of commitments in respect of the Tranche A DIP Loans.<br><br>"**Required Supermajority DIP Lenders**" shall mean DIP Lenders (other than the fronting lender) holding greater than 66.67% of the aggregate amount of commitments in respect of the Tranche A DIP Loans. |
| **Governing Law** | This DIP Facility Term Sheet and the DIP Documents shall be governed by the laws of the State of New York (except as otherwise set forth therein). During the pendency of the Chapter 11 Cases, the Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the DIP Documents and the exercise of the remedies by the DIP Lenders and preservation of the value of the DIP Collateral. |
| **Counsel to the DIP Lenders** | Paul Hastings LLP. |
| **Investment Banker to the DIP Lenders** | Lazard Frères & Co. |
| **Syndication and Fronting** | All beneficial holders of First Lien Claims who sign the RSA on or before closing of the syndication process may participate in the DIP Facility on a *pro rata* basis based upon their holdings of First Lien Loans pursuant to syndication procedures acceptable to the Required DIP Lenders (the "**Syndication Procedures**"), which procedures shall be attached as an exhibit to the Interim DIP Order. Company Parties shall facilitate, and pay for all fees and expenses concerning, fronting the Tranche A DIP Loans. |
| **Agreement to Roll** | Notwithstanding anything to the contrary herein, each DIP Lender shall agree that, on the Plan Effective Date and so long as the RSA remains in effect (and there shall not have occurred and be continuing any event, act, or omission that, upon the delivery of a notice would permit the Required Consenting First Lien Lenders to terminate the RSA), the Tranche A DIP Loans and Tranche B DIP Loans held by each DIP Lender (or any of its designated Related Funds) shall convert either into "Loans" under the Take-Back Debt Facility (as such term is defined in the RSA) or Reorganized Common Equity, in each case in accordance with the terms set forth in the RSA and Restructuring Term Sheet (as may be amended). |

<div align="right"><u>**Annex I**</u></div>

<div align="center"><u>Interest and Certain Payments</u></div>

| | |
|---|---|
| Interest Rate: | The DIP Loans shall bear interest at a rate per annum equal to the adjusted SOFR rate (subject to a floor of 1.0%) <u>plus</u> (i) with respect to the Tranche A DIP Loans, 10.00%, and (ii) with respect to the Tranche B DIP Loans, 4.75%. |
| Interest Payment Dates: | Interest shall be payable in cash on a quarterly basis in arrears, upon any prepayment due to acceleration and at final maturity. |
| Commitment Premium: | The Borrowers shall pay to the DIP Lenders a non-refundable commitment premium (the "<u>**Commitment Premium**</u>") equal to 2.5% of the aggregate principal amount of the New Money Commitment of each DIP Lender, which shall be fully earned upon entry of the Interim DIP Order, and due and payable in kind on the date of entry of the Interim DIP Order and to be included in the principal amount of the Tranche A DIP Loans. |
| Exit Premium: | The Borrowers shall pay to the DIP Lenders a non-refundable exit premium (the "<u>**Exit Premium**</u>") equal to 2.5% of the aggregate amount of the DIP Obligations as of the Plan Effective Date, which shall be fully earned upon entry of the Interim DIP Order and due and payable in the form of Tranche A DIP Loans upon any prepayment in full or immediately prior to the Maturity Date. |
| Default Rate: | During the continuance of an event of default, principal, overdue interest, overdue premium and fees and other overdue amounts shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations. |
| Rate and Payment Basis: | All per annum rates shall be calculated on the basis of a year of 360 days. All amounts payable under this DIP Term Sheet shall be made in Dollars. |

<div align="center">*        *        *        *</div>

| Priority | DIP Collateral that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral that constitutes Term Loan Priority Collateral[3] or that would otherwise constitute Term Loan Priority Collateral | Unencumbered Property | Claims |
|---|---|---|---|---|
| *First* | Carve-Out and Permitted Prior Liens | Carve-Out and Permitted Prior Liens | Carve-Out | Carve-Out |
| *Second* | ABL Adequate Protection Liens | DIP Liens | DIP Liens | DIP Superpriority Claims |
| *Third* | ABL Liens | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens and ABL Adequate Protection Liens | First Lien Adequate Protection Claims and ABL Adequate Protection Claims |
| *Fourth* | DIP Liens | First Lien Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | Second Lien Adequate Protection Claims and Second Lien Sidecar Adequate Protection Liens |
| *Fifth* | First Lien Adequate Protection Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | | |
| *Sixth* | First Lien Liens | Second Lien Liens and Second Lien Sidecar Liens | | |
| *Seventh* | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | ABL Adequate Protection Liens | | |
| *Eighth* | Second Lien Liens and Second Lien Sidecar Liens | ABL Liens | | |

---

[3]    Note to Draft:  As defined in the Existing ABL Intercreditor Agreement.

## EXHIBIT C

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of November 1, 2024 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among the Company Parties and the Consenting First Lien Lenders party thereto.  Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1. <u>Agreement to be Bound</u>.  The Joinder Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as **<u>Annex I</u>** (as the same has been or may hereafter be amended, supplemented, amended and restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joinder Party shall hereafter be deemed to be a "Consenting First Lien Lenders" and a "Party" for all purposes under the Agreement and with respect to all Company Claims/Interests held such Joinder Party.

2. <u>Representations and Warranties</u>.  The Joinder Party hereby makes the representations and warranties of the Parties and Consenting First Lien Lenders set forth in the Agreement to each other Party.

3. <u>Notice</u>.  The Joinder Party shall deliver an executed copy of this joinder agreement (the "**<u>Joinder</u>**") to the Parties identified in <u>Section 14.10</u> of the Agreement.

*[Signature Page Follows.]*

**[JOINING PARTY]**

_____
Name:
Title:


Address:


E-mail address(es):


| _Aggregate Amounts Beneficially Owned or Managed on Account of:_ | |
|---|---|
| First Lien Claims: | |
| Second Lien Claims: | |
| Second Lien Pari Passu Claims: | |
| Prepetition HoldCo Loan Claims: | |
| ABL Claims: | |
| Existing Equity Interests: | |

_[Signature Page to Joinder]_

**<u>Annex I to Joinder</u>**

Restructuring Support Agreement

[*intentionally omitted*]