## <u>EXHIBIT 1</u>

**Plan Blackline**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |

~~SECOND~~THIRD **AMENDED JOINT CHAPTER 11 PLAN OF
FRANCHISE GROUP, INC. AND ITS AFFILIATED DEBTORS**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com

*Counsel to the Debtors*
*and Debtors in Possession*

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
Betsy L. Feldman (Del. No. 6410)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: February 3̶5, 2025

**TABLE OF CONTENTS**

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ............................................................ **2**

    A.      Definitions. ............................................................................................................. 2
    B.      Interpretation; Application of Definitions and Rules of Construction. ................. ~~28~~29
    C.      Appendices and Plan Documents. ......................................................................... ~~28~~29
    D.      Definitive Document Consent Rights. .................................................................. ~~29~~30
    E.      Nature of the Restructuring Transactions. ........................................................... ~~29~~30

**ARTICLE II. CERTAIN INTERCREDITOR AND INTER-DEBTOR ISSUES** ............ ~~29~~30

    2.1.     Settlement of Certain Intercreditor and Inter-Debtor Issues. ............................... ~~29~~30
    2.2.     Formation of Debtor Groups for Convenience Purposes. .................................... 30

**ARTICLE III. DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, FEE
CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS** ............................ ~~30~~31

    3.1.     DIP Claims. ........................................................................................................ ~~30~~31
    3.2.     Administrative Expense Claims. ......................................................................... ~~31~~32
    3.3.     Fee Claims. ......................................................................................................... 33
    3.4.     Priority Tax Claims. ............................................................................................ ~~35~~36
    3.5.     U.S. Trustee Fees and Related Reporting Obligations. ....................................... ~~36~~37

**ARTICLE IV. CLASSIFICATION OF CLAIMS AND INTERESTS** ............................ ~~36~~37

    4.1.     Classification of Claims and Interests. ................................................................ ~~36~~37
    4.2.     Unimpaired Classes of Claims. ........................................................................... ~~37~~38
    4.3.     Impaired Classes of Claims. ............................................................................... ~~37~~38
    4.4.     Separate Classification of Other Secured Claims. .............................................. ~~38~~39

**ARTICLE V. TREATMENT OF CLAIMS AND INTERESTS** ........................................ 39

    5.1.     Priority Non-Tax Claims (Class 1). ..................................................................... 39
    5.2.     Other Secured Claims (Class 2). ......................................................................... ~~39~~40
    5.3.     Prepetition ABL Loan Claims (Class 3). ............................................................ ~~40~~41
    5.4.     Prepetition First Lien Loan Claims (Class 4). ..................................................... ~~41~~42
    5.5.     Prepetition Second Lien Loan Claims (Class 5). ................................................ 42
    5.6.     Franchise Group, Inc. General Unsecured Claims (Class 6-A). .......................... 43
    5.7.     American Freight General Unsecured Claims (Class 6-B). .................................. ~~43~~44
    5.8.     Buddy's General Unsecured Claims (Class 6-C). ............................................... ~~43~~44
    5.9.     PSP General Unsecured Claims (Class 6-D). ...................................................... 44
    5.10.    Vitamin Shoppe General Unsecured Claims (Class 6-E). ................................... ~~44~~45
    5.11.    Prepetition HoldCo Loan Claims (Class 7). ........................................................ ~~44~~45
    5.12.    Freedom HoldCo General Unsecured Claims (Class 8-A). ................................. 45
    5.13.    HoldCo Receivables General Unsecured Claims (Class 8-B) ............................. 46
    5.14.    TopCo General Unsecured Claims (Class 8-C) ................................................... ~~46~~47
    5.15.    Intercompany Claims (Class 9). .......................................................................... 47

5.16.    Subordinated Claims (Class 10). 48
5.17.    Existing TopCo Equity Interests (Class 11). 49
5.18.    Existing Intercompany Equity Interests (Class 12). 49

**ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN;  EFFECT OF REJECTION BY ONE OR MORE  CLASSES OF CLAIMS OR INTERESTS** ~~49~~50

6.1.    Class Acceptance Requirement. 50
6.2.    Tabulation of Votes on a Non-Consolidated Basis. 50
6.3.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown." 50
6.4.    Voting Classes; Deemed Acceptance or Rejection by Non-Voting Classes. 50
6.5.    Confirmation of All Cases. 51
6.6.    Vacant and Abstaining Classes. 51
6.7.    Controversy Concerning Impairment. 51

**ARTICLE VII. MEANS FOR IMPLEMENTATION** 51

7.1.    Non-Substantive Consolidation. 51
7.2.    Plan Equitization Transaction. ~~51~~52
7.3.    Sale Transaction or Partial Sale Transaction. ~~52~~53
7.4.    Continued Corporate Existence in Certain Debtors; Vesting of Assets; Dissolution of Certain Debtors. 53
7.5.    Indemnification Provisions in Organizational Documents. 54
7.6.    Sources for Cash Distributions under this Plan. 54
7.7.    Take-Back Debt Facility. 55
7.8.    New ABL Facility. 56
7.9.    Reorganized Debtors' Ownership. 57
7.10.    OpCo Debtor Litigation Trust. 57
7.11.    Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust. ~~61~~62
7.12.    New Warrants. ~~63~~64
7.13.    Exemption from Registration Requirements. ~~63~~64
7.14.    Organizational Documents. ~~64~~65
7.15.    Exemption from Certain Transfer Taxes and Recording Fees. ~~64~~65
7.16.    Other Tax Matters. ~~65~~66
7.17.    Cancellation of Existing Securities and Agreements. ~~65~~66
7.18.    Boards. ~~66~~67
7.19.    Management. ~~67~~68
7.20.    Directors and Officers Insurance Policies. ~~67~~68
7.21.    Corporate Action. ~~67~~68
7.22.    Plan Administrator. ~~68~~69
7.23.    Wind Down of the Debtors' Estates. ~~69~~70
7.24.    Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights. ~~70~~71
7.25.    Additional Transactions Authorized Under this Plan. ~~71~~72

**ARTICLE VIII. DISTRIBUTIONS** ............................................................ ~~71~~72

8.1.    Distributions. ................................................................................ ~~71~~72
8.2.    No Postpetition Interest on Claims. .............................................. ~~71~~72
8.3.    Date of Distributions. .................................................................... ~~71~~72
8.4.    Distribution Record Date. .............................................................. ~~71~~72
8.5.    Disbursing Agent. .......................................................................... ~~72~~73
8.6.    Delivery of Distribution. ................................................................ ~~72~~74
8.7.    Unclaimed Property. ...................................................................... ~~73~~74
8.8.    Satisfaction of Claims. .................................................................. ~~73~~74
8.9.    Manner of Payment Under Plan. .................................................... ~~73~~75
8.10.   De Minimis Cash Distributions. .................................................... ~~74~~75
8.11.   Distributions on Account of Allowed Claims Only. ...................... ~~74~~75
8.12.   Fractional Shares. .......................................................................... ~~74~~75
8.13.   No Distribution in Excess of Amount of Allowed Claim. .............. ~~74~~75
8.14.   Setoffs and Recoupments. ............................................................. ~~74~~75
8.15.   Withholding and Reporting Requirements. .................................... ~~75~~76

**ARTICLE IX. PROCEDURES FOR RESOLVING CLAIMS** ...................... ~~75~~76

9.1.    Claims Process. ............................................................................. ~~75~~76
9.2.    Objections to Claims. ..................................................................... ~~75~~76
9.3.    Payments and Distributions with Respect to Disputed Claims. ...... ~~76~~77

**ARTICLE X. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ..... ~~76~~77

10.1.   Assumption and Rejection of Executory Contracts and Unexpired Leases. .... ~~76~~77
10.2.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .... ~~77~~79
10.3.   Claims Based on Rejection of Executory Contracts and Unexpired Leases. .... ~~78~~80
10.4.   Contracts and Leases Entered into After the Petition Date. ........... ~~79~~80
10.5.   Reservation of Rights. ................................................................... ~~79~~80
10.6.   Employee Compensation and Benefits. .......................................... ~~79~~80

**ARTICLE XI. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** ............................................................................................. ~~80~~82

11.1.   Conditions Precedent to Confirmation. ......................................... ~~80~~82
11.2.   Conditions Precedent to the Effective Date. .................................. ~~81~~82
11.3.   Satisfaction and Waiver of Conditions Precedent. ........................ ~~83~~85
11.4.   Effect of Failure of Conditions. .................................................... ~~83~~85
11.5.   Binding Effect. .............................................................................. ~~84~~85
11.6.   Substantial Consummation. ........................................................... ~~84~~85

**ARTICLE XII. RELEASE, INJUNCTION, AND RELATED PROVISIONS** .... ~~84~~86

12.1.   Discharge of Claims and Termination of Certain Equity Interests; Compromise and Settlement of Claims, Certain Equity Interests, and Controversies. ....... ~~84~~86

12.2.    Releases by the Debtors. ............................................................. 8587
12.3.    Third-Party Release. .................................................................... 8788
12.4.    Exculpation. ................................................................................. 8990
12.5.    Discharge of Claims and Termination of Interests. ...................... 9091
12.6.    Injunction. .................................................................................... 9092
12.7.    Setoffs and Recoupment. ............................................................. 9192
12.8.    Release of Liens. .......................................................................... 9193

**ARTICLE XIII. RETENTION OF JURISDICTION** ................................ 9293

**ARTICLE XIV. MISCELLANEOUS PROVISIONS** ................................ 9495

14.1.    Dissolution of Creditors' Committee. .......................................... 9495
14.2.    Termination of Professional Persons. .......................................... 9495
14.3.    Amendments. ............................................................................... 9496
14.4.    Revocation or Withdrawal of this Plan. ....................................... 9496
14.5.    Allocation of Distributions under this Plan Between Principal and Interest. ...... 9596
14.6.    Severability. ................................................................................. 9597
14.7.    Governing Law. ............................................................................ 9597
14.8.    Section 1125(e) of the Bankruptcy Code. .................................... 9697
14.9.    Inconsistency. ............................................................................... 9697
14.10.   Time. ............................................................................................ 9698
14.11.   Exhibits. ....................................................................................... 9698
14.12.   Notices. ........................................................................................ 9698
14.13.   Filing of Additional Documents. ................................................. 9799
14.14.   Reservation of Rights. ................................................................. 9799
14.15.   Closing of Chapter 11 Cases. ...................................................... 9799
14.16.   Tax Matters. ................................................................................. 9899

**ARTICLE XV. COMMITTEE SETTLEMENT** ...................................... 9899

## ~~SECOND~~THIRD AMENDED JOINT CHAPTER 11 PLAN OF
## FRANCHISE GROUP, INC. AND ITS AFFILIATED DEBTORS

Franchise Group, Inc. and each of the debtors and debtors-in-possession in the above-captioned cases (each, a "***Debtor***," and collectively, the "***Debtors***") propose this joint chapter 11 plan for the resolution of the outstanding Claims against, and Interests in, the Debtors.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement, filed contemporaneously with this Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.

**The Non-Liquidating Debtors are pursuing on parallel paths both the Plan Equitization Transaction and a Sale Transaction, all as described in further detail in the Disclosure Statement.**

**The American Freight Debtors are pursuing Store-Closing and Liquidation Sales, all as described in further detail in the Disclosure Statement.  Following the Store-Closing and Liquidation Sales, the American Freight Debtors will be wound down.  The proceeds of the Store-Closing and Liquidation Sales shall be distributed in accordance with the applicable provisions of this Plan.**

In addition, this Plan provides for and implements the Committee Settlement, as incorporated into this Plan and embodied in the term sheet dated February [•]3, 2025 annexed hereto as **Exhibit I**, by and among the Committee Settlement Parties.  Pursuant to the Committee Settlement, the Committee Settlement Parties have agreed to, among other things, resolve any and all disputes between the Required Consenting First Lien Lenders, the Debtors, and the Creditors' Committee in exchange for: (i) the establishment of the OpCo Debtor Litigation Trust; (ii) funding of the OpCo Debtor Litigation Trust Escrow Amount; (iii) mutual releases as provided for in this Plan; and (iv) support for this Plan.  This Plan serves as a motion to approve the Committee Settlement pursuant to Bankruptcy Rule 9019.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Committee Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, ~~holders~~Holders of Claims, and other parties in interest, and are fair, equitable, and reasonable.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

# ARTICLE I.
# DEFINITIONS AND INTERPRETATION

### A.    Definitions.

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1.    *ABL Credit Agreement*** means that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as a borrower, and the other borrowers and guarantors party thereto, the ABL Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

**1.2.    *ABL Credit Agreement Agent*** means JPMorgan Chase Bank, N.A., together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the ABL Credit Agreement, in its capacity as administrative agent and collateral agent for the lenders under the ABL Credit Agreement.

**1.3.    *ABL Lenders*** means, collectively, and as of the relevant time, those lenders that are party to the ABL Credit Agreement.

**1.4.    *ABL Loan Documents*** means the ABL Credit Agreement and any Financing Agreements (as defined in the ABL Credit Agreement).

**1.5.    *ABL Loans*** means the loans arising under or pursuant to the ABL Credit Agreement.

**1.6.    *ABL Priority Collateral*** means any Collateral securing the obligations arising under the ABL Credit Agreement.

**1.7.    *Ad Hoc Group*** means that certain ad hoc group of certain Consenting First Lien Lenders, represented by, among others, Paul Hastings LLP, Landis Rath & Cobb LLP, and Lazard Frères & Co., as may be reconstituted from time to time.

**1.8.    *Ad Hoc Group Advisors*** means (a) Paul Hastings LLP, as counsel to the Ad Hoc Group, (b) Lazard Frères & Co., as financial advisor to the Ad Hoc Group, (c) Landis Rath & Cobb LLP, as Delaware counsel to the Ad Hoc Group, and (d) such other professionals that may be retained by or on behalf of the Ad Hoc Group (including the retention of any such professional made by Paul Hastings), solely in the case referred to in this clause (d), with the consent of the Debtors.

**1.9.    *Administrative Bar Date*** means the first Business Day that is or follows the date that is the thirtieth (30th) day after the Effective Date, or such other date as is ordered by the Bankruptcy Court.

**1.10.    *Administrative Expense Claim*** means a Claim (other than any DIP Claim) for costs and expenses of administration of the Chapter 11 Cases Allowed under Bankruptcy Code sections 503(b), 507(a)(2), 507(b), or, if applicable, 1114(e)(2), including, but not limited to: (a) any actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including, but not limited to, wages, salaries, commissions for services, and payments for inventories, leased equipment, and premises); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330, 331, 363, or 503(b) to the extent incurred on or before the Effective Date; (c) all U.S. Trustee Fees; (d) any 503(b)(9) Claims; and (e) any Claims that have been designated "Administrative Claims" by Final Order of the Bankruptcy Court.

**1.11.    *Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.  For the avoidance of doubt, none of (a) Conn's, Inc., (b) B. Riley Financial, Inc., and (c) each of their respective Affiliates (excluding Freedom VCM Holdings, LLC and its subsidiaries) shall be "Affiliates" of the Debtors for purposes of this Plan.

**1.12.    *Allowed*** means, with respect to a Claim under this Plan, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim or Proof of Interest filed by the Bar Date or a request for payment of an Administrative Expense Claim filed by the Administrative Bar Date, as applicable (or for which Claim a Proof of Claim or Proof of Interest is not required under the Plan, the Bankruptcy Code, the Bar Date Order, or a Final Order, including the Interim DIP Order and Final DIP Order); (b) a Claim that is scheduled by the Debtors as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim or Proof of Interest, as applicable, has been timely filed; or (c) a Claim allowed pursuant to the Plan or a Final Order, including the Interim DIP Order and Final DIP Order; provided that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim or Proof of Interest is or has been timely filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim or Proof of Interest filed after the Bar Date or a request for payment of an Administrative Expense Claim filed after the Administrative Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

**1.13.** ***American Freight Debtors*** means, collectively, American Freight FFO, LLC, Franchise Group Newco Intermediate AF, LLC, and each of Franchise Group Newco Intermediate AF, LLC's direct and indirect subsidiaries.

**1.14.** ***American Freight Liquidation Proceeds*** means net Cash proceeds generated by the sale, lease, liquidation, or other disposition of property owned by the American Freight Debtors.

**1.15.** ***Assumed Contracts*** means those Executory Contracts and Unexpired Leases that shall be (i) in the event the Restructuring Transactions are consummated through the Sale Transaction or a Partial Sale Transaction (if any), assumed by the Non-Liquidating Debtors and assigned to the applicable Successful Bidder or its designee pursuant to and as set forth in any applicable Sale Documents, or (ii) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), assumed by the Non-Liquidating Debtors.

**1.16.** ***Assumed Contracts List*** means the list or lists of Assumed Contracts, which (i) in the event the Restructuring Transactions are consummated through the Sale Transaction or a Partial Sale Transaction (if any), will be included in the applicable Sale Documents and filed with the Bankruptcy Court no later than two (2) Business Days prior to the Sale Hearing, or (ii) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), will be included in the Plan Supplement and may be amended or supplemented up to and including the Effective Date.

**1.17.** ***Assumed Liabilities*** has the meaning set forth in any Sale Documents (or other such similar term as may be used in such Sale Documents).

**1.18.** ***Auction*** means an auction (if any) conducted by the Non-Liquidating Debtors to solicit bids for a Sale Transaction or a Partial Sale Transaction, free and clear of all Liens, Claims, encumbrances, and other interests pursuant to section 363 of the Bankruptcy Code, pursuant to the terms and conditions of the Bidding Procedures.

**1.19.** ***Avoidance Actions*** means any and all avoidance, recovery, subordination, or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5, and section 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

**1.20.** ***Ballot*** means the form distributed by the Debtors or the Claims Agent to Holders of impaired Claims entitled to vote on this Plan on which the acceptance or rejection of this Plan is to be indicated.

**1.21.** ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.22.**    ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware, or any other court exercising competent jurisdiction over the Chapter 11 Cases or any proceeding therein.

**1.23.**    ***Bankruptcy Rules*** means (a) the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, (b) the Local Rules, and (c) any chambers rules of the Bankruptcy Court.

**1.24.**    ***Bar Date*** means the applicable date established by the Bar Date Order by which respective Proofs of Claim and Interests must be filed.

**1.25.**    ***Bar Date Order*** means the *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising under 503(b)(9) of the Bankruptcy Code) and (B) Approving the Form and Manner of Notice Thereof* [Docket No. 354], entered by the Bankruptcy Court on December 6, 2024.

**1.26.**    ***Bidding Procedures*** means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

**1.27.**    ***Bidding Procedures Order*** means the *Order (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief* [Docket No. 444], entered by the Bankruptcy Court on December 16, 2024.

**1.28.**    ***Buddy's Debtors*** means collectively, Franchise Group Intermediate B, LLC and each of its subsidiaries.

**1.29.**    ***Business Day*** means any day other than a Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or a day on which banks are not open for general business in New York, New York.

**1.30.**    ***Cash*** means the legal currency of the United States and equivalents thereof.

**1.31.**    ***Cash Sale Proceeds*** means the Sale Proceeds that are Cash.

**1.32.**    ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).

**1.33.**    *Chapter 11 Cases* means the cases (jointly administered) under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court.

**1.34.**    *Claim* means any "claim" as defined in section 101(5) of the Bankruptcy Code against any Debtor or property of any Debtor, including any Claim arising after the Petition Date.

**1.35.**    *Claims Agent* means Kroll Restructuring Administration LLC in its capacity as noticing, claims and solicitation agent for the Debtors.

**1.36.**    *Claims Objection Deadline* means the deadline for objecting to a Claim, which shall be on the date that is 180 days after the Effective Date, which may be extended by an order of the Bankruptcy Court.

**1.37.**    *Claims Register* means the official register of Claims maintained by the Claims Agent.

**1.38.**    *Class* means a category of Claims or Interests established under Article IV of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.39.**    *Collateral* means any property, wherever located, or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim.

**1.40.**    *Committee Settlement* means the settlement agreed to by the Committee Settlement Parties, as incorporated into this Plan and embodied in the term sheet dated February [•]3, 2025 annexed hereto as **Exhibit I**, which settlement resolves various disputes, provides ~~valuation~~valuable consideration to the Debtors and the Estates, and grants certain releases on the terms and conditions provided for therein.

**1.41.**    *Committee Settlement Parties* means the Required Consenting First Lien Lenders, the Debtors, and the Creditors' Committee.

**1.42.**    *Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.43.**    *Confirmation Hearing* means a hearing to be held by the Bankruptcy Court regarding confirmation of this Plan (as may be amended pursuant to Section 14.3 of this Plan), as such hearing may be adjourned or continued from time to time.

**1.44.**    *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as may be amended, modified, or supplemented from time to time, which shall be subject to the Definitive Document Consent Rights **and shall be reasonably acceptable to the Creditors' Committee**.

**1.45.**    *Consenting First Lien Lenders* means, as of the relevant time, those First Lien Lenders that are party to the Restructuring Support Agreement.

**1.46.**    *Creditors' Committee* means the statutory committee of unsecured creditors, appointed in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, as

identified in the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 188], filed by the U.S. Trustee on November 19, 2024, as the same may be reconstituted from time to time.

    **1.47.**   *CRO* means David Orlofsky, as Chief Restructuring Officer of the Debtors.

    **1.48.**   *Cure Cost* means (i) all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) and (ii) to the extent required to be cured by the Bankruptcy Code, other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

    **1.49.**   *Cure Dispute* has the meaning set forth in Section 10.2 of this Plan.

    **1.50.**   *D&O Liability Insurance Policies* means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to or providing coverage to any of the Debtors for current or former directors', managers', and officers' liability.

