## EXHIBIT 2

**Disclosure Statement Blackline**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.* | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR THE ~~SECOND~~THIRD AMENDED JOINT CHAPTER 11
## PLAN OF FRANCHISE GROUP, INC. AND ITS AFFILIATED DEBTORS

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com

*Counsel to the Debtors*
*and Debtors in Possession*

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
Betsy L. Feldman (Del. No. 6410)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
dsinclair@willkie.com
mfeldman@willkie.com
bfeldman@willkie.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: February ~~3~~5, 2025

This Disclosure Statement contains only a summary of the Debtors' joint chapter 11 plan disclosed herein (as may be amended).  The Disclosure Statement is not intended to replace careful and detailed review and analysis of the Plan, but to aid and supplement such review.  This Disclosure Statement is qualified in its entirety by reference to the more detailed provisions set forth in the Plan (which is included as <u>Exhibit A</u> to this Disclosure Statement), which is incorporated herein by reference.  In the event of a conflict between the Plan and the Disclosure Statement, the provisions of the Plan will govern.  All Holders of Claims and Interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits annexed hereto, before deciding whether to vote to accept or reject the Plan.

The statements contained in this Disclosure Statement are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstances, create any implication that the information contained herein is correct at any time after the date hereof.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure.  Dissemination of this Disclosure Statement is controlled by Bankruptcy Rule 3017.  This Disclosure Statement was prepared to provide parties in interest in these Chapter 11 Cases with "adequate information" (as defined in section 1125 of the Bankruptcy Code) so that those creditors who are entitled to vote with respect to the Plan can make an informed judgment regarding such vote on the Plan.

Holders of Claims and Interests should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice.  Each such Holder should, therefore, consult with his or her own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan and the transactions contemplated thereby.

Information contained herein is subject to completion or amendment.  The Debtors reserve the right to file an amended plan and related disclosure statement from time to time, subject to the terms of the Plan.  This Disclosure Statement does not constitute an offer to sell, or the solicitation of an offer to buy, any securities.

The effectiveness of the Plan is subject to several conditions precedent.  There is no assurance that these conditions will be satisfied or waived.

No person has been authorized by the Debtors in connection with the Plan or the Solicitation to give any information or to make any representation other than as contained in this Disclosure Statement, the Plan and the exhibits, notices and schedules attached to or incorporated by reference or referred to in this Disclosure Statement and/or the Plan, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

**Except where specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles.**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................. 1

    A.     Purpose of this Disclosure Statement ................................................................. 1

II.     GENERAL HISTORICAL INFORMATION ABOUT THE DEBTORS ................ 4

    A.     General Background, Corporate History, and Business Operations ................... 4
    B.     Corporate Structure ........................................................................................... 10
    C.     Prepetition Capital Structure ............................................................................ 10

III.    KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER
    11 CASES ........................................................................................................................ 13

IV.     SUMMARY OF THE PLAN AND RESTRUCTURING SUPPORT AGREEMENT 15

    A.     The Plan ............................................................................................................. 15
    B.     Other Material Terms of the Restructuring Support Agreement ...................... 23
    C.     Acceptance of the Plan ..................................................................................... 24
    D.     Management/Employee Incentive Plans ........................................................... 24

V.      MATERIAL DEVELOPMENTS SINCE THE PETITION DATE ........................ 25

    A.     The Debtors' First-Day Motions and Certain Related Relief .......................... 25
    B.     Bidding Procedures and Sale Process ............................................................... 26
    C.     Claims Process and Bar Date ............................................................................ 27
    D.     Freedom Lender Group's Motion to Terminate Exclusivity ............................ 29
    E.     Committee Settlement ....................................................................................... 29

VI.     SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11
    CASES AND THE PLAN ............................................................................................. 30

    A.     Voting on the Plan ............................................................................................. 30
    B.     The Confirmation Hearing ................................................................................ 31
    C.     Summary of Classification and Treatment Under the Plan .............................. 32
    D.     Summary of Treatment Under the Plan ............................................................ 47

VII.    SECURITIES LAWS MATTERS ................................................................................ 65

    A.     Issuance and Resale of the Reorganized Common Equity and the New
    Warrants Under the Plan ................................................................................... 66

VIII.   ALTERNATIVES TO CONSUMMATION OF THE PLAN .................................. 67

    A.     Liquidation Under the Bankruptcy Code .......................................................... 67
    B.     Alternative Plan of Reorganization .................................................................. 68
    C.     Inaction/Maintenance of Status Quo ................................................................ 68

IX.     RISK FACTORS ............................................................................................................. 69

    A.     Risks Associated with the Debtors' Business ................................................... 69
    B.     Certain Bankruptcy Considerations .................................................................. 74

C.      Risks Relating to Tax and Accounting Consequences of the Plan ........ 78
D.      Other Risks .................................................................................... 79

X.      DESCRIPTION OF SECURITIES TO BE ISSUED IN CONNECTION WITH THE PLAN ..... 80

A.      Reorganized Common Equity ........................................................... 80
B.      New Warrants ................................................................................ 80

XI.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ............ 80

A.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors ..... 82
B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Consenting First Lien Term Loan Claims, ABL Loan Claims, Second Lien Term Loan Claims, Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests ..... 86
C.      Information Reporting and Back-Up Withholding ............................... 98

XII.    IMPLEMENTATION OF THE PLAN ................................................. 99

A.      Plan Distributions and Transactions ................................................. 99
B.      Continued Corporate Existence and Corporate Action ...................... 100
C.      Effectuating Documents and Further Transactions ........................... 102
D.      Cancellation of Certain Existing Agreements .................................. 102
E.      Release of Liens, Claims and Interests ............................................ 102
F.      Directors of the Reorganized Debtors ............................................. 103
G.      Management/Employee Incentive Plans ........................................... 104
H.      General Distribution Mechanics .................................................... 104
I.      Allocation of Plan Distributions Between Principal and Interest ....... 105
J.      Withholding Taxes ....................................................................... 105
K.      Exemption from Certain Transfer Taxes .......................................... 106
L.      Exemption from Securities Laws ..................................................... 106
M.      Setoffs and Recoupments ............................................................... 107
N.      Solicitation of Debtors .................................................................. 107
O.      OpCo Debtor Litigation Trust ........................................................ 107
P.      Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust ................. 111

XIII.   EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND INTERESTS 113

A.      Discharge ..................................................................................... 113
B.      Release of Claims ......................................................................... 114
C.      Objections to Claims and Interests .................................................. 119

XIV.    EXECUTORY CONTRACTS UNDER THE PLAN .......................... 120

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ..... 120
B.      Cure of Defaults for Assumed Executory Contracts or Unexpired Leases .... 122
C.      Ipso Facto and Similar Provisions Ineffective ................................. 123
D.      Insurance Policies ......................................................................... 123
E.      Survival of Certain Indemnification Obligations .............................. 123

F.      Postpetition Contracts and Leases ..................................................................124

XV.   **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ...................................................................................................**124**

A.      Conditions to Confirmation .............................................................................124
B.      Conditions to the Effective Date .....................................................................124
C.      Waiver of Conditions Precedent ......................................................................127
D.      Effect of Failure of Conditions .......................................................................127
E.      Binding Effect ..................................................................................................127
F.      Withdrawal of the Plan ....................................................................................128

XVI.  **CONFIRMATION OF THE PLAN** ........................................................................**128**

A.      Confirmation Generally ...................................................................................128
B.      Voting Procedures and Standards ....................................................................128
C.      Acceptance .......................................................................................................131
D.      Confirmation and Consummation ....................................................................132

XVII.  **ADDITIONAL INFORMATION** .........................................................................**137**

XVIII. **CONCLUSION** ......................................................................................................**138**

## INDEX OF EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Liquidation Analysis

EXHIBIT C    Financial Projections

EXHIBIT D    Restructuring Support Agreement

## I.    INTRODUCTION

### A.    Purpose of this Disclosure Statement

On November 3, 2024, Franchise Group, Inc. ("Franchise Group") and each of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Prior to the commencement of these Chapter 11 Cases, on November 1, 2024, the Debtors and certain beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts, that beneficially hold more than at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the aggregate outstanding principal amount of the Prepetition First Lien Loan Claims (the "Consenting First Lien Lenders") entered into that certain Restructuring Support Agreement (the "Restructuring Support Agreement"), annexed hereto as **Exhibit D**.

**Pursuant to the Restructuring Support Agreement, simultaneously with the filing of the Plan, the Debtors are conducting Store-Closing and Liquidation Sales at American Freight and conducting a marketing and sale process for all of their assets pursuant to section 363 of the Bankruptcy Code.**

The Debtors jointly submit this *Disclosure Statement for the ~~Second~~Third Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances or rejections from Holders of Claims and Interests against the Debtors

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).   The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

with respect to the ~~Second~~*Third* *Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors*, annexed hereto as **Exhibit A** (the "Plan").

All capitalized terms used in this Disclosure Statement that are not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Restructuring Support Agreement, as applicable.

The Debtors urge all parties in interest to read this Disclosure Statement and the Plan carefully. This Disclosure Statement does not include a description of each and every term of the Plan. Accordingly, the description of the Plan set forth herein is qualified by the entirety of the Plan, which is incorporated by reference into this Disclosure Statement.

This Disclosure Statement contains information regarding the history of the Debtors and their businesses, the events leading up to these Chapter 11 Cases, factors supporting approval of the Committee Settlement, and descriptions of the Plan and the Plan Supplement, including the Committee Settlement. It is being provided to Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, General Unsecured Claims, Prepetition HoldCo Loan Claims, Subordinated Claims, and Existing TopCo Equity Interests.

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders and to enhance the ongoing financial viability of the Debtors.

Generally, to the extent the Restructuring Transactions (as defined in the Restructuring Support Agreement) are consummated through the Plan Equitization Transaction:

- Allowed DIP Claims will be converted into a mix of (i) loans under the Take-back Debt Facility on a dollar-for-dollar basis and (ii) Reorganized Common Equity (subject to dilution) at a 25% discount to plan value, which value will be determined during the Chapter 11 Cases;

- Allowed Prepetition First Lien Loan Claims will be equitized into 100% of Reorganized Common Equity (subject to dilution);

- Solely if they vote to accept the Plan, New Warrants convertible into 5% of Reorganized Common Equity will be delivered to the OpCo Debtors Litigation Trust for further distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of Prepetition Second Lien Loan Claims and OpCo Debtor Litigation Trust Units;

- Allowed General Unsecured Claims will receive their *pro rata* share of (i) the distribution from a pool of assets allocable to the respective Debtor against which the Holders of such Allowed General Unsecured Claim hold Claims, and (ii) the OpCo Debtor Litigation Trust Units allocable to the respective Debtor against which the Holders of such Allowed General Unsecured Claim hold Claims.

**PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT, THE CONSENTING FIRST LIEN LENDERS, REPRESENTING OVER TWO-THIRDS (2/3) IN DOLLAR AMOUNT AND MORE THAN ONE-HALF (1/2) IN NUMBER OF PREPETITION FIRST LIEN LOAN CLAIMS HAVE ALREADY AGREED TO CONSENT TO THE PLAN.**

Additional copies of this Disclosure Statement (including its Exhibits) are available upon request made to the office of the Debtors' counsel:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York 10019
> Attention:       Debra M. Sinclair
>                          Matthew A. Feldman
>                          Betsy L. Feldman
>
> E-mail address: dsinclair@willkie.com
>                          mfeldman@willkie.com
>                          bfeldman@willkie.com
>
> and
>
> Young Conaway Stargatt & Taylor, LLP
> Rodney Square
> 1000 North King Street
> Wilmington, Delaware 19801
> Attention:       Edmon L. Morton
>                          Matthew B. Lunn
>                          Allison S. Mielke
>
> E-mail address: emorton@ycst.com
>                          mlunn@ycst.com
>                          amielke@ycst.com

If you have any questions concerning the procedures for voting on the Plan (including the Plan), please contact the Claims Agent at:

> Franchise Group, Inc. Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue
> Suite 412
> Brooklyn, New York 11232
> Telephone:       (844) 285-4564 (U.S./Canada, toll free) or
>                          +1 (646) 937-7751 (international, toll)
>
> Email:             FRGInfo@ra.kroll.com

## II.    GENERAL HISTORICAL INFORMATION ABOUT THE DEBTORS

Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "Orlofsky Declaration").

### A.    General Background, Corporate History, and Business Operations

As described in further detail in the Orlofsky Declaration, the Debtors are a privately held operator and acquirer of franchised and franchisable businesses. The Debtors' business segments include a diverse collection of highly recognized, market-leading, and emerging retail brands, including The Vitamin Shoppe, Pet Supplies Plus ("PSP"), American Freight, and Buddy's Home Furnishings ("Buddy's"). The Debtors operate both franchise and corporate-owned programs with respect to each of their business segments. Across all brands, the Debtors have approximately 2,200 total retail store locations (including both corporate-owned and franchised locations), approximately 11,900 total employees, and operations spanning across the United States.

#### i.    The Debtors' Business Segments

- **The Vitamin Shoppe**. Founded in 1977, The Vitamin Shoppe is an omnichannel specialty retailer and wellness lifestyle company with the mission of providing customers with the most trusted products, guidance and services to help them become their best selves, however they define it. The Vitamin Shoppe offers a comprehensive assortment of nutritional solutions, including vitamins, minerals, specialty supplements, herbs, sports nutrition, homeopathic remedies, green living products, and natural beauty aids through proprietary brands and approximately 700 national brands. The company's broad product offering enables it to provide its loyal customer base with a depth of selection of products that may not be readily available at other specialty retailers or mass merchants, such as discount stores, supermarkets, drug stores and wholesale clubs. Approximately 85% of The Vitamin Shoppe's customers are members of its customer loyalty program. The Vitamin Shoppe's commitment to good health for *all* is reflected in its dedicated teams that serve numerous communities. The Vitamin Shoppe operates approximately 680 company-operated retail store locations and 20 franchised locations across the United States and Canada. The Vitamin Shoppe also sells its products directly to its customers through its online store, at vitaminshoppe.com. The Vitamin Shoppe maintains its headquarters in Secaucus, New Jersey and has over 4,000 employees.

- **Pet Supplies Plus**. PSP was founded in 1988 and is a leading omnichannel retail chain and franchisor of pet supplies and services. PSP offers a curated selection of premium brands and proprietary private label and specialty products with retail price parity with online competitors. Additionally, PSP offers grooming, pet wash, and other services in most of its locations. The company's wholly owned subsidiary, Wag N' Wash, is a grooming, pet-wash and natural pet food franchise

primarily focused on dogs. Wag N' Wash is operated by the PSP management team. PSP is headquartered in Livonia, Michigan and has over 4,000 employees. The company has approximately 240 company-operated retail locations, in addition to approximately 550 franchised locations, across the country (inclusive of Wag N' Wash locations). PSP also sells its products directly to its customers through its online store, at petsuppliesplus.com, and offers same-day home product delivery from its stores.

- **American Freight**. Founded in 1994, American Freight is a retail chain that offers in-store and online access to furniture, mattresses, new and out-of-box home appliances and home accessories at discount prices. American Freight buys direct from manufacturers and sells direct in warehouse-style stores. By cutting out the middleman and keeping overhead costs low, American Freight is able to offer quality products at low prices. American Freight provides its customers with multiple payment options, including third-party financing, which provides its customers with access to high-quality products and brand name appliances that may otherwise remain aspirational. American Freight also serves as a liquidation channel for major appliance vendors. American Freight operates specialty distribution centers that test out-of-box appliances before they are offered for sale. Customers are typically covered by the original manufacturer's warranty and are offered the opportunity to purchase a full suite of extended-service plans and services. In February 2020, Sears Hometown Outlet, one of the nation's leading retailers of appliance and appliance-related products, combined with American Freight, making American Freight a leading national value retailer and one-stop-shop for furniture, mattresses and appliances. American Freight has its headquarters in Delaware, Ohio and operates 357 locations across the country, consisting of 344 company-owned locations and 13 franchise-operated locations. The company has approximately 3,000 total employees.

- **Buddy's Home Furnishings**. Buddy's was founded in 1961 and is a specialty retailer of high quality, name brand consumer electronic, residential furniture, appliances, and household accessories through rent-to-own agreements. The rental transaction allows the company's customers the opportunity to benefit from the use of high-quality products under flexible rental purchase agreements without long-term obligations. Buddy's currently operates 34 company-operated stores and has over 300 franchised locations. Buddy's is headquartered in Orlando, Florida and has approximately 230 employees.

ii.     The Take-Private Transaction

In March 2023, the Board of Directors of Franchise Group received a non-binding, unsolicited proposal from B. Riley Financial, Inc. ("BRF") (an affiliate of B. Riley Principal Investments, LLC ("BRPI")) to acquire all of the outstanding shares of Franchise Group's common stock for a price of $30.00 per share, subject to the participation of certain members of Franchise Group's management team in the transaction, including Mr. Kahn. Between the time of BRF's initial proposal and early May 2023, BRF determined that it was interested in providing financing to facilitate a transaction, but would need to do so in a manner

5

that would not result in BRF controlling or consolidating Franchise Group. Ultimately, a transaction proposal materialized whereby Mr. Kahn and his affiliates would take private control of Franchise Group, with the transaction being financed, in part, with equity financing provided by various investors, including BRF and certain affiliated entities, and debt financing provided by several lenders, including Irradiant Partners. During this period, an independent committee of Franchise Group's Board of Directors, and the independent committee's advisors, conducted a review of Mr. Kahn's take-private proposal and other strategic alternatives that were available to Franchise Group, including the potential sale of The Vitamin Shoppe, with a focus on obtaining the best outcome for Franchise Group's public shareholders. The independent committee ultimately determined that Mr. Kahn's proposal was in the best interests of Franchise Group and its public shareholders, as it would deliver immediate and certain value for public shareholders at a significant premium to Franchise Group's unaffected share price.

In August 2023, Franchise Group completed the take-private transaction (the "Take-Private Transaction") pursuant to that certain *Agreement and Plan of Merger*, dated as of May 10, 2023 (the "Merger Agreement"), by and among Franchise Group, Freedom VCM, Inc., and Freedom VCM Subco, Inc. Freedom VCM Holdings, LLC ("TopCo") and its subsidiaries that sit above Franchise Group (the "Freedom Entities") were created in connection with the Take-Private Transaction. Specifically, TopCo was established as Franchise Group's new holding company, through which the Take-Private Transaction investors acquired private ownership of Franchise Group. Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. were created to borrow and guarantee the HoldCo Term Loan Facility, which provided the debt financing for the transaction; and Debtors Freedom VCM Receivables, Inc. and Freedom Receivables II, LLC were also established in connection with the transaction (as further described herein).

Franchise Group's common shareholders, other than Mr. Kahn and certain other shareholders of Franchise Group that agreed to "roll-over" their Franchise Group equity into equity in TopCo, received $30.00 in cash for each share of Franchise Group's common shares that they held. This represented a premium of 31.9% to Franchise Group's unaffected closing common stock price on March 17, 2023, the last trading day before Franchise Group announced the receipt of the unsolicited proposal. Moreover, Franchise Group's preferred stock was redeemed in cash for a redemption price equal to $25.00 per share, plus any accrued and unpaid dividends thereon. As a result of the Take-Private Transaction, Franchise Group's common stock and preferred stock ceased trading and were delisted from the Nasdaq Global Select Market.

The Take-Private Transaction was predicated on continuing the strategy of Franchise Group, which included the potential for rapid deleveraging of the Debtors through monetization transactions involving the various business segments of Franchise Group. However, this strategy did not materialize due to, among other things, the business headwinds described herein and the allegations made against Mr. Kahn regarding his alleged business association with Prophecy Asset Management LP ("Prophecy"). For example, the allegations against Mr. Kahn complicated and delayed the pursuit of a potential securitization financing of PSP, as the investment banker conducting that process had to undertake additional due diligence regarding the transaction in light of the allegations, including reviews by its internal risk committees. These delays, coupled with the macroeconomic issues impacting the Debtors and the need to undertake the restructuring transactions described herein, ultimately required Franchise Group to

6

defer further pursuit of the potential securitization financing until its overall capital structure issues were adequately addressed.

        iii.    The Receivables Transaction

In September of 2022, an affiliate of BRPI, B. Riley Receivables II, LLC ("BRRII"), acquired certain accounts receivable (the "Tranche 1 Receivables") from W.S. Badcock Corporation ("Badcock"). To finance its purchase of the Tranche 1 Receivables, BRRII entered into that certain Credit Agreement, dated as of September 23, 2022, by and among Freedom II, PLC Agent LLC (the "PLC Agent"), and the lender thereunder (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Pathlight Credit Facility"). This transaction provided valuable liquidity to Badcock, particularly given that Badcock was experiencing difficulty in implementing third-party financing solutions for its receivables portfolio.

As part of the Take-Private Transaction, Freedom VCM Receivables, Inc., an indirect subsidiary of TopCo, acquired BRRII, which has since been renamed Freedom Receivables II, LLC ("Freedom II"), for consideration consisting of a promissory note (the "Promissory Note") in favor of BRPI (and the Klotz Family Trust, a minority owner of BRRII) (the "Receivables Acquisition"), which had recourse solely against the receivables assets. Freedom II then acquired additional accounts receivable from Badcock in August 2023 (the "Tranche 2 Receivables") with the incremental debt provided under the Pathlight Credit Facility and pledged the Tranche 2 Receivables to the PLC Agent to secure the obligations under the facility. The acquisition was structured in this manner because Pathlight Capital LP was willing to provide incremental debt to Freedom II to finance the purchase of additional accounts receivable, but could not do so absent the Receivables Acquisition due to fund-level restrictions.

Freedom II sold the Tranche 2 Receivables to Conn's, Inc. ("Conn's") as part of the sale of Badcock to Conn's in December 2023. However, due to certain restrictions within the Pathlight Credit Facility, the Debtors could not deliver the Tranche 2 Receivables to Conn's at closing. In addition, BRPI, the Klotz Family Trust, Freedom II, Freedom VCM Interco Holdings, Inc., and Freedom VCM Receivables, Inc. entered into that certain Amended & Restated Funding Agreement, dated as of December 18, 2023 (the "Funding Agreement"), which governed the repayment of the Pathlight Credit Facility and the Promissory Note. Following the payment of the Pathlight Credit Facility debt, Freedom II was obligated to deliver the Tranche 1 Receivables to an affiliate of BRPI (with any remaining amounts due on the Promissory Note canceled) up to the amount of approximately $15.3 million (the "Deferred Accrual"), and deliver the Tranche 2 Receivables to Conn's.

The Pathlight Credit Facility was repaid in June 2024. In early October 2024, the full amount of the Deferred Accrual was paid and the Promissory Note was canceled in accordance with the terms of the Funding Agreement. Freedom VCM Receivables, Inc. has no economic interest in any of the Tranche 1 Receivables or Tranche 2 Receivables. As of the Petition Date, Freedom II currently does not hold any Tranche 1 Receivables that it was contractually obligated to deliver an affiliate of BRPI, but it does hold certain Tranche 2 Receivables that it is contractually obligated to deliver to Conn's.

iv.    Removal of Mr. Kahn and Independent Investigation

Shortly after the Take-Private Transaction, in January 2024, Mr. Kahn stepped down from his roles as Franchise Group's Chief Executive Officer and a member of the Boards of Directors of Franchise Group and TopCo. Mr. Kahn also relinquished his board member rights, which he held in his capacity as an equity holder of TopCo. These events unfolded in light of the SEC and DOJ's pending investigations into Mr. Kahn's alleged involvement in the collapse of Prophecy. Specifically, in November 2023, Mr. Kahn was identified by federal prosecutors as an unindicted co-conspirator in a securities fraud Indictment (as defined in the Orlofsky Declaration) against Mr. Hughes, the former president and chief compliance officer of Prophecy, for, as set forth in the Indictment, his involvement in a multi-year fraud that concealed losses of hundreds of millions of dollars from Prophecy's investors. Mr. Hughes was also charged civilly by the SEC for his involvement in the fraud pursuant to the Complaint (as defined in the Orlofsky Declaration). Franchise Group learned that Mr. Kahn was one of two unindicted co-conspirators referred to in both the Complaint and the Indictment. Mr. Hughes eventually pled guilty to the allegations against him.

Promptly following the Indictment and Complaint, Franchise Group engaged Petrillo Klein + Boxer ("Petrillo") to conduct the Independent Investigation into whether Franchise Group or any of its executive officers or employees at the time, were involved in, or had any knowledge of, any of Mr. Kahn's alleged misconduct. The Independent Investigation was fulsome, and included, among other things, Petrillo's review of approximately 18,000 documents, as well as interviews of numerous individuals, including members of Franchise Group's executive team and Board of Directors.

The Independent Investigation concluded in December 2023, and Petrillo ultimately found that neither Franchise Group, nor any of its executive officers, current or former directors and officers, or employees (other than Mr. Kahn) had any involvement in, nor any knowledge of, Mr. Kahn's alleged misconduct. Petrillo also concluded that no business relationship ever existed between Franchise Group and Prophecy. Finally, Petrillo found that Mr. Kahn's alleged misconduct occurred outside the scope of his roles as Franchise Group's Chief Executive Officer and a member of its Board of Directors, and that Mr. Kahn's alleged misconduct should not be imputed to Franchise Group. Petrillo's findings in the Independent Investigation were also consistent with the Indictment and Complaint, which did not allege any wrongdoing on the part of Franchise Group or any of its executive officers or employees, other than Mr. Kahn.

v.    The Badcock and Sylvan Learning Transactions

Following the Take-Private Transaction, Franchise Group undertook efforts to improve its liquidity profile and reduce the liquidity issues associated with certain of its capital-intensive businesses through strategic mergers and acquisitions transactions. In December 2023, Franchise Group completed the combination of its then-owned subsidiary Badcock with Conn's and in February 2024, Franchise Group sold its Sylvan Learning business for significant cash proceeds.

Although the Badcock combination and Sylvan Learning sale had a positive impact on Franchise Group's liquidity profile, Franchise Group's other operating businesses continued to encounter headwinds driven by the macro-economic and other factors, which made it increasingly difficult for Franchise Group to sufficiently deleverage its balance sheet and reduce the related liquidity and cash flow burdens associated with its high debt levels.

vi.    The Additional Independent Investigations

In October 2024, in anticipation of the commencement of these Chapter 11 Cases, the Debtors engaged Petrillo to conduct another independent investigation (the "Independent Investigation") into, among other things, potential claims and causes of actions that the Debtors' estates may have against Mr. Kahn, any of their other current or former directors and officers, or any other third-parties arising from, or related to, among other things: (i) Franchise Group's sale of Badcock to Conn's in December 2023; (ii) the Take-Private Transaction; (iii) the FRII acquisition and any other transactions involving BRPI and its affiliates; and (iv) the Debtors' historical transactions and relationship with Mr. Kahn.

The Independent Investigation will also evaluate the appropriateness of any releases by the Debtors' estates of their current directors and officers through these Chapter 11 Cases and under their proposed chapter 11 plan.

In December 2024, in response to assertions by certain stakeholders that the interests of Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. (the "Freedom HoldCo Debtors") were not being independently represented by the Freedom HoldCo Debtors' existing boards of directors, the boards of directors of each of the Freedom HoldCo Debtors appointed Michael Wartell as independent director to the boards of directors at each Freedom HoldCo Debtor. Mr. Wartell is authorized to engage separate advisors and to investigate all matters relating to any claims, rights, and Causes of Action that may be held by or against the Freedom HoldCo Debtors (such investigation, the "Freedom HoldCo Independent Investigation" and such matters, along with all other matters that may become subject to the Freedom HoldCo Independent Investigation, the "Freedom HoldCo Independent Investigation Related Matters"). Mr. Wartell is also empowered and authorized by each of the Freedom HoldCo Debtors to (a) grant or enter into any agreement that provides for the release(s) of (i) Intercompany Claims the Freedom HoldCo Debtors may have against Franchise Group and/or any of its subsidiaries that are identified in the Freedom HoldCo Independent Investigation or (ii) Claims that the Freedom HoldCo Debtors may have against the Freedom HoldCo Debtors' or their subsidiaries' directors and/or officers that are identified in the Freedom HoldCo Independent Investigation; (b) preserve the Claims that are identified in the Freedom HoldCo Independent Investigation for the benefit of the Freedom HoldCo Debtors and their stakeholders; and (c) settle or enter into any agreement that provides for the settlement(s) of the Claims that are identified in the Freedom HoldCo Independent Investigation for the benefit of the Freedom HoldCo Debtors and their stakeholders.

