# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (LSS)<br>(Jointly Administered)<br><br>**Hearing Date: March 18, 2025 at 10:00 am ET**<br><br>**Objection Deadline: March 11, 2025 at 4:00 pm ET** |

## MOTION OF OPCO 2L AGENT AND AD HOC GROUP OF SECOND LIEN LENDERS FOR ALLOWANCE OF A <u>SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM</u>

Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, the "**OpCo 2L Agent**"), for itself and on behalf of the lenders party to the OpCo 2L Credit Loan Documents (as defined below) (together with the OpCo 2L Agent (including, without limitation, with respect to the Secured Holdco Obligations Guarantee (as defined below)), the "**OpCo 2L**

---

[1] The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

**Secured Parties**"), and certain funds and accounts advised, sub-advised, and/or managed by (i) Pacific Investment Management Company LLC and/or its affiliates and (ii) Irradiant Partners, LP and/or its affiliates in their capacities as OpCo 2L Secured Parties (the "**OpCo 2L Group**" and together with the OpCo 2L Agent, the "**Movants**"),[2] by and through their respective undersigned counsel, hereby file this motion (the "**Motion**"), for entry of an order substantially in the form attached hereto as **Exhibit A** setting the amount of the superpriority administrative expense claim owed to the OpCo 2L Secured Parties under the terms of the DIP Orders (as defined below) and sections 503 and 507(b) of the Bankruptcy Code (the "**Superpriority Administrative Expense Claim**"), and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      On the Petition Date, the fair market value of the collateral securing the payment of obligations owed to the OpCo 1L Lenders, the lenders under the OpCo ABL Facility, and the OpCo 2L Secured Parties exceeded the aggregate amount of such prepetition claims.  As a result, the OpCo 2L Secured Parties' prepetition secured claims—approximately $158 million—were fully secured on the Petition Date.

2.      The Interim DIP Order entered by the Court two days later (over the Freedom Lender Group's objection) granted the OpCo 2L Secured Parties adequate protection, including an administrative expense claim under sections 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code to protect the OpCo 2L Secured Parties from any diminution in the value of their collateral.

3.      Under the currently proposed chapter 11 plan, the Debtors take the position that

---

[2]     The members of the OpCo 2L Group are the same parties that are members of the Ad Hoc Group of Freedom Lender Group (the "**Freedom Lender Group**"), as named in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229] (as it may be amended and supplemented from time to time) who hold approximately 93% of the loans under the OpCo 2L Facility.

the claims of the OpCo 2L Secured Parties are entirely unsecured. In other words, they value the OpCo 2L Secured Parties' interest in their collateral at zero. Movants adopt that position solely for purposes of this Motion. Movants have not done a separate valuation as of the potential effective date of a plan, but it is clear that there have been events that have impaired the value of the OpCo 2L Secured Parties' interest in their collateral, including:

- approximately $100 million of the new money component of the DIP Facility, which is senior to the claims and liens of the OpCo 2L Secured Parties, was used to pay prepetition unsecured claims that were junior to the OpCo 2L Secured Claims (again over the objection of the Freedom Lender Group), resulting in a dollar-for-dollar decrease in the value of the OpCo 2L Secured Parties' interest in their collateral;

- the additional new money borrowings under the DIP Facility may not have resulted in an offsetting increase in the value of the OpCo 2L Secured Parties' interest in their collateral, further reducing it; and

- the Debtors have indicated that the postpetition operation of their business has underperformed and deteriorated, resulting in a reduction in the value of the businesses that comprise the OpCo 2L Secured Parties' collateral.

Regardless of whether the diminution in value of the OpCo 2L Secured Parties' interest in their collateral was caused by the incurrence of Debtors' priming DIP financing facility under section 364 of the Bankruptcy Code or the Debtors' use of their collateral under section 363 of the Bankruptcy Code, section 507(b) of the Bankruptcy Code entitles the OpCo 2L Secured Parties to an administrative expense claim having priority over all other claims equal to that diminution in value. This statutory requirement reflects an equitable balancing—one of the Bankruptcy Code's many *quid pro quos*—of constitutionally protected property rights of debtors and stakeholders. In this instance, a debtor is given the protection of the automatic stay and afforded special rights to fund and operate its business in the hopes of maximizing its value but, when those efforts do not pan out, the lender whose collateral position is diminished must be

compensated with a superpriority administrative expense claim that must be paid in any reorganization.

