## <u>Exhibit B</u>

**OpCo 2L Credit Agreement**

*Execution Version*

**ANNEX A**

**Amended Second Lien Credit Agreement**

[see attached]

CONFORMED THROUGH THE ~~FOURTH~~FIFTH AMENDMENT TO
SECOND LIEN CREDIT AGREEMENT
DATED AS OF ~~DECEMBER 18~~AUGUST 19, ~~2023~~2024

SECOND LIEN CREDIT AGREEMENT

dated as of

March 10, 2021

among

FRANCHISE GROUP, INC.,
as a Borrower and Lead Borrower,

FRANCHISE GROUP NEWCO PSP, LLC,
as a Borrower,

VALOR ACQUISITION, LLC,
as a Borrower,

FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC,
as a Borrower,

the Lenders from time to time party hereto,

and

ALTER DOMUS (US) LLC,
as Administrative Agent and as Collateral Agent


FLORIDA DOCUMENTARY STAMP TAX REQUIRED BY LAW IN THE AMOUNT OF $2,450.00
HAS BEEN PAID OR WILL BE PAID DIRECTLY TO THE DEPARTMENT OF REVENUE.

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS..................................................................................1

SECTION 1.01   Defined Terms. .......................................................................1
SECTION 1.02   Classification of Loans and Borrowings.....................~~79~~78
SECTION 1.03   Terms Generally.......................................................................79
SECTION 1.04   Accounting Terms; GAAP. ...........................................~~80~~79
SECTION 1.05   Effectuation of Transactions. ..............................................80
SECTION 1.06   Limited Conditionality Acquisition. ....................................80
SECTION 1.07   Certain Determinations. .................................................~~81~~80
SECTION 1.08   Divisions. ...............................................................................82
SECTION 1.09   Interest Rates...................................................................~~83~~82

ARTICLE II THE CREDITS ........................................................................~~83~~82

SECTION 2.01   Commitments. ...................................................................~~83~~82
SECTION 2.02   Loans and Borrowings. ..........................................................83
SECTION 2.03   Requests for Borrowings. ...............................................~~84~~83
SECTION 2.04   [Reserved]. .......................................................................~~85~~84
SECTION 2.05   [Reserved]. .......................................................................~~85~~84
SECTION 2.06   Funding of Borrowings. ..................................................~~85~~84
SECTION 2.07   Interest Elections. ...........................................................~~85~~84
SECTION 2.08   Termination and Reduction of Commitments...........................86
SECTION 2.09   Repayment of Loans; Evidence of Debt. .........................~~87~~86
SECTION 2.10   Repayment of Term Loans. ...................................................87
SECTION 2.11   Prepayment of Loans. .....................................................~~88~~87
SECTION 2.12   Fees. ..............................................................................~~103~~101
SECTION 2.13   Interest. ..........................................................................~~104~~102
SECTION 2.14   Benchmark Unavailability; Benchmark Replacement Setting. ...............~~104~~102
SECTION 2.15   Increased Costs. .............................................................~~107~~104
SECTION 2.16   Break Funding Payments. ...............................................~~108~~106
SECTION 2.17   Taxes. .............................................................................~~108~~106
SECTION 2.18   Payments Generally; Pro Rata Treatment; Sharing of Setoffs.................~~112~~109
SECTION 2.19   Mitigation Obligations; Replacement of Lenders....................~~113~~111
SECTION 2.20   Holdco Exchange Loans. ................................................~~114~~111
SECTION 2.21   Refinancing Amendments. .............................................~~115~~113
SECTION 2.22   Defaulting Lenders. ........................................................~~116~~113
SECTION 2.23   Illegality. ........................................................................~~117~~114
SECTION 2.24   Loan Modification Offers. ..............................................~~117~~115

ARTICLE III REPRESENTATIONS AND WARRANTIES ..................~~118~~116

SECTION 3.01   Organization; Powers. ....................................................~~119~~116
SECTION 3.02   Authorization; Enforceability. ........................................~~119~~116
SECTION 3.03   Governmental Approvals; No Conflicts. ..........................~~119~~116
SECTION 3.04   Financial Condition; No Material Adverse Effect. ...........~~119~~117
SECTION 3.05   Properties. ......................................................................~~120~~117
SECTION 3.06   Litigation and Environmental Matters. ...........................~~120~~117
SECTION 3.07   Compliance with Laws. ..................................................~~121~~118
SECTION 3.08   Investment Company Status. ..........................................~~121~~118

**TABLE OF CONTENTS**
(continued)

Page

SECTION 3.09   Taxes. .................................................................................. ~~121~~118
SECTION 3.10   ERISA; Labor Matters. ........................................................ ~~121~~118
SECTION 3.11   Disclosure. ............................................................................ ~~122~~119
SECTION 3.12   Subsidiaries. .......................................................................... ~~122~~119
SECTION 3.13   Intellectual Property; Licenses, Etc. ...................................... ~~122~~119
SECTION 3.14   Solvency. ............................................................................... ~~122~~120
SECTION 3.15   Federal Reserve Regulations ................................................. ~~123~~120
SECTION 3.16   Use of Proceeds. .................................................................... ~~123~~120
SECTION 3.17   Anti-Corruption Laws and Sanctions. .................................... ~~123~~120
SECTION 3.18   Security Documents. .............................................................. ~~123~~121
SECTION 3.19   Insurance. ............................................................................... ~~124~~121
SECTION 3.20   Franchise Agreements. ........................................................... ~~124~~121

ARTICLE IV CONDITIONS ............................................................................... ~~125~~122

SECTION 4.01   Effective Date. ....................................................................... ~~125~~122
SECTION 4.02   Each Credit Event after the Effective Date. ........................... ~~127~~124

ARTICLE V AFFIRMATIVE COVENANTS ...................................................... ~~128~~125

SECTION 5.01   Financial Statements and Other Information. ......................... ~~128~~125
SECTION 5.02   Notices of Material Events. .................................................... ~~130~~127
SECTION 5.03   Information Regarding Collateral. ........................................... ~~131~~128
SECTION 5.04   Existence; Conduct of Business. ............................................ ~~131~~128
SECTION 5.05   Payment of Taxes, etc. ........................................................... ~~131~~128
SECTION 5.06   Maintenance of Properties. .................................................... ~~132~~129
SECTION 5.07   Insurance. ............................................................................... ~~132~~129
SECTION 5.08   Books and Records; Inspection and Audit Rights. ................. ~~132~~129
SECTION 5.09   Compliance with Laws. .......................................................... ~~133~~130
SECTION 5.10   Use of Proceeds. .................................................................... ~~133~~130
SECTION 5.11   Additional Subsidiaries. ......................................................... ~~134~~130
SECTION 5.12   Further Assurances. ................................................................ ~~134~~131
SECTION 5.13   Franchise Agreements. ........................................................... ~~135~~132
SECTION 5.14   Certain Post-Closing Obligations. .......................................... ~~135~~132
SECTION 5.15   Covenant Relief Period Affirmative Covenants. ..................... 132
SECTION 5.16   Designation of Securitization Entities. ................................... 138

ARTICLE VI NEGATIVE COVENANTS ........................................................... ~~136~~138

SECTION 6.01   Indebtedness; Certain Equity Securities. ............................... ~~136~~138
SECTION 6.02   Liens. ...................................................................................... ~~141~~143
SECTION 6.03   Fundamental Changes; Lead Borrower Covenant . ................. ~~144~~146
SECTION 6.04   Investments, Loans, Advances, Guarantees and Acquisitions ............ ~~147~~149
SECTION 6.05   Asset Sales. ............................................................................ ~~150~~152
SECTION 6.06   ~~Sale and Leaseback Transactions.~~ .......................... ~~153~~[Reserved]. 154
SECTION 6.07   Restricted Payments; Certain Payments of Indebtedness. ....................... ~~153~~154
SECTION 6.08   Transactions with Affiliates. .................................................. ~~156~~158
SECTION 6.09   Restrictive Agreements. .......................................................... ~~157~~159

-ii-

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| SECTION 6.10 | Financial Maintenance Covenants. | ~~159~~160 |
| SECTION 6.11 | Changes in Fiscal Periods. | ~~159~~161 |
| SECTION 6.12 | Amendment of Financing Documents. | ~~159~~161 |
| SECTION 6.13 | Franchise Agreements. | ~~159~~161 |
| SECTION 6.14 | Anti-Layering. | ~~160~~161 |
| SECTION 6.15 | Badcock. | ~~160~~161 |
| SECTION 6.16 | Minimum Liquidity. | 162 |
| SECTION 6.17 | Special Committee and Independent Directors. | 162 |
| ARTICLE VII EVENTS OF DEFAULT | | ~~161~~162 |
| SECTION 7.01 | Events of Default. | ~~161~~163 |
| SECTION 7.02 | Right to Cure. | ~~164~~165 |
| SECTION 7.03 | Application of Proceeds. | ~~165~~167 |
| ARTICLE VIII ADMINISTRATIVE AGENT | | ~~166~~168 |
| SECTION 8.01 | Appointment and Authority. | ~~166~~168 |
| SECTION 8.02 | Rights as a Lender. | ~~167~~168 |
| SECTION 8.03 | Exculpatory Provisions. | ~~167~~169 |
| SECTION 8.04 | Reliance by Agents. | ~~168~~170 |
| SECTION 8.05 | Delegation of Duties. | ~~169~~171 |
| SECTION 8.06 | Resignation of Administrative Agent; Mergers. | ~~169~~171 |
| SECTION 8.07 | Non-Reliance on Agents and Lenders. | ~~171~~172 |
| SECTION 8.08 | [Reserved]. | ~~171~~173 |
| SECTION 8.09 | Administrative Agent May File Proofs of Claim. | ~~171~~173 |
| SECTION 8.10 | No Waiver; Cumulative Remedies; Enforcement. | ~~172~~174 |
| SECTION 8.11 | Withholding Taxes. | ~~173~~174 |
| SECTION 8.12 | Credit Bidding. | ~~173~~175 |
| SECTION 8.13 | Erroneous Payments. | ~~174~~176 |
| ARTICLE IX MISCELLANEOUS | | ~~176~~177 |
| SECTION 9.01 | Notices. | ~~176~~177 |
| SECTION 9.02 | Waivers; Amendments. | ~~177~~179 |
| SECTION 9.03 | Expenses; Indemnity; Damage Waiver. | ~~180~~182 |
| SECTION 9.04 | Successors and Assigns. | ~~183~~185 |
| SECTION 9.05 | Survival. | ~~188~~189 |
| SECTION 9.06 | Counterparts; Integration; Effectiveness. | ~~189~~190 |
| SECTION 9.07 | Severability. | ~~190~~191 |
| SECTION 9.08 | Right of Setoff. | ~~190~~191 |
| SECTION 9.09 | Governing Law; Jurisdiction; Consent to Service of Process. | ~~191~~192 |
| SECTION 9.10 | WAIVER OF JURY TRIAL. | ~~191~~192 |
| SECTION 9.11 | Headings. | ~~192~~193 |
| SECTION 9.12 | Confidentiality. | ~~192~~193 |
| SECTION 9.13 | USA PATRIOT Act. | 194 |
| SECTION 9.14 | Release of Liens and Guarantees. | ~~194~~195 |
| SECTION 9.15 | No Advisory or Fiduciary Responsibility. | ~~195~~196 |
| SECTION 9.16 | Interest Rate Limitation. | ~~195~~196 |

**TABLE OF CONTENTS**
(continued)

**Page**

SECTION 9.17   Intercreditor Agreements .............................................................196

SECTION 9.18   Judgment Currency ..............................................................~~196~~197

SECTION 9.19   Acknowledgement and Consent to Bail-In of Affected Financial Institutions ..................................................................~~196~~197

SECTION 9.20   Acknowledgement Regarding Any Supported QFCs ...........................~~197~~198

SECTION 9.21   PSP Securitization Non-Disturbance Terms. ..................................................198

-iv-

SCHEDULES:

Schedule 1.01          =          PSP Securitization Entities
Schedule 2.01          —          Commitments and Loans
Schedule 2.02          —          Second Amendment Effective Date Badcock Material Real Property
Schedule 3.03          —          Government Approvals; No Conflicts
Schedule 3.06          —          Litigation and Environmental Matters
Schedule 3.12          —          Subsidiaries
Schedule 3.20          —          Franchise Agreements
Schedule 5.14(a)       —          Certain Post-Closing Obligations
Schedule 6.01          —          Existing Indebtedness
Schedule 6.02          —          Existing Liens
Schedule 6.04(e)       —          Existing Investments
Schedule 6.05(k)       —          Specified Disposition
Schedule 6.08          —          Existing Affiliate Transactions
Schedule 6.09          —          Existing Restrictions
Schedule 9.01          —          Notices

EXHIBITS:

Exhibit A          —          Form of Assignment and Assumption
Exhibit B          —          Form of Guarantee Agreement
Exhibit C          —          Form of Perfection Certificate
Exhibit D          —          Form of Collateral Agreement
Exhibit E          —          Form of Compliance Certificate
Exhibit F          —          [Reserved]
Exhibit G          —          Form of Solvency Certificate
Exhibit H          —          Form of Closing Certificate
Exhibit I          —          Form of Master Intercompany Note
Exhibit J          —          Form of Specified Discount Prepayment Notice
Exhibit K          —          Form of Specified Discount Prepayment Response
Exhibit L          —          Form of Discount Range Prepayment Notice
Exhibit M          —          Form of Discount Range Prepayment Offer
Exhibit N          —          Form of Solicited Discounted Prepayment Notice
Exhibit O          —          Form of Solicited Discounted Prepayment Offer
Exhibit P          —          Form of Acceptance and Prepayment Notice
Exhibit Q-1        —          Form of United States Tax Compliance Certificate 1
Exhibit Q-2        —          Form of United States Tax Compliance Certificate 2
Exhibit Q-3        —          Form of United States Tax Compliance Certificate 3
Exhibit Q-4        —          Form of United States Tax Compliance Certificate 4
Exhibit R          —          Form of Note
Exhibit S          —          Form of Notice of Borrowing
Exhibit T          —          Form of Interest Election Request
Exhibit U          —          Form of Exchange Notice
Exhibit V          —          Form of Sidecar Pari Second Lien Credit Agreement
Exhibit W          —          Form of Sidecar Pari Lien Intercreditor Agreement

SECOND LIEN CREDIT AGREEMENT, dated as of March 10, 2021 (this "Agreement"), among FRANCHISE GROUP, INC., a Delaware corporation ("Lead Borrower"), FRANCHISE GROUP NEWCO PSP, LLC, a Delaware limited liability company ("FG Newco PSP"), VALOR ACQUISITION, LLC, a Delaware limited liability company ("Valor") and FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC, a Delaware limited liability company ("FG Newco Intermediate AF", and together with Lead Borrower, FG Newco PSP and Valor, individually and collectively, the "Borrower"), the Lenders from time to time party hereto and ALTER DOMUS (US) LLC, as Administrative Agent and as Collateral Agent.

The parties hereto agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01    Defined Terms.

As used in this Agreement, the following terms have the meanings specified below:

"A Team" means A Team Sales, LLC, a Delaware limited liability company.

"ABL Agent" means JPM, as agent under the ABL Credit Agreement or any successor thereto acting in such capacities.

"ABL Credit Agreement" means (i) that certain Third Amended and Restated Loan and Security Agreement, as in effect on the First Amendment Effective Date and as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof (including by reference to the ABL Intercreditor Agreement), among each Loan Party party thereto, certain lenders party thereto and the ABL Agent, and (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (subject to the limitations set forth herein (including by reference to the ABL Intercreditor Agreement)) in whole or in part the Indebtedness and other obligations outstanding under (x) the credit agreement referred to in clause (i) or (y) any subsequent asset-based revolving credit facility, unless the agreement or instrument related thereto expressly provides that it is not intended to be and is not an ABL Credit Agreement hereunder.  Any reference to the ABL Credit Agreement hereunder shall be deemed a reference to any ABL Credit Agreement then in existence.

"ABL Intercreditor Agreement" means (a) that certain Amended and Restated Intercreditor Agreement, dated as of the First Amendment Effective Date, by and among the Collateral Agent, the First Lien Agent, the Badcock First Lien Agent, the Badcock Second Lien Agent and the ABL Agent, and acknowledged by the Loan Parties, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof or (b) such other intercreditor agreement or arrangement among the ABL Agent (or other applicable representative on behalf of the holders of the Indebtedness incurred under the ABL Credit Agreement and the other ABL Loan Documents), the Agents (or any of them) and the First Lien Agent (and any other Persons party thereto), that is reasonably acceptable to the Collateral Agent, the Required Lenders and the Lead Borrower, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof, as applicable.

"ABL Loan Documents" shall have the meaning ascribed to the term "Financing Agreements" in the ABL Credit Agreement.

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Discount" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(2).

"Acceptable Prepayment Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(3).

"Acceptance and Prepayment Notice" means an irrevocable written notice from a Term Lender accepting a Solicited Discounted Prepayment Offer to make a Discounted Term Loan Prepayment at the Acceptable Discount specified therein pursuant to Section 2.11(a)(ii)(D)(2) substantially in the form of Exhibit P.

"Acceptance Date" has the meaning specified in Section 2.11(a)(ii)(D)(2).

"Accepting Lenders" has the meaning specified in Section 2.24(a).

"Acquired Company" means PSP Midco, LLC, a Delaware limited liability company.

"Acquired EBITDA" means, with respect to any Pro Forma Entity, for any period, the amount of Consolidated EBITDA of such Pro Forma Entity (determined as if references to the Borrower and its Subsidiaries in the definition of "Consolidated EBITDA" were references to such Pro Forma Entity and its subsidiaries that will become Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity.

"Acquired Entity or Business" has the meaning given such term in the definition of "Consolidated EBITDA."

"Acquired Subsidiaries" means the Acquired Company and its subsidiaries.

"Acquisition" means the acquisition of the Acquired Company and the Acquired Subsidiaries pursuant to the Acquisition Agreement.

"Acquisition Agreement" means that certain Amended and Restated Equity Purchase Agreement dated as of March 3, 2021 (including the schedules, exhibits and disclosure letters thereto) by and among the Acquired Company, FG Newco PSP, Lead Borrower, PSP Holdings, LLC, Sentinel Capital Partners VI-A, L.P., Sentinel PSP Blocker, Inc., PSP Intermediate, LLC, Sentinel Capital Partners, L.L.C. and PSP Midco Holdings, LLC.

"Ad Hoc Lender Group" means that certain group of Lenders constituting the Required Lenders and represented by the Lender Professionals, as may be reconstituted from time to time.

"Additional Lender" means any Additional Term Lender.

"Additional Term Lender" means, at any time, any bank, financial institution or other institutional lender or investor that agrees to provide any portion of any Credit Agreement Refinancing Indebtedness with respect to any existing Term Loans or Term Commitments, as applicable, pursuant to a

Refinancing Amendment in accordance with Section 2.21; provided that each Additional Term Lender shall be subject to the approval of the Administrative Agent if such consent would be required under Section 9.04(b) for an assignment of Term Loans or Term Commitments, as applicable, to such bank, financial institution or other institutional lender or investor (such approval not to be unreasonably withheld, conditioned or delayed) and the Lead Borrower.

"Adjusted Term SOFR" means, subject to Section 2.14(b), with respect to any SOFR Borrowing, for any Interest Period, a rate per annum equal to Term SOFR as in effect at such time for such Interest Period; provided that Adjusted Term SOFR for any Interest Period shall not be less than (i) at any time prior to the Toggle Term Effective Date, 1.00% per annum and (ii) at any time after the Toggle Term Effective Date, 3.50% per annum (the "Toggle Term Floor").

"Administrative Agent" means Alter Domus, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain Administrative Agent Fee Letter, dated as of the Effective Date, by and among the Borrower and the Administrative Agent.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Class" has the meaning specified in Section 2.24(a).

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"After Year End Payment" has the meaning assigned to such term in Section 2.11(d).

"Agent" means the Administrative Agent and the Collateral Agent, and any successors and assigns in such capacity, and "Agents" means two or more of them.

"Agent Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Agent Parties" has the meaning given to such term in Section 9.01(c).

"Aggregate Add-Back Cap" means an aggregate amount for all adjustments or add-backs to Consolidated EBITDA pursuant to clauses (a)(vi) and (a)(vii) in the definition thereof and any adjustments pursuant to the definition of Pro Forma Basis not to exceed an aggregate amount to be mutually agreed by the Borrower and the Required Lenders acting reasonably, but no less than the greater of 20% of Consolidated EBITDA and $23,800,000.

"Aggregate Cure Amount" has the meaning assigned to such term in Section 7.02(a).

"Agreement" has the meaning given to such term in the preliminary statements hereto.

"Agreement Currency" has the meaning given to such term in Section 9.18.

"Alter Domus" means Alter Domus (US) LLC.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1.00% and (c) Adjusted Term SOFR for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1%; provided that for the purpose of this definition, Adjusted Term SOFR for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 p.m. (New York City time) on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or Adjusted Term SOFR, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.14 hereof, then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.

"Ancillary Document" has the meaning assigned to such term in Section 9.06.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, and all other applicable laws, rules, and regulations concerning or relating to bribery or corruption.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Discount" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(2).

"Applicable Period" has the meaning assigned to such term in Section 5.15(c).

"Applicable Rate" means, (a) with respect to any Initial Term Loans and Holdco Exchange Loans at any time prior to the Toggle Term Effective Date (i) with respect to any Initial Term Loans and Holdco Exchange Loans maintained as ABR Loans, 9.00% per annum, (ii) with respect to any Initial Term Loans and Holdco Exchange Loans maintained as SOFR Loans, 10.00% per annum, (b) with respect to any Other Term Loans, as set forth in the applicable Refinancing Amendment or Loan Modification Agreement and (c)  with respect to the Initial Term Loans and Holdco Exchange Loans at any time after the Toggle Term Effective Date, the sum of (i)(x) with respect to any Initial Term Loans and Holdco Exchange Loans maintained as ABR Loans, 9.00% per annum, and (y) with respect to any Initial Term Loans and Holdco Exchange Loans maintained as SOFR Loans, 10.00% per annum, plus, (ii) the Leverage-Based Margin Increase, if any.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Budget" has the meaning assigned to such term in Section 5.15(b).

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Asset Sale Prepayment Percentage" means 100%; provided that, if at any time the Secured

~~Net Leverage Ratio is (i) less than or equal to 3.06 to 1.00 and greater than 2.56 to 1.00 (as set forth in the most recent Compliance Certificate delivered to the Administrative Agent for any fiscal quarter or fiscal year of the Lead Borrower in accordance with~~ ~~Section 5.01,~~ ~~provided that for purposes of calculating the Secured Net Leverage Ratio for this definition, the Consolidated EBITDA of any Person acquired pursuant to a Limited Condition Transaction shall not be included until such Limited Condition Transaction is consummated), the applicable Asset Sale Prepayment Percentage shall instead be 50% and (ii) less than or equal to 2.56 to 1.00 (as set forth in the most recent Compliance Certificate delivered to the Administrative Agent for any fiscal quarter or fiscal year of the Lead Borrower in accordance with~~ ~~Section 5.01,~~ ~~provided that for purposes of calculating the Secured Net Leverage Ratio for this definition, the Consolidated EBITDA of any Person acquired pursuant to a Limited Condition Transaction shall not be included until such Limited Condition Transaction is consummated), the applicable Asset Sale Prepayment Percentage shall instead be 0%~~.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by <u>Section 9.04</u>), substantially in the form of <u>Exhibit A</u> or any other form reasonably approved by the Administrative Agent.

"<u>Auction Agent</u>" means (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Term Loan Prepayment pursuant to <u>Section 2.11(a)(ii)(A)</u>; <u>provided</u> that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent).

"<u>Audited Financial Statements</u>" means (a) the audited consolidated balance sheet of the Lead Borrower and its Subsidiaries, and the related audited statements of income, cash flows and stockholders' equity, for the fiscal year of the Lead Borrower ended on or about December 31, 2019 and (b) the audited consolidated balance sheet of PSP and its Subsidiaries, and the related audited statements of income, cash flows and stockholders' equity, for the fiscal year of PSP, ended on or about December 31, 2019.

"<u>Available Amount</u>" means, as of any date of determination, a cumulative amount equal to (without duplication and without duplication of any amount included in the Available Equity Amount):

(a)     [Reserved], <u>plus</u>

(b)     the sum of an amount (which amount shall not be less than zero) equal to the sum of (x) Excess Cash Flow (but not less than zero in any period) for the fiscal year of the Lead Borrower ending on or about December 31, 2021 and (y) Excess Cash Flow for each succeeding completed fiscal year as of such date, in each case, that was not required to prepay Term Loan Borrowings pursuant to <u>Section 2.11(d)</u> or Term Loan Borrowings (as defined in the First Lien Credit Agreement) pursuant to Section 2.11(d) of the First Lien Credit Agreement, <u>plus</u>

(c)     returns, profits, distributions and similar amounts received in (or converted into) cash or Permitted Investments (and the fair market value (as determined in good faith by the Lead Borrower) of non-cash returns, profits, distributions and similar amounts) by the Borrower and its Subsidiaries on Investments made using the Available Amount (not to exceed the original amount of such Investments), <u>plus</u>

(d)     [Reserved], <u>plus</u>

(e)    the Net Proceeds of a sale or other Disposition received by the Borrower or any Subsidiary of Investments made using the Available Amount, plus

(f)    [Reserved], plus

(g)    [Reserved], plus

(h)    the aggregate amount of any Retained Declined Proceeds and Retained Asset Sale Proceeds.

"Available Equity Amount" means a cumulative amount equal to (without duplication, and without duplication of any amount included in the Available Amount):

(a)    without duplication of any amount included in the Available Amount, the Net Proceeds of new public or private issuances after the Effective Date of Qualified Equity Interests (excluding (i) Qualified Equity Interests the proceeds of which will be applied as Aggregate Cure Amounts and (ii) any other Qualified Equity Interests used for, or otherwise having the effect of increasing, any other basket under this Agreement) of the Lead Borrower, plus

(b)    capital contributions received by the Lead Borrower after the Effective Date in cash or Permitted Investments (and the fair market value (as determined in good faith by the Lead Borrower) of non-cash capital contributions) in respect of Qualified Equity Interests (excluding (i) Qualified Equity Interests the proceeds of which will be applied as Aggregate Cure Amounts and (ii) any other Qualified Equity Interests used for, or otherwise having the effect of increasing, any other basket under this Agreement), plus

(c)    the net cash proceeds received by the Borrower or any Subsidiary from Indebtedness and Disqualified Equity Interest issuances issued after the Effective Date and which have been exchanged or converted into Qualified Equity Interests, plus

(d)    returns, profits, distributions and similar amounts received in (or converted into) cash or Permitted Investments (and the fair market value (as determined in good faith by the Lead Borrower) of non-cash returns, profits, distributions and similar amounts) by the Borrower or any Subsidiary on Investments made using the Available Equity Amount (not to exceed the original amount of such Investments).

~~"Available General RP Capacity Amount" means (i) the amount of Restricted Payments that may be made at the time of determination pursuant to Section 6.07(a)(xv) plus (ii) the amount of prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing that may be made at the time of determination pursuant to Section 6.07(b)(vi)(A) minus (iii) the sum of the amount of the Available General RP Capacity Amount utilized by the Borrower or any Subsidiary prior to such time to make (a) Restricted Payments pursuant to Section 6.07(a)(xv), (b) prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing pursuant to Section 6.07(b)(vi)(A), (c) Investments pursuant to Section 6.04(m)(A)(ii) utilizing the Available General RP Capacity Amount or (d) prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing pursuant to Section 6.07(b)(vi)(B) utilizing the Available General RP Capacity Amount.~~

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an

Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.14(e).

"Badcock" means W.S. Badcock Corporation, a Florida corporation.

"Badcock Acquisition" means the "Badcock Acquisition" as defined in the First Amendment.

"Badcock Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Badcock Security Documents as security for the Secured Obligations. For the avoidance of doubt, Collateral does not constitute "Badcock Collateral".

"Badcock Collateral Agreement" means the Amended and Restated Second Lien Collateral Agreement, dated as of the Third Amendment Effective Date, between Badcock and the Collateral Agent, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Badcock Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)     the Administrative Agent and the Lenders shall have received from Badcock

(i)     a counterpart of the Badcock Guarantee Agreement duly executed and delivered on behalf of Badcock, and

(ii)     a counterpart of the Badcock Collateral Agreement duly executed and delivered on behalf of Badcock,

in each case under this clause (a) together with opinions and documents of the type referred to in Sections 4.01(b) and 4.01(d);

(b)     all outstanding Equity Interests of each direct Subsidiary (other than (i) any Equity Interests constituting Excluded Assets, (ii) Equity Interests of Immaterial Subsidiaries, (iii) Equity Interests in any Person other than a Subsidiary and (iv) Equity Interests in any Foreign Subsidiary (other than, with respect to this clause (iv), to the extent constituting "securities" within the meaning of the UCC)) owned by or on behalf of Badcock, shall have been pledged pursuant to the Badcock Collateral Agreement, and, subject to the Intercreditor Agreements, the Collateral Agent shall have received certificates, if any, of such entity reflecting the pledge, or other instruments, if any, representing all such Equity Interests (other than such Equity Interests in Immaterial Subsidiaries), together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)     (i) if any intercompany Indebtedness for borrowed money of the Borrower, any other Loan Party or any Subsidiary in a principal amount of $7,500,000 or more is owing by such obligor to Badcock and such Indebtedness shall be evidenced by a promissory note, such promissory note shall be pledged pursuant to the Badcock Collateral Agreement, and, subject to the Intercreditor Agreements, the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank; provided, however, that the foregoing delivery requirement with respect to any intercompany indebtedness may be satisfied by delivery of an omnibus or global intercompany note executed by Badcock as payee and all such obligors as payors in the form of the Badcock Master Intercompany Note and (ii) if any Indebtedness for borrowed money of any Person that is not a

Loan Party or a Subsidiary in a principal amount of $7,500,000 or more is owing by such obligor to Badcock and such Indebtedness is evidenced by a promissory note, such promissory note shall be pledged pursuant to the Badcock Collateral Agreement and, subject to the Intercreditor Agreements, the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)       with respect to any Badcock Collateral owned by Badcock, all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements and Badcock Intellectual Property Security Agreements required by this Agreement, the Badcock Security Documents, Requirements of Law and reasonably requested by the Collateral Agent or the Required Lenders to be filed, delivered, registered or recorded to create the Liens intended to be created by the Badcock Security Documents and perfect such Liens to the extent required by, and with the priority required by, this Agreement, the Badcock Security Documents, the Intercreditor Agreements and the other provisions of the term "Badcock Collateral and Guarantee Requirement," shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or recording no later than the tenth (10th) Business Day following the First Amendment Effective Date (other than with respect to Uniform Commercial Code financing statements); and

(e)       the Collateral Agent shall have received (i) counterparts of a Badcock Mortgage with respect to each Badcock Material Real Property duly executed and delivered by Badcock; provided, that, to the extent any Badcock Mortgaged Property is located in a jurisdiction that imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, the Collateral Agent will cooperate with the Lead Borrower in order to minimize the amount of tax payable in connection with such Badcock Mortgage as permitted by, and in accordance with, applicable law including, to the extent permitted by applicable law, limiting the amount secured by such Badcock Mortgage to the book value of such Badcock Mortgaged Property, as reasonably determined by the Lead Borrower, if such limitation results in such mortgage tax being calculated based upon such book value, (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) issued by a nationally recognized title insurance company insuring the Lien of each such Badcock Mortgage as a first priority Lien on the Mortgaged Property described therein (subject to the terms of the Intercreditor Agreements), free of any other Liens except as expressly permitted by Section 6.02 and Section 6.15, together with such customary lender's endorsements as the Collateral Agent or the Required Lenders may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates (it being agreed that the Collateral Agent shall accept zoning reports from a nationally recognized zoning company in lieu of zoning endorsements to such title insurance policies), in an amount equal to the book value of such Badcock Mortgaged Property or as otherwise reasonably agreed by the parties; provided that in no event will the Borrower be required to obtain independent appraisals of such Badcock Mortgaged Properties, unless required by FIRREA, (iii) a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Badcock Mortgaged Property, and if any Badcock Mortgaged Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, a duly executed notice about special flood hazard area status and flood disaster assistance and evidence of such flood insurance as provided in Section 5.07(b), (iv) opinions, addressed to the Administrative Agent and the Secured Parties, from counsel qualified to opine in each jurisdiction where a Badcock Mortgaged Property is located regarding the enforceability of the Badcock Mortgage and such other matters as may be in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders, (v) a survey or existing survey together with a no change affidavit of such Badcock Mortgaged Property, in compliance with the 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys or such other ALTA/NSPS requirements as are in effect on the date of preparation of such survey and otherwise reasonably satisfactory to the Collateral Agent and the Required Lenders, and (vi) evidence of payment of title insurance premiums and expenses and all recording, mortgage, transfer and stamp taxes and fees payable in connection with recording the Badcock

Mortgage, any amendments thereto and any fixture filings in appropriate county land office(s); provided further that, with respect to any Second Amendment Effective Date Badcock Material Real Property, the requirements set forth in this clause (e) shall not be required to be satisfied until October 26, 2023, or such later date as may be agreed to by the First Lien Agent in its reasonable discretion.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, (i) any assets of the Loan Parties (other than Badcock) or (ii) particular assets of Badcock, if, solely for purposes of this clause (a)(ii), and for so long as the Required Lenders and the Lead Borrower reasonably agree in writing that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets outweighs the benefits to be obtained by the Lenders therefrom; (b) Liens required to be granted from time to time pursuant to the term "Badcock Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in the Badcock Security Documents and the Intercreditor Agreements; (c) control agreements or control or similar arrangements shall not be required with respect to deposit or securities accounts, except to the extent required under the Loan Documents with respect to an account in respect of which such a control agreement or control or similar arrangement is required under the ABL Loan Documents, in which case Badcock shall be required to use commercially reasonable efforts to cause the Collateral Agent to be a party to such control agreements or control or similar arrangements; (d) in no event shall Badcock be required to complete any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States, and no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken, nor shall the Collateral Agent be authorized to take any such action, to create any security interests or to perfect or make enforceable any security interests in any such assets; (e) in no event shall Badcock be required to complete any filings or other action with respect to perfection of security interests in assets subject to certificates of title beyond the filing of UCC financing statements; (f)(i) in the case of intercompany debt described in the first clause (c)(i) of this definition, other than the filing of UCC financing statements and the delivery of the Badcock Master Intercompany Note, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $7,500,000 and (ii) in the case of third party debt described in the first clause (c)(ii) of this definition, other than the filing of UCC financing statements, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $7,500,000; (g) in no event shall Badcock be required to complete any filings or other action with respect to security interests in Badcock Intellectual Property beyond the filing of Badcock Intellectual Property Security Agreements with the United States Patent and Trademark Office or the United States Copyright Office; (h) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of UCC financing statements), except to the extent constituting a supporting obligation for other Badcock Collateral as to which perfection is accomplished by the filing of a UCC financing statement; (i) in no event shall the Badcock Collateral include any Excluded Assets; (j) landlord lien waivers, bailee waivers, collateral access agreements or similar agreements shall not be required; (k) notices shall not be required to be sent to account debtors or other contractual third parties, except to the extent set forth in the Loan Documents following the occurrence and during the continuance of an Event of Default; and (l) notices to, or acknowledgements from, counterparts under, or compliance with the Assignment of Claims Act (or any state or municipal equivalent) shall not be required. The Required Lenders may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets and any other obligations under this definition where they determine that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Badcock Security Documents.

"Badcock First Lien Agent" means JPM, as administrative agent and collateral agent under the Badcock First Lien Credit Agreement, or any successor thereto acting in such capacities.

"Badcock First Lien Credit Agreement" means that certain First Lien Credit Agreement, dated as of the First Amendment Effective Date, among the Borrower, the Badcock First Lien Agent and the lenders from time to time party thereto, as in effect on the First Amendment Effective Date as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof (including by reference to the ABL Intercreditor Agreement, the First Lien/Second Lien Intercreditor Agreement and the Badcock Intercreditor Agreement).

"Badcock First Lien Loan Documents" shall have the meaning ascribed to the term "Loan Documents" in the Badcock First Lien Credit Agreement.

"Badcock Guarantee Agreement" means the Second Lien Guarantee Agreement, dated as of the Effective Date, between Badcock and the Administrative Agent, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Badcock Intellectual Property" has the meaning assigned to such term in the Badcock Collateral Agreement.

"Badcock Intellectual Property Security Agreement" means short-form security agreements, suitable for filing with the United States Patent and Trademark Office or the United States Copyright Office (as applicable), with respect to any Badcock Intellectual Property that is registered, issued, or applied for registration or issuance in the United States and that constitute Badcock Collateral that can be perfected by the filing of such security agreements, in each case, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Badcock Intercreditor Agreement" means that certain that certain Four Lien Intercreditor Agreement, dated as of the First Amendment Effective Date, by and among the Collateral Agent, the First Lien Agent, the Badcock First Lien Agent and the Badcock Second Lien Agent and acknowledged by Badcock, as it may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof.

"Badcock Master Intercompany Note" means the Master Intercompany Note, dated the First Amendment Effective Date, pursuant to which Badcock is the "payee" and the Lead Borrower and its Subsidiaries (other than Badcock) are the "payors".

"Badcock Material Real Property" means (a) the real property described on Schedule 2.02 (the "Second Amendment Effective Date Badcock Material Real Property") and (b) any other real property (including fixtures) (i) located in the United States, (ii) first acquired by Badcock after the Second Amendment Effective Date and (iii) owned (but not leased or ground-leased) by Badcock with a book value, as reasonably determined by the Lead Borrower in good faith on the date of acquisition thereof, greater than or equal to $7,500,000. For the avoidance of doubt, Material Real Property does not constitute "Badcock Material Real Property".

"Badcock Mortgage" means a mortgage, deed of trust, deed to secure debt or other security document granting a Lien on any Badcock Mortgaged Property in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Secured Obligations, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time. Each Badcock Mortgage shall be in form and substance reasonably satisfactory to the Collateral Agent, the Required Lenders and the Borrower.

"Badcock Mortgaged Property" means each parcel of Badcock Material Real Property with respect to which a Badcock Mortgage is granted pursuant to the "Badcock Collateral and Guarantee Requirement", Section 5.12(a) or Section 5.12(c).

"Badcock Pledged Equity Interests" has the meaning set forth in the Badcock Collateral Agreement.

"Badcock Second Lien Agent" means Alter Domus (US) LLC, as administrative agent and collateral agent under the Badcock Second Lien Credit Agreement, or any successor thereto acting in such capacities.

"Badcock Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of the First Amendment Effective Date, among the Borrower, the Badcock Second Lien Agent and the lenders from time to time party thereto, as in effect on the First Amendment Effective Date as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof (including by reference to the ABL Intercreditor Agreement, the First Lien/Second Lien Intercreditor Agreement and the Badcock Intercreditor Agreement).

"Badcock Second Lien Loan Documents" shall have the meaning ascribed to the term "Loan Documents" in the Badcock Second Lien Credit Agreement.

"Badcock Security Documents" means the Badcock Collateral Agreement, the Badcock Mortgages (if any) and each other security agreement or pledge agreement executed and delivered pursuant to the "Badcock Collateral and Guarantee Requirement" and/or Section 5.12(a) (solely as it may relate to Badcock) or Section 5.12(c) to secure any of the Secured Obligations.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof; provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or

writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Basel III" means: (i) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision on 16 December 2010, each as amended, supplemented or restated; (ii) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and (iii) any further guidance or standards published by the Basel Committee on Banking Supervision relating to Basel III.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.14(b).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Required Lenders for the applicable Benchmark Replacement Date:

(a)        the sum of: (1) Daily Simple SOFR and (2) the related Benchmark Replacement Adjustment;

(b)        the sum of: (1) the alternate benchmark rate that has been selected by the Required Lenders (in consultation with the Administrative Agent and the Lead Borrower) as the replacement for the then-current Benchmark giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for dollar-denominated syndicated credit facilities at such time and (2) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Lead Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, the applicability of Section 2.14 and other technical, administrative or operational matters) that the Required Lenders decide may be appropriate to reflect the adoption and implementation of any such rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Required Lenders decide that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders determine that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders decide is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents); provided that any such changes shall be administratively feasible for the Administrative Agent.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"<u>Benchmark Unavailability Period</u>" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 2.14</u> and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 2.14</u>.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>BHC Act Affiliate</u>" of a party means an 'affiliate' (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"<u>Board of Directors</u>" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing or any committee thereof duly authorized to act on behalf of such board, manager or managing member, (c) in the case of any partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"<u>Board of Governors</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>Borrower Materials</u>" has the meaning assigned to such term in <u>Section 5.01</u>.

-14-

"Borrower Offer of Specified Discount Prepayment" means the offer by the Borrower to make a voluntary prepayment of Term Loans at a Specified Discount to par pursuant to Section 2.11(a)(ii)(B).

"Borrower Solicitation of Discount Range Prepayment Offers" means the solicitation by the Borrower of offers for, and the corresponding acceptance by a Term Lender of, a voluntary prepayment of Term Loans at a specified range at a discount to par pursuant to Section 2.11(a)(ii)(C).

"Borrower Solicitation of Discounted Prepayment Offers" means the solicitation by the Borrower of offers for, and the subsequent acceptance, if any, by a Term Lender of, a voluntary prepayment of Term Loans at a discount to par pursuant to Section 2.11(a)(ii)(D).

"Borrowing" means Loans of the same Class and Type, made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Minimum" means $1,000,000.

"Borrowing Multiple" means $500,000.

"Borrowing Request" means a written request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Requirements of Law to remain closed.

"Business Plan" has the meaning assigned to such term in Section 5.15(i)(iv).

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any Capitalized Leases; provided, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness and shall not be included in Consolidated Cash Interest Charges or clause (b) of the definition of "Fixed Charge Coverage Ratio", unless the corresponding leases would have been treated as Capitalized Leases under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases, and the interest component of such Capitalized Leases shall be included in Consolidated Cash Interest Charges, and, by virtue thereof, clause (b) of the definition of "Fixed Charge Coverage Ratio"). For purposes of Section 6.02, a Capital Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Capitalized Lease" means, as applied to any Person, any lease of any property (whether real, personal, or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee which is a transaction of a type commonly known as a "synthetic lease" (i.e., a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for federal income Tax purposes); provided, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness and shall not be included in Consolidated Cash Interest Charges or clause (b) of the definition of "Fixed Charge Coverage Ratio", unless the corresponding leases would have been treated as Capitalized Leases under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases, and the interest component of

such Capitalized Leases shall be included in Consolidated Cash Interest Charges, and, by virtue thereof, clause (b) of the definition of "Fixed Charge Coverage Ratio").

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and its Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrower and its Subsidiaries.

"Cash Management Obligations" means (a) obligations of the Borrower or any Subsidiary in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit or purchase card programs and similar arrangements.

"Casualty Event" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards, in each case, in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Change in Law" means: (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law," to the extent enacted, adopted, promulgated or issued after the date of this Agreement, but only to the extent such rules, regulations, or published interpretations or directives are applied to the Borrower and its Subsidiaries by the Administrative Agent or any Lender in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities, including for purposes of Section 2.15.

"Change of Control" means (x) the acquisition of beneficial ownership, directly or indirectly, by any Person or group, other than the Permitted Holders (directly or indirectly, including through one or more holding companies), of Equity Interests representing 35% or more of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in the Lead Borrower and the percentage of the aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests in the Lead Borrower held by the Permitted Holders, unless the Permitted Holders (directly or indirectly, including through one or more holding companies) otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate, nominate or appoint (and do so designate, nominate or appoint) a majority of the Board of Directors of the Lead Borrower or (y) any "change of control" or similar event under the ABL Credit Agreement, the First Lien Credit Agreement, the Badcock First Lien Credit Agreement or the Badcock Second Lien Credit Agreement.; provided that, notwithstanding anything in this Agreement to the contrary, the appointment of Todd Arden and/or Christopher Meyer as independent directors on one or more of the boards of FRG and/or any direct or indirect parent thereof (including, Freedom VCM Holdings, LLC, a

Delaware limited liability company), and any independent director succeeding or replacing any of the foregoing, shall not constitute a Change of Control.

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act, (ii) the phrase "Person or group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and (iii) if any Person or "group" includes one or more Permitted Holders, the issued and outstanding Equity Interests of the Lead Borrower directly or indirectly owned by the Permitted Holders that are part of such Person or "group" shall not be treated as being owned by such Person or "group" for purposes of determining whether clause (c) of this definition is triggered.

"Class" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Initial Term Loans, Holdco Exchange Loans or Other Term Loans, (b) any Commitment, refers to whether such Commitment is an Initial Term Loan Commitment or Other Term Commitment and (c) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments. Other Term Commitments and Other Term Loans that have different terms and conditions shall be construed to be in different Classes.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Secured Obligations. For the avoidance of doubt, Badcock Collateral does not constitute "Collateral".

"Collateral Agent" means Alter Domus, in its capacity as collateral agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Collateral Agreement" means the Second Lien Collateral Agreement among the Borrower, each other Loan Party (other than Badcock) and the Collateral Agent, substantially in the form of Exhibit D.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)     the Administrative Agent and the Lenders shall have received from

(i)     each Borrower and Subsidiary (other than any Excluded Subsidiary or Badcock) either (x) in the case of any Person that is a Loan Party on the Effective Date, a counterpart of the Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary but excluding Badcock), a supplement to the Guarantee Agreement, in substantially the form specified therein, duly executed and delivered on behalf of such Person, and

(ii)     each Borrower and Subsidiary (other than any Excluded Subsidiary or Badcock) either (x) in the case of any Person that is a Loan Party on the Effective Date, a counterpart of the Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary but excluding Badcock), a supplement to the Collateral Agreement, in substantially the form specified therein, duly executed and delivered on behalf of such Person,

in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, to the extent reasonably requested by the Administrative Agent or the Required Lenders, opinions and documents of the type referred to in Sections 4.01(b) and 4.01(d) (but excluding any opinions in the case of an Immaterial Subsidiary which ceases to be an Immaterial Subsidiary as a result of, or in connection with, the Fifth Amendment);

(b)    subject to Section 5.14, all outstanding Equity Interests of the Borrower and each Subsidiary (other than (i) any Equity Interests constituting Excluded Assets, (ii) Equity Interests of Immaterial Subsidiaries or PSP Securitization Entities, (iii) Equity Interests in any Person other than a Borrower or Subsidiary and (iv) Equity Interests in any Foreign Subsidiary (other than, with respect to this clause (iv), to the extent constituting "securities" within the meaning of the UCC)) owned by or on behalf of any Loan Party (other than Badcock), shall have been pledged pursuant to the Collateral Agreement, and, subject to the Intercreditor Agreements, the Collateral Agent shall have received certificates, if any, of such entity reflecting the pledge, or other instruments, if any, representing all such Equity Interests (other than such Equity Interests in Immaterial Subsidiaries), together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank; provided, that, with respect to any Equity Interests of Badcock (which the Lead Borrower hereby agrees shall be evidenced by a certificate following the First Amendment Effective Date), the requirements set forth in this clause (b) (including the issuance of such certificate) shall not be required to be satisfied until the date that is sixty (60) days following the First Amendment Effective Date, or such longer time period as agreed by the First Lien Agent in its reasonable discretion;

(c)    subject to Section 5.14, (i) if any intercompany Indebtedness for borrowed money of the Borrower, any other Loan Party or any Subsidiary in a principal amount of $7,500,000 or more is owing by such obligor to any Loan Party (other than Badcock) and such Indebtedness shall be evidenced by a promissory note, such promissory note shall be pledged pursuant to the Collateral Agreement, and, subject to the Intercreditor Agreements, the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank; provided, however, that the foregoing delivery requirement with respect to any intercompany indebtedness may be satisfied by delivery of an omnibus or global intercompany note executed by all Loan Parties (other than Badcock) as payees and all such obligors as payors in the form of the Master Intercompany Note and (ii) if any Indebtedness for borrowed money of any Person that is not a Loan Party or a Subsidiary in a principal amount of $7,500,000 or more is owing by such obligor to any Loan Party (other than Badcock) and such Indebtedness is evidenced by a promissory note, such promissory note shall be pledged pursuant to the Collateral Agreement and, subject to the Intercreditor Agreements, the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)    with respect to any Collateral owned by any Loan Party (other than Badcock), all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements and Intellectual Property Security Agreements required by this Agreement, the Security Documents, Requirements of Law and reasonably requested by the Collateral Agent or the Required Lenders to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, this Agreement, the Security Documents, the Intercreditor Agreements and the other provisions of the term "Collateral and Guarantee Requirement," shall have been filed, registered or recorded or delivered to the Collateral Agent for filing, registration or recording; and

(e)    all Secured Obligations shall have been unconditionally guaranteed by each Borrower (other than with respect to such Borrower's direct Secured Obligations as a primary obligor (as

-18-

opposed to a guarantor) under the Loan Documents) and each Subsidiary (other than any Excluded Subsidiary); and

(f)    (e) the Collateral Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property duly executed and delivered by the record owner of such Mortgaged Property; provided, that, to the extent any Mortgaged Property is located in a jurisdiction that imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, the Collateral Agent will cooperate with the Borrower or the applicable Loan Party in order to minimize the amount of tax payable in connection with such Mortgage as permitted by, and in accordance with, applicable law including, to the extent permitted by applicable law, limiting the amount secured by such Mortgage to the book value of such Mortgaged Property, as reasonably determined by the Lead Borrower, if such limitation results in such mortgage tax being calculated based upon such book value, (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a first priority Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such customary lender's endorsements as the Collateral Agent or the Required Lenders may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates (it being agreed that the Collateral Agent shall accept zoning reports from a nationally recognized zoning company in lieu of zoning endorsements to such title insurance policies), in an amount equal to the book value of such Mortgaged Property or as otherwise reasonably agreed by the parties; provided that in no event will the Borrower be required to obtain independent appraisals of such Mortgaged Properties, unless required by FIRREA, (iii) a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Mortgaged Property, and if any Mortgaged Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, a duly executed notice about special flood hazard area status and flood disaster assistance and evidence of such flood insurance as provided in Section 5.07(b), (iv) opinions, addressed to the Administrative Agent and the Secured Parties, from counsel qualified to opine in each jurisdiction where a Mortgaged Property is located regarding the enforceability of the Mortgage and such other matters as may be in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders, (v) a survey or existing survey together with a no change affidavit of such Mortgaged Property, in compliance with the 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys or such other ALTA/NSPS requirements as are in effect on the date of preparation of such survey and otherwise reasonably satisfactory to the Collateral Agent and the Required Lenders, and (vi) evidence of payment of title insurance premiums and expenses and all recording, mortgage, transfer and stamp taxes and fees payable in connection with recording the Mortgage, any amendments thereto and any fixture filings in appropriate county land office(s).

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, (i) any assets of Badcock or (ii) particular assets of the Loan Parties, or the provision of Guarantees by any Subsidiary, if, solely for purposes of this clause (a)(ii), and for so long as the Required Lenders and the Lead Borrower reasonably agree in writing that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such Guarantees (taking into account any adverse tax consequences to the Borrower and its Affiliates (including the imposition of withholding or other material taxes)), outweighs the benefits to be obtained by the Lenders therefrom; (b) Liens required to be granted from time to time pursuant to the term "Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in the Security Documents and the Intercreditor Agreements; (c) control agreements or control or similar arrangements shall not be required with respect to deposit or securities accounts, except to the extent required under the

Loan Documents with respect to an account in respect of which such a control agreement or control or similar arrangement is required under the ABL Loan Documents, in which case the applicable Loan Parties shall be required to use commercially reasonable efforts to cause; provided that, to the extent control agreements are entered into in favor of the ABL Agent on or after the Fifth Amendment Effective Date, the Collateral Agent to be a party to such control agreements or control or similar arrangementsand be the First Lien Agent must also be party thereto; (d) in no event shall any Loan Party be required to complete any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States, and no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken, nor shall the Collateral Agent be authorized to take any such action, to create any security interests or to perfect or make enforceable any security interests in any such assets; (e) in no event shall any Loan Party be required to complete any filings or other action with respect to perfection of security interests in assets subject to certificates of title beyond the filing of UCC financing statements; (f)(i) in the case of intercompany debt described in the first clause (c)(i) of this definition, other than the filing of UCC financing statements and the delivery of the Master Intercompany Note, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $7,500,000 and (ii) in the case of third party debt described in the first clause (c)(ii) of this definition, other than the filing of UCC financing statements, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $7,500,000; (g) in no event shall any Loan Party be required to complete any filings or other action with respect to security interests in Intellectual Property beyond the filing of Intellectual Property Security Agreements with the United States Patent and Trademark Office or the United States Copyright Office; (h) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of UCC financing statements), except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement; (i) in no event shall the Collateral include any Excluded Assets; (j) landlord lien waivers, bailee waivers, collateral access agreements or similar agreements shall not be required, except to the extent required under the Loan Documents with respect to distribution centers of the Loan Parties; (k) notices shall not be required to be sent to account debtors or other contractual third parties, except to the extent set forth in the Loan Documents following the occurrence and during the continuance of an Event of Default; and (l) notices to, or acknowledgements from, counterparts under, or compliance with the Assignment of Claims Act (or any state or municipal equivalent) shall not be required. The Required Lenders may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) and any other obligations under this definition where they determine that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

"Commitment" means with respect to any Lender, the Term Commitment or Other Term Commitment of any Class or any combination thereof (as the context requires).

"Commitment Parties" means Irradiant Solutions Fund, L.P., IFRG Investors II, L.P., HVS XXXIV LLC, D3V XI LLC, PIF Onshore XVII LP, RSF XVIII LLC and OC III LVS XXI LP.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Company Advisors" has the meaning assigned to such term in Section 5.15(d).

"Compliance Certificate" has the meaning assigned to such term in Section 5.01(e).

"Conn's" means, collectively, (i) Conn's Inc. (ii) Conn Appliances, Inc., (iii) CAI Holding, LLC, (iv) Conn Lending, LLC, (v) Conn Credit I, LP, (vi) Conn Credit Corporation, Inc., (vii) CAI Credit Insurance Agency, Inc., (viii) New RTO, LLC, (ix) W.S. Badcock LLC, (x) W.S. Badcock Credit LLC, and (xi) W.S. Badcock Credit I LLC, and to the extent applicable, each of their respective bankruptcy estates.

"Consolidated Cash Interest Charges" means, for any period, the total interest expense of the Borrower and its Subsidiaries for such period determined on a consolidated basis net of any interest income, which shall be determined on a cash basis only and solely in respect of Indebtedness of the type described in the definition of Consolidated Total Indebtedness and excluding, for the avoidance of doubt, (i) any non-cash interest expense and any capitalized interest, whether paid or accrued, (ii) the amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (iii) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses (including agency costs, amendment, consent or other front end, one-off or similar non-recurring fees), (iv) any expenses resulting from discounting of indebtedness in connection with the application of recapitalization accounting or purchase accounting, (v) penalties or interest related to taxes and any other amounts of non-cash interest resulting from the effects of acquisition method accounting or pushdown accounting, (vi) the accretion or accrual of, or accrued interest on, discounted liabilities (other than Indebtedness) during such period, (vii) non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under hedging agreements or other derivative instruments pursuant to FASB Accounting Standards Codification No. 815-Derivatives and Hedging, (viii) any one-time cash costs associated with breakage in respect of Swap Agreements for interest rates, (ix) any payments with respect to make whole premiums, commissions or other breakage costs of any Indebtedness, (x) all non-recurring interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with GAAP, (xi) expensing of bridge, arrangement, structuring, commitment, fronting or other financing fees, (xii) fees and expenses (including any penalties and interest relating to Taxes but excluding any bona fide interest expense) associated with the consummation of the Transactions, (xiii) agency fees paid to the administrative agents and collateral agents under any credit facilities or other debt instruments or documents ~~and~~, (xiv) fees (including any ticking fees) and expenses (including any penalties and interest relating to Taxes) associated with any Investment not prohibited by Section 6.04 or the issuance of Equity Interests or Indebtedness (in each case excluding any bona fide interest expense) and (xv) Secured Holdco Guarantee Obligations.

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period, plus:

(a)    without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    total interest expense and, to the extent not reflected in such total interest expense, the sum of (A) premium payments, debt discount, fees, charges and related expenses incurred in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets plus (B) the portion of rent expense with respect to such period under Capitalized Leases that is treated as interest expense in accordance with GAAP plus (C) the implied interest component of synthetic leases with respect to such period plus (D) any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or such derivative instruments plus (E) bank and letter of credit fees and costs of surety bonds in connection with financing activities, plus (F) amortization or write-off of deferred financing fees, debt issuance costs, debt discount or premium, terminated hedging obligations and other commissions, financing fees and expenses and, adjusted, to the extent included, to exclude any refunds or similar credits

-21-

received in connection with the purchasing or procurement of goods or services under any purchasing card or similar program;

(ii)    provision for taxes based on income, profits, revenue or capital and sales taxes, including federal, foreign, state, franchise, excise, and similar taxes paid or accrued during such period (including in respect of repatriated funds) including penalties and interest related to such taxes or arising from any tax examinations;

(iii)    Non-Cash Charges;

(iv)    [reserved];

(v)    net cash received from A Team and its Subsidiaries and utilized to repay or prepay Indebtedness;

(vi)    severance, relocation, integration and facilities' opening costs and expenses and other business optimization costs and expenses and operating improvements (including related to new product introductions and any operating expenses, losses or charges related to the implementation of cost savings initiatives, operating expense reductions and other similar initiatives), recruiting fees, signing costs, reserve, retention, recruiting, relocation and signing bonuses and expenses, transition costs, costs related to closure/consolidation of facilities, internal costs in respect of strategic initiatives and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities), contract terminations, professional and consulting fees incurred in connection with any of the foregoing and other one-time and nonoperational costs and expenses; provided that the amounts added-back pursuant to this clause (vi) shall be subject to the Aggregate Add-Back Cap;

(vii)    restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves), whether or not classified as restructuring expense on the consolidated financial statements; provided that the amounts added-back pursuant to this clause (vii) shall be subject to the Aggregate Add-Back Cap;

(viii)    the amount of any non-controlling interest consisting ofexpense associated to income attributable to non-controlling interests of third parties in any Non-Wholly Owned Subsidiary deducted (and not added back in such period) in calculating Consolidated Net Income, excludingnet of any cash distributionsincome in respect thereof;

(ix)    [reserved];

(x)    any non-cash loss attributable to the mark to market movement in the valuation of any Equity Interests, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(xi)    any loss relating to amounts paid in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income for such period;

(xii)    any gain relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from Consolidated EBITDA pursuant to clause (c)(iv) below;

(xiii)    any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of FASB Accounting Standards Codification 715, and any other items of a similar nature;

(xiv)    charges, losses, lost profits, expenses (including litigation expenses, fee and charges) or write-offs to the extent indemnified or insured by a third party, including expenses or losses covered by indemnification provisions or by any insurance provider in connection with the Transactions, a Permitted Acquisition or any other acquisition or Investment, disposition or any Casualty Event, in each case, to the extent that coverage has not been denied and so long as such amounts are actually reimbursed in cash within one year after the related amount is first added to Consolidated EBITDA pursuant to this clause (xiv) (and if not so reimbursed within one year, such amount shall be deducted from Consolidated EBITDA during the next measurement period);

(xv)    cash receipts (or any netting arrangements resulting in reduced cash expenses) not included in Consolidated EBITDA in any period to the extent non-cash gains relating to such receipts were deducted in the calculation of Consolidated EBITDA pursuant to clause (c) below for any previous period and not added back;

(xvi)    Earn-Out payments, contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments incurred in connection with the Acquisition and/or any acquisition or other investment (including any acquisition or other investment consummated prior to the Effective Date) which are paid or accrued during the applicable period; ~~and~~

(xvii)    on or after a Permitted PSP Securitization, cash or Cash Equivalents received by the Lead Borrower or any of the Loan Parties from any PSP Securitization Entities;

(xviii)    on or after a Permitted PSP Securitization and to the extent not otherwise included in Consolidated Net Income, proceeds of any sale (other than to a Borrower or any Subsidiary that is not a PSP Securitization Entity) of property or the Equity Interests of any PSP Securitization Entity received by the Borrower or any of the Loan Parties;

(xix)    on or after a Permitted PSP Securitization, any reasonable transaction fees, expenses or charges incurred in connection with a Permitted PSP Securitization;

(xx)    on or after with a Permitted PSP Securitization, any reasonable management fee, servicing fee, administrative fee or other similar fee paid by any PSP Securitization Entity to the Lead Borrower or any of the Loan Parties; and

(xxi)    ~~(xvii)~~ other adjustments (i) identified to the Commitment Parties prior to the Effective Date, (ii) set forth in (A) the Model or (B) the quality of earnings report prepared by independent registered public accountants of recognized national standing or any other accounting firm reasonably acceptable to the Commitment Parties and delivered to the Commitment Parties in connection with the Transactions or (iii) contemplated by the Acquisition Agreement; plus

~~(b) without duplication, (i) the amount of "run rate" cost savings, operating expense reductions and synergies related to any of the Transactions, any Specified Transaction, any restructuring, any business optimization activities, cost saving initiatives and operating improvements or other initiatives, actions or events (each of the foregoing, an "Event") that are reasonably identifiable and projected by the~~

-23-

~~Lead Borrower in good faith to result from actions that either have been taken, with respect to which substantial steps have been taken or that are expected to be taken within 18 months after the date of consummation of such Event (or, if the underlying Event is any of the Transactions, within 18 months after the Effective Date) (including actions initiated prior to the Effective Date) (in the good faith determination of the Lead Borrower) (which cost savings, operating expense reductions and synergies shall be added to Consolidated EBITDA until fully realized and calculated on a pro forma basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of the relevant period), net of the amount of actual benefits realized from such actions; provided that no cost savings, operating expense reductions or synergies shall be added pursuant to this clause (b) to the extent duplicative of any expenses or charges relating to such cost savings, operating expense reductions, other operating improvements or synergies that are included above or in the definition of "Pro Forma Basis" (it being understood and agreed that "run rate" shall mean the full recurring benefit that is associated with any action taken); provided, further that the aggregate amount of addbacks to Consolidated EBITDA pursuant this clause (b) for any period, excluding any addbacks for such period pursuant to this clause (b) where the underlying Event is any of the Transactions, shall not exceed 20.0% of Consolidated EBITDA for such period (calculated after giving effect to such addbacks); less~~

(b)      [reserved]; less

(c)      without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)      non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period and any non-cash gains attributable to accrual of revenue or recording of receivables in the ordinary course of business);

(ii)      any non-cash gain attributable to the mark to market movement in the valuation of any Equity Interests, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(iii)      any gain relating to amounts received in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income in such period;

(iv)      any loss relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from Consolidated EBITDA pursuant to clauses (a)(xi) and (a)(xii) above;

(v)      the amount of any non-controlling interest consisting of loss attributable to non-controlling interests of third parties in any Non-Wholly Owned Subsidiary added (and not deducted in such period) to Consolidated Net Income;

(vi)      non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or cash reserve for a potential cash item that reduced Consolidated EBITDA in any prior period, any non-cash gains with respect to cash actually received in a prior period so long as such cash did not increase Consolidated EBITDA in such prior period, and any non-cash gains attributable to accrual of revenue or recording of receivables in the ordinary course of business; and

(vii)    any amount included in Consolidated Net Income of such Person for such period attributable to non-controlling interests pursuant to the application of FASB Accounting Standards Codification Topic 810-10-45;

in each case, as determined on a consolidated basis for the Borrower and its Subsidiaries in accordance with GAAP; provided that:

(I)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA currency translation gains and losses related to currency remeasurements of assets or liabilities (including the net loss or gain resulting from hedging agreements for currency exchange risk and revaluations of intercompany balances),

(II)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of Financial Accounting Standards Codification No. 815—Derivatives and Hedging,

(III)    there shall be included in determining Consolidated EBITDA for any period, without duplication, (A) to the extent not included in Consolidated Net Income, the Acquired EBITDA of any Person, property, business or asset acquired by the Borrower or any Subsidiary during such period to the extent not subsequently sold, transferred or otherwise disposed of (but not including the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired) (each such Person, property, business or asset acquired, including pursuant to the Transactions, an "Acquired Entity or Business"), based on the Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) determined on a historical Pro Forma Basis, (B) the Acquired EBITDA of any PSP Securitization Entity that is converted into a Loan Party during such period (each, a "Converted Subsidiary"), based on the actual Acquired EBITDA of such Converted Subsidiary for such period (including the portion thereof occurring prior to such acquisition), (C) in the case of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting, the Consolidated EBITDA of such Person multiplied by the ownership percentage of the Borrower or applicable Subsidiary therein and (CD) the amount of Payments made pursuant to Section 6.07(a)(xiii) of the Holdco Credit Agreement;

(IV)    there shall be (A) to the extent included in Consolidated Net Income, excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations in accordance with GAAP (other than (x) if so classified on the basis that it is being held for sale unless such sale has actually occurred during such period and (y) for periods prior to the applicable sale, transfer or other disposition, if the Disposed EBITDA of such Person, property, business or asset is positive (i.e., if such Disposed EBITDA is negative, it shall be added back in determining Consolidated EBITDA for any period)) by the Borrower or any Subsidiary during such period (each such Person, property, business or asset so sold, transferred or otherwise disposed of, closed or classified, a "Sold Entity or Business"), based on the Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer, disposition, closure, classification or conversion) determined on a historical Pro Forma Basis and (B) to the extent not included in Consolidated Net Income, included in determining Consolidated EBITDA for any period in which a Sold Entity or Business is disposed, an adjustment equal to the Pro Forma Disposal Adjustment with respect to such Sold Entity or Business (including the portion thereof occurring prior to such disposal) as specified in the Pro Forma Disposal Adjustment certificate delivered to the Administrative Agent (for further delivery to the Lenders); and

-25-

(V)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA any non-cash expense (or income) as a result of adjustments recorded to contingent consideration liabilities relating to the Transactions or any Permitted Acquisition (or other Investment permitted hereunder).

Notwithstanding the foregoing, Consolidated EBITDA shall be deemed to equal (a) $102,145,028 for the fiscal quarter of the Lead Borrower ended on or about December 31, 2020, (b) $135,453,700 for the fiscal quarter of the Lead Borrower ended on or about March 31, 2021, (c) $129,457,547 for the fiscal quarter of the Lead Borrower ended on or about June 30, 2021 and (d) $115,698,793 for the fiscal quarter of the Lead Borrower ended on or about September 30, 2021 (it being understood that such amounts are subject to adjustments, as and to the extent otherwise contemplated in this Agreement, in connection with any calculation on a Pro Forma Basis (including, for the avoidance of doubt, in respect of any disposition of Badcock Collateral during the relevant periods)); provided that such amounts of Consolidated EBITDA for any such fiscal quarter shall be adjusted to include, without duplication, any cost savings that would otherwise be included pursuant to clause (b) of this definition.

"Consolidated Net Income" means, for any period, the net income (loss) of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(a)    extraordinary (as defined under GAAP as in effect prior to FASB Update No. 2015-01) unusual, or non-recurring gains or losses for such period,

(b)    the cumulative effect of a change in accounting principles during such period;

(c)    any Transaction Costs incurred during such period,

(d)    any fees, costs and expenses (including (x) any transaction or retention bonus or similar payment and (y) any indemnities) incurred during such period, or any amortization thereof for such period, in connection with or in relation to any acquisition (including any acquisition of a franchisee), non-recurring costs to acquire equipment to the extent not capitalized in accordance with GAAP, Investment, recapitalization, asset disposition, non-competition agreement, incurrence, issuance or repayment of debt or similar transaction, issuance of equity securities, option buyouts, refinancing transaction or amendment or other modification of or waiver or consent relating to any debt instrument or similar transaction (in each case, including the Transaction Costs and any such transaction consummated prior to the Effective Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt, the effects of expensing all transaction-related expenses in accordance with FASB Accounting Standards Codification 805 and gains or losses associated with FASB Accounting Standards Codification 460),

(e)    any income (loss) (and all fees and expenses or charges relating thereto) for such period attributable to the early extinguishment of Indebtedness, hedging agreements or other derivative instruments,

(f)    accruals and reserves that are established or adjusted as a result of the Transactions or any Permitted Acquisition or other Investment not prohibited under this Agreement in accordance with GAAP (including any adjustment of estimated payouts on Earn-Outs) or changes as a result of the adoption or modification of accounting policies during such period,

(g)    stock-based award compensation expenses (including any one-time compensation related to unvested options outstanding as of the Effective Date),

(h)    any income (loss) attributable to deferred compensation plans or trusts,

(i)    any income (loss) from Investments recorded using the equity method,

(j)    the amount of any expense required to be recorded as compensation expense related to contingent transaction consideration,

(k)    any unrealized gain or loss due solely to fluctuations in currency values and the related tax effects, determined in accordance with GAAP,

(l)    [Reserved],

(m)    (A) the amount of management, monitoring, consulting and advisory fees, indemnities and related expenses paid or accrued in such period (including any termination fees payable in connection with the early termination of management and monitoring agreements) and (B) the amount of expenses relating to payments made to option holders of the Lead Borrower or any of its direct or indirect parent companies in connection with, or as a result of, any distribution being made to shareholders of such Person or its direct or indirect parent companies, which payments are being made to compensate such option holders as though they were shareholders at the time of, and entitled to share in, such distribution, in each case, to the extent permitted in the Loan Documents,

(n)    any costs or expenses incurred by the Borrower or any Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, any severance agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are non-cash or otherwise funded with cash proceeds contributed to the capital of the Borrower or Net Proceeds of an issuance of Equity Interests of the Borrower (other than Disqualified Equity Interests),

(o)    the Consolidated Net Income of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that Consolidated Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary or its stockholders, and

(p)    any non-cash goodwill impairment charges or other intangible asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of ASC 350 or other non-cash asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of SFAS 144.

There shall be included in Consolidated Net Income, without duplication, the amount of any cash tax benefits related to the tax amortization of intangible assets in such period. There shall be excluded from Consolidated Net Income for any period the effects from applying acquisition method accounting, including applying acquisition method accounting to inventory, property and equipment, loans and leases, software and other intangible assets and deferred revenue (including deferred costs related thereto and deferred rent) required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and its Subsidiaries), as a result of the Transactions, any acquisition or Investment consummated prior to the Effective Date and any Permitted

Acquisitions (or other Investment not prohibited hereunder) or the amortization or write-off of any amounts thereof.

In addition, to the extent included in the Consolidated Net Income of such Person and its Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall (i) exclude any expenses and charges that are reimbursed by indemnification or other reimbursement provisions in connection with any acquisition or other investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder and (ii) include the amount of business interruption insurance proceeds received and, to the extent covered by insurance and actually reimbursed, or, so long as the Lead Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (A) not denied by the applicable carrier in writing within 180 days and (B) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), expenses with respect to liability or casualty events or business interruption.

"Consolidated Secured Indebtedness" means, as of any date of determination, Consolidated Total Indebtedness secured by Liens on the Collateral and the Badcock Collateral; provided that Consolidated Secured Indebtedness shall not include, in any event, Secured Holdco Guarantee Obligations.

"Consolidated Total Indebtedness" means, as of any date of determination, (i) the aggregate amount of Indebtedness of the Lead Borrower and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of the acquisition method accounting in connection with the Transactions or any Permitted Acquisition (or other Investment not prohibited hereunder)) consisting only of third-party Indebtedness for borrowed money, drawn but unreimbursed obligations under letters of credit, letters of guaranty and bankers' acceptances and third-party debt obligations evidenced by bonds, debentures, loan agreements, promissory notes or similar instruments, and, in each case, without duplication, Guarantees by the Lead Borrower and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP, in respect of any of the foregoing Indebtedness of any other Person minus (ii) the sum of (x) unrestricted cash and cash equivalents of the Lead Borrower and its Subsidiaries in an aggregate amount not to exceed $150,000,000 and (y) cash and cash equivalents restricted in favor of the Administrative Agent, the Collateral Agent or any Lender (which may also include cash and cash equivalents securing other indebtedness (including Indebtedness under the Secured Holdco Obligations Guarantee, the ABL Loan Documents, the First Lien Loan Documents, the Badcock First Lien Loan Documents or the Badcock Second Lien Loan Documents) secured by a Lien on the Collateral and the Badcock Collateral); provided that Consolidated Total Indebtedness shall not include, in any event, Secured Holdco Guarantee Obligations.

"Consolidated Working Capital" means, at any date, the excess of (a) the sum of all amounts (other than cash and Permitted Investments) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Subsidiaries at such date, excluding the current portion of current and deferred income taxes over (b) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Lead Borrower and its Subsidiaries on such date, including deferred revenue but excluding, without duplication, (i) the current portion of any Funded Debt, (ii) all Indebtedness consisting of Loans to the extent otherwise included therein, (iii) the current portion of interest and (iv) the current portion of current and deferred income taxes; provided that, for purposes of calculating Excess Cash Flow, increases or decreases in working capital (A) arising from acquisitions or dispositions by the Lead Borrower and its Subsidiaries shall be measured from the date on which such acquisition or disposition occurred until the first anniversary of such acquisition or disposition with respect to the Person subject to such acquisition or disposition and (B) shall exclude (I) the

impact of non-cash adjustments contemplated in the Excess Cash Flow calculation, (II) the impact of adjusting items in the definition of Consolidated Net Income and (III) any changes in current assets or current liabilities as a result of (x) the effect of fluctuations in the amount of accrued or contingent obligations, assets or liabilities under hedging agreements or other derivative obligations, (y) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent or (z) the effects of acquisition method accounting.

"Contract Consideration" has the meaning assigned to such term in the definition of "Excess Cash Flow".

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Covenant Restriction Period" means the period beginning on the Fifth Amendment Effective Date and continuing until November 30, 2024; provided that if there are any Defaults or Events of Default which are continuing on November 30, 2024, the Covenant Restriction Period shall continue until such Defaults or Events of Default are waived by the Required Lenders in their sole discretion or remedied.

"Covenant Testing Trigger Event" means the occurrence of any of the following events or dates:

(a)      any Event of Default; or

(b)      September 30, 2024, unless a Permitted PSP Securitization has occurred by such date.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b), (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b) or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party"  has the meaning specified in Section 9.20.

"COVID-19 Pandemic" means the global spread of the coronavirus illness, which was declared to be a pandemic by the World Health Organization on March 11, 2020.

"Credit Agreement Refinancing Indebtedness" means Indebtedness issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) by the Borrower or any other Loan Party in exchange for, or to extend, renew, replace or refinance, in whole or part, existing Term Loans ("Refinanced Debt"); provided that such exchanging, extending, renewing, replacing or refinancing Indebtedness (a) is in an original aggregate principal amount not greater than the aggregate principal amount of the Refinanced Debt (plus any premium, accrued interest, original issue discount and fees and expenses incurred in connection with such exchange, extension, renewal, replacement or refinancing), (b) does not mature earlier than or have a Weighted Average Life to Maturity shorter than the Refinanced Debt (other than with respect to any customary bridge loan facility, so long as the long-term Indebtedness into which any such customary bridge facility is to be converted or exchanged satisfies the requirements of this clause (b) and such conversion or exchange is subject only to the conditions customary for similar conversions or exchanges), (c) if such Indebtedness is unsecured or secured by the Collateral

and the Badcock Collateral on a junior lien basis to the Secured Obligations, does not (1) mature prior to the date that is 91 days after the maturity date of the Refinanced Debt (or if later, 91 days after the Latest Maturity Date), (2) have a Weighted Average Life to Maturity shorter than the Refinanced Debt (or any later maturing Term Facility then in effect) plus 91 days, or (3) have mandatory prepayment, redemption or offer to purchase events more onerous than those with respect to Refinanced Debt (and shall otherwise be subject to the same terms as the Refinanced Debt) (in each case other than with respect to any customary bridge loan facility, so long as the long-term Indebtedness into which any such customary bridge facility is to be converted or exchanged satisfies the requirements of this underline clause (c) and such conversion or exchange is subject only to the conditions customary for similar conversions or exchanges), (d) [reserved], (e) shall not be guaranteed by any entity that is not a Loan Party, (f) in the case of any secured Indebtedness (i) is not secured by any assets not securing the Secured Obligations, (ii) if not comprising Indebtedness hereunder, is subject to the relevant Intercreditor Agreement(s) and (iii) in the case of Refinanced Debt that was secured on a junior basis to the Secured Obligations, shall be secured on a junior basis to the Secured Obligations; provided that any unsecured Refinanced Debt shall not be refinanced with secured Credit Agreement Refinancing Indebtedness, (g) in the case of Refinanced Debt that is subordinated in right of payment to the Secured Obligations, shall be subordinated on the same basis, (h) has covenants, events of default and guarantees (excluding, for avoidance of doubt, pricing, interest rate margins, rate floors, discounts, fees, premiums and prepayment or redemption provisions) of any such Indebtedness, that are not materially more restrictive to the Borrower and the Subsidiaries, when taken as a whole, than the Refinanced Debt (or, with respect to any Permitted First Priority Refinancing Debt, than the Indebtedness under the First Lien Credit Agreement) (as determined by the Lead Borrower in good faith) unless (1) the Lenders under the Term Loans also receive the benefit of such more restrictive terms (it being understood to the extent that any covenant is added for the benefit of any such Indebtedness, no consent shall be required from the Administrative Agent or any Lender to the extent that such covenant is also added for the benefit of any corresponding existing Term Loans), (2) any such provisions apply after the Latest Maturity Date at the time of such refinancing, (3) such terms shall be reasonably satisfactory to the Administrative Agent and the Lead Borrower or (4) such terms reflect market terms and conditions (taken as a whole) at the time of such refinancing (as determined by the Lead Borrower in good faith) and are also added for the benefit of the Lenders of the Initial Term Loans and the Holdco Exchange Loans (to the extent remaining outstanding after the incurrence or issuance of such refinancing Indebtedness) (it being understood to the extent that any such terms are added for the benefit of the Lenders of the Initial Term Loans or Holdco Exchange Loans, no consent shall be required from the Administrative Agent or any such Lenders of the Initial Term Loans or Holdco Exchange Loans), and (i) (1) if such Indebtedness is secured on a *pari passu* basis with the Liens securing the Secured Obligations, such Indebtedness may participate on a *pro rata* basis or a less than a *pro rata* basis (but not greater than a *pro rata* basis) in any mandatory repayments or prepayments in respect of the Term Loans and (2) if such Indebtedness is secured on a senior priority basis relative to the Liens securing the Secured Obligations, such Indebtedness may participate on a greater than *pro rata*, *pro rata* or less than *pro rata* basis in any mandatory repayments or prepayments in respect of the Term Loans; provided that a certificate of a Responsible Officer delivered to the Administrative Agent (to be promptly distributed by the Administrative Agent to the Lenders) at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such resulting Indebtedness or drafts of the documentation relating thereto, stating that the Lead Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement, shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Required Lenders notify the Lead Borrower within such five (5) Business Day period that they disagree with such determination (including a reasonably detailed description of the basis upon which they disagree). For the avoidance of doubt, such Credit Agreement Refinancing Indebtedness shall not be subject to any "most favored nation" pricing provisions.

"Cure Amount" has the meaning assigned to such term in Section 7.02(a).

"Cure Expiration Date" has the meaning assigned to such term in Section 7.02(a).

"Cure Right" has the meaning assigned to such term in Section 7.02(a).

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Required Lenders in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, or (ii) pay over to the Administrative Agent  or any other Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Lead Borrower or the Administrative Agent, or any other Lender, as applicable, in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent or any other Lender, as applicable, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Loans and under this Agreement; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's  or any other Lender's, as applicable, receipt of such certification in form and substance satisfactory to it and the Administrative Agent or (d) has become the subject of (i) a Bankruptcy Event or (ii) a Bail-In Action.

"Deposit Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Designated Non-Cash Consideration" means the fair market value of non-cash consideration received by the Borrower or a Subsidiary in connection with a Disposition pursuant to Section 6.05(k) that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Lead Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within 180 days following the consummation of the applicable Disposition or, if converted to cash after 180 days, the lesser

of (a) the consideration in cash or cash equivalents received from such conversion and (b) the fair market value of such non-cash consideration at the time of such conversion).

"Disbursements Variance" has the meaning assigned to such term in Section 5.15(c).

"Discount Prepayment Accepting Lender" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(2).

"Discount Range" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"Discount Range Prepayment Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"Discount Range Prepayment Notice" means a written notice of a Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.11(a)(ii)(C)(1) substantially in the form of Exhibit L.

"Discount Range Prepayment Offer" means the irrevocable written offer by a Term Lender, substantially in the form of Exhibit M, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"Discount Range Prepayment Response Date" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"Discount Range Proration" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(3).

"Discounted Prepayment Determination Date" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(3).

"Discounted Prepayment Effective Date" means in the case of a Borrower Offer of Specified Discount Prepayment or Borrower Solicitation of Discount Range Prepayment Offer, five (5) Business Days following the receipt by each relevant Term Lender of notice from the Auction Agent in accordance with Section 2.11(a)(ii)(B), Section 2.11(a)(ii)(C) or Section 2.11(a)(ii)(D), as applicable, unless a shorter period is agreed to between the Borrower and the Auction Agent.

"Discounted Term Loan Prepayment" has the meaning assigned to such term in Section 2.11(a)(ii)(A).

"Dispose" and "Disposition" each has the meaning assigned to such term in Section 6.05.

"Disposed EBITDA" means, with respect to any Sold Entity or Business for any period through (but not after) the date of such disposition, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the Borrower and its Subsidiaries in the definition of the term "Consolidated EBITDA" (and in the component financial definitions used therein) were references to such Sold Entity or Business and its subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is

exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)     matures or is mandatorily redeemable or contains any mandatory put, redemption or repayment provision (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)     is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests);

(c)     is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof; or

(d)     in the case of any preferred Equity Interest, provides for scheduled payments of dividends and/or distributions in cash;

in each case, on or prior to the date ninety-one (91) days after the Latest Maturity Date; provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after, or payment thereunder is subject to the prior, repayment in full of all the Loans and all other Loan Document Obligations that are accrued and payable and the termination of the Commitments, (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of employees of the Borrower (or any direct or indirect parent thereof) or any of its subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Borrower or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) any Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for a requirement of payment of dividends or distributions in violation of clauses (a) or (b) above shall not constitute a Disqualified Equity Interest if terms of such Equity Interest (x) give the applicable issuer the option to elect to pay such dividends or distributions on a non-cash basis and (y) do not require the cash payment of dividends or distributions at any time that such cash payment is not permitted under Section 6.07 of this Agreement or would result in an Event of Default hereunder.

"Disqualified Lenders" means (i) those Persons identified by the Lead Borrower to the Commitment Parties in writing prior to the Effective Date as being "Disqualified Lenders", (ii) those Persons who are competitors of the Lead Borrower, the Acquired Company and/or any of their Subsidiaries or Persons Controlling or Controlled by any of the foregoing, in each case, identified by the Lead Borrower to the Commitment Parties (or on and following the Effective Date, the Administrative Agent) from time to time in writing (including by email) which designation shall become effective three (3) Business Days after the delivery of each such written designation to the Administrative Agent, but which shall not apply retroactively to disqualify any persons that have previously acquired, or entered into a trade to acquire, an assignment or participation interest in the Loan and (iii) in the case of each Person identified pursuant to clauses (i) and (ii) above, any of their Affiliates (other than any such Affiliate that is primarily engaged in, or that advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which the primary Disqualified Lender does not possess the power to direct or

cause the direction of the investment policies of such entity referenced in clause (ii) above, unless separately identified by the Lead Borrower pursuant to clause (i) above) that are either (x) identified in writing by the Lead Borrower to the Commitment Parties (or, on and following the Effective Date, the Administrative Agent) from time to time or (y) clearly identifiable as Affiliates on the basis of such Affiliate's name. Such list of Disqualified Lenders shall be available for inspection upon request by any Lender. Notwithstanding anything to the contrary contained in this Agreement, (a) each Borrower and the Lenders acknowledge and agree that the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to assignments or participations to a Disqualified Lender and (b) each Borrower and the Lenders agree that the Administrative Agent shall have no responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Lender and the Administrative Agent shall have no liability with respect to any assignment or participation made to a Disqualified Lender.

"<u>dollars</u>" or "<u>$</u>" refers to lawful money of the United States of America.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"<u>Earn-Outs</u>" means, with respect to any Person, obligations of such Person arising from Permitted Acquisitions or other Investments permitted hereunder which are payable to the sellers thereunder in their capacity as such based on the achievement of specified financial results or other criteria or milestones over time.

"<u>ECF Percentage</u>" means, with respect to the prepayment required by <u>Section 2.11(d)</u> with respect to any fiscal year of the Lead Borrower, 50%; <u>provided</u>, that, if the Secured Net Leverage Ratio (prior to giving effect to the applicable prepayment pursuant to <u>Section 2.11(d)</u>, but after giving effect to any voluntary prepayments made pursuant to <u>Section 2.11(a)</u> prior to the date of such prepayment) as of the end of the applicable fiscal year is (a) less than or equal to 3.06 to 1.00 but greater than 2.81 to 1.00, the ECF Percentage shall be reduced to 25.0% for such fiscal year and (b) less than or equal to 2.81 to 1.00, the ECF Percentage shall be reduced to 0.00% for such fiscal year.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Date</u>" means March 10, 2021.

"<u>Electronic Signature</u>" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) the Borrower and each other Loan Party, (e) an Affiliate of a Loan Party, (f) Holdco, (g) Holdco Parent, and (h) any other Person, other than, in each case, (i) a natural person (or a holding company, investments vehicle, investment vehicle or trust for, or owned and operated by or for the primary benefit of a natural person), (ii) a Defaulting Lender or (iii) a Disqualified Lender; provided that a Disqualified Lender will constitute an Eligible Assignee solely to the extent that such assignment is consented to in writing by the Lead Borrower; provided, further, that assignments made to parties in clauses (d), (e), (f), and (g) shall only be made in connection with the Partial 2L Discharge.

"Environmental Laws" means all applicable treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, to preservation or reclamation of natural resources, to Release or threatened Release of any Hazardous Material or to the extent relating to exposure to Hazardous Materials, to health or safety matters.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities) directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Title IV and Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 4001(b) of ERISA or Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, in each case whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any Plan; (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by a Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA) with respect to the termination of any Plan or by application of Section 4069 of ERISA with respect to any terminated plan; (f) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or to an intention to terminate or to appoint a trustee to administer any plan or plans in respect of which such

Loan Party or ERISA Affiliate would be deemed to be an employer under Section 4069 of ERISA; (g) the incurrence by a Loan Party or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Multiemployer Plan; (h) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability, or the failure of a Loan Party or any ERISA Affiliate to pay when due, after the expiration of any applicable grace period, any installment payment with respect to any Withdrawal Liability; or (i) the withdrawal of a Loan Party or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"Erroneous Payment" has the meaning assigned to such term in Section 8.13(a).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excess Cash Flow" means, for any period, an amount equal to the excess of:

(a)        the sum, without duplication, of:

(i)        Consolidated Net Income for such period,

(ii)        an amount equal to the amount of all Non-Cash Charges to the extent deducted in arriving at such Consolidated Net Income,

(iii)        decreases in Consolidated Working Capital and long-term account receivables for such period,

(iv)        an amount equal to the aggregate net non-cash loss on dispositions by the Borrower and its Subsidiaries during such period (other than dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income, and

(v)        extraordinary (as defined under GAAP as in effect prior to FASB Update No. 2015-01) gains, less:

(b)        the sum, without duplication, of:

(i)        an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income (including any amounts included in Consolidated Net Income pursuant to the last sentence of the definition of "Consolidated Net Income" to the extent such amounts are due but not received during such period) and cash charges included in clauses (a) through (j) of the definition of "Consolidated Net Income" (other than cash charges to the extent financed with the proceeds of long-term Indebtedness (other than revolving Indebtedness)),

(ii)        the amount of capital expenditures made in cash or accrued during such period, except to the extent that such capital expenditures were financed with the proceeds of (x) long term Indebtedness of the Borrower or its Subsidiaries (other than revolving Indebtedness) or (y) the issuance of Equity Interests,

(iii)    (x) the aggregate amount of all principal payments of Indebtedness (including the principal component of payments in respect of Capitalized Leases, but excluding (A) all principal payments of Indebtedness to the extent reducing the required prepayment of Term Loans pursuant to Section 2.11(d) as a result of the application of clauses (i) through (v) of the first proviso thereof, (B) all prepayments of revolving loans except to the extent there is an equivalent permanent reduction in commitments thereunder and (C) all principal payments of Indebtedness to the extent financed with long-term Indebtedness (other than revolving Indebtedness)) and (y) the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Borrower and its Subsidiaries during such period that are required to be made in connection with any prepayment of Indebtedness, to the extent not financed with long-term Indebtedness (other than revolving Indebtedness),

(iv)    an amount equal to the aggregate net non-cash gain on dispositions by the Borrower and its Subsidiaries during such period (other than dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(v)    increases in Consolidated Working Capital and long-term account receivables for such period,

(vi)    cash payments by the Borrower and its Subsidiaries during such period in respect of long-term liabilities of the Borrower and its Subsidiaries other than Indebtedness,

(vii)    the aggregate amount of payments and expenditures actually made by the Borrower and its Subsidiaries in cash during such period (including expenditures for the payment of financing fees) to the extent that such payments and expenditures are not expensed during such period, except to the extent financed with the proceeds of (x) long-term Indebtedness of the Borrower or its Subsidiaries other than revolving Indebtedness or (y) the issuance of Equity Interests,

(viii)    cash payments by the Borrower and its Subsidiaries during such period in respect of Non-Cash Charges included in the calculation of Consolidated Net Income in any prior period, except to the extent financed with the proceeds of (x) long-term Indebtedness of the Borrower or its Subsidiaries or (y) the issuance of Equity Interests,

(ix)    without duplication of amounts deducted from Excess Cash Flow in respect of a prior period, at the option of the Lead Borrower, the aggregate consideration (including Earn-Outs) required to be paid in cash by the Borrower and its Subsidiaries pursuant to binding contracts, commitments, letters of intent or purchase orders (the "Contract Consideration") entered into prior to or during such period relating to capital expenditures, Permitted Acquisitions or other Investments permitted hereunder (other than intercompany Investments or Investments in cash equivalents) to be consummated or made during the period of four consecutive fiscal quarters of Lead Borrower following the end of such period (except, in each case, to the extent financed with long-term Indebtedness (other than revolving Indebtedness)); provided that to the extent the aggregate amount actually utilized to finance such capital expenditures, Permitted Acquisitions or other applicable Investments during such subsequent period of four consecutive fiscal quarters is less than the Contract Consideration, the amount of such shortfall shall be added to the calculation of Excess Cash Flow at the end of such subsequent period of four consecutive fiscal quarters,

(x)    the amount of cash rent payments made in such period to the extent they exceed the amount of rent payments deducted in determining Consolidated Net Income for such period,

(xi)    the amount of taxes (including penalties and interest) paid in cash and/or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, and

(xii)    extraordinary (as defined under GAAP as in effect prior to FASB Update No. 2015-01) losses or charges.

"Excess Cash Flow Period" has the meaning set forth in Section 2.11(d).

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Exchange Notice" means an Exchange Notice, substantially in the form of Exhibit U, delivered by Holdco and the Lead Borrower to the Administrative Agent and the Holdco Agent pursuant to Section 2.20.

"Excluded Accounts" means (a) Zero Balance Accounts (provided that, upon any such account ceasing to be a Zero Balance Account, such account shall cease to be an Excluded Account), (b) Store Accounts, (c) accounts into which government receivables and government reimbursement payments are deposited, (d) payroll accounts (including accounts used for the disbursement of payroll, payroll taxes and other employee wage and benefit payments, including 401(k) and other retirement plans, rabbi trusts for deferred compensation and health care benefits), (e) withholding and trust accounts, escrow and other fiduciary accounts, (f) Manual Sweeping Accounts, (g) Deposit Accounts, Securities Accounts and commodity accounts that (x) individually have a daily balance of not more than $~~100,000~~50,000 and (y) together with all other Deposit Accounts, Securities Accounts and commodity accounts constituting Excluded Accounts under this clause (g), have a daily balance of not more than $~~2,500,000~~1,000,000 in the aggregate for all such Deposit Accounts, Securities Accounts or commodity accounts and (h) consisting solely of cash or Cash Equivalents securing Indebtedness permitted by Section 6.01(a)(xxvi) to the extent such security constitutes Liens permitted by Section 6.02(xxiii).

"Excluded Assets" means, (a) any fee-owned real property that is not Material Real Property, all leasehold (including ground lease) interests in real property (including requirements to deliver landlord lien waivers, estoppels and collateral access letters) and any real property that contains improvements and is located in an area determined (as of the First Amendment Effective Date with respect to real property owned on the First Amendment Effective Date and as of the date of acquisition of any real property acquired after the First Amendment Effective Date) by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, (b) motor vehicles, railcars, trailers, aircraft, aircraft engines, construction and earth moving equipment and other assets subject to certificates of title or ownership (except to the extent perfection of a security interest therein can be accomplished by filing of a UCC-1 financing statement or equivalent financing statement with a central registry), (c) letter of credit rights (except to the extent constituting supporting obligations (as defined under the UCC) in which a security interest can be perfected with the filing of a UCC-1 financing statement or equivalent financing statement with a central registry), (d) commercial tort claims with an individual value, as determined by the Lead Borrower in good faith~~,~~ (and in the case of commercial tort claims with an individual value in excess of $2,500,000, after consultation with the Required Lenders) of less than $5,000,000 and commercial tort claims for which no complaint or counterclaim has been filed in a court of competent jurisdiction, (e) Equity Interests in any Person (other than any Wholly Owned Subsidiaries) to the extent the pledge thereof to the Collateral Agent is not permitted by the terms of such Person's organizational, incorporation or joint venture documents, (f) [Reserved], (g) ~~Equity Interests of any Immaterial Subsidiary (except to the extent perfection of a security interest therein can be accomplished by filing of a UCC-1 financing statement or equivalent financing statement with a central registry), not-for~~

~~profit Subsidiaries,~~ captive insurance companies ~~or other special purpose subsidiaries (including real estate special purpose entities)~~, (h) [reserved], (i) any lease, license or other agreement, government approval or franchise with any Person if, to the extent and for so long as, the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, such lease, license or other agreement, government approval or franchise (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or any applicable Requirements of Law), other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code, (j) any asset subject to a Lien of the type permitted by Section 6.02(iv) (whether or not incurred pursuant to such Section) or a Lien permitted by Section 6.02(xi), in each case if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, any agreement pursuant to which such Lien has been created (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or any applicable Requirements of Law), (k) any intent-to-use trademark applications filed in the United States Patent and Trademark Office, pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. Section 1051, prior to the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an accepted filing of an "Amendment to Allege Use" whereby such intent-to-use trademark application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act, (l) any asset if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations is prohibited by any applicable Requirements of Law, rule or regulation, or agreements with any Governmental Authority (other than to the extent that any such prohibition would be rendered ineffective pursuant to the Uniform Commercial Code or any other applicable Requirements of Law) or which would require consent, approval, license or authorization from any Governmental Authority or regulatory authority, unless such consent, approval, license or authorization has been received in consultation with the Collateral Agent, (m) margin stock (within the meaning of Regulation U of the Board of Governors, as in effect from time to time) and, to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than the Borrower or any Material Subsidiary of the Borrower), under the terms of any applicable organizational or incorporation documents, joint venture agreement or shareholders' agreement, equity interests in any person other than Material Subsidiaries that are Wholly Owned Subsidiaries after giving effect to the anti-assignment provisions of the UCC or any other applicable Requirements of Law, (n) Excluded Accounts, (o) assets to the extent a security interest in such assets would result in material adverse tax consequences to the Borrower (or any direct or indirect parent or beneficial owner thereof) or one of its subsidiaries (as determined in good faith by the Lead Borrower <u>and with the prior written consent of the Required Lenders to be granted in their sole discretion</u>), (p) assets sold to any Person who is not a Loan Party in compliance with the Loan Documents, (q) assets owned by a Subsidiary Loan Party after the release of the Guarantee of such Subsidiary Loan Party pursuant to the Loan Documents, ~~and~~ (r) <u>any Equity Interest in any PSP Securitization Entities following a Permitted PSP Securitization and (s</u>) any assets with respect to which, in the reasonable judgment of the Required Lenders and the Lead Borrower (as agreed to in writing), the cost or other consequences (including adverse tax consequences as determined by the Lead Borrower and the Required Lenders in good faith) of pledging such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

"Excluded Information" has the meaning assigned to such term in Section 2.11(a)(ii)(A).

"Excluded Party" has the meaning assigned to such term in Section 9.03(b).

"Excluded Subsidiary" means (a) ~~any Subsidiary that is not a Wholly Owned Subsidiary of the Lead Borrower~~[reserved], (b) any Subsidiary that is prohibited by applicable law, rule or regulation or contractual obligation (so long as any such contractual prohibition is not incurred in contemplation of

the acquisition of such Subsidiary, and only for so long as such contractual prohibition shall be continuing) existing on the Effective Date or, if later, the date such Subsidiary first becomes a Subsidiary, from guaranteeing the Secured Obligations or which would require any governmental or regulatory consent, approval, license or authorization to do so, unless such consent, approval, license or authorization has been obtained (c) any Subsidiary acquired pursuant to a Permitted Acquisition or similar Investment financed with secured Indebtedness permitted to be incurred pursuant to Section 6.01(xx) (and not incurred in contemplation of such Permitted Acquisition or similar Investment) and any subsidiary thereof that guarantees such Indebtedness, in each case to the extent, and so long as, such secured Indebtedness prohibits such Subsidiary from becoming a Loan Party, providing a Guarantee of the Secured Obligations or granting Liens on its assets as security for the Secured Obligations, (d) ~~any direct or indirect U.S. subsidiary of a~~ ~~Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Code, and~~ ~~any direct or indirect U.S. Subsidiary that has no material assets other than the equity of (or equity of and~~ ~~obligations owed to or treated as owed by) one or more direct or indirect non-U.S. subsidiaries that are~~ ~~"controlled foreign corporations" within the meaning of Section 957 of the Code~~[reserved], (e) any Immaterial Subsidiary, (f) any other Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Lead Borrower (as agreed in writing), the cost or other consequences (including any adverse tax consequences as determined in good faith by the Borrower and the Required Lenders) of providing the guaranty shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (g) any Subsidiary if the provision of a guaranty by such Subsidiary would result in material adverse tax consequences to the Lead Borrower (or any direct or indirect parent or beneficial owner thereof) or one of its subsidiaries (as determined in good faith by the Lead Borrower in consultation with the Required Lenders), (h) any other Subsidiary excused from becoming a Loan Party pursuant to the last paragraph of the definition of the term "Collateral and Guarantee Requirement", (i) any Subsidiary that is (or, if it were a Loan Party, would be) an "investment company" under the Investment Company Act of 1940, as amended, (j) any not-for-profit Subsidiaries, captive insurance companies or other special purpose subsidiaries and (k) other than during the Covenant Restriction Period, any Foreign Subsidiary; provided that any Immaterial Subsidiary that is a signatory to the Collateral Agreement and the Guarantee Agreement shall be deemed not to be an Excluded Subsidiary for purposes of this Agreement and the other Loan Documents unless the Lead Borrower has otherwise notified the Administrative Agent; provided further that the Lead Borrower may at any time and in its sole discretion, with the consent of the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed), cause any Subsidiary to not be an Excluded Subsidiary for purposes of this Agreement and the other Loan Documents; provided, further, that notwithstanding the foregoing, no Subsidiary that Guarantees the obligations under the ABL Credit Agreement, the First Lien Credit Agreement, the Badcock First Lien Credit Agreement or the Badcock Second Lien Credit Agreement shall be an Excluded Subsidiary hereunder.

"Excluded Taxes" means, with respect to any Recipient, (a) Taxes imposed on (or measured by) net income (however denominated) and franchise Taxes by a jurisdiction (i) as a result of such recipient being organized or having its principal office or, in the case of any Lender, its applicable lending office located in such jurisdiction (or any political subdivision thereof), or (ii) that are Other Connection Taxes, (b) any branch profits tax imposed under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a) above, (c) any withholding Tax imposed pursuant to FATCA, (d) any Tax that is attributable to a Lender's failure to comply with Section 2.17(e) and (e) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Lead Borrower under Section 2.19(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17(a), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office.

"<u>Existing FRG ABL Credit Agreement</u>" means that certain ABL Credit Agreement, dated as of September 23, 2020, by and among the Loan Parties party thereto as borrowers or guarantors, the lenders from time to time party thereto and Citizens Bank, N.A., as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"<u>Existing Term Loan Credit Agreement</u>" means that certain Credit Agreement, dated as of February 14, 2020, by and among the Loan Parties party thereto as borrowers or guarantors, the lenders from time to time party thereto, GACP Finance Co., LLC, as administrative agent, and Kayne Solutions Fund, L.P., as collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"<u>Existing VSI ABL Credit Agreement</u>" means that certain Second Amended and Restated Loan and Security Agreement, dated as of December 16, 2019, by and among the Loan Parties party thereto as borrowers or guarantors, the lenders from time to time party thereto and JPM, as agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable thereto and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>Federal Funds Effective Rate</u>" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website  from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; <u>provided</u> that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"<u>Federal Reserve Bank of New York's Website</u>" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"<u>FG Newco Intermediate AF</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>FG Newco PSP</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>Fifth Amendment</u>" means that certain Fifth Amendment to Second Lien Credit Agreement, dated as of the Fifth Amendment Effective Date, among the Lead Borrower, the other Loan Parties party thereto, the Lenders party thereto and the Agents.

"<u>Fifth Amendment Effective Date</u>" means August 19, 2024.

"<u>Financial Maintenance Covenants</u>" means the covenants set forth in <u>Section 6.10</u>.

"<u>Financial Advisor</u>" means AlixPartners, LLP, as financial officer to the Loan Parties and their Subsidiaries.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or corporate controller of the Lead Borrower, another officer of the Lead Borrower with similar responsibilities, or the chief executive officer or chief operating officer of the Lead Borrower.

"Financing Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party and (b) the borrowing of Loans hereunder and the use of the proceeds thereof.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Amendment" means that certain First Amendment to Second Lien Credit Agreement, dated as of the First Amendment Effective Date, among the Borrower, the other Loan Parties party thereto and the Agents.

"First Amendment Effective Date" means November 22, 2021.

"First Amendment to Holdco Credit Agreement" means that First Amendment to Credit Agreement, dated as of the Fourth Amendment Effective Date, as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time, by and among Holdco, Holdco Parent, the lenders party thereto and the Holdco Agent, which amends the Holdco Credit Agreement.

"First Amendment to Sidecar Pari Second Lien Credit Agreement" means the First Amendment to Credit Agreement, dated as of the Fourth Amendment Effective Date, by and among the Borrowers, the other loan parties party thereto, the lenders party thereto and the Sidecar Pari Second Lien Credit Agreement Agent, which amends the Sidecar Pari Second Lien Credit Agreement.

"First Lien Agent" means JPM, as administrative agent and collateral agent under the First Lien Credit Agreement, or any successor thereto acting in such capacities.

"First Lien Credit Agreement" means (i) that certain First Lien Credit Agreement, as in effect on the First Amendment Effective Date and as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof (including by reference to the ABL Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement), among each Loan Party party thereto, the lender(s) party thereto and the First Lien Agent and (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (subject to the limitations set forth herein (including by reference to the ABL Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement)) in whole or in part the Indebtedness and other obligations outstanding under (x) the credit agreement referred to in clause (i) or (y) any subsequent first lien term loan facility, unless the agreement or instrument related thereto expressly provides that it is not intended to be and is not a First Lien Credit Agreement hereunder. Any reference to the First Lien Credit Agreement hereunder shall be deemed a reference to any First Lien Credit Agreement then in existence. For the avoidance of doubt, the Badcock First Lien Credit Agreement shall not constitute a "First Lien Credit Agreement" hereunder.

"First Lien Loan Documents" shall have the meaning ascribed to the term "Loan Documents" in the First Lien Credit Agreement.

"First Lien/Second Lien Intercreditor Agreement" means (a) that certain Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of the First Amendment Effective Date,

by and among the Agents, the First Lien Agent, the Badcock First Lien Agent and the Badcock Second Lien Agent, and acknowledged by the Loan Parties, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof or (b) such other intercreditor agreement or arrangement between the First Lien Agent (or other applicable representative on behalf of the holders of the Indebtedness incurred under the First Lien Credit Agreement and the other First Lien Loan Documents) and the Agents (or any of them) (and any other Persons party thereto), that is reasonably acceptable to the Collateral Agent, the Required Lenders and the Lead Borrower, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof, as applicable.

"<u>Fixed Amounts</u>" has the meaning assigned to such term in <u>Section 1.07(b)</u>.

"<u>Fixed Charge Coverage Ratio</u>" means, for any period of four fiscal quarters of the Lead Borrower, the ratio of (a) Consolidated EBITDA for such period <u>minus</u> (i) all Unfinanced Capital Expenditures for such period and (ii) cash taxes paid (including in the form of tax distributions) for such period (net of cash refunds received during such period) to (b) the sum of (i) Consolidated Cash Interest Charges paid or payable currently for such period <u>plus</u> (ii) scheduled amortization of Funded Debt (including Capitalized Leases) paid or payable currently in cash for such period.

"<u>Flood Insurance Laws</u>" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"<u>Floor</u>" means the applicable benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to Adjusted Term SOFR (as specified as of the Third Amendment Effective Date in the definition of Adjusted Term SOFR).

"<u>Foreign Lender</u>" has the meaning assigned to such term in <u>Section 2.17(e)(ii)</u>.

"<u>Foreign Prepayment Event</u>" has the meaning assigned to such term in <u>Section 2.11(g)</u>.

"<u>Foreign Subsidiary</u>" means each Subsidiary that is organized under or incorporated in the laws of a jurisdiction other than the United States, any state thereof or the District of Columbia.

"<u>Fourth Amendment</u>" means that certain Fourth Amendment to Second Lien Credit Agreement, dated as of the Fourth Amendment Effective Date, among the Borrower, the other Loan Parties party thereto, the Lenders party thereto and the Administrative Agent.

"<u>Fourth Amendment Effective  Date</u>" means December 18, 2023.

"<u>Franchise Agreement</u>" means a franchising agreement between any Loan Party or any Subsidiary thereof, as franchisor, and any other Person, as franchisee, pertaining to the establishment and operation of a business with operations comparable to the operations of the Lead Borrower and its Subsidiaries.

"Franchise Disclosure Documents" means any uniform franchise offering circulars and franchise disclosure documents used by (and, to the extent required, filed by) any Loan Party or Subsidiary of a Loan Party to comply with any applicable law, rule, regulation or order of any Governmental Authority.

"Franchise Laws" means all applicable laws, rules, regulations, orders, binding guidance or other requirements of the United States Federal Trade Commission or any other Governmental Authority relating to the relationship between franchisor and franchisees or to the offer, sale, termination, non-renewal or transfer of a franchise.

"Franchise Rights" mean the rights of a franchisee of any Loan Party or Subsidiary within any specified geographic area.

"Freedom VCM Holdings, LLC" means Freedom VCM Holdings, LLC, a Delaware limited liability company.

"Funded Debt" means all Indebtedness of the Borrower and its Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans and in respect of the Loans under and as defined in each of the ABL Credit Agreement, the First Lien Credit Agreement, the Badcock First Lien Credit Agreement and the Badcock Second Lien Credit Agreement.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capital Lease Obligations or Capitalized Leases shall be determined in accordance with the definitions of such terms.

"Governmental Approvals" means all authorizations, consents, approvals, permits, licenses and exemptions of, registrations and filings with, and reports to, Governmental Authorities.

"Governmental Authority" means any (i) federal, state, local, municipal, or other government, (ii) governmental or quasi-Governmental Authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness

of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantee Agreement" means the Second Lien Guarantee Agreement among the Loan Parties (other than Badcock) and the Administrative Agent, substantially in the form of Exhibit B.

"Hazardous Materials" means all explosive, radioactive, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants of any nature and in any form regulated pursuant to any Environmental Law.

"Holdco" means Freedom VCM, Inc., a Delaware corporation.

"Holdco Agent" means Alter Domus (US) LLC in its capacity as administrative agent and collateral agent under the Holdco Credit Agreement and its permitted successors and assigns in such capacity.

"Holdco Credit Agreement" means that certain Credit Agreement, dated as of the Third Amendment Effective Date, as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time, by and among Holdco, Holdco Parent, the lenders party thereto and the Holdco Agent.

"Holdco Deferred Interest Amount" means an amount equal to $19,505,047.98 which is comprised of the amount of the interest payment due under the Holdco Credit Agreement on or around August 21, 2024.

"Holdco Discharge Date" means the date on which all commitments under the Holdco Credit Agreement have expired or been terminated, and the principal of and interest on each Loan (as defined in the Holdco Credit Agreement) and all fees, expenses and other amounts payable (other than contingent indemnification obligations and similar obligations that are not yet due) under any "Loan Documents" (as defined in the Holdco Credit Agreement) have been paid in full, including as a result of any Holdco Exchange and/or any "Holdco Exchange" as defined in the Sidecar Pari Second Lien Credit Agreement.

"Holdco Exchange" means an exchange of Holdco Term Loans for Holdco Exchange Loans pursuant to Section 2.20.

"Holdco Exchange Facility Cap" means, as of any date of determination, an amount equal to the difference of (a) $300,000,000 minus (b) the aggregate principal amount of Initial Term Loans then outstanding minus (c) the aggregate principal amount of Holdco Exchange Loans then outstanding.

"Holdco Exchange Loans" has the meaning specified in Section 2.20(a).

"Holdco Loan Documents" shall have the meaning ascribed to the term "Loan Documents" in the Holdco Credit Agreement.

"Holdco Parent" means Freedom VCM Interco, Inc., a Delaware corporation.

"Holdco Term Loans" means loans outstanding under the Holdco Credit Agreement.

"Identified Participating Lenders" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(3).

"Identified Qualifying Lenders" has the meaning specified in Section 2.11(a)(ii)(D)(3).

"Immaterial Subsidiary" means any Subsidiary other than a Material Subsidiary.

"Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness or in the form of Qualified Equity Interests of the Borrower or any of its direct or indirect parent entities, the accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

"Incurrence Based Amounts" has the meaning assigned to such term in Section 1.07(b).

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (w) trade accounts payable in the ordinary course of business, (x) any Earn-Out obligation, purchase price adjustment or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid within thirty (30) days after being due and payable, (y) liabilities associated with customer prepayments and deposits and (z) expenses accrued in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and, (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (j) Disqualified Equity Interests and other preferred equity issuances (and similar instruments); provided that the term "Indebtedness" shall not include (i) deferred or prepaid revenue, (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty, indemnity or other unperformed obligations of the seller, (iii) contingent indemnity and similar obligations incurred in the ordinary course of business (iv) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (v) Indebtedness of any Person that is a direct or indirect parent

of the Borrower appearing on the balance sheet of the Borrower, or solely by reason of push down accounting under GAAP, (vi) any non-compete or consulting obligations incurred in connection with a Permitted Acquisition, (vii) any reimbursement obligations under pre-paid contracts entered into with clients in the ordinary course of business, (viii) for the avoidance of doubt, any Qualified Equity Interests issued by the Borrower. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of the Borrower and its Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms).

"Indemnified Taxes" means Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document, other than Excluded Taxes and Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Independent Directors" has the meaning assigned to such term in Section 5.15(i)(iii).

"Information" has the meaning assigned to such term in Section 9.12(a).

"Initial Budget" has the meaning assigned to such term in Section 5.15(i)(ii).

"Initial Budget Delivery Date" has the meaning assigned to such term in Section 5.15(i)(ii).

"Initial Term Loan Commitment" means the commitment of a Lender to make Initial Term Loans, and "Initial Term Loan Commitments" means such commitments of all Lenders.  The aggregate amount of the Initial Term Loan Commitments as of the Effective Date is $300,000,000.

"Initial Term Loan Lender" means a Lender with an Initial Term Loan Commitment or an outstanding Initial Term Loan.

"Initial Term Loans" means the Term Loans made on the Effective Date pursuant to Section 2.01.

"Intellectual Property" has the meaning assigned to such term in the Collateral Agreement.

"Intellectual Property Security Agreement" means short-form security agreements, suitable for filing with the United States Patent and Trademark Office or the United States Copyright Office (as applicable), with respect to any Intellectual Property that is registered, issued, or applied for registration or issuance in the United States and that constitute Collateral that can be perfected by the filing of such security agreements.

"Intercreditor Agreement" means the ABL Intercreditor Agreement,  the First Lien/Second Lien Intercreditor Agreement, the Badcock Intercreditor Agreement, the Sidecar Pari Lien Intercreditor Agreement and/or the Junior Lien Intercreditor Agreement, as the context may require.

"Interest Election Request" means a written request by the Borrower to convert or continue a Term Loan Borrowing in accordance with Section 2.07.

"Interest Payment Date" means, other than as further set forth in Section 2.13(d) herein, (a) with respect to any ABR Loan, the last Business Day of each March, June, September and December and on the Term Maturity Date and (b) with respect to any SOFR Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a SOFR Borrowing with an Interest Period of more than three months' duration, each Business Day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period and on the Term Maturity Date. The initial Interest Payment Date for each Holdco Exchange Loan shall match the Interest Payment Date then in effect under the Holdco Credit Agreement immediately prior to the exchange for the Holdco Term Loans exchanged into such Holdco Exchange Loans.

"Interest Period" means, other than as set forth in Section 2.13(d) herein, with respect to any SOFR Borrowing, the period commencing on the date such Borrowing is disbursed or converted to or continued as a SOFR Borrowing and ending on the date that is one, three or six months thereafter as selected by the Borrower in its Borrowing Request (or, if agreed to by each Lender participating therein, twelve months or such other period less than one month thereafter as the Borrower may elect, unless such twelve month or other period is administratively infeasible for the Administrative Agent); provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period and (c) no Interest Period shall extend beyond the Term Maturity Date. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and the Subsidiaries (i) intercompany advances arising from their cash management, tax, and accounting operations and (ii) intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms)) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (a) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment and without duplication of amounts increasing the Available Amount or the Available Equity Amount), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (b) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (c) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the fair market value (as determined in good

faith by a Financial Officer) of such Equity Interests or other property as of the time of the transfer, minus any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment and without duplication of amounts increasing the Available Amount or the Available Equity Amount), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (d) any Investment (other than any Investment referred to in clause (a), (b) or (c) above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), plus (i) the cost of all additions thereto and minus (ii) the amount of any portion of such Investment that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (to the extent the amounts referred to in clause (ii) do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto and without duplication of amounts increasing the Available Amount or the Available Equity Amount), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of Section 6.04, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; provided that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"Investment-Linked Refinancing Transaction" means the refinancing in full of the Term Facility undertaken in connection with (x) the purchase or other acquisition, by merger, consolidation or otherwise, by the Borrower or any Subsidiary, of any Equity Interests in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person or (y) any similar Investment. Any determination by the Required Lenders with respect to whether an Investment-Linked Refinancing Transaction shall have occurred shall be conclusive and binding on all Lenders holding the Initial Term Loans.

"Investors" means the one or more co-investors and other investors (which may include existing shareholders, board members, management or other rollover investors of the Acquired Company) who are holders of Equity Interests in the Borrower (or any direct or indirect parent thereof) on the Effective Date after giving effect to the Transactions, together with their Affiliates.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"JPM" means JPMorgan Chase Bank, N.A.

"Judgment Currency" has the meaning assigned to such term in Section 9.18.

"Junior Financing" means (a) any Indebtedness (other than any permitted intercompany Indebtedness owing to the Borrower or any Subsidiary) for borrowed money in a principal amount in excess of $11,500,000 that is secured on a junior basis to the Secured Obligations, unsecured or contractually subordinated in right of payment or right of lien to the Loan Document Obligations and (b) any Permitted Refinancing in respect of the foregoing.

"<u>Junior Lien Intercreditor Agreement</u>" means any intercreditor agreement among the Agents (or any of them) and one or more Representatives for holders of Indebtedness permitted by this Agreement to be secured by the Collateral and the Badcock Collateral on a junior basis (but without regard to the control of remedies) in customary form reasonably acceptable to the Collateral Agent, the Required Lenders and the Lead Borrower, as amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof.

"<u>Latest Maturity Date</u>" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Other Term Loan or any Other Term Commitment, in each case as extended in accordance with this Agreement from time to time.

"<u>LCA Election</u>" has the meaning assigned to such term in <u>Section 1.06</u>.

"<u>LCA Test Date</u>" has the meaning assigned to such term in <u>Section 1.06</u>.

"<u>Lead Borrower</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>Legal Reservations</u>" has the meaning assigned to such term in <u>Section 3.02</u>.

"<u>Lender Fee Letter</u>" means, individually and collectively, (a) that certain letter agreement, dated as of March 4, 2021, by and among the Lead Borrower, HVS XXXIV LLC, D3V XI LLC, PIF Onshore XVII LP, RSF XVIII LLC and CO Finance LVS VII LLC and (b) that certain letter agreement, dated as of February 24, 2021, by and among the Lead Borrower and Kayne Anderson Capital Advisors, L.P.

"<u>Lender Indemnitee</u>" has the meaning assigned to such term in <u>Section 9.03(b)</u>.

"<u>Lender Professionals</u>" means, collectively, Davis Polk & Wardwell LLP, as counsel, and Evercore Group L.L.C., as financial advisor, to certain Lenders constituting the Required Lenders (and/or such other professionals as determined by the Required Lenders from time to time).

"<u>Lenders</u>" means the Persons listed on <u>Schedule 2.01</u> and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, a Loan Modification Agreement or a Refinancing Amendment, in each case, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Leverage-Based Margin Increase</u>" means (a) at any time prior to the Fourth Amendment Effective Date, if the "Total Net Leverage Ratio" of Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) for any four fiscal quarter period as certified by any compliance certificate delivered pursuant to <u>Section 5.01(e)</u> of the Holdco Credit Agreement, exceeds 4.00 to 1.00, an additional 2.00% per annum, which 2.00% per annum shall be payable only with respect to the period comprising the fiscal quarter following delivery of such compliance certificate, and (b) at any time on and after the Fourth Amendment Effective Date, (i) at any time prior to the Holdco Discharge Date, (A) initially an additional 10.00% per annum, (B) at any time (x)(1) after proceeds from the sale of any property or assets by Holdco or any Subsidiary of Holdco have been applied to reduce "Consolidated Total Indebtedness" of Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) by no less than $150,000,000 and (2) "Consolidated Total Indebtedness" of the Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) is less than $1,850,000,000; <u>provided</u> that any such proceeds shall have been applied to the prepayment of principal amounts outstanding

under the First Lien Credit Agreement (or if all amounts thereunder have been paid in full in accordance with its terms, under this Agreement and the Sidecar Pari Second Lien Credit Agreement on a pro rata basis); provided, further, that the Borrower may apply any such proceeds from ABL Priority Collateral (as defined in the First Lien Credit Agreement) to amounts outstanding under the ABL Credit Agreement as permitted in the First Lien Credit Agreement if such application is accompanied by a permanent reduction of commitments under the ABL Credit Agreement in such amount, and (y) written notice thereof from the Borrower has been received by the Administrative Agent, the Leverage-Based Margin Increase shall be reduced to 8.00% per annum, (C) at any time (x)(1) after proceeds from the sale of any property or assets by Holdco or any Subsidiary of Holdco have been applied to reduce "Consolidated Total Indebtedness" of Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) by no less than $700,000,000, (2) "Consolidated Total Indebtedness" of the Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) is less than $1,300,000,000; provided that any such proceeds shall have been applied to the prepayment of principal amounts outstanding under the First Lien Credit Agreement (or if all amounts thereunder have been paid in full in accordance with its terms, under this Agreement and the Sidecar Pari Second Lien Credit Agreement on a pro rata basis); provided, further, that the Borrower may apply any such proceeds from ABL Priority Collateral (as defined in the First Lien Credit Agreement) to amounts outstanding under the ABL Credit Agreement as permitted in the First Lien Credit Agreement if such application is accompanied by a permanent reduction of commitments under the ABL Credit Agreement in such amount, and (y) written notice thereof from the Borrower has been received by the Administrative Agent, the Leverage-Based Margin Increase shall be reduced to 6.00% per annum, (D) at any time (x)(1) after proceeds from the sale of any property or assets by Holdco or any Subsidiary of Holdco have been applied to reduce "Consolidated Total Indebtedness" of Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) by no less than $800,000,000 and (2) "Consolidated Total Indebtedness" of Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) is less than $1,200,000,000; provided that any such proceeds shall have been applied to the prepayment of principal amounts outstanding under the First Lien Credit Agreement (or if all amounts thereunder have been paid in full in accordance with its terms, under this Agreement and the Sidecar Pari Second Lien Credit Agreement on a pro rata basis); provided, further, that the Borrower may apply any such proceeds from ABL Priority Collateral (as defined in the First Lien Credit Agreement) to amounts outstanding under the ABL Credit Agreement as permitted in the First Lien Credit Agreement if such application is accompanied by a permanent reduction of commitments under the ABL Credit Agreement in such amount, (y) written notice thereof from the Borrower has been received by the Administrative Agent,   and (z) the "Total Net Leverage Ratio" of Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) for any four fiscal quarter period as certified by any compliance certificate delivered pursuant to Section 5.01(e) of the Holdco Credit Agreement, is equal to or less than 5.75 to 1.00, the Leverage-Based Margin Increase shall be reduced to 4.00% per annum; provided that upon the sale of any property or assets by Holdco or any Subsidiary of Holdco, Holdco may deliver an updated compliance certificate for such applicable four fiscal quarter period, and if, as a result of the applicable of proceeds from the sale of any property or assets by Holdco or any Subsidiary of Holdco the conditions of this clause (D) shall have been satisfied on a Pro Forma Basis after giving effect to such sale, the Leverage Based Margin Increase shall be reduced to 4.00% per annum for the period after the delivery of such updated compliance certificate and (E) at any time (x)(1) after proceeds from the sale of any property or assets by Holdco or any Subsidiary of Holdco have been applied to reduce "Consolidated Total Indebtedness" of Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) by no less than $800,000,000 and (2) "Consolidated Total Indebtedness" of Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) is less than $1,200,000,000; provided that any such proceeds shall have been applied to the prepayment of principal amounts outstanding under the First Lien Credit Agreement (or if all amounts thereunder have been paid in full in accordance with its terms, under this Agreement and the Sidecar Pari Second Lien Credit Agreement on a pro rata basis); provided, further, that the Borrower may apply any such proceeds from ABL Priority Collateral (as defined in the First Lien Credit Agreement) to amounts outstanding under the ABL Credit Agreement as

permitted in the First Lien Credit Agreement if such application is accompanied by a permanent reduction of commitments under the ABL Credit Agreement in such amount, (y) written notice thereof from the Borrower has been received by the Administrative Agent and (z) the "Total Net Leverage Ratio" of Holdco and its Subsidiaries (as determined in accordance with the Holdco Credit Agreement) for any four fiscal quarter period as certified by any compliance certificate delivered pursuant to Section 5.01(e) of the Holdco Credit Agreement, is equal to or less than 4.00 to 1.00, the Leverage-Based Margin Increase shall be reduced to 2.00% per annum; provided that upon the sale of any property or assets by Holdco or any Subsidiary of Holdco, Holdco may deliver an updated compliance certificate for such applicable fiscal quarter period, and if, as a result of the applicable of proceeds from the sale of any property or assets by Holdco or any Subsidiary of Holdco the conditions of this clause (E) shall have been satisfied on a Pro Forma Basis after giving effect to such sale, the Leverage Based Margin Increase shall be reduced to 2.00% per annum for the period after the delivery of such updated compliance certificate, and (ii) at any time after the Holdco Discharge Date (A) initially: an additional 10.00% per annum, (B) at any time (x)(1) after proceeds from the sale of any property or assets by the Borrower or any Subsidiary of the Borrower have been applied to reduce Consolidated Total Indebtedness by no less than $150,000,000 and (2) Consolidated Total Indebtedness is less than $1,850,000,000; provided that any such proceeds shall have been applied to the prepayment of principal amounts outstanding under the First Lien Credit Agreement (or if all amounts thereunder have been paid in full in accordance with its terms, under this Agreement and the Sidecar Pari Second Lien Credit Agreement on a pro rata basis); provided, further, that the Borrower may apply any such proceeds from ABL Priority Collateral (as defined in the First Lien Credit Agreement) to amounts outstanding under the ABL Credit Agreement as permitted in the First Lien Credit Agreement if such application is accompanied by a permanent reduction of commitments under the ABL Credit Agreement in such amount, and (y) written notice thereof from the Borrower has been received by the Administrative Agent, the Leverage-Based Margin Increase shall be reduced to 8.00% per annum, (C) at any time (x)(1) after proceeds from the sale of any property or assets by the Borrower or any Subsidiary of the Borrower have been applied to reduce Consolidated Total Indebtedness by no less than $700,000,000 and (2) Consolidated Total Indebtedness is less than $1,300,000,000; provided that any such proceeds shall have been applied to the prepayment of principal amounts outstanding under the First Lien Credit Agreement (or if all amounts thereunder have been paid in full in accordance with its terms, under this Agreement and the Sidecar Pari Second Lien Credit Agreement on a pro rata basis); provided, further, that the Borrower may apply any such proceeds from ABL Priority Collateral (as defined in the First Lien Credit Agreement) to amounts outstanding under the ABL Credit Agreement as permitted in the First Lien Credit Agreement if such application is accompanied by a permanent reduction of commitments under the ABL Credit Agreement in such amount, and (y) written notice thereof from the Borrower has been received by the Administrative Agent, the Leverage-Based Margin Increase shall be reduced to 6.00% per annum, (D) at any time (x)(1) after proceeds from the sale of any property or assets by the Borrower or any Subsidiary of the Borrower have been applied to reduce Consolidated Total Indebtedness by no less than $800,000,000 and (2) Consolidated Total Indebtedness is less than $1,200,000,000; provided that any such proceeds shall have been applied to the prepayment of principal amounts outstanding under the First Lien Credit Agreement (or if all amounts thereunder have been paid in full in accordance with its terms, under this Agreement and the Sidecar Pari Second Lien Credit Agreement on a pro rata basis); provided, further, that the Borrower may apply any such proceeds from ABL Priority Collateral (as defined in the First Lien Credit Agreement) to amounts outstanding under the ABL Credit Agreement as permitted in the First Lien Credit Agreement if such application is accompanied by a permanent reduction of commitments under the ABL Credit Agreement in such amount, (y) written notice thereof from the Borrower has been received by the Administrative Agent and (z) the Total Net Leverage Ratio for any Test Period as certified by any Compliance Certificate delivered pursuant to Section 5.01(e), is equal to or less than 5.75 to 1.00, the Leverage-Based Margin Increase shall be reduced to 4.00% per annum; provided that upon the sale of any property or assets by the Borrower or any Subsidiary of the Borrower, the Borrower may deliver an updated Compliance Certificate for such applicable Test Period, and if, as a result of the application of proceeds from the sale of any property or assets by the Borrower or any Subsidiary of the Borrower, the conditions

under this clause (D) shall have been satisfied on a Pro Forma Basis after giving effect to such sale, the Leverage-Based Margin Increase shall be reduced to 4.00% per annum for the period after the delivery of such updated Compliance Certificate, and (E) at any time (x)(1) after proceeds from the sale of any property or assets by the Borrower or any Subsidiary of the Borrower have been applied to reduce Consolidated Total Indebtedness by no less than $800,000,000 and (2) Consolidated Total Indebtedness is less than $1,200,000,000; provided that any such proceeds shall have been applied to the prepayment of principal amounts outstanding under the First Lien Credit Agreement (or if all amounts thereunder have been paid in full in accordance with its terms, under this Agreement and the Sidecar Pari Second Lien Credit Agreement on a pro rata basis); provided, further, that the Borrower may apply any such proceeds from ABL Priority Collateral (as defined in the First Lien Credit Agreement) to amounts outstanding under the ABL Credit Agreement as permitted in the First Lien Credit Agreement if such application is accompanied by a permanent reduction of commitments under the ABL Credit Agreement in such amount, (y) written notice thereof from the Borrower has been received by the Administrative Agent and (z) the Total Net Leverage Ratio for any Test Period as certified by any Compliance Certificate delivered pursuant to Section 5.01(e), is equal to or less than 4.00 to 1.00, the Leverage-Based Margin Increase shall be reduced to 2.00% per annum; provided that upon the sale of any property or assets by the Borrower or any Subsidiary of the Borrower, the Borrower may deliver an updated Compliance Certificate for such applicable Test Period, and if, as a result of the application of proceeds from the sale of any property or assets by the Borrower or any Subsidiary of the Borrower, the conditions under this clause (E) shall have been satisfied on a Pro Forma Basis after giving effect to such sale, the Leverage-Based Margin Increase shall be reduced to 2.00% per annum for the period after the delivery of such updated Compliance Certificate.  In any event, no Lender shall be required to return any amounts received as a result of any Leverage-Based Margin Increase.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, ground lease, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Limited Condition Transaction" means any Permitted Acquisition or other investment, incurrence of Indebtedness, Restricted Payment or repayment, repurchase or redemption of Indebtedness permitted hereunder by the Borrower or one or more of its Subsidiaries.

"Limited Waiver" has the meaning assigned to such term in the Fifth Amendment.

"Liquidity" means, as of any date of determination, (a) the sum of (i) the daily unrestricted (except for any restrictions pursuant to the collateral and security documents (including any account control agreements) for the benefit of the respective lenders, agents and/or other secured parties under this Agreement, the First Lien Credit Agreement and the ABL Credit Agreement) cash and cash equivalents of the Lead Borrower and the operating Subsidiaries of the Lead Borrower for such period and (ii) the amount of unused revolving credit commitments under the ABL Credit Agreement available to be drawn for such period minus (b) any cash in the Deposit Accounts maintained by Lead Borrower at Canadian Imperial Bank of Commerce with the account numbers ending in x9922 and x0508 needed to cover expenses incurred in connection with the self-insurance policies maintained by the Lead Borrower in accordance with the terms hereof.

"Liquidity Report Deadline" has the meaning assigned to such term in Section 5.15(f).

"Loan Document Obligations" means (a) the due and punctual payment in cash by the Borrower of (i) the principal of the Loans and all accrued and unpaid interest thereon at the Applicable Rate or rates provided in this Agreement (including interest accruing during the pendency of any bankruptcy,

insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents to which it is a party, including obligations to pay fees, expenses, reimbursement obligations and indemnification obligations and obligations to provide cash collateral, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding and including any Post-Toggle Term Effective Date Prepayment Premium, as applicable), (b) the due and punctual payment in cash and performance of all other monetary obligations of the Borrower under or pursuant to each of the Loan Documents to which it is a party and (c) the due and punctual payment and performance of all the monetary obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents to which it is a party (including interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Loan Documents" means this Agreement, any Refinancing Amendment, any Loan Modification Agreement, the Guarantee Agreement, the Secured Holdco Obligations Guarantee, the Badcock Guarantee Agreement, the Collateral Agreement, the Badcock Collateral Agreement, the other Security Documents, the other Badcock Security Documents, each Intercreditor Agreement then in effect, each Lender Fee Letter, the Administrative Agent Fee Letter and, except for purposes of Section 9.02, any Note delivered pursuant to Section 2.09(e).

"Loan Modification Agreement" means a Loan Modification Agreement, in form reasonably satisfactory to the Administrative Agent, among the Borrower, the Administrative Agent and one or more Accepting Lenders, effecting one or more Permitted Amendments and such other amendments hereto and to the other Loan Documents as are contemplated by Section 2.24.

"Loan Modification Offer" has the meaning specified in Section 2.24(a).

"Loan Parties" means the Borrower and any Subsidiary Loan Parties.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Majority in Interest", when used in reference to Lenders of any Class, means, at any time, Lenders holding outstanding Term Loans of such Class representing more than 50% of all Term Loans of such Class outstanding at such time; provided that whenever there are one or more Defaulting Lenders, the total outstanding Term Loans each Defaulting Lender shall be excluded for purposes of making a determination of the Majority in Interest.

"Make-Whole Premium" means, with respect to any applicable prepayment of Loans, the excess of (a) the "present value" as of the date of such prepayment of (i) 102% of the principal amount of the Loans being prepaid plus (ii) all required interest payments due on the Loans being prepaid through, with respect to any Make-Whole Premium due in accordance with Section 2.11(b)(i)(x), the six-month anniversary of the Effective Date (excluding interest accrued prior to such prepayment date), and with respect to any Make-Whole Premium due in accordance with Section 2.11(b)(i)(y), the nine-month anniversary of the Effective Date (excluding interest accrued prior to such prepayment date), over (b) the principal amount of the Loans being prepaid; provided, that the Make-Whole Premium may in no event be less than zero. For purposes of this definition, "present value" with respect to each of clauses (a)(i) and (a)(ii) hereof shall be computed using a discount rate applied quarterly equal to the Treasury Rate as of such prepayment date plus 50 basis points.

"Manual Sweeping Accounts" shall have the meaning ascribed to the term "Manual Sweeping Accounts" in the ABL Credit Agreement as in effect on the date hereof.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement".

"Master Intercompany Note" means the Amended and Restated Master Intercompany Note, dated the First Amendment Effective Date, pursuant to which the Lead Borrower and its Subsidiaries (other than Badcock) are the "payees" and the Lead Borrower and its Subsidiaries are the "payors".

"Material Adverse Effect" means (a) on the Effective Date or with respect to any representations and warranties made as of the Effective Date (any date prior thereto), a Company Material Adverse Effect (as defined in the Acquisition Agreement as in effect on the Effective Date) and (b) otherwise, a circumstance or condition that would materially and adversely affect (i) the business, results of operations or financial condition of the Lead Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Loan Parties, taken as a whole, to perform their payment obligations under the applicable Loan Documents or (iii) the rights and remedies, taken as a whole, of the Agents and the Lenders under the Loan Documents.

"Material Indebtedness" means Indebtedness for borrowed money (other than the Loan Document Obligations), Capital Lease Obligations, unreimbursed obligations for letter of credit drawings and financial guarantees (other than ordinary course of business contingent reimbursement obligations) or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $57,500,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Intellectual Property" means any intellectual property owned by the Borrower or any of its Subsidiaries, the loss of which would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

"Material Non-Public Information" means material non-public information with respect to the Lead Borrower or its Affiliates, or the respective securities of any of the foregoing for purposes of United States Federal and state securities laws.

"Material Real Property" means real property (including fixtures) (i) located in the United States, (ii) first acquired by any Loan Party (other than Badcock) after the Effective Date and (iii) owned (but not leased or ground-leased) by any Loan Party (other than Badcock) with a book value, as reasonably determined by the Lead Borrower in good faith on the date of acquisition thereof, greater than or equal to $~~7,500,000~~2,000,000. For the avoidance of doubt, Badcock Material Real Property does not constitute "Material Real Property".

"Material Subsidiary" means each Wholly Owned Subsidiary that, as of the last day of the fiscal quarter of the Lead Borrower most recently ended, had net revenues or total assets for such quarter in excess of ~~2.5~~1.25% of the consolidated net revenues or total assets, as applicable, of the Lead Borrower and its Subsidiaries for such fiscal quarter; provided that in the event that the Immaterial Subsidiaries, taken together, had as of the last day of the fiscal quarter of the Lead Borrower most recently ended net revenues or total assets in excess of ~~7.5%~~(x) 5% prior to the Fifth Amendment Effective Date and (y) 2.5% on or after the Fifth Amendment Effective Date, in each case of the consolidated net revenues or total assets, as applicable, of the Borrower and its Subsidiaries for such fiscal quarter, the Lead Borrower shall designate

at its sole discretion one or more Immaterial Subsidiaries to be a Material Subsidiary as may be necessary such that the foregoing 7.52.5% limit shall not be exceeded, and any such Subsidiary shall thereafter be deemed to be a Material Subsidiary hereunder; provided, further, that the Borrower may re-designate Material Subsidiaries as Immaterial Subsidiaries so long as Borrower is in compliance with the foregoing.

"Maximum Rate" has the meaning assigned to such term in Section 9.16.

"Milestones" has the meaning assigned to such term in Section 5.15(i).

"Model" means the model delivered by the Lead Borrower to the Commitment Parties on or prior to the Effective Date.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means a mortgage, deed of trust, deed to secure debt or other security document granting a Lien on any Mortgaged Property in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Secured Obligations, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time. Each Mortgage shall be in form and substance reasonably satisfactory to the Collateral Agent, the Required Lenders and the Borrower.

"Mortgaged Property" means each parcel of Material Real Property with respect to which a Mortgage is granted pursuant to the "Collateral and Guarantee Requirement", Section 5.11, Section 5.12 or Section 5.14 (if any).

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any Designated Non-Cash Consideration or other non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or Earn-Out, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, minus (b) the sum of (i) all fees and out-of-pocket expenses paid by the Borrower and its Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by the Borrower and its Subsidiaries as a result of such event to repay Indebtedness (other than (A) the Loans, (B) in respect of the Collateral, Indebtedness secured by a lien on such Collateral that is *pari passu* or junior to the lien on such Collateral securing the Secured Obligations including the  Second Lien Loans and (C) in respect of the Badcock Collateral, Indebtedness secured by a lien on such Badcock Collateral that is *pari passu* or junior to the lien on such Badcock Collateral securing the Secured Obligations including the Second Lien Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the *pro rata* portion of net cash proceeds thereof (calculated without regard to this clause (y)) attributable to minority interests and not available for distribution to or for the account of the Borrower or its Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by the Borrower or any

Subsidiary and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established by the Borrower and its Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, <u>provided</u> that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of Net Proceeds in the amount of such reduction.

"Non-Accepting Lender" has the meaning assigned to such term in Section 2.24(c).

"Non-Cash Charges" means (a) any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles pursuant to GAAP (which, without limiting the foregoing, shall include any impairment charges resulting from the application of FASB Statements No. 142 and 144 and the amortization of intangibles arising pursuant to No. 141), (b) all losses from Investments recorded using the equity method, (c) all Non-Cash Compensation Expenses, (d) the non-cash impact of acquisition method accounting, (e) depreciation and amortization (including amortization of deferred financing fees or costs, Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pension and other post-employment benefits) and (f) other non-cash charges (including non-cash charges related to deferred rent) (provided, in each case, that if any non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period).

"Non-Cash Compensation Expense" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Non-Wholly Owned Subsidiary" means any Subsidiary other than a Wholly Owned Subsidiary.

"Not Otherwise Applied" means, with reference to the Available Amount or the Available Equity Amount, that such amount was not previously applied pursuant to 6.04(m), 6.07(a)(vii) and 6.07(b)(vii).

"Note" means a promissory note of the Borrower, in substantially the form of Exhibit R, payable to a Lender in a principal amount equal to the principal amount of the Term Loans of such Lender.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the average rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from three federal fund brokers of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Offered Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(1).

"Offered Discount" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(1).

"Organizational Documents" means, with respect to any Person, the charter, articles of association or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of any present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient (x) having executed, delivered, become a party to, performed its obligations or received payments under, received or perfected a security interest under or enforced any Loan Documents or engaged in any other transaction pursuant to this Agreement or (y) having sold or assigned an interest in any Loan Documents).

"Other Taxes" means any and all present or future recording, stamp, documentary or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19(b)).

"Other Term Commitments" means one or more Classes of term loan commitments hereunder that result from a Refinancing Amendment or a Loan Modification Agreement.

"Other Term Loans" means one or more Classes of Term Loans that result from a Refinancing Amendment, or a Loan Modification Agreement.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight SOFR Borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Parity Lien Intercreditor Agreement" means any intercreditor agreement among the Agents (or any of them) and one or more Representatives for holders of Indebtedness permitted by this Agreement to be secured by the Collateral (and from and after Payment in Full of Badcock Obligations, the Badcock Collateral) on a *pari passu* basis (but without regard to the control of remedies) with the Loan Document Obligations in customary form reasonably acceptable to the Collateral Agent, the Required Lenders and the Lead Borrower, as amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof.

"Partial 2L Discharge" means the purchase by Holdco of Second Lien Initial Term Loans in a principal amount of $175,000,000 and the contribution by Holdco of the Second Lien Initial Term Loans as an equity contribution to the Lead Borrower and the resulting discharge and cancellation of such Second Lien Initial Term Loans pursuant to Section 9.04(g).

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(ii).

"Participating Lender" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(2).

"Payment in Full of Badcock Obligations" means, collectively, (i) the termination of all Commitments (under and as defined in the Badcock First Lien Credit Agreement) and the payment in full of all Secured Obligations (as defined in the Badcock First Lien Credit Agreement) (other than contingent indemnification obligations) and (ii) the termination of all Commitments (under and as defined in the Badcock Second Lien Credit Agreement) and the payment in full of all Secured Obligations (as defined in the Badcock Second Lien Credit Agreement) (other than contingent indemnification obligations).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Perfection Certificate" means a certificate substantially in the form of Exhibit C.

"Perfection Requirements" means the need for appropriate filings, registrations, endorsements, notarizations, stampings and/or notifications of the Security Documents, the Badcock Security Documents, the Collateral or the Badcock Collateral and any other steps or actions necessary in any jurisdiction or under any laws or regulations in order to (i) create or perfect the Liens on the Collateral granted by the Loan Parties (other than Badcock) in favor of the Secured Parties, (ii) create or perfect the Liens on the Badcock Collateral granted by Badcock in favor of the Secured Parties and/or (iii) achieve the relevant priority expressed therein or in the Intercreditor Agreements (including the delivery of any stock certificate or promissory note required to be delivered pursuant to the applicable Loan Documents).

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR Reference Rate".

"Permitted Acquisition" means the purchase or other acquisition, by merger, consolidation or otherwise, by the Borrower or any Subsidiary of any Equity Interests in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person; provided that (a) in the case of any purchase or other acquisition of Equity Interests in a Person, (i) such Person, upon the consummation of such purchase or acquisition, will be a Subsidiary (including as a result of a merger or consolidation between any Subsidiary and such Person), or (ii) such Person is merged into or consolidated with a Subsidiary and such Subsidiary is the surviving entity of such merger or consolidation, (b) the business of such Person, or such assets, as the case may be, constitute a Similar Business (or assets with respect thereto), (c) with respect to each such purchase or other acquisition, all actions required to be taken with respect to such newly created or acquired Subsidiary (including each subsidiary thereof) or assets in order to satisfy the requirements set forth in clauses (a), (b), (c) and (d) of the definition of the term "Collateral and Guarantee Requirement" to the extent applicable shall have been taken to the extent required by Sections 5.11 or 5.12 (or shall be taken within the time periods set forth in this Agreement or such later date as agreed to by the Required Lenders in their sole discretion) (other than with respect to any Subsidiary of such newly created or acquired Subsidiary that is an Excluded Subsidiary), (d) subject to Section 1.06, after giving effect to any such purchase or other acquisition no Event of Default shall have occurred and be continuing, (e) ~~the total consideration paid in connection with~~ all such purchases and acquisitions of the Equity Interests in any Person ~~which will not become~~will result in such Person becoming a Loan Party (within the time periods set forth in this Agreement), or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of) ~~any~~such Person ~~if substantially all of such assets will not~~will become owned by a Loan Party (or a Person that will become a Loan Party within the time periods set forth in this Agreement)~~, shall not exceed $23,000,000 in the aggregate, unless financed with the proceeds of Qualified Equity Interests (excluding (i) Qualified Equity Interests the proceeds of which will be applied as Aggregate Cure Amounts and (ii) any other Qualified Equity Interests used for, or otherwise having the effect of increasing, any other basket under this Agreement)~~, and  (f) after giving effect to such purchase or acquisition, on a Pro Forma Basis, the Total Net Leverage Ratio is no greater

-59-

than 3.31 to 1.00 ~~and (g) the total consideration paid in connection with (i) any individual purchase or acquisition shall not exceed $75,000,000 and (ii) all such purchases and acquisitions shall not exceed $250,000,000 in the aggregate (in each case with respect to this clause (g) calculated without giving effect to any non-cash consideration or consideration paid with the proceeds of substantially concurrent capital contributions or issuances or sales of Equity Interests).~~.

"Permitted Amendment" means an amendment to this Agreement and, if applicable the other Loan Documents, effected in connection with a Loan Modification Offer pursuant to Section 2.24, providing for an extension of a maturity date applicable to the Loans and/or Commitments of the Accepting Lenders and, in connection therewith, (a) a change in the Applicable Rate with respect to the Loans and/or Commitments of the Accepting Lenders and/or (b) a change in the fees payable to, or the inclusion of new fees to be payable to, the Accepting Lenders and/or (c) additional covenants or other provisions (i) with respect to which the Lenders under the Term Loans also receive the benefit of such more restrictive terms (it being understood to the extent that any covenant is added for the benefit of any such Indebtedness, no consent shall be required from the Administrative Agent or any Lender to the extent that such covenant is also added for the benefit of any corresponding existing Term Loans), (ii) to the extent any such provisions apply after the Latest Maturity Date at the time of such Loan Modification Offer, or (iii) to the extent such terms shall be reasonably satisfactory to the Required Lenders and the Lead Borrower.

"Permitted ECF Recalculation Considerations" has the meaning assigned to such term in Section 2.11(d).

"Permitted Encumbrances" means:

(a)     Liens for Taxes, assessments or governmental charges that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b)     Liens with respect to outstanding motor vehicle fines and Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

(c)     Liens incurred, pledges or deposits made in the ordinary course of business (i) in connection with payroll taxes, workers' compensation, unemployment insurance and other social security legislation, public liability laws or similar legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause (i);

(d)     Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts, customer claims, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters

of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(e)      easements, licenses, servitudes, restrictive covenants, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole;

(f)      leases or subleases of real or personal property granted to other Persons (as lessee thereof) that do not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole;

(g)      rights of future tenants pursuant to written leases entered into in accordance with the terms hereof;

(h)      Liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 7.01(j) and any pledge and/or deposit securing any settlement of threatened litigation;

(i)      Liens on (i) goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of its Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such Lien secures only the obligations of the Borrower or such Subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 6.01 and (ii) specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(j)      Liens arising from precautionary Uniform Commercial Code financing statements or similar filings made in respect of operating leases entered into by the Borrower or any of its Subsidiaries;

(k)      rights of recapture of unused real property (other than any Mortgaged Property or any Badcock Mortgaged Property) in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any Governmental Authority;

(l)      Liens in favor of deposit banks or securities intermediaries securing customary fees, expenses or charges in connection with the establishment, operation or maintenance of deposit accounts or securities accounts;

(m)      liens in favor of obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(n)      Liens arising from grants of non-exclusive licenses or sublicenses of Intellectual Property or Badcock Intellectual Property, or covenants not to sue with respect to Intellectual Property or Badcock Intellectual Property, made in the ordinary course of business;

(o)      rights of setoff, banker's lien, netting agreements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the

maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(p)     Liens arising from the right of distress enjoyed by landlords or Liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent or performance of other obligations in respect of leased properties, so long as such Liens are not exercised or except where the exercise of such Liens would not reasonably be expected to have a Material Adverse Effect;

(q)     Liens or security given to public utilities or to any municipality or Governmental Authority when required by the utility, municipality or Governmental Authority in connection with the supply of services or utilities to the Borrower or any of its Subsidiaries;

(r)     servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other agreements pertaining to the use or development of any of the assets of the Person, provided the same do not result in (i) a substantial and prolonged interruption or disruption of the business activities of the Borrower and its Subsidiaries, taken as a whole, or (ii) a Material Adverse Effect; and

(s)     Liens securing Priority Obligations;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money other than Liens referred to in clauses (d) and (k) above securing obligations under letters of credit or bank guarantees or similar instruments related thereto and in clause (g) above, in each case to the extent any such Lien would constitute a Lien securing Indebtedness for borrowed money.

"Permitted First Priority Refinancing Debt" means any secured Indebtedness incurred by any Loan Party in the form of one or more series of senior secured notes or senior secured loans; provided that (i) such Indebtedness is secured by the Collateral and the Badcock Collateral on a *pari passu* basis (but without regard to the control of remedies) with the Loan Document Obligations (as defined in the First Lien Credit Agreement), (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, and (iii) a Representative acting on behalf of the holders of such Indebtedness shall have become party to the relevant Intercreditor Agreement(s); provided that if such Indebtedness is the initial Permitted First Priority Refinancing Debt incurred by the Borrower, then the Borrower, the Subsidiary Loan Parties, the Agents (or any of them) and the Representative for such Indebtedness shall have executed and delivered the relevant Intercreditor Agreement(s). Permitted First Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Holders" means (a) Vintage Capital Management, LLC, (b) Brian Kahn, (c) Lauren Kahn, (d) Tributum, L.P., (e) Stefac LP, (f) Vintage Tributum, L.P., (g) Kahn Capital Management, LLC, (h) Vintage Vista GP, LLC, (i) Andrew Laurence, (j) B. Riley FBR, Inc., (k) Bryant R. Riley, (l) any direct or indirect current or former equity holders of Buddy's Newco, LLC or Franchise Group New Holdco, LLC, (m) Samjor Family LP, (n) Vintage RTO, L.P. and (o) any Affiliates, general partners, limited partners, investment managers, investment advisors, investment funds or direct or indirect equity holders, successors or assigns of any of the foregoing.

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Subsidiary:

(a)     dollars, euros, Swiss francs, Sterling, Canadian dollars, or such other currencies held by it from time to time in the ordinary course of business;

(b)        readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States, (ii) the United Kingdom, (iii) Canada, (iv) Switzerland or (v) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; <u>provided</u> that the full faith and credit of such country or such member nation of the European Union is pledged in support thereof;

(c)        time deposits with, or certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $250,000,000 in the case of U.S. banks and $100,000,000 (or the dollar equivalent as of the date of determination) in the case of foreign banks (any such bank in the foregoing clauses <u>(i)</u> or <u>(ii)</u> being an "<u>Approved Bank</u>"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)        commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)        repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer covering securities described in clauses <u>(b)</u> and <u>(c)</u> above;

(f)        marketable short-term money market and similar highly liquid funds substantially all of the assets of which are comprised of securities of the types described in clauses <u>(b)</u> through <u>(e)</u> above;

(g)        securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, the United Kingdom, Canada, Switzerland, a member of the European Union or by any political subdivision or taxing authority of any such state, member, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)        investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(i)        instruments equivalent to those referred to in clauses <u>(a)</u> through <u>(h)</u> above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily held by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized or incorporated in such jurisdiction;

(j)        investments, classified in accordance with GAAP as current assets of the Borrower or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000 or its equivalent, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses <u>(a)</u> through <u>(i)</u> of this definition;

(k)        demand deposit accounts holding cash;

(l)        interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G7 government or other G7 governmental agency or a G7 financial institution with

credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof;

(m)    other short-term investments of a type analogous to the foregoing utilized by Foreign Subsidiaries;

(n)    investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (m) above; and

(o)    any guarantee or indemnity for the obligations of a Subsidiary in connection with a Subsidiary claiming exemption from audit, the preparation and filing of its accounts or other similar exemptions (including under section 394C, 448C or 479C of the Companies Act 2006 or other similar or equivalent provisions).

"Permitted Junior Priority Refinancing Debt" means any secured Indebtedness incurred by any Loan Party in the form of one or more series of secured notes or secured loans; provided that (i) such Indebtedness is secured by the Collateral and the Badcock Collateral on a junior basis to the Secured Obligations, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, and (iii) a Representative acting on behalf of the holders of such Indebtedness shall have become party to the relevant Intercreditor Agreement(s); provided that if such Indebtedness is the initial Permitted Junior Priority Refinancing Debt incurred by the Borrower, then the Borrower, the Subsidiary Loan Parties, the Agents (or any of them) and the Representative for such Indebtedness shall have executed and delivered the relevant Intercreditor Agreement(s). Permitted Junior Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Parity Priority Refinancing Debt" means any secured Indebtedness incurred by any Loan Party in the form of one or more series of senior secured notes or senior secured loans; provided that (i) such Indebtedness is secured by the Collateral and the Badcock Collateral on a *pari passu* basis (but without regard to the control of remedies) with the Loan Document Obligations, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, and (iii) a Representative acting on behalf of the holders of such Indebtedness shall have become party to the relevant Intercreditor Agreement(s); provided that if such Indebtedness is the initial Permitted First Priority Refinancing Debt incurred by the Borrower, then the Borrower, the Subsidiary Loan Parties, the Agents (or any of them) and the Representative for such Indebtedness shall have executed and delivered the relevant Intercreditor Agreement(s). Permitted First Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted PSP Securitization" means the whole business securitization of Pet Supplies Plus, LLC, a Delaware limited liability company, and its subsidiaries, on terms and conditions acceptable to the Required Lenders in their sole discretion.

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal, exchange or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, exchanged or extended except (i) by an amount equal to unpaid accrued interest and premium thereon plus underwriting discounts, other amounts paid, and fees and expenses (including upfront fees, original issue discount or initial yield payments) incurred, in connection with such modification, refinancing, refunding, renewal or extension, (ii) by an amount equal to any existing revolving commitments unutilized thereunder to the extent that the portion of any existing and unutilized revolving commitment being refinanced was permitted to be drawn under Section 6.01 immediately prior to such refinancing (other than by reference to a Permitted Refinancing) and such drawing shall be deemed to have been made and (iii) to the extent such excess

amounts is otherwise permitted to be incurred under Section 6.01, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.01(a)(v), (a)(xii) and (a)(xxvi), Indebtedness resulting from such modification, refinancing, refunding, renewal, exchange or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, exchanged or extended; provided that the foregoing requirements of this clause (b) shall not apply to the extent such Indebtedness constitutes a customary bridge facility, so long as the long-term Indebtedness into which any such bridge facility is to be converted or exchanged satisfies the requirements of this clause (b) and such conversion or exchange is subject only to conditions customary for similar conversions or exchanges (c) if the Indebtedness being modified, refinanced, refunded, renewed, exchanged or extended is subordinated in right of payment to the Loan Document Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Loan Document Obligations on terms not materially less favorable, taken as a whole, to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, exchanged or extended, (d) such Permitted Refinancing is not secured by a Lien on any assets other than the collateral securing, and, to the extent secured by the Collateral and the Badcock Collateral, with no higher priority than the Liens securing, the Indebtedness being refinanced, except for accessions and additions to such property and replacements and proceeds thereof (unless permitted to be secured by another provision of Section 6.02), (e) if unsecured, such Indebtedness shall remain unsecured (unless permitted to be secured by another provision of Section 6.02) and (f) no Loan Party that was not an obligor with respect to the Indebtedness being refinanced shall be an obligor under the Permitted Refinancing and if the Indebtedness being refinanced was (or was required to be) subject to an Intercreditor Agreement, the holders of such Permitted Refinancing (if such Indebtedness is secured) or their authorized representative on their behalf, shall become party to such Intercreditor Agreement, in each case providing for the same (or lesser) lien priority renewed, exchanged or extended. For the avoidance of doubt, it is understood that a Permitted Refinancing may constitute a portion of an issuance of Indebtedness in excess of the amount of such Permitted Refinancing; provided that such excess amount is otherwise permitted to be incurred under Section 6.01. For the avoidance of doubt, it is understood and agreed that a Permitted Refinancing includes successive Permitted Refinancings of the same Indebtedness to the extent such successive Permitted Refinancings satisfy the foregoing requirements.

"Permitted Tax Distributions" means, with respect to any taxable year in which the Borrower is a member of a consolidated, combined, unitary or similar group for U.S. federal or other applicable Tax purposes that includes Holdco Parent, Holdco, and a majority of their respective equity holders, payments to Holdco Parent, Holdco, and/or such equity holders in an aggregate amount with respect to such taxable year that does not exceed the amount of Taxes that the Borrower and its Subsidiaries would have been required to pay for such taxable year if they paid such Taxes on a separate return basis (taking into account any limitations on net operating losses, credits and other Tax benefits that are imposed on the consolidated, combined, unitary or similar group).

"Permitted Unsecured Refinancing Debt" means any unsecured Indebtedness incurred by the Loan Parties in the form of one or more series of senior unsecured notes or senior unsecured loans; provided that such Indebtedness constitutes Credit Agreement Refinancing Indebtedness. Permitted Unsecured Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Variance" has the meaning assigned to such term in Section 5.15(c).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity, whether existing as of the Effective Date or subsequently created or coming to exist.

"Plan" means any employee pension benefit plan as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA.

"Platform" has the meaning assigned to such term in Section 5.01.

"Pledged Equity Interests" has the meaning set forth in the Collateral Agreement.

"Post-Toggle Term Effective Date Make-Whole Premium" means, with respect to any applicable prepayment, repayment, refinancing, repurchase, substitution, replacement or becoming due (including as a result of any acceleration thereof) of Loans (excluding, for the avoidance of doubt, any Holdco Exchange and the selection, extension or continuation of any Interest Period) on any date, including as a result of any acceleration thereof, (A) the difference between (1) the aggregate amount of interest at the interest rate that would have otherwise been payable pursuant to Section 2.13 from the date of prepayment or required prepayment or repayment through the first anniversary of the Third Amendment Effective Date on the prepaid principal amount (based on the then-effective cash interest rate applicable to Term SOFR Loans with an Interest Period of three months), *minus* (2) the aggregate amount of interest the Lenders would earn if the prepaid or reduced principal amount were reinvested for the period from the date of prepayment or required prepayment or repayment through the first anniversary of the Third Amendment Effective Date at the Treasury Rate as of such date *plus* 50 basis points, *plus* (B) an amount equal to the Post-Toggle Term Effective Date Prepayment Premium on the principal amount of such Loans being prepaid, repaid, refinanced, repurchased, substituted, replaced or becoming due (including as a result of any acceleration thereof), as applicable, that would otherwise be payable as if such prepayment or required repayment had occurred on the day after the first anniversary of the Third Amendment Effective Date; provided, that the Post-Toggle Term Effective Date Make-Whole Premium may in no event be less than zero.

"Post-Toggle Term Effective Date Prepayment Premium" has the meaning set forth in Section 2.11(b)(i)(B).

"Post-Transaction Period" means, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the eighth full consecutive fiscal quarter of the Lead Borrower immediately following the date on which such Specified Transaction is consummated.

"Prepayment Event" means:

(a)        (I) the Disposition described on Schedule 6.05(k), (II) Dispositions by Badcock pursuant to Section 6.05(f) and Section 6.05(u) and/or (III) any other non-ordinary course sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries pursuant to Section 6.05(k) or the occurrence of any other Casualty Event, in each case of this clause (III) resulting in aggregate Net Proceeds exceeding (A) with respect to any single transaction or series of related transactions, the greater of $8,000,000 and 2.5% of Consolidated EBITDA individually or (B) with respect to all dispositions pursuant to Section 6.05(k) or Casualty Events in each case not excluded pursuant to previous clause (A), the greater of $16,000,000 and 5.0% of Consolidated EBITDA in the aggregate in any fiscal year of the Lead Borrower, other than dispositions constituting a sale and leaseback transaction to the extent consummated substantially contemporaneously with the acquisition by the Borrower or such Subsidiary of the property subject to such sale and leaseback transaction; provided that, for the avoidance of doubt, in each case of this clause (III), (x) only Net Proceeds in excess of such amount shall be subject to the mandatory prepayment provisions set forth in Section 2.11(e) and (y) no Prepayment Event shall occur in

~~any fiscal year of the Lead Borrower until the Net Proceeds received during such fiscal year that are subject to clause (B) above exceed the amount set forth in clause (B) above; or~~;

(b)      the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness, other than Indebtedness permitted under Section 6.01 (other than Credit Agreement Refinancing Indebtedness) or permitted by the Required Lenders pursuant to Section 9.02~~.~~; or

(c)      without duplication, a Disposition by a Borrower to a Subsidiary or a PSP Securitization Entity pursuant to any receivables securitization or "whole" business securitization, including in connection with a Permitted PSP Securitization.

"Prepayment Percentage" means (w) with respect to a Prepayment Event described in clause (a)(I) of the definition of Prepayment Event, 100%, (x) with respect to a Prepayment Event described in clause (a)(II) of the definition of Prepayment Event, 100%, (y) with respect to a Prepayment Event described in clause (a)(III) of the definition of Prepayment Event, the Asset Sale Prepayment Percentage and (z) with respect to a Prepayment Event described in clause (b) of the definition of Prepayment Event, 100%.

"Prepayment Premium Period" means the period commencing on the Third Amendment Effective Date and ending on the 24-month anniversary of the Third Amendment Effective Date.

"Prime Rate" means the per annum rate publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases quoting a prime rate of the type described, either (a) the per annum rate quoted as the base rate on such corporate loans in a different national publication as reasonably selected by Administrative Agent or (b) the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the Bank prime loan rate or its equivalent).

"Priority Obligation" means any obligation that is secured by a Lien on any Collateral and/or any Badcock Collateral in favor of a Governmental Authority, which Lien ranks or is capable of ranking prior to or *pari passu* with the Liens created thereon by the applicable Security Documents and/or Badcock Security Documents, as the case may be, including any such Lien securing amounts owing for wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, other Taxes, workers compensation, governmental royalties and stumpage or pension fund obligations.

"Pro Forma Basis," "Pro Forma Compliance" and "Pro Forma Effect" mean, as to any Person, for any events as described below that occur subsequent to the commencement of a period for which the effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the four (4) consecutive fiscal quarter of the Lead Borrower period ended on or before the occurrence of such event (the "Reference Period"):

(a) in making any determination of Consolidated EBITDA or any component thereof or the determination of financial ratios and tests hereunder, effect shall be given to ~~the Transactions,~~ any Specified Transaction made during the applicable Test Period ~~and any synergies, operating improvements, operating expense reductions or cost savings pertaining to the business of the Borrower or any of its Subsidiaries~~, in each case, that occurred during the Reference Period or with respect to any such event or transaction included in the definition of Specified Transactions and projected by the Lead Borrower in good faith to result from actions that either have been taken, with respect to which substantial steps have been taken or that are expected to be taken within 18 months after the date of consummation of such Specified Transaction~~, synergies, operating improvements, operating expense reductions or cost savings (or, with~~

~~respect to the Transactions, within 18 months of the Effective Date) (~~ (including, in each case, actions initiated prior to the Effective Date) (in the good faith determination of the Lead Borrower), net of the amount of actual benefits realized, and without duplication of any such amount included in Consolidated EBITDA pursuant to the definition thereof;

(b) in making any determination on a Pro Forma Basis, of Pro Forma Compliance or of Pro Forma Effect, (i) all Indebtedness (including Indebtedness issued, incurred or assumed as a result of, or to finance, any relevant transactions and for which the financial effect is being calculated, whether incurred under the Loan Documents or otherwise) issued, incurred, assumed or repaid during the Reference Period (or with respect to Indebtedness repaid, during the Reference Period or subsequent to the end of the Reference Period and prior to, or simultaneously with, the event for which the calculation of any such ratio is made) shall be deemed to have been issued, incurred, assumed or repaid at the beginning of such period, (ii) such calculation shall be made without regard to the netting of any cash proceeds of Indebtedness incurred in connection with the relevant transactions, (iii) in the case of any Indebtedness in the nature of a revolving credit facility, the entire principal amount of such credit facility shall be deemed to have been fully drawn and (iv) interest expense of such Person attributable to interest on any Indebtedness for which pro forma effect is being given as provided in preceding <u>clause (i)</u> bearing floating interest rates shall be computed on a pro forma basis at the rate which is or would be in effect with respect to such Indebtedness as of the relevant date of determination,

(c) [Reserved], and

(d) income statement items (whether positive or negative) attributable to all property acquired or disposed of in such relevant transaction shall be included as if such transaction had occurred as of the first day of the relevant Test Period.  Whenever a financial ratio or test or covenant is to be calculated on a Pro Forma Basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Borrower were delivered pursuant to <u>Section 5.01(a)</u> or <u>(b).</u>

"<u>Pro Forma Disposal Adjustment</u>" means, for any Test Period that includes all or a portion of a fiscal quarter of the Lead Borrower included in any Post-Transaction Period with respect to any Sold Entity or Business, the pro forma increase or decrease in Consolidated EBITDA projected by the Lead Borrower in good faith as a result of contractual arrangements between the Borrower or any Subsidiary entered into with such Sold Entity or Business at the time of its disposal or within the Post-Transaction Period and which represent an increase or decrease in Consolidated EBITDA which is incremental to the Disposed EBITDA of such Sold Entity or Business for the most recent Test Period prior to its disposal.

"<u>Pro Forma Entity</u>" means any Acquired Entity or Business.

"<u>Pro Forma Financial Statements</u>" has the meaning assigned to such term in <u>Section 3.04(c)</u>.

"<u>Proposed Change</u>" has the meaning assigned to such term in <u>Section 9.02(c)</u>.

"<u>PSP</u>" means Pet Supplies "Plus", LLC, a Delaware limited liability company.

"<u>PSP Entity</u>" means PSP or any of its subsidiaries.

"<u>PSP Securitization Entity</u>" means (i) PSP and each other subsidiary of the Lead Borrower listed on Schedule 1.01 from time to time, except to the extent redesignated as a Subsidiary in accordance with such Section 5.16, and (ii) any Subsidiary of a PSP Securitization Entity pursuant to the foregoing

clause (i).

"Public Company Costs" means, as to any Person, costs associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and charges relating to compliance with the provisions of the Securities Act and the Exchange Act, as applicable to companies with equity or debt securities held by the public, the rules of national securities exchange companies with listed equity or debt securities, directors' or managers' compensation, fees and expense reimbursement, charges relating to investor relations, shareholder meetings and reports to shareholders or debtholders, directors' and officers' insurance and other executive costs, legal and other professional fees and listing fees.

"Public Lender" has the meaning assigned to such term in Section 5.01.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning specified in Section 9.20.

"Qualified Equity Interests" means Equity Interests of the Borrower other than Disqualified Equity Interests.

"Qualifying Lender" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(3).

"Receipts Variance" has the meaning assigned to such term in Section 5.15(c).

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Reference Time" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is Term SOFR, 5:00 p.m. (New York City time) on the day that is two U.S. Government Securities Business Days preceding the date of such setting or (2) if such Benchmark is not Term SOFR, the time determined by the Required Lenders in their reasonable discretion, and notified to the Administrative Agent.

"Refinanced Debt" has the meaning assigned to such term in the definition of "Credit Agreement Refinancing Indebtedness."

"Refinancing Amendment" means an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent and the Lead Borrower executed by each of (a) the Lead Borrower, (b) the Administrative Agent and (c) each Additional Lender and Lender that agrees to provide any portion of the Credit Agreement Refinancing Indebtedness being incurred pursuant thereto, in accordance with Section 2.21.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Registered Equivalent Notes" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, trustees, agents, controlling persons, advisors and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns of each of the foregoing.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, emptying, escaping, pumping, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Relevant Governmental Body" means the Board of Governors or the NYFRB, or a committee officially endorsed or convened by the Board of Governors or the NYFRB, or any successor thereto.

"Removal Effective Date" has the meaning assigned to such term in Section 8.06.

"Representative" means, with respect to any series of Indebtedness permitted by this Agreement to be secured by the Collateral and/or the Badcock Collateral on a senior, *pari passu* or junior or "silent" subordinated basis, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"Required Lenders" means, at any time, Lenders having Term Loans and unused Commitments representing more than 50% of the aggregate Term Loans and unused Commitments at such time; provided that to the extent set forth in Section 9.02 or Section 9.04 whenever there are one or more Defaulting Lenders, the total outstanding Term Loans and the unused Commitments of each Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Required First Lien Lenders" means, at any time, the "Required Lenders" under and as defined in the First Lien Credit Agreement at such time.

"Requirements of Law" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date" has the meaning assigned to such term in Section 8.06.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, company secretary or other similar officer, manager or a member of the Board of Directors of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on the Effective Date or thereafter pursuant to paragraph (a)(i) of the definition of the term "Collateral and Guarantee Requirement," any secretary, assistant secretary, company secretary or director of a Loan Party, and as to the Lead Borrower, any Financial Officer. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of

such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Subsidiary.

"Restructuring Proposal" has the meaning assigned to such term in Section 5.15(i)(vi).

"Restructuring Transaction" has the meaning assigned to such term in Section 5.15(i)(iii).

"Retained Asset Sale Proceeds" means any proceeds of any Prepayment Event described in clause (a) of the definition of the term "Prepayment Event" that are not required to be used to prepay Term Loan Borrowings pursuant to Section 2.11(c) or Term Loan Borrowings (as defined in the First Lien Credit Agreement) pursuant to Section 2.11(c) of the First Lien Credit Agreement.

"Retained Declined Proceeds" has the meaning assigned to such term in Section 2.11(e).

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the non-government controlled areas of the Zaporizhzhia and Kherson Regions of Ukraine, the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned 50% or more or controlled by any such Person or Persons in the foregoing clauses (a) and (b), or (d) any Person otherwise the subject of Sanctions.

"Sanctions" means all applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Second Amendment Effective Date" means August 1, 2022.

"Second Amendment Effective Date Badcock Material Real Property" has the meaning assigned to such term in the definition of the term "Badcock Material Real Property".

"Second Amendment to Sidecar Pari Second Lien Credit Agreement" means the Second

Amendment to Credit Agreement, dated as of the Fifth Amendment Effective Date, by and among the Borrowers, the other loan parties party thereto, the lenders party thereto, and the Sidecar Pari Second Lien Credit Agreement Agent, which amends the Sidecar Pari Second Lien Credit Agreement.

"Second Lien Deferred Interest Amount" means an amount equal to $4,891,489.86 which is comprised of the amount of the interest payment due under the Second Lien Credit Agreement on or around September 13, 2024.

"Second Lien Loan Documents" means all Loan Documents, except the Secured Holdco Obligations Guarantee.

"Secured Holdco Obligations Guarantee" means the supplement to the Guarantee Agreement, dated as of the Fifth Amendment Effective Date, by and among the Loan Parties and Alter Domus (US) LLC, as administrative agent and collateral agent, pursuant to which all of the Loan Parties become "New Guarantors" under the "Guarantee Agreement" (as defined in the Holdco Credit Agreement) and which shall terminate upon payment in full in cash of the Holdco Deferred Interest Amount to the respective parties.

"Secured Holdco Guarantee Obligations" means the obligations of the Loan Parties in an amount equal to the Holdco Deferred Interest Amount pursuant to the "Guarantee Agreement" (as defined in the Holdco Credit Agreement) as supplemented by the Secured Holdco Obligations Guarantee, including their guarantees of the "Secured Obligations" (as defined in the Holdco Credit Agreement) pursuant to Section 2.01 thereof.

"Secured Net Leverage Ratio" means, as of any date of determination, the ratio, on a Pro Forma Basis, of (a) Consolidated Secured Indebtedness as of such date to (b) Consolidated EBITDA for the most recently completed Test Period.

"Secured Obligations" means the Loan Document Obligations.

"Secured Parties" means (a) each Lender, (b) the Administrative Agent, (c) the Collateral Agent, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (e) the permitted successors and assigns of each of the foregoing.

"Securities Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Security Documents" means the Collateral Agreement, the Mortgages (if any) and each other security agreement or pledge agreement executed and delivered pursuant to the "Collateral and Guarantee Requirement" and/or Section 5.11, Section 5.12(a) (other than as it may relate to Badcock), Section 5.12(b) or Section 5.14 to secure any of the Secured Obligations.

"Sidecar Pari Second Lien Credit Agreement" means the Sidecar Pari Passu Second Lien Credit Agreement, dated as of the Third Amendment Effective Date, by and among the Borrowers, the lenders from time to time party thereto and the Sidecar Pari Second Lien Credit Agreement Agent, which shall be substantially in the form of Exhibit V hereto.

"Sidecar Pari Second Lien Credit Agreement Agent" means Alter Domus (US) LLC, in its capacity as the administrative agent and collateral agent under the Sidecar Pari Second Lien Credit Agreement, and its permitted successors and assigns in such capacity.

"Sidecar Pari Second Lien Loans" shall mean, at any time, any "Loans" that are outstanding under the Sidecar Pari Second Lien Credit Agreement at such time.

"Sidecar Pari Lien Intercreditor Agreement" means that certain intercreditor agreement, dated as of the Third Amendment Effective Date, by and among the Administrative Agent, the Collateral Agent and the Sidecar Pari Second Lien Credit Agreement Agent as Representatives and substantially in the form attached as Exhibit W hereto.

"Similar Business" means (1) any business conducted by the Borrower or any Subsidiary on the Effective Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Subsidiaries conduct or propose to conduct on the Effective Date.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Alternate Base Rate".

"Sold Entity or Business" has the meaning assigned to such term in the definition of the term "Consolidated EBITDA."

"Solicited Discount Proration" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(3).

"Solicited Discounted Prepayment Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(1).

"Solicited Discounted Prepayment Notice" means an irrevocable written notice of a Borrower Solicitation of Discounted Prepayment Offers made pursuant to Section 2.11(a)(ii)(D) substantially in the form of Exhibit N.

"Solicited Discounted Prepayment Offer" means the irrevocable written offer by each Term Lender, substantially in the form of Exhibit O, submitted following the Administrative Agent's receipt of a Solicited Discounted Prepayment Notice.

"Solicited Discounted Prepayment Response Date" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(1).

"Solvent" means, with respect to the Lead Borrower and its Subsidiaries, (i) each of the Fair Value and the Present Fair Salable Value of the assets of the Lead Borrower and its Subsidiaries taken as a whole exceed their Stated Liabilities and Identified Contingent Liabilities, (ii) the Lead Borrower and its Subsidiaries taken as a whole do not have Unreasonably Small Capital and (iii) the Lead Borrower and its Subsidiaries taken as a whole can pay their Stated Liabilities and Identified Contingent Liabilities as

they mature. For the purposes of this definition, capitalized terms used and not defined in this Agreement shall have the meanings provided for in Exhibit G.

"Special Committee" has the meaning assigned to such term in Section 5.15(i)(iii).

"Specified Acquisition Agreement Representations" means such of the representations and warranties in the Acquisition Agreement made by, or with respect to, the Acquired Company and its subsidiaries and its businesses as are material to the interests of the Lenders, but only to the extent that the Borrower (or any of its Affiliates) has the right (taking into account any applicable cure provisions) to terminate its or such Affiliates' obligations under the Acquisition Agreement or decline to consummate the Acquisition (in accordance with the terms thereof) as a result of a breach of such representations and warranties in the Acquisition Agreement.

"Specified Discount" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(1).

"Specified Discount Prepayment Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(1).

"Specified Discount Prepayment Notice" means an irrevocable written notice of the Borrower Offer of Specified Discount Prepayment made pursuant to Section 2.11(a)(ii)(B) substantially in the form of Exhibit J.

"Specified Discount Prepayment Response" means the irrevocable written response by each Term Lender, substantially in the form of Exhibit K, to a Specified Discount Prepayment Notice.

"Specified Discount Prepayment Response Date" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(1).

"Specified Discount Proration" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(3).

"Specified Representations" means the representations and warranties of the Borrower, and to the extent applicable, the other Loan Parties, set forth in Section 3.01(a), Section 3.01(b) (as it relates to the organizational power and authority to execute, deliver and perform obligations under each Loan Document to which each applicable Person is a party after giving effect to the Transactions), Section 3.02, Section 3.03(b)(i) (with respect to the incurrence of the loans and the provision of the Guarantees, in each case under the Loan Documents, and the granting of the security interests in the Collateral to secure the Secured Obligations), Section 3.08, Section 3.14, Section 3.15, Section 3.17(a) (with respect to the use of proceeds of the Term Facility on the Effective Date), 3.17(b) (with respect to the PATRIOT Act), and Section 3.18 (as it relates to the creation, validity and perfection of the security interests in the Collateral).

"Specified Transaction" means, with respect to any period, any Investment, sale, transfer or other disposition of assets, incurrence or repayment of Indebtedness, Restricted Payment, subsidiary designation or other event that by the terms of the Loan Documents requires "Pro Forma Compliance" with a test or covenant hereunder or requires such test or covenant to be calculated on a Pro Forma Basis.

"Store Accounts" shall have the meaning ascribed to the term "Store Accounts" in the ABL Credit Agreement as in effect on the date hereof.

"Submitted Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"Submitted Discount" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held (unless parent does not Control such entity), or (b) that is, as of such date, otherwise Controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent; in each case, whether existing as of the Effective Date or subsequently created or coming to exist.

"Subsidiary" means any subsidiary of the Lead Borrower (unless otherwise specified or the context otherwise requires); provided that on or after the Fifth Amendment Effective Date, Subsidiary shall exclude (unless otherwise expressly specified) any PSP Securitization Entity after any designation as such pursuant to Section 5.16.

"Subsidiary Loan Party" means (i) each Subsidiary of the Lead Borrower (other than FG Newco PSP, Valor and FG Newco Intermediate AF) that is a Material Subsidiary is party to the Guarantee Agreement and (ii) Badcock.

"Successor Borrower" has the meaning assigned to such term in Section 6.03(a)(iv).

"Supported QFC" has the meaning specified in Section 9.20.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Sylvan Sale Net Proceeds" means the Net Proceeds from the sale of all of the outstanding equity interests of Sylvan Learning, LLC pursuant to that certain Equity Purchase Agreement, dated as of February 16, 2024, by and between Educate, Inc., as seller, and Unleashed Brands, LLC, as buyer.

"Tax Restructuring" means any reorganizations and other activities related to tax planning and tax reorganization (as determined by Lead Borrower in good faith) entered into after the Effective Date so long as (i) such Tax Restructuring does not result in any Borrower or successor thereto being treated as other than a corporation or limited liability company organized and existing under the laws of any state of the United States of America or the District of Columbia, (ii) any Borrower that is currently treated as a corporation for U.S. federal income tax purposes shall remain a corporation for U.S. federal income tax purposes and (iii) Tax Restructuring does not materially impair the Guarantee, the Badcock Guarantee, the

security interests of the Agents and the Lenders under the Security Documents in the Collateral or the security interests of the Agents and the Lenders under the Badcock Security Documents in the Badcock Collateral, taken as a whole, and Borrower and its Subsidiaries otherwise comply with <u>Sections 5.11</u> and <u>5.12</u>.

"<u>Taxes</u>" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Commitment</u>" means, with respect to each Lender, the Initial Term Loan Commitment, if any, of such Lender to make Term Loans hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the Term Loans to be made by such Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to <u>Section 2.08</u> and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Lender pursuant to an Assignment and Assumption, (ii) a Refinancing Amendment or (iii) a Loan Modification Agreement.  The amount of each Lender's Term Commitment is set forth on <u>Schedule 2.01</u> or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Term Commitment, Loan Modification Agreement or Refinancing Amendment, as the case may be.  ~~As of the Effective Date, the total Term Commitment is $300,000,000.~~

"<u>Term Facility</u>" means the Term Loans provided to or for the benefit of the Borrower pursuant to the terms of this Agreement.

"<u>Term Lender</u>" means a Lender with a Term Commitment or an outstanding Term Loan.

"<u>Term Loans</u>" means, individually or collectively as the context requires, Initial Term Loans, Holdco Exchange Loans, and Other Term Loans.

"<u>Term Maturity Date</u>" means (a) in the case of the Initial Term Loans and the Holdco Exchange Loans, September 10, 2026 and (b) in the case of any Other Term Loan, the date set forth in the applicable documentation in respect thereof.

"<u>Term SOFR</u>" means, for any SOFR Loan, the Term SOFR Reference Rate and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 p.m. (New York City time), two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the Term SOFR Administrator.

"<u>Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"<u>Term SOFR Reference Rate</u>" means, for any day and time (such day, the "<u>Periodic Term SOFR Determination Day</u>"), with respect to any SOFR Loan and for any tenor comparable to the applicable Interest Period, the rate per annum published by the Term SOFR Administrator and identified by the Administrative Agent as the forward-looking term rate based on SOFR.  If by 5:00 pm (New York City time) on  such Periodic Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to Term SOFR has not occurred, then, so long as such day is otherwise a U.S. Government Securities Business Day, the Term SOFR Reference Rate for such Periodic Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government

Securities Business Day for which such Term SOFR Reference Rate was published by the Term SOFR Administrator, so long as such first preceding U.S. Government Securities Business Day is not more than five (5) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"Test Period" means, at any date of determination, the period of four consecutive fiscal quarters of the Lead Borrower then last ended as of such time for which financial statements are delivered pursuant to Section 5.01(a) or (b); provided that for any date of determination before the delivery of the first financial statements pursuant to Section 5.01(a) or (b), the Test Period shall be the period of four consecutive fiscal quarters of the Lead Borrower then last ended as of such time.

"Third Amendment Effective Date" means August 21, 2023.

"Toggle Term Effective Date" means the date on which each of the following conditions shall be satisfied:

(a) the Lead Borrower shall have provided the Required Lenders and Administrative Agent at least six (6) Business Days' prior written notice of an anticipated Toggle Term Effective Date;

(b) the ABL Intercreditor Agreement shall have been amended, amended and restated, terminated, or replaced, in each case such that the Toggle Terms shall not be prohibited by the terms thereof;

(c) the First Lien/Second Lien Intercreditor Agreement shall have been amended, amended and restated, terminated, or replaced, in each case such that the Toggle Terms shall not be prohibited by the terms thereof; and

(d) the Lead Borrower shall have delivered a certificate of a Responsible Officer of the Lead Borrower (in form and substance satisfactory to the Required Lenders) to the Administrative Agent certifying that each of the foregoing conditions have been satisfied.

"Toggle Term Floor" has the meaning assigned to such term in the definition of the term "Adjusted Term SOFR".

"Toggle Terms" means (a) the Toggle Term Floor, (b) the Leverage-Based Margin Increase, and (c) the Post-Toggle Term Effective Date Prepayment Premium.

"Total Net Leverage Ratio" means, as of any date of determination, the ratio, on a Pro Forma Basis, of (a) Consolidated Total Indebtedness as of such date to (b) Consolidated EBITDA for the most recently completed Test Period.

"Transaction Costs" means all fees, premiums, costs and expenses incurred or payable by the Borrower or any other Subsidiary in connection with the Transactions.

"Transactions" means (a) the Acquisition, (b) the execution and delivery of the Loan Documents, the creation of the Liens pursuant to the Security Documents and the incurrence of the Term Facility and the funding of the Initial Term Loans on the Effective Date, (c) the consummation of the other transactions contemplated by this Agreement on the Effective Date, (d) the consummation of any other transactions in connection with the foregoing, (e) the repayment of the existing Indebtedness under the Existing Term Loan Credit Agreement and the termination of such Existing Term Loan Credit Agreement

and the documents related thereto, (f) the repayment of the existing Indebtedness under the Existing FRG ABL Credit Agreement and the termination of the Existing FRG ABL Credit Agreement and the documents related thereto, (g) the execution and delivery of the ABL Credit Agreement and the other ABL Loan Documents (to the extent entered into on or after the Effective Date or otherwise originally entered into in connection with the ABL Credit Agreement rather than the Existing VSI ABL Credit Agreement), the creation or continuation on or after the Effective Date of the Liens pursuant to the Collateral Documents (as defined in the ABL Credit Agreement) and the incurrence or continuance of any borrowings thereunder to be incurred or continued on the Effective Date, (h) the execution and delivery of the First Lien Credit Agreement and the other First Lien Loan Documents, the creation on or after the Effective Date of the Liens pursuant to the Security Documents (as defined in the First Lien Credit Agreement) and the incurrence of any borrowings thereunder to be incurred on the Effective Date and (i) the payment of the Transaction Costs related thereto.

"Treasury Rate" means, as of any prepayment date, the yield to maturity as of such date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H. 15 (519) that has become publicly available at least three business days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date to the one-year anniversary of the Third Amendment Effective Date.

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Alternate Base Rate.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Special Resolution Regimes" has the meaning specified in Section 9.20.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral or the Badcock Collateral is governed by the Uniform Commercial Code as in effect in a U.S. jurisdiction other than the State of New York, the terms "UCC" and "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>Unaudited Financial Statements</u>" means (a) the unaudited consolidated balance sheet of the Lead Borrower and its Subsidiaries, and the related unaudited statements of income, cash flows and stockholders' equity, for the fiscal quarter of the Lead Borrower ended on or about September 30, 2020 and (b) the unaudited consolidated balance sheet of PSP and its Subsidiaries, and the related unaudited statements of income, cash flows and stockholders' equity, for the fiscal quarter of PSP ended on or about September 30, 2020.

"<u>Unfinanced Capital Expenditures</u>" means, for any period, capital expenditures paid in cash (other than cash constituting proceeds of long-term Indebtedness (other than revolving Indebtedness)) during such period, other than (a) the purchase price paid in connection with a Permitted Acquisition or other similar Investment not prohibited by this Agreement and expenditures made in connection with the Transactions, (b) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for such existing equipment being traded in at such time, (c) expenditures made with the proceeds of Dispositions, Casualty Events or similar dispositions or events that are not required to be applied to repay Indebtedness pursuant to the terms of this Agreement, the ABL Credit Agreement, the First Lien Credit Agreement, the Badcock First Lien Credit Agreement or the Badcock Second Lien Credit Agreement, (d) expenditures made in leasehold improvements, to the extent reimbursed by the landlord, (e) expenditures to the extent actually paid for by any Person other than any Borrower or Subsidiary and for which no Borrower or Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation in respect of the relevant expenditures to such Person, (f) property, plant and equipment taken in settlement of accounts and (g) that portion of interest on Indebtedness incurred for capital expenditures which is capitalized in accordance with GAAP.

"<u>United States Tax Compliance Certificate</u>" has the meaning assigned to such term in Section 2.17(e)(ii)(C).

"<u>Updated Budget</u>" has the meaning assigned to such term in Section 5.15(b).

"<u>Updated Budget Deadline</u>" has the meaning assigned to such term in Section 5.15(b).

"<u>USA PATRIOT Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"<u>Valor</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>Variance Report</u>" has the meaning assigned to such term in Section 5.15(c).

"<u>Variance Report Deadline</u>" has the meaning assigned to such term in Section 5.15(c).

"<u>Weighted Average Life to Maturity</u>" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"<u>Wholly Owned Subsidiary</u>" means any Subsidiary that is a wholly owned subsidiary.

"wholly owned subsidiary" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"Zero Balance Accounts" means Deposit Accounts in which a balance of zero is maintained by the depository institution at all times by automatically transferring funds from a master Deposit Account to such Zero Balance Account in an amount only large enough to cover checks presented and other debits to such account, such that any such Zero Balance Account maintains an overnight balance of zero dollars at all times.

SECTION 1.02    Classification of Loans and Borrowings.

For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Class (e.g., an "Initial Term Loan") or by Type (e.g., a "SOFR Loan" or "ABR Loan") or by Class and Type (e.g., a "SOFR Initial Term Loan"). Borrowings also may be classified and referred to by Class (e.g., an "Initial Term Loan Borrowing") or by Type (e.g., a "SOFR Borrowing") or by Class and Type (e.g., a "SOFR Initial Term Loan Borrowing").

SECTION 1.03    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document, including all schedules, exhibits and other attachments thereto and as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or other modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words

of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Notwithstanding anything to the contrary herein, unless specified otherwise herein or in any Second Lien Loan Document, any reference in this Agreement or any other Second Lien Loan Document to a "Loan Document" or "Loan Documents" shall be a reference to the applicable Second Lien Loan Document or Second Lien Loan Documents.

SECTION 1.04     Accounting Terms; GAAP.

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     Notwithstanding anything to the contrary herein, but subject to Section 1.09, for purposes of determining compliance with any test contained in this Agreement, the Total Net Leverage Ratio, the Secured Net Leverage Ratio, the Fixed Charge Coverage Ratio and any other financial ratio or test that are calculated with respect to any Test Period during which a Specified Transaction occurs shall be calculated on a Pro Forma Basis. Further, if since the beginning of any such Test Period and on or prior to the date of any required calculation of any financial ratio or test (x) any Specified Transaction has occurred or (y) any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries or any joint venture since the beginning of such Test Period has consummated any Specified Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Test Period as if such Specified Transaction had occurred at the beginning of the applicable Test Period (it being understood, for the avoidance of doubt, that solely for purposes of (x) calculating compliance with Section 6.10, if applicable and (y) the determination of "ECF Percentage", in each case, the date of the required calculation shall be the last day of the Test Period, and no Specified Transaction occurring thereafter shall be taken into account).

SECTION 1.05     Effectuation of Transactions.

All references herein to the Borrower and its Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of the Borrower and the other Loan Parties contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Transactions that occurred on the Effective Date, unless the context otherwise requires.

SECTION 1.06     Limited Conditionality Acquisition.

Notwithstanding anything in this Agreement or any Loan Document to the contrary, when calculating any applicable ratio, the amount or availability of the Available Amount or any other basket based on Consolidated EBITDA or total assets or whether a Default or Event of Default has occurred and is continuing or any representations and warranties have been complied with, in each case in connection with a Limited Condition Transaction, the date of determination of such ratio or other provisions, determination of whether any Default or Event of Default has occurred and is continuing shall, at the option of the Lead Borrower (the Lead Borrower's election to exercise such option in connection with any Limited Condition Transaction, an "LCA Election"), be deemed to be the date the definitive agreements for such Limited Condition Transaction are entered into or the date of the declaration or making of such Restricted

Payment constituting a Limited Condition Transaction or of the giving of irrevocable (which may be conditional) notice with respect to a repayment, repurchase or redemption of Indebtedness constituting a Limited Condition Transaction, or, as an alternative option with respect to Permitted Acquisitions or investments constituting Limited Condition Transactions, the date of a public announcement of an intention to make an offer in respect of the target of such Permitted Acquisition or investment (the "LCA Test Date") after giving Pro Forma Effect to such Limited Condition Transaction and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if such transactions occurred at the beginning of the applicable Test Period, and for the avoidance of doubt, if any of such ratios or other provisions are exceeded as a result of fluctuations in such ratio or amount (including due to fluctuations in Consolidated EBITDA of the Borrower or such person subject to such Limited Condition Transaction) or other provisions at or prior to the consummation of the relevant Limited Condition Transaction, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Transaction is permitted hereunder. If the Lead Borrower has made an LCA Election for any Limited Condition Transaction, then in connection with any subsequent calculation of any ratio on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated or the date that the definitive agreement for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, any such ratio shall be calculated (and tested) on a pro forma basis assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) had been consummated on the LCA Test Date.

SECTION 1.07    Certain Determinations.

(a)    Notwithstanding anything to the contrary herein, for purposes of the covenants described in Article V and Article VI, if any transaction or action would be permitted pursuant to one or more provisions described therein, the Borrower may divide and classify such transaction or action within the relevant covenant (or other provisions) in any manner that complies with such covenant (or other provision) set forth therein, and may later divide and reclassify any such transaction or action so long as the transaction or action (as so divided and/or reclassified) would be permitted to be made in reliance on the applicable exception (or other provisions) as of the date of such reclassification; provided that if any financial ratio or test governing any applicable Incurrence Based Amount would be satisfied in any subsequent period following the utilization of any Fixed Amount, such reclassification shall be deemed to have automatically occurred if not elected otherwise by the Lead Borrower; provided, further, that such reclassification shall not be permitted with respect to (i) the Indebtedness consisting of the Initial Term Loans, which shall only be permitted under Section 6.01(a)(i), or Liens with respect to the Initial Term Loans, which shall only be permitted under Section 6.02(i), (ii) the Indebtedness under the ABL Credit Agreement and the other ABL Loan Documents, which shall only be permitted under Section 6.01(a)(xxxi), or Liens with respect to the Loans (as defined in the ABL Credit Agreement), which shall only be permitted under Section 6.02(xvii), (iii) the Indebtedness consisting of the Initial Term Loans (as defined in the First Lien Credit Agreement), which shall only be permitted under Section 6.01(a)(xxxii), or Liens with respect to the Initial Term Loans (as defined in the First Lien Credit Agreement), which shall only be permitted under Section 6.02(xxi) and (iv) the Indebtedness under the Sidecar Pari Second Lien Credit Agreement, which shall only be permitted under Section 6.01(a)(xxx), or Liens securing obligations under the Sidecar Pari Second Lien Credit Agreement, which shall only be permitted under Section 6.02(xxxii). For the avoidance of doubt, if the applicable date for meeting any requirement hereunder or under any other Loan Document falls on a day that is not a Business Day, compliance with such requirement shall not be required until noon on the first Business Day following such applicable date.

(b)    Notwithstanding anything to the contrary herein, with respect to any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that

does not require compliance with a financial ratio or test (including any Total Net Leverage Ratio) (any such amounts, the "Fixed Amounts") substantially concurrently with any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that requires compliance with any such financial ratio or test (any such amounts, the "Incurrence Based Amounts"), it is understood and agreed that the Fixed Amounts (and any cash proceeds thereof) shall be disregarded in the calculation of the financial ratio or test applicable to the Incurrence Based Amounts in connection with such substantially concurrent incurrence.

(c)        Notwithstanding the foregoing, for purposes of any determination under Article V, Article VI or Article VII or any determination under any other provision of this Agreement subject to any Dollar limitation, threshold or basket, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than Dollars shall be translated into Dollars based on the relevant currency exchange rate in effect on the applicable date of determination (rounded to the nearest currency unit, with 0.5 or more of a currency unit being rounded upward); provided, however, that for purposes of determining compliance with Article VI with respect to any amount in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness, Lien or Investment is incurred or Disposition, Restricted Payment or prepayment, redemption, purchase, defeasance or other payment in respect of any Junior Financing is made or such transaction with an Affiliate is entered into; provided, further, that, for the avoidance of doubt, the foregoing provisions of this Section 1.07(c) shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness, Lien or Investment may be incurred or Disposition, Restricted Payment or prepayment, redemption, purchase, defeasance or other payments in respect of any Junior Financing may be made or such transaction with an Affiliate may be entered into at any time under such Sections. For purposes of any determination of Consolidated Total Indebtedness, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the most recently delivered financial statements pursuant to Section 5.01(a) or Section 5.01(b) adjusted to reflect the currency translation effects, determined in accordance with GAAP, of any Swap Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the dollar equivalent thereof. Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Borrower's consent (such consent not to be unreasonably withheld) to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

SECTION 1.08        Divisions.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.09        Interest Rates.

The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform. Upon the occurrence of a Benchmark Transition Event, Section 2.14(b) provides a mechanism for determining an alternative rate of interest.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any

alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability. Without limiting the Administrative Agent's obligations under this Agreement to determine interest rates as and to the extent set forth in this Agreement, the Administrative Agent shall not be under any obligation to (i) to monitor, determine or verify whether or when there has occurred any Benchmark Transition Event, Benchmark Replacement Date or Benchmark Unavailability Period, or (ii) select, determine or designate any Benchmark Replacement, or other successor or replacement benchmark index, or (iii) select, determine or designate any Benchmark Replacement Adjustment, or other modifier to any replacement or successor index (provided, that the Administrative Agent may be required to calculate Benchmark Replacement Adjustments or other modifiers as and to the extent set forth herein), or (iv) determine whether or what Benchmark Replacement Conforming Changes are necessary or advisable, if any, in connection with any of the foregoing. The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrowers.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrowers, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE II

## THE CREDITS

SECTION 2.01    Commitments.

Subject to the terms and conditions set forth herein, each Initial Term Loan Lender severally agrees to make an Initial Term Loan to the Borrower denominated in dollars on the Effective Date in a principal amount equal to its Initial Term Loan Commitment.  Amounts repaid or prepaid in respect of Term Loans may not be reborrowed.

SECTION 2.02    Loans and Borrowings.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, provided that the Commitments of the Lenders are several and other than as expressly provided herein with respect to a Defaulting Lender, no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

(b)    Subject to Section 2.14, each Term Loan Borrowing shall be comprised entirely of ABR Loans or SOFR Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement;

(c)     At the commencement of each Interest Period for any SOFR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that a SOFR Borrowing that results from a continuation of an outstanding SOFR Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of twelve (12) SOFR Borrowings outstanding.

SECTION 2.03     Requests for Borrowings.

To request a Term Loan Borrowing, the Lead Borrower shall notify the Administrative Agent of such request in writing by electronic mail or overnight courier (a) in the case of a SOFR Borrowing, not later than 12:00 p.m., New York City time, three (3) U.S. Government Securities Business Days before the date of the proposed Borrowing, (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one (1) Business Day before the date of the proposed Borrowing; provided that any notice given in connection with Borrowings on the Effective Date (including SOFR Borrowings) may be given not later than 2:00 p.m., New York City time, one (1) Business Day before the Effective Date; provided further that, in each case, the Administrative Agent may in its discretion accept any later request. Each such written Borrowing Request shall be signed by the Lead Borrower substantially in the form of Exhibit S and shall be irrevocable. Each such written Borrowing Request shall specify the following information:

(i)     whether the requested Borrowing is to be a Borrowing of Initial Term Loans and/or a Borrowing of any other Class (specifying the Class thereof);

(ii)     the aggregate amount of such Borrowing;

(iii)     the date of such Borrowing, which shall be a Business Day;

(iv)     whether such Borrowing is to be an ABR Borrowing or a SOFR Borrowing;

(v)     in the case of a SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(vi)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.06; and

(vii)     except in the case of any Borrowing that is made on the Effective Date, that as of the date of such Borrowing, the conditions set forth in Sections 4.02(a) and 4.02(b) are satisfied.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested SOFR Borrowing, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04        [Reserved].

SECTION 2.05        [Reserved].

SECTION 2.06        Funding of Borrowings.

(a)        Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, New York City time, to the Applicable Account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders or in accordance with Section 2.20 in the case of Holdco Exchange Loans. Upon satisfaction or waiver of the conditions precedent specified herein applicable to such Loan and receipt of all requested funds from each Lender (provided, for avoidance of doubt, that this sentence shall not limit any obligations of the Lenders to provide such funds), Administrative Agent will make such Loans available to the Borrower by promptly wiring the amounts so received, in like funds, to an account of the Borrower designated by the Lead Borrower in the applicable Borrowing Request.  Unless Lead Borrower has notified the Administrative Agent in writing (which notification may be by email) by not later than 5:00 p.m. (New York City time) on the Effective Date that it has not received the funds from IFRG Investors II, L.P. and Irradiant Solutions Fund, L.P., Administrative Agent shall deem those funds funded and make the appropriate recordations in the Register.

(b)        [Reserved].

(c)        The obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 9.03(c).

SECTION 2.07        Interest Elections.

(a)        Each Term Loan Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03. Thereafter, the Lead Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.07. The Lead Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)        To make an election pursuant to this Section 2.07, the Lead Borrower shall notify the Administrative Agent of such election in writing by electronic mail or overnight courier by the time that a Borrowing Request would be required under Section 2.03 if the Lead Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such written Interest Election Request shall be irrevocable and shall be signed by the Lead Borrower and shall be substantially in the form of Exhibit T.

(c)        Each written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)       the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)       the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)       whether the resulting Borrowing is to be an ABR Borrowing or a SOFR Borrowing; and

(iv)       if the resulting Borrowing is to be a SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a SOFR Borrowing but does not specify an Interest Period, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)       Promptly following receipt of an Interest Election Request in accordance with this Section 2.07, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)       If the Lead Borrower fails to deliver a timely Interest Election Request with respect to a SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Lead Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Borrowing and (ii) unless repaid, each SOFR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08       Termination and Reduction of Commitments.

(a)       Unless previously terminated, on the Effective Date, the Term Commitments in effect on such date shall terminate upon the making of the relevant Term Loans.

(b)       The Lead Borrower may at any time terminate, or from time to time reduce, the Commitments of any Class, provided that each reduction of the Commitments of any Class shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 unless such amount represents all of the remaining Commitments of such Class.

(c)       The Lead Borrower shall notify the Administrative Agent, in writing, of any election to terminate or reduce the Commitments under paragraph (b) of this Section 2.08 no later than 2:00 p.m., New York City time, at least one (1) Business Day prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section 2.08 shall be irrevocable. Any termination or reduction of the Commitments of any Class shall be permanent. Each reduction of the Commitments of any Class shall be made ratably among the Lenders in accordance with their respective Commitments of such Class.

SECTION 2.09    Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender as provided in Section 2.10.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section 2.09, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section 2.09 shall control.

(e)    Any Lender may request that the Loans of any Class made by it be evidenced by a Note. In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns).

SECTION 2.10    Repayment of Term Loans.

(a)    Subject to adjustment pursuant to paragraph (c) of this Section 2.10, the Borrower shall repay Term Loan Borrowings with respect to the Other Term Loans as specified in the applicable Refinancing Amendment or Loan Modification Agreement; provided, with respect to this clause (a), that any such payment due on a date that is not a Business Day shall instead be due on the next preceding Business Day.

(b)    To the extent not previously paid, all Term Loans shall be due and payable on the Term Maturity Date.

(c)    Notwithstanding anything contained herein to the contrary, any prepayment of a Term Loan Borrowing of any Class (i) pursuant to Section 2.11(a) shall be applied to reduce the subsequent scheduled and outstanding repayments of the Term Loan Borrowings of such Class to be made pursuant to this Section 2.10 as directed by the Lead Borrower (and absent such direction in direct order of maturity), and (ii) pursuant to Section 2.11(c) or 2.11(d) shall be applied to reduce the subsequent scheduled and outstanding repayments of the Term Loan Borrowings of such Class to be made pursuant to this Section 2.10, or, except as otherwise provided in any Refinancing Amendment or Loan Modification Agreement, pursuant to the corresponding section of such Refinancing Amendment or Loan Modification Agreement, as applicable, in direct order of maturity.

(d)     Prior to any repayment of any Term Loan Borrowings of any Class hereunder, the Borrower shall select the Borrowing or Borrowings of the applicable Class to be repaid and shall notify the Administrative Agent in writing by telecopy, electronic mail, facsimile or overnight courier of such election not later than 2:00 p.m., New York City time, one (1) Business Day before the scheduled date of such repayment. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing. Repayments of Term Loan Borrowings shall be accompanied by accrued interest on the amount repaid.

(e)     Notwithstanding anything to the contrary in this Agreement, at any time at which Sidecar Pari Second Lien Loans are outstanding, all prepayments of Term Loans shall be made on a ratable basis between the Term Loans and the Sidecar Pari Second Lien Loans based on the amounts of the Term Loans and Sidecar Pari Second Lien Loans that are then outstanding as if the Term Loans and the Sidecar Pari Second Lien Loans constituted a single Class of Loans (and, without duplication of any other provision in this Agreement, any required mandatory prepayment amount with respect to Term Loans shall be reduced by the amount of Sidecar Pari Second Lien Loans that are so repaid or prepaid).

SECTION 2.11     Prepayment of Loans.

(a)     (i)     Subject to Section 2.10(e) and to clause (b) below, the Lead Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty.

(ii)     Notwithstanding anything in any Loan Document to the contrary but subject to clause (b) below, so long as no Default or Event of Default has occurred and is continuing, the Borrower or any of its Subsidiaries may offer to prepay all or a portion of the outstanding Term Loans on the following basis:

(A)     the Borrower or any of its Subsidiaries shall have the right to make a voluntary prepayment of Term Loans at a discount to par (such prepayment, the "Discounted Term Loan Prepayment") pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers, in each case made in accordance with this Section 2.11(a)(ii); provided that the Borrower or any of its Subsidiaries shall not initiate any action under this Section 2.11(a)(ii) in order to make a Discounted Term Loan Prepayment unless (I) at least ten (10) Business Days shall have passed since the consummation of the most recent Discounted Term Loan Prepayment as a result of a prepayment made by the Borrower or any of its Subsidiaries on the applicable Discounted Prepayment Effective Date; or (II) at least three (3) Business Days shall have passed since the date the Borrower or any of its Subsidiaries were notified that no Term Lender was willing to accept any prepayment of any Term Loan and/or Other Term Loan at the Specified Discount, within the Discount Range or at any discount to par value, as applicable, or in the case of Borrower Solicitation of Discounted Prepayment Offers, the date of the Borrower's or any of its Subsidiaries' election not to accept any Solicited Discounted Prepayment Offers; provided, further, that each Lender participating in any Discounted Term Loan Prepayment acknowledges and agrees that in connection with such Discounted Term Loan Prepayment, (1) the Borrower then may have, and later may come into possession of, information regarding the Term Loans or the Loan Parties hereunder that is not known to such Lender and that may be material to a decision by such Lender to participate in such Discounted Term Loan Prepayment ("Excluded Information"), (2) such Lender has independently and, without reliance on the Borrower, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination

-89-

to participate in such Discounted Term Loan Prepayment notwithstanding such Lender's lack of knowledge of the Excluded Information and (3) none of the Borrower, its Subsidiaries, the Administrative Agent, or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by Requirements of Law, any claims such Lender may have against the Borrower, its Subsidiaries, the Administrative Agent, and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information; provided further that any Term Loan that is prepaid will be automatically and irrevocably cancelled.

(B)    (1)    Subject to the proviso to subsection (A) above, the Borrower or any of its Subsidiaries may from time to time offer to make a Discounted Term Loan Prepayment by providing the Auction Agent (with a copy to the Administrative Agent) with three (3) Business Days' notice in the form of a Specified Discount Prepayment Notice; provided that (I) any such offer shall be made available, at the sole discretion of the Borrower or any of its Subsidiaries, to each Term Lender and/or each Lender with respect to any Class of Term Loans on an individual tranche basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "Specified Discount Prepayment Amount") with respect to each applicable tranche, the tranche or tranches of Term Loans subject to such offer and the specific percentage discount to par (the "Specified Discount") of such Term Loans to be prepaid (it being understood that different Specified Discounts and/or Specified Discount Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such an event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $1,000,000 and whole increments of $500,000 in excess thereof and (IV) each such offer shall remain outstanding through the Specified Discount Prepayment Response Date. The Auction Agent will promptly provide each relevant Term Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York City time, on the third Business Day after the date of delivery of such notice to the relevant Term Lenders (the "Specified Discount Prepayment Response Date").

(2)    Each relevant Term Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its relevant then outstanding Term Loans at the Specified Discount and, if so (such accepting Term Lender, a "Discount Prepayment Accepting Lender"), the amount and the tranches of such Lender's Term Loans to be prepaid at such offered discount. Each acceptance of a Discounted Term Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable. Any Term Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(3)    If there is at least one Discount Prepayment Accepting Lender, the Borrower or any of its Subsidiaries will make prepayment of outstanding Term Loans pursuant to this subsection (B) to each Discount Prepayment Accepting Lender in accordance with the respective outstanding amount and tranches of Term Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to paragraph (2) above; provided that, if the aggregate principal amount of Term Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made pro-rata among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (in consultation with the Borrower or any of its Subsidiaries and subject to rounding requirements

of the Auction Agent made in its reasonable discretion) will calculate such proration (the "Specified Discount Proration"). The Auction Agent shall promptly, and in any case within three (3) Business Days following the Specified Discount Prepayment Response Date, notify (I) the Borrower or any of its Subsidiaries of the respective Term Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Term Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the tranches of Term Loans to be prepaid at the Specified Discount on such date, (III) each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, tranche and Type of Loans of such Lender to be prepaid at the Specified Discount on such date and (IV) the Administrative Agent of the Discounted Prepayment Effective Date, and the aggregate principal amount, tranche and Types of Loans to be prepaid at the Specified Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Borrower or any of its Subsidiaries and Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the Borrower or any of its Subsidiaries shall be due and payable by the Borrower or any of its Subsidiaries on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(C)    (1)    Subject to the proviso to subsection (A) above, the Borrower or any of its Subsidiaries may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent (with a copy to the Administrative Agent) with three (3) Business Days' notice in the form of a Discount Range Prepayment Notice; provided that (I) any such solicitation shall be extended, at the sole discretion of the Borrower or any of its Subsidiaries, to each Term Lender and/or each Lender with respect to any Class of Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Term Loans (the "Discount Range Prepayment Amount"), the tranche or tranches of Term Loans subject to such offer and the maximum and minimum percentage discounts to par (the "Discount Range") of the principal amount of such Term Loans with respect to each relevant tranche of Term Loans willing to be prepaid by the Borrower or any of its Subsidiaries (it being understood that different Discount Ranges and/or Discount Range Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such an event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $1,000,000 and whole increments of $500,000 in excess thereof and (IV) each such solicitation by the Borrower or any of its Subsidiaries shall remain outstanding through the Discount Range Prepayment Response Date. The Auction Agent will promptly provide each relevant Term Lender with a copy of such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding relevant Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York City time, on the third Business Day after the date of delivery of such notice to the relevant Term Lenders (the "Discount Range Prepayment Response Date"). Each relevant Term Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "Submitted Discount") at which such Term Lender is willing to allow prepayment of any or all of its then outstanding Term Loans of the applicable tranche or tranches and the maximum aggregate principal amount and tranches of such Lender's Term Loans (the "Submitted Amount") such Lender is willing to have prepaid at the Submitted Discount. Any Term Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Term Loan Prepayment of any of its Term Loans at any discount to their par value within the Discount Range.

(2)    The Auction Agent shall review all Discount Range Prepayment Offers received

on or before the applicable Discount Range Prepayment Response Date and shall determine (in consultation with the Borrower or any of its Subsidiaries and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Term Loans to be prepaid at such Applicable Discount in accordance with this subsection (C). The Borrower or any of its Subsidiaries agree to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by the Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "Applicable Discount") which yields a Discounted Term Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts. Each Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Submitted Amount (subject to any required proration pursuant to the following paragraph (3)) at the Applicable Discount (each such Lender, a "Participating Lender").

(3)     If there is at least one Participating Lender, the Borrower or any of its Subsidiaries will prepay the respective outstanding Term Loans of each Participating Lender in the aggregate principal amount and of the tranches specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; provided that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment of the principal amount of the relevant Term Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "Identified Participating Lenders") shall be made pro-rata among the Identified Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (in consultation with the Borrower or any of its Subsidiaries and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "Discount Range Proration"). The Auction Agent shall promptly, and in any case within five (5) Business Days following the Discount Range Prepayment Response Date, notify (I) the Borrower or any of its Subsidiaries of the respective Term Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Term Lender of the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount and tranches of Term Loans to be prepaid at the Applicable Discount on such date, (III) each Participating Lender of the aggregate principal amount and tranches of such Lender to be prepaid at the Applicable Discount on such date, (IV) if applicable, each Identified Participating Lender of the Discount Range Proration and (V) the Administrative Agent of the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid at the Applicable Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Borrower or any of its Subsidiaries and Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the Borrower or any of its Subsidiaries shall be due and payable by such Borrower on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(D)     (1)     Subject to the proviso to subsection (A) above, the Borrower or any of its Subsidiaries may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent (with a copy to the Administrative Agent) with three (3) Business Days' notice

in the form of a Solicited Discounted Prepayment Notice; provided that (I) any such solicitation shall be extended, at the sole discretion of the Borrower or any of its Subsidiaries, to each Term Lender and/or each Lender with respect to any Class of Term Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate dollar amount of the Term Loans (the "Solicited Discounted Prepayment Amount") and the tranche or tranches of Term Loans that the Borrower or any of its Subsidiaries is willing to prepay at a discount (it being understood that different Solicited Discounted Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such an event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than $1,000,000 and whole increments of $500,000 in excess thereof and (IV) each such solicitation by the Borrower or any of its Subsidiaries shall remain outstanding through the Solicited Discounted Prepayment Response Date. The Auction Agent will promptly provide each relevant Term Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York City time on the third Business Day after the date of delivery of such notice to the relevant Term Lenders (the "Solicited Discounted Prepayment Response Date"). Each Term Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date, and (z) specify both a discount to par (the "Offered Discount") such Term Lender is willing to allow to be applied to the prepayment of its then outstanding Term Loan and the maximum aggregate principal amount and tranches of such Term Loans (the "Offered Amount") such Term Lender is willing to have prepaid subject to such Offered Discount. Any Term Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Term Loans at any discount.

(2)     The Auction Agent shall promptly provide the Borrower or any of its Subsidiaries with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date. The Borrower or any of its Subsidiaries shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Term Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the Borrower or any of its Subsidiaries (the "Acceptable Discount"), if any. If the Borrower or any of its Subsidiaries elects to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the third Business Day after the date of receipt by the Borrower or any of its Subsidiaries from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this paragraph (2) (the "Acceptance Date"), the Borrower or any of its Subsidiaries shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount. If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from the Borrower or any of its Subsidiaries by the Acceptance Date, the Borrower or any of its Subsidiaries shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(3)     Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, within three (3) Business Days after receipt of an Acceptance and Prepayment Notice (the "Discounted Prepayment Determination Date"), the Auction Agent will determine (in consultation with the Borrower or any of its Subsidiaries and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the tranches of Term Loans (the "Acceptable Prepayment Amount") to be prepaid by the Borrower or any of its Subsidiaries at the Acceptable Discount in accordance with this Section 2.11(a)(ii)(D). If the

Borrower or any of its Subsidiaries elects to accept any Acceptable Discount, then the Borrower or any of its Subsidiaries agrees to accept all Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount. Each Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "Qualifying Lender"). The Borrower or any of its Subsidiaries will prepay outstanding Term Loans pursuant to this subsection (D) to each Qualifying Lender in the aggregate principal amount of and of the tranches specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; provided that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment of the principal amount of the Term Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "Identified Qualifying Lenders") shall be made pro-rata among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (in consultation with the Borrower or any of its Subsidiaries and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "Solicited Discount Proration"). On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the Borrower or any of its Subsidiaries of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Term Lender who made a Solicited Discounted Prepayment Offer of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Term Loans and the tranches to be prepaid to be prepaid at the Applicable Discount on such date, (III) each Qualifying Lender of the aggregate principal amount and the tranches of such Lender to be prepaid at the Acceptable Discount on such date, (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration and (V) the Administrative Agent of the Discounted Prepayment Effective Date, the Acceptable Discount, the Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the tranches to be repaid at the Applicable Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to such Borrower and Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to such Borrower shall be due and payable by such Borrower on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(E)      In connection with any Discounted Term Loan Prepayment, the Borrower or any of its Subsidiaries and the Lenders acknowledge and agree that the Auction Agent may require as a condition to any Discounted Term Loan Prepayment, the payment of reasonable and customary fees and expenses from the Borrower or any of its Subsidiaries in connection therewith.

(F)      If any Term Loan is prepaid in accordance with subsections (B) through (D) above, the Borrower or any of its Subsidiaries shall prepay such Term Loans on the Discounted Prepayment Effective Date. The Borrower or any of its Subsidiaries shall make such prepayment to the Auction Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, in immediately available funds not later than 11:00 a.m. (New York City time) on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the remaining principal installments (if any) of the relevant tranche of Term Loans on a pro rata basis across such installments. The Term Loans so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but

not including, the Discounted Prepayment Effective Date. Each prepayment of the outstanding Term Loans pursuant to this <u>Section 2.11(a)(ii)</u> shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable. The aggregate principal amount of the tranches and installments of the relevant Term Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the tranches of Term Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Term Loan Prepayment.

(G)    To the extent not expressly provided for herein, each Discounted Term Loan Prepayment shall be consummated pursuant to procedures consistent with the provisions in this <u>Section 2.11(a)(ii)</u>, established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the Borrower or any of its Subsidiaries.

(H)    Notwithstanding anything in any Loan Document to the contrary, for purposes of this <u>Section 2.11(a)(ii)</u>, each notice or other communication required to be delivered or otherwise provided to the Auction Agent (or its delegate) shall be deemed to have been given upon Auction Agent's (or its delegate's) actual receipt during normal business hours of such notice or communication; <u>provided</u> that any notice or communication actually received outside of normal business hours shall be deemed to have been given as of the opening of business on the next Business Day.

(I)    Each of the Borrower or any of its Subsidiaries and the Lenders acknowledges and agrees that the Auction Agent may perform any and all of its duties under this <u>Section 2.11(a)(ii)</u> by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate. The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Term Loan Prepayment provided for in this <u>Section 2.11(a)(ii)</u> as well as activities of the Auction Agent.

(J)    The Borrower or any of its Subsidiaries shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its offer to make a Discounted Term Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the applicable Specified Discount Prepayment Response Date, Discount Range Prepayment Response Date or Solicited Discounted Prepayment Response Date, as applicable (and if such offer is revoked pursuant to the preceding clauses, any failure by such Borrower to make any prepayment to a Term Lender, as applicable, pursuant to this <u>Section 2.11(a)(ii)</u> shall not constitute a Default or Event of Default under <u>Section 7.01</u> or otherwise)

(K)    Notwithstanding anything to the contrary in this Agreement, at any time at which Sidecar Pari Second Lien Loans are outstanding, (i) any offer to make a Discounted Term Loan Prepayment shall be made on a ratable basis to all Lenders and to all Lenders under and as defined in the Sidecar Pari Second Lien Credit Agreement based on the amounts of the Term Loans and Sidecar Pari Second Lien Loans that are then outstanding and (ii) any offer to make a Discounted Term Loan Prepayment may only be accepted by any Lender if such Lender accepts such offer on the same terms with respect to the Sidecar Pari Second Lien Loans that are held by such Lender and (iii) all Discounted Term Loan Prepayments to any Lender shall be made ratably between the Loans held by such Lender under this Agreement and the Sidecar Pari Second Lien Loans held by such Lender.

(b)    (i)    (A) Prior to the Toggle Term Effective Date, in the event that the Borrower (x) on or prior to the date that is six (6) months after the Effective Date, (I) prepays, repays, refinances,

repurchases, substitutes or replaces, in each case, voluntarily, all of the Initial Term Loans in connection with an Investment-Linked Refinancing Transaction, or (II) effects any amendment, modification or waiver of, or consent under, this Agreement resulting in an Investment-Linked Refinancing Transaction (including in the case of any required assignment pursuant to Section 9.02(c)), the Borrower shall pay to the Administrative Agent, for the account of each applicable Lender (including each Lender holding Initial Term Loans immediately prior to the consummation of such Investment-Linked Refinancing Transaction that withholds its consent to such Investment-Linked Refinancing Transaction and is replaced as a Non-Consenting Lender pursuant to Section 9.02(c)), (A) in the case of clause (I), a premium equal to the Make-Whole Premium on the aggregate principal amount of the Initial Term Loans so prepaid, repaid, refinanced, substituted or replaced and (B) in the case of clause (II), a fee equal to the Make-Whole Premium on the aggregate principal amount of the Initial Term Loans that are the subject of such Investment-Linked Refinancing Transaction outstanding immediately prior to such amendment, modification, waiver or consent, (y) on or prior to the date that is nine (9) months after the Effective Date, (I) other than in connection with or resulting in an Investment-Linked Refinancing Transaction, prepays, repays, refinances, repurchases, substitutes or replaces, in each case, voluntarily, all or any portion of the Initial Term Loans (including through the incurrence of Credit Agreement Refinancing Indebtedness or as a result of a Prepayment Event under clause (b) of the definition thereof), or all or any portion of the Initial Term Loans become due in advance of their stated maturity by acceleration pursuant to the terms hereof and are so repaid, or (II) effects any amendment, modification or waiver of, or consent under, this Agreement resulting in a transaction referred to in clause (I) of this clause (y) (including in the case of any required assignment pursuant to Section 9.02(c)), the Borrower shall pay to the Administrative Agent, for the account of each applicable Lender (including each Lender holding Initial Term Loans immediately prior to the consummation of such amendment, modification, waiver or consent that withholds its consent to such amendment, modification, waiver or consent and is replaced as a Non-Consenting Lender pursuant to Section 9.02(c)), (A) in the case of clause (I), a premium equal to the Make-Whole Premium on the aggregate principal amount of the Initial Term Loans so prepaid, repaid, refinanced, substituted or replaced or (B) in the case of clause (II), a fee equal to the Make-Whole Premium on the aggregate principal amount of the Initial Term Loans outstanding immediately prior to such amendment, modification, waiver or consent with respect to which a transaction referred to in clause (I) of this clause (y) has been effected pursuant to such amendment, modification waiver or consent, or (z) (I) prepays, repays, refinances, repurchases, substitutes or replaces, in each case, voluntarily, all or any portion of the Initial Term Loans (including through the incurrence of Credit Agreement Refinancing Indebtedness or as a result of a Prepayment Event under clause (b) of the definition thereof), or all or any portion of the Initial Term Loans become due in advance of their stated maturity by acceleration pursuant to the terms hereof, or (II) effects any amendment, modification or waiver of, or consent under, this Agreement resulting in a transaction referred to in clause (I) of this clause (z) (including in the case of any required assignment pursuant to Section 9.02(c)), the Borrower shall pay to the Administrative Agent, for the account of each applicable Lender (including each Lender holding Initial Term Loans immediately prior to the consummation of such amendment, modification, waiver or consent that withholds its consent to such amendment, modification, waiver or consent and is replaced as a Non-Consenting Lender pursuant to Section 9.02(c)), solely to the extent no premium, fee or other payment is due pursuant to clauses (x) or (y) of this Section 2.11(b)(i)(A) with respect thereto, (A) in the case of clause (I), a premium equal to 2.00% of the aggregate principal amount of the Initial Term Loans so prepaid, repaid, refinanced, substituted or replaced, or (B) in the case of clause (II), a fee equal to 2.00% of the aggregate principal amount of the Initial Term Loans outstanding immediately prior to such amendment, modification, waiver or consent with respect to which a transaction referred to in clause (I) of this clause (z) has been effected pursuant to such amendment, modification waiver or consent; and

(B) following the Toggle Term Effective Date, in the event that the Borrower (x) on or prior to the date that is the twelve-month anniversary of the Third Amendment Effective Date, (I) prepays, repays, refinances, repurchases, substitutes or replaces, all or any portion of the Initial Term Loans or Holdco Exchange Loans,

in each case, voluntarily, as a result of a Prepayment Event, or pursuant to Section 2.11(c) or Section 2.11(d), or all or any portion of the Initial Term Loans or Holdco Exchange Loans becomes due in advance of their stated maturity by acceleration pursuant to the terms hereof, or (II) effects any amendment, modification or waiver of, or consent under, this Agreement resulting in a transaction referred to in clause (I) of this clause (x), the Borrower shall pay to the Administrative Agent, for the account of each applicable Lender (including each Lender holding Initial Term Loans or Holdco Exchange Loans immediately prior to the consummation of such amendment, modification, waiver or consent that withholds its consent to such amendment, modification, waiver or consent and is replaced as a Non-Consenting Lender pursuant to Section 9.02(c)), a premium equal to the Post-Toggle Term Effective Date Make-Whole Premium on the aggregate principal amount of such Initial Term Loans or Holdco Exchange Loans so prepaid, repaid, refinanced, substituted, replaced or that become due or (y) during the period from and after the twelve-month anniversary of the Third Amendment Effective Date up to and including the date that is the twenty four-month anniversary of the Third Amendment Effective Date, (I) prepays, repays, refinances, repurchases, substitutes or replaces, all or any portion of the Initial Term Loans or Holdco Exchange Loans in each case, voluntarily, as a result of a Prepayment Event, or pursuant to Section 2.11(c) or Section 2.11(d), or all or any portion of the Initial Term Loans or Holdco Exchange Loans becomes due in advance of their stated maturity by acceleration pursuant to the terms hereof, or (II) effects any amendment, modification or waiver of, or consent under, this Agreement resulting in a transaction referred to in clause (I) of this clause (y), the Borrower shall pay to the Administrative Agent, for the account of each applicable Lender (including each Lender holding Initial Term Loans or Holdco Exchange Loans immediately prior to the consummation of such amendment, modification, waiver or consent that withholds its consent to such amendment, modification, waiver or consent and is replaced as a Non-Consenting Lender pursuant to Section 9.02(c)), a premium equal to 3.00% of the aggregate principal amount of the Initial Term Loans or Holdco Exchange Loans so prepaid, repaid, refinanced, substituted, replaced or that become due (collectively, the "Post-Toggle Term Effective Date Prepayment Premium"). No Post-Toggle Term Effective Date Prepayment Premium shall be payable on any prepayment, repayment, refinancing, repurchase, substitution or replacement of any of the Initial Term Loans or Holdco Exchange Loans and/or following any acceleration, thereof occurring after the Prepayment Premium Period.

The Post-Toggle Term Effective Date Prepayment Premium shall be payable in connection with  (i) any voluntary prepayments pursuant to Section 2.11(a) or mandatory prepayment pursuant to Section 2.11(c) or (d), (ii) an acceleration of the Loan Document Obligations in respect of an Event of Default, (iii) the sale of, or collection of, the Collateral following an Event of Default, (iv) sale of the Collateral in any insolvency proceeding or (v) the restructure, reorganization, or compromise of the Loan Document Obligations by the confirmation of a plan of reorganization or any other plan of compromise, restructure, or arrangement in any insolvency proceeding, in each case occurring during the Prepayment Premium Period. Without limiting the generality of the foregoing, it is understood and agreed that if, following the Toggle Term Effective Date, the Loan Document Obligations are accelerated or otherwise become due during the Prepayment Premium Period in each case as a result of an Event of Default during the Prepayment Premium Period (including, but not limited to, upon the occurrence or because of the commencement of any bankruptcy or insolvency proceeding or other proceeding or event pursuant to any applicable bankruptcy law, sale, disposition, or encumbrance (including that by operation of law or otherwise)), the Post-Toggle Term Effective Date Prepayment Premium, determined as of the date of acceleration or such date as the Borrowing otherwise becoming due during the Prepayment Premium Period, will also be automatically due and payable immediately upon acceleration as though said Loan Document Obligations were being repaid, prepaid, paid or assigned as of such date and shall constitute part of the Loan Document Obligations. The Post-Toggle Term Effective Date Prepayment Premium shall also be payable in the event the Loan Document Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure, or by any other means or the Loan Document Obligations are reinstated pursuant to section 1124 of the Bankruptcy Code, in each case to the extent occurring during the Prepayment Premium Period. If the Post-Toggle Term Effective Date Prepayment

Premium becomes due and payable pursuant to this Agreement, the Post-Toggle Term Effective Date Prepayment Premium shall be deemed to be principal of the Term Loans and Loan Document Obligations under this Agreement and interest shall accrue on the full principal amount of the Borrowing (including the Post-Toggle Term Effective Date Prepayment Premium) from and after the date of acceleration (or such date as the Term Loans otherwise become due during the Prepayment Premium Period). In the event the Post-Toggle Term Effective Date Prepayment Premium is determined not to be due and payable by order of any court of competent jurisdiction, including, without limitation, by operation of the Bankruptcy Code, despite any date of acceleration having occurred during the Prepayment Premium Period, the Post-Toggle Term Effective Date Prepayment Premium shall nonetheless constitute Loan Document Obligations under this Agreement for all purposes hereunder.  It is understood and agreed that the Make-Whole Premium and the Post-Toggle Term Effective Date Prepayment Premium, as the case may be, applicable at the time of a prepayment, repayment, refinancing, repurchase, substitution, replacement, or acceleration or becoming due as described above in this paragraph (a "Premium Event") shall constitute part of the Loan Document Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof. Any Make-Whole Premium, Post-Toggle Term Effective Date Prepayment Premium or other premium payable under the terms of this Agreement shall be presumed to be the liquidated damages sustained by each Lender as the result of the early termination, and the Borrower agrees that it is reasonable under the circumstances currently existing. EACH LOAN PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING MAKE-WHOLE PREMIUM, POST-TOGGLE TERM EFFECTIVE DATE PREPAYMENT PREMIUM OR OTHER PREMIUM IN CONNECTION WITH SUCH PREMIUM EVENT. The Borrower expressly agrees (to the fullest extent that it may lawfully do so) that: (A) each applicable Make-Whole Premium, Post-Toggle Term Effective Date Prepayment Premium,  or other premium described in this Section 2.11(b) above is reasonable for the circumstances with respect to which it is required and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) each of the Make-Whole Premium, Post-Toggle Term Effective Date Prepayment Premium and the other premium described in this Section 2.11(b) above shall be payable if and when due notwithstanding the then-prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay any applicable Make-Whole Premium, Post-Toggle Term Effective Date Prepayment Premium or other premium described in this Section 2.11(b) if and when due; and (D) the Borrower shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Borrower expressly acknowledges that its agreement to pay any Make-Whole Premium, Post-Toggle Term Effective Date Prepayment Premium or other premium described in this Section 2.11(b) if and when due to the Lenders as herein described is a material inducement to the Lenders to provide the Commitments and make the Loans. For the avoidance of doubt, the Administrative Agent shall have no obligation to calculate, or to verify the Borrower's or any Lender's calculation of, any Make-Whole Premium, Post-Toggle Term Effective Date Prepayment Premium or other premium due under this Agreement.

(ii)    All voluntary prepayments shall be applied ratably to Term Loans outstanding under the Term Facility and the Sidecar Pari Second Lien Loans, including in accordance with Section 2.10(e).  All voluntary prepayments of the Term Facility shall be applied to the remaining amortization payments (if any) under such Term Facility, as directed by the Lead Borrower (and absent such direction, in direct order of maturity thereof), including to any Class of extending or existing Term Loans in such order as the Lead Borrower may designate.

(c)    In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any of its Subsidiaries in respect of any Prepayment Event (other than any Prepayment Event in respect of ABL Priority Collateral (as defined in the ABL Intercreditor Agreement),

to the extent such Prepayment Event is in respect of ABL Priority Collateral, as determined by the Lead Borrower in good faith) the Borrower shall, within five (5) Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (b) of the definition of "Prepayment Event", on the date of such Prepayment Event), prepay Term Loan Borrowings (with respect to a Prepayment Event described in clause (b) of the definition of "Prepayment Event", (x) to the extent resulting from the incurrence of Credit Agreement Refinancing Indebtedness, limited to the applicable Refinanced Debt and (y) otherwise, on a *pro rata* basis among all Term Loan Borrowings) in an aggregate amount equal to the Prepayment Percentage (or, with respect to Net Proceeds in respect of a Prepayment Event triggered by clause (b) of the definition of "Prepayment Event", 100%) of the amount of such Net Proceeds; provided that, ~~in the case of any event described in clause (a)(III) of the definition of the term "Prepayment Event", if the Borrower or any of the Subsidiaries invest (or commit to invest) the Net Proceeds from such event (or a portion thereof) within 12 months after receipt of such Net Proceeds~~notwithstanding anything to the contrary contained in this Agreement, at all times, the Sylvan Sale Net Proceeds may be invested by the Borrower in the business of the Borrower and ~~the other~~its Subsidiaries ~~(including any acquisitions permitted under Section 6.04 and capital expenditures), then no prepayment shall be required pursuant to this paragraph in respect of such Net Proceeds in respect of such event (or the applicable portion of such Net Proceeds, if applicable) except to the extent of any such Net Proceeds therefrom that have not been so invested (or committed to be invested) by the end of such 12-month period (or if committed to be so invested within such 12-month period, have not been so invested within 180 days after the end of such 12-month period), at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been so invested (or committed to be invested); provided further that (1) the Lead Borrower may elect to deem expenditures that otherwise would be permissible reinvestments that occur prior to receipt of the Net Proceeds by or on behalf of the Borrower or any of its Subsidiaries in respect of any Prepayment Event triggered by clause (a)(III) of the definition of the term "Prepayment Event" to~~; provided further that, as of the Fifth Amendment Effective Date, all Sylvan Sale Net Proceeds have been reinvested in accordance with this Section 2.11(c)~~, so long as such deemed expenditure shall have been made no earlier than the earlier of execution of a definitive agreement and consummation of such transaction, in each case, for such Prepayment Event triggered by clause (a)(III) of the definition of the term "Prepayment Event"; (2) the Borrower may use a portion of such Net Proceeds in respect of a Prepayment Event triggered by clause (a)(III) of the definition of "Prepayment Event" to prepay or repurchase any Credit Agreement Refinancing Indebtedness that is secured on a pari passu basis with the Term Loans, in each case in an amount not to exceed the product of (x) the amount of such Net Proceeds and (y) a fraction, the numerator of which is the outstanding principal amount of such Credit Agreement Refinancing Indebtedness and the denominator of which is the aggregate outstanding principal amount of Term Loans and such Credit Agreement Refinancing Indebtedness, and such amount so used shall reduce on a dollar-for-dollar basis, any prepayment amount due hereunder in respect of such Net Proceeds and (3) the foregoing reinvestment rights shall not be applicable and the Borrower shall be required to prepay Term Loan Borrowings with 100% of the Net Proceeds of any Prepayment Event triggered by (i) clause (a)(III) of the definition of "Prepayment Event" with respect to any non-ordinary course sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries pursuant to Section 6.05(k) if the Total Net Leverage Ratio, determined on a pro forma basis after giving effect to any such Prepayment Event, is greater than the Total Net Leverage Ratio immediately prior to giving effect to such Prepayment Event and (ii) clause (a)(I) or (a)(II) of the definition of "Prepayment Event".~~.

(d)    Following the end of each fiscal year of the Lead Borrower, commencing with the fiscal year ending on or about December 31, 2021 (each, an "Excess Cash Flow Period"), the Borrower shall prepay Term Loan Borrowings in an aggregate amount equal to the ECF Percentage (after giving effect to any adjustment pursuant to the Permitted ECF Recalculation Considerations (as defined below)) of Excess Cash Flow for such fiscal year; provided that such amount shall be reduced, at the option of the Borrower, by the aggregate amount (other than any amount applied to reduce the prepayment required under this clause (d) in respect of any prior year) of: (i) voluntary prepayments of Term Loans (as defined

in the First Lien Credit Agreement) or Term Loans during such fiscal year or, at the option of the Borrower, after such fiscal year and prior to the time such prepayment is due as provided below (provided that such reduction as a result of prepayments pursuant to Section 2.11(a)(ii) of the First Lien Credit Agreement or Section 2.11(a)(ii) hereof shall be limited to the actual amount of such cash prepayment) (in each case, excluding all such prepayments funded with the proceeds of other long-term Indebtedness (other than revolving Indebtedness) or Disqualified Equity Interests), (ii) (A) voluntary prepayments of (x) Indebtedness under the Badcock First Lien Credit Agreement and/or the Badcock Second Lien Credit Agreement and (y) Indebtedness secured on a *pari passu* basis with the Term Loans that are incurred under Incremental Facilities, Incremental Equivalent Debt, Credit Agreement Refinancing Indebtedness or Ratio Debt secured on a *pari passu* basis with the Term Loans (each of the foregoing capitalized terms in this clause (ii)(A), as defined in the First Lien Credit Agreement), in each case, during such fiscal year or, at the option of the Borrower, after such fiscal year and prior to the time such prepayment is due as provided below (provided that such reduction as a result of prepayments pursuant to Section 2.11(a)(ii) of the First Lien Credit Agreement or similar provisions therein shall be limited to the actual amount of such cash prepayment) (in each case, excluding all such prepayments funded with the proceeds of other long-term Indebtedness (other than revolving Indebtedness) or Disqualified Equity Interests) and (B) voluntary prepayments of Indebtedness secured on a *pari passu* basis with the Term Loans that are incurred under Credit Agreement Refinancing Indebtedness during such fiscal year or, at the option of the Borrower, after such fiscal year and prior to the time such prepayment is due as provided below (provided that such reduction as a result of prepayments pursuant to Section 2.11(a)(ii) or similar provisions herein shall be limited to the actual amount of such cash prepayment) (in each case, excluding all such prepayments funded with the proceeds of other long-term Indebtedness (other than revolving Indebtedness) or Disqualified Equity Interests), (iii) except to the extent deducted in the calculation of Excess Cash Flow, the amount of any reduction in the outstanding amount of any Term Loans (as defined in the First Lien Credit Agreement) resulting from any assignment made in accordance with Section 9.04(g) of the First Lien Credit Agreement or Term Loans resulting from any assignment made in accordance with Section 9.04(g) during such fiscal year or, at the option of the Borrower, after such fiscal year and prior to the time such prepayment is due as provided below (provided that such reduction shall be limited to the actual amount of cash paid in connection with the relevant assignment) (in each case, excluding all such prepayments funded with the proceeds of other long-term Indebtedness (other than revolving Indebtedness) or Disqualified Equity Interests), (iv) prepayments of revolving loans under the ABL Credit Agreement or any other revolving credit facility secured by a Lien on the Collateral and the Badcock Collateral ranking *pari passu* with the Lien on the Collateral and the Badcock Collateral securing the ABL Credit Agreement or senior or *pari passu* with the Lien on the Collateral and the Badcock Collateral securing the Indebtedness hereunder, in each case, to the extent accompanied by a permanent reduction in commitments therefor and not financed with the incurrence of other long-term Indebtedness (other than revolving Indebtedness or Disqualified Equity Interests), in each case, during such fiscal year or, at the option of the Borrower, after such fiscal year and prior to the time such prepayment is due as provided below, (v) except to the extent deducted in the calculation of Excess Cash Flow, without duplication of any Contract Consideration already deducted in a previous Excess Cash Flow Period, capital expenditures, Permitted Acquisitions or other Investments not prohibited by this Agreement (other than Investments among the Borrower and its Subsidiaries and Investments in cash or Permitted Investments) during such fiscal year and, at the option of the Borrower, after fiscal year-end and prior to the date such prepayment is due as provided below (or committed during such period to be used for such purposes within the succeeding twelve month period, in each case subject to reversal of such deduction if any such committed amount is not actually expended within such twelve-month period), (vi) except to the extent deducted in the calculation of Excess Cash Flow, Restricted Payments (other than Restricted Payments made by any Borrower or Subsidiary to any other Borrower or Subsidiary) and prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing, in each case, during such fiscal year or, at the option of the Borrower, after such fiscal year and prior to the time such prepayment is due as provided below (or committed during such period to be used for such purposes within the succeeding twelve month period, in each case subject to reversal of

such deduction if any such committed amount is not actually expended within such twelve-month period), (vii) (A) regularly scheduled principal payments in respect of (x) any Term Loans (as defined in the First Lien Credit Agreement), (y) Indebtedness under the Badcock First Lien Credit Agreement and/or the Badcock Second Lien Credit Agreement or (z) Indebtedness secured on a *pari passu* basis with the Term Loans (as defined in the First Lien Credit Agreement) that are incurred under Incremental Facilities (as defined in the First Lien Credit Agreement), Incremental Equivalent Debt (as defined in the First Lien Credit Agreement), Credit Agreement Refinancing Indebtedness (as defined in the First Lien Credit Agreement) or Ratio Debt (as defined in the First Lien Credit Agreement) secured on a *pari passu* basis with the Term Loans (as defined in the First Lien Credit Agreement) and (B) regularly scheduled principal payments in respect of any Indebtedness secured on a *pari passu* basis with the Term Loans that are incurred under Credit Agreement Refinancing Indebtedness and (viii) transaction costs and expenses related to items set forth in the preceding clauses (i) through (vii) (any payments described in the foregoing clauses (i) through (viii) of this proviso that are made after the end of the applicable Excess Cash Flow Period but prior to the making of the applicable prepayment in respect of such Excess Cash Flow Period being referred to herein as an "After Year End Payment"); provided that (1) an Excess Cash Flow payment pursuant to this clause (d) shall only be required with respect to amounts in excess of $10,000,000 for any Excess Cash Flow Period (and only such excess amount shall be applied to the payment thereof) and (2) following the making of any After Year End Payment, (i) the Secured Net Leverage Ratio shall be recalculated giving Pro Forma Effect to such After Year End Payment as if such payment were made during the applicable Excess Cash Flow Period and the ECF Percentage for purposes of making such Excess Cash Flow prepayment shall be determined by reference to such recalculated Secured Net Leverage Ratio and (ii) such After Year End Payment shall not be applied to the calculation of the Secured Net Leverage Ratio in connection with the determination of the ECF Percentage for purposes of (and shall not reduce the required amount of) any subsequent Excess Cash Flow payment in another Excess Cash Flow Period (the foregoing the "Permitted ECF Recalculation Considerations"). Notwithstanding anything to the contrary in the foregoing, the Borrower may use a portion of such amount of Excess Cash Flow (as so reduced) in respect of any such fiscal year of the Lead Borrower that would otherwise be required to be applied to prepay Term Loans to prepay or repurchase any Credit Agreement Refinancing Indebtedness that is secured by the Collateral and the Badcock Collateral on a *pari passu* basis with the Term Loans to the extent such other Indebtedness and the Liens securing such other Indebtedness are permitted hereunder, in each case in an amount not to exceed the product of (A) the amount of Excess Cash Flow (as so reduced) in respect of such fiscal year otherwise required to be applied to prepay Term Loan Borrowings (without giving effect to this sentence) and (B) a fraction, the numerator of which is the outstanding principal amount of such Credit Agreement Refinancing Indebtedness and the denominator of which is the aggregate outstanding principal amount of Term Loans and such Credit Agreement Refinancing Indebtedness. Each prepayment pursuant to this paragraph shall be made on or before the date that is five Business Days after the date on which financial statements are required to be delivered pursuant to Section 5.01(a) with respect to the fiscal year for which Excess Cash Flow is being calculated.

(e)     Prior to any optional prepayment of Borrowings pursuant to Section 2.11(a)(i), the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (f) of this Section 2.11. In the event of any mandatory prepayment of Term Loan Borrowings made at a time when Term Loan Borrowings of more than one Class remain outstanding, the Borrower shall select Term Loan Borrowings to be prepaid so that the aggregate amount of such prepayment is allocated between Term Loan Borrowings (and, to the extent provided in the Refinancing Amendment or Loan Modification Agreement for any Class of Other Term Loans, the Borrowings of such Class) *pro rata* based on the aggregate principal amount of outstanding Borrowings of each such Class; provided that any Term Lender (and, to the extent provided in the Refinancing Amendment or Loan Modification Agreement for any Class of Other Term Loans, any Lender that holds Other Term Loans of such Class) may elect, by notice to the Administrative Agent in writing by electronic mail or overnight courier no later than 2:00 p.m., New York City time, two (2) Business Days prior to the

prepayment date, to decline all or any portion of any prepayment of its Term Loans or Other Term Loans of any such Class pursuant to this Section 2.11 (other than an optional prepayment pursuant to paragraph (a)(i) of this Section or a mandatory prepayment as a result of the Prepayment Event set forth in clause (b) of the definition thereof, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Term Loans or Other Term Loans of any such Class but was so declined (to the extent remaining after compliance with any applicable mandatory prepayment provisions of the ABL Credit Agreement and the First Lien Credit Agreement) shall be retained by the Borrower and added to the Available Amount (such amounts, "Retained Declined Proceeds"). Any Lender that fails to provide written notice to the Administrative Agent in the time frame set forth above shall be deemed to have accepted the prepayment. Optional prepayments of Term Loan Borrowings shall be allocated among the Classes of Term Loan Borrowings as directed by the Borrower, and in the absence of a designation by the Borrower, in direct order of maturity (to the extent relevant), and subject to the foregoing, the Administrative Agent shall apply such prepayments in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16; provided that, in connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to Section 2.11(c) or (d), such prepayments shall be applied on a *pro rata* basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are ABR Loans or SOFR Loans.

(f)        The Borrower shall notify the Administrative Agent of any optional prepayment pursuant to Section 2.11(a)(i) or mandatory prepayment pursuant to Section 2.11(c) or (d) in writing by electronic mail or overnight courier of any prepayment hereunder (i) in the case of voluntary prepayment of a SOFR Borrowing, not later than 11:00 a.m., New York City time, three (3) U.S. Government Securities Business Days before the date of prepayment, (ii) in the case of voluntary prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one (1) Business Day before the date of prepayment or (iii) in the case of a mandatory prepayment, not later than 2:00 p.m., New York City time, three (3) Business Days prior to the date of such prepayment (or, in each case, such later date or date which the Administrative Agent may agree to in its sole discretion). Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13, and subject to Section 2.11(b), shall be without premium or penalty. At the Borrower's election in connection with any prepayment pursuant to this Section 2.11, such prepayment shall not be applied to any Term Loan of a Defaulting Lender (under any of subclauses (a), (b) or (c) of the definition of "Defaulting Lender") and shall be allocated ratably among the relevant non-Defaulting Lenders.

(g)        Notwithstanding any other provisions of Section 2.11(c) or (d), (A) to the extent that any of or all the Net Proceeds of any Prepayment Event set forth in clause (a)(III) of the definition thereof by a Foreign Subsidiary giving rise to a prepayment pursuant to Section 2.11(c) (a "Foreign Prepayment Event") or Excess Cash Flow of a Foreign Subsidiary giving rise to a payment pursuant to Section 2.11(d) are prohibited by, would violate or conflict with, or be delayed by, applicable local law from being repatriated to the Borrower, the portion of such Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in Section 2.11(c) or (d), as

the case may be, and such amounts may be retained by such Subsidiary so long, but only so long, as the Lead Borrower determined in good faith that the applicable local law will not permit repatriation to the Borrower and once the Lead Borrower has determined in good faith that such repatriation of any of such affected Net Proceeds or Excess Cash Flow is permitted under the applicable local law, such repatriation will be effected as soon as practicable and such repatriated Net Proceeds or Excess Cash Flow will be applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans pursuant to <u>Section 2.11(c)</u> or <u>(d)</u>, as applicable, (B) to the extent that and for so long as the Lead Borrower has determined in good faith that repatriation of any or all of the Net Proceeds of any Foreign Prepayment Event or Excess Cash Flow of a Foreign Subsidiary giving rise to a payment pursuant to <u>Section 2.11(d)</u> would have a material adverse tax or cost consequence with respect to such Net Proceeds or Excess Cash Flow, the Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in <u>Section 2.11(c)</u> or <u>Section 2.11(d)</u>, as the case may be, and such amounts may be retained by such Subsidiary; <u>provided</u> that if the Lead Borrower determines in good faith that repatriation of any of or all the Net Proceeds of any Foreign Prepayment Event or Excess Cash Flow so affected would no longer have a material adverse tax consequence with respect to such Net Proceeds or Excess Cash Flow, such Net Proceeds or Excess Cash Flow shall be applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans pursuant to <u>Section 2.11(c)</u> or <u>Section 2.11(d)</u>, as applicable, and (C) to the extent that and for so long as the Lead Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Prepayment Event or Excess Cash Flow would conflict with the fiduciary duties of a Subsidiary's directors, or result in, or could reasonably be expected to result in, a material risk of personal or criminal liability for any officer, director, employee, manager, member or management or consultant of such Subsidiary, the Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in <u>Section 2.11(c)</u> or <u>Section 2.11(d)</u>, as the case may be, and such amounts may be retained by such Subsidiary.

(h)      Notwithstanding anything to the contrary herein, until the Discharge of First Lien Obligations (as defined in the First Lien/Second Lien Intercreditor Agreement) has occurred, the Borrower shall only be required to make mandatory prepayments pursuant to <u>Sections 2.11(c)</u> and <u>(d)</u> by applying any such amounts that are otherwise (i.e., in the absence of this clause (h)) required to be used to make a mandatory prepayment pursuant to <u>Sections 2.11(c)</u> or <u>(d)</u> and that are declined or waived by the holders of the First Lien Obligations (as defined in the First Lien/Second Lien Intercreditor Agreement) (<u>provided</u>, for avoidance of doubt, if the applicable First Lien Loan Documents (as defined in the First Lien/Second Lien Intercreditor Agreement) provide that mandatory payments that are declined or waived by certain holders of First Lien Obligations (as defined in the First Lien/Second Lien Intercreditor Agreement) thereunder shall be offered to any other holders of First Lien Obligations (as defined in the First Lien/Second Lien Intercreditor Agreement), such payments shall not be considered declined or waived for purposes of this clause (h) until such payments shall have been declined or waived by all applicable holders of First Lien Obligations (as defined in the First Lien/Second Lien Intercreditor)) as a mandatory repayment of Loans, and such mandatory repayment shall be made in accordance with the requirements of this <u>Section 2.11</u> within five (5) Business Days after the applicable deadline for the holders of such First Lien Obligations to decline or waive such payment; <u>provided</u>, <u>further</u>, that notwithstanding anything to the contrary in this Agreement, a mandatory prepayment of the Term Loans with any amounts with respect to which the holders of the First Lien Obligations (as defined in the First Lien/Second Lien Intercreditor Agreement) have declined or waived a prepayment shall not be subject to any prepayment premium or fee pursuant to <u>Section 2.11(b)</u> hereof.

(i)      Any mandatory prepayments by the Borrower of the Term Loans pursuant to <u>Section 2.11(c)</u> or <u>(d)</u> shall be applied ratably to Term Loans outstanding under the Term Facility and the Sidecar Pari Second Lien Loans, including in accordance with <u>Section 2.10(e)</u>.

SECTION 2.12    Fees.

(a)    [Reserved].

(b)    [Reserved].

(c)    The Borrower agrees to pay (i) to the Administrative Agent, for its own account, fees in respect of the Term Facility payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent in the Administrative Agent Fee Letter and (ii) to the Commitment Parties (or their Affiliates) and/or the Administrative Agent, as applicable, for their accounts or the accounts of the Lenders (as specified therein), fees in respect of the Term Facility payable in the amounts and at the times separately agreed upon between the Borrower and the Commitment Parties in each Lender Fee Letter.

(d)    Notwithstanding the foregoing, and subject to Section 2.22, the Borrower shall not be obligated to pay any amounts to any Defaulting Lender pursuant to Section 2.11(d) and this Section 2.12.

SECTION 2.13    Interest.

(a)    The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)    The Loans comprising each SOFR Borrowing shall bear interest at Adjusted Term SOFR for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)    Notwithstanding the foregoing, if upon the occurrence and during the continuance of any Event of Default under paragraph (a), (b), (h) or (i) of Section 7.01 any principal of or interest on any Loan or any fee or other amount payable by any Loan Party under a Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, all overdue principal amounts of the Loans shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of the principal of any Loan, 2.00% per annum plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section 2.13 or (ii) in the case of any other amount, 2.00% per annum plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section 2.13; provided that no amount shall be payable pursuant to this Section 2.13(c) to a Defaulting Lender so long as such Lender shall be a Defaulting Lender; provided, further that no amounts shall accrue pursuant to this Section 2.13(c) on any overdue amount or other amount payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(d)    Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan, provided that (i) interest accrued pursuant to paragraph (c) of this Section 2.13 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion; provided, further, that the Interest Payment Date which would otherwise occur on or around September 13, 2024 shall be October 30, 2024.

(e)    All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Adjusted Term

SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.14    Benchmark Unavailability; Benchmark Replacement Setting.

(a)    If prior to the commencement of any Interest Period for a SOFR Borrowing:

(1)    the Administrative Agent or the Required Lenders determine (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining Adjusted Term SOFR or Term SOFR, as applicable, for such Interest Period; provided that no Benchmark Transition Event with respect to such benchmark shall have occurred at such time; or

(2)    the Administrative Agent or the Required Lenders determine that for any reason Adjusted Term SOFR or Term SOFR, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then in each such case, the Administrative Agent shall give notice thereof to the Lead Borrower and the Lenders in writing by telecopy, electronic mail, facsimile or overnight courier as promptly as practicable thereafter and, until the Administrative Agent notifies the Lead Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a SOFR Borrowing shall be ineffective and (ii) if any Borrowing Request requests a SOFR Borrowing, then such Borrowing shall be made as an ABR Borrowing; provided, however, that, in each case, the Lead Borrower may revoke any Borrowing Request that is pending when such notice is received.

(b)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document (and any Swap Agreement shall be deemed not to be a "Loan Document" for purposes of this Section 2.14), if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(c)    Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Required Lenders (in consultation with the Lead Borrower) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document; provided that, without the Administrative Agent's express written consent, the Administrative Agent shall not be bound to follow or agree to any Benchmark Replacement Conforming Changes that would (i) increase or materially change or affect the duties, obligations or liabilities of the Administrative Agent (including without limitation the imposition or expansion of discretionary authority), or reduce, eliminate, limit or otherwise change any right, privilege or protection of the Administrative Agent, in each case, in a manner that would be materially adverse to the interests of the Administrative Agent, or (ii) otherwise materially and adversely affect the Administrative Agent, in each case of clauses (i) and (ii) hereof, as determined by the Administrative Agent in its reasonable judgment.

(d)      *Notices; Standards for Decisions and Determinations*. The Required Lenders will promptly notify, in writing, the Lead Borrower and the Administrative Agent of the occurrence of a Benchmark Transition Event, and the applicable Benchmark Replacement and Benchmark Replacement Date with respect thereto, and upon receipt of such notice, the Administrative Agent will promptly (and in any event within one (1) Business Day) notify the Lenders of such Benchmark Transition Event and its related Benchmark Replacement and Benchmark Replacement Date. Promptly (and in any event within one (1) Business Day) upon receipt of notice thereof from the Required Lenders, the Administrative Agent will notify the Lenders of, as applicable, (i) the effectiveness of any Benchmark Replacement Conforming Changes, (ii) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (e) below and (iii) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Lenders (or any group of Lenders) pursuant to this <u>Section 2.14</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 2.14</u>. In the event that the then current Benchmark is not available on any determination date, then unless the Administrative Agent is notified, in writing, of a replacement Benchmark in accordance with the provisions of this Agreement within two (2) Business Days, the Administrative Agent shall use the interest rate in effect for the immediately prior Interest Period.

(e)      *Unavailability of Tenor of Benchmark*. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will no longer be representative, then the Required Lenders may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Required Lenders may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor, and the Required Lenders shall promptly notify the Administrative Agent and the Lead Borrower of any such modification.  In the event that the applicable Benchmark is not available on any determination date, then unless the Administrative Agent is notified of a replacement Benchmark in accordance with the provisions of this Agreement within two (2) Business Days, the Administrative Agent shall use the interest rate in effect for the immediately prior Interest Period.

(f)      *Benchmark Unavailability Period*. Upon the Lead Borrower's receipt of notice from the Required Lenders of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

SECTION 2.15    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender;

(ii)    subject the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document to any Taxes (other than Indemnified Taxes, Other Taxes or Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or otherwise), then, from time to time upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such increased costs actually incurred or reduction actually suffered; provided that the Borrower shall not be liable for such compensation if, in the case of requests for reimbursement under clause (ii) above resulting from a market disruption, (A) the relevant circumstances are not generally affecting the banking market or (B) the applicable request has not been made by the Majority in Interest of Term Lenders with respect to Term Loans; provided, further, that to the extent any such costs or reductions are incurred by any Lender as a result of any requests, rules, guidelines or directives enacted or promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and Basel III, then such Lender shall be compensated pursuant to this Section 2.15(a) only to the extent such Lender is imposing such charges on similarly situated borrowers where the terms of other syndicated credit facilities permit it to impose such charges.

(b)    If any Lender determines that any Change in Law regarding capital requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then, from time to time upon request of such Lender, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section 2.15 delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to

the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.16    Break Funding Payments.

In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Term Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(f) and is revoked in accordance therewith) or (d) the assignment of any SOFR Loan other than on the last day of the Interest Period (other than in connection with the Partial 2L Discharge) applicable thereto as a result of a request by the Borrower pursuant to Section 2.19 or Section 9.02(c), then, in any such event, the Borrower shall, after receipt of a written request by any Lender affected by any such event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the loss, cost and expense (excluding loss of profit) actually incurred by it as a result of such event. Such loss, cost or expense shall in no event exceed that which would have been incurred by such Lender had it funded each SOFR Loan made by it at Adjusted Term SOFR for such Loan by a matching borrowing for a comparable amount and for a comparable period, whether or not such SOFR Loan was in fact so funded. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 and the reasons therefor delivered to the Borrower (with a copy to the Administrative Agent) shall be prima facie evidence of such amounts. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt of such demand. Notwithstanding the foregoing, this Section 2.16 will not apply to losses, costs or expenses resulting from Taxes, as to which Section 2.17 shall govern. Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.16 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in similar circumstances under comparable provisions of other credit agreements.

SECTION 2.17    Taxes.

(a)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable Requirements of Law. If the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct any Taxes from such payments, then the applicable withholding agent shall make such deductions and shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law, and if such Taxes are Indemnified Taxes, then the amount payable by the applicable Loan Party shall be increased as necessary so that after all such required deductions have been made (including such deductions applicable to additional amounts payable under this Section 2.17), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions been made.

(b)    The Borrower shall timely pay to the relevant Governmental Authority in accordance with Requirements of Law or, at the option of the Administrative Agent, timely reimburse it for the payment of, any Other Taxes.

-108-

(c)     The Borrower, jointly and severally, shall indemnify the Administrative Agent and each Lender within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of any Loan Party under any Loan Document, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of any Taxes by a Loan Party to a Governmental Authority pursuant to this Section 2.17, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Each Lender shall, at such times as are reasonably requested by Borrower or the Administrative Agent, provide Borrower and the Administrative Agent with any properly completed and executed documentation prescribed by any Requirement of Law, or reasonably requested by Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under the Loan Documents. Each such Lender shall, whenever a lapse in time or change in circumstances renders any such documentation expired, obsolete or inaccurate in any respect (including any specific documentation required below in this Section 2.17(e)), deliver promptly to Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify Borrower and the Administrative Agent in writing of its legal ineligibility to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding tax or are subject to Tax at a rate reduced by an applicable tax treaty, Borrower, Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable law from such payments at the applicable statutory rate.

Without limiting the generality of the foregoing:

(i)     Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax.

(ii)     Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) (such Lender, a "Foreign Lender") shall deliver (to the extent it is legally entitled to do so) to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the Administrative Agent) whichever of the following is applicable:

(A)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E

establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)    two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of Exhibit Q-1, Q-2, Q-3 or Q-4, as applicable, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of such Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to such Borrower as described in Section 881(c)(3)(C) of the Code (any such certificate a "United States Tax Compliance Certificate"), and (y) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(D)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (provided that, if the Lender is a partnership and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)    any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(iii)    If a payment made to any Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has or has not complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

-110-

(f)     If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of Taxes as to which it has been indemnified pursuant to this Section 2.17 or with respect to which additional amounts have been paid pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrower pursuant to this Section 2.17(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential). Notwithstanding anything to the contrary in this Section 2.17(f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrowers pursuant to this Section 2.17(f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. Notwithstanding anything to the contrary, this Section 2.17(f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential) to any Loan Party or any other person.

(g)     The agreements in this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(h)     For purposes of this Section 2.17, the term "applicable Requirements of Law" includes FATCA.

(i)     Each Lender shall severally indemnify the Administrative Agent, within thirty (30) days after written demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting any obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Lenders by the Administrative Agent, shall be conclusive absent manifest error.

(j)     The Borrower and Lenders agree that for U.S. federal and applicable state and local income Tax purposes, the transactions contemplated by this Agreement are intended to constitute one or more debt instruments subject to Section 1.1275-4(b) of the United States Treasury regulations governing contingent payment debt instruments. The Borrower and Lenders shall cooperate in good faith to determine the comparable yield (as such term is described in the United States Treasury regulations governing contingent payment debt instruments) for any Loan within ninety (90) days following the date of borrowing with respect to such Loan.

SECTION 2.18    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)    The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest or fees, or of amounts payable under Sections 2.15, 2.16 or 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan shall be made in dollars, all payments of accrued interest payable on a Loan shall be made in dollars, and all other payments under each Loan Document shall be made in dollars.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties.

(c)    If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender (in each case other than (a) pursuant to the Partial 2L Discharge or (b) in connection with a Holdco Exchange Facility pursuant to Section 2.20), then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (B) any disproportionate payment obtained by a Lender of any Class as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    [Reserved].

-112-

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.06(a) or Section 2.06(b), Section 2.18(d) or Section 9.03(c), then the Administrative Agent may, in its discretion and in the order determined by the Administrative Agent (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and to be applied to, any future funding obligations of such Lender under any such Section.

SECTION 2.19    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event gives rise to the operation of Section 2.23, then such Lender shall (at the request of the Lead Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Sections 2.15 or 2.17 or mitigate the applicability of Section 2.23, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such assignment and delegation requested by the Borrower.

(b)    If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.23, (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17 or (iii) any Lender is a Defaulting Lender, then the Lead Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Lead Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (C) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.23, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Lead Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

SECTION 2.20    Holdco Exchange Loans.

(a)    The Borrower shall, if required by Section 2.20 of the Holdco Credit Agreement but in each case, no more frequently than once per fiscal quarter or at the Borrower's election following the sale or Disposition of any property or assets by Holdco or any Subsidiary of Holdco, by written Exchange Notice delivered to the Administrative Agent at such date selected by the Borrower (but no later than fifteen (15) Business Days after (i) delivery by the Borrower of the financial statements required pursuant to Sections 5.01(a) or (b) or (ii) the closing of such sale or Disposition of any property or assets by Holdco or any Subsidiary of Holdco), request to incur additional term loans under this Agreement on the same terms as the then existing Term Loans ("Holdco Exchange Loan"), which shall be incurred solely to exchange, on a dollar-for-dollar and pro rata basis among all Lenders, loans outstanding under the Holdco Credit Agreement held by each Lender thereunder, subject only to the satisfaction of the conditions set forth in Section 2.20(c); provided that any Holdco Exchange Loans, including without limitation, Holdco Exchange Loans that are not fungible with then-outstanding Initial Term Loans or Holdco Exchange Loans for U.S. federal income tax purposes, shall be issued under a separate CUSIP and constitute as a separate Class.

(b)    The Holdco Exchange Loans shall (i) rank equal in right of payment with the Term Loans, shall be secured by the Collateral and the Badcock Collateral securing the Loan Document Obligations on a *pari passu* basis with the Term Facility, (ii) not be guaranteed by any Person which is not a Loan Party, (iii) have terms identical to the Initial Term Loans and (iv) initially have the same Interest Period and the Interest Payment Date then in effect for the Holdco Term Loans being exchanged.

(c)    The incurrence of Holdco Exchange Loans shall be subject to the following conditions, each of which shall be certified by a Financial Officer of the Lead Borrower in the Exchange Notice: (i) on a "Pro Forma Basis" after such incurrence (determined in accordance with the First Lien Credit Agreement), the Total Net Leverage Ratio (as defined in the First Lien Credit Agreement) shall not exceed 2.81 to 1.00, (ii) on a "Pro Forma Basis" after such incurrence (determined in accordance with the First Lien Credit Agreement), the Secured Net Leverage Ratio (as defined in the First Lien Credit Agreement) shall not exceed 3.56 to 1.00, (iii) the aggregate outstanding principal amount of Holdco Exchange Loans that would be outstanding after giving effect to such incurrence shall not exceed the Holdco Exchange Facility Cap at such time and (iv) on a "Pro Forma Basis" after such incurrence (determined in accordance with the ABL Credit Agreement), the Lead Borrower shall be in compliance with the Required Conditions (as defined in the ABL Credit Agreement). Notwithstanding anything to the contrary herein, the aggregate outstanding principal amount of the Holdco Exchange Loans that can be incurred at any time shall not exceed the Holdco Exchange Facility Cap at such time.

(d)    Each Exchange Notice from the Borrower pursuant to this Section shall set forth the requested amount of the relevant Holdco Exchange Loans. The aggregate principal amount of Holdco Exchange Loans exchanged pursuant to an Exchange Notice shall be no less than $10,000,000 (unless the Lead Borrower and the Administrative Agent otherwise agree); provided that such amount may be less than $10,000,000 if such amount represents the remaining amount of Holdco Term Loans then outstanding. At the request of any Lender, the Borrower shall provide a Note to such Lender in connection with the incurrence of Holdco Exchange Loans under this Section 2.20.

(e)    Each Holdco Exchange Loan will be deemed made by each existing Lender in a principal amount equal to the principal amount of Holdco Term Loans held by such Lender that are subject to such exchange, as specified by the Borrower in the applicable Exchange Notice, and without the need for any further action or consent by any such Lender. Each Holdco Exchange Loan shall constitute a "Loan" for all purposes of this Agreement and the other Loan Documents. The effectiveness of any Holdco Exchange (including the making (but not the conversion or continuation) of a Loan thereunder) with respect to such Holdco Exchange Loans shall only be subject to the satisfaction of the conditions set forth in this

Section 2.20. The Lead Borrower will use the proceeds of the Holdco Exchange Loans to exchange Holdco Term Loans, and such Holdco Term Loans will be deemed irrevocably discharged in full (including for purposes of determining whether the Holdco Discharge Date has occurred) upon the Holdco Exchange under this Agreement.

(f)     Notwithstanding anything to the contrary, this Section 2.20 shall supersede any provisions in Section 2.18 or Section 9.02 to the contrary.

(g)     Notwithstanding anything to the contrary and for the avoidance of doubt, no Holdco Exchange shall trigger any Post-Toggle Term Effective Date Prepayment Premium.

(h)     Notwithstanding anything to the contrary herein, each existing Lender irrevocably agrees to make the Holdco Exchange Loans upon satisfaction of the conditions set forth in this Section 2.20 up to the Holdco Exchange Facility Cap.

SECTION 2.21     Refinancing Amendments.

(a)     At any time after the Effective Date, the Borrower may obtain, from any Lender or any Additional Lender, Credit Agreement Refinancing Indebtedness in respect of all or any portion of the Term Loans then outstanding under this Agreement (which for purposes of this clause (a) will be deemed to include any then outstanding Other Term Loans), in the form of Other Term Loans or Other Term Commitments; provided that the Net Proceeds of such Credit Agreement Refinancing Indebtedness shall be applied, substantially concurrently with the incurrence thereof, to the prepayment (or reduction) of outstanding Indebtedness being so refinanced, as the case may be, and accompanied by any prepayment premium payable thereon in accordance with the terms hereof. Each Class of Credit Agreement Refinancing Indebtedness incurred under this Section 2.21 shall be in an aggregate principal amount that is (x) not less than $5,000,000 in the case of Other Term Loans and (y) an integral multiple of $1,000,000 in excess thereof (in each case unless the Borrower and the Administrative Agent otherwise agree). The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment. Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Credit Agreement Refinancing Indebtedness incurred pursuant thereto (including any amendments necessary to treat the Loans and Commitments subject thereto as Other Term Loans). Any Refinancing Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Lead Borrower, to effect the provisions of this Section.

(b)     This Section 2.21 shall supersede any provisions in Section 2.18 or Section 9.02 to the contrary.

SECTION 2.22     Defaulting Lenders.

(a)     Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 9.02.

(ii)    Reallocation of Payments. Subject to the last sentence of Section 2.11(f), any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 9.08), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fourth, so long as no Default or Event of Default exists, to the payment of any amounts owing to any Loan Party as a result of any judgment of a court of competent jurisdiction obtained by any Loan Party against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and fifth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans and such Lender is a Defaulting Lender under clause (a) of the definition thereof, such payment shall be applied solely to pay the relevant Loans of the relevant non-Defaulting Lenders on a pro rata basis prior to being applied pursuant to Section 2.05(j) or this Section 2.22(a)(ii). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to Section 2.05(j) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(b)    Defaulting Lender Cure. If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders, whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided further that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

SECTION 2.23    Illegality.

If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue SOFR Loans denominated in dollars or to convert ABR Loans denominated in dollars to SOFR Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Alternate Base Rate, the interest rate on such ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Lead Borrower that the

circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower shall, upon three (3) Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans denominated in dollars of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Each Lender agrees to notify the Administrative Agent and the Lead Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

SECTION 2.24    Loan Modification Offers.

(a)    At any time after the Effective Date, the Lead Borrower may on one or more occasions, by written notice to the Administrative Agent, make one or more offers (each, a "Loan Modification Offer") to all the Lenders of one or more Classes (each Class subject to such a Loan Modification Offer, an "Affected Class") to effect one or more Permitted Amendments relating to such Affected Class pursuant to procedures reasonably specified by the Administrative Agent and reasonably acceptable to the Lead Borrower (including mechanics to permit cashless rollovers and exchanges by Lenders). Such notice shall set forth (i) the terms and conditions of the requested Permitted Amendment and (ii) the date on which such Permitted Amendment is requested to become effective. Permitted Amendments shall become effective only with respect to the Loans and Commitments of the Lenders of the Affected Class that accept the applicable Loan Modification Offer (such Lenders, the "Accepting Lenders") and, in the case of any Accepting Lender, only with respect to such Lender's Loans and Commitments of such Affected Class as to which such Lender's acceptance has been made.

(b)    A Permitted Amendment shall be effected pursuant to a Loan Modification Agreement executed and delivered by the Lead Borrower, each applicable Accepting Lender and the Administrative Agent; provided that no Permitted Amendment shall become effective unless the Lead Borrower shall have delivered to the Administrative Agent such legal opinions, board resolutions, secretary's certificates, officer's certificates and other documents as shall be reasonably requested by the Administrative Agent in connection therewith. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Loan Modification Agreement. Each Loan Modification Agreement may, without the consent of any Lender other than the applicable Accepting Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to give effect to the provisions of this Section 2.24, including any amendments necessary to treat the applicable Loans and/or Commitments of the Accepting Lenders as a new "Class" of loans and/or commitments hereunder.

(c)    If, in connection with any proposed Loan Modification Offer, any Lender declines to consent to such Loan Modification Offer on the terms and by the deadline set forth in such Loan Modification Offer (each such Lender, a "Non-Accepting Lender") then after receipt of consents from Lenders constituting the Required Lenders hereunder, the Lead Borrower may, on notice to the Administrative Agent and the Non-Accepting Lender, (i) replace such Non-Accepting Lender in whole or in part by causing such Lender to (and such Lender shall be obligated to) assign and delegate, without

recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 9.04</u>) all or any part of its interests, rights and obligations under this Agreement in respect of the Loans and Commitments of the Affected Class to one or more Eligible Assignees (which Eligible Assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender; <u>provided</u>, <u>further</u>, that (a) the applicable assignee shall have agreed to provide Loans and/or Commitments on the terms set forth in the applicable Permitted Amendment, (b) such Non-Accepting Lender shall have received payment of an amount equal to the outstanding principal of the Loans of the Affected Class assigned by it pursuant to this <u>Section 2.24(c)</u>, accrued interest thereon, accrued fees and all other amounts (including any amounts under <u>Section 2.11(a)(i)</u>) payable to it hereunder from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in <u>Section 9.04(b)</u>.

(d)     Notwithstanding anything to the contrary, this <u>Section 2.24</u> shall supersede any provisions in <u>Section 2.18</u> or <u>Section 9.02</u> to the contrary.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders and each Agent that (limited, on the Effective Date, to the Specified Representations):

SECTION 3.01     <u>Organization; Powers</u>.

Each of the Borrower and its Subsidiaries (a) is duly organized or incorporated, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization or incorporation, (b) has the corporate or other organizational power and authority to carry on its business as now conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdictions) in, every jurisdiction where such qualification is required, except, with respect to <u>clause (a)</u> above (other than with respect to the Borrower), <u>clause (b)</u> above (other than with respect to the Borrower) and <u>clause (c)</u> above, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.02     <u>Authorization; Enforceability</u>.

This Agreement has been duly authorized, executed and delivered by the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of the Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, (ii) general principles of equity, regardless of whether considered in a proceeding in equity or at law, and similar concepts under applicable law, (iii) any other matters which are set out as qualifications or reservations as to matters of law or general application in any legal opinion delivered to an Agent in connection with any Loan Document (together, the "<u>Legal Reservations</u>") and (iv) the Perfection Requirements.

SECTION 3.03    Governmental Approvals; No Conflicts.

Except as set forth in Schedule 3.03 and subject to the Legal Reservations and the Perfection Requirements, the execution, delivery and performance by any Loan Party of this Agreement or any other Loan Document (a) does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of the Borrower or any other Loan Party, or (ii) any Requirements of Law applicable to the Borrower or any other Loan Party, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon the Borrower or any Subsidiary or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by the Borrower or any Subsidiary, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any Subsidiary, except Liens created under the Loan Documents or permitted by Section 6.02, except (in the case of each of clauses (a), (b)(ii), (c) and (d)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right, or imposition of Lien, as the case may be, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04    Financial Condition; No Material Adverse Effect.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, including the notes thereto and (ii) fairly present in all material respects the financial condition of the Persons covered thereby as of the respective dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, including the notes thereto.

(b)    The Unaudited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Persons covered thereby as of the respective dates thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)    The Borrower has heretofore furnished to the Commitment Parties the consolidated pro forma balance sheet of the Lead Borrower and its Subsidiaries as of and for the period of twelve fiscal months of the Lead Borrower ended on or about September 30, 2020 (the "Pro Forma Financial Statements"), which have been prepared in good faith, based on assumptions believed by the Lead Borrower to be reasonable as of the date of delivery thereof, and present fairly in all material respects on a pro forma basis the estimated financial position of the Lead Borrower and its Subsidiaries as at the fiscal quarter of the Lead Borrower ended on or about September 30, 2020, assuming that the Transactions had actually occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such statement of operations).

(d)    Since the Effective Date, there has been no Material Adverse Effect.

SECTION 3.05    Properties.

Each of the Borrower and its Subsidiaries has good title to, or valid interests in, all its real and personal property material to its business, if any (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere with its ability to conduct its

business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, in each case, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06    Litigation and Environmental Matters.

(a)    Except as set forth in Schedule 3.06, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any of its Subsidiaries that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except as set forth in Schedule 3.06, and except with respect to any other matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of the Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of the Borrower, any basis to reasonably expect that the Borrower or any of its Subsidiaries will become subject to any Environmental Liability.

SECTION 3.07    Compliance with Laws.

Each of the Borrower and its Subsidiaries is in compliance with all Requirements of Law applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.08    Investment Company Status.

None of the Loan Parties is required to register as an "investment company" under the Investment Company Act of 1940, as amended from time to time.

SECTION 3.09    Taxes.

Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Borrower and each Subsidiary (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all Taxes levied or imposed on their properties, income or assets otherwise due and payable (whether or not shown on a Tax return), except any Taxes that are being contested in good faith by appropriate proceedings, provided that the Borrower or such Subsidiary, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP. There is no proposed Tax assessment, deficiency or other claim against the Borrower or any Subsidiary that would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.10    ERISA; Labor Matters.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred during the six year period prior to the

date on which this representation is made or deemed made or is reasonably expected to occur, and (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

(c)    Except as would not reasonably be expected, individually or in the aggregate to result in a Material Adverse Effect, (i) each employee benefit plan (as defined in Section 3(2) of ERISA) that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service; (ii) to the knowledge of the Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status; and (iii) there are no pending or, to the knowledge of the Borrower, threatened in writing claims, actions or lawsuits, or action by any Governmental Authority, with respect to any such plan.

(d)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) none of the Borrower or its Subsidiaries has experienced any labor strike or work stoppage or other collective labor dispute by employees due to labor disagreements and (ii) each of the Borrower and its Subsidiaries is in compliance in all respects with any collective bargaining agreement to which it is a party.

SECTION 3.11    Disclosure.

(a)    As of the First Amendment Effective Date, the written reports, financial statements, certificates or other written factual information (other than projections and information of a general economic or industry specific nature) furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished), when taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected and pro forma financial information, the Borrower represents only that such information, when taken as a whole, was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered, it being understood that (i) any such projected financial information is merely a prediction as to future events and is not to be viewed as fact, (ii) such projected financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower or any of its Subsidiaries and (iii) no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material.

(b)    As of the First Amendment Effective Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification (if any) provided pursuant to Section 4.01(l) is true and correct in all respects.

SECTION 3.12    Subsidiaries.

As of the First Amendment Effective Date, Schedule 3.12 sets forth the name of, and the ownership interest of the Borrower and each of its subsidiaries in, each subsidiary of the Lead Borrower.

SECTION 3.13    Intellectual Property; Licenses, Etc.

Except as would not reasonably be expected to have a Material Adverse Effect, to the knowledge of the Borrower, each of the Borrower and its Subsidiaries owns, licenses or possesses the right

to use all Intellectual Property and Badcock Intellectual Property that is reasonably necessary for the operation of its business substantially as currently conducted. To the knowledge of the Borrower, no Intellectual Property or Badcock Intellectual Property owned by the Borrower or any Subsidiary and used in the operation of its business as currently conducted infringes upon the Intellectual Property or Badcock Intellectual Property of any Person except for such infringements that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No claim or litigation regarding any of the Intellectual Property or the Badcock Intellectual Property is pending or, to the knowledge of the Borrower, threatened in writing against the Borrower or any Subsidiary, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

SECTION 3.14    Solvency.

Immediately after the consummation of each of the Transactions that occurred on the Effective Date (including the execution and delivery of this Agreement, the making of the Loans and the use of proceeds of such Loans on the date hereof) and the transactions contemplated by the First Amendment, the Lead Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

SECTION 3.15    Federal Reserve Regulations.

None of the Borrower or any of its Subsidiaries is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock. No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

SECTION 3.16    Use of Proceeds.

The Borrower will use the proceeds of (i) the Initial Term Loans made on the Effective Date to directly or indirectly finance the Transactions and to fund any original issue discount or upfront fees payable in connection therewith and (ii) the Holdco Exchange Loans to exchange outstanding Holdco Term Loans.

SECTION 3.17    Anti-Corruption Laws and Sanctions.

(a)       The Borrower and each of its Subsidiaries will not, directly or to their knowledge indirectly, use the proceeds of the Loans to fund any activity or business with any Person, or in any country or territory that, at the time of such funding, is the subject of Sanctions, or in violation of any Anti-Corruption Laws, the USA PATRIOT Act, any sanctions administered by the Office of Foreign Assets Control of the U.S. Department of Treasury and any successor Governmental Authority, or other applicable anti-money laundering or anti-terrorism laws.

(b)       The Borrower and its Subsidiaries and, to the knowledge of the Borrower, the officers, directors, employees and agents of the Borrower and its Subsidiaries are in compliance in all material respects with applicable Anti-Corruption Laws and applicable Sanctions, the USA PATRIOT Act, and other applicable anti-money laundering and anti-terrorism laws.

(c)       (i) None of the Borrower or its Subsidiaries and (ii) to the knowledge of the Borrower or its Subsidiaries, none of their respective directors, officers, employees and agents that will act

in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

(d)    The Borrower has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance in all material respects by the Borrower and its Subsidiaries with applicable Anti-Corruption Laws and applicable Sanctions.

SECTION 3.18    Security Documents.

Subject to Section 5.14, the Legal Reservations and the Perfection Requirements, (a) the Security Documents are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Collateral described therein and proceeds and products thereof and (b) the Badcock Security Documents are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Badcock Collateral described therein and proceeds and products thereof. In the case of (i) Pledged Equity Interests and Badcock Pledged Equity Interests represented by certificates, (x) if and when such certificates are delivered to the Collateral Agent or (y) when financing statements in appropriate form are filed in the appropriate filing offices, (ii) the other Collateral described in the Collateral Agreement, which can be perfected by filing a financing statement, when financing statements in appropriate form are filed in the appropriate filing offices and such other filings as are required in the Collateral Agreement have been completed and (iii) the other Badcock Collateral described in the Badcock Collateral Agreement, which can be perfected by filing a financing statement, when financing statements in appropriate form are filed in the appropriate filing offices and such other filings as are required in the Badcock Collateral Agreement have been completed, the Lien created by the Collateral Agreement or the Badcock Collateral Agreement, as applicable, shall constitute, to the extent such perfection is required by the Collateral Agreement or the Badcock Collateral Agreement, as applicable, a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral or the Badcock Collateral, as applicable, and the proceeds and products thereof, as security for the Secured Obligations.

SECTION 3.19    Insurance.

The Borrower and each of its Subsidiaries maintain, with insurance companies that the Lead Borrower believes (in the good faith judgment of the management of the Lead Borrower) were financially sound and responsible at the time the relevant coverage was last placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Lead Borrower believes (in the good faith judgment of management of the Lead Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Lead Borrower believes (in the good faith judgment or the management of the Lead Borrower) are reasonable and prudent in light of the size and nature of its business.

SECTION 3.20    Franchise Agreements.

(a)    Schedule 3.20 sets forth a complete and accurate list as of the First Amendment Effective Date of all Franchise Agreements to which any Loan Party or any of their Subsidiaries is a party.

(b)    Except as set forth on Schedule 3.20, as of the First Amendment Effective Date, to the knowledge of the Loan Parties, none of the Franchise Agreements contains any grant of exclusive rights to a territory designated therein which conflicts, or potentially conflicts, with any grant of exclusive rights to a territory granted under any other Franchise Agreement. Except as set forth in Schedule 3.20, as of the First Amendment Effective Date, no current franchisee under a Franchise Agreement has given written

notice to a Loan Party's management during the six (6) month period before the First Amendment Effective Date of its intention to rescind or terminate (with or without cause) any Franchise Agreement.

(c)        Except as could not reasonably be expected to have a Material Adverse Effect, (i) each Loan Party has prepared and maintained each of its Franchise Disclosure Documents, in an accurate and correct manner, (ii) each Loan Party has filed all required Franchise Disclosure Documents required by law in all states and jurisdictions requiring registration and approval prior to any offers or sales of franchises in such states, and (iii) each Loan Party has filed all material changes, amendments, renewals thereto on a timely and accurate basis as required under, and required by applicable Requirements of Law. Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party's Franchise Disclosure Documents were prepared in compliance with applicable Franchise Laws and disclosure guidelines, and there were no misrepresentations or omissions of information in any Franchise Disclosure Documents at the time such Loan Party was using such Franchise Disclosure Documents.  Each Franchise Agreement complies, and the offer and sale of such Franchise Agreement complied, in each case at the time such offer and sale was made, with all Franchise Laws, except to the extent of any non-compliance therewith which could not reasonably be expected to have a Material Adverse Effect.

ARTICLE IV
CONDITIONS

SECTION 4.01        Effective Date.

The obligation of each Lender to make Loans hereunder on the Effective Date shall be subject to satisfaction of the following conditions (or waiver thereof in accordance with Section 9.02):

(a)        The Administrative Agent (or its counsel) and the Lenders shall have received from each party hereto a counterpart of this Agreement signed on behalf of such party (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement).

(b)        The Administrative Agent and the Lenders shall have received a customary written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Willkie Farr & Gallagher LLP, special counsel to the Loan Parties, and such local counsel as may be reasonably requested by the Required Lenders in the jurisdictions of organization of any Loan Party, each in form and substance reasonably satisfactory to the Required Lenders.  The Borrower hereby requests such counsel to deliver such opinions.

(c)        The Administrative Agent and the Lenders shall have received (i) a certificate of each Loan Party, dated the Effective Date, with appropriate insertions, or otherwise in form and substance reasonably satisfactory to the Required Lenders, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in paragraph (d) of this Section 4.01, and (ii) a certificate of the Lead Borrower, dated the Effective Date, substantially in the form of Exhibit H, executed by any Responsible Officer of the Lead Borrower.

(d)        The Administrative Agent and the Lenders shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) with respect to each Loan Party executing the Loan Documents, an incumbency certificate identifying the name and title and bearing the signatures of the authorized signatories of such Loan Party, (iii) copies of resolutions of the Board of Directors of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Effective Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment and (iv) a good standing certificate (to

-124-

the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation.

(e)    (i) The Administrative Agent shall have received all fees required to be paid on the Effective Date pursuant to the Administrative Agent Fee Letter and reasonable and documented out-of-pocket expenses (including reasonable and documented out-of-pocket fees and expenses of a single counsel to the Administrative Agent) required to be paid on the Effective Date, to the extent invoiced (in the case of expenses) at least two (2) Business Days prior to the Effective Date (except as otherwise agreed to by the Lead Borrower) and (ii) the Commitment Parties (or their Affiliates) and/or the Administrative Agent, as applicable, shall have received all fees in respect of the Term Facility required to be paid on the Effective Date pursuant to each Lender Fee Letter and reasonable and documented out-of-pocket expenses (including reasonable and documented out-of-pocket fees and expenses of a single counsel to the Commitment Parties) required to be paid on the Effective Date, to the extent invoiced (in the case of expenses) at least two (2) Business Days prior to the Effective Date (except as otherwise agreed to by the Lead Borrower); provided, that any or all such amounts referred to in this clause (e) may, at the option of the Lead Borrower, be offset against the proceeds of the initial Loans made hereunder.

(f)    The Collateral and Guarantee Requirement (other than in accordance with Section 5.14) shall have been satisfied and the Administrative Agent and the Lenders shall have received a completed Perfection Certificate dated the Effective Date and signed by a Responsible Officer of the Borrower, together with all attachments contemplated thereby; provided that if, notwithstanding the use by the Borrower of commercially reasonable efforts without undue burden or expense to cause the Collateral and Guarantee Requirement to be satisfied on the Effective Date, the requirements thereof (other than (i) the execution and delivery of the Guarantee Agreement and the Collateral Agreement by the Loan Parties, (ii) subject to the Intercreditor Agreements, the creation and perfection of security interests in the Equity Interests of the Borrower and each Subsidiary owned by or on behalf of any Loan Party (provided that such Equity Interests are not Excluded Assets or owned or held by an Excluded Subsidiary), with respect to Equity Interests in the Acquired Company and the Acquired Subsidiaries, to the extent received on the Effective Date, and (iii) delivery of Uniform Commercial Code financing statements with respect to perfection of security interests in the assets of the Loan Parties that may be perfected by the filing of a financing statement under the Uniform Commercial Code) are not satisfied as of the Effective Date, the satisfaction of such requirements shall not be a condition to the availability of the initial Loans on the Effective Date (but shall be required to be satisfied as promptly as practicable after the Effective Date or otherwise within the period specified in Schedule 5.14, or such later date as the Required Lenders may otherwise reasonably agree).  Notwithstanding the foregoing, no Collateral shall be subject to any other pledges, security interest or mortgages, except for the Liens permitted under this Agreement.

(g)    Since the date of the Acquisition Agreement, there shall not have occurred a Company Material Adverse Effect (as defined in the Acquisition Agreement).

(h)    The Commitment Parties shall have received the Audited Financial Statements, the Unaudited Financial Statements and the Pro Forma Financial Statements.

(i)    The Specified Acquisition Agreement Representations shall be true and correct to the extent required by the definition thereof on and as of the Effective Date and the Specified Representations shall be true and correct in all material respects (or, if qualified by materiality, in all respects) on and as of the Effective Date; provided that, in each case, to the extent that any such representation expressly refers to an earlier date, such representation shall be true and correct in all material respects as of such earlier date.

(j)       The Acquisition shall have been consummated, or substantially simultaneously with the borrowing of the Initial Term Loans on the Effective Date, shall be consummated, in all material respects in accordance with the terms of the Acquisition Agreement.

(k)       The Administrative Agent and the Lenders shall have received (i) a certificate from the chief financial officer or equivalent Responsible Officer of the Lead Borrower certifying as to the solvency (as of the Effective Date) of the Lead Borrower and its Subsidiaries on a consolidated basis after giving effect to the Transactions, in substantially the form attached hereto as <u>Exhibit G</u> and (ii) certificates with respect to insurance policies of the Loan Parties as required under <u>Section 5.07</u>, all in form and substance reasonably satisfactory to the Required Lenders.

(l)       (i) The Administrative Agent shall have received at least three (3) Business Days before the Effective Date all documentation and other information about the Loan Parties that the Administrative Agent reasonably determines is required by United States regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the USA PATRIOT Act, including, without limitation, a duly executed W-9 tax form (or such other applicable IRS tax form) of Borrower and (ii) if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Administrative Agent and each initial Lender that requests a Beneficial Ownership Certification will have received, at least three (3) Business Days prior to the Effective Date, a Beneficial Ownership Certification in relation to the Borrower, in each case of clauses <u>(i)</u> and <u>(ii)</u>, to the extent that the Administrative Agent has reasonably requested such items in writing delivered to the Loan Parties at least ten (10) Business Days prior to the Effective Date.

(m)       The Administrative Agent shall have received a fully executed and delivered Borrowing Request in accordance with the requirements hereof.

(n)       The Administrative Agent (or its counsel) and the Lenders shall have received from each party thereto (i) a counterpart of the ABL Intercreditor Agreement signed on behalf of such party and (ii) a counterpart of the First Lien/Second Lien Intercreditor Agreement signed on behalf of such party.

(o)       The Administrative Agent shall have received from Borrower a counterpart of the Administrative Agent Fee Letter signed on behalf of such party.

SECTION 4.02       <u>Each Credit Event after the Effective Date</u>.

After the Effective Date, the obligation of each Lender to make a Loan on the occasion of any Borrowing (other than, for the avoidance of doubt, the incurrence of Holdco Exchange Loans), is subject to the satisfaction of the following conditions:

(a)       In the case of any Borrowing, the representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing; <u>provided</u> that, in each case, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; <u>provided further</u> that, in each case, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on the date of such credit extension or on such earlier date, as the case may be.

(b)       At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(c)    The Administrative Agent shall have received a fully executed and delivered Borrowing Request in accordance with the requirements hereof with respect to such Borrowing.

Each Borrowing (provided that a conversion or a continuation of a Borrowing shall not constitute a "Borrowing" for purposes of this Section 4.02) shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) of this Section 4.02.

ARTICLE V

AFFIRMATIVE COVENANTS

From and after the Effective Date and until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and other amounts (other than contingent amounts not yet due) payable under any Loan Document shall have been paid in full, the Borrower covenants and agrees with the Lenders that:

SECTION 5.01    Financial Statements and Other Information.

Borrower and its Subsidiaries will furnish to the Administrative Agent, on behalf of each Lender:

(a)    (i) on or before the date that is 90 days after the end of each fiscal year of the Lead Borrower, commencing with the fiscal year of the Lead Borrower ended on or about December 31, 2021, the audited consolidated balance sheet and audited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of the Lead Borrower and its Subsidiaries and the PSP Securitization Entities (if any) as of the end of and for such year, and related notes thereto, setting forth in each case, in comparative form the figures for the previous fiscal year, all reported on by BDO, Deloitte or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any material qualification or exception as to the scope of such audit (other than with respect to, or resulting from, (A) an upcoming maturity date of any indebtedness for borrowed money or, (B) any actual or potential breach or inability to satisfy a financial covenant under any indebtedness for borrowed money or (C) the activities, operations, performance, assets or liability of any PSP Securitization Entity)) to the effect that such consolidated financial statements present fairly in all material respects the financial condition as of the end of and for such year and results of operations and cash flows of the Lead Borrower and such Subsidiaries and the PSP Securitization Entities (if any) on a consolidated basis in accordance with GAAP consistently applied and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal year;

(b)    (i) on or before the date that is 30 days after the end of each of the first three fiscal quarters of each fiscal year of the Lead Borrower, commencing with the first fiscal quarter of the Lead Borrower ended after the Effective Date, the unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of the Lead Borrower and its Subsidiaries and the PSP Securitization Entities (if any) as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case, in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition as of the end of and for such fiscal quarter and such portion of the fiscal year and results of operations and cash flows of the Lead Borrower and its Subsidiaries and the PSP Securitization Entities (if any) on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal quarter;

(c)      [reserved];

(d)      not later than ten (10) Business Days of any delivery of financial statements under paragraph (a) above, a reasonably detailed annual budget for the Borrower and its Subsidiaries on a consolidated basis, in a form customarily prepared by the Lead Borrower or otherwise as may be reasonably agreed between the Lead Borrower and the Required Lenders (it being agreed that such annual budget shall not be provided to Public Lenders);

(e)      not later than five (5) days after any delivery of financial statements under paragraph (a) or (b) above, a certificate (a "Compliance Certificate") of a Financial Officer in the form of Exhibit E hereof (i) certifying as to whether a Default then exists and, if a Default does then exist, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) setting forth reasonably detailed calculations (A) to the extent the Financial Maintenance Covenants are then required to be tested, demonstrating compliance with the Financial Maintenance Covenants, and (B) in the case of financial statements delivered under paragraph (a) above, beginning with the financial statements for the fiscal year of the Lead Borrower ending on or about December 31, 2021, of Excess Cash Flow for such fiscal year;

(f)      not later than 20 Business Days after the end of each calendar month, management discussion and analysis in the form prepared and delivered by the Borrower internally;

(g)      Promptly upon the satisfaction of each of the conditions described in clauses (b) and (c) of the definition of "Toggle Term Effective Date" and in no event later than five Business Days following the date on which each condition is satisfied, the Lead Borrower shall deliver a certificate of a Responsible Officer of the Lead Borrower (in form and substance satisfactory to the Required Lenders) to the Administrative Agent certifying that each of the conditions described in the definition of "Toggle Term Effective Date" have been satisfied.;

(h)      simultaneously with the delivery of financial statements under paragraph (a) or (b) above, the related consolidated financial statements reflecting adjustments necessary to eliminate the accounts of PSP Securitization Entities (if any) from such consolidated financial statements;

(i)      (h) promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and registration statements (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) filed by the Borrower or any Subsidiary with the SEC or with any national securities exchange; and

(j)      (i) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 5.01 may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing the Form 10-K or 10-Q (or the equivalent), as applicable, of the Borrower (or a parent company thereof) filed with the SEC within the applicable time periods required by applicable law and regulations; provided that such materials are accompanied by a report and opinion of BDO, Deloitte or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any

"going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (other than with respect to, or resulting solely from, (i) an upcoming maturity date of any indebtedness for borrowed money ~~or,~~ (ii) any actual or potential breach or inability to satisfy a financial covenant under any indebtedness for borrowed money or (iii) the activities, operations, performance, assets or liabilities of any PSP Securitization Entity).

Documents required to be delivered pursuant to Section 5.01(a), (b) or (h) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on Schedule 9.01 (or otherwise notified pursuant to Section 9.01(d)); or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent). The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

Notwithstanding anything to the contrary herein, neither the Borrower nor any Subsidiary shall be required to deliver, disclose, permit the inspection, examination or making of copies of or excerpts from, or any discussion of, any document, information, or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent (or any Lender (or their respective representatives or contractors)) is prohibited by applicable law, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) with respect to which any Loan Party owes confidentiality obligations (to the extent not created in contemplation of such Loan Party's obligations under this Section 5.01) to any third party.

The Borrower hereby acknowledges that (a) the Administrative Agent may make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to the Borrower's or its Affiliates' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; provided that the Borrower's failure to comply with this sentence shall not constitute a Default or an Event of Default under this Agreement or the Loan Documents. Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials as "PUBLIC". Each Loan Party hereby acknowledges and agrees that, unless the Borrower notifies the Administrative Agent in advance, all financial statements and certificates furnished pursuant to Sections 5.01(a), (b) and (e) above are hereby deemed to be suitable for distribution, and to be made available, to all Lenders and may be treated by the Administrative Agent and the Lenders as not containing any Material Non-Public Information.

SECTION 5.02       Notices of Material Events.

Promptly after any Responsible Officer of the Borrower or any Subsidiary obtains knowledge thereof, the Borrower or the applicable Subsidiary will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)       the occurrence of any Default or Event of Default (other than any Default resulting from any non-compliance with Section 5.01);

(b)       the occurrence of any ERISA Event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(c)       any litigation, or governmental investigation or proceeding pending against the Borrower or any of its Subsidiaries which, either individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect; and

(d)       any other development or event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Each notice delivered under this Section 5.02 shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03       Information Regarding Collateral.

(a)       The Borrower will furnish to the Administrative Agent prompt (and in any event within thirty (30) days or such longer period as reasonably agreed to by the Administrative Agent) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or incorporation or like document), (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number to the extent that such Loan Party is organized or owns Mortgaged Property or Badcock Mortgaged Property in a jurisdiction where an organizational identification number is required to be included in a UCC financing statement for such jurisdiction.

(b)       Not later than five (5) Business Days after delivery of financial statements pursuant to Section 5.01(a), the Lead Borrower shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of the Lead Borrower (i) setting forth any material changes to the information required pursuant to the Perfection Certificate or confirming that there has been no material change in such information since the date of the Perfection Certificate delivered on the Effective Date or the date of the most recent certificate delivered pursuant to this Section 5.03 and (ii) identifying any Wholly Owned Subsidiary that has become, or ceased to be, a Material Subsidiary or an Excluded Subsidiary during the most recently ended fiscal quarter of the Lead Borrower.

SECTION 5.04       Existence; Conduct of Business.

The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, Material Intellectual Property and Governmental Approvals used in the conduct of its business, except to the extent (other than with respect to the preservation of the existence of the Borrower) that the failure to do so would not reasonably be expected to have a Material

Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any Disposition permitted by Section 6.05.

SECTION 5.05    Payment of Taxes, etc.

The Borrower will, and will cause each of its Subsidiaries to, pay all Taxes (whether or not shown on a Tax return) imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except where (a) the same are being contested in good faith by an appropriate proceeding diligently conducted by the Borrower or any of its Subsidiaries or (b) the failure to make payment would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 5.06    Maintenance of Properties.

The Borrower will, and will cause each of its Subsidiaries to, keep and maintain all tangible property material to the conduct of its business in good working order and condition (subject to casualty, condemnation and ordinary wear and tear), except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.07    Insurance.

(a)    The Borrower will, and will cause each of its Subsidiaries to, maintain, with insurance companies that the Lead Borrower believes (in the good faith judgment of the management of the Lead Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Lead Borrower believes (in the good faith judgment of management of the Lead Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Lead Borrower believes (in the good faith judgment or the management of the Lead Borrower) are reasonable and prudent in light of the size and nature of its business, and will furnish to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the insurance so carried. Each such general liability policy of insurance (other than directors and officers policies, workers compensation policies and business interruption insurance), to the extent covering Collateral or Badcock Collateral and to the extent that Collateral Agent can be granted an insurable interest therein, shall (i) in the case of each such general liability policy, name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each such casualty insurance policy, contain a loss payable clause or mortgagee endorsement that names the Collateral Agent, on behalf of the Lenders as the loss payee or mortgagee thereunder.

(b)    If any portion of any Mortgaged Property or Badcock Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower shall, or shall cause each Loan Party to (i) if required by the Flood Insurance Laws or other applicable law, maintain, or cause to be maintained, with insurance companies that the Lead Borrower believes (in the good faith judgment of the management of the Lead Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) furnish to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the flood insurance so carried.

-131-

SECTION 5.08        Books and Records; Inspection and Audit Rights.

(a)        The Borrower will, and will cause each of its Subsidiaries to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP (or applicable local standards) consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or its Subsidiary, as the case may be. The Borrower will, and will cause each of its Subsidiaries that is a Loan Party to, permit any representatives designated by the Administrative Agent or any Lender, during normal business hours and upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that, excluding any such visits and inspections during the continuance of an Event of Default, only the Required Lenders (or any larger group of Lenders) acting jointly may exercise the visitation and inspection rights under this Section 5.08; provided, further, that the Lenders shall not exercise such rights more often than one time during any calendar year absent the existence of an Event of Default and such time shall be at the Borrower's expense; provided, further that (a) when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

(b)        The Lead Borrower will, within 30 days (or, after using commercially reasonable efforts to schedule such call at a later date agreed to by the Required Lenders at their sole discretion) after the date of the delivery (or, if later, required delivery) of the quarterly and annual financial information pursuant to Sections 5.01(a) and (b), hold a conference call or teleconference, at a time selected by the Lead Borrower and reasonably acceptable to the Required Lenders, with all of the Lenders that choose to participate, to review the financial results of the previous fiscal quarter or fiscal year of the Lead Borrower, as the case may be, of the Lead Borrower (it being understood that any such call may be combined with any similar call held for any of the Lead Borrower's other lenders or security holders).

SECTION 5.09        Compliance with Laws.

(a)        The Borrower will, and will cause each of its Subsidiaries to, comply with its Organizational Documents and all Requirements of Law (including ERISA, Environmental Laws, the USA PATRIOT Act, Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the U.S. Foreign Corrupt Practices Act of 1977 and other anti-money laundering, anti-corruption, sanctions and anti-terrorism laws) with respect to it, its property and operations, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)        The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country except to the extent permissible for a Person required to comply with Sanctions, (ii) in any manner that would result in the violation of any Sanctions applicable to the Borrower and its Subsidiaries or to the knowledge of the Borrower, any other party hereto or (iii) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any legislation.

SECTION 5.10      Use of Proceeds.

The Borrower will use the proceeds of the Loans for the purposes set forth in Section 3.16.

SECTION 5.11      Additional Subsidiaries.

(a)      If (i) any additional Subsidiary is formed or acquired after the Effective Date (other than Badcock), (ii) any Subsidiary ceases to be an Excluded Subsidiary or (iii) the Borrower, at its option, elects to cause a Domestic Subsidiary, or a PSP Securitization Entity that is not already required to be a Loan Party, and to the extent reasonably acceptable to the Required Lenders, elects to cause a Foreign Subsidiary that is not a Wholly Owned Subsidiary (including any consolidated Affiliate in which the Borrower and its Subsidiaries own no Equity Interest) to become a Subsidiary Loan Party, then, the Borrower will, within thirty (30) days (or such longer period as may be agreed to by the Required Lenders in their reasonable discretion) after such newly formed or acquired Subsidiary is formed or acquired or such Subsidiary ceases to be an Excluded Subsidiary or the Borrower has made such election, notify the Administrative Agent thereof, and will cause such Subsidiary (unless such Subsidiary is an Excluded Subsidiary) to satisfy the Collateral and Guarantee Requirement with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party within thirty (30) days after such notice (or such longer period as the Required Lenders shall reasonably agree) and the Administrative Agent shall have received a completed Perfection Certificate (or supplement thereof) with respect to such Subsidiary signed by a Responsible Officer, together with all attachments contemplated thereby.

(b)      Within sixty (60) days (or, to the extent any new Material Subsidiary is organized or incorporated under the laws of a jurisdiction in which no existing Loan Party is organized or incorporated, within ninety (90) days) (or, in each case, such longer period as otherwise provided in this Agreement or as the Required Lenders may reasonably agree) after the Borrower identifies any new Material Subsidiary (other than Badcock) pursuant to Section 5.03(b), all actions (if any) required to be taken with respect to such Subsidiary in order to satisfy the Collateral and Guarantee Requirement shall have been taken with respect to such Subsidiary, to the extent not already satisfied pursuant to Section 5.11(a).

(c)      Notwithstanding the foregoing, in the event any real property would be required to be mortgaged pursuant to this Section 5.11, the Borrower shall be required to comply with the "Collateral and Guarantee Requirement" as it relates to such real property within ninety (90) days, following the formation or acquisition of such real property or such Subsidiary or the identification of such new Material Subsidiary, or such longer time period as agreed by the Required Lenders in their reasonable discretion.

SECTION 5.12      Further Assurances.

(a)      The Borrower will, and will cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Required Lenders may reasonably request, in each case, to cause the "Collateral and Guarantee Requirement" (or the "Badcock Collateral and Guarantee Requirement" in the case of Badcock) to be and remain satisfied, all at the expense of the Loan Parties.

(b)      If, after the Effective Date, any material assets (other than Excluded Assets), including any owned (but not leased or ground-leased) Material Real Property or improvements thereto or any interest therein, are acquired by the Borrower or any other Loan Party (other than Badcock) or are held by any Subsidiary on or after the time it becomes a Loan Party pursuant to Section 5.11 (other than assets

-133-

constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof or constituting Excluded Assets), the Borrower will notify the Administrative Agent and the Lenders thereof, and, if requested by the Required Lenders, the Borrower will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Administrative Agent or the Required Lenders to grant and perfect such Liens, including actions described in paragraph (a) of this Section and as required pursuant to the "Collateral and Guarantee Requirement", all at the expense of the Loan Parties and subject to the last paragraph of the definition of the term "Collateral and Guarantee Requirement". In the event any Material Real Property is mortgaged pursuant to this Section 5.12(b), the Borrower or such other Loan Party (other than Badcock), as applicable, shall be required to comply with the "Collateral and Guarantee Requirement" and paragraph (a) of this Section 5.12 within ninety (90) days following the acquisition of such Material Real Property or such longer time period as agreed by the Required Lenders in their reasonable discretion.

(c)    If, after the First Amendment Effective Date, any material assets (other than Excluded Assets), including any owned (but not leased or ground-leased) Badcock Material Real Property or improvements thereto or any interest therein, are acquired by Badcock (other than assets constituting Badcock Collateral under a Badcock Security Document that become subject to the Lien created by such Badcock Security Document upon acquisition thereof or constituting Excluded Assets), the Borrower will notify the Administrative Agent and the Lenders thereof, and, if requested by the Required Lenders, the Borrower will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause Badcock to take, such actions as shall be necessary and reasonably requested by the Administrative Agent or the Required Lenders to grant and perfect such Liens, including actions described in paragraph (a) of this Section and as required pursuant to the "Badcock Collateral and Guarantee Requirement", all at the expense of the Loan Parties and subject to the last paragraph of the definition of the term "Badcock Collateral and Guarantee Requirement".  In the event any Badcock Material Real Property is mortgaged pursuant to this Section 5.12(c), Badcock shall be required to comply with the "Badcock Collateral and Guarantee Requirement" and paragraph (a) of this Section 5.12 within ninety (90) days following the acquisition of such Badcock Material Real Property or such longer time period as agreed by the Required Lenders in their reasonable discretion.

SECTION 5.13    Franchise Agreements.

The Borrower will, and will cause each Loan Party to, satisfy and perform in all material respects all obligations of each such Person under each Franchise Agreement, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.14    Certain Post-Closing Obligations.

As promptly as practicable, and in any event within the time periods after the Effective Date specified in Schedule 5.14(a) or such later date as the Required Lenders agree to in writing, including to reasonably accommodate circumstances unforeseen on the Effective Date, the Borrower and each other Loan Party shall deliver the documents or take the actions specified on Schedules 5.14(a) and 5.14(b), as applicable, that, where such actions are to be taken to reasonably accommodate circumstances unforeseen on the Effective Date, would have been required to be delivered or taken on the Effective Date, in each case except to the extent otherwise agreed by the Collateral Agent or the Required Lenders pursuant to its or their authority as set forth in the definition of the term "Collateral and Guarantee Requirement".

SECTION 5.15    Covenant Relief Period Affirmative Covenants.

-134-

From and after the Fifth Amendment Effective Date, the Borrower hereby covenants, promises and agrees as follows (which shall supplement and in no event limit or disapply, the agreements, covenants and obligations applicable to the Borrower and its Subsidiaries pursuant to this Agreement and the other Loan Documents, all of which shall continue in effect at all times):

(a)    [Reserved].

(b)    Updated Budgets.  No later than 5:00 p.m. (New York City time) on every fourth Thursday, commencing on the fourth Thursday immediately following the Initial Budget Delivery Date and continuing until November 30, 2024 (each such Thursday, the "Updated Budget Deadline"), the Borrower shall deliver to the Lender Professionals a supplement to the Initial Budget (each, an "Updated Budget"), covering the then-upcoming 13-week period that commences with Saturday of the calendar week immediately preceding such Updated Budget Deadline, in each case consistent with the form and detail set forth in the Initial Budget and including a forecasted unrestricted cash balance; provided, however, that the Updated Budget is, in each case, (i) automatically approved unless the Required Lenders provide written notice of their disapproval of such Updated Budget (which notice of disapproval may be provided by one of the Lender Professionals on their behalf via email), (ii) if the Required Lenders provide written notice of their disapproval of such Updated Budget (which notice of disapproval may be provided by one of the Lender Professionals on their behalf via email), the Initial Budget or most recent Approved Budget, as applicable, shall remain in effect until the Required Lenders approve the Updated Budget; (iii) Required Lenders shall not have any obligation to approve any Updated Budget, and (iv) no modification to the Initial Budget or any Updated Budget, or any reforecasting of any information relating to any period covered thereby, as the case may be, shall in any event be effective without the affirmative written consent of the Required Lenders (which may be provided by one of the Lender Professionals on their behalf via email). Upon, and subject to, the approval of any such Updated Budget by the Required Lenders (or by one of the Lender Professionals on their behalf) in accordance with the foregoing, such Updated Budget shall constitute the "Approved Budget" (which Approved Budget shall be the Initial Budget until superseded by an approved Updated Budget).

(c)    Variance Reporting.  No later than 11:00 a.m. (New York City time) every Thursday, commencing with the first Thursday immediately following the Initial Budget Delivery Date and continuing until November 30, 2024 (each such Thursday, the "Variance Report Deadline"), the Borrower shall deliver to the Lender Professionals a variance report, each in form, detail and substance satisfactory to the Required Lenders in their sole discretion (each, a "Variance Report"), setting forth the difference between, on a line-by-line and aggregate basis, (i) actual operating receipts and budgeted operating receipts as set forth in the Approved Budget, as the case may be (the "Receipts Variance"), and (ii) actual operating disbursements and budgeted operating disbursements as set forth in the Approved Budget, as the case may be (the "Disbursements Variance"), in each case, for the Applicable Period (as defined below), in each case, together with a reasonably detailed explanation of such Receipts Variance and Disbursements Variance. The Loan Parties shall not permit the Receipts Variance on an aggregate basis or the Disbursements Variance on an aggregate basis with respect to any Applicable Period to exceed the Permitted Variance (as defined below).  "Applicable Period" means (i)  with respect to the first Variance Report, the one-week period ending on Friday of the week immediately preceding the applicable Variance Report Deadline for such Variance Report, (ii) with respect to the second Variance Report, the 2-week period ending on Friday of the week immediately preceding the applicable Variance Report Deadline for such Variance Report, (iii) with respect to the third Variance Report, the 3-week period ending on Friday of the week immediately preceding the applicable Variance Report Deadline for such Variance Report, and (iv) with respect to each Variance Report thereafter, the 4-week period ending on Friday of the week immediately preceding the applicable Variance Report Deadline for such Variance Report.  "Permitted Variance" means, (i) with respect to the first Variance Report, no limitations on Disbursements Variance and Receipts Variance, (ii) with respect to the second and third Variance Reports, Disbursements Variance less than 30% and Receipts

-135-

Variance less than 30% and (iii) with respect to the fourth Variance Report and every Variance Report thereafter, Disbursements Variance less than 20% and Receipts Variance less than 25%, in each case under the foregoing clauses (i) through (iv), on an aggregate basis and excluding in any event any and all professional fees of any Person.

(d)    Management Calls.  On the first Thursday immediately following the Fifth Amendment Effective Date, upon request by the Lender Professionals and on no more than a bi-weekly basis thereafter until the consummation of a Restructuring Transaction, at a time to be agreed with the Ad Hoc Lender Group (or the Lender Professionals on their behalf), the Borrower shall host a conference call with the Ad Hoc Lender Group who are subject to a non-disclosure agreement and their advisors (including the Lender Professionals) that choose to participate to discuss, among other things, the Business Plan, the Restructuring Proposal, the Initial Budget and any Updated Budget, the Variance Report, any Restructuring Transactions, any sales process (including any whole business securitizations) with respect to (including any unsolicited bid on or indication of interest in) any asset or business of the Borrower or its Subsidiaries that is not in the ordinary course, and any other issues related to the financial affairs, finances, business, assets, operations or condition (financial or otherwise) of the Borrower and its Subsidiaries with the relevant members of the Borrower's management and its advisors, including, to the extent applicable, the Financial Advisor, Willkie Farr & Gallagher LLP, as special counsel to the Loan Parties, and Ducera Partners LLC, as the investment banker for the Loan Parties (collectively, the "Company Advisors"); provided, that any failure to comply with this clause (d) will only constitute a breach of this covenant if the Required Lenders (or the Lender Professionals) have given written notice of such failure and such failure has not been cured within five Business Days.

(e)    Advisor Calls.  On the first Monday immediately following the Fifth Amendment Effective Date, and on a weekly basis thereafter, at a time to be agreed with the Required Lenders (or the Lender Professionals on their behalf), the Company Advisors shall host a conference call with the Ad Hoc Lender Group who are currently subject to a non-disclosure agreement and their advisors (including the Lender Professionals), to discuss, among other things, each of the matters discussed or to be discussed at the immediately preceding or then-upcoming management call in accordance with Section 5.15(d) hereof, any outstanding financial, corporate, document or other diligence requests, and any other matter as requested by the Lender Professionals reasonably in advance of such call; provided, that any failure to comply with this clause (e) will only constitute a breach of this covenant if the Required Lenders (or the Lender Professionals) have given written notice of such failure and such failure has not been cured within five Business Days.

(f)    Liquidity Reporting.  No later than 5:00 p.m. Eastern Time each Tuesday and Thursday, commencing with the first Tuesday and Thursday immediately following the Fifth Amendment Effective Date (each such Tuesday and Thursday, a "Liquidity Report Deadline") and continuing through until November 30, 2024, the Borrower shall deliver to the Lender Professionals a report setting forth the Liquidity (i) with respect to the report delivered every Tuesday, as of the Monday immediately preceding such Liquidity Report Deadline, and (ii) with respect to the report delivered every Thursday, as of the Wednesday immediately preceding such Liquidity Report Deadline, in each case, as well as the aggregate amounts outstanding and available under the ABL Credit Agreement (to the extent updated information is available to the Borrower).

(g)    Diligence.  Borrower shall, and shall cause its officers, members of senior management and advisors to furnish such other available information regarding the Collateral and/or the financial affairs, finances, business, assets, operations or condition (financial or otherwise) of the Borrower and its Subsidiaries that is reasonably requested by or on behalf of the Required Lenders or any of the Lender Professionals, and shall accommodate any reasonable request by the Required Lenders or any of the Lender Professionals for physical inspections or site visits of the Borrower's or its Subsidiaries' physical

assets at mutually agreed times, upon reasonable notice (which shall be given at least forty-eight (48) hours in advance of such inspection or visit) and that do not interfere with the ordinary course of business; provided, that any failure to comply with this clause (g) will only constitute a breach of this covenant if the Required Lenders (or the Lender Professionals) have given written notice of such failure and such failure has not been cured within five Business Days.

(h)    Restructuring Advisors.    Until consummation of a Restructuring Transaction acceptable to Required Lenders, the Borrower shall continue to retain the Financial Advisor or another restructuring consultant and investment banking firm (respectively) reasonably acceptable to the Required Lenders on terms reasonably acceptable to the Required Lenders to advise the Borrower in connection with, among other things, preparation of the Initial Budget, the Updated Budgets, the Business Plan and the Restructuring Proposal, liquidity management, diligence, and cash flow projections.

(i)    Milestones.    Borrower shall, and shall cause each of its Subsidiaries to, and work in good faith and use commercially reasonable efforts to satisfy and comply with each of the following milestones by the deadlines set forth below, in each case, as such deadlines may be extended in writing by the Required Lenders in their sole discretion (including by one of the Lender Professionals on their behalf via email) (collectively, the "Milestones"):

(i)    ABL Consent.    No later than August 20, 2024, the Borrower shall deliver to the Lender Professionals a consent from the ABL Agent (the "ABL Consent"), in form and substance reasonably satisfactory to the Required Lenders, acknowledging and consenting to the appointment and authority of the Independent Directors in accordance with Section 5.15(i)(iii); provided that the Required Lenders shall agree to extend such deadline while the Borrower is negotiating the consent in good faith with the ABL Agent and other relevant parties.

(ii)    Initial Budget.    No later than the later of (A) seven (7) days after the Fifth Amendment Effective Date and (B) August 22, 2024, (such later date, the "Initial Budget Delivery Date"), Borrower shall deliver to the Lender Professionals a 13-week cash flow projection, covering the then-upcoming 13-week period that commences with Saturday of the calendar week immediately preceding the Initial Budget Delivery Date, in form, detail and substance satisfactory to the Required Lenders in their sole discretion (the "Initial Budget"), setting forth in all material respects all forecasted receipts and disbursements on a weekly basis for the Borrower and its Subsidiaries (commencing with the week in which the Initial Budget is delivered in accordance with the foregoing), it being agreed that the Initial Budget shall be prepared by the Financial Advisor in consultation with the Lender Professionals, and shall include line items with respect to cash receipts, payroll, trade payables, rent, insurance, taxes, debt payments, gross capital expenditures, available cash, the aggregate amounts outstanding under the ABL Loan Documents, Second Lien Loan Documents and Holdco Loan Documents, the anticipated weekly use of cash and the proceeds of any revolving loans under the ABL Credit Agreement.

(iii)    Independent Directors and the Special Committee.    No later than the Fifth Amendment Effective Date, the Lead Borrower and Freedom VCM Holdings, LLC (including the Board of Directors of each such entity), as applicable, shall each (i) appoint two (2) independent directors (collectively, the "Independent Directors" and each, an "Independent Director"), to be selected by the Lead Borrower and Freedom VCM Holdings, LLC from a list of individuals provided by the Required First Lien Lender's professionals on behalf of the Required First Lien Lenders, to the Board of Directors of each of Freedom VCM Holdings, LLC and the Lead Borrower; (ii) designate, establish and form a special committee of each of the Board of Directors of Freedom VCM Holdings, LLC and the Board of Directors of the Lead Borrower (collectively, the "Special Committees" and each, a "Special Committee"), with each such Special Committee

(A) to consist of three (3) members (collectively, the "SC Members" and each, a "SC Member"), with each such SC Member that is an Independent Director to be paid at least the same total compensation in cash, and provided with the same expense reimbursement and other benefits, that is paid and provided to other independent directors on the Board of Directors of Freedom VCM Holdings, LLC as of the Fifth Amendment Effective Date, (B) to be delegated and vested with the right, power and authority to explore, consider and negotiate any Restructuring Transaction (as defined below) (including, without limitation, the right, power and authority to (x) have direct conversations, discussions and negotiations with any Person concerning any Restructuring Transaction, and (y) make recommendations to the Board of Directors of Freedom VCM Holdings, LLC or the Board of Directors of the Lead Borrower, as applicable, with respect to any Restructuring Transaction) along with the management team and external advisors of Freedom VCM Holdings, LLC and the Lead Borrower (including the Company Advisors), as applicable, subject to such parameters as may be agreed upon in good faith between such management team and the Independent Directors that are consistent with special committees of governing bodies delegated with rights, powers and authorities to explore, consider and negotiate distressed transactions that are similar in nature to a Restructuring Transaction, (C) to be required to attend meetings of the Board of Directors of Freedom VCM Holdings, LLC or the Board of Directors of the Lead Borrower, as applicable, which shall be held at least once per calendar week, to discuss the nature and negotiation of any Restructuring Transactions, (D) to have access to management, advisors, and books and records of Freedom VCM Holdings, LLC and the Lead Borrower, as applicable, as any SC Member reasonably requests, and (E) to have such rules and procedures as may be established by such Special Committee from time to time (notwithstanding any contrary rules or procedures set forth in any of the organizational or governance documents of any such entity), including the right to call such meetings of such Special Committee at such times as determined by such Special Committee; provided, that (I) each SC Member of such Special Committee shall have one (1) vote on all matters on which such Special Committee shall vote or consider, (II) a quorum for a meeting of such Special Committee shall only require the attendance of a majority of the number of authorized SC Members of such Special Committee, subject to the procedures set forth in the Special Committee charter for calling and noticing meetings, (III) the vote of a majority of the number of authorized SC Members of such Special Committee shall be the act of such Special Committee, and (IV) management and external advisors of Freedom VCM Holdings, LLC or the Lead Borrower (including the Company Advisors), as applicable, and other members of the Board of Directors of Freedom VCM Holdings, LLC or the Board of Directors of the Lead Borrower, as applicable, shall be invited to attend any meetings of such Special Committee, but subject to the right of such Special Committee to hold executive sessions with only such persons in attendance that are approved by such Special Committee in its sole discretion; (iii) appoint each of the Independent Directors to the pricing committees of the Board of Directors of Freedom VCM Holdings, LLC and the Lead Borrower for the whole business securitization of Pet Supplies Plus, LLC and its subsidiaries; (iv) appoint each of the Independent Directors to both of the Special Committees, and appoint Andrew Laurence to the third seat on each Special Committee; (v) provide that neither Freedom VCM Holdings, LLC nor the Lead Borrower (including the Board of Directors of each such entity), as applicable, will authorize, approve, implement, consummate or make effective any Restructuring Transaction that is not approved by the Special Committees; and (vi) amend its organizational and governance documents, adopt resolutions, obtain waivers and consents from its equity owners, and take such other steps and actions as are necessary or desirable to implement the matters described in clauses (i)-(v) of this Section 5.15(i)(iii), all of which shall be in form and substance mutually acceptable to the Required Lenders and the Lead Borrower and/or Holdco (the "Special Committee Procedures"). For purposes of this Agreement, the term "Restructuring Transaction" means any restructuring, reorganization, and/or other recapitalization transaction involving Freedom VCM Holdings, LLC and/or one or more of its direct and/or indirect subsidiaries (including, without limitation, the Lead Borrower), which transaction may include, but

is not limited to, entry into new financing facilities, refinancing of existing financing facilities, amendments or modifications to existing financing facilities, and/or asset sales (and may involve a series of more than one of the aforementioned transactions).

(iv)    Five-Year Business Plan.  No later than September 13, 2024, the Borrower shall deliver to the Lender Professionals a five-year business plan and projected operating budget for the Borrower and its Subsidiaries, in form, detail and substance satisfactory to the Required Lenders in their sole discretion (the "Business Plan"), for remainder of fiscal year ending December 31, 2024 through the end of the fiscal year ending December 31, 2029, setting forth income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, cost savings and headcount reductions, targeted retail store idlings and/or closures, and other milestones, and which shall include, without limitation, line items setting forth total available liquidity for the period covered thereby, the anticipated uses and payments of the Term Loans and any other Indebtedness (including, without limitation, under the ABL Loan Documents, the Second Lien Loan Documents and the Holdco Loan Documents) for such periods, and any other line items reasonably requested by the Lender Professionals.

(v)    Real Estate Advisor.  To the extent reasonably requested by the Lender Professionals (at the request of the Required Lenders) after delivery of the Business Plan, the Borrower shall retain a real estate advisor (the "Real Estate Advisor") mutually acceptable to the Required Lenders and the Borrower, each in their sole discretion.

(vi)    Restructuring Proposal.  No later than September 13, 2024, the Borrower shall deliver to the Administrative Agent and the Lenders a comprehensive Restructuring Transaction proposal for the Borrower and its Subsidiaries (the "Restructuring Proposal").

(vii)    Transaction Support Agreement.  No later than September 30, 2024, the Borrower and its Subsidiaries shall enter into with the Required Lenders, a transaction support agreement and/or any other similar or related agreement, each in form, detail and substance satisfactory to the Required Lenders and the Borrower, each in their sole discretion, pursuant to which, among other things, the Borrower and its Subsidiaries agree to support, and take certain actions to implement and consummate, a comprehensive Restructuring Transaction, in each case pursuant to definitive documentation and on terms and conditions acceptable to the Required Lenders.

(j)    Notwithstanding anything to the contrary contained herein, until the earlier of (i) October 30, 2024 and (ii) Freedom VCM Holdings, LLC, Holdco, the Borrower or any of its Subsidiaries entering into a transaction support agreement and/or any other similar or related agreement that is not supported by Required Lenders, if and to the extent that the Required First Lien Lenders (x) waive compliance with, extend the deadline to comply with, or amend or modify any covenant contained in Section 5.16 (other than clauses (d), (e) or (g) of Section 5.16),  Section 6.15 or Section 6.16 of the First Lien Credit Agreement or the Event of Default contained in Section 7.01(o) of the First Lien Credit Agreement, such waiver, amendment or modification shall automatically apply to the corresponding covenant set forth in Section 5.15 (other than clauses (d), (e) or (g) of Section 5.15), Section 6.16 or Section 6.17 of this Agreement, and the Event of Default contained in Section 7.01(o) of this Agreement without any further action by the Required Lenders, or (y) approve or consent (or are deemed to have approved or consented to) to any Initial Budget, any Updated Budget, any Variance Report, the form of ABL Consent, the Restructuring Advisors, the Special Committee Procedures, the Real Estate Advisor or any Business Plan (in each case pursuant to the terms of the First Lien Credit Agreement), such approval or consent (or deemed approval or consent) shall automatically constitute the approval of the applicable Initial Budget, Updated Budget, Variance Report, the form of ABL Consent, the Restructuring Advisors, the Special

-139-

Committee Procedures, the Real Estate Advisor or Business Plan under this Agreement without any further action by the Required Lenders, so long as the Lead Borrower has consulted with the Required Lenders or the Lender Professionals prior to the effectiveness of such approval or deemed approval; provided that the foregoing shall not apply to (x) any extension of any milestone beyond, or any amendment, waiver, approval, consent, extension or other modification after, October 30, 2024 or (y) any amendment, waiver, approval, consent, extension or other modification that the Required First Lien Lenders have conditioned upon the Loan Parties agreeing to, or in connection with which the Required First Lien Lenders otherwise receive the benefit of, any additional covenants or restrictions (other than immaterial covenants or restrictions) that were not otherwise contemplated by the First Lien Credit Agreement as of the Fifth Amendment Effective Date; provided, further that the Lead Borrower shall consult with the Required Lenders prior to the appointment of an Independent Director after the Fifth Amendment Effective Date (other than the appointment of Todd Arden and/or Christopher Meyer), which appointment, for the avoidance of doubt, shall be from a list of individuals proposed by the Required First Lien Lenders.

SECTION 5.16    Designation of Securitization Entities.

Solely in connection with a Permitted PSP Securitization and subject to the prior written consent of the Required Lenders in their sole discretion, the Lead Borrower may at any time and from time to time on or after the Fifth Amendment Effective Date designate any PSP Entity as a PSP Securitization Entity or any PSP Securitization Entity as a Subsidiary by written notice to the Administrative Agent; provided that (i) immediately before and after such designation, no Event of Default shall have occurred and be continuing, (ii) in the case of the designation of any PSP Entity as a PSP Securitization Entity, such designation shall constitute an Investment in such PSP Securitization Entity (calculated as an amount equal to the sum of the fair market value of the Equity Interests of the designated PSP Entity and any of its Subsidiaries that are owned by the Lead Borrower or any Subsidiary, immediately prior to such designation (such fair market value to be calculated without regard to any Secured Obligations of such designated PSP Entity or any of its Subsidiaries under the Guarantee Agreement), and such Investment shall be permitted under Section 6.04, (iii) no PSP Entity may be designated as a PSP Securitization Entity if it or any of its Subsidiaries is a guarantor under (I) the ABL Credit Agreement, (II) the First Lien Credit Agreement or (III) the Holdco Credit Agreement, (iv) following the designation of a PSP Securitization Entity as a Subsidiary, Borrower shall comply with the provisions of Section 9.12 with respect to such designated Subsidiary, (v) any Subsidiary of a PSP Securitization Entity shall automatically be designated a PSP Securitization Entity, (vi) no Borrower may be designated a PSP Securitization Entity and (vii) in the case of the designation of any PSP Entity as a PSP Securitization Entity, each of (a) the PSP Entity to be so designated and (b) its Subsidiaries has not, at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of Lead Borrower or any Subsidiary (other than Equity Interests in a PSP Securitization Entity). The designation of any PSP Securitization Entity as a Subsidiary shall constitute (i) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary and its Subsidiaries existing at such time and (ii) a return on any Investment by the Loan Parties an amount equal to the fair market value of the PSP Securitization Entities so designated.

ARTICLE VI

NEGATIVE COVENANTS

From and after the Effective Date and until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable (other than (i) contingent amounts not yet due and (ii) Cash Management Obligations) under any Loan Document have been paid in full, the Borrower covenants and agrees with the Lenders that:

SECTION 6.01        Indebtedness; Certain Equity Securities.

(a)        The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(i)        Indebtedness of the Borrower and any of the Subsidiaries under the Loan Documents (including any Indebtedness incurred pursuant to Section 2.21);

(ii)        Indebtedness outstanding on the First Amendment Effective Date and any Permitted Refinancing thereof; provided that any Indebtedness in excess of $6,900,000 for the most recently ended Test Period as of such time, shall only be permitted if set forth on Schedule 6.01;

(iii)        Guarantees by the Borrower and its Subsidiaries in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; provided that (A) such Guarantee is otherwise permitted by Section 6.04, (B) no Guarantee by any Subsidiary of any Junior Financing or any unsecured Indebtedness for borrowed money that constitutes Material Indebtedness shall be permitted unless such Subsidiary shall have also provided a Guarantee of the applicable Loan Document Obligations pursuant to the Guarantee Agreement or the Badcock Guarantee Agreement, as the case may be, and (C) if the Indebtedness being guaranteed is subordinated to the Loan Document Obligations, such Guarantee shall be subordinated to the Guarantee of the Loan Document Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(iv)        Indebtedness of the Borrower or any Subsidiary owing to the Borrower or any Subsidiary, to the extent permitted by Section 6.04; provided that all such Indebtedness of any Loan Party owing to any Subsidiary that is not a Loan Party shall be subordinated to the Loan Document Obligations (to the extent any such Indebtedness is outstanding at any time after the date that is thirty (30) days after the Effective Date (or the date of acquisition of such Subsidiary) or such later date as the Required Lenders may reasonably agree) (but only to the extent permitted by applicable law and not giving rise to material adverse tax consequences) on terms (i) not materially less favorable, taken as a whole, to the Lenders as those set forth in the Master Intercompany Note and the Badcock Master Intercompany Note or (ii) otherwise reasonably satisfactory to the Required Lenders;

(v)        (A) Indebtedness (including Capital Lease Obligations and purchase money indebtedness) incurred, issued or assumed by the Borrower or any Subsidiary to finance the acquisition, purchase, lease, construction, repair, replacement or improvement of fixed or capital property, equipment or other assets; provided that, in the case of any purchase money Indebtedness, such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, purchase, lease, construction, repair, replacement or improvement; provided, further that, at the time of any such incurrence of Indebtedness and after giving Pro Forma Effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (v) (excluding any Capital Lease Obligations incurred pursuant to a sale and leaseback transaction permitted under Section 6.06) shall not exceed the greater of $27,600,000 and 8.625% of Consolidated EBITDA for the most recently ended Test Period as of such time and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof);

(vi)        Indebtedness in respect of Swap Agreements not incurred for speculative purposes;

(vii)    [reserved];

(viii)    [reserved]Indebtedness with respect to the Secured Holdco Obligations Guarantee;

(ix)    [reserved];

(x)    Indebtedness in respect of Cash Management Obligations and other Indebtedness in respect of netting services, automated clearinghouse arrangements, overdraft protections and similar arrangements, in each case, in connection with deposit accounts or from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(xi)    Indebtedness consisting of obligations under deferred compensation (including indemnification obligations, obligations in respect of purchase price adjustments, Earn-Outs, incentive non-competes and other contingent obligations) or other similar arrangements incurred or assumed in connection with any Permitted Acquisition, any other Investment or any Disposition, in each case, permitted under this Agreement;

(xii)    (A) Indebtedness of the Borrower or any of the Subsidiaries; provided that at the time of the incurrence thereof and after giving Pro Forma Effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xii) shall not exceed the greater of $55,200,000 and 17.25% of Consolidated EBITDA for the most recently ended Test Period as of such time7,500,000 and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof);

(xiii)    [reserved];

(xiv)    [reserved];

(xiii) (A) Indebtedness of, incurred on behalf of, or representing Guarantees of Indebtedness of, joint ventures in an aggregate outstanding principal amount not to exceed the greater of $27,600,000 and 8.625% of Consolidated EBITDA for the most recently ended Test Period and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof);

(xiv) Indebtedness (A) incurred pursuant to the Badcock First Lien Credit Agreement and the other Badcock First Lien Loan Documents in an aggregate principal amount not to exceed $425,000,000 (which amount shall be reduced by any prepayments or repayments of the principal thereof); provided that, to the extent such Indebtedness is secured, the Badcock First Lien Agent shall have entered into (x) the First Lien/Second Lien Intercreditor Agreement and (y) the Badcock Intercreditor Agreement and (B) incurred pursuant to the Badcock Second Lien Credit Agreement and the other Badcock Second Lien Loan Documents in an aggregate principal amount not to exceed $150,000,000 (which amount shall be reduced by any prepayments or repayments of the principal thereof); provided that, to the extent such Indebtedness is secured, the Badcock Second Lien Agent shall have entered into (x) the First Lien/Second Lien Intercreditor Agreement, (y) the Badcock Intercreditor Agreement and (z) the Parity Lien Intercreditor Agreement;

(xv)    Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xvi)    Indebtedness supported by a letter of credit, in a principal amount not to exceed the face amount of such letter of credit;

(xvii)    (A) Indebtedness arising from an agreement providing for indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments incurred in any Permitted Acquisition, any other Investment or any Disposition, in each case permitted under this Agreement, and (B) Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance pursuant to any such agreement described in clause (A);

(xviii)    Permitted Unsecured Refinancing Debt and any Permitted Refinancing thereof;

(xix)    (A) Permitted First Priority Refinancing Debt (subject to clause (xxxii) of this Section 6.01(a)) and any Permitted Refinancing thereof, (B) Permitted Parity Priority Refinancing Debt and any Permitted Refinancing thereof and (C) Permitted Junior Priority Refinancing Debt and any Permitted Refinancing thereof;

(xx)    [reserved];

(xxi)    [reserved];

(xx) (A)(I) Indebtedness of any Person that becomes a Subsidiary (or of any Person not previously a Subsidiary that is merged or consolidated with or into the Borrower or any Subsidiary) after the Effective Date as a result of any Permitted Acquisition or any other Investment not prohibited by Section 6.04, or (II) Indebtedness of any Person that is assumed by the Borrower or any Subsidiary in connection with an acquisition of assets by the Borrower or such Subsidiary in any Permitted Acquisition or any other Investment not prohibited by Section 6.04; provided that such Indebtedness is not incurred in contemplation of such Permitted Acquisition or other Investment and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof); provided, further, that the aggregate principal amount of Indebtedness at any time outstanding under this clause (xx) shall not exceed the greater of $27,600,000 and 8.625% of Consolidated EBITDA for the most recently ended Test Period as of such time of determination;

(xxi) (A) Indebtedness of any Subsidiary that is not a Loan Party; provided that the aggregate principal amount of Indebtedness of which the primary obligor or a guarantor is a Subsidiary that is not a Loan Party outstanding in reliance of this clause (xxi) shall not exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the greater of $27,600,000 and 8.625% of Consolidated EBITDA for the most recently ended Test Period and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof);

(xxii)    Indebtedness incurred by the Borrower or any of the Subsidiaries in respect of letters of credit, bank guarantees, warehouse receipts, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xxiii)  obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case, in the ordinary course of business or consistent with past practice;

(xxiv)  (x) Indebtedness representing deferred compensation or stock-based compensation owed to employees, consultants or independent contractors of the Borrower or its Subsidiaries incurred in the ordinary course of business or consistent with past practice and (y) Indebtedness consisting of obligations of the Borrower (or any direct or indirect parent thereof) or its Subsidiaries under deferred compensation to employees, consultants or independent contractors of the Borrower (or any direct or indirect parent thereof) or its Subsidiaries or other similar arrangements incurred by such Persons in connection with the Transactions, any Permitted Acquisition or any other Investment not prohibited by Section 6.04;

(xxv)  Indebtedness consisting of unsecured promissory notes issued by the Borrower or any Subsidiary to future, current or former officers, directors, employees, managers and consultants or their respective estates, spouses or former spouses, successors, executors, administrators, heirs, legatees or distributees, in each case to finance the purchase or redemption of Equity Interests of the Borrower (or any direct or indirect parent thereof) to the extent permitted by Section 6.07(a);

(xxvi)  (A) letters of credit or bank guarantees (exclusive of letters of credit issued pursuant to the ABL Credit Agreement) and similar instruments incurred by the Borrower and ~~the Subsidiaries~~other Loan Parties; provided that at the time of the incurrence thereof and after giving Pro Forma Effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xxvi) shall not exceed the greater of $18,400,000 and 5.75% of Consolidated EBITDA for the most recently ended Test Period as of such time and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof);

(xxvii)  ~~Capital Lease Obligations arising under any sale and leaseback transaction permitted hereunder in reliance upon Section 6.05(f)~~[reserved];

(xxviii) to the extent constituting Indebtedness, motor vehicle leases in the ordinary course of business;

(xxix)  ~~Indebtedness of any Loan Parties or Subsidiaries  incurred in connection with  any non-payment of rent by such Loan Parties or Subsidiaries caused by the COVID-19 Pandemic to the extent the landlord or other party to which such rent is due has accepted such temporary non-payment and has not declared a default under any applicable lease; provided that the aggregate outstanding amount of such Indebtedness attributable to unpaid rent shall not at any time exceed $11,500,000 for the most recently ended Test Period as of such time of determination;~~ [reserved];

(xxx)  Indebtedness incurred pursuant to the Sidecar Pari Second Lien Credit Agreement resulting from exchanges of Holdco Term Loans for loans under the Sidecar Pari Second Lien Credit Agreement in accordance with Section 2.20 of the Holdco Credit Agreement and incurred in compliance with Section 6.01(a)(viii) of the First Lien Credit Agreement and Section 9.9(t) of the ABL Credit Agreement;

(xxxi)  Indebtedness incurred pursuant to any ABL Credit Agreement and the other ABL Loan Documents (including incremental incurrences and increased amounts thereunder) in an aggregate principal amount not to exceed $400,000,000 and any Permitted Refinancing thereof; provided that, to the extent such Indebtedness is secured, the ABL Agent (or other applicable representative on behalf of the holders of such Indebtedness) shall have entered into with the Collateral Agent (or the Agents) the ABL Intercreditor Agreement;

(xxxii)  Indebtedness incurred pursuant to any First Lien Credit Agreement and the other First Lien Loan Documents (including incremental incurrences and increased amounts thereunder) in an aggregate principal amount, together with any Permitted First Priority Refinancing Debt, not to exceed $1,100,000,000 and any Permitted Refinancing thereof; provided that, to the extent such Indebtedness is secured, the First Lien Agent (or other applicable representative on behalf of the holders of such Indebtedness) shall have entered into with the Agents (or any of them) the First Lien/Second Lien Intercreditor Agreement; and, provided, further that, during the Covenant Restriction Period such Indebtedness shall be limited to the sum of (x) the existing principal amount of Indebtedness of the Borrower and its Subsidiaries as of the Fifth Amendment Effective Date plus (y) the amount of any interest owed in respect of such Indebtedness that is paid in kind by increasing the principal amount thereof or is otherwise deferred; and

(xxxiii)  all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxxii) above.

(b)      The Borrower will not, and will not permit any of its Subsidiaries to, issue any preferred Equity Interests or any Disqualified Equity Interests, except (A) in the case of the Borrower, preferred Equity Interests that are Qualified Equity Interests and (B)(x) preferred Equity Interests issued to and held by the Borrower or any Subsidiary and (y) preferred Equity Interests issued to and held by joint venture partners after the Effective Date; provided that in the case of this clause (B) (x) any such issuance of preferred Equity Interests that are not Qualified Equity Interests shall constitute incurred Indebtedness and be subject to the provisions set forth in Sections 6.01(a) and (b) (and shall only be permitted if the incurrence of such Indebtedness would have been permitted thereunder) and (y) if so incurred, any cash payments made with respect to such preferred Equity Interests shall constitute Restricted Payments and shall be subject to Section 6.07(a).

For purposes of determining compliance with any dollar denominated restriction on the incurrence of Indebtedness, the dollar equivalent principal amount of Indebtedness denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first commitment, in the case of revolving credit debt; provided, however, that if such Indebtedness is a Permitted Refinancing incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable dollar denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance such dollar denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Permitted Refinancing does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased. Notwithstanding any other provision of this Section 6.01, the maximum amount of Indebtedness the Borrower or any Subsidiary may incur pursuant to this Section 6.01 shall not be deemed exceeded by fluctuations in the exchange rate of currencies. The principal amount of any Permitted Refinancing shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of any extension, replacement, refunding, refinancing, renewal or defeasance of any Indebtedness.

With respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

Notwithstanding anything to the contrary in this Section 6.01, any outstanding Indebtedness incurred prior to the Fifth Amendment Effective Date that was permitted under Section 6.01 (before giving effect to the Fifth Amendment Effective Date) shall continue to be permitted to the extent such Indebtedness was permitted at the time of the incurrence of such Indebtedness; provided that, for the avoidance of doubt, this sentence shall not constitute a waiver of any Default or Event of Default resulting from transactions that were not permitted under this Agreement at the time of occurrence.

SECTION 6.02    Liens.

The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned (but not leased or ground-leased) or hereafter acquired (but not leased or ground-leased) by it, except:

(i)        Liens created under the Loan Documents;

(ii)       Permitted Encumbrances;

(iii)      Liens existing on the First Amendment Effective Date (provided that any Lien securing Indebtedness or other obligations in excess of $6,900,000 shall only be permitted if set forth on Schedule 6.02) and any modifications, replacements, renewals or extensions thereof; provided that (A) such modified, replacement, renewal or extension Lien does not extend to any additional property other than (1) after-acquired property that is affixed or incorporated into the property covered by such Lien and (2) proceeds and products thereof, and (B) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.01;

(iv)      Liens securing Indebtedness permitted under Section 6.01(a)(v); provided that (A) such Liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness except for replacements, additions, accessions and improvements to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Lease Obligations, such Liens do not at any time extend to or cover any assets (except for replacements, additions, accessions and improvements to or proceeds of such assets) other than the assets subject to such Capital Lease Obligations; provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)       (i) easements, leases, licenses, subleases or sublicenses granted to others (including licenses and sublicenses of Intellectual Property and Badcock Intellectual Property) that do not (A) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (B) secure any Indebtedness and (ii) any interest or title of a lessor or licensee

-146-

under any lease or license entered into by the Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased or licensed;

(vi)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)    Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, (B) attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business or (C) in favor of a banking or other financial institution or entity, or electronic payment service provider, arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking or finance industry;

(viii)    Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.04 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under Section 6.05 (including any letter of intent or purchase agreement with respect to such Investment or Disposition), or (B) consisting of an agreement to dispose of any property in a Disposition permitted under Section 6.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix)    ~~Liens on property or other assets of any Subsidiary that is not a Loan Party, which Liens secure Indebtedness or other obligations of such Subsidiary or another Subsidiary that is not a Loan Party, in each case permitted by this Agreement;~~[reserved];

(x)    Liens granted by a Subsidiary that is not a Loan Party in favor of any Subsidiary or the Borrower and Liens granted by a Loan Party in favor of any other Loan Party;

(xi)    Liens existing on property or other assets at the time of its acquisition or existing on the property or other assets of any Person at the time such Person becomes a Subsidiary, in each case after the Effective Date and any modifications, replacements, renewals or extensions thereof; provided that (A) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary and (B) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition);

(xii)    any interest or title of a lessor or sublessor under leases or subleases (other than leases constituting Capital Lease Obligations) entered into by the Borrower or any Subsidiary in the ordinary course of business;

(xiii)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by the Borrower or any Subsidiary in the ordinary course of business;

(xiv)    Liens deemed to exist in connection with Investments in repurchase agreements under clause (e) of the definition of the term "Permitted Investments";

(xv)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xvi)    Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(xvii)    Liens securing Obligations (as defined in the ABL Credit Agreement) under the ABL Credit Agreement and the other ABL Loan Documents; provided that the ABL Agent (or other applicable representative on behalf of the holders of such Indebtedness) shall have entered into with the Agents (or any of them) the ABL Intercreditor Agreement;

(xviii)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)    Liens securing Indebtedness permitted under Section 6.01(a)(xix);

(xx)    Liens on real property other than the Mortgaged Properties or the Badcock Mortgaged Properties;

(xxi)    Liens securing Secured Obligations (as defined in the First Lien Credit Agreement) under the First Lien Credit Agreement and the other First Lien Loan Documents; provided that the First Lien Agent (or other applicable representative on behalf of the holders of such Indebtedness) shall have entered into with the Agents (or any of them) (x) the First Lien/Second Lien Intercreditor Agreement and (y) prior to Payment in Full of Badcock Obligations, the Badcock Intercreditor Agreement;

(xxii)    Liens securing Indebtedness permitted under Section 6.01(a)(xii);

(xxiii)    Liens on cash and Permitted Investments to secure Indebtedness permitted under Section 6.01(a)(x) or (xxvi);

(xxiv)    Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; provided such satisfaction or discharge is permitted hereunder;

(xxv)    Receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxvi)    Liens on Equity Interests of any joint venture (a) securing obligations of such joint venture or (b) pursuant to the relevant joint venture agreement or arrangement;

(xxvii)    Liens securing Indebtedness permitted under Section 6.01(a)(xxi); on the Collateral securing the Secured Holdco Obligations Guarantee; provided that such Liens shall rank

-148-

*pari passu* with the Liens securing the Secured Obligations (as defined in the Second Lien Loan Documents);

(xxviii)   other Liens; provided that at the time of the granting of and after giving Pro Forma Effect to any such Lien and the obligations secured thereby (including the use of proceeds thereof) the lesser of (x) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xxviii) and (y) the fair market value of the assets securing such obligations shall not exceed the greater of $55,200,000 and 17.25% of Consolidated EBITDA for the most recently ended Test Period7,500,000;

(xxix)   Liens in favor of credit card issuers and credit card processors arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(xxx)   Liens on motor vehicles securing Indebtedness permitted by clause (xxviii) of Section 6.01;

(xxxi) Liens securing (A) Secured Obligations (as defined in the Badcock First Lien Credit Agreement) under the Badcock First Lien Credit Agreement and the other Badcock First Lien Loan Documents; provided that the Badcock First Lien Agent shall have entered into (x) the First Lien/Second Lien Intercreditor Agreement and (y) the Badcock Intercreditor Agreement and (B) Secured Obligations (as defined in the Badcock Second Lien Credit Agreement) under the Badcock Second Lien Credit Agreement and the other Badcock Second Lien Loan Documents; provided that the Badcock Second Lien Agent shall have entered into (x) the First Lien/Second Lien Intercreditor Agreement, (y) the Badcock Intercreditor Agreement and (y) the Parity Lien Intercreditor Agreement; and

(xxxi)   solely in connection with a Permitted PSP Securitization, Liens on Equity Interests of PSP Securitization Entities in connection therewith;

(xxxii)   [reserved]; and

(xxxiii)   (xxxii)Liens securing Indebtedness permitted under Section 6.01(a)(xxx).

With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.

Notwithstanding anything to the contrary in this Section 6.02, any Lien in existence prior to the Fifth Amendment Effective Date that was permitted under Section 6.02 (before giving effect to the Fifth Amendment Effective Date) shall continue to be permitted to the extent (i) existing on the Fifth Amendment Effective Date and (ii) such Lien was permitted at the time of the creation of such Lien; provided that, for the avoidance of doubt, this sentence shall not constitute a waiver of any Default or Event of Default resulting from transactions that were not permitted under this Agreement at the time of occurrence.

SECTION 6.03      Fundamental Changes; Lead Borrower Covenant .

(a)   The Borrower will not, and will not permit any of its Subsidiaries to, merge into or consolidate with any other Person (including pursuant to a division), or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that:

(i)    (A) any Subsidiary (other than a Borrower) may merge or consolidate with a Borrower; provided that a Borrower shall be the continuing or surviving Person and (B) any Subsidiary (other than a Borrower) may merge or consolidate with one or more other Subsidiaries; provided that when any Subsidiary Loan Party is merging or consolidating with another Subsidiary the continuing or surviving Person shall be a Subsidiary Loan Party; provided further that if the continuing or surviving Person is not a Subsidiary Loan Party, as applicable, the acquisition of such Subsidiary Loan Party by such surviving non-Loan Party Subsidiary is otherwise permitted under Section 6.04;

(ii)    (A) any Subsidiary that is not a Loan Party may merge or consolidate with or into any other Subsidiary that is not a Loan Party and (B) any Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders;

(iii)    (x) any Borrower, other than the Lead Borrower, may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to a Borrower and (y) any Subsidiary may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then (A) the transferee must be a Loan Party, (B) to the extent constituting an Investment, such Investment must be a permitted Investment in a Subsidiary that is not a Loan Party in accordance with Section 6.04 or (C) to the extent constituting a Disposition to a Subsidiary that is not a Loan Party, such Disposition is for fair market value (as determined in good faith by the Lead Borrower) and any promissory note or other non-cash consideration received in respect thereof is a permitted Investment in a Subsidiary that is not a Loan Party in accordance with Section 6.04;

(iv)    a Borrower may merge or consolidate with (or Dispose of all or substantially all of its assets to) any other Person (including another Borrower); provided that (A) a Borrower shall be the continuing or surviving Person (or, if one of the parties to such merger, consolidation or Disposal is the Lead Borrower, then the Lead Borrower shall be the continuing or surviving Person) or (B) if the Person formed by or surviving any such merger or consolidation (or, in connection with a Disposition of all or substantially all of the Borrower's assets, if the transferee of such assets) is not a Borrower or is a Person into which the Borrower has been liquidated (any such Person, the "Successor Borrower"), (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any State thereof or the District of Columbia, (2) the Successor Borrower shall expressly assume all the obligations of a Borrower under this Agreement and the other Loan Documents to which such Borrower is a party, pursuant to a supplement hereto or thereto in form and substance reasonably satisfactory to the Required Lenders, (3) each Loan Party other than such Borrower, unless it is the other party to such merger or consolidation, shall have reaffirmed, pursuant to an agreement in form and substance reasonably satisfactory to the Required Lenders, that its Guarantee of and grant of any Liens as security for the Secured Obligations shall apply to the Successor Borrower's obligations under this Agreement, and (4) such Borrower shall have delivered to the Administrative Agent and the Lenders a certificate of a Responsible Officer and an opinion of counsel, each stating that such merger or consolidation complies with this Agreement; provided further that if the foregoing requirements are satisfied, the Successor Borrower will succeed to, and be substituted for, such Borrower under this Agreement and the other Loan Documents; provided further that such Successor Borrower will use commercially reasonable efforts to provide any documentation and other information about the Successor Borrower as shall have been reasonably requested in writing by any Lender through the Administrative Agent that such Lender shall have reasonably determined is required by regulatory

authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Title III of the USA PATRIOT Act; provided, further, that a Successor Borrower may not succeed to or be substituted for the Lead Borrower pursuant to this clause (iv);

(v)     subject to prior written consent by the Required Lenders in each case to be granted in their sole discretion, the Borrower and its Subsidiaries may undertake or consummate any Tax Restructuring;

(vi)     [Reserved];

(vii)     any Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an Investment permitted pursuant to Section 6.04; provided that the continuing or surviving Person shall be a Borrower or a Subsidiary, which together with each of the Subsidiaries, shall have complied with the requirements of Sections 5.11 and 5.12; and

(viii)     any Subsidiary may effect a merger, dissolution, liquidation, consolidation or amalgamation to effect a Disposition permitted pursuant to Section 6.05.

(b)     Neither the Borrower, nor any Subsidiary Loan Party, shall amend or permit any amendments to such Person's Organizational Documents after the Effective Date in any manner that (when taken as a whole) would be materially adverse to Lenders.

(c)     The Lead Borrower will not conduct, transact or otherwise engage in any material business or material operations other than (i) the ownership and/or acquisition of the Equity Interests of its Subsidiaries and any other Persons engaged in a Similar Business (subject to Section 6.04), (ii) the performance of obligations under and compliance with its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including as a result of or in connection with the activities of any of its Subsidiaries, and including in connection with the maintenance of its status as public company and any activities related or incidental thereto, including compliance with Requirements of Law and requirements, rules, regulations and guidance (whether or not binding) of the SEC and Nasdaq, Inc., (iii) subject to Section 6.04, repurchases of Indebtedness through open market purchases and Dutch auctions (to the extent not in violation hereof and to the extent any Loans so purchased are automatically and irrevocably cancelled after repurchase), the making of any loan to any officers, directors, managers, members of management, consultants or independent contractors and the making of any Investment in any of its Subsidiaries, (iv) participating in tax, accounting and other administrative matters related to the Lead Borrower and its Subsidiaries, (v) the entry into, and exercise of rights and performance of its obligations under and in connection with the Loan Documents and Guarantees of other Indebtedness not prohibited from being incurred under this Agreement by the Lead Borrower and its Subsidiaries, including borrowings under this Agreement, the ABL Credit Agreement, the First Lien Credit Agreement, the Badcock First Lien Credit Agreement, the Badcock Second Lien Credit Agreement and any other Indebtedness not prohibited from being incurred under this Agreement, (vi) any issuance or registration of its Qualified Equity Interests for sale or resale (including, for the avoidance of doubt, the making of any dividend or distribution on account of, or any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of, any shares of any class of Qualified Equity Interests), including the costs, fees and expenses related thereto, (vii) holding of any cash and Permitted Investments, (viii) the payment of dividends or making of distributions, making of loans and contributions to the capital of its Subsidiaries and any other Persons engaged in a Similar Business and guaranteeing the obligations of its Subsidiaries and making Investments, in each case, not in violation of Article VI of this Agreement, (ix) incurring fees, costs and expenses relating to overhead and general operating expenses including professional fees for legal, tax and accounting issues and paying taxes, (x)

providing indemnification for its current and former officers, directors, managers, members of management, employees, advisors, consultants or independent contractors, (xi) performing of its obligations under the Acquisition Agreement and the other documents and agreements related thereto or contemplated thereby, (xii)(1) the payment of Public Company Costs or (2) activities reasonably incidental to the consummation of a Tax Restructuring, (xiii) activities incidental to the businesses or activities described in the foregoing clauses and (xiv) any business or other activities that are identical, reasonably similar, ancillary, incidental, complementary or related to, or a reasonable extension, development or expansion of, the business and activities conducted by or proposed to be conducted by the Lead Borrower on or immediately prior to the Effective Date.

Notwithstanding anything to the contrary in this Section 6.03, any transaction that occurred prior to the Fifth Amendment Effective Date that was permitted under Section 6.03 (before giving effect to the Fifth Amendment Effective Date) shall continue to be permitted to the extent such transaction was permitted at the time of occurrence; provided that, for the avoidance of doubt, this sentence shall not constitute a waiver of any Default or Event of Default resulting from transactions that were not permitted under this Agreement at the time of occurrence.

SECTION 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.

The Borrower will not, and will not permit any of its Subsidiaries to, make or hold any Investment, except:

(a)    Permitted Investments at the time such Permitted Investment is made and purchases of assets in the ordinary course of business consistent with past practice;

(b)    loans or advances to officers, members of the Board of Directors and employees of the Borrower and its Subsidiaries (i) subject to the Approved Budget, for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of the Borrower (or any direct or indirect parent thereof) (provided that the amount of such loans and advances made in cash to such Person shall be immediately contributed to the Lead Borrower in cash as common equity or Qualified Equity Interests and shall not increase the Available Equity Amount or constitute Aggregate Cure Amounts) and (iii) subject to prior written consent by the Required Lenders to be granted in their sole discretion, for purposes not described in the foregoing clauses (i) and (ii), in an aggregate principal amount outstanding at any time in reliance on this clause (iii) not to exceed $17,250,000 for the most recently ended Test Period as of such time;

(c) Investments by any Borrower or Subsidiary in any Borrower or Subsidiary; provided, that (i) Investments by any Loan Parties in any Subsidiaries that are not a Loan Party shall not exceed an aggregate outstanding amount of the greater of $18,400,000 and 5.75% of Consolidated EBITDA for the most recently ended Test Period as of such time and (ii) prior to Payment in Full of Badcock Obligations, Investments by any Borrower or any Subsidiary (other than Badcock) in Badcock pursuant to this clause (c) shall not exceed an aggregate outstanding amount equal to the sum of (A) $28,750,000 plus (B) the Available Equity Amount (assuming that each reference in such definition to "Effective Date" refers to the "First Amendment Effective Date");

(c)    to the extent (if any) constituting an Investment, the Secured Holdco Obligations Guarantee;

(d)    Investments consisting of extensions of trade credit and accommodation guarantees in the ordinary course of business;

(e)    Investments (i) existing or contemplated on the First Amendment Effective Date (<u>provided</u> that any Investment in an amount greater than $6,900,000 shall only be permitted if set forth on <u>Schedule 6.04(e)</u>) and any modification, replacement, renewal, reinvestment or extension thereof and (ii) Investments existing on the First Amendment Effective Date by any Borrower or any Subsidiary in any Borrower or any Subsidiary and any modification, renewal or extension thereof; <u>provided</u>, in each case, that the amount of the Investment as of the First Amendment Effective Date (or, if later, the date of the initial making of such Investment) is not increased except by the terms of such Investment to the extent, in the event such increase is in excess of $6,900,000 for the most recently ended Test Period as of such time, set forth on <u>Schedule 6.04(e)</u> or as otherwise permitted by this <u>Section 6.04</u>;

(f)    Investments in Swap Agreements incurred in the ordinary course of business and not for speculative purposes;

(g)    promissory notes and other non-cash consideration received in connection with Dispositions permitted by <u>Section 6.05, subject to prior written consent by the Required Lenders in their sole discretion</u>;

(h)    (A) Permitted Acquisitions, (B) the Badcock Acquisition and (C) intercompany Investments required (as determined by the Lead Borrower in good faith) to consummate Permitted Acquisitions and the Badcock Acquisition; <u>provided that all entities, businesses and assets (other than Excluded Assets) acquired through a Permitted Acquisition after the Fifth Amendment Effective Date shall become Loan Parties and Collateral, as applicable, pursuant to Sections 5.11 and 5.12;</u>

(i)    Investments in connection with the Transactions;

(j)    Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers in the ordinary course of business;

(k)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)    <u>subject to prior written consent by the Required Lenders to be granted in their sole discretion,</u> loans and advances to <u>officers or members of the Board of Directors of</u> any equity holder of the Lead Borrower (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to such holder (or such parent) in accordance with <u>Section 6.07(a)</u>;

(m)    additional Investments (other than Investments in Badcock prior to Payment in Full of Badcock Obligations) and other acquisitions; <u>provided</u> that the aggregate outstanding amount of such Investment or acquisition made in reliance on this clause (<u>m</u>), together with the aggregate amount of all consideration paid (excluding the Net Proceeds from the issuance of such Qualified Equity Interests) in connection with all other Investments and acquisitions made in reliance on this clause (<u>m</u>) (including the aggregate principal amount of all Indebtedness assumed in connection with any such other Investment or acquisition previously made under this clause (<u>m</u>)), shall not exceed the sum of (A) ~~(i) the greater of~~ $~~46,000,000 and 14.375% of Consolidated EBITDA for the most recently ended Test Period after giving Pro Forma Effect to the making of such Investment or other acquisition; plus (ii) the Available General RP Capacity Amount at such time; plus (~~5,000,000, plus (B) the Available Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Investment, <u>plus</u> (C) the Available

Equity Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Investment, plus (D) Investments in an aggregate outstanding amount not to exceed the portion, if any, of any unused amounts available under Section 6.07(a)(v) or 6.07(a)(xv) for Restricted Payments on the relevant date of determination that the Borrower elects to apply pursuant to this Section 6.04(m); provided that any Investment made in reliance on preceding ~~clause~~clauses (B) or (C) shall be subject to (~~x~~w) prior written consent by the Required Lenders to be granted in their sole discretion, (x) use of such Investments to (i) cover interest payments under the Holdco Credit Agreement or (ii) provide loans or advances to officers or members of the Board of Directors of Freedom VCM Holdings, LLC, (y) no Event of Default under paragraph (a), (b), (h) or (i) of Section 7.01 having occurred and be continuing or resulting therefrom and (~~y~~z) before and after giving Pro Forma Effect to such Investment, on a Pro Forma Basis, the Total Net Leverage Ratio being less than or equal to 3.56 to 1.00 as of the end of the most recently ended Test Period as of such time;

(n)       advances of payroll payments to employees in the ordinary course of business;

(o)       Investments (other than Investments in Badcock prior to Payment in Full of Badcock Obligations) and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests;

(p)       Investments of a Subsidiary acquired after the Effective Date or of a Person merged or consolidated with any Subsidiary in accordance with this Section 6.04 and Section 6.03 after the Effective Date or that otherwise becomes a Subsidiary (provided that if such Investment is made under Section 6.04(h), existing Investments in subsidiaries of such Subsidiary or Person shall comply with the requirements of Section 6.04(h)) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(q)       receivables owing to the Borrower or any Subsidiary, if created or acquired in the ordinary course of business;

(r)       Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business;

(s)       Investments in the Borrower or any Subsidiary in connection with any Tax Restructuring;

(t)       [reserved];

(u)       Investments consisting of Indebtedness, Liens, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this Section 6.04(u)) under Sections 6.01, 6.02, 6.03, 6.05 and 6.07, respectively;

(v)       contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Borrower;

(w)       to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, Badcock Intellectual Property, or other rights, in each case in the ordinary course of business;

~~(x) Investments in joint ventures (or in any Subsidiary to enable such Subsidiary to make substantially concurrent Investments in joint ventures) in an aggregate outstanding amount not to exceed the greater of $27,600,000 and 8.625% of Consolidated EBITDA for the most recently ended Test Period;~~

(x)    solely in connection with a Permitted PSP Securitization, Investments in any PSP Securitization Entity, including the initial designation of PSP and any subsidiary of PSP as a PSP Securitization Entity in connection therewith;

(y)    solely in connection with a Permitted PSP Securitization, Investments by a PSP Securitization Entity entered into prior to the day such PSP Securitization Entity is redesignated as a Subsidiary;

(z)    ~~(y)~~ [reserved];

(aa)    ~~(z)~~ [reserved];

(bb)    [reserved]; and

~~(aa) Investments in Similar Businesses (or in any Subsidiary to enable such Subsidiary to make substantially concurrent Investments in Similar Businesses) in an aggregate outstanding amount not to exceed the greater of $55,200,000 and 17.25% of Consolidated EBITDA for the most recently ended Test Period;~~

~~(bb) (i) Investments arising as a result of sale and leaseback transactions permitted by Section 6.06 hereto and (ii) to the extent constituting Investments, Investments by Badcock consisting of guarantees by Badcock of operating lease liabilities of lessees to the owners of real property sold by Badcock pursuant to and in accordance with Section 6.05(u) (solely with respect to the real property that was the subject of any such sale); and~~

(cc)    loans and advances to franchisees in the ordinary course of business (A) in connection with the sale of Franchise Rights or (B) to provide working capital to franchisees; provided that (i) such loans and advances in excess of $750,000 individually shall be evidenced by promissory notes and any such promissory notes shall be pledged to the Collateral Agent to the extent required by the Security Documents and (ii) the aggregate outstanding principal amount of such loans and advances made in reliance on this clause (cc) shall not exceed $11,500,000 for the most recently ended Test Period at any time.

Notwithstanding anything to the contrary in this Section 6.04, other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries in a transaction not prohibited by this Agreement, no Material Intellectual Property (except for non-exclusive leases or non-exclusive licenses with respect thereto) as of the Fifth Amendment Effective Date owned or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be contributed and/or assigned as an Investment or otherwise transferred to (i) any non-Loan Party or (ii) prior to Payment in Full of Badcock Obligations, Badcock.

Notwithstanding anything to the contrary in this Section 6.04, any Investment that was made prior to the Fifth Amendment Effective Date that was permitted under Section 6.04 (before giving effect to the Fifth Amendment Effective Date) shall continue to be permitted to the extent such Investment was permitted at the time of the making of such Investment; provided that, for the avoidance of doubt, this sentence shall not constitute a waiver of any Default or Event of Default resulting from transactions that were not permitted under this Agreement at the time of occurrence.

SECTION 6.05    Asset Sales.

The Borrower will not, and will not permit any of its Subsidiaries to, (i) sell, transfer, lease or otherwise dispose (including pursuant to a division) of any asset, including any Equity Interest owned by it or (ii) permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law and other than issuing Equity Interests to the Borrower or a Subsidiary in compliance with Section 6.04(c)) (each, a "Disposition" and the term "Dispose" as a verb has the corresponding meaning), except:

(a)    Dispositions of obsolete, damaged, used, surplus or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable to maintain, in the conduct of the business of the Borrower and its Subsidiaries (including allowing any registration or application for registration of any Intellectual Property or Badcock Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, be dedicated to the public domain or be invalidated);

(b)    Dispositions of inventory and other assets in the ordinary course of business and immaterial assets (considered in the aggregate) in the ordinary course of business;

(c)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) an amount equal to Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)    Dispositions of property to the Borrower or a Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party (other than, prior to Payment in Full of Badcock Obligations, Badcock), (ii) to the extent constituting an Investment, such Investment must be a Permitted Investment in a Subsidiary that is not a Loan Party or, prior to Payment in Full of Badcock Obligations, Badcock, in each case, in accordance with Section 6.04 or (iii) ~~to the extent constituting a Disposition to a Subsidiary that is not a Loan Party or, prior to Payment in Full of Badcock Obligations, Badcock, such Disposition is for fair market value (as determined in good faith by the Borrower) and any promissory note or other non-cash consideration received in respect thereof is a permitted investment in a Subsidiary that is not a Loan Party or, prior to Payment in Full of Badcock Obligations, Badcock, in each case, in accordance with Section 6.04~~[reserved];

(e)    Dispositions permitted by Section 6.03 and Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.07 and Liens permitted by Section 6.02;

(f)    ~~Dispositions of property pursuant to sale and leaseback transactions permitted by Section 6.06 hereto~~[reserved];

(g)    Dispositions of Permitted Investments;

(h)    Dispositions of accounts receivable in connection with the collection or compromise thereof (including sales to factors or other third parties);

(i)    leases, subleases, service agreements, product sales, abandonments, licenses, sublicenses or other disposals (including of Intellectual Property and Badcock Intellectual Property), in each case, (A) granted in the ordinary course of business or (B) that do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(j)        transfers of property subject to Casualty Events;

(k)        Dispositions of property to Persons other than Subsidiaries (including the sale or issuance of Equity Interests of a Subsidiary and including the sale of real property) for fair market value (as determined by a Responsible Officer of the Lead Borrower in good faith) not otherwise permitted under this Section 6.05; provided that with respect to any Disposition pursuant to this clause (k) for a purchase price in excess of (x) with respect to any single transaction or series of related transactions, $11,500,000 or (y) with respect to all other Dispositions in any fiscal year of the Lead Borrower not excluded from the requirements of this proviso pursuant to the immediately preceding subclause (x), $23,000,000, unless subject to prior written consent by the Required Lenders in their sole discretion, the Borrower or any Subsidiary shall receive not less than 75100% of such consideration in excess of the amounts referred to subclauses (x) and (y) in the form of cash or Permitted Investments; provided, however, that solely for the purposes of this clause (k), (A)and subject to the prior written consent of the Required Lenders to be granted in their sole discretion, any liabilities (as shown on the most recent balance sheet of the Borrower or such Subsidiary or in the footnotes thereto) of the Borrower or such Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Loan Document Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of the Subsidiaries shall have been validly released by all applicable creditors in writing, shall be deemed to be cash, (B) any securities, notes or other obligations or assets received by the Borrower or such Subsidiary from such transferee that are converted by the Borrower or such Subsidiary into cash or Permitted Investments (to the extent of the cash or Permitted Investments received) within one hundred and eighty (180) days following the closing of the applicable Disposition, shall be deemed to be cash, (C) Indebtedness of any Subsidiary that ceases to be a Subsidiary as a result of such Disposition (other than intercompany debt owed to the Borrower or its Subsidiaries), to the extent that the Borrower and all of the Subsidiaries (to the extent previously liable thereunder) are released from any guarantee of payment of the principal amount of such Indebtedness in connection with such Disposition, shall be deemed to be cash and (D) any Designated Non-Cash Consideration received by the Borrower or such Subsidiary in respect of such Disposition having an aggregate fair market value (as determined by a Responsible Officer of the Lead Borrower in good faith), taken together with all other Designated Non-Cash Consideration received pursuant to this clause (k) that is at that time outstanding, not in excess of $28,750,000, with the fair market value (as determined in good faith by the Lead Borrower) of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash; provided, further, that, other than in respect of the Disposition described on Schedule 6.05(k), no Event of Default shall have occurred and be continuing at the time of, and after giving effect to, any Disposition made pursuant to this clause (k);

(l)        Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(m)       Dispositions or forgiveness of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(n)        Dispositions of any assets (including Equity Interests) (A) acquired in connection with any Permitted Acquisition or other Investment not prohibited hereunder, which assets are not used or useful to the core or principal business of the Borrower and its Subsidiaries and (B) made to obtain the approval of any applicable antitrust authority in connection with a Permitted Acquisition;

(o) Dispositions of assets that are not Collateral or Badcock Collateral in an aggregate amount not to exceed the greater of $9,200,000 and 2.875% of Consolidated EBITDA for the most recently ended Test Period in any fiscal year of the Lead Borrower;

(o)    [reserved];

(p)    transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(q)    any Disposition of the Equity Interests of any Immaterial Subsidiary;

(r) other Dispositions in an aggregate amount not to exceed the greater of $9,200,000 and 2.875% of Consolidated EBITDA for the most recently ended Test Period in any fiscal year of the Lead Borrower;

(r)    (s)[reserved];

(s)    solely in connection with a Permitted PSP Securitization, each Borrower and any Subsidiary may Dispose of Equity Interests in, or Indebtedness or other securities of, a PSP Securitization Entity subject to the prior written consent of the Required Lenders in their sole discretion;

(t)    sales or other dispositions by any Borrower or any Subsidiary of assets in connection with the closing or sale of a retail store location (the closure of a store is not in and of itself the disposition of assets), warehouse, distribution center or corporate office of such Borrower or Subsidiary in the ordinary course of business of such Borrower or Subsidiary, which sale or disposition consists of leasehold interests in the premises of such store or distribution center, the equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such store or distribution center; provided, that, such sale shall be on commercially reasonable prices and terms in a bona fide arm's length transaction; and

(u)    Dispositions of Badcock Collateral for fair market value (as determined by a Responsible Officer of the Lead Borrower in good faith).

Notwithstanding anything to the contrary in this Section 6.05, (x) other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries in a transaction not prohibited by this Agreement, no Loan Party shall, directly or indirectly, sell or otherwise transfer (except for non-exclusive leases or non-exclusive licenses with respect thereto) any Material Intellectual Property owned as of the Fifth Amendment Effective Date or thereafter acquired or any interest in any Franchise Agreement to (i) any non-Loan Party or (ii) prior to Payment in Full of Badcock Obligations, Badcock., and (y) on and following the Fifth Amendment Effective Date, (i) any sales or other dispositions by any Borrower or any Subsidiary of assets outside the ordinary course of business in excess of $5,000,000 in the aggregate require prior written consent by the Required Lenders to be granted in their sole discretion and (ii) neither Borrower nor its Subsidiaries shall undertake any receivables securitization, any whole business securitization or any other securitization transaction with respect to its assets or businesses other than a Permitted PSP Securitization.

Notwithstanding anything to the contrary in this Section 6.05, any Asset Sale that occurred prior to the Fifth Amendment Effective Date that was permitted under Section 6.05 (before giving effect to the Fifth Amendment Effective Date) shall continue to be permitted to the extent such Asset Sale was permitted at the time of occurrence; provided that, for the avoidance of doubt, this sentence shall not constitute a waiver of any Default or Event of Default resulting from transactions that were not permitted under this Agreement at the time of occurrence.

SECTION 6.06    ~~Sale and Leaseback Transactions~~[Reserved].

~~The Borrower will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any tangible property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for (i) sale and leaseback transactions in an aggregate amount not to exceed the greater of $18,400,000 and 5.75% of Consolidated EBITDA, (ii) any such sale of any fixed or capital assets by the Borrower or any Subsidiary that is made for cash consideration in an amount not less than the fair market value (as determined in good faith by the Lead Borrower) of such fixed or capital asset and is consummated within 270 days after the Borrower or such Subsidiary, as applicable, acquires or completes the construction of such fixed or capital asset and (iii) any sale and leaseback transactions of Badcock Collateral so long as such sale is for fair market value (as determined by a Responsible Officer of the Lead Borrower in good faith).~~

SECTION 6.07    Restricted Payments; Certain Payments of Indebtedness.

(a)    The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(i)    each Subsidiary may make Restricted Payments to the Borrower or any other Subsidiary; provided that in the case of any such Restricted Payment by a Subsidiary that is not a Wholly Owned Subsidiary of the Borrower, such Restricted Payment is made to the Borrower and/or any Subsidiary ~~and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests~~;

(ii)    the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person;

(iii)    Restricted Payments made on or substantially contemporaneously with the Effective Date to consummate the Transactions, including to finance the payment of Transaction Costs;

(iv)    repurchases of Equity Interests in the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price or withholding taxes payable in connection with the exercise of such options or warrants or other incentive interests;

(v)    Restricted Payments used to redeem, acquire, retire, repurchase or settle the Borrower's Equity Interests (or any options, warrants, restricted stock or stock appreciation rights or similar securities issued with respect to any such Equity Interests) held directly or indirectly by current or former officers, managers, consultants, members of the Board of Directors, employees or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of the Lead Borrower (or any direct or indirect parent thereof), and its Subsidiaries (in each case, other than the executive management (i.e., the CEO, the CFO, any executive vice presidents and any similar executive management positions)), upon the death, disability, retirement or termination of employment of any such Person or otherwise in accordance with any stock option or stock appreciation rights plan, any management, director and/or employee stock ownership or incentive plan, stock subscription plan, employment termination agreement or any other employment agreements or equity holders' agreement in an aggregate amount ~~after the Effective Date~~ not to exceed $11,500,000 ~~in any fiscal year~~ ~~of the Lead~~

Borrower with unused amounts in any fiscal year being carried over solely to the next succeeding fiscal years; provided that such amount in any fiscal year may be increased by (1) an amount not to exceed(1) the cash proceeds of key man life insurance policies received by the Borrower or the Subsidiaries after the Effective Date, or (2) the amount of any bona fide cash bonuses otherwise payable to members of the Board of Directors, consultants, officers, employees, managers or independent contractors the Borrower or any Subsidiary that are foregone in return for the receipt of Equity Interests, the fair market value of which is equal to or less than the amount of such cash bonuses, which, if not used in any year, may be carried forward solely to the next subsequent fiscal year; provided further that cancellation of Indebtedness owing to the Borrower or any Subsidiary from members of the Board of Directors, consultants, officers, employees, managers or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of the Borrower or any Subsidiary in connection with a repurchase of Equity Interests of the Borrower will not be deemed to constitute a Restricted Payment for purposes of this Section 6.07 or any other provisions of this Agreement.

(vi)    [reserved]to the extent (if any) constituting a Restricted Payment, the Secured Holdco Obligations Guarantee;

(vii)    in addition to the foregoing Restricted Payments, the Borrower may make additional Restricted Payments, in an aggregate amount, when taken together with the aggregate amount of loans and advances previously made pursuant to Section 6.04(m) in lieu of Restricted Payments permitted by this clause (vii), not to exceed the sum of (A) the Available Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Restricted Payment, plus (B) the Available Equity Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Restricted Payment; provided that any Restricted Payment made in reliance on preceding clauseclauses (A) or (B) shall be subject to, (xw) prior written consent by the Required Lenders to be granted in their sole discretion, (x) use of such Investments to (i) cover interest payments under the Holdco Credit Agreement, (ii) provide loans or advances to officers or members of the Board of Directors of Freedom VCM Holdings, LLC, or (iii) reimburse costs and expenses relating to overhead to Freedom VCM Holdings, LLC, (y) no Event of Default having occurred and be continuing or resulting therefrom (tested at the time of declaration of such Restricted Payment) and (yz) before and after giving Pro Forma Effect to such Restricted Payment, on a Pro Forma Basis, the Total Net Leverage Ratio being less than or equal to 3.21 to 1.00 as of the end of the most recently ended Test Period (tested at the time of declaration of such Restricted Payment);

(viii)    redemptions in whole or in part of any of its Equity Interests for another class of its Equity Interests or with proceeds from substantially concurrent equity contributions;

(ix)    payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units;

(x)    Restricted Payments to pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition (or other similar Investment) and (b) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

-160-

(xi)    payments made or expected to be made by the Borrower or any Subsidiary in respect of withholding or similar Taxes payable upon exercise of Equity Interests by any future, present or former employee, director, officer, manager or consultant (or their respective controlled Affiliates or permitted transferees) and any repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants or required withholding or similar taxes; provided that if such payments are finally determined to be in excess of the withholding or similar Taxes, the Borrower shall make best efforts to return such payments within thirty (30) days of such final determination;

(xii)    [Reserved];

(xiii)    [Reserved];

(xiv)    [Reserved];

(xv)    additional Restricted Payments in an amount not to exceed $138,000,000; provided that after giving effect to such Restricted Payment  no Event of Default  exists or would result therefrom;[Reserved];

(xvi)    [Reserved];

(xvii)    additional Restricted Payments (other than Restricted Payments of Equity Interests of any Wholly Owned Subsidiary); provided that after giving effect to such Restricted Payment (A) on a Pro Forma Basis, the Total Net Leverage Ratio is equal to or less than 2.96 to 1.00 and (B) no Event of Default exists or would result therefrom; andsubject to prior written consent by the Required Lenders to be granted in their sole discretion, payment of regularly scheduled interest payments under the Holdco Credit Agreement in accordance with the terms thereof; and

(xviii)    Permitted Tax Distributions.

(b)    The Borrower will not, and will not permit any of its Subsidiaries to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Junior Financing, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Junior Financing, or any other payment (including any payment under any Swap Agreement) that has a substantially similar effect to any of the foregoing, in each case, except:

(i)    payment of regularly scheduled interest and principal payments, mandatory offers to repay, repurchase or redeem, mandatory prepayments of principal, premium and interest, and payment of fees, expenses and indemnification obligations, in each case with respect to such Junior Financing, other than payments in respect of any Junior Financing prohibited by the subordination provisions thereof; provided that, during the Covenant Restriction Period, payment of such regularly scheduled interest and principal payments (other than with respect to unsecured Indebtedness, which will be paid pursuant to the terms and conditions thereof) shall be paid in kind by increasing the principal amount thereof;

(ii)    refinancings of Indebtedness to the extent permitted by Section 6.01;

(iii)    (1) the conversion of any Junior Financing to Equity Interests (other than Disqualified Equity Interests) of the Borrower and (2) any payment that is intended to prevent any Junior Financing from being treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code;

(iv)    prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing; provided that after giving effect to such prepayments, redemptions, purchases, defeasances or other payments (A) on a Pro Forma Basis, the Total Net Leverage Ratio is equal to or less than 2.96 to 1.00 and (B) no Event of Default exists or would result therefrom; provided further, that during the Covenant Restriction Period, such prepayments, redemptions, purchases, defeasances and other payments shall be subject to prior written consent by the Required Lenders to be granted in their sole discretion

(v)    payments made in connection with, or in order to consummate, the Transactions;

(vi)    (A) prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing in an aggregate amount not to exceed the greater of $92,000,000 and 28.75% of Consolidated EBITDA on a Pro Forma Basis for the most recently ended Test Period plus (B) the amount of Restricted Payments that may be made pursuant to Section 6.07(a)(xv) at such time; provided that during the Covenant Restriction Period, such prepayments, redemptions, purchases, defeasances and other payments shall be subject to prior written consent by the Required Lenders to be granted in their sole discretion;

~~(vii)    additional prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing;~~ ~~provided that the aggregate amount of such prepayments, redemptions, purchases, defeasances and other payments~~ ~~made in reliance on this clause (vii),~~ ~~shall not exceed the sum of (A) the Available Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such prepayments, redemptions, purchases, defeasances and other payments,~~ ~~plus (B) the Available Equity Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such prepayments, redemptions, purchases, defeasances and other payments;~~ ~~provided that any prepayments, redemptions, purchases, defeasances and other payments made in reliance on preceding clause (A)~~ ~~shall be subject to, before and after giving Pro Forma Effect to such prepayments, redemptions, purchases, defeasances and other payments, the Total Net Leverage Ratio being less than or equal to 3.21 to 1.00 as of the end of the most recently ended Test Period (tested at the time of distribution or delivery of any irrevocable notice of prepayment, redemption, repurchase or defeasance, as applicable, in respect thereof);~~

(vii)    [reserved];

(viii)    the prepayment of any Junior Financing owed to the Borrower or a Subsidiary or the prepayment of any Permitted Refinancing of such Indebtedness with the proceeds of any other Junior Financing; provided that (A) no Loan Party shall make any prepayment of any Junior Financing owed to any Subsidiary that is not a Loan Party pursuant to this clause (viii) and (B) prior to Payment in Full of Badcock Obligations, neither the Borrower nor any Subsidiary (other than Badcock) shall make any prepayment of any Junior Financing owed to Badcock pursuant to this clause (viii); and

(ix)    prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing within one year of the scheduled maturity of such Junior Financing;

provided, that after giving effect to such prepayments, redemptions, purchases, defeasances and other payments, no Event of Default under paragraph (a), (b), (h) or (i) of Section 7.01 exists or would result therefrom.; provided that during the Covenant Restriction Period, such prepayments, redemptions, purchases, defeasances and other payments shall be subject to prior written consent by the Required Lenders to be granted in their sole discretion.

Notwithstanding anything to the contrary in this Agreement, no Material Intellectual Property (except for non-exclusive leases, non-exclusive licenses or Excluded Assets with respect thereto) owned as of the Fifth Amendment Effective Date or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be made as a Restricted Payment or Investment, or otherwise transferred to or held by, any non-Loan Party.

Notwithstanding anything to the contrary in this Section 6.07, any Restricted Payment that occurred prior to the Fifth Amendment Effective Date (or after such date pursuant to a binding contractual agreement that is in place prior to the Fifth Amendment Effective Date) that was permitted under Section 6.07 (before giving effect to the Fifth Amendment Effective Date) shall continue to be permitted to the extent such Restricted Payment was permitted at the time of occurrence (or entrance into such agreement, as applicable); provided that, for the avoidance of doubt, this sentence shall not constitute a waiver of any Default or Event of Default resulting from transactions that were not permitted under this Agreement at the time of occurrence.

SECTION 6.08    Transactions with Affiliates.

The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (i) (A) transactions between or among any Borrower or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction and (B) transactions involving aggregate payment or consideration of less than the greater of $27,600,000 and 8.625% of Consolidated EBITDA for the most recently ended Test Period as of such time, (ii) on terms not materially less favorable to the Borrower or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's-lengtharm's length transaction with a Person other than an Affiliate (as determined by the majority of the members of the Board of Directors (or any committee thereof) or a majority of the disinterested members of the Board of Directors (or any committee thereof) of the Lead Borrower in good faith), (iii) the payment of Transaction Costs, fees and expenses related to the Transactions, (iv) Dispositions in the form of a sale of furniture and assignment of lease agreements to franchisees in the ordinary course of business consistent with past practices, so long as the sale thereof is approved by disinterreddisinterested members of the Board of Directors (or any committee thereof), (v) issuances of Equity Interests of the Borrower and the Subsidiaries to the extent otherwise permitted by this Agreement, (vi) employment and severance arrangements and other compensation arrangements between the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Sections 6.04(b) and 6.04(n)), (vii) investments by Affiliates in Indebtedness and preferred Equity Interests of the Borrower and the Subsidiaries, (viii) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board of Directors, officers and employees of the Lead Borrower (or any direct or indirect parent thereof)  and the Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Lead Borrower and its Subsidiaries, (ix) transactions pursuant to agreements in existence or contemplated on the First Amendment Effective Date and set forth on Schedule 6.08 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect, (x) Restricted Payments permitted under Section 6.07 and loans and advances in lieu thereof pursuant toInvestments permitted under Section 6.04(l), (xi) payments to or from, and transactions with, any joint venture in the ordinary course of business (including any cash

-163-

management activities related thereto), (xii) transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services that are Affiliates, in each case in the ordinary course of business and which are fair to the Borrower and the Subsidiaries, in the reasonable determination of the Lead Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party, such (xiii) [reserved], (xiv) customary payments by the Borrower and any Subsidiaries to any Investors made for any financial advisory, consulting, financing, underwriting or placement services or in respect of other investment banking activities (including in connection with acquisitions, divestitures or financings), which payments are approved by the majority of the members of the Board of Directors (or any committee thereof) or a majority of the disinterested members of the Board of Directors (or any committee thereof) of the Lead Borrower in good faith and (xv) payments by the Borrower and any Subsidiaries to reimburse any Investors and other Affiliates for any indemnities and reasonable out-of-pocket costs and expenses incurred in connection with the provision of any financial advisory, consulting, financing, underwriting or placement services or in respect of other investment banking activities (including in connection with acquisitions, divestitures or financings) by such Investor to Borrower and any Subsidiaries. and (xiii) a Permitted PSP Securitization; provided that, each such transaction (other than any transaction pursuant to clauses (i)(A), (ii), (iii), (iv), (vi), (x) and (xiii) shall be on terms not materially less favorable to the Borrower or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate.

Notwithstanding anything to the contrary in this Section 6.08, any transaction that occurred prior to the Fifth Amendment Effective Date (or after such date pursuant to a binding contractual agreement that is in place prior to the Fifth Amendment Effective Date) that was permitted under Section 6.08 (before giving effect to the Fifth Amendment Effective Date) shall continue to be permitted to the extent such transaction was permitted at the time of occurrence (or entrance into such agreement, as applicable); provided that, for the avoidance of doubt, this sentence shall not constitute a waiver of any Default or Event of Default resulting from transactions that were not permitted under this Agreement at the time of occurrence.

SECTION 6.09    Restrictive Agreements.

The Borrower will not, and will not permit any of its Subsidiaries to enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties with respect to the Secured Obligations or under the Loan Documents; provided that the foregoing shall not apply to:

(a)    restrictions and conditions imposed by (1) Requirements of Law, (2) any Loan Document, (3) [reserved], (4) any documentation governing Permitted Unsecured Refinancing Debt, Permitted Junior Priority Refinancing Debt, Permitted Parity Priority Refinancing Debt or Permitted First Priority Refinancing Debt; provided that none of such documentation shall prohibit or limit the Lien in favor of the Collateral Agent for the benefit of the Secured Parties with respect to the Secured Obligations as in effect on the Effective Date, (5) any documentation governing Indebtedness incurred pursuant to Section 6.01(a)(xxi) or Section 6.01(a)(xxvi), (6) the ABL Loan Documents, the First Lien Loan Documents, the Badcock First Lien Loan Documents or the Badcock Second Lien Loan Documents or (7) any documentation governing any Permitted Refinancing incurred to refinance any such Indebtedness referenced in clauses (1) through (6) above;

(b)    customary restrictions and conditions in any agreements, instruments, deeds or leases existing on the Effective Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

-164-

(c)      restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; <u>provided</u> that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)      customary provisions in leases, licenses, sublicenses and other contracts restricting the assignment thereof;

(e)      restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f)      any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Lead Borrower or any other Subsidiary;

(g)      restrictions or conditions in any Indebtedness permitted pursuant to <u>Section 6.01</u> that is incurred or assumed by Subsidiaries that are not Loan Parties to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Loan Documents or, in the case of any Junior Financing, are market terms at the time of issuance and are imposed solely on such Subsidiary and its Subsidiaries;

(h)      restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)      restrictions set forth on <u>Schedule 6.09</u> and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)      customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by <u>Section 6.04</u>;

(k)      customary restrictions contained in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto;

(l)      customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary; and

(m)      customary provisions related to creditworthiness of the tenant contained in real property leases entered into by Subsidiaries, so long as the Borrower has determined in good faith that such creditworthiness provisions could not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations.

<u>Notwithstanding anything to the contrary in this Section 6.09, any agreement, instrument, deed or lease entered into prior to the Fifth Amendment Effective Date that was permitted under Section 6.09 (before giving effect to the Fifth Amendment Effective Date) shall continue to be permitted to the extent such agreement, instrument, deed or lease was permitted at the time of entry; provided that, for the avoidance of doubt, this sentence shall not constitute a waiver of any Default or Event of Default resulting from transactions that were not permitted under this Agreement at the time of occurrence.</u>

SECTION 6.10    Financial Maintenance Covenants.

(a)    *Maximum Total Net Leverage Ratio*. As of the last day of each fiscal quarter of the Lead Borrower (commencing with the first full fiscal quarter ending after the Effective Date), the Lead Borrower will not permit the Total Net Leverage Ratio of the Lead Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, to be greater than (a) for each fiscal quarter (commencing with the first full fiscal quarter ending after the Effective Date) prior to the fiscal quarter ending on or about December 31, 2022, 4.40 to 1.00 and (b) for each fiscal quarter thereafter (beginning with the fiscal quarter ending on or about December 31, 2022, other than in respect of the fiscal quarter ending on or about June 29, 2024, in respect of which no test under this Section 6.10(a) will apply; provided that upon the occurrence of a Covenant Testing Trigger Event, the financial covenants in this Section 6.10(a) will be tested for all fiscal quarters ending on and after the date of such Covenant Testing Trigger Event), 3.90 to 1.00.

(b)    *Minimum Fixed Charge Coverage Ratio*. As of the last day of each fiscal quarter of the Lead Borrower (commencing with the first full fiscal quarter ending after the Effective Date), the Lead Borrower will not permit the Fixed Charge Coverage Ratio of the Lead Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, on a consolidated basis to be less than 1.50 to 1.00., other than in respect of the fiscal quarter ending on or about June 29, 2024, in respect of which no test under this Section 6.10(b) will apply; provided that upon the occurrence of a Covenant Testing Trigger Event, the financial covenants in this Section 6.10(b) will be tested for all fiscal quarters ending on and after the date of such Covenant Testing Trigger Event..

SECTION 6.11    Changes in Fiscal Periods.

The Lead Borrower will not make any change in its fiscal year; provided, however, that the Lead Borrower may, upon written notice to the Administrative Agent (which the Administrative Agent shall promptly deliver to the Lenders), change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Lead Borrower and the Required Lenders will, and are hereby authorized by the Lenders and the Administrative Agent to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year, without any requirement of consent by any other Lender or other Person (notwithstanding anything to the contrary in Section 9.02); and provided further that the limitation of this Section 6.11 shall not apply with respect to any short year resulting from the Transactions that occurred on the Effective Date.

SECTION 6.12    Amendment of Financing Documents.

The Borrower will not, and will not permit any of its Subsidiaries to, amend, modify, waive, terminate or release any ABL Loan Document, any First Lien Loan Document, any Badcock First Lien Loan Document, any Badcock Second Lien Loan Document or the documentation governing any other Junior Financing, in each case, in a manner restricted by the terms of any applicable intercreditor or subordination agreement.

SECTION 6.13    Franchise Agreements.

The Borrower will not, and will not permit any of its Subsidiaries to, maintain or distribute any Franchise Disclosure Documents, or enter into any Franchise Agreements, in violation of Section 3.20(c).

SECTION 6.14    Anti-Layering.

The Borrower will not, and will not permit any of its Subsidiaries to, create or incur any Indebtedness which is contractually subordinated or contractually junior in right of payment or security to the Indebtedness incurred under the First Lien Loan Documents, unless such Indebtedness is contractually *pari passu* or contractually junior in right of payment or security, as applicable, to the Loan Document Obligations, in each case, other than the creation or incurrence of Indebtedness under the ABL Loan Documents.

SECTION 6.15    Badcock.

In addition to the restrictions set forth in Sections 6.1 through 6.14, the Borrower will not permit Badcock to, in each case prior to Payment in Full of Badcock Obligations:

(a)    create, incur, assume or permit to exist any Indebtedness, except Indebtedness permitted by clauses (a)(i), (a)(ii), (a)(iii), (a)(iv), (a)(x), (a)(xiv), (a)(xv), (a)(xvi), (a)(xxii), (a)(xxiii), (a)(xxiv), (a)(xxv), (a)(xxvii), (a)(xxix), (a)(xxxii) and (a)(xxxiii) (solely as it relates to clauses (a)(i), (a)(ii), (a)(iii), (a)(iv), (a)(x), (a)(xiv), (a)(xv), (a)(xvi), (a)(xxii), (a)(xxiii), (a)(xxiv), (a)(xxv), (a)(xxvii), (a)(xxviii), (a)(xxix), (a)(xxxii) of Section 6.01) of Section 6.01;

(b)    issue any preferred Equity Interests or any Disqualified Equity Interests;

(c)    create, incur, assume or permit to exist any Lien on any property or asset now owned (but not leased or ground-leased) or hereafter acquired (but not leased or ground-leased) by it, except Liens permitted by clauses (i), (ii), (iii), (v), (vi), (vii), (viii), (xii), (xiii), (xv), (xvi), (xviii), (xx), (xxi), (xxiii) (solely in respect of Section 6.01(a)(x)), (xxv), (xxix), (xxx) and (xxxi) of Section 6.02;

(d)    merge into or consolidate with any other Person (including pursuant to a division), or permit any other Person to merge into or consolidate with it, or liquidate or dissolve;

(e)    make or hold any Investment, except Investments permitted by clauses (a), (d), (e), (g), (j), (k), (n), (q), (r), (s), (v), (w) and (bb) of Section 6.04;

(f)    sell, transfer, lease or otherwise dispose (including pursuant to a division) of any asset, including any Equity Interest owned by it, except Dispositions permitted by clauses (a), (b), (c), (d), (f), (g), (h), (i), (j), (m), (p), (t) and (u) of Section 6.05; *provided* that any Disposition by Badcock pursuant to Section 6.05(f) or Section 6.05(u) shall only be permitted hereunder to the extent the Net Proceeds of such Disposition are used to repay Indebtedness in accordance with the terms of the Badcock First Lien Credit Agreement, the Badcock Second Lien Credit Agreement, the First Lien Credit Agreement and this Agreement (without giving effect to any reinvestment rights that would otherwise allow the Borrower and its Subsidiaries to reinvest such Net Proceeds in lieu of making any such repayment); or

(g)    allow to be effective any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any tangible property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except to the extent permitted by Section 6.06(iii).

SECTION 6.16    Minimum Liquidity.

As of any date as determined in accordance with Section 5.15(f) during the Covenant Restriction Period, the Lead Borrower shall not permit Liquidity of the Lead Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, to be less than $15,000,000.

SECTION 6.17    Special Committee and Independent Directors.

Neither the Lead Borrower nor Freedom VCM Holdings, LLC (including the Board of Directors of each such entity), as applicable, shall (1) dissolve, disband or terminate either Special Committee, (2) limit, diminish or modify the rights, powers or authorities delegated to either Special Committee, (3) remove any of the Independent Directors from the Board of Directors of Freedom VCM Holdings, LLC, the Board of Directors of the Lead Borrower, or either of the Special Committees, or (4) take, or allow or permit to be taken or exist, any action that alters, changes or otherwise modifies any of the matters set forth in Section 5.15(i)(iii), unless approved in advance by the Required Lenders, subject in any case to Section 5.15(j) hereof.

ARTICLE VII

EVENTS OF DEFAULT

SECTION 7.01    Events of Default.

If any of the following events (any such event, an "Event of Default") shall occur:

(a)    any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    any Loan Party shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) of this Section 7.01) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of the Borrower or any of the Subsidiaries in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect (or all respects to the extent already qualified by materiality) when made or deemed made, and such incorrect representation or warranty (if curable) shall remain incorrect for a period of thirty (30) days after notice thereof from the Administrative Agent or the Required Lenders to the Borrower;

(d)    the Borrower or any of the Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.02(a), 5.04 (with respect to the existence of the Borrower), 5.10, 5.14 or in Article VI; provided that any Event of Default due to failure to comply with the Financial Maintenance Covenants is subject to cure as provided in Section 7.02 and an Event of Default with respect to such Section shall not occur until the Cure Expiration Date for the applicable fiscal quarter of the Lead Borrower;

(e)    the Borrower or any of the Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section 7.01) and (i) during the Covenant Restriction Period such failure shall continue unremedied for a period of five (5) Business Days and (ii) at all other times, shall continue unremedied for a period of thirty (30) days, in each case after written notice thereof from the Administrative Agent or the Required Lenders to the Borrower;

(f)    any Lien purported to be created under any Badcock Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material portion of the Badcock Collateral, with the priority required by the applicable Badcock Security Documents, except (i) as a result of the sale or other disposition of the applicable Badcock Collateral to a Person that is not a Loan Party in a transaction permitted under the Loan Documents, (ii) as a result of any Agent's (or any agent acting on its behalf pursuant to any applicable Intercreditor Agreement) failure to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Badcock Security Documents or (B) file Uniform Commercial Code continuation statements, (iii) as to Badcock Collateral consisting of real property to the extent that (x) such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (y) such deficiency arose through no fault of Borrower or its Subsidiaries, and such deficiency is corrected with reasonable diligence upon obtaining actual knowledge thereof, or (iv) as a result of acts or omissions of any Agent or any Secured Party;

(g)    any event or condition occurs that results in any Material Indebtedness, Indebtedness under the ABL Loan Documents, Indebtedness under the First Lien Credit Agreement, Indebtedness under the Badcock First Lien Credit Agreement and/or Indebtedness under the Badcock Second Lien Credit Agreement becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any such Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, provided that this paragraph (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness, other than on account of failure to make a payment required as a result of such termination or similar events; provided, further, that an event or condition with respect to the First Lien Credit Agreement that would otherwise constitute an Event of Default pursuant to this paragraph (g) shall not be an Event of Default (A) unless such event or condition constitutes a payment "Event of Default" under (and as defined in) the First Lien Credit Agreement or (B) otherwise, until the earlier of (x) the date on which the Indebtedness under the First Lien Credit Agreement has been accelerated as a result of such event or condition and (y) the first date on which such event or condition shall have continued unremedied for a period of 30 days after the initial date of such event or condition (during which the applicable "Event of Default" under (and as defined in) the First Lien Credit Agreement is not waived or cured);

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, court protection, reorganization or other relief in respect of the Borrower or any Material Subsidiary or its debts, or of a material part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, examiner, sequestrator, conservator or similar official for the Borrower or any Material Subsidiary or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in paragraph (h) of this Section 7.01, (iii) apply for or consent to the appointment of a receiver, trustee, examiner, custodian, sequestrator, conservator or similar official for the Borrower or any Material Subsidiary or for a material part of its assets, (iv) file an answer admitting the material allegations

of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(j)        one or more final, non-appealable, enforceable judgments for the payment of money in an aggregate amount in excess of $57,500,000 (to the extent not covered by insurance (including self-insurance) as to which the insurer has been notified of such judgment or order and has not denied coverage) shall be rendered against the Borrower and any of the Material Subsidiaries or any combination thereof and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan Party that are material to the businesses and operations of the Borrower and its Subsidiaries, taken as a whole, to enforce any such judgment;

(k)        an ERISA Event occurs that has resulted or would reasonably be expected to result in a Material Adverse Effect;

(l)        any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Documents, except (i) as a result of the sale or other disposition of the applicable Collateral to a Person that is not a Loan Party in a transaction permitted under the Loan Documents, (ii) as a result of the Collateral Agent's (or any agent acting on its behalf pursuant to any applicable Intercreditor Agreement) failure to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Documents or (B) file Uniform Commercial Code continuation statements, (iii) as to Collateral consisting of real property to the extent that (x) such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (y) such deficiency arose through no fault of Borrower or its Subsidiaries, and such deficiency is corrected with reasonable diligence upon obtaining actual knowledge thereof, or (iv) as a result of acts or omissions of the Collateral Agent or any Secured Party;

(m)        any material provision of any Loan Document or any material Guarantee of the Loan Document Obligations shall for any reason be asserted in writing by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)        any material Guarantee of the Loan Document Obligations by any Loan Party pursuant to the Guarantee Agreement or the Badcock Guarantee Agreement shall cease to be in full force and effect (other than in accordance with the terms of the Loan Documents); or

(o)        if there is a final non-appealable judgment in excess of $5,000,000 with respect to any enforcement action filed by any Conn's landlords against any Loan Party in connection with certain Conn's leases guaranteed by the Lead Borrower; or

(p)        (o) a Change of Control shall occur;

then, and in every such event (other than an event with respect to the Borrower described in paragraph (h) or (i) of this Section 7.01), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower

accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Lead Borrower described in paragraph (h) or (i) of this Section 7.01, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

SECTION 7.02      Right to Cure.

(a)      Notwithstanding anything to the contrary contained in Section 7.01, in the event that the Borrower and its Subsidiaries fail to comply with the requirements of the Financial Maintenance Covenants as of the last day of any applicable fiscal quarter of the Lead Borrower, at any time after the end of such fiscal quarter until the expiration of the fifteenth (15th) Business Day subsequent to the date on which the financial statements with respect to such fiscal quarter of the Lead Borrower (or the fiscal year of the Lead Borrower ended on the last day of such fiscal quarter of the Lead Borrower) are required to be delivered pursuant to Sections 5.01(a) or (b), as applicable (such date, the "Cure Expiration Date"), the Lead Borrower shall have the right to issue Qualified Equity Interests (or other Equity Interests reasonably acceptable to the Required Lenders) for cash or otherwise receive cash contributions to the capital of the Lead Borrower as cash common equity or other Qualified Equity Interests (or other Equity Interests reasonably acceptable to the Required Lenders) (collectively, the "Cure Right"). Upon the receipt by the Borrower of the Net Proceeds of such issuance (the "Cure Amount", and together with the First Lien Cure Amount (as defined below), without duplication, the "Aggregate Cure Amount") and/or upon the receipt by the Borrower of any Cure Amount (as defined in the First Lien Credit Agreement) (the "First Lien Cure Amount") pursuant to the First Lien Credit Agreement, the Financial Maintenance Covenants shall be recalculated giving effect to the following pro forma adjustment:

(i)      Consolidated EBITDA shall be increased with respect to such applicable fiscal quarter and any four fiscal quarter period that contains such fiscal quarter, solely for the purpose of measuring the Financial Maintenance Covenants and not for any other purpose under this Agreement, by an amount equal to the Aggregate Cure Amount; and

(ii)      if, after giving effect to the foregoing pro forma adjustment (without giving pro forma effect to any repayment of any Indebtedness with any portion of the Aggregate Cure Amount and without netting against the calculation of Consolidated Total Indebtedness any portion of the Aggregate Cure Amount on the balance sheet of the Lead Borrower and its Subsidiaries, in each case, with respect to such fiscal quarter only), the Lead Borrower and its Subsidiaries shall then be in compliance with the requirements of the Financial Maintenance Covenants, the Borrower and its Subsidiaries shall be deemed to have satisfied the requirements of the Financial Maintenance Covenants as of the relevant date of determination with the same effect as though there had been no failure to comply therewith (if any) at such date, and, if applicable, the applicable breach or default of the Financial Maintenance Covenants (if any) that had occurred shall be deemed cured for the purposes of this Agreement;

provided that the Borrower shall have notified the Administrative Agent of the exercise of such Cure Right within five (5) Business Days of the issuance of the relevant Qualified Equity Interests for cash or the receipt of the cash contributions by the Borrower (or any other receipt of cash in respect of its Cure Rights).

(b)      Notwithstanding anything herein to the contrary, (i) in each four consecutive fiscal quarter period of the Lead Borrower there shall be no more than two (2) fiscal quarters in which the Cure Right is exercised, (ii) during the term of this Agreement, the Cure Right shall not be exercised more than

five (5) times and (iii) for purposes of this Section 7.02, the Cure Amount shall be no greater than the amount required for purposes of complying with the Financial Maintenance Covenants and any amounts in excess thereof shall not be deemed to be a Cure Amount.  Notwithstanding any other provision in this Agreement to the contrary, the Aggregate Cure Amount received pursuant to any exercise of the Cure Right or the Cure Right (as defined in the First Lien Credit Agreement) shall be disregarded for purposes of determining any financial ratio based conditions and/or available basket under Article VI of this Agreement (and the Aggregate Cure Amount shall not be credited as an addition to any basket (including the Available Amount or the Available Equity Amount) or for any other calculation).  For the avoidance of doubt, no Aggregate Cure Amounts shall be applied to reduce the Indebtedness of the Borrower and its Subsidiaries on a Pro Forma Basis (whether by "cash netting" or otherwise) for purposes of determining compliance with the Financial Maintenance Covenants for the fiscal quarter with respect to which such Cure Right or Cure Right (as defined in the First Lien Credit Agreement) was exercised.

(c)    [Reserved].

(d)    Notwithstanding anything herein to the contrary, neither the Administrative Agent nor any Lender shall exercise the right to accelerate the Loans under the Term Facility or terminate the Commitments and none of the Administrative Agent, any Lender or any other Secured Party shall exercise any right to foreclose on or take possession of the Collateral or the Badcock Collateral or exercise any remedy solely on the basis of an Event of Default having occurred and being continuing with respect to the Financial Maintenance Covenants, in each case, unless such Event of Default is not cured pursuant to the exercise of the applicable Cure Right on or prior to the applicable Cure Expiration Date (except to the extent that the Lead Borrower has confirmed in writing that it does not intend to provide the Cure Amount).

(e)    Notwithstanding anything herein to the contrary, any amounts constituting a "Cure Amount" under and as defined in the Holdco Credit Agreement shall not constitute a Cure Amount under this Agreement except to the extent designated by the Borrower in its sole discretion as a Cure Amount hereunder.

SECTION 7.03    Application of Proceeds.

(a)    Subject to the terms of any applicable Intercreditor Agreement contemplated by this Agreement, in connection with the exercise of remedies provided for in Section 7.01, any amounts received on account of the Secured Obligations (including in respect of any sale of, collection from or other realization upon all or any part of the Collateral or the Badcock Collateral (including any Collateral or Badcock Collateral consisting of cash) or the Guarantees) shall be applied by the Administrative Agent and/or the Collateral Agent, as applicable, to the payment of the Secured Obligations as follows:

(i)    first, to the payment of all reasonable and documented or invoiced out of pocket costs and expenses incurred by the Collateral Agent in connection with such sale, collection, other realization or otherwise and to the payment of all other amounts owing to each of the Administrative Agent, and the Collateral Agent in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all reasonable and documented or invoiced out of pocket court costs and the fees and expenses of its agents, the repayment of all advances made by it under any Loan Document on behalf of any Grantor and any other costs or expenses incurred in connection with the exercise of any right or remedy under any Loan Document, in each case, if and to the extent payable pursuant to the terms of the Loan Documents;

(ii)    second, to the payment in full of the Secured Obligations (the amounts so applied to be distributed among such Secured Parties *pro rata* in accordance with the amounts of the Secured Obligations owed to them on the date of any such distribution) in accordance with this Agreement;

(iii)    third, to any agent of any other junior secured debt, in accordance with any applicable Intercreditor Agreement; and

(iv)    fourth, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Administrative Agent and/or the Collateral Agent, as applicable, shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement.  In the event that application of payments, Collateral proceeds or Badcock Collateral proceeds is to be made after any bankruptcy or insolvency proceeding has been commenced, references in this Section 7.03(a) with respect to (i) interest shall include interest accruing after the commencement of such bankruptcy or insolvency proceeding whether or not such interest is an allowed claim in such bankruptcy or insolvency proceeding, and (ii) any other amounts shall only include amounts that are allowed claims in such bankruptcy or insolvency proceeding.

ARTICLE VIII

ADMINISTRATIVE AGENT

SECTION 8.01        Appointment and Authority.

(a)    Each of the Lenders hereby irrevocably (i) appoints (A) Alter Domus to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and (B) Alter Domus to act on its behalf as Collateral Agent hereunder and under the other Loan Documents and (ii) authorizes the Administrative Agent and the Collateral Agent (in their capacities as such), as applicable, to take such actions on such Lender's behalf and to exercise such powers as are delegated to the Administrative Agent and the Collateral Agent, as applicable, by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents and the Badcock Security Documents, hereby irrevocably appoints Alter Domus to act on its behalf as Collateral Agent under the Security Documents and the Badcock Security Documents and authorizes Alter Domus (in its capacity as Collateral Agent) to take such actions on such Secured Party's behalf and to exercise such powers as are delegated to the Collateral Agent by the terms hereof or thereof together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirements of Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)    Each of the Lenders and each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents and the Badcock Security Documents, hereby irrevocably appoints and authorizes the Collateral Agent, as applicable, to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral and Badcock Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent and/or the Collateral Agent pursuant to Section 8.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents and any Lien on the Badcock Collateral (or any portion thereof) granted under the Badcock Security Documents, or for exercising any rights and remedies thereunder at the direction of the

Administrative Agent, shall be entitled to the benefits of all provisions of this <u>Article VIII</u> and <u>Article IX</u> (including <u>Section 9.03</u> as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

<span style="color:blue">(c)      Notwithstanding anything to the contrary in the Loan Documents, each of the Lenders hereby authorize and empower the Agent, upon approval by the Required Lenders and the Special Committee, to (i) execute all documents, (ii) make all acknowledgements (including with respect to Section 9.22) and (iii) and take any and all actions that are necessary in connection with the Permitted PSP Securitization.</span>

SECTION 8.02      <u>Rights as a Lender</u>.

Any Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, own securities of, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 8.03      <u>Exculpatory Provisions</u>.

No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, each Agent:

(a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); <u>provided</u> that such Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law;

(c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity;

(d)      shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions;

(e)        shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 9.02 and in the last paragraph of Section 7.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment; provided, that the taking or not taking of any action by any Agent in accordance with the direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances) shall not be deemed to constitute gross negligence or willful misconduct of such Agent;

(f)        shall be deemed not to have knowledge of any Default unless and until written notice describing such Default and clearly labeled as a "Default" or "Event of Default" is given to such Agent by the Borrower or a Lender;

(g)        shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents or the Badcock Security Documents, (v) the value or the sufficiency of any Collateral or Badcock Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent; and

(h)        shall not be responsible for nor have any duty to monitor the performance or any action of the Borrower or other Loan Party, or any of their directors, members, officers, agents, affiliates or employees, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party, and may assume performance by all such Persons of their respective obligations and shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other Person.

SECTION 8.04        Reliance by Agents.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. As to any matters not expressly provided for in this Agreement and in the other Loan Documents (including enforcement or collection), the Administrative Agent and/or the Collateral Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, pursuant to the terms in the Loan Documents), and, unless

and until revoked in writing, such instructions shall be binding upon each Lender.  Upon request by the Administrative Agent and/or the Collateral Agent, as the case may be, the Required Lenders shall confirm in writing the Administrative Agent's authority and/or the Collateral Agent's authority, as the case may be, to take any action in accordance with the terms of the Loan Documents and this <u>Section 8.04</u> and may refrain from acting until such confirmation has been provided.

Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement, or any other Loan Document, to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent or the Collateral Agent, it is understood that in all cases the Administrative Agent or such Collateral Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from (i) in the case of the Administrative Agent, the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document) or (ii) in the case of the Collateral Agent, the Administrative Agent. The Administrative Agent and Collateral Agent shall have no liability for any failure or delay in taking any actions contemplated above as a result of a failure or delay on the part of the Required Lenders (or Administrative Agent in the case of the Collateral Agent) to provide such instruction, advice or concurrence. This provision is intended solely for the benefit of each of the Administrative Agent and the Collateral Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

Except for any action expressly required of the Administrative Agent or the Collateral Agent hereunder or other Loan Document to which it is a party, it shall in all cases be fully justified in failing or refusing to act unless it shall receive further assurances to its reasonable satisfaction, including indemnification, from the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  No provision of this Agreement or any Loan Document shall require the Administrative Agent or the Collateral Agent to take any action that it reasonably believes to be contrary to applicable law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

SECTION 8.05     <u>Delegation of Duties</u>.

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent.  Any Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of any Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Term Facility as well as activities as such Agent.  No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

SECTION 8.06     <u>Resignation of Administrative Agent; Mergers</u>.

Each Agent may resign upon thirty (30) days' notice to the Lenders and the Lead Borrower, whether or not a successor Agent has been appointed. Upon receipt of any such notice of resignation, the

Required Lenders shall have the right, with the Lead Borrower's consent (such consent not to be unreasonably withheld or delayed) unless an Event of Default under Sections 7.01(a), (b), (h) or (i) has occurred and is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Agent, which shall be an Approved Bank with an office in New York, New York, or an Affiliate of any such Approved Bank (the date upon which the retiring Agent is replaced, the "Resignation Effective Date"); provided that if the retiring Agent shall notify the Lead Borrower and the Lenders that no qualifying Person accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice.

If the Person serving as an Agent is a Defaulting Lender, the Required Lenders and the Lead Borrower may, to the extent permitted by applicable law, by notice in writing to such Person remove such Person as Agent and, with the consent of the Lead Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except (i) that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed and (ii) with respect to any outstanding payment obligations of such retiring or removed Agent) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Agent shall (to the extent not already discharged as provided above) be discharged from all of its duties and obligations hereunder and under the other Loan Documents as set forth in this Section. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article VIII and Section 9.04 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

Any corporation or association into which an Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which an Agent is a party, will be and become the successor Agent under this Agreement and related Loan Documents and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

SECTION 8.07    Non-Reliance on Agents and Lenders.

Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or Refinancing Amendment pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Agents and/or the Lenders on the Effective Date.

No Lender and no other Secured Party shall have any right individually to realize upon any of the Collateral or the Badcock Collateral or to enforce any Guarantee of the Secured Obligations or the Badcock Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent and the Collateral Agent on behalf of the Lenders and the other Secured Parties in accordance with the terms thereof. In the event of a foreclosure by the Administrative Agent or the Collateral Agent on any of the Collateral or the Badcock Collateral pursuant to a public or private sale or other disposition, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral or such Badcock Collateral at any such sale or other disposition, and the Administrative Agent or such Collateral Agent, as agent for and representative of the Lenders and the other Secured Parties (but not any Lender, Lenders, Secured Party or Secured Parties in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral or the Badcock Collateral sold at any such public sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent or the Collateral Agent on behalf of the Lenders at such sale or other disposition. Each Lender, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral, the Badcock Collateral, the Guarantees of the Secured Obligations and the Badcock Guarantee of the Secured Obligations, to have agreed to the foregoing provisions.

SECTION 8.08    [Reserved].

SECTION 8.09    Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, and any Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the

Lenders and such Agent and their respective agents and counsel and all other amounts due the Lenders and each Agent under <u>Sections 2.12</u> and <u>9.03</u>) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and, by its acceptance of the benefits of the Security Documents and the Badcock Security Documents, each Secured Party that is not a party hereto, to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of any Agent and its agents and counsel, and any other amounts due such Agent under <u>Sections 2.12</u> and <u>9.03</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any Secured Party that is not a party hereto any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or any Secured Party that is not a party hereto to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

SECTION 8.10    <u>No Waiver; Cumulative Remedies; Enforcement</u>.

No failure by any Lender or any Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Article VII</u> for the benefit of all the Lenders; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (a) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with <u>Section 9.08</u> (subject to the terms of <u>Section 2.18</u>), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and <u>provided</u> <u>further</u> that if at any time there is no Person acting as an Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to such Agent pursuant to <u>Article VII</u> and (ii) in addition to the matters set forth in clauses <u>(b)</u>, <u>(c)</u> and <u>(d)</u> of the preceding proviso and subject to <u>Section 2.18</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

SECTION 8.11    <u>Withholding Taxes</u>.

To the extent required by any applicable Requirements of Law (as determined in good faith by the Administrative Agent), the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any

other Governmental Authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold any Indemnified Tax or Excluded Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Loan Parties pursuant to Section 2.17 and without limiting any obligation of the Loan Parties to do so pursuant to such Section) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 8.11. The agreements in this Section 8.11 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

SECTION 8.12    Credit Bidding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (including by accepting some or all of the Collateral and/or the Badcock Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral and/or the Badcock Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid, (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Secured Obligations

which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral and/or Badcock Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of Secured Obligations credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Secured Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

SECTION 8.13    Erroneous Payments.

(a)    Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine.  A notice of the Administrative Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it receives a payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Lender is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine. Each Lender agrees

-181-

that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)     The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Administrative Agent's rights and remedies under this Section 8.13), the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Secured Obligations owed by the Borrower or any other Loan Party.

(d)     In addition to any rights and remedies of the Administrative Agent provided by law, the Administrative Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 8.13 and which has not been returned to the Administrative Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Administrative Agent or any of its Affiliates, branches or agencies thereof to or for the credit or the account of such Lender. The Administrative Agent agrees promptly to notify the Lender after any such setoff and application made by the Administrative Agent; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

(e)     Each party's obligations under this Section 8.13 shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments and the repayment, satisfaction or discharge of all Secured Obligations (or any portion thereof) under any Loan Document.

ARTICLE IX

MISCELLANEOUS

SECTION 9.01     Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)     if to the Borrower, the Administrative Agent or the Collateral Agent, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)     if to any other Lender, to it at its address (or fax number, telephone number or e-mail address) set forth in its Administrative Questionnaire (including, as appropriate, notices

delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain Material Non-Public Information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax or other electronic transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction in a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc. Each of the Borrower and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto. Each other Lender may change its address, fax

or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Administrative Agent and Lenders. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent and each of the parties hereto hereby consents to such recording.

SECTION 9.02     Waivers; Amendments.

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)     Except as provided in Section 2.14, Section 2.21 with respect to any Refinancing Amendment or Section 2.24 with respect to any Permitted Amendment, neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Lead Borrower, the Administrative Agent (to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of the Administrative Agent under this Agreement, the Administrative Agent shall execute such waiver, amendment or other modification to the extent approved by the Required Lenders) and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent or the Collateral Agent, as the case may be, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; provided that no such agreement shall (i) increase the Commitment of any Lender or change any ratable sharing or payment provision that directly and adversely affects any Lender (with only such Lenders whose entitlement to a payment under such provisions is reduced being "directly and adversely affected") without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment

of any Lender), (ii) reduce the principal amount of any Loan (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute a reduction or forgiveness of principal) or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby, provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to Section 2.13(c), (iii) postpone the maturity of any Loan, or the date of any scheduled amortization payment of the principal amount of any Term Loan under Section 2.10 or the applicable Refinancing Amendment, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension of any maturity date, any scheduled amortization payment or the date for payment of any interest or fees), without the written consent of each Lender directly and adversely affected thereby, (iv) change any of the provisions of this Section without the written consent of each Lender directly and adversely affected thereby; provided that any such change which is in favor of a Class of Lenders holding Loans maturing after the maturity of other Classes of Lenders (and only takes effect after the maturity of such other Classes of Loans or Commitments) will require the written consent of the Required Lenders with respect to each Class directly and adversely affected thereby, (v) change the percentage set forth in the definition of "Required Lenders", "Majority in Interest" or any other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (or each Lender of such Class, as the case may be), (vi) subordinate (or have the effect of subordinating) Liens securing any material portion of the Collateral or the Badcock Collateral (other than in connection with debtor-in-possession financing or use of cash collateral in accordance with the terms of the applicable Intercreditor Agreements) or payment rights, without the written consent of each Lender directly and adversely affected thereby, (vii) release (or have the effect of releasing) all or substantially all or any material portion of the value of the Guarantees under the Guarantee Agreement or the Badcock Guarantee Agreement (except as expressly provided in the Loan Documents) without the written consent of each Lender (other than a Defaulting Lender), (viii) release (or have the effect of releasing) all or substantially all or any material portion of the Collateral from the Liens of the Security Documents or the Badcock Collateral from the Liens of the Badcock Security Documents, without the written consent of each Lender (other than a Defaulting Lender) except as expressly provided in the Loan Documents, (ix) change any pro rata sharing and/or payment provisions or any payment "waterfall" herein or in any other Loan Document, without the written consent of each Lender directly and adversely affected thereby, or (x) change any provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of any Class differently than those holding Loans of any other Class, without the written consent of the Required Lenders with respect to any Class directly and adversely affected thereby; provided further that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable, (B) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Lead Borrower and the Required Lenders (consent of the Required Lenders not to be unreasonably withheld, conditioned or delayed) in order (i) to comply with local law or advice of local counsel, (ii) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Lead Borrower and the Required Lenders, or (iii) to add any provisions to any Loan Documents that, in the reasonable judgment of the Required Lenders, are more favorable to the Lenders (or to the applicable subset thereof), (C) any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Lead Borrower and the requisite percentage in interest of the affected Class of Lenders

that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time and (D) no Lenders other than the Lenders holding a Majority in Interest of the applicable Class shall be required to waive, amend, supplement or modify the conditions precedent to any Borrowings of Loans of such Class.  Notwithstanding the foregoing, (a) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Lead Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion and (b) guarantees, Security Documents, Badcock Security Documents and related documents in connection with this Agreement may be, together with this Agreement and the other Loan Documents, amended and waived with the consent of the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed) at the request of the Lead Borrower without the need to obtain the consent of any other Lender or the Administrative Agent if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Lead Borrower and the Required Lenders, (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents or (iv) to integrate any Credit Agreement Refinancing Indebtedness in a manner consistent with this Agreement and the other Loan Documents, including the relevant Intercreditor Agreement(s).  Notwithstanding any other language to the contrary contained herein, with respect to any amendment, waiver or modification to which neither the Administrative Agent's nor the Collateral Agent's consent is required, the parties thereto agree to deliver to the Administrative Agent a copy of each such amendment, waiver or modification; provided that, (i) no party shall be liable for its failure to comply with this sentence and (ii) the Administrative Agent shall not be bound by any such amendment unless and until it has received a copy thereof.

(c)    In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders (and, to the extent any Proposed Change requires the consent of Lenders holding Loans of any Class pursuant to clause (iv), (v) or (ix) of paragraph (b) of this Section 9.02, the consent of a Majority in Interest of the outstanding Loans and unused Commitments of such Class) to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section 9.02 being referred to as a "Non-Consenting Lender"), then the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, (i) if no Event of Default under Sections 7.01(a), (b), (h) or (i) exists, permanently prepay all of the Loans of any Class owing by it to, and terminate any Commitments of, such Non-Consenting Lender or (ii) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, conditioned or delayed, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding par principal amount of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder (including pursuant to Section 2.11(a)(i)) from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

-186-

(d)    Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, Term Loans of any Lender that is at the time a Defaulting Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of a Class), all affected Lenders (or all affected Lenders of a Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 9.02); provided that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

(e)    If at any time at which the Sidecar Pari Second Lien Credit Agreement is in effect, this Agreement, any Loan Document or any provision hereof or thereof is waived, amended or modified, the parties agreeing to such waiver, amendment or other modification shall also waive, amend or modify, as applicable, any corresponding provision in the Sidecar Pari Second Lien Credit Agreement to the same extent, on the same terms and with the same effect.

SECTION 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Borrower, jointly and severally, shall pay, if the Effective Date occurs and the Transactions have been consummated, (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Commitment Parties and the Agent (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of Davis Polk & Wardwell LLP, Sheppard Mullin Richter & Hampton LLP and Holland & Knight LLP and, if reasonably necessary, of a single firm of local counsel to the Commitment Parties and Agents in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and of such other counsel retained with the Lead Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), in each case incurred in connection with the Term Facility, and the preparation, execution and delivery of the Loan Documents, and any amendment thereto and any preparation, negotiation of any Restructuring Proposal or actual or potential Restructuring Transaction (whether or not entered into or consummated), and including the reasonable and documented fees and expenses of the Lender Professionals and (ii) all reasonable and documented out-of-pocket costs and expenses incurred by the Lenders and the Agent (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of Davis Polk & Wardwell LLP, and Holland & Knight LLP and, if reasonably necessary, of a single firm of local counsel to the Lenders and a single firm of local counsel to the Agents in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and of such other counsel retained with the Lead Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), in each case incurred in connection with the administration of the Loan Documents after the Third Amendment Effective Date and any amendment thereto and any preparation, negotiation of any Restructuring Proposal or actual or potential Restructuring Transaction (whether or not entered into or consummated), and including the reasonable and documented fees and expenses of the Lender Professionals, (iii) all reasonable and documented out-of-pocket costs and expenses incurred by the Lenders and the Agent (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of Davis Polk & Wardwell LLP, Sheppard Mullin Richter & Hampton LLP, Milbank LLP and Holland & Knight LLP and, if reasonably necessary, of a single firm of local counsel to the Lenders and  a single firm of local counsel to the Agents in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and of such other counsel retained with the Lead Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), in each case incurred in connection with any amendments, modifications or waivers of the Loan Documents, and (iv) all reasonable and documented out-of-pocket expenses incurred by each Agent or any Lender, including the fees, charges and

disbursements of counsel for such Agent and of counsel for the Lenders, in connection with the preservation, enforcement or protection of any rights or remedies (A) in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws), including its rights under this Section 9.03 or (B) in connection with the Loans made hereunder, including all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel with respect to this clause (iv) shall be limited to one lead counsel and one local counsel in each applicable jurisdiction (exclusive of any reasonably necessary special counsel) for the Agents, taken as a whole, and one lead counsel and one local counsel in each applicable jurisdiction (exclusive of any reasonably necessary special counsel) for the Lenders, taken as a whole (and, in the case of a conflict of interest, where each Agent or any Lender affected by such conflict notifies the Lead Borrower of the existence of such conflict and thereafter retains its own counsel, one additional counsel) and such other counsel as may be retained with the Lead Borrower's consent (such consent not to be unreasonably withheld or delayed).  Notwithstanding the foregoing, the expenses of counsel shall not include any allocated costs of in-house counsel.

(b)      The Borrower, jointly and severally, shall indemnify each Agent and each Related Party of any of the foregoing Persons (each such Person being called an "Agent Indemnitee") and each Lender and each Related Party of any of the foregoing Persons (but excluding any such Person to the extent such Person is acting as a financial advisor to the Investors in connection with the Transactions (any such Person to the extent acting in such capacity, an "Excluded Party")) (each such Person being called a "Lender Indemnitee"; together with the Agent Indemnitees, each, an "Indemnitee") against, and hold each Indemnitee harmless from (without duplication), any and all losses, claims, damages, liabilities and reasonable and documented out-of-pocket fees and expenses (limited, in the case of legal fees and expenses, to the reasonable and documented fees, charges and disbursements of (A) one counsel for all Agent Indemnitees, to the extent reasonably necessary, and a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Agent Indemnitees, taken as a whole and (B) one counsel for all Lender Indemnitees, to the extent reasonably necessary, and a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Lender Indemnitees, taken as a whole (and solely in the case of an actual or potential conflict of interest, where the Indemnitee affected by such conflict notifies the Lead Borrower of the existence of such conflict and thereafter retains its own counsel after receipt of consent from the Lead Borrower (not to be unreasonably withheld or delayed), of one additional firm of counsel for the affected Indemnitees, and, if reasonably necessary, one additional firm of local counsel in each appropriate material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for such affected Indemnitees, taken as a whole)), incurred by or asserted against any Indemnitee by any third party or by the Borrower or any Subsidiary arising out of, in connection with, or as a result of any claim, litigation, investigation or proceeding (including any inquiry or investigation), regardless of whether any such Indemnitee is a party thereto, whether based on contract, tort or any other theory, relating to (i) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder, the consummation of the Transactions or any other transactions contemplated thereby, the syndication of the Term Facility or the enforcement of any obligations of a Loan Party hereunder or under any other Loan Document, (ii) any Loan  or the use of the proceeds therefrom or (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any Mortgaged Property, any Badcock Mortgaged Property or any other property currently or formerly owned or operated by the Borrower or any Subsidiary, or any other Environmental Liability related in any way to the Borrower or any Subsidiary; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (w) resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitee (in each case, as determined by a court of competent jurisdiction

in a final and non-appealable judgment), (x) other than with respect to any indemnity with respect to an Agent Indemnitee, resulted from a material breach of the Loan Documents by such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitees (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (y) arise from disputes between or among Indemnitees (other than disputes involving claims against the Agents in their respective capacities) that does not arise from an act or omission by the Borrower or any Subsidiary. This Section 9.03 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     Each Lender shall indemnify and hold harmless the Agent Indemnitees (to the extent not indefeasibly and timely indemnified by or on behalf of the Borrower and without limiting the obligation of the Borrower to do so), based on and to the extent of such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), from and against any and all losses, claims, damages, liabilities and related expenses (including reasonable and documented or invoiced out-of-pocket fees and expenses of one counsel for the Agent Indemnitees, taken as a whole (in addition to, in the event of an actual conflict of interest that arises, one additional counsel (plus one local counsel in each relevant material jurisdiction) for the conflicted Agent Indemnitees, taken as a whole), and excluding any allocated costs of in-house legal counsel and any other third parties and consultants) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any Agent Indemnitee in any way relating to or arising out of or in connection with this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent Indemnitees. Without limiting the foregoing, each Lender shall promptly following written demand therefor, pay or reimburse the Administrative Agent and the Collateral Agent based on and to the extent of such Lender's pro rata share of all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Loan Documents (including all such out-of-pocket costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective fees, charges and disbursements of one counsel and a single firm of local counsel for the Agent Indemnitees, to the extent that the Agent Indemnitees are not timely reimbursed for such expenses by or on behalf of the Borrower (solely to the extent, in each case, that the Borrower is required to so indemnify and hold harmless the Agent Indemnitees pursuant to (and subject to the limitations of) paragraph (a) and/or (b) of this Section 9.03). For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the outstanding Loans and unused Commitments at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full and the Commitments are terminated in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full and the Commitments are terminated).

(d)     To the extent permitted by applicable law, (i) the Borrower shall not assert, and each hereby waives, any claim against any Indemnitee for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such direct or actual damages are determined by a court of competent jurisdiction in a final, non-appealable judgment to have resulted from (A) the gross negligence, bad faith or willful misconduct of such Indemnitee or its Related Parties or (B) other than with respect to any indemnity with respect to an Agent Indemnitee, a material breach of the Loan Documents by such Indemnitee or its Related Parties and (ii) no Loan Party (or any Affiliate thereof), Investor (or any Affiliate thereof), or Indemnitee shall be liable for any special, indirect, consequential, incidental, exemplary or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Financing

-189-

Transactions, any Loan or the use of the proceeds thereof; provided that nothing in this paragraph shall limit any Loan Party's (or any Affiliate thereof) or Investor's (or any Affiliate thereof) indemnity and reimbursement obligations to the extent that such indirect, special, punitive or consequential damages are included in any claim by a third party unaffiliated with the applicable Indemnitee with respect to which the applicable Indemnitee is entitled to indemnification as set forth in this Section 9.03.

(e)    All amounts due under this Section 9.03 shall be payable not later than thirty (30) Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

SECTION 9.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the acknowledgement of the Administrative Agent (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no assignment shall be made to any Defaulting Lender or any of its Subsidiaries, or any Persons who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (ii) and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 9.04), the Indemnitees and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent (except with respect to assignments to competitors of the Borrower) not to be unreasonably withheld, conditioned or delayed) of (A) the Lead Borrower; provided that no consent of the Lead Borrower shall be required for an assignment (x) by a Term Lender to any other Lender, any Affiliate of a Lender, any Approved Fund, Holdco Parent, Holdco, or any Loan Party, or (y) if an Event of Default under Sections 7.01(a), (b), (h) or (i) with respect to the Lead Borrower has occurred and is continuing (other than in respect of a proposed assignment to a Disqualified Lender); provided further that no assignee contemplated by the immediately preceding proviso shall be entitled to receive any greater payment under Section 2.15 or Section 2.17 than the applicable assignor would have been entitled to receive with respect to the assignment made to such assignee, unless the assignment to such assignee is made with the Lead Borrower's prior written consent; provided further that the Lead Borrower shall have the right to withhold its consent to any assignment if in order for such assignment to comply with applicable law, the Lead Borrower or any Subsidiary would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority and (B) the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan or Term Commitment to (x) a Lender, an Affiliate of a Lender or an Approved Fund, or (y) subject to Section 9.04(g), the Borrower or any of its Subsidiaries. Notwithstanding anything in this Section 9.04 to the contrary, if the Lead Borrower has not given the Administrative Agent written notice of its objection to an assignment of Term Loans within five (5) Business Days after written notice of such assignment, the Lead Borrower shall be deemed to have consented to such assignment (other than in respect of a proposed assignment to a Disqualified Lender).

(ii)    Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, or in connection with the Partial 2L Discharge, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date set forth in the Assignment and Assumption delivered to the Administrative Agent with respect to such assignment) shall not be less than $2,500,000 (and integral multiples of $500,000 in excess thereof), unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld, conditioned or delayed), (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement (other than assignments in connection with the Partial 2L Discharge); provided that this clause (B) shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, and, in each case, together with a processing and recordation fee of $3,500; provided that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided further that any such Assignment and Assumption shall include a representation by the assignee that the assignee is not a Disqualified Lender or an Affiliate of a Disqualified Lender; provided further that assignments made pursuant to Section 2.19(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective, (D) the assignee, if it shall not be a Lender, shall deliver to the Lead Borrower and the Administrative Agent any tax forms required by Section 2.17(e), all documentation and other information reasonably determined by the Administrative Agent to be required by applicable regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain Material Non-Public Information about the Borrower, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws, and (E) any Lender assigning any Commitment or Loan under this Agreement shall be obligated to make, as a condition to the validity thereof and notwithstanding any term or condition herein or therein, a proportionate assignment of any commitment or loan outstanding under each of the Holdco Credit Agreement and Sidecar Pari Second Lien Credit Agreement.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 9.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) Sections 2.15, 2.16, 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section 9.04.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior written notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, any "know your customer" information requested by the Administrative Agent, the assignee's completed Administrative Questionnaire and any tax forms required by Section 2.17(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)    The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)    (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons (other than to a Person that is not an Eligible Assignee) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C)  the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. Subject to paragraph (c)(iii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations thereof and Section 2.19, it being understood that any tax forms required by Section 2.17(e) shall be provided solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.04. To the extent permitted by law, each Participant

also shall be entitled to the benefits of <u>Section 9.08</u> as though it were a Lender; <u>provided</u> that such Participant agrees to be subject to <u>Section 2.18(c)</u> as though it were a Lender.

(ii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related stated interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "<u>Participant Register</u>"). The entries in the Participant Register shall be conclusive, absent manifest error, and the parties hereto shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of its Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or other obligations under the Loan Documents) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any Loan or other obligation under the Loan Documents is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury regulations. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining the Participant Register.

(iii)    A Participant shall not be entitled to receive any greater payment under <u>Section 2.15</u>, <u>2.16</u> or <u>2.17</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld, conditioned or delayed) or such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(d)    Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this <u>Section 9.04</u> shall not apply to any such pledge or assignment of a security interest, <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Lead Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(f)    [Reserved].

(g)     Any Lender may, at any time, assign all or a portion of its Term Loans to the Borrower or any of its Subsidiaries, through (x) Dutch auctions or other offers to purchase open to all Lenders on a pro rata basis in accordance with procedures of the type described in <u>Section 2.11(a)(ii)</u> or other customary procedures acceptable to the Administrative Agent, (y) open market purchases offered to all Lenders on a pro rata basis and/or (z) in connection with the Partial 2L Discharge on a non-pro rata basis, <u>provided</u> that (i) no proceeds from any loans under any revolving credit facilities will be used to fund such assignments, (ii) any Term Loans that are so assigned will be automatically and irrevocably cancelled and the aggregate principal amount of the tranches and installments of the relevant Term Loans then outstanding shall be reduced by an amount equal to the principal amount of such Term Loans, (iii) no Event of Default shall have occurred and be continuing (other than with respect to assignments pursuant to clause (i)(z)) and (iv) each Lender making such assignment to the Borrower or any of its Subsidiaries acknowledges and agrees that in connection with such assignment, (1) the Borrower or its Subsidiaries then may have, and later may come into possession of Material Non-Public Information, (2) such Lender has independently and, without reliance on the Borrower, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination to enter into such assignment notwithstanding such Lender's lack of knowledge of the Material Non-Public Information and (3) none of the Borrower, its Subsidiaries, the Administrative Agent, or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by Requirements of Law, any claims such Lender may have against the Borrower, its Subsidiaries, the Administrative Agent, and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Material Non-Public Information. Each Lender entering into such an assignment further acknowledges that the Material Non-Public Information may not be available to the Administrative Agent or the other Lenders. Except as otherwise set forth in this Agreement (including in connection with the calculation of Excess Cash Flow prepayments), cancellation of Term Loans in connection with this clause (g) shall not constitute a voluntary or mandatory prepayment of Term Loans.

(h)     Notwithstanding the foregoing, no assignment may be made or participation sold to a Disqualified Lender without the prior written consent of the Lead Borrower. Upon inquiry by any Lender to the Administrative Agent as to whether a specified potential assignee or prospective participant is on the list of Disqualified Lenders, the Administrative Agent shall be permitted to make the list of Disqualified Lenders available to such Lender for inspection. Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, if any Lender was a Disqualified Lender at the time of the assignment of any Loans or Commitments to such Lender, following written notice from the Lead Borrower to such Lender and the Administrative Agent: (1) such Lender shall promptly assign all Loans and Commitments held by such Lender to an Eligible Assignee; <u>provided</u> that (A) the Administrative Agent shall not have any obligation to the Borrower, such Lender or any other Person to find such a replacement Lender, (B) the Borrower shall not have any obligation to such Disqualified Lender or any other Person to find such a replacement Lender or accept or consent to any such assignment to itself or any other Person subject to the Lead Borrower's consent in accordance with <u>Section 9.04(b)(i)</u> and (C) the assignment of such Loans and/or Commitments, as the case may be, shall be at par plus accrued and unpaid interest and fees; (2) such Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of any Class), all affected Lenders (or all affected Lenders of any Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to <u>Section 9.02</u>); <u>provided</u> that (x) the Commitment of any Disqualified Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Disqualified Lender adversely and in a manner that is disproportionate to other affected Lenders shall require the consent of such Disqualified Lender; and (3) no Disqualified Lender is entitled to receive information provided solely to Lenders by the Administrative Agent or any Lender or will be permitted to attend or participate in meetings attended solely by the Lenders and the Administrative Agent, other than the right to receive notices or Borrowings, notices

or prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Article II.

SECTION 9.05        Survival.

All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and all other amounts payable hereunder, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof or the resignation or removal of any Agent.

SECTION 9.06        Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent or the Commitment Parties or the syndication of the Loans and Commitments constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of (x) this Agreement, (y) any other Loan Document and/or (z) any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Administrative Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of the Borrower or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (ii) upon the request of the Administrative Agent (whether on its own

behalf or on behalf of any Lender), any Electronic Signature shall be promptly followed by a manually executed counterpart.  Without limiting the generality of the foregoing, the Borrower and each Loan Party hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and the Loan Parties, Electronic Signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (ii) the Administrative Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (iii) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (iv) waives any claim against the Administrative Agent, any Lender or any Affiliates or Related Parties of any of the foregoing for any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising solely from the Administrative Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

SECTION 9.07      Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 9.07, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent then such provisions shall be deemed to be in effect only to the extent not so limited.

SECTION 9.08      Right of Setoff.

If an Event of Default under Sections 7.01(a), (b), (h) or (i) shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide

-196-

promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.

SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    (c) This Agreement shall be construed in accordance with and governed by the laws of the State of New York, except that (x) the interpretation of the definition of "Company Material Adverse Effect" (as defined in the Acquisition Agreement) (and whether or not a Company Material Adverse Effect has occurred) for the purpose of Section 4.01(g), (y) the determination of the accuracy of any Specified Acquisition Agreement Representation and whether as a result of any inaccuracy thereof the Borrower or any of its Affiliates have the right to terminate its or their obligations under the Acquisition Agreement and (z) the determination of whether the Acquisition has been consummated in accordance with the terms of the Acquisition Agreement shall in each case be determined pursuant to the Acquisition Agreement, which is governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

(b)    (d) Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in any Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)    (e) Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section 9.09. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    (f) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10    WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT

NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

SECTION 9.11    Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12    Confidentiality.

(c)    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors, and actual and potential financing sources, in each case, who need to know such Information in connection with the Transactions (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons acting on behalf of the Administrative Agent or the relevant Lender to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent or the relevant Lender, as applicable), (ii) to the extent requested by any governmental authority or self-regulatory authority having jurisdiction over the Administrative Agent, any Lender or any Affiliates of any of the foregoing, as applicable, or, based on reasonable advice of counsel, to the extent required by (A) an order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, (B) applicable law or by any subpoena or similar compulsory legal process or (C) in connection with the exercise of remedies or enforcement of rights hereunder in any suit, action or proceeding relating to this Agreement; provided that (x) solely to the extent permitted by law and other than in connection with routine audits and reviews by bank accountants or governmental or self-regulatory authorities exercising examination or regulatory authority, each Lender and the Administrative Agent shall notify the Lead Borrower as promptly as practicable of any such requested or required disclosure and (y) in the case of clause (ii) only, each Lender and the Administrative Agent shall use commercially reasonable efforts to ensure that such Information is kept confidential in connection with the exercise of such remedies, and provided further that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any of its ~~Subsidiaries~~subsidiaries, (iii) to any other party to this Agreement, (iv) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section 9.12, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any direct or indirect contractual counterparty to any Swap Agreement or derivative transaction relating to any Loan Party or its ~~Subsidiaries~~subsidiaries and its obligations under the Loan Documents or (C) any pledgee referred to in Section 9.04(d), (v) if required by any rating agency in connection with obtaining a rating; provided that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information, (vi) to service providers (including any numbering, administration or settlement service providers) providing administrative and ministerial services solely in connection with the syndication and administration of the Loan Documents and the Term Facility (e.g., identity of the party providing such information to such service provider, maturity dates, interest rates, etc.) on a confidential basis, (vii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 9.12 or otherwise by reason of improper disclosure by the Administrative Agent any Lender or any Affiliates or Related Parties of any of the foregoing (including the Persons referred to in clauses (i)

above) in violation of any confidentiality obligations owing to the Loan Parties or any ~~Subsidiaries~~subsidiaries, Affiliates or Related Parties of any of the foregoing or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower or any ~~Subsidiary~~subsidiary, which source is not known by the recipient of such information to be subject to a confidentiality obligation, or (viii) to the extent that such information was already in the possession of the Administrative Agent or any Lender prior to any duty or other undertaking of confidentiality or is independently developed by the Administrative Agent or any Lender without the use of such information and without otherwise violating the terms of this <u>Section 9.12</u>. For the purposes hereof, "<u>Information</u>" means all information received from or on behalf of the Borrower or any of its ~~Subsidiaries~~subsidiaries relating to the Borrower, any of its ~~Subsidiaries~~subsidiaries or their business. Any Person required to maintain the confidentiality of Information as provided in this <u>Section 9.12</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding the foregoing, other than as set forth in the proviso below, (x) no such information shall be disclosed to a Disqualified Lender or Excluded Party that constitutes a Disqualified Lender or Excluded Party, as applicable, at the time of such disclosure without the Lead Borrower's prior written consent and (y) in connection with any proposed assignment of Loans and/or Commitments in accordance with <u>Section 9.04</u>, upon request by the applicable potential assignee thereof, the applicable potential assigning Lender may disclose the list of Disqualified Lenders to such potential assignee solely for purposes of enabling such assignee to make a representation in its applicable Assignment and Assumption that such prospective assignee is an Eligible Assignee, <u>provided</u>, <u>however</u>, that, subject to an agreement containing confidentiality undertakings substantially similar to those of this <u>Section 9.12</u>, the list of Disqualified Lenders may be disclosed to any bona fide potential assignee or Participant, so that such potential assignee or Participant can represent and warrant that it is neither a Disqualified Lender nor an Affiliate of a Disqualified Lender.

(d)    EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN THIS <u>SECTION 9.12</u>) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(e)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

SECTION 9.13    <u>USA PATRIOT Act</u>.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of

the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.

SECTION 9.14        Release of Liens and Guarantees.

(a)        (c) A Subsidiary Loan Party shall automatically be released from its obligations under the Loan Documents (including its Guarantee or Badcock Guarantee, as the case may be, of the Secured Obligations) and all security interests created by the Security Documents in Collateral or by the Badcock Security Documents in Badcock Collateral, as the case may be, owned by such Subsidiary Loan Party shall be automatically released, (1) upon the consummation of any transaction or designation permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary (including pursuant to a permitted merger with a Subsidiary that is not a Loan Party) or becomes an Excluded Subsidiary (other than solely as a result of such Subsidiary Loan Party ceasing to be a Wholly Owned Subsidiary) or (2) upon the request of the Lead Borrower, in connection with a transaction permitted under this Agreement (but only a transaction (x) in which such Subsidiary Loan Party becomes a bona fide joint venture and the other Person taking an equity interest in such Subsidiary Loan Party takes such equity interest for fair market value (as determined in good faith by the Lead Borrower) and is not an Investor, an Affiliate of an Investor or an Affiliate of the Borrower (other than as a result of such joint venture), (y) in which such Subsidiary Loan Party does not own or have an exclusive license of any Material Intellectual Property or own any Equity Interests of any Person that owns or is the exclusive licensee of any Material Intellectual Property and (z) the primary purpose (as determined by the Lead Borrower in good faith) of which is not the release of any Guarantee of or Lien on the assets of such Subsidiary Loan Party) as a result of which such Subsidiary Loan Party ceases to be a Wholly Owned Subsidiary. Upon any sale or other transfer by any Loan Party (other than to the Borrower or any Subsidiary Loan Party) of any Collateral and/or Badcock Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral and/or under any Badcock Security Document in any Badcock Collateral, the security interests in such Collateral created by the Security Documents and/or such Badcock Collateral created by the Badcock Security Documents, as the case may be, shall be automatically released. Upon the release of any Subsidiary Loan Party from its Guarantee or Badcock Guarantee, as the case may be, in compliance with this Agreement, the security interest in any Collateral or Badcock Collateral owned by such Subsidiary created by the Security Documents or the Badcock Security Documents, as the case may be, shall be automatically released. Upon termination of the aggregate Commitments and payment in full of all Secured Obligations (other than contingent indemnification obligations), all obligations under the Loan Documents and all security interests created by the Security Documents and the Badcock Security Documents shall be automatically released. In connection with any termination or release pursuant to this Section 9.14, the Administrative Agent or the Collateral Agent (acting at the direction of the Administrative Agent), as the case may be, shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release so long as the Borrower or applicable Loan Party shall have provided the Administrative Agent or that Collateral Agent, as the case may be, such certifications or documents as the Administrative Agent or that Collateral Agent, as the case may be, shall reasonably request in order to demonstrate compliance with this Agreement.

(b)        (d) The Administrative Agent or the Collateral Agent (acting at the direction of the Administrative Agent), as the case may be, will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to subordinate its Lien on any property granted to or held by the Administrative Agent or the Collateral Agent, as the case may be, under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv).

-200-

(c)    (e) Each of the Lenders, and by accepting the benefits of the Security Documents and the Badcock Security Documents, each Secured Party that is not a party hereto, irrevocably authorizes the Administrative Agent or the Collateral Agent, as the case may be, to provide any release or evidence of release, termination or subordination contemplated by this Section 9.14. Upon request by the Administrative Agent or the Collateral Agent, as the case may be, at any time, the Required Lenders will confirm in writing the Administrative Agent's authority or that Collateral Agent's authority, as the case may be, to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Documents and this Section 9.14. Solely in connection with a Permitted PSP Securitization and subject to the conditions herein, the security interests in Collateral created by the Security Documents shall be automatically released upon any sale or other transfer by any Loan Party (other than to the Borrower or any Subsidiary Loan Party) of such Collateral to a PSP Securitization Entity or upon designation of a Restricted Subsidiary as a PSP Securitization Entity.

SECTION 9.15    No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent and the Lenders on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, any of its Affiliates or any other Person and (B) none of the Administrative Agent and the Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent and the Lenders has any obligation to disclose any of such interests to the Borrower or any of its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.16    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

SECTION 9.17    Intercreditor Agreements.

Each of the Lenders and, by accepting the benefits of the Security Documents and the Badcock Security Documents, each Secured Party that is not a party hereto, hereby agrees that the Administrative Agent and/or the Collateral Agent may enter into any intercreditor agreement and/or subordination agreement pursuant to, or contemplated by, the terms of this Agreement (including with respect to Indebtedness permitted pursuant to Section 6.01 and defined terms referenced therein) on its behalf and agrees to be bound by the terms thereof and, in each case, consents and agrees to the appointment of the Administrative Agent and/or the Collateral Agent (and/or their affiliated designees, representatives or agents) on its behalf as collateral agent, respectively, thereunder.  In the event of any conflict between the provisions of this Agreement or any other Loan Document (other than any Intercreditor Agreement) and the provisions of any Intercreditor Agreement, the provisions of such Intercreditor Agreement shall govern and control.

SECTION 9.18    Judgment Currency.

If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or under any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with the normal banking procedures the Lenders could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrowers in respect of any such sum due from them to the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the relevant Lender of any sum adjudged to be so due in the Judgment Currency, the relevant Lender may in accordance with the normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or such Lender from the Borrowers in the Agreement Currency, each Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent, or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or such Lender in such currency, the Administrative Agent or such Lender agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

SECTION 9.19    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

1.    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

2.    the effects of any Bail-In Action on any such liability, including, if applicable:

    i.    a reduction in full or in part or cancellation of any such liability;

ii.    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected  Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

iii.    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 9.20    Acknowledgement Regarding Any Supported QFCs.

.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

SECTION 9.21    PSP Securitization Non-Disturbance Terms.

Each Agent and the Secured Parties hereby acknowledge, subject to the prior written consent of the Required Lenders in their sole discretion, that:

(a)    It has been provided with notice of the Permitted PSP Securitization to which the PSP Securitization Entities are party, including all transfers of assets that have been or may in the future be made as part of such Permitted PSP Securitization, and acknowledges and agrees that the Permitted PSP Securitization will not result in any breach of or default under either this Agreement or the other Loan Documents, and that each of the PSP Securitization Entities is intended to be a distinct legal entity separate from the Borrower and each of its Subsidiaries (other than the PSP Securitization Entities) (each of Borrower or any such Subsidiary, a "Parent Entity").

(b)    It will not have any recourse to or any Lien or claim on (whether legal, equitable

or otherwise) any PSP Securitization Entity or any assets of any PSP Securitization Entity or special purpose entity or other subsidiary owned by a PSP Securitization Entity, or any "Collateral" described in any indenture, note purchase agreement, credit agreement or other document governing the Indebtedness incurred by any PSP Securitization Entity in connection with a Permitted PSP Securitization (the "PSP Securitization Indenture") for the purpose of the repayment of the Secured Obligations.

(c)     Until one year (or if longer, the applicable preference period then in effect) and one day after the notes relating to the Permitted PSP Securitization (the "Securitization Notes") have been paid in full and the PSP Securitization Indenture has been satisfied and discharged in accordance with the terms thereof, it shall not at any time institute against, or file any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or any other similar proceedings under any United States federal or state bankruptcy or similar laws with respect to, the PSP Securitization Entities ("Insolvency Proceedings").

(d)     Until one year (or if longer, the applicable preference period then in effect) and one day after the Securitization Notes have been paid in full and the PSP Securitization Indenture has been satisfied and discharged in accordance with the terms thereof, if any Insolvency Proceedings are commenced against the PSP Securitization Entities or a special purpose entity or other subsidiary which is owned by the PSP Securitization Entities as part of the Permitted PSP Securitization it will not challenge the characterization of any transfer of assets (whether termed as a sale, contribution or other transfer) made in connection with the Permitted PSP Securitization by or to any PSP Securitization Entity as a "true sale" or contribution to capital.

(e)     Until one year (or if longer, the applicable preference period then in effect) and one day after the Securitization Notes have been paid in full and the PSP Securitization Indenture has been satisfied and discharged in accordance with the terms thereof, if any Insolvency Proceedings are commenced against the PSP Securitization Entities or a special purpose entity or other subsidiary which is owned by the foregoing entities as part of the Permitted PSP Securitization, it will not at any time institute against or file any motion or other action seeking to consolidate the assets and liabilities of any PSP Securitization Entity with those of any Parent Entity or any of its affiliates or with any other PSP Securitization Entity; provided that the foregoing shall not (i) limit the rights of any party hereto to file any claim in or otherwise take any action, which is not otherwise specifically prohibited by this Agreement, with respect to any Insolvency Proceeding that was instituted other than by it, any other Secured Party or any of their respective affiliates, agents or representatives against any Parent Entity, the PSP Securitization Entities or a special purpose entity or other subsidiary which is owned by or affiliated with any of the foregoing or (ii) require any party hereto to resist any legal process.

(f)     In the event that the assets and/or liabilities of one or more of the Parent Entities shall ever be consolidated with those of any PSP Securitization Entity (whether through substantive consolidation in an Insolvency Proceeding or otherwise), or any Secured Party shall otherwise be deemed to have a claim of any type against any PSP Securitization Entity in respect of the Secured Obligations ("Subordinated Obligations"), then each of the First Lien Agent and the Second Lien Agent, for itself and on behalf of such Secured Party, agrees that the Subordinated Obligations shall be subordinated to the prior payment in full of the Notes and the other Obligations (as defined in the Indenture) incurred pursuant to the Indenture. In furtherance of the foregoing, each of the First Lien Agent and the Second Lien Agent, for itself and on behalf of its respective Secured Parties, agrees (i) that any payment that any Secured Party may be entitled to receive from any claim against a PSP Securitization Entity which, but for the terms hereof, would otherwise be payable or deliverable in respect of any Subordinated Obligation, shall be paid directly to the trustee under the Securitization Indenture (the "Securitization Trustee") or turned over to the Securitization Trustee for application to the Securitization Notes and the other obligations incurred pursuant to the Securitization Indenture until they are paid in full, and (ii) to take whatever actions may be reasonably requested by the Securitization Trustee to effectuate the subordination provided for herein.

(g)    The Loan Parties shall have the ability to take any and all actions that are necessary in connection with the Permitted PSP Securitization, including but not limited to, amending the organizational documents of Pet Supplies Plus, LLC, a Delaware limited liability company, and/or the parent of such entity, to (x) appoint one or more independent managers or directors on the board of such entity and (y) require unanimous written consent of all managers for certain material actions. Notwithstanding anything herein to the contrary, each of the Agents and the Secured Parties hereby consents to the Loan Parties taking such actions.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGES INTENTIONALLY OMITTED]