## <u>EXHIBIT 2</u>

**Disclosure Statement Blackline**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |

~~AMENDED~~ DISCLOSURE STATEMENT FOR
THE ~~FIFTH~~SIXTH AMENDED JOINT CHAPTER 11 PLAN ~~OF~~
OF FRANCHISE GROUP, INC. AND ITS DEBTOR AFFILIATES

| | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP** | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Edmon L. Morton (Del. No. 3856) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Matthew B. Lunn (Del. No. 4119) | Nicole L. Greenblatt, P.C. (admitted *pro hac vice*) |
| Allison S. Mielke (Del. No. 5934) | Derek I. Hunter (admitted *pro hac vice*) |
| Shella Borovinskaya (Del. No. 6758) | |
| Rodney Square | 601 Lexington Avenue |
| 1000 North King Street | New York, New York 10022 |
| Wilmington, Delaware 19801 | Telephone:     (212) 446-4800 |
| Telephone:     (302) 571-6600 | Facsimile:     (212) 446-4900 |
| Facsimile:     (302) 571-1253 | Email:     joshua.sussberg@kirkland.com |
| Email:     emorton@ycst.com | nicole.greenblatt@kirkland.com |
| mlunn@ycst.com | derek.hunter@kirkland.com |
| amielke@ycst.com | |
| sborovinskaya@ycst.com | |

*Co-Counsel to the Debtors
and Debtors in Possession*

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

Dated: February ~~19~~20, 2025

> **THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

<u>**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**</u>

THE DEBTORS ARE PROVIDING THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE ~~FIFTH~~SIXTH AMENDED JOINT CHAPTER 11 PLAN OF FRANCHISE GROUP, INC. AND ITS DEBTOR AFFILIATES (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "<u>PLAN</u>"). NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE XI</u> HEREIN.

THE DEBTORS, CERTAIN HOLDERS OF CLAIMS, INCLUDING THE CONSENTING FIRST LIEN LENDERS, AND THE CREDITORS' COMMITTEE, SUPPORT THE PLAN. THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS AND THE CREDITORS' COMMITTEE STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE

SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE

**STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE PLAN SUPPLEMENT.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE XI OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE XI, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER, THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE EXTENT PERMITTED UNDER APPLICABLE LAW. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. IF EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT UNDER A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES ISSUED UNDER THE PLAN CONSULT THEIR OWN LAWYER CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES IN COMPLIANCE WITH THE FEDERAL SECURITIES LAWS AND ANY APPLICABLE "BLUE SKY" LAWS. THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF SUCH SECURITIES.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. ALTHOUGH THE DEBTORS BELIEVE THE EXPECTATIONS REFLECTED IN SUCH FORWARD-LOOKING STATEMENTS ARE BASED ON REASONABLE ASSUMPTIONS, THE DEBTORS CAN GIVE NO ASSURANCE THAT THEIR EXPECTATIONS WILL BE ATTAINED, AND IT IS POSSIBLE THAT

**ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE INDICATED BY THESE FORWARD-LOOKING STATEMENTS DUE TO A VARIETY OF RISKS AND UNCERTAINTIES. FORWARD LOOKING STATEMENTS MAY INCLUDE, BUT ARE NOT LIMITED TO, STATEMENTS ABOUT:**

- **THE DEBTORS' PLANS, OBJECTIVES, INTENTIONS, AND EXPECTATIONS;**
- **THE DEBTORS' BUSINESS STRATEGY;**
- **THE DEBTORS' FINANCIAL STRATEGY, BUDGET, AND PROJECTIONS;**
- **THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**
- **THE SUCCESS OF THE DEBTORS' OPERATIONS;**
- **THE COSTS OF CONDUCTING THE DEBTORS' OPERATIONS;**
- **THE DEBTORS' LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**
- **THE LEVEL OF UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;**
- **THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;**
- **THE TERMS OF CAPITAL AVAILABLE TO THE DEBTORS;**
- **THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;**
- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS;**
- **THE EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES; AND**
- **THE DEBTORS' COUNTERPARTIES' CREDIT RISK.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO MAINTAIN RELATIONSHIPS WITH SUPPLIERS, EMPLOYERS AND OTHER THIRD PARTIES AS A RESULT OF THE CHAPTER 11 FILING OR THOSE PARTIES' FAILURE TO**

**COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; TRADE BALANCE; NATURAL DISASTERS, INCLUDING PANDEMICS, SUCH AS THE COVID-19 PANDEMIC, THAT MAY CAUSE GENERAL BUSINESS DISRUPTIONS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

**You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The projections and forward-looking information contained or incorporated by reference herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

**TABLE OF CONTENTS**

I.      PURPOSE OF THIS DISCLOSURE STATEMENT .................................................. 1

II.     INTRODUCTION ........................................................................................................ 4

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
        AND THE PLAN ......................................................................................................... 7

        A.    What is chapter 11? .......................................................................................... 7
        B.    Why are the Debtors sending me this Disclosure Statement? ......................... 7
        C.    Am I entitled to vote on the Plan? .................................................................. 7
        D.    What will I receive from the Debtors if the Plan is consummated? ................ 8
        E.    Are any regulatory approvals required to consummate the Plan? ................ 17
        F.    What happens to my recovery if the Plan is not confirmed or does not go
              effective? ....................................................................................................... 18
        G.    If the Plan provides that I get a distribution, do I get it upon Confirmation or
              when the Plan goes effective, and what is meant by "Confirmation,"
              "Effective Date," and "Consummation?" ..................................................... 18
        H.    What are the sources of Cash and other consideration required to fund the
              Plan? .............................................................................................................. 18
        I.     Is there potential litigation related to the Plan? ........................................... 19
        J.     Does the Plan preserve Causes of Action? ................................................ ~~19~~20
        K.    Will there be releases, exculpation, and injunction granted to parties in
              interest as part of the Plan? .......................................................................... 20
        L.     When is the deadline to vote on the Plan? ................................................ 2~~1~~2
        M.    How do I vote on the Plan? ........................................................................... 22
        N.    Why is the Bankruptcy Court holding a Confirmation Hearing? ................. 22
        O.    What is the purpose of the Confirmation Hearing? .................................. 2~~2~~3
        P.     When is the Confirmation Hearing set to occur? ......................................... 23
        Q.    Who do I contact if I have additional questions with respect to this
              Disclosure Statement or the Plan? ................................................................ 23
        R.    Do the Debtors recommend voting in favor of the Plan? ......................... 2~~3~~4
        S.    Does the Creditors' Committee recommend voting in favor of the Plan? ... 2~~3~~4
        T.    What is the OpCo Debtor Litigation Trust? .................................................. 24
        U.    What is the Freedom HoldCo Debtor Litigation Trust? ............................... 25
        V.    What happens if Any of the First Day Orders are Reversed? ...................... 26
        W.    How Is Class 6 Being Treated? ..................................................................... 26
        X.    Is the Restructuring Support Agreement Still Effective? ............................. 26

IV.    GENERAL HISTORICAL INFORMATION ABOUT THE DEBTORS ............ 2~~5~~7

        A.    General Background, Corporate History, and Business Operations ......... 2~~5~~7
        B.    Corporate Structure ................................................................................... 3~~2~~3
        C.    Prepetition Capital Structure ..................................................................... 3~~2~~4

V.      KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER
        11 CASES ........................................................................................................... 3~~5~~6

VI.     SUMMARY OF THE PLAN AND RESTRUCTURING SUPPORT AGREEMENT3~~7~~9
        A.      The Plan ..................................................................................................... 3~~7~~9
        B.      Other Material Terms of the Restructuring Support Agreement .................. 4~~1~~3
        C.      Acceptance of the Plan ............................................................................... 4~~2~~4
        D.      Management/Employee Incentive Plans ...................................................... 4~~3~~5

VII.    MATERIAL DEVELOPMENTS SINCE THE PETITION DATE ...................... 4~~3~~5
        A.      The Debtors' First-Day Motions and Certain Related Relief ....................... 4~~3~~5
        B.      Bidding Procedures and Sale Process ......................................................... 4~~5~~7
        C.      Claims Process and Bar Date ...................................................................... 4~~6~~8
        D.      Freedom Lender Group's Motion to Terminate Exclusivity ......................... 4~~7~~50
        E.      Motion for Allowance of Superpriority Administrative Expense Claim ........ 4~~8~~50
        F.      Disclosure Statement Objections ................................................................ 4~~8~~51
        G.      Proposed Confirmation Schedule ............................................................... 5~~0~~2
        H.      Committee Settlement ................................................................................ 5~~0~~2
        I.      Retention of Counsel .................................................................................. 5~~3~~5

VIII.   SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11
        CASES AND THE PLAN .................................................................................. 5~~4~~6
        A.      Voting on the Plan ..................................................................................... 5~~4~~6
        B.      The Disclosure Statement Hearing ............................................................. 5~~5~~7
        C.      The Confirmation Hearing ......................................................................... 5~~5~~7
        D.      Summary of Classification and Treatment Under the Plan ......................... 5~~5~~8
        E.      Treatment Under the Plan .......................................................................... 6~~5~~8

IX.     SECURITIES LAWS MATTERS ..................................................................... 6~~5~~8
        A.      Issuance and Resale of the Reorganized Common Equity and the New
                Warrants Under the Plan ............................................................................ 6~~6~~9

X.      ALTERNATIVES TO CONSUMMATION OF THE PLAN ............................ 6~~7~~0
        A.      Liquidation Under the Bankruptcy Code .................................................... 6~~7~~0
        B.      Alternative Plan of Reorganization ............................................................ 6~~8~~70
        C.      Inaction/Maintenance of Status Quo .......................................................... 6~~8~~71

XI.     RISK FACTORS ............................................................................................... 6~~8~~71
        A.      Bankruptcy Law Considerations ................................................................ 6~~8~~71
        B.      Risks Related to Recoveries Under the Plan ............................................... 7~~3~~6
        C.      Risks Associated with the Debtors' and the Reorganized Debtors' Business  7~~5~~8
        D.      Risks Relating to Tax and Accounting Consequences of the Plan ............... 8~~2~~5
        E.      Other Risks ............................................................................................... 8~~3~~6

XII.    DESCRIPTION OF SECURITIES TO BE ISSUED IN CONNECTION WITH
        THE PLAN ....................................................................................................... 8~~4~~7
        A.      Reorganized Common Equity ..................................................................... 8~~4~~7

B.      New Warrants ................................................................. 847

XIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ............. 847

A.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors ...................................................... 869
B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, General Unsecured Claims, and Existing TopCo Equity Interests ........... 903
C.      Information Reporting and Back-Up Withholding ..................... 1058

XIV.    IMPLEMENTATION OF THE PLAN ........................................ 1068

A.      Plan Distributions and Transactions ..................................... 1068
B.      Continued Corporate Existence and Corporate Action ............... 1079
C.      Effectuating Documents and Further Transactions ................... 1108
D.      Cancellation of Certain Existing Agreements .......................... 10811
E.      Release of Liens, Claims, and Interests ................................. 10912
F.      Directors of the Reorganized Debtors ................................... 1103
G.      Management/Employee Incentive Plans ................................. 1113
H.      General Distribution Mechanics .......................................... 1114
I.      Allocation of Plan Distributions Between Principal and Interest ..... 1125
J.      Withholding Taxes ......................................................... 1125
K.      Exemption from Certain Transfer Taxes ................................ 1135
L.      Setoffs and Recoupments ................................................. 1136
M.      Solicitation of Debtors .................................................... 1136
N.      OpCo Debtor Litigation Trust ............................................ 1136
O.      Freedom HoldCo Debtor Litigation Trust .............................. 1218

XV.     EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND INTERESTS 1203

A.      Discharge of Claims and Termination of Certain Equity Interests ... 1203
B.      Release of Claims .......................................................... 1214
C.      Objections to Claims and Interests ...................................... 1259

XVI.    EXECUTORY CONTRACTS UNDER THE PLAN ........................ 1269

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ... 1269
B.      Cure of Defaults for Assumed Executory Contracts or Unexpired Leases ... 1269
C.      Claims Based on Rejection of Executory Contracts and Unexpired Leases. ... 1269
D.      Ipso Facto and Similar Provisions Ineffective .......................... 12630
E.      Insurance Policies ......................................................... 12630
F.      Survival of Certain Indemnification Obligations ...................... 12730
G.      Postpetition Contracts and Leases ....................................... 12730

XVII.   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................ 12730

A.      Conditions to Confirmation .............................................. 12730
B.      Conditions to the Effective Date ......................................... 12731
C.      Satisfaction and Waiver of Conditions Precedent ..................... 1303

D.  Effect of Failure of Conditions .......................................................... 130~~3~~

E.  Binding Effect ................................................................................... 13~~1~~4

F.  Revocation or Withdrawal of the Plan ............................................... 13~~1~~4

**XVIII. CONFIRMATION OF THE PLAN** ................................................................ **13~~1~~5**

A.  Confirmation Generally ..................................................................... 13~~1~~5

B.  Voting Procedures and Standards ...................................................... 13~~1~~5

C.  Acceptance ......................................................................................... 135~~8~~

D.  Confirmation and Consummation ..................................................... 135~~9~~

**XIX.  ADDITIONAL INFORMATION** ....................................................................... **14~~1~~4**

**XX.  CONCLUSION** ............................................................................................... **14~~1~~5**

## <u>INDEX OF EXHIBITS</u>

<u>EXHIBIT A</u>    Plan

<u>EXHIBIT B</u>    Liquidation Analysis

<u>EXHIBIT C</u>    Financial Projections

<u>EXHIBIT D</u>    Restructuring Support Agreement

# I.    PURPOSE OF THIS DISCLOSURE STATEMENT

On November 3, 2024, Franchise Group, Inc. ("Franchise Group") and each of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Prior to the commencement of these Chapter 11 Cases, on November 1, 2024, the Debtors and certain beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts, that beneficially hold more than at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the aggregate outstanding principal amount of the Prepetition First Lien Loan Claims (collectively, the "Consenting First Lien Lenders") entered into that certain Restructuring Support Agreement (the "Restructuring Support Agreement"), annexed hereto as **Exhibit D**.

**The Non-Liquidating Debtors (as further described in this Disclosure Statement) are pursuing the Plan Equitization Transaction with the possibility of consummating a Partial Sale Transaction.**

**The American Freight Debtors are pursuing Store-Closing and Liquidation Sales. Following the Store-Closing and Liquidation Sales, the American Freight Debtors will be wound down. The proceeds of the Store-Closing and Liquidation Sales shall be distributed in accordance with the applicable provisions of the Plan.**

The Debtors jointly submit this *Disclosure Statement for the ~~Fifth~~Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances or rejections from Holders of Claims against and Interests in the Debtors with respect to the *~~Fifth~~Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors*, annexed hereto as **Exhibit A** (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

All capitalized terms used in this Disclosure Statement that are not otherwise defined herein shall have the meanings ascribed to them later in this Disclosure Statement, in the Plan, or the Restructuring Support Agreement, as applicable.

The Debtors urge all parties in interest to read this Disclosure Statement and the Plan carefully. This Disclosure Statement does not include a description of each and every term of the Plan. Accordingly, the description of the Plan set forth herein is qualified by the entirety of the Plan, which is incorporated by reference into this Disclosure Statement.

This Disclosure Statement contains information regarding the history of the Debtors and their businesses, the events leading up to these Chapter 11 Cases, factors supporting approval of the Committee Settlement, and descriptions of the Plan and the Plan Supplement, including the Committee Settlement. It is being provided to Holders of Prepetition ABL Loan Claims,

Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, certain General Unsecured Claims, Prepetition HoldCo Loan Claims, and Existing TopCo Equity Interests.

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders and to enhance the ongoing financial viability of the Debtors.

Generally, pursuant to the Plan, on the Effective Date (terms used but not defined below shall have the meanings set forth in the Plan or this Disclosure Statement):

- The OpCo Debtor Litigation Trust will be established to reconcile OpCo General Unsecured Claims and to investigate, pursue, litigate, and/or settle OpCo Litigation Claims for the benefit of the Holders of OpCo General Unsecured Claims;

- The Freedom HoldCo Debtor Litigation Trust will be established to preserve the Freedom HoldCo Debtor Litigation Trust Claims for the benefit of the Holders of Allowed Claims against the Freedom HoldCo Debtors, including, to the extent the Freedom HoldCo DIP Election is made, Holders of Allowed DIP Claims outstanding against the Freedom HoldCo Debtors;

- Allowed DIP Claims will be converted into a mix of (i) loans under the Take-back Debt Facility on a dollar-for-dollar basis and (ii) Reorganized Common Equity (subject to dilution) at a 25% discount to plan value, which value will be determined during the Chapter 11 Cases;

- Allowed Prepetition First Lien Loan Claims will be equitized into 100% of Reorganized Common Equity (subject to dilution);

- Solely if Holders of Claims in Class 5 vote to accept the Plan, New Warrants convertible into 5% of Reorganized Common Equity ~~will be delivered~~shall be issued and distributed to the OpCo Debtor Litigation Trust for distribution of the New Warrants or the proceeds thereof on a ratable basis to all holders of OpCo Debtor Litigation Trust Units;

- Holders of Allowed Prepetition HoldCo Loan Claims will receive their *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election; and

- Holders of Allowed OpCo General Unsecured Claims will receive their *pro rata* share of the OpCo Debtor Litigation Trust Units allocable to the respective OpCo Debtor against which the Holders of such Allowed General Unsecured Claim hold Claims. Allowed OpCo General Unsecured Claims are consolidated in Class 6 for procedural purposes and votes shall be tabulated for each individual OpCo Debtor.

**PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN IS CURRENTLY SUPPORTED BY THE DEBTORS AND THE CONSENTING FIRST LIEN LENDERS, REPRESENTING OVER TWO-THIRDS (2/3) IN DOLLAR AMOUNT AND MORE THAN ONE-HALF (1/2) IN NUMBER OF PREPETITION FIRST LIEN LOAN CLAIMS. ADDITIONALLY, THE CREDITORS' COMMITTEE IS SUPPORTIVE OF THE PLAN AND RECOMMENDS VOTING IN FAVOR OF THE PLAN.**

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article XI of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the Restructuring Transactions contemplated by the Plan.

**The Debtors strongly encourage Holders of Claims in Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, and 11 to read this Disclosure Statement (including the Risk Factors described in <u>Article XI</u> hereof) and the Plan in their entirety before voting to accept or reject the Plan. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the hearing on confirmation of the Plan (the "<u>Confirmation Hearing</u>").**

<div style="border:1px solid black; padding:10px;">

<u>**RECOMMENDATION BY THE DEBTORS**</u>

**EACH DEBTOR'S BOARD OF DIRECTORS, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED RESTRUCTURING TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.**

**EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN [APRIL 2~~3~~, 2025, AT 5:00 P.M. (PREVAILING EASTERN TIME)] PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.**

</div>

Additional copies of this Disclosure Statement (including its exhibits) are available upon request made to the office of the Debtors' counsel:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:      Joshua A. Sussberg, P.C.
                Nicole L. Greenblatt, P.C.
                Derek I. Hunter
                Maddison Levine
                Brian Nakhaimousa

E-mail address:  joshua.sussberg@kirkland.com
                nicole.greenblatt@kirkland.com
                derek.hunter@kirkland.com
                maddison.levine@kirkland.com
                brian.nakhaimousa@kirkland.com

and

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attention:      Edmon L. Morton
                Matthew B. Lunn
                Allison S. Mielke

E-mail address: emorton@ycst.com
               mlunn@ycst.com
               amielke@ycst.com

If you have any questions concerning the procedures for voting on the Plan (including the Plan), please contact the Claims Agent at:

Franchise Group, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue
Suite 412
Brooklyn, New York 11232
Telephone:     (844) 285-4564 (U.S./Canada, toll free) or
               +1 (646) 937-7751 (international, toll)

Email:          FRGInfo@ra.kroll.com

## II.    INTRODUCTION

The Debtors are a privately held operator and acquirer of franchised and franchisable businesses and the premier solution for catapulting franchise brands forward.  With over 100 years of combined franchising and operational expertise, the Debtors provide a first-class environment for operating companies and their associates to thrive by partnering with strong management teams who are committed to growth through franchising.  The Debtors' business segments include a diverse collection of highly recognized, market-leading, and emerging retail brands, including the Vitamin Shoppe, Pet Supplies Plus, American Freight, and Buddy's Home Furnishings.  As of the Petition Date, the Debtors have approximately 2,200 total retail store locations (including both corporate-owned and franchised locations), approximately 11,900 total employees, and operations spanning across the United States.

Over the past several years, the Debtors have faced numerous significant challenges stemming from, among other things, adverse macroeconomic trends and headwinds facing the retail industry, including operational declines and losses from underperforming locations, inflationary pressure, an overleveraged balance sheet, and rising interest expenses.  These challenges, along with the impending maturities of the Debtors' revolving credit facility and term loans in 2026 placed increased pressure on the Debtors.  At the same time, allegations of securities fraud surrounding the Debtors' former Chief Executive Officer distracted the Company from effectively addressing its liquidity challenges.  ~~Further complicating the Debtors' ability to address these challenges, the HoldCo Lenders leveraged their blocking right with respect to the Badcock divestiture and required that the Debtors make certain additional interest payments to the HoldCo Lenders under the HoldCo Credit Agreement.  The HoldCo Lenders further placed restrictions on how the Debtors could apply the proceeds from the Badcock merger and any other sale transactions of certain of its businesses.  The HoldCo Lenders' tightening grip, along with the public scrutiny facing the Debtors in the wake of the securities fraud allegations against the Debtors' former Chief Executive Officer, adversely impacted both the Debtors' liquidity and ability to address these challenges on an out-of-court basis.~~

In August 2024, the Debtors engaged Willkie Farr & Gallagher LLP, Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), and Ducera Partners LLC ("Ducera") to assist with exploring potential restructuring and strategic alternatives, including engaging with potential interested parties concerning the purchase of some or all of the Debtors assets, as well as engaging with certain of the Debtors' stakeholders on a value-maximizing path forward.  As part of these efforts, the Debtors, through their advisors, engaged in discussions with stakeholders throughout their capital structure, including negotiations with their ABL Lenders, certain First Lien Lenders, and the Freedom Lender Group.

On November 1, 2024, the Debtors entered into the Restructuring Support Agreement with certain First Lien Lenders holding approximately 80% of the principal amount outstanding under the First Lien Term Loan Facility.  Two days later, on November 3, 2024, the Debtors initiated a prearranged court-supervised process under chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court.

On November 5, 2024, the Bankruptcy Court held the "First Day" hearing where the Bankruptcy Court granted, among other things, interim approval to access approximately $100

million of the $750 million debtor-in-possession financing facility, approximately $250 million of which constituted new money and approximately $500 million of which constituted a "roll up" of prepetition obligations under the First Lien Term Loan Facility [Docket No. 134] (the "DIP Facility").  On December 2, 2024, the Freedom Lender Group filed an objection to the DIP Facility (the "Freedom DIP Objection").  In response to the Freedom DIP Objection, the DIP Lenders agreed to amend the obligors under the DIP Facility to remove the HoldCo Debtors, subject to amounts necessary to administer the HoldCo Debtors' estates.  The DIP Lenders also agreed to allow the amounts loaned to the HoldCo Debtors from the other Debtors, as applicable, to be borrowed on an interest-free basis, fee-free basis, and secured only to the extent of any HoldCo Debtor unencumbered assets.

Further, on November 11, 2024, the Debtors filed a motion to establish procedures to facilitate the continuation of the Debtors' prepetition marketing process that commenced on September 3, 2024, for the sale of the Debtors' assets.  On December 11, 2024, the Bankruptcy Court entered the *Order (I) (A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief* [Docket No. 411] (as modified by the revised Bidding Procedures Order [Docket No. 444],[2] the "Bidding Procedures Order," and the bidding procedures approved thereby, the "Bidding Procedures").  Among other things, the Bidding Procedures established February 3, 2025, at 5:00 p.m. (ET) as the deadline for submission of Qualified Bids (as defined in the Bidding Procedures) (the "Qualified Bid Deadline").  Following the Qualified Bid Deadline, the Debtors, in consultation with the Required Consenting First Lien Lenders and the Creditors' Committee, decided to cancel the Sale Process and elected instead to pursue the Plan Equitization Transaction.  Nonetheless, as of the filing of this Disclosure Statement, the Debtors are engaged in ongoing discussions with certain potential purchasers for the sale of certain of the Debtors' assets.  Accordingly, as described in greater detail herein, the Plan provides the Debtors with flexibility to pursue such a discreet asset sale, whereby any proceeds from such sale would ultimately be distributed to Holders of Claims pursuant to the Plan.

On February 13, 2025, the Bankruptcy Court entered an order denying the *Debtors' Application for Order Authorizing the Retain and Employment of Willkie Farr & Gallagher LLP as Co-Counsel for the Debtors, Nunc Pro Tunc to the Petition Date* [Docket No. 474] [Docket No. 976].   On February 14, 2025, the Debtors engaged Kirkland & Ellis, LLP ("Kirkland") as proposed co-counsel in these Chapter 11 Cases.  Since Kirkland's engagement, Kirkland has held numerous conversations with the Debtors and their stakeholders, including the Debtors' management and advisors, counsel to the Creditors' Committee, counsel to the Freedom Lender Group, counsel to the Consenting First Lien Lenders, counsel to the ABL Lenders, counsel to Mr. Wartell, the independent director appointed to the board of directors at each Freedom HoldCo Debtor, and the U.S. Trustee.  These discussions have been, and continue to be, constructive and enable Kirkland to get up to speed quickly in advance of the hearing

---

[2]    The Debtors filed a revised Bidding Procedures Order under certificate of counsel after the initial Bidding Procedures Order was entered [Docket No. 431].  The revised Bidding Procedures Order was entered on December 16, 2024 [Docket No. 444].

seeking approval of this Disclosure Statement on a final basis (the "Disclosure Statement Hearing"), scheduled for February 19, 2025, at 10:00 a.m. (prevailing Eastern Time).

On February 18, 2025, the Debtors filed the Plan and this Disclosure Statement in advance of the Disclosure Statement Hearing.  On February 14, 2025, Kirkland requested a meeting with the Freedom Lender Group and the Consenting First Lien Lenders.  The Freedom Lender Group denied the request for a meeting.  The Consenting First Lien Lenders agreed to schedule a meeting for February 17, 2025.  Additionally, on February 15, 2025, Kirkland sent a draft of this Disclosure Statement to counsel to the Freedom Lender Group and asked for comment in the hopes of reaching a resolution on at least certain of the outstanding issues prior to the Disclosure Statement Hearing.

As of the date hereof, the Freedom Lender Group has indicated that they will not vote in favor of the Plan as to the HoldCo Debtors, in which case the Debtors may be unable to receive the requisite votes to confirm the Plan as to the HoldCo Debtors.  Nonetheless, the Debtors are continuing to engage with all interested parties, including the Freedom Lender Group, in good-faith, arm's length negotiations in an effort to reach a global resolution to the Freedom Lender Group's anticipated objections to Confirmation of the Plan.  If the Debtors are unable to reach a resolution prior to Confirmation, however, the Debtors remain prepared to meet their burden of proof to confirm the Plan at the applicable Debtors at the Confirmation Hearing.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to

prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of [January 31], 2025).  Each category of Holders of Claims or Interests, as set forth in Article IV of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Prepetition ABL Loan Claims | Impaired | Entitled to Vote |
| Class 4 | Prepetition First Lien Loan Claims | Impaired | Entitled to Vote |
| Class 5 | Prepetition Second Lien Loan Claims | Impaired | Entitled to Vote |
| Class 6 | OpCo Debtors General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Prepetition HoldCo Loan Claims | Impaired | Entitled to Vote |
| Class 8-A | Freedom HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8-B | HoldCo Receivables General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8-C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| Class 9 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Existing TopCo Equity Interests | Impaired | Entitled to Vote |
| Class 12 | Existing Intercompany Equity Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights, as applicable, regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### D.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement

may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Priority Non-Tax Claims | The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Required Consenting First Lien Lenders): (i) Cash in an amount equal to such Allowed Claim or in the ordinary course of business as and when due; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  In the event of a Partial Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors. | N/A | 100% |
| 2 | Other Secured Claims | The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, | N/A | 100% |

---

[3]    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to potential recoveries from Retained Causes of Action.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date each Holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Partial Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors. Each Holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan. Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order or rule or the vote, consent, authorization or approval of any Person and the Holder of such Claims shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any | | |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | related financing statements, guaranties, or *lis pendens*, or similar interests or documents. Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.<br><br>Deficiency Claims:  To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim, only as applicable, and shall be classified and treated as a Class 6 Claim or Class 8-A Claim, Class 8-B Claim, or Class 8-C Claim, only as applicable. | | |
| 3 | Prepetition ABL Loan Claims | On the Effective Date, the Prepetition ABL Loan Claims shall be Allowed under the Plan in the amount of $248.7 million plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims (including, without limitation, any reimbursement obligations under outstanding letters of credit), and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition ABL Loan Claim, except to the extent that the ABL | $248.7 million, plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition ABL Loan Claims. | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Credit Agreement Agent or a Holder of a Prepetition ABL Loan Claim agrees to different treatment with respect to such Holder's Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Prepetition ABL Loan Claim shall receive its *pro rata* share of (i) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (ii) (A) proceeds of the Exit ABL Facility, or (B) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (i) hereunder. | | |
| 4 | Prepetition First Lien Loan Claims | On the Effective Date, the Prepetition First Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition First Lien Loan Claim, except to the extent that the First Lien Credit Agreement Agent or a Holder of a Prepetition First Lien Loan Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of an Allowed Prepetition First Lien Loan Claim shall receive, subject to the terms of the Plan, payment of all outstanding | $1.13 billion, plus interest, fees, costs, charges, and other amounts arising under or in connection with the Prepetition First Lien Loan Claims | Unspecified[4] |

---

[4]    As described herein, the Debtors continue to engage with multiple bidders with respect to a potential Partial Sale Transaction.  To avoid potential prejudice to the sale process by disclosing potential estimated recoveries for Prepetition First Lien Loan Claims, such recovery is not estimated herein.  The Plan is broadly supported by the Holders whose claims represent 80 percent of the Claims arising on account of obligations under the First Lien Term Loan Facility.  For additional information regarding valuation, refer to Article XVIII.D.iii herein.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | unreimbursed fees and expenses, if any, and its *pro rata* share of (i) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transaction, if applicable, and (ii) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable). <br><br> Deficiency Claims:  If applicable, any First Lien Deficiency Claims shall be classified and treated as a Class 6 Claim and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in Class 6. | | |
| 5 | Prepetition Second Lien Loan Claims | On the Effective Date, the Prepetition Second Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition Second Lien Loan Claim, except to the extent that a Holder of a Prepetition Second Lien Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Prepetition Second Lien Loan Claim shall receive (A)its *pro rata share of the OpCo Debtor Litigation Trust Units, and,* solely if the Class votes to accept the Plan, the New | $~~12~~45 million, plus accrued but unpaid prepetition interest and fees through the Effective Date[5] | 0% - TBD[56] |

---

[5]   For the avoidance of doubt, such amount outstanding includes $19.51 million on account of the Secured HoldCo Guarantee Obligations.

[~~5~~6]   The value of the New Warrants is undetermined at this time.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| | | Warrants, which~~, if issued,~~ New Warrants (if applicable) shall be issued and distributed to the OpCo Debtor Litigation Trust to be shared ratably with all ~~H~~holders of OpCo Debtor Litigation Trust Units~~, or (B) if the Class votes to reject the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under sections 1129(a)(7) and 1129(b) of the Bankruptcy Code~~.<br><br>Deficiency Claims: If applicable, any Second Lien Deficiency Claims shall be treated for all purposes under the Plan as a General Unsecured Claim and shall be classified and treated as a Class 6 Claim and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in Class 6.  It is anticipated that the full value of the Prepetition Second Lien Loan Claims shall be a Second Lien Deficiency Claim hereunder. | | |
| 6 | OpCo Debtors General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed OpCo General Unsecured Claim, except to the extent that a Holder of a General Unsecured Claim against any OpCo Debtor agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim at any OpCo Debtor shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units. | $1,140,427,705[7] | ~1%[68] |

---

[7] This estimate includes potential First Lien Deficiency Claims and Second Lien Deficiency Claims.

