# EXHIBIT A

## DISTRIBUTION CENTER LEASE

THIS DISTRIBUTION CENTER LEASE ("**Lease**") is made this 7th day of _August_, 2013 (the "**Effective Date**"), between **CENTERPOINT 550, LLC**, a Delaware limited liability company ("**Landlord**"), and **SEARS OUTLET STORES, L.L.C.**, a Delaware limited liability company ("**Tenant**"). The parties agree as follows:

1. **Demised Premises**

    (a)    Landlord is the owner of the land located in the City of New Castle, County of New Castle, State of Delaware and the single-tenant building located thereon which consists of approximately 196,149 square feet of gross leasable area (the land and the single-tenant building located thereon are referred to herein collectively as the "**Center**"), all as legally described on **Exhibit "A"** attached hereto and made a part hereof, and as shown on the site plan attached hereto as **Exhibit "B"** (the "**Site Plan**") which is located in the Centerpoint Business Park (the "**Park**").

    (b)    Landlord wishes to lease to Tenant and Tenant wishes to lease from Landlord all of the approximately 196,149 square feet of gross leasable area in the Building, which space is more particularly described as:

    approximately 196,149 square feet of gross leasable area of the Building, identified as the area cross-hatched on the Site Plan ("**Demised Premises**" or the "**Building**"), located in the Center, along with exclusive parking as required by all applicable laws and codes. The mailing address for the Demised Premises is 700 Centerpoint Boulevard, New Castle, Delaware 19720.

    (c)    Landlord also leases and grants to Tenant an exclusive license to use all portions of the Center not intended for use or occupancy by Landlord or other tenants, including, but not limited to, all easements, alleys, sidewalks, parking and loading areas, rights of ingress and egress (collectively the "**Common Areas**"), fixtures and appurtenances appertaining to the Demised Premises and benefiting the Demised Premises. Tenant shall have access sufficient to permit a delivery truck with a fifty-three (53) foot trailer to access the driveway at the rear of the Demised Premises for the delivery of inventory to the Demised Premises. Landlord shall maintain such rear driveway to ensure unobstructed grade level loading.

2. **Use**

    The Demised Premises may be used by Tenant or any assignees, sublessees, licensees, or other occupants (which reference to assignees, sublessees, licensees, and other occupants shall not be deemed to give Tenant any rights to assign or sublet not specifically set forth in this Lease), or permitted to be used and occupied by Tenant or any other such parties only for the operation of a reconditioning, testing, product repair and distribution facility, or for any other lawful uses (the "**Permitted Use**"). Tenant agrees to comply with

BH01\1847018.8
ID\NJW - 109304\0055

federal, state and local governmental laws, rules, regulations and ordinances applicable to the Permitted Use of the Demised Premises. Tenant will set the hours and days of operation of the Demised Premises in its sole and absolute discretion.  Notwithstanding the foregoing, if Tenant requests Landlord's consent to a change of use for the Demised Premises for a purpose other than the Permitted Use, Landlord will not unreasonably withhold, condition or delay its consent to the proposed use provided that (i) the proposed use is a lawful use; (ii) such use does not violate any then-existing use restriction otherwise imposed on Landlord, whether in a so-called "REA" or other recorded document; and (iii) such use is not deemed a public or private nuisance in Landlord's reasonable business judgment.

3. **Term**

   (a)  Landlord shall deliver the Demised Premises to Tenant free of asbestos and any other Hazardous Materials and free and clear of any and all tenancy or other occupancy rights (other than the rights of Tenant under this Lease), within five (5) days after the Effective Date.  The Lease will commence upon the date Landlord so delivers the Demised Premises to Tenant (the "**Commencement Date**"). The parties shall specify the Commencement Date by executing the Lease Commencement Date Acknowledgement Form attached as **Exhibit "G"** and execute the Lease Supplement attached as **Exhibit "H"**.  Landlord shall deliver **Exhibit "G"** and **Exhibit "H"** to Tenant within three (3) business days following the Rent Commencement Date.

   (b)  During the period beginning with the Effective Date and ending with the Commencement Date (the "**Interim Term**"), Tenant and Landlord shall have all rights and obligations as provided in this Lease, except that during the Interim Term no rent or any other monetary obligations due hereunder shall be charged. Landlord shall pay for all utility charges for the Demised Premises during the Interim Term.  Beginning on the Commencement Date, Tenant shall pay for all utility charges for the Demised Premises.

   (c)  The term of this Lease shall be for an initial term of approximately ten (10) years, commencing on the Commencement Date and terminating ten (10) years after the Rent Commencement Date (as defined in **Section 4** below) (the "**Initial Term**"); provided, if the Rent Commencement Date is not the first day of a calendar month, then the Term shall also include the period from the Rent Commencement Date to the first day of the next calendar month.

   (d)  Provided that Tenant is not then in default under this Lease beyond all applicable cure periods, Tenant may extend the Term of this Lease on the same terms and conditions contained herein for two (2) additional periods of five (5) years each (each an "**Option Term**"; the Initial Term and each Option Term, if exercised, shall hereinafter be referred to as the "**Term**"), by giving Landlord notice, not less than one hundred eighty (180) days prior to the end of the Term; provided, however, that if Tenant shall fail to give any such Notice within such 180-day time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option at any

2

time until the expiration of said 30-day period. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any Option Term set forth in this **Section 3(d)** through inadvertent failure to give notice thereof within the time limits prescribed. During any Option Term, all Sections of this Lease shall be effective, and references to Term will incorporate such Option Term.

(e)     If Tenant remains in possession of the Demised Premises after expiration, or termination of this Lease, as provided herein, Tenant's holding over shall constitute a month-to-month tenancy at one hundred fifty percent (150%) of the last rent payable under and pursuant to and on the same terms of this Lease. In addition, in the event Tenant continues to hold over at the Demised Premises for more than ninety (90) days after receipt of written notice from Landlord to vacate the Demised Premises, Landlord shall be entitled to all the remedies now or hereafter in effect in the State of Delaware, at law or in equity, relating to the speedy recovery of possession of lands and damages for wrongful detention.

4. **Rent and Security Deposit**

(a)     Rent shall begin to accrue and shall be due to Landlord upon the date which is the earlier of: (i) one hundred twenty (120) days after the Commencement Date or (ii) the date Tenant begins operating its business at the Demised Premises (the earlier of (i) and (ii) being referred to herein as the "**Rent Commencement Date**"); provided, however, that in no event except for a Landlord Delay as described in **Section 5(i)** below shall the Rent Commencement Date be any later than November 1, 2013. Tenant agrees to pay rent under the following schedule as of the Rent Commencement Date:

| PERIOD | RENT/MO. | RENT/YR. | RENT/S.F. |
|---|---|---|---|
| Years 1 through 5 | $44,950.81 | $539,409.72 | $2.75 |
| Years 6 through 10 | $53,123.69 | $637,484.28 | $3.25 |
| Years 11 through 15 (1st Option Term) | $61,296.56 | $735,558.72 | $3.75 |
| Years 16 through 20 (2nd Option Term) | $69,469.44 | $833,633.28 | $4.25 |

or a proportionate sum during partial months or nonpayment during free rent periods, in advance, on the first day of each month. The rent shall be made payable to Landlord and wired pursuant to the following wiring instructions:

Company: Centerpoint 550 LLC
Bank: Bank of America
ABA: 026009593
Account #: 383007326569

BH01\1847018.8
ID\NJW – 109304\0055

until the payee or address is changed by written notice from Landlord. Landlord's Federal Employer Identification Number is 51-0383814. As a condition to the first payment of rent under this Lease, Landlord shall provide Tenant with a copy of its Tax Form W-9 and executed counterparts of **Exhibit "G"** and **Exhibit "H"**; and Tenant shall not be obligated to make its first rent payments until five (5) business days following receipt of the W-9, **Exhibit "G"** and **Exhibit "H"**.

(b)     Except as expressly set forth herein, the payment of Rent shall be triple net to the Landlord, and accordingly shall be in addition to and over and above all other payments to be made by Tenant as hereinafter provided.

(c)     Tenant covenants to pay when due, without any abatement, deduction, or set-off, except as otherwise set forth in this Lease, the Rent provided for herein and to pay as additional rental when due all other sums, costs, charges, and expenses payable by Tenant under this Lease (collectively, **"Additional Rental"**), and in the event of any nonpayment thereof, such sums shall be collected as rent, and Landlord shall have all the rights and remedies provided for herein or by law in the case of nonpayment of rent. All payments of Rent and Additional Rental, which are not paid by Tenant to Landlord within ten (10) days after the date the same are due, shall be subject to a late charge of one percent (1%) per month.

(d)     Tenant shall, at the execution of this Lease, pay to Landlord the sum of Forty-Four Thousand Nine Hundred Fifty and 81/100 Dollars ($44,950.81) as a security deposit (the **"Security Deposit"**). The Security Deposit shall be held by Landlord and may be applied in payment of any Rent and/or Additional Rent due under this Lease or to cure other default by Tenant during the Term including to reimburse Landlord for the amount of any cost incurred or damage sustained as a result of the default. The Security Deposit shall be retained by Landlord without interest and not in trust or in a separate account. The portion of the Security Deposit which shall not be utilized by Landlord during the Term shall be returned to Tenant upon the expiration of the Term and surrender of the Demised Premises to Landlord in the condition required by this Lease.

5. **Improvements**

Landlord agrees, at its sole cost and expense, to place the Demised Premises and Common Areas in the condition which shall include all of those items designated as Landlord's responsibility as set forth on the attached **Exhibit "C"** (collectively, **"Landlord's Work"**). Except as otherwise provided herein, Tenant shall accept the Demised Premises in its "as is" condition.

(a)     Prior to commencing the performance of Landlord's Work, Landlord, at Landlord's sole cost and expense, shall:

(i)     Diligently pursue and secure all permits, if any, for the performance of Landlord's Work and any consents or approvals, if any, of lenders or any other party with approval rights to Tenant's occupancy of the Demised Premises or the performance of Landlord's Work.

(ii)     Furnish Tenant with evidence of any required approvals, if any, including, without limitation, the City of New Castle.

4

(b)    Landlord shall diligently pursue Substantial Completion of Landlord's Work. Subject to **Section 5(j)** hereof, Landlord shall Substantially Complete Landlord's Work on or before October 1, 2013 (the "**Landlord's Work Deadline**"). For purposes of this Lease, "**Substantially Complete**" shall mean that (i) Landlord's Work is reasonably acceptable to Tenant (subject to minor punch list items); and (ii) all utilities are available and operating in the Demised Premises, the parking lot of the Center is paved, striped, and illuminated, and all means of ingress and egress as shown on the Site Plan have been completed.

    (i)    If Landlord fails to so Substantially Complete the Landlord's Work by the Landlord's Work Deadline, then Tenant shall receive a credit equal to one (1) day's Rent for each day between the Landlord's Work Deadline and the date that Substantial Completion is achieved.

    (ii)    Notwithstanding the foregoing, if Landlord fails to so Substantially Complete the Landlord's Work by December 1, 2013, Tenant may terminate this Lease upon written notice to Landlord, with no cost or liability to Tenant.

    (iii)    Upon completion of Landlord's Work, the Demised Premises shall be in compliance with all zoning, building code and all other governmental regulations as related to the intended use of Tenant, subject to the completion of the Tenant's Improvements.

(c)    Intentionally Deleted.

(d)    Landlord agrees that Tenant shall have the right to perform the Tenant's Improvements during Landlord's performance of Landlord's Work. Such performance of Tenant's Improvements, prior to completion of Landlord's Work, shall not be deemed approval or acceptance by Tenant of Landlord's Work. Landlord and Tenant shall reasonably cooperate with each other in the coordination and scheduling of the performance of Landlord's Work and Tenant's Improvements so as to minimize any disruptions or interference.

