## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (LSS)<br><br>(Jointly Administered)<br><br>**Hearing Date: April 3, 2025 at 10:00 a.m. (ET)**<br>**Objections Due: March 21, 2025 at 4:00 p.m. (ET)** |

**FIFTH & ALTON (EDENS) LLC'S MOTION (I) FOR THE ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM; (II) TO COMPEL TENANT DEBTOR TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE UNDER THE LEASE; (III) TO COMPEL THE CURE OF NONMONETARY DEFAULTS UNDER THE LEASE; AND (IV) TO ESTABLISH AN APRIL 4, 2025 <u>DEADLINE FOR THE DEBTORS TO ASSUME OR REJECT THE LEASE</u>**

Fifth & Alton (Edens) LLC ("Landlord"), by and through its undersigned attorneys, hereby moves (the "Motion") this Court for an order compelling the Debtors to 1) pay monthly rent due for the Debtors' occupancy of Landlord's units; 2) vacate the Original Premises under the Lease and Relocation Agreement; 3) provide adequate assurance that Debtors or any assignee will pay for all pecuniary losses for Debtors' ongoing breach of nonmonetary acts under the Lease and Relocation Agreement; and 4) assume or reject the Lease and Relocation Agreement on or before April 4, 2025. In support of this Motion, Landlord represents as follows:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are §§ 503(b)(1), 507(a)(2), and

365 of the Bankruptcy Code.

4.        In accordance with Del. Bankr. L.R. 9013-1(f), Landlord consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the Constitution of the United States.

**RELEVANT PROCEDURAL BACKGROUND**

5.        On November 3, 2024 (the "Petition Date"), Franchise Group, Inc. and its affiliated debtors (collectively, the "Debtors") commenced these bankruptcy cases, by filing petitions for relief under Chapter 11 of the United States Bankruptcy Code.

6.        The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.  No trustee or examiner has been appointed in these chapter 11 cases.

7.        On November 5, 2024, the Court entered its Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases [D.I. 88.]

8.        On November 11, 2024, the Debtors filed the *Debtors Motion for Entry of Orders (I) (A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II) (A) Approving the Sale of the Debtors Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 154] (the "Sale Procedures Motion").

9.        On November 19, 2024, the Office of the United States Trustee appointed the Committee of Unsecured Creditors pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.

188].

10.     On December 11, 2024, the Court entered its *Order (I) (A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief* [D.I. 411.]

11.     On December 16, 2024, the Court entered its *Order (REVISED) (I) (A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief* [D.I. 444] (the "Sales Procedures Order").

12.     On December 20, 2024, Debtors filed the *Notice of Possible Assumption and Assignment and Cure Costs with Respect to Executory Contracts and Unexpired Leases filed on December 20, 2024* [D.I. 487] (the "Cure Notice").

13.     In the Cure Notice, the Debtors identify two (2) lease agreements Landlord Fifth & Alton (Edens) LLC for potential assumption with Vitamin Shoppe Industries LLC (the "Tenant Debtor") listed as the Debtor counterparty, each stating a total cure amount through the date of the Cure Notice of $1,844.12. These two agreements are identified as a "Lease, dated 09/24/2009, as amended (South Beach)" and "Lease, dated 12/16/2024, as amended (Miami Beach (Relocation))".

14.     On January 3, 2025, Landlord filed its *Objection and Reservation of Rights of Fifth & Alton (Edens) LLC to Proposed Cure Amounts* [D.I. 641] (the "Landlord Cure Objection").

15.     In the Landlord Cure Objection, Landlord asserted, *inter alia*, that the Tenant Debtor has remained in possession of the Original Premises (defined *infra*.) since the Petition Date and has had possession of the Relocation Premises (defined *infra*.) since August 1, 2024; that Rent on the

Relocation Premises began effective January 3, 2025; that any cure shall include payment of any Rent due from the Tenant Debtor's occupation of both the Original and Relocation Premises; and that the Tenant Debtor remains potentially liable under the Lease for any additional damages suffered by Landlord due to Tenant Debtor's failure to vacate the Original Premises. *Id*.

