# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

FRANCHISE GROUP, INC., *et al.*,

Debtors.

Chapter 11

Case No. 24-12480 (LSS)

(Jointly Administered)

## DECLARATION OF GAIL MCKINNEY

I, Gail McKinney, hereby depose and state as follows:

1. I am the Senior Tenant Construction Manager at EDENS, located at 500 E. Broward Blvd, Suite 1620, Fort Lauderdale, FL 33301.

2. As Senior Tenant Construction Manager I am responsible for supervision and management of build outs and construction at various EDENS properties, including the Fifth & Alton (Edens) LLC (the "Landlord") property located at Fifth St. and Alton Road in the City of Miami Beach, Florida (the "Shopping Center").

3. I make this Declaration in support of *Fifth & Alton (Edens) LLC's Motion (I) for the Allowance and Payment of Administrative Expense Claim; (II) to Compel Tenant Debtor to Provide Adequate Assurance of Future Performance Under the Lease; (III) to Compel the Cure Of Nonmonetary Defaults Under the Lease; and (IV) to Establish an April 4, 2025 Deadline for the Debtors to Assume or Reject the Lease* ("Landlord Motion")[1] filed in the above-captioned bankruptcy cases.

4. Attached hereto as **Exhibit 1** is a true and correct copy of the Relocation Agreement and Second Amendment to Lease.

5. On August 1, 2024, Landlord delivered to Tenant Debtor physical access and legal possession of Unit #140 (the "Relocation Premises") at the Shopping Center. Physical access and legal possession was provided to the Tenant Debtor at that time.

6. Landlord's August 1, 2024 delivery of the Relocation Premises and the completion of the Landlord's work was confirmed by written notice to Tenant Debtor dated August 5, 2024 (the "Confirmation Letter" attached hereto as **Exhibit 2**). The Landlord provided a copy of the Certificate of Occupancy with the Confirmation Letter.

7. Upon delivery of the premises and the issuance of the Certificate of Occupancy, Landlord's Work was complete and Tenant Debtor could operate from the Relocation

---

[1] Terms not defined herein shall have the meaning ascribed to them in the Motion.

8. On August 7, 2024, the walkthrough contemplated pursuant to Section 3(iii) of the Lease and Relocation Agreement was conducted. During the walkthrough, Tenant Debtor did not indicate any Punch List Items and accepted delivery of the Relocation Premises. On August 12, 2024, Tenant Debtor's commercial real estate representative confirmed via email that there were no Punch List Items to complete. An email chain reflecting this process is attached hereto as **Exhibit 3**.

9. Pursuant to Section 3(iii) of the Lease and Relocation Agreement, Tenant Debtor was required to deliver to Landlord a copy of the Punch List Items within five (5) days from the walkthrough. Tenant Debtor did not provide any Punch List Items within the subsequent five (5) days.

10. As Tenant Debtor was entitled to sixty (60) days' advance notice of the estimated delivery date pursuant to Section 3(v) of the Lease and Relocation Agreement, the actual delivery of access and possession on August 1, 2024 constituted the sixty (60) day notice. Therefore, the Relocation Premises Delivery Date was established as September 30, 2024.

11. In conjunction with the turnover and legal possession of the Relocation Premises, Landlord turned over responsibility for the utilities at the Relocation Premises, including electric, no later than September 30, 2024.

12. Pursuant to Section 5 of the Lease and Relocation Agreement, the "Surrender Date" of the Original Premises is ninety-five (95) days after the Relocation Premises Delivery Date , or January 3, 2025. Landlord's communication of the Surrender Date was memorialized via a letter to Tenant Debtor on December 5. 2024, a copy of which is attached hereto as **Exhibit 4**.

13. Based upon my review of the submissions made to the City of Miami Beach, the Tenant Debtor submitted its plans for the Tenant Work on August 21, 2024. The first round of comments from the City of Miami Beach were returned to the Tenant Debtor on October 2, 2024.

14. Based upon my review of the tracked submissions to and responses from the City of Miami Beach, Tenant Debtor did not respond to the City of Miami Beach's comments for approximately one hundred and twenty (120) days until January 31, 2025. The January 31, 2025 submission to the City of Miami Beach failed and returned to the Tenant Debtor on February 18, 2025. Tenant Debtor has not re-submitted to the City of Miami Beach as of March 5, 2025.

15. Tenant Debtor has failed to surrender the Original Premises by the Surrender Date as required under Section 5 of the Lease and Relocation Agreement.

16.     Landlord has entered into agreements with two third-party lessees regarding the leasing of the Original Premises. The leases for those new tenants have delivery dates for the premises of May 1, 2025 and July 1, 2025. The build-out of the Original Premises for the new tenants is estimated to take one hundred and twenty (120) days. Based upon this projected timeline, buildout and construction on the Original Premises should have already commenced.

17.     Failure to turnover the re-let Original Premises to the new tenants by the above dates will trigger escalating losses under the third-party leases. Ultimately, failure to timely turnover the premises will result in rent penalties, cancellation of the third-party leases, and additional penalties of up to $50,000.00 each.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Gail McKinney

Executed on: 3/7/2025

Exhibit 1

# RELOCATION AGREEMENT AND SECOND AMENDMENT TO LEASE

THIS RELOCATION AGREEMENT AND SECOND AMENDMENT TO LEASE (this "Agreement"), made as of the _18_ day of November, 2022 (the "Effective Date"), by and between **FIFTH & ALTON (EDENS) LLC**, hereinafter referred to as Lessor, and **VITAMIN SHOPPE INDUSTRIES LLC**, hereinafter referred to as Tenant.

## WITNESSETH:

WHEREAS, Lessor and Vitamin Shoppe Industries Inc. (Tenant's predecessor-in-interest) are parties to that certain Lease dated November 14, 2008, as amended by that First Amendment to Lease dated December 31, 2018 (as amended, the "Lease"), for certain premises consisting of approximately 3,575 square feet of floor area, currently known as Unit #180 (the "Original Premises"), located within the Fifth & Alton Shopping Center, County of Miami-Dade, City of Miami Beach, State of Florida;

WHEREAS, Lessor and Tenant have agreed that Tenant shall relocate to Unit #140 (the "Relocation Premises"), on the ground floor of the Shopping Center facing 5th Street, containing approximately 2,285 square feet, as shown on **Exhibit A**, subject to the terms and conditions of the Lease, as amended by this Agreement; and

WHEREAS, the current Term of the Lease expires September 30, 2022 (the "Original Expiration Date"), and the parties have agreed to extend the current Term through and including the day immediately preceding the commencement of the "Extended Term," as defined in this Agreement.

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS, that for and in consideration of the mutual promises and covenants contained herein and other valuable consideration, Lessor and Tenant hereby agree as follows:

1. Recitations. The recitations set forth above are true and correct and are incorporated into this Agreement by this reference, together with any definitions included therein and any exhibits referenced therein.

2. Construction Plans and Lessor's Work. No later than forty-five (45) days following the Effective Date, Tenant (at Tenant's sole cost and expense) will provide detailed plans and specifications for all work to be performed in the Relocation Premises, including the scope of work identified as "Lessor's Work" in **Exhibit C** ("Lessor's Work") and Tenant's Work (as hereinafter defined) for Lessor's review and approval (as to both design and materials), which approval shall not be unreasonably withheld, conditioned or delayed.  Tenant shall provide Lessor with both a hard copy and an electronic (PDF) set of the plans for Lessor's Work and Tenant's Work ("Lessor's Plans" and "Tenant's Plans," respectively, and together the "Plans").  Lessor agrees to use commercially reasonable efforts to promptly review and either approve, conditionally approve, or disapprove the Plans within fifteen (15) days after Lessor's receipt thereof.  If Lessor fails to notify Tenant that it approves, conditionally approves or disapproves of the Plans within the aforesaid 15-day period, Lessor shall be deemed to have approved the Plans as provided to Lessor.  If Lessor advises Tenant that changes to the Plans are required, Tenant shall have twenty (20) days thereafter



to revise (as reasonably required by Lessor) and resubmit for Lessor's reasonable approval. This process shall continue until Lessor has approved the Plans. The Plans for Lessor's Work approved by Lessor are hereinafter called the "Approved Lessor's Plans".

The Plans for Lessor's Work shall be in such format, as required by the applicable municipality for Lessor to submit with its application for building permits for Lessor's Work ("Lessor's Permits"). At Lessor's sole cost and expense, Lessor shall apply for and obtain Lessor's Permits, and Tenant agrees to cooperate with Lessor in all reasonable respects to enable Lessor to promptly respond to any comments from the municipality, including making any required changes to the plans for Lessor's Work. Lessor shall notify Tenant of any changes to the Approved Lessor's Plans required by an applicable governmental authority and Tenant shall have five (5) business days to review and approve, conditionally approve, or disapprove the change (which approval shall not be unreasonably withheld, conditioned or delayed) and if Lessor does not receive a response from Tenant within the aforesaid five (5) business-day period, then Tenant shall be deemed to have approved the plan change. Tenant shall have a period of twenty (20) days after the expiration of the aforesaid five (5) business-day period to submit the revised plans to Landlord. Lessor's Work shall be performed by Lessor, at Lessor's sole cost and expense.

3.    Lessor's Delivery of the Relocation Premises.

(i)    The date on which the last of the following events occurs shall be referred to as the "Relocation Premises Delivery Date": (i) Lessor delivers legal possession of the Relocation Premises to Tenant, vacant and free of all rights of any third parties and free of all hazardous materials, with Lessor's Work substantially complete (as described below) in accordance with the Approved Lessor's Plans and in compliance with applicable Laws, provided that Tenant shall not be required to accept possession of the Relocation Premises prior to April 1, 2023, (ii) Tenant receives from Metropolitan Life Insurance Company ("Lender"), the holder of the current financing encumbering the Shopping Center, a non-disturbance agreement ("SNDA") executed by Lender in accordance with Section 20 below, and (iii) the applicable governmental authority(ies) responsible for issuing the building permits for Tenant's Work ("Tenant's Permits") approves the application for Tenant's Permits to the extent necessary for Tenant to commence Tenant's Work. Tenant hereby acknowledges and agrees that Tenant has inspected the Relocation Premises and that Tenant agrees to accept the Relocation Premises in its current "as is" condition, except for Lessor's Work, and Lessor makes no representations as to the condition of the Relocation Premises.

(ii)    Lessor's Work shall be deemed substantially complete when all of Lessor's Work is complete in accordance with the Approved Lessor's Plans (as modified if required by applicable governmental entities for issuance of Lessor's Permits, subject to the last paragraph of Section 2 above) except for any "Punch List Items" (as hereinafter defined) and a certificate of completion has been issued by the municipality with respect to Lessor's Work.



