## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (JTD) (Jointly Administered) |
| Debtors. | |
| | **Re: Docket No. 1044** |

### OBJECTION OF THE AD HOC GROUP OF FREEDOM
### LENDERS TO THE DEBTORS' EXCLUSIVITY EXTENSION MOTION

The Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**"),[2] consisting of

approximately 93% of the Lenders (the "**HoldCo Lenders**"), as defined in that certain Credit

Agreement, dated as of August 21, 2023 among Freedom VCM Interco, Inc. as Borrower, Freedom

VCM, Inc. as Holdings (together with Freedom VCM Interco, Inc., the "**HoldCo Debtors**"), Alter

---

[1]     The debtors in these Chapter 11 Cases (the "**Debtors**"), along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), B. Riley Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home and Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing, LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

[2]     The Freedom Lender Group is comprised of the entities named in the *Verified Statement of the Ad Hoc Group of Freedom Lenders Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 229], as it may be amended and supplemented from time to time.

Domus (US) LLC as administrative agent, and the lenders party thereto, by and through its undersigned counsel, hereby file this objection (the "**Objection**") to the *Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1044] (the "**Motion**") as to the HoldCo Debtors, and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The HoldCo Debtors are pursuing confirmation of a plan that is not in the best interests of their estates or their stakeholders.  An alternative plan, which the Freedom Lender Group would support and would be ready to file imminently if permitted, would simply distribute to the HoldCo Lenders, as the sole prepetition secured creditors of the HoldCo Debtors, the equity interests in FRG (and whatever rights and other value is associated with them) and claims and causes of action of the HoldCo Debtors.  But the Debtors continue to use exclusivity as a sword to block this outcome because their conflicted boards and management (most of whom were involved in the Debtors' August 2023 Take Private Transaction) are intent on obtaining releases for themselves.

2.      These proposed releases do not just deprive the HoldCo Lenders of value they are legally entitled to — they also would come at an extremely steep price.  An estimate recently produced by the Debtors of administrative expenses that the Debtors allege should be allocated to the HoldCo Debtors, a copy of which is attached as **Exhibit A** hereto, projects such expenses at over *$8.9 million*.  This includes an estimated *$8.3 million* for Akin Gump Strauss Hauer & Feld LLP ("**Akin**"), as counsel to Michael Wartell, the HoldCo Debtors' independent director, whose mandate is limited to determining whether parties slated to be released by the HoldCo Debtors

2

under the proposed plan deserve those releases.  As the Freedom Lender Group has repeatedly advised the Debtors and Akin, these releases could simply be removed from the Debtors' plan, obviating the need for the independent director and his excessively costly investigation.  It cannot be argued that this investigation is saving the estates any money, as any related indemnity claims against the Debtors would be unsecured claims sitting behind over $1 billion of secured debt and are slated to receive an approximately 1% recovery under the Debtors' proposed plan.  Therefore, the Wartell investigation and the pursuit of releases that are its target need to stop before further damage is done to the HoldCo Debtors' estates.

3.      In addition to not being in the best interests of the HoldCo Debtors, the Debtors' proposed plan is unconfirmable at the HoldCo Debtors.  The Freedom Lender Group controls the only non-insider class of creditors of the HoldCo Debtors and will not vote in favor of a plan that provides no benefit to the HoldCo Debtors' stakeholders and whose only purpose is to provide free releases for officers and directors (which is not a valid purpose for pursuing confirmation of a plan) and pave the way for a smooth exit for Franchise Group, Inc. ("**FRG**") and its subsidiaries (collectively with FRG, the "**OpCo Debtors**"), which is irrelevant to the HoldCo Debtors.  Therefore, the Debtors' plan cannot satisfy section 1129(a)(10) of the Bankruptcy Code for the HoldCo Debtors.

4.      In their attempt to justify an extension of exclusivity, the Debtors gloss over these issues by lumping all of the Debtors together and discussing the factors for "cause" for an extension as applying to the Debtors as a whole.  As the Debtors march through each of the factors for whether cause exists to extend exclusivity, they address only the Debtors as a whole.  But, when properly viewed through the lens of the HoldCo Debtors alone (as is legally required given that these Chapter 11 Cases are not substantively consolidated), it is clear that each factor, to the extent

it is satisfied, is only satisfied for the OpCo Debtors and that an extension of exclusivity for the HoldCo Debtors cannot be justified. Instead, the HoldCo Debtors' pursuit of the proposed plan is a hopeless effort in pursuit of an unconfirmable plan that is saddling the HoldCo Debtors with excessive alleged administrative expenses with no benefit.

5.    The Debtors also argue that the "breathing spell" that exclusivity affords them must continue in order to advance settlement negotiations. But at the HoldCo Debtors, there is no one for the Freedom Lender Group to settle with – this is a case of the Debtors insisting on obtaining releases for officers and directors against the wishes of the HoldCo Debtors' sole controlling creditors. That is exclusivity improperly used as a sword, and there is no cause to extend it solely to further the Debtors' relentless campaign to gift certain people free releases.

