IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FRANCHISE GROUP, INC., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12480 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 1063, 1081, 1089** |

**STATEMENT OF THE AD HOC GROUP OF FIRST LIEN LENDERS
IN RESPONSE TO THE DEBTORS' REQUEST FOR STATUS CONFERENCE**

The Ad Hoc Group of First Lien Lenders (the "First Lien Group"), by and through its undersigned counsel, hereby submits this statement (this "Statement") in response to the *Debtors' Request for Status Conference* [Docket No. 1063] (the "Status Conference Request"), and respectfully states as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

**STATEMENT**[2]

1. The First Lien Group remains steadfast that the Freedom Lender Group's myriad arguments, claims, and challenges lack *any* merit and continue to be little more than a thinly veiled attempt to delay their inevitable loss by playing with "house money" in hopes of forcing a settlement at any cost. This unfortunate strategy is illustrated by the fact that the Freedom Lender Group has to date requested tens of thousands of documents from parties in these Chapter 11 Cases, sought 14 depositions (with more likely to come), and is forcing this Court to preside over two simultaneous valuation trials, all premised on the notion that, based on management projections issued in June of last year (projections, it should be noted, that did not contemplate a bankruptcy for the Company), the Debtors were solvent and definitively worth well over $1.6 billion at all relevant times leading up to, and including on, the Petition Date. At the same time, however, the Freedom Lender Group will ask this Court to ignore the critical fact that over the course of the summer leading up to the filing of these Chapter 11 Cases, the members of the Freedom Lender Group spent weeks with the Debtors' management team analyzing those same projections and elected not to provide the Debtors with even $1 of truly junior capital or to invest in debt or post-reorganized equity at multiples well *below* such valuation.

2. Then, with this "pie in sky" valuation in hand, the Freedom Lender Group will blame the fact that Ducera Partners LLC, and not the Freedom Lender Group's chosen banker, was running the sale process, for the reason that hundreds of potential bidders (including members of the Freedom Lender Group themselves), with access to the same diligence information, chose not to submit proposals during the Court-approved sale process, at minimum bid prices that marketed

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Status Conference Request or the *Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates* [Docket No. 1015], as applicable.

the Debtors' assets at a more than ***$400 million*** discount to the Freedom Lender Group's supposed $1.6 billion+ valuation. The outcome of the sale process is particularly contradictory to the Freedom Lender Group's valuation position given its counsel's assertions that the Debtors have faced ***no*** business degradation since the Petition Date.[3] And, even if they can somehow accomplish a victory in their contorted valuation fight, the Freedom Lender Group will still need to somehow prove that recovery on their adequate protection claim is not subject to the turnover provisions in the operative intercreditor agreement directly on point.

3. Indeed, regardless of whether the Freedom Lender Group is successful in its appeals (and, to be clear, it will not be) and no matter how large the Second Lien Lenders' supposed adequate protection claim may turn out to be (with evidence at trial soon showing that it is zero), not one of the various issues and disputes the Freedom Lender Group has teed up for this Court can hide the fundamental fact that the Second Lien Loans are subordinate to the First Lien Loans. Unless the Freedom Lender Group is able to provide the parties with a path to take out the Debtors' senior debt, something the Freedom Lender Group has been either unable or unwilling to do for nearly a year, the end result of the litigation will be the same – the Freedom Lender Group will continue to have a subordinated claim that sits behind almost $1.6 billion in senior claims secured by ***all*** of the Debtors' assets.

4. Put simply, the mental gymnastics necessary for the Freedom Lender Group to prevail is astonishing.

5. Yet here we are. Nearly five months into these Chapter 11 Cases, it is increasingly apparent that the Freedom Lender Group – despite repeated losses before this Court, the massive

---

[3] *See, e.g.*, Feb. 19, 2025 Hr'g Tr. at 28:19-29:1 (counsel to the Freedom Lender Group representing that the Debtors are "ahead of plan" and "ahead of budget" and thus arguing that there is no risk to the Debtors' operations from further delay of the bankruptcy cases), annexed hereto as **Exhibit A**.

fees its professionals are presumably incurring, and notwithstanding the legal risks to the members of the Freedom Lender Group that exist without a comprehensive deal that provides those members with much-needed releases from liability – is dead set on costing the Debtors' estates tens of millions of additional dollars regardless of the anticipated outcome. Before going down that path, however, it is important to take stock of where things stand. As of the time of filing this Statement, the Debtors have already incurred more than $60 million in professional fees and expenses, the lion's share of which can be directly traced to the scorched-earth litigation tactics employed by the Freedom Lender Group. These are costs that have been funded by the First Lien Group through the DIP Loans. Between now and the confirmation hearing, a host of issues will or may need to be litigated, including:

- valuation of the reorganized Debtors' assets as of the effective date of any plan of reorganization;

