## Exhibit A

*In re Franchise Group, Inc. et al.*, Case No. 24-12480 (LSS) (Bankr. D. Del.)

February 19, 2025 Hearing Transcript

```
 1                   UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE
 2

 3   IN RE:                     .  Chapter 11
                                .  Case No. 24-12480 (LSS)
 4   FRANCHISE GROUP, INC.,     .
     et al.,                    .  (Jointly Administered)
 5                              .
                                .  Courtroom No. 2
 6                              .  824 Market Street
                 Debtors.       .  Wilmington, Delaware 19801
 7                              .
                                .  Wednesday, February 19, 2025
 8   . . . . . . . . . . . . .  .  10:01 a.m.

 9
                         TRANSCRIPT OF HEARING
10          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                  CHIEF UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For the Debtors:          Edmon L. Morton, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR, LLP
14                             Rodney Square
                               1000 North King Street
15                             Wilmington, Delaware 19801

16

17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Brandon J. McCarthy, ECRO

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
 1   APPEARANCES (CONTINUED):

 2   For the Debtors:          Joshua A. Sussberg, P.C.
                               Nicole L. Greenblatt, P.C.
 3                             Derek I. Hunter, Esquire
                               KIRKLAND & ELLIS, LLP
 4                             601 Lexington Avenue
                               New York, New York 10022
 5
                               Mark McKane, P.C.
 6                             555 California Street
                               San Francisco, California 94101
 7
     For the Official
 8   Committee of
     Unsecured Creditors:      Robert J. Feinstein, Esquire
 9                             PACHULSKI, STANG, ZIEHL & JONES, LLP
                               780 Third Avenue
10                             34th Floor
                               New York, New York 10017
11
     For the Ad Hoc Group
12   of Freedom Lenders:       J. Christopher Shore, Esquire
                               Andrew T. Zatz, Esquire
13                             WHITE & CASE, LLP
                               1221 Avenue of the Americas
14                             New York, New York 10020

15   For the Ad Hoc Group
     of First Lien Lenders
16   and DIP Lenders:          Daniel Fliman, Esquire
                               PAUL HASTINGS, LLP
17                             200 Park Avenue
                               New York, New York 10166
18
     For Buddy Mac
19   Holdings, LLC:            Matthew P. Ward, Esquire
                               WOMBLE BOND DICKINSON (US), LLP
20                             1313 North Market Street
                               Suite 1200
21                             Wilmington, Delaware 19801

22   For Michael J.
     Wartell:                  Michael S. Stamer, Esquire
23                             AKIN GUMP STRAUSS HAUER FELD, LLP
                               One Bryant Park
24                             New York, New York 10036

25
```

1 | <u>APPEARANCES (CONTINUED)</u>:

2 | For the US Trustee:     Timothy J. Fox Jr., Esquire
    OFFICE OF THE UNITED STATES TRUSTEE
3 |     J. Caleb Boggs Federal Building
    844 King Street
4 |     Suite 2207, Lockbox 35
    Wilmington, Delaware 19801

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 1:    Debtors' Motion for an Order (I) Approving the      48
4               Disclosure Statement; (II) Approving
                Solicitation and Voting Procedures, Including
5               (A) Fixing the Voting Record Date, (B)
                Approving the Solicitation Packages and
6               Procedures for Distribution, (C) Approving
                the Form of the Ballots and Solicitation
7               Materials and Establishing Procedures for
                Voting, and (D) Approving Procedures for Vote
8               Tabulation; (III) Scheduling a Confirmation
                Hearing and Establishing Notice and Objection
9               Procedures; and (IV) Granting Related
                Relief [D.I. 152, 11/11/24]
10
                Court's Ruling:
11
     Agenda
12   Item 2:    The Ad Hoc Group of Freedom Lenders' Renewed        30
                Motion to Adjourn Disclosure
13              Statement Hearing [D.I. 993, 2/17/25]

14              Court's Ruling:                                     48

15   Agenda
     Item 3:    Ad Hoc Group of Freedom Lenders' Motion to
16              Shorten the Notice Period for the Ad
                Hoc Group of Freedom Lenders' Renewed Motion
17              to Adjourn Disclosure Statement
                Hearing [D.I. 994, 2/17/25]
18
                Court's Ruling:
19

20

21   Transcriptionists' Certificate                              139

22

23

24

25

1          (Proceedings commence at 10:01 a.m.)

2          (Call to order of the Court)

3                THE COURT:  Please be seated.

4                MR. MORTON:  Good morning, Your Honor.

5                THE COURT:  Good morning, Mr. Morton.

6                MR. MORTON:  For the record, Edmon Morton from

7    Young Conaway on behalf of the debtors.

8                I won't say there's new faces in the courtroom, I

9    know you're acquainted with the Kirkland & Ellis team, but

10   there are different faces in the courtroom this morning.  As

11   we indicated at the hearing last week, the board had already

12   started the process of interviewing replacement counsel.

13   They did select Kirkland & Ellis, who has been working

14   diligently since their selection last Thursday to get

15   underway.

16               So without further ado, I'll cede the podium to

17   Mr. Sussberg to introduce his team and kind of tell you where

18   we are.

19               THE COURT:  Thank you.

20               MR. MORTON:  Thank you.

21               THE COURT:  Mr. Sussberg.

22               MR. SUSSBERG:  Good morning, Your Honor.  It's

23   good to see you.  Joshua Sussberg, Kirkland & Ellis, proposed

24   counsel to the debtors.

25               I thought it would be important to start with a

1  moment of levity because this case has been difficult, to say

2  the least.  I spoke a few times over the weekend to Mr.

3  Lauria, he asked me to call him last night, and I started the

4  phone call by saying "it's Rubber Stamp Sussberg here," to

5  which he laughed.

6          (Laughter)

7          MR. SUSSBERG:  And he was very proud of himself

8  that he was able to cite The Who in his pleading, and "Won't

9  Get Fooled Again" was the name of the song.

10          THE COURT:  Uh-huh.

11          MR. SUSSBERG:  Now that song was from 1971, and

12  that's before my time.  I was --

13          THE COURT:  Not mine.

14          (Laughter)

15          MR. SUSSBERG:  I was born in '78, but --

16          THE COURT:  I recognized it, yes.

17          MR. SUSSBERG:  There you go.  My father knew The

18  Who and I looked at --

19          THE COURT:  That may not be the best thing to say

20  to me.

21          (Laughter)

22          THE COURT:  "My father knew The Who."  Okay.

23          (Laughter)

24          MR. SUSSBERG:  And I decided to look at the

25  lyrics, but then do some diligence.

1        THE COURT:  Uh-huh.

2        MR. SUSSBERG:  And in my digging, I found that the

3 lead guitarist, Pete Townsend --

4        THE COURT:  Uh-huh.

5        MR. SUSSBERG:  -- he was famous for breaking

6 guitars on stage.

7        THE COURT:  Yes.

8        MR. SUSSBERG:  And I said to Mr. Lauria, pretty

9 interesting because you're known for breaking guitars.

10        THE COURT:  Ah ...

11     (Laughter)

12        MR. SUSSBERG:  I will tell you --

13        THE COURT:  Well, I probably had that album and

14 yes, it's an album.

15        MR. SUSSBERG:  Absolutely.

16     (Laughter)

17        MR. SUSSBERG:  No, no.  I'd get you the CD or the

18 Spotify, but ...

19        THE COURT:  No.

20     (Laughter)

21        MR. SUSSBERG:  Your Honor, Mr. Lauria's first

22 email to me and his letter that was attached to the pleading

23 said we need to take a reset, new counsel involved, you have

24 to have time to do three things:  One, reasonable diligence;

25 two, provide independent advice; and three, engage with

1  stakeholders.

2          And so I want to explain to Your Honor, during the

3  course of the status conference, which is set up first, how

4  we checked each of those three boxes.

5          Myself and Ms. Greenblatt, who's here with me,

6  Mr. McKane, Mr. Hunter, who will be presenting today,

7  Ms. Greenblatt and I will take care of the status conference.

8          And before I moved forward, I did want to say it's

9  been five days and I'd be remiss not to say thank you to the

10  rubber stamp team from Kirkland who have been up 24 hours a

11  day the entire time working through this to do the reasonable

12  diligence, provide the advice, and engage with stakeholders.

13          I'd like to start our presentation.

14          Ms. Levine, do you have access?

15          MS. LEVINE:  Not yet.

16          MR. SUSSBERG:  Your Honor, we quickly determined,

17  as company-side lawyers, after listening to various parties,

18  that priority A to Z was reorganizing this company because

19  our job as company counsel is to maximize value.  And I don't

20  think there's anyone in this room -- they reviewed the

21  liquidation analysis, they know that there are no other

22  alternatives other than the plan -- that would agree that, in

23  order to maximize value, we need to preserve close to 12,000

24  jobs at 2,200 locations.

25          And if people have alternative ways to reorganize

1  this company, we are all ears.  But the reality is this is a

2  retail company and, for better or for worse, we have more

3  retail experience than, I think, anyone in the country, and

4  we've been on the wrong side of many of those retail cases.

5  And why do you get on the wrong side of a retail case?

6  Because vendors get nervous, vendors get scared.

7           And in this new day and age, vendors are listening

8  in.  And what have they heard over the last four months?

9  Noise of conversion, appeals of critical vendor payments that

10  were made to them, noise of trustees, delay.  All of that is

11  causing major consternation amongst the vendor base.  And if

12  there is disruption and delay and no more liquidity, this

13  company will not be able to see it to the other side.  And we

14  owe a duty to 12,000 employees at 2,200 locations to get that

15  done.

16           And I want those vendors who are listening to

17  understand we are going to do everything in our power to move

18  these cases forward as quickly as possible.  I'll get to the

19  schedule in a moment because we've made some adjustments to

20  take into account the reality because the schedule wasn't

21  credible.  But the best thing for this company and the only

22  way to maximize value is to reorganize it.  And if people

23  have objections, if people have concerns, we welcome their

24  proposals.  And we're going to talk about that and the lack

25  thereof in a few minutes.

1        On the next slide, Your Honor, you know, what I'd

2   say, over the course of five days, that we've learned, this

3   case has gotten incredibly personal.  And when cases get

4   personal, emotions sometimes get in the way, and I've learned

5   that firsthand in my career.

6        And what we wanted to do was really get the

7   perspective of everybody involved, and so we've spoken to

8   every single professional in this room multiple times.  We

9   also had an opportunity -- Mr. Goldstein was kind enough to

10  set up a call with every single one of the lenders in his

11  group because we wanted to hear from them.

12       And what I would tell you, Your Honor, is

13  something you already know:  We have two parties that are so

14  dug in.

15       We have the 1Ls, on the one hand, who have debt

16  that's trading around 50 cents on the dollar.  They're

17  prepared to sponsor a reorganization.  They want to

18  facilitate a reorganization, they want to save the business.

19  And they truly believe that Mr. Shore's clients -- and he's

20  got HoldCo clients, he's got OpCo clients, we'll get to the

21  conflicts there.  But they believe Mr. Shore's clients are

22  wholly out of the money at both entities.

23       On the other hand, we have the second lien

24  lenders.  And again, I've spent time with Mr. Lauria.  I go

25  way back with Mr. Lauria and Mr. Shore, they are incredibly

1    effective advisors.  And by the way, we don't criticize

2    anyone for being a zealous advocate.  But those second lien

3    lenders at the OpCo, they want to sell.

4          And at the end of the day, I think you're going to

5    understand that this is simply a value allocation.  Is there

6    a number at which the 1L lenders and the 2L lenders can have

7    a meeting of the minds, or are all of those fees going to go

8    to the professionals in this room to fight every single step

9    along the way.

10          And if you look on the next slide, Your Honor, I

11    think we demonstrate that in spades because this is

12    everything -- and I'm not criticizing anyone in this room.

13    It's easy for us because we've been here five days.  But this

14    is everything that's wrong with Chapter 11.  This is the

15    reason why we get on with clients and they say I want one of

16    those liability management transactions, I don't want the

17    litigation costs, I don't want the expense, the headache of

18    people fighting nonstop, over and over on every single issue.

19          And so I said very clearly to Mr. Goldstein's

20    clients there is two paths:  One is the professionals get

21    paid lots of money and we fight all of these issues and we

22    win or lose and no one is making a determination today, or

23    reasonable minds will prevail and we will get together and we

24    will try to settle this case.

25          And we are making progress at setting up a meeting

1  next week with the principals for the 2Ls and the principals

2  for the 1Ls.  I have no idea if it's going to be successful.

3  And I also said to Mr. Lauria there's no reason to delay

4  these cases when liquidity is running short and we have no

5  idea what's going to happen with settlement discussions to

6  somehow put this reorganization at jeopardy.  If we are able

7  to settle this, that is absolutely our goal and mission, but

8  we don't know if it's possible because parties are dug in.

9  But I can promise the Court we will die trying, along with

10 reorganizing this business.

11         On the next slide, Your Honor, you know, I think

12 this is important because I know it was talked about during

13 the course of the Willkie disqualification hearing, as well

14 as your bench ruling, which we read very carefully.  The

15 first three boxes that we circled, it's important because I

16 know there have been four iterations, and now five, of the

17 plan.  And that first iteration of the plan said those causes

18 of action would be released subject to investigation.  And

19 then it kept moving and moving and moving to the point where,

20 ultimately, before the disqualification hearing, all of those

21 claims were reserved.

22         And now there's a trust at the HoldCo, there's a

23 trust at the OpCo.  I think we've generally satisfied the

24 HoldCo creditors' issues because they have an opportunity to

25 pursue those claims.  I'm sure they'll have issues and

1  concerns along the way.  But there are two trusts that

2  preserve all claims at the HoldCo and at the OpCo.

3          Another thing I want to mention because it was

4  referenced in the White & Case pleading, in June 2022,

5  Kirkland & Ellis represented Blue Owl in connection with a

6  sale/leaseback involving Badcock.  Blue Owl gave lots of

7  money to Badcock, Franchise Group gave a guarantee, and then

8  Badcock sold itself to Conn's, and that's all in the

9  disclosure statement and it's well said.

10          Blue Owl still has a guarantee against Franchise

11  Group that they believe is woefully out of the money.  We had

12  filed a notice of appearance at the outset of the case

13  because Blue Owl wanted to make sure that they got

14  documentation and access to the Court.  We did not represent

15  Blue Owl.  Two days later, Kelley, Drye & Warren filed a

16  notice of appearance on behalf of Blue Owl.  We did not bill

17  any time to Blue Owl, never appeared in the court.  We are

18  conflict-free and we are able to proceed.

19          If Mr. Shore has an issue, I know he'll raise it.

20  We're going to have our application on file immediately.  And

21  hopefully, we can get these cases to the right resolution

22  quickly, so that all of these disputes that I'm going to walk

23  through can go away.

24          Next slide, Your Honor.  Just a couple of points

25  that were raised at the last moment when the disclosure

1  statement was sought to be adjourned on February 6th.  I

2  think all of these have resolved themselves.  There was a lot

3  of talk, as Your Honor knows, about the investigations.  And

4  you know, the reality is these investigations now are limited

5  to literally a handful of people that are management at the

6  company that the first lien lenders would like to continue at

7  the company.

8          Mr. Stamer, on behalf of Mr. Wartell, is

9  conducting an investigation.  To the extent he determines

10 there are claims, just like all of those other causes of

11 action and claims, they will be carved out of the relief.  So

12 it's really a red herring when we talk about investigations

13 that are ongoing.  It is minimal.  And Mr. Stamer and Mr.

14 Wartell will make the results of those investigations clear

15 by the plan supplement.

16         Next, Your Honor, I had mentioned, you know, we

17 took a look at the schedule.  And we've had the benefit or

18 the burden of being across from Mr. Lauria and Mr. Shore

19 many, many times.  We know that they've already talked about

20 discovery and the search terms that were used by conflicted

21 counsel.  And we looked at the schedule and we know the first

22 lien lenders want to move forward because the burn in this

23 case is so severe, but we said it wasn't realistic.

24         And so we worked with the first lien lenders -- we

25 appreciate their consent to this -- and we kicked out the

1   confirmation hearing by approximately 30 days.  And that, we

2   believe -- and Mr. McKane will speak to this -- will give us

3   sufficient time to deal with the issues at hand, produce the

4   appropriate discovery, and be able to proceed where

5   everyone's due process is afforded.

6           Next, Your Honor, put this slide up.  You know,

7   obviously, the goal is a global settlement.  But I wanted

8   Your Honor to be aware of all the various pieces that are

9   floating out there that are open:  The four appeals, the

10  valuation, this 2L adequate protection motion, the continued

11  fee burn, right?  The litigation trusts.  What are HoldCo

12  claims?  What are OpCo claims?  How do we define standing?

13  How do we define standing?  How do we define sharing?

14  There's lots of different issues.

15          But the reality is, when you look at the middle of

16  the slide, global settlement, this is about one thing and one

17  thing only:  Are the 1L lenders and 2L lenders able to reach

18  common ground on a transfer of value on account of the 2L

19  claim.  The 1L lenders believe they're out of the money.  The

20  2L lenders are going to come up with arguments that say

21  they're not.  Our job is to try to bring those parties to the

22  middle and, if we can't, proceed head on to get this company

23  reorganized because that, again, is priority A through Z.

24          Before I turn it over to Ms. Greenblatt to give a

25  bit of a summary on the status of the disclosure statement

1   and plan, I just want to hit this next slide.  That, right

2   there, Your Honor, is the turnover provision in the

3   intercreditor agreement.  That says, unless and until the

4   first lien lenders are paid in full, every single dollar that

5   the second lien lenders get gets turned over to the 1L.

6   Pretty standard in an intercreditor agreement.

7          Now what these 2Ls and HoldCo lenders -- because I

8   actually believe they're hopelessly convicted and I'll

9   explain why -- what they're going to argue, in one instance

10  is we who architected Irradiant, we architected the take-

11  private transaction, we put money into the HoldCo, and the

12  HoldCo, maybe even the OpCo, was rendered insolvent as a

13  result of the take-private transaction.  Okay.  We're going

14  to pursue fraudulent conveyance claims, we have direct

15  claims, whatever that may be, they're in trust, Mr. Shore can

16  have at it.

17          But at the same time, they filed a motion asking

18  for adequate protection for the diminution in value of their

19  claim from the petition date.  And Mr. Augustine is going to

20  testify, I spoke to him this weekend.  Mr. Augustine is going

21  to testify that, based on the company's numbers, they were in

22  the money on the petition date, he's going to say that.  And

23  he's going to say that because he's looking at a business

24  plan that the company prepared in June of 2024.  This company

25  filed early November of 2024.  That June business plan was

1  used to solicit investment in the company, to which Irradiant

2  and PIMCO said we're not willing to invest.

3         But they're going to use that business plan to try

4  to justify that they were in the money on the petition date.

5  And then they're going to come in -- and this is why they

6  want the adequate protection first and the valuation second,

7  they should together.  They want to come in and argue

8  valuation.  Mr. Shore said we're going to have a huge

9  valuation fight, battle of the experts.

10        And I'll tell you, Your Honor, I've been doing

11  this for twenty-two years, I've never really understood the

12  valuation.  I've watched the trials as a young lawyer.  Three

13  people stand up and they all pick a number.

14        I can pick Mr. Augustine's number.  Do you know

15  what it's going to be?  A dollar more than the first lien

16  debt.  And then my answer to him is Mr. Augustine, look what

17  you've won, guess what you need to do, you now need to

18  reinstate a billion-one of secured debt.  And Your Honor is

19  going to decide what the interest rate is.  Well, it's a

20  company today that's trading at 50 cents that can't afford

21  the debt.  And you have to attach an interest rate to that

22  that takes into account the risk that it won't be repaid.

23  And then, on top of that, Irradiant and PIMCO, guess what you

24  need to do, you need to provide new capital to finance the

25  business.  It doesn't work, it makes no sense.  But if we

1  need to have that valuation fight, we will have it.

2          But our whole point here is that this is getting

3  all lost and people are throwing mud against the wall.  And

4  at the end of the day, it's our job to get the first lien

5  lenders and the second lien lenders together.  And if we

6  can't accomplish that, we don't need a mediator.  We'll be

7  the mediator.  If we can't get that done, we're going to have

8  to proceed.

9          And the reason we're here today is it's our

10 judgment that this business is on the rails.  And if it keeps

11 moving at this pace, with litigation and distraction, we're

12 all going to lose sight of what we're supposed to do in life:

13 Maximize value, keep jobs, and keeps businesses operational.

14          Unless you have any questions for me, Ms.

15 Greenblatt is going to take the next piece.

16          THE COURT:  No, I have no questions.  Thank you.

17          MS. GREENBLATT:  Good morning, Your Honor.  Nicole

18 Greenblatt, proposed counsel for the debtors.  I promise I

19 will not be even remotely as funny or charming as Mr.

