**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FRANCHISE GROUP, INC., *et al.*,[1] | ) Case No. 24-12480 (LSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

**SUPPLEMENTAL
DECLARATION OF BRADLEY VINEYARD
IN CONNECTION WITH THE APPLICATION OF
DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE
RETENTION AND EMPLOYMENT OF DELOITTE & TOUCHE LLP
AS INDEPENDENT AUDITOR EFFECTIVE AS OF THE PETITION DATE**

I, Bradley Vineyard, under penalty of perjury, declare as follows:

1.     I am a partner at Deloitte & Touche LLP ("Deloitte & Touche"), which has an office at 650 S. Tryon Street, Suite 1800, Charlotte, North Carolina 28202.  I am duly authorized to make and submit this declaration (this "Declaration") on behalf of Deloitte & Touche, as independent auditor to the debtors in possession in the above-captioned cases (collectively, the "Debtors"), to

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

supplement the disclosures contained in my initial declaration (the "Initial Declaration"), attached as Exhibit B to the *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Deloitte & Touche LLP as Independent Auditor Effective as of the Petition Date* [Docket No. 295] (the "Application").[2]

2.      I previously submitted the Initial Declaration in support of the Application.  The disclosures set forth in this Declaration are subject to the statements and qualifications made in the Initial Declaration, which are incorporated herein by reference.  The statements set forth in this Declaration are based upon my personal knowledge, information, and belief, and/or upon client matter records kept in the ordinary course of business that were reviewed by me or other personnel of Deloitte & Touche or its affiliates.

3.      The Initial Declaration was filed in support of the Application.  On January 7, 2025, the Court entered an order approving the Application [Docket No. 670] (the "Retention Order").  Pursuant to paragraph 8 of the Retention Order, if the Debtors and Deloitte & Touche enter into any additional engagement agreements, a notice including such additional engagement agreement(s) shall be filed with the Court and served upon the U.S. Trustee and counsel to the Committee.  To the extent any party objects, within ten (10) days of such notice being filed and served, to the additional services to be provided by Deloitte & Touche, the Debtors will promptly schedule a hearing before the Court.  If no objections are received prior to the applicable objection deadline, pursuant to the Retention Order, Deloitte & Touche will be authorized to perform such additional services without further notice, hearing, or order of the Court.  All additional services will be subject to the provisions of the Retention Order.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

4.      Accordingly, by this Declaration, in accordance with paragraph 8 of the Retention Order, I am disclosing that the Debtors and Deloitte & Touche have entered into a new engagement letter, dated February 7, 2025, for additional audit services for certain of the Debtors (the "Additional Engagement Letter").  A copy of the Additional Engagement Letter is attached hereto as **Exhibit 1**.

5.      Pursuant to the terms of the Additional Engagement Letter, Deloitte & Touche is to (a) perform certain audits in accordance with generally accepted auditing standards and (b) express an opinion on whether the financial statements of Debtor PSP Franchising, LLC, Debtor WNW Franchising, LLC, and the National Advertising Fund of Pet Supplies "Plus", LLC are presented fairly, in all material respects, in accordance with generally accepted accounting principles.

6.      Additionally, pursuant to the terms and conditions of the Additional Engagement Letter, Deloitte & Touche estimates that its fees for this engagement will be approximately $150,000, excluding expenses, which will be based on actual time incurred by each professional at agreed-upon rates, as set forth in the following table:

| Professional Level | Hourly Rates |
| --- | --- |
| Partner / Principal / Managing Director | $980 |
| Senior Manager | $970 |
| Manager | $845 |
| Senior | $740 |
| Staff | $615 |

7.      In addition to the rates set forth above, the Debtors shall reimburse Deloitte & Touche for all actual, reasonable, and necessary expenses actually incurred including, but not limited to, expenses incurred on account of travel and lodging, report production delivery services, and other expenses related to the services performed.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Date:  March 14, 2025

*/s/ Bradley Vineyard*

Bradley Vineyard
Partner
Deloitte & Touche LLP

## Exhibit 1

**Additional Engagement Letter**



**Deloitte & Touche LLP**
1001 Woodward Ave
Suite 700
Detroit, MI 48226-1904
USA

Tel:  +1 313 396 3000
Fax: +1 313 396 3618
www.deloitte.com

February 7, 2025

Mr. Dan McNamara
Chief Financial Officer
Pet Supplies Plus, LLC
17410 College Pkwy
Livonia, MI 48152

Dear Mr. McNamara:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for the entities listed in Appendix F (each and collectively, the "Company" or "you" or "your"). Ms. Marilyn Steffens will be responsible for the services that we perform for the Company hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Company on issues as they arise throughout the year. Hence, we hope that you will call Ms. Steffens whenever you believe D&T can be of assistance.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

## Audits of Financial Statements

Our engagement is to perform audits in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). The objective of an audit conducted in accordance with generally accepted auditing standards is to express an opinion on whether the Company's financial statements listed in Appendix F (the "financial statements"), are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America ("generally accepted accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

## D&T Reports

We expect to issue a written report upon the completion of our audits. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audits or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete our audits, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Board of Directors of Freedom VCM Holdings, LLC (the "Board of Directors") and the Company's management ("management").

