## EXHIBIT 2

**Blackline**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRANCHISE GROUP, INC., *et al.,*[1] | ) | Case No. 24-12480 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  Docket No. ——1084** |

## ORDER (I) AUTHORIZING
## THE RETENTION AND EMPLOYMENT OF
## HILCO DILIGENCE SERVICES, LLC AS FIELD EXAMINER
## FOR THE DEBTORS AND DEBTORS IN POSSESSION EFFECTIVE
## AS OF FEBRUARY 10, 2025, (II) WAIVING CERTAIN REQUIREMENTS
## IMPOSED BY LOCAL RULE 2016-1, AND (III) GRANTING RELATED RELIEF

Upon the application (the "Application")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors") for the entry of an order (this "Order"):  (a) authorizing

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Application.

the retention and employment of Hilco Diligence Services, LLC ("Hilco") so that it may perform services as field examiner in accordance with that certain letter agreement dated February 10, 2025, by and between the Debtors and Hilco (the "Engagement Agreement"), a copy of which is attached hereto as **Exhibit 1**; (b) approving the terms of Hilco's employment and retention, including the fee and expense structure and the indemnification, contribution, reimbursement, and related provisions set forth in the Engagement Agreement; (c) waiving certain requirements imposed by Local Rule 2016-1; and (d) granting related, all as more fully set forth in the Application; and upon the First Day Declaration and the Kaup Declaration; and the United States District Court for the District of Delaware having jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the Court under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Application is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Application and opportunity for a hearing on the Application were appropriate and no other notice need be provided; and this Court having reviewed the Application; and this Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT

1.      The Application is GRANTED on a final basis as set forth herein.

2.      In accordance with sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(a), and Local Rules 2014-1 and 2016-1, the Debtors are hereby authorized to employ and retain Hilco as field examiner in accordance with the terms and conditions set forth in the Application and the Engagement Agreement.

3.      Except to the extent set forth herein, the Engagement Agreement, together with all annexes and exhibits thereto and all compensation set forth therein, including, without limitation, the Fee Structure and Indemnification Provision, are approved pursuant to section 328(a) of the Bankruptcy Code, and Hilco shall be compensated, reimbursed, and indemnified pursuant to section 328(a) of the Bankruptcy Code in accordance with the terms of, and at the times specified in, the Engagement Agreement, as modified by the Order.

4.      Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or orders of this Court, Hilco is not required to maintain time records or file monthly or interim fee applications; *provided* that Hilco shall (a) file a final fee application with a summary of fees earned and expenses incurred along with a summary of what fees and expenses have been paid and (b) submit invoices to the Debtors and the U.S. Trustee for the payment of compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases in accordance with the Engagement Agreement when such compensation becomes due and owing and such expenses are incurred. Any invoices submitted pursuant to this paragraph 4 shall include a summary of (i) fees requested in the current invoice, (ii) fees paid pursuant to prior invoices, and (iii) an aggregate total of all fees requested.

5.     The Debtors, the U.S. Trustee, and the Creditor's Committee shall have 14 days to review and dispute any such invoice submitted by Hilco, and if no such disputes are received, without any further order of this Court, the Debtors shall be authorized to pay such Hilco invoices in accordance with the terms of the Engagement Agreement.  If an objection is received, the Debtors shall withhold the payment of the portion of the payment that is objected to and promptly pay the remainder and all objections that are not resolved shall be preserved and presented to this Court for determination.

6.     The payment of all fees and reimbursement of all expenses pursuant to the Engagement Agreement shall be free and clear of all liens, claims, and encumbrances; *provided*, *however*, such fees and reimbursed expenses shall remain subject to disgorgement until this Court has approved Hilco's final fee application.  Any and all rights of Hilco to contest or otherwise object to any such requests for disgorgement are hereby reserved.

7.     The fees payable to Hilco pursuant to the Engagement Agreement shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code.

8.     With respect to controversies or claims arising out of or in any way related to the Services in the Engagement Agreement notwithstanding any arbitration, dispute resolution, or exclusive jurisdiction provisions contained in the Engagement Agreement, any disputes arising under the Engagement Agreement shall be heard in this Court during the pendency of these chapter 11 cases.

