**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., et al., | Case No. 24-12480 (LSS) |
| Debtors.[1] | (Jointly Administered) |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING THE COMMITTEE, LEAVE, STANDING, AND AUTHORITY TO COMMENCE, PROSECUTE AND SETTLE CERTAIN CLAIMS ON BEHALF OF THE OPCO DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby moves this Court for entry of an order pursuant to sections 105, 503(b), 1103, and 1109 of the Bankruptcy Code, granting the Committee leave, standing, and authority to commence, prosecute, and settle avoidance actions and claims, claims for illegal dividends, and similar and other claims on behalf

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

of the estates of Franchise Group, Inc. and each of its direct and indirect debtor subsidiaries (collectively, the ("OpCo Debtors") against the defendants (collectively, as may be supplemented or modified, the "Defendants") named in the proposed complaint substantially in the form attached hereto as **Exhibit A** (as may be amended or modified, the "Proposed Complaint").  In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.     As is typical of many large business organizations, the Debtors are composed of operating entities, the entities that hold all of the Debtors' tangible assets and operating business segments, and holding entities, with no operations or source of revenues or income of their own.  As described in greater detail below, in connection with the Take Private Transaction,[2] the holding entities (and only the holding entities) became obligors on the $475 million Holdco Facility, and their ability to make interest payments thereunder was entirely dependent on the receipt of dividends from the Opco entities.

2.     After the Take Private Transaction closed, in order for the Holdco Debtors to make three interest payments due in November 2023, February 2024, and May 2024, as required by the HoldCo Facility, Franchise Group New HoldCo, an OpCo Debtor, issued three dividends of approximately $18.5 million each to its indirect parent, Debtor Freedom VCM, Inc., a HoldCo Debtor.  Immediately, as per the parties' arrangements, the proceeds of the dividends were used to make the interest payments to the Holdco Lenders.  Each of these dividend payments constitute avoidable fraudulent transfers and illegal dividends, the value of which should be recovered from Debtor Freedom VCM, Inc. and from the Holdco Agent and HoldCo Lenders, the intended transferees of the fraudulently transferred funds.

---

[2]    Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them in the body of the Motion.

3.      In August 2024, the HoldCo Debtors faced another interest payment date in connection with the HoldCo Facility, but the OpCo Debtors' lenders declined to consent to the OpCo Debtors making any further dividend payments to the HoldCo Debtors in order to fund the then-required interest payments in connection with the HoldCo Facility. Instead, without receiving any consideration, certain of the OpCo Debtors provided the HoldCo Guarantee, which guaranteed obligations under the HoldCo Term Loan Credit Facility (to which the OpCo Debtors were not parties) in an amount of up to $19.51 million.  The OpCo Debtors' obligations were secured by a lien on the OpCo's assets ratable with the obligations under the Second Lien Term Loan Credit Agreement. These obligations incurred by the Supplement No. 1 Obligors in connection with the HoldCo Guarantee are also avoidable and recoverable as fraudulently incurred obligations and the securing of such obligations is avoidable as a fraudulent transfer.

4.      The Committed demanded that the OpCo Debtors bring suit against the Defendants in connection with the Transferred Funds and the HoldCo Guarantee.  The OpCo Debtors have  refused to do so.  The Committee brings this motion to obtain standing to bring the claims of the OpCo Debtors' estates relating to the Transferred Funds, Supplement No. 1 and the HoldCo Guarantee contained therein, and the Supplement No. Transferred Property (collectively, the "Subject Claims") against the Defendants and to object to the proofs of claim filed by the Defendants.  The Subject Claims are colorable, and their prosecution has the potential to generate substantial value for the creditors of the OpCo Debtors.  In light of the OpCo Debtors' refusal to bring the Subject Claims, the Committee should be granted authority to pursue the Subject Claims, thereby preserving and maximizing value for creditors.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1334.  This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory predicates for the relief requested herein are sections 105(a), 1103(c), and 1109(b) of the Bankruptcy Code and Bankruptcy Rules 3007 and 7001.

