## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.,*[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 1044 and 1099** |

### DEBTORS' REPLY IN SUPPORT OF THE MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

submit this reply (this "Reply") in support of the *Motion of Debtors for Entry of an Order*

*(I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances*

*Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

[Docket No. 1044] (the "Motion") and in response to the *Objection of the Ad Hoc Group of Freedom Lenders to the Debtors' Exclusivity Extension Motion* [Docket No. 1099] (the "Objection") filed by the Ad Hoc Group of Freedom Lenders (the "Freedom Lender Group").[2] In support of this Reply and in response to the Objection, the Debtors state the following:

### Preliminary Statement

1.      Since the status conference held on March 17, 2025 (the "Status Conference"), the Debtors have continued their efforts to bring the two lender groups together and settle these cases once and for all.  After back and forth with the parties, the Ad Hoc Group has agreed to commit $40 million in additional consideration for the Freedom Lender Group.  Further, the boards of directors for TopCo, the OpCo Debtors, and the HoldCo Debtors (together, the "Boards") are working toward a comprehensive settlement of certain Intercompany Claims, which would result in additional value being allocated to Holders of Claims against the HoldCo Debtors and significant cost savings for all the Debtors through the resolution of several inter-Debtor disputes. The Debtors intend to file an amended Plan before the hearing on April 3, 2025, which will incorporate the commitments from the Ad Hoc Group and, if approved by the Boards (including the Freedom HoldCo Independent Director with respect to any conflict matters), the terms of a comprehensive intercompany settlement.  The Debtors believe that there is a clear path to consensus and Confirmation after five months of a battle royale, as will be reflected in the amended Plan.  It is time for these cases to come to their rightful conclusion.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them later in this Reply, in the Motion, or in the *Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1015] (as may be amended, supplemented, or otherwise modified, the "Plan"), as applicable.

2.       The Bankruptcy Code grants exclusivity to a debtor so that it has the opportunity to propose a chapter 11 plan without the distraction and confusion associated with competing plans from multiple parties with potentially diverging interests.  The Debtors, as fiduciaries for these Estates, are entitled to such protections, especially in these Chapter 11 Cases when there is only one responsible path forward:  ending the value-destructive litigation war, confirming a Plan that maximizes value for ***all*** of the Debtors' stakeholders, and ensuring prompt and near-term distributions to the Debtors' stakeholders (including unsecured creditors).  The amended Plan that the Debtors will file in the coming days provides for a deleveraging of approximately $1.32 billion in total funded debt, valuable consideration for the Freedom Lender Group on account of their positions at both the HoldCo Debtors and the OpCo Debtors, the preservation of certain Claims and Causes of Action held by the Debtors' Estates, and a resolution of certain Intercompany Claims (subject to approval by the relevant Boards).  The Debtors are working in tandem with the Ad Hoc Group and expect their full support for the proposed Plan.  The Debtors are hopeful that the Freedom Lender Group will vote in favor of such amended Plan to capture the consideration contemplated thereby and/or otherwise engage in conversations to end the war.

3.       Terminating exclusivity now—just three weeks from the Voting Deadline—would not only cause significant disruption to these Chapter 11 Cases, but also exacerbate the stress already facing the Debtors' operations.  This disruption would further erode the confidence of key vendor, landlord, and consumer constituencies, who are already experiencing growing uncertainty. The Debtors have used the Exclusivity Periods[3] thus far to diligently develop, negotiate, and prosecute a value-maximizing Plan which is already out for solicitation.  Moreover, the Debtors

---

[3]    "Exclusivity Periods" means, together, the period during which the Debtors have the exclusive right to file a chapter 11 plan and the period during which the Debtors may solicit votes thereon.

are working on certain Plan amendments that will provide the Debtors the best prospect of promptly emerging with minimal further harm to the Debtors and their Estates.  The Debtors respectfully request a reasonable and customary extension of the Exclusivity Periods so that the Debtors can continue their important work.

