**<u>EXHIBIT A</u>**

*In re MTE Holdings LLC*, Dec. 13, 2019 Hr'g Tr.

```
1                  UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
2
                                     .   Chapter 11
3    IN RE:                          .
                                     .   Case No. 19-12269 (KBO)
4    MTE HOLDINGS LLC, et al.,       .
                                     .   Courtroom No. 1
5                                    .   824 North Market Street
                                     .   Wilmington, Delaware 19801
6                                    .
7                       Debtors.     .   December 13, 2019
     . . . . . . . . . . . . . . . .     10:00 A.M.
8
                  TRANSCRIPT OF OMNIBUS HEARING
9            BEFORE THE HONORABLE KAREN B. OWENS
                 UNITED STATES BANKRUPTCY JUDGE
10
11   APPEARANCES:

12   For the Debtors:        Robert Dehney, Esquire
                             MORRIS NICHOLS ARSHT & TUNNELL
13                           1201 North Market Street
                             Wilmington, Delaware 19801
14
                             - and
15
                             Andrew Glenn, Esquire
16                           Matthew Stein, Esquire
                             KASOWITZ BENSON TORRES, LLP
17                           1633 Broadway
                             New York, New York 10019
18
     Audio Operator:         Dana Moore
19
     Transcription Company:  Reliable
20                           1007 N. Orange Street
                             Wilmington, Delaware 19801
21                           (302)654-8080
                             Email:  gmatthews@reliable-co.com
22
     Proceedings recorded by electronic sound recording, transcript
23   produced by transcription service.

24

25
```

APPEARANCES (Continued):

| | |
|---|---|
| For U.S. Trustee: | Linda Richenderfer, Esquire<br>OFFICE OF U.S. TRUSTEE<br>844 King Street<br>Wilmington, Delaware 19801 |
| For Natixis: | Troy Wood, Esquire<br>BRACEWELL<br>711 Louisiana Street<br>Houston, Texas 77002 |
| For Baker Hughes: | Robert Feinstein, Esquire<br>PACHULSKI STANG ZIEHL & JONES<br>780 Third Avenue<br>New York, New York 10017 |
| For Riverstone: | Jessica Peet, Esquire<br>David Meyer, Esquire<br>VINSON ELKKINS LLP<br>666 Fifth Avenue, 26th Floor<br>New York, New York 10103 |

1                                          INDEX

2

3     ADVERSARY PROCEEDING:

4     *Riverstone Credit Management, Inc., LLC v. MDC Energy, LLC*
      (Adv. Pro. No. 19-50792)

5     Complaint of Declaratory Relief [A.D.I. 1, Filed 11/12/19]

6     **Ruling: 59**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 10:05 a.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Good morning.  Please be seated.

4               Wow, a lot of people here.

5          (Laughter)

6               THE COURT:  Mr. Glenn, how are you?

7               MR. GLENN:  Good morning, Your Honor.  Before we

8    get to the Riverstone Adversary proceeding I figured it would

9    make sense to give the court and the parties in interest a

10   very brief update on some of the developments over the past

11   week.

12               THE COURT:  Okay.

13               MR. GLENN:  As I indicated at the last status

14   conference, Your Honor, I told the court that the company was

15   committed to finding a replacement financial advisor for the

16   Conway MacKenzie firm.  I am very pleased to report that

17   after interviewing three different financial advisory firms

18   the company has decided to hire CR3 Partners.  William Snyder

19   will be leading the engagement.  Gregory Baracato is here

20   today in court.

21               THE COURT:  Welcome.

22               MR. GLENN:  He is here to observe the proceedings.

23               In the last week, Your Honor, not having a

24   financial advisor the company's chief operating officer, Paul

25   Cyphers, who is actually on the telephone, I believe, has had

1   literally daily calls with representatives of both

2   Riverstone, and Natixis, RPA and Alix to go over the budget,

3   to account for previous expenditures and the like.  And I

4   believe the good news there is that there is now an agreed

5   upon budget.  The bad news is we're not quite there yet on

6   the form of cash collateral order.

7            As I understand it, Your Honor has directed us to

8   Judge Sontchi and that hearing on cash collateral will be

9   held on Monday at 2 p.m. before him.  We will commit to

10  trying to resolve all the open issues between now and then,

11  and if not Judge Sontchi can decide any lingering disputes.

12           The other thing that Mr. Cyphers has been engaged

13  on is coming to a consensus on the royalty payments that must

14  be made by the company.  Those will include some prepetition

15  amounts.  The reason that's important, and Mr. Wood raised

16  this, again, on the first day hearing, is that the company,

17  potentially faces forfeiture if those payments are not made.

18  I think we're very close, if not there, with an agreement on

19  what royalty payments have been made.

20           What I would say to the court is assuming we get

21  to a consensus our intention -- the hearing for that matter

22  has been put on for January.  I think all parties in interest

23  with the court's indulgence, and we may need to see another

24  judge depending on your schedule, is to have a hearing before

25  the year end.  So, in an abundance of caution those payments

1  can be made by the end of the month and so that everybody can

2  rest assured that there will be no forfeitures.

3          THE COURT:  Okay.

4          MR. GLENN:  So, that is my brief update.  And with

5  that I would turn it over to Mr. Meyer on the Riverstone

6  complaint.

7          THE COURT:  Okay.  Whoever is standing up he's --

8          MR. GLENN:  Oh, I'm sorry.

9          MR. WOOD:  Your Honor, Troy Wood on behalf of

10 Natixis as agent for the secured creditors.

11         I know we're going to have a status conference on

12 our trustee motion, but to the extent that what we just heard

13 was to give some comfort to this court that things are

14 improving, not from our perspective, Your Honor,

15 unfortunately.  We are not involved in the process of

16 selecting a new FA.  We were told we were going to get an

17 engagement letter before this hearing and we haven't received

18 it.  So, we don't know the extent and powers of that FA, but

19 that is a concern for us.

20         Also, we are pleased that the COO has been meeting

21 with us, but what we're learning from those meetings remains

22 concerning.  And specifically what we're learning is that

23 approximately $8.5 million dollars went out the door as part

24 of this bankruptcy from January 2019 until November to pay a

25 consulting fee to Mr. Seth.  It's our understanding there was

1 no contract to support these consulting fees and it's our

2 understanding that the COO first received these invoices on

3 November 8th, the day they filed bankruptcy.

4          So, we continue to be concerned.  And we will talk

5 about this in our trustee motion.  A lot will depend on what

6 this court rules.  If the court rules in favor of the board,

7 we have already had discussions with the board about kicking

8 that trustee to a status conference in January, but if this

9 current management remains in place, Your Honor, the status

10 conference this afternoon on the trustee motion we're going

11 to be continued to push for a hearing on that because we do

12 want our day in court.

13          THE COURT:  Okay.

14          MR. WOOD:  Thank you.

15          THE COURT:  Thank you.

16          Have you commenced discovery in connection with

17 that?

18          MR. WOOD:  Yes, we have.

19          THE COURT:  Okay.

20          MR. WOOD:  Thank you.

21          MR. GLENN:  The engagement letter for the CR3 firm

22 has not been fully counter-signed.  I promised Mr. Wood I

23 would get that to him today once it is.

24          Thank you.

25          THE COURT:  Okay.  Shall we move onto the

1 complaint?

2         MR. MEYER:  Good morning, Your Honor.

3         THE COURT:  Good morning.

4         MR. MEYER:  For the record David Meyer of Vinson &

5 Elkins on behalf of Riverstone as administrative agent for

6 the lenders under the MTE Holdings credit facility.

7         With me in the courtroom today, Your Honor, are my

8 colleagues Marisa Antos-Fallon of Vinson & Elkins, as well as

9 Mr. James Yoch of Young Conaway.  Also with me in the

10 courtroom today, Your Honor, are Jessica Peet, Cliff Thau, Ed

11 Morton and Brian Glass are my co-counsel.

12         THE COURT:  Welcome.

13         MR. MEYER:  An additional introduction for Your

14 Honor, who you may recall from our first day hearing, is Mr.

15 Chris Abbott, a managing director of Riverstone.

16         THE COURT:  Welcome, sir.

17         MR. MEYER:  Your Honor, one housekeeping matter

18 before moving forward with the complaint today, as part of a

19 stipulation which I will address momentarily we did agree on

20 the form of exhibits that would be admitted into evidence

21 today. I have a binder for you.  Would that be helpful for me

22 to pass that up, Your Honor?

23         THE COURT:  I have the binders already.

24         MR. MEYER:  Fantastic.  Thank you again, Your

25 Honor, for hearing this dispute on an expedited basis.  The

1 | parties have extensively briefed the issues before Your Honor
2 | on an accelerated track, of course, and I want to be
3 | appropriately limited in my opening remarks as a result.  But
4 | one of the reasons we were able to reach that agreement to
5 | move quickly was the stipulation that I outlined at the
6 | outset and thank you for your indulgence on us proceeding in
7 | that fashion.
8 | The stipulation really mitigated what we had to
9 | cover today in respect of the defaults, all which were
10 | uncured, and with respect that we could not have known about
11 | before exercising our inspection rights under the credit
12 | ability.  That has allowed this key dispute to advance on an
13 | expedited basis which is imperative given our significant
14 | concerns; and we share some of the concerns that Mr. Wood
15 | identified at the outset.
16 | Most importantly, for today's hearing, Your Honor,
17 | to keep the focus narrow, the parties do not dispute the
18 | following key points for the adversary proceeding.  The
19 | parties agree that at least one material event of default
20 | under the credit agreement occurred and was continuing and
21 | was properly noticed to MTE as of October 21st, 2019.  That
22 | is, of course, before the petition date of October 22nd.  The
23 | parties agree that such event of default was a sufficient and
24 | effective predicate for the agent to exercise remedies under
25 | the credit agreement and the collateral agreement.  The

1  debtors agree that the agent effectuated the pledge equity

2  vote purported to effectuate the Riverstone written consent

3  and the amendment to the MDC LLC agreement on October 21st;

4  again, before MTE's petition date on October 22nd

5          As a brief reminder for Your Honor what did the

6  Riverstone consent and the MDC LLC agreement amendment

7  achieve?  First, it proposed to appoint John Echols of

8  Opportune LLP as chief restructuring officer at MDC.  It

9  proposed to appoint a five member board of directors at MDC

10 consisting of Dan Gillett and Steve Pully, both of whom we

11 submit are independent of Riverstone, the equity holders, the

12 debtors, any other party in interest in this case; Mr.

