

April 2, 2025

**VIA ECF**
The Honorable Laurie Selber Silverstein
United States Bankruptcy Court for the District of Delaware
824 N. Market Street
6th Floor                                                                 **REDACTED VERSION**
Wilmington, DE  19801

               Re: *In re Franchise Group, Inc., et al.*, Case No. 24-12480 (LSS)

Dear Judge Silverstein:

The Scheduling Order concerning the confirmation hearing in these cases, entered by this Court on March 11, 2025, provides that "[f]or good cause, the Court may modify any provision hereof." *See* [Dkt. No. 1086] Ex. A § e (the "**Scheduling Order**").  In light of recent developments, there are five independent bases for "good cause" to modify the scheduling order and adjourn the confirmation hearing.  As such, the Ad Hoc Group of Freedom Lenders (the "**Freedom Lender Group**") requests a status conference on April 3 to discuss scheduling, and if the Court deems it appropriate, to have the Court modify the Scheduling Order.

As the Court will recall, during the March 17, 2025 status conference, Debtors' counsel made multiple representations that the Debtors were shifting their focus to Plan settlement, rather than Plan litigation.  Specifically, Debtors' counsel stated that "our game plan is to file [an amended plan] in the next couple of days" and that "[o]ur proposal would be to freeze all of the pending litigation, just given the insane amounts of cost that we're incurring."  Mar. 17, 2025 Hr'g Tr. 14:16-17; 16:3-5.  Debtors' counsel added that "what we really want to happen today is for the litigators to move aside for the commercial parties," and that "we're not simply going to put on a chin strap and drive forward." *Id*. at 31:10-16; 9:14-21.  To further drive home the point that the parties should focus on settlement, counsel to the Ad Hoc Group of First Lien Lenders (the "**First Lien Lenders**"), warned the Court and the other parties, that "[t]o find a settlement here, to find a resolution here, is purely to avoid future litigation spend.  With each day that goes by, with each one of these hearings we have, and with each day that you have the Debtors working towards trial, you've got the Committee, you've got us working towards trial, each day, we are reviewing documents, we're working on briefs, we're doing research, we're defending on appeal, the fees are mounting.  Each day, the utility of settlement for our clients goes down, the value that we would give goes down, and, inherently, the likelihood of a settlement goes down." *Id.* at 23:7-17.

Consistent with those in-Court statements, in a follow-up email to counsel to the Freedom Lender Group sent after the hearing, Mr. Sussberg specifically cited the Court's statements that this was a "matter that does cry out for a commercial resolution" and that the risks involved included "time and money" and "judicial risk."  Mar. 17, 2025 Hr'g Tr. at 32:10-33:9.  In reliance on those representations and instructions, and in the spirit of cooperation, the Freedom Lender Group re-focused its efforts and resources on settlement discussions, working to formulate a comprehensive, revised settlement proposal (which represented yet another move in the Freedom Lender Group's position) to meet the Debtors' self-imposed deadline of March 20, 2025.  Further, in reliance on the Debtors' representations regarding the litigation freeze, the Freedom Lender Group agreed

with the Debtors to postpone the first scheduled deposition and ceased work on several litigation workstreams, including document review, document production and preparing for depositions. Specifically, in a call between litigators on Friday, March 21, Debtors' counsel stated that, to the best of his understanding, it remained the Debtors' intention to proceed as stated at the status conference—that is, to file an amended plan and freeze litigation.  On that basis, the parties agreed that it would make no good sense to go forward with a deposition on Monday, March 24.  Debtors' counsel provided no updates to the Freedom Lenders Group's counsel over the next three days. On the morning of Tuesday, March 25, we requested a brief check-in with the Debtors' counsel to discuss next steps.  Debtors' counsel responded that the entire day was "not good" and that they could not speak until the afternoon of the following day, March 26, 2025.

On the ensuing March 26 call, without any explanation, the Debtors announced that they had reversed themselves and were proceeding with the existing plan on the existing confirmation timeline, without any litigation freeze.[1]  As for the other self-proclaimed supporters of the armistice on litigation, they apparently decided to use the reprieve to spend estate resources filing three new litigations affecting the Freedom Lender Group: (1) the First Lien Lenders filed a 34 page Adversary Proceeding (defined below) claiming violations of an inter-creditor agreement; (2) the Unsecured Creditors Committee ("**Committee**") filed a 21 page Standing Motion (defined below); and (3) the Debtors' current and former directors and officers, having perhaps been made aware that the Wartell investigation was not going as they expected, filed a motion for relief from the automatic stay to allow payment of defense costs and other losses under their insurance policies related to Take-Private litigation [D.I. 1144].  (The Freedom Lender Group filed their objection to this third motion on March 27, 2025 [D.I. 1185], and the motion will be heard on April 3).

On March 28, the Freedom Lender Group sent the Debtors correspondence asking that they agree to push the confirmation hearing and discovery schedule, and, barring any agreement on the extension, engage in a meet and confer.

The Debtors waited three days to respond to the Freedom Lender Group.  On the afternoon of March 31, the Debtors responded by letter (the "**March 31 Letter**") which denied the Freedom Lender Group's request for any extension of the confirmation schedule.  Nearly simultaneously with sending the March 31 Letter, the Debtors also filed their *Reply in Support of the Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to file a Chapter 11 Plan And Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Dkt 1206] (the "**Exclusivity Reply**"), at which time the Freedom Lender Group learned for the first time that once again they were reversing course.  Rather than proceeding on the existing plan (as announced on March 25), the Debtors announced that they "intend to file an amended Plan before the hearing on April 3, 2025, which will incorporate the commitments of the [First Lien Lenders], and if approved by the Boards (including the Freedom HoldCo Independent Director with respect to any conflict matters), the terms of a comprehensive intercompany settlement," which will supposedly result in "additional value to the HoldCo Debtors."  Exclusivity Reply ¶ 1.  Despite repeated requests, the Debtors have yet to share the Plan even in draft form.  This morning, just before this letter was filed, the Debtors shared a half-page

---

[1] If the Freedom Lender Group had not requested the call, it is not clear when, if ever, the Debtors intended to inform the Freedom Lender Group that they no longer intended to seek a litigation freeze.

term sheet with a vague description of some of the terms and, importantly, caveats that the terms may change.

