## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FRANCHISE GROUP, INC., *et al.*,[1] | ) | Case No. 24-12480 (LSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: May 6, 2025, at 11:30 a.m. (ET)** |
|  | ) | **Obj. Deadline: April 29, 2025, at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING FRANCHISE GROUP INTERMEDIATE V, LLC TO ENTER INTO AND PERFORM ITS OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT, (II) APPROVING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion (the "<u>Motion</u>"):[2]

## Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Sale Order</u>"):  (a) authorizing and approving the Debtors' entry into and performance under that certain asset purchase agreement, in the form attached to the Sale Order as <u>Exhibit 1</u> (together with all schedules, exhibits, and ancillary documents related thereto, as amended, modified, or supplemented from time to time, the "<u>APA</u>"), whereby Debtor Franchise Group Intermediate V, LLC ("<u>Franchise Group Intermediate</u>" or the "<u>Seller</u>") has agreed to sell, transfer, convey, assign, and deliver to TVS Buyer, LLC (the "<u>Buyer</u>," and together with Franchise Group Intermediate, the "<u>Parties</u>"), and the Buyer has agreed to purchase, acquire, accept, and assume the Purchased Assets and the Assumed Liabilities from the Seller (including all actions taken or required to be taken in connection with the implementation and consummation of the APA, the "<u>Sale</u>"); (b) authorizing and approving the sale of the Purchased Assets and the Assumed Liabilities to the Buyer free and clear of any and all Encumbrances, other than Permitted Encumbrances and Assumed Liabilities; (c) authorizing the assumption and assignment of the Purchased Contracts and the Purchased Leases; and (d) granting related relief.

## Jurisdiction and Venue

2.     The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") under 28 U.S.C. § 157 and the *Amended Standing*

---

[2]    Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the APA, the Final DIP Order, the Bidding Procedures (each as defined herein), or the *Seventh Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1233].

*Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1 and 9013-1.

## Background

5. On November 3, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the Debtors, their businesses, and the facts and circumstances giving rise to the Debtors' chapter 11 cases is set forth in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "First Day Declaration"), which is incorporated herein by reference.

6. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On November 5, 2024, the Court entered an order [Docket No. 88] authorizing the procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. On November 19, 2024, the United States

Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 188] (the "Creditors' Committee").  On January 15, 2025, the Debtors appointed a fee examiner [Docket No. 747] (the "Fee Examiner").

7.    On December 11, 2024, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 414] (the "Final DIP Order").  Under the Final DIP Order, the Debtors were authorized on a final basis to enter into and perform under that certain *Senior Secured Super-Priority Priming Term Loan Debtor-In-Possession Credit Agreement* dated as of November 7, 2024 (as amended, modified, or supplemented from time to time, the "DIP Credit Agreement").[3]

### The Proposed Sale

8.    As described more fully in the First Day Declaration, leading up to the Petition Date, the Debtors explored a wide array of strategic and operational measures to better position the Debtors for sustainable growth and improve their strained liquidity position.  In addition to engaging in extensive negotiations with their key lender constituents on the terms of a potential out-of-court transaction, the Debtors explored various strategic transactions to monetize

---

[3]    Pursuant to section 6.05(k) of the DIP Credit Agreement and paragraph 8(b) of the Final DIP Order, the Debtors are not permitted to sell, transfer, lease, or otherwise dispose of any assets, including any Equity Interests (as defined in the DIP Credit Agreement) owned by the Debtors, unless such Disposition (as defined in the DIP Credit Agreement) is made in connection with a Sufficient Bid (as defined in the DIP Credit Agreement) or otherwise with the prior written consent of the Required Supermajority Lenders (as defined in the DIP Credit Agreement). At the request of the Buyer and the applicable Debtors, the Required Supermajority Lenders have consented to the Sale, as further described herein.

their core business segments, including The Vitamin Shoppe ("TVS"), the Debtors' market-leading, omni-channel, specialty retailer and wellness lifestyle company.

9.  Prior to the Petition Date, in April 2023, the Debtors retained Jefferies LLC ("Jefferies") to gauge market interest and undertake a broad search for any potential buyers in connection with a potential sale of TVS. In January 2024, Jefferies launched a formal marketing and sale process, which included contacting 34 parties—22 financial buyers and 12 strategic buyers—executing 17 non-disclosure agreements ("NDAs") and engaging with the 17 parties under NDA with respect to a potential going concern sale of TVS. Despite these efforts, no actionable proposals were received. In parallel, the Debtors' liquidity position continued to tighten, and it became clear that achieving a comprehensive, value-maximizing out-of-court transaction on the timeline required was not feasible.

10.  To that end, on November 1, 2024, the Debtors and the Ad Hoc Group entered into a Restructuring Support Agreement which, among other things, memorialized the Ad Hoc Group's support for a sale process in chapter 11 for the purpose of identifying a value-maximizing transaction with a bidder or series of bidders. As more fully described in the bidding procedures approved by the Court on December 16, 2024 [Docket No. 444] (the "Bidding Procedures"), the Debtors, in consultation with the Ad Hoc Group and with the assistance of Ducera Partners LLC ("Ducera"), the Debtors' investment banker, commenced a formal marketing process (the "Marketing Process") on November 4, 2024, in search of such a bidder or bidders for a sale of certain of the Debtors' business segments, including TVS, pursuant to section 363 of the Bankruptcy Code.

11.  In connection with the Marketing Process, with respect to TVS, Ducera solicited interest from 208 parties—185 financial sponsors and 23 strategic buyers—and executed 59 NDAs

in connection therewith.[4]  Over the next several months, the Debtors continued to engage with multiple parties in interest, including the Buyer.  As of the February 3, 2025 Bid Deadline, no Qualified Bids were submitted.  The Buyer did, however, submit a revised indication of interest. On February 12, 2025, the Debtors filed the *Notice of Cancellation of Auction* [Docket No. 961] cancelling any potential auction and adjourning any potential sale hearing indefinitely. Nonetheless, the Debtors continued conversations with certain parties in interest, including a robust, ongoing dialogue with the Buyer, over the next several weeks regarding the terms of a potential going concern sale of TVS.  After weeks of extensive, arm's-length negotiations, the Parties entered into the APA on April 15, 2025.  Pursuant to the APA, the Buyer will purchase the Purchased Assets free and clear of any Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) in exchange for, among other things, (a) the assumption of the Assumed Liabilities and (b) a cash payment of $193.5 million (the "Purchase Price"), subject to the post-closing adjustment process as set forth in the APA.

