**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | ) Case No. 24-12480 (LSS) |
| Debtors. | ) (Jointly Administered) |
| | ) **Re: Docket No. 1283** |

**DECLARATION OF CHRISTOPHER GRUBB
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) AUTHORIZING FRANCHISE GROUP
INTERMEDIATE V, LLC TO ENTER INTO AND PERFORM
ITS OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT,
(II) APPROVING THE SALE OF CERTAIN ASSETS FREE AND CLEAR
OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES,
(III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

I, Christopher Grubb, declare under penalty of perjury:

1. I am a Partner at Ducera Partners LLC (together with its affiliates, "Ducera"), an investment banking firm located at 11 Times Square, New York, NY 10036. Ducera specializes in providing leading-edge capital structure and restructuring advice to companies, creditors, and investors in bankruptcy. Ducera provides a broad range of corporate and financial services to its clients, including: (a) general corporate advice; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; and (d) private placements. Ducera and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases.[2]

2. Prior to the Petition Date, Ducera was initially engaged by the above-captioned debtors and debtors in possession (collectively, the "Debtors") to assist the Company in connection with its restructuring initiatives, which expanded to include the marketing of the Debtors' American Freight business, and then later, further expanded to include advising the Debtors on the marketing and sale of the Debtors' other business segments, including The Vitamin Shoppe ("TVS"), Pet Supplies Plus, and Buddy's.

3. I have close to 20 years of restructuring-related experience as a trusted advisor to leading companies on a wide range of complex corporate finance transactions. Since joining Ducera in 2023, I have provided investment banking expertise, including with respect to marketing and sale transactions, to financially distressed companies, as well as creditors and strategic

---

[2] Capitalized terms used but not defined in this Declaration (as defined herein) have the meanings ascribed to them in the Motion (as defined herein), the *Declaration of David Orlofsky in Support of Debtors' Motion for Entry of an Order (I) Authorizing Franchise Group Intermediate V, LLC to Enter into and Perform its Obligations Under the Asset Purchase Agreement, (II) Approving the Sale of Certain Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Orlofsky Declaration"), filed contemporaneously herewith, or the *Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1312] (as may be amended, modified, or supplemented from time to time, the "Plan"), as applicable.

investors in distressed and special situations engagements. I currently serve as a Partner at Ducera, where I specialize in providing financial advice to leading companies, creditors groups, and other parties of interest in a range of complex and transformative corporate finance transactions, including financial restructurings, mergers and acquisitions, and court-supervised insolvency proceedings. Prior to joining Ducera, I was a Managing Director at Greenhill & Co. for over 17 years, advising companies and other stakeholders on special situation restructuring and mergers and acquisitions engagements. Prior to that time, I was an investment banker at UBS. I hold a Bachelor of Science degree in Operations Research and Industrial Engineering from Cornell University, a Master of Business Administration from Columbia Business School, and I am a CFA Charterholder.

4. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an Order (I) Authorizing Franchise Group Intermediate V, LLC to Enter into and Perform its Obligations Under the Asset Purchase Agreement, (II) Approving the Sale of Certain Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1283] (the "Motion").

5. In my capacity as investment banker to the Debtors, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I have assisted the Debtors in a variety of tasks, including working directly with the Debtors' management team and key business personnel—including, but not limited to, members of the finance, legal, and human resources groups—to evaluate the Debtors' liquidity requirements, general operations, and strategic restructuring considerations.

6. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge or information that I have received from employees of Ducera working directly with me or under my supervision, direction, or control, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge as an investment banking professional. If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis. I am over the age of 18 years and am authorized to submit this Declaration on behalf of the Debtors.

## The Proposed Sale

7. As described in the Motion, leading up to the Petition Date, the Debtors explored a range of potential strategic and operational measures to better position the Debtors for sustainable growth and improve their strained liquidity position. Specifically, the Debtors, among other things, explored various strategic transactions to monetize their core business segments, including TVS.

8. Prior to the Petition Date, in April 2023, I understand the Debtors retained Jefferies LLC ("Jefferies") to gauge market interest and undertake a broad search for any potential buyers in connection with a potential sale of TVS. In January 2024, I understand that Jefferies launched a formal marketing and sale process. As part of that process, I understand that Jefferies contacted 34 potential acquirers—22 financial institutions and 12 strategic buyers—executing 17 non-disclosure agreements ("NDAs") and engaging with those 17 parties under NDA with respect to a potential going concern sale of TVS. Despite these efforts, I understand that no actionable proposals were received. In parallel with these discussions, the Debtors' liquidity position

continued to tighten, and it became clear that a value-maximizing out-of-court transaction was not feasible.

