## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 24-12480 (JTD) |
| FRANCHISE GROUP, INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | Related Docket Nos. 1021, 1182, 1312, 1322, 1371 |
|  | **Obj. Deadline:  May 7, 2025, 5:00 p.m. (ET)**<br>**Hearing Date: May 20, 2025, 10:00 a.m. (ET)** |

### OBJECTION OF BUDDY MAC HOLDINGS, LLC AND AFFILIATES TO (I) CONFIRMATION OF CHAPTER 11 PLAN, (II) ADEQUATE ASSURANCE OF FUTURE PERFORMANCE, (III) PROPOSED REJECTION OF CONTRACTS AND LEASES, AND (IV) RESERVATION OF RIGHTS

Buddy Mac Holdings, LLC and its subsidiaries (collectively, "BMH") respectfully file this

objection (the "Objection") to confirmation of the proposed chapter 11 plan as presented and

failure to provide assurance of future performance.  BMH reserves all rights to raise additional

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom Group New Holdco, LLC (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising , LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

objections in response to any supplemental filings of the Debtors.  In support of the Objection, BMH respectfully states as follows:

**I.**
**PRELIMINARY STATEMENT**

BMH is currently the largest franchisor of the Buddy's brand.  The Debtors seek confirmation of a plan which would, based on the papers filed to date, accomplish the assumption of fifty-six (56) franchise agreements with BMH, rejection of twenty-six (26) franchise agreements, and rejection of four (4) purported subleases.

The Debtors have a well-established track record of breaching their agreements with BMH, and the Debtors' breaches have deprived BMH of fundamental and essential elements of BMH's bargain, causing severe damage.  The incurable defaults and large cure claims are likely why the Debtors now propose to reject roughly one third of the BMH franchise agreements.

BMH objects to confirmation on several grounds.  The Debtors have not provided any adequate assurance of future performance with respect to the franchise agreements that they seek to retain, or of their ability to operate into the future.  The current lenders will own the Reorganized Debtors, but creditors have not been informed who will actually manage and run the operations.  Many terms of the plan are overreaching, inequitable, and inconsistent with applicable law.  The plan does not address BMH's development agreement at all.  Finally, the plan that the Debtors seek to confirm is not the same plan that was sent to creditors for solicitation, in material ways.

Accordingly, the Court should deny confirmation of the plan as proposed.

**II.**
**RELEVANT BACKGROUND**

A.    **The Bankruptcy Cases**

1.    On November 3, 2024 (the "Petition Date"), the above-captioned Debtors ("Debtors" or "Franchise Group") filed voluntary petitions for relief under chapter 11 of title 11

2

of the United States Code (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (this "<u>Court</u>").

2.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Section 11 U.S.C. §§ 1107(a) and 1108. No trustee or examiner has been appointed in these chapter 11 cases.

**B.      <u>BMH's Business Relationships with the Debtors</u>**

3.      The Debtors privately hold and operate franchised businesses.  Their collection of brands and business segments on the Petition Date included The Vitamin Shoppe ("<u>Vitamin Shoppe</u>"), Pet Supplies Plus ("<u>Pet Supplies</u>"), Buddy's Home Furnishings ("<u>Buddy's</u>"), and American Freight ("<u>American Freight</u>").  According to the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* [D.I. 15] (the "<u>Orlofky Declaration</u>"), the Debtors oversaw what was, collectively, an enterprise encompassing approximately 2,200 total retail store locations and 11,900 employees across the United States.

4.      The Buddy's Home Furnishings concept was founded in 1961 in Tampa, FL and first franchised in 2010.  The branded stores sell home furnishings, electronics, and appliances. Sales are often in the form of rent-to-own ("<u>RTO</u>") contracts, pursuant to which consumers make regular payments until they fully pay off the item.  As of the Petition Date, there were approximately 334 Buddy's stores, 34 of which were corporate owned, and the remaining 300 of which were owned by franchisees. Orlofky Declaration, ¶30.

5.      Roughly a quarter of the Buddy's stores are operated by BMH pursuant to more than 80 franchise agreements (each, a "<u>Franchise Agreement</u>" and collectively, the "<u>Franchise Agreements</u>") with Buddy's Franchising and Licensing LLC ("<u>Buddy's Franchising</u>").

6.      Currently, the Debtors propose to assume fifty-six (56) of the Franchise Agreements, and reject twenty-six (26) of the Franchise Agreements.  *See* D.I. 1371 (listing BMH franchise agreements.

7.      BMH has previously objected to the assumption of its agreements on account of the Debtors' prior breaches and resulting cure claims.  *See* D.I. 644 (*Objection of Buddy Mac Holdings LLC to Notice of Possible Assumption and Assignment Cure Costs With Respect to Executory Contracts and Unexpired Leases and Reservation of Rights)* (the "Cure Objection").[2]

8.      BMH is the largest franchisee of Buddy's, operating eighty-two (82) Buddy's stores.  The majority of the stores operate under separate Franchise Agreements, with each Franchise Agreement creating a territory for the franchisee's operations.

9.      BMH is also party to a Development Agreement with Buddy's Franchising dated effective June 2014 (as amended, the "Development Agreement"), wherein the parties exchanged mutual agreements to expand the Buddy's brand, pursuant to which BMH paid hundreds of thousands of dollars for exclusive rights that it did not receive, and where the Debtors agreed to provide financing to BMH.

## C.      The Debtors' Numerous Breaches of the Franchise Agreements and Development Agreement

10.     As set forth in more detail in the Cure Objection and below,[3] BMH holds claims against the Debtors for material, non-monetary breaches of certain Franchise Agreements.  These

---

[2] The Debtors apparently plan to reject four leases, and the corresponding subleases, for locations from which BMH operates four (4) Buddy's stores (Stores 4, 5, 8 and 13).  *See* D.I. 1182, Exhibit E (Plan Supplement, Rejected Contracts/Lease List).  By rejecting the subleases, the Debtors may have made it impossible for BMH to operate those four stores under the applicable Franchise Agreements, thereby giving rise to further damages in addition to those set forth in the Cure Objection.