    **1.51.**   *Debtor(s)* has the meaning set forth in the preamble.

    **1.52.**   *Debtor Releasing Party* means any Releasing Party that is a Debtor.

    **1.53.**   *Definitive Document Consent Rights* means the documentation principles set forth in Section I.D. hereof.

    **1.54.**   *Definitive Documents* has the meaning set forth in the Restructuring Support Agreement.

    **1.55.**   *DIP Agent* means the administrative and the collateral agent for the DIP Lenders with respect to the DIP Facility, which shall be either (a) Wilmington Trust, National Association or (b) another financial institution selected by, and qualified to perform the duties customarily associated with such roles as determined by, the Required DIP Lenders and reasonably acceptable to Franchise Group, Inc.

    **1.56.**   *DIP Backstop Premium* has the meaning set forth in the DIP Credit Agreement.

    **1.57.**   *DIP Budget* means the 13-week cash flow projection in form and substance acceptable to the Required DIP Lenders, reflecting (i) the loan parties under the DIP Credit Agreement's anticipated Cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth calendar week thereafter, and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by Professional Persons during the thirteen week period.

    **1.58.**   *DIP Claims* means all Claims of the DIP Agent and/or the DIP Lenders related to, arising under, or in connection with the Interim DIP Order, Final DIP Order and the DIP

Documents, including, without limitation, Claims for all principal amounts outstanding, interest, fees, reasonable and documented expenses (including the reasonable and documented expenses of counsel as set forth in the DIP Credit Agreement), costs and other charges of the DIP Agent and the DIP Lenders in respect of the obligations of the Debtors arising under the DIP Credit Agreement, including, without limitation, the Tranche A DIP Loan Claims and the Tranche B DIP Loan Claims.

    **1.59.**   *DIP Credit Agreement* means the Senior Secured Super-Priority Priming Term Loan Debtor-in-Possession Credit Agreement, dated as of November 7, 2024, by and among the Debtors and the DIP Lenders, as the same may be modified, amended or supplemented from time to time, in accordance with the terms thereof (and including any and all documents and instruments executed in connection therewith).

    **1.60.**   *DIP Documents* means collectively, the DIP Motion, the DIP Orders, and the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof, each of which shall be subject to the Definitive Document Consent Rights.

    **1.61.**   *DIP Equitization* has the meaning set forth in Section 3.1 of this Plan.

    **1.62.**   *DIP Facility* means the debtor-in-possession financing facility on the terms and conditions set forth in the DIP Credit Agreement.

    **1.63.**   *DIP Lenders* means, collectively, and as of the relevant time, those lenders that are party to the DIP Credit Agreement.

    **1.64.**   *DIP Loans* means the Tranche A DIP Loans and the Tranche B DIP Loans.

    **1.65.**   *DIP Motion* means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 51], filed by the Debtors on November 4, 2024.

    **1.66.**   *DIP Orders* means the Interim DIP Order and Final DIP Order.

    **1.67.**   *DIP Premium Conversion* means, in the event of a Plan Equitization Transaction, the conversion by any Holder of a DIP Claim (and/or one or more Related Funds of such Holder) that received a DIP Backstop Premium and/or Commitment Premium (each as defined in the DIP Credit Agreement), as of closing of the syndication process for the DIP Facility and an Exit Premium (as defined in, and in accordance with, the DIP Credit Agreement), of its DIP Backstop Premium, Commitment Premium and/or its Exit Premium (as defined in the DIP Credit Agreement), as applicable, into Reorganized Common Equity at a 25% discount to

total equity value of the Reorganized Debtors as set forth in the Disclosure Statement and/or Plan Supplement.

**1.68.** *Disallowed* means a finding or conclusion of law of the Bankruptcy Court in a Final Order, or provision in the Confirmation Order, disallowing a Claim or Interest.

**1.69.** *Disbursing Agent* means the Post-Effective Debtors or the Entity designated by the Post-Effective Debtors, who may be the Plan Administrator, to make distributions under this Plan.

**1.70.** *Disclosure Statement* means the disclosure statement that relates to this Plan, including all exhibits and schedules annexed thereto or referred to therein (in each case, as it or they may be amended, modified, or supplemented from time to time), which shall be subject to the Definitive Document Consent Rights.

**1.71.** *Disclosure Statement Hearing* means a hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

**1.72.** *Disclosure Statement Order* means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, as may be amended, modified, or supplemented from time to time, which shall be subject to the Definitive Document Consent Rights.

**1.73.** *Disputed Claim* means, as of any relevant date, any Claim, or any portion thereof: (a) that is not an Allowed Claim as of the relevant date; and/or (b) is otherwise disputed by any of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled; or (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors or any party in interest has interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order as of the relevant date.

**1.74.** *Distribution Date* means: (a) with respect to Administrative Expense Claims, Priority Non-Tax Claims, Priority Tax Claims, Other Secured Claims, and U.S. Trustee Fees, the date that is the latest of: (i) the Effective Date (or any date within thirty (30) days thereafter); (ii) the date such Claim would be due and payable in the ordinary course of business; and (iii) any date that is within thirty (30) days after such Claim becomes an Allowed Claim or otherwise becomes payable under this Plan (or, if such date is not a Business Day, on the next Business Day thereafter); (b) with respect to Fee Claims, the date (or as soon thereafter as reasonably practicable) that such Claims become Allowed Claims; and (c) with respect to all other Claims, the Effective Date or as soon as reasonably practicable thereafter.

**1.75.** *Distribution Record Date* means the date for determining which Holders of Claims are eligible to receive initial distributions under the Plan, which date shall be the Confirmation Date, or such later date as shall be agreed by the Debtors and the Required Consenting First Lien Lenders; underlined provided that the Distribution Record Date shall not apply to any

securities of the Debtors deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

**1.76.** ***DTC*** means The Depository Trust Company.

**1.77.** ***Effective Date*** means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 11.2 of this Plan have been satisfied or waived and no stay of the Confirmation Order is in effect.

**1.78.** ***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.79.** ***Equity Interest*** means collectively, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, and any other equity, ownership, membership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, or other equity, ownership, membership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement).

**1.80.** ***Estate*** means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**1.81.** ***Estate Professional(s)*** means any Person(s) retained by the Estates.

**1.82.** ***Exculpated Party*** means (a) the Debtors, (b) the Debtors' directors and officers who served at any time between the Petition Date and the Effective Date, (c) the Creditors' Committee, (d) the members of the Creditors' Committee and the individuals who served on the Creditors' Committee on behalf of each member in their capacities as such, (e) the Professional Persons, (f) as to all Debtors who are limited liability companies, their members, and (g) with respect to each of the foregoing in clauses (a) and (c), solely to the extent they are Estate fiduciaries, and without duplication of parties otherwise set forth above, each such Entity's current and former Affiliates, and each such Entity's and its current and former Affiliates' current and former subsidiaries, officers, directors (including any sub-committee of directors), managers, principals, members (including ex officio members and managing members), employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such on or before the Petition Date and prior to or on the Effective Date; provided that, for purposes of the foregoing clause (g), any "former" party shall only be treated as an "Exculpated Party" to the extent they acted as an ~~estate~~**Estate** fiduciary after the Petition Date; provided, for the avoidance of doubt, notwithstanding the foregoing, that Brian Kahn and Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., and each of their Affiliates, shall not be included in the definition of "Exculpated Parties"; provided, further, for the avoidance of doubt, that none of the Debtors are Affiliates of Brian Kahn and/or Prophecy Asset Management LP.

**1.83.**    *Exculpation* means the exculpation provision set forth in Article XII of this Plan.

**1.84.**    *Executory Contract* means a contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

**1.85.**    *Existing ABL Intercreditor Agreement* means that certain Amended Intercreditor Agreement, dated as of November 22, 2021, among the ABL Credit Agreement Agent, the First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent, Franchise Group, Inc., Valor Acquisition, LLC, Franchise Group Newco Intermediate AF, LLC Pet Supplies "Plus", LLC, as borrowers, the other borrowers from time to time party thereto, and the other loan parties from time to time party thereto, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

**1.86.**    *Existing Equity Interests* means Equity Interests existing as of the Effective Date.

**1.87.**    *Existing Intercompany Equity Interests* means any Existing Equity Interests in a Debtor or a subsidiary of a Debtor that are owned or held by another Debtor.

**1.88.**    *Existing TopCo Equity Interests* means any Existing Equity Interests in TopCo.

**1.89.**    *Exit ABL Facility* means an exit asset based loan facility provided by third parties acceptable to the Debtors and the Required Consenting First Lien Lenders, in an amount necessary to refinance all Allowed Prepetition ABL Loan Claims outstanding under the existing ABL Credit Agreement upon such terms and conditions acceptable to the Required Consenting First Lien Lenders and the Debtors.

**1.90.**    *Fee Claim* means a Claim by a Professional Person for compensation, indemnification or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, including in connection with final fee applications of such Professional Persons.

**1.91.**    *Final DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 414], entered by the Bankruptcy Court on December 11, 2024.

**1.92.**    *Final Order* means an order, ruling or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in

no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment; provided, further, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

1.93.    *First Lien Credit Agreement* means that certain First Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as lead borrower, the other borrowers and guarantors party thereto, the First Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

1.94.    *First Lien Credit Agreement Agent* means Wilmington Trust, National Association (as successor to JPMorgan Chase Bank, N.A.), in its capacity as successor administrative agent and successor collateral agent for the First Lien Lenders.

1.95.    *First Lien Deficiency Claim(s)* means, to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claims), the undersecured portion of such Allowed Claim.

1.96.    *First Lien Lenders* means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, Prepetition First Lien Loan Claims.

1.97.    *First Lien Loan Documents* means the "Loan Documents" as defined in the First Lien Credit Agreement.

**1.98.**    ***Freedom HoldCo Debtor(s)*** means, collectively and individually, Freedom VCM Interco, Inc. and Freedom VCM, Inc.

**1.99.**    ~~1.98.~~ *Freedom HoldCo Debtor* ~~*Liquidation*~~**Litigation** *Trust* means~~, if applicable, any~~ **the** trust to be established on the Effective Date to administer any Claims or Causes of Action of the Freedom HoldCo Debtors that are not settled, discharged, or released as part of the Plan.

**1.100.**    ~~1.99.~~ *Freedom HoldCo Debtor* ~~*Liquidation*~~**Litigation** *Trust Agreement* means~~, if applicable,~~ that certain agreement entered into no later than the Effective Date setting forth, among other things, the terms and conditions for the establishment of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust and the appointment of ~~a trustee for~~ the Freedom HoldCo Debtor ~~Liquidation Trust~~ ~~that has the authority and power to determine whether to pursue or settle Claims and Causes of Action that are vested in the Freedom HoldCo Debtor Liquidation Trust~~**Litigation Trustee**, all of which shall be consistent with the applicable provisions of the

Plan and which shall be in form and substance satisfactory to the Debtors, ~~and~~ **and** the DIP Lenders~~, and the Required Consenting First Lien Lenders~~.

~~1.100.~~ ~~*Freedom HoldCo Debtor(s)* means, collectively and individually, Freedom VCM Interco, Inc. and Freedom VCM, Inc.~~

**1.101.** *Freedom HoldCo Debtor Litigation Trust Claims* **means the following Claims and Causes of Action belonging to the Freedom HoldCo Debtors, which shall not be released pursuant to this Plan, and shall be transferred to the Freedom HoldCo Debtor Litigation Trust: (x) all potential Claims and Causes of Action against former directors and officers of the Debtors; (y) all potential Claims and Causes of Action against Brian Kahn, Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., Vintage Capital Management LLC, Lauren Kahn, the OpCo Debtors, and solely in the case of Brian Kahn, Prophecy Asset Management LP and B. Riley Financial, Inc., each of their affiliates, directors, officers, managers, partners, and owners (in each case, solely in their capacity as such, and,** for the avoidance of doubt, not including any **of the Debtors); provided that,** for the avoidance of doubt, **any Claims and Causes of Action against the OpCo Debtors belonging to the Freedom HoldCo Debtors shall continue to be treated as a Class 9 Intercompany Claim; and (z) any other Claims and Causes of Action that the Freedom HoldCo Independent Director does not settle or release with the approval of the Bankruptcy Court and instead transfers to the Freedom HoldCo Debtor Litigation Trust.**

**1.102.** *Freedom HoldCo Debtor Litigation Trustee* **means the Person or Entity (or any successor thereto) who or which, on and after the Effective Date, shall have the rights, powers, and duties as set forth in this Plan and the Freedom HoldCo Debtor Litigation Trust Agreement, who shall be chosen by the Debtors, in consultation with the DIP Lenders, and whose identity shall be set forth in the Plan Supplement,** that has the authority and power to determine whether to pursue or settle Claims and Causes of Action that are vested in the Freedom HoldCo Debtor **Litigation Trust and to make distributions to Holders of Allowed Prepetition HoldCo Loan Claims (after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election) and Allowed** Freedom HoldCo General Unsecured Claims**, all of which shall be consistent with the applicable provisions of the Plan.**

**1.103.** ~~1.101.~~ *Freedom HoldCo DIP Election* has the meaning set forth in <u>Section 3.1</u> of this Plan.

**1.104.** ~~1.102.~~ *Freedom HoldCo General Unsecured Claim* means any General Unsecured Claim against any of the Freedom HoldCo Debtors.

**1.105.** ~~1.103.~~ *Freedom HoldCo Independent Director* means Michael Wartell, as independent director appointed to the board of directors at each Freedom HoldCo Debtor.

**1.106.** ~~1.104.~~ *Freedom HoldCo Independent Investigation* means any investigation conducted by the Freedom HoldCo Independent Director.

**1.107.** ~~1.105.~~ *Freedom HoldCo Independent Investigation Related Matters* means all matters related to any claims, rights and Causes of Action that may be held by or against the

13

Freedom HoldCo Debtors, and all other matters that may become subject to the Freedom HoldCo Independent Investigation.

**1.108.** ~~1.106.~~ *Freedom Lender Group* means that certain ad hoc group of certain HoldCo Lenders, as may be reconstituted from time to time, as identified in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedures* [Docket No. 229], filed November 22, 2024, as may be amended or supplemented from time to time.

**1.109.** ~~1.107.~~ *General Unsecured Claim* means any unsecured Claim, other than an Administrative Expense Claim, a DIP Claim, a Priority Non-Tax Claim, a Priority Tax Claim, ~~or~~**a Secured Claim,** an Intercompany Claim**, or a Subordinated Claim**, including, without limitation, Claims arising from the rejection of Executory Contracts and Unexpired Leases, and Claims arising from any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by, a Debtor in connection therewith.  **For the avoidance of doubt, a General Unsecured Claim excludes any Equity Interests.**

**1.110.** ~~1.108.~~ *Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

**1.111.** ~~1.109.~~ *HoldCo Credit Agreement* means that certain Credit Agreement, dated as of August 21, 2023, among Freedom VCM, Inc., as borrower, Freedom VCM Interco, Inc., as holdings, the HoldCo Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

**1.112.** ~~1.110.~~ *HoldCo Credit Agreement Agent* means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the HoldCo Lenders.

**1.113.** ~~1.111.~~ *HoldCo Debtor(s)* means, collectively and individually, Freedom VCM Holdings, LLC, Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, Freedom VCM Receivables, Inc., and each Freedom HoldCo Debtor.

**1.114.** ~~1.112.~~ *HoldCo General Unsecured Claims Distribution* means, in the event the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular HoldCo Debtor, less (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Freedom HoldCo General Unsecured Claims, HoldCo Receivables General Unsecured Claims, and TopCo General Unsecured Claims, as applicable, in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims and any taxes due on account of any Sale Transaction or Partial Sale Transaction) (including, without limitation, the satisfaction in full of any DIP Claims at any HoldCo Debtor, and, if applicable, the Prepetition HoldCo Loan Claims including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law.

1.115. 1.113. *HoldCo Lenders* means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, Prepetition HoldCo Loan Claims.

1.116. 1.114. *HoldCo Receivables General Unsecured Claim* means any General Unsecured Claim against Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc.

1.117. 1.115. *Holder* means any Entity or Person holding a Claim or Interest.

1.118. 1.116. *Independent Directors* means Todd Arden, John Hartmann, Christopher P. Meyer, and Michael Wartell each in their capacities as members of the board of directors of any of the Debtors.

1.119. 1.117. *Initial Strike Price* means an exercise price equal to approximately $1.6 billion, representing the equity value of the Reorganized Debtors implied by a total enterprise value equal to the aggregate amount of all Allowed DIP Claims, Allowed Prepetition First Lien Loan Claims, and Allowed Prepetition ABL Loan Claims.

1.120. 1.118. *Intercompany Claim* means any Claim, Cause of Action, or remedy held by or asserted against a Debtor by another Debtor.

1.121. 1.119. *Interests* means, collectively, Equity Interests and Existing Intercompany Equity Interests.

1.122. 1.120. *Interim Compensation Order* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Estate Professionals* [Docket No. 353], entered by the Bankruptcy Court on December 6, 2024.

1.123. 1.121. *Interim DIP Order* means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 134], entered by the Bankruptcy Court on November 7, 2024.

1.124. 1.122. *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.125. 1.123. *Local Rules* means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.126. 1.124. *Management Incentive Plan* means, to the extent applicable, the management incentive plan of the Reorganized Debtors, which shall be implemented by the New Board.

1.127. 1.125. *New ABL Credit Agreement* means the loan agreement memorializing the New ABL Facility, the material terms of which shall be included in the Plan Supplement, and

which shall be entered into by one or more of the Reorganized Debtors, the New ABL Credit Agreement Agent, and the New ABL Facility Lenders.

1.128.  ~~1.126.~~ *New ABL Credit Agreement Agent* means the administrative agent under the New ABL Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New ABL Credit Agreement.

1.129.  ~~1.127.~~ *New ABL Facility* means, as applicable, the Take-Back ABL Term Loan Facility, and the Exit ABL Facility, each in accordance with the terms of the New ABL Facility Documents.

1.130.  ~~1.128.~~ *New ABL Facility Documents* means, collectively, the New ABL Credit Agreement and any other agreements or documents related to or executed in connection with the New ABL Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof; provided that with the consent of the ABL Credit Agreement Agent and, unless expressly provided otherwise herein or in the New ABL Facility Documents, all ABL Loan Documents shall be deemed to be New ABL Facility Documents.

1.131.  ~~1.129.~~ *New ABL Facility Lenders* means the lenders party to the New ABL Credit Agreement.

1.132.  ~~1.130.~~ *New Boards* means the initial boards of the Reorganized Debtors.

1.133.  ~~1.131.~~ *New Organizational Documents* means the new Organizational Documents of the Post-Effective Debtors (including New TopCo), to be entered into on the Effective Date, including certificates of incorporation, limited liability company agreements, stockholders or shareholders agreements, operating agreements, equity subscription or purchase agreements, charters or by-laws, which shall be consistent in all material respects with the Restructuring Support Agreement, and each of which shall be subject to the Definitive Document Consent Rights.

1.134.  ~~1.132.~~ *New TopCo* means Franchise Group, Inc. or any other Entity designated as such that will, directly or indirectly, own 100% of the Equity Interests in, or substantially all of the assets of, Franchise Group, Inc. upon consummation of the Restructuring Transactions, as mutually agreed by the Debtors and the Required Consenting First Lien Lenders.

1.135.  ~~1.133.~~ *New Warrants* means warrants exercisable for up to 5.0% of the Reorganized Common Equity as of the Effective Date (subject to dilution from the Management Incentive Plan), which warrants shall expire five (5) years from the Effective Date (subject to earlier termination upon the occurrence of a "liquidity event") and have an initial exercise price equal to the Initial Strike Price; provided that the Initial Strike Price shall increase, on a dollar-for-dollar basis (the "*Strike Price Multiplier*"), in an amount equal to all of the fees and expenses incurred by any Professional Persons and/or the Ad Hoc Group Advisors related to any litigation initiated by the Freedom Lender Group since the Petition Date, as determined, in good faith, by the Debtors and the Required Consenting First Lien Lenders, including, without limitation, all fees and expenses of the Freedom HoldCo Debtors; provided, further, that for every week that the confirmation of the Plan is delayed because of litigation brought or initiated by the Freedom Lender Group, the Initial Strike Price shall be further increased by the lesser of

(x) actual costs incurred by the Debtors as a result of the delay (e.g., any resulting value degradation, additional rent payments, overhead, etc.) or (y) an increase of the Strike Price Multiplier by a simple multiple of 0.25x for every week that the confirmation of the Plan is delayed beyond the Debtors' current timeline,[2] in each case, as determined in good faith by the Debtors and the Required Consenting First Lien Lenders.  The New Warrants shall not be subject to any anti-dilution provisions (including any economic anti-dilution provisions), other than the adjustments for splits, reverse splits, and similar structural transactions that are not liquidity events.  The New Warrants shall not be entitled to Black-Scholes or similar protections.

**1.136.**  ~~1.134.~~ ***New Warrants Documentation*** means any and all agreements, certificates, instruments or other documents required to implement, issue, and distribute, or that otherwise govern or evidence, the New Warrants, each of which shall be subject to the Definitive Document Consent Rights.

**1.137.**  ~~1.135.~~ ***Non-Debtor Releasing Party*** means any Releasing Party that is not a Debtor.

**1.138.**  ~~1.136.~~ ***Non-Liquidating Debtor(s)*** means any Debtor other than the American Freight Debtors.

**1.139.**  ~~1.137.~~ ***Non-Partial Sale Transaction Debtor(s)*** means any Non-Liquidating Debtor other than a Partial Sale Transaction Debtor.

**1.140.**  ~~1.138.~~ ***OpCo Debtor(s)*** means any particular Debtor other than any HoldCo Debtor.

**1.141.**  ~~1.139.~~ ***OpCo Debtor Litigation Trust*** means the trust to be established on the Effective Date to administer the OpCo Litigation Claims.