**For the avoidance of doubt, neither the Freedom HoldCo Debtor Litigation Trust Claims nor the OpCo Litigation Claims are ~~not~~ released under or pursuant to the Plan. Furthermore, the Freedom HoldCo Independent Investigation may identify Claims and Causes of Action that are not otherwise settled or released under or pursuant to the Plan. Subject to the Committee Settlement and any other global settlements that the Debtors and their creditors may reach, any such Claims or Causes of Action will not be released pursuant to Section 12.2 of the Plan and will be retained by the applicable Debtor. Such Claims and Causes of Action may be pursued by ~~any trustee for~~ the Freedom HoldCo Debtor ~~Liquidation Trust in the case of potential Claims or Causes of Action identified by the Freedom HoldCo Independent Investigation~~ Litigation Trustee.**

## B.    Corporate Structure

Each of the Debtors is privately held. Prior to the Take-Private Transaction, Franchise Group was a publicly traded company whose common shares traded on the Nasdaq Global Select

Market under the ticker FRG.  TopCo is the Debtors' ultimate parent company.  In connection with the Take-Private Transaction, Mr. Kahn "rolled over" his entire stake in Franchise Group, resulting in him and his affiliates owning approximately 32.4% of the outstanding equity of TopCo.  BRPI and its affiliates provided equity financing in connection with the Take-Private Transaction, and own approximately 58.9% of the outstanding equity of TopCo.  TopCo wholly owns Freedom VCM Interco Holdings, Inc., which, in turn wholly owns, directly and indirectly, each of the other subsidiaries in the Debtors' corporate structure.  As further described herein, the Freedom Entities are not obligors, and sit outside of the "credit circle," with respect to the Debtors' senior funded debt facilities—the ABL Facility (as defined herein), First Lien Term Loan Facility (as defined herein), and Second Lien Term Loan Facility (as defined herein).

### C.    Prepetition Capital Structure

As of the Petition Date, the Debtors have approximately $1.985 billion in prepetition debt, consisting of (a) approximately $248.7 million in aggregate principal amount outstanding under their senior secured asset-based revolving credit facility (the "ABL Facility"); (b) approximately $1.13 billion in aggregate principal amount outstanding under their first lien secured term loan credit facility (the "First Lien Term Loan Facility"); (c) approximately $125 million in aggregate principal amount outstanding under their second lien secured term loan credit facility (the "Second Lien Term Loan Facility"); (d) approximately $514.7 million in aggregate principal amount outstanding under their junior term loan credit facility (the "HoldCo Term Loan Facility"); and $0 in aggregate principal amount outstanding under their sidecar *pari passu* second lien secured term loan credit facility (the "Pari Passu Second Lien Term Loan Facility").

The Debtors' capital structure as of the Petition Date is generally described below:

### i.    ABL Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, each as a borrower, the guarantors party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the ABL Lenders, are parties the ABL Credit Agreement.  The ABL Credit Agreement provides for a senior secured revolving credit facility, maturing March 2026, in an amount up to $400 million (subject to borrowing base availability).  Debtor Franchise Group and each of its direct and indirect subsidiaries guarantee the ABL Facility.

Subject to the terms of the Existing ABL Intercreditor Agreement, the Debtors' obligations under the ABL Credit Agreement are secured by: (a) a first priority lien on all ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement); and (b) a third priority lien on all Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement).  As of the Petition Date, approximately $248.7 million on account of principal amounts was outstanding under the ABL Facility, in addition to approximately $12.9 million in face amount of letters of credit outstanding.

### ii.    First Lien Term Loan Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the borrowers, the guarantors party thereto, and Wilmington Trust, National Association, as successor administrative agent, and the First Lien Lenders, are parties to the First Lien Credit Agreement.

The First Lien Credit Agreement provides for a senior secured term loan credit facility, which was issued in an original aggregate principal amount of $1 billion, and, in February 2023, was subsequently upsized through an incremental amendment providing for an additional $300 million of aggregate principal amount. The First Lien Term Loan Facility matures in March 2026. Debtor Franchise Group and each of its direct and indirect subsidiaries guarantee the First Lien Term Loan Facility.

Subject to the terms of the Existing ABL Intercreditor Agreement and the Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, among Franchise Group, Inc., the other grantors referred to therein, the First Lien Credit Agreement Agent, as collateral agent, and the Second Lien Credit Agreement Agent (the "Existing First Lien/Second Lien Intercreditor Agreement"), the First Lien Term Loan Facility is secured by (x) a first priority lien on all Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement); and (y) a second priority lien on all ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement). As of the Petition Date, approximately $1.13 billion on account of principal amounts was outstanding under the First Lien Term Loan Facility.

### iii.    Second Lien Term Loan Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the borrowers, the guarantors party thereto, and Alter Domus (US) LLC, as administrative agent, and Second Lien Lenders are parties to the Second Lien Credit Agreement.

The Second Lien Credit Agreement provides for a junior secured term loan credit facility, which was issued in the original aggregate principal amount of $300 million. The Second Lien Term Loan Facility matures in September 2026. Franchise Group and each of its direct and indirect subsidiaries guarantee the Second Lien Term Loan Facility.

Subject to the terms of the Existing ABL Intercreditor Agreement and the Existing First Lien/Second Lien Intercreditor Agreement, the Second Lien Term Loan Facility is secured by a (x) second priority lien on all Term Loan Priority Collateral; and (y) a third priority lien on all ABL Priority Collateral. As of the Petition Date, approximately $125 million on account of principal amounts was outstanding under the Second Lien Term Loan Facility.

### iv.    Pari Passu Second Lien Term Loan Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the borrowers, the guarantors party thereto, and Alter Domus (US) LLC, as administrative agent, and the lenders party thereto from time to time, are parties to that certain *Sidecar Pari Passu Second Lien Credit Agreement*, dated as of August 21, 2023 (as amended, amended and restated, supplemented, or otherwise modified,

refinanced, or replaced from time to time prior to the Petition Date, the "Pari Passu Second Lien Term Loan Credit Agreement").

The Pari Passu Second Lien Term Loan Credit Agreement provides for the Pari Passu Second Lien Term Loan Credit Agreement facility. Debtor Franchise Group and each of its direct and indirect subsidiaries guarantee the Pari Passu Second Lien Term Loan Credit Agreement facility. Subject to the terms of the Pari Passu Second Lien Intercreditor Agreement (as defined in the Orlofsky Declaration), the Pari Passu Second Lien Term Loan Credit Agreement facility is secured by the same assets that secure the Second Lien Term Loan Facility and is *pari passu* with the Second Lien Credit Agreement facility with respect to lien priority. As of the Petition Date, there is no principal amount outstanding under the Pari Passu Second Lien Term Loan Facility.

> v.    HoldCo Term Loan Facility

Freedom VCM, Inc., as the borrower, Freedom VCM Interco, Inc., as Holdings, the guarantors from time to time party thereto, and Alter Domus (US) LLC, as administrative agent, and the HoldCo Lenders, are parties to the HoldCo Credit Agreement.

The HoldCo Credit Agreement provides for the HoldCo Credit Agreement facility. The HoldCo Credit Agreement facility matures in March 2026 and is secured by substantially all of the assets of Freedom VCM Interco, Inc. and Freedom VCM, Inc. Pursuant to that certain Supplement No. 1, dated as of August 19, 2024, certain of the Debtors obligated under the ABL Credit Agreement, the First Lien Term Loan Credit Agreement, or the Second Lien Term Loan Credit Agreement provided a guarantee of the obligations under the HoldCo Credit Agreement in an amount not to exceed $19.51 million, and pursuant to that certain Fifth Amendment to the Second Lien Term Loan Credit Agreement, dated as of August 19, 2024, certain of the Debtors agreed to treat the "Secured Holdco Guarantee Obligations" as "Secured Obligations" (each as defined in the Second Lien Term Loan Credit Agreement).

As of the Petition Date, approximately $514.7 million on account of principal amounts, including any interest that has been capitalized and added to principal, was outstanding under the HoldCo Credit Agreement facility. In connection with the Take-Private Transaction, approximately $175 million in principal amount outstanding under the Second Lien Credit Agreement facility was purchased using proceeds of the HoldCo Credit Agreement facility and subsequently canceled. None of the Debtors obligated under the ABL Credit Agreement, the First Lien Credit Agreement, or the Second Lien Credit Agreement are obligated under the HoldCo Credit Agreement.

> vi.    Unsecured Claims

The Debtors also have outstanding unsecured claims as of the Petition Date, including both liquidated and unliquidated and contingent claims. These claims include obligations payable by each of the Debtors' business segments to vendors, shippers, utility providers, landlords, and other parties in the ordinary course of business. As of the Petition Date, the Debtors estimate that approximately $106 million remained outstanding on account of liquidated unsecured claims.

### III.  KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

#### A.    Liquidity Constraints

Prior to the Petition Date, the Debtors faced several challenges that stressed their capital structure and liquidity profile.  Although the Debtors own and operate a strong collection of assets which generate meaningful cash flow, several factors, among others, impacted the Debtors' ability to meet their near- and long-term liquidity needs, working capital requirements, and debt obligations.

- **Macroeconomic Headwinds in the Retail Industry**.  In recent years, macroeconomic headwinds in the retail industry have negatively impacted the financial performance of the Debtors' various business segments.  Higher interest rates and inflation have slowed new store openings and franchise sales, and consumer discretionary spending has decreased, especially with respect to lower-income consumers, who comprise the core customer bases of American Freight and Buddy's.  With respect to American Freight and Buddy's, although the COVID-19 pandemic saw a dramatic spike and "pull-forward" in consumer expenditures with respect to home remodeling and furnishing, a steady increase of inflationary pressures and interest rates following the pandemic had a substantial impact on consumer discretionary spending—resulting in consumers moving away from financing for discretionary home appliances and accessories.  Large declines in retail foot traffic have also negatively and disproportionally affected furniture and big-ticket retailers.

- **Overleverage and Rising Interest Expenses**.  Over the past several years, the Debtors have relied upon cash flows generated by their ongoing activities and the issuance of debt to fund their operations and strategic initiatives.  As discussed herein, the Debtors have approximately $1.985 billion in funded debt obligations outstanding as of the Petition Date. The interest owed on these obligations fluctuates based on certain base rates (i.e., SOFR).  As interest rates have increased, so too have the expenses associated with the Debtors' outstanding indebtedness.  The ongoing increase in interest rates and the Debtors' increased leverage profile undertaken in connection with the Take-Private Transaction, combined with the macroeconomic headwinds impacting their businesses, has detrimentally impacted the Debtors' cash flow and related ability to service their debt obligations.

- **Material Contingent Obligations**.  Following Franchise Group's acquisition of Badcock in November 2021, Badcock effectuated several sale and leaseback transactions of properties associated with headquarters, retail stores, offices, and distribution centers, which generated approximately $260 million in proceeds.  In connection with these transactions, Badcock entered into long-term lease arrangements to utilize the real estate that was the subject of these transactions.  Franchise Group executed lease guaranty agreements (the "Lease Guaranty Agreements") with respect to certain of Badcock's lease agreements (the "Badcock Lease Agreements"), covering certain of Badcock's retail store locations,

distribution centers, and its headquarters that were the subject of the sale and leaseback transactions.  As described above, in December 2023, Franchise Group combined Badcock with Conn's, which resulted in Badcock becoming a wholly owned subsidiary of Conn's.  Conn's did not meet the requirements under the Badcock Lease Agreements to allow for the substitution and release of the Franchise Group guarantee of Badcock's obligations as tenant thereunder.  As a result, Franchise Group remained as the guarantor in respect of the Badcock Lease Agreements following the completion of the combination of Badcock and Conn's.  In July 2024, Conn's and its subsidiaries, including Badcock, filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.  Conn's chapter 11 cases are currently pending.  The rejection of one or more of the Badcock Lease Agreements in Conn's chapter 11 cases could potentially result in the landlords under such agreements asserting claims against Franchise Group pursuant to the Lease Guaranty Agreements.

**B.       Prepetition Marketing Process & Out-of-Court Restructuring Efforts**

In light of these challenges, in the year leading up to the Petition Date, the Debtors and their advisors pursued and evaluated several strategic initiatives intended to preserve the Debtors' value and liquidity.  These included a potential securitization financing of the Debtors' PSP business, potential monetization of The Vitamin Shoppe and Buddy's businesses, and the marketing of American Freight on a going concern basis.  Indeed, the Debtors retained a leading international investment bank in April 2023 and undertook a broad outreach for the potential sale of The Vitamin Shoppe.  The sale of The Vitamin Shoppe was considered as an alternative to the Take-Private Transaction and was evaluated by the independent committee of Franchise Group's Board of Directors, which ultimately determined that the Take-Private Transaction was in the best interests of Franchise Group and its public shareholders.  Following the Take-Private Transaction, the Debtors continued to broadly market The Vitamin Shoppe with the same leading international investment bank for a potential going-concern sale of the business.

Similarly, in September 2023, the Debtors engaged a leading international investment bank to pursue a whole business securitization of the PSP business, and the Debtors have been actively soliciting interest in the sale of Buddy's for the past several months.  Finally, and as further described in the Debtors' motion to approve bidding procedures and declarations in support thereof, prior to the Petition Date, the Debtors and their advisors ran a robust marketing process to sell American Freight.  The Debtors' objective was to raise proceeds that could be applied to reduce the Debtors' funded debt obligations and provide an immediate, near-term deleveraging of their balance sheet.  Despite their efforts, and in light of some of the issues facing the Debtors as summarized herein, the Debtors were unable to complete any of these transactions.

In addition to exploring potential transactions to monetize their business segments, in the months leading up to the Petition Date, the Debtors attempted to restructure outside of chapter 11 and engaged in extensive negotiations with their key lender constituents to evaluate a consensual out-of-court transaction that was predicated on the Debtors' reorganization around their profitable business lines.  Notwithstanding these efforts, in the weeks leading up to the Petition Date, it became clear that achieving a consensual out-of-court transaction on the timeline required by the Debtors' liquidity constraints was not feasible.  Following this conclusion, the Debtors and the Ad Hoc Group of First Lien Lenders quickly pivoted to negotiating the terms of

a restructuring that could be implemented through a chapter 11 process, with the support of the Consenting First Lien Lenders. To that end, shortly before the Petition Date, the Debtors entered into the Restructuring Support Agreement with the Consenting First Lien Lenders and negotiated the DIP Facility, which is fully backstopped by certain members of the Ad Hoc Group of First Lien Lenders.

Given continuing liquidity constraints, on October 15, 2024, First Lien Term Lenders constituting "Required Lenders" under the First Lien Term Loan Facility entered into an amendment to the First Lien Term Loan Facility under which, among other things, the First Lien Term Lenders agreed to extend the grace period by which any default for failure to pay interest under the First Lien Term Loan Facility would mature into an "Event of Default" until November 3, 2024. The October 15, 2024, amendment gave the Debtors much-needed runway to prepare for a structured and orderly bankruptcy filing.

Notwithstanding the First Lien Term Lenders' agreement to defer their interest payment, around the same time, the ABL Lenders informed the Debtors of their intent to increase certain reserves under the ABL Facility. Following extensive negotiations with the ABL Lenders, on October 24, 2024, the Debtors entered into an amendment to the ABL Facility which provided for, among other things, an $18 million prepayment of the outstanding Revolving Loans and Swingline Loans under the ABL Facility. In exchange, the ABL Lenders agreed to waive any events of default under the ABL Facility to November 3, 2024.

## IV.    SUMMARY OF THE PLAN AND RESTRUCTURING SUPPORT AGREEMENT

### A.    The Plan

The Debtors will be soliciting acceptances, subject to the conditions set forth in this Disclosure Statement, from all voting Classes under the Plan consistent with sections 1125 and 1126 of the Bankruptcy Code, Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law (the "Solicitation"). Pursuant to the Plan, among other things, Holders of Claims and Interests against the Debtors shall receive the following treatment as of the Effective Date:

- In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, (i) if the Plan Equitization Transaction is consummated and there is no Partial Sale Transaction, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into Take-Back Term Loans, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into Take-Back Term Loans, ratably, on a dollar-for-dollar basis in an amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Effective Date after giving effect to the Restructuring Transactions (the "Pro Forma Leverage Cap"), and (z) third, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in this Disclosure Statement and/or Plan Supplement, or (ii) if a Plan Equitization Transaction is consummated and there is a Partial Sale Transaction, (x) first, all Allowed DIP

Claims allocable to the applicable Partial Sale Transaction Debtors shall be indefeasibly paid in full in Cash from the applicable net Sale Proceeds, and (y) second, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clause (y) hereof shall be treated in accordance with the foregoing clause (i) hereof, <u>provided</u>, <u>however</u>, that at the election of the Required Consenting First Lien Lenders and DIP Lenders, which election shall be made in good faith and in consultation with the Debtors, the Pro Forma Leverage Cap shall be reduced to account for any assets sold as part of the Partial Sale Transaction that will no longer vest in the Reorganized Debtors, with the method of calculation of any such reduction to be reasonably agreed to by the Required Consenting First Lien Lenders and the Debtors, and (iii) if a Sale Transaction is consummated, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from net Sale Proceeds.  Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

Notwithstanding anything to the contrary contained herein, in the event of a Plan Equitization Transaction (whether or not a Partial Sale Transaction has occurred), ~~to the extent the Freedom HoldCo Debtor Liquidation Trust is established,~~ at the election of the Required Consenting First Lien Lenders and DIP Lenders, all DIP Claims against the Freedom HoldCo Debtors, shall, in lieu of the treatment set forth in the previous paragraph, convert *mutatis mutandis* into claims against the Freedom HoldCo Debtor ~~Liquidation~~<u>Litigation</u> Trust in the same amount, with the same priority and security interest in, and otherwise having the same economic terms as the DIP Claims currently outstanding against the Freedom HoldCo Debtors (the "<u>Freedom HoldCo DIP Election</u>").  For the avoidance of doubt, to the extent the Freedom HoldCo DIP Election is made, the DIP Claims that are converted in accordance with the immediately preceding sentence shall not convert into Take-Back Term Loans or Reorganized Common Equity and any remaining DIP Claims shall be converted in accordance with the immediately preceding paragraph.

- Holders of Allowed Prepetition ABL Loan Claims will receive its *pro rata* share of: (i) to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) proceeds of (x) the Exit ABL Facility, or (y) the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.

- Holders of Allowed Prepetition First Lien Loan Claims will receive its *pro rata* share of: (i) to the extent the Restructuring Transactions are consummated through

the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), and (C) to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claims), the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim against each applicable Debtor, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.

- Holders of Allowed Prepetition Second Lien Loan Claims shall receive: (i) to the extent the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to <u>accept</u> the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably with OpCo General Unsecured Claims, or (2) if the Class votes to <u>reject</u> the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution. If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.

- Holders of Allowed General Unsecured Claims against Franchise Group, Inc. shall receive: whether the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to Franchise Group, Inc. in~~

17

- ~~connection with any Sale Transaction or Partial Sale Transaction, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to Franchise Group, Inc.

- Holders of Allowed General Unsecured Claims against the American Freight Debtors shall receive ~~the recovery such claimant would be entitled to receive under chapter 7 or section 1129(a)(7) of the Bankruptcy Code (*i.e.*,~~ its pro rata share ~~of~~ ~~any residual~~<u>the OpCo Debtor Litigation Trust Units allocable to the</u> American Freight ~~Liquidation Proceeds)~~<u>Debtors</u>.

- Holders of Allowed General Unsecured Claims against the Buddy's Debtors shall receive: whether the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the Buddy's Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the Buddy's Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the Buddy's Debtors.

- Holders of Allowed General Unsecured Claims against the PSP Debtors shall receive: whether the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the PSP Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the PSP Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the PSP Debtors.

- Holders of Allowed General Unsecured Claims against the Vitamin Shoppe Debtors shall receive: whether the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the Vitamin Shoppe Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the Vitamin Shoppe Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the Vitamin Shoppe Debtors.

- Holders of Allowed Prepetition HoldCo Loan Claims shall receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) ~~solely to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors~~

~~have Claims and Causes of Action that are not otherwise settled, discharged or released under or pursuant to the Plan, any recovery~~<ins>proceeds</ins> from the Freedom HoldCo Debtor ~~Liquidation~~<ins>Litigation</ins> Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election. If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~<ins>Litigation</ins> Trust ~~(to the extent even applicable)~~, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

- Except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its claim, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to the Freedom HoldCo Debtors resulting from any Partial Sale Transaction, if any, and (B) ~~to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or pursuant to the Plan,~~ its *pro rata* share of ~~any recovery~~<ins>proceeds</ins> from the Freedom HoldCo Debtor ~~Liquidation~~<ins>Litigation</ins> Trust. If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~<ins>Litigation</ins> Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any and (B) ~~to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or pursuant to the Plan,~~ its *pro rata* share of ~~any recovery~~<ins>proceeds</ins> from the Freedom HoldCo Debtor ~~Liquidation~~<ins>Litigation</ins> Trust. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~<ins>Litigation</ins> Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.

- Except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its claim, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to Freedom VCM Interco Holdings, Inc.,

Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc. resulting from any Partial Sale Transaction, if any. If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim.

- Except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its claim, each Holder of an Allowed TopCo General Unsecured Claim shall receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.3(c) of the Plan, and (B) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to TopCo resulting from any Partial Sale Transaction, if any. If (x) there is no Cash held at TopCo following the allocation described in Section 3.3(c) of the Plan, and (y) the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.

- On the Effective Date, each Holder of an Allowed Intercompany Claim shall receive: (i) in the event of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), on or after the Effective Date: (A) any and all Intercompany Claims between, among and/or against, Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; and (B) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date, or (y) reinstated and otherwise

20

survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; provided, however, that notwithstanding the foregoing, any Intercompany Claims, held by or against or among any of the Freedom HoldCo Debtors shall receive the recovery that such Intercompany Claim would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if such Intercompany Claim is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date. To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; or (ii) in the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (A) extinguished, canceled and/or discharged on the Effective Date or (B) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired. To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

- Except to the extent that a Holder of a Subordinated Claim agrees to less favorable treatment, each Holder of a Subordinated Claim shall receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any). If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any. If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.

- Except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (A) its *pro rata* share of Cash (if any) held by TopCo following all distributions required under the

Plan and the allocation described in Section 3.3(c) of the Plan, or (B) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest.

- Whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired; provided that in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, such election shall be with the consent of Required Consenting First Lien Lenders; provided, further, that, notwithstanding the foregoing, the Allowed Existing Intercompany Equity Interests held by any of the Freedom HoldCo Debtors shall be extinguished, canceled, and/or discharged on the Effective Date.

In addition to the foregoing, the Plan shall provide as follows:

- Holders of Allowed Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, U.S. Trustee Fees, Other Secured Claims, and Priority Non-Tax Claims shall be paid in full in Cash or receive such other treatment that renders such Claims unimpaired.

## B.    Other Material Terms of the Restructuring Support Agreement

The Restructuring Support Agreement contains a number of termination events that may be triggered if, among other things, the Debtors pursue a restructuring transaction that is inconsistent with the Plan and the applicable term sheets appended to the Restructuring Support Agreement, or otherwise file restructuring documents that are not in form and substance consistent with the terms and consent rights contemplated by the Restructuring Support Agreement. Importantly, the Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement and can terminate the Restructuring Support Agreement if the board of directors, board of managers, or such similar governing body of any of the Debtors, in good faith and after consulting with outside counsel, determines that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law, or, in the exercise of its fiduciary duties, determines to pursue an alternative restructuring transaction.

The Restructuring Support Agreement also contains a number of milestones for these Chapter 11 Cases. Unless otherwise extended with the consent of the Required Consenting First

Lien Lenders, failure to achieve these milestones provides the Required Consenting First Lien Lenders with the right to terminate their obligations under the Restructuring Support Agreement.

Pursuant to the Restructuring Support Agreement and the Plan, the Debtors shall concurrently (i) conduct the Store Closing and Liquidation Sales of the American Freight Debtors and (ii) (a) effectuate a sale of all or substantially all of the remaining assets of the Debtors pursuant to a Sufficient Bid and consummate a Sale Transaction, (b) effectuate a sale of all or substantially all of the remaining assets of the applicable Partial Sale Transaction Debtors and consummate a Partial Sale Transaction, and exclusively pursue consummation of the Plan Equitization Transaction with respect to the applicable Non-Partial Sale Transaction Debtor(s), or (c) consummate the Plan Equitization Transaction. In the event of the consummation of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), all Allowed Prepetition First Lien Loan Claims will be equitized into 100% of Reorganized Common Equity (subject to dilution from (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable).

Simultaneously with the commencement of these Chapter 11 Cases, the Debtors have launched a fulsome marketing process that will permit the solicitation of bids for all or some of the Debtors' assets. The Sale Transaction is an alternative to the Plan Equitization Transaction and operates as a "market check" to ensure that the Debtors are maximizing the value of their assets for the benefit of all stakeholders. A Sale Toggle Event will occur if the Debtors enter into one or more qualifying asset purchase agreements or other definitive document to consummate a Sale Transaction, solely to the extent entered into in connection with a Sufficient Bid. A Sufficient Bid (i.e., a bid that allows the Debtors to "toggle," or pivot from a Plan Equitization Transaction to a Sale Transaction) is one that, among other things, (i) will substantially contemporaneously with closing of such Sale Transaction satisfy in full, in cash the Allowed DIP Claims, Allowed Prepetition First Lien Loan Claims, and Allowed Prepetition ABL Loan Claims, or (2) is otherwise consented to by the Consenting First Lien Lenders. The Debtors may consummate a Partial Sale Transaction (i.e., a sale of all or substantially all of the assets or Equity Interests of the Buddy's Debtors, the Vitamin Shoppe Debtors, the PSP Debtors, or a combination of two or more of the foregoing), solely if a Sufficient Bid for a Partial Sale Transaction is received by the applicable Partial Sale Transaction Debtors in accordance with the Bidding Procedures and subject to the Auction.

## C.    Acceptance of the Plan

An acceptance of the Plan will constitute an acceptance and consent to all of the terms and provisions in the Plan, including, without limitation, the releases, exculpations, and injunction provisions included therein.

**All voting Classes are urged to read this Disclosure Statement and the documents attached hereto and enclosed herewith in full. The Debtors believe that the Plan is in the best interests of the Debtors, their Estates, and all of its stakeholders, including the voting Classes. Accordingly, the voting Classes are urged to vote in favor of the Plan.**

**No person has been authorized to give any information or make any representation about the Plan not contained in this Disclosure Statement. The statements in this Disclosure Statement are made as of the date hereof. Neither this Disclosure Statement's distribution nor the consummation of Plan will, under any circumstance, create any implication that the information herein is correct as of any time after the date hereof. All summaries herein are qualified by reference to the actual terms of each of the documents attached to this Disclosure Statement. In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability, but shall be deemed a statement made in settlement negotiations. Unless otherwise indicated, the Debtors have provided the factual information in this Disclosure Statement.**

### D.     Management/Employee Incentive Plans

In the event of a Plan Equitization Transaction, the New Board shall: (x) adopt and implement Management Incentive Plans at each operating company or (y) assume, assume as amended, or reject the existing long term incentive plans of Franchise Group's direct or indirect subsidiaries, in each case structured to incentivize operating performance and align economic interests on terms and conditions acceptable to the New Board and the Required Consenting First Lien Lenders. If applicable, the Management Incentive Plan shall provide for the issuance of equity or equity-linked awards representing up to 10% of the Reorganized Common Equity on a fully diluted basis, to be allocated by the New Board. The form of the awards under the Management Incentive Plan, if applicable (*i.e.*, options, restricted stock or units, appreciation rights, etc.), the participants in the Management Incentive Plan, the allocations of the awards to such participants (including the amount of allocations and the timing of the grant of the awards), and the terms and conditions of the awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion.

In the event of a Sale Transaction, the compensation and benefits programs shall either be assumed and assigned upon consummation of an applicable Sale Transaction in accordance with the terms and conditions of the applicable Sale Documents or, if no Successful Bidder assumes the compensation and benefits programs, rejected. On the Effective Date, or in the event of assumption by a Successful Bidder of the compensation and benefits programs, all Proofs of Claim filed for amounts due under any compensation and benefits programs shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan.