4.      Here, based on the midpoint value of the OpCo 2L Secured Parties' interests in collateral on the Petition Date, the superpriority administrative expense claim to be awarded to the OpCo 2L Secured Parties' is equal to the full amount of their prepetition secured claim.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Movants confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 506, and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rule 3012 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 9013-1.

## BACKGROUND

### I.    The OpCo 2L Facility

8.    Movants are party to that certain Second Lien Credit Agreement, dated as of March 10, 2021 (as amended, restated, supplemented or otherwise modified, the "**OpCo 2L Credit Agreement**") by and among the OpCo 2L Secured Parties, Franchise Group, Inc. ("**Franchise Group**") as Lead Borrower, Franchise Group NewCo PSP, LLC, Valor Acquisition, LLC, and Franchise Group NewCo Intermediate AF, LLC, as borrowers (together with Franchise Group, the "**Borrowers**"), and each of Franchise Group's other Debtor subsidiaries, other than WNW Franchising, LLC and WNW Stores, LLC, as guarantors (collectively, the "**Guarantors**," and collectively with the Borrowers, the "**OpCo Loan Parties**").[3]    Under the OpCo 2L Credit Agreement, the OpCo Loan Parties borrowed an original principal amount of $300 million from the lenders under the OpCo 2L Credit Agreement.  The Secured Holdco Obligations Guarantee (as defined in the OpCo 2L Credit Agreement), which is a guarantee by the OpCo Loan Parties of $19,505,047.98 of the first lien secured facility with Freedom VCM, Inc. and Freedom VCM Interco, Inc., as the original obligors (the "**HoldCo Facility**"), is included in the obligations under the OpCo 2L Loan Documents and is secured by the liens granted to the OpCo 2L Agent.

9.    As of November 3, 2024 (the "**Petition Date**"), the OpCo Loan Parties owed the OpCo 2L Secured Parties, on a joint and several basis, at least $158,383,581.49 under the OpCo 2L Loan Documents (collectively, the "**OpCo 2L Secured Obligations**").  The OpCo Loan

---

[3]    The OpCo 2L Credit Agreement, collectively with all Loan Documents (as defined in the OpCo 2L Credit Agreement), shall be referred to herein as the "**OpCo 2L Loan Documents**" and the facility thereunder, the "**OpCo 2L Facility**."  A copy of the OpCo 2L Credit Agreement, as attached to that certain Fifth Amendment to the Second Lien Credit Agreement (the "**Fifth Amendment**"), is attached hereto as **Exhibit B**, and a copy of that certain Amended and Restated Lien Collateral Agreement, dated as of August 21, 2023 (as amended, restated, supplemented or otherwise modified, the "**OpCo 2L Collateral Agreement**") by and among the OpCo 2L Secured Parties and the OpCo Loan Parties, as attached to the Fifth Amendment, is attached hereto as **Exhibit C**.

Parties granted the OpCo 2L Agent, for the benefit of itself and the other OpCo 2L Secured Parties, properly perfected and continuing liens and security interests (collectively, the "**OpCo 2L Liens**") in substantially all of the assets of the OpCo Loan Parties, including, without limitation, all "Collateral" (as defined in the OpCo 2L Credit Agreement). The OpCo 2L Liens are junior to the liens granted to two other prepetition facilities incurred by the OpCo Loan Parties: a first lien term loan facility (the "**OpCo 1L Facility**") and a first lien ABL facility (the "**OpCo ABL Facility**"). The Debtors have scheduled the outstanding amounts outstanding under each facility on the Petition Date as $1,131,839,374.17 and $262,888,509.42, respectively.[4]

10.    In the OpCo 2L Collateral Agreement, each of the OpCo Loan Parties granted the OpCo 2L Agent, for the benefit of itself and the other OpCo Secured Parties, a security interest in the following assets (each as defined in the OpCo 2L Loan Documents) then owned or later acquired by such OpCo Loan Party:

(i)      all Accounts;

(ii)     all Chattel Paper;

(iii)    all Deposit Accounts;

(iv)     all Documents;

(v)      all Equipment;

(vi)     all General Intangibles, including all Intellectual Property;

(vii)    all Instruments and Promissory Notes;

(viii)   all Inventory;

(ix)     all other Goods;

(x)      all Investment Property;

---

[4]     *See Schedules of Assets and Liabilities for Franchise Group Inc.* [Docket No. 526], Sched. D, Part 1.