[68] The projected recovery to Holders of Allowed General Unsecured Claims against the OpCo Debtors does not take into account any possible recovery on account of OpCo Litigation Claims.  The estimated recovery for General Unsecured Claims in Class 6 may be greater than 1% depending on the outcome of the OpCo Litigation Trustee's pursuit of such OpCo Litigation Claims.

| \| SUMMARY OF EXPECTED RECOVERIES | | | | |
| --- | --- | --- | --- | --- |
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 7 | Prepetition HoldCo Loan Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition HoldCo Loan Claim, except to the extent that a Holder of a Prepetition HoldCo Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition HoldCo Loan Claim shall receive its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election.  If there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim. | $514.8 million, plus accrued but unpaid prepetition interest and fees through the Effective Date | 0%[29] |
| 8-A | Freedom HoldCo General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Freedom HoldCo General Unsecured Claim, except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive its *pro rata* share of the proceeds from the Freedom HoldCo Debtor Litigation Trust.  If there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured | $0 | N/A |

---

[29]    The estimated recovery for Class 7 Prepetition HoldCo Loan Claims and Class 8-A Freedom HoldCo General Unsecured Claims, may be greater than 0% depending on the outcome of the Freedom HoldCo Debtor Litigation Trustee's pursuit of the Freedom HoldCo Debtor Litigation Trust Claims and the outcome of the Freedom HoldCo Independent Investigation.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Claim. | | |
| 8-B | HoldCo Receivables General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo Receivables General Unsecured Claim, except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive its *pro rata* share of Cash, if any, held by the HoldCo Receivables Debtors. If there is no Cash held at the HoldCo Receivables Debtors after paying all Claims in Class 8-B that are senior or structurally senior to the Allowed HoldCo Receivables General Unsecured Claims, if applicable, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim. | $0 | N/A |
| 8-C | TopCo General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed TopCo General Unsecured Claim, except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed TopCo General Unsecured Claim shall receive its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.6 of the Plan. If there is no Cash held at TopCo following the allocation described in Section 3.6 of the Plan, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim. | $0 | N/A |
| 9 | Intercompany Claims | On or after the Effective Date, or as soon as practicable thereafter, (i) any and all Intercompany Claims between, among and/or against Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP | N/A | N/A |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| | | Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (A) Reinstated or (B) set off, settled, discharged, contributed, canceled, released, without any distribution on account of such Intercompany Claims, or otherwise addressed, and (ii) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (A) Reinstated or (B) set off, settled, discharged, contributed, canceled, released, without any distribution on account of such Intercompany Claims, or otherwise addressed; <u>provided, however</u>, that notwithstanding the foregoing, any Intercompany Claims held by ~~or against or among~~ any of the Freedom HoldCo Debtors ~~shall receive the recovery that~~ <u>against any of the OpCo Debtors (if any) shall, in full and final satisfaction, compromise, settlement, release, and discharge of</u> such Intercompany Claim ~~would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if,~~ <u>receive its</u> *pro rata* <u>share of the OpCo Debtor Litigation Trust Units; provided, further, that any Intercompany Claims held by any of the OpCo Debtors against any of the Freedom HoldCo Debtors (if any) shall, in full and final satisfaction, compromise, settlement, release, and discharge of</u> such Intercompany Claim ~~is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date~~, <u>receive its</u> *pro rata* <u>share of the Freedom HoldCo Debtor Litigation Trust Units</u>. To the extent any Intercompany Claim is Reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy | | |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Court, act or action under applicable Law, regulation, order or rule or the vote, consent, authorization or approval of any Person. | | |
| 10 | Subordinated Claims | Each Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim. | N/A | 0% |
| 11 | Existing TopCo Equity Interests | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing TopCo Equity Interest, except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (i) its *pro rata* share of Cash (if any) held by TopCo after paying all Allowed Claims against TopCo and following the allocation described in Section 3.6 of the Plan, or (ii) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest. | N/A | 0%[810] |
| 12 | Existing Intercompany Equity Interests | Subject to the Restructuring Transactions Memorandum, each Allowed Existing Intercompany Equity Interest shall be, at the option of the applicable Debtor or Reorganized Debtor, either (i) Reinstated or (ii) set off, settled, distributed, contributed, canceled, and released without any distribution on account of such Existing Intercompany Equity Interests, or otherwise addressed at the option of the Reorganized Debtors and the Required Consenting First Lien Lenders. | N/A | 0% |

---

[810]    The estimated recovery for Class 11 Existing TopCo Equity Interests may be greater than 0% depending on whether there are any TopCo Allocated Fees and Expenses.

**E.**     **Are any regulatory approvals required to consummate the Plan?**

At this time, there are no known regulatory approvals that are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**F.**     **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended Chapter 11 Case, see Article XI.B.xv of this Disclosure Statement.

**G.**     **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived before the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date.  *See* Article XVII of this Disclosure Statement, entitled "*Conditions Precedent to Confirmation and Consummation of the Plan*," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**H.**     **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Reorganized Debtors, as applicable, shall fund Cash distributions under the Plan with Cash on hand, including Cash from operations, the American Freight Liquidation Proceeds, the Sale Proceeds (if any) and the proceeds of the DIP Facility.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors or the Disbursing Agent in accordance with Article VIII of the Plan.

The Debtors shall fund Cash distributions under the Plan from Cash on hand (if any), the American Freight Liquidation Proceeds, and the Sale Proceeds (if any) in accordance with the terms of the Sale Documents and the Plan.

The Debtors shall fund distributions to Allowed Claims against Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. (together, the "Freedom HoldCo Debtors") from proceeds of the Freedom HoldCo Debtor Litigation Trust.

From and after the Effective Date, subject to any applicable limitations set forth in any agreement entered into on or after the Effective Date (including, without limitation, the New Organizational Documents, the New ABL Facility Documents, and the Take-Back Debt Documents), the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of managers or directors, as applicable (or other applicable governing bodies), of the applicable Reorganized Debtors deem appropriate.

## I.        Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cram down" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article XVIII.D.v of this Disclosure Statement, entitled "*Cram Down*."

On January 8, 2025, the Freedom Lender Group filed the Freedom Lender Group Objection, objecting to the adequacy of this Disclosure Statement.  Among other things, the Freedom Lender Group argued that the Plan is patently unconfirmable with respect to the HoldCo Debtors because, they assert, that the Freedom Lender Group is the only class of Claims eligible to vote on the HoldCo Debtors' Plan—and that they intend to vote to reject the Plan because it does not provide a meaningful recovery to the lenders under the Debtors' Second Lien Term Loan Facility.  Accordingly, the Debtors may not receive the requisite votes to confirm the Plan at the HoldCo Debtors.

The Debtors intend to engage in good-faith negotiations with all parties-in-interest, including the Freedom Lender Group between now and the Voting Deadline in an effort to reach a consensual resolution to the Freedom Lender Group's anticipated confirmation objections. However, the Debtors also believe that the Freedom Lender Group's arguments regarding the confirmability of the Plan lack merit, and, should the parties be unable to consensually resolve their issues in advance of Confirmation, the Debtors intend to prove the Plan, particularly as to the OpCo Debtors, satisfies the requirements of applicable Law and is confirmable at the Confirmation Hearing.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court disagrees with the Debtors' position, the Plan may not be confirmed.  If the Plan is not confirmed with respect to the Debtors, there is no assurance that the Debtors will be able to reorganize the Debtors' businesses.  Further, it is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.[9][11]

---

[9][11] For a more detailed description of the aforementioned consequences, or of a liquidation scenario, *see* Article X of this Disclosure Statement, entitled "Alternatives to Consummation of the Plan," and the Liquidation Analysis attached hereto as Exhibit B.

**J.**    **Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.

In accordance with section 1123(b) of the Bankruptcy Code and except as otherwise provided for in the Plan, the Reorganized Debtors, the OpCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, any actions constituting OpCo Litigation Claims, and any actions constituting Freedom HoldCo Debtor Litigation Trust Claims, as applicable. The Reorganized Debtors', the OpCo Litigation Trustee's, and the Freedom HoldCo Debtor Litigation Trustee's rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article XII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors, the OpCo Litigation Trustee, and the Freedom HoldCo Debtor Litigation Trustee, as applicable may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors, the OpCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trust, as applicable. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, the OpCo Litigation Trustee, or the Freedom HoldCo Debtor Litigation Trustee, as applicable, will not pursue any and all available retained Causes of Action against it. The Debtors, the Reorganized Debtors, the OpCo Litigation Trustee, and the Freedom HoldCo Debtor Litigation Trustee expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan. The Reorganized Debtors, the OpCo Litigation Trustee, and the Freedom HoldCo Debtor Litigation Trustee, as applicable, may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything herein to the contrary, Retained Causes of Action remaining with the Reorganized Debtors will be limited to Claims and Causes of action, counterclaims, or cross claims, that are not otherwise specified as being vested in the OpCo Debtor Litigation Trust or the Freedom HoldCo Debtor Litigation Trust, and are against continuing trade partners, vendor counterparties, contractual counterparties, or otherwise relate to the Reorganized Debtors' continued operations.

**K.**    **Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. Specifically, the Debtors propose to release the Debtors, the Reorganized Debtors, the DIP Agent and each DIP Lender, the First Lien Credit Agreement Agent, the Consenting First

Lien Lenders, the Creditors' Committee and each of its members solely in their capacity as members of the Creditors' Committee, all Holders of Claims and Interests that elect to opt in to the Third-Party Release, and each of their Related Parties.

The Debtors are not proposing to release former directors of the Debtors, other than those terminated without cause between February 3, 2025 and the Effective Date of the Plan, former employees, including officers of the Debtors, other than those terminated without cause between February 3, 2025 and the Effective Date of the Plan, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., and each of their Affiliates and Related Parties, Irradiant Partners, LP and the members of the Freedom Lender Group, Brian Kahn, Lauren Kahn, Vintage Capital Management LLC, Prophecy Asset Management LP, and each of their Affiliates and Related Parties, and WFG.

In support of the releases and exculpations contemplated under the Plan with respect to the HoldCo Debtors, and as described in greater detail herein, Mr. Wartell has been delegated sole authority, in his capacity as the sole member of the Conflicts Committee, on Conflicts Matters, and to conduct the Freedom HoldCo Independent Investigation related thereto. Further, Mr. Wartell has the authority to, on behalf of the HoldCo Debtors, take any action with respect to the Conflict Matters, including with respect to a Transaction, solely to the extent such Transaction constitutes a Conflicts Matter, and has the authority to release or settle potential Claims or Causes of Action of the HoldCo Debtors not otherwise assigned to the Freedom HoldCo Debtor Litigation Trust. Accordingly, to the extent the Freedom HoldCo Independent Investigation uncovers Claims or Causes of Action worthy of pursuit prior to Confirmation, the Debtors may amend and narrow the scope of the proposed released parties and such Claims or Causes of Action may be preserved and ultimately pursued by the Freedom HoldCo Debtor Litigation Trustee. For additional information regarding the Freedom HoldCo Independent Investigation, refer to Article IV.A.vii herein.

The Debtors believe that the Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and their key constituencies in obtaining support for the Plan.

The Debtors believe that the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, the Debtors believe that each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

For the avoidance of doubt, parties' rights regarding the Debtors' releases, third-party releases, exculpation, and injunction provisions are reserved for Confirmation.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST**

**THE DEBTORS AND THE RELEASED PARTIES: ALL HOLDERS OF CLAIMS OR INTERESTS WHO ELECT TO OPT IN TO THE RELEASES CONTAINED IN THE PLAN.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN**.

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part in Article XV of this Disclosure Statement.[10][12]

**L.     When is the deadline to vote on the Plan?**

The Voting Deadline is [April 23], 2025.

**M.     How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballot").[11][13]  For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and submitted via the E-Ballot Portal (https://cases.ra.kroll.com/FRG) as directed so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent, Kroll Restructuring Administration LLC (the "Solicitation Agent") **on or before the Voting Deadline, *i.e.* [April 23, 2025], at 5:00 p.m. (ET)**.  Ballots will also be accepted in paper form.  Paper Ballots may be delivered by first-class mail postage prepaid, personal delivery, or overnight courier to the Solicitation Agent at the following address:

<div align="center">

Franchise Group, Inc.
Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

</div>

See Article XIV.M, *"Solicitation of Debtors,"* for additional information.

---

[10][12]     Release provisions are subject to ongoing review, including as part of the Freedom HoldCo Independent Investigation.

[11][13]     The voting Ballot includes the option to opt in to the Third-Party Release.  To affirmatively opt in to granting the Third-Party Release, a Holder of a Claim in the Voting Class who returns a Ballot must check the box indicated on the Ballot.  Holders of all Claims that are not included in the Voting Classes will also have the opportunity to opt in to the Third-Party Release.  To affirmatively opt in to the Third-Party Release, Holders of Claims in these Classes must complete, sign, and date the Opt-In Form and return it promptly to the Solicitation Agent, in accordance with instructions provided in the Opt-In Form.

### N.    Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.  The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.  The Confirmation Hearing may be adjourned from time to time without further notice.

### O.    What is the purpose of the Confirmation Hearing?

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a chapter 11 plan, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan resolves any debt of the debtor that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

### P.    When is the Confirmation Hearing set to occur?

The Bankruptcy Court has scheduled the Confirmation Hearing for [April May 12 9], 2025. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan and approval of the Disclosure Statement on a final basis must be filed and served on the Debtors, and certain other parties, by no later than [April 23], 2025 in accordance with the Confirmation Hearing Notice that accompanies this Disclosure Statement and the Disclosure Statement Order.

### Q.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Kroll Restructuring Administration LLC, via one of the following methods:

> *By electronic mail at:*
> FRGInfo@ra.kroll.com (with "Franchise Group Solicitation Inquiry" in the subject line).
>
> *By telephone at:*
> (844) 285-4564 (U.S./Canada toll free) or +1 (646) 937-7751 (International).

Copies of the Plan, this Disclosure Statement, and any other publicly-filed documents in the Chapter 11 Cases are available free of charge on the Debtors' restructuring webpage maintained by the Debtors' Solicitation Agent, at https://cases.ra.kroll.com/FRG.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases by visiting the Bankruptcy Court's website at

https://www.deb.uscourts.gov (a PACER account is required) or upon request to the Solicitation Agent via the methods listed above.

> **R.    Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which provides for a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of the Debtors' stakeholders, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

> **S.    Does the Creditors' Committee recommend voting in favor of the Plan?**

Yes.  As described in a letter accompanying this Disclosure Statement, the Plan has been the subject of extensive negotiations and discussions between the Creditors' Committee and the Debtors, including the Independent Directors.  As discussed more fully in Article VII.H of this Disclosure Statement, the Plan reflects a negotiated settlement with the Creditors' Committee, which provides for, among other things, the establishment of the OpCo Debtor Litigation Trust and the transfer of the OpCo Litigation Claims to the OpCo Debtor Litigation Trust for the benefit of Holders of General Unsecured Claims.  The Creditors' Committee recommends voting in favor of the Plan.

> **T.    What is the OpCo Debtor Litigation Trust?**

Pursuant to the Committee Settlement, on the Effective Date, the Debtors will establish a litigation trust (the "OpCo Debtor Litigation Trust").  The purpose of the OpCo Debtor Litigation Trust is to evaluate, and to the extent value-maximizing, pursue potential Claims and Causes of Action that are vested or deemed to be vested in the OpCo Debtor Litigation Trust on the Effective Date.  The OpCo Debtor Litigation Trust, and the evaluation and pursuit of such Claims and Causes of Action, shall be funded by $21 million in Cash, as described herein and in the Plan.  The OpCo Debtor Litigation Trust will be administered by the OpCo Litigation Trustee and governed by the OpCo Debtor Litigation Trust Agreement.

Specifically, the OpCo Debtor Litigation Trust will be funded on the Effective Date with (a) $21 million *less* the Creditors' Committee's professionals' fees, (b) proceeds from OpCo Litigation Claims, and (c) solely if Holders of Claims in Class 5 vote to accept the Plan, five-year warrants to purchase up to 5% of reorganized equity, with such warrants subject to the strike price mechanics set forth in the Plan (for the avoidance of doubt, first lien deficiency claims share ratably with the listed classes of General Unsecured Creditors).  The beneficiaries of the OpCo Debtor Litigation Trust will be all Holders of Claims in Class 5 and Class 6.  Under the OpCo Debtor Litigation Trust, creditors of the HoldCo Debtors, including the Freedom Lender Group, solely in their capacities as creditors of the HoldCo Debtors, shall not recover from the OpCo Debtor Litigation Trust (except potentially with respect to the HoldCo Facility OpCo Guarantees).

The OpCo Debtor Litigation Trust includes the following Claims and Causes of Actions belonging to the OpCo Debtors (collectively, the "OpCo Litigation Claims"):  (a) all potential

Claims and Causes of Action held by the OpCo Debtors against former directors and officers (including, without limitation, Brian Kahn), and all Claims and Causes of Action against Bryant Riley; (b) all potential Claims and Causes of Action held by the OpCo Debtors against B. Riley Financial, Inc. ("BRF"), B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., Irradiant Partners, LP, Vintage Capital Management LLC, and Lauren Kahn, and solely in the case of BRF. and Irradiant Partners, LP, each of their affiliates, directors, officers, managers, partners, and owners (in each case, solely in their capacity as such, and, for the avoidance of doubt, not including any of the Debtors); (c) all Claims and Causes of Action held by the non-HoldCo Debtors against HoldCo Debtors; and (d) all potential Claims and Causes of Action held by the OpCo Debtors against the members of the Freedom Lender Group.

As part of the Committee Settlement, the Debtors agreed to terminate the OpCo Independent Investigation. The Debtors do not anticipate disclosing a copy of Petrillo's report in these Chapter 11 Cases in advance of Confirmation. The Debtors are prepared to meet their burden at Confirmation with respect to the scope and appropriateness of the releases contemplated under the Plan.

Certain Claims and Causes of Action that vest in the OpCo Debtor Litigation Trust may overlap with certain Claims or Causes of Action that will also vest in the Freedom HoldCo Debtor Litigation Trust. Accordingly, the OpCo Debtor Litigation Trust and the Freedom HoldCo Debtor Litigation Trust will need to resolve ownership of the overlapping Claims prior to pursuit of such Claims, which will not occur prior to the Effective Date. Such resolution may impact your ultimate recovery. Subject to the OpCo Litigation Claims, Holders of Claims in Class 6 who vote in favor of the Plan shall receive a release under the Plan. Holders of Claims in Classes 3 and 4 shall provide to, and receive a release from, the Released Parties under the Plan (including, without limitation, the Consenting First Lien Lenders).

The Plan does not provide for the substantive consolidation of any Debtor with any other Debtor. As such, a Holder of an Allowed General Unsecured Claim against an OpCo Debtor will only receive a recovery under the Plan to the extent there is value allocated to the OpCo Debtor against which it holds an Allowed Claim under the OpCo Debtor Litigation Trust. The Freedom Lender Group contends that only Franchise Group, Inc. and the Freedom HoldCo Debtors participated in the Take-Private Transaction and that, as a result, those are the only Debtor entities with related Claims and Causes of Action. Therefore, there is a risk that a Holder of a General Unsecured Claim at a subsidiary of Franchise Group, Inc. (including the PSP Debtors, the Vitamin Shoppe Debtors, Buddy's Debtors and the American Freight Debtors) would not receive proceeds of any such Claim or Causes of Action and, a result, may not receive any additional distribution from the OpCo Debtor Litigation Trust on account of such Claim or Causes of Action.

### U.    What is the Freedom HoldCo Debtor Litigation Trust?

On the Effective Date, the Debtors will establish the Freedom HoldCo Debtor Litigation Trust to administer any Claims or Causes of Action of the Freedom HoldCo Debtors that are not settled, discharged, or released as part of the Plan. Specifically, on the Effective Date, the following Claims and Causes of Action will vest or deem to be vested in the Freedom HoldCo Debtor Litigation Trust: all Claims and Causes of Action belonging to the Freedom HoldCo

Debtors, other than (a) the Freedom HoldCo Debtor Released Claims and (b) Claims and Causes of Action against (i) Ducera in its capacity as investment banker to the Debtors, (ii) AlixPartners, LLP in its capacity as financial advisor to the Debtors, and (iii) the CRO, which, in each case, shall be released pursuant to the Plan.

However, the Plan provides that the Debtors shall release any Claims and Causes of Action belonging to any of the Freedom HoldCo Debtors against (a) the Independent Directors, (b) the Consenting First Lien Lenders, (c) Andrew M. Laurence, (d) Andrew F. Kaminsky, (e) Eric Seeton, and (f) Tiffany McMillan-McWaters, and thus such claims will not be transferred to the Freedom HoldCo Debtor Litigation Trust, unless the Freedom HoldCo Independent Director determines that any such Claims and Causes of Action shall not be settled or released and identifies such Claims and Causes of Action in the Plan Supplement.

Unlike the OpCo Debtor Litigation Trust, the Plan does not provide for Cash proceeds to fund and administer the Freedom HoldCo Debtor Litigation Trust. In addition, certain Claims and Causes of Action that vest in the OpCo Debtor Litigation Trust may overlap with certain Claims or Causes of Action that will vest in the Freedom HoldCo Debtor Litigation Trust. Accordingly, the Freedom HoldCo Debtor Litigation Trust and the OpCo Debtor Litigation Trust will need to resolve ownership of the overlapping Claims prior to pursuit of such Claims, which will not occur prior to the Effective Date. Such resolution may impact your ultimate recovery.

### V.    What happens if Any of the First Day Orders are Reversed?

As discussed herein, on December 18, 2024, the Freedom Lender Group filed an appeal of the Exclusivity Termination Order, the Critical Vendors Order, the Final DIP Order, and the Bidding Procedures Order. The appeals are currently pending before the United States District Court for the District of Delaware. If any of the orders subject to these appeals are reversed, the Debtors may need to amend the Plan and resolicit it, or formulate a new chapter 11 plan and solicit votes on such new plan.

### W.    ~~What are Some of the Freedom Lender Group's Open Issues~~**How Is Class 6 Being Treated**?

~~On February 18, 2025, the Freedom Lender Group requested that, among other things, (i) the Debtors file a report prepared by Petrillo with the results of the Independent Investigation at least 60 days prior to the Confirmation Hearing, (ii) the Debtors file a report prepared by Mr. Wartell and/or his advisors with the results of the Freedom HoldCo Independent Investigation at least 60 days prior to the Confirmation Hearing, and (iii) that the Debtors file a valuation analysis at least 60 days prior to the Objection Deadline. The Debtors believe these timelines would significantly extend the Chapter 11 Cases to the detriment of all stakeholders, and therefore have not agreed. The Freedom Lender Group also requested that, if Mr. Wartell seeks to settle any Claim or Cause of Action, notice of such settlement be Filed at least 21 days prior to any hearing with respect to such settlement be effectuated only by order of the Bankruptcy Court.~~ If Mr. Wartell determines that any such Claims and Causes of Action shall not be settled or released, he will identify such Claims and Causes of Action in the Plan Supplement.

Allowed OpCo General Unsecured Claims in Class 6 are consolidated for procedural purposes and votes shall be tabulated for each individual OpCo Debtor.  The Plan is not substantively consolidating Class 6 OpCo General Unsecured Claims.

### X.    Is the Restructuring Support Agreement Still Effective?

Yes, as of the date hereof, the Restructuring Support Agreement is still effective.  The milestones contained therein have been extended by the parties thereto consistent with the Confirmation schedule described herein.

## IV.    GENERAL HISTORICAL INFORMATION ABOUT THE DEBTORS

### A.    General Background, Corporate History, and Business Operations

As described in further detail in the Orlofsky Declaration,[14] the Debtors are a privately held operator and acquirer of franchised and franchisable businesses.  The Debtors' business segments include a diverse collection of highly recognized, market-leading, and emerging retail brands, including The Vitamin Shoppe, Pet Supplies Plus ("PSP"), American Freight, and Buddy's Home Furnishings ("Buddy's").  The Debtors operate both franchise and corporate-owned programs with respect to each of their business segments.  Across all brands, the Debtors have approximately 2,200 total retail store locations (including both corporate-owned and franchised locations), approximately 11,900 total employees, and operations spanning across the United States.

i.    The Debtors' Business Segments

- **The Vitamin Shoppe.**  Founded in 1977, The Vitamin Shoppe is an omnichannel specialty retailer and wellness lifestyle company with the mission of providing customers with the most trusted products, guidance, and services to help them become their best selves, however they define it.  The Vitamin Shoppe offers a comprehensive assortment of nutritional solutions, including vitamins, minerals, specialty supplements, herbs, sports nutrition, homeopathic remedies, green living products, and natural beauty aids through proprietary brands and approximately 700 national brands.  The company's broad product offering enables it to provide its loyal customer base with a depth of selection of products that may not be readily available at other specialty retailers or mass merchants, such as discount stores, supermarkets, drug stores, and wholesale clubs.  Approximately 85% of The Vitamin Shoppe's customers are members of its customer loyalty program.  The Vitamin Shoppe's commitment to good health for *all* is reflected in its dedicated teams that serve numerous communities.  The Vitamin Shoppe operates approximately 680 company-operated retail store locations and 20 franchised locations across the United States and Canada.  The Vitamin Shoppe also sells its

---

[14]    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "Orlofsky Declaration").

products directly to its customers through its online store, at *vitaminshoppe.com*. The Vitamin Shoppe maintains its headquarters in Secaucus, New Jersey and has over 4,000 employees.

- **Pet Supplies Plus**.  PSP was founded in 1988 and is a leading omnichannel retail chain and franchisor of pet supplies and services.  PSP offers a curated selection of premium brands and proprietary private label and specialty products with retail price parity with online competitors.  Additionally, PSP offers grooming, pet wash, and other services in most of its locations.  The company's wholly owned subsidiary, Wag N' Wash, is a grooming, pet-wash and natural pet food franchise primarily focused on dogs.  Wag N' Wash is operated by the PSP management team.  PSP is headquartered in Livonia, Michigan and has over 4,000 employees. The company has approximately 240 company-operated retail locations, in addition to approximately 550 franchised locations, across the country (inclusive of Wag N' Wash locations).  PSP also sells its products directly to its customers through its online store, at petsuppliesplus.com, and offers same-day home product delivery from its stores.

- **American Freight**.  Founded in 1994, American Freight is a retail chain that offers in-store and online access to furniture, mattresses, new and out-of-box home appliances, and home accessories at discount prices.  American Freight buys direct from manufacturers and sells direct in warehouse-style stores.  By cutting out the middleman and keeping overhead costs low, American Freight is able to offer quality products at low prices.  American Freight provides its customers with multiple payment options, including third-party financing, which provides its customers with access to high-quality products and brand name appliances that may otherwise remain aspirational.  American Freight also serves as a liquidation channel for major appliance vendors.  American Freight operates specialty distribution centers that test out-of-box appliances before they are offered for sale. Customers are typically covered by the original manufacturer's warranty and are offered the opportunity to purchase a full suite of extended-service plans and services.  In February 2020, Sears Hometown Outlet, one of the nation's leading retailers of appliance and appliance-related products, combined with American Freight, making American Freight a leading national value retailer and one-stop-shop for furniture, mattresses, and appliances.  American Freight has its headquarters in Delaware, Ohio and operates 357 locations across the country, consisting of 344 company-owned locations and 13 franchise-operated locations. The company has approximately 3,000 total employees.

- **Buddy's Home Furnishings**.  Buddy's was founded in 1961 and is a specialty retailer of high quality, name brand consumer electronic, residential furniture, appliances, and household accessories through rent-to-own agreements.  The rental transaction allows the company's customers the opportunity to benefit from the use of high-quality products under flexible rental purchase agreements without long-term obligations.  Buddy's currently operates 34 company-operated stores and

has over 300 franchised locations.  Buddy's is headquartered in Orlando, Florida and has approximately 230 employees.

ii.    The Take-Private Transaction

In March 2023, the board of directors of Franchise Group (the "Franchise Board") received a non-binding, unsolicited proposal from BRF (an affiliate of B. Riley Principal Investments, LLC ("BRPI")) to acquire all of the outstanding shares of Franchise Group's common stock for a price of $30.00 per share, subject to the participation of certain members of Franchise Group's management team in the transaction, including Brian Kahn.  Between the time of BRF's initial proposal and early May 2023, BRF determined that it was interested in providing financing to facilitate a transaction, but would need to do so in a manner that would not result in BRF controlling or consolidating Franchise Group.  A transaction proposal ultimately materialized whereby Mr. Kahn and his affiliates would take private control of Franchise Group, with the transaction being financed, in part, with equity financing provided by various investors, including BRF and certain affiliated entities, and debt financing provided by several lenders, including Irradiant Partners.  During this period, an independent committee of Franchise Board, including its advisors, conducted a review of Mr. Kahn's take-private proposal and other strategic alternatives that were available to Franchise Group, including the potential sale of The Vitamin Shoppe, with a focus on obtaining the best outcome for Franchise Group's public shareholders.  The independent committee ultimately determined that Mr. Kahn's proposal was in the best interests of Franchise Group and its stakeholders, as it would deliver immediate and certain value for public shareholders at a significant premium to Franchise Group's unaffected share price.

In August 2023, Franchise Group completed the take-private transaction (the "Take-Private Transaction") pursuant to that certain *Agreement and Plan of Merger*, dated as of May 10, 2023 (the "Merger Agreement"), by and among Franchise Group, Freedom VCM, Inc., and Freedom VCM Subco, Inc. Freedom VCM Holdings, LLC ("TopCo") and its subsidiaries that sit above Franchise Group (collectively, the "Freedom Entities") were created in connection with the Take-Private Transaction.  Specifically, TopCo was established as Franchise Group's new holding company through which the Take-Private Transaction investors acquired private ownership of the Franchise Group.  Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. were created to borrow and guarantee the HoldCo Term Loan Facility, which provided the debt financing for the transaction, and Debtors Freedom VCM Receivables, Inc. and Freedom Receivables II, LLC were also established in connection with the transaction (as further described herein).

Franchise Group's common shareholders, other than Mr. Kahn and certain other shareholders of Franchise Group that agreed to "roll over" their Franchise Group equity into equity in TopCo, received $30.00 in cash for each share of Franchise Group's common shares that they held.  This represented a premium of 31.9% to Franchise Group's unaffected closing common stock price on March 17, 2023, the last trading day before Franchise Group announced the receipt of the unsolicited proposal.  Moreover, Franchise Group's preferred stock was redeemed in cash for a redemption price equal to $25.00 per share, plus any accrued and unpaid dividends thereon.  As a result of the Take-Private Transaction, Franchise Group's common

stock and preferred stock ceased trading and were delisted from the Nasdaq Global Select Market.

The Take-Private Transaction was advertised to stakeholders as continuing the strategy of Franchise Group, which included the potential for rapid deleveraging of the Debtors through monetization transactions involving the various business segments of Franchise Group. However, this strategy did not materialize due to, among other things, the business headwinds described herein and the allegations made against Mr. Kahn regarding his alleged business association with Prophecy Asset Management LP ("Prophecy"). For example, the allegations against Mr. Kahn complicated and delayed the pursuit of a potential securitization financing of PSP, as the investment banker conducting that process had to undertake additional due diligence regarding the transaction in light of the allegations, including reviews by its internal risk committees. These delays, coupled with the macroeconomic issues impacting the Debtors and the need to undertake the restructuring transactions described herein, ultimately required Franchise Group to defer further pursuit of the potential securitization financing until its overall capital structure issues were adequately addressed.

The Debtors have not expressed a position as to credibility of projections and other materials prepared by or for the Debtors in connection with the Take-Private Transaction or the intentions of the individuals who assisted with those projections or the Take-Private Transaction itself. The Freedom Lender Group alleges that such projections may have contributed to the failure of the materialization of the Take-Private Transaction. The Debtors reserve their rights to refute the Freedom Lender Group allegations.

<div style="text-align:center">iii.   <u>The Receivables Transaction</u></div>

In September of 2022, an affiliate of BRPI, B. Riley Receivables II, LLC ("BRRII"), acquired certain accounts receivable (the "Tranche 1 Receivables") from Badcock. To finance its purchase of the Tranche 1 Receivables, BRRII entered into that certain Credit Agreement, dated as of September 23, 2022, by and among Freedom II, PLC Agent LLC (the "PLC Agent"), and the lender thereunder (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Pathlight Credit Facility"). This transaction provided valuable liquidity to Badcock, particularly given that Badcock was experiencing difficulty in implementing third-party financing solutions for its receivables portfolio.

As part of the Take-Private Transaction, Freedom VCM Receivables, Inc., an indirect subsidiary of TopCo, acquired BRRII, which has since been renamed Freedom Receivables II, LLC ("Freedom II"), for consideration consisting of a promissory note (the "Promissory Note") in favor of BRPI (and the Klotz Family Trust, a minority owner of BRRII) (the "Receivables Acquisition"), which had recourse solely against the receivables assets. Freedom II then acquired additional accounts receivable from Badcock in August 2023 (the "Tranche 2 Receivables") with the incremental debt provided under the Pathlight Credit Facility and pledged the Tranche 2 Receivables to the PLC Agent to secure the obligations under the facility. The acquisition was structured in this manner because Pathlight Capital LP was willing to provide incremental debt to Freedom II to finance the purchase of additional accounts receivable but could not do so absent the Receivables Acquisition due to fund-level restrictions.

<div style="text-align:center">31</div>

Freedom II sold the Tranche 2 Receivables to Conn's, Inc. ("Conn's") as part of the sale of Badcock to Conn's in December 2023. However, due to certain restrictions within the Pathlight Credit Facility, the Debtors could not deliver the Tranche 2 Receivables to Conn's at closing. In addition, BRPI, the Klotz Family Trust, Freedom II, Freedom VCM Interco Holdings, Inc., and Freedom VCM Receivables, Inc. entered into that certain Amended & Restated Funding Agreement, dated as of December 18, 2023 (the "Funding Agreement"), which governed the repayment of the Pathlight Credit Facility and the Promissory Note. Following the payment of the Pathlight Credit Facility debt, Freedom II was obligated to deliver the Tranche 1 Receivables to an affiliate of BRPI (with any remaining amounts due on the Promissory Note canceled) up to the amount of approximately $15.3 million (the "Deferred Accrual") and deliver the Tranche 2 Receivables to Conn's.

The Pathlight Credit Facility was repaid in June 2024. In early October 2024, the full amount of the Deferred Accrual was paid, and the Promissory Note was canceled in accordance with the terms of the Funding Agreement. Freedom VCM Receivables, Inc. has no economic interest in any of the Tranche 1 Receivables or Tranche 2 Receivables. As of the Petition Date, Freedom II currently does not hold any Tranche 1 Receivables that it was contractually obligated to deliver an affiliate of BRPI, but it does hold certain Tranche 2 Receivables that it is contractually obligated to deliver to Conn's.

      iv.     The Badcock and Sylvan Learning Transactions

Following the Take-Private Transaction, Franchise Group undertook efforts to improve its liquidity position and reduce the liquidity issues associated with certain of its capital-intensive businesses through strategic mergers and acquisitions transactions. In December 2023, Franchise Group completed the combination of its then-owned subsidiary Badcock with Conn's, and in February 2024, Franchise Group sold its Sylvan Learning business for significant cash proceeds.

Although the Badcock combination and Sylvan Learning sale had a positive impact on Franchise Group's liquidity profile, Franchise Group's other operating businesses continued to encounter headwinds driven by, among other things, certain macro-economic factors, which made it increasingly difficult for Franchise Group to sufficiently deleverage its balance sheet and reduce the related liquidity and cash flow burdens associated with its high debt levels.

      v.     Removal of Mr. Kahn and 2023 Investigation

In November 2023, Mr. Kahn was identified by federal prosecutors as an unindicted co-conspirator in a securities fraud Indictment (as defined in the Orlofsky Declaration) against Mr. Hughes, the former president and chief compliance officer of Prophecy, for, as set forth in the Indictment, his involvement in a multi-year fraud that concealed losses of hundreds of millions of dollars from Prophecy's investors. Mr. Hughes was also civilly charged by the SEC for his involvement in the fraud pursuant to the Complaint (as defined in the Orlofsky Declaration). Shortly thereafter, Franchise Group learned that Mr. Kahn was one of two unindicted co-conspirators referred to in both the Complaint and the Indictment, and, in January 2024, Mr. Kahn stepped down from his roles as Franchise Group's Chief Executive Officer and a

member of the Franchise Board and TopCo board of directors. Mr. Kahn also relinquished his board member rights, which he held in his capacity as an equity holder of TopCo.