(e)    Intentionally Deleted.

(f)    Tenant shall have the right, subject to all rules, regulations, requirements and ordinances of the City of New Castle and the terms of any recorded documents applicable to the Center, at Tenant's sole cost, to build-out the Demised Premises as Tenant may require, and, at any time, to make non-structural interior alterations, additions, improvements or replacements to the Demised Premises, including, but not limited to, interior lighting, electrical wiring and the usual and customary signage which Tenant employs in a majority of Tenant's other facilities performing a similar function, and to install a satellite dish to service the Demised Premises (collectively, "**Tenant's Improvements**"). The initial Tenant's Improvements are set forth on **Exhibit "C-1"** attached hereto. Landlord shall cooperate with Tenant (at no cost to Landlord) in securing any permits, consents or approvals required for any aspect of Tenant's Improvements, including the initial Tenant's Improvements. Tenant shall complete Tenant's Improvements in compliance with all applicable laws and codes. Tenant shall

<div align="center">5</div>

ensure that all Tenant's Improvements are completed in a good and workmanlike manner and in accordance with the provisions of this Lease.

(g)    Prior to commencing construction of the initial Tenant's Improvements, Tenant, at Tenant's sole cost and expense, shall:

(i)    Diligently pursue and secure all permits for the construction of Tenant's Improvements. To the extent that Tenant's ability to procure any required license or permit is hindered or hampered by any conditions at the Park, to the extent Landlord has the ability to do so, Landlord shall reasonably assist Tenant to address any such conditions so as to allow Tenant to obtain such license or permit, and such event shall be subject to the provisions of **Section 5(i)** below, governing Landlord Delays.

(ii)    On or before August 5, 2013 (the "**Plans Deadline**"), submit the plans for the initial Tenant's Improvements and the construction documents conforming to such plans and the initial Tenant's Improvements set forth on **Exhibit "C-1"** (collectively, the "**Plans**") to Landlord for its review and approval, which approval shall not be unreasonably withheld. Landlord shall have ten (10) days to approve or disapprove of such Plans. If Landlord fails to approve or disapprove within such 10-day period, the Plans shall be deemed approved.

(h)    Provided that (i) Tenant has submitted the Plans to Landlord for its review and approval on or before the Plans Deadline, (ii) Tenant has submitted the Plans to the City of New Castle for review and approval within two (2) business days after Landlord's approval (or deemed approval) of the Plans, and (iii) Tenant uses diligent efforts to pursue and secure any required permits for the Tenant's Improvements, if Tenant fails to secure any required permits for the Tenant's Improvements on or before October 15, 2013 (the "**Permit Receipt Deadline**"), then Tenant shall have the right, at Tenant's sole option, to either (x) terminate this Lease on written notice to Landlord at any time prior to the receipt of all required permits, or (y) extend the period within which Tenant may secure any required permits. Tenant shall promptly provide Landlord with written notice of Tenant's receipt of all required permits. Notwithstanding the foregoing, if Landlord fails to approve the Plans or the parties are otherwise unable to mutually agree upon the Plans on or before August 15, 2013, the Permit Receipt Deadline shall be extended by one (1) day for each day beyond August 15, 2013 until the date the Plans have been approved by Landlord.

(i)    If the performance of the initial Tenant's Improvements is delayed due to a Landlord Delay (as defined herein), then the Rent Commencement Date (as defined in **Section 4** above) shall be extended by one (1) day for each one (1) day of Landlord Delay, but not beyond the date Tenant begins operating its business at the Demised Premises. As used herein, the term "**Landlord Delay**" means any delay in Tenant's performance and/or substantial completion of the initial Tenant's Improvements caused by Landlord (including preventing Tenant or Tenant's contractors from obtaining reasonable access to the Demised Premises), in each case only to the extent delaying the performance and/or substantial completion of the initial Tenant's Improvements. Landlord Delay shall not

6

include any delay that would in any event (i.e., even if the Landlord Delay had not occurred) have resulted from other causes.

(j)     If the performance of Landlord's Work is delayed due to a Tenant Delay (as defined herein), then the Landlord's Work Deadline (as defined in **Section 5(b)** above) shall be extended by one (1) day for each one (1) day of Tenant Delay. As used herein, the term **"Tenant Delay"** means any delay in Landlord's performance and/or substantial completion of Landlord's Work caused by Tenant (including preventing Landlord or Landlord's contractors from obtaining reasonable access to the Demised Premises), in each case only to the extent delaying the performance and/or substantial completion of Landlord's Work. Tenant Delay shall not include any delay that would in any event (i.e., even if the Tenant Delay had not occurred) have resulted from other causes.

(k)     Any structural alterations, excluding exterior signage, shall require Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord shall have thirty (30) days to approve or disapprove of any request for consent to structural alterations. If Landlord fails to approve or disapprove within such 30-day period, the structural alterations shall be deemed approved.

(l)     All of Tenant's Improvements which are so permanently attached or affixed to the Demised Premises that their removal would cause substantial damage to the Demised Premises shall become the property of Landlord upon the expiration of this Lease, unless Tenant, in its sole discretion, removes them and repairs the damage caused by their removal; provided, however, that with respect to any Tenant's Improvements for which Tenant must obtain Landlord's consent under this Lease, including, without limitation, the initial Tenant Improvements, Landlord shall have the option, which option must be exercised by Landlord, if at all, in writing at the time Landlord's consent is requested by Tenant, to designate any such Tenant's Improvements as items which shall be removed by Tenant at its sole cost and expense upon the expiration or sooner termination of its Lease and in such event Tenant shall also repair all damage to the Leased Premises caused by such installation or removal. Notwithstanding the foregoing, all trade fixtures, improvements specialized for Tenant's use, machinery, equipment and personal property shall be the property of Tenant upon the expiration of this Lease, and Tenant shall be entitled to remove them, provided all damage caused by such removal is repaired by Tenant.

6. **Landlord's Representations, Warranties and Covenants**

(a)     Landlord warrants and represents that the following shall be true and correct as of the Effective Date:

(i)     Landlord holds good and marketable title to the Center;

(ii)    The execution and delivery of this Lease shall not be precluded by or cause a breach of any other agreement, mortgage, contract or other instrument or document to which Landlord is a party or to which the Center is subject;

7

     (iii)    To the best of Landlord's knowledge, there is no asbestos or asbestos-containing material in or on the Demised Premises, and no asbestos or asbestos-containing material has been removed from the Demised Premises;

     (iv)    All utilities, including gas, electric, telephone, water, and municipal sanitary sewer are and will be supplied to the Demised Premises from the point of connection of the utility provider, at Landlord's cost. Landlord, at Landlord's cost, shall bring all utilities into the interior of the Demised Premises. Tenant may, at its sole option and cost, provide any additional utility meters it deems necessary. Landlord shall reimburse Tenant for any damages caused by unauthorized use of Tenant's utilities by Landlord during the Term;

     (v)    Intentionally deleted; and

     (vi)    To the best of Landlord's knowledge and to the extent required, the Demised Premises and the Common Areas are in compliance with Title III of the Americans with Disability Act of 1990, all regulations issued thereunder and the Accessibility Guidelines for Buildings and Facilities issued pursuant thereto, as the same are in effect on the date hereof and may be hereafter modified, amended or supplemented (the "**ADA**").

   (b)    Landlord hereby covenants to Tenant that the following shall be true and correct as of the Effective Date and shall remain true and correct throughout the Term of this Lease:

     (i)    Landlord has the full power and authority to execute and deliver this Lease and to perform its obligations under this Lease;

     (ii)    Tenant, upon performing its obligations under this Lease, shall and may peaceably and quietly have, hold and enjoy the Demised Premises, without interference from Landlord or anyone acting by, through or under Landlord;

     (iii)    The Common Areas of the Center, including the paved areas, and any parking and sidewalks, shall be maintained by Landlord in first class condition and repair and usable for the purposes intended; and

     (iv)    Except to the extent required by governmental authorities having jurisdiction over the Center, Landlord shall not reconfigure or reduce the number of parking spaces otherwise available in the Center without Tenant's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

7. **Taxes**

    Landlord shall pay when due all real estate taxes, general and special assessments and any other charges, levies, or impositions levied or assessed upon the Center. Tenant's contribution is prorated as outlined in **Section 11** of this Lease.

BH01\1847018.8
ID\NJW - 109304\0055

8. **Tenant's Signs**

Tenant shall have the right to install signage on the Building, at Tenant's sole cost, provided it is in compliance with Landlord's reasonable sign criteria, the rules and regulations of the Center and the Park and the applicable signage codes and any requirements of the City of New Castle (collectively, the "Signage Requirements"). Notwithstanding the foregoing, provided that Landlord has approved Tenant's signage, Tenant shall have the right to seek a variance from the applicable municipality for Tenant's signage. Subject to Landlord's approval of Tenant's signage and of the location of such signage, which approval shall not be unreasonably withheld, and the Signage Requirements, Tenant may erect temporary signage during performance of Landlord's Work, including temporary "Opening Soon" and "Now Hiring" signs, which signs shall be permitted during the thirty (30) day period immediately prior to the date Tenant opens for business to the general public. Subject to Landlord's approval of Tenant's signage and of the location of such signage and the Signage Requirements, Tenant shall also have the right, for a period of thirty (30) days after the date Tenant opens for business to the general public, to install and maintain "Grand Opening" signage. Subject to the Signage Requirements, Tenant shall also have the right, but not the obligation, to attach signage to the exterior façade of the Building. Whenever Landlord's approval is required under the terms of this **Section 8**, such approval shall not be unreasonably withheld, conditioned, or delayed.

9. **Repairs and Maintenance**

(a) Landlord shall, at its cost, during the Term:

(i) Maintain, repair and/or replace when necessary all structural members, exterior and load bearing walls, floor slabs, plate glass damage caused by building settlement, fire sprinkler systems, trusses, beams, exterior painting, foundations, roofs, electrical wiring and plumbing lines installed by Landlord, interior damage caused by roof failure, including but not limited to ceiling tiles, except such repairs or replacements that are caused by the willful acts or negligence of Tenant, or its agents or employees;

(ii) Maintain, repair and/or replace (including preventative maintenance) when necessary heating, ventilating and air conditioning ("**HVAC**") equipment whether on the interior or exterior, including rooftop, of the Demised Premises; provided, however, that the costs for preventative maintenance of and minor repairs to the HVAC shall be included within the CAM costs pursuant to **Section 10** below beginning one (1) year after the Commencement Date;

(iii) Maintain, repair and/or replace when necessary all storm, sewage and drainage systems, other utility facilities, except such repairs or replacements that are caused by the willful acts or negligence of Tenant, or its agents or employees;

(iv) Make all repairs or replacements necessary due to or arising out of the negligence of Landlord, its agents, employees or other tenants in the Center, or by reason of the breach of this Lease by Landlord;

9

    (v)    Use its best efforts to enforce all warranties and guarantees related to the Demised Premises, the Center and Landlord's Work;

    (vi)    Keep the Demised Premises and the Center in compliance with all applicable state, federal and municipal laws and regulations, including, without limitation, the ADA, subject only to Tenant's obligations under subsection (d) below; and

    (vii)    Perform the Common Area Maintenance (as defined in **Section 10** below), provided, however, such costs may be passed through as CAM costs, pursuant to **Section 11** below.