16.     On February 12, 2025, the Court entered its *Order Extending The Deadline For The Debtors To Assume Or Reject Unexpired Leases Of Non-Residential Real Property Under Which Any Of The Debtors Is A Lessee* (the "Assumption/Rejection Extension Order")[D.I. 970] extending the period by which the Debtor must assume or reject unexpired leases on non-residential real property up to and until June 1, 2025 (the "General Lease Deadline").

## THE LEASE AND RELOCATION AGREEMENT

17.     On November 14, 2008, Landlord's predecessor in interest, AR & J SOBE, LLC and Vitamin Shoppe Industries, Inc. entered into a ten-year lease (the "Original Lease") for improved real property located at 5th and Alton Shopping Center, Miami Beach, Florida. The premises under the Original Lease included approximately 3,547 sq. ft. of leaseable floor area known as Unit #180 (the "Original Premises").

18.     On December 31, 2018, Landlord and Vitamin Shoppe Industries Inc. entered into the First Amendment to Lease (the "Lease Amendment") extending the term of the Original Lease for three (3) years until September 30, 2022 and otherwise modified the terms of the Original Lease as set forth therein.

19.     Pursuant to Section 2 of the Lease Amendment, Rent on the Original Premises for the period of October 1, 2021 through September 30, 2022 consisted of monthly rent in the amount of $22,743.04 plus monthly operating costs, monthly tax charges, and monthly insurance charges (the "Original Premises Rent").

20.     On November 18, 2022, Landlord and Debtor Vitamin Shoppe Industries LLC (the "Tenant Debtor") entered into the Relocation Agreement and Second Amendment to Lease (the "Lease and Relocation Agreement"[1] together with the Original Lease and the Lease Amendment, the "Lease").

21.     The Lease and Relocation Agreement provides, among other items, that the Tenant Debtor shall relocate from Unit #180 (consisting of approximately 3,575 sq. ft) to Unit #140 (the "Relocation Premises") consisting of approximately 2,285 sq. ft.

22.     Pursuant to Section 3(i) of the Lease and Relocation Agreement:

> The date on which the last of the following events occurs shall be referred to as the "Relocation Premises Delivery Date ': (i) Lessor delivers legal possession of the Relocation Premises to Tenant, vacant and free of all rights of any third parties and free of all hazardous materials, with Lessor's Work substantially complete (as described below) in accordance with the Approved Lessor's Plans and in compliance with applicable Laws, provided that Tenant shall not be required to accept possession of the Relocation Premises prior to April 1, 2023, (ii) Tenant receives from Metropolitan Life Insurance Company ("Lender"), the holder of the current financing encumbering the Shopping Center, a non-disturbance agreement ("SNDA") executed by Lender in accordance with Section 20 below, and (iii) the applicable governmental authority(ies) responsible for issuing the building permits for Tenant's Work ("Tenant's Permits") approve~ the application for Tenant's Permits to the extent necessary for Tenant to commence Tenant's Work. Tenant hereby acknowledges and agrees that Tenant has inspected the Relocation Premises and that Tenant agrees to accept the Relocation Premises in its current "as is" condition, except for Lessor's Work, and Lessor makes no representations as to the condition of the Relocation Premises.

---

1 A copy of the Lease and Relocation Agreement is attached as **Exhibit 1** to the *Declaration of Gail McKinney* (the "McKinney Declaration") submitted herewith.

23.     Attached as Exhibit C to the Lease and Relocation Agreement are descriptions of the above-referenced Lessor's Work and Tenant's Work. Tenant's Work requires that the Tenant shall:

> Renovate, remodel, refurbish and redecorate the Relocation Premises, and make all interior improvements, alterations and changes to the Relocation Premises (other than Lessor's Work) to place same in a first class, modern and attractive condition, to enable the Tenant to use the Relocation Premises for Tenant's Permitted Use (all of which shall be included in "Tenant's Work"). . .