(iii)     On or before the Relocation Premises Delivery Date, Lessor's and Tenant's representatives together shall conduct a walk-through of the Relocation Premises to compile a punch list of the Punch List Items.  Tenant shall deliver to Lessor a copy of said punch list within five (5) days after the walk-through.  If Lessor does not receive the list of Punch List Items from Tenant within such 5-day period, then Tenant shall be deemed to have waived the right to have Lessor complete any Punch List Items.  If Lessor does receive the list of Punch List Items from Tenant within such 5-day period, Lessor shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list, subject to force majeure.  If Lessor fails to complete any item on said punch list within said 10-day period, Tenant shall give written notice to Lessor and Lessor then shall have five (5) business days to complete same or provide Tenant with its good-faith basis for the delay and time within which the work will be completed.  If Lessor does neither of the foregoing within such 5 business-day period, then Tenant shall have the right to complete such item(s) using its own contractors, and Lessor shall reimburse Tenant such reasonable costs actually incurred by Tenant within thirty (30) days after receiving a statement therefor, together with supporting documentation reasonably acceptable to Lessor showing such amounts paid by Tenant.  If Lessor fails to reimburse Tenant for such amounts within such time period, Tenant shall have the right to offset the reasonable costs and expenses thereof against the Fixed Rent and Additional Rent payable by Tenant hereunder.

(iv)     As used herein, the term "Punch List Items" for purposes of determining substantial completion of Lessor's Work shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect or delay either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Relocation Premises.   Tenant and Lessor shall reasonably cooperate in the scheduling of such work (other than emergency work, if not practicable) and Lessor shall use commercially reasonable efforts to avoid interference with work being performed by Tenant or on behalf of Tenant within the Relocation Premises.

(v)     Lessor shall provide Tenant with sixty (60) days' prior written notice of the estimated date Lessor expects to deliver possession of the Relocation Premises to Tenant; provided, however, Lessor shall not be in default and Tenant shall not be entitled to any remedy if delivery of possession does not occur on such estimated date.

4.     Tenant's Obligations Upon Delivery of Relocation Premises.

(i)     **Entry into the Relocation Premises**.  Beginning on the Relocation Premises Delivery Date, Tenant and its agents, servants, employees, and contractors may enter the Relocation Premises, provided Tenant has submitted to Lessor evidence of insurance coverage applicable to the Relocation Premises as required by the Lease, as well as evidence of coverage required for any and all contractors involved in Tenant's Work.  Tenant, at its sole cost and expense, shall perform and construct, in a good and workmanlike manner, any work (other than Lessor's Work) necessary

3

4419\0407-4316098\v8

for Tenant to occupy the Relocation Premises and to operate therein for the Permitted Use ("Tenant's Use"), subject to **Exhibit C**. Any work performed by Tenant shall be subject to the terms and conditions of the Lease and this Agreement. Tenant must obtain Lessor's written approval, which shall not be unreasonably withheld, conditioned or delayed, prior to submitting applications to the applicable governmental authorities for approval and permitting, and Tenant must comply in all respects with all applicable laws and ordinances.

Tenant hereby agrees that Tenant, Tenant's agents, and their work, equipment, and materials will not interfere with any work or construction being or to be performed by Lessor or any other tenant of the Shopping Center; that Tenant will indemnify, defend and hold harmless Lessor of and from any and all liability, damage, costs, and expense (including attorneys' fees) for personal injury (including death) and/or property damage attributable directly or indirectly to any act or omission of any one or more of such parties; that Tenant will pay all utility charges with respect to the Relocation Premises which accrue on and after the date of Tenant's first such entry; and that such entry shall be subject to all terms, conditions, and covenants of the Lease, as amended by this Agreement.

(ii)   **Completion of Tenant's Work and Opening for Business**.   Within ten (10) days after the Relocation Premises Delivery Date, Tenant shall commence Tenant's Work. Tenant shall substantially complete all of Tenant's Work, obtain a certificate of occupancy for the Relocation Premises and all other governmental approvals, licenses and permits required for Tenant to operate for the Permitted Use in the Relocation Premises, and open for business to the public in the Relocation Premises on or before the date which is ninety (90) days following the earlier of: (a) the date Tenant commences to perform Tenant's Work, or (b) ten (10) days after the Relocation Premises Delivery Date (the "Opening Deadline"), except for reasons of Force Majeure or "Lessor Delay" (which shall mean any actual delay to the completion of Tenant's Work that is directly caused by an act or omission of Lessor) of which Lessor has been notified in writing and no such delay shall be deemed to have occurred until the date such notice is received. Should Tenant fail to open for business in the Relocation Premises within ninety (90) days following the Opening Deadline (the "Outside Opening Deadline"), except for reasons of Force Majeure or Lessor Delay of which Lessor has been notified in writing, then Lessor shall have the right at its option to the following as its sole and exclusive remedies: (1) liquidated damages in the amount of Five Hundred and 00/100 ($500.00) Dollars for each and every day after the Outside Opening Deadline that the Tenant shall fail to open for business as required by this Agreement, and (2) if Tenant has not opened for business on or before the thirtieth (30th) day following the Outside Opening Deadline, Lessor shall also have the right to terminate this Lease by written notice to Tenant, given at any time prior to the date Tenant opens for business; provided, however, if Lessor gives a notice of termination to Tenant and within thirty (30) days after the giving of such notice Tenant opens for business in the Relocation Premises, then Lessor's termination notice shall be negated and the Lease shall continue in full force and effect.

44190/0407-43160980v8



(iii)    **Signage.**    Within ninety (90) days after the Relocation Premises Delivery Date, Tenant shall have installed its exterior signage for the Relocation Premises. For purposes of this Agreement, "signs" shall include all signs, designs, monuments, logos, banners, projected images, pennants, decals, advertisements, pictures, notices, lettering, numerals, graphics or decoration. Tenant shall not maintain or display any exterior signs, or any interior signs that are visible from the exterior of the Relocation Premises, including without limitation, any signs on either side of any window, and all signs must comply with this Agreement and the Sign Criteria as set forth on **Exhibit B** attached hereto and made a part hereof. All costs and expenses related to any aspects of Tenant's signs shall be Tenant's sole responsibility, including but not limited to the care and maintenance of same. Subject to this subsection (iii) and Tenant's compliance with all applicable laws and ordinances (including all necessary approvals and permits); provided, however, in the event any changes to Tenant's current signage are required as a condition of any necessary governmental approvals or permits, prior to submitting such revised signage plans to the applicable governmental authorities, Tenant must submit its proposed plans therefor to Lessor and obtain Lessor's written approval, which approval shall not be unreasonably withheld, conditioned or delayed. All signs must be installed by a professional sign company and conform to all laws and ordinances. Upon demand of Lessor, Tenant shall, at its sole cost and expense, immediately remove any signs that do not conform to this Agreement and Tenant agrees to repair and restore any damage caused by their installation and/or removal. Lessor hereby approves Tenant's signage attached hereto as **Exhibit B-1** and made a part hereof and agrees that, subject to all applicable Laws, the same may be utilized by Tenant at the Relocation Premises, notwithstanding the provisions of the Sign Criteria, and does not require the approval of any persons or parties other than applicable governmental bodies.

Upon termination or expiration of the Lease, Tenant shall be required to remove its exterior façade signage and repair any damage caused by the removal thereof. Such repair shall include, but not be limited to, the patching of holes or penetrations, and the painting of any patched areas, with paint which matches the color of the Shopping Center façade at the time such repairs are made. Lessor shall have the right to temporarily remove any signs in connection with any repairs and/or renovations in or upon the Relocation Premises or the Shopping Center wherein such signs are situated.

5.    **Surrender of Original Premises.**    On or before the earlier to occur of: (i) the date which is five (5) days following the date on which Tenant opens for business in the Relocation Premises, or (ii) ninety-five (95) days after the Relocation Premises Delivery Date (the "Surrender Date"), Tenant shall surrender possession and vacate the Original Premises, leaving same in broom-clean condition, free of all moveable trade fixtures, inventory, equipment, and any other property, excepting only Tenant's permanent leasehold improvements, which may remain in place. Tenant shall be entitled to occupy the Original Premises and shall perform all of Tenant's obligations with respect thereto, in accordance with the terms and conditions of the Lease, through the Surrender Date. Notwithstanding anything in this Agreement to the contrary, including but not limited to the provisions of



6.      Section 6 below, should Tenant fail to surrender possession of the Original Premises on or before the Surrender Date, Tenant shall be a tenant at sufferance occupying the Original Premises and Tenant shall be obligated, in addition to any other remedies available to Lessor under the Lease and/or Florida law, to continue paying Rent pursuant to the Lease for the period of any such tenancy at sufferance in the Original Premises, in addition to Rent on the Relocation Premises, which Tenant shall be obligated to pay in accordance with Section 9 of this Agreement, regardless of whether Tenant has surrendered possession of the Original Premises. The terms, conditions and obligations set forth in the preceding sentence shall survive any expiration of the Lease, and/or any release of liability of Tenant with respect to the Original Premises.

7.      Substitution of Relocation Premises.      Effective from and after the Surrender Date, (i) Exhibit A of the Lease is hereby deleted in its entirety and the site plan attached hereto as **Exhibit A** and made a part hereof, shall be inserted in its place and stead, (ii) the Lease shall be deemed amended by substituting the Relocation Premises for the Original Premises for all purposes thereunder, and all references in the Lease to the "Premises" shall mean and refer to the Relocation Premises, (iii) Tenant shall have no further obligation to pay Fixed Rent and Additional Rent applicable to the Original Premises, and (iv) the Lease shall be deemed to have expired with respect to the Original Premises and Tenant shall have no further obligations under the Lease with respect to the Original Premises, except that for any obligations that would have survived the expiration of the Original Premises, except the Surrender Date, and Tenant shall be released from all further liability with respect to the Original Premises, except that any liability that would have survived the expiration of the Lease shall survive the Surrender Date.

8.      Relocation Commencement Date and Rent on Original Premises.      Tenant shall commence paying Rent applicable to the Relocation Premises on the earlier of (i) ninety (90) days following the Relocation Premises Delivery Date, or (ii) the date on which Tenant first opens for business in the Relocation Premises (the "Relocation Commencement Date"). Notwithstanding anything in the Lease or this Agreement to the contrary, so long as Tenant timely surrenders possession of the Original Premises in accordance with Section 5 above, Tenant shall continue paying Rent on the Original Premises at the rates set forth in the Lease through and including the day immediately prior to the Relocation Commencement Date.

9.      Extension of Term.      The current Term of the Lease is hereby extended through and including the day immediately preceding the Relocation Commencement Date, at the same Fixed Rent rate in effect as of the Original Expiration Date and subject to all other terms and conditions of the Lease. Beginning on the Relocation Commencement Date, the Term of the Lease is hereby extended for a period of seven (7) years (the "Extended Term"), upon the same terms and conditions of the Lease as modified by this Agreement. The defined term "Term" as used in the Lease shall mean the Term as extended through the Extended Term pursuant to this Section 8.

Rent for Extended Term.      Beginning on the Relocation Commencement Date, Tenant shall pay Rent as set forth below:



(i) Fixed Rent: Fixed Rent for the Extended Term shall be as stated below, payable monthly in advance:

| Lease Year | PSF | Monthly Rent | Annual Rent |
|---|---|---|---|
| 1 | $60.00 | $11,425.00 | $137,100.00 |
| 2 | $61.80 | $11,767.75 | $141,213.00 |
| 3 | $63.65 | $12,120.02 | $145,440.25 |
| 4 | $65.56 | $12,483.72 | $149,804.60 |
| 5 | $67.53 | $12,858.84 | $154,306.05 |
| 6 | $69.56 | $13,245.38 | $158,944.60 |
| 7 | $71.64 | $13,641.45 | $163,697.40 |

(ii) Lessor's Operating Costs: Tenant shall pay estimated monthly installments in advance of $1,157.73.