6.    The solution to these problems is clear: the Court should deny the Motion as to the HoldCo Debtors and allow the Freedom Lender Group to propose an alternative plan that would ensure that the value of those estates is maximized and that the HoldCo Debtors have a viable path to resolving their Chapter 11 Cases.

## **BACKGROUND**

### I.    **HoldCo Debtors and OpCo Debtors**

7.    The HoldCo Debtors were created as part of the August 2023 take private transaction (the "**Take Private Transaction**") whereby the members of FRG's management team took private control of FRG. The HoldCo Debtors have no operations and their only assets are Freedom VCM, Inc.'s 100% equity ownership of FRG and claims and causes of action, particularly those relating to the Take Private Transaction.[3] The Take Private Transaction was funded, in part,

---

[3]    *See* Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings [Docket No. 15] (the "**First Day Declaration**") ¶ 49; *see also* Nov. 5, 2024 Hr'g Tr. 123: 19-25 (Debtors' proposed counsel stating that "the HoldCo entities are not operating entities" who "have no trade creditors because they have no operations").

with a $475 million facility provided by the HoldCo Lenders and incurred by the HoldCo Debtors (the "**HoldCo Facility**"), 93% of which was provided by the members of the Freedom Lender Group.[4]  Under the HoldCo Facility, the HoldCo Lenders were granted a security interest in substantially all assets of the HoldCo Debtors, including the equity interests in FRG.[5]  As of the Petition Date, approximately $514.7 million of principal was outstanding under the HoldCo Facility.[6]

8.      The HoldCo Lenders are the only legitimate non-insider creditors of the HoldCo Debtors.[7]  Several non-insider unsecured proofs of claim were filed against the HoldCo Debtors, but as set forth in the *First Omnibus (Non-Substantive) Objection of the Ad Hoc Group of Freedom Lenders to Certain Claims Filed Against the HoldCo Debtors* [Docket No. 1059], these claims were filed against the wrong debtor, are not supported by the Debtors' books and records, and do not include information or documentation to establish *prima facie* evidence of the validity of such claims.[8]

9.      The OpCo Debtors hold all of the Debtors' tangible assets and operating business segments.[9]  The OpCo Debtors are obligated on a $247.8 million asset-based lending facility, a

---

[4]     First Day Decl. at ¶ 32.

[5]     *Id.* at ¶ 63.

[6]     *Id.* at ¶ 64.

[7]     *See* Nov. 5, 2024 Hr'g Tr. 83:16-25 (Debtors' CRO acknowledging that the HoldCo Lenders are the only creditors of the HoldCo Debtors); Dec. 17, 2024 Hr'g Tr. 26:9-11 (Debtors' proposed counsel admitting that the Debtors are "not aware of" and "don't expect" any general unsecured claims to be filed against the HoldCo Debtors); *see also Disclosure Statement for the Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* (the "**Disclosure Statement**") [Docket No. 1014] Art. III.D (estimating that there are no general unsecured claims against the HoldCo Debtors).

[8]     One such proof of claim was filed by the Settlement-Related Liquidating Trust 2022-23, which has filed a motion seeking temporary allowance of its claim for voting purposes pursuant to Rule 3018(A) of the Federal Rules of Bankruptcy Procedure [Docket No. 1098].  The Freedom Lender Group reserves all rights with respect to that motion.

[9]     See Nov. 5, 2024 Hr'g Tr. 9:3-10 (Debtors' proposed counsel noting that FRG "essentially operates four distinct businesses through franchisees, the Vitamin Shop retailer, Pet Supplies Plus, Buddy's Home Furnishings, and American Freight" and that Franchise Group, Inc. operates "through itself and its franchisees").

5

$1.097 billion first lien term loan facility (the "**OpCo 1L Term Facility**" and the lenders thereunder, the "**OpCo 1L Term Lenders**") and a $125 million second lien term loan facility.[10] The credit facilities at the OpCo Debtors and the HoldCo Facility are entirely separate and, aside from a $19.51 million guarantee of the HoldCo Facility by the OpCo Debtors, each has different obligors.[11]

10.     There is a complete overlap of decision makers at the OpCo Debtors and the HoldCo Debtors. They have the same advisors and management teams.[12]  Their boards of directors are made up of almost entirely the same individuals (most of whom were involved in the Take Private Transaction).[13]  The sole exception to this is Michael Wartell, the independent director of the HoldCo Debtors appointed four weeks into the chapter 11 cases (these "**Chapter 11 Cases**"), who is not empowered to make any decisions regarding the Debtors' plan or chapter 11 strategy and is empowered solely to investigate and potentially seek to settle claims and causes of action of the HoldCo Debtors.[14]

---

[10]    First Day Decl. ¶¶ 50-61.

[11]    *Id.* at ¶ 63.