- the Second Lien Lenders' motion for an administrative expense claim on account of their adequate protection claims, which will also require valuation of the Debtors' assets to be determined as of the Petition Date;

- the unequivocal obligation of the Second Lien Lenders to turn over any adequate protection payments to the First Lien Lenders, pursuant to the operative intercreditor agreement, and for the Freedom Lender Group's breach of that agreement;

- avoidance actions against the Freedom HoldCo Debtors and the members of the Freedom Lender Group, as HoldCo Lenders, for (a) receipt of over $54 million in dividend payments from the OpCo Debtors (dividends that were used to pay interest on the HoldCo Loans) and (b) a $19 million uptier guarantee provided to the HoldCo Lenders, all of which occurred while the OpCo Debtors were insolvent; and

- breaches of the Restructuring Support Agreement by a member of the Freedom Lender Group and/or its affiliates that executed such agreement, and related claims for disgorgement of any benefits (including the opportunity to participate in the DIP) received by such member in breach of its obligations under the RSA.

All in, the Freedom Lender Group plans on forcing the estates to expend almost $40 million in additional professional fees on account of its subordinated second lien and holdco positions.

6. Make no mistake: the litigation barrage launched by the Freedom Lender Group is not a good faith effort to recover on their Second Lien or HoldCo Loans. It is the effort of disgruntled out of the money creditors, whose only hope at a recovery is to make these bankruptcy cases as long and expensive as possible in the hopes that, faced with mounting legal fees and delay, the First Lien Group will pay their ransom to make them go away.

7. It is against that stark backdrop that the members of the First Lien Group have time and again attempted meaningfully to reach consensus with the members of the Freedom Lender Group. From numerous settlement attempts made directly and through their professionals before and on the eve of bankruptcy, to various proposals made during the Chapter 11 Cases at the request of current and former counsel to the Debtors, the First Lien Group has made clear that it sees benefit in avoiding the time and expense of a contested bankruptcy process, and would be willing to provide some measure of those savings to the Debtors' junior constituency in exchange for peace.

8. Additionally, when K&E was brought in as counsel to the Debtors five weeks ago, the First Lien Group was cautiously optimistic that a new voice with untapped energy and ideas would help break the logjam between the parties that has existed since well before the Petition Date. As a result, the members of the First Lien Group used this opportunity to proactively facilitate what they hoped would be a constructive conversation with the Freedom Lender Group. Unfortunately, the First Lien Group's attempts to find a resolution have been met with a total lack of focus or seriousness by the Freedom Lender Group, who refused to even attend the scheduled principals meeting.

9. The First Lien Group appreciates the herculean efforts of the Debtors, their boards and their professionals to push the parties to settle. They have been notable, and in many respects, helpful for the parties in framing their issues and expectations. However, the First Lien Group is certain that it has taken this potential settlement process far more seriously than the members of the Freedom Lender Group have and feels that its significant efforts to date have just led to wasted time and money. While the First Lien Group desires an end to the litigation and to curtail the expenses that the Freedom Lender Group has forced other stakeholders to expend, the First Lien Group is not "required" to settle.

10. These cases are at a precipice. There is a unique opportunity to stem the bleed of litigation costs before the point of no return. Now is indisputably the time for the Freedom Lender Group to get realistic with the seriousness and focus that this situation commands if it wants to save itself further legal fees, wants to embrace something more than zero recovery (notwithstanding that the first lien debt is severely underwater and has been trading in the 50s and 60s since the summer), and wants to save all parties the time of fighting over meritless arguments destined to fail.

11. The First Lien Group is always happy to answer any questions that this Court may have regarding the status of settlement discussions. Unfortunately, however, given the apparent stance of the Freedom Lender Group, any prospects of settlement have grown extremely dim, and the First Lien Group is fully prepared to litigate all contested issues to conclusion and protect whatever value remains on its well over $1 billion investment.

[*Remainder of Page Intentionally Left Blank*]

Dated: March 14, 2025
      Wilmington, Delaware

Respectfully submitted,

**LANDIS RATH & COBB LLP**

*/s/ Adam G. Landis*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Elizabeth A. Rogers (No. 7335)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mcguire@lrclaw.com
      erogers@lrclaw.com

-and-

**PAUL HASTINGS LLP**

Jayme T. Goldstein (admitted *pro hac vice*)
Daniel A. Fliman (admitted *pro hac vice*)
Jeremy D. Evans (admitted *pro hac vice*)
Isaac S. Sasson (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: jaymegoldstein@paulhastings.com
      danfliman@paulhastings.com
      jeremyevans@paulhastings.com
      isaacsasson@paulhastings.com

Nicholas A. Bassett (admitted *pro hac vice*)
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1700
Facsimile: (202) 551-1705
Email: nicholasbassett@paulhastings.com

*Counsel to the Ad Hoc Group of First Lien Lenders*