20 Sussberg.

21     (Laughter)

22          MS. GREENBLATT:  But we did think it was

23 appropriate, at the status conference phase, to just level-

24 set and take a little bit of stock as to what the story is as

25 we sit here today, which I think requires looking a little

1  bit backwards, not just forward to the hopeful settlement of

2  the cases, but where we sit today, in terms of a plan and

3  disclosure statement that's in front of Your Honor and

4  whether we should be proceeding, in terms of moving forward

5  with the disclosure statement.

6           We looked back on the history of the debtors pre-

7  petition.  And look, this is a long story, where you have

8  investors who have been heavily involved for a long period of

9  time, who were involved in many of the transactions that are

10 being questioned, in terms of claims, but who also were

11 involved in a many-months discussion around ongoing

12 restructuring and alternatives to what is the proposed plan

13 and the equitization plan.  And we don't want that to be

14 lost, that many months have gone where people have been

15 engaged in those types of discussions.

16          As we look forward into kind of the post-petition

17 period of time, again, we know what's ensued is a litigation

18 morass, and we're concerned about what the impact of that is

19 on the business.  But we agree that what's important is that

20 you turn over every stone, right?  If there's out-of-the-

21 money creditors, no matter how far out of the money you are,

22 you turn every stone, but you don't do it at the expense of

23 the operating business.

24          And it occurs to us that a lot has happened in

25 this case where adult professionals have looked at this and

1  made an effort to do that.  And I know there's been many

2  iterations of a plan and Your Honor has had a lot of

3  distractions with other litigation matters, but a lot of work

4  has been done to get to where we are today on February 19th.

5          Josh also mentioned that the schedule that we're

6  looking forward to is also adding -- you know, this reflects

7  kind of a back-to-back against the DIP milestones, but we're

8  looking at an incremental 48 days in the case to deal with

9  any of the litigation issues that might move forward.

10          And so, Your Honor, I think what's also important

11  is that we take stock of the plan.

12          So if we can move to the next slide.

13          We really tried to illustrate here what we're

14  talking about because there's a lot of noise around how

15  complicated it is, how many issues there are.  And this story

16  we don't think is that complicated.  Yes, there's a HoldCo

17  and OpCo structure, again, not that uncommon.  We look at

18  this case, as it sits today, there's a DIP claim, there's

19  HoldCo debt, there's OpCo debt.  And then we look at where

20  we're going from here.

21          And again, we've highlighted on this page all the

22  infrastructure that's already in place, in terms of the setup

23  of HoldCo having its own independent director -- directors,

24  with a special committee designated; OpCo having now

25  completed a committee settlement, which I'll come back to.

1           But -- so when we look at the plan, what we're

2    really moving to is the column on the right, which is the pro

3    forma capital structure.  And this plan basically simplifies

4    the capital structure from about 2 billion in debt to a net

5    debt of around 600 million.  You're going to have a

6    replacement ABL, which is a necessary component for a retail

7    business.  You're going to have net debt of around 600

8    million, so we think that's rougher -- roughly four fifty.

9    You're going to equitize all of the other debt that's out

10   there.  And there's a warrant package on the table for some

11   of the out-of-the-money stakeholders.

12          At the same time, the plan preserves any and all

13   of the estate assets that may exist in the form of litigation

14   claims related to any wrongdoing by anyone.  So, when we go

15   back and look at that pre-petition time line or post-petition

16   time line, the take-private, the Conn claims, the B. Riley

17   issues, missteps in the pre-bankruptcy liability management

18   transactions, whether there were overpayments to some of the

19   lenders as consent fees, missteps in the Chapter 11 with the

20   appeals, was the DIP appropriate, was the roll-up

21   appropriate, were the payments to critical vendors

22   appropriate, no one is forfeiting or foreclosing litigation

23   on any of those issues.

24          What we're trying to do -- again, back to the plan

25   picture -- is move from this pre-petition debt stack to this

1  post-petition debt stack.  And the issues around litigation

2  really come second to reorganizing the business.

3          We also know, Your Honor, that the plan is better

4  than any current alternative because, when we look at the

5  time lines, again, there was a market check.  It fell short,

6  nobody showed up.  There was -- we have evidence of what a

7  forced liquidation looks like.  That exhibit, I think it's

8  Exhibit B, included in this morning's filing at Docket 1009

9  of the disclosure statement, shows that, in a liquidation

10  scenario, the DIP is severely impaired and there's nothing

11  beyond that.  Alternatively, we have a plan on file that will

12  actually get value to people and, most importantly, preserve

13  the operations and the 12,000 jobs at stake.

14          Your Honor, I appreciate that we left a heavy

15  markup on your plate over the past couple of days, and we

16  wanted to talk a little bit about what changes we made to the

17  plan:

18          We worked closely with the committee as a

19  statutory body in this case.

20          We consolidated Class 6 for voting and

21  distribution purposes.

22          We laid out more explicitly the claims and causes

23  of action that are being transferred to the OpCo litigation

24  trust.

25          We clarified the resolution for procedures of

1  disputed claims.

2          We worked with Mr. Wartell and his independent

3  counsel at Akin to clarify the scope of his investigation,

4  which, again, at this point, is pretty limited.

5          And we also worked very closely with the U.S.

6  Trustee to work out issues with his objection to confirmation

7  and agreed to opt-in provisions for third-party releases.

8          We've dealt with administrative claims and built

9  out provisions for the allowance of those claims and added a

10  condition precedent to the effective date that the admin

11  claims need to be acceptable to the 1L lenders, which was

12  responsive to the 2Ls' -- to the -- sorry -- to the Freedom

13  Lenders' motion for adequate protection.

14          And we also worked with White & Case and asked

15  them for -- we solicited and have incorporated most of the

16  comments we received from them to date.  We understand

17  they're still working on their inserts.  But again, we had

18  five days, we got a lot done.  We figured they could get us

19  their comments in the same time period.

20          And lastly, Your Honor, the time line, we pushed

21  the time line.  And if we go back to the post-petition time

22  line, that's just what I wanted to highlight, is that we are

23  adding those incremental 48 days to be able to fully and

24  fairly resolve any issues that relate to open matters.

25          And of course, Your Honor, we recognize that there

1  are still matters that will need to be resolved between the

2  disclosure statement and plan confirmation, but that, too, is

3  not an unusual story.  And we think those issues are really

4  pretty narrow:

5          You have scope of the releases and, again, the

6  completion of the investigations and what's going to be

7  published around that.

8          You have pegging the valuation of this business

9  and how we allocate that value among the secured lenders in

10  this case.  That includes dealing with this adequate

11  protection issue on diminution of value.  They're just

12  different variations of a valuation fight.

13          And then you have control over and prosecution of

14  the claims and causes of action that are outside of the

15  business enterprise and a sharing mechanism that has to be

16  developed among the HoldCo and OpCo trusts.

17          We think the best way to do that is to put some

18  discipline on this, and that includes a time line and a

19  timetable, reduce the cash burn, and keep everyone focused on

20  preserving the very real value in the business and maximizing

21  the distributable value available from continued operations,

22  uninterrupted by the prolonged litigation in these cases; at

23  the same time, preserve all the claims that can all be dealt

24  with later.  There is no need to resolve all of these issues

25  before you move forward with the disclosure statement.

1          So we're ready to move forward and we believe it's
2    indisputably in the best interests of these estates to do so.
3    I will put up the status of the disclosure statement
4    objections we have, so you have a sense of you're willing to
5    entertain going forward kind of the limited issues we'd be
6    dealing with.

7          I would just flag that I think, you know, the
8    biggest open issue, obviously, is the Freedom Lenders'
9    objections, and their story, Your Honor, is mostly taint that
10   there was conflicted counsel who drafted the documents
11   before, no other counsel could possibly step into these shoes
12   and put a plan on file for these debtors.  We disagree that
13   that story really syncs with the facts here.  Their real
14   issues center on three things:  Joint plans are
15   inappropriate, Inter-debtor conflict issues and identifying
16   claims and causes of action, and the confirmation time line.

17         And again, I would just go back to the idea that
18   we don't think a joint plan is inappropriate.  The goal of
19   these Chapter 11 cases is to resolve all of the debt, and so
20   we are looking at this as one corporate organization.
21   There's, again, already significant infrastructure in place
22   to resolve and address potential conflicts of interest,
23   which, again, haven't been identified, you know, in a way
24   that we think is preclusive of moving forward with the
25   disclosure statement.

1          White & Case would take it further, I think, and

2     argue that the HoldCo debtors need separate counsel.  We also

3     don't think that's appropriate.  There's ample precedent for

4     representing HoldCo and OpCo debtors in these cases.  And

5     again, the infrastructure put in place is appropriate in all

6     circumstances.  I think what would be inappropriate is

7     allowing counsel for -- you know, for a group of lenders who

8     is at both entities to decide and dictate the outcome of

9     plans for these entities.

10          So, Your Honor, I think, as to status, I just

11    wanted to also flag that the Freedom Lenders had a number of

12    other things listed in their most recent filing on adjourning

13    the disclosure statement.  And again, we think these have all

14    been addressed in the updated plan and disclosure statement:

15          Lack of valuation, we've made clear it's going to

16    be provided in the plan supplement, that is standard and

17    we're building a schedule to deal with valuation issues.  I

18    would also just flag that the Freedom Lenders, obviously,

19    have had access to all of the information in the debtors'

20    data room, dating back pre-petition and post-petition, and

21    have had opportunities to invest in this business, to which

22    they have turned down.

23          The lack of clarity on potential deficiency

24    claims, again, a subset of valuation issues, and we don't see

25    it as a real voting prohibition.

1          Failure to file or commit to file independent

2    reports, again, there are very real, you know, privilege

3    issues in connection with doing these investigations.  But

4    we've spoken with counsel for Mr. Wartell, we understand he's

5    perfectly happy to release the conclusions from his report

6    ahead of the voting deadline.  We've incorporated that into

7    the plan and disclosure statement, so we think that should be

8    off the table.

9          The description of claims and causes of action

10   updated -- have all been updated in detail in the disclosure

11   statement.  Again, this notion that the debtors are retaining

12   causes of action and forfeiting them, again, just isn't

13   relevant given the formation of the HoldCo and OpCo trusts.

14         And finally, disclosure related to the 2Ls'

15   adequate protection claims, again, we updated the disclosure

16   statement to reflect that they filed a motion.  If they would

17   like to put more of an advocacy piece into the disclosure

18   statement, we're happy to let that go forward, as well.

19         And with that, Your Honor, we believe it's

20   appropriate and in the best interests of these debtors to

21   proceed with the hearing for today, including approval of the

22   disclosure statement.

23         THE COURT:  Thank you.

24         MS. GREENBLATT:  Thank you.

25      (Participants confer)

1          MR. SHORE:  Good morning, Your Honor.  Chris Shore

2    from White & Case.

3          I don't want to jump ahead to the motion to

4    adjourn or the disclosure statement or the scheduling, but I

5    do want to respond to what was said, and that was a lot that

6    was just said.

7          With respect to the vendors being nervous and this

8    being a retail case and everything else, first, there's no

9    evidence of that.

10          But second, this case isn't a normal case.  A

11    hundred million dollars was paid out to the vendors in

12    exchange for post-petition terms in a plan that the debtors

13    now disclosed, as of Monday, is a one-cent recovery for

14    unsecured creditors.  So the notion that vendors, who have

15    received 100 cents on the dollar in exchange for post-

16    petition terms, are protesting the 99 percent increase that

17    they got because they were all treated as critical vendors is

18    a bid odd.

19          But more importantly, the notion that liquidity is

20    running short, again, no evidence of that.  And if Mr.

21    Orlofsky were here today, he would answer the question how

22    are you on plan right now, and he's going to say we're ahead

23    of plan, we're ahead of budget right now.  So people can come

24    in and say this is a retail case and everything is fizzling

25    out.  But if people were here to put on evidence about that,

1  that's not the case.

2         The cost of the reorg.  Look, from our

3  perspective, you know, it doesn't -- if people understand a

4  case, we can all get in a room and say you know how this case

5  is going to be go, we're going to go from A to B to C to D

6  to -- we're all going to end up at E.  That the debtors,

7  whoever was running the show, fought from A to B and B to C

8  and C to D and D to E, and ran up those bills, that's their

9  choice.  But we are kind of at E right now, which is where we

10 all could have been at the first day of the case, if people

11 had just taken a rational approach to the reorganization.

12        Our motion, we'll come to that when we talk about

13 scheduling.  I -- Mr. Sussberg has it all wrong about what

14 that's going to go on.  But I'm going to put on the record

15 right now he did not, as far as I know, have anyone's consent

16 to talk to my testifying witness without counsel present.  I

17 don't know how he thought he could do that.  I reserve all

18 rights with respect to that.  But that's not appropriate.

19        The -- with respect to the conflict, I assume

20 we're going to get disclosures from them with respect to

21 screening.  I don't have any interest or dog in that hunt, if

22 they screened it right.  We know from the Maxus decision in

23 the Third Circuit that's not a problem, but they better have

24 those screens up, and they should have been up before they

25 ever started work.

1          Where I see today going, unless other people want

2    to talk on status, we have a motion to adjourn.  The debtors

3    have consented to have it expedited.  If Your Honor is going

4    to expedite it, Mr. Zatz will handle that again.

5          If we have the disclosure statement hearing,

6    Mr. Zatz will handle that.

7          And then, with respect to scheduling, if we could

8    come back to that at the end, 30 days of an adjournment is

9    not enough, and I'll explain the reasons and give you our

10   view as to what it's going to take to get to a confirmation

11   hearing, in light of where we sit today.

12          THE COURT:  Okay.  Thank you.

13          MR. SHORE:  Thank you, Your Honor.

14          THE COURT:  Anyone else?

15       (No verbal response)

16          THE COURT:  Okay.  I'll hear the motion to

17   adjourn, Mr. Zatz.

18          MR. ZATZ:  Good morning, Your Honor.  Andrew Zatz

19   from White & Case for the Ad Hoc Group of Freedom Lenders.

20          We filed our renewed motion to adjourn at Docket

21   Number 993.  I think in the spirit of continuing the status

22   conference a bit and segueing to our motion to adjourn, it

23   would be useful to talk about this last week, because a lot

24   has transpired.  It started from a week ago today when Your

25   Honor gave her bench ruling on the Willkie retention

1   application, which, suffice to say, was a major turning point

2   in these cases and as we explained to the debtors at the

3   time, we felt was a time to reflect and take a step back and

4   potentially reset.  Keeping in mind that the debtors key

5   witness, Mr. Orlofsky, at that hearing for Willkie retention

6   application had testified that if Willkie was not retained,

7   it would necessitate delay and something of a reset, and so

8   the day after the bench ruling was handed down, we sent the

9   letter to Young Conaway explaining our position on the case

10  and it was not about reasonable diligence, independent advice

11  and engagement.

12        The three points that we flagged were, one, that

13  as the bench ruling said, there were aspects of the plan that

14  Willkie had the sole pen on that related to their conflicts

15  of interest; namely, claims against Brian Kahn and his

16  affiliates and the trust that had been set up to deal with

17  those claims, and that because of that, there was a need to

18  not plow ahead with the disclosure statement hearing, but,

19  rather, take a step back and reassess.  The second point he

20  made was related to the OpCo Holdco conflicts and how they

21  needed to be addressed and how the Holdco debtors need a real

22  fiduciary advocating for them, rather than, simply, an

23  academic analysis of claims that may sit there.  And then,

24  third, was on the confirmation timeline.  So, those are the

25  three issues we flagged.  We really haven't gotten engagement

1 on any.

2          Then, the next day, now -- we're on Friday,

3 February 14th; this is the day that Kirkland was hired --

4 apparently, we came to learn early yesterday morning when a

5 revised disclosure statement was filed, Mr. Wartell's powers

6 were expanded.  We concluded briefing on the pending appeals

7 and the debtors filed an agenda saying that today's hearing

8 was going forward.

9          Later that day, Kirkland sent us the existing

10 disclosure statement, the one that Willkie had drafted,

11 soliciting comments from us.  Early on yesterday morning, we

12 sent suggested comments and then about two hours later, they

13 filed a totally new amended plan and disclosure statement,

14 making many new changes that we had not yet seen.  And then

15 yesterday evening, said, Now, here are our attempts at making

16 your changes to this new plan and disclosure statement that

17 you just spent the day trying to digest.  Do these work for

18 you?  And we communicated that in light of preparing and

19 traveling to this hearing, combined with trying to understand

20 what they had just filed and then making sense of their

21 responses to our comments, it was not going to be possible to

22 synthesize all of that for today's hearing.

23          So, here we are and the debtors are forging ahead,

24 seeking approval of the disclosure statement.  In our view,

25 this is a mistake and consideration of the disclosure

1  statement should be adjourned for six reasons.  First, it is

2  premature and does not fix the Willkie problems.  Two, the

3  recent changes have not given the parties enough time to

4  digest and react.  Third, it's not necessary to maintain the

5  confirmation timeline.  Fourth, they still have no commitment

6  to provide a valuation analysis.  Fifth, they still have no

7  real commitment to provide the investigation reports.  And

8  sixth, is a lack of the description of the claims.

9          So, let me start with how determination of the

10 disclosure statement motion is premature and that still what

11 they have filed does not address the Willkie issues.  Again,

12 one of the main points of the bench decision was that Willkie

13 was conflicted because they had the exclusive pen on the plan

14 that dealt with issues where they had other representations,

15 prior and current.

16         Now, I heard Mr. Sussberg say, Well, that's all

17 basically solved because all claims are going to the trust,

18 but that's not true; not all claims are going to the trust.

19 Certain specified claims are going into the trust; other

20 claims are being released and we take issue with those

21 releases.

22         THE COURT:  But isn't that a confirmation issue?

23         MR. ZATZ:  It's a confirmation issue, but my point

24 is that the issues with the plan that relate to the same

25 problems that arose in connection with the Willkie retention

1  had not been solved.  There's a lot of red ink on what was

2  filed early yesterday morning on the fifth amended plan and

3  fifth amended disclosure statement, but none of it tackles

4  the claims against Brian Kahn, his affiliates, and the trust;

5  that all is exactly as it was.

6          THE COURT:  Well, if you want to have some comment

7  on it, draft it.  I mean, Willkie drafted what they drafted.

8  Kirkland has reviewed it.  They've decided to move forward.

9          What do you want me to do, order them to change

10 it?

11         MR. ZATZ:  I think what we would like is an

12 adjournment of the hearing so we can have the time to sit

13 down and try to address these issues in a real way without

14 forging ahead on a plan that is still tainted by these

15 conflicts.

16         THE COURT:  Well, just because Willkie is

17 disqualified doesn't mean -- well, read Zenith.  Read Judge

18 Walrath's decision in Zenith and then you'll understand the

19 difference between disqualifying a firm and what they can do,

20 okay.

21         MR. ZATZ:  Okay.

22         THE COURT:  It doesn't mean that everything they

23 did has to be redone if it doesn't need to be redone.

24         MR. ZATZ:  Understood.

25         And to your point, Your Honor, I think there are

1  some real confirmation issues here, but let me, then, move to

2  the second point, which are major changes that came late in

3  the game.  So, again, our view is that there's a lot of red

4  ink on this fifth amended plan and disclosure statement, when

5  you compare it to the prior version.  I think, really, when

6  it comes to the plan, there are two major changes that are

7  worth flagging.  One is that they have flipped the opt-out

8  mechanic and the releases to an opt-in.  The other is the

9  consolidation of the general unsecured classes into what is

10  now Class 6.

11            THE COURT:  Uh-huh.

12            MR. ZATZ:  And there's a very meaningful change

13  when you look at the summary of potential recoveries or

14  projected recoveries.  In the prior version of the plan, the

15  general unsecured claims against the OpCo debtors were all

16  split out.  When you added them all up, they came out to

17  about $64.5 million.  Now, they're all in one class together

18  and the number has turned into $1.14 billion.  There's no

19  explanation as to why this massive increase has resulted from

20  consolidating the classes.

21            Maybe it ties to a view of value and yet the

22  debtors continue to say that no valuation analysis is

23  required and will be provided, but that seems like a major

24  change to us.  But, at the same time, there's many other

25  smaller changes in the disclosure statement that we're still

1  trying to digest and match up with their prior comments and

2  their reactions to them.