Mr. Dan McNamara
February 7, 2025
Page 2

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Communications with the Board of Directors

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Board of Directors and management.

## Fees

We estimate that our fees for this engagement will be $150,000, plus expenses. This estimated fee excludes any procedures specific to the Company's bankruptcy filing and corresponding accounting impacts to the financial statements, which will be billed at the following hourly rates:

| Professional Level | Hourly Rate |
|---|---|
| Partner / Principal / Managing Director | $980 |
| Senior Manager | $970 |
| Manager | $845 |
| Senior | $740 |
| Staff | $615 |

Based on the anticipated timing of the work, our fees will be billed monthly February 2025 through April 2025.

We anticipate sending invoices according to the above schedule, and payments are due 30 days from the date of the invoice, in each case subject to any applicable Bankruptcy Court (as defined below) orders, rules or procedures. Engagement-related expenses, such as, and technology- and administrative-related charges will be billed in addition to the fees and will be stated separately on the invoices.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Company intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in an annual report, in a debt or equity offering circular, or in a private placement memorandum), thereby associating

Mr. Dan McNamara
February 7, 2025
Page 3

D&T with such document, the Company agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Company also agrees that its management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company. Any request by the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

Company agrees that it will promptly seek the Bankruptcy Court's approval of this engagement in the bankruptcy proceeding (the "Case").  The application, proposed order and other supporting documents submitted to the Bankruptcy Court seeking its approval of this engagement must be satisfactory to D&T in all respects.

In addition to D&T's other rights or remedies, D&T may, in its sole discretion and without any liability arising therefrom, terminate this engagement in the event that (a) a third-party objects or threatens to object, or D&T believes that a third-party may object, in the form of an objection or otherwise, to D&T's retention by Company in the Case on the terms and conditions set forth in this engagement letter, (b) a final order authorizing the employment of D&T as independent auditors for Company is not issued by the Bankruptcy Court in the Case on or before sixty (60) days from the date hereof on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to D&T in its sole discretion, or (c) the application of Company seeking such order is denied by the Bankruptcy Court in the Case.  In any such event, Company hereby agrees to withdraw or amend, promptly upon D&T's request, any application filed or to be filed with the Bankruptcy Court to retain D&T in the Case.

For purposes of this letter, "Bankruptcy Court" shall mean the United Bankruptcy Court for the District of Delaware.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Company or the Board of Directors request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through F attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

Mr. Dan McNamara
February 7, 2025
Page 4

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Accepted and agreed to by Pet Supplies Plus, LLC on behalf of itself and the Company (Pet Supplies Plus, LLC confirms that it has the power and authority to execute this engagement letter, including the appendices attached hereto, on behalf of, and to bind, the Company):

By: _____

Title: `Chief Financial Officer`
     _____

Date: `07-Feb-2025 | 11:41:09 AM CST`
     _____

APPENDIX A

## AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS

This Appendix A is part of the engagement letter dated February 7, 2025, between Deloitte & Touche LLP and Pet Supplies Plus, LLC.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Board of Directors are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audits of the financial statements does not relieve management or the Board of Directors of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements can arise from fraud or error and are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

An audit performed in accordance with generally accepted auditing standards, includes the following:

- Exercising professional judgment and maintaining professional skepticism throughout the audit.

- Identifying and assessing the risks of material misstatement of the financial statements, whether due to fraud or error, and designing and performing audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding amounts and disclosures in the financial statements.

- Obtaining an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion will be expressed.

- Evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

- Concluding whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.

Because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether due to fraud or error, that are not material to the financial statements as a whole are detected.

## MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated February 7, 2025, between Deloitte & Touche LLP and Pet Supplies Plus, LLC.

## Financial Statements

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements, including disclosures, in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Company complies with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Evaluating whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audits, and (3) unrestricted access to personnel within the Company from whom we determine it necessary to obtain audit evidence

D&T will use the Company's internal auditors to perform audit procedures under our direction, supervision, and review ("direct assistance"). In connection therewith, management acknowledges and agrees that (1) the internal auditors that will provide direct assistance to us will be allowed to follow our instructions, and (2) the Company will not intervene in the work performed by such internal auditors for us.