9.     The indemnification, contribution and reimbursement provisions included in the Engagement Agreement are approved, subject during the pendency of these chapter 11 cases to the following modifications:

(a)     subject to the provisions of subparagraphs (b) and (c) below, the Debtors are authorized to indemnify Hilco in accordance with the Engagement Agreement for any claim arising from, related to, or in connection with their performance of the services described in the Engagement Agreement for the time period arising after the Petition Date; *provided*, *however*, that the indemnified persons shall not be indemnified for any claim arising from services other than the services provided under the Engagement Agreement, unless such services and the indemnification, contribution, or reimbursement therefor are approved by this Court;

(b)     notwithstanding anything to the contrary in the Engagement Agreement, the Debtors shall have no obligation to indemnify any person or provide contribution or reimbursement to any person for any claim or expense that is either (i) judicially determined (the determination having become final) to have arisen primarily from that person's gross negligence or willful misconduct, (ii) for a contractual dispute in which the Debtors allege breach of Hilco's obligations under the Engagement Agreement unless this Court determines that indemnification, contribution or reimbursement would be permissible pursuant to applicable law, or (iii) settled prior to a judicial determination as to sub-clauses (i) or (ii) above, but determined by this Court, after notice and a hearing, to be a claim or expense for which that person should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Agreement as modified by this Order; and

(c)     if, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these chapter 11 cases (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing these chapter 11 cases, Hilco believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, or reimbursement obligations under the Engagement Agreement (as modified by this Order), including, without limitation, the advancement of defense costs, Hilco must file an application before this Court, and the Debtors may not pay any such amounts before the entry of an order by this Court approving the payment; *provided*, *however*, that for the avoidance of doubt, this subparagraph (c) is intended only to specify the period of time under which this Court shall have jurisdiction over any request for fees and expenses for indemnification, contribution, or reimbursement and not a provision limiting the duration of the Debtors' obligation to indemnify Hilco.  The U.S. Trustee shall retain the right to object to any request for indemnification by Hilco.

10.     None of the fees payable to Hilco under the Engagement Agreement shall constitute a "bonus" or fee enhancement under applicable law.

11.    During the course of these chapter 11 cases, any limitation of liability provisions in the Standard Terms and Conditions included in the Engagement Agreement shall have no force and effect.

12.    ~~11.~~ To the extent that there may be any inconsistency between the terms of the Application, the Engagement Agreement, and this Order, the terms of this Order shall govern.

13.    ~~12.~~ Notice of the Application as provided therein is deemed to be good and sufficient notice of such Application, and the requirements of the Local Rules are satisfied by the contents of the Application.

14.    ~~13.~~ The Debtors a are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

15.    ~~14.~~ Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

16.    ~~15.~~ The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

## EXHIBIT 1

**Engagement Agreement**



Delivered via e-mail: eseeton@franchisegrp.com


February 5, 2025

Eric Seeton, CFO
Franchise Group – The Vitamin Shoppe and Pet Supplies Plus
109 Innovation Ct, Ste J
Delaware, OH 43015

Dear Mr. Seeton:

This letter will confirm the arrangements discussed with you regarding the field examination services Hilco Diligence Services, LLC, 5 Revere Drive, Suite 300, Northbrook, IL 60062 ("Hilco", "our", or "we") will provide to The Vitamin Shoppe and Pet Supplies Plus ("Company" or "Prospective Borrower"), in connection with seeking a Lender. By executing below, you hereby agree to engage Hilco according to the terms and conditions of this letter (the "Agreement").

Scope of Engagement: Our field examination will be based on the books, records and representations of the Prospective Borrower's management, employees, accountants, attorneys, other professionals, or other representatives (collectively, the "Representatives"). In conducting our field examination, we will apply certain agreed-upon procedures to the financial statements and other accounting records of the Prospective Borrower (the "Records") for the period as set forth in Appendix A attached hereto, which are hereby incorporated herein by reference as if fully set forth fully herein. From time-to-time, it may be necessary to amend or augment the procedures, which shall be confirmed in writing.  But we have no obligation to perform any procedures beyond those listed in Exhibit A or any written amendments thereto. This engagement is solely to assist a Lender with respect to evaluating certain assets of the Prospective Borrower pledged as collateral in conjunction with your proposed loan. The sufficiency of the procedures is solely the responsibility of a Lender.  HILCO MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE SUFFICIENCY THEREOF.   Upon completion of the agreed-upon procedures, we will submit a report containing the procedures performed and the results of those procedures.  This report is solely for the use of you or a Lender and its agents, and should not and may not be used by any other person or entity absent Hilco's express prior written consent.