**STATEMENT OF FACTS**

**A.     General Background**

7.      On November 3, 2024 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court, thereby commencing these Cases.  The Debtors continue in possession of their property and are operating and managing their businesses as debtors in possession pursuant to the provisions of 11 U.S.C. §§ 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

**B.     The Take Private Transaction**

8.      In August, 2023, when FRG was still a publicly traded company, it effectuated a take private transaction (the "Take Private Transaction"), led by Brian Kahn, the former Chief Executive Officer of FRG, whereby Mr. Kahn and other members of FRG management took private control of FRG.  The Take Private Transaction was funded, in part, with a $475 million facility (the "HoldCo Facility") incurred by Freedom VCM, Inc. and Freedom VCM Interco, Inc. (together, the "HoldCo Debtors.")

9.      The HoldCo Debtors and their parent Debtors, Freedom VCM, Interco Holdings, Inc., and Freedom VCM Holdings, LLC ("Freedom Topco"), were created as part of the Take Private Transaction.  The HoldCo Debtors have no operations or source of revenues or

income (other than dividends), and their main asset is Freedom VCM's 100% equity ownership of FRG. As noted by the Ad Hoc Group of Freedom Lenders, the HoldCo Lenders are the only non-insider creditors of the HoldCo Debtors. *See First Omnibus (Non-Substantive) Objection of the Ad Hoc Group of Freedom Lenders to Certain Claims Filed Against the HoldCo Debtors* (the "Freedom Lenders Claims Objection ") [Docket No. 1059] ¶ 2.

## C.    The Debtors' Corporate Structure

10.    Each of the Debtors is privately held. Prior to the Take Private Transaction, FRG was a publicly traded company with its common shares traded on the Nasdaq Global Select Market under the ticker FRG. Freedom Topco wholly owns Freedom VCM Interco Holdings, Inc., which, in turn, wholly owns, directly and indirectly, each of the other subsidiaries in the Debtors' corporate structure.

## D.    The Debtors' Prepetition Capital Structure

### 1.    The OpCo Facilities

11.    The OpCo Debtors hold all of the Debtors' tangible assets and operating business segments. As of the Petition Date, the OpCo Debtors were obligated on: (a) a $247.8 million asset-based lending facility that is memorialized in that certain *Third Amended and Restated Loan and Security Agreement*, dated as of March 10, 2021 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "ABL Credit Agreement"), (b) a $1.097 million first lien term loan facility that is memorialized in that certain *First Lien Credit Agreement*, dated as of March 10, 2021 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "First Lien Term Loan Credit Agreement"), and (c) a $125 million second lien term loan facility which is memorialized in that certain *Second Lien Credit Agreement*, dated as of March 10, 2021 (as amended, amended and restated,

supplemented, or otherwise modified, refinanced or replaced from time to time prior to the Petition Date, the "Second Lien Term Loan Agreement").

**2.    The HoldCo Facility**

12.    As noted above, the Take Private Transaction was funded, in part, with the $475 million HoldCo Facility.  The HoldCo Facility is memorialized in that certain *Credit Agreement*, dated as of August 21, 2023 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date (the "HoldCo Term Loan Credit Agreement").  Pursuant to the HoldCo Term Loan Credit Agreement, the HoldCo Debtors were required to make quarterly interest payments to the HoldCo Lenders; these interest payments amounted to over $18 million in each of November 2023, February 2024, and May 2024.

13.    None of the Debtors other than the HoldCo Debtors are obligors under the HoldCo Facility, except by virtue of the HoldCo Guarantee described below.  Under the HoldCo Facility, the HoldCo lenders were granted a security interest in substantially all assets of the HoldCo Debtors, which consist principally if not exclusively of the equity interests in FRG.

**E.    The Transferred Funds**

14.    As noted above, the HoldCo Debtors had and have no operations, and their main asset is Freedom VCM's 100% equity interest in FRG.

15.    Thus, the HoldCo Debtors' ability to make the interest payments required by the HoldCo Facility was dependent on their receipt of dividend payments from their operating subsidiaries.