4.      Under the guise of an objection to the Debtors' first request for an extension of exclusivity, which courts routinely grant if the Debtors have made nearly *any* good faith progress towards confirmation of a plan, the Freedom Lender Group raises a number of issues that were already argued before[4]—and ultimately overruled by[5]—this Bankruptcy Court.  The remainder will either be addressed in the amended Plan or are confirmation issues that the Debtors will address at the appropriate time.  The Debtors have made substantial progress in these Chapter 11 Cases and cause readily exists to extend the Exclusivity Periods.  It would neither be efficient nor beneficial to pursue two competing plans at this time.  The Debtors believe that the relief requested in the Motion will ensure that they have the time required to continue to discharge their fiduciary obligation to attempt to broker a resolution between the Ad Hoc Group and the Freedom Lender Group, prosecute a chapter 11 plan with the maximum support from their creditors, and ultimately implement a value-maximizing restructuring for all stakeholders.  For the foregoing reasons, as

---

[4]     *See generally Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the Holdco Debtors' Cases, (II) Lifting the Automatic Stay in the Holdco Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the Holdco Debtors* [Docket No. 192] (the "Exclusivity Termination Motion").

[5]     On December 18, 2024, during a hearing on the Exclusivity Termination Motion, the Bankruptcy Court denied the relief requested therein, stating that "[t]hese cases are large and complex cases, and the debtors have made a good faith effort to put forward a plan. . . . [which] is still a work in progress and subject to negotiation with various constituency groups, including the Holdco lenders and the unsecured creditors committee." *See* Dec. 17, 2024 Hr'g Tr. at 65: 13-17.  As discussed in the Motion, the reasons for the Bankruptcy Court's denial of the Exclusivity Termination Motion at that time are even more compelling now, as the Bankruptcy Court approved the Disclosure Statement for *all* Debtors, including the Freedom HoldCo Debtors.

well as the reasons set forth herein and in the Motion, the Bankruptcy Court should grant the Motion without prejudice to future extensions and overrule the Objection.

**Argument**

5.      Cause readily exists to extend the Exclusivity Periods, and the Freedom Lender Group's arguments to the contrary appear to be recycled from its already-denied Exclusivity Termination Motion and are based on facts that are either incorrect or stale.  Each of the Debtors' actions described above and herein were crafted to return the most value to the Debtors' stakeholders as quickly as possible.  The Debtors' other key stakeholders, including the Creditors Committee and the Ad Hoc Group, remain aligned toward this goal and do not want this clear path forward to become fraught with competing plans which would only serve to further distract from and hinder achieving the overall goal of reaching a swift resolution.  The Debtors have overwhelmingly satisfied each of the factors that courts consider in determining whether to extend exclusivity.  Accordingly, the Debtors have demonstrated ample cause to preserve exclusivity at this crucial juncture.

**I.      The Freedom Lender Group's Objection Should Be Overruled.**

6.      At the outset, the Objection raises numerous issues that pertain to Confirmation rather than to exclusivity.  The Freedom Lender Group's objection to exclusivity on the basis that it does not support the Plan in its current form is a premature Confirmation objection and does not rise to the level of cause required to support terminating the Debtors' Exclusivity Periods.[6]  The

---

[6]     *See In re Geriatrics Nursing Home*, 187 B.R. 128, 134 (D.N.J. 1995) (stating in response to a motion to terminate the debtors' exclusivity that the court "cannot conclude, based on reasoning of the Bankruptcy cases treating of 'cause' under 11 U.S.C. § 1121(d) . . . that the fact that one creditor constituency is not happy with the debtor's plan constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period.").

Freedom Lender Group will have the opportunity to raise any issues with the Plan, as it may be amended or modified in the coming weeks, at Confirmation.[7]

7.      Further, through the Debtors' efforts, the Ad Hoc Group has committed to support $40 million in additional consideration for the Freedom Lender Group, before accounting for incremental value that could be allocated to the HoldCo Debtors as part of an intercompany settlement.  Critically, these commitments, which will be reflected in the amended Plan, provide significantly more value to the Freedom Lender Group than they would otherwise be entitled to receive in a chapter 7 liquidation.  The Freedom Lender Group's assertion in the Objection that it will vote to reject the Plan does not account for this enhanced consideration.  An amended Plan reflecting the foregoing will not only provide direct financial benefits for the Freedom Lender Group, but will also result in significant cost savings and the preservation of enterprise value, which comprise most of the recovery allocated to the senior lenders in the capital structure. Extending exclusivity only further supports the Debtors' efforts to realize these broader benefits that will ultimately accrue to all stakeholders in these Chapter 11 Cases.

8.      For the reasons set forth herein, the Objection should be overruled, and the Motion should be granted without prejudice to future extensions.