13 Siffin, the debtors' CEO and principal shareholder; H.R. McKo

14 [phonetic], the Olam shareholder also in this case; and Mr.

15 Eckles.

16         The resolution also proposed to authorize Mr.

17 Eckles as chief restructuring officer to obtain directors and

18 officers insurance.  It's our understanding that did not

19 exist before the petition date and so, of course, that was

20 important to any people that would sit on the board.  Also to

21 negotiate compensation arrangements with the directors at

22 MDC.  It authorized the MDC board to engage in negotiations

23 with Evercore on a potential exploration of strategic

24 alternatives.  The terms of what that might look like were to

25 be determined by the MDC board.  It authorized MDC to

1   negotiate amendments to the RBL credit facility amendment.

2          While there was a lot of briefing, Your Honor, I

3   think that we can really distill the adversary proceeding

4   down to two points.  It's did the agent properly exercise

5   remedies and if the agent properly exercised remedies what

6   impact does the subsequent filing of MTE have on such valid

7   prepetition exercises of remedies.

8          Before we jump into those questions, Your Honor, I

9   think just a little bit of background as to the financing

10  facility.  How it is structured, I think, is really helpful

11  for the court and for all the parties today.

12         In September 2018 MTE entered into a $475 million

13  dollar credit facility between the agent and the lenders;

14  $240 million dollars of that will be funded at closing.  An

15  aggregate of about $235 million dollars was available during

16  the next 12 month period in the form of delayed draw term

17  loans.  Today there is $410 million dollars outstanding under

18  that facility.  That makes this by far the largest

19  constituency in these Chapter 11 cases.

20         As I mentioned, Your Honor, the financing

21  structure is important.  MTE pledged its membership interests

22  in its operating subsidiary, MDC, to the agent to secure the

23  obligations under the agreement.  That equity pledge is the

24  primary collateral securing MTE's obligations. So, what does

25  that mean?  It really means for purposes of this case my

1 clients are structurally junior to the OpCo creditors, the

2 OpCo lenders just as a matter of the way the financing

3 structure is put forth.

4        The fundamental bargain underlying this commonly

5 used financing structure is how the court should think about

6 the adversary proceeding in my view, as well as the long term

7 consequences on the financing markets.  Why is that?  A

8 lender at a parent company with no operating assets is, by

9 definition, not secured.  It cannot be secured or exercise

10 remedies against the operating assets of that business.

11        So, to induce sophisticated lenders to lend large

12 sums of money without a security interest in those operating

13 interests borrowers regularly agree to fundamental

14 protections the lenders require.  One of the most important

15 ones of that is a pledge on the equity interest and the

16 rights attended thereto.  Thus, equity pledges are universal

17 in all of these holding company facilities.

18        Here, the agent did more than just that, but

19 negotiated for a variety of other protections.  It negotiated

20 for a covenant not to incur indebtedness under the RBL at MDC

21 in excess of $200 million dollars or the applicable borrowing

22 base, whichever is lower.  There is a covenant not to incur

23 liens on the assets including the operating assets other than

24 the liens under the RBL and certain other limited ordinary

25 course liens.  Again, a pledge agreement to obtain a pledge

1   on the voting securities of OpCo is a condition precedent to

2   funding the loan in the first instance.

3          To say it bluntly, Your Honor, the debtor's

4   position seeks to undermine the entire financing market

5   practice.  By their rationale any holding company could file

6   for Chapter 11 to unwind the pledge equity vote of a lender

7   who validly exercised remedies under the collateral agreement

8   including the rights granted to it under the pledge

9   agreement.  That can't be the case.  It creates absurd

10  results.  These facilities have existed for a long period of

11  time.  We did not create a new financing facility as part of

12  this transaction.

13          THE COURT:  But you would agree that you would

14  have to be able to exercise rights properly under the LLC

15  Act, the LLC agreement and your collateral agreement.  I

16  would not be undermining the securities market by making a

17  general ruling in this case if you didn't comply with the

18  terms of the various agreements that govern your

19  relationship.

20          MR. MEYER:  Your Honor, I agree with that.

21          THE COURT:  Okay.

22          MR. MEYER:  I think that we did exercise remedies

23  properly, but I agree with your statement that in no

24  circumstance am I trying to say that if the court found we

25  did not exercise remedies properly that that somehow changes

1  the -- there is discussion we will have about benefit of the

2  bargain between the party's expectations, market

3  expectations, the debtor's expectations, but I agree with

4  your assessment.

5          THE COURT:  Okay.

6          MR. MEYER:  Many very smart lawyers, investors and

7  other professionals have spent years creating these

8  facilities in the common financing structure.  It's rare, I

9  will acknowledge, but when there is a breakdown between the

10  parties lenders have exercised similar remedies in other

11  situations.

12          While we can't agree on much in this case I think

13  one thing we can agree about as we talk today, there's not a

14  case on all fours that covers any of these particular issues.

15  Why is that? I think it's an important question to ask.  It's

16  that borrowers facing analogous fact patters, if they do

17  exist, and I have advised many of those companies that are

18  financial distress just generally, you really sort of have

19  two options in my view.  You engage with your stakeholders

20  often on a forbearance because it's what the company wants or

21  you file for Chapter 11.

22          Again, I will acknowledge, it's rare for a

23  borrower owing hundreds of millions of dollars in debt to

24  sophisticated lenders and many other trade creditors that are

25  in this room have made appearances, objected to cash

1   collateral and, otherwise, to stick its head in the sand and

2   force my clients to fire the biggest weapon in their arsenal.

3          You will recall Natixis commenced a foreclosure

4   action prepetition that resulted in the filing of MDC.  There

5   are a lot of parties in this room, I anticipate on the phone,

6   they certainly made appearances in the case and have filed

7   lien claims.  Mr. Samis, Ms. Good, they represent a large

8   stakeholder group of a very concerning quantum of mechanic's

9   liens.  And I'd add the U.S. Trustee has raised numerous

10  concerns with the information flow at literally every hearing

11  in this case.

12         As Mr. Wood outlined at the outset we have seen

13  the same pattern of behavior since we started and I would

14  add, Your Honor, we said it before, I'm not going to belabor

15  it, it was the same pattern of concerning behavior that

16  proceeded during prepetition that led us to take our steps in

17  the first instance.

18         We do see the existing -- well, we also don't -- I

19  should say, Your Honor, why we don't see analogous fact

20  patters is we don't see debtors then turn around and file

21  companies in situations like this.  Why is that?  Well, if

22  remedies were properly exercised, to Your Honor's earlier

23  point, the potential damages associated with how having that

24  potential case dismissed, the impact on the business, it's

25  not your decision to make, it's not my position.  This is the

1    first time that I've stood up in front of Your Honor, it's

2    been our position throughout this case that that's what

3    happens here.

4            Also, just their expectations.  The collateral

5    argument and pledge agreement make really clear, Section

6    6.01(d) of the collateral agreement, Section 5.08 of the

7    pledge agreement that in this circumstance its agreed as to

8    what happens between the parties and MDC has agreed that my

9    client's control the equity interest -- excuse me, the voting

10   interest in that box during the course of this case.

11           With that background -- I will come back to the

12   two key questions.  So, did the agent properly exercise

13   remedies?  If the agent properly exercised remedies what

14   impact does the subsequent filing of MTE have on such valid

15   prepetition exercise remedies?  A lot of noise, I'll say, in

16   the debtor's papers about notice.

17           Our position is no notice was required under

18   6.01(b).  Again, covered in our briefing, it's very explicit,

19   it says no notice.  How do we read that in connection with

20   6.01(a)?  6.01(a) is designed to make sure there is clarity

21   as to who is controlling the pledged shares during that

22   process and period.  And so there is no requirement that --

23   there is no temporal requirement associated with those two

24   provisions.

25           As a consequence, prior notice was not required,

1  as our view and we don't concede that under 6.01(b) in the

2  first instance, but even if it was the -- excuse me, our

3  notice clearly indicated, that was sent on October 21st, that

4  we were notifying the debtors that we were prepared to

5  exercise remedies that we had deemed the shares and then

6  subsequent to that we were acting on the pledge shares in the

7  first instance.

8          In addition to that we had, at least, five written

9  correspondences where the borrowers knew where we were and we

10  were prepared to exercise any and all remedies, and the

11  parties, again, have stipulated that, at least, one event of

12  default was properly noticed as of October 21st, 2019.

13          Moving to deemed registration, Your Honor.  Agent

14  registered the membership interest in the only way they

15  could, and that's by deeming them registered. MDC is an LLC.

16  It's not a corporation.  There is no prescribed way of

17  registering membership interest under the MDC LLC agreement,

18  the collateral agreement or the Delaware Limited Liability

19  Act.

20          The debtors suggest that we should look to the

21  section of the MDC LLC agreement applicable to transfer

22  membership interest, but this isn't a transfer of membership

23  interest under Section 35.  There also has unquestionably

24  been no assignment of the membership interest consistent with

25  the collateral and pledge agreements.  In any event, again,

1  pursuant to our notice deemed registration happened before

2  the pledged securities were voting in the first instance.

3         The last piece that the debtors argue is a

4  shareholders meeting.  A shareholders meeting was not

5  required to vote the pledge equity for all the reasons we

6  said in our papers.  It was made effective by the written

7  consent.  Section 6.01(b), again, refers to the exercise can

8  occur at a shareholders meeting or otherwise.  The debtors

9  ignore the or otherwise language in their initial briefing.