On the morning of April 1, the Freedom Lender Group and the Debtors met and conferred, and, once again, the Debtors were unwilling to agree to move the confirmation hearing by a single day.

In light of the Debtors' determination to maintain the current confirmation schedule, albeit on a new, as yet unfiled plan, the Freedom Lender Group finds it necessary to seek a modification of the Scheduling Order for the following five reasons, each of which independently constitute "good cause" to adjourn the confirmation hearing.

*First,* the Debtors' reversal on their self-suggested nine-day litigation freeze, described above, should not be countenanced. As described above, the Freedom Lender Group relied on the multiple representations by the Debtors that they would pursue a litigation freeze and the Freedom Lender Group laid down its arms to focus its efforts on settlement. Between the March 17 status conference and March 26, the Debtors stopped producing documents. Then suddenly on the afternoon of March 26, when the Debtors called off the litigation freeze, they dumped approximately 40,000 new documents on the Freedom Lender Group between March 26 and March 28. Precious days were lost in a case where discovery is already significantly behind schedule, as discussed below. At the very least, confirmation needs to be pushed by nine days, subject to the Court's availability, to avoid rewarding the Debtors for their bait and switch.

*Second*, and perhaps more substantively, the Debtors have plainly failed to meet the milestones in the agreed-upon discovery schedule and admit that they will not be able to substantially complete productions before the close of fact discovery under the Stipulated Scheduling Order. The Freedom Lender Group served its operative plan discovery requests on November 16, 2024, ten days into these Chapter 11 Cases (the "**Initial Requests**"). All the plan discovery to date relates to the Initial Requests or to clarifying supplemental requests. The Scheduling Order requires that the Debtors had to be substantially complete with document production in response to the initial Requests by March 7, 2025. This is what followed:

- Before late December 2024, the Debtors, through their prior counsel, Willkie Farr & Gallager LLP ("**Willkie**") had refused to produce any plan-related discovery on the basis that it was "premature."

- On December 27, 2024, Willkie made its first plan-related production of 675 documents. At that time a confirmation hearing was set for February 21, 2025.

- By the time Willkie was disqualified on February 12, 2025, only nine days before the confirmation hearing was then scheduled, Willkie had produced a total of only 11,168 documents.

- Following the proposed retention of Kirkland & Ellis ("**K&E**") as Debtors counsel, K&E represented to the Court on February 19, 2025 that the Debtors could keep the cases on track to substantially complete document productions and complete depositions in advance of the May 12 confirmation date, even though Debtors had at that point made only one additional production of approximately 1,000 documents on February 18, 2025.

Feb. 19, 2025 Hr'g Tr. at 14:25-15:5 ("[W]e kicked out the confirmation hearing by approximately 30 days. And that, we believe -- and Mr. McKane will speak to this -- will give us sufficient time to deal with the issues at hand, produce the appropriate discovery, and be able to proceed where everyone's due process is afforded.").

- Following the February 19 scheduling conference which set the confirmation hearing for May 12-19, the Debtors and the other parties agreed to the March 7, 2025 deadline for the Debtors' to substantially complete document production and to produce a privilege log. Stipulated Scheduling Order at 2.

- Between February 19 and March 7, K&E produced approximately 28,400 additional documents which were subject to the inappropriately narrow search parameters Willkie had agreed to produce in response to the Initial Requests. By the substantial completion cutoff, the Debtors had produced 39,773 documents.

- <u>Since March 7, 2025, the Debtors have to-date produced a total of 72,701 documents and are still producing. In other words, Debtors (through K&E) have produced now twice as many documents after the substantial completion deadline than before it.</u>

- In addition, as of April 1, the Debtors have failed to produce a privilege log that satisfies the applicable rules. The Debtors have represented that they expect to be able to produce an incomplete privilege log by April 4, 2025.

In their March 31 Letter, the Debtors admitted the only exception to the March 7, 2025 substantial completion deadline was for "new" requests. According to the Debtors, the Freedom Lender Group's "new" requests fall into three categories: (1) documents responsive to two new search terms and an expanded date range proposed by the Freedom Lender Group; (2) documents responsive to the still further expanded date range *i.e.*, the Petition Date to the present; and (3) documents provided by the Debtors to Akin and Petrillo in connection with their respective investigations, which Willkie had refused to produce. To be clear, each of these categories of documents are, in fact, responsive to the Initial Requests, and are therefore not "new." Documents in category 1 were always relevant and responsive to the Initial Requests but were picked up by the simple fixes the Freedom Lender Group and K&E agreed to use in order to address the unreasonably narrow parameters that Willkie (conflicted counsel) had imposed on producing documents and communications concerning the Debtors' pre-2024 transactions, including the Take-Private Transaction, the Receivables Transactions and the Badcock Transaction. *See HoldCo Lenders' First Requests for the Production of Documents to the HoldCo Debtors in Connection with the Plan and Disclosure Statement*, Request Nos. 9-12, 13 and 14 (attached at Exhibit A). Documents in category 2 are also not "new" but are simply a clarification that the Debtors were obligated to produce documents relevant to the Initial Requests on an ongoing basis, which would include post-Petition Date document and communications concerning (i) the preparation of business plan projections, (ii) communications with the First Lien Lenders and the Committee regarding valuation of any estate assets, (iii) the marketing, sale and auction process, (iv) plan classifications and the treatment of claims, and (v) the basis for any plan releases. *Id.*, Request Nos. 1-4, 1, 16, 31, and 27, respectively. Documents in category 3, and specifically documents relevant to the Petrillo investigation were, from day one, responsive to several of the Freedom Lender Group's Initial Requests, including requests for all documents and

communications concerning the "Independent Investigation and the Chapter 11 Investigation." *Id.*, Request Nos. 19 and 20. In short, whatever portion of the 72,000 plus documents produced after March 7 related to the three categories, nothing about their production was unforeseeable when K&E committed to the schedule.

Troublingly, the Debtors' productions in the last week (totaling in excess of 40,000 documents) include key documents produced for the first time which are very likely to be used in upcoming depositions and which plainly fit within the original search parameters agreed to by Willkie.[2] In addition, on March 31, 2025, the Debtors informed the Freedom Lender Group, for the first time, that documents reviewed and relied on for purposes of the Petrillo investigation (they are still reviewing more than 500 gigabytes of data) are not expected to be substantially produced until April 13, 2025, which is more than five weeks after the substantial completion deadline and more than one week after the close of fact discovery under the Scheduling Order. This has to stop, and the Debtors have to reset.