12.    The Debtors determined, in an exercise of their business judgment, that a transaction with the Buyer on the terms set forth in the APA was value maximizing for the Debtors and their estates.  Among other things, the sale represents the highest or otherwise best offer for the Purchased Assets.  Additionally, the TVS business was not growing and failing to meet the Debtors' profitability targets.  Selling TVS will allow management to focus their efforts on the Debtors' other business lines, and specifically on implementing a long-term, value-maximizing business plan for its other business segments.  The APA provides for, and the Ancillary

---

[4]    On December 19, 2024, Greenhill & Co., investment banker to the Freedom Lender Group, provided Ducera with a list of 59 additional parties—44 financial sponsors and 15 strategic buyers—requesting that Ducera solicit interest from these parties in connection with the Marketing Process.  Ducera promptly solicited interest from 51 of the 59 parties and executed 5 NDAs in connection therewith, allowing such parties to receive access to the data room and confidential information memorandum.

Agreements include, a Transition Services Agreement that will ensure the continuation of key services previously performed by the Debtors, which in turn will significantly diminish the impact of the Sale on the Debtors' customers during these chapter 11 cases. For these reasons, the Sale aligns with the Debtors' business objectives and is in the best interest of the Debtors, their estates, and their stakeholders.

13.     The Debtors and their advisors do not believe that the cost and delay inherent in a public auction or additional marketing of the Purchased Assets would be outweighed by any marginal increase to the Sale proceeds, if any, particularly in light of the benefits to the Debtors, their estates, and all stakeholders if the Sale is approved. The Debtors, in their reasonable business judgment, believe that the Sale is necessary to preserve and support their core business. Approval of the Sale on the terms set forth herein and in the APA represents the most value-maximizing path to divesting the Purchased Assets for fair consideration for the benefit of all stakeholders in these chapter 11 cases.

14.     The Debtors therefore believe that entering into the APA and consummating the Sale is fair, reasonable, represents a sound exercise of the Debtors' business judgment, and is the best available option to maximize value for the Debtors and all stakeholders.

## Summary of Key Sale Terms

15.     The following chart summarizes the material terms and conditions of the APA:[5]

| Provision | Summary Description |
| --- | --- |
| Parties | Seller: Franchise Group Intermediate V, LLC |
| | Buyer: TVS Buyer, LLC |
| Purchased Assets | "Purchased Assets" means all rights, title and interests of Seller or its Subsidiaries in and to all of the assets, properties, interests, rights and Claims of Seller and its Subsidiaries |

---

[5]   This summary is provided for the convenience of the Court and parties in interest and describes, generally, the terms contained in the APA. To the extent there is any conflict between this summary and the APA, the APA shall govern in all respects. Capitalized terms used in the following summary shall have the meanings ascribed to them in the APA.

| Provision | Summary Description |
|---|---|
| | related to, or used in connection with, the Business (other than the Excluded Assets), including the following assets related to, or used in connection with, the Business, in each case free and clear of any Encumbrances (other than Permitted Encumbrances and Assumed Liabilities). *See* APA, Art. II § 2.1.1. |
| **Excluded Assets** | Notwithstanding anything to the contrary in the APA or in any Ancillary Agreement, (a) Buyer shall not acquire the Excluded Assets, including any Contract (including Leases) set forth on Section 2.1.2 of Seller Disclosure Schedules (each such Contract or Lease, an "Excluded Contract"), (b) the Purchased Assets shall not include the Excluded Assets, and (c) Seller shall retain the Excluded Assets following the Closing. *See* APA, Art. II § 2.1.2. |
| **Date, Time, and Place of Sale** | Pursuant to the terms and subject to the conditions of the APA, the closing of the Transactions (the "Closing") shall take place by telephone conference and electronic exchange of documents, at 10:00 a.m. local time, on the third (3rd) Business Day following satisfaction of all conditions (other than those that by their terms are to be satisfied or taken at the Closing) set forth in Article 6 (or, to the extent permitted by applicable Law, waived by the Party entitled to the benefits thereof), or such other time and place as the Parties may mutually agree to in writing (such date of the Closing being hereinafter referred to as the "Closing Date"); *provided*, that, in no event shall the Closing occur prior to May 15, 2025 without the prior written consent of Buyer. *See* APA, Art. II § 2.4. |
| **Purchase Price** | Upon the terms and subject to the conditions of the APA, in consideration of the conveyances contemplated under Section 2.1, Buyer shall at the Closing, pay to Seller an amount equal to the Estimated Cash Purchase Price, *less* the Deposit (together with any and all investment interest thereon, if any, that is released to Seller), by wire transfer of immediately available funds to the account designated by Seller by Notice to Buyer, such Notice to be provided at least five (5) Business Days prior to the Closing Date (such amount, the "Closing Payment"). *See* APA, Art. II § 2.3.1(a). "Estimated Cash Purchase Price" means an amount equal to (a) the Base Cash Purchase Price,[6] *plus* (b) the amount by which the Estimated Net Working Capital Amount is greater than the Target Net Working Capital Amount (if any), *less* (c) the amount by which the Target Net Working Capital Amount is greater than the Estimated Net Working Capital Amount (if any) *less* (d) the Estimated Assumed Indebtedness; *provided*, that in any and all events, the Base Cash Purchase Price is inclusive of the Deposit. *See* APA, Art. I. |
| **Conditions Precedent of Sale** | Conditions to Obligations of Buyer and Seller. The obligations of Buyer and Seller to complete the Transactions are subject to the satisfaction or waiver (if permitted by applicable Law) at or prior to the Closing of the following conditions: 6.1.1 No Illegality or Law. There shall not be in effect any applicable Law that enjoins or prohibits the Transactions. 6.1.2 Bankruptcy Orders. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order. |