9. Accordingly, on November 1, 2024, the Debtors and the Ad Hoc Group entered into a Restructuring Support Agreement which, among other things, memorialized the Ad Hoc Group's support for a marketing and sale process in chapter 11. As more fully described in the *Debtors' Motion for Entry of Orders (I) (A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors Assets, (B) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, and (D) Granting Related Relief; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 154] (the "Bidding Procedures Motion"), the Debtors, in consultation with the Ad Hoc Group, and with the assistance of Ducera, commenced a formal marketing process on November 4, 2024, for the sale of all or substantially all of the Debtors' assets (the "Marketing Process"). The Marketing Process was robust. In total, the Debtors, with the assistance of Ducera, engaged with approximately 260 parties, including potential financial and strategic parties, and executed approximately 65 NDAs. The parties that executed NDAs were provided access to a virtual data room containing diligence materials, and, with respect to certain of these parties, held numerous calls and meetings with the Debtors' management and advisors.

10. Over the next several months, the Debtors, with the assistance of their advisors, continued to engage with multiple parties in interest, including Performance Investment Partners,

LLC ("PIP").[3]  Ultimately, the Debtors received three non-binding written indications of interest ("IOIs") for TVS prior to the December 23, 2024 IOI deadline, including one from PIP. Following receipt of the IOIs, the Debtors continued to engage with these three interested parties and other parties in interest in an effort to enhance their bids and to support their preparation of a binding offer.

11.     As of the final bid deadline on February 3, 2025, the Debtors, in consultation with the Ad Hoc Group Advisors, the professional advisors to the Freedom Lender Group, and the professional advisors to the Committee (collectively, the "Consultation Parties"), determined that no Qualified Bids[4] were received. PIP did, however, submit a revised IOI for TVS. Having not received any Qualified Bids, on February 12, 2025, the Debtors filed the *Notice of Cancellation of Auction* [Docket No. 961] cancelling the scheduled auction and adjourning any potential sale hearing with respect thereto indefinitely. However, the Debtors, with the assistance of Ducera, continued to engage in arms'-length negotiations with certain parties in interest (including PIP and later Kingswood), in an effort to develop a value-maximizing proposal.

12.     On March 14, 2025, PIP notified the Debtors that Kingswood would be acting as its financing partner in connection with the potential purchase of TVS. On or about March 25, 2025, the Buyer submitted an offer for TVS, which they represented was fully financed, along with a revised draft of the APA. Over the next several weeks, the Debtors and the Buyer, through counsel Kirkland & Ellis LLP and McDermott Will & Emery LLP, respectively, exchanged

---

[3]  TVS Buyer, LLC was created by Kingswood Capital Management, LP ("Kingswood"), the indirect majority equity owner of TVS Buyer, LLC (the "Buyer").

[4]  A "Qualified Bid" means a bid that is submitted in writing by an Acceptable Bidder (as defined in the bidding procedures approved by the Bankruptcy Court on December 16, 2024 [Docket No. 444] (the "Bidding Procedures")) by the February 3, 2025 bid deadline and is determined, in the Debtors' business judgment, to comply with all of the requirements enumerated in section IV of the Bidding Procedures.

6

multiple iterations of the APA, memorializing the terms of the asset sale transaction with the Buyer, and engaged in extensive, arms'-length negotiations regarding the same.

13. On April 15, 2025, the Debtors and the Buyer entered into the APA. Pursuant to the APA, the Buyer will purchase the Purchased Assets (including the assumption and assignment of certain contracts and leases provided on Schedule 1 to the Sale Order) free and clear of any Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) in exchange for, among other things, (a) the assumption of the Assumed Liabilities and (b) a cash payment of $193.5 million (the "Purchase Price"), subject to the post-closing adjustment process as set forth in the APA.