[3] BMH incorporates the Cure Objection by reference as if fully set forth herein.

4

non-monetary breaches stem from breaches of territorial restrictions and failures to offer BMH rights of first refusal.

11.    It is critical to "adequate assurance of future performance" that BMH not be harmed following assumption of its Franchise Agreements.

12.    Before and during these bankruptcy proceedings the Franchise Agreements were breached by violations of restrictions on conduct.  For example:

- OPTION TO PURCHASE:  Buddy's Franchising agreed to support BMH's expansion of the Buddy's brand, by offering BMH an option to purchase stores in the event that Buddy's Franchising, or an affiliate of Buddy's Franchising, acquired Competitive Businesses (as defined in the Franchise Agreements) within BMH-protected territories.   The Franchise Agreements define "Competitive Business" in pertinent part as

> any rent-to-own, rental purchase, lease purchase or other business that leases, rents, sells or distributes home furnishings, electronics or appliances through any channel including, without limitation, a business conducted by means of retail outlets, internet or direct marketing.

*See, e.g.*, Franchise Agreement dated December 11, 2019, by and between Buddy's Franchising and BMH-TNM 31, LLC (the "Lubbock Franchise Agreement"), for a BMH store in Lubbock, Texas (the "BMH Lubbock Store") at §1(e).[4]  Importantly, the term "Competitive Business" is not limited by any geographic boundary, and it includes business operations over the internet.

The option to purchase was integral to the Franchise Agreements; both BMH and (in theory) Buddy's Franchising had an interest in promoting the Buddy's brand and expanding the reach of Buddy's franchised locations.

---

[4] The Lubbock Franchise Agreement is in the general form of nearly all of the other Franchise Agreements between BMH and Buddy's Franchising.  The Lubbock Franchise Agreement and other Franchise Agreements also have an exclusion for a business operating as part of a Multi-Unit Apartment Business, which is not applicable here.

- <u>NON-COMPETITION</u>:  Buddy's Franchising also agreed to support and promote the BMH Buddy's stores, and Buddy's Franchising retained certain rights of competition, but relinquished others.

For example, Franchise Group retained the right to operate and license Buddy's Retail Businesses outside of the BMH-protected territories, and to sell products and services to customers residing within the protected territories over the internet or by other electronic means. Lubbock Franchise Agreement, §2(d)(i) and (iii).

Importantly, however, with respect to operating other retail businesses, the Franchise Agreements provide the following:

> (d)  *Our Retention of Rights*.  You acknowledge and agree that we and our affiliates retain all rights not expressly granted to you under this Agreement and that we or our affiliates may, among other things, on any terms and conditions we deem advisable:
>
> \*   \*   \*
>
> (ii)    operate and grant to others the right to operate retail businesses or any other business, <u>other than Competitive Businesses</u>, at any location (including within the Territory) that operate under any trademarks, service marks or trade dress (including the Trademarks) and pursuant to such terms and conditions as we deem appropriate.

Lubbock Franchise Agreement, §2(d)(ii) (emphasis added).

"Affiliates" is defined as "any Entity . . . of which you or your owners (i) own a 51% or greater interest of the issued and outstanding ownership interest and voting rights or (ii) have the right and power to Control such Entity."  Lubbock Franchise Agreement, §1(a).[5]

---

[5] "Affiliates" is defined in terms of BMH's relationship to other entities.  Applying the definition to Buddy's Franchising, the term would also include all Franchise Group entities.  The dictionary defines the term "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation.'" Blacks Law Dictionary 59 (7th Ed. 1999).  This definition would also include all Franchise Group entities.

6

In other words, Buddy's Franchising breached the Franchise Agreements when its affiliates (i.e. any of the Franchise Group entities) operated other retail businesses that were Competitive Businesses within the territories protected by those Franchise Agreements.[6]

- <u>RIGHT OF FIRST REFUSAL</u>:  The Franchise Agreements also provided BMH with a right of first refusal with respect to the acquisition of certain business opportunities. Specifically, the agreements contemplated that Franchise Group could acquire other businesses, by permitting Franchise Group to

> (iv) merge with, acquire, establish or become associate with any business or locations of any kind under other systems and/or marks, which businesses and locations may offer or sell items, products and services that are the same as or similar to the Approved Products and Services offered at or from your Retail Business and which businesses or locations may be located anywhere within or outside the Territory.  Notwithstanding the preceding sentence, except as provided in Sections 2(e) and 2(f) below, we may not grant a Competitive Business the right to use the Trademarks at a location within the Territory.

Lubbock Franchise Agreement, §2(d)(iv).

Importantly, however, in the event that Buddy's Franchising, or an affiliate of Buddy's Franchising,

> acquires any store operating under different trademarks that sells or leases the same, similar or different products and services as those offered and sold by Buddy's Retail Businesses (each a "<u>Non-System Store</u>") within the Territory, **<u>we shall promptly thereafter deliver to you a written notice offering you the opportunity to purchase such Non-System Store for the purposes of converting it to a Retail Business</u>** (each, a "Conversion Notice").  Provided that you are in compliance in all material respects with the provisions of this Agreement and there are no continuing uncured events of default of any material terms of this Agreement of which you have been given notice, or an event which, with the giving of notice or the passage of time or both, would become a default, exists under this Agreement, you shall have the option to purchase the Non-System Store,

---

[6] In their February 12, 2025 letter from Edmon Morton, Esq. to the Court concerning discovery [D.I. 971], the Debtors attempted to raise various arguments in response to BMH's claims.  For example, the Debtors asserted the notion that the Franchise Agreements were not breached because the acts in question were committed by entities who were not parties to the Franchise Agreements.  However, because the Franchise Agreements include restrictions on "affiliates", the Debtors' position is not supportable.  Contracts frequently specify that certain actions, by persons who are not parties to the agreement, are events of default, and the Franchise Agreements have done so here.