**1.142.**  ***OpCo Debtor Litigation Trust Agreement*** means that certain agreement entered into no later than the Effective Date setting forth, among other things, the terms and conditions for the establishment of **the OpCo Debtor Litigation Trust and the appointment of the OpCo Litigation Trustee.**

**1.143.**  ***OpCo Debtor Litigation Trust Assets*** **means (i) the OpCo Debtor Litigation Trust Escrow Account, (ii) the OpCo Litigation Claims, and (iii) solely to the extent that Holders of Claims in Class 5 vote to accept the Plan, the New Warrants, *plus* any additional amounts funded into the OpCo Debtor Litigation Trust Escrow Account following the Effective Date.**

---

[2]   For example, if confirmation of the Plan is delayed by two (2) weeks beyond the Debtors' current timeline as a result of litigation brought or initiated by the Freedom Lender Group, the Strike Price Multiplier shall increase by one and a half dollars ($1.50) for every one dollar ($1.00) of fees and expenses incurred by any Professional Persons and/or the Ad Hoc Group Advisors related to responding to any litigation initiated by the Freedom Lender Group.

**1.144.** ~~1.140.~~ *OpCo Debtor Litigation Trust Escrow Account* means an account funded **and paid to the OpCo Debtor Litigation Trust** by the Debtors and other parties (if applicable) with Cash no later than the Effective Date in an amount equal to the OpCo Debtor Litigation Trust Escrow Amount.

**1.145.** ~~1.141.~~ *OpCo Debtor Litigation Trust Escrow Amount* means the aggregate amount equal to (x) $21 million *minus* (y) the total amount of fees and expenses (including transaction and success fees) incurred on or after the Petition Date through the Effective Date by all Professional Persons retained by the Creditors' Committee under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5), or any other provision of the Bankruptcy Code, which amount, shall include, without limitation, the Professional Fee Escrow Amount for all Professional Persons retained by the Creditors' Committee.

**1.146.** ~~1.142.~~ *OpCo Debtor Litigation Trust* ~~Agreement means that certain agreement entered into no later than the Effective Date setting forth, among other things, the terms and conditions for the establishment of~~*Expenses* **means the reasonable expenses (including any taxes imposed on or payable by** the OpCo Debtor Litigation Trust and ~~the appointment of~~**professional fees) incurred by the OpCo Debtor Litigation Trust, any professionals retained by the OpCo Debtor Litigation Trust, and any additional amount determined to be necessary by** the OpCo Litigation Trustee **to adequately reserve for the operating expenses of the OpCo Debtor Litigation Trust that shall be paid out of the OpCo Debtor Litigation Trust Escrow Account.**

**1.147.** ~~1.143.~~ *OpCo Debtor Litigation Trust Units* means the ~~units of~~**non-certificated beneficial interests in** the OpCo Debtor Litigation Trust~~.~~ **granted to each Holder of Allowed OpCo General Unsecured Claims, which shall entitle such Holder to a** *pro rata* **share of the** OpCo General Unsecured Claims Distribution **net of OpCo Debtor Litigation Trust Expenses, subject to the terms of the Plan and the OpCo Debtor Litigation Trust Agreement.**

**1.148.** ~~1.144.~~ *OpCo General Unsecured Claim(s)* means, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, any Allowed General Unsecured Claim against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E, including, for the avoidance of doubt, any First Lien Deficiency Claims and any Prepetition Second Lien Loan Claims (including, without duplication, any Second Lien Deficiency Claims).

**1.149.** ~~1.145.~~ *OpCo General Unsecured Claims Distribution* means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor (other than any HoldCo Debtor) (after taking into account any taxes due on account of any Sale Transaction or Partial Sale Transaction), *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to General Unsecured Claims of that particular Debtor in priority of payment under the Bankruptcy Code(including the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, and the Prepetition Second Lien Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law.

**1.150.** **1.146.** *OpCo Litigation Claims* has the meaning set forth in Section 7.10(c)(ii)**7.10(c)(iii)** of this Plan.

**1.151.** **1.147.** *OpCo Litigation Trustee* means, the Person or Entity (or any successor thereto) who or which, on and after the Effective Date, shall have the rights, powers, and duties as set forth in this Plan and the OpCo Debtor Litigation Trust Agreement, who shall be chosen by the Creditors' Committee and shall be reasonably acceptable to the Required Consenting First Lien Lenders, and in consultation with Debtors and whose identity shall be set forth in the Plan Supplement, that has the authority and power to determine whether to pursue or settle Claims and Causes of Action that are vested in the OpCo Debtor Litigation Trust and to make distributions to holders of OpCo Debtor Litigation Trust Units, all of which shall be consistent with the applicable provisions of the Plan and the Committee Settlement and which shall be in form and substance satisfactory to the Debtors, the Creditors' Committee, the DIP Lenders, and the Required Consenting First Lien Lenders.

**1.152.** **1.148.** *OpCo Litigation Trustee Duties* has the meaning set forth in Section 7.10(b)(i) of this Plan.

**1.153.** **1.149.** *Organizational Documents* means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as by-laws or a partnership agreement, or an operating, limited liability company or members agreement).

**1.154.** **1.150.** *Other Priority Claim* means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**1.155.** **1.151.** *Other Secured Claim* means any Secured Claim against a Debtor other than a Prepetition First Lien Loan Claim **or,** DIP Claim **(but** for the avoidance of doubt, not including any**, or** Prepetition Second Lien Loan Claim or any Prepetition HoldCo Loan Claim**)**.

**1.156.** **1.152.** *Partial Sale Transaction* means a sale of all or substantially all of the assets or Equity Interests of the Buddy's Debtors, the Vitamin Shoppe Debtors, the PSP Debtors, or a combination of two or more of the foregoing, as further set forth herein, pursuant to sections 363 or 1129 of the Bankruptcy Code and the Bidding Procedures, solely if a Sufficient Bid is received by the Debtors; provided, for the avoidance of doubt, that a sale of all or substantially all of the assets or Equity Interest of the Debtors (taken as a whole) shall not be a Partial Sale Transaction.

**1.157.** **1.153.** *Partial Sale Transaction Debtor(s)* means any of the Buddy's Debtors, the Vitamin Shoppe Debtors and/or the PSP Debtors, as applicable, in each case that sells all or substantially all of its assets or its Equity Interests through one or more Partial Sale Transactions.

**1.158.** **1.154.** *Person* has the meaning set forth in section 101(14) of the Bankruptcy Code and also means any individual, corporation, partnership, association, indenture trustee, limited liability company, cooperative, organization, joint stock company, joint venture, estate,

fund, trust, unincorporated organization, Governmental Unit or any political subdivision thereof, or any other Entity or organization of whatever nature.

1.159.  ~~1.155.~~ *Petition Date* means November 3, 2024.

1.160.  ~~1.156.~~ *Plan* means this joint chapter 11 plan proposed by the Debtors, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Restructuring Support Agreement, the Committee Settlement, and the terms hereof.  If the Plan is withdrawn as the Plan for a particular Debtor, the defined term "Plan" shall not include the plan of reorganization or liquidation for such Debtor in its Chapter 11 Case where the context otherwise requires.

1.161.  ~~1.157.~~ *Plan Administrator* means, the Person or Entity (or any successor thereto) who or which, on and after the Effective Date, shall have the rights, powers, and duties as set forth in this Plan and the Plan Administrator Agreement, and whose identity and compensation shall be agreed to by the Debtors in consultation with the Required Consenting First Lien Lenders and shall be set forth in the Plan Supplement, if applicable; provided that to the extent the Restructuring Transactions are consummated pursuant to the Plan Equitization Transaction, (i) the Plan Administrator shall be appointed by the Required Consenting First Lien Lenders, and may be the Reorganized Debtors, (ii) compensation of the Plan Administrator shall be agreed to by the Debtors with the consent of the Required Consenting First Lien Lenders, and (iii) the identity and compensation of the Plan Administrator shall be set forth in the Plan Supplement.

1.162.  ~~1.158.~~ *Plan Administrator Agreement* means, if applicable, that certain agreement entered into no later than the Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan and which, solely in the event of a Plan Equitization Transaction, shall be in form and substance satisfactory to the Debtors, the DIP Lenders, and the Required Consenting First Lien Lenders.

1.163.  ~~1.159.~~ *Plan Documents* means the documents, other than this Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including the documents to be included in the Plan Supplement and any and all exhibits to this Plan and the Disclosure Statement, each of which shall be subject to the Definitive Document Consent Rights.

1.164.  ~~1.160.~~ *Plan Equitization Transaction* means the equitization of all Allowed Prepetition First Lien Loan Claims into 100% of Reorganized Common Equity (subject to dilution from (1) the Management Incentive Plan, (2) the DIP Premium Conversion, if applicable, (3) the DIP Equitization, and (4) the New Warrants, if applicable), as further set forth in the Restructuring Support Agreement.

1.165.  ~~1.161.~~ *Plan Supplement* means any compilation of documents and forms of documents (including term sheets), agreements, schedules, and exhibits to the Plan, **which may be amended from time to time,** including (i) the New Organizational Documents, (ii) the Schedule of Retained Causes of Action, (iii) the Take-Back Debt Documents, (iv) the

Restructuring Transactions Memorandum, (v) the Rejected Contracts/Lease List, (vi) the Plan Administrator, (vii) to the extent known, the identity of the known members of the New Board and the nature and compensation for any director who is an "insider" under the Bankruptcy Code, (viii) the New ABL Facility Documents, (ix) the New Warrants Documentation, (x) the OpCo Debtor Litigation Trust Agreement, (xi) the identity of the OpCo Litigation Trustee, (xii) the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust Agreement ~~(if applicable)~~, (xiii) **the identity** of the Freedom HoldCo Debtor **Litigation Trustee, (xiv)** in the case of a Plan Equitization Transaction, the Assumed Contracts List, ~~and~~ (~~xiv~~xv) in the event of a Sale Transaction, the Wind Down Budget, and (~~xv~~xvi) any and all other documents necessary to effectuate the Restructuring Transactions or that are contemplated by the Plan subject to this Agreement, which shall be filed by the Debtors prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be subject to the Definitive Document Consent Rights.

**1.166.** ~~1.162.~~ *Post-Effective Debtors* means, as applicable, either (a) in the case of a Plan Equitization Transaction (including, for the avoidance of doubt, following a Partial Sale Transaction, if any), the Reorganized Debtors, or (b) in the case of a Sale Transaction, the Wind Down Debtors.

**1.167.** ~~1.163.~~ *Pre-Effective Date PA Duties* has the meaning set forth in Section 7.22(a) of this Plan.

**1.168.** ~~1.164.~~ *Prepetition ABL Loan Claims* means any Claim on account of ABL Loans arising under or pursuant to the ABL Credit Agreement or the other ABL Loan Documents.

**1.169.** ~~1.165.~~ *Prepetition First Lien Loan Claims* means any Claim on account of Prepetition First Lien Loans arising under or pursuant to the First Lien Credit Agreement or the other First Lien Loan Documents.

**1.170.** ~~1.166.~~ *Prepetition First Lien Loans* means the term loans arising under or pursuant to the First Lien Credit Agreement.

**1.171.** ~~1.167.~~ *Prepetition HoldCo Lender Distribution* means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any of the HoldCo Debtors (after taking into account any structurally senior Allowed Claims and any taxes due on account of any Sale Transaction or Partial Sale Transaction) *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims after taking into account all structurally senior Allowed Claims and all Allowed Claims that are senior to Prepetition HoldCo Loan Claims in priority of payment under the Bankruptcy Code (including, if applicable, the DIP Claims allocable to the Freedom HoldCo Debtors in accordance with the Final DIP Order) or applicable nonbankruptcy law.

**1.172.** ~~1.168.~~ *Prepetition HoldCo Loan Claims* means any Claim on account of Prepetition HoldCo Loans arising under or pursuant to the HoldCo Credit Agreement.

**1.173.** ~~1.169.~~ *Prepetition HoldCo Loans* means the term loans arising under or pursuant to the HoldCo Credit Agreement.

**1.174.** ~~1.170.~~ *Prepetition Second Lien Lender Distribution* means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) (in the event of a Partial Sale Transaction, as allocable to the to the applicable Partial Sale Transaction Debtor (after taking into account any taxes due on account of any Sale Transaction or Partial Sale Transaction)) *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Prepetition Second Lien Loan Claims in priority of payment under the Bankruptcy Code (including, without limitation, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, and the Prepetition First Lien Loan Claims, including any interest, fees, or premiums payable thereon, and in the event of a Partial Sale Transaction, as allocable to the to the applicable Partial Sale Transaction Debtors) or applicable nonbankruptcy law.

**1.175.** ~~1.171.~~ *Prepetition Second Lien Loan Claims* means any Claim on account of term loans arising under or pursuant to the Second Lien Credit Agreement.

**1.176.** ~~1.172.~~ *Priority Non-Tax Claim* means any Claim, other than a DIP Claim, an Administrative Expense Claim, a Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**1.177.** ~~1.173.~~ *Priority Tax Claim* means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.178.** ~~1.174.~~ *Priority Tax Claims Bar Date* means the date that is 180 days after the Petition Date.

**1.179.** ~~1.175.~~ *Pro Forma Leverage Cap* has the meaning set forth in Section 3.1 of this Plan.

**1.180.** ~~1.176.~~ *Professional Fee Claim* means any Claim by a Professional Person for compensation for services rendered or reimbursement of expenses incurred by such Professional Person on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional Person's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

**1.181.** ~~1.177.~~ *Professional Fee Escrow Account* means an account funded by the Debtors with Cash no later than the Effective Date in the amount equal to the Professional Fee Escrow Amount.

**1.182.** ~~1.178.~~ *Professional Fee Escrow Amount* means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professional Persons have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and

as of the Effective Date, which shall be estimated pursuant to the method set forth in <u>Article III</u> of this Plan.

**1.183.** ~~1.179.~~ ***Professional Person(s)*** means any Persons (a) retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.184.** ~~1.180.~~ ***Proof of Claim*** means a proof of Claim filed by a Holder of a Claim against any of the Debtors in the Chapter 11 Cases.

**1.185.** ~~1.181.~~ ***Proof of Interest*** means a proof of Interest filed by a Holder of any Interests in any of the Debtors the Chapter 11 Cases.

**1.186.** ~~1.182.~~ ***PSP Debtors*** means, collectively, Franchise Group Intermediate PSP, LLC and each of its subsidiaries.

**1.187.** ~~1.183.~~ ***Rejected Contracts/Lease List*** means the list (as determined by the Debtors) of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto), if any, that will be rejected pursuant to the Plan.

**1.188.** ~~1.184.~~ ***Related Funds*** means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person, or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

**1.189.** ~~1.185.~~ ***Related Parties*** means collectively with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the date of the Restructuring Support Agreement, and any Person claiming by or through any of them, including such Related Parties' respective heirs, executors, estates, servants, and nominees.

**1.190.** ~~1.186.~~ ***Released Parties*** means, collectively, and each solely in its capacity as such: (a) the Debtors, their Estates, and the Post-Effective Debtors; (b) the DIP Agent and the DIP Lenders; (c) the First Lien Credit Agreement Agent; (d) the Consenting First Lien Lenders; (e) the Creditors' Committee and each of its members solely in their capacity as members of the Creditors' Committee; (f) the Holders of **General Unsecured** Claims in Classes 6-A, 6-B, 6-C, 6-D, and 6-E who vote to approve the Plan; and (g) each of such parties' Related Parties; <u>provided</u>, that no Person or Entity shall be a Released Party if they opt-out of the releases provided for in <u>Article XII</u> of this Plan; <u>provided</u>, further, that, notwithstanding the foregoing, Released Parties shall not include: (i) former directors of the Debtors**, other than those terminated without cause between February 3, 2025 and the Effective Date of the Plan**; (ii)

former employees, including officers, of the Debtors other than those terminated without cause between February 3, 2025 and the Effective Date of the Plan; (iii) Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., and each of their Affiliates and Related Parties (provided, that none of Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., shall be deemed Affiliates of the Debtors for purposes of this ~~carve out~~**proviso**); (iv) Irradiant Partners**,** LP and the members of the Freedom Lender Group; (v) Brian Kahn, Lauren Kahn, Vintage Capital Management LLC, Prophecy Asset Management LP, and each of their Affiliates and Related Parties (provided, that none of Brian Kahn, Lauren Kahn, Vintage Capital Management LLC, and Prophecy Asset Management LP, shall be deemed Affiliates of the Debtors for purposes of this ~~carve out~~**proviso**); and (vi) WFG solely for any prepetition services rendered**,**; provided, further, that, notwithstanding the foregoing, any party that contributes **Cash** to the OpCo Debtor Litigation Trust Escrow Account in an amount agreed to by the Creditors' Committee, in consultation with the Required **Consenting** First Lien Lenders, shall be a Released Party for purposes of releases granted by the OpCo Debtors.

**1.191.** ~~1.187.~~ *Releasing Parties* means, collectively, and each solely in its capacity as such: (a) the Debtors, their Estates, and Post-Effective Debtors; (b) the DIP Agent and the DIP Lenders; (c) the First Lien Credit Agreement Agent; (d) the Consenting First Lien Lenders; (e) the Creditors' Committee (if any) and each of its members solely in their capacity as members of the Creditors' Committee; (f) all Holders of Claims in Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 that (i) vote to accept or reject the Plan and do not timely submit a release opt-out indicating such Holder's decision not to participate in the releases set forth in Article XII, or (ii) do not vote to accept or reject the Plan, and either do not timely submit a release opt-out, or do not file an objection to the releases in Article XII of the Plan prior to the deadline to object to confirmation of the Plan; provided that the Consenting First Lien Lenders shall not opt out of the releases set forth in Article XII of the Plan; and (g) all unimpaired creditors of the Debtors who do not file an objection to the releases set forth in Article XII of the Plan on or before the deadline to object to confirmation of the Plan. Holders who were not provided a Ballot or opt-out form and are not listed in clauses (a) through (g) above are not Releasing Parties.

**1.192.** ~~1.188.~~ *Reorganized Common Equity* means the common Equity Interests of New TopCo authorized under the New Organizational Documents of the Reorganized Debtors and issued and/or distributed on the Effective Date in accordance with this Plan.

**1.193.** ~~1.189.~~ *Reorganized Debtor(s)* means, on or after the Effective Date, the Debtors, as reorganized pursuant to and under the Plan Equitization Transaction, or any successors thereto, by merger, consolidation, reorganization or otherwise, as the case may be, including New TopCo and any Non-Partial Sale Transaction Debtors that are reorganized pursuant to and under the Plan Equitization Transaction following the consummation of a Partial Sale Transaction.

**1.194.** ~~1.190.~~ *Required Consenting First Lien Lenders* means, as of the relevant date, Consenting First Lien Lenders that are members of the Ad Hoc Group holding, collectively, in excess of 66 2/3% of the aggregate outstanding principal amount of Prepetition First Lien Loans

that are held by Consenting First Lien Lenders that are members of the Ad Hoc Group at such time.

**1.195.** ~~1.191.~~ *Required DIP Lenders* means the "Required Lenders" as defined in the DIP Credit Agreement.

**1.196.** ~~1.192.~~ *Restructuring Expenses* means all reasonable and documented fees, costs and expenses of each of the Ad Hoc Group Advisors.

**1.197.** ~~1.193.~~ *Restructuring Support Agreement* means the Restructuring Support Agreement, dated as of November 1, 2024, inclusive of all exhibits and schedules thereto, by and among the Debtors, the Consenting First Lien Lenders, and any other Person that may become a party to such agreement pursuant to its terms, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

**1.198.** ~~1.194.~~ *Restructuring Transactions* means (a) the Plan Equitization Transaction, (b) the Sale Transaction, (c) a Partial Sale Transaction, or (d) each of the Plan Equitization Transaction, the Sale Transaction, and a Partial Sale Transaction, as the context requires.

**1.199.** ~~1.195.~~ *Restructuring Transactions Memorandum* means, solely in the event of the Plan Equitization Transaction, a document to be included in the Plan Supplement that will set forth the material components of the applicable Restructuring Transactions, including a summary of any transaction steps necessary to complete the Plan, and shall otherwise be in form and substance acceptable to the applicable Debtors and the Required Consenting First Lien Lenders, each in their sole discretion.

**1.200.** ~~1.196.~~ *Sale Documents* means one or more asset purchase agreements, other agreements, instruments, pleadings, orders and related documents, including, without limitation, the applicable Assumed Contracts List, pursuant to which the Non-Liquidating Debtors implement and consummate any Sale Transaction or Partial Sale Transaction, each of which shall be subject to the Definitive Document Consent Rights.

**1.201.** ~~1.197.~~ *Sale Order* means the order entered by the Bankruptcy Court authorizing and approving the Sale Transaction or Partial Sale Transaction, which shall be subject to the Definitive Document Consent Rights.

**1.202.** ~~1.198.~~ *Sale Proceeds* means all proceeds from consummation of a Sale Transaction or Partial Sale Transaction, as applicable, that are distributable or payable to the Estates, which proceeds shall consist of Cash.

**1.203.** ~~1.199.~~ *Sale Process* means the sale process conducted in accordance with the Bidding Procedures Order.

**1.204.** ~~1.200.~~ *Sale Toggle Event* means entry into one or more qualifying asset purchase agreements or other definitive document to consummate a Sale Transaction or Partial Sale Transaction, solely to the extent entered into in connection with a Sufficient Bid and in compliance with the Bidding Procedures Order.

**1.205.** ~~1.201.~~ *Sale Transaction* means a sale of all or substantially all of the remaining assets of the Debtors after the consummation of the Store-Closing and Liquidation Sales, which may be through one or more sales of the assets or Equity Interests of the Debtors, as further set forth herein, pursuant to sections 363 or 1129 of the Bankruptcy Code and the Bidding Procedures, solely if a Sufficient Bid is received by the Debtors; provided, for the avoidance of doubt, that a Partial Sale Transaction shall not constitute a Sale Transaction.

**1.206.** ~~1.202.~~ *Schedule of Retained Causes of Action* means the schedule of those Causes of Action that shall vest in the Post-Effective Debtors on the Effective Date, which will be contained in the Plan Supplement; provided, for the avoidance of doubt, that the OpCo Litigation Claims shall vest in the OpCo Debtor Litigation Trust and not in the Reorganized Debtors**, and the Freedom HoldCo Debtor Litigation Trust Claims shall vest in the Freedom HoldCo Debtor Litigation Trust and not in the Reorganized Debtors**.