## V.     MATERIAL DEVELOPMENTS SINCE THE PETITION DATE

### A.     The Debtors' First-Day Motions and Certain Related Relief

#### i.     Operational First-Day Pleadings

As described in further detail in the Orlofsky Declaration, to minimize disruption to the Debtors' operations and effectuate the terms of the Plan, upon the commencement of these Chapter 11 Cases, the Debtors filed various first-day motions seeking authority to, among other things, (i) jointly administer the Chapter 11 Cases, (ii) appoint the Claims Agent, (iii) honor

customer obligations and otherwise continue prepetition customer programs in the ordinary course of business, (iv) establishing notice and hearing procedures for transfers of membership interests in TopCo and declarations of worthlessness with respect to Equity Interests in Freedom VCM Interco Holdings, Inc., (v) pay prepetition claims owed due to maintaining insurance and continue maintaining the Debtors' insurance, (vi) provide adequate assurance of payment to utility companies, (vii) redact certain personally identifiable information of customers form publicly filed documents, (viii) continue using the Debtors' existing cash management system; (ix) pay prepetition claims owed to certain critical vendors, (x) pay prepetition claims owed to employees and on account of employee benefit programs and to continue offering employee benefit programs postpetition, (xi) pay prepetition claims owed to taxing authorities and continue paying taxes in the ordinary course of business; (xii) approve the Debtors' entry into the consulting agreement and commence store closing procedures with respect to the liquidation of American Freight, and (xiii) obtain debtor-in-possession financing and use cash collateral.

The Freedom Lender Group opposed the Debtors' motion to pay prepetition claims owed to certain critical vendors (item (ix) above, the "Critical Vendors Motion") on various grounds. Following an agreed resolution between the Debtors and the Freedom Lender Group, on November 6, 2024, the Bankruptcy Court entered a first interim order approving the Critical Vendors Motion [Docket No. 129]. Following entry of the first interim order, the Debtors sought further interim relief with respect to the Critical Vendors Motion. The Freedom Lender Group opposed the Debtors' request for such further interim relief. Following a hearing on November 21, 2024, the Bankruptcy Court overruled the Freedom Lender Group's objection and entered a second interim order approving the Critical Vendors Motion [Docket No. 217]. Following entry of the second interim order, the Freedom Lender Group filed an objection to the approval of the Critical Vendors Motion on a final basis [Docket No. 277]. Following an agreed resolution between the Debtors and the Freedom Lender Group, the Freedom Lender Group withdrew its objection and, on December 11, 2024, the Bankruptcy Court entered an order approving the Critical Vendors Motion on a final basis [Docket No. 410]. On December 18, 2024, the Freedom Lender Group filed an appeal of the final order approving the Critical Vendors Motion, which appeal is currently pending before the United States District Court for the District of Delaware, Case No. 24-1403.

ii.    Postpetition Debtor-in-Possession Financing

The Debtors sought approval of the DIP Facility on an interim and final basis. The DIP provides up to $250 million in new money financing and ensures the Debtors have access to sufficient liquidity during these Chapter 11 Cases. The DIP Facility includes a conversion, or "roll up," of certain outstanding obligations under the First Lien Term Loan Facility into obligations under the DIP Facility. The DIP Facility bears interest at a rate equal to S+9.00% with respect to the Tranche A DIP Loans and S+4.75% with respect to Tranche B DIP Loans per annum. The Debtors sought entry into the DIP Facility to permit them to (i) pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with these Chapter 11 Cases, and (ii) obtain necessary funds to be used for working capital needs and general corporate purposes.

The Freedom Lender Group objected to the approval of the DIP Facility on both an interim and final basis. Following a hearing on November 6, 2024, the Bankruptcy Court

overruled the Freedom Lender Group's objection and approved the DIP Facility on an interim basis. On November 7, 2024, the Bankruptcy Court entered an interim order approving the DIP Facility [Docket No. 134] (the "Interim DIP Order"). Following entry of the Interim DIP Order, the Debtors drew $100 million of the new money financing available under the DIP Facility (the "Interim Draw"). As a result of the Interim Draw, $100 million of the First Lien Term Loan Facility was rolled up, or converted, into Tranche B DIP Loans.

Following a hearing on December 10, 2024, the Bankruptcy Court overruled the Freedom Lender Group's objection and approved the DIP Facility on a final basis. On December 11, 2024, the Bankruptcy Court entered a final order approving the DIP Facility [Docket No. 414].

All Holders of Prepetition First Lien Loan Claims (and/or one or more Related Funds of such Holders) who signed the Restructuring Support Agreement prior to the closing of the DIP syndication process were eligible to subscribe for their *pro rata* share of the DIP Facility based on their respective *pro rata* holdings of their Allowed Prepetition First Lien Loan Claims pursuant to syndication procedures approved under the Interim DIP Order. To the extent a Holder of Prepetition First Lien Loan Claims (x) did not execute the Restructuring Support Agreement and (in which case, such Holder had no right to subscribe for any portion of the DIP Facility) or (y) executed the Restructuring Support Agreement but did not subscribe for its portion of the DIP Facility in accordance with the syndication procedures, then (in either case) each DIP backstop party had the option to, severally and not jointly, increase its share of the DIP Facility for any portion of the DIP Facility that is not subscribed for (or not permitted to be subscribed for) by such Holder.

On December 18, 2024, the Freedom Lender Group filed an appeal of the Final DIP Order, which is currently pending before the United States District Court for the District of Delaware, Case No. 24-1404.

### B.    Bidding Procedures and Sale Process

On the November 11, 2024, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 154], pursuant to which the Debtors sought to establish certain procedures (the "Proposed Bidding Procedures") with respect to a competitive sale and marketing process for their assets. A number of parties, including the Committee, submitted informal responses to the Proposed Bidding Procedures, which the Debtors resolved with certain changes to the Proposed Bidding Procedures. Certain landlords filed a limited objection to the Proposed Bidding Procedures [Docket No. 305], which the Debtors resolved at the hearing scheduled to consider the Proposed Bidding Procedures. The Freedom Lender Group also filed an objection to the Proposed Bidding Procedures, which the Bankruptcy Court overruled at the hearing. On December 16, 2024, the Bankruptcy Court entered an order approving the Bidding Procedures Motion (the "Bidding

Procedures Order") [Docket No. 444], including the revised Proposed Bidding Procedures (as revised, the "Bidding Procedures").

Pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order, interested parties are required to submit bids on the Debtors' assets no later than 4:00 p.m. (prevailing Eastern Time) on February 3, 2025 (the "Bid Deadline"). Interested parties may submit bids for all of the Debtors' assets, and may also submit bids on individual business lines. For a bid to be considered a "Qualified Bid" or a "Sufficient Bid" under the Bidding Procedures, the bid must have met the various requirements described therein, including with respect to bids for the individual business lines, meeting specified minimum bid prices. Pursuant to the Bidding Procedures, if the Debtors receive at least one Sufficient Bid at least forty-eight (48) hours prior to the date of the Auction, then the Debtors shall hold an auction (the "Auction") for the Assets (as defined in the Bidding Procedures) that are the subject of such Sufficient Bid unless the Debtors do not receive another Qualified Bid that covers such Assets prior to the later of (x) six (6) hours prior to the commencement of the Auction and (y) twenty-four (24) hours after the Debtors designate Qualified Bidders (in which case, the Debtors shall not hold an Auction with respect to the Assets that are the subject of that Sufficient Bid and the Debtors shall proceed with such Sufficient Bid). At the Auction, the Debtors, consistent with the Bidding Procedures, will select the Successful Bidder for the Debtors' assets. If the Debtors do not receive any Sufficient Bids prior to the Bid Deadline, after consultation with the Consultation Parties, the Debtors shall file with the Court, serve on the Sale Hearing Notice Parties (as defined below), and cause to be published a notice canceling the Auction.

On December 18, 2024, the Freedom Lender Group filed an appeal of the Bidding Procedures Order, which is currently pending before the United States District Court for the District of Delaware, Case No. 24-1405.

**C.    Claims Process and Bar Date**

i.    Schedules of Assets and Liabilities and Statements of Financial Affairs

On December 24, 2024, the Debtors filed their schedules of assets and liabilities, and statements of financial affairs [Docket Nos. 500-552; 553-558 (sealed)] (collectively, the "Schedules and Statements"). On December 31, 2024, the Debtor Vitamin Shoppe Industries LLC (Case No. 24-12521) filed an amendment to its Schedule A/B [Docket No. 584].

ii.    Claim Bar Dates

On December 6, 2024, the Bankruptcy Court entered that certain *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising under 503(b)(9) of the Bankruptcy Code) and (B) Approving the Form and Manner of Notice Thereof* [Docket No. 354] (the "Bar Date Order"). On December 26, 2024, after the Debtors filed the Schedules and Statements, the Debtors filed that certain *Notice of Deadline for the Filing of Proofs of Claim, Including for Claims Asserted under Section 503(b)(9) of the Bankruptcy Code* [Docket No. 562] (the "Bar Date Notice"), which set the following deadlines:

- <u>General Bar Date</u>:  January 23, 2025 at 11:59 p.m. (prevailing Eastern Time). The "General Bar Date" is the last date for all entities (except governmental units) to file a proof of claim in respect of any claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code.

- <u>Government Bar Date</u>:  May 2, 2025 at 11:59 p.m. (prevailing Eastern Time). The "Governmental Bar Date" is the last date for a governmental unit, as defined in section 101(27) of the Bankruptcy Code, to file a proof of claim against the Debtors in respect of any claims against the Debtors (whether secured, unsecured priority, or unsecured non-priority) that arose on or prior to the Petition Date, including governmental units with claims against the Debtors for unpaid taxes, whether such claims arise from prepetition tax years or periods or prepetition transactions to which the Debtors were a party.

Additionally, pursuant to the Bar Date Order, unless otherwise ordered by the Court, all entities holding claims against the Debtors arising from the rejection of executory contracts and unexpired leases of the Debtors are required to file Proofs of Claim by the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, (ii) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors, and (iii) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following the effective date of the rejection of any executory contract or unexpired lease of the Debtors pursuant to operation of any Court order (the "<u>Rejection Damages Bar Date</u>").

The Bar Date Order also provides that if, subsequent to the date of the Bar Date Notice, the Debtors amend or supplement the Schedules and Statements to reduce the undisputed, noncontingent, and liquidated amount of a claim listed in the Schedules and Statements, to change the nature or classification of a claim against the Debtors reflected in the Schedules and Statements, or to add a new claim to the Schedules and Statements, then the Debtors shall give notice of any such amendment or supplement to the holders of claims affected thereby, the affected creditor is required to file a Proof of Claim or amend any previously filed Proof of Claim in respect of the amended scheduled claim by the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days from the date on which the Debtors mail notice of the amendment to the Schedules (or another time period as may be fixed by the Court) (the "<u>Supplemental Bar Date</u>," and collectively with the General Bar Date, the Government Bar Date, and the Rejection Damages Bar Date, the "<u>Bar Dates</u>").

Notice of the Bar Dates was provided by mail and publication in accordance with the procedures outlined in the Bar Date Order.

### D.    Freedom Lender Group's Motion to Terminate Exclusivity

On November 20, 2024, the Freedom Lender Group filed the *Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the Holdco Debtors' Cases, (II) Lifting the Automatic Stay in the Holdco Debtors' Cases, or (III) Appointing*

*a Chapter 11 Trustee for the Holdco Debtors* [Docket No. 192] (the "Exclusivity Termination Motion"). On December 3, 2024, the Committee [Docket No. 294], the Debtors [Docket No. 298], and the Ad Hoc Group of First Lien Lenders [Docket No. 299] filed objections to the Exclusivity Termination Motion. On December 6, 2024, the Freedom Lender Group filed an omnibus reply in support of the Exclusivity Termination Motion [Docket No. 365]. On December 10 and 17, 2024, the Bankruptcy Court held a hearing to consider the Exclusivity Termination Motion. For the reasons set forth on the record at the hearing on December 17, 2024, the Bankruptcy Court overruled the Exclusivity Termination Motion on all grounds. On December 18, 2024, the Court entered an order denying the Exclusivity Termination Motion (the "Exclusivity Termination Order").

On December 18, 2024, the Freedom Lender Group filed an appeal of the Exclusivity Termination Order, which is currently pending before the United States District Court for the District of Delaware, Case No. 24-1394. The Freedom Lender Group filed its Appellant's Brief on January 8, 2025. The Creditors' Committee moved to intervene in the appeal on January 16, 2025, which was granted on January 28, 2025.

### E.    Committee Settlement

In parallel with the ongoing Independent Investigation and the Freedom HoldCo Independent Investigation, the Committee undertook an extensive investigation of the prepetition conduct of the Debtors and their Affiliates and certain third parties affiliated with the Debtors. In connection with its investigation, the Committee took formal and informal discovery from the Debtors. The Committee requested and received several thousand pages of documents and diligence materials in furtherance of its investigation. As of the date of this Disclosure Statement, the Committee's investigation is ongoing. Ultimately, the investigations have revealed certain transactions and events in the Debtors' recent corporate history that may give rise to potential claims or causes of action—namely, the OpCo Litigation Claims.

The Debtors, the Consenting First Lien Lenders, and the Creditors' Committee engaged in extensive, good-faith and arms' length negotiations with respect to the OpCo Litigation Claims, which resulted in a global compromise (as defined in the Plan, the "Committee Settlement"). The Committee Settlement not only resolves the OpCo Litigation Claims, but also paves the way for the resolution of these Chapter 11 Cases and confirmation of the Plan with support from the Creditors' Committee and the Consenting First Lien Lenders.

The Committee Settlement is described more fully in Article XV of the Plan, and the term sheet memorializing the Committee Settlement is attached as Exhibit I to the Plan, which is fully incorporated as a material component of the Plan.[2] In general, the Committee Settlement Parties have agreed to the Committee Settlement on the following terms:

(i)    any and all disputes between the Committee Settlement Parties will be resolved;

---

[2]    To the extent that there is any inconsistency between this summary of the primary terms of the Committee Settlement and the description of the Committee Settlement in the Plan, the Plan controls.

(ii)     the OpCo Debtor Litigation Trust will be established;

(iii)    the OpCo Debtor Litigation Trust Escrow Amount will be funded;

(iv)    the Independent Investigation will be terminated;

(v)     the Committee Settlement Parties have agreed to mutual releases as provided for in the Plan; and

(vi)    the Committee and the Consenting First Lien Lenders have agreed to support the Plan.

The Committee Settlement provides significant value to the Debtors and their Estates, favorably resolves and avoids potential protracted expensive and uncertain litigation, and enables the prompt and efficient wind-down of the Debtors' Estates through the Plan. The Plan shall serve as a motion to approve the Committee Settlement pursuant to Bankruptcy Rule 9019. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Committee Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, ~~holders~~**Holders** of Claims, and other parties in interest, and are fair, equitable, and reasonable.

## VI.    SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11 CASES AND THE PLAN

This Article details certain issues in connection with these Chapter 11 Cases and the Plan.

### A.    Voting on the Plan

As described herein and in the Plan, only certain classes under the Plan are entitled to vote on the Plan. Specifically, Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, General Unsecured Claims, Prepetition HoldCo Loan Claims, Freedom HoldCo General Unsecured Claims, HoldCo Receivables General Unsecured Claims, TopCo General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests are members of the only Classes that are "impaired" and entitled to vote to accept or reject the Plan. Any Holder of a Claim whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan, or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code, is considered "impaired." Each Holder of a Claim or Interest of a Class that is deemed to accept or reject the Plan will receive a notice of non-voting status after the Petition Date, but will not have received a Ballot because they are not eligible to vote on the Plan. All Holders of Claims or Interests may receive a copy of these documents and/or the Plan Supplement, if applicable, by mailing a written request to the Claims Agent.

> **Which Classes of Claims and Interests Are Entitled to Vote on the Plan?**
>
> Classes of Claims and Interests are entitled to vote on the Plan as follows:
>
> - Claims and Interests in Classes 1 and 2 are unimpaired under the Plan, are deemed to have accepted the Plan, and are not entitled to vote on the Plan.
>
> - Claims and Interests in Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 are impaired and entitled to vote on the Plan.
>
> - Interests in Classes 9, 10, and 12 are impaired and deemed to have rejected the Plan and are not entitled to vote on the Plan.

For a description of the Classes of Claims and Interests and their treatment under the Plan, see Article VI.C, "*Summary of Classification and Treatment Under the Plan*," below.

Under the Bankruptcy Code, a Class of Claims shall have accepted the Plan if it is accepted or deemed accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Holders of the Allowed Claims or Interests in such Class that have voted on the Plan. The votes in favor of the Plan must be obtained from one impaired accepting Class, excluding the votes of any insiders.

## B.    The Confirmation Hearing

The Debtors will request that the Court schedule, as promptly as practicable, a hearing to approve this Disclosure Statement as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code.

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to confirm a plan. Section 1128(b) provides that a party-in-interest may object to confirmation of a plan. Objections to confirmation must be filed with the Bankruptcy Court and served on the Debtors as well as the other parties set forth in the notice of the Confirmation Hearing (the "Notice of Confirmation Hearing") by the objection deadline, as set forth in the Notice of Confirmation Hearing. The Notice of Confirmation Hearing will be mailed to parties at a later date, after the filing of these Chapter 11 Cases.

At the Confirmation Hearing, the Bankruptcy Court will:

- determine whether the solicitation of votes on the Plan was in compliance with section 1126 of the Bankruptcy Code;

- determine whether the Plan has been accepted by a sufficient number of Holders and amount of claims entitled to vote on the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

**C.      Summary of Classification and Treatment Under the Plan**

The following table and description summarize the classification and treatment of Claims and Interests and the consideration contemplated to be distributed to the Holders of Allowed Claims and Interests under the Plan.  The recoveries set forth in the following table assume that the Plan Equitization Transaction is consummated on the Effective Date of the Plan.  Unless otherwise noted, these estimates are as of the date hereof.  For an explanation of the assumptions and uncertainties regarding these calculations, see Article IX, "*Risk Factors*."

A number of events may occur that may result in recoveries being higher than are reflected in the following table.  First, a Sale Transaction or a Partial Sale Transaction could result in Cash Sale Proceeds for the benefit of applicable creditors.  Additionally, the Debtors and their creditors may reach a negotiated resolution of certain issues, resulting in the exchange of valuable consideration for the benefit of applicable creditors.  Finally, the Freedom HoldCo Independent Investigation may result in Claims and Causes of Action that will be retained by the applicable Debtor if they are not otherwise settled, discharged, or released under or pursuant to the Plan.

---

**Important Note on Estimates**

Statements regarding projected amounts of Claims and Interests or distributions are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts.  Except as otherwise indicated, these statements are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.

---

**Note on Numerical Information.  The numerical information in this Disclosure Statement, including the Financial Projections annexed as Exhibit C hereto and the estimated Allowed amounts, has been prepared by the Debtors, with the assistance of its investment banker, Ducera Partners LLC.  The assumptions used in preparing such Financial Projections and estimates are inherently subject to significant uncertainties and actual results may differ from such Financial Projections and estimates, as further described in Article XVI.D.ii.**

i.    <u>Summary of Classification and Treatment of Claims</u>

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| Class 1:<br><br>Priority Non-Tax Claims | The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable Distribution Date, each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Required Consenting First Lien Lenders): (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  In the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.<br><br>**Unimpaired – Presumed to accept.** | N/A | 100% |
| Class 2:<br><br>Other Secured Claims | The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each Holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or | N/A | 100% |

---

[3]    The amounts set forth in this chart reflect the Debtors' most current estimates of projected claim amounts, and does not reflect potential unsecured damages claims resulting from the rejection of any Executory Contracts or Unexpired Leases.  Additional Claims and Interests may be asserted against the Debtors prior to the applicable Bar Dates for filing proofs of Claim or Interests in these Chapter 11 Cases, which, as of the date of this Disclosure Statement, have not passed.  Thus, the total amount of Claims may be materially more or less than the estimate set forth in this Disclosure Statement.

[4]    This chart does not purport to set forth a valuation of the Debtors' assets.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Sale Transaction or a Partial Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.<br><br>Each Holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein. Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person and the Holder of such Claims shall deliver to the Debtors or Post-Effective Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, or *lis pendens*, or similar interests or documents. Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Post-Effective Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.<br><br>Deficiency Claims: To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the | | |

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim, only as applicable, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, Class 6-E Claim, Class 8-A Claim, Class 8-B Claim, or Class 8-C Claim, only as applicable.<br><br>**Unimpaired – Presumed to accept.** | | |
| Class 3:<br><br>Prepetition ABL Loan Claims | On the Effective Date, the Prepetition ABL Loan Claims shall be Allowed under the Plan in the amount of $248.7 million plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims (including, without limitation, any reimbursement obligations under outstanding letters of credit), and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition ABL Loan Claim, except to the extent that the ABL Credit Agreement Agent or a Holder of a Prepetition ABL Loan Claim agrees to different treatment with respect to such Holder's Claim, on the Effective Date, or as soon as practicable thereafter, each ABL Lender shall receive its *pro rata* share of:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) (x) proceeds of the Exit ABL Facility, or (y) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its | $248.7 million, plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims. | 100% |

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | Allowed Prepetition ABL Loan Claim.<br><br>**Impaired – Entitled to vote.** | | |
| Class 4:<br><br>Prepetition First Lien Loan Claims | On the Effective Date, the Prepetition First Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition First Lien Loan Claim, except to the extent that the First Lien Credit Agreement Agent or a Holder of a Prepetition First Lien Loan Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each First Lien Lender shall receive, subject to the terms of the Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), and (C) to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claims), the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim against each applicable Debtor, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class; or<br><br>(ii) in the event the Restructuring Transactions are | $1.13 billion, plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition First Lien Loan Claims | TBD |

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.<br><br>Deficiency Claims:  If applicable, any First Lien Deficiency Claims shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.<br><br>**Impaired – Entitled to vote.** | | |
| Class 5:<br><br>Prepetition Second Lien Loan Claims | On the Effective Date, the Prepetition Second Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition Second Lien Loan Claim, except to the extent that a Holder of a Prepetition Second Lien Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition Second Lien Loan Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to accept the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably with OpCo General Unsecured Claims, or (2) if the Class votes to reject the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or<br><br>(ii) in the event the Restructuring Transactions are | $125 million, plus accrued but unpaid prepetition interest and fees through the Effective Date | 0% - TBD[5] |

---

[5]    The value of the New Warrants is undetermined at this time.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution.   If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.<br><br>Deficiency Claims:   If applicable, any Second Lien Deficiency Claims shall be treated for all purposes under ~~this~~the Plan as a General Unsecured Claim only against the applicable Debtor, and shall be classified and treated as the applicable Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, only as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.<br><br>**Impaired – Entitled to vote.** | | |
| Class 6-A:<br><br>General Unsecured Claims against Franchise Group, Inc. | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim at Franchise Group, Inc., except to the extent that a Holder of a General Unsecured Claim against Franchise Group, Inc. agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim at Franchise Group, Inc. shall receive, its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to Franchise Group, Inc. in connection with any Sale Transaction or Partial Sale Transaction, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to Franchise Group, Inc.<br><br>**Impaired – Entitled to vote.** | $6.1 million | 0%[6] |

---

[6]    As discussed above in Section II(A)(vi) and Section VI(C), the estimated recovery for General Unsecured Claims in Class 6-A, Class 6-B, Class 6-C, Class 6-D, and Class 6-E may be greater than 0% depending on the outcome of the Sale Process and any negotiations among major constituent groups.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| Class 6-B:<br><br>General Unsecured Claims against the American Freight Debtors | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the American Freight Debtors, on the Effective Date, each Holder of an Allowed General Unsecured Claim against the American Freight Debtors shall receive ~~the recovery such claimant would be entitled to receive under chapter 7 or section 1129(a)(7) of the Bankruptcy Code (i.e.,~~ its pro rata share of ~~any residual~~ the OpCo Debtor Litigation Trust Units allocable to the American Freight ~~Liquidation Proceeds)~~Debtors.<br><br>**Impaired – Entitled to vote.** | $36.9 million | 0%[7] |
| Class 6-C:<br><br>General Unsecured Claims against the Buddy's Debtors | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Buddy's Debtors, except to the extent that a Holder of a General Unsecured Claim against the Buddy's Debtors agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Buddy's Debtors shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the Buddy's Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the Buddy's Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the Buddy's Debtors.<br><br>**Impaired – Entitled to vote.** | $0.5 million | 0%[8] |
| Class 6-D:<br><br>General Unsecured Claims against the PSP Debtors | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the PSP Debtors, except to the extent that a Holder of a General Unsecured Claim against the PSP Debtors agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization~~ | $5.9 million | 0%[9] |

---

[7]    See footnote 5.

[8]    See footnote 5.

[9]    See footnote 5.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | ~~Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the PSP Debtors shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the PSP Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the PSP Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the PSP Debtors.<br><br>**Impaired – Entitled to vote.** | | |
| Class 6-E:<br><br>General Unsecured Claims against the Vitamin Shoppe Debtors | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Vitamin Shoppe Debtors, except to the extent that a Holder of a General Unsecured Claim against the Vitamin Shoppe Debtors agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Vitamin Shoppe Debtors shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the Vitamin Shoppe Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the Vitamin Shoppe Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the Vitamin Shoppe Debtors.<br><br>**Impaired – Entitled to vote.** | $15.1 million | 0%[10] |
| Class 7:<br><br>Prepetition HoldCo Loan Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition HoldCo Loan Claim, except to the extent that a Holder of a Prepetition HoldCo Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition HoldCo Loan Claim shall receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of | $514.8 million, plus accrued but unpaid prepetition interest and fees through the Effective Date | 0%[11] |

[10]  See footnote 5.

[11]  As discussed above in Section II(A)(vi) and Section VI(C), the estimated recovery for Class 7 Prepetition HoldCo Loan Claims, Class 8-A Freedom HoldCo General Unsecured Claims, Class 8-B HoldCo Receivables General Unsecured Claims, and Class 8-C TopCo General Unsecured Claims may be greater than 0% depending on the outcome of the Sale Process, the outcome of the Freedom HoldCo Independent Investigation, or any negotiations among major constituent groups.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) ~~solely to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or pursuant to the Plan, any recovery~~**proceeds** from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election.  If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust ~~(to the extent even applicable)~~, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.<br><br>**Impaired – Entitled to vote.** | | |
| Class 8-A:<br><br>Freedom HoldCo General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Freedom HoldCo General Unsecured Claim, except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to the Freedom HoldCo Debtors resulting from any Partial Sale Transaction, if any, and (B) ~~to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or pursuant to the Plan,~~ its *pro rata* share of ~~any recovery~~**proceeds** from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust.  If the | $0 | 0%[12] |

---

[12]   See footnote 10.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any and (B) ~~to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or pursuant to the Plan,~~ its *pro rata* share of ~~any recovery~~proceeds from the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** | | |
| Class 8-B:<br><br>HoldCo Receivables General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo Receivables General Unsecured Claim, except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc. resulting from any Partial Sale Transaction, if any.  If the proceeds of the Partial Sale Transaction do not result in a | $37.9 million | 0%[13] |

---

[13]    See footnote 10.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** | | |
| Class 8-C:<br><br>TopCo General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed TopCo General Unsecured Claim, except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed TopCo General Unsecured Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.3(c) of the Plan, and (B) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to TopCo resulting from any Partial Sale Transaction, if any.  If (x) there is no Cash held at TopCo following the allocation described in Section 3.3(c) of the Plan, and (y) the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured | $0 | 0%[14] |

---

[14]    <u>See</u> footnote 10.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** | | |
| Class 9:<br><br>Intercompany Claims | On the Effective Date, each Holder of an Allowed Intercompany Claim shall receive the following treatment:<br><br>(i) in the event of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), on or after the Effective Date: (A) any and all Intercompany Claims between, among and/or against, Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; and (B) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date, or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; provided, however, that notwithstanding the foregoing, any Intercompany Claims, held by or against or among any of the Freedom HoldCo Debtors shall receive the recovery that such Intercompany Claim would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if such Intercompany Claim is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date. To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; or | N/A | N/A |

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | (ii) in the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (A) extinguished, canceled and/or discharged on the Effective Date or (B) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired.    To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>**Impaired – Deemed to reject.** | | |
| Class 10:<br><br>Subordinated Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Subordinated Claim, except to the extent that a Holder of a Subordinated Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Subordinated Claim shall receive:<br><br>(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any).  If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or<br><br>(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.<br><br>**Impaired – Deemed to reject.** | N/A | 0% |

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| Class 11:<br><br>Existing TopCo Equity Interests | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing TopCo Equity Interest, except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (A) its *pro rata* share of Cash (if any) held by TopCo following all distributions required under the Plan and the allocation described in Section 3.3(c) of the Plan, or (B) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest.<br><br>**Impaired – Entitled to vote.** | N/A | 0%[15] |
| Class 12:<br><br>Existing Intercompany Equity Interests | On the Effective Date, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired; provided that in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, such election shall be with the consent of Required Consenting First Lien Lenders; provided, further, that, notwithstanding the foregoing, the Allowed Existing Intercompany Equity Interests held by any of the | N/A | 0% |

---

[15] The estimated recovery for Class 11 Existing TopCo Equity Interests may be greater than 0% depending on whether there are any TopCo Allocated Fees and Expenses.

| Class | Treatment | Estimated Amount of Claims in Class[3] | Estimated Recovery (%)[4] |
|---|---|---|---|
| | Freedom HoldCo Debtors shall be extinguished, canceled, and/or discharged on the Effective Date.<br><br>**Impaired – Deemed to reject.** | | |

### D.    Summary of Treatment Under the Plan

The following section describes more fully the treatment to be provided to each Class of Claims and Interests under the Plan. This description is only a summary of certain important provisions of the Plan and should not replace careful review of the Plan. Each Holder of a Claim or Interest should read the Plan carefully. Please refer particularly to Articles IV and V of the Plan, Article VII below, and the liquidation analysis annexed as Exhibit B hereto (the "Liquidation Analysis") for a more detailed description of the classification and treatment of Claims and Interests provided under the Plan.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not designate Classes of Claims for: DIP Claims, Administrative Claims, Fee Claims, Priority Tax Claims, and U.S. Trustee Fees. The Plan designates twelve Classes of Claims and Interests: Class 1 - Priority Non-Tax Claims, Class 2 - Other Secured Claims, Class 3 - Prepetition ABL Loan Claims, Class 4 - Prepetition First Lien Loan Claims, Class 5 - Prepetition Second Lien Loan Claims, Class 6 - General Unsecured Claims against (A) Franchise Group, Inc., (B) the American Freight Debtors, (C) the Buddy's Debtors, (D) the PSP Debtors, and (E) the Vitamin Shoppe Debtors, Class 7 - Prepetition HoldCo Loan Claims, Class 8 - General Unsecured Claims against (A) the Freedom HoldCo Debtors, (B) Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc., and (C) TopCo, Class 9 - Intercompany Claims, Class 10 - Subordinated Claims, Class 11 - Existing TopCo Equity Interests, and Class 12 - Existing Intercompany Equity Interests.

i.    DIP Claims

To the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, (i) each Holder of DIP Claims (and/or one or more Related Funds of such Holder, to the extent such Related Funds are Holders of DIP Claims) that received a DIP Backstop Premium or Commitment Premium (as defined in the DIP Credit Agreement) as of closing of the DIP syndication process, and (ii) each Holder of DIP Claims that receives an Exit Premium (as defined in the DIP Credit Agreement) shall be entitled to elect, at its sole discretion, to convert such DIP Backstop Premium, Commitment Premium and/or Exit Premium into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in an amendment to this Disclosure Statement and/or Plan Supplement.