(xi)    all Letter-of-Credit Rights;

(xii)    all cash and Moneys;

(xiii)    all Securities Accounts;

(xiv)    all Commercial Tort Claims specifically described on the relevant schedule attached thereto;

(xv)    all books and records pertaining to the foregoing collateral; and

(xvi)    all Proceeds, substitutions, replacement and products of any all of the foregoing and all Supporting Obligations, collateral security and guarantees given by any Person with respect to any of the foregoing.[5]

In addition, each of the OpCo Loan Parties pledged its intercompany equity interests and debt securities to the OpCo 2L Agent, for the benefit of itself and the other OpCo 2L Secured Parties, including the equity interests in each of Franchise Group's operating subsidiaries.[6]  Accordingly, the OpCo 2L Secured Parties have a security interest in substantially all of the assets that are relevant to the assessment of the OpCo Loan Parties' total enterprise value.

11.    Certain "Excluded Assets" (as defined in the OpCo 2L Credit Agreement) are specifically carved out from the Collateral package, including, among others:

(i)    fee-owned real property with a value of less than $2 million and leasehold interests in real property;

(ii)    commercial tort claims with an individual value of less than $5 million and commercial tort claims for which no complaint or counterclaim has been filed in a court of competent jurisdiction;

(iii)    equity interests other than the intercompany equity interests pledged under the OpCo 2L Collateral Agreement;

(iv)    certain Excluded Accounts (as defined in the OpCo 2L Credit Agreement); and

---

[5]    *See* OpCo 2L Collateral Agreement § 3.01; *see also id.*, Scheds. III-IV.

[6]    *See id.* § 2.01; *see also id.*, Sched. II.

(v)     any other assets to the extent the cost or other consequences (including adverse tax consequences) of pledging such assets is deemed excessive by certain Required Lenders and Franchise Group.[7]

Such assets are either not the type of revenue-generating assets relevant to an enterprise valuation or are irrelevant to a calculation of the total enterprise value of the OpCo Loan Parties.

## II.     The DIP Orders and the Committee's Challenge

12.     On November 7, 2024, over the Freedom Lender Group's objection, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 134] (the "**Interim DIP Order**") allowing the Debtors to borrow $100 million in Interim New Money DIP Loans (as defined in the Interim DIP Order) on an interim basis.

13.     On December 11, 2024, again over the Freedom Lender Group's objection, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 414] (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**").  The Final DIP Order increased the new money loans available to the Debtors from $100 million to $250 million (such loans, the "**New Money DIP**

---

[7]     *See* OpCo 2L Credit Agreement § 1.01.

Loans"). The Debtors project that the entire $250 million of the New Money DIP Loans will be funded as of the Effective Date.

14.    Each of the DIP Orders stipulates as to the validity, unavoidability, and perfection of the claims under the OpCo 2L Loan Documents and the OpCo 2L Liens, subject to a potential challenge.[8]    On January 28, 2025, the Official Committee of Unsecured Creditors (the "**Committee**") filed a motion seeking standing to prosecute certain challenges to the extent and validity of the OpCo 2L Secured Parties' liens on the Collateral [Docket No. 855] (the "**Standing Motion**"). The Standing Motion does not challenge the validity, enforceability, or perfection of the OpCo 2L Liens generally but, rather, seeks determinations that such liens do not extend to certain discrete assets, such as cash in deposit accounts not subject to control agreements and commercial tort claims, the latter of which are not included in Greenhill & Co. LLC's valuation of the Collateral as of the Petition Date. As of the filing of this Motion, the Standing Motion is pending before this Court.[9]

15.    Each of the DIP Orders grants the OpCo 2L Secured Parties an adequate protection package to compensate them for any Diminution in Value of the OpCo 2L Liens and the Collateral (including Cash Collateral). "**Diminution in Value**" is defined in the DIP Orders as:

> any post-petition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, (i) the use, sale or lease by the Debtors of such collateral, (ii) the market value decline of such collateral, (iii) the use of Cash Collateral by each of the Debtors, (iv) the imposition of the automatic stay, (v) the subordination of the Prepetition Liens and Prepetition Secured Obligations to the Carve Out, the DIP Liens and the DIP Obligations, in each case, as set forth in this Final Order, and (vi) any other act or omission which causes diminution in the value of their respective liens or interests in the Prepetition Collateral.[10]

---

[8]    Interim DIP Order ¶ F(c), (f); Final DIP Order ¶ F(c), (f).