Promptly following the Indictment and the Complaint, in November 2023, Franchise Group engaged Petrillo Klein + Boxer LLP ("Petrillo"), a law firm with expertise in white collar investigations, internal investigations, and regulatory enforcement to conduct an investigation into whether Franchise Group or any of its executive officers or employees at the time were involved in, or had any knowledge of, any of Mr. Kahn's alleged misconduct. The investigation (the "2023 Investigation") spanned approximately two months and included approximately nine interviews of members of Franchise Group's executive team and the Franchise Board, as well as and the review of more than approximately 18,000 documents, among other things.

In connection with the 2023 Investigation, Petrillo prepared a preliminary investigative report that was presented to the Franchise Board in December 2023. Petrillo ultimately concluded that neither Franchise Group, nor any of its executive officers, current or former directors and officers, or employees (other than Mr. Kahn) had any involvement in, nor any knowledge of, Mr. Kahn's alleged misconduct. Petrillo also concluded that no business relationship ever existed between Franchise Group and Prophecy. Finally, Petrillo concluded that Mr. Kahn's alleged misconduct occurred outside the scope of his roles as Franchise Group's Chief Executive Officer and a member of the Franchise Board, and that Mr. Kahn's alleged misconduct should not be imputed to Franchise Group. Notably, these findings were also consistent with the Indictment and the Complaint, which did not allege any wrongdoing on the part of Franchise Group or any of its executive officers or employees, other than Mr. Kahn.

vi.     The Expanded OpCo Independent Investigation

In October 2024, in anticipation of the commencement of these Chapter 11 Cases, the Debtors reengaged Petrillo as special counsel to the Debtors and directed Petrillo, at the direction of the Independent Directors, to conduct an additional independent investigation (together, with the 2023 Investigation, the "OpCo Independent Investigation") into, among other things, potential Claims and Causes of Actions that the Debtors' estates may have against Mr. Kahn, any of their other current or former directors and officers, or any other third parties arising from, or related to, among other things: (a) Franchise Group's sale of Badcock to Conn's in December 2023; (b) the Take-Private Transaction; (c) the FRII acquisition and any other transactions involving BRPI and its affiliates; and (d) the Debtors' historical transactions and relationship with Mr. Kahn.

On December 17, 2024, the Bankruptcy Court entered the *Order Authorizing the Retention and Employment of Petrillo Klein + Boxer LLP as Special Counsel to the Debtors and Debtors in Possession Effective as of the Petition Date* [Docket No. 453]. Since its engagement and retention, Petrillo, at the direction of the Independent Directors, had made substantial progress in connection with the OpCo Independent Investigation. As a result of the Committee Settlement, however (discussed in greater detail herein), Petrillo paused its OpCo Independent Investigation as the Committee Settlement contemplated that the OpCo Litigation Trustee would be responsible for investigating, pursuing, litigating, and/or settling the OpCo Litigation Claims transferred to the OpCo Debtor Litigation Trust, including potential Claims and Causes of Action related to the transactions described above. In connection with the Committee Settlement, Petrillo and the Independent Directors will also facilitate the transfer of

investigation-related materials and its findings as of the date of the Committee Settlement to the OpCo Litigation Trustee to minimize duplication of efforts and administrative costs of evaluating the merits of these Claims and Causes of Action, if any.

vii.    Conflicts Committees

On December 13, 2024, in response to assertions by certain stakeholders that the interests of the Freedom HoldCo Debtors were not being independently represented by the Freedom HoldCo Debtors' existing boards of directors, the boards of directors of each of the Freedom HoldCo Debtors appointed Mr. Wartell as an independent and disinterested director (together, the "Freedom HoldCo Boards"). Further, the Freedom HoldCo Boards established a conflicts committee comprised solely of Mr. Wartell (the "Conflicts Committee") and delegated to Mr. Wartell the authority to investigate all matters relating to any claims, rights, and Causes of Action that may be held by or against the Freedom HoldCo Debtors.

On January 9, 2025, the Freedom HoldCo Boards clarified the scope of Mr. Wartell's delegation to include the power to investigate claims the Company may have against the directors and officers of the Freedom HoldCo Debtors, solely in their capacities as such.

On February 14, 2025, each of the Freedom HoldCo Boards further expanded the scope of Mr. Wartell's delegation to include (a) the power to investigate claims the Freedom HoldCo Debtors may have against the First Lien Lenders and/or the DIP Lenders, solely in their capacities as such, (b) certain rights, authority, and powers in connection with any matters in which a conflict of interests exists or is reasonably likely to exist between the each of the Freedom HoldCo Debtors, as applicable, on the one hand, and any related party, on the other hand, as reasonably determined by the Conflicts Committee (each, a "Conflicts Matter"), and (c) to consider, evaluate, and negotiate any strategic transaction or series of strategic transactions for the applicable Freedom HoldCo Debtors and their stakeholders in connection with these Chapter 11 Cases (a "Transaction") to the extent such Transaction constitutes a Conflicts Matter. The February 14, 2025 delegation to Mr. Wartell does not predetermine whether any matter is a Conflicts Matter. Mr. Wartell has the sole authority to determine whether a matter constitutes a Conflicts Matter, including whether any of the Transactions contemplated under the Plan constitutes a Conflicts Matter. Such determination is binding on the applicable Freedom HoldCo Debtor. To the extent Mr. Wartell determines that a Transaction constitutes a Conflicts Matter, then Mr. Wartell has sole authority to act and bind the applicable Freedom HoldCo Debtor to the extent of the applicable Conflicts Matter.

While Mr. Wartell has a broad delegation of investigative and transactional authority with respect to Conflicts Matters, his investigation at this point (the "Freedom HoldCo Independent Investigation") only relates to Claims or Causes of Action against the Independent Directors, the Consenting First Lien Lenders, Andrew M. Laurence, Andrew F. Kaminsky, Eric Seeton, and Tiffany McMillan-McWaters. This is because any and all other claims belonging to the HoldCo Debtors, are already reserved to be placed into the Freedom HoldCo Debtor Litigation Trust, except for those released pursuant to the Plan.

As discussed in greater detail herein, to the extent the Freedom HoldCo Independent Investigation uncovers valuable Claims or Causes of Action the Freedom HoldCo Independent

Director deems worth pursuing, the Debtors will amend the releases contemplated under the Plan to remove and preserve such Claim or Cause of Action, as applicable, and such Claim or Cause of Action, as applicable, will be transferred to the Freedom HoldCo Debtor Litigation Trust and be available for pursuit by the Freedom HoldCo Debtor Litigation Trustee. For purposes of voting on the Plan, voting creditors should assume that no additional Claims and Causes of Action will be added to the Freedom HoldCo Debtor Litigation Trust as a result of the Freedom HoldCo Independent Investigation. If any Claims or Causes of Action against the ~~the~~ Independent Directors, the Consenting First Lien Lenders, Andrew M. Laurence, Andrew F. Kaminsky, Eric Seeton, and Tiffany McMillan-McWaters are transferred to the Freedom HoldCo Debtor Litigation Trust as a result of the Freedom HoldCo Independent Investigation, then such Claims or Causes of Action will only enhance the potential recovery of a voting creditor under the Plan.

### B.    Corporate Structure

Each of the Debtors is privately held. Prior to the Take-Private Transaction, Franchise Group was a publicly traded company whose common shares traded on the Nasdaq Global Select Market under the ticker FRG. TopCo is the Debtors' ultimate parent company. In connection with the Take-Private Transaction, Mr. Kahn "rolled over" his entire stake in Franchise Group, resulting in him and his affiliates owning approximately 32.4% of the outstanding equity of TopCo. BRPI and its affiliates provided equity financing in connection with the Take-Private Transaction and own approximately 58.9% of the outstanding equity of TopCo. TopCo wholly owns Freedom VCM Interco Holdings, Inc., which, in turn wholly owns, directly and indirectly, each of the other subsidiaries in the Debtors' corporate structure. As further described herein, the Freedom Entities are not obligors, and sit outside of the "credit circle," with respect to the Debtors' senior funded debt facilities—the ABL Facility (as defined herein), First Lien Term Loan Facility (as defined herein), and Second Lien Term Loan Facility (as defined herein).

### C.    Prepetition Capital Structure

As of the Petition Date, the Debtors have approximately $1.985 billion in prepetition debt, consisting of (a) approximately $248.7 million in aggregate principal amount outstanding under their senior secured asset-based revolving credit facility (the "ABL Facility"); (b) approximately $1.097 billion in aggregate principal amount outstanding under their first lien secured term loan credit facility (the "First Lien Term Loan Facility"); (c) approximately $125 million in aggregate principal amount outstanding under their second lien secured term loan credit facility (the "Second Lien Term Loan Facility"); (d) approximately $514.7 million in aggregate principal amount outstanding under their junior term loan credit facility (the "HoldCo Term Loan Facility"); and (e) $0 in aggregate principal amount outstanding under their sidecar *pari passu* second lien secured term loan credit facility (the "Pari Passu Second Lien Term Loan Facility").

The Debtors' capital structure as of the Petition Date is generally described below:

i.    ABL Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, each as a borrower, the guarantors party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the ABL Lenders, are parties the ABL Credit Agreement.  The ABL Credit Agreement provides for a senior secured revolving credit facility, maturing March 2026, in an amount up to $400 million (subject to borrowing base availability).  Debtor Franchise Group and each of its direct and indirect subsidiaries guarantee the ABL Facility.

Subject to the terms of the Existing ABL Intercreditor Agreement, the Debtors' obligations under the ABL Credit Agreement are secured by: (a) a first priority lien on all ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement); and (b) a third priority lien on all Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement).  As of the Petition Date, approximately $248.7 million on account of principal amounts was outstanding under the ABL Facility, in addition to approximately $12.9 million in face amount of letters of credit outstanding.

ii.    First Lien Term Loan Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the borrowers, the guarantors party thereto, and Wilmington Trust, National Association, as successor administrative agent, and the First Lien Lenders, are parties to the First Lien Credit Agreement.

The First Lien Credit Agreement provides for a senior secured term loan credit facility, which was issued in an original aggregate principal amount of $1 billion, and, in February 2023, was subsequently upsized through an incremental amendment providing for an additional $300 million of aggregate principal amount.  The First Lien Term Loan Facility matures in March 2026.  Debtor Franchise Group and each of its direct and indirect subsidiaries guarantee the First Lien Term Loan Facility.

Subject to the terms of the Existing ABL Intercreditor Agreement and the Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, among Franchise Group, Inc., the other grantors referred to therein, the First Lien Credit Agreement Agent, as collateral agent, and the Second Lien Credit Agreement Agent (the "Existing First Lien/Second Lien Intercreditor Agreement"), the First Lien Term Loan Facility is secured by (x) a first priority lien on all Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement); and (y) a second priority lien on all ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement).  As of the Petition Date, approximately $1.13 billion on account of principal amounts was outstanding under the First Lien Term Loan Facility.

iii.    Second Lien Term Loan Facility

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the borrowers, the guarantors party thereto,

and Alter Domus (US) LLC, as administrative agent, and Second Lien Lenders are parties to the Second Lien Credit Agreement.

The Second Lien Credit Agreement provides for a junior secured term loan credit facility, which was issued in the original aggregate principal amount of $300 million. The Second Lien Term Loan Facility matures in September 2026. Franchise Group and each of its direct and indirect subsidiaries guarantee the Second Lien Term Loan Facility.

Subject to the terms of the Existing ABL Intercreditor Agreement and the Existing First Lien/Second Lien Intercreditor Agreement, the Second Lien Term Loan Facility is secured by a (x) second priority lien on all Term Loan Priority Collateral; and (y) a third priority lien on all ABL Priority Collateral. As of the Petition Date, approximately $125 million on account of principal amounts was outstanding under the Second Lien Term Loan Facility.

<div align="center">

iv.     Pari Passu Second Lien Term Loan Facility

</div>

Franchise Group, Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as the borrowers, the guarantors party thereto, and Alter Domus (US) LLC, as administrative agent, and the lenders party thereto from time to time, are parties to that certain *Sidecar Pari Passu Second Lien Credit Agreement*, dated as of August 21, 2023 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Pari Passu Second Lien Term Loan Credit Agreement").

The Pari Passu Second Lien Term Loan Credit Agreement provides for the Pari Passu Second Lien Term Loan Credit Agreement facility. Debtor Franchise Group and each of its direct and indirect subsidiaries guarantee the Pari Passu Second Lien Term Loan Credit Agreement facility. Subject to the terms of the Pari Passu Second Lien Intercreditor Agreement (as defined in the Orlofsky Declaration), the Pari Passu Second Lien Term Loan Credit Agreement facility is secured by the same assets that secure the Second Lien Term Loan Facility and is *pari passu* with the Second Lien Credit Agreement facility with respect to lien priority. As of the Petition Date, there is no principal amount outstanding under the Pari Passu Second Lien Term Loan Facility.

<div align="center">

v.     HoldCo Term Loan Facility

</div>

Freedom VCM, Inc., as the borrower, Freedom VCM Interco, Inc., as Holdings, the guarantors from time to time party thereto, and Alter Domus (US) LLC, as administrative agent, and the HoldCo Lenders, are parties to the HoldCo Credit Agreement.

The HoldCo Credit Agreement provides for the HoldCo Credit Agreement facility. The HoldCo Credit Agreement facility matures in March 2026 and is secured by substantially all of the assets of Freedom VCM Interco, Inc. and Freedom VCM, Inc. Pursuant to that certain Supplement No. 1, dated as of August 19, 2024, certain of the Debtors obligated under the ABL Credit Agreement, the First Lien Credit Agreement, or the Second Lien Term Loan Credit Agreement provided a guarantee of the obligations under the HoldCo Credit Agreement in an amount not to exceed $19.51 million, and pursuant to that certain Fifth Amendment to the Second Lien Term Loan Credit Agreement, dated as of August 19, 2024, certain of the Debtors

agreed to treat the "Secured Holdco Guarantee Obligations" as "Secured Obligations" (each as defined in the Second Lien Term Loan Credit Agreement).

As of the Petition Date, approximately $514.7 million on account of principal amounts, including any interest that has been capitalized and added to principal, was outstanding under the HoldCo Credit Agreement facility. In connection with the Take-Private Transaction, approximately $175 million in principal amount outstanding under the Second Lien Credit Agreement facility was purchased using proceeds of the HoldCo Credit Agreement facility and subsequently canceled. None of the Debtors obligated under the ABL Credit Agreement, the First Lien Credit Agreement, or the Second Lien Credit Agreement are obligated under the HoldCo Credit Agreement.

vi.    Unsecured Claims

The Debtors also have outstanding unsecured claims as of the Petition Date, including both liquidated and unliquidated and contingent claims. These claims include obligations payable by each of the Debtors' business segments to vendors, shippers, utility providers, landlords, and other parties in the ordinary course of business. As of the Petition Date, the Debtors estimate that approximately $106 million remained outstanding on account of liquidated unsecured claims.

## V.    KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

### A.    Liquidity Constraints

Prior to the Petition Date, the Debtors faced several challenges that stressed their capital structure and liquidity profile. Although the Debtors own and operate a strong collection of assets which generate meaningful cash flow, several factors, among others, impacted the Debtors' ability to meet their near- and long-term liquidity needs, working capital requirements, and debt obligations.

- **Macroeconomic Headwinds in the Retail Industry**. In recent years, macroeconomic headwinds in the retail industry have negatively impacted the financial performance of the Debtors' various business segments. Higher interest rates and inflation have slowed new store openings and franchise sales, and consumer discretionary spending has decreased, especially with respect to lower-income consumers, who comprise the core customer bases of American Freight and Buddy's. With respect to American Freight and Buddy's, although the COVID-19 pandemic saw a dramatic spike and "pull-forward" in consumer expenditures with respect to home remodeling and furnishing, a steady increase of inflationary pressures and interest rates following the pandemic had a substantial impact on consumer discretionary spending—resulting in consumers moving away from financing for discretionary home appliances and accessories. Large declines in retail foot traffic have also negatively and disproportionally affected furniture and big-ticket retailers.

- **Overleverage and Rising Interest Expenses**.  Over the past several years, the Debtors have relied upon cash flows generated by their ongoing activities and the issuance of debt to fund their operations and strategic initiatives.  As discussed herein, the Debtors have approximately $1.985 billion in funded debt obligations outstanding as of the Petition Date.  The interest owed on these obligations fluctuates based on certain base rates (*i.e.*, SOFR).  As interest rates have increased, so too have the expenses associated with the Debtors' outstanding indebtedness.  The ongoing increase in interest rates and the Debtors' increased leverage profile undertaken in connection with the Take-Private Transaction, combined with the macroeconomic headwinds impacting their businesses, has detrimentally impacted the Debtors' cash flow and related ability to service their debt obligations.

- **Material Contingent Obligations**.  Following Franchise Group's acquisition of Badcock in November 2021, Badcock effectuated several sale and leaseback transactions of properties associated with headquarters, retail stores, offices, and distribution centers, which generated approximately $260 million in proceeds.  In connection with these transactions, Badcock entered into long-term lease arrangements to utilize the real estate that was the subject of these transactions.  Franchise Group executed lease guaranty agreements (the "<u>Lease Guaranty Agreements</u>") with respect to certain of Badcock's lease agreements (the "<u>Badcock Lease Agreements</u>"), covering certain of Badcock's retail store locations, distribution centers, and its headquarters that were the subject of the sale and leaseback transactions.  As described above, in December 2023 Franchise Group combined Badcock with Conn's, which resulted in Badcock becoming a wholly owned subsidiary of Conn's.  Conn's did not meet the requirements under the Badcock Lease Agreements to allow for the substitution and release of the Franchise Group guarantee of Badcock's obligations as tenant thereunder.  As a result, Franchise Group remained as the guarantor in respect of the Badcock Lease Agreements following the completion of the combination of Badcock and Conn's.  In July 2024, Conn's and its subsidiaries, including Badcock, filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.  Conn's chapter 11 cases are currently pending.  The rejection of one or more of the Badcock Lease Agreements in Conn's chapter 11 cases could potentially result in the landlords under such agreements asserting claims against Franchise Group pursuant to the Lease Guaranty Agreements.

- <u>The Debtors have not expressed a position as to credibility of projections and other materials prepared by or for the Debtors in connection with the Take-Private Transaction or the intentions of the individuals who assisted with those projections or the Take-Private Transaction itself.  The Freedom Lender Group alleges that such projections may have contributed to the failure of the materialization of the Take-Private Transaction.  The Debtors reserve their rights to refute the Freedom Lender Group alleges.</u>

## B.    Issues Pertaining to Brian Kahn

As discussed herein, in November 2023, the Debtors' former chief executive officer Brian Kahn was identified by federal prosecutors as an unindicted co-conspirator in a securities fraud indictment related to Prophecy, the investment fund that Mr. Kahn was a key member and fund manager of. The Indictment identified a multi-year fraud that concealed losses of hundreds of millions of dollars from Prophecy investors. These accusations negatively impacted Mr. Kahn's other business ventures, including the Franchise Group. Investigations regarding Mr. Kahn and his conduct, including investigations being conducted by parties in interest in these Chapter 11 Cases and the federal government, remain ongoing. These accusations and investigations also created issues for the Debtors in pursuing prepetition growth strategies, which also contributed to the commencement of these Chapter 11 Cases.

### C.    Prepetition Marketing Process & Out-of-Court Restructuring Efforts

In light of these challenges, in the year leading up to the Petition Date, the Debtors and their advisors pursued and evaluated several strategic initiatives intended to preserve the Debtors' value and liquidity. These included a potential securitization financing of the Debtors' PSP business, potential monetization of The Vitamin Shoppe and Buddy's businesses, and the marketing of American Freight on a going concern basis. Indeed, the Debtors retained a leading international investment bank in April 2023 and undertook a broad outreach for the potential sale of The Vitamin Shoppe. The sale of The Vitamin Shoppe was considered as an alternative to the Take-Private Transaction and was evaluated by the independent committee of Franchise Group's Board of Directors, which ultimately determined that the Take-Private Transaction was in the best interests of Franchise Group and its public shareholders. Following the Take-Private Transaction, the Debtors continued to broadly market The Vitamin Shoppe with the same leading international investment bank for a potential going-concern sale of the business.

Similarly, in September 2023, the Debtors engaged a leading international investment bank to pursue a whole business securitization of the PSP business, and the Debtors have been actively soliciting interest in the sale of Buddy's for the past several months. Finally, and as further described in the Debtors' motion to approve bidding procedures and declarations in support thereof, prior to the Petition Date, the Debtors and their advisors ran a robust marketing process to sell American Freight. The Debtors' objective was to raise proceeds that could be applied to reduce the Debtors' funded debt obligations and provide an immediate, near-term deleveraging of their balance sheet. Despite their efforts, and in light of some of the issues facing the Debtors as summarized herein, the Debtors were unable to complete any of these transactions.

In addition to exploring potential transactions to monetize their business segments, in the months leading up to the Petition Date, the Debtors attempted to restructure outside of chapter 11 and engaged in extensive negotiations with their key lender constituents, including the Freedom Lender Group, to evaluate a consensual out-of-court transaction that was predicated on the Debtors' reorganization around their profitable business lines.

Among other things, the Debtors and the Freedom Lender Group discussed a number of restructuring proposals contemplating, among other constructs, (i) opportunities for new money investment from the Freedom Lender Group, (ii) certain modifications to the Second Lien Term Loan Facility and the HoldCo Term Loan Facility, including maturity extensions, adjusted

interest rates, minimum multiple-of-invested-capital constructs, and various debt and debt-to-equity exchange transactions, (iii) potential governance rights and the ability to appoint members to the Boards, and (iv) a warrant package that would provide the Freedom Lender Group with an opportunity to participate in the Company's future performance. Notwithstanding these efforts, in the weeks leading up to the Petition Date, it became clear that achieving a consensual out-of-court transaction on the timeline required by the Debtors' liquidity constraints was not feasible. Following this conclusion, the Debtors and the Ad Hoc Group of First Lien Lenders quickly pivoted to negotiating the terms of a restructuring that could be implemented through a chapter 11 process, with the support of the Consenting First Lien Lenders. To that end, shortly before the Petition Date, the Debtors entered into the Restructuring Support Agreement with the Consenting First Lien Lenders and negotiated the DIP Facility, which is fully backstopped by certain members of the Ad Hoc Group of First Lien Lenders.

Notwithstanding the First Lien Lenders' agreement to defer their interest payment, around the same time, the ABL Lenders informed the Debtors of their intent to increase certain reserves under the ABL Facility. Following extensive negotiations with the ABL Lenders, on October 24, 2024, the Debtors entered into an amendment to the ABL Facility which provided for, among other things, an $18 million prepayment of the outstanding Revolving Loans and Swingline Loans under the ABL Facility. In exchange, the ABL Lenders agreed to waive any events of default under the ABL Facility to November 3, 2024.

## VI.    SUMMARY OF THE PLAN AND RESTRUCTURING SUPPORT AGREEMENT

### A.    The Plan

The Debtors will be soliciting acceptances, subject to the conditions set forth in this Disclosure Statement, from all Voting Classes under the Plan consistent with sections 1125 and 1126 of the Bankruptcy Code, Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law (the "Solicitation"). Pursuant to the Plan, among other things, Holders of Claims and Interests against the Debtors shall receive the following treatment as of the Effective Date:

- In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, (i) if there is no Partial Sale Transaction, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into Take-Back Term Loans, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into Take-Back Term Loans, ratably, on a dollar-for-dollar basis in an amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Effective Date after giving effect to the Restructuring Transactions (the "Pro Forma Leverage Cap"), and (z) third, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors as set forth this Disclosure Statement and/or the Plan Supplement, and (ii) if there is a Partial Sale Transaction, (x) first, all Allowed DIP

Claims allocable to the applicable Partial Sale Transaction Debtors shall be indefeasibly paid in full in Cash from the applicable net Sale Proceeds, and (y) second, any Allowed DIP Claims that remain outstanding after giving effect to the transactions contemplated in clause (y) hereof shall be treated in accordance with the foregoing clause (i) hereof; provided, however, that at the election of the Required Consenting First Lien Lenders and DIP Lenders, which election shall be made in good faith and in consultation with the Debtors, the Pro Forma Leverage Cap shall be reduced to account for any assets sold as part of the Partial Sale Transaction that will no longer vest in the Reorganized Debtors, with the method of calculation of any such reduction to be reasonably agreed to by the Required Consenting First Lien Lenders and the Debtors.  Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

Notwithstanding anything to the contrary contained herein, at the election of the Required Consenting First Lien Lenders and the DIP Lenders, all DIP Claims against the Freedom HoldCo Debtors, shall, in lieu of the treatment set forth in the previous paragraph, convert *mutatis mutandis* into Claims against the Freedom HoldCo Debtor Litigation Trust in the same amount, with the same priority and security interest in, and otherwise having the same economic terms as the DIP Claims currently outstanding against the Freedom HoldCo Debtors (the "Freedom HoldCo DIP Election").  For the avoidance of doubt, to the extent the Freedom HoldCo DIP Election is made, the DIP Claims that are converted in accordance with the immediately preceding sentence shall not convert into Take-Back Term Loans or Reorganized Common Equity and any remaining DIP Claims shall be converted in accordance with the immediately preceding paragraph.

- Each ABL Lender shall receive its *pro rata* share of (i) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (ii) (A) proceeds of the Exit ABL Facility, or (B) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (i) hereunder.

- Each First Lien Lender shall receive, subject to the terms of the Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of (i) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transaction, if applicable, and (ii) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), as well as any applicable recovery on account of its First Lien Deficiency Claim.

- Each Holder of an Allowed Prepetition Second Lien Loan Claim shall receive (A)its *pro rata* share of the OpCo Debtor Litigation Trust Units, and, solely if the Class votes to accept the Plan, the New Warrants, which, if issued, New Warrants (if applicable) shall be issued and distributed to the OpCo Debtor Litigation Trust to be shared ratably with all holders of OpCo Debtor Litigation Trust Units, or (B) if the Class votes to reject the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under sections 1129(a)(7) and 1129(b) of the Bankruptcy Code, as well as any applicable recovery on account of its Second Lien Deficiency Claim..

- Each Holder of an Allowed OpCo General Unsecured Claim in Class 6 shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units. allocable to the OpCo Debtor(s) it holds Claims against.  Allowed OpCo General Unsecured Claims in Class 6 are consolidated for procedural purposes and votes shall be tabulated for each individual OpCo Debtor.

- Each Holder of a Prepetition HoldCo Loan Claim shall receive its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election.  If there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

- Each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive its *pro rata* share of the proceeds from the Freedom HoldCo Debtor Litigation Trust.  If there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.

- Each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive its *pro rata* share of Cash, if any, held by the HoldCo Receivables Debtors.  If there is no Cash held at the HoldCo Receivables Debtors after paying all Claims in Class 8-B that are senior or structurally senior to the Allowed HoldCo Receivables General Unsecured Claims, if applicable, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim.

- Each Holder of an Allowed TopCo General Unsecured Claim shall receive its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.6 of the Plan.  If there is no Cash held at TopCo following the allocation described in Section 3.6 of the Plan, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.

- On or after the Effective Date, or as soon as practicable thereafter, (i) any and all Intercompany Claims between, among and/or against, Franchise Group, Inc. and

43

any of its direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (A) Reinstated or (B) set off, settled, discharged, contributed, canceled, released, without any distribution on account of such Intercompany Claims, or otherwise addressed, and (ii) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (A) Reinstated or (B) set off, settled, discharged, contributed, canceled, released, without any distribution on account of such Intercompany Claims, or otherwise addressed; _provided_, _however_, that notwithstanding the foregoing, any Intercompany Claims held by ~~or against or among~~ any of the Freedom HoldCo Debtors ~~shall receive the recovery that~~ against any of the OpCo Debtors (if any) shall, in full and final satisfaction, compromise, settlement, release, and discharge of such Intercompany Claim ~~would be entitled to receive under sections 1129(a)(7) and 1129(b) of the Bankruptcy Code, and if,~~ receive its _pro rata_ share of the OpCo Debtor Litigation Trust Units; provided, further, that any Intercompany Claims held by any of the Freedom HoldCo Debtors against any of the Freedom HoldCo Debtors (if any) shall, in full and final satisfaction, compromise, settlement, release, and discharge of such Intercompany Claim ~~is not entitled to any recovery under sections 1129(a)(7) and 1129(b) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date.~~, receive its _pro rata_ share of the OpCo Debtor Litigation Trust Units receive its _pro rata_ share of the Freedom HoldCo Debtor Litigation Trust Units.[15] To the extent any Intercompany Claim is Reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable Law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

- Each Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim.

- Each Holder of an Allowed Existing TopCo Equity Interest shall receive (i) its _pro rata_ share of Cash (if any) held by TopCo after paying all Allowed Claims against TopCo and following the allocation described in Section 3.6 of the Plan, or (ii) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest

---

[15]   The Freedom Lender Group has asserted they may also be entitled to a Class 2 Secured Claim. The Debtors reserve all rights.

shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest.

- Each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled, and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired; provided that, such election shall be with the consent of Required Consenting First Lien Lenders; provided, further, that, notwithstanding the foregoing, the Allowed Existing Intercompany Equity Interests held by any of the Freedom HoldCo Debtors shall be extinguished, canceled, and/or discharged on the Effective Date.

In addition to the foregoing, the Plan shall provide as follows:

- Holders of Allowed Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, U.S. Trustee Fees, Other Secured Claims, and Priority Non-Tax Claims shall be paid in full in Cash or receive such other treatment that renders such Claims unimpaired.

## B.    Other Material Terms of the Restructuring Support Agreement

The Restructuring Support Agreement contains a number of termination events that may be triggered if, among other things, the Debtors pursue a restructuring transaction that is inconsistent with the Plan and the applicable term sheets appended to the Restructuring Support Agreement, or otherwise file restructuring documents that are not in form and substance consistent with the terms and consent rights contemplated by the Restructuring Support Agreement. Importantly, the Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement and can terminate the Restructuring Support Agreement if the board of directors, board of managers, or such similar governing body of any of the Debtors, in good faith and after consulting with outside counsel, determines that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or, in the exercise of its fiduciary duties, determines to pursue an alternative restructuring transaction.

The Restructuring Support Agreement also contains a number of milestones for these Chapter 11 Cases. Unless otherwise extended with the consent of the Required Consenting First Lien Lenders, failure to achieve these milestones provides the Required Consenting First Lien Lenders with the right to terminate their obligations under the Restructuring Support Agreement.

Pursuant to the Restructuring Support Agreement and the Plan, the Debtors shall concurrently (i) conduct the Store Closing and Liquidation Sales of the American Freight Debtors and (ii) either (a) effectuate a sale of certain of the remaining assets of the applicable Partial Sale Transaction Debtors and consummate a Partial Sale Transaction, and pursue consummation of the Plan Equitization Transaction with respect to the applicable Non-Partial Sale Transaction Debtor(s), or (b) exclusively consummate the Plan Equitization Transaction, and, in each case, all Allowed Prepetition First Lien Loan Claims will be equitized into 100% of

Reorganized Common Equity (subject to dilution from (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable).

Simultaneously with the commencement of these Chapter 11 Cases, the Debtors launched a fulsome marketing process that solicited bids for all or some of the Debtors' assets. The Sale Process operated as a "market check" to ensure that the Debtors are maximizing the value of their assets for the benefit of all stakeholders. Pursuant to the Restructuring Support Agreement, solely if a Sufficient Bid was received by the Debtors for substantially all of the Debtors' assets (a "Sale Transaction"), would the Debtors "toggle," or pivot from a Plan Equitization Transaction and pursue such Sale Transaction. A Sufficient Bid (*i.e.*, a bid that allows the Debtors to "toggle," or pivot from a Plan Equitization Transaction to a Sale Transaction) is one that, among other things, (i) will substantially contemporaneously with closing of such Sale Transaction satisfy in full, in cash the Allowed DIP Claims, Allowed Prepetition First Lien Loan Claims, and Allowed Prepetition ABL Loan Claims, or (2) is otherwise consented to by the Consenting First Lien Lenders. The Debtors may separately consummate a Partial Sale Transaction (*i.e.*, a sale of all or substantially all of the assets or Equity Interests of the Buddy's Debtors, the Vitamin Shoppe Debtors, or a combination of the Buddy's Debtors and the Vitamin Shoppe Debtors), solely if a Sufficient Bid for a Partial Sale Transaction is received by the applicable Partial Sale Transaction Debtors in accordance with the Bidding Procedures and subject to the Auction. For the avoidance of doubt, a Partial Sale Transaction does not constitute a Sale Transaction.

**As of the Bid Deadline (as defined herein), the Debtors did not receive any Sufficient Bids that would allow the Debtors to "toggle," or pivot from a Plan Equitization Transaction to a Sale Transaction. The Debtors are therefore pursuing a Plan Equitization Transaction with the possibility of consummating a Partial Sale Transaction.**

C.     **Acceptance of the Plan**

An acceptance of the Plan will constitute an acceptance and consent to all of the terms and provisions in the Plan, including, without limitation, the releases, exculpations, and injunction provisions included therein.

**All Voting Classes are urged to read this Disclosure Statement and the documents attached hereto and enclosed herewith in full. The Debtors believe that the Plan is in the best interests of the Debtors, their Estates, and all of its stakeholders, including the Voting Classes. Accordingly, the Voting Classes are urged to vote in favor of the Plan.**

**No person has been authorized to give any information or make any representation about the Plan not contained in this Disclosure Statement. The statements in this Disclosure Statement are made as of the date hereof. Neither this Disclosure Statement's distribution nor the consummation of Plan will, under any circumstance, create any implication that the information herein is correct as of any time after the date hereof. All summaries herein are qualified by reference to the actual terms of each of the documents attached to this Disclosure Statement. In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability, but shall**

be deemed a statement made in settlement negotiations.  Unless otherwise indicated, the Debtors have provided the factual information in this Disclosure Statement.

### D.    Management/Employee Incentive Plans

In the event of a Plan Equitization Transaction, the New Board shall: (x) adopt and implement Management Incentive Plans at each operating company or (y) assume, assume as amended, or reject the existing long term incentive plans of Franchise Group's direct or indirect subsidiaries, in each case structured to incentivize operating performance and align economic interests on terms and conditions acceptable to the New Board and the Required Consenting First Lien Lenders.  If applicable, the Management Incentive Plan shall provide for the issuance of equity or equity-linked awards representing up to 10% of the Reorganized Common Equity on a fully diluted basis, to be allocated by the New Board.  The form of the awards under the Management Incentive Plan, if applicable (*i.e.*, options, restricted stock or units, appreciation rights, etc.), the participants in the Management Incentive Plan, the allocations of the awards to such participants (including the amount of allocations and the timing of the grant of the awards), and the terms and conditions of the awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion.