(b)    Tenant shall, except as provided in subsection (a), above, and at Tenant's cost, during the Term:

    (i)    Maintain, repair and replace when necessary, all window and door glass therein, interior and exterior, maintain and repair loading dock doors and equipment (including levelers and seals/shelters), and any of Tenant's Improvements installed by Tenant, including any plumbing, wires, lighting and tiles; maintain and repair all Building service equipment therein including, but not limited to, electrical, plumbing, heating, air conditioning and sprinkler equipment, pipes, wires, ducts, fixtures, and appliances, but specifically excluding any of the foregoing located within walls and/or under the floor slab; to make all ordinary and necessary repairs to any of the foregoing; to keep the Demised Premises in a safe, clean, and sanitary condition; and to provide for the removal of trash and rubbish. Landlord will provide, at Tenant's expense, for inspection at least once each calendar quarter, of the Building's heating, air conditioning and ventilating equipment (other than any such equipment installed in the Building by Tenant). Such inspection shall provide for necessary repairs thereto;

    (ii)    Maintain and repair the non-structural interior portions of the Demised Premises, the windows and window frames, doors and door frames;

    (iii)    Paint the interior walls of the Demised Premises, as deemed necessary by Tenant, and perform interior decorating;

    (iv)    Arrange for the removal of trash from the Demised Premises;

    (v)    Keep the Demised Premises in a clean condition, meeting applicable city ordinances; and

    (vi)    Upon the termination of this Lease, deliver the Demised Premises to Landlord in broom-clean condition, excepting ordinary wear and tear or loss or damages caused by fire or other casualty.

(c)    If Landlord fails to promptly perform the obligations in subsection (a) above, after being given forty-five (45) days prior written notice by Tenant (except for those matters determined by Tenant to be of an emergency nature, in which event subsection (e) below shall govern), Tenant shall have the right, but not the obligation, to make any repairs or cure any defaults hereunder and to recover

10

Tenant's cost from Landlord by providing notice to Landlord of the costs and expenses incurred by Tenant to cure Landlord's failure to fulfill its obligations hereunder. If the cost is not paid by Landlord within thirty (30) days of notice and demand by Tenant, Tenant shall have the right to deduct such cost, with interest thereon at one percent (1%) plus the Prime Rate, from any installments of rent or other adjustments payable by Tenant to Landlord. Provided, further, in no event shall Tenant's exercise of its rights under this **Section 9(c)** limit the rights and remedies afforded to Tenant under this Lease.

(d)     If repairs and/or replacements in the Demised Premises become necessary in order to comply with the ADA solely by reason of the manner in which Tenant operates its business (e.g., for the operation of a reconditioning, testing, product repair and distribution facility at the commencement of the Lease and not as would be applicable to any other similar use or simply in connection with the pulling of building permits for the improvements to the Demised Premises) in the Demised Premises, Tenant shall, at its cost, during the Term, make such repairs and/or replacements.

(e)     Tenant shall have the right at all times, at its sole option, to make emergency repairs or replacements as Tenant deems necessary. Tenant shall use commercially reasonable efforts to provide notice to Landlord prior to making such emergency repairs or replacements. Upon demand by Tenant, Landlord shall pay Tenant an amount equal to the cost of the repair or replacement. If Landlord fails to pay to Tenant the repair cost, then Tenant may deduct such cost, with interest thereon at one percent (1%) plus the Prime Rate, from rent and adjustments owed by Tenant to Landlord.

(f)     Landlord shall, upon prior written notice to Tenant, have access to the Demised Premises, at reasonable intervals during normal business hours, for examining or repairing it, and Landlord may enter at any time for emergency repairs. Notwithstanding the foregoing, to the extent reasonably possible, Landlord shall not interfere with the conduct of Tenant's business.

10.     **Common Area Maintenance** – Items Included.   Landlord shall perform or be responsible for the following Common Area Maintenance ("CAM"), which shall be defined as routine maintenance expenditures limited to actual cash expenditures undertaken to repair and operate the Center and the Common Areas, but shall not include tenant improvements or other improvements which do not benefit all of the tenants in the Center or capital costs or expenditures except as otherwise provided herein. For purposes of computing Tenant's proportionate share of CAM costs, those items listed below which are considered to be capital expenditures which, as determined under Generally Accepted Accounting Principles ("GAAP") consistently applied (x) add value to the Center, (y) extend the life of the Common Areas or portions thereof, or (z) are designed to reduce the overall CAM costs in the Center beyond the cost of the capital expenditure itself, shall be amortized over the useful GAAP life of the capital expenditure (as determined by commercial industry standards) and the annual amortized costs shall be included in CAM costs when determining Tenant's proportionate share. CAM costs shall include the following:

11

(i) cleaning of and removing rubbish from the paving, parking areas, driveways and other Common Areas;

(ii) labor, payroll taxes, customary fringe benefits, and workers' compensation insurance premiums in connection with employees of Landlord, if any, employed solely to maintain the Center and the Common Areas;

(iii) except if such utilities are separately metered and paid directly by Tenant to the utility service provider, water and sanitary sewer consumed by Tenant at the Demised Premises and all utility services which are used in connection with the operation and maintenance of the Common Areas, including, without limitation, all water, electricity, gas and any and all usage, service, availability and/or standby fees, or charges pertaining to same;

(iv) the costs for preventative maintenance of and minor repairs to the HVAC, pursuant to **Section 9(a)(ii)** above;

(v) maintaining, repairing, restoring or replacing of the Common Areas and exterior surfaces of the Center, but excluding the roof, which is Landlord's responsibility under **Section 9(a)** above;

(vi) remarking, patching and resurfacing of paved surfaces;

(vii) maintaining, repairing and replacing of curbs, parking areas, parking control systems, devices and structures, sidewalks, directional and other signs, landscaping maintenance, holiday decorating, lighting facilities, drainage and other similar items;

(viii) rental cost for tools, machinery and equipment used in connection with the maintenance of the Common Areas and materials and supplies used in maintenance and repair of the Common Areas (provided that the cost of machinery, equipment and tools used at more than one location shall be prorated based on the total gross leasable area at all locations at which such items are used);

(ix) maintenance of utility pipes underlying easements or the Common Areas if not maintained by utility companies;

(x) personal property taxes and assessments levied against all personal property of Landlord located within the Common Areas if such personal property is used solely by Landlord to maintain the Common Areas; and

(xi) fees and charges of independent contractors used to maintain the Center and the Common Areas.

(b) <u>Common Area Maintenance – Items Excluded.</u>  CAM costs for purposes of this Lease shall not include the following:

(i) costs, expenses, depreciation, or amortization for repairs and replacements required to be made by Landlord under **Section 9(a)** of this Lease;

(ii) costs of improvements to any other tenant's premises;

12

(iii)   costs associated with capital improvements, except as expressly permitted to be included as a CAM cost, pursuant to **Section 10(a)** above;

(iv)   principal or interest payments on loans of Landlord whether or not secured by mortgages or trust deeds on the Demised Premises or the Center or rent payable on any ground lease by Landlord;

(v)   costs of utilities and other services provided to and used in the operation of the other tenants, tenant spaces or leasable areas in the Center;

(vi)   costs and expenses incurred in connection with leasing space in the Center such as leasing commissions and advertising and promotional expenses;

(vii)   costs of work or services, repairs, restoration, or materials furnished to the extent that Landlord receives reimbursement from an insurance carrier (or would have received reimbursement from an insurance carrier if Landlord had maintained the insurance policies required under the Lease) or a tenant of the Center;

(viii)   costs of repairs or replacements incurred by reason of fire or other casualty or condemnation;

(ix)   any amounts paid to a corporation, partnership, entity or person which is an affiliate of Landlord and which amount is in excess of the amount which would reasonably have been paid had Landlord negotiated a contract with an independent third party;

(x)   legal fees in connection with disputes with tenants;

(xi)   wages and salaries paid to any employee of Landlord above the level of the manager of the Center or any employee of Landlord not directly involved in the maintenance and management of the Common Areas;

(xii)   costs of any utility service which is separately metered to tenants or occupants of the Center and for which such tenants or occupants pay the utility directly or for which Landlord is reimbursed (other than through rent escalation or operating expense reimbursement collected from tenants or occupants in the Center);

(xiii)   expenses in connection with any service of a type which Tenant is not entitled to receive under the Lease but which is provided to another tenant or occupant of the Center without reimbursement by direct payment by such tenant or occupant;

(xiv)   management fees or administrative fees (except as provided in **Section 11** below);

(xv)   costs of removal, abatement or encapsulation of any asbestos-containing materials or tiles or other materials located in the Center;

(xvi)   costs of any improvement necessary to have the Center comply with any applicable law, ordinance of governmental code, regulation or requirement with which the Center does not comply and required to be made by Landlord under **Section 9(a)** above;

13

(xvii) costs to remove any Hazardous Material (as hereinafter defined) or any other materials defined by any state or federal regulations as hazardous because of their properties or because of their quantities;

(xviii) costs of any insurance maintained by Landlord, including, without limitation, property insurance, the payment of said cost being provided for in **Section 11** below;

(xix) relocation costs of the personnel of Landlord or its managing agent;

(xx) costs of defending or paying for any audit or challenge of Landlord's calculation of CAM costs or other costs passed through to tenants and the cost of any overhead (other than the reasonable cost of preparing and maintaining the books and records dealing with CAM costs which are included);

(xxi) real estate taxes and special assessments affecting the Center, the payment of said items being provided for in **Section 11** below; and

(xxii) costs to cause the Center to comply with the ADA or other laws, statutes or ordinances similar to the ADA, except if required by laws and regulations applicable to Tenant's use or occupation of the Demised Premises.

## 11. **Adjustments**

(a) In addition to the rent provided for in this Lease, Tenant agrees, from and after the Rent Commencement Date and during the remainder of the Term, to pay to Landlord as provided in **Section 11(b)** hereof, Tenant's proportionate share of:

(i) Real estate taxes ("**Taxes**") levied against the Center by any governmental authority having jurisdiction, but no other taxes or assessments. Taxes shall also include any gross receipts tax to which Landlord may be subject from time to time as a result of its operation of the Center. Taxes shall also include all reasonable costs and expenses (including, without limitation, reasonable legal fees and court costs) charged for the protest or the reduction of any of the aforesaid taxes, but only to the extent savings are realized. The reimbursement shall be payable thirty (30) days after presentation of receipts marked paid in full. However, "Taxes" shall not include any capital stock, franchise, estate, inheritance, devolution, succession, transfer, gift or income tax or tax of a similar nature which is or may become payable by Landlord or which may be imposed against Landlord by reason of any law now in force or hereafter enacted;

(ii) Insurance premiums for property and casualty insurance as required in this Lease, payable thirty (30) days after presentation of receipts marked paid in full;

(iii) CAM costs as defined in **Section 10** above. Notwithstanding anything to the contrary contained in this Lease, Tenant's liability for its proportionate share of CAM costs during the time period beginning on the Rent Commencement Date and ending on December 31, 2014 shall not exceed

14

one hundred five percent (105%) of the estimated CAM costs as set forth in **Section 11(c)** below exclusive of water, sewer, Taxes, insurance premiums, other utilities and snow removal costs on a per square foot per annum basis. From and after January 1, 2015, during each year of the Term, as the same may be extended or renewed, Tenant's liability for its proportionate share of CAM costs for such year, other than water, sewer Taxes, insurance premiums, other utilities, and snow removal costs, shall not increase by more than three percent (3%), on a non-cumulative basis, over Tenant's actual liability for the same (as limited by the provisions of this subsection) for the immediately preceding calendar year (the "**CAM Cap**"). Landlord and Tenant hereby acknowledge that as part of the CAM costs, Landlord shall be allowed to charge a management fee in an amount not to exceed four percent (4%) of the rent, Taxes, insurance premiums, and CAM costs payable by Tenant to Landlord under this Lease.