> Within fifteen (15) days following the Lessor's approval of the Approved Tenant's Plans ("Permit Filing Date") Tenant shall, at Tenant's expense, apply for Tenant's Permits, which shall include all necessary governmental permits, approvals and licenses as required to perform Tenant's Work and thereafter Tenant shall diligently pursue obtaining Tenant's Permits.

24.     Pursuant to Section 3(ii) of the Lease and Relocation Agreement:

> Lessor's Work shall be deemed substantially complete when all of Lessor's Work is complete in accordance with the Approved Lessor's Plans (as modified if required by applicable governmental entities for issuance of Lessor's Permits, subject to the last paragraph of Section 2 above) except for any "Punch List Items" (as hereinafter defined) and a certificate of completion has been issued by the municipality with respect to Lessor's Work.

25.     Pursuant to Section 3(iii) of the Lease and Relocation Agreement:

> On or before the Relocation Premises Delivery Date, Lessor's and Tenant's representatives together shall conduct a walk-through of the Relocation Premises to compile a punch list of the Punch List Items. Tenant shall deliver to Lessor a copy of said punch list within five (5) days after the walk-through. If Lessor does not receive the list of Punch List Items from Tenant within such 5-day period, then Tenant shall be deemed to have waived the right to have Lessor complete any Punch List Items. If Lessor does receive the list of Punch List Items from Tenant within such 5-day period, Lessor shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list, subject to force majeure. . .

26.     Pursuant to Section 3(iv) of the Lease and Relocation Agreement:

> As used herein, the term "Punch List Items" for purposes of determining substantial completion of Lessor's Work shall mean such

minor items of a cosmetic nature which, when considered as a whole, do not adversely affect or delay either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Relocation Premises. Tenant and Lessor shall reasonably cooperate in the scheduling of such work ( other than emergency work, if not practicable) and Lessor shall use commercially reasonable efforts to avoid interference with work being performed by Tenant or on behalf of Tenant within the Relocation Premises.

27.    Pursuant to Section 3(v) of the Lease and Relocation Agreement:

Lessor shall provide Tenant with sixty (60) days' prior written notice of the estimated date Lessor expects to deliver possession of the Relocation Premises to Tenant; provided, however, Lessor shall not be in default and Tenant shall not be entitled to any remedy if delivery of possession does not occur on such estimated date.

28.    Pursuant to Section 4 of the Lease and Relocation Agreement:

(i)    **Entry in the Relocation Premises**. Beginning on the Relocation Premises Delivery Date, Tenant and its agents, servants, employees, and contractors may enter the Relocation Premises, provided Tenant has submitted to Lessor evidence of insurance coverage applicable to the Relocation Premises as required by the Lease, as well as evidence of coverage required for any and all contractors involved in Tenant's Work. Tenant, at its sole costs and expense, shall perform and construct, in a good and workmanlike manner, any work (other than Lessor's Work) necessary for Tenant to occupy the Relocation Premises and to operate therein for the Permitted Uses ("Tenant's Work""), subject to Exhibit C. Any work performed by Tenant shall be subject to the terms and conditions of the Lease and this Agreement. Tenant must obtain Lessor's written approval, which shall no be unreasonably withheld, conditioned or delayed, prior to submitting applications to the applicable governmental authorities for approval and permitting, and Tenant must comply in all respects with all applicable laws and ordinances.

Tenant hereby agrees that Tenant. . .will pay all utility charges with respect to the Relocation Premises which accrue on and after the date of Tenant's first such entry; and that such entry shall be subject to all terms, conditions, and covenants of the Lease, as amended by this Agreement.