(iii) Tax Charges: Tenant shall pay estimated monthly installments in advance of $1,235.80.

(iv) Insurance Charges: Tenant shall pay estimated monthly installments in advance of $715.96.

(v) Total Initial Monthly Payment: $15,479.23, which includes Miami-Dade County sales tax. Tenant will continue to be responsible for paying any sales tax applicable to Rent, which is currently at the rate of 6.5% for Miami-Dade County, Florida.

10. Tenant Improvement Allowance for Relocation Premises. Subject to the provisions of this Section, Lessor shall reimburse Tenant for the actual costs (hard costs and soft costs) incurred by Tenant for Leasehold Improvements (as defined below) performed in connection with Tenant's Work, in an amount not to exceed Eighty-Five Thousand Nine Hundred Sixteen Dollars ($85,916.00) (the "Tenant Improvement Allowance"). As used herein "Leasehold Improvements" shall mean alterations, additions, improvements, and/or installations attached to the Relocation Premises in a way as to require significant effort and costs to remove. It is specifically understood and agreed that Tenant shall only use the Tenant Improvement Allowance for the construction and installation of Leasehold Improvements, and in no event shall the Tenant Improvement Allowance be used to purchase and/or install any movable goods, inventory, furniture, equipment, trade fixtures or other movable personal property belonging to or used by Tenant that are not attached to the Relocation Premises.



The Tenant Improvement Allowance shall be due only after Tenant has opened for business in the Relocation Premises in accordance with this Agreement and the Lease. Provided Tenant is not in default after its receipt of any required notice and the expiration of any applicable cure period, Lessor shall pay to Tenant the Tenant Improvement Allowance within thirty (30) days after Lessor's receipt of the first monthly installment of Rent due under this Agreement for the Relocation Premises, and has received and approved all of the following:

(i)     **Certification of Final Completion.** A certification in writing, in form and content approved by Lessor, from Tenant and its general contractor or architect, that one hundred percent (100%) of Tenant's Work is complete in accordance with Tenant's Plans as approved by Lessor and 100% of such Tenant's Work is actually completed.

(ii)    **General Contractor Application for Payment and Invoices.** AIA Document G702 and AIA Document G703 (or such other format as may be approved by Lessor, which approval shall not be unreasonably withheld, conditioned or delayed) duly completed, executed and notarized by Tenant's general contractor, and copies of paid invoices, certified by Tenant as being for such Tenant's Work totaling an amount equal to or greater than the amount of the Tenant Improvement Allowance being requested by Tenant.

(iii)   **Lien Waivers.** The lien period for all of Tenant's Work shall have expired with no liens in connection with the same being filed, or, if said lien period shall not have expired, Final Unconditional Lien Waivers in the form attached hereto as **Exhibit C-1** from Tenant's general contractor, and all subcontractors, materialmen and suppliers who provided or supplied $10,000.00 or more in labor, services, goods or materials to the Relocation Premises.

(iv)    **Certificate of Occupancy.** A copy of the Certificate of Occupancy for the Relocation Premises.

(v)     **Exterior Sign Installation.** Proof of installation of a Lessor-approved exterior sign on the Relocation Premises which identifies Tenant's business, and proof that the permit for such signage has been closed out.

(vi)    **W-9 Form.** Internal Revenue Service Form W-9, Request for Taxpayer Identification Number and Certification.

Lessor in its sole discretion reserves the right to (a) issue joint checks to Tenant and the contractors, subcontractors, or suppliers to whom Tenant or its general contractor owe funds; or (b) offset from and against the Tenant Improvement Allowance any monies due Lessor under the terms of the Lease. If Tenant has not made application for the Tenant Improvement Allowance or satisfied all conditions to Lessor's obligation to pay the Tenant Improvement Allowance within one (1) year after the Relocation Commencement Date, then Lessor's obligation to pay the Tenant Improvement Allowance shall automatically terminate without any requirement that Lessor send notice to Tenant. The rights given Lessor in this paragraph shall be in addition to all other rights and remedies under the

44190/0407-43160980v8

Lease, at law or in equity arising from Tenant's failure to open for business in the Relocation Premises.

11. Intentionally Deleted.

12. Use and Exclusivity. Article 41(B) of the Lease is hereby deleted in its entirety (excluding the language added to 41(B) in Section 4 of the First Amendment to Lease, which shall remain at the end of 41(B), as amended hereby) and the following is inserted in its place:

Lessor and Tenant agree that no portion of the "Retail Space" (as defined in the Condominium Documents), including therein the Premises, shall be used for any of the following purposes: (a) amusement or game room or similar establishment, including without limitation the use of pinball machines, electronic games or similar apparatus (but notwithstanding the foregoing, the following uses shall not be restricted: an internet cafe or other similar operation which allows or includes computer games, operations which provide experiential retail entertainment, such as those currently known as ""TopGolf" and "Puttshack," and operations similar to those now referred to as "virtual reality game rooms"); (b) sale of tires, batteries or automobile accessories (but this shall not restrict an operation similar to Advance Auto); (c) paint shop or garage (whether for body or mechanical repair), or for the dispensing of petroleum products; (d) carwash or similar facility; (e) funeral home; (f) laundromat or dry cleaning operation (but a pick-up/drop off dry cleaning facility, such as those operated by Dryclean USA is not restricted; (g) bingo, games of chance (sale of lottery tickets is not restricted) or, if it is on the ground floor, fronting on 5th Street, billiard room or pool parlor); (h) bowling alley (prohibited only if it is on the ground floor, fronting on 5th Street) (but notwithstanding the foregoing, uses such as those currently known as "Lucky Strike, "Bowlero" and "Strike 10" shall not be prohibited on the ground floor, fronting on 5th Street); (i) car, boat, truck or motorcycle sales, display, leasing or repair (but notwithstanding the foregoing, the following shall not be prohibited: operations such as West Marine, high-end car or truck showroom such as Lucid Motors, Tesla, or Rivian, high-end yacht or luxury boat showroom, or high-end motorized scooters such as Vespa); (j) natatoriums (if on the ground floor fronting 5th Street); (k) self-service storage facility; (l) skating rink (if it is on the ground floor, fronting on 5th Street); (m) crematorium; (n) blaster tag or other game arena (if it is on the ground floor, fronting on 5th Street); (o) nightclub or discotheque or bar, with or without the service of alcoholic beverages (excluding a bar that is part of an operation which is primarily a restaurant or an upscale wine or cocktail bar, which shall be permitted); (p) head shop, massage parlor (excluding therapeutic or relaxation massage, which shall be permitted), adult book store or any other store involved in the sale, distribution, lease or exhibition of pornographic materials, or any other business restricted by law to "adults" only; (q) conducting an auction, fire sale or liquidation sale or "second hand" store (but excluding higher-end second-hand stores such as Play it Again Sam, which shall be permitted); (r) flea market or surplus store; (s) movie theater, health spa (if it is on the ground floor, fronting on 5th Street, except that boutique fitness users such as a yoga studio, Pilates studio, or studios similar to those operations currently known as OrangeTheory and Pure Barre shall be permitted on the ground floor, fronting on 5th Street), or training/educational facility (unless directly related to any tenant's retail use or operations such as Code Ninja or Mathnasium, which shall be permitted), (t) intentionally deleted; (u)

any mobile home park, trailer court, labor camp, or junkyard; (v) any dumping, disposing, incineration, or reduction of garbage (exclusive of trash containers located near the rear of any building); (w) intentionally deleted; (x) any living quarters, sleeping apartments, or lodging rooms; (y) intentionally deleted; (z) intentionally deleted; (aa) any unlawful use; (bb) any pawn shop, gun shop, or tattoo parlor; (cc) any church or other place of religious worship; (dd) any carnival, amusement park or circus; (ee) intentionally deleted; and (ff) hotel/motel. Tenant further agrees that the Premises will not be used for any use in violation of the prohibited uses specified on Exhibit H attached hereto, or the primary use of another occupant of the Shopping Center to whom an exclusive granted by Lessor (including those set forth on Exhibit H) in its leasing of space in the Shopping Center, provided the foregoing shall not prevent Tenant from operating as a then-current Vitamin Shoppe health and vitamin store, provided Tenant's primary use does not violate the Exhibit H exclusives or prohibited uses. The Premises shall be operated in a manner so that no sound or odor originating from the Premises shall be heard or smelled, other than inadvertently, outside of the Premises.

13. Acknowledgement Regarding Renewal Option. Tenant hereby acknowledges and agrees that Tenant elected not to exercise the remaining renewal option provided in the Lease and therefore Tenant shall have no renewal options available upon the expiration of the Extended Term, as extended by this Amendment. Accordingly, Article 4 of the Lease is hereby deleted in its entirety.

14. Force Majeure. The term "force majeure" as used in this Agreement and the Lease shall mean any period of delay which arises from or through the events set forth in Section 51B of the Lease.

15. Counterparts/Electronic Signatures. This Agreement may be executed in several counterparts, each of which, when so executed and delivered, shall constitute an original and all of which, when taken together, shall constitute one agreement. This Agreement may be executed by and through electronic signature technology which is in compliance with the applicable state law governing electronic signatures, including but not limited to DocuSign®. Electronic signatures shall be considered as valid and binding as original, wet signatures. Signatures originally signed by hand and transmitted via email or fax shall also be deemed valid and binding original signatures.

16. Defined Terms. Any capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Lease and/or in the above recitations.

17. Effect of this Agreement. Except as expressly provided herein, the Lease shall remain unmodified and in full force and effect. Lessor and Tenant each expressly reserves all of its rights and remedies against the other party with respect to the Lease.

18. Entire Agreement and Opportunity for Counsel. This Agreement is an integrated document and contains all of the terms and conditions of the subject matter set forth herein. This Agreement may not be modified in any manner other than by agreement in writing signed by all of the parties hereto or their successors in interest. This Agreement may not be changed or terminated orally. This Agreement supersedes all previous communications

44190/0407-43160980v8



and negotiations regarding the subject matter set forth herein. There are no other agreements, representations, or inducements, whether written or oral, between the parties concerning the subject matter of this Agreement. Tenant expressly agrees that they are not relying upon any verbal or written representation from Lessor, its agents, employees, officers, directors, accountants, attorneys, successors, or assigns that is not contained herein. Tenant agrees that is has been afforded a reasonable opportunity to review this Agreement and consult with their legal counsel regarding same.

19.   Patriot Act.   Tenant represents and warrants that it is not listed in Executive Order 13224-Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, as amended ("Executive Order 13224"), and has no present, actual knowledge that any other persons or entities holding any legal or beneficial interest whatsoever in it are included in, owned by, controlled by, knowingly acting for or on behalf of, knowingly providing assistance, support, sponsorship, or services of any kind to, or otherwise knowingly associated with any of the persons or entities referred to or described in Executive Order 13224, or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control. Any breach by Tenant of the foregoing representations and warranties shall constitute an event of default by Tenant and shall be covered by the indemnity provisions of the Lease.

20.   Lender Approval and SNDA.   Lessor has obtained approval of this Agreement from Lender and has requested from Lender an executed SNDA in favor of Tenant in the form attached hereto as **Exhibit D** and made a part hereof. Tenant hereby approves the form of SNDA attached hereto as **Exhibit D** and agrees to execute same, along with its execution of this Agreement.