[12]    *See Voluntary Petition for Non-Individuals Filing for Bankruptcy*, In re Freedom VCM, Inc., Case No. 24-12509 (Bankr. D. Del. Nov. 3, 2024) [Docket No. 1] at 53-77; *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, In re Freedom VCM Interco, Inc., Case No. 24-12502 (Bankr. D. Del. Nov. 3, 2024) [Docket No. 1] at 53-77.

[13]    *Id.*; *see also* Franchise Group, Inc., Franchise Group, Inc., Proxy Statement (Schedule 14A) (June 8, 2023) at 62, 104, http://edgar.secdatabase.com/1603/110465923069163/filing-main.htm (June 8, 2023) (Andrew Kaminsky was an Executive Vice President and Chief Administrative Officer at the time of the Take Private Transaction; Andrew Laurence was an Executive Vice President at the time of the Take-Private Transaction); First Day Decl. ¶ 49 (Bryant R. Riley at the time of the Take Private Transaction was Chairman and co-Chief Executive Officer of B. Riley Financial, Inc., which became the equity owner of Freedom VCM Holdings, LLC as a result of the Take Private Transaction); Franchise Group, Inc., Our Team, https://franchisegrp.com/our-team/ (Tiffany McMillan-McWaters was deputy general counsel at the time of the Take Private Transaction).

[14]    *See* Dec. 10, 2024 Hr'g Tr. 10:1-6 (Proposed Debtors' counsel noting that the boards of the HoldCo Debtors "voted a little over a week ago to appoint an independent director solely at those two boxes" and that "those two boards have appointed Michael Wartell [ ] into the role"); *Application of Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc. For Entry of an Order Authorizing the Employment and Retention of Akin Gump Strauss Hauer & Feld LLP as Special Co-Counsel on Behalf of and at the Sole Discretion of the Independent Director Michael J. Wartell, Effective as of December 9, 2024* [Docket No. 702] ¶ 6 (defining the scope of Mr. Wartell's

## II.    The Initial Plan

11.    On November 1, 2024, prior to filing these Chapter 11 Cases, the Debtors entered into a Restructuring Support Agreement (the "**RSA**") with an ad hoc group of OpCo 1L Term Lenders (the "**OpCo 1L Group**"), who collectively hold approximately 80% of the principal amount outstanding under the OpCo 1L Term Facility.[15]  As required under the RSA, the Debtors filed these chapter 11 cases (the "**Chapter 11 Cases**") on November 3, 2024 (the "**Petition Date**"). The terms of the RSA have largely dictated the path and pace of these Chapter 11 Cases.  The RSA requires the Debtors to exclusively pursue the plan contemplated by the RSA, subject to a "fiduciary out" that, if exercised, would cause a default under the Debtors' postpetition financing facility.[16]

12.    On November 11, 2024, the Debtors filed their initial chapter 11 plan [Docket No. 150] (the "**Initial Plan**") approved by the OpCo 1L Group.  As originally filed, the Initial Plan was consistent in all material respects with the terms of the RSA and contemplated a parallel process whereby the Debtors would pursue (i) a sale of substantially all of the Debtors' assets (the "**Sale Transaction**") and (ii) if the Debtors could not effectuate a Sale Transaction that repays all prepetition and postpetition first lien secured debt at the OpCo Debtors in full, an equitization of secured claims of the OpCo 1L Lenders into 100% of FRG's reorganized equity, subject to certain dilutions (the "**Equitization Transaction**").[17] Under the Initial Plan, creditors of the Holdco Debtors could potentially receive proceeds of a successful sale but, if the Debtors failed to

---

delegated authority, which solely involves investigating and releasing, settling or preserving claims and causes of action of the HoldCo Debtors).

[15]    First Day Decl.  ¶ 15; Ex. B.

[16]    RSA §§ 7.01(a), 8.01, 12.01(h); [Docket No. 134], Ex. 1, § 7.01(p)(ii).

[17]    Initial Plan § 1.E.

consummate a Sale Transaction, they would receive nothing.[18]

13.    The Freedom Lender Group informed the Debtors that they would not vote in favor of the Initial Plan because, among other things, it canceled the equity interests in FRG for no consideration and released or assigned the HoldCo Debtors' claims and causes of action that constitute the Freedom Lender Group's sole source of recovery.  Despite the fact that the Freedom Lender Group controls the only non-insider class of creditors at the HoldCo Debtors, the Debtors did not seek to negotiate with the Freedom Lender Group or otherwise solicit potential revisions that would lead the Freedom Lender Group to support the Initial Plan.

### III.    DIP Facility and HoldCo Debtor Administrative Expenses

14.    The Debtors' postpetition credit facility consists of $250 million of new money and a $500 million roll up of prepetition loans under the OpCo 1L Term Facility (which the Freedom Lender Group is currently appealing).[19]  Originally, the Debtors proposed to make the HoldCo Debtors co-obligors on this facility for the full amount despite receiving no proceeds, or other benefit, from it.[20]  In response to an objection from the Freedom Lender Group, the Debtors agreed to defer any requirement for the HoldCo Debtors to be liable for the DIP facility until final approval.[21]

15.    When the Debtors sought final approval of their DIP facility, the Freedom Lender Group again objected to prevent any attempt to saddle the HoldCo Debtors with obligations under

---

[18]    *Id.* § 5.11.