3          And, you know, their claims that we've had ample

4  time are simply untrue.  They gave us a prior version of the

5  disclosure statement to markup, only to blindside us, you

6  know, yesterday morning with a new plan and disclosure

7  statement that we had no preview of.  You know, there's a

8  reason why disclosure statement hearings are on 35 days'

9  notice, and yes, it is typical for there to be last-minute

10 changes and blacklines filed on the eve of the hearing, but

11 that's usually as part of a consensual resolution.  It's not

12 an offering to try to make the objectors happy that may or

13 may not work.  And in this case, it does not work.  The

14 changes they made are not the comments we provided.  They're

15 responsive to them, but they are not the comments that we

16 sent over.

17         Our third point is that it's not necessary to

18 maintain the timeline.  They're asking for a confirmation

19 hearing on April 29th.  I think I saw April 30th on their

20 presentation, but they're saying 30-day kick.  So, why is it

21 necessary to proceed today?  We have a 30-day window where we

22 could take a step back and engage and try to fix these

23 problems.

24         THE COURT:  Well, don't we need to start now so

25 that there's -- and it doesn't mean you can't continue to

1   talk -- but if we wait 30 days to fix problems and then we're

2   at the disclosure statement hearing, don't your clients know

3   how they're going to vote?  Who are you arguing for, in terms

4   of the need for further disclosure?

5            MR. ZATZ:  I'm arguing for our clients, and so let

6   me address the issue of the fact that we intend -- that we

7   are not supportive of the plan because it is relevant to why

8   we are here today and why we are objecting.  First of all,

9   we've been on the record, clearly, you know, in our capacity

10  as Holdco lenders, we are very much not supportive of this

11  plan and intend to reject it; as a result, our view is that

12  the Holdco debtor plan is not confirmable.

13           We still have our second lien claims and the

14  pending adequate protection motion.  We have to see what

15  happens with that and whether that side of the plan can get

16  resolved.  In the meantime, the 1125 inquiry has nothing to

17  do with whether we support the plan or not; it's about

18  adequate disclosure.  And if we are going to wind up at a

19  point that Mr. Sussberg fears we could wind up at if the

20  settlement discussions don't materialize in the way that we

21  all hope they will, then we need to know what we are, in

22  fact, objecting to and some of the disclosure deficiencies,

23  which I can get to if we're going to move to the motion

24  itself, go to the debtors hiding the ball and not disclosing

25  things that we need to know to know what we're shooting at

1  here.

2           THE COURT:  Okay.  Well, I'll hear that if we get

3  to that, but that, to me, is what today is about.  It's about

4  what disclosure needs to be made --

5           MR. ZATZ:  Yes.

6           THE COURT:  -- so that you can make an informed

7  decision, your clients can make an informed decision.

8           MR. ZATZ:  Yes, I agree, Your Honor.

9           And so, let me move to the fourth point, which is

10  the lack of valuation analysis.  This is, you know, this was

11  the debtors' stance when Willkie was their proposed counsel.

12  It apparently is their continued stance, which is they're

13  being -- they're certainly being clear they are not going to

14  submit a valuation analysis with this disclosure statement.

15  Our view is that under the language of Section 1125(b), that

16  is not permitted.

17           Section 1125(b) says that a Court may approve a

18  disclosure statement without a valuation analysis.  That's

19  what the debtors hang their hat on.  But they're trying to

20  twist the context of the word "may" where it's not that the

21  Court may approve a disclosure statement without one, but

22  rather, the debtors have the choice.  But that's not what

23  Section 1125(b) is about.  And when you look at the

24  legislative history of it and some of the cases that have

25  interpreted it, which we have cited to in our disclosure

1  statement objection, it is clear that it's the Court's

2  determination on a case-by-case basis whether a valuation

3  analysis is required.

4          So the debtors cite, in response, to certain

5  orders that don't exactly engage on the 1125(b) analysis, but

6  rather, simply say that under those circumstances, a

7  valuation analysis is not required for the disclosure

8  statement to be approved, but those were very different

9  circumstances that we have here, where valuation is very much

10  at issue:  first, because of our pending adequate protection

11  motion; second, because there are deficiency claims that are

12  sharing in the pool of recovery for general unsecured

13  creditors; and, third, because there are going to be

14  confirmation issues related to the value of this company and

15  whether the absolute priority rule is being adhered to.  So,

16  value is very much at issue here and a valuation analysis

17  should be required in order for this plan to be solicited and

18  the disclosure statement to be approved.

19          Next, is the pending investigations.  Because, as

20  I think Your Honor is aware, there have been two ongoing

21  investigations in these cases for which the estates have paid

22  substantially so far, and at least in the case of

23  Mr. Wartell, will continue to.  One is the Petrillo's

24  investigation, which is their second investigation into

25  claims and causes of action that the debtors, collectively,

1    OpCo or Holdco, may have against third parties.  And the plan

2    for that is the same as it was the last time we were here,

3    which is that that investigation is going to get handed to

4    the committee behind closed doors and will be the end of

5    Petrillo's involvement in these cases.  Our view is that

6    whatever Petrillo's findings are and whatever causes of

7    action they've identified should be publicized.

8           Now, let me go to -- I don't know, Your Honor, if

9    you've had a chance to digest what the debtors filed this

10   morning, but, again, they filed change pages in an attempt to

11   address the comments that we had sent over.  There's a part

12   of their Q and A, their new Q and A section is, effectively,

13   you know, what are the things we asked for that they said no

14   to, which is not exactly the kind of disclosure we wanted.

15   We asked for certain disclosure and they said they -- and

16   their disclosure is they asked for disclosures and we said

17   no, okay.

18          Well, one of -- you know, we offered as something

19   of an attempt at a compromise that the Petrillo report would

20   have to be publicized 60 days in advance of the confirmation

21   hearing, as opposed to our prior position, which we think is

22   the right position, which is that should be publicized before

23   the disclosure statement is approved at all.  But there's

24   still no commitment to disclose in any way the findings of

25   that report.  But our view is that there should be a

1    publicization of those findings in order for the disclosure

2    statement to be launched, or at least a commitment to give

3    parties ample time to digest them in advance of confirmation.

4         And the same goes for the Wartell investigation.

5    Now, we're hearing, well, the Wartell findings will be in the

6    plan supplement.  Well, for one thing, perhaps it's a minor

7    point, but it's shaving a week off the normal requirements

8    that we're statutorily entitled to, but there's also no real

9    commitment to provide a real kind of report here.  It sounds

10   like the kind of typical schedule that you'd see in a plan

11   supplement of the retained causes of action that doesn't get

12   into what was reviewed, what kind of analysis was done, how

13   the conclusions were reached, et cetera.  I think we need

14   that kind of full investigative report to be made public in

15   order to react and, again, know what we're shooting at here.

16        My last argument on why we feel today's disclosure

17   statement should be adjourned is the description of claims

18   and causes of action.  Now, I hear the debtors saying today

19   that's been addressed because there is a list of some of the

20   things and causes of action in the plan and disclosure

21   statement now, but that list is incomplete for two reasons.

22   One is, it's only the OpCo claims that are described.  We

23   are, of course, extremely focused on the Holdco debtors'

24   claims.  As Mr. Shore was here telling you at the last

25   hearing, that is really the sole source of recovery that we

1  have to look to at the Holdco debtors and, yet, there's no

2  description of those claims at all.

3        And then you have another issue, which is some of,

4  you know, these claims are described very broadly.  It's

5  things like, retained causes of action against Brian Kahn,

6  but when you look at cases like Crystal Cadillac, which is

7  what we're concerned with here and why we're raising the

8  objection, those cases say, claims have to be described with

9  specificity or you run the risk of effectively waiving them

10 under the doctrine of judicial *estoppel*.

11       So our view is in order for the disclosure

12 statement to really be doing its job here and preserving the

13 claims that a huge part of this plan is meant to preserve,

14 they need to be described with particularity.  So, putting

15 aside, Your Honor, confirmation objections of which we think

16 there are some serious ones that will need to get addressed,

17 I think there are real reasons to take a step back here, give

18 the parties more time to engage.  We're not talking about

19 taking the full 30 days that the debtors have; perhaps, it

20 could be done in a week or two, but this all feels premature

21 and rushed, from our perspective, and unnecessary.

22       Now, just on the point of necessity, to wrap up,

23 we're hearing that time is of the essence, and Mr. Shore

24 addressed this, in part.  As he said, there's no evidence in

25 the record that vendors are skittish or that the company is

1  running out of money; in fact, the opposite is true.  And so,

2  you know, there is just no pressing need to be moving forward

3  today.  I understand that people want to show progress and

4  want to have a good message to deliver, but we think it's

5  more important for this to be done right.

6          So, with that, I will rest unless you have any

7  questions, Your Honor.

8          THE COURT:  I don't have any questions.  Thank

9  you.

10          MR. MCKANE:  Good morning, Your Honor.

11          Mark McKane of Kirkland & Ellis, proposed counsel

12  for the debtors.  I'll be brief in responding to Mr. Zatz'

13  arguments, because, in many ways, like some of Mr. Shore's

14  music selections, they're kind of stuck in the past.  They're

15  stuck with where we were, not where we are.

16      (Laughter)

17          MR. MCKANE:  As I understand it, as we went

18  through the chronology, Mr. Zatz needs to talk to his

19  partner, Mr. Lauria, about, like, whether there's been any

20  engagement at all, because there's been engagement throughout

21  Friday, Saturday, Sunday, Monday moving things forward.  When

22  we got the disclosure statement, as we had it, we didn't just

23  send it to our friends at White & Case; we sent it to

24  everyone and said, tell us what you want.  Give it to us.

25  Right.

1          We took them altogether, we compiled it, we made

2    it our own.  We sent it back out and took another turn with

3    comments.  That's what you do with a disclosure statement:

4    you turn the document to address the disclosures that

5    everyone needs and if you don't -- if we can't find common

6    ground, put in your own -- we'll give you -- here's your

7    spot, give us your letter, we'll address it.  The Committee

8    can do that.  The Freedom Lenders can do that.  Anyone can do

9    that.

10          The notion that this is premature, Your Honor,

11   this is not the first time that this company has tried to get

12   this disclosure statement done and they've had more than

13   enough time to address the issues that are in front of them.

14   This Kahn issue, with regards to claims, it's all reserved

15   for them.

16          I don't think they want us to write their

17   complaint.  I think what they're asking us to do is like,

18   look, here it is, whatever you think there's value at the

19   HoldCo level, you got it.  So, too, with the OpCo, if you

20   think the OpCo has claims, they're yours.

21          What the plan issue is about is, if there are any

22   standalone claims that are being released at the HoldCo

23   level, that's why Mr. Wartell and the Akin team are here to

24   evaluate for those individuals, are we going to release those

25   claims?  And we said when they're done with their

1  investigation, they will identify these individuals are going

2  to be released and we can adjudicate whether that's

3  appropriate at confirmation.  Really, these are confirmation

4  issues.

5          Your Honor, on one through six, premature, I think

6  we've addressed.  Changes late in the game -- this issue with

7  the consolidation of the claims at Class 6; that's the

8  deficiency claims getting rolled in, as I understand it.  So,

9  the big leap is something that has come from multiple

10 constituencies.  Give us some sense of the size of the

11 potential deficiency claims, so we did.  We're not

12 blindsiding anyone when we incorporate comments into a turn.

13 We move the document forward.

14          As it relates to the 30 days, Your Honor, we, like

15 you, think we need to move this case forward.  We need to,

16 like, get the disclosure statement out.  It doesn't mean

17 we're done talking.  Absolutely not.  You heard Mr. Sussberg

18 earlier today:  we want to have that meeting next week.  We

19 want to, it looks like, see if we can resolve these things

20 before the full-on litigation machine hits high gear.

21          But as it relates to the timeline, I will say

22 this, and I'll talk to Mr. Shore about it and I'll respond to

23 what he has to say, as well, we put in the additional month

24 because we wanted to be credible and realistic about what it

25 may take.  We haven't waited.  When we came onboard, we

1  understood that the Willkie team had already been working up

2  a production that was almost ready to go.  We did the

3  additional, like, e-discovery processing necessary to get

4  that out and that went out last night.

5       So, we're moving the case forward in every way

6  that we can.  That doesn't mean that we're done.  Don't get

7  me wrong, I know it won't satisfy Mr. Shore and his team.

8  We've engaged before and we'll engage again, you know, as we

9  have in every case, to figure out what needs to be done for

10  confirmation.  If we're going to have a full-on valuation

11  fight, okay, but I think Mr. Sussberg has properly identified

12  how that works.

13       As to the valuation in the disclosure statement,

14  we (indiscernible) there was a market check that was done and

15  we detailed that process and that market check did not yield

16  a clearing bid.  So we're out there saying we tried to do

17  what is typically viewed as the gold standard to see what the

18  market will say.  We put in minimum bids.  Nobody cleared

19  those bids.  That's good evidence as to what we think the

20  value is; nonetheless, we'll come back in a plan supplement

21  and pen it down.

22       As it relates to the investigations, I'm somewhat

23  at a loss.  The investigation that you need to know is,

24  whatever was potentially identified and, more importantly,

25  whatever the UCC thinks may be potential claims at the OpCo

1  level, they're going to that litigation trust.  Whatever

2  value it is, it is.

3          Who are we to say what they think are the best

4  claims?  If we go further, we don't want to throw shade on a

5  potential recovery.  If those are viable claims, those are

6  claims; they have them.  The same is true with the Holdco

7  trust, as well.  The only thing that relates to an

8  investigation on a go-forward, is, are there any that are

9  going to be released and that's why we have the Akin team and

10 Mr. Wartell.

11         And as it relates to interdebtor conflicts, I

12 don't want this to be lost, we got onboard; we looked at what

13 had been done; we looked at the resolutions and the

14 delegation of authority down to Mr. Wartell; and we revised

15 it.  We made it a little bit broader to make it absolutely

16 clear, if there are interdebtor conflicts as it relates to

17 the transaction, Mr. Wartell has full delegation of that, as

18 well, and that's true as of the 14th.  So, before anybody

19 said anything about interdebtor conflicts, we did our own

20 work coming in new and figured out that was what was

21 appropriate.  So, that's where we are on investigations.

22         And then, you know, finally, the last half of what

23 Mr. Zatz argued, it's not a motion to adjourn; it's what he

24 thinks is appropriate in a disclosure statement.  We don't

25 agree with that.  I know, you know, frankly, Mr. Hunter will

1  address it on the substance, but we're here today and we

2  think it's appropriate now with new counsel, with a fresh

3  look, doing exactly what Mr. Lauria said we should be doing,

4  which is get up to speed, give independent advice, talk to

5  your constituencies.  We've done all of that, as Mr. Sussberg

6  has said, now we need to move forward.

7          THE COURT:  Okay.  Thank you.

8          Okay.  We're going to move forward today.  I'm

9  going to deny the motion to adjourn.  I think what I heard is

10 the substantive concerns really go to the adequacy of the

11 disclosure statement itself, and I'll hear that, and the

12 timeline, quite frankly.  I think it all boils down to the

13 timeline.  So I'm going to overrule the objection -- I'm

14 sorry -- the motion to adjourn and we're going to get going

15 on the substance of the disclosure statement.

16         Mr. Fox?

17         MR. FOX:  Good morning, Your Honor.

18         May I please the Court?  Tim Fox, on behalf of the

19 United States Trustee.

20         Just imposing on the Court for a scheduling issue,

21 I have a status conference before Judge Shannon starting at

22 11 o'clock in Tupperware.  I was just asking if I could be

23 excused --

24         THE COURT:  Certainly.

25         MR. FOX:  -- momentarily to attend that and then

1  come back for the balance of the hearing?

2         THE COURT:  You certainly can.

3         And anybody else who has something else they need

4  to attend to, as long as you're not addressing me, you can do

5  whatever you want.

6      (Laughter)

7         MR. FOX:  Thank you, Your Honor.

8         THE COURT:  Thank you.

9         MR. FOX:  I will return.

10         THE COURT:  Okay.

11         MR. HUNTER:  Thank you, Your Honor.

12         For the record, Derek Hunter of Kirkland & Ellis,

13  on behalf of the debtors.

14         So, I think we've talked a lot about the substance

15  of the disclosure statement.  To your point, I don't feel

16  like my thunder was stolen at all --

17      (Laughter)

18         MR. HUNTER:  -- but I think we can focus on the

19  discussion here on a lot of the issues that were discussed.

20  You know, Mr. McKane hit it, you know, the timeline was, we

21  got involved, we reviewed it quickly, we sent the documents

22  out to everybody.  You know, to White & Case's credit, it was

23  a quick timeline.  They did get us comments as we were filing

24  the first draft.  We worked to try to incorporate their

25  comments, to the extent we could.  Of course, there were

1  provisions that were, we thought, substantive:  file a

2  report 60 days before the confirmation hearing, which we

3  substantively were not willing to agree to, but we wanted to

4  disclose that they asked for that and why we disagreed.  And

5  so, the disclosure statement was revised to add, we think,

6  the disclosures that had been raised by the parties in the

7  last few weeks and by the White & Case team and other taking

8  around the table.

9           You know, first, as Ms. Greenblatt mentioned, we

10 went from opt out to opt in; that creates a lot of red on the

11 page, but, of course, I'm going to a U.S. Trustee issue as

12 soon as Mr. Fox steps out, but he expressed his appreciation

13 for that change and we understand it resolves his issue, but

14 we'll check with him when he comes back.  We streamlined the

15 Class 6 construct in the plan and disclosure statement.  We

16 described the litigation claims, you know, with the help of

17 the Pachulski team as to the OpCo trust, and if there are

18 disclosures that the White & Case team wants to add with

19 respect to the claims for the Holdco trust as they see it,

20 they're free to do that.

21          You know, we tried to describe the claims in much

22 more detail, how the trusts work.  You know, in reading the

23 transcripts from the prior hearings, it seemed like maybe

24 there was a little confusion about how they worked together.

25 There are two trusts -- that's slightly unusual -- they may

1    have similar, competing claims.  You know, we disclosed that

2    and that'll be an issue that we'll have to think through and

3    the trusts will have to reconcile that.  One trust is funded,

4    pursuant to the UCC settlement; the other is not.  We made

5    that clear in plain English.

6            There was some confusion about how the

7    investigation worked, *vis-a-vis*, the trusts, understandably.

8    We tried to disclose that, again, in plain English in the

9    disclosure statement.  Everything is going in the trust

10   except for a few specific things that Mr. Wartell is

11   investigating.  There was talk about intercompany conflicts:

12   Holdco v OpCo.  We expanded the delegation for Mr. Wartell

13   and we explained that in the disclosure statement, again, we

14   attempted to, in plain English, as best we could.  Some

15   current events:  obviously, the Willkie disqualification

16   hearing; Kirkland's engagement; and the lead-up to these

17   cases and the engagement with the parties and kind of what's

18   ensued from that point.  And, you know, those were the

19   disclosures that were made primarily in the disclosure

20   statement filed at Docket 995.

21           Those did not incorporate the comments from the

22   White & Case team, just because of the timing.  We filed

23   another one early this morning.  I'm not sure if you've had a

24   chance to review it, but I'm happy to hand it up.

25           THE COURT:  I've reviewed it.

1          MR. HUNTER:  And those were, you know, attempts to

2    address the disclosure issues that the White & Case team

3    flagged and, again, if they have an insert, if they have

4    further language from their perspective that they want to

5    add, we're all ears.

6          But we think, you know, with all the hearings that

7    have already been had on this and the disclosures we've

8    added, we think the disclosure statement certainly has

9    adequate information, which, as you've already highlighted,

10   is the standard for today.  There are confirmation issues.

11   There's a lot of information that the White & Case team has

12   indicated they're going to want, you know, (indiscernible)

13   objecting to the plan, valuation, and investigations, and

14   support for releases.

15         We know our burden at confirmation, Your Honor.

16   We'll have to show that the plan satisfies the absolute

17   priority rule.  Does it doesn't unfairly discriminate?  If

18   we're releasing claims, does it meet the appropriate

19   standard?  We're going to have to, you know, put our evidence

20   up and we'll have to work with objecting parties so they have

21   access to that information so that they can formulate their

22   objection.  But we think that's something that we can work

23   through between now and confirmation because, as the White &

24   Case team has told us clearly, they know -- they have what

25   they need to vote on the plan.  They're voting against it, as

1  they've told us, and so we think the disclosure statement

2  should be approved and go forward today and we'll work

3  through all those other issues between now and confirmation.

4        So, I think that's the punchline on the disclosure

5  statement, from our perspective.  I'm happy to walk through

6  any questions you have on the changes or talk about the

7  schedule.  I know the confirmation date we proposed might not

8  work for Your Honor, but, you know, I wanted to just start

9  there and take it however you'd like, Your Honor.