## Management's Representations

We will make specific inquiries of the Company's management about the representations embodied in the financial statements. In addition, we will request that management provide us with the written representations the Company is required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinion on the Company's financial statements. Because of the importance of management's representations, the Company agrees to release and indemnify D&T, its subcontractors, and their respective personnel from all claims, liabilities, and expenses relating to our services under this engagement letter attributable to any misrepresentation by management.

## Independence

For purposes of the subsections within this section entitled "Independence," "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

### Independence Matters

In connection with our engagement, D&T, management, and the Board of Directors will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that under American Institute of Certified Public Accountants (AICPA) or other applicable rules would impair D&T's independence. All potential services are to be discussed with Ms. Steffens.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees in a key position, as defined in the AICPA *Code of Professional Conduct*. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in a key position that would cause a violation of the AICPA *Code of Professional Conduct* or other applicable independence rules. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Ms. Steffens before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee.

# APPENDIX C

## COMMUNICATIONS WITH THE BOARD OF DIRECTORS

This Appendix C is part of the engagement letter dated February 7, 2025, between Deloitte & Touche LLP and Pet Supplies Plus, LLC.

We are responsible for communicating with the Board of Directors significant matters related to the audits that are, in our professional judgment, relevant to the responsibilities of the Board of Directors in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Board of Directors any fraud we identify or suspect that involves (1) management, (2) employees of the Company who have significant roles in internal control, or (3) other employees of the Company when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Board of Directors any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Board of Directors, unless otherwise directed by the Board of Directors.

We will also communicate to the Board of Directors matters involving the Company's noncompliance with laws and regulations that have come to our attention during the course of our audits, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Board of Directors any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audits, including those that were remediated during the audits.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Board of Directors. However, we will communicate to the Board of Directors matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

APPENDIX D

## GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated February 7, 2025, between Deloitte & Touche LLP and Pet Supplies Plus, LLC.

1.  Independent Contractor. D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Company, management, or the Board of Directors.

2.  Survival. The agreements and undertakings of the Company and the Board of Directors contained in the engagement letter will survive the completion or termination of this engagement.

3.  Assignment and Subcontracting. Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Company and the Board of Directors hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  Severability. If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  Force Majeure. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  Confidentiality. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Company, D&T shall not disclose such information to any third party without the Company's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Company and the Board of Directors hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T, subcontractors providing services in connection with this engagement and

10

Deloitte Entities and their contractors to develop and enhance tools and services of Deloitte Entities, in each case, whether located within or outside of the United States, provided they have agreed to be bound by confidentiality obligations similar to those in this paragraph. Deloitte Entities may also use or disclose any information to provide services or client offerings to current or prospective clients provided that information is not used or disclosed in a way that would permit the Company to be identified by third parties, without the Company's consent. "Deloitte Entities" shall mean any member firm of Deloitte Touche Tohmatsu Limited and its affiliates bound by confidentiality terms similar to the paragraph above.

7.  <u>Data Privacy</u>.

  (a)  For purposes of these terms, the following definitions apply:

  "Personal Information" means any information received from, or on behalf of, the Company by D&T in its performance of services under the engagement letter (the "services") that is capable of individually identifying a natural person or is otherwise defined as "personal information" under applicable privacy laws.

  "Personal Information Breach" means D&T's confirmation of unauthorized access to, or unauthorized use or disclosure of, Personal Information under D&T's possession or control that compromises the security, confidentiality or integrity of such Personal Information.

  "Processing" means any operation or set of operations performed on Personal Information, such as accessing, obtaining, storing, retaining, selling, sharing, combining, transmitting, using, maintaining, disclosing or disposing of Personal Information.

  (b)  D&T shall comply with the privacy laws applicable to it in connection with the performance of the services. D&T shall only Process Personal Information in connection with its performance of the services, or as otherwise permitted under the engagement letter or these terms or as required by applicable law or professional standards. Taking into account the nature of the Personal Information being Processed, D&T shall have in place reasonable technical and organizational measures designed to (i) provide a level of security appropriate to the risks, and (ii) assist the Company in responding to consumer rights requests. Upon written request, D&T shall make available information with respect to D&T's Processing of Personal Information to: (i) demonstrate D&T's compliance with its obligations in this paragraph, which may take the form of an independent third-party certificate or audit report, or other relevant documentary information; and (ii) reasonably cooperate with the Company in fulfilling its obligations under applicable privacy laws, such as responding to Personal Information requests of individuals, maintaining the security of Personal Information, conducting privacy impact assessments, and consulting with applicable regulatory authorities. Unless otherwise required in connection with the services, D&T agrees that it will not re-identify any de-identified data it receives from or on behalf of the Company. D&T agrees that, upon written notice, the Company may take reasonable and appropriate steps to stop and remediate D&T's unauthorized use of Personal Information. D&T will notify the Company, to the extent required by law, if D&T makes a determination that it can no longer meet its obligations with respect to Personal Information under applicable privacy laws. To the extent required by applicable privacy laws, D&T certifies that it understands and agrees to comply with its privacy obligations set forth herein.