Limitations Concerning Engagement.  For purposes of our engagement, we will accept as accurate the Records of the Prospective Borrower. Moreover, we will not express an opinion with respect to such Records or any elements, accounts, or items thereof.  Similarly, we will rely upon the accuracy of the representations, statements and other information of the Prospective Borrower or the Prospective Borrower's Representatives from other public sources we deem to be appropriate.  With respect to all Records and all representations, statements or other information, written or oral, provided by the Prospective Borrower or its Representatives, we will not independently verify any such Records or such representations, statements or other information, and our review will make no representation or warranty as to the accuracy or completeness of such Records or representations, statements or other information. We also make no representation or warranty and assume no responsibility with respect to the financial condition of the Prospective Borrower.

The agreed-upon procedures detailed in Exhibit A do not constitute an audit under generally accepted auditing standards, generally accepted accounting principles, or any other standard or convention on such information and is not designed to and cannot and may not be relied upon to disclose or detect errors, irregularities or illegal acts, including (without limitation) fraud and defalcations, that may affect the collectability of your existing or subsequent loan(s), should any exist.  However, should any such errors or irregularities come to our attention; we will report them to you as soon as reasonably practicable.



Fees, Costs and Report Delivery

Based on the assumptions in the following paragraph, Hilco's fee range for the Field Examination will be $100,000 - $125,000 plus reasonable out-of-pocket costs and expenses. The fee noted above is based on the Fee assumptions below. The fees are payable as follows: $50,000 upon acceptance of this engagement letter and the balance due upon completion but prior to the mailing or the release of any verbal or written indication of our field exam report.

Fee assumptions:
1) Procedures are full scope in nature.
2) We are assuming that The Vitamin Shoppe and Pet Supplies Plus are the two OPCO's within our scope and Pet Supplies Plus has one AR Aging and one Inventory Perpetual and The Vitamin Shoppe has one Inventory Perpetual.
3) Each OPCO has one accounting system to consolidate for financial statement purposes.
4) Full cooperation of the Company and regular access to the Company's team in order to complete our work.
5) Primary data requests can be provided in excel.
6) All information will be provided in a timely manner and organized fashion.
7) Fieldwork is contingent on direct access to Company management team members for interviews and accounting personnel for ongoing questions and follow ups on information.

Any deviations from the above assumptions can result in a fee change. The field exam information request list will be provided upon the execution of this letter with the field exam commencing upon receipt of all information and testing support.  Hilco will advise the Prospective borrower of any differences in the above assumptions and the resultant fee impact on a commercially reasonable basis.  Hilco will solicit written approval from the Prospective borrower advance of any fee changes.

The field examination is intended only for use in financing. The field examination may be invalid if used for any other purpose. A final signed copy of the reports will be sent to the Prospective borrower and its designated agents.

The field examination reports shall be used for decision-making purposes regarding financing of the assets. After receipt of payment in full of the fee, the reports shall be deemed to be owned by Prospective borrower who may, at its option, provide such reports to other persons interested in providing financing for any or all of the assets ("Lenders").  The Lenders shall be entitled to rely on the field exam report to the same extent as Prospective borrower.

Standard Terms and Conditions.  This Agreement shall be governed by and in accordance with the "Standard Terms and Conditions" annexed as Appendix B, which are hereby incorporated herein by reference as if set forth fully herein.

\*        \*        \*

We believe the foregoing correctly sets forth our understanding, but if you have any questions, please let us know.  If you find the arrangements acceptable, please execute this Agreement by signing below and returning to us the copy enclosed.