16.    To that end, on or about the dates set forth below, the HoldCo Debtors' wholly owned indirect subsidiary, Franchise Group New HoldCo made the following three

payments in the total amount of $55,616,506.48 (the "Transferred Funds") as dividends to Freedom VCM, Inc.:

| Date of Payment | Amount of Payment |
| --- | --- |
| November 25, 2023 | $18,669,319.78 |
| February 20, 2024 | $18,553,745.58 |
| May 20, 2024 | $18,393,441.12 |

17.    The Transferred Funds were then transferred from Franchise VCM, Inc. to the HoldCo Agent as follows:

| Date of Payment | Amount of Payment |
| --- | --- |
| November 25, 2023 | $18,669,319.78 |
| February 21, 2024 | $18,553,745.58 |
| May 21, 2024 | $18,393,441.12 |

18.    After receipt of each payment, the HoldCo Agent disbursed the funds to the HoldCo Lenders. The economic reality of the transactions whereby Franchise Group New HoldCo made $18 million dividend payments to Freedom VCM, Inc. to fund simultaneous interest payments in the identical amounts to the HoldCo Lenders is that Franchise Group New HoldCo's assets were fraudulently transferred to the ultimate and intended beneficiaries, the HoldCo Lenders, for no consideration.

19.    At each time that the HoldCo Agent received the Transferred Funds and each time that each HoldCo Lender received its *pro rata* portion of the Transferred Funds from the HoldCo Agent, the HoldCo Agent and each HoldCo Lender knew or should have known that (i) the Transferred Funds were transferred as dividends from Franchise Group New HoldCo to Freedom VCM, Inc. in order to make interest payments on the HoldCo Facility, and (ii) at each time that the Transferred Funds were transferred, Franchise Group New HoldCo (a) was

Case 24-12480-LSS    Doc 1200    Filed 03/28/25    Page 8 of 21

insolvent or became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Franchise Group New HoldCo was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured. The Transferred Funds benefitted the HoldCo Debtors and the HoldCo Lenders and harmed the OpCo Debtors' creditors, and are avoidable as fraudulent transfers

### 3. The HoldCo Guarantee

20. In August 2024, after making a series of dividend payments in prior periods that were used to pay interest on the HoldCo Facility, the OpCo Debtors did not have sufficient cash to make the interest payments required by the HoldCo Term Loan Credit Agreement, and OpCo Debtors' lenders declined to consent to any further dividend payments to the HoldCo Debtors in order to fund the then-required interest payments. Accordingly, pursuant to that certain Supplement No. 1, dated as of August 19, 2024 (the "Supplement No. 1"), certain of the OpCo Debtors (collectively the "Supplement No. 1 Obligors") obligated under the ABL Credit Agreement, the First Lien Term Loan Credit Agreement, or the Second Lien Term Loan Credit Agreement provided a guarantee (the "HoldCo Guarantee") of the obligations under the HoldCo Term Loan Credit Agreement in an amount not to exceed $19.51 million, and pursuant to that certain Fifth Amendment to the Second Lien Credit Agreement, dated as of August 19, 2024, the HoldCo Debtors agreed to treat the "Secured HoldCo Guarantee Obligations" as "Secured Obligations" (each as defined in the Second Lien Term Loan Credit Agreement).

21. Upon information and belief, the HoldCo Lenders contend that they have a lien on certain of the OpCo Debtors' property (the "HoldCo Lenders' Purported Lien") on the basis of the HoldCo Guarantee.

4917-1383-2494.3 29177.00002                                    8

22.     The credit facilities at the OpCo Debtors and the HoldCo Facility are entirely separate, and aside from the HoldCo Guarantee provided by the Supplement No. 1 Obligors, each has different obligors.

23.     The Supplement No. 1 Obligors received no consideration for their delivery of the HoldCo Guarantee or the grant of the HoldCo Lenders' Purported Lien.

24.     Although Supplement No. 1, the HoldCo Guarantee, and the pledge of the assets that ultimately became subject to the HoldCo Lenders Purported Lien (collectively, the "Supplement No. 1 Transferred Property") benefitted the HoldCo Debtors and the HoldCo Lenders, these transactions provided no benefit to the OpCo Debtors and their creditors who previously had no obligations to the HoldCo Lenders.  At the time that the HoldCo Agent and each HoldCo Lender entered into the HoldCo Guarantee with the Supplement No. 1 Obligors, the HoldCo Debtors, as ultimate parents of the Supplement No. 1. Obligors, knew or should have known that each Supplement No. 1 Obligor (a) was insolvent or became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with it was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

F.      **The HoldCo Lender Proofs of Claim**

25.     On or about January 23, 2025, the HoldCo Agent filed claim number 2137 (the "Agent Proof of Claim") in an amount of not less than $527,654,196.52.