---

[7]     The Freedom Lender Group contends that they are the only creditor at the Freedom HoldCo Debtors, but the Settlement-Related Liquidating Trust 2022-23 (the "Prophecy Trust") contends it holds a general unsecured claim against the Freedom HoldCo Debtors.  *See The Settlement-Related Liquidating Trust 2022-23's (I) Motion Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject Plan; and (II) Response to First Omnibus (Non-Substantive) Objection of the Ad Hoc Group of Freedom Lenders to Certain Claims Filed Against the Holdco Debtors* [Docket No. 1098]. While the Debtors reserve all rights to contest the validity of the Prophecy Trust's claims at the appropriate time, the Freedom HoldCo Lenders cannot dispute or ignore the fact that another party has asserted a Claim at the Freedom HoldCo Debtors.

A.    **The Debtors' Pursuit of the Plan Does Not Harm the Freedom HoldCo Debtors and The Freedom HoldCo Independent Investigation is Value-Maximizing.**

9.    The Freedom Lender Group contends that the Freedom HoldCo Debtors are harmed by the Freedom HoldCo Independent Investigation, claiming that such investigation is a "relentless campaign to gift certain people free releases."[8]  This was wrong.  On March 26, 2025, Mr. Wartell filed a statement indicating that the current Plan lacks sufficient consideration to the Freedom HoldCo Debtors to release certain potential Claims and Causes of Action identified as part of his investigation.[9]  Following the receipt of both the HoldCo Debtors' and OpCo Debtors' independent director reports, the Debtors are evaluating potential amendments and revisions to the Plan.

10.    The Objection is also wrong about Mr. Wartell's scope of authority.  On February 14, 2025, the board of each Freedom HoldCo Debtor broadened Mr. Wartell's authority, in his capacity as sole member of the Conflicts Committees[10] of the Freedom HoldCo Debtors, to take any action with respect to certain conflict matters, including with respect to a transaction that constitutes a conflict matter.  As the Freedom Lender Group has repeatedly stated, the Freedom HoldCo Debtors require an independent fiduciary to pursue the best interests of the Freedom HoldCo Debtors in these Chapter 11 Cases.[11]  That fiduciary has been appointed with the appropriate scope of authority and is discharging his fiduciary duty.

---

[8]    *See* Objection ¶ 26.

[9]    *See Notice of Filing Plan Supplement* [Docket No. 1182], Exhibit J.

[10]    "Conflicts Committees" means, together, the conflicts committees of the boards of directors of Debtors Freedom VCM Interco, Inc. and Freedom VCM, Inc.

[11]    *See e.g.,* Dec. 17, 2025 Hr'g Tr. at 10:14–17 (". . . the HoldCo board comprised entirely of OpCo directors, approved without deliberation or independent advice. . ."); *id.* at 14:21–25 ("The record makes clear that in launching their comprehensive multi-faceted assault no one was thinking separately about the Holdco's, the value of their assets or the right to their creditors."); Feb. 19, 2025 Hr'g Tr. at 68: 24–25 ("You know, we certainly welcome the idea of having a real, independent fiduciary, . . ").

11.    The Debtors will put forth an amended joint Plan that provides valuable consideration to the HoldCo Lenders and will continue to work with all parties on an intercompany settlement that would provide additional consideration that directly benefits the Freedom HoldCo Debtors.    The Freedom HoldCo Independent Director has been delegated the authority to determine whether permitting releases at the HoldCo Debtors in exchange for resolving Intercompany Claims and other potential consideration as part of a settlement is more value-maximizing than foregoing such releases.    Importantly, in the absence of a joint Plan with an intercompany settlement that may include funding for a trust to pursue HoldCo Debtor Claims and Causes of Action, the Freedom HoldCo Debtors would be left solely with alleged Claims and Causes of Action but no funding to pursue such claims.    The Freedom Lender Group's objections are simply stale and do not take into account the current reality of the Debtors' efforts.