10  They said that the proper construction does not make or,

11  otherwise, modify the meaning of shareholders, but rather

12  apply to pledge entity or pledged entities.

13         The debtors don't really explain how that might

14  work, but in any event the plain language in that sentence

15  only has a single subject which is meaning of the owners of

16  the relevant entity or, otherwise, modifies that subject in

17  our view, Your Honor.  Written consent is an alternative and

18  well established way under Delaware to take action as a

19  member.  I'd also add that the only purported written consent

20  that was executed post-petition that was done as a written

21  consent.  There was no shareholder meeting.  So, the

22  positions are inconsistent.

23         Your Honor, I'll move briefly to impact of MTE's

24  Chapter 11 filing.  It's our view that there is no change

25  based on our valid prepetition act that occurred that changes

1  anything during the dynamic post-petition.  The collateral

2  agreement makes clear that upon the occurrence and

3  continuance of an event of default the agent can exercise

4  remedies including voting the pledge securities.  The right

5  to vote such pledged securities exists until the event of

6  default is cured.  That is clear under 6.01(b).  As I

7  mentioned the Chapter 11 case does not change the result in

8  our view.

9          First, under state law this in irrevocable proxy

10  under Delaware law.  We cover that in our briefing.  It makes

11  clear that we have that right to vote the pledge securities.

12  Second, this is really no different than a lot of other

13  contractual disputes we do see inside Chapter 11.  That is if

14  a contract is validly terminated prepetition in this

15  illustrative example I am going to provide.

16          Bankruptcy doesn't bring that back to life.  The

17  filing of a bankruptcy case doesn't change if a counterparty

18  appropriately terminates it contract.  You can litigate that

19  issue in bankruptcy court, but I think that's pretty well-

20  settled law, I think.  Here a prepetition remedy has been

21  validly exercised in our view and the same result applies;

22  you don't get a do-over as it relates to that issue.  At

23  bottom, bankruptcy does not improve the debtor's position as

24  it relates to the pledged equity vote.

25          I'd also add, Your Honor, there is nothing

1  material for the member to do from this point going forward.

2  This court will have jurisdiction over all those matters in

3  the first instance.  The board has been tasked under the LLC

4  agreement to run the business of MDC.  They're independent

5  board members as I noted at the outset.  Despite the we're in

6  control, the agent is controlling, whoever is controlling,

7  the independent directors don't have any affiliation with

8  Riverstone as I will talk about in some subsequent remarks,

9  they are still involved in all the day to day discussions

10  that that board will be involved in.

11          What can the member do?  The tasks are rather

12  limited.  Its replace board members for cause, as defined in

13  the LLC agreement.  There's still a vacancy on the board.

14  Its amend, alter or modify the LLC agreement.  And if any of

15  those things happen it's our position we will have to come

16  back to the court in the first instance on all of those and

17  you're going to be the supervisor of what you think with

18  respect to that and each of the parties in the case.  My

19  clients may not like certain things, Mr. Glenn's clients may

20  not like certain things, but people are parties in interest,

21  they can object just as any other party; they just can't

22  object during the course of the case.

23          Briefly, Your Honor, for these reasons, for that

24  reason we just don't think the automatic stay is implicated

25  at all.  That is consistent with (indiscernible), I should

1   say.  That is very clear that passively exercising control

2   over property of the estate does not violate the automatic

3   stay.  The agent has not used the voting rights since MTE

4   filed for Chapter 11 protection.  It also has not

5   relinquished control over them which it is not permitted to

6   do without violating the automatic stay.

7            We have said this in our papers, we are confident

8   the MDC and independent board is going to manage this

9   business appropriately and we think it's really important.

10  That is again, why we thought this proceeding needed to

11  proceed as fast as possible.  We're prepared to defer to

12  their judgment.  The Corvette, Your Honor, is in the garage.

13           On turnover, Your Honor --

14           THE COURT:  Let me ask you're a question.  Walk me

15  through why the Corvette is in the garage here?

16           MR. MEYER:  I'm happy to.  I think it's the sheer

17  fact that prepetition, based on a valid exercise of remedies,

18  the MDC board is now in control of this business.  So, what

19  does that mean?  My rights to vote -- my client's rights, I

20  should say, to vote the interests at MDC, to the extent they

21  exist, the action has already occurred.  MDC is going to take

22  the actions that a prudent board should take or it won't take

23  the prudent actions that a board will take and the

24  consequences of that will be I have no control over what that

25  board does.  I don't have any relationship to that board.

1  Those are independents plus representatives of the debtors
2  and well-established industry veterans in the first instance
3  that are very experienced in navigating situations like this.
4  That is why there have been no other cases.

5        I don't think anybody here can dispute their
6  professionalism and experience.  It benefits all of the
7  stakeholders.  If I were to hypothetically try -- my clients,
8  I should say, were to hypothetically try to exercise their
9  voting rights what does that mean?  We'd have to lift the
10 automatic stay.  We have to come back to the court.
11 Everybody would be here in the first instance.  It's not as
12 if we can take other actions.  To the extent it were
13 (indiscernible) we will tell you and represent we will come
14 back to the court to the extent that that gives somebody
15 comfort, but we are planning, as we've said, to sit by.

16       We may not be happy, frankly, with the MDC board
17 does.  I don't know.  I don't know what -- to the extent Your
18 Honor finds in our favor we're going to not be involved -- we
19 will be involved just as every other stakeholder in the
20 course of the case and watching what that board does, but we
21 don't have influence on how that works.

22       THE COURT:  I guess I'm trying to understand in
23 them being the car, the physical car was in the garage you
24 were never given the car, is that right?

25       MR. MEYER:  I think we were given --

1    THE COURT:  So, you have a contractual right.

2    MR. MEYER:  We have a contractual right to vote

3 the pledged shares until we don't.  That could happen during

4 the course of the case.  It could so happen that if Mr.

5 Siffin hypothetically is able to raise a bunch of financing

6 and take all of out, it's pretty self-explanatory.

7    I don't think that that stands for the

8 proposition, I will get to this, for why we did what we did

9 that we had to -- we negotiated for a contractual remedy,

10 that's part of the business understanding of the parties.

11 The debtor's acknowledge we're entitled to take and now we

12 have to avoid, after the facts here matter, but we have to

13 take that action which, again, I have acknowledged is our

14 largest weapon.

15    It can't be that the response is not withstanding

16 this sophisticated negotiation that happened between parties

17 and the fact that this and other financing facilities ignore

18 that, go foreclose on your collateral and now you have to

19 take physical possession in that way.  That is just -- that

20 ignores the remedy that is negotiated between sophisticated

21 parties not just in this deal, but in a host of other deals

22 as well.

23    THE COURT:  Okay.  I understand.

24    MR. MEYER:  On turnover, Your Honor, I'll touch on

25 it briefly.  I think it's pretty clear that turnover is not

1   automatic under both 542 and 543.  I am, of course, happy to

2   answer any questions under that front to the extent that you

3   have them, but one thing we think is really clear, Your

4   Honor, and 543 is only in front of the court, is that

5   Riverstone is not a custodian.  Riverstone is an

6   administrative agent under a credit agreement.  The role that

7   Riverstone agrees to play and how it acts in the direction of

8   required lenders is extensively described in Section 9 of the

9   credit agreement and Article 7 of the collateral agreement.

10          It can't be that just because we have an agent

11   acting for required lenders that that somehow changes the

12   view as to Riverstone's role.  The agent -- there is no case

13   law that supports the proposition that an administrative

14   agent would be a custodian under Section 101-11 of the

15   Bankruptcy Code.  I would submit it's clearly also

16   inconsistent with legislative history.

17          To the extent that there is an argument that agent

18   is used in 101-11 should mean administrative agent under a

19   credit facility; notwithstanding the fact there is no support

20   for that proposition.  I would just also, you know, note

21   briefly that that, by definition, makes it ambiguous.  You

22   have to look to the legislative history in the first

23   instance.

24          What we would say on that point, Your Honor, is if

25   you determine that the agent appropriately exercised remedies

1  consistent with the parties expectation, the business

2  agreement between the parties and the funded debt documents

3  then based on that 543 defense, 543(d) we reserve that for

4  another day to the extent it applies, we don't think it does,

5  then the debtor's argument must fail.

6          So, I will just briefly, in closing, Your Honor, a

7  couple quick points.  So, if the court determines the

8  exercise of remedies was ineffective or the bankruptcy can

9  unwind a prepetition exercise of remedies that was valid what

10 happens, in our view.  A couple points.

11         First, in my view, it endangers the financing

12 structure that provides liquidity for borrowers.  I would

13 anticipate that other alternative lenders that have funded in

14 a similar facilities for an extended period of time will no

15 longer be willing to participate in those facilities on

16 similar terms.

17         THE COURT:  If that's the key I want to clear

18 because I'm not swayed by the argument that I'm going to

19 somehow crash the lending market here.  It is on similar

20 terms.  So, I want to be clear whatever my ruling here today

21 is it's based on these documents.  It's based on the

22 agreements that the parties entered into to govern their

23 relationships.

24         So, the argument that I am somehow going to effect

25 these markets; yeah, if lenders have agreed to similar terms

1  then, yes, that may be the case that my ruling could effect

2  them, but I want to be very clear that I am not somehow -- I

3  don't believe that my ruling would somehow crash or effect

4  the lending markets.  I just want to be very clear about

5  that.

6            MR. MEYER:  I understand, Your Honor. And nor am I

7  trying to say that -- I think that with respect to this

8  bespoke, which is a common financing term, it will have a

9  market.  Sitting here and trying to say that outside of what

10  a HoldCo facility looks like I am not trying to argue.

11            THE COURT:  Okay.  I just want to be careful

12  because there's a lot of people listening, and there's press

13  in the room, and I want to be very clear.