Throughout the discovery process, the Freedom Lender Group has repeatedly stated its position that depositions should not begin until the Debtors have, in fact, substantially completed productions as required by the Scheduling Order. Debtors have not met their obligations, and, for this reason, the Court should extend the confirmation hearing deadline for at least four weeks to provide the Freedom Lender Group with the same gap between substantial completion and trial that was agreed to in the Scheduling Order.

**Third**, on March 26, 2025, the Debtors produced (1) not one, but two investigative reports of Michael Wartell (the "**Wartell Reports**") and (2) an Investigative Report of the Independent Directors of Franchise Group, Inc. (the "**Petrillo Report**" and, together with the Wartell Reports, the "Independent Director Reports.") As the Court presaged at the confirmation scheduling hearing on February 19, 2025, it was not clear at that time whether confirmation disputes would revolve solely around valuation or whether proposed estate releases would be an issue as well. As noted at that hearing, the issue could have been circumvented by simply excising the releases from the then-operative Plan, which was in no way dependent on those releases being granted. Feb. 19, 2025 Hr'g Tr. at 114:14-18. Now the Independent Director Reports are out; and the Debtors have made clear that plan releases are on the table. As such, and as the Court observed during the

---

[2] To take just a few examples, the Debtors' most recent production includes ███████████████████
█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████ The Freedom
Lender Group does not understand why it is still receiving documents from the only pre-2024 custodian (Brian Kahn) within the original date range (February 16, 2023 – last date of Mr. Kahn's employment) which Willkie agreed to search three months ago.

confirmation scheduling hearing, "[w]e will see if we keep to our schedule, whether the discovery can get done with respect to [Mr. Wartell's] conclusions...depending on what the conclusion is makes a difference." *Id.* at 119:13-20.  It is now clear that there are several material disputes regarding releases that will require discovery, and which will need to be addressed at confirmation, including the directors and officers that are *still* receiving releases for no consideration. Specifically:

- The Debtors have consistently represented, including in open Court and in their currently filed plan, that the Petrillo investigation was terminated months ago.  *See Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Affiliated Debtors*, Ex. I (incorporating by reference the Committee Settlement Term Sheet filed at Dkt. No. 957) [Dkt. No. 1015]; *Fourth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Affiliated Debtors*, Ex. I at 2 [Dkt. No. 957] ("Upon the Debtors agreeing to the terms of this term sheet, the Debtors shall (i) terminate the Petrillo investigation, and (ii) provide to the Committee analysis that supports the releases contemplated in this Section.").  The Debtors' undisclosed decision to restart the Petrillo investigation with a revised scope and then submit a Petrillo report will require additional discovery that was shelved when the Debtors announced that the investigation was terminated, and the conclusions of the Petrillo Report, including the recommendation that the OpCo Debtors release certain officers and directors, will require additional discovery.

- It is now clear that, in his reports, Mr. Wartell failed to analyze certain material categories of estate claims and causes of action, including the utter inaccuracy of the Debtors' Take Private projections, which the Freedom Lender Group has identified as paramount since the earliest days of these Chapter 11 Cases.  Notwithstanding his failure to investigate, Mr. Wartell has decided that the HoldCo Debtors should release, among others, Mr. Seeton, the Debtors' CFO who was principally responsible for the catastrophically inaccurate projections.  If the Debtors remain insistent on releasing him (and others assisting him in their plan), the Freedom Lender Group must take discovery regarding (i) why Mr. Wartell did not investigate key issues, including the inaccuracy of the projections that were used to induce investment in the Take Private Transaction, and (ii) whether potential claims and causes of action exist against Mr. Seeton and the other officers and directors that Mr. Wartell proposes to release.

- Certain findings in the Petrillo Report appear to contradict certain findings and conclusions in the Wartell Report.  As just one example, the Petrillo Report includes documents which implicate the likelihood that ██████████████████████████████████████ ██████████████████████████████████████████████████████████████ By contrast, the Wartell Report found that ████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ *See* Report by Michael J. Wartell, dated March 26, 2025 at 35 (attached at Exhibit B).  The Freedom Lender Group will obviously need discovery into these inconsistent findings, as they bear on the reports' conclusions and recommended releases.

6

- Many if not most of the documents referenced in and relied on in reaching the conclusions of the Independent Director Reports have not yet been produced. The Freedom Lender Group cannot fully vet the findings and conclusions of the Independent Director Reports until it possesses those documents. Again, the Debtors are not committing to produce <u>any</u> of the 500 gigabytes of data that they are now reviewing for two more weeks.

**Fourth,** there are several motions and issues set to be heard by this Court in the first weeks of May which justify pushing confirmation and the discovery schedule. In addition to the primary issues involved in confirming the plan currently on file, the Court is also scheduled to hear:

- On May 6, a preliminary scheduling conference is scheduled in the adversary case commenced by the First Lien Lenders [Dkt. No. 1157], filed on March 23, 2025 (the "**Adversary Proceeding**"). The Adversary Proceeding protests the Freedom Lender Group's filing of the Adequate Protection Motion (defined below) which seeks to enforce this Court's cash collateral order affording the Second Lien Lenders the right to an administrative priority claim if the value of their collateral has diminished. (In short, the First Lien Lenders do not dispute that they agreed to give an adequate protection claim, they just contend that the Freedom Lender Group can never seek relief). The Freedom Lender Group believes there are substantial grounds to dismiss the Adversary Proceeding. Furthermore, late last night the First Lien Lenders filed a pre-answer motion for summary judgment. All this motion practice will require time for briefing and consideration by the Court.

- On May 6, a hearing is scheduled on the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting the Committee, Leave, Standing, and Authority to Commence, Prosecute and Settle Certain Claims on Behalf of the OpCo Debtors' Estates*, filed on March 28, 2025 [Dkt. No. 1200] (the "**Standing Motion**"). The Standing Motion seeks standing for the Committee to bring claims and causes of action on behalf of one Debtor estate (for the benefit of creditors for which they are a fiduciary) against another Debtor estate (at the expense of creditors for which they are also a fiduciary). That is simply not something that one sees every day, particularly from experienced committee counsel who should understand the third-rail nature of picking sides between debtor estates. Additionally, the logical throughput of the Standing Motion is that the Committee, at great expense to the estates, is seeking to receive standing at confirmation, which they will immediately have to relinquish to a litigation trustee pursuant to the plan they are supporting.