---

[6]    The Base Cash Purchase Price is $193.5 million.

| Provision | Summary Description |
|---|---|
| | 6.1.3    <u>Regulatory Approvals</u>. Any waiting period (including any extension thereof) or approvals applicable to the consummation of the Transactions under the HSR Act shall have expired or been terminated (and the Laws set forth on <u>Section 6.1.3</u> of Seller Disclosure Schedules shall have expired or been terminated and any agreement with a Governmental Authority not to consummate the Transactions).<br><br>*See* APA, Art. VI § 6.1.<br><br>There are also Conditions to Obligations of Buyer and Conditions to Obligations of Seller. *See* APA, Art VI § 6.2, 6.3. |
| **Deadline for the Approval of the Sale** | 11:59 p.m. (Eastern Time) on May 15, 2025 (unless further extended upon mutual agreement by Buyer and Seller in writing (email to counsel being sufficient)).<br><br>*See* APA, Art, VIII § 8.1.3. |
| **Executory Contracts and Leases to be Assumed and Assigned** | <u>Section 2.7.1</u> of Seller Disclosure Schedules sets forth a true and complete list, as of the date of entry into the APA, of (a) all executory Contracts which require expenditures made or to be made by Seller or payments or amounts received or to be received by Seller in excess of $100,000 in the twelve (12) months prior to the date hereof and unexpired Leases to which any Seller is a party (excluding the Excluded Contracts), including Seller's proposed Cure Costs associated with each such Contract and unexpired Lease set forth therein, and (b) the Purchased Contracts and Purchased Leases as of the date of entry into the APA.<br><br>From and after the date hereof until 3:00 P.M. (Eastern Time) on May 4, 2025, Buyer may, in its sole discretion, (a) add any Contract or any Lease listed on <u>Section 2.7.1</u> of Seller Disclosure Schedules (or otherwise used in connection with the Business) to the schedule of Purchased Contracts and Purchased Leases, (b) remove from the schedule of Purchased Contracts and Purchased Leases any Contract listed on <u>Section 2.7.1</u> of Seller Disclosure Schedules and instead designate such Contract for rejection effective on and as of the Closing or (c) remove from the schedule of Purchased Contracts and Purchased Leases any Lease listed on <u>Section 2.7.1</u> of Seller Disclosure Schedules and instead designate such Lease for rejection effective on and as of the Closing; *provided*, that in the immediately preceding clauses (a), (b), and (c), Buyer shall not be able to add any Contract or Lease to the schedule of Purchased Contracts and Purchased Leases if such Contract or Lease is associated with a Store already in the active process of Closing.  The schedule of Purchased Contracts and Purchased Leases shall be (and shall be deemed) modified or supplemented to reflect the additions or removals, as applicable, of Leases and Contracts that are (i) designated for assumption and assignment or (ii) designated for rejection, each as set forth in <u>Section 2.7.2</u> of the APA.<br><br>*See* APA, Art. II § 2.7.1.–2.7.2. |
| **Assumed Liabilities** | Upon the terms and subject to the conditions of the APA, at the Closing, Seller shall (or shall cause its applicable Subsidiaries to) assign to Buyer and Buyer shall assume from Seller or its applicable Subsidiaries and agree to pay and discharge when due, only the following Liabilities of Seller and its Subsidiaries (other than the Excluded Liabilities) arising out of the conduct of the Business or the ownership of the Purchased Assets or the Business, in each case, immediately following the Closing (collectively, the "<u>Assumed Liabilities</u>"):<br><br>(a)    all Liabilities arising under the Purchased Contracts and the Purchased Leases that become due from and after, solely to the extent relating to facts, occurrences or other circumstances first arising after, the Closing;<br><br>(b)    (i) the "current liabilities" of the Business to the extent set forth in the Net Working |

| Provision | Summary Description |
|---|---|
| | Capital Amount and (ii) the accounts payable, arising from the ownership of the Purchased Assets or the conduct or operation of the Business from and after the Closing; |
| | (c) all Liabilities (i) arising from the employment or termination of any Continuing Employees and currently engaged independent contractors whenever incurred or arising, including, any wages, salaries, commissions, or normal course bonuses or incentive obligations with respect to the Continuing Employees, and (ii) with respect to any accrued and unused paid time off and sick time accrued prior to the Closing by any Continuing Employee to the extent permitted by applicable Law to the extent set forth in the Net Working Capital Amount (including any amounts required to be paid out by Seller under applicable law, which amounts shall be timely reimbursed to Seller by Buyer following the Closing); |
| | (d) all Liabilities for Transfer Taxes; |
| | (e) all Liabilities arising from the sale of merchandise pursuant to product warranties, product returns and rebates from and after the Closing, in each case solely to the extent arising out of the Purchased Contracts; |
| | (f) all Liabilities for gift cards, store credits, customer loyalty programs, and gift certificates validly issued by Seller and/or its Subsidiaries prior to the Closing Date; and |
| | (g) (i) all Liabilities for Taxes with respect to the Purchased Assets, the Assumed Liabilities, the Business, or the Continuing Employees with respect to any taxable period (or portion thereof) beginning after the Closing Date and (ii) all Liabilities for Transfer Taxes pursuant to Section 5.3.2 (such Taxes described in prongs (i) and (ii), the "Assumed Taxes"); |
| | (h) all Liabilities arising for the Plans set forth on Section 2.1.1(w) of Seller Disclosure Schedules from and after Closing; and |
| | (i) all Liabilities for Assumed Indebtedness (including the Liabilities set forth in Exhibit H attached hereto with respect to (and not taking into account any caps or amounts set forth in) clause (a) through (h) in the definition of Assumed Indebtedness) and which shall include, for the avoidance of doubt, the Tax Reserve Liabilities. |
| | *See* APA, Art. II § 2.2.1. |
| **Excluded Liabilities** | "Excluded Liabilities" means all Liabilities of Seller or any of its Subsidiaries of whatever nature, whether presently in existence or arising or asserted hereafter (other than the Assumed Liabilities), including, without limiting the generality of the foregoing, the following: (a) Excluded Taxes; (b) all Liabilities arising out of, resulting from, or relating to any Excluded Assets; (c) all (i) indebtedness for borrowed money of the Debtors' (other than the Assumed Indebtedness) and (ii) other indebtedness set forth on Section 1.1.2(c) of Seller Disclosure Schedules; (d) fees, costs and expenses incurred in connection with the Chapter 11 Cases or the Transactions (except as otherwise contemplated by this Agreement); (e) except, in each case, with respect to any Liabilities specifically assumed by Buyer pursuant to Section 5.12, (i) any transaction, change of control, success, retention or stay bonuses, severance, bonus incentive, or deferred compensation payments or other similar payments or obligations payable to any current or former employee, officer, director or other individual service provider of Seller or its Subsidiaries (including the Business |