14. In my opinion, based on my involvement in the Marketing Process and the negotiations that took place with the Buyer and my experience as a restructuring investment banker, the Marketing Process was robust and provided a reasonable amount of time to solicit and potentially identify a higher-value or otherwise better transaction than those contemplated under the APA. Accordingly, I do not believe that the cost and delay inherent in a public bankruptcy auction would result in a more value-maximizing transaction for TVS. The Debtors, with the assistance of Ducera, conducted a robust Marketing Process for the Sale of the Purchased Assets, and I do not believe that any alternative purchaser that the Debtors and their advisors are not already aware of would come forward with an actionable offer for the Purchased Assets at this time.

15. I further believe that the Sale is the culmination of a fair and transparent marketing and negotiation process in which all Parties were represented by competent counsel and all negotiations were conducted on an arms'-length, good faith basis.

## **The Sale Is Value-Maximizing**

16. I believe that the Sale is a value-maximizing transaction. I understand that the Sale was evaluated and approved by the Debtors in consultation with the Consultation Parties. It is my understanding that, after thorough review of the Sale and the terms thereof, the Debtors determined that it was a sound exercise of their business judgment to enter into the APA and pursue and consummate the Sale.

    a. **Qualifications of the Buyer.**

17. To my knowledge, the Buyer is supported by Kingswood, a well-capitalized, sophisticated private investment firm. Ducera assisted the Debtors in evaluating the financial wherewithal of the Buyer before finalizing the APA. I believe that the Buyer, as supported by Kingswood, has the necessary financial credibility, willingness, and ability to perform under the Purchased Contracts and the Purchased Leases.

18. To the best of my knowledge, the Buyer is purchasing the Purchased Assets in good faith and for fair value. I understand that the Seller and the Buyer are not affiliated in any way and share no officers, directors, shareholders, employees, or economic interests—other than those embodied in the Sale—in common.

    b. **Purchase Price.**

19. The Seller and the Buyer agreed on the Purchase Price for the Purchased Assets, which comprises $193.5 million (subject to certain adjustments set forth in the APA), in addition to the assumption of the Assumed Liabilities. I believe that this value generated by the Sale outweighs any benefits of retaining the Purchased Assets. The Purchase Price is the highest and best value that the Debtors can reasonably expect to receive for the Purchased Assets from any bidder. In reaching this conclusion, the Debtors weighed multiple factors, including the amount and timing of consideration, the timeframe required to consummate the Sale, and the Purchased

Assets. Further, I do not believe that the Debtors would have been able to secure a buyer for the Purchased Assets (including the Buyer) without a finding that the Sale would be consummated free and clear of all claims, interests, and encumbrances.

    **c. Purchased Contracts and Purchased Leases.**

    20.    I understand that the Purchased Contracts and the Purchased Leases are necessary to operate the Purchased Assets and, as such, the assumption and assignment of the Purchased Contracts and the Purchased Leases are essential to inducing the best offer for the Purchased Assets. I believe that the Buyer would not want to purchase the Purchased Assets unless the Purchased Contracts and the Purchased Leases needed to manage the day-to-day operations, among other things, were included in the proposed Sale. Further, I understand that the Buyer has provided adequate assurance of future performance with respect to each Purchased Contract and Purchased Lease.

    **d. Buyer Expense Reimbursement.**

    21.    I understand the APA provides that the Buyer may receive a reimbursement from the Seller for the Buyer's reasonable fees, costs, and expenses in an amount not to exceed $3,000,000 (the "Buyer Expense Reimbursement") in the event the APA is terminated prior to the Closing Date as a result of a material breach of the APA by the Seller. I also understand that the Buyer Expense Reimbursement was a material component of the APA, and the Buyer required its inclusion as an inducement to enter into the APA. I believe that the Buyer Expense Reimbursement is reasonable under the circumstances and in the context of a transaction that is otherwise value-maximizing for the Debtors.

## Conclusion

    22.    For the foregoing reasons, I believe that there are sound business reasons for the Sale, and that the Sale represents the best available option to maximize the value of the Purchased

Assets for the Debtors' estates.  It is my opinion that consummating the Sale is appropriate in light of the facts and circumstances of these chapter 11 cases and is in the best interests of the Debtors' estates and all parties in interest.

[*Signature Page Follows*]

10

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  May 2, 2025                                             *By: /s/ Christopher Grubb*
                                                                                    Name: Christopher Grubb
                                                                                    Title:   Partner
                                                                                                  Ducera Partners LLC