> exercisable by providing written notice to us within 30 days after your
> receipt of the Conversion Notice.

Lubbock Franchise Agreement, § 2(e) (emphasis added).  Buddy's Franchising also agreed to provide financing in the event that BMH exercised its option.  *Id.*

13.    BMH has never received a notice of default under any of its Franchise Agreements.

14.    In or about February of 2020, an affiliate of Buddy's Franchising acquired American Freight.  Orlofky Declaration at ¶ 20.  As a result, an affiliate of Buddy's Franchising became the owner of an American Freight store ("Lubbock American Freight Store") only 2.8 miles from the BMH Buddy's store in Lubbock – i.e., within the BMH territory protected in the Lubbock Franchise Agreement.  The Lubbock American Freight Store is a Competitive Business and a Non-System Store within the meaning of the Lubbock Franchise Agreement.  The ownership and operation of the Lubbock American Freight Store by an affiliate of Buddy's Franchising, without affording BMH the right of first refusal, was a breach of the Lubbock Franchise Agreement.

15.    There are similar breaches of at least 22 other BMH Franchise Agreements. Franchise Group purchased and operated Competitive Businesses in 22 other BMH-protected territories, without honoring BMH's options under its Franchise Agreements.  Some of those Competitive Businesses were operated from leased locations, which leases have now been rejected.[7]

16.    Post-petition, the Debtors continued to disregard BMH's Conversion Notice option. In the *Motion of Debtors for Entry of Order (A) Approving the Private Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, and (B) Granting Related Relief* (D.I. 435), Educate, Inc. (an affiliate of Buddy's

---

[7]    The American Freight stores in Ada, Oklahoma and in North Richland Hills, Texas, were in BMH-protected territories.

8

Franchising) sought and obtained approval of a private sale of a group of American Freight stores, including the Lubbock American Freight Store. The sale of the Lubbock American Freight Store to a third party has now made it impossible to cure this breach. BMH objected to the sale, pointing out that the sale of the Lubbock American Freight Store would render the Lubbock Franchise Agreement incurable and reserving its rights. The Debtors sold the Lubbock American Freight Store anyway, after obtaining Court approval.

17.    One of the Franchise Agreements (the "Omitted Franchise Agreement") that was breached by the Debtor's incursions into BMH's exclusive territories is not listed in the Amended Plan Supplement. *See* D.I. 1371 (omitting Franchise Agreement with subsidiary BMH-New 68, LLC in Amarillo, Texas). Under the Eighth Amended Plan, the Omitted Franchise Agreement is neither assumed nor is it rejected. Eighth Amended Plan, Article X.

18.    In addition to their breaches of the Franchise Agreements, the Debtors are in breach of the Development Agreement on account of their acquisition and operation of the Competing Businesses. In the Development Agreement, BMH bargained and paid for the right to develop new Buddy's Retail Businesses in a specified Development Area, echoing the exclusive rights that BMH bargained for in the Franchise Agreements. Specifically, the Development Agreement provides, in relevant part, that

> If we [Buddy's Franchising], or an affiliate of ours, acquires any store operating under different trademarks that sells or leases the same, similar or different products and services as those offered and sold by Buddy's Retail Businesses (each a "Non-System Store") within the Development Area, we shall promptly thereafter deliver to you [BMH] a written notice offering you the opportunity to purchase such Non-System Store for the purposes of converting it to a Retail Business (each, a "Conversion Notice"). Provided that you are in compliance in all material respects with the provisions of this Agreement and there are no continuing uncured events of default of any material terms of this Agreement of which you have been given notice, or an event which, with the giving of notice or passage of time or both, would become a default, exists under this Agreement, you shall have the option to purchase the Non-System Store, exercisable by providing written notice to us within 30 days after your receipt of such Conversion Notice.

9

Development Agreement, § 1(c) (as modified in that Amendment to Buddy's Development Agreement). The Development Agreement also offered financing terms in the event that BMH exercised its option to purchase.

19.     Franchise Group purchased and operated 13 American Freight stores within BMH's protected Development Area under the Development Agreement. Franchise Group did not send any Conversion Notices with respect to the 13 stores. BMH never received any formal notice of default under the Development Agreement. BMH was entitled to exercise its option to purchase the 13 American Freight stores and convert them to Buddy's-branded stores and was denied that opportunity.

20.     The Development Agreement is not listed in the Amended Plan Supplement. *See* D.I. 1371. Under the Eighth Amended Plan, the Development Agreement is neither assumed nor is it rejected. Eighth Amended Plan, Article X.

**D.     BMH's Claims Against the Debtors**

21.     BMH has been materially damaged by Buddy's breaches of the Franchise Agreements and Development Agreement, which breaches are continuing. BMH notified Franchise Group that the Franchise Agreements and Development Agreement had been breached on account of, among other things, the acquisition of American Freight and other competing brands and the failure to send Conversion Notices, by letter dated March 1, 2024 ("BMH Demand"). There are numerous other causes of action that BMH has against Franchise Group, and BMH holds claims for substantial damages, as described in the BMH Demand. The Debtors have denied that they are in breach of any agreements with BMH.

22.     In addition to BMH's claims under the Franchise Agreement and Development Agreement, BMH holds claims against Buddy's Franchising, Buddy's Newco, LLC, Franchise Group, Inc., Franchise Group Intermediate Holdco, LLC, Franchise Group New Holdco LLC and

10

Franchise Group Intermediate B, LLC for breach of implied covenant of good faith and fair dealing, tortious interference with contract, civil conspiracy, and violations of, and/or aiding and abetting violations of, deceptive and unfair trade practices and consumer protection acts of Florida, Texas, Oklahoma, Arkansas and New Mexico.