**1.207.** ~~1.203.~~ *Second Lien Credit Agreement* means that certain Second Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., and the other borrowers and guarantors party thereto, the Second Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

**1.208.** ~~1.204.~~ *Second Lien Credit Agreement Agent* means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the Second Lien Lenders.

**1.209.** ~~1.205.~~ *Second Lien Deficiency Claim(s)* means, to the extent that the value of the Collateral securing any Prepetition Second Lien Loan Claim is less than the Allowed amount of such Prepetition Second Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition Second Lien Loan Claims), the undersecured portion of such Allowed Claim.

**1.210.** ~~1.206.~~ *Second Lien Lenders* means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, Prepetition Second Lien Loan Claims.

**1.211.** ~~1.207.~~ *Secured Claim* means a Claim: (a) that is secured by a valid, perfected and enforceable Lien on Collateral, to the extent of the value of the Claim Holder's interest in such Collateral as of the Confirmation Date; (b) to the extent that the Holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code; or (c) otherwise Allowed pursuant to the Plan or order of the Bankruptcy Court as a secured claim.

**1.212.** ~~1.208.~~ *Securities Act* means the Securities Act of 1933, as amended.

**1.213.** ~~1.209.~~ *Specified Party* means any of the following: (a) any current or former Holders of Interests (other than Franchise Group, Inc. or any of its subsidiaries); (b) any current or former Affiliate of any Person described in clause (a) of this definition; or (c) any current or former partner, officer, director, principal, employee or agent of any Person described in clause (a) or clause (b) of this definition.

**1.214.** ~~1.210.~~ ***Store-Closing and Liquidation Sales*** means the going out of business sales and store closing procedures at the American Freight Debtors on the terms and conditions set forth in the Store-Closing and Liquidation Sales Documents and the Plan.

**1.215.** ~~1.211.~~ ***Store-Closing and Liquidation Sales Documents*** means the Store-Closing and Liquidation Sales Orders and all documents or pleadings necessary or desirable to facilitate the Store-Closing and Liquidation Sales, each of which shall be subject to the Definitive Document Consent Rights.

**1.216.** ~~1.212.~~ ***Store-Closing and Liquidation Sales Orders*** means, collectively, (a) the *Interim Order I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 132], entered by the Bankruptcy Court on November 6, 2024, and (b) the *Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 351], entered by the Bankruptcy Court on December 6, 2024.

**1.217.** ~~1.213.~~ ***Subordinated Claim*** means any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise.

**1.218.** ~~1.214.~~ ***Subordinated Claims Distribution*** means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction or a Partial Sale Transaction, as applicable, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor, *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Subordinated Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims and any taxes due on account of any Sale Transaction or Partial Sale Transaction) (including, to the extent applicable, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, the Prepetition Second Lien Loan Claims, the General Unsecured Claims, the Prepetition HoldCo Loan Claims, the Freedom HoldCo General Unsecured Claims, the HoldCo Receivables General Unsecured Claims, and the TopCo General Unsecured Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law.

**1.219.** ~~1.215.~~ ***Successful Bidder*** means any Entity or Entities whose bid(s) for all or substantially all of the Non-Liquidating Debtors' assets pursuant to a Sufficient Bid is the highest and otherwise best bid for such assets or equity, respectively, pursuant to a Sale Order. For the avoidance of doubt, the Successful Bidder may be more than one Entity, submitting one or more bids, and if applicable, use of the term "Successful Bidder" herein may be read as "Successful Bidders." Where a Successful Bidder has consent rights (or is referenced) under the Plan, such consent rights (or reference) only apply to the extent such consent right (or reference) relates to the respective Successful Bidder's Sale Transaction.

**1.220.** ~~1.216.~~ ***Sufficient Bid*** shall have the meaning set forth in the Bidding Procedures.

**1.221.** ~~1.217.~~ ***Take-Back ABL Term Loan Facility*** means a take-back debt asset-backed term facility with an aggregate principal amount equal to the Allowed amount of the Prepetition ABL Loan Claims, which facility shall (a) be secured by the same Collateral securing the

Prepetition ABL Loan Claims with the same priorities as set forth in the ABL Loan Documents (including the Existing ABL Intercreditor Agreement), (b) mature within six (6) years of the Effective Date, and (c) bear an interest rate to be established by the Required Consenting First Lien Lenders and the Debtors, or otherwise set forth by the Bankruptcy Court.

**1.222.** ~~1.218.~~ ***Take-Back Debt Agent*** means the administrative and collateral agent for the Take-Back Debt Lenders under the Take-Back Debt Documents, or any successor administrative agents thereunder.

**1.223.** ~~1.219.~~ ***Take-Back Debt Credit Agreement*** means the credit agreement governing or evidencing the Take-Back Debt Facility to be entered into on the Effective Date by and among the Reorganized Debtors, the guarantors from time to time party thereto, the Take-Back Debt Lenders, the Take-Back Debt Agent, and the other Entities party thereto from time to time.

**1.224.** ~~1.220.~~ ***Take-Back Debt Documents*** means the Take-Back Debt Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, each of which shall be subject to the Definitive Document Consent Rights.

**1.225.** ~~1.221.~~ ***Take-Back Debt Facility*** means the take-back debt financing facility on the terms and conditions set forth in the Restructuring Support Agreement.

**1.226.** ~~1.222.~~ ***Take-Back Debt Lenders*** means the lenders party to the Take-Back Debt Credit Agreement.

**1.227.** ~~1.223.~~ ***Take-Back Term Loans*** means the term loans arising under or pursuant to the Take-Back Debt Credit Agreement.

**1.228.** ~~1.224.~~ ***Take-Private Transaction*** shall have the meaning set forth in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15], filed November 4, 2024.

**1.229.** ~~1.225.~~ ***Third-Party Release*** means the releases set forth in Article XII of this Plan.

**1.230.** ~~1.226.~~ ***TopCo*** means Freedom VCM Holdings, LLC.

**1.231.** ~~1.227.~~ ***TopCo Allocated Fees and Expenses*** has the meaning set forth in Section 3.3(c) of this Plan.

**1.232.** ~~1.228.~~ ***TopCo General Unsecured Claim*** means any General Unsecured Claim against TopCo.

**1.233.** ~~1.229.~~ ***Tranche A DIP Loan Claims*** means Claims arising on account of the Tranche A DIP Loans.

**1.234.** ~~1.230.~~ *Tranche A DIP Loans* means the new money first-out delayed-draw term loans arising under or pursuant to the DIP Credit Agreement.

**1.235.** ~~1.231.~~ *Tranche B DIP Loan Claims* means Claims arising on account of the Tranche B DIP Loans.

**1.236.** ~~1.232.~~ *Tranche B DIP Loans* means the second-out roll up facility arising under or pursuant to the DIP Credit Agreement.

**1.237.** ~~1.233.~~ *U.S. Trustee* means the United States Trustee for Region 2.

**1.238.** ~~1.234.~~ *U.S. Trustee Fees* means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.239.** ~~1.235.~~ *Unexpired Lease* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

**1.240.** ~~1.236.~~ *Vitamin Shoppe Debtors* means Franchise Group Intermediate V, LLC and each of its subsidiaries.

**1.241.** ~~1.237.~~ *WFG* means Willkie Farr & Gallagher LLP, in its capacity as counsel to the Debtors.

**1.242.** ~~1.238.~~ *Wind Down Account* means an account funded by the Debtors with Cash no later than the Effective Date in the amount equal to the Wind Down Amount.

**1.243.** ~~1.239.~~ *Wind Down Amount* means, in the event of a Sale Transaction, an amount sufficient to fund (a) the payment in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims to the extent not otherwise assumed under any Sale Documents, and (b) the costs to wind down the Estates and Chapter 11 Cases in accordance with the Wind Down Budget, which amount shall be funded from the Sale Proceeds **and shall be determined in consultation with the Creditors' Committee**.

**1.244.** ~~1.240.~~ *Wind Down Budget* means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases in the event of a Sale Transaction, as set forth in the Plan Supplement**, which budget shall be prepared in consultation with the Creditors' Committee**.

**1.245.** ~~1.241.~~ *Wind Down Co* means, in the event of a Sale Transaction, Franchise Group, Inc., or an Entity that, in the discretion of Debtors, may be established on the Effective Date for the benefit of ~~holders~~**Holders** of Claims against the Debtors (which Entity may be a liquidating trust or one of the Debtors other than any Reorganized Debtors) in connection with the distribution of proceeds from the Sale Transaction and any other assets of the Debtors (as determined by the Debtors or in accordance with the Restructuring Transactions Memorandum).

**1.246.** ~~**1.242.**~~ *Wind Down Debtors* means, on or after the Effective Date, the Debtors, as reorganized pursuant to and under the Sale Transaction, or any successors thereto, by merger, consolidation or otherwise.

### B.    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. The use of "include" or "including" is without limitation, whether stated or not. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan. Any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. References to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Equity Interests," "Holders of Interests," "Disputed Interests," and the like, as applicable. Subject to the provisions of any contracts, certificates or articles of incorporation, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules. The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns. Any reference to directors or board of directors includes managers, managing members or any similar governing body, as the context requires, and references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws.

### C.    Appendices and Plan Documents.

All Plan Documents and appendices to this Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or, free of charge, via the Debtors' restructuring website maintained by the Claims Agent at https://cases.ra.kroll.com/FRG, or obtain a copy of any of the Plan Documents, at the Debtors' expense, by a written request sent to the Claims Agent at the following mailing or email addresses or by calling the Claims Agent at the following telephone numbers:

Franchise Group, Inc.
Ballot Processing Center
c/o Kroll Restructuring Administration LLC

850 3rd Avenue, Suite 412
Brooklyn, NY 11232
(844) 285-4564 (U.S./Canada, Toll-Free); +1 (646) 937-7751 (International, Toll)
FRGInfo@ra.kroll.com

### D.      Definitive Document Consent Rights.

Notwithstanding anything to the contrary in this Plan, certain of the Definitive Documents remain subject to negotiation and completion, as applicable.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of the Restructuring Support Agreement, and shall otherwise be in form and substance acceptable to the Debtors and the Required Consenting First Lien Lenders in their sole discretion.

### E.      Nature of the Restructuring Transactions.

The Restructuring Transactions will be consummated (i) on the terms and conditions set forth in the Restructuring Support Agreement and (ii) pursuant to confirmation of this Plan in the Chapter 11 Cases.

Subject in all respects to the Restructuring Support Agreement, the Debtors shall concurrently (a) conduct the Store-Closing and Liquidation Sales consistent with the Store-Closing and Liquidation Sales Documents, and (b) conduct the Sale Process, and, (i) solely if a Sufficient Bid for a Sale Transaction is received by the Debtors and a Sale Toggle Event shall have occurred, execute and consummate the Sale Transaction, (ii) solely if a Sufficient Bid for a Partial Sale Transaction is received by the applicable Partial Sale Transaction Debtors in accordance with the Bidding Procedures and subject to the Auction, execute and consummate the Partial Sale Transaction with respect to the applicable Partial Sale Transaction Debtor and exclusively pursue consummation of the Plan Equitization Transaction with respect to the applicable Non-Partial Sale Transaction Debtor(s), subject to distribution of the proceeds of the Partial Sale Transaction(s) in accordance with this Plan, or (iii) to the extent a Sufficient Bid for a Sale Transaction or a Partial Sale Transaction, as applicable, is not received by at least forty-eight (48) hours prior to the date of the Auction, promptly provide for the Sale Process to be terminated and, unless otherwise agreed by the Required Consenting First Lien Lenders, exclusively pursue consummation of the Plan Equitization Transaction, which shall be undertaken and prosecuted with the support of the Consenting First Lien Lenders.

## ARTICLE II.
## CERTAIN INTERCREDITOR AND INTER-DEBTOR ISSUES

### 2.1.      Settlement of Certain Intercreditor and Inter-Debtor Issues.

The treatment of Claims and Interests under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor and inter-debtor disputes.

**2.2.** *Formation of Debtor Groups for Convenience Purposes.*

The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making distributions under this Plan in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal Entities.

## ARTICLE III.
## DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,
## FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

The Plan constitutes a joint plan of reorganization for all of the Debtors. All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on this Plan.

A Claim or Interest is placed in a particular Class only to the extent that any portion of such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

**3.1.** *DIP Claims.*

To the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, (i) each Holder of DIP Claims (and/or one or more Related Funds of such Holder, to the extent such Related Funds are Holders of DIP Claims) that received a DIP Backstop Premium or Commitment Premium (as defined in the DIP Credit Agreement) as of closing of the DIP syndication process, and (ii) each Holder of DIP Claims that receives an Exit Premium (as defined in the DIP Credit Agreement) shall be entitled to elect, at its sole discretion, to convert such DIP Backstop Premium, Commitment Premium and/or Exit Premium into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in the Disclosure Statement and/or Plan Supplement.

On the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or

32

otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, (i) if the Plan Equitization Transaction is consummated and there is no Partial Sale Transaction, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into Take-Back Term Loans, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into Take-Back Term Loans, ratably, on a dollar-for-dollar basis in an amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Effective Date after giving effect to the Restructuring Transactions (the "***Pro Forma Leverage Cap***"), and (z) third, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in the Disclosure Statement and/or Plan Supplement (the "***DIP Equitization***"), (ii) if a Plan Equitization Transaction is consummated and there is a Partial Sale Transaction, (x) first, all Allowed DIP Claims allocable to the applicable Partial Sale Transaction Debtors shall be indefeasibly paid in full in Cash from the applicable net Sale Proceeds, and (y) second, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clause (y) hereof shall be treated in accordance with the foregoing clause (i) hereof, provided, however, that at the election of the Required Consenting First Lien Lenders and DIP Lenders, which election shall be made in good faith and in consultation with the Debtors, the Pro Forma Leverage Cap shall be reduced to account for any assets sold as part of the Partial Sale Transaction that will no longer vest in the Reorganized Debtors, with the method of calculation of any such reduction to be reasonably agreed to by the Required Consenting First Lien Lenders and the Debtors, and (iii) if a Sale Transaction is consummated, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from net Sale Proceeds.  Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

Notwithstanding anything to the contrary contained herein, in the event of a Plan Equitization Transaction (whether or not a Partial Sale Transaction has occurred), ~~to the extent the Freedom HoldCo Debtor Liquidation Trust is established,~~ at the election of the Required Consenting First Lien Lenders and DIP Lenders, all DIP Claims against the Freedom HoldCo Debtors, shall, in lieu of the treatment set forth in the previous paragraph, convert *mutatis mutandis* into claims against the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust in the same amount, with the same priority and security interest in, and otherwise having the same economic terms as the DIP Claims currently outstanding against the Freedom HoldCo Debtors (the "***Freedom HoldCo DIP Election***").  For the avoidance of doubt, to the extent the Freedom HoldCo DIP Election is made, the DIP Claims that are converted in accordance with the immediately preceding sentence shall not convert into Take-Back Term Loans or Reorganized Common Equity and any remaining DIP Claims shall be converted in accordance with the immediately preceding paragraph.

**3.2.** *Administrative Expense Claims.*

    (a)    <u>Time for Filing Administrative Expense Claims</u>.

The Holder of an Administrative Expense Claim, other than DIP Claims, Fee Claims, Intercompany Claims, or U.S. Trustee fees that accrued on or before the Effective Date other than in the ordinary course of business must file with the Bankruptcy Court and serve on the Reorganized Debtors, the Wind Down Debtors, and the Plan Administrator (if appointed) proof of such Administrative Expense Claim no later than the Administrative Bar Date.  Such proof of Administrative Expense Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim, and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the Holder of the Administrative Expense Claim; (3) the asserted amount of the Administrative Expense Claim; (4) the basis of the Administrative Expense Claim; and (5) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

The Debtors, the Post-Effective Debtors or the Plan Administrator, as applicable, in consultation with the Required Consenting First Lien Lenders, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors, the Post-Effective Debtors, or the Plan Administrator, as applicable, may also choose to object to any Administrative Expense Claim (other than a Cure Cost, which will be addressed pursuant to <u>Section 10.2</u> of this Plan) no later than the Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors, the Post-Effective Debtors, or the Plan Administrator, as applicable (or other party with standing) object to a timely-filed and properly served Administrative Expense Claim, such Administrative Expense Claim will be deemed Allowed in the amount requested after expiration of the Claims Objection Deadline (as may be extended).  In the event that the Debtors, the Post-Effective Debtors, or the Plan Administrator object(s) to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

    (b)    <u>Treatment of Administrative Expense Claims</u>.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the Holder of such Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim or such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that, to the extent consistent with the DIP Budget, Allowed Administrative Expense Claims representing liabilities incurred in the

ordinary course of business by any of the Debtors, as debtors-in-possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, that any Allowed Administrative Expense Claim that has been assumed by a Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan.

**3.3.    *Fee Claims.***

(a)    Time for Filing Fee Claims.

Any Professional Person seeking allowance of a Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred on and prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than forty-five (45) calendar days after the Effective Date or such other date as established by the Bankruptcy Court. Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order.

(b)    Treatment of Fee Claims.

The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Confirmation Order. The Post-Effective Debtors or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash to such Professional Persons in the amount the Bankruptcy Court allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; provided that the Debtors' and the Post-Effective Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the **Debtors'** Professional Persons, the Post-Effective Debtors or the Plan Administrator, as applicable, shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims. **To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Creditors' Committee's Professional Persons, the OpCo Debtor Litigation Trust shall fund any shortfall into the Professional Fee Escrow Account.**

Professional Persons shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than three (3) days before the anticipated Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional Person's final request for payment in the Chapter 11 Cases. If a Professional Person does not provide an estimate, the

Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional Person.

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash on hand of the Debtors, subject to the terms of Section 3.3(c) of this Plan, equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professional Persons and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the Bankruptcy Court. No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable. Notwithstanding the foregoing sentence, funding of the Professional Fee Escrow Account will not be reported as a disbursement from the Estates, and disbursements from the Professional Fee Escrow Account on account of payment of Allowed Professional Fee Claims will be reported as disbursements from the Estates on the relevant monthly operating report(s). When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be remitted to the Post-Effective Debtors or the Plan Administrator, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Any further disbursements of such funds shall be reported in accordance with the Bankruptcy Rules.

The Professional Persons shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors (which estimate may include a reasonable cushion to cover unexpected or unknown fees) before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than three (3) Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional Person's final request for payment of Professional Fee Claims filed with the Bankruptcy Court, and such Professional Persons are not bound to any extent by the estimates. If a Professional Person does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional Person for inclusion in the Professional Fee Escrow Amount. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; provided that the Post-Effective Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

Following the Effective Date, the Plan Administrator shall have authority with respect to matters related to Professional Fee Claim requests by Professional Persons, if any, acting at their direction in accordance with the terms of the Plan.

(c)    Allocation of Payment of Certain Fees and Expenses.

Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "*TopCo Allocated Fees and Expenses*").  Freedom VCM Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such TopCo Allocated Fees and Expenses, if any; provided that, for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the TopCo Allocated Fees and Expenses; provided, further, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims.

Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to the Freedom HoldCo Debtors with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be subject to the terms of, (i) in the case of the fees and expenses of the Freedom HoldCo Independent Director, that certain letter agreement dated as of December 9, 2024 between the Freedom HoldCo Debtors and Michael J. Wartell of Bluerose Associates LLC, (ii) in the case of the fees and expenses of any advisors hired by the Freedom HoldCo Independent Director, any order approving the retention of the same, and (iii) in the case of any other fees and expenses allocable to the Freedom HoldCo Debtors, Paragraphs 2(c) and (j) of the Interim Compensation Order.

3.4.    *Priority Tax Claims.*

(a)    Time for Filing Priority Tax Claims.

The Holder of a Priority Tax Claim must file with the Bankruptcy Court and serve on the Post-Effective Debtors, the Plan Administrator (if appointed), the Claims Agent, and the U.S. Trustee, proof of such Priority Tax Claim by the Priority Tax Claims Bar Date.  Such proof of Priority Tax Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Priority Tax Claim and if the Priority Tax Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the Holder of the Priority Tax Claim; (3) the asserted amount of the Priority Tax Claim; (4) the basis of the Priority Tax Claim; and (5) supporting documentation for the Priority Tax Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF PRIORITY TAX CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH PRIORITY TAX CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

(b)    <u>Treatment of Priority Tax Claims</u>.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting First Lien Lenders, each Holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, either: (a) on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the Holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); <u>provided</u> that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due; <u>provided</u>, <u>further</u>, that (i) in the event of a Plan Equitization Transaction, notwithstanding any provision of the Plan or the Restructuring Support Agreement to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state law shall be assumed by and reinstated against the applicable Reorganized Debtor and (ii) in the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Tax Claim that has been expressly assumed by a Successful Bidder under the Sale Documents shall not be an obligation of the Debtors.  On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person.

**3.5.    *U.S. Trustee Fees and Related Reporting Obligations.***

All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  After the Effective Date, the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable.  The Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, is responsible.  The U.S. Trustee shall not be treated as providing any release under the Plan. U.S. Trustee Fees are Allowed.  The U.S. Trustee shall not be required to file any Proof of Claim or any request for administrative expense for U.S. Trustee Fees. The provisions of this paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary.