On the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement and shall not be subject to any avoidance, reductions, setoff,

offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person. In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, (i) if the Plan Equitization Transaction is consummated and there is no Partial Sale Transaction, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into Take-Back Term Loans, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into Take-Back Term Loans, ratably, on a dollar-for-dollar basis in an amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Effective Date after giving effect to the Restructuring Transactions, and (z) third, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth in an amendment to this Disclosure Statement and/or Plan Supplement, (ii) if a Plan Equitization Transaction is consummated and there is a Partial Sale Transaction, (x) first, all Allowed DIP Claims allocable to the applicable Partial Sale Transaction Debtors shall be indefeasibly paid in full in Cash from the applicable net Sale Proceeds, and (y) second, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clause (y) hereof shall be treated in accordance with the foregoing clause (i) hereof, provided, however, that at the election of the Required Consenting First Lien Lenders and DIP Lenders, which election shall be made in good faith and in consultation with the Debtors, the Pro Forma Leverage Cap shall be reduced to account for any assets sold as part of the Partial Sale Transaction that will no longer vest in the Reorganized Debtors, with the method of calculation of any such reduction to be reasonably agreed to by the Required Consenting First Lien Lenders and the Debtors, and (iii) if a Sale Transaction is consummated, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from net Sale Proceeds. Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

Notwithstanding anything to the contrary contained herein, in the event of a Plan Equitization Transaction (whether or not a Partial Sale Transaction has occurred), ~~to the extent the Freedom HoldCo Debtor Liquidation Trust is established,~~ at the election of the Required Consenting First Lien Lenders and DIP Lenders, all DIP Claims against the Freedom HoldCo Debtors, shall, in lieu of the treatment set forth in the previous paragraph, convert *mutatis mutandis* into claims against the Freedom HoldCo Debtor ~~Liquidation~~ Litigation Trust in the same amount, with the same priority and security interest in, and otherwise having the same economic terms as the DIP Claims currently outstanding against the Freedom HoldCo Debtors. For the avoidance of doubt, to the extent the Freedom HoldCo DIP Election is made, the DIP Claims that are converted in accordance with the immediately preceding sentence shall not convert into Take-Back Term Loans or Reorganized Common Equity and any remaining DIP Claims shall be converted in accordance with the immediately preceding paragraph.

ii.    Administrative Claims

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the Holder of such Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim or such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors-in-possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, that any Allowed Administrative Expense Claim that has been assumed by a Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan.

iii.    Fee Claims

Any Professional Person seeking allowance of a Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred on and prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than forty-five (45) calendar days after the Effective Date or such other date as established by the Bankruptcy Court. Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order.

a.    Professional Fee Escrow Account

The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Confirmation Order. The Post-Effective Debtors or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash to such Professional Persons in the amount the Bankruptcy Court allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; provided that the Debtors' and the Post-Effective Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the **Debtors'** Professional Persons, the Post-Effective Debtors or the Plan Administrator, as applicable, shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims. **To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Creditors' Committee's Professional Persons, the OpCo Debtor Litigation Trust shall fund any shortfall into the Professional Fee Escrow Account.**

Professional Persons shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than three (3) Business Days before the anticipated Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional Person's final request for payment in the Chapter 11 Cases.  If a Professional Person does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional Person.

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash on hand of the Debtors, subject to the terms of Section 3.3(c) of the Plan, equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professional Persons and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the Bankruptcy Court.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable.  Notwithstanding the foregoing sentence, funding of the Professional Fee Escrow Account will not be reported as a disbursement from the Estates, and disbursements from the Professional Fee Escrow Account on account of payment of Allowed Professional Fee Claims will be reported as disbursements from the Estates on the relevant monthly operating report(s).  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be remitted to the Post-Effective Debtors or the Plan Administrator, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Any further disbursements of such funds shall be reported in accordance with the Bankruptcy Rules.

The Professional Persons shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors (which estimate may include a reasonable cushion to cover unexpected or unknown fees) before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than three (3) Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional Person's final request for payment of Professional Fee Claims filed with the Bankruptcy Court, and such Professional Persons are not bound to any extent by the estimates.  If a Professional Person does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional Person for inclusion in the Professional Fee Escrow Amount.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; provided that the Post-Effective Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee

applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

Following the Effective Date, the Plan Administrator shall have authority with respect to matters related to Professional Fee Claim requests by Professional Persons, if any, acting at their direction in accordance with the terms of the Plan.

### b. Allocation of Payment of Certain Fees and Expenses.

Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "TopCo Allocated Fees and Expenses"). Freedom VCM Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such TopCo Allocated Fees and Expenses, if any; provided that for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the TopCo Allocated Fees and Expenses; provided, further, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims.

Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to the Freedom HoldCo Debtors with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be subject to the terms of, (i) in the case of the fees and expenses of the Freedom HoldCo Independent Director, that certain letter agreement dated as of December 9, 2024 between the Freedom HoldCo Debtors and Michael J. Wartell of Bluerose Associates LLC, (ii) in the case of the fees and expenses of any advisors hired by the Freedom HoldCo Independent Director, any order approving the retention of the same, and (iii) in the case of any other fees and expenses allocable to the Freedom HoldCo Debtors, Paragraphs 2(c) and (j) of the Interim Compensation Order.

### iv. Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting First Lien Lenders, each Holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, either: (a) on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the Holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become

due; provided, further, that (i) in the event of a Plan Equitization Transaction, notwithstanding any provision of the Plan or the Restructuring Support Agreement to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state law shall be assumed by and reinstated against the applicable Reorganized Debtor and (ii) in the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Tax Claim that has been expressly assumed by a Successful Bidder under the Sale Documents shall not be an obligation of the Debtors. On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person.

### v.    U.S. Trustee Fees and Related Reporting Obligations

All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. After the Effective Date, the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable. The Debtors, the Post-Effective Debtors, and the Plan Administrator (if appointed), as applicable, shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors, the Post-Effective Debtors, and/or the Plan Administrator (if appointed), as applicable, is responsible. The U.S. Trustee shall not be treated as providing any release under the Plan. U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to file any Proof of Claim or any request for administrative expense for U.S. Trustee Fees. The provisions of this paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary.

### vi.    Priority Non-Tax Claims – Class 1

Classification:  Class 1 consists of Priority Non-Tax Claims against each Debtor.

Treatment:  The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan. In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable Distribution Date, each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Required Consenting First Lien Lenders): (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. In the event of a Sale Transaction or a Partial Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

Impairment and Voting:  Priority Non-Tax Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

vii.    Other Secured Claims – Class 2

Classification:  Class 2 consists of Other Secured Claims against each Debtor.

Treatment:  The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each Holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Sale Transaction or a Partial Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

Each Holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein.  Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person and the Holder of such Claims shall deliver to the Debtors or Post-Effective Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, or *lis pendens*, or similar interests or documents.  Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Post-Effective Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

Deficiency Claims:  To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured

portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim, only as applicable, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, Class 6-E Claim, Class 8-A Claim, Class 8-B Claim, or Class 8-C Claim, only as applicable.

Impairment and Voting: The Other Secured Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

      viii.    Prepetition ABL Loan Claims – Class 3

Classification: Class 3 consists of approximately $248.7 million plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims.

Treatment:  On the Effective Date, the Prepetition ABL Loan Claims shall be Allowed under the Plan in the amount of $248.7 million plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims (including, without limitation, any reimbursement obligations under outstanding letters of credit), and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition ABL Loan Claim, except to the extent that the ABL Credit Agreement Agent or a Holder of a Prepetition ABL Loan Claim agrees to different treatment with respect to such Holder's Claim, on the Effective Date, or as soon as practicable thereafter, each ABL Lender shall receive its *pro rata* share of:

      (i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) (x) proceeds of the Exit ABL Facility, or (y) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or

      (ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.

Impairment and Voting:  The Prepetition ABL Loan Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition ABL Loan Claims.

ix.    Prepetition First Lien Loan Claims – Class 4

Classification:  Class 4 consists of approximately $1.13 billion in outstanding principal, plus interest, fees, and other expenses pursuant to the First Lien Credit Agreement.

Treatment:  On the Effective Date, the Prepetition First Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition First Lien Loan Claim, except to the extent that the First Lien Credit Agreement Agent or a Holder of a Prepetition First Lien Loan Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each First Lien Lender shall receive, subject to the terms of the Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of:

(i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), and (C) to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claims), the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim against each applicable Debtor, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.

Deficiency Claims:  If applicable, any First Lien Deficiency Claims shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class

6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.

Impairment and Voting: The Prepetition First Lien Loan Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition First Lien Loan Claims.

x.    Prepetition Second Lien Loan Claims – Class 5

Classification:  Class 5 consists of approximately $125 million in outstanding principal, plus interest, fees, and other expenses pursuant to the Second Lien Credit Agreement.

Treatment:  On the Effective Date, the Prepetition Second Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition Second Lien Loan Claim, except to the extent that a Holder of a Prepetition Second Lien Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition Second Lien Loan Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to accept the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably with OpCo General Unsecured Claims, or (2) if the Class votes to reject the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution.  If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.

Deficiency Claims:  If applicable, any Second Lien Deficiency Claims shall be treated for all purposes under ~~this~~the Plan as a General Unsecured Claim only against the applicable Debtor, and shall be classified and treated as the applicable Class 6-A Claim, Class 6-B Claim,

Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, only as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class.

Impairment and Voting:  The Prepetition Second Lien Loan Claims are impaired Claims. In accordance with section 1126(g) of the Bankruptcy Code.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition Second Lien Loan Claims.

### xi.    General Unsecured Claim against Franchise Group, Inc. – Class 6-A

Classification: Class 6-A consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against Franchise Group, Inc.

Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim at Franchise Group, Inc., except to the extent that a Holder of a General Unsecured Claim against Franchise Group, Inc. agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim at Franchise Group, Inc. shall receive, its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to Franchise Group, Inc. in connection with any Sale Transaction or Partial Sale Transaction, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to Franchise Group, Inc.

Impairment and Voting: The General Unsecured Claims at Franchise Group, Inc. are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims at Franchise Group, Inc.

### xii.    General Unsecured Claim against American Freight – Class 6-B

Classification:  Class 6-B consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against American Freight.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the American Freight Debtors, on the Effective Date, each Holder of an Allowed General Unsecured Claim against the American Freight Debtors shall receive ~~the recovery such claimant would be entitled to receive under chapter 7 or section 1129(a)(7) of the Bankruptcy Code (i.e.,~~ its pro rata share of ~~any~~

~~residual~~the OpCo Debtor Litigation Trust Units allocable to the American Freight ~~Liquidation Proceeds)~~Debtors.

Impairment and Voting:  The General Unsecured Claims against the American Freight Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the American Freight Debtors.

xiii.    General Unsecured Claim against Buddy's – Class 6-C

Classification:  Class 6-C consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against Buddy's.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Buddy's Debtors, except to the extent that a Holder of a General Unsecured Claim against the Buddy's Debtors agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Buddy's Debtors shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the Buddy's Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the Buddy's Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the Buddy's Debtors.

Impairment and Voting: The General Unsecured Claims against the Buddy's Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the Buddy's Debtors.

xiv.    General Unsecured Claim against PSP – Class 6-D

Classification:  Class 6-D consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against PSP.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the PSP Debtors, except to the extent that a Holder of a General Unsecured Claim against the PSP Debtors agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the PSP Debtors shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the PSP Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to~~

~~the PSP Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the PSP Debtors.

Impairment and Voting:  The General Unsecured Claims against the PSP Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the PSP Debtors.

xv.    General Unsecured Claim against Vitamin Shoppe – Class 6-E

Classification:  Class 6-E consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against Vitamin Shoppe.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Vitamin Shoppe Debtors, except to the extent that a Holder of a General Unsecured Claim against the Vitamin Shoppe Debtors agrees to less favorable treatment, ~~whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction,~~ on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Vitamin Shoppe Debtors shall receive its *pro rata* share of ~~(A) the OpCo General Unsecured Claims Distribution allocable to the Vitamin Shoppe Debtors resulting from any Sale Transaction or Partial Sale Transaction with respect to the Vitamin Shoppe Debtors, if any, and (B)~~ the OpCo Debtor Litigation Trust Units allocable to the Vitamin Shoppe Debtors.

Impairment and Voting:  The General Unsecured Claims against the Vitamin Shoppe Debtors are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the Vitamin Shoppe Debtors.

xvi.    Prepetition HoldCo Claims – Class 7

Classification:  Class 7 consists of approximately $514.7 million in outstanding principal, plus interest, fees, and other expenses pursuant to the HoldCo Credit Agreement.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition HoldCo Loan Claim, except to the extent that a Holder of a Prepetition HoldCo Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition HoldCo Loan Claim shall receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) ~~solely to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or~~

pursuant to the Plan, any recovery **proceeds** from the Freedom HoldCo Debtor **Liquidation****Litigation** Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election.  If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor **Liquidation****Litigation** Trust **(to the extent even applicable)**, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

Impairment and Voting:  The Prepetition HoldCo Loan Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition HoldCo Loan Claims.

xvii.    General Unsecured Claims against the Freedom HoldCo Debtors – Class 8-A

Classification: Class 8-A consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against the HoldCo Debtors.

Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Freedom HoldCo General Unsecured Claim, except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to the Freedom HoldCo Debtors resulting from any Partial Sale Transaction, if any, and (B) **to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or pursuant to the Plan,** its *pro rata* share of **any recovery****proceeds** from the Freedom HoldCo Debtor **Liquidation****Litigation** Trust.  If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor **Liquidation****Litigation** Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim; or

(ii)    in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any and (B) **to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled,**

~~discharged or released under or pursuant to the Plan,~~ its *pro rata* share of ~~any recovery~~proceeds from the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust. If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, or there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.

<u>Impairment and Voting</u>: The Freedom HoldCo General Unsecured Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Freedom HoldCo General Unsecured Claims.

xviii.   <u>HoldCo Receivables General Unsecured Claims – Class 8-B</u>

<u>Classification</u>:  Class 8-B consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc.

<u>Treatment</u>:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo Receivables General Unsecured Claim, except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive:

(i)    in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, or Freedom VCM Receivables, Inc. resulting from any Partial Sale Transaction, if any.  If the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim; or

(ii)   in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim.

<u>Impairment and Voting</u>:  The HoldCo Receivables General Unsecured Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such HoldCo Receivables General Unsecured Claims.

xix.    TopCo General Unsecured Claims – Class 8-C

Classification:  Class 8-C consists of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court against TopCo.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed TopCo General Unsecured Claim, except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed TopCo General Unsecured Claim shall receive:

(i)      in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.3(c) of the Plan, and (B) its *pro rata* share of the HoldCo General Unsecured Claims Distribution allocable to TopCo resulting from any Partial Sale Transaction, if any.  If (x) there is no Cash held at TopCo following the allocation described in Section 3.3(c) of the Plan, and (y) the proceeds of the Partial Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim; or

(ii)     in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.

Impairment and Voting:  The TopCo General Unsecured Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such TopCo General Unsecured Claims.

xx.    Intercompany Claims – Class 9

Classification:  Class 9 consists of any prepetition Claim, Cause of Action, or remedy held by or asserted against a Debtor by another Debtor.

Treatment:  On the Effective Date, each Holder of an Allowed Intercompany Claim shall receive the following treatment:

(i)      in the event of the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), on or after the Effective Date: (A) any and all Intercompany Claims between, among and/or against, Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and

the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; and (B) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (x) extinguished, canceled, and/or discharged on the Effective Date, or (y) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired; provided, however, that notwithstanding the foregoing, any Intercompany Claims, held by or against or among any of the Freedom HoldCo Debtors shall receive the recovery that such Intercompany Claim would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if such Intercompany Claim is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date.  To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; or

(ii)    in the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (A) extinguished, canceled and/or discharged on the Effective Date or (B) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Impairment and Voting:  The Intercompany Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Intercompany Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Intercompany Claims.

xxi.    Subordinated Claims – Class 10

Classification:  Class 10 consists of any prepetition Claim that is subject to subordination pursuant to sections 510(b)-(c) of the Bankruptcy Code or otherwise.

Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Subordinated Claim, except to the extent that a Holder of a Subordinated Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Subordinated Claim shall receive:

(i)      in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any).  If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or

(ii)     in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.

Impairment and Voting:  The Subordinated Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Subordinated Claims.

xxii.   Existing TopCo Equity Interests – Class 11

Classification:  Class 11 consists of any Existing Equity Interests in TopCo.

Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing TopCo Equity Interest, except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (A) its *pro rata* share of Cash (if any) held by TopCo following all distributions required under the Plan and the allocation described in Section 3.3(c) of the Plan, or (B) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest.

Impairment and Voting:  The Existing TopCo Equity Interests are impaired Interests. Holders of such Interests are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Existing TopCo Equity Interests.

xxiii.    Existing Intercompany Equity Interest – Class 12

Classification:   Class 12 consists of any Existing Equity Interests other than Existing TopCo Equity Interests.

Treatment: On the Effective Date, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) or the Sale Transaction, each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired; provided that in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, such election shall be with the consent of the Required Consenting First Lien Lenders; provided, further, that, notwithstanding the foregoing, the Allowed Existing Intercompany Equity Interests held by any of the Freedom HoldCo Debtors shall be extinguished, canceled, and/or discharged on the Effective Date.

Impairment and Voting:   The Existing Intercompany Equity Interests are impaired Interests.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Existing Intercompany Equity Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Existing Intercompany Equity Interests.

## VII.    SECURITIES LAWS MATTERS

> **The Issuance of the Reorganized Common Equity and the New Warrants Raises Issues Under U.S. Federal and State Securities Laws.**
>
> The issuance of the Reorganized Common Equity and the New Warrants under the Plan raises certain securities law issues under the Bankruptcy Code and U.S. federal and state securities laws that are discussed in this section.   The information in this section should not be considered applicable to all situations or to all Holders of Claims receiving the Reorganized Common Equity and the New Warrants.   Holders of Claims should consult their own legal counsel concerning the facts Reorganized Common Equity and the New Warrants.

### A.    Issuance and Resale of the Reorganized Common Equity and the New Warrants Under the Plan

The Debtors will seek, pursuant to section 1145 of the Bankruptcy Code, to exempt the Reorganized Common Equity and the New Warrants from the registration requirements of the Securities Act of 1933 (as amended, the "Securities Act") (and of any state securities or "blue sky" laws).  Section 1145 exempts from registration the sale of a debtor's securities under a

chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administration expense in a case concerning, such debtor. In reliance upon this exemption, the Debtors believe that the Reorganized Common Equity and the New Warrants generally will be exempt from the registration requirements of the Securities Act. The Debtors intend that recipients will be able to resell the Reorganized Common Equity and the New Warrants without registration under the Securities Act or other federal securities laws, unless the recipient is (i) an "underwriter" with respect to such securities, within the meaning of section 1145(b) of the Bankruptcy Code, or (ii) an affiliate of the issuer. Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan, or (iv) is an "issuer" of the relevant security, as such term is used in section 2(11) of the Securities Act. An entity is not an "underwriter" under section 2(a)(11) of the Securities Act with regard to securities received under section 1145(a)(1), in "ordinary trading transactions" made on a national securities exchange. However, the Debtors do not anticipate that the Reorganized Common Equity and/or the New Warrants will be listed in the near term on a stock exchange. What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC. Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the Plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), or (iii) payment of special compensation to brokers or dealers in connection with the sale. The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(l)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer. Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a "controlling person" and therefore a statutory underwriter within the meaning of section 1145(b)(i) of the Bankruptcy Code.

You should confer with your own legal advisors to determine whether or not you are an "underwriter" or an "affiliate."

## VIII.  ALTERNATIVES TO CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain over-leveraged and the Debtors may be unable to service their debt obligations.  Accordingly, if the Plan is not consummated, the alternatives include:

### A.  Liquidation Under the Bankruptcy Code

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code.  A discussion of how a chapter 7 liquidation would affect the recoveries of the Holders of Claims is set forth in this Article VIII.  The Debtors believe that liquidation would result in either the same, or lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in attached Exhibit B to this Disclosure Statement.

Specifically, in the event of a chapter 7 liquidation, the Liquidation Analysis provides that the Holders of Prepetition First Lien Loan Claims would receive no recovery.  In contrast, under the Plan, the Holders of Prepetition First Lien Loan Claims would receive their *pro rata* share of (i) to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, and (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable); or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.  Accordingly, such Holders would receive greater value under the Plan than such Holders would receive in a chapter 7 liquidation.

Similarly, in the event of a chapter 7 liquidation, the Liquidation Analysis provides that the Holders of Prepetition Second Lien Loan Claims would receive no recovery.  Under the Plan, the Holders of Prepetition Second Lien Loan Claims would receive their *pro rata* share of to the extent the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) (1) solely if the class votes to accept the Plan, the New Warrants, or (2) if the class votes to reject the Plan, its *pro rata* share of the greater of (x) recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution.  If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien

Loan Claim.  Accordingly, such Holders would receive greater value under the Plan than such Holders would receive in a chapter 7 liquidation.

Finally, Holders of General Unsecured Claims, Subordinated Claims, and Existing Equity Interests in the event of a chapter 7 liquidation would receive no recovery.

### B.    Alternative Plan of Reorganization

In formulating and developing the Plan, the Debtors have explored other alternatives, and have engaged in a negotiating process with the Consenting First Lien Lenders.  The Debtors believe that the Plan fairly adjusts the rights of various Classes of Claims, and also provides superior recoveries to Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 over any likely alternative (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns.

**THE DEBTORS BELIEVE THAT THE PLAN IS PREFERABLE TO ANY ALTERNATIVE PLAN OR TRANSACTION BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL FIRST LIEN LENDERS AND ALL SECOND LIEN TERM LOAN LENDERS CONSENT TO ACCEPT THE PLAN.**

### C.    Inaction/Maintenance of Status Quo

If the Restructuring Transactions are not consummated, the Debtors could be in default under the ABL Credit Agreement, First Lien Credit Agreement, Second Lien Credit Agreement, and HoldCo Credit Agreement.  As the Debtors believe they will be unable to repay such indebtedness if it were to be accelerated or upon maturity, the Debtors believe that inaction is not an option.  Further, if the Debtors are forced to file for bankruptcy protection without a consensual restructuring agreement among its creditors, the bankruptcy cases could be time-consuming and much more costly than the current contemplated restructuring.  The Debtors believe that these actions could seriously undermine its ability to obtain financing and could possibly lead to its inability to restructure its debt obligations.  Therefore, the Debtors believe that inaction is not a viable alternative to consummation of the Restructuring Transaction.