[9]    The OpCo 2L Agent and the OpCo 2L Group intend to defend and contest certain of the assertions made in the Standing Motion and reserve all rights with respect thereto.

[10]    Interim DIP Order ¶ H(e); Final DIP Order ¶ H(e).

16.     This adequate protection package includes replacement liens on all of the Debtors' prepetition and postpetition assets.[11]  It also includes "superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code secured by such liens against each of the DIP Loan parties in each of the Chapter 11 Cases and any Successor Cases . . . which shall be payable by each of the DIP Loan Parties, on a joint and several basis" (the "**Second Lien Adequate Protection Claims**") in an amount equal to the Diminution in Value of the OpCo 2L Secured Parties' liens in DIP Collateral (as defined in the Final DIP Order).[12]  The Second Lien Adequate Protection Claims granted under the DIP Orders are (i) subject and subordinate to (a) an approximately $4 million Carve Out and (b) DIP Superpriority Claims, (ii) subject to the relative priorities set forth in Exhibit 4 to the Interim DIP Order and Exhibit 2 to the Final DIP Order, and (iii) "senior to any and all other administrative expense claims and all other claims against the DIP Loan Parties and their estates, now existing or hereafter arising, of any kind or nature whatsoever."[13]

## III.    OpCo 1L Group Plan and Disclosure Statement

17.     Prior to the Petition Date, the Debtors entered into a Restructuring Support Agreement (the "**RSA**") with an ad hoc group (the "**OpCo 1L Group**") of certain lenders under the OpCo Loan Parties' first lien term loan facility (the "**OpCo 1L Lenders**").  On November 11, 2024, the Debtors filed their initial plan consistent with the terms of the RSA [Docket No. 150] (the "**Initial OpCo 1L Group Plan**").  The Debtors have since amended their proposed plan a number of times, most recently on February 12, 2025 [Docket No. 957] (the "**Fourth Amended**

---

[11]    Interim DIP Order ¶ 10(e)(ii); Final DIP Order ¶ 10(e)(ii).

[12]    Interim DIP Order ¶ 10(e)(i); Final DIP Order ¶ 10(e)(i).

[13]    *Id.*

**OpCo 1L Group Plan**").

18.     Each iteration of the Debtors' proposed plan has provided that, unless the Debtors effectuate a sale transaction that repays all of the OpCo Loan Parties' prepetition and postpetition first lien secured debt in full, (i) the OpCo 1L Lenders will receive, on account of their secured claims, 100% of Franchise Group's reorganized equity, subject to certain dilutions (the "**Equitization Transaction**") and (ii) the OpCo 2L Secured Parties will receive no recovery on account of their secured claims.[14]

19.     The obvious premise of the proposed Equitization Transaction is that the value of the Collateral is insufficient to provide even a dollar of value to the Opco 2L Secured Parties. Remarkably, the Debtors appear to have adopted this position at the demand of the overzealous OpCo 1L Group (who now seek to own Franchise Group and its operating subsidiaries), without the benefit of independent counsel and without any valuation work having been done.  By agreeing to treat the Opco 2L Secured Parties' collateral position as worthless at the end of the case without doing any work to establish that their collateral stake was also worthless at the beginning of the case, but nevertheless agreeing to provide them with an administrative expense claim for Diminution in Value, the Debtors assumed the risk of incurring the Superpriority Administrative expense Claim the Movants now seek.

20.     At a hearing held on February 6, 2025, the Debtors disclosed that they "did not receive a sufficient bid for the entire company" and the concept of "selling the whole company through an asset sale is off the table."[15]  The Debtors have cancelled the auction and adjourned

---

[14]   *See* Fourth Amended OpCo 1L Group Plan §§ 5.4(a)(i), 5.5(a)(i), 7.2, 7.3.  The Fourth Amended OpCo 1L Group Plan bifurcates the OpCo 2L Secured Parties' claims, providing the deficiency claim with the same treatment as general unsecured creditors but giving no distribution to the OpCo 2L Secured Parties on account of their secured claims, unless they vote to accept the plan, in which case they will receive warrants. *Id.* §§ 5.5(a)(i), 5.5(b).