## VII.    MATERIAL DEVELOPMENTS SINCE THE PETITION DATE

### A.    The Debtors' First-Day Motions and Certain Related Relief

#### i.    Operational First-Day Pleadings

As described in further detail in the Orlofsky Declaration, to minimize disruption to the Debtors' operations and effectuate the terms of the Plan, upon the commencement of these Chapter 11 Cases, the Debtors filed various first-day motions seeking authority to, among other things, (i) jointly administer the Chapter 11 Cases, (ii) appoint the Claims Agent, (iii) honor customer obligations and otherwise continue prepetition customer programs in the ordinary course of business, (iv) establish notice and hearing procedures for transfers of membership interests in TopCo and declarations of worthlessness with respect to Equity Interests in Freedom VCM Interco Holdings, Inc., (v) pay prepetition claims owed due to maintaining insurance and continue maintaining the Debtors' insurance, (vi) provide adequate assurance of payment to utility companies, (vii) redact certain personally identifiable information of customers from publicly filed documents, (viii) continue using the Debtors' existing cash management system, (ix) pay prepetition claims owed to certain critical vendors, (x) pay prepetition claims owed to employees and on account of employee benefit programs and to continue offering employee benefit programs postpetition, (xi) pay prepetition claims owed to taxing authorities and continue paying taxes in the ordinary course of business, (xii) approve the Debtors' entry into the consulting agreement and commence store closing procedures with respect to the liquidation of American Freight, and (xiii) obtain debtor-in-possession financing and use cash collateral.

The Freedom Lender Group opposed the Debtors' motion to pay prepetition claims owed to certain critical vendors (item (ix) above, the "Critical Vendors Motion") on various grounds. Following an agreed resolution between the Debtors and the Freedom Lender Group, on

November 6, 2024, the Bankruptcy Court entered a first interim order approving the Critical Vendors Motion [Docket No. 129]. Following entry of the first interim order, the Debtors sought further interim relief with respect to the Critical Vendors Motion. The Freedom Lender Group opposed the Debtors' request for such further interim relief. Following a hearing on November 21, 2024, the Bankruptcy Court overruled the Freedom Lender Group's objection and entered a second interim order approving the Critical Vendors Motion [Docket No. 217]. Following entry of the second interim order, the Freedom Lender Group filed an objection to the approval of the Critical Vendors Motion on a final basis [Docket No. 277]. Following an agreed resolution between the Debtors and the Freedom Lender Group, the Freedom Lender Group withdrew its objection and, on December 11, 2024, the Bankruptcy Court entered an order approving the Critical Vendors Motion on a final basis [Docket No. 410] (the "Critical Vendors Order"). On December 18, 2024, the Freedom Lender Group filed an appeal of the final order approving the Critical Vendors Motion, which appeal is currently pending before the United States District Court for the District of Delaware, Case No. 24-1403. The Freedom Lender Group filed its Appellant's Brief on January 8, 2025. The Creditors' Committee moved to intervene in the appeal on January 16, 2025, which was granted on January 28, 2025. The Debtors, the Creditors' Committee, and the Ad Hoc Group filed their Appellees' Briefs on February 7, 2025. The Freedom Lender Group filed a reply to the Appellee's Briefs on February 14, 2025.

ii.     Postpetition Debtor-in-Possession Financing

The Debtors sought approval of the DIP Facility on an interim and final basis. The DIP provides up to $250 million in new money financing and ensures the Debtors have access to sufficient liquidity during these Chapter 11 Cases. The DIP Facility includes a conversion, or "roll up," of certain outstanding obligations under the First Lien Term Loan Facility into obligations under the DIP Facility. The DIP Facility bears interest at a rate equal to S+9.00% with respect to the Tranche A DIP Loans and S+4.75% with respect to Tranche B DIP Loans per annum. The Debtors sought entry into the DIP Facility to permit them to (i) pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with these Chapter 11 Cases, and (ii) obtain necessary funds to be used for working capital needs and general corporate purposes.

The Freedom Lender Group objected to the approval of the DIP Facility on both an interim and final basis. Following a hearing on November 6, 2024, the Bankruptcy Court overruled the Freedom Lender Group's objection and approved the DIP Facility on an interim basis. On November 7, 2024, the Bankruptcy Court entered an interim order approving the DIP Facility [Docket No. 134] (the "Interim DIP Order"). Following entry of the Interim DIP Order, the Debtors drew $100 million of the new money financing available under the DIP Facility (the "Interim Draw"). As a result of the Interim Draw, $100 million of the First Lien Term Loan Facility was rolled up, or converted, into Tranche B DIP Loans.

Following a hearing on December 10, 2024, the Bankruptcy Court overruled the Freedom Lender Group's objection and approved the DIP Facility on a final basis. On December 11, 2024, the Bankruptcy Court entered a final order approving the DIP Facility [Docket No. 414].

All Holders of Prepetition First Lien Loan Claims (and/or one or more Related Funds of such Holders) who signed the Restructuring Support Agreement prior to the closing of the DIP

syndication process were eligible to subscribe for their *pro rata* share of the DIP Facility based on their respective *pro rata* holdings of their Allowed Prepetition First Lien Loan Claims pursuant to syndication procedures approved under the Interim DIP Order. To the extent a Holder of Prepetition First Lien Loan Claims (x) did not execute the Restructuring Support Agreement and (in which case, such Holder had no right to subscribe for any portion of the DIP Facility) or (y) executed the Restructuring Support Agreement but did not subscribe for its portion of the DIP Facility in accordance with the syndication procedures, then (in either case) each DIP backstop party had the option to, severally and not jointly, increase its share of the DIP Facility for any portion of the DIP Facility that is not subscribed for (or not permitted to be subscribed for) by such Holder.

On December 18, 2024, the Freedom Lender Group filed an appeal of the Final DIP Order, which is currently pending before the United States District Court for the District of Delaware, Case No. 24-1404. The Freedom Lender Group filed its Appellant's Brief on January 8, 2025. The Creditors' Committee moved to intervene in the appeal on January 16, 2025, which was granted on January 28, 2025. The Debtors, the Creditors' Committee, and the Ad Hoc Group filed their Appellees' Briefs on February 7, 2025. The Freedom Lender Group filed a reply to the Appellee's Briefs on February 14, 2025.

### B.    Bidding Procedures and Sale Process

On November 11, 2024, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 154], pursuant to which the Debtors sought to establish certain procedures (the "Proposed Bidding Procedures") with respect to a competitive sale and marketing process for their assets. A number of parties, including the Creditors' Committee, submitted informal responses to the Proposed Bidding Procedures, which the Debtors resolved with certain changes to the Proposed Bidding Procedures. Certain landlords filed a limited objection to the Proposed Bidding Procedures [Docket No. 305], which the Debtors resolved at the hearing scheduled to consider the Proposed Bidding Procedures. The Freedom Lender Group also filed an objection to the Proposed Bidding Procedures, which the Bankruptcy Court overruled at the hearing. On December 16, 2024, the Bankruptcy Court entered an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") [Docket No. 444], including the revised Proposed Bidding Procedures (as revised, the "Bidding Procedures").

Pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order, interested parties were required to submit bids on the Debtors' assets no later than 4:00 p.m. (prevailing Eastern Time) on February 3, 2025 (the "Bid Deadline"). Interested parties could submit bids for all of the Debtors' assets and could also submit bids on individual business lines. For a bid to be considered a "Qualified Bid" or a "Sufficient Bid" under the Bidding Procedures, the bid must have met the various requirements described therein, including with respect to bids for the individual business lines and meeting specified minimum bid prices. Pursuant to the

Bidding Procedures, if the Debtors received at least one Sufficient Bid at least forty-eight (48) hours prior to the date of the Auction, then the Debtors would hold an auction (the "Auction") for the Assets (as defined in the Bidding Procedures) that are the subject of such Sufficient Bid unless the Debtors did not receive another Qualified Bid that covers such Assets prior to the later of (x) six (6) hours prior to the commencement of the Auction and (y) twenty-four (24) hours after the Debtors designated Qualified Bidders (in which case, the Debtors would not hold an Auction with respect to the Assets that are the subject of that Sufficient Bid and the Debtors would proceed with such Sufficient Bid). At the Auction, the Debtors, consistent with the Bidding Procedures, would select the Successful Bidder for the Debtors' assets. If the Debtors did not receive any Sufficient Bids prior to the Bid Deadline, after consultation with the Consultation Parties, the Debtors would file with the Bankruptcy Court, serve on the Sale Hearing Notice Parties (as defined below), and cause to be published a notice canceling the Auction.

On December 18, 2024, the Freedom Lender Group filed an appeal of the Bidding Procedures Order, which is currently pending before the United States District Court for the District of Delaware, Case No. 24-1405. The Freedom Lender Group filed its Appellant's Brief on January 8, 2025. The Creditors' Committee moved to intervene in the appeal on January 16, 2025, which was granted on January 28, 2025. The Debtors, the Creditors' Committee, and the Ad Hoc Group filed their Appellees' Briefs on February 7, 2025. The Freedom Lender Group filed a reply to the Appellee's Briefs on February 14, 2025.

**As of the Bid Deadline, the Debtors did not receive any Sufficient Bids that would allow the Debtors to "toggle," or pivot from a Plan Equitization Transaction to a Sale Transaction. The Debtors are therefore pursuing a Plan Equitization Transaction with the possibility of consummating a Partial Sale Transaction.** In the event of a Partial Sale Transaction, the Sale Proceeds would provide an immediate cash infusion for the Debtors and be used to fund the distributions to Holders of Allowed Claims against the Debtors. Moreover, any distributions made under the Plan on account of Allowed Claims that are Assumed Liabilities as part of a Partial Sale Transaction would be the sole responsibility of the applicable Successful Bidder, meaning such Claims would not be entitled to a recover under the Plan, further maximizing value for the Debtors' stakeholders**.**

C.    **Claims Process and Bar Date**

i.    Schedules of Assets and Liabilities and Statements of Financial Affairs

On December 24, 2024, the Debtors filed their schedules of assets and liabilities, and statements of financial affairs [Docket Nos. 500-552; 553-558 (sealed)] (collectively, the "Schedules and Statements"). On December 31, 2024, the Debtor Vitamin Shoppe Industries LLC (Case No. 24-12521) filed an amendment to its Schedule A/B [Docket No. 584].

ii.    Claim Bar Dates

On December 6, 2024, the Bankruptcy Court entered that certain *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising under 503(b)(9) of the Bankruptcy Code) and (B) Approving the Form and Manner of Notice*

*Thereof* [Docket No. 354] (the "Bar Date Order").  On December 26, 2024, after the Debtors filed the Schedules and Statements, the Debtors filed that certain *Notice of Deadline for the Filing of Proofs of Claim, Including for Claims Asserted under Section 503(b)(9) of the Bankruptcy Code* [Docket No. 562] (the "Bar Date Notice"), which set the following deadlines:

- **General Bar Date**: January 23, 2025, at 11:59 p.m. (prevailing Eastern Time). The "General Bar Date" is the last date for all entities (except governmental units) to file a proof of claim in respect of any claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code.

- **Government Bar Date**: May 2, 2025, at 11:59 p.m. (prevailing Eastern Time). The "Governmental Bar Date" is the last date for a governmental unit, as defined in section 101(27) of the Bankruptcy Code, to file a proof of claim against the Debtors in respect of any claims against the Debtors (whether secured, unsecured priority, or unsecured non-priority) that arose on or prior to the Petition Date, including governmental units with claims against the Debtors for unpaid taxes, whether such claims arise from prepetition tax years or periods or prepetition transactions to which the Debtors were a party.

Additionally, pursuant to the Bar Date Order, unless otherwise ordered by the Bankruptcy Court, all entities holding claims against the Debtors arising from the rejection of executory contracts and unexpired leases of the Debtors are required to file Proofs of Claim by the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, (ii) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors, and (iii) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following the effective date of the rejection of any executory contract or unexpired lease of the Debtors pursuant to operation of any Court order (the "Rejection Damages Bar Date").

The Bar Date Order also provides that if, subsequent to the date of the Bar Date Notice, the Debtors amend or supplement the Schedules and Statements to reduce the undisputed, noncontingent, and liquidated amount of a claim listed in the Schedules and Statements, to change the nature or classification of a claim against the Debtors reflected in the Schedules and Statements, or to add a new claim to the Schedules and Statements, then the Debtors shall give notice of any such amendment or supplement to the holders of claims affected thereby, the affected creditor is required to file a Proof of Claim or amend any previously filed Proof of Claim in respect of the amended scheduled claim by the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days from the date on which the Debtors mail notice of the amendment to the Schedules (or another time period as may be fixed by the Bankruptcy Court) (the "Supplemental Bar Date," and collectively with the General Bar Date, the Government Bar Date, and the Rejection Damages Bar Date, the "Bar Dates").

Notice of the Bar Dates was provided by mail and publication in accordance with the procedures outlined in the Bar Date Order.

### D. Freedom Lender Group's Motion to Terminate Exclusivity

On November 20, 2024, the Freedom Lender Group filed the *Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the Holdco Debtors' Cases, (II) Lifting the Automatic Stay in the Holdco Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the Holdco Debtors* [Docket No. 192] (the "Exclusivity Termination Motion").  On December 3, 2024, the Creditors' Committee [Docket No. 294], the Debtors [Docket No. 298], and the Ad Hoc Group of First Lien Lenders [Docket No. 299] filed objections to the Exclusivity Termination Motion.  On December 6, 2024, the Freedom Lender Group filed an omnibus reply in support of the Exclusivity Termination Motion [Docket No. 365].  On December 10 and 17, 2024, the Bankruptcy Court held a hearing to consider the Exclusivity Termination Motion.  For the reasons set forth on the record at the hearing on December 17, 2024, the Bankruptcy Court overruled the Exclusivity Termination Motion on all grounds.  On December 18, 2024, the Bankruptcy Court entered an order denying the Exclusivity Termination Motion (the "Exclusivity Termination Order").

On December 18, 2024, the Freedom Lender Group filed an appeal of the Exclusivity Termination Order, which is currently pending before the United States District Court for the District of Delaware, Case No. 24-1394.  The Freedom Lender Group filed its Appellant's Brief on January 8, 2025.  The Creditors' Committee moved to intervene in the appeal on January 16, 2025, which was granted on January 28, 2025.  The Debtors, the Creditors' Committee, and the Ad Hoc Group filed their Appellees' Briefs on February 7, 2025.  The Freedom Lender Group filed a reply to the Appellee's Briefs on February 14, 2025.

### E. Motion for Allowance of Superpriority Administrative Expense Claim

On February 13, 2025, Alter Domus (US) LLC, as administrative agent and collateral agent (the "OpCo 2L Agent") and certain funds and accounts advised, sub-advised, and/or managed by (i) Pacific Investment Management Company LLC and/or its affiliates and (ii) Irradiant Partners, LP and/or its affiliates in their capacities as second lien secured lenders (the "2L OpCo Group") filed the *Motion of OpCo 2L Agent and Ad Hoc Group of Second Lien Lenders for Allowance of a Superpriority Administrative Expense Claim* [Docket No. 978] (the "2L Administrative Claim Motion").  Pursuant to the 2L Administrative Claim Motion, the 2L OpCo Group seek allowance of an administrative expense claim in the amount of $158,383,581.49 (the "2L Administrative Claim").  The 2L OpCo Group allege that they are entitled to a superpriority administrative expense claim as adequate protection for the value of their security interests in certain collateral that has diminished in value from and after the Petition Date caused by the incurrence of the Debtors' DIP Facility and the use of their collateral.

Under the Plan, unless a Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, the Debtors shall pay all Allowed Administrative Expense Claims in Cash in an amount equal to such Allowed Claim; provided, however, that such payment is consistent with the DIP Budget.  If the 2L Administrative Claim is Allowed by the Bankruptcy Court, whether in full or in part, the Debtors may not have sufficient liquidity to continue to administer these Chapter 11 Cases and reorganize their businesses.  Accordingly, it is possible

that any alternative may provide Holders of Claims and Interests with materially less than they would receive pursuant to the Plan.

### F.    Disclosure Statement Objections

On November 11, 2024, the Debtors filed the *Debtors' Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballots and Solicitation Materials and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 152] (the "Disclosure Statement Motion") seeking approval of this Disclosure Statement and authority to commence solicitation of the Debtors' Plan.  In response to the Disclosure Statement Motion, the Debtors received four formal Objections.[1316]  In response to the Objections, on February 3, 2025, the Debtors filed the *Debtors' Omnibus Reply in Support of Debtors' Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballots and Solicitation Materials and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 891] (the "Omnibus Disclosure Statement Reply").

Further, in the days leading up to the Disclosure Statement Hearing, the Debtors worked diligently to resolve certain of the issues raised in the U.S. Trustee Objection by amending the Plan to provide for an "opt-in" feature with respect to the proposed releases, among other things. Accordingly, the only remaining Objection was the Freedom Lender Group Objection.

On January 8, 2025, the Freedom Lender Group filed the Freedom Lender Group Objection, objecting to the adequacy of this Disclosure Statement.  Among other things, the Freedom Lender Group argued that:  (i) the Disclosure Statement is inadequate because it does not provide stakeholders with adequate information to determine whether to vote on the Plan, including by failing to provide a valuation analysis and or additional disclosure on the treatment of Holders of Claims and Interests at the HoldCo Debtors, the Debtor Releases, the Freedom HoldCo Debtor Litigation Trust, or the HoldCo Debtors; and (ii) the Plan is patently unconfirmable with respect to the HoldCo Debtors because, they assert, that the Freedom Lender

---

[1316]    The objections were filed by:  Accelerated Services, Inc. ("Accelerated" and such objection, the "Accelerated Objection") [Docket No. 441]; the U.S. Trustee [Docket No. 679] (the "U.S. Trustee Objection"); the U.S. Securities and Exchange Commission (the "SEC", and such objection the "SEC Limited Objection") [Docket No. 486], and the Freedom Lender Group [Docket No. 686] (the "Freedom Lender Group Objection", and together with the Accelerated Objection, the U.S. Trustee Objection, and the SEC Objection, collectively, an "Objection" and collectively, the "Objections").  The Debtors also received certain informal comments, which were resolved with additional disclosures or revisions to the proposed Disclosure Statement Order, from, among others:  JPMorgan Chase Bank, N.A., in its capacity as Prepetition ABL Agent, certain landlords represented by Barclay Damon, LLP, Ballard Spahr LLP, and Allen Matkins Leck Gamble Mallory & Natsis LLP; the Creditors' Committee, and the SEC.

Group is the only class of Claims eligible to vote on the HoldCo Debtors' Plan—and that they intend to vote to reject the Plan because it does not provide a meaningful recovery to the lenders under the Debtors' Second Lien Term Loan Facility.  Accordingly, the Freedom Lender Group argues that the Plan cannot be confirmed at the HoldCo Debtors without the Freedom Lender Group's support.

On February 17, 2025, the Freedom Lender Group filed *the Ad Hoc Group of Freedom Lenders' Renewed Motion to Adjourn Disclosure Statement Hearing* [Docket No. 993] and the *Ad Hoc Group of Freedom Lenders' Motion To Shorten The Notice Period For The Ad Hoc Group Of Freedom Lenders' Renewed Motion To Adjourn Disclosure Statement Hearing* [Docket No. 994].

The Debtors intend to continue to engage in good-faith negotiations with all parties-in-interest, including the Freedom Lender Group, between now and the Voting Deadline in an effort to reach a consensual resolution to the Freedom Lender Group's anticipated confirmation objections.  However, the Debtors also believe that the Freedom Lender Group's arguments regarding the confirmability of the Plan lack merit, and, should the parties be unable to consensually resolve their issues in advance of Confirmation, the Debtors intend to prove the Plan satisfies the requirements of applicable Law and is confirmable at the Confirmation Hearing.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court disagrees with the Debtors' position, the Plan may not be confirmed.  If the Plan is not confirmed with respect to the HoldCo Debtors, there is no assurance that the Debtors will be able to reorganize the HoldCo Debtors' businesses.  Further, it is possible that any alternative may provide Holders of HoldCo Debtor Claims with less than they would have received pursuant to the Plan.[14][17]

### G.    Proposed Confirmation Schedule

Subject to Court approval, the Debtors intend to solicit votes to accept or reject the Plan and proceed in accordance with the following timeline, which is consistent with the milestones in these Chapter 11 Cases and the Bankruptcy Code.

| Event | Date |
|---|---|
| Voting Record Date | [January 31], 2025 |
| Solicitation Commencement Date | Five (5) Business Days after entry of this Order, or as soon as reasonably practicable thereafter |
| Publication Date | Five (5) Business Days after entry of this Order or as soon as reasonably practicable thereafter |
| Claims Objection Deadline | [March 6], 2025 |
| Rule 3018 Motion Deadline | [March 13], 2025, at 4:00 p.m. (ET) |
| Plan Supplement Deadline | ~~Seven~~Twenty-eight (~~7~~28) days before Voting Deadline (*i.e.*, [March 26], 2025) |
| Voting Deadline | [April 23, 2025], at 5:00 p.m. (ET) |

---

[14][17]    For a more detailed description of the aforementioned consequences, or of a liquidation scenario, *see* Article X of this Disclosure Statement, entitled "Alternatives to Consummation of the Plan," and the Liquidation Analysis attached hereto as Exhibit B.

| Event | Date |
|---|---|
| Objection Deadline | [April 23, 2025], at 5:00 p.m. (ET) |
| Voting Report Deadline | [April 25]May 7, 2025], at 12:00 p.m. (ET) |
| Deadline to File Confirmation Brief and Reply | [April 25]May 7, 2025], at 12:00 p.m. (ET) |
| Confirmation Hearing | [April]May 129, 2025], at 10:00 a.m. (ET) |

### H.    Committee Settlement

In parallel with the ongoing Independent Investigation and the Freedom HoldCo Independent Investigation, the Creditors' Committee undertook an extensive investigation of the prepetition conduct of the Debtors and their Affiliates and certain third parties affiliated with the Debtors.  In connection with its investigation, the Creditors' Committee took formal and informal discovery from the Debtors.  The Creditors' Committee requested and received several thousand pages of documents and diligence materials in furtherance of its investigation.  As of the date of this Disclosure Statement, the Creditors' Committee's investigation remains ongoing and certain requests for relevant documents remain outstanding.  The Creditors' Committee expects to receive additional documentation that it anticipates will provide additional relevant information.  Based upon the information received to date, this investigation has revealed facts relevant to certain transactions and events in the Debtors' recent corporate history that support or may otherwise give rise to potential claims or causes of action that may be brought on behalf of the OpCo Debtors.

The following list of at least certain of these potential claims is based upon the information secured by means of the Creditors' Committee's investigation conducted to date and is not intended to be an exhaustive list considering the remaining information the investigation is expected to yield.  Consistent with the Schedule of Retained Causes of Action, the Creditors' Committee now identifies the following potential Claims and Causes of Action belonging to the OpCo Debtors:

(i)    All Causes of Action against former directors of the Debtors, other than those terminated without cause between February 3, 2025 and the Effective Date of the Plan;

(ii)    All Causes of Action against former employees, including officers, of the Debtors other than those terminated without cause between February 3, 2025 and the Effective Date of the Plan;

(iii)    All Causes of Action against Bryant Riley, in his individual and all representative capacities, B. Riley Financial, Inc., B. Riley Receivables II, LLC, Freedom VCM Receivables, Inc., and each of their Affiliates and Related Parties (provided that neither Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, nor Freedom VCM Receivables, Inc. shall be deemed Affiliates of the Debtors for purposes of this proviso);

(iv)     All Causes of Action against Irradiant Partners, LP and each member of the Freedom Lender Group;

(v)      All Causes of Action against the HoldCo Debtors, including without limitation, federal fraudulent transfer claims arising pursuant to Section 548 of the Bankruptcy Code and all state law equivalents (as provided by Section 544 of the Bankruptcy Code), and all other claims allowed by applicable state law, including but not limited to claims relating to unlawful dividend payments or unlawful stock purchase or redemption;

(vi)     All Causes of Action against Brian Kahn, in his individual and all representative capacities, Lauren Kahn, in her individual and all representative capacities, Vintage Capital Management LLC, Prophecy Asset Management LP, and each of their Affiliates and Related Parties (provided that neither Brian Kahn, Lauren Kahn, Vintage Capital Management LLC, nor Prophecy Asset Management LP shall be deemed Affiliates of the Debtors for purposes of this proviso);

(vii)    All Causes of Action against WFG;

(viii)   All Causes of Action relating to any preferential payments made by the HoldCo Debtors to the HoldCo Lenders and any similar payments made by the OpCo Debtors to one or more Second Lien Lender within the ninety (90) day period prior to the Petition Date, unless the discovered facts and applicable federal and/or state law supports a one (1) year lookback period for any and all such claims, in which case all such Causes of Action are reserved;

(ix)     All Causes of Action against the HoldCo Lenders arising pursuant to Section 548 of the Bankruptcy Code and all state law equivalents (as provided by Section 544 of the Bankruptcy Code) as the intended beneficiaries and ultimate recipients of the transfers referenced in clause (v) above.

(x)      All Causes of Action that may be asserted against previously retained professionals providing services to the OpCo Debtors at all relevant times with respect to any facts or circumstances relevant to the above-referenced Causes of Action and all related transactions, events and occurrences, including without limitation (a) WFG, (b) Troutman Pepper Locke LLP, (c) Wachtell, Lipton, Rosen & Katz, and (d) Jefferies, LLC, and each of their respective members, partners, employees, consultants, contractors, financial or other advisors, Affiliates and Related Parties.

The Debtors, the Consenting First Lien Lenders, and the Creditors' Committee engaged in extensive, good-faith and arms' length negotiations with respect to the OpCo Litigation Claims, which resulted in a global compromise (as defined in the Plan, the "Committee Settlement"). The Committee Settlement not only resolves the go-forward approach for the

pursuit, settlement, and/or prosecution of the OpCo Litigation Claims, but also paves the way for the resolution of these Chapter 11 Cases and confirmation of the Plan with support from the Creditors' Committee and the Consenting First Lien Lenders.

The Committee Settlement is described more fully in Article XV of the Plan, and the term sheet memorializing the Committee Settlement is attached as Exhibit I to the Plan, which is fully incorporated as a material component of the Plan.<del>15</del>18  In general, the Committee Settlement Parties have agreed to the Committee Settlement on the following terms:

(i)    any and all disputes between the Committee Settlement Parties will be resolved;

(ii)    the OpCo Debtor Litigation Trust will be established;

(iii)    the OpCo Debtor Litigation Trust Escrow Account will be funded with the OpCo Debtor Litigation Trust Escrow Amount;

(iv)    the Independent Investigation will be terminated;

(v)    the Committee Settlement Parties have agreed to mutual releases as provided for in the Plan; and

(vi)    the Creditors' Committee and the Consenting First Lien Lenders have agreed to support the Plan.

The Committee Settlement provides significant value to the Debtors and their Estates, favorably resolves and avoids potential protracted expensive and uncertain litigation, and enables the prompt and efficient restructuring of the Debtors' Estates through the Plan.  The Plan shall serve as a motion to approve the Committee Settlement pursuant to Bankruptcy Rule 9019.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Committee Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Holders of Claims, and other parties in interest, and are fair, equitable, and reasonable.

## I.    Retention of Counsel

The Debtors' originally proposed Willkie Farr and Gallagher, LLP ("WFG") to serve as co-counsel to the Debtors in these Chapter 11 Cases.  On December 19, 2024, the Debtors filed its *Debtors' Application for Order Authorizing the Retain and Employment of Willkie Farr & Gallagher LLP as Co-Counsel for the Debtors, Nunc Pro Tunc to the Petition Date* [Docket No. 474].  On January 3, 2025, January 13, 2025, and February 1, 2025, the U.S. Trustee, the Settlement-Related Liquidating Trust 2022-23, and the Freedom Lender Group, respectively, objected to the Debtors' application to retain WFG, arguing, among other things,

---

<del>15</del>18    To the extent that there is any inconsistency between this summary of the primary terms of the Committee Settlement and the description of the Committee Settlement in the Plan, the Plan controls.

that WFG's prepetition representations of Mr. Kahn and other entities associated with the Take-Private Transaction resulted in a conflict of interest in these Chapter 11 Cases.  On February 3, 2025, the Debtors and WFG filed a joint reply responding to the objections raised.  On February 6, 2025, the Bankruptcy Court held a hearing on WFG's retention.  On February 13, 2025, the Bankruptcy Court entered an order denying the *Debtors' Application for Order Authorizing the Retain and Employment of Willkie Farr & Gallagher LLP as Co-Counsel for the Debtors, Nunc Pro Tunc to the Petition Date [Docket No. 474]* [Docket No. 976].  One day later, on February 14, 2025, the Debtors engaged Kirkland as proposed co-counsel in these Chapter 11 Cases.

Kirkland had previously filed a notice of appearance on behalf of a creditor in the Chapter 11 Cases.  Kirkland withdrew their notice of appearance of such creditor on February 13, 2025.  On February 14, 2025, Kirkland was engaged by the Debtors.  Kirkland is working expeditiously to prepare its retention application and will make all appropriate disclosures in connection therewith.

Since Kirkland's engagement, Kirkland has held numerous conversations with the Debtors and their stakeholders, including the Debtors' management and advisors, counsel to the Creditors' Committee, counsel to the Freedom Lender Group, counsel to the Consenting First Lien Lenders, counsel to Mr. Wartell, the Company's prepetition special counsel, counsel to the ABL Lenders, and the U.S. Trustee.  These discussions have been, and continue to be, constructive and enable the Debtors to develop a go-forward plan that maximizes value for all of the Debtors' stakeholders.  On February 14, 2025, the Debtors requested a meeting with the Freedom Lender Group.  The Freedom Lender Group denied the request for a meeting.  The Debtors sent drafts of the Plan, this Disclosure Statement, and the Disclosure Statement Order and related exhibits to counsel to the Creditors' Committee, counsel to the Consenting First Lien Lenders, members of the Ad Hoc Group of First Lien Lenders, and counsel to Mr. Wartell ahead of the Disclosure Statement Hearing to ensure each party in interest had an opportunity to provide comments and initiate discussions with respect thereto.  The Debtors sent a draft of this Disclosure Statement to counsel to the Freedom Lender Group and asked for comment in the hopes of reaching a resolution on at least certain of the outstanding issues prior to the Disclosure Statement Hearing.  On February 17, 2025, the Freedom Lender Group filed the *Ad Hoc Group of Freedom Lenders' Renewed Motion to Adjourn Disclosure Statement Hearing* [Docket No. 993], seeking further delay of the Disclosure Statement Hearing.

On February 18, 2025, the Debtors filed the Plan and this Disclosure Statement in advance of a hearing on the adequacy of Disclosure Statement scheduled for February 19, 2025, at 10:00 a.m. (prevailing Eastern Time).

## VIII.  SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11 CASES AND THE PLAN

This Article details certain issues in connection with these Chapter 11 Cases and the Plan.

A.        **Voting on the Plan**

As described herein and in the Plan, only certain classes under the Plan are entitled to vote on the Plan.  Specifically, Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, General Unsecured Claims, Prepetition HoldCo Loan Claims, Freedom HoldCo General Unsecured Claims, HoldCo Receivables General Unsecured Claims, TopCo General Unsecured Claims, and Existing TopCo Equity Interests are members of the only Classes that are "impaired" and entitled to vote to accept or reject the Plan.  Any Holder of a Claim whose legal, contractual, or equitable rights are altered, modified or changed by the proposed treatment under the Plan, or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code, is considered "impaired."  Each Holder of a Claim or Interest of a Class that is deemed to accept or reject the Plan will receive a notice of non-voting status after the Petition Date but will not have received a Ballot because they are not eligible to vote on the Plan.  All Holders of Claims or Interests may receive a copy of these documents and/or the Plan Supplement, if applicable, by mailing a written request to the Claims Agent.

---

**Which Classes of Claims and Interests Are Entitled to Vote on the Plan?**

Classes of Claims and Interests are entitled to vote on the Plan as follows:

- Claims and Interests in Classes 1 and 2 are unimpaired under the Plan, are deemed to have accepted the Plan, and are not entitled to vote on the Plan.

- Claims and Interests in Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, and 11 are impaired and entitled to vote on the Plan.

- Claims and Interests in Classes 9, 11, and 12 are reinstated or impaired and deemed to have accepted or rejected the Plan and are not entitled to vote on the Plan.

---

For a description of the Classes of Claims and Interests and their treatment under the Plan, see Article VIII.D, "*Summary of Classification and Treatment Under the Plan*," below.

Under the Bankruptcy Code, a Class of Claims shall have accepted the Plan if it is accepted or deemed accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Holders of the Allowed Claims or Interests in such Class that have voted on the Plan.  The votes in favor of the Plan must be obtained from one impaired accepting Class, excluding the votes of any insiders.

### B.    The Disclosure Statement Hearing

The Bankruptcy Court has ~~scheduled~~held a hearing on **February 19, 2025, at 10:00 a.m. (prevailing Eastern Time)** to approve this Disclosure Statement as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code.

### C.    The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on **[~~April~~May 12~~9~~], 2025 at [~~10:00 a.m.~~] (prevailing Eastern Time)** to confirm the Plan.

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to confirm a plan.  Section 1128(b) provides that a party-in-interest may object to confirmation of a plan.  Objections to confirmation must be filed with the Bankruptcy Court and served on the Debtors as well as the other parties set forth in the notice of the Confirmation Hearing (the "Notice of Confirmation Hearing") by the objection deadline, as set forth in the Notice of Confirmation Hearing.  The Notice of Confirmation Hearing will be mailed to parties at a later date, after the filing of these Chapter 11 Cases.

At the Confirmation Hearing, the Bankruptcy Court will:

- determine whether the solicitation of votes on the Plan was in compliance with section 1126 of the Bankruptcy Code;

- determine whether the Plan has been accepted by a sufficient number of Holders and amount of claims entitled to vote on the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

### D.    Summary of Classification and Treatment Under the Plan

The following table and description summarize the classification and treatment of Claims and Interests and the consideration contemplated to be distributed to the Holders of Allowed Claims and Interests under the Plan.  The recoveries set forth in the following table assume that the Plan Equitization Transaction is consummated on the Effective Date of the Plan.  Unless otherwise noted, these estimates are as of the date hereof.  For an explanation of the assumptions and uncertainties regarding these calculations, see Article XI, "*Risk Factors*."