(b)     Tenant shall pay Landlord for CAM costs, Taxes and insurance premiums in equal monthly installments on the first day of each month starting with the Rent Commencement Date, as Additional Rental, without notice, demand, or set-off except as otherwise expressly provided in this Lease, an amount equal to one-twelfth (1/12th) of Tenant's proportionate share of Landlord's estimate of the CAM costs, Taxes and insurance premiums for that calendar year, provided that the monthly installment for the first full month following the Rent Commencement Date shall be paid at the signing of this Lease. Landlord shall apply such payments to the CAM costs, Taxes and insurance owed to Landlord by Tenant pursuant to this **Section 11.** By April 30 of each year (and as soon as practical after the expiration or termination of this Lease or at any time in the event of a sale of the Demised Premises), Landlord shall provide Tenant with a statement of the actual amount of such expenses for the preceding calendar year or part thereof. If there shall be any increase or decrease in the CAM costs, Taxes or insurance premiums for any year, whether during or after such year, Landlord shall furnish to Tenant a revised estimate and the CAM costs, Taxes and insurance premiums shall be adjusted and paid or refunded, as the case may be. Such adjustment or refund shall be made not more than once a year. If a calendar year ends after the expiration or termination of this Lease, the additional rent payable hereunder shall be prorated to correspond to that portion of the calendar year occurring within the Term of this Lease. Tenant shall either receive a refund or be assessed an additional sum based upon the difference between Tenant's proportionate share of the actual CAM costs, Taxes and insurance premiums and the payments for CAM costs, Taxes and insurance premiums made by Tenant during said year. Any additional sum owed by Tenant to Landlord shall be paid within thirty (30) days of receipt of assessment. Any refund owed by Landlord to Tenant shall be credited toward the next month's additional rent payment or, in the event this Lease has expired or terminated earlier pursuant to its terms, payment shall be made by Landlord to Tenant within thirty (30) days of such expiration or earlier termination.

(c)     By April 30 of each calendar year during the Term, Landlord shall furnish to Tenant, Landlord's estimate of CAM costs (calculated based on the CAM Cap),

15

Taxes and insurance for the upcoming calendar year. Estimates for the first year are as follows: (i) Taxes $0.61 psf per annum; (ii) CAM costs $0.38 psf per annum; and (iii) insurance $0.14 psf per annum.

(d)     Landlord shall, on request made not later than two hundred ten (210) days following the end of any calendar year, provide Tenant with any applicable financial records and, as required, permit Tenant or Tenant's auditors, with reasonable notice, to inspect all records for CAM costs, Taxes, insurance costs and any other expense passed on to Tenant under this Lease. Landlord shall promptly repay Tenant for any overpayments or unsupported costs which Tenant or its auditors identify. Landlord shall pay the cost of Tenant's audit if overpayments or unsupported costs exceed actual costs by five percent (5%) or more.

(e)     Tenant's proportionate share for adjustments provided under this **Section 11** shall be one hundred percent (100%) and defined as the sum due for the Center multiplied by a fraction, the numerator of which shall be the number of gross leasable square feet in the Demised Premises, and the denominator of which shall be the gross leasable area of the Center (i.e., 196,149 square feet/196,149 square feet).

(f)     Tenant's obligation to pay CAM costs that have accrued during the Term of this Lease shall survive the expiration or termination of this Lease.

12. **Insurance**

(a)     Landlord shall pay for and maintain, from the Effective Date through the end of the Term, the following policies of insurance covering the Center, which insurance shall be obtained from companies currently rated "A-/VII" or better as defined in the then-current edition of Bests Insurance Reports (or the equivalent thereof if Bests Insurance Reports is no longer published):

(i)     Commercial General Liability Insurance covering Landlord's operations on the Center with coverage for premises/operations, products/completed operations, contractual, and personal/advertising injury liabilities with combined single limits of not less than $5,000,000 per occurrence for bodily injury and property damage, including Tenant as an additional insured (as defined in form U-GL-1504-A).

(ii)     Property Insurance upon all buildings and building improvements, and upon all furniture, fixtures and merchandise on the Center, if any (excluding the furniture, fixtures and merchandise located within the Demised Premises), including those perils generally covered on a "Causes of Loss-Special Form," including fire and extended coverage, windstorm, vandalism, malicious mischief, sprinkler leakage, water damage, accidental collapse, flood, and earthquake, in an amount equal to at least ninety percent (90%) of the full replacement cost with an Increased Cost of Construction Endorsement; provided, however, that Landlord may maintain separate limits for flood and earthquake coverage of $1,000,000 each.

16

    (iii)    Such other insurance as required by the laws of the state in which the Center is located, including, without limitation, Workers' Compensation insurance.

    (iv)    Landlord shall cause its contractors to maintain Workers' Compensation and Commercial General Liability Insurance, and Landlord shall indemnify, defend and hold harmless Tenant and its agents from all claims, losses, damages or expenses incurred by Tenant or its agents due to the failure of Landlord's contractors to maintain Workers' Compensation and Commercial General Liability Insurance.

    (v)    The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies. Each policy shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice, and that the coverage provided by such insurance policy shall be deemed primary insurance and that any insurance provided by or on behalf of Tenant shall be in excess of any insurance provided by such policy. Landlord shall provide Tenant with prompt written notice of any cancellation or material change of any insurance required to be maintained by Landlord under this Lease. Landlord shall furnish Tenant, or cause to be furnished to Tenant, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates evidencing the insurance required to be maintained pursuant to this **Section 12(a)**. All policies required to be provided by Landlord hereunder shall include an endorsement to show that such insurance carrier acknowledges the waiver of subrogation in favor of Tenant contained in **Section 13**.

(b)    Tenant shall provide property and liability insurance throughout the Term as follows:

    (i)    Tenant shall maintain in force special form property insurance covering personal property Tenant places upon or installs within the Demised Premises in an amount equal to the replacement cost of that personal property.

    (ii)    Tenant shall maintain in force a policy of commercial general liability insurance insuring Tenant against liability arising from Tenant's use, occupancy or maintenance of the Demised Premises and appurtenant areas and providing contractual liability coverage for the indemnities Tenant makes in this Lease. Landlord, Tenant and Landlord's mortgagee(s) shall be named as additional insureds on Tenant's policy. The amount of that insurance must be at least Five Million Dollars ($5,000,000.00) per occurrence for bodily injury to or death of any persons or property damage. Tenant must cause the policy by which Tenant provides that commercial general liability insurance to be endorsed to order to confirm that (A) the insurance is primary insurance, and (B) insurance maintained by or for Landlord's benefit will not reduce the proceeds payable in

17

respect of any claim made on the insurance Tenant furnishes in accordance with the terms of this **Section 12**.

(iii)     If Tenant does not qualify as a self-insurer in accordance with the rules and regulations of the agency or commission that administers the workers' compensation program in the State where the Demised Premises are located, Tenant shall maintain in force workers' compensation insurance in the amount required by applicable law and employer's liability insurance in an amount not less than Five Hundred Thousand Dollars ($500,000.00). The workers' compensation insurance must include an all-states endorsement.

(iv)     Tenant shall also maintain automobile liability insurance for owned, non-owned and hired vehicles, with limits of at least Two Million Five Hundred Thousand Dollars ($2,500,000) per occurrence for bodily injury and property damage combined. If no vehicles are owned or leased, the Commercial General Liability insurance shall be extended to provide insurance for non-owned and hired automobiles in lieu of separate automobile liability insurance.

(v)     All policies shall be issued by companies qualified to do business in the State where the services are to be provided, and shall be rated A-/VII or better in the most current edition of Best's Insurance Reports.

(vi)     The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies. Each policy shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice, and that the coverage provided by such insurance policy shall be deemed primary insurance and that any insurance provided by or on behalf of Landlord shall be in excess of any insurance provided by such policy. Tenant shall provide Landlord with prompt written notice of any cancellation or material change of any insurance required to be maintained by Tenant under this Lease. Tenant shall furnish Landlord, or cause to be furnished to Landlord, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates evidencing the insurance required to be maintained pursuant to this **Section 12(b)**. All policies required to be provided by Tenant hereunder shall include an endorsement to show that such insurance carrier acknowledges the waiver of subrogation in favor of Landlord contained in **Section 13**.

13. **Subrogation**

Each party hereto hereby waives any and every claim which arises or may arise in its favor and against the other party hereto during the term of this Lease for any and all loss of or damage to any of its property located within or upon, or constituting a part of, the Demised Premises, which loss or damage is covered by valid and collectible fire and extended coverage insurance policies, to the extent that such loss or damage is recoverable under such insurance policies. Said mutual waivers shall be in addition to

18

and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties hereto. Inasmuch as the above mutual waivers will preclude the assignment of any aforesaid claim by way of subrogation (or otherwise) to an insurance company, or any other person, each party hereto hereby agrees immediately to give to each insurance company which has issued to it policies of fire and extended coverage insurance, written notice of the terms of said mutual waivers and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverage by reason of said waivers. Each party agrees that if there shall be any increase in premium by reason of this mutual waiver, the other party will pay the amount of such increase. Tenant agrees to furnish Landlord with information concerning the limits of Tenant's insurance coverage as requested by Landlord from time to time.

14. **Indemnity**

    (a)    Landlord agrees to indemnify, protect, defend and hold Tenant, its directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses (including, but not limited to, attorneys' fees and court costs) and liabilities (except those caused solely by the willful or negligent acts or omissions of Tenant), arising out of (1) actual or alleged injury to or death of any person or loss of or damage to property in or upon the Center, including, without limitation, the Demised Premises or (2) a breach by Landlord of this Lease.

    (b)    Tenant agrees to indemnify, protect, defend and hold Landlord, its directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses (including, but not limited to, attorneys' fees and court costs) and liabilities (except those caused solely by the willful or negligent acts or omissions of Landlord), arising out of (1) actual or alleged injury to or death of any person or loss of or damage to property in or upon the Demised Premises or (2) a breach by Tenant of this Lease.

    (c)    Notwithstanding anything in this Lease to the contrary, neither party shall be responsible to the other party for consequential or punitive damages.

15. **Damage or Destruction**

    (a)    If during the Term the Demised Premises are damaged or destroyed by fire or any other casualty covered or required to be covered by Landlord's property insurance, Landlord shall send Tenant a written estimate, from an independent architect or general contractor selected by Landlord, of the amount of time reasonably required to repair and restore the Demised Premises and access thereto, as the case may be ("**Completion Estimate**"). If the Completion Estimate states that the Demised Premises will not be repaired, restored and delivered to Tenant within one hundred eighty (180) days after the casualty without the payment of overtime or other premiums, then Tenant may terminate this Lease by giving Landlord written notice of termination within thirty (30) days after Tenant's receipt of the Completion Estimate (such termination notice to include a termination date providing not more than ninety (90) days for Tenant to vacate the Demised Premises); provided, however, that termination by Tenant

19

shall not be permitted if the damage or destruction was caused by Tenant's gross negligence or wilful misconduct. The estimated completion date set forth in Landlord's Completion Estimate shall be referred to herein as the "**Estimated Completion Date.**" If Tenant does not elect to terminate the Lease as provided above, Landlord shall, at Landlord's expense, promptly, with due diligence, rebuild, repair and restore the Demised Premises, including Landlord's Work, to substantially the same condition existing just prior to the damage or destruction. If Landlord has not substantially completed such restoration within forty-five (45) days from the Estimated Completion Date, Tenant shall have the right to terminate this Lease upon forty-five (45) days' notice to Landlord, which must be exercised, if at all, prior to delivery of the Demised Premises to Tenant. If such restoration is completed within such forty-five (45) day notice period, such termination shall be nullified and this Lease shall continue in full force and effect. Promptly following Landlord's restoration of the Demised Premises and Tenant's receipt of the necessary permits, Tenant, at Tenant's expense or under insurance coverage carried or required to be carried by Tenant, shall restore Tenant's Improvements installed by Tenant, at Tenant's expense, and Tenant's fixtures, equipment and personal property.