(ii)    **Completion of Tenant's Work and Opening for Business**. Within ten (10) days after the Relocation Premises Delivery Date, Tenant shall commence Tenant' Work. Tenant shall substantially

complete all of Tenant's Work, obtain a certificate of occupancy for the Relocation Premises, and open for business to the public in the Relocation Premises on or before the date which is ninety (90) days following the earlier of: (a) the date Tenant commences to perform the Tenant's Work, or (b) ten (10) days after the Relocation Premises Delivery Date (the "Opening Deadline")

29.     Pursuant to Section 5 of the Lease and Relocation Agreement:

Surrender of Original Premises. On or before the earlier to occur of : (i) the date which is five (5) days following the date on which Tenant opens for business in the Relocation Premises, or (ii) ninety-five (95) days after the Relocation Premises Delivery Date (the "Surrender Date"), Tenant shall surrender possession and vacate the Original Premises, leaving same in broom-clean condition, free of all moveable trade fixtures, inventory, equipment, and any other property, excepting only Tenant's permanent leasehold improvements, which may remain in place. Tenant shall be entitled to occupy the Original Premises and shall perform all of Tenant's obligations with respect thereto, in accordance with the terms and conditions of the Lease, through the Surrender Date. Notwithstanding anything in this Agreement to the contrary, including but not limited to the provisions of Section 6 below, should Tenant fail to surrender possession of the Original Premises on or before the Surrender Date, Tenant shall be a tenant at sufferance occupying the Original Premises and Tenant shall be obligated, in addition to any other remedies available to Lessor under the Lease and/or Florida law, to continue paying Rent pursuant to the Lease for the period of any such tenancy at sufferance in the Original Premises, in addition to Rent on the Relocation Premises, which Tenant shall be obligated to pay in accordance with Section 9 of this Agreement, regardless of whether Tenant has surrendered possession of the Original Premises. The terms, conditions and obligations set forth in the preceding sentence shall survive any expiration of the Lease, and/or any release of liability of Tenant with respect to the Original Premises.

30.     Pursuant to Section 7 of the Lease and Relocation Agreement:

Relocation Commencement Date and Rent on Original Premises. Tenant shall commence paying Rent applicable to the Relocation Premises on the earlier of (i) ninety (90) days following the Relocation Premises Delivery Date; or (ii) the date on which Tenant first opens for business in the Relocation Premises (the "Relocation Commencement Date'). Notwithstanding anything in the Lease or this Agreement to the contrary, so long as Tenant timely surrenders possession of the Original Premises in accordance with Section 5

above, Tenant shall continue paying Rent on the Original Premises at the rates set forth in the Lease through and including the day immediately prior to the Relocation Commencement Date.

31.     The Lease and Relocation Agreement extended the term of the Lease for seven (7) years from the day immediately preceding the "Relocation Commencement Date".

32.     Pursuant to Section 9 of the Lease and Relocation Agreement, Rent for the first year of the Relocation Premises consists of $15,479.23 (the "Relocation Premises Rent" together with the Original Premises Rent, the "Rent"), including $11,425 in monthly rent, plus monthly operating costs, monthly tax charges, and monthly insurance charges.

## **LANDLORD DELIVERED THE RELOCATION PREMISES**

33.     On August 1, 2024, Landlord delivered physical access and legal possession of the Relocation Premises to Tenant Debtor. Physical access and legal possession was provided to the Tenant Debtor at that time. McKinney Declaration, ¶ 5.

34.     Landlord's August 1, 2024 delivery of the Relocation Premises and work completion was confirmed by written notice to Tenant Debtor dated August 5, 2024 (the "Confirmation Letter" attached to the McKinney Declaration as **Exhibit 2**). In conjunction with the delivery of the Confirmation Letter, Landlord provided Tenant Debtor a copy of the Certificate of Occupancy. McKinney Declaration, ¶ 6.