21.   Time of the Essence.   Time is of the essence in this Agreement.

22.   Broker.   Lessor and Tenant each represents and warrants to the other that it has had no dealings with any other broker or agent in connection with this Agreement, and Lessor and Tenant covenant to hold harmless, defend and indemnify each other from and against any and all costs, expense or liability for any damages (including reasonable attorneys' fees and expenses), compensation, commissions and charges claimed by any broker or agent with respect to this Lease or to negotiation thereof, arising out of Lessor's and/or Tenant's conduct or conversations, as the case may be. The provisions of this Section shall survive the expiration or earlier termination of this Agreement and the Lease.

23.   Lessor's and Tenant's Representations.   Lessor hereby represents and warrants to Tenant that (i) Lessor is duly organized, validly existing and in good standing under the laws of the state of its organization and has full power and authority to enter into this Agreement and to perform its obligations under this Agreement in accordance with its terms, and (ii) Lessor's signatory of this Amendment has the authority to execute and deliver the same on behalf of Lessor. Tenant hereby represents and warrants to Lessor that (i) Tenant is duly organized, validly existing and in good standing under the laws of the state of its organization and has full power and authority to enter into this Agreement and to perform its obligations under this Agreement in accordance with its terms, and (ii) Tenant's

11



signatory of this Amendment has the authority to execute and deliver the same on behalf of Tenant.

24.    Notices.    Article A(vi) of the Lease shall hereby be amended by deleting Tenant's address therefrom and substituting the following therefor:

Tenant:

VITAMIN SHOPPE INDUSTRIES LLC
300 Harmon Meadow Boulevard
Secaucus, New Jersey 07094
Attention: General Counsel

With a duplicate copy to:

VITAMIN SHOPPE INDUSTRIES LLC
300 Harmon Meadow Boulevard
Secaucus, New Jersey 07094
Attention: Lease Administrator – Legal

[Signature Page to Follow]

WHEREUPON, the Lease shall continue in full force and remain binding in full upon the parties hereto in all of its terms and provisions, except as amended and modified above.



IN WITNESS WHEREOF, the parties have signed their hands, affixed their seals, and caused this Second Amendment to Lease to be executed the day and year above written.

LESSOR:

**FIFTH & ALTON (EDENS), LLC,** a Florida limited liability company

By:    Edens    Limited    Partnership,    a
Delaware limited partnership, its sole
member

By:    Edens GP, LLC, a Delaware limited
liability company, its sole general
partner

By: 
Name: Jodie W. McLean
Title:    Chief Executive Officer

TENANT:

**VITAMIN SHOPPE INDUSTRIES LLC,** a New York limited liability company

By:_____
Name:_____
Title:_____

44190/0407-43166098v8

13

IN WITNESS WHEREOF, the parties have signed their hands, affixed their seals, and caused this Second Amendment to Lease to be executed the day and year above written.

LESSOR:

**FIFTH & ALTON (EDENS), LLC,** a Florida limited liability company

By:    Edens    Limited    Partnership,    a
       Delaware limited partnership, its sole
       member

By:    Edens GP, LLC, a Delaware limited
       liability company, its sole general
       partner

By: _____
Name: Jodie W. McLean
Title:   Chief Executive Officer

TENANT:

**VITAMIN SHOPPE INDUSTRIES LLC,** a New York limited liability company

By: _____
Name:    Carlos Lopez
Title:    Vice President, General Counsel



**EXHIBIT A**

**Site Plan**



# EXHIBIT B

## Sign Criteria

The following sign guidelines shall govern the design, color, size, illumination, location and manner of installation of all of Tenant's signs to be placed on or near the Relocation Premises and/or the Shopping Center. The design, size and location of all signs must be approved in writing by Lessor, in its sole discretion. Lessor's approval of Tenant's sign shall not constitute the assumption of any liability on the part of Lessor with respect to accuracy or conformity with any zoning, building or signage code or other governmental or regulatory requirements. Tenant shall be solely responsible, at its sole cost, for its sign plan and obtaining all permits and approvals from all appropriate governmental and regulatory bodies. Tenant is required to use professional environmental graphic designers and signage companies to determine sign design and specifications.

Tenant's signage shall be subject to Lessor's approval in accordance with Lessor's Retailer Signage & Display Criteria (which may be modified from time to time as Lessor may elect) a copy of which was made available to Tenant before the execution of the Lease and will be thereafter provided to Tenant by Lessor at any time following Tenant's request for the same. Tenant hereby acknowledges having had the opportunity to review the Retailer Signage & Display Criteria and either has reviewed it or has elected not to review it.

1. Tenant is permitted one (1) front sign, one (1) blade sign, and one (1) rear sign [if applicable]. All signs are subject to both government and Lessor approvals, in Lessor's sole discretion.

2. All Tenants are required to have a unique identity. If Tenant does not have an identity, the Lessor will refer the Tenant to a preferred professional designer to establish an identity. Generic business names like "Cleaners," "Bank," "Diner," etc. are not allowed.

3. Only signs that carry Underwriters Laboratory (UL) listing will be permitted. The following sign types are not permitted (without written approval by Lessor, in Lessor's sole discretion):

   a. Signs of the flashing, rotating, moving, blinking or animated type

   b. Signs with red, green or yellow as a primary color (includes material finish & illumination)

   c. Signs with exposed neon tubing, exposed lamps, or any exposed sign illumination or illuminated sign cabinets

   d. Roof mounted signs

4. Tenant shall submit sign working drawings to Lessor within the timeframe required by the Lease and no sign shall be installed until Lessor's written approval has been granted in Lessor's sole discretion. Tenant shall provide Lessor a copy of the sign permit prior to sign installation. All drawings should show actual construction of the sign. No standard details will be acceptable. The sign working drawings must indicate the following:

1



a.    Shopping center name

b.    Store name

c.    Space number

d.    Complete address

e.    Type and size of all lettering

f.    Elevation view of storefront showing sign (drawn to scale) with overall height and width dimensions of sign, overall square footage of sign, detail dimensions of major sign elements (graphics, letterforms, etc.) and the linear dimension of the allowable areas of Tenant's presentation.

g.    A technical section (to scale) through the sign and storefront showing all pertinent construction details. Describe all fastener and weld details. Show attachment detail to building.

h.    Colors and finishes of all materials

i.    Wattage and light intensity by lamping type

j.    Location of penetrations for conduit and sleeves, etc. required for sign installation

k.    A photograph of the storefront with sign location shown to scale

5.    Tenant's sign shall be located above the storefront of the Relocation Premises and within the limits of the area designated by Lessor as the "sign band." Tenant's sign shall be centered vertically within said sign band and horizontally within the lineal front footage of the Relocation Premises. Façade signs to have a minimum clearance of 10" from upper and lower edges of sign band, and 12" clearance from demising wall centerline. The letters of Tenant's sign shall have a maximum height of 18"and a minimum height of 12".

6.    Major Tenant signage shall be regulated by Lessor and the size and location will be at the discretion and approval of Lessor.

7.    All Tenant signage shall be installed in accordance with Lessor provided Signage & Display Criteria. These criteria also provide direction and character images for window signs, graphics and displays, in addition to A-frame signs, outdoor furniture and awnings. These design elements must be approved by the Lessor in its sole discretion in order to maintain a first class shopping experience.

8.    Illumination shall be internal to the sign (exposed neon within letterforms, halo-illuminated) or by external front lighting. Light sources shall not cause glare hazardous to pedestrians or vehicle drivers. Lighting is to be white. Colored lamps shall be permitted only with Lessor approval.



9.     Face illumination to only consist of day/night type face material so that face reads as solid element during the day and illuminates at night. Illumination to be consistent with no shows or hot spots. Standard type acrylic faced letters/signs with colored faces are prohibited.

10.    Non-illuminated storefront façade signage prohibited without express Lessor approval.

11.    All tenant signs must be new and custom-made. Restored vintage or reuse signs are acceptable if approved by Lessor.

12.    No sign shall be placed in final position without Lessor approval. Poor quality materials or construction will not be approved. Final installation will be subject to approval and must conform to criteria and drawings provided, as well as to local building codes.

13.    If applicable, Tenant shall provide a dedicated circuit for the Tenant's signage illumination and shall coordinate and utilize Lessor-provided master switching relay system for all illuminated signage.

14.    Service/rear egress/delivery doors to Tenant areas will have standard identification (Tenant's name and address number) designed and installed by the Lessor at the Tenant's expense. No other signing or graphic is permitted at the service entrance.

15.    The signage contractor shall perform all cutting and patching of existing surfaces where required for installation of the signage work included herein. The procedures proposed for the accomplishment of cutting and patching work shall be submitted by the sign contractor to the Lessor for approval. Submission to also include work schedule showing start of work, finish date and any other important dates within project timeline.

16.    All penetrations of the building structure required for sign installation shall be neatly sealed in a watertight manner.

17.    All signs shall be individually pin-mounted or, if canopy mounted, on a raceway (not to be larger than 4'x4') pre-finished to match building or per individual development standard.

18.    Lessor is not responsible for cost incurred for replacement or construction of signs that do not conform to these sign guidelines.

19.    Sign company names or stamps shall be concealed if permitted by code.

20.    Public safety decals on glass in minimum sizes, subject to the approval of Lessor, may be used, as required by building codes or other governmental regulations.

21.    Prohibited sign materials include, but are not limited to the following:

a.     Flashing lights

b.     Animated components



c. Vinyl trim caps on letterform/sign face or return. See note J for face material limitations. Use of minimal size aluminum retainers or other low profile retainers for letterform/sign face are encouraged.

d. Cabinet signs with illuminated, translucent background and silhouette letters

e. Vacuum-formed plastic letters

f. Intentionally deleted.

g. Sandblasted wood signs in natural wood finish with painted, raised letters and/or logos

h. Advertising placards, banners, pennants, names, insignia, trademarks, or other descriptive or promotional material not designed as part of Tenant's overall presentation and brand identity may not be affixed or maintained on windows, glass fixtures, equipment, or another area of the storefront without Lessor approval.

i. Exposed raceways, exposed ballast boxes or electrical transformers. If raceway is used, it must be integrated into design of sign. Note applies to wall/façade and canopy signs.

j. Acrylic faced letterforms and sign cabinet. Only allowed acrylic faced elements are day/night type where face appears a solid color during the day and illuminates white at night. See note C for trim cap limitations.



44190/0407-43160980v8

5



**LOCATION NUMBER:**
901

**SITE ADDRESS:**
1119 5th St Ste 140
Miami Beach, FL 33139-6506





Infinite possibilities, ideal solutions.







44190/0407-43160939v8



# CODE CHECK

**Code check :** 0.75SF for every ft of in. frontage max 100SF min 15SSF.

Only I will projecting or detached sign shall be permitted per allowed frontage for each principal or licensed accessory use, unless otherwise allowed.

All signs shall be subject to design review procedures.