[19]    *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 51] ¶ 13(a)(i)-(ii).

[20]    *Id.* at ¶ 13(a).

[21]    *See* Nov. 6, 2024 Hr'g Tr. 15:3-9 ("[O]ne of the concerns that we heard yesterday was … from the second liens and the HoldCos was the removal of the unsecured guarantees from two of the HoldCos, and that was from Freedom [VCM], Inc. and Freedom [VCM] Interco.  Those two entities will no longer be guaranteeing the DIP.").

the DIP facility and the Freedom Lender Group.[22]  A "compromise" never discussed with, or approved by, the Freedom Lender Group was proposed by the Debtors just prior to the hearing on final approval pursuant to which the HoldCo Debtors would guarantee the DIP facility "in a principal amount equal to the aggregate amount of proceeds of the DIP Facility used by, or for the benefit of, the [HoldCo Debtors]" with such obligations having superpriority administrative expense status and secured by all unencumbered assets of the HoldCo Debtors.[23]  This provision (along with the rest of the proposed DIP facility) was approved by the Court over the Freedom Lender Group's objection.

16.    On March 10, 2025, in connection with an ongoing valuation dispute, the Debtors produced to the Freedom Lender Group a summary of estimates of administrative expenses to be allocated to the HoldCo Debtors, a copy of which is attached as **Exhibit A** hereto.  This summary indicates that the Debtors intend to seek to allocate over $8.9 million of administrative expenses to the HoldCo Debtors, nearly all of which ($8.3 million) will be owed to Akin, as counsel to Michael Wartell.  Akin is projected to incur $1.9 million of fees *after* Mr. Wartell delivers a report summarizing his investigation.

## IV.    The Protective Motion

17.    On November 20, 2024, the Freedom Lender Group filed the *Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [Docket No. 192] (the "**Protective Motion**").  The

---

[22]    *See Objection of the Ad Hoc Group of Freedom Lenders to Final Approval of the Debtors' DIP Motion* [Docket No. 274] ¶ 29.

[23]    *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 414] (the "**Final DIP Order**") ¶ 2(f).

Protective Motion sought to, among other things, terminate the initial exclusive periods as to the HoldCo Debtors to allow the Freedom Lender Group to file and solicit an alternative plan that would simply distribute to the HoldCo Lenders their collateral.  On December 17, 2024, the Court (with Judge Dorsey presiding over the Chapter 11 Cases) denied the Protective Motion.  The Freedom Lender Group is appealing that denial (among other things).

## V.    The Debtors' Failed Sale Process

18.    On November 11, 2024, the Debtors filed a motion seeking the approval of bidding procedures in connection with its sale process [Docket No. 154].  On December 16, 2024, over the objection of the Freedom Lender Group, which argued that the proposed procedures were unlikely to result in any actionable bids, the Court entered the requested bidding procedures order [Docket No. 444], setting a bid deadline of February 3, 2025.  On February 12, 2025, the Debtors filed a *Notice of Cancellation of Auction* [Docket No. 961] and have stated that "the Debtors, in consultation with the Required First Lien Lenders and Creditors' Committee, decided to cancel the [s]ale [p]rocess and elected instead to pursue the Plan Equitization Transaction."[24]

## VI.    The Amended Plan

19.    Since the Initial Plan, the Debtors have amended their proposed plan six times.  On February 20, 2025, the Debtors' filed the Disclosure Statement for the sixth amended proposed plan [Docket No. 1015] (the "**Amended Plan**").  None of the iterations of the Debtors' proposed plan, including the Amended Plan, has fixed the problems with respect to the HoldCo Debtors that the Freedom Lender Group has identified.  Nor have the Debtors sought to negotiate with the Freedom Lender Group to formulate a plan of reorganization for the HoldCo Debtors that the Freedom Lender Group would support.

---

[24]    Disclosure Statement Art. II.