10        THE COURT:  I think the big, as I said, I think

11  the big question is the timeline and to the extent that

12  things are not, like the valuation and the investigation, the

13  conclusion of the investigation, so the knowledge of the

14  releases, until we have that, it's hard to -- well, until

15  that's disclosed, you can't engage of those issues.  So, I

16  think not disclosing that now, while it may be okay in terms

17  of getting the disclosure statement out, I think it creates

18  the problem for the timeline.  You push the timeline back.

19        MR. HUNTER:  Yes, Your Honor.

20        THE COURT:  So, as I'm looking here at the

21  proposed timeline, we'll get into that because now I can't

22  entertain confirmation on April 29th because of my current

23  schedule, but, basically, you're proposing 30 days -- 33 days

24  between plan supplement and confirmation hearing and 30 --

25  well, March 26th to April 2nd, so that's 4 -- 6 days between

1   plan supplement and objection deadline.

2          So, how does that work from a logistics

3   standpoint?  And I did notice and I appreciated that the time

4   that the confirmation was pushed out.  I saw that, and I

5   assumed, which you have confirmed, that you took a look at it

6   and said that doesn't work, so I appreciate that.

7          So I'm trying to understand why you believe this

8   timeline does work.

9          MR. HUNTER:  Yeah, Your Honor, I think with -- I

10  mean, for example, and, look, these dates, we know we have to

11  work with the parties on this and so if we have to move this

12  stuff around, which may work -- we'll doing in real time, we

13  can do that.  You know, filing some of this information, you

14  know, like the outcome of the Wartell investigation, if

15  that's a plan supplement item, right, which I think that's

16  how it's been described, and that's in advance of the

17  confirmation hearing by, you know, 30 days or so, we would

18  think that gives the parties enough time to react to it, you

19  know, ask questions, serve discovery, et cetera, because

20  there's time to, you know, then work out of the objection

21  deadline.  But if there needs to be more time, we should move

22  it back a week so they have more time with it, you know, we

23  need a schedule that works, of course.

24          THE COURT:  Well, I'm looking.  The objection

25  deadline is six days after -- seven days after the plan

1  supplement deadline.  So, you find -- you get the valuation.

2  You get the results of the Wartell investigation, then you

3  have to do our discovery, take your depositions, et cetera,

4  and you want people to file objections by -- in seven days?

5         MR. HUNTER:  Yeah, we can talk with the Akin team.

6  I think, to your point, we have to balance when they can have

7  conclusion ready, for example --

8         THE COURT:  Yeah.

9         MR. HUNTER:  -- versus when the parties can

10  object.  So it's probably a mix of, can you move that up, the

11  report and the objection deadline back a little bit to make

12  that work.

13        Your Honor, would you like us to take a few

14  minutes and try to --

15        THE COURT:  Well, I -- we will do this, but I'm

16  just previewing, because I really do see that that is more

17  the issue.  I want to hear the disclosure, actual objections,

18  but I want y'all to think about this, the logistics here,

19  which I know that you have thought about, but I want you to

20  continue to think about.

21        So, let me from Mr. Shore or Mr. Zatz, whoever's

22  going to do the disclosure statement objections.

23        MR. ZATZ:  Yes, thank you, Your Honor.

24        Andrew Zatz, again, from White & Case, on behalf

25  of the Freedom Lenders.  Mr. Shore and I are going to tag

1  team here.  I want to hit on patent unconfirmability quickly,

2  get into the disclosure deficiencies, then I'm going to pass

3  to Mr. Shore to talk about the scheduling, which I know is

4  very important to Your Honor.

5         Patent unconfirmability.  I know you had said you

6  want to hear about disclosure deficiencies.  I'm not going to

7  harp on the point, but I do want to note in response to some

8  of the comments the debtors made in their status conference

9  update.  They're very focused on reorganization.  I think

10  Mr. Sussberg said the word about 20 times in his opening

11  statement.  Priority A to Z is reorganization, talking about

12  one corporate reorganization.

13         Our point is there is no reorganization prospect

14  for the Holdco debtors without our support.  That's been the

15  case since day one.  We've been banging that drum.  We filed

16  a motion seeking to have the stay lifted, our exclusivity

17  terminated to give us control there, which was denied and

18  we're appealing it.  We have serious concerns here.

19         Administrative expenses are being accrued and

20  people are looking at the Holdco debtors.  There's some sort

21  of allocation under the DIP order that could put some of

22  those allocations on the Holdco debtors.  They'd be getting

23  no benefit from these cases and there's no safe landing in

24  sight.  This is a road to nowhere, currently.

25         We continue to believe that the plan is patently

1  unconfirmable as to the Holdco debtors and the debtors are

2  saying in their disclosure statement they're going to make

3  their case at confirmation.  That's their right, but we would

4  like to put the Court and everyone else on notice that we

5  don't see this ending well.  There are new risk factors that

6  speak to the conversion of the Holdco debtors.  That is a

7  real risk and if that is where this is headed, we should have

8  a conversation about getting it over with because there is

9  not progress being made on that front.

10         THE COURT:  Well, that's like the one motion y'all

11 haven't brought, right?

12     (Laughter)

13         MR. ZATZ:  To convert it, yeah.  But we're

14 reserving rights on that, Your Honor.

15         THE COURT:  Uh-huh.

16     (Laughter)

17         MR. ZATZ:  Let me get into the disclosure

18 deficiencies.  Really, there are three categories of

19 disclosure issues that we've identified.  There are the

20 misrepresentations, the things that have carried over from

21 prior versions of the plan that did not make sense and

22 continue to not make sense.  And there are new things in what

23 was filed yesterday morning that do not make sense.

24         On misrepresentations, let me first just address

25 two that were made at this hearing.  I don't want to let them

1  go unaddressed.  One was that Irradiant was an architect of

2  the take-private.  That is not true.  They participated in,

3  in financing it.  They were not the architect of it.

4         And the second is that there were opportunities to

5  invest that our clients did not avail themselves of.  That is

6  also untrue.  There were numerous proposals made to invest,

7  prepetition, on various terms.  They didn't materialize, but

8  those conversations were had.

9         In any event, let's get to the misrepresentations

10  in the actual disclosure statement.  One is about how the

11  Holdco lenders, quote, tightened the grip on the company,

12  prepetition, related to amendments that were, in fact, about

13  providing the company with flexibility and liquidity, not

14  tightening the grip on the company.

15         Another is about conversations that were had with

16  Mr. Lauria the weekend after Kirkland was selected as

17  replacement counsel about setting up a meeting, that we

18  refused.  This is not a true version of events.  There is a

19  request for a call that we said did not make sense, and so,

20  you know, with our clients on and that call didn't happen.

21  But there was no, you know, idea of having, like, some sort

22  of settlement meeting that we refused, and, in fact, as

23  Mr. Sussberg said earlier, we're trying to make one happen, I

24  suppose, in a week or so.

25         THE COURT:  Okay.  So, do you want to add your own

1  language or do you want them to take that out?

2          MR. SUSSBERG:  We'll just delete it.

3          THE COURT:  Just take it out.

4          MR. SUSSBERG:  We'll take it out.  That's no

5  problem.

6          THE COURT:  Okay.

7          MR. ZATZ:  That's fine.

8          There's another part of the disclosure where they

9  talked about our position on refusing to vote for the plan.

10 It talks about why we are doing so in our 2L capacity; again,

11 that has not been our position.  Our position on voting

12 against the plan in our Holdco capacity -- are issue, really,

13 again --

14         MR. SUSSBERG:  We'll delete it.  No problem.

15         THE COURT:  Yep.

16         MR. ZATZ:  And then, last, on this -- on the back-

17 and-forth around marking of the disclosure statement and how

18 the disclosure statement reads, as though we were presented

19 with the filed version of the disclosure statement to markup,

20 when we were, in fact, given the prior one.  And I suspect

21 that --

22         MR. SUSSBERG:  We'll delete that, too.

23         MR. ZATZ:  All right.  So let's get to the parts

24 about the things in the disclosure that don't make sense, and

25 this relates to what disclosure statements are really about,

1  which is informing voters of what the plan is doing so they

2  can make an informed decision.  Because it -- and it does

3  tie, perhaps, to confirmation issues, but it is worth

4  highlighting things where the plan is simply inconsistent or

5  does not work or make sense that could be clarified now or

6  fixed now and should be.

7           So, one is this notion that permeates, still, the

8  plan and the disclosure statement, about how there will be,

9  quote, retained causes of action that will vest in the

10  reorganized debtors.  We're missing where that's possible.

11  It seems to us that every claim or cause of action is either

12  being released or going into a trust and that seems to be the

13  continued story and, yet, there's lots of language in the

14  plan and disclosure statement about the reorganized debtors

15  retaining causes of action.  That does not --

16           THE COURT:  Can you point me to where that is?

17           MR. ZATZ:  It's going to require a little bit of

18  page-flipping, Your Honor, but I will find it for you.

19           THE COURT:  Okay.

20      (Pause)

21           MR. ZATZ:  So, I'm looking at the blackline that

22  was filed early yesterday morning.

23           Okay.  So here's one example.  This comes up in a

24  number of places, but I'm on page 21 of the blackline they

25  filed.  It's at Docket 998-2.  It's part of their new Q and A

1    section.   The question posed is in Section J:

2              "The does plan preserve causes of action?"

3              And in the second paragraph it says -- I'm going

4    to skip some words here, but in accordance with

5    Section 1123(b) of the Bankruptcy Code, the reorganized

6    debtors, the OpCo litigation trust and the Holdco litigation

7    trust, as applicable, may retain -- shall retain and may

8    enforce rights to pursue causes of action, including actions

9    specifically enumerated in the schedule of retained causes of

10   action, claims going in the OpCo litigation trust and claims

11   going in the Holdco litigation trust.

12             So, within that sentence, again, one of a number

13   of examples, there's a notion that there'll be a schedule for

14   retained causes of action which will be vested in the

15   reorganized debtors, which, again, does not seem to fit the

16   framework that the plan is putting out there.

17             MR. SUSSBERG:  Rather than run down a rabbit

18   hole --

19             THE COURT:  Yeah.

20             MR. SUSSBERG:  -- let me address this real

21   briefly.

22             THE COURT:  Uh-huh.

23             MR. SUSSBERG:  So, when Mr. Zatz talked before, he

24   was kind of conflating the causes of action that were going

25   to the trust, which, surely, they don't want us to

1 necessarily describe and draft their complaint and any

2 retained causes of action.  Every single disclosure statement

3 Your Honor has seen, it says if the estate is going to retain

4 a cause of action, it will list it in the plan supplement.

5          Currently, right now, we're not sure.  We don't

6 believe there are any retained causes of action, but if there

7 are, we will describe it with sufficiency as part of the plan

8 supplement like we always do.  But the idea here is that all

9 of the claims, the Mr. Kahn claims, the B. Riley claims, the

10 take-private claims, they're all going to the trust, and so

11 those are preserved; there's no judicial *estoppel* issue

12 whatsoever.  They go to the trust and are preserved.

13          If there's some action that relates to a vendor

14 that's a go-forward partner to the company that we want to

15 describe as a retained cause of action, we've always reserved

16 the right for the last hundred years to put it in the plan

17 supplement.  That's all we're talking about.  If we want to

18 make that clearer in the document, just like everything else,

19 tell us what you want to delete, tell us what you want to

20 add.  It's a disclosure statement.  That's it.

21          THE COURT:  Okay.  But I think the question is --

22 and that's kind of where I assumed we'd go with some vendor

23 cause of action, but the -- I'm not sure if the definitions

24 do work that way.  It sounds like every Holdco cause of

25 action, which could include an action against a vendor, is

1  going to the Holdco trust.  Every OpCo cause of action, which

2  could be against a vendor, is going to the OpCo trust.

3         So is there is an operational exception or

4  something like that to the where the causes of action are

5  going, maybe that does need to be clarified.

6         MR. SUSSBERG:  We will --

7         THE COURT:  And maybe it's in there, but maybe it

8  needs to be clarified.

9         MR. SUSSBERG:  To the extent it's not in there, we

10 will clarify that and then we'll supplement at the plan

11 supplement time, if there are any of those claims.

12        THE COURT:  Okay.

13        MR. SUSSBERG:  No problem.

14        MR. ZATZ:  Look, I'm going to assume, perhaps I'm

15 being ambitious that Mr. Sussberg, he will work with us on

16 these issues, but we need to have that conversation.

17        Let me finish the list of things that did not make

18 sense and then I think it will be helpful if Mr. Sussberg is

19 of the view that, in fact, these things cannot be worked

20 through, because, then, I think we have real issues.  Look, I

21 think we have an issue about the trust structure, generally,

22 and the potential overlap of claims.  Now the debtors are

23 identifying, I suppose as a risk factor or a point of

24 disclosure, that there could be overlapping claims between

25 the two trusts, which will have to get worked out, but will

1  not by the effective date.

2          And that's kind of the end of the story that they

3  tell.  There's no, seemingly, no mechanism to resolve it or

4  no, you know, means of moving forward if it cannot be

5  resolved, which seems to meaningfully undermine the idea of

6  preserving the claims and causes of action, letting the trust

7  move forward on preserving the value, then, for creditors.

8          So, in our -- I think there needs to be some

9  disclosure around, you know, some sort of plan of action for

10  dealing with this overlap issue.  It also, again, going back

11  to the description of claims, I mentioned this earlier, it's

12  only the OpCo claims that are described and they're, in our

13  view, not described with the level of specificity that is

14  legally required.

15          There's a lot of language that does not make sense

16  to us now about Mr. Wartell expanding his investigation;

17  again, let me just take a step back here.  We're the sole

18  creditors at the Holdco debtors or I should say the Holdco

19  lenders are and we are, our clients are 93 percent of the

20  Holdco lenders.  This is another in a line of decisions that

21  the Holdco board has apparently made that we've had no

22  consultation on or prior warning of, but Mr. Wartell's role

23  has been expanded again.

24          And part of this expansion is he's going to

25  investigate some new people that he wasn't authorized to

1 investigate before and one of them is the First Lien Lenders/

2 DIP lenders.  And we have no reason to think that there are,

3 necessarily, any viable claims against the First Lien

4 Lenders, but at the same time, what is the point of this

5 investigation, because there's a DIP order that basically,

6 completely cleanses them and a challenge period that has

7 passed for everyone, but the Committee, who has settled and

8 is not going to pursue those claims.  So, why is the estate

9 paying Mr. Wartell to investigate claims that cannot be

10 pursued?  That seems like a question that should be answered

11 here.

12          You also have the Holdco lenders' guaranty.  The

13 Holdco lenders have a $19.5 million guaranty from the OpCo

14 debtors, completely unaddressed by the plan.  So it would be

15 helpful to get some explanation as to why that is.  Again, I

16 will add the issues about the valuation analysis and the

17 ongoing investigations to the list.  We've tackled those.

18          I think I hear the debtors saying they're at least

19 going to disclose these things by the plan supplement

20 deadline and then we have to figure out scheduling, so I

21 think I'm probably getting into Mr. Shore's territory and

22 I'll let him address it, but those are issues that are kind

23 of on our list of things that we do not think make sense

24 before and still do not.

25          And then, I would get to new issues that are

1  raised by the changes they made early yesterday morning that

2  we think require additional explanation and clarification.

3  The first, I mentioned it before, there has been a massive

4  increase in the estimated amount of general unsecured claims,

5  now that they've been consolidated in one class.  Why?  Why

6  has the number gone up from 64.5 million to 1.14 billion?

7          This is, obviously, an issue for unsecured

8  creditors at large.  It's an issue for us, as well, because

9  we're being told that our entire 2L claim is a deficiency

10  claim and that we're now sharing with other general unsecured

11  creditors.  So, I think, at a minimum, it's necessary to

12  inform the voting public on what this number represents, why

13  consolidating the classes is expansive in this way.

14          Another thing that's changed, or, actually, before

15  I move to the next point, kind of a related point on the

16  increase of the number, is what exactly they're doing with

17  this new Class 6; it's not clear to us.  Are they treating

18  all unsecured creditors, now, the same regardless of what

19  debtor they have claims against or is this a matter of

20  administrative convenience?  I don't think that the changes

21  from yesterday morning really make that clear.  It certainly

22  wasn't clear to me in reading it, what their intent is there

23  in consolidating the class.

24          But I think that if the answer is they're

25  effectively, substantively consolidating all of the general

1    unsecured creditors where it doesn't matter who you have a

2    claim against, you're getting the same thing, that's a very

3    significant confirmation issue that they're creating.

4            I do think, number 3 on the list of new things

5    that don't make sense, there are now these new references,

6    you know, to treatment, well, your treatment in this scenario

7    is going to be whatever you're entitled to under 1129(a)(7)

8    and 1129(b).  And our view is that that's not sufficient

9    disclosure to inform.  This is for our treatment.  This is on

10   treatment of our 2L claims and, indirectly, our Holdco

11   claims, because it relates to the claims that the Holdco

12   debtors may have against the OpCo debtors.

13           In both cases, there's this language, you're going

14   to get whatever 1129(a)(7) and 1129(b) requires.  Well, what

15   is that?  Is it the debtors' position that under those two

16   Code standards, we're entitled to nothing or it's just

17   something that we're going to figure out later and when are

18   we going to find out exactly what it is that that equates to.

19   I think there needs to be disclosure around that, as well.

20           Number four, the restructuring support agreement.

21   All right.  We've heard a lot of talk about vendors and not

22   spooking the vendors and how they're paying close attention.

23   You know, one thing that would probably really reassure the

24   vendors right now is if someone from the OpCo 1L group come

25   out and said, The restructuring support agreement has been

1  amended.  Our violations have been waived and it is still

2  live and everyone is still onboard and rowing in the same

3  direction.  But in light of the Willkie retention decision

4  and the extended timeline, there seems to be a lot of

5  uncertainty, at least from our perspective, as to what the

6  status of the RSA is.

7          And then last on my list of the new things that

8  don't make sense is trying to make sense of the new, expanded

9  role that Mr. Wartell has.  I understand that he was more

10  limited before in who he could investigate and now he can

11  investigate more people, so that makes sense to me.

12          What doesn't make sense is now he has these

13  broader-conflict matters rights.  So, surely, because

14  Mr. Wartell was appointed a couple of weeks into these cases,

15  he did not approve the RSA, the DIP, the plan framework, the

16  bid procedures, a lot of stuff that was wrapped up before the

17  case was even filed.  It's not clear to me whether he's

18  approved these new amended, this plan and disclosure

19  statement, or whether he was asked to or whether they've been

20  designated as conflict matters, or what this is really even

21  meant to cover.

22          There's a notion of a conflict, strategic

23  transaction that he can pursue and what would that be, other

24  than what the plan has provided?  You know, we certainly

25  welcome the idea of having a real, independent fiduciary, but

1   the dividing line here and given where we are in the cases,

2   what that could possibly address is confusing to us and

3   seems, frankly, a bit empty because we're still proceeding

4   down a path that was all designed by the RSA before the cases

5   were filed.  So I think just more disclosure and explanation

6   around what exactly, one, a strategic transaction could be,

7   is it really on in the context of an alternative plan, you

8   know, I think that kind of disclosure would be helpful.

9            So I think that is it for the disclosure

10  deficiencies.  I would like to hear a response from the

11  debtors on whether they feel like those can be addressed, but

12  I also want to give Mr. Shore the floor to tackle the

13  schedule.

14           So, Your Honor, what order --

15           THE COURT:  I'd like to do the disclosure

16  statement issues first and then we'll get into the

17  scheduling.

18           MR. ZATZ:  Okay.

19       (Pause)

20           MR. SUSSBERG:  Thank you, Your Honor.

21           For the record, Derek Hunter of Kirkland & Ellis,

22  on behalf of the debtors.

23           So, yeah, just to take these in order and, you

24  know, the 1L lenders and/or the Committee may have a few

25  thoughts.  First, on the patently unconfirmability, the fact

1  that they are not voting for the plan or say they're not

2  doesn't mean the plan -- preordains that the plan is patently

3  unconfirmable and that's why we send out solicitation and

4  then we're going to spend that time trying to engage and

5  reach a compromise.  So, I don't think the law says if a

6  creditor has decided that they're not voting, it

7  automatically means it's unconfirmable, you know, and that's

8  to be figured out as part of this process.  But we're on

9  notice of their intent and the added risk factors in the

10 disclosure statement specific to their intent that they've

11 indicated they don't want to vote and that creates risk and I

12 think that's what's important for disclosure purposes.

13       We heard about what was described as

14 misrepresentations.  I think Mr. Sussberg addressed those.

15 We will delete them or if they have language, we will take

16 that language.

17       We talked about the retained causes of action and

18 how we deal with that through the plan supplement.

19       On the trust structure, you know, there's this

20 tension where if it's helpful to the argument, they say, you

21 know, get out there and do stuff with my claims and the trust

22 and stuff, if that's helpful for the argument, but also, you

23 know, those should be reserved for creditors.  You know, we

24 don't want the debtors messing with those.  You know, it's

25 hard to square that circle sometimes.