  (c)  In the event of a Personal Information Breach, D&T shall promptly and within any timeframe

governing D&T's notification obligation under applicable law inform the Company's primary business contact for the services of such Personal Information Breach and shall provide to the Company additional information relating to the Personal Information Breach reasonably requested by the Company, to the extent then known by D&T, including information required for the Company to provide any notices required by applicable law.

(d)     D&T shall require that its personnel and subprocessors which Process Personal Information are subject to duties of confidentiality consistent with these terms. D&T may not use subprocessors to Process Personal Information without the prior written consent of the Company. The Company hereby consents to the Processing of Personal Information by the following subprocessors: (i) subcontractors authorized to provide services under the engagement letter in order to perform the services, and (ii) contractors to the extent necessary, in connection with providing administrative, infrastructure, and other support services to D&T. D&T shall enter into a written contract with each of its subprocessors consistent with the privacy obligations in this paragraph.

(e)     Upon the Company's written request, D&T shall delete or return Personal Information that it maintains. Notwithstanding the foregoing, D&T shall have the right to retain copies of such Personal Information to the extent required by applicable law or professional standards, provided that D&T complies with the privacy obligations in this paragraph.

(f)     Description of Processing attached hereto as Appendix D: Exhibit 1 sets forth certain details regarding D&T's Processing of Personal Information in connection with this engagement.

8.    <u>Dispute Resolution.</u> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

APPENDIX D: EXHIBIT 1

## DESCRIPTION OF PROCESSING

Categories of individuals whose Personal Information is Processed:

- ☒ Employees
- ☒ Clients and customers
- ☒ Vendors or suppliers
- ☒ Dependents, beneficiaries, spouses, and/or domestic partners of employees
- ☒ Board of directors, audit committee, or those charged with governance
- ☐ Other:

Categories of Personal Information Processed:

- ☒ Name
- ☒ Contact information such as telephone number, physical address, email address
- ☒ Employment information such as position, title, job description or personnel number
- ☒ Education information
- ☒ Compensation and tax-related Personal Information
- ☒ Banking and financial account information
- ☒ Date of birth
- ☒ Internet log and tracking information, including cookies, beacons, IP addresses, and web browser and device information
- ☒ Online identifiers such as login and account information, including screen name, password and unique user ID
- ☒ Gender
- ☒ Photos and videos
- ☒ Government-issued unique identifiers
- ☐ Precise geolocation data
- ☐ Immigration status
- ☐ Citizenship information
- ☐ Information from children under 13 years old
- ☐ Other:

Categories of sensitive Personal Information Processed which reveals an individual's:

- ☒ Health or medical-related Personal Information
- ☒ Racial or ethnic origin
- ☒ Criminal convictions and offenses
- ☐ Political opinions
- ☐ Religious or philosophical beliefs
- ☐ Trade union membership
- ☐ Genetic or biometric (such as a facial scan, fingerprint, voice print or iris scan) Personal Information
- ☐ Sex life or sexual orientation

Nature and purpose(s) of the Processing: D&T Processes Personal Information in the context of providing the services.

Duration of Processing: While performing the services and as required by applicable laws and professional standards.

APPENDIX E

## DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated February 7, 2025, between Deloitte & Touche LLP and Pet Supplies Plus, LLC.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Mediation: All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

Arbitration Procedures: If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. The Company, on the one hand, and Deloitte & Touche LLP, on the other hand, shall each designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators shall have no power to award punitive, exemplary or other damages not based on a party's actual damages (and the parties expressly waive their right to receive such damages). The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

Costs: Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

# APPENDIX F

# LISTING OF COMPANIES TO BE AUDITED

This Appendix F is part of the engagement letter dated February 7, 2025, between Deloitte & Touche LLP and Pet Supplies Plus, LLC, on behalf of the Companies.

| Sc No. | Entities | Year/ Period Ending |
|--------|----------|---------------------|
| 1. | PSP Franchising, LLC | As of and for fiscal year ended December 28, 2024 |
| 2. | WNW Franchising, LLC | As of and for fiscal year ended December 28, 2024 |
| 3. | The National Advertising Fund of Pet Supplies Plus, LLC | Fund Statement of Operations for fiscal year ended December 28, 2024 |