Very truly yours,
HILCO DILIGENCE SERVICES, LLC

*Jessica Benevides Caron*
By:  Jessica Benevides Caron

5 Revere Drive, Ste. 300, Northbrook, IL 60062



Its: Executive Director

Acknowledged and ACCEPTED this 6ᵗʰ day
of ___FebruarY___ 2025

By: _____

Name: _____ERIC SEETON_____

Its: _____CFO_____

5 Revere Drive, Ste. 300, Northbrook, IL 60062



APPENDIX A)   Schedule of Procedures
**Scope of Work**
**The following procedures will be performed as of the month ended <u>Dec-24</u> ("Current Period"), unless otherwise noted, with the comparative "Prior Period" representing <u>Dec-23</u>. In the event that HDS encounters items that are unusual, unforeseen, or more complex than the planned procedures below, HDS we will bring these items to the attention of the Client for further discussion. Additional procedures requested by the Client not included within the below may result in additional engagement fees.**

**The below procedures relate to Full Scope Opcos/entities and are applicable for the following operating / legal entities:**

1. **The Vitamin Shoppe**
2. **Pet Supplies Plus**

### CREDIT CARD ACCOUNTS RECEIVABLE:

A. Interview relevant Company personnel to understand the processing, timing and flow of funds from the credit card processors to the Company's depository accounts as well as the process whereby store cash deposits are controlled and monitored. This includes an understanding of the Sales Audit process.
B. Obtain and/or prepare a reconciliation of Credit Card AR to the general ledger and from the general ledger to the financial statements for the Current Period.
C. Prepare and/or comment on a borrowing base utilizing the Credit Card AR balance based on the Credit Agreement and/or Term Sheet provided by the Client for the Current Period
D. Obtain and/or prepare a sales by tender type schedule for the last 12 months ended as of the Current Period and for the last 12 months ended for the Prior Period. Discuss any changes in tender type mix between the two periods.
E. Obtain a chargeback analysis (consolidated) for each of the last 12 months ended as of the Current Period. Document any higher than expected or unusual chargeback activity.
F. Obtain the Company's agreements with its credit card processors. Note if the agreement term is still current.
G. Obtain from the Company their annual Payment Card Industry (PCI) data security compliance certification and note in the report.
H. Obtain and/or prepare a schedule showing the Company's returns and net sales on a monthly basis for the LTM ended as of the Current Period. Note overall return rate and any unusual trends.
I. Obtain and/or prepare a schedule showing comparable store sales for the last 12 months ended for the Current Period. Comment on the trends providing any Company explanations.
J. Obtain balance and support for all gift card, customer deposit, merchandise credit, and loyalty program liabilities as of the Current Period.
K. Select daily credit card receipts (consolidated) from 5 stores for the last 5 days of the month ended as of the Current Period. Trace the days lag from the credit card processor statements to ultimate deposit into the Company's bank accounts.

### ACCOUNTS RECEIVABLE:

A. Interview relevant Company personnel to understand the customer order and sales process, whether any unusual customers or customer relationships exist (related party, exceptions to policies), credit and collections procedures, credit memos, defect/return handling, revenue recognition process, AR tools & systems and all activity relevant to accounts receivable, billing and collection (including review of the Company's policies and practices for new and ongoing customer credit analysis, delinquent accounts and collections). This includes contract accounting/percentage, milestone, progress billing, and retainage, surety bond requirements, if applicable.
B. Obtain and/or prepare a reconciliation from the AR aging to the general ledger and from the general ledger to the financial statements for the Current Period.
C. Prepare and/or comment on a borrowing base utilizing the AR Aging balance based on the Credit Agreement and/or Term Sheet provided by the Client for the Current Period.