26.     In addition, the following HoldCo Lenders filed the following proofs of claim (together, the "HoldCo Lender Proofs of Claim") against the Debtors on the following dates:

| Claim Number | HoldCo Lender | Date of Filing |
|---|---|---|
| 1924 | Irradiant Solutions Fund, L.P. | January 23, 2025 |
| 1955 | Irradiant Solutions Mini-Master, Fund, L.P. | January 23, 2025 |
| 1961 | IFRG Investors II, L.P. | January 23, 2025 |
| 1977 | Irradiant Solutions Fund II, L.P. | January 23, 2025 |
| 1862 | IFRG Investors III, L.P | January 23, 2025 |
| 2054 | Irradiant Solutions Mini-Master Fund II, SCSP | January 23, 2025 |
| 2106 | Co Finance II LVS II LLC | January 23, 2025 |
| 2110 | OC III LVS LXII LP | January 23, 2025 |
| 2098 | RSF XVIII LLC | January 23, 2025 |
| 2107 | HVS XXXIV LLC | January 23, 2025 |

27.     The Agent Proof of Claim and each HoldCo Lender Proof of Claim assert that pursuant to the *Order Authorizing Filing Master Proof of Claim by the Prepetition HoldCo Secured Parties* [Docket No. 801] (the "HoldCo Claim Stipulation"), it is authorized to file a master proof of claim against FRG that will be deemed a proof of claim against all of the Debtors and that, accordingly, the proof of claim "will be deemed a proof of claim against all of the Debtors." *See, e.g.*, Proof of Claim No. 2137, filed by HoldCo Agent.  Thus, each Holder Lender Proof of Claim, *inter alia*, asserts claims against every OpCo Debtor, regardless of whether the claimant is in privity with any or all of the OpCo Debtors.

## RELIEF REQUESTED

28.     By this Motion, pursuant to sections 105(a), 1103(c), and 1109 of the Bankruptcy Code, the Committee seeks entry of an order (attached hereto as **Exhibit B**) granting

the Committee authority and standing to commence, prosecute, and, if appropriate, settle the

Subject Claims identified in the Proposed Complaint.[3]

## ARGUMENT

### A.    Legal Standard

29.    The filing of a petition under chapter 11 of the Bankruptcy Code creates

an estate that includes "all legal or equitable interests of the debtor in property as of the

commencement of the case."  11 U.S.C. § 541(a)(l*).*  Causes of action that belong to a debtor

when its bankruptcy case is filed are property of the bankruptcy estate.  *In re Louisiana World

Expo. v. Fed. Ins. Co.*, 858 F.2d 233, 245 (5th Cir. 1988) ("*LA World*") (citing *In re S.J. Acq.*,

817 F.2d 1142, 1149 (5th Cir. 1987)); *In re Mortgage America Corp.*, 714 F.2d 1266, 1274 (5th

Cir. 1983); *In re Ozark Rest. Equip., Co.*, 816 F.2d 1222, 1225 (8th Cir. 1987).

30.    A debtor in possession is "duty bound" to assert causes of action that are

property of the estate "if doing so would maximize the value of the estate."  *LA World,*  858 F.2d

at 246.  When a debtor refuses to pursue such causes of action, a bankruptcy court should grant a

creditors' committee authority to do so.   *See id.* at 247, 251; *see also Coral Petroleum, Inc. v.

Banque Paribas-London*, 797 F.2d 1351, 1363 (5th Cir. 1986) (suggesting that section 1109(b)

provides a basis for creditors' committee standing); *Unsecured Cred. Comm. v. Noyes* (*In re STN

Enters.*), 779 F.2d 901, 904 (2d Cir. 1985) (holding that sections "1103(c)(5) and 1109(b) imply

a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy

court"); *In re iPCS, Inc.*, 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("[I]f a debtor has a

cognizable claim, but refuses to pursue that claim, an important objective of the Code [the

---

[3]    The Committee expressly reserves the right to amend and supplement the Subject Claims and the Proposed
Complaint.  For the avoidance of doubt, the lack of specific identification herein or in the Proposed Complaint
of a particular claim or cause of action any against any party does not constitute a waiver of such claims by the
Committee.

recovery and collection of estate property] would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead.").