B.    **It Is Not in the Debtors' Best Interest to Propose a Separate Plan for the Freedom HoldCo Debtors.**

12.    The Freedom Lender Group asserts that the "most efficient and fair way" to resolve the Freedom HoldCo Debtors' Chapter 11 Cases is to allow the Freedom Lender Group to file an alternative plan that transfers collateral to the HoldCo Lenders.[12]    This assertion is flawed for three reasons.    ***First,*** it is the responsibility of the estate fiduciaries to propose a value-maximizing plan to the benefit of all stakeholders.    The bankruptcy system operates under a debtor-in-possession model, whereby a debtor retains control of the estate and is responsible for managing its assets in a manner that maximizes value for all stakeholders.    As estate fiduciaries, debtors in possession cannot cede these responsibilities to their creditor constituencies.    Here, the Debtors are negotiating a Plan that serves the best interests of the Estates and secures meaningful value for their stakeholders, including the Freedom Lender Group.    If the Freedom Lender Group does not

---

[12]    *See* Objection ¶ 44.

support the Plan, their recourse is to vote to reject the Plan or object to Confirmation, not to terminate exclusivity and effectively seize control of the Debtors' business.  The Debtors have shown that they deserve to maintain the rights and responsibilities of debtors in possession, including exclusivity, to successfully pursue an effective reorganization in the best interests of *all* stakeholders.

13.     ***Second***, as noted previously, the long-term benefits that will accrue to all stakeholders in these Chapter 11 Cases by pursuing Confirmation of the Plan far outweigh any collateral the HoldCo Lenders may receive if a separate plan for the Freedom HoldCo Debtors is proposed.  For example, in the absence of a joint Plan, there is no funding for a trust to pursue any potential HoldCo Debtor Claims and Causes of Action, which are the only source of potential value at the HoldCo Debtors.  The Debtors' holistic approach ensures that the Debtors' successful reorganization will benefit all creditors, including the Freedom Lender Group at all Estates, while preserving jobs, maximizing asset value, and ensuring the long-term success of the Debtors' operations.

14.     ***Third***, a single, unified plan offers a more streamlined and efficient approach by effectively addressing the intercompany issues between the Freedom HoldCo Debtors and the OpCo Debtors.  As an unsecured creditor of the OpCo Debtors, the Freedom Lender Group has a significant interest in the success of a comprehensive chapter 11 plan.  Additionally, the amended Plan will include a litigation trust construct that will benefit the Freedom Lender Group, which construct can only be accomplished through Confirmation of the Plan.  The Freedom Lender Group has failed to demonstrate why pursuing two separate plans would be more advantageous in light of the Intercompany Claims and the Freedom Lender Group's interests at both the Freedom HoldCo Debtors and the OpCo Debtors.

## II.    The Debtors Have Demonstrated "Cause" to Extend the Exclusivity Periods.

15.    Section 1121(d)(1) of the Bankruptcy Code permits a court to extend a debtor's exclusivity "for cause," subject to certain limitations not relevant here.  A debtor should be given a reasonable opportunity to negotiate an acceptable plan with creditors and to prepare adequate financial and nonfinancial information concerning the ramifications of any proposed plan for disclosure to creditors.[13]  The fact that the Debtors *already* have a Plan and an adequate Disclosure Statement on file—and intend to file a further amended Plan before the hearing on April 3, 2025— with a Confirmation Hearing scheduled for a mere month and a half from now, demonstrates that the Debtors have maximized their opportunity prior to the expiration of exclusivity and now simply seek a standard extension to allow the Plan to come to fruition.

16.    Courts in the Third Circuit and in other jurisdictions examine a number of factors to determine whether a debtor has had an adequate opportunity to develop, negotiate, and propose a chapter 11 plan and thus whether there is "cause" for extension of the Exclusivity Periods.[14] Although the Freedom Lender Group asserts that the Debtors have not satisfied a number of these factors, as set forth below, these arguments fail to demonstrate why exclusivity should be terminated.

---

[13]    *See In re Texaco Inc.*, 76 B.R. 322, 327 (Bankr. S.D.N.Y. 1987).

[14]    These factors include the following:  (a) the size and complexity of the case; (b) the existence of good-faith progress towards a chapter 11 plan; (c) the necessity of sufficient time to negotiate and prepare adequate information to allow a creditor to determine whether to accept such chapter 11 plan; (d) whether the debtor is paying its debts as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress negotiating with creditors; (g) the length of time a case had been pending; (h) whether the debtor is seeking an extension to pressure creditors; and (i) whether or not unresolved contingencies exist.  *See In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); *McLean Indus.*, 87 B.R. at 834; *see also Dow Corning*, 208 B.R. at 664–65 (identifying the above factors and noting that courts generally rely on the same factors to determine whether exclusivity should be extended); *In re Friedman's Inc.*, 336 B.R. 884, 888 (Bankr. D. Ga. 2005) (same).