14            MR. MEYER:  I do think, to be clear, it is very

15  relevant with respect to that type of financing.

16            THE COURT:  Yes.  If the documents, and the

17  agreements, and the LLC Act is the same for whatever the

18  lending relationship is then maybe my ruling here could have

19  implications.

20            MR. MEYER:  I would submit, Your Honor, its

21  substantially similar.

22            THE COURT:  Okay.

23            MR. MEYER:  If you accept my point on that

24  particular piece I think there is harm to well-behaved

25  borrowers that abide by their credit agreements and create

1  stress on companies that unnecessary may lose that option in

2  the first instance from alternative source of capital.

3       Perhaps more important that I don't think is

4  disputable, it creates perverse incentives for borrowers to

5  thumb their nose at companies unnecessarily and daring the

6  holding company to foreclose and only then start to

7  negotiate.  Your Honor, the restructuring process works.

8  Rational restructuring processes work, parties engage with

9  key stakeholders, it minimizes the cost inside Chapter 11.

10 None of those points that I just made are novel arguments.

11      So, taking something where sophisticated parties

12 don't get to this point and now, effectively, encouraging, at

13 least some borrowers.  I don't want to make broad sweeping

14 statements, but some borrowers would say, well, they're going

15 to be concerned about taking an exercised remedy on the

16 pledge.  Let's wait for them to foreclose and now we will

17 start the discussions.  That is not -- that actually flips

18 the dice in a negative fashion in my view.

19      We're still not at the negotiating table, Your

20 Honor.  We've been trying for months.  We've said that.  And,

21 you know, this is a textbook case for why this remedy is

22 appropriate and defined to the contrary will disturb the

23 borrower/creditor relations.

24      Last part of this point, Your Honor, I think a

25 finding, to the extent, again, we value the exercise remedies

1   that an agent is somehow a custodian, would disrupt many

2   credit facility negotiations and other financing facilities.

3   Again, credit agreements carefully tailor what the

4   administrative agent's role is, what the collateral agent's

5   role is.  Not a novel proposition, agents definitely don't

6   take the position that they're ever fiduciaries that need to

7   act for all creditors.  I can say directly my client's

8   position they're certainly not that.

9           Riverstone is acting at the direction of the

10  required lenders and is unquestionably exercising duties

11  against -- is unquestionably exercising duties beyond just

12  enforcing a lien for the benefit of all stakeholders.  The

13  fact that the agent appointed an independent board that we

14  hope to maximize value for all stakeholders and that includes

15  the equity holders or the fact that Riverstone is the most

16  significant creditor at MTE that doesn't change that result.

17          In closing let's come back to what we really asked

18  for, this is not a cu by a creditor group to control a debtor

19  during this Chapter 11 case.  There will not be far reaching

20  effects on the debtor/creditor relationships other then what

21  I outlined with respect to these types of facilities.  There

22  will not be impacts where creditors control property that is

23  critical to the reorganization efforts other, perhaps, then

24  the cautious sticking your head in the sand doesn't pay.

25          The pledged equity vote installed experienced

1  independent professionals with industry experience to assist,

2  not control, assist MDC for the benefit of all the

3  stakeholders.  Managment still is participating in this

4  process, the senior managment team, the CEO; they will be

5  sitting on the board.  That by definition is not a cu.

6  Perspective matters.

7        We have covered already, and I don't want to

8  belabor the points, but the factual records there is no

9  surprise there is a new financial advisor shortly before this

10 hearing.  I respect that Mr. Glenn went and did a process,

11 that's good news.  We have an engagement letter that will get

12 signed up.

13       We hope that an independent fiduciary can maximize

14 value for everyone including equity holders.  The lenders are

15 not stepping onto the board to take control.  The lenders

16 will have no role in corporate governance.  Mr. Siffin will

17 continue to do so.

18       So, back to why did we do what we did?  We

19 exercised remedies under the pledge to avoid a banruptcy in

20 the first instance.  It was our judgement that if we

21 commenced a foreclosure proceeding, more likely than not we

22 would be in a dynamic where there would be a forced sale or a

23 prompt Chapter 11 filing.  Our judgment was confirmed by the

24 fact that the minute that Natixis commenced a foreclosure

25 proceeding what happened MDC filed for Chapter 11.

1           It's unfortunate that we're here, Your Honor.  We

2    really wish that we could have been out of court.  We are

3    where we are.  To the extent Your Honor rules in our favor is

4    not my decision to decide what MDC ultimately does.  It will

5    be the MDC's board's decision.

6           Your Honor, that is the end of my opening. If you

7    have any questions I'm happy to answer them now.

8           THE COURT:  I do not at this time.

9           MR. GLENN:  Thank you, Your Honor.  I appreciate

10   it.

11          THE COURT:  I appreciate it.  Thank you.

12          MR. GLENN:  Your Honor, I have a PowerPoint I'd

13   like to distribute.  All it is, is excerpts from the

14   documents in case they come up.

15          THE COURT:  Okay.

16          MR. GLENN:  May I approach?

17          THE COURT:  Yes.  And if you could give a copy to

18   my law clerk, I would appreciate it.

19          MR. GLENN:  Absolutely.

20          For the record, again, Andrew Glenn, Kasowitz

21   Benson Torres LLP, proposed counsel to the debtors and

22   debtors-in-possession.

23          Your Honor, this case will be decided based on the

24   impact of two fundamental issues.  First, whether Riverstone

25   followed the requisite steps to perfect its rights to vote

1  MTE's Holdings of the MDC membership interests.  It did not.

2    Second, whether the operative provisions of the

3  Bankruptcy Code effectively override Riverstone's actions to

4  the extent they were otherwise valid.  They do.

5    Before I delve into the specific merits, I want to

6  draw the court's attention to two points.  I'm not going to

7  talk about the markets.  I don't know anything about the

8  markets.  The markets -- there's no evidence of that in the

9  record.

10    THE COURT:  Well, I think we can all agree that

11  there's probably many, many, many agreements and

12  relationships that mirror what --

13    MR. GLENN:  Correct.

14    THE COURT:  -- the documents I'm seeing.

15    MR. GLENN:  And if Your Honor looks at the <u>Texas</u>

16  <u>Rangers</u> case and some of the other cases where these proxies,

17  the language is not really all that different.  It's

18  substantively the same.

19    But the world is watching and the world that's

20  watching are Chapter 11 professionals.  I guarantee it.

21  Hedge funds, banks that would love to find a new roadmap to

22  control companies in and out of Chapter 11.

23    I agree with Mr. Meyer in one respect, there is

24  not one case out there that says that this fact pattern fits

25  into one or the other buckets of decision-making.  This is an

1  unprecedented case.  But if it's allowed to stand, if

2  Riverstone actions are allowed to stand, no good will come of

3  that.

4           Second, the fundamental premise, really the

5  starting point of our argument is that Riverstone took

6  shortcuts when it attempted its cue.  It did not do so

7  because it was necessary.  It did so because it was

8  expedient.

9           The record is clear that we filed our Chapter 11

10 petition within a day after Riverstone acted and had

11 Riverstone follow the contractual roadmap it agreed to it

12 would have provided notice, and it would have required other

13 actions that would have given the debtors other forms of

14 notice like calling a shareholder's meeting.

15          The reason it acted in the manner it did so was to

16 stop us or to beat us or to do a gotcha from us filling a

17 Chapter 11 petition.

18          THE COURT:  Well, we don't really know that.

19 There's no evidence to that.

20          MR. GLENN:  Well the temporal sequence, I think,

21 you can draw an inference from that.

22          THE COURT:  But it's not relevant to what I'm

23 doing.

24          MR. GLENN:  That's true.

25          But the question really is they did what they did.

1    Did it work under the documents?  It did not.

2           Section 6.01(b) of the collateral agreement and it

3    is excerpted in the documents, page 1 and page 2 are 601(a)

4    and (b).

5           601(a) indicates that the company, MTE, keeps

6    dividends and MTE keeps all voting and corporate governance

7    rights unless and until notice is given that there is going

8    to be actions taken -- notice of intent to take actions under

9    601(b).  The plain meaning of the words notice of intent in

10   this context is that the agent has actually determined what

11   is contemplated by 601(b) and that it will be doing that in

12   the future; otherwise, the words are illusory.

13          They claim that there's on temporal requirement at

14   all in giving notice of intent in 6.01(a) and they can do it

15   by fiat without any prior notice, and that's just this gotcha

16   point.

17          THE COURT:  Isn't that what (b) says?  It says

18   without notice.  How could it not be clear?

19          MR. GLENN:  Because 601(a) says they have to give

20   notice.  601(a) says --

21          THE COURT:  I don't think that that 601 -- well --

22          MR. GLENN:  Unless an event of default occurred

23   and continuing and the agent shall have given notice to the

24   relevant grantor of an agent's intent to exercise its

25   corresponding rights pursuant to 6.01(b).  Then, we get to

1  keep dividends and we get to keep governance.

2          THE COURT:  So what happens when they give you

3  notice?

4          MR. GLENN:  Then they can act after they do that,

5  based on some reasonable period of them acting.

6          THE COURT:  But you didn't say 601(a) governs what

7  the company is required to do once they give you notice?

8          MR. GLENN:  No, 601(a) gives the company notice of

9  what the lender intends to do.  So, the company take whatever

10  actions it deems appropriate in response to that.

11          THE COURT:  So if they give you notice of an

12  intent to exercise the remedy in 601(b), what was the

13  obligation of MTE at that point?  Could they just drain all

14  cash profits at that point, for example?

15          MR. GLENN:  Well, I don't think that question is

16  before the court.  I would expect not under any reasonable

17  scenario that that would occur.  I think the question really

18  is if they give notice of intent under 601(a) then the

19  company knows that there's going to be a change in corporate

20  governance after that.

21          Now, once they've given notice of intent after

22  that period -- at any period of time they can act.  But if

23  you read that out of the document then it's illusory.  And we

24  all know that contractual interpretations don't allow us to

25  do that.