- On May 12, 2025, the *Motion of OpCo 2L Agent and Ad Hoc Group of Second Lien Lenders for Allowance of a Superpriority Administrative Expense Claim* filed on February 13, 2025 [Dkt. 978] (the "**Adequate Protection Motion**"), is currently calendared to be heard; and

- On May 12, 2025, the *Settlement-Related Liquidating Trust 2022-23's (I) Motion Pursuant to Rule 3018(A) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject Plan; and (II) Response to First Omnibus (Non-Substantive) Objection of the Ad Hoc Group of Freedom Lenders*

*to Certain Claims Filed Against the HoldCo Debtors* filed on March 13, 2025 [Dkt. No. 1098] is currently calendared to be heard.

Given all that is going on, the Freedom Lender Group suggests that using the time the Court has already set aside beginning May 12 to clear the underbrush before the Court hears evidence on a full valuation trial in connection with confirmation, is likely to prove most efficient for the Court and the parties.

***Fifth,*** the Debtors announced for the first time in their Exclusivity Reply that they intend to substantially amend the Plan this week, which may itself justify an extension to the schedule.  Of course, from day one settlement has been the Freedom Lender Group's preferred option, as can be made clear from the Freedom Lender Group's seriatim settlement overtures and offers.  To be clear, the Group has been willing and able to compromise on all of the issues in these cases and is happy, should the Court request it, to have disclosure of all of the parties' back and forth.  In any event, it is the Freedom Lender Group's understanding that the new Plan will contain a vaguely-described package of consideration and an "intercompany settlement," if approved "by the various Debtor boards."  The Freedom Lender Group has not been part of any negotiations or consulted in anyway and will require time to evaluate a Plan which materially changes the treatment at the HoldCo and OpCo Debtors.  But, Debtors cannot simply rush an entirely new plan through on the same old schedule.  When we see the new Plan, we can assess and provide the Court news as to what, if any, changes are needed in the schedule, in the absence of a settlement.

For all the foregoing reasons, the Freedom Lender Group respectfully requests that the Court set a status conference on the confirmation schedule for April 3, 2025 at 10:00 AM and, if appropriate, make any needed changes to the confirmation schedule.  We thank the Court for its consideration (and patience with this eight-page, single-spaced letter).

Respectfully submitted,

/s/ Michael J. Farnan

Michael J. Farnan

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FRANCHISE GROUP, INC.[1] | ) | Case No. 24-12480 (JTD) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### HOLDCO LENDERS' FIRST REQUESTS FOR THE PRODUCTION OF DOCUMENTS TO THE HOLDCO DEBTORS IN CONNECTION WITH THE PLAN AND DISCLOSURE STATEMENT

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, made applicable by Rules 7026, 7034, and 9014 of the Federal Rules of Bankruptcy Procedure, the Lenders, as defined in that certain *Credit Agreement*, dated as of August 21, 2023, among Freedom VCM Interco, Inc., Freedom VCM, Inc., and Alter Domus (US) LLC (as amended, restated, supplemented or otherwise modified from time to time) (the "**HoldCo Lenders**") serve, in their capacity as HoldCo

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

Lenders, their First Requests for the Production of Documents (the "**Requests**" and each, a "**Request**") to Freedom VCM, Inc. and Freedom VCM Interco, Inc. (together, the "**HoldCo Debtors**") in connection with the Disclosure Statement and Plan.  Responses to these Requests must be served on **Samuel P. Hershey, White & Case LLP, 1221 Avenue of the Americas, New York, New York, 10020**, counsel to the Ad Hoc Group of Freedom Lenders, immediately on a rolling basis, with production to be completed on or before **November 26, 2024**.

## DEFINITIONS

For the purposes of these Document Requests, the following Definitions shall apply:[2]

1.    "**Ad Hoc Group of First Lien Lenders**" shall have the meaning ascribed to it in the First Day Declaration.

2.    "**Affiliate**" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

3.    "**Alix Partners**" means AlixPartners, LLP.

4.    "**Allowed**" shall have the meaning ascribed to it in Section 1.12 of the Plan.

5.    "**American Freight Debtors**" shall have the meaning ascribed to it in Section 1.13 of the Plan.

6.    "**Avoidance Actions**" shall have the meaning ascribed to it in Section 1.19 of the Plan.

7.    "**B. Riley**" means B. Riley Financial, Inc. and its affiliates, including but not limited to the entities referred to in the First Day Declaration such as BRF, BRPI, and BRRII.

8.    "**Bankruptcy Code**" means title 11 of the United States Code, as amended.

---

[2] Capitalized terms not defined herein shall take on the definition provided in the Plan.

9. "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

10. "**Board**" means any board of directors, managers, or comparable supervisory body, or any group or committee with the responsibility of, among other things, governing the Debtors or overseeing the activities and operations of the Debtors.

11. "**Board Materials**" means all documents and materials prepared for, presented to, reviewed by, or distributed to any member of the Board in connection with any Board or committee meeting or action, including but not limited to, meeting minutes, agendas, resolutions, presentations, Board books, reports, and any other documents shared with Board members or committee members for the purpose of decision-making, discussion, or record-keeping related to Board or committee activities.

12. "**Cash Collateral**" means all cash of the Debtors as defined in the DIP Motion.

13. "**Cash Management Motion**" means the *Debtors' Motion for Interim and final orders (I) Authorizing the Debtors to (A) Continue to Maintain Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions; (II) Waiving Certain Operating Guidelines; (III) Suspending Time to Comply with Section 345(b) of the Bankruptcy Code; and (IV) Granting Related Relief* [D.I. 9].

14. "**Causes of Action**" has the meaning set forth in Section 1.30 of the Plan.

15. "**Commercial Tort Claims**" has the meaning set forth in the Uniform Commercial Code, Section 9-102(a)(13(A) and shall be given its broadest possible definition.

16. "**Chapter 11 Cases**" means the voluntary chapter 11 cases commenced on the Petition Date by the Debtors in the Bankruptcy Court.