| Provision | Summary Description |
|---|---|
| | Employees) under each Plan, policy, program, agreement, arrangement, or Contract sponsored or maintained by Seller or its Subsidiaries or to which Seller or its Subsidiaries is a party (including in connection with or arising out of the consummation of the Transactions (except as excluded pursuant this clause (e), including any "double-trigger" severance or other payments or obligations payable in combination with any other event)), (ii) other than Liabilities assumed by Buyer pursuant to Section 2.2.1(c), any outstanding and unpaid bonus, commission or incentive obligations in respect of any current or former employee, officer, director or other individual service provider of Seller or its Subsidiaries (including the Business Employees), (iii) other than payments required to be made by Buyer to Seller pursuant to the Transition Services Agreement, all Liabilities at any time arising under, pursuant to or in connection with each Plan and any other benefit or compensation plan, program, policy, agreement, arrangement, or Contract, in each case, at any time sponsored, maintained, contributed to or required to be contributed to by Seller or any of its Affiliates or under or with respect to which Seller or any of its Affiliates has (or has had) any Liability (including on account of an ERISA Affiliate), including Liabilities arising under Title IV of ERISA or on account of any violation of COBRA, (iv) all Liabilities relating to or arising out of the employment or termination of employment of (A) any Business Employee who becomes a Continuing Employee with respect to periods of employment or termination of employment with Seller or its Subsidiaries prior to the Closing (but excluding in respect of any (1) Liabilities assumed pursuant to Section 2.2.1(c) and (2) severance obligations for any Continuing Employee caused directly by any actions taken by Buyer or at the direction of Buyer after the Closing), (B) any former employees of Seller or its Subsidiaries (including any former employees of the Business) and Business Employees who do not become Continuing Employees with respect to periods of employment or termination of employment with Seller or its Subsidiaries, and (C) any applicant for employment with Seller or its Subsidiaries at any time prior to the Closing, including any Claims in respect of hiring, promotion, compensation, overtime, bonuses, commissions, workers' compensation or disability, vacation, sick pay or paid time off, other employee benefits to which any such employees may be entitled as a result of his or her employment by Seller or its Subsidiaries, and any other terms and conditions of employment, (v) all Liabilities arising out of or relating to Claims by any agents or independent contractors of, and who provide personal services to, Seller or its Subsidiaries with respect to any Claims or personal injuries sustained in connection with the retention of such Person by Seller or any of its Subsidiaries, including workers' compensation or disability, regardless of when such claim is made or asserted; (f) except for the accrued and unpaid accounts payable of the Business reflected on Exhibit E attached hereto (and included as part of Net Working Capital), all accrued and unpaid accounts payable of the Business as of the Closing Date, including legal expenses accrued but unpaid as of the Closing Date related to any Litigation to which Seller or its Subsidiaries are party, in each case, whether invoiced before or after Closing; (g) all Cure Costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Purchased Assets, including the Purchased Contracts and the Purchased Leases as finally determined by the Bankruptcy Court (provided, that, in no event shall Buyer be liable for any Cure Costs); (h) any pending or threatened Litigation with respect to any events, acts or circumstances occurring prior to the Closing; and (i) any Liabilities set forth on Section 1.1.2(i) of Seller Disclosure Schedules.

*See* APA Art. I § 1.1.

Excluded Liabilities. Notwithstanding anything to the contrary in the APA or any Ancillary Agreement, neither Buyer nor any of its Affiliates shall assume, nor shall they be or become responsible for, any Excluded Liabilities or any Liabilities of Seller or any of its Subsidiaries, other than the Assumed Liabilities. For greater certainty, the Excluded Liabilities shall remain the sole obligation and responsibility of Seller and its Subsidiaries. |