23. On January 23, 2025, BMH timely filed proofs of claim against the following Debtors, each of which specified the amount of BMH's claims for damages in Exhibit 2 of the addenda attached to the proofs of claim, in the preliminary, partially estimated amount of $28,811,271, plus $325,000 for payments for exclusivity rights, for a total of $29,136,271:[8]

| Claim No. | Debtor |
|-----------|--------|
| 1839 | Franchise Group, Inc. |
| 1861 | Franchise Group Intermediate Holdco, LLC |
| 1831 | Buddy's Franchising and Licensing LLC |
| 1978 | Buddy's Newco, LLC |
| 1877 | Franchise Group New Holdco, LLC |
| 1799 | Franchise Group Intermediate B, LLC |

The Debtors' claims agent incorrectly docketed BMH's claims as unliquidated, with a value of $0.00.

24. On April 30, 2025, the Debtors filed the *Amended Plan Supplement for the Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates* [D.I. 1371] (the

---

[8] The Debtors have argued that BMH's claims were released by a provision in a December 10, 2020, agreement. *See* D.I. 971 However, the release in that agreement (if any) was limited to claims arising before December 10, 2020. The proofs of claim filed by BMH assert damages that arose after that date. Furthermore, the release only benefitted Buddy's Newco, LLC, Buddy's Franchising and Licensing, LLC and their "successors, assigns, heirs and personal representatives, and all persons acting on our or its behalf or claiming under us or it and all entities in which we or it has or had an ownership interest." Sixth Amendment to Buddy's Franchising and Licensing Development Agreement, p. 1. The foregoing language did not cover parent entities, so BMH did not release Franchise Group Intermediate B, LLC, Franchise Group Intermediate Holdco, LLC, Franchise Group New Holdco, LLC or Franchise Group, Inc.

11

"Amended Plan Supplement"), and for the first time included twenty-six (26) BMH Franchise Agreements on the Rejected Contracts List. The damages claims arising from the Debtors' rejection of the Franchise Agreements will be tens of millions of dollars *in addition to* the $29,136,271 in damages claims for violations of the BMH's territorial rights.

26. As set forth in BMH's proofs of claim and Cure Objection, the cure claim on account of the Omitted Franchise Agreement totals at least $511,167.

26. In the Amended Plan Supplement, the Debtors also indicate their intent to reject a "Amended Sublease Agreement" between Buddy's Newco, LLC and Buddy Mac Holdings, LLC ("Purported Florida Sublease"). for three stores in Tampa, Florida, and one store in Bradenton, Florida (the "Florida Stores").

27. There is no valid "sublease agreement" between Buddy's Newco, LLC and Buddy Mac Holdings, LLC or any BMH affiliate, because the primary lease forbids subleasing without the landlord's consent, and the landlord did not consent to any assignment or sublease of the premises. BMH does not object to the Debtors relinquishing the premises on which the Florida Stores are located (while reserving all claims for damages on account of the same), but BMH does object to the inclusion of the Purported Florida Sublease on the rejection schedule to the extent that inclusion suggests that such the Purported Florida Sublease is enforceable. BMH subsidiaries are currently tenants at sufferance and their rights are governed by state law, not the Purported Florida Sublease, and the affected BMH subsidiaries reserve all rights related to the Florida Stores and related agreements.

28. One of the Florida Stores is Store Number 13, located in Bradenton, Florida. The Debtors propose to assume the Franchise Agreement for Store Number 13, with a cure amount of $0.00, even though the Debtors are rejecting the lease from which Store Number 13 is operated. The inclusion of the Franchise Agreement for Store Number 13 on the assumed contract list

appears to be in error, as rejection of the underlying lease will give rise to a large cure claim for damages associated with any relocation expenses. Further, BMH was directed by the Debtors to vacate the location of Store Number 13. The Debtors should be required to confirm that the Franchise Agreement for Store Number 13 is a rejected contract, not an assumed contract.

29.     Finally, the Amended Plan Supplement does not address the Development Agreement at all. The Development Agreement is not on the Assumed Contract List or on the Rejected Contrast List. Because the Development Agreement requires the Debtors to provide financing to BMH and is subject to a cure claim of more than $11,210,979, it would appear that the Debtors would reject it. The Debtors should be required to confirm that the Development Agreement is a rejected contract.

### E.  The Debtors Fail to Comply with the Solicitation Order

30.     Following the failure of the Debtors' court-approved sale process, the Debtors turned to confirmation.

31.     On February 21, 2025, the Court entered an Order ("Solicitation Order") [D.I. 1019] approving the *Disclosure Statement for the Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. And its Affiliated Debtors* (the "Disclosure Statement") [D.I. 1014] and approving solicitations and voting procedures with respect to the *Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Affiliated Debtors* (the "Sixth Amended Plan") [D.I. 1015].

32.     The Solicitation Order required the Debtors to mail their solicitation materials five (5) business days after the entry of the Solicitation Order, or as soon as reasonably practicable thereafter. Solicitation Order, p. 3.

33.     The Solicitation Order required that each Holder of a Claim in Voting Classes receive a ballot in the amount of its "Claim" which, for each claimant that had filed a proof of claim, was to be in the following amount:

[t]he liquidated amount specified in a Proof of Claim against the Debtors, timely filed with the Court or the Solicitation Agent by the appliable Bar Date . . . to the extent such Proof of Claim has not been amended or superseded by another Proof of Claim and is not the subject of an objection filed by **March 6, 2025** (or, if such Claim has been resolved pursuant to a stipulation or order entered by the Court, the amount set forth in such stipulation or order.

Solicitation Order, ¶27(b) (emphasis in original).

34.    The Debtors did not file an objection to BMH's claims by March 6, 2025.

35.    The Debtors sent BMH six ballots, each in the amount of $1.00, contrary to the requirements of the Solicitation Order.  Objection, BMH timely voted against the proposed Plan, indicating the correct liquidated amount of its claim ($29,136,271.00) on each of its ballots.[9]

## F.    **The Eighth Amended Plan**

36.    On April 25, 2025, long after solicitation materials had been distributed, the Debtors filed their Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Debtor Affiliates (the "Eighth Amended Plan") [D.I. 1312].