## ARTICLE IV.
## CLASSIFICATION OF CLAIMS AND INTERESTS

**4.1.** *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (a) impaired or unimpaired by this Plan; (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; or (c) deemed to accept or reject this Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | No | No (deemed to accept) |
| Class 2 | Other Secured Claims | No | No (deemed to accept) |
| Class 3 | Prepetition ABL Loan Claims | Yes | Yes |
| Class 4 | Prepetition First Lien Loan Claims | Yes | Yes |
| Class 5 | Prepetition Second Lien Loan Claims | Yes | Yes |
| Class 6-A | General Unsecured Claims against Franchise Group, Inc. | Yes | Yes |
| Class 6-B | General Unsecured Claims against the American Freight Debtors | Yes | Yes |
| Class 6-C | General Unsecured Claims against the Buddy's Debtors | Yes | Yes |
| Class 6-D | General Unsecured Claims against the PSP Debtors | Yes | Yes |
| Class 6-E | General Unsecured Claims against the Vitamin Shoppe Debtors | Yes | Yes |
| Class 7 | Prepetition HoldCo Loan Claims | Yes | Yes |
| Class 8-A | Freedom HoldCo General Unsecured Claims | Yes | Yes |
| Class 8-B | HoldCo Receivables General Unsecured Claims | Yes | Yes |
| Class 8-C | TopCo General Unsecured Claims | Yes | Yes |
| Class 9 | Intercompany Claims | Yes | No (deemed to reject) |
| Class 10 | Subordinated Claims | Yes | No (deemed to reject) |
| Class 11 | Existing TopCo Equity Interests | Yes | Yes |
| Class 12 | Existing Intercompany Equity Interests | Yes | No (deemed to reject) |

The Plan constitutes a separate chapter 11 plan for each Debtor. Except for the Claims addressed in Article III above (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the applicable Debtors.

The Plan consolidates certain Claims against all Debtors solely for purposes of voting and confirmation. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Expense Claims, DIP Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, as described in Article III.

39

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

**4.2.**    ***Unimpaired Classes of Claims.***

The following Classes of Claims are unimpaired and, therefore, deemed to have accepted this Plan and are not entitled to vote on this Plan under section 1126(f) of the Bankruptcy Code:

(a)    Class 1: Class 1 consists of all Priority Non-Tax Claims.

(b)    Class 2: Class 2 consists of all Other Secured Claims.

**4.3.**    ***Impaired Classes of Claims.***

The following Classes of Claims are impaired and entitled to vote on this Plan:

(a)    Class 3: Class 3 consists of all Prepetition ABL Loan Claims.

(b)    Class 4: Class 4 consists of all Prepetition First Lien Loan Claims.

(c)    Class 5: Class 5 consists of all Prepetition Second Lien Loan Claims.

(d)    Class 6-A: Class 6-A consists of all General Unsecured Claims against Franchise Group, Inc.

(e)    Class 6-B: Class 6-B consists of all General Unsecured Claims against the American Freight Debtors.

(f)    Class 6-C: Class 6-C consists of all General Unsecured Claims against the Buddy's Debtors.

(g)    Class 6-D: Class 6-D consists of all General Unsecured Claims against the PSP Debtors.

(h)    Class 6-E: Class 6-E consists of all General Unsecured Claims against the Vitamin Shoppe Debtors.

(i)    Class 7: Class 7 consists of all Prepetition HoldCo Loan Claims.

(j)    Class 8-A: Class 8-A consists of all Freedom HoldCo General Unsecured Claims.

(k)     Class 8-B: Class 8-B consists of all HoldCo Receivables General Unsecured Claims.

(l)     Class 8-C: Class 8-C consists of all TopCo General Unsecured Claims.

(m)     Class 11: Class 11 consists of all Existing TopCo Equity Interests.

The following Classes of Claims are impaired and are not entitled to vote on this Plan:

(a)     Class 9: Class 9 consists of all Intercompany Claims.

(b)     Class 10: Class 10 consists of all Subordinated Claims.

(c)     Class 12: Class 12 consists of all Existing Intercompany Equity Interests.

**4.4.   *Separate Classification of Other Secured Claims.***

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under this Plan.

## ARTICLE V.
## TREATMENT OF CLAIMS AND INTERESTS

**5.1.   *Priority Non-Tax Claims (Class 1).***

(a)     Treatment: The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable Distribution Date, each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Required Consenting First Lien Lenders): (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  In the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

(b)     Voting: Priority Non-Tax Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

**5.2.**    *Other Secured Claims (Class 2).*

(a)    <u>Treatment</u>: The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each Holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; <u>provided</u>, <u>further</u>, that in the event of a Sale Transaction or a Partial Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

Each Holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein.  Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person and the Holder of such Claims shall deliver to the Debtors or Post-Effective Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, or *lis pendens*, or similar interests or documents. Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Post-Effective Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

(b)    <u>Deficiency Claims</u>: To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under this Plan as a General Unsecured Claim, only as applicable, and shall be classified and treated as the applicable Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, Class 6-E Claim, Class 8-A Claim, Class 8-B Claim, or Class 8-C Claim, only as applicable.

(c)    <u>Voting</u>: The Other Secured Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the

Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

**5.3.**     *Prepetition ABL Loan Claims (Class 3).*

(a)     <u>Treatment</u>:  On the Effective Date, the Prepetition ABL Loan Claims shall be Allowed under this Plan in the amount of $248.7 million plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims (including, without limitation, any reimbursement obligations under outstanding letters of credit), and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.   In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition ABL Loan Claim, except to the extent that the ABL Credit Agreement Agent or a Holder of a Prepetition ABL Loan Claim agrees to different treatment with respect to such Holder's Claim, on the Effective Date, or as soon as practicable thereafter, each ABL Lender shall receive its *pro rata* share of:

(i)     in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) (x) proceeds of the Exit ABL Facility, or (y) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or

(ii)     in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.

(b)     <u>Voting</u>:  The Prepetition ABL Loan Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Prepetition ABL Loan Claims.

**5.4.**     *Prepetition First Lien Loan Claims (Class 4).*

(a)     <u>Treatment</u>:  On the Effective Date, the Prepetition First Lien Loan Claims shall be Allowed under this Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or

regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition First Lien Loan Claim, except to the extent that the First Lien Credit Agreement Agent or a Holder of a Prepetition First Lien Loan Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each First Lien Lender shall receive, subject to the terms of this Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of:

> (i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, and (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable); or

> (ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.

(b)    Deficiency Claims:  If applicable, any First Lien Deficiency Claims shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.

(c)    Voting:  The Prepetition First Lien Loan Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition First Lien Loan Claims.

### 5.5.    *Prepetition Second Lien Loan Claims (Class 5).*

(a)    Treatment:  On the Effective Date, the Prepetition Second Lien Loan Claims shall be Allowed under this Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition Second Lien Loan Claim, except to the extent that a Holder of a Prepetition Second Lien Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition Second Lien Loan Claim shall receive:

> (i)    in the event the Restructuring Transactions are consummated through a Plan Equitization Transaction

(including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to <u>accept</u> the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably with OpCo General Unsecured Claims, or (2) if the Class votes to <u>reject</u> the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution.  If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.

(b)    <u>Deficiency Claims</u>:  If applicable, any Second Lien Deficiency Claims shall be treated for all purposes under this Plan as a General Unsecured Claim only against the applicable Debtor, and shall be classified and treated as the applicable Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, only as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.

(c)    <u>Voting</u>:  The Prepetition Second Lien Loan Claims are impaired Claims. In accordance with section 1126(g) of the Bankruptcy Code.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition Second Lien Loan Claims.

### 5.6.    *Franchise Group, Inc. General Unsecured Claims (Class 6-A).*

(a)    <u>Treatment</u>:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim at Franchise Group, Inc., except to the extent that a Holder of a General Unsecured Claim against Franchise Group, Inc. agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including,~~ for the avoidance of doubt, ~~following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim at Franchise Group, Inc. shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution~~

~~allocable to Franchise Group, Inc. in connection with any Sale Transaction or Partial Sale Transaction, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to Franchise Group, Inc.

(b)     Voting:   The General Unsecured Claims at Franchise Group, Inc. are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims at Franchise Group, Inc.

### 5.7.     *American Freight General Unsecured Claims (Class 6-B).*

(a)     Treatment:   In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the American Freight Debtors, on the Effective Date, each Holder of an Allowed General Unsecured Claim against the American Freight Debtors shall receive ~~the recovery such claimant would be entitled to receive under chapter 7 or section 1129(a)(7) of the Bankruptcy Code (*i.e.,*~~ its *pro rata* share of ~~any residual~~**the OpCo Debtor Litigation Trust Units allocable to the** American Freight ~~Liquidation Proceeds)~~**Debtors**.

(b)     Voting:   The General Unsecured Claims against the American Freight Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the American Freight Debtors.

### 5.8.     *Buddy's General Unsecured Claims (Class 6-C).*

(a)     Treatment:   In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Buddy's Debtors, except to the extent that a Holder of a General Unsecured Claim against the Buddy's Debtors agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Buddy's Debtors shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the Buddy's Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the Buddy's Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the Buddy's Debtors.

(b)     Voting:   The General Unsecured Claims against the Buddy's Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the Buddy's Debtors.

### 5.9.     *PSP General Unsecured Claims (Class 6-D).*

(a)     Treatment:   In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the PSP Debtors, except to the extent that a Holder of a General Unsecured Claim against the PSP Debtors agrees to less

favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the PSP Debtors shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the PSP Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the PSP Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the PSP Debtors.

(b)     Voting:  The General Unsecured Claims against the PSP Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the PSP Debtors.

### 5.10.   *Vitamin Shoppe General Unsecured Claims (Class 6-E).*

(a)     Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Vitamin Shoppe Debtors, except to the extent that a Holder of a General Unsecured Claim against the Vitamin Shoppe Debtors agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Vitamin Shoppe Debtors shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the Vitamin Shoppe Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the Vitamin Shoppe Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the Vitamin Shoppe Debtors.

(b)     Voting:  The General Unsecured Claims against the Vitamin Shoppe Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the Vitamin Shoppe Debtors.

### 5.11.   *Prepetition HoldCo Loan Claims (Class 7).*

(a)     Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition HoldCo Loan Claim, except to the extent that a Holder of a Prepetition HoldCo Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition HoldCo Loan Claim shall receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) ~~solely to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or~~

~~released under or pursuant to the Plan, any recovery~~**proceeds** from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election. If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust ~~(to the extent even applicable)~~, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

(b)　　Voting: The Prepetition HoldCo Loan Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition HoldCo Loan Claims.

**5.12.**　***Freedom HoldCo General Unsecured Claims (Class 8-A).***

(a)　　Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Freedom HoldCo General Unsecured Claim, except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive:

(i)　　in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to the Freedom HoldCo Debtors resulting from any Partial Sale Transaction, if any, and (B) ~~to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or pursuant to the Plan,~~ its *pro rata* share of ~~any recovery~~**proceeds** from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust. If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim; or

(ii)　　in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any and (B) ~~to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or~~

~~pursuant to the Plan,~~ its *pro rata* share of ~~any recovery~~**proceeds** from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.

(b)    <u>Voting</u>:  The Freedom HoldCo General Unsecured Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Freedom HoldCo General Unsecured Claims.

### 5.13.    *HoldCo Receivables General Unsecured Claims (Class 8-B)*

(a)    <u>Treatment</u>:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo Receivables General Unsecured Claim, except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc. resulting from any Partial Sale Transaction, if any.  If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim.

(b)    <u>Voting</u>:  The HoldCo Receivables General Unsecured Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of

such Holders will be solicited with respect to such HoldCo Receivables General Unsecured Claims.

### 5.14.    *TopCo General Unsecured Claims (Class 8-C)*

(a)    <u>Treatment</u>:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed TopCo General Unsecured Claim, except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed TopCo General Unsecured Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of Cash, if any, held by TopCo following the allocation described in <u>Section 3.3(c)</u> hereof, and (B) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to TopCo resulting from any Partial Sale Transaction, if any.  If (x) there is no Cash held at TopCo following the allocation described in <u>Section 3.3(c)</u> hereof, and (y) the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.

(b)    <u>Voting</u>:  The TopCo General Unsecured Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such TopCo General Unsecured Claims.

### 5.15.    *Intercompany Claims (Class 9).*

(a)    <u>Treatment</u>:   On the Effective Date, each Holder of an Allowed Intercompany Claim shall receive the following treatment:

(i)    <u>Plan Equitization Transaction</u>.  In the event of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), on or after the Effective Date: (A) any and all Intercompany Claims between, among and/or against, Franchise Group, Inc. and any of its direct

or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; and (B) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date, or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; provided, however, that notwithstanding the foregoing, any Intercompany Claims, held by or against or among any of the Freedom HoldCo Debtors shall receive the recovery that such Intercompany Claim would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if such Intercompany Claim is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date.  To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(ii)    Sale Transaction.  In the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (A) extinguished, canceled and/or discharged on the Effective Date or (B) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(b)    Voting:  The Intercompany Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Intercompany Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Intercompany Claims.

### 5.16.  *Subordinated Claims (Class 10).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Subordinated Claim, except to the extent that a Holder of a Subordinated Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Subordinated Claim shall receive:

> (i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any).  If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or

> (ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.

(b)    Voting:  The Subordinated Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Subordinated Claims.

### 5.17.  *Existing TopCo Equity Interests (Class 11).*

(a)    Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing TopCo Equity Interest, except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (A) its *pro rata* share of Cash (if any) held by TopCo following all distributions required under this Plan and the allocation described in Section 3.3(c) hereof, or (B) if there is no Cash held at TopCo, no consideration on account of its

Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under this Plan on account of such Allowed Existing TopCo Equity Interest.

(b)    Voting:  The Existing TopCo Equity Interests are impaired Interests. Holders of such Interests are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Existing TopCo Equity Interests.

### 5.18.    *Existing Intercompany Equity Interests (Class 12).*

(a)    Treatment:  On the Effective Date, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired; provided that in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, such election shall be with the consent of Required Consenting First Lien Lenders; provided, further, that, notwithstanding the foregoing, the Allowed Existing Intercompany Equity Interests held by any of the Freedom HoldCo Debtors shall be extinguished, canceled, and/or discharged on the Effective Date.

(b)    Voting:   The Existing Intercompany Equity Interests are impaired Interests.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Existing Intercompany Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Existing Intercompany Equity Interests.

### ARTICLE VI.
### ACCEPTANCE OR REJECTION OF THE PLAN;
### EFFECT OF REJECTION BY ONE OR MORE
### CLASSES OF CLAIMS OR INTERESTS

### 6.1.    *Class Acceptance Requirement.*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Holders of the Allowed Claims in such Class that have voted on the Plan.  A Class of Interests that is entitled to vote on the Plan has accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of Allowed Interests of such Class that have voted on the Plan.

**6.2.**     *Tabulation of Votes on a Non-Consolidated Basis.*

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.

**6.3.**     *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."*

Because certain Classes are deemed to have rejected this Plan, the Debtors will request confirmation of this Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Section 14.3 and Section 14.4 of this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to Section 14.3 and Section 14.4 of this Plan, the Debtors also reserve the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

**6.4.**     *Voting Classes; Deemed Acceptance or Rejection by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

Claims in Classes 1 and 2 are unimpaired under this Plan and Holders of Claims or Interests in such Classes are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 1 and 2 are not entitled to vote to accept or reject this Plan.

Claims in Classes 9, 10 and 12 are impaired and shall receive no distributions under this Plan and Holders of Claims or Interests in such Classes are, therefore, conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 9, 10 and 12 are not entitled to vote on this Plan and votes of such Holders shall not be solicited.

**6.5.**     *Confirmation of All Cases.*

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; provided, however, that the Debtors, with the consent of the Required Consenting First Lien Lenders, may at any time waive this Section 6.5.

**6.6.**     *Vacant and Abstaining Classes.*

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from this Plan for

purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. Moreover, any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept this Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 6.7. *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) is impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date, absent consensual resolution of such controversy consistent with the Restructuring Support Agreement among the Debtors and the complaining Entity or Entities, in consultation with the Required Consenting First Lien Lenders.

## ARTICLE VII.
## MEANS FOR IMPLEMENTATION

### 7.1. *Non-Substantive Consolidation.*

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof. Except as specifically set forth herein, nothing in this Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any Claim against any other Debtor. Additionally, claimants holding Claims and Interests against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as holding a separate Claim or separate Interest, as applicable, against each Debtor's Estate; provided, however, that no Holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.

### 7.2. *Plan Equitization Transaction.*

The Plan Equitization Transaction will be consummated (regardless of whether there is a Partial Sale Transaction) unless the Debtors receive Cash Sale Proceeds in an amount sufficient to pay off, in full, in Cash, all Allowed DIP Claims, Prepetition ABL Loan Claims and Prepetition First Lien Loan Claims.

Following entry of the Confirmation Order and subject to any applicable limitations set forth in any post-Effective Date agreements, or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors or New TopCo, as applicable, may, consistent with the terms of the Restructuring Support Agreement, take all actions as may be necessary or appropriate to effect the Restructuring Transaction (including any transaction described in, approved by, contemplated by or necessary to effectuate this Plan), and as set forth in the Restructuring Transactions Memorandum, including: (a) the execution and delivery of appropriate agreements

or other documents of reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, migration, consolidation, or other Organizational Documents with the appropriate governmental authorities pursuant to applicable law; (d) the execution, delivery, and filing, if applicable, of the New Organizational Documents and the Take-Back Debt Documents; (e) the New ABL Facility; (f) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (g) all other actions that the Reorganized Debtors reasonably determine, in consultation with the Required Consenting First Lien Lenders, are necessary or appropriate, including making filings or recordings that may be required by applicable law.  For the purposes of effectuating this Plan, none of the Restructuring Transactions contemplated herein shall constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction or matter that would result in a violation, breach, or default under, or increase, accelerate, or otherwise alter any obligations, rights or liabilities of the Debtors, the Reorganized Debtors or New TopCo under, or result in the creation or imposition of a Lien upon any property or asset of the Debtors, the Reorganized Debtors or New TopCo pursuant to, any agreement, contract, or document of the Debtors, and any consent or advance notice required under any agreement, contract, or document of the Debtors shall be deemed satisfied by confirmation.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 7.3. *Sale Transaction or Partial Sale Transaction.*

In the event a Sale Transaction or a Partial Sale Transaction is consummated, the Sale Proceeds, the Professional Fee Escrow Amount, the Wind Down Amount, any reserves required pursuant to the applicable Sale Documents, the Non-Liquidating Debtors' rights under the applicable Sale Documents, payments made directly by the applicable Successful Bidder(s) on account of any Assumed Liabilities under the applicable Sale Documents, payments of Cure Costs made by the applicable Successful Bidder(s) pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in this Plan.  Unless otherwise agreed in writing by the Non-Liquidating Debtors or the Non-Partial Sale Transaction Debtors, as applicable, and the applicable Successful Bidder(s), distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the applicable Successful Bidder(s) even if such Claim is Allowed against the Debtors, and such Claims shall have no recovery from the Debtors under the terms of the Plan.

7.4.    *Continued Corporate Existence in Certain Debtors; Vesting of Assets; Dissolution of Certain Debtors.*

(a)    General.  Subject to the terms and conditions of the Restructuring Support Agreement, except as otherwise provided in this Plan or as otherwise may be agreed between the Debtors and the Required Consenting First Lien Lenders, each of the Debtors, as Reorganized Debtors, and, if the Plan Equitization Transaction occurs, New TopCo, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor or New TopCo, each of the Reorganized Debtors and New TopCo, as applicable (and in the event of the Plan Equitization Transaction, in consultation with the Required Consenting First Lien Lenders), may take such action as permitted by applicable law and such Reorganized Debtor's or New TopCo's New Organizational Documents, as such Reorganized Debtor or New TopCo, as applicable, may determine is reasonable and appropriate, including, but not limited to, causing: (a) a Reorganized Debtor or New TopCo to be merged with and into another Reorganized Debtor, or a subsidiary and/or Affiliate of a Reorganized Debtor or New TopCo; (b) a Reorganized Debtor or New TopCo to be dissolved; (c) the conversion of a Reorganized Debtor or New TopCo from one Entity type to another Entity type; (d) the legal name of a Reorganized Debtor or New TopCo to be changed; (e) the closure of a Reorganized Debtor's or New TopCo's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor or New TopCo under the law of jurisdictions other than the law under which the Debtor currently is incorporated.

(b)    Vesting of Assets.  Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estates, wherever located, including all claims, rights and Causes of Action and any property, wherever located, acquired by the Debtors under or in connection with this Plan, shall vest in the applicable Post-Effective Debtor, free and clear of all Claims, Liens, charges, other encumbrances and Interests, except for those Claims, Liens, charges, other encumbrances and Interests arising from or related to the Take-Back Debt Documents, the New ABL Facility Documents, or to the extent the Freedom HoldCo DIP Election is made, the DIP Claims at the Freedom HoldCo Debtors.  On and after the Effective Date, except as otherwise provided in this Plan or in the Confirmation Order, each applicable Post-Effective Debtor and New TopCo may operate its business(es) and may use, acquire and dispose of property, wherever located, and each Reorganized Debtor and New TopCo, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims), Interests and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.  Without limiting the foregoing, the Post-Effective Debtors and New TopCo may pay the charges that they incur on or after the Effective Date, if any, for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.  Anything in this Plan to the contrary notwithstanding, any unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized

Debtor and shall not become obligations of any other Debtor, Reorganized Debtor or New TopCo by virtue of this Plan, the Chapter 11 Cases, or otherwise.

          (c)     Dissolving the Wind Down Debtors.  On or as soon as reasonably practicable after the Effective Date, in the event a Sale Transaction is consummated, the Wind Down Debtors shall be authorized, following the consummation of such Sale Transaction and the completion of the distributions set forth in Article V hereof, to merge, dissolve and/or wind down the Wind Down Debtors under applicable law; provided that, notwithstanding such dissolution, Wind Down Debtors shall remain authorized to continue the wind down of the Wind Down Debtors, including filing any necessary documents with the appropriate authorities, including any tax returns, and to facilitate the closing of the Chapter 11 Cases as to such Debtors. On or as soon as reasonably practicable after the Effective Date, in the event a Partial Sale Transaction is consummated, the Reorganized Debtors shall be authorized, following the consummation of such Partial Sale Transaction and the completion of the distributions set forth in Article V hereof, to merge, dissolve and/or wind down the Partial Sale Transaction Debtors under applicable law.