## IX.    RISK FACTORS

> **Important Risks to Be Considered**
>
> **Holders of Claims against and Interests in the Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Supplement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan before voting to accept or reject the Plan.**
>
> **These risk factors should not, however, be regarded as constituting the only risks involved in connection with the implementation of the Plan.**

### A.    Risks Associated with the Debtors' Business

i.    <u>The Reorganized Debtors may not be able to Generate Sufficient Cash to Service all of their Indebtedness</u>

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness.

ii.    <u>The Debtors Rely on a Limited Number of Key Vendors to Operate its Business</u>

The loss of any of the Debtors' key vendors or an interruption of production at these vendors from work stoppages, equipment failures or other adverse events or quality control failure would adversely affect the Debtors' ability to provide services and fill customer orders. The Debtors may not be able to find replacement vendors to provide critical supplies on attractive rates.

iii.    <u>The Debtors are Subject to the Conditions of the General Economy</u>

Unfavorable economic conditions may adversely affect the Debtors' business, financial condition or results of operations.  The Debtors are globally vulnerable to general economic downturns.  Any decline in demand for the Debtors' services resulting from a general economic downturn could materially and adversely affect the Debtors' business, financial condition or results of operations.  A prolonged period of sluggish economic conditions has had and may continue to have an adverse impact on the level of maintenance expenditures of the Debtors' customers and their ability to maintain historic levels of these expenditures.  As a result of significantly increased volatility and instability in the international financial markets and

unfavorable global economic conditions, it is difficult for the Debtors, their customers and their suppliers to forecast demand trends accurately.  The Debtors are unable to accurately predict the extent or duration of cycles or their effect on the Debtors' financial condition or results of operations and can give no assurance as to the timing, extent or duration of the current or future business cycles.

iv.    <u>Loss of Key Management or Personnel could Negatively Impact the Debtors' Business</u>

The Debtors have an experienced management team and key personnel who play critical roles in the Debtors' operations.  The Debtors believe their ability to be successful in the future will be due, in part, to their management team and key personnel.  Losing the services of one or more members of the Debtors' management team or key personnel could adversely affect their business.

v.    <u>The Difficulty in Attracting and Retaining Qualified Employees could Detrimentally Impact the Debtors' Business</u>

Both the Debtors and their franchisees and dealers depend on the ability to find, hire and retain qualified employees to manage day-to-day business activities.  The Debtors also need qualified and competent personnel to execute their business plans and serve their customers.  The Debtors' inability to recruit and retain qualified and competent managers and personnel could have a material adverse effect on their business, financial condition, and results of operations.

vi.    <u>The Debtors' Operations may be Negatively Impacted by Unfavorable Publicity or Consumer Perception</u>

The Debtors depend significantly on consumer perception regarding the safety and quality of their products, as well as similar products distributed by other companies.  Consumer perception of products can be significantly influenced by adverse publicity in the form of published scientific research, national media attention or other publicity, whether or not accurate, that associates consumption of Vitamin Shoppe's products or any other similar products with illness or other adverse effects, or questions the benefits of these or similar products or that claims that any such products are ineffective.  A new product may initially be received favorably, resulting in high sales of that product, but that sales level may not be sustainable as consumer preferences change.  Future scientific research or publicity could be unfavorable to Vitamin Shoppe's industry or any of its particular products and may not be consistent with earlier favorable research or publicity.  Unfavorable research or publicity could have a material adverse effect on the Debtors' ability to generate sales within Vitamin Shoppe.

vii.    <u>Product Recalls, Withdrawals or Seizures may Materially and Adversely Affect the Debtors' Business</u>

The Debtors may be subject to product recalls, withdrawals or seizures if any of the products they sell are believed to cause injury or illness or if the Debtors are alleged to have violated governmental regulations in the manufacturing, labeling, promotion, sale or distribution of those products.  A significant recall, withdrawal or seizure of any of the products the Debtors

70

manufacture or sell may require significant management attention, which would likely result in substantial and unexpected costs and may materially and adversely affect the Debtors' business. Furthermore, a recall, withdrawal or seizure of any of the Debtors' products may adversely affect consumer confidence in their brands and thus decrease consumer demand for the Debtors' products.  In some cases, the Debtors rely on their contract manufacturers and suppliers to ensure that the products they manufacture and sell to them comply with all applicable regulatory and legislative requirements.    In general, the Debtors seek representations and warranties, indemnification and/or insurance from their contract manufacturers and suppliers.  However, even with adequate insurance and indemnification, any claims of non-compliance could significantly damage the Debtors' reputation and consumer confidence in the Debtors' products. In addition, the failure of those products to comply with applicable regulatory and legislative requirements could prevent the Debtors from marketing the products or require them to recall or remove such products from the market, which in certain cases could materially and adversely affect their business, financial condition and results of operations.

viii.    The Success of the Debtors' Different Business Segments is Dependent on Factors Affecting Consumer Spending Outside of the Debtors' Control

Consumer spending is affected by general economic conditions and other factors including levels of employment, disposable consumer income, prevailing interest rates, consumer debt and availability of credit, costs of fuel, inflation, recession and fears of recession, war and fears of war, pandemics (such as the COVID-19 pandemic), inclement weather, tariff policies, tax rates and rate increases, timing of receipt of tax refunds, consumer confidence in future economic conditions and political conditions, and consumer perceptions of personal well-being and security.  Unfavorable changes in factors affecting discretionary spending could reduce demand for the Debtors' products and services resulting in lower revenue and negatively impacting their business and financial results.

ix.    The Debtors' Operating Results will be Adversely Affected if they do Not Manage their Inventory Levels

The Debtors must maintain sufficient inventory levels to operate their business successfully.  However, the Debtors also must avoid accumulating excess inventory as they seek to minimize out-of-stock levels across all product categories and to maintain in-stock levels. The Debtors continue to rely on and obtain significant portions of their inventory from vendors located outside the United States.  Some of these vendors often require the Debtors to provide lengthy advance notice of their requirements in order to be able to supply products in the quantities they request.  This usually requires the Debtors to order merchandise and enter into purchase order contracts for the purchase and manufacture of such merchandise, well in advance of the time these products will be offered for sale.  As a result, the Debtors may experience difficulty in responding to a changing retail environment, which makes them vulnerable to changes in price and consumer preferences.  If the Debtors do not accurately anticipate the future demand for a particular product or the time it will take to obtain new inventory, their inventory levels will not be appropriate, and the results of operations may be negatively impacted.

x.      The Debtors' Vitamin Shoppe and PSP Segments Sell Food, Dietary Supplements, Topical Products and/or Pet Products Containing Cannabidiol which may Open the Debtors to Regulatory Enforcement Action

Products that contain cannabidiol ("CBD") are subject to various state and federal laws regarding the production and sale of hemp-based products.  Historically, the Drug Enforcement Administration ("DEA") considered CBD to be a Schedule I controlled substance subject to the Controlled Substances Act ("CSA") under the definition for "marijuana."  However, the Agriculture Improvement Act of 2018 (the "2018 Farm Bill") removed "hemp" from the definition of "marijuana."  "Hemp" is defined as the plant *Cannabis sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol ("THC") concentration of not more than 0.3 percent on a dry weight basis.  As a result of the enactment of the 2018 Farm Bill, the Debtors believe that Vitamin Shoppe's CBD products and the hemp from which they are derived are not Schedule I controlled substances under the CSA.  However, there is a risk that the Debtors could be subject to DEA enforcement action, including prosecution, if any of Vitamin Shoppe's products are determined to not meet the definition of "hemp" and to constitute "marijuana" based on THC levels or other violations.

In addition, although hemp and hemp-derived CBD are no longer controlled substances subject to regulation under the CSA, the FDA has stated publicly that it is nonetheless unlawful under the Federal Food, Drug, and Cosmetic Act ("FDCA") to market foods or dietary supplements containing CBD, even if lawful under the 2018 Farm Bill.  Specifically, the FDCA prohibits the introduction or delivery for introduction into interstate commerce of any food or dietary supplement that contains an approved drug or a drug for which substantial clinical investigations have been instituted and made public, unless a statutory exemption applies.  The FDA has stated its conclusion that this statutory prohibition applies and none of the exceptions has been met for CBD.

The FDA has held public meetings and formed an internal working group to evaluate the potential pathways to market for CBD products, which could include seeking statutory changes from Congress or promulgating new regulations.  If legislative action is necessary, such legislative changes could take years to finalize and may not include provisions that would enable Vitamin Shoppe and PSP to produce, market and/or sell CBD products, and FDA could similarly take years to promulgate new regulations.  Additionally, while the agency's enforcement focus to date has primarily been on CBD products that are associated with therapeutic claims, the agency has recently issued warning letters to companies marketing CBD products without such claims, and there is a risk that FDA could take enforcement action against Vitamin Shoppe and PSP, their third party contract manufacturers or suppliers, or those marketing similar products, which could limit or prevent these segments from marketing CBD products.  While the FDA announced on March 5, 2020 that it is currently evaluating a risk-based enforcement policy for CBD to provide more clarity to industry and the public while the agency takes potential steps to establish a clear regulatory pathway, it remains unclear whether or when FDA will ultimately issue such an enforcement policy.

Moreover, local, state, federal, and international CBD, hemp and cannabis laws and regulations are rapidly changing and subject to evolving interpretations, which could require Vitamin Shoppe and PSP to incur substantial costs associated with compliance requirements or alteration of certain aspects of their business plan in the event that their CBD products become subject to new restrictions. In addition, violations of these laws, or allegations of such violations, could disrupt the businesses and result in a material adverse effect on their operations. The Debtors cannot predict the nature of any future laws, regulations, interpretations, or applications, nor can they determine what effect additional governmental regulations or administrative policies and procedures, when and if promulgated, could have on Vitamin Shoppe and PSP's activities in the hemp and CBD industry. The constant evolution of laws and regulations may require these segments to incur substantial costs associated with legal and compliance fees and ultimately require them to alter their current business plans.

   xi. <u>The Debtors' Financial Success is Tied to the Growth and Effective Operations of the Debtors' Owned Locations, Franchises and Dealers, and the Franchise and Dealer Operations</u>

The Debtors' financial success depends on how effectively they operate the Debtor-owned locations and how their franchisees and dealers operate and develop their businesses. The Debtors do not exercise direct control over the day-to-day operations of the franchises and dealers, and the franchisees and dealers may not operate their businesses in a manner consistent with the Debtors' philosophy and standards and may not increase the level of revenues generated compared to prior years. The Debtors' growth and revenues may, therefore, be adversely affected.

There can be no assurance that the training programs and quality control procedures the Debtors have established will be effective in enabling franchisees and dealers to run profitable businesses or that the Debtors will be able to identify problems or take corrective action quickly enough. In addition, failure by a franchisee or dealer to provide service at acceptable levels may result in adverse publicity that can materially adversely affect the Debtors' reputation and ability to compete in the market in which the franchisee or dealer is located.

   xii. <u>The Debtors' Business Lines Involve Substantial Litigation which may Damage the Debtors' Reputation or Result in Material Liabilities</u>

The Debtors have been named, from time to time, as a defendant in various legal actions, including arbitration, class-actions, and other litigation arising in connection with their various business activities. Adverse outcomes related to litigation could result in substantial damages and could materially affect the Debtors' liquidity and capital resources and cause the Debtors' net income to decline or may require them to alter their business operations. Negative public opinion can also result from the Debtors' actual or alleged conduct in such claims, possibly damaging their reputation, which could negatively impact their financial performance.

Some of the products the Debtors sell may expose them to product liability claims relating to personal injury, death, or property damage caused by such products, and may require them to take actions such as product recalls. Although the Debtors maintain liability insurance, they cannot be certain that their coverage will be adequate for liabilities actually incurred or that

insurance will continue to be available to them on commercially reasonable terms, or at all. Vitamin Shoppe, in particular, as a retailer and direct marketer of products designed for human consumption, is subject to product liability claims if the use of its products is alleged to have resulted in injury or to include inadequate instructions for use or inadequate warnings concerning possible side effects and interactions with other substances.    In addition, third-party manufacturers produce many of the products the Debtors sell which may expose them to product liability claims for products they do not manufacture.    While the Debtors attempt to manage these risks by obtaining indemnification agreements from the manufacturers of products that they sell and insurance, third parties may not satisfy their indemnification obligations to the Debtors and/or their insurance policies may not be sufficient or available.    A product liability claim against the Debtors, whether with respect to products of a third-party or their branded products, could result in increased costs and could adversely affect their reputation with their customers, which in turn could materially adversely affect their business, financial condition and results of operations.

> xiii.    <u>The Debtors' Business Relies on Technology Systems and Electronics Communications which, if disrupted, could materially Affect the Debtors' Business</u>

The Debtors depend heavily upon their information technology systems in the conduct of their business.    The Debtors develop, own and license or otherwise contract for sophisticated technology systems and services.    If they experience significant disruptions to their systems, the Debtors could experience a loss of business, which could have a material adverse effect on their business, financial condition, and results of operations.    Any data breach or severe disruption of the Debtors' network or electronic communications could have a material adverse effect on their business, financial condition, and results of operations.    The Debtors rely on certain software vendors to maintain and periodically upgrade many of these systems so that they can continue to support the Debtors' business.    The software programs supporting many of their systems were licensed to the Debtors by independent software developers.    The inability of these developers or the Debtors to continue to maintain and upgrade these information systems and software programs would disrupt or reduce the efficiency of their operations if they were unable to convert to alternate systems in an efficient and timely manner.

**B.    Certain Bankruptcy Considerations**

> i.    <u>General</u>

While the Debtors believe that these Chapter 11 Cases, commenced in order to implement the Plan, will be of short duration and will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case.    Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, these Chapter 11 Cases could have an adverse effect on the Debtors' business.    Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key vendors and

suppliers, customers, employees and agents. Bankruptcy proceedings also will involve additional expenses and may divert the attention of the Debtors' management away from the operation of the business.

The extent to which bankruptcy proceedings disrupt the Debtors' business will likely be directly related to the length of time it takes to complete the proceedings. If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while it tries to develop a different reorganization plan that can be confirmed. That would increase both the probability and the magnitude of the potentially adverse effects described herein.

ii.    <u>Failure to Receive Adequate Acceptances</u>

The Debtors believe they will receive the requisite amount of votes in favor of the Plan in light of the fact that, as set forth herein, the Consenting First Lien Lenders who hold more than 80% of the Prepetition First Lien Loan Claims agreed to vote for, support and not object to the Plan. However, the Plan constitutes a separate chapter 11 plan for each Debtor and all references to the Plan are intended on an individual and per-Debtor basis. The Plan groups (but does not substantively consolidate) certain Debtors solely for purposes of describing treatment of Claims against and Interests in the Debtors under the Plan. As a result, if for some reason the Debtors do not receive, with respect to each Debtor, votes from Holders of at least two-thirds in dollar amount and a majority in number of Holders (the "<u>Requisite Acceptances</u>") with respect to at least one Class of Claims that is impaired and entitled to vote (excluding insiders), the Debtors will not be able to seek confirmation of the Plan as to those Debtors that do not receive Requisite Acceptances under the Plan, and the Debtors will seek confirmation of the Plan as to all other Debtors that meet the standards under section 1129 of the Bankruptcy Code. Further, if the Requisite Acceptances are not received, the Debtors may, subject to the terms and conditions of the Restructuring Support Agreement, seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Consenting First Lien Lenders and/or the Debtors may be required to sell their business under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

iii.    <u>Failure to Confirm the Plan</u>

Even if the Requisite Acceptances are received, there is some risk that the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may deny confirmation of the Plan. A non-accepting (or deemed rejecting) creditor or equity security Holder of the Debtors might, among other things, challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by

the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting Holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such Holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  While the Debtors cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will satisfy the statutory requirements for confirmation and will not be followed by a need for further financial reorganization and that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a restructuring of the Debtors could be implemented and what distribution Holders of Claims ultimately would receive with respect to their Claims, which may constitute less favorable treatment than they would receive under the Plan.  If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case the Debtors believe that Holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

      iv.      Failure to Receive Bankruptcy Court Approval of the Compromises and Settlements Contemplated by the Plan

The Plan provides for certain releases, injunctions and exculpations that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties.  The releases, injunctions, and exculpations may not be approved, in which case certain Released Parties may withdraw their support from the Plan, notwithstanding the existence of the Restructuring Support Agreement.

      v.      Alternative Plans of Reorganization may be Proposed

If these Chapter 11 Cases are commenced, other parties-in-interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization.  Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization.  However, such exclusivity period can be reduced or terminated upon a showing of cause and an order of the Bankruptcy Court.  Were such an order to be entered, other parties-in-interest would then have the opportunity to propose alternative plans of reorganization.

If other parties-in-interest were to propose an alternative plan following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to Holders of Claims or Interests.  If there are competing plans of reorganization, these Chapter 11 Cases are likely to become longer and more complicated.

vi.    Failure to Consummate the Plan

Article XI of the Plan contains various conditions to consummation of the Plan, including the Confirmation Order having become final and non-appealable, the Debtors having entered into the Plan Documents, and all conditions precedent to effectiveness of such agreements having been satisfied or waived in accordance with the terms thereof.  As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.  If the Plan is not consummated and the restructuring completed, these Chapter 11 Cases will be prolonged and the Debtors may lack sufficient liquidity to effect a successful restructuring under chapter 11 of the Bankruptcy Code.

vii.    Extended Stay in a Bankruptcy Proceeding

While the Debtors expects that a chapter 11 bankruptcy filing solely for the purpose of implementing the Plan would be of short duration and would not be unduly disruptive to the Debtors' business, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan would be confirmed.  Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business.  There is a risk, due to uncertainty about the Debtors' future, that:

- customers could seek alternative sources of products from the Debtors' competitors, including competitors that are in little or no relative financial or operational distress;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- vendors, suppliers or agents and other business partners could terminate their relationship with the Debtors or require financial assurances or trade terms which are materially different from what the Debtors have today.

A lengthy bankruptcy proceeding would also involve significant expenses and divert the attention of management from operating the Debtors' business, as well as creating concerns for employees, suppliers and customers.

The disruption that a bankruptcy proceeding could inflict upon the Debtors' business would increase with the length of time it takes to complete these Chapter 11 Cases and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties on whom the Debtors depend, including vendors, employees, agents and customers.  If the Debtors are unable to obtain confirmation of the Plan on a timely basis, because of a challenge to the Plan or a failure to satisfy the conditions to the effectiveness of the Plan, the Debtors may be forced to operate in bankruptcy for an extended period while they try to develop a different reorganization plan that can be confirmed.  A

protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

viii.    Termination of the Restructuring Support Agreement in Certain Circumstances

Pursuant to the Restructuring Support Agreement, the Consenting First Lien Lenders have agreed to support the Plan, however, such support can be terminated and such votes revoked pursuant to the terms and conditions thereof upon the occurrence of certain "Termination Events" (as defined therein) under the Restructuring Support Agreement. Such Termination Events include, among other things, the failure of the Debtors to reach certain milestones in these Chapter 11 Cases in a timely manner. While the Debtors believe that they will be able to meet such milestones, there can be no assurance that will be the case. Additional events that constitute Termination Events under the Restructuring Support Agreement include the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, a material breach by the Debtors of their obligations under the Restructuring Support Agreement, or a final determination by a governmental agency of competent jurisdiction that the Restructuring Transactions contemplated by the Plan cannot legally go forward. See Exhibit D for additional detail. If a Termination Event occurs and the support of the Consenting First Lien Lenders were to be withdrawn, and the votes of such Holders were revoked, the Debtors may need to amend the Plan and re-solicit votes thereon, or formulate a new chapter 11 plan and solicit votes on such new plan. Such amendment and/or re-solicitation could cause material delay in these Chapter 11 Cases, and may adversely impact the Debtors' businesses and its ability to reorganize.

ix.    Distributions could be Delayed

If the Plan is confirmed, the date of the distributions to be made pursuant to the Plan will not occur until the Effective Date. The Debtors estimate that the process of obtaining confirmation of the Plan will be no longer than ninety (90) days from the date of the commencement of the Debtors' Chapter 11 Cases and, if these Chapter 11 Cases are filed, intends to seek to confirm the Plan on an expedited timeframe. While the Debtors anticipate making distributions under the Plan upon or shortly after entry of the Confirmation Order, they may be delayed for a substantially longer period if the conditions to consummation of the Plan have not yet been met.

x.    Objections to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

C.    **Risks Relating to Tax and Accounting Consequences of the Plan**

    i.    <u>Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations</u>

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors currently do not intend to seek any ruling from the Internal Revenue Service (the "<u>IRS</u>") on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.  In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request.  Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment of the Plan, or that a court would not sustain such a challenge.  Holders of Claims and Interests should carefully review <u>Article XI</u> hereof, "*Certain U.S. Federal Income Tax Considerations*," to determine how the tax implications of the Plan may adversely affect the Debtors, Reorganized Debtors, and Holders of Claims and Interests.

    ii.    <u>Use of Historical Financial Information</u>

As a result of the consummation of the Plan and the transactions contemplated thereby, the Debtors believe they will be subject to the fresh start accounting rules.  Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued.  This process is guided by purchase price allocation standards under GAAP.  Application of fresh start accounting rules could result in the values of certain of the Debtors' assets being written down.

D.    **Other Risks**

    i.    <u>The Effective Date May Not Occur</u>

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.  Effectiveness of the Plan is also subject to certain conditions as described in Article XI of the Plan.  If these conditions have not occurred or have not been waived as set forth in the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to the Claims and Interests would remain unchanged.

    ii.    <u>The Freedom HoldCo Debtor ~~Liquidation~~<span style="color:blue">Litigation</span> Trust May Not Be Funded</u>

The Debtors are investigating potential Claims and Causes of Action that may exist at the Freedom HoldCo Debtors through the Freedom HoldCo Independent Investigation.  As of the date hereof, the Freedom HoldCo Debtors do not have any Cash assets.  Accordingly, if any Claims or Causes of Action are identified and are not otherwise settled, discharged, or released under or pursuant to the Plan, the Freedom HoldCo Debtor ~~Liquidation~~<span style="color:blue">Litigation</span> Trust would

need to be funded to enable the Trustee thereof to pursue such Claims and/or Causes of Action. There can be no assurance that the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust will be funded. Further, even if the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust is funded, there can be no assurance that any such Claims or Causes of Action so identified will be successful.

### iii.    The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### iv.    No representations outside this Disclosure Statement are Authorized

No representations concerning or related to the Debtors or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your vote to accept the Plan, other than those contained in or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### v.    No legal or tax advice is provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to provide you with information regarding the Debtors and the proposed Restructuring Transactions to assist you in making a decision regarding whether or not to support the Plan.

## X.    DESCRIPTION OF SECURITIES TO BE ISSUED IN CONNECTION WITH THE PLAN

### A.    Reorganized Common Equity

In the event of a Plan Equitization Transaction, the common equity in New TopCo will be authorized, issued, or reserved on the Effective Date. The Reorganized Common Equity shall be described in the Plan Supplement.

### B.    New Warrants

In the event of a Plan Equitization Transaction, on the Effective Date, in accordance with the terms of the Plan and the Restructuring Transactions Memorandum and as further set forth in the New Warrant Documentation, New TopCo shall issue and deliver all of the New Warrants to (subject to dilution by the Management Incentive Plan) to the OpCo Debtors Litigation Trust for

further distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of OpCo General Unsecured Claims, pursuant to the terms and conditions of the Restructuring Support Agreement, the OpCo Debtor Litigation Trust Agreement, and the New Warrant Documentation.  The issuance of New Warrants pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, and all of the New Warrants issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  On the Effective Date, the New Warrant Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

The New Warrants shall be distributed in a single instrument to be held by the OpCo Litigation Trustee.

## XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims entitled to vote on the Plan. This summary is based on the United States Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes to, or new interpretations of, the Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the Reorganized Common Equity or New Warrants as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, people who use the accrual method of accounting and report income on an "applicable financial statement," and Holders who are in bankruptcy). Further, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected

for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than as a Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary generally does not address the U.S. federal income tax consequences to Non-U.S. Holders (as defined below).  In addition, this discussion does not address U.S. federal taxes other than income taxes.

For purposes of this discussion, a U.S. Holder is a Holder of a Claim that is: (i) an individual citizen or resident of the United States for U.S. federal income tax purposes; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is a Holder that is not a U.S. Holder.

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult with their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

A.    **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

i.    Characterization of the Plan

Certain tax consequences of the Plan will depend on whether the Plan is consummated pursuant to a Sale Transaction or a Plan Equitization Transaction (including, for the avoidance of doubt, following a Partial Sale Transaction, if any).  The Debtors anticipate that a Plan Equitization Transaction will be effectuated pursuant to one of two potential structures.  In one structure, the New ABL Facility, Take-Back Term Loans, Reorganized Common Equity and New Warrants will be issued by New TopCo, which will continue to own its subsidiaries (the "Existing Structure").  In the alternative structure, the Debtors' assets will be transferred to a

newly-formed entity ("Newco") (the "Newco Structure"). The tax consequences of a Plan Equitization Transaction will depend on whether the Existing Structure or the Newco Structure will be used.

(a)    Sale Transaction; Partial Sale Transaction

A Sale Transaction would effectuate a sale of all or substantially all of the Debtors' assets and a Partial Sale Transaction would effectuate a sale of a portion of the Debtors' assets. The Debtors generally would recognize gain or loss upon a Sale Transaction in an amount equal to the difference, if any, between (i) the sum of (x) proceeds from such Sale Transaction or Partial Sale Transaction, as applicable, and (y) the amount of any liabilities directly or indirectly assumed by the acquirer and (ii) the tax basis in the assets transferred (including any assets deemed transferred, such as by reason of the transfer of the membership interests in a wholly-owned limited liability company that is disregarded for U.S. federal income tax purposes). Any gain not offset by the Debtors' net operating loss carryforwards (the "NOLs") or other tax attributes would result in a cash tax liability.

(b)    Plan Equitization Transaction

The Debtors and the Consenting First Lien Lenders have not yet determined how a potential Plan Equitization Transaction will be structured, assuming there is no Sale Transaction. Such decision may principally depend on whether a determination can be reached that the Newco Structure would not result in significant cash tax liability for the Debtors.

It is currently contemplated that the Newco Structure would be structured as a direct acquisition of all of the assets of Franchise Group, Inc. (after otherwise giving effect to the Plan) and a constructive acquisition of all of the then assets of Franchise Group, Inc.'s direct and indirect subsidiaries. The constructive asset acquisition occurs by reason of the fact that all of Franchise Group, Inc.'s subsidiaries (other than Educate, Inc.) are limited liability companies that are treated as disregarded entities for U.S. federal income tax purposes such that, by acquiring the membership interests of such direct and indirect subsidiaries, Newco would be treated for U.S. federal income tax purposes as acquiring all of the underlying assets of such subsidiaries. The consideration for the acquisition of the assets in the Newco Structure would be the Reorganized Common Equity, New Warrants, the issuance or assumption of the New ABL Facility and Take-Back Term Loans, and the direct and indirect assumption of all of the obligations of the Reorganized Debtors under the Plan.

The Reorganized Debtors would recognize gain or loss upon the transfer in an amount equal to the difference, if any, between (i) the sum of (x) the fair market value of the Reorganized Common Equity and Warrants, (y) the "issue price" of the New ABL Facility (to be distributed to Holders of Allowed Prepetition ABL Loan Claims) and Take-Back Term Loans, and (z) the amount of any other obligations of the Reorganized Debtors directly or indirectly assumed by Newco and its subsidiaries and (ii) the adjusted tax basis in the assets transferred including any assets deemed transferred, such as by reason of the transfer of the membership interests in the directly and indirectly wholly-owned limited liability company subsidiaries that are treated as disregarded entities for U.S. federal income tax purposes. Any gain not offset by the Debtors' NOLs or other tax attributes would result in a cash tax liability. The determination

as to whether or not to elect the Newco Structure will be based on all facts and circumstances as of the time the election is made, including the projected enterprise value of the Reorganized Debtors, the timing of the Effective Date, estimated available tax attributes and other factors. Nevertheless, the actual facts may vary from those projected, estimated or assumed, and the Reorganized Debtors' ability to utilize applicable tax attributes to offset any gain attributable to the transfer may be subject to limitation, which could result in tax consequences different from those expected, and any resulting tax liability would remain subject to audit and adjustment by the IRS or other applicable taxing authorities.

   ii.  <u>Cancellation of Debt</u>

   The Debtors expect to incur a substantial amount of cancellation of indebtedness income ("<u>COD Income</u>") as a result of the Plan.

   In general, absent an exception, COD Income is includable in a taxpayer's gross income upon the satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  If COD Income is recognized by a debtor in a case under chapter 11 and the discharge of the debt occurs pursuant to the bankruptcy case, it is generally excluded from the debtor's gross income.  The Tax Code provides that where COD Income is excluded because of this bankruptcy exception, the debtor must reduce certain of its tax attributes, such as NOLs, current year losses, tax credits and tax basis in property, by the amount of any excluded COD Income after the determination of the U.S. federal income tax for the year of the discharge of the debt.  Although not free from doubt, it is expected that carryover of disallowed business interest expense would not be a tax attribute subject to such reduction.  In applying the attribute reduction rule to the tax basis in property, the Tax Code limits the reduction in tax basis to the amount by which the tax basis exceeds the debtor's post-emergence liabilities (often referred to as the "liability floor").  If advantageous, the debtors can elect to reduce the basis of depreciable property prior to any reduction of its NOL carryforwards or other tax attributes.  The Debtors expect that COD Income realized as a result of the implementation of the Plan will be excluded from the Debtors' gross income, resulting in a reduction of certain tax attributes.

   The amount of the COD Income will generally equal the excess of (i) the adjusted issue price of the indebtedness satisfied over (ii) the sum of (a) the amount of Cash paid, (b) the issue price of any new indebtedness of the taxpayer issued, and (c) the fair market value of any other consideration (including stock of the debtor or a party related to the debtor) given in satisfaction of such indebtedness at the time of the exchange, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD Income (such as where the payment of the canceled debt would have given rise to a tax deduction).  To the extent the amount of COD Income exceeds the tax attributes available for reduction, the remaining COD Income is without further current or future tax cost to the debtor.  Special rules apply where the excluded COD Income is recognized by a debtor that is a member of a consolidated group.  Under these rules, the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member) are first subject to reduction.  To the extent that the excluded COD Income exceeds the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member), the Treasury Regulations generally require the reduction of certain consolidated tax attributes attributable to other members of the group.  If one of the attributes of the debtor member reduced under the above rules is the basis of stock of another member of the

group, a "look-through rule" applies requiring that certain corresponding reductions be made to the tax attributes of the lower-tier member (including consolidated tax attributes of such lower-tier member).

If COD Income is realized, the amount of COD Income will depend, in part, on the issue price of the New ABL Facility and the fair market value of the Reorganized Common Equity and the New Warrants distributed in discharge of Claims. Under the rules discussed above, certain tax attributes of the Debtors (including tax basis in assets, capital losses, and NOLs) could be substantially reduced if there is significant COD Income.

Any reduction in tax attributes attributable to the COD Income incurred in a reorganization transaction does not occur until the end of the taxable year in which the Plan goes effective. As a result, the Debtors do not expect the attribute reduction to affect the U.S. federal income tax treatment to Debtors of the Newco Structure, including the computation of gain or loss on the transfer.

The Debtors anticipate that a sale or taxable transfer of all or substantially all of the Debtors' assets pursuant to the Plan would be treated as a plan of liquidation for U.S. federal income tax purposes. In such a scenario, the Debtors intend to take the position that no COD Income should be incurred by any Debtor at the time of the implementation of the Plan and prior to the disposition by such Debtor of all or substantially all of its assets and distribution of Sale Proceeds to holders of Claims (other than to the extent that all remaining assets and Claims are transferred to Wind Down Co or any Allowed Claim's distribution is subject to a maximum amount, or has been or is separately settled for less than its carrying value). In that event, the reduction of tax attributes resulting from such COD Income (which, as indicated, only occurs as of the end of the tax year in which the COD Income occurs) would not generally be expected to have a material impact on the Debtors. Given the lack of direct authoritative guidance as to when COD Income occurs in the context of a liquidating chapter 11 plan, there can be no assurance that the IRS will not challenge this position, and there can be no assurance that all or a substantial amount of the COD Income will not be incurred earlier than as described above.