[15]   Feb. 6, 2025, Hr'g Tr. 45:24-46:6.

the sale hearing indefinitely.[16]  In light of the failed sale process, the Debtors now intend to move

forward with the Equitization Transaction, in which the OpCo 2L Secured Parties will receive no

recovery on account of their interests in the Collateral.  Consistent with that course of action, the

Fourth Amended OpCo 1L Group Plan now states: "It is anticipated that the full value of the

Prepetition Second Lien Loan Claims shall be a Second Lien Deficiency Claim hereunder," which

the Debtors project to receive no recovery.[17]

## RELIEF REQUESTED

21.    By this Motion, the OpCo 2L Secured Parties request that the Court enter an order,

pursuant to sections 105, 503, and 507(b), and Bankruptcy Rule 3012, allowing the OpCo 2L

Secured Parties' Adequate Protection Claims with priority over all other administrative expense

claims in the amount of $158,383,581.49.

## BASIS FOR RELIEF REQUESTED

### I.    The OpCo 2L Secured Parties Have a Right to a Superpriority Claim Senior to All Other Such Claims Under Section 507(b)

22.    Adequate protection is a fundamental right of secured creditors under the

Bankruptcy Code, based on the prohibition against the taking of private property without due

process of law enshrined in the Fifth Amendment to the U.S. Constitution.  *United States v. Sec.

Indus. Bank*, 459 U.S. 70, 75 (1982) (citing *Louisville Joint Stock Land Bank v. Radford*, 295 U.S.

555 (1935)); 11 U.S.C. §§ 361, 362, 363 and 364.  When Congress "chose . . . to include [secured

lenders' collateral] [with]in the [debtor's] estate," it "provide[d] secured creditors with [the right

to] 'adequate protection' for their interests."  *United States v. Whiting Pools, Inc.*, 462 U.S. 198,

---

[16]    *Notice of Cancellation of Auction* [Docket No. 961].

[17]    Fourth Amended OpCo 1L Group Plan § 5.5(b); *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* [Docket No. 960], Ex. 1 at 34-37 (disclosing the Second Lien Deficiency Claims shall be treated for all purposes under the Plan as a General Unsecured Claim only against the applicable Debtor and that the estimated recovery for all classes of unsecured claims is "0%").

204 (1983). The *quid pro quo* for a secured lender being subject to the automatic stay and unable to enforce their property rights while a chapter 11 debtor continues to use its collateral is the secured lender's right to cash payments, liens, or other consideration equal to any diminution in value of its interests in collateral while it remains in a debtor's possession. *See* 11 U.S.C. §§ 361; 362(d)(1); 363(e); 364(d)(1)(B).

23.     To the extent adequate protection granted to an undersecured creditor proves to be insufficient in protecting such creditor's interest in its collateral, the secured creditor is entitled to a superpriority claim under section 507(b) of the Bankruptcy Code, which entitles such creditor to recovery ahead of every unsecured and administrative creditor.   Section 507(b) of the Bankruptcy Code provides that:

> If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under [section 507(a)(2)] arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

The reference in section 507(b) of the Bankruptcy Code to section 507(a)(2) is itself a cross-reference to administrative expense claims of the type described in section 503(b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 507(b); 507(a)(2); 503(b)(2).  These are exactly the type of claims that, as referenced in section 507(b), are to be granted as adequate protection to secured creditors subject to priming liens under DIP facility approved under section 364(d) of the Bankruptcy Code.

24.     In the DIP Orders, the Debtors provided the OpCo 2L Agent, for itself and on behalf the other OpCo 2L Secured Parties, with the Second Lien Adequate Protection Claims and the Second Lien Adequate Protection Liens to the extent of a Diminution in Value of the

Collateral.  As described below, this adequate protection package has proved insufficient and, thus, under section 507(b), the OpCo 2L Secured Parties are entitled to a superpriority claim with "priority over every other claim allowable under [section 507]."  11 U.S.C. § 507(b).

## II.    The OpCo 2L Secured Parties' Interests in the Collateral has Diminished in Value Since the Petition Date

25.    The amount of the diminution in value of the OpCo 2L Secured Parties' interest in the Collateral is determined by comparing the value of such interest on the Petition Date to the consideration the Debtors propose to provide the OpCo 2L Secured Parties under their proposed Plan.  *In re Scopac*, 624 F.3d 274, 285 (5th Cir. 2010); *In re Residential Capital, LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013) ("To establish their entitlement to an adequate protection claim, the [secured creditors] must show that the aggregate value of their collateral diminished from the Petition Date to the Effective Date.").