A number of events may occur that may result in recoveries being higher than are reflected in the following table.  For instance, the OpCo Litigation Trustee may successfully pursue, settle, and/or resolve the OpCo Litigation Claims, and distribute the proceeds (if any) to the beneficiaries of the OpCo Debtor Litigation Trust pursuant to the Plan and the OpCo Debtor

Litigation Trust Agreement.  Likewise, the Freedom HoldCo Debtor Litigation Trustee may successfully pursue, settle and/or resolve Claims and Causes of Action transferred to and vested in the Freedom HoldCo Debtor Litigation Trust and distribute the proceeds (if any) to the beneficiaries of the Freedom HoldCo Debtor Litigation Trust pursuant to the Plan and the Freedom HoldCo Debtor Litigation Trust Agreement.  Additionally, the Freedom HoldCo Independent Investigation may result in additional Claims and Causes of Action being transferred to the Freedom HoldCo Debtor Litigation Trust.

---

**Important Note on Estimates**

Statements regarding projected amounts of Claims and Interests or distributions are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts.  Except as otherwise indicated, these statements are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.

---

**Note on Numerical Information.  The numerical information in this Disclosure Statement, including the Financial Projections annexed as <u>Exhibit C</u> hereto and the estimated Allowed amounts, has been prepared by the Debtors, with the assistance of its investment banker, Ducera.  The assumptions used in preparing such Financial Projections and estimates are inherently subject to significant uncertainties and actual results may differ from such Financial Projections and estimates, as further described in <u>Article XVII</u> herein.**

   i.  <u>Summary of Classification and Treatment of Claims</u>

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| 1 | Priority Non-Tax Claims | The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Required Consenting First Lien Lenders):  (i) Cash in an amount | N/A | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | equal to such Allowed Claim or in the ordinary course of business as and when due; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  In the event of a Partial Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors. | | |
| 2 | Other Secured Claims | The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date each Holder of an Allowed Other Secured Claim shall receive:  (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Partial Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.<br><br>Each Holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan.  Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such | N/A | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order or rule or the vote, consent, authorization or approval of any Person and the Holder of such Claims shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, or *lis pendens*, or similar interests or documents. Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.<br><br>Deficiency Claims: To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim, only as applicable, and shall be classified and treated as a Class 6 Claim or Class 8-A Claim, Class 8-B Claim, or Class 8-C Claim, only as applicable. | | |
| 3 | Prepetition ABL Loan Claims | On the Effective Date, the Prepetition ABL Loan Claims shall be Allowed under the Plan in the amount of $248.7 million plus interest, fees, costs, charges, and other | $248.7 million, plus interest, fees, costs, charges, and | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | amounts arising under or in connection with the Prepetition ABL Loan Claims (including, without limitation, any reimbursement obligations under outstanding letters of credit), and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition ABL Loan Claim, except to the extent that the ABL Credit Agreement Agent or a Holder of a Prepetition ABL Loan Claim agrees to different treatment with respect to such Holder's Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Prepetition ABL Loan Claim shall receive its *pro rata* share of (i) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (ii) (A) proceeds of the Exit ABL Facility, or (B) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (i) hereunder. | other amounts arising under or in connection with the Prepetition ABL Loan Claims. | |
| 4 | Prepetition First Lien Loan Claims | On the Effective Date, the Prepetition First Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, | $1.13 billion, plus interest, fees, costs, charges, and other amounts arising under or | Unspecified[16][19] |

---

[16][19]  As described herein, the Debtors continue to engage with multiple bidders with respect to a potential Partial Sale Transaction. To avoid potential prejudice to the sale process by disclosing potential estimated recoveries for Prepetition First Lien Loan Claims, such recovery is not estimated herein. The Plan is broadly supported by the Holders whose claims represent 80 percent of the Claims arising on account of obligations under the First Lien Term Loan Facility. For additional information regarding valuation, refer to Article XVIII.D.iii herein.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition First Lien Loan Claim, except to the extent that the First Lien Credit Agreement Agent or a Holder of a Prepetition First Lien Loan Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of an Allowed Prepetition First Lien Loan Claim shall receive, subject to the terms of the Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of (i) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transaction, if applicable, and (ii) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable).<br><br>Deficiency Claims:  If applicable, any First Lien Deficiency Claims shall be classified and treated as a Class 6 Claim and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in Class 6. | in connection with the Prepetition First Lien Loan Claims | |
| 5 | Prepetition Second Lien Loan Claims | On the Effective Date, the Prepetition Second Lien Loan Claims shall be Allowed under the Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, | $1~~2~~45 million, plus accrued but unpaid prepetition interest and fees through the Effective Date[20] | 0% - TBD~~17~~21 |

[20] For the avoidance of doubt, such amount outstanding includes $19.51 million on account of the Secured HoldCo Guarantee Obligations.

~~17~~21 The value of the New Warrants is undetermined at this time.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition Second Lien Loan Claim, except to the extent that a Holder of a Prepetition Second Lien Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Prepetition Second Lien Loan Claim shall receive (A)its *pro rata* share of the OpCo Debtor Litigation Trust Units, and, solely if the Class votes to accept the Plan, the New Warrants, which if issued, New Warrants (if applicable) shall be issued and distributed to the OpCo Debtor Litigation Trust to be shared ratably with all Hholders of OpCo Debtor Litigation Trust Units, or (B) if the Class votes to reject the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under section 1129(a)(7) and 1129(b) of the Bankruptcy Code.<br><br>Deficiency Claims:   If applicable, any Second Lien Deficiency Claims shall be treated for all purposes under the Plan as a General Unsecured Claim and shall be classified and treated as a Class 6 Claim and any Holder of such Claim shall receive its share of the recovery *pari passu* and ratably with the Holders of the Claims in Class 6. It is anticipated that the full value of the Prepetition Second Lien Loan Claims shall be a Second Lien Deficiency Claim hereunder. | | |
| 6 | OpCo Debtors General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed OpCo General Unsecured Claim, except to the extent that a Holder of a General Unsecured Claim against any OpCo Debtor agrees to less favorable treatment, on | $1,140,427,705[2] | ~1%[1823] |

[22] This estimate includes potential First Lien Deficiency Claims and Second Lien Deficiency Claims.

[22] This estimate includes potential First Lien Deficiency Claims and Second Lien Deficiency Claims.

[1823] The projected recovery to Holders of Allowed General Unsecured Claims against the OpCo Debtors does not take into account any possible recovery on account of OpCo Litigation Claims.  The estimated recovery for General Unsecured Claims in Class 6 may be greater than 1% depending on the outcome of the OpCo Litigation Trustee's pursuit of such OpCo Litigation Claims.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim at any OpCo Debtor shall receive its *pro rata* share of the OpCo Debtor Litigation Trust Units. | | |
| 7 | Prepetition HoldCo Loan Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition HoldCo Loan Claim, except to the extent that a Holder of a Prepetition HoldCo Loan Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Prepetition HoldCo Loan Claim shall receive its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election.  If there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim. | $514.8 million, plus accrued but unpaid prepetition interest and fees through the Effective Date | 0%[19][24] |
| 8-A | Freedom HoldCo General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Freedom HoldCo General Unsecured Claim, except to the extent that a Holder of an Allowed Freedom HoldCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive its *pro rata* share of the proceeds from the Freedom HoldCo Debtor Litigation Trust.  If there is | $0 | N/A |

[19][24]  The estimated recovery for Class 7 Prepetition HoldCo Loan Claims and Class 8-A Freedom HoldCo General Unsecured Claims, may be greater than 0% depending on the outcome of the Freedom HoldCo Debtor Litigation Trustee's pursuit of the Freedom HoldCo Debtor Litigation Trust Claims and the outcome of the Freedom HoldCo Independent Investigation.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
| --- | --- | --- | --- | --- |
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim. | | |
| 8-B | HoldCo Receivables General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo Receivables General Unsecured Claim, except to the extent that a Holder of an Allowed HoldCo Receivables General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive its *pro rata* share of Cash, if any, held by the HoldCo Receivables Debtors. If there is no Cash held at the HoldCo Receivables Debtors after paying all Claims in Class 8-B that are senior or structurally senior to the Allowed HoldCo Receivables General Unsecured Claims, if applicable, then such Holder of a HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim. | $0 | N/A |
| 8-C | TopCo General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed TopCo General Unsecured Claim, except to the extent that a Holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment on account of its Claim, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed TopCo General Unsecured Claim shall receive its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.6 of the Plan. If there is no Cash held at TopCo following the allocation described in Section 3.6 of the Plan, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim. | $0 | N/A |
| 9 | Intercompany Claims | On or after the Effective Date, or as soon as practicable thereafter, (i) any and all | N/A | N/A |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| | | Intercompany Claims between, among and/or against, Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, the American Freight Debtors, the Buddy's Debtors, the PSP Debtors, and the Vitamin Shoppe Debtors, to the extent each of the foregoing constitute Non-Partial Sale Transaction Debtors) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (A) Reinstated or (B) set off, settled, discharged, contributed, canceled, released, without any distribution on account of such Intercompany Claims, or otherwise addressed, and (ii) any and all Intercompany Claims between and among the HoldCo Debtors shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (A) Reinstated or (B) set off, settled, discharged, contributed, canceled, released, without any distribution on account of such Intercompany Claims, or otherwise addressed; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, any Intercompany Claims held by ~~or against or among~~ any of the Freedom HoldCo Debtors ~~shall receive the recovery that~~<u>against any of the OpCo Debtors (if any) shall, in full and final satisfaction, compromise, settlement, release, and discharge of</u> such Intercompany Claim ~~would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and if~~, <u>receive its</u> *pro rata* <u>share of the OpCo Debtor Litigation Trust Units; provided, further, that any Intercompany Claims held by any of the OpCo Debtors against any of the Freedom HoldCo Debtors (if any) shall, in full and final satisfaction, compromise, settlement, release, and discharge of</u> such Intercompany Claim ~~is not entitled to any recovery under section 1129(a)(7) of the Bankruptcy Code, such Intercompany Claim shall otherwise be extinguished and/or canceled on the Effective Date~~, <u>receive its</u> *pro rata* <u>share of the Freedom HoldCo Debtor Litigation Trust Units</u>. To the extent any Intercompany Claim is Reinstated, or | | |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable Law, regulation, order or rule or the vote, consent, authorization or approval of any Person. | | |
| 10 | Subordinated Claims | Each Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim. | N/A | 0% |
| 11 | Existing TopCo Equity Interests | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing TopCo Equity Interest, except to the extent that a Holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Existing TopCo Equity Interest shall receive (i) its *pro rata* share of Cash (if any) held by TopCo after paying all Allowed Claims against TopCo and following the allocation described in Section 3.6 of the Plan, or (ii) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interest. | N/A | 0%[2025] |
| 12 | Existing | Subject to the Restructuring Transactions | N/A | 0% |

---

[2025]    The estimated recovery for Class 11 Existing TopCo Equity Interests may be greater than 0% depending on whether there are any TopCo Allocated Fees and Expenses.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | Intercompany Equity Interests | Memorandum, each Allowed Existing Intercompany Equity Interest shall be, at the option of the applicable Debtor or Reorganized Debtor, either (i) Reinstated or (ii) set off, settled, distributed, contributed, canceled, and released without any distribution on account of such Existing Intercompany Equity Interests, or otherwise addressed at the option of the Reorganized Debtors and the Required Consenting First Lien Lenders. | | |

### E.    Treatment Under the Plan

Articles III–V of the Plan describes the treatment to be provided to each Class of Claims and Interests.  Each Holder of a Claim or Interest should read the Plan carefully.  Please also refer to Article VIII.D.i herein, and the liquidation analysis annexed as **Exhibit B** hereto (the "Liquidation Analysis") for a more detailed description of the classification and treatment of Claims and Interests provided under the Plan.

## IX.    SECURITIES LAWS MATTERS

> **The Issuance of the Reorganized Common Equity and the New Warrants Raises Issues Under U.S. Federal and State Securities Laws.**
>
> The issuance of the Reorganized Common Equity and the New Warrants under the Plan raises certain securities law issues under the Bankruptcy Code and U.S. federal and state securities laws that are discussed in this section.  The information in this section should not be considered applicable to all situations or to all Holders of Claims receiving the Reorganized Common Equity and the New Warrants.  Holders of Claims should consult their own legal counsel concerning the facts Reorganized Common Equity and the New Warrants.

### A.    Issuance and Resale of the Reorganized Common Equity and the New Warrants Under the Plan

Pursuant to section 1145 of the Bankruptcy Code, to the extent permitted and available, the Reorganized Common Equity and the New Warrants will be exempt from the registration requirements of the Securities Act of 1933 (as amended, the "Securities Act") (and of any state

securities or "blue sky" laws).  Section 1145 exempts from registration the sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administration expense in a case concerning, such debtor.  In reliance upon this exemption, it is expected that the Reorganized Common Equity and the New Warrants generally will be exempt from the registration requirements of the Securities Act, and recipients will then be able to resell the Reorganized Common Equity and the New Warrants without registration under the Securities Act or other federal securities laws, unless the recipient is (i) an "underwriter" with respect to such securities, within the meaning of section 1145(b) of the Bankruptcy Code, or (ii) an affiliate of the issuer.  Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan, or (iv) is an "issuer" of the relevant security, as such term is used in section 2(11) of the Securities Act.  An entity is not an "underwriter" under section 2(a)(11) of the Securities Act with regard to securities received under section 1145(a)(1), in "ordinary trading transactions" made on a national securities exchange; however, such entity may be an affiliate for purposes of the federal securities laws.  However, the Debtors do not anticipate that the Reorganized Common Equity and/or the New Warrants will be listed in the near term on a stock exchange.  What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC.  Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the Plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934 (the "<u>Exchange Act</u>"), or (iii) payment of special compensation to brokers or dealers in connection with the sale.  The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(l)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer.  Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a "controlling person" and therefore a statutory underwriter within the meaning of section 1145(b)(i) of the Bankruptcy Code.

## X.    ALTERNATIVES TO CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain over-leveraged and the Debtors may be unable to service their debt obligations.  Accordingly, if the Plan is not consummated, the alternatives include:

### A.    Liquidation Under the Bankruptcy Code

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code.  A discussion of how a chapter 7 liquidation would affect the recoveries of the Holders of Claims is set forth in this Article VIII.  The Debtors believe that liquidation would result in either the same, or lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in attached Exhibit B to this Disclosure Statement.

Specifically, in the event of a chapter 7 liquidation, the Liquidation Analysis provides that the Holders of Prepetition First Lien Loan Claims would receive no recovery.  In contrast, under the Plan, the Holders of Prepetition First Lien Loan Claims would receive their *pro rata* share of (i) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transaction, if applicable, and (ii) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), as well as any applicable recovery on account of their First Lien Deficiency Claim.  Accordingly, such Holders would receive greater value under the Plan than such Holders would receive in a chapter 7 liquidation.

Similarly, in the event of a chapter 7 liquidation, the Liquidation Analysis provides that the Holders of Prepetition Second Lien Loan Claims would receive no recovery.  Under the Plan, each Holder of an Allowed Prepetition Second Lien Loan Claim shall receive (A)its *pro rata* share of the OpCo Debtor Litigation Trust Units, and, solely if the Class votes to accept the Plan, the New Warrants, which, if issued, New Warrants (if applicable) shall be issued and distributed to the OpCo Debtor Litigation Trust to be shared ratably with all holders of OpCo Debtor Litigation Trust Units, or (B) if the Class votes to reject the Plan, its pro rata share of the recovery such claimant would be entitled to receive under sections 1129(a)(7) and 1129(b) of the Bankruptcy Code, as well as any applicable recovery on account of its Second Lien Deficiency Claim.  Accordingly, such Holders would receive greater value under the Plan than such Holders would receive in a chapter 7 liquidation..

Finally, Holders of General Unsecured Claims, Intercompany Claims, Subordinated Claims, and Existing Equity Interests in the event of a chapter 7 liquidation would receive no recovery.

### B.    Alternative Plan of Reorganization

In formulating and developing the Plan, the Debtors have explored other alternatives, and have engaged in a negotiating process with the Consenting First Lien Lenders.  The Debtors believe that the Plan fairly adjusts the rights of various Classes of Claims, and also provides

superior recoveries to Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, and 11 over any likely alternative (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns.

**THE DEBTORS BELIEVE THAT THE PLAN IS PREFERABLE TO ANY ALTERNATIVE PLAN OR TRANSACTION BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.   THEREFORE, THE DEBTORS RECOMMEND THAT ALL FIRST LIEN LENDERS AND ALL SECOND LIEN TERM LOAN LENDERS CONSENT TO ACCEPT THE PLAN.**

### C.   Inaction/Maintenance of Status Quo

If the Restructuring Transactions are not consummated, the Debtors could be in default under the ABL Credit Agreement, First Lien Credit Agreement, Second Lien Credit Agreement, and HoldCo Credit Agreement.   As the Debtors believe they will be unable to repay such indebtedness if it were to be accelerated or upon maturity, the Debtors believe that inaction is not an option.   Further, if the Debtors are forced to file for bankruptcy protection without a consensual restructuring agreement among its creditors, the bankruptcy cases could be time-consuming and much more costly than the current contemplated restructuring.   The Debtors believe that these actions could seriously undermine its ability to obtain financing and could possibly lead to its inability to restructure its debt obligations.   Therefore, the Debtors believe that inaction is not a viable alternative to consummation of the Restructuring Transaction.

## XI.   RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.   THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.**

### A.   Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the impaired Classes to accept or reject the Plan or require a re-solicitation of the votes of Holders of Claims or Interests in such impaired Classes.

i.       The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, and any other transaction that could maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, could add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring could have other adverse effects on the Debtors. For example, it could adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

ii.      Failure to Receive Adequate Acceptances

The Debtors believe they will receive the requisite number of votes in favor of the Plan in light of the fact that, as set forth herein, the Consenting First Lien Lenders who hold more than 80% of the Prepetition First Lien Loan Claims agreed to vote for, support and not object to the Plan. However, the Plan constitutes a separate chapter 11 plan for each Debtor and all references to the Plan are intended on an individual and per-Debtor basis. The Plan groups (but does not substantively consolidate) certain Debtors solely for purposes of describing treatment of Claims against and Interests in the Debtors under the Plan. As a result, if for some reason the Debtors do not receive, with respect to each Debtor, votes from Holders of at least two-thirds in dollar amount and a majority in number of Holders (the "Requisite Acceptances") with respect to at least one Class of Claims that is impaired and entitled to vote (excluding insiders), the Debtors may not be able to confirm a Plan as to those Debtors, and the Debtors will seek confirmation of the Plan as to all Debtors that meet the standards under section 1129 of the Bankruptcy Code. Pursuant to Sections 6.3 and 14.4 of the Plan, if any Debtor is not able to comply with the requirements of section 1129 of the Bankruptcy Code, the Debtors, with the consent of the

Required Consenting First Lien Lenders, reserve the right to remove such Debtor from the Plan, and seek confirmation of the Plan as to any remaining Debtor(s).

Further, if the Requisite Acceptances are not received, the Debtors may, subject to the terms and conditions of the Restructuring Support Agreement, seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Consenting First Lien Lenders and/or the Debtors may be required to sell their business under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

iii.    <u>Failure to Confirm the Plan</u>

There is some risk that the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may deny confirmation of the Plan.  A non-accepting (or deemed rejecting) creditor or equity security Holder of the Debtors might, among other things, challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting Holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such Holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  While the Debtors cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will satisfy the statutory requirements for confirmation and will not be followed by a need for further financial reorganization and that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, the Plan will need to be revised (either, in whole or in part) and, as discussed *supra* in <u>Article XI.B.ii</u>, the Debtors, with the consent of the Required Consenting First Lien Lenders, reserve the right to remove certain Debtor(s) from the Plan, and seek confirmation of the Plan as to any remaining Debtor(s).

Further, if the Plan is not confirmed it is unclear whether a restructuring of the Debtors could be implemented and what distribution Holders of Claims ultimately would receive with respect to their Claims, which may constitute less favorable treatment than they would receive under the Plan.  If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case the Debtors believe that Holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative restructuring arrangement

or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

      iv.     <u>The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code</u>

If the Bankruptcy Court finds that it could be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee could be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 could result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets could have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which could be entitled to priority, that could be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

      v.     <u>Failure to Receive Bankruptcy Court Approval of the Compromises and Settlements Contemplated by the Plan</u>

The Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody. The releases, injunctions, and exculpations may not be approved, in which case certain Released Parties may withdraw their support from the Plan, notwithstanding the existence of the Restructuring Support Agreement.

      vi.     <u>Alternative Plans of Reorganization may be Proposed</u>

Other parties-in-interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization. Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization. However, such exclusivity period can be reduced or terminated upon a showing of cause and an order of the Bankruptcy Court. Were such an order to be entered, other parties-in-interest would then have the opportunity to propose alternative plans of reorganization.

If other parties-in-interest were to propose an alternative plan following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to Holders of

Claims or Interests. If there are competing plans of reorganization, these Chapter 11 Cases are likely to become longer and more complicated.

     vii.    <u>Failure to Consummate the Plan</u>

As more fully set forth in Article XI of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived and not met, the Confirmation and Effective Date of the Plan will not take place.

     viii.    <u>Extended Stay in a Bankruptcy Proceeding</u>

While the Debtors expect that a chapter 11 bankruptcy filing solely for the purpose of implementing the Plan would be of short duration and would not be unduly disruptive to the Debtors' business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan would be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business. There is a risk, due to uncertainty about the Debtors' future, that:

- customers could seek alternative sources of products from the Debtors' competitors, including competitors that are in little or no relative financial or operational distress;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- vendors, suppliers or agents and other business partners could terminate their relationship with the Debtors or require financial assurances or trade terms which are materially different from what the Debtors have today.

A lengthy bankruptcy proceeding would also involve significant expenses and divert the attention of management from operating the Debtors' business, as well as creating concerns for employees, suppliers, and customers.

The disruption that a bankruptcy proceeding could inflict upon the Debtors' business would increase with the length of time it takes to complete these Chapter 11 Cases and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties on whom the Debtors depend, including vendors, employees, agents and customers. If the Debtors are unable to obtain confirmation of the Plan on a timely basis, because of a challenge to the Plan or a failure to satisfy the conditions to the effectiveness of the Plan, the Debtors may be forced to operate in bankruptcy for an extended period while they try to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

ix.    Termination of the Restructuring Support Agreement in Certain Circumstances

Pursuant to the Restructuring Support Agreement, the Consenting First Lien Lenders have agreed to support the Plan, however, such support can be terminated and such votes revoked pursuant to the terms and conditions thereof upon the occurrence of certain "Termination Events" (as defined therein) under the Restructuring Support Agreement.  Such Termination Events include, among other things, the failure of the Debtors to reach certain milestones in these Chapter 11 Cases in a timely manner.  While the Debtors believe that they will be able to meet such milestones, there can be no assurance that will be the case.  Additional events that constitute Termination Events under the Restructuring Support Agreement include the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, a material breach by the Debtors of their obligations under the Restructuring Support Agreement, or a final determination by a governmental agency of competent jurisdiction that the Restructuring Transactions contemplated by the Plan cannot legally go forward.  See Exhibit D for additional detail.  If a Termination Event occurs and the support of the Consenting First Lien Lenders were to be withdrawn, and the votes of such Holders were revoked, the Debtors may need to amend the Plan and re-solicit votes thereon or formulate a new chapter 11 plan and solicit votes on such new plan.  Such amendment and/or re-solicitation could cause material delay in these Chapter 11 Cases and may adversely impact the Debtors' businesses and its ability to reorganize.

x.    Distributions could be Delayed

If the Plan is confirmed, the date of the distributions to be made pursuant to the Plan will not occur until the Effective Date.  The Debtors estimate that the process of obtaining confirmation of the Plan will be no longer than ninety (90) days from the date of the commencement of the Chapter 11 Cases and, if these Chapter 11 Cases are filed, intends to seek to confirm the Plan on an expedited timeframe.  While the Debtors anticipate making distributions under the Plan upon or shortly after entry of the Confirmation Order, they may be delayed for a substantially longer period if the conditions to consummation of the Plan have not yet been met.

xi.    Objections to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

xii.    The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, including with respect to the HoldCo Debtors given the Freedom Lender Group's assertions that they will not vote in favor of the Plan with respect to the HoldCo Debtors, the Debtors may need to seek to confirm an

alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### B.    Risks Related to Recoveries Under the Plan

i.    <u>Certain Significant Holders of Shares of Reorganized Common Equity May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date</u>

Assuming that the Effective Date occurs, Holders of Claims and Interests who receive distributions representing a substantial percentage of the outstanding shares of the Reorganized Common Equity may be in a position to influence the business and affairs of the Reorganized Debtors and matters requiring approval from the Holders of shares of Reorganized Common Equity, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.  The Holders may have interests that differ from those of the other holders of shares of Reorganized Common Equity and may vote in a manner adverse to the interests of other holders of shares of Reorganized Common Equity.  This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of Reorganized Common Equity.  Such actions by Holders of a significant number of shares of Reorganized Common Equity may have a material adverse impact on the Reorganized Debtors' business, financial condition, and operating results.

ii.    <u>Estimated Valuations of the Reorganized Common Equity and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values</u>

The Debtors' estimated recoveries to Holders of Allowed Claims and Interests are not intended to represent the market value of the Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors via the Restructuring Transactions; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

iii.    <u>The Reorganized Common Equity is Subject to Dilution</u>

The ownership percentage represented by the Reorganized Common Equity distributed on the Effective Date under the Plan will be subject to dilution from the Reorganized Common Equity issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.  In particular, the Plan provides for potential issuance of Reorganized Common Equity pursuant to the Management Incentive Plan, the DIP Premium Conversion, the DIP Equitization, and the New Warrants, which will permit recipients under such plan to acquire shares of Reorganized

Common Equity.  Issuance of Reorganized Common Equity pursuant to the Management Incentive Plan would have a dilutive effect on the Reorganized Common Equity issued pursuant to the Plan.  In addition, the Reorganized Debtors could issue shares or obtain additional equity financing in the future similar to other companies, which could adversely affect the value of the Reorganized Common Equity issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

  iv. <u>The Shares of Reorganized Common Equity are an Equity Interest and Therefore Subordinated to the Indebtedness of the Reorganized Debtors</u>

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the Reorganized Common Equity would rank junior to all debt claims against the Reorganized Debtors.  As a result, holders of shares of Reorganized Common Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of their obligations to their debt holders have been satisfied.

  v. <u>A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt</u>

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable.  Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

  vi. <u>The Plan Does Not Provide for the Substantive Consolidation of any Debtor with any other Debtor</u>

The Plan does not provide for the substantive consolidation of any Debtor with any other Debtor.  As such, a Holder of an Allowed General Unsecured Claim against an OpCo Debtor will only receive a recovery under the Plan to the extent there is value allocated to the OpCo Debtor against which it holds an Allowed Claim under the OpCo Debtor Litigation Trust.  The Freedom Lender Group contends that only Franchise Group, Inc. and the Freedom HoldCo Debtors participated in the Take-Private Transaction and that, as a result, those are the only Debtor entities with related Claims and Causes of Action.  Therefore, there is a risk that a Holder of a General Unsecured Claim at a subsidiary of Franchise Group, Inc. (including the PSP Debtors, the Vitamin Shoppe Debtors, Buddy's Debtors and the American Freight Debtors) would not receive proceeds of any such Claim or Causes of Action and, a result, may not receive any additional distribution from the OpCo Debtor Litigation Trust on account of such Claim or Causes of Action.

**C.    Risks Associated with the Debtors' and the Reorganized Debtors' Business**

xiii.    <u>The Reorganized Debtors may not be able to Generate Sufficient Cash to Service all of their Indebtedness</u>

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness.

xiv.    <u>The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases</u>

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  the (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

xv.    <u>Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses</u>

The Debtors' future results will depend upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court

protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

xvi.    The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

xvii.    The Debtors Rely on a Limited Number of Key Vendors to Operate its Business

The loss of any of the Debtors' key vendors or an interruption of production at these vendors from work stoppages, equipment failures, or other adverse events or quality control failures would adversely affect the Debtors' ability to provide services and fill customer orders. The Debtors may not be able to find replacement vendors to provide critical supplies on attractive rates.

xviii.    The Debtors are Subject to the Conditions of the General Economy

Unfavorable economic conditions may adversely affect the Debtors' business, financial condition, or results of operations. The Debtors are globally vulnerable to general economic downturns. Any decline in demand for the Debtors' services resulting from a general economic downturn could materially and adversely affect the Debtors' business, financial condition, or

results of operations. A prolonged period of sluggish economic conditions has had and may continue to have an adverse impact on the level of maintenance expenditures of the Debtors' customers and their ability to maintain historic levels of these expenditures. As a result of significantly increased volatility and instability in the international financial markets and unfavorable global economic conditions, it is difficult for the Debtors, their customers, and their suppliers to forecast demand trends accurately. The Debtors are unable to accurately predict the extent or duration of cycles or their effect on the Debtors' financial condition or results of operations and can give no assurance as to the timing, extent, or duration of the current or future business cycles.

xix.    Loss of Key Management or Personnel could Negatively Impact the Debtors' Business

The Debtors' operations are dependent on a group of key management personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' operations.

xx.    The Difficulty in Attracting and Retaining Qualified Employees Could Detrimentally Impact the Debtors' Business

Both the Debtors and their franchisees and dealers depend on the ability to find, hire, and retain qualified employees to manage day-to-day business activities. The Debtors also need qualified and competent personnel to execute their business plans and serve their customers. The Debtors' inability to recruit and retain qualified and competent managers and personnel could have a material adverse effect on their business, financial condition, and results of operations.

xxi.    The Debtors' Operations may be Negatively Impacted by Unfavorable Publicity or Consumer Perception

The Debtors depend significantly on consumer perception regarding the safety and quality of their products, as well as similar products distributed by other companies. A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products and services. Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively. Consumer perception of products can be significantly influenced by adverse publicity in the form of published scientific research, national media attention or other publicity, whether or not accurate, that associates consumption of Vitamin Shoppe's products or any other similar products with illness or other adverse effects, or questions the benefits of these or similar products or that claims that any such products are ineffective. A new product may initially be received favorably, resulting in high sales of that product, but that sales level may not be sustainable as consumer

preferences change.  Future scientific research or publicity could be unfavorable to Vitamin Shoppe's industry or any of its particular products and may not be consistent with earlier favorable research or publicity.  Unfavorable research or publicity could have a material adverse effect on the Debtors' ability to generate sales within Vitamin Shoppe.

      xxii.   Product Recalls, Withdrawals or Seizures may Materially and Adversely Affect the Debtors' Business

The Debtors may be subject to product recalls, withdrawals, or seizures if any of the products they sell are believed to cause injury or illness or if the Debtors are alleged to have violated governmental regulations in the manufacturing, labeling, promotion, sale, or distribution of those products.  A significant recall, withdrawal, or seizure of any of the products the Debtors manufacture or sell may require significant management attention, which would likely result in substantial and unexpected costs and may materially and adversely affect the Debtors' business. Furthermore, a recall, withdrawal, or seizure of any of the Debtors' products may adversely affect consumer confidence in their brands and thus decrease consumer demand for the Debtors' products.  In some cases, the Debtors rely on their contract manufacturers and suppliers to ensure that the products they manufacture and sell to them comply with all applicable regulatory and legislative requirements.   In general, the Debtors seek representations and warranties, indemnification and/or insurance from their contract manufacturers and suppliers.  However, even with adequate insurance and indemnification, any claims of non-compliance could significantly damage the Debtors' reputation and consumer confidence in the Debtors' products. In addition, the failure of those products to comply with applicable regulatory and legislative requirements could prevent the Debtors from marketing the products or require them to recall or remove such products from the market, which in certain cases could materially and adversely affect their business, financial condition, and results of operations.

      xxiii.   The Success of the Debtors' Different Business Segments is Dependent on Factors Affecting Consumer Spending Outside of the Debtors' Control

Consumer spending is affected by general economic conditions and other factors including levels of employment, disposable consumer income, prevailing interest rates, consumer debt and availability of credit, costs of fuel, inflation, recession and fears of recession, war and fears of war, pandemics (such as the COVID-19 pandemic), inclement weather, tariff policies, tax rates and rate increases, timing of receipt of tax refunds, consumer confidence in future economic conditions and political conditions, and consumer perceptions of personal well-being and security.  Unfavorable changes in factors affecting discretionary spending could reduce demand for the Debtors' products and services resulting in lower revenue and negatively impacting their business and financial results.

      xxiv.   The Debtors' Operating Results will be Adversely Affected if they do Not Manage their Inventory Levels

The Debtors must maintain sufficient inventory levels to operate their business successfully.  However, the Debtors also must avoid accumulating excess inventory as they seek to minimize out-of-stock levels across all product categories and to maintain in-stock levels. The Debtors continue to rely on and obtain significant portions of their inventory from vendors

located outside the United States.  Some of these vendors often require the Debtors to provide lengthy advance notice of their requirements in order to be able to supply products in the quantities they request.  This usually requires the Debtors to order merchandise and enter into purchase order contracts for the purchase and manufacture of such merchandise, well in advance of the time these products will be offered for sale.  As a result, the Debtors may experience difficulty in responding to a changing retail environment, which makes them vulnerable to changes in price and consumer preferences.  If the Debtors do not accurately anticipate the future demand for a particular product or the time it will take to obtain new inventory, their inventory levels will not be appropriate, and the results of operations may be negatively impacted.

      xxv.   <u>The Debtors' Vitamin Shoppe and PSP Segments Sell Food, Dietary Supplements, Topical Products and/or Pet Products Containing Cannabidiol which may Open the Debtors to Regulatory Enforcement Action</u>

Products that contain cannabidiol ("<u>CBD</u>") are subject to various state and federal laws regarding the production and sale of hemp-based products.  Historically, the Drug Enforcement Administration ("<u>DEA</u>") considered CBD to be a Schedule I controlled substance subject to the Controlled Substances Act ("<u>CSA</u>") under the definition for "marijuana."  However, the Agriculture Improvement Act of 2018 (the "<u>2018 Farm Bill</u>") removed "hemp" from the definition of "marijuana."  "Hemp" is defined as the plant *Cannabis sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol ("<u>THC</u>") concentration of not more than 0.3 percent on a dry weight basis.  As a result of the enactment of the 2018 Farm Bill, the Debtors believe that Vitamin Shoppe's CBD products and the hemp from which they are derived are not Schedule I controlled substances under the CSA.  However, there is a risk that the Debtors could be subject to DEA enforcement action, including prosecution, if any of Vitamin Shoppe's products are determined to not meet the definition of "hemp" and to constitute "marijuana" based on THC levels or other violations.