(b)    From the date of the damage or destruction until the date that is the earlier to occur of (i) the date Tenant completes its restoration work and re-opens for business from the Demised Premises, or (ii) ninety (90) days after the restoration is completed by Landlord and the Demised Premises are delivered to Tenant for reconstruction of Tenant's Improvements, rent and all adjustments and all other charges payable by Tenant shall abate in the proportion that the square footage of the part of the Demised Premises destroyed or rendered unfit for Tenant's use bears to the total square footage in the Demised Premises. Except as expressly provided herein to the contrary, the provisions of this Lease shall be unaffected by such damage or destruction. Notwithstanding the foregoing, if such a casualty occurs in the last year of the Term of this Lease, Landlord or Tenant may, at its option, elect to terminate this Lease as of the date of the casualty on written notice to the other party to be delivered within thirty (30) days of the date of the casualty; provided, however, if Tenant elects to exercise an available Option Term, Landlord's termination shall be vitiated and Landlord shall remain obligated to rebuild, repair and restore as required above.

(c)    If during the Term the Demised Premises are totally destroyed and/or the Center is materially destroyed (i.e., more than 20% of the replacement cost) by fire or any other casualty not covered or required to be covered by Landlord's property insurance, provided Landlord was maintaining the insurance required to be maintained by Landlord under **Section 12** of the Lease at the time of such uninsured event, Landlord shall have the right to terminate this Lease by providing written notice to Tenant within forty-five (45) days after the date of damage; provided, however, Landlord shall have the right to terminate this Lease only in the event Landlord terminates all other leases within the Center and Landlord does not rebuild or repair the Demised Premises. If Landlord does not elect to terminate this Lease, (i) rent and all adjustments and other charges payable by Tenant shall abate for the timeframe set forth in subsection (b) above,

20

(ii) Landlord shall promptly pay to Tenant any unearned rent, adjustments or other charges paid by Tenant, or Tenant shall promptly pay to Landlord any rent earned and unpaid, and (iii) Landlord shall, at Landlord's expense, promptly, with due diligence, rebuild, repair and restore the Demised Premises, including Landlord's Work, to substantially the same condition existing just prior to the damage or destruction. Promptly following Landlord's restoration of the Demised Premises and Tenant's receipt of the necessary permits, Tenant, at Tenant's expense or under insurance coverage carried or required to be carried by Tenant, shall restore Tenant's Improvements installed by Tenant, at Tenant's expense, fixtures, equipment and personal property.

16. **Eminent Domain**

    (a)    Landlord shall promptly notify Tenant in writing of any proposed taking or condemnation which will affect the Demised Premises.

    (b)    In the event of any taking by eminent domain or condemnation or conveyance in lieu thereof wherein the Demised Premises or access thereto are materially adversely affected, whether or not this Lease has been terminated as a result thereof, Tenant shall have the right to make any separate claims allowed by the laws of the State of Delaware against the condemning authority for the following: (a) the value of its fixtures, equipment and other personalty; (b) its relocation expenses; (c) loss of business; and (d) the unamortized amount, if any, of any alterations paid for by Tenant and not from proceeds provided by Landlord; and (e) such other separate award as may be permitted by law which does not reduce the award payable to Landlord.

    (c)    Tenant shall have, at its option, the right to terminate this Lease upon a taking or condemnation of any of the following: any part or all of the Demised Premises; any access to the loading areas of the Demised Premises; at least ten percent (10%) of the parking spaces in the Center are taken, unless Landlord provides Tenant with substituted parking reasonably acceptable to Tenant within fifteen (15) days of the taking; or points of ingress and egress to the public roadways as shown on the Site Plan.

    (d)    If Tenant elects to terminate this Lease under this **Section 16**, Tenant shall notify Landlord in writing of this election within sixty (60) days after the taking effective on the date the condemnor takes possession. Tenant's rental obligation shall cease as of the date the condemnor takes possession, and Landlord shall promptly refund rent and other charges paid by Tenant for periods beyond that date.

    (e)    If Tenant does not elect to terminate this Lease, Landlord shall, at its sole cost, promptly and diligently repair, alter, raze and restore the remaining part of the Demised Premises, replace the parking area taken and/or replace the points of ingress and egress taken, so the improvements are made into a complete architectural unit, and the Demised Premises, parking areas and points of ingress and egress are returned to, as nearly as reasonably possible, the condition existing prior to the taking or condemnation. Tenant shall not be obligated to make any payment or contribution toward the repair or restoration work. Tenant's rental

BH01\1847018.8
ID\NJW - 109304\0055

obligation shall be proportionately reduced by the percentage of the Demised Premises taken, whether on a temporary or permanent basis.

17. **Defaults**

(a)    If Tenant: (i) fails to make within five (5) business days of receipt of written notice any monetary payment past due hereunder; or (ii) fails to commence to cure any non-monetary covenant or agreement to be performed by Tenant under this Lease within thirty (30) days of receipt of written notice or within such additional time as may reasonably be necessary; or (iii) shall make an assignment for the benefit of its creditors; or (iv) call for the appointment of a receiver or trustee of all or part of Tenant's property; or (v) files a petition in bankruptcy by Tenant; or (vi) or another party files a petition by or against Tenant for its reorganization or for an arrangement under any bankruptcy law or other law; or (vii) files a petition to effect a composition or an extension of time to pay its debts; provided that if an event referred to in sections (iv) and (vi) above shall have been involuntary on the part of Tenant, the Tenant shall have sixty (60) days to discharge the receiver or trustee or dismiss the petition after the appointment or filing, then it shall be a default hereunder entitling Landlord to recover such sums past due and pursue such other remedies at law or in equity in the manner prescribed by applicable statute.    If Tenant, after receiving written notice, proceeds to cure the default, then no default shall be deemed continuing.

(b)    In the event that this Lease is terminated by court proceedings, Landlord or Landlord's agents, servants, or representatives may, at any time after written notice to Tenant, reenter and resume possession of said Demised Premises, or any part thereof, and remove all persons and property therefrom (at the cost and expense of Tenant), either by any suitable action or proceeding at law, without being liable for any damages thereof except to the extent caused by the negligence or willful misconduct of Landlord's agents, servants, or representatives. No reentry by Landlord shall be deemed to be an acceptance of a surrender of this Lease.

(c)    Subject to the terms of this Lease, the Landlord, upon the happening of any of the events giving it the right to cancel and terminate this Lease, shall be entitled to the benefit of all of the provisions of law for the speedy recovery of lands and tenements in the State of Delaware that are now in force or may hereafter be enacted and as such Landlord shall be entitled to exercise any or all rights or remedies available to landlords in the State of Delaware at law or in equity following a tenant default. All remedies available to Landlord under this Lease and at law or in equity shall be cumulative and concurrent. Notwithstanding anything to the contrary contained herein, in the event of default by Tenant under this Lease, Landlord shall use commercially reasonable efforts to mitigate its damages, but only to the extent required by applicable law.

(d)    If Landlord fails to: (i) cure within thirty (30) days (or such shorter time as may be provided for such payment in this Lease) after receipt of written notice from Tenant to Landlord, any monetary payment past due hereunder; or (ii) commence to cure any non-monetary covenant or agreement to be performed by Landlord

22

under this Lease within thirty (30) days of receipt of written notice or within such additional time as may reasonably be necessary, then Tenant shall provide a further notice and an additional fifteen (15) days to cure such default. In the event that Landlord's default shall continue following the additional notice and cure period, Tenant may cure such default and off-set all of Tenant's costs, including interest thereon at one percent (1%) plus the Prime Rate, from rent or other adjustments payable by Tenant to Landlord; provided, if such condition of default continues for sixty (60) days thereafter and Landlord has not commenced the cure of such condition within such additional sixty (60) day period, then Tenant may, in addition to the foregoing remedy, elect to terminate this Lease on written notice to Landlord. Notwithstanding the foregoing, with regard to Landlord's maintenance and repair obligations under this Lease, Tenant shall have the rights provided in **Section 9**, and further, in the event Landlord defaults on any mortgage encumbering the Center and during any foreclosure process or the appointment of a receiver, if Tenant exercises its rights under **Section 9**, Tenant shall have the right to recover Tenant's expenses as set forth in **Section 9**.

18. **Subordination, Non-Disturbance and Attornment and Estoppels**

(a)    As of the Effective Date of this Lease, there are no mortgages or deeds of trust encumbering the Demised Premises or the Center.

(b)    If during the Term the Demised Premises becomes subject to a mortgage, Landlord shall use its best efforts to ensure that Landlord's mortgagee, Landlord and Tenant shall execute a Subordination, Non-Disturbance and Attornment Agreement ("**SNDA**") in a commercially reasonable form that is mutually acceptable to Landlord's mortgagee, Tenant, and Landlord, and Landlord shall deliver such SNDA executed by Landlord's subsequent mortgagee and Landlord to Tenant within sixty (60) days after execution of the mortgage.

(c)    No personalty or fixtures of Tenant shall be subject to a mortgage lien.

(d)    Tenant agrees to give all mortgagees by certified mail, a copy of any notice of default served upon the Landlord, provided that prior to such notice, Tenant has been notified in writing (by way of notice of assignment of rents and leases, or otherwise) of the address of such mortgagee(s).

(e)    In the event the Demised Premises are sold at any foreclosure sale or sales, by virtue of any judicial proceedings or otherwise, this Lease shall continue in full force and effect and Tenant agrees upon request to attorn to and acknowledge the foreclosure purchaser or purchasers at such sale as Landlord hereunder. The Tenant shall, promptly at the request of the Landlord or any mortgagee, execute, enseal, acknowledge, and deliver such further instrument or instruments attorning to such mortgagee, provided that such mortgagee agrees with Tenant that such mortgagee will, in the event of a foreclosure of any such mortgage or deed of trust (or termination of any such ground lease) take no action to interfere with Tenant's rights hereunder, except on the occurrence of a default or event of default beyond applicable notice and cure periods.

23

(f)     Tenant shall furnish Landlord upon thirty (30) days' prior written request therefor, an estoppel certificate in the form attached hereto as **Exhibit "E"** or in Tenant's then current form, and such estoppel certificate shall be addressed to the mortgagee, proposed mortgagee, financial institution or such other party designated by Landlord. If Landlord requests an estoppel certificate from Tenant in a form other than the form attached hereto as **Exhibit "E"**, Landlord shall pay to Tenant an administrative fee in the amount of One Thousand and 00/100 Dollars ($1,000.00), and Tenant shall have the right to make reasonable modifications to such estoppel certificate.

(g)     Landlord shall furnish Tenant upon thirty (30) days' prior written request therefor, an estoppel certificate addressed to Tenant or such other party designated by Tenant, providing the following information (to the extent true and correct and stating any exceptions therefrom):

(i)     that Landlord has completed all of Landlord's Work (if applicable);

(ii)    the Commencement Date of the Lease and the expiration date of the Lease;

(iii)   the Rent Commencement Date of the Lease;

(iv)    that Tenant has opened for business within the Demised Premises;

(v)     that Landlord has no claim, set-off or recoupment against Tenant (and if Landlord does have such a claim it shall be stated in specific detail);

(vi)    that there are no defaults or events which with the passage of time or giving of notice, or both, would constitute a default by Tenant or Landlord under the Lease (and if such defaults or events exist, they shall be stated in reasonable detail); and

(vii)   such other information regarding the Lease or the parties performance of the terms and conditions under the Lease as Tenant shall reasonably request.