35.     Upon delivery of the premises and the issuance of the Certificate of Occupancy, Landlord's Work was complete and Tenant Debtor could operate from the Relocation Premises and begin preparing the space for its use. Most, if not all, of the Tenant's Work under the Lease and Relocation Agreement could have been completed by the Tenant Debtor while open for business. McKinney Declaration, ¶ 7

36.     On August 7, 2024, the walkthrough contemplated pursuant to Section 3(iii) of the

Lease and Relocation Agreement was conducted. During the walkthrough, Tenant Debtor did not indicate any Punch List Items and accepted delivery of the Relocation Premises. On August 12, 2024, Tenant Debtor's commercial real estate representative confirmed via email that there were no Punch List Items to complete. McKinney Declaration, ¶ 8.

37.     Additionally, pursuant to Section 3(iii) of the Lease and Relocation Agreement, Tenant Debtor was required to deliver to Landlord a copy of the Punch List Items within five (5) days from the walkthrough. Tenant Debtor did not provide any Punch List Items within the subsequent five (5) days. McKinney Declaration, ¶ 9.

38.     As Tenant Debtor was entitled to sixty (60) days' advance notice of the estimated delivery date pursuant to Section 3(v) of the Lease and Relocation Agreement, the actual delivery of access and possession on August 1, 2024 constituted the sixty (60) day notice. Therefore, the Relocation Premises Delivery Date was established as September 30, 2024. McKinney Declaration, ¶ 10.

39.     Landlord turned over responsibility for the utilities at the Relocation Premises, including electric, no later than September 30, 2024. McKinney Declaration, ¶ 11.

40.     Pursuant to Section 5 of the Lease and Relocation Agreement, the Surrender Date of the Original Premises is ninety-five (95) days after the Relocation Premises Delivery Date , or January 3, 2025 (the "Surrender Date"). McKinney Declaration, ¶ 12.

41.     Therefore, effective January 3, 2025, the Tenant Debtor is currently occupying and in possession of both the Original Premises and the Relocation Premises and is responsible for all Rent including the Original Premises Rent and the Relocation Premises Rent.

## TENANT DEBTOR'S BREACH OF LEASE AND RELOCATION AGREEMENT

42.    Despite Relocation Premises Rent becoming due starting January 3, 2025, Tenant Debtor has failed to remit the Relocation Premises Rent in the amount of $15,479.23 for each of January, February, and March 2025.

43.    In addition to having legal possession under the Lease and Relocation Agreement, Tenant Debtor failed to diligently pursue any required permitting with the City of Miami Beach.

44.    On August 21, 2024, the Tenant Debtor submitted its plans for the Tenant Work to the City of Miami Beach. McKinney Declaration, ¶ 13.

45.    The first round of comments from the City of Miami Beach were returned to the Tenant Debtor on October 2, 2024. McKinney Declaration, ¶ 13.

46.    Tenant Debtor failed to timely respond to the comments by the City of Miami Beach, delaying one hundred and twenty (120) days until January 31, 2025 to resubmit the plans for the Tenant's Work to the City of Miami Beach. The January 31, 2025 submission to the City of Miami Beach failed and returned to the Tenant Debtor on February 18, 2025. Tenant Debtor has not re-submitted to the City of Miami Beach as of March 5, 2025.  McKinney Declaration, ¶ 14.

47.    Additionally, Tenant Debtor has failed to surrender the Original Premises by the Surrender Date as required under Section 5 of the Lease and Relocation Agreement (McKinney Declaration, ¶ 15), which provides, among other things, that the Tenant Debtor remains a tenant at sufferance occupying the Original Premises.

48.    Landlord has entered into agreements with two third-party lessees regarding the leasing of the Original Premises. The leases for those new tenants have delivery dates for the premises of May 1, 2025 and July 1, 2025.  The build-out of the Original Premises for the new tenants is estimated to take one hundred and twenty (120) days. McKinney Declaration, ¶ 16.

49.     Failure to turnover the re-let Original Premises to the new tenants by the above dates will trigger escalating losses under the third-party leases. Ultimately, failure to timely turnover the premises can result in rent penalties, cancellation of the third-party leases, and additional penalties of up to $50,000.00 each. McKinney Declaration, ¶ 17.