Max quantity per frontage - Multiple signs for the same establishment may be permitted through the design review process. If the aggregate sign area does not exceed the largest permitted area

External Halo lit signs permitted only thru design review

**Landlord criteria:**

1. Tenant is permitted one (1) front sign, one (1) blade sign and (1) rear sign if applicable. All signs are subject to both government and Lessor approval, in Lessor's sole discretion
2. All tenants are required to have a unique identity
3. Only signs that carry Underwriters Laboratory (UL) listing will be permitted. The following sign types are not permitted without written approval by Lessor, Lessor's sole discretion:
a. Signs of the flashing, rotating, moving blinking or animated type
b. Signs with red, green or yellow as a primary color (include material finish & illumination)
c. Signs with exposed neon tubing, exposed lamps or any exposed sign illumination or sign cabinets
d. Roof mounted signs
4. Tenant shall submit sign working drawings to Lessor within the timeframe required by the Lease and no sign shall be installed until Lessor's written approval has been granted in Lessor's sole discretion. Tenant shall provide Lessor a copy of the sign permit prior to sign installation. All drawings should show actual construction of the sign. No standard details will be acceptable.
a. Shopping center name
b. Store name
c. Space number
d. Complete Address
e. Type and size of all lettering
f. Elevation view of storefront showing sign with overall height and width dimensions of sign, overall square footage of sign, detail dimension of major sign elements (graphics, letterforms, etc) and the linear dimension of the allowable areas of Tenant's presentation
g. A vertical section (to scale) through the sign and storefront showing all pertinent construction details. Describe all fastener and weld details. Show attachment detail to building
h. Colors and finishes of all materials
i. Wattage and light intensity by lamping type
j. Location of penetrations for conduit sleeves, etc. required for sign installation
k. A Photograph of the storefront with sign location shown to scale

---

**Stratus**

| NAME: | | | |
|---|---|---|---|
| THE VITAMIN SHOPPE | | | |

## EXHIBIT C
## LESSOR'S WORK:

The following improvements shall be included in Lessor's Plans (subject to approval by Lessor) and made at Lessor's sole cost and expense, and are deemed to be "Lessor's Work":

1.      FLOOR STRUCTURE: Floor finishes from previous tenant will be removed and new flooring and wall base installed per Tenant's specifications in the Approved Lessor's Plans throughout the entire Relocation Premises.

2.      CEILING: Existing 2 x 2 ceiling grid will be extended as necessary after demo of walls and bulkhead in the sales area and new acoustical ceiling tiles will be installed per Tenant's specifications in the Approved Lessor's Plans. Replace stained/damaged ceiling tiles in the bathrooms and storage room as necessary.

3.      STOREFRONT: Existing storefront and doors to remain as-is. New Tenant-specific hardware to be installed.

4.      DEMISING/PARTITION WALLS: Existing demising and partition walls to be patched after demo of previous tenant finishes and exposed plumbing removal. All gypsum wallboard shall be taped, sanded, and primed and painted per Tenant's specifications in the Approved Lessor's Plans.

5.      REAR DOOR: One (1) existing 3'-0" x 7'-0" x 1¾" hollow metal door set in 7'-4" high hollow metal frame. New hardware per Tenant's specifications in the Approved Lessor's Plans.

6.      ELECTRICAL: Existing 120 / 208V, 3 phase, 150-amp panel box located in rear corridor of Relocation Premises. All existing outlets within the remaining walls will remain.

7.      LIGHTS: Existing light fixtures in the front area will be cleaned and relamped as necessary. Additional light fixtures to match will be installed in the new ceiling area per Tenant's specifications in the Approved Lessor's Plans.

8.      HEATING AND AIR CONDITIONING: Two (2) new 5-ton HVAC unit(s) will be installed. Existing ductwork will be reworked into the ceiling after demo of walls. All diffuser/vents to be in working order and T-stat to be relocated (if required) per the Approved Lessor's Plans. Lessor to provide test and balance report.

9.      WATER & SEWER: 4" sewer line and ¾" water line are existing to the toilet rooms. All other plumbing will be cut/capped.

10.     FIRE PROTECTION: Rework existing fire sprinkler system in the Relocation Premises as needed after demo of walls. Existing sprinkler heads to be in good working condition (head covers included, etc). Fire alarm, if applicable, in accordance with code.

11.     RESTROOMS: Restrooms to be delivered as-is. Any and all modifications to existing toilet rooms will be by Tenant at Tenant's expense, including but not limited to any modifications necessary to meet current ADA requirements.

9





# TENANT'S WORK:

Tenant shall, at its sole cost and expense, renovate, remodel, refurbish and redecorate the Relocation Premises, and make all interior improvements, alterations and changes to the Relocation Premises (other than Lessor's Work) to place same in a first class, modern and attractive condition, to enable Tenant to use the Relocation Premises for Tenant's Permitted Use (all of which shall be included in "Tenant's Work"). All work to be performed by Tenant hereunder shall be in accordance with the Tenant's Plans, as approved by Lessor (or deemed approved pursuant to Paragraph 2 of the Agreement) (the "Approved Tenant's Plans"), necessary to enable Tenant to complete Tenant's Work.

Within fifteen (15) days following Lessor's approval of the Approved Tenant's Plans ("Permit Filing Date"), Tenant shall, at Tenant's expense, apply for Tenant's Permits, which shall include all necessary governmental permits, approvals and licenses as required to perform Tenant's Work and thereafter Tenant shall diligently pursue obtaining Tenant's Permits. Tenant shall give a copy of the Tenant's Permits to Lessor within five (5) days of Tenant's receipt of same.

All submittals to Lessor shall be in a digital Adobe PDF format including sign shop drawings, Preliminary Design Drawings, Working Drawing submittals, all copies of Permit Drawings, and all forms, affidavits, permits, and miscellaneous close out documents.

All of Tenant's architects, contractors and subcontractors shall be (i) licensed and (ii) insured and, Tenant shall provide Lessor with the name, address, telephone number and, if available, email address of Tenant's construction representative (and/or project manager). Prior to commencing any work Tenant and its contractor must comply with the insurance requirements set forth in Article 22 of the Lease. No changes of materials or finishes are permitted after Lessor's final approval of the Tenant's Plans unless approved in writing by Lessor or required by governmental requirements, including, without limitation, the building code, which approval shall not be unreasonably withheld, conditioned or delayed.

Any work involving the roof of the Relocation Premises and the fire alarm and sprinkler system shall be performed by Lessor's designated contractor or subcontractor at Tenant's expense. All tap, meter, impact and other utility service fees shall be paid by Tenant.

Tenant's Work shall be performed and constructed in a good and workmanlike manner and in accordance with all Laws and shall be diligently pursued to completion.

Tenant shall provide Lessor with proof that it has obtained a Certificate of Occupancy (or local jurisdictional equivalent) for the Relocation Premises within ten (10) days of Tenant's receipt thereof.

Neither Lessor's approval of any plans, nor any other inspections or approvals of the improvements to the Relocation Premises or plans for construction thereof, by Lessor's employees, agents or inspecting engineers shall constitute a warranty or representation as to the technical sufficiency, adequacy or safety of the plans, structures, any of the component parts, or any other physical condition or feature pertaining to the improvements, it being acknowledged by Tenant that Lessor has made such approvals solely as a Lessor in determining and protecting the value of its property for internal purposes, and not for construction-related matters nor for compliance with all Laws.

ALL CONSTRUCTION SHALL COMPLY WITH ANY LOCAL CODES APPLICABLE TO GENERAL RETAIL USE. TENANT, AT TENANT'S SOLE COST, SHALL BE RESPONSIBLE FOR ANY ADDITIONAL IMPROVEMENTS REQUIRED IN CONNECTION WITH TENANT'S SPECIFIC USE OF THE RELOCATION PREMISES THAT ARE IMPOSED BY LOCAL CODE.

[REST OF THIS PAGE INTENTIONALLY LEFT BLANK]

44190/0407-43160980v8



**EXHIBIT C-1**
**FORM OF LIEN WAIVER**

**WAIVER AND RELEASE OF LIEN UPON FINAL PAYMENT**

OWNER:

GENERAL CONTRACTOR:

PROJECT NAME: _____

STATE OF _____

COUNTY OF _____

The undersigned lienor, in consideration of the final payment in the amount of _____ and ____/100 Dollars $_____, the receipt and sufficiency of which is hereby acknowledged, hereby waives and releases its lien and right to claim a lien for labor, services, or materials furnished to _____ on the job of _____ to the following described property:

_____

**ADDITIONAL WARRANTIES AND REPRESENTATIONS**

(1)    Any and all contractors, subcontractors, laborers, suppliers and materialmen that have provided labor, material or services to the undersigned for use or incorporation into the construction of the improvements to the Property have been paid and satisfied in full, and there are no outstanding claims of any character arising out of, or related to, undersigned's activities on, or improvements to, the Property. This statement is intended to comply with Fla. Stat. Ann. § 713.06(d), and this document should be treated as the Contractor's Final Affidavit under that section. This Waiver is specifically made for the benefit of Owner and the Owner's lender, and any other person or entity with a legal or equitable interest in the Property.

(2)    This Waiver constitutes a representation by the undersigned signatory, for and on behalf of the undersigned, that the payment referenced above, once received, constitutes full and complete payment for all work performed, and all costs or expenses incurred (including, but not limited to, costs for supervision, field office overhead, home office overhead, interest on capital, profit, and general conditions costs) relative to the work or improvements at the Property. The undersigned hereby specifically waives, quitclaims and releases any claim for damages due to delay, hindrance, interference, acceleration, inefficiencies or extra work, or any other claim of any kind it may have against the Owner and its lender, any tenant of the Owner, the Owner's project and/or development manager (if any), the General Contractor (if this Waiver is signed by a subcontractor or supplier), or any other person or entity with a legal or equitable interest in the Property, relative to the work or improvements at the Property.

IN WITNESS WHEREOF, the undersigned signatory, acting for and on behalf of the firm or company listed below and all of its laborers, subcontractors, and suppliers, has placed his hand and seal this ____ day of _____, 20___.

FIRM OR COMPANY: _____

By: _____

Print Name: _____

Sworn to and subscribed



Before me this _____ day of _____, 20___.

_____
Notary Public

(NOTARY SEAL)

My Commission Expires:

Its: _____

44190/0407-43160980v8

Prepared by and return to:
Vitamin Shoppe Industries LLC
300 Harmon Meadow Boulevard
Secaucus, New Jersey 07094
Attention: General Counsel

## EXHIBIT D
## FORM OF SNDA

## AMENDED AND RESTATED NON-DISTURBANCE, ATTORNMENT AND SUBORDINATION AGREEMENT

THIS AMENDED AND RESTATED NON-DISTURBANCE, ATTORNMENT AND SUBORDINATION AGREEMENT ("Agreement") is made and entered into this _____ day of _____ by and between FIFTH & ALTON (EDENS) LLC, a Florida limited liability company (hereinafter called the "Landlord"), whose address is c/o Edens Limited Partnership, Attn: Legal Department, 1221 Main Street, Suite 1000, Columbia, South Carolina 29201, for the benefit of METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation (hereinafter called the "Lender"), and VITAMIN SHOPPE INDUSTRIES LLC, a New York limited liability company (hereinafter called the "Tenant"). The addresses for Lender and Tenant are set forth in paragraph 6 below.