20.    On February 21, 2025, this Court authorized the solicitation of the Disclosure Statement by the Debtors on the Amended Plan [Docket No. 1019].  Like prior iterations, the Amended Plan does not provide for the substantive consolidation of the Debtors' estates,[25] requires that votes will only be counted on a debtor-by-debtor basis for the purposes of tabulation under section 1129(a)(10) of the Bankruptcy Code[26] and provides that, unless agreed by the OpCo 1L Group, it must be confirmed at all Debtors.[27]

21.    Under the Amended Plan, the Debtors intend to cancel all equity interests of the HoldCo Lenders in FRG and the HoldCo Lenders would receive their pro rata share of beneficial interests in the "Freedom HoldCo Debtor Litigation Trust."[28]  The Freedom HoldCo Debtor Litigation Trust will hold certain claims and causes of action of the HoldCo Debtors, while other specified claims and causes of action (including against the Debtors' officers and directors, most of whom were involved in the Take Private Transaction) are subject to releases unless the HoldCo Debtors' independent director, Michael Wartell, determines not to release them.[29]  There is no mechanism for funding the Freedom HoldCo Debtor Litigation Trust.[30]  Whatever claims and causes of action go into the litigation trust for the HoldCo Debtors would be pursued by a separate newly-appointed trustee.[31]

22.    The Freedom Lender Group was not consulted regarding Mr. Wartell's appointment, did not request or approve his appointment, and has repeatedly stated that his

---

[25]    Amended Plan § 7.1.

[26]    *Id.* § 6.2.

[27]    *Id.* § 6.5

[28]    *Id.* §§ 5.7, 5.14.

[29]    *Id.* §§ 1.104, 7.11, 12.2.

[30]    Disclosure Statement Art. III.U.

[31]    Amended Plan § 1.103.

investigation does not serve the interests of the HoldCo Debtors' estates (and certainly does not provide any benefit with a value that exceeds the steep cost of the investigation). The Freedom Lender Group, as the primary stakeholder of the HoldCo Debtors, has sent letters to the HoldCo Debtors' boards, Debtors' proposed counsel and Akin expressing this view and requesting that the Wartell investigation be terminated. The Debtors and Akin have ignored those requests.

**VII.  Exclusivity Motion**

23.     On February 28, 2025, the Debtors filed the Motion, seeking to extend their exclusive right to (i) file a chapter 11 plan by 90 days through and including June 2, 2025 and (ii) solicit votes thereon by 90 days through and including July 31, 2025 (clauses (i) and (ii), the "**Exclusivity Periods**").

<u>**OBJECTION**</u>

24.     The Debtors are statutorily granted an exclusive right to file a plan during the first 120 days following the Petition Date, which the Court may extend "for cause" pursuant to section 1121(d)(1). As stated in the Motion, to determine whether "cause" exists for extending the Debtors' Exclusivity Periods, courts consider the following factors:

(a)     the size and complexity of the case;

(b)     the existence of good-faith progress towards a chapter 11 plan;

(c)     the necessity of sufficient time to negotiate and prepare adequate information to allow a creditor to determine whether to accept such chapter 11 plan;

(d)     whether the debtor is paying its debts as they become due;

(e)     whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(f)     whether the debtor has made progress in negotiating with creditors;

(g)     the length of time a case has been pending;

(h)     whether the debtor is seeking an extension to pressure creditors; and

(i)    whether or not unresolved contingencies exist.[32]

When seeking an extension of the exclusivity periods, the burden is on the Debtors, as the party seeking to extend the Exclusivity Periods, to prove that "cause" exists.  *In re Lehigh Valley Pro Sports Club, Inc.*, No. 00-11296 (DWS), 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000).

## I.    The Debtors' Continued Pursuit of Their Plan is Harming the HoldCo Debtors

25.    The investigation being conducted by Michael Wartell, as the independent director of the HoldCo Debtors, is a waste of estate resources and, as long as the Debtors have the exclusive right to pursue confirmation of a plan that would authorize and bless that investigation, the HoldCo Debtors will continue to unnecessarily suffer.  Mr. Wartell's appointment and his ongoing investigation have never been approved by this Court.  Nor should they be, as they provide no value to the HoldCo Debtors' estates.

26.    Mr. Wartell's investigation can have only two outcomes: either (i) he will determine that certain claims and causes of action against parties proposed to be released should go into the Freedom HoldCo Debtor Litigation Trust to be prosecuted at some future date or turned over to a chapter 7 trustee or similar fiduciary or (ii) he will "clear" the targets of the investigation and pave the way for their releases.  Neither outcome provides any tangible, much less economic, benefit to the HoldCo Debtors' estates relative to ceasing the investigation immediately and putting all claims and causes of action in a trust for the benefit of the HoldCo Debtors and their creditors.

27.    In the first scenario, the Freedom Lender Group has always had, and has expressed, grave concerns about the associated costs of an investigation that could easily be avoided by putting all claims and causes of action in a trust.  This is particularly true given that any future trustee will effectively have to redo all of Akin's work to determine for itself whether to assert any

---

[32]    Mot. ¶ 21.

of the preserved claims.  This problem is exacerbated by the staggering estimates of administrative expenses that the Debtors purport to foist on the HoldCo Debtors: over *$8.9 million*, of which $8.3 million alone is estimated to be paid to Akin in connection with Mr. Wartell's investigation.[33]

28.      With respect to the second scenario, if Mr. Wartell decides to release one or more targets, that decision cannot be justified, as the only potential value to the estates is avoiding potential indemnity claims that sit behind over $1 billion of secured claims and are proposed to receive an approximately 1% recovery under the Amended Plan.[34]   Therefore, spending $8.3 million on the Wartell investigation could only be justified if there were over $830 million of indemnity claims that would be avoided and – if claims of that magnitude exist – the releases are inherently unwarranted.