1        What we have disclosed are there's two trusts.

2   They're getting set up for different creditor constituents.

3   Those creditor constituents have said, we can look out for

4   ourselves.  We don't want the debtor messing with our claims.

5        We can see how that could create issues, but, you

6   know, if an entity owns a claim, it's going in the trust.

7   And if there's a dispute about whether one of those trusts

8   owns a claim or doesn't, you know, we can't solve for that at

9   this point.  And I don't think the creditors that are

10  beneficiaries to that trust would want us to try to solve for

11  it.  The trusts will have to work it out amongst themselves

12  if they're pursuing competing claims in the future.

13       THE COURT:  Well, presumably, there could be two

14  Plaintiffs who have claims.

15       MR. HUNTER:  And it could be as simple as that,

16  Your Honor, and everyone can recover.

17       And if there's issues, you know, the confirmation

18  orders have typical language about retaining jurisdiction for

19  those types of issues if we need to get in front of the

20  Bankruptcy Court or something along those lines.

21       You know, with the Wartell expansion of authority,

22  you know, that was both, I guess, an issue in the first DS

23  and the most recent we filed.  He has, I think we described

24  it very clearly.  It's plain English.  It's from the exact

25  delegation of authority.  It is meant to address the

1  intercompany, the alleged intercompany conflicts that the

2  White & Case team has raised; that's the purpose of it.

3            THE COURT:  Well, I'll confess to being a little

4  confused by the language that's in -- that probably was in

5  the original and now even with the revisions that have been

6  made.  It uses the term conflicts committee, which I don't

7  think is defined, at least not in the disclosure statement

8  that I could find it, and it does talk about conflicts

9  matters, but I don't really know what that means.  I really

10 don't know what the scope of his authority is.  Is he now

11 making decisions for Holdco with respect to the plan, or is

12 he not?

13            MR. HUNTER:  Yeah, we can put -- we can add

14 language.

15            MR. SUSSBERG:  I want to be very clear here, okay?

16 The White & Case team from day one in this case has been

17 seeking to effectively take over Holdco.  Why do they want to

18 take over Holdco?  Because they then want to try to take over

19 Opco.  Okay?

20            What is typical in a delegation of authority is

21 for an independent, disinterested party to be the one to

22 identify the conflict.  You don't want non-disinterested

23 parties identifying the conflict and then delegating that to

24 the disinterested director, and the delegation here didn't

25 have that.

1          So what we've done is we put in place a provision

2    that says if Mr. Wartell determines there's a conflict

3    because someone raises an intercompany claim between Opco and

4    Holdco, he has the authority to determine the conflict matter

5    and then the authority to make a determination.  He is not

6    taking over ownership, operation, or overall control of the

7    Holdco.  And if we need to clarify and make that a little

8    simpler and clearer, that's all it is, it's a typical

9    delegation that wasn't in place.  And he is a conflicts

10   committee of one.

11          THE COURT:  Okay.  And he's a conflicts committee

12   of one.  And has he determined that there are any particular

13   matters on which there is a conflict?

14          MR. SUSSBERG:  Not at the moment, other than with

15   respect to making determinations as to the releases of those

16   handful of people.  And as far as the 1L lenders are

17   concerned, if everybody here is stipulating that the 1Ls are

18   released, the investigation is done --

19          THE COURT:  Right.

20          MR. SUSSBERG:  -- it's over.

21          MR. HUNTER:  Your Honor, on the Holdco guarantees,

22   I think we added language on that front.  If they have

23   language that we didn't accurately capture that they have

24   some guarantee at the Opco box on account of their Holdco

25   claim, we'll take the language, no problem.

1          THE COURT:  How is that being treated in the plan?

2   Is that an intercompany claim or is that -- what is it?

3   How's it being treated?

4          MR. HUNTER:  It's a claim against Opco.  There's a

5   guarantee claim for a specific amount against Opco, so it

6   would be a claim against Opco, not an intercompany claim.  It

7   gets to the question about the size of Class 6, which was

8   about deficiency claims.  And so the question of how big the

9   deficiency claim is is a valuation issue, which I'm sure

10  folks might have their views on.  From a disclosure

11  perspective, you know, we take the perspective, you disclose

12  as big as it could be, right, as bad as it could be, and then

13  if it's better for that creditor because the deficiency claim

14  isn't as big, for example, and the $2 billion number is

15  something smaller, that inures to the benefit of those

16  creditors at that class.  And so that's what that is, but we

17  can clarify that.

18         THE COURT:  Yes.  So put your footnote in that

19  says what it consists of.

20         MR. HUNTER:  Absolutely.  RSA milestones, they

21  were extended.  The RSA is still in place.  You know, the 1L

22  lenders can get up and confirm that, if Your Honor would

23  like, but just to address that, and we can make that clear in

24  the disclosure statement.

25         And then we talked about -- we talked about Mr.

1   Wartell and his delegation of authority.  So, you know --

2         THE COURT:  What about the 1129(a)(7) and 1129(b)

3   treatment?

4         MR. HUNTER:  Yes, Your Honor.  I mean, this was,

5   again, Kirkland coming in, looking at the plan, seeing if

6   there were issues that we wanted to solve for.  To the extent

7   there is a claim from the Holdco to the Opco, it would be an

8   intercompany claim.  There's often language in our

9   intercompany claim treatment section, which is like tax-

10  driven, it could be reinstated, it could be discharged, you

11  know, this and that, but this is not a tax issue to them,

12  it's substantive.

13        And so the treatment that it receives, while we

14  want to be able to do the right thing from a tax perspective,

15  if it's not substantive, we want to make clear we can't give

16  them something that's less than liquidation value and that,

17  you know, just discriminates unfairly.  And so that was meant

18  to just address substantively, if there is a claim and we

19  have GUCs that are recovering at the Opco boxes and that's

20  what that claim is, it needs to get treatment that is

21  consistent with (a)(7) and doesn't discriminate unfairly as

22  compared to the other unsecured creditors, or whatever the

23  nature of the claim is at that box.  But the claim hasn't

24  really been articulated yet and so it's hard to put too much

25  specificity behind it, but the debtors understand that we've

1  got to comply with the Bankruptcy Code and that language was

2  not meant to be like an end-around on giving them worse

3  treatment than they should get compared to other similarly

4  situated creditors at the Opcos.

5          THE COURT:  Okay.  I haven't seen language like

6  that before, but --

7          MR. HUNTER:  And, again, if the White & Case team

8  has more specificity they want us to add, we will take that.

9          THE COURT:  I think what I heard from Mr. Zatz is

10 he wants to know if you think that's zero or what he's

11 getting.

12         MR. HUNTER:  And I think, based off the nature of

13 the claim, if they allege it's secured, if it's unsecured, it

14 has to get treatment that's consistent with comparable claims

15 at the Opco entities, which we put in the disclosure

16 statement and we think unsecured creditors, you know, as far

17 as how we can specify their recovery from cash is relatively

18 de minimis, plus they get claims and we can't value that.  So

19 they need to get consistent treatment if that's what the

20 claim is.

21         THE COURT:  Okay.

22         MR. HUNTER:  Your Honor, any other questions from

23 you on the disclosure statement, or do you want to move to

24 scheduling?

25         THE COURT:  No.  Well, I guess I want to hear from

1  Mr. Zatz, is there additional language that you want in the

2  disclosure statement?

3            MR. ZATZ:  So the answer is yes, and it's really

4  to clarify all the points that we just raised.  If your

5  question is, is there some rider we want to insert, no, we're

6  not trying to put a position piece in here.  We're trying to

7  clarify the points that I raised.

8            I think I'm hearing that there is an opportunity

9  to work with debtors' counsel and provide those

10 clarifications.  The one thing it doesn't seem like we've

11 quite resolved is that last point about the 1129(a)(7),

12 1129(b) treatment.  I think Your Honor has it right, we would

13 like to know what that means.  Maybe there's certain things

14 that are still up in the air, I don't know what they are.  I

15 think what our claims are are quite clear, but if there are

16 things that are up in the air that need to be settled at some

17 point in advance of confirmation, they need to tell us -- let

18 me put it this way:  If the plan gets confirmed and we say

19 where's our 1129(b) treatment, like there's no clarity as to

20 what it is we're asking for.  Those are provisions that need

21 to be satisfied for the plan to be confirmed, but we need to

22 know what our treatment is.

23            THE COURT:  Okay.  Show me where that is in the

24 plan -- I do remember reading it, but show me where it's in

25 the plan or disclosure statement.

1          MR. ZATZ:  So, it shows up twice, Your Honor,

2    first in the treatment section for the 2L claims.  So I'm

3    looking at the blackline of the plan that they filed early

4    yesterday morning.

5          THE COURT:  Yes.

6          MR. ZATZ:  And this is on page 46 of that

7    blackline.  It's section 5.5 of the plan, subsection (a),

8    treatment, the last part of that section.  Your Honor, just

9    stop me if I'm going too fast for you.

10          THE COURT:  No, I'm there.

11          MR. ZATZ:  It says, in receipt for the 2L claims,

12    cutting to the end, or if the class votes to reject, it will

13    get its pro rata share of the recovery, such claim it would

14    be entitled to receive under Sections 1129(a)(7) and 1129(b).

15          MS. GREENBLATT:  Your Honor, if I could help

16    clarify for a moment?

17          THE COURT:  Okay.

18          MS. GREENBLATT:  Nicole Greenblatt from Kirkland.

19    Sorry.  So, Your Honor, this is just anticipating what's come

20    up in other cases.  If and when there's identified to be an

21    intercompany claim and the plan language is consistent with

22    most plans, and it says it can just be canceled or reinstated

23    at the option of the reorganized company for tax or whatever

24    other reasons, you will see an objection from them at

25    confirmation that says you can't treat our intercompany like

1   that, right?  We need recovery on it for some other reason.

2            So all this is meant to say is we are not trying

3   to treat your claim any worse than any other unsecured

4   creditor will be.  So, to the extent other unsecured

5   creditors get an allocation of trust units or something else,

6   we'll have to build that into the plan.  So it's just a fix

7   mechanism.  We're happy to include disclosure that says this

8   may be zero, it may be nothing.  Our only point is to put a

9   mechanical fix to say this intercompany like elimination of

10  claims will not be used against you in a way that's going to

11  be harmful or unfairly discriminatory towards you.  It is

12  completely meant to be beneficial to Mr. Zatz's clients.

13           THE COURT:  And how does that work with respect to

14  the second lien claim, it's the same concept, since this is

15  not an intercompany --

16           MS. GREENBLATT:  No, the second lien claim is

17  direct against the company, so it's a completely different

18  issue.  It's not an intercompany, it can't be canceled.

19           THE COURT:  Right, so -- but that's what I'm

20  seeing, the treatment -- if the class votes against, it gets

21  its pro rata share of the recovery it would be entitled to

22  receive under 1129(a)(7) --

23           MS. GREENBLATT:  Oh, that's a different --

24           THE COURT:  -- and 1129(b).

25           MS. GREENBLATT:  -- that's a different -- that's a

1  difficult --

2       MR. FEINSTEIN:  Yeah.

3       MS. GREENBLATT:  -- that's a different one.

4       MR. FEINSTEIN:  For the record, Robert Feinstein,

5  Pachulski Stang Ziehl & Jones, for the committee.  Your

6  Honor, I think that's holdover language.  Elsewhere in the

7  plan, and we were hoping throughout, it would say that the 2L

8  deficiency claim is a general unsecured claim.  The 1129

9  language relates to the intercompany claim and I'd like to be

10 heard on that for just a moment, if I could, Your Honor.

11      What the committee did in the last five days is

12 what we were supposed to do, which is interact with the

13 debtor and provide additional disclosure.  And we provided a

14 long list of Opco litigation claims that are going into the

15 trust.  We think that's appropriately specific and any more

16 would be inappropriate.  But what we don't have the benefit

17 of is a list from the Holdco group of what the Holdco

18 litigation claims looks like including, most importantly for

19 this analysis, the intercompany claim, because what they're

20 positing is that Holdco downstream a billion-plus money into

21 Opco in connection with the take-private transaction, and

22 that money went out to the old shareholders.

23      So there may be claims against the shareholders,

24 there may be claims against the board, the sponsors.  What I

25 have yet to see articulated, Your Honor, is a claim by Holdco

1 against Opco on account of that downstreaming of money

2 because the money was supposed to be downstreamed, that was

3 how the transaction was engineered, and the money was

4 supposed to go out to the old shareholders.

5          So I've been doing this a really long time, Your

6 Honor, I've litigated many, many failed LPOs, I've never

7 heard of a claim by the sponsor, a Holdco company against the

8 Opco on account of money that they invested as equity in the

9 proof of claim in connection with the LPO.  So it would be

10 really helpful if the Holdco lenders would do what the

11 committee did, which is write it out on a piece of paper and

12 include it in the disclosure statement, these are the causes

13 of action we think Holdco has, including whatever claim

14 Holdco may have against Opco, but I've yet to hear any

15 cognizable claim articulated by anyone in this case.

16          That's all I wanted to add.  Thank you.

17          THE COURT:  Okay, thank you.

18          Okay.  So, as to this particular issue, I'm

19 hearing that needs to be deleted, that that --

20          MR. ZATZ:  Well, it can't --

21          THE COURT:  -- was a holdover.

22          MR. ZATZ:  -- I don't think it can be deleted,

23 Your Honor.  So there -- just looking at section 5.5, there's

24 the treatment of the second lien loan claim, which is now --

25 I say now, this was the case in the fourth amended plan, but

1  in the fourth amended plan there was a notion of bifurcating

2  the claim.  So the treatment section, as I read it, is about

3  the secured portion of the claim.  Then there's section (b),

4  the deficiency claim.

5              THE COURT:  The deficiency claim.

6              MR. ZATZ:  That part is clear enough to me.  On

7  account of the 2L deficiency claim, we're getting our share

8  of the general GUC pool, whatever they're getting, which

9  right now is the Opco litigation trust.

10             So, back to the treatment of the secured claim, if

11 we vote to accept, we get warrants; if we vote to reject,

12 someone has to fill in that blank.  Citing to 1129 standards

13 I don't think checks the box.

14             THE COURT:  No, I think, if you vote to accept,

15 the warrants go into --

16             MR. ZATZ:  We get a share of the warrants --

17             THE COURT:  -- and are divided among everyone,

18 right?

19             MR. ZATZ:  -- a share of the warrants, yes.

20             THE COURT:  Okay.  And if you vote to reject, I

21 guess that's the question, what do they get?

22             MR. HUNTER:  Your Honor, then it's the -- they get

23 no worse treatment than any other similarly situated

24 creditor.  I mean, if it's -- if they have an unsecured

25 claim, which I think this is presupposing, they're going to

1   get interest in the Opco trust.  So, if we need to -- if that

2   needs to be clearer, we can do that.  The Opco unsecured

3   creditors are getting trusts that the Pachulski team

4   negotiated for and that's what they would be getting, and

5   it's just the value of that trust is higher if they vote in

6   favor of the plan because there's warrants in it.

7           So, if there's a simpler way we can say it, we're

8   happy to do that, and, substantively, that's what we were

9   going for.

10          MR. ZATZ:  It sounds like we can put this under

11  the category of things that we can hopefully work out with

12  the Kirkland team coming off this hearing if --

13          THE COURT:  Well, you're going to have a couple

14  hours to do that, but you're not going to have a couple weeks

15  to do that.  So --

16          MR. SUSSBERG:  I was going to suggest, Your Honor,

17  we are happy for Mr. Zatz to come on over to Young Conaway's

18  lovely offices, we'll sit in a conference room.  We'd love a

19  deadline because, otherwise, this will go on for eternity.

20          THE COURT:  Yeah.  Well, and I have a meeting to

21  go to.  So we're going to talk a little bit more and then

22  we're going to take a break.  And you're going to have like

23  three hours and then you're going to come back, and we'll

24  hopefully have all this resolved.

25          MR. SUSSBERG:  Excellent.

```
 1              THE COURT:  Because I think these are disclosure
 2    issues --
 3              MR. SUSSBERG:  Yeah, no need to --
 4              THE COURT:  -- and there can be cleanup -- and
 5    they can be cleanup.  You know, as for the overlap of claims,
 6    they both may have claims.  I'm not sure that there needs to
 7    be some way to reconcile that.  I think the two of them have
 8    to talk and they're both going to take their positions and,
 9    if they both sue, some judge will figure out what that is,
10    but I'm not sure, if they can't agree, that that's something
11    that this plan needs to get into.
12              The Opco guarantee we've talked about, you all
13    will figure that out.  The new what does the 196 number mean,
14    we were going to clarify that because the Class 6 claims have
15    now been consolidated in some fashion.  Put in some language
16    that the RSA is still in place.  And you're going to take a
17    look at being a little more -- clarifying a little bit more
18    Mr. Wartell's expanded role.
19              I think those are all the issues.
20              MR. SUSSBERG:  Thank you, Your Honor.  I don't
21    think it will take that long, but we'll see.
22              THE COURT:  Uh-huh.  Okay.
23          (Laughter)
24              MR. ZATZ:  Your Honor, perhaps this is a good time
25    to cede the podium to Mr. Shore to talk about scheduling.
```

1          THE COURT:  Yeah, let's talk scheduling.

2          MR. SHORE:  Well, one of the good things about

3   being a litigator for a creditor at a disclosure statement

4   time is disclosure statements force a debtor to fish or cut

5   bait on the record they want to make.  Part of the reason we

6   want them to make these disclosures is that's the plan

7   they're going on, that's what they want to prove, that's what

8   they need to prove.

9          Based upon this disclosure statement that we got,

10  I guess the last one I got through was Monday morning's,

11  there are five issues, five factual issues that Mr. West and

12  I are going to need to be -- try if we can't get to

13  resolution.  One is our adequate protection claim that the

14  Court may have seen, we filed it on February 13th.  It's

15  been -- I believe it's been set for April 3rd.

16          We are prepared to establish that our 2L position

17  was in the money at the petition date based on the debtors'

18  projection.  Mr. Augustine is prepared to sit down in the

19  chair and testify on that, get his deposition taken, but that

20  needs to be done because the debtors are taking the position

21  that the collateral now breaks in the 1L, that is that, if we

22  were in the money on the petition date and it now breaks in

23  the 1L, we have an adequate protection claim.  That motion

24  needs to be heard before confirmation because, if the claim

25  is non-zero, this plan can't be confirmed, as the debtors now

1  disclose, because they don't have the cash or cash

2  equivalents to pay that admin expense claim on the effective

3  date of the plan.  That's going to require -- I know Mr.

4  Sussberg says he doesn't like when witnesses do it, but the

5  law and the Rules of Evidence require that the Court take

6  admissible evidence with respect to the value of an asset or,

7  in this case, since they're all asset liens, the total

8  enterprise value of the debtors, and make a ruling based upon

9  the evidence in front of you.

10         There is no market test as of the petition date.

11 So the debtor is going to have to get somebody, if they want

12 to fight this, and the 1Ls, if they want to fight it.

13 They're going to have to have their own experts and we're

14 going to need to build time in the schedule for when that's

15 all going to happen.

16         Two, we have the issue of the size of the 1L

17 deficiency claim.  The prior plans were vague as to what

18 happened with the 1L deficiency claim.  I forget, it was two

19 or three plans ago that Willkie changed the plan to have a

20 bifurcation of the 1L claim.  At each estate, the 1Ls will

21 now get, one, a secured claim in the value of the collateral

22 at that estate, and a deficiency claim for the remainder.

23 The newest disclosure statement indicates that the unsecureds

24 are getting one percent, which means I think the debtors have

25 come into a position, which isn't disclosed anywhere, that

1    the 1L deficiency claim is somewhere in the several hundred

2    million dollar range, but we don't have disclosure around

3    that.  That I guess is going to come at the plan supplement

4    time, which I'll get to.

5            That's new to us because we've been asking Willkie

6    for months for their valuation.  It's part of our disclosure

7    statement objection, in fact.  And Willkie's position that

8    we're not giving you any valuation at all, we're going to

9    take the position that we've had a market test.

10           Now, when we talk about evidence -- and I don't

11   want to presage a motion *in limine*, but we're going to need

12   to work that into the schedule.  It is not competent evidence

13   for someone to try to say I ran a sample process and didn't

14   get any bids, nor is it competent evidence to say that I got

15   bids that I did not accept.  We are going to have to under

16   this plan have a valuation as of the effective date of the

17   plan as well to set the 1L recovery.  That's a discounted

18   cash flow, comp company, comp transaction.  That's what the

19   law requires on valuation evidence, not someone standing up

20   and saying we ran a process, but if that's going to be their

21   evidence we are going to put on Mr. Augustine to testify

22   about total enterprise value as of the effective date in

23   setting the claim.  And if the debtors want to say we ran a

24   robust process, then Mr. Augustine is going to come in and

25   refresh his testimony as this was a process that was doomed

1  to value, here are the reasons why it was doomed to fail,

2  these are the reasons why it failed, this was not an

3  appropriate process, and it turned out it got no bids.