**D.** Obtain and/or prepare a monthly rollforward of the Company's AR (either the general ledger or AR aging) for the last 13 months ended as of the Current Period identifying sales/billings, cash receipts, credit memos, write-offs, other credit adjustments, debit adjustments, and other balancing items.
**E.** Prepare a dilution analysis for the 12 months ended as of the Current Period;
**F.** Obtain a reconciliation of each month's ending balance to its historic AR aging balance or general ledger balance;
**G.** Prepare a cash proof for the last 3 months ended as of the Current Period between the Company's cash collections for the last 3 months ended as of the Current Period to the Company's bank statements; and
**H.** Obtain a reconciliation of sales/billings for the 12 months ended as of the Current Period compared to sales per the financial statements.
**I.** Compare and comment on the Company's AR aging spreads for Current Period, Prior Period and last fiscal year-end. Include the monthly AR aging spreads for the last 13 months as an appendix within the report
**J.** Obtain or determine the Company's top ten customers (by opco) based on sales for the last 12 months ended as of the Current Period and obtain the sales for those same customers for the last 12 months ended as of the Prior Period. List each customer's payment terms, length of relationship, products purchased and other pertinent information. Obtain an explanation for significant changes within the top 10 customer sales between each period.
**K.** Obtain or determine the Company's top ten customers (by opco) based on AR balance for the Current Period. Listing the payment terms, AR aging spreads, length of relationship, products purchased and other pertinent information.
**L.** Obtain or determine the Company's top ten customers (by opco) based on past due AR for the Current Period.  Comment on the reason for each account being past due, subsequent collections and/or future collectability of the account(s). Compare results to the Company's relevant AR collection policies.  Consider whether dilution should be adjusted for unrecorded write-offs.
**M.** Obtain or determine and comment on (as applicable) the Company's accrued rebates, volume incentives, marketing allowances, other financing arrangements, sales taxes, or other items that may impact the AR borrowing base.
**N.** Comment on the Company's allowance for doubtful accounts reserve for the last 12 months ended as of the Current Prior, obtain an explanation for any customer write-offs and compare results to the Company's relevant AR or accounting policies.
**O.** Select 20 invoices (by opco) from the AR aging(s) focusing on invoices that appear to be eligible.  Obtain evidence of shipment and/or delivery (e.g. bill of lading, proof of delivery, etc), the invoice and associated payment details noting whether the invoice is aged consistent with the AR aging, if the invoice was pre-billed and any other pertinent information, such as bill to/ship to locations or billing legal entity.
**P.** Select 20 credit memos (by opco) from the Company's credit memo listing for the last 3 months ended as of the Current Period.  Obtain a copy of the original invoice, credit memo, rebilled invoice (if applicable). Note the associated credit memo lag and reason for the credit memo.
**Q.** Select 20 cash receipts (by opco) from the Company's cash receipts listing for the last 3 months ended as of the Current Period.  Obtain a copy of the original invoice, check/wire/ACH, remittance advice and evidence the timing of cash application.

INVENTORY:

**A.** Interview relevant Company personnel to understand the general operations, processes and controls related to inventory procurement, production, distribution/storage/logistics, customer fulfilment, accounting/costing methodologies, inventory systems and if applicable accounting methodologies for capitalizing/expensing standard to actual variances.
**B.** Obtain and/or prepare a reconciliation from the inventory perpetual to the general ledger and from the general ledger to the financial statements for the Current Period.  Consider whether any reconciling items should be reflected in the BB.
**C.** Prepare and/or comment on a borrowing base utilizing the inventory perpetual balance based on the Credit Agreement and/or Term Sheet provided by the Client for the Current Period.
**D.** Obtain and document the Company's calculation for their inventory reserves including but not limited to the slowing moving and obsolescence reserve, LCM reserve, NRV reserve, intercompany profit, samples, etc.
**E.** Obtain an inventory by location schedule and note any differences between the schedule and the inventory perpetual. Note if the location is leased or owned and, if leased, provide the monthly rental expense and



landlord information. Document the various inventory components (e.g., RM, WIP, FG) by location and provide their physical address.

**F.**  Document the Company's physical and/or cycle count policies. Include the Company's book-to-physical adjustments for the last 12 months ended as of the Current Period including final shrink results.

**G.**  Obtain and comment on (as applicable) the Company's marketing incentive programs, including accrued vendor rebates, volume incentive programs, or returns, freight reserves, landed costs (if applicable), etc.

**H.**  Obtain an inventory by type and/or category schedule to analyze mix and or identify potential ineligibles.

**I.**  If perishable or limited life inventory exists obtain or prepare an analysis of the inventory aging based on expiration date or end of service date. Coordinate with appraiser if applicable.

**J.**  Select 20 items for each location from the perpetual listings and perform inventory counts at each opco for one retail location and one distribution center. Obtain and comment on variances between the perpetual listing and the count.