31.     The Bankruptcy Code provides that a committee may "perform such . . . services as are in the interest of those represented."  11 U.S.C. § 1103(c)(5).  The Bankruptcy Code also allows a party in interest, including a creditors' committee, to be heard on any issue in a chapter 11 case.  *See* 11 U.S.C. § 1109(b).  Moreover, section 105(a) empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  *See* 11 U.S.C. § 105(a).

32.     The Third Circuit, in common with the majority of circuits reaching the issue,[4] has held that derivative standing is available to a creditors' committee to pursue estate claims when it shows that a debtor in possession "unreasonably refuses" to do so.  *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (en banc) (derivative standing appropriate if the debtor unreasonably refuses to pursue a fraudulent transfer action); *accord Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 144-45 (D. Del. 2004) (the Third Circuit expressed its agreement with approaches taken by the Second and Seventh Circuits; denial of derivative standing reversed); *Official Comm. v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532 (W.D. Pa. 2005) (retroactive approval of derivative standing and adversary proceeding by committee).

33.     To establish derivative standing, the Committee must show that the Debtors unreasonably refused to bring an action that would benefit the estate.  *In re Cybergenics*

---

[4]     Cases from the following circuits support the bankruptcy court's authority to grant derivative standing: *Smart World Techs. v. Juno Online Servs. (In re Smart World Techs.)*, 423 F.3d 166, 176 (2d Cir. 2005); *LA World*, 858 F.2d at 247-52; *Canadian Pac. Forest Prods. v. J.D. Irving (In re Gibson Grp.)*, 66 F.3d 1436, 1440-46 (6th Cir. 1995); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *PW Enterprises v. North Dakota Racing Comm. (In re Racing Servs.)*, 540 F.3d 892, 898 (8th Cir. 2008); and *Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.)*, 199 F. 3d 1029, 1031 (9th Cir. 1999).

*Corp.*, 330 F.3d at 568.  Although the Third Circuit has not specified procedural requirements for allowing derivative standing, it expressed approval of the approaches taken by the Second and Seventh Circuits.  *Id*.  These courts and others have generally recognized derivative standing upon a showing that: (1) the claims are colorable; (2) the debtor has unjustifiably refused to pursue the claim; and (3) the bankruptcy court has granted permission to initiate the action on behalf of the estate.  *Yes! Ent. Corp.*, 316 B.R. at 145 (citing recognized factors); *Nat'l Forge Co.*, 326 B.R. at 543 (same).

34.    As set forth below, the Committee satisfies each of the foregoing elements.

**B.    The Proposed Claims Are Colorable**

35.    Whether a party has asserted a colorable claim for purposes of derivative standing is a legal question, requiring the same analysis that would be undertaken upon a motion to dismiss.  The Court must accept all well-pleaded facts as true, draw all inferences from such facts in the light most favorable to the plaintiff, and determine as a matter of law whether a claim is sufficiently pled.  *Walnut Creek Mining Co. v. Cascade Inv. (In re Optim Energy, LLC)*, 527 B.R. 169, 173 (D. Del. 2015) (derivative standing review; quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 555-56 (2007), for the proposition that there is no probability requirement at the pleading stage but there must be sufficient facts to expect that discovery will reveal supporting evidence of claims).  The Committee satisfies this standard.

**1.    The Avoidance Claims**

36.    The Proposed Complaint asserts colorable avoidance claims arising out of the Bankruptcy Code and Delaware fraudulent transfer statute in connection with the Transferred Funds and Supplement No. 1 and the Holdco Guarantee contained therein.

37.     Pursuant to 11 U.S.C. § 548(a)(1)(b), a transfer or obligation can be avoided where (i) the transferor did not receive reasonably equivalent value for the transfer or obligation and (ii) the transferor (a) was insolvent or became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Franchise Group New HoldCo was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.  *Id*.   The Delaware version of the Uniform Fraudulent Transfer Act, together with section 544 of the Bankruptcy Code, provides for avoidance by the Debtor of transfers under the same circumstances.  *See* 6 Del. Code §§ 1304(a)(2) and 1305(a), 11 U.S.C. § 544(b)(1).