A. **Factor (a): The Freedom HoldCo Debtors' Chapter 11 Cases Are Large and Complex.**

17.     As Judge Dorsey noted in his prior bench ruling denying the Exclusivity Termination Motion, "these cases are large and complex cases," a characterization that remains just as relevant when applied specifically to the Freedom HoldCo Debtors.[15] The Freedom Lender Group itself has previously acknowledged as much, despite arguing in their Objection that these Chapter 11 Cases, as they relate to the Freedom HoldCo Debtors, are "exceedingly simple."[16] In its *Reply to Debtors' and Ad Hoc Group of First Lien Lenders' Oppositions to Emergency Motion of Appellants to Expedite Appeal* filed in the Appeal,[17] the Freedom Lender Group explicitly acknowledges the complexity of these cases, stating that  "the chapter 11 cases of the two [Freedom] HoldCo Debtors on a standalone basis, with over $515 million in funded debt, are by themselves among the largest chapter 11 cases currently pending in the United States."[18]

18.     The Debtors agree that these Chapter 11 Cases are large and complex with respect to the Freedom HoldCo Debtors.  While the Freedom HoldCo Debtors may have a simplified capital structure relative to other Debtors, this does not diminish the overall complexity of the cases.  In fact, significant liabilities and complex issues remain to be resolved with respect to the Freedom HoldCo Debtors, including the Intercompany Claims between the various Debtors.  Thus, by any measure, these Chapter 11 Cases are sufficiently large and complex to warrant an extension of the Exclusivity Periods.

---

[15]     *See* Dec. 17, 2024 Hr'g Tr. at 65: 13-14.

[16]     *See* Objection ¶ 31.

[17]     *Freedom Lender Group v. Franchise Group, Inc., et al.*, No. 24-1394 (JLH) (D. Del. Jan. 13, 2025) (the "<u>Appeal</u>").

[18]     *Id.*

B.      **Factor (b):  Progress Has Been Made to Confirm a Plan.**

19.      In light of the Status Conference, the commitments obtained from the Ad Hoc Group to provide more consideration to the Freedom Lender Group, and ongoing negotiations between all parties in interest with respect to an intercompany settlement, the Freedom Lender Group's assertion that the Debtors have made no progress and "show no signs of making progress" toward confirming a plan is just wrong.[19]  As discussed in the Motion, the Debtors have worked diligently since the commencement of these Chapter 11 Cases to implement a dual-path restructuring strategy.  This process involved actively marketing nearly all of their assets while simultaneously engaging with key creditor constituencies to finalize the terms of a comprehensive restructuring transaction.  The sale and marketing process provided a valuable market check of the Debtors' assets, enabling them to better evaluate potential alternatives and resulting in an ultimate determination that a sale of all or substantially all of their assets would be more value-maximizing for the Estates than the Plan Equitization Transaction contemplated under the Plan.  Nevertheless, the Debtors remain actively engaged with interested parties regarding a Partial Sale Transaction and will pursue such a transaction if it proves to be value-maximizing for the Estates.  Therefore, it would be inaccurate to characterize the marketing and sale process as a failure, as the Objection suggests.[20]

20.      Further, the Debtors have worked, and are working, relentlessly to resolve many complex issues in these cases.  The Freedom Lender Group, in its Objection, highlights just a few

---

[19]      *See* Objection ¶ 32.

[20]      *See* Objection ¶ 18.

of the Debtors' extensive efforts to date that will maximize the value of their enterprise, reorganize

their businesses, preserve 9,000 jobs, and emerge as a going concern.[21]  These efforts include:

- obtaining approval of various first-day and second-day relief, including, but not limited to, the DIP Orders and the Critical Vendors Order;[22]

- conducting a fulsome marketing process *that remains ongoing* as the Debtors continue to engage with interested parties on a Partial Sale Transaction;

- working with Hilco Real Estate, LLC, the Debtors' real estate advisor, to address and manage the Debtors' extensive real estate portfolio;

- undertaking significant efforts to liquidate and winddown the American Freight business;

- obtaining the Committee Settlement;

- negotiating and filing several amended versions of the Plan [Docket Nos. 150, 654, 894, 925, 957, 996, and 1015];

- expanding the scope of authority of the Conflicts Committees to support the efficacy of the Freedom HoldCo Independent Investigation;

- securing denial of the Freedom Lender Group's Exclusivity Termination Motion;[23] and

- obtaining approval of the Disclosure Statement [Docket No. 1019] and commencing solicitation of the Plan.