1          Second, they claim that they provided all the

2  notice that was required by notifying us of the existence of

3  events of default.  And they have an email on the record

4  where one of their lawyers emails my partner that says

5  they're poised to do various things.

6          The credit agreement -- and, I'm sorry -- the

7  collateral agreement and the credit agreement all indicate a

8  particular methodology for providing notice.  And that's

9  under Section 10.01 -- 10.1 of the credit agreement.  And

10  basically, what that provision says that -- which page --

11  thank you.  It's page 3 of the document, Your Honor.  Yeah,

12  the one with the blue writing on it.

13          It says, all notices required under the document

14  when exercising remedies or otherwise have to be delivered by

15  these means in the designated way."  There's a formality to

16  it.  So, if they want to exercise their remedies and they

17  give any of these notices, they have to send it to an address

18  in Indianapolis, Indiana where the company's CFO is located.

19  They didn't follow that.

20          Next, I would submit that there's a formality

21  required for these kinds of notices because we all know that

22  there are discussions among counsel, there's posturing,

23  there's threats about what may or may not happen.  And while

24  the company has to consider those things, for sure, that's

25  very different than formal notice being delivered as required

1 under the agreement itself.

2 Now, the next flaw in the corporate governance

3 scheme was that they had to seek to have the shares

4 registered in Riverstone's name. And there is a roadmap in

5 the document in the operating agreement for registration.

6 They have to ask for a certificate to be issued. The

7 certificate is then issued and then they can call a

8 shareholder's meeting and effect the changes if they've

9 jumped through all the other hoops before that.

10 THE COURT: Well talk to me about how that

11 dovetails with the argument about transfer, because Section

12 35(c) talks about transferring and when your re-registration

13 -- so talk to me about how that, I guess, dovetails with the

14 argument that there was never a transfer here, I guess?

15 MR. GLENN: There was never a transfer in the

16 shareholding records, the register as required by the

17 collateral agreement. The only operative provisions of the

18 operating agreement are the ones we cited.

19 Section 35 and that provides for a very specific

20 35(c) requires delivery of an indorsed certificate and that

21 is effective only upon registration of such transfer in the

22 books of the company.

23 So, the transfer is to them. They required under

24 the terms of their collateral agreement to affect the

25 registration and this is the only roadmap in the operating

1 agreement to do that.  If they wanted to do it some other

2 way, they could have contracted for that.  They didn't do so.

3 They didn't follow the roadmap in their own document.

4           And, again, had they done that there would have

5 been some temporal sequence that would allow the company to

6 evaluate that.  At any point in that sequence, the company

7 could have filed a Chapter 11 and cut off those rights, so

8 they took the shortcut and it wasn't effective.

9           Riverstone claims that the LLC Act does not

10 provide for any mechanism or body through which Riverstone

11 could have registered the shares, but it's in there and they

12 complain they would have difficulty to get physical excess to

13 the shares but difficulty with compliance is not an excuse.

14 You have to comply with the plain terms of your agreements

15 and they didn't do that.

16           THE COURT:  So what would they have done, had to

17 file the Chancery Court action?

18           MR. GLENN:  They would have --

19           THE COURT:  Talk to me how this would have

20 actually occurred?

21           MR. GLENN:  They should have asked the company to

22 issue the certificate in their name.  Had we refused that's

23 one of the actions they could have taken, had we received.

24 But I think it's a fair inference, as I indicated earlier,

25 that a Chapter 11 petition would have been filed before that.

1          THE COURT:  Could they have issued the certificate

2  in their name under 7.01?

3          MR. GLENN:  Of the collateral agreement or the

4  operating agreement, Your Honor?

5          THE COURT:  The collateral agreement.

6          MR. GLENN:  One moment.

7          THE COURT:  I think they were given the attorney,

8  in fact, status.

9          MR. GLENN:  They're given the attorney, in fact,

10  of MTE, not of MDC.  So, the actions would have had to be

11  taken by MDC.  So, they can do everything that MTE can do but

12  the shares or at MDC.

13          Yeah and then they would have to do that before.

14  There's still a temporal requirement.  They have to do that

15  and then you can take those actions.  They did it all in one

16  fail swoop.

17          So what does all of that mean?  If they never

18  perfected their rights before the Chapter 11 petition was

19  filed then the actions were ineffective to constitute their

20  board.  And I think Your Honor is done with the inquiry and

21  you don't have to address some of the more technical and

22  somewhat complex bankruptcy issues that we've briefed at

23  length before the court.

24          And I think once Your Honor gets there or if Your

25  Honor gets there, I think the fundamental point that you have

1  to decide is what the actual interest that the company

2  conveyed to Riverstone under these documents. And it's kind

3  of a trick analysis but once you delve into what I think it

4  becomes very clear.

5       First and foremost, is there evidence in the

6  record that Riverstone acquired some kind of ownership

7  interest in the voting rights? And the answer to that is no.

8  There was never an assignment of the voting rights. They

9  admit that. They claim that they only have what Your Honor

10 indicated in the colloquy earlier which is a contractual

11 right.

12      The LLC Act as we've cited makes clear that you

13 have to have an operating agreement provision in the

14 circumstance to divest separately voting rights from

15 membership interests or the economic rights. And that

16 plainly did not occur here.

17      There was never an assignment and there was never

18 a mechanic implemented to allow for an assignment to occur.

19 So, the only thing that happened here was the grant of a

20 contractual right for Riverstone to have power of attorney,

21 proxy, however you want to denominate it.

22      We cited case law and I don't think this point is

23 really controversial at all. When you have a right to some -

24 - to affect some performance by the debtor that does not

25 subsist in bankruptcy. The definition of a claim in

1   bankruptcy is both a claim for money damages and any

2   equitable type right to cause specific performance or

3   anything of the like.

4          And the case law that we have here also supports

5   that.  So, we agree with them.  There's no case law that

6   says, hey the minute before -- although the <u>Texas Rangers</u>

7   case have a little of that.  There's no case that says right

8   before a bankruptcy these things happen and we have to look

9   at them during the bankruptcy as well.

10         The case law we've cited for you says, okay, the

11  lender has this right.  There's been a default.  It hasn't

12  done anything prepetition so let's look at what their rights

13  are post-petition.  And the courts uniformly hold that they

14  have no right to exercise proxies or power of attorney's

15  post-petition.

16         If they had a property interest, if they had an

17  ownership interest, the result would be different because

18  they would own that.  It would not become property of the

19  estate.  Your Honor would have no rights to impose an

20  automatic stay upon them, and they would be free to do that.

21         But all of the proxy cases and all of the power of

22  attorney cases that we've cited are uniformly clear.  The

23  lender cannot exercise those rights without lifting the

24  automatic stay.

25         So what that means is even if they perfected their

1    rights prepetition, they have no rights to do anything with

2    that post-petition and what flows from that.

3           We get to the world of repossessed cars.  So, if

4    Your Honor concludes that they have no post-petition right to

5    block us from changing corporate governance which is what

6    happened via the post-petition written consent, then those

7    rights then belong to us.  That's the learning of the <u>Texas</u>

8    <u>Rangers</u> case and the other cases that we've cited in our

9    papers.

10          So you didn't even have to get to the <u>Denby-</u>

11   <u>Peterson</u> Analysis of whether this is passive, whether this is

12   active.  It's nothing.  It's cancelled.  But if you do, let's

13   talk about repossessed cars.

14          First a repossessed contrasts with what they have

15   because they have actual possession of a tangible asset which

16   is different than a contractual right like we've already

17   spoken about.  But let's talk about the commercial reality of

18   a car sitting in a garage versus an oil and gas company, an

19   E&P company, a salt water disposable company with daily

20   operations that's a living and breathing animal in a dynamic

21   business.

22          Riverstone amended the operating agreement to

23   install a handpicked board, a handpicked CRO, a handpicked

24   financial advisor, and a handpicked investment banker.  Under

25   the Riverstone amendment, MTE cannot remove a board member

1 | for cause or even appoint a new board member to fill a

2 | vacancy without Riverstone's consent.

3 | So, the board that Riverstone installed knows who

4 | they're really answerable to.  That is control.  If we back

5 | out of the bankruptcy world and you look at a company where a

6 | party has installed a board, installed all of the

7 | professionals, I think we would all concede that is that

8 | looks, smells, and acts like a controlling interest in a

9 | company.

10 | But I think the fundamental point that flows from

11 | that as well is that they purport to have a blocking right.

12 | So, they claim they're being passive.  They claim that the

13 | board is not really answerable to them.  Even if you accept

14 | the notion that that's true having a veto right over a

15 | debtor's right under the constituent documents to change the

16 | governance is an act of control, and that's what they've

17 | done.

18 | We changed the board post-petition to the extent

19 | that it was already changed prepetition and now they're

20 | saying, look, we can block you from doing anything.  That is

21 | the definition of control, and that's the holding of the

22 | Texas Rangers case where the lender in that case tried to

23 | block a sale of the company pursuant to a proxy that gave it

24 | the purported right to block that sale.

25 | And the court ruled that even if there were the

1  right to vote had, in fact, shifted to the lender prepetition

2  under the pledge agreement there, the lender could still not

3  block the debtor from approving the sale.

4       The implication of that case and the cases that

5  deny enforceability of the proxy and power of attorney is

6  someone has the right to exercise oversight of the board.  It

7  can't be Your Honor.  It has to be someone outside of the

8  bankruptcy court because corporate governance stays the same

9  in bankruptcy as it does pre-bankruptcy in the absence of

10  circumstances not present here.

11       And so, I think that's a good transition to

12  another point.  Has Riverstone cited any authority for the

13  proposition that it can affirmatively block the debtors from

14  exercising their rights under the governing documents even

15  after Riverstone amended them under the automatic stay?  And

16  they have not.  There is no authority where a party can block

17  an existing member from exercising their rights once the

18  Chapter 11 petition has been filed.

19       So, that brings us to another issue with their

20  documents, with their amendment.  Is there a pathway in the

21  document, even after they amended the document for the member

22  which remains MTE to exercise corporate governance rights,

23  and there is?