17.    "**Chapter 11 Investigation**" refers to the additional investigation lead by Petrillo and commercial in 2024 into, among other things, potential claims and Causes of Actions the Debtors' estates may have against Mr. Kahn, any other of their other current or former directors and officers, or any other third-parties arising from, or related to, among other things: (i) Franchise Group's sale of Badcock to Conn's in December 2023; (ii) the Take-Private Transaction; (iii) the Receivables Transactions; and (iv) Debtors' historical transactions and relationship with Mr. Kahn, as well as (v) the appropriateness of any releases by the Debtors' estates of their current directors and officers through these Chapter 11 Cases and under the Plan, as described on pages 8 and 9 of the Disclosure Statement.

18.    "**Communication**" means any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more persons, by or to whomsoever made, and including without limitation, correspondence, documents, conversations, dialogues, discussions, e-mail, interviews, consultations, agreements, and other understandings.

19.    "**Complaint**" has the meaning set forth in the First Day Declaration.

20.    "**Concerning**," "**regarding**," "**in connection with**," "**relating to**," and/or "**referring to**" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

21.    "**Consenting First Lien Lenders**" has the meaning set forth in the First Day Declaration.

22.    "**Critical Vendors**" means any holder of a prepetition Critical Vendors Claim, Foreign Vendors Claim, Shippers & Logistics Providers Claim, and/or 503(b)(9) Claim, each as defined in the Critical Vendor Motion.

23.    "**Critical Vendor Motion**" means *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors, Foreign Vendors, Shippers & Logistics Providers, and 503(B)(9) Claimants; and (II) Granting Related Relief* [D.I. 10].

24.    "**Debtors**" means Franchise Group, Inc. and its affiliated debtors, that filed voluntary chapter 11 petitions under the Bankruptcy Code commencing the Chapter 11 Cases, and any of their respective current or former affiliates, subsidiaries, parent corporations, predecessors, or successors entities; and all of their respective current or former directors, officers, employees, agents, attorneys, advisors, and representatives.

25.    "**Disclosure Statement**" means the *Disclosure Statement for the Joint Chapter 11 Plan of Franchise Group, Inc. and its Affiliated Debtors* [D.I. 151].

26.    "**Document**" means any printed, written, typed, recorded, transcribed, taped, photographic, or graphic mater, in draft or final form, including, but not limited to: any letter, correspondence, or Communication of any sort; photograph; sound recording; video recording; note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; telex, telegram, or cable; summary, report or record of telephone conversation, voice mail or voice mail back-up, text message, instant message, Bloomberg message, WhatsApp message, personal conversation, discussion, interview, meeting, conference, investigation, negotiation, act, or activity; projection, work paper, or draft; computer or computer network output or input, portable storage devices, e-mail, magnetic and/or optical medias, archived or back up data on any

of these medias on the cloud or otherwise, and documents that have been deleted but are recoverable from any of these medias; opinion or report of consultant; request, order, invoice, or bill of lading; analysis, diagram, map, index, sketch, drawing, plan, chart, manual, brochure, pamphlet, advertisement, circular, newspaper or magazine clipping, or press release; receipt, journal, ledger, schedule, bill, or voucher; financial statement, statement of account, bank statement, checkbook, stubs, register, canceled check, deposit slip, charge slip, tax return (income or other), requisition, file, study, graph, or tabulation, and any and all other writings and recordings of whatever nature, and any other data compilation from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonable usable form; including, without limitation, all things meeting the definition of "documents" or "electronically stored information" set forth in Rule 34 of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, or meeting the definition of "writing" or "recording" set forth in Rule 1001 of the Federal Rules of Evidence. Any document with any marks such as initials, comments, or notations of any kind is not deemed to be identical to one without such marks and is a separate document within the meaning of this term.

27.     "**Ducera**" means Ducera Partners LLC.

28.     "**Existing Intercompany Equity Interests**" has the meaning set forth in Section 1.101 of the Plan.

29.     "**First Day Declaration**" means the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 15].

30.     "**First Day Filings**" refers to the filings submitted on November 3 and 4, 2024 and argued during the First Day Hearing.

6

31.    "**First Day Hearing**" refers to the hearing held in the above-captioned matter on November 5 and 6, 2024.

32.    "**Franchise Group**" has the meaning set forth in the Disclosure Statement.

33.    "**HoldCo Debtors**" refers to Freedom VCM, Inc. and Freedom VCM Interco, Inc.

34.    "**Including**" means "including, without limitation" or "including, but not limited to."

35.    "**Independent Investigation**" has the meaning set forth in the First Day Declaration.

36.    "**Indictment**" has the meaning set forth in the First Day Declaration.

37.    "**Initial DIP Budget**" means the 13-week cash flow forecast statements of the Debtors that the use of Cash Collateral and proceeds of the DIP Facility are subject to as set forth in Exhibit 3 to the DIP Motion.

38.    "**Insider**" has the meaning set forth in section 101 of the Bankruptcy Code.

39.    "**Intercompany Claims**" has the meaning set forth in Section 1.101 of the Plan.

40.    "**Investigation Related Matters**" has the meaning set forth in Section 1.104 of the Plan.

41.    "**OpCo Debtors**" refers to Franchise Group, Inc. and its direct and indirect subsidiaries.

42.    "**Petition Date**" means November 3, 2024.

43.    "**Petrillo**" means Petrillo Klein Boxer LLP.

44.    "**Plan**" means the *Joint Chapter 11 Plan of Franchise Group, Inc. and its Affiliated Debtors* [D.I. 150].

45.     "**Prepetition Marketing Process**" refers to the prepetition marketing process described in paragraphs 13-19 of the DIP Declaration.

46.     "**Prophecy**" refers to Prophecy Asset Management LP.

47.     "**Relate**" and its variants encompass the terms "refer," "reflect," "constitute," "evidence," "in connection with," and "concern" and shall be construed to bring within the scope of the Document Request, as applicable, all documents and information that comprise, evidence, constitute, describe, explicitly or implicitly refer to, were reviewed in conjunction with, or were generated as a result of the subject matter of the Document Request, as applicable, including, but not limited to, all documents and information that reflect, record, memorialize, discuss, evaluate, consider, review, report, or otherwise evidence the existence of the subject matter of the Document Request, as applicable.