| Provision | Summary Description |
|---|---|
| | *See* APA Art. II § 2.2. |
| **Sale of Property Free and Clear of Leasehold Interest, License, or Other Right** | Except as set forth in <u>Section 3.1.7(a)</u> of Seller Disclosure Schedules, Seller has good and valid title to, a valid leasehold interest in or right to use, all of the Purchased Assets that is necessary for Seller to operate the Business in all material respects. Upon the entry and effectiveness of the Sale Order, Seller will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to Buyer the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances and Assumed Liabilities. Other than Encumbrances that will be released upon the entry and effectiveness of the Sale Order, Seller owns or has rights to, and upon delivery to Buyer at the Closing will transfer to Buyer, good title to or a valid leasehold interest in all of the Purchased Assets, free and clear of all Encumbrances, except for Permitted Encumbrances and Assumed Liabilities.<br><br>*See* APA, Art. III § 3.1.7(a). |
| **Buyer Expense Reimbursement** | The Buyer may terminate the APA if certain conditions are met:<br><br>(a) if there is a material breach of the Sale Order or the APA by the Seller such that the conditions of Closing set forth in <u>Section 6.2.1</u> or <u>Section 6.2.2</u> would not be satisfied and the breach is not cured within twenty (20) days following Notice of such breach by the Buyer, then the APA will be terminated;<br><br>(b) if (a) the Bankruptcy Court has not approved and entered the Sale Order prior to 11:59 p.m. (Eastern Time) on May 15, 2025 (unless further extended upon mutual agreement by Buyer and Seller in writing (email to counsel being sufficient)), (b) following entry of the Sale Order if such Sale Order is not a Final Order (unless such Final Order requirement is waived by Seller and Buyer in their respective discretion) within fourteen (14) days of entry of the Sale Order, or (c) the Bankruptcy Court enters any Order materially inconsistent with the Sale Order or the consummation of this Agreement and such order is not reversed, modified or amended to the satisfaction of Buyer within thirty (30) days; *provided*, that the right to terminate this Agreement under this <u>Section 8.1.3</u> shall not be available to Buyer if Buyer failed to fulfill any material obligation under this Agreement and such failure is the cause of, or resulted in, such stay, reversal, modification, amendment or vacation;<br><br>(c) if Seller seeks to have the Bankruptcy Court enter an order (or consents to or does not oppose entry of an order) (a) dismissing the Chapter 11 Cases or converting the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code, (b) appointing a trustee, receiver or other Person responsible for operation or administration of Seller or its business or assets, or a responsible officer for Seller, or an examiner with enlarged powers relating to the operation or administration of Seller or its business or assets (each, an "<u>Appointee</u>"); *provided*, that Appointee shall not include any chief restructuring officer that has been or that may be appointed by Seller and authorized by the Bankruptcy Court in the Chapter 11 Cases, or (c) if Seller files any stand-alone plan of reorganization or liquidation, in each case, that does not contemplate consummation of the Transactions (or announces support of any such plan filed by any other party);<br><br>(d) if (a) the Bankruptcy Court enters any Final Order that would reasonably be expected to prevent, impede or materially delay the consummation of the Transactions in accordance with the terms of this Agreement or (b) any creditor of Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the automatic stay to foreclose on any material portion of the Purchased Assets; or |

| Provision | Summary Description |
|---|---|
| | (e) if Seller fails to file the Sale Motion within five (5) Business Days after execution of this Agreement. |
| | If the Buyer terminates due to any of the above circumstances, within three (3) Business Days of such termination, Buyer shall receive reimbursement from Seller (by wire transfer of immediately available funds to the account designated by Buyer by Notice to Seller) for Buyer's reasonable fees, costs, expenses in an amount not to exceed $3,000,000 (the "Buyer Expense Reimbursement"). |
| | *See* APA, Art. VIII § 8.1. |
| 6004(h) and 6004(d) Waivers<br><br>Local Rule 6004-1(b)(iv)(O) | In order to close the Sale prior to the Outside Date, the Seller seeks a waiver of the stay imposed by Bankruptcy Rules 6004(h) or 6006(d). |

## Basis for Relief Requested

### I.    The Sale Is a Sound Exercise of the Debtors' Business Judgment, Is Appropriate Pursuant to Bankruptcy Rule 6004(f), and Should be Approved.

16.    Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  In determining whether to authorize the use, sale, or lease of property of the estates under section 363 of the Bankruptcy Code, "courts require the debtor to show that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *see*, *e.g.*, *In re ICL Holding Co., Inc.*, 802 F.3d 547, 551 (3d Cir. 2015).  The "sound business purpose" test requires a debtor to establish that:  "(1) a sound business purpose [for the sale] exists; (2) the [total consideration] is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith."  *In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *see also In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).  The Debtors submit that the Sale satisfies each of these elements.

- ***A sound business purpose for the Sale exists.***  The Debtors submit that the proposed

Sale is a sound exercise of the Debtors' business judgment. Among other things, the Purchased Assets were not meeting the Debtors' profitability targets. The value generated by the Sale therefore outweighs any potential future benefits of maintaining the Purchased Assets. Consummating the Sale on the terms set forth in the APA will allow the Debtors to maximize the value of the Debtors' estates. Further, the Debtors are able to consummate the Sale with minimal disruption to customer operations. To that end, the APA contemplates, and the Ancillary Agreements include, a Transition Services Agreement that provides for the smooth transition of operational and financial information, which in turn maintains the continuity of customer operations.

- ***The total consideration is fair.*** After engaging in good-faith, arm's-length negotiations, the Parties agreed on the applicable purchase price in cash for the Purchased Assets, which totals approximately $193.5 million in cash consideration (subject to the Net Adjustment Amount) *plus* the assumption of certain Assumed Liabilities. The $193.5 million in cash will be increased or decreased by the Net Adjustment Amount prior to payment in accordance with the terms and conditions set forth in the APA. The Debtors and their advisors analyzed the Purchase Price and (a) concluded it measured favorably against comparable transactions and (b) determined that further marketing of the Purchased Assets would be unlikely to yield additional value. The value generated by the Sale outweighs any benefits of maintaining the Purchased Assets.

- ***The Debtors have provided adequate and reasonable notice.*** The Debtors have provided adequate and reasonable notice to all interested persons—the Debtors, with the assistance of Ducera, solicited interest from 208 parties through the Marketing Process as of the date hereof, and only the Buyer submitted a viable bid worthy of pursuit. This robust level of marketing, combined with the sustained interest from the Buyer and the strength of the terms of the Sale, reflects the comprehensiveness of the marketing of the Purchased Assets and demonstrates that notice was provided to all parties in interest.

- ***The Buyer has acted in good faith.*** As more fully described herein, the Buyer is an unaffiliated third party acting for bona fide commercial purposes. The Debtors agreed to sell the Purchased Assets to the Buyer following a fair and extensive negotiation process.