37.    The Eighth Amended Plan modifies the Sixth Amended Plan that was distributed with the solicitation materials for voting.  The Eighth Amended Plan makes changes that are material.  Among other things, the Debtors would combine the two trusts contemplated under the Sixth Amended Plan, and incorporate a "global compromise" among the Debtors, certain lenders, and the Committee, in a manner that would reduce the recovery for general unsecured creditors.  Indeed, the original disclosure statement projected that general unsecured claims held by Class 6 OpCo Claimants, in an estimated amount of $1,140,427,705, would receive a distribution of approximately 1.0%.  *See Disclosure Statement* at p. 63 [D.I. 1019-1] (projecting approximately 1% recovery).  In contrast, under the Eighth Amended Plan, a smaller group of creditors, holding

---

[9] The Order (I) Approving the Form, Content, and Manner of Notice of the Disclosure Statement Supplement, (II) Approving Certain Deadlines and Procedures in Connection with Confirmation, and (III) Granting Related Relief [D.I. 1322] establishes May 14, 2025, as the deadline for the Debtors to file their voting report.

claims estimated to be in the aggregate amount of $304,400,000, would receive a distribution of approximately 0.75%. *See Disclosure Statement Supplement* at p. 14 [D.I. 1322-1] (projecting a .75% recovery under the Eighth Amended Plan). The assumptions that were used to come up with those figures are not disclosed.

### III.
### Legal Argument

**A. The Court Should Deny Confirmation of the Plan Because It Contains Provisions Concerning Executory Contracts That Are Contrary to Law**

38.　　In order to confirm a chapter 11 plan, a debtor must show that the plan complies with the Bankruptcy Code. 11 U.S.C. § 1129(a)(1) ("The court shall confirm a plan only if all of the following requirements are met: (1)The plan complies with the applicable provisions of this title."). Fundamental to the rights of non-debtor parties, and included within the provisions of the Bankruptcy Code with which a plan must comply in order to be confirmed, are the provisions of Bankruptcy Code section 365.

39.　　Provisions affecting executory contracts are of central importance in this case. As explained below, various provisions of the Plan would severely prejudice the rights of counterparties to executory contracts, including BMH, and are inapposite to the treatment to which counterparties are entitled under bankruptcy and non-bankruptcy law. Consequently, the Court should deny confirmation of the Plan, because it violates Bankruptcy Code section 365 and, in turn, section 1129(a)(1). The Court should not permit the Debtors to run roughshod over their counterparties, including BMH.

### i.　　**Assumed Executory Contracts May Not Be Modified Without Consent**

40.　　The Debtors may not (as they attempt to do) assume the BMH Franchise Agreements with modifications imposed upon BMH without BMH's consent. Specifically, under the Eighth Amended Plan, the Debtors attempt to have their assumed executory contracts

15

revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, *except as such terms may have been modified* by agreement of the parties or, other than with respect to non-residential Unexpired Leases, *by an order of the Bankruptcy Court*.

Eighth Amended Plan, §10.1 (emphasis added).

41.     The Eighth Amended Plan then goes on to modify contractual provisions that afford counterparties remedies on account of any "'change of control', sale of business, assignment, vesting, termination, acceleration or similar provisions," such that they would not be enforceable by the non-Debtor in connection with any transaction "contemplated by the Plan or any other Restructuring Transaction". Eighth Amended Plan, §10.1. Similar language is included in section 7.2 of the Eighth Amended Plan.

42.     "Restructuring Transaction" is defined as the transactions described in Article VII of the Plan and the Restructuring Transactions Memorandum, including Partial Sale Transaction(s). Eighth Amended Plan, §1.204.

43.     Among the transactions described in Article VII of the Plan are

(f) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, formations, organizations, dissolutions, or liquidations; and (g) all other actions that the Reorganized Debtors reasonably determine, in consultation with the Required Consenting First Lien Lenders, are necessary or appropriate . . .

Eighth Amended Plan, §7.2 (first paragraph)

44.     In other words, the Eighth Amended Plan would modify – for all future transactions -- all of the Debtors' contracts to eliminate prohibitions on changes of control, assignments, and the like. "The Court has no authority under § 365 to vary the terms of a contract assumed under the provision of the law." *In re Mellen*, 79 B.R. 385, 387 (Bankr. N.D. Ill. 1987). The Eighth Amended Plan, in attempting to do so, violates the restrictions of Bankruptcy Code section 365 and this language should be stricken.

16

ii. **Assumed Executory Contracts May Not Be Cherrypicked**

45.     Under the Eighth Amended Plan, executory contracts that are assumed include all amendments, supplements, or other agreements "unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan." Eighth Amended Plan, §10.5. The foregoing language appears to be an attempt by the Debtors to cull an agreement's amendments or supplements that they do not like, while assuming the remainder of such an agreement.

46.     It is well-settled, however, that executory contracts and unexpired leases must be assumed or rejected in their entirety. *In re Buffets Holdings, Inc.*, 387 B.R. 115, 128 (Bankr. D. Del. 2008) (Debtors were required to assume or reject a bundle of leases as a whole). Courts must consider, not only whether the proposed treatment benefits the estate and creditors, but also consider the rights of the non-debtor counterparty, so that the bankruptcy policy of allowing the non-debtor party to receive the benefit of its bargain is fulfilled. *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1990).

47.     Section 365 endeavors to strike a balance, between the non-debtor's interest in retaining the material and economic benefit of its bargain, and the interests of the debtors' creditors in maximizing the estate. *Fleming*, 499 F.3d at 306. One way that a balance is achieved is the requirement that contracts be assumed *cum onere*, subject to all of the benefits and the burdens thereunder. *In re ANC Rental Corp.*, 277 B.R. 226, 238 (Bankr. D. Del. 2002).

48.     The Debtors should not be permitted to undermine that fundamental policy by authorizing rejections of amendments in a plan.

iii. **Blanket Retroactive Rejection is Inequitable**

49.     The Plan further violates the provisions of Bankruptcy Code section 365 (and, consequently, 1129(a)(1)) by attempting to permit retroactive rejections of agreements. Section

17

365(d)(2) provides that in a case under chapter 11, "the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before confirmation of a plan . . ."