      **7.5.**   *Indemnification Provisions in Organizational Documents.*

On and as of the Effective Date, all indemnification obligations of the Debtors that are in place as of the Petition Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements or otherwise) for the current directors, officers and managers, of the Debtors, except any indemnification obligations of the Debtors on account of any ~~OpCo~~**Freedom HoldCo Debtor** Litigation **Trust** Claims that are transferred to the Freedom HoldCo Debtor ~~Liquidation~~**Litigation Trust and any OpCo Litigation Claims that are transferred to the OpCo Debtor Litigation** Trust, shall be assumed or assumed and assigned and remain in full force and effect after the Effective Date, and shall survive unimpaired and unaffected, irrespective of when such obligation arose, as applicable.

      **7.6.**   *Sources for Cash Distributions under this Plan.*

In the event of a Plan Equitization Transaction, the Debtors shall fund Cash distributions under the Plan with Cash on hand, including Cash from operations, the American Freight Liquidation Proceeds, the Sale Proceeds (if any) and the proceeds of the DIP Facility. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors or the Disbursing Agent in accordance with Article VIII.

In the event of a Sale Transaction or a Partial Sale Transaction, the Debtors shall fund Cash distributions under the Plan from Cash on hand (if any), the American Freight Liquidation Proceeds, and the Sale Proceeds in accordance with the terms of the Sale Documents and the Plan.

~~In the event a Freedom HoldCo Debtor Liquidation Trust is established, the~~**The** Debtors shall fund distributions to Allowed Claims against the Freedom HoldCo Debtors from proceeds of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the New Organizational Documents, the New ABL Facility Documents, and the Take-Back Debt Documents), the Post-Effective Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of managers or directors, as applicable (or other applicable governing bodies), of the applicable Reorganized Debtors deem appropriate.

### 7.7.    *Take-Back Debt Facility.*

To the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, on the Effective Date, the Reorganized Debtors shall enter into a Take-Back Debt Facility in the maximum amount necessary to ensure that the Reorganized Debtors are in compliance with the Pro Forma Leverage Cap,[3] which will be made up of, as further set forth below, a first-lien term loan consisting of all DIP Claims arising from the Tranche A DIP Loans, and certain DIP Claims arising from the Tranche B DIP Loans, in each case as of the Effective Date, and each being consistent with the terms and conditions set forth in the Restructuring Support Agreement.

In the event of a Plan Equitization Transaction, confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Take-Back Debt Facility and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Take-Back Debt Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations in connection with the Take-Back Debt Facility, pursuant to the terms and conditions of the Restructuring Support Agreement.

On the Effective Date, the agreements with respect to the Take-Back Debt Facility shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Take-Back Debt Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in connection with the Take-Back Debt Facility (1) shall be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the Take-Back Debt Facility, (3) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under in connection with the Take-Back Debt Facility, and (4) shall not be subject to avoidance, recharacterization, or subordination (including

---

[3]    Estimates as of the Petition Date are that the Take-Back Debt Facility will equal approximately $510 million.

equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

Any Holder entitled to receive Take-Back Term Loans hereunder may designate that all or a portion of such Holder's share of the Take-Back Term Loans to be distributed as part of the treatment of such Holder's Allowed Claims, be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Claims Agent at least five (5) Business Days prior to the Effective Date.

### 7.8. *New ABL Facility.*

In the event of a Plan Equitization Transaction, confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the New ABL Facility and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the New ABL Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations in connection with the New ABL Facility, pursuant to the terms and conditions of the Restructuring Support Agreement.

On the Effective Date, the agreements with respect to the New ABL Facility shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New ABL Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in connection with the New ABL Facility (1) shall be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the New ABL Facility, (3) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under in connection with the New ABL Facility, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable

non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**7.9.** *Reorganized Debtors' Ownership.*

In the event of a Plan Equitization Transaction, on the Effective Date, in accordance with the terms of the Plan and the Restructuring Transactions Memorandum and as further set forth in the Plan Supplement, New TopCo shall issue and deliver all of the Reorganized Common Equity to Holders of Prepetition First Lien Loan Claims and certain of the DIP Claims, pursuant to the terms and conditions of this Plan, the New Organizational Documents and the DIP Credit Agreement.  The issuance of Reorganized Common Equity pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, and all of the Reorganized Common Equity issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Any Holder of an Allowed Prepetition First Lien Loan Claim or Allowed DIP Claim may designate that all or a portion of such Holder's *pro rata* share of the Reorganized Common Equity to be distributed as part of the treatment of such Allowed Prepetition First Lien Loan Claims, be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Claims Agent at least five (5) Business Days prior to the Effective Date.  Any such designee shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

**7.10.** *OpCo Debtor Litigation Trust.*

(a)     General.  In connection with the Committee Settlement, on the Effective Date, (i) the OpCo Debtors shall execute the OpCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the OpCo Debtor Litigation Trust in accordance with the terms of the Plan and the beneficial interests therein shall be for the benefit of the Holders of OpCo General Unsecured Claims, and (ii) the OpCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the OpCo Debtor Litigation Trust all of their rights, title and interest in the OpCo **Debtor** Litigation ~~Claims~~**Trust Assets**.  Pursuant to section 1141 of the Bankruptcy Code, such OpCo **Debtor** Litigation ~~Claims~~**Trust Assets** shall automatically vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests**, except as otherwise set forth in this Plan**.  For the avoidance of doubt, any right, title and interest in the Claims and Causes of Action belonging to the HoldCo Debtors (if any) shall not be transferred to or vest in the OpCo Debtor Litigation Trust.

The (i) establishment, purpose, and administration of the OpCo Debtor Litigation Trust, (ii) appointment, rights, and powers, of ~~any~~**the** OpCo Litigation Trustee, and (iii) treatment of the OpCo Debtor Litigation Trust for federal income tax purposes, among other things, shall be governed by the OpCo Debtor Litigation Trust Agreement.  On and after the Effective Date, the OpCo Litigation Trustee shall be authorized, in accordance with the terms of this Plan and the OpCo Debtor Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any ~~assets of the~~ OpCo Debtor Litigation Trust **Assets**.

In furtherance of this section of the Plan, (i) it is intended that the OpCo Debtor Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of OpCo General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the OpCo Debtor Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of OpCo General Unsecured Claims, and then contributed by the Holders of OpCo General Unsecured Claims to the OpCo Debtor Litigation Trust in exchange for their interest in the OpCo Debtor Litigation Trust; (ii) the sole purpose of the OpCo Debtor Litigation Trust shall be the liquidation and distribution of the net assets of the OpCo Debtor Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with the valuation of the assets transferred to the OpCo Debtor Litigation Trust as determined by the OpCo Litigation Trustee (or its designee); (v) the OpCo Litigation Trustee shall be responsible for filing all applicable tax returns for the OpCo Debtor Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the OpCo Litigation Trustee shall annually send to each Holder of an interest in the OpCo Debtor Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the OpCo Litigation Trustee of a private letter ruling if the OpCo Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the OpCo Litigation Trustee), the OpCo Litigation Trustee may timely elect to (i) treat any portion of the OpCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes.  If a "disputed ownership fund" election is made, (i) the portion of the OpCo Debtor Litigation Trust assets allocated to the disputed ownership

fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing.  Any taxes (including with respect to earned interest, if any) imposed on the OpCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the OpCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  The OpCo Litigation Trustee may request an expedited determination of taxes of the OpCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the OpCo Debtor Litigation Trust for all taxable periods through the dissolution of the OpCo Debtor Litigation Trust.

 (b) <u>OpCo Litigation Trustee</u>.

  (i) *Appointment; Duties*.  The Creditors' Committee, in consultation with the Debtors, shall select the Person who initially will serve as the OpCo Litigation Trustee, which trustee shall be reasonably acceptable to the Required Consenting First Lien Lenders.  On or after the Effective Date, the OpCo Litigation Trustee shall assume all of its obligations, powers and authority under the OpCo Debtor Litigation Trust Agreement to (x) reconcile General Unsecured Claims, First Lien Deficiency Claims (though not the quantum thereof, which shall be **~~the~~in an** amount **~~described~~consistent with the description** in Section 5.5(b) hereof), and any Prepetition Second Lien Loan Claims, and (y) investigate, pursue, litigate and/or settle OpCo Litigation Claims that are transferred to the OpCo Debtor Litigation Trust (collectively, the "***OpCo Litigation Trustee Duties***").

  (ii) *OpCo Litigation Trustee as Fiduciary*.  The OpCo Litigation Trustee shall be a fiduciary of the Post-Effective Debtors, shall have such qualifications and experience as are sufficient to enable the OpCo Litigation Trustee to perform its obligations under this Plan and under the OpCo Debtor Litigation Trust Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the OpCo Debtor Litigation Trust Agreement.  To the extent necessary, following the Effective Date, the OpCo Litigation Trustee shall be deemed to be a judicial substitute for the Post-Effective Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.  The OpCo Litigation Trustee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers**, including upon advice of counsel,** unless it is ultimately and finally determined by a court of

competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

(iii)    *Resignation, Death or Removal*.  The OpCo Litigation Trustee may be removed by the Bankruptcy Court upon application by any party-in-interest for cause shown.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the OpCo Litigation Trustee, the Bankruptcy Court shall designate another Person to become the OpCo Litigation Trustee and thereupon the successor OpCo Litigation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

(c)    OpCo **Debtor** Litigation Trustee Agreement.

(i)    *Provisions of Agreement and Order*.  The OpCo Debtor Litigation Trust Agreement and the Confirmation Order shall provide that: (i) the OpCo Litigation Trustee shall be a fiduciary of the Post-Effective Debtors and the beneficiaries of the OpCo Debtor Litigation Trust; and (ii) neither the Post-Effective Debtors (except as expressly set forth in the OpCo Debtor Litigation Trust Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the OpCo Litigation Trustee in performing the OpCo Litigation Trustee Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to this Plan on account of any such action taken or omitted to be taken.

(ii)    **The OpCo Debtor Litigation Trust Agreement will be filed with the Plan Supplement and will provide for, among other things: (1) the transfer of the OpCo Debtor Litigation Trust Assets to the OpCo Debtor Litigation Trust; (2) the payment of OpCo Debtor Litigation Trust Expenses from the OpCo Debtor Litigation Trust Assets; (3) distributions to Holders of Allowed OpCo General Unsecured Claims, as provided herein and in the OpCo Debtor Litigation Trust Agreement; (4) reasonable access to the Debtors' books and records; (5) the identity of the OpCo Litigation Trustee; (6) the terms of the OpCo Litigation Trustee's engagement; (7) reasonable and customary provisions that allow for limitation of liability and indemnification of the OpCo Litigation Trustee and its professionals by the OpCo Debtor Litigation Trust; provided that any such indemnification shall be the sole responsibility of the OpCo Debtor Litigation Trust and payable solely from the OpCo Debtor Litigation Trust Assets; and (8) the term and**

64

**dissolution of the OpCo Debtor Litigation Trust. Following the Effective Date, the OpCo Litigation Trustee shall be responsible for all decisions and duties with respect to the OpCo Litigation Trustee Duties, except as otherwise provided in the Plan, the Confirmation Order, or the OpCo Debtor Litigation Trust Agreement.**

(iii)    (ii)    *OpCo    Litigation    Claims*. Notwithstanding anything to the contrary in this Plan, including Article XII hereof, the following Claims and Causes of Action belonging to the OpCo Debtors (collectively, the "***OpCo Litigation Claims***") shall not be released pursuant to this Plan, and shall be transferred to the OpCo Debtor Litigation Trust: (x) all potential Claims and Causes of Action against former directors and officers of the Debtors in their capacity as such as of the Effective Date and (y) all potential Claims and Causes of Action against Brian Kahn, Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., Irradiant Partners, LP, Vintage Capital Management LLC, Lauren Kahn, members of the Freedom Lender Group, the HoldCo Debtors, and solely in the case of Brian Kahn, Prophecy Asset Management LP, B. Riley Financial, Inc. and Irradiant Partners, LP, each of their affiliates, directors, officers, managers, partners, and owners (in each case, solely in their capacity as such, and, for the avoidance of doubt, not including any of the Debtors).

For the avoidance of doubt, the following shall be released pursuant to this Plan and shall not be transferred to the OpCo Debtor Litigation Trust: (a) all potential Claims and Causes of Action against the members of the Ad Hoc Group; (b) all potential Claims and Causes of Action belonging to the OpCo Debtors against any party that contributes **Cash** to the OpCo Debtor Litigation Trust Escrow Account in an amount agreed to by the Creditors' Committee in consultation with the Required Consenting First Lien Lenders; (c) all potential Claims and Causes of Action against current employees of the Debtors, including management and directors (including, without limitation the Independent Directors, and officers (including the CRO), but excluding Bryant Riley), in each case who are employed by the Debtors or Reorganized Debtors as of the Effective Date; (d) all potential Claims and Causes of Action against former employees and directors of the Debtors that were terminated without cause between February 3, 2025, and the Effective Date of the Plan; and (e) all potential Claims and Causes of Action against any prepetition Estate Professionals and postpetition Estate Professionals **in their capacities as such**. For the avoidance of doubt, notwithstanding the foregoing, any potential Claims and Causes of Action against WFG for prepetition services rendered are not released pursuant to this Plan.

(iv)    (iii)*New Warrants*. Solely to the extent that Holders of Claims in Class 5 vote to accept the Plan, the New Warrants shall be vested in the OpCo Debtor Litigation Trust for

distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of OpCo General Unsecured Claims.

(d) **OpCo Debtor Litigation** Trust Funding. On the Effective Date, the Debtors and other parties (if applicable) shall fund the OpCo Debtor Litigation Trust Escrow Account in an amount equal to the OpCo Debtor Litigation Trust Escrow Amount. The OpCo Debtor Litigation Trust Escrow Amount shall **automatically and irrevocably vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests. The OpCo Debtor Litigation Trust Escrow Amount shall** be used for the administration of the OpCo Debtor Litigation Trust**, to pay OpCo Debtor Litigation Trust Expenses,** and to pursue the OpCo Litigation Claims, with any excess amount being used to distribute to Holders of General Unsecured Claims. All proceeds from the pursuit of the OpCo Litigation Claims shall be used by the OpCo Litigation Trustee to pay for the costs and expenses of administration of the OpCo Debtor Litigation Trust, pursuit of the OpCo Litigation Claims, and distribution to Holders of OpCo General Unsecured Claims. The OpCo Litigation Trustee shall exercise its fiduciary duty and business judgment to allocate such proceeds among the Classes of Claims receiving interests in the OpCo Debtor Litigation Trust. **The OpCo Litigation Trustee, on behalf of the OpCo Debtor Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the OpCo Debtor Litigation Trust Assets in accordance with the Plan and the OpCo Debtor Litigation Trust Agreement.**

~~**7.11. Freedom HoldCo Debtor Liquidation Trust.**~~

(e) **OpCo Debtor Litigation Trust Units. Any and all OpCo Debtor Litigation Trust Units shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. In addition, any and all OpCo Debtor Litigation Trust Units will not be registered pursuant to the Securities Act or any applicable state or local securities law pursuant to section 1145 of the Bankruptcy Code, and will be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.**

**7.11.** *Freedom HoldCo Debtor Litigation Trust.*

**(a)** ~~To the extent that, after the completion of~~ the Freedom HoldCo ~~Independent Investigation, the Freedom HoldCo~~ ~~Debtors have Claims and Causes of Action that are not otherwise settled, discharged, or released under or pursuant to~~**General. On the Effective Date of** the Plan, (i) the Freedom HoldCo Debtors shall execute the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust Agreement and shall take such steps as necessary to establish the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust in accordance with the terms of the Plan and the beneficial interests therein, which shall be for the benefit of the Holders of Allowed Claims against the Freedom HoldCo Debtors, including to the extent the Freedom HoldCo DIP Election is made, the Allowed DIP Claims currently outstanding against the Freedom HoldCo Debtors**,** and (ii) the Freedom HoldCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust all of their rights, title and interest in ~~such~~**the Freedom HoldCo Debtor Litigation Trust** Claims ~~and~~

66

~~Causes of Action~~.  Pursuant to section 1141 of the Bankruptcy Code, such Claims and Causes of Action (if any) shall automatically vest in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust free and clear of all Claims, Liens, encumbrances, or interests.

For the avoidance of doubt, prior to the Effective Date of the Plan, the Freedom HoldCo Independent Director has the sole power and authority to conduct the Freedom HoldCo Independent Investigation.  **Notwithstanding any language in the definition of Released Parties, if the Freedom HoldCo Independent Director identifies potential Claims through the Freedom HoldCo Independent Investigation, the Freedom HoldCo Independent Director shall have the sole power and authority (i) to settle or release such Claims (other than the Freedom HoldCo Debtor Litigation Trust Claims), subject to further order of the Bankruptcy Court after notice and a hearing, or (ii) to preserve such Claims for transfer to the Freedom HoldCo Debtor Litigation Trust.**

The (i) establishment, purpose, and administration of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust; (ii) appointment, rights, and powers, of ~~any trustee of~~ the Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee**; and (iii) treatment of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust for federal income tax purposes, among other things, shall be governed by the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust Agreement.  On **and after** the Effective Date, the Freedom HoldCo Debtor ~~Debtors~~**Debtor Litigation Trustee** shall be authorized, in accordance with the terms of the Plan and the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any assets of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust.

In furtherance of this section of the Plan, (i) it is intended that the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, and then contributed by the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims to the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust in exchange for their interest in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust; (ii) the sole purpose of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust shall be the liquidation and distribution of the net assets of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust in accordance with Treasury Regulation section 301.7701-4(d)~~, including the resolution of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims in accordance with the Plan~~, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, ~~the~~ Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, and ~~the trustee of~~ the Freedom HoldCo Debtor

~~Liquidation Trust~~**Litigation Trustee**) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, and ~~the trustee of~~ the Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee**) shall report consistently with the valuation of the assets transferred to the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust as determined by the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** (or its designee); (v) the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** shall be responsible for filing all applicable tax returns for the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** shall annually send to each Holder of an interest in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** of a private letter ruling if the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the ~~trustee of~~**Freedom HoldCo Debtor Litigation Trustee),** the Freedom HoldCo Debtor ~~Liquidation Trust), the trustee of the Freedom HoldCo Debtor Liquidation Trust~~**Litigation Trustee** may timely elect to (i) treat any portion of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, and ~~the trustee of~~ the Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee**) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** may request an expedited determination of taxes of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust for all taxable periods through the dissolution of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust.

**7.12.    *New Warrants.***

In the event of a Plan Equitization Transaction, on the Effective Date, in accordance with the terms of the Plan and the Restructuring Transactions Memorandum and as further set forth in the New Warrant Documentation, New TopCo shall issue and deliver all of the New Warrants (subject to dilution by the Management Incentive Plan) to the OpCo Debtors Litigation Trust for further distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of OpCo General Unsecured Claims, pursuant to the terms and conditions of the Restructuring Support Agreement, the OpCo Debtor Litigation Trust Agreement, and the New Warrant Documentation.  The issuance of New Warrants pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, and all of the New Warrants issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  On the Effective Date, the New Warrant Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

The New Warrants shall be distributed in a single instrument to be held by the OpCo Litigation Trustee.

**7.13.    *Exemption from Registration Requirements.***

The offering, issuance, and distribution of any securities, including the Reorganized Common Equity and the New Warrants, in exchange for Claims pursuant to Article III or Article V of the Plan, shall be exempt from, among other things, the registration requirements of the Securities Act and any other applicable U.S. state or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).  Except as otherwise provided in the Plan or the governing certificates or instruments, any and all such Reorganized Common Equity and the New Warrants so issued under the Plan (a) will not be "restricted securities" (as defined under the Securities Act), and (b) will be freely tradable and transferable under the Securities Act by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Debtors, the Reorganized Debtors or New TopCo, in each case, subject to (x) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (y) compliance with applicable securities laws and any rules and regulations, including those of the United States Securities and Exchange Commission or U.S. state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments, and (z) any restrictions in the New Organizational Documents of New TopCo.

Notwithstanding anything to the contrary in the Plan or the Restructuring Support Agreement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether issuance of the Reorganized Common Equity and/or the New Warrants is exempt from registration.

### 7.14.    *Organizational Documents.*

In the event of a Plan Equitization Transaction, the Reorganized Debtors or New TopCo, as applicable, shall enter into such agreements and/or amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan and the Bankruptcy Code, which shall: (1) contain terms consistent with the Plan Supplement; and (2) authorize the issuance, distribution, and reservation of the Reorganized Common Equity and the New Warrants to the Entities entitled to receive such issuances, distributions and reservations, as applicable under the Plan. The New Organizational Documents will be deemed to be modified to prohibit (and will include a provision prohibiting) the issuance of non-voting equity securities, pursuant to and solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. Without limiting the generality of the foregoing, as of the Effective Date, the Reorganized Debtors and New TopCo shall be governed by the New Organizational Documents applicable to it. On or immediately before the Effective Date, each Debtor, each Reorganized Debtor and New TopCo, as applicable, will file its respective New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of its state of incorporation or formation, to the extent required under this Plan or applicable nonbankruptcy law for such New Organizational Documents to become effective. After the Effective Date, the Reorganized Debtors and New TopCo may amend and restate the formation, incorporation, organizational, and constituent documents, as applicable, as permitted by the laws of its respective jurisdiction of formation or incorporation, as applicable, and the terms of such documents.