### iii.    Section 382

Section 382 of the Tax Code places significant limitations upon the use of a corporation's (or consolidated group's) NOLs and certain other tax attributes if an "ownership change" occurs with respect to such corporation's stock. Section 382 generally imposes an annual limitation on the use of pre-ownership change losses equal to the product of (i) the fair market value of the corporation immediately before the ownership change multiplied by (ii) the "long term tax-exempt rate" for the month in which the ownership change occurs. If a corporation (or consolidated group) recognizes tax losses during the tax year in which an ownership change occurs, the tax losses are generally apportioned between the period prior to the ownership change and the period after the ownership change using a "daily proration" methodology. Losses that are apportioned to the period prior to the ownership change will be subject to the section 382 limitations on the use of NOLs and certain other tax attributes, and losses that are apportioned to the period after the ownership change will not be subject to such limitations. Absent the Newco

Structure, it is anticipated that an ownership change will occur with respect to the Debtors on the Effective Date.

If a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then built-in losses recognized during the five-year period following the ownership change generally will be treated as pre-ownership change losses and will be subject to the annual limitation provided under section 382. If a corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the five-year period following the ownership change generally will increase the annual limitation in the year such gains are recognized.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's pre-ownership change losses are not limited on an annual basis, but, instead, NOLs will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' pre-ownership change losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) Exception the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without triggering the elimination of its pre-ownership change losses. Instead, if a subsequent ownership change occurs, the resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not yet determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

As discussed above, in the Newco Structure, Newco should obtain a tax basis in the assets acquired (or deemed acquired) from the Debtors equal to the fair market value of such

assets, and Newco would not succeed to any of the tax attributes of the Debtors. Accordingly, the discussion above regarding section 382 would be generally irrelevant for Newco.

**B.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Consenting First Lien Term Loan Claims, ABL Loan Claims, Second Lien Term Loan Claims, Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests**

U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Plan.

i.    <u>Certain U.S. Federal Income Tax Consequences to U.S. Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests; General</u>

Each Holder of Allowed Prepetition ABL Loan Claims will receive its *pro rata* share of: (i) to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (B) proceeds of (x) the Exit ABL Facility, or (y) the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (A) hereunder; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) the American Freight Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (B) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.

Each Holder of Allowed Prepetition First Lien Loan Claims will receive its *pro rata* share of: (i) to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any) (A) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transactions, if applicable, (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), and (C) to the extent that the value of the Collateral securing any Prepetition First Lien Loan Claim is less than the Allowed amount of such Prepetition First Lien Loan Claim (after taking into account any Allowed Claims that are senior in priority to the Prepetition First Lien Loan Claims), the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim against each applicable Debtor, and shall be classified and treated as a Class 6-A Claim, Class 6-B Claim, Class 6-C Claim, Class 6-D Claim, or Class 6-E Claim, as applicable, and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in the applicable Class; or (ii) to the extent the Restructuring Transactions are consummated through

the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim.

Each Holder of Allowed Prepetition Second Lien Loan Claims will receive: (i) to the extent the Restructuring Transactions are consummated through a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), (A) its *pro rata* share of American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, and (B) (1) solely if the Class votes to <u>accept</u> the Plan, the New Warrants, which, if issued, shall be distributed to the OpCo Debtors Litigation Trust to be shared ratably among Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim), or (2) if the Class votes to <u>reject</u> the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code; or (ii) to the extent the Restructuring Transactions are consummated through the Sale Transaction, (A) its ratable share of American Freight Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, *plus* (B) its *pro rata* share of the Prepetition Second Lien Lender Distribution.  If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such Holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim.

Each Holder of Allowed Prepetition HoldCo Loan Claims will receive, in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), a Partial Sale Transaction or a Sale Transaction, its *pro rata* share of (x) the Prepetition HoldCo Lender Distribution, if any, resulting from, to the extent applicable, any Partial Sale Transaction or Sale Transaction and (y) ~~solely to the extent that, after conclusion of the Freedom HoldCo Independent Investigation, it is determined that the Freedom HoldCo Debtors have Claims and Causes of Action that are not otherwise settled, discharged or released under or pursuant to the Plan, any recovery~~**proceeds** from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election.  If the proceeds of the Sale Transaction or Partial Sale Transaction (if applicable) do not result in a Prepetition HoldCo Lender Distribution and there is no recovery from the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust (to the extent even applicable), then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

Each Holder of a Subordinated Claim will receive: (i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), its *pro rata* share of the Subordinated Claims Distribution resulting from any Partial Sale Transaction (if any).  If the proceeds of the Partial Sale Transaction (if any) do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim; or (ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims

Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.

Each Holder of Allowed Existing TopCo Equity Interests will receive (A) its pro rata share of Cash (if any) held by TopCo following all distributions required under the Plan and the allocation described in Section 3.3(c) of the Plan, or (B) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest.

The treatment of each Holder of General Unsecured Claims is set forth in Article V of the Plan.

The tax consequences of the Plan to a U.S. Holder of a Claim may depend in part upon (i) whether such Claim is based on an obligation that constitutes a "security" for U.S. federal income tax purposes and (ii) whether all or a portion of the consideration received for such Claim is an obligation that constitutes a "security" for U.S. federal income tax purposes. Neither the Tax Code nor Treasury Regulations define the term "security."  The determination of whether a debt obligation constitutes a "security" for U.S. federal tax purposes is complex and depends on the facts and circumstances surrounding the origin and nature of the claim, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. Generally, obligations arising out of the extension of trade credit have been held not to be securities, while corporate debt obligations evidenced by written instruments with original maturities of ten (10) years or more have been held to be securities. An instrument with a term of less than five (5) years generally has been held not to be a security. However, the IRS has ruled that new debt obligations with a term of less than five (5) years issued in exchange for and bearing the same terms (other than interest rate) as securities may also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the issuing corporation in substantially the same form.  It is uncertain whether the debt obligations under the ABL Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement will be considered securities for U.S. federal income tax purposes and U.S. Holders are advised to consult their tax advisors with respect to this issue.  It is uncertain what form the New ABL Facility will take, and what the maturity date of the New ABL Facility would be if issued. The discussion herein assumes that the New ABL Facility will not constitute securities for U.S. federal income tax purposes.

If the debt obligations under the ABL Credit Agreement, First Lien Credit Agreement, and Second Lien Credit Agreement, respectively, are considered securities for U.S. federal income tax purposes, then each U.S. Holder of Prepetition ABL Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, respectively, should recognize gain, but not loss (other than amounts received in payment of accrued but unpaid interest, as discussed below), in an amount equal to the lesser of (i) the sum of the issue price of the New ABL Facility and the amount of Cash received, and (ii) the excess of (a) the sum of Cash, fair market value of the Reorganized Common Equity or New Common Warrants (as applicable), and the issue price

of the New ABL Facility received over (b) the adjusted tax basis of the U.S. Holder's Claim. Such U.S. Holder's holding period in the Reorganized Common Equity or New Warrants (as applicable) would include the U.S. Holder's holding period in its Claim, while the U.S. Holder would start a new holding period in the New ABL Facility. Such U.S. Holder's adjusted tax basis in the Reorganized Common Equity or New Warrants (as applicable) received would equal the U.S. Holder's basis in its Claim, less the issue price of the New ABL Facility, the amount of Cash received and any deductions claimed in respect of any previously accrued but unpaid interest income, plus the amount of gain or interest income, if any, recognized on the exchange.

If the debt obligations under the ABL Credit Agreement, First Lien Credit Agreement, or Second Lien Credit Agreement, respectively, are not considered securities for U.S. federal income tax purposes then, other than with respect to any amounts received that are attributable to accrued but unpaid interest, each such U.S. Holder would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) Cash plus (b) the fair market value of Reorganized Common Equity or New Warrants (if any) plus (c) the issue price of the loans under the New ABL Facility, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

Other than with respect to any amounts received that are attributable to accrued but unpaid interest, each U.S. Holder of Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, and Existing TopCo Equity Interests would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) Cash (if any) plus (b) the fair market value of such U.S. Holder's share (if any) of net assets of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, as applicable, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

In the event of the subsequent disallowance of any Disputed Prepetition HoldCo Loan Claims, General Unsecured Claims, Subordinated Claims, or Existing TopCo Equity Interests, a holder of a previously Allowed Prepetition HoldCo Loan Claim, General Unsecured Claim, Subordinated Claim, or Existing TopCo Equity Interest may receive additional distributions in respect of its Claim or Interest. Accordingly, it is possible that such a holder may have additional gain (if any) and/or imputed interest income in respect of any additional Cash or property distributions received in respect of its Claim or Interest. In addition, it is possible that the recognition of any loss realized by a holder of such an Allowed Claim or Interest as to which additional Cash or property could be received may be deferred until all Disputed Claims are Allowed or not allowed. See Article XI.B.i, "*Treatment of the Freedom HoldCo Debtor* ~~*Liquidation*~~*Litigation Trust*," below.

If the Newco Structure is used, all U.S. Holders of Claims should be treated as engaging in a fully taxable exchange, and therefore, each U.S. Holder would recognize gain or loss equal to the difference, if any, between  (i) the sum of (a) Cash plus (b) the fair market value of Reorganized Common Equity or New Warrants (if any) plus (c) the issue price of the loans under the New ABL Facility received, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss will be determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount" and accrued but untaxed interest, whether the Claim constitutes a capital asset

within the meaning of section 1221 of the Tax Code in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If such recognized gain or loss is capital in nature, it generally would be a long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

      ii.    <u>Treatment of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust</u>

Although not free from doubt, other than with respect to any assets that are subject to potential Disputed Claims of ownership or uncertain distributions, the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the U.S. Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims. The Debtors intend to take the position that this treatment applies to the extent reasonably practicable. In such case, any beneficiaries of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust net assets and then contributed such undivided interest in the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust net assets to the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust. If this treatment applies, the person or persons responsible for administering the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust pursuant to the Plan and not unduly prolong its duration. The Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the governing documents for the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust.

Other than with respect to any assets of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable U.S. Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims prior to the contribution of such assets to the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

As soon as reasonably practicable after the transfer of the Debtors' applicable assets to the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust, the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust (or its designee) shall make a good faith valuation of such assets. All parties to the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust (including, without limitation, the Debtors, Reorganized Debtors, the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims and beneficiaries of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust) must consistently use such valuation for all U.S. federal

income tax purposes.  The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Other than with respect to any assets of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust with respect to earnings generated by the assets held by it.  Each beneficiary must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust, even if no distributions are made.  Allocations of taxable income with respect to the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust.  Similarly, taxable losses of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.  The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any U.S. Holder of a beneficial interest in the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust, and the ability of such U.S. Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the U.S. Holder.  Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust and not as income or loss with respect to such beneficiary's applicable Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims.  In the event any tax is imposed on the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust, the person or persons responsible for administering the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust shall be responsible for payment, solely out of the assets of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust, of any such taxes imposed on the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust.

Other than with respect to any assets of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, after the Effective Date, a U.S. Holder's share of any collections received on the assets of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust should not be included, for U.S. federal income tax purposes, in the U.S. Holder's amount realized in respect of its Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims but should be separately treated as amounts realized in respect of such U.S. Holder's ownership interest in the underlying assets of the Freedom HoldCo Debtor ~~Liquidation~~Litigation Trust.

The person or persons responsible for administering the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all U.S. federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income. The ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee**, or such other person or persons responsible for administering the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations. As soon as reasonably practicable after the close of each taxable year, the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust or such other person or persons responsible for administering the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** of a private letter ruling if the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the ~~trustee of~~**Freedom HoldCo Debtor Litigation Trustee),** the Freedom HoldCo Debtor ~~Liquidation Trust), the trustee of the Freedom HoldCo Debtor Liquidation Trust~~**Litigation Trustee** may timely elect to (i) treat any portion of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, and ~~the trustee of~~ the Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee**) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** may request an expedited determination of taxes of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust

for all taxable periods through the dissolution of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust.

### iii. Treatment of the OpCo Debtor Litigation Trust

Although not free from doubt, other than with respect to any assets that are subject to potential Disputed Claims of ownership or uncertain distributions, the OpCo Debtor Litigation Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim). The Debtors intend to take the position that this treatment applies to the extent reasonably practicable. In such case, any beneficiaries of the OpCo Debtor Litigation Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the OpCo Debtor Litigation Trust net assets and then contributed such undivided interest in the OpCo Debtor Litigation Trust net assets to the OpCo Debtor Litigation Trust. If this treatment applies, the person or persons responsible for administering the OpCo Debtor Litigation Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the OpCo Debtor Litigation Trust pursuant to the Plan and not unduly prolong its duration. The OpCo Debtor Litigation Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the governing documents for the OpCo Debtor Litigation Trust.

Other than with respect to any assets of the OpCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable U.S. Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) prior to the contribution of such assets to the OpCo Debtor Litigation Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

As soon as reasonably practicable after the transfer of the Debtors' applicable assets to the OpCo Debtor Litigation Trust, the OpCo Debtor Litigation Trust (or its designee) shall make a good faith valuation of such assets. All parties to the OpCo Debtor Litigation Trust (including, without limitation, the Debtors, Reorganized Debtors, the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim)) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Other than with respect to any assets of the OpCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the OpCo Debtor Litigation Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the OpCo Debtor

Litigation Trust, even if no distributions are made. Allocations of taxable income with respect to the OpCo Debtor Litigation Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the OpCo Debtor Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the OpCo Debtor Litigation Trust. Similarly, taxable losses of the OpCo Debtor Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any U.S. Holder of a beneficial interest in the OpCo Debtor Litigation Trust, and the ability of such U.S. Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the U.S. Holder. Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the OpCo Debtor Litigation Trust and not as income or loss with respect to such beneficiary's applicable Prepetition Second Lien Loan Claims or Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim). In the event any tax is imposed on the OpCo Debtor Litigation Trust, the person or persons responsible for administering the OpCo Debtor Litigation Trust shall be responsible for payment, solely out of the assets of the OpCo Debtor Litigation Trust, of any such taxes imposed on the OpCo Debtor Litigation Trust.

Other than with respect to any assets of the OpCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, after the Effective Date, a U.S. Holder's share of any collections received on the assets of the OpCo Debtor Litigation Trust should not be included, for U.S. federal income tax purposes, in the U.S. Holder's amount realized in respect of its Prepetition Second Lien Loan Claims or Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) but should be separately treated as amounts realized in respect of such U.S. Holder's ownership interest in the underlying assets of the OpCo Debtor Litigation Trust.

The person or persons responsible for administering the OpCo Debtor Litigation Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all U.S. federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income. The OpCo Litigation Trustee, or such other person or persons responsible for administering the OpCo Debtor Litigation Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the OpCo Debtor Litigation Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and

related Treasury Regulations. As soon as reasonably practicable after the close of each taxable year, the OpCo Debtor Litigation Trust or such other person or persons responsible for administering the OpCo Debtor Litigation Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the OpCo Litigation Trustee of a private letter ruling if the OpCo Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the OpCo Litigation Trustee), the OpCo Litigation Trustee may timely elect to (i) treat any portion of the OpCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the OpCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, and Holders of Allowed Prepetition Second Lien Loan Claims and General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the OpCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the OpCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The OpCo Litigation Trustee may request an expedited determination of taxes of the OpCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the OpCo Debtor Litigation Trust for all taxable periods through the dissolution of the OpCo Debtor Litigation Trust.

iv.    Accrued Interest

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest (or original issue discount ("OID"), if any) on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to untaxed interest that accrued but was not previously paid on such Claims, if any. Certain legislative history indicates that an allocation of consideration as

between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

v.    <u>Market Discount</u>

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  U.S. Holders are urged to consult their tax advisors concerning the application of the market discount rules to the Claims.

vi.    <u>Medicare Tax</u>

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan or the Plan.

vii.    <u>U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Reorganized Common Equity</u>

***In the event that a Newco Structure is utilized, it has not yet been determined whether New TopCo will be an entity that is treated as a corporation or as a partnership for U.S. federal income tax purposes.***

a.    ***If New TopCo is a Corporation for U.S. Federal Income Tax Purposes***

*1.*  a. *Dividends on Reorganized Common Equity*

Generally, distributions made on account of the Reorganized Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or

accumulated earnings and profits of the issuer of such Reorganized Common Equity as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's tax basis in its shares of the Reorganized Common Equity. Any such distributions in excess of the U.S. Holder's adjusted tax basis in its shares (determined on a share-by share basis) generally will be treated as capital gain. Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividend-received deduction may be disallowed.

### *2. ~~b.~~ Sale, Redemption, or Repurchase of Reorganized Common Equity*

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the Reorganized Common Equity. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the Reorganized Common Equity for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

### *3. ~~c.~~ Ownership, Exercise, and Disposition of New Warrants*

A U.S. Holder that elects to exercise the New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the Reorganized Common Equity it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the New Warrants. A U.S. Holder's aggregate tax basis in the Reorganized Common Equity will equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its New Warrants plus (ii) such U.S. Holder's adjusted tax basis in its New Warrants immediately before the New Warrants are exercised. A U.S. Holder's holding period in the Reorganized Common Equity will begin on the day after the exercise date of the New Warrants.

Under section 305 of the Tax Code, certain transactions that have the effect of increasing the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest. Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the U.S. Holder in connection with such distribution.

A U.S. Holder that elects not to exercise the New Warrants and instead allows the New Warrants to lapse may be entitled to claim a capital loss upon expiration of the New Warrants in an amount equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants. In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the Reorganized Common Equity to which the New Warrants relate would have had in the hands of the U.S. Holder if such stock had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants.

**b.** ***If New TopCo is a Partnership for U.S. Federal Income Tax Purposes***

**The Debtors currently contemplate, and the following discussion also assumes, that if New TopCo is treated as a partnership for U.S. federal income tax purposes then the receipt by a Holder of Reorganized Common Equity and/or New Warrants will be treated for U.S. federal income tax purposes as though the Holder received equity and/or warrants in the first-tier subsidiary of New TopCo that is treated as a corporation for U.S. federal income tax purposes (referred to herein as "Parent") and then immediately exchanged such equity and/or warrants for the Reorganized Common Equity and/or New Warrants.**

**1.** ***Ownership and Disposition of Reorganized Common Equity***

**As noted above, it is intended that the receipt by a Holder of Reorganized Common Equity on the Effective Date pursuant to the Plan will be treated for U.S. federal income tax purposes as though the Holder received equity in Parent, and then immediately exchanged such equity for the Reorganized Common Equity. Assuming that treatment is respected, the exchange by a U.S. Holder of equity in Parent for the Reorganized Common Equity will generally be treated a tax-free exchange pursuant to section 721 of the Tax Code (in a transaction described in Situation 2 of IRS Revenue Ruling 99-5, 1999-1 C.B. 434) and should result in a U.S. Holder having a tax basis in, and holding period with respect to, the Reorganized Common Equity equal to the U.S. Holder's tax basis in, and holding period with respect to, the equity in Parent exchanged therefore.**

**Because the Reorganized Common Equity will be equity of an entity that will be treated for U.S. federal income tax purposes as a partnership, a U.S. Holder receiving Reorganized Common Equity will be treated as a partner in New TopCo. Accordingly, as a partnership, New TopCo itself will not be subject to U.S. federal income tax. Instead, each U.S. Holder will be required to report on its U.S. federal income tax return its distributive share (whether or not distributed) of New TopCo's income, gains, losses, deductions, and credits for New TopCo's taxable year ending with or within such U.S. Holder's taxable year even if New TopCo does not make a concurrent distribution to such**

U.S. Holder. However, because it is expected that New TopCo's sole asset will be its equity in Parent, an entity classified as a corporation for U.S. federal income tax purposes, absent an actual distribution from Parent that is treated as a "dividend" for purposes of the Tax Code or a sale (or other taxable disposition) by New TopCo of any of its equity in Parent, any partner in New TopCo should not generally have any current allocations of taxable income or loss.

In general, a U.S. Holder of Reorganized Common Equity will not recognize taxable income as a consequence of receiving a distribution (whether in cash or in kind) from New TopCo, except to the extent that any cash (and/or fair market value of any marketable securities) distributed exceeds such U.S. Holder's adjusted tax basis in its Reorganized Common Equity. Any such excess will be treated as gain from the sale of such U.S. Holder's Reorganized Common Equity and will be treated as capital gain. A U.S. Holder generally will not recognize a loss for U.S. federal income tax purposes as a consequence of receiving a distribution from New TopCo, except that if a U.S. Holder receives a distribution solely of cash (and/or marketable securities) in complete liquidation of its interest in New TopCo, the U.S. Holder will recognize a capital loss equal to the excess, if any, of its adjusted tax basis in its Reorganized Common Equity over the amount of such cash (and/or marketable securities). If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

Gain or loss recognized by a U.S. Holder on the disposition of all or any portion of its Reorganized Common Equity will generally, subject to the application of certain recharacterization rules (i.e., related to a sale of "hot assets" like unrealized receivables or inventory of the partnership under section 751 of the Tax Code) be capital gain or loss. If a U.S. Holder transfers less than all of its Reorganized Common Equity, the U.S. Holder will take into account the percentage of its adjusted tax basis in its Reorganized Common Equity that is transferred, determined by comparing the relative fair market values of the portion of the Reorganized Common Equity that is transferred and the portion of the Reorganized Common Equity that is retained.

New TopCo intends to furnish to each Holder of Reorganized Common Equity, after the close of each calendar year, specific tax information, including a Schedule K-1, which describes such Holder's allocable share of New TopCo's income, gain, loss and deductions for New TopCo's preceding taxable year. In preparing this information, New TopCo will take various accounting and reporting positions to determine each Holder's allocable share of such income, gain, loss and deductions. However, New TopCo cannot provide assurances that those positions will yield a result that conforms to the requirements of the Tax Code, applicable Treasury Regulations or administrative interpretations of the IRS. Furthermore, New TopCo cannot provide assurances that the IRS will not successfully contend in court that those positions are impermissible.

Pursuant to the Bipartisan Budget Act of 2015, for U.S. federal income tax purposes, any audit adjustment to New TopCo's tax items (or any partner's distributive share of such item) may result in the imposition of tax (including any applicable penalties and interest) at the New TopCo level. Generally, New TopCo will have the ability to elect to have the partners take such audit adjustment into account in accordance with their

interests in New TopCo during the taxable year under audit, but there can be no assurance that New TopCo will choose to make such election or that such election will be effective in all circumstances. If New TopCo is unable to have the partners take into account such audit adjustment in accordance with their interests in New TopCo during the taxable year under audit, or New TopCo chooses not to do so, the partners in the year of such audit adjustment may bear some or all of the tax liability resulting from such audit adjustment, without regard to each such partner's ownership interest in New TopCo (if any) during the taxable year under audit. In addition, New TopCo may be able to reduce the amount owed by New TopCo in certain cases based on the status of the partners or if certain partners file amended returns to take into account such adjustments, but there is no assurance New TopCo will be able to obtain any such reduction. If, as a result of any such audit adjustment, New TopCo is required to make payments of taxes, penalties, and/or interest, New TopCo's operating agreement may provide that each partner's share of such amounts shall be treated as an advance against amounts otherwise distributable to such partner or as a loan to such partner. Future Treasury Regulations, other administrative guidance or judicial decisions may affect the application of these rules to New TopCo and the Holders of Reorganized Common Equity and, as a result, the application of these rules to New TopCo and the Holders of Reorganized Common Equity is uncertain.

U.S. Holders generally will recognize gain or loss upon the sale or taxable disposition of the Reorganized Common Equity in an amount equal to the difference, if any, between (i) the U.S. Holder's adjusted tax basis in the Reorganized Common Equity exchanged and (ii) the sum of the cash and the fair market value of any property received in such disposition. Any such gain or loss generally should be long-term capital gain or loss if at the time of the sale, redemption, or other taxable disposition, the U.S. Holder has held its Reorganized Common Equity for more than one year (a U.S. Holder may have a split holding period in the Reorganized Common Equity if it contributes property to New TopCo or otherwise acquires Reorganized Common Equity on multiples dates), subject to the application of certain recharacterization rules discussed above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

### a.    Non-Partner Status.

Based on their currently contemplated terms, the New Warrants are expected to be treated as "noncompensatory options" pursuant to Treasury Regulation Sections 1.704-1, 1.721-2 and 1.761-3 (the "Noncompensatory Option Regulations"). Accordingly, ownership of a New Warrant alone generally should not cause a U.S. Holder to be treated as a partner of New TopCo, as the New Warrants do not convey any interest in New TopCo's capital or profits unless or until the point at which a New Warrant is exercised and Reorganized Common Equity is issued. However, there can be no assurance that the IRS would not express a contrary view, including, that the terms of the New Warrants could cause the New Warrants to be treated as additional Reorganized Common Equity prior to their exercise.

**b.  Sale or Other Disposition of New Warrants.**

In general, a U.S. Holder will recognize gain or loss for U.S. federal income tax purposes upon the sale, exchange or other taxable disposition of a New Warrant in an amount equal to the difference, if any, between the amount realized and such U.S. Holder's adjusted tax basis in the New Warrant.  The amount realized upon the sale or other taxable disposition of the New Warrants will be measured by the sum of all consideration received. Any gain or loss generally will be capital gain or loss, and generally will be long-term capital gain or loss if at the time of the sale, exchange or other taxable disposition, the U.S. Holder has held its New Warrants for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

**c.  Exercise or Lapse of New Warrants.**

Generally, a U.S. Holder will not recognize gain or loss on the receipt of Reorganized Common Equity after exercising a New Warrant.  An exercising U.S. Holder of a New Warrant will be treated as having contributed, in exchange for newly issued Reorganized Common Equity, an amount of money equal the amount paid to exercise such New Warrant and purchase the Reorganized Common Equity. A U.S. Holder's initial tax basis in Reorganized Common Equity received on exercise of a New Warrant will generally equal the sum of any money paid to exercise such New Warrant and the U.S. Holder's adjusted basis in such New Warrant. On the lapse of a New Warrant, a U.S. Holder may be entitled to claim a capital loss upon expiration of the New Warrants in an amount equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants.

The tax consequences to a U.S. Holder of owning interests in New TopCo where New TopCo is a treated as a partnership for U.S. federal income tax purposes are complex, and U.S. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of owning Reorganized Common Equity and/or New Warrants.

viii.   U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of the New ABL Facility

*a.  Interest and Original Issue Discount*

Payments of stated interest under the New ABL Facility will constitute payments of "qualified stated interest" and generally will be taxable to holders as ordinary income at the time the payments are received or accrued, in accordance with the holder's method of tax accounting. The preceding discussion assumes the New ABL Facility will not be issued with OID.  The New ABL Facility generally would be treated as issued with OID if the principal amount of the New ABL Facility, plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeds the issue price of the debt instrument by more than a de minimis amount.

The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (i.e., interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange. A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium. However, a debt instrument will generally not be treated as publicly traded if at the time the determination is made the outstanding stated principal amount of the issue that includes the debt instrument does not exceed $100 million.

### b. Sale, Retirement or Other Taxable Disposition

A U.S. Holder of the New ABL Facility will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the obligations due under the New ABL Facility equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in New ABL Facility.  Any such gain or loss generally will be capital gain or loss, and will be long term capital gain or loss if the U.S. Holder has held the New ABL Facility for more than one year as of the date of disposition. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

### C.    Information Reporting and Back-Up Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions,

certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a non-U.S. Holder is resident.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XII.    IMPLEMENTATION OF THE PLAN

### A.    Plan Distributions and Transactions

As soon as reasonably practicable after the Effective Date, the distributions provided for under the Plan will be effectuated pursuant to the following restructuring transactions, which shall take place, *in seriatim*, pursuant to documentation reasonably satisfactory to the Debtors and the Consenting First Lien Lenders:

- the Debtors will implement the transactions as set forth in Article VII of the Plan;

- the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order;

- certificates of incorporation, by-laws and other organizational documents of the Reorganized Debtors, in form and substance satisfactory to the Consenting First Lien Lenders, shall be amended and restated as necessary to effectuate the terms of the Plan;

- the Debtors shall implement the Committee Settlement, pursuant to which, among other things, any and all disputes among the Committee Settlement Parties are resolved.