26.    Comparing the midpoint of the value of the OpCo 2L Secured Parties' interests in their Collateral on the Petition Date to the consideration proposed to be provided to the OpCo 2L Secured Parties on the effective date of the Fourth Amended OpCo 1L Group Plan, the OpCo 2L Secured Parties have experienced a Diminution in Value of their interests in collateral of at least $158,383,581.49, the full value of their prepetition secured claim.

### A.    The Value of the Collateral as of the Petition Date Exceeded the OpCo Loan Parties' First Lien Secured Debt

27.    In an adequate protection setting, the value of a secured creditor's collateral is "determined in light of the purpose of the valuation and of the proposed disposition or use of the property[.]"  11 U.S.C. § 506(a).  The Supreme Court has held that "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question" and, where a debtor proposes to retain collateral to generate revenue, "[t]hat actual use [of the collateral], rather than a [hypothetical] foreclosure sale that will not take place, is the proper guide under a prescription

14

hinged to the property's 'disposition or use.'" *Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 962-63 (1997). The Third Circuit has subsequently held that the foundational valuation principal articulated in *Rash* "applies with equal force in the [c]hapter 11 reorganization context," and the fair market value of collateral should be used when a debtor intends retain and use the collateral to generate income. *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141-42 (3d Cir. 2012).[18] In the section 506(b) setting, courts have thus held that the fair market value of collateral on the petition date should be used to calculate the diminution in value of a secured lender's interest in collateral when the debtor intends to continue to operate or sell the business as a going concern. *See, e.g., In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 223 (Bankr. S.D.N.Y. 2016); *In re Residential Capital, LLC*, 501 B.R. at 592-95.

28.    Here, on the Petition Date, the Debtors had entered into the RSA with the OpCo 1L Group that contemplated a standalone reorganization in which the OpCo 1L Lenders would convert "their first-lien pre-petition debt into 100 percent of the equity and new debt of the reorganized company," with the Debtors, "in parallel, run[ning] a market check as to the value of the assets[.]"[19] Only eight days after the Petition Date, the Debtors filed their Initial OpCo 1L Group Plan, which provided for just that.[20] Each subsequent amended Plan has provided for an equitization of the OpCo Loan Parties First Lien Debt and the continuation of the Debtors' businesses as a going concern.[21] Because the Debtors entered these Chapter 11 Cases with the

---

[18]    In addition, valuation in the adequate protection context is the same as the valuation for establishing the amount of a secured claim under section 506(a) of the Bankruptcy Code. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372 (1988).

[19]    Nov. 5, 2024, Hr'g Tr. 8:4-10.

[20]    Initial OpCo 1L Group Plan §§ 1.171, 1.185 7.2, 7.3.

[21]    The Debtors proposed to liquidate their American Freight business. *See generally Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 14]. Accordingly, that business is not valued as a going concern and its value is based on the liquidation proceeds estimated by the Debtors as of the Petition Date.

intent to continue operating their business as a going concern, the appropriate valuation standard for the OpCo 2L Secured Parties' interest in the Collateral as of the Petition Date is its fair market value on such date.

29.     White & Case LLP, in its capacity as counsel to the OpCo 2L Group, has retained Greenhill & Co., LLC to provide expert valuation services.  Neil A. Augustine, Vice Chairman and Co-Head of North American Financing Advisory and Restructuring at Greenhill & Co., LLC, has performed an expert valuation of the Collateral and is expected to testify that the midpoint value of the Collateral on the Petition Date exceeded the claims of the OpCo Loan Parties' ABL lenders, the OpCo 1L Lenders, **and** the OpCo 2L Secured Parties, indicating that the latter was oversecured on the Petition Date.

**B.     The Value of the OpCo 2L Secured Parties' Interests in Collateral Has Decreased Significantly During these Cases**

30.     Courts calculate the amount of a section 507(b) claim based upon the "actual decrease in the value of [a creditor's] interest in the collateral due to the automatic stay and the debtor's use of its collateral, less any adequate protection payments made by the debtor."  *In re Carpet Ctr. Leasing Co., Inc.*, 991 F.2d 682, 688 (11th Cir. 1993), *opinion amended on denial of reh'g,* 4 F.3d 940 (11th Cir. 1993) (internal citation omitted); *In re Scopac*, 624 F.3d at 288 (calculating adequate protection claim based upon cash collateral at petition date, plus net proceeds of collateral received during bankruptcy case, minus creditor's payment under the plan and payments made to creditor's professionals); *In re Bailey Tool & Mfg. Co.*, Case No. 16-30503 (BJH), 2018 WL 550581, at *10 (Bankr. N.D. Tex. Jan. 23, 2018) (granting an interim diminution claim based on the diminution in the creditor's collateral that was not offset by replacement liens granted under cash collateral orders and DIP order).