In addition, although hemp and hemp-derived CBD are no longer controlled substances subject to regulation under the CSA, the Food and Drug Administration ("<u>FDA</u>") has stated publicly that it is nonetheless unlawful under the Federal Food, Drug, and Cosmetic Act ("<u>FDCA</u>") to market foods or dietary supplements containing CBD, even if lawful under the 2018 Farm Bill.  Specifically, the FDCA prohibits the introduction or delivery for introduction into interstate commerce of any food or dietary supplement that contains an approved drug or a drug for which substantial clinical investigations have been instituted and made public, unless a statutory exemption applies.  The FDA has stated its conclusion that this statutory prohibition applies and none of the exceptions has been met for CBD.

The FDA has held public meetings and formed an internal working group to evaluate the potential pathways to market for CBD products, which could include seeking statutory changes from Congress or promulgating new regulations.  If legislative action is necessary, such legislative changes could take years to finalize and may not include provisions that would enable Vitamin Shoppe and PSP to produce, market and/or sell CBD products, and FDA could similarly take years to promulgate new regulations.  Additionally, while the agency's enforcement focus to date has primarily been on CBD products that are associated with therapeutic claims, the agency has recently issued warning letters to companies marketing CBD products without such claims,

and there is a risk that FDA could take enforcement action against Vitamin Shoppe and PSP, their third party contract manufacturers or suppliers, or those marketing similar products, which could limit or prevent these segments from marketing CBD products.  While the FDA announced on March 5, 2020 that it is currently evaluating a risk-based enforcement policy for CBD to provide more clarity to industry and the public while the agency takes potential steps to establish a clear regulatory pathway, it remains unclear whether or when FDA will ultimately issue such an enforcement policy.

Moreover, local, state, federal, and international CBD, hemp and cannabis laws and regulations are rapidly changing and subject to evolving interpretations, which could require Vitamin Shoppe and PSP to incur substantial costs associated with compliance requirements or alteration of certain aspects of their business plan in the event that their CBD products become subject to new restrictions.  In addition, violations of these laws, or allegations of such violations, could disrupt the businesses and result in a material adverse effect on their operations. The Debtors cannot predict the nature of any future laws, regulations, interpretations, or applications, nor can they determine what effect additional governmental regulations or administrative policies and procedures, when and if promulgated, could have on Vitamin Shoppe and PSP's activities in the hemp and CBD industry.  The constant evolution of laws and regulations may require these segments to incur substantial costs associated with legal and compliance fees and ultimately require them to alter their current business plans.

xxvi.    The Debtors' Financial Success is Tied to the Growth and Effective Operations of the Debtors' Owned Locations, Franchises and Dealers, and the Franchise and Dealer Operations

The Debtors' financial success depends on how effectively they operate the Debtor-owned locations and how their franchisees and dealers operate and develop their businesses.  The Debtors do not exercise direct control over the day-to-day operations of the franchises and dealers, and the franchisees and dealers may not operate their businesses in a manner consistent with the Debtors' philosophy and standards and may not increase the level of revenues generated compared to prior years.  The Debtors' growth and revenues may, therefore, be adversely affected.

There can be no assurance that the training programs and quality control procedures the Debtors have established will be effective in enabling franchisees and dealers to run profitable businesses or that the Debtors will be able to identify problems or take corrective action quickly enough.  In addition, failure by a franchisee or dealer to provide service at acceptable levels may result in adverse publicity that can materially adversely affect the Debtors' reputation and ability to compete in the market in which the franchisee or dealer is located.

xxvii.    The Debtors' Business Lines Involve Substantial Litigation which may Damage the Debtors' Reputation or Result in Material Liabilities

The Debtors have been named, from time to time, as a defendant in various legal actions, including arbitration, class-actions, and other litigation arising in connection with their various business activities.  Adverse outcomes related to litigation could result in substantial damages and could materially affect the Debtors' liquidity and capital resources and cause the Debtors'

net income to decline or may require them to alter their business operations. Negative public opinion can also result from the Debtors' actual or alleged conduct in such claims, possibly damaging their reputation, which could negatively impact their financial performance.

Some of the products the Debtors sell may expose them to product liability claims relating to personal injury, death, or property damage caused by such products, and may require them to take actions such as product recalls. Although the Debtors maintain liability insurance, they cannot be certain that their coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to them on commercially reasonable terms, or at all. Vitamin Shoppe, in particular, as a retailer and direct marketer of products designed for human consumption, is subject to product liability claims if the use of its products is alleged to have resulted in injury or to include inadequate instructions for use or inadequate warnings concerning possible side effects and interactions with other substances. In addition, third-party manufacturers produce many of the products the Debtors sell which may expose them to product liability claims for products they do not manufacture. While the Debtors attempt to manage these risks by obtaining indemnification agreements from the manufacturers of products that they sell and insurance, third parties may not satisfy their indemnification obligations to the Debtors and/or their insurance policies may not be sufficient or available. A product liability claim against the Debtors, whether with respect to products of a third-party or their branded products, could result in increased costs and could adversely affect their reputation with their customers, which in turn could materially adversely affect their business, financial condition and results of operations.

xxviii. <u>The Debtors' Business Relies on Technology Systems and Electronics Communications which, if disrupted, could materially Affect the Debtors' Business</u>

The Debtors depend heavily upon their information technology systems in the conduct of their business. The Debtors develop, own and license or otherwise contract for sophisticated technology systems and services. If they experience significant disruptions to their systems, the Debtors could experience a loss of business, which could have a material adverse effect on their business, financial condition, and results of operations. Any data breach or severe disruption of the Debtors' network or electronic communications could have a material adverse effect on their business, financial condition, and results of operations. The Debtors rely on certain software vendors to maintain and periodically upgrade many of these systems so that they can continue to support the Debtors' business. The software programs supporting many of their systems were licensed to the Debtors by independent software developers. The inability of these developers or the Debtors to continue to maintain and upgrade these information systems and software programs would disrupt or reduce the efficiency of their operations if they were unable to convert to alternate systems in an efficient and timely manner.

**D.      Risks Relating to Tax and Accounting Consequences of the Plan**

    i.    <u>Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations</u>

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors currently do not intend to seek any ruling from the Internal Revenue Service (the "<u>IRS</u>") on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.  In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request.  Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment of the Plan, or that a court would not sustain such a challenge.  Holders of Claims and Interests should carefully review <u>Article XIII</u> hereof, "*Certain U.S. Federal Income Tax Considerations*," to determine how the tax implications of the Plan may adversely affect the Debtors, Reorganized Debtors, and Holders of Claims and Interests.

    ii.    <u>Use of Historical Financial Information</u>

As a result of the consummation of the Plan and the transactions contemplated thereby, the Debtors believe they will be subject to the fresh start accounting rules.  Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued.  This process is guided by purchase price allocation standards under GAAP.  Application of fresh start accounting rules could result in the values of certain of the Debtors' assets being written down.

**E.      Other Risks**

    i.    <u>The Effective Date May Not Occur</u>

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.  Effectiveness of the Plan is also subject to certain conditions as described in Article XI of the Plan.  If these conditions have not occurred or have not been waived as set forth in the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to the Claims and Interests would remain unchanged.

    ii.    <u>The Freedom HoldCo Debtor Litigation Trust May Not Be Funded</u>

The Debtors are investigating potential Claims and Causes of Action that may exist at the Freedom HoldCo Debtors through the Freedom HoldCo Independent Investigation.  Pursuant to the Plan and the Freedom HoldCo Debtor Litigation Trust Agreement, on the Effective Date the Freedom HoldCo Debtor Litigation Trust Claims shall be transferred to the Freedom HoldCo Debtor Litigation Trust.  Unlike the OpCo Debtor Litigation Trust, the Plan does not provide for Cash proceeds to fund and administer the Freedom HoldCo Debtor Litigation Trust.  In addition,

certain Claims and Causes of Action that vest in the OpCo Debtor Litigation Trust may overlap with certain Claims or Causes of Action that will vest in the Freedom HoldCo Debtor Litigation Trust. Accordingly, the Freedom HoldCo Debtor Litigation Trust and the OpCo Debtor Litigation Trust will need to resolve ownership of the overlapping Claims prior to pursuit of such Claims, which will not occur prior to the Effective Date. Such resolution may impact your ultimate recovery. Additionally, there is no guarantee that additional Freedom HoldCo Debtor Litigation Trust Claims will be transferred to the Freedom HoldCo Debtor Litigation Trust as a result of the Freedom HoldCo Independent Investigation.

### iii.    The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### iv.    No Representations Outside this Disclosure Statement are Authorized

No representations concerning or related to the Debtors or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your vote to accept the Plan, other than those contained in or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### v.    No Legal or Tax Advice is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to provide you with information regarding the Debtors and the proposed Restructuring Transactions to assist you in making a decision regarding whether or not to support the Plan.

## XII.    DESCRIPTION OF SECURITIES TO BE ISSUED IN CONNECTION WITH THE PLAN

### A.    Reorganized Common Equity

On the Effective Date, in accordance with the terms of the Plan and the Restructuring Transactions Memorandum and as further set forth in the Plan Supplement, New TopCo shall issue and deliver all of the Reorganized Common Equity to Holders of Prepetition First Lien Loan Claims and certain of the DIP Claims, pursuant to the terms and conditions of the Plan, the New Organizational Documents and the DIP Credit Agreement.

**B.  New Warrants**

On the Effective Date, in accordance with the terms of the Plan and the Restructuring Transactions Memorandum and as further set forth in the New Warrant Documentation, New TopCo shall issue and deliver all of the New Warrants (subject to dilution by the Management Incentive Plan) to the OpCo Debtor Litigation Trust for further distribution of the New Warrants or the proceeds thereof on a ratable basis to Holders of all OpCo Debtor Litigation Trust Units, pursuant to the terms and conditions of the Restructuring Support Agreement, the OpCo Debtor Litigation Trust Agreement, and the New Warrant Documentation.  The issuance of New Warrants pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, and all of the New Warrants issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  On the Effective Date, the New Warrant Documentation shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

The New Warrants shall be distributed in a single instrument to be held by the OpCo Litigation Trustee.

## XIII.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims entitled to vote on the Plan.  This summary is based on the United States Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes to, or new interpretations of, the Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the Reorganized Common Equity or New Warrants as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of

accounting, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, people who use the accrual method of accounting and report income on an "applicable financial statement," and Holders who are in bankruptcy).  Further, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than as a Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary generally does not address the U.S. federal income tax consequences to Non-U.S. Holders (as defined below).  In addition, this discussion does not address U.S. federal taxes other than income taxes.

For purposes of this discussion, a U.S. Holder is a Holder of a Claim that is: (i) an individual citizen or resident of the United States for U.S. federal income tax purposes; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the Tax Code).  For purposes of this discussion, a "Non-U.S. Holder" is a Holder that is not a U.S. Holder.

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the Entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult with their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

A.    **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

i.    Characterization of the Plan

Certain tax consequences of the Plan will depend on whether the Plan is consummated pursuant to a Plan Equitization Transaction (including, for the avoidance of doubt, following a Partial Sale Transaction, if any). The Debtors anticipate that a Plan Equitization Transaction will be effectuated pursuant to one of two potential structures. In one structure, the New ABL Facility, Take-Back Term Loans, Reorganized Common Equity and New Warrants will be issued by New TopCo, which will continue to own its subsidiaries (the "Existing Structure"). In the alternative structure, the Debtors' assets will be transferred to a newly-formed entity ("Newco") (the "Newco Structure"). The tax consequences of a Plan Equitization Transaction will depend on whether the Existing Structure or the Newco Structure will be used.

(a)    Partial Sale Transaction

A Partial Sale Transaction would effectuate a sale of a portion of the Debtors' assets. The Debtors generally would recognize gain or loss upon a Partial Sale Transaction in an amount equal to the difference, if any, between (i) the sum of (x) proceeds from such Partial Sale Transaction, and (y) the amount of any liabilities directly or indirectly assumed by the acquirer and (ii) the tax basis in the assets transferred (including any assets deemed transferred, such as by reason of the transfer of the membership interests in a wholly-owned limited liability company that is disregarded for U.S. federal income tax purposes). Any gain not offset by the Debtors' net operating loss carryforwards (the "NOLs") or other tax attributes would result in a cash tax liability.

(b)    Plan Equitization Transaction

The Debtors and the Consenting First Lien Lenders have not yet determined how a potential Plan Equitization Transaction will be structured. Such decision may principally depend on whether a determination can be reached that the Newco Structure would not result in significant cash tax liability for the Debtors.

It is currently contemplated that the Newco Structure would be structured as a direct acquisition of all of the assets of Franchise Group (after otherwise giving effect to the Plan) and a constructive acquisition of all of the then assets of Franchise Group's direct and indirect subsidiaries. The constructive asset acquisition occurs by reason of the fact that all of Franchise Group, Inc.'s subsidiaries (other than Educate, Inc.) are limited liability companies that are treated as disregarded entities for U.S. federal income tax purposes such that, by acquiring the membership interests of such direct and indirect subsidiaries, Newco would be treated for U.S. federal income tax purposes as acquiring all of the underlying assets of such subsidiaries. The consideration for the acquisition of the assets in the Newco Structure would be the Reorganized Common Equity, New Warrants, the issuance or assumption of the New ABL Facility and Take-Back Term Loans, and the direct and indirect assumption of all of the obligations of the Reorganized Debtors under the Plan.

93

The Reorganized Debtors would recognize gain or loss upon the transfer in an amount equal to the difference, if any, between (i) the sum of (x) the fair market value of the Reorganized Common Equity and Warrants, (y) the "issue price" of the New ABL Facility (to be distributed to Holders of Allowed Prepetition ABL Loan Claims) and Take-Back Term Loans, and (z) the amount of any other obligations of the Reorganized Debtors directly or indirectly assumed by Newco and its subsidiaries and (ii) the adjusted tax basis in the assets transferred including any assets deemed transferred, such as by reason of the transfer of the membership interests in the directly and indirectly wholly-owned limited liability company subsidiaries that are treated as disregarded entities for U.S. federal income tax purposes. Any gain not offset by the Debtors' NOLs or other tax attributes would result in a cash tax liability. The determination as to whether or not to elect the Newco Structure will be based on all facts and circumstances as of the time the election is made, including the projected enterprise value of the Reorganized Debtors, the timing of the Effective Date, estimated available tax attributes and other factors. Nevertheless, the actual facts may vary from those projected, estimated or assumed, and the Reorganized Debtors' ability to utilize applicable tax attributes to offset any gain attributable to the transfer may be subject to limitation, which could result in tax consequences different from those expected, and any resulting tax liability would remain subject to audit and adjustment by the IRS or other applicable taxing authorities.

ii.    Cancellation of Debt

The Debtors expect to incur a substantial amount of cancellation of indebtedness income ("COD Income") as a result of the Plan.

In general, absent an exception, COD Income is includable in a taxpayer's gross income upon the satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. If COD Income is recognized by a debtor in a case under chapter 11 and the discharge of the debt occurs pursuant to the bankruptcy case, it is generally excluded from the debtor's gross income. The Tax Code provides that where COD Income is excluded because of this bankruptcy exception, the debtor must reduce certain of its tax attributes, such as NOLs, current year losses, tax credits and tax basis in property, by the amount of any excluded COD Income after the determination of the U.S. federal income tax for the year of the discharge of the debt. Although not free from doubt, it is expected that carryover of disallowed business interest expense would not be a tax attribute subject to such reduction. In applying the attribute reduction rule to the tax basis in property, the Tax Code limits the reduction in tax basis to the amount by which the tax basis exceeds the debtor's post-emergence liabilities (often referred to as the "liability floor"). If advantageous, the debtors can elect to reduce the basis of depreciable property prior to any reduction of its NOL carryforwards or other tax attributes. The Debtors expect that COD Income realized as a result of the implementation of the Plan will be excluded from the Debtors' gross income, resulting in a reduction of certain tax attributes.

The amount of the COD Income will generally equal the excess of (i) the adjusted issue price of the indebtedness satisfied over (ii) the sum of (a) the amount of Cash paid, (b) the issue price of any new indebtedness of the taxpayer issued, and (c) the fair market value of any other consideration (including stock of the debtor or a party related to the debtor) given in satisfaction of such indebtedness at the time of the exchange, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD Income (such as where the payment of the

canceled debt would have given rise to a tax deduction). To the extent the amount of COD Income exceeds the tax attributes available for reduction, the remaining COD Income is without further current or future tax cost to the debtor. Special rules apply where the excluded COD Income is recognized by a debtor that is a member of a consolidated group. Under these rules, the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member) are first subject to reduction. To the extent that the excluded COD Income exceeds the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member), the Treasury Regulations generally require the reduction of certain consolidated tax attributes attributable to other members of the group. If one of the attributes of the debtor member reduced under the above rules is the basis of stock of another member of the group, a "look-through rule" applies requiring that certain corresponding reductions be made to the tax attributes of the lower-tier member (including consolidated tax attributes of such lower-tier member).

If COD Income is realized, the amount of COD Income will depend, in part, on the issue price of the New ABL Facility and the fair market value of the Reorganized Common Equity and the New Warrants distributed in discharge of Claims. Under the rules discussed above, certain tax attributes of the Debtors (including tax basis in assets, capital losses, and NOLs) could be substantially reduced if there is significant COD Income.

Any reduction in tax attributes attributable to the COD Income incurred in a reorganization transaction does not occur until the end of the taxable year in which the Plan goes effective. As a result, the Debtors do not expect the attribute reduction to affect the U.S. federal income tax treatment to Debtors of the Newco Structure, including the computation of gain or loss on the transfer.

The Debtors anticipate that a sale or taxable transfer of all or substantially all of the Debtors' assets pursuant to the Plan would be treated as a plan of liquidation for U.S. federal income tax purposes. In such a scenario, the Debtors intend to take the position that no COD Income should be incurred by any Debtor at the time of the implementation of the Plan and prior to the disposition by such Debtor of all or substantially all of its assets and distribution of Sale Proceeds to holders of Claims (other than to the extent that all remaining assets and Claims are transferred to Wind Down Co or any Allowed Claim's distribution is subject to a maximum amount, or has been or is separately settled for less than its carrying value). In that event, the reduction of tax attributes resulting from such COD Income (which, as indicated, only occurs as of the end of the tax year in which the COD Income occurs) would not generally be expected to have a material impact on the Debtors. Given the lack of direct authoritative guidance as to when COD Income occurs in the context of a liquidating chapter 11 plan, there can be no assurance that the IRS will not challenge this position, and there can be no assurance that all or a substantial amount of the COD Income will not be incurred earlier than as described above.

    iii.   <u>Section 382</u>

Section 382 of the Tax Code places significant limitations upon the use of a corporation's (or consolidated group's) NOLs and certain other tax attributes if an "ownership change" occurs with respect to such corporation's stock. Section 382 generally imposes an annual limitation on the use of pre-ownership change losses equal to the product of (i) the fair market value of the

corporation immediately before the ownership change multiplied by (ii) the "long term tax-exempt rate" for the month in which the ownership change occurs. If a corporation (or consolidated group) recognizes tax losses during the tax year in which an ownership change occurs, the tax losses are generally apportioned between the period prior to the ownership change and the period after the ownership change using a "daily proration" methodology. Losses that are apportioned to the period prior to the ownership change will be subject to the section 382 limitations on the use of NOLs and certain other tax attributes, and losses that are apportioned to the period after the ownership change will not be subject to such limitations. Absent the Newco Structure, it is anticipated that an ownership change will occur with respect to the Debtors on the Effective Date.

If a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then built-in losses recognized during the five-year period following the ownership change generally will be treated as pre-ownership change losses and will be subject to the annual limitation provided under section 382. If a corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the five-year period following the ownership change generally will increase the annual limitation in the year such gains are recognized.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's pre-ownership change losses are not limited on an annual basis, but, instead, NOLs will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' pre-ownership change losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) Exception the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without triggering the elimination of its pre-ownership change losses. Instead, if a

subsequent ownership change occurs, the resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not yet determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

As discussed above, in the Newco Structure, Newco should obtain a tax basis in the assets acquired (or deemed acquired) from the Debtors equal to the fair market value of such assets, and Newco would not succeed to any of the tax attributes of the Debtors. Accordingly, the discussion above regarding section 382 would be generally irrelevant for Newco.

**B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, General Unsecured Claims, and Existing TopCo Equity Interests**

U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Plan.

i.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, General Unsecured Claims, and Existing TopCo Equity Interests; General

Each ABL Lender shall receive its *pro rata* share of (i) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (ii) (A) proceeds of the Exit ABL Facility, or (B) loans under the Take-Back ABL Term Loan Facility, in each case in an amount equal to the amount of the Prepetition ABL Loan Claims *minus* any amounts to be distributed under clause (i) hereunder.

Each First Lien Lender shall receive, subject to the terms of the Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of (i) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transaction, if applicable, and (ii) 100% of the Reorganized Common Equity (subject to dilution by (1) the Management Incentive Plan, (2) the DIP Premium Conversion, (3) the DIP Equitization, and (4) the New Warrants, if applicable), as well as any applicable recovery on account of its First Lien Deficiency Claim.

Each Holder of an Allowed Prepetition Second Lien Loan Claim shall receive (i)its *pro rata* share of the OpCo Debtor Litigation Trust Units, and, solely if the Class votes to accept the Plan, the New Warrants, which, New Warrants (if issuedapplicable), shall be issued and distributed to the OpCo Debtor Litigation Trust to be shared ratably with all Hholders of Allowed OpCo General Unsecured Claims, or (ii) if the Class votes to reject the Plan, its *pro rata* share of the recovery such claimant would be entitled to receive under sections 1129(a)(7)

and 1129(b) of the Bankruptcy Code, as well as any applicable recovery on account of its Second Lien Deficiency Claim.Debtor Litigation Trust Units.

Each Holder of a Prepetition HoldCo Loan Claim shall receive its *pro rata* share of proceeds from the Freedom HoldCo Debtor Litigation Trust after accounting for any DIP Claims subject to the Freedom HoldCo DIP Election.  If there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Prepetition HoldCo Loan Claim shall receive no consideration on account of its Prepetition HoldCo Loan Claim.

Each Holder of an Allowed Freedom HoldCo General Unsecured Claim shall receive its *pro rata* share of the proceeds from the Freedom HoldCo Debtor Litigation Trust.  If there is no recovery from the Freedom HoldCo Debtor Litigation Trust, then such Holder of a Freedom HoldCo General Unsecured Claim shall receive no consideration on account of its Freedom HoldCo General Unsecured Claim.

Each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive no consideration on account of its HoldCo Receivables General Unsecured Claim.

Each Holder of an Allowed TopCo General Unsecured Claim shall receive its *pro rata* share of Cash, if any, held by TopCo following the allocation described in Section 3.6 of the Plan.  If there is no Cash held at TopCo following the allocation described in Section 3.6 of the Plan, then such Holder of a TopCo General Unsecured Claim shall receive no consideration on account of its TopCo General Unsecured Claim.

Each Holder of an Allowed Existing TopCo Equity Interest shall receive (i) its *pro rata* share of Cash (if any) held by TopCo after paying all Allowed Claims against TopCo and following the allocation described in Section 3.6 of the Plan, or (ii) if there is no Cash held at TopCo, no consideration on account of its Allowed Existing TopCo Equity Interest and on the Effective Date, all Allowed Existing TopCo Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect.

The treatment of each Holder of General Unsecured Claims is set forth in Article V of the Plan.

The tax consequences of the Plan to a U.S. Holder of a Claim may depend in part upon (i) whether such Claim is based on an obligation that constitutes a "security" for U.S. federal income tax purposes and (ii) whether all or a portion of the consideration received for such Claim is an obligation that constitutes a "security" for U.S. federal income tax purposes.  Neither the Tax Code nor Treasury Regulations define the term "security."  The determination of whether a debt obligation constitutes a "security" for U.S. federal tax purposes is complex and depends on the facts and circumstances surrounding the origin and nature of the claim, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.  Generally, obligations arising out of the extension of trade credit have been held not to be securities, while corporate debt obligations evidenced by written instruments with original maturities of ten (10) years or more have been held to be securities.  An instrument with a term of less than five (5) years generally has been held not to be a security.  However, the IRS has ruled that new debt obligations with a term of less than five (5) years issued in exchange for and bearing the same terms (other than

interest rate) as securities may also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the issuing corporation in substantially the same form.  It is uncertain whether the debt obligations under the ABL Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement will be considered securities for U.S. federal income tax purposes and U.S. Holders are advised to consult their tax advisors with respect to this issue.  It is uncertain what form the New ABL Facility will take, and what the maturity date of the New ABL Facility would be if issued.  The discussion herein assumes that the New ABL Facility will not constitute securities for U.S. federal income tax purposes.

If the debt obligations under the ABL Credit Agreement, First Lien Credit Agreement, and Second Lien Credit Agreement, respectively, are considered securities for U.S. federal income tax purposes, then each U.S. Holder of Prepetition ABL Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, respectively, should recognize gain, but not loss (other than amounts received in payment of accrued but unpaid interest, as discussed below), in an amount equal to the lesser of (i) the sum of the issue price of the New ABL Facility and the amount of Cash received, and (ii) the excess of (a) the sum of Cash, fair market value of the Reorganized Common Equity or New Warrants (as applicable), and the issue price of the New ABL Facility received over (b) the adjusted tax basis of the U.S. Holder's Claim.  Such U.S. Holder's holding period in the Reorganized Common Equity or New Warrants (as applicable) would include the U.S. Holder's holding period in its Claim, while the U.S. Holder would start a new holding period in the New ABL Facility.  Such U.S. Holder's adjusted tax basis in the Reorganized Common Equity or New Warrants (as applicable) received would equal the U.S. Holder's basis in its Claim, less the issue price of the New ABL Facility, the amount of Cash received and any deductions claimed in respect of any previously accrued but unpaid interest income, plus the amount of gain or interest income, if any, recognized on the exchange.

If the debt obligations under the ABL Credit Agreement, First Lien Credit Agreement, or Second Lien Credit Agreement, respectively, are not considered securities for U.S. federal income tax purposes then, other than with respect to any amounts received that are attributable to accrued but unpaid interest, each such U.S. Holder would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) Cash plus (b) the fair market value of Reorganized Common Equity or New Warrants (if any) plus (c) the issue price of the loans under the New ABL Facility, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

Other than with respect to any amounts received that are attributable to accrued but unpaid interest, each U.S. Holder of Prepetition HoldCo Loan Claims, General Unsecured Claims, and Existing TopCo Equity Interests would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) Cash (if any) plus (b) the fair market value of such U.S. Holder's share (if any) of net assets of the Freedom HoldCo Debtor Litigation Trust, as applicable, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

In the event of the subsequent disallowance of any Disputed Prepetition HoldCo Loan Claims, General Unsecured Claims, or Existing TopCo Equity Interests, a holder of a previously Allowed Prepetition HoldCo Loan Claim, General Unsecured Claim, or Existing TopCo Equity Interest may receive additional distributions in respect of its Claim or Interest.  Accordingly, it is

possible that such a holder may have additional gain (if any) and/or imputed interest income in respect of any additional Cash or property distributions received in respect of its Claim or Interest. In addition, it is possible that the recognition of any loss realized by a holder of such an Allowed Claim or Interest as to which additional Cash or property could be received may be deferred until all Disputed Claims are Allowed or not allowed. See Article XIII.B.ii, "*Treatment of the Freedom HoldCo Debtor Litigation Trust*," below.

If the Newco Structure is used, all U.S. Holders of Claims should be treated as engaging in a fully taxable exchange, and therefore, each U.S. Holder would recognize gain or loss equal to the difference, if any, between (i) the sum of (a) Cash plus (b) the fair market value of Reorganized Common Equity or New Warrants (if any) plus (c) the issue price of the loans under the New ABL Facility received, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss will be determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount" and accrued but untaxed interest, whether the Claim constitutes a capital asset within the meaning of section 1221 of the Tax Code in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If such recognized gain or loss is capital in nature, it generally would be a long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

ii.     Treatment of the Freedom HoldCo Debtor Litigation Trust

Although not free from doubt, other than with respect to any assets that are subject to potential Disputed Claims of ownership or uncertain distributions, the Freedom HoldCo Debtor Litigation Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the U.S. Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims. The Debtors intend to take the position that this treatment applies to the extent reasonably practicable. In such case, any beneficiaries of the Freedom HoldCo Debtor Litigation Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the Freedom HoldCo Debtor Litigation Trust net assets and then contributed such undivided interest in the Freedom HoldCo Debtor Litigation Trust net assets to the Freedom HoldCo Debtor Litigation Trust. If this treatment applies, the person or persons responsible for administering the Freedom HoldCo Debtor Litigation Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the Freedom HoldCo Debtor Litigation Trust pursuant to the Plan and not unduly prolong its duration. The Freedom HoldCo Debtor Litigation Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the governing documents for the Freedom HoldCo Debtor Litigation Trust.

Other than with respect to any assets of the Freedom HoldCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable U.S. Holders of Prepetition HoldCo Loan Claims and

Freedom HoldCo General Unsecured Claims prior to the contribution of such assets to the Freedom HoldCo Debtor Litigation Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

As soon as reasonably practicable after the transfer of the Debtors' applicable assets to the Freedom HoldCo Debtor Litigation Trust, the Freedom HoldCo Debtor Litigation Trust (or its designee) shall make a good faith valuation of such assets. All parties to the Freedom HoldCo Debtor Litigation Trust (including, without limitation, the Debtors, Reorganized Debtors, the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims and beneficiaries of the Freedom HoldCo Debtor Litigation Trust) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Other than with respect to any assets of the Freedom HoldCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Freedom HoldCo Debtor Litigation Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Freedom HoldCo Debtor Litigation Trust, even if no distributions are made. Allocations of taxable income with respect to the Freedom HoldCo Debtor Litigation Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the Freedom HoldCo Debtor Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the Freedom HoldCo Debtor Litigation Trust. Similarly, taxable losses of the Freedom HoldCo Debtor Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction, and credit to any U.S. Holder of a beneficial interest in the Freedom HoldCo Debtor Litigation Trust, and the ability of such U.S. Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the U.S. Holder. Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the Freedom HoldCo Debtor Litigation Trust and not as income or loss with respect to such beneficiary's applicable Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims. In the event any tax is imposed on the Freedom HoldCo Debtor Litigation Trust, the person or persons responsible for administering the Freedom HoldCo Debtor Litigation Trust shall be responsible for payment, solely out of the assets of the Freedom HoldCo Debtor Litigation Trust, of any such taxes imposed on the Freedom HoldCo Debtor Litigation Trust.

Other than with respect to any assets of the Freedom HoldCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, after the

Effective Date, a U.S. Holder's share of any collections received on the assets of the Freedom HoldCo Debtor Litigation Trust should not be included, for U.S. federal income tax purposes, in the U.S. Holder's amount realized in respect of its Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims but should be separately treated as amounts realized in respect of such U.S. Holder's ownership interest in the underlying assets of the Freedom HoldCo Debtor Litigation Trust.

The person or persons responsible for administering the Freedom HoldCo Debtor Litigation Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all U.S. federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable Law, including, if required under applicable Law, notices required to report interest or dividend income. The Freedom HoldCo Debtor Litigation Trustee, or such other person or persons responsible for administering the Freedom HoldCo Debtor Litigation Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the Freedom HoldCo Debtor Litigation Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations. As soon as reasonably practicable after the close of each taxable year, the Freedom HoldCo Debtor Litigation Trust or such other person or persons responsible for administering the Freedom HoldCo Debtor Litigation Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Freedom HoldCo Debtor Litigation Trustee of a private letter ruling if the Freedom HoldCo Debtor Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the Freedom HoldCo Debtor Litigation Trustee), the Freedom HoldCo Debtor Litigation Trustee may timely elect to (i) treat any portion of the Freedom HoldCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable Law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the Freedom HoldCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the Freedom HoldCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Freedom HoldCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The Freedom HoldCo Debtor Litigation Trustee may request an expedited determination of taxes of the Freedom HoldCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the

Freedom HoldCo Debtor Litigation Trust for all taxable periods through the dissolution of the Freedom HoldCo Debtor Litigation Trust.

### iii. Treatment of the OpCo Debtor Litigation Trust

Although not free from doubt, other than with respect to any assets that are subject to potential Disputed Claims of ownership or uncertain distributions, the OpCo Debtor Litigation Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of Allowed OpCo General Unsecured Claims. The Debtors intend to take the position that this treatment applies to the extent reasonably practicable. In such case, any beneficiaries of the OpCo Debtor Litigation Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the OpCo Debtor Litigation Trust net assets and then contributed such undivided interest in the OpCo Debtor Litigation Trust net assets to the OpCo Debtor Litigation Trust. If this treatment applies, the person or persons responsible for administering the OpCo Debtor Litigation Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the OpCo Debtor Litigation Trust pursuant to the Plan and not unduly prolong its duration. The OpCo Debtor Litigation Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the governing documents for the OpCo Debtor Litigation Trust.

Other than with respect to any assets of the OpCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable U.S. Holders of Allowed OpCo General Unsecured Claims prior to the contribution of such assets to the OpCo Debtor Litigation Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

As soon as reasonably practicable after the transfer of the Debtors' applicable assets to the OpCo Debtor Litigation Trust, the OpCo Debtor Litigation Trust (or its designee) shall make a good faith valuation of such assets. All parties to the OpCo Debtor Litigation Trust (including, without limitation, the Debtors, Reorganized Debtors, the Holders of Allowed OpCo General Unsecured Claims) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Other than with respect to any assets of the OpCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the OpCo Debtor Litigation Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction, and credit, if any, recognized or incurred by the OpCo Debtor Litigation Trust, even if no distributions are made. Allocations of taxable income with respect to the OpCo Debtor Litigation Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the

OpCo Debtor Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the OpCo Debtor Litigation Trust.  Similarly, taxable losses of the OpCo Debtor Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.  The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction, and credit to any U.S. Holder of a beneficial interest in the OpCo Debtor Litigation Trust, and the ability of such U.S. Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the U.S. Holder.  Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the OpCo Debtor Litigation Trust and not as income or loss with respect to such beneficiary's applicable OpCo General Unsecured Claim.  In the event any tax is imposed on the OpCo Debtor Litigation Trust, the person or persons responsible for administering the OpCo Debtor Litigation Trust shall be responsible for payment, solely out of the assets of the OpCo Debtor Litigation Trust, of any such taxes imposed on the OpCo Debtor Litigation Trust.