19. **Assignment and Sublease**

(a)     Tenant shall have the right, without Landlord's consent, but with notice to Landlord, to assign this Lease to (a) any franchisee of Tenant or Tenant's affiliate, any franchisor of Tenant or Tenant's affiliate, any franchisee of Tenant's or Tenant's affiliate franchisor, or any authorized retail dealer of Tenant, (b) a parent, subsidiary or related entity, (c) an entity in connection with a merger, acquisition, reorganization or consolidation of Tenant, or (d) an entity in connection with the sale of Tenant's corporate stock or assets (a "**Permitted Assignee**"). If Tenant desires to assign this Lease to a party other than a Permitted Assignee, Tenant shall obtain prior written approval from Landlord, which approval will not unreasonably be withheld, conditioned or delayed; provided that in the event of any such assignment or subletting requiring Landlord's consent, any rental received by Tenant in excess of the Rent reserved under this Lease or any payment made to Tenant in consideration of such assignment or subletting shall be paid over to Landlord as Additional Rental

24

concurrently with such assignment or subletting. If Landlord does not accept or reject such proposed assignment within ten (10) business days after receipt of such written request from Tenant, Landlord shall be deemed to have approved such proposed assignment. If an assignment is requested and then approved by Landlord (or deemed approved by Landlord), Tenant shall remain responsible for the payment of rent and the performance of its other obligations hereunder throughout the Term, including any Option Term.

(b)     Tenant shall have the right, without Landlord's consent, to sublet all or part of the Demised Premises to (a) any franchisee of Tenant or Tenant's affiliate, any franchisor of Tenant or Tenant's affiliate, any franchisee of Tenant's or Tenant's affiliate franchisor, or any authorized retail dealer of Tenant, (b) a parent, subsidiary or related entity, (c) an entity in connection with a merger, acquisition, reorganization or consolidation of Tenant, or (d) an entity in connection with the sale of Tenant's corporate stock or assets (a "**Permitted Sublessee**"). If Tenant desires to sublet all or a part of the Demised Premises to a party other than a Permitted Sublessee, Tenant shall obtain prior written approval from Landlord, which approval will not unreasonably be withheld, conditioned or delayed. If Landlord does not accept or reject such proposed sublease within ten (10) business days after receipt of such written request from Tenant, Landlord shall be deemed to have approved such proposed sublease.

(c)     Notwithstanding anything in this **Section 19** to the contrary, during any period after an assignment of this Lease where Tenant remains liable hereunder, in order for Landlord to hold Tenant responsible for the payment of rent and the performance of its other obligations under this Lease, Landlord agrees that upon any assignment of this Lease by Tenant, if Tenant's successor assignee breaches the Lease and Landlord desires to exercise any of its rights or remedies hereunder against assignee and/or Tenant, Landlord shall, as a condition to exercising any of its rights or remedies under the Lease, first (a) send a copy of any and all notices of default by the assignee to Tenant (at the address currently provided for in this Lease or as may be changed from time to time by Tenant giving notice to Landlord) concurrently with the notice sent to the assignee by Landlord, and (b) if Tenant elects in its sole and absolute discretion to do so, permit Tenant to cure any such alleged breach or default by assignee under the Lease.

(d)     Nothing contained herein shall be deemed to prevent or limit Tenant from licensing space within the Demised Premises to third parties, or leasing, engaging in a sale-leaseback for, and/or granting security interests to any third party in any of its personal property, fixtures and/or equipment at the Center or any services produced by Tenant at the Demised Premises, without the consent of Landlord, which may include (without limitation) a lease or sale-leaseback of Tenant's personal property, fixtures and/or equipment at the Center to a tax-exempt and/or governmental entity for purposes of abating or reducing personal property or other taxes payable with respect thereto.

25

20. **Notices**

Notices shall be in writing and shall be deemed properly served (A) the same day if hand-delivered, (B) three (3) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (C) the next business day after being deposited with a reputable overnight express carrier (e.g., Federal Express, Airborne, Express Mail) for guaranteed next business day delivery. Notices shall be addressed as follows:

Tenant:                           Sears Outlet Stores, L.L.C.
                                  5500 Trillium Blvd., Suite 501
                                  Hoffman Estates, Illinois 60192
                                  Attn: Vice President – Real Estate

Copy to:                          Sears Outlet Stores, L.L.C.
                                  5500 Trillium Blvd., Suite 501
                                  Hoffman Estates, Illinois 60192
                                  Attn: General Counsel

Landlord:                         Centerpoint 550, LLC
                                  1201 N. Market Street
                                  Suite 400
                                  Wilmington, Delaware 19801
                                  Attention: Paul McConnell

Copy to:                          Connolly Gallagher LLP
                                  1000 West Street, Suite 1400
                                  Wilmington, Delaware 19801
                                  Attn: Rachel A. Dwares, Esq.

or to any other address furnished in writing by any of the foregoing. However, any change of addresses furnished shall comply with the Notice requirements of this **Section 20** and shall include a complete outline of all current notice of addresses to be used for all parties.

21. **Hazardous Material**

(a)    Definitions:

(i)    **"Environmental Laws"** means all federal, state and local laws, statutes, ordinances, regulations, criteria, guidelines, rules, standards, rules of common law now or hereafter in effect, and in each case as amended, and any judicial or administrative order, consent decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources.

(ii)   **"Hazardous Material"** means any hazardous or toxic substance, chemical, material or waste, or any pollutant, contaminant or other substance, that is or becomes defined, listed, or regulated by Environmental Laws, including, without limitation, polychlorinated

26

biphenyls, asbestos, radioactive materials and petroleum, crude oil or any fraction thereof.

(iii) "**Tenant's Hazardous Material**" means Hazardous Material brought or released onto the Demised Premises during the Term of this Lease by Tenant, its agents, contractors or employees.

(b) Landlord's Representations and Warranties. Landlord hereby represents and warrants to Tenant that, to Landlord's knowledge, (i) no Hazardous Material has been used, stored, released, disposed of or is located in the Center (other than industry-standard cleaning products used in compliance with Environmental Laws) and (ii) Landlord has not received any notice of violation of any Environmental Laws with respect to the Center and the improvements thereon.

(c) Landlord's Covenants. If Landlord learns of the existence of Hazardous Material on the Center (other than industry-standard cleaning products used in compliance with Environmental Laws), Landlord shall promptly disclose the nature of such material to Tenant. Landlord shall comply with all Environmental Laws with respect to the Center, including, without limitation, any requirement to perform repair, cleanup, remediation, abatement or detoxification work or prepare any closure or other plans required as a result of a release, spill or discharge of Hazardous Material, and shall diligently pursue to completion all such work in accordance with applicable Environmental Laws. Landlord acknowledges and agrees that Tenant shall have no obligation to pay for any costs and expenses of such compliance and performance, except for costs and expenses relating to Tenant's Hazardous Material. Landlord shall make reasonable effort to remove or cause to be removed Hazardous Material if it materially interferes with Tenant's use and enjoyment of the Demised Premises or Tenant's conduct of business within the Demised Premises. If Landlord fails to do so, Tenant shall provide thirty (30) days written notice to Landlord of such failure to remove or cause to be removed Hazardous Material. If Landlord shall fail to remove or cause to be removed Hazardous Material within such 30-day period, Tenant shall send a subsequent written notice to Landlord of such failure, which notice shall state in bold, conspicuous and all capital letters "**LANDLORD'S FAILURE TO RESPOND WITHIN TEN (10) DAYS WILL RESULT IN TENANT HAVING THE RIGHT TO TERMINATE THE LEASE**". If Landlord shall fail to remove or cause to be removed such Hazardous Material within such additional 10-day period (or such additional time as required, if Landlord is unable to remove or cause to be removed Hazardous Material within such 10-day period but commences to remove or cause to be removed such Hazardous Material within such 10-day period and is diligently pursuing completion of same), Tenant shall have the right, but not the obligation, to terminate the Lease.

(d) Landlord's Indemnity. Landlord shall defend, indemnify and hold harmless Tenant, its directors, officers, employees and agents against and from any and all claims, actions, liabilities and losses including, but not limited to, all costs and expenses, including attorneys' fees, paid or incurred by Tenant in defending or otherwise responding to, such claims, actions, liabilities and losses arising from or related to (1) Hazardous Material (other than Tenant's Hazardous Material) on, in

27

under or migrating from the Center or (2) the breach of any representation, warranty or covenant of Landlord contained in this Section.

(e)    Tenant's Covenants.  Tenant hereby covenants to Landlord that Tenant shall comply with all Environmental Laws with respect to Tenant's Hazardous Materials including, without limitation, performance of any repair, cleanup, remediation, abatement or detoxification work and the preparation of any closure or other plans required as a result of a release, spill or discharge of Tenant's Hazardous Material, and shall diligently pursue to completion all such work in accordance with applicable Environmental Laws and shall pay all costs and expenses of such compliance and performance.  If Tenant fails to do so, Landlord shall provide thirty (30) days written notice to Tenant of such failure to remove or cause to be removed Tenant's Hazardous Material.  If Tenant shall fail to remove or cause to be removed Tenant's Hazardous Material within such 30-day period, Landlord shall send a subsequent written notice to Tenant of such failure, which notice shall state in bold, conspicuous and all capital letters "TENANT'S FAILURE TO RESPOND WITHIN TEN (10) DAYS WILL RESULT IN LANDLORD HAVING THE RIGHT TO TERMINATE THE LEASE".  If Tenant shall fail to remove or cause to be removed such Tenant's Hazardous Material within such additional 10-day period (or such additional time as required, if Tenant is unable to remove or cause to be removed Tenant's Hazardous Material within such 10-day period but commences to remove or cause to be removed such Tenant's Hazardous Material within such 10-day period and is diligently pursuing completion of same), Landlord shall have the right, but not the obligation, to terminate the Lease.

(f)    Tenant's Indemnity.  Tenant shall defend, indemnify and hold harmless Landlord, its directors, officers, employees and agents against and from any and all claims, actions, liabilities and losses including, but not limited to, all costs and expenses, including attorneys' fees, paid or incurred by Landlord in defending or otherwise responding to, such claims, actions, liabilities and losses arising from or related to (1) Tenant's Hazardous Material on, in under or migrating from the Center or (2) the breach of any representation, warranty or covenant of Tenant contained in this Section.

22. **Utilities; Electrical Equipment**

(a)    Tenant shall pay for all charges for gas, electricity, sewer (both sanitary and storm), telephone, water (including water for fire protection service), and all other utilities and communication services used, rendered or supplied upon or in connection with the Demised Premises.  Tenant shall be obligated to contract with such utility(s) directly.  Tenant shall be responsible at all times for the maintenance and repair of all of Landlord's electrical equipment located within the Demised Premises unless such repair is necessitated by reason of waste or negligence on the part of Landlord, its agents or employees, or such electrical equipment is located within the walls or under the floor slabs.  Should Tenant at any time require additional utility service, Landlord agrees to cooperate with Tenant (at no cost to Landlord) and to execute such documents as may be necessary to obtain same, but all costs in connection therewith shall be paid by

28

Tenant. In all events, Landlord's consent (not to be unreasonably withheld) shall be required with respect to any expanded or enhanced electric service which requires access to Landlord's electric equipment servicing the Demised Premises.

(b)   As to heat, ventilation, air conditioning, electricity, and any other services, Landlord shall not be responsible or liable in any way for any failure, interruption or inadequacy in the quantity or quality of the same where caused by war, civil commotion, governmental restrictions, prohibitions or other regulations, strikes, labor disturbances, inability to obtain adequate supplies or materials, casualties, or causes beyond Landlord's reasonable control whether similar or dissimilar to the foregoing.

## 23. Liens or Encumbrances

(a)   Tenant shall keep the Demised Premises free from any liens arising out of any work performed, materials furnished or obligations incurred by or on behalf of Tenant and shall indemnify, defend and hold Landlord harmless from all claims, costs and liabilities, including reasonable attorneys' fees and costs, in connection with or arising out of any such lien or claim of lien. Tenant shall cause any such lien imposed on the Demised Premises to be released of record by payment or posting of a proper bond within thirty (30) days after written request by Landlord.