50.     As such, Tenant Debtor's failure to diligently pursue permits with the City of Miami Beach and its refusal to vacate the Original Premises have likely interfered with Landlord's ability to perform under the third-party leases. Therefore, Tenant Debtor's breach of the Lease and Relocation Agreement will undoubtedly cause Landlord pecuniary losses that must be cured by the Tenant Debtor as a condition of assumption.

## RELIEF REQUESTED AND BASIS THEREFOR

51.     Landlord is seeking immediate payment of Rent on the Relocation Premises as set forth in the Lease and Relocation Agreement. Rent requested totals $45,439.03 (the "Landlord Administrative Expense Claim"), consisting of $15,479.23 for the months of February and March, 2025, and $14,480.57 for the month of January (pro-rated from January 3, 2025.) Landlord is also seeking the Debtor's immediate vacation of the Original Premises. Landlord is also seeking adequate assurance of future payment of all amounts due under the Lease and Relocation Agreement, including any pecuniary loss for Tenant Debtor's unjustified delay and lack of diligence in pursuing permits with the City of Miami Beach, Florida. The Landlord is also seeking a deadline of April 4, 2025 for the Tenant Debtor to assume the Lease and Relocation Agreement and cure all defaults, including the vacation of the Original Premises and payment of all outstanding Rent due on both units. If the Tenant Debtor is unable to do so, Landlord requests the rejection of the Lease and Relocation Agreement by that date.

**Landlord is Entitled to an Administrative Expense Claim for Rent on Both Premises**

52.     Section 503(b) of the Bankruptcy Code provides, in pertinent part, that allowed administrative expense claims exist for the "actual, necessary costs and expenses of preserving the estate…" 11 U.S.C. § 503(b)(1)(A).   Section 507(a) of the Bankruptcy Code provides that administrative expense claims that are allowed under section 503(b) of the Bankruptcy Code have second priority.  11 U.S.C. § 507(a)(2).

53.     Under the Bankruptcy Code, "[i]f the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531 (1984); *see also Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy Inc.*), 181 F.3d 527, 533 (3d Cir. 1999); *Matter of H.L.S. Energy Co., Inc.*, 151 F.3d 434, 437 (5th Cir. 1998) ("The Bankruptcy Code provides that 'the actual, necessary costs and expenses of preserving the estate' are characterized as administrative expenses … entitled to priority over the claims of other unsecured creditors." (citing 11 U.S.C. § 503(b)(1)(A))).

54.     Additionally, pursuant to Section 365(d)(3) of the Bankruptcy Code, the Debtors "shall timely perform all of the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3); see also *In re: Montgomery Ward Holding Corp.*, 268 F.3d 204 (3d Cir. 2001); *In re: Pac-West TeleComm, Inc.*, 377 B.R. 119, 123 (Bankr. D. Del. 2007).

55.     Landlord submits that the Tenant Debtor's use of the Original and Relocation Premises has been actual and necessary in preserving the Debtors' bankruptcy estates.

56.     As a result, Landlord is entitled to an allowed administrative priority claim in the amount of $45,439.03 for amounts due under the Lease and Relocation Agreement from January 3, 2025 through March 31, 2025, plus ongoing monthly Relocation Premises Rent, attorneys' fees and costs that continue to accrue.

### Tenant Debtor Must Cure All Monetary and Nonmonetary Defaults, Including the Payment of All Pecuniary Losses Associated Therewith

57.     11 U.S.C. 365(b)(1) provides in relevant part that:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

58.     This provision, in addition to 11 U.S.C. § 365 (b)(1)(B) and (C), generally requires that to assume a contract, a debtor must (1) cure any default or provide adequate assurance of prompt cure of default; (2) provide adequate assurance of prompt compensation for monetary loss; and (3) provide adequate assurance of future performance of the contract.  11 U.S.C. §§ 365(a), (b)(1). The obligation to cure defaults mandates that the contract counterparty be compensated for any actual pecuniary loss resulting from the default, and includes any late fees or similar charges under the lease. *In re Crown Books Corp.*, 269 B.R. 12, 15 (Bankr. D. Del. 2001).