### WITNESSETH:

WHEREAS, Landlord (formerly known as AR & J Sobe, LLC, a Florida limited liability company) has entered into and delivered a certain Amended and Restated Mortgage, Security Agreement, Fixture Filing and Notice of Future Advance (as amended and as supplemented by any related collateral documents, the "Mortgage") held by Lender, encumbering the property legally described on Exhibit "A" attached hereto, which is located at the site bounded by 5th and 6th Streets, Alton Road and Lenox Avenue, Miami Beach, Florida, and commonly known as 5th & Alton Shopping Center (the "Shopping Center"), to secure the payment of the indebtedness described in the Mortgage.

WHEREAS, Landlord and Tenant (as successor in interest to Vitamin Shoppe Industries Inc., a New York corporation, made and entered into that certain Lease ("Original Lease") dated November 14, 2008, with respect to certain premises ("Leased Premises") therein described, which Original Lease has been previously amended by that certain First Amendment to Lease dated December 31, 2018 and that certain Relocation Agreement and Second Amendment to Lease dated _____, 2022 (collectively, the "Lease").

WHEREAS, the parties hereto desire to enter into this Agreement;

WHEREAS, Landlord, Tenant and Lender previously entered into that certain Non-Disturbance, Attornment and Subordination Agreement dated as of November 14, 2008, and recorded on May 26, 2009 in the Office of the Clerk of Court Miami-Dade County, Florida in DR Book 2678 at Pages 3548 - 3554 (the "Original SNDA") and the parties desire to amend and restate the Original SNDA in its entirety and this Agreement shall be deemed to supersede the Original SNDA.

NOW, THEREFORE, for and in consideration of the mutual covenants hereinafter set forth, Lender, Tenant and Landlord hereby covenant and agree as follows:

1. Non-Disturbance. So long as no default exist, beyond any applicable notice and cure period, nor any event has occurred which has continued to exist for such period of time (after notice, if any required by the Lease) as would entitle the lessor under the Lease to terminate the Lease or would entitle cause, without any further action on the part of Landlord, the termination of the Lease or would entitle

[2841-02529/01238031.1}





44190/0407-43166980v8

1

such lessor to disposses its interest thereunder, the Lease shall not be terminated, nor shall such lessee's use, possession or enjoyment of the Leased Premises be interfered with nor shall the leasehold estate granted by the Lease be affected in any other manner by a foreclosure of the Mortgage, or by any foreclosure or any action or proceeding instituted under or in connection with the Mortgage or in case the Lender takes possession of the property described in the Mortgage pursuant to any provisions thereof, unless the lessor under the Lease would have had such right if the Mortgage had not been made except that the person or entity acquiring the interest of the lessor under the Lease as a result of any such action or proceeding, including, without limitation, Lender, and the successors and assigns thereof (hereinafter called the "Purchaser") shall not be (a) liable for any act or omission of any prior lessor under the Lease, except for liabilities arising out of continuing non-monetary defaults under the Lease and occurring after Purchaser becomes the owner of the Shopping Center, provided that Lender has received written notice of any such non-monetary default prior to Purchaser acquiring title to the Shopping Center and only after the expiration of any applicable cure period provided for in the Lease; or (b) subject to any offsets or defenses which the lessee under the Lease might have against any prior lessor under the Lease (except for offsets or defenses arising out of continuing non-monetary defaults under the Lease to the extent they relate to the time after Lender becomes the owner of the Shopping Center and of which Lender has been provided notice and opportunity to cure as provided in Section 6 below); or (c) bound by any base rent or other payments which the lessee under the Lease might have paid for more than the Current month to any prior lessor under the Lease, unless such additional rent is required by and paid in accordance with the applicable provisions of the Lease; or (d) bound by any amendment or modification of the Lease made without Lender's prior written consent; or (e) bound by any consent by any lessor under the Lease (if required) to any assignment of the lessee's interest in the Lease made without also obtaining Lender's prior written consent; or (f) liable to Tenant or any other party for any conflict between the provisions of the Lease and the provisions of any other lease affecting the Shopping Center which is not entered into by Lender/Purchaser; or (g) obligated to expend any monies to restore casualty damage in excess of available insurance proceeds; or (h) obligated or liable with respect to any representations, warranties or indemnities contained in the Lease; and Tenant shall not have the right to make repairs and deduct the cost of such repairs from the rent without a judicial determination that Purchaser is in default of its obligations under the Lease, except as otherwise expressly provided in the Lease.

2.      Construction of Improvements. From and after the date Purchaser acquires title to the Shopping Center, Purchaser shall not have any obligation or incur any liability with respect to the completion of any construction (including tenant improvements) for the Shopping Center or Leased Premises, but this shall not affect provisions of the Lease that condition certain matters (including rent commencement) on completion of such work or permit Tenant to terminate the Lease if such work is not timely completed.

3.      Subordination and Release of Purchase Options. Tenant represents that it has no right or option of any nature to purchase the Shopping Center or any portion of the Shopping Center or any interest in Landlord. To the extent Tenant has or acquires any such right or option, these rights or options are acknowledged to be subject and subordinate to the Mortgage and are waived and released as to Lender and any Purchaser.

4.      Attornment. If the interests of the lessor under the Lease shall be transferred by reason of any foreclosure or other proceeding for enforcement of the Mortgage, the lessee thereunder shall be bound to the Purchaser under all of the terms, covenants and conditions of the Lease for the balance of the term thereof and any extensions or renewals thereof which may be effected in accordance with any option therefor in the Lease, with the same force and effect as if the Purchaser were the lessor under the Lease, and Tenant, as lessee under the Lease, does hereby attorn to the Purchaser, including the lender if it be the Purchaser, as its lessor under the Lease. Said attornment shall be, at the option of Purchaser, effective and self-operative without the execution of any further instruments upon the succession by Purchaser to the

2

44190/0407-43160980v8



interest of the lessor under the Lease. The respective rights and obligations of Purchaser and of the lessee under the Lease upon such attornment to the extent of the then remaining balance of the terms of the Lease and any such extensions and renewals, shall be and are the same as now set forth in the Lease except as otherwise expressly provided herein.

5. Subordination. Tenant hereby subordinates all of its right, title and interest as lessee under the Lease to the right, title and interest of the Lender under the Mortgage and Tenant further agrees that the Lease now is and shall at all times continue to be subject and subordinate in each and every respect to the Mortgage and to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Mortgage, and any future advances thereunder.

6. Notice of Default by Lessor. Tenant, as lessee under the Lease, hereby covenants and agrees to give Lender written notice properly specifying wherein the lessor under the Lease has failed to perform any of the covenants or obligations of the lessor under the Lease, simultaneously with the giving of any notice of such default to the lessor under the provisions of the Lease. Tenant agrees that Lender shall have the right, but not the obligation, within thirty (30) days after receipt by Lender of such notice (or within such additional time as is reasonably require to correct any such default) to correct or remedy, or cause to be corrected or remedied, each such default before the lessee under the Lease may take any action under the Lease by reason of such default. Such notices to Lender shall be delivered in duplicate to:

Metropolitan Life Insurance Company
One MetLife Way
Whippany, New Jersey 07981-1449
Attn: Senior Vice President
Real Estate Investments

and

Metropolitan Life Insurance Company
Real Estate Investments
3500 Lenox Road, Suite 200
Atlanta, Georgia 30326
Attn: Regional Director

or to such other address as the Lender shall have designated to Tenant by giving written notice to Tenant at 300 Harmon Meadow Boulevard, Secaucus, New Jersey 07094, Attention: General Counsel, with a duplicate copy to 300 Harmon Meadow Boulevard, Secaucus, New Jersey 07094, Attention: Lease Administrator – Legal, or to such other addresses as may be designated by written notice from Tenant to Lender.

7. No Further Subordination. Landlord and Tenant covenant and agree with Lender that there shall be no further subordination of the interest of lessee under the Lease to any lender or to any other party without first obtaining the prior written consent of Lender. Any attempt to effect a further subordination of lessee's interest under the Lease without first obtaining the prior written consent of Lender shall be null and void.

8. As to Landlord and Tenant. As between Landlord and Tenant, Landlord and Tenant covenant and agree that nothing herein contained nor anything done pursuant to the provisions hereof shall be deemed or construed to modify the Lease.

9. As to Landlord and Lender. As between Landlord and Lender, Landlord and Lender

44190/0407-43160980v8

{2041-0259/01238031.1}



covenant and agree that nothing herein contained nor anything done pursuant to the provisions hereof shall be deemed or construed to modify the Mortgage.

10.    Title of Paragraphs.  The titles of the paragraphs of this agreement are for convenience and reference only; and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this agreement.

11.    Governing Law.  This Agreement be governed by and construed in accordance with the laws of the State of Florida.

12.    Provisions Binding.  The terms and provisions hereof shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and permitted assigns, respectively, of Lender, Tenant and Landlord. The reference contained to successors and assigns of Tenant is not intended to constitute and does not constitute a consent by Landlord or Lender to an assignment by Tenant, but has reference only to those instances in which the lessor under the Lease and Lender shall have given written consent to a particular assignment by Tenant thereunder.

13.    Counterparts.  This Agreement maybe executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

14.    Liability of Lender.  In the event that Lender or any other party acquiring title to the Premises or Shopping Center by foreclosure or conveyance in lieu of foreclosure acquires title to the Premises or the Shopping Center, Lender or such party shall have no obligation nor incur any liability in an amount in excess of $5,000,000, and Tenant's recourse against Lender or such party shall to no extent exceed the amount of $5,000,000. If a Purchaser acquires the Shopping Center or if Lender assigns or transfers its interest in the Mortgage and any notes secured by the Mortgage or in the Shopping Center, all obligations and liabilities of Lender under this Agreement shall terminate and be the responsibility of the Purchaser or other party to whom Lender's interest is assigned or transferred.

15.    Tenant's Fixtures and Equipment. It is expressly agreed to between Lender, Landlord and Tenant that in no event shall the Mortgage cover or encumber (shall not be construed as subjecting in any manner to the lien thereon) any of Tenant's moveable trade fixtures, business equipment, furniture, signs, inventory, or other personal property at any time placed in, on or about the Shopping Center.

16.    Sanctions Lists.  Tenant and Lender hereby represent, warrant and covenant to each other, that either: (i) it is a Regulated Entity (as defined below), or (ii) neither it nor any person or entity that directly or indirectly has an ownership interest in it of twenty-five percent (25%) or more, is or will be (A)(1) subject to a U.S. comprehensive sanctions program administered by the U.S. Department of Treasury: Office of Foreign Assets Control ("OFAC"), (2) named on OFAC's U.S. Specially Designated Nationals list, or (3) named on OFAC's Sectoral Sanctions Identifications list (1), (2) and (3) collectively the "OFAC Sanctions Lists"), (B) named on any other locally required sanctions lists ("Country Lists"), or (C) named on the United Nations Security Council's sanctions list (the "U.N. List" and together with the OFAC Sanctions Lists and the Country Lists, the "Sanctions Lists"). For purposes of this Section, a "Regulated Entity" shall mean a U.S. public company (including their documented wholly-owned subsidiaries) or any other entity, including a bank, that is regulated by the SEC, FINRA, or Federal Reserve.

[NO FURTHER TEXT ON THIS PAGE]

44190/0407/431609080v8



IN WITNESS WHEREOF, the parties have hereunto set their respective hands and seals as of the day, month and year first above written.