29.      The Debtors' reckless and expensive pursuit of releases that ultimately cannot be approved over the rejecting votes of the Freedom Lender Group needs to stop.  Denying the Motion as to the HoldCo Debtors would send this necessary message to the Debtors and pave the way for pursuit of a proposed plan for the HoldCo Debtors that the Freedom Lender Group would support and that does not include a needless and excessively expensive investigation or the related releases.

## II.      The Debtors Have Not Established Cause to Extend Exclusivity

30.      In addressing the factors for establishing cause for an extension of exclusivity, the Debtors ignore the separateness of the OpCo Debtors and the HoldCo Debtors, arguing that each factor is satisfied for the Debtors collectively.  But in cases where there are distinct creditor groups at different debtors, this Court should analyze these factors on a debtor-by-debtor basis.  *See In re Trib. Co.*, 464 B.R., 126, 182 (Bankr. D. Del. 2011) ("In the absence of substantive consolidation,

---

[33]    The Freedom Lender Group reserves all rights to contest any attempt to allocate these or any other expenses to the HoldCo Debtors.

[34]    Disclosure Statement Art. III.D.

14

entity separateness is fundamental.") (citing *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2007) ("[T]he general expectation of state law and of the Bankruptcy Code, and thus commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play."); *cf. In re Lucky Bucks LLC*, Case No. 23-10758 (KBO) (Bankr. D. Del. June 30, 2023) Hr'g Tr. 72:23-25, 74:10-16 (considering that "Holdings is financially separate from the OpCo debtors … and is non-operational with no employees or trade vendors" in granting motion of Holdings debtor's one class of creditors to convert Holdings debtor's chapter 11 case). When viewed through the lens of the HoldCo Debtors, the factors for establishing cause are not met here.

A.    **Factor (a): The HoldCo Debtors' Chapter 11 Cases Are Not Complex**

31.    The Debtors argue that the cases are complex because of their vast operations and many retail store locations. But this only applies to the OpCo Debtors where all of the Debtors' operations lie. The cases of the HoldCo Debtors are exceedingly simple as the HoldCo Debtors have $514.7 million of debt under one facility (the HoldCo Facility), one group of known creditors (the HoldCo Lenders); and limited assets (equity in FRG and claims and causes of action). As such, this factor is not met for the HoldCo Debtors. *See In re GMG Cap. Partners III, L.P.*, 503 B.R. 596, 600-01 (Bankr. S.D.N.Y. 2014) (holding no cause to extend exclusivity periods where the debtor was a "non-operating company" whose sole business was to manage a portfolio of stock and had "no other assets" and "no business to restructure."); *cf. In re Indianapolis Downs, LLC*, Case No. 11-11046 (BLS) (Bankr. D. Del. Aug. 26, 2021) Hr'g Tr. 57:18-25 [Docket No. 410] (extending exclusivity for large and complex debtors and noting that "this is not a simply business or a simple case like a holding company"). Judge Dorsey's prior bench ruling to the contrary (which the Freedom Lender Group is appealing) should have no bearing here as the Court mistakenly conflated all of the Debtors in its analysis determining that the HoldCo Debtors'

Chapter 11 Cases are complex.

> **B.     Factor (b): No Progress Has Been Made to Confirm a Plan for the HoldCo Debtors**

32.     In their Motion, the Debtors misstate this factor, arguing that they can demonstrate that they have made progress toward concluding the Chapter 11 Cases.  But this factor relates to progress not toward concluding the cases, but toward confirming a plan.  In that regard, the Debtors have made no progress and show no signs of making progress.

33.     At the HoldCo Debtors, the Freedom Lender Group has a complete block over confirmation because they control the only non-insider class at the HoldCo Debtors and, absent substantive consolidation, 1192(a)(10) must be satisfied by each debtor.  *See In re Trib. Co*, 464 B.R. at 180-83   ("I find nothing ambiguous in the language of § 1129(a)(10), which, absent substantive consolidation or consent, must be satisfied by each debtor in a joint plan."), *aff'd sub nom. In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018), *aff'd sub nom. In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 302 (Bankr. D. Del. 2011) ("absent substantive consolidation, there must be a consenting class for each individual debtor in a joint plan for it to be confirmed.").  The Debtors have acknowledged this reality.[35]

34.     The members of the Freedom Lender Group intend to vote against the Amended Plan (and any future, similar plan) for legitimate reasons that they have repeatedly expressed to the Debtors, to no avail.  For one, the Amended Plan would eliminate the equity in FRG, which is the HoldCo Debtor's primary asset – it defies reason that the members of the Freedom Lender Group would support this.  Further, with respect to the only other assets of the HoldCo Debtors –