4          So that's a whole second suite of issues that have

5  to be resolved.  But the 1L deficiency claim is important for

6  another reason because the debtors have now, as of Monday

7  morning, raised the classification cramdown issue.

8          Prior plans had classified the unsecureds

9  separately in each estate.  At PSP, they were showing $5.9

10 million of unsecured claims; American Freight, 36.9; Buddy's,

11 500,000; FRG, Inc., 6.1; Vitamin Shoppe, 15.1; for a total of

12 $65 million of general unsecured claims at those various

13 estates.  And the 2L lenders, because they had guarantees,

14 would have had their $150 million unsecured claim at each of

15 those estates.  They changed that on Monday, so it's all one

16 class of one debtor.

17         What does that mean?  All unsecured creditors

18 under this plan are getting the same treatment, they're

19 getting the shares in the litigation trusts and $21 million,

20 if Pachulski doesn't spend that before the effective date of

21 the plan.  Whatever is left over gets thrown in to fund that

22 trust.

23         So now a rejected lessee at American Freight gets

24 a share of the take-private litigation even though the

25 transaction, the take-private transaction took place at the

1    Holdcos, which are disassociated from the company.  Now, if

2    the debtors are going to be making a subcon argument, then we

3    can come back for confirmation sometime in December of 2029,

4    right?  I mean, that's the most fact-intensive inquiry we can

5    do.  But, if they're not going to do that, somebody is going

6    to have to get on the stand and explain the classification

7    scheme here because the way we see it, look at just FRG, Inc.

8    FRG, Inc. has a $150 million unsecured claim, that's the top

9    Opco, it has $150 million allowed unsecured claim of the 2Ls

10   held by multiple entities within the -- our group is holding

11   the claims in funds, which are being run by Pimco and

12   Irradiant.  So we have a numerosity there.  There is one

13   creditor, I believe, holding a $6.1 million claim.

14          Then we have the deficiency claim of the 1Ls, and

15   a 1L secured claim that FRG, Inc. is, under the terms of the

16   plan, being paid in full.  If there is collateral at that

17   estate, they will get paid out of that collateral.

18          So, on my math, if the 1L deficiency claim is not

19   more than $300 million, we have a rejecting class, unsecured

20   class, unless Your Honor allows them to gerrymander all the

21   creditors who have general unsecured claims against an estate

22   who were all getting the same treatment into these three

23   classes.  And, if Your Honor is not willing to do that, what

24   we have at FRG, Inc., and, quite frankly, what we'll have at

25   all the other estates is a plan of reorganization which gives

1  everything to the secured creditors over the objection or the

2  rejecting class of the unsecureds.  And whether Your Honor is

3  going to approve a judicial foreclosure in the guise of a

4  reorganization is all going to be dependent upon the size of

5  the 1L deficiency claim at the effective date of the plan,

6  which is the valuation I was talking about, but we're going

7  to have to take depositions around the classification scheme

8  that they've just thrown into the plan.

9          Four, we have inter-debtor allocations of admin

10  expense.  Again, all these debtors need to pay their admin

11  expense -- and just to step back for a minute, at the DIP

12  hearing, we had a big fight about why are the Holdco lenders,

13  they were originally going to be guarantors of the full

14  amount, and we worked back to a position, over our objection,

15  which is up on appeal, that the DIP -- that the Holdco

16  borrowers -- the Holdco debtors were going to borrow an

17  indeterminate amount of DIP to fund admin expense through a

18  complicated formula, but that the allocation was going to be

19  TBD.

20          So there are potentially DIP claims at the Holdco

21  which are going to affect the disposition of interests in the

22  trust that I'll get to in a second of the claims.  That

23  process is not laid out anywhere in the disclosure statement,

24  the debtors have punted on it, I have no -- maybe it's a Mr.

25  Wartell issue, maybe it's somebody else, who's he going to

1   negotiate with on the other side, but we're going to have a

2   real dispute over the attempt to allocate DIP expense to the

3   Holdco estates.  As I said before, all we ever wanted with

4   the Holdco estates is give us our claims, and they fought us,

5   fought us, fought us.  If they're going to try to allocate --

6   well, not Willkie expense anymore, but any other expense up

7   to that estate, fighting us to get back to the plan we

8   wanted, we're going to have a fight about that.

9            So I have no idea when they're going to get that

10  allocation out, but it's going to have to be, I would think,

11  by the time of the plan supplement.  They've got to put a

12  stake in the ground as to how much DIP expense is going into

13  which boxes so we can figure out whether on a debtor-by-

14  debtor basis each plan is going to be confirmable.  We're

15  also going to need to know the 1Ls' position that if there's

16  an allowed admin expense -- or, sorry, the DIP lenders'

17  position if there's an allowed DIP expense at any

18  particular -- at the Holdco estates that's not being paid in

19  cash whether they're going to go forward with the

20  reorganization or whether they're going to force a conversion

21  of the case.

22           Then let's come to the Wartell actions.  We've

23  been clear from the beginning, stop the investigations, put

24  all the claims and causes of action into a trust, nobody gets

25  released.  This is really a judicial foreclosure, in our

1   view, or a 7, no one is going to get releases, just put it

2   all in.  And they keep saying, you're going to get all,

3   you're getting all you want.  No, that's not true.  The

4   officers and directors who are current officers and

5   directors, who participated in the prepetition actions,

6   including the take-private action -- or the take-private

7   transaction, are getting released, unless Mr. Wartell says I

8   don't want to release them, or I'm going to release them of

9   some claims, but not others.

10          So think in particular because you weren't here

11  for the first -- Andy Lawrence testified.  Andy Lawrence was

12  the EDP at the time of the transaction, he is currently the

13  CEO of the debtors; he is getting a release for no

14  consideration.  All of the -- the COO -- sorry, the CFO who

15  came up with the projections for the take-private that we had

16  this little back and forth on about why those projections

17  failed, he's getting a release, unless Mr. Wartell says no.

18          Can we pause here?  I don't know what the UCC is

19  doing here.  Andy Lawrence is now the CEO; he described

20  himself as Mr. Kahn's long-term partner who worked with him

21  on the take-private transaction.  Willkie proposed in their

22  plan he's releasing them.  K&E has not changed that at all.

23          So what is Mr. Wartell going to do?  He's going to

24  come in and say -- I mean, look, there are two ways to look

25  at independent directors.  I have my view of independent

1  directors, other people have views of independent directors,

2  but there's a substantial portion of the community that says,

3  if you hire a hammer, it's going to hit the nail.  Mr.

4  Wartell is being asked, should Andy Lawrence get a clean bill

5  of health or not?  What is going to happen to the take-

6  private claims against Mr. Kahn if he decides to on behalf of

7  the debtors say that Mr. Wartell -- or, sorry, that Mr.

8  Lawrence was lily white in this transaction?  I don't know

9  why the committee whose one percent recovery for unsecured

10 creditors is going to be coming out of these litigation

11 claims, is allowing that to happen, but if Mr. Wartell is

12 going to put out a report, we don't need 30 days.

13         We have asked the Aiken team, can we see the

14 documents that are going into -- that you're reviewing?  No.

15 Are you going to be reviewing privileged documents?  Yes.

16 Can we see the privileged documents that are going to be

17 reviewed?  No.  Are you going to be interviewing witnesses?

18 Yes.  Are you going to allow us to participate in those?  No.

19 Are you going to let us see your witness notes?  No.

20         So when Mr. Wartell puts out something at this

21 date, depending on how big it is and how exhaustive it is, we

22 are starting from zero.  We will have no documents with

23 respect to that.

24         Now, let me make clear one thing.  It's going to

25 be an astonishing thing to say.  We don't have a single

1  email, text, anything related to the take-private because

2  Willkie Farr & Gallagher, as part of their diligence process

3  here, proposed that we would only get one custodian, Mr.

4  Kahn.  No Willkie custodian, no CFO, no Jefferies, no one.

5  We will get one custodian and he had no documents.

6      So we are -- if Mr. Wartell is going to put out a

7  report at the plan supplement deadline, it is a 60-to-90-day

8  issue and subject to further extension depending on how big

9  this comes in.  If he gives us a hundred-page report citing,

10  you know, documents that we haven't seen or documents -- not

11  citing documents that he's reviewed and hasn't given to us,

12  and 31 interviews -- they've spent two and a half -- or $2

13  million to date, so they've been doing something -- we're

14  going to need real time to deal with that.

15      Now, of course, the debtors could make this all go

16  away.  No one is getting a release, Mr. Wartell, shut down

17  the investigation, it all goes to the thing, but if they want

18  to play that game and my client's path to recovery is on the

19  claims he's trying to release, not just against Mr. Lawrence,

20  but having an effect on all of the claims related to the

21  take-private, there's going to be a fight over that.  You

22  don't lose $500 million on a loan given 18 months ago and

23  say, you know what, you probably didn't do anything wrong.

24      The status of plan discovery in general is we're

25  nowhere.  We sent document requests and interrogatories in

1   the first month of the case because Willkie wanted to go

2   ahead with a January confirmation at that time.  Willkie was

3   still producing documents last week before Your Honor's

4   ruling, K&E was producing yesterday, we have no view as to

5   when they're going to get to substantial completion, but I

6   can tell you there are material deficiencies in the

7   production to date, not the least of which is nothing related

8   to the take-private.  They still have not updated their

9   interrogatories.  We kept asking Willkie, you said it was

10  premature to answer the plan interrogatories in November when

11  you were going ahead with the January confirmation, could you

12  at least update it now?  No response, they've just totally

13  blown us off on that.  We still don't even have a

14  verification of the interrogatories, and that's largely what

15  sets the stage for discovery, right?  What are we doing here,

16  give me the basics, how can I go -- who were the people

17  involved, right?

18          So we've had no depositions, we've had no

19  interviews.  I think, I think our side will need ten to

20  twelve depositions based on these five issues:  Mr. Orlofsky;

21  Mr. Grubb, or whoever is going to be their valuation expert;

22  Mr. Lawrence; Mr. Seton, who was the CFO at the time; Mr.

23  Kahn, Mr. Riley, because if they're going to try to release

24  claims against Andy Lawrence, then they're going to want to

25  talk to Mr. Kahn and Mr. Riley; a representative of Jefferies

1  who led the deal.

2          And then we have the business plan issue, right?

3  The foundation of either of these two valuations is going to

4  be the business plan, right?  DCF comp companies, comp

5  transactions, all going to run off that.

6          We're going to need Mr. Wartell and, if he says

7  the key to this whole thing is my discussion that I had with

8  these three witnesses, then we're going to want those three

9  witnesses to the extent they're not on the list.

10          So we have tons to do and we all have busy

11  calendars.  And we're not at the point -- the notion that

12  we're going to move something by a week and that's going to

13  solve these problems is not practical at all.  We had in fact

14  multiple meet-and-confers with Willkie before K&E came up

15  when they wanted a January trial, when they wanted a February

16  trial, when they wanted a March trial, now we have an April

17  trial.  By the way, all of these dates set without any

18  consideration for whether we're available on those dates,

19  this is just the date we're going forward with the

20  confirmation.  But the point I've been making for months with

21  Willkie is that we have issues to be tried and the litigators

22  need to get to a common agreement as to what we're going to

23  do.  We've had zero engagement -- well, except for one thing,

24  which I'll get to.

25          So, I don't know, I haven't had a talk with them,

1   what issues do you want to try at confirmation?  These are

2   the issues I see.  I have had no discussions with what other

3   people are going to want to try.  I suppose the U.S. Trustee

4   is going to want to try some issues as well if we don't get

5   to ground on the releases.

6          Then we need the sequence, so we're not wasting

7   time, right?  Again, because they're performing better than

8   planned, could we just at least do a process that says let's

9   complete fact discovery, let's complete expert discovery,

10  let's have objections, and then let's have a trial.  If they

11  want to push forward on this plan that creates these issues,

12  it seems like we should do it that way because it gets really

13  inefficient when we're producing expert reports after the

14  objection deadline, and then we're all supplementing and then

15  we're getting you direct testimony a day before the hearing.

16  There doesn't seem to be that need right now to upset that.

17         So then I said, once we can get to a common

18  understanding of that, can we get to a common understanding

19  as to how many days we need?  They keep saying one day.  This

20  is not a one-day confirmation trial.  This is a two-week

21  confirmation trial, which we should do on the clock so that

22  nobody is wasting time, but I've gotten zero engagement from

23  the other side as to anything other, sorry, this is a one-day

24  confirmation trial, maybe we can spill over into a second

25  day.

1           Then, since all the trial lawyers are out of
2    state, could we find out what times the Court has, can we get
3    a block of days.  You know, it's not good for you and it's
4    certainly not good for us to leave all our boxes in here for
5    weeks at a time as we come in for a day here and a day there.
6    We need a block of time from the Court so that we can avoid
7    that situation where people are traveling for a day or two.
8    We'd prefer ten days together, but if we could do five and
9    five or something like that, or we can come to some
10   discussion, rational, informed discussion about how many days
11   we need, we can come back to you with a block.
12          So, what do we want right now?  One, K&E has to
13   review the projections and vouch for them.  And what do I
14   mean by that?  Willkie, Your Honor ruled, had a conflict, it
15   had an actual conflict of interest.  And in selecting
16   custodians -- well, we protested the whole time.  Why aren't
17   you just using Mr. Kahn?  Why didn't they use a Willkie
18   attorney?  The Willkie attorneys were all over that file.
19   Why didn't they use the CFO who was doing the projections?
20   But K&E is going to have to vouch for that, it is not going
21   to be to us an acceptable answer, well, sorry, that was all
22   Willkie's problem.  They made a cut for privilege, it was a
23   bad cut, go talk to Willkie.  No, they've got to own this.
24   They made a determination that it was a nonresponsive
25   document and it turns out it all happens, but they've got to

1  own it.

2          So if Mr. McKane wants to stand up and say we're

3  willing to go forward, the documents are substantially

4  complete, then he, from my perspective, is owning the

5  production process that occurred, which I believe was flawed.

6          Two, we need a firm date for the production of the

7  valuation report that they have the burden of proof on, the

8  Wartell investigation, if they're going to go forward with

9  the proposed release or settlement of claims, and the

10  allocations of inter-debtor expense.  Then we need five to

11  eight days, I think, in a block or two, 90 days out from when

12  they've produced that stuff, subject to coming back to the

13  Court and shortening it if it turns out that we're not having

14  the fights we had.  In other words, if they are going to go

15  forward on their valuation trial as we ran a robust marketing

16  process and, geez, no one showed up to -- we can cut some

17  time out then, right?  It will just be our valuation expert

18  providing you evidence and them telling you things that are

19  not evidence.  Okay, but we need to have a discussion; we

20  need to have a discussion around all of that.

21          There has been engagement -- and this is not to

22  fault them, they've been here for three days or four days

23  now, but the bed that was made before was none of this was

24  addressed leading up to this, although I -- as I said, we've

25  been talking about plan discovery since November.

1          THE COURT:  Thank you.

2          MR. MCKANE:  Your Honor, it is no longer morning,

3  but it's Mark McKane of Kirkland & Ellis, proposed counsel

4  for the debtor.

5          This may not surprise you, but Mr. Shore and I

6  know each other from other cases, and if I had a checklist of

7  like things that Chris will do, right, he -- like I hit bingo

8  in 15 minutes --

9      (Laughter)

10         MR. MCKANE:  -- because it's all about I'm going

11  to make this as incredibly complicated as possible, I'm going

12  to build in every aspect and potential procedural posture

13  necessary, I want to do this like we're in Federal District

14  Court, and we don't have a debtor that's a retail company, we

15  have to move this forward.  It doesn't mean he doesn't get

16  due process, I get that, but you start with -- the first

17  thing out of his mouth is I have an adequate protection claim

18  and it's critical, and I need to establish that on April 3rd.

19  You're like, well, wait a minute, that's to valuation trials,

20  that's a valuation hearing as of the petition date and then a

21  valuation hearing as of the effective date.  Why would we

22  ever have an adequate protection fight before we had the

23  confirmation hearing and the valuation fight?

24         If we're going to do this -- and I think we all

25  want to step back for a second and say like none of us want

1 | to do this, we want to actually like see if we can get to a
2 | deal next week, declare victory, and go home, but if we're
3 | going to do this, we're going to do it once.  We're going to
4 | have to do it right.  I'm not certain even Mr. Shore could
5 | make it as complicated as it sounds.

6 | But I will say this, what we do in these cases is
7 | we recognize we have a debtor, we've got DIP financing, yes,
8 | right, but we have trade creditors, and no one can ever lose
9 | sight of the fact that we, as retail debtor counsel, are
10 | extremely aware of trade credit and the importance of it, and
11 | how it can evaporate or not evaporate, and our message always
12 | is that we are on path.  So all we ask is, we will work with
13 | Mr. Shore, like we always have when you set a date for
14 | confirmation and we work backwards from there.

15 | The idea that White & Case needs 60 to 90 days
16 | after getting a valuation is bananas.  And I say that because
17 | his clients have had access to full-on data rooms of this
18 | company and all of their financials since before the petition
19 | date.  White & Case and Greenhill got it in December and
20 | they've been there, they know the valuation.  Like we can
21 | have these like very articulate discussions about what the
22 | deficiency claims are and are not, but we can solve for that.
23 | If you set the value, we do the math, there's the deficiency
24 | claims, and we can figure out if this plan is confirmable or
25 | not, we think it is.

1         THE COURT:  How many days do you think this --

2         MR. MCKANE:  I was --

3         THE COURT:  -- confirmation hearing is?

4         MR. MCKANE:  You know, like things when you grab

5    the podium on, two weeks is no, no, no.

6         THE COURT:  I'm asking you, how long do you think

7    it is?

8         MR. MCKANE:  I would say, candidly, look, it's not

9    a day, no way.  It's a question in many ways like how does

10   Your Honor want to run the trial.  Chess clock, love it,

11   we've done it before.  It actually gets one another --

12   actually, we're on the same side, which is even more fun.

13        (Laughter)

14        MR. MCKANE:  That's fine.  Do you want to take

15   written directs because that's a great way to streamline

16   this.

17        THE COURT:  Yeah, people say that, and then that's

18   a lot of work for the Court, you know.

19        MR. MCKANE:  I don't --

20        (Laughter)

21        THE COURT:  It's like, oh, then we can do it in a

22   day --

23        MR. MCKANE:  Well, I could say --

24        THE COURT:  -- like the Court doesn't have to read

25   all this.

1       (Laughter)

2           MR. MCKANE:  No, totally --

3           THE COURT:  I love that when counsel suggests

4   that.

5           MR. MCKANE:  I'm always dumbstruck when we do

6   written directs and then people want to dep designate

7   everything from the depositions, and I'm like now you're just

8   doubling down on the Judge.

9           THE COURT:  Yeah, they do that too, yeah.

10          MR. MCKANE:  So there is a manner of how you want

11  this tried.  I think it is a handful of witnesses, at best.

12  What I do have concerns about is Mr. Shore wants to take all

13  of the discovery necessary to build his take-private

14  litigation that he will bring and so -- you know, in

15  conjunction with Pachulski, and they can work on their joint

16  complaints together now.  That seems inappropriate, in part

17  because that builds an incredible administrative expense on

18  the case.  Five days, maybe four, I think you can streamline

19  things.  I think, if you start with ten, it could easily

20  become 15, and that's crazy.  Two weeks?  We haven't done a

21  two-week, full-on like bankruptcy trial on something like a

22  straightforward valuation in many years.

23          THE COURT:  Well, I'm hearing different issues

24  besides valuation, but I wanted to -- I was curious what you

25  were going to say in response to my question.

1          MR. MCKANE:  I'm trying to maintain credibility,

2   Your Honor.

3          THE COURT:  Uh-huh.  Okay.

4          Like I say, we're going to take a break, you all

5   are going to talk, on both the disclosure issues and on a

6   potential schedule.  I cannot -- I already have at least a

7   one-week confirmation hearing scheduled at the end of April,

8   so that's not happening, and I agree that I would prefer to

9   have consecutive days.

10      (Pause)

11          THE COURT:  So, subject to everyone's schedules,

12  I'm going to say the week of May 12.  You will have the

13  entire week; it can be on the clock.  And, with any luck,

14  there will be a resolution before then.