**K.**  Select 20 items (by opco) from the Company's inventory perpetual listing as of the Current Period.  Obtain a copy of the original vendor invoice to compare the cost per the vendor invoice to the perpetual listing. Obtain explanations for any variances from Management.

**L.**  Select 20 invoices (by opco) from the AR aging or inventory perpetual to compare the gross margins within the Company's invoices to the Company's overall gross margins within the financial statements. Obtain and comment on any variances.

**M.**  Prepare and/or comment on an Inventory borrowing base utilizing the in-transit inventory listing balance based on the Credit Agreement and/or Term Sheet provided by the Client for the Current Period.  Consult with the Lender/Client to ensure our understanding of their In-Transit eligibility criteria and testing required. Note in some cases the Company's existing process may not be suitable and will need to be revised to conform with the Lender's requirements.

**N.**  Select 20 items (by opco) from the Company's in-transit inventory listing as of the Current Period. Obtain a copy of the purchase order, vendor invoice, bill of lading, sea waybill (if applicable) and receiving documentation. Document the following:
   a.  The transfer of title date which indicates when the Company obtained the proper title of the items
   b.  The shipping lag between the transfer of title date to the date the items are received at the United States port and then when the items are received at the Company's location
   c.  Document the negotiability of the bill of lading (i.e. "to the order of", etc.) and include the listed consignee

ACCOUNTS PAYABLE:

**A.**  Interview relevant Company personnel to understand the general controls and procurement processes related to accounts payable and purchases.

**B.**  Obtain and/or prepare a reconciliation from the AP aging to the general ledger and from the general ledger to the financial statements for the Current Period.

**C.**  Compare and comment on the Company's AR aging spreads for Current Period, Prior Period and last fiscal year-end. Include the monthly AR aging spreads for the last 13 months as an appendix within the report.

**D.**  Obtain the Company's top ten vendors (by opco) based on purchases for the last 12 months ended as of the Current Period and obtain the purchases for those same vendors for the last 12 months ended as of the Prior Period. List each vendor's payment terms, length of relationship, products purchased and other pertinent information. Obtain an explanation for significant changes within the top 10 vendor purchases between each period.

**E.**  Obtain the Company's top ten vendors (by opco) based on AP balance for the Current Period. Listing the payment terms, AP aging spreads, length of relationship, products purchased and other pertinent information.

**F.**  Prepare a schedule of the Company's accrued liabilities from the general ledger and provide an explanation related to those accounts with any potential impact on availability.

**G.**  Obtain the most recently filed Federal tax return, a selection of three State tax returns. Review for inter-co and related party transactions as well as whether they have any taxes payable in arrears or are a taxpayer. Note if any undergoing audits are currently underway by governmental authorities.

**H.**  Obtain a selection of three property tax returns, a selection of three sales and use tax returns and the Company's last two filed US Form 941documents.or other applicable jurisdictions payroll tax filing forms. In addition, obtain the Company's proof of payment for each tax filing to determine if they are current on their taxes. Note if any undergoing audits are currently underway by governmental authorities.



I. For relevant jurisdictions, obtain a listing of all employee related liabilities and if not evident their purpose and payment timing.

CASH & OTHER:

A. Interview relevant Company personnel to understand the general controls and procedures related to cash processes.
B. Obtain the Company's cash flow diagram for all bank accounts and a brief description of the purpose of each bank account.
C. Obtain a listing of bank accounts and note the bank name, account number, GL number and purpose of each account.
D. Select bank statements and obtain the Company's reconciliations commenting on any reconciling items.
E. Select 20 cash disbursements (by opco) from the Company's disbursement listing for the last 3 months ended as of the Current Period. Obtain a copy of the original vendor invoice and check/wire/ACH and obtain the purpose of the disbursement.
F. Obtain the Company's outstanding letters of credit noting the purpose, amount and expiration dates.
G. Obtain from the Company a list of their intercompany, affiliated, and related party relationships and transactions
   a. Obtain supporting documentation and explanations for material non-recurring transactions as defined by the Company
   b. Obtain supporting documentation and explanations for 5 typical recurring transactions
   c. Obtain and document the Company's legal entity chart and highlight which legal entities are loan parties and applicable for HDS' procedures
   d. Document settlement practices and note whether they are settled in cash or via journal entry
H. Obtain and document the Company's list of threatening or pending litigation.
I. Prepare a schedule of monthly self-insured medical claims for the 12 months ending as of the Current Period (or most recent annual claims analysis provided by the Company's benefit administrator.
J. Obtain the Company's current property insurance policy and amount of coverage, deductible, period of coverage, insurance providers, loss payee, proof of payment and expiration date. Also, document if there have been any claims within the last 12 months ended as of the Current Period and if so how they were adjudicated.