38.     Bankruptcy Code section 550 provides for the recovery of transfers avoided pursuant to sections 544 and 548 of the Bankruptcy Code from the "(1) the initial transferee of such entity or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(1), (2).  Each of the avoidable fraudulent transfer claims discussed below assert colorable claims for avoidance and recovery.

### a.     Avoidable Fraudulent Transfers Arising Out Of the Transferred Funds

39.     The first and second counts contained in the Proposed Complaint seek to avoid Franchise Group New HoldCo's transfers of the Transferred Funds to Freedom VCM, Inc. pursuant to 11 U.S.C. §§ 548 and 550 and 11 U.S.C. §§ 544 and 550 and 6 Del. Code §§ 1304(a)(2) and 1305(a).  The fourth and fifth counts seek to recover the Transferred Funds from the HoldCo Agent and the HoldCo Lenders as immediate or mediate transferees of such funds pursuant to 11 U.S.C. §§ 544 and 550 and 6 Del. Code §§ 1304(a)(2) and 1305(a).

### b.    Avoidable Fraudulent Transfers
### Arising Of the HoldCo Guarantee

40.    Counts 6 through 11 of the Proposed Complaint relate to transfers made and obligations incurred in connection with the HoldCo Guarantee.  Counts 6 and 7 seek to avoid Supplement No. 1 and the HoldCo Guarantee contained therein as fraudulently incurred obligations pursuant to 11 U.S.C. §§ 548 and 550 and 11 U.S.C. §§ 544 and 550 and 6 Del. C. §§ 1304(a)(2) and 1305(a), counts 8 and 9 of the Proposed Complaint seek, pursuant to the same statutes, to avoid the pledges that ultimately became subject to the HoldCo Lenders' Purported Liens, and counts 10 and 11 of the Proposed Complaint seek to recover from the HoldCo Debtors the value of the Supplement No. 1 Transferred Property as immediate or mediate transferees pursuant to 11 U.S.C. §§ 544 and 550 and 6 Del. Code §§ 1304(a)(2) and 1305(a).

### c.    Each of the Avoidance Claims Are Colorable

41.    The Proposed Complaint alleges colorable claims that the transfers of the Transferred Funds and the Supplement No. 1 constituted fraudulent transfers under applicable provisions of the Bankruptcy Code and Delaware statute.

42.    The Proposed Complaint alleges that Franchise Group New HoldCo directly or indirectly transferred the Transferred Funds to Freedom VCM, Inc. for less than reasonably equivalent value at times when Franchise Group New HoldCo (a) was insolvent or became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Franchise Group New HoldCo was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

43.    Similarly, the Proposed Complaint alleges that the Supplement No. 1 Obligors incurred the Supplement No. 1 Obligations for less than reasonably equivalent value at

times when they too (a) were insolvent or became insolvent as a result of such transfers; (b) were engaged in business, or was about to engage in business, for which any property remaining with the Supplement No. 1 Obligors was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

44.    The Proposed Complaint also alleges colorable claims that the subsequent transfers of the Transferred Funds and the value of the Supplement No. 1 Obligations are recoverable pursuant to 11 U.S.C. §§ 544, 548, and 550 and 6 Del. C. §§ 1304(a)(2) and 1305(a).

45.    Specifically, as noted above, the Proposed Complaint alleges that Franchise Group New HoldCo directly or indirectly transferred the Transferred Funds to Freedom VCM, Inc. for less than reasonably equivalent value at times when Franchise Group New HoldCo (a) was insolvent or became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Franchise Group New HoldCo was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.  The Proposed Complaint also alleges that Freedom VCM, Inc. directly or indirectly transferred the Transferred Funds to the HoldCo Agent and then to the HoldCo Lenders.  In addition, the Proposed Complaint alleges that the Holdco Agent and the HoldCo Lenders knew or should have known that (i) the Transferred Funds were transferred as dividends from Franchise Group New HoldCo to Freedom VCM, Inc. in order to make interest payments on the HoldCo Facility, and (ii) at each time that the Transferred Funds were transferred, Franchise Group New HoldCo (a) was insolvent or became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Franchise Group New HoldCo was

unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

46.     And with respect to the Supplement No. 1 Transferred Property, the Proposed Complaint alleges that Supplement No. 1 Obligors indirectly or indirectly transferred the Supplement No. 1 Transferred Property to the HoldCo Debtors when the Supplement No. 1. Obligors: (a) were  insolvent or became insolvent as a result of such transfers; (b) were engaged in business, or were about to engage in business, for which any property remaining with the Supplement No. 1 Obligors was unreasonably small capital; or (c) intended to incur, or believed that they would incur, debts beyond its ability to pay as such debts matured.  In addition, the Proposed Complaint alleges that at the time that the HoldCo Agent and each HoldCo Lender entered into the HoldCo Guarantee with the Supplement No. 1 Obligors, the HoldCo Debtors, as ultimate parents of the Supplement No. 1 Obligors, knew or should have known that each Supplement No. 1 Obligor (a) was insolvent or became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with it was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

47.     In sum, all of the claims for avoidance and recovery of fraudulent transfers asserted in the Proposed Complaint are colorable.

**2.     The Illegal Dividend Claims**

48.     Count 3 of the Proposed Complaint asserts a claim against Freedom VCM, Inc. for recovery of illegal dividends pursuant to sections 170, 173, and 174 of the Delaware General Corporate Law ("DGCL").  Section 170 of the DGCL provides, in relevant part, that "directors … may declare and pay dividends upon the shares of its capital stock either . . . [o]ut of its surplus [or] [i]n case there shall be no such surplus, out of its net profits for the fiscal year

in which the dividend is declared and/or the preceding fiscal year." 8 Del. C. § 170. Surplus is defined as "[t]he excess, if any, at any given time, of the net assets of the corporation over the amount so determined to be capital." *Id*. Net assets "means the amount by which total assets exceed total liabilities," and capital for par value stock equals the par value of consideration received for the issuance of such stock. *Id*. Section 173 of the DGCL provides that "[n]o corporation shall pay dividends except in accordance with this chapter." *Id*. § 173.

49.     The Proposed Complaint alleges that the HoldCo Distributions were dividends under Delaware law and that each was illegal at the time it was made because Franchise Group New HoldCo lacked the surplus or net profits from which to issue the HoldCo Distributions. This is sufficient to allege colorable claims for illegal dividends against its indirect shareholder, Freedom VCM, Inc. *See* 8 Del. Code §§ 173, 174. *See also PHP Liq. v. Robbins*, 291 B.R. 603, 608 (Bankr. D. Del. 2003) (DGCL 174(c) implies cause of action against shareholder where shareholder had knowledge that redemption was unlawful).[5]

## C.     The Debtors Unjustifiably Refuse to Pursue the Claims

50.     As the Third Circuit emphasized, the critical inquiry is whether the Debtors have unreasonably or unjustifiably refused to bring the claims. *Cybergenics*, 330 F.3d at 553 ("We believe that . . . bankruptcy courts' equitable powers enable them to authorize such [derivative] suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue an avoidance claim."); *Id*. at 568 ("The problem at bar is that the intended system broke

---

[5]     The Proposed Complaint also objects to the Agent Proof of Claim and the HoldCo Lender Proofs of Claim on the grounds that (i) the HoldCo Agent and the HoldCo Lenders do not have the right to assert claims related to the HoldCo Facility and the HoldCo Guarantee against Debtors that are not obligors pursuant to those instruments, (ii) the proofs of claim lack specificity and fail to state claims upon which relief can be granted, and (iii) pursuant to 11 U.S.C. § 502(d), each of the claims filed by the Defendants should be disallowed until the applicable Defendant has paid the amounts and/or returned the property subject to avoidance as set forth in the Proposed Complaint. Each of these bases for objection are colorable.

down.  The debtor refused to bring an action that the Bankruptcy Court found would benefit the estate, and thereby violated its fiduciary duty to maximize the estate's value.").

51.    Here, despite the Committee's demand, the OpCo Debtors have declined to bring the Subject Claims.   The Committee is therefore fulfilling its statutory duties consistent with the Bankruptcy Code by seeking authority to do so.