---

[21]   *See* Objection ¶¶ 12, 15, 17, 19, 20.  The Freedom Lender Group references some of the Debtors' progress to date, include the filing of the Debtors' initial Plan, the entry of the Final DIP Order, the denial of the Exclusivity Termination Motion, the filing of several subsequent amended versions of the Plan, and the commencement of Plan solicitation.

[22]   "Critical Vendors Order" means the *Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors, Foreign Vendors, Shippers & Logistics Providers, and 503(b)(9) Claimants; and (II) Granting Related Relief* [Docket No. 410].

[23]   *See Order Denying Motion of the Ad Hoc Group of Freedom Lenders Seeking Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [Docket No. 460].  The Exclusivity Termination Motion is currently on appeal before the United States District Court for the District of Delaware (the "District Court").  *See Freedom Lender Group v. Franchise Group, Inc., et al., and Ad Hoc Group of First Lien Lenders*, No. 24-1394 (TLA) (D. Del. 2024).

21.     Additionally, the Debtors have engaged in extensive and meaningful negotiations throughout the course of these Chapter 11 Cases, including by facilitating lender meetings and ongoing discussions between key stakeholders.   Over the last several weeks, and prior to the hearing to approve the Disclosure Statement, the Debtors have continued to refine and incorporate Plan amendments based on feedback from all parties in interest, including input received from the Freedom Lender Group following recent settlement discussions.   Far from being stalled, these Chapter 11 Cases are moving forward with clear momentum, bringing the Debtors closer to a value-maximizing resolution for all stakeholders.

22.     What's more, the District Court stated in the Appeal that, in light of the progress that the Debtors have made to date, it found "no reason to interfere with the Bankruptcy Court's consideration of the motion to extend the exclusivity period[.]"[24]   In short, the Debtors have made substantial progress in these Chapter 11 Cases to confirm a plan and cause readily exists for the exclusivity extension requested in the Motion.   Notably, courts in this district and others have found cause to extend a debtor's exclusive period to file and solicit a plan where the debtor showed significant efforts to develop and promote a consensual reorganization plan.[25]   Accordingly, the Debtors contend that they have made considerable progress to warrant an extension of exclusivity.

---

[24]    *See Memorandum Order* [Docket No. 72], *Freedom Lender Group v. Franchise Group, Inc., et al., and Ad Hoc Group of First Lien Lenders*, No. 24-1394 (TLA) (D. Del. March 5, 2025).

[25]    *See, e.g., In re Tribune Co.*, No. 08-13141 (Bankr. D. Del.), Hr'g Tr. Dec. 7, 2009, 70:2–4 (extending exclusivity based, in part, on the fact that "there are ongoing discussions, which may or may not result in a global resolution"); *In re Boy Scouts of Am. and Del. BSA, LLC*, No. 20-10343 (LSS) (Bankr. D. Del. Aug. 18, 2021) (granting debtors' exclusivity extension based "on the current status of the proceedings and the record made on May 19, 2021" which record stated that the debtors have "discussed numerous detailed proposals and counter-proposals" with stakeholders in an effort to "to achieve a consensual mediated resolution of these cases"); *In re Mirant Corp.*, No. 4-04-CV-476-A, 2004 WL 2250986, at *2 (N.D. Tex. Sept. 30, 2004) (noting that an extension of exclusivity is typically granted where "the debtor showed substantial progress had been made in negotiations toward reorganization"); *In re MSR Resort Golf Course LLC*, No. 11-10372 (Bankr. S.D.N.Y.), Hr'g Tr. Nov. 3, 2011, 377:2–8 (granting debtors' second exclusivity extension based, in part, on compromises reached between the debtors and their stakeholders and concluding that the debtors' "good-faith progress is also evidenced by these

14

C.    Factor (e):  The Plan is Viable.

23.    The Plan is currently on file and is actively being solicited.  The Debtors intend to file an amended version prior to the April 3, 2025 hearing, supported by the Ad Hoc Group, which will incorporate the valuable commitments from the Ad Hoc Group and may incorporate the resolution of certain Intercompany Claims.  In the weeks ahead, the Debtors will continue engaging with the Freedom Lender Group to gain their support for the Plan.  It is not relevant that the Freedom Lender Group claims that it will not vote in favor of the Plan, or that it is ready to propose its own chapter 11 plan.  Rather, this factor asks only whether "a debtor [is] able to [obtain] confirmation of at least some viable plan, not necessarily the plan currently proposed."[26]  Courts are clear that "[d]ispleasure with a plan on file is not one of the enumerated factors, and is not a basis for terminating exclusivity.  Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals, with or without a formal plan on file."[27]