24       The operating agreement maintains Section -- and

25  that's in Section 31.  It's excerpted in this agreement.  It

1   allows amendment of the operating agreement by the member,

2   subject to 9(b) which has no restrictions in the member's

3   ability to amend.  The member in this case, MTE, exercised

4   those rights and re-amended the agreement as was its right

5   under the operative terms of the operating agreement.

6              Riverstone has no authority indicating as a matter

7   of interpretation of the contract or otherwise that MTE was

8   not free to do that.  So, the inescapable conclusion is that

9   we validly exercised those rights.

10             Now, they cite one case for the proposition that

11  we were obligated to get Your Honor's approval before

12  exercising those constituent rights.  It's a district

13  bankruptcy court for the District of Maine from 1991.  I have

14  been doing this a long time and we looked for other precedent

15  that would have obligated us to do that.  We have not seen

16  that.

17             We're involved in the <u>LightSquared</u> bankruptcy

18  where right before the plan, there was a complete change of

19  governance where independent directors were brought in. That

20  was simply announced because it was permitted under the

21  governing documents, so we don't believe we ever had any

22  obligation to seek relief from this court before we did that.

23             So, I will conclude by addressing turnover.

24             Mr. Meyer is correct that there are only two

25  operative provisions at play for turnover.  Once Your Honor

1 │ comes to the conclusion which I think is now relatively

2 │ undisputed that these voting rights are merely contractual

3 │ rights and that the voting rights remain, you know, estate

4 │ property, if they are in somehow possession of them, then as

5 │ property of the estate they have an obligation to turn them

6 │ over.

7 │ The Third Circuit precedent, the Denby-Peterson

8 │ case goes into this.  The question is what kind of due

9 │ process is required and due process is what we've done here.

10 │ We filed an adversary proceeding.

11 │ Section 543, if it applies, if that is property of

12 │ the estate, it must be turned over. And what's left over from

13 │ that analysis is there 543(d) defenses in that regard.  And

14 │ we've agreed that if Your Honor doesn't conclude that or does

15 │ conclude that all of our prior arguments failed that we come

16 │ back to Your Honor under 543(d) in January.

17 │ But if 542 applies, then I don't even think we

18 │ have to have that hearing, then they're just a third party

19 │ and they're subject to turnover.  And the question of whether

20 │ it's in the best interest of creditors or not doesn't really

21 │ apply.

22 │ We looked at this and we looked at the analysis.

23 │ 542 says it applies to, you know, property in the possession

24 │ of I think third-parties.  543 says a custodian, which is an

25 │ agent, he admitted that they're an agent.  He claims that

1   they're an agent in a different capacity then what the
2   statute contemplates, but the plain language of the statute
3   uses the word agent.
4         If the properties in the hands of an agent
5   attempting to enforce a lien they've admitted they're
6   enforcing a lien then we have to address the 543(d) defenses.
7   If they're not the custodian then we go under the 542 rubric.
8   I don't think we have to have that hearing.  We can amend the
9   complaint to simply reflect that as a matter of justice.  We
10  can file a new counterclaim which we're allowed under our
11  stipulation.  I don't think Your Honor has to get there.
12        So, I will conclude by saying this; we have been
13  accused of a lot of things.  There has not been an
14  evidentiary hearing to substantiate a lot of those things.  I
15  don't stand before the court today claiming that this Chapter
16  11 debtor hasn't made mistakes.  I don't stand before the
17  court today saying that we are perfect.  We're like any other
18  company that's going through a period of distress in an
19  industry that's in distress.
20        We look forward to getting past today so we can
21  have the authority to get a DIP, get rid of Natixis and Mr.
22  Wood's complaint.  If you allow us to substantiate what we
23  believe happened here that we are still in control, we are a
24  hundred percent focused on moving this case forward.  We're
25  operating under a de facto injunction where we can't really

1  do anything because the financing parties that we're dealing

2  with don't know whether we're really in charge or not.

3  Creditors don't know whether they should negotiate with us

4  because they don't know who is in charge or not.

5          We can't take away anybody's rights to file any

6  motions that they have filed or they will file, but I

7  gaurantee, Your Honor, we have CR3 Partners in place.  We

8  have our firms in place.  We are going to do the right thing

9  going forward.  We are laser focused on maximizing value.

10  Mr. Siffin bothers me every single day, when can I talk to

11  the judge, when can I tell her all the great things I have

12  done and will do and that I'm not this boogeyman that

13  everyone is making me out to be.

14          So, for all those reasons we look forward to

15  engaging with the court.  We look forward to engaging with

16  the creditors.  I strenuously disagree with Mr. Meyer that we

17  haven't engaged with him.  We have.  We're at an impasse.

18  These things happen.  I have told the creditors, as I said

19  last time, that we will endeavor and I will endeavor to

20  ensure transparency going forward. I believe I have kept my

21  end of that bargain and I will continue to do so going

22  forward.

23          Thank you very much.

24          THE COURT:  Thank you.

25          Any replies?

1     MR. MEYER:  Your Honor, just a few brief remarks

2 if I may.

3     THE COURT:  Absolutely.

4     MR. MEYER:  Two points I agree with Mr. Glenn on,

5 I do agree the world is watching and I do agree this is an

6 unprecedented case.  Your Honor, I agree with your read of

7 Section 6.01(b) and 6.01(a) of the collateral agreement.  I

8 think it's very clear that 6.01(b) provides that no notice is

9 required.  Without notice, it couldn't be clearer as to what

10 that means.  As I indicated in my opening argument what is

11 the point of 6.01(a)? It's to make sure there is not

12 confusion, frankly, between the respected parties as to who

13 is exercising rights under the pledged securities.

14     Let's just assume Mr. Glenn is right for a minute,

15 which I do not think that he is, we can go off our notes and

16 there is no -- I think he would not dispute that it doesn't

17 say anything as to the time periods that have to lapse before

18 each of these things might occur in the first instance.

19     Our notice clearly indicated, if I can turn to it

20 here, Your Honor, that first to the point in time that we

21 delivered the notice to exercise to the debtors they were on

22 notice under 6.01(a).  Excuse me, Your Honor, I lost my --

23 I'm in our exercise of remedies letter in the first

24 paragraph.  It says:

25     "The administrative agent hereby notifies you

1     that, (i) the rights of the company to exercise all voting

2     and membership rights with respect to the equity interest of

3     MDC are no longer effective and become vested in the

4     administrative agent which has the sole right to exercise

5     such voting and membership rights."

6           So, again, even if he is right that you have to

7     read these provisions together, and I don't think that he is,

8     that stuff has been accomplished. Then the pledged securities

9     are hereby deemed registered in the name of the

10     administrative agent.  That step unquestionably happened

11     next.  Then the last step is the administrative agent then,

12     at the direction of the requisite lenders, has exercised its

13     rights under Section 6.01(b) of the collateral agreement.  I

14     think that is extremely clear.

15           Your Honor, what I also note comes back to facts

16     do matter here and Mr. Glenn eluded to the facts.  And if you

17     accept those first two arguments, but we were having

18     extensive discussions pre-filing.  Mr. Glenn eluded to the

19     email in the record in which there is an email from one of my

20     partners saying we're poised to exercise all remedies.  I'm

21     not sure what else that could be led to mean.

22           Mr. Glenn points to Section 10.01(a) of the credit

23     agreement.  I don't think that matters because they have

24     stipulated that notice was appropriate in the first instance.

25     Clearly, the notice worked.  They filed for Chapter 11 24

1   hours later.  So, they knew they got it.  So, I don't have

2   any other points as to the notice piece.

3           As to deemed registration, I mentioned this in my

4   opening arguments.  There is no registration requirements

5   under the operating agreement, the collateral agreement to

6   the limited liability company.  Are we supposed to go knock

7   on the door of the company to go in search of the books and

8   records.  It was a point that we made in our opening brief.

9   We don't think that that applies.  Again, deemed registered

10  in the first instance, we believe, works under the applicable

11  law.

12          One other piece I would just add as it relates to

13  the exercise of remedies more broadly, a potential total

14  other litigation you could see play out.  So, we could be

15  litigating this in a different form as we exercise remedies

16  properly in the first instance.  So, I would just add that as

17  a passing comment.

18          Mr. Glenn notes that this is a challenging

19  dispute.  I don't think that this is that hard given the fact

20  that we have an irrevocable proxy during the time that an

21  event of default does exist.  The Texas Rangers case, all the

22  cases that are cited why are they different?  We're talking

23  about post-petition actions. We had a prepetition remedy that

24  was taken.  I think the example was the contract terminated

25  prepetition is much more appropriate.

1          Those cases, yes, they deal with governance

2    rights, Marvel, Texas Rangers, other cases in corporations

3    where people are exercising their rights to lift the stay to

4    seek to foreclose.  The Texas Rangers case you had parties

5    that showed up at the last minute trying to say now we want

6    to assert ourselves in connection with this sale process.

7    This case, I think, we can all agree couldn't be further from

8    that.  We have had two litigations that we have commenced.

9    We have a lift stay, an adversary proceeding.  The parties

10   don't see eye to eye.  I will agree with Mr. Glenn, there is

11   definitely an impasse here, but Texas Rangers case is not on

12   all fours with respect to anything here.

13          As to the LLC agreement, the amendments and

14   somehow the import that lenders who control -- excuse me,

15   lenders who exercise remedies to then appoint directors to a

16   board my response to that would be how many cases, Your

17   Honor, come across the bench in this jurisdiction and other

18   jurisdictions where private equity sponsors have portfolio

19   companies and those private equity sponsors are involved in

20   connection with the selection of independent directors that

21   are good for corporate governance.  That just falls flat.  We

22   see that in, albeit, a different context all the time and

23   those independent directors they have a duty.  The LLC

24   agreement there is no waiver of fiduciary duties.  Those

25   parties have to exercise their fiduciary duties or there are

1  other consequences that necessarily come to pass.