48.     "**RSA**" refers to that certain *Restructuring Support Agreement*, dated as of November 1, 2024, attached as Exhibit B to the First Day Declaration.

49.     "**Special Committee**" has the meaning set forth in the First Day Declaration.

50.     "**Take-Private Transaction**" has the meaning set forth in the First Day Declaration.

51.     "**Take-Private Transaction Committee**" refers to the "independent committee" described on pages 5 and 6 of the Disclosure Statement.

52.     "**TopCo**" has the meaning set forth in the Disclosure Statement.

53.     "**Willkie**" means Willkie Farr & Gallagher LLP.

54.     "**Young Conaway**" means Young Conaway Stargatt & Taylor, LLP.

55.     "**You**" and "**Your**" means the HoldCo Debtors.

## **INSTRUCTIONS**

The preceding Definitions apply to each of these Instructions and for purposes of these Document Requests, the following Instructions shall be followed:

1.      In accordance with Rule 34(a) of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, the Document Requests shall be deemed to include any document now or at any time in Your possession, custody, or control, including, but not limited to, documents in the possession, custody, or control of any Your current or former affiliates, subsidiaries, parent corporations, predecessors, or successor entitles and all of their respective current or former directors, officers, employees, agents, attorneys, advisors, and representatives, or other person acting or purporting to act on its or their behalf.  A document is deemed to be in Your possession, custody, or control it if is in Your physical custody, or if it is in the physical custody of any other person or entity and You:  (i) own such document in whole or in part; (ii) have a right, by contract, statute, or otherwise, to use, inspect, examine, or copy such document on any terms; (iii) have an understanding, express or implied, that You may use, inspect, examine, or copy such document when You sought to do so, or (iv) as a practical matter, have been able to use, inspect, examine or copy such document on any terms.  If any requested document was, but no longer is, in Your control, state the disposition of each such document.

2.      As the term " possession" pertains to e-mails, the term includes, but is not limited to, e-mails contained in Your electronic e-mail directories containing (i) "deleted" e-mails which have not been permanently deleted, including all subdirectories irrespective of the title of such subdirectories; (ii) "sent" e-mails, including all subdirectories irrespective of the title of such subdirectories; and (iii) "received" e-mails, including all subdirectories irrespective of the title of such subdirectories.

3.      The word "all" shall also include "each of," and vice versa.  The word "any" shall be construed to mean "any and all" where the effect of such construction is to broaden the scope of the Document Request.

4.      In responding to each Document Request, You are to review and search all relevant files of appropriate entities and persons.

5.      All Document Requests shall be deemed to include requests for any and all transmittal sheets, cover letters, enclosures, or any other annexes or attachments to the documents.

6.      You are to produce the original and all non-identical copies, including all drafts of each document requested.  If You are not able to produce the original of any document, please produce the best available copy and all non-identical copies, including drafts.  Any document that cannot be produced in full shall be produced to the fullest extent possible.

7.      In accordance with Rule 34(b) of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, documents shall be produced as they are kept in the ordinary course of business or shall be organized and labeled to correspond with the categories in each Document Request.  The name of the file from which it was produced, the identity of the person from whose file it was produced, and the identity of the present custodian of that file each shall be set forth.  All documents requested herein shall be produced electronically as tagged image file format ("**TIFF**") or portable document format ("**PDF**") files, except that all spreadsheets and accounting and financial data, including those created with Excel software, shall be produced in a fully functional native form (i.e., in a linked format).

8.      If any responsive document is known to have existed and cannot now be located, or has been destroyed, discarded, or otherwise disposed, set forth a complete statement of the circumstances surrounding such loss, destruction, discarding, or other disposition, including:

a.      A description of the document, including the date, a summary of its contents and the identity of its author and the persons(s) to whom it was sent or shown:

b.      The last known custodian;

c.      Whether the document is missing or lost or was destroyed, discarded, or otherwise disposed;

d.      The date of loss, destruction, discarding, or other disposition;

e.      The reason(s) for destruction, discarding, or other disposition;

f.      The person(s) authorizing or carrying out such destruction, discarding, or other deposition; and

g.      The efforts made to locate lost or misplaced documents.

9.      In the event You seek to withhold any document, thing, or information on the basis that it is properly entitled to some privilege or other limitation of discovery, You shall produce as much of the document concerned as to which no claim of privilege or other limitation of discovery is made.  With respect to documents or portions of documents for which a claim of privilege or other limitation of discovery is made, You are instructed to provide a numeral list of the document(s) and thing(s) for which a privilege or limitation is claimed that (1) identifies the nature of the privilege or limitation (including work product) asserted and, if the privilege or limitation is governed by state law, indicate the state of the privilege rule or other limitation invoked; and (2) provides the following information in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged or otherwise protected information: (i) the type of

document; (ii) the name and capacity of each author and recipient of the document; (iii) the general

subject matter of the document in a manner sufficient to support the privilege or other protection

claimed; (iv) the date of the document; (v) such other information as is sufficient to identify the

document for a subpoena *duces tecum*, including, where appropriate, the author(s) of the

document, the addressee(s) of the document, and any other recipient(s) shown in the document,

and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each

other; and (vi) the same information referenced in (i)-(v) above for each enclosure or attachment

to each listed document if the enclosure or attachment is also withheld from production.

Notwithstanding the assertion of any privilege or other protection, any requested document that

contains responsive, non-privileged or protected information should be produced, but that portion

of the document for which the privilege or other protection is asserted may be redacted, provided

that the redacted portion is identified and described consistently according to the requirements

listed herein.

10.     Each Definition, Instruction, and Document Request herein shall be construed

independently and not with reference to any other Definition, Instruction, or Document Request,

for the purposes of limitation.

11.     If any meaning of any term in any Document Request herein is unclear to You,

without waiver of the right to seek a full and complete response to the Document Request, You

shall assume a reasonable meaning, state what the assumed meaning is, and respond to the

Document Request according to the assumed meaning.

12.     In accordance with Rule 34 of the Federal Rules of Civil Procedure, as incorporated

by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, objections

to any part of these Document Requests shall be stated in full and with specificity.  In the event

You interpose an objection to a Document Request, You must produce the documents to which objection is not made or provide testimony or information not objected to.

13.     Each Document Request shall be deemed continuing.  If, after responding, You obtain or become aware of any additional documents or information responsive to these Document Requests, production of such additional documents or information shall be made forthwith.