17.    Once a debtor articulates a valid business justification, then the burden of rebutting the "strong presumption . . . that the agreement at issue was negotiated in good faith and in the best interests of the estate" falls to parties opposing the transaction. *In re Filene's Basement*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49

(2d Cir. 1993).  Thus, if a debtor satisfies the business judgment rule, the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

18.     Moreover, Bankruptcy Rule 6004(f)(1) authorizes a debtor to sell estate property outside of the ordinary course of its business by private sale or public auction.  Courts generally afford debtors in possession broad discretion in determining the manner in which estate property is sold.  *See*, *e.g.*, *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998).  Sales by a debtor outside of the ordinary course of business are appropriate where the debtor demonstrates that the sale is permissible pursuant to section 363 of the Bankruptcy Code.  *See In re Stephens Indus., Inc.*, 789 F.2d 386, 390 (6th Cir. 1986) (holding a debtor may sell property via private sale "when a sound business purpose dictates such action"); *In re Schipper*, 933 F.2d 513 (7th Cir. 1991) (approving private real estate sale by debtor when purchase price was the same as independent appraisal); *In re Woodscape Ltd. P'ship*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction."); *In re Paper Corp. of Am.*, 138 F.Supp. 29 (S.D.N.Y. 1956) (holding that the trustee's inability to sell the property after "many months . . . was sufficient to warrant the private sale."); *see also In re Blue Coal Corp.*, 168 B.R. 553, 564 (M.D. Penn. 1994) ("[A] larger measure of discretion is available to the court in considering whether a private bid should be approved or confirmed.").

19.     Selling the Purchased Assets is in the best interests of the Debtors' estates and should be approved.  The Debtors believe that a public auction for the Purchased Assets would require the Debtors' estates to incur substantial additional costs and create undue delay and would not result in any incremental value.  A sale of the Purchased Assets under the terms and conditions of the APA—as opposed to a lengthy public auction process—will allow the Debtors to avoid

incurring additional operating and lease expenses associated with the retail locations, thereby preserving value for the Debtors' estates and all stakeholders. Additionally, the Debtors believe that the Buyer is uniquely positioned to fully appreciate the value in the Purchased Assets, and that, despite a robust prepetition marketing process and subsequent postpetition marketing efforts, it is unlikely that another purchaser would come forward within a reasonable time frame with a higher or otherwise better offer. The Debtors believe that the Sale comports with the long-term strategic initiatives of the Debtors and is value-maximizing. Accordingly, the Debtors have determined that entry into the APA and consummation of the Sale is in the best interests of their estates and all stakeholders.

20. Courts in this jurisdiction have authorized sales pursuant to section 363 of the Bankruptcy Code. *See, e.g.*, *In re Sunpower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 29, 2024) (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Mar. 11, 2024) (same); *In re Armstrong Flooring, Inc.*, No. 22-10426 (MFW) (Bankr. D. Del. Mar. 27, 2023) (same); *In re Indep. Pet Partners Holdings, LLC*, No. 23-10153 (LSS) (Bankr. D. Del. Feb. 24, 2023); and *In re Boy Scouts of Am.*, No. 20-10343 (LSS) (Bankr. D. Del. Apr. 22, 2022) (same).

## II.     The Sale Free and Clear of Liens and Other Interests Is Authorized by Section 363(f) of the Bankruptcy Code.

21. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;
>
> (2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Because these requirements are listed in the disjunctive, the Debtors only need to satisfy one of the five requirements to permit the Purchased Assets to be sold "free and clear" of liens and interests. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002). The Debtors submit that each lien or interest in the Purchased Assets, except with respect to any Assumed Liabilities or Permitted Encumbrances, satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code. The Debtors further submit that any interest that will not be an Assumed Liability or Permitted Encumbrance satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing or by attaching to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.

22.     Importantly, the requisite DIP Lenders and Prepetition First Lien Lenders under the DIP Facility and the First Lien Term Loan Facility consented to the Sale on the condition that, among other things, (a) the DIP Liens and the Prepetition First Lien Liens attach to the proceeds of the Sale with the same validity, force, and effect that such DIP Liens and Prepetition First Lien Liens had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto, and (b) the proceeds of the Sale shall be distributed in accordance with the DIP Credit Agreement and the Final DIP Order. Further, to the extent any prepetition secured lenders have a prepetition security interest in and liens upon the Purchased Assets, these creditors can be compelled to accept a monetary satisfaction of their interests or are adequately

protected by having their claims that constitute interests in the Purchased Assets, if any, attach to the proceeds of the Sale with the same priority that existed immediately prior to the closing.  Thus, section 363(f)(5) of the Bankruptcy Code is satisfied and any existing interests in the Purchased Assets will be adequately protected through attachment to the proceeds of the Sale.  *See In re Katy Indus.*, No. 17-11101 (KJC), 2017 WL 5434578, at \*5 (Bankr. D. Del. 2017) (finding that holders of liens against property sold free and clear of all liens are "adequately protected by having their Encumbrances, if any, attach to the cash proceeds of the Sale attributable to the Purchased Assets in which such holder alleges an Encumbrance"); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.").

23.    Accordingly, the Debtors request that the Purchased Assets be transferred to the Buyer free and clear of liens, claims, and encumbrances, other than Assumed Liabilities and Permitted Encumbrances, with any such liens, claims, and encumbrances attaching to the net sale proceeds realized from the Sale.

## III.    The Buyer Is a Good-Faith Purchaser and Is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.

24.    Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith[.]"  Although good faith is not specifically defined in the Bankruptcy Code, one court has stated that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings . . .  A purchaser's good faith is lost by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt

to take grossly unfair advantage of other bidders." *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (internal quotations omitted).  Within the Third Circuit, a good faith purchaser is one who purchases assets for value and in good faith.  *See In re Abbotts Dairies of Pa.,* 788 F.2d 143, 147 (3d Cir. 1986).  "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa.,* 788 F.2d at 147.

25.     The Debtors submit that the Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and that the APA is a good faith agreement on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  All Parties were represented by competent counsel and all negotiations in connection with the APA and the Sale contemplated therein were conducted on an arm's-length, good-faith basis.  There is no indication of fraud or any improper insider dealing.  Further, the consideration to be received by the Debtors for the Purchased Assets pursuant to the APA is substantial, fair, and reasonable under the circumstances.

26.     The Sale was evaluated and approved by the Debtors in consultation with their advisors and the Ad Hoc Group, the Freedom Lender Group, and the Creditors' Committee.  Additionally, the Buyer and the Debtors are wholly unrelated, share no officers, directors, shareholders, incorporators, employees, or economic interests—other than as embodied in the Sale—in common, and the Buyer is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.  Accordingly, the Debtors request that the Court enter an order entitling the APA and the Parties to the Sale to the full protections of section 363(m) of the Bankruptcy Code.