50.    The Eighth Amended Plan provides that, the Debtors may elect to reject a contract after confirmation (where, for instance, the Court later determines that the cure amount is more than the Debtors want to pay) and the rejection would be effective as of the Effective Date. Eighth Amended Plan, §10.2.

51.    Litigation over cure amounts may occur well after the Effective Date. As a result, counterparties to executory contracts in question stand to be substantially prejudiced, particularly if they continue to perform after the Effective Date and then the contract were ultimately allowed to be rejected retroactively to the Effective Date. For example, if the Debtors were to retroactively reject a franchise agreement pursuant to which royalty payments were made in the interim, the result would be inherently unfair to the counterparty.

52.    The retroactive rejection of a lease or contract is a decision that is governed by equity and fairness. *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 185 (Bankr. E.D. Pa. 2010) (listing cases). It is not appropriate to adopt a one-size-fits-all approach to the retroactive rejection of an executory contract, as the equitable considerations will vary from case to case.

53.    The Court should not approve a blanket, retroactive effective date of rejection. Rather, the effective date of rejection, particularly with respect to the Franchise Agreements, should be fixed by Court order following the opportunity for a full hearing.

   iv.    **The Plan Improperly Establishes Certain
          Effects of Rejection Without Regard to Applicable Law**

54.    BMH objects to the following language in the Eighth Amended Plan:

To the extent applicable, rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor or the Reorganized Debtors, as applicable, under

18

such Executory Contracts or Unexpired Leases and the Debtors are entitled to all the rights provided under section 365 of the Bankruptcy Code.

Eighth Amended Plan, §10.2.

55.    The foregoing language should be stricken, as it could be errantly interpreted by a non-Bankruptcy Court as granting the Debtors a right to continue to enforce provisions in an executory contract following rejection.  The United States Supreme Court, however, has confirmed the well-settled proposition that rejection of a contract in bankruptcy operates as a breach.  *See Mission Product Holdings, Inc. v. Tempnology, LLC,* 587 U.S. 370, 378, 139 S.Ct. 1652, 1661 (2019) (adopting the view that rejection of a contract has the same consequence as a contract breach outside of bankruptcy); *In re National Gypsum Co*., 208 F.3d 498, 505 (5th Cir. 2000) (effect of rejection is a breach).

56.    Another well-settled maxim is that "[t]he estate cannot possess anything more than the debtor itself did outside of bankruptcy."  *See Mission Product Holdings, Inc. v. Tempnology, LLC,* 587 U.S. 370, 381, 139 S.Ct. 1652, 1663 (2019).  The counterparty's rights that survive rejection are the same as the rights that would survive a material breach outside of bankruptcy, which prevents the debtor "from recapturing interests it had given up."  *See Mission Product Holdings, Inc. v. Tempnology, LLC,* 587 U.S. 370, 382, 139 S.Ct. 1652, 1663 (2019).

57.    Accordingly, the non-debtor counterparty's rights and obligations following rejection are determined by applicable contract and state law, and non-bankruptcy law may not permit the Debtors to enforce the contract following rejection.  *See In re Energy Conversion Devices, Inc*., 621 B.R. 674, 718 n. 144 (Bankr. E.D. Mich. 2020) (observing that non-debtor counterparty, following rejection, could have relied on the general rule under Michigan law that the party who commits the first substantial breach of a contract cannot maintain an action against the other party for its failure to perform).

     v.    **To the Extent the Debtors Intend to Invoke the "Ride Through"**

19

**Doctrine With Respect to the Development Agreement and Omitted Franchise Agreement, the Court Should Not Permit Them to Do So**

58.     As stated above, the Debtors' defaults under the Development Agreement and Omitted Franchise Agreement are historical and incurable.  The Development Agreement and Omitted Franchise Agreement may not be assumed, as explained below.

59.     Prior to the 2005 amendments to the Bankruptcy Code, there was a split of authority as to whether, under section 365, non-monetary defaults had to be cured at all.  *See In re Empire Equities Capital Corp*., 405 B.R. 687, 690 (Bankr. S.D.N.Y. 2009) (comparing pre-2005 cases which held that debtors were relieved from curing non-monetary defaults altogether, with cases requiring that non-monetary defaults be cured and absent cure, could not be assumed).

60.     When Congress amended the Bankruptcy Code in 2005, it provided a limited exception to the cure requirement for non-monetary defaults, applicable to non-monetary obligations under an unexpired real property lease.  *Id.* at 691.  By making an exception only for unexpired real property leases, Congress made clear its intention that non-monetary defaults in executory contracts must be cured.  *Id*.

61.     A material, non-monetary default under an executory contract that cannot be cured precludes assumption of the executory contract.  *Id.  See also Fleming*, 499 F.3d at 302 (affirming bankruptcy court's decision to deny a request to excise a provision which would have required the assignee to supply groceries to the non-debtor from a specific location); *In re Eagle Creek Subdivision, LLC*, 397 B.R. 758, 763-64 (Bankr. E.D.N.C. 2008) (debtor's failure to complete lots by the contractual deadline was a material, non-monetary default that could not be cured, and accordingly, the contracts could not be assumed); *In re Escarent Entities, L.P.*, 423 Fed. Appx. 462, 465 (5th Cir. Apr. 28, 2011) (failure of seller to close by the specified date in the contract was a material breach that could not be cured, preventing assumption of the contract); *Ring v. Ted's Jumbo Red Hots, Inc.*, 2022 WL 465075 *5 (W.D.N.Y. Feb. 15, 2022) (violation of non-

20

disparagement clause was a non-monetary default that could not be cured, affirming the bankruptcy court's denial of motion to assume executory contract).

62.    In *Empire Equities*, the executory contract in question was an option contract, and the deadline for exercising the option had expired.  The Court found that the failure to exercise the option by the deadline was a material and incurable default that would have precluded assumption, had the debtor not been able to extend the deadline under section 108 of the Bankruptcy Code.  *Id*. at 691.