As a condition to receiving (1) the Reorganized Common Equity, Holders of Allowed Prepetition First Lien Loan Claims and/or Allowed DIP Claims and/or any of their respective designees for receipt of Reorganized Common Equity and (2) the New Warrants, Holders of OpCo General Unsecured Claims that vote to accept the Plan and/or any of their respective designees for receipt of New Warrants, in each case, will be required to execute and deliver the applicable New Organizational Documents for New TopCo. For the avoidance of doubt, any Entity's or Person's receipt of Reorganized Common Equity and/or New Warrants under, or as contemplated by, the Plan shall be deemed as its agreement to the applicable New Organizational Documents for New TopCo, and such Entities and Persons shall be deemed signatories to the applicable New Organizational Documents for New TopCo without further action required on their part (solely in their capacity as members of New TopCo). The New Organizational Documents for New TopCo will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of Reorganized Common Equity and/or New Warrants will be bound thereby in all respects even if such Holder has not actually executed and delivered a counterpart thereof.

### 7.15.    *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to or in connection with the Plan (including, if applicable, the Sale Transaction), including: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3)

the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any U.S. federal, state or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate U.S. federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Plan.

### 7.16. *Other Tax Matters.*

In the event of a Plan Equitization Transaction, from and after the Effective Date, the Reorganized Debtors, including New TopCo, shall be authorized to make and to instruct any of their wholly-owned subsidiaries to make any elections available to them under applicable law with respect to the tax treatment of the Restructuring Transaction as specified in the Restructuring Transactions Memorandum.

### 7.17. *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to distribution under this Plan, and except as otherwise set forth in this Plan or in the Restructuring Transactions Memorandum, on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents directly or indirectly evidencing, related to or connected with any Claim, other than (x) to the extent the Freedom HoldCo DIP Election is made, DIP Claims against the Freedom HoldCo Debtors, or (y) certain Intercompany Claims and Existing Intercompany Equity Interests, in each case as expressly set forth in the Plan, and any rights of any Holder in respect thereof, shall be deemed canceled, discharged and of no force or effect without further act or action under any applicable agreement, law, regulation, order, or rule. The holders of or parties to such canceled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan. Notwithstanding anything to the contrary herein and in the Restructuring Support Agreement, each of the DIP Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement, and the HoldCo Credit Agreement shall continue in effect solely to the extent necessary to: (a) permit Holders of the DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims and Prepetition HoldCo Loan Claims to receive distributions under this Plan on account of such respective Claims; and (b) permit the Second Lien Credit Agreement Agent and HoldCo Credit Agreement Agent, respectively, to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan. Except as provided pursuant to this Plan, upon satisfaction of the DIP Claims, Prepetition First Lien Loan Claims, the Prepetition Second Lien

Loan Claims and the Prepetition HoldCo Loan Claims, respectively (and as the case may be), each of the DIP Credit Agreement, First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent and the HoldCo Credit Agreement Agent, respectively (and as the case may be), shall be discharged of all of their respective obligations associated with the DIP Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement, and the HoldCo Credit Agreement, respectively (and as the case may be).

On the Effective Date, except as otherwise specifically provided for in this Plan (including in the Restructuring Transactions Memorandum): (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to this Plan, if any) shall be canceled, terminated and of no further force or effect solely as to the Debtors, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to this Plan, if any) shall be automatically and fully released and discharged.

### 7.18.   *Boards.*

(a)     In the event of a Plan Equitization Transaction, subject to the terms of the Restructuring Support Agreement and the applicable New Organizational Documents, on the Effective Date, the New Boards shall consist of those individuals identified in the Plan Supplement to be filed with the Bankruptcy Court at or before the Confirmation Hearing. Unless reappointed, the members of the boards of the Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors or to New TopCo on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor or to New TopCo on the Effective Date. Commencing on the Effective Date, each of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Debtor or New TopCo, as applicable, and may be replaced or removed in accordance therewith, as applicable.

(b)     In the event of a Sale Transaction, the Plan Administrator shall be the sole director, manager or managing member, as applicable, of each of the Reorganized Debtors from and following the Effective Date. The members of the boards of the Non-Liquidating Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors on

and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

**7.19.  *Management.***

In the event of a Plan Equitization Transaction, as of the Effective Date, the individuals who will serve in certain senior management positions of the Reorganized Debtors shall consist of those individuals set forth in the Plan Supplement.  In the event of a Sale Transaction, from and after the Effective Date, the Wind Down Debtors shall be managed and administered by the Plan Administrator, who shall be appointed the sole officer of each of the Wind Down Debtors and shall have full authority to administer the provisions of the Plan.  The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.

**7.20.  *Directors and Officers Insurance Policies.***

In accordance with the Plan, (i) on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, which "tail policy" shall not be otherwise terminated or reduced) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim or Proof of Interest need be filed; (iii) the Debtors and the Reorganized Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary; and (iv) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies.

For the avoidance of doubt, on and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

**7.21.  *Corporate Action.***

(a)     On the Effective Date, the New Organizational Documents and any other applicable amended and restated corporate Organizational Documents of each of the Reorganized Debtors and New TopCo, shall be deemed authorized in all respects.  On the Effective Date, all actions contemplated by this Plan (including any transaction described in, or contemplated by, the Restructuring Transactions Memorandum) and the Restructuring Transaction shall be deemed authorized and approved in all respects, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.

(b)     Any action under the Plan to be taken by or required of the Debtors, the Reorganized Debtors or New TopCo, including the adoption or amendment of certificates of formation, incorporation and by-laws, the issuance of securities and instruments, or the selection of officers or directors shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors', the Reorganized Debtors' or New TopCo's equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

(c)     On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors or New TopCo, as applicable, shall be authorized and, as applicable, directed to issue, execute, deliver, acknowledge, file, and/or record, as applicable, such securities, documents, contracts, instruments, releases and other agreements and take such other action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, in the name of and on behalf of the Debtors, the Reorganized Debtors and New TopCo, as applicable, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, or shareholder approval or action.  In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors and New TopCo as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Debtor or New TopCo.

(d)     The authorizations, approvals and directives contemplated by this Section 7.21 shall be effective notwithstanding any requirements under non-bankruptcy Law.

### 7.22.   *Plan Administrator.*

(a)     Appointment; Duties.    The Post-Effective Debtors shall designate the Person who initially will serve as the Plan Administrator in the Plan Supplement; provided, however, that: (i) the Debtors shall have the right at any time prior to the Effective Date to remove the Plan Administrator without cause; and (ii) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time.   On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan to: (y) establish bank accounts as may be required to fulfill the Debtors' obligations under this Plan; and (z) exercise such other power and authority as may be set forth in the Confirmation Order (collectively, the "***Pre-Effective Date PA Duties***").   On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan.

(b)     Qualifications; Plan Administrator Agreement.

(i)     *Plan Administrator as Fiduciary*.   The Plan Administrator shall be a fiduciary of the Post-Effective Debtors, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under this Plan and under the Plan Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement.   To the extent

necessary, following the Effective Date, the Plan Administrator shall be deemed to be a judicial substitute for the Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

(ii)     *Provisions of Agreement and Order.*  The Plan Administrator Agreement and the Confirmation Order shall provide that: (i) the Plan Administrator shall be a fiduciary of the Post-Effective Debtors; (ii) neither the Debtors (except as expressly set forth in the Plan Administrator Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the Plan Administrator in performing the Pre-Effective Date PA Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to this Plan on account of any such action taken or omitted to be taken; and (iii) if the Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Plan Administrator position shall thereafter be dissolved automatically.

(c)     <u>Resignation, Death or Removal</u>.  The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Bankruptcy Court shall designate another Person to become Plan Administrator and thereupon the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

(d)     <u>Wind Down Funds</u>.  In the case of a Sale Transaction, the Plan Administrator shall establish and fund the Wind Down Account from all Cash of the Debtors as of the Effective Date, *minus* the distributions to Holders of Claims required by this Plan, *plus* any Cash received by the Wind Down Debtors on and after the Effective Date.

### 7.23.     *Wind Down of the Debtors' Estates.*

(a)     In the event of a Sale Transaction, the Plan Administrator shall oversee the wind down of the Wind Down Debtors and shall make distributions to, and otherwise hold all property of the Estates for the benefit of, Holders of Allowed Claims and Allowed Interests in accordance with the Plan and the Confirmation Order.  Neither the Wind Down Debtors nor the Plan Administrator shall be required to post a bond in favor of the United States.

(b)    In the event of a Sale Transaction, as set forth in the Plan Administrator Agreement, the Plan Administrator shall have the power and authority to perform the following acts with respect to the Wind Down Debtors, in addition to any powers granted by law or conferred by any other provision of the Plan and orders of the Bankruptcy Court: (i) take all steps and execute all instruments and documents necessary to make distributions to Holders of Allowed Claims and Allowed Interests that the Wind Down Debtors are responsible for payment of pursuant to the terms of this Plan; (ii) object to Claims, if any, as provided in this Plan and prosecute such objections; (iii) resolve, compromise and/or settle any objections to the amount, validity, priority, treatment or allowance of Claims, Administrative Expense Claims, or Interests; (iv) comply with this Plan and the obligations hereunder; (v) if necessary, employ, retain, or replace professionals to represent it with respect to its responsibilities; (vi) take all actions necessary or appropriate to enforce the Wind Down Debtors' rights and fulfill the Wind Down Debtors' obligations under the Sale Documents; (vii) prepare and file applicable tax returns for the Reorganized Debtors; (viii) deposit Estate funds, draw checks and make disbursements consistent with the terms of this Plan; (ix) purchase or continue insurance protecting the Wind Down Debtors, the Plan Administrator and property of the applicable Estates; (x) seek entry of a final decree in any of the Wind Down Debtors' Chapter 11 Cases at the appropriate time; (xi) resolve, compromise and/or settle any Cure Disputes; (xii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization (as such term is described in Internal Revenue Code section 501(c)(3) (whose contributions are deductible under Internal Revenue Code section 170)) of the Plan Administrator's choice, any Estate assets that are of no material benefit, including distributable Cash under this Plan; and (xiii) take such other action as the Plan Administrator may determine to be necessary or desirable to carry out the purpose of this Plan.

(c)    In the event of a Sale Transaction, following the Effective Date, none of the Wind Down Debtors shall engage in any business activities or take any actions except those necessary to effectuate the Plan (including under the Sale Documents) and the wind down of the Wind Down Debtors.  On and after the Effective Date, the Plan Administrator may, in the name of the Wind Down Debtors, take such action and settle and compromise Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order.

**7.24.    *Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights.***

(a)    Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, or controversies (i) belonging to the Debtors or the Debtors' Estates as set forth in the Plan and (ii) by and among the Debtors, the Creditors' Committee, the DIP Lenders, and the Consenting First Lien Lenders.  This Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies belonging to the Debtors or the Debtors' Estates pursuant to section 1123 of the Bankruptcy Code and, with respect to the compromise and settlement by and among the Debtors, the DIP Lenders, and the Consenting First Lien Lenders, Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.

The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests, Causes of Action, or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (i) in the best interest of the Debtors, the Reorganized Debtors, and their respective Estates and property, and of Holders of Claims or Interests; and (ii) fair, equitable and reasonable.

(b)    Except as provided herein, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code or otherwise, and any and all such rights against the Debtors and/or their estates are terminated pursuant to the Plan.

### 7.25.    *Additional Transactions Authorized Under this Plan.*

On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to reinstate Claims or Interests or render Claims or Interests not impaired, as provided for under this Plan.

## ARTICLE VIII.
## DISTRIBUTIONS

### 8.1.    *Distributions.*

The Disbursing Agent shall make all distributions under this Plan to the applicable Holders of Allowed Claims in accordance with the terms of this Plan.

### 8.2.    *No Postpetition Interest on Claims.*

Except with respect to Allowed DIP Claims and the Prepetition First Lien Loan Claims and unless otherwise specifically provided for in the Confirmation Order or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 8.3.    *Date of Distributions.*

Unless otherwise provided herein, any distributions under this Plan and deliveries to be made hereunder shall be made on the applicable Distribution Date; *provided* that the Reorganized Debtors may utilize periodic Distribution Dates to the extent that use of a periodic Distribution Date does not delay payment of the Allowed Claim more than thirty (30) days. **The manner of distributions to Holders of Allowed OpCo General Unsecured Claims shall be in the sole discretion of the OpCo Litigation Trustee after reserving for Disputed Claims and expenses of the OpCo Debtor Litigation Trust.** In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably

practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**8.4.    *Distribution Record Date.***

As of the close of business on the Distribution Record Date, the various lists of Holders of Claims in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date.  Additionally, with respect to payment of any Cure Costs or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' Executory Contracts and Unexpired Leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Costs.  For the avoidance of doubt, the Distribution Record Date shall not apply to any securities of the Debtors deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

**8.5.    *Disbursing Agent.***

(a)    <u>Powers of Disbursing Agent</u>.  The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions under this Plan or payments contemplated hereby in respect of the Reorganized Debtors; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)    <u>Expenses Incurred by the Disbursing Agent On or After the Effective Date</u>.  Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Wind Down Debtors (solely if the Plan Administrator is not the Disbursing Agent), the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash and will not be deducted from distributions under this Plan made to Holders of Allowed Claims by the Disbursing Agent.  The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Wind Down Debtors and without the need for approval by the Bankruptcy Court, as set forth in <u>Section 3.3(c)</u> of this Plan.  In the event that the Disbursing Agent and the Wind Down Debtors are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

(c)    <u>Bond</u>.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the

Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors. Furthermore, any such Entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

(d)     Cooperation with Disbursing Agent.  The Wind Down Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of Holders of Claims, in each case, that are entitled to receive distributions under this Plan, as set forth in the Debtors' or the applicable Reorganized Debtors' books and records.  The Wind Down Debtors will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in Section 8.15 of this Plan.

**8.6.     *Delivery of Distribution.***

Subject to the provisions contained in this Article VIII, with respect to distributions required to be made to Holders of Allowed Claims by the Reorganized Debtors under this Plan, the Disbursing Agent will, subject to Bankruptcy Rule 9010, make all distributions under this Plan or payments to any Holder of an Allowed Claim as and when required by this Plan at: (a) the address of such Holder on the books and records of the Debtors or their agents; or (b) the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed Proofs of Claim or transfers of Claim filed with the Bankruptcy Court.  In the event that any distribution under this Plan to any such Holder is returned as undeliverable, no distribution or payment to such Holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter such distribution under this Plan shall be made to such Holder without interest; provided, however, that such distributions under this Plan or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of ninety (90) days from: (i) the Effective Date; and (ii) the first Distribution Date after such Holder's Claim is first Allowed.  Notwithstanding the foregoing, all distributions to be made on account of (w) the Prepetition ABL Loan Claims shall be delivered to the ABL Credit Agreement Agent for the benefit of itself and the ABL Lenders in accordance with the terms of the ABL Credit Agreement; (x) the Prepetition First Lien Loan Claims shall be delivered to the First Lien Credit Agreement Agent for the benefit of itself and the First Lien Lenders in accordance with the terms of the First Lien Credit Agreement; (y) the Prepetition Second Lien Loan Claims shall be delivered to the Second Lien Credit Agreement Agent for the benefit of itself and the Second Lien Lenders in accordance with the terms of the Second Lien Credit Agreement, and (z) the Prepetition HoldCo Loan Claims shall be delivered to the HoldCo Credit Agreement Agent for the benefit of itself and the HoldCo Lenders in accordance with the terms of the HoldCo Credit Agreement.

**8.7.     *Unclaimed Property.***

Ninety (90) days from the later of: (i) the Effective Date, and (ii) the first Distribution Date after such Holder's Claim is first Allowed, all unclaimed property, wherever located, or interests in property distributable hereunder on account of such Claim shall revert to the applicable Reorganized Debtor or its successor or assign and be deposited in the Wind Down

Account, and any Claim or right of the Holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred.  The Wind Down Debtors and the Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records, and the Proofs of Claim filed against the Debtors, as reflected on the Claims Register maintained by the Claims Agent.

### 8.8.   *Satisfaction of Claims.*

Unless otherwise specifically provided herein, any distributions under this Plan and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

### 8.9.   *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Wind Down Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or the applicable Reorganized Debtor, as the case may be.

### 8.10.   *De Minimis Cash Distributions.*

None of the Reorganized Debtors, the Plan Administrator or the Disbursing Agent shall have any obligation to make a distribution that is less than $50.00 in Cash.

### 8.11.   *Distributions on Account of Allowed Claims Only.*

Notwithstanding anything herein and in the Restructuring Support Agreement to the contrary, no distribution under this Plan shall be made on account of a Claim until such Claim becomes an Allowed Claim.

### 8.12.   *Fractional Shares.*

No fractional interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution would otherwise result in the issuance of a number of interests that is not a whole number, the actual distribution of interests shall be rounded as follows: (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized interests to be distributed shall be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC will be treated as a single Holder, if applicable.

### 8.13.   *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything herein and in the Restructuring Support Agreement to the contrary, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution under this Plan of a value in excess of the Allowed amount of such Claim.

**8.14.**   *Setoffs and Recoupments.*

Except as expressly provided in this Plan and except with respect to the Secured Claims, the Reorganized Debtors may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any distributions under this Plan to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action that the applicable Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount between the applicable Reorganized Debtor and the Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or any of their respective successors of any and all claims, rights and Causes of Action that such Persons or any of their respective successors may possess against the applicable Holder.

**8.15.**   *Withholding and Reporting Requirements.*

In connection with this Plan and all distributions under this Plan hereunder, the Post-Effective Debtors, Wind Down Co, the **OpCo Debtor Litigation Trust, the Freedom HoldCo Debtor Litigation Trust, the** Disbursing Agent and any Claims Agent shall comply with all withholding and reporting requirements imposed by any U.S. federal, state, provincial, local or foreign taxing authority, and all distributions under this Plan hereunder shall be subject to any such withholding and reporting requirements.  The Post-Effective Debtors, Wind Down Co, the **OpCo Debtor Litigation Trust, the Freedom HoldCo Debtor Litigation Trust, the** Disbursing Agent and any Claims Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including requiring a Holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of this Plan: (a) each Holder of an Allowed Claim that is to receive a distribution under this Plan under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations on account of such distribution; and (b) no distributions under this Plan shall be required to be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Post-Effective Debtors, Wind Down Co, the **OpCo Debtor Litigation Trust, the Freedom HoldCo Debtor Litigation Trust, the** Disbursing Agent or the Claims Agent, as applicable, for the payment and satisfaction of such tax obligations or has, to their satisfaction, established an exemption therefrom.

**ARTICLE IX.**
**PROCEDURES FOR RESOLVING CLAIMS**

**9.1.**   *Claims Process.*

Except as otherwise required by order of the Bankruptcy Court, Holders of Claims need not file Proofs of Claim with the Claims Agent or the Bankruptcy Court and shall be subject to

the Bankruptcy Court claims process only to the extent set forth in this Plan and/or Confirmation Order.

**9.2.    *Objections to Claims.***

Other than with respect to Fee Claims, (i) only the Reorganized Debtors or New TopCo, or (ii) in the event of a Sale Transaction, only Wind Down Co, on behalf of itself and the other the Wind Down Debtors, shall be entitled to object to Claims **(other than OpCo General Unsecured Claims, Prepetition HoldCo Loan Claims, and Allowed Freedom HoldCo General Unsecured Claims)** on and after the Effective Date, except that nothing herein shall be understood to waive the Reorganized Debtors', New TopCo's or the Wind Down Debtors' right to argue that a Claim filed against the Debtors or the Reorganized Debtors has been discharged under the Plan**.  Only the OpCo Debtor Litigation Trust shall be entitled to object to OpCo General Unsecured Claims on and after the Effective Date.**  Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) one hundred eighty (180) days following the later of (x) the Effective Date and (y) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof.  From and after the Effective Date, either (i) the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, ~~or~~ (ii) the Wind Down Debtors, **(iii) the OpCo Debtor Litigation Trust, or (iv) the Freedom HoldCo Debtor Litigation Trust,** as applicable, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**9.3.    *Payments and Distributions with Respect to Disputed Claims.***

If an objection to a Claim is filed as set forth in Section 9.2 of this Plan, except as otherwise agreed by (i) the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, or (ii) the Wind Down Debtors, as applicable, if any portion of a Claim (other than a Fee Claim) is a Disputed Claim, no payment or distribution (partial or otherwise) provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**ARTICLE X.**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**10.1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.***

In the event a Sale Transaction or Partial Sale Transaction is consummated, to the extent assumption has not already occurred, the Assumed Contracts to be assumed and assigned in connection with such Sale Transaction or Partial Sale Transaction will be assumed (unless previously assumed pursuant to a separate order of the Bankruptcy Court) and assigned to the applicable Successful Bidder pursuant to a Sale Order in accordance with the applicable Sale Documents.  Effective as of the Effective Date, in the event a Sale Transaction is consummated, except as otherwise provided herein, any Executory Contract or Unexpired Lease (i) not previously assumed, (ii) not assumed and assigned in accordance with any Sale Documents, (iii) not previously rejected pursuant to an order of the Bankruptcy Court, or (iv) not subject of a

pending motion to reject, assume or assume and assign, will be rejected effective as of the Effective Date pursuant to the Confirmation Order.