- the OpCo Debtors shall execute the OpCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the OpCo Debtor Litigation Trust in accordance with the terms of the Plan;

- ~~if applicable,~~ the Freedom HoldCo Debtors shall execute the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust Agreement and shall take such steps as necessary to

establish the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust **in accordance with the terms of the Plan**;

- New TopCo shall issue the Reorganized Common Equity, if applicable, pursuant to the terms of the Plan;

- New TopCo shall issue the New Warrants, if applicable pursuant to the terms of the Plan;

- the Debtors shall consummate the Plan by: (i) making distributions of the Reorganized Common Equity to the First Lien Lenders; (ii) making distributions of the New Warrants to the Second Lien Lenders if certain conditions are met; (iii) satisfying all DIP Claims in full by conversion to Take-Back Term Loans and, if certain conditions are met, by conversion to Reorganized Common Equity; and (iv) entering into either the Exit ABL Facility or the Take-Back ABL Term Loan Facility; and

- the releases provided for in the Plan, which are an essential element of the Restructuring Transactions, shall become effective.

### B.    Continued Corporate Existence and Corporate Action

Subject to the terms and conditions of the Restructuring Support Agreement, except as otherwise provided in the Plan or as otherwise may be agreed between the Debtors and the Required Consenting First Lien Lenders, each of the Debtors, as Reorganized Debtors, and, if the Plan Equitization Transaction occurs, New TopCo, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor or New TopCo, each of the Reorganized Debtors and New TopCo, as applicable (and in the event of the Plan Equitization Transaction, in consultation with the Required Consenting First Lien Lenders), may take such action as permitted by applicable law and such Reorganized Debtor's or New TopCo's New Organizational Documents, as such Reorganized Debtor or New TopCo, as applicable, may determine is reasonable and appropriate, including, but not limited to, causing: (a) a Reorganized Debtor or New TopCo to be merged with and into another Reorganized Debtor, or a subsidiary and/or Affiliate of a Reorganized Debtor or New TopCo; (b) a Reorganized Debtor or New TopCo to be dissolved; (c) the conversion of a Reorganized Debtor or New TopCo from one Entity type to another Entity type; (d) the legal name of a Reorganized Debtor or New TopCo to be changed; (e) the closure of a Reorganized Debtor's or New TopCo's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor or New TopCo under the law of jurisdictions other than the law under which the Debtor currently is incorporated.

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the

execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates, wherever located, including all claims, rights and Causes of Action and any property, wherever located, acquired by the Debtors under or in connection with the Plan, shall vest in the applicable Post-Effective Debtor, free and clear of all Claims, Liens, charges, other encumbrances and Interests, except for those Claims, Liens, charges, other encumbrances and Interests arising from or related to the Take-Back Debt Documents or the New ABL Facility Documents. On and after the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, each applicable Post-Effective Debtor and New TopCo may operate its business(es) and may use, acquire and dispose of property, wherever located, and each Reorganized Debtor and New TopCo, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims), Interests and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Without limiting the foregoing, the Post-Effective Debtors and New TopCo may pay the charges that they incur on or after the Effective Date, if any, for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court. Anything in the Plan to the contrary notwithstanding, any unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor, Reorganized Debtor or New TopCo by virtue of the Plan, the Chapter 11 Cases, or otherwise.

On or as soon as reasonably practicable after the Effective Date, in the event a Sale Transaction is consummated, the Wind Down Debtors shall be authorized, following the consummation of such Sale Transaction and the completion of the distributions set forth in Article V of the Plan, to merge, dissolve and/or wind down the Wind Down Debtors under applicable law; provided that, notwithstanding such dissolution, Wind Down Debtors shall remain authorized to continue the wind down of the Wind Down Debtors, including filing any necessary documents with the appropriate authorities, including any tax returns, and to facilitate the closing of the Chapter 11 Cases as to such Debtors. On or as soon as reasonably practicable after the Effective Date, in the event a Partial Sale Transaction is consummated, the Reorganized Debtors shall be authorized, following the consummation of such Partial Sale Transaction and the completion of the distributions set forth in Article V of the Plan, to merge, dissolve and/or wind down the Partial Sale Transaction Debtors under applicable law.

On the Effective Date, these Chapter 11 Cases for all of the Debtors, other than Franchise Group, Inc. (or other such entity that may be designated by the Debtors and the Consenting First

Lien Lenders), shall be closed without the need to file any further documents with the Bankruptcy Court, and the Confirmation Order shall act as a final decree closing each of such other Debtor's Chapter 11 Cases; provided that, notwithstanding the foregoing, the Reorganized Debtors shall pay when due all U.S. Trustee Fees owing through the day before the Effective Date; provided, further, that in no way will the closing of such Chapter 11 Cases prejudice the treatment of any Holder of an Allowed Claim, including any right to receive distributions under the Plan, nor will the closing of such Chapter 11 Cases otherwise alter or modify the terms of the Plan.

### C.    Effectuating Documents and Further Transactions

The Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements (including the Plan Documents) and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, shareholder, or shareholder approval or action.

### D.    Cancellation of Certain Existing Agreements

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise expressly provided in the Plan, on the Effective Date, all notes, instruments, and certificates related to the ABL Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement, the HoldCo Credit Agreement, and the Existing Equity Interests shall be deemed surrendered and canceled and obligations of the Debtors thereunder shall be discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or any requirement of further action, vote or other approval or authorization by any Person.

### E.    Release of Liens, Claims and Interests

Except as otherwise provided in the Confirmation Order, in the Plan, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with the Plan and DIP Claims subject to the Freedom HoldCo DIP Election, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns or, in the event of a Sale Transaction, the Plan Administrator.  Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any Collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery,

and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Plan Administrator, or any administrative agent, collateral agent or indenture trustee under any Take-Back Debt Facility (at the expense of the Debtors or Reorganized Debtors, as applicable) that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Reorganized Debtors or Plan Administrator, as applicable, shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

### F.    Directors of the Reorganized Debtors

#### i.    Boards

In the event of a Plan Equitization Transaction, subject to the terms of the Restructuring Support Agreement and the applicable New Organizational Documents, on the Effective Date, the New Boards shall consist of those individuals identified in the Plan Supplement to be filed with the Bankruptcy Court at or before the Confirmation Hearing. Unless reappointed, the members of the boards of the Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors or to New TopCo on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor or to New TopCo on the Effective Date. Commencing on the Effective Date, each of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Debtor or New TopCo, as applicable, and may be replaced or removed in accordance therewith, as applicable.

In the event of a Sale Transaction, the Plan Administrator shall be the sole director, manager or managing member, as applicable, of each of the Reorganized Debtors from and following the Effective Date. The members of the boards of the Non-Liquidating Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

#### ii.    Management

In the event of a Plan Equitization Transaction, as of the Effective Date, the individuals who will serve in certain senior management positions of the Reorganized Debtors shall consist

of those individuals set forth in the Plan Supplement.  In the event of a Sale Transaction, from and after the Effective Date, the Wind Down Debtors shall be managed and administered by the Plan Administrator, who shall be appointed the sole officer of each of the Wind Down Debtors and shall have full authority to administer the provisions of the Plan.  The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.

### G.     Management/Employee Incentive Plans

The Confirmation Order, if any, shall authorize the New Board to (i) adopt and implement Management Incentive Plans at each operating company or (ii) shall assume, amend or reject the existing long term incentive plans with the current members of the senior management team of Franchise Group's direct or indirect subsidiaries.

The securities issued under the Management Incentive Plan shall dilute the Reorganized Common Equity and New Warrants issued by New TopCo.  On the Effective Date, New TopCo shall issue or cause to be delivered the applicable Interests in the Debtors directly to applicable members of management in accordance with the terms of the Management Incentive Plan.

### H.     General Distribution Mechanics

- Distributions on Account of Allowed Claims Only.  Notwithstanding anything in the Plan to the contrary, no distribution shall be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.

- Disbursing Agent.  Except as otherwise provided in the Plan, all distributions under the Plan, including the distribution of the Reorganized Common Equity and New Warrants, shall be made by the Disbursing Agent or by such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.

- Distribution Record Date.  Distributions under the Plan to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date.  Any transfers of Claims after the Distribution Record Date shall not be recognized for purposes of the Plan unless otherwise provided herein.

- No Recourse.  Except with respect to Claims which are reinstated, no claimant shall have recourse to the Reorganized Debtors (or any property thereof), other than with regard to the enforcement of rights or distributions under the Plan.

- Method of Cash Distributions.  Any Cash payment to be made pursuant to the Plan will be made in U.S. dollars and may be made by draft, check, or wire transfer, in the sole discretion of the Debtors or the Reorganized Debtors, or as otherwise required or provided in any relevant agreement or applicable law.

- Distributions on Non-Business Days.  Any payment or distribution under the Plan due on a day other than a Business Day may be made, without interest, on the next Business Day.

- <u>No Distribution in Excess of Allowed Amount of Claim</u>.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive in respect of such Claim any distribution under the Plan in excess of the Allowed amount of such Claim.

- <u>Disputed Payments</u>.  If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any distribution under the Plan, the Reorganized Debtors may, in lieu of making such distribution to such Person, make such distribution into a segregated account until the disposition thereof shall be determined by Court order or by written agreement among the interested parties.

- <u>Fractional Shares</u>.  No fractional interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.

## I.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall for U.S. federal (and applicable state and local) income tax purposes be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (but solely to the extent that such other amount is an allowable portion of such Allowed Claim).

## J.    Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities and shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate. From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on them by any Governmental Unit in accordance with applicable law with respect to such withholding taxes.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws.  Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

### K.      Exemption from Certain Transfer Taxes

To the fullest extent permitted by applicable law, all transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by the Debtors of any owned property pursuant to section 363(b) or 1123(b)(4) of the Bankruptcy Code, any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, and the creation, modification, consolidation or recording of any mortgage pursuant to the terms of the Plan, or any ancillary documents, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### L.      Exemption from Securities Laws

The Debtors intend to rely on one or more exemptions from the registration provisions of the Securities Act regarding the issuance and distribution of the Reorganized Common Equity and New Warrants. However, the SEC has expressed no views concerning the validity of the exemptive claim under the Securities Act as to the transactions contemplated under the Plan. Therefore, no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

The Debtors believe that the issuance of and the distribution under the Plan of the Reorganized Common Equity and New Warrants is exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, Regulation D promulgated under the Securities Act Regulation S promulgated under the Securities Act, to the maximum extent permitted thereunder.

Except as otherwise set forth immediately below, the Reorganized Common Equity and New Warrants issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. The Debtors believe that the Reorganized Common Equity and New Warrants issued under the Plan, in reliance upon section 1145 of the Bankruptcy Code, are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities.  The Debtors believe that the Reorganized Common Equity and New Warrants issued pursuant to section 1145 of the Bankruptcy Code are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and, subject to the terms of the applicable Amended LLC Agreements, Amended Certificates of Formation and any other applicable amended and restated corporate organizational documents of each of the Reorganized Debtors, are freely

tradable and transferable by any holder thereof that: (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act; (ii) has not been an "affiliate" within 90 days of such transfer; (iii) has not acquired the Reorganized Common Equity and New Warrants from an "affiliate" within one year of such transfer; and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, THE DEBTORS DO NOT MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE DEBT EXCHANGE. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE DEBT EXCHANGE CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## M.    Setoffs and Recoupments

Except as expressly provided in the Plan and except with respect to the Secured Claims, the Reorganized Debtors may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any distributions under the Plan to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action that the applicable Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount between the applicable Reorganized Debtor and the Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or any of their respective successors of any and all claims, rights and Causes of Action that such Persons or any of their respective successors may possess against the applicable Holder.

## N.    Solicitation of Debtors

Notwithstanding anything to the contrary in the Plan, each Debtor and all non-Debtor direct or indirect subsidiaries of any Debtor that would otherwise be entitled to vote to accept or reject the Plan as a Holder of a Claim against or Interest in another Debtor shall not be solicited for voting purposes, and such Debtor or non-Debtor subsidiary will be deemed to have voted to accept the Plan.

O.    **OpCo Debtor Litigation Trust**

i.    **General**

In connection with the Committee Settlement, on the Effective Date, (i) the OpCo Debtors shall execute the OpCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the OpCo Debtor Litigation Trust in accordance with the terms of the Plan and the beneficial interests therein shall be for the benefit of the Holders of OpCo General Unsecured Claims, and (ii) the OpCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the OpCo Debtor Litigation Trust all of their rights, title and interest in the OpCo **Debtor** Litigation ~~Claims~~**Trust Assets**.  Pursuant to section 1141 of the Bankruptcy Code, such OpCo **Debtor** Litigation ~~Claims~~**Trust Assets** shall automatically vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests**, except as otherwise set forth in the Plan**.  For the avoidance of doubt, any right, title and interest in the Claims and Causes of Action belonging to the HoldCo Debtors (if any) shall not be transferred to or vest in the OpCo Debtor Litigation Trust.

The (i) establishment, purpose, and administration of the OpCo Debtor Litigation Trust, (ii) appointment, rights, and powers, of ~~any~~**the** OpCo Litigation Trustee, and (iii) treatment of the OpCo Debtor Litigation Trust for federal income tax purposes, among other things, shall be governed by the OpCo Debtor Litigation Trust Agreement.  On and after the Effective Date, the OpCo Litigation Trustee shall be authorized, in accordance with the terms of the Plan and the OpCo Debtor Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any ~~assets of the~~ OpCo Debtor Litigation Trust **Assets**.

In furtherance of this section of the Plan, (i) it is intended that the OpCo Debtor Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim), consistent with the terms of the Plan, and accordingly, all assets held by the OpCo Debtor Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim), and then contributed by the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) to the OpCo Debtor Litigation Trust in exchange for their interest in the OpCo Debtor Litigation Trust; (ii) the sole purpose of the OpCo Debtor Litigation Trust shall be the liquidation and distribution of the net assets of the OpCo Debtor Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of Prepetition Second Lien Loan Claims and

Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of Prepetition Second Lien Loan Claims and Allowed General Unsecured Claims against the OpCo Debtors in Classes 6-A, 6-B, 6-C, 6-D, and 6-E (including, for the avoidance of doubt, any First Lien Deficiency Claim) receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with the valuation of the assets transferred to the OpCo Debtor Litigation Trust as determined by the OpCo Litigation Trustee (or its designee); (v) the OpCo Litigation Trustee shall be responsible for filing all applicable tax returns for the OpCo Debtor Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the OpCo Litigation Trustee shall annually send to each Holder of an interest in the OpCo Debtor Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the OpCo Litigation Trustee of a private letter ruling if the OpCo Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the OpCo Litigation Trustee), the OpCo Litigation Trustee may timely elect to (i) treat any portion of the OpCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the OpCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the OpCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the OpCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The OpCo Litigation Trustee may request an expedited determination of taxes of the OpCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the OpCo Debtor Litigation Trust for all taxable periods through the dissolution of the OpCo Debtor Litigation Trust.

<u>ii.</u>        ~~iii.~~ OpCo Litigation Trustee

The Creditors' Committee, in consultation with the Debtors, shall select in the Plan Supplement the Person who initially will serve as the OpCo Litigation Trustee, which trustee shall be reasonably acceptable to the Required Consenting First Lien Lenders. On or after the Effective Date, the OpCo Litigation Trustee shall assume all of its obligations, powers and authority under the OpCo Debtor Litigation Trust Agreement to (x) reconcile General Unsecured

Claims, First Lien Deficiency Claims (though not the quantum thereof, which shall be ~~the~~in an amount ~~described~~consistent with the description in Section 5.5(b) of the Plan), and any Prepetition Second Lien Loan Claims (though not the quantum thereof, which shall be the amount set forth in any Allowed Proof of Claim asserting such Claims), and (y) investigate, pursue, litigate and/or settle OpCo Litigation Claims that are transferred to the OpCo Debtor Litigation Trust (collectively, the "OpCo Litigation Trustee Duties").

The OpCo Litigation Trustee shall be a fiduciary of the Post-Effective Debtors, shall have such qualifications and experience as are sufficient to enable the OpCo Litigation Trustee to perform its obligations under the Plan and under the OpCo Debtor Litigation Trust Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the OpCo Debtor Litigation Trust Agreement. To the extent necessary, following the Effective Date, the OpCo Litigation Trustee shall be deemed to be a judicial substitute for the Post-Effective Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code. The OpCo Litigation Trustee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers, including upon advice of counsel, unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

The OpCo Litigation Trustee may be removed by the Bankruptcy Court upon application by any party-in-interest for cause shown. In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the OpCo Litigation Trustee, the Bankruptcy Court shall designate another Person to become the OpCo Litigation Trustee and thereupon the successor OpCo Litigation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

### iii.    ~~iv.~~ OpCo Debtor Litigation Trustee Agreement

Provisions of Agreement and Order. The OpCo Debtor Litigation Trust Agreement and the Confirmation Order shall provide that: (i) the OpCo Litigation Trustee shall be a fiduciary of the Post-Effective Debtors and the beneficiaries of the OpCo Debtor Litigation Trust; and (ii) neither the Post-Effective Debtors (except as expressly set forth in the OpCo Debtor Litigation Trust Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the OpCo Litigation Trustee in performing the OpCo Litigation Trustee Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to the Plan on account of any such action taken or omitted to be taken.

The OpCo Debtor Litigation Trust Agreement will be filed with the Plan Supplement and will provide for, among other things: (1) the transfer of the OpCo Debtor Litigation Trust Assets to the OpCo Debtor Litigation Trust; (2) the payment of OpCo Debtor Litigation Trust Expenses from the OpCo Debtor Litigation Trust Assets; (3) distributions to Holders of Allowed OpCo General Unsecured Claims, as provided herein and in the OpCo Debtor Litigation Trust Agreement; (4) reasonable access to the Debtors' books and records; (5) the identity of the OpCo Litigation Trustee; (6) the terms

115

**of the OpCo Litigation Trustee's engagement; (7) reasonable and customary provisions that allow for limitation of liability and indemnification of the OpCo Litigation Trustee and its professionals by the OpCo Debtor Litigation Trust; provided that any such indemnification shall be the sole responsibility of the OpCo Debtor Litigation Trust and payable solely from the OpCo Debtor Litigation Trust Assets; and (8) the term and dissolution of the OpCo Debtor Litigation Trust. Following the Effective Date, the OpCo Litigation Trustee shall be responsible for all decisions and duties with respect to the OpCo Litigation Trustee Duties, except as otherwise provided in the Plan, the Confirmation Order, or the OpCo Debtor Litigation Trust Agreement.**

**OpCo Litigation Claims.** Notwithstanding anything to the contrary in the Plan, including Article XII thereof, the following Claims and Causes of Action belonging to the OpCo Debtors (collectively, the "OpCo Litigation Claims") shall not be released pursuant to the Plan, and shall be transferred to the OpCo Debtor Litigation Trust: (x) all potential Claims and Causes of Action against former directors and officers of the Debtors in their capacity as such as of the Effective Date; and (y) all potential Claims and Causes of Action against Brian Kahn, Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., Irradiant Partners, LP, Vintage Capital Management LLC, Lauren Kahn, members of the Freedom Lender Group, the HoldCo Debtors, and solely in the case of Brian Kahn, Prophecy Asset Management LP, B. Riley Financial, Inc. and Irradiant Partners, LP, each of their affiliates, directors, officers, managers, partners, and owners (in each case, solely in their capacity as such, and, for the avoidance of doubt, not including any of the Debtors).

For the avoidance of doubt, the following shall be released pursuant to ~~this~~**the** Plan and shall not be transferred to the OpCo Debtor Litigation Trust: (a) all potential Claims and Causes of Action against the members of the Ad Hoc Group; (b) all potential Claims and Causes of Action belonging to the OpCo Debtors against any party that contributes **Cash** to the OpCo Debtor Litigation Trust Escrow Account in an amount agreed to by the Creditors' Committee in consultation with the Required Consenting First Lien Lenders; (c) all potential Claims and Causes of Action against current employees of the Debtors, including management and directors (including, without limitation the Independent Directors, and officers (including the CRO), but excluding Bryant Riley), in each case who are employed by the Debtors or Reorganized Debtors as of the Effective Date; (d) all potential Claims and Causes of Action against former employees and directors of the Debtors that were terminated without cause between February 3, 2025 and the Effective Date of the Plan; and (e) all potential Claims and Causes of Action against any prepetition Estate Professionals and postpetition Estate Professionals **in their capacity as such**. For the avoidance of doubt, notwithstanding the foregoing, any potential Claims and Causes of Action against WFG for prepetition services rendered are not released pursuant to ~~this~~**the** Plan.

**New Warrants.** Solely to the extent that Holders of Claims in Class 5 vote to accept the Plan, the New Warrants shall be vested in the OpCo Debtor Litigation Trust for distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of OpCo General Unsecured Claims.

iv.    ~~v.~~ OpCo **Debtor** Litigation Trust Funding

On the Effective Date, the Debtors and other parties (if applicable) shall fund the OpCo Debtor Litigation Trust Escrow Account in an amount equal to the OpCo Debtor Litigation Trust Escrow Amount. The OpCo Debtor Litigation Trust Escrow Amount shall **automatically and irrevocably vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests. The OpCo Debtor Litigation Trust Escrow Amount shall** be used for the administration of the OpCo Debtor Litigation Trust**, to pay OpCo Debtor Litigation Trust Expenses,** and to pursue the OpCo Litigation Claims, with any excess amount being used to distribute to Holders of General Unsecured Claims. All proceeds from the pursuit of the OpCo Litigation Claims shall be used by the OpCo Litigation Trustee to pay for the costs and expenses of administration of the OpCo Debtor Litigation Trust, pursuit of the OpCo Litigation Claims, and distribution to Holders of OpCo General Unsecured Claims. The OpCo Litigation Trustee shall exercise its fiduciary duty and business judgment to allocate such proceeds among the Classes of Claims receiving interests in the OpCo Debtor Litigation Trust. **The OpCo Litigation Trustee, on behalf of the OpCo Debtor Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the OpCo Debtor Litigation Trust Assets** in accordance with the Plan **and the OpCo Debtor Litigation Trust Agreement.**

~~P. Freedom HoldCo Debtor Liquidation Trust~~

v.    **OpCo Debtor Litigation Trust Units**

**Any and all OpCo Debtor Litigation Trust Units shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. In addition, any and all OpCo Debtor Litigation Trust Units will not be registered pursuant to the Securities Act or any applicable state or local securities law pursuant to section 1145 of the Bankruptcy Code, and will be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145** of the Bankruptcy Code.

**P.    Freedom HoldCo Debtor Litigation Trust**

i.    **General.**

~~To~~**On** the ~~extent that, after the completion of~~ the Freedom HoldCo ~~Independent Investigation, the Freedom HoldCo~~ **Debtors have Claims and Causes of Action that are not otherwise settled, discharged, or released under or pursuant to**~~Effective Date of~~ the Plan, (i) the Freedom HoldCo Debtors shall execute the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust Agreement and shall take such steps as necessary to establish the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust in accordance with the terms of the Plan and the beneficial interests therein, which shall be for the benefit of the Holders of Allowed Claims against the Freedom HoldCo Debtors, Debtors, including to the extent the Freedom HoldCo DIP Election is made, the Allowed DIP Claims currently outstanding against the Freedom HoldCo Debtors and (ii) the

Freedom HoldCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust all of their rights, title and interest in ~~such~~**the Freedom HoldCo Debtor Litigation Trust** Claims ~~and Causes of Action~~. Pursuant to section 1141 of the Bankruptcy Code, such Claims and Causes of Action (if any) shall automatically vest in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust free and clear of all Claims, Liens, encumbrances, or interests.

For the avoidance of doubt, prior to the Effective Date of the Plan, the Freedom HoldCo Independent Director has the sole power and authority to conduct the Freedom HoldCo Independent Investigation. **Notwithstanding any language in the definition of Released Parties, if the Freedom HoldCo Independent Director identifies potential Claims through** the Freedom HoldCo Independent Investigation, the Freedom HoldCo **Independent Director shall have the sole power and authority (i) to settle or release such Claims (other than the Freedom HoldCo Debtor Litigation Trust Claims), subject to further order of the Bankruptcy Court after notice and a hearing, or (ii) to preserve such Claims for transfer to the Freedom HoldCo Debtor Litigation Trust.**

The (i) establishment, purpose, and administration of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust; (ii) appointment, rights, and powers, of ~~any trustee of~~ the Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee**; and (iii) treatment of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust for federal income tax purposes, among other things, shall be governed by the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust Agreement. On **and after** the Effective Date, the Freedom HoldCo ~~Debtors~~**Debtor Litigation Trustee** shall be authorized, in accordance with the terms of the Plan and the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of the assets of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust.

In furtherance of this section of the Plan, (i) it is intended that the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, and then contributed by the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims to the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust in exchange for their interest in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust; (ii) the sole purpose of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust shall be the liquidation and distribution of the net assets of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust in accordance with Treasury Regulation section 301.7701-4(d)~~, including the resolution of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims in accordance with the Plan~~, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without

118

limitation, the Debtors, the Reorganized Debtors, ~~the~~ Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, and ~~the trustee of~~ the Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee**) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, and ~~the trustee of~~ the Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee**) shall report consistently with the valuation of the assets transferred to the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust as determined by the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** (or its designee); (v) the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** shall be responsible for filing all applicable tax returns for the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** shall annually send to each Holder of an interest in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** of a private letter ruling if the ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the ~~trustee of~~**Freedom HoldCo Debtor Litigation Trustee),** the Freedom HoldCo Debtor ~~Liquidation Trust), the trustee of the Freedom HoldCo Debtor Liquidation Trust~~**Litigation Trustee** may timely elect to (i) treat any portion of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, and ~~the trustee of~~ the Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee**) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The ~~trustee of the~~ Freedom HoldCo Debtor ~~Liquidation Trust~~**Litigation Trustee** may request an expedited determination of taxes of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust

for all taxable periods through the dissolution of the Freedom HoldCo Debtor ~~Liquidation~~**Litigation** Trust.

## XIII.   EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND INTERESTS

~~A. Discharge~~

~~Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim is Allowed; or (3) the Holder of such Claim or Equity Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. For the avoidance of doubt, (i) nothing in~~ Section 12.1 ~~of the Plan shall affect the rights of Holders of Claims to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims are entitled under the Plan, and (ii) notwithstanding any other Plan provision or provision in the Restructuring Support Agreement to the contrary, in the event a Sale Transaction is consummated, the Debtors shall not receive a discharge, pursuant to section 1141(d)(3)~~ of the Bankruptcy Code.

~~In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without~~

~~any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims against the Debtors and their Estates, as well as claims and Causes of Action against other Entities.~~

~~**B. Release of Claims**~~

**A.**    ~~**i.**~~ **Discharge of Claims and Termination of Certain Equity Interests.**

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim is Allowed; or (3) the Holder of such Claim or Equity Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.  For the avoidance of doubt, (i) nothing in Section 12.1 of the Plan shall affect the rights of Holders of Claims to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims are entitled under the Plan, and (ii) notwithstanding any other Plan provision or provision in the Restructuring Support Agreement to the contrary, in the event a Sale Transaction is consummated, the Debtors shall not receive a discharge, pursuant to section 1141(d)(3) of the Bankruptcy Code.

In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.   In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle

any Claims against the Debtors and their Estates, as well as claims and Causes of Action against other Entities.