31.     The value of the OpCo 2L Secured Parties' interest in the Collateral has, according

to the Debtors, been wiped out during the postpetition period. The cause of this purported deterioration of value is to be determined but, as an initial matter, the Debtors reduced the value of the Collateral on a dollar-for-dollar basis for each dollar of senior New Money DIP Loans incurred postpetition. *See In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) (finding that speculative benefit to an undersecured creditor if DIP proceeds were used to develop real property collateral was insufficient to prove adequate protection, as "[t]here is no question that the [DIP] loan will cause a dollar-for-dollar diminution in the value of [the creditor's] secured position."). Those New Money DIP Loans were not used to improve the Collateral, but rather were used to pay nearly $100 million in junior unsecured creditors' claims, tens of millions of professional fees, and fund a flawed and failed sales process. Notwithstanding the injection of new capital and protections afforded by the Bankruptcy Code, based on the Debtors' own actual and projected post-emergence financials, the enterprise value of their businesses has decreased since the Petition Date. Those losses will soon be crystalized under the Debtors' proposed plan, which does not provide the OpCo 2L Secured Parties with any recovery on account of their secured claim. Further, the Diminution in Value of the Collateral since the Petition Date has not been offset by any adequate protection payments made during the Chapter 11 Cases (as there were none) or by the junior replacement adequate protection liens provided under the DIP Orders, which will be extinguished on the consummation of the proposed plan with no recovery on account of such liens.

32.    As a result, the OpCo 2L Secured Parties have experienced a diminution in value in the full amount of their approximately $158 million prepetition secured claim. Under section 507(b) of the Bankruptcy Code, this loss entitles the OpCo 2L Secured Parties to the Superpriority Administrative Expense Claim in an amount equal to such diminution with "priority over every

other claim allowable under [section 507(a)] of the Bankruptcy Code." Alternatively, the OpCo 2L Secured Parties have been granted the Second Lien Adequate Protection Claim under the DIP Orders, which, notwithstanding the language of section 507(b), is junior to certain other superpriority administrative expense claims. In either instance, the Superpriority Administrative Expense Claim owed to the OpCo 2L Secured Parties must be paid in full in cash under any chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring administrative expense claims allowable under section 507(a)(2) to be paid in full in cash to be confirmed by a bankruptcy court).

## NO PRIOR REQUEST

33.     No prior request for the relief sought herein has been made to this or any other Court.

## NOTICE

34.     Notice of this Motion will be been provided to the following parties: (i) counsel to the Debtors; (ii) the U.S. Trustee; (iii) counsel to the Committee; (iv) counsel to the DIP Lenders; (v) counsel to the Ad Hoc Group of First Lien Lenders; (vii) counsel to the DIP Agent; and (viii) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

## CONCLUSION

35.     For the reasons set forth in the Motion, the Movants respectfully request that the Court enter an order substantially in the form attached hereto as **Exhibit A** (a) granting this Motion; (b) allowing the OpCo 2L Secured Parties a Superpriority Administrative Expense Claim in the amount of $158,383,581.49; and (c) granting such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 13, 2025
Wilmington, DE

Respectfully submitted,

By: */s/ Phillip W. Nelson*

By: */s/ Michael J. Farnan*

**HOLLAND AND KNIGHT LLP**
Phillip W. Nelson (*pro hac vice* forthcoming)
150 N. Riverside Plaza, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 578-6584
Facsimile: (312) 578-6666
Email: phillip.nelson@hklaw.com

*Counsel to Alter Domus (US) LLC, In Its Capacity as the OpCo 2L Agent*

**FARNAN, LLP**
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**
Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
azatz@whitecase.com
sam.hershey@whitecase.com
erin.smith@whitecase.com
brett.bakemeyer@whitecase.com

*Counsel to the Ad Hoc Group of OpCo 2L Secured Parties*