Other than with respect to any assets of the OpCo Debtor Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, after the Effective Date, a U.S. Holder's share of any collections received on the assets of the OpCo Debtor Litigation Trust should not be included, for U.S. federal income tax purposes, in the U.S. Holder's amount realized in respect of its OpCo General Unsecured Claim but should be separately treated as amounts realized in respect of such U.S. Holder's ownership interest in the underlying assets of the OpCo Debtor Litigation Trust.

The person or persons responsible for administering the OpCo Debtor Litigation Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all U.S. federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable Law, including, if required under applicable Law, notices required to report interest or dividend income.  The OpCo Litigation Trustee, or such other person or persons responsible for administering the OpCo Debtor Litigation Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the OpCo Debtor Litigation Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations.  As soon as reasonably practicable after the close of each taxable year, the OpCo Debtor Litigation Trust or such other person or persons responsible for administering the OpCo Debtor Litigation Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the OpCo Litigation Trustee of a private letter ruling if the OpCo Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the OpCo Litigation Trustee), the OpCo Litigation Trustee may timely elect to (i) treat any portion of the OpCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable Law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the OpCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, and Holders of Allowed OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the OpCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the OpCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The OpCo Litigation Trustee may request an expedited determination of taxes of the OpCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the OpCo Debtor Litigation Trust for all taxable periods through the dissolution of the OpCo Debtor Litigation Trust.

iv.    Accrued Interest

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest (or original issue discount ("OID"), if any) on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to untaxed interest that accrued but was not previously paid on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

v.     <u>Market Discount</u>

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). U.S. Holders are urged to consult their tax advisors concerning the application of the market discount rules to the Claims.

vi.     <u>Medicare Tax</u>

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan or the Plan.

vii.     <u>U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Reorganized Common Equity</u>

In the event that a Newco Structure is utilized, it has not yet been determined whether New TopCo will be an entity that is treated as a corporation or as a partnership for U.S. federal income tax purposes.

a.     *If New TopCo is a Corporation for U.S. Federal Income Tax Purposes*

*1. Dividends on Reorganized Common Equity*

Generally, distributions made on account of the Reorganized Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the issuer of such Reorganized Common Equity as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's tax basis in its shares of the Reorganized Common Equity. Any such distributions in excess of the U.S. Holder's adjusted tax basis in its shares (determined on a share-by share basis) generally will be treated as capital gain. Subject to applicable limitations, distributions treated as

dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividend-received deduction may be disallowed.

2. *Sale, Redemption, or Repurchase of Reorganized Common Equity*

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the Reorganized Common Equity. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the Reorganized Common Equity for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

3. *Ownership, Exercise, and Disposition of New Warrants*

A U.S. Holder that elects to exercise the New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the Reorganized Common Equity it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the New Warrants. A U.S. Holder's aggregate tax basis in the Reorganized Common Equity will equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its New Warrants plus (ii) such U.S. Holder's adjusted tax basis in its New Warrants immediately before the New Warrants are exercised. A U.S. Holder's holding period in the Reorganized Common Equity will begin on the day after the exercise date of the New Warrants.

Under section 305 of the Tax Code, certain transactions that have the effect of increasing the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest. Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the U.S. Holder in connection with such distribution.

A U.S. Holder that elects not to exercise the New Warrants and instead allows the New Warrants to lapse may be entitled to claim a capital loss upon expiration of the New Warrants in an amount equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants. In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S.

Holder's tax basis in the New Warrants. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the Reorganized Common Equity to which the New Warrants relate would have had in the hands of the U.S. Holder if such stock had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants.

b.    *If New TopCo is a Partnership for U.S. Federal Income Tax Purposes*

The Debtors currently contemplate, and the following discussion also assumes, that if New TopCo is treated as a partnership for U.S. federal income tax purposes then the receipt by a Holder of Reorganized Common Equity and/or New Warrants will be treated for U.S. federal income tax purposes as though the Holder received equity and/or warrants in the first-tier subsidiary of New TopCo that is treated as a corporation for U.S. federal income tax purposes (referred to herein as "Parent") and then immediately exchanged such equity and/or warrants for the Reorganized Common Equity and/or New Warrants.

1.    *Ownership and Disposition of Reorganized Common Equity*

As noted above, it is intended that the receipt by a Holder of Reorganized Common Equity on the Effective Date pursuant to the Plan will be treated for U.S. federal income tax purposes as though the Holder received equity in Parent, and then immediately exchanged such equity for the Reorganized Common Equity. Assuming that treatment is respected, the exchange by a U.S. Holder of equity in Parent for the Reorganized Common Equity will generally be treated a tax-free exchange pursuant to section 721 of the Tax Code (in a transaction described in Situation 2 of IRS Revenue Ruling 99-5, 1999-1 C.B. 434) and should result in a U.S. Holder having a tax basis in, and holding period with respect to, the Reorganized Common Equity equal to the U.S. Holder's tax basis in, and holding period with respect to, the equity in Parent exchanged therefore.

Because the Reorganized Common Equity will be equity of an entity that will be treated for U.S. federal income tax purposes as a partnership, a U.S. Holder receiving Reorganized Common Equity will be treated as a partner in New TopCo. Accordingly, as a partnership, New TopCo itself will not be subject to U.S. federal income tax. Instead, each U.S. Holder will be required to report on its U.S. federal income tax return its distributive share (whether or not distributed) of New TopCo's income, gains, losses, deductions, and credits for New TopCo's taxable year ending with or within such U.S. Holder's taxable year even if New TopCo does not make a concurrent distribution to such U.S. Holder. However, because it is expected that New TopCo's sole asset will be its equity in Parent, an entity classified as a corporation for U.S. federal income tax purposes, absent an actual distribution from Parent that is treated as a "dividend" for purposes of the Tax Code or a sale (or other taxable disposition) by New TopCo of any of its equity in Parent, any partner in New TopCo should not generally have any current allocations of taxable income or loss.

In general, a U.S. Holder of Reorganized Common Equity will not recognize taxable income as a consequence of receiving a distribution (whether in cash or in kind) from New TopCo, except to the extent that any cash (and/or fair market value of any marketable securities)

distributed exceeds such U.S. Holder's adjusted tax basis in its Reorganized Common Equity. Any such excess will be treated as gain from the sale of such U.S. Holder's Reorganized Common Equity and will be treated as capital gain. A U.S. Holder generally will not recognize a loss for U.S. federal income tax purposes as a consequence of receiving a distribution from New TopCo, except that if a U.S. Holder receives a distribution solely of cash (and/or marketable securities) in complete liquidation of its interest in New TopCo, the U.S. Holder will recognize a capital loss equal to the excess, if any, of its adjusted tax basis in its Reorganized Common Equity over the amount of such cash (and/or marketable securities). If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

Gain or loss recognized by a U.S. Holder on the disposition of all or any portion of its Reorganized Common Equity will generally, subject to the application of certain recharacterization rules (*i.e.*, related to a sale of "hot assets" like unrealized receivables or inventory of the partnership under section 751 of the Tax Code) be capital gain or loss. If a U.S. Holder transfers less than all of its Reorganized Common Equity, the U.S. Holder will take into account the percentage of its adjusted tax basis in its Reorganized Common Equity that is transferred, determined by comparing the relative fair market values of the portion of the Reorganized Common Equity that is transferred and the portion of the Reorganized Common Equity that is retained.

New TopCo intends to furnish to each Holder of Reorganized Common Equity, after the close of each calendar year, specific tax information, including a Schedule K-1, which describes such Holder's allocable share of New TopCo's income, gain, loss, and deductions for New TopCo's preceding taxable year. In preparing this information, New TopCo will take various accounting and reporting positions to determine each Holder's allocable share of such income, gain, loss and deductions. However, New TopCo cannot provide assurances that those positions will yield a result that conforms to the requirements of the Tax Code, applicable Treasury Regulations or administrative interpretations of the IRS. Furthermore, New TopCo cannot provide assurances that the IRS will not successfully contend in court that those positions are impermissible.

Pursuant to the Bipartisan Budget Act of 2015, for U.S. federal income tax purposes, any audit adjustment to New TopCo's tax items (or any partner's distributive share of such item) may result in the imposition of tax (including any applicable penalties and interest) at the New TopCo level. Generally, New TopCo will have the ability to elect to have the partners take such audit adjustment into account in accordance with their interests in New TopCo during the taxable year under audit, but there can be no assurance that New TopCo will choose to make such election or that such election will be effective in all circumstances. If New TopCo is unable to have the partners take into account such audit adjustment in accordance with their interests in New TopCo during the taxable year under audit, or New TopCo chooses not to do so, the partners in the year of such audit adjustment may bear some or all of the tax liability resulting from such audit adjustment, without regard to each such partner's ownership interest in New TopCo (if any) during the taxable year under audit. In addition, New TopCo may be able to reduce the amount owed by New TopCo in certain cases based on the status of the partners or if certain partners file amended returns to take into account such adjustments, but there is no assurance New TopCo will be able to obtain any such reduction. If, as a result of any such audit adjustment, New TopCo is required to make payments of taxes, penalties, and/or interest, New

TopCo's operating agreement may provide that each partner's share of such amounts shall be treated as an advance against amounts otherwise distributable to such partner or as a loan to such partner. Future Treasury Regulations, other administrative guidance or judicial decisions may affect the application of these rules to New TopCo and the Holders of Reorganized Common Equity and, as a result, the application of these rules to New TopCo and the Holders of Reorganized Common Equity is uncertain.

U.S. Holders generally will recognize gain or loss upon the sale or taxable disposition of the Reorganized Common Equity in an amount equal to the difference, if any, between (i) the U.S. Holder's adjusted tax basis in the Reorganized Common Equity exchanged and (ii) the sum of the cash and the fair market value of any property received in such disposition. Any such gain or loss generally should be long-term capital gain or loss if at the time of the sale, redemption, or other taxable disposition, the U.S. Holder has held its Reorganized Common Equity for more than one year (a U.S. Holder may have a split holding period in the Reorganized Common Equity if it contributes property to New TopCo or otherwise acquires Reorganized Common Equity on multiples dates), subject to the application of certain recharacterization rules discussed above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

a.    Non-Partner Status.

Based on their currently contemplated terms, the New Warrants are expected to be treated as "noncompensatory options" pursuant to Treasury Regulation Sections 1.704-1, 1.721-2 and 1.761-3 (the "Noncompensatory Option Regulations"). Accordingly, ownership of a New Warrant alone generally should not cause a U.S. Holder to be treated as a partner of New TopCo, as the New Warrants do not convey any interest in New TopCo's capital or profits unless or until the point at which a New Warrant is exercised and Reorganized Common Equity is issued. However, there can be no assurance that the IRS would not express a contrary view, including, that the terms of the New Warrants could cause the New Warrants to be treated as additional Reorganized Common Equity prior to their exercise.

b.    Sale or Other Disposition of New Warrants.

In general, a U.S. Holder will recognize gain or loss for U.S. federal income tax purposes upon the sale, exchange, or other taxable disposition of a New Warrant in an amount equal to the difference, if any, between the amount realized and such U.S. Holder's adjusted tax basis in the New Warrant. The amount realized upon the sale or other taxable disposition of the New Warrants will be measured by the sum of all consideration received. Any gain or loss generally will be capital gain or loss, and generally will be long-term capital gain or loss if at the time of the sale, exchange or other taxable disposition, the U.S. Holder has held its New Warrants for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

c.  Exercise or Lapse of New Warrants.

Generally, a U.S. Holder will not recognize gain or loss on the receipt of Reorganized Common Equity after exercising a New Warrant.  An exercising U.S. Holder of a New Warrant will be treated as having contributed, in exchange for newly issued Reorganized Common Equity, an amount of money equal the amount paid to exercise such New Warrant and purchase the Reorganized Common Equity.  A U.S. Holder's initial tax basis in Reorganized Common Equity received on exercise of a New Warrant will generally equal the sum of any money paid to exercise such New Warrant and the U.S. Holder's adjusted basis in such New Warrant.  On the lapse of a New Warrant, a U.S. Holder may be entitled to claim a capital loss upon expiration of the New Warrants in an amount equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants.

**The tax consequences to a U.S. Holder of owning interests in New TopCo where New TopCo is a treated as a partnership for U.S. federal income tax purposes are complex and U.S. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of owning Reorganized Common Equity and/or New Warrants.**

viii.  <u>U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of the New ABL Facility</u>

*a.  Interest and Original Issue Discount*

Payments of stated interest under the New ABL Facility will constitute payments of "qualified stated interest" and generally will be taxable to holders as ordinary income at the time the payments are received or accrued, in accordance with the holder's method of tax accounting.  The preceding discussion assumes the New ABL Facility will not be issued with OID.  The New ABL Facility generally would be treated as issued with OID if the principal amount of the New ABL Facility, plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeds the issue price of the debt instrument by more than a de minimis amount.  The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date.  If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (*i.e.*, interest at least at the applicable federal rate as of the issue date) or will be its imputed principal amount if the instrument does not provide for adequate stated interest.  If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance.  If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.  A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium.  However, a debt instrument will generally not be treated as publicly traded if

at the time the determination is made the outstanding stated principal amount of the issue that includes the debt instrument does not exceed $100 million.

### b. Sale, Retirement, or Other Taxable Disposition

A U.S. Holder of the New ABL Facility will recognize gain or loss upon the sale, redemption, retirement, or other taxable disposition of the obligations due under the New ABL Facility equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in New ABL Facility.  Any such gain or loss generally will be capital gain or loss and will be long term capital gain or loss if the U.S. Holder has held the New ABL Facility for more than one year as of the date of disposition.  If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

### C.    Information Reporting and Back-Up Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).    Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a non-U.S. Holder is resident.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF

ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XIV.   IMPLEMENTATION OF THE PLAN

### A.      Plan Distributions and Transactions

As soon as reasonably practicable after the Effective Date, the distributions provided for under the Plan will be effectuated pursuant to the following restructuring transactions, which shall take place, *in seriatim*, pursuant to documentation reasonably satisfactory to the Debtors and the Consenting First Lien Lenders:

- the Debtors will implement the transactions as set forth in Article VII of the Plan;

- the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order;

- certificates of incorporation, by-laws, and other organizational documents of the Reorganized Debtors, in form and substance satisfactory to the Consenting First Lien Lenders, shall be amended and restated as necessary to effectuate the terms of the Plan;

- the Debtors shall implement the Committee Settlement, pursuant to which, among other things, any and all disputes among the Committee Settlement Parties are resolved;

- the OpCo Debtors shall execute the OpCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the OpCo Debtor Litigation Trust in accordance with the terms of the Plan;

- the Freedom HoldCo Debtors shall execute the Freedom HoldCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the Freedom HoldCo Debtor Litigation Trust in accordance with the terms of the Plan;

- New TopCo shall issue the Reorganized Common Equity, if applicable, pursuant to the terms of the Plan;

- New TopCo shall issue the New Warrants, if applicable pursuant to the terms of the Plan;

- the Debtors shall consummate the Plan by: (i) making distributions of the Reorganized Common Equity to the First Lien Lenders; (ii) making distributions of the New Warrants to the Second Lien Lenders if certain conditions are met; (iii) satisfying all DIP Claims in full by conversion to Take-Back Term Loans and, if certain conditions are met, by conversion to Reorganized Common Equity; and (iv) entering into either the Exit ABL Facility or the Take-Back ABL Term Loan Facility; and

- the releases provided for in the Plan, which are an essential element of the Restructuring Transactions, shall become effective.

**B.    Continued Corporate Existence and Corporate Action**

(a)    <u>General</u>.    Subject to the terms and conditions of the Restructuring Support Agreement, except as otherwise provided in the Plan or as otherwise may be agreed between the Debtors and the Required Consenting First Lien Lenders, each of the Debtors, as Reorganized Debtors, and New TopCo, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable Laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.    On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor or New TopCo, each of the Reorganized Debtors and New TopCo, as applicable (and in consultation with the Required Consenting First Lien Lenders), may take such action as permitted by applicable Law and such Reorganized Debtor's or New TopCo's New Organizational Documents, as such Reorganized Debtor or New TopCo, as applicable, may determine is reasonable and appropriate, including, but not limited to, causing:    (a) a Reorganized Debtor or New TopCo to be merged with and into another Reorganized Debtor, or a subsidiary and/or Affiliate of a Reorganized Debtor or New TopCo; (b) a Reorganized Debtor or New TopCo to be dissolved; (c) the conversion of a Reorganized Debtor or New TopCo from one Entity type to another Entity type; (d) the legal name of a Reorganized Debtor or New TopCo to be changed; (e) the closure of a Reorganized Debtor's or New TopCo's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor or New TopCo under the Law of jurisdictions other than the Law under which the Debtor currently is incorporated.

(b)    <u>Vesting of Assets</u>.    Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property of the Estates, wherever located, including all Claims, rights and Causes of Action and any property, wherever located, acquired by the Debtors under or in connection with the Plan, shall vest in the applicable Reorganized Debtor, free and clear of all Claims, Liens, charges, other encumbrances and Interests, except for those Claims, Liens, charges, other encumbrances and Interests arising from or related to the Take-Back Debt Documents, the New ABL Facility Documents, or to the extent the Freedom HoldCo DIP Election is made, the DIP Claims at the Freedom HoldCo Debtors.    On and after the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, each applicable Reorganized Debtor and New TopCo may operate its business(es) and may use, acquire and dispose of property, wherever located, and each Reorganized Debtor and New TopCo, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims), Interests and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.    Without limiting the foregoing, the Reorganized Debtors and New TopCo may pay the charges that they incur on or after the Effective Date, if any, for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.    Anything in the Plan to the contrary notwithstanding, any Unimpaired Claims against a Debtor shall remain the obligations

solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor, Reorganized Debtor or New TopCo by virtue of the Plan, the Chapter 11 Cases, or otherwise.

### C.    Effectuating Documents and Further Transactions

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors or New TopCo, as applicable, shall be authorized and, as applicable, directed to issue, execute, deliver, acknowledge, file, and/or record, as applicable, such securities, documents, contracts, instruments, releases and other agreements and take such other action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, in the name of and on behalf of the Debtors, the Reorganized Debtors and New TopCo, as applicable, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, or shareholder approval or action.  In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors and New TopCo as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Debtor or New TopCo and each shall serve from and after the Effective Date pursuant to and in accordance with the terms of the applicable New Organizational Documents and other applicable documents until such director, officer, or manager resigns or is removed or terminated in accordance with the applicable New Organizational Documents and other applicable documents.

### D.    Cancellation of Certain Existing Agreements

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth in the Plan or in the Restructuring Transactions Memorandum, on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents directly or indirectly evidencing, related to or connected with any Claim, other than (x) to the extent the Freedom HoldCo DIP Election is made, DIP Claims against the Freedom HoldCo Debtors, or (y) certain Intercompany Claims and Existing Intercompany Equity Interests, in each case as expressly set forth in the Plan, and any rights of any Holder in respect thereof, shall be deemed canceled, discharged and of no force or effect without further act or action under any applicable agreement, Law, regulation, order, or rule.  The holders of or parties to such canceled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  Notwithstanding anything to the contrary herein and in the Restructuring Support Agreement, each of the DIP Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement, and the HoldCo Credit Agreement shall continue in effect solely to the extent necessary to:  (a) permit Holders of the DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims and Prepetition HoldCo Loan Claims to receive distributions under the Plan on account of such respective Claims; and (b) permit the Second Lien Credit Agreement Agent and HoldCo Credit Agreement Agent, respectively, to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan.  Except as provided pursuant to the Plan, upon satisfaction of the DIP Claims, Prepetition First Lien Loan Claims, the Prepetition Second Lien Loan Claims and the Prepetition HoldCo Loan Claims, respectively (and as the case may be),

each of the DIP Credit Agreement, First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent and the HoldCo Credit Agreement Agent, respectively (and as the case may be), shall be discharged of all of their respective obligations associated with the DIP Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement, and the HoldCo Credit Agreement, respectively (and as the case may be).

On the Effective Date, except as otherwise specifically provided for in the Plan (including in the Restructuring Transactions Memorandum): (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be canceled, terminated and of no further force or effect solely as to the Debtors, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be automatically and fully released and discharged.

### E.    Release of Liens, Claims, and Interests

Except as otherwise provided in the Confirmation Order, herein or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan and DIP Claims subject to the Freedom HoldCo DIP Election, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.  Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any Collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or

local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any administrative agent, collateral agent or indenture trustee under any Take-Back Debt Facility (at the expense of the Debtors or Reorganized Debtors, as applicable) that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Reorganized Debtors shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

Only Holders of Claims in Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, and 11 (collectively, the "Voting Classes") are entitled to vote to accept or reject the Plan. The voting Ballot includes the option to opt in to the Third-Party Release. To affirmatively opt in to granting the Third-Party Release, a Holder of a Claim in the Voting Class who returns a ballot must check the box indicated on the Ballot. By failing to opt in to the Third-Party Release, Holders of all Claims will forgo the benefit of obtaining the releases set forth in Article XIII of the Plan if such party would otherwise be a Released Party.

The Plan does not contain any non-consensual release of any non-debtor by any Third Party. Holders of all Claims that are not included in the Voting Classes, however, will also have the opportunity to opt in to the Third-Party Release. To affirmatively opt in to the Third-Party Release, Holders of Claims in these Classes must complete, sign, and date the Opt-In Form and return it promptly to the Notice and Claims Agent, in accordance with instructions provided in the Opt-In Form.

### F.    Directors of the Reorganized Debtors

i.    Boards

As of the Effective Date, the Boards shall expire.   Subject to the terms of the Restructuring Support Agreement and the applicable New Organizational Documents, on the Effective Date, the New Boards shall be established and new members of the Boards appointed. The initial members of the New Boards shall consist of those individuals identified in the Plan Supplement to be fFiled with the Bankruptcy Court at or before the Confirmation Hearing. Unless reappointed, the members of the boards of the Debtors prior to the Effective Date shall have no continuing obligations to any of the Reorganized Debtors or to New TopCo on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor or to New TopCo on the Effective Date. Commencing on the Effective Date, each of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of

117

such Reorganized Debtor or New TopCo, as applicable, and may be replaced or removed in accordance therewith, as applicable.

The members of the ~~b~~Boards of the Non-Liquidating Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

ii.    Management

As of the Effective Date, the individuals who will serve in certain senior management positions of the Reorganized Debtors shall consist of those individuals set forth in the Plan Supplement.

## G.    Management/Employee Incentive Plans

The Confirmation Order, if any, shall authorize the New Board to (i) adopt and implement Management Incentive Plans at each operating company or (ii) shall assume, amend or reject the existing long term incentive plans with the current members of the senior management team of Franchise Group's direct or indirect subsidiaries.

The securities issued under the Management Incentive Plan shall dilute the Reorganized Common Equity and New Warrants issued by New TopCo. On the Effective Date, New TopCo shall issue or cause to be delivered the applicable Interests in the Debtors directly to applicable members of management in accordance with the terms of the Management Incentive Plan.

## H.    General Distribution Mechanics

- <u>Distributions on Account of Allowed Claims Only</u>. Notwithstanding anything in the Plan to the contrary, no distribution shall be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.

- <u>Disbursing Agent</u>. Except as otherwise provided in the Plan, all distributions under the Plan, including the distribution of the Reorganized Common Equity, shall be made by the Disbursing Agent or by such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.

- <u>Distribution Record Date</u>. Distributions under the Plan to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Any transfers of Claims after the Distribution Record Date shall not be recognized for purposes of the Plan unless otherwise provided therein.

- <u>No Recourse</u>. Except with respect to Claims which are reinstated, no claimant shall have recourse to the Reorganized Debtors (or any property thereof), other than with regard to the enforcement of rights or distributions under the Plan.

- <u>Method of Cash Distributions</u>. Any Cash payment to be made pursuant to the Plan will be made in U.S. dollars and may be made by draft, check, or wire transfer, in the sole

discretion of the Debtors or the Reorganized Debtors, or as otherwise required or provided in any relevant agreement or applicable Law.

- <u>Distributions on Non-Business Days</u>.  Any payment or distribution under the Plan due on a day other than a Business Day may be made, without interest, on the next Business Day.

- <u>No Distribution in Excess of Allowed Amount of Claim</u>.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive in respect of such Claim any distribution under the Plan in excess of the Allowed amount of such Claim.

- <u>Disputed Payments</u>.  If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any distribution under the Plan, the Reorganized Debtors may, in lieu of making such distribution to such Person, make such distribution into a segregated account until the disposition thereof shall be determined by Court order or by written agreement among the interested parties.

- <u>Fractional Shares</u>.  No fractional interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.

## I.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall for U.S. federal (and applicable state and local) income tax purposes be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (but solely to the extent that such other amount is an allowable portion of such Allowed Claim).

## J.    Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by federal, state, or local taxing authorities and shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate. From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on them by any Governmental Unit in accordance with applicable Law with respect to such withholding taxes.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws.  Notwithstanding the foregoing, each Holder

of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

### K.    Exemption from Certain Transfer Taxes

To the fullest extent permitted by applicable Law, all transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by the Debtors of any owned property pursuant to section 363(b) or 1123(b)(4) of the Bankruptcy Code, any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, and the creation, modification, consolidation or recording of any mortgage pursuant to the terms of the Plan, or any ancillary documents, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### L.    Setoffs and Recoupments

Except as expressly provided in the Plan and except with respect to the Secured Claims, the Reorganized Debtors may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy lLaw, setoff and/or recoup against any distributions under the Plan to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action that the applicable Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount between the applicable Reorganized Debtor and the Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or any of their respective successors of any and all claims, rights and Causes of Action that such Persons or any of their respective successors may possess against the applicable Holder.

### M.    Solicitation of Debtors

Notwithstanding anything to the contrary in the Plan, each Debtor and all non-Debtor direct or indirect subsidiaries of any Debtor that would otherwise be entitled to vote to accept or reject the Plan as a Holder of a Claim against or Interest in another Debtor shall not be solicited for voting purposes, and such Debtor or non-Debtor subsidiary will be deemed to have voted to accept the Plan.

N.      **OpCo Debtor Litigation Trust**

i.      <u>General</u>

In connection with the Committee Settlement, on the Effective Date, (i) the OpCo Debtors shall execute the OpCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the OpCo Debtor Litigation Trust in accordance with the terms of the Plan and the beneficial interests therein shall be for the benefit of the Holders of OpCo General Unsecured Claims, and (ii) the OpCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the OpCo Debtor Litigation Trust all of their rights, title and interest in the OpCo Debtor Litigation Trust Assets.  Pursuant to section 1141 of the Bankruptcy Code, such OpCo Debtor Litigation Trust Assets shall automatically vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests, except as otherwise set forth in the Plan.  For the avoidance of doubt, any right, title and interest in the Claims and Causes of Action belonging to the HoldCo Debtors (if any) shall not be transferred to or vest in the OpCo Debtor Litigation Trust.

The (i) establishment, purpose, and administration of the OpCo Debtor Litigation Trust, (ii) appointment, rights, and powers, of the OpCo Litigation Trustee, and (iii) treatment of the OpCo Debtor Litigation Trust for federal income tax purposes, among other things, shall be governed by the OpCo Debtor Litigation Trust Agreement.  On and after the Effective Date, the OpCo Litigation Trustee shall be authorized, in accordance with the terms of the Plan and the OpCo Debtor Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any OpCo Debtor Litigation Trust Assets.

In furtherance of the Plan: (i) it is intended that the OpCo Debtor Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of OpCo General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the OpCo Debtor Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of OpCo General Unsecured Claims, and then contributed by the Holders of OpCo General Unsecured Claims to the OpCo Debtor Litigation Trust in exchange for their interest in the OpCo Debtor Litigation Trust; (ii) the sole purpose of the OpCo Debtor Litigation Trust shall be the liquidation and distribution of the net assets of the OpCo Debtor Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report consistently with the valuation of the assets transferred to the OpCo Debtor Litigation Trust as determined by the OpCo Litigation Trustee (or its designee); (v) the OpCo Litigation Trustee shall be responsible for filing all applicable tax

returns for the OpCo Debtor Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the OpCo Litigation Trustee shall annually send to each Holder of an interest in the OpCo Debtor Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the OpCo Litigation Trustee of a private letter ruling if the OpCo Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the OpCo Litigation Trustee), the OpCo Litigation Trustee may timely elect to (i) treat any portion of the OpCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable Law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the OpCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of OpCo General Unsecured Claims receiving interests in the OpCo Debtor Litigation Trust, and the OpCo Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the OpCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the OpCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The OpCo Litigation Trustee may request an expedited determination of taxes of the OpCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the OpCo Debtor Litigation Trust for all taxable periods through the dissolution of the OpCo Debtor Litigation Trust.

The Plan does not provide for the substantive consolidation of any Debtor with any other Debtor. As such, a Holder of an Allowed General Unsecured Claim against an OpCo Debtor will only receive a recovery under the Plan to the extent there is value allocated to the OpCo Debtor against which it holds an Allowed Claim under the OpCo Debtor Litigation Trust. The Freedom Lender Group contends that only Franchise Group, Inc. and the Freedom HoldCo Debtors participated in the Take-Private Transaction and that, as a result, those are the only Debtor entities with related Claims and Causes of Action. Therefore, there is a risk that a Holder of a General Unsecured Claim at a subsidiary of Franchise Group, Inc. (including the PSP Debtors, the Vitamin Shoppe Debtors, Buddy's Debtors and the American Freight Debtors) would not receive proceeds of any such Claim or Causes of Action and, a result, may not receive any additional distribution from the OpCo Debtor Litigation Trust on account of such Claim or Causes of Action.

ii.    OpCo Litigation Trustee

The Creditors' Committee, in consultation with the Debtors, shall select the Person who initially will serve as the OpCo Litigation Trustee, which trustee shall be reasonably acceptable to the Required Consenting First Lien Lenders. On or after the Effective Date, the OpCo

Litigation Trustee shall assume all of its obligations, powers and authority under the OpCo Debtor Litigation Trust Agreement to (x) reconcile General Unsecured Claims, First Lien Deficiency Claims (though not the quantum thereof, which shall be in an amount consistent with the description in Section 5.4 of the Plan), and any Prepetition Second Lien Loan Claims, and (y) investigate, pursue, litigate and/or settle OpCo Litigation Claims that are transferred to the OpCo Debtor Litigation Trust (collectively, the "OpCo Litigation Trustee Duties").

The OpCo Litigation Trustee shall have such qualifications and experience as are sufficient to enable the OpCo Litigation Trustee to perform its obligations under the Plan and under the OpCo Debtor Litigation Trust Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the OpCo Debtor Litigation Trust Agreement. To the extent necessary and in furtherance of the OpCo Litigation Trustee Duties, following the Effective Date, the OpCo Litigation Trustee shall be deemed to be a judicial substitute for the Reorganized Debtors as the party in interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code. The OpCo Litigation Trustee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers, including upon advice of counsel, unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

The OpCo Litigation Trustee may be removed by the Bankruptcy Court upon application by any party in interest for cause shown. In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the OpCo Litigation Trustee, the Bankruptcy Court shall designate another Person to become the OpCo Litigation Trustee and thereupon the successor OpCo Litigation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

### iii.    OpCo Litigation Trustee Agreement

The OpCo Debtor Litigation Trust Agreement and the Confirmation Order shall provide that neither the Reorganized Debtors (except as expressly set forth in the OpCo Debtor Litigation Trust Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the OpCo Litigation Trustee in performing the OpCo Litigation Trustee Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to the Plan on account of any such action taken or omitted to be taken.

The OpCo Debtor Litigation Trust Agreement will be Filed with the Plan Supplement and will provide for, among other things: (1) the transfer of the OpCo Debtor Litigation Trust Assets to the OpCo Debtor Litigation Trust; (2) the payment of OpCo Debtor Litigation Trust Expenses from the OpCo Debtor Litigation Trust Assets; (3) distributions to Holders of Allowed OpCo General Unsecured Claims, as provided in the Plan and in the OpCo Debtor Litigation Trust Agreement; (4) reasonable access to the Debtors' books and records; (5) the identity of the OpCo Litigation Trustee; (6) the terms of the OpCo Litigation Trustee's engagement; (7) reasonable and customary provisions that allow for limitation of liability and indemnification of the OpCo Litigation Trustee and its professionals by the OpCo Debtor Litigation Trust,

provided that any such indemnification shall be the sole responsibility of the OpCo Debtor Litigation Trust and payable solely from the OpCo Debtor Litigation Trust Assets; and (8) the term and dissolution of the OpCo Debtor Litigation Trust. Following the Effective Date, the OpCo Litigation Trustee shall be responsible for all decisions and duties with respect to the OpCo Litigation Trustee Duties, except as otherwise provided in the Plan, the Confirmation Order, or the OpCo Debtor Litigation Trust Agreement.

iv.    OpCo Litigation Claims

Notwithstanding anything to the contrary in the Plan, including Article XII thereof, the following Claims and Causes of Action belonging to the OpCo Debtors (collectively, the "OpCo Litigation Claims") shall not be released pursuant to the Plan, and shall be transferred to the OpCo Debtor Litigation Trust: (x) all potential Claims and Causes of Action against former directors and officers of the Debtors in their capacity as such as of the Effective Date and (y) all potential Claims and Causes of Action against Brian Kahn, Prophecy, Bryant Riley, BRF, BRRII, Freedom VCM Receivables, Inc., Irradiant Partners, LP, Vintage Capital Management LLC, Lauren Kahn, members of the Freedom Lender Group, the HoldCo Debtors, and solely in the case of Brian Kahn, Prophecy, BRF, and Irradiant Partners, LP, each of their Affiliates, directors, officers, managers, partners, and owners (in each case, solely in their capacity as such, and, for the avoidance of doubt, the term "Affiliate" for purposes of the definition of OpCo Litigation Claims shall not include any of the Debtors).