(b)   It is specifically understood and acknowledged by Tenant that Tenant has no authority to act as agent or representative of, or bind Landlord in any way with respect to contracts it may enter into for the alteration or repair of the Demised Premises or the furnishing of any materials to be utilized in connection therewith. Notwithstanding anything to the contrary in this Lease or in any other writing signed by Landlord, neither this Lease nor any other writing signed by Landlord shall be construed as evidencing, indicating, or causing an appearance that any erection, construction, alteration or repair to be done, or caused to be done, by Tenant is or was in fact for the immediate use and benefit of Landlord. Further, nothing contained herein shall be deemed or construed in any way to constitute the consent of Landlord to allow any lien to be filed against the Demised Premises or the Center or any part thereof.

## 24. Compliance with Laws

Tenant covenants throughout the Term at its expense to comply promptly with all laws, codes, ordinances, administrative and court orders and directives, rules and regulations which have the force of law, whether now in effect or hereafter promulgated, applicable to Tenant's use and occupancy of the Demised Premises. Except to the extent the same is an obligation of Landlord under this Lease, Tenant shall be required to install at its cost all of Tenant's Improvements and/or alterations (both structural and nonstructural), required by law or code or any capital improvements required by law or code as a result of Tenant's occupancy of the Demised Premises.

## 25. Landlord's Right to Perform Tenant's Covenants

If Tenant shall fail to commence to cure any non-monetary covenant or agreement to be performed by Tenant under this Lease within thirty (30) days of receipt of written notice or within such additional time as may reasonably be necessary, Landlord shall have the

BH01\1847018.8
ID\NJW - 109304\0055

right (but not the duty) to enter the Demised Premises, if necessary, to perform the same without further notice, but the reasonable cost thereof shall be deemed to be Additional Rent, and shall give the Landlord the same rights and remedies as though the Additional Rent were part of the Rent due the Landlord under this Lease.

26. **Assignment of Landlord's Interest**

If Landlord should ever assign this Lease or the Rent hereunder to a creditor as security for a debt, Tenant shall, after receipt of written notice of such assignment, and upon demand by Landlord or the assignee, pay all sums thereafter becoming due Landlord hereunder to the assignee (from and after the time Tenant is furnished with such assignee's address) and furnish such evidence of insurance coverages required hereunder as the assignee may reasonably require so as to protect the assignee's interest as it may appear. Notwithstanding the foregoing, Tenant shall have no liability for the payment of any sums required under this **Section 26** to an improper payee unless Tenant was provided with at least thirty (30) days' prior written notice of such assignment and demand by Landlord or the assignee.

27. **Utility Lines and Facilities**

To the extent required by any law, ordinance, rule or regulation of any agency having jurisdiction over the Demised Premises, any governmental requirement or the Declaration of Restrictions for the Park, recorded in Book 742, Page 285 with the New Castle County Recorder of Deeds, as such may be amended from time to time, and only to such extent, Landlord reserves the right to place in, over, below and upon the Demised Premises (in such a manner as to not unreasonably interfere with Tenant's use of the Demised Premises), utility lines, conduits, pipes, tunneling and the like to service the Demised Premises and to use, replace, repair, and maintain such utility lines, conduits, pipes, tunneling and the like, in, over, below, and upon the Demised Premises in such a manner as will not materially interfere with Tenant's enjoyment thereof, provided that Landlord shall use its best efforts to see that such work does not significantly interfere with the ongoing business and operations of Tenant, that such work shall be done expeditiously and in a workmanlike manner, and further that the Demised Premises shall, upon conclusion of the work, be restored to substantially the same conditions as they were prior to the commencement of the work.

28. **Name of Building**

The Building may be designated and known by any name Landlord may reasonably choose, and such name may be changed from time to time at Landlord's reasonable discretion; provided, however, that Landlord shall provide Tenant with at least ninety (90) days' prior written notice of any such name change.

29. **Time of Essence**

Time is of the essence in this Lease.

30. **Entire Agreement**

This Lease and the attached exhibits constitute the entire agreement between Landlord and Tenant with respect to the Demised Premises. Neither this Lease nor any of its

30

provisions may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the parties.

31. **Choice of Law**

This Lease shall be construed in accordance with and governed by the laws of the state in which the Center is located.

32. **Binding Effect**

(a)    Subject to the restrictions on transfer herein, this Lease shall inure to the benefit of and be binding upon Landlord and Tenant and their respective heirs, executors, legal representatives and successors and assigns.

(b)    Tenant will not be bound by any assignment of this Lease by Landlord unless Tenant has received written notice and evidence of such assignment.

33. **Broker**

Landlord and Tenant represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Lease except McConnell Johnson Real Estate Company, LLC (the "**Broker**"), whose commission is payable by Landlord pursuant to a separate agreement. Landlord shall indemnify, defend and hold Tenant harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker.

34. **No Partnership**

Nothing contained in this Lease shall be construed to make Landlord and Tenant partners or joint venturers or to render either party liable for the debts or the obligations of the other.

35. **Third Party Beneficiaries**

Except as may be specifically provided herein, no other person, subtenant, customer, employee or invitee of Tenant or any other third party shall be deemed to be a third party beneficiary of any of the provisions herein.

36. **Partial Invalidity**

If any section, paragraph, subparagraph, sentence, clause or phrase of this Lease shall be declared or judged invalid or unconstitutional, such adjudication shall not affect the other sections, paragraphs, subparagraphs, sentences, clauses or phrases which shall remain in full force and effect.

37. **Recordings**

Neither party may require the other to execute or record a short form of this Lease.

38. **Prime Rate**

The term "**Prime Rate**" as used herein shall mean the rate of interest announced from time to time by JPMorgan Chase & Co. (or if JPMorgan Chase & Co. is not in existence, the largest bank in the City of Chicago, Illinois, measured in terms of net worth) as its "prime rate".

31

39. **Failure to Insist Upon Strict Performance**

The failure of either party to insist upon a strict performance of any of the terms, conditions, and covenants herein contained shall not be deemed a waiver of any rights or remedies that either party may have and shall not be deemed a waiver of any subsequent breach or default in the terms, conditions, and covenants herein contained. This Lease may not be changed, modified, or discharged except by a writing signed by both parties hereto.

40. **Headings**

The section headings are for convenience and are not a part of this Lease.

41. **Construction**

This Lease shall be construed without regard to any presumption or any other rule requiring construction against the party drafting a document. The parties acknowledge that this Lease is the result of negotiations between the parties, and in construing any ambiguity hereunder no presumption shall be made in favor of either party.

42. **Counterparts**

This Lease may be executed in counterparts and shall be deemed to have become effective when and only when one or more of such counterparts shall have been signed by or on behalf of each of the parties to this Lease (although it shall not be necessary that any single counterpart be signed by or upon behalf of each of the parties hereto and all such counterparts shall be deemed to constitute but one and the same instrument) and shall have been delivered by each of the parties to the other. Furthermore, the parties agree that: (i) this Lease may be transmitted between them by telecopier or e-mail; (ii) this Lease may be executed by telecopier or e-mail signature but upon request by either party, original signatures shall be subsequently delivered after e-mail signatures have been circulated; (iii) telecopier and e-mail signatures shall have the effect of original signatures; and (iv) that a faxed or e-mailed Agreement containing the signatures (original, faxed or e-mailed) of all parties hereto shall be binding on a party when the signature page of such party is transmitted to the other party.

43. **Attorneys' Fees**

If any legal action, suit or proceeding is commenced between Tenant and Landlord regarding their respective rights and obligations under this Lease, the prevailing party shall be entitled to recover, in addition to damages or other relief, reasonable costs and expenses, attorneys' fees and court costs (including, without limitation, expert witness fees). As used herein, the term "prevailing party" shall mean the party which obtains the principal relief it has sought, whether by compromise settlement or judgment. If the party which commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of the other party, such other party shall be deemed the prevailing party.

44. **No Waiver**

The waiver by either party of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach

32

of the same or any other term, covenant or condition herein contained. No covenant, term or condition of this Lease shall be deemed to have been waived by either party unless such waiver is in writing and executed by either party.

45. **OFAC Certification**

Tenant and Landlord (each, a "**Representing Party**") each represents and warrants to the other (i) that, to its knowledge, neither the Representing Party nor any of its officers, directors or managing members is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 (the "**Executive Order**") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Person Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, (ii) that, to its knowledge, the Representing Party's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "**Money Laundering Act**"), and (iii) that throughout the Term of this Lease the Representing Party shall comply as required with the Executive Order and with the Money Laundering Act.

*[Remainder of this page intentionally left blank; signature page follows.]*

33

IN WITNESS WHEREOF, the parties have caused this Distribution Center Lease to be executed as of the Effective Date.

**LANDLORD**:

**CENTERPOINT 550, LLC,**
a Delaware limited liability company

By: _Paul M McConnell_
Name: _Paul M McConnell_
Its: _Managing Member_

**TENANT**:

**SEARS OUTLET STORES, L.L.C.,**
a Delaware limited liability company

By:       Sears Hometown and Outlet Stores, Inc.,
          a Delaware corporation
Its:      Sole Member

          By: _____
          Name:       Peter Nero
          Its:        Vice President, Real Estate

Approved by Dykema Gossett PLLC
_Nicholas J. Winter_

SHOS RE

34

**List of Exhibits:**

| | |
|---|---|
| A | Legal Description -- Center |
| B | Site Plan |
| C | Landlord's Work |
| C-1 | Initial Tenant's Improvements |
| D | Intentionally Deleted |
| E | Estoppel Certificate |
| F | Intentionally Deleted |
| G | Lease Commencement Date Acknowledgement |
| H | Lease Supplement |

BH01\1847018.8
ID\NJW - 109304\0055

# EXHIBIT "A"

## LEGAL DESCRIPTION - CENTER

Exhibit "A"

ALL that certain piece, parcel or tract of land, with the improvements thereon, situate in the City of New Castle, New Castle County, and State of Delaware, commonly known as 700 Centerpoint Boulevard, being shown as Parcel 2C on the Record Minor Subdivision Plan of Parcels 3A, 4A, 2C & Storm Water Management Area, CENTERPOINT BUSINESS PARK, dated March 31, 1999 and recorded April 28, 1999 in the Office of the Recorder of Deeds in and for New Castle County and State of Delaware at Microfilm No. 13840, and being more particularly bounded and described as follows, to-wit:

BEGINNING at a point on the northerly side of Centerpoint Boulevard (60 feet wide), said point being a common corner for Parcel 1 and lands herein being described and located the following five courses and distances from the southeasterly end of a fillet joining the southerly side of Delaware Route 273 (80 feet wide) with the westerly side of Centerpoint Boulevard (60 feet wide):

(1)    South 08 degrees 19 minutes 11 seconds West, 307.47 feet to a point of curvature; thence,

(2)    by an arc curving to the right having a radius of 437.27 feet, an arc distance of 271.80 feet to a point of compound curvature; thence,

(3)    by an arc curving to the right having a radius of 532.68 feet, an arc distance of 224.31 feet to a point of tangency; thence,

(4)    South 68 degrees 03 minutes 43 seconds West, 881.67 feet to a point of curvature; thence,

(5)    by an arc curving to the left having a radius of 1782.54 feet, an arc distance of 299.01 feet to the Point of Beginning.