59.     The 2005 amendments, included in BAPCPA, modified the original provision with

regard to unexpired leases of nonresidential real property. 11 U.S.C. § 365(b)(1)(A). A trustee or debtor in possession need not cure a default arising from a failure to perform a nonmonetary obligation if it is impossible for the trustee to cure such default by performing nonmonetary acts. However, section 365 further qualifies this exception by providing that "if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary loses resulting from such default shall be compensated. . ." 11 U.S.C. § 365(b)(1)(A).

60.    11 U.S.C. 365(d)(3)(A) provides:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

61.    Combined, a debtor in possession is obligated to perform all obligations under the lease and may not assume an unexpired lease of nonresidential real property absent an ability to meet the nonmonetary operating requirements at and after the time of assumption. *See e.g. In re Patriot Place, Ltd.*, 486 B.R. 773, 797 (Bankr. W.D. Tex. 2013) ("Significantly, § 365(b)(1)(A) provides that if a nonmonetary default arises from a failure to operate in accordance with a nonresidential real property lease, *then such default shall be cured by performance at and after the time of assumption in accordance with such lease....* 11 U.S.C. § 365(b)(1)(A)" (internal quotations omitted, emphasis in original)). Additionally, the Debtor must compensate the landlord for all pecuniary loses resulting from such default of non-monetary obligations under lease that cannot be cured upon assumption.

62.    Landlord delivered physical access and legal possession of the Relocation Premises on August 1, 2025. The Certificate of Occupancy was issued for the Relocation Premises. A walk-through was conducted on August 7, 2024 and no "Punch List" items were provided to the Landlord

and Tenant Debtor specifically acknowledged that there were no "Punch List Items."

63.    The utilities for the Relocation Premises were transferred to the Tenant Debtor no later than September 30, 2024.

64.    As the Tenant Debtor was in possession of the Relocation Premises, there was nothing preventing the Tenant Debtor from commencing the "Tenant's Work" as set forth in the Lease and Relocation Agreement. In fact, most, if not all, of the Tenant's Work under the Lease and Relocation Agreement could have been completed by the Tenant Debtor while open for business. While the Tenant Debtor submitted plans to the City of Miami Beach, Tenant Debtor thereafter failed to diligently pursue its permits, to the extent it was required to do so, in breach of the Lease and Relocation Agreement.

65.    Failure to pay Rent for the Relocation Premises is a monetary breach of the Lease and Relocation Agreement. Failure to vacate the Original Premises, and to diligently pursue any permits with the City of Miami Beach, constitute nonmonetary breaches of the Lease and Relocation Agreement.

66.    Tenant Debtor is required to perform all obligations, monetary and nonmonetary, under the Lease and Relocation Agreement. Tenant Debtor has failed to do so.

67.    Furthermore, Landlord has entered into agreements with certain third-parties regarding the leasing of the Original Premises. Tenant Debtor's various delays and failure to vacate the Original Premises very likely will interfere with Landlord's ability to perform under agreements with the Original Premises' prospective tenants. McKinney Declaration, ¶ 16. Therefore, Tenant Debtor's breach of the Lease and Relocation Agreement will undoubtedly cause Landlord pecuniary losses that must be cured by the Tenant Debtor as a condition of assumption.

**Debtors Must Provide Adequate Assurance Regarding Landlord's Pecuniary Losses**

68.     Prior to assumption of an executory contract in default, adequate assurance of future performance is required by 11 U.S.C. § 365(b)(1)(C).

69.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption." *In re Fleming Cos.*, 499 F.3d 300, 307 (3d Cir. 2007) (quoting *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n. 10 (3d Cir. 2001)).