TENANT:

VITAMIN SHOPPE INDUSTRIES LLC,
a New York limited liability company

By: _____

Name: _____

Title: _____

[CORPORATE SEAL]

Acknowledged before me by Tenant:

_____

_____

Notary Public:
Print Name:
Commission date:
[NOTARIAL SEAL]



Acknowledged before me by Landlord:

LANDLORD:

**FIFTH & ALTON (EDEN'S), LLC,**
a Florida limited liability company

By:   Edens Limited Partnership, a
     Delaware limited partnership,
     its sole member

By:   Edens GP, LLC,
     a Delaware limited liability company,
     its sole general partner

By: _____
Name:  Jodie W. McLean
Title:  Chief Executive Officer

[CORPORATE SEAL]

Notary Public: _____
Print Name:
Commission date:
[NOTARIAL SEAL]

(2041-02559-01238031.1)

6

44190/0407-43160980v8



Acknowledged before me by Lender.

LENDER:

**METROPOLITAN LIFE INSURANCE COMPANY**,
a New York corporation

By:     MetLife Investment Management, LLC,
        a Delaware limited liability company,
        its investment manager

By: _____
Name:
Title:    Authorized Signatory and
          [Director/Managing Director]

[CORPORATE SEAL]

_____
Notary Public:
Print Name:
Commission data:
[NOTARIAL SEAL]

(2041-0259 02128031.2)

7

44190/0407-43166980v8



# EXHIBIT A

## Legal Description of Shopping Center

Lot 1 through 16 in Block 104, of OCEAN BEACH FLORIDA, ADDITION NO. 3, according to the plat thereof as recorded in Plat Book 2, Page 81, of the Public Records of Miami - Dade County, Florida less the South 10 feet of the East 50 feet of Lot 8 and less the South 10 feet of the West 50 feet of the East 100 feet of Lot 8 and less the South 10 feet of Lot 9 in Block 104 of Ocean Beach;

AND

That certain 20 foot wide alley, bounded on the east by the west boundary of Lots 1 through 8, Block 104, Ocean Beach Florida Addition No. 3 according to the plat thereof as recorded in Plat Book 2, Page 81 of the Public Records of Miami-Dade County, Florida, bounded on the west by the east line of Lots 9 through 16, of said Block 104; bounded on the north by the north line of Lot 1 of said Block 104 projected westerly; and bounded on the south by the north line of the south 10 feet of Lot 8 of said Block 104 projected westerly

LESS AND EXCEPT the following described "bus stop" property:

A PORTION OF LOTS 14 THROUGH 16, BLOCK 104, OCEAN BEACH FLORIDA ADDITION No. 3, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 2 AT PAGE 81 OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE N.W. CORNER OF SAID LOT 16; THENCE RUN SOUTH 01 DEGREES 57 MINUTES 11 SECONDS EAST, ALONG THE EAST RIGHT OF WAY LINE OF ALTON ROAD, FOR 25.03 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 46 DEGREES 57 MINUTES 38 SECONDS EAST FOR 9.19 FEET; THENCE SOUTH 01 DEGREES 57 MINUTES 11 SECONDS EAST, ALONG A LINE PARALLEL WITH AND 6.50 FEET EASTERLY OF, AS MEASURED AT RIGHT ANGLES TO, THE EAST RIGHT OF WAY LINE OF ALTON ROAD, FOR 80.60 FEET; THENCE SOUTH 43 DEGREES 02 MINUTES 22 SECONDS WEST FOR 9.19 FEET; THENCE NORTH 01 DEGREES 57 MINUTES 11 SECONDS WEST, ALONG THE EAST RIGHT OF WAY LINE OF ALTON ROAD, FOR 93.60 FEET TO THE POINT OF BEGINNING; ALL LYING BETWEEN THE HORIZONTAL PLANES OF ELEVATION 3.00 FEET AND ELEVATION 15.67 FEET, NATIONAL GEODETIC VERTICAL DATUM OF 1929.

LYING AND BEING IN SECTION 03, TOWNSHIP 54 SOUTH, RANGE 42 EAST, CITY OF MIAMI BEACH, MIAMI-DADE COUNTY, FLORIDA.

[2041-0259-0123803 1.3]

A-1

44190/0407-43160980v8



Exhibit 2

EDENS.

August 5, 2024

100 East Broward Boulevard Suite 1600 Fort Lauderdale FL 33301  /  954.670.8900  /  www.EDENS.com

VIA FEDEX OVERNIGHT MAIL
Vitamin Shoppe Industries LLC
300 Harmon Meadow Blvd.
Secaucus, NJ 07094
Attn: General Counsel

Re:    **DELIVERY OF POSSESSION – Vitamin Shoppe at Fifth & Alton, Miami Beach, FL**
Shopping Center Relocation Agreement and Second Amendment to Lease dated November 18, 2022 (the
"Lease") by and between Fifth & Alton (EDENS) LLC ("Landlord") and Vitamin Shoppe Industries, LLC
("Tenant")

Dear Tenant:

In accordance with the terms of the Lease, this letter will provide confirmation that Landlord has substantially
completed Landlord's Work and Landlord's delivery of legal possession of the Premises as defined in the Lease
occurred on August 1, 2024. Attached is a copy of the Certificate of Occupancy issued by the City of Miami Beach.

Please remember that certain obligations, including insurance, now exist under the terms of your lease as of the date
of delivery of possession of the Premises.  Your Property Manager is Andrew Bonner.  He can be reached at
954.622.4204 and can answer any questions you may have about Fifth & Alton or your space.

As Tenant Construction Manager, I am eager to help you in any way I can to expedite your opening for business.
Please do not hesitate to contact me directly at 954.829.2076 during your construction. Prior to commencing
construction at the Premises, Tenant shall not commence activities in the space until Landlord has approved all
construction documents, and all pre-construction requirements, as outlined in the Lease, including obtaining all
required building permits.

Sincerely,

*Gail McKinney*

Gail McKinney
Sr. Tenant Construction Manager
EDENS

cc via e-mail:    Mark Doster, Director of Leasing (EDENS)
                 Andrew Bonner, Regional Property Manager (EDENS)
                 Cathy Cauthen, Vice President – Legal (EDENS)
                 Lease Administration (EDENS)

cc via FEDEX:    Vitamin Shoppe Industries LLC
                 300 Harmon Meadow Blvd.
                 Secaucus, NJ 07094
                 Attn: Lease Administration



# MIAMIBEACH

**Building Department**
**City of Miami Beach**
1700 Convention Center Drive, 2nd floor, Miami Beach, Florida 33139, (305) 673-7610, www.miamibeachfl.gov

# CERTIFICATE OF OCCUPANCY

**Certificate Number:** CO24-3242

**Applied Date:** 08/01/2024

**Issued Date:** 08/01/2024                    **Status:** Issued

**Site Address:** 1101 5 ST

**Unit Number:**                    **Parcel Number:** 0242033520050

**Tenant:**                    **Property Owner:** Fifth & Alton (EDENS) LLC

**Building Permit #:** BC2321150

**Occupancy Classification Code:** B office,professional or srType of Construction:

**Number of Building Floor:**                    **Total Number of Units of the Building:**

**Residential/Commercial/Mixed Use:** Commercial                    **Sprinkler System Required:**

**New or Substantial Improvement (Y/N):**                    **Base Flood Elevation:**

**Florida Building Code Edition:** 2020                    **Occupant Load:**

**Certificate description and specific conditions:**

CO BC2321150/(1119 5th St) Change of Use from restaurant to retail (Vitamin Shoppe); interior alteration non structural including drywall, ceiling tile, flooring HVAC

**General terms and conditions of this certificate:**

1. This is to certify that the above noted structure or portion of the structure has been inspected for compliance of Florida Building Code and the provision of the zoning ordinance 89-2665 of City of Miami Beach for the proposed occupancy and use.

2. As-built elevation certificate shall be provided by the applicant for new construction, addition or substantial improvement, and is retained in the records of the Building Department. If the structure is designed for dry-flood proofing, the tenant shall comply with procedures and guidelines of the Flood Emergency Operation Plan and insta watertight shields over openings prior to a flood warning

3. Any unauthorized additions, alterations or change in use of this property will void Certificate of Occupancy.

**A Certificate of Occupancy is hereby granted to use said building for the purpose described above, subject to any condition(s) detailed in this document.**

Mashael Ismail
Building Official

8/1/2024

Date

*This Certificate of Completion is valid only if there is an ISSUED status and a Building Official Signature.*

Exhibit 3



**THE VITAMIN SHOPPE**
Lifelong wellness starts here.™

Shop with us | 📷 📘 ▶ 💼 🎵

**Ariella Alvarez**

**Director of Lease Administration, Legal Department**

Mon. Theatergoer. Health Enthusiast.

---

Thank you,
Ariella

We look forward to working with you on the next steps that are necessary to get our relocation premises open in a timely manner.

We received the attached letter and as stated in Susan's email below we disagree with the Delivery of Possession date referenced in the letter along with additional items that were mentioned during your call.

Hi Gail,

**This Message Is From an External Sender**
This message came from outside your organization.
Please verify the sender before clicking links, opening attachments, or providing important data.

Report Suspicious

**From:** Ariella Alvarez <Ariella.Alvarez@vitaminshoppe.com>
**Sent:** Wednesday, August 14, 2024 12:22 PM
**To:** Goodman, Susan @ CBRE Retail Project Management <susan.goodman@cbre.com>; Gail McKinney <GMckinney@edens.com>
**Cc:** McNamara, Lisa @ Phoenix <Lisa.McNamara@cbre.com>; Cindy Acton-Blackburn <cacton-blackburn@arcv.com>
**Subject:** Re: 901 The Vitamin Shoppe - Miami Beach (LL Delivery)

Facebook | Instagram | Twitter | LinkedIn

**Phone/Fax** 954.422.4222 **Cell** 954.829.2076
F of L Lauderdale, FL 33301
500 E. Broward Blvd, Suite 1620
**EDENS**
SR. TENANT CONSTRUCTION MANAGER
**Gail McKinney**

---

We were pretty close to being complete when your store designer, Esi Gibson, did a walkthrough in July and saw the progress. I believe only the floors and a couple of inspections were pending, so substantially complete and a punch list could have been generated at the time. I told her that we should have a Certificate of Occupancy by August 1, which we did.

There have been a series of emails and discussions for over a year about this space. The discovery of TVS not being able to submit drawings to the City of Miami Beach only came up when TVS submitted their plans. I submitted the Landlord Work plans, completed by TVS architect, when I received them. Landlord work plans were already in review and we were too far along in the review process to change them to show "white box" work, without a Tenant name. LLW permit was issued on August 1, 2023. Our initial schedule was to complete the work by November 1, 2023, but the city inspectors made it impossible to make that date. With every inspection issue that came up, we relayed it to the TVS architect and CBRE group. Even when we thought things were resolved, another issue came up. Giving a 60-day notice after we realized the inspection issues, would have been nearly impossible. As I have mentioned to several in this group in the past, this is an extremely difficult city to work in.