---

[35]  Disclosure Statement Art.XI.A.xii ("In the event that sufficient votes are not received, including with respect to the HoldCo Debtors given the Freedom Lender Group's assertions that they will not vote in favor of the Plan with respect to the HoldCo Debtors, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.").

claims and causes of action – the Amended Plan still purports to release certain of them and put the control over whether any claims and causes of action are settled in the hands of an independent director, who was appointed without any discussion with the Freedom Lender Group and who has no obligation to answer to, or even consult with, the Freedom Lender Group. On these fundamental issues, the Debtors and the Freedom Lender Group are at an impasse. As such, whatever progress the Debtors have made in the chapter 11 case at large is irrelevant to the Debtors' progress toward confirming a plan at the HoldCo Debtors. To the contrary, the Debtors have had months to make progress in that regard, but have failed to do so.

35. Even if the Debtors are correct that this factor is about their accomplishments in the Chapter 11 Cases generally, each of the milestones achieved by the Debtors has served only to advance the cases and interests of the OpCo Debtors. The proceeds of the DIP facility that the Debtors have gotten approved go only to the OpCo Debtors – even if some administrative expenses are ultimately allocated to the HoldCo Debtors, the Amended Plan does not purport to pay them in cash.[36] The Debtors' sale process resulted in no viable bids, as the Freedom Lender Group warned, but – in any event – the sale was only for the three operating businesses sitting at the OpCo Debtors. The Debtors' efforts to bring the Unsecured Committee of Unsecured Creditors (the "**Committee**") up to speed is meaningless for the HoldCo Debtors, given that the Committee has disclaimed any obligations at the HoldCo Debtors.[37] And the Committee's settlement with the Debtors provides no benefit to the HoldCo Debtors or their stakeholders. The American Freight liquidation and rejection of uneconomic contracts similarly provide no benefit to the HoldCo Debtors, as the Debtors' plan is predicated on all proceeds thereof being absorbed at the OpCo

---

[36]    Amended Plan §§ 3.1, 3.6.

[37]    Feb. 19, 2025 Hr'g Tr. 107:2-3 ("So we stuck to Opco, our letter is addressed to the Opco creditors because those are our only known constituents.").

Debtors.[38]  That leaves as the Debtors' only remaining touted accomplishments having undertaken standard administrative steps (e.g., setting a bar date, filing schedules, establishing interim compensation procedures) and their approval of the Disclosure Statement, which for all the reasons stated herein, provides no benefit to the HoldCo Debtors.

### C.    Factor (c): The HoldCo Debtors Have No Bills

36.    The Debtors argue that they are paying their undisputed postpetition obligations in the ordinary course.  That may be true for the OpCo Debtors, but the HoldCo Debtors have no bills on which to stay current, as they are non-operational.  Therefore, this factor is irrelevant as to the HoldCo Debtors.

### D.    Factor (e): The Amended Plan is Not Viable as to the HoldCo Debtors

37.    As stated above, the Freedom Lender Group intends to vote to reject the Amended Plan and, thus it is unconfirmable.  Therefore, this factor is not satisfied for the HoldCo Debtors. *See GMG Cap. Partners*, 503 B.R. at 602 (terminating exclusivity where the debtor was unable to propose a viable plan due to the inability to satisfy section 1129(a)(10) of the Bankruptcy Code because the only impaired class controlled nearly 90% of claims and would not accept debtor's proposed plan).

38.    The Debtors argue that the Freedom Lender Group's dissatisfaction with the Amended Plan is not grounds to deny a request to extend exclusivity.[39]  Creditor dissatisfaction may be an insufficient basis to terminate exclusivity where the applicable creditors cannot carry a class or are potentially subject to cram down.  But here, where the Freedom Lender Group has an irrefutable blocking position over confirmation of the HoldCo Debtors' plan and the Debtors have

---

[38]    Amended Plan §§ 5.3(a); 5.4(a).

[39]    Mot. ¶ 27, n. 7.

provided no evidence that they can or will resolve the Freedom Lender Group's issues, the Amended Plan is simply not viable as to the HoldCo Debtors.

### E. Factor (g): The Debtors Have Had Ample Time

39.     The Debtors argue that the Motion should be granted because these Chapter 11 Cases are only four months old.[40]  But the Debtors are seeking an extension of exclusivity beyond their scheduled confirmation hearing.  Granting the Motion would serve no purpose other than to prevent the Freedom Lender Group from filing an alternative plan that could actually be confirmed. *See Century Glove, Inc. v. First Am. Bank.*, 860 F.2d 94, 102 (3d Cir. 1998) (noting that "[t]he ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals.  A broad exclusivity provision, holding that only the debtor's plan may be 'on the table,' takes this tool from creditors.").