15          And in coming to this date I am trying to balance

16  the needs of the debtor to get out of bankruptcy, and

17  bankruptcy doesn't really help any debtor, including retail

18  debtors.  The due process rights, the need for discovery,

19  and -- but what I'd like you all to talk about is when is a

20  realistic date that the valuation, debtors' valuation is

21  going to be provided, that Mr. Wartell's investigation is

22  going to be concluded and his conclusions are going to be

23  provided, those two things in particular I think really drive

24  what discovery is going to have to be done.  I recognize

25  there's other issues, but I think those are the two biggest

1    ones.  And particularly for Mr. Wartell I think it creates

2    issues because his investigation takes the time it takes and

3    shortening it to meet the deadline, I think, is tricky.  But

4    I will say this, the debtor has chosen how this plan works,

5    it has chosen this, I would -- rather than everything is in

6    unless I take something out, it's sort of, no, stuff is out

7    unless I put it in, it creates a complication.

8            I do -- I did notice today -- let me say this as

9    well -- I did notice today the change in Class 6, and I

10   haven't thought through what that means, but the debtors

11   obviously know they will have to address that and the

12   appropriateness of that at confirmation, and how we address

13   the issues around impaired accepting classes, et cetera.

14           So I'll give you all a chance to talk about the

15   schedule.

16           Mr. Feinstein, I have a question.

17           MR. FEINSTEIN:  Yes, Your Honor.

18           THE COURT:  And we'll get to the order, but part

19   of the order was blessing the committee letter.  And I read

20   the committee letter and it's directed to the holders of

21   Class 6 general unsecured claims, and it encourages them,

22   recommends to them to vote in favor.  It doesn't say anything

23   with respect to the Opco general unsecured claims -- I'm

24   sorry, the Holdco general unsecured claims.  I don't think

25   I've seen a letter like this before.

1           So I'm curious because, as I understood it -- and

2  maybe I'm wrong, but as I understood it the committee is the

3  committee for all of the debtors, it was appointed just for

4  the Opco debtors.  So --

5           MR. FEINSTEIN:  I'm happy to address it, Your

6  Honor.

7           THE COURT:  Please.

8           MR. FEINSTEIN:  I think it's a null set.  I don't

9  think there are non-insider, non-noteholder unsecured claims

10 at Holdco.

11          THE COURT:  Well, that's something that changed

12 from the last plan to this plan.  There was like 30-something

13 million dollars at one of the Holdco debtors and now it's

14 zero, but that changed.  So --

15          MR. FEINSTEIN:  Of claims?  I know there's money

16 captured at like the top Holdco, there's cash in there, but I

17 don't believe, Your Honor -- and somebody can correct me if

18 I'm wrong -- that there -- again, that there are any filed or

19 scheduled non-insider, non-Holdco lender debt claims at any

20 of the Holdcos.

21          THE COURT:  Well, maybe I'm wrong, but --

22          MR. FEINSTEIN:  So I think -- and the U.S. Trustee

23 appointed the committee for all entities, the Holdco

24 noteholders made it very clear to us that we had no -- it

25 wasn't appropriate for us to be speaking for Holdco because

1  there were no Holdco non-insider, non-noteholder creditors.

2  So we stuck to Opco, our letter is addressed to the Opco

3  creditors because those are our only known constituents.

4         THE COURT:  Okay.  So to the extent that there

5  are, which I guess you're saying there are not -- I'll have

6  to look back, I was certain there were in the disclosure

7  statement previously -- so to the extent that there are any

8  general unsecured creditors at the Holdco level, the

9  committee has no recommendation for them?

10         MR. FEINSTEIN:  So that -- it's hypothetical, Your

11  Honor.  If somebody can show me any creditor out there that's

12  in our constituency, we'll make a recommendation to them, but

13  there's none scheduled and I don't believe any unsecured

14  claims were filed.

15         THE COURT:  Okay.

16         MR. FEINSTEIN:  One other note --

17         THE COURT:  Yes --

18         MR. FEINSTEIN:  -- from that, Your Honor --

19         THE COURT:  -- yes.

20         MR. FEINSTEIN:  -- behind the consolidation

21  concept --

22         THE COURT:  Yes.

23         MR. FEINSTEIN:  -- is that all of the unsecured

24  creditors at Opco are behind what we believe is underwater

25  secured debt attaching to all the assets.  So, anything

1  that's coming their way, I don't want to call it a gift, but

2  it was a negotiated settlement with the 1Ls to carve out

3  value for the unsecureds.  So putting it all in a single pot

4  to be shared by the true Opco unsecured creditors and the

5  deficiency claims seemed to be the appropriate outcome.  To

6  the extent anybody quibbles with that, we think it's a

7  confirmation issue.

8              Thank you.

9              THE COURT:  Thank you.

10             MR. FLIMAN:  Thank you, Your Honor, very briefly,

11 Dan Fliman, Paul Hastings, for the first lien lenders.

12             Your Honor, I think just one thing to give us some

13 guidance as we go and break and talk about the schedule, we

14 fully agree with the debtors' view that the adequate

15 protection issues need to get teed up in connection with

16 confirmation.  There's overlap on the valuation issues.  It

17 would be helpful, at least for us, as we talk about the

18 schedule going forward to get any guidance from Your Honor of

19 whether the adequate protection issues will be heard in

20 connection with confirmation or earlier, as the Freedom

21 Lender Group has been asking.

22             THE COURT:  I hadn't thought about it.  I haven't

23 read the motion; I know it's out there.  To me, it makes

24 sense that it's all heard together.  And if I'm going to have

25 two valuation fights at two different points in -- you know,

1  for two different points in time, that would be a first for

2  me, but if we have to have it, we'll have it.  But I think it

3  ties into a confirmation issue, so we'll hear it at

4  confirmation.

5          MR. FLIMAN:  Thank you, Your Honor.

6          THE COURT:  If we need an extra day for that,

7  we'll add an extra day for it.

8          MR. FLIMAN:  Thank you, Judge.

9          THE COURT:  Okay.  Anything else before we break?

10          Mr. Fox.

11          MR. FOX:  Good afternoon, Your Honor.  May it

12  please the Court, Tim Fox on behalf of the United States,

13  just rising briefly to indicate I know there are going to be

14  some discussions regarding certain additional information to

15  go into the disclosure statement and, specifically with

16  respect to the releases, I just want to note that the U.S.

17  Trustee had some concerns about the current version of the

18  disclosure statement and the information on that front.

19  We'll participate in those discussions and try to work those

20  issues out, but I did just want to note for purposes of our

21  objection the switch to the opt-in did eliminate the largest

22  component of what I might be presenting to Your Honor today

23  if that was still an opt-out, and we appreciate the parties

24  for making that change.

25          There is still what we view as a confirmation-

1  related issue with respect to the terms of the injunction in

2  support of the release and exculpation.  My office has

3  brought that up in a few matters recently, but we agree that

4  we can deal with that in connection with confirmation to the

5  extent it's still an issue, but wanted to again flag that the

6  information regarding the releases and the interlocking piece

7  with the Wartell investigation is something that we weren't

8  necessarily sure there was clarity sufficient to support the

9  1125 standards.  I think everybody is rowing in the same

10 direction, but I did want to note that on the record before

11 we got to the return this afternoon, just so Your Honor was

12 aware that that was still open from the U.S. Trustee's

13 perspective.

14          THE COURT:  Thank you.

15          MR. FOX:  Thank you.

16          MR. HUNTER:  Your Honor, for the record, Derek

17 Hunter, Kirkland & Ellis, on behalf of the debtors, just

18 briefly.  We had a few clerical changes on the order that we

19 got from our claims agent, we don't have to do it now.  I do

20 have a redline note.  Do you want that now, or we can wait

21 and handle it when we come back, whatever you'd like, Your

22 Honor.

23          THE COURT:  Yeah, I'll take it when you come back.

24          MR. HUNTER:  Okay.  Thank you, Your Honor.

25          THE COURT:  Okay.  So we're going to take a break,

1    we will come back at 3:00 -- no, let's say 3:30.  If you need

2    more time, please contact chambers.  I recognize that there

3    may still need to be a lot of wordsmithing that has to happen

4    after that, but let's see if we can get concepts down.

5            Thank you.  We're in recess.

6            COUNSEL:  Thank you, Your Honor.

7        (Recess taken at 12:24 p.m.)

8        (Proceedings resume at 3:30 p.m.)

9            THE COURT:  Please be seated.

10            MR. MCKANE:  Good afternoon, Your Honor.

11            THE COURT:  Good afternoon.

12            MR. MCKANE:  For the record, Mark McKane,

13    Kirkland & Ellis, proposed counsel for the debtors.  I'm

14    certain you cringe when you see the litigator rise in what's

15    hoping to be an announcement of all the things that are

16    resolved in the disclosure statement.

17            I think in light of what's open, we thought it

18    would be better to address the schedule first and then walk

19    through what we think is, like, mainly a resolution, the

20    disclosure statement issues, and to the extent you

21    immediately think are they just buying time to get things

22    printed, that's also true.

23            THE COURT:  Okay.

24            MR. MCKANE:  So Your Honor, the -- just to level

25    set where we are.  Once you gave us the confirmation date of

1  May 12th for that week, we went back, had a series of

2  exchanges with Mr. Shore, put out an initial proposal of an

3  objection deadline that was gave him a couple -- gave him

4  some additional time.

5           But more importantly, before I went to Mr. Shore,

6  I went to the Akin team with regards to Mr. Wartell and like

7  when can you get a -- your investigation done?  When can you

8  tell us what's in and what's out?  And we started with that,

9  and that date was not moving.  And that is the date that is

10  March 16th.  It is the date that is planned supplement.

11  Sorry, March 26th.  Excuse me.  It's the plan supplement.

12  That's the -- Chris loves that.  That's the plan supplement

13  deadline that was already -- we already had.

14           So okay.  We accept that as a fact, as a truism.

15  So working from there, we gave the White & Case team as much

16  time as we can.  We gave them three additional weeks.  And we

17  came out and said we can have voting deadline, an objection

18  deadline of April 23rd.  That's 21 days after the report.

19           And with the report, I think we would be -- we'll

20  have to work on all these interim dates in terms of actual

21  reports.  But at least based on the exchange that Mr. Shore

22  and I had, that would be, you know, if we did that opening

23  reports for people carrying the burden.

24           So we would put in our evaluation report.  They

25  would put in their adequate protection report.  So for the

1  opening reports.  To be fair, all of the interim litigation

2  dates are not landed on.  All we're trying to work on here

3  are disclosure statement dates.  We'll continue to meet and

4  confer.  And if we can't, we'll come back to you and maybe

5  ask for a Zoom conference.

6          But working off of plan supplement date with those

7  opening reports being March 26th, what the debtors are

8  proposing is the objection deadline and the voting deadline

9  be April 23rd.  That's 21 days.  Then we would ask for the

10  confirmation brief and reply and the voting report deadline

11  to be May 7th, consistent with the local rules.  And then we

12  could -- that's a Wednesday.  And then we pick up with the

13  confirmation hearing on the 12th for a week.

14          So that's where we are.  We're going first because

15  that's not where Mr. Shore is.  White & Case is asking for

16  things to come on -- come in earlier in time with regards to

17  the extra report and other dates.  We'll meet with him on

18  that.  I know they're asking for things earlier in March, and

19  I can let him address that as he will, but I do think that

20  this is consistent with your guidance and direction.  Give

21  them some more time, work within -- within the dates that

22  you've set and, you know, gives us the opportunity to get the

23  document production and other things out on the fact side as

24  well.

25          Recognizing in light of how we do things here, we

1    may not be able to do the perfect sequencing of facts and an

2    expert, but we will be -- we'll get the discovery done well

3    in advance of the hearing on the 12th.

4              THE COURT:  Okay.

5              MR. MCKANE:  Thank you, Your Honor.

6              THE COURT:  Mr. Shore.

7              MR. SHORE:  All right.  Just three points, Your

8    Honor.  We're asking for March 14th.  And let me explain why.

9    First, we agree with you.  An investigation should take when

10   investigation has.  No one should be ordering Mr. Wartell to

11   get his report out by that date.  But if they want to start

12   on May 12th, they got to get a report in by a certain date.

13   And we think that's the 14th.

14             Point two, as I explained, we don't think we

15   should be going forward with the report.  There seems to be

16   an easy fix here, and we can reduce a lot of this friction if

17   we just put things in the trust.  But it's their plan right

18   now, and they have the pen on it, so.

19             But if we're going forward with the report, we

20   have a ton to do.  He says, oh, you get three weeks.  Well,

21   Mr. Wartell has a $2 million head start, as that presentation

22   showed.  Then we need to get his report.  We need to read the

23   report.  It's the first time we'll be seeing what his views

24   are with respect to any number of transactions.

25             Then we need to propound document requests.  We

1  need to get responses and objections to document requests.

2  We need to get the documents in.  We're going to have a

3  privilege fight.  If they're going to be taking the position

4  that Mr. Wartell can review a whole bunch of privileged

5  documents, come to a conclusion, and tell Your Honor that

6  based upon his review of documents, he thinks there are no

7  claims, then they can't have it both ways.  So that's --

8  we're just teeing that up in what they say should be a three-

9  week period.

10         And then we have to take, as I said, depositions

11  if there are going to be additional depositions because he

12  says I have a star witness who told me what, you know, what

13  needs to be done.  I'm not -- I mean, this is federal court

14  litigation.  I think I understand the Constitution, but it

15  is -- I'm not saying we're not willing to move, but I'm

16  saying can we at least get it by March 14th?

17         And I'll point out the third reason.  As of the

18  filing of the fifth disclosure statement, Willkie, the

19  Willkie disclosure statement that they were going forward on,

20  which was the operative one until Monday morning, had the

21  plan things going in on 2/6.  No, 3/6.  Sorry.

22         So all the valuation reports, all the Mr. Wartell

23  report were going to -- they committed the March 6th.  Mr.

24  Wartell wasn't saying I can't possibly do it by that date.

25  And we've been -- mostly my team has been working breakneck

1  preparing for that trial.  Now for them to say, well, you

2  know what, we decided that we need more time, that's not

3  particularly fair.

4          They had committed as they had this done at the

5  beginning of March.  We're giving them an additional week.

6  And the fact that Willkie's coming -- sorry, Willkie's out

7  and K&E's in shouldn't make a difference now.  That should

8  have -- if he was able to make it on 3/6, he can make it on

9  3/14.

10         And by the way, not a week.  I think Your Honor

11  said six days.  If we're combining the adequate protection

12  with confirmation, I think we need that following Monday I

13  thought you had for us so.  And usually it'll get eaten up

14  with some sort of closing and evidence stuff if we need to do

15  that.

16         MR. MCKANE:  Your Honor, just very briefly.

17         THE COURT:  Um-hum.

18         MR. MCKANE:  I learned a lot from Mr. Shore, and

19  one of the things I've learned that he's very good at is

20  creating false deadlines.  The idea that Mr. Shore is going

21  to start his discovery into issues that Mr. Wartell is

22  looking at on the date that he issues the conclusion is not

23  true.  In fact, he's already asked for those materials and

24  will -- and the company will be providing those materials

25  now.

1          So it is not as if like discovery is going to kick

2    off on the 14th, if anything, or on the 26th, it'll be

3    supplementary to what's already been done and the vast lift

4    is already going to be done.  So I think that's not, like, a

5    fair point.

6          As it relates to the trial dates, like, I wasn't

7    trying to say five versus six.  We will have a conflict on

8    the 19th.  I have to -- to the extent I'm required in the

9    courtroom, we'll figure that out.  I can't be here.  But

10   there are other things, I think, more important about what

11   are we asking for when we came to you this morning.

12         We said we moved out the confirmation schedule

13   because we did not think what was previously presented was

14   credible, and we needed to work on it.  And so we went to

15   Wartell and said, and the Akin team give us a real date, and

16   we got a real date.  And so now we're all locking ourselves

17   in on that.  And so that's what we -- that's what we're here

18   to do.  So we just need something that we all can work with.

19         THE COURT:  What about the valuation?  When can

20   that be done?

21         MR. MCKANE:  Valuation would also come in on the

22   plan supplement date.

23         THE COURT:  Why does it have to come in then?  Why

24   can't it come in earlier?

25         MR. MCKANE:  If you want to split the baby and say

1  valuation in on the 14th, you know, findings on the 26th, I

2  will work with our team.

3          THE COURT:  Why can't it come in sooner?  I mean,

4  I understand that Mr. Wartell is taking the time that he

5  feels he needs to take, but the debtor wants confirmation.

6          MR. MCKANE:  It does.

7          THE COURT:  The debtor --

8          MR. MCKANE:  Yeah.

9          THE COURT:  -- needs to be prepared --

10          MR. MCKANE:  Yeah.

11          THE COURT:  -- so that at least discovery can

12  start on the valuation issue.

13          MR. MCKANE:  Your Honor, even Mr. Shore isn't

14  asking for valuation report before the 14th.  But my only

15  point on what I'm trying not to commit to is to the extent

16  that we're going to bring in, you know, a valuation expert,

17  which we haven't made the decision to do yet, I can't commit

18  somebody yet who I haven't even engaged.

19          THE COURT:  Well, are we premature, then?

20          MR. MCKANE:  No.  No.

21          THE COURT:  I mean, which is it?

22          MR. MCKANE:  We'll get it done.  We'll get it

23  done.

24          MALE VOICE:  I'll do the valuation (inaudible).

25          MR. MCKANE:  Yeah, we'll do that.  So then we're

1  done.   14th it is.   That's Mr. Shore's valuation date.

2          MR. SHORE:   Fine.   And we can also get the Wartell

3  report on the 14th, but I -- I guess my -- I'm a little

4  confused here.   The debtors are moving forward with an

5  equitization transaction.   They haven't engaged an expert who

6  said that the 1L's aren't getting paid.   I don't --

7          MR. MCKANE:   To be fair, I haven't spoken with the

8  person yet.   They obviously have a team in place.   Yes.

9  Like, it's just -- it's just, frankly, me as the litigator at

10 the podium.   I'm not saying it's the debtors as a whole.

11 That's all.   Do I have -- do we have view on valuation?   Of

12 course we (inaudible).

13         THE COURT:   Okay.   Well, I think the -- I'm not

14 going to require a deadline that doesn't work for the

15 independent director.   We will see, if we keep to our

16 schedule, whether the discovery can get done with respect to

17 his conclusions, which could be anywhere from I'm not going

18 to release anybody on the list, or I'm going to release

19 everybody on the list.   And depending on what the conclusion

20 is makes a difference.

21         Or the debtors can simply do what Mr. Shore says,

22 put it all in a trust, and the independent director doesn't

23 have to do any investigation.   So we'll see because I'm not

24 going to -- we'll see how the discovery exchange goes.

25         With respect to the valuation, I think it should

1  come in as soon as it can.  I don't see any reason to hold

2  off on the valuation because -- to be at the plan supplement.

3  There's no magic date to that.  So I think it should come in

4  sooner so that at least discovery can get started there.  And

5  I would suggest that the debtor put its valuation analysis in

6  on -- on the 10th.

7            MR. MCKANE:  March 10th?

8            THE COURT:  Um-hum.

9            MR. MCKANE:  And Your Honor, can I get a date for

10  the -- their valuation on the adequate protection as --

11            MALE VOICE:  (Inaudible).

12            MR. MCKANE:  As long as it's mutual.  That

13  helps --

14            THE COURT:  Do you want it on the 6th?

15            MR. SHORE:  I want the report tomorrow.  But I'm

16  willing to give them my report tomorrow.  I just was dealing

17  with the practicalities of them not having a valuation report

18  right now.  But there's -- you're not going to default them

19  because they didn't put in a report, so I would love it as

20  early as possible.  But if they can get it by the 10th, we'll

21  get it by the 10th.

22            THE COURT:  Okay.  For both reports.

23            MR. SHORE:  And then maybe what we do with Mr.

24  Wartell is we're willing to -- we can talk witness sequencing

25  to -- we have six days.  And if we have to push him to the

1  last day, we buy another week that way.

2              THE COURT:  Um-hum.

3              MR. MCKANE:  (Inaudible) we can all work together

4  on that.  I'm trying to find a sixth day that works for

5  folks.

6              THE COURT:  Okay.

7              MR. MCKANE:  (Inaudible) Monday.  In the meantime,

8  we'll continue to build out the interim dates, and if we have

9  issues in on those, if you don't mind, reach out by letter

10 and ask for a Zoom.