APPENDIX B)   Standard Terms and Conditions

**For purposes of these Standard Terms and Conditions, "Agreement" means (i) the engagement letter/agreement to which these Standard Terms and Conditions are annexed (the "Engagement Letter"),[1] (ii) all amendments, instruments, documents, agreements, attachments, exhibits thereto, (iii) all valuations, appraisals, and other deliverables contemplated by the engagement letter/agreement (collectively, the "Deliverables"), and (iv) these Standard Terms and Conditions.**

Reliance by HILCO.  If necessary to complete the Services set forth in the Agreement, HILCO is authorized to, and the Prospective borrower hereby acknowledges that HILCO will, (i) rely upon the involvement of the Prospective borrower and the Prospective borrower designees, all data provided by the foregoing or other third parties from which HILCO obtains data, field visits, and due diligence information, interviews, and responses to requests.  HILCO is authorized to, and the Prospective borrower hereby acknowledges that HILCO will, (ii) rely upon the foregoing without independent verification or confirmation, and (ii) rely upon all information provided to HILCO as being complete and accurate.  Where appropriate, HILCO may rely upon any information already developed and/or available to HILCO that is not confidential or subject to a confidentiality agreement with a third party other than the Prospective borrower.

Survival. The terms of the "Limitation of Liability" and Indemnification" sections of this Agreement paragraph shall survive the termination of this Agreement.

Use of Deliverables.  For the avoidance of doubt, each Deliverable is valid only for the purpose stated in the agreement, except to the extent expressly set forth in the Engagement Letter or expressly otherwise authorized by HILCO in writing.  The Prospective Borrower agrees not to reference, orally or in writing, HILCO or its affiliates or the Deliverables in whole, or in part, in any communication or document made available to third parties where it is reasonable to assume that any such third party may rely on any Deliverable.

Use of Independent Contractors.  The Prospective borrower understands and agrees that from time to time HILCO may engage independent contractors in connection with performing its services under the Agreement.  HILCO will advise the Prospective Borrower of such contractors and such contractors will be obligated to comply with all HILCO obligations under the Agreement.

Confidentiality/Use of Information.  In connection with its performance of services for the Prospective borrower, HILCO may have access to information and materials relating to the Prospective borrower and the Prospective borrower' clients that are not generally available to the public and that must be treated as confidential and proprietary ("Confidential Information").  Confidential Information shall not include any information that is or becomes available to the public generally other than as a result of a breach of this Agreement. Other than as set forth in the Agreement, HILCO will not disclose Confidential Information or use Confidential Information without the Prospective borrower' permission, except (i) to HILCO' members, affiliates, officers, directors, employees, appraisers, independent contractors, representatives, or agents who need to know such Confidential Information or (ii) pursuant to legal process issued by regulatory and judicial bodies having jurisdiction over these matters, provided that whenever reasonably possible, HILCO will give the Prospective borrower notice of such process prior to the release of Confidential Information. The Prospective borrower hereby acknowledges and agrees that HILCO is not under an obligation to disclose information obtained from other engagements to the Prospective borrower ("Other Information"). The Prospective borrower further agrees that Company Name will not assert that HILCO has an actual or potential conflict or has breached any duty or obligation to the Prospective borrower by virtue of HILCO' possession of Confidential Information, not revealing Other Information to the Prospective borrower, and/or not using Other Information in connection with the engagement under the Agreement.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Engagement Letter.

5 Revere Drive, Ste. 300, Northbrook, IL 60062



No Guaranty.  HILCO has not guaranteed, and is not guarantying, by the Agreement or otherwise, any specific result.