52.    The Committee seeks to bring proposed avoidance and illegal dividend claims that will preserve and recover substantial assets for the benefit of the OpCo Debtors' estates and to object to proofs of claim of the HoldCo Agent and the HoldCo Lenders. Derivative standing is warranted because the Debtors have refused to assert these valuable Subject Claims, leaving the interests of creditors unprotected.

**D.    The Committee Seeks Court Authority for Derivative Standing**

53.    The third factor this Court must consider is whether the Committee has obtained Court approval to assert claims on behalf of the relevant Debtors' estates.   The Committee seeks approval to pursue the Subject Claims via this Motion.  Under *Cybergenics*, a committee may be granted derivative standing to pursue claims on behalf of the bankruptcy estate where the debtor has unreasonably refused to bring such claims.  Derivative standing is conditioned upon the bankruptcy court's permission, based on its equitable powers and ability to implement flexible remedies.  *Cybergenics*, 330 F.3d at 568-69 (Congress anticipated court's use of equitable powers as a gatekeeper when the trustee [or debtor] is delinquent).

54.    The Committee is the proper party to bring the Subject Claims because it has a fiduciary duty to safeguard the interests of the Debtors' estates and maximize value for general unsecured creditors.  *In re Enron Corp.*, 279 B.R. 671, 689 (Bankr. S.D.N.Y. 2002) ("'the primary purpose of a committee . . . is to maximize the return to the constituency

represented by the committee and all actions undertaken by the committee should be with that goal in mind'") (quoting *Collier on Bankruptcy*).

55.     The Subject Claims are brought deriviately on behalf of Franchise Group New HoldCo, one of the OpCo Debtors, against the HoldCo Debtors.   Admittedly, the Committee was appointed to represent all of the general unsecured creditors at all Debtor entities, whether OpCo or HoldCo entities.   Anticipating a potential challenge from the Defendants that the Committee is disabled somehow from pursuing claims on behalf of an OpCo against one of the HoldCo's, the fact is that, as acknowledged repeatedly by the HoldCo Lenders, there are no general unsecured claims at any of the HoldCo entities.   To quote the Ad Hoc Group of Freedom Lenders, the "HoldCo Lenders are the only non-insider creditors of the HoldCo Debtors."   Freedom Lenders Claim Objection at ¶ 2.[6] Thus, any suggestion that the Committee is somehow precluded from suing the HoldCo Debtors on behalf of Franchise Group New HoldCo would be baseless and disingenuous**.**

56.     Given the OpCo Debtors' unwillingness to assert the Subject Claims, and the fact that there are no non-insider, non-HoldCo Lender general unsecured creditors of the Holdco Debtors, it is both appropriate and necessary for the Committee to bring these claims. Accordingly, the Committee brings this Motion to request permission from the Court to pursue colorable claims for the benefit of the estates.

## **CONCLUSION**

57.     Based upon the foregoing, the Committee should be granted standing to commence, prosecute, and settle the claims set forth in the Proposed Complaint.

---

[6]     Indeed, the Freedom Lenders Group has objected to the six non-insider proofs of claim asserted against the HoldCo Debtors as improperly filed against the HoldCo Debtors rather than one or more of the OpCo Debtors. *See* Freedom Lenders Claim Objection ¶ 3.

## NO PRIOR REQUEST

58.    No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Committee respectfully requests that this Court:  (i) enter an order authorizing the Committee to commence, prosecute, and settle the causes of action set forth in the Proposed Complaint and (ii) grant such other and further relief to the Committee as the Court may deem just and proper.

Dated:    March 28, 2025          Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Colin R. Robinson*
Bradford J. Sandler, Esq.
Colin R. Robinson, Esq.
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:        bsandler@pszjlaw.com
                    crobinson@pszjlaw.com

-and-

Robert J. Feinstein, Esq. (admitted *pro hac vice*)
Alan J. Kornfeld, Esq. (admitted *pro hac vice*)
Theodore S. Heckel, Esq. (admitted *pro hac vice*)
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
Email:        rfeinstein@pszjlaw.com
                    akornfeld@pszjlaw.com
                    theckel@pszjlaw.com

*Counsel to the Official Committee
of Unsecured Creditors*