24.    The Freedom Lender Group's assertion that they intend to vote to reject the Plan is an issue that should be reserved for Confirmation and has no applicability for purposes of determining whether to extend the Exclusivity Periods.  The Freedom Lender Group will have the

---

settlements, which evidence . . . progress in trying to reach some consensus on the end game strategy in these cases, and the timing for such a strategy").

[26]    *See Adelphia Commc'ns Corp.*, 352 B.R. at 588; *see also In re Apex Pharms., Inc.*, 203 B.R. 432, 439–41 (N.D. Ind. 1996) (holding that during the debtors' initial exclusive period, courts merely inquire whether "a reasonable possibility of a successful reorganization within a reasonable time" exists).

[27]    *See, e.g., Adelphia Commc'ns Corp.*, 352 B.R. at 587; *In re Geriatrics Nursing Home*, 187 B.R. at 134 ("This Court is not satisfied that statements made by creditors and parties in interest that they were prepared to offer more favorable plans if the court were to terminate the exclusivity period constitutes sufficient cause to cut short the debtor's window of opportunity opened by Congress."); *In re Apex Pharms., Inc.*, 203 B.R. at 439–41 (holding that during the debtors' initial exclusive period, courts merely inquire whether "a reasonable possibility of a successful reorganization within a reasonable time" exists).

opportunity to raise issues with the Plan ***at Confirmation***.[28]  The purpose of the solicitation period

is to allow creditors to vote on the Plan, and the Freedom Lender Group should be afforded the

same opportunity to exercise that right, rather than having a premature decision made before the

solicitation period has concluded.

> **D.      Factor (g):  These Cases Are Five Months Old.**

25.      The Freedom Lender Group argues that the Debtors "have had ample time" to work

with the Freedom Lender Group on a viable plan for the Freedom HoldCo Debtors and "have not

done so."[29]  This is not the case.  The Debtors are barely five months into a highly complex case,

and despite the challenging nature of the proceedings, they have made significant strides toward a

resolution as discussed herein.  Midway through these Chapter 11 Cases, the Debtors were forced

to change counsel, a transition that inevitably required additional time and resources to ensure

continuity and effectiveness.  This change in counsel, however, did not impede the Debtors' ability

to move forward with their restructuring efforts.  In addition to these challenges, the Debtors have

faced a backdrop of extensive and protracted litigation brought by, among other parties, the

Freedom Lender Group, including multiple appeals and objections, which have further

complicated their expeditious path to a consensual resolution.  This ongoing litigation has not only

absorbed considerable resources but has also added to the overall complexity of the case, requiring

the Debtors to carefully navigate a myriad of legal and procedural issues.

26.      Additionally, contrary to the Freedom Lender Group's assertions, the Debtors have

actively sought to engage with the Freedom Lender Group in good faith to facilitate a commercial

settlement.  As part of these efforts, the Debtors invited principals and advisors of both lender

---

[28]    During the Disclosure Statement Hearing, the Bankruptcy Court remarked that the Freedom Lender Group's concerns regarding the proposed Plan releases were "confirmation issue[s]."  *See* Feb. 19, 2025 Hr'g Tr. at 33: 22.

[29]    *See* Objection ¶ 40.

groups for an in-person settlement discussion at Kirkland & Ellis LLP in New York on February 27, 2025. While the Ad Hoc Group attended the meeting and demonstrated a readiness to engage, the Freedom Lender Group did not attend.

27.     Furthermore, the Motion is the Debtors' first request to extend the Exclusivity Periods. Given that initial extensions are routinely granted in this district,[30] even in the face of objections from its key creditor constituencies,[31] the Bankruptcy Court should approve the Motion.