2         As it relates to no authority to act, again a

3  prepetition remedy that was exercised.  It's our position

4  that it will continue to be so.  We had the right to exercise

5  rights to MTE.  I think it's a stretch to say that in the

6  context of litigation that if MTE wanted to come back to the

7  court and wanted to have a dispute that somehow in litigation

8  changing your board, changing your documents, dismissing a

9  bunch of professionals in the ordinary course of business I

10  don't agree with that particular point.

11         I'm happy to address any points from Your Honor --

12  questions from Your Honor as it relates to the definition of

13  custodian in the bankruptcy code.  I think it couldn't be

14  clearer.  Yes, it does say agent, but it also is referring to

15  trustees, receivers.  We're talking about parties that are

16  appointed by a court, not parties that are involved in

17  complex financing instruments.  Yes, there's an exercise of

18  remedies provision in there, but Riverstone is the

19  administrative agent for a lot of other things under the

20  credit agreement.  In the first instance I think it's all

21  consistent with Section 543.  I'd also note they didn't plead

22  under 542.  It is not part of the adversary proceeding here

23  in the first instance.

24         Lastly, I appreciate that situations can be

25  difficult, I do, but what I would respectfully say, Your

1  Honor, is this debtor has had its chance.  They have had

2  their opportunity over the last several months to

3  constructively engage and they didn't.  And so to now say

4  maybe they're trying to -- we can agree to disagree, impasse

5  or stonewall, fine.  What shouldn't happen -- it's not just

6  my clients who are the largest stakeholder in this case, but

7  there are a lot of other parties that are impacted by this

8  decision.  Trade creditors who are significantly impacted by

9  this decision have expressed significant concern during the

10 course of this case too.

11         I think all those things matter.  And when you

12 think about the remedy we're requesting, which is not to have

13 a bunch of lenders come sit on the board, but rather put

14 seasoned, sophisticated experienced professionals to sit in a

15 capacity to act for all those stakeholders that is what we're

16 used to seeing in a normal regular Chapter 11 case in the

17 first instance.

18         Your Honor, I don't have any other comments unless

19 you have questions for me.

20         THE COURT:  Okay.  I do not have any questions.

21         MR. MEYER:  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         MR. GLENN:  Just one last point?

24         THE COURT:  Sure.

25         MR. GLENN:  I asked (indiscernible) to look at the

1  actual stipulation.  I think Mr. Meyer might have made a

2  mistake when he said that we agreed that the notice was

3  somehow "effective"; that's what we're litigating here.  We

4  agreed that the notice was given and whether it was effective

5  or not is the issue that Your Honor is deciding.  Thank you.

6           THE COURT:  Okay.  Thank you.

7           Mr. Samis wants to make a few remarks.

8           MR. GLENN:  I object.  Mr. Samis did not file any

9  pleadings with respect to this matter.  He doesn't have

10  standing.  This is a dispute solely at MTE, so I would object

11  to any evidence or any argument by Mr. Samis.

12           MR. SAMIS:  Your Honor, I'm not --

13           THE COURT:  Are you taking a position with respect

14  to the issues before me?

15           MR. SAMIS:  Actually, no, Your Honor.

16           THE COURT:  Oh, okay.

17           MR. SAMIS:  We're just making a general statement

18  in the context of the cases.

19           THE COURT:  Okay.  Maybe he wanted

20  (indiscernible) --

21           MR. GLENN:  Well, if the record is done with that

22  and we're back to status conference world, that's fine.  I

23  just wanted to be clear on that.

24           THE COURT:  I'm happy to hear you out and we'll

25  decide how relevant it is to the current dispute.

1          MR. SAMIS:  Very well, Your Honor.

2          THE COURT:  Okay.

3          MR. SAMIS:  It's not penned, I think, or pinned to

4    any particular parties' position.  It's really just a

5    statement of the intent of our constituency.

6          So, Your Honor, so, first off good morning, Chris

7    Samis, Potter Anderson, & Corroon, here for ad hoc committee

8    of service providers.  Your Honor, the ad hoc committee

9    represents more than $87 million of claims in these cases and

10   its membership is both, critical to the debtors' business

11   operations and we're a substantial stakeholder in the outcome

12   of these Chapter 11 cases.

13         The committee only wants three things, Your Honor.

14   It wants to end gridlock.  It wants a fair recovery on its

15   claims.  And it wants a strong, well-capitalized, go-forward

16   business partner.  In as much, whoever the winner is in this

17   dispute today and whoever ends up controlling the debtor, we

18   want that party to know that we stand ready and willing to

19   negotiate a resolution of our claims in these Chapter 11

20   cases and we look forward to the opportunity to do so as soon

21   as possible to maximize value for our constituency.

22         THE COURT:  Okay.  Thank you.

23         MR. SAMIS:  Thank you.

24         THE COURT:  Okay.  Now you may -- Mr. Feinstein is

25   about to stand up.  He wants to negotiate a resolution --

1    (Laughter)

2         THE COURT:  -- of his clients.

3         MR. FEINSTEIN:  The door has been opened, Your

4    Honor.

5    (Laughter)

6         THE COURT:  Duly noted.

7    (Laughter)

8         MR. FEINSTEIN:  So, we're the other ad hoc group.

9         So, Your Honor, Mr. Meyer said, you know, the

10   trade creditors are concerned and yes, we are, and I want to

11   articulate very clearly what that concern is.  We're almost

12   two months into this case and nothing has happened except

13   fighting about who's going to run the debtor, all right.

14   Value is dissipating.  There is discovery (indiscernible) up,

15   how many lawyers are in the courtroom at what billable rate?

16        So, Your Honor, I'd like to make a suggestion and

17   the parties can take it and Your Honor can consider it or

18   reject it, but we were counsel to the committee in the

19   Woodbridge case where we had a trustee motion, we had an SEC

20   receivership action, with a debtor trying to maintain control

21   and what resulted after a lot of negotiation among the

22   parties, with the help of Judge Carey was a consensual

23   governance resolution.

24        So, if you look at where the parties stand, the

25   debtor would like to have a CRO, Mr. Snyder, who -- I don't

1   know if Your Honor knows him -- but Mr. Snyder is a member of

2   the American College of Bankruptcy, he's a very sophisticated

3   CRO.  They want Mr. Siffin involved, too.  So, apparently,

4   does Riverstone.  They want Mr. Echols from Opportune,

5   instead of Mr. Snyder.  They've put Mr. Siffin on their board

6   under their new arrangement.  And then Natixis wants a

7   trustee, which is probably the most destructive thing because

8   you bring a stranger into this case and it's only going to be

9   value-destructive.

10          We're also concerned, Your Honor, that depending

11  upon the ruling on the Riverstone matter, an appeal might be

12  taken by one of the other parties, leaving governance in

13  suspense, creating more expense and more uncertainty in the

14  case.  So, what we would encourage, Your Honor, as a

15  constructive step, either with the benefit of the Court or a

16  mediator, or just the parties working themselves, is to try

17  to come up with a construct that allows Mr. Siffin to stay on

18  the board as the debtor wants and as Riverstone wants, to

19  have a responsible CRO -- and Mr. Snyder, they don't come any

20  better -- and some other terms and conditions that might

21  normalize this case and move it towards a successful

22  conclusion.

23          But right now, we're simply seeing value destroyed

24  by a bunch of litigation over the shape of the table.  That's

25  all I have to say.

1              THE COURT:  Okay.  Thank you.

2              MR. MEYER:  Your Honor, just if I may, really

3  quickly on that front?  I don't believe there's been a

4  proposal -- again, I haven't seen Mr. Snyder's engagement

5  letter that he would be a CRO in the first instance; I

6  understood him to be a financial advisor in the first

7  instance -- and I would also just identify, to be clear, we

8  put Mr. Siffin on the board, as well as the principal other

9  shareholder as (indiscernible).

10             And, again, we would have gone -- we could have

11 put whoever we wanted in our -- to constitute that board, but

12 we didn't intentionally and for a reason.  And so, I just

13 want to make clear on that particular point so it's clear for

14 the record.

15             THE COURT:  Okay.  Well, Mr. Feinstein, I am going

16 to rule on that issue, okay.  I appreciate your comments.  It

17 boggles my mind that there's not been a CRO appointed in this

18 case, but I'm not standing in the shoes of the debtor; I just

19 call the balls and strikes, as I've said in other cases.

20             So, here's what I'm going to do.  I'm going to

21 take a break.  I'm going to come back at a quarter of and

22 make my decision and then we will address the other matters

23 on for today, okay.

24             All right.  We'll stand adjourned.

25         (Recess taken at 11:19 a.m.)

1        (Proceedings resumed at 11:45 a.m.)

2                THE COURT:  Please be seated.

3                As a housekeeping matter before I make my ruling,

4    I'll note that no one moved the exhibits into evidence, so

5    I'm going to go ahead and move those into evidence, given

6    that they're stipulated to and there's no objection.

7                So, before the Court are the request for

8    declaratory judgment made by Riverstone, as agent for the

9    lenders, under the term loan credit agreement, dated as of

10   September 17, 2018, and those made by the debtor, MTE

11   Holdings, and its wholly-owned subsidiary debtor, MDC Energy.

12   Following commencement of the adversary by Riverstone and a

13   filing of an answer and counterclaim, the parties

14   stipulated -- or excuse me -- entered in stipulated facts and

15   exchanged briefing on the issues presented to the Court

16   today.

17               The parties have agreed that with the exception of

18   the turnover counterclaim the Court's decision today will

19   constitute a decision on the merits of the claims of the

20   parties set forth in the complaint and the answer in the

21   count claims.