14.     "Including" shall not be construed to limit the scope of any Document Request.

15.     Whenever necessary to bring within the scope of a Document Request documents or information that might otherwise be construed to be outside its scope:

      a.     The use of a verb in any tense shall be construed as the use of that verb in all other tenses;

      b.     The use of a word in its singular form shall be deemed to include within its use the plural form, and vice versa;

      c.     The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

      d.     The use of the conjunctive or disjunctive, respectively, shall be construed as necessary to be inclusive rather than exclusive.

16.     Each paragraph, subparagraph, clause, and word therein should be construed independently and not by reference to any other paragraph, subparagraph, clause or word herein for purposes of limitation.

17.     Unless otherwise stated, each Request calls for production of documents from November 3, 2019 through the present.

## DOCUMENT REQUESTS

*Valuation*

13

1.      All Documents and Communications concerning the valuation of the HoldCo Debtors, the OpCo Debtors, or any of the Debtors' former business segments, including any (a) total enterprise value or fair market valuation; (b) valuation of the assets; and (c) valuation of any property including foreclosure or liquidation value of any property, including, but not limited to, any valuations in connection with the Take-Back Transaction, any other potential or consummated transactions, and the store-closings, liquidation sales and wind-down of the American Freight Debtors.

2.      All financial statements, projections, balance sheets, business plans, and solvency opinions for any of the HoldCo Debtors, OpCo Debtors, or any of the Debtors' former business segments.

3.      All Documents and Communications concerning the exhibits to the Disclosure Statement, including the Liquidation Analysis and Financial Projections, and any underlying data, assumptions, models and other related materials, such as any entity-specific liquidation analyses and entity-specific financial projections.

4.      All Documents and Communications concerning the Plan Supplement materials, including underlying data, assumptions, models and other related materials for each of the Plan Supplement materials/

5.      Documents sufficient to show any tax attributes of the Debtors (and their consolidated group), including any net operating losses, and projections of such attributes that are expected to be available following each transaction proposed in the Disclosure Statement, taking into account the utilization of such attributes to reduce the tax liability of the Debtors (and their consolidated group) with respect to such transactions and any reduction in such attributes by reason of Section 108(b) of the Internal Revenue Code of 1986, as amended.

6.      Documents sufficient to show the amount of gain expected to be recognized by the Debtors (and their consolidated group) with respect to each transaction proposed in the Disclosure Statement and the expected quantum of U.S. federal, state, and local income tax with respect thereto, taking into account any tax attributes of the Debtors (and their consolidated group) expected to be available to reduce the tax liability of the Debtors (and their consolidated group) with respect to such transactions.

7.      Any other existing tax analyses or reports concerning the transactions proposed in the Disclosure Statement.

8.      All Documents and Communications concerning the Debtors' projected cashflows and liquidity through emergence from the Chapter 11 Cases.

***Take-Private Transaction***

9.      All Documents and Communications between the Debtors and B. Riley concerning the transaction proposals described on page 5 of the Disclosure Statement.

10.      All Documents and Communications between the Debtors and B. Riley concerning B. Riley's determination that "it was interested in providing financing to facilitate a transaction but would need to do so in a manner that would not result in BRF controlling or consolidating Franchise Group," as described on page 5 of the Disclosure Statement.

11.      Regarding the Take-Private Transaction, all Documents and Communications concerning:

> a.   the formation, composition, advisors to, and mandate of the Take-Private Transaction Committee;
>
> b.   the Take-Private Transaction Committee's (a) "review of Mr. Kahn's take-private proposal and other strategic alternatives that were available to Franchise Group, including the potential sale of the Vitamin Shoppe" and

(b) determination that "Mr. Kahn's proposal was in the best interests of Franchise Group and its public shareholders" as described on pages 5 and 6 of the Disclosure Statement;

c. all reports, findings, summaries, or conclusions created by, for, or at the direction of the Take-Private Transaction Committee, including any Board Materials;

d. all valuations, analyses, reports, or estimates concerning the Debtors' solvency before, after or because of the Take-Private Transaction;

e. all tax analyses or reports concerning the Take-Private Transaction; and

f. any fairness opinions conducted in connection with the Take-Private Transaction.

12.    All Documents and Communications concerning the creation of TopCo and the HoldCo Debtors in connection with the Take-Private Transaction as described on page 6 of the Disclosure Statement.

***Other Transactions and Strategic Alternatives Considered***

13.    All Documents and Communications between the Debtors and B. Riley concerning the negotiation and terms of the Receivables Transactions described in pages 6 and 7 of the Disclosure Statement, including:

a.    the Tranche 1 Receivables;

b.    the Pathlight Credit Facility and its repayment in June 2024;

c.    the Receivables Acquisition;

d.    the Promissory Note and its cancellation in October 2024;

e.    the Tranche 2 Receivables and Freedom II's obligations to deliver to Conn's;

   f.  the Funding Agreement; and

   g.  the Deferred Accrual and its payment in October 2024.

  14.  All Documents and Communications concerning the Badcock Transaction, including:

   a. the Debtors' consideration of and efforts to find alternative financing models for Badcock or a potential sale of or business combination with Badcock prior to the Take-Private Transaction;

   b. the negotiation and terms of the Badcock combination with Conn's;

   c. the negotiation and terms of the sale and leaseback transactions described on page 13 of the Disclosure Statement; and

   d. Communications between the Debtors, on the one hand, and Conn's or B. Riley, on the other hand, concerning Conn's financial condition, solvency and chapter 11 cases.

  15.  All Documents and Communications concerning the negotiation and terms of the Sylvan Learning sale.

  16.  Any Board Materials, solicitations, informational and marketing materials, fairness opinions, and proposals concerning strategic initiatives pursued and evaluated by the Debtors since January 2023 as described on pages 13 and 14 of the Disclosure Statement, including, without limitation, the potential securitization financing of the Debtors' PSP business, potential monetization of The Vitamin Shoppe and Buddy's businesses, and the marketing of American Freight on a going concern basis.

  17.  All Documents and Communications concerning (a) the "strategy" of the Franchise Group which "included the potential for rapid deleveraging of the Debtors through monetization

transactions involving the various business segments of the Franchise Group," as described on page 6 of the Disclosure Statement, and (b) the Debtors' statement on page 6 of the Disclosure Statement that this strategy "did not materialize due to . . . allegations made against Mr. Kahn regarding his alleged business association with Prophecy Asset Management LP."