**IV.**     **The Assumption and Assignment of the Purchased Contracts and Purchased Leases Should Be Approved**.

    **A.**     **The Assumption and Assignment of the Purchased Contracts and the Purchased Leases Reflects the Debtors' Reasonable Business Judgment.**

        27.     Assumption and assignment of the Purchased Contracts and Purchased Leases in connection with the Sale reflects the Debtors' sound business judgment.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign their executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such executory contracts and unexpired leases are cured and adequate assurance of future performance is provided.  A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Grp. of Inst'l Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co*., 318 U.S. 523 (1943) (applying section 77(b) of the Bankruptcy Act, predecessor to section 365 of the Bankruptcy Code, and rejecting the test of whether an executory contract was burdensome in favor of whether rejection is within a debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code."); *In re S.A. Holding Co., LLC*, 357 B.R. 51, 56 (Bankr. D.N.J. 2006) (applying the business judgment test in determining whether to approve a contract rejection); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) ("Although the [Bankruptcy Code] does not provide the standard to be applied in determining the propriety of the [debtor's] decision [to assume or reject a contract], most Circuits, including the Third Circuit have adopted the business judgment test.").

28.     Here, the Court should approve the decision to assume and assign the Purchased Contracts and the Purchased Leases in connection with the Sale as a sound exercise of the Debtors' business judgment.  The Purchased Contracts and Purchased Leases—which include, among other things, customer and supplier contracts, real property leases, intellectual property agreements, and liabilities related thereto—are necessary to manage the day-to-day operations of the Purchased Assets, and the assumption and assignment of the Purchased Contracts and the Purchased Leases are therefore essential to inducing the best offer for the Purchased Assets.  The assumption and assignment of the Purchased Contracts and the Purchased Leases is necessary and appropriate under the circumstances in connection with the Sale, is integral to the Debtors' overall restructuring efforts, and the Buyer has demonstrated that it can reasonably carry on the obligations under the Purchased Contracts and the Purchased Leases.  Importantly, the counterparties to the Purchased Contracts and the Purchased Leases will be treated fairly and equitably, as all existing defaults under the Purchased Contracts and the Purchased Leases will be promptly cured by the Debtors as described below.  Accordingly, the Debtors submit that the assumption of the Purchased Contracts and the Purchased Leases and their assignment to the Buyer should be approved as a sound exercise of the Debtors' business judgment.

**B.     Defaults Under the Purchased Contracts and Purchased Leases will be Cured in Connection with the Sale.**

29.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code.  Specifically, before assumption will be permitted, a debtor must (a) cure existing defaults or provide adequate assurance that cure will promptly occur, (b) compensate any party to the agreement that has suffered actual pecuniary loss as a result of default or provide adequate

assurance of prompt compensation to the injured party, and (c) provide adequate assurance of future performance under the agreement. *In re Carlisle Homes, Inc.,* 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *see also Cinicola v. Scharffenberger,* 248 F.3d 110, 120 (3d Cir. 2001) ("Before an executory contract may be assigned, the trustee first must assume the contract and 'adequate assurance of future performance' of the contract must be provided."). This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Id.* (*quoting In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)).

30.     Here, the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will promptly be satisfied because the applicable Debtor or Debtors will cure all defaults associated with, or required to properly assume and assign, the Purchased Contracts and the Purchased Leases on, prior to, or after the Closing Date, as applicable, in accordance with the terms of the APA. The Debtors believe that if any defaults exist that must be cured, such cure will be achieved fairly, efficiently, properly, and consistently with the Bankruptcy Code. In conjunction with or following consummation of the Sale, the applicable Debtor or Debtors will pay all identified and outstanding obligations under the Purchased Contracts and the Purchased Leases and will perform all of their undisputed prepetition obligations in connection with the assumption and assignment of any Purchased Contract and the Purchased Lease.

31.     Further, the Purchased Contracts and the Purchased Leases and the related amounts required to cure all defaults or other obligations thereunder pursuant to section 365 of the Bankruptcy Code are listed on <u>Schedule 1</u> of the Sale Order (as may be amended or modified from time to time, the "<u>Cure Schedule</u>," and the related costs, collectively, the "<u>Cure Costs</u>"). On the

date hereof, the applicable Debtor or Debtors will serve each non-Debtor counterparty to a Purchased Contract or Purchased Lease with the Motion, the Sale Order, and the Cure Schedule, notifying such counterparty (a) that the Purchased Contract or the Purchased Lease may be assumed and assigned to the Buyer in connection with the Sale and (b) of the proposed Cure Cost associated with the relevant Purchased Contract or Purchased Lease.  Objections to the proposed assumption and assignment of a Purchased Contract or Purchased Lease (including with respect to the proposed Cure Cost) must (i) be in writing, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state, with specificity, the legal and factual bases thereof, including the Cure Cost that the counterparty believes is required to cure defaults under the relevant Purchased Contract or Purchased Lease if different from the Cure Cost set forth in Schedule 1, and (iv) be filed with the Court (contemporaneously with a proof of service) by no later than (A) April 29, 2025 (which shall be no less than 14 days after the date of notice) or (B) for any Purchased Contract or Purchased Lease added to Schedule 1 after April 15, 2025, 14 days after service of the notice to such Purchased Contract or Purchased Lease counterparty (each, an "Assignment Objection").

32.     If a counterparty to a Purchased Contract or Purchased Lease fails to properly and timely file and serve an Assignment Objection in accordance with paragraph 31 of this Motion, the counterparty shall be forever barred from asserting any objection with regard to the assumption or assignment of its Purchased Contract or Purchased Lease, as applicable, and notwithstanding anything to the contrary in the Purchased Contract or Purchased Lease or any other document, the Cure Costs set forth in the Cure Schedule shall be the only amount necessary to cure outstanding defaults under the applicable Purchased Contract or Purchased Lease under section 365 of the Bankruptcy Code.