63.    As explained at the outset of this Objection (*see supra* Part II.C), Franchise Group has caused the Development Agreement and Omitted Franchise Agreement to be materially, and incurably, breached.  In particular, among other things, Franchise Group operated Competitive Businesses, including within territories protected by BMH's Development Agreement and Omitted Franchise Agreement.

64.    BMH has been heavily damaged by the operation of Competitive Businesses within its protected territories and areas, depriving BMH of the valuable business opportunities for which it bargained and paid.  As a result of these incurable defaults, the Development Agreement and Omitted Franchise Agreement cannot be assumed.

65.    The Debtors may be attempting to apply the "ride through" doctrine to the Development Agreement and Omitted Franchise Agreement, to retain their benefits without paying millions of dollars of cure.  "The classic statement of the 'ride through' doctrine appears in *Consolidated Gas*: where there is no breach or default in an executory contract as of the commencement of the case, the contract remains in force unless it is rejected and, if not rejected, 'passes with other property to the reorganized' debtor." *In re JZ L.L.C.*, 371 B.R. 412, 424 (Bankr. 9th Cir. 2007) (*quoting Consol. Gas, Elec. Light, & Power Co. v. United Rys. & Elec. Co.*, 85 F.2d 799, 805 (4th Cir. 1936).

21

66.     This attempt must fail for at least two reasons.  First, the Debtors have breached the Development Agreement and Omitted Franchise Agreement, and the breaches are nonmonetary and incurable.  The Debtor should not be permitted to use the "ride through" doctrine to do an end run around section 365's requirements.  Second, permitting the contracts to "ride through" the bankruptcy would be tantamount to an implied assumption, which the Third Circuit has rejected. *See In re Dura Automotive Systems, LLC*, 628 B.R. 750, 754-55 (Bankr. D. Del. 2021) (discussing *Univ. Med. Ctr. v. Sullivan* (*In re Univ. Med. Ctr.*), 973 F.2d 1065 (3d Cir. 1992), which held that provider agreement could not be implicitly assumed.); *see also In re Access Beyond Technologies, Inc.*, 237 B.R. 32, 47 (Bankr. D. Del. 1999) ([i]f the debtor does not assume an executory contract, it is deemed rejected.").

67.     The Plan should not be confirmed to the extent that it attempts to either implicitly assume the Development Agreement and Omitted Franchise Agreement, or cause the Development Agreement and Omitted Franchise Agreement to ride through the bankruptcy.[10]

### vi.     The Debtors Should Be Required to Reject the Franchise Agreement for Store 13 or, in the Alternative, BMH Objects to the Cure Amount of $0.00

68.     As stated above, the Debtors propose to reject the lease for Store Number 13, while at the same time, they propose to assume the Franchise Agreement for the same store.  On May 5, 2025, the Debtors gave notice to BMH to vacate the location of Store Number 13 by May 19, 2025. It appears that the Debtors have no intention of continuing to operate Store Number 13, so the Debtors should reject the related franchise agreement.  Further, BMH will be entitled to a cure claim on account of the franchisor ordering it to close Store Number 13 on two weeks' notice, for damages including lost profits, moving expenses, and the like.  If the Debtors intend to assume the

---

[10] To the extent necessary, BMH hereby requests pursuant to section 365(d)(2) that the Court compel the Debtors to either assume or reject the Development Agreement and Omitted Franchise Agreement at confirmation, and BMH reserves all rights including its cure claims on account of the Debtors' incursions into BMH's protected territories by operating competing businesses.

Franchise Agreement for Store Number 13, BMH objects to the cure cost of $0.00 and reserves

the right to prove its damages following discovery and at an evidentiary hearing.

**B.    The Court Should Deny Confirmation Because the Debtors Have Failed to Provide Adequate Assurance of Future Performance to BMH and Have Failed to Comply With Section 1129(a)(5) of the Bankruptcy Code**

69.    The Eighth Amended Plan provides:

> Any objection by a contract or lease counterparty to (a) the ability of the applicable Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned, or (b) any other matter pertaining to the proposed assumption must be Filed, served, and actually received by the Debtors by the date on which objections to Confirmation of the Plan are due.

Eighth Amended Plan, § 10.2.

70.    As a preliminary matter, establishing a deadline in a plan that expires before

confirmation is not appropriate.

71.    More importantly, the Debtors have failed to provide adequate assurance of future

performance.  Indeed, BMH requested adequate assurance from the Debtors months ago in

connection with the failed sales process, and to date has received no such information whatsoever.

72.    At a minimum, that the Debtors must provide income and expense projections for

the Reorganized Debtors that demonstrate that they will be able to stay in business.  The Debtors

must show that the Reorganized Debtors will maintain adequate cash reserves to fund, among other

things, the Debtors' obligations under the assumed Franchise Agreements to perform services,

support, and purchase inventory.  The Reorganized Debtors must be prohibited from directly or

indirectly competing in any exclusive territory described in the BMH Franchise Agreements or

Development Agreement (if not rejected), and they should be prohibited from acquiring competing

businesses without honoring contractual rights of first refusal.  In the event that the Reorganized

23

Debtors violate those prohibitions, BMH must be permitted to terminate its Franchise Agreement without triggering any liability for termination (for BMH or any guarantors).

73.     The Debtors have also failed to disclose who will manage the Buddy's business line going forward.  The Eighth Amended Plan provides that David Orlofsky will serve as the Chief Restructuring Officer of Freedom VCM Holdings, LLC and Franchise Group, Inc. Eighth Amended Plan, § 1.47.  The initial members of the "New Boards" were supposed to be identified in a plan supplement, but the Amended Plan Supplement only identifies which entities will designate the managers on the New Boards.  Similarly, management is supposed to be disclosed in the Plan Supplement, but it is not.  Eighth Amended Plan, §7.17.