In the event of a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), except as otherwise provided herein, any Executory Contracts and Unexpired Leases (i) not previously assumed, (ii) not previously assumed and assigned in accordance with any Partial Sale Transaction or other order approving such assumption and assignment, or (iii) not previously rejected pursuant to an order of the Bankruptcy Court, will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order except any Executory Contract or Unexpired Lease (1) identified on the Rejected Contracts/Lease List (which shall initially be filed with the Plan Supplement) as a contract or lease to be rejected, (2) that is the subject of a separate motion or notice to reject, assume, or assume and assign pending as of the Confirmation Date, or (3) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code). In the event of a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such later date as may be identified on the Rejected Contracts/Lease List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

The Debtors and the Required Consenting First Lien Lenders will work together in good faith to determine which Executory Contracts and Unexpired Leases shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases; provided that, to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, if requested by the Required Consenting First Lien Lenders, (x) absent a Partial Sale Transaction involving the Vitamin Shoppe Debtors, the Vitamin Shoppe Debtors shall reject any and all Executory Contracts or Unexpired Leases held by such Debtor(s), and (y) the Debtors shall reject any Executory Contracts or Unexpired Leases between (i) any of the Debtors, on the one hand, and (ii) any Specified Party, on the other hand.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party (including the applicable Successful Bidder in the event of a Sale Transaction or Partial Sale Transaction, if any) on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by an order of the Bankruptcy Court. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, or increases, accelerates or otherwise alters any obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder as a result of, or creates any Lien on any asset or property of the Debtors or the Reorganized Debtors as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of any other Restructuring Transaction (including any

"change of control" provision), then such provision shall be deemed unenforceable (solely for purposes of the transactions contemplated under this Plan) and modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder, or create or impose a Lien on any asset or property of the Debtors or the Reorganized Debtors.  For the avoidance of doubt, confirmation of the Plan shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary herein and in the Restructuring Support Agreement, the Debtors or Reorganized Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts/Lease List in their discretion prior to the Confirmation Date (or such later date as may be agreed with a counterparty); provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

### 10.2.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Notwithstanding anything to the contrary herein and in the Restructuring Support Agreement, in the event the Restructuring Transactions are consummated through the Sale Transaction or a Partial Sale Transaction (if any), the terms of any Sale Documents and any Sale Order shall govern the cure of defaults, assumption and assignment, and compliance with section 365 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases assumed and assigned pursuant to such Sale Documents and Sale Order.

In the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), the applicable terms of the Bidding Procedures Order and section 365 of the Bankruptcy Code shall govern the process for cure of defaults, assumption, assumption and assignment (if applicable) with respect to any Executory Contracts or Unexpired Leases assumed or assumed and assigned by the Debtors pursuant to this Plan.  Notwithstanding the foregoing, any Assumption and Assignment Notices (as defined in the Bidding Procedures Order), including, but not limited to, those filed at Docket Nos. 487, 499, 597 & 650, shall constitute notice of the potential assumption and proposed Cure Costs.  Any objection by a contract or lease counterparty to the proposed Cure Cost (as defined in the Bidding Procedures Order) must be filed, served, and actually received by the Debtors by the date set forth in the applicable Assumption and Assignment Notice (a "***Cure Dispute***").  In the event that a non-Debtor contract counterparty files a timely Cure Dispute and the Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard at the Confirmation Hearing or such other date on at least seven (7) days' notice to the applicable non-Debtor contract counterparty, or such date as the parties agree, subject to the Court's calendar.  Any objection by a contract or lease counterparty to (i) the ability of the applicable Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned, or (ii) any other matter pertaining to the proposed

assumption (such objection, an "***Assumption Dispute***") must be filed, served, and actually received by the Debtors by the date on which objections to confirmation of the Plan are due.

In the event the Restructuring Transactions are consummated through the Plan Equitization (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, the Debtors shall pay any Cure Costs, if monetary, in full in Cash either (i) on the Effective Date or as soon as reasonably practicable thereafter, or (ii) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (x) the Effective Date or as soon as reasonably practicable thereafter and (y) seven (7) days after the date on which such Cure Dispute has been resolved.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan and payment or performance of the applicable Cure Costs shall result in the full satisfaction and cure of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption.

### 10.3.    *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases under this Plan must be filed with the Claims Agent within thirty (30) days after the date of the effectiveness of the rejection of the applicable Executory Contract or Unexpired Lease. **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely filed shall be subject to disallowance by further order of the Court upon objection on such grounds.** All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with <u>Article IV</u>.

### 10.4.    *Contracts and Leases Entered into After the Petition Date.*

The Debtors or Reorganized Debtors, and, to the extent assigned to a Successful Bidder in the event of a Sale Transaction, the Successful Bidder, as applicable, will perform under any contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by any Debtor, and will be liable thereunder in the ordinary course of business.

### 10.5.    *Reservation of Rights.*

Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts/Lease List or Assumed Contracts List, as applicable, nor anything contained in the Plan or Sale Documents, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Cost to any contract and lease counterparties, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or

that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors or Plan Administrator, as applicable, shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article XIII.

### 10.6.    *Employee Compensation and Benefits.*

Subject to the provisions of the Plan or any applicable Sale Order or Sale Documents, all compensation and benefits programs shall be treated as Executory Contracts.

In the event of a Plan Equitization Transaction, unless otherwise rejected, to the extent consented to by the Required Consenting First Lien Lenders, all compensation and benefits programs (other than any equity or equity based (including any phantom equity) compensation or benefits plans) shall be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Confirmation of the Plan, or any assumption of compensation and benefits programs pursuant to the terms herein, shall not be deemed to trigger any applicable change of control, assignment, vesting, termination, acceleration or similar provisions therein.  No counterparty shall have rights under a compensation and benefits programs assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

In the event of a Plan Equitization Transaction, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of the Debtors, or will enter into new compensation arrangements, as applicable, on the Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting First Lien Lenders and which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting First Lien Lenders.

In the event of a Plan Equitization Transaction, the New Board shall: (x) adopt and implement Management Incentive Plans at each operating company or (y) assume, assume as amended, or reject the existing long term incentive plans of Franchise Group's direct or indirect subsidiaries, in each case structured to incentivize operating performance and align economic interests on terms and conditions acceptable to the New Board and the Required Consenting First Lien Lenders.  If applicable, the Management Incentive Plan shall provide for the issuance of equity or equity-linked awards representing up to 10% of the Reorganized Common Equity on a fully diluted basis, to be allocated by the New Board.  The form of the awards under the Management Incentive Plan, if applicable (*i.e.*, options, restricted stock or units, appreciation rights, etc.), the participants in the Management Incentive Plan, the allocations of the awards to such participants (including the amount of allocations and the timing of the grant of the awards), and the terms and conditions of the awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion.

In the event of a Sale Transaction, the compensation and benefits programs shall either be assumed and assigned upon consummation of an applicable Sale Transaction in accordance with the terms and conditions of the applicable Sale Documents or, if no Successful Bidder assumes the compensation and benefits programs, rejected.  On the Effective Date, or in the event of assumption by a Successful Bidder of the compensation and benefits programs, all Proofs of Claim filed for amounts due under any compensation and benefits programs shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan.

## ARTICLE XI.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

**11.1.** *Conditions Precedent to Confirmation.*

Confirmation of this Plan is subject to the satisfaction or waiver of the following conditions:

(a)    the DIP Orders shall have been entered by the Bankruptcy Court and shall remain in full force and effect;

(b)    the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Orders;

(c)    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan;

(d)    entry of the Disclosure Statement Order;

(e)    entry of the Confirmation Order;

(f)    the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time; and

(g)    in the event of a Sale Transaction, the receipt of a Sufficient Bid and the Sale Documents shall not have been terminated in accordance with their terms.

**11.2.**    *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date is subject to the satisfaction or waiver of the following conditions:

(a)    the DIP Orders, Disclosure Statement Order, and Confirmation Order having become Final Orders in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified, unless otherwise agreed by the Debtors and the Required Consenting First Lien Lenders;

(b)    no court of competent jurisdiction or other competent governmental or regulatory authority having issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

(c)    each of the applicable Definitive Documents having been executed, delivered, acknowledged, and/or filed, as applicable, by the Entities and Persons intended to be parties thereto and effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein having been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Definitive Documents;

(d)    any non-technical and/or immaterial amendments, modifications or supplements to the Plan having been acceptable to the Debtors and the Required Consenting First Lien Lenders, except as otherwise provided in Section 14.3 of this Plan;

(e)    in the event of the Plan Equitization Transaction, each of the offers, issuances, sales, and/or deliveries of Reorganized Common Equity in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no proceeding by any Governmental Unit or other Entity or Person that alleges that any such offer, issuance, sale and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such proceeding shall be threatened in writing or instituted by any Governmental Unit on or prior to the Effective Date;

(f)    the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, having not been terminated in accordance with its respective terms, and there having not occurred and been continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time;

(g)    to the extent a Plan Equitization Transaction is implemented, all of the actions set forth in the Restructuring Transactions Memorandum, as applicable, having been completed and implemented;

(h)    there not having been instituted or threatened to be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by

any Governmental Unit (x) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transaction contemplated herein, in the Restructuring Support Agreement, and in the Definitive Documents or (y) imposing a material award, claim, injunction, fine or penalty that, in each case, both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

(i)      the Debtors having obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and having filed all notices and reports, if any, required to be filed, including with any Governmental Unit, by the Debtors in connection with this Plan's effectiveness, in each case, as may be required by a Governmental Unit;

(j)      in the event of a Plan Equitization Transaction, the Reorganized Common Equity to be issued and/or delivered on the Effective Date having been validly issued by New TopCo, having been fully paid and non-assessable, and being free and clear of all taxes, Liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents of New TopCo;

(k)      all conditions precedent to the effectiveness of the OpCo **Debtor Litigation Trust Agreement and the Freedom HoldCo** Debtor Litigation Trust Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the OpCo Debtor Litigation Trust Agreement **and the Freedom HoldCo Debtor Litigation Trust Agreement** shall be in full force and effect;

**(l)      the OpCo Debtor Litigation Trust Escrow Amount shall have been paid to the OpCo Debtor Litigation Trust;**

**(m)**   ~~(l)~~ all conditions precedent to the effectiveness of the Take-Back Debt Credit Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the Take-Back Debt Credit Agreement shall be in full force and effect;

**(n)**   ~~(m)~~ all conditions precedent to the effectiveness of the New ABL Facility having been satisfied or duly waived by the party whose consent is required thereunder, and the New ABL Facility shall be in full force and effect;

**(o)**   ~~(n)~~ all requisite filings with any Governmental Unit and third parties having become effective, and all such Governmental Unit and third parties having approved or consented to the Restructuring Transactions, to the extent required;

**(p)**   ~~(o)~~ any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions having been obtained;

**(q)**   ~~(p)~~ all accrued and unpaid Restructuring Expenses having been paid in full in Cash by the Debtors;

**(r)**   ~~(q)~~ in the event of a Sale Transaction, the Sale Documents, as applicable, not having been terminated in accordance with their terms;

**(s)**   ~~(r)~~ the following documents being in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions, and not having been, as applicable, stayed, modified, reversed, vacated, subject to any pending appeal, and/or terminated prior to the Effective Date: (a) the New Organizational Documents; (b) if applicable, any Sale Order; (c) the Exit ABL Facility; (d) the Take-Back Debt Credit Agreement (if applicable); (e) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (f) all other documents necessary to consummate a transaction of the type contemplated by this Plan to the extent not otherwise listed above; and

**(t)**   ~~(s)~~ all closing conditions and other conditions precedent in the Restructuring Support Agreement having been satisfied or waived in accordance with the terms thereof.

### 11.3.   *Satisfaction and Waiver of Conditions Precedent.*

Except as otherwise provided herein or in the Restructuring Support Agreement, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in <u>Section 11.1</u> and <u>Section 11.2</u> of this Plan may be waived in whole or part upon agreement by the Debtors **and,** the Required Consenting First Lien Lenders**, and the Creditors' Committee**, and as the case may be, without notice and a hearing, and the Debtors' benefits under any "mootness" doctrine, but only to the extent applicable, shall be unaffected by any provision hereof.  The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

### 11.4.   *Effect of Failure of Conditions.*

If all of the conditions to effectiveness have not been satisfied (as provided in <u>Section 11.1</u> and <u>Section 11.2</u> hereof) or duly waived (as provided in <u>Section 11.3</u> hereof) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors may file a motion to vacate the Confirmation Order.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in <u>Section 11.1</u> and <u>Section 11.2</u> hereof are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this <u>Section 11.4</u>, this Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under this Plan shall be made, the Debtors and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the

rights of the Holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

### 11.5.    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under this Plan and whether or not such Holder has accepted this Plan.

### 11.6.    *Substantial Consummation.*

Substantial consummation of this Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

### ARTICLE XII.
### RELEASE, INJUNCTION, AND RELATED PROVISIONS

### 12.1.    *Discharge of Claims and Termination of Certain Equity Interests; Compromise and Settlement of Claims, Certain Equity Interests, and Controversies.*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim is Allowed; or (3) the Holder of such Claim or Equity Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. For the avoidance of doubt, (i) nothing in this Section 12.1 shall affect the rights of Holders of Claims to seek to enforce the Plan, including the distributions to which

Holders of Allowed Claims are entitled under the Plan, and (ii) notwithstanding any other Plan provision or provision in the Restructuring Support Agreement to the contrary, in the event a Sale Transaction is consummated, the Debtors shall not receive a discharge, pursuant to section 1141(d)(3) of the Bankruptcy Code.

In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims against the Debtors and their Estates, as well as claims and Causes of Action against other Entities.

**12.2.**  ***Releases by the Debtors.***

**Subject to the outcome of the Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtor Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release, to the maximum extent permitted by law, to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all claims, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement,**

the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; (vii) the Take-Private Transaction and/or (viii) the confirmation or consummation of this Plan or the solicitation of votes on this Plan, in each case, that such Debtor Releasing Party would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Debtor Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Debtor Releasing Party to enforce this Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or any Sale Transaction or assumed pursuant to this Plan or any Sale Transaction or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in this **Article XII.2** shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; (2) any act or omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates; (3) any retained Causes of Action; (4) any OpCo Litigation Claims; ~~or~~ (5) any Freedom HoldCo Debtor Litigation Trust Claims; or (6) any Avoidance Actions held by Debtors Freedom Receivables II, LLC and Freedom VCM Receivables, Inc.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for

the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

12.3.   *Third-Party Release.*

Notwithstanding anything contained in the Plan or the Restructuring Support Agreement to the contrary, and subject to the outcome of ~~the~~ Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Non-Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third-Party Release</u>") from any and all Claims, Interests, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the

94

New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the confirmation or consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third-Party Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Third-Party Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Non-Debtor Releasing Party to enforce this Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or any Sale Transaction or assumed pursuant to this Plan or any Sale Transaction or Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; (2) any act or omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates; (3) any retained Causes of Action; (4) any OpCo Litigation Claims; or (5) any Freedom HoldCo Debtor Litigation Trust Claims; or (6) any Avoidance Actions held by Debtors Freedom Receivables II, LLC and Freedom VCM Receivables, Inc.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

### 12.4.  *Exculpation.*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of confirmation and consummation of this Plan, making distributions under this Plan, the Disclosure Statement, the Sale Process, the Sale Order, or the solicitation of votes for, or confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing, including but not limited to the Restructuring Support Agreement; the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation or consummation of this Plan; provided, however, that the foregoing provisions of this Exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Exculpation), or gross negligence of such applicable Exculpated Party; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this <u>Article XII.4</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpations set forth above do not exculpate Brian Kahn,

96

Prophecy Asset Management LP, or any of their Affiliates.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

12.5. *Discharge of Claims and Termination of Interests.*

Except as otherwise provided for herein and in the Restructuring Support Agreement, effective as of the Effective Date, with respect to the Non-Liquidating Debtors: (a) the rights afforded in the Plan and the treatment of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property or Estates; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  In accordance with section 1141(d)(3) of the Bankruptcy Code, this Plan does not discharge the American Freight Debtors.  For the avoidance of doubt, in the event of a Plan Equitization Transaction, at the election of the Required Consenting First Lien Lenders in their sole discretion, the existing ABL Credit Agreement (as defined in the Restructuring Support Agreement), and the Prepetition ABL Loan Claims (as defined in the Restructuring Support Agreement), may be reinstated.

12.6. *Injunction.*

Except as otherwise provided herein or for obligations issued pursuant hereto, all Persons or Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to Exculpation pursuant to Article XII, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties or the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such

**Entities or against the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated or settled pursuant to the Plan.**

      **12.7.**    *Setoffs and Recoupment.*

      Except as otherwise provided herein, each Reorganized Debtor or the Plan Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); provided that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor or the Plan Administrator, as applicable, of any such claims, rights, and Causes of Action.  In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Causes of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

      **12.8.**    *Release of Liens.*

      Except as otherwise provided in the Confirmation Order, herein or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with this Plan and DIP Claims subject to the Freedom HoldCo DIP Election, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns or, in the event of a Sale Transaction, the Plan Administrator.  Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any Collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation

Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Plan Administrator, or any administrative agent, collateral agent or indenture trustee under any Take-Back Debt Facility (at the expense of the Debtors or Reorganized Debtors, as applicable) that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Reorganized Debtors or Plan Administrator, as applicable, shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     To hear and determine applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the Cure Disputes resulting therefrom;

(b)     To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)     To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     To ensure that distributions under this Plan to Holders of Allowed Claims are accomplished as provided herein;

(e)     To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(g)     To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person

with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    To hear and determine all Fee Claims;

(j)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any Sale Documents (if any), or any agreement, instrument, or other document governing or relating to any of the foregoing; provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(k)    To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(l)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    To hear and determine all disputes involving the existence, nature or scope of the discharge, releases and injunction provisions contained in the Plan;

(n)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)    To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement Hearing, the Confirmation Hearing, the Administrative Bar Date, or the deadline for responding or objecting to a Cure Cost, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(q)    To recover all assets of the Debtors and property of the Estates, wherever located; and

(r)     To enter a final decree closing each of the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of this Article XIII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

### 14.1.   *Dissolution of Creditors' Committee.*

The Creditors' Committee shall be automatically dissolved on the Effective Date and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases under the Bankruptcy Code, except for purposes of filing applications for Professional Person compensation in accordance with this Plan.

### 14.2.   *Termination of Professional Persons.*

On the Effective Date, the engagement of each Professional Person retained by the Debtors and the Creditors' Committee shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Fee Claims, and the Reorganized Debtors shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Fee Claims.   Nothing herein shall preclude any Reorganized Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

### 14.3.   *Amendments.*

Subject to the terms and conditions of the Restructuring Support Agreement and this Plan, this Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Required Consenting First Lien Lenders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of Holders of Allowed Claims and Allowed Interests pursuant to this Plan, the Debtors may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.  With the consent of the Required Consenting First Lien Lenders, the Debtors may make technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; provided, however, that, such

technical adjustments and modifications are immaterial or do not adversely affect the treatment of Holders of Claims or Interests under the Plan.

### 14.4.  *Revocation or Withdrawal of this Plan.*

Subject to the terms and conditions of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw this Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Person.

### 14.5.  *Allocation of Distributions under this Plan Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall for U.S. federal (and applicable state and local) income tax purposes be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (but solely to the extent that such other amount is an allowable portion of such Allowed Claim).

### 14.6.  *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.7.  *Governing Law.*

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights,

duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

### 14.8.    *Section 1125(e) of the Bankruptcy Code.*

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors, and the Consenting First Lien Lenders (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under this Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

### 14.9.    *Inconsistency.*

In the event of any inconsistency among the Plan, the Disclosure Statement, the Restructuring Support Agreement, any exhibit to the Plan, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern; provided, however, that the parties to the Restructuring Support Agreement shall use commercially reasonable efforts to eliminate any such inconsistency by agreement prior to the provisions of this section becoming applicable and enforceable; provided, further, that the foregoing shall not abrogate any party's consent rights.  In the event of a conflict between any provision of this Plan and the Confirmation Order, the Confirmation Order shall govern and control.

### 14.10.    *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

### 14.11.    *Exhibits.*

All exhibits to this Plan (including, without limitation, all documents filed with the Plan Supplement and all exhibits and ancillary agreements thereto) are incorporated and are a part of this Plan as if set forth in full herein.

### 14.12.    *Notices.*

All notices, demands, or requests in connection with the Plan shall be in writing (including by facsimile or electronic mail transmission) and, unless otherwise provided herein,

shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or electronic mail transmission, when received and telephonically confirmed, addressed as follows:

      (a)     if to the Debtors, to:

Franchise Group, Inc.
109 Innovation Court, Suite J
Delaware, OH 43015
Attention: Tiffany McMillan-McWaters
E-mail address: tmcwaters@franchisegrp.com

with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Debra M. Sinclair; Matthew A. Feldman; Betsy L. Feldman
E-mail address: dsinclair@willkie.com; mfeldman@willkie.com; bfeldman@willkie.com

      (b)     if to a Consenting First Lien Lender:

c/o Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Jayme Goldstein; Jeremy Evans; Isaac Sasson
E-mail address: jaymegoldstein@paulhastings.com; jeremyevans@paulhastings.com; isaacsasson@paulhastings.com

### 14.13. *Filing of Additional Documents.*

Subject to the terms and conditions of the Restructuring Support Agreement, on or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 14.14. *Reservation of Rights.*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

**14.15.** *Closing of Chapter 11 Cases.*

The Claims Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

**14.16.** *Tax Matters.*

The Debtors will cooperate with any advisors selected by the Required Consenting First Lien Lenders in respect of all tax structuring matters.

The Post-Effective Debtors or Wind Down Co, as applicable, shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date. In the event of a Sale Transaction, from and after the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences relating to the activities of the Reorganized Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

## ARTICLE XV.
## COMMITTEE SETTLEMENT

Following good faith and arm's length negotiations, in exchange for the releases and other valuable consideration provided for in this Plan, the Committee Settlement Parties have agreed to the settlement provided for in the Committee Settlement term sheet annexed hereto as Exhibit I and fully incorporated herein as a material component of the Plan. The Committee Settlement provides significant value to the Debtors and their Estates, favorably resolve and avoid potential protracted expensive and uncertain litigation, and enable the prompt and efficient wind-down of the Debtors' Estates through this Plan. The Committee Settlement is integral to the development and implementation of this Plan. This Plan, taken together with the Disclosure Statement, shall serve as a motion to approve the Committee Settlement pursuant to Bankruptcy Rule 9019. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Committee Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Holders of Claims and Interests and other parties in interest, and are fair, equitable, and reasonable.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 3̶5, 2025
        Wilmington, Delaware

Respectfully submitted,

**FRANCHISE GROUP, INC.,** on behalf of itself
and its affiliated Debtors

By: /s/ DRAFT _____
Name: Andrew Laurence
Title: Chief Executive Officer

## Exhibit I

**Committee Settlement Term Sheet**

*[Intentionally Omitted]*