**B.** **Release of Claims**

**i.** ~~ii.~~ Releases by the Debtors

**Subject to the outcome of the Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtor Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release, to the maximum extent permitted by law, to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all claims, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; (vii) the Take-Private Transaction and/or (viii) the confirmation or consummation of the Plan or the solicitation of votes on the Plan, in each case, that such Debtor Releasing Party would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; provided, however, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action arising from**

willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Debtor Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Debtor Releasing Party to enforce the Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or any Sale Transaction or assumed pursuant to the Plan or any Sale Transaction or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in **Article XII.2 of the Plan** shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; (2) any act or omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates; (3) any retained Causes of Action; (4) any OpCo Litigation Claims; ~~or (~~5) any Freedom HoldCo Debtor Litigation Trust Claims; or (6) any Avoidance Actions held by Debtors Freedom Receivables II, LLC and Freedom VCM Receivables, Inc.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

### ii.        ~~iii.~~ Third Party Release

Notwithstanding anything contained in the Plan or the Restructuring Support Agreement to the contrary, and subject to the outcome of Freedom HoldCo Independent Investigation with respect to Freedom HoldCo Independent Investigation Related Matters

and Claims and Causes of Action against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Non-Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Debtor Releasing Parties) and their respective assets and properties (the "__Third-Party Release__") from any and all Claims, Interests, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the confirmation or consummation of the Plan or the solicitation of votes on the Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; __provided__, __however__, that the foregoing provisions of this Third-Party Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Third-Party Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Non-Debtor Releasing Party to enforce the Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or any Sale

Transaction or assumed pursuant to the Plan or any Sale Transaction or Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; (2) any act or omission, transaction, or other occurrence or circumstances related to Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates; (3) any retained Causes of Action; (4) any OpCo Litigation Claims; ~~or~~ (5) any Freedom HoldCo Debtor Litigation Trust Claims; or (6) any Avoidance Actions held by Debtors Freedom Receivables II, LLC and Freedom VCM Receivables, Inc. For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

### iii.    ~~iv.~~ Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of confirmation and consummation of the Plan, making distributions under the Plan, the Disclosure Statement, the Sale Process, the Sale Order, or the solicitation of votes for, or confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing,

including but not limited to the Restructuring Support Agreement; the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation or consummation of the Plan; **provided**, **however**, that the foregoing provisions of this Exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Exculpation), or gross negligence of such applicable Exculpated Party; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; **provided**, **further**, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in <u>Article XII.4</u> of the Plan shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpations set forth above do not exculpate Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates.  For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

### C.    Objections to Claims and Interests

Other than with respect to Fee Claims, (i) only the Reorganized Debtors or New TopCo, or (ii) in the event of a Sale Transaction, only Wind Down Co, on behalf of itself and the other the Wind Down Debtors, shall be entitled to object to Claims **(other than OpCo General Unsecured Claims, Prepetition HoldCo Loan Claims, and Allowed** Freedom HoldCo General Unsecured Claims**)** on and after the Effective Date, except that nothing herein shall be understood to waive the Reorganized Debtors', New TopCo's or the Wind Down Debtors' right to argue that a Claim filed against the Debtors or the Reorganized Debtors has been discharged under the Plan.  **Only the OpCo Debtor Litigation Trust shall be entitled to object to OpCo General Unsecured Claims on and after the Effective Date**.  Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) one hundred eighty (180) days following the later of (x) the Effective Date and (y) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; and (b) such other date as may be fixed by the Bankruptcy

Court, whether fixed before or after the date specified in clause (a) hereof.  From and after the Effective Date, either (i) the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, **or** (ii) the Wind Down Debtors, **(iii) the OpCo Debtor Litigation Trust, or (iv) the Freedom HoldCo Debtor Litigation Trust,** as applicable, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

If an objection to a Claim is filed as set forth in Section 9.2 of the Plan, except as otherwise agreed by (i) the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, or (ii) the Wind Down Debtors, as applicable, if any portion of a Claim (other than a Fee Claim) is a Disputed Claim, no payment or distribution (partial or otherwise) provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

## XIV.  EXECUTORY CONTRACTS UNDER THE PLAN

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

In the event a Sale Transaction or Partial Sale Transaction is consummated, to the extent assumption has not already occurred, the Assumed Contracts to be assumed and assigned in connection with such Sale Transaction or Partial Sale Transaction will be assumed and assigned to the applicable Successful Bidder pursuant to a Sale Order in accordance with the applicable Sale Documents.  Effective as of the Effective Date, in the event a Sale Transaction is consummated, except as otherwise provided herein, any Executory Contract or Unexpired Lease (i) not previously assumed, (ii) not assumed and assigned in accordance with any Sale Documents, (iii) not previously rejected pursuant to an order of the Bankruptcy Court, or (iv) not subject of a pending motion to reject, assume or assume and assign, will be rejected effective as of the Effective Date pursuant to the Confirmation Order.

In the event of a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), except as otherwise provided in the Plan, any Executory Contracts and Unexpired Leases (i) not previously assumed, (ii) not previously assumed and assigned in accordance with any Partial Sale Transaction or other order approving such assumption and assignment, or (iii) not previously rejected pursuant to an order of the Bankruptcy Court, will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order except any Executory Contract or Unexpired Lease (1) identified on the Rejected Contracts/Lease List (which shall initially be filed with the Plan Supplement) as a contract or lease to be rejected, (2) that is the subject of a separate motion or notice to reject, assume, or assume and assign pending as of the Confirmation Date, or (3) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).  In the event of a Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such later date as may be identified on the Rejected Contracts/Lease List or other motion or

notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

The Debtors and the Required Consenting First Lien Lenders will work together in good faith to determine which Executory Contracts and Unexpired Leases shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases; provided that, to the extent the Restructuring Transactions are consummated through the Plan Equitization Transaction, if requested by the Required Consenting First Lien Lenders, (x) absent a Partial Sale Transaction involving the Vitamin Shoppe Debtors, the Vitamin Shoppe Debtors shall reject any and all Executory Contracts or Unexpired Leases held by such Debtor(s), and (y) the Debtors shall reject any Executory Contracts or Unexpired Leases between (i) any of the Debtors, on the one hand, and (ii) any Specified Party, on the other hand.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party (including the applicable Successful Bidder in the event of a Sale Transaction or Partial Sale Transaction, if any) on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by an order of the Bankruptcy Court. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, or increases, accelerates or otherwise alters any obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder as a result of, or creates any Lien on any asset or property of the Debtors or the Reorganized Debtors as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed unenforceable (solely for purposes of the transactions contemplated under the Plan) and modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder, or create or impose a Lien on any asset or property of the Debtors or the Reorganized Debtors. For the avoidance of doubt, confirmation of the Plan shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary in the Plan and in the Restructuring Support Agreement, the Debtors or Reorganized Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts/Lease List in their discretion prior to the Confirmation Date (or such later date as may be agreed with a counterparty); provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

**B.      Cure of Defaults for Assumed Executory Contracts or Unexpired Leases**

Notwithstanding anything to the contrary in the Plan and in the Restructuring Support Agreement, in the event the Restructuring Transactions are consummated through the Sale Transaction or a Partial Sale Transaction (if any), the terms of any Sale Documents and any Sale Order shall govern the cure of defaults, assumption and assignment, and compliance with section 365 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases assumed and assigned pursuant to such Sale Documents and Sale Order.

In the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), the applicable terms of the Bidding Procedures Order and section 365 of the Bankruptcy Code shall govern the process for cure of defaults, assumption, assumption and assignment (if applicable) with respect to any Executory Contracts or Unexpired Leases assumed or assumed and assigned by the Debtors pursuant to the Plan.  Notwithstanding the foregoing, any Assumption and Assignment Notices (as defined in the Bidding Procedures Order), including, but not limited to, those filed at Docket Nos. 487, 499, 597 & 650, shall constitute notice of the potential assumption and proposed Cure Costs.  Any objection by a contract or lease counterparty to the proposed Cure Cost (as defined in the Bidding Procedures Order) must be filed, served, and actually received by the Debtors by the date set forth in the applicable Assumption and Assignment Notice (a "Cure Dispute").  In the event that a non-Debtor contract counterparty files a timely Cure Dispute and the Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard at the Confirmation Hearing or such other date on at least seven (7) days' notice to the applicable non-Debtor contract counterparty, or such date as the parties agree, subject to the Court's calendar.  Any objection by a contract or lease counterparty to (i) the ability of the applicable Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned, or (ii) any other matter pertaining to the proposed assumption (such objection, an "Assumption Dispute") must be filed, served, and actually received by the Debtors by the date on which objections to confirmation of the Plan are due.

In the event the Restructuring Transactions are consummated through the Plan Equitization Transaction (including, for the avoidance of doubt, following any Partial Sale Transaction, if any), except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, the Debtors shall pay any Cure Costs, if monetary, in full in Cash either (i) on the Effective Date or as soon as reasonably practicable thereafter, or (ii) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (x) the Effective Date or as soon as reasonably practicable thereafter and (y) seven (7) days after the date on which such Cure Dispute has been resolved.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan and payment or performance of the applicable Cure Costs shall result in the full satisfaction and cure of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related

defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption.

### C.    Ipso Facto and Similar Provisions Ineffective

Any term of any policy, contract, or other obligation applicable to a Debtor shall be unenforceable with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Person or entity based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of any of these Chapter 11 Cases; (iii) confirmation or consummation of the Plan, including any change of control that will occur as a result of such consummation; or (iv) the Restructuring Transactions.

### D.    Insurance Policies

In accordance with the Plan, (i) on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, which "tail policy" shall not be otherwise terminated or reduced) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed; (iii) the Debtors and the Reorganized Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary; and (iv) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies.

For the avoidance of doubt, on and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

### E.    Survival of Certain Indemnification Obligations

On and as of the Effective Date, all indemnification obligations of the Debtors that are in place as of the Petition Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements or otherwise) for the current directors, officers and managers, of the Debtors, except any indemnification obligations of the Debtors on account of any **Freedom HoldCo Debtor Litigation Trust Claims that are transferred to the OpCo Debtor Litigation Trust and any** OpCo Litigation Claims that are transferred to the ~~Freedom HoldCo~~**OpCo** Debtor ~~Liquidation~~**Litigation** Trust, shall be assumed or assumed and assigned

and remain in full force and effect after the Effective Date, and shall survive unimpaired and unaffected, irrespective of when such obligation arose, as applicable.

### F.    Postpetition Contracts and Leases

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

## XV.  CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Conditions to Confirmation

It shall be a condition the confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI of the Plan:

- the DIP Orders shall have been entered by the Bankruptcy Court and shall remain in full force and effect;

- the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Orders;

- the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan;

- entry of the Disclosure Statement Order;

- entry of the Confirmation Order;

- the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time; and

- in the event of a Sale Transaction, the receipt of a Sufficient Bid and the Sale Documents shall not have been terminated in accordance with their terms.

**B.      Conditions to the Effective Date**

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI of the Plan:

- the DIP Orders, Disclosure Statement Order, and Confirmation Order having become Final Orders in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified, unless otherwise agreed by the Debtors and the Required Consenting First Lien Lenders;

- no court of competent jurisdiction or other competent governmental or regulatory authority having issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

- each of the applicable Definitive Documents having been executed, delivered, acknowledged, and/or filed, as applicable, by the Entities and Persons intended to be parties thereto and effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein having been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Definitive Documents;

- any non-technical and/or immaterial amendments, modifications or supplements to the Plan having been acceptable to the Debtors and the Required Consenting First Lien Lenders, except as otherwise provided in Section 14.3 of the Plan;

- in the event of the Plan Equitization Transaction, each of the offers, issuances, sales, and/or deliveries of Reorganized Common Equity in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no proceeding by any Governmental Unit or other Entity or Person that alleges that any such offer, issuance, sale and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such proceeding shall be threatened in writing or instituted by any Governmental Unit on or prior to the Effective Date;

- the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, having not been terminated in accordance with its respective terms, and there having not occurred and been continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time;

- to the extent a Plan Equitization Transaction is implemented, all of the actions set forth in the Restructuring Transactions Memorandum, as applicable, having been completed and implemented;

- there not having been instituted or threatened to be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Unit (x) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transaction contemplated herein, in the Restructuring Support Agreement, and in the Definitive Documents or (y) imposing a material award, claim, injunction, fine or penalty that, in each case, both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

- the Debtors having obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and having filed all notices and reports, if any, required to be filed, including with any Governmental Unit, by the Debtors in connection with the Plan's effectiveness, in each case, as may be required by a Governmental Unit;

- in the event of the Plan Equitization Transaction, the Reorganized Common Equity to be issued and/or delivered on the Effective Date having been validly issued by New TopCo, having been fully paid and non-assessable, and being free and clear of all taxes, Liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents of New TopCo;

- all conditions precedent to the effectiveness of the OpCo **Debtor Litigation Trust Agreement and the Freedom HoldCo** Debtor Litigation Trust Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the OpCo Debtor Litigation Trust Agreement **and the Freedom HoldCo Debtor Litigation Trust Agreement** shall be in full force and effect;

- **the OpCo Debtor Litigation Trust Escrow Amount shall have been paid to the OpCo Debtor Litigation Trust;**

- all conditions precedent to the effectiveness of the Take-Back Debt Credit Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the Take-Back Debt Credit Agreement shall be in full force and effect;

- all conditions precedent to the effectiveness of the New ABL Facility having been satisfied or duly waived by the party whose consent is required thereunder, and the New ABL Facility shall be in full force and effect;

- all requisite filings with any Governmental Unit and third parties having become effective, and all such Governmental Unit and third parties having approved or consented to the Restructuring Transactions, to the extent required;

- any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions having been obtained;

- all accrued and unpaid Restructuring Expenses having been paid in full in Cash by the Debtors;

- in the event of a Sale Transaction, the Sale Documents, as applicable, not having been terminated in accordance with their terms;

- substantially contemporaneous with the consummation of the Restructuring Transactions, and not having been, as applicable, stayed, modified, reversed, vacated, subject to any pending appeal, and/or terminated prior to the Effective Date: (a) the New Organizational Documents; (b) if applicable, any Sale Order; (c) the Exit ABL Facility; (d) the Take-Back Debt Credit Agreement (if applicable); (e) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (f) all other documents necessary to consummate a transaction of the type contemplated by the Plan to the extent not otherwise listed above; and

- all closing conditions and other conditions precedent in the Restructuring Support Agreement having been satisfied or waived in accordance with the terms thereof.

### C.    **Satisfaction and Waiver of Conditions Precedent**

Except as otherwise provided herein, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Sections 11.1 and 11.2 of the Plan may be waived in whole or part upon agreement by the Debtors and, the Consenting First Lien Lenders, and the Creditors' Committee, and as the case may be, without notice and a hearing, and the Debtors' benefits under any "mootness" doctrine, but only to the extent applicable, shall be unaffected by any provision hereof.  The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

### D.    **Effect of Failure of Conditions**

If all of the conditions to effectiveness have not been satisfied (as provided in Sections 11.1 and 11.2 of the Plan) or duly waived (as provided in Section 11.3 of the Plan) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors may file a motion to vacate the Confirmation Order.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Sections 11.1 and 11.2 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to

this Section 11.4, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under the Plan shall be made, the Debtors and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

### E.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan and whether or not such Holder has accepted the Plan.

### F.    Withdrawal of the Plan

Subject to the terms and conditions of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

## XVI.  CONFIRMATION OF THE PLAN

### A.    Confirmation Generally

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code. It requires further that a debtor's disclosures concerning its plan of reorganization are adequate.

If the Plan is confirmed, the Debtors expect the Effective Date to occur no later than one hundred twenty (120) days after the Petition Date, or ten (10) days after the Confirmation Date.

To confirm the Plan, the Bankruptcy Court must find that all of the requirements of section 1129 of the Bankruptcy Code have been met.  Thus, even if the statutorily required

majority vote in number and dollar amount is achieved for Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 (the only Classes entitled to vote under the Plan), the Bankruptcy Court must make independent findings respecting the Plan's satisfaction of the requirements of the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are discussed below.

## B. Voting Procedures and Standards

Holders of Claims and Interests in Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 (the only Classes entitled to vote under the Plan) as of the Distribution Record Date will receive prior to the commencement of these Chapter 11 Cases, this Disclosure Statement, the Plan, a Ballot for accepting or rejecting the Plan and Plan, and related credit and investment documents.  Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 are entitled to vote because they are Classes that are impaired under the Plan.

A class is "impaired" under a plan unless, with respect to each Claim or Interest of such class, the Plan:

(i) leaves unaltered the legal, equitable and contractual rights to which the Claim or Interest entitles the Holder of such claim or interest; or

(ii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the Holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such Holder based on such claim or interest.

A class that is not impaired under a plan of reorganization is deemed to have accepted the Plan, or is impaired and deemed to have rejected the Plan and, therefore, solicitation of acceptances with respect to such class is not required and will not occur.

Among other things, the following are the Voting Procedures in connection with voting on the Plan and Plan:

(a) For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Interests held by a single Holder against the Debtors in a voting Class will be aggregated as if such Holder held a single Claim or Interest against the Debtors in the voting Class, and the votes related to those Claims or Interests shall be treated as a single vote on the Plan; provided, however, that separate Claims or Interests held as of the Petition Date by different entities (even if related, affiliated, or properly and timely assigned or transferred prior to the Voting Record Date) shall not be deemed to be held by a single Holder pursuant to this provision, and the votes with respect to any such Claims or Interests shall be treated as separate votes on the Plan.

(b) Holders with multiple Claims or Interests within each voting Class must vote all such Claims or Interests to either accept or reject the Plan, and may not split their vote(s) within the voting Class.  Accordingly, an individual Ballot that partially rejects and partially accepts the Plan on account of multiple Claims or Interests within the voting Class will not be counted.

(c) Each Holder will be provided a single individual Ballot for all Claims or Interests held by such Holder in each voting Class against the Debtors.

(d) If a Claim or Interest is transferred after the date established as the voting record date pursuant to the Disclosure Statement Order (the "Voting Record Date"), only the Holder of such Claim or Interest as of the Voting Record Date may execute and submit a Ballot to the Claims Agent, the transferee of such Claim or Interest shall be bound by any such vote (and the consequences thereof) made by the Holder of such transferred Claim or Interest as of the Voting Record Date, and no "cause" will exist to permit any vote change under Bankruptcy Rule 3018(a).

(e) The delivery of a Ballot will be deemed made only when the Claims Agent actually receives the executed Ballot or a Ballot is received via electronic mail.

(f) Any party who has previously submitted to the Claims Agent prior to the date and time set forth in the Disclosure Statement Order by which Ballots for accepting or rejecting the Plan must be received by the Claims Agent (the "Voting Deadline"), a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Claims Agent prior to the Voting Deadline a subsequent properly completed Ballot.  If multiple Ballots are received from the same Holder with respect to the same Claim or Interest prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that Holder's intent and will supersede and revoke any Ballot previously received.

(g) If a Holder of a Claim or Interest casts multiple Ballots on account of the same Claim or Interest, which are received by the Claims Agent on the same day and at the same time, but which are voted inconsistently, such Ballots shall not be counted.

(h) Except as otherwise provided in subsection (f) hereof, any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Claims Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims or Interests to which it relates and the aggregate principal amount represented by such Claims or Interests, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a

certification that the withdrawing party owns the Claims or Interests and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Claims Agent prior to the Voting Deadline. The Debtors expressly reserve the right to contest the validity of any such withdrawals of Ballots.

The following types of Ballots will not be counted in determining whether the Plan has been accepted or rejected.

(1) Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan.

(2) Any Ballot received after the Voting Deadline, except by order of the Bankruptcy Court or if the Debtors have granted an extension of the Voting Deadline, in writing, with respect to such Ballot;

(3) Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

(4) Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

(5) Any Ballot cast by an Entity that does not hold a Claim in the voting Classes;

(6) Any unsigned Ballot; and

(7) Any Ballot submitted by any means other than as set forth herein and in the Ballots, unless approved by the Debtors in writing or otherwise ordered by the Court.

In connection with these Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to approve the process by which Holders of Claims submit their votes (the "Voting Procedures"). In the event these Chapter 11 Cases are commenced, to the extent that the Bankruptcy Court does not or is unable to approve any portion of these Voting Procedures, the Debtors reserve the right to modify the Voting Procedures and recalculate the balloting in accordance with such modified procedures.

**If a Ballot is damaged or lost or if you have any questions concerning Voting Procedures, you may contact the Claims Agent at**

**Franchise Group, Inc. Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 3rd Avenue, Suite 412**
**Brooklyn, NY 11232**

**A vote may be designated (i.e., disregarded) if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not made or solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.**

**Under the Bankruptcy Code, the Plan will be "accepted" by a voting Class if (excluding insiders) at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims in such voting Class that cast Ballots to accept or reject the Plan vote in favor of the Plan.**

**A vote in favor of the Plan also shall be a vote in favor of the Plan, including the agreement to provide the releases set forth in Article XII of the Plan.**

### C.     Acceptance

The Bankruptcy Code provides that a class of claims will have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims in such class that have voted on the Plan. There must be one impaired accepting class excluding insiders. Here, acceptance of the Plan need only be solicited from Holders of Claims in Classes 3, 4, 5, 6-A, 6-B, 6-C, 6-D, 6-E, 7, 8-A, 8-B, 8-C, and 11 as those are the only Classes which are impaired and entitled to vote under the Plan. Except in the context of a "cram down" (described below), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each impaired Class accepts the Plan. If these Chapter 11 Cases are filed, the Debtors intend to request confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any voting Classes that vote to reject or are deemed to reject the Plan. This procedure is commonly referred to as a "cram down." For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation of the Plan notwithstanding rejection by certain impaired Classes, see Article XVI.D.iv, "*Cram Down*," below.

### D.     Confirmation and Consummation

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all impaired Classes of Claims or Interests, or if rejected by an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith. Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code;

- the Plan has been proposed in good faith and not by any means forbidden by law;

- any payment made or to be made by the proponent, by the debtor or by a person issuing securities under the Plan, for services or for costs and expenses in, or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the bankruptcy court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the Plan with the debtor, or a successor to the debtor under the Plan.  The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such claim or interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the Plan or is not impaired under the Plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that allowed administrative expenses and priority claims (other than priority tax claims) will be paid in full on the Effective Date (except that if a class of priority claims has voted to accept the Plan, holders of such claims may receive deferred cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amounts of such claims) and that holders of priority tax claims may receive on account of such claims regular installment payments in cash of a total value, as of the Effective Date, equal to the allowed amount of such claims over a period that ends no later than 5 years from the petition date and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan;

- if a class of claims is impaired, at least one impaired class of claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class; and

- confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a more detailed summary of certain statutory confirmation requirements.

### i.    Best Interests of Holders of Claims and Interests

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.  Thus, with respect to each impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In determining whether this test is satisfied, the first step is to determine the dollar amount that would be generated from the liquidation of each of the Debtors' assets and properties in a chapter 7 liquidation case.  The gross amount of cash available in such a liquidation would be the sum of the proceeds from the disposition of such Debtor's assets and the cash held by such Debtor at the time of the commencement of the chapter 7 case.  This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the applicable Debtor's business and the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders of the applicable Debtor in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

See the Liquidation Analysis annexed as Exhibit B hereto and Article XVI.D.i herein for a further discussion of how the Plan satisfies the "best interests" test.  The Liquidation Analysis is incorporated herein by reference and was prepared by the Debtors with the assistance of the

Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors.

THE DEBTORS HAVE DETERMINED, AS DISCUSSED IN THE LIQUIDATION ANALYSIS ATTACHED AS <u>EXHIBIT B</u> HERETO, THAT CONFIRMATION OF THE PLAN WILL PROVIDE EACH CREDITOR AND INTEREST HOLDER OF EACH DEBTOR WITH A RECOVERY THAT IS NOT LESS THAN IT WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE APPLICABLE DEBTOR UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. AND, AS REFLECTED IN THE LIQUIDATION ANALYSIS, THE DEBTORS BELIEVE THAT LIQUIDATION OF THE DEBTORS' BUSINESSES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE WOULD RESULT IN SUBSTANTIAL DIMINUTION IN THE VALUE TO BE REALIZED BY HOLDERS OF CLAIMS AS COMPARED TO DISTRIBUTIONS CONTEMPLATED UNDER THE PLAN. CONSEQUENTLY, THE DEBTORS AND THEIR MANAGEMENT BELIEVE THAT CONFIRMATION OF THE PLAN WILL PROVIDE A SUBSTANTIALLY GREATER RETURN TO HOLDERS OF CLAIMS THAN WOULD A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

ii.    <u>Financial Feasibility</u>

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtors have prepared projections of the financial performance of the Reorganized Debtors for the fiscal years 2025 through 2029 (the "<u>Financial Projections</u>"). The Financial Projections, and certain of the assumptions on which they are based, are set forth in the projected financial information contained in <u>Exhibit D</u> hereto.

THE PROJECTIONS SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS. THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED ABOVE IN ARTICLE IX.A. IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE PROJECTIONS.

The Debtors prepared these Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. The Financial Projections have not been examined or compiled by independent accountants. The Debtors makes no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the

Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period of the Financial Projections may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

The Financial Projections indicate, on a pro forma basis, that the projected level of cash flow is sufficient to satisfy the Debtors' future capital expenditures and other obligations during the applicable period. Accordingly, if these Chapter 11 Cases are commenced, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

iii.    Valuation

As described above, the Debtors are presently engaged in marketing their assets for sale and soliciting bids in connection therewith pursuant to the Bidding Procedures. The Debtors believe that this process provides the best method of valuing their enterprise, as it allows the market to speak as to that value. The Debtors' marketing and sale process is a comprehensive and arm's length processes with the goal of identifying counterparties for one or more potential value-maximizing sale transactions. To ensure that the integrity of the marketing and sale process is preserved and value is maximized, this Disclosure Statement does not identify expected recoveries for Prepetition ABL Claims, Prepetition First Lien Loan Claims, nor does it include a valuation analysis (which the Debtors at this time do not anticipate filing). See 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); In re LBI Media, Inc., Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (Docket No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary).

iv.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or

modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

v.  <u>Cram Down</u>

The Bankruptcy Code contains provisions for confirmation of a plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan.  The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the Plan does not discriminate unfairly with respect to each non accepting impaired class;

- the Plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the Plan.

vi.  <u>No Unfair Discrimination; Fair and Equitable Test</u>

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims, or equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive any value under the Plan on account of such junior claims or interests.

The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The "fair and equitable" test applies to classes of different priority and status (*e.g*., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting

class, the test sets different standards depending upon the type of claims or equity interests in the class.

Specifically, with respect to equity interests, a plan is "fair and equitable" if either (i) each holder of an equity interest will receive or retain under the Plan a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the Plan on account of such interest.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

        vii.    <u>Classification of Claims and Interests</u>

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a plan of reorganization place each claim or interest into a class with other claims or interests that are "substantially similar."

## XVII.  ADDITIONAL INFORMATION

All of the exhibits to the Plan, the Plan Supplement and to this Disclosure Statement will be available for inspection by contacting the Claims Agent.

*[Remainder of Page Intentionally Left Blank]*

# XVIII. CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, General Unsecured Claims against Franchise Group, Inc., General Unsecured Claims against the American Freight Debtors, General Unsecured Claims against the Buddy's Debtors, General Unsecured Claims against the PSP Debtors, General Unsecured Claims against the Vitamin Shoppe Debtors, Prepetition HoldCo Loan Claims, General Unsecured Claims against the HoldCo Debtors, HoldCo Receivables General Unsecured Claims, General Unsecured Claims against TopCo, Subordinated Claims, and Existing TopCo Equity Interest to **ACCEPT** the Plan, and to duly complete and return their Ballots so that they will be **ACTUALLY RECEIVED** on or before **5:00 p.m. (prevailing Eastern Time) on [●]March 13, 2025**.

Dated: February 35, 2025
Wilmington, Delaware

Franchise Group, Inc.
Freedom VCM Holdings, LLC
Freedom VCM Interco Holdings, Inc.
Freedom Receivables II, LLC
Freedom VCM Receivables, Inc.
Freedom VCM Interco, Inc.
Freedom VCM, Inc.
Franchise Group New Holdco, LLC
American Freight FFO, LLC
Franchise Group Acquisition TM, LLC
Franchise Group Intermediate Holdco, LLC
Franchise Group Intermediate L, LLC
Franchise Group Newco Intermediate AF, LLC
American Freight Group, LLC
American Freight Holdings, LLC
American Freight, LLC
American Freight Management Company, LLC
Franchise Group Intermediate S, LLC
Franchise Group Newco S, LLC
American Freight Franchising, LLC
Home & Appliance Outlet, LLC
American Freight Outlet Stores, LLC
American Freight Franchisor, LLC
Franchise Group Intermediate B, LLC
Buddy's Newco, LLC
Buddy's Franchising and Licensing LLC
Franchise Group Intermediate V, LLC
Franchise Group Newco V, LLC
Franchise Group Intermediate BHF, LLC
Franchise Group Newco BHF, LLC

Valor Acquisition, LLC
Vitamin Shoppe Industries LLC
Vitamin Shoppe Global, LLC
Vitamin Shoppe Mariner, LLC
Vitamin Shoppe Procurement Services, LLC
Vitamin Shoppe Franchising, LLC
Vitamin Shoppe Florida, LLC
Betancourt Sports Nutrition, LLC
Franchise Group Intermediate PSP, LLC
Franchise Group Newco PSP, LLC
PSP Midco, LLC
Pet Supplies "Plus", LLC
PSP Group, LLC
PSP Service Newco, LLC
WNW Franchising, LLC
WNW Stores, LLC
PSP Stores, LLC
PSP Franchising, LLC
PSP Subco, LLC
PSP Distribution, LLC
Franchise Group Intermediate SL, LLC
Franchise Group Newco SL, LLC
Educate, Inc.


By: /s/ DRAFT

    Name: Andrew Laurence

    Title: Chief Executive Officer

## <u>EXHIBIT A</u>

**Plan of Reorganization**

*[Intentionally Omitted]*

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

*[Intentionally Omitted]*

**<u>EXHIBIT C</u>**

**Financial Projections**

[Filed at Docket No. 592]

## EXHIBIT D

**Restructuring Support Agreement**

*[Intentionally Omitted]*