For the avoidance of doubt, the following Claims and Causes of Action belonging to the OpCo Debtors shall be released pursuant to the Plan and shall not be transferred to the OpCo Debtor Litigation Trust: (a) all potential Claims and Causes of Action against the members of the Ad Hoc Group; (b) all potential Claims and Causes of Action against current employees of the Debtors, including management and directors (including, without limitation the Independent Directors, and officers (including the CRO), but excluding Bryant Riley) in each case who are employed by the Debtors or Reorganized Debtors as of the Effective Date; (c) all potential Claims and Causes of Action against former employees and directors of the Debtors that were terminated without cause between February 3, 2025 and the Effective Date of the Plan; and (d) all potential Claims and Causes of Action against any prepetition Estate Professionals and postpetition Estate Professionals in their capacities as such. For the avoidance of doubt, notwithstanding the foregoing, any potential Claims and Causes of Action against WFG are not released pursuant to the Plan.

As described herein, in connection with the Committee Settlement, the Creditors' Committee has identified a number of potential Claims and Causes of Action held by certain of the OpCo Debtors. If any additional Claims and Causes of Action held by certain of the OpCo Debtors are identified by the Debtors or the Creditors' Committee, such Claims and Causes of Action will be identified in the Plan Supplement.

v.    New Warrants

Solely to the extent that Holders of Claims in Class 5 vote to accept the Plan, the New Warrants shall be vested inissued and distributed to the OpCo Debtor Litigation Trust for

distribution of the New Warrants or the proceeds thereof on a ratable basis to to be shared ratably with all holders of OpCo Debtor Litigation Trust Units.

### vi.    OpCo Debtor Litigation Trust Funding

On the Effective Date, the Debtors and other parties (if applicable) shall fund the OpCo Debtor Litigation Trust Escrow Account in an amount equal to the OpCo Debtor Litigation Trust Escrow Amount (after being reduced for payment of the Creditors Committee's professional fees and expenses as provided for in the Plan). The OpCo Debtor Litigation Trust Escrow Amount shall automatically and irrevocably vest in the OpCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests. The OpCo Debtor Litigation Trust Escrow Amount shall be used for the administration of the OpCo Debtor Litigation Trust, to pay OpCo Debtor Litigation Trust Expenses, and to pursue the OpCo Litigation Claims, with any excess amount being used to distribute to Holders of General Unsecured Claims. All proceeds from the pursuit of the OpCo Litigation Claims shall be used by the OpCo Litigation Trustee to pay for the costs and expenses of administration of the OpCo Debtor Litigation Trust, pursuit of the OpCo Litigation Claims, and distribution to Holders of OpCo General Unsecured Claims. The OpCo Litigation Trustee shall exercise its fiduciary duty and business judgment to allocate such proceeds among the Classes of Claims receiving interests in the OpCo Debtor Litigation Trust. The OpCo Litigation Trustee, on behalf of the OpCo Debtor Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the OpCo Debtor Litigation Trust Assets in accordance with the Plan and the OpCo Debtor Litigation Trust Agreement.

### vii.    OpCo Debtor Litigation Trust Units

Any and all OpCo Debtor Litigation Trust Units shall be non-transferable other than if transferred by will, intestate succession, if required to be transferred as part of a liquidation or winding up of a holder, or otherwise by operation of Law. In addition, any and all OpCo Debtor Litigation Trust Units, to the extent such units may be deemed "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state or local securities Laws, will not be registered pursuant to the Securities Act or any applicable state or local securities Law pursuant to section 1145 of the Bankruptcy Code, to the extent permitted and available, and will be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

### O.    Freedom HoldCo Debtor Litigation Trust

### i.    General

On the Effective Date of the Plan, (i) the Freedom HoldCo Debtors shall execute the Freedom HoldCo Debtor Litigation Trust Agreement and shall take such steps as necessary to establish the Freedom HoldCo Debtor Litigation Trust in accordance with the terms of the Plan and the beneficial interests therein, which shall be for the benefit of the Holders of Allowed Claims against the Freedom HoldCo Debtors, including to the extent the Freedom HoldCo DIP Election is made, the Allowed DIP Claims currently outstanding against the Freedom HoldCo

Debtors, and (ii) the Freedom HoldCo Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Freedom HoldCo Debtor Litigation Trust all of their rights, title and interest in the Freedom HoldCo Debtor Litigation Trust Claims.[2126]  Pursuant to section 1141 of the Bankruptcy Code, such Claims and Causes of Action (if any) shall automatically vest in the Freedom HoldCo Debtor Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests.  The Freedom HoldCo Debtor Litigation Trust Agreement shall be in form and substance agreed upon between the Debtors, the DIP Lenders, and the Freedom Lender Group, and shall set forth the mechanics of the Freedom HoldCo Debtor Litigation Trust.

For the avoidance of doubt, prior to the Effective Date of the Plan, the Freedom HoldCo Independent Director has the sole power and authority to conduct the Freedom HoldCo Independent Investigation.  Notwithstanding any language in the definition of Released Parties, if the Freedom HoldCo Independent Director identifies potential Claims or Causes of Action through the Freedom HoldCo Independent Investigation, the Freedom HoldCo Independent Director shall have the sole power and authority (i) to settle or release such Claims or Causes of Action (other than the Freedom HoldCo Debtor Litigation Trust Claims), subject to further order of the Bankruptcy Court after notice and a hearing, or (ii) to preserve such Claims or Causes of Action for transfer to the Freedom HoldCo Debtor Litigation Trust.

The Freedom Lender Group and the Prepetition Second Lien Agent have identified a number of potential Claims and Causes of Action held by certain of the OpCo Debtors and certain of the HoldCo Debtors, as described in Proofs of Claim Nos. 1804, 1847, 1862, 1878, 1898, 1904, 1913, 1924, 1955, 1961, 1975, 1977, 1980, 2006, 2054, 2098, 2106, 2107, 2109, 2110, 2137, and 2171.

The (i) establishment, purpose, and administration of the Freedom HoldCo Debtor Litigation Trust, (ii) appointment, rights, and powers, of the Freedom HoldCo Debtor Litigation Trustee, and (iii) treatment of the Freedom HoldCo Debtor Litigation Trust for federal income tax purposes, among other things, shall be governed by the Freedom HoldCo Debtor Litigation Trust Agreement.  On and after the Effective Date, the Freedom HoldCo Debtor Litigation Trustee shall be authorized, in accordance with the terms of the Plan and the Freedom HoldCo Debtor Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any assets of the Freedom HoldCo Debtor Litigation Trust.

In furtherance of the Plan, (i) it is intended that the Freedom HoldCo Debtor Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the

---

[2126]  "Freedom HoldCo Debtor Litigation Trust Claims" means, collectively, all Claims and Causes of Action belonging to the Freedom HoldCo Debtors, other than (a) the Freedom HoldCo Debtor Released Claims and (b) Claims and Causes of Action against (i) Ducera Partners LLC in its capacity as investment banker to the Debtors, (ii) AlixPartners, LLP in its capacity as financial advisor to the Debtors, and (iii) the CRO, which, in each case, shall be released pursuant to the Plan; provided that, for the avoidance of doubt, any Claims and Causes of Action against any of the OpCo Debtors belonging to the Freedom HoldCo Debtors shall continue to be treated as Class 9 Intercompany Claims and such treatment as a Class 9 Intercompany Claim shall be consistent with sections 1129(a)(7) and 1129(b) of the Bankruptcy Code shall receive OpCo Debtor Litigation Trust Units on account of such Claims.

meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the Freedom HoldCo Debtor Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims, and then contributed by the Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims to the Freedom HoldCo Debtor Litigation Trust in exchange for their interest in the Freedom HoldCo Debtor Litigation Trust; (ii) the sole purpose of the Freedom HoldCo Debtor Litigation Trust shall be the liquidation and distribution of the net assets of the Freedom HoldCo Debtor Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Reorganized Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Reorganized Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report consistently with the valuation of the assets transferred to the Freedom HoldCo Debtor Litigation Trust as determined by the Freedom HoldCo Debtor Litigation Trustee (or its designee); (v) the Freedom HoldCo Debtor Litigation Trustee shall be responsible for filing all applicable tax returns for the Freedom HoldCo Debtor Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the Freedom HoldCo Debtor Litigation Trustee shall annually send to each Holder of an interest in the Freedom HoldCo Debtor Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Freedom HoldCo Debtor Litigation Trustee of a private letter ruling if the Freedom HoldCo Debtor Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the Freedom HoldCo Debtor Litigation Trustee), the Freedom HoldCo Debtor Litigation Trustee may timely elect to (i) treat any portion of the Freedom HoldCo Debtor Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable Law, report consistently with the foregoing for United States state and local income tax purposes. If a "disputed ownership fund" election is made, (i) the portion of the Freedom HoldCo Debtor Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, Holders of Prepetition HoldCo Loan Claims and Freedom HoldCo General Unsecured Claims receiving interests in the Freedom HoldCo Debtor Litigation Trust, and the Freedom HoldCo Debtor Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing. Any taxes

(including with respect to earned interest, if any) imposed on the Freedom HoldCo Debtor Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Freedom HoldCo Debtor Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The Freedom HoldCo Debtor Litigation Trustee may request an expedited determination of taxes of the Freedom HoldCo Debtor Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Freedom HoldCo Debtor Litigation Trust for all taxable periods through the dissolution of the Freedom HoldCo Debtor Litigation Trust.

## XV.    EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND INTERESTS

### A.    Discharge of Claims and Termination of Certain Equity Interests

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are Reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim is Allowed; or (3) the Holder of such Claim or Equity Interest has accepted the Plan. Except as otherwise provided in the Plan, any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the Filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests (other than any Existing Intercompany Equity Interests that are Reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. For the avoidance of doubt, (i) nothing in Section 12.1 of the Plan shall affect the rights of Holders of Claims to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims are entitled under the Plan, and (ii) notwithstanding any other Plan provision or provision in the Restructuring Support Agreement to the contrary, in the event a Partial Sale Transaction is consummated, the Partial Sale Transaction Debtors shall not receive a discharge, pursuant to section 1141(d)(3) of the Bankruptcy Code.

In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order

shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims against the Debtors and their Estates, as well as claims and Causes of Action against other Entities.

### B.    Release of Claims

#### i.    Releases by the Debtors

**Subject to the outcome of the Freedom HoldCo Independent Investigation with respect to any Freedom HoldCo Debtor Released Claims and Claims and Causes of Action belonging to the Freedom HoldCo Debtors against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtor Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release, to the maximum extent permitted by Law, to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Debtor Releasing Parties) and their respective assets and properties (the "_Debtor Release_") from any and all claims, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in Law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common Laws, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; (vii) the Take-Private Transaction; and/or (viii) the Confirmation or consummation of the Plan or the solicitation of votes on the Plan, in each case, that such Debtor Releasing Party**

would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; provided, however, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Debtor Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Debtor Releasing Party to enforce the Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or any Partial Sale Transaction or assumed pursuant to the Plan or any Partial Sale Transaction or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in Article XII.2 of the Plan shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth therein; (2) any Causes of Action retained by the Reorganized Debtors; (3) any OpCo Litigation Claims; or (4) any Freedom HoldCo Debtor Litigation Trust Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

ii.    <u>Third Party Release</u>

**Notwithstanding anything contained in the Plan or the Restructuring Support Agreement to the contrary, and subject to the outcome of the Freedom HoldCo Independent Investigation with respect to any Freedom HoldCo Debtor Released Claims and Claims and Causes of Action belonging to the Freedom HoldCo Debtors against any Holders of DIP Claims or Prepetition First Lien Loan Claims, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable Law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Non-Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third-Party Release</u>") from any and all Claims, Interests, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in Law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common Laws, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Definitive Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; (vii) the Take-Private Transaction; and/or (viii) the Confirmation or consummation of the Plan or the solicitation of votes on the Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third-Party Release shall not operate to waive or release:**

(i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Third-Party Release), or gross negligence of such applicable Released Party; and/or (ii) the rights of such Non-Debtor Releasing Party to enforce the Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or any Partial Sale Transaction or assumed pursuant to the Plan or any Partial Sale Transaction or Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date, without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth therein; (2) any Causes of Action retained by the Reorganized Debtors; (3) any OpCo Litigation Claims; or (4) any Freedom HoldCo Debtor Litigation Trust Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

iii.    Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of eConfirmation and consummation of the Plan, making distributions under the Plan, the Disclosure Statement, the Sale Process, the Sale Order, or the solicitation of votes for, or eConfirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the

Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing, including but not limited to the Restructuring Support Agreement; the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the DIP Documents (including with respect to the DIP Loans), the Take-Back Debt Facility, the New ABL Facility, the New Warrants, or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this Exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud (except for Avoidance Actions, which are subject to this Exculpation), or gross negligence of such applicable Exculpated Party; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; <u>provided</u>, <u>further</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy Law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in <u>Article XII.4</u> of the Plan shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the Exculpations set forth above do not exculpate Brian Kahn, Prophecy Asset Management LP, or any of their Affiliates. For the avoidance of doubt, none of the Debtors are Affiliates of Brian Kahn or Prophecy Asset Management LP.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### C.    Objections to Claims and Interests

Other than with respect to Professional Fee Claims only the Reorganized Debtors or New TopCo shall be entitled to object to Claims (other than OpCo General Unsecured Claims, Prepetition HoldCo Loan Claims, and Freedom HoldCo General Unsecured Claims) on and after the Effective Date, except that nothing in the Plan shall be understood to waive the Reorganized

Debtors' or New TopCo's right to argue that a Claim filed against the Debtors or the Reorganized Debtors has been discharged under the Plan. Only the OpCo Debtor Litigation Trust shall be entitled to object to OpCo General Unsecured Claims on and after the Effective Date. Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) one hundred eighty (180) days following the later of (x) the Effective Date and (y) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof. From and after the Effective Date, either (i) the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, (ii) the OpCo Debtor Litigation Trust, or (iii) the Freedom HoldCo Debtor Litigation Trust, as applicable, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

If an objection to a Claim is fFiled as set forth in Section 9.4 of the Plan, except as otherwise agreed by the Reorganized Debtors, in consultation with the Required Consenting First Lien Lenders, if any portion of a Claim (other than a Professional Fee Claim) is a Disputed Claim, no payment or distribution (partial or otherwise) provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

## XVI.   EXECUTORY CONTRACTS UNDER THE PLAN

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Refer to Section 10.1 of the Plan for a description of the procedures for the assumption and rejection of Executory Contracts and Unexpired Leases under the Plan.

### B.    Cure of Defaults for Assumed Executory Contracts or Unexpired Leases

Refer to Section 10.2 of the Plan for a description of the procedures for the cure of defaults for Executory Contracts and Unexpired Leases under the Plan.

### C.    Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Refer to Section 10.3 of the Plan for a description of the procedures for claims based on Executory Contracts and Unexpired Leases under the Plan.

### D.    Ipso Facto and Similar Provisions Ineffective

Any term of any policy, contract, or other obligation applicable to a Debtor shall be unenforceable with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Person or entity based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of any of these Chapter 11 Cases; (iii) Confirmation or consummation of the Plan, including any change of control that will occur as a result of such consummation; or (iv) the Restructuring Transactions.

### E.        Insurance Policies

Refer to Section 7.21 for a description of the treatment of the Debtors' D&O Liability Insurance Policies under the Plan.

### F.        Survival of Certain Indemnification Obligations

Refer to Section 7.6 for the treatment of indemnification obligations of the Debtors under the Plan.

### G.        Postpetition Contracts and Leases

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

## XVII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.        Conditions to Confirmation

It shall be a condition the confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI of the Plan:

- the DIP Orders shall be in full force and effect;

- the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Orders, and as provided in the Plan;

- the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan;

- entry of the Confirmation Order; and

- the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time.

### B.    Conditions to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI of the Plan:

- the DIP Orders, Disclosure Statement Order, and Confirmation Order having become Final Orders in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified, unless otherwise agreed by the Debtors and the Required Consenting First Lien Lenders;

- no court of competent jurisdiction or other competent governmental or regulatory authority having issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

- each of the applicable Definitive Documents having been executed, delivered, acknowledged, and/or Filed, as applicable, by the Entities and Persons intended to be parties thereto and effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein having been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Definitive Documents;

- any non-technical and/or immaterial amendments, modifications or supplements to the Plan having been acceptable to the Debtors and the Required Consenting First Lien Lenders, except as otherwise provided in Section 14.3 of the Plan;

- each of the offers, issuances, sales, and/or deliveries of Reorganized Common Equity in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no proceeding by any Governmental Unit or other Entity or Person that alleges that any such offer, issuance, sale and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such proceeding shall be threatened in writing or instituted by any Governmental Unit on or prior to the Effective Date;

- the Restructuring Support Agreement, the DIP Facility, and the DIP Orders, having not been terminated in accordance with its respective terms, and there having not occurred and been continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facility), or the DIP Facility in accordance with its respective terms upon the expiration of such time;

- all of the actions set forth in the Restructuring Transactions Memorandum, as applicable, having been completed and implemented;

- there not having been instituted or threatened to be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any

Governmental Unit (x) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transaction contemplated in the Plan, in the Restructuring Support Agreement, and in the Definitive Documents or (y) imposing a material award, claim, injunction, fine or penalty that, in each case, both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

- the Debtors having obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and having filed all notices and reports, if any, required to be filed, including with any Governmental Unit, by the Debtors in connection with the Plan's effectiveness, in each case, as may be required by a Governmental Unit;

- the Reorganized Common Equity to be issued and/or delivered on the Effective Date having been validly issued by New TopCo, having been fully paid and non-assessable, and being free and clear of all taxes, Liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents of New TopCo;

- all conditions precedent to the effectiveness of the OpCo Debtor Litigation Trust Agreement and the Freedom HoldCo Debtor Litigation Trust Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the OpCo Debtor Litigation Trust Agreement and the Freedom HoldCo Debtor Litigation Trust Agreement shall be in full force and effect;

- the OpCo Debtor Litigation Trust Escrow Amount shall have been paid to the OpCo Debtor Litigation Trust;

- all conditions precedent to the effectiveness of the Take-Back Debt Credit Agreement having been satisfied or duly waived by the party whose consent is required thereunder, and the Take-Back Debt Credit Agreement shall be in full force and effect;

- all conditions precedent to the effectiveness of the New ABL Facility having been satisfied or duly waived by the party whose consent is required thereunder, and the New ABL Facility shall be in full force and effect;

- all requisite filings with any Governmental Unit and third parties having become effective, and all such Governmental Unit and third parties having approved or consented to the Restructuring Transactions, to the extent required;

- any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions having been obtained;

- all accrued and unpaid Restructuring Expenses having been paid in full in Cash by the Debtors, consistent with the terms of the Plan;

- the total amount of Allowed Administrative Expense Claims to be paid on or in connection with the Effective Date is acceptable to the Required Consenting First Lien Lenders in their sole discretion;

- the following documents being in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions, and not having been, as applicable, stayed, modified, reversed, vacated, subject to any pending appeal, and/or terminated prior to the Effective Date: (a) the New Organizational Documents; (b) if applicable, any Sale Order; (c) the Exit ABL Facility; (d) the Take-Back Debt Credit Agreement (if applicable); (e) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (f) all other documents necessary to consummate a transaction of the type contemplated by the Plan to the extent not otherwise listed above; and

- all closing conditions and other conditions precedent in the Restructuring Support Agreement having been satisfied or waived in accordance with the terms thereof.

## C.    Satisfaction and Waiver of Conditions Precedent

Except as otherwise provided in the Plan or in the Restructuring Support Agreement, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Any of the conditions set forth in Section 11.1 and Section 11.2 of the Plan may be waived in whole or part upon agreement by the Debtors, the Required Consenting First Lien Lenders, and the Creditors' Committee, and as the case may be, without notice, leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth in the Plan) at any time or from time to time.

## D.    Effect of Failure of Conditions

If all of the conditions to effectiveness have not been satisfied (as provided in Section 11.1 and Section 11.2 of the Plan) or duly waived (as provided in Section 11.3 of the Plan) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice Filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors, with the consent of the Required Consenting First Lien Lenders, may File a motion to vacate the Confirmation Order. Notwithstanding the Filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 11.1 and Section 11.2 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to Section 11.4 of the Plan, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under the Plan shall be made, the Debtors

and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Equity Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

## E.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

## F.    Revocation or Withdrawal of the Plan

Subject to the terms and conditions of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan as to any particular Debtor prior to the Effective Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if cConfirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired lLeases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Person.

# XVIII. CONFIRMATION OF THE PLAN

## A.    Confirmation Generally

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code. It requires further that a debtor's disclosures concerning its plan of reorganization are adequate.

If the Plan is confirmed, the Debtors expect the Effective Date to occur no later than one hundred twenty (120) days after the Petition Date, or ten (10) days after the Confirmation Date.

To confirm the Plan, the Bankruptcy Court must find that all of the requirements of section 1129 of the Bankruptcy Code have been met.  Thus, even if the statutorily required

majority vote in number and dollar amount is achieved for Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, and 11 (the only Classes entitled to vote under the Plan), the Bankruptcy Court must make independent findings respecting the Plan's satisfaction of the requirements of the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are discussed below.

      **B.**     **Voting Procedures and Standards**

Holders of Claims and Interests in Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, and 11 (the only Classes entitled to vote under the Plan) as of the Distribution Record Date will receive prior to the commencement of these Chapter 11 Cases, this Disclosure Statement, the Plan, a Ballot for accepting or rejecting the Plan and Plan, and related credit and investment documents.  Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, and 11 are entitled to vote because they are Classes that are impaired under the Plan.

A class is "impaired" under a plan unless, with respect to each Claim or Interest of such class, the Plan:

      (i)  leaves unaltered the legal, equitable and contractual rights to which the Claim or Interest entitles the Holder of such claim or interest; or

     (ii)  notwithstanding any contractual provision or applicable Law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the Holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such Holder based on such claim or interest.

A class that is not impaired under a plan of reorganization is deemed to have accepted the Plan or is impaired and deemed to have rejected the Plan and, therefore, solicitation of acceptances with respect to such class is not required and will not occur.

Among other things, the following are the Voting Procedures in connection with voting on the Plan and Plan:

     (a)  For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Interests held by a single Holder against the Debtors in a voting Class will be aggregated as if such Holder held a single Claim or Interest against the Debtors in the voting Class, and the votes related to those Claims or Interests shall be treated as a single vote on the Plan; provided, however, that separate Claims or Interests held as of the Petition Date by different entities (even if related, affiliated, or properly and timely assigned or transferred prior to the Voting Record Date) shall not be deemed to be held by a single Holder pursuant to this provision, and the votes with respect to any such Claims or Interests shall be treated as separate votes on the Plan.

(b) Holders with multiple Claims or Interests within each Voting Class must vote all such Claims or Interests to either accept or reject the Plan and may not split their vote(s) within the Voting Class.  Accordingly, an individual Ballot that partially rejects and partially accepts the Plan on account of multiple Claims or Interests within the Voting Class will not be counted.

(c) Each Holder will be provided a single individual Ballot for all Claims or Interests held by such Holder in each Voting Class against the Debtors.

(d) If a Claim or Interest is transferred after the date established as the voting record date pursuant to the Disclosure Statement Order (the "Voting Record Date"), only the Holder of such Claim or Interest as of the Voting Record Date may execute and submit a Ballot to the Claims Agent, the transferee of such Claim or Interest shall be bound by any such vote (and the consequences thereof) made by the Holder of such transferred Claim or Interest as of the Voting Record Date, and no "cause" will exist to permit any vote change under Bankruptcy Rule 3018(a).

(e) The delivery of a Ballot will be deemed made only when the Claims Agent actually receives the executed Ballot, or a Ballot is received via electronic mail.

(f) Any party who has previously submitted to the Claims Agent prior to the Voting Deadline, a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Claims Agent prior to the Voting Deadline a subsequent properly completed Ballot.  If multiple Ballots are received from the same Holder with respect to the same Claim or Interest prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that Holder's intent and will supersede and revoke any Ballot previously received.  After the Voting Deadline, no Ballot may be withdrawn or amended without the written consent of the Debtors, with the grant of such consent, absent a contrary order of this Court, being a matter of the Debtors' sole discretion, subject to applicable disclosures thereof in the Voting Report.

(g) If a Holder of a Claim or Interest casts multiple Ballots on account of the same Claim or Interest, which are received by the Claims Agent on the same day and at the same time, but which are voted inconsistently, such Ballots shall not be counted.

(h) Except as otherwise provided in subsection (f) hereof, any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Claims Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims or Interests to which it relates and the aggregate principal amount represented by such Claims or Interests, (ii) be signed by the withdrawing

party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims or Interests and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Claims Agent prior to the Voting Deadline. The Debtors expressly reserve the right to contest the validity of any such withdrawals of Ballots.    Notwithstanding any of the foregoing, a previously submitted Ballot may be superseded by the voting creditor by submitting a subsequent valid Ballot prior to the Voting Deadline.

The following types of Ballots will not be counted in determining whether the Plan has been accepted or rejected.

(1) Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan.

(2) Any Ballot received after the Voting Deadline, except by order of the Bankruptcy Court or if the Debtors have granted an extension of the Voting Deadline, in writing, with respect to such Ballot;

(3) Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

(4) Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

(5) Any Ballot cast by an Entity that does not hold a Claim in the voting Classes;

(6) Any unsigned Ballot; and

(7) Any Ballot submitted by any means other than as set forth in the Disclosure Statement Order and in the Ballots, unless approved by the Debtors in writing or otherwise ordered by the Bankruptcy Court.

In connection with these Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to approve the process by which Holders of Claims submit their votes (the "Voting Procedures"). In the event these Chapter 11 Cases are commenced, to the extent that the Bankruptcy Court does not or is unable to approve any portion of these Voting Procedures, the Debtors reserve the right to modify the Voting Procedures and recalculate the balloting in accordance with such modified procedures.

**If a Ballot is damaged or lost or if you have any questions concerning Voting Procedures, you may contact the Claims Agent at**

**Franchise Group, Inc. Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 3rd Avenue, Suite 412**

Brooklyn, NY 11232

A vote may be designated (i.e., disregarded) if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not made or solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Under the Bankruptcy Code, the Plan will be "accepted" by a voting Class if (excluding insiders) at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims in such voting Class that cast Ballots to accept or reject the Plan vote in favor of the Plan.

A vote in favor of the Plan also shall be a vote in favor of the Plan, including the agreement to provide the releases set forth in Article XII of the Plan.

### C.    Acceptance

The Bankruptcy Code provides that a class of claims will have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims in such class that have voted on the Plan. There must be one impaired accepting class excluding insiders. Here, acceptance of the Plan need only be solicited from Holders of Claims in Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, and 11 as those are the only Classes which are impaired and entitled to vote under the Plan. Except in the context of a "cram down" (described below), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each impaired Class accepts the Plan. If these Chapter 11 Cases are filed, the Debtors intend to request confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any Voting Classes that vote to reject or are deemed to reject the Plan. This procedure is commonly referred to as a "cram down." For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation of the Plan notwithstanding rejection by certain impaired Classes, see Article XVIII.D.v, "Cram Down," below.

### D.    Confirmation and Consummation

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all impaired Classes of Claims or Interests, or if rejected by an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith. Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code;

- the Plan has been proposed in good faith and not by any means forbidden by law;

- any payment made or to be made by the proponent, by the debtor or by a person issuing securities under the Plan, for services or for costs and expenses in, or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the Plan with the debtor, or a successor to the debtor under the Plan.  The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such claim or interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the Plan or is not impaired under the Plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that allowed administrative expenses and priority claims (other than priority tax claims) will be paid in full on the Effective Date (except that if a class of priority claims has voted to accept the Plan, holders of such claims may receive deferred cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amounts of such claims) and that holders of priority tax claims may receive on account of such claims regular installment payments in cash of a total value, as of the Effective Date, equal to the allowed amount of such claims over a period that ends no later than 5 years from the petition date and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan;

- if a class of claims is impaired, at least one impaired class of claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class; and

- confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a more detailed summary of certain statutory confirmation requirements.

i.     Best Interests of Holders of Claims and Interests

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7. Thus, with respect to each impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In determining whether this test is satisfied, the first step is to determine the dollar amount that would be generated from the liquidation of each of the Debtors' assets and properties in a chapter 7 liquidation case. The gross amount of cash available in such a liquidation would be the sum of the proceeds from the disposition of such Debtor's assets and the cash held by such Debtor at the time of the commencement of the chapter 7 case. This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the applicable Debtor's business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders of the applicable Debtor in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

See the Liquidation Analysis annexed as Exhibit B hereto and Article XVI.D.i herein for a further discussion of how the Plan satisfies the "best interests" test. The Liquidation Analysis is incorporated herein by reference and was prepared by the Debtors with the assistance of the

Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors.

THE DEBTORS HAVE DETERMINED, AS DISCUSSED IN THE LIQUIDATION ANALYSIS ATTACHED AS <u>EXHIBIT B</u> HERETO, THAT CONFIRMATION OF THE PLAN WILL PROVIDE EACH CREDITOR AND INTEREST HOLDER OF EACH DEBTOR WITH A RECOVERY THAT IS NOT LESS THAN IT WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE APPLICABLE DEBTOR UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.  AND, AS REFLECTED IN THE LIQUIDATION ANALYSIS, THE DEBTORS BELIEVE THAT LIQUIDATION OF THE DEBTORS' BUSINESSES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE WOULD RESULT IN SUBSTANTIAL DIMINUTION IN THE VALUE TO BE REALIZED BY HOLDERS OF CLAIMS AS COMPARED TO DISTRIBUTIONS CONTEMPLATED UNDER THE PLAN. CONSEQUENTLY, THE DEBTORS AND THEIR MANAGEMENT BELIEVE THAT CONFIRMATION OF THE PLAN WILL PROVIDE A SUBSTANTIALLY GREATER RETURN TO HOLDERS OF CLAIMS THAN WOULD A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

ii.    <u>Financial Feasibility</u>

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed its ability to meet its obligations under the Plan.  As part of this analysis, the Debtors have prepared projections of the financial performance of the Reorganized Debtors for the fiscal years 2025 through 2029 (the "<u>Financial Projections</u>").  The Financial Projections, and certain of the assumptions on which they are based, are set forth in the projected financial information contained in <u>Exhibit D</u> hereto.

THE PROJECTIONS SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED.  THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.  THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED ABOVE IN <u>ARTICLE XI.A</u>.  IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE PROJECTIONS.

The Debtors prepared these Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances.  The Financial Projections have not been examined or compiled by independent accountants.  The Debtors makes no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the

Debtors and their management. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period of the Financial Projections may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

The Financial Projections indicate, on a pro forma basis, that the projected level of cash flow is sufficient to satisfy the Debtors' future capital expenditures and other obligations during the applicable period. Accordingly, if these Chapter 11 Cases are commenced, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

   iii. <u>Valuation</u>

As described above, the Debtors engaged in marketing their assets for sale and soliciting bids in connection therewith pursuant to the Bidding Procedures. The Debtors believe that this process provides the best method of valuing their enterprise, as it allows the market to speak as to that value. The Debtors' marketing and Sale Process regarding a possible Partial Sale Transaction is a comprehensive and arm's length processes with the goal of identifying counterparties for one or more potential value-maximizing sale transactions. To ensure that the integrity of the marketing and Sale Process regarding a possible Partial Sale Transaction is preserved and value is maximized, this Disclosure Statement does not identify expected recoveries for Prepetition ABL Claims, Prepetition First Lien Loan Claims, nor does it include a valuation analysis (which the Debtors at this time do not anticipate filing). *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (Docket No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary); *In re SiO2 Med. Prods., Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. June 9, 2023) [Docket No. 378] (order approving disclosure statement without a valuation analysis where debtors conducted comprehensive marketing process for debtors' assets pursuant to bidding procedures); *In re Gastar Expl. Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) [Docket No. 282] (order approving disclosure statement that conducted valuation analysis through a comprehensive marketing process).

~~The Freedom Lender Group alleges that filing a valuation analysis at this stage of the Chapter 11 Cases would not disrupt the Debtors' ongoing marketing and sale process because potential bidders with access to the Debtors' marketing materials have all the same financial data that the Debtors would base their valuation analysis on and can form their own view. The Freedom Lender Group contends that it is essential to have a valuation to confirm the Plan. The Debtors dispute their assertions and intend to meet their burden at Confirmation.~~

   iv. <u>Confirmation Without Acceptance by All Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; <u>provided</u> that the plan has been accepted by at

least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cram down" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cram down" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, as to any particular Debtor, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

<div align="center">v.     <u>Cram Down</u></div>

The Bankruptcy Code contains provisions for confirmation of a plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan.  The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the Plan does not discriminate unfairly with respect to each non accepting impaired class;

- the Plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the Plan.

<div align="center">vi.     <u>No Unfair Discrimination; Fair and Equitable Test</u></div>

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims, or equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the

<div align="center">148</div>

"absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive any value under the Plan on account of such junior claims or interests.

The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

Specifically, with respect to equity interests, a plan is "fair and equitable" if either (i) each holder of an equity interest will receive or retain under the Plan a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the Plan on account of such interest.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

        vii.   <u>Classification of Claims and Interests</u>

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a plan of reorganization place each claim or interest into a class with other claims or interests that are "substantially similar."

# XIX.  ADDITIONAL INFORMATION

All of the exhibits to the Plan, the Plan Supplement and to this Disclosure Statement will be available for inspection by contacting the Claims Agent.

## XX.    CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Plan is preferable to all other alternatives.   Consequently, the Debtors urge all Holders of Prepetition ABL Loan Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, General Unsecured Claims against Franchise Group, General Unsecured Claims against the OpCo Debtors, Prepetition HoldCo Loan Claims, General Unsecured Claims against the HoldCo Debtors, HoldCo Receivables General Unsecured Claims, General Unsecured Claims against TopCo, and Existing TopCo Equity Interest to **ACCEPT** the Plan, and to duly complete and return their Ballots so that they will be **ACTUALLY RECEIVED** on or before **5:00 p.m. (prevailing Eastern Time) on** ~~[April 23]~~**,** **2025**.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 1920, 2025
          Wilmington, Delaware

                              Respectfully submitted,

                              **FRANCHISE GROUP, INC.,** on behalf of itself
                              and its affiliated Debtors


                              By: /s/ *Andrew Laurence*_____
                              Name: Andrew Laurence
                              Title: Chief Executive Officer

## <u>EXHIBIT A</u>

**Plan**

[Filed at Docket No. 1015]

## **EXHIBIT B**

**Liquidation Analysis**

[Filed at Docket No. 958]

**<u>EXHIBIT C</u>**

**Financial Projections**

[Filed at Docket No. 592]

## EXHIBIT D

**Restructuring Support Agreement**

[Filed at Docket No. 15]