THENCE, from said Point of Beginning the following sixteen courses and distances;

(1)    by an arc curving to the left having a radius of 1782.54 feet, an arc distance of 58.73 feet to a corner for Parcel 2B; thence, with same the next five courses and distances,

(2)    North 21 degrees 56 minutes 17 seconds West, 313.81 feet to a point; thence,

(3)    South 68 degrees 03 minutes 43 seconds West, 273.93 feet to a point; thence,

(4)    South 46 degrees 28 minutes 19 seconds West, 36.57 feet to a point; thence,

(5)    South 08 degrees 34 minutes 09 seconds West, 118.00 feet to a point; thence,

(6)    South 21 degrees 56 minutes 17 seconds East, 220.00 feet to a point; thence,

(7)    by an arc curving to the right having a radius of 23.00 feet, an arc distance of 4.44 feet to a point of reverse curvature; thence,

(8)    by an arc curving to the left having a radius of 70.00 feet, an arc distance of 133.06 feet to a corner for Parcel 4A; thence, with same the next two courses and distances,

(9)    North 82 degrees 44 minutes 44 seconds West, 209.23 feet to a point; thence,

(10)    South 89 degrees 29 minutes 07 seconds West, 461.29 feet to a point in line of lands now or formerly of Cheminter Investments, Inc.; thence, with same the next four courses and distances,

(11)    North 24 degrees 42 minutes 05 seconds East, 56.05 feet to a point; thence,

(12)    North 26 degrees 05 minutes 36 seconds East, 280.79 feet to a point; thence,

(13)    North 28 degrees 28 minutes 34 seconds East, 162.40 feet to a point; thence,

(14)    North 46 degrees 28 minutes 19 seconds East, 642.80 feet to a corner for Parcel 2A; thence, with same,

(15)    South 43 degrees 31 minutes 41 seconds East, 427.64 feet to a corner for Parcel 1; thence, with same,

(16)    South 24 degrees 12 minutes 35 seconds East, 447.37 feet to the Point of Beginning.

A-1

**EXHIBIT "B"**

**SITE PLAN**

(see attached)

B-1

BH01\1847018.8
ID\NJW - 109304\0055



B-2

## EXHIBIT "C"

### LANDLORD'S WORK

- Turn over Building with all operational items/utilities in good working condition and up to current code, including the following:

  o Lighting, Sewer, Sprinkler, Roof, HVAC, Dock Levelers, Dock Doors, Exterior Doors, Railings, stairs, Electrical equipment/distribution, water supply/pumps, lavatories, sinks, water heaters and roof.

- Remove Dock Door shrouds and install bumpers

- Fill in all current pits on warehouse floor – unless noted by Tenant

- Remove old tenant's files and paperwork, interior signage

- Turn over all offices in like new condition – clean, holes patched and walls painted that were patched from corner to corner with matching paint (if walls in good condition, no work required)

- Keep previous tenant's office furniture in place

- Remove all old light fixtures not in use

- Remove previous tenant's warehouse racking and HVAC duct for paper removal

- Perform routine maintenance/work on the landscaping around Building

- Perform routine maintenance/work on the parking lot

C-1

**EXHIBIT "C-1"**

**INITIAL TENANT'S IMPROVEMENTS**

[please see attached]

BH01\1847018.8
ID\NJW - 109304\0055



C-1-2

## EXHIBIT "D"

[Intentionally Deleted]

BH01\1847018.8
ID\NJW - 109304\0055

EXHIBIT "E"

## ESTOPPEL CERTIFICATE

[City/State/Store #]

Date

To:    ("**Lender**")

   ("**Purchaser**")

Re:    [Center/City/State]  (the "**Center**")

The undersigned, **SEARS OUTLET STORES, L.L.C.** ([*as successor in interest to_____]* "**Tenant**"), under that certain Lease dated _____, by and between _____ [*as successor in interest to _____]* (as "**Landlord**"), and Tenant, as amended by _____ (collectively, the "**Lease**") covering the premises commonly known as Sears Store # _____ (the "**Premises**"), located in the Center and as more particularly described in the Lease, hereby certifies that as of the date hereof:

Subject to the provisions herein, Tenant hereby certifies that:

1.  Tenant has not received nor given any notice of default pursuant to the terms of the Lease which has not been cured and is aware of no circumstance which, with the giving of notice or the lapse of time, or both, would give rise to a default under the Lease.  However, although the following problems have not risen to the level of default, they have the potential to become serious, even to the level of default, if not cured:

2.  The current term of the Lease expires on _____, but may be extended or terminated as specified in the Lease.

3.  All payments under the Lease have been made through _____. The current fixed minimum monthly rental amount is $ _____.

4.  The Lease is in full force and effect and has not been amended, except as noted above.

E-1

5. Tenant: (i) has not made a thorough inspection of the Premises or audit of the bills or other documents issued by Landlord under, pursuant to, or in connection with the Lease; (ii) expressly reserves the right to conduct such an inspection or audit at a later date; (iii) makes no representation as to Landlord's obligations under the Lease except as specifically stated herein; and (iv) except as specifically stated herein, expressly reserves: (a) any and all claims Tenant has or may have against Landlord and/or its representatives, agents, successors, and assigns relating to overcharges or other incorrect billings by Landlord and Landlord's failure to perform its obligations under the Lease, (b) any and all compliance issues relating to the Americans with Disabilities Act and/or state and local accessibility laws, including but not limited to, accessibility issues which may require a survey of the property, including exterior barriers to wheelchair and scooter accessibility that may be Landlord's responsibility under the Lease, and (c) all rights and remedies available to Tenant under the Lease or as otherwise provided at law or in equity.

6. If any conflict between the terms of this document and the Lease should arise, the terms of the Lease shall prevail.

7. This Estoppel Certificate is given solely for the information of the party or parties to whom addressed, and it may not be relied upon by any other person or entity. This Estoppel Certificate shall not create any liability in, or provide any right of action against Tenant, its officers, directors, agents, employees and representatives.

<div style="margin-left: 40%;">

**SEARS OUTLET STORES, L.L.C.**, a Delaware limited liability company

By:    Sears Hometown and Outlet Stores, Inc., a Delaware corporation

Its:    Sole Member

By: _____
Name: _____
Its: _____

</div>

BH01\1847018.8
ID\NJW - 109304\0055

# EXHIBIT "F"

Intentionally Deleted

BH01\1847018.8
ID\NJW - 109304\0055

## EXHIBIT "G"

### LEASE COMMENCEMENT DATE ACKNOWLEDGEMENT

Date _____ 9/12/13 _____

Attention:    Project Manager
              Sears Outlet Stores, L.L.C.

Landlord:     Centerpoint  550  LLC
              (Name and Company)
              1201  N.  Market  St.  Suite 400
              (Address)
              Wilmington , DE , 19801
              (City/State/Zip Code)

Landlord's Agent:    Michael McConnell   McConnell Johnson Real Estate
                     (Name and Company)
                     1201 N. Market St. Wilmington , DE 19801
                     (Address)

                     _____
                     (City/State/Zip Code)

RE:    Facility Inspection/Sears Unit #_____

To Whom It May Concern:

The undersigned Landlord and Tenant hereby acknowledge that they have toured the Demised Premises.    The parties acknowledge that the Commencement Date for the Lease is
8/12/13    9/12/13 MTM    . Tenant is in receipt of all keys and the property has been substantially completed in accordance with the lease documents.

Tenant takes possession of the above-mentioned Demised Premises in what appears to be a good and satisfactory condition, subject to the minor punch list items listed below being completed on or before    11/1/13    .

Except as otherwise defined herein, all capitalized terms used but not defined herein shall have the same meaning ascribed to such terms in the Lease, dated as of August 7, 2013 , between Sears Outlet Stores, L.L.C., and    Centerpoint 550 LLC

Punch List Completion Date  11/1/13

                                    Items

One janitorial cleaning of office and warehouse area. Completion of overhead door work. Landscaping by main entrance.

G-1

BH01\1847018.8
ID\NJW – 109304\0055

IN WITNESS WHEREOF, this Lease Commencement Date Acknowledgment is executed as of the day and year first above set forth.

<u>**LANDLORD/LANDLORD'S AGENT**</u>:

_____ ,

a(n) _____

By: _____
Name: Michael McConnell
Its: _____

<u>**TENANT**</u>:

**SEARS OUTLET STORES, L.L.C.**, a
Delaware limited liability company

By:   Sears Hometown and Outlet Stores, Inc., a
Delaware corporation, its sole member

By:   _____
Name: _____ PETE JOHNSON _____
Its:  _____

G-2

## EXHIBIT "H"

### LEASE SUPPLEMENT

**THIS LEASE SUPPLEMENT** ("**Supplement**") is made on _____, _____, between _Centerpoint 550, LLC_____, a _Delaware limited liability company_ ("**Landlord**") and **SEARS OUTLET STORES, L.L.C.**, a Delaware limited liability company ("**Tenant**").

### RECITALS:

A.    Landlord and Tenant entered into an Distribution Center Lease dated _August  7_, _2013_ (the "**Lease**"), for certain property in the City of _New Castle_, County of _New Castle_, State of _Delaware_, more specifically described in the Lease (the "**Premises**").

B.    Section/Article/Paragraph _3a_ of the Lease provides that Landlord and Tenant shall specify the Commencement Date of the Lease by supplemental agreement.

C.    Section/Article/Paragraph _4a_ of the Lease provides that the Rent Commencement Date shall be the earlier of (i) _one hundred twenty_ (120) days after the Commencement Date, or (ii) the date that Tenant opens for business to the general public .

**NOW, THEREFORE,** Landlord and Tenant agree to supplement the Lease as follows:

2.    Tenant opened for business to the general public on _____, 20__, and the Rent Commencement Date is _____, 20__.

3.    The Commencement Date of the Lease is _9 / 12_, 2013.

4.    The Initial Term of the Lease is _____, 20__, through _____, 20__.

5.    Tenant's proportionate share of Landlord's estimate of the CAM costs, Taxes and insurance for the first year are as follows: (i) Taxes $ _0.67 psf_ ; (ii) CAM costs $ _0.38 psf_ _____; and (iii) insurance $ _0.14 psf_

6.    The Lease, except as herein supplemented, is in all other respects fully ratified and confirmed.

7.    Except as otherwise defined herein, all capitalized terms used in this Supplement shall have the meaning ascribed to such terms in the Lease.

8.    Landlord represents and warrants that Landlord has full right, power and authority to enter into this Supplement.

*[Remainder of this page intentionally left blank; signature page follows.]*

H-1

IN WITNESS WHEREOF, Landlord and Tenant have caused this Supplement to be executed as of the day and year first above set forth.

**LANDLORD**:

_____,
a(n) _____

By: _____
Name: _____
Its: _____


**TENANT**:

**SEARS OUTLET STORES, L.L.C.**, a Delaware limited liability company

By:    Sears Hometown and Outlet Stores, Inc.,
       a Delaware corporation
Its:    Sole Member

       By: _____
       Name: _____
       Its: _____

H-2

# **41** **AMERICAN FREIGHT**
# FURNITURE · MATTRESS · APPLIANCE

109 Innovation Court, Suite J
Delaware, OH 43015
740.363.2222 ph
740.480.1663 fax

January 24, 2023

**VIA UPS OVERNIGHT**

Centerpoint 550, LLC
2710 Centerville Road, Suite 104
Wilmington, DE 19808

Re:    American Freight Unit #4052
Lease dated August 7, 2013 between CENTERPOINT 550, LLC, ("Landlord") and
AMERICAN FREIGHT OUTLET STORES, LLC successor in interest to SEARS OUTLET
STORES, LLC., ("Tenant"), as amended, modified and/or assigned (collectively, the
"Lease"), for the demised premises as defined in the lease as 700 Centerpoint Boulevard,
New Castle, DE 19720

### NOTICE OF EXERCISE OPTION TO RENEW

Pursuant to Section 3(d) of the Lease, you are hereby notified that Tenant has elected to, and
does hereby, exercise its right to extend the Lease and the term thereof for a further period of five
(5) years, commencing November 1, 2023, and continuing and including October 31, 2028 per
the terms of the Lease.

Sincerely,

**AMERICAN FREIGHT OUTLET STORES, LLC**

By _Jeff Seghi_
Jeff Seghi
Chief Financial Officer

cc:    Connolly Gallagher LLP
1000 West Street, Suite 1400
Wilmington, Delaware 19801
Attn: Rachel A. Dwares, Esq.