70.     The form of adequate assurance to be provided depends on the facts and circumstances of the case, but "fall[s] considerably short of an absolute guarantee of performance." *See Winters Nursery v. Color Spot Holdings,* 2018 WL 3996938, at *8 (Bankr. D. Del. 2018). A party may demonstrate adequate assurance by showing that it is financially capable of performing under the agreement. *See Cinicola*, 248 F.3d at 117. However, the focus is rightly placed on the importance of an economic term within the overall bargained-for exchange; that is, whether the term is integral to the bargain struck between the parties (its materiality) and whether performance of that term gives a party the full benefit of his bargain (its economic significance). *Fleming*, at 306.

71.     In the context of this case, the Debtors, including the Tenant Debtor, failed to obtain any qualifying bids for the operating assets of the Franchise Group, including the Vitamin Shoppe assets. The Debtors instead have pivoted to an "equitization strategy" pursuant to the *Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [D.I. 1015] (the "Amended Plan").

72.     This "equitization strategy" by its nature suggests that there is little to no money

available to pay administrative expense creditors outside of the money funded pursuant to *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [D.I. 414].

73.    Through the Amended Plan, the Debtors still propose the potential sale of assets, including the Vitamin Shoppe assets. The Confirmation Hearing for the Amended Plan is currently set for May 12, 2025 [D.I. 1019]. Given the lack of funding and unsuccessful sale, the Debtors and its future owners have little motivation to spend the money necessary to complete the Relocation Premises and begin operations. This is particularly true in the context of the "Partial Sale Transaction" contemplated in the Amended Plan—there is no visibility into the Debtors' or its future owners' intentions regarding the Relocation Premises, and the potential costs of cure *vis a vis* the escalating pecuniary losses of Landlord make the Relocation Premises less and less desirable to any purchaser.

74.    Given the failed auction of the Vitamin Shoppe assets, the delays in these Bankruptcy Cases, the Tenant Debtor's failure and unwillingness to diligently pursue its permits with the City of Miami Beach, and the Tenant Debtor's refusal to vacate the Original Premises, it is likely that the Landlord will suffer escalating pecuniary losses through confirmation of the Amended Plan. Landlord is entitled to adequate assurance of future performance, including assurance that the Debtors and its new owners have adequate funds to cure all the above-referenced pecuniary losses.

75.    To the extent the Tenant Debtor is unable to provide adequate assurance of future performance, including the Debtors' and their prospective new owners' ability to pay for all pecuniary losses caused by Tenant Debtor's delay, Landlord requests that this Court compel the

Debtors to reject the Lease and Relocation Agreement by April 4, 2025. To the extent adequate assurance is provided, Landlord requests that this Court compel the Debtors to assume the Lease and Relocation Agreement by April 4, 2025 to provide clarity as to the Debtors' plans for the Original and Relocation Premises. Otherwise, Tenant Debtor can continue to drag the relocation process out at greater and greater costs to the Landlord with no assurance of payment for such delay.

WHEREFORE, for all of the foregoing reasons, Landlord respectfully requests that this Court enter an Order 1) approving and allowing the Landlord's administrative expense claim for the Relocation Rent and compelling the Tenant Debtor to pay Landlord for all past due rent under the Lease and Relocation Agreement for both the Original and Relocation Premises; 2) requiring Tenant Debtor to provide adequate assurance of future performance for future Rent as well as any pecuniary losses suffered by Landlord due to Tenant Debtor's failure to diligently perform under the Lease and Relocation Agreement; and 3) compelling the assumption or rejection of the Lease and Relocation Agreement no later than April 4, 2025.

Dated: March 7, 2025

**COOCH AND TAYLOR, P.A.**

   /s/ *R. Grant Dick IV*
R. Grant Dick IV (No. 5123)
Kevin D. Levitsky (No. 7228)
1000 N. West Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 984-3800
Facsimile: (302) 984-3989
Email: gdick@coochtaylor.com
      klevitsky@coochtaylor.com

*Counsel for Fifth & Alton (Edens) LLC*