Hi Ariella,

**From:**          Gail McKinney
**To:**            Ariella Alvarez; Goodman, Susan @ CBRE Retail Project Management
**Cc:**            McNamara, Lisa @ Phoenix; Cindy Acton-Blackburn
**Subject:**       RE: 901 The Vitamin Shoppe - Miami Beach (LL Delivery)
**Date:**          Wednesday, August 14, 2024 1:18:00 PM
**Attachments:**   image001.png
                   image002.png
                   image003.png
                   image004.png
                   image005.png
                   image006.png
                   image007.png
                   image008.png
                   image009.png
                   image010.png
                   image011.png

300 Harmon Meadow Blvd.

Secaucus, NJ 07094

T: 201-552-6084,

F: 201-552-6464,

Ariella.Alvarez@vitaminshoppe.com

**From:** Goodman, Susan @ Atlanta <Susan.Goodman@cbre.com>
**Sent:** Monday, August 12, 2024 9:58 AM
**To:** Gail McKinney <GMcKinney@edens.com>
**Cc:** McNamara, Lisa @ Phoenix <Lisa.McNamara@cbre.com>; Ariella Alvarez <Ariella.Alvarez@vitaminshoppe.com>; Cindy Acton-Blackburn <acton-blackburn@arcv.com>
**Subject:** [EXTERNAL] 901 The Vitamin Shoppe - Miami Beach (LL Delivery)

External Sender: Please do not click on links or open attachments from senders you do not trust.

Hi Gail,

Thank you again for your time last week; to walk the space so we could accept delivery.

I know during the call, you stated that your concern about the RCD being 90 days after delivery, however, I've reached out to TVS legal counsel and that doesn't appear to be the case, per the lease (3.1., iii.& v.):

- (i/iii): the applicable governmental authority(ies) responsible for issuing the building permits for Tenant's Work ("Tenant Permits") approves the application Tenant's Permits to the extent necessary for Tenant to commence Tenant's Work.
  - You stated that we would have been able to obtain our permits, while your drawings were in for permit, however, due to the THE VITAMIN SHOPPE being on both sets of drawings. Per the attached email, from 2023, the drawings were approved with NO COMMENTS, our drawings being able to be submitted. Per the attached email, that this caused your drawings/work to be completed and C/O issued prior to or any mention that the THE VITAMIN SHOPPE logo should NOT be on the drawings, otherwise they would have removed and submitted the drawings as Landlord Work/Shell Drawings.
- (iii): I confirm that we did do our walk thru on 8/7 and that we do not have any punch items for you to complete
- (v): We did not receive (60) days written notice of delivery of the space.

3.    Lessor's Delivery of the Relocation Premises.

(i)    The date on which the last of the following events occurs shall be referred to as the "Relocation Premises Delivery Date": (i) Lessor delivers legal possession of the Relocation Premises to Tenant, vacant and free of all rights of any third parties and free of all hazardous materials, with Lessor's Work substantially complete (as described below) in accordance with the Approved Lessor's Plans and in compliance with applicable Laws, provided that Tenant shall not be required to accept possession of the Relocation Premises prior to April 1, 2023, (ii) Tenant receives from Metropolitan Life Insurance Company ("Lender"), the holder of the current financing encumbering the Shopping Center, a non-disturbance agreement ("SNDA") executed by Lender in accordance with Section 20 below, and (iii) the applicable governmental authority(ies) responsible for issuing the building permits for Tenant's Work ("Tenant's Permits") approves the application for Tenant's Permits to the extent necessary for Tenant to commence Tenant's Work. Tenant hereby acknowledges and agrees that Tenant has inspected the Relocation Premises and that Tenant agrees to accept the Relocation Premises in its current "as is" condition, except for Lessor's Work, and Lessor makes no representations as to the condition of the Relocation Premises.

(ii)    Lessor's Work shall be deemed substantially complete when all of Lessor's Work is complete in accordance with the Approved Lessor's Plans (as modified if required by applicable governmental entities for issuance of Lessor's Permits, subject to the last paragraph of Section 2 above) except for any "Punch List Items" (as hereinafter defined) and a certificate of completion has been issued by the municipality with respect to Lessor's Work.

(iii)    On or before the Relocation Premises Delivery Date, Lessor's and Tenant's representatives together shall conduct a walk-through of the Relocation Premises to compile a punch list of the Punch List Items. Tenant shall deliver to Lessor a copy of said punch list within five (5) days after the walk-through. If Lessor does not receive the list of Punch List Items from Tenant within such 5-day period, then Tenant shall be deemed to have waived the right to have Lessor complete any Punch List Items. If Lessor does receive the list of Punch List Items from Tenant within such 5-day period, Lessor shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list, subject to force majeure. If Lessor fails to complete any item on said punch list within said 10-day period, Tenant shall give written notice to Lessor and Lessor then shall have five (5) business days to complete same or provide Tenant with its good-faith basis for the delay and time within which the work will be completed. If Lessor does neither of the foregoing within such 5 business-day period, then Tenant shall have the right to complete such item(s) using its own contractors, and Lessor shall reimburse Tenant such reasonable costs actually incurred by Tenant within thirty (30) days after receiving a statement therefor, together with supporting documentation reasonably acceptable to Lessor showing such amounts paid by Tenant. If Lessor fails to reimburse Tenant for such amounts within such time period, Tenant shall have the right to offset the reasonable costs and expenses thereof against the Fixed Rent and Additional Rent payable by Tenant hereunder.

(iv)    As used herein, the term "Punch List Items" for purposes of determining substantial completion of Lessor's Work shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect or delay either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Relocation Premises. Tenant and Lessor shall reasonably cooperate in the scheduling of such work (other than emergency work, if not practicable) and Lessor shall use commercially reasonable efforts to avoid interference with work being performed by Tenant or on behalf of Tenant within the Relocation Premises.

(v)    Lessor shall provide Tenant with sixty (60) days' prior written notice of the estimated date Lessor expects to deliver possession of the Relocation Premises to Tenant; provided, however, Lessor shall not be in default and Tenant shall not be entitled to any remedy if delivery of possession does not occur on such estimated date.

Please review with your team and let us know if there are any additional questions, as I've cc'd Ariella Alvarez, who is TVS legal counsel, and can assist.

Thank you

Susan Goodman, PMP

Senior Project Manager

CBRE | On Demand

Project Management

Atlanta, GA

T +1 404 456 7030

susan.goodman@cbre.com

Follow CBRE:  CBRE.com | LinkedIn | Twitter | Instagram | Facebook

Details about the personal data CBRE collects and why, as well as your data privacy rights under applicable law, are available at **CBRE – Privacy Policy.**

The information contained in this electronic message is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. It is intended only for the use of the individual(s) or entity named above. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete the electronic message and any associated attachments.

Exhibit 4

LEGAL DEPARTMENT
M. Catherin Cauthen
Vice President - Legal
(803) 744-6754
ccauthen@edens.com

EDENS.

December 5, 2024

VIA FEDEX OVERNIGHT DELIVERY

Vitamin Shoppe Industries LLC
d/b/a Vitamin Shoppe No 468
Attn: Lease Administration
300 Harmon Meadow Blvd
Secaucus, NJ 07094

Dear Tenant:

RE:     **Vitamin Shoppe (store # 468), Fifth & Alton, Miami Beach, Florida**
        Shopping Center Lease Agreement by and between Fifth & Alton (EDENS), LLC
        ("Landlord") and Vitamin Shoppe Industries LLC ("Tenant"), as amended by that
        Relocation Agreement and Second Amendment to Lease (the "Relocation Agreement") (as
        amended, the "Lease")

## NOTICE OF ORIGINAL PREMISES SURRENDER DATE

    As you know, the Relocation Agreement establishes certain dates governing Tenant's relocation
from unit 180 ("Original Premises") to unit 140 ("Relocation Premises") at Fifth & Alton Shopping Center.
This letter is to confirm the deadline for Tenant to return possession of the Original Premises to Landlord,
which is **Friday, January 3, 2025** ("Surrender Date"), and provide notice that Landlord does not consent
to Tenant holding over in the Original Premises beyond the Surrender Date.

    The Surrender Date was established under the Relocation Agreement, based upon the following
timeline:

- Landlord delivered physical access and legal possession of the Relocation Premises to Tenant on
  August 1, 2024. Upon delivery, Landlord's Work was complete and Tenant could begin preparing
  the space for its use. Landlord's August 1 delivery and work completion was confirmed by written
  notice to Tenant dated August 5, 2024, accompanied by a copy of the Certificate of Occupancy. A
  walkthrough was conducted on August 7 and there were no punch list items.

- Because Tenant was entitled to 60 days' advance notice of the estimated delivery date (paragraph
  3(v)), the actual delivery of access and possession on August 1 constituted the 60-day notice.
  Therefore, 60 days later – September 30, 2024 – is established as the "Relocation Premises Delivery
  Date."

- Under paragraph 5, the Surrender Date is 95 days after the Relocation Premises Delivery Date
  (assuming Tenant does not open for business in the Relocation Premises before then). January 3,
  2025, is 95 days after September 30, 2024.

    Accordingly, please arrange a time with the Property Manager to coordinate a walk-through of the
Original Premises.

Please feel free to contact us if you have any questions.

Sincerely,

*Cathy Cauthen*

M. Catherin Cauthen

**VIA FEDEX OVERNIGHT DELIVERY**
Vitamin Shoppe Industries LLC
Attn: General Counsel
300 Harmon Meadow Blvd
Secaucus, NJ 07094

cc:

MCC/rac

1221 Main Street, Suite 1000, Columbia, SC 29201    /    800.662.7212    /    www.EDENS.com

ORIGIN ID:USCA     (803) 744-2452
BECKY COLLINS
EDENS
1221 MAIN STREET
SUITE 1000
COLUMBIA, SC 29201
UNITED STATES US

SHIP DATE: 05DEC24
ACTWGT: 1.00 LB
CAD: 4756699/INET4535

BILL SENDER

TO **VITAMIN SHOPPE INDUSTRIES LLC**
**D/B/A VITAMIN SHOPPE NO 468**
**ATTN: LEASE ADMINISTRATION**
**300 HARMON MEADOW BLVD**
**SECAUCUS NJ 07094**

(000) 000-0000              REF: 5TH & ALTON
INV:
PO:                         DEPT: 165 LEASING MANAGEMENT FL

58CJ4EB7&C6C4





**FedEx**
Express

E

TRK# **7705 1473 6587**
0201

FRI - 06 DEC 5:00P
STANDARD OVERNIGHT

07094

**G2 JSLA**

NJ-US     EWR



After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line
2. Place label in shipping pouch and affix it to your shipment

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

ORIGIN ID:USCA    (803) 744-2452
BECKY COLLINS
EDENS
1221 MAIN STREET
SUITE 1000
COLUMBIA, SC 29201
UNITED STATES US

SHIP DATE: 05DEC24
ACTWGT: 1.00 LB
CAD: 4756699/INET4535

BILL SENDER

TO **VITAMIN SHOPPE INDUSTRIES LLC**

**ATTN: GENERAL COUNSEL**
**300 HARMON MEADOW BLVD**
**SECAUCUS NJ 07094**

(000) 000-0000          REF: 5TH & ALTON
INV:
PO:                     DEPT: 165 LEASING MANAGEMENT FL





FedEx
Express

TRK# 0201  **7705 1469 6204**

**FRI - 06 DEC 5:00P**
**STANDARD OVERNIGHT**

**G2 JSLA**          07094

NJ-US        EWR



After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line
2. Place label in shipping pouch and affix it to your shipment

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.