40.     The Debtors have had ample time to work with the Freedom Lender Group on a viable plan for the HoldCo Debtors and have not done so.  There is no basis to allow them to run out the clock on an unconfirmable plan, to the detriment of the HoldCo Debtors and their creditors. *See In re Samson Res. Corp.*, Case No. 15-11934 (BLS) (Bankr. D. Del. Sept. 27, 2016) Hr'g Tr. at 98:7–15, 99:7–10 [Docket No. 1418] (terminating exclusivity after more than one year of bankruptcy when "debtors [had] not engaged constructively" with their creditor constituents); *In re Pub. Serv. Co. of N.H.*, 99 B.R. 155, 175-77 (Bankr. D.N.H. 1989) (denying motion to extend exclusivity where the impasse existing between the debtor and creditor would not allow for a consensual chapter 11 plan to be proposed within a reasonable time period).

41.     Further, the Debtors argue that this is their first request for such an extension.[41]

---

[40]   *Id.* at ¶ 28.

[41]   Mot. ¶ 28

But, "that fact, by itself, does not constitute cause for an extension." *In re Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011) ("Although this is the Debtors' first request to extend their Exclusive Periods, that fact, by itself, does not constitute cause for an extension"); *see also In re General Bearing Corp.*, 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992) (same).

### F.    Factor (h): The Debtors Are Pressuring the HoldCo Lenders

42.    The Debtors argue that they are not using the extension of the exclusive period to pressure creditors and that they are using it as an opportunity to give stakeholders a meaningful opportunity to actively participate in substantive discussions with the Debtors regarding a consensual plan of reorganization.[42]  But putting the members of the Freedom Lender Group in a position where they either must support a plan that provides free releases that are unwarranted and that the Freedom Lender Group does not support or face the conversion of the HoldCo Debtors' cases does exactly that.  *In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) (emphasizing that "an extension [of exclusivity] should be based on a showing of some promise of probable success.  An extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory.") (quoting S. Rep. No. 95-989, 95th Cong. 2d Sess. 118 (1978)).  The correct approach would be to allow the Freedom Lender Group to propose an alternative plan for the HoldCo Debtors so that parties do not find themselves in a position where there is a need to start over on a plan process for the HoldCo Debtors but money has run out.

## III.    Extending Exclusivity Would Not Move the HoldCo Debtors' Cases Forward

43.    In determining the Motion, the Court's analysis should ultimately focus on whether extending the Exclusivity Periods would facilitate the cases moving forward.  *See In re Adelphia*

---

[42]    *Id.* at ¶ 29.

*Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) ("It has been held that the primary consideration for the court in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward."); *In re Indianapolis Downs, LLC*, Case No. 11-11046 (BLS) (Bankr. D. Del. Aug. 26, 2021) Hr'g Tr. 56:14-23, 58:1-6 [Docket No. 410] (noting that consideration of extending a debtor's exclusivity period is a "question of whether or not reasonable progress is being made" and as a debtor's case "gets further and further, the debtor needs to really show, frankly, real progress" to extend exclusivity); *In re Dow Corning Corp.*, 208 B.R. 661, 664-65, 670 (Bankr. E.D. Mich. 1997) ("[T]he primary consideration should be whether or not [terminating exclusivity] would facilitate moving the case forward.").

44.    As shown above, the Amended Plan as proposed is hopeless for the HoldCo Debtors because the Freedom Lender Group will not support it.  The HoldCo Debtors have no reorganization in prospect and, as such, the appropriate outcome is simply to liquidate and distribute their assets to their creditors.[43]  Yet the Debtors (under the control of conflicted advisors, boards and management) continues in their pursuit of releases by the HoldCo Debtors at an extremely high potential cost to the HoldCo Debtors' estates.  The excessively costly pursuit of Mr. Wartell's investigation, which the HoldCo Debtors cannot afford and the Freedom Lender Group (as the vast majority of the HoldCo Debtors' stakeholders) does not support is not an appropriate use of estate resources.  The most efficient and fair way to resolve the HoldCo Debtors' Chapter 11 Cases is to deny the Motion as to them and allow the Freedom Lender Group to file an alternative plan that would be confirmable and would simply transfer to the HoldCo Lenders their collateral.

---

[43]    For the same reason (plus a completely lack of adequate protection), the Protective Motion should have been granted and the automatic stay should have been lifted at the HoldCo Debtors, which the Freedom Lender Group intends to demonstrate on appeal.

## **CONCLUSION**

45.     The Court should deny the Motion as to the HoldCo Debtors for the reasons stated herein and grant such other relief as it deems just and proper.

Dated: March 14, 2025
Wilmington, Delaware

Respectfully submitted,

**Farnan LLP**

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0300
Email: bfarnan@farnanlaw.com
   mfarnan@farnanlaw.com

-and-

**WHITE & CASE LLP**
Thomas Lauria (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
Erin Smith (admitted *pro hac vice*)
Brett Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
   azatz@whitecase.com
   sam.hershey@whitecase.com
   erin.smith@whitecase.com
   brett.bakemeyer@whitecase.com

*Counsel to the Ad Hoc Group of Freedom
Lenders*