11             THE COURT:  Well -- okay.  Yeah, just call.

12             MR. MCKANE:  Sounds good.  Are we good?  Okay.

13 Your Honor, I'm done stalling.

14             MR. HUNTER:  Good afternoon, Your Honor.  For the

15 record, Derek Hunter, Kirkland & Ellis, on behalf of the

16 debtors.  We don't have redlines.  That would take a little

17 bit more time, and better to be thoughtful.  But I do think

18 we have agreement in concept with Mr. Zatz and the White &

19 Case team on edits to the disclosure statement.

20             You know, appreciate everyone's efforts.  We

21 turned out a draft as soon as we got out of here.  Mr. Zatz

22 took a handful of edits to start on his end, and we kind of

23 passed them back and forth.  And so I think we're pretty

24 close, and we have the concepts there.

25             You know, the key final points, which I'll just

1  mention on the record, Class 6 is not being substantively

2  consolidated.  It's an administrative and, you know, it's

3  being done administratively, and you know, the votes will be

4  tabulated separately, and that's how it's going to work, and

5  we're going to clarify that.

6           On the inter-company claims that HoldCo might have

7  against OpCo, those are getting either Class 6 treatment as

8  an unsecured claim or if, you know, the White & Case team can

9  articulate a theory where they're secured, then they'll get,

10  you know, Class 2 secured treatment or whatever, you know,

11  appropriate secured treatment they should get.  And so we'll

12  clarify that with some agreed language that we're working

13  through.

14          And then we've otherwise passed some edits back

15  and forth around Mr. Wartell and the investigation, retained

16  causes of action, things like that.  And so I think we've

17  checked all the, you know, checked all the boxes from this

18  morning on what needs to be cleaned up in the DS.

19          So what I'd suggest is we can -- I think we can

20  work it out amongst the parties and submit a version with the

21  edits, you know, this evening/tomorrow morning under CoC with

22  everyone's sign off.

23               THE COURT:  Mr. Zatz?

24               MR. ZATZ:  Hello again, Your Honor, Andrew Zatz,

25  White & Case, for the Freedom Lender Group.  I can confirm

1  that based on -- we have competing markups, and we just got a

2  consolidated one as the hearing was starting, so we're going

3  to go through.  But I think based on our conversations and

4  the markups that we've been discussing, we have a path to

5  resolving everything.

6          So we'll take the next 12 or so hours to nail it

7  all down.  And sounds like the CoC route should work fine.

8          THE COURT:  Okay, great.  Thank you for working

9  over the recess to come to consensus on the matters you were

10  able to reach consensus on.  I appreciate that.  Let's take a

11  look at the form of order.

12          Oh, I'm sorry, Mr. Ward.

13          MR. WARD:  Good afternoon, Your Honor, I didn't

14  know when the appropriate time would be for other parties

15  that wanted to weigh in on the matters here today to speak

16  up.  If now is the time.

17          THE COURT:  Sure.  Let's go.

18          MR. WARD:  So we don't object to the entry of the

19  disclosure statement.  We certainly don't object to the

20  retention of Kirkland & Ellis and recognize that, you know,

21  parties probably have not focused so much on our issue, but

22  we do want to raise it.

23          So as Your Honor may recall, I represent Buddy Mac

24  Holdings, which is the largest franchisee of the Buddy's

25  division.  In connection with what originally was a sale and

1  now is proposed to be a plan, the debtors are likely to

2  assume our franchise agreements.

3           And in that context, we have objected.  We

4  objected in the sale context to the cure amount saying that

5  we're owed tens of millions of dollars resulting from

6  American Freight's breach of the exclusivity provisions in

7  those franchise agreements.

8           About a month ago, it was, I think, a month ago to

9  the day today, we served discovery on the debtors.  We served

10 document requests and notices of deposition in connection

11 with proving up our cure claims.  Again, that was part of the

12 sale.  Now there's not a sale.

13          But the same fight will have to be had with

14 respect to the plan to the extent that those contracts are

15 assumed.  So we have received only limited documents from the

16 debtors.  We got a subset of documents on the American First

17 Financial credit documents, but nothing regarding the profits

18 that Buddy's received.

19          And so just at a very high level to boil things

20 down to, you know, to the minimum necessities, to say that

21 American Freight breached our exclusivity, to prove up the

22 damages that we suffered as a result of that, it would be the

23 profits that Buddy's -- that American Freight enjoyed as a

24 result of operating during that breached period.  So we need

25 documents regarding their profit.

1      We've received none of those.  We've received

2   objections to any such request.  So I don't know that we need

3   a ruling from Your Honor today.  We did send the debtors a

4   discovery response, a discovery letter.  We sent that to Your

5   Honor.  We got a responsive letter from the debtors.

6          THE COURT:  Mr. Morton filed a response.

7          MR. WARD:  Yeah, you've probably seen those

8   letters.  So I don't know that we need a ruling today.  But

9   what we would respectfully ask Your Honor to do, candidly, is

10  direct the debtors to not jam us on discovery because if you

11  look at the disclosure statement, what the disclosure

12  statement says is that cure disputes can be heard at the

13  confirmation hearing or any date that the parties mutually

14  agree to or on seven days' notice.

15         THE COURT:  Well, it's not going to be on seven

16  days' notice.

17         MR. WARD:  Yeah, so.  And I know -- and I know

18  that the Kirkland & Ellis team isn't -- their intent, just

19  getting into this case for five days, their intent is not to

20  jump on jamming us on discovery.  That's low, I'm sure, on

21  the priority list.  But what we can't have happen is the

22  debtors to now, you know, queue up a cure dispute for a

23  hearing on seven days.

24         So as long as I have comfort from Your Honor that

25  we're able to have a reasonable period of time to prepare for

1  our depositions, that the debtors are required to produce the

2  witnesses for the depositions after a meaningful opportunity

3  for us to review documents on the profits that American

4  Freight earned during the violation periods, which the debtor

5  should produce to us in order for us to, you know, prove up

6  our cure claim.  Otherwise, we're unable to prove that up,

7  then I think we're okay, notwithstanding the language in the

8  disclosure statement.

9           But I'm really at Your Honor's direction on how

10  you want to handle this dispute, because confirmation is

11  coming up in a little over a month, and in order to get

12  documents and do depositions, you know, we need time to

13  prepare.  I'm sure the debtors do as well.  So --

14           THE COURT:  Well, I'm going to give you all time

15  to talk.  I did see the letters.  I will schedule a Zoom

16  conference, if we need one, if the parties can't agree on

17  discovery, whether that's timing or what documents are going

18  to be produced.  But why don't you all speak first?

19           MR. WARD:  Okay.

20           THE COURT:  And then let me know.

21           MR. WARD:  Okay.

22           MR. MCKANE:  Yeah.  I am confident that we will

23  coordinate on a schedule.  We're not looking to jam anybody.

24           MR. WARD:  Appreciate that.

25           MR. MCKANE:  We've been working on a few other

1  things.

2          MR. WARD:  A few other things?  Isn't that a

3  statement?

4          MR. MCKANE:  No problem.  Yeah.

5          MR. WARD:  Thank you, both.

6          THE COURT:  Yes.

7          MR. STAMER:  Good afternoon, Your Honor.  Mike

8  Stamer from Akin Gump on behalf of Mr. Wartell.

9          THE COURT:  Yes.

10          MR. STAMER:  One very discreet issue.  You heard

11  counsel for the Freedom Lenders earlier raise an issue with

12  the disclosure statement regarding the scope of Mr. Wartell's

13  investigation, specifically the investigation of the first

14  liens.  They described that, and I won't -- I'll paraphrase

15  that they thought that was a waste of money based upon the

16  language and the DIP.

17          I think there is violent agreement, at least as it

18  relates to Mr. Wartell.  If the parties think it's a waste of

19  money, we're happy not to do it.  I had a conversation with

20  Mr. Zatz.  He needs to circle back on his side.

21          So from our perspective, it's binary.  Either Mr.

22  Wartell is instructed not to have this part of his mandate,

23  or it is part of his mandate.  And we're happy to do the

24  investigation if people think it's necessary, but we don't

25  want to waste people's money if we don't have to.

1          So one way or another, it'll be resolved in the

2    markup, but wanted to make sure that people knew and on the

3    record, that it's still at least a partial live issue.

4               THE COURT:  Okay.  Thank you.

5               MR. WARD:  Thank you, Judge.

6               MR. FEINSTEIN:  For the record, Robert Feinstein,

7    Pachulski, Stang, Ziehl & Jones.  Your Honor, I just want to

8    address one narrow matter of something I raised before where

9    we really don't have visibility, and it could be material.

10          The way that inter-company claims by HoldCo

11   against OpCo landed, it's going to be a Class 6 unsecured

12   claim.  There is no bar date.  There is no claim that's ever

13   been asserted.  There's no way of evaluating just what that

14   claim is or how big it might be.

15          And it would be helpful if the architects of those

16   claims, the authors of those claims, the HoldCo lenders,

17   would indicate what that theory of liability is and put it in

18   the disclosure statement.  Because otherwise, we're just told

19   that there is this HoldCo claim out there that could dilute

20   general unsecured creditors' recovery but no disclosure of a

21   theory of liability and that damned amount or anything else

22   if -- it's a hole in the -- the document.

23               MR. SHORE:  Okay, as I said earlier, I don't have

24   a single email or text from the take-private.  How am I

25   supposed to outline the claims that exist?  And if the

1   debtors want to set a bar date for inter-company claims, they

2   can set a bar date for inter-company claims.  That's not my

3   doing.

4          THE COURT:  I agree.  It's the debtor's plan.  If

5   the debtor can articulate them, they should articulate them.

6   If the debtors think there are none, they should say there

7   are none.  If there's been no bar date because inter-company

8   claims were carved out of the bar date order, then there

9   isn't one.  But I'm not going to put that on -- I'm not going

10  to put that on the Freedom Lenders.

11         MR. HUNTER:  Understood.  Your Honor, we can work

12  with the parties on a solution to that, including potentially

13  through a bar date.

14         THE COURT:  And I assume you don't want me to put

15  off the disclosure statement approval while we draft that,

16  right?

17         MR. HUNTER:  The debtors would, Your Honor.

18         MR. FEINSTEIN:  No.  But again, the only party

19  who's ever indicated there might be a HoldCo versus OpCo

20  claim are the HoldCo lenders without the benefit of emails.

21  So it would be nice to hear what it is they're talking about

22  because nobody else knows.

23         THE COURT:  Well, this is the debtor's disclosure

24  statements.

25         MR. HUNTER:  Okay.  Your Honor, with those

1   reservation of rights, I do think we will have a disclosure

2   statement to send to your chambers as soon as possible.  You

3   mentioned the order.

4           THE COURT:  Yes.

5           MR. HUNTER:  We did have a couple administrative

6   changes.  I'm happy to hand those up.

7           THE COURT:  Okay.

8           MR. HUNTER:  And then, otherwise, answer any

9   questions you have.  If I may approach, Your Honor.

10          THE COURT:  You may.  Thank you.

11          MR. HUNTER:  So these are mostly minor drafting

12  changes, Your Honor.  It's, you know, labeling where a debtor

13  could be indicated on the ballot.  There's an addition for

14  the opt-ins and other minor edits that the claims agent

15  provided.  You know, these are just changes to reflect that

16  one issue (inaudible).

17          THE COURT:  Okay.  Okay.  Those look fine to me.

18  Does anybody have any comments?  Okay.  Then turning to the

19  order, and I happen to be looking at the redline, the second

20  redline.  I don't know why this doesn't have the docket

21  number on it, but it's the most recent one that I received.

22          Okay.  Paragraph K on, it looks like, page 5.

23  It's been crossed out, but it looks like page 5.  If you need

24  more than 60 pages in your confirmation brief, you can ask me

25  at the time and let me know why.

1          MR. HUNTER:  Yes, Your Honor.

2          THE COURT:  I note that in paragraphs 2, 3, 7, 8,

3  and probably onwards, we have everything being approved in

4  all respects.  I just don't even know what that means.  So

5  let's just get that out.  That's not a habit I like.

6          In paragraph 10, the committee letter, I'll

7  authorize the committee to send out a letter.  I will not

8  approve the letter.

9          Okay.  Paragraph 12 talks about soliciting -- mail

10  in solicitation materials to holders of rejection claims.

11  And then paragraph 16 seems to do the same.  But I can't tell

12  if they're consistent or not.  So I'd just like y'all to take

13  a look at that.

14          MR. HUNTER:  Okay.  We will, Your Honor.

15          THE COURT:  Okay.  Paragraph 21, and this -- okay,

16  this provides that the debtors are not required to mail the

17  package to creditors whose claims or interests have been paid

18  in full.  And it may sound like a silly question, but as

19  lawyers learn and add a lot of stuff into their orders,

20  courts learn too, right?  How are you going to determine

21  which ones have been paid in full and how are you going to

22  let those people know that that's what you think?

23          MR. HUNTER:  Yeah, understood, Your Honor.

24  Definitely hypothetical.  Maybe we just delete it because the

25  process of -- it's meant to be administratively convenient,

1 and a process to determine they're satisfied would probably

2 be more administratively burdensome.  So maybe we just delete

3 the language.

4         THE COURT:  Okay.  Paragraph 22 and 23 talk about

5 the solicitation and who we're mailing things to and what the

6 debtor and the solicitation agent can rely on.  And I'm okay

7 with -- and I'm looking at the last clause in both of those.

8 I'm okay with, for example, the solicitation agent relying on

9 the debtor's records.  I'm okay with them relying on -- they

10 don't have to contact somebody regarding defects or

11 irregularities.  But I'm not going to pre-bless no liability.

12 I just don't do that.

13         MR. HUNTER:  Okay.

14         THE COURT:  I can't imagine there really would be

15 any, but I'm not going to pre-bless it.  Okay.

16 Paragraph 28(a)(iii) is the same thing about satisfied

17 claims.  So just look for that everywhere.

18         MR. HUNTER:  Okay.

19         THE COURT:  Paragraph B, the amount -- okay.  So

20 we're talking about the amount of the claim, right?  It says

21 the undisputed, noncontingent, unpaid, and liquidated amount.

22 I'm not sure how undisputed fits in there.  Somebody files a

23 proof of claim, it doesn't say disputed on it, right?

24         MR. HUNTER:  Right.

25         THE COURT:  So because unpaid, we're already

1  taking out.  Noncontingent.

2            MR. HUNTER:  Yeah, it's probably --

3            THE COURT:  Can a contingent creditor vote?

4  Maybe.  They have a claim.  I don't know.  Never had that

5  issue.  But they have a claim.  So --

6            MR. HUNTER:  Yeah, I agree.  I think it's getting

7  to amount, not whether they can vote or not.  It's not meant

8  to invalidate it.  But we could clarify that.

9            THE COURT:  Okay.  But even if it's a contingent

10  claim --

11            MR. HUNTER:  They get to vote.

12            THE COURT:  They get to vote.  If you want to

13  somehow say they don't, I'll deal with it later.  But in the

14  first instance, I think they should get to vote.

15            MR. HUNTER:  Understood.

16            THE COURT:  Okay.  Paragraph G, again, experience.

17  Duplicative claims are only those that have the check the box

18  that say I amended my claim because half the time, I'd look

19  at what the debtors or the -- someone objecting to claims

20  thinks is duplicative or amended, it's not.  So it's when

21  they check the box.  Otherwise, the debtor doesn't get to

22  decide, oh, this is duplicative.  If you have a duplicative

23  objection, file your objection.

24            MR. HUNTER:  Yes, Your Honor.

25            THE COURT:  Okay.  And then just a general

1 comment, it starts at paragraph 30, is that everything needs

2 to appear in the voting declaration.  Any extensions the

3 debtors give, any ballots that aren't counted, and why are

4 they not being counted.  But every action that's taken where

5 somebody's vote isn't counted or somebody's given an

6 extension of time to vote, I need disclosed.

7           MR. HUNTER:  Yes, Your Honor.

8           THE COURT:  Okay.  Paragraph 31.  Motions.  3018

9 motions.  When are the debtors going to file objections so

10 that people know they have to file a Rule 3018 motion?  And

11 you may not know this because y'all are so new to the case,

12 but is the debtor really going to file any objections?

13           MR. HUNTER:  Very rarely, Your Honor, and it's

14 probably unlikely here.  I believe in most solicitation

15 procedures, without having parsed these, it's shortly before

16 the voting deadline.  But we have no plans to.  So if we need

17 to delete the language, yeah, just to take that issue off, I

18 think that's totally fine.

19           THE COURT:  Okay.  Because I don't like the, you

20 know, like one week to have to get an objection and find a

21 lawyer and file a motion doesn't work.

22           MR. HUNTER:  Understood.

23           THE COURT:  Paragraph 32, the second sentence.

24 The debtors are authorized to reject any and all ballots, not

25 in proper form, the acceptance of which would, in the opinion

1  of the debtors or its counsel, be unlawful.  What does that

2  mean?

3             MR. HUNTER:  We'll delete it, Your Honor.

4             THE COURT:  Okay.

5             MR. FEINSTEIN:  Your Honor, question about

6  paragraph 31.  I want to make sure we're not throwing out the

7  baby with the bath water.  Paragraph 31 says any party who

8  wants to challenge the allowance of its claim for voting

9  purposes can file a 3018 motion.

10            While the debtor may not have filed objection to

11 claims, it may have listed claims as disputed in their

12 schedules.  And those creditors might want to vote.  So they

13 should be allowed to file a motion.  Yes?

14            THE COURT:  Yes, they could file a motion.  I

15 guess.  It's really interesting.  I'm not sure Rule 3018

16 really anticipates that, but I suppose if they want to, they

17 could.  And you're right.  I don't want to disenfranchise

18 anybody.

19            Yeah, I don't know that it anticipates that, but

20 sure.  Let's put -- we can find a mechanism for them to file

21 something to challenge the scheduled amount or the disputed

22 nature of it or whatever.  So y'all can come up with that.

23            MR. FEINSTEIN:  Thank you, Your Honor.

24            THE COURT:  Um-hum.  Thank you.  Paragraph 33 with

25 Kroll.  I understand why that's here, but I actually have a

1  case where we're a year past the effective date.  The case is

2  still ongoing, and it could get reversed on appeal.  So I

3  don't think Kroll should be destroying ballots.  I think they

4  can come back and ask, and then we'll give them permission.

5  But I don't want to bless it in advance because, as I said,

6  I've got one where it would be a problem if they have done

7  that.

8            MR. HUNTER:  Okay.  No problem, Your Honor.

9            THE COURT:  Is paragraph 44 something that

10  somebody wanted in?  Is that like a negotiated --

11            MR. HUNTER:  No, I don't believe so, Your Honor.

12  I mean, I think we -- it's probably been negotiated over the

13  years in many different precedents, and this is the creature

14  of it.  I'm not aware there's specific comments, you know, in

15  this case, on it.

16            THE COURT:  Yeah, let's take it out.

17            MR. HUNTER:  Okay.

18            THE COURT:  This order doesn't do a whole lot of

19  things, but if we start saying what it doesn't do, then --

20            MR. HUNTER:  Yeah.

21            THE COURT:  Okay.  Same with 49.  It's just a

22  throwaway paragraph that everybody puts in everything.

23  Unless it was negotiated with someone, let's take it out.

24            MR. HUNTER:  Will do.

25            THE COURT:  Okay.  Okay.  I don't think I had any

1  comments to all the ballots or the notices.  Okay, so those

2  are my comments.  Is there anything else on the disclosure

3  statement that I'm missing?

4          MR. HUNTER:  I don't believe so, Your Honor.

5  We'll update the order for these comments, the dates, and,

6  you know, of course, the disclosure statement with the

7  parties and submit them.

8          THE COURT:  Yes.  And when you do, you'll contact

9  chambers so we know it's here.

10          MR. HUNTER:  Yes, Your Honor.

11          THE COURT:  Okay.  Anything else from anyone else.

12          Mr. Fox?

13          MR. FOX:  Good afternoon, Your Honor.  May it

14  please the Court.  Tim Fox, on behalf of United States

15  Trustee.  Just rising again to confirm our reservation of

16  rights with respect to confirmation.  It's probably

17  unnecessary.  I know Your Honor has said so on occasions

18  before, but just in light of the resolution of our disclosure

19  statement objection, wanted to make the record clear before

20  we were done today.  Thank you.

21          THE COURT:  You got it.  Everybody's rights are

22  reserved for confirmation.

23          MR. SUSSBERG:  Thank you for the time today, Your

24  Honor, and we're going to use the time productively over the

25  next several weeks.  So thank you.

1          THE COURT:  Excellent.  We're adjourned.

2       (Proceedings concluded at 4:12 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                February 20, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                February 20, 2025

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Coleen Rand                       February 20, 2025

18   Coleen Rand, CET-341

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Wendy K. Sawyer                   February 20, 2025

23   Wendy K. Sawyer, CDLT

24   Certified Court Transcriptionist

25   For Reliable