Governing Law.  The Agreement shall be governed by and interpreted in accordance with the laws of the State of Illinois, without reference to any conflict of laws provisions thereof.  Each of the Prospective borrower and HILCO irrevocably and unconditionally submits, for itself and its properties, to the jurisdiction of the courts of the State of Illinois, County of Cook, or, if it has or can acquire jurisdiction, in the United States District Court for the District of Illinois.  Each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any action or proceeding arising out of or relating to the Agreement and waives any objection to venue laid therein.  Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

No Third Party Beneficiaries.  Nothing in the Agreement expressed or implied is intended to confer upon any person (other than HILCO and the Prospective borrower) any right, remedies, obligations or liabilities under or by reason of the Agreement.

WAIVER OF JURY TRIAL.  EACH OF HILCO AND THE PROSPECTIVE BORROWER WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THE AGREEMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT, AGREEMENT, ATTACHMENTS, EXHIBITS, APPRAISALS OR DELIVERABLES DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

LIMITATION OF LIABILITY.  HILCO' MAXIMUM LIABILITY TO THE PROSPECTIVE BORROWER AND ALL THIRD PARTIES, IN THE AGGREGATE, ARISING FOR ANY REASON OUT OF OR RELATING TO THE AGREEMENT, WHETHER A CLAIM IN TORT, CONTRACT, OR OTHERWISE, SHALL BE LIMITED TO THE AMOUNT OF FEES PAID BY THE PROSPECTIVE BORROWER TO HILCO UNDER THE AGREEMENT FOR THE SERVICES DESCRIBED THEREIN, EXCEPT TO THE EXTENT SUCH LIABILITY IS FINALLY DETERMINED TO HAVE BEEN SUBSTANTIALLY CAUSED BY THE FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF HILCO.  NEITHER HILCO NOR HILCO' MEMBERS, AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, APPRAISERS, INDEPENDENT CONTRACTORS, REPRESENTATIVES, OR AGENTS SHALL BE LIABLE TO THE PROSPECTIVE BORROWER FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES.

Indemnification.  The Prospective borrower agrees to and shall indemnify HILCO, defend HILCO, and hold HILCO harmless from and against any and all causes of action, demands, losses, claims, damages, liabilities, costs, and expenses, including without limitation, reasonable legal fees, costs, and expenses, incurred by HILCO arising from, related to, or in any way connected with the Agreement or the Services contemplated by the Agreement, except to the extent such causes of action, demands, losses, claims, damages, liabilities, costs, or expenses are finally determined to have been substantially caused by the fraud, gross negligence or willful misconduct of HILCO.

Litigation Cooperation by HILCO.  If HILCO or any employee, any independent contractor, or any former HILCO employee or independent contractor who participated in the Services is required to prepare for and/or participate in any stage of a legal proceeding, including (without limitation) in response to subpoenas, demand letters, or discovery, prepare or appear for depositions, hearings, proceedings, or trials (collectively, "Litigation Services"), regarding the Services or the subject matter of the Agreement, Company Name agrees to compensate HILCO and any employee, any independent contractor, or any former HILCO employee or independent contractor who participated in the Services for the Litigation Services on such terms and for such amounts as shall be mutually agreed by HILCO and Company Name.



Counterparts and Execution. The Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. A manual signature on the Agreement or other documents to be delivered pursuant to the Agreement, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes. The delivery of copies of the Agreement or other documents to be delivered pursuant to the Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of the Agreement or such other document for all purposes.

Captions. The captions and headings used in the Agreement are inserted for convenience only and shall not constitute a part hereof.

Construction. Each of HILCO and the Prospective borrower agree that, in the event an ambiguity or question of intent or interpretation arises, the Agreement shall be construed as if drafted jointly by HILCO and Company Name and no presumption or burden of proof shall arise favoring or disfavoring either HILCO or the Prospective borrower by virtue of the authorship of any of the provisions of the Agreement. The word "including" shall mean including without limitation.

Severability. Any term or provision of the Agreement that is determined by a court of competent jurisdiction invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Entire Agreement/Amendment. The Agreement constitutes the entire agreement between the Prospective borrower and HILCO and supersedes all prior discussions, negotiations and agreements, whether oral or written. The Agreement shall not be modified or amended in any respect, except by a written instrument executed by or on behalf of the parties to the Agreement.