**E.     Factor (h): The Debtors Are Not Pressuring the HoldCo Lenders.**

28.     As the Freedom Lender Group itself recognizes, the Debtors intend to use the extension of the Exclusivity Periods as an opportunity to provide stakeholders with a meaningful opportunity to engage in substantive discussions with the Debtors regarding a consensual plan of reorganization and vote on the Plan. However, the Freedom Lender Group perceives these efforts towards global resolution as "pressure."[32] The mere fact that a debtor pursues a Plan that one group of stakeholders opposes does not qualify as undue "pressure" that justifies terminating exclusivity. For example, in *Adelphia*, a bondholder group objected to exclusivity, arguing that the debtors were using it to "strong-arm" them into accepting the "harsh economic impact" of the debtors' proposed plan.[33] The court overruled the objection and granted the extension, noting that

---

[30]     *See, e.g.*, *In re SL Beverage Liquidation, Inc.*, No. 24-11468 (LSS) (Bankr. D. Del. Oct. 21, 2024) (granting an initial exclusivity extension of 90 days); *In re Old Mbria, Inc.*, No. 24-10952 (LSS) (Bankr. D. Del. Sept. 9, 2024) (granting an initial exclusivity extension of 180 days); *In re Burgress BioPower, LLC*, No. 24-10235 (LSS) (Bankr. D. Del. Aug. 7, 2024) (granting an initial exclusivity extension of 90 days); *In re Water Gremlin Co.*, No. 23-11775 (LSS) (Bankr. D. Del. Mar. 25, 2024) (same)*; In re Water Gremlin Co.*, No. 23-11775 (LSS) (Bankr. D. Del. Mar. 25, 2024) (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Feb. 26, 2024) (same).

[31]     *See, e.g.*, *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. Aug. 7, 2024) (granting the debtors' first request for an extension of exclusivity over an objection from the official committee of unsecured creditors); *In re Kidde-Fenwal, Inc.*, No. 23-10638 (LSS) (Bankr. D. Del. Sept. 27, 2023) (same).

[32]     *See* Objection ¶ 42.

[33]     *Adelphia Commc'ns Corp.*, 352 B.R. at 578, 589-90.

if creditors did not agree with the benefits in the proposed plan, the plan would "presumably not secure the requisite votes."[34]  Indeed, courts have found inappropriate "pressure" where the debtor *lacks* sufficient consensus to get a plan confirmed but seeks to use the delay caused by an exclusivity extension to wear creditors down until sufficient consensus is achieved.  That is plainly not the case here.  If the law were any different, exclusivity would terminate in every case without full consensus.

29.     The Debtors are not seeking to use the extension to pressure the Freedom Lender Group to consent to the Plan, which they expect will not occur absent a mutually agreed-upon settlement.  Rather, the Debtors are only seeking to solicit, confirm, and, if approved, consummate a Plan that they believe is in the best interests of all their stakeholders, including the Freedom Lender Group.  As noted, since filing the Objection, the Freedom Lender Group has constructively engaged with the Debtors on the terms of a settlement, and the Debtors believe that additional time is needed to finalize these negotiations and forge a value-maximizing path forward.  Extending the Exclusivity Periods is eminently reasonable under these circumstances.

## Conclusion

30.     The Debtors believe that all parties in interest are best served by an extension of the Exclusivity Periods to focus efforts on settlement among all parties.   Alternatively, disengagement by the Freedom Lender Group while they formulate their own competing plan would significantly prolong these cases even more, introduce chaos, and waste key resources at a time when the Debtors simply cannot afford it.  For the reasons set forth in this Reply and in the

---

[34]     *Id*.; *see also In re Geriatrics Nursing Home, Inc.*, 187 B.R. at 134 (stating in response to a motion to terminate the debtors' exclusivity, that the court "cannot conclude, based on reasoning of the Bankruptcy cases treating of 'cause' under 11 U.S.C. § 1121(d) . . . that the fact that one creditor constituency is not happy with the debtor's plan constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period.").

Motion, the Exclusivity Periods should be extended.  Accordingly, the Bankruptcy Court should overrule the Objection and grant the relief requested in the Motion.

[<em>Remainder of page intentionally left blank.</em>]

The Debtors respectfully request that the Bankruptcy Court overrule the Objection and grant the relief requested in the Motion.

Dated:  March 31, 2025
Wilmington, Delaware

/s/  Allison S. Mielke

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:        emorton@ycst.com
              mlunn@ycst.com
              amielke@ycst.com
              sborovinskaya@ycst.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com
              nicole.greenblatt@kirkland.com
              derek.hunter@kirkland.com

- and -

Mark McKane, P.C. (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:        mark.mckane@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*