22               The Court will not restate the relevant stipulated

23   facts underlying the dispute today, as they are uncontested

24   and are familiar with the Court and the parties; however,

25   it's important to summarize for the record, the issues

1   presented before the Court.  First, the Court has been asked

2   to decide whether Riverstone had, prior to the petition date

3   and continuing now, the power to vote MTE's membership

4   interests in MDC and whether such power to vote by extension,

5   deprived and continues to deprive MTE of control over MDC.

6           Additionally, several related questions have been

7   posed to the Court:  whether Riverstone's October 21st, 2019,

8   written consent and LLC amendment were validly adopted and

9   effective prior to MDC's petition date and served to, among

10  other things, appoint a CRO and create a new five-member

11  board; whether MDC's subsequent written consent and LLC

12  amendment were validly adopted and effective following

13  Riverstone's written consent amendment; whether MDC's

14  Chapter 11 case was properly commenced; whether Riverstone is

15  barred post-petition from asserting control over the voting

16  rights, including determining whether to withdraw MDC's

17  Chapter 11 petition; and whether Riverstone must turn over

18  any control right it currently possesses MTE.

19          Following careful consideration of the evidence

20  presented, the stipulated facts, the briefing of the parties,

21  and the arguments today, I find in favor of MTE and MDC on

22  these issues and hold the following.

23          First, under Article VI of the collateral

24  agreement, MTE granted Riverstone the contractual right to

25  exercise MTE's right to vote its membership rights in MDC

1 upon the occurrence of an event of default, under the credit

2 agreement, and during its continuance; however, to exercise

3 its contractual right, the parties agreed in

4 Section 6.01(b)(2) that the pledged securities must be first

5 registered in the name of Riverstone and that was not done.

6     Riverstone deemed the securities registered in

7 their name and has argued that this was proper as there was

8 no other mechanism to effectuate registration.  The

9 collateral agreement, as well as the LLC after, is silent as

10 to Riverstone could register the pledged securities; however,

11 the LLC agreement addresses registration in Section 35(c),

12 which is entitled, "Registration of Membership Interests."

13 It provides that:

14     "The company shall maintain the books for the

15 purpose of registering the transfer of membership interests

16 notwithstanding any provisions in this agreement, to the

17 contrary, a transfer of membership interests requires the it

18 delivery of an endorse certificate and shall be effective

19 upon registration of such transfer in the books of the

20 company."

21     Accordingly, to register the pledged securities,

22 Riverstone was required to obtain a transfer of the

23 membership interests and, two, a certificate evincing

24 Riverstone's ownership of the membership interests in MTE was

25 to be endorsed, delivered, and registered in the books and

1   records, however, Riverstone did not obtain ownership of any

2   part of MTE's membership interests prior to purporting to

3   exercise MTE's voting rights and no endorsed certificate was

4   delivered and registered.

5         And while this may seem onerous for Riverstone,

6   such a procedure avoids the very situation presented here,

7   where there's a disputed exercise of voting rights and while

8   Riverstone may have believed it bargained for the ability to

9   proceed in the fashion that it did, the documents do not

10  reflect it; moreover, even if the Court is wrong and

11  Riverstone's deemed registration was sufficient to register

12  the pledge securities, Section 6.01(b)(2) requires that any

13  registration of the pledge securities was to occur prior to

14  exercise of voting rights.

15        Riverstone's October 21st, 2019, letter indicates

16  that the deemed registration occurred after the purported

17  exercise of MTE's voting rights.  Accordingly, any actions

18  taken by Riverstone prepetition purporting to exercise its

19  contractual right and to control MTE's voting rights,

20  including the October 21st action by written consent and the

21  LLC amendment are ineffective and invalid.

22        Second, as noted, the Court concludes that MTE was

23  never divested of its voting rights pre-or post-petition.

24  Nothing in the credit agreement, collateral agreement, LLC

25  agreement, or LLC Act provide for such a consequence as a

1   result of the facts and circumstances presented here.

2        MTE is the owner of the voting rights, as sole

3   member, and holder of the membership interests of MDC,

4   pursuant to the LLC agreement, and as such, was and continues

5   to be entitled to exercise those rights under and pursuant to

6   the LLC agreement and the LLC Act.

7        Riverstone simply possesses a contractual right to

8   exercise MTE's voting rights.  It is neither a member, nor

9   has it foreclosed on the membership interests or otherwise

10  obtained ownership.  If anything, there's an argument that

11  MTE may have breached the terms of the collateral agreement;

12  in particular, Section 6.01(a), by exercising its voting

13  rights to among other things, commence MDC's bankruptcy

14  filing, alleged notice by Riverstone of its intention to

15  exercise its contractual rights under 6.01(b).

16       But until Riverstone could validly exercise its

17  contractual rights under that section, MTE was able to do so

18  and to hold contrary and effectively find that MTE was

19  prevented from commencing MDC's case would be violative of

20  public policy.  Accordingly, MTE's exercise of its voting

21  rights, pre- and post-petition, including the decision to

22  commence MDC's case is valid and appropriate; moreover, given

23  that the voting rights are property of MTE's estates and are

24  not held or possessed by Riverstone, the debtors' request for

25  turnover is moot.

1          Third, to the extent that prior authorization from

2     this Court was required pursuant to Section 363(b) of the

3     Bankruptcy Code for MTE to exercise its rights to file MDC's

4     bankruptcy case, this Court grants MTE retroactive authority

5     for the filing, as the evidence to date and the cases

6     indicate that the filing was in the best interests of MTE and

7     furthered the policies of the Bankruptcy Code.

8          Fourth and finally, consistent with applicable

9     case law addressing this issue, including the Marvel, Texas

10    Rangers, and Bicoastal, and Hutchison cases, any post-

11    petition attempt of Riverstone to exercise its contractual

12    right to exercise MTE's voting rights is stayed under Section

13    362(a)(3) of the Bankruptcy Code, as it would be an act to

14    exercise control over property of these estates.

15         Riverstone has reserved its rights to seek relief

16    from the stay but has also moved for the appointment of a

17    trustee, which the Court anticipates will be heard in the

18    near future.

19         Given the foregoing, the Court is prepared to

20    enter judgment against Riverstone and in favor of MDC and MTE

21    and I would ask that the parties confer an appropriate form

22    of order and submit it under certification of counsel as soon

23    as possible.  And I say "as soon as possible" because I have

24    determined, and due to my prior law firm's representations in

25    these proceedings and the likely active role of similarly

1  situated parties, that I must reassign these cases to avoid

2  inefficiencies and case management that will likely result

3  from the need to have a second judge hear matters over which

4  it is not appropriate for me to hear.

5       Judge Sontchi has agreed to take assignment of

6  these matters and will do so following the entry of an order

7  reflecting my order today.  And I apologize for any

8  inconvenience that this may cause the parties and counsel,

9  but, unfortunately, it's unavoided, given the circumstances.

10       I understand that you wanted to discuss with me

11  the scheduling of the trustee motion, but for the reasons

12  that I just discussed, you're going to have to bring that up

13  with Judge Sontchi on Monday.  I understand you have a

14  hearing before him at 2:00 p.m. and you can go -- and you can

15  do so at that time.

16       MR. GLENN:  So, Your Honor, should we file a

17  notice -- we filed a revised agenda, but should we file a new

18  notice of hearing for Monday, notice of status conference so

19  the public knows you might not be participating today what's

20  happened [sic].

21       THE COURT:  You should, yes.

22       MR. GLENN:  Thank you, Your Honor.

23       THE COURT:  And to the extent -- I'll speak to

24  Judge Sontchi, but to the extent the parties are not able to

25  agree on a form of order and present it to me before the 2:00

1  p.m. status conference and hearing on the cash collateral

2  motion, I anticipate Judge Sontchi is still going to hear

3  that matter, as I have to recuse myself, but then we would

4  need that order as soon as possible, so he can enter the

5  reassignment order and get the cases moved and you can move

6  forward as soon as possible with the matters that you want to

7  present to him.

8               MR. GLENN:  We'll do that, Your Honor.  And I'm

9  sure I speak for everybody in the courtroom that we thank you

10 for your help with this case going forward and we'll --

11              THE COURT:  I was looking forward to --

12              MR. GLENN:  It's an interesting case, if nothing

13 else, right?

14              THE COURT:  Mr. Meyer?

15              You're welcome.

16              MR. MEYER:  I'd like to echo Mr. Glenn's comments.

17 Thank you, Your Honor.  We're, obviously, disappointed.

18              Just one thing before we close in front of Your

19 Honor is we're not picking up (indiscernible) Judge Sontchi

20 is it would be my expectation that we will be moving forward

21 with our trustee motion on a parallel path to Mr. Woods.

22 There's no reason that shouldn't happen with respect to the

23 same timeline and process.  Our motion, of course, would be

24 *vis-a-vis*, MTE, and I just say that so that when we pick up

25 on Monday, no one can say that I didn't say that before.

1          THE COURT:  Okay.  And I will relate to Judge

2   Sontchi what I think are the critical points that I think he

3   needs to know and then you can feel free to fill him in on

4   Monday.  Again, I have spoken to him.  He is ready, willing,

5   and able to take over the case and it's unfortunate, but I

6   think that you would have been seeing Judge Sontchi more than

7   me in this case, given, especially the presence of the ad hoc

8   committees and my prior law firm's alignment with their

9   positions in this case, okay:

10         MR. MEYER:  Thank you, Your Honor.  We appreciate

11   all your (indiscernible).

12         THE COURT:  Okay.  Is there anything further that

13   we need to address before we adjourn?

14         UNIDENTIFIED:  No, Your Honor.

15         THE COURT:  No, okay.

16         Everyone have a wonderful holiday and I will --

17   we'll stand adjourned.  Thank you.

18         COUNSEL:  Thank you, Your Honor.

19      (Proceedings concluded at 11:56 a.m.)

1                              CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6
     /s/Mary Zajaczkowski_____        December 14, 2019
7          Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25