***Investigations***

18.    All Documents and Communications concerning Prophecy, the Indictment, or the Complaint, including:

    a.    Documents the Debtors have produced to any third party, including the Securities and Exchange Commission, Department of Justice or any plaintiff;

    b.    Documents provided to Petrillo in connection with the Independent Investigation; and

    c.    Documents and Communications between Brian Kahn and any of the Debtors' directors and officers concerning Prophecy, the Indictment, or the Complaint.

19.    All Documents and Communications concerning the Independent Investigation, including:

    a.    Documents concerning the retention of advisors, including Petrillo, to conduct the Independent Investigation;

    b.    Documents concerning the scope, mandate, and timeline of the Independent Investigation;

    c.    Engagement letters with Petrillo to conduct the Independent Investigation;

    d.    Any Board Materials, reports, findings, summaries, presentations, or conclusions in connection with the Independent Investigation; and

e.  Documents that support Petrillo's "findings" in connection with the independent Investigation and described on page 8 of the Disclosure Statement.

20.    All Documents and Communications concerning the Chapter 11 Investigation including:

a.  Documents concerning the retention of advisors, including Petrillo, to conduct the Chapter 11 Investigation;

b.  Documents concerning the scope, mandate, and timeline of the Chapter 11 Investigation;

c.  Documents concerning the HoldCo Debtors oversight of the Chapter 11 Investigation;

d.  Engagement letters with Petrillo to conduct the Chapter 11 Investigation;

e.  Documents produced to Petrillo in connection with the Chapter 11 Investigation; and

f.  Any Board Materials, reports, findings, summaries, presentations, or conclusions in connection with the Chapter 11 Investigation, including any Board Materials about the Chapter 11 Investigation.

21.    All Documents and Communications concerning potential or designated Investigation Related Matters.

22.    All Documents and Communications concerning the prepetition bonus program described in footnote 2 of the First Day Declaration.

23.    Documents sufficient to show any transfers (excluding wages and health benefits) made by any of the Debtors to any of their insiders from two years prior to the Petition Date, including any incentive, retention, or bonus payments.

24.    Documents sufficient to show all intercompany activity for the Debtors, including outstanding balances among the Debtors.

25.    All intercompany agreements between the HoldCo Debtors and any OpCo Debtors.

***RSA and Plan***

26.    All Documents and Communications concerning the formation, composition, advisors, and mandate of the Special Committee, including any work or analysis the Special Committee did with respect to the HoldCo Debtors in particular.

27.    All Documents and Communications concerning any of the (i) Causes of Action, (ii) Intercompany Claims, (iii) Chapter 5 Claims; or (iv) Avoidance Actions belonging to the HoldCo Debtors or the OpCo Debtors and their estates that are or might be retained, released, waived, abandoned, or extinguished under the RSAs and/or the Chapter 11 Plans.

28.    All Documents and Communications concerning Commercial Tort Claims held by any of the HoldCo Debtors.

29.    Documents sufficient to identify:

    a.    All Commercial Tort Claims that are encumbered under any security agreement held by any of the HoldCo Debtors;

    b.    All Commercial Tort Claims that are not encumbered under any security agreement held by any of the Debtors; and

    c.    All of the Debtors involved in each of the foregoing.

30.    Documents concerning any valuation, litigation risk, or estimated damages concerning any Commercial Tort Claims held by the HoldCo Debtors.

31.    All Documents and Communications, including Communications with the Consenting First Lien Lenders, concerning:

      a.    the negotiation and terms of the RSA, the Disclosure Statement, and the Plan;

      b.    waiving, moving, or extending any milestones under the RSA or Plan;

      c.    the Releases, Injunctions, and Exculpation provisions pursuant to the Plan, including the exceptions to those Plan provisions;

      d.    the classification and treatment of Claims and Interests in Article IV and V of the Plan;

      e.    the identification of any holders of Class 8 Claims and which Debtors the Class 8 Claims may be held against;

      f.    the treatment of the Intercompany Claims and Existing Intercompany Equity Interests under the Plan, including the treatment of any Intercompany Claims any of the HoldCo Debtors may have against the OpCo Debtors;

      g.    the terms of Section 6.6 of the Plan; and

      h.    the Chapter 11 Investigation.

32.    All Documents and Communications supporting Your contention on page 20 of the Disclosure Statement that "the Plan is in the best interests of the Debtors, their Estates, and all of its stakeholders, including the voting Classes," particularly Classes 7 and 8.

Dated:          November 16, 2024
               New York, New York

                                        */s/ Samuel P. Hershey*
                                        **FARNAN LLP**
                                        Brian E. Farnan (Bar No. 4089)
                                        Michael J. Farnan (Bar No. 5165)
                                        919 North Market Street, 12th Floor
                                        Wilmington, DE 19801
                                        Telephone: (302) 777-0300
                                        Facsimile: (302) 777-0301
                                        bfarnan@farnanlaw.com
                                        mfarnan@farnanlaw.com

                                        -and-

                                        **WHITE & CASE LLP**
                                        Thomas E Lauria (admitted *pro hac vice*)
                                        Southeast Financial Center
                                        200 South Biscayne Boulevard, Suite 4900
                                        Telephone: (305) 371-2700
                                        Facsimile: (305) 358-5744
                                        Email: tlauria@whitecase.com

                                        -and-

                                        J. Christopher Shore (admitted *pro hac vice*)
                                        Andrew T. Zatz (admitted *pro hac vice*)
                                        Samuel P. Hershey (admitted *pro hac vice*)
                                        Erin Smith (admitted *pro hac vice*)
                                        Brett Bakemeyer (admitted *pro hac vice*)
                                        1221 Avenue of the Americas
                                        New York, NY 10020
                                        Telephone: (212) 819-8200
                                        Facsimile: (212) 354-8113
                                        Email: cshore@whitecase.com
                                        azatz@whitecase.com
                                        sam.hershey@whitecase.com
                                        erin.smith@whitecase.com
                                        brett.bakemeyer@whitecase.com

                                        *Counsel to the Ad Hoc Group of Freedom*
                                        *Lenders*

# EXHIBIT B

REDACTED