33.    In the event of a dispute between the applicable Debtor or Debtors and a counterparty to any Purchased Contract or Purchase Lease with respect to a Cure Cost for which there is an unresolved objection, the Seller proposes that it will promptly pay the appropriate amount, on the date that is five (5) Business Days after the date on which:  (a) the applicable Debtor or Debtors reach agreement on the amount of the cure with the applicable counterparty; or (b) the Court has entered an order fixing such amount.  The applicable Debtor or Debtors propose that any Cure Costs be satisfied pursuant to the APA.  For the avoidance of doubt, the Debtors are not seeking to impair any cure claims.

34.    Similarly, the requirement of section 365(b)(1)(C) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied here.  "The phrase 'adequate assurance of future performance,' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance." *Carlisle Homes*, 103 B.R. at 538 (internal citations omitted).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Filene's Basement,* 2014 WL 1713416, at *12 (holding that a contract could be assigned because the assignee had the financial ability to perform the contract obligations going forward and would not fail to perform the contract's obligations at risk of losing a significant investment); *In re Bygaph, Inc*., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is present where a prospective assignee has the financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

35.     Here, the Buyer is a well-capitalized, sophisticated private investment firm primarily focused on businesses in transition.  The Debtors evaluated the financial wherewithal of the Buyer before finalizing the APA (*e.g.*, financial credibility, willingness, and ability of the Buyer to perform under executory contracts and unexpired leases).  The Buyer has demonstrated such financial wherewithal, willingness, and ability to perform under the Purchased Contracts and the Purchased Leases.  As such, the Buyer is equipped to step into the Debtors' position as operator of the Purchased Assets.

## V.     The Buyer Expense Reimbursement Has a Sound Business Purpose and Should be Approved.

36.     The Debtors are also seeking approval of the Buyer Expense Reimbursement under section 8.1 of the APA.  Specifically, if, prior to the Closing Date, the Buyer terminates the APA in accordance with sections 8.1.2, 8.1.3, 8.1.4, 8.1.8, or 8.1.9 of the APA, then, within three (3) Business Days of such termination, the Buyer shall receive reimbursement from the Seller for its reasonable fees, costs, and expenses in an amount not to exceed $3 million in accordance with the applicable terms and conditions of the APA.  Bid protections are a normal and necessary component of significant sales conducted in chapter 11 to protect the potential buyer from circumstances where a debtor determines not to proceed with the signing and closing of the sale.  *See In re Integrated Res. Inc.*, 147 B.R. 650, 659–61 (S.D.N.Y. 1992) ("break-up fees can be *necessary* to discharge the directors' duties to maximize value . . . [and] ensure that a bidder does not retract its bid") (emphasis in original); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's…due diligence"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter

the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

37.     As a result, courts regularly approve such buyer protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp*., 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees. . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (citing *In re O'Brien Envtl. Energy, Inc.,* 181 F.3d 527, 535 (3d Cir. 1999)) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (same).

38.     The Debtors submit that the Buyer Expense Reimbursement is amply justified, within the Debtors' business judgment, and in the best interests of the Debtors' estates and their creditors.   The Debtors believe, and the Buyer has represented that, the Buyer Expense Reimbursement is a material inducement for the Buyer's commitment to purchase the Purchased Assets.  The Sale, including the Buyer Expense Reimbursement, has been thoroughly negotiated, and the Debtors were able to achieve other material concessions from the Buyer in exchange for providing the Buyer Expense Reimbursement.

39.     Additionally, the benefits provided by the Sale and the Transactions will far outweigh the potential costs associated with the Buyer Expense Reimbursement, especially since the Buyer Expense Reimbursement will only be paid to the extent that the APA is terminated by the Buyer in accordance with section 8.1 of the APA.  Accordingly, the Debtors believe that the Buyer Expense Reimbursement is reasonable and appropriate under the circumstances of the Sale. As such, the Debtors respectfully request that the Court approve the Buyer Expense Reimbursement.

**VI.**      **Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**.

40.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."   The Debtors request that the Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

41.      The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *In re Filene's Basement,* 2014 WL 1713416, at \*14; see Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, the leading treatise on bankruptcy suggests that the 14-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  *See* 10 *Collier on Bankruptcy* ¶ 6004.11, ¶ 6004.04 (16th rev. ed. 2014).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *See id.*; *In re Filene's Basement,* 2014 WL 1713416, at \*14 (reducing the stay to seven days from the date of entry of the sale order).

42.      Time is of the essence in closing the Sale and the Transactions, and the Seller and the Buyer seek to close the Sale as soon as practicable to maximize the value received for the Purchased Assets and reduce the accrual of administrative expenses relating to such assets.

Additionally, there is no credible basis for concluding that a delay in the Sale would result in a higher or otherwise better offer for the Purchased Assets, and absent the relief requested in this Motion, the closing process would likely be delayed, thereby placing the consummation of the Sale in jeopardy.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

### Reservation of Rights

43.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law.

**<u>Notice</u>**

44.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) the Creditors' Committee; (c) counsel to the ABL Lenders; (d) counsel to the Ad Hoc Group of First Lien Lenders; (e) counsel to the Second Lien Term Loan Lenders; (f) counsel to the HoldCo Lenders; (g) counsel to the DIP Agent; (h) counsel to the DIP Lenders; (i) counsel to the Buyer; (j) all parties to the Purchased Contracts and Purchased Leases to be assumed and assigned in connection with the Sale; (k) all known holders of Encumbrances secured by the Purchased Assets; and (l) any party that is entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder Of Page Intentionally Left Blank*]

WHEREFORE, the Debtors request entry of the Sale Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  April 15, 2025
Wilmington, Delaware

*/s/ Allison S. Mielke*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    emorton@ycst.com
    mlunn@ycst.com
    amielke@ycst.com
    sborovinskaya@ycst.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com
    nicole.greenblatt@kirkland.com
    derek.hunter@kirkland.com

- and -

Mark McKane, P.C. (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:    mark.mckane@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*