74.     Failure to identify who will run the operation is, itself, a failure to prove adequate assurance of future performance.   This failure also renders the Eighth Amended Plan unconfirmable.  The Bankruptcy Code requires a plan proponent to disclose the identity and affiliation of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan.  In addition, the proponent must show that the appointment of such person, or continuation in office, is consistent with the interests of creditors and public policy.  11 U.S.C. § 1129(5).

75.     To the extent that existing management will run the operations going forward, it is the existing management that permitted the Debtors to breach the Franchise Agreements and Development Agreement, and BMH has no assurance (nor has any been provided) that such individuals will not similarly breach them again in the future.  Indeed, the documents provided with the Amended Plan Supplement enable such a result to occur.  Each of the Managers of the Reorganized Debtors (with the exception of the CEO Manager) is required to be an "Independent Manager," but an Independent Manager could be an individual who was employed by one of the

24

Debtors or a Unitholder or Affiliate more than six (6) months prior to their designation as a Manager.  Amended Plan Supplement, Exhibit A(i).  In other words, nothing prevents the same individuals who caused the breaches of BMH's Franchise Agreements from becoming Managers of the Reorganized Debtors.

76.     The determination of whether there is "adequate assurance of future performance" is extremely fact-specific.  *In re Texas Health Enters. Inc*., 72 Fed. Appx. 122, 126 (5th Cir. 2003).  Evidence of prior defaults is probative of whether a debtor will be able to perform under an agreement in the future.  *Id.* (affirming Bankruptcy Court's finding that there was no adequate assurance of future performance when debtor had a history of monetary defaults, poor communications and outright refusals to perform); *In re Gen. Oil Distribs., Inc*., 18 B.R. 654, 658 (Bankr. E.D.N.Y. 1982) ("What constitutes adequate assurance is a factual question to be determined on a case by case basis with due regard to the nature of the parties, their past dealings and present commercial realities.").

77.     Nor have the Debtors provided projections or demonstrated that they have sufficient liquidity to satisfy their obligations under the Franchise Agreements after the Effective Date.  The Debtors may not simply sit back and collect royalties.  The Debtors are required to maintain the brand.  This includes maintaining certain technology and IT; furnishing franchisees with lists of approved supplies, suppliers and products; maintaining an operations manual; maintaining the trademarks; and marketing.  The Debtors have altogether failed to demonstrate in any way (let alone an adequately assuring way) that they have the ability to do so.

C.     **The Plan's Overbroad Release Should Not Be Approved**

78.     Section 12.1 of the Eighth Amended Plan contains the following statement: "Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the Filing of the Chapter 11 Cases shall be deemed cured on

25

the Effective Date." This sentence should be stricken as it would purportedly "cure" all defaults –

even those defaults that are incurable – to the detriment of counterparties to executory contracts.

**D.**      **The Court Should Not Approve Overbroad Retention of Jurisdiction**

79.      Article XIII(a) of the Eighth Amended Plan provides that the Court would retain

jurisdiction over "any potential contractual obligation under any Executory Contract or Unexpired

Lease that is assumed."

80.      A contract cannot be assumed unless and until any cure dispute is determined, and

to the extent that the contract may be assumed, the cure payment made. Both of these issues are

squarely within the Court's jurisdiction under 28 U.S.C. §157.

81.      Once a contract has been assumed, however, contractual disputes between the

parties are not matters that concern the administration of the estate or the adjustment of the debtor-

creditor relationship. A dispute is even more attenuated once the plan has been substantially

consummated, or the contract is assigned to a third party.

82.      The Court should strike the language above from the retention of jurisdiction

provision of Article XIII(a) of the Eighth Amended Plan. If the Court has jurisdiction by statute,

such language is unnecessary in any event.

**E.**      **The Court Should Deny Confirmation of the Plan**
**Because It Was Not Properly Solicited**

83.      Among the requirements with which the Debtors must comply in order to confirm

a Plan under Bankruptcy Code sections 1129(a)(1) and (a)(2) is the requirement that the acceptance

or rejection of a plan may not be solicited unless, "at the time of or before such solicitation, there

is transmitted to such holder the plan or summary of the plan and a written disclosure statement

approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C.

§ 1125(b).

84.     As stated above, the Eighth Amended Plan makes material changes to the Sixth Amended Plan that was distributed with the solicitation materials, in a manner that is detrimental to the holders of Class 6 claims.  Among other things, the Debtors would combine the two trusts contemplated under the Sixth Amended Plan in a manner that would, it appears, reduce the recovery for general unsecured creditors of the Opco Debtors by 25%, from approximately 1.0% to 0.75%.  These changes were not contemplated by the Disclosure Statement or the Sixth Amended Plan.

85.     Unless the Debtors can show that the treatment of the holders of Class 6 claims has not been detrimentally impacted by these modifications made to the Sixth Amended Plan in the Eighth Amended Plan, confirmation should be denied.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WBD (US) 4920-3420-9847v7

## IV.
## RESERVATION OF RIGHTS

86.    BMH does not waive (and expressly reserves) its right to amend, modify and supplement this objection at or prior to the conclusion of the hearing to consider confirmation of a plan and/or any cure objection, including but not limited to, asserting additional objections to the assumption of the BMH Agreements.  BMH further reserves the right to modify or supplement the damages claimed as its cure amount.

WHEREFORE, for all of the foregoing reasons, BMH respectfully requests the entry of an Order (i) denying confirmation of the Eighth Amended Plan as proposed, and (ii) granting such further relief as may be appropriate.

**WOMBLE BOND DICKINSON (US) LLP**

Dated:  May 7, 2025
Wilmington, Delaware

By: */s/ Lisa Bittle Tancredi*
Matthew P. Ward (Del. Bar No. 4471)
Lisa Bittle Tancredi (Del. Bar No. 4657)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: matthew.ward@wbd-us.com
          lisa.tancredi@wbd-us.com

*Counsel for Buddy Mac Holdings, LLC and Subsidiaries*